# Exhibit 8

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

IN RE: JOHNSON & JOHNSON TALCUM
POWDER PRODUCTS MARKETING, SALES
PRACTICES AND PRODUCTS LIABILITY
LITIGATION

MDL NO. 16-2738 (FLW) (LHG)

*THIS DOCUMENT RELATES TO ALL CASES*

## EXPERT REPORT OF GREGORY DIETTE, MD, MHS
## FOR GENERAL CAUSATION *DAUBERT* HEARING

Date: February 25, 2019

_____
Gregory Diette, M.D., M.H.S.

## I.      SCOPE OF REPORT

I was retained by Johnson & Johnson and Johnson & Johnson Consumer Inc. to review the epidemiological literature regarding the hypothesized connection between talc or asbestos in talc and the development of ovarian cancer.

## II.     MY QUALIFICATIONS

I am a professor of medicine at the Johns Hopkins University School of Medicine.  I hold joint appointments in the Departments of Environmental Health Sciences and Epidemiology in the Johns Hopkins Bloomberg School of Public Health.

I received my M.D. from the Temple University School of Medicine.  I completed my residency at the Hospital of the University of Pennsylvania and performed a fellowship in pulmonary and critical care medicine at Johns Hopkins.  I received my M.H.S. in Epidemiology and Clinical Epidemiology from the Johns Hopkins Bloomberg School of Public Health. Currently, I am an attending Physician at the Johns Hopkins Hospital and the Johns Hopkins Bayview Medical Center, practicing both inpatient and outpatient care.

My areas of clinical expertise include internal medicine, pulmonary medicine and critical care medicine.  My areas of research include environmental impacts on lung disease and epidemiology of chronic diseases.  I have published more than 200 studies in peer-reviewed journals on a variety of medical and scientific subjects, including the epidemiological study of disease causation, disease risk factors and gene expression, as well as the health effects of environmental pollutants.  In addition, I am a peer reviewer for a number of journals.  I have also repeatedly lectured and instructed on advanced research methods in epidemiology.

I currently hold multiple positions related to teaching and clinical research.  I am an attending physician at Johns Hopkins and a member of the American Thoracic Society, where I served on the Board of Directors and have participated in a number of its teaching programs, including the Methods in Epidemiologic, Clinical and Operations Research program.  I also previously served as the Director of Clinical Research in the Division of Pulmonary and Critical Care Medicine for almost 14 years.

Additional information pertaining to my background and qualifications can be ascertained from my curriculum vitae, which is attached to this report, together with other required disclosures.  I am being compensated at a rate of $485 per hour for my work on this case and $600 per hour for testimony.

## III.    SUMMARY OF OPINIONS

The body of relevant epidemiological evidence does not support a causal connection between perineal use of talcum powder products (whatever constituents those products may contain in addition to talc) and ovarian cancer.  As fully set forth below:

1. The epidemiological literature shows a non-existent association or, at most, a small association between perineal talc use and ovarian cancer that constitutes only weak epidemiological evidence. Because any purported association demonstrated in the literature is weak, it may well be attributed to factors such as confounding, bias or chance.

2. Studies have not consistently shown an association. The prospective epidemiological studies (cohort studies) do not show a statistically significant association; the hospital-based case-control studies do not show a statistically significant association; and only a subset of the population-based case-control studies show a statistically significant association. If consistency could be drawn from these inconsistent results, it would be a consistency of null results because case-control studies, which are more easily subject to certain biases and confounding factors, are not the best evidence for proving causation.

3. Evidence of a dose-response relationship is lacking. None of the cohort studies reveals a dose-response relationship, and only a handful of case-control studies, including those analyzing "cumulative" talc use, have purported to find one. Moreover, study authors and plaintiffs' experts all agree that there are major challenges to interpreting the study findings on dose-response because there can be no assurance that any estimates of talc use are accurate or valid. Indeed, there is not a single epidemiologic study of ovarian cancer and talcum powder that has used, or purports to have used, a validated measure of talcum powder use. Without a validated measure of talcum powder use, it is impossible to correctly determine whether or not an exposure occurred or the quantity of purported exposure, casting considerable doubt on any purported causative relationship between perineal talcum powder use and ovarian cancer.

4. The theories as to how talc or asbestos would reach the ovaries have not been validated, and the scientific community has repeatedly expressed the opinion that the potential mechanism by which talcum powder is associated with ovarian cancer remains speculative.

5. Additional Bradford Hill factors – temporality, coherence of the association and analogy – are not satisfied based on the available epidemiologic evidence and do not support the allegation that talcum powder use can cause ovarian cancer.

6. To the extent plaintiffs' experts opine that asbestos is an accessory mineral present in cosmetic talc that causes ovarian cancer, this theory would not alter the analysis because the existing epidemiological literature regarding perineal talc use would necessarily account for the presence of any asbestos in the products used in those studies. Plaintiffs' experts' asbestos-based theories are also problematic due to the lack of a plausible mechanism by which asbestos could reach the ovaries and a lack of any reliable epidemiology supporting such a causal connection.

## IV.   APPROACH

### A.   Bradford Hill Framework

Epidemiologists and other scientists are often tasked with determining whether or not an exposure can cause an illness or condition.  After an association has been demonstrated, criteria articulated by Austin Bradford Hill in a lecture in 1965 are often employed.  These Bradford Hill considerations, or criteria, are considered the gold standard for assessing causation based on observed associations.  The nine considerations are: consistency, strength of association, specificity, dose-response relationship, temporality, biologic plausibility, coherence of the association, analogy and experimentation.[1]  In applying these criteria, an epidemiologist should consider all available evidence, which can be assessed and graded according to its sufficiency (or lack thereof) to establish a causal link.  Evidence typically comes from research studies that involve humans, but it can also include well-designed studies of animals or in vitro systems (toxicological and experimental) to provide supportive evidence, especially for plausibility.

Another useful factor for assessing causation includes consideration of non-causal explanations for the results of individual studies.[2]  As explained further below, these other explanations can come from bias, confounding and chance.  For example, drinking coffee might be correlated with a higher risk of lung cancer, but the cause of the additional cases of lung cancer among individuals who drink coffee would be smoking cigarettes.  In this example, the obvious confounding factor is that individuals who drink coffee are more likely to smoke.  But confounding factors are not always identifiable, even after extended study, and these and other factors can consistently drive statistical associations that are not causal in nature.  Such limitations can be quite important, as they can lead to risk estimates that are falsely higher or lower than actual risk, and they can even lead to conclusions that an exposure causes a disease when it does not, and vice versa.

### B.   Methodology

I was asked to assess whether perineal exposure to talcum powder causes ovarian cancer.  Based on my extensive qualifications and experience, review of the available studies and data and assessment of the Bradford Hill factors, I conclude that the observations and evidence to date are insufficient to find a causal relationship between perineal exposure to talcum powder and ovarian cancer.

My opinions are based on a review of the epidemiology literature relevant to the evaluation of the association between perineal talcum powder use and ovarian cancer.  In my review, I considered case-control studies, prospective cohort studies and meta-analyses.  I did not consider randomized trial data, since I am not aware of any such data reporting on the presence

---

[1]      Hill AB. The Environment and Disease: Association or Causation? Proc R Soc Med. 1965; 58(5):295-300 ("Hill 1965").

[2]      Elwood JM. Causal Relationships in Medicine: A Practical System for Critical Appraisal. Oxford: 1988, 163-182.

or absence of an association between of talcum powder and ovarian cancer.  Because the accuracy of the findings of case-control and cohort studies can be influenced by bias and confounders, I carefully considered whether there was any indication that these sorts of errors affected the results.

In evaluating the epidemiologic data and other scientific evidence under the Bradford Hill framework, I primarily focus on whether the criteria of strength of association, consistency of the association, biologic gradient (or dose response) and biologic plausibility have been met.  Although it is not essential to address every factor under the Bradford Hill framework, as plaintiffs' experts acknowledge,[3] I also address specificity, temporality, coherence of the association, experiment and analogy.

Lastly, I reviewed several of the reports submitted by plaintiffs' experts and their depositions.  A number of these experts claim to have analyzed the Bradford Hill criteria and to have concluded through these analyses that perineal talc use causes ovarian cancer.  I assess and address several of plaintiffs' experts' methods and analyses in this regard.

## V.   **STUDY DESIGNS**

Epidemiologists recognize that there is a hierarchy of evidence with respect to human studies.  Clinical trials are often considered the strongest type of evidence, followed by observational studies (cohort and case-control).  The lowest quality of evidence comes from case reports, case series and descriptive studies.[4]

There are two main types of epidemiological studies at issue here:  prospective cohort studies and case-control studies.

Prospective cohort studies consist of identifying a large group of healthy individuals who differ in the key areas being observed and following them forward in time.  Based on the data collected, it is determined how the factors of interest, e.g., exposure to talcum powder, are associated with a certain outcome or disease.  Cohort studies are widely regarded as more reliable than retrospective case-control studies because they are not susceptible to recall bias, which is the propensity of study subjects with the disease that is being studied to inaccurately report their exposure to the agent at issue, a phenomenon that can generate inflated risk estimates.[5]  Cohort studies generally avoid this pitfall because they are prospective rather than retrospective.[6]  Due to the ability of cohort studies to assess exposure at baseline instead of relying solely on recall, they can be better suited to detect risks from exposure to an agent.

---

[3]       Smith-Bindman Rep. at 36; Singh Rep. at 62.

[4]       Elwood at 174-175.

[5]       Gertig DM, Hunter DJ, Cramer DW, et al. Prospective Study of Talc Use and Ovarian Cancer. J Natl Cancer Inst. 2000; 92(3): 249-252, 252 ("Gertig 2000"); Langseth H, Hankinson SE, Siemiatycki J, Weiderpass E. Perineal Use of Talc and Risk of Ovarian Cancer. J Epidemiol Community Health. 2008; 62(4):358-360, 358 ("Langseth 2008").  *See generally* Leon Gordis. Epidemiology. 5th ed. Philadelphia, PA: 2014.

[6]       Although there are also retrospective cohort studies, those are not at issue here, because the cohort studies involving cosmetic talc use are prospective in design.

In case-control studies, individuals with the disease of interest (cases) and those without the disease of interest (controls) are first identified.  These two groups are then compared to assess any differences between them regarding a specified exposure.  Case-control studies can be further broken down into population-based and hospital-based studies.  Hospital-based studies draw their control population from patients who are hospitalized with conditions other than the one under study.  Population-based studies draw study participants from the general population.

## VI.   REVIEW OF EPIDEMIOLOGY DATA

In forming my opinions, I employed search tools, including Medline and Google Scholar, to identify studies that examined the association of perineal talcum powder use and ovarian cancer.  I also reviewed the reference lists of individual studies and the meta-analyses to assemble a complete list of studies.  Specifically, I first located and reviewed the relevant cohort studies, meta-analyses and case-control epidemiologic studies.  I then reviewed how other medical experts or other professional organizations interpreted those studies.  My reliance list, which is attached to this report, is comprised of all studies located and assessed specifically for this case.  In total, I identified and reviewed 32 case-control studies and three prospective cohort studies published since 1982 that pertain to perineal talc use and ovarian cancer.

It is my understanding that plaintiffs are asserting in this litigation that talc products contain asbestos.  The epidemiological literature concerning talc products and ovarian cancer generally has not attempted to investigate the question whether asbestos is present in talc as an accessory mineral.  Nevertheless, if talc products have generally contained asbestos, the epidemiological literature would reflect the risks of asbestos in talc.

### A.   Strength Of Association Is Weak.

The first Bradford Hill criterion, strength of the association, refers to the magnitude of the risk of developing a given outcome in the presence of a measured risk factor.  In the studies discussed in this report, risk is reported in various ways – as a relative risk ("RR"), odds ratio ("OR"), or hazard ratio ("HR") – typically with a confidence internal ("CI").  A relative risk "of an event is the likelihood of its occurrence after exposure to a risk variable" – here, talcum powder or asbestos – "as compared with the likelihood of its occurrence in a control or reference group."[7]  An odds ratio is "a comparison of the odds of an event after exposure to a risk factor with the odds of that event in a control or reference situation."[8]  A hazard ratio is a type of relative risk that measures "how often a particular event happens in one group compared to how often it happens in another group, over time."[9]  In each case, the risk is expressed as a number for which 1 is the denominator, so that a relative risk of 1.3, for example, would mean that the outcome of interest occurred 1.3 times as often in the exposed group as compared to the control

---

[7]     Andrade C. Understanding Relative Risk, Odds Ratio, and Related Terms. J Clin Psychiatry. 2015; 76(7):e857-861.

[8]     *Id.*

[9]     National Cancer Inst., NCI Dictionary of Cancer Terms, "hazard ratio," https://www.cancer.gov/publications/dictionaries/cancer-terms/def/hazard-ratio.

group – a 30% greater incidence.  A relative risk of 1.0, by contrast, would mean there was no difference.  In each case, a confidence interval can be calculated to determine statistical significance – in essence, whether the difference between the exposed and unexposed groups is likely to persist if the same study were repeated.  When a confidence interval contains 1.0, the result is deemed not to be statistically significant because the possibility that there is no real association is within the expected range of results.  It is typical to calculate a 95% confidence interval, expressed in this report as "95% CI," meaning that if the study were repeated, the results would be expected to fall within the confidence interval 95% of the time.

While there is no absolute cutoff to define a large versus a small relative risk, Hill provided examples of large risks, including the 200 times risk of scrotal cancer in chimney sweeps, an estimate of 9-10 times risk of lung cancer in smokers and 20-30 times risk of lung cancer in heavy smokers.  As an example of a low risk, Dr. Hill used death from coronary thrombosis in smokers, which he described as "no more than twice, probably less" than the death rate in non-smokers.  Dr. Hill further explained:

> "[T]hough there is good evidence to support causation it is surely much easier in this case to think of some features of life that may go hand in hand with smoking—features that might conceivably be the real underlying cause or, at the least, an important contributor, whether it be lack of exercise, nature of diet or other factors.  But to explain the pronounced excess in cancer of the lung in any other environmental terms requires some feature of life so intimately linked with cigarette smoking and with the amount of smoking that such a feature should be easily detectable."[10]

What this passage from Hill means is that low observed risks are more likely to be non-causal than are high risks, because the effects of distorting factors (such as confounders and bias) have a greater chance of being the true explanation for the observations.  Because very small risks are obviously highly susceptible to distorting effects in observational studies, further evidence is required to demonstrate that the purported association did not arise from bias, confounding or chance alone.  Plaintiffs' experts express opinions about risks articulated as approximately a 1.2-1.3 odds ratio.[11]  This is considered a weak association by the scientific community, as some of plaintiffs' experts acknowledge.[12]  To the extent other plaintiffs' experts dispute this point (most notably Dr. Moorman, who attempted to argue that straightforward adjectives like "weak," "modest" or "strong" do not have "clear definitions"), their position is simply not credible, and even Dr. Moorman acknowledges that 1.2-1.3 is "weaker" than well-established large associations such as smoking/lung cancer.[13]  While the size of the risk does not, in itself, determine causation, this purported low risk estimate is not strong evidence of

---

[10]    Hill 1965.

[11]    Moorman Rep. at 17.

[12]    Singh Dep. 140:19-25 (agreeing that scientific literature does not consider 1.3 a strong association).

[13]    Moorman Dep. 246:24-250:16; *id.* 287:14-289:3 (refusing to define a "weak association" but acknowledging that epidemiology textbooks would not agree that it cannot be defined); *see also id.* 145:4-17 (agreeing that the medical community accepts smoking as a cause of lung cancer but questioning the definition of "medical community" when asked the same about talc and ovarian cancer).

causation.  As plaintiffs' expert, Dr. Siemiatycki, wrote in a 1988 article, "[s]mall excess relative risks, even if they are statistically significant, are often interpreted with great caution, if not skepticism."[14]

        1.        Results Of Cohort Studies, Case-Control Studies And Meta-Analyses And Pooled Studies

As fully set forth in the next sections, the prospective epidemiological studies (cohort studies) do not show a statistically significant association between genital talc use and ovarian cancer, while a subset of the population-based case-control studies do show weak statistically significant associations.

        a.    Results of Cohort Studies

The most recent cohort study, referred to by many as the "Sister Study," enrolled 50,884 women in the U.S. and Puerto Rico beginning in 2003, who had a sister diagnosed with breast cancer, and followed 41,654 of those women for a median 6.5 years.[15]  The study identified 154 cases of ovarian cancer and found no association between the use of talc and ovarian cancer – in fact, there was an inverse association that was not statistically significant (HR 0.73 (95% CI: 0.44-1.2)).[16]  Of note, this study separately found an association between douching and ovarian cancer, suggesting that douching (which sometimes accompanies perineal talc use) may be a confounding variable that has not sufficiently been accounted for in past studies.[17]

A prior cohort study known as the Women's Health Initiative Study followed 61,576 women for a mean of 12.4 years.[18]  The study showed no increased risk of ovarian cancer from genital use of talc (HR 1.12 (95% CI: 0.92-1.36), no increased risk of ovarian cancer from genital talc use for 10 or more years (HR 0.98 (95% CI: 0.75-1.29) or 20 or more years (HR 1.10 (95% CI: 0.82-1.48)), and no increased risk of ovarian cancer with talc use on sanitary napkins (HR 0.95 (95% CI: 0.76-1.20)) or contraceptive diaphragms (HR 0.92 (95% CI: 0.68-1.23)).[19]  The result for combined powder use was a statistically non-significant hazard ratio (HR 1.06 (95% CI: 0.87-1.28)) and an even lower statistically non-significant hazard ratio for combined use for more than ten years (HR 1.02 (95% CI: 0.80-1.30)).[20]  The authors concluded

---

[14]       Siemiatycki Dep. 328:22-329:2.

[15]       Gonzalez NL, O'Brien KM, D'Aloisio AA, Sandler DP, Weinberg CR. Douching, Talc Use, and Risk of Ovarian Cancer. Epidemiology. 2016; 27(6): 797–802. ("Gonzalez 2016").

[16]       *Id.* at 800-02.

[17]       *Id.* at 800.

[18]       Houghton SC, Reeves KW, Hankinson SE, et al. Perineal Powder Use and Risk of Ovarian Cancer. J Natl Cancer Inst. 2014; 106(9): dju208. ("Houghton 2014").

[19]       *Id.*

[20]       *Id.*

that "perineal powder use does not appear to influence ovarian cancer risk."[21]

The results of an additional cohort study were published in 2000[22] and updated in another publication ten years later.[23]  These reports looked at talc use within the Nurses' Health Study ("NHS"), which was a prospective cohort of 121,700 registered nurses in the United States and was established in 1976.[24]  The Gertig analysis showed no statistically significant association between perineal talc use (RR 1.09 (95% CI: 0.86-1.37)), use of talc on sanitary napkins (RR 0.89 (95% CI: 0.61-1.28)) and for both uses combined (RR 0.90 (95% CI: 0.59-1.37)).[25]  It further showed no statistically significant association for various different frequencies of use and no indication that risk increased with more frequent use:  less than one per week (RR 1.14 (95% CI: 0.81-1.59)); 1-6 uses per week (RR 0.99 (95% CI: 0.67-1.46)); daily use (RR 1.12 (95% CI: 0.82-1.55)).[26]  When examining the results by histology, the authors observed a weak statistically significant association for serous invasive (RR 1.40 (95% CI: 1.02-1.91)) but no other types of ovarian cancer.[27]  They noted that perineal talc use "may modestly increase the risk of invasive serous ovarian cancers" but not for "all serous cancers (including borderline cancers), endometrioid cancers, or mucinous cancers," and concluded overall that their "results provide little support for any substantial association between perineal talc use and ovarian cancer risk."[28]

The 2010 Gates report, which followed up on the Nurses' Health cohort ten years later, found no statistically significant elevations in risk for talc use for all epithelial ovarian cancers (RR 1.06 (95% CI: 0.89-1.28)), serous invasive ovarian cancers (RR 1.06 (95% CI: 0.84-1.35)), endometrioid ovarian cancers (RR 1.06 (95% CI: 0.66-1.69)), or mucinous ovarian cancers (RR 1.50 (95% CI: 0.84-2.66)).[29]  The authors concluded that their results for talc exposure "generally are consistent with the existing literature," i.e., consistent with generally null and/or weakly associated results.[30]  It is notable too, that with further passage of time, there was no longer an increased association for the serous invasive type of ovarian cancer.

Plaintiffs' experts' argument that the Gates report should be disregarded because the participants in the Nurses' Health Study were only asked about talcum powder use once is

---

[21]     *Id.*

[22]     Gertig 2000.

[23]     Gates MA, Rosner BA, Hecht JL, Tworoger SS. Risk Factors for Epithelial Ovarian Cancer by Histologic Subtype. Am J Epidemiol. 2010; 171(1):45-53, 50 ("Gates 2010").

[24]     Gertig 2000.

[25]     *Id.* at 251.

[26]     *Id.*

[27]     *Id.*

[28]     *Id.* at 250-51.

[29]     Gates 2010 at 50.

[30]     *Id.* at 51.  While the 2010 NHS updated the number of women studied, the new participants were not asked about talc, which the authors acknowledged was a "weakness[]" in the study.  *Id.* at 52.

9

unfounded.[31]  Ten additional years of follow-up is valuable data regardless of whether further questioning regarding talc use took place.  Moreover, as other studies and plaintiffs' experts themselves have admitted, for women who are ever-users of perineal talcum powder, the mean duration of use is greater than 20 years[32] and the vast majority of women who use talcum powder initiate use before age 36.[33]  That means that, even though the participants were only asked about their talcum powder use once, the data collected on perineal talcum powder application would have likely reflected chronic, habitual use.  For similar reasons, recent meta-analyses by Penninkilampi (relied on heavily by plaintiffs' experts)[34] and Taher[35] (discussed further below) are of questionable value in light of their omission of the findings reported by Gates, which are derived from a cohort study that found no statistically significant elevations in risk for talc users with respect to epithelial ovarian cancers, serous invasive ovarian cancers, endometrioid ovarian cancers or mucinous ovarian cancers.

Dr. McTiernan's argument that cohort studies are limited because they were "designed to study a large number of outcomes and a wide variety of exposures" in addition to talc and ovarian cancer[36] is also wrong.  The fact that cohort studies are able to study many variables and outcomes is an illustration of what is valuable and can be achieved with cohort studies.  I know of no epidemiologists who believe that the results of all cohort studies should be discounted due to this common design trait; indeed, such a view would conflict with the generally accepted principle that cohort studies can produce a higher level of evidence than case-control studies.  Moreover, the typical concern when studies include multiple variables is that they might report false positive associations for particular variables, and no plaintiffs' expert argues that the talc results in cohort studies are false positives (although that argument could be applied to the single positive finding from the Gertig study).  Dr. McTiernan relatedly argues that the cohort studies were not "able to accurately measure dose of exposure," but this is equally true of case-control studies, as discussed herein.[37]

---

[31]     Singh Dep. 164:16-23; Moorman Dep. 190:4-24; McTiernan Dep. 224:3-7; Smith-Bindman Rep. at 20.

[32]     Wu AH, Pearce CL, Tseng CC, Pike MC. African Americans and Hispanics Remain at Lower Risk of Ovarian Cancer Than Non-Hispanic Whites after Considering Nongenetic Risk Factors and Oophorectomy Rates. Cancer Epidemiol Biomarkers Prev. 2015; 24(7):1094-100 ("Wu 2015").

[33]     Singh Dep. 165:2-8; Gates MA, Tworoger SS, Terry KL, et al. Talc use, variants of the GSTM1, GSTT1, and NAT2 genes, and risk of epithelial ovarian cancer. Cancer Epidemiol Biomarkers Prev. 2008; 17(9):2436-2444 ("Gates 2008").

[34]     Penninkilampi R, Eslick GD. Perineal Talc Use and Ovarian Cancer: A Systematic Review and Meta-Analysis. Epidemiology. 2018; 29(1):41-49, 44 ("Penninkilampi 2018"); Smith-Bindman Rep. at 27 ("Penninkilampi provides a comprehensive and high quality review"); McTiernan Rep. at 49 ("[T]he results of this 2018 meta-analysis give strong support for an association between perineal talcum powder product use and risk for ovarian cancer.").

[35]     Taher MK, Farhat N, Karyakina NA, et al. Systematic Review and Meta-Analysis of the Association Between Perineal Use of Talc and Risk of Ovarian Cancer (2018) (unpublished manuscript) ("Taher 2018").

[36]     McTiernan Rep. at 46.

[37]     *Id.*

Plaintiffs' experts also criticize cohort studies for having short follow-up and therefore supposedly not considering the latency period for ovarian cancer.[38]  In light of the data noted above about mean initiation and duration of talc use, it is reasonable to assume that the date on which study participants were asked about their talcum powder use was not the date of first use and thus not the date that a true latency period would have begun.  Moreover, the Women's Health Initiative Study asked about talcum powder use for 20-plus years and found no statistically significant increased risk in ovarian cancer after following those women for 12.4 years (meaning at least 32.4 years of latency were factored in),[39] and the Sister Study enrolled women between the ages of 35-74 and followed up after 6 years.[40]  Therefore, it is clear in the case of the WHI study, and quite likely in the case of the Sister Study, that substantial numbers of cohort study participants were using talcum powder for decades, long enough to put any serious concerns about latency to rest.

Any criticism of the studies that rests on the idea of a latency period is highly speculative anyway.  For the reasons set out in this report, science has not even established a causal relationship between talc and ovarian cancer of any sort; far less has it established a latency effect or the duration of any such effect.  There is simply no scientific basis for the suggestion of a number of plaintiffs' experts that it takes 20 years for some unspecified degree of perineal talc exposure to cause ovarian cancer.

Finally, plaintiffs' experts' criticisms of cohort studies are collectively suspect because they are so extensive when compared to their relatively muted criticisms for case-control studies, which, as I detail in the next sections, have their own significant weaknesses.  For example, Dr. Smith-Bindman devotes several pages of her report to lodging numerous criticisms of each study that reported on cohort data; although she mostly spares Gertig 2000 (which happens to be the one cohort study she believes supports her theory), she declares in summary fashion that there is nothing "meaningful" to be gleaned from any of the other cohort studies.[41]  Yet she provides no similar analysis of the strengths and weaknesses of the case-control studies, noting in the single paragraph in which she discusses them that her review and abstraction of data from them was done "[w]ithout assessing the[ir] quality."[42]  Similarly, Dr. Moorman did not offer any criticisms or cautions regarding the talc meta-analyses, whereas she pointed out limitations of cohort studies extensively in her report.[43]  None of the studies is perfect.  But plaintiffs' experts' focused attack on cohort studies (as they seek to minimize the significant flaws of the case-control studies) reveals the biased and unscientific nature of their analyses.

---

[38]     Singh Rep. at 11, 53; McTiernan Rep. at 47.

[39]     Houghton 2014 at 2.

[40]     Gonzalez 2016 at 2.

[41]     Smith-Bindman Rep. at 20-22.

[42]     *Id.* at 29-30.

[43]     Moorman Dep. 164:16-18; Moorman Rep. at 24-28.

In summary, none of the cohort studies found a statistically significant association between talc use and ovarian cancer.[44]  The fact that these studies have shown uniformly null results indicates no association between talc use and ovarian cancer.

### b.  Results of Case-Control Studies

I have identified 25 population-based case-control studies addressing talc use and ovarian cancer.[45]  The following table sets forth these studies' findings with respect to the association between ever/never talc use and ovarian cancer:

---

[44]     Berge W, Mundt K, Luu H, Boffetta P. Genital Use of Talc and Risk of Ovarian Cancer: A Meta-Analysis. Eur J Cancer Prev. 2018; 27(3):248-257, 251 ("Berge 2018") (assigning a statistically insignificant 1.02 relative risk to the cohort studies in aggregate).

[45]     Cramer DW, Welch WR, Scully RE, Wojciechowski CA. Ovarian cancer and talc: a case-control study. Cancer. 1982; 50(2):372-376; Harlow BL, Weiss NS. A case-control study of borderline ovarian tumors: the influence of perineal exposure to talc. Am J Epidemiol. 1989; 130(2):390-394; Harlow BL, Cramer DW, Bell DA, Welch WR. Perineal exposure to talc and ovarian cancer risk. Obstet Gynecol. 1992; 80(1):19-26 ("Harlow 1992"); Chen Y, Wu PC, Lang JH, et al. Risk factors for epithelial ovarian cancer in Beijing, China. Int J Epidemiol. 1992; 21(1):23-29; Cramer DW, Xu H. Epidemiologic evidence for uterine growth factors in the pathogenesis of ovarian cancer. Ann Epidemiol. 1995; 5(4):310-314; Purdie D, Green A, Bain C, et al. Reproductive and other factors and risk of epithelial ovarian cancer: an Australian case-control study. Survey of Women's Health Study Group. Int J Cancer. 1995; 62(6):678-684; Chang S, Risch HA. Perineal Talc Exposure and Risk of Ovarian Carcinoma. Cancer. 1997; 79(12):2396-2401 ("Chang & Risch 1997"); Cook LS, Kamb ML, Weiss NS. Perineal Powder Exposure and the Risk of Ovarian Cancer Am J Epidemiol. 1997; 145(5):459-465 ("Cook 1997"); Green A, Purdie D, Bain C, et al. Tubal sterilisation, hysterectomy and decreased risk of ovarian cancer. Survey of Women's Health Study Group. Int J Cancer. 1997; 71(6):948-951; Godard B, Foulkes WD, Provencher D, et al. Risk factors for familial and sporadic ovarian cancer among French Canadians: a case-control study. Am J Obstet Gynecol. 1998; 179(2):403-410; Cramer DW, Liberman RF, Titus-Ernstoff L, et al. Genital Talc Exposure and Risk of Ovarian Cancer. Int J Cancer. 1999; 81(3):351-356 ("Cramer 1999"); Ness RB, Grisso JA, Cottreau C, et al. Factors related to inflammation of the ovarian epithelium and risk of ovarian cancer. Epidemiology. 2000; 11(2):111-117; Mills PK, Riordan DG, Cress RD, Young HA. Perineal talc exposure and epithelial ovarian cancer risk in the Central Valley of California. Int J Cancer. 2004; 112(3):458-464 ("Mills 2004"); Cramer DW, Titus-Ernstoff L, McKolanis JR, et al. Conditions associated with antibodies against the tumor-associated antigen MUC1 and their relationship to risk for ovarian cancer. Cancer Epidemiol Biomarkers Prev. 2005; 14(5):1125-1131; Jordan SJ, Green AC, Whiteman DC, Webb PM, Australian Ovarian Cancer Study Group. Risk factors for benign, borderline and invasive mucinous ovarian tumors: epidemiological evidence of a neoplastic continuum? Gynecol Oncol. 2007; 107(2):223-230; Gates 2008; Merritt MA, Green AC, Nagle CM, et al. Talcum powder, chronic pelvic inflammation and NSAIDs in relation to risk of epithelial ovarian cancer. Int J Cancer. 2008; 122(1):170-176 (2008) ("Merritt 2008"); Moorman PG, Palmieri RT, Akushevich L, et al. Ovarian cancer risk factors in African-American and white women. Am J Epidemiol. 2009; 170(5):598-606; Wu AH, Pearce CL, Tseng CC, et al. Markers of inflammation and risk of ovarian cancer in Los Angeles County. Int J Cancer. 2009; 124(6):1409-1415 ("Wu 2009"); Rosenblatt KA, Weiss NS, Cushing-Haugen KL. Genital powder exposure and the risk of epithelial ovarian cancer. Cancer Causes Control. 2011; 22(5):737-742 ("Rosenblatt 2011"); Kurta ML, Moysich KB, Weissfeld JL, et al. Use of fertility drugs and risk of ovarian cancer: results from a U.S.-based case-control study. Cancer Epidemiol Biomarkers Prev. 2012; 21(8):1282-1292; Kotsopoulos J, Terry KL, Poole EM, et al. Ovarian cancer risk factors by tumor dominance, a surrogate for cell of origin. Int J Cancer. 2013; 133(3):730-739; Wu 2015; Cramer DW, Vitonis AF, Terry KL, et al. The Association Between Talc Use and Ovarian Cancer: A Retrospective Case-Control Study in Two US States. Epidemiology. 2016; 27(3):334-346 ("Cramer 2016"); Schildkraut JM, Abbott SE, Alberg AJ, et al. Association between Body Powder Use and Ovarian Cancer: The African American Cancer Epidemiology Study (AACES). Cancer Epidemiol Biomarkers Prev. 2016; 25(10):1411-1417 (2016) ("Schildkraut 2016").

| Author, Year | Ever/Never Results |
|---|---|
| Cramer 1982 | RR 1.92 (95% CI: 1.27-2.89) |
| Harlow & Weiss 1989 | RR 1.10 (95% CI: 0.70-2.10) |
| Harlow 1992 | OR 1.50 (95% CI: 1.00-2.10) |
| Chen 1992 | RR 3.90 (95% CI: 0.90-10.6) |
| Cramer & Xu 1995 | OR 1.10 (95% CI: 0.60-2.10) |
| Purdie 1995 | OR 1.27 (95% CI: 1.04-1.54) |
| Chang & Risch 1997 | OR 1.42 (95% CI: 1.08-1.86) |
| Cook 1997 | RR 1.60 (95% CI: 0.90-2.80) |
| Green 1997 | RR 1.30 (95% CI: 1.10-1.60) |
| Godard 1998 | RR 2.49 (95% CI: 0.94-6.58) |
| Cramer 1999 | OR 1.45 (95% CI: 0.97-2.18) |
| Ness 2000 | OR 1.50 (95% CI: 1.10-2.00) |
| Mills 2004 | OR 1.37 (95% CI: 1.02-1.85) |
| Cramer 2005 | OR 1.16 (95% CI: 0.90-1.49) |
| Jordan 2007 | OR 1.00 (95% CI: 0.40-2.10) |
| Gates 2008 | RR 1.36 (95% CI: 1.14-1.63) |
| Merritt 2008 | OR 1.17 (95% CI: 1.01-1.36) |
| Moorman 2009 | Afr. Am.: OR 1.19 (95% CI: 0.68-2.09) Caucasian: OR 1.04 (95% CI: 0.82-1.33) |
| Wu 2009 | RR 1.53 (95% CI: 1.13-2.09) |
| Rosenblatt 2011 | OR 1.27 (95% CI: 0.97-1.66) |
| Kurta 2012 | OR 1.40 (95% CI: 1.16-1.69) |
| Kotsopoulos 2013[46] | RR 1.19 (95% CI: 0.73-1.96) |
| Wu 2015 | OR 1.46 (95% CI: 1.27-1.69) |
| Cramer 2016 | OR 1.33 (95% CI: 1.16-1.52) |
| Schildkraut 2016 | OR 1.44 (95% CI: 1.11-1.86) |

I have identified seven hospital-based case-control studies addressing the association between talc use and ovarian cancer.[47] As set forth in the following table, none of these studies observed a statistically significant association:

---

[46]     Study looked at all types of genital powder used at least once per week.

[47]     Hartge P, Hoover R, Lesher LP, McGowan L. Talc and Ovarian Cancer. JAMA. 1983; 250(14):1844 ("Hartge 1983"); Whittemore AS, Wu ML, Paffenbarger RS Jr, et al. Personal and environmental characteristics related to epithelial ovarian cancer. II. Exposures to talcum powder, tobacco, alcohol, and coffee. Am J Epidemiol. 1988; 128(6):1228-1240 ("Whittemore 1988"); Booth M, Beral V, Smith P. Risk factors for ovarian cancer: a case-control study. Br J Cancer. 1989; 60(4):592-598 ("Booth 1989"); Rosenblatt KA, et al. Mineral fiber exposure and the development of ovarian cancer. Gynecol Oncol. 1992; 45(1):20-25. ("Rosenblatt 1992"); Tzonou A, Polychronopoulou A, Hsieh CC, et al. Hair dyes, analgesics, tranquilizers and perineal talc application as risk factors for ovarian cancer. Int J Cancer. 1993; 55(3):408-410 ("Tzonou 1993"); Hartge P, Stewart P. Occupation and ovarian cancer: a case-control study in the Washington, DC, metropolitan area, 1978-1981. J Occup Med. 1994; 36(8):924-927 ("Hartge & Stewart 1994"); Wong C, Hempling RE, Piver MS, et al. Perineal talc exposure and subsequent epithelial ovarian cancer: a case-control study. Obstet Gynecol. 1999; 93(3):372-376. ("Wong 1999").

| Author, Year | Ever/Never Results |
|---|---|
| Hartge 1983 | RR 0.70 (95% CI: 0.40-1.10) |
| Whittemore 1988 | RR 1.45 (95% CI: 0.81-2.60) |
| Booth 1989 | RR 1.30 (95% CI: 0.80-1.90) |
| Rosenblatt 1992 | OR 1.70 (95% CI: 0.70-3.90) |
| Tzonou 1993 | RR 1.05 (95% CI: 0.28-3.98) |
| Hartge & Stewart 1994 | RR 0.3 (95% CI: 0.1-1.4) to RR 0.5 (95% CI: 0.2-1.5)[48] |
| Wong 1999 | OR 1.00 (95% CI: 0.80-1.30) |

In summary, 11 of the 25 population-based case-control studies do not show a statistically significant association, and none of the hospital-based studies does.  Notably, the authors of the case-control studies have generally cautioned that even when they found a statistically significant elevated risk, their results do not establish causation, even in combination with the results of other studies.[49]

c.  Results of Meta-analyses and Pooled Studies

Meta-analyses and pooled studies, which use statistical methods to pool results from different studies, have also been performed on the body of talc-ovarian cancer epidemiological literature.  These studies have calculated an overall odds ratio of approximately 1.3,[50] which they have characterized as a "relatively weak odds ratio[]" that "can be attributed to bias in" case-control studies.[51]  As some of these studies have stated, the epidemiological data are "insufficient

---

[48]      This study did not provide a value for ever/never use; range reflects values across three strata of use durations.

[49]      Cramer DW, Welch WR, Berkowitz RS, Godleski JJ, Presence of talc in pelvic lymph nodes of a woman with ovarian cancer and long-term genital exposure to cosmetic talc. Obstet Gynecol. 2007; 110(2 Pt 2):498-501, 500 (case study stating that "[w]e are not claiming that a causal relationship between ovarian cancer and talc use is proven for this case or in general").

[50]      Berge 2018 at 251 (RR 1.22 (95% CI: 1.13-1.30)); Terry KL, Karageorgi S, Shvetsov YB, et al. Genital Powder Use and Risk of Ovarian Cancer: A Pooled Analysis of 8,525 Cases and 9,859 Controls. Cancer Prev Res (Phila). 2013; 6(8):811-821 ("Terry 2013") (OR 1.24 (95% CI: 1.15-1.33)); Langseth 2008 (OR 1.40 (95% CI: 1.29-1.52)).

[51]      Berge 2018 at 253; Cramer DW, Liberman RF, Titus-Ernstoff L, et al. Genital Talc Exposure and Risk of Ovarian Cancer. Int J Cancer. 1999; 81(3):351-356, 354 ("Cramer 1999"); Huncharek M, Geschwind JF, Kupelnick B. Perineal application of cosmetic talc and risk of invasive epithelial ovarian cancer: a meta-analysis of 11,933 subjects from sixteen observational studies. Anticancer Res. 2003; 23(2C):1955-1960 (2003 meta-analysis explaining that "[s]election bias and uncontrolled confounding may account for the positive associations seen in prior epidemiological studies"); Rothman KJ, Pastides H, Samet J. Interpretation of Epidemiologic Studies on Talc and Ovarian Cancer 4 (Nov. 28, 2000), https://ntp.niehs.nih.gov/ntp/newhomeroc/roc12/mcewen-07-14-04.pdf ("Recall bias can readily introduce enough bias to produce the modestly-sized overall effect (RR = 1.3) that emerges from these studies.").  I am aware of Dr. Zambelli-Weiner's criticisms of the Huncharek studies, but Dr. Zambelli-Weiner does not claim that the studies understated the association between genital talc use and ovarian cancer; indeed, her efforts to replicate the dose-response calculations in Huncharek (2003) similarly failed to show a dose-response relationship.

to establish a causal association between perineal use of talc and ovarian cancer risk" and "not support[ive of] a causal interpretation of the association."[52]

Plaintiffs' experts rely on a 2018 study by Penninkilampi and Eslick, which conducted a literature review of studies addressing talcum powder use and ovarian cancer and performed a meta-analysis that "revealed an increased risk of ovarian cancer associated with any perineal use of talc (. . . OR = 1.31; 95% CI = 1.24, 1.39)."[53]  Although the finding was statistically significant, it remains low, with a 1.31 odds ratio that falls within the range of prior studies, adding little to the existing literature on this question.  Indeed, the authors acknowledged that several meta-analyses had been conducted by 2018, but sought to justify the need for another in light of ongoing litigation, contending that "the association between talc use and ovarian cancer [has taken] on considerable relevance" because "Johnson & Johnson has recently had damages levied to the total of US$717 million against [it] in five law suits" and because "producers of talcum powder products continue to sell these products without any warning labels regarding perineal use and potential associations with ovarian cancer," leading the authors to conclude that "there is a need for clarification, to allow women to be adequately informed of the risk of use of these products, possibly preventing future harm."[54]  This is an unusual statement in a scientific article and especially odd in an article that is ostensibly premised on the idea that existing science has not concretely defined the risk that the authors are suggesting should be warned against.  The study is also puzzling in that its stated purpose is to update prior meta-analyses – in particular, because "the results of a number of large case-control studies and two cohort studies" had been reported since the last meta-analysis was published[55] – and yet the meta-analyses wholly excluded consideration of the Gates report (the NHS follow-up), another cohort study published during the same period.  Ultimately, notwithstanding the authors' expressed concerns about warning women and updating the research, their conclusions echo those of prior studies, acknowledging in some detail the possibility that recall bias drove the results in the case-control studies[56] and concluding that while the authors believe their results are "suggestive of a causal association," it remains the case that "[a]dditional epidemiologic evidence from prospective studies with attention to effects within ovarian cancer subtype is warranted" and that "it is important that research into this association continue."[57]

I also note that plaintiffs' experts Dr. Smith-Bindman and Dr. Siemiatycki decided to conduct their own meta-analyses for purposes of their reports.  I did not attempt such an undertaking because there is no need; there have been a number of recent meta-analyses in this area, and not enough new recent studies to justify running the same meta-analysis one more time

---

[52]   Langseth 2008 at 359; Berge 2018 at 256.

[53]   Penninkilampi 2018 at 44.

[54]   *Id.* at 42.

[55]   *Id.*

[56]   *Id.* at 47.

[57]   *Id.* at 48.

(indeed, Dr. Siemiatycki acknowledges that the cumulative 1.28 relative risk his analysis generated is on par with those of the recent published meta-analyses).[58]

Dr. Smith-Bindman purports to have conducted her meta-analysis in an effort to specifically assess whether "regular" talc use causes ovarian cancer and serous invasive ovarian cancer in particular.[59]  According to Dr. Smith-Bindman, a "narrow[er]" meta-analysis would offer the "most meaningful and consistent results," ostensibly by reducing variation between the included studies as to "relevant factors such as age or race/ethnicity."[60]  But she does not cite any reference in support of her "less is more" theory; nor does she identify any generally accepted criticisms of existing talc meta-analytic work that would justify her narrower approach.  She also offers no basis for concluding that the results of her study are somehow more reliable than the studies that have previously been done on the same body of literature, and which have been published after peer review.  And indeed they are not, due to at least the following significant methodological deficiencies:

·  Dr. Smith-Bindman states that she chose to focus on serous invasive ovarian cancer because it was the only subtype "for which most individual research studies accumulated sufficient cases for valid statistical analysis," but she provides no analysis or data to support this claim.[61]  Her decision to focus on serous invasive ovarian cancer (the only subtype that previously has been associated with an increased risk from talc in any of the cohort studies) illustrates a systematic exclusion of data that do not support her theory.

·  Her concession that her measure of "regular" talc use was "subjective[]" is an understatement.[62]  She defines "regular use" "ideally as daily or at least more than 3 uses per week," but she also "accepted studies that defined use as 'regular' where the description made it clear that this was regular use."[63]  For some studies that reported "regular" use but sub-grouped that categorization, she only "included data for women in the highest use category," and only if that group "was large enough to be meaningful."[64]  And when studies "asked about ever use but defined use and stratified results by use," she "included any data that may have reflected daily use."[65]  Far too many questions arise from these vague and subjective criteria.  For example, why did Dr. Smith-Bindman arbitrarily choose three uses per week as the lower threshold for regular use?  Notably, this cut-off excluded the Gates study, which included data on women who used talc more

---

[58]   Siemiatycki Rep. at 41.

[59]   *Id.* at 31.

[60]   *Id.* at 30.

[61]   *Id.* at 32.

[62]   *Id.* at 34 ("I tried to be consistent in defining exposure, but this factor was subjectively determined by the individual studies."); *see* Smith-Bindman Dep. Vol. II 272:3-273:3 (Smith-Bindman "tried to approximate regular use" and has not validated her metric).

[63]   Smith-Bindman Rep. at 32.

[64]   *Id.*

[65]   *Id.*

than once per week (as explained below, including Gates in the meta-analysis would have lowered the odds ratio Dr. Smith-Bindman calculated for serous invasive). What criteria governed her determination of whether a study's description "made it clear" that it really addressed regular use? Why did she only use the highest use category when studies reported multiple categories of regular use, and what made such a group "large enough to be meaningful"? How did she determine "which data may have reflected daily use"? Although Dr. Smith-Bindman speculated at her deposition that other epidemiologists could repeat her analysis using her methodology,[66] the lack of a clear protocol and the need to reproduce seemingly arbitrary decisions in her assessment of "regular" talc use would make that very difficult, if not impossible. And importantly, whether a study reported on "regular" talc use appears to be the sole criterion Dr. Smith-Bindman employed in choosing studies for her review.

· Dr. Smith-Bindman excluded studies that examined talc use on sanitary napkins, diaphragms or condoms, claiming (without any supporting data) that perineal use is "the most common exposure type and is likely to reflect the most consistent exposure."[67] Notably, if the talc migration theory Dr. Smith-Bindman endorses is correct, data regarding talc use on condoms and diaphragms should be especially valuable, since such use introduces talc directly into the vagina. But studies examining such use have not reported an association with ovarian cancer, and her decision to exclude them again illustrates that she systematically avoided data that did not support her desired result.

· Even after designing a study selection methodology that enabled her to cherry-pick studies that supported finding an association, Dr. Smith-Bindman omitted Rosenblatt 2011 after initially selecting it.[68] That study reported negative associations between talc use and both invasive serous ovarian cancer and ovarian cancer overall for its two highest use categories.[69] At her deposition, Dr. Smith-Bindman speculated that she omitted this study because doing so did not make a difference in her results.[70] That is both an odd reason to exclude a study (all other things being equal, a more robust data set is obviously preferable) and objectively wrong, since her underlying data show that omitting the Rosenblatt study increased her odds ratio for frequent use and serous invasive from 1.38 to 1.52 and for frequent use and all ovarian cancer from 1.32 to 1.43.[71] In other words, if Dr. Smith-Bindman had not excluded Rosenblatt 2011 from her final results, she would

---

[66]    Smith-Bindman Dep. Vol. II 357:1-15; Smith-Bindman Dep. Vol. I 102:21-104:18; *see, e.g.*, Smith-Bindman Dep. Vol. I 197:19-198:6 (Smith-Bindman has no written protocol setting forth the myriad assumptions she and her colleague made when abstracting data).

[67]    Smith-Bindman Rep. at 32-33.

[68]    *Id.* at 33-34.

[69]    Rosenblatt 2011 at Table 2 (reporting point estimates of 0.78 and 0.87 for invasive tumors and all tumors in women with between 4,800 and 9,999 lifetime applications; and 0.84 and 0.87, respectively, for women with more than 10,000 lifetime applications).

[70]    Smith-Bindman Dep. Vol. I 177:20-180:13.

[71]    TalcDataResults-janehall.xlsx (compare "All papers" tab with "Excluding Rosenblatt" tab).

17

not have been able to opine that regular talc use is associated with a 50 percent increase in the risk of serous invasive ovarian cancer.[72]

· The pool of studies on which she relies for her assessment of serous invasive ovarian cancer is very small – consisting of only four reports and far fewer cases overall than the broader pool of ovarian cancer studies, making the dataset less robust.  Moreover, while Dr. Smith-Bindman includes the Gertig study as one of the four in her consideration of serous ovarian cancer risk, she omits the Gates study,[73] which, as noted above, updated the findings of the NHS on which Gertig had reported and concluded after ten more years of study that there was no association between talc use and serous ovarian cancer specifically (RR 1.06 (95% CI: 0.84-1.35)).[74]  Had Gates been considered, Dr. Smith-Bindman's reported overall odds ratio of 1.52 for serous ovarian cancer would presumably have been much lower.

· As noted above, Dr. Smith-Bindman admittedly made no effort to assess the quality of the case-control studies that comprise 90 percent of her meta-analysis.[75]  As she confirmed at her deposition, this included no effort to assess whether the studies she selected adequately controlled for bias and confounding.[76]

· Dr. Smith-Bindman admittedly abstracted inaccurate data from the studies she considered in her review.[77]  Indeed, none of the confidence interval data she reports for the ten studies she includes in Figures 2 and 3 of her report match what was reported in the studies themselves.[78]  This is surprising since Dr. Smith-Bindman acknowledges that data abstraction is an extremely important step for a meta-analysis and that having inaccurate

---

[72]      *See* Smith-Bindman Rep. at 34.

[73]      *Id.*

[74]      Gates 2010 at 50.

[75]      Smith-Bindman Rep. at 29.

[76]      Smith-Bindman Dep. Vol. II 311:18-312:24; *see id.* 284:7-15 (agreeing that bias in underlying studies does not disappear when they are combined in a meta-analysis).

[77]      Smith-Bindman Dep. Vol. I 105:14-21.

[78]      *Id.* 182:13-183:24.  *Compare Smith-Bindman* Rep. at 33 fig. 2, *with* Booth 1989 at 596 (Smith-Bindman (0.75-1.85) vs. study (0.8-1.9)), *and* Chang & Risch 1997 at 2399 (Smith-Bindman (0.51-1.39) vs. study (0.61-1.49)), *and* Cook 1997 at 462 (Smith-Bindman (0.55-3.05) vs. study (1.2-2.9)), *and* Cramer 2016 at 335 (Smith-Bindman (0.97-2.01) vs. study (1.06-2.10)), *and* Gertig 2000 at 250 (Smith-Bindman (0.76-1.48) vs. study (0.82-1.55)), *and* Harlow 1992 at 19 (Smith-Bindman (0.85-2.75) vs. study (1.1-3.0)), *and* Mills 2004 at 460 (Smith-Bindman (0.93-2.55) vs. study (1.14-2.64)), *and* Schildkraut 2016 at 1413 (Smith-Bindman (1.18-2.24) vs. study (1.26-2.33)), *and* Whittemore 1988 at 1231 (Smith-Bindman (0.81-2.09) vs. study (0.81-2.60)), *and* Wu 2009 at 1409 (Smith-Bindman (1.14-3.02) vs. study (1.34-3.23)).  *Compare* Smith-Bindman Rep. at 34 fig. 3, *with* Chang & Risch 1997 at 2399 (Smith-Bindman (1.07-1.96) vs. study (1.13-2.02)), *and* Cook 1997 at 462 (Smith-Bindman (0.55-3.05) vs. study (1.2-2.9)), *and* Cramer 2016 at 342 (Smith-Bindman (1.08-2.00) vs. study (1.15-2.07)), *and* Gertig 2000 at 250 (Smith-Bindman (0.86-2.12) vs. study (0.98-2.26)).

data can compromise a meta-analysis.[79]  Dr. Smith-Bindman also admits that she likely double-counted patients in her data, despite acknowledging that this should be avoided.[80]

In short, Dr. Smith-Bindman's meta-analysis is arbitrary, error-laden and designed to systematically exclude data that do not support the theory that talc use causes ovarian cancer. These methods are unreliable.  Based on her meta-analysis, Dr. Smith-Bindman concluded that she does "not have **_any uncertainty_** that regular exposure to talc powder products" increases the risk of ovarian cancer;[81] yet, it is difficult to conceive how use of such a methodology would not introduce **_substantial uncertainty_** into a meta-analysis, as well as any interpretation of its results.

2.    Bias

Bias is a particularly important issue when analyzing whether perineal exposure to talcum powder causes ovarian cancer because, as set forth above, the reported risks are very small.  The reporting of small risks suggests these studies are susceptible to biases.[82]

Additionally, case-control studies are particularly susceptible to bias (although I agree with Dr. McTiernan that hospital-based studies may be less distorted by recall bias than population-based studies because the former feature both ill cases and ill controls).[83]  In most of the case-control studies pertaining to perineal talcum powder use and ovarian cancer, the authors discuss the potential for bias, including recall bias.  However, only one study examined the issue directly, and it found striking and clear evidence of the impact of recall bias on the study results.

In the case-control study reported by Schildkraut et. al., the authors (including Dr. Moorman) considered that "the possibility of differential misclassification exists in a case-control study such as AACES, especially due to the heightened awareness of the exposure as a result of" well-publicized litigation.[84]  The investigators examined their finding based on whether the study subjects were interviewed before 2014 versus 2014 onward.  Among those interviewed before 2014, the reported use of body powder on the genitals was nearly the same for cases and controls (36.5 and 34.0%, respectively).  But from 2014 onward, the reported use among cases was markedly higher (51.5%), while it stayed the same in controls (34.4%).  This striking and abrupt change in reporting clearly demonstrates the major impact of recall bias, and that plaintiffs' experts are wrong to label recall bias in case-control studies "theoretical."[85]  But it also calls into question earlier results because – contrary to Dr. Moorman's claim that "the vast

---

[79]    Smith-Bindman Dep. Vol. I 104:22-105:13, 106:6-13; Smith-Bindman Dep. Vol. II 282:16-283:3.

[80]    Smith-Bindman Rep. at 34; Smith-Bindman Dep. Vol. II 344:9-345:3.

[81]    Smith-Bindman Rep. at 4 (emphasis added).

[82]    Moorman Dep. 251:2-7 ("I think that with a smaller association, there is more concern that it could be due to bias from various reasons.").

[83]    McTiernan Rep. at 24

[84]    Schildkraut 2016 at 1416.

[85]    McTiernan Rep. at 20; Moorman Rep. at 23.

majority of studies" were not affected by this issue[86] – the question of talc and ovarian cancer did not emerge for the first time in 2014, and earlier studies could well have been affected by a more modest but nonetheless significant recall bias. Clearly, media reporting about talc and ovarian cancer did not begin in 2014; rather, there are multiple news reports between 1982 and 2013 (**See Appendix A: Sample Of Pre-2014 News Articles Addressing Posited Link Between Talc Use And Ovarian Cancer for a list of examples**).  Women with ovarian cancer in that era could easily have been influenced in their recall of talcum powder use, which would potentially amplify recall bias in pre-2014 studies as well.

Dr. Moorman further argues that "empirical evidence" shows that recall bias in case-control studies is only a theoretical concern, citing a study by Lanza et al. that found that case-control and cohort studies reached similar results regarding certain therapeutic interventions.[87] But the Lanza findings (which had nothing to do with talc) are obviously not applicable to the situation here, where the case-control and cohort studies at issue have been highly heterogeneous.[88]

Other study authors have recognized the problem of bias in their studies as well.  For example, a 2017 pooled study of 12 case-control studies addressing ovarian cancer risk factors in four ethnic groups found a statistically significant elevated risk for talc use among two of the four ethnic groups (Non-Hispanic White (OR 1.30 (95% CI: 1.20–1.41)) and Black (OR 1.62 (95% CI: 1.32–2.00)) and no statistically significant elevated risk for the other two groups (Hispanic (OR 1.41 (95% CI: 0.93–2.13)) and Asian/Pacific Islander (OR 1.02 (95% CI: 0.61–1.70))).[89]  The authors characterized the differences across groups as "[s]tudy heterogeneity" and cautioned:  "A concern with self-reported data is recall bias, especially for characteristics that are difficult to report with accuracy, require subjective summarization or can be influenced by the investigator, media or similar factors.  Such problematic characteristics may include body powder exposure[.]"[90]

### 3.   Confounding

Similarly, confounding factors may have affected the studies that found a small estimated risk pertaining to perineal exposure to talcum powder and ovarian cancer.  This issue is especially concerning when it comes to ovarian cancer risk because, generally, scientists do not know the cause of ovarian cancer.[91]  Thus, even studies that attempt to account for known confounders (such as familial or genetic risk) likely do not account for most of the risks – known or unknown.

---

[86]     Moorman Rep. at 23.

[87]     Moorman Rep. at 23; Moorman Dep. 227:11-23.

[88]     *See* Moorman Dep. 227:24-232:15.

[89]     Peres LC, Risch H, Terry KL, et al. Racial/ethnic differences in the epidemiology of ovarian cancer: a pooled analysis of 12 case-control studies. Int J Epidemiol. 2018; 47(2):460-472.

[90]     *Id.* at 8-9.

[91]     Siemiatycki Dep. 173:6-9 (agreeing that "all of the factors that might make someone susceptible to developing ovarian cancer are not currently known").

The Sister Study[92] provides insight into one potential source of confounding in prior studies.  In that study, the investigators accounted for douching, an exposure not considered in nearly all other studies.  The authors were interested in douching because of concerns that it could "introduce particles and toxicants in the upper reproductive tract and increase the risk of cancers and infections."  They cited evidence that douching products contain phthalates that "could influence ovarian cancer risk through hormone disruption."  The study found that douching was a risk factor for ovarian cancer (HR 1.8 (1.2-2.8)), while talc use was not (HR 0.73 (0.44-1.2)).  Douching, with or without concurrent talc use, had similar risk (HR 1.8 and 1.9, respectively).  The investigators noted that the practice of douching and talc use are correlated and that "if douching is a risk factor for ovarian cancer, some of the earlier reports on talc could have been subject to confounding bias."  The same study also showed that douche users are different from non-users, with users more likely being Non-Hispanic Black, of lower educational attainment and/or obese.  These systematic differences highlight the complexity of understanding the potential effect of a non-random feminine hygiene practice and judging causation when estimated risks are otherwise so small.

The finding in Gonzalez that the douche users had lower educational attainment suggests that socioeconomic status may be another important confounder.  Indeed, in another study by Alberg et al. the investigators found that higher educational attainment may be protective against developing ovarian cancer (or in other words, low educational attainment is associated with higher risk of developing ovarian cancer).[93]  The authors noted that if socioeconomic status is truly protective, the reasons for the relationship still need to be identified.[94]  They suggested that differences in diet and exercise could be related to risk, which overall means that assessing confounding in ovarian cancer studies is important, complex and not yet fully developed in research.[95]  What is important in assessing the epidemiologic studies of talc and ovarian cancer is that, as Dr. Smith-Bindman acknowledges, the studies did not use a uniform approach to assessing confounders, with, for example, nearly all not adjusting for douching and many not accounting for education or socioeconomic status.[96]  Accordingly, Dr. McTiernan's argument that confounding is unlikely because studies have reported small differences between adjusted and crude results is overly simplistic (and in any event ignores that studies cannot adjust for unknown confounders).[97]

### 4.   Other Considerations

It is important to recognize that the strength of an association is not the same as the importance of the association.  The importance of an association is based on the judgment of

---

[92]    Gonzalez 2016.

[93]    Alberg AJ, Moorman PG, Crankshaw S, et al. Socioeconomic Status in Relation to the Risk of Ovarian Cancer in African-American Women: A Population-Based Case-Control Study. Am J Epidemiol. 2016; 184(4):274-283.

[94]    *Id.* at 282.

[95]    *Id.*

[96]    Smith-Bindman Dep. Vol. II 307:21-308:24.

[97]    McTiernan Rep. at 24; McTiernan Dep. 176:17-177:23.

those using the information.  A new medication that reduces death from heart attacks by 2% may be judged to be very important, and if that drug causes itching in 30% of users, that finding may be judged less important.  An effect that is judged to be important is not evidence of causation, however.

In this matter, some of plaintiffs' experts have provided confusing opinions about strength of association.  While the strength of association between talcum powder use and ovarian cancer is indisputably small, the experts have nevertheless found it to be "strong" by discussing their judgments about the potential importance of the findings and also by bringing in other arguments, such as statistical significance.  For example, Dr. Smith-Bindman states:

> "It is frequently argued that the larger an apparent association, the more likely the association is to be real (causal) and important for epidemiological assessment.  This would suggest that an OR of 2.0 is more likely to indicate causality and importance than an OR of 1.5.  While this is often argued, I do not believe this is necessarily the case.  If a risk factor increases the risk of disease by 50%, and the exposure is common, it will have far greater impact on a number of people, in comparison to a rare exposure that has a higher associated OR.  A larger association between exposure and disease may be easier to identify, but I do not believe it is more likely to indicate causality or importance."[98]

Dr. Smith-Bindman is conflating the distinct issues of causation and importance in arguing that "the data supporting the causality of talcum powder products exposure for ovarian cancer is extremely strong."[99]  She goes on to calculate the number of ovarian cancers she believes are caused by talcum powder products and uses this calculated number of cancers to support her statement that "this Bradford Hill Factor of the Strength of the association is important and met."[100]  In other words, Dr. Smith-Bindman opines that because, according to her calculations, a large percentage of ovarian cancer is caused by talcum powder, the association is "strong."  This statement is misleading and circular because Dr. Smith-Bindman is using the "importance" of the finding, which is only important if true (i.e., causal), to support the judgment that the very small association is causal.  One needs to first determine if an association is causal, and only then, if it is causal, decide on its importance.

Other plaintiffs' experts make similar conflated arguments.  Dr. Blair Smith uses the potential importance of the finding in her assessment of the strength of association when she states that "there is no set magnitude or threshold for ascribing causality.  I would maintain that any practice or element that increases the risk of ovarian cancer by ANY consistent percentage is significant."[101]  Dr. Moorman also states that it is "critical to consider the prevalence of the exposure" in assessing strength of association and "how many cases of disease could be

---

[98]     Smith-Bindman Rep. at 36.

[99]     *Id.* at 37.

[100]    *Id.* at 38.

[101]    Blair Smith Rep. at 19.

attributable to this exposure."[102]  Likewise, Dr. McTiernan, although admitting the risks are approximately 22-31% (equivalent to RR ~1.2-1.3), expressed the opinion that the association is strong because "given the high prevalence of use of talcum powder products" in this population, these levels of risk present a clinically significant public health concern."[103]  Thus, Drs. Blair Smith and McTiernan are using the concept of importance to justify the strength of a very small numerical risk.  Furthermore, Dr. McTiernan's opinion about the strength of association is confusing for the additional reason that she folds in other criteria such as consistency of findings, which should be assessed separately.  Dr. McTiernan's conflation of many different concepts makes her Bradford Hill analysis unreliable.

Plaintiffs' experts also cite to examples of "established carcinogens" with similar estimates of strength of association – like passive smoke exposure and lung cancer, or hormone replacement therapy and breast cancer – to conclude that the association between talc and ovarian cancer is strong enough to be causative.[104]  Although it is true that the associations are numerically similar, it is improper to conclude that any association of the same size is causal. After all, for those other exposures, the fact of a weak association may have been overcome by strong evidence that the other Bradford Hill criteria were met.  And, as Dr. Moorman concedes, there are also examples of numerically similar associations that have not been established as causal.[105]  Additionally, causation for certain of these other examples was based on data from randomized trials, which are the strongest evidence of a causal relationship.  For example, the clinical trials pertaining to hormone therapy and breast cancer randomly assigned patients to treatment and control groups, rendering a high likelihood that any association that is observed is due to the exposure, as opposed to bias or confounders.  In other words, the causal relationship between hormone therapy and breast cancer is based on better data, not on the finding of a small association.[106]

Additionally, plaintiffs' experts' heavy reliance – and in the case of Dr. McTiernan, exclusive reliance[107] – on meta-analyses and pooled analyses to demonstrate strength of association is flawed in many respects.  First, as plaintiffs' experts have repeatedly acknowledged, the meta-analyses do not eliminate the bias inherent in the underlying studies.[108] And although plaintiffs' experts focus on newer studies,[109] Dr. Siemiatycki admits that the

---

[102]    Moorman Dep. 261:1-262:1.

[103]    McTiernan Rep. at 9.

[104]    Singh Rep. at 17; Moorman Rep. at 12; Moorman Dep. 245:10-16; Siemiatycki Dep. 148:8-19.

[105]    Moorman Dep. 255:12-25 ("I acknowledge that – of course, that there are reports of exposures that have reported relative risk in this range, and it could either be something that was associated with another risk factor and it was not the causal factor or the level of evidence was not adequate.").

[106]    Chlebowski RT, Hendrix SL, Langer RD, et al. Influence of estrogen plus progestin on breast cancer and mammography in healthy postmenopausal women: the Women's Health Initiative Randomized Trial. JAMA. 2003; 289(24):3243-3253.

[107]    McTiernan Rep. at 63; McTiernan Dep. 243:7-14.

[108]    McTiernan Dep. 244:9-13; Moorman Dep. 159:8-160:18.

[109]    McTiernan Dep. 282:2-4.

relative risks have gone down as more data has been collected over the years.  For example, the 1.28 odds ratio provided by Dr. Siemiatycki in his 2018 meta-analysis is lower than the 1.35 relative risk published in the 2008 Langseth article.[110]  And Dr. Siemiatycki acknowledged that the Berge 2018 authors noted a downward trend in the risk assessment over time.[111]

Finally, Dr. Smith-Bindman reports finding a slightly higher odds ratio of 1.52 by focusing on the particular histologic subtype of serous ovarian cancer.[112]  But this alternative approach to the issue of strength does not materially affect the analysis.  An odds ratio of 1.52 remains well below 2.0 and would still be considered a weak association.  The studies offering odds ratios for serous ovarian cancer, like the broader pool of studies, contain a mix of findings, with some reporting statistically significant findings and others not.[113]  And Dr. Smith-Bindman's methodology to reach the 1.52 odds ratio was deficient for the numerous reasons discussed above.

Based on the foregoing, it is my opinion that the association between perineal talcum powder exposure and ovarian cancer is weak and likely impacted by bias, confounding and/or chance.  Moreover, plaintiffs' experts' attempts to explain away these problems and cast the science as standing for essentially the opposite proposition – that the epidemiology establishes a strong or conclusive association – strongly suggest that they are engaged in advocacy rather than science.

## B.    Epidemiologic Studies Are Inconsistent.

As set forth above, the prospective epidemiologic studies (cohort studies) do not show a statistically significant association, while only a subset of the population-based case-control studies does.[114]  This disparity reflects inconsistent results across different types of studies, undermining the conclusion that cosmetic talc use causes ovarian cancer.  The fact that none of the cohort studies found a statistically significant association between talc use and ovarian cancer is critical in this regard,[115] because it calls into doubt even the modest association in some of the population-based case-control studies.

Other inconsistencies exist in the literature as well, including some that overlap with the concepts of coherence and plausibility.[116]  Evaluating an association with the use of talc-dusted

---

[110]     Siemiatycki Dep. 149:14-150:3.

[111]     Siemiatycki Dep. 206:21-207:19.

[112]     Smith-Bindman Rep. at 34.

[113]     *Id.* at 34 fig. 3 (citing four studies, one of which (Cook 1997) reported a statistically insignificant result, and two of which have confidence intervals that are only barely above 1.0).

[114]     As just explained, this disparity holds for the subtype of serous ovarian cancer as well, as to which the Gates study reported no statistically significant association.

[115]     Berge 2018 at 251.

[116]     Fiume MM, Boyer I, Bergfeld WF, et al. Safety Assessment of Talc as Used in Cosmetics. Int J Toxicol. 2015; 34(1 Suppl):66S-129S, 119S ("Fiume 2015"); Hartge 1983; Muscat JE, Huncharek MS. Perineal talc use and

diaphragms and condoms has been deemed "the most valid method for testing the carcinogenic potential of talc" because "[b]y definition, the female reproductive tract is exposed to talc containing powders introduced by diaphragms, whereas an exposure route based on perineal dusting requires unproven assumptions about vaginal exposure."[117]  Studies pertaining to use of talcum powder on diaphragms and condoms have shown a consistent lack of risk.  It is illogical that talcum powder applied to the outside of the genital tract can cause ovarian cancer, while talcum powder applied inside the genital tract would not.  Additionally, assertions by plaintiffs' experts that these studies are "obsolete" due to a "lower methodological quality"[118] are merely unfounded assertions.

Some of plaintiffs' experts still argue that the data on the association between genital talc use and ovarian cancer are highly consistent, but their explanations fail.

For example, Dr. McTiernan states that "[a]cross the case-control and cohort studies, the association between use of talcum powder products and risk of ovarian cancer was highly consistent."[119]  This statement is simply not true: while some of the case-control studies have shown a small positive risk, the cohort studies have uniformly failed to demonstrate a risk, as Dr. McTiernan admits.[120]  She states further that because the cohort studies "were not well designed to determine true risk for ovarian cancer and perineal talc use their results as a group do not negate the significant case-control findings."[121]  But her criticisms of cohort studies are misplaced, as previously discussed.  In any event, her argument assumes that the results of some studies are not consistent, or else there would be no reason for Dr. McTiernan to find fault with the cohort study designs in order to explain why their results do not negate the findings from other studies.  Furthermore, Dr. McTiernan completely ignores the fact that within the case-control studies, there is evidence of inconsistency based on the type of control group.  The different findings in the case-control studies by type of control group is further evidence of inconsistency.

Drs. Singh and Moorman purport to find consistency because "[t]he meta-analysis of case-control studies has consistently shown a statistically significant increased risk" and "the meta-analysis of cohort studies has also shown an excess risk, [] which failed to reach statistical significance."[122]  This consistency analysis is faulty for two reasons.  First, since meta-analyses

---

ovarian cancer: a critical review. Eur J Cancer Prev. 2008; 17(2):139-146, 144-145 (2008) ("Muscat & Huncharek 2008").

[117]     Muscat & Huncharek 2008.

[118]     Singh Rep. at 17, 26-27.

[119]     McTiernan Rep. at 64.

[120]     McTiernan Dep. 200:25-201:10 ("So yes, there was heterogeneity between the case-control and cohort studies"), 202:17-203:1 ("I agree that the cohort studies have lower relative risks than do the case-control studies, yes.").

[121]     McTiernan Rep. at 64.

[122]     Singh Rep. at 17; Singh Dep. 146:25-147:5 (stating "[t]he cohort studies show . . . increased risk, which is in the same direction as the case-control studies"); Moorman Dep. 262:20-264:13 (explaining that "both the Houghton study and the Nurses' Health Study . . . are consistent in terms of the direction of the effect").

analyze overlapping sets of individual studies, it is not surprising that meta-analyses yield consistent results.  For this reason, consistency as determined by the meta-analyses' estimates is not supportive of Bradford Hill's consistency of association criterion.  Second, as Drs. Singh and Moorman admit, the purported "excess risk" or "direction of the effect" shown in the meta-analyses of cohort studies does not amount to "statistical significance."[123]  Drs. Singh and Moorman's classification of "excess risk" or "direction of the effect" glosses over the fact that case-control studies and cohort studies found varying strengths of association that do not amount to consistent results.  Similarly, Dr. McTiernan's purported assessment of consistency by "look[ing] at whether the relative risk is above one consistently" is so broad that it is nonsensical, as it would consider near-null associations and definitively causal associations consistent.[124]  And plaintiffs' experts' argument that certain studies would have shown a statistically significant increased risk if they had larger sample sizes (i.e., Dr. McTiernan with respect to cohort studies and Dr. Moorman with respect to small, non-statistically significant associations in African American and white women found in her 2009 study)[125] is speculative because there is no way to know whether a larger sample would provide the same or a different estimate or whether that estimate would be statistically significant.  I note that the fact that Dr. Moorman did not include these results from her own 2009 study in her report suggests a biased approach to synthesizing the literature.[126]  In any event, Drs. McTiernan and Moorman likewise ignored the Berge study's analysis demonstrating that the cohort studies collectively had sufficient power to detect a 1.25 relative risk if one existed; as the authors stated, "low power of cohort studies cannot be invoked as [an] explanation of the heterogeneity of results."[127]

## C.   Specificity Is Not Compelling.

Specificity was not considered very important by plaintiffs' experts and I agree.[128]  There is no compelling case for specificity here either.

## D.   The Epidemiological Data Do Not Show Biological Gradient (Dose Response).

### 1.   Available Epidemiological Data On Dose-Response

Evidence of dose-response – i.e., whether the risk of developing ovarian cancer increases with increased perineal talc exposure – is one of the most important factors to consider in

---

[123]   Moorman Dep. 266:6-16.

[124]   McTiernan Dep. 212:17-21; *see* McTiernan Rep. at 44 (considering the near-null and not statistically significant 1.06 odds ratio reported in Houghton 2014 evidence of consistency of association); Moorman Dep. 263:13-264:13 (similar).

[125]   McTiernan Rep. at 45-46; Moorman Dep. 136:12-19.

[126]   Moorman Dep. 136:21-137:2; *see* Moorman PG1, Palmieri RT, Akushevich L, et al. Ovarian cancer risk factors in African-American and white women. Am J Epidemiol. 2009; 170(5):598-606 (reporting non-statistically significant odds ratios of 1.19 and 1.04 for African American and white women, respectively).

[127]   Berge 2018 at 253; *see* Moorman Dep. 213:2-23; McTiernan Rep. at 46-47.

[128]   Singh Rep. at 64.

evaluating causation.  The epidemiological literature studying talc and ovarian cancer has failed to show a dose-response relationship.  Plaintiffs' experts claim that there is sufficient data supporting the existence of a dose-response relationship[129] and have pointed to some studies as purported evidence of dose-response, including, for example, the articles by Schildkraut and Cramer.[130]  But overall, the literature is very inconsistent with regard to dose-response, as Drs. Smith-Bindman and Moorman concede.[131]

None of the cohort studies (Gonzalez 2016; Houghton 2014; and Gates 2010/Gertig 2000) demonstrates a dose-response relationship, and only a handful of case-control studies (Harlow et al. 1992; Cramer 2016 and Schildkraut 2016) have purported to find one.  The case-control studies have in fact shown a wide variety of findings, including:  (1) a positive dose-response; (2) no dose-response; (3) a negative dose-response; and (4) a haphazard or bizarre pattern.  Notably, among the numerous case-control studies that have not reported a dose-response relationship are several studies that have analyzed "cumulative" talc use (otherwise known as "frequency times duration" of use).  For example, Mills 2004 examined cumulative dose by quartiles and reported risks of 1.03, 1.81, 1.74 and 1.06 for ascending quartiles – a bizarre trend that does not support there being a dose response.[132]  Similarly, the Cook 1997 study looked for an association across various strata of "cumulative lifetime days."[133]  The results showed no statistically significant elevated risk for any of the four categories, with the relative risk for the lowest group (fewer than 2,000 cumulative days, RR 1.8 (95% CI: 0.9-3.5)) essentially matching that of the highest group (greater than 10,000 cumulative days, RR 1.8 (95% CI: 0.9-3.4)).[134]  Moreover, as noted above, the Rosenblatt 2011 study looked at the association across four categories of increasing lifetime applications and reported the lowest associations (in fact, negative associations) for its two highest use categories.[135]  In addition, Chang found an inverse relationship with risks related to use per month of 1.8, 1.1 and 0.9 for respectively <10, 10-25 and more than 25 applications; similar inverse findings for years of use were 1.7, 1.4 and 0.86 for <30, 30-40 and >40 years of use.[136]

Although some studies have purported to observe a dose trend with cumulative use, those results are not meaningful.  For example, the Schildkraut study only compared women who had used talc fewer than 20 years versus more than 20 years and fewer than 3600 applications versus

---

[129]    Singh Rep. at 55-56; Smith-Bindman Rep. at 39-40.

[130]    Singh Rep. at 56.

[131]    Smith-Bindman Rep. at 40 ("most but not all studies of talcum powder products and ovarian cancer show a dose response, but the results are inconsistent, and more importantly, are not considered or assessed in most of the published studies"); Moorman Dep. 272:5-10 ("across the studies, some have found a dose-response, some have not").

[132]    Mills 2004.

[133]    Cook 1997 at 463.

[134]    *Id.*

[135]    Rosenblatt 2011 at 740.

[136]    Chang & Risch 1997.

more than 3600 applications.[137]  Although it found statistically significant associations for the higher but not lower use categories, the study provides little useful information about dose-response because exposure is crudely dichotomized into just two categories each for frequency and duration.  And the Cramer study found essentially no difference – and certainly no steady increase – in risk as to women who had (as the study calculated) used talc for the equivalent of 1-5 years, 5-20 years and more than 20 years (odds ratios of 1.36, 1.41 and 1.39, respectively).[138]

Several meta-analyses and pooled studies have analyzed the body of studies and resoundingly concluded that there is not a demonstrated dose response.  For example, the 2013 Terry pooled study of eight case-control studies addressed the potential association between ovarian cancer and the use of powder (broadly defined to include both talc and cornstarch).[139]  One of the primary goals of the analysis was to determine whether a dose-response relationship existed, as previous evidence "ha[d] been inconsistent."[140]  The authors found that it did not.[141]  Indeed, although Dr. Siemiatycki claims that this study is "the most important evidence around dose-response," the authors stated that they "observed *no significant trend in risk with increasing number of lifetime applications*," as he has acknowledged.[142]  The Terry study, in fact, only observed a positive dose trend when including non-talc users in the analysis,[143] which is not actually meaningful evidence of a dose response, since including nonusers in a dose-response analysis makes that analysis redundant with whether there is an association with ever/never use, as Dr. Siemiatycki acknowledges.[144]  Although Dr. Siemiatycki argues that it may be appropriate to include nonusers in the dose-response analysis when a study only reports on dose-response and not ever/never use,[145] that clearly does not apply to the Terry study, which reported on both types of data.  Of note, the Terry authors did not mention the trend with nonusers in their abstract or discussion, instead highlighting that they found "no significant [dose] trend" and explaining that "[w]hether risk increases with number of genital powder applications and for all histologic types of ovarian cancer . . . remains uncertain."[146]  The authors also acknowledged that, if anything, the study might *overstate* the relationship between powder use and ovarian cancer if cases [i.e., women with ovarian cancer] were more likely to report

---

[137]    Schildkraut 2016 at 1415-1416 (Table 2).

[138]    Cramer 2016 at 337 (Table 1).

[139]    Terry 2013 at 812.

[140]    *Id.*

[141]    *Id.*

[142]    *Id.* at 811, 812 (emphasis added); Siemiatycki Dep. 197:17-22, 266:8-15, 268:14-21.

[143]    Terry 2013 at 817.

[144]    Siemiatycki Rep. at 43 ("If the Ever/Never result is presented and then a dose-response analysis is conducted, it is preferable to maintain statistical independence of the two analyses by excluding the baseline unexposed category from the dose-response analyses).

[145]    *Id.*

[146]    Terry 2013 at 811, 819-20.

genital-powder use than controls [i.e., women without ovarian cancer]."[147]

Similarly, a 2008 meta-analysis identified "the absence of clear exposure-response associations in most studies" as a crucial piece of missing evidence needed to establish causation.[148]   And in assessing the body of literature, the National Cancer Institute ("NCI") and the United States Food & Drug Administration ("FDA") have respectively concluded that "a dose response relationship was not found" and that "dose-response evidence is lacking."[149] Although two more recent meta-analyses claimed to find evidence of a very small dose-response, these data are not compelling.  Specifically, Berge 2018 reported a "weak" dose-response trend, but cautioned that these data came from a small number of case-control studies.[150]  And Penninkilampi divided talc users into only two categories (greater and fewer than 3,600 lifetime applications), finding only a "slightly greater increased risk" for the former category (also based only on case-control data).[151]  As with Schildkraut, the arbitrary dichotomous categorization of lifetime use further undercuts the significance of this finding.

Consistent with these results, pathological studies have not reported a correlation between the amount of talc used and talc particle counts in ovaries.  As one study explained:  "ovarian talc particle burden has been found not to correlate with the reported number of lifetime applications, which (if not reflective of inaccurate reporting) may indicate that duration of the powder use is not relevant when assessing risk associated with differing levels of exposure to talc."[152]

In sum, the findings of so many different patterns, or lack of patterns, by dose-response estimation weighs against causation, and indeed, the fact that the data show no clear dose trend is consistent with there being no causal relationship.  If one were to believe that perineal talcum powder use causes ovarian cancer, these mixed and inconsistent results should cast serious doubt

---

[147]     *Id.* at 820.

[148]     Langseth 2008 at 359; *see* Gertig 2000 at 249, 251 (cohort study concluding that "[w]e did not observe a dose-response relationship with talc use, and previous studies have been inconsistent in this regard"); Cramer 1999 at 355 (case-control study by Dr. Daniel Cramer conceding that "[t]he most obvious weakness in the argument for biologic credibility of the talc and ovarian cancer association is the lack of a clear dose response" and that "[m]ost talc and ovarian cancer studies that have addressed dose response, including this one, have failed to demonstrate consistent dose response relationships").

[149]     National Cancer Institute, Ovarian, Fallopian Tube, and Primary Peritoneal Cancer Prevention (PDQ®)– Health Professional Version, https://www.cancer.gov/types/ovarian/hp/ovarian-prevention-pdq (last updated Jan. 4, 2019); Letter from Food & Drug Administration, U.S. Department of Health and Human Services, to Samuel S. Epstein, M.D., Cancer Prevention Coalition, University of Illinois (Apr. 1, 2014);International Agency for Research on Cancer, Monographs on the Evaluation of Carcinogenic Risks to Humans Vol. 93: Carbon Black, Titanium Dioxide, and Talc 18-19 (2010) ("IARC Talc Monographs") (concluding that evidence of a dose-response relationship was "inconsistent").

[150]     Berge 2018 at abstract, 255.

[151]     Penninkilampi 2018 at 45.

[152]     Rosenblatt 2011 at 742 (discussing Heller DS, Westhoff C, Gordon RE, Katz N. The Relationship Between Perineal Cosmetic Talc Usage and Ovarian Talc Particle Burden. Am J Obstet Gynecol. 1996; 174(5):1507-1510 ("Heller 1996")).

on the validity of the measures used to estimate whether and how much talcum powder was used.

<div align="center">

2.   <u>Validity Of Exposure Measure</u>

</div>

In epidemiologic research, it is critical to assess exposures of interest with accuracy and precision. This includes measuring exposures with tools that have demonstrable validity. Without a validated measure of exposure, it is not possible to know whether or not an exposure occurred, and even if it did, it is not possible to quantify the exposure with any degree of certainty.

While there is a scientific approach for development and testing of survey questions for use in research,[153,154,155] there is not a single epidemiologic study of the potential association between perineal use of cosmetic talcum powder and ovarian cancer that has used, or purports to have used, a validated measure of talcum powder use.[156] Thus, it is unknown whether any of the studies have accurately assessed whether talcum powder was used, for how long and how frequently. Self-report measures can be highly inaccurate, and none has been shown to be valid. In studies of medication use, for example, validation of self-report can come from examining pharmacy dispensation records or deploying electronic counters to medications as objective measures to validate a person's reported use of a medication. No such efforts have gone into the development of questions about self-reported talc use.

Even more important, perhaps, is that no study has a measure that has been shown to estimate the relevant dose of talcum powder. An "application" of talcum powder has no standard definition. It is unknown how much, if any, talcum powder reported on any of the questionnaires is applied to the perineum, how much, if any, reached the vagina, nor how much, if any, reached the ovaries. The problem is especially profound in this context, because slight inaccuracies in estimating the amount used on a daily basis could significantly alter total estimated use where the history in some cases spans multiple decades. Thus, it is impossible from the studies to determine how much, if any, talcum powder was applied to the perineum, and likewise impossible to measure how much, if any, talcum powder migrated into the vagina, across the cervix, up through the uterus and eventually reached the ovaries. At best, the wide variety of non-validated measures of talcum powder use can collect hypothesis-generating data, and there is no assurance that any estimates of talc use are accurate or valid.

Below is an example of the challenges presented when a validated measure of exposure is nonexistent:

---

[153]    *See generally* Aday LA, Cornelius LJ. Designing and Conducting Health Surveys: A Comprehensive Guide. 3rd ed. San Francisco, CA: 2006.

[154]    Fowler FJ Jr. Survey Research Methods. 5th ed. Thousand Oaks, CA: 2014.

[155]    Seifert B. Validity criteria for exposure assessment methods. Sci Total Environ. 1995; 168(2):101-107.

[156]    *See* McTiernan Dep. 53:18-22 ("It was not possible to determine exactly how much talcum powder product was used").

<div align="center">30</div>

· Consider the question of whether or not consumption of milk can either cause or protect against the development of allergies.  It might seem simple that one could design a survey to ask people, with and without allergies, about their past consumption of milk.  A question could be: in the past 12 months, did you drink milk?  People with and without allergies could be compared by whether or not they drink milk.  But does the development of allergy depend on the amount of fat in the milk?  In that case, we need to ask if the milk was whole milk, skim milk, 1%, or 2% fat?  And does the person only drink one of those types of milk or multiple types of milk?  Perhaps a person drinks 2% milk, but uses half-and-half in their coffee.  So, we would need questions to understand that.  In case people change their milk preferences over time, we might need questions to determine at what ages the person drank whole milk, for example, and then when did they start also drinking skim milk.

· But what if the issue of allergy is related to protein in milk?  Then we need to be able to assess any other beverages and foods that contain milk protein.  We cannot simply ask about milk.  The range of foods with milk protein is tremendous and includes yogurt, milkshakes, and breads.  Among breads alone, milk protein can be found in loaves of bread, biscuits, donuts, crackers, pancakes, waffles, French toast and others.  Milk protein can be found in other foods, too, such as cereals and desserts, including cake, cookies, pudding, ice cream and pastries.  Milk protein may be in scrambled eggs, butter, cream and margarine, salad dressing and even some "non-dairy" creamers.  The list of foods with milk proteins goes on and on, even including meat products such as sausage, vegetables prepared *au gratin* or with butter or cream, candy including chocolate and many soups, chowders and bisques.

· It should be apparent that our simple question about milk is far more complicated than whether or not one drinks milk.

· Once we have identified all of the foods and beverages we need to ask about, we still need to determine the amount, or "dose," of milk consumed.  This step can be very difficult.  If you ask about eating soup that may have milk in it, how do you quantify if?  A cup or a bowl?  How big is the cup?  Is the cup full to the top or about 2/3 of the way up?  How much milk is in a "glass" of milk?  We might need some tools to use, such as food models or empty containers, to show the person telling us the amount they consumed.

· And then if we agree on a way to standardize how large is a portion of soup or milk, how do we know that people are accurately reporting when they say they typically drink 3 glasses of milk per week?  The answer is: if we want to come close to knowing the truth, then we have to demonstrate the validity of the questionnaire.

31

The validation process is separate from the research study and typically enrolls other people for the sole purpose of determining whether and how well the questionnaire works.  One method is to ask people to fill out very detailed food diaries for a few different days (in nearly real-time as they are eating and drinking, so the information is fresh) and then compare how those same people answer a question a week later about what they consumed over the past week. The extent to which the answers using the two methods are in agreement provides evidence for the validity of the survey questions.  Other approaches include asking people to take pictures of what they eat to use for validation.  The main point is that there is a formal process of determining the validity of survey questions that is necessary if one wants to collect high quality data and be able to approximate the truth.

Certain of plaintiffs' experts have raised related issues in their critiques of the evidence for and against dose-response.[157]  However, these same issues of validity of the exposure measure are just as important for assessing the overall proposition of whether or not talcum powder causes ovarian cancer.  For example, Dr. Smith-Bindman criticizes Gates and other cohort studies for examining any talc use (which she labels "a weak, crude predictor").[158]  But if Dr. Smith-Bindman believes the cohort studies suffer from assessing "any" use, she should apply this criticism even-handedly to the case-control studies and meta-analyses (such as the Penninkilampi study) that did the same.  And she further should have pointed out that the questionnaires that case-control studies use to assess talc use habits are often haphazardly designed and not validated.  Indeed, as Dr. Smith-Bindman observes, the Terry study (which numerous plaintiffs' experts rely on heavily) reported that the prevalence of powder use by controls in the underlying studies ranged from 15 to 45 percent, which she attributes to "variation in the definition of powder use" in the underlying studies it examined.[159]  Her point affirms concern about the validity of talc exposure assessment and that the magnitude of error could be tremendous.  But cohort studies are not uniquely subject to exposure assessment problems, and it is inappropriate for plaintiffs' experts to criticize them for this reason while ignoring similar issues with case-control studies.[160]

Further highlighting the importance of using validated measures of exposure, Dr. Colditz described the evolution of the Nurses' Health Study and noted that "there have been continuing efforts to validate questionnaire-based exposure measures used in the study."[161]  For example, in order to measure nutritional exposures that might be relevant to cancer and other disease risks, Dr. Colditz noted that "[a]ssessment of long term diet is necessary to relate nutrient intake to the risk of chronic diseases," and that "this is best accomplished through the use of a food-frequency questionnaire."  Further, he stated that the "Nurses' Health Study investigators have devoted great attention to the development, evaluation and refinement of food-frequency questionnaires

---

[157]     Singh Rep. at 55.

[158]     Smith-Bindman Rep. at 21.

[159]     Smith-Bindman Rep. at 28.

[160]     *E.g.*, Moorman Dep. 187:13-18 (criticizing Gonzales 2016).

[161]     Colditz GA, Hankinson SE. The Nurses' Health Study: lifestyle and health among women. Nat Rev Cancer. 2005; 5(5):388-396. ("Colditz 2005").

for epidemiological applications."  There were no such efforts employed in the NHS, nor in any other study, to develop and validate measures of talcum powder use.

Other authors have repeatedly discussed the limits of exposure measures in the epidemiologic studies.  For example, in Schildkraut, the authors stated:  "A recent publication of data from the WHI, which did not find an association with genital talc use and ovarian cancer, was accompanied by an editorial that emphasized the challenges in assessing the exposure to talc due to reliance on self-report.  This limitation in the measurement of the exposure variables in the current study needs to be considered when interpreting our results."[162]  And the Berge authors noted as a limitation to their meta-analysis that "neither the definition of the exposure of interest (genital talc use) nor the strategy for adjustment for potential confounders were fully consistent across studies."[163]  Another limitation was the "self-reported information on the main exposure of interest, with no external validation."[164]  In the Langseth (2008) paper, the authors noted that "the current body of epidemiologic evidence is insufficient to establish a causal association between perineal use of talc and ovarian cancer risk," and pointed to the "crudeness of the exposure metric used," and that "it is important that future studies, irrespective of study design, devote some effort to better assessment of exposure."[165]  This "crudeness" of the exposure measure was apparent in Terry (2013) as the authors needed to define genital powder use as "any type of powder (talc, baby, deodorizing, cornstarch or unspecified/unknown)" and acknowledged that a study limitation was "differences in the wording of questions about genital powder use between studies."[166]  In the same vein, another author cautioned that composition of body powders varies from one brand to the next.  Thus, "[d]ata from additional cohort studies would be welcome, but without details concerning the composition of the powders used by cohort members—details that many participants may not be able to provide—the results of such studies may be similarly ambiguous in their interpretation."[167]  Dr. Cramer, a plaintiffs' expert in prior talc cases, similarly acknowledged that "[t]here are inherent limitations quantifying a dose-response due to a lack of metrics for how much talc is in an 'application,' how much enters the vagina, and how much reaches the upper genital tract where, presumably, any deleterious effect is mediated."[168]  Many other authors expressed similar concerns pertaining to the accuracy of exposure measurements.[169]

---

[162]    Schildkraut 2016 at 1416.

[163]    Berge 2018 at 255.

[164]    *Id.*

[165]    Langseth 2008.

[166]    Terry 2013 at 812, 820.

[167]    Rosenblatt 2011.

[168]    Cramer 2016 at 344.

[169]    Gonzalez 2016 ("one challenge with studying talc is that the chemical formulation of talc has changed over time, and not all powders contain the mineral talc"); Cook 1997 ("it is not clear how ascertainment of perineal powder application correctly estimates actual exposure to particles in powder that may influence ovarian cancer risk"); Mills 2004 at 463 ("the lack of dose response between talc use and EOC may be explained by the inability to quantify the actual amount of talc used per application and timing of the application"); Rosenblatt 2011 ("the validity of all these studies, including ours, may be influenced by the level of non-response among cases and

In sum, without a validated measure of talcum powder use, it is impossible to correctly determine whether or not an exposure occurred or the quantity of purported exposure, making it impossible to reliably conclude that there is a causative relationship between perineal talcum powder use and ovarian cancer based on the current literature.

### E.   The Epidemiological Data Do Not Demonstrate Temporality.

The strongest evidence for temporality comes from studies that assess the exposure at one point in time, and then assess the outcome at a future time. The prospective cohort studies are the only studies in this matter that do that and thus represent the best evidence to assess temporality. As described more fully above, the cohort studies failed to show an association of ovarian cancer with talcum powder use. The case-control studies ask about past exposure, but they ask those questions at the same time that the outcome is already known. Temporality is assumed in case-control studies, though it is not a fact, as it is in cohort studies (or clinical trials). That is the reason that recall errors and recall bias are such a concern in case-control studies. Unlike prospective studies, subjects need to accurately remember and report past exposures. Recall bias occurs when people with a disease, compared to those without a disease, report different exposure histories compared to the truth. People with a disease may be more likely to recall or report exposures than those without the disease, which can inflate the apparent risk. This distortion is especially important when measured risks are low.

While it is a different concept from temporality, latency is a concept that is important to consider when evaluating temporality. Latency is the time from exposure to development of disease. When latency is known, one would want to make sure that not only did the exposure occur in the past, but that it occurred long enough ago in the past that a cancer would have time to develop. Obviously, without determining whether or not talcum powder causes ovarian cancer, it is not possible to state that there is a known latency. Nonetheless, Dr. Wolf states that the average latency period between exposure to talc and diagnosis of ovarian cancer is at least 20 years, citing two articles[170,171] that do not examine this issue.[172] Based on this theory, several experts have stated that a limitation of the cohort studies is that they were not of sufficient length to capture latency.[173] Obviously, without a known latency period, that concept is only speculative. Moreover, as explained above, the cohort studies have accounted for decades of talcum powder use. Thus, if women started using talcum powder at approximately 20 years

---

controls, and by the potential for misclassification (differential and non-differential) of exposure status. The latter derives not just from errors in the recall of the use of genital powder, but from the fact that the presence or concentration of talc can vary from brand to brand and even within one brand of powder over time. Therefore, even when respondents are asked specifically about perineal exposure to powders that contain talc (as in our study), they may be unable to provide accurate information.").

[170]     Purdie DM, Bain CJ, Siskind V, et al. Ovulation and risk of epithelial ovarian cancer. Int. J. Cancer. 2003; 104:228-232.

[171]     Okada F. Beyond foreign-body-induced carcinogenesis: Impact of reactive oxygen species derived from inflammatory cells in tumorigenic conversation and tumor progression. Int. J. Cancer. 2007; 121:2364-2372.

[172]     Wolf Rep. at 15.

[173]     Singh Rep. at 11, 53; McTiernan Rep. at 47.

old[174] and the latency period is approximately 20 years,[175] then both the Women's Health Initiative Study and Sister Study would account for a sufficient latency period.

### F.      The Epidemiological Data Lack Coherence.

Dr. Hill stated that the cause and effect interpretation of the data "should not seriously conflict with the generally known facts and the biology of the disease."  Dr. Hill cited the example of temporal trends in the rise in lung cancer rates while smoking was increasing.  But here, there are no published studies that have demonstrated any such ecological coherence with talcum powder and ovarian cancer.  Specifically, I can find no published studies that have examined trends in ovarian cancer rates in relation to trends in talcum powder use.  Dr. Hill also cited, as an example of coherence, the changes of bronchial epithelial cells in smokers.  But again, here there are no studies that have demonstrated histopathological differences in ovaries of talc users and non-users (nor in any tissues of the female genital tract).  This fact strongly argues against coherence.

### G.      No Experimental Evidence.

There is no experimental evidence of the relationship of talcum powder use and ovarian cancer in humans, as plaintiffs' experts agree.[176]

### H.      The Epidemiologic Data Is Not Analogous.

A few of the experts considered analogy, although Dr. Moorman "did not weight it heavily"[177] and Dr. Singh found it "less significant than other viewpoints."[178]  They and other experts opined that talcum powder's similarity to asbestos offers an appropriate analogy,[179] but asbestos and talc are distinct minerals, with distinct elemental composition and morphology, and it cannot simply be assumed that epidemiological study of asbestos can be applied by analogy to the case of talc, especially in light of the fact that talc itself has been extensively studied and its epidemiological literature reports vastly different risk levels than the asbestos literature.  In particular, the talc/asbestos analogy is unpersuasive because talc exposure is not associated with an increased risk of mesothelioma or lung cancer (diseases caused by asbestos), and as set forth below, it is far from clear that asbestos causes ovarian cancer.  Moreover, the limited analogy arguments that plaintiffs' experts advance do not make sense.  For example, Dr. Moorman compares asbestos to "asbestiform talc," but fails to explain why her attempted analogy applies to platy talc.[180]  Dr. Smith-Bindman similarly refers to talc's "fibrous nature," even though platy

---

[174]     Cramer 2016 at 335.

[175]     Wolf Rep. at 15.

[176]     Moorman Rep. at 38; Singh Rep. at 66; Wolf Rep. at 16.

[177]     Moorman Rep. at 38.

[178]     Singh Rep. at 66.

[179]     Moorman Rep. at 38; Singh Rep. at 66; Smith-Bindman Rep. at 41.

[180]     Moorman Rep. at 38.

talc is not fibrous, and she further essentially concedes that the talc-ovarian cancer evidence is "weak[]" in making the unsupported claim that "weaker evidence" should suffice to prove causation when there is an appropriate analogy.[181]  In short, analogy has not been established.

I.    **The Evidence For A Biological Mechanism By Which Talc Could Cause Cancer Is Weak.**

Plaintiffs' experts generally propose that talc or alleged other constituents in talcum powder (e.g., asbestos, heavy metals or fragrance chemicals) can travel from the perineum up the genital tract to the ovaries – against gravity and the downward flow of vaginal mucous and menstrual fluids.[182]  They also suggest an alternative pathway, via inhalation and the lymphatic system.[183] These proposed mechanisms are speculative and unsupported by science.

1.    Studies Have Repeatedly Stated That Scientific Evidence Is Insufficient To Show Mechanisms Of Talc-Based Ovarian Carcinogenesis.

As an initial matter, based on my review of the available epidemiologic literature, many authors of studies have made clear that the evidence is insufficient to understand any purported mechanism by which talc-based cosmetic powders could cause ovarian cancer.  For example:

Penninkilampi (2018)[184]

· "[T]he potential mechanism by which genital talc is associated with an increased risk of ovarian cancer hence remains unclear."

· "[U]nfortunately, the evidence remains insufficient to understand the mechanisms with any reasonable certainty."

· "[T]here is a substantial need for further research on a potential mechanism."

Berge (2018)[185]

· "[T]he biological basis and plausibility of a possible carcinogenic effect of talc on the ovaries is still not understood and remains questionable."

---

[181]    Smith-Bindman Rep. at 41.

[182]    Carson Rep. at 8; Kane Rep. at 4, 14; McTiernan Rep. at 8, 58-59, 66; Moorman Rep. at 32-33; Plunkett Rep. at 27-38; Singh Rep. at 18-19, 57; Singh Dep. 212:6-18; Smith-Bindman Rep. at 35; Zelikoff Rep. at 12-14.

[183]    Carson Rep. at 8; Kane Rep. at 14; McTiernan Rep. at 58-59, 66; Moorman Rep. at 33; Plunkett Rep. at 27-28; Singh Rep. at 18-19, 57-58; Wolf Rep. at 11, 15; Zelikoff Rep. at 14-17.

[184]    Penninkilampi 2018 at 11-12, 14.

[185]    Berge 2018 at 255.

Cramer (2016)[186]

· "[U]nfortunately, no epidemiologic study of epithelial ovarian cancer and talc has taken the opportunity to determine whether talc can actually be found in tissues removed at surgery and correlated with exposure to talc."

Terry (2013)[187]

· "[T]he biological plausibility for the observed association between genital powder use and ovarian cancer has been challenged because evidence for dose-response has been inconsistent."

· "[L]ittle is known about the biologic effects of genital powder use."

· "[M]ore work is needed to understand how genital powders may exert a carcinogenic effect, and which constituents (e.g., talc) may be involved."

Gates (2008)[188]

· "The association remains controversial due to the lack of a clear dose-response with increasing frequency or duration of talc use, the possibility of confounding or other biases, and the uncertain biological mechanism."

Merritt (2008)[189]

· "[T]hese results in combination with previous studies suggest that chronic inflammation is unlikely to play a major role in the development of ovarian cancer."

Mills (2004)[190]

· "[R]esearch has provided little biologic or experimental evidence to support a relationship between talcum powder use and ovarian cancer risk."

Whittemore (1988)[191]

· "While these findings indicate that vaginal exposure to particulates can lead to deposition on the ovaries, they do not implicate such exposure in ovarian carcinogenesis, and data relating directly to this possibility are needed."

---

[186]    Cramer 2016 at 344.

[187]    Terry 2013 at 819-20.

[188]    Gates 2008 at 2437.

[189]    Merritt 2008 at 174.

[190]    Mills 2004 at 464.

[191]    Whittemore 1988.

As these excerpts make clear, plaintiffs' experts' suggestion that biological plausibility is "accepted widely" based on "robust data" is simply false.[192]

        2.    <u>Scientific Study Does Not Support The Inhalation Or Migration Theories By Which Talc Is Supposed To Reach The Ovaries.</u>

Scientific data also fail to demonstrate a plausible mechanism by which talc or accessory particles could physically reach the ovaries from external use.

Plaintiffs' experts principally suggest that talc and asbestos particles can travel from the perineum up the genital tract to the ovaries – against gravity and the downward flow of vaginal mucous and menstrual fluids.[193]  The results of research addressing retrograde transport have been inconclusive.[194]  For example, one study examining the amount of talc in the ovaries of women who had undergone surgery for benign ovarian neoplasms found no correlation between the women's talc use and their talc particle counts.[195]  Another study reviewed pathology slides from 213 ovarian tumors and found definite silicate crystals in only five patients, which may have reflected talc contamination from surgical gloves.[196]  And as noted by IARC, while some studies of potential retrograde movement of particles in women who were about to undergo gynecological surgery for diseases or complications of the reproductive tract or organs have suggested that such transport is possible, "broad interpretations with regard to healthy women" based on these studies "may be limited."[197]  Thus, IARC reported that, "[o]n balance, the Working Group believed that the evidence for retrograde transport of talc to the ovaries in normal women is weak."[198]

Relatedly, while plaintiffs' experts point out that talc particles and asbestos fibers have been found in ovarian tissue, this fact is of no scientific significance because researchers have found such particles in the ovaries of women with and without perineal talc use or other known exposures to talc or asbestos.[199]  The Heller (1996) study found that "talc particles were observed to a similar extent with both exposed and unexposed subjects" and that particles were actually found in higher proportions among women who did not apply talc on the perineum, stating that "our results do not support a linear dose-related ovarian talc particle burden."[200]  As this research

---

[192]    Blair Smith Rep. at 20; Moorman Rep. at 32; Singh Rep. at 65.

[193]    Singh Dep. 212:6-18, 215:7 ("talc can migrate upwards").

[194]    IARC Talc Monographs at 392.

[195]    Heller 1996.

[196]    Yaker A, Benirschke K. A ten year study of ovarian tumors. Virchows Arch A Pathol Anat Histol. 1975; 366(4):275-86.

[197]    IARC Talc Monographs at 392.

[198]    *Id.* at 411.

[199]    Heller 1996 at 1508, 1510; Heller DS, Gordon RE, Westhoff C, Gerber S. Asbestos exposure and ovarian fiber burden. Am J Ind Med. 1996;2 9(5):435-439 (noting that asbestos fibers were found in ovarian tissue of women with and without history of exposure).

[200]    Heller 1996 at 1508, 1510.

indicates, the presence of fibers in ovarian tissue does not establish the relevant exposure pathways.

Studies have also failed to show an association between use of talc-dusted diaphragms and condoms and ovarian cancer.[201] Evaluating an association with the use of talc-dusted diaphragms and condoms has been deemed "the most valid method for testing the carcinogenic potential of talc" because "[b]y definition, the female reproductive tract is exposed to talc containing powders introduced by diaphragms, whereas an exposure route based on perineal dusting requires unproven assumptions about vaginal exposure."[202]

Moreover, numerous studies have considered whether tubal ligation and hysterectomy – procedures that "block the environmental contamination of the ovaries" – are associated with a decreased risk of ovarian cancer generally, while others have looked at this question in perineal talc users specifically.[203]   Although plaintiffs' experts assert that these studies "strongly suggest that the increased risk of ovarian cancer associated with talcum powder products use is reduced or eliminated after tubal ligation or hysterectomy,"[204] my review of the available literature reveals that the results have been inconsistent.[205]   In fact, the only cohort study to address this issue concluded that "no effect modification was seen by history of tubal ligation."[206]   And a pooled analysis of case-control studies observed similar associations for talc use in women with tubal ligation or hysterectomy regardless of whether the  "exposure to genital powder applications" occurred before or after the surgery.[207]   Several case-control studies have found a lower incidence of ovarian cancer in patients who had tubal ligation but a higher incidence in patients who had hysterectomies,[208] which is a puzzling result since both hysterectomy and tubal ligation should cut off the pathway through which talc could travel to the ovaries.  Because tubal ligation and hysterectomy would prevent the migration of talc particles from the perineum, the

---

[201]     Hartge 1983; Fiume 2015 at 122S ("[S]tudies demonstrating that the use of talc-dusted condoms or diaphragms, which would clearly result in exposure close to the cervical opening, [have found that talc] was generally not associated with increased RR estimates for ovarian cancer."); Muscat & Huncharek 2008 at 5-6 (describing meta-analyses showing no association between use of talc-dusted diaphragms and condoms and ovarian cancer); Penninkilampi 2018 at 42, 44 ("Talc use on diaphragms or on sanitary napkins was not individually associated with increased risk of ovarian cancer.").

[202]     Muscat & Huncharek 2008 at 5, 9 ("It may be argued that the overall null findings associated with talc-dusted diaphragms and condom use is more convincing evidence for a lack of a carcinogenic effect, especially given the lack of an established correlation between perineal dusting frequency and ovarian tissue talc concentrations and the lack of a consistent dose-response relationship with ovarian cancer risk.").

[203]     Id. at 7.

[204]     Smith-Bindman Rep. at 35.

[205]     Muscat & Huncharek 2008 at 7; Singh Rep. at 23 (admitting that the Terry pooled study found that "[a]fter excluding those with tubal ligation and hysterectomy, the results were similar.  Restricting analysis to application before tubal ligation made no substantive difference.").

[206]     Gertig 2000 at 251.

[207]     Terry 2013 at 817.

[208]     Mills 2004 (finding odds ratios of 0.88 and 1.54 for tubal ligation/no tubal ligation and odds ratios of 1.79 and 1.33 for hysterectomy/no hysterectomy); Cramer 1999 at 352 (odds ratios of 0.98 and 1.80 for tubal ligation/no tubal ligation and 2.61 and 1.60 for hysterectomy/no hysterectomy).

fact that studies have not consistently shown a reduced risk associated with these surgeries undermines the premise that talc particles travel to the ovaries and cause cancer.

Finally, some of plaintiffs' experts espouse a theory that talc or accessory particles can reach the ovaries via inhalation (i.e., that women who use cosmetic talc inhale some amount of talc particles while they are applying cosmetic talc).[209]  But I have not seen a mechanistic study that demonstrates that inhaled talc particles can reach the ovaries, and plaintiffs' experts concede there is not sufficient evidence pertaining to inhalation of talcum powder.[210]  Furthermore, while most of the epidemiologic studies did not examine non-perineal application of talcum powder, those that assessed application to other body parts found inconsistent results.  For example, although Penninkilampi found a small elevation in risk with "any non-perineal" talc use [1.24(1.01-1.51), this finding was limited by finding significant heterogeneity across the studies. In the Terry pooled analysis of more than 18,000 women, non-perineal application showed no risk [0.98(0.89-1.07)].  Likewise, the recent study by Cramer (2016) showed no association of body use of powder with ovarian cancer [0.99[0.84-1.16].

### 3. The Theory That Talc Can Cause Inflammation That Promotes Cancer Lacks Scientific Support.

The theory asserted by several of plaintiffs' experts that talc particles that reach the ovaries can cause inflammation leading to cancer (the "inflammation theory") also lacks support.[211]

First and foremost, no biological mechanism theory accounts for the fact that talc is not mutagenic or genotoxic.[212]  This fact significantly undermines the theory that talc causes ovarian cancer, since gene mutation is widely recognized as what triggers ovarian cancer.[213]  And Dr. Singh's assertion – without citation – that "[t]alc has also been shown to be mutagenic"[214] is simply incorrect, as is Dr. McTiernan's similar assertion that talc can cause genotoxicity.[215]  In

---

[209]   McTiernan Rep. at 66; Siemiatycki Rep. at 65; Moorman Rep. at 33; Singh Rep. at 19, 57-58.

[210]   Moorman Dep. 303:17-304:15 (stating there is not sufficient evidence to conclude that inhaled talcum powder causes ovarian cancer because there are not "epidemiologic studies that have actually looked at inhaled talcum powder in relation to ovarian cancer"); Singh Dep. 216:14-19 (agreeing that "studies of talcum powder use failed to show a statistically significant association between nongenital use of talcum powder and ovarian cancer").

[211]   Smith-Bindman Rep. at 12; McTiernan Rep. at 8; Siemiatycki Rep. at 65; Moorman Rep. at 33-34; Singh Rep. at 19.

[212]   Muscat & Huncharek 2008 at 9 (citing Endo-Capron S, Renier A, Janson X, et al. In vitro response of rat pleural mesothelial cells to talc samples in genotoxicity assays (sister chromatid exchanges and DNA repair). Toxicol In Vitro. 1993; 7(1):7-14); IARC Talc Monographs at 399.

[213]   Mayo Clinic, Cancer (Dec. 12, 2018), https://www.mayoclinic.org/diseases-conditions/cancer/symptoms-causes/syc-20370588; Anand P, Kunnumakkara AB, Sundaram C, et al. Cancer is a preventable disease that requires major lifestyle changes. Pharm Res. 2008; 25(9):2097-2116, 2098 (noting that "all cancers are a result of multiple mutations").

[214]   Singh Rep. at 19.

[215]   McTiernan Rep. at 67.

this vein, animal studies (including studies directly injecting talc into the ovaries of rats) have not shown that prolonged exposure to talc causes ovarian cancer or precancerous changes in ovarian cells.[216]  Likewise, in vitro and pathological studies have not shown evidence of talc-induced ovarian cancer.[217]

The inflammation theory is also unsupported and implausible.  A recent study sought to determine whether histological signs of inflammation were associated with ovarian cancer and found "no significant correlation . . . between serous carcinoma and histological signs of inflammation or chronic tubal injury."[218]  Studies have not established a causal association between the use of cosmetic talc and cancers in vaginal, uterine and cervical tissue.[219]  If talc (or alleged asbestos in talc products) produced inflammatory responses or carcinogenesis in ovarian tissue, it might also produce the same in other tissue.  These tissues are closer to the perineum than the ovaries and likely are exposed to greater concentrations of talc than the ovaries.

The lack of evidence showing a reduced risk associated with the use of anti-inflammatory drugs further undermines the inflammation theory.  Most meta-analyses examining this issue have found no risk reduction with either aspirin or NSAID use.[220]  One did report a modest risk reduction for aspirin use but found no such reduction for non-steroidal anti-inflammatory drug ("NSAID") use.[221]  The meta-analysis concluded that "[f]urther biological and pharmacological

---

[216]     Muscat & Huncharek 2008 at 9 (lifetime whole body exposure experiments in female laboratory rats found that ovarian tissue was not contaminated with talc and that ovarian tumor incidence was not increased) (citing Boorman GA, Seely JC. The lack of an ovarian effect of lifetime talc exposure in F344/N rats and B6C3F1 mice. Regul Toxicol Pharmacol. 1995; 21(2):242-243); Hamilton TC, Fox H, Buckley CH, et al. Effects of talc on the rat ovary. Br J Exp Pathol. 1984; 65(1):101-106 (study exposing rat ovaries to talc finding that the "epithelium covering the papillae was regular with no evidence of cytoplasmic or nuclear atypia"; there was no "evidence of frank neoplasia"; and that observed inflammation was not near the papillae).

[217]     Muscat & Huncharek 2008 at 9; IARC Talc Monographs at 397-98; Lee P, Sun L, Lim CK, et al. Selective apoptosis of lung cancer cells with talc. Eur Respir J. 2010; 35(2):450-452, 452; Nasreen N, Mohammed KA, Brown S, et al. Talc mediates angiostasis in malignant pleural effusions via endostatin induction. Eur Respir J. 2007; 29(4):761-769, 761-762 (in vitro studies reporting that talc stops new blood vessels from forming and causes cell death only in malignant cells, leaving healthy cells alone).

[218]     Malmberg K, Klynning C, Flöter-Rådestad A, Carlson JW. Serous tubal intraepithelial carcinoma, chronic fallopian tube injury, and serous carcinoma development. Virchows Arch. 2016; 468(6):707-713.

[219]     Singh Dep. 209:9-16.

[220]     Bonovas S, Filioussi K, Sitaras NM. Do nonsteroidal anti-inflammatory drugs affect the risk of developing ovarian cancer? A meta-analysis. Br J Clin Pharmacol. 2005; 60(2):194-203 (RR 0.93 (95% CI: 0.81-1.06) for aspirin use; RR 0.88 (95% CI: 0.76-1.01) for NSAID use); Ni X, Ma J, Zhao Y, et al. Meta-analysis on the association between non-steroidal anti-inflammatory drug use and ovarian cancer. Br J Clin Pharmacol. 2013; 75(1):26-35 (RR 0.94 (95% CI: 0.87-1.01) for aspirin use; RR 0.89 (95% CI: 0.74-1.08) for NSAID use); Baandrup L, Faber MT, Christensen J, et al. Nonsteroidal anti-inflammatory drugs and risk of ovarian cancer: systematic review and meta-analysis of observational studies. Acta Obstet Gynecol Scand. 2013; 92(3):245-255 (RR 0.93 (95% CI: 0.84-1.02) for aspirin use; RR 0.94 (95% CI: 0.84-1.06) for NSAID use).

[221]     Trabert B, Ness RB, Lo-Ciganic WH, et al. Aspirin, nonaspirin nonsteroidal anti-inflammatory drug, and acetaminophen use and risk of invasive epithelial ovarian cancer: a pooled analysis in the Ovarian Cancer Association Consortium. J Natl Cancer Inst. 2014; 106(2):djt431, 5 (2014) (for aspirin, OR 0.91 (95% CI: 0.84-0.99); for NSAIDs, OR 0.90 (95% CI: 0.77-1.05)).

research is necessary to understand the mechanisms of ovarian cancer risk reduction by aspirin use."[222]  The authors reported the results of further study just this year, continuing to find a modest decrease in risk with daily aspirin use but not with other types of anti-inflammatories, and further contradicting the inflammation theory, "observ[ing] a consistently <u>elevated</u> ovarian cancer risk with frequent, long-duration use of aspirin and nonaspirin NSAIDs.[223]  Moreover, the Wu 2009 study – on which plaintiffs' experts have relied on the issue of dose-response – likewise found the opposite effect, reporting that, "contrary to the study hypothesis that NSAIDs may have chemopreventative effects by decreasing inflammation, we found that the risk of ovarian cancer ***increased*** significantly with increasing frequency and duration of NSAIDs use."[224]  And Merritt (2008) additionally found risk reduction with the use of anti-inflammatories, concluding that "on balance, chronic inflammation does not play a major role in the development of ovarian cancer."[225]  In sum, and as plaintiffs' experts agree, studies of the effect of anti-inflammatory drugs on ovarian cancer are mixed at best, and some even show the reverse relationship – i.e., increased incidence of ovarian cancer with increased use of NSAIDs.[226]

Finally, "inflammation" is a broad term and does not inevitably lead to cancer.  For example, pollen can lead to increased inflammation in the asthmatic lung, but it does not cause cancer.  Thus, even if one finds inflammation in tissue, that does not mean that cancer inevitably or even likely follows from that.  And if talc in fact caused cancer by causing inflammation, it would surely do so in patients who undergo pleurodesis (which entails the therapeutic injection of talc into the pleural cavity to cause beneficial scarring).  Yet, there is no evidence that pleurodesis patients subsequently develop cancer as a result of the procedure.  Plaintiffs' expert Dr. Ghassan Saed has performed experiments – apparently for litigation purposes[227] – to attempt to establish an inflammation-based mechanism by which talc could cause ovarian cancer.  While I leave a detailed assessment of Dr. Saed's efforts to other experts, I did review Dr. Saed's report and his two depositions and was struck by the irregularities in his study, which render his results highly questionable.  I also read the highly skeptical comments from the reviewers at *Gynecologic Oncology*, which rejected his manuscript.[228]  But even accepting the results of Dr. Saed's study, they at best raise questions about the inflammation hypothesis that would have to be addressed through future *in vitro* and *in vivo* testing, as he effectively acknowledged at his

---

[222]     *Id.*

[223]     Trabert B, Poole EM, White E, et al. Analgesic Use and Ovarian Cancer Risk: An Analysis in the Ovarian Cancer Cohort Consortium, J. Nat'l Cancer Inst. 2019; 111(2):137-145, 139-142 (emphasis added).

[224]     Wu 2009 (emphasis added).

[225]     Merritt 2008.

[226]     Singh Dep. 231:23-233:2 ("[NSAIDs] don't consistently reduce the risk of ovarian cancer"); Kane Rep. at 9-13 ("[S]ome studies show[] a protective effect of anti-inflammatory drugs on the risk of developing carcinoma, although some studies have failed to show a protective effect."); Blair Smith Rep. at 17-18 (describing studies that "looked at the effects of aspirin and nonsteroidal anti-inflammatory drugs (NSAIDs) on the risk of developing cancer" as "inconsistent").

[227]     Saed Dep. Vol. I 62:16-63:7, 72:10-73:2, 178:14-21.

[228]     Gynecologic Oncology Email dated Sept. 19, 2018 re: GYN-18-1020: Final Decision.

deposition.[229]

## VII.   THE ASBESTOS LITERATURE DOES NOT SUPPORT THE THEORY THAT ASBESTOS ALLEGED TO BE IN COSMETIC TALC COULD CAUSE OVARIAN CANCER.

There are numerous problems with plaintiffs' experts' theory that asbestos is an accessory mineral present in cosmetic talc that causes ovarian cancer.

First, all of the problems addressed above with respect to plaintiffs' theories by which particulates in talcum powder could migrate to the ovaries would apply to asbestos fibers.  And plaintiffs' experts' inhalation theories are all the more infirm with respect to asbestos particularly.  Assuming talc contained asbestos, the larger burden of any inhaled asbestos should be seen in the lungs, which are directly exposed, rather than the ovaries, which would only be indirectly exposed, if at all.  If that is the case, as Dr. Moorman testified, we should be seeing an epidemic of mesothelioma and lung cancer cases among cosmetic talc users.[230]  But no expert has identified any studies showing that mesothelioma or lung cancer is a risk of talc use, and I am not aware of any such studies. To the contrary, studies that have looked at talc miners and millers – who would presumably confront greater exposures to asbestos if it were present in talc given the occupational context – have not found any increased incidence of mesothelioma or lung cancer attributable to talc exposure in the mines or mills.[231]  Notably, IARC emphasized this point, stating that there was "little or inconsistent evidence of an increased risk of cancer in the studies of workers occupationally exposed to talc," where the potential for talc inhalation would be particularly significant, and that "studies of talc miners and millers were considered to provide the best source of evidence."[232]  And the body of literature investigating perineal talc use has focused on ovarian cancer, and not mesothelioma or lung cancer, which indicates that researchers have not even considered them worth investigating.

In addition to the lack of a plausible mechanism by which asbestos could reach the ovaries, there is also a lack of any reliable epidemiology supporting such a causal connection. There have been relatively few studies examining the association between asbestos exposure and

---

[229]        Saed Dep. Vol. II 542:16-25.

[230]        Moorman Dep. 112:7-15 ("Q. You would agree with me that if talcum powder, that is used in cosmetic talc products, is, in fact, contaminated with asbestos, then you would expect to see increased cancer incidence rates, for example, of mesothelioma, in cosmetic talc miners and millers; correct? . . . . [A] I wouldn't be surprised to see that, yes.").

[231]        Fiume 2015 at 119S (studies looking at occupational inhalational talc exposure do not show an increased risk of lung disease); Pira PE, Coggiola M, Ciocan C, et al. Mortality of Talc Miners and Millers from Val Chisone, Northern Italy: An Updated Cohort Study. J Occup Environ Med. 2017; 59(7):659-664 (concluding that there was a lack of association between exposure to asbestos-free talc, lung cancer, and mesothelioma in a cohort of talc miners and millers from Val Chisone, Italy); Wergeland E, Andersen A, Baerheim A. Morbidity and mortality in talc-exposed workers. Am J Ind Med. 1990; 17(4):505-513 (finding no elevated incidence of lung cancer or mesothelioma in a cohort or 94 talc miners and 295 talc millers).

[232]        IARC Talc Monographs at 412.

ovarian cancer.[233]  Of the studies that have reported a statistically significant association between asbestos exposure and ovarian cancer, all looked at populations heavily exposed to asbestos in the workplace.[234]  As noted by the authors of a 2011 meta-analysis that included most of this research, studies examining the asbestos-ovarian cancer association have been "limited," in part due to a "[s]mall number of cases" – i.e., "[m]uch fewer women than men have been exposed to asbestos, particularly in [the] more heavily exposed occupational settings" that have predominantly been examined.[235]  Although some of these studies show a statistically significant elevated risk, others do not, and the overall results are highly inconsistent.[236]  Moreover, the meta-analysis calculated an overall standardized mortality ratio ("SMR") of 1.75 across 16 studies, which is not even a doubling of risk.[237]  The SMR in these studies ranged from 0.79 in a study of Polish women diagnosed with asbestosis (in which there was only one case of ovarian cancer across 490 exposed women) to 4.77 in a study of Italian women compensated for asbestosis (nine cases of ovarian cancer in 631 exposed women).[238]  Ten of the 16 studies reported SMRs lower than 2.0, none of them statistically significant.[239]

---

[233]   International Agency for Research on Cancer, Monographs on the Evaluation of Carcinogenic Risks to Humans Vol. 100C: Asbestos (Chrysotile, Amosite, Crocidolite, Tremolite, Actinolite, and Anthophyllite) 253 (2012) ("IARC Asbestos Monographs") (observing that "the published literature examining the association between asbestos exposure and cancer of the ovaries is relatively sparse").

[234]   Acheson ED, Gardner MJ, Pippard EC, Grime LP. Mortality of two groups of women who manufactured gas masks from chrysotile and crocidolite asbestos: a 40-year follow-up. Br J Ind Med. 1982; 39(4):344-348 (for gas mask workers exposed to crocidolite, SMR 2.75 (95% CI: 1.42-4.81)); Berry G, Newhouse ML, Wagner JC. Mortality from all cancers of asbestos factory workers in east London 1933-80. Occup Environ Med. 2000; 57(11):782-785 (for insulation workers, SMR 2.53 (95% CI: 1.16-4.80)); Camargo MC, Stayner LT, Straif K. Occupational exposure to asbestos and ovarian cancer: a meta-analysis. Environ Health Perspect. 2011; 119(9):1211-1217, 1216 ("Camargo 2011") (meta-analysis "restricted to highly exposed women" reporting "findings . . . consistent with the hypothesis that exposure to asbestos is associated with an increased risk of ovarian cancer"); Germani D, Belli S, Bruno C, et al. Cohort mortality study of women compensated for asbestosis in Italy. Am J Ind Med. 1999; 36(1):129-134 ("Germani 1999") (for cement works, SMR 5.40 (95% CI: 1.75-12.61); for textile works, SMR 5.26 (95% CI: 1.43-13.47); for all workers, SMR 4.77 (95% CI: 2.18-9.06)); IARC Asbestos Monographs at 256 (concluding that there is a causal association based "on five strongly positive cohort mortality studies of women with **heavy occupational exposure** to asbestos") (emphasis added); Magnani C, Ferrante D, Barone-Adesi F, et al. Cancer risk after cessation of asbestos exposure: a cohort study of Italian asbestos cement workers. Occup Environ Med. 2008; 65(3):164-170 (for cement factory workers, SMR 2.27 (95% CI: 1.04-4.32)); Wignall BK, Fox AJ. Mortality of female gas mask assemblers. Br J Ind Med. 1982; 39(1):34-38. ("Wignall & Fox 1982") (for gas mask workers, SMR 2.13).

[235]   Reid A, de Klerk N, Musk AW. Does exposure to asbestos cause ovarian cancer? A systematic literature review and meta-analysis. Cancer Epidemiol Biomarkers Prev. 2011; 20(7):1287-129, 1287 ("Reid 2011").

[236]   *See id.* ("The relationship between asbestos exposure and ovarian cancer is not as well understood."); *see also id.* at 1293 fig. 1 (chart showing the 16 studies, 12 of which did not report statistically significant results); *id.* at 1294 ("The present study has shown that 4 of 14 cohort studies reported a statistically significant excess rate for ovarian cancer among women exposed to asbestos.  Of the remaining 10 studies, 5 reported a tendency to excess but failed to reach statistical significance and 5 reported rates that were similar to those of their reference populations. Strong evidence of consistency was not observed among these studies, although no study reported any protective effect."); IARC Asbestos Monographs at 254-56 (describing cohort studies and case-control studies).

[237]   Reid 2011 at 1287 (abstract).

[238]   *Id.* at 1289.

[239]   *Id.* at 1289-90.

Addressing this body of research, the authors of the 2011 meta-analysis noted above acknowledged an IARC Working Group's recent conclusion that a causal association between asbestos exposure and ovarian cancer had been established,[240] but criticized that conclusion as "premature and not wholly supported by the evidence."[241]   The authors also emphasized that "[s]trong evidence of consistency was not observed among these studies,"[242] pointing out that "no significant excess risk was reported among those studies that examined the incidence of ovarian cancer where cases were ascertained from a cancer registry" as opposed to from death certificates, which is significant because there is evidence of misclassification in death certificates.[243]   The authors also noted that many studies involved too few women to address dose-response.[244]   With respect to the studies that did address dose-response, the findings "were inconsistent"; no study showed a "statistically significant trend of ovarian cancer with degree of asbestos exposure"; and "there was no evidence of a significant trend across studies as grouped exposure increased."[245]   In light of these conclusions, I find it puzzling that some of plaintiffs' experts claim reliance on this meta-analysis for the conclusion that "[a]sbestos has been established as a cause of . . . epithelial ovarian cancer."[246]   The study itself claims the opposite.

In addition, no study has found that asbestos exposure comparable to that allegedly sustained by women who use cosmetic talc causes an increased risk of ovarian cancer. Specifically, the occupational studies described above include workers who worked with raw asbestos as part of their job for months or years at a time.[247]   And as Dr. Moorman testified, the level of exposure is qualitatively different in the occupational context from the exposure to the genital areas alleged by plaintiffs.[248]   I am not aware of any study showing that the use of cosmetic talc would result in asbestos exposures comparable to occupational asbestos exposure even if the cosmetic talc contained trace amounts of asbestos, as claimed by plaintiffs' experts. Thus, the results of occupational studies cannot be reliably extrapolated to exposure scenarios such as cosmetic talc use.

The results of the occupational asbestos studies also cannot be used to support causation of ovarian cancer in cosmetic talc users because the studies have predominantly examined exposure to crocidolite asbestos or some combination of crocidolite and chrysotile, and

---

[240]    IARC Asbestos Monographs at 256.

[241]    Reid 2011 at 1294.

[242]    *Id.*

[243]    *Id.* at 1293-94.

[244]    *Id.* at 1294.

[245]    *Id.*

[246]    McTiernan Rep. at 57; McTiernan Dep. 268:21-25; Moorman Dep. 108:6-109:10, 111:7-14.

[247]    Germani 1999 at 129 ("Subjects included in this cohort were certainly exposed to high levels of asbestos."); Wignall & Fox 1982 at 35 (subjects were "directly exposed to asbestos dust," and "by the end of the working day they were covered in fluff from the pads" they worked on).

[248]    Moorman Dep. 106:4-17.

crocidolite is regarded as the most potent form of asbestos.[249]  I note that studies examining the composition of talc-based body powders have not observed crocidolite fibers.[250]

Even assuming exposure to asbestos of some variety and in certain exposure scenarios can cause ovarian cancer, no science supports the notion – put forth by a number of plaintiffs' experts – that "any exposure" to asbestos can cause ovarian cancer.[251]  To the contrary, as suggested by the discussion of occupational studies above, the available data suggest that very significant exposure would be necessary.  This conclusion is strongly supported by the fact that the few studies that have looked at environmental asbestos exposure (in women living in an asbestos mining town and family members of male asbestos factory workers) rather than occupational exposure do not show a statistically significant increased rate of ovarian cancer or increased mortality from ovarian cancer.[252]  For example, in one study of women who lived near or worked in a crocidolite mine and who had cumulative exposures of up to 40 fiber/cc-years, there was no increased risk of ovarian cancer.[253]  Even these studies are not perfectly analogous to the asbestos exposure alleged through perineal use of cosmetic talc.  But they underscore the fact that not every circumstance where there is asbestos exposure, even crocidolite exposure, leads to elevated ovarian cancer risk.

Finally, I note that studies addressing whether there is an association between asbestos and ovarian cancer have cautioned that to the extent there is an observed association, it may be inflated by the misclassification of other diseases such as mesothelioma as ovarian cancer on subjects' death certificates.[254]  As these studies have explained, it has only recently become

---

[249]     Reid 2011 at 1291 (noting that crocidolite is "the most mesotheliogenic of the asbestos fibers"); IARC Asbestos Monographs at 242 (discussing studies finding no excess mortality for cancer of the pharynx in amosite asbestos miners but an excess mortality rate for crocidolite miners and a higher risk rate for factory workers exposed to crocidolite than workers exposed to chrysotile); id. at 254-55 (relying on studies that involved crocidolite and, in some cases also chrysotile).

[250]     IARC Talc Monographs at 303-05.

[251]     E.g., Moorman Dep. 75:22-76:3.

[252]     Reid A, Heyworth J, de Klerk NH, Musk B. Cancer Incidence Among Women and Girls Environmentally and Occupationally Exposed to Blue Asbestos at Wittenoom, Western Australia. Int J Cancer. 2008; 122(10):2337-2344 (study of 2,552 women living in an asbestos mining town in Australia (reporting a "minimum estimate" standard incidence ratio ("SIR") of 1.11 (95% CI 0.39-1.84) and "maximum estimate" SIR of 1.43 (95% CI 0.50-2.37), depending on the method used to determine when to stop following women in the study; a standard incidence ratio reports the ratio of the number of cases of cancer found in the studied population relative to the expected number of such cases as derived from broader population statistics rather than a control group, and a standard mortality ratio ("SMR") employs a similar comparison but focuses on rates of death rather than incidence of disease); Reid A, Segal A, Heyworth JS, et al. Gynecologic and breast cancers in women after exposure to blue asbestos at Wittenoom. Cancer Epidemiol Biomarkers Prev. 2009; 18(1):140-147 ("Reid 2009") (analysis of ovarian cancer incidence in the same population (SIR 1.18 (95% CI: 0.45-1.91))); Ferrante D, Bertolotti M, Todesco A, et al. Cancer mortality and incidence of mesothelioma in a cohort of wives of asbestos workers in Casale Monferrato, Italy. Environ Health Perspect. 2007; 115(10):1401-1405 (study of family members of men employed at an asbestos-cement factory in Italy (SMR 1.42 (95% CI: 0.71-2.54))).

[253]     Reid 2009.

[254]     Reid 2011 at 1287 (explaining that many studies ascertained mortality from death certificates, "[t]he accuracy of [which] has been questioned repeatedly"; observing that it has been "particularly difficult to distinguish

technologically possible to reliably "distinguish pathologically between peritoneal mesothelioma and ovarian cancer."[255]   As the authors of one meta-analysis explained, even a low number of misclassification errors can drastically affect reported mortality rates given the limited number of ovarian cancer cases in the studies.[256]   Notably, the authors of that meta-analysis did not find a statistically significant ovarian cancer incidence when looking only at studies that obtained ovarian cancer diagnoses from cancer registries rather than death certificates.[257]

## VIII.   HEALTH CANADA AND THE ANALYSIS BY MOHAMED TAHER

I understand that plaintiffs' experts have begun relying on the recent draft screening assessment of talc by Health Canada[258] and the related analysis by Mohamed Taher[259] and others.  I have reviewed these documents, and they are consistent with the opinions I set forth above and do not support a conclusion that talc causes ovarian cancer.

The Health Canada ("HC") assessment raises a number of new issues that if anything further cloud the scientific picture and erect further obstacles to a conclusion that perineal talcum powder use causes ovarian cancer.  For example, the document highlights other sources of exposure to talc.  Specifically, it states that "a potential concern for human health has been identified" for perineal exposure to talc "from use of various self-care products (e.g., body powder, baby powder, diaper and rash creams, genital antiperspirants and deodorants, body wipes, bath bombs)."[260]   The document further notes that talc is present in approximately 8,500 self-care products, in addition to being found as a food additive, in medications, and many other consumer and commercial products.[261]

In other respects, the HC assessment largely covers old ground.  Indeed, as part of the overall assessment, there was a health effects assessment that relied on the work of other

---

between peritoneal mesothelioma and ovarian serous carcinoma").  Notably, this meta-analysis found that "no significant excess risk was reported among those studies that examined the incidence of ovarian cancer where cases [were] ascertained from a cancer registry."  *Id.* at 1294.

[255]    Camargo 2011 at 1216; *see id.* at 1215 (observing that earlier meta-analyses concluded that they could not conclude causality despite evidence of an association because of concerns about tumor misclassification and failure to account for known risk factors).

[256]    Reid 2011 at 1294 ("Where disease outcome was identified from the cause of death as listed on the death certificate, given the small numbers of ovarian cancer cases in each study, even misclassification of 1 cancer may exert a large impact on the exposure effect.").

[257]    *Id.* ("The meta-analysis of those studies that examined ovarian cancer as determined on the death certificate reported an excess risk.  In contrast, no significant excess risk was reported among those studies that examined the incidence of ovarian cancer where cases [were] ascertained from a cancer registry.").

[258]    *See* Health Canada, Draft screening assessment talc ($Mg_3H_2(SiO_3)_4$), Chemical Abstracts Service Registry Number 14807-96-6, https://www.canada.ca/content/dam/eccc/documents/pdf/pded/talc/Draft-screening-assessment-talc.pdf ("HC Assessment").

[259]    Taher 2018.

[260]    *See* HC Assessment at iii.

[261]    *See id.* at 6.

agencies (e.g., IARC and the United States Environmental Protection Agency) and a literature search.  With regard to perineal exposure to talc, the HC assessment cites IARC's Group 2B classification (possibly carcinogenic to humans), and the CIR Expert Panel (2013) that "determined that there is no causative relationship between cosmetic use of talc in the perineal area and ovarian cancer[.]"[262]  The assessment notes that rodents are poor experimental models for perineal studies and that "animal data are very limited."[263]  In terms of human studies, it cites several meta-analyses, including those cited by plaintiffs' experts, as well a newer unpublished manuscript by Taher (2018).[264]

In a discussion of mode of action, the HC assessment states that "the etiology of most ovarian tumors, in general, has not been well established."[265]  While it notes that talc particles instilled into the uterus or to a lesser extent the vagina can be found in the ovaries of rats, no similar translocation occurred in studies of rabbits and monkeys.[266]

The HC assessment found no health effects of ingested talc or dermally applied talc. With regard to inhalation, it cites the Danish EPA (2016) "note that talc is not absorbed via inhalation."[267]  It points to potential for retention of talc in the lungs as leading to talc-induced pneumoconiosis or talcosis in certain industrial settings.[268]  The assessment considers the NTP rat study of inhalation (1993) of talc with doses as high as 18 mg/m$^3$.[269]  It cites conclusions of a symposium of experts from the NTP as well as academic, industry and government experts who evaluated the NTP study results and reached a consensus that because the dose was so high, the neoplasms seen were not relevant to human health risk assessment.[270]  The lung tumors seen in only female rats were judged to be attributed to the general particle effects of dust, and not specific to talc, and the pheochromocytomas were attributed to tissue hypoxia, and not talc per se.[271]

The HC assessment also addresses the issue of asbestos, noting that selective mining, ore processing, and benefaction can remove many of the impurities from mined talc, that United States Pharmacopeia ("USP") requires the absence of asbestos, and that cosmetic grade talc should comply with USP standards.[272]  Further, "health effect studies on cosmetic-grade talc

---

[262]   *Id.* at 15.

[263]   *Id.*

[264]   *Id.* at 16-17.

[265]   *Id.* at 18.

[266]   *Id.* at 18-19.

[267]   *Id.* at 11.

[268]   *Id.*

[269]   *Id.* at 12.

[270]   *Id.* at 13.

[271]   *Id.*

[272]   *Id.* at 3.

cited in this assessment were considered to be free of asbestos."[273]

At the end of the day, the HC assessment failed to conclude that talc use causes ovarian cancer,[274] and plaintiffs' experts misread the report to the extent they contend that it did.[275]

HC's overall assessment appears to rely heavily on the unpublished meta-analysis by Taher and cites Taher's Bradford Hill analysis extensively. HC's extensive reliance on Taher is unusual and problematic. First, the manuscript has not gone through the peer-review process for publication. There is no way to know, at this point, whether and where it will ultimately be published, but even if it is, there is no assurance that the findings and conclusions will be the same once reviewers and editors have provided feedback. Second, it seems unusual to rely on the Taher paper in that there is no novelty and the studies reviewed in it have been repeatedly evaluated by other authors, whose results have, in fact, been through the peer-review process.

As a rationale for performing the study, Taher et al. cite "increasing concern that perineal exposure to talc, a commonly used personal care product, might be associated with an increased risk of ovarian cancer."[276] Further, they note that "the data describing this association is somewhat inconsistent."[277] Again, it is not clear why another meta-analysis of the same underlying data would be expected to solve past inconsistency.

In reviewing animal studies, Taher et al. note that "data from the animal studies [that] considered various routes of talc administration are inconsistent. . . ."[278] They cite the NTP rat study (1993), findings that HC stated "were not relevant to human health risk assessment" and were not specific to talc.[279] Taher et al. use the NTP study as evidence that, "overall, the avaiable [sic] experimental data suggest irritation, followed by oxidative stress and inflammation, may play be involved [sic] in local carcinogenic effects of talc in the ovaries."[280] Taher et al. note that "data on talc migration in the genital tract of animals is inconsistent, but could not exclude such possibility."[281]

The Hill analysis performed by Taher et al. also has serious flaws. With respect to strength of association, the authors note that 6 of 30 studies showed statistically significant risk

---

[273]    *Id.*

[274]    *Id.* at 28 (concluding that talc use is a "potential concern for human health").

[275]    Moorman Dep. 145:19-21.

[276]    Taher 2018 at 2.

[277]    *Id.* at 3.

[278]    *Id.* at 22.

[279]    HC Assessment at 3.

[280]    Taher 2018 at 23.

[281]    *Id.* at 24.

of 1.5 or greater and that none of the cohort studies found statistically significant associations.[282] While these findings show marked inconsistency, they are not supportive of a strong association.

With regard to consistency, Taher et al. cite 15 of 30 studies with positive, significant associations.[283]  Obviously, the same number do not show such an association, which is further evidence against consistency.

As to temporality, Taher et al. state that "the participants recalled that exposure to talc preceded the reported outcome,"[284] which ignores the fact that this recall is retrospective rather than prospective.

Regarding biologic gradient, the cited evidence is that 6 of 12 studies showed a significant dose-response trend,[285] which is again evidence of the inconsistency of the study findings, and is in any event wrong given that the cited positive studies included several that did not find a dose response with cumulative use, such as Mills 2004 and Rosenblatt 2011. Moreover, at a later point in the paper, the authors acknowledge that "conflicting findings were reported on the nature of the exposure-response relationship" and that a possible increasing trend is hampered by "a high degree of uncertainty surrounding many of the risk estimates."[286]

For experimentation, there are no cited human studies and no tests of animal models of perineal talc and ovarian cancer.  The authors again cite the NTP rat study,[287] which remains problematic for the reasons discussed previously.

The analysis of analogy relies on supposed similarities of talc and asbestos and the belief that there are histologic similarities of ovarian cancer and mesothelioma, and that these purported similarities have some bearing on talc causing cancer (even though Taher et al. state that "talc is not genotoxic").[288]

In the discussion, the authors note subgroup differences they observed by ethnicity, menopausal state, and tubal ligation.  But they go on to note that these three subgroup analyses (ethnicity, menopausal state and pelvic surgery) showed considerable heterogeneity that "might have had an impact on the results."[289]

---

[282]     *Id.* at 25.

[283]     *Id.*

[284]     *Id.* at 26.

[285]     *Id.*

[286]     *Id.* at 37.

[287]     *Id.* at 26.

[288]     *Id.* at 27.

[289]     *Id.* at 30.

Taher et al. reaffirmed the effect of study design on results, with, once again, positive findings only in population-based case-control studies, but not in those with hospital-based controls [0.96 (0.78-1.17)] or in cohort studies [1.06 (0.9-1.25)]. They also highlighted previously demonstrated paradoxical findings, such as lower risk of cancer with longer use of talc and the "expected, yet non-significant, negative association" with talc applied to diaphragms.[290] While they noted a protective effect of tubal ligation [0.64 (0.45-0.92)], they acknowledged incoherent findings of no significant effect of hysterectomy [0.89 (0.54-1.46)] and a small, non-significant higher risk in women with both tubal ligation and hysterectomy [1.06 (0.78-1.42)].[291]

In the conclusion, the authors state that their evaluation is consistent with that of IARC in 2010 and that it "indicates that perineal exposure to talc powder is a possible cause of ovarian cancer in humans."[292] In other words, eight years later their conclusion is the same – that the evidence shows only that it is possible, not probable, that perineal talc use causes ovarian cancer. Thus, Taher does not add anything new to the body of literature addressed in this report.

## IX.   **CONCLUSION**

It is my opinion, based on my qualifications and my extensive review of the available epidemiology studies and scientific literature, that there is not sufficient evidence to conclude that there is a causal relationship between perineal talcum powder exposure and ovarian cancer. The epidemiologic literature shows a non-existent association or, at most, a small association between perineal talc use and ovarian cancer that constitutes only weak epidemiologic evidence that can be attributed to bias, confounding or chance. The studies are inconsistent across study designs and within study designs, as cohort and hospital-based case-control studies do not show a statistically significant association and only a subset of the population-based case-control studies demonstrate a statistically significant association. Moreover, the case-control studies do not show any consistent evidence of a dose-response relationship, and there is a complete lack of evidence for dose-response in the cohort studies. The theories pertaining to biological plausibility are entirely speculative and have not been demonstrated in the epidemiology studies or scientific literature; rather, relevant science contradicts the purported theories of talcum powder transport and development of ovarian cancer by inflammation. Finally, the assertion that asbestos present in talc – even if true – causes ovarian cancer is problematic on the grounds that there is a lack of a plausible mechanism by which asbestos could reach the ovaries and also a lack of any reliable epidemiology supporting such a causal connection.

All of the opinions in this report are stated to a reasonable degree of scientific certainty.

---

[290]     *Id.* at 32.

[291]     *Id.* at 33.

[292]     *Id.* at 49.

# APPENDIX A

**Appendix A: Sample Of Pre-2014 News Articles Addressing Posited Link Between Talc Use And Ovarian Cancer**

[1] Boston Globe, Study links talc use to ovarian cancer (Aug. 6, 1982)

[2] New York Times, Talcum company calls study on cancer link inconclusive (August 12, 1982) ("A major talcum powder manufacturer, while criticizing a recent study linking the use of talcum powder by women to ovarian cancer, said it would further investigate any possible relationship between cosmetic-grade talc and the development of disease.")

[3] New York Times, Personal Health, (July 03, 1985) ("A number of studies have indicated that exposure to talc, the principal ingredient in talcum powder, increases the risk. This may be because talc is usually contaminated with particles of asbestos, which are known cancer-promoting substances.")

[4] Washington Post, Fighting Ovarian Cancer: Doctors Don't Know Who's at Risk, or Why (May 30, 1989) ("One theory is that asbestos containing talc may account for some of the increased rate of disease in western countries that emphasize personal hygiene.")

[5] San Francisco Chronicle, Use powder with caution (July 31, 1990)

[6] Business Times, Safe Neways option to looking beautiful (Feb 17, 1991) ("According to him, the talc in talcum powder and colour cosmetics have a similar molecular structure as asbestos which can cause ovarian cancer while the alcohol content in mouthwash can cause throat and stomach cancer.")

[7] Philadelphia Inquirer, Cancer risk and talcum linked; for women who used talc for a lifetime, the risk increased 300% (July 1, 1992)

[8] Houston Chronicle, Use of talc on panties tied to cancer (July 1, 1992)

[9] Los Angeles Daily News, Study says talc use increases women's risk of ovarian cancer (July 1, 1992)

[10] Seattle Times, Study links talcum use, ovarian cancer (July 1, 1992)

[11] St. Louis Post-Dispatch, Talcum powder, ovarian cancer linked (July 2, 1992)

[12] The Independent, Condom talc risks, (Mar. 21, 1995) ("They point out that if it gets into the female reproductive tract, talc may result in fallopian tube fibrosis and infertility, and it may also be linked to ovarian cancer.")

[13] Philadelphia Inquirer, Breaking the silence: women take on a deadly stalker ovarian cancer will kill more than 14,000 this year. Activists are targeting ignorance and complacency (May 18, 1997) ("using talcum powder on the genital area, among other factors, increase the risk")

[14] Chicago Tribune, Survivor speaks out on ovarian cancer (Aug. 22, 1997) ("It is more prevalent in women who have had no pregnancies, have taken fertility drugs, had an early menopause, eaten a high-fat diet or frequently used talcum powder in the genital area.")

[15] Harvard Women's Health Watch, Ovarian cancer (Oct. 1998) ("Several studies also suggest that two other practices -- a high-fat diet and long-term use of talcum powder on the genital region -- increase the likelihood of ovarian cancer. Researchers theorize that talc travels into the vagina, cervix, uterus, and ultimately to the ovaries, where it may prompt cellular changes and, later, cancer.")

[16] Chicago Tribune, Talcum takes a tumble (July 14, 1999)

**Appendix A: Sample Of Pre-2014 News Articles Addressing Posited Link Between Talc Use And Ovarian Cancer**

[17] HealthCommunities.com, Ovarian Cancer Risk Factors, (August 14, 1999) ("Some research indicates that there is an increased risk of ovarian cancer among women who apply talcum powder to the genital area or sanitary napkins.")

[18] Cleveland Plain Dealer, Possible link between talcum powder, ovarian cancer (Aug. 17, 1999)

[19] CNN.com, Ovarian cancer: It's less common than you think (Sept. 3, 1999) ("The ruling on talcum powder is still unclear, as well. In the past, talcum powder was sometimes contaminated with asbestos, a known cancer-causing mineral.")

[20] Chicago Tribune, How much do you know about ovarian cancer? (Sept. 15, 1999) ("Some research has shown a possible link between talcum powders used in the genital region and an increased risk of ovarian cancer.")

[21] Las Vegas Review Journal, Some promising treatments being developed for ovarian cancer (Nov. 25, 1999) ("In support of this, scientists point to several studies showing that talcum powder, which some women put on diaphragms or on genital skin, can raise ovarian cancer risk.")

[22] Philadelphia Inquirer, Don't worry about talc in eye shadow, face powder (Jan. 16, 2000) ("That doesn't mean not to use eyeshadow or face powder with talc, but it absolutely means to consider never using it on your children, or vaginally on yourself.")

[23] St. Louis Dispatch, Can genital warts cause cancer? (Apr. 26, 2000) ("Talc, the main ingredient of talcum powder, has been linked to ovarian cancer when used as a vaginal dusting powder.")

[24] USA Today, Estrogen may join carcinogen list (Dec. 8, 2000) ("Research suggests that talcum powder used in feminine hygiene increases the risk of ovarian cancer.")

[25] New York Post, Feds eye new causes of cancer (Dec. 9, 2000) ("Meanwhile, talc has been linked to an increased risk of ovarian cancer in women who use it for feminine hygiene")

[26] Los Angeles Times, Study Suggests Aspirin May Help Prevent Ovarian Cancer (Mar. 12, 2001) ("Ovarian cancer might be preceded by inflammation due to pelvic inflammatory disease or the use of talcum powder, both of which are linked to an increased risk of the disease.")

[27] The Guardian, Is your beauty regime damaging your health? Once again, studies are suggesting that chemicals used in cosmetics such as talc could increase the risk of cancer. Just how worried should we be . . .  (Sept. 11, 2007)

[28] National Health Service, Talcum powder and ovarian cancer (Sept. 29, 2008) ("Although this study has shortcomings and does not provide strong evidence of a causal link in itself, when put in context with other studies on this topic, it adds to the body of evidence suggesting that use of talc may be linked to ovarian cancer.")

[29] Washington Post, Cellphones are possible cancer risk, WHO says (June 1, 2011) ("Other substances that the group has categorized as 'possibly carcinogenic' include talcum powder, which has been possibly linked to ovarian cancer).

**Appendix A: Sample Of Pre-2014 News Articles Addressing Posited Link Between Talc Use And Ovarian Cancer**

[30] Cancer Weekly, Researchers from Pennsylvania State University Detail New Studies and Findings in the Area of Ovarian Cancer (Nov. 8, 2011) ("'A number of observational studies (largely case-control) conducted over the last two decades suggest an association between use of talc powders on the female perineum and increased risk of ovarian cancer")

[31] Women's Health Weekly, Recent findings from University of Queensland highlight research in ovarian cancer (Apr. 5, 2012) ("'Use of talcum powder in the perineal area has been associated with an increased risk of ovarian cancer")

[32] The Guardian, Ovarian cancer: a call to arms: Susan Gubar was when she was diagnosed with ovarian cancer. It wasn't exactly tragedy - her daughters fully grown, her work complete. The tragedy is the ignorance which still surrounds this neglected disease (Sept. 1, 2012) ("Asbestos exposure, talcum powder, hormone replacement therapy, and fallout from nuclear testing have all been linked to ovarian cancer")

[33] Huffington Post, Health Myths: 7 medical misconceptions exposed (May 16, 2013) ("Harvard researchers recently found that postmenopausal women who use talcum powder in their genital area just once a week increase their risk of developing endometrial cancer by 24 percent. Another Harvard study found a strong link between talcum powder use and ovarian cancer (it can increase the risk of developing the cancer by up to 40 percent.")

[34] Daily Mail, Women who regularly use talcum powder increase their risk of ovarian cancer by 24% (June 18, 2013) (The researchers analysed data from 8,525 women diagnosed with ovarian cancer and compared talcum powder use with that of 9,800 women who remained cancer-free. The results, published in the journal Cancer Prevention Research, showed regularly applying the powder particles after bathing or showering raised the risk of an ovarian tumour by 24 per cent.")

[35] Daily Mail (UK), Talc can raise ovarian cancer risk by quarter (June 19, 2013)

[36] The Sydney Morning Herald, Surprising cancer causes, (Aug. 02, 2013) ("Researchers have found a link between frequent use of talcum powder "for intimate personal hygiene" and ovarian cancer. The results published in the journal Cancer Prevention Research showed regularly applying the powder particles after bathing or showering raised the risk of an ovarian tumour by 24 per cent.")

[37] Rapid City Journal, South Dakota jury ties talc powder to cancer risk (Oct. 05, 2013) ("A federal jury in Sioux Falls has found that a woman's use of Johnson & Johnson products that contained talcum contributed to her ovarian cancer.")

[38] Reuters Legal, Johnson & Johnson failed to warn of possible talc-cancer link: jury (Oct. 8, 2013)

# APPENDIX B

**Materials Reviewed and Considered by Dr. Gregory Diette, M.D., M.H.S.**

## Expert References

Expert Report of Michael M. Crowley, Ph.D., Nov. 12, 2018 (MDL No. 2328)

Expert Report of William E. Longo, Ph.D, and Mark W. Rigler, Ph.D., Nov. 14, 2018

Expert Report of Sarah E. Kane, M.D., Nov. 15, 2018 (MDL No. 2738)

Expert Report of Rebecca Smith-Bindman, M.D., Nov. 15, 2019 (MDL No. 2738)

Expert Report of Alan Campion, Ph.D., Nov. 16, 2018 (MDL No. 2738)

Expert Report of Arch Carson, M.D., Ph.D., Nov. 16, 2018 (MDL No. 2738)

Expert Report of Daniel L. Clarke-Pearson, M.D., Nov. 16, 2018 (MDL No. 2738)

Expert Report of Robert B. Cook, Ph.D., Nov. 16, 2018 (MDL No. 2738)

Expert Report of David Kessler, M.D., Nov. 16, 2018 (MDL No. 2738)

Expert Report of Mark Krekeler, Ph.D., Nov. 16, 2018 (MDL No. 2738)

Expert Report of Shawn Levy, Ph.D., Nov. 16, 2018 (MDL No. 2738)

Expert Report of Anne McTiernan, M.D., Ph.D., Nov. 16, 2019 (MDL No. 2738)

Expert Report of Patricia Moorman, M.S.P.H., Ph.D., Nov. 16, 2018 (MDL No. 2738)

Expert Report of Laura Plunkett , Ph.D., D.A.B.T., Nov. 16, 2018 (MDL No. 2738)

Expert Report of Ghassan Saed, Ph.D., Nov. 16, 2018 (MDL No. 2738)

Expert Report of Sonal Singh, M.D., M.P.H., Nov. 16, 2018 (MDL No. 2738)

Expert Report of Jack Siemiatycki, M.Sc., Ph.D., Nov. 16, 2018 (MDL No. 2738)

Expert Report of Ellen Blair Smith, Nov. 16, 2018 (MDL No. 2738)

Expert Report of Judith Wolf, M.D., Nov. 16, 2018 (MDL No. 2738)

Expert Report of April Zambelli-Weiner, Ph.D., M.P.H., Nov. 16, 2018 (MDL No. 2738)

Expert Report of Judith Zelikoff, Ph.D., Nov. 16, 2018 (MDL No. 2738)

Deposition of Sonal Singh, M.D., M.P.H., Jan. 16, 2019 (MDL No. 2738)

Deposition of Anne McTiernan, Jan. 28, 2019 (MDL No. 2738)

Deposition of Patricia Moorman, M.S.P.H., Ph.D. Jan. 25, 2019 (MDL No. 2738)

**Materials Reviewed and Considered by Dr. Gregory Diette, M.D., M.H.S.**

Deposition of Ghassan Saed, Ph.D., Jan. 23, 2019 (MDL No. 2738)

Deposition of Ghassan Saed, Ph.D., Feb. 14, 2019 (MDL No. 2738)

Deposition of Jack Siemiatycki, Jan. 31, 2019 (MDL No. 2738)

Deposition of Rebecca Smith-Bindman, M.D., Feb. 7, 2019 (MDL No. 2738)

Deposition of Rebecca Smith-Bindman, M.D., Feb. 8, 2019 (MDL No. 2738)

Deposition of April Zambelli-Weiner, Ph.D., Jan. 11, 2019 (MDL No. 2738)

Deposition of April Zambelli-Weiner, Ph.D., Feb. 7, 2019 (MDL No. 2738)

Gynecologic Oncology Email dated Sept. 19, 2018 re: GYN-18-1020: Final Decision (Ex. 35 to the Deposition of Ghassan Saed, Ph.D., Feb. 14, 2019 (MDL No. 2738))

## Scholarly References

Acheson ED, Gardner MJ, Pippard EC, Grime LP. Mortality of two groups of women who manufactured gas masks from chrysotile and crocidolite asbestos: a 40-year follow-up. Br J Ind Med. 1982; 39(4):344-348

Aday LA, Cornelius LJ. Designing and Conducting Health Surveys: A Comprehensive Guide. 3rd ed. San Francisco, CA: 2006

Alberg AJ, Moorman PG, Crankshaw S, et al. Socioeconomic Status in Relation to the Risk of Ovarian Cancer in African-American Women: A Population-Based Case-Control Study. Am J Epidemiol. 2016; 184(4):274-283

Anand P, Kunnumakkara AB, Sundaram C, et al. Cancer is a preventable disease that requires major lifestyle changes. Pharm Res. 2008; 25(9):2097-2116

Andrade C. Understanding Relative Risk, Odds Ratio, and Related Terms. J Clin Psychiatry. 2015; 76(7):e857-861

Baandrup L, Faber MT, Christensen J, et al. Nonsteroidal anti-inflammatory drugs and risk of ovarian cancer: systematic review and meta-analysis of observational studies. Acta Obstet Gynecol Scand. 2013; 92(3):245-255

Berge W, Mundt K, Luu H, Boffetta P. Genital Use of Talc and Risk of Ovarian Cancer: A Meta-Analysis. Eur J Cancer Prev. 2018; 27(3):248-257

Berry G, Newhouse ML, Wagner JC. Mortality from all cancers of asbestos factory workers in east London 1933-80. Occup Environ Med. 2000; 57(11):782-785

Boorman GA, Seely JC. The lack of an ovarian effect of lifetime talc exposure in F344/N rats and B6C3F1 mice. Regul Toxicol Pharmacol. 1995; 21(2):242-243.

**Materials Reviewed and Considered by Dr. Gregory Diette, M.D., M.H.S.**

Bonovas S, Filioussi K, Sitaras NM. Do nonsteroidal anti-inflammatory drugs affect the risk of developing ovarian cancer? A meta-analysis. Br J Clin Pharmacol. 2005; 60(2):194-203

Booth M, Beral V, Smith P. Risk factors for ovarian cancer: a case-control study. Br J Cancer. 1989; 60(4):592-598

Camargo MC, Stayner LT, Straif K. Occupational exposure to asbestos and ovarian cancer: a meta-analysis. Environ Health Perspect. 2011; 119(9):1211-1217

Chang S, Risch HA. Perineal Talc Exposure and Risk of Ovarian Carcinoma. Cancer. 1997; 79(12):2396-2401

Chen Y, Wu PC, Lang JH, et al. Risk factors for epithelial ovarian cancer in Beijing, China. Int J Epidemiol. 1992; 21(1):23-29

Chlebowski RT, Hendrix SL, Langer RD, et al. Influence of estrogen plus progestin on breast cancer and mammography in healthy postmenopausal women: the Women's Health Initiative Randomized Trial. JAMA. 2003; 289(24):3243-3253

Colditz GA, Hankinson SE. The Nurses' Health Study: lifestyle and health among women. Nat Rev Cancer. 2005; 5(5):388-396

Cook LS, Kamb ML, Weiss NS. Perineal Powder Exposure and the Risk of Ovarian Cancer Am J Epidemiol. 1997; 145(5):459-465

Cramer DW, Liberman RF, Titus-Ernstoff L, et al. Genital Talc Exposure and Risk of Ovarian Cancer. Int J Cancer. 1999; 81(3):351-356

Cramer DW, Titus-Ernstoff L, McKolanis JR, et al. Conditions associated with antibodies against the tumor-associated antigen MUC1 and their relationship to risk for ovarian cancer. Cancer Epidemiol Biomarkers Prev. 2005; 14(5):1125-1131

Cramer DW, Vitonis AF, Terry KL, et al. The Association Between Talc Use and Ovarian Cancer: A Retrospective Case-Control Study in Two US States. Epidemiology. 2016; 27(3):334-346

Cramer DW, Welch WR, Berkowitz RS, Godleski JJ, Presence of talc in pelvic lymph nodes of a woman with ovarian cancer and long-term genital exposure to cosmetic talc. Obstet Gynecol. 2007; 110(2 Pt 2):498-501

Cramer DW, Welch WR, Scully RE, Wojciechowski CA. Ovarian cancer and talc: a case-control study. Cancer. 1982; 50(2):372-376

Cramer DW, Xu H. Epidemiologic evidence for uterine growth factors in the pathogenesis of ovarian cancer. Ann Epidemiol. 1995; 5(4):310-314

Elwood JM. Causal Relationships in Medicine: A Practical System for Critical Appraisal. Oxford: 1988, 163-182

**Materials Reviewed and Considered by Dr. Gregory Diette, M.D., M.H.S.**

Endo-Capron S, Renier A, Janson X, et al. In vitro response of rat pleural mesothelial cells to talc samples in genotoxicity assays (sister chromatid exchanges and DNA repair). Toxicol In Vitro. 1993; 7(1):7-14

Ferrante D, Bertolotti M, Todesco A, et al. Cancer mortality and incidence of mesothelioma in a cohort of wives of asbestos workers in Casale Monferrato, Italy. Environ Health Perspect. 2007; 115(10):1401-1405

Fiume MM, Boyer I, Bergfeld WF, et al. Safety Assessment of Talc as Used in Cosmetics. Int J Toxicol. 2015; 34(1 Suppl):66S-129S

Fowler FJ Jr. Survey Research Methods. 5th ed. Thousand Oaks, CA: 2014

Gates MA, Rosner BA, Hecht JL, Tworoger SS. Risk Factors for Epithelial Ovarian Cancer by Histologic Subtype. Am J Epidemiol. 2010; 171(1):45-53

Gates MA, Tworoger SS, Terry KL, et al. Talc use, variants of the GSTM1, GSTT1, and NAT2 genes, and risk of epithelial ovarian cancer. Cancer Epidemiol Biomarkers Prev. 2008; 17(9):2436-2444

Germani D, Belli S, Bruno C, et al. Cohort mortality study of women compensated for asbestosis in Italy. Am J Ind Med. 1999; 36(1):129-134

Gertig DM, Hunter DJ, Cramer DW, et al. Prospective Study of Talc Use and Ovarian Cancer. J Natl Cancer Inst. 2000; 92(3): 249-252

Godard B, Foulkes WD, Provencher D, et al. Risk factors for familial and sporadic ovarian cancer among French Canadians: a case-control study. Am J Obstet Gynecol. 1998; 179(2):403-410

Gonzalez NL, O'Brien KM, D'Aloisio AA, Sandler DP, Weinberg CR. Douching, Talc Use, and Risk of Ovarian Cancer. Epidemiology. 2016; 27(6): 797-802

Gordis L. Epidemiology. 5th ed. Philadelphia, PA: 2014

Green A, Purdie D, Bain C, et al. Tubal sterilisation, hysterectomy and decreased risk of ovarian cancer. Survey of Women's Health Study Group. Int J Cancer. 1997; 71(6):948-951

Hamilton TC, Fox H, Buckley CH, et al. Effects of talc on the rat ovary. Br J Exp Pathol. 1984; 65(1):101-106

Harlow BL, Cramer DW, Bell DA, Welch WR. Perineal exposure to talc and ovarian cancer risk. Obstet Gynecol. 1992; 80(1):19-26

Harlow BL, Weiss NS. A case-control study of borderline ovarian tumors: the influence of perineal exposure to talc. Am J Epidemiol. 1989; 130(2):390-394

**Materials Reviewed and Considered by Dr. Gregory Diette, M.D., M.H.S.**

Hartge P, Hoover R, Lesher LP, McGowan L. Talc and Ovarian Cancer. JAMA. 1983; 250(14):1844

Hartge P, Stewart P. Occupation and ovarian cancer: a case-control study in the Washington, DC, metropolitan area, 1978-1981. J Occup Med. 1994; 36(8):924-927

Health Canada, Draft screening assessment talc ($Mg_3H_2(SiO_3)_4$), Chemical Abstracts Service Registry Number 14807-96-6, https://www.canada.ca/content/dam/eccc/documents/pdf/pded/talc/Draft-screening-assessment-talc.pdf

Health Canada, Risk management scope for talc ($Mg_3H_2(SiO_3)_4$), Chemical Abstracts Service Registry Number 14807-96-6, 2018.

Heller DS, Gordon RE, Westhoff C, Gerber S. Asbestos exposure and ovarian fiber burden. Am J Ind Med. 1996; 29(5):435-439.

Heller DS, Westhoff C, Gordon RE, Katz N. The Relationship Between Perineal Cosmetic Talc Usage and Ovarian Talc Particle Burden. Am J Obstet Gynecol. 1996; 174(5):1507-1510

Hill AB. The Environment and Disease: Association or Causation? Proc R Soc Med. 1965; 58(5):295-300

Houghton SC, Reeves KW, Hankinson SE, et al. Perineal Powder Use and Risk of Ovarian Cancer. J Natl Cancer Inst. 2014; 106(9): dju208

Huncharek M, Geschwind JF, Kupelnick B. Perineal application of cosmetic talc and risk of invasive epithelial ovarian cancer: a meta-analysis of 11,933 subjects from sixteen observational studies. Anticancer Res. 2003; 23(2C):1955-1960

International Agency for Research on Cancer, Monographs on the Evaluation of Carcinogenic Risks to Humans Vol. 100C: Asbestos (Chrysotile, Amosite, Crocidolite, Tremolite, Actinolite, and Anthophyllite) 253 (2012)

International Agency for Research on Cancer, Monographs on the Evaluation of Carcinogenic Risks to Humans Vol. 93: Carbon Black, Titanium Dioxide, and Talc 18-19 (2010)

Jordan SJ, Green AC, Whiteman DC, Webb PM, Australian Ovarian Cancer Study Group. Risk factors for benign, borderline and invasive mucinous ovarian tumors: epidemiological evidence of a neoplastic continuum? Gynecol Oncol. 2007; 107(2):223-230

Jordan SJ, Green AC, Whiteman DC, Webb PM. Risk factors for benign serous and mucinous epithelial ovarian tumors. Obstet Gynecol. 2007; 109(3):647-654

Kotsopoulos J, Terry KL, Poole EM, et al. Ovarian cancer risk factors by tumor dominance, a surrogate for cell of origin. Int J Cancer. 2013; 133(3):730-739

**Materials Reviewed and Considered by Dr. Gregory Diette, M.D., M.H.S.**

Kurta ML, Moysich KB, Weissfeld JL, et al. Use of fertility drugs and risk of ovarian cancer: results from a U.S.-based case-control study. Cancer Epidemiol Biomarkers Prev. 2012; 21(8):1282-1292

Langseth H, Hankinson SE, Siemiatycki J, Weiderpass E. Perineal Use of Talc and Risk of Ovarian Cancer. J Epidemiol Community Health. 2008; 62(4):358-360

Lee P, Sun L, Lim CK, et al. Selective apoptosis of lung cancer cells with talc. Eur Respir J. 2010; 35(2):450-452

Letter from Food & Drug Administration, U.S. Department of Health and Human Services, to Samuel S. Epstein, M.D., Cancer Prevention Coalition, University of Illinois (Apr. 1, 2014)

Magnani C, Ferrante D, Barone-Adesi F, et al. Cancer risk after cessation of asbestos exposure: a cohort study of Italian asbestos cement workers. Occup Environ Med. 2008; 65(3):164-170

Malmberg K, Klynning C, Flöter-Rådestad A, Carlson JW. Serous tubal intraepithelial carcinoma, chronic fallopian tube injury, and serous carcinoma development. Virchows Arch. 2016; 468(6):707-713

Mayo Clinic, Cancer (Dec. 12, 2018), https://www.mayoclinic.org/diseases-conditions/cancer/symptoms-causes/syc-20370588

Merritt MA, Green AC, Nagle CM, et al. Talcum powder, chronic pelvic inflammation and NSAIDs in relation to risk of epithelial ovarian cancer. Int J Cancer. 2008; 122(1):170-176

Mills PK, Riordan DG, Cress RD, Young HA. Perineal talc exposure and epithelial ovarian cancer risk in the Central Valley of California. Int J Cancer. 2004; 112(3):458-464

Moorman PG, Palmieri RT, Akushevich L, et al. Ovarian cancer risk factors in African-American and white women. Am J Epidemiol. 2009; 170(5):598-606

Muscat JE, Huncharek MS. Perineal talc use and ovarian cancer: a critical review. Eur J Cancer Prev. 2008; 17(2):139-146

Nasreen N, Mohammed KA, Brown S, et al. Talc mediates angiostasis in malignant pleural effusions via endostatin induction. Eur Respir J. 2007; 29(4):761-769

National Cancer Institute, NCI Dictionary of Cancer Terms, "hazard ratio," https://www.cancer.gov/publications/dictionaries/cancer-terms/def/hazard-ratio.

National Cancer Institute, Ovarian, Fallopian Tube, and Primary Peritoneal Cancer Prevention (PDQ®)–Health Professional Version, https://www.cancer.gov/types/ovarian/hp/ovarian-prevention-pdq (last updated Jan. 4, 2019)

Ness RB, Grisso JA, Cottreau C, et al. Factors related to inflammation of the ovarian epithelium and risk of ovarian cancer. Epidemiology. 2000; 11(2):111-117

**Materials Reviewed and Considered by Dr. Gregory Diette, M.D., M.H.S.**

Ni X, Ma J, Zhao Y, et al. Meta-analysis on the association between non-steroidal anti-inflammatory drug use and ovarian cancer. Br J Clin Pharmacol. 2013; 75(1):26-35

Okada, F. Beyond foreign-body-indiced carcinogenesis: Impact of reactive oxygen species deived from inflammatory cells in tumorigenic conversation and tumor progression. Int. J. Cancer. 2007; 121:2364-2372.

Penninkilampi R, Eslick GD. Perineal Talc Use and Ovarian Cancer: A Systematic Review and Meta-Analysis. Epidemiology. 2018; 29(1):41-49

Peres LC, Risch H, Terry KL, et al. Racial/ethnic differences in the epidemiology of ovarian cancer: a pooled analysis of 12 case-control studies. Int J Epidemiol. 2018; 47(2):460-472

Purdie DM, Bain CJ, Siskind V, et al. Ovulation and risk of epithelial ovarian cancer. Int. J. Cancer. 2003; 104:228-232.

Pira PE, Coggiola M, Ciocan C, et al. Mortality of Talc Miners and Millers from Val Chisone, Northern Italy: An Updated Cohort Study. J Occup Environ Med. 2017; 59(7):659-664

Purdie D, Green A, Bain C, et al. Reproductive and other factors and risk of epithelial ovarian cancer: an Australian case-control study. Survey of Women's Health Study Group. Int J Cancer. 1995; 62(6):678-684

Reid A, de Klerk N, Musk AW. Does exposure to asbestos cause ovarian cancer? A systematic literature review and meta-analysis. Cancer Epidemiol Biomarkers Prev. 2011; 20(7):1287-1295

Reid A, Heyworth J, de Klerk NH, Musk B. Cancer Incidence Among Women and Girls Environmentally and Occupationally Exposed to Blue Asbestos at Wittenoom, Western Australia. Int J Cancer. 2008; 122(10):2337-2344

Reid A, Segal A, Heyworth JS, et al. Gynecologic and breast cancers in women after exposure to blue asbestos at Wittenoom. Cancer Epidemiol Biomarkers Prev. 2009; 18(1):140-147

Rosenblatt KA, Szklo M, Rosenshein NB. Mineral fiber exposure and the development of ovarian cancer. Gynecol Oncol. 1992; 45(1):20-25

Rosenblatt KA, Weiss NS, Cushing-Haugen KL. Genital powder exposure and the risk of epithelial ovarian cancer. Cancer Causes Control. 2011; 22(5):737-742

Rothman KJ, Pastides H, Samet J. Interpretation of Epidemiologic Studies on Talc and Ovarian Cancer 4 (Nov. 28, 2000), https://ntp.niehs.nih.gov/ntp/newhomeroc/roc12/mcewen-07-14-04.pdf

Schildkraut JM, Abbott SE, Alberg AJ, et al. Association between Body Powder Use and Ovarian Cancer: The African American Cancer Epidemiology Study (AACES). Cancer Epidemiol Biomarkers Prev. 2016; 25(10):1411-1417

Seifert, B. Validity criteria for exposure assessment methods. The Science of the Total Environment. 1995; 168: 101-107.

Taher MK, Farhat N, Karyakina NA, et al. Systematic Review and Meta-Analysis of the Association Between Perineal Use of Talc and Risk of Ovarian Cancer (2018) (unpublished manuscript)

TalcDataResults-janehall.xlsx

Terry KL, Karageorgi S, Shvetsov YB, et al. Genital Powder Use and Risk of Ovarian Cancer: A Pooled Analysis of 8,525 Cases and 9,859 Controls. Cancer Prev Res (Phila). 2013; 6(8):811-821

Trabert B, Ness RB, Lo-Ciganic WH, et al. Aspirin, nonaspirin nonsteroidal anti-inflammatory drug, and acetaminophen use and risk of invasive epithelial ovarian cancer: a pooled analysis in the Ovarian Cancer Association Consortium. J Natl Cancer Inst. 2014; 106(2):djt431

Trabert B, Poole EM, White E, et al. Analgesic Use and Ovarian Cancer Risk: An Analysis in the Ovarian Cancer Cohort Consortium. J Natl Cancer Inst. 2019; 111(2):137-145

Tzonou A, Polychronopoulou A, Hsieh CC, et al. Hair dyes, analgesics, tranquilizers and perineal talc application as risk factors for ovarian cancer. Int J Cancer. 1993; 55(3):408-410

Wergeland E, Andersen A, Baerheim A. Morbidity and mortality in talc-exposed workers. Am J Ind Med. 1990; 17(4):505-513

Whittemore AS, Wu ML, Paffenbarger RS Jr, et al. Personal and environmental characteristics related to epithelial ovarian cancer. II. Exposures to talcum powder, tobacco, alcohol, and coffee. Am J Epidemiol. 1988; 128(6):1228-1240

Wignall BK, Fox AJ. Mortality of female gas mask assemblers. Br J Ind Med. 1982; 39(1):34-38

Wong C, Hempling RE, Piver MS, et al. Perineal talc exposure and subsequent epithelial ovarian cancer: a case-control study. Obstet Gynecol. 1999; 93(3):372-376

Wu AH, Pearce CL, Tseng CC, et al. Markers of inflammation and risk of ovarian cancer in Los Angeles County. Int J Cancer. 2009; 124(6):1409-1415

Wu AH, Pearce CL, Tseng CC, Pike MC. African Americans and Hispanics Remain at Lower Risk of Ovarian Cancer Than Non-Hispanic Whites after Considering Nongenetic Risk Factors and Oophorectomy Rates. Cancer Epidemiol Biomarkers Prev. 2015; 24(7):1094-100

Yaker A, Benirschke K. A ten year study of ovarian tumors. Virchows Arch A Pathol Anat Histol. 1975; 366(4):275-86

# APPENDIX C

**CURRICULUM VITAE**
**The Johns Hopkins University School of Medicine**

June 2017

**GREGORY B. DIETTE, MD, MHS**

**DEMOGRAPHIC AND PERSONAL INFORMATION**

**Current Appointment:**

*University:*  Professor of Medicine
Division of Pulmonary and Critical Care Medicine
The Johns Hopkins University School of Medicine
Baltimore, MD

Division of General Internal Medicine
The Johns Hopkins University School of Medicine
Baltimore, MD

Department of Epidemiology
The Johns Hopkins University Bloomberg School of Public Health
Baltimore, MD

Department of Environmental Health Sciences
Johns Hopkins University Bloomberg School of Public Health
Baltimore, MD

**Personal Data:**

*Business Address:*

Division of Pulmonary and Critical Care Medicine
The Johns Hopkins University School of Medicine
1830 East Monument Street, 5th Floor
Baltimore, MD  21205
Telephone (410) 955-3467/3468
FAX (410) 367-2014
E-mail: gdiette@jhmi.edu

**Education and Training**

| | | |
|---|---|---|
| 1981-1986 | B.S. | The University of Pennsylvania Wharton School, Philadelphia, PA. BS degree in economics. Concentration: Management of Entrepreneurship |
| 1981-1986 | B.A. | The University of Pennsylvania School of Arts and Sciences Philadelphia, PA. English; Minor in Chemistry |
| 1986-1990 | M.D. | Temple University School of Medicine, Philadelphia, PA |
| 1995-1997 | M.H.S. | Johns Hopkins University, School of Hygiene and Public Health Epidemiology; Clinical Epidemiology |

**Post-Doctoral Training**

| | |
|---|---|
| 1990-1993 | Intern-Resident, Department of Internal Medicine, Hospital of the University of Pennsylvania, Philadelphia, PA |
| 1994-1995 | Clinical Fellow, Division of Pulmonary and Critical Care, Johns Hopkins University School of Medicine, Baltimore, MD |
| 1995-1998 | Research Fellow, Division of Pulmonary and Critical Care, Johns Hopkins University School of Medicine, Baltimore, MD |

**Professional Experience:**

| | |
|---|---|
| 1991-1993 | Assistant Clinical Instructor, University of Pennsylvania School of Medicine, Philadelphia, PA |
| 1993-1994 | Clinical Instructor, University of Pennsylvania School of Medicine, Philadelphia, PA |
| 1993-1994 | Attending Physician, Full-time, Department of Emergency Medicine, Hospital of the University of Pennsylvania, Philadelphia, PA |
| 1996-1999 | Senior Physician Scientist, Quality Assessment and Improvement Systems Division, Covance Health Economics and Outcomes Services. Washington, D.C. |
| 1998-2000 | Instructor, Departments of Medicine and Epidemiology, Johns Hopkins University, Baltimore, MD |
| 1998-present | Attending Physician, Department of Medicine, Johns Hopkins Hospital and Johns Hopkins Bayview Medical Center, Baltimore, MD Duties include outpatient practice devoted to adult asthma and general pulmonary medicine; inpatient care in acute care hospital and intensive care units. |
| 1998-2005 | Core Faculty, Program for Medical Practice and Technology Assessment, Johns Hopkins University, Baltimore, MD |

| 2000-2005 | Assistant Professor of Medicine, Departments of Medicine and Epidemiology, Johns Hopkins University, Baltimore, MD |
|---|---|
| 2005-2011 | Associate Professor of Medicine, Departments of Medicine and Epidemiology, Johns Hopkins University, Baltimore, MD |
| 2001-2015 | Director of Clinical Research, Division of Pulmonary and Critical Care Medicine, Johns Hopkins University School of Medicine, Baltimore, MD. |
| 2011-Present | Professor of Medicine, Schools of Medicine and Public Health, Johns Hopkins University, Baltimore, MD |
| 2011-Present | Director, Obstructive Lung Disease Program, Division of Pulmonary and Critical Care Medicine, Johns Hopkins University, Baltimore, MD |

## RESEARCH ACTIVITIES

**Original Research**

1.  Grasso M, Weller WE, Shaffer TJ, **Diette GB**, Anderson GF.  Capitation, Managed Care, and Chronic Obstructive Pulmonary Disease.  American Journal of Respiratory and Critical Care Medicine 1998;158:133-138.

2.  **Diette GB**, White P, Terry P, Jenckes M, Wise RA, Rubin H.  Quality Assessment through Patient Self-Report of Symptoms Pre- and Post- Fiberoptic Bronchoscopy. Chest 1998;114:1446-1453.

3.  **Diette GB**, Wiener CM, White P. The Higher Risk of Bleeding in Lung Transplant Recipients from Bronchoscopy is Independent of Traditional Bleeding Risks: Results of a Prospective Cohort Study. Chest 1999;115:397-402.

4.  **Diette GB**, Wu AW, Skinner EA, Clark R, Markson L, McDonald R, Huber M, Markson L, Steinwachs D.  Treatment Patterns Among Adult Asthmatics: Factors Associated with Overuse of Inhaled β-Agonists and Underuse of Inhaled Corticosteroids. Archives of Internal Medicine 1999;159: 2697-2704.

5.  Barr LF, Campbell SE, **Diette GB**, Gabrielson EW, Kim S, Shim H, Dang CV. C-Myc Suppresses the Tumorigenicity of Lung Cancer Cells and Down-regulates Vascular Endothelial Growth Factor Expression. Cancer Research 2000; 60:143-9.

6.  **Diette GB**, White P, Terry P, Jenckes M, Rosenthal D, Rubin HR.  Utility of On-site Cytopathology Assessment for Bronchoscopic Evaluation of Lung Masses and Adenopathy. Chest 2000; 117:1186-1190.

7.  Lechtzin N, Rubin HR, Jenckes M, White P, Zhou L, Thompson DA, **Diette GB**. Predictors of Pain Control in Patients Undergoing Flexible Bronchoscopy. American Journal of Respiratory and Critical Care Medicine 2000; 162:440-445.

8.  **Diette GB,** Markson L, Skinner EA, Nguyen TTH, Algatt-Bergstrom P, Clark R, Wu AW. Nocturnal Asthma in Children Affects School Attendance, School Performance and Parents' Work Attendance. Archives of Pediatric and Adolescent Medicine 2000;154:923-928.

9.  **Diette GB**, Skinner EA, Markson L, Algatt-Bergstrom P, Nguyen TTH, Clark RD, Wu AW. Consistency of Care with National Guidelines for Children with Asthma in Managed Care. Journal of Pediatrics 2001;138:59-64.

10. Lechtzin N, Wiener CM, Clawson L, Chaudhry V, **Diette GB**. Hospitalization in amyotrophic lateral sclerosis: Causes, Costs and Outcomes. Neurology 2001;56:753-757.

11. Krishnan JA, **Diette GB**, Skinner EA, Clark BD, Steinwachs D, Wu AW. Race and Sex Differences in Consistency of Care with National Asthma Guidelines in Managed Care Organizations. Archives of Internal Medicine 2001;161:1660-1668.

12. **Diette GB**, Skinner EA, Nguyen TTH, Markson L, Clark BD, Wu AW. Comparison of Quality of Care of Specialist and Generalist Physicians as Usual Source of Asthma Care for Children. Pediatrics 2001;108: 432-437.

13. Wu AW, Young Y, Skinner EA, **Diette GB**, Vogeli C, Huber M, Peres A, Steinwachs D. Quality of Care and Outcomes of Adult Asthmatics Treated by Specialists and Generalists in Managed Care. Archives of Internal Medicine 2001;161:2554-2560.

14. Rubin HR, Pronovost P, **Diette GB**. From a Process of Care to a Measure: The Development and Testing of a Quality Indicator. International Journal for Quality in Health Care 2001; 13: 489-496.

15. Rubin HR, Pronovost P, **Diette GB**. The advantages and disadvantages of process-based measures of health care quality.  International Journal for Quality in Health Care 2001; 13: 469-474.

16. Lechtzin N, Wiener CM, Shade DM, Clawson L, **Diette GB.** Spirometry in the supine position improves the detection of diaphragmatic weakness in ALS. Chest 2002; 121: 436-442.

17. Wolfenden LL, **Diette GB**, Skinner EA, Steinwachs DM, Wu AW. Gaps in Asthma Care of the Oldest Adults. Journal of the American Geriatrics Society 2002; 50: 877-883.

18. **Diette GB**, Krishnan J, Dominici F, Haponik E, Skinner EA, Steinwachs D, Wu AW. Asthma in older patients: Factors associated with hospitalization. Archives of Internal Medicine 2002;162:1123-1132.

19. Lechtzin N, Rothstein J, **Diette GB**, Wiener CM. Amyotrophic Lateral Sclerosis: Evaluation and Treatment of Respiratory Impairment. Amyotrophic Lateral Sclerosis and Other Motor Neuron Diseases 2002;3:5-13.

20. Allen-Ramey FC, Clawson L, **Diette GB**, McDonald RC, Skinner EA, Steinwachs DM, Wu AW. Methods Aimed at Improving Asthma Care and Outcomes Management.  Disease Management & Health Outcomes 2002;10(8):495-503.

21. Lechtzin N, Rubin HR, Jenckes M, White P, **Diette GB**. Patient satisfaction with bronchoscopy. American Journal of Respiratory and Critical Care Medicine 2002;166: 1326-1331.

22. Scatarige JD, **Diette GB**, Merriman B, Haponik EF, Fishman EK. Availability, Requesting Practices, and Barriers to Referral for High-Resolution Computed Tomography of the Lungs: Results of a Survey of U.S. Pulmonologists. Academic Radiology 2002;9:1370-1377.

5

23.     Srinivasan A, Wolfenden LL, Song X, Hartsell T, Jones HD, **Diette GB**, Orens JB, Yung RC, Ross TL, Mackie K, Merz W, Scheel PJ, Haponik EF, Perl TM. An outbreak of *Pseudomonas aeruginosa* associated with flexible bronchoscopes.  New England Journal of Medicine 2003 Jan 16;348: 221-7.

24.     Wolfenden LL, **Diette GB**, Krishnan JA, Skinner EA, Steinwachs DM, Wu AW. Lower physician estimate of underlying asthma severity leads to under-treatment. Archives of Internal Medicine 2003; 163:231-6.

25.     Scatarige JD, **Diette GB**, Merriman B, Haponik EF, Fishman EK. Utility of High-resolution CT for Management of Patients with Diffuse Lung Disease: Results of a Survey of U.S. Pulmonary Physicians. Academic Radiology 2003; 10:167-175.

26.     Scatarige JD, **Diette GB**, Merriman B, Fishman EK. Physician Satisfaction with HRCT Services Provided by Radiologists: Results of a Nationwide Survey of American Pulmonary Sub-specialists. American Journal of Roentgenology 2003; 180:585-589.

27.     **Diette GB**, Lechtzin N, Haponik E, Devrotes A, Rubin HR. Distraction Therapy with Nature Sights and Sounds Reduces Pain During Flexible Bronchoscopy: A Complementary Approach to Routine Analgesia. Chest 2003; 123(3):941-948.

28.     Patil S, Krishnan JA, Lechtzin N, **Diette GB**.  In-Hospital Mortality Following Acute Exacerbation of Chronic Obstructive Pulmonary Disease. Archives of Internal Medicine 2003 May 26;163(10): 1180-6.

29.     Hehn BT, Haponik E, Rubin HR, Lechtzin N, **Diette GB**. The Relationship of Age to Process of Care and Patient Tolerance of Bronchoscopy. Journal of the American Geriatrics Society 2003 51:917-922.

30.     Krishnan JA, Parce PB, Martinez T, **Diette GB**, Brower RG.  Caloric Intake in Medical Intensive Care Unit Patients: Consistency of Care with Guidelines and Relationship to Clinical Outcomes. Chest 2003; 124:297-305.

31.     Rubinson L, Wu AW, Haponik EF, **Diette GB**.  Internists' Adherence to Guidelines for Prevention of Intravascular Catheter Infections. JAMA 2003;290(21):2802.

32.     Alberg AJ, **Diette** GB, Ford JG. Invited Commentary:  Attendance and Absence as Markers of Health Status – The Example of Active and Passive Cigarette Smoking. Am J Epidemiol 2003; 157:870-873.

33.     Lechtzin N, Wiener CM, Clawson L, Davidson MC, Anderson F, Gowda N, **Diette GB** and the ALS CARE Study Group. Use of noninvasive ventilation in patients with amyotrophic lateral sclerosis. ALS and Other Motor Neuron Disorders 2004;5(1):9-15.

34.     Rubinson L, **Diette GB**, Song X. Brower RG, Krishnan JA. Low Caloric Intake is Associated with Nosocomial Blood Stream Infections in Patients in the Medical Intensive Care Unit. Critical Care Medicine 2004;32(2)350-357.

35.     Hansel NN, Wu AW, Chang B, **Diette GB**. Quality of Life in Tuberculosis: Patient and Provider Perspectives. Quality of Life Research 2004;13:639-652.

36.     Yurk R, **Diette GB**, Skinner EA, Steinwachs DM, Wu AW. Predicting Patient Reported Asthma Outcomes for Adults in Managed Care.  American  Journal of Managed Care 2004;10:321-328.

37.     Swartz LJ, Callahan KA, Butz AM, Rand CA, Kanchanaraksa S, **Diette GB**, Krishnan JA, Breysse PN, Buckley TJ, Mosley AM, Eggleston PA. Methods and Issues in Conducting a Community-Based Environmental Randomized Trial. Environmental Research 2004 June;95(2):156-65.

38.     Matsui EC, Krop EJM, **Diette GB**, Aalberse RC, Smith AL, Eggleston PA. Mouse Allergen Exposure and Immunologic Responses: IgE-Mediated Mouse Sensitization, Mouse-Specific IgG and IgG4. Annals of Allergy, Asthma and Immunology 2004; 93(2):171-8.

39.     Hansel NN, Merriman B, Haponik EF, **Diette GB**. Hospitalizations for Tuberculosis in the United States in 2000: Predictors of In-hospital Mortality. Chest 2004; 126(4):1079-86.

40.     Okelo S, Wu AW, Krishnan J, Rand CS, Skinner EA, **Diette GB**. Emotional Quality of Life and Outcomes in Adolescents with Asthma. Journal of Pediatrics 2004; 145(4):523-9.

41.     Chang B, Wu AW, Hansel NN, **Diette GB**. Quality of life in tuberculosis: A review of the English language literature. Quality of Life Research 2004; 13:1633-1642.

42.     **Diette GB**, Krishnan JA, Wolfenden LL, Skinner EA, Steinwachs DM, Wu AW. Relationship of Physician Estimate of Underlying Asthma Severity to Asthma Outcomes. Annals of Allergy, Asthma and Immunology 2004; 93(6):546-52.

43.     Huang I, **Diette GB,** Dominici F, Frangakis C, Wu AW. Variations of Physician Group Profiling Indicators for Asthma Care. Am J Managed Care. 2004;10:38-44.

44.     Skinner EA, **Diette GB**, Algatt-Bergstrom P, Nguyen TTH, Clark B, Markson LE, Wu AW. The Asthma Therapy Assessment Questionnaire (ATAQ) for Children and Adolescents. Disease Management. 2004;7:305-313.

45.     Huang I, Dominici F, Frangakis C, **Diette GB,** Damberg CL, Wu AW.  Is risk-adjustor selection more important that statistical approach for provider profiling? Asthma as an example. Medical Decision Making. 2005 Jan-Feb 25(1):20-34.

46.     Sapkota A, Symons JM, Kleissl J, Wang L, Parlange MB, Ondov J, Breysse PN, **Diette GB**, Eggleston PA, and Buckley TJ. Impact of the 2002 Canadian forest fires on particulate matter air quality in Baltimore city. Environmental Science Technology 2005 Jan 1;39(1):24-32.

47.     Huang I, Frangakis C, Dominici F, **Diette GB**, Wu, AW.  Application of a propensity score approach for risk adjustment in profiling multiple physician groups on asthma care. Health Services Research. 2005;40(1):253-278.

48.     **Diette** GB, Scatarige JC, Haponik EF, Merriman B, Fishman EK. Do High-Resolution CT Findings of Usual Interstitial Pneumonitis Obviate Lung Biopsy? Respiration. 2005;72:134-141.

49.     Breysse PN, Buckley TJ, Williams D, Beck CM, Kanchanaraksa S, Swartz LJ, Callahan KA, Butz AM, Rand CS, **Diette GB**, Krishnan JA, Moseley AM, Curtin-Brosnan J, Durkin NB, Eggleston PA.

Indoor Exposures to Air Pollutants and Allergens in the Homes of Asthmatic Children in Inner-City Baltimore. Environmental Research. 2005;98:167-176.

50.    Hansel NN, Hilmer SC, Georas SN, Cope LM, Guo J, Irizarry RA, **Diette GB**. Oligonucleotide Microarry Analysis of Peripheral Blood Lymphocytes in Severe Asthma. Journal of Laboratory and Clinical Medicine 2005 May;145(5):263-274.

51.    Girgis RE, Champion HC, **Diette GB**, Johns RA, Permutt S, Sylvester JT.  Decreased Exhaled Nitric Oxide in Pulmonary Arterial Hypertension: Response to Bosentan Therapy. American Journal of Respiratory and Critical Care Med Medicine 2005;172(3):352-7.

52.    Rubinson L, Wu AW, Haponik EF, **Diette GB**. Why is it that internists do not follow guidelines for preventing intravascular catheter infections? Infection Control Hospital Epidemiology 2005;26(6):525-533.

53.    Wanner TJ, Gerhardt SG, **Diette GB**, Orens JB. The Utility of Cytopathology Testing in Lung Transplant Recipients. J Heart and Lung Transplant. 2005;24(7):870-874.

54.    Matsui EC, **Diette GB**, Krop EJM, Aalberse RC, Smith AL, Curtin-Brosnan J, Eggleston PA. Mouse allergen-specific immunoglobulin G and immunoglobulin G4 and allergic symptoms in immunoglobulin E-sensitized laboratory animal workers. Clin Exp Allergy. 2005;35:1347-1353.

55.    Eggleston PA, **Diette GB**, Lipsett M, Lewis T, Tager I, McConnell R, Chrischilles R, Lanphear B, Miller R, Krishnan J. Lessons Learned for the Study of Childhood Asthma from the Centers for Children's Environmental Health and Disease Prevention Research. Environ Health Perspect. 2005;113(10):1430-1436.

56.    Eggleston PA, Butz A, Rand C, Curtin-Brosnan J, Kanchanaraksa S, Swartz L, Breysse P, Buckley T, **Diette GB**, Merriman B, Krishnan J. Home environmental intervention in inner-city asthma: a randomized controlled clinical trial. Ann Allergy Asthma and Immunology. 2005;95(6):496-497.

57.    Weiss CR, Scatarige JC, **Diette GB**, Haponik EF, Merriman B, Fishman, EK. CT Pulmonary Angiography is the First-Line Imaging Test for Acute Pulmonary Embolism: A Survey of US Clinicians. Academic Radiology. 2006 Apr; 13(4):434-46.

58.    Colom AJ, Teper AM, Vollmer WM, **Diette GB.** Risk Factors for the Development of Bronchiolitis Obliterans in Children with Bronchiolitis. Thorax. 2006 Jun; 61(6):462-3.

59.    Scatarige JC, Weiss CR, **Diette GB**, Haponik EF, Merriman B, Fishman EK. Scanning Systems and Protocols used during imaging for Acute Pulmonary Embolism:  How Much do our Clinical Colleagues Know?  Academic Radiology. 2006; 13:678-685.

60.    Matsui EC, **Diette GB**, Krop EJM, Aalberse RC, Smith AL, Eggleston PA. Mouse Allergen-specific Immunoglobulin G4 and risk of mouse skin test sensitivity. Clin Exper Allergy. 2006;36(8): 1097-103.

61.    Krishnan V, **Diette GB**, Rand CS, Bilderback AL, Merriman BJ, Hansel NN, Krishnan JA. Mortality in patients hospitalized for asthma exacerbations in the United States. Am J Resp Crit Care Med. 2006 Jun 15;174(6):633-8.

62.   Lechtzin N, John M, Irizarry R, Merlo C, **Diette GB**, Boyle MP. Outcomes of Adults with Cystic Fibrosis Infected with Antibiotic Resistant *Pseudomonas aeruginosa*. Respiration. 2006;73(1):27-33.

63.   Hansel NN, Eggleston PA, Krishnan JA, Curtin-Brosnan J, Rand CS, Patino CM, **Diette GB**. Asthma-Related Health Status Determinants of Environmental Control Practices for Inner-City Pre-School Children. Annals of Allergy, Asthma & Immunology. 2006 Sep; 97(3):409-17.

64.   Matsui EC, Eggleston PA, Buckley TJ, Krishnan JA, Breysse P, Rand C, **Diette GB**. Household Mouse Allergen Exposure and Asthma Morbidity in Inner-City Pre-School Children. Annals of Allergy, Asthma & Immunology. 2006; 97(4): 514-20.

65.   Hansel NN, Rand CS, Krishnan JA, Okelo S, Breysse PN, Eggleston PA, Matsui E, Curtin-Brosnan J, **Diette GB**. Influence of Caregiver's Health Beliefs and Experiences on their Use of Environmental Control Practices in Homes of Pre-School Children with Asthma. Pediatric Asthma, Allergy & Immunology. 2006;19(4):231-242.

66.   Matsui EC, Eggleston PA, Breysse PN, Rand CS, **Diette GB**. Mouse allergen-specific antibody responses in inner-city children with asthma. Journal of Allergy and Clinical Immunology 2007;119(4):910-5.

67.   Schmier JK, Manjunath R, Halpern MT, Jones ML, Thompson K, **Diette GB**. The impact of inadequately controlled asthma in urban children on quality of life and productivity. Annals of Allergy Asthma Immunology 2007;98(3):245-251.

68.   Okelo SO, Wu AW, Merriman B, Krishnan JA, **Diette GB**. Are Physician Estimates of Asthma Severity Less Accurate in Black than in White Patients? Journal of General Internal Medicine 2007;22(7):976-81.

69.   Han MK, Kim MG, Mardon R, Renner P, Sullivan S, **Diette GB,** Martinez FJ. Spirometry utilization for COPD? How do we measure up?  Chest. 2007;132(2):403-9.

70.   **Diette GB**, Patino CM, Merriman B, Paulin L, Okelo S, Thompson K, Krishnan JA, Quartey R, Perez-Williams D, Rand C. Patient Factors that Physicians Use to Assign Asthma Treatment. Archives of Internal Medicine. 2007;167(13):1360-6.

71.   Sharma HP, Matsui EC, Eggleston PA, Hansel NN, Curtin-Brosnan J, **Diette GB**. Does current asthma control predict future health care use among black preschool-aged inner-city children? Pediatrics. 2007 Nov;120(5):e1174-81.

72.   **Diette GB**, Hansel NN, Buckley TJ, Curtin-Brosnan J, Eggleston PA, Matsui EC, McCormack MC, Williams DL, Breysse PN. Home indoor pollutant exposures among inner-city children with and without asthma. Environmental Health Perspectives. 2007 Nov;115(11):1665-9.

73.   Weiss CR, **Diette GB**, Haponik EF, Merriman B, Scatarige JC, Fishman EK. Pretest risk assessment in suspected acute pulmonary embolism. Academic Radiology. 2008 Jan;15(1):3-14.

74.   Hansel NN, Cheadle C, **Diette GB**, Wright J, Thompson KM, Barnes KC, Georas SN. Analysis of CD4+T cell gene expression in allergic subjects using two different microarray platforms. Allergy. 2008;63:366-369.

75.   Okelo SO, Patino CM, Hansel NN, Eggleston PA, Krishnan JA, Rand CS, **Diette GB**. Use of Asthma Specialist Care in High-Risk Inner-City Black Children. Pediatric Asthma Allergy & Immunology. 2007;20(4):255-262.

76.   Okelo SO, Patino CM, Riekert K, Merriman B, Bilderback BS, Hansel NN, Thompson K, Thompson J, Quartey R, Rand CS, **Diette GB**. Patient Factors that Pediatricians Use to Assign Asthma Treatment. Pediatrics, 2008;122(1):e195-201.

77.   Tonorezos ES, Breysse PN, Matsui EC, McCormack MC, Curtin-Brosnan J, Williams D'Ann, Hansel NN, Eggleston PA, **Diette GB**. Does neighborhood violence lead to depression among caregivers of children with asthma? Social Science Medicine. 2008;67(10):31-7.

78.   Hansel NN, Breysse PN, McCormack MC, Matsui EC, Curtin-Brosnan J, Williams DL, Moore JL, Cuhran JL, **Diette GB**. A longitudinal study of indoor nitrogen dioxide levels and respiratory symptoms in inner-city children with asthma. Environmental Health Perspectives 2008;116(10):1428-32.

79.   Kim S, Aung T, Berkeley E, **Diette GB**, Breysse P. Measurement of Nicotine in Household Dust. Environmental Research. 2008;108(3):289-93.

80.   Curtin-Brosnan J, Matsui EC, Breysse PN, McCormack MC, Hansel NN, Tonorezos ES, Eggleston PA, Williams D'Ann, **Diette GB**. Parent Report of Pests and Pets and Indoor Allergen Levels in Inner City Homes. Annals of Allergy, Asthma and Immunology. 2008;101(5):517-23.

81.   Patino, CM, Okelo SO, Rand CS, Riekert KA, Krishnan JA, Thompson K, Quartey RI, Perez-Williams D, Bilderback A, Merriman B, Paulin L, Hansel N, **Diette GB**. The Asthma Control and Communication Instrument: a clinical tool developed for ethnically diverse populations. Journal of Allergy and Clinical Immunology. 2008;122(5):936-943.e6.

82.   McCormack MC, Breysse PN, Hansel NN, Matsui EC, Tonorezos E, Curtin-Brosnan J, Eggleston PA, **Diette GB**. Common Household Activities are Associated with Elevated Particulate Matter Concentrations in Bedrooms of Inner-City Baltimore Preschool Children.  Environmental Research, 2008;106(2):148-55.

83.   McCormack MC, Breysse PN, Matsui EC, Hansel NN, Williams D, Curtin-Brosnan J, Eggleston P, **Diette GB**. In-home particle concentrations and childhood asthma morbidity. Environ Health Perspect. 2009;117(1):294-8.

84.   O'Brien Jr JM,  Aberegg SK, Ali NA, **Diette GB**, Lemeshow S. Results from the National Sepsis Practice Survey: predictions about mortablity and morbidity and recommendations for limitation of care orders. Crit Care, 2009;13(3):R96.

85.   Clerisme-Beaty E, Karam S, Rand C, Patino CM, Bilderback A, Riekert KA, Okelo SO, **Diette GB**. Does higher body mass index contribute to worse asthma control in an urban population? J Allergy Clin Immunol, 2009;124(2):207-12.

86.   Mathias RA, Grant AV, Rafaels N, Hand T, Gao L, Vergara C, Tsai YJ, Yang M, Campbell M, Foster C, Gao P, Togias A, Hansel NN, **Diette G**, Adkinson NF, Liu MC, Faruque M, Dunston GM, Watson HR, Bracken MB, Hoh J, Maul P, Maul T, Jedlicka AE, Murray T, Hetmanski JB, Ashworth R, Ongaco CM, Hetrick KN, Doheny KF, Pugh EW, Rotimi CN, Ford J, Eng C,

10

Burchard EG, Sleiman PM, Hakonarson H, Forno E, Raby BA, Weiss ST, Scott AF, Kabesch M, Liang L, Abecasis G, Moffatt MF, Cookson WO, Ruczinski I, Beaty TH, Barnes KC. A genome-wide association study on African-ancestry populations for asthma. J Allergy Clin Immunol. 2010 Feb;125(2):336-346.e4.

87.    Castro M, Rubin AS, Laviolette M, Fiterman J, De Andrade Lima M, Shah PL, Fiss E, Olivenstein R, Thomson NC, Niven RM, Pavord ID, Simoff M, Duhamel DR, McEvoy C, Barbers R, Ten Hacken NH, Wechsler ME, Holmes M, Phillips MJ, Erzurum S, Lunn W, Israel E, Jarjour N, Kraft M, Shargill NS, Quiring J, Berry SM, Cox G, and **AIR2 Trial Study Group.**  Effectiveness and safety of bronchial thermoplasty in the treatment of severe asthma: a multicenter, randomized, double-blind, sham-controlled clinical trial.  Am J Respir Crit Care Med. 2010;181(2):116-24.

88.    **Diette GB**, Sajjan SG, Skinner EA, Weiss TW, Wu A, Markson LE. Using the pediatric Asthma Therapy Assessment Questionnaire to measure asthma control and health care utilization in children. The Patient: Patient-Centered Outcomes Research. 2009; 2 (4), 233-241

89.    **Diette GB**, Orr P, McCormack MC, Gandy W, Hamar N. Is Pharmacologic Care of COPD Consistent with Guidelines? Population Health Manage. 2010 Feb;13(1):21-6.

90.    Breysse PN, **Diette GB**, Matsui EC, Butz AM, Hansel NH, and McCormack MC.  Indoor Air Pollution and Asthma in Children.  Proceedings of the American Thoracic Society. 2010 May (2):102-106.

91.    Lechtzin N, Busse AM, Smith MT, Grossman S, Nesbitt S, **Diette GD**.  A randomized trial of nature scenery and sounds vs. urban scenery and sounds to reduce pain in adults undergoing bone marrow aspirate and biopsy. Journal Altern Complement Med 2010 Sep (9):965-972. PMCID:PMC3110836

92.    O'Brien JM Jr, Aberegg SK, Ali NA, **Diette GD**, Lemeshow S.  Results from the National Sepsis Practice Survey: Use of drotrecogin alfa (activated) and other therapeutic decisions.  Journal of Critical Care 2010 25(4):658.e7-658.e15.  PMCID: PMC2978258

93.    Murphy A, Chu JH, Xu M. Carey VJ, Lazarus R, Liu A, Szefler SJ, Strunk R, Demuth K, Castro M, Hansel NN, **Diette GB**, Vonakis BM, Adkinson  Jr, FN, Klanderman BJ, Senter-Sylvia J, Ziniti J, Lange C, Pastinen T, Raby BA.  Mapping of numerous disease associated expression polymorphisms in primary peripheral blood CD4+ lymphocytes.  Hum Mol Genet 2010;19(23):4745-57. PMCID: PMC2972694

94.    Bollinger ME, **Diette GB,** Chang C-L, Stephenson JJ, Sajjan S, Fan T, Allen-Ramey FC. Patient characteristics and prescription fill patterns for allergic rhinitis medications, with a focus on montelukast, in a commercially-insured population. Clinical Therapeutics 2010 32(6):1093-1102.

95.    Butz AM, Breysse P, Rand C, Curtin-Brosnan J, Eggleston P, **Diette GB**, Williams D, Bernert JT, Matsui EC.  Household smoking behavior: Effects of indoor air quality and health in urban children with asthma.  Matern Child Health J 15:460-468, 2011. PMCID: PMC3113654

96.    McCormack MC, Breysse PN, Matsui EC, Hansel NN, Peng RD, Curtin-Brosnan J, Williams DL, Wills-Karp M, **Diette GD**.  Indoor Particulate Matter Increases Asthma Morbidity in Children with Non-Atopic and Atopic Asthma.  Ann of Allergy Asthma Immunol 106(4):308-315, 2011.  PMCID: PMC3118306

97.    Sharma S, Murphy A, Howrylak J, Himes B, Cho M, Chu JH, Hunninghake G, Fuhlbrigge A, Klandermann B, Ziniti J, Senter-Sylvia J, Liu A, Szefler SJ, Strunk R, Castro M, Hansel NN, **Diette GB,** Vonakis BM, Adkinson Jr, NF, Carey VJ, Raby BA.  The impact of race in epidemiologic studies of gene expression.  Genetic Epidemiology, 2011;35(2):93-101.

98.    **Diette GB**, Fuhlbrigge A, Allen-Ramey F, Hopper A, Sajjan S, Markson LE.  Asthma severity in patients initiating controller monotherapy versus combination therapy.  J Asthma 2011;48(3): 304-310.

99.    Torgerson DG, Ampleford EJ, Chiu GY, Gauderman WJ, Gignoux CR, Graves PE, Himes BE, Levin AM, Mathias RA, Hancock DB, Baurley JW, Eng C, Stern DA, Celedón JC, Rafaels N, Capurso D, Conti DV, Roth LA, Soto-Quiros M, Togias A, Li X, Myers RA, Romieu I, Berg DJ, Hu D, Hansel NN, Hernandez RD, Israel E, Salam MT, Galanter J, Avila PC, Avila L, Rodriquez-Santana JR, Chapela R, Rodriguez-Cintron W, **Diette GB,** Adkinson NF, Abel RA, Ross KD, Shi M, Faruque MU, Dunston GM, Watson HR, Mantese VJ, Ezurum SC, Liang L, Ruczinski I, Ford JG, Huntsman S, Chung KF, Vora H, Li X, Calhoun WJ, Castro M, Sienra-Monge JJ, Del Rio-Navarro B, Deichmann KA, Heinzmann A, Wenzel SE, Busse WW, Gern JE, Lemanske RF Jr, Beaty TH, Bleecker ER, Raby BA, Meyers DA, London SJ; Children's Health Study (CHS) and HARBORS study, Gilliland FD; Genetics of Asthma in Latino Americans (GALA) Study, the Study of Genes-Environment and Admixture in Latino Americans (GALA2) and the Study of African Americans, Asthma, Genes & Environments (SAGE), Burchard EG; Childhood Asthma Research and Education (CARE) Network, Martinez FD; Childhood Asthma Management Program (CAMP), Weiss ST; Study of Asthma Phenotypes and Pharmacogenomic Interactions by Race-Ethnicity (SAPPHIRE), Williams LK; Genetic Research on Asthma in the African Diaspora (GRAAD) Study, Barnes KC, Ober C, Nicolae DL. Meta-analysis of genome-wide association studies of asthma in ethnically diverse North American populations. Nat Genet. 2011 Jul 31;43(9):887-92. PMCID: PMC3445408

100.   Mahajan AK, **Diette GB**, Hatipoglu U, Bilderback A, Ridge A, Walker Harris V, Dalapathi V, Badlani S, Lewis S, Charbeneau JT, Naureckas ET, Krishnan JA.  High frequency chest wall oscillation for asthma and chronic obstructive pulmonary disease exacerbations: A randomized sham-controlled clinical trial.  Respir Res, 2011; 12(1): 120

101.   Maziqiue D, **Diette GB**, Breysse PN, Matsui EC, McCormack MC, Curtin-Brosnan J, Williams D, Peng RD, Hansel NN.  Predictors of airborne endotoxin concentrations in inner city homes.  Environ Res 111(4):614-617, 2011.  PMCID: PMC3085396

102.   Williams DL, Breysse PN, McCormack MC, **Diette GB**, McKenzie S, Geyh AS.  Airborne cow allergen, ammonia and particulate matter at homes vary with distance to industrial scale dairy operations: An exposure assessment.  Environ Health 2011;10(1): 72. PMCID:PMC3184623.

103.   Hansel NN, Matsui EC, Rusher R, McCormack MC, Curtin-Brosnin J, Peng RG, Mazique D, Breysse PN, **Diette GB**. Predicting future asthma morbidity in preschool inner city children. J of Asthma 2011, 48(8):797-803.  PMID: 21861602.

104.   Sharma S, Murphy A, Howrylak J, Himes B, Cho MH, Chu JH, Hunninghake GM, Fuhlbrigge A, Klanderman B, Ziniti J, Senter-Sylvia J, Liu A, Szefler SJ, Strunk R, Castro M, Hansel NN, **Diette GB**, Vonakis BM, Adkinson NF Jr, Carey VJ, Raby PA.  The impact of self-identified race on epidemiologic studies of gene expression.  Genet Epidemiol 2011;35(2)93-101.

12

105.   Torgerson DG, Ampleford EJ, Chiu GY, Gauderman WJ, Gignoux CR, Graves PE, Himes BE, Levin AM, Mathias RA, Hancock DB, Baurley J, Eng C, Stern DA, Celedón JC, Rafaels N, Capurso D, Conti DV, Roth LA, Soto-Quiros M, Togias A, Li X, Myers RA, Romieu I, Van den Berg DJ, Hu D, Hansel NN,  Hernandez RD, Israel E, Salam MT, Galanter J, Avila PC, Avila L,. Rodriguez-Santana JR, Rocio Chapela V R, Rodriguez-Cintron W, **Diette GB**, Adkinson NF, Abel RA, Ross KD, Shi M, Faruque WMU, Dunston GM, Watson HR, Mantese VJ, Ezurum SC, Liang L, Ruczinski I, Ford JG, Huntsman S, Chung KF, Vora H, Li X, Calhoun WJ, Castro M, Sierra-Monge JJ, del Rio-Navarro B, Deichmann KA, Heinzmann A, Wenzel SE  *et al.* Meta-analysis of genomewide association studies of asthma in ethnically diverse North American populations.   Nat Genet. 2011 Jul 31;43(9):887-92.

106.   Butz AM, Matsui EC, Breysse P, Curtin-Brosnan J, Eggleston P, **Diette G,** Williams D, Yuan J, Bernert JT, Rand C.  A randomized trial of air cleaners and a health coach to improve indoor air quality for inner-city children with asthma and secondhand smoke exposure. Arch Pediatr Adolesc Med. 2011 Aug;165(8):741-8.

107.   Davis MF, Baron P, Price LB, Williams D, Jeyaseelan S, Hambleton I, **Diette GB**, Breysse PN, McCormack MC.  Dry collection and culture methods for recovery of methicillin-susceptible and methicillin-resistant *Staphylococcus aureus* from indoor home environments.  Appl Environ Microbiol. 2012 Apr;78(7):2474-2476.  PMCID:PMC3306591

108.   Miranda JJ, Bernabe-Oritz a, Smeeth L, Gilman RH, Checkley; CRONICAS Cohort Study Group. Antonio Bernabé-Ortiz, Juan P Casas, George Davey Smith, Shah Ebrahim, Raúl Gamboa, Héctor H García, Robert H Gilman, Luis Huicho, Germán Málaga, J Jaime Miranda, Víctor M Montori, Liam Smeeth; Chronic Obstructive Pulmonary Disease: William Checkley, **Gregory B Diette**, Robert H Gilman, Luis Huicho, Fabiola León-Velarde, María Rivera, Robert A Wise; Training & Capacity Building: William Checkley, Héctor H García, Robert H Gilman, J Jaime Miranda, Katherine Sacksteder. CRONICAS Cohort Study :Cardiovascular Disease.  BMJ Open 2012 Jan 11; 2(1):e000610.

109.   Demissie S, Riekert KA, Eakin MN, Bilderback A, **Diette GB**, Okelo SO. How do perceptions of asthma control and severity relate to indicators of asthma status and treatment recommendations by pediatricians? Pediatr Allergy Immunol Pulmonol. 2012 Mar;25(1):17-23. PMCID:PMC3306591

110.   **Diette GB,** Accinelli RA, Balmes JR,  Buist AS, Checkley W, Garbe P, Hansel NN, Kapil V, Gordon S, Lagat DK, Yip F, Mortimer K, Perez-Padilla R, Roth C, Schwaninger JM, Punturieri A, Kiley J.  Obstructive lung disease and exposure to burning biomass fuel in the indoor environment. Global Heart J 2012:7(3)265-270.

111.   Mahajan AK, **Diette GB**, Hatipoglu U,  Bilderback A, Ridge A, Harris VS, Dalapathi V, Badlani S, Lewis S, Charbeneau JT, Naureckas ET, Krishnan JA.  High frequency chest wall oscillation for asthma and chronic obstructive pulmonary disease exacerbations: A randomized sham-controlled clinical trial.  Respir Res. 2011 Sept 10;12:120.  PMCID:PMC3179725

112.   Torjusen EN, **Diette GB**, Breysse PN, Curtin-Brosnan J, Aloe C, Matsui EC. Dose-response relationships between mouse allergen exposure and asthma morbidity among urban children and adolescents.  Indoor Air. 2013 Aug 23; (4):268-74.

113.   Lin J, Matsui W, Aloe C, Peng RD, **Diette GB**, Breysse PN, Matsui EC.  Relationships between Folate and inflammatory features of asthma.  J Allergy Clin Immunol. 2012 Mar; 131(3):918-920.

114.  Paulin LM, Williams D, Oberweiser C, **Diette GB**, Breysse PN, McCormack C, Matsui EC, Peng R, Metts TA, Hansel NN.  Indoor air quality in central Appalachia homes impacted by wood and coal use.  J Environ Protection 2013;4:67-71.

115.  Bose S, Jun J, **Diette G**. High frequency chest wall oscillation successful in controlling refractory asthma.  J Asthma. 2013 Mar; 50(2):219-221.

116.  Okelo SO, Eakin MN, Patino CM. Teodoro AP, Bilderback AL, Thompson DA, Loiaza-Martinez A, Rand CS, Thyne S, **Diette GB**, Riekert KA.  The pediatric asthma control and communication instrument asthma questionnaire: for use in diverse children of all ages.  J Allergy Clin Immunol 2013 Jul;132(1)55-62.

117.  Lu KD, Breysse PN, **Diette GB**, Curtin-Brosnan J, Aloe C, William DL, Peng RD, McCormack MC, Matsui EC.  Being overweight increases susceptibility to indoor pollutants among urban children with asthma.  J Allergy Clin Immunol 131(4):1017-1023. 2013.  PMCID: PMC3889705

118.  McCormack M. Matsui E, **Diette GD,** Breysse P, Aloe C, Curtin-Brosnan J. Guideline-recommended fractional exhaled nitric oxide is a poor predictor of health care use among inner-city children and adolescents receiving usual asthma care. Chest 2013 Sep;144(3):923-9. PMCID: PMC3760744

119.  Jassal MS, **Diette GB**, Dowdy DW.  Cost Consequence Analysis of Multimodal Interventions with Environmental Components for Pediatric Asthma in the State of Maryland.   J Asthma. 2013;50(6):672-80.

120.  Jamieson DB, Matsui EC, Belli A, McCormack MC, Peng E, Pierre-Louis S, Curtin-Brosnan J, Breysse PN, **Diette GB**, Hansel NN.  Effects of Allergic Phenotype on Respiratory Symptoms and Exacerbations in Patients with COPD.  Am J Respir Crit Care Med. 2013 Jul 15;188(2):187-92. PMCID: PMC3778754

121.  Hansel NN, McCormack MC, Belli A, Matsui EC, Peng RD, Aloe C, Paulin L, Williams DL, **Diette GB.**  In-home air pollution is linked to respiratory morbidity in former smokers with COPD.  Am J Crit Care Med. 2013 May 15;187(10):1085-90.  PMCID: PMC3734614

122.  Ahluwalia SK, Peng RD, Breysse P, **Diette GD**, Curtin-Brosnan J, Aloe C, Matsui EC.  Mouse allergen is the major allergen of public health relevance in Baltimore.  J Allergy Clin Immunol 2013 Oct: 123(4):830-835.  PMCID: PMC3800085

123.  Bose S, Breysse PN, McCormack M, Hansel NN, Rusher RR, Matsui E, Peng R, Curtin-Brosnan J, **Diette GB.**  Outdoor exposure and vitamin D levels in urban children with asthma.  Nutrition J, 2013 Jun 12;12(1)81.

124.  Martin WJ 2nd, Glass RI, Araj H,  Balbus J, Collins FS, Curtis S, **Diette GB**, Elwood WN, Falk H, Hibbert PL, Keown SE, Mehta S. Patrick E, Rosenbaum J, Sapkota A, Tolunay HE, Bruce NG. Household air pollution in low- and middle-income countries: health risks and research priorities. PLoS Med. 2013 Jun;10(6):e1001455.

125.  Matsui EC, Hansel NN, Aloe C, Schiltz AM, Peng RD, Rabinovitch N, Ong MJ, Williams DL, Breysse PN, **Diette GB**, Liu AH.  Indoor pollutant exposures modify the effect of airborne

endotoxin on asthma in urban children. Am J Respir Crit Care Med 2013 Nov 15;188(10)1210-5. PMCID: PMC3863732

126.   Okelo SO, Eakin MN, Riekert KA, Teodoro AP, Bilderback AL, Thompson DA, Loiaza-Martinez A, Rand CS, Thyne S, **Diette GB**, Patino CM.  Validation of parental reports of asthma trajectory, burden, and risk by using the pediatric asthma control and communication instrument. J Allergy Clin Immunol Pract 2014 Mar-Apr; 2(2):186-192.

127.   Okelo SO, Riekert KA, Eakin M, Bilderback A, Rand CS, **Diette GB,** Yenokyan G. Pediatrician qualifications and asthma management behaviors and their association with patient race/ethnicity.  J Asthma 2014 Mar;51(2):155-161.

128.   Sharma S, Zhou X, Thibault DM, Himes BE, Liu A, Szefler SJ, Strunk R, Castro M, Hansel NN, **Diette GB**, Vonakis BM, Adkinston NF Jr, Avila L, Soto-Quiros M. Barraza-Villareal A, Lemanske RF Jr, Solway J, Krishnan J. White SR, Cheadle C, Berger SAE, Fan J. Boorgula MP, Nicolae D, Gilliland F, Barnes K, London SJ, Martinez F, Ober C, Celedon JC, Carey VJ, Weiss ST, Raby BA. A genome-wide survey of CD4 lymphocyte regulatory genetic variants identifies novel asthma genes. J Allergy Clin Immunol 2014; 134(5): 1153-1162.

129.   Peng RD, Butz A, Hacksta A, Williams DL, **Diette GB**, Breysse P, Matsui E. Estimating the health benefit of reducing indoor air pollution in a randomized environmental intervention.  J Royal Statistical Society.  2015; 178(2): 425-443.

130.   Williams DL, McCormack M, Matsui EC, **Diette GB**, McKenzie SE, Geyh AS, Breysse PN.  Cow allergen (Bos d 2) and Endotoxin Concentrations are higher in the settled dust of homes proximate to industrial scale dairy operations.  Journal of Exposure Science & Environmental Epidemiology. Advance online publication] DOI: JES.2014.57,  2014

132.   Hersh CP, Make BJ, Lynch DA, Barr RG, Bowler RP, Calverley PM, Castaldi PJ, Cho MH, Coxson HO, DeMeo DL, Foreman MG, Han MK, Harshfield BJ, Hokanson JE, Lutz S, Ramsdell JW, Regan EA, Rennard SI, Schroeder JD, Sciurba FC, Steiner RM, Tal-Singer R, van Beek E Jr, Silverman EK, Crapo JD, COPDGene and ECLIPSE Investigators. Non-emphysematous chronic obstructive pulmonary disease is associated with diabetes mellitus. BMC Pulm Med. 2014; 14: 164.

133.   Kim V, Desai P, Newell JD, Make BJ, Washko GR, Silverman EK, Crapo JD, Bhatt SP, Criner GJ, COPDGene Investigators. Airway wall thickness is increased in COPD patients with bronchodilator responsiveness. Respir Res. 2014; 15:84.

134.   Vachani A, Tanner NT, Aggarwal J, Mathews C, Kearney P, Fang KC, Silvestri G, **Diette GB**. Factors that influence physician decision making for indeterminate pulmonary nodules. Annals of American Thoracic Society. 2014; 11(10): 1586-1591.

135.   Kaji DA, Belli AJ, McCormack MC, Matsui EC, Williams DL, Paulin L, Putcha N, Peng RD, **Diette GB**, Breysse PN, Hansel NN. Indoor pollutant exposure is associated with heightened respiratory symptoms in atopic compared to non-atopic individuals with COPD. BMC Pulm Med. 2014; 14:147.

136.   Hackstadt AJ, Matsui EC, Williams DL, **Diette GB**, Breysse PN, Butz AM, Peng RD. Inference for environmental intervention studies using principal stratification. Stat Med. 2014; 33(28): 4919-4933.

137. Lee JH, McDonald ML, Cho MH, Wan ES, Castaldi PJ, Hunninghake GM, Marchetti N, Lynch DA, Crapo JD, Lomas DA, Coxson HO, Bakke PS, Silverman EK, Hersh CP; COPDGene and ECLIPSE Investigators. DNAH5 is associated with total lung capacity in chronic obstructive pulmonary disease. Respir Res. 2014; 15:97.

138. Wan ES, Castaldi PJ, Cho MH, Hokanson JE, Regan EA, Make BJ, Beaty TH, Han MK, Curtis JL, Curran-Everett D, Lynch DA, DeMeo DL, Crapo JD, Silverman EK; COPDGene Investigators. Epidemiology, genetics, and subtyping of preserved ratio impaired spirometry (PRISm) in COPDGene. Respir Res. 2014; 15:89.

139. Brigham EP, Kolahdooz F, Hansel N, Breysse PN, Davis M, Sharma S, Matsui EC, **Diette GB**, McCormack M. Association Between Western Diet Pattern and Adult Asthma: A Focused Review. Annals of Allergy, Asthma & Immunology. 2015; 114(4): 273-80.

140. Paulin LM, **Diette GB**, Blanc PD, Putcha N, Eisner MD, Kanner RE, Belli AJ, Christenson S, Tashkin DP, Han M, Barr RG, Hansel NN, SPIROMETRICS Research Group. Occupational Exposures are Associated with Worse Morbidity in Patients with COPD. Am J Respir Crit Care Med. 2015; 191(5): 557-565.

141. Jaganath D, Miranda JJ, Gilman RH, Wise RA, **Diette GB**, Miele CH, Bernabe-Ortiz A, Checkley W, CHONICAS Cohort Study Group. Prevalence of chronic obstructive pulmonary disease and variation in risk factors across four geographically diverse resource-limited settings in Peru. *Respiratory Research*. 2015; 16(1):40.

142. Kolahdooz F, Butler JL, Chrisiansen K, **Diette GB**, Breysse PN, Hansel NN, McCormack MC, Sheehy T, Gittelsohn J, Sharma S. Food and Nutrient Intake in African American Children and Adolescents Aged 5 to 16 Years in Baltimore City. *Journal of the American College of Nutrition*. 2015; 9:1-12.

143. **Diette GB**, Dalal AA, D'Souza Ao, Lunacsek OE, Nagar SP. Treatment patterns of chronic obstructive pulmonary disease in employed adults in the United States. *International Journal of Chronic Obstructive Pulmonary Disease*. 2015; 10:415-22.

144. McCormack MC, Belli AJ, Kahi DA, Matsui EC, Brigham EP, Peng RD, Sellers C, Williams DL, **Diette GB**, Breysse PN, Hansel NN. Obesity as a susceptibility factor to indoor particulate matter health effects in COPD. *Eur Respir J*. 2015; 45(5): 1248-57.

145. Bose S, Hansel NN, Tonorezos ES, Williams DL, Bilderback A, Breysse PN, **Diette GB**, McCormack MC. Indoor particulate matter associated with systemic inflammation in COPD. *Journal of Environmental Protection*. 2015; 6: 566-72.

146. Sussan T, Gajghate S, Chatterjee S, Mandke P, McCormick S, Sudini K, Kumar S, Breysse P, **Diette GB**, Sidhaye V, Biswal S. Nrf2 reduces allergic asthma in mice through enhanced airway epithelial cytoprotective function. *American Journal of Lung Cell Mol Physiol*. 2015; 309(1):L27-36.

147. Lerner AG, Bernabé-Ortiz A, Ticse R, Hernandez A, Huaylinos Y, Pinto ME, Málaga G, Checkley W, Gilman RH, Miranda JJ; CRONICAS Cohort Study Group. Type 2 diabetes and cardiac autonomic neuropathy screening using dynamic pupillometry. *Diabet Med*. 2015 Nov; 32(11): 1470-8.

148. Schwartz NG, Rattner A, Schwartz AR, Mokhlesi B, Gilman RH, Bernabe-Ortiz A, Miranda JJ, Checkley W; CRONICAS Cohort Study Group. Sleep Disordered Breathing in Four Resource-Limited Settings in Peru: Prevalence, Risk Factors, and Association with Chronic Diseases. *Sleep*. 2015 Sept; 38(9): 1451-9.

149. Tanner NT, Aggarwal J, Gould MK, Kearney P, **Diette G**, Vachani A, Fang KC, Silvestri GA. Management of Pulmonary Nodules by Community Pulmonologists: A Multicenter Observational Study. *Chest*. 2015; 148(6):1405-14.

150. Bazo-Alvarez JC, Quispe R, Peralta F, Poterico JA, Valle GA, Burroughs M, Pillay T, Gilman RH, Checkley W, Malaga G, Smeeth L, Bernabé-Ortiz A, Miranda JJ; PERU MIGRANT Study; CRONICAS Cohort Study Group. Agreement Between Cardiovascular Disease Risk Scores in Resource-Limited Settings: Evidence from 5 Peruvian Sites. *Crit Pathw Cardiol*. 2015; 14(2): 74-80.

151. Francis ER, Kuo CC, Bernabe-Ortiz A, Nessel L, Gilman RH, Checkley W, Miranda JJ, Feldman HI; CRONICAS Cohort Study Group. Burden of chronic kidney disease in resource-limited settings from Peru: a population-based study. *BMC Nephrol*. 2015; 16:114.

152. Benziger CP, Bernabé-Ortiz A, Gilman RH, Checkley W, Smeeth L, Málaga G, Miranda JJ; CRONICAS Cohort Study group. Metabolic Abnormalities Are Common among South American Hispanics Subjects with Normal Weight or Excess Body Weight: The CRONICAS Cohort Study. *PLoS One*. 2015; 10(11): e0138968.

153. Lutz SM, Cho MH, Young K, Hersh CP, Castaldi PJ, McDonald ML, Regan E, Mattheisen M, DeMeo DL, Parker M, Foreman M, Make BJ, Jensen RL, Casaburi R, Lomas DA, Bhatt SP, Bakke P, Gulsvik A, Crapo JD, Beaty TH, Laird NM, Lange C, Hokanson JE, Silverman EK; ECLIPSE Investigators.; COPDGene Investigators. A genome-wide association study identifies risk loci for spirometric measures among smokers of European and African ancestry. *BMC Genet*. 2015; 16:138.

154. Bernabé-Ortiz A, Carrillo-Larco RM, Gilman RH, Checkley W, Smeeth L, Miranda JJ; CRONICAS Cohort Study Group. Contribution of modifiable risk factors for hypertension and type-2 diabetes in Peruvian resource-limited settings. *J Epidemiol Community Health*. 2016; 70(1): 49-55.

155. Quispe R, Bazo-Alvarez JC, Burroughs Peña MS, Poterico JA, Gilman RH, Checkley W, Bernabé-Ortiz A, Huffman MD, Miranda JJ; PERU MIGRANT Study.; CRONICAS Cohort Study Group. Distribution of Short-Term and Lifetime Predicted Risks of Cardiovascular Diseases in Peruvian Adults. *J Am Heart Assoc*. 2015; 4(8): e002112.

156. Miele CH, Jaganath D, Miranda JJ, Bernabe-Ortiz A, Gilman RH, Johnson CM, **Diette GB**, Wise RA, Checkley W; CRONICAS Cohort Study Group. Urbanization and Daily Exposure to Biomass Fuel Smoke Both Contribute to Chronic Bronchitis Risk in a Population with Low Prevalence of Daily Tobacco Smoking. *COPD*. 2016; 13(2): 186-95.

157. Ruiz-Grosso P, Miranda JJ, Gilman RH, Walker BB, Carrasco-Escobar G, Varela-Gaona M, Diez-Canseco F, Huicho L, Checkley W, Bernabe-Ortiz A; CRONICAS Cohort Study Group. Spatial distribution of individuals with symptoms of depression in a periurban area in Lima: an example from Peru. *Ann Epidemiol*. 2016; 26(2): 93-9.

158.   Gaviola C, Miele CH, Wise RA, Gilman RH, Jaganath D, Miranda JJ, Bernabe-Ortiz A, Hansel NN, Checkley W; CRONICAS Cohort Study Group. Urbanisation but not biomass fuel smoke exposure is associated with asthma prevalence in four resource-limited settings. *Thorax*. 2016; 71(2): 154-60.

159.   Sulaiman I, Mac Hale E, Holmes M, Hughes C, D'Arcy S, Taylor T, Rapcan V, Doyle F, Breathnach A, Seheult J, Murphy D, Hunt E, Lane SJ, Sahadevan A, Crispino G, **Diette G**, Killane I, Reilly RB, Costello RW. A protocol for a randomised clinical trial of the effect of providing feedback on inhaler technique and adherence from an electronic device in patients with poorly controlled severe asthma. *BMJ Open*. 2016; 6(1): e009350.

160.   Engelgau MM, Sampson UK, Rabadan-Diehl C, Smith R, Miranda J, Bloomfield GS, Belis D, Narayan KM; National Health, Lung, and Blood Institute–UnitedHealth Global Health Centers of Excellence Collaborators. Tackling NCD in LMIC: Achievements and Lessons Learned From the NHLBI-UnitedHealth Global Health Centers of Excellence Program. *Glob Heart*. 2016; 11(1): 5-15.

161.   Zavala-Loayza JA, Benziger CP, Cárdenas MK, Carrillo-Larco RM, Bernabé-Ortiz A, Gilman RH, Checkley W, Miranda JJ; CRONICAS Cohort Study Group. Characteristics Associated With Antihypertensive Treatment and Blood Pressure Control: A Population-Based Follow-Up Study in Peru. *Glob Heart*. 2016; 11(1): 109-19.

162.   Quispe R, Benziger CP, Bazo-Alvarez JC, Howe LD, Checkley W, Gilman RH, Smeeth L, Bernabé-Ortiz A, Miranda JJ; CRONICAS Cohort Study Group. The Relationship Between Socioeconomic Status and CV Risk Factors: The CRONICAS Cohort Study of Peruvian Adults. *Glob Heart*. 2016; 11(1): 121-130.e2.

163.   Sudini K, **Diette GB**, Breysse PN, McCormack MC, Bull D, Biswal S, Zhai S, Brereton N, Peng RD, Matsui EC. A Randomized Controlled Trial of the Effect of Broccoli Sprouts on Antioxidant Gene Expression and Airway Inflammation in Asthmatics. *J Allergy Clin Immunol Pract*. 2016; 4(5): 932-40.

164.   McCormack MC, Belli AJ, Waugh D, Matsui EC, Peng RD, Williams DL, Paulin L, Saha A, Aloe CM, **Diette GB**, Breysse PN, Hansel NN. Respiratory Effects of Indoor Heat and the Interaction with Air Pollution in Chronic Obstructive Pulmonary Disease. *Ann Am Thorac Soc*. 2016; 13(12): 2125-2131.

165.   Peters KO, Williams AL, Abubaker S, Curtin-Brosnan J, McCormack MC, Peng R, Breysse PN, Matsui EC, Hansel NN, **Diette GB**, Strickland PT. Predictors of polycyclic aromatic hydrocarbon exposure and internal dose in inner city Baltimore children. *J Expo Sci Environ Epidemiol*. 2017; 27(3): 290-298.

166.   Ludwig S, Jimenez-Bush I, Brigham E, Bose S, **Diette G**, McCormack MC, Matsui EC, Davis MF. Analysis of home dust for Staphylococcus aureus and staphylococcal enterotoxin genes using quantitative PCR. *Sci Total Environ*. 2017; 581-582: 750-755.

167.   Bernabé-Ortiz A, Carrillo-Larco RM, Gilman RH, Checkley W, Smeeth L, Miranda JJ; CRONICAS Cohort Study Group. Impact of urbanisation and altitude on the incidence of, and risk factors for, hypertension. *Heart*. 2017; In Press.

**EXTRAMURAL FUNDING:**

**Current Funding:**

09/01/2015-08/31/2019   Obesity Enhances Susceptibility to Pollutant Effects in Asthma
NIH/NIEHS P50ES018176
Annual Direct: $1,051,797
PI: Hansel
Role: Co-Director, 25%
OBesity Enhances Susceptibility to Pollutant Effects in Asthma (OBESE ASTHMA), will study mechanisms by which obesity leads to enhanced susceptibility to pollutants (particulate matter with aerodynamic diameter < 2.5 μm (PM2.5) and ultrafine particles (UFP)) leading to increased asthma morbidity in children.

07/01/2015-06/30/2020   Comparing Urban and Rural Effects of Poverty on COPD (CURE COPD)
NIH/NIEHS P50ES026096
Annual Direct: $693,432
PI: Hansel
Role: Co-Director, 5%
Comparing Urban and Rural Effects of Poverty on COPD (CURE COPD)
Annual Direct Cost: $693,432 Principal Investigator, 23% effort The aim of our Center, Comparing Urban and Rural Effects of poverty on COPD (CURE COPD), is to understand these interactive effects (high indoor air pollution, obesity and pro-inflammatory diets) in both urban (Project 1) and rural (Project 2) low income communities, both of which suffer disproportionate prevalence and morbidity from COPD.

09/01/2012-08/31/2017   K-24 Mentoring and Patient Oriented Research in Asthma
NIH/NIEHS K24ES021098
Annual Direct: $182,540.00
Grant Number 1133451
PI: Diette
Role: Principal Investigator, 6.0 calendar months
A major focus of this proposal will be to expand the present research program from inner city children to also include inner city adults with asthma. With this expansion in the research program, the candidate will provide the foundation for future trials in adults of home-based multi-component environmental interventions, goals which are concordant with the career goals of current mentees and will establish the infrastructure for future mentees with a research interest in adult asthma

09/01/2009-07/31/2015   Title: Mechanisms of asthma-dietary interventions against environmental triggers (No cost extension)
P01 ES018176
NIH/NIEHS/EPA
Total Direct $4,999,821 ($970,685 Year 3)
PI/PD: Diette
Roles: Program Director, Administrative Core Leader, Project 1 Leader. 3.0 calendar months

Goals: The long-term goal of the **ASTHMA-DIET** (**A S**tudy to understand The **M**echanisms of **A**sthma--**D**ietary **I**nterventions to protect against **E**nvironmental **T**riggers) Program is to understand how diet influences the asthmatic response to indoor and outdoor airborne pollutants and allergens, with the expectation of translating these findings into practical dietary strategies to improve pediatric asthma health.

| | |
|---|---|
| 09/07/2010-04/30/2015 | Genetic susceptibility to asthma and indoor air pollution in Peru |

R01 ES018845
NIH/NIEHS
Annual Direct Cost: $433,836
PI: Hansel
Role: Co-Investigator, 1.20 calendar months
The goal of this proposal is to examine the contribution of genetic susceptibility to the adverse effects of indoor air pollution (particulate matter and nitrogen dioxide) on asthma health in a Hispanic population.

| | |
|---|---|
| 02/18/2011-12/31/2015 | Statistical methods for complex environmental health data. |

R01 ES019560
NIH/NIEHS
Annual Direct: $243,746
PI: Peng
Role: Co-Investigator, 0.60 calendar months
This project will develop a spatial-temporal Bayesian hierarchical multivariate receptor model for identifying sources of air pollution chemical mixtures and estimating their effect on population health outcomes. Innovation focuses on (a) conducting an integrated national assessment of the health effects of pollution sources; (b) the use of spatial-temporal models for source apportionment; and (c) the introduction of national databases on source profiles and emissions to inform model development and parameter estimation. These methods will be applied to data from a national study of air pollution and health outcomes, the Medicare Cohort Air Pollution Study, to (a) estimate short-term population health effects of PM sources on a national, regional, and local scale; (b) estimate short- and long-term health effects of PM constituents and identify the sources of toxic constituents

**PAST (most recent 5 years only)**

| | |
|---|---|
| 09/14/2007-08/31/2013 (NCE) | SCCOR: Mechanisms and Treatment of COPD Progression |

1P50HL084945-01
NIH/NHLBI
Annual Direct $1,957,399
Program Director: Wise
Role:  Core C Leader, 1.2 calendar months
The overall goal of this SCCOR program is to understand the complex interplay of mechanisms that promote the progression of COPD and to translate that understanding into treatments that can benefit persons who suffer from COPD.

| | |
|---|---|
| 09/29/2007-06/30/2013 | Center for Childhood Asthma in the Urban Environment |

| | |
|---|---|
| (NCE) | The Role of Particulate Matter and Allergens in Oxidative Stress in Asthma (DISCOVER)<br>1P50ES015903<br>NIH/NIEHS<br>Annual Direct $ 1,607,733<br>PI/PD: Breysse<br>Roles: Co-Program Director; Project Leader, Project 1 (1.2 calendar months); Co-Investigator, Administrative Core (1.8 calendar months)<br>The long-term goals of this Center are to examine how exposures to environmental pollutants and allergens may relate to airway inflammation and respiratory morbidity in children with asthma living in the inner city of Baltimore, and to search for new ways to reduce asthma morbidity by reducing exposure to these agents. |
| 07/01/2008-06/30/2013 | The Impact of Indoor Particulate Matter Exposure on Non-allergic Asthma<br>5K23 ES016819<br>NIH/NIEHS<br>Total Direct: $755,875<br>PI: McCormack<br>Role: Mentor, no salary support<br>K23 Mentored Patient-Oriented Research Career Development Award<br>The goal of this project is to examine adverse effects of coarse indoor PM. Using a study design that combines a longitudinal panel study and an exposure challenge model the research will demonstrate a causal relationship between indoor coarse PM exposure and exacerbation of asthma status. |
| 07/01/2010-06/30/2012 | Vitamin D and Susceptibility to Inhaled Pollutants in Urban Children with Asthma<br>NIH<br>Total Direct: $187,645<br>PI: Bose<br>Role: Primary Mentor<br>NRSA. The goal of this study is to identify the role of vitamin D upon the effects of inhaled pollutants upon asthma severity in inner-city children. |
| 07/01/2011-09/24/2012 | Interventions to Modify Adherence to Asthma Guidelines<br>HHSA 290 2007 10061 I<br>Agency: AHRQ<br>Annual Direct Costs: $260,643<br>PI: Eric Bass<br>Role: Co-PI<br>The objective of this CER is to determine the comparative effectiveness of interventions to modify the adherence of health care providers to asthma guidelines. |
| 12/15/2008-12/14/2011 | Intervention trial to reduce nitrogen dioxide and carbon monoxide concentrations in Baltimore City homes<br>FR-5200-N-01A<br>HUD<br>Annual Direct $271,415 |

PI: Hansel
Role: Co-Investigator, 0.96 calendar months
The purpose of this research is to conduct a randomized intervention trial aimed at reducing indoor nitrogen dioxide and carbon monoxide concentrations in homes.

07/08/2009-06/30/2011    Effect of Fenzian treatment on symptoms, pulmonary function and Albuterol use in patients with mild persistent asthma: A multi-center, sham-controlled clinical trial
Fenzian, Inc. (Formerly Eumedics)
Annual Direct: $88,433
PI: Diette, 1.20 calendar months
The purpose of the study is to test the efficacy of Fenzian treatment over five weeks to improve asthma control, pulmonary function, symptoms and bronchodilator use.

07/01/2006-06/30/2011    Mouse Allergen and Inner-City Asthma
1R01 A1070630-01
NIH/NIAAD
Annual Direct $225,000
PI: Matsui
Role: Co-Investigator, 0.60 calendar months
The primary aims of this project are (1) to examine the link between household mouse allergen exposure and asthma morbidity, and (2) to determine the diagnostic utility of allergy skin testing in predicting allergic airways responses to mouse allergen.

12/26/2003-01/30/2011    Evaluation of home automated tele-management in COPD.
R01 AI070630
NIH
Annual Direct: $225,000
PI: Finkelstein
Role: Co-Investigator, 0.60 calendar months
The goal of this project is to evaluate the impact of home tele-management in COPD patients.

12/01/2005-11/30/2010    A Multicenter Randomized Clinical Trial:  Asthma Intervention Research (AIR2 Trial)
Asthmatix, Inc
Annual Direct $313,504
PI: Yung
Role: Co-Investigator,  0.12 calendar months
The goal of this trial is to assess the safety and effectiveness of the Alair system for the treatment of asthma.

11/1/2003-10/31/2009    Center for Childhood Asthma in the Urban Environment
P01 R-826724/P01 ES09606 (Breysse)
NIH/EHS/EPA
Annual Direct $918,780
PI: Breysse

Roles: Deputy Program Director; PI of Epidemiology Component, Co-Investigator, 1.5 calendar months
The long term goals of this Center were to examine how exposures to environmental pollutants and allergens might relate to airway inflammation and respiratory morbidity in children with asthma living in the inner city of Baltimore, and to search for new ways to reduce asthma morbidity by reducing exposure to these agents.

09/30/2003-06/30/2009     SCCOR:  Ventilator associated lung injury: Molecular approaches
P50 HL073944-03 (Brower)
NIH/NHLBI
Annual Direct $2,790,934
PI/PD: Brower
Role:  Core Leader, Core B, Data Management Core, 0.60 calendar months
This SCCOR was focused on understanding the complex interplay between mechanical ventilation and the increased morbidity and mortality associated with acute lung injury.  The application had interactive Cores using state of the art approaches to provide understanding of critical pathobiologic processes in ventilator-associated lung injury and to define key genetic determinants relevant to acute lung injury.

09/30/2004-08/31/2009     Genetics of Asthma Severity and Lung Function Decline
K23 HL76322 -02
NIH/NHLBI
Annual Direct $148,250
PI: Hansel
Role: Primary Mentor, effort as needed
The goal of this study was to identify genetic polymorphisms that mark high risk individuals for early intervention to decrease asthma morbidity.

09/10/2001-08/31/2006     Improving physician adherence to asthma guidelines
K23 HL04266
NIH
Annual Direct $146,772
Role: Principal Investigator, 9.0 calendar months
Provide mentored training and research period for early career development. Improve physician adherence to national asthma guidelines

09/01/2002-07/31/2007     Baltimore Asthma Severity Study
R01 HL67905  (Ford)
NIH
Annual Direct $443,417
PI: Ford
Role: Co-Investigator, 0.6 calendar months
The objective of this study was to provide insight into the genes controlling susceptibility to human asthma and promote the development of novel therapeutics.

9/01/2002-08/31/2007     Improving Respiratory Outcomes in ALS

K23 HL67887 (Lechtzin)
NIH
Annual Direct $121,750
PI: Lechtzin
Role: Advisor (effort as needed)
The overall theme of this award is to study various aspects of non-invasive positive pressure ventilation in patients with ALS with the goal of improving respiratory management of these patients.

2007-2008 (NCE)
Howard/Hopkins Center for Reducing Asthma Disparities
HL072455
NIH/NHLBI
Annual Direct $513,475
PI: Rand
Role:  Leader, Project 1, 1.5 calendar months, no cost extension
This application presents four research projects designed to collaboratively investigate factors associated with the disproportionate burden of asthma experienced by inner-city, African-American children and adults.

09/30/2004-06/30/2008
Improving asthma care for minority children in Head Start
R18 HL73833
NIH
Annual Direct $625,506
PI: Rand
Role: Co-Investigator, 0.6 calendar months
The goal of this project is to study the effect communication intervention on asthma-related morbidity and mortality among low-income African American children.

02/23/2004-12/31/2006
A randomized, sham-controlled, double-blinded pilot study to assess the effect of high frequency chest wall oscillation therapy in patients with chronic bronchitis
Advanced Respiratory
PI: Diette, 0.12 calendar months

10/01/2007-09/30/2009
Randomized clinical trial
Protocol #: CQAB149B2335S
Novartis
Total Direct Costs: $161,368
PI: Diette, 1.20 calendar months
A 26-week treatment, multicenter, randomized, double-blind, double dummy, placebo-controlled, adaptive, seamless, parallel-group study to assess the efficacy, safety and tolerability of two doses of indacaterol (selected from 75, 150, 300 & 600 ug o.d.) in patients with chronic obstructive pulmonary disease using blinded formoterol (12 ug b.i.d.) and open label tiotropium (18 ug o.d.) as active controls.

## EDUCATIONAL ACTIVITIES

**Educational Publications**

**Invited Review Articles**

1.  Rubinson L, Diette GB.  Best Practices for Insertion of Central Venous Catheters in Intensive Care Units to Prevent Catheter-Related Bloodstream Infections.  Journal of Laboratory and Clinical Medicine 2004;143:5-13.

2.  Sharma HP, Hansel NN, Matsui EC, Diette GB, Eggleston PA, Breysee PN. Indoor Environmental Influences on Children's Asthma. Pediatric Clinics North America. 2007;54:103-120

3.  Hansel NN and Diette GB.  Gene Expression Profiling in Human Asthma.  Proc Am Thorac Soc. 2007; 4(1):32-6.

4.  **Diette GB**, Rand C. The Contributing Role of Health-Care Communication to Health Disparities for Minority Patients with Asthma. Chest. 2007 Nov;132(5 Suppl):802S-9S.

5.  **Diette GB**, McCormack MC, Hansel NN, Breysee PN, Matsui EC. Environmental issues in managing asthma. Respiratory Care. 2008;53(5):602-15; discussion 616-7.

6.  Matsui EC, Hansel NN, McCormack MC, Rusher R, Breysse P, **Diette GB**. Asthma in the Inner City and the Indoor Environment. Immunology Allergy Clinics North America. 2008;28:665-686.

7.  Okelo SO, Butz AM, Sharma R, **Diette GB**, Pitts SI, King TM, Linn ST, Reuben M. Chelladurai Y, Robinson KA.  Interventions to modify health care provider adherence to asthma guidelines: A systemic review.  Pediatrics. 2013 Sep;132(3):517-34.

**Editorials**

1.  Krishnan JA, **Diette GB**, Rand CS. Disparities in Outcomes from Chronic Disease: Impaired Patient-Physician Partnerships May Be an Important Cause in Minorities. British Medical Journal 2001;323:950.

2.  Alberg A, **Diette GB**, Ford J. Attendance and absence as markers of health status: The example of active and passive cigarette smoking. American Journal of Epidemiology 2003 May 15;157(10):870-3.

3.  **Diette GB**, Clinical Commentary: Overuse of β2-agonists. *J Resp Diseases* 2000;21:721.

**Case Reports**

None.

**Letters**

1.  Patil S**,** Krishnan JA, Lechtzin N, **Diette GB**.  In-hospital mortality following acute exacerbation of chronic obstructive pulmonary disease. *Archives of Internal Medicine*. 2004 Jan 26;164:222-223.

2.  **Diette GB**, Wu AW. Elderly asthmatic patients. *Archives of Internal Medicine*. 2003 Jan 13;163;1:122.

4.  Clerisme-Beaty EM, Rand C, **Diette GB.**  Reply to Farah. Weight loss in asthma: More evidence is needed. Reply to Farah.Journal of Allergy and Clinical Immunology 2010 125(3):770. PMCID: PMC2908807.

**Book Chapters:**

1.  **Diette G**, Brower R.  Traditional Invasive Ventilation.  In, <u>Pulmonary Respiratory Therapy Secrets,</u> 2nd Edition, Parsons P and Heffner J, Eds., Philadelphia, Hanley & Belfus, 2002.

2.  **Diette G**, Brower R.  Traditional Invasive Ventilation.  In, <u>Pulmonary Respiratory Therapy Secrets,</u> Parsons P and Heffner J, Eds., Philadelphia, Hanley & Belfus, 1997.

3.  **Diette G.**  Pleural Effusion. In, Mosby's Success in Medicine Specialty Clinical Sciences, Donnelly JL, Ed., Mosby, 1996.

5.  **Diette G.**  Pneumothorax. In, Mosby's Success in Medicine Specialty Clinical Sciences, Donnelly JL, Ed., Mosby, 1996.

6.  **Bose S, Diette GB.** Health disparities related to environmental air quality.  In: Health Disparities in Respiratory Medicine.  Eds: Gerald L and Berry C.  Springer.  In press.

**Internet:**

**Diette GB**, Liu MC. Disease Update on Asthma. Medcast Networks. [Released March 1, 1999]

Okelo SO, Butz AM, Sharma R, **Diette GB**, Pitts SI, King TM, Linn ST, Reuben M, Chelladurai Y, Robinson KA.  Interventions to modify health care provider adherence to asthma guidelines [Internet].  Rockville MD: Agency for Healthcare Research and Quality (US); 2013 May.

**Reports:**

1.  Wu A, **Diette GB**, Skinner E, Clark R, Steinwachs D.  Treatment Patterns Among Adult Asthmatics:  Factors Associated with High Use of Inhaled β-agonists, Low Use of Inhaled Corticosteroids, and Nocturnal Symptoms. Submitted to Merck & Co., Inc., July 1997.

2.  Steinberg EP, Holtz PM, Greenwald TP, **Diette GB**, Wills S, Webb A, Daugherty L, Caravoulias CL, Gabrielsen M, Pomponio C.  Report of results of a pilot test of draft NCQA HEDIS measures of health plan performance in control of blood pressure among diagnosed hypertensives.  Submitted to the NCQA Hypertension Measure Advisory Committee, July 1998.

3.  Wu AW, Skinner EA, **Diette GB**, Nguyen TTH, Clark RD.  Quality of Care and Outcomes for Childhood Asthma in Managed Care:  Validation of the Asthma Therapy Assessment Questionnaire. Submitted to Merck & Co., Inc., November 1998.

4.  **Diette GB**, Krishnan JA, Lechtzin N, Belcastro D.  Evidence Report on Chronic Obstructive Pulmonary Disease: Treatment and Risks. Submitted to CardioContinuum, September 1999.

5.  Wu AW, **Diette GB**, Dominici F, Skinner EA. The 1998 Asthma Outcomes Survey: Phase I Final Report. Submitted to the Pacific Business Group on Health, October 1999.

6.  **Diette GB**, Krishnan JA, Lechtzin N, Belcastro D. Report on Focus Group of Clinician Experts on Treatment of Chronic Obstructive Pulmonary Disease. Submitted to CardioContinuum, September 1999.

7.  **Diette GB,** Qutami M, Sullivan B. Report on Cystic Fibrosis Utilization and Asthma Utilization and Medication Use. Submitted to Aerogen, December 1999.

8.  **Diette GB**, Rand C, Wise RA, Thompson K, Merriman B. Pilot Study of Alternative Treatment Settings of High Frequency Chest Wall Oscillation in Patients with Chronic Bronchitis. Submitted to Advanced Respiratory, Inc, December 2003.

## Teaching

## Classroom Instruction

| | |
|---|---|
| 1993-1994 | Instructor, Course on Clinical Management in the Emergency Department, University of Pennsylvania Department of Emergency Medicine |
| 12/1993 | Instructor, First Aid for First Year Medical Students, University of Pennsylvania School of Medicine |
| 1996 & 1999 | Clinical Faculty for Human Anatomy Discussion Group, Heart and Lungs, Johns Hopkins University School of Medicine |
| 1997-2000 | Instructor, Evidence-Based Medicine Rotation for Medical Interns, Chronic Obstructive Pulmonary Diseases, Department of Medicine, Johns Hopkins Bayview Medical Center |
| 1997 & 2000 | Discussion Leader, Organ Systems Course, Pulmonary Physiology Section, Johns Hopkins University School of Medicine |
| 1997 | Teaching Assistant, The Science of Clinical Investigation: Design of Clinical Studies.  Johns Hopkins University School of Hygiene and Public Health |
| 1998 | Lecturer, Clinical Skills Course: The Pulmonary Examination, Johns Hopkins University School of Medicine |
| 1999 & 2000 | Discussion Leader, Pathophysiology Course, Pathophysiology of Shock, Johns Hopkins University School of Medicine |
| 1999 | Lecturer, Advanced Research Methods, International Respiratory Epidemiology Course, American Thoracic Society, Cusco, Peru |
| **1999-2002** | Co-Director. The Science of Clinical Investigation: Design of Clinical Studies. Johns Hopkins University School of Hygiene and Public Health |
| 2000-2003 | Lecturer, Patient Outcomes and Quality of Care Course, Department of Health Policy and Management, Johns Hopkins University School of Hygiene and Public Health |
| 2000 | Lecturer, Advance Research Methods, International Respiratory Epidemiology Course, |

| | American Thoracic Society, Quinamavida, Chile |
|---|---|
| 2001 | Discussion Leader, Clinical Epidemiology, Department of Epidemiology, Johns Hopkins University, April 2001. |
| 2003 | Co-Director. Advanced Research Methods, International Respiratory Epidemiology Course, American Thoracic Society, Buenos Aires, Argentine |
| 2004 | Director. Advanced Research Methods, Method in Epidemiologic, Clinical and Operations Research, American Thoracic Society, Punta del Este, Uruguay |
| 2005 | Faculty. Methods in Clinical Research. ERS/ATS School Course. Prague, Czech Republic, |
| 2005 | Director. Advanced Research Methods, Methods in Epidemiologic, Clinical and Operations Research, American Thoracic Society, Quito, Ecuador |
| 2006 | Director. Advanced Research Methods, Methods in Epidemiologic, Clinical and Operations Research, American Thoracic Society, Alphaville, Brazil. |
| 2007-Present | Attending Physician, the Barker Firm, Johns Hopkins University School of Medicine |

## Continuing Medical Education

| 2010 | Managed care strategies used in the successful treatment of asthma. National Asthma Education and Prevention Program.  Medical Communications Media, Inc. |
|---|---|

## Mentoring (pre- and post-doctoral):

## Advisees

| 2012-Present | Emily Bingham, MD<br>Post-doctoral Fellow, Division of Pulmonary and Critical Care Medicine |
|---|---|
| 2011-Present | Laura M. Paulin, MD<br>Post-doctoral Fellow, Division of Pulmonary and Critical Care Medicine |
| 2012-Present | Jessica Rice, MD<br>Post-doctoral Fellow, Department of Pediatrics |
| 2010-2014 | Niru Putcha, MD<br>Post-doctoral Fellow, Division of Pulmonary and Critical Care Medicine |
| 2010-2011 | Daniel Jamieson, MD<br>Post-doctoral Fellow, Division of Pulmonary and Critical Care Medicine |
| 2009-Present | Sonali Bose, MD, MPH<br>Post-doctoral Fellow, Division of Pulmonary and Critical Care Medicine<br>Research Theme:  Vitamin D levels in urban black children with asthma |

28

Current Position: Instructor of Medicine, Pulmonary and Critical Care Medicine

2009-2010    Marisha Cook, MD
Post-doctoral Fellow, Division of Allergy and Clinical Immunology
Research Theme: Dietary pattern differences by race in asthma
Current Position: Post-doctoral Fellow, Allergy & Clinical Immunology

2008-2009    Timothy Scialla, MD
Post-doctoral Fellow, Division of Pulmonary and Critical Care Medicine
Research Theme:  Inner City Diet and Asthma
Current Position: Assistant Professor of Medicine, University of Miami, Miami, Florida

2006-2007    Sabine Karem, MD
Post-doctoral Fellow, Division of Pulmonary and Critical Care Medicine
Research Theme:  Asthma Control in African-Americans
Current Position: Internal Medicine Resident, Montifiore Hospital, Bronx, NY

2005-2006    Lindsey Kim
MPH student, School of Hygiene and Public Health
Thesis:  Outcomes Study on Environmental Control Practices on Health of Inner-City Children with Asthma

2005-2007    Emily Smith Tonorezos
Post-Doctoral Fellow, Division of General Internal Medicine
Research Theme:  Diabetes as a modifying factor on the effect of particulate matter in COPD
Current Position: Assistant Professor of Medicine, Memorial Sloan Kettering, New York.

2005-2008    Meredith C. McCormack, MD, MHS
Post-Doctoral Fellow, Division of Pulmonary and Critical Care Medicine
Awarded Chest Foundation Award for Women's Studies, Loan Repayment Program, NIH K-23 Award, Johns Hopkins Bloomberg School of Public Health Faculty Grant in Global Health, and Pearl M. Stetler Research Fund
Research Theme:  Particulate Matter Effects on Asthma and COPD
Current Position: Assistant Professor of Medicine, Johns Hopkins University, Baltimore, Maryland

2004-2006    Amit Rahman
Medical Student, Johns Hopkins University, School of Medicine
Research Theme: Co-Morbidity COPD Outcomes

2004-2005    Alan Salas
Under-represented Minority Summer Research Program
Undergraduate Student, Johns Hopkins University, Baltimore, MD
Research Theme: Early Life Exposures and Risk of Asthma

2002-2003    Deanna Perez Williams
Community Health Scholars Program, Kellogg Foundation

Research Theme: Development of a Culturally-Sensitive, Patient-Focused Asthma Communication Instrument Designed to Enhance Provider-Patient Communication in Hispanics in Baltimore
Current Position: Howard University

2002-2004    Elizabeth C. Matsui, MD
Post-Doctoral Fellow, Division of Allergy and Immunology, Department of Pediatrics, Johns Hopkins University
Research Theme: Mouse allergen exposure, antibody responses, prick skin test response and allergy symptoms in laboratory workers
Current Position:  Associate Professor of Pediatrics. Division of Allergy and Immunology, Department of Pediatrics, Johns Hopkins University


2002-2004    Necole Streeper, MD
Minority Summer Research Program
Research Theme: Physician Underestimation of Self-Management Ability of African-Americans with Asthma
Current Position:  Resident, Dept of Urology, University of Texas HSC, San Antonio, TX


2002-2004    James Lee, MD
Housestaff, Internal Medicine, Johns Hopkins Hospital
Research Theme:  Gender Differences in Childhood Asthma
Current Position:  Assistant Professor of Medicine, Division of Pulmonary, Allergy and Critical Care Medicine, Hospital of the University of Pennsylvania, Philadelphia, PA


2002-2007    Cecilia Patino, MD
Research Associate, Division of Pulmonary and Critical Care Medicine
Research Theme: (1) Physician Adherence to Asthma Guidelines; (2) Validation of Survey Methods of Environmental Assessment
Current Position: Assistant Professor, Department of Preventive Medicine, University of Southern California, Los Angeles, CA


2001-2003    Marianelle Platon, MD
Under-represented Minority Summer Research Program
Research Theme: Validation of Physician Reported Adverse Events during Bronchoscopy
Current Position:  Physician, National Navel Medical Center, Bethesda, Maryland


2001-2004    Lucian Davis, MD
Housestaff, Internal Medicine, Johns Hopkins Hospital
Research Theme: Predictors of New-Onset Dyspnea in COPD
Current Position:  Assistant Adjunct Professor, Division of Pulmonary and Critical Care Medicine, University of California, San Francisco, San Francisco.


2001-2005    Susan Gerhardt, MD
Post-Doctoral Fellow, Division of Pulmonary and Critical Care Medicine
Awarded Pearl M. Stetler Research Grant
Research Theme: Treatment of Bronchiolitis Obliterans in Lung Transplant Rejection
Current Position:  Private Practice, Pennsylvania


2000-2005    Lewis J. Rubinson, MD

Post-Doctoral fellow, Division of Pulmonary and Critical Care Medicine
Research theme: National Guidelines and Central Venous Catheter Infections in the Intensive Care Unit
Current Position:  Assistant Professor, Division of Pulmonary and Critical Care Medicine, University of Washington, Seattle.

2000-2003   Sande Okelo, MD
Post-Doctoral fellow, Division of Pediatric Pulmonary Medicine
Research theme:  Emotional Function and Asthma Morbidity in Children
Awarded NIEHS Minority Supplement Award
Awarded ATS Minority Travel Award
Current Position: Assistant Professor, Department of Pediatrics, David Geffen School of Medicine at UCLA, Mattel Children's Hospital UCLA, Los Angeles, CA

2000-2004   Nadia N. Hansel, MD, MHS
Post-Doctoral fellow, Division of Pulmonary and Critical Care Medicine
Awarded Howard C. and Jane R. Goodman Award
Awarded the Bauernschmidt Fellowship Award from Eudowood Foundation
Awarded Chest Foundation Award for Women's Studies
Awarded American Thoracic Society Underrepresented Minority Travel Award
Research themes:  1) Quality of Life in Tuberculosis; 2) Th1/Th2 phenotype in tuberculosis and asthma.
Current Position: Associate Professor of Medicine, Johns Hopkins University

1999-2001   Edward Cox, Jr., MD, MPH
MPH student, School of Hygiene and Public Health
Project: Association of Hospital Volume and In-Hospital Mortality among Patients with Community-Acquired Pneumonia
Current Position: Director, Office of Antimicrobial Products (OAP) Food and Drug Administration, Rockville, Maryland

1999-2001   Noah Lechtzin, MD, MPH
Post-Doctoral fellow, Division of Pulmonary and Critical Care Medicine
Awarded Travel Award for Poster Presentation at 2001 American Thoracic Society International Meeting
Research theme: Respiratory manifestations of ALS: 1. Measures of disease burden; 2. Improving patient outcomes.
Current Position: Associate Professor of Medicine, Johns Hopkins University.

1998-2001   Jerry A. Krishnan, MD, PhD
Post-Doctoral fellow, Division of Pulmonary and Critical Care Medicine.
Awarded Chest Foundation Research Award for "Assessment of Gender and Race Differences in Quality of Care and Clinical Outcomes from Asthma."
Research theme: Quality of care and outcomes for asthma by gender and race
Current Position: Professor of Medicine, University of Illinois, Chicago.

1998-1999   Su Wang
MPH student, School of Hygiene and Public Health

Thesis: Nocturnal Symptoms in Pediatric Asthma: Clinical Features and Health Care Utilization in a Managed Care Setting
Current Position:  Unknown.

1997-2002    Lindy Wolfenden, MD
Housestaff, Internal Medicine, Johns Hopkins Hospital
Post-Doctoral Fellow, Division of Pulmonary and Critical Care Medicine
Research Theme: Older Adults and Asthma
(Deceased.)

## Thesis committees

07/2014    Kamau Peters, Doctoral Candidate in Environmental Health Scoenvces.
Role: Thesis Advisor and Final Oral Examination Committee Member.
04/2013    María Fernanda Cely-García, Doctoral Candidate, Universidad de Los Andes, Bogotá Columbia (*Personal exposures to asbestos and respiratory health of automotive mechanics in Bogotá, Columbia*)
Role: Thesis advisor and Final Oral Defense Committee Member
04/2010    Deanna M. Green, Doctoral Candidate in Environmental Health Sciences
Role: Thesis Advisor and Final Oral Defense Committee Member
10/2008    Maura Dwyer, Doctoral Candidate in Environmental Health Sciences
Role: Final Oral Defense Committee Member
10/2007    Juan Ramos Bonilla, Doctoral Candidate in Environmental Health Sciences
Role: Final Oral Defense Committee Member
12/2006    Sorina Eftin, Doctoral Candidate in Environmental Health Sciences
Role:  Thesis Committee Chair
04/2005    Laura LaRosa, Doctoral Candidate in Environmental Health Engineering
Role: Final Oral Defense Committee Member
11/2005    Kannika Taenkhum, Doctoral Candidate in Environmental Health Engineering
Role: Preliminary Orals Committee Member
12/2005    Sande Okele, Doctoral Candidate in Graduate Training Program in Clinical Investigation
Role: Final Oral Defense Committee Member
09/2004    Lewis Rubinson, Doctoral Candidate in Epidemiology
Role: Final Oral Defense Committee Member
03/2003    Ichan Huang, Doctoral Candidate in Health Policy and Management
Role: Thesis Committee Chair
03/2002    Ichan Huang, Doctoral Candidate in Health Policy and Management
Role: Preliminary Orals Committee Member
10/2001    Erika Tang, Doctoral Candidate in Epidemiology
Role: Preliminary Orals Committee Member

## Editorial Activities

### Peer review activities

### Editorial Boards
2010- Present   Member, *Clinical Respiratory Journal*
2013-Present    Member, *Journal of Pollution Effects & Control*

**Peer Reviewer**

*American Journal of Respiratory and Critical Care Medicine*
*Archives of Internal Medicine*
*Archives of Pediatric and Adolescent Medicine*
*Cancer Epidemiology, Biomarkers & Prevention*
*Chest*
*Epidemiology*
*Expert Opinion on Pharmacotherapy*
*Health Services Research*
*Journal of Allergy and Clinical Immunology*
*Journal of Clinical Outcomes Management*
*Journal of General Internal Medicine*
*Journal of Respiratory Diseases*
*Medical Care*
*Pediatrics*
*Preventative Medicine in Managed Care*
*Quality of Life Research*
*Thorax*

## CLINICAL ACTIVITIES:

**Certification:**

**MEDICAL LICENSURE**     Maryland        D-47616

**BOARD CERTIFICATION**

| | |
|---|---|
| 1991 | National Board of Medical Examiners |
| 1993 | American Board of Internal Medicine |
| 1996, 2006 | American Board of Internal Medicine, Pulmonary Medicine |

**Service Responsibilities (specialty, role, time commitment):**

Intensive Care Medicine, Attending Physician,
Oncology Center, Pulmonary and Critical Care Service, Attending Physician
Pulmonary Inpatient Medicine, Attending Physician
Barker Inpatient Internal Medicine, Attending Physician
Outpatient Pulmonary Clinic, Attending Physician

## SYSTEM INNOVATION AND QUALITY IMPROVEMENT ACTIVITIES

**System Innovation and Quality Improvement Publications**

Please see original research citation numbers  2, 3, 4, 6, 7, 9, 11, 12, 13, 14, 15, 17, 20, 21, 22, 23, 24, 26, 27, 29, 30, 31, 34, 36, 42, 43, 44, 45, 47, 52, 59, 68, 69, 70, 73, 75,76, 81, 84, 88, 89, 92, 93, 95 and 99.

**System Innovation and Quality Improvement efforts within JHM:**

1996-2006      **Initiator and Director**, Bronchoscopy Quality Improvement Project (BRONCHQI), Johns Hopkins Medical Institutions, Baltimore, MD

This highly successful project had many findings, including:

1. Documentation of unsafe dosing of lidocaine, which led to a reduction in the strength used from 2% to 1%. Documented no loss of analgesia with the change.
2. Identified risk of bleeding complications with lung biopsy
3. Documented diagnostic utility of having on-site cytopathology services during needle biopsy cases
4. Identified factors associated with patient satisfaction
5. Identified excessive pain and reasons for pain during the procedure
6. Performed a clinical trial of distraction therapy to reduce pain during the procedure
7. Identified predictors of positive diagnostic findings in immune-compromised patients
8. Demonstrated benefits of use of atropine pre-procedure to prevent adverse events

1997-2000    **Member**, Committee for Procedure Review, Pulmonary and Critical Care Medicine Procedures, Johns Hopkins Bayview Medical Center, Baltimore, MD

## System Innovation and Quality Improvement efforts outside JHM:

1996-1999    Senior Physician Scientist, Quality Assessment and Improvement Systems Division, Covance Health Economics and Outcomes Services. Washington, D.C.

Dialysis Outcomes Quality Initiative (DOQI): Co-investigator, Medical consultant, NCQA HEDIS hypertension measure: Co-investigator on measure validation

2003    **Member,** Howard County Comprehensive Health Improvement Plan for the Year 2010, Howard County Health Department, Columbia, MD

**National Committee for Quality Assurance**
2003    Member, COPD Technical Subgroup
2004-Present    Member, Clinical Expert Panel
2008    Member, National Committee for Quality Assurance (NCQA) Advisory Panel.  HEDIS Trends Publication Expert Advisory Panel.

## Production of guidelines and/or protocols:

2002    American Healthways/Johns Hopkins
2nd Annual Disease Management Outcomes Summit:  Standard Outcome Metrics and Evaluation Methodology for Disease Management Programs, November 7-10, 2002, Palm Desert, CA.
Role: Physician Steering Committee. The outcome metrics remain intact to date.

## System Innovation and Quality Improvement Program Building/Leadership:

N/A

## System Innovation and Quality Improvement Extramural Funding

12/26/2003-01/30/2011    Evaluation of home automated tele-management in COPD.
R01 AI070630
NIH
Annual Direct: $225,000
PI: Finkelstein

|  | Role: Co-Investigator, 0.60 calendar months |
|---|---|
| 09/10/2001-08/31/2006 | Improving physician adherence to asthma guidelines |

09/10/2001-08/31/2006    Improving physician adherence to asthma guidelines
K23 HL04266
NIH
Annual Direct $146,772
Role: Principal Investigator, 9.0 calendar months
Provide mentored training and research period for early career development.
Improve physician adherence to national asthma guidelines

9/01/2002-08/31/2007    Improving Respiratory Outcomes in ALS
K23 HL67887 (Lechtzin)
NIH
Annual Direct $121,750
PI: Lechtzin
Role: Advisor (effort as needed)
The overall theme of this award is to study various aspects of non-invasive positive pressure ventilation in patients with ALS with the goal of improving respiratory management of these patients.

2007-2008 (NCE)    Howard/Hopkins Center for Reducing Asthma Disparities
HL072455
NIH/NHLBI
Annual Direct $513,475
PI: Rand
Role:  Leader, Project 1, 1.5 calendar months, no cost extension
This application presents four research projects designed to collaboratively investigate factors associated with the disproportionate burden of asthma experienced by inner-city, African-American children and adults.

09/30/2004-06/30/2008    Improving asthma care for minority children in Head Start
R18 HL73833
NIH
Annual Direct $625,506
PI: Rand
Role: Co-Investigator, 0.6 calendar months
The goal of this project is to study the effect communication intervention on asthma-related morbidity and mortality among low-income African American children.

## ORGANIZATIONAL ACTIVITIES

### Institutional Administrative Appointments

1995-1997    **Initiator and Coordinator**, Pulmonary and Critical Care Epidemiology Seminar, Johns Hopkins University, Baltimore, MD

1996-present    **Initiator and Director**, Bronchoscopy Quality Improvement Project (BRONCHQI), Johns Hopkins Medical Institutions, Baltimore, MD

1997-2000    **Member**, Committee for Procedure Review, Pulmonary and

|  | Critical Care Medicine Procedures, Johns Hopkins Bayview Medical Center, Baltimore, MD |
|---|---|
| 1999-present | **Member,** Education Committee, Pulmonary and Critical Care Medicine, Johns Hopkins University School of Medicine, Baltimore, MD |
| 1999-present | **Member,** Research Committee, Pulmonary and Critical Care Medicine, Johns Hopkins University School of Medicine, Baltimore, MD |
| 1999-2006 | **Chair,** Conference Committee, Pulmonary and Critical Care Medicine, Johns Hopkins University School of Medicine, Baltimore, MD |
| 1999-present | **Member**, Internship Selection Committee, Department of Medicine, Johns Hopkins University School of Medicine, Baltimore, MD |
| 1999-present | **Member**, Fellowship Selection Committee, Division of Pulmonary and Critical Care Medicine, Department of Medicine, Johns Hopkins University School of Medicine, Baltimore, MD |
| 2001-present | **Member,** Fellow Review Committee, Division of Pulmonary and Critical Care Medicine, Department of Medicine, Johns Hopkins University School of Medicine, Baltimore, MD |
| 2003 | **Member,** Howard County Comprehensive Health Improvement Plan for the Year 2010, Howard County Health Department, Columbia, MD |
| 2003-present | **Member**, Faculty Development Committee, Division of Pulmonary and Critical Care Medicine, Department of Medicine, Johns Hopkins University School of Medicine, Baltimore, MD |
| 2005 | **Member**, Curriculum Reform Committee Meeting, Johns Hopkins School of Medicine, Baltimore, MD |
| 2009-present | **Member**, Planning Committee, CME Activity – Medical Grand Rounds, Johns Hopkins School of Medicine, Baltimore, MD |
| 2011-present | **Director**, Obstructive Lung Disease Program, Division of Pulmonary and Critical Care Medicine |
| 2013 | Member, Panel Presentation/Discussion: "writing a successful career development application.  Johns Hopkins Professional Development Office, September 25. 2013. |
| 2014 | *Ad hoc* Committee for a Department of Biostatistics faculty member's promotion to Associate Scientist. |

## Professional Societies

Associate, American College of Physicians (ACP)
Fellow, American College of Chest Physicians (ACCP)
Member, American Thoracic Society (ATS)

Member, American Federation for Clinical Research (AFCR)
Member, Central Society for Clinical Research (CSCR)
Member, International Society of Environmental Epidemiology

## Committee Memberships

### American Academy of Allergy, Asthma and Immunology

| | |
|---|---|
| 2003-Present | Member, Genetics and Epidemiology |

### American Thoracic Society

| | |
|---|---|
| 1999-2006 | Course Faculty Member, Education: Methods in epidemiologic, clinical and operations research (MECOR). |
| 2002-Present | Member, Behavioral Science Assembly Long Range Planning Committee |
| 2003-Present | Member, Behavioral Science Assembly Program Committee |
| 2003-2004 | Chair Elect, Behavioral Science Assembly Program Committee |
| 2003 | Member, IRE/MECOR Planning Retreat Committee |
| 2004-2005 | Chair, Behavioral Science Assembly Program Committee |
| 2006-2008 | Chair, Behavioral Science Assembly |
| 2006-2008 | Member, ATS Board of Directors |
| 2008-2009 | Chair, Behavioral Science Assembly Nominating Committee |
| 2008-2010 | Member, Environmental and Occupational Heath Assembly, Clinical Research Committee |
| 2008-2010 | Member, Environmental and Occupational Heath Assembly Program Committee |
| 2008-2010 | Member, Environmental and Occupational Health Assembly Working Group on Epidemiology |
| 2008-2009 | Mentor Member, Members in Transition and Training Committee |
| 2009-2011 | Member, Grant Review Committee for ATS Foundation-Tobacco-dependence research fund grant. |
| 2010-2015 | Member, Drug/Device Discovery and Development Committee |
| 2013-2014 | Member, Behavioral Science Assembly Planning Committee |
| 2013-2014 | Member, Behavioral Sciences and Health Services Research Assembly Nominating Committee |

### National Committee for Quality Assurance

| | |
|---|---|
| 2003 | Member, COPD Technical Subgroup |
| 2004-Present | Member, Clinical Expert Panel |

### Pennsylvania Department of Health

| | |
|---|---|
| 2004 | Member, Grant Review Committee, Centers of Excellence for Research on Lung Disease Review Panel. Washington, DC. |
| 2010-2011 | Member, Pennsylvania Final Performance Review, Master Tobacco Settlement for the Pennsylvania Department of Health, 09-10 Cycle B |

### State of Maryland

| | |
|---|---|
| 2006-2007 | Member, Governor-elect Martin O'Malley's Transition Committee, State of Maryland, Department of Health and Mental Hygiene, December, 2006 to January, 2007. |

### Clinical Trials & Surveys Corp (C-TASC)

| | |
|---|---|
| 2009-present | Member, Institutional Review Board |

**Qatar National Research Fund**

    2010-present    Reviewer, National Priorities Research Program

**Netherlands Asthma Foundation**

    2012-present    Member, Grant Review Section


**Conference Organizer, Session Chair (**see also Classroom Instruction, pages 19-20**)**

2003    Chair, American Thoracic Society International Conference Session: Assessing Patient Health, Healthcare and Outcomes: Limits of Physician Estimation

         Facilitator, American Thoracic Society International Conference Session: Environmental and Genetic Risk Factors for Pediatric Lung Disease.

         Chair, American Thoracic Society International Conference Symposium: Impact of Psychosocial Factors on Respiratory Health.

2004    Chair, American Thoracic Society International Conference Symposium: Assessing Asthma Severity and Asthma Control According to National Guidelines: Are our Assessments Working?

         Chair, American Thoracic Society International Conference Symposium:  Diagnosis and Outcomes in Pediatric Asthma.

         Chair, American Thoracic Society International Conference Symposium: Pediatric Asthma.

2005    Chair, American Thoracic Society International Conference Symposium: Health Disparities: Understanding and Addressing Them through Research and Practice.

         Chair, American Thoracic Society International Conference Symposium: Implementation of Asthma Severity Measurements in the Real World of Clinical Practice: What Are We Doing Now and What Should Come Next?

2006    Chair, American Thoracic Society International Conference Symposium: The Complex Interaction of Race, Stress and Neighborhood on Respiratory Disease. May 21, 2006.

2007    Chair, American Thoracic Society International Conference Symposium: Current Methods for the Respiratory and Environmental Researcher: A Toolkit for Clinical Investigation

         Chair, American Thoracic Society International Conference Symposium: Scientific Writing: How to Publish for Academic Success.

         Chair, American Thoracic Society International Conference: Assembly on Behavioral Science Membership Meeting.

2008    Chair, American Thoracic Society International Conference Symposium: Introduction to Data Analysis: Exploring the Great Unknown.

         Chair, American Thoracic Society International Conference Symposium: Asthma Severity Versus Asthma Control: What Should We Use in Clinical Practice?

2009    Chair, American Thoracic Society International Conference Symposium: Measuring and Improving the Quality of Care in Lung Disease.

Facilitator, American Thoracic Society International Conference Symposium: Developing Surveys that Measure or Predict.

Facilitator, American Thoracic Society International Conference Symposium: Asthma in the Inner City: A Unique Mix of Allergen and Pollutant Exposures.

2010    Chair, American Thoracic Society International Conference, Poster Session Discussion, New Orleans

Chair, American Thoracic Society International Conference, Scientific Symposium: Individual susceptibility to air pollution.

Chair, American Thoracic Society International Conference, Scientific Symposium: Asthma disparities: Root causes and global solution

2013    Chair, American Thoracic Society International Conference, EOH Program Committee

2013    Chair/Moderator, American Thoracic Society International Conference, Poster Session Discussion, Pollution Effects, Philadelphia

2013    Discussant, American Thoracic Society International Conference, Poster Session Discussion, Obesity: Impact on lung function and disease, Philadelphia

2013    Chair, Scientific Symposium: Developmental origins of asthma and allergies: Environment, modifiers and mediators, American Thoracic Society International Meeting, Philadelphia, May 2013.

2015    Chair, Scientific Symposium: Advances in Understanding and Reducing Asthma Disparities, American Thoracic Society International Meeting, San Diego, May 2015.

**Advisory Committees, Review Groups**

2001-2006    American Lung Association
Member, National Grants Review Award Selection Committee

2002    American Healthways/Johns Hopkins 2nd Annual Disease Management Outcomes Summit:  Standard Outcome Metrics and Evaluation Methodology for Disease Management Programs, November 7-10, 2002, Palm Desert, CA, Role: Physician Steering Committee

2003    American Healthways/Johns Hopkins 3rd Annual Disease Management Outcomes Summit: Defining the Patient-Physician Relationship for the 21st Century, October, 2003, Phoenix, AZ.  Role: Physician Steering Committee

Member, Aventis AVE0547 HE Asthma Advisory Board

| | |
|---|---|
| 2004 | American Healthways/Johns Hopkins 4th Annual Disease Management Outcomes Summit: Outcomes-Based Compensation: Pay-for-Performance Design Principles, November 11-14, 2004, Rancho Mirage, CA, Role: Physician Steering Committee |
| | Member, DEY, LP, Managed Care Advisory Board, Napa, CA. |
| 2005 | American Healthways/Johns Hopkins 5th Annual Disease Management Outcomes ummit: Improving Care Coordination through Physician-Disease Management Collaboration, November 10-13, 2005, Fort Lauderdale, Florida, Role: Physician Steering Committee |
| | Invited Faculty representing ATS, National Workshop to Reduce Asthma Disparities, Chicago, Illinois |
| 2006 | American Healthways/Johns Hopkins 6th Annual Disease Management Outcomes Summit: Embracing Health: Tools and Systems for Health Promotion and Disease Prevention, November, 2006, JW Marriott Starr Pass Resort, Tucson, AZ , Role: Physician Steering Committee |
| | Member, NIH/NHLBI Grant Review Award Selection Committee |
| | Member, NHLBI Strategic Planning Process Committee |
| 2007 | American Healthways/Johns Hopkins 7th Annual Disease Management Outcomes Summit: Integrated Medicine: Complementary Approaches, November 8-11, 2007, Austin, Texas, Role: Physician Steering Committee |
| 2008 | Reviewer, *ad hoc*, Deuthsche Forschungsgemeinschaft (German Research Foundation). |
| | Member, Cancer, Cardiovascular and Pulmonary Disease (CCPD) program. The Amendment 25 Program Evaluation Group. |
| | Member, National Committee for Quality Assurance (NCQA) Advisory Panel.  HEDIS Trends Publication Expert Advisory Panel. |
| 2008- | Member, EXPORT's P60 Advisory Board, University of Puerto Rico (UPR)/CHA Research presentCenter of Excellence: Making a Difference for Latino Health. San Juan, Puerto Rico. |
| 2008-2009 | Chair, The Donaghue Program for Research Leadership, Hartford, CT. |
| 2009-2011 | Member, NIH/NHLBI Study Section for Patient Oriented Research (K23, 24, and 25). |
| 2009 | Member, NIH/NIAID Review Panel for Special Emphasis Study Section ZAI1-RRS-I-M1. |
| 2010 | Discussant, NIH/NIAID, Asthma, Allergy and Inflammation Branch:  Asthma Outcomes Workshop, Bethesda, MD. |
| 2011 | Member, NIH/NHLBI Review Panel for Small Business Respiratory Sciences, Special Emphasis Study Section, ZRG1 CVRS-H (10) B (K12) |

| 2011 | Member, NIH/NHLBI Review Panel for NHLBI Career Development Programs in Emergency Medicine Research (K12). |
|------|---|
| 2011 | Chair, NIH/NHLBI Review Panel for RFA-HL-12-011, Development and testing of a case finding methodology in COPD (R01), Washington, DC |
| 2012 | Discussant, Webinar Presentation, NIEHS, Virtual Forum: Childhood Obesity and the Environment, November 2012. Research Triangle Park, NC |

**Consultancies**

Aventis 2002; Physician Advisory Panel

Cardiocontinuum, 1999-2000; Role: Development of COPD Program

American Healthways, 2002-Present; Role: Steering Committee Member and Performance Measure Development

Sorption Technologies, Inc., 2004-Present; Role: Research Design Consultant

Interactive Forums, Inc., 2004-Present; Role:  Health Care Consulting

Merck, Beta-agonist Measure Panel Meeting, December 3, 2004, Denver, Colorado.

Pfizer Academic Round Table, May 24-25, 2005, American Thoracic Society, San Diego, California.

# RECOGNITION

## Awards, honors

| 1986 | English Degree awarded with Honors, University of Pennsylvania |
|------|---|
| 1986 | BA, *Magna cum Laude*, University of Pennsylvania |
| 1986 | BS, *Magna cum Laude*, University of Pennsylvania |
| 1997 | Delta Omega Public Health Honor Society |
| 2000 | Solo Cup Clinician Scientist Award |
| 2001 | GlaxoSmithKline Development Partners' Junior Faculty Award |
| 2009 | Qforma's List of Most Influential Doctors, created for USA Today. |
| 2010 | Pfizer Visiting Professorship in Pulmonology. East Tennessee State University College of Public Health. |

**Invited Talks, Panels**

1993    The Special Value of Undergraduate Research.  Presented at the 64th Annual Meeting
of the Eastern Psychological Association.  Arlington, Virginia.

PSA as a Screening Test? Medical Management Conference.  Department of Internal Medicine,
University of Pennsylvania.

1994    Carbon Monoxide Poisoning, Medical Management Conference, Department of Internal Medicine,
University of Pennsylvania.

Invited Discussant, Morbidity and Mortality Conference, Department of Internal Medicine,
University of Pennsylvania.

1996    Vitamins and the Risk of Lung Cancer: Randomized Clinical Trials as a Gold-Standard, Longcope
Attending Rounds, Department of Internal Medicine, The Johns Hopkins University School of
Medicine.

PSA and DRE Screening for Prostate Cancer: Principles of Screening, Longcope Attending Rounds,
Department of Internal Medicine, Johns Hopkins University School of Medicine.

1997    Predictors of overuse of inhaled β-agonists, underuse of inhaled corticosteroids, and of nocturnal
symptoms in adult asthmatics.  Outcomes research group, Merck & Co., Inc., West Point, PA.

Associations of misuse of asthma medications in adult asthmatics enrolled in managed care.
Managed Care Health Care Consortium, Washington, DC.

Misuse of corticosteroid and β-agonist metered dose inhalers (MDIs) among adult asthmatics in
managed care (MCOs), Maryland Thoracic Society Annual Research Dinner, Baltimore, MD.

1998    Treatment patterns among adult asthmatics: Overuse of inhaled beta-agonists, underuse of inhaled
corticosteroids, Division of Pulmonary and Critical Care Medicine, Yale University School of
Medicine, New Haven, CT.

Treatment patterns among adult asthmatics: Overuse of inhaled beta-agonists, underuse of inhaled
corticosteroids, Division of General Internal Medicine, Case Western University School of
Medicine, Cleveland, OH.

Misuse of corticosteroid and β-agonist metered dose inhalers (MDIs) among adult asthmatics in
managed care (MCOs), Combined Allergy and Immunology Meeting, Palm Beach, FL.

Future HEDIS Measures for Asthma.  Glaxo-Wellcome Asthma Managed Care Consultants
Program. Naples, FL.

Asthma Therapy Assessment Questionnaire: Results of a Validation Study, Blue Plus, Minneapolis,
MN.

1999    Bronchoscopy Quality Improvement Project: A Hospital Based Cohort Study. Health Services
Research and Development Research Seminar.

Lesson Learned from Studies of Asthma in Managed Care. Best Practices Symposium sponsored by the Pacific Business Group on Health, Oakland, California.

Quality of Care and Guidelines: Management of Asthma. Practice Guidelines Workshop. Johns Hopkins Medical Services Corporation, Baltimore, MD, November 1999 and May 2000.

2000    Asthma Care by Asthma Specialists. Department of Medicine Grand Rounds. Greater Baltimore Medical Center, Baltimore, MD.

Predictors of Outcomes in Asthma. Frontiers in Research and Clinical Management of Asthma and Allergy Conference. Johns Hopkins Asthma & Allergy Center, Baltimore, MD.

Update in Asthma. Update in Pulmonary and Critical Care Medicine, Johns Hopkins University, Santa Fe, NM.

Fine-tuning your Bronchoscopy Practice. Bronchoscopy Workshop. Johns Hopkins University, Santa Fe, NM.

Underuse of Inhaled Corticosteroids in Asthma. Department of Medicine Grand Rounds, Johns Hopkins University, Baltimore, MD.

Nocturnal Asthma: Impact on Children and Their Parents. Research Conference of the Center  for Childhood Asthma in the Urban Environment, Johns Hopkins University, Baltimore, MD.

Bronchoscopy Quality Improvement Project: Design Issues and Results.  Robert Wood Johnson Clinical Scholars Program, Johns Hopkins University, February 1998 and April 2000.

2001    COPD- The Role of Steroids. Maryland Thoracic Society 41st Annual Meeting and Scientific Session, Pulmonary and Critical Care Medicine: State-of-the-Art, Baltimore, MD.

Update in Asthma. Johns Hopkins Bayview Medical Center, Department of Medicine, Baltimore, MD.

Severity, Control and Nocturnal Symptoms of Asthma in Children.  Research Conference, Division of Pediatric Pulmonary Medicine, Johns Hopkins University. Baltimore, MD.

2002    Non-pharmacologic pain control with Bedscapes for Bronchoscopy. American Red Cross, Arlington, VA.

2003    Annual High Sierra Critical Care Conference; Update in Asthma Management for 2003.

Annual High Sierra Critical Care Conference; How to get the most from your bronchoscopy practice.

Office of Community Health, Community Chats 2002-2003.

Burnt Pizza and Near-Death from Asthma. Department of Internal Medicine Grand Rounds, Johns Hopkins Bayview Medical Center, Baltimore, Maryland.

43

Using Functional Genomics to Understand Complex Lung Disease, ATS/NHLBI.

Aligning Asthma Care with Assessment of Severity, Healthcare Quality and Safety Research Seminar Series, JHU.

Asthma Epidemiology, World Allergy Organization (WAO), Vancouver.

Aligning Asthma Care with Assessment of Severity. Pulmonary and Critical Care Grand Rounds, Oregon Health Services University.

2004   Office of Community Health, Community Chats 2003-2004; Impact of Night Time Asthma on Children and their Families Effective Asthma Medication.

The Role of the Indoor Home Environment in Childhood Asthma. Johns Hopkins-Barbados Genetic Epidemiology of Obstructive Lung Disease Research Conference, Almond Bay, Hastings, Christ Church, Barbados.

Environmental Factors Impacting Respiratory and Immunologic Disease. Gulf Coast Pediatric Environmental Health Symposium, Baylor College of Medicine, Houston, Texas.

Aligning Asthma Care with Estimates of Asthma Severity: Development of the Asthma Communication Instrument. Research Conference, Division of Pulmonary and Critical Care Medicine, Department of Pediatrics, Johns Hopkins University, Baltimore, Maryland.

Epidemiology as a Tool for Understanding Respiratory Disease: Case-Control Studies, American Thoracic Society, Orlando, Florida.

Standardizing the Care of the Patient with COPD: Is the Quality of Care Truly Improved? American Thoracic Society, Orlando, Florida.

Getting the Most Out of Bronchoscopy Services, 6th Annual Update, Pulmonary and Critical Care Medicine, Santa Rosa, California.

Severe Asthma:  Current and Future Management, 6th Annual Update, Pulmonary and Critical Care Medicine, Santa Rosa, California.

2005   Office of Community Health, Community Chats 2005-2006.  The Growing Child and Other Health Issues:  Impact of Night-Time Asthma on Children and Their Families

Office of Community Health, Community Chats 2005-2006; Lung Disease: Making the Home Safer for Asthmatics.

Health Care Communications and Cultural Competency, National Workshop to Reduce Asthma Disparities, Chicago, Illinois.

The Home Environment of East Baltimore Preschool Children With and Without Asthma, Department of Physiology, Bloomberg School of Public Health, Johns Hopkins University.

COPD: A Pragmatic Approach to Improving Outcomes. Baltimore, Maryland.

44

COPD: A Pragmatic Approach to Improving Outcomes. COPD Exchange, Pittsburgh, Pennsylvania.

COPD:  Evolving Concepts of Therapy. COPD Exchange, Baltimore, Maryland.

Aligning Asthma Care with Assessment of Severity and Control in Practice. Department of Internal Medicine, York Hospital, York, Pennsylvania.

Office of Community Health, Community Chats 2005-2006; Treating Asthma in Children, New Psalmist Christian School, Baltimore, Maryland.

The Role of the Indoor Home Environment in Childhood Asthma. Johns Hopkins-Barbados Asthma Conference, Almond Bay, Hastings, Christ Church, Barbados.

Is it Smart to Prescribe Long-Acting β-Agonists for Patients with Asthma? Division of Allergy and Clinical Immunology, Johns Hopkins University. December 2, 2005; and Rush University, Chicago, Illinois.

Aligning Asthma Care with Assessment of Severity and Control in Practice. Primary Care Conference, Baltimore, Maryland, February 24, 2006;
Ohio State Pulmonary Grand Rounds, April 7, 2006; and
Hospital of the University of Pennsylvania. January 25, 2008.

2006    Aligning Asthma Care with Assessment of Severity and Control in Practice. American Lung Association, Chicago, Illinois.

Should We Still use Long-acting Beta-Agonists in Patients with Asthma? Johns Hopkins University, School of Medicine, Department of Medicine Grand Rounds.

Development of the Asthma and Control Communication Instrument. University of Maryland, Pulmonary Research Conference, Baltimore, MD.

Update in COPD. Baltimore-Washington Hospital, Department of Medicine Grand Rounds. Glen Burnie, Maryland.

Issues Related to Beta-2 Agonist Therapy; Polymorphisms/Clinical Outcomes/Adverse Events Profile. 20th Annual Update. Frontiers in Research and Clinical Management of Asthma and Allergy: From Bench to Bedside. Johns Hopkins University School of Medicine, Division of Allergy and Clinical Immunology, Johns Hopkins Asthma & Allergy Center at Johns Hopkins Bayview Medical Center, Baltimore, Maryland.

2007    Office of Community Health, Community Chats 2007-2008; Asthma:  How Asthmatics Can Make Their Home Safer; Effective Asthma Medication.

Hyperinflation in COPD Linking Physiology to Patient Experience. Boehringer-Ingelheim Pharmaceuticals, Inc, Christiana Care Hospital, Newark, Delaware.

Environmental Issues in Managing Asthma. 41st Respiratory Care Journal Conference. Scottsdale, Arizona, September 28, 2007.

45

Translational Science Think Tank. Collaborative Research Bridging Basic, Clinical and Health Services Domains: Challenges and Opportunities." University of Connecticut Health Center, Farmington, CT, December 6, 2007.

2008    NCQA On-line Program: Best Practices in COPD Treatment. Course Faculty. December 2007-December 2008.

Approaching and Garnering the Support of Community Partners for Community-Based Research. American Thoracic Society International Meeting.

Logistic Regression. American Thoracic Society International Meeting Post-graduate Course.

Assessing Control is Good, But Not Sufficient for Management of Asthma. American Thoracic Society International Meeting Scientific Symposium.

The Death of Primary Care. Barker Grand Rounds, Johns Hopkins University, Baltimore, Maryland.

Is Genetic Polymorphism important in response to asthma therapy? Johns Hopkins 21st Update Frontiers in Research and Clinical Management of Asthma and Allergy. Johns Hopkins Asthma and Allergy Center, Baltimore, Maryland.

Joint Indo-US Workshop on Environmental Risks of Respiratory Disease. Prevalence of Respiratory Disease in India. Chandigarh, India.

Bridging the Evidence-to-Practice Gap in Asthma and Chronic Obstructive Pulmonary Disease from a National and International Perspective: An Update. American Thoracic Society International Meeting, San Diego, CA.

2009    Diet and inner city asthma: Is there a connection? Department of Medicine Grand Rounds, Johns Hopkins University, Baltimore, MD.

Role of indoor pollutants in respiratory disease.  Fellows Orientation Conference, Division of Allergy and Clinical Immunology, Johns Hopkins University, Baltimore, MD.

Susceptibility determinants of childhood asthma.  Session: Contributing factors that influence the relationship between environmental exposures and children's health.  Pediatric Academic Societies Annual Meeting, Baltimore, MD.

Scientific Advisory Committee, Merck Childhood Asthma Network, Washington, DC.

Pediatric Asthma Roundtable meeting-Improve lives of children with asthma in the Baltimore area. National Asthma Campaign, Baltimore, MD.

2010    Topics in Clinical Medicine 2010.  Session: Meet the Professor—Pulmonary.  Johns Hopkins University Annual Topics in Clinical Medicine, Baltimore, MD.

Validated questionnaires in the management of allergic disorders: Applications and interpretation. Johns Hopkins Community Physicians, Baltimore, MD.

Validated questionnaires in the management of allergic disorders: Effective Use in an Allergy Practice Setting. Session: State-of-the-Art Session 2525: American Academy of Allergy, Asthma and Immunology International Meeting, New Orleans, LA.

Indoor environmental exposures and asthma disparities. Scientific Symposium: Asthma disparities: Root cause and global solution. American Thoracic Society International Meeting, New Orleans, LA.

2010    Speaker: Environmental Issues in Managing Asthma. Post-Graduate Respiratory Medicine Meeting, Irish Lung Foundation, Dublin, Ireland. June 2010.

Speaker, Asthma Update Seminar.  Eastern Shore AHEC, Hyatt Regency Chesapeake Bay, Cambridge, Maryland. August 2010.

Academy of Industrial Hygiene, PCIH 2010. Fort Worth, Texas, October 7-8, 2010
21st Century Toxicity Testing and Human Health Risk Assessment for Environmental Agents.
Speaker:  (1) "Lung responses to environmental toxins"
Speaker:  (2) "Environmental residential exposures to allergens and irritant gases"
Speaker:  (3) "Role of Pulmonary and Respiratory Irritants in Asthma, COPD, and Bronchiolitis Obliterans"

Speaker:  "Is diet driving the asthma epidemic?"  NIEHS/EPA Conference, Protecting children's health for a lifetime: Environmental health research meets clinical practice and public policy conference, October 19-20, Washington, DC

Speaker: Environmental Health Department Doctoral Seminar, Boston University, October 22, 2010.  "The role of indoor pollutants and allergens and asthma in inner city children: Some of the bad ingredients in a toxic stew."

Participant, Workshop: Task Force for the Asthma Disparities Working Group/Federal Task Force on Environmental Health Risks and Safety Risks to Children Steering Committee,  "Developing a coordinated federal action plan to reduce asthma disparities." NIH-NHLBI/EPA/HUD. Washington, DC. December 16-17, 2010.

2011    Visiting Professor, Leading Voices in Public Health Lecture Series. "The mouse, the house and the hamburger: Making sense of the asthma epidemic."  The College of Public Health and the Public Health Student Association, East Tennessee State University, March 3, 2011.

Lecturer, Teaching Course entitled Health Care Organization and Delivery: "Indoor environmental exposures and asthma disparities." East Tennessee State University, March 3, 2011.

Lecturer, Teaching Course entitled Introduction to Air Pollution: "Asthma and Air Pollution." East Tennessee State University, March 4, 2011.

Invited Speaker: U.S. Congress Briefing, Preventing Breast Cancer and Pediatric Asthma:  Links to the Environments of Women and Children, Rayburn House Office Building B-354 NIH/NIEHS. "The Mouse, the House and the Hamburger: Making Sense of the Asthma Epidemic." April 21, 2011.

47

Invited Speaker-Panelist: Clearing the Air, Addressing asthma disparities in Maryland. Session A-3: "Asthma Interventions: Research into Practice," and Session B-4: "The human side of asthma: Educating patients to make health decisions—overcoming barriers to medication adherence." Linthicum, MD.  June 2011.

Invited Speaker: National Healthy Homes Conference.  Track 7: Just the Facts.  Session 7H-2. "Nanoparticles and nitrogen dioxide from stoves: Health effects and strategies to reduce exposure and improve asthma control." Denver, CO. June 2011.

2012   Visiting Professor, Division of Pulmonary Medicine, Allergy and Immunology Children's Hospital of Pittsburgh of UPMC, Pittsburgh, PA, January 5, 2012.

Invited Speaker, Pediatric Pharmacology Division, National Jewish Health. "The house, the mouse and the hamburger: Making sense of the asthma epidemic." Denver, CO, June 2012.

Invited Speaker, Johns Hopkins Bloomberg School of Public Health/The Maryland Department of Health and Mental Hygiene/The mid-Atlantic Public Health Training Center.  "Reducing asthma disparities in children:  A model program with promising results. Baltimore, MD, June 2012.

Invited Speaker, EPA/NIEHS Children's Centers 2012 Webinar Series, Protecting children's health for a lifetime. "Role of home environment and diet on childhood asthma." December 2012.

2013   Visiting Professor, "The house, the mouse and pizza: Explaining the asthma epidemic." Universidad de Los Andes, Bogota, Columbia, April 2013.

Invited Speaker, Scientific Symposium: Developmental origins of asthma and allergies: Environment, modifiers and mediators, "Indoor exposures and ETS." American Thoracic Society International Meeting, Philadelphia, PA.  May 2013.

Invited Speaker, Congressional Briefing, Health and Medicine Counsel of Washington.  "Protecting children's health for a lifetime: How the environment influences health and development," hosted by Senator Kirsten E. Gillibrand, 385 Russell Senate Office Building. Sponsored by Friends of NIEHS, the American Academy of Pediatrics, and the Children's Environmental Health Network. October 2013.

Invited Lecturer, Johns Hopkins University School of Nursing, "Diagnosis, Symptom, and Illness Management I – Adult Course."  Topic: Asthma.  December 2013.

2014   Invited Lecturer and participant, NIH – MOST Clinical and Translational Science Workshop, NIH Campus, Stone House, Bethesda, MD, July 21-22, 2014.

Invited Speaker, Respiratory Expert Forum Ireland, "Beat the Professor" Case Studies on treating difficult airways disease, Dublin, Ireland, October 17-18, 2014.

2015   Invited Speaker, The Children's Environmental Health Network's 2015 CEHN Pediatric Research Conference Children: Food and Environment, "Prevention and Treatment of Asthma with Diet: Progress and Promise." The University of Texas at Austin, Austin, TX. February 4-6, 2015.

Invited Speaker, Scientific Symposium: Advances in Understanding and Reducing Asthma Disparities, "Indoor Exposures and Asthma Disparities."  American Thoracic Society International Meeting, San Diego, CA.  May 2015.

Office of Community Health, Community Chats 2015-2016; Asthma:  "How People With Asthma Can Make Their Homes Safer."

Office of Community Health, Community Chats 2015-2016; Asthma:  "Does Diet Affect Asthma?"

# APPENDIX D

Gregory Diette, MD, MHS

Diette publications, continued, after June 2017

1. Brigham EP, Steffen LM, London SJ, Boyce D, **Diette GB**, Hansel NN, Rice J, McCormack MC. Diet Pattern and Respiratory Morbidity in the Atherosclerosis Risk in Communities Study. *Annals of the American Thoracic Society.* 2018; 15(6).

2. Brigham EP, Matsui EC, Appel LJ, Bull DA, Curtin-Brosnan J, Zhai S, White K, Charleston JB, Hansel NN, **Diette GB**, McCormack MC. A pilot feeding study for adults with asthma: The healthy eating better breathing trial. *PLOS ONE.* 2017; 12(7).

3. Cloutier MM, Salo PM, Akinbami LJ, Cohn RD, Wilkerson JC, **Diette GB**, Williams S, Elward KS, Mazurek JM, Spinner JR, Mitchell TA, Zeldin DC. Clinician Agreement, Self-Efficacy, and Adherence with the Guidelines for the Diagnosis and Management of Asthma. *The Journal of Allergy and Clinical Immunology: In Practice.* 2018; 6(3): 886-894.

4. Lin SY, Azar A, Suarez -Cuervo C, **Diette GB**, Brigham E, Rice J, Ramanathan M, Gayleard J, Robinson KA. The Role of Immunotherapy in the Treatment of Asthma. *AHRQ Comparative Effectiveness Reviews, No. 196.* 2018.

5. Lin SY, Azar A, Suarez-Cuervo C, **Diette GB**, Brigham E, Rice J, Ramanathan Jr. M, Robinson KA. Role of sublingual immunotherapy in the treatment of asthma: An updated systematic review. *International Forum of Allergy and Rhinology.* 2018; 8(9): 982-992.

6. McCormack MC, Paulin LM, Gummerson CE, Peng RD, **Diette GB**, Hansel NN. Colder temperature is associated with increased COPD morbidity. *European Respiratory Journal.* 2017; 49(6).

7. Nnodum BN, McCormack MC, Putcha N, Hwang S, Paulin LM, Brigham EP, Fawzy A, Romero K, **Diette GB**, Hansel NN. Impact of Physical Activity on Reporting of Childhood Asthma Symptoms. *Lung.* 2017; 195(6): 693-698.

8. Paulin LM, Williams DL, Peng R, **Diette GB**, McCormack MC, Breysse P, Hansel NN. 24-h Nitrogen dioxide concentration is associated with cooking behaviors and an increase in rescue medication use in children with asthma. *Environmental Research.* 2017; 159: 118-213.

9. Rice JL, **Diette GB**, Suarez-Cuervo C, Brigham EP, Lin SY, Ramanathan Jr. M, Robinson KA, Azar A. Allergen-Specific Immunotherapy in the Treatment of Pediatric Asthma: A Systematic Review. *Pediatrics.* 2018; 141(5).

10. Rice JL, Brigham E, Dineen R, Muqueeth S, O'Keefe G, Regenold S, Koehler K, Rule A, McCormack M, Hansel NN, **Diette GB**. The feasibility of an air purifier and secondhand smoke education intervention in homes of inner city pregnant women and infants living with a smoker. *Environmental Research. 2018;* 160: 524-530.

11. Sulaiman I, Greene G, MacHale E, Seheult J, Mokoka M, D'Arcy S, Taylor T, Murphy DM, Hunt E, Lane SJ, **Diette GB**, FitzGerald JM, Boland F, Breathnach AS, Cushen B, Reilly RB, Doyle F, Costello RW. A randomized clinical trial of feedback on inhaler adherence and technique in patients with severe uncontrolled asthma. *European Respiratory Journal.* 2018; 51(1).

Tuesday, February 5, 2019

Gregory Diette, MD, MHS
Diette publications, continued, after June 2017

12. Wu TD, Eakin MN, Rand CS, Brigham EP, **Diette GB**, Hansel NN, McCormack MC. In-Home Secondhand Smoke Exposure Among Urban Children With Asthma: Contrasting Households With and Without Residential Smokers. *Journal of Public Health Management and Practice.* 2018; 25(2): E7-E16.

13. Wu TD, Brigham EP, Peng R, Koehler K, Rand C, Matsui EC, **Diette GB**, Hansel NN, McCormack MC. Overweight/obesity enhances associations between secondhand smoke exposure and asthma morbidity in children. *The Journal of Allergy and Clinical Immunology: In Practice.* 2018; 6(6): 2157-2159.

14. POSTER DISCUSSION SESSION:

Nnodum BN, Hwang S, Romero K, Kineza C, Tariq Z, Peng R, Putcha N, McCormack MC, Diette GB, Hansel NN. Impact Of Physical Activity On Childhood Asthma Symptoms: Longitudinal Study In Inner City Baltimore, Maryland. *Poster Discussion Session/ Wednesday May 24 2017/ Walter E. Washington Convention Center*

15. POSTER DISCUSSION SESSION:

Wu TD, Eakin M, Rand CS, Brigham E, Diette GB, Hansel NN, McCormack MC. Factors Associated with In-Home Secondhand Smoke Exposure from External Sources in Urban Children with Asthma. *Poster Discussion Session/ Sunday May 20/ San Diego Convention Center*

16. POSTER DISCUSSION SESSION:

Wu TD, Brigham E, Rand CS, **Diette GB**, Peng R, Putcha N, Koehler K, Hansel NN, McCormack MC. Overweight and Obesity Increases Respiratory Symptoms Associated With Secondhand Smoke Exposure Among Us Children. *Poster Discussion Session/ Wednesday May 24/ Walter E. Washington Convention Center*

17. POSTER DISCUSSION SESSION:

Koch A, Woo H, Brown RH, Brooker A, Paulin LM, Schneider H, Schwartz AR, Diette GB, Wise RA, Hansel NN, Putcha N. Obstructive Sleep Apnea is Associated with Airway Dimensions in COPD. *Poster Discussion Session/ Tuesday May 22, 2018/ Marriott Marquis San Diego Marina*

18. POSTER DISCUSSION SESSION:

Liesching TN, Huynh T, Cereda M, **Diette GB**. Treatment with the MetaNeb® System in High-Risk Post-Surgical Patients Reduced Hospital and Intensive Care Unit Length of Stay. *Poster Discussion Session/Sunday May 20/San Diego Convention Center*

19. POSTER DISCUSSION SESSION:

Polito C, Eakin M, Woo H, Romero K, McCormack MC, Fawzy A, Paulin LM, **Diette GB**, Koehler K, Hansel NN, Putcha N. Indoor Air Pollution May Be Associated with cognitive Impairment in Chronic Obstructive Pulmonary Disease. *Thematic Discussion Session/Monday May 21/San Diego Convention Center*

20. POSTER DISCUSSION SESSION:

Tuesday, February 5, 2019

Gregory Diette, MD, MHS
Diette publications, continued, after June 2017

Putcha N, Fawzy A, Matsui E, Bowler RP, Woodruff P, O'Neal WK, Comellas AP, Han MK, Dransfield MT, Lugogo N, Hoffman EA, Cooper CB, Hersh CP, Paulin LM, Drummond M, Wise RA, **Diette GB**, Hansel NN. Allergen Sensitization and Exposure Is Associated with Exacerbations in COPD. *Poster Discussion Session/Monday May 21/San Diego Convention Center*

21. POSTER DISCUSSION SESSION

Rice J, Brigham EP, Koehler K, McCormack MC, **Diette GB**, Woo H, Hanson C, Sharma S, Kolahdooz F, Hansel NN. Adherence to a Mediterranean Diet Attenuates the Adverse Effect of Indoor Particulate Matter on Asthma Symptoms in Children. *Poster Discussion Session/ Tuesday May 22/ San Diego Convention Center*

22. THEMATIC POSTER SESSION:

Wu TD, Rice J, Koehl R, Brigham E, **Diette GB**, Hansel NN, Sterni LM, McCormack MC. Pediatric Sleep Disordered Breathing is Associated with Worse Acute Asthma Control. *Thematic Poster Session/ Sunday May 20, 2018/ San Diego Convention Center*

23. THEMATIC POSTER SESSION:

Cereda M, Huynh T, Liesching T, **Diette GB**. Identification Of Surgical Population At High Risk Of Postoperative Pulmonary Complications. *Thematic Poster Session/ Sunday May 21, 2017/ Walter E, Washington Convention Center*

24. THEMATIC POSTER SESSION:

Soto, CML, Woo H, Romero K, Brigham E, McCormack MC, **Diette GB**, Hanson C, Fawzy A, Koch A, Putcha N, Hansel NN. Association of Omega-3 and Omega-6 Fatty Acid Intake with Inflammation and Respiratory Outcomes in COPD. *Thematic Poster Session/ Monday May 21, 2018/ San Diego Convention Center*

25. MINI SYMPOSIUM:

Bose S, McCormack MC, Woo HS, Romero K, Brigham E, Koehler K, Detrick B, **Diette GB**, Hansel NN. Vitamin D Status Modifies Response to Indoor Air Pollution in Urban Children with Asthma. *Mini Symposium/ Sunday May 20/ San Diego Convention Center*

26. MINI SYMPOSIUM:

Brigham E, McCormack MC, Woo H, Rice J, Koehler K, Vulcain T, Wu TD, Biswal SS, Sudini K, Koch A, Hanson C, Sangita S, Kolahdooz F, Bose S, Romero K, **Diette GB**, Hansel NN. Omega-3 and Omega-6 Fatty Acid Intake Modifies Response to Indoor Air Pollution in Children with Asthma. *Mini Symposium/ Sunday May 20/ San Diego Convention Center.*

27. Listed as a Reviewer and Technical Contributor:

World Health Organization. Air Pollution and Child Health: Prescribing Clean Air Summary. 2018.

Tuesday, February 5, 2019

# APPENDIX E

**Expert Testimony of Gregory B. Diette, MD, MHS**

| Date | Case Name | Case Number | Deposition or Trial |
|------|-----------|-------------|---------------------|
| 16-Jan-2014 | Ismael Rosas v. Flavorchem Corporation, et al | Superior Court of the State of California Count of Los Angeles, Central Civil West<br>Case No.: BC400974 | Deposition<br>(O'Laughlin Industries) |
| 1-Aug-2014 | Tanu Vatuvei v. Mission Flavors & Fragrances, Inc., et al. | Superior Court of the State of California for the county of Orange, Central Justice Center<br>Case No.: 30-2011-00518123 | Deposition<br>(O'Laughlin Industries) |
| 10-Jun-2014 | Harry Goldsmith v. ACandS, Inc., et al.<br>(Law Offices of Peter G. Angelos: Mr. William Minkin, Esq.) | In the Circuit Court for Baltimore City<br>Case No.: 24x13000097 | Deposition<br>(Hampshire Industries) |
| 3-Oct-2014 | Charles Waters v. ACandS, Inc., et al.<br>(Law Offices of Peter G. Angelos: Mr. Gary Ignatowsi, Esq.) | In the Circuit Court for Baltimore City<br>Case No.: 24x13000461 | Deposition<br>(Hampshire Industries) |
| 31-Oct-2014 | Francis Murphy v. ACandS, Inc., et al.<br>(Law Offices of Peter G. Angelos: Mr. William Minkin, Esq.) | In the Circuit Court for Baltimore City<br>Case No.: 24x13000371 | Deposition<br>(Hampshire Industries) |
| 19-Feb-2015 | Rachele and David Ventres v. 002 Auto Parts Inc., et al.<br>(Levy Konigsberg: Joseph Mandia, Esq.) | Superior Court of New Jersey<br>Case No.: MID-L-1933-12AS | Deposition<br>(BASF) |
| 19-Feb-2015 | Thomas and Donna Gioglio v. 3M Company, et al.<br>(Levy Konigsberg: Joseph Mandia, Esq.) | Superior Court of New Jersey<br>Case No.: MID-L-4593-12AS | Deposition<br>(BASF) |
| 25-Feb-2015 | Lorene McKenzie, deceased v. Palestine Principal Healthcare Limited Partnership, et al. | District Court of Anderson County Texas, 369th Judicial District.<br>Case No.: 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 | Trial<br>(Plaintiff) |
| 13-Mar-2015 | Walter Henry Hakenjos v. AT&T Corporation, et al.<br>(Cannella Law Firm: David Cannella, Esq.) | Civil District Court for the Parish of Orleans State of Louisiana<br>Case No.: 14-3828 | Deposition<br>(AT&T) |
| 10-Apr-2015 | Robert Menoche (as part of Raymond Michaels, et al.,) v. ACandS, Inc., et al.<br>(Law Offices of Peter G. Angelos: Mr. Theodore Fierlage, Jr., Esq.) | In the Circuit Court for Baltimore City<br>Case No.: 24x14000259 | Deposition<br>(Hampshire Industries) |

**Expert Testimony of Gregory B. Diette, MD, MHS**

| Date | Case Name | Case Number | Deposition or Trial |
|------|-----------|-------------|---------------------|
| 22-May-2015 | Kathy Mason v. Vistas at Lake Largo, LLC (Eccleston and Wolf: Mark Johnson, Esq.) | | Deposition (de bene esse) (Vistas at Lake Largo) |
| 3-Jun-2015 | Senate Committee on Environment & Public Works | Challenges and Implications of EPA's Proposed National Ambient Air Quality Standard for Ground-Level Ozone and Legislative Hearing on S. 638, S. 751, and S. 640. | (Minority) |
| 12-Jun-2015 | Donald Russ and Ann Russ v. Alcatel-Lucent USA Inc, et al. (Simmons Hanley Conroy: Daniel Blouin, Esq.) | In the Superior Court of New Jersey Case No.: MID-L-1249-14-AS | Deposition (AT&T) |
| 16-Jun-2015 | House Committee on Energy & Commerce | EPA's Proposed Ozone Rule: Potential Impacts on Manufacturing. | (Minority) |
| 31-Jul-2015 | Eric Heggie, as Special Administrator of the Estate of Karry Heggie, Deceased v. Honeywell International, Inc., Et al. (Wylder Corwin Kelly LLP) | In the Circuit Court of the Eleventh Judicial Circuit County of McLean Case No.: 12 L 87 | Deposition (Lincoln Electric Company; Hobart Brothers Company) |
| 23-Oct-2015 | Kris Penny v. AT&T Corporation, et al. (The Ruckdeschel Law Firm, LLC) | In the United States District Court Middle District of Florida Orlando Division Case No.: 6:15-cv-557-ORL-31KRS | Deposition (AT&T) |
| 25-Aug-2016 | Wanda Allen, Individually and as Personal Representative of the Estate of Byron K. Allen, et al. (Dumer & Barnes, P.A.) | In the Circuit Court for Baltimore City Case No.: 24-C-15-003256 OT | Deposition (Clinical Associates, PA: Sinai Hospital of Baltimore, Inc.) |
| 28-Sep-2016 | Rudiger & Joan Herion v. Donley's Inc., et al. (Bevan & Associates LPA, Inc.) | In the Court of Common Pleas, Cuyahoga County, Ohio Case No.: 15 CV 848879 | Deposition (Donley's Inc.) |
| 11-Jan-2017 | Anita M. Albright v. Kevin Anthony Seymour (Law Office of Neil J. Bixler, P.A.: Neil Bixler, Esq.) | Carroll County Circuit Court in Maryland | Trial (Kevin Anthony Seymour) |

**Expert Testimony of Gregory B. Diette, MD, MHS**

| Date | Case Name | Case Number | Deposition or Trial |
|---|---|---|---|
| 3-Feb-2017 | Brian Tucker and Sherri Tucker, his wife v. Momentive Performance Materials USA, Inc., et al. (Motley Rice, LLC: Scott B. Hall, Esq.) | In the United States District Court for the Southern District of West Virginia at Charleston Civil Action No. 2:13-cv-04480 | Deposition (Joint Defense) |
| 3-Mar-2017 | Dennis John Zampa and Pamela S. Zampa v. Georgia-Pacific LLC, et al. (Kazan, McClain, Satterley & Greenwood: Trey Jones, Esq.) | In the Alameda County Superior Court of California Case No.: RG16836998 | Deposition (E.I. Du Pont de Nemours and Company) |
| 8-Mar-2017 | Gregory Aregood, Jr., et al. v. International Flavors & Fragrances, Inc., et al. (Humphrey, Farrington & McClain, P.C.: Steven E. Crick, Esq.) | United States District Court for the Southern District of Indiana                    Civil Action No.: 1:14-CV-00274-LRM-TAB | Deposition (Givaudan Flavors Corporation) |
| 24-Mar-2017 | Gregory Aregood, Jr., et al. v. International Flavors & Fragrances, Inc., et al. (Humphrey, Farrington & McClain, P.C.: Steven E. Crick, Esq.) | United States District Court for the Southern District of Indiana                    Civil Action No.: 1:14-CV-00274-LRM-TAB | Continued Deposition (Givaudan Flavors Corporation) |
| 29-Mar-2017 | Dennis John Zampa and Pamela S. Zampa v. Georgia-Pacific LLC, et al. (Kazan, McClain, Satterley & Greenwood: Trey Jones, Esq.) | In the Alameda County Superior Court of California Case No.: RG16836998 | Deposition (E.I. Du Pont de Nemours and Company) |
| 6-Sep-2017 | Aaron Ruby, et al., v. International Flavor & Fragrances, INC., et al. (Stephen J. Butler, Esq.) | Court of Common Pleas Marion County, Ohio          Case No.: 2014 CV 0509 | Deposition (Givaudan Flavors Corporation) |
| 14-Dec-2017 | Terry Darpel, et al. v. Cargill Flavor Systems US, LLC, et al. (Motley Rice, LLC: Scott B. Hall, Esq.) | Commonwealth of Kentucky Kenton Circuit Court, Division III. Case No.: 12-CI-446 | Deposition (Emoral; Berje Incorporated) |
| 17-Jan-2018 | Delbert Cohen, Individually, and as Personal Representative of the Estate of Muriel Cohen, et al., v. 84 Lumber Company, et al. (The Ruckdeschel Law Firm, LLC; Z. Stephen Horvat, Esq.) | In the Circuit Court for Prince George's County Case No.: CAL16-37427 | Deposition (Hampshire Industries) |

**Expert Testimony of Gregory B. Diette, MD, MHS**

| Date | Case Name | Case Number | Deposition or Trial |
|---|---|---|---|
| 4-Apr-2018 | Darrell Palmer and Norma Palmer v. Appleton GRP, LLC d/b/a Appleton Group and Emerson Electric Co., et al. (Geoge & Farinas, LLP) | In the Marion Superior Court SS: Civil Division Room 2 Cause No. 49D02-1704-MI-016728 | Deposition (Rockwell Automation; Reliance Electric) |
| 22-Apr-2018 | Gail Lucille Ingham and Robert Ingham, et al. v. Johnson & Johnson; Johnson & Johnson Consumer Companies, Inc.; and Imerys Talc America, Inc., f/k/a Luzenac America, Inc. (The Lanier Law Firm; Sam E. Taylor, Esq.) | In the Circuit Court of the City of St. Louis State of Missouri Cause No. 1522-CC10417-01 | Deposition (Johnson & Johnson) |
| 10-Jul-2018 | Blades, Kevin, et al. v. Emoral, Inc., f/k/a Polarome International, Inc., et al. (Humphrey, Farrington & McClain; Scott A. Britton-Mehlisch) | In the Circuit Court of Jasper County, Missouri Case No. 17AO-CC00025 | Deposition (Emoral) |
| 27-Jul-2018 | Herman Leischner and Bonnie Leischner v. Aerco International, Inc., et al. (Wylder Corwin Kelly LLP; Stephen Wood, Esq.) | In the Circuit Court of the Eleventh Judicial Circuit County of McLean No. 15 L 53 | Deposition (Hobart Brothers and Lincoln Electric) |
| 3-Aug-2018 | Marlin Herbst v. Bush Boake Allen, Inc., et al. (Humphrey, Farrington & McClain; Michael S. Kilgore, Esq.) | In the United States District Court Northern District of Iowa Western Division No. C17-4008-MWB | Deposition (Givaudan Flavors Corporation & Emoral, Inc.) |
| 30-Aug-2018 | Rosalind Henry and Frederick C. Henry v. Brenntag North America, et al. (Motley Rice LLC, W. Christopher Swett, Esq.) | Superior Court of New Jersey, Middlesex County No. MID-L-1748-17AS | Deposition (Johnson & Johnson, Johnson & Johnson Consumer Inc., and Imerys Talc America, Inc.) |
| 28-Sep-2018 | Nelcome Courville, Jr. v. Lamorak Insurance Company, et al. (Roussel & Clement; Gerolyn P. Roussel, Esq.) | Civil Dirstric Court for the Parish of New Orleans, Louisiana No. 2017-1117 | Deposition (Chemours Company) |

## Expert Testimony of Gregory B. Diette, MD, MHS

| Date | Case Name | Case Number | Deposition or Trial |
|------|-----------|-------------|---------------------|
| 3-Oct-2018 | Rosalind Henry and Frederick C. Henry v. Brenntag North America, et al. (Motley Rice LLC; W. Christopher Swett, Esq.) | Superior Court of New Jersey, Middlesex County No. MID-L-1748-17AS | Trial (Johnson & Johnson, Johnson & Johnson Consumer Inc., and Imerys Talc America, Inc.) |
| 17-Oct-2018 | Carol Kerkhof, et al. v. Brenntag North American, INC, et al. (Simon Greenstone Panatier Bartlett, PC) | Circuit Court for Montgomery County No. 439392-V | Depositon (Johnson & Johnson, Johnson & Johnson Consumer Inc., and Imerys Talc America, Inc.) |
| 26-Oct-2018 | Anastasia Brower, a minor, through her legal guardian Pamela Russell, and Pamela Russell, as the executrix of the Estate of Diane Brower, deceased v. Johnson & Johnson, et al. | In the State Court of Fulton County Fulton State of Georgia No. 16-EV-005534-E | Deposition (Johnson & Johnson, Johnson & Johnson Consumer Inc.) |
| 9-Nov-2018 | Paul E. Beach and Rheta E. Beach, Pltfs. vs. 3M Company, etc., et al. | Superior Court of the State of California, County of Alameda - Court of Unlimited Jurisdiction. Case No. RG18893273 | Deposition (Rockwell Automation) |
| 13-Dec-2018 | Terry Lee Siegfried v. 3M Company, etc., et al. (The Lanier Law Firm; Mark A. Linder, Esq.) | Los Angeles County- Superior Court- Case No. BC691900 | Deposition (Rockwell Automation) |
| 9-Jan-2019 | Joseph Woon-Shing Lee and Marina Lai-Kuen Lee vs. A. W. Chesterton Company, et al. (Shingler Law; Ronald J. Shingler) | Solano County - Superior Court - Fairfield, CA Case # FCS050176 | Deposition (Johnson & Johnson, Johnson & Johnson Consumer Inc.) |
| 25-Jan-2019 | Phillip Luna v. The Kerry Group, Inc. et al. (TORHOERMAN LAW, LLC) | Los Angeles County- Superior Court- Case No. BC544985 | Deposition (PENTA, et al.) |
| 22-Feb-2019 | Lester D. Gardner and Marilyn A. Gardner, etc. vs. ABB INC., etc., et al. (Weinstein Couture, PLLC; Brian D. Weinstein) | Pierce County - Superior Court - Olympia, WA Case No. 172112033 | Deposition (Rockwell Automation) |

Exhibit 9

Gregory B. Diette, M.D.

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY

----------------------------x

IN RE JOHNSON & JOHNSON        ) MDL No.

TALCUM POWDER PRODUCTS         ) 16-2738 (FLW)(LHG)

MARKETING SALES PRACTICES,     )

AND PRODUCTS LIABILITY         )

LITIGATION                     )

                               )

THIS DOCUMENT RELATES TO       )

ALL CASES                      )

----------------------------x


VIDEOTAPED DEPOSITION OF

GREGORY B. DIETTE, M.D.

TOWSON, MARYLAND

TUESDAY, APRIL 9, 2019

8:58 A.M.


Reported by: Leslie A. Todd

Gregory B. Diette, M.D.

| Page 2 | |
|---|---|
| 1 | Deposition of GREGORY B. DIETTE, M.D., held at |
| 2 | the: |
| 3 | |
| 4 | |
| 5 | SHERATON BALTIMORE NORTH HOTEL |
| 6 | 903 Dulaney Valley Road |
| 7 | Towson, Maryland 21204 |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | Pursuant to notice, before Leslie Anne Todd, |
| 17 | Court Reporter and Notary Public of the State of |
| 18 | Maryland, who officiated in administering the oath |
| 19 | to the witness. |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

| Page 4 | |
|---|---|
| 1 | APPEARANCES (Continued): |
| 2 | |
| 3 | CYNTHIA L. GARBER, ESQUIRE |
| 4 | ROBINSON CALCAGNIE, INC. |
| 5 | 19 Corporate Plaza Drive |
| 6 | Newport Beach, California 92660 |
| 7 | (949) 720-1288 |
| 8 | |
| 9 | NATHAN D. FINCH, ESQUIRE |
| 10 | MOTLEY RICE LLC |
| 11 | 401 9th Street, NW |
| 12 | Suite 1001 |
| 13 | Washington, D.C. 20004 |
| 14 | (202) 232-5507 |
| 15 | |
| 16 | ON BEHALF OF THE JOHNSON & JOHNSON DEFENDANTS: |
| 17 | ALLISON M. BROWN, ESQUIRE |
| 18 | RICHARD M. HEASLIP, ESQUIRE |
| 19 | WEIL, GOTSHAL & MANGES LLP |
| 20 | 17 Hutfish Street, Suite 201 |
| 21 | Princeton, New Jersey 08542-3792 |
| 22 | (609) 986-1104 |
| 23 | |
| 24 | |
| 25 | |

| Page 3 | |
|---|---|
| 1 | A P P E A R A N C E S |
| 2 | |
| 3 | ON BEHALF OF THE PLAINTIFFS: |
| 4 | MICHELLE PARFITT, ESQUIRE |
| 5 | ADAM K. ROSEN, ESQUIRE |
| 6 | ASHCRAFT & GEREL, LLP |
| 7 | 1825 K Street, N.W. |
| 8 | Suite 700 |
| 9 | Washington, D.C. 20006 |
| 10 | (202) 783-6400 |
| 11 | |
| 12 | CHRISTOPHER V. TISI, ESQUIRE |
| 13 | LEVIN PAPANTONIO THOMAS MITCHELL |
| 14 | RAFFERTY PROCTOR, P.A. |
| 15 | 316 South Baylen Street |
| 16 | Pensacola, Florida 32502 |
| 17 | (850) 435-7000 |
| 18 | |
| 19 | DENNIS M. GEIER, ESQUIRE |
| 20 | COHEN PLACITELLA ROTH, PC |
| 21 | 127 Maple Avenue |
| 22 | Red Bank, New Jersey 07701 |
| 23 | (732) 747-9003 |
| 24 | |
| 25 | |

| Page 5 | |
|---|---|
| 1 | APPEARANCES (Continued): |
| 2 | |
| 3 | KATHERINE MCBETH, ESQUIRE |
| 4 | DRINKER BIDDLE & REATH, LLP |
| 5 | One Logan Square, Suite 2000 |
| 6 | Philadelphia, Pennsylvania 19103-69896 |
| 7 | (215) 988-2706 |
| 8 | |
| 9 | JESSICA D. MILLER, ESQUIRE |
| 10 | SKADDEN, ARPS, MEAGHER & FLOM, LLP |
| 11 | 1440 New York Avenue, N.W. |
| 12 | Washington, D.C. 20005 |
| 13 | (202) 371-7000 |
| 14 | |
| 15 | ON BEHALF OF THE PCPC: |
| 16 | THOMAS T. LOCKE, ESQUIRE |
| 17 | SEYFARTH SHAW LLP |
| 18 | 975 F Street, N.W. |
| 19 | Washington, D.C. 20004-1454 |
| 20 | (202) 463-2400 |
| 21 | |
| 22 | ALSO PRESENT: |
| 23 | DANIEL HOLMSTOCK, Videographer |
| 24 | |
| 25 | |

Gregory B. Diette, M.D.

Page 6

C O N T E N T S

1  EXAMINATION OF GREGORY B. DIETTE, M.D.     PAGE
2  By Ms. Parfitt              14
3  By Mr. Finch                465
4  By Ms. Brown                467
5
6
7  E X H I B I T S
8  (Attached to transcript)
9  DIETTE DEPOSITION EXHIBITS            PAGE
10  No. 1   Notice of Oral and Videotaped
11          Deposition of Gregory Diette, MD,
12          MHS, and Duces Tecum        16
13  No. 2   Defendants' Response to Plaintiffs'
14          Document Requests Contained in Notice
15          of Oral and Videotaped Deposition of
16          Gregory Diette, M.D., MHS and Duces
17          Tecum                       17
18  No. 3   Expert Report of Gregory Diette, MD,
19          MHS for General Causation Daubert
20          Hearing, Supplemental Materials
21          Reviewed and Considered     18
22  No. 4   Article entitled "Ovulation and Risk
23          of Epithelial Ovarian Cancer"    44

Page 7

E X H I B I T S (Continued)

1  (Attached to transcript)
2  DIETTE DEPOSITION EXHIBITS           PAGE
3  No. 5   Bottle of Johnson's Baby Powder
4          (Retained by Plaintiffs' Counsel)   52
5  No. 6   Excerpt of Deposition of Susan
6          Nicholson, M.D.             82
7  No. 7   Document entitled "Appendix C"
8          Curriculum Vitae of Gregory B.
9          Diette, MD, MHS             91
10  No. 8   Document from Johns Hopkins Medicine
11          website, entitled "Find an Expert,"
12          Gregory Bruce Diette, M.D.      95
13  No. 9   Gregory B. Diette, MD, Associate
14          Professor, Departmental Affiliations 98
15  No. 10  Expert Report of Gregory Diette, MD,
16          MHS for General Causation Daubert
17          Hearing                   133
18  No. 11  Document entitled "Appendix E,"
19          Expert Testimony of Gregory B.
20          Diette, MD, MHS           138
21  No. 12  Document from the Sidney Kimmel
22          Comprehensive Cancer Center, Risk
23          Factors & Symptoms        213

Page 8

E X H I B I T S (Continued)

1  (Attached to transcript)
2  DIETTE DEPOSITION EXHIBITS            PAGE
3  No. 13  Document headed "Statement of Dr.
4          Anne Mc Tiernan prepared for the
5          Subcommittee on Economic and
6          Consumer Policy Hearing on Examining
7          the Public Health Risk on
8          Carcinogens and Consumer Products,
9          March 12, 2019"             235
10  No. 14  Draft Screening Assessment, Talc,
11          Chemical Abstracts Service Registry
12          Number 14807-96-6, Environment and
13          Climate Change Canada, Health Canada,
14          December 2018               267
15  No. 15  Article entitled "Asbestos Exposure
16          and Ovarian Fiber Burden," Bates
17          JNJ 000004999 to 000005003     281
18  No. 16  Excerpt from "Modern Epidemiology,"
19          Third Edition, by Rothman, Greenland
20          and Lash                   289
21  No. 17  Taylor and Francis Group article,
22          "Moving to a World Beyond "p < 0.05" 297

Page 9

E X H I B I T S (Continued)

1  (Attached to transcript)
2  DIETTE DEPOSITION EXHIBITS            PAGE
3  No. 18  Article entitled "Retire statistical
4          Significance," by Amrhein, Greenland,
5          McShane                    299
6  No. 19  Article from Johns Hopkins Institute
7          for Clinical & Translational Research,
8          "The American Statistician Special
9          Issue: Moving to a World Beyond 'P
10          < 0.05'"                   308
11  No. 20  Supplementary information to: Retire
12          Statistical significance, Valentin
13          Amrhein et al.             312
14  No. 21  Document entitled "Gregory Diette,
15          MD, MHS: Talc/Ovarian Cancer Disease
16          Control Studies (Hospital Studies
17          Below Line)                324
18  No. 22  Chart showing Estimated Relative
19          Risk of Ovarian Cancer, According
20          to Reported Use of Talc, Bates
21          JNJ 000013131              327

3  (Pages 6 to 9)

Gregory B. Diette, M.D.

Page 10

```
 1        E X H I B I T S (Continued)
 2          (Attached to transcript)
 3    DIETTE DEPOSITION EXHIBITS          PAGE
 4    No. 23   Article entitled "Exposure to
 5          Secondhand Smoke and Risk of Cancer
 6          in Never Smokers: A Meta-Analysis of
 7          Epidemiologic Studies"        366
 8    No. 24   International Journal of Cardiology
 9          article, "Risk of all-cause mortality
10          and cardiovascular disease associated
11          with secondhand smoke exposure: A
12          systematic review and meta-analysis" 369
13    No. 25   NIH Public Access Author Manuscript,
14          "Common Household Activities are
15          Associated with Elevated Particulate
16          Matter Concentrations in Bedrooms of
17          Inner-City Baltimore Pre-School
18          Children"                      377
19    No. 26   "The Health Consequences of
20          Involuntary Exposure to Tobacco
21          Smoke," A Report of the Surgeon
22          General                        377
23    No. 27   IARC Monograph entitled "Arsenic,
24          Metals, Fibres and Dusts," Volume
25          100 C, A review of Human Carcinogens 392
```

Page 12

```
 1        E X H I B I T S (Continued)
 2          (Attached to transcript)
 3    DIETTE DEPOSITION EXHIBITS          PAGE
 4    No. 34   Article entitled "Possible Role of
 5          Epithelial Inflammation in Ovarian
 6          Cancer"                        442
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 11

```
 1        E X H I B I T S (Continued)
 2          (Attached to transcript)
 3    DIETTE DEPOSITION EXHIBITS          PAGE
 4    No. 28   Table 2.8 Epidemiologic studies of
 5          asbestos exposure and ovarian cancer
 6          (and, for comparison, lung cancer
 7          and mesothelioma)              396
 8    No. 29   Article entitled "Association between
 9          Body Powder Use and Ovarian Cancer:
10          The African American Cancer
11          Epidemiology Study (AACES)"    413
12    No. 30   Article entitled "Perineal Talc Use
13          and Ovarian Cancer, A Systematic
14          Review and Meta-Analysis"      416
15    No. 31   Ultrastructural Pathology article,
16          "Correlative polarizing light and
17          scanning electron microscopy for
18          the assessment of talc in pelvic
19          region lymph nodes"            427
20    No. 32   Letter to Samuel Epstein from the
21          Department of Health and Human
22          Services, dated April 1, 2014  431
23    No. 33   Facsimile dated September 30,
24          2004 to Luzenac America from
25          Richard Zazenski to Bill Ashton  437
```

Page 13

```
 1            P R O C E E D I N G S
 2          ------------------
 3        THE VIDEOGRAPHER:  We are now on the
 4    record, and my name is Daniel Holmstock.  I am the
 5    videographer for Golkow Litigation Services.
 6    Today's date is April 9th, 2019, and the time on
 7    the video screen is 8:58 a.m.
 8        This video deposition is being held at
 9    the Sheraton Baltimore North Hotel, at 903 Dulaney
10    Valley Road in Towson, Maryland, in the matter of
11    Johnson & Johnson Talcum Powder Products
12    Marketing, Sales Practices and Products Liability
13    Litigation, MDL No. 2738, and is pending before
14    the United States District Court for the Eastern
15    District of New Jersey.
16        Our deponent today is Dr. Gregory
17    Diette.
18        Counsel for appearances will be noted on
19    the stenographic record.  And our court reporter
20    today is Leslie A. Todd, who will now administer
21    the oath.
22        GREGORY B. DIETTE, M.D.,
23        and having been first duly sworn,
24        was examined and testified as follows:
25            DIRECT EXAMINATION
```

4 (Pages 10 to 13)

Gregory B. Diette, M.D.

Page 14

1    BY MS. PARFITT:
2        Q   Good morning, Dr. Diette.  How are you?
3        A   Good morning.  Fine, thanks.
4        Q   Good.  We will dispense with the usual
5    comments with regard to a deposition.  I
6    understand you've had --
7            THE VIDEOGRAPHER:  Microphone.
8    BY MS. PARFITT:
9        Q   All right.  Now we're back on the mic.
10       Dr. Diette, we'll dispense with the
11   usual comments with regard to what a deposition is
12   about.  I understand you've probably had your
13   deposition taken more than a hundred times.  Is
14   that fair?
15       A   I don't know if it's a hundred, but --
16   but plenty enough that I think that I -- I
17   understand the process.
18       Q   All right.  The only one that I will ask
19   you to pay some attention to is the fact that if
20   you don't understand my question, please let me
21   know.  Otherwise, I'm going to assume you
22   understand every question that I ask, and the
23   answers that you're giving are truthful and
24   accurate.  Fair enough?
25       A   It is.

Page 15

1        Q   All right.  Now, you're sitting here
2    today in Towson, Maryland, in a Sheraton Hotel; is
3    that correct?
4        A   That is.
5        Q   All right.  You are normally, I believe,
6    over at Johns Hopkins University Medical Center,
7    correct?
8        A   That's right.
9        Q   All right.  Is your department aware of
10   the fact that you're sitting over here having a
11   deposition taken?
12       A   I don't know if anybody knows about this
13   today, but they wouldn't be surprised, I mean, to
14   hear it if I told them.
15       Q   All right.  They know that you
16   frequently give depositions so they would not be
17   surprised; is that correct?
18           MS. BROWN:  Objection to form.
19           THE WITNESS:  They -- I don't know about
20   frequently, but they know that -- that I do give
21   depositions.
22   BY MS. PARFITT:
23       Q   All right.  Very good.
24           Would you please introduce your formal
25   God-given name for the ladies and gentlemen of the

Page 16

1    jury.
2        A   Sure.  It's Gregory --
3            MS. BROWN:  Objection.  There's no jury
4    here.
5            MS. PARFITT:  There may be.
6            MS. BROWN:  Go ahead, Dr. Diette.
7            THE WITNESS:  My parents gave it to me,
8    for what it's worth, but it's Gregory Bruce
9    Diette.
10   BY MS. PARFITT:
11       Q   Okay.  Very good.
12           Dr. Diette, what I'd like to do is mark
13   as Exhibit 1 a notice of the deposition.
14           (Diette Exhibit No. 1 was marked
15           for identification.)
16   BY MS. PARFITT:
17       Q   Dr. Diette, if I may, Exhibit 1 is the
18   notice of deposition.  Have you seen that document
19   before?
20       A   Yeah, I've certainly seen -- seen
21   something just like this.
22       Q   All right.  Do you see at the back of
23   the deposition, there is a notice that -- there is
24   a request for you to bring certain information to
25   your deposition?  Do you see that?

Page 17

1        A   Yes.
2        Q   All right.  Have you had a chance to
3    review that?
4        A   I have.
5        Q   All right.  How recently?
6        A   Last week sometime.
7        Q   All right.  Was it provided to you by
8    counsel?
9        A   I think that's the only way I could get
10   it.
11       Q   Okay.  Very good.
12           Now, yesterday, perhaps early in the
13   morning, I was also provided a copy of the
14   Defendants' Response to the Plaintiffs' Document
15   Requests Contained in the Notice of Oral and
16   Videotaped Deposition.
17           Let me show you what we will have marked
18   as Exhibit No. 2.
19           (Diette Exhibit No. 2 was marked
20           for identification.)
21   BY MS. PARFITT:
22       Q   Dr. Diette, let me present you with a
23   copy of Exhibit No. 2.
24           All right.  Dr. Diette, my understanding
25   is that this document, Exhibit No. 2, represents

5 (Pages 14 to 17)

Gregory B. Diette, M.D.

Page 18

1    your responses to the requests that were
2    propounded upon you to -- for documents and other
3    materials prior to your deposition, correct?
4             MS. BROWN:  Objection to the form.  It
5    represents the lawyer's objections to the document
6    requests you served.
7             MS. PARFITT:  Fair.
8             THE WITNESS:  I -- I think Ms. Brown's
9    got it right.
10   BY MS. PARFITT:
11        Q    All right.  Did you -- well, let's have
12   marked the attachment to the response to
13   plaintiffs' document, which was prepared by your
14   lawyers.  And let's separately mark as Exhibit
15   No. 3 the attachments, if you will.
16        A    Should I pull this apart or -- or you
17   want to do that?
18        Q    And for purposes of the record,
19   Exhibit 2 will represent the entire document, the
20   response to plaintiffs' request, and No. 3 will
21   represent just the attachments to the request,
22   which would be material that you, Dr. Diette, were
23   to provide.
24             (Diette Exhibit No. 3 was marked
25             for identification.)

Page 19

1    BY MS. PARFITT:
2         Q    And we'll briefly just review what's
3    here, so we can move on to other areas.
4             The first page of that document
5    indicates supplemental materials reviewed and
6    considered.
7             MS. BROWN:  Counsel, can we go off the
8    record for a second?
9             MS. PARFITT:  Yes.
10            THE VIDEOGRAPHER:  The time is 9:03.
11   We're going off the record.
12            (Pause in the proceedings.)
13            THE VIDEOGRAPHER:  The time is 9:04 a.m.
14   We're back on the record.
15            MS. BROWN:  Good morning.  This is Ali
16   Brown for J&J.  We're back on the record, having
17   taken a short break to put the cameras on both the
18   questioner and myself, and we'll proceed, of
19   course, with the camera on Dr. Diette.  Thank you.
20            MS. PARFITT:  Thank you.  And I should
21   have asked, there's no one on the phone, is there,
22   today?
23            THE VIDEOGRAPHER:  There is no phone
24   present here today.
25            MS. PARFITT:  Perfect.  Thank you very

Page 20

1    much.
2    BY MS. PARFITT:
3         Q    All right.  Dr. Diette, number -- or
4    Exhibit No. 3, the first document, Supplemental
5    Materials Reviewed and Considered, did you prepare
6    this Supplemental Materials Reviewed and
7    Considered?
8         A    I contributed to it, but I didn't do the
9    typing.
10        Q    Okay.  What does that mean when you say
11   you contributed to it?
12        A    I helped to clarify what other --
13   because this -- this looks like it's all
14   reports -- I just want to make sure what's here --
15   reports, a couple of papers probably, and I -- I
16   helped to verify that these were also things that
17   I had -- had received and had a chance to look at.
18        Q    All right.  So would it be fair to say
19   that the 23 items listed on this were materials
20   that somebody typed on a list and asked that you
21   review it; is that correct?
22            MS. BROWN:  Objection to the form.
23   Misstates his testimony.
24            THE WITNESS:  So I think, just in terms
25   of the sequence, I mean I've gotten materials in

Page 21

1    this matter over a period of time, right.  So they
2    come in dribs and drabs.  And a lot of this looks
3    like some of the more recent things that came, you
4    know, because you guys have been doing
5    depositions, and some of the reports came in later
6    and so forth.  So it's really -- that's how I got
7    the materials, and then this is just to make sure
8    that I had a complete list of everything that I've
9    gotten.
10   BY MS. PARFITT:
11        Q    All right.  And the reason I asked is
12   because you submitted your report on
13   February 25th, 2019.  So may I assume that
14   everything on the list, Exhibit No. 3, the first
15   page, supplemental, represents documents you
16   received after February 25th, 2019, correct?
17            MS. BROWN:  Objection to the form.
18            THE WITNESS:  I wouldn't assume that.  I
19   mean, so certainly some things here, right.  So
20   the expert reports that are dated 2/25, I didn't
21   have, you know, even on the day that I submitted
22   mine, so those came after.  Something like the
23   Barnard study, I may well have had that.  I mean,
24   my -- my goal here was to -- just to make sure
25   that we hadn't left anything off.

6 (Pages 18 to 21)

Gregory B. Diette, M.D.

Page 22

1    BY MS. PARFITT:
2        Q   All right.  Is it fair to say that the
3    items that are listed on Exhibit No. 2 -- 3 were
4    not items that you considered for purposes of the
5    opinions you've expressed in your report of
6    February 25th, 2019?
7            MS. BROWN:  Objection to the form.
8            THE WITNESS:  So I -- it's very possible
9    that the Barnard study I did consider.  Trabert, I
10   can't remember.  But definitely, right, the expert
11   reports that are dated on 2/25, I couldn't have
12   considered.  And anything that's a deposition
13   transcript that happened after 2/25, obviously I
14   couldn't have considered that either.
15   BY MS. PARFITT:
16       Q   All right.  Very good.
17           The information thereafter, I believe we
18   have -- one, two, three -- four invoices.  They
19   begin with the date of 12/14/2018, and end with a
20   date of 3/15/19.
21           Are there any other invoices that you
22   would like to share with me today?
23       A   I don't have any others that I'm aware
24   of.
25       Q   Are you preparing any invoices for your

Page 23

1    time post the very last invoice which is dated
2    3/15/2019?
3        A   I will be.
4        Q   All right.  How many hours have you
5    spent since your submitting the invoice of
6    3/15/2019?
7        A   Let's see, three -- I would estimate
8    about -- about 20 hours or maybe 25 hours, give or
9    take.
10       Q   All right.  And what is your hourly
11   rate?
12       A   So to clarify, so when on here it says
13   it's 485, my -- my rate itself is actually $400 an
14   hour, and that's the amount that was charged.
15       Q   Okay.  Now, is the amount that was
16   charged, 400, because you worked with someone else
17   who assists you with preparing the materials?
18       A   It's not --
19           MS. BROWN:  Objection to the form of the
20   question.
21           THE WITNESS:  Sorry.
22           MS. BROWN:  Go ahead.  You can answer.
23           THE WITNESS:  No, it's because that's
24   how much I've asked to be paid is $400 per hour.
25   BY MS. PARFITT:

Page 24

1        Q   All right.  Let me get this straight.
2    Your hourly rate is 485.
3        A   Well, sort of.  I'll describe it if
4    you'd like here.
5        Q   Well, I -- you can understand my
6    confusion.  If your hourly rate is 485, I want to
7    know you're -- why I'm getting --
8        A   You don't need to be confused for very
9    long, though.
10           MS. BROWN:  Hold on.  Hold on.
11           Counsel, you've got to let him answer
12   the question.
13           MS. PARFITT:  Sure.
14           MS. BROWN:  He is endeavoring to set
15   that straight.
16           MS. PARFITT:  Please.
17           MS. BROWN:  So go ahead.
18           THE WITNESS:  I think it's pretty easy.
19   I charge $400 an hour, and Medical Science
20   Affiliates prepares this invoice, and part of
21   their business model is to add an hourly rate
22   to -- to my rate.
23   BY MS. PARFITT:
24       Q   Okay.  And I want to talk a little bit
25   about that in a moment, but that's exactly one of

Page 25

1    the issues I need some clarification on.  But
2    let's finish up the bills.
3        A   Mm-hmm.
4        Q   We have a bill for 12/14/2018 for
5    $17,103.75.  Correct?
6        A   Correct.
7        Q   And we have a bill for 1/15/2018 for
8    $5,068.02, correct?
9        A   That's correct.
10       Q   We have a bill for 2/12/2019 for
11   $35,375.  Is that correct?
12       A   It is.
13       Q   And we have a bill for $20,973.75; is
14   that correct?
15       A   It is.
16       Q   And then we have an additional 20, maybe
17   25 hours that you will charge at the rate of $400,
18   although Medical Science Affiliates gets $85 of
19   that, correct?
20       A   That's correct, although I think -- I
21   don't know if you're following -- well, that's
22   correct.  Go ahead.
23       Q   Okay.  And we'll explore that in a
24   minute.
25       A   Okay.

7 (Pages 22 to 25)

Gregory B. Diette, M.D.

Page 26

```
 1      Q   Now, attached to that is -- it has an
 2  exhibit on it, Plaintiffs' Exhibit No. 7, and it
 3  appears to be several pages of notes.
 4      Do you see that?
 5      A   I do.
 6      Q   All right.  What are these notes?
 7      A   Well, these -- I haven't looked to see
 8  for sure what's --
 9      MS. BROWN:  And, Counsel, just to make
10  sure the record is clear, this was produced in
11  response per your request for his notes that were
12  marked at the Ingham deposition.  So this exhibit
13  number is the marking from the Ingham deposition,
14  and these were the notes that he produced there
15  that I'm frankly sure you have access to, but in
16  the effort of cooperation, we reproduced them here
17  per your request.
18  BY MS. PARFITT:
19      Q   So, Doctor --
20      A   It's -- oh, go ahead.  I'm sorry.
21      Q   Go ahead.  You were going to tell me
22  what they are.
23      A   Yeah, and I didn't know if that was
24  the -- the sufficient answer, because that's
25  literally, I guess, what they are right there.
```

Page 27

```
 1  These are -- they're an exhibit.  But did you mean
 2  something else, like --
 3      Q   Well, now that I've had clarification by
 4  your attorney, that does help a bit, but I do have
 5  a couple of questions.
 6      MS. MILLER:  For the record, she's not
 7  his attorney.  She's J&J's attorney.
 8      MS. PARFITT:  We're going to have one
 9  examiner today.  So you and Ali decide who that's
10  going to be.
11      MS. BROWN:  Okay.  Counsel, let's keep
12  going with the questions for Dr. Diette so we
13  don't waste the doctor's time.
14      MS. PARFITT:  Believe me, I don't want
15  to waste my time.  So let's -- okay.  I realize
16  every now and again it happens.
17  BY MS. PARFITT:
18      Q   So, Dr. Diette, these are notes that you
19  prepared back at the time of the Ingham
20  deposition, correct?
21      A   So not literally.  Right, there are -- I
22  was asked, and I don't remember exactly what --
23  what was on the notice, but I was asked to bring
24  any notes that I had made.  So they're not
25  necessarily for the Ingham matter.  They're notes
```

Page 28

```
 1  that I just made as I was reading through
 2  different articles.
 3      Q   Okay.  Would --
 4      A   No, I'm sorry.
 5      Q   Are you finished?
 6      A   No, that's just what I was going to say,
 7  so these are -- it just represents just notes that
 8  I was making at certain times when I was looking
 9  at some of the articles.
10      Q   Okay.  When did you first start looking
11  at any of the articles?
12      A   Sometime in -- by -- if we're talking
13  about the articles, meaning articles pertaining to
14  ovarian cancer and talcum powder, is it?
15      Q   Well, it's a good question, because you
16  just said when you started looking at any of the
17  articles, are you talk- -- do these represent any
18  articles or do these represent articles of ovarian
19  cancer and talcum powder?
20      A   Yeah, yeah.
21      MS. BROWN:  And hold on, I think the
22  record is going to be unclear.  When you say
23  "these," are you referring to what has been marked
24  as Plaintiffs' Exhibit 7 in response to your --
25      MS. PARFITT:  Correct.
```

Page 29

```
 1      MS. BROWN:  -- notice of deposition?
 2  Okay.
 3      THE WITNESS:  So this would have been
 4  sometime in 2017 that -- that I started.  I don't
 5  know if these notes were made in 2017, but I
 6  just mean that that's the answer to when I started
 7  to look at those article -- articles.
 8  BY MS. PARFITT:
 9      Q   And we'll get to that timeline in a
10  moment.
11      Are there any additional notes that you
12  have prepared post Plaintiffs' Exhibit No. 7,
13  which I understand you presented at the Ingham
14  deposition?
15      A   I don't think so.  I'll give you an
16  example of something that I don't know whether you
17  consider it a note or not.
18      Q   Okay.
19      A   Like as I was preparing my report, I
20  would put like a -- like a little sticker on a
21  paper where I wanted to pull a quote into the --
22  into the paper, and then I would tear that off and
23  throw it away because it wasn't, you know, useful
24  anymore.  But nothing else that kind of -- that
25  looks like this.
```

8 (Pages 26 to 29)

Gregory B. Diette, M.D.

Page 30

1     Q   All right.  So you would put a sticker
2  on a paper like when I wanted to put a quote in,
3  and then I tore it off.
4          Are these medical records that -- or
5  excuse me, medical articles that you were
6  reviewing?
7     A   These are scientific articles, yeah, the
8  ones that informed my report.
9     Q   All right.  So do you have a stack of
10  scientific and medical articles that informed your
11  report at your office, at your home?
12     A   I've got -- I've got little piles of
13  stuff everywhere you can look.
14     Q   Okay.  Do any of them have markings on
15  them or any stickies?
16     A   I don't think there's any stickies
17  anymore.  If they have markings, there could be
18  some that have yellow highlights.
19     Q   All right.
20     A   But I don't think any that have like
21  writing on them per se.
22     Q   Okay.  But there might be yellow
23  highlights on them, correct?
24     A   There sure could be, yeah.  Not on all
25  of them, but could be on some.

Page 31

1     Q   All right.
2          MS. PARFITT:  I'll address this with
3  counsel later, but I would request copies of all
4  those highlighted articles that you may have
5  somewhere.  But we can talk about that --
6          MS. BROWN:  We can talk about that off
7  the record.
8          THE WITNESS:  Okay.
9  BY MS. PARFITT:
10     Q   All right.  So other than notations on
11  some medical and scientific articles, there would
12  be no additional notes like that which forms part
13  of the part of Plaintiffs' Exhibit 7, correct?
14     A   Correct.
15     Q   All right.  In the request to appear
16  here at your deposition, there was an inquiry with
17  regard to, I believe you called it, Medical
18  Science Affiliates.
19     A   Correct.
20     Q   All right.  Do you have a retainer
21  agreement with Medical Science Affiliates?
22          MS. BROWN:  And I'm just going to
23  interject here, Counsel.  To the extent you've
24  made a request for any documentation regarding
25  Medical Science Affiliates, you have our

Page 32

1  objections to those document requests, and
2  Dr. Diette's testimony will be consistent with
3  that.
4          MS. PARFITT:  My question -- are you
5  objecting to providing me with a copy of
6  Dr. Diette's agreement with Medical Science
7  Affiliates?
8          MS. BROWN:  Well, we haven't even
9  established that there is such a thing.  I
10  understand you to be getting into questions
11  regarding Medical Sciences.
12          MS. PARFITT:  I will, yeah.
13          MS. BROWN:  I understand you've asked a
14  number of document requests regarding Medical
15  Sciences, and I just want to make sure that the
16  record is clear that we have endeavored to respond
17  to those and object accordingly.
18          MS. PARFITT:  Okay.  And we're going to
19  try and reduce the number of narrative objections
20  if we can so we can get through this --
21          THE WITNESS:  I remember your question
22  if you want me to answer it.
23  BY MS. PARFITT:
24     Q   I do.
25          I wanted to know in response to request

Page 33

1  number 14, whether or not you have any contracts,
2  agreements, writings conveying mutual
3  understandings between you and Medical Science
4  Affiliates or any entity of or related to Medical
5  Science Affiliates for the past ten years?
6          MS. BROWN:  And, Counsel, I'm going to
7  object to the extent that any of those requests or
8  documentation involve work product that we have
9  asserted privilege over, he will not be answering
10  that question under the work-product privilege.
11          MS. PARFITT:  Okay, Counsel, you can
12  assert work product.  Got it.  Is that what you're
13  asserting right now?
14          MS. BROWN:  Yes.  He's not going to
15  answer that question.  We're asserting work
16  product.
17          MS. PARFITT:  So he is not going to
18  answer my question with regard to any agreement or
19  writing or contracts that he has with Medical
20  Science Affiliates under the guidance of counsel
21  that is objecting and refusing to have you answer
22  that question.  Is that correct -- record correct?
23          MS. BROWN:  That's correct, Counsel.
24          MS. PARFITT:  Okay.
25  BY MS. PARFITT:

9 (Pages 30 to 33)

Gregory B. Diette, M.D.

Page 34

```
 1      Q   And we're going to talk about Medical
 2  Science in just -- just a moment.
 3          Anything else other than the documents
 4  that I have in front of you, Exhibit 7, the
 5  invoice and your supplemental reliance, that you
 6  have brought to your deposition today?
 7      A   So I didn't bring this today.
 8      Q   Okay.  Fair enough.
 9      A   I mean I -- I didn't bring anything -- I
10  mean I didn't bring any materials to the
11  deposition.
12      Q   Okay.
13          All right.  Dr. Diette, what is your
14  profession?
15      A   Well, I'm a physician, epidemiologist,
16  researcher.
17      Q   Okay.  You're actually a professor of
18  medicine at the Department of Pulmonary and
19  Critical Care, is that correct, at Johns Hopkins?
20      A   Literally it's the Department of
21  Internal Medicine, and it's the Division of
22  Pulmonary, Critical Care, and Sleep Medicine.
23      Q   Okay.  Dr. Diette, do you agree that
24  ovarian cancer ranks as the fifth cause of
25  neoplastic death among women?
```

Page 35

```
 1      A   I've seen -- I've seen it listed on --
 2  you know, on lists of causes of death.  I don't
 3  know what you mean by "agree with," but I mean --
 4      Q   Do you have a difference of opinion as
 5  to whether or not ovarian cancer ranks fifth with
 6  regard to causes of neoplastic death among women?
 7          MS. BROWN:  Objection.  Asked and
 8  answered.
 9          THE WITNESS:  It doesn't seem to be
10  something that there's an opinion on.  That's what
11  I mean.  I mean it's like an objective fact.  I
12  mean if there's a list that's put out by, you
13  know, government stats, and it's number 5 on that
14  list, that's -- that's an objective fact.
15  BY MS. PARFITT:
16      Q   Do you object to that?
17          MS. BROWN:  Let him answer, Counsel.
18          MS. PARFITT:  I have.  Thank you.
19          Are you objecting as --
20  BY MS. PARFITT:
21      Q   Let me ask you this, Doctor.
22      A   Okay.
23      Q   Have you seen that in any published
24  scientific literature?
25          MS. BROWN:  Objection to the form.
```

Page 36

```
 1          THE WITNESS:  I've seen -- I've seen it
 2  ranked highly.  I don't remember if it was fifth,
 3  but I've seen it ranked highly.
 4  BY MS. PARFITT:
 5      Q   All right.  Are you aware of the fact
 6  that ovarian cancer accounts for more deaths than
 7  any other cancer in the female reproductive
 8  system?
 9      A   Ovarian cancer.  Is that -- is that a
10  statement from a -- like a document or something?
11      Q   It's a question.
12      A   It's a question that --
13      Q   Do you know whether or not ovarian
14  cancer accounts for more deaths than any other
15  cancer of the female reproductive system?
16      A   I know it's a highly ranked one.  I
17  wouldn't be able to say whether it's more than all
18  others.
19      Q   All right.  Do you know whether
20  approximately 22,000 new cases of ovarian cancer
21  identified each year and 14,000 women
22  approximately will die in the United States alone
23  from ovarian cancer?
24          MS. BROWN:  Objection to the form.
25          THE WITNESS:  I haven't memorized
```

Page 37

```
 1  anything with exact numbers like that.  I mean I'm
 2  not saying it's far off from the truth, and if you
 3  have, you know, some document that supports that,
 4  I'd be glad to look at it and see if it looks
 5  right, but -- but I haven't memorized the exact
 6  number.
 7  BY MS. PARFITT:
 8      Q   All right.  And you know, Dr. Diette,
 9  this won't be a memory test, but I do understand
10  that you have spent almost $100,000 in this case
11  alone reviewing medical and scientific articles,
12  so all I'm simply asking is that you provide me
13  with your best answers.  Fair?
14          MS. BROWN:  I object to the --
15          MS. PARFITT:  That's all, Counsel.
16  That's all --
17          MS. BROWN:  -- speech by counsel.  He's
18  here to answer your questions.
19          MS. PARFITT:  Counsel --
20          MS. BROWN:  That is a highly
21  objectionable statement, Counsel, and you know it.
22  If you have a question to ask him, he is here to
23  answer it.  We're not going to be here to have you
24  give speeches on the record about the fees that he
25  has charged for the work that he has done.
```

10 (Pages 34 to 37)

Gregory B. Diette, M.D.

Page 38

1           MS. PARFITT: Ms. Brown, your objection,
2    according to the CMO in the MDL case, perhaps
3    you're doing other state depositions, is that you
4    say, "Objection. Form."
5           And I'll try and do my best, if you'd do
6    the same. And I'm not admonishing you, and I hope
7    you're not admonishing me. That's not how I roll.
8           MS. BROWN: Well, the record is going to
9    be very clear --
10          MS. PARFITT: It will be.
11          MS. BROWN: -- about the statement that
12   you just made about the other work that I'm doing.
13          MS. PARFITT: I said --
14          MS. BROWN: I am well aware of the
15   CMO --
16          MS. PARFITT: Perfect. Okay.
17   Counsel --
18          MS. BROWN: -- and the deposition
19   protocol in this case.
20          MS. PARFITT: -- that's fine.
21          MS. BROWN: And I --
22          MS. PARFITT: Counsel --
23          MS. BROWN: -- expect that you will
24   abide by it --
25          MS. PARFITT: -- let me ask questions.

Page 39

1           MS. BROWN: -- and not interrupt me.
2    Thank you.
3           MS. PARFITT: I am not going to, but I
4    would ask the same courtesy. And, listen, we have
5    a long day to go, and it will be longer --
6           MS. BROWN: Just ask the doctor a
7    question and move on.
8           MS. PARFITT: -- if we go back and
9    forth. "Objection, form" is the appropriate way,
10   or we will have to call the judge.
11          MS. BROWN: Happy to do it.
12          MS. PARFITT: Very good. So will I.
13   BY MS. PARFITT:
14      Q   All right. Dr. Diette, do you have an
15   understanding from your review of the scientific
16   and medical literature that ovarian cancer cases
17   are detected and diagnosed at a late stage and
18   there are limited prospects for cure?
19          MS. BROWN: Objection to the form of the
20   question.
21          THE WITNESS: I didn't listen to what
22   you said because --
23   BY MS. PARFITT:
24      Q   Sure.
25      A   But just for the reason that I'm still

Page 40

1    thinking about your question before, I just wanted
2    to clarify that I -- because when you said that I
3    billed $100,000, I think what you might be doing
4    is adding up all of those MSA invoices, which that
5    doesn't all go to me. I mean there's a way to
6    figure out how much that I've billed, but -- but
7    you wouldn't be correct if you're saying that
8    those four invoices represent the amount that I've
9    charged.
10      Q   Okay. And we'll talk about that, but I
11   appreciate the clarification.
12          So, the other question is, do you have
13   an understanding that most ovarian cancer cases
14   are detected and diagnosed at a late stage and
15   there are limited prospects for cure?
16          MS. BROWN: Same objection.
17          THE WITNESS: I have that general
18   understanding.
19   BY MS. PARFITT:
20      Q   Okay. Do you have any knowledge as to
21   what the mortality and morbidity of ovarian cancer
22   is?
23      A   Well, the morbidity is not a number,
24   right. I mean you're talking about what are the
25   consequences?

Page 41

1       Q   You're right.
2       A   And then the mortality would be
3    something that's an objective fact that there's a
4    percentage of people with the disease that die.
5       Q   Right.
6       A   I don't know the number. I didn't
7    memorize that. If it's important, we can look it
8    up, but it's a high -- it's a high proportion that
9    die from it.
10      Q   Fair. Do you know what the latency is
11   for ovarian cancer?
12      A   Between what and what?
13      Q   The latency period between -- let's take
14   some examples -- asbestos and ovarian cancer.
15          MS. BROWN: Objection to the form of the
16   question.
17          You can answer if you understand.
18          THE WITNESS: So the -- that's a tricky
19   issue, I think in a way, because I'm not sure that
20   it's been fully established that asbestos causes
21   ovarian cancer. I mean I'm aware of what the IARC
22   has put out on it, but I'm not sure that that's a
23   fact. But I don't recall seeing in there where
24   the latency, if it was even true, whether that
25   was -- whether that was established.

Page 42

BY MS. PARFITT:
   Q   All right.  Have you in the course of -- strike that.
       All right.  From a review of the materials you reviewed attached to your expert report, Doctor, I see that you reviewed the Purdie case --
       MS. BROWN:  Counsel -- Counsel, is there a page you want to point him to so we can follow along?
       MS. PARFITT:  I'm still asking the question, Counsel.
BY MS. PARFITT:
   Q   Dr. Diette, attached to your report is a materials reviewed.  And on page 7, it lists that you have read the Purdie case, which is a 1995 case study -- excuse me, not case study, but a scientific article.
       MS. BROWN:  Objection to the form.
       Take your time to get to that page, Doctor.
       THE WITNESS:  It's 7 in my report?
       MS. PARFITT:
   Q   It is on page 7 of your report.
       MS. BROWN:  And, Counsel, I think we

Page 43

have a disconnect here.  Are you referring to the 7 of the reliance list?
       MS. PARFITT:  I am.  I'm sorry about that.
       THE WITNESS:  Oh.  Is it 7 of the -- the exhibit you gave me or is it part of what's my reliance list that's attached to my report?
BY MS. PARFITT:
   Q   What I have is your reliance list, and it's page 7 of your reliance list.
   A   I got you.
       MS. BROWN:  Got that.  Okay.
BY MS. PARFITT:
   Q   And I believe you have three Purdie -- excuse me, two Purdie cites, one 2003 and one 1995.  Correct?
   A   That's correct.
   Q   Okay.  Did you indeed review the Purdie article for purposes of your testimony here today?
       MS. BROWN:  Objection to the form.
       THE WITNESS:  I don't think I reviewed it for the purpose of my testimony, but I -- I included it because it's something I reviewed at some point prior to preparing the report.
BY MS. PARFITT:

Page 44

   Q   Okay.  All right.  And we're going to talk about that in conjunction with -- just hold tight.  I'm going to set that aside, and let me ask you this --
   A   Can I ask just real quick?
   Q   Sure.
   A   There's like a cold breeze blowing down here, and I know we will regret making it warmer in here at some point.
   Q   Sure.
       MS. PARFITT:  Well, let's take a moment and let's see if we can --
       MS. BROWN:  Why don't we go off the record for one second.
       THE VIDEOGRAPHER:  The time is 9:25 a.m. We're going off the record.
       (Pause in the proceedings.)
       THE VIDEOGRAPHER:  The time is 9:27 a.m. and we are back on the record.
       (Diette Exhibit No. 4 was marked for identification.)
       MS. PARFITT:  Ready?
       THE VIDEOGRAPHER:  Oh, yeah, we're on.
       MS. PARFITT:  Okay.  Thank you.
BY MS. PARFITT:

Page 45

   Q   Dr. Diette, let me show you what's been marked as Plaintiffs' Exhibit No. 4 to the Diette deposition, and I'll represent to you -- sorry -- I'll represent to you that this is the --
       MS. BROWN:  Thank you.
BY MS. PARFITT:
   Q   -- an article by Dr. Purdie entitled "Ovulation and Risk of Epithelial Ovarian Cancer" published in the International Journal of Cancer in 2003.  Do you see that?
   A   I do.
   Q   All right.  If I can direct your attention to page 231 of that article.
       MS. PARFITT:  Let's put it on the ELMO.
BY MS. PARFITT:
   Q   Okay.  And, Dr. Diette, I'll put it up on the overhead as well.  About halfway down -- there you go -- left-hand column, Dr. Purdie and authors state:  "Thus, the latency period of more advanced malignant epithelial ovarian cancer could be estimated to be approximately 30 to 40 years."
       Did I read that correctly?
   A   You read it fine.
   Q   All right.  Do you agree or disagree that the latency period of more advanced malignant

12 (Pages 42 to 45)

Gregory B. Diette, M.D.

Page 46

1  epithelial ovarian cancer can be estimated to be
2  approximately 30 to 40 years?
3       A  Well, I think, you know -- so there's no
4  way for me to know for sure, right, but could
5  be -- it seems like a pretty safe statement
6  because it could be more, it could be less.
7       It's also an incomplete sentence, right,
8  in the sense that when you talk about the latency,
9  you talk about the latency between a particular
10 kind of exposure.  I mean, in this context, right,
11 there may have other -- there may be other ways
12 people use that word, but in this context it's the
13 time from the exposure to the development of the
14 disease.  So there's no exposure mentioned in that
15 sentence, so it's a little -- a little loose, you
16 know.
17      MS. PARFITT:  All right.  Move to strike
18 that last part of your statement.
19 BY MS. PARFITT:
20      Q  Okay.  Dr. Diette, do you agree that
21 it's imperative to develop public health programs
22 that either reduce the incidence or detect ovarian
23 cancer at an earlier stage?
24      A  It's an agreeable statement.
25      Q  Okay.  In developing public health

Page 47

1  programs, does -- in order to set up preventive
2  programs, detection programs, does that include
3  getting information about whatever the putative
4  exposure may be to individuals who may be
5  susceptible to them?
6       MS. BROWN:  Objection to the form of the
7  question.
8       MS. PARFITT:  Let me strike that
9  question completely.  It was a lousy question.
10 All right.
11      THE WITNESS:  It was --
12      MS. PARFITT:  And I'm going to agree
13 with counsel on that.  How about that?
14      THE WITNESS:  It was below average.  It
15 wasn't lousy.
16 BY MS. PARFITT:
17      Q  Sure.  Okay.
18      When one develops a public health
19 program in order to alert individuals about a
20 public health issue, what is the manner, let's
21 say, in your department to do that?
22      MS. BROWN:  Objection to the form of the
23 question.
24      THE WITNESS:  I'm not sure what we're
25 talking about.  I mean --

Page 48

1  BY MS. PARFITT:
2       Q  Sure.  And, you know, that might be --
3  that might be fair.  So let me go for a third try.
4  Okay?
5       A  Okay.
6       Q  Do you develop public health programs
7  for Johns Hopkins?
8       A  I'm trying to think -- I would say
9  generally, no.  I mean --
10      Q  It's not part of your role.
11      MS. BROWN:  Well, let him finish.  I'm
12 sorry.
13      THE WITNESS:  But I don't know -- I
14 mean, I don't know what -- I mean that's a pretty
15 broad topic, which is what's a public health
16 program.  So I'm just thinking like, for example,
17 you know, I've done work with asthma in -- in the
18 inner city nearby.
19 BY MS. PARFITT:
20      Q  Correct.
21      A  And we certainly have a program, you
22 know, that deals with -- with that.  I wouldn't
23 say I've developed it as a public health program
24 per se but as a -- as a research program.  But,
25 you know, where public health starts and stops,

Page 49

1  I'm not exactly sure.
2       Q  Fair enough.
3       All right.  Talcum powder products are
4  widely available, correct?
5       MS. BROWN:  Objection to the form of the
6  question.
7       THE WITNESS:  You know, they -- I
8  guess -- so anyway, I'm an epidemiologist, so when
9  somebody says something like that, like when you
10 say it, like I'm thinking like to whom or for whom
11 or where or when or something.  I mean there's
12 sort of like a time and place and something else
13 more to that.  I think it's a common product, but
14 I don't -- I don't know what it means to be widely
15 available.
16 BY MS. PARFITT:
17      Q  All right.  Did you ever ask Johnson &
18 Johnson or their attorneys a question with regard
19 to how many bottles of Johnson & Johnson's Baby
20 Powder they distribute each year in America?
21      MS. BROWN:  Objection to the form of the
22 question.
23      THE WITNESS:  I have not asked that.
24 BY MS. PARFITT:
25      Q  Okay.  Similarly, have you ever asked

13 (Pages 46 to 49)

Gregory B. Diette, M.D.

Page 50

1    Johnson & Johnson how many bottles of their Shower
2    to Shower they distributed?
3        A   No.
4        MS. BROWN:  Same objection.
5    BY MS. PARFITT:
6        Q   All right.  Have you ever purchased
7    talcum powder products?
8        A   I -- I don't do the shopping.  You know,
9    and so it -- like, I don't -- I don't buy anything
10   at the store.
11       Q   Okay.  Fair enough.
12           Are you aware of the fact that Johnson &
13   Johnson continues to sell their talcum powder
14   products?
15       A   I wasn't aware that they weren't.  I
16   mean, I don't know where I would get that from,
17   but as best as I can tell.
18       Q   All right.  Have you ever looked at the
19   back of a Johnson & Johnson's Baby Powder product
20   to see what it says about its usage --
21       MS. BROWN:  Objection.
22   BY MS. PARFITT:
23       Q   -- and direction?
24       MS. BROWN:  Excuse me.  Objection to the
25   form of the question.

Page 51

1        THE WITNESS:  It's possible that I have
2    years ago, but not -- not recently.
3    BY MS. PARFITT:
4        Q   Nothing recent.
5            How about since you were retained by
6    Johnson & Johnson as an expert, have you ever
7    looked at a bottle of Johnson & Johnson's Baby
8    Powder or Shower to Shower?
9        MS. BROWN:  Same objection.
10       THE WITNESS:  No.  I've seen pictures,
11   you know, in different settings, but I haven't --
12   I haven't seen a bottle of it or looked at it.
13   BY MS. PARFITT:
14       Q   Okay.  Do you have an understanding as
15   to whether or not Johnson & Johnson's Baby Powder
16   or the Shower to Shower contains a warning on its
17   product against use in the genital area to avoid
18   ovarian cancer?
19       MS. BROWN:  Objection to the form.
20       THE WITNESS:  I don't know whether they
21   do or don't.  But I'm also not, you know, skilled
22   in warnings.  So I wouldn't -- I mean, I -- even
23   if it said something, I wouldn't necessarily be
24   the person to tell you whether that's a warning or
25   not.

Page 52

1    BY MS. PARFITT:
2        Q   Okay.  Let me show you what I'll have
3    marked as Exhibit --
4        MS. PARFITT:  Where are we?
5        MR. ROSEN:  Five.
6    BY MS. PARFITT:
7        Q   -- 5.  And I'll represent to you,
8    Dr. Diette, that this is a bottle of Johnson's
9    Baby Powder, and we'll have it marked as Exhibit
10   No. 5.
11           (Diette Exhibit No. 5 was marked
12           for identification.)
13   BY MS. PARFITT:
14       Q   Now, my understanding is that you are
15   trained, skilled, and have expertise in pulmonary
16   medicine, correct?
17       A   Among other things.
18       Q   And I didn't mean to limit your
19   expertise.  Okay.
20           If you will, let me show -- pass to you
21   the Exhibit No. 5, and ask that you turn it to the
22   back.  Look at the bottle.
23       MS. BROWN:  Counsel, before he does
24   that, will you put -- represent on the record
25   where this bottle that you've marked as Exhibit 5

Page 53

1    came from and when it was purchased and by whom?
2        MS. PARFITT:  Counsel, I'm asking the
3    questions.  I just represent that it is a bottle
4    of Johnson & Johnson's Baby Powder purchased from
5    a store.
6        MS. MILLER:  Michelle, I'm trying
7    really, really hard not to say a word today.
8        MS. PARFITT:  Sure.
9        MS. MILLER:  I know that I'll annoy
10   you --
11       MS. PARFITT:  Oh, no, you're not.
12       MS. MILLER:  -- but it's not Johnson &
13   Johnson's Baby Powder.  It's Johnson's Baby
14   Powder, and you keep saying it wrong.
15       MS. PARFITT:  That's fine.  That's fine.
16       MS. MILLER:  And I think for the record,
17   it's important.  It's a product by JJCI, as you
18   know.
19       MS. PARFITT:  That's fine.
20       MS. MILLER:  So we just need
21   Johnson's --
22       MS. PARFITT:  Okay.  And why don't we --
23   whenever I -- since I'm sure I won't remember all
24   that, why don't we just reflect for the record
25   that when I say Johnson & Johnson's Baby Powder,

14  (Pages 50 to 53)

Gregory B. Diette, M.D.

Page 54

1   that it's Johnson's Baby Powder. Okay?
2         MS. BROWN: And just to get my -- my
3   objection on the record to what you marked as
4   Exhibit 5, we have no representation of when this
5   was bought, by whom it was bought.
6         With that, Dr. Diette, here is
7   Exhibit 5.
8         MS. PARFITT: Thank you.
9   BY MS. PARFITT:
10    Q   All right, Dr. Diette, look at the back
11  of that. Do you see that there's a little picture
12  that looks like a little baby with an X on it?
13    A   I do.
14        MS. BROWN: Objection to the form.
15  BY MS. PARFITT:
16    Q   Okay. Okay. What does that say on the
17  back of the product?
18    A   It says: "Warning: Keep powder away
19  from child's face to avoid inhalation, which can
20  cause breathing problems. Avoid contact with the
21  eyes. For external use only."
22    Q   Okay. And at the bottom of that
23  product, does it happen to say what's contained in
24  it?
25        MS. BROWN: Objection to the form of the

Page 55

1   question.
2         THE WITNESS: It has a line called
3   "Ingredients," which says "Talc, fragrance."
4   BY MS. PARFITT:
5     Q   Okay. Dr. Diette, you've been retained
6   by Johnson & Johnson since when, for purposes of
7   the ovarian cancer cases?
8         MS. BROWN: Objection. Form. Do you
9   mean the Ingham case or do you mean the MDL?
10  BY MS. PARFITT:
11    Q   Well, let me clarify.
12        When were you first -- it's a fair
13  question -- when were you first retained by
14  Johnson & Johnson to represent them in either
15  mesothelioma cases or ovarian cancer cases?
16        MS. BROWN: Objection to the form. He
17  is an expert witness on behalf of Johnson &
18  Johnson. He is not here representing anyone.
19        THE WITNESS: That honestly sounds like
20  Ms. Brown's job, I mean, but -- but I guess to try
21  to answer your question, the -- I was first asked
22  to review the epidemiology in 2017.
23  BY MS. PARFITT:
24    Q   Okay. And was that the first time that
25  Johnson & Johnson had asked you to provide any

Page 56

1   expert work for them?
2         MS. BROWN: Objection to the form.
3         THE WITNESS: I believe so, yeah.
4   BY MS. PARFITT:
5     Q   Okay. Had you ever worked for Johnson &
6   Johnson or any of their entities prior to 2017 in
7   any type of litigation?
8         MS. BROWN: Same objection.
9         THE WITNESS: I -- I don't think so. I
10  would say almost certainly no.
11  BY MS. PARFITT:
12    Q   Okay. Since your retention in 2017, did
13  Johnson & Johnson, their medical department, their
14  regulatory department, science department, ever
15  ask that you take a look at the back of the
16  product, Johnson's Baby Powder, for purposes of
17  giving an opinion as to what scientific and
18  medical information should be on that product?
19        MS. BROWN: Objection to the form of the
20  question.
21        THE WITNESS: I would be the wrong kind
22  of expert for that. I mean I'm not a warnings
23  expert, so it wouldn't -- wouldn't make any sense
24  for anybody to ask me that question.
25  BY MS. PARFITT:

Page 57

1     Q   I'm not asking you about the adequacy of
2   the warning. I'm asking you about your expertise
3   as a pulmonary medicine expert with regard to
4   inhalation issues as contained on the back of that
5   product.
6     A   It still wouldn't make any sense. I
7   wouldn't be the person to ask that to.
8     Q   Dr. Diette, whether or not it makes
9   sense to you or not, my question is simply this:
10  Yes or no, has Johnson & Johnson asked your
11  opinion at any point in time with regard to what
12  kind of scientific and medical information should
13  be on the back of their powder?
14        MS. BROWN: Objection. Answered three
15  times.
16        THE WITNESS: They and everybody else in
17  the world has not asked me to do anything like
18  that ever.
19  BY MS. PARFITT:
20    Q   Okay. And they, Johnson & Johnson, has
21  never asked you to -- your opinion with regard to
22  the inhalation warning; is that correct?
23        MS. BROWN: Objection. Counsel, we've
24  been through this like six times.
25        THE WITNESS: I think it's the same

Gregory B. Diette, M.D.

Page 58

1  warning we're talking about, right?
2  BY MS. PARFITT:
3      Q   The one that's on the back, yeah.
4      A   So it's still -- still the same.
5      Q   Okay.  And just for the record, we're
6  going to put on the ELMO -- thank you.  Just go
7  ahead and see if we can get that on there.  Okay.
8      (Counsel conferring.)
9  BY MS. PARFITT:
10     Q   And again, for clarity of the record,
11 what we've been talking about is on -- the child
12 with the X over the nose and mouth and the warning
13 that is to the far right, correct?
14         MS. BROWN:  Objection to the form.
15         THE WITNESS:  I was with you until you
16 said "to the far right."  I don't know --
17 BY MS. PARFITT:
18     Q   To the right of the baby.
19     A   Oh, I see.  I'm sorry.
20     Q   Yeah, no problem.
21     A   Yeah.  No, that's --
22     Q   That's what we're talking about.
23     A   It's to the right of the baby, yeah.
24     Q   Okay.  Very good.  All right.
25         Dr. Diette, as a scientist and a

Page 59

1  clinician, do you have a belief or opinion that
2  women should be informed of even a potential risk
3  of using talcum powder products on their genital
4  area?
5          MS. BROWN:  Objection.
6          THE WITNESS:  Not based on what I've
7  reviewed.
8  BY MS. PARFITT:
9      Q   Okay.  Is it your opinion that there is
10 no risk of ovarian cancer from the long-term use
11 of talcum powder products?
12         MS. BROWN:  Objection.  Form.
13         THE WITNESS:  I -- I don't see evidence
14 that there's a -- so I'm an epidemiologist, so the
15 way I talk about things might be a little
16 different than the way you're asking it.  But
17 there's not sufficient evidence to say that it's a
18 cause of ovarian cancer.
19 BY MS. PARFITT:
20     Q   Okay.  And we'll talk about that in a
21 little bit.
22         Do you have an understanding as to
23 whether there are other scientists and
24 epidemiologists who have reviewed the same
25 scientific and epidemiological information that

Page 60

1  you have who have a different opinion with regard
2  to the causality of talcum powder products and
3  ovarian cancer?
4          MS. BROWN:  Objection to the form.
5          THE WITNESS:  Well, I've seen like, for
6  example, the expert reports that are -- that are
7  part of this matter and some of the deposition
8  transcripts.  So -- so, yes, I mean I've seen what
9  they've said.
10 BY MS. PARFITT:
11     Q   Okay.  And from your review of those
12 expert reports, do you understand that many of
13 those scientists and epidemiologists are
14 individuals who treat women who have been
15 diagnosed for ovarian cancer?  Do you understand
16 that?
17         MS. BROWN:  Objection.  Lacks
18 foundation, calls for speculation.
19         THE WITNESS:  So I saw that there were
20 some GYN oncologists involved.  I don't remember
21 the count of them, but I saw there were GYN
22 oncologists, both on the defense and the
23 plaintiffs' side.
24 BY MS. PARFITT:
25     Q   Okay.  And the GYN oncologists would be

Page 61

1  the practice of medicine that treats women for
2  reproductive diseases and cancers like ovarian
3  cancer, correct?
4          MS. BROWN:  Objection.
5          THE WITNESS:  They -- they would be the
6  ones that provide treatment for the GYN cancers.
7  BY MS. PARFITT:
8      Q   Okay.  You're a pulmonologist, correct?
9      A   I am.
10     Q   All right.
11     A   And again, among other things.
12     Q   Understood.
13         MS. BROWN:  Let him finish, Counsel, he
14 wasn't done.
15 BY MS. PARFITT:
16     Q   My -- it's a simple question, are you a
17 pulmonologist?
18         MS. BROWN:  Wait, but he was still
19 answering.  You cut him off.  Let him finish.
20         MS. PARFITT:  Doc -- I withdraw that
21 question.
22 BY MS. PARFITT:
23     Q   Are you a pulmonologist?
24     A   I am a pulmonologist.
25     Q   All right.  As a pulmonologist, do you

16 (Pages 58 to 61)

Gregory B. Diette, M.D.

Page 62

1  treat and care for women -- treat and care and
2  provide gynecological and oncological care to
3  women who have been diagnosed with ovarian cancer?
4         MS. BROWN: Objection to the form.
5         THE WITNESS: Mostly, no, although
6  I'll just -- there was a lot in your question,
7  right, so that --
8  BY MS. PARFITT:
9     Q  You want me to break it down?
10        MS. BROWN: Let him finish first, and
11 then you can follow up. He has to be allowed to
12 answer your question.
13        MS. PARFITT: Oh, absolutely, but if
14 it's unclear -- that was one of the --
15        THE WITNESS: I didn't say it was
16 unclear. I just said it -- it's complicated, so
17 there's more than -- it's not just a simple
18 answer.
19        MS. PARFITT: Let me withdraw the
20 question.
21        MS. BROWN: Wait, Counsel, he's not
22 done.
23        Dr. Diette, you finish your answer, and
24 then counsel, of course, will follow up.
25 BY MS. PARFITT:

Page 63

1     Q  Okay. Go ahead.
2     A  Thank you.
3     Q  Sure.
4     A  So, you know, I wouldn't be the person
5  who prescribes chemotherapy or provides the
6  surgery. Part of my work is as an intensive care
7  doc in the oncology center, and so I'll see people
8  with every kind of cancer possible and provide
9  some of the care to them.
10        I see people in my clinic that have, you
11 know, pulmonary consequences of some of their
12 treatment for ovarian cancer. And so it's -- it's
13 not a straightforward yes or no that I do or don't
14 participate, but I don't do the -- the GYN onc
15 part of that care.
16    Q  All right. Have you in your practice of
17 pulmonary medicine ever diagnosed a woman with
18 ovarian cancer?
19    A  I can't remember ever doing that.
20    Q  All right. Now, Dr. Diette, are you
21 aware of whether or not -- strike that.
22        Are you aware that Johnson & Johnson has
23 tested their talcum powder products?
24        MS. BROWN: Objection to the form.
25        THE WITNESS: I have some awareness of

Page 64

1  that.
2  BY MS. BROWN:
3     Q  Okay. What is your understanding of the
4  testing that's been performed by Johnson & Johnson
5  on their talcum powder products?
6         MS. BROWN: Objection. That's overly
7  broad.
8         THE WITNESS: Well, like the type --
9         MS. BROWN: You mean internal, external,
10 third party, FDA?
11 BY MS. PARFITT:
12    Q  Do you understand the question?
13    A  I was actually going to say something
14 similar to what Ms. Brown said but less
15 sophisticated.
16        I mean what I meant was, were you asking
17 about like the kinds of tests that were done or --
18 or things of that sort? I just -- I just know,
19 generally speaking, that there has been testing
20 done.
21    Q  Sure. Let me make it very simple.
22        Are you aware of studies -- strike that.
23        Have you seen studies done by Johnson &
24 Johnson that tested and evaluated their talcum
25 powder products for the presence of asbestos?

Page 65

1         MS. BROWN: Same objection.
2         THE WITNESS: I don't think I've seen
3  anything from Johnson & Johnson, per se.
4         Is that what -- is that what you're
5  referring to?
6  BY MS. PARFITT:
7     Q  That is, yes.
8     A  Okay. Then not -- not that I'm aware
9  of.
10    Q  All right. I saw where you looked at
11 the depositions of Drs. Longo and Rigler.
12        MS. BROWN: Objection to the form.
13        THE WITNESS: Is that in a different
14 case?
15 BY MS. PARFITT:
16    Q  Good question. You have their
17 depositions listed as part of the materials
18 reviewed and relied upon. Have you read those?
19        MS. BROWN: Objection.
20        If you want to refresh yourself on your
21 reliance list, I'm sure counsel will point you to
22 the page.
23        MS. PARFITT: Absolutely.
24 BY MS. PARFITT:
25    Q  Let me direct you to -- just bear with

17 (Pages 62 to 65)

Gregory B. Diette, M.D.

Page 66

1  me one second.  I apologize here.
2          Okay.  It's -- your reference materials
3  reviewed and considered start on -- or in
4  Appendix B of your report.
5          Do you see that?
6      A  I don't see Longo and Rigler.
7      Q  Okay.  At the very top, it has
8  "Materials Reviewed and Considered by Gregory
9  Diette," and the second item under "Expert
10  References" says "Expert report of William Longo
11  and Mark Rigler."
12          Do you see that?
13      A  Oh, I do, yeah.  So I see Longo, and I'm
14  just --
15      Q  Do you see Rigler?  He's right after
16  that.  It says William --
17      A  Oh, got you.
18          MS. BROWN:  Counsel, these are reports.
19  I thought your question was about a deposition.
20          MS. PARFITT:  That's a -- that's a fair
21  objection.
22  BY MS. PARFITT:
23      Q  Have you read the expert report of
24  William Longo and Mark Rigler?
25      A  So, because I see there's a date on it

Page 67

1  of November 14th, 2018 --
2      Q  Correct.
3      A  -- I know I've seen at least a few of
4  Dr. Longo's reports, and I -- I think they're the
5  same over and over again.  So I -- if I -- if I'm
6  not mistaken, I don't think I would have reread it
7  like, you know, specifically for this matter if it
8  looked the same as others.  I think I probably
9  just like flipped through it to see what it was --
10  was there generally.
11      Q  All right.  So I understand your answer,
12  is your testimony that you don't recall
13  specifically reviewing the November 14th, 2018
14  expert report of Dr. Longo's and Rigler?
15          MS. BROWN:  Objection to the form,
16  misstates his testimony.
17          MS. MILLER:  So can I say something?
18  Because I was involved in that, I think that every
19  item with respect to litigation that we sent to
20  Dr. Diette, which would have been depositions or
21  expert reports, was put on the list because it was
22  sent to him.  I --
23          MS. PARFITT:  Oh, and I understand.  I
24  appreciate that.
25  BY MS. PARFITT:

Page 68

1      Q  But my question --
2          MS. PARFITT:  And noted.
3  BY MS. PARFITT:
4      Q  My question to you is, sitting here
5  today, what I need to know -- and if it's no,
6  that's a fine answer.  If it's yes, that's a fine
7  answer.
8          Have you read the expert report of
9  Drs. Longo and Rigler dated November 14, 2018?
10          If you did, I'm not -- I'm not --
11          MS. BROWN:  Objection to the form.  I
12  think he answered that.
13          Counsel, I think what you're really
14  after is, is he relying on that to form his
15  opinion.
16          MS. PARFITT:  Actually, I'm not.  That's
17  a good question, but I'm not asking that.
18  BY MS. PARFITT:
19      Q  Did you read the report?
20      A  So I -- I'm not sure if I read this one
21  with this particular date.
22      Q  That's fine.
23      A  But wait, wait, wait.  But, you know, if
24  it's on here, because that's what it reminds me
25  of, I don't have a specific memory for this matter

Page 69

1  because I've been reading some of these things for
2  other matters as well.  So I -- you know, I don't
3  remember whether -- whether I read that particular
4  one, but if it looked like other ones that I had,
5  I would have, you know, touched it, opened it,
6  looked to see what was in there, and then not read
7  every word of it.  But I don't remember which way
8  it worked.
9      Q  Sitting here today, are you able to tell
10  me the results of Dr. Longo and Rigler's testing
11  of Johnson & Johnson's talcum powder products as
12  reflected in their expert reports of November 14,
13  2018?
14          MS. BROWN:  Objection to the form.
15          THE WITNESS:  I don't remember the
16  details, but I could -- I could look that up and
17  pull -- pull out what I saw.
18  BY MS. PARFITT:
19      Q  Did you mark it?
20          MS. BROWN:  Objection to the form.
21          THE WITNESS:  Oh, you mean like with
22  highlights?
23  BY MS. PARFITT:
24      Q  Mm-hmm.  Yes, with highlights.
25      A  Sorry.  I thought you were talking about

18 (Pages 66 to 69)

Gregory B. Diette, M.D.

Page 70

1  marking exhibits, I'm thinking like that's not
2  what I do.  So, no -- so I don't know.
3      Q   All right.
4      A   This particular one, I might have
5  highlighted an earlier one or -- or even not.  And
6  the only reason I say that is because his reports
7  tend to have an awful lot of like sort of like
8  testing data in the -- in the back of it, and
9  there's not a lot of like words, you know, to
10  read.  So there's not a lot to really highlight
11  for me.  I mean, you know what I mean?  It's kind
12  of succinct in terms of like the opinion part, and
13  then there's a whole bunch of scientific stuff
14  that's somebody else's field.
15      Q   Understood.  And I think what I'm
16  getting at is for purposes of the opinions you are
17  presenting to the jury in this case, are you
18  relying on the test results of Dr. Longo's and
19  Rigler's that are contained in not only their
20  November 14th -- contained in their November 14th,
21  2018 report?
22          MS. BROWN:  And objection.
23          Counsel, you said "jury."  I assume you
24  mean for purposes of this Daubert hearing, is he
25  relying on the Rigler and Longo report of

Page 71

1  November 14th, 2018.
2  BY MS. PARFITT:
3      Q   For purposes of the opinions that you
4  have provided in your expert report and I assume
5  will present to Judge Wolfson sometime in July,
6  are you relying on the information that's
7  contained in the expert report of Dr. Longo and
8  Rigler, November 14, 2018?
9      A   I wouldn't use the word "rely."  I would
10  say aware of, but not -- I'm not relying on it.
11      Q   And let me explore that, because this is
12  the only time I will have a chance to talk to you
13  before that Daubert hearing.
14      A   Sure.
15      Q   Are you, for purposes of your opinion
16  that you're sharing -- will share with me today
17  and will share with the court in July, relying on
18  any of the test results of Drs. Longo and Rigler
19  contained in their reports of November 14, 2018?
20      A   Yeah, I think the way I said it is
21  exactly right, because to me I rely on" has some --
22  there's some legal connotation for that, right.
23          And so it doesn't -- it doesn't inform
24  my opinion, but I'm aware of what his general
25  position has been.  And so -- but I don't -- I

Page 72

1  wouldn't say I rely on it in the sense that it's
2  an underpinning of an opinion or something like
3  that.
4      Q   All right.  Do you have an understanding
5  then that Drs. Longo and Rigler found the presence
6  of asbestos in the talcum powder products they
7  tested?
8          MS. BROWN:  Objection to the form of the
9  question.
10          THE WITNESS:  My -- my understanding is
11  they say they found it, but I don't -- I don't
12  know the fact of whether they found it or not.
13  BY MS. PARFITT:
14      Q   Okay.  Did -- from your read or not read
15  of Drs. Longo and Rigler -- strike that.
16          Did Drs. Longo and Rigler find
17  asbestiform fibers in the tests done of Johnson &
18  Johnson's product, talcum powder products?
19          MS. BROWN:  Objection to the form.
20          THE WITNESS:  I guess I need to know
21  what we're talking about if you say "asbestiform
22  fibers," because I thought your question before
23  was asbestos.
24  BY MS. PARFITT:
25      Q   It was.

Page 73

1      A   And are you expecting me to -- to say
2  that that's two different things, or is it just
3  another way of you trying to ask the same
4  question?
5      Q   How do you define "asbestiform fibers"?
6          MR. LOCKE:  Objection.
7          MS. BROWN:  Objection to the form of the
8  question.
9          THE WITNESS:  Well, I -- I understand
10  some of the terminology, but I'm not a mineralogist.
11  Right.  So I -- I can tell you -- I think I have
12  to diverge a little bit to answer your question,
13  if I can, just to say that -- unless you don't
14  want me to.  Feel free to --
15          MS. BROWN:  No, you should answer the
16  question --
17          THE WITNESS:  Okay.
18          MS. BROWN:  -- as honestly and
19  truthfully and accurately as you can.
20          THE WITNESS:  Because asbestos -- I
21  mean, asbestos in terms of at least its
22  commercial, you know, forms is something that's
23  in -- that's in asbestiform fiber, right.  It's in
24  asbestiform habit.  And so I think, you know, for
25  me to understand the minerals, when we're talking

19 (Pages 70 to 73)

Gregory B. Diette, M.D.

Page 74

1    about asbestos, we're talking about a particular
2    kind of mineral that's in a particular form or
3    habit.
4              And so I -- I think when you're talking
5    about an abestiform fiber, there's some
6    redundancy there in a way, right, which is that
7    that's a description that you could apply to
8    something that other people would call asbestos.
9    BY MS. PARFITT:
10       Q    All right.  Fine.  Thank you.
11             Has Johnson & Johnson provided you with
12   any testing that they performed on their product?
13             MS. BROWN:  Objection.
14   BY MS. PARFITT:
15       Q    Shower to Shower or Johnson's Baby
16   Powder.
17             MS. BROWN:  Objection.
18             THE WITNESS:  I don't think I have seen
19   anything.
20   BY MS. PARFITT:
21       Q    Did you ever ask Johnson & Johnson to
22   see any of the testing that they performed on
23   their own talcum powder products?
24             MS. BROWN:  Objection.  Asked and
25   answered.

Page 75

1              THE WITNESS:  I have not.
2    BY MS. PARFITT:
3        Q    Okay.  Dr. Diette, are you aware that
4    there are generic talcum powder products being
5    sold in the marketplace today that contain an
6    ovarian cancer warning for individuals who use it
7    in their genital area?
8              MS. BROWN:  Objection to the form --
9              THE WITNESS:  I don't --
10             MS. BROWN:  -- lacks foundation, calls
11   for speculation.
12             THE WITNESS:  I don't know one way or
13   the other.
14   BY MS. PARFITT:
15       Q    Okay.  Has Johnson & Johnson shared that
16   information with you?
17             MS. BROWN:  Same objections.
18             THE WITNESS:  Well, if they had, I'd be
19   aware of it, right?  I mean --
20   BY MS. PARFITT:
21       Q    I would think.
22       A    Yeah.  So it has to be no.  Yeah.
23       Q    Okay.  You state in your -- you state in
24   your expert report that the presence of asbestos
25   as an accessory mineral present in cosmetic talc

Page 76

1    would not alter your analysis, and I assume
2    opinions, with regard to talcum powder products
3    causing ovarian cancer.
4        A    That's in my report?
5        Q    Yes.
6        A    Can we flip to that?
7        Q    Sure.  Why don't you go to page 3.
8              And if I may, it's at the bottom,
9    paragraph 6.
10       A    I'm with you, yeah.
11       Q    Okay.  And it says:  "To the extent
12   plaintiffs' expert opined that asbestos is an
13   accessory mineral present in cosmetic talc that
14   causes ovarian cancer, this theory would not alter
15   the analysis because the existing epidemiological
16   literature regarding talc use would
17   necessarily" --
18             MS. BROWN:  You're reading it --
19             MS. PARFITT:  Beg your pardon?
20             MS. BROWN:  You read it wrong.  Perineal
21   talc use.
22             MS. PARFITT:  Oh, I'm sorry.  Perineal.
23   Thank you.
24   BY MS. PARFITT:
25       Q    -- "perineal talc use would necessarily

Page 77

1    account for the presence of any asbestos in the
2    products used in both studies."
3              Did I now read that correctly, with
4    counsel's correction?
5        A    Yeah, you're -- you've got it right now.
6        Q    Okay.  What do you mean by that
7    statement?
8        A    So what I -- what I mean generally is
9    that I've reviewed the -- what I think is the
10   whole epidemiology on the -- on the topic, and the
11   studies themselves don't break down or don't do
12   analyses of what the talcum powder is or what it
13   consists of.  So to the extent that they've
14   studied talcum powder, to me whatever is in talcum
15   powder is baked into the epidemiology.  And so
16   whether asbestos is a fact that it's in there or
17   it's a fact that it's not doesn't really change
18   how to interpret those studies.
19             Is that what you're asking?
20       Q    Mm-hmm.
21       A    Okay.
22       Q    Mm-hmm.  Is asbestos a carcinogen?
23       A    It is.
24       Q    We're going to come back to that.
25             Let me just get on a little bit further

20  (Pages 74 to 77)

Gregory B. Diette, M.D.

Page 78

1    on here.
2         Are you going to be giving an opinion in
3    this case that Johnson & Johnson's talcum powder
4    products contain asbestos?
5         A   No.
6         Q   You will not?
7         A   I will not.
8         Q   Have you made an assumption then for
9    purposes of your opinion that Johnson's -- that
10   Johnson & Johnson's talcum powder products do not
11   contain asbestos?
12        A   I -- no, I haven't made that assumption.
13   I -- I recognize that there's a debate about that,
14   and I don't have the expertise to sort through
15   what's right about that debate.
16        Q   All right.  Assume that Johnson &
17   Johnson's talcum powder products contain asbestos,
18   would that place consumers that use the product in
19   needless danger?
20        MS. BROWN:  Objection.  Counsel, that's
21   an incomplete hypothetical.  Is that the same talc
22   that's in the epi?
23   BY MS. PARFITT:
24        Q   Can you answer the question?
25        MS. PARFITT:  And please don't coach the

Page 79

1    witness.
2         MS. BROWN:  Objection to the incomplete
3    hypothetical.
4         THE WITNESS:  So, anyway, so the
5    needless part, I think -- I'm not sure if you need
6    that in your question or whether it changes how I
7    would answer it.  I think the general issue is
8    whether or not there's a risk or whether there's a
9    danger.  And from what I can tell from reading the
10   literature, that there's not a risk of -- did you
11   say "ovarian cancer" in your question?
12   BY MS. PARFITT:
13        Q   Correct.
14        A   Yeah, I don't see that there's a -- a
15   risk of ovarian cancer from the literature.
16        Q   Assume for purposes of my question that
17   Johnson & Johnson's talcum powder products has
18   asbestos in it, would it be imprudent and not
19   reasonable for Johnson & Johnson to sell that
20   product to its customers, yes or no?
21        MS. BROWN:  Objection to the incomplete
22   hypothetical.
23        THE WITNESS:  So I think, you know, it
24   isn't a yes or no, right?  I mean, because it's --
25   if you're talking about asbestos, there's asbestos

Page 80

1    all over the world, right.  And so everything
2    comes down to dose in any case, right.  So for me
3    to be concerned about it, you'd have to show me
4    that there's a sufficient dose that a person gets
5    in order to raise the risk of whatever it is that
6    you're talking about.
7    BY MS. PARFITT:
8         Q   Let me ask you this:  Assume Johnson &
9    Johnson's talcum powder products has asbestos in
10   it.  Are you with me?
11        A   I am, yeah.
12        Q   All right.  Would it be imprudent for
13   Johnson & Johnson to sell its talcum powder
14   products to consumers to use it in their
15   genital -- on their genital areas?
16        MS. BROWN:  I object to this line of
17   question, Counsel.  Are you divorcing your
18   hypothetical from the epidemiology he has reviewed
19   and is here to talk about?
20        MS. PARFITT:  He didn't answer the
21   question, Counsel.  Counsel, if he understands --
22   he understood the last question, it's the same.
23   Thank you.
24        MS. BROWN:  I object to the entire line
25   of questioning.

Page 81

1    BY MS. PARFITT:
2         Q   Please.
3         A   If we're talking about what exists in
4    the world right now, I -- I don't see any issue
5    with it.
6         Q   All right.  Do you know who
7    Dr. Nicholson is?
8         A   Which -- which Nicholson?
9         Q   Susan Nicholson.
10        A   I'm not sure.  Is she an expert in --
11        Q   She's not.  She's actually the -- and
12   I'll represent to you, the chief medical officer
13   for Johnson & Johnson.
14        A   Oh, I don't know her.
15        Q   Okay.  Let me represent to you that
16   Dr. Nicholson, who is a medical officer for
17   Johnson & Johnson, was deposed in this case, this
18   same case that we're in together, you and I.  Are
19   you aware of that?
20        A   Only because you said so.
21        Q   Okay.  And the deposition that was taken
22   of Dr. Nicholson was a deposition that was taken
23   wherein she -- we call it a 30(b)(6).  That means
24   she represents the voice of the company that she
25   works for.  Understand?

21 (Pages 78 to 81)

Gregory B. Diette, M.D.

Page 82

1    MS. BROWN: Objection to the form of the
2  question.
3    THE WITNESS: I understand what you
4  said. I don't know what I -- if I understand what
5  that means.
6    MS. PARFITT: Okay. All right. Let me
7  have marked as Exhibit -- I believe it's
8  Exhibit No. 6 that we're on.
9    (Diette Exhibit No. 6 was marked
10   for identification.)
11   MS. BROWN: And, Counsel, if you're
12 going to ask him questions about Dr. Nicholson's
13 deposition that he has not reviewed, we need to at
14 least have a full copy of the deposition here.
15 Thanks.
16   MS. PARFITT: I believe you have --
17   MS. BROWN: And you should take as long
18 as you need to review it to answer any questions
19 counsel might have.
20   MS. PARFITT: Okay. And, Counsel, I'll
21 get you that -- I don't have a copy --
22   MS. BROWN: We have -- I mean your
23 colleague just --
24   MS. PARFITT: We have just one. I'm
25 just saying we just have one. I don't have one

Page 83

1  for you.
2    MS. BROWN: As long as the doctor has
3  time to review it -- you know he hasn't seen this
4  before. If you're going to ask him questions
5  about it, he needs to read it.
6    MS. PARFITT: Just one.
7  BY MS. PARFITT:
8    Q   Dr. Nich- -- or Dr. Diette, let me
9  direct your attention to page 37.
10   A   Okay.
11   Q   And specifically line 2, and let me read
12 it. We'll put it up on the ELMO.
13   MS. BROWN: Counsel, while you're doing
14 that, I'm going to object to taking one page out
15 of Dr. Nicholson's deposition that the doctor has
16 not reviewed and asking questions out of context.
17 And if he needs to read the whole deposition to
18 answer your question, he will need to do that.
19   MS. PARFITT: Counsel, please not --
20 let's not coach.
21   MS. BROWN: And I'm objecting on the
22 record to the improper questioning with snippets
23 of somebody else's deposition.
24   MS. PARFITT: Okay.
25 BY MS. PARFITT:

Page 84

1    Q   Okay. At the top, if I may, it says --
2  line 2: "Well" -- and I'll represent to you that
3  I was one of the attorneys that took
4  Dr. Nicholson's deposition.
5    The question is: "Well, if your
6  products contain asbestos, would you agree with me
7  that that impacts the safety of the product?"
8    Answer: "Absolutely, yes."
9    Next question: "Would you agree that
10 Johnson & Johnson has a zero tolerance policy with
11 regard to having asbestos in their talcum powder
12 products?"
13   The answer: "Yeah, that is correct."
14   Next question: "In fact, as a
15 representative of the company, it's your position
16 that your Johnson & Johnson's talcum powder
17 products should not contain asbestos; is that
18 correct?"
19   "That's correct -- that is correct."
20   Next question: "And you would agree
21 with me that if your talcum powder products had
22 asbestos in them, it would place the consumers
23 that use your product in needless danger,
24 correct?"
25   "It could, yes."

Page 85

1    Next question on page 48 of that same
2  deposition --
3    MS. BROWN: Counsel, I'm sorry, but your
4  pages are not matching up to what we've been
5  handed. Can you just direct us -- and we're -- in
6  the snippet you gave us, I can't find this.
7    THE WITNESS: I don't have 48. Mine
8  goes to 41.
9    MS. BROWN: Yeah, mine says 37, 37, 37.
10   THE WITNESS: Maybe here in the whole
11 thing?
12   MR. HEASLIP: And mine is 46 through 53.
13   MS. PARFITT: Okay.
14   MS. BROWN: This is not what you're
15 reading, so it's impossible to follow.
16   Were you able to follow that, Doctor?
17   MS. PARFITT: We have it on the
18 overhead. I think --
19   MR. ROSEN: I go to -- I go to 41.
20   MS. BROWN: Yeah, well, he needs to have
21 it in front of him. We don't have a copy.
22   MS. PARFITT: Well, let's do this. I
23 have an overhead and an ELMO. So let's keep
24 going. Why don't you read the screen.
25   Do you need me to go back over those

22 (Pages 82 to 85)

Gregory B. Diette, M.D.

Page 86

1    questions?
2         MS. BROWN: But, Counsel, that's not
3    even a transcript. What is that?
4         MS. PARFITT: It's --
5         MS. MILLER: How are you going to mark
6    that as an exhibit?
7         MS. PARFITT: I'm going to put an
8    exhibit sticker on it, and I'm going to put it in
9    as representative pages from the Nicholson
10   deposition.
11        MS. BROWN: Can he find it in the large
12   copy?
13        MR. ROSEN: Would you mind passing
14   back Exhibit 6 that we handed --
15        THE WITNESS: Oh. This is all of your
16   36's. That's a whole bundle of the same thing.
17        But I would like to get the 36-page
18   back --
19        MS. PARFITT: Sure.
20        THE WITNESS: -- if we're going to talk
21   about it.
22        MS. PARFITT: Absolutely. I want you to
23   have actually 37, and you need -- here we go.
24        MS. BROWN: This is the complete set?
25        MS. PARFITT: Yes, I'm assuming.

Page 87

1         MS. BROWN: You have that in front of
2    you?
3         THE WITNESS: I do.
4    BY MS. PARFITT:
5         Q    And, Dr. Diette, if you have any trouble
6    reading any of that -- or you can also look up on
7    the ELMO that's being displayed.
8         MS. BROWN: Thank you.
9         MS. PARFITT: Okay. Yeah, sorry.
10   BY MS. PARFITT:
11        Q    Again, page 48, line 14.
12        Do you have that there, Doctor, in front
13   of you?
14        A    I do.
15        Q    Okay.
16        "Q.  You would agree, Dr. Nicholson, if
17   Johnson & Johnson's Baby Powder indeed had
18   asbestos in it, it would be imprudent and not
19   reasonable for Johnson & Johnson to sell it to its
20   consumers?"
21        "A.  I would agree with that.
22        "Q.  Thank you.
23        "A.  I would not support Johnson &
24   Johnson selling a product that contained
25   asbestos."

Page 88

1         Did I read all that correctly?
2         A    You did.
3         Q    All right. Do you -- so you disagree
4    with Dr. Nicholson; is that correct?
5         MS. BROWN: Objection to the form.
6         MR. LOCKE: Objection.
7         MS. BROWN: Misstates his testimony.
8         THE WITNESS: I don't -- I don't agree
9    or disagree. I mean, I -- I honestly don't know
10   who she is other than what you just said. But --
11   but it sounds like she's articulating a policy for
12   the company, which I think is her right -- her
13   right to do that and to express those opinions.
14   BY MS. PARFITT:
15        Q    Okay. All right.
16        Okay. Now, counsel provided for us in
17   advance of this deposition a copy of your CV. So
18   let me --
19        THE WITNESS: Would it -- would it be a
20   good time just to refill coffee? Is that okay?
21        MS. PARFITT: Sure. And I should have
22   said that. Any time you need a break --
23        THE WITNESS: No, I know.
24        MS. PARFITT: -- you holler.
25        THE WITNESS: Thank you. I appreciate

Page 89

1    that.
2         MS. PARFITT: You're very welcome.
3         THE VIDEOGRAPHER: The time is 10:07
4    p.m. We're going off the record.
5         (Recess.)
6         THE VIDEOGRAPHER: The time is
7    10:20 a.m., and we're back on the record.
8    BY MS. PARFITT:
9         Q    Dr. Diette, are you still --
10        THE VIDEOGRAPHER: Microphone, Counsel.
11   BY MS. PARFITT:
12        Q    Are you good?
13        A    All set. Thank you.
14        Q    All right. Dr. Diette, if asbestos was
15   found to be in talcum powder products -- strike
16   that.
17        Would the presence of asbestos in talcum
18   powder products provide evidence to support the
19   hypothesis that talcum powder products -- strike
20   that.
21        Would the presence of asbestos in talcum
22   powder products provide biologically plausible
23   evidence to support the hypothesis that talcum
24   powder products can cause ovarian cancer?
25        MR. LOCKE: Objection.

23 (Pages 86 to 89)

Gregory B. Diette, M.D.

Page 90

1     MS. BROWN:  Objection to the form of the
2  question.
3     THE WITNESS:  You would have to qualify
4  it, right, because I -- if you're talking about
5  like -- even like, you know, one fiber or
6  something would be quite different than if there's
7  a sufficient amount in order to -- to cause a
8  disease, right.  So it -- it always comes down to
9  dose in terms of what you're talking about.
10     So it's -- all by itself, I don't think
11  that that question is answerable.
12  BY MS. PARFITT:
13     Q  Can one fiber of asbestos alone cause
14  cancer?
15     MS. BROWN:  Objection to the form.
16     THE WITNESS:  It's -- it's so impossible
17  to think that it would, because we all have
18  asbestos in our lungs, and there's a background
19  amount of asbestos in the world that if one fiber
20  could do it, I think we would all have cancer.  So
21  I -- I think somebody could say that, but I don't
22  think it would be true.
23  BY MS. PARFITT:
24     Q  You certainly don't think it's true; is
25  that correct?

Page 91

1     A  Oh, for sure, yeah.
2     Q  Okay.  Let me mark at this time a
3  copy -- a copy of your curriculum vitae, and we'll
4  have it marked as exhibit -- Exhibit 7.
5     (Diette Exhibit No. 7 was marked
6     for identification.)
7  BY MS. PARFITT:
8     Q  Do you have that in front of you?
9     A  I do.
10     Q  Okay.  Who prepared that curriculum
11  vitae?
12     A  Well, not one person.  This is an
13  iterative exercise over time.  So it's -- I mean,
14  me in the sense, although not as the person, you
15  know, typing the words, but it's -- you know, it's
16  my -- my information on here.  And I've had
17  different administrative assistants who have --
18  who have helped to sort of shape it.
19     Q  Is it current?
20     A  No.
21     Q  It's not?
22     A  It's not.
23     Q  All right.  What additions or deletions
24  would you make to your curriculum vitae?
25     A  For the most part, I'd add a bunch of

Page 92

1  papers that have been either accepted or published
2  since then.  There's probably some talks and
3  things.  The -- the grant award section I'm sure
4  needs updating.
5     Q  Okay.  It looks, on the far right of
6  that CV, that it's got a June 2017 date; is that
7  correct?
8     A  It is.
9     Q  All right.  Has there been a curriculum
10  vitae prepared by you since June of 2017?
11     A  No.
12     Q  All right.  Where would I get these
13  additional articles and speeches?  Do you have
14  them in a -- contained in one particular place?
15     A  No.  Where -- where you could get the
16  articles would be on PubMed, and if you just did a
17  PubMed search with my name, you would find them
18  all.
19     For speeches, I don't actually have a
20  repository, so it's going to take me some work to
21  actually sort of populate that part of the CV.
22     Q  Are you -- do you have any intention of
23  updating your CV?
24     A  Yes.  Can I give you an extra sentence
25  or two?

Page 93

1     Q  Sure.
2     A  Okay.  So I sure want to.  The stakes
3  are low for me at this point.  This is our
4  Department of Medicine format CV, which we use for
5  promotion purposes, for the most part.  I've been
6  promoted to professor, which there's no other rank
7  to get promoted to.  And so it's not really that
8  urgent for me to -- to change that.
9     Then on top of that, my administrative
10  assistant went out on maternity leave, and then I
11  didn't want to swamp her with this when she came
12  back.
13     Q  That was nice.
14     A  And literally just last week, she took a
15  new job, a better job but in a different place.
16     So long answer, yeah, I want to, but
17  it's not going to happen really soon.
18     Q  Okay.  So your current academic
19  appointment at Johns Hopkins University, is that a
20  professor of medicine, is that correct, Division
21  of Pulmonary and Critical Care?
22     A  Yeah, and I think it's called Pulmonary,
23  Criteria Care and Sleep Medicine now.  We just --
24  we just changed the name recently.
25     Q  And sleep medicine?

24 (Pages 90 to 93)

Gregory B. Diette, M.D.

Page 94

1      A   And sleep, yeah.
2      Q   All right.  Are you still within the
3  Department of Epidemiology?
4      A   Yes.
5      Q   All right.  Are you still an associate
6  professor of medicine in epi and environmental
7  health?
8      A   No, that's a typo somewhere.  I don't
9  know where you saw that, but -- oh, probably in my
10  report.  But, no, I'm -- the professor label
11  carries across all the -- different entities.
12      Q   So you're no longer an associate
13  professor.
14      A   Right.  Professor of whatever it is that
15  I'm a professor of.
16      Q   All right.  Your board certification is
17  in pulmonary and critical care?
18      A   It's in internal medicine and pulmonary
19  medicine.
20      Q   You're not a member of the American
21  College of Epidemiology, correct?
22      A   No.
23      Q   Your undergraduate degree was in
24  English?
25      A   English and economics.

Page 95

1      Q   Okay.  And then post-medical school, you
2  received a MHS in public health; is that correct?
3      A   Well, it was in epidemiology.
4      Q   Okay.
5      A   I only just say that because there is a
6  degree in public health, and that's not what mine
7  was called.
8      Q   Okay.  Let me show you what we'll have
9  marked as the Johns Hopkins Medicine website as --
10      MS. PARFITT:  What exhibit?
11      MS. BROWN:  8.
12  BY MS. PARFITT:
13      Q   -- Exhibit 8?
14      (Diette Exhibit No. 8 was marked
15      for identification.)
16  BY MS. PARFITT:
17      Q   All right.  Do you have that in front of
18  you?
19      A   I do.
20      Q   All right.  Now, this is for the Johns
21  Hopkins Medical School; is that correct, or
22  medical center?
23      A   So I don't know.  You know, the top says
24  "Johns Hopkins Medicine," which is a broader label
25  that includes the medical school and probably the

Page 96

1  hospital as well.
2      Q   All right.  So if someone were going on
3  the website to look at the hospital, the medical
4  school, medical center, this is what they would
5  see.  And look over to the far right, and it has
6  "Expertise."  Do you see that?
7      A   I do.
8      Q   All right.  Is -- it reads:  "Expertise:
9  Asthma, chronic obstructive pulmonary disease
10  (COPD), pulmonary" -- excuse me -- "pulmonary
11  disease, and critical care medicine, pulmonary
12  medicine."
13      Is that correct?
14      A   It is correct.
15      Q   All right.  Is there anything you want
16  to add with regard to your expertise?
17      MS. BROWN:  Objection to the form of the
18  question.
19      THE WITNESS:  So I honestly don't know
20  what this is.  I mean, I don't doubt that it comes
21  from Hopkins, but it's not something I look at.
22  BY MS. PARFITT:
23      Q   Okay.
24      A   If you -- well, no, just one second.
25  Because if you look at the bottom, it says

Page 97

1  "Request an appointment."  So this looks like some
2  kind of place that somebody could go and find a
3  call-in number to get an appointment for -- for a
4  doctor.
5      Q   Okay.
6      A   So I think it's -- I don't know.  I
7  could add all kinds of things, but I don't -- I
8  don't know what the format is for this.  Like I
9  don't know if there is a word limit.
10      Q   Sorry.
11      A   I don't know -- I don't know what the
12  purpose of this is.
13      Q   All right.  The second line says:
14  "Research interests," and it states:
15  "Environmental impacts on lung disease,
16  epidemiology of airway disease and chronic
17  obstructive pulmonary disease, asthma."
18      Did I read that correctly?
19      A   You did.
20      Q   Does that accurately reflect your
21  current research interests?
22      MS. BROWN:  Objection.  Form.
23      THE WITNESS:  Well, it's some, but it's
24  so incomplete.  You know, it's obviously just a
25  couple of snippets that somebody chose to put on

25 (Pages 94 to 97)

Gregory B. Diette, M.D.

Page 98

1    this -- on this page.
2    BY MS. PARFITT:
3        Q   Okay.  Well, I will represent to you
4    that if one chose to go on the Johns Hopkins
5    Medicine website, this is how they hold you out to
6    the -- to the world, so to speak.
7            MS. BROWN:  Objection to the speech.  Is
8    there a question?
9            THE WITNESS:  So --
10           MS. PARFITT:  Counsel --
11           MS. BROWN:  There's no question.
12           MS. PARFITT:  -- please.
13           MS. BROWN:  Is there a question?
14           MS. PARFITT:  Yes.
15           MS. BROWN:  What is it?
16   BY MS. PARFITT:
17       Q   Is this how -- is this information
18   correct, Dr. Diette?
19       A   Oh, the information is correct.
20       Q   Okay.
21       A   It's very incomplete.
22       Q   Okay.  Let me show you now what we'll
23   have marked as Exhibit 9.
24           (Diette Exhibit No. 9 was marked
25           for identification.)

Page 99

1            THE WITNESS:  Can I just -- just
2    clarify?
3    BY MS. PARFITT:
4        Q   There's no question pending right now.
5        A   I want to clarify my last --
6            MS. BROWN:  But if you want --
7    BY MS. PARFITT:
8        Q   Your counsel will have a chance to -- to
9    talk with you.
10           MS. BROWN:  Whoa, Counsel.  Are you
11   going to take the position on the record that the
12   witness can't clarify any --
13           MS. PARFITT:  No, I'm not doing that
14   all.
15           MS. BROWN:  Well, that was his request,
16   and he wanted to --
17   BY MS. PARFITT:
18       Q   What do you need to do, Doctor?  I'm
19   sorry.
20       A   Oh, well, I just -- because we were
21   talking about this front page, and I didn't
22   realize there were other pages here.  This still
23   isn't complete, but there's a whole lot here more
24   about me than just what was on that front page.  I
25   just wanted to point to all that.  I haven't read

Page 100

1    it to see if it's accurate or not, but there's --
2    there's certainly more about me than just those
3    couple of --
4        Q   Okay.  Well, you know, that's a good
5    point, and I missed that.  So thank you for
6    bringing that to our attention.
7            Let's look at that sec- -- second page
8    of the website for Johns Hopkins Medical Center.
9            MR. TISI:  Counsel, that is Exhibit 8.
10           MS. PARFITT:  And it is Exhibit 8.
11   Thank you.
12           Okay.  Let's put that up there.
13   BY MS. PARFITT:
14       Q   And there's a category that says
15   "Background"; is that correct?
16       A   It is.
17       Q   All right.  Now, it states:
18   "Dr. Gregory Diette is a professor of medicine at
19   the Johns Hopkins University School of Medicine.
20   He holds a joint appointment in the Department of
21   Epidemiology in the Johns Hopkins Bloomberg School
22   of Public Health."  Hashtag, "His areas of
23   clinical expertise include asthma and obstructive
24   lung disease."
25           Did I read that correctly?

Page 101

1        A   You did.
2        Q   Okay.  Is that correct?
3        A   That -- that it includes those two
4    diseases?
5        Q   Yes.
6        A   It does include that.
7        Q   Okay.  And the third paragraph reads:
8    "His research interests include environmental
9    impacts on lung disease, epidemiology of airway
10   disease, and chronic obstructive pulmonary
11   disease."
12           Did I read that correctly?
13       A   You did.
14       Q   All right.  And does that reflect some
15   of your research interests?
16       A   It does.
17       Q   All right.  Now, let's move over -- and
18   thank you for correcting me on that.
19           Now, I will represent to you that
20   Exhibit 9 is from the website from the Bloomberg
21   School of Public Health.
22           Do you have that in front of you?
23       A   I do.
24       Q   All right.  Now, if one was to go onto
25   the website for the Bloomberg School of Public

26  (Pages 98 to 101)

Gregory B. Diette, M.D.

Page 102

1    Health, this is the type of information they would
2    receive, Dr. Diette.
3            Look down at the "Overview." Do you see
4    that?
5    A   I do.
6    Q   Okay. It says --
7            MS. PARFITT: Let's get that up on the
8    ELMO.
9    BY MS. PARFITT:
10   Q   All right. Do you see under "Overview,"
11   it says: "My research focuses on identifying
12   factors that cause or provoke asthma. We have
13   been interested especially in air pollutants,"
14   parens, "particulate matter, NO2, secondhand
15   smoke," close parens, "and allergens," parens,
16   "including mouse," close parens, "that are
17   especially problematic in inner city homes. We
18   are studying the effects of these pollutants and
19   allergens on inflammation and oxidative stress.
20   More recently, we have begun examining how dietary
21   patterns, especially a Western diet style -- a
22   Western-style diet, may increase susceptibility to
23   inhalable pollutants and allergens."
24           Did I read that correctly?
25   A   You did.

Page 103

1    Q   Okay. And then again, under your
2    "Research Interests, it states: "Epidemiology of
3    lung diseases, asthma, COPD" --
4            And what's COPD?
5    A   Chronic obstructive pulmonary disease.
6    Q   -- "outcomes, environmental," and then
7    it says, "Particulate matter, allergens and health
8    disparities."
9            Did I read that correctly?
10   A   You did.
11   Q   All right. Does that represent some of
12   your research interests?
13   A   It does represent some.
14   Q   Okay. You are a clinician?
15   A   True.
16   Q   All right. What is the profile of the
17   types of patients that you see in your practice?
18           MS. BROWN: Form.
19           THE WITNESS: You want me to just take a
20   stab at it? Because I'm not sure -- is profile --
21           MS. BROWN: If you don't understand the
22   question, I'm sure counsel will clarify it.
23           MS. PARFITT: I will, sure.
24   BY MS. PARFITT:
25   Q   What is the nature of the diseases that

Page 104

1    patients who come to you are experiencing?
2            MS. BROWN: Objection to the form.
3            THE WITNESS: And I'll do my best, and
4    then if it's not what you're looking for, please
5    just ask me to clarify.
6            I -- I see probably, you know, almost
7    every single kind of medical problem there is
8    because I -- I attend in so many different
9    locations within the Hopkins system. So meaning
10   that I do work in the intensive care unit where
11   it's every kind of medical problem you could
12   imagine, it just happens to be the sickest of the
13   sick. So it could be any -- any organ system, or
14   not even an organ system, but all sorts of
15   illnesses.
16           In the pulmonary clinic, I see -- I
17   certainly see people with asthma and COPD, but I
18   see pretty much any kind of pulmonary disease and
19   get referrals for things that aren't pulmonary
20   diseases. They -- they may be somebody who's got
21   a -- a symptom that turns out to be a
22   pulmonary disease.
23           In the oncology center, when I attend
24   there, I see every kind of cancer patient that at
25   least that Hopkins sees.

Page 105

1            And then I'm also lucky enough to attend
2    on the general internal medicine service, and so
3    there it's really everything, it's all comers.
4    And so it ranges from basically head-to-toe kind
5    of medicine.
6    BY MS. PARFITT:
7    Q   Okay. Now, if I arrived at -- for in --
8    I guess you said the intensive care clinic, and I
9    had a gynecological problem, would I see you?
10           MS. BROWN: Objection to the form.
11           THE WITNESS: So there's no intensive
12   care clinic, just to be clear. Like a clinic is
13   an outpatient setting. So our intensive care unit
14   is an inpatient setting for critically ill people.
15   BY MS. PARFITT:
16   Q   Okay.
17   A   So you might or might not end up seeing
18   me, because if we're -- the way that the program
19   works is that -- so, for example, if somebody's
20   pregnant, just giving an example, if it's an early
21   pregnancy, then those patients would end up in our
22   medical ICU. If it's a later pregnancy, then they
23   would go to the -- the obstetrics unit to their --
24   their own particular unit. And then you might see
25   me if I was consulted into that unit, whether or

Gregory B. Diette, M.D.

Page 106

1    not you were in our -- our unit or not.
2        Q   So if I came in with a gynecological
3    problem, they might call you -- you, who are a
4    pulmonologist, they might call you in to consult
5    with me?
6            MS. BROWN:  Objection to the form of the
7    question and the tone.
8            THE WITNESS:  Well, I am picking up the
9    tone, which I -- which I think -- I mean, I know
10   you're trying to make a point here.  And the
11   question as you asked it is -- the answer is, of
12   course.  But I think what you're trying to get at
13   is would they have asked me to come deal with
14   their pregnancy, for example, and I wouldn't be
15   the person dealing with their pregnancy.  I would
16   be dealing with something else.
17   BY MS. PARFITT:
18       Q   Okay.  All right.  Is it fair to say
19   that your practice primarily deals with
20   individuals who have pulmonary and lung disease
21   conditions?
22           MS. BROWN:  Objection.
23           THE WITNESS:  I think if you dial back
24   and listen to what I said for those other answers,
25   you would be pretty clear that it isn't just that.

Page 107

1    BY MS. PARFITT:
2        Q   Okay.  Well, I would include asthma in
3    that as well.
4            MS. BROWN:  Same objection.
5            THE WITNESS:  Well, include it, but I
6    mean -- but, you know, when I'm on the general
7    internal medicine service, I'm not seeing mostly
8    asthma.  I might be seeing somebody with diabetes
9    or a heart attack or pelvic inflammatory disease,
10   you know, to name a GYN problem.  I mean it's the
11   whole gamut from head to toe.
12   BY MS. PARFITT:
13       Q   Is it fair to say your research in
14   public health focuses on factors that cause and
15   provoke asthma?
16           MS. BROWN:  Objection to the form of the
17   question.
18           THE WITNESS:  It's a focus.
19   BY MS. PARFITT:
20       Q   Is it fair to say that you have a
21   particular interest in air pollutants, and that
22   includes secondhand smoke and mouse allergens?
23       A   I agree with most of what you said, but
24   not literally the way you said it, because I don't
25   think mouse allergen's a pollutant.  So I'm

Page 108

1    certainly interested in pollutants.
2        Q   Okay.  And more recently, you've
3    expressed a research interest in dietary patterns
4    particularly, and especially a Western diet and
5    how that might increase susceptibility to
6    inhalable pollutants; is that correct?
7        A   True.
8            MS. BROWN:  Form.
9    BY MS. PARFITT:
10       Q   Are you -- have you published recently
11   on that?
12       A   I'm sure there's stuff that's come out.
13       Q   Well, I only have your CV from 2017, so
14   I'll represent that I'm not seeing something on
15   that CV.
16           Is there something you've done recently?
17       A   Yeah, it's a couple of years ago.
18       Q   Okay.
19       A   I mean the best way to find stuff would
20   be on PubMed.
21       Q   All right.  You've been retained to
22   serve as an expert for Johnson & Johnson, correct?
23           MS. BROWN:  Form.
24           THE WITNESS:  That's correct.
25   BY MS. PARFITT:

Page 109

1        Q   Okay.  Do you know what the -- do you
2    have an understanding of what the allegations are
3    against Johnson & Johnson?
4            MS. BROWN:  Objection to the form.
5            THE WITNESS:  Which -- which ones?
6    BY MS. PARFITT:
7        Q   Do you know why you're -- Johnson &
8    Johnson is being sued?
9            MS. BROWN:  Objection.
10           Counsel, are you asking a legal
11   question?
12           MS. PARFITT:  No.
13   BY MS. PARFITT:
14       Q   Do you have any understanding of the
15   allegations or the nature of the lawsuit against
16   Johnson & Johnson, the company that's retained you
17   to provide expert legal testimony?
18           MS. BROWN:  Same objection.
19           THE WITNESS:  I think, generally
20   speaking, what I understand is that there's an
21   allegation that talcum powder causes ovarian
22   cancer.
23   BY MS. PARFITT:
24       Q   Okay.  Do you have an understanding of
25   the allegations against Imerys?

28 (Pages 106 to 109)

Gregory B. Diette, M.D.

Page 110

1          MS. BROWN: Objection.
2          THE WITNESS: I don't have any separate
3    understanding.
4    BY MS. PARFITT:
5          Q    Okay.  Do you know who Imerys are -- is
6    or are?
7          A    I'm aware that it's a supply company of
8    some sort, but I don't know much more about them.
9          Q    All right.  And do you have an
10   understanding of the allegations against the
11   Personal Care Products Corporation --
12         MS. BROWN: Objection.
13   BY MS. PARFITT:
14         Q    -- otherwise known as the PCPC?
15         MS. BROWN: Objection.  Calls for
16   speculation.
17         THE WITNESS: I don't --
18         MR. LOCKE: Objection.
19   BY MS. PARFITT:
20         Q    You don't.
21         A    I don't know who that is.
22         Q    All right.  Have you ever seen a
23   complaint in this case?
24         MS. BROWN: Objection.
25   BY MS. PARFITT:

Page 111

1          Q    And when I say "this case," I'm talking
2    about this case of talcum powder products and
3    ovarian cancer, be it in an MDL context or a state
4    context.
5          MS. BROWN: Same objection.
6          MS. MILLER: With any complaint, any
7    talcum --
8          MS. PARFITT: Any -- yeah, has he ever
9    seen a complaint in any talcum powder product and
10   ovarian cancer case.
11         MS. BROWN: Objection to the form.
12         THE WITNESS: I'm sure I must have.
13   BY MS. PARFITT:
14         Q    You're sure you must have.
15         Is it in the materials that you have
16   reviewed for purposes of your -- your deposition
17   today or for purposes of the report you prepared?
18         A    No.
19         MS. BROWN: Objection.
20   BY MS. PARFITT:
21         Q    Okay.  If you have seen it, what have
22   you done with it?
23         MS. BROWN: Objection.  Vague.
24         THE WITNESS: Well, the same thing I do
25   with any complaint, which is just to try to read

Page 112

1    through it quickly and just get a sense of what
2    the case is about.
3    BY MS. PARFITT:
4          Q    And then what do you do with it?
5          MS. BROWN: Form.
6    BY MS. PARFITT:
7          Q    Do you keep it?
8          A    Oh, not forever.  I mean if the case is
9    over, then I destroy it with all the other
10   materials.
11         Q    Well, this case is far from over.
12   Have -- do you still have --
13         MS. BROWN: Counsel, just ask the
14   question.
15   BY MS. PARFITT:
16         Q    -- a copy of the complaint?
17         MS. MILLER: You asked about a state
18   court case.
19         MS. PARFITT: No.  I said was there --
20   hey -- again, hey, ladies, I'm sorry, I think the
21   two of you are going to have to agree who is going
22   to com-- -- who's going to complain -- who's going
23   to object.  One of you can object.
24         MS. BROWN: Well, if you're going to
25   complain, I'm going to object.

Page 113

1          MS. PARFITT: Okay.
2          MS. BROWN: Please just ask the
3    question.  No speeches.
4          MS. PARFITT: Then, please, and I --
5    listen, I think that we're getting at a crossroads
6    here.  One person gets to object.  And let me
7    remind you what the CMO says, because I know you
8    know that --
9          MS. BROWN: Counsel --
10         MS. PARFITT: And I'm not admonishing.
11   Let me finish, Counsel --
12         MS. BROWN: Don't yell at me.
13         MS. PARFITT: -- and then you can speak.
14         MS. BROWN: You're raising your tone at
15   me.
16         MS. PARFITT: Well, the camera will --
17   oh, please, don't be so condescending.
18         MS. BROWN: Sure, it's going to reflect
19   that you're raising your tone.
20         MS. PARFITT: I hope -- I hope that the
21   Judge sees this because we're probably --
22         MS. BROWN: We are well aware of the
23   CMO.
24         MS. PARFITT: -- going to have to call
25   him soon.

29 (Pages 110 to 113)

Gregory B. Diette, M.D.

Page 114

1      MS. BROWN:  We are complying with it.
2  We're happy to call the Judge.
3      MS. PARFITT:  So the CMO says that you
4  get to say, "Objection. Form." That's what you
5  get to say.
6      You have a wonderful opportunity at the
7  end of this deposition to ask him as many
8  questions as you like, but for right now, my time,
9  my deposition. It's, "Objection. Form." And I
10  really would appreciate that courtesy. I will
11  give it to you, but I would appreciate getting it
12  back. So --
13      MS. BROWN:  And to be clear --
14      MS. PARFITT:  No, Counsel, no more
15  speeches. No more speeches.
16      MS. BROWN:  You just made a speech, and
17  I'm going to respond --
18      MS. PARFITT:  No more speeches, Counsel.
19  My deposition.
20      MS. BROWN:  No, Counsel.
21      MS. PARFITT:  Not your deposition.
22  BY MS. PARFITT:
23      Q   Next question I have --
24      MS. PARFITT:  No more questions,
25  Counsel. You want me to depose you?

Page 115

1      MS. BROWN:  Counsel, no. You are
2  raising your tone.
3      MS. PARFITT:  Counsel --
4      MS. BROWN:  You are yelling at me.
5      MS. PARFITT:  -- you know what, I was
6  told a little bit earlier nobody could hear me.
7  So I have lifted my voice, and now I'm using my
8  stage voice. So now everyone can hear me, and now
9  I'm speaking too loud to you.
10      So I'm going to try -- you know, you
11  can't have it both ways. One speaker, one
12  objectioner. Next question.
13      MS. BROWN:  The record will reflect that
14  you are making incessant speeches. Please --
15  BY MS. PARFITT:
16      Q   Are you an oncologist, Dr. Diette?
17      A   I am not an oncologist.
18      Q   Are you a radiation oncologist?
19      A   No.
20      Q   Are you a gynecologist?
21      A   No.
22      Q   Okay. Have you ever provided
23  gynecological care or treatment for a woman who
24  has been diagnosed with ovarian cancer?
25      MS. BROWN:  Objection. Form.

Page 116

1      THE WITNESS:  Can you say it again?
2  BY MS. PARFITT:
3      Q   Sure.
4      A   Yeah.
5      Q   Have you ever been provided
6  gynecological care or treatment for a woman who
7  has been diagnosed with ovarian cancer?
8      A   So there's just a couple of things
9  there, and I think maybe I heard it wrong.
10      Did you say been provided care?
11      Q   Have you ever provided --
12      A   Provided. Okay. I'm sorry. I thought
13  you said "been provided."
14      Q   No, no, no, no.
15      MS. MILLER:  You did say that.
16      THE WITNESS:  I thought it sounded like
17  did I get care. I was like --
18      MS. MILLER:  You did --
19  BY MS. PARFITT:
20      Q   No, I -- I don't think you did.
21      A   Yeah, right.
22      Q   I know, that would have been a very
23  awkward question, wouldn't it?
24      Have you ever provided gynecological
25  care or treatment for a woman who has been

Page 117

1  diagnosed with ovarian cancer?
2      A   Sure. And I think it goes back to some
3  of the things I said before where I see people in
4  the hospital who have ovarian cancer, and through
5  my training, you know, for medical school and
6  residency, that was part of our training also,
7  which was to rotate on services where people
8  had every -- every imaginable illness.
9      Q   Okay. Well, your residency was how long
10  ago?
11      MS. BROWN:  Objection.
12      THE WITNESS:  My residency was 1990 to
13  1993.
14  BY MS. PARFITT:
15      Q   Okay. So I'm not talking about what you
16  did in 1993, back in that period of time.
17      What I'm talking about is whether or not
18  you have actually provided gynecological care to a
19  woman who presented to you with ovarian cancer?
20      MS. BROWN:  Objection to the form.
21  Asked and answered five times.
22      You can answer, Dr. Diette.
23  BY MS. PARFITT:
24      Q   And by that, primary care. Not in a
25  consulting role but primary care.

30 (Pages 114 to 117)

Gregory B. Diette, M.D.

Page 118

1      MS. BROWN:  Same objection.
2      THE WITNESS:  I think I know your
3  question, but could you be specific like --
4  BY MS. PARFITT:
5      Q   Sure.
6      A   -- like just an example, and then I'll
7  know that we're talking about the same thing.
8      Q   Okay.  Have you ever provided primary
9  care, gynecological care or treatment for a woman
10  who has been diagnosed with ovarian cancer?
11      A   So --
12      MR. LOCKE:  Objection.
13      THE WITNESS:  -- I'm not trying to
14  criticize the question, but primary care sounds
15  like something that a -- like a family
16  practitioner or an internist would do.  I think
17  you mean something else, so --
18  BY MS. PARFITT:
19      Q   I do.  Okay.  What I'm talking about is
20  if I called up Johns Hopkins and said, I have been
21  diagnosed with ovarian cancer, I need to see a
22  physician, would I be referred to the pulmonology
23  department, your department, or would I be
24  referred to a different department?
25      MS. BROWN:  Objection to the form.

Page 119

1      THE WITNESS:  Different department,
2  assuming it's literally for the care of the
3  ovarian cancer.
4  BY MS. PARFITT:
5      Q   Okay.  Fair.  Thank you.
6      Have you ever researched the life
7  expectancy of a woman who has ovarian cancer?
8      A   No.
9      MS. BROWN:  Objection to the form.
10  BY MS. PARFITT:
11      Q   Are you a pathologist?
12      A   I am not.
13      Q   All right.  And are you a radiologist?
14      A   I am not.
15      Q   Okay.  Are you a mineralogist?
16      A   No.
17      Q   Are you a toxicologist?
18      A   No.
19      Q   Are you a pharmacologist?
20      A   No.
21      Q   Okay.  Are you a regulatory expert?
22      A   I don't know what that means, but I
23  don't -- I don't use those words to describe
24  myself.
25      Q   Okay.  Are you a certified industrial

Page 120

1  hygienist?
2      A   No.
3      Q   Okay.  Are you what's referred to as a
4  mineralogist or a mineral scientist specialist?
5      A   Neither one.
6      Q   Are you a geologist?
7      A   No.
8      Q   Okay.  Is it fair to say that you do not
9  hold yourself out in the scientific and medical
10  community as an expert with regard to testing
11  standards of particulate matter, toxins or
12  carcinogens?
13      A   I think that sounds right.
14      Q   And that would include testing of
15  minerals -- or, excuse me, that would include
16  testing of asbestos?
17      MS. BROWN:  Objection to the form.
18      THE WITNESS:  Correct.
19  BY MS. PARFITT:
20      Q   And that would include testing of talcum
21  powder products?
22      A   That I -- I don't do that, is that
23  right?
24      Q   Right.
25      A   Yeah, that's correct.

Page 121

1      Q   All right.  Let's talk a little bit
2  about your publications and your research.
3      Let me direct your attention to -- I
4  believe this is Appendix C of your CV, which I
5  believe is Exhibit 7.
6      Do you have that in front of you?
7      A   I do.
8      Q   Okay.  I understand, now that I have a
9  CV that's dated June of 2017, and the CV I have,
10  it says that you've published approximately 167
11  publications in peer-reviewed literature.
12      Is that correct or incorrect?
13      A   It was probably true as of June 2017.
14      Q   All right.  So sitting here today in
15  April of 2019, approximately how many publications
16  in peer-reviewed journals have you published?
17      A   I think if you look on PubMed, you will
18  see more than 200.
19      Q   Okay.  Is it fair to say that you've
20  published no papers or studies in the peer-
21  reviewed literature about asbestos or asbestos-
22  related diseases?
23      A   Correct.
24      Well, can you ask that as two different
25  questions?

31 (Pages 118 to 121)

Gregory B. Diette, M.D.

Page 122

1    Q   Sure.
2    A   I can help you just clarify what I --
3  what I'm trying to answer.
4    Q   Please.
5    A   So nothing about asbestos, but if you --
6  if you consider asbestos-related diseases to
7  include lung cancer, for example, that there are
8  publications that bear on lung cancer, and there's
9  at least one article, maybe more, on interstitial
10  lung diseases, and asbestosis would be an
11  interstitial lung disease.
12    Q   Okay.  Can you tell me what those
13  articles are?
14    A   Let's see.  Would the -- how do you want
15  me to do it, like the number?
16    Q   If you give me the number, that would be
17  fine.
18    A   Yeah.  So number 5 has to do with lung
19  cancer.
20    Q   Now, does that have to do with lung
21  cancer and asbestos exposure?
22    A   No, not specifically.
23    Q   All right.  So that has -- that is not
24  lung cancer and asbestos.
25        All right.  Is there another one?

Page 123

1    A   Yeah, so if you look at number 6, this
2  is, you know, a study about evaluating lung masses
3  and large lymph nodes.
4    Q   Yes.
5    A   So that would include, you know, lung
6  cancer in that as well.
7    Q   Does that include asbestos and lung
8  cancer?
9    A   Not specifically.
10    Q   All right.  Any others?
11    A   I would say any of the ones where you
12  see the word "bronchoscopy," is something to
13  do with lung cancer for the most part, though not
14  literally lung cancer and asbestos.
15        So, for example, like 21, number 2,
16  number 3, you know, all sort of have some bearing
17  on at least the -- you know, the care or
18  management of people with suspected lung cancer or
19  who actually have lung cancer.
20    Q   Dr. Diette, my question is very specific
21  to publications in the peer-reviewed journal that
22  deal with the topic of asbestos or asbestos-
23  related diseases like lung cancer where the word
24  "asbestos" appears in your publication.
25        MS. BROWN:  Objection to the form.

Page 124

1        THE WITNESS:  So that's a different
2  question.  So the answer to that is no.
3  BY MS. PARFITT:
4    Q   All right.  Have you published any
5  papers in the peer-reviewed literature on
6  mesothelioma?
7    A   No.
8    Q   All right.  So nowhere in the 200
9  publications that you have prepared would I see
10  the word "mesothelioma"?
11    A   I can't promise that you won't see that
12  word in some paper, but there's not a paper whose
13  primary topic is about mesothelioma.
14    Q   All right.  Very good.
15        Having reviewed your 200 or so
16  publications, is it fair to say that there are no
17  peer-reviewed publications regarding the subject
18  matter of ovarian cancer?
19    A   That's correct.
20    Q   Is it fair to say that none of your
21  peer-reviewed papers address a diagnosis of
22  ovarian cancer?
23        MS. BROWN:  Objection.  Form.  I don't
24  understand that.
25        THE WITNESS:  Well, I think -- I think

Page 125

1  the answer to the one before encompasses, you
2  know, something else with the word "ovarian
3  cancer" in the question.
4  BY MS. PARFITT:
5    Q   Okay.  All right.  Have you published
6  any peer-reviewed publications that talk about the
7  causes of ovarian cancer?
8        MS. BROWN:  Objection.
9        THE WITNESS:  No.
10  BY MS. PARFITT:
11    Q   Have you published any peer-reviewed
12  papers that talk about risk factors for ovarian
13  cancer?
14        MS. BROWN:  Same objection.
15        THE WITNESS:  No.
16  BY MS. PARFITT:
17    Q   Have you published any publications in
18  the peer-reviewed journal on risk factors for
19  mesothelioma?
20    A   No.
21    Q   What causes mesothelioma?
22    A   A few things.  You know, asbestos in
23  sufficient dose can do it.  Radiation can do it.
24  There's some other minerals that aren't asbestos
25  that are suspected to do it.  It can arise on its

32 (Pages 122 to 125)

Gregory B. Diette, M.D.

Page 126

1    own spontaneously.  And, you know, there's
2    thoughts of, at least in the peritoneum, about
3    certain kinds of chronic inflammation that may
4    lead to that as well.
5        Q   Okay.  Can asbestos cause lung cancer?
6        A   Yes.  In a sufficient dose.
7        Q   Okay.  Is it fair to say that you have
8    not published in the peer-reviewed literature any
9    studies on talcum powder products as a causative
10   factor for ovarian cancer?
11       A   That is correct.
12       Q   Is it fair to say that you have not
13   published in the peer-reviewed journal any studies
14   with regard to talcum powder products as a risk
15   factor for ovarian cancer?
16       A   That's correct.
17       Q   Is it fair to say to say that there are
18   no publications in your peer-reviewed literature
19   on the subject of talcum -- of talc as a source of
20   asbestos fibers?
21           MS. BROWN:  Objection.  Counsel, I think
22   you just misspoke.  Do you mean on his CV?
23           MS. PARFITT:  I'm sorry?  I did.
24   BY MS. PARFITT:
25       Q   Is it fair to say --

Page 127

1            MS. PARFITT:  Thank you.
2    BY MS. PARFITT:
3        Q   Is it fair to say that there are no
4    peer-reviewed publications in your CV that discuss
5    the subject as -- of talc as a source of asbestos
6    fibers?
7        A   Correct.
8        Q   Is it fair to say there are no
9    publications in a peer-reviewed journal contained
10   in your curriculum vitae regarding the association
11   or relationship between talcum powder products and
12   ovarian cancer?
13           MS. BROWN:  Objection to the form of the
14   question.
15           THE WITNESS:  Correct.
16   BY MS. PARFITT:
17       Q   Are there any publications in --
18   peer-reviewed publications on your curriculum
19   vitae regarding the association or relationship
20   between asbestos and ovarian cancer?
21           MS. BROWN:  Objection.  Asked and
22   answered.
23           THE WITNESS:  You said are there any --
24   BY MS. PARFITT:
25       Q   Asbestos.

Page 128

1        A   Right, are there -- no.
2        Q   Okay.  I noted in your CV or in some of
3    the readings that you are currently involved in
4    some clinical trials.
5            Did I -- did I get that correct?
6        A   I have been involved in trials.
7        Q   Something recent?
8        A   Oh, all the time.
9        Q   Okay.  Are you currently involved in any
10   clinical trial --
11       A   Yeah.
12       Q   -- trials?
13           Okay.  Do any of them deal with the
14   subject of asbestos?
15       A   No.
16       Q   Do any of your trials or research deal
17   with the subject of talcum powder products?
18       A   No.
19       Q   All right.  Do you currently have
20   ongoing any research work in the area of asbestos?
21           MS. BROWN:  Objection to the form.
22           THE WITNESS:  No.
23   BY MS. PARFITT:
24       Q   Do you currently have ongoing in any of
25   your research work on the topic of mesothelioma?

Page 129

1        A   No.
2        Q   Do you currently have any research work
3    ongoing on the topic of talcum powder products?
4        A   No.
5        Q   Do you currently have any research in
6    the works with regard to work on -- work on
7    ovarian cancer?
8        A   No.
9            MS. BROWN:  Objection to the form.
10   BY MS. PARFITT:
11       Q   Okay.  Would it be fair to say that the
12   only report that you have prepared on the topic of
13   talcum powder products and ovarian cancer would be
14   your litigation report --
15           MS. BROWN:  Object --
16   BY MS. PARFITT:
17       Q   -- in the multidistrict litigation?
18           MS. BROWN:  Objection to the form,
19   misstates his testimony.
20           THE WITNESS:  I doubt it's the only
21   report.  But I certainly did prepare a report for
22   this.
23   BY MS. PARFITT:
24       Q   Okay.  How many reports have you
25   prepared on the issue of talcum powder products

33 (Pages 126 to 129)

Gregory B. Diette, M.D.

Page 130

1  and ovarian cancer?
2       MS. BROWN:  Objection to the form.
3  Litigation?
4       MS. PARFITT:  Litigation reports.
5       THE WITNESS:  Like less than ten, and --
6  and I may be getting the terminology wrong.  I
7  think there's like a couple of affidavits that I
8  think to me are like a report.  So I don't know --
9  BY MS. PARFITT:
10      Q   That's a good clarification.
11      MS. BROWN:  Well, let him finish.  Let
12  him finish.
13  BY MS. PARFITT:
14      Q   I was trying to clarify for you, Doctor.
15      MS. BROWN:  Right, but just let him
16  finish and then you can clarify.
17      MS. PARFITT:  Counsel, I will.  Please.
18      THE WITNESS:  But -- but that's what I
19  meant, so there's -- there's other things that
20  I've sort of written in the litigation work that
21  are other than just this report that we're looking
22  at here today.
23  BY MS. PARFITT:
24      Q   Okay.  So your understanding of what you
25  have prepared in written form on talcum powder

Page 131

1  products and ovarian cancer would be, one,
2  affidavits.  Correct?
3      A   Correct.
4      Q   And two, a legal expert report or more?
5      MS. BROWN:  Form.
6      THE WITNESS:  Correct.
7  BY MS. PARFITT:
8      Q   Okay.  Do you know whether or not you
9  have prepared any legal expert reports like the
10  one you prepared here in the MDL?
11      MS. BROWN:  Objection to the form.
12      THE WITNESS:  Well, on any topic?
13  BY MS. PARFITT:
14      Q   Affidavits -- no, on ovarian cancer and
15  talcum powder products.
16      A   I don't think I --
17      MS. BROWN:  I object.
18      THE WITNESS:  I'm sorry.
19      Yeah, I don't know if I've completed
20  another -- another report, although I'm just
21  trying to think if there was like -- like a case-
22  specific report that might have had something in
23  it.  I mean not a report like this one, meaning
24  where -- where the whole topic is just about
25  the -- the epidemiology and so forth.

Page 132

1  BY MS. PARFITT:
2      Q   Okay.  So the record is clear and I'm
3  clear --
4      A   Yeah.
5      Q   -- the only report that you have
6  prepared dealing with the -- your evaluation of
7  the epidemiology on talcum powder products and
8  ovarian cancer is the report that we have marked
9  as exhibit -- I guess we haven't had it marked
10  yet, but is the report that you filed in this
11  case; is that right?
12      MS. BROWN:  Objection.  Misstates his
13  testimony.
14      MS. MILLER:  When you say "report," do
15  you mean depositions?
16      MS. PARFITT:  Counsel, I -- I know --
17  we'll get to it.  You'll get a -- you'll get a
18  question.
19      MS. MILLER:  It's not about us having a
20  question.  It's about you asking fair questions.
21      MR. TISI:  Well, it's not -- her job --
22  I'm going to jump in here because --
23      MS. PARFITT:  Okay.  Right.
24      MR. TISI:  -- now you're double teaming.
25  I assume you have competent counsel defending this

Page 133

1  deposition.  Honestly, you did this last week, and
2  you've done it in every deposition, and you in
3  particular, and you have a real problem with
4  obstructing depositions.  You need to stop.
5  BY MS. PARFITT:
6      Q   Okay.  Dr. Diette, I'll try and break it
7  down, and I'm just trying to -- this isn't a trick
8  question.  So you let me know if you don't
9  understand my question.
10      MS. BROWN:  And, Counsel, in all
11  seriousness, in an effort to help, are you meaning
12  to include or exclude the Ingham affidavit, which
13  I think is the --
14      MS. PARFITT:  I haven't gotten to it.  I
15  really haven't gotten to it.  That's -- that's --
16  I'm hoping that the doctor knows what he -- what
17  he's filed.
18      Let's have marked as Plaintiffs' Exhibit
19  No. 10.
20      (Diette Exhibit No. 10 was marked
21      for identification.)
22  BY MS. PARFITT:
23      Q   Okay.  Dr. Diette, let me present you
24  with an "Expert Report of Gregory Diette for
25  General Causation Daubert Hearing."  Okay.

Gregory B. Diette, M.D.

Page 134

1    A   That's this --
2    Q   Do you see that?
3    A   That's this one for here?
4    Q   Correct.
5    A   Yes.
6    Q   All right.  Now, you've identified on
7  the record that the report I have handed you,
8  which is Exhibit No. 10, is a copy of your federal
9  court expert report in the matter of -- dealing
10 with the issues of talc and ovarian cancer,
11 correct?
12   A   Exactly right.
13   Q   And in addition to that report, you have
14 prepared some affidavits in the past also
15 addressing the topic of talcum powder products and
16 ovarian cancer, correct?
17   A   That's correct.
18   Q   Okay.  Have you prepared any reports on
19 talcum powder products and ovarian cancer outside
20 of the legal context?
21       MS. BROWN:  Objection to the form.
22       THE WITNESS:  No.
23 BY MS. PARFITT:
24   Q   Okay.  And have you provided any other
25 type of written report in a legal context, aside

Page 135

1  from affidavits and the MDL report that you have
2  in front of you?
3       MS. BROWN:  Form.
4  BY MS. PARFITT:
5    Q   On talcum powder products and ovarian
6  cancer.  I'm just trying to find out your world.
7    A   No, I understand.  And I'm not sure if
8  there could be like a work in progress.  But
9  you're talking about completed, completed like
10 products like this, right?
11   Q   Correct.
12   A   I -- I can't think of another one.
13   Q   Okay.  Do you have another report and/or
14 affidavit in progress in the talcum powder
15 products cases and ovarian cancer?
16       MS. BROWN:  Dr. Diette, I'm going to
17 instruct you to the extent you're doing any work
18 on this issue that is in a consulting nature and
19 has not been disclosed, you should not disclose
20 that here.
21       I assume counsel is only asking for
22 situations in which you have been disclosed as an
23 expert, and with that, you can answer the
24 question.
25       THE WITNESS:  Is that right?

Page 136

1  BY MS. PARFITT:
2    Q   That's correct.
3    A   Oh, yeah, so then, no, nothing --
4  nothing for which I've been disclosed.
5    Q   Okay.  But I take it that you have been
6  retained -- you're currently retained to work on
7  some other cases other than talcum powder products
8  and ovarian cancer, is that correct, by Johnson &
9  Johnson?
10       MS. BROWN:  Counsel, I'm going to -- to
11 the extent you're asking about consulting
12 engagements, I'm going to instruct him not to
13 answer.
14 BY MS. PARFITT:
15   Q   No, I'm asking this:  Are you an expert
16 on behalf of Johnson & Johnson and asbestos and --
17 and ovarian cancer cases?
18   A   So there's a subtlety there, right,
19 because -- I mean you may call this an asbestos
20 and ovarian cancer case.  I think it's a talcum
21 powder and ovarian cancer case.
22   Q   Okay.
23   A   There's nothing that's about asbestos
24 separately from what we're talking about here.
25   Q   Fair enough.  Have you been retained by

Page 137

1  Johnson & Johnson to testify as a legal expert in
2  any talcum powder product cases and meso- --
3  mesothelioma?
4    A   Yes.
5    Q   Okay.  Are you currently an expert in
6  any of those cases?
7    A   Yes.
8    Q   How many?
9        MS. BROWN:  And again, Doctor, to the
10 extent you've been disclosed, you can answer the
11 question.
12       THE WITNESS:  So I don't -- I don't know
13 the count then.  I would estimate ten, but I could
14 be off by a couple.
15 BY MS. PARFITT:
16   Q   Have you given depositions in those
17 cases yet?
18   A   In some cases I have.
19   Q   Okay.  Is this the first deposition that
20 you have given in talcum powder products and
21 ovarian cancer?
22       MS. BROWN:  Objection.
23       THE WITNESS:  I don't think so.
24 BY MS. PARFITT:
25   Q   Okay.  Did you give testimony in the

35 (Pages 134 to 137)

Gregory B. Diette, M.D.

| Page 138 | Page 140 |
|---|---|

**Page 138**

1 Ingham case?
2      A   I did.
3      Q   Okay.  Did you testify at trial at the
4 Ingham case?
5      A   I did not.
6      Q   Okay.  Is there any other case other
7 than the Ingham case where you have given
8 deposition in an ovarian cancer and a talcum
9 powder case?
10      A   I think there's at least one other one.
11      Q   Okay.  Do you remember the name of it?
12      A   I don't.  I could look at my testimony
13 list and see if I can figure it out.
14      Q   Okay.  And we'll have that marked as
15 well.  Why don't we have that marked as Diette
16 Exhibit -- it's part of your exhibit number --
17 it's part of your report, but we'll have it marked
18 as a separate exhibit.
19          (Counsel conferring.)
20 BY MS. PARFITT:
21      Q   Let me show you what's -- we'll have
22 marked as Exhibit No. 11.
23          (Diette Exhibit No. 11 was marked
24           for identification.)
25 BY MS. PARFITT:

**Page 139**

1      Q   All right.  Let me show you what's
2 Exhibit 11.
3          MS. PARFITT:  We have a copy for
4 counsel.
5          MS. BROWN:  Thank you.
6          MR. ROSEN:  I think there's --
7          THE WITNESS:  Oh, there's two.
8          MS. PARFITT:  Oh, okay, we'll take one
9 back.  Thank you.  Okay.  Very good.
10 BY MS. PARFITT:
11      Q   Dr. Diette, does this represent an
12 accurate list of cases in which you have been
13 retained as an expert since I believe 2014?
14      A   It is.
15      Q   All right.  Are there any additions to
16 this list of cases --
17      A   I'm sorry.
18      Q   -- where you've given testimony?
19      A   I'm sorry.  I think I -- I wasn't paying
20 attention to your last question.
21      Q   That's all right.
22      A   Did you say is this a list of cases that
23 I provided depositions?
24      Q   Expert testimony.
25      A   Expert testimony.  Then the answer is

**Page 140**

1 yes.
2      Q   Okay.  The last date I have here is
3 September 28, '18.
4      A   No.  It should go further.
5          MS. BROWN:  We have another page,
6 Counsel.
7          MS. PARFITT:  Okay.
8          THE WITNESS:  I think it's two-sided, so
9 it's the back of that page.
10          MS. PARFITT:  Okay.  Well --
11          MS. BROWN:  Do you want my copy?
12          MS. PARFITT:  That would be great.  I
13 appreciate that.  I will give it right back to
14 you.
15 BY MS. PARFITT:
16      Q   Okay.  All right.  So the last date is
17 February 22nd, 2019; is that correct?
18      A   That is.
19      Q   All right.  Are you able to circle for
20 me which cases are cases in which you have been
21 retained as an expert in the -- on the topic of
22 talcum powder products and ovarian cancer?
23          MS. BROWN:  Objection to the form.
24          You can answer to the extent you know,
25 Doctor.

**Page 141**

1          THE WITNESS:  I actually don't.  I'd
2 have to look it up to figure out if I'm right that
3 there is one on here, but I don't know -- and
4 other than Ingham, right?
5 BY MS. PARFITT:
6      Q   Yes, sir.
7      A   Other than Ingham, yeah, so I -- I'm not
8 sure.  I can't tell.
9      Q   All right.  Have you -- we talked about
10 your peer-reviewed publications.  Are any of your
11 public -- peer-reviewed publications discussing
12 cohort studies?
13          MS. BROWN:  Objection to the form.
14          THE WITNESS:  So some of them are cohort
15 studies.
16 BY MS. PARFITT:
17      Q   But you have performed --
18          MS. BROWN:  Let him answer, please.
19          MS. PARFITT:  Sure.
20          THE WITNESS:  That I performed, yes.
21 BY MS. PARFITT:
22      Q   All right.  So in your carrier as a
23 medical doctor, you have published cohort studies?
24      A   I have.
25      Q   What have been the general topics of

36 (Pages 138 to 141)

Gregory B. Diette, M.D.

Page 142

1   those cohort studies?
2       A   Generally speaking, things related to
3   respiratory diseases and -- and things people
4   inhale.
5       Q   All right.  Have you published case-
6   control studies?
7       A   I don't know.  I can't think of one.  It
8   doesn't mean that there isn't one, but I'm -- I
9   can't think of a case-control study.
10      Q   All right.  Is it fair to say that none
11  of the published cohort studies address the issue
12  of talcum powder products and ovarian cancer?
13      A   Correct.
14      Q   And is it fair to say that none of the
15  cohort studies that you published address the
16  issue of talcum powder products and mesothelioma?
17      A   Correct.
18      Q   Is it fair to say that none of the
19  cohort studies that you have published address the
20  issue of asbestos and mesothelioma?
21      A   Correct.
22      Q   Is it fair to say that -- that the
23  majority of your publications in your -- listed in
24  your curriculum CV and those that you said you
25  have published since 2017 deal primarily in the

Page 143

1   research interests of lung disease, COPD,
2   asthma --
3       MS. BROWN:  Objection --
4   BY MS. PARFITT:
5       Q   -- pulmonary medicine, lung diseases?
6       MS. BROWN:  Objection to the form.
7       THE WITNESS:  There's certainly plenty
8   there.  You know, I get different feedback from
9   different people who look at my CV to tell whether
10  or not it's, you know, all that or whether there's
11  other things.  I think people read into it what
12  they -- what they see.  Because there's -- you
13  know, there's ICU research topics, there's
14  procedure-related topics, there's radiology
15  topics.  I mean there's all -- all sorts of
16  different things besides those.
17  BY MS. PARFITT:
18      Q   Okay.  Do you publish on methods and
19  methodology?
20      MS. BROWN:  Form.
21      THE WITNESS:  So I think there's a
22  couple of methods -- methods related papers.
23  BY MS. PARFITT:
24      Q   Papers that deal primarily with
25  epidemiological methodology?

Page 144

1       MS. BROWN:  Wait.  Hold on.  Is that a
2   question?
3       MS. PARFITT:  Mm-hmm.
4       MS. BROWN:  I didn't understand that.
5       If you understood it, you can answer.
6       THE WITNESS:  Well, the papers I was
7   thinking about had to do with methods and
8   quality -- quality assessment in terms of
9   healthcare.
10  BY MS. PARFITT:
11      Q   Okay.
12      A   I don't know if I've published anything
13  on epi methods, meaning like, you know, the topic
14  of a case-control study or --
15      Q   Right.
16      A   -- cohort studies, things of that sort.
17      Q   So it would be fair to say that you have
18  not published in a peer-reviewed journal a paper
19  on study designs, correct?
20      MS. BROWN:  Objection to the form.
21      THE WITNESS:  I would have to look back
22  and see.  I mean it's -- it's possible I've been
23  involved in something that -- that -- I mean it's
24  just hard to remember.  It's 200 plus papers,
25  so --

Page 145

1   BY MS. PARFITT:
2       Q   Right.  So nothing you can remember
3   today.
4       A   Correct.
5       Q   Okay.  And have you published on the
6   Bradford Hill factors?
7       MS. BROWN:  Form.
8       MR. LOCKE:  Objection.
9       THE WITNESS:  So I've not written a
10  paper about Bradford Hill.
11  BY MS. PARFITT:
12      Q   All right.  In any of the 200 papers
13  that you have published in a peer-reviewed
14  journal, do you set forth in those papers the
15  Bradford Hill framework?
16      MS. BROWN:  Objection to the form of the
17  question.
18      THE WITNESS:  You couldn't do it.
19  Right.  I mean, it's -- the papers that I write
20  are primary research papers, and that framework
21  doesn't belong in those papers, but we articulate
22  the -- the issues that are -- that are relevant
23  for a Bradford Hill analysis.
24  BY MS. PARFITT:
25      Q   Okay.  Well, in this expert report that

37 (Pages 142 to 145)

Gregory B. Diette, M.D.

Page 146

1   you did file in the federal court, you stated
2   specifically that you followed the Bradford Hill
3   framework. Do you recall saying that?
4       A   I -- I do. There was more to it, but it
5   included that.
6       Q   Okay. So what I'm asking you, in any of
7   the papers, whether they be cohort study, case
8   control, other research and scientific
9   publications that you've listed on your curriculum
10  vitae, have you stated in those papers that you
11  are following or are guided by the Bradford Hill
12  framework?
13          MS. BROWN: Objection. He just answered
14  that.
15          THE WITNESS: Yeah, it's sort of baked
16  into what we do. So it's like in -- I mean the
17  answer is no, generally, but -- but we include
18  things in a way that they fit with what Bradford
19  Hill considerations are. But there's not one that
20  was called like the Bradford Hill approach or
21  something.
22  BY MS. PARFITT:
23      Q   Okay. And by --
24          MS. BROWN: Let him finish.
25          Were you finished, Doctor?

Page 147

1           THE WITNESS: I'm okay. Thank you.
2           MS. PARFITT: Thank you.
3   BY MS. PARFITT:
4       Q   Assume I did a search of the word
5   "Bradford Hill" in the 167 papers that you have
6   published in the peer-reviewed journal, would it
7   surprise you if those words did not appear?
8           MS. BROWN: Objection to the form.
9           THE WITNESS: It wouldn't surprise me,
10  but I -- I don't know that it's not there
11  somewhere. And I would search more broadly than
12  just those 167. I would look at the more recent
13  ones too. I mean I can't say that it's not there,
14  but there's not a paper about Bradford Hill.
15  BY MS. PARFITT:
16      Q   Okay. Have you been involved in any
17  original research on asbestos in general?
18          MS. BROWN: Objection to the form.
19          THE WITNESS: I have not.
20  BY MS. PARFITT:
21      Q   Have you -- have you conducted any
22  original research on ovarian cancer?
23          MS. BROWN: Objection to the form, asked
24  and answered.
25          THE WITNESS: I guess, I mean -- is it

Page 148

1   different than what you asked? Because I'm
2   just --
3   BY MS. PARFITT:
4       Q   It is.
5           This would be some original research
6   that you might be -- got a funding or a grant or
7   something.
8       A   I see. Nothing like that.
9       Q   Okay. Have you received any funds --
10  any funding or any grants to study mesothelioma?
11      A   No.
12      Q   Have you received any funding or grants
13  to study asbestos?
14      A   No.
15      Q   Have you received any funding or grants
16  to study talcum powder products and their
17  association with ovarian cancer?
18          MS. BROWN: Objection to the form.
19          THE WITNESS: No.
20  BY MS. PARFITT:
21      Q   Have you ever published in peer-reviewed
22  literature a causation analysis or a review
23  article asking whether an exposure causes a
24  disease?
25          MS. BROWN: Objection to the form of the

Page 149

1   question.
2           THE WITNESS: I don't know. I would
3   have to look back over. I don't -- like I don't
4   know if I would use those words "causation
5   analysis," but we certainly write -- did you say
6   review article?
7   BY MS. PARFITT:
8       Q   Yes.
9       A   So I don't write many review articles.
10  They're really -- they're really low quality
11  academic products for the most part, and so I try
12  to focus more on original research.
13      Q   All right. Well, same question applied
14  to original research.
15          MS. BROWN: Objection to the form.
16          THE WITNESS: Well, it wouldn't be -- I
17  mean that wouldn't be an original research
18  article.
19  BY MS. PARFITT:
20      Q   Okay. Have you ever performed any
21  research on the environmental impacts of talcum
22  powder products and ovarian cancer?
23          MS. BROWN: Objection to the form,
24  vague.
25          THE WITNESS: No.

38 (Pages 146 to 149)

Gregory B. Diette, M.D.

Page 150

1    BY MS. PARFITT:
2        Q   Environmental impacts of diseases is
3    something -- is a topic that you are interesting
4    in, correct?
5        A   I am.
6        Q   You've studied the impact of
7    environmental effects on lung diseases, correct?
8        A   I have.
9        Q   In fact, that's something you continue
10   to be interested in, correct?
11       A   I am.
12       Q   But you've not studied any environmental
13   impacts on ovarian cancer, correct?
14       A   Correct.
15       MS. BROWN:  Asked and answered.
16   BY MS. PARFITT:
17       Q   Would it be fair to say that prior to
18   being retained by Johnson & Johnson sometime in
19   2017, you had done no research on the issue of
20   talcum powder products and ovarian cancer?
21       MS. BROWN:  Objection to the form,
22   misstates his testimony.
23       THE WITNESS:  I think it's the same as
24   before.  Right.  I mean you went through each --
25   each item, and my answer was no.

Page 151

1    BY MS. PARFITT:
2        Q   So it was not until you were retained by
3    Johnson & Johnson that you conducted any research
4    on the topic of ovarian cancer and talcum powder
5    products, correct?
6        MS. BROWN:  Objection to the form,
7    misstates his testimony.
8        THE WITNESS:  That is right.
9        MS. PARFITT:  Okay.  And is now a good
10   time for a bio break or is it --
11       MS. PARFITT:  Sure.
12       THE WITNESS:  If you're in the middle of
13   something, I --
14       MS. PARFITT:  No, no, this is fine.
15   We'll just move into another area quickly, yeah.
16       THE VIDEOGRAPHER:  The time is
17   11:14 a.m., and we're going off the record.
18       (Recess.)
19       THE VIDEOGRAPHER:  The time is
20   11:24 a.m., and we are back on the record.
21   BY MS. PARFITT:
22       Q   All right.  Dr. Diette, I want to talk
23   for a moment about Medical Science Affiliates.
24   All right?
25       A   Okay.

Page 152

1        Q   And to give you some -- a reference,
2    we'll spend a little time on that before we get
3    into your report.  All right?  Fair?
4        A   Sounds good.
5        Q   Okay.  What is Medical Science
6    Affiliates?
7        A   I think they -- they call themselves an
8    environmental consulting company.
9        Q   How long have you been involved with
10   Medical Science Affiliates?
11       MS. BROWN:  Form.
12       THE WITNESS:  So involved, I guess we'll
13   have to sort, but I -- I've known about them and
14   done some work with them for about ten years.
15   BY MS. PARFITT:
16       Q   Okay.  And I too want to sort, so let me
17   ask you this:  When were you first introduced to
18   Medical Science Affiliates?
19       A   Well, I guess if it's ten years, it
20   would have been about ten years ago.
21       Q   And what were -- how did it come about
22   that you learned of a group called Medical Science
23   Affiliates?
24       A   There was a woman who worked there
25   then -- I don't remember what her name is, she's

Page 153

1    not there anymore -- and she knew a colleague of
2    mine, and they were I think at the time looking
3    for somebody to take on an epidemiology project, a
4    review.  And so he -- he sent around like a note
5    or talked to us, I don't remember how he did it,
6    but to see if anybody was interested in -- in
7    doing an epidemiology project.
8        Q   Who was that colleague?
9        A   I think it was Hank Fessler, but I could
10   be wrong.  That's a while ago.
11       Q   And what is his position within the
12   university?
13       A   He works in pulmonary.
14       Q   Okay.  So you were -- you were then
15   engaged by Medical Science Affiliates to do an
16   epidemiological report for them?
17       MS. BROWN:  Objection.  Misstates
18   testimony.
19       THE WITNESS:  I don't know about
20   engaged.  I mean my -- my relationship is as an
21   independent contractor.  So it's like -- it's not
22   like I have an agreement to do anything with them
23   or for them.  But that's -- that's the place
24   where, you know, they organize the materials for
25   me to look over and to -- and to do the

39 (Pages 150 to 153)

Gregory B. Diette, M.D.

Page 154

1    epidemiological review.
2    BY MS. PARFITT:
3        Q   Okay.  Your counsel has objected, as you
4    heard, to me obtaining a copy of your agreement,
5    so I'm going to have to ask you a few more
6    questions about this.
7            What is your arrangement with Medical
8    Science Affiliates?  Independent contractor?
9        A   That's exactly right.
10           MS. BROWN:  He just said it.
11           MS. PARFITT:  Okay.  I understand.  You
12   can take your own deposition, Counsel.  It's going
13   to show up on the record too, you're rubbing your
14   head.
15   BY MS. PARFITT:
16       Q   Medical Science, you have an independent
17   contract relationship, to do what?
18       A   I think what it establishes is that I
19   can use their administrative services as kind of
20   like an outside office for me to do work.
21       Q   Okay.  So that's one role, they're an
22   outside office.  You mentioned, though, that they
23   contracted you to also write an epidemiology
24   report.  Correct?
25       A   It's --

Page 155

1            MS. BROWN:  Objection to the form.
2            THE WITNESS:  It's incorrect.
3    BY MS. PARFITT:
4        Q   Okay.  Straighten it out for me.
5        A   Well, they didn't contract me to do
6    anything.  They asked if I was interested in doing
7    this epidemiologic project for a client that they
8    knew of.
9        Q   Okay.  That helps me.
10           So Medical Science Affiliates reached
11   out -- requested that you do an epidemiological
12   report for one of their clients.
13       A   Exactly right.
14       Q   Okay.  Over the course of ten years that
15   you've been affiliated as an independent
16   contractor with Medical Science Affiliates, how
17   many times have you prepared a report for one of
18   Medical Science Affiliates' clients?
19       A   I don't know.
20       Q   More than ten?
21       A   Sure.
22       Q   More than a hundred?
23       A   A hundred would be pushing it.  So
24   something in the tens, I would say.  But not ten.
25   I mean something higher up in --

Page 156

1        Q   More 50?
2        A   At least 50.
3        Q   Okay.  And what has been the topic of
4    those reports that you have prepared for Medical
5    Science Affiliates' clients?
6            MS. BROWN:  And I'm going to jump in
7    here.  To the extent that those projects are
8    governed by confidentiality agreements, I would
9    ask Dr. Diette that you only disclose that which
10   has been disclosed publicly, for example, in court
11   or at a deposition.
12           MS. PARFITT:  Please stop coaching the
13   witness.
14   BY MS. PARFITT:
15       Q   Can you answer?
16           MS. BROWN:  We're trying to protect
17   confidentiality.
18           MS. PARFITT:  I get --
19           MS. BROWN:  I'm instructing him on
20   privilege.
21           MS. PARFITT:  That's fine.  I
22   understood.  He can talk now.
23           THE WITNESS:  So I would say that most
24   of the work is in the context of what Ms. Brown
25   said, which is that it wasn't for me to share with

Page 157

1    other people.
2    BY MS. PARFITT:
3        Q   All right.  Is J&J a client of Medical
4    Science Affiliates?
5        A   I don't know what their relationship is,
6    like I don't know if you would call them a client
7    or not.
8        Q   Okay.  Does Medical Science Affiliates
9    do some work for Johnson & Johnson?
10           MS. BROWN:  Objection.  Speculation.
11           THE WITNESS:  So I can tell you about
12   what they do for me with regard to Johnson &
13   Johnson.  I don't know about anything else.
14   BY MS. PARFITT:
15       Q   All right.  Tell me what you know.
16       A   Well, like, for example, like in the
17   cases that we've discussed that involve Johnson &
18   Johnson, they've provided a service by collecting
19   the materials, right.  So, for example, like when
20   you see that list of materials that -- that I
21   provided that I reviewed, they will collect those
22   and -- and organize them for me.
23           If there's a need to have a meeting or a
24   phone call, they'll help to set that up, right, so
25   that -- so, for example, for the deposition today,

Gregory B. Diette, M.D.

Page 158

1  they were able to help sort my -- through my
2  schedule, you know, with me, and figure out a day
3  or days, I don't remember what we offered, things
4  of that sort. They'll prepare invoices on my
5  behalf. They'll help edit a report. You know,
6  administrative type things.
7      Q  Okay. Let's break that down a little
8  bit.
9      Is it your understanding that Medical
10  Science Affiliates bills Johnson & Johnson --
11      MS. BROWN: Object --
12  BY MS. PARFITT:
13      Q  -- and invoices them for work?
14      MS. BROWN: Objection to the form, calls
15  for speculation.
16  BY MS. PARFITT:
17      Q  If you know.
18      A  I don't know where the bill goes because
19  I don't know if it goes to the law firm. Like if
20  it matters to you whether it's directly to Johnson
21  & Johnson or -- I mean I can only guess that, you
22  know, the law firm is not going to pay the bill
23  out of their own pocket. They're probably going
24  to then invoice Johnson & Johnson, but I don't
25  know whether the bill goes directly to Johnson &

Page 159

1  Johnson or whether it goes to the law firm.
2      Q  All right.
3      MS. BROWN: And, Doctor, counsel doesn't
4  want you to guess, so just answer the question the
5  best --
6  BY MS. PARFITT:
7      Q  Dr. Diette, if they -- Medical Science
8  Affiliates collects material for you -- as you say
9  they did, correct?
10      A  That's correct.
11      Q  -- do they bill you or do they bill
12  someone else?
13      MS. BROWN: Objection to the form.
14      THE WITNESS: They bill someone else.
15  BY MS. PARFITT:
16      Q  Okay. So when you testified that J&J --
17  excuse me, when you testified that you had
18  assistance with regard to the preparation of some
19  of the materials that accompany your report, that
20  was work that you contracted with Medical Service
21  Affiliates to do, and they didn't bill you, they
22  billed somebody else, correct?
23      MS. BROWN: Objection to the form.
24      THE WITNESS: I don't know if
25  "contracted" is right, but -- but they did what

Page 160

1  you said, which is that they billed somebody else
2  for the work that they did.
3  BY MS. PARFITT:
4      Q  Do you know who that somebody else is?
5  And I want to remind you you're under oath,
6  Dr. Diette.
7      MS. BROWN: What --
8      THE WITNESS: What's --
9      MS. BROWN: Whoa, whoa, whoa. I'm
10  objecting to the implication there. Dr. Diette
11  has done nothing but testify truthfully today.
12      MS. PARFITT: Counsel, objection, form.
13  I'm telling you.
14  BY MS. PARFITT:
15      Q  Please go on, Dr. Diette.
16      MS. BROWN: No, but what you just said
17  is inappropriate --
18      MS. PARFITT: It was not --
19      MS. BROWN: -- and it violates both the
20  federal rules --
21      MS. PARFITT: -- violative of anything,
22  Counsel.
23      MS. BROWN: -- as well as deposition
24  protocol. He of course is testifying under oath,
25  and if you're suggesting something otherwise,

Page 161

1  that's wildly inappropriate.
2      MS. PARFITT: Counsel, let the Court
3  decide if it's -- I think the Court might decide
4  that your objections and your manner today are
5  wildly inappropriate.
6  BY MS. PARFITT:
7      Q  So, Dr. Diette, so we can move forward,
8  do you remember the question?
9      A  I remember it, but I think I already
10  answered it. It's -- I don't have a better answer
11  than what I gave you before.
12      Q  You don't know who Medical Science
13  billed for the services they rendered to you?
14      A  Well, let's look at the invoice if we
15  want to. If it's on the top of that, then I
16  might --
17      Q  It's been blacked out, Dr. Diette.
18      A  So it's either a law firm or it's
19  Johnson & Johnson. I don't know whether it's one
20  or the other.
21      MS. BROWN: Counsel, you're
22  misrepresenting the documents. It's very clear
23  who they sent the bill to on the face of the
24  invoice, and it has not been redacted for
25  work-product privilege.

41 (Pages 158 to 161)

Gregory B. Diette, M.D.

Page 162

1    BY MS. PARFITT:
2        Q   What I want to understand, for purpose
3    of the expert report you prepared in this
4    litigation, I want you to tell me, if you will,
5    every service that Medical Science Affiliates
6    performed for you.
7        A   I don't think I can give you a full
8    list.  I think that the -- go ahead.
9        Q   No, no, please, go ahead.
10       A   All right.  So I think the category of
11   things that I told you about here are the kinds
12   of things that they -- that they did in this case.
13   I don't know if I mentioned like arranging like a
14   phone call.  Like if I was going to have a phone
15   call, they would arrange that.  Help with -- I
16   already talked about editing -- editing reports
17   and -- I can't think of another service they did,
18   but that's what I can think of right now.
19       Q   Okay.  Did Medical Science Affiliates
20   research the scientific literature for you in
21   preparation for some of the information contained
22   in your expert report?
23       A   I don't -- I don't think they did any of
24   that.  I mean, they've -- they've done searches in
25   the past on other -- other topics, but I don't

Page 163

1    think they did any for this.
2        Q   All right.  So it's your testimony that
3    in the talcum powder/ovarian cancer case, they did
4    not do any research of the peer-reviewed
5    literature; is that correct?
6        A   Well, let me be clear, when you talk
7    about talcum powder and ovarian cancer -- because
8    I have to think back with each -- you know, each
9    case or whatever, but we're talking about this
10   particular matter as you're asking these questions
11   or --
12       Q   Well, that's a -- that's a great point.
13   You got involved in talcum powder and ovarian
14   cancer cases sometime in 2017.  That's your
15   testimony.
16       A   It is.
17       Q   All right.  So at that point in time
18   when you became engaged to work on talcum powder
19   products and ovarian cancer, what I'm interested
20   in knowing is whether or not, whether it was for
21   this report, another report, has Medical Science
22   Affiliates done any research work of the
23   literature on this topic?
24       A   And by "research work," does that -- do
25   you mean like finding papers or does it mean doing

Page 164

1    something else with the papers?
2        Q   I'll break it down.  Did they do a
3    literature search for you?
4        A   Yeah, and that's what I don't remember.
5    So I'm just saying that they've done that at my
6    request in the past.  But not -- not too much.  I
7    mean it's actually not that helpful, because I --
8    I find it easier to do it myself.
9        Q   Whether it was helpful or not, my
10   question is, did Medical Science Affiliates do any
11   literature research for you in -- on the topic of
12   talcum powder products and ovarian cancer?
13       A   I can't give you a better answer.  I
14   mean I -- I think it sounds to me like you keep
15   asking the same thing, and it -- my answer is I'm
16   not -- I'm not sure.  Like they may have gathered
17   a couple of papers, I don't remember if they did
18   or not.  They certainly didn't do the search, like
19   I didn't commission anybody to do like -- like the
20   search.
21       Q   Okay.  And how would they deliver that
22   information to you?  Do they e-mail it to you?  Do
23   they send it to you?  What happens?
24       A   It depends upon how I ask.  So it can
25   come as a binder, like the binder you have in

Page 165

1    front of you, it could like that, and be hard
2    copies.  It could be through, you know, an
3    electronic mechanism, if there were something to
4    share that way.
5        Q   All right.  Did Medical Science
6    Affiliates summarize any of those depositions that
7    you have listed in your report?
8        A   I don't -- do I have -- I don't think --
9    do I have deposition summaries?
10       Q   No.
11       A   Oh, then no.
12       Q   You have depositions.
13       A   Then the answer is no.
14       Q   Okay.  Now, what you've provided me are
15   reports and depositions of various experts either
16   for Johnson & Johnson or for the plaintiff that
17   you've indicated you've -- you've put them on your
18   reliance list.
19           And what I'm questioning is whether or
20   not you've had any summaries done of those reports
21   by Medical Science Affiliates.
22       A   No.
23       Q   Okay.  Have they done any summaries of
24   any type of information for you in the talcum
25   powder products and ovarian cancer?

42 (Pages 162 to 165)

Gregory B. Diette, M.D.

Page 166

1      MS. BROWN:  And, Counsel, here I'm going
2  to interject, and to the extent your question --
3      MS. PARFITT:  Objection.  Form.
4      MS. BROWN:  -- seeks to -- I'm
5  instructing on privilege, which I'm allowed to do
6  under the federal rules and under the --
7      MS. PARFITT:  If it's a privilege
8  issue --
9      MS. BROWN:  -- let me do that.
10      MS. PARFITT:  -- it's certainly fine.
11      MS. BROWN:  Thanks.  So my instruction
12  here will be that, Doctor, you are not under the
13  work-product privilege to disclose any
14  correspondence you've had with MSA, unless it is
15  something on which you rely for your opinions
16  here, and then of course, counsel is entitled to
17  have that information.
18  BY MS. PARFITT:
19      Q    With that understanding, how do you
20  answer the question?
21      A    Can you say it again because I think I
22  lost it?
23      Q    Sure.  Let me just have it read back to
24  you here.
25          Has Medical Science Affiliates done any

Page 167

1  summaries of any type of information for you -- or
2  provided any information for you on the talcum
3  powder products and ovarian cancer cases?
4      MS. BROWN:  Same instruction.  If you're
5  relying on anything they've done, of course,
6  please answer the question.
7      THE WITNESS:  So if we're talking about
8  cases -- because that's why I clarified before,
9  we're not talking about this matter.  We're
10  talking about ever in any -- in any case?
11  BY MS. PARFITT:
12      Q    Ovarian cancer and talcum powder
13  products.
14      A    Oh, yeah.  No, I understand the words.
15  I'm just trying to make sure whether we're talking
16  about like this -- this matter that we're talking
17  about only or -- or beyond that.
18      Q    Has -- has -- beyond that.
19      A    So I'm going to say probably they have.
20  That if there are cases where there were like
21  medical records, for example, although I don't
22  think I've gotten any medical records, but they
23  would have provided a summary.  If there were
24  deposition transcripts in those other cases, they
25  might well have -- have done that.

Page 168

1      Q    Did you use for purposes of your expert
2  report any of the summaries that were -- that were
3  conducted by Medical Science Affiliates that you
4  just spoke about?
5      A    See, this is where I -- I don't know if
6  you're trying to confuse me or what, but --
7      Q    No, I'm not.
8      A    Okay.  So I just want to be clear,
9  because there aren't any summaries for this,
10  right.
11      Q    Okay.
12      A    So -- and that's why I keep trying to --
13  I just -- because there's a different answer for
14  what -- what people have done in other matters and
15  what they've done in this matter.  There aren't
16  any summaries that I'm aware of to -- to look at.
17      Q    All right.  Did Medical Science
18  Affiliates help you write your expert report?
19      MS. BROWN:  Objection to the form of the
20  question.
21      THE WITNESS:  You know, "write" is a --
22  is a word that can mean a lot of things.  They
23  helped me to -- to shape it, like to create the --
24  the format for it and like edit out typos and
25  things of that sort.

Page 169

1  BY MS. PARFITT:
2      Q    Okay.  Well, that has -- it means a lot
3  of things as well.  So let me ask you --
4      MS. BROWN:  Counsel, just ask the
5  question.
6      MS. PARFITT:  Counsel, I'm -- please.
7      MS. BROWN:  You can't editorialize like
8  that.  It's a question and an answer.
9  BY MS. PARFITT:
10      Q    Dr. Diette, what I would like to ask you
11  is, when you say they helped shape your report,
12  what do you mean they helped shape your report?
13      MS. BROWN:  Objection.
14      THE WITNESS:  What I just said -- I mean
15  what I said after -- after that before.
16  BY MS. PARFITT:
17      Q    Is every word in your expert report that
18  you have there in front of you a word that you put
19  in it?
20      MS. BROWN:  Objection to the form.
21      THE WITNESS:  Well, I don't know.  I
22  mean, there's -- there's quotes from people,
23  right, so that those aren't my words, for example.
24  BY MS. PARFITT:
25      Q    Well, you know, I'm glad you brought

43 (Pages 166 to 169)

Gregory B. Diette, M.D.

Page 170

1    that up.  That's a good question.
2        A    Yeah.
3        Q    Are the opinions and the writings
4    contained in that report words that you selected?
5        A    Oh, for sure.  I mean like the opinions
6    and my -- my summaries of things and -- is that
7    what we're talking about?
8        Q    No.  No.
9        A    We're not?  All right.
10       Q    The report is about -- let's see how
11   many pages -- it's about 51 pages long, and the
12   question I have, with the exception of quotes from
13   other people, Dr. Diette, is every word in this
14   report a word you chose to put in there?
15           MS. BROWN:  Objection to the form.
16           THE WITNESS:  For sure, yes.  Although
17   like some of the words, for example, I think might
18   come from one of those affidavits that we were
19   talking about, right.  So it may be like, you
20   know, words that I created in a different context
21   and then pulled into this.
22   BY MS. PARFITT:
23       Q    Okay.  Well, then when you say "Medical
24   Science Affiliates helped shape," I'm trying to
25   get an understanding, what do you mean "shape"?

Page 171

1        A    It would look like a disaster if I did
2    this myself.  So the fact that there are headings,
3    that, you know, things don't spill over from one
4    page to another.  I don't remember if there's a
5    table in here, but to not have the table split
6    across, to have, you know, references look okay.
7    That I'm not good at.  So the fact that this, in
8    my view, looks like a professional product, that's
9    what they -- that's what they've done for me is to
10   make it look like that.
11       Q    Okay.  There are multiple footnotes in
12   your report to testimony of various experts that
13   were retained by the plaintiff.
14       A    Yeah.
15       Q    Who prepared those footnotes?
16           MS. BROWN:  Objection to the form.
17           THE WITNESS:  Staff somewhere, but --
18   BY MS. PARFITT:
19       Q    I'm sorry.
20       A    Staff.
21       Q    Staff?
22       A    Yes.
23       Q    What staff?
24       A    I don't know which staff did it, but I
25   mean like the -- if you say who prepared the

Page 172

1    footnotes, like the information that comes from it
2    was information that I pulled from the --
3        Q    Not my question.  Who prepared the
4    actual footnotes that appear at the bottom of your
5    expert report of 58 -- or, excuse me, 51 pages?
6        A    So like actually put like -- like 110
7    and then put like "Siemiatycki dep, 149"?
8        Q    Or how about put "226, Singh depo, don't
9    consistently reduce," and there's a summary, I
10   mean who provided that information, what staff?
11           MS. BROWN:  Objection to the form.
12   Misstates his testimony about how the report was
13   prepared.
14           THE WITNESS:  I'm sorry.  We're looking
15   at number 226.
16   BY MS. PARFITT:
17       Q    By way of example, Dr. Diette.
18       A    No, no, I'm just -- I'm just trying to
19   help because an example helps.
20           So I don't know.  I mean some -- some
21   staff person put that particular -- literally that
22   segment in, but like it came from me identifying
23   that NSAIDS don't consistently reduce the risk of
24   ovarian cancer and wanting to link it there to my
25   statement.

Page 173

1        Q    Who's the staff?  Staff for MSA?
2        A    It could be MSA; it could be the law
3    firm.  I'm not sure which.
4        Q    Did you dictate to MSA or anyone else
5    portions of your expert report, and someone else
6    then did the recordation?
7        A    Somebody else did the --
8        Q    Did the -- did --
9        A    The --
10       Q    Did you dictate any portions of your
11   report to anyone?
12       A    I don't -- I don't do that.
13       Q    You don't dictate.  Okay.
14       A    No.
15       Q    Did you spend time on the phone with
16   anyone at MSA and discuss what your -- your report
17   should look like?
18           MS. BROWN:  And again, I'm going to
19   instruct on work product, that you not reveal the
20   substance of any discussions you had regarding
21   drafts of this report.  Whether or not there was a
22   conversation is an appropriate question to answer.
23           THE WITNESS:  Sure.
24   BY MS. PARFITT:
25       Q    You did?

44 (Pages 170 to 173)

Gregory B. Diette, M.D.

Page 174

1    A   Yes.
2    Q   So you had a conversation --
3    A   Yes.
4    Q   -- about the substance of your report,
5    correct?
6        MS. BROWN: Objection to the form.
7        THE WITNESS: Oh, no, you just -- you
8    said something else before that. What was the
9    question before?
10        MS. BROWN: Discuss what your report
11   should look like.
12        THE WITNESS: Yeah, that's different.
13   BY MS. PARFITT:
14    Q   Okay.
15    A   You changed it to "substance." But I
16   mean what it should look like is what I'm talking
17   about. It was -- it should look good, right? And
18   so there should be like, you know, bold headings
19   and there should be spaces where they belong.
20    Q   What's the name of the contact person
21   you interfaced with at MSA?
22    A   My main one is Maddie Petta --
23   Pettenati.
24    Q   Okay. And how long have you worked with
25   Maddie Pettenati?

Page 175

1    A   A couple of years.
2    Q   Okay. Do you work with anyone else over
3    at MSA to help you with your reports?
4    A   Oh, sure.
5        MS. BROWN: Objection to the form.
6        THE WITNESS: Yeah.
7    BY MS. PARFITT:
8    Q   Who?
9    A   There's a woman named April, Shannon.
10   I'm sure there's others too.
11    Q   What are their backgrounds?
12        MS. BROWN: Objection to the form.
13        THE WITNESS: Everybody has a -- a
14   science background of some sort, like biology
15   degrees, things of that sort.
16   BY MS. PARFITT:
17    Q   Okay. How much time did you spend with
18   the folks at -- the team at MSA for purposes of
19   getting your report put together?
20    A   I don't know. I mean, what do you mean
21   by "with"?
22    Q   Well, we know you've had conversations.
23   We know that you have received information with
24   regard to shaping your report, and what I want to
25   know is, how much time did you spend with the team

Page 176

1    at MSA to help you get your report in order?
2        MS. BROWN: Objection to the form,
3    misstates the testimony.
4        THE WITNESS: I don't recall the amount
5    of time. I mean whatever it took. Like some of
6    it might be like a two-minute conversation to say
7    like, you know, I want to move a section down or
8    something. Or, you know, Can you proofread that
9    particular paragraph and look for typos? And
10   things of that sort.
11   BY MS. PARFITT:
12    Q   Did any of the folks at MSA make any
13   suggestions with regard to the scientific or
14   medical content of your report?
15        MS. BROWN: Objection. Instruct not to
16   answer on work product. You can discuss -- you
17   can answer the question of whether you had any
18   conversations, the substance of which is
19   privileged, and I'll instruct you not to answer.
20        MS. PARFITT: MSA is a third-party
21   contractor from what I'm understanding.
22        MS. BROWN: No different than if he was
23   working with a secretary to format this.
24   Conversations about drafts of the report are
25   privileged and will not be discussed.

Page 177

1    BY MS. PARFITT:
2    Q   Doctor, if you can answer the question.
3    Can you say it again? I'm sorry.
4    Q   Sure. No worries. I'm just getting it
5    here.
6        Did any of the folks at MSA make any
7    suggestions with regard to the scientific or
8    medical content of your report?
9        MS. BROWN: I'm instructing you not to
10   answer that question under the work-product
11   privilege.
12   BY MS. PARFITT:
13    Q   Do you keep time records of the time you
14   spend with MSA?
15    A   No.
16    Q   Okay. Well, I believe you testified at
17   the beginning of your deposition that your charge
18   per hour is $485, correct?
19    A   Well, I was trying -- I was trying to
20   make you understand that differently, and you said
21   we would talk about it, so maybe we can. My
22   charge is $400 an hour.
23    Q   All right. Where does the 485 come
24   from?
25    A   It's what I said before, right. They

45 (Pages 174 to 177)

Gregory B. Diette, M.D.

Page 178

1  add $85 when they bill somebody for my time.
2      Q  Who "they"?
3      A  MSA.
4      Q  "They," MSA?
5      A  Yeah.
6      Q  All right.  So that I get it straight,
7  you charge 400 -- $400 for your time, correct?
8      A  Correct.
9      Q  And then your understanding is MSA
10  charges an additional $85 to someone for their
11  assistance for you, correct?
12      MS. BROWN:  Objection to the form, calls
13  for speculation.
14      THE WITNESS:  So it's -- I don't know --
15  I don't know how they break it down, because they
16  bill for different things, like they bill for
17  photocopying, they bill for some administrative
18  tasks separately.  Whatever it is, it's their
19  business model, and they -- they add that amount
20  to the hourly rate.
21  BY MS. PARFITT:
22      Q  How much did Medical Science bill for
23  their work, do you know?
24      MS. BROWN:  Objection.  Calls for
25  speculation.

Page 179

1      THE WITNESS:  You can tell if we look at
2  the -- the invoices.
3  BY MS. PARFITT:
4      Q  Okay.  They would bill the same number
5  of -- well, let me ask for a clarification.  Not
6  all your work was done in conjunction with the
7  assistance of Medical Science Affiliates, correct?
8      MS. BROWN:  Objection to the form.
9      THE WITNESS:  I mostly sat by myself.
10  Yeah.
11      Q  Okay.  So the invoices that I have for
12  you would not necessarily reflect all of the work
13  that Medical Science Affiliates afforded you,
14  correct?
15      A  That's incorrect.
16      MS. BROWN:  Objection to the form.
17  BY MS. PARFITT:
18      Q  Okay.
19      A  I mean that's what I was trying to offer
20  you earlier is to try to understand the -- the
21  bills.  Because also when you add that comment
22  about the amount of money in total, it wasn't all
23  money that goes to me.
24      Q  Yeah.  The bills that I have have a date

Page 180

1  and basically an amount.  I don't have --
2      A  Like it --
3      Q  -- it's been blacked out.
4      A  It doesn't matter.  I can still --
5      MS. BROWN:  It's been redacted for work
6  product.
7      THE WITNESS:  I mean I can help you
8  understand it if you want.
9  BY MS. PARFITT:
10      Q  All I really want to understand and get
11  a better understanding, Dr. Diette, is the types
12  of services that MSA provided you in order to
13  file this -- prepare this report.
14      A  Yeah, I -- I listed those.
15      Q  Okay.  Do they help you with all of your
16  expert reports?
17      A  In what?
18      Q  Does MSA provide any type of service in
19  any and all expert reports that you prepare in the
20  context of litigation?
21      A  No.
22      Q  Okay.  Do you have another go-to service
23  to help you with the preparation of your expert
24  services?
25      MS. BROWN:  Objection to form.

Page 181

1      THE WITNESS:  No.  I do stuff on my own
2  as well.
3  BY MS. PARFITT:
4      Q  All right.  So there are cases where
5  you've done the work by yourself, and there are
6  cases like this particular case where you engage
7  the services of MSA, correct?
8      A  That is --
9      MS. BROWN:  Objection to the form.
10      THE WITNESS:  -- correct.
11  BY MS. PARFITT:
12      Q  Okay.  And did MSA edit any of your --
13  any of your -- did MSA edit your expert report?
14      A  Yeah.
15      Q  Okay.  What kind of edits did they make?
16      A  Well, all sorts.  Like I asked them to
17  look for typos, for example.
18      Q  Right.
19      A  I just happen to be open to page 30 and
20  31, and where you see that the -- there's like
21  bulleted sections, when I wrote that, it was just
22  one long impenetrable paragraph, and so they were
23  nice enough to sort of break it into some chunks
24  so it would be easier to read.
25      Q  Okay.  Bear with me if I asked this

Gregory B. Diette, M.D.

Page 182

1    before, but did MSA ever suggest any new sentences
2    or study that you didn't previously insert in your
3    paper?
4         A    I doubt a new study.  It could be -- I
5    mean we worked -- we worked pretty hard to make
6    sure that I have the full list of studies, you
7    know, acknowledged, and so if there was something
8    I left off -- I mean I don't remember this
9    specifically for this, but that would be a normal
10   practice, right, like which is to say, you know,
11   Oh, I saw in your list of papers that there's a
12   Smith paper, should that be on here?  Not them
13   going out and saying, Oh, I found a Smith paper,
14   would you like that on there?
15        Q    But they might looked at yours and say,
16   You -- you missed a study.  Fair?
17        A    Oh, sure.
18             MS. BROWN:  Objection to the form.
19             THE WITNESS:  Yeah.
20   BY MS. PARFITT:
21        Q    Okay.  And they might look at your
22   report and say, You missed --
23        I think what I'm getting at, Dr. Diette,
24   you described their efforts as generally
25   editorial.  Is that fair?

Page 183

1             MS. BROWN:  Objection to the form.
2             THE WITNESS:  I would say administrative
3    and editorial.
4    BY MS. PARFITT:
5         Q    Okay.  So we can agree that it's both
6    administrative and editorial?
7             MS. BROWN:  Objection to the form.
8             THE WITNESS:  Correct.
9    BY MS. PARFITT:
10        Q    And as I appreciate, in addition to
11   perhaps providing you with a study or two that --
12   or three, however number, that you might have
13   omitted, is there anything substantive like that
14   that they did for you for purposes of your expert
15   report?
16        A    I insist that they don't.  I tell them
17   that I don't want any intellectual input into
18   the -- to the stuff that we're working on.  Like I
19   don't want their -- I don't even know if they have
20   opinions, but I don't want their opinions.  I
21   literally want this to look like a professional
22   product, and I want to get it done in a way that I
23   can still spend my time -- my other professional
24   time on other things.  So if I were to try to make
25   this look like this, it would take me forever.

Page 184

1         Q    And I'm not concerned about the format.
2    What I'm concerned about is the substance,
3    Dr. Diette, as you can appreciate.
4             MS. BROWN:  Objection.
5    BY MS. PARFITT:
6         Q    And so what I'm trying to -- to get some
7    clarity here is that, other than perhaps providing
8    you a study that you may have omitted from your
9    report, is there anything else that falls more in
10   the substantive area that they provided and
11   offered for you?
12        A    I -- I think I've answered as best I
13   can.
14        Q    Well, why don't we -- let's talk about
15   your contact with J&J.  When did they first reach
16   out to you to talk with you about being an expert
17   to defend them in these lawsuits?
18             MS. BROWN:  Objection to the form of the
19   question.
20             THE WITNESS:  So they never asked me to
21   defend them.  They -- they asked me to evaluate
22   the epidemiologic literature.
23             And just to be clear, because it seemed
24   like it was tripping us up before trying to talk
25   about this, when I talk about J&J, it's lawyers

Page 185

1    that are working with J&J as opposed to somebody
2    from J&J per se.  And so I'll leave it to you guys
3    to sort out what that -- what that means.
4    BY MS. PARFITT:
5         Q    Fair enough.
6         A    But -- but the first time would have
7    been a lawyer back in 2017 who asked if I would be
8    interested in reviewing the epidemiologic
9    literature.
10        Q    Who was that lawyer?
11        A    Jonathan Cooper.
12        Q    Okay.  Now, at the time that Jonathan --
13   or Jonathan Cooper contacted you, did you -- were
14   you working with MSA?
15        A    Obviously, because I said ten years,
16   and, you know, this was 2017.
17        Q    Okay.  Did you share with Jonathan
18   Cooper that you worked with this MSA company to
19   help you prepare your expert reports?
20        A    He knew about it already, because I
21   think the reason he reached out to me is because
22   he was impressed with the work I had done in
23   other -- other cases.
24        Q    Okay.  Well, when he -- when you say he
25   was impressed with you, with the work that you've

Page 186

1    done, when he -- let me explore that a little bit.
2         When he called you, did you tell him
3    that you had previously worked with MSA to help
4    you with your expert reports?
5         A   I didn't have to.
6         Q   He knew that.
7         A   Yes.
8         Q   Okay.  How would Mr. Cooper have known
9    that you worked with MSA before?
10             MS. BROWN:  Objection to the form, calls
11   for speculation.
12             MR. LOCKE:  Objection.
13   BY MS. PARFITT:
14        Q   If you know.  Seems like you know.
15        A   Oh, I do.  We had -- he and I had worked
16   together on other cases.
17        Q   Okay.  What other cases did you work
18   with Mr. Cooper on?
19        A   They were asbestos-related cases with
20   plastic or phenolics, like electrical equipment.
21        Q   Okay.  And in those cases that you
22   worked with Jonathan on -- or Mr. Cooper on, did
23   you utilize the services of MSA as well to help
24   you prepare your expert report in those cases?
25        A   I did.

Page 187

1         Q   Okay.  Has MSA reached out to you and
2    engaged or asked if you would engage in assisting
3    them on any other projects currently?
4         A   What do you mean by "currently"?
5         Q   Well, are you working with MSA on any
6    other projects other than the talcum powder
7    products and ovarian cancer?
8         A   Yes.
9         Q   What projects?
10             MS. BROWN:  And again, Doctor, to the
11   extent that a confidentiality agreement doesn't
12   prevent you from disclosing other work that you're
13   doing, you can answer the question.
14             THE WITNESS:  Some cases that relate to
15   asbestos and other chemical-related cases.
16   BY MS. PARFITT:
17        Q   Okay.  Was there a time when you,
18   instead of receiving services from MSA, you
19   provided services to MSA as an affiliate expert?
20             MS. BROWN:  Objection to the form of the
21   question.
22             THE WITNESS:  I know they have that word
23   "affiliate" in their name.  I don't know what that
24   means.  But I don't provide services to them.
25   BY MS. PARFITT:

Page 188

1         Q   Okay.  Have they ever listed you on some
2    type of website as a consultant for legal
3    purposes?
4         A   Well, I see --
5             MS. BROWN:  Objection to the form,
6    calls for speculation.
7             THE WITNESS:  -- Mr. Finch is here and
8    he --
9             THE REPORTER:  Excuse me.
10             THE WITNESS:  Oh, sorry.
11             MS. BROWN:  Objection to the form, call
12   for speculation.  Thank you.
13             THE WITNESS:  Mr. Finch flashed
14   something up at a trial to suggest that they had,
15   but that wasn't an advertisement for me.  It was a
16   list of somebody who had credentials that were
17   similar to mine.
18   BY MS. PARFITT:
19        Q   Okay.  Well, my question is, have -- are
20   you aware of whether or not Medical Science
21   Affiliates has ever advertised your name out in
22   the -- the community as someone --
23             MS. BROWN:  Same objection --
24   BY MS. PARFITT:
25        Q   -- who was a specialist in pulmonology

Page 189

1    medicine?
2             MS. BROWN:  Same objection.
3             THE WITNESS:  I'm not aware that they
4    advertise.
5    BY MS. PARFITT:
6         Q   Okay.  So are there times that Medical
7    Science Affiliates reaches out to you and says,
8    Dr. Diette, we want you to do a medical -- a
9    scientific review for us on a topic?
10        A   Never.
11        Q   Okay.  They've never done that.  You've
12   never provided that service for them.
13        A   They -- they don't ask me to do work for
14   them.
15        Q   Okay.  Do their clients ask you to do
16   work for them?
17        A   Of course, that's where we started,
18   right, from ten years ago.
19        Q   Right.  And that's what I'm trying to
20   figure out.
21             MS. BROWN:  Let him finish.  I don't
22   think he was done.
23             THE WITNESS:  No, that was -- that was
24   the description of what I was saying, like how
25   the -- the first time that I met them was that

48 (Pages 186 to 189)

Gregory B. Diette, M.D.

Page 190

1   they -- there was some, you know, group that
2   wanted an epidemiologic review, and they were
3   trying to figure out if there were local
4   epidemiologists that could take on a task like
5   that, and so that's the way it worked.
6   BY MS. PARFITT:
7       Q   Okay.  So I now get --
8          MS. BROWN:  He is not done.
9   BY MS. PARFITT:
10      Q   Are you done, Doctor?  I thought you
11  were.
12      A   I'll be done.
13      Q   Okay.  So if I appreciate this
14  structure, so we can move on, a client, some
15  company can reach out to Medical Science
16  Affiliates and say, We need some work done and
17  research done on a particular area.  Will you do
18  that for me?
19          Medical Science Affiliates will say,
20  Yes, we can.  And then Medical Science Affiliates
21  reaches out to people like you?
22          MS. BROWN:  Objection to the form.
23          THE WITNESS:  So I don't know -- I don't
24  know when they say, Yes, we can.  Like I don't
25  know, for example -- like their -- I don't know

Page 191

1   what their size is, but they may say, Yes, we can,
2   and just do it themselves.  Right.  They have
3   other people that I don't work with that work
4   there.
5          I'm just saying, like you're asking the
6   question, so it's like -- so if somebody calls
7   them and says, Can you do this work?  They may
8   well say, Yes, we can do it.  They may or may not
9   need a content expert or methodologic expert to do
10  it.  So it -- I assume it depends, but I'm -- I'm
11  not familiar with their entire business operation.
12  BY MS. PARFITT:
13      Q   Okay.  All I'm trying to find out is --
14  is who comes to who, and from what I understand
15  your testimony is, a client will reach out to MSA
16  and say, We have a project.  MSA will determine
17  whether or not someone -- someone's expertise is
18  needed in order to complete that job, and then MSA
19  reaches out to you.  Is that fair?
20          MR. LOCKE:  Objection.
21          MS. BROWN:  Objection.  Speculation.
22          THE WITNESS:  I like the answer I just
23  gave.  I mean I think that really was my answer to
24  that exact question.
25  BY MS. PARFITT:

Page 192

1       Q   So you never work for MSA; you always
2   work for a corporate client?
3          MR. LOCKE:  Objection.
4          MS. BROWN:  Objection to the form of the
5   question.
6          THE WITNESS:  So I've never worked for
7   MSA.
8   BY MS. PARFITT:
9       Q   Who pays your bills?  Law firms?
10         MS. BROWN:  Objection to the form.
11         THE WITNESS:  So --
12         MS. BROWN:  What bills?  What are you
13  talking about?
14  BY MS. PARFITT:
15      Q   Who pays your bills for doing services
16  at the request of MSA?
17         MS. BROWN:  Objection to the form.
18  BY MS. PARFITT:
19      Q   Anybody?
20         MS. BROWN:  Objection.  Can we -- let's
21  have one question and let him answer.
22         Go ahead.
23  BY MS. PARFITT:
24      Q   And I'll tell you the reason I'm asking,
25  Dr. Diette.

Page 193

1          MS. BROWN:  No, no, no, no.  You ask the
2   question, he answers.  We don't need to know why
3   you're asking the question.
4          MS. PARFITT:  Excuse me.
5          MS. BROWN:  It's improper.  You're not
6   going to give a speech, Counsel.
7   BY MS. PARFITT:
8       Q   Dr. Diette, we -- has there ever been a
9   chance or an opportunity where you have reached
10  out to MSA on your own, and say, A client that
11  doesn't work or do business with you, MSA, has
12  asked me to do a report.  Can you help me?
13      A   Yes.
14      Q   Okay.  So that's one scenario, correct?
15      A   Correct.
16      Q   It's some other client has -- some other
17  individual or entity has reached out to you and
18  said, Dr. Diette, I would like to engage your
19  expertise in the legal context.  Fair?
20         MS. BROWN:  Objection to the form.
21         THE WITNESS:  Or the epidemiologic
22  context, but in some context.
23  BY MS. PARFITT:
24      Q   Okay.  And then you have in turn reached
25  out to MSA and said, I need some help.

49 (Pages 190 to 193)

Gregory B. Diette, M.D.

Page 194

1        MS. BROWN: Objection to the form.
2        THE WITNESS: Something like that, yeah.
3    BY MS. PARFITT:
4        Q    Okay.  That's one scenario.
5        Another scenario is when a corporate
6    client, for instance, engages the services of MSA
7    to do a project and a particular expertise is
8    needed, and MSA then reaches out to folks like
9    yourself or folks in other medical specialties.
10   Fair?
11       MS. BROWN: Objection. Speculation.
12       THE WITNESS: So I'm not a lawyer,
13   right. So I'm trying to listen carefully to the
14   words that you're using, and when you say they
15   reach out and they retain MSA, I -- I actually
16   don't know if that's actually what happens, right.
17       So I gave you an example that --
18   BY MS. PARFITT:
19       Q    Okay.
20       A    -- they might retain MSA for their own
21   purposes, and nobody else gets involved.  If like,
22   for example, in this case when Jonathan Cooper
23   reached out, he wanted to work with me, and MSA
24   provided the support services for me to get that
25   work done.  So I -- I have no idea whether he

Page 195

1    retained MSA per se.  I mean that's -- that's
2    something for lawyers to kind of sort through.
3        Q    Well, did Jonathan Cooper go to you
4    directly or did Jonathan Cooper go to MSA?
5        MS. BROWN: Objection to the form.
6        You can answer if you know.
7        THE WITNESS: It was kind of both.  I
8    mean I think we -- we were talking about something
9    else one day, and he asked if I would be
10   interested in this.
11   BY MS. PARFITT:
12       Q    Okay.  And did Jonathan Cooper then
13   reach out to MSA as well?
14       MS. BROWN: Objection. Speculation.
15   BY MS. PARFITT:
16       Q    You said both.  That's why I'm asking.
17       A    Yeah, yeah, I mean --
18       MS. BROWN: Same objection.
19       THE WITNESS: I don't know how that part
20   worked, I mean, but -- but it was pretty clear
21   that it was such a big volume of work, that if I
22   was going to do it with him that I was going to
23   use MSA's services.
24   BY MS. PARFITT:
25       Q    When you're engaged, who does the

Page 196

1    conflicts checks?
2        MS. BROWN: Objection. Speculation.
3    Engaged by who?
4    BY MS. PARFITT:
5        Q    When you're engaged by a client, who
6    does the conflict --
7        MS. BROWN: Same --
8    BY MS. PARFITT:
9        Q    -- conflicts checks for you?
10       MS. BROWN: Same objection.
11       THE WITNESS: I don't know that anybody
12   does conflicts checks.  I mean if there is
13   somebody, I'm not aware of who that is.  If it
14   comes up, people will ask me sometimes if I have a
15   conflict of interest.  Sometimes I'll see a
16   complaint, you know, and be asked to look at, you
17   know, the names on the complaint.
18       It all depends, but I -- I don't even
19   know if I know what a conflict checks is, I mean
20   if that's a technical term.  It's only been --
21   it's only been done the way I'm describing, which
22   somebody will say to me like, you know, Do you
23   have any conflict of interest?
24   BY MS. PARFITT:
25       Q    Okay.  You prepared two affidavits that

Page 197

1    I'm aware of, one in the Ingham case and one in
2    the Forrest.  Do you recall doing that back in
3    2018?
4        A    I do.
5        Q    Okay.  Are you aware of any other
6    affidavits you prepared in 2018 other than the
7    Ingham and the Forrest?
8        A    I don't think so.  But I mean if you
9    have one, I would be glad to help confirm it, but
10   I can't recall one off the top of my head.
11       Q    Fair enough.  How much did you charge
12   for preparation of the Ingham affidavit?
13       MS. BROWN: Objection to the form.
14       THE WITNESS: I don't remember.
15   BY MS. PARFITT:
16       Q    More than 50,000?
17       MS. BROWN: Same objection.
18       THE WITNESS: So I guess it depends upon
19   when we're talking about like me, you know,
20   because earlier you were lumping together, you
21   know, services that MSA charges for and gets paid
22   for.  So I don't remember what -- what part I got.
23   It wouldn't -- it wouldn't have taken $50,000
24   worth of my time to prepare, you know, the
25   affidavit, I don't think.  And in part, because,

Gregory B. Diette, M.D.

Page 198

1  you know, the input for that was stuff I was
2  already, you know, reading and interpreting
3  otherwise.
4  BY MS. PARFITT:
5      Q   All right.  How much did you charge for
6  the Forrest report?
7          MS. BROWN:  Objection to the form.
8          THE WITNESS:  The same -- same answer.
9  I don't know.  And in fact, the Forrest report, if
10  it came second, probably not very much because I
11  think it's mostly derivative from the first.  I
12  mean I try -- I'm not trying to just, you know,
13  create work to create it.  Like if there's
14  something I -- that I like the way it reads, I try
15  to use it again.
16  BY MS. PARFITT:
17      Q   Okay.  Are you aware, having actually
18  prepared both of those affidavits, they are
19  virtually the same affidavit?  Would that surprise
20  you?
21          MS. BROWN:  Objection to the form.
22          THE WITNESS:  I hope they are.  I mean
23  that -- that was the intent.
24  BY MS. PARFITT:
25      Q   Okay.  Other than the ovarian cancer/

Page 199

1  talcum powder cases, have you been engaged by
2  anyone else for opinions on a non-pulmonary issue?
3          MS. BROWN:  Objection to the form.
4          THE WITNESS:  Related to?
5  BY MS. PARFITT:
6      Q   Your work with MSA.
7      A   No, but you said -- it sounded like
8  there's something missing from the question.
9      Q   Sure.  Let me -- let me ask it again.
10  Okay.
11          Other than this case involving ovarian
12  cancer and talcum powder products, have you been
13  asked and -- or requested by anyone for your
14  opinions on a topic that was something other than
15  non-pulmonary?
16          MS. BROWN:  Objection.  Do you mean --
17          MS. PARFITT:  That was non-pulmonary.
18          MS. BROWN:  -- to exclude Ingham and the
19  other?  When you say "this case," do you mean just
20  the MDL?
21          MS. PARFITT:  Yeah.
22  BY MS. PARFITT:
23      Q   And I think that's where we're getting
24  hung up.  When I say "this case," I'm going to be
25  talking about "this case" being talcum powder

Page 200

1  products and ovarian cancer.
2          And the question I have is, in any
3  context, when the topic of interest is talcum
4  powder products and ovarian cancer, have you ever
5  been asked by MSA to do any work that's
6  non-pulmonary, other than the ovarian cancer
7  cases?
8      A   Related --
9          MR. LOCKE:  Objection.
10          THE WITNESS:  Related to talcum powder?
11  BY MS. PARFITT:
12      Q   Related to anything.
13      A   Well, wait a minute.  No, because -- so,
14  first of all, you said has MSA asked me to do it.
15  Like they don't ask me to do stuff.  Like they --
16  it's -- the relationship we described before is
17  what it is.  So if it's more general about are
18  there other cases --
19      Q   Yeah.
20      A   -- and when you say non-pulmonary, you
21  know, there are cases I've been involved in that
22  have nothing do with talcum powder that are
23  non-pulmonary.
24          So I'm just trying to figure out,
25  there's a lot of different angles to what -- to

Page 201

1  what you're asking.
2      Q   Sure.
3      A   Are you talking about talcum powder
4  cases that are related to something other than
5  ovarian cancer, and something other than a
6  pulmonary --
7      Q   I'll simplify it.  Have you ever
8  prepared a report in a -- let me do it this way.
9          Talcum powder products and ovarian
10  cancer have nothing to do with pulmonary medicine,
11  correct?
12          MS. BROWN:  Objection to the form.  Are
13  we abandoning inhalation as a theory of --
14          MS. PARFITT:  No, we're not, no.
15          MS. BROWN:  Okay.
16          THE WITNESS:  Then no.  I mean, no,
17  meaning that if that's a theory, then that
18  certainly has something to do with pulmonary
19  medicine.
20  BY MS. PARFITT:
21      Q   Okay.  And I think what I'm really
22  driving at is, it looks as though your focus for
23  the last couple of years has been talcum powder
24  products and ovarian cancer or asbestos and
25  mesothelioma.  Is that fair?

51 (Pages 198 to 201)

Gregory B. Diette, M.D.

Page 202

1      MR. LOCKE:  Objection.
2      THE WITNESS:  My focus --
3  BY MS. PARFITT:
4      Q   Focus and research --
5      MS. BROWN:  Objection.
6  BY MS. PARFITT:
7      Q   -- for preparation of expert legal
8  reports.
9      MS. BROWN:  Objection to the form.
10     THE WITNESS:  I -- I'm either not
11  hearing you well or I think things are getting
12  jumbled.
13  BY MS. PARFITT:
14     Q   Okay.
15     A   And I --
16     Q   Probably the -- the latter.
17     A   No, and I apologize.
18     Q   It's probably me.
19     A   I'm not trying to give you a hard time.
20  I just mean that -- what I -- what I heard earlier
21  is am I working on something with talcum powder
22  other than ovarian cancer or other than ovarian
23  cancer and something that isn't part of the lung?
24  Is that it?
25     Q   Are you preparing expert reports on a

Page 203

1  topic area other than talcum powder products and
2  ovarian cancer currently?
3      MS. BROWN:  Objection.  He's not
4  answering questions about reports that have not
5  been served in cases --
6      MS. PARFITT:  Understood.
7      MS. BROWN:  -- where he's not a
8  disclosed expert.
9      THE WITNESS:  You mean in my
10  professional life in general?
11  BY MS. PARFITT:
12     Q   Correct.
13     A   Yes.
14     Q   Okay.  What other areas?
15     A   Well, that's what we talked about
16  before, right.  So there was asbestos, there's
17  some chemicals, probably like mold and dampness.
18  There's malpractice cases.  I mean a whole variety
19  of different things.
20     Q   Okay.  All right.  I want to come to --
21  where I want to go is your -- your actual report.
22  I want you to take me through -- I'll ask you some
23  questions about the process that you went through
24  in actually putting this report together.  Or
25     A   And I don't want to overbreak or

Page 204

1  anything --
2      Q   Do you want to take --
3      A   No, I'm just wondering.  Not
4  necessarily, but if it's --
5      MS. MILLER:  This would be a good time
6  for lunch.
7      THE WITNESS:  Yeah, that's what I'm
8  wondering, just if it's going to be --
9      MS. BROWN:  Yeah, it's up to you.  If
10  you want to break, counsel will give you a break.
11     MS. PARFITT:  Whatever you want to do.
12  Do you want to take a break now?
13     THE WITNESS:  It would be nice to -- to
14  get a snack, and --
15     MS. PARFITT:  You want to take a half
16  hour and grab --
17     THE WITNESS:  Would that be okay?
18     MS. PARFITT:  That's totally fine, yep.
19     THE VIDEOGRAPHER:  The time is 12:08
20  p.m., and we are going off the record.
21     (Lunch recess.)
22     THE VIDEOGRAPHER:  The time is 12:43
23  p.m., and we're back on the record.
24  BY MS. PARFITT:
25     Q   Good afternoon, Dr. Diette.

Page 205

1      A   Good afternoon.
2      Q   All right, Dr. Diette, I'd like to focus
3  for a little bit about your -- actually your
4  expert report and hopefully get to your opinions
5  here soon.
6      It's fair to say that this report is --
7  this expert report is not a report that you
8  prepared in the ordinary course of your activities
9  as a pulmonary medicine at Johns Hopkins?
10     MS. BROWN:  Objection to the form.
11     THE WITNESS:  That's correct.
12  BY MS. PARFITT:
13     Q   Okay.  And are all the opinions which
14  you will be sharing with us today, and eventually
15  the court and a jury, set forth in your -- your
16  expert report?
17     MS. BROWN:  Form.
18     THE WITNESS:  I hope so.  I mean,
19  it's -- there may be like -- like smaller opinions
20  that are underpinnings that I didn't capture, but
21  I mean the fundamental opinions should be there.
22  And assuming nothing different comes out when
23  you're asking me about it today, I guess the only
24  other thing I'd say is that I don't think that
25  I've seen all of the -- the testimony yet in this

Gregory B. Diette, M.D.

Page 206

1    case. So I don't know whether that's going to,
2    you know, spur some other thought, you know, from
3    the other -- other experts who are testifying, but
4    aside from that, then this should otherwise be
5    complete.
6    BY MS. PARFITT:
7        Q   And obviously if you see something,
8    testimony that causes you to change your opinions,
9    you will let me know, correct?
10       MS. BROWN: Form.
11       THE WITNESS: I will.
12   BY MS. PARFITT:
13       Q   All right. Dr. Diette, on the front of
14   your report it says "Expert Report of Gregory
15   Diette, MD, MHS, For General Causation Daubert
16   Hearing." Did you write that?
17       A   Not this page, no.
18       Q   All right. Who wrote that?
19       MS. BROWN: Objection to the form.
20       THE WITNESS: I -- I don't know
21   literally. I think this came from the law firm as
22   a cover page for me to -- to sign.
23   BY MS. PARFITT:
24       Q   You've testified both in general
25   causation case -- as a general causation witness

Page 207

1    and as well as a specific causation witness,
2    correct?
3        A   Generally speaking, like in legal cases?
4        Q   Correct.
5        A   Yes, I have.
6        Q   All right. So you understand the
7    difference.
8        A   I hope so, yeah.
9        Q   Okay. Have you actually testified in an
10   asbestos/meso- -- mesothelioma case on giving
11   specific causation opinions?
12       A   Yes.
13       Q   Okay. Have you also provided general
14   causation opinions in a meso/asbestos case?
15       A   Yes.
16       Q   Okay. Now, it says Daubert. Do you
17   understand what a Daubert hearing is?
18       MS. BROWN: Objection to the form.
19       THE WITNESS: Probably not the way that
20   you do. I have a general -- general sense of
21   this, but -- you know, I -- I wouldn't be able to
22   answer, you know, a lot of test questions about
23   it.
24   BY MS. PARFITT:
25       Q   Okay. All right. And would it be fair

Page 208

1    to say that that is your signature on the -- on
2    the front page, Gregory Diette?
3        A   Yes, it is.
4        Q   And you completed that on February 25th,
5    2019, correct?
6        A   Exactly right.
7        Q   Okay. And it would also -- is it also
8    fair to say that the opinions contained in this
9    report are not the opinions of Johns Hopkins
10   University?
11       A   Not as far as I know. I mean they're
12   literally just mine.
13       Q   Have you shared these opinions with any
14   of the other members of the Johns Hopkins
15   community?
16       A   No.
17       Q   All right. Did you run the opinions
18   that you have by any of the staff or your
19   superiors at Johns Hopkins?
20       MS. BROWN: Objection to the form.
21       THE WITNESS: No.
22   BY MS. PARFITT:
23       Q   Okay. Aside from this expert report and
24   the opinions retained herein, have you shared your
25   opinions with anyone else outside of the Johns

Page 209

1    Hopkins community, regulatory or scientific
2    bodies?
3        MS. BROWN: Objection to the form.
4        THE WITNESS: No. You mean other than
5    the lawyers and --
6    BY MS. PARFITT:
7        Q   Correct, other than your lawyers.
8        A   Oh, yeah, yeah, yeah.
9        MS. BROWN: Objection to the form.
10   We're not his lawyers.
11       THE WITNESS: Right, but I mean but
12   lawyers that are involved in this case, I have
13   expressed it to, but not those other kinds of
14   entities that you described.
15   BY MS. PARFITT:
16       Q   Okay. And to be clear, you have not
17   shared with the Johns Hopkins community your
18   opinions on talcum powder products and ovarian
19   cancer.
20       MS. BROWN: Objection to the form.
21       THE WITNESS: That is correct.
22   BY MS. PARFITT:
23       Q   Okay. Let's go to I believe page 2 of
24   your report, if you will.
25       And take a moment. Do you have that in

Gregory B. Diette, M.D.

Page 210

1    front of you?
2        A   I do.  Thank you.
3        Q   Okay.  Is it fair to say that your
4    report contains the bases for your opinions as
5    well?
6        A   Yes.
7        Q   All right.  And is it fair the -- do you
8    know whether or not this report has answered all
9    the questions that J&J asked you to answer for
10   them?
11       MS. BROWN:  Objection.  Lacks
12   foundation.
13       THE WITNESS:  Well, I think there's only
14   one question, right?
15   BY MS. PARFITT:
16       Q   And what was that question?
17       MS. BROWN:  Wait.  Let him finish.
18   BY MS. PARFITT:
19       Q   What was that question?
20       A   I'm sorry.  So the question was -- was
21   really about whether or not the -- what does the
22   epidemiologic evidence say about the relationship
23   between talcum powder and ovarian cancer.
24       Q   All right.  So let's turn to your
25   report, page 2, and I believe --

Page 211

1        MS. PARFITT:  And we'll put it up on the
2    ELMO here.
3        (Counsel conferring.)
4        MS. PARFITT:  I guess we won't put it up
5    on the ELMO here.
6    BY MS. PARFITT:
7        Q   Looking at the Summary of Opinions,
8    would you please read, if you will, that first
9    sentence.
10       A   Down at the bottom?
11       Q   Please.
12       A   "The body of"?
13       Q   Under "Summary of Opinions."
14       A   Yep, sure.
15       "The body of relevant epidemiological
16   evidence does not support a causal connection
17   between perineal use of talcum powder products,"
18   parentheses, "whatever constituents those products
19   may contain in addition to talc," end parentheses,
20   "and ovarian cancer."
21       Q   All right.  And then in the next page is
22   you talk about the bases for that, correct?
23       A   I think that's the right way to say the
24   bases.  I mean it's sort of an elaboration of that
25   general -- general opinion.

Page 212

1        Q   Okay.  And if you would turn -- be so
2    kind to turn to the last page of the report,
3    page 51.
4        A   Okay.
5        Q   And again, if you would read the first
6    paragraph.
7        A   At the --
8        Q   And we'll go ahead and put that up on
9    the ELMO.
10       A   Under "Conclusion" or the --
11       Q   Under the Conclusion, if you will.
12       A   Yep.  The whole thing?
13       Q   Just that -- just that first
14   paragraph -- or first sentence.
15       A   First sentence.  Oh, okay.  Yep.
16       "It is my opinion, based on my
17   qualifications and my extensive review of the
18   available epidemiology studies and scientific
19   literature, that there is not sufficient evidence
20   to conclude that there is a causal relationship
21   between perineal talcum powder exposure and
22   ovarian cancer."
23       Q   Okay.  And I know you have much to say
24   about that, but that is basically the -- the
25   general opinion that you're going to be sharing,

Page 213

1    correct?
2        A   I agree with you, yes.
3        Q   Okay.  Let me show you what we'll have
4    marked as 12, Exhibit 12.
5        (Counsel conferring.)
6        MS. PARFITT:  Let me show you, Counsel,
7    what we -- what we'll have marked as Exhibit 12.
8    There you go.
9        (Diette Exhibit No. 12 was marked
10       for identification.)
11   BY MS. PARFITT:
12       Q   Doctor, have you seen this before?
13       A   Let me take a look and see.  (Peruses
14   document.)
15       So generally speaking, yes.  The -- the
16   only reason I can't say for sure I've literally
17   seen this exact version is because that -- not
18   that I would know when it was updated otherwise,
19   but I don't know who's in charge of all these
20   different -- excuse me -- websites that you found
21   at Johns Hopkins, and so I don't know, you know,
22   whether what I looked at is literally identical to
23   what we're looking at here.
24       Q   All right.
25       A   But it's approximately something that

Gregory B. Diette, M.D.

Page 214

```
 1   I've seen.
 2        Q   Okay.  Fair.
 3            Now, this is from the Sidney Kimmel
 4   Comprehensive Cancer Center, correct?
 5        A   That's right.
 6        Q   And it's entitled "Risk Factors -- Risk
 7   Factors" -- excuse me -- and Symptoms."  Do you
 8   see that?
 9        A   I do.
10        Q   All right.  And if you and this is for
11   ovarian cancer, you see that?
12            On the second line, "ovarian cancer," it
13   talks --
14        A   Yes.
15        Q   Okay.  Now, what I'd like you to do is
16   turn to the second page, and there is a risk
17   factor listed, amongst others.  Do you see that?
18        A   I do.
19        Q   And it says "Talcum Powder and
20   Asbestos."  Do you see that?
21        A   Yes.
22        Q   All right.  Would you read that, please.
23        A   "Habitual use of talcum powder on the
24   genital area may increase the risk for ovarian
25   cancer, but the evidence is not strong.  A study"
```

Page 215

```
 1   -- the first sentence or the whole thing?
 2        Q   The whole thing.
 3        A   Yep.  "A study at Harvard Medical School
 4   found that using talc this way doubled the risk,
 5   but other studies found no increased risk.  Some
 6   researchers believe that talc may be carcinogenic
 7   because it contains particles of asbestos, a known
 8   carcinogen.  It's been shown that rates of ovarian
 9   cancer are higher than normal in women whose jobs
10   expose them to asbestos."
11        Q   All right.  Thank you.
12            Fair to say, Dr. Diette, that your
13   opinions are contrary to the opinions of what --
14   of those individuals at the Sidney Kimmel
15   Comprehensive Cancer Center?
16            MS. BROWN:  Objection to the form of the
17   question, lacks foundation.
18            THE WITNESS:  I wouldn't say globally.
19   I mean there's -- there's things here that
20   resonate with me just fine.
21   BY MS. PARFITT:
22        Q   What resonates with you fine and what
23   does not resonate with you?
24        A   Well, so, for example, when --
25        Q   And if you will, I'm going to put mine
```

Page 216

```
 1   up here, and I'm going to doc- -- and I'm going to
 2   go ahead and make a notation as you talk, and
 3   we're going to put your initials by that which you
 4   agree or don't agree, or that which resonates with
 5   you or that which does not.
 6            So give me a moment.  Hang with me,
 7   okay?
 8        A   Yeah.
 9        Q   All right.
10            MS. BROWN:  Objection to the exercise.
11            THE WITNESS:  And I will say -- I mean I
12   wasn't -- you know, that I don't necessarily --
13   I'm not going to be able to necessarily agree or
14   literally disagree with each one of these, but
15   I'll just try to comment on what they -- what they
16   have here and what it says to me.
17   BY MS. PARFITT:
18        Q   All right.  Well, why don't we take the
19   first one.
20            "Habitual use of talcum powder on the
21   genital area may increase the risk for ovarian
22   cancer, but the evidence is not strong."
23        A   Yeah.
24        Q   Do you agree with that?
25        A   I agree that the evidence is not strong.
```

Page 217

```
 1   And -- and I think it's a -- it's a pretty nuanced
 2   statement.  It may increase, which leaves open
 3   that it may not increase.  So I think it's a --
 4   it's a balanced statement.  And their inclusion of
 5   the evidence not being strong is what resonates
 6   with me.
 7        Q   Okay.  Do you disagree, though, that
 8   it -- do you agree or disagree with this
 9   statement: "Habitual use of talcum powder on the
10   genital area may increase the risk for ovarian
11   cancer, but the evidence is not strong"?
12            MR. LOCKE:  Objection.
13   BY MS. PARFITT:
14        Q   Do you agree with that statement?
15        A   I don't literally agree or disagree with
16   it.  I mean, I think I break it down the way that
17   I did into those two parts.
18        Q   Okay.  Well, I have a different
19   question.  I know how you want to do it, but I --
20   I do get the ask the questions.
21            MS. BROWN:  He answered your question,
22   Counsel.
23   BY MS. PARFITT:
24        Q   Habitual question -- yes or no --
25            MS. BROWN:  No.
```

Gregory B. Diette, M.D.

Page 218

```
 1    BY MS. PARFITT:
 2        Q   "Habitual use of talcum powder on the
 3    genital area may increase the risk for ovarian
 4    cancer." True or false?
 5        MR. LOCKE:  Objection.
 6        MS. BROWN:  Objection to the form of the
 7    question, asked and answered.
 8        You can give the same answer again.
 9        THE WITNESS:  It's --
10        MS. PARFITT:  Counsel, please quit
11    instructing the witness.
12        MS. BROWN:  Counsel, don't yell at me.
13    BY MS. PARFITT:
14        Q   Go ahead.
15        MS. BROWN:  We can call the Judge.
16        MS. PARFITT:  I'm not yelling -- we can
17    call the Judge because I'll tell you, I don't
18    think he'll be -- she will be impressed.
19        MS. BROWN:  That's fine.  Let's go.
20    Let's walk right there and call her right now.
21        MS. PARFITT:  I'm not going to waste the
22    time right now.
23        MS. BROWN:  Okay.
24        THE WITNESS:  So I don't see it as a
25    true or false questions.  I think that there's two
```

Page 219

```
 1    parts, and I -- I like the way that I answered it.
 2    BY MS. PARFITT:
 3        Q   Well, let me ask you this:  My -- if
 4    Judge Wolfson, who is the judge presiding over
 5    this case, says to you, Dr. Diette, I've got a
 6    question for you -- this is in July -- do you have
 7    an opinion whether or not habitual use of talcum
 8    powder on the genital area may increase the risk
 9    for ovarian cancer, what are you going to tell
10    her?
11        MS. BROWN:  Objection to the form of the
12    question and to the yelling at the witness.
13    BY MS. PARFITT:
14        Q   I'm not yelling at you, Dr. Diette.
15        MS. PARFITT:  Everyone is saying I
16    talk -- believe me, I'm not yelling at him.  I'm
17    not that disrespectful.  Trust me, please.
18        THE WITNESS:  Okay.  I don't think it
19    does, but, you know, there's so many ways you
20    could write this, which is why that it doesn't
21    strike me as something to agree or disagree with.
22    They could -- could have said "habitual use
23    causes."  They could have said that it does
24    increase the risk.
25        So, you know, those are very different
```

Page 220

```
 1    than "may increase the risk," and it's very
 2    different than saying it causes it.
 3    BY MS. PARFITT:
 4        Q   Okay.
 5        A   So it's -- it's a pretty vague
 6    statement.
 7        Q   Okay.  And I think -- I hear what you're
 8    saying, but my question, and I think you just
 9    answered it, is if -- if Judge Wolfson says to
10    you, Dr. Diette, I would like an answer to my
11    question:  Does the habitual use of talcum powder
12    on the genital area increase the risk for ovarian
13    cancer?
14        My -- my question to you from Judge
15    Wolfson.
16        MR. LOCKE:  Objection.
17        MS. BROWN:  Objection to the form of the
18    question, asked and answered.
19        THE WITNESS:  And whether it does?
20    BY MS. PARFITT:
21        Q   Yeah, the question is --
22        A   Well, it doesn't say that, though.
23        Q   -- do you have -- no, no, no, I know it
24    doesn't.
25        A   Oh.
```

Page 221

```
 1        Q   I'm representing -- you've already told
 2    me what you said about what's here.
 3        A   I see.
 4        Q   What I'm asking you is, do you have an
 5    opinion whether or not the habitual use of talcum
 6    powder -- powder on the genital area may increase
 7    the risk for ovarian cancer?
 8        A   Not to quibble, but you just said does
 9    increase before that, and now it's may increase?
10    Is it -- is it does increase --
11        Q   I'm going to do both, yeah.
12        A   Okay.  Well, I think this is so watered
13    down that it doesn't really say anything
14    definitive when you say "may increase."  If the
15    question is about "does increase," I would say it
16    does not increase the risk.
17        Q   Okay.  And as worded, you feel that it's
18    somewhat equivocal.  Is that fair?
19        MS. BROWN:  Objection to the form of the
20    question.
21        THE WITNESS:  Well, not the entire
22    statement.  I mean the evidence is not strong.
23    Seems like a pretty -- a pretty potent part of the
24    statement.
25    BY MS. PARFITT:
```

56 (Pages 218 to 221)

Gregory B. Diette, M.D.

Page 222

1    Q   Okay.  So you agree with "the evidence
2    is not strong."
3         And then what about the next part, "A
4    study at Harvard Medical School found that using
5    talc this way doubled the risk, but other studies
6    found no increased risk."  Do you agree with that
7    statement?
8         MS. BROWN:  Objection to the form of the
9    question.
10        THE WITNESS:  It's -- I would say maybe.
11   And the reason is because they -- they haven't
12   cited what the Harvard study is.  It -- I could
13   assume, but I might be wrong that maybe it's the
14   Cramer study from '82.  Maybe it's not.  So I
15   don't know.  So if they're citing that, then --
16   then that might well be a correct statement.  And
17   it's certainly correct that other studies have
18   found no increased risk.
19   BY MS. PARFITT:
20        Q   All right.  So from your review of the
21   medical and scientific literature, you have seen
22   where scientists who look at the same scientific
23   and medical literature can arrive at different
24   opinions, correct?
25        MS. BROWN:  Objection to the form of the

Page 223

1    question.
2         THE WITNESS:  Are we talking about a
3    specific topic or just you -- in general, that
4    scientists can disagree with each other?
5    BY MS. PARFITT:
6         Q   Scientists can disagree with each other.
7         MS. BROWN:  Objection to the form.
8         THE WITNESS:  I think in general, they
9    can disagree about all sorts of things.  I don't
10   think there's a good reason to disagree about this
11   topic that we're talking about.
12   BY MS. PARFITT:
13        Q   Well, in this particular sentence, Johns
14   Hopkins University is representing to consumers,
15   or anyone who wants to get onto the website, that
16   medical schools found -- that a study of the
17   Harvard Medical School found that using talc this
18   way doubled the risk, but other studies found no
19   increased risk.
20        A   Yes.
21        Q   Is it fair to say they're communicating
22   that there are science -- there's science out
23   there that goes both ways?
24        MS. BROWN:  Objection to the form --
25        MR. LOCKE:  Objection.

Page 224

1         MS. BROWN:  -- of the question,
2    misstates the document, and it's been asked and
3    answered.
4         THE WITNESS:  I'd be careful a lot of
5    ways, right?  I think it's -- it's easy to say
6    what, you know, Johns Hopkins is saying.  I don't
7    know how well this represents Johns Hopkins as an
8    entity.  I -- like I don't know who controls this
9    website.  I don't know who the author was.  I
10   don't know if it was -- you know, somebody who was
11   hired for the summer to create a website or
12   whether it's somebody who is a credible
13   researcher.
14        But I also know that these kinds of
15   things populate all kinds of different websites,
16   and they're not necessarily like a policy
17   statement, you know, of a university or a hospital
18   or an entity.
19   BY MS. PARFITT:
20        Q   And I'll --
21        A   I would just be careful, I mean just in
22   terms of saying Johns Hopkins is saying this.
23        Q   Well, I will represent to you, and you
24   can see for yourself, that the Sidney Kimmel
25   Comprehensive Center puts out this information.

Page 225

1    Your institution.
2         MS. BROWN:  Objection to the form of the
3    question, and misstates the document.
4         THE WITNESS:  It's the same issue.
5    Right.  I mean I know the Sidney Kimmel Cancer
6    Center, and I work there.  It's -- but I don't
7    know what the source is of this information, I
8    don't know who's the author, and I don't know what
9    they expect it to represent in terms of a Johns
10   Hopkins, you know, point of view.
11   BY MS. PARFITT:
12        Q   Did anyone over at the Sidney Kimmel
13   Comprehensive Cancer Center ever consult you with
14   regard to what language should be included on the
15   website with regard to risk factor information?
16        A   No.
17        MS. BROWN:  Objection to the form.
18   BY MS. PARFITT:
19        Q   Okay.  The second part, let's go on.  If
20   you will, it starts with -- if you can read on
21   "Some," if you would read that, please.
22        A   "Some researchers believe that talc may
23   be carcinogenic because it contains particles of
24   asbestos, a known carcinogen."
25        Q   All right.  And do you agree with that

57 (Pages 222 to 225)

Gregory B. Diette, M.D.

Page 226

1  statement?
2       MS. BROWN: Objection to the form.
3       THE WITNESS: Well, I certainly agree
4  that some researchers believe that, because we've
5  seen it in plaintiffs' experts. So it's -- on its
6  face, I think it's a -- a true -- true statement
7  that there are people who believe that.
8       And I think the part that asbestos is a
9  known carcinogen is also something I agree with.
10 BY MS. PARFITT:
11      Q   Okay. And then it goes on to say:
12 "It's been shown that rates of ovarian cancer are
13 higher than normal in women whose jobs expose them
14 to asbestos."
15      Do you agree with that statement?
16      A   So, you know, this language is -- is not
17 great, right? It has been shown that, right. So
18 we could look at, you know, any one of those
19 studies that was done around World War II, for
20 example, and if you looked at one that was
21 positive, you could say it was shown that they
22 were higher. I'm not sure whether the general
23 proposition has been established, though.
24      Q   Okay.
25      A   If you guys are going to whisper, you're

Page 227

1  going to miss what I'm saying.
2       Q   No, I was -- I was just turned.
3       A   Okay.
4       Q   I heard what you said. Thank you.
5       A   All right.
6       Q   And fortunately, I have it right here in
7  front of you too.
8       A   Okay, good. Good, good, good.
9       Q   Yeah, thank you. And I thought you had
10 finished what you were saying because you finished
11 "okay," so I thought --
12      MS. BROWN: That's your "okay," Counsel.
13 BY MS. PARFITT:
14      Q   I'm sorry. I believe you finished. I'm
15 not sure whether the general proposition has been
16 established. So I thought that was the end --
17      A   That was the end --
18      Q   -- of your sentence.
19      A   Yeah.
20      Q   Right. Okay. All right.
21      Q   Are we done with this one?
22      Q   For the time being, yeah. We may come
23 back to that.
24      Other than providing counsel with an
25 expert report of your opinions, have you reached

Page 228

1  out to the Food and Drug Administration to share
2  your opinions with them?
3       A   No.
4       Q   All right. Other than counsel who has
5  retained you to provide an expert -- a legal
6  expert report, have you reached out to any
7  scientific body to share your opinions?
8       MS. BROWN: Objection to the form.
9       THE WITNESS: No.
10 BY MS. PARFITT:
11      Q   Okay. Have you reached out to any
12 medical body to share your opinions?
13      MS. BROWN: Objection to the form.
14      THE WITNESS: No.
15 BY MS. PARFITT:
16      Q   Okay. Did you reach out to the Sidney
17 Kimmel Comprehensive Cancer Center and the folks
18 over there and share with them what your opinions
19 are?
20      A   No.
21      MS. BROWN: Asked and answered.
22 BY MS. PARFITT:
23      Q   Do you know Dr. Merlo?
24      A   I do.
25      Q   He's a friend of yours, right?

Page 229

1       A   He is.
2       Q   Okay. And you're Facebook friends.
3       A   I'm friends with his wife. He and I
4  might be also, but we're friends in -- in reality,
5  not just on --
6       Q   Not just on Facebook.
7       A   Yeah.
8       Q   Is his wife a doctor?
9       A   She is not.
10      Q   Okay. Do you know Dr. April
11 Zambelli-Weiner?
12      A   I do.
13      Q   Okay. You have worked with her in the
14 past, correct?
15      A   Really briefly, way back when.
16      Q   Okay. Do you consider her -- do you
17 know she's an epidemiologist, correct?
18      A   I think I know that.
19      Q   Okay. Do you consider her an
20 epidemiologist with expertise and well received in
21 the medical comm-- and scientific community?
22      MS. BROWN: Objection. Lacks
23 foundation, calls for speculation.
24      THE WITNESS: So I don't know much
25 about -- about her lately. I think the last time

58 (Pages 226 to 229)

Gregory B. Diette, M.D.

Page 230

1  that I saw her was when she was still training at
2  Hopkins.  And so there's a couple of decades that
3  have gone by.  So I -- so I honestly have no idea
4  what her reputation is at this point.
5  BY MS. PARFITT:
6      Q   Okay.  Did you work with her?
7      A   Sort of.  Like not -- we were -- we were
8  both involved in a research project, but we
9  weren't both involved in the same part of the
10  project.  So I -- it's -- to say that we worked
11  together, it's -- it's a little bit vague in a way
12  about whether we did.  We traveled together for
13  one particular research program we were a part of.
14  But --
15      Q   Okay.
16      A   Like I don't think we published
17  together.  I don't think.
18      Q   Do you think of her as a good scientist?
19          MS. BROWN:  Objection to the form of the
20  question, calls for speculation.
21          THE WITNESS:  I -- I honestly don't know
22  what she's -- what she's up to.  I mean it's
23  literally been a couple of decades.
24  BY MS. PARFITT:
25      Q   Sure.  Well, when you did know her back

Page 231

1  a couple of decades ago, did you consider her a
2  good scientist?
3          MS. BROWN:  Objection to the form,
4  vague, calls for speculation.
5          THE WITNESS:  I wouldn't say that I know
6  that she wasn't, but I really wasn't very familiar
7  with what her work was.
8  BY MS. PARFITT:
9      Q   Her work.  Okay.  That's fair enough.
10          Okay.  Alrighty.  Let's set this aside.
11          Dr. Diette, are you aware that just last
12  month, and I believe it was March 12th, the House
13  Committee on Oversight and Reform, Committee on
14  Economic and Consumer Policy conducted a hearing
15  about the public health risk of carcinogens in
16  talcum powder products and other consumer
17  products?  Were you aware of that?
18          MR. LOCKE:  Objection.
19          MS. BROWN:  Objection to the form.
20          THE WITNESS:  I saw that -- a question
21  about that in one of the deposition transcripts
22  that I -- that I read.  I don't remember which
23  one.  But that's my only awareness of that.
24  BY MS. PARFITT:
25      Q   Okay.  So no one requested that you

Page 232

1  appear and give testimony, correct?
2      A   Correct.
3          MS. BROWN:  Form.
4  BY MS. PARFITT:
5      Q   Right.  So no one inquired as to what
6  your opinions were on this topic; is that correct?
7          MS. BROWN:  Asked and answered.
8          THE WITNESS:  That is correct.
9  BY MS. PARFITT:
10      Q   Okay.  I'll represent to you that at the
11  hearing, both consumer and industry were invited
12  to attend.
13          Are you aware that Dr. McTiernan, who is
14  an expert in this case, was one of those
15  individuals that was invited to attend?
16          MR. LOCKE:  Objection.
17          MS. BROWN:  Objection.  Lacks
18  foundation.
19          THE WITNESS:  I don't know.
20  BY MS. PARFITT:
21      Q   Okay.  You've read her expert report,
22  correct?
23      A   I did.
24      Q   And you understand that she was one of
25  the coinvestigators with the WHI study?

Page 233

1          MS. BROWN:  Objection to the form.
2  BY MS. PARFITT:
3      Q   One of the cohorts that you rely on.
4          MS. BROWN:  Foundation, speculation.
5          THE WITNESS:  That's what I understand.
6  BY MS. PARFITT:
7      Q   Okay.  When you were writing your expert
8  report and researching the cohort studies, did you
9  ever reach out to Dr. McTiernan to consult with
10  her with regard to her thoughts and opinions about
11  that particular cohort study?
12          MS. BROWN:  Objection to the form.
13  Which study?
14          MS. PARFITT:  I said the WHI study.
15          MS. BROWN:  It's not in your question.
16          THE WITNESS:  Assuming the WHI study, I
17  did not.
18  BY MS. PARFITT:
19      Q   Okay.  Dr. McTiernan testified at that
20  hearing, and her testimony went uncontroverted,
21  that there was a statistically significant
22  increased risk of 22 to 31 percent of developing
23  ovarian cancer from genital use of talcum powder
24  products.
25          Do you agree or disagree with that?

Gregory B. Diette, M.D.

Page 234

1      MR. LOCKE: Objection.
2      MS. BROWN: Objection. This lacks
3  foundation. Counsel, are you giving him a
4  hypothetical? Or if not, are you going to give
5  him something that would support the statements
6  that you're making on the record?
7  BY MS. PARFITT:
8      Q   Assume that Dr. McTiernan testified
9  before the subcommittee who was investigating the
10  safety of talcum powder products, that
11  Dr. McTiernan testified that there was scientific
12  evidence that women who used talcum powder
13  products have a statistically significant
14  increased risk of 22 to 31 percent of developing
15  ovarian cancer.
16      A   So, first of all --
17      MS. BROWN: Wait, wait. What's the
18  question?
19  BY MS. PARFITT:
20      Q   And I should add developing epithelial
21  ovarian cancer having used talcum powder products.
22      MS. BROWN: What's the question? You
23  just gave an assumption.
24  BY MS. PARFITT:
25      Q   Do you --

Page 235

1      MS. PARFITT: I just was finishing.
2  BY MS. PARFITT:
3      Q   But do you agree with her statement
4  before Congress?
5      MS. BROWN: Objection to the form.
6      MR. LOCKE: Objection.
7      MS. BROWN: Incomplete hypothetical,
8  lacks foundation, calls for speculation.
9      THE WITNESS: So I don't know what she
10  said -- and I know you're asking me to assume what
11  she said -- I don't know what else she said about
12  it, so how the -- how that's framed -- it sounds
13  compatible generally with what her report had at
14  least one sentence about.
15  BY MS. PARFITT:
16      Q   Okay. Let me show you what we'll have
17  marked as Exhibit 13.
18      (Diette Exhibit No. 13 was marked
19      for identification.)
20  BY MS. PARFITT:
21      Q   And I'll represent to you that this
22  is the statement of Ann McTiernan that was
23  prepared for the Subcommittee on Economic and
24  Consumer Policy on "Examining the Public Health
25  Risks of Carcinogens in Consumer Products" dated

Page 236

1  March 12th, 2019.
2      Do you see that?
3      A   I see it.
4      Q   Okay. If I can direct your attention
5  to -- and I'll represent that this was a statement
6  that she submitted prior to the hearing, and
7  specifically -- I can put it on the ELMO here.
8  Let's go down to the third full paragraph.
9      Do you see that, it starts
10  "Summarizing"?
11      A   Yes.
12      Q   Okay. And it states: "Summarizing data
13  from all of the published studies consistently
14  shows that women who had ever used talcum powder
15  products in the genital area had a statistically
16  significant 22 to 31 percent increased risk of
17  developing epithelial ovarian cancer compared with
18  women who had never used them. Evidence suggests
19  that these associations hold across diverse race
20  and ethnic groups."
21      Did I read that correctly?
22      A   You did.
23      Q   All right. Do you agree with that
24  statement?
25      MS. BROWN: Objection to the form.

Page 237

1      THE WITNESS: Well, I think this is
2  compatible with what, you know, her report and her
3  testimony has been generally. I think it's --
4  it's -- unfortunately, it's not very balanced,
5  right. I mean she -- she's leaving out an awful
6  lot of information here and -- and really
7  referring just to one narrow slice of the evidence
8  that she's -- that she's citing here.
9  BY MS. PARFITT:
10      Q   Okay. What did she leave out, Doctor?
11      A   I'm sorry?
12      Q   What is she leaving out?
13      A   Well, saying that -- that "data from all
14  the published studies consistently shows that
15  women who had ever used talcum powder products in
16  the genital area had a statistically significant
17  22 to 31 percent increased risk," and I won't
18  finish the rest, but, you know, of developing
19  ovarian cancer.
20      So, you know, they don't all have a
21  statistically significant increase, and she's
22  leaving out information that would run counter to
23  that also, including I think -- let me just see
24  what she cites.
25      She cites Berge and Penninkilampi and

Gregory B. Diette, M.D.

Page 238

1    Terry, but there's other information in there,
2    like from Berge, for example, you know, who points
3    out that there's no risk seen in the cohort
4    studies. So I think if this were balanced, that
5    she would -- she would have more information than
6    just that particular statement.
7        Q    Okay. And we'll talk a little bit more
8    about the -- the cohorts in just -- just a moment.
9        Okay. What was the methodology you
10   employed in order to present the opinions and
11   bases for opinions in your report?
12       A    So generally, I tried to identify all of
13   the relevant epidemiologic studies -- is that what
14   you're -- you're asking?
15       Q    That is?
16       A    Okay.
17       Q    That is.
18       A    And so I tried to find them in an
19   iterative way, you know, meaning that there were
20   meta-analyses that had many of them listed. I did
21   some searches of their own reference lists to look
22   for others. I did searches, you know, using
23   web-based, you know, tools to find other -- other
24   studies, and tried to get what I thought was a
25   pretty comprehensive group of all the

Page 239

1    epidemiologic studies.
2        And then I also tried to read other
3    things, you know, IARC monographs, other -- like
4    reports from like American College of Obstetrics
5    and Gynecology, and -- and get a sense of how some
6    of the information was being interpreted by
7    other -- other bodies.
8        And -- and then ultimately looked at
9    criteria that people recognize as useful for
10   assessing causation, which are labeled sometimes
11   Bradford Hill considerations, and then other
12   things too.
13       So besides that, then, you know, looking
14   at the quality of the studies in some cases. So,
15   for example, were there valid measures of -- of
16   exposure that were used, was there evidence for
17   confounding and bias, and so forth.
18       Q    All right.
19       A    Meaning especially those latters
20   aren't -- those latter factors aren't part of
21   Bradford Hill. Like he doesn't talk about, you
22   know, bias and confounding and validity of the
23   measures and so forth. So there's more to looking
24   at it than just Bradford Hill.
25       Q    Okay. So what was -- what were the

Page 240

1    search terms that you used in order to do your
2    literature review?
3        A    I didn't -- I didn't write them down,
4    but it -- you know, this didn't start as like a --
5    like a -- like there's been some searches that
6    I've been involved in where, you know, somebody
7    might commission a review of a particular topic,
8    and you have to figure out what those search terms
9    are.
10       In this case, there's a really good head
11   start because there's meta-analyses done and
12   there's some other -- some other papers. And so
13   what I tried to use was the words that the authors
14   used, you know, assuming that they would then link
15   up and find the other -- other articles.
16       So -- so like "ovarian cancer," "talc,"
17   "talcum powder," probably some -- you know, some
18   words like "risk" and "cause" and -- I think for
19   that part of it that was -- that was kind of the
20   bulk of it. There may have been other terms that
21   came up in some of the -- some of the articles
22   that I would search for also, but that -- that was
23   the main ones.
24       Q    Did you search for the word "cancer"?
25       A    Oh, well, "ovarian cancer."

Page 241

1        Q    Okay. Did you search for the word
2    "asbestos"?
3        A    I did, but differently -- so I did sort
4    of a separate search for that, which was "asbestos
5    and ovarian cancer." Same approach, but -- but
6    different -- I thought we were just talking about
7    the talcum powder at the moment.
8        But separately, I did a search for
9    "asbestos and -- and ovarian cancer." And -- and
10   just like for this issue of talcum powder, there
11   was a good head start from -- from IARC, at least
12   having identified several -- several key studies,
13   and then looked for more because there were
14   obviously some that they didn't cite or that
15   weren't available to them at the time that they
16   did their -- their review.
17       Q    Did you search for the word
18   "inflammation"?
19       A    I did, for -- part of the searches was
20   for inflammation.
21       Q    Okay.
22       A    I should say also -- I mean there's more
23   to it if you want, just a little bit more.
24       Q    No. Let me ask you a question first.
25       A    Okay.

Gregory B. Diette, M.D.

Page 242

1    Q   There's no question pending.
2        I assume you did a literature search
3  back in the early part of 2017 when you were first
4  retained, correct?
5    A   Correct.
6    Q   All right.  So did you update that
7  literature search?
8    A   Oh, yeah.
9    Q   Okay.  Did you keep -- do you keep some
10  kind of recordation of material you had before and
11  then what material you're looking at now for
12  purposes of this most recent report?
13    A   No, I mean it's not sorted by -- by when
14  I found it.
15    Q   All right.  You represented, at least in
16  your report, that you looked at the databases
17  Medline and Google.
18        Did you use any other databases for your
19  research?
20    A   Well, scholar -- Google Scholar as
21  opposed to just plain Google and then main Google
22  itself.  I don't remember if I used any others.
23    Q   Okay.  Where in your report do you share
24  your systematic review and collection of the
25  various literature that formed the bases of your

Page 243

1  opinion?
2    A   I didn't write that part, I don't think,
3  but it -- I do talk about the -- the methodology
4  in general.
5    Q   Okay.  Well, you talk about the
6  methodology on page -- I believe it's page 4, and
7  there's about two paragraphs there, and then on
8  the top of page 5, where there's just two full
9  paragraphs.
10        So my question is, where do you -- is
11  there anywhere else in your report that you set
12  forth your methodology --
13    A   Yeah.
14    Q   -- employed in order to --
15    A   Sure, other places --
16    Q   -- form the basis for your opinions?
17    A   Sorry, I didn't mean to interrupt.
18    Q   No, and what I'm saying --
19    A   Were you done?
20    Q   -- you have a methodology section --
21  let's start over.
22        You have a methodology section of your
23  report.  Is it fair that that is where you set
24  forth the methodology that you employ in this
25  case?

Page 244

1    A   Some --
2        MS. BROWN:  Objection to the form.
3        THE WITNESS:  Some of it.
4  BY MS. PARFITT:
5    Q   Okay.  And how did you select the
6  case -- the cases that became part of your list of
7  cases on page 13 and 14 of your report?
8    A   What does "cases" mean?
9    Q   Studies.  You have them listed on
10  page 13, and it carries over to page 14.
11    A   It's -- the way I describe it, I don't
12  think I got to finish answering the question about
13  the -- the rest of the methodology.  You'd have to
14  turn over to page 6, and in the section called
15  "Review of Epidemiology Data," there's a
16  description of what I just told you verbally just
17  a moment ago, which is talking about MedLine and
18  Google Scholar, and reviewed the reference list of
19  the individual studies and the meta-analyses to
20  assemble a complete list of studies, and then I --
21  it goes on.  That's not the whole paragraph
22  obviously, but that's the -- that's the general
23  method of how I found them.
24    Q   Okay.  And what process did you go
25  through to select or deselect certain pieces of

Page 245

1  literature that you reviewed?
2    A   Well, I -- I included all of the ones
3  that I could find.  I mean we're talking about the
4  epidemiologic studies.
5    Q   We are.  We are indeed, yeah.
6    A   So like in terms of the cohort studies,
7  there's only three I could find.  There's more
8  than three publications that pertain to the three,
9  but I included all three, and I included all the
10  publications I could find on the topic.
11        But the case-control study, a similar
12  approach, although there's a little bit of
13  confusion with the case controls because there's
14  overlap.  There is a redundant publication where
15  some authors are presenting the same data twice,
16  and it's not entirely clear how to unravel them.
17  So I just tried to include as many of those as I
18  could that looked like distinct studies, and I
19  tried to make sure I had the -- you know, the vast
20  majority of what was being considered in the
21  meta-analysis as well.
22    Q   I think where I'm going is, where do
23  you -- where do you tell the -- the reader what
24  your inclusion criteria was for selecting studies?
25        MS. BROWN:  Objection to the form.

Gregory B. Diette, M.D.

Page 246

1    THE WITNESS:  I tried to get them all.
2  I wasn't trying to exclude any studies.
3  BY MS. PARFITT:
4    Q  So every -- so may I assume from that
5  statement that all of the literature that you've
6  listed on page 13 and 14 in the cohort studies and
7  the meta-analysis is the entire body of literature
8  that you reviewed?
9    A  Of course not.
10    MS. BROWN:  Objection to the form.
11    THE WITNESS:  No, no, what -- well, I
12  guess, if you could, please be very precise what
13  you're asking.
14    To me what I think we're talking about
15  is the case-control studies and the cohort
16  studies, and so I tried to identify every single
17  one of them.  So I didn't have an exclusion
18  criteria to say I was going to ignore this one
19  because it wasn't supportive of my view or
20  something like that.  I included them all.
21    I searched for clinical trials, but
22  there weren't any.  So that was -- that was an
23  issue as well.
24  BY MS. PARFITT:
25    Q  Were there any studies that you chose

Page 247

1  not to include on your list of 13 and 14 that you
2  had actually reviewed during the course of your
3  study?
4    A  And we're talking about case-control
5  studies and cohorts.
6    Q  Correct.
7    A  I didn't -- wait a minute.  I didn't
8  deliberately not include any of them.  I tried to
9  include every single one, with that exception
10  being -- and I don't remember which ones were
11  which, but there were a couple that were
12  redundant.  You know, the -- the authors of these
13  haven't in every case been careful about reporting
14  findings that are unique.
15    Q  Okay.  Focusing now, if I may, on your
16  chart, page 13 and 14 of the case-control studies.
17    Do you have that in front of you?
18    A  Almost.
19    Q  Okay.
20    A  I do.
21    Q  All right.  Where in this document,
22  page 13 and 14, do you identify the number of
23  ovarian cases that formed the bases of the study?
24    MS. BROWN:  Objection to the form.
25    THE WITNESS:  This is the list of the --

Page 248

1  of the risk -- risk estimates, not of the number
2  of cases.
3  BY MS. PARFITT:
4    Q  Correct.  So where on this page 13 or 14
5  do you tell the reader how many ovarian cancer
6  cases were part of that study?
7    MS. BROWN:  Objection to the form.
8    THE WITNESS:  It's not on there.
9  BY MS. PARFITT:
10    Q  Okay.  Where on your list of cases, 13
11  and 14, do you tell the reader the number of
12  controls that were involved in that study?
13    A  I didn't -- I didn't list every single
14  thing like that on here.
15    Q  You didn't list it in your report
16  either, correct?
17    MS. BROWN:  Objection to the form.
18    THE WITNESS:  Well, this is the report.
19  BY MS. PARFITT:
20    Q  Well, you didn't list it anywhere else
21  other -- that information is not contained in your
22  report.  Is that fair?
23    MS. BROWN:  Objection to the form.
24    MR. LOCKE:  Objection.
25    THE WITNESS:  The sample size?

Page 249

1  BY MS. PARFITT:
2    Q  The sample size is not information that
3  you contained -- that you included in your report,
4  correct?
5    A  I did not.
6    MS. BROWN:  Same objection.
7  BY MS. PARFITT:
8    Q  Okay.  Where in your report do you tell
9  the reader the country from where these studies
10  came from?
11    MS. BROWN:  Objection to the form.
12    THE WITNESS:  I don't list that.
13  BY MS. PARFITT:
14    Q  Okay.  Where do you tell the reader what
15  the mean age of the participants in this study
16  were?
17    MS. BROWN:  Same objection.
18    THE WITNESS:  And same answer, I
19  don't -- I don't list that either.
20  BY MS. PARFITT:
21    Q  Where in your report do you tell the
22  reader the number of adjusted variables per study
23  that were considered?
24    MS. BROWN:  Objection to the form.
25    THE WITNESS:  I didn't -- I didn't

Gregory B. Diette, M.D.

Page 250

```
 1    capture that here.
 2    BY MS. PARFITT:
 3        Q    Okay.  And where in your report do you
 4    tell the reader the type of ovarian cancer that
 5    the women suffered?
 6        MS. BROWN:  Objection to the form.
 7        THE WITNESS:  That's not listed on -- on
 8    this table either.
 9    BY MS. PARFITT:
10        Q    Did you create this table yourself or
11    did you have assistance?
12        A    So, actually, I made this initially, and
13    there might have been a couple that filtered in
14    after I started to create it where -- you know,
15    where I had an assistant, you know, plug in a
16    different study.
17        Q    Where in your report do you tell the
18    reader if you applied a scoring system to the data
19    and the studies that you reviewed?
20        A    That wasn't --
21        MS. BROWN:  Objection.  Lacks
22    foundation.
23        THE WITNESS:  That wasn't my approach.
24    BY MS. PARFITT:
25        Q    Okay.  We'll talk about that in a
```

Page 251

```
 1    minute.  Appreciate that.
 2            Did you exercise any independent
 3    judgment in determining what cases to include on
 4    this chart of case-control studies on 13 and 14?
 5        MS. BROWN:  Objection.  Asked and
 6    answered.
 7        THE WITNESS:  I tried to be inclusive.
 8    BY MS. PARFITT:
 9        Q    Being inclusive -- did being inclusive
10    require you to exercise professional judgment with
11    regard to selection of the cases that you reviewed
12    and included for purposes of your analysis?
13        A    So, mostly, yes.  What I would say is I
14    was trying to understand what the universe was of
15    case controls that were being listed in the
16    meta-analyses, what the case controls were that
17    were informing the opinions of the plaintiffs'
18    experts.  And so I didn't want to have some
19    arbitrary rule for saying one shouldn't be in
20    here.  I wanted to look at them all.  And so my
21    goal was actually to include them all, and not
22    deselect some because I thought that there was a
23    quality issue with them.
24            (Brief interruption.)
25    BY MS. PARFITT:
```

Page 252

```
 1        Q    What specific, if any, in vitro studies
 2    did you consider for purposes of your opinion?
 3        A    So I -- are you good?
 4        Q    Yeah, thank you.
 5        A    Okay.  So I -- I don't know if you're
 6    including some animal studies as in vitro studies
 7    or whether you just mean sort of like ones that
 8    are -- that are cell-based or in a dish.
 9        Q    Well, there's a difference, isn't there?
10        A    There should be, yeah, but I just --
11    since you're asking the question, I don't know
12    you, and so I -- I just want to be clear.
13        Q    No, I'm -- I'm cognizant of the
14    difference between in vivo and in vitro, so what
15    I -- what I would ask you is what in vitro studies
16    did you consider for purposes of your analysis?
17        A    Yeah, I looked at some.  I think the
18    ones that were cited by IARC I looked at.  I don't
19    remember the full list of ones -- which ones I may
20    have listed, if any, that -- that I looked at.
21    But that wasn't really my main -- my main purpose
22    in looking at the epidemiology, which was to --
23    was to look at in vitro studies.
24        Q    Okay.  Was part of your analysis -- or
25    did part of your analysis include looking at
```

Page 253

```
 1    in vivo studies?
 2        A    So I looked at -- at a bunch of the
 3    different animal studies that were cited, cited in
 4    some of the other documents.
 5        Q    Which ones?
 6        A    So I don't remember the author names.  I
 7    mean, there were -- there were studies of, you
 8    know, rats, rabbits, primates.  I can't remember
 9    if there were mouse -- there were mouse studies as
10    well.
11            So whatever that list is that was in
12    IARC that they had considered at that point, and
13    then I think I found a couple more.
14        Q    What, if any, information did you glean
15    from your review of the in vitro and in vivo
16    studies that formed the basis of your study
17    report?
18        A    Well, mostly -- so to -- to think about
19    how -- for me as an epidemiologist, and not as a
20    cancer biologist or molecular biologist, I wanted
21    to just understand generally how some of the other
22    entities were wielding that information, right.
23    So that -- like I wasn't about to become a cancer
24    biologist in reading these things or understand
25    whether their methods were appropriate or not, but
```

Gregory B. Diette, M.D.

Page 254

1    I did want to understand some of their
2    underpinnings.
3        Q.   Okay.
4        A.   And just so, for example, right, so
5    there's the -- the studies on migration, for
6    example.  I thought it was important to look at
7    those and see what kind of animals, for example,
8    had what kind of particles either put into their
9    vaginas or put into their uterus, or whatever it
10   was, so I could understand what the -- what the
11   story was there.
12       Q.   Okay.  Do animals have vaginas?
13       A.   Some do, yeah.
14       Q.   You -- you indicated you're not a cancer
15   specialist.  Would you defer to -- on topics
16   involving those issues to a cancer biologist?
17           MS. BROWN:  Objection to the form of the
18   question.
19   BY MS. PARFITT:
20       Q.   And let me clean it up because I think I
21   left that off.  You are not a cancer biologist,
22   correct?
23       A.   Correct.
24       Q.   All right.  So would you defer questions
25   in that wheelhouse to someone who is a cancer

Page 255

1    biologist?
2            MS. BROWN:  Same objection.
3            THE WITNESS:  So I mostly don't think
4    about deferring my opinions to other -- other
5    people's categorically.  You know, so that I think
6    if there were somebody that was a cancer biologist
7    and they had an opinion that seemed credible, I
8    would take it into account.  But to the extent
9    that I needed to understand something, I would
10   still rely on my own -- my own background and
11   knowledge.
12   BY MS. PARFITT:
13       Q.   All right.  You're not a -- a molecular
14   specialist, correct?
15           MS. BROWN:  Objection.
16           THE WITNESS:  Not a molecular biologist.
17   BY MS. PARFITT:
18       Q.   Okay.  I believe you stated in your
19   report that you were deferring to other experts in
20   this case as it pertains to the opinions that
21   Dr. Saed has given; is that correct?
22           MS. BROWN:  Objection to the form.
23   Counsel, is there a part of the report you're
24   referring to?
25           MS. PARFITT:  Mm-hmm, there is.

Page 256

1            MS. BROWN:  What report is --
2            MS. PARFITT:  Saed.
3    BY MS. PARFITT:
4        Q.   Just give me a moment, Doctor.
5            If you turn your attention to page 42.
6        A.   Mm-hmm.
7        Q.   At the bottom.
8        A.   Okay.
9        Q.   "I leave a detailed assessment of
10   Dr. Saed's efforts to other experts.  I did review
11   Dr. Saed's report and his two depositions and was
12   struck by the irregularities in his study, which
13   render his results highly questionable."
14           So are you or are you not deferring with
15   regard to opinions concerning what Dr. Saed had to
16   say?
17           MS. BROWN:  Objection.  Misstates the
18   expert report and the opinion.
19           THE WITNESS:  I -- I meant to be
20   somewhat nuanced here, right, which is that -- you
21   know, it's possible for me to read things and
22   understand that there might be some issues with
23   what he's done.  I -- I'm not going to be the
24   person to critique the biologic aspects of his
25   work, though.

Page 257

1    BY MS. PARFITT:
2        Q.   Okay.  Fair enough.  In fact, let me ask
3    you, have you read the published scientific
4    article by Dr. Saed?
5        A.   Not yet.
6        Q.   Okay.  Do you have any plans to do that?
7        A.   I might.  I might, because I was just --
8    I was curious because I saw some of the -- like
9    the expert reports that came in after I wrote my
10   report, and there were things that just kind of
11   struck me that would be worth trying to sort
12   through, like whether he had changed like 48 to 36
13   or -- yeah, 48 hours to 72 hours, whatever it was,
14   that there were like some tables apparently that
15   were the same as an original paper, that the only
16   change was like the numbers on them.  And so just
17   to sort of understand the quality issues related
18   to the study, I thought I might take a look at it.
19       Q.   All right.  But prior to preparing your
20   expert report, and, frankly, this deposition
21   today, you have not read either Dr. Saed's -- you
22   have not read Dr. Saed's most current peer-
23   reviewed paper, correct?
24       A.   True for both time periods.  I don't
25   think it was published or available to me before I

Gregory B. Diette, M.D.

Page 258

```
 1    did the report, but I could be wrong.
 2        Q   Well, it's available now, isn't it?
 3        A   That's what I've heard.
 4            MS. BROWN:  Objection to the form.
 5    BY MS. PARFITT:
 6        Q   But you've not seen it.
 7        A   No.  I just -- I mean like -- I mean
 8    it -- sorry, it's the way I think.  It sounds like
 9    two different time periods.  One was --
10        Q   No.
11        A   -- before the report and one was between
12    then and now.
13        Q   No, my question goes --
14            MS. BROWN:  Wait, he's finishing.  Let
15    him finish.
16    BY MS. PARFITT:
17        Q   My question -- are you done?
18        A   I'm good.
19        Q   My question really goes to, is it fair
20    to say that you have not read Dr. Saed's published
21    peer-reviewed article at the time of your
22    deposition?
23        A   That is correct.
24            THE WITNESS:  Sorry.
25            MS. BROWN:  That's all right.
```

Page 259

```
 1    BY MS. PARFITT:
 2        Q   Okay.  Now, you've mentioned IARC a
 3    couple of times during the course of your
 4    testimony.
 5            Have you rereviewed the IARC
 6    monograms -- or the IARC monogram that was
 7    published in 2010 on silica?
 8            MS. BROWN:  The monograph?
 9            MS. PARFITT:  The monograph.  Monograph.
10            MS. BROWN:  Monograph on talc?
11            MS. PARFITT:  On talc, mm-hmm.
12            THE WITNESS:  Did you just say silica or
13    no?
14    BY MS. PARFITT:
15        Q   I did say silica.  I meant talc.
16        A   You meant talc.  Yeah, I've read the
17    talc one.
18        Q   You've read the talc one.  Have you read
19    the 2012 monograph, the one 100C, have you seen
20    that?
21        A   I have.
22        Q   Okay.  Have you read any other
23    monographs on talc or asbestos?
24        A   I've read earlier ones on asbestos.  I
25    don't know of any other ones on talc, I don't
```

Page 260

```
 1    think, but I've certainly read other -- I mean
 2    others that aren't on either of those topics.
 3        Q   Would you agree -- would you agree that
 4    IARC is a well-respected scientific organization?
 5            MS. BROWN:  Object -- I'm sorry.  I
 6    didn't hear the question.
 7    BY MS. PARFITT:
 8        Q   Would you agree that IARC is a well-
 9    respected scientific organization?
10            MS. BROWN:  Objection to the form.
11            THE WITNESS:  It's -- it's hard for me
12    to characterize whole organizations, you know, in
13    terms of whether they're well respected or by whom
14    or when, but generally speaking, you know, they --
15    they do produce some -- some credible documents.
16    BY MS. PARFITT:
17        Q   They do produce some credible documents.
18            It's -- IARC is part of the World Health
19    Organization, correct?
20        A   It is.
21        Q   Okay.  And when IARC has its meetings to
22    discuss classification of carcinogens, it invites
23    world-renowned experts for whatever area and
24    specialty is being discussed.  Is that fair?
25            MS. BROWN:  Objection to the form.
```

Page 261

```
 1            MR. LOCKE:  Objection.
 2            MS. BROWN:  Calls for speculation.
 3            THE WITNESS:  I don't know their
 4    selection process, but they -- but they certainly
 5    invite -- invite people to attend.
 6    BY MS. PARFITT:
 7        Q   Okay.  Have you ever been invited to
 8    attend an IARC --
 9        A   I have not.
10        Q   -- working group?
11        A   No.
12        Q   Okay.  Did IARC invite you to attend
13    their working group back in 2006 when they were
14    deliberating on the issue of talcum -- talc
15    products?
16            MS. BROWN:  Objection.  Same question,
17    asked and answered.
18            THE WITNESS:  She's right, but -- but
19    no.
20    BY MS. PARFITT:
21        Q   Okay.  Did IARC ever invite you to
22    attend and share your opinions when they had their
23    asbestos meetings?
24            MS. BROWN:  Same objection.
25            THE WITNESS:  No.
```

66 (Pages 258 to 261)

Gregory B. Diette, M.D.

Page 262

1  BY MS. PARFITT:
2      Q   Do you know what the NTP is?
3      A   It's like the National Toxicological
4  Program.
5      Q   Okay.  Has the National Toxicological
6  Program ever asked you to do research for them on
7  talcum powder products?
8      A   No.
9      Q   Has the National Toxicology Program ever
10  asked that you do research with them on asbestos?
11      A   No.
12      Q   Have you ever submitted any research to
13  the NTP on anything?
14      A   No.
15      Q   Have you ever submitted any research to
16  IARC on anything?
17      A   No.
18      Q   What is a risk factor?
19      MS. BROWN:  Objection to the form.
20      THE WITNESS:  Are we talking about like
21  an epidemiologic definition?
22  BY MS. PARFITT:
23      Q   Just generally, what's a risk factor?
24      MS. BROWN:  Objection.
25      THE WITNESS:  Well, I don't -- you said

Page 263

1  generally.  It could mean a million things to
2  different people.
3  BY MS. PARFITT:
4      Q   What's it mean to you?
5      A   It depends upon the context.  That's why
6  I'm asking from like an epidemiologic standpoint
7  as opposed to some other context.
8      Q   Well, let's take mesothelioma.  What are
9  the risk factors for mesothelioma?
10      A   Well, if we're talking about, you know,
11  asbestos, for example, as one risk factor, then
12  you could use it that way, that -- that an
13  exposure elevates the risk of developing a
14  disease.
15      Q   Okay.  Let's take talcum powder.  Is
16  talcum powder a risk factor for ovarian cancer?
17      A   I don't believe so.
18      Q   Are there risk factors that are
19  modifiable?
20      MS. BROWN:  Objection to the form.
21      THE WITNESS:  For what?
22  BY MS. PARFITT:
23      Q   For a disease.
24      MS. BROWN:  Same objection.
25  BY MS. PARFITT:

Page 264

1      Q   For instance, if -- is talcum powder a
2  modifiable behavior -- the use of talcum powder a
3  modifiable behavior?
4      MS. BROWN:  Objection.  Misstates his
5  prior testimony.
6      THE WITNESS:  So it -- it should be,
7  yeah.
8  BY MS. PARFITT:
9      Q   Okay.  Now, Dr. Diette, your paper or
10  your expert report was signed and executed by you
11  on February 25th, 2019.
12      A   Correct.
13      Q   Okay.  When did you actually finish the
14  paper, the report?
15      A   Oh, I think about then.  I mean --
16      Q   About then?
17      A   I think around then.  I mean it's -- I
18  don't know whether it was the day before or the --
19  or that actual day, but -- but right around then.
20      Q   Okay.  Are you aware that -- I guess it
21  was just a couple of months earlier that Health
22  Canada issued and published a critical review and
23  assessment of the science, which actually included
24  a comprehensive review of the epidemiological
25  literature?  Did you know that?

Page 265

1      MR. LOCKE:  Objection.
2      MS. BROWN:  Objection.  That misstates
3  the draft assessment.
4      THE WITNESS:  I'm familiar with it.
5  BY MS. PARFITT:
6      Q   Okay.  Have you read it?
7      A   I have.
8      Q   Have you read it in its entirety?
9      A   I don't remember if there's like
10  appendices or something, but I read all the -- you
11  know, the mean part of the text.
12      Q   Okay.  There is also meta-analysis that
13  was performed about that same time.
14      A   Yes.  Yeah.
15      Q   Have you read that?
16      A   I have.
17      Q   Okay.  Did Health Canada do what we
18  would refer to in your world of epidemiology a
19  causality assessment?
20      MS. BROWN:  Objection to the form of the
21  question.
22      THE WITNESS:  I don't know if that's
23  what they did.
24  BY MS. PARFITT:
25      Q   What did they do?

67 (Pages 262 to 265)

Gregory B. Diette, M.D.

Page 266

1    MS. BROWN:  Objection.
2    THE WITNESS:  It looks to me as if they
3  create -- well, so I don't know.  So they -- they
4  have their own process.  I don't know anything
5  about Health Canada, so I don't know what they
6  typically do.  You know, I've never -- it's unlike
7  some other entities where I would kind of
8  understand their process because I've read their
9  things before.
10    I don't -- I don't know anybody
11  personally that looks to Health Canada for
12  information, so I've never had a conversation with
13  anybody about, you know, what their methods are,
14  how they go about their business.
15    But it looks as if what they were trying
16  to do was to try to line up whether there was
17  information about where talcum powder is found in
18  Canada, so meaning like, you know, how many
19  different kinds of products.  It looked like they
20  were trying to assess some things about dermal
21  absorption or not, whether it's ingested or not,
22  whether it's inhaled, whether perineal application
23  matters or not.
24    It seems that they commissioned yet
25  another meta-analysis of some sort by Dr. Taher,

Page 267

1  and -- and then created the document that I guess
2  that they put out there for -- for public comment
3  of some sort.
4  BY MS. PARFITT:
5    Q  Okay.  All right.  Let's have marked the
6  Health Canada report, the draft assessment.  And
7  we'll have that marked as Exhibit No. 14.
8    (Diette Exhibit No. 14 was marked
9    for identification.)
10    (Counsel conferring.)
11  BY MS. PARFITT:
12    Q  Do you have that in front of you?
13    A  I do.
14    Q  Okay.  All right.  Did the -- did Health
15  Canada look at all three types of study designs?
16  And by that, I mean case control, cohort, and
17  meta-analyses.
18    MS. BROWN:  Objection to what you mean
19  by "look at."  Objection to the form.
20    THE WITNESS:  They've listed -- they've
21  listed some of each.
22  BY MS. PARFITT:
23    Q  All right.  So they consider for
24  purposes of their analysis cohort studies,
25  case-control studies and meta-analyses.  Is that

Page 268

1  fair?
2    MS. BROWN:  Objection to the form.
3    THE WITNESS:  That looks to be part of
4  what they've included in here.
5  BY MS. PARFITT:
6    Q  And you yourself, for purposes of your
7  report, looked at case-control studies, cohort
8  studies, and meta-analyses, correct?
9    A  I did.
10    Q  Okay.  Did Health Canada perform a
11  Bradford Hill assessment of the evidence?
12    MS. BROWN:  Objection to the form.
13    THE WITNESS:  They have a section here.
14  I mean, there's something here that -- that
15  resembles a Bradford Hill analysis.
16  BY MS. PARFITT:
17    Q  Okay.  Let me direct your --
18    MS. BROWN:  Take as long as you need,
19  Doctor, to finish your answer.
20    THE WITNESS:  Well, I just -- like I
21  don't know -- I don't know how much leeway there
22  is in the world for people to say that they did a
23  Bradford Hill analysis just by listing out certain
24  keywords, right?  I mean it's sort of like a word
25  salad exercise to me for some of these cases, and

Page 269

1  so --
2  BY MS. PARFITT:
3    Q  I'm sorry.  A word what?
4    A  Word salad.
5    Q  Word salad.
6    A  Yeah.  Not a technical term, but it's
7  kind of a mess, right.  So they've got -- like on
8  page 19, they've got strength, and strength is a
9  Bradford Hill criterion.  They don't say whether
10  the risk is, you know, weak or strong.  They just
11  have a list of 30 epidemiologic studies, and they
12  say a couple things about some of them being
13  statistically significant and -- and so forth.
14    Q  Okay.
15    A  And so that -- that isn't really a
16  Bradford Hill type analysis about what the --
17  whether the strength is high or low.
18    And similarly, I would just say like,
19  you know, for temporality, you know, what they've
20  said here is crazy, right.  So it's like --
21    Q  I'm sorry.  What they've said here is
22  what?
23    A  Crazy.
24    Q  Crazy.
25    A  Crazy.

Gregory B. Diette, M.D.

Page 270

1    Q   So let me just ask --
2        MS. BROWN:  Wait now, he is not done.
3    You can follow up when he is done with --
4        MS. PARFITT:  Fair enough.
5        MS. BROWN:  Go ahead, Doctor.
6    BY MS. PARFITT:
7    Q   Okay.  Crazy.
8    A   Okay.  Oh, well, they said like in all
9    case-control studies reporting positive outcomes,
10   the participants recalled the exposure to talc
11   preceded the reported outcome.  I mean that is so
12   far afield from any realistic epidemiologic
13   principle that to say that that somehow informs a
14   Bradford Hill analysis -- I don't know, maybe
15   "crazy" is the wrong word.  Maybe absurd, maybe
16   ridiculous.  But every person in the world that
17   has a particular event or outcome, everything
18   about them preceded them.  That isn't the same as
19   temporality.  Temporality in the epidemiologic
20   world is demonstrating that time flowed from the
21   time of the exposure.
22       So, that's why I say like -- you know, I
23   read the words here, I see consistency,
24   specificity, and so forth, but I don't think their
25   application to this is actually a legitimate

Page 271

1    Bradford Hill analysis.
2    Q   All right.  So it's absurd, it's crazy,
3    and your opinion is that they did not do a proper
4    Bradford Hill analysis.  Is that your opinion?
5    A   It is.
6        MR. LOCKE:  Objection.
7        MS. BROWN:  Objection to the form.
8    BY MS. PARFITT:
9    Q   Okay.  All right.  Let me direct -- did
10   they -- let me direct your attention to page 21.
11   And we'll put that up on the ELMO.
12       All right.  Do you see that?  Okay?
13   A   I'm on page 21.
14   Q   Page 21, and it's the last paragraph,
15   and I'll read it.
16       "The most recent meta-analysis detailed
17   above, Taher, et al., 2018, and consistent with
18   the Hill criteria, suggests a small but
19   consistently statistically significant positive
20   association between ovarian cancer and perineal
21   exposure to talc.  Further available data are
22   indicative of a causal effect.  A clear point of
23   departure could not be derived from the available
24   literature.  Consequently, hazard characterization
25   is qualitative in nature."

Page 272

1        Did I read that correctly?
2        MS. BROWN:  You didn't, and actually you
3    said "consistently" and the word is "consistent."
4        MS. PARFITT:  Thank you.
5    BY MS. PARFITT:
6    Q   Did I read that correctly with that
7    correction?
8    A   Yes.
9    Q   Okay.  Do you see where the authors
10   state that, "Further available data are indicative
11   of a causal effect"?  Do you see that?
12   A   I do.
13   Q   Do you agree with Health Canada that
14   there was a causal effect drawn from the genital
15   use of talcum powder products and ovarian cancer?
16       MS. BROWN:  Objection to the form,
17   misstates the draft assessment, lacks foundation.
18       THE WITNESS:  I don't think so, but for
19   the reason that -- being that this is -- this is
20   at some level -- maybe it's a summary, I don't
21   know -- of what they have from above.  But their
22   input information into what they're concluding
23   here is not good.  Right.
24       I mean look -- look up a couple of
25   sentences under "Biologic plausibility," and they

Page 273

1    say:  "The presence of talc in the ovaries has
2    been documented," and cite Heller.  And they say,
3    "The evidence of retrograde transport supports the
4    biologic plausibility."
5        That Heller study doesn't -- doesn't
6    support that, right.  So they're -- they're
7    stringing things together here that don't
8    literally support I think a conclusive statement
9    here.
10       And also I would just say too, that when
11   they say that -- that with the last part of that
12   part you read where it says that "The hazard
13   characterization is qualitative in nature," well,
14   "qualitative" doesn't tell you something about
15   whether it's a strong association.  I mean they --
16   they've resisted using that -- that word here.
17   BY MS. PARFITT:
18   Q   Okay.  So my question for you,
19   Dr. Diette, is do you disagree with the draft
20   Health Canada assessment which found that there
21   was a causal relationship between the use of
22   genital talcum powder products and ovarian cancer?
23       MS. BROWN:  Objection.  That's not what
24   the draft assessment --
25       MS. PARFITT:  Counsel, objection, form.

69 (Pages 270 to 273)

Gregory B. Diette, M.D.

Page 274

```
 1            MS. BROWN:  You're -- it misstates the
 2   document intentionally attempting to mislead the
 3   witness.
 4            MS. PARFITT:  Objection.
 5            THE WITNESS:  So I -- first of all,
 6   so --
 7   BY MS. PARFITT:
 8       Q   And, Doctor, let me just say something.
 9   You can explain, but -- I have a question, and
10   then you can explain it if you wish.
11            And my question is, do you disagree with
12   the draft Health Canada assessment which found or
13   concluded that there was a causal relationship
14   between the use of genital talcum powder product
15   and ovarian cancer?
16            MR. LOCKE:  Objection.
17            MS. BROWN:  Objection to the form.
18            You can answer it truthfully and
19   accurately.
20            THE WITNESS:  I can't answer it.
21   BY MS. PARFITT:
22       Q   You can't -- wait one second.
23       A   I cannot answer it.
24       Q   You can't answer the question as to
25   whether or not you agree that they concluded that
```

Page 275

```
 1   there was a causal relationship between talcum
 2   powder products and ovarian cancer?
 3       A   So that --
 4            MS. BROWN:  Objection to the form,
 5   misstates the document.
 6            Go ahead, Doctor.
 7            THE WITNESS:  Yeah, your question has
 8   morphed, right.  And so I'm still stuck on the way
 9   it came out when you first said it.
10   BY MS. PARFITT:
11       Q   Then let's go -- we'll go with the one
12   the --
13            MS. BROWN:  Wait, let him finish.
14            MS. PARFITT:  No.  Excuse me.
15            MS. BROWN:  Counsel, you've been doing
16   that all day.  You cannot cut this witness off.
17   He needs to finish.
18            MS. PARFITT:  I'm not -- he asked for
19   what question I wanted to ask, so let me ask it
20   again.
21   BY MS. PARFITT:
22       Q   Do you have -- is it -- do you -- strike
23   that.
24            Do you agree or disagree with Health
25   Canada and their assessment of causality between
```

Page 276

```
 1   talcum powder products used in the genital area
 2   and ovarian cancer?  That's the question.
 3            MS. BROWN:  Objection to the form of the
 4   question, misstates the document --
 5   BY MS. PARFITT:
 6       Q   You may answer.
 7       A   Is there a specific sentence in there
 8   that says that?
 9       Q   It's the question that I've asked you.
10       A   Oh, so I can't answer it.  I can answer
11   the --
12       Q   Is there a specific question --
13            MS. BROWN:  Wait, wait, let him finish.
14   BY MS. PARFITT:
15       Q   -- 20, 21, 28, and Roman numeral iii?
16            MS. BROWN:  What?
17            THE WITNESS:  If there's a specific
18   sentence that says that, and you want me to agree
19   or disagree, I can agree or disagree with that
20   sentence.
21            What I can't agree with is an entire
22   document because I think it's not fair.  I'm not
23   talking about just this one.  I think, you know,
24   lawyers like to do this, right.  They like to say,
25   Do you agree with a such-and-such paper.  Well,
```

Page 277

```
 1   it's nonsense.  You don't agree with the paper.
 2   You agree with the finding or you agree with the
 3   conclusion, but not with the entire thing.
 4            So here what I'm saying is, there's an
 5   entire document here.  There's some good stuff and
 6   some bad stuff, and I can point out some of --
 7   some of each.
 8            But the point here is if there's a
 9   specific statement that they made that says --
10   about causation, I would just like to see that
11   particular statement and tell you whether I can
12   agree with it or not.
13   BY MS. PARFITT:
14       Q   Well, look at page 28 -- or excuse me,
15   21, the page we were on.
16            Do you have that in front of you?
17       A   I do.
18       Q   Okay.  "Available data are
19   indicative" --
20            MS. BROWN:  Counsel, where are you?
21            MS. PARFITT:  It's the paragraph just
22   above "Exposure Assessment."  It says the recent
23   -- we just read it.
24   BY MS. PARFITT:
25       Q   "The most recent meta-analysis detailed
```

70 (Pages 274 to 277)

Gregory B. Diette, M.D.

Page 278

1 above, Taher, and consistent with the Hill
2 criteria, suggests a small but consistent
3 statistically significant positive association
4 between ovarian cancer and perineal exposure to
5 talc. Further available data are indicative of a
6 causal effect."
7         MS. BROWN: What's the question?
8 BY MS. PARFITT:
9    Q   Do you agree with the conclusions of
10 Health Canada?
11        MS. BROWN: Objection to the form. This
12 is not the conclusion section.
13        THE WITNESS: So, first of all, the --
14 the first sentence that you read there talks about
15 a significant positive association, which isn't
16 the same as cause. Right. And then they say,
17 "Further available data are indicative of..."
18        I -- I think if you're trying to say
19 that something causes something, you come out and
20 you say it. You don't say, "Further data are
21 indicative of it." So I -- I don't think this
22 statement says talcum powder causes ovarian
23 cancer.
24 BY MS. PARFITT:
25    Q   Okay. So your quarrel with Health

Page 279

1 Canada is the fact that they didn't say it, Talcum
2 powder products used in the genital area cause
3 ovarian cancer.
4    A   Well --
5    Q   You quarrel with their language. Is
6 that what you're saying?
7    A   Well, I quarrel --
8        MS. BROWN: Objection. Misstates his
9 testimony.
10        THE WITNESS: I quarrel a little with
11 you, I think -- I'm sorry.
12        THE REPORTER: I'm sorry, your --
13        MS. BROWN: I just want to object to the
14 question as misstating your testimony.
15        THE WITNESS: Because I think your
16 initial question before you read it literally was
17 about whether or not they said that it causes it,
18 and I don't think that it said that.
19        And -- and I think otherwise that there
20 are some flaws in the -- in the information that
21 they've used up above to reach this -- I guess
22 it's a conclusion. I don't know if it is or not.
23 BY MS. PARFITT:
24    Q   Okay. Does it say, "Further available
25 data are indicative of a causal effect"?

Page 280

1    A   That sentence is there.
2    Q   All right. Okay.
3        MS. BROWN: Counsel, if you're moving to
4 another area, would --
5        MS. PARFITT: I am.
6        MS. BROWN: Would this be a good time
7 for a break?
8        MS. PARFITT: Yeah. I'm going to move
9 on and change gears.
10        THE VIDEOGRAPHER: The time is 1:52
11 p.m., and we are off the record.
12        (Recess.)
13        THE VIDEOGRAPHER: The time is
14 2:04 p.m., and we're back on the record.
15 BY MS. PARFITT:
16    Q   Dr. Diette, you mentioned before the
17 break the Heller article, and so I don't misquote
18 you, what was your position with regard to Heller
19 and what it stood for?
20    A   I think if we're talking about the --
21 the right one, it's the one where the ovaries were
22 removed from, I think, 24 women, and that 12 -- 12
23 had said that they were talcum powder users and 12
24 not, but they found a -- they found a similar
25 amount of talc in ovaries regardless of whether

Page 281

1 they were users or not.
2    Q   Okay. Is -- is it your opinion that
3 talc cannot migrate to the ovaries?
4    A   I don't know that it can. I -- if it's
5 found there, I'm not sure how it got there.
6    Q   Is it your opinion that asbestos can
7 migrate to the ovaries?
8        MS. BROWN: Objection to the form.
9        THE WITNESS: I've seen -- I don't think
10 I've seen anything that shows for sure that it
11 can.
12 BY MS. PARFITT:
13    Q   Okay. If asbestos was found in the
14 ovaries, how would it get there?
15        MS. BROWN: Objection to the form.
16        THE WITNESS: So I don't know. I mean,
17 it's -- I don't know of a worked-out mechanism
18 that shows how it got there.
19        (Diette Exhibit No. 15 was marked
20        for identification.)
21 BY MS. PARFITT:
22    Q   Let me show you what's been marked as
23 Heller Exhibit No. 15. And it is a 1996 article
24 entitled "Asbestos Exposure and Ovarian Fiber
25 Burden."

71 (Pages 278 to 281)

Gregory B. Diette, M.D.

Page 282

1        (Counsel conferring.)
2    BY MS. PARFITT:
3        Q   Do you have that in front of you?
4        A   I do.
5        Q   All right.  Now, this was a different
6    Heller article than the one you were referring to?
7        A   Thank you, yes.
8        Q   Okay.  All right.  Now, let me direct
9    your attention to the Abstract section, the last
10   paragraph.
11       Okay.  And it states:  "This study
12   demonstrates that asbestos can reach the ovary.
13   Although the number of subjects is small, asbestos
14   appears to be present in ovarian tissue more
15   frequently and in higher amounts in women with a
16   documentable exposure history."
17       Did I read that correctly?
18       A   Yes.
19       Q   All right.  Do you agree with that
20   statement?
21       MS. BROWN:  Objection to the form.
22       THE WITNESS:  Give me one sec, because
23   I -- it's been a while since I looked at this.
24       MS. BROWN:  Take your time, Doctor.
25       THE WITNESS:  (Peruses document.)  Yeah,

Page 283

1    again, like -- so not entirely.
2    BY MS. PARFITT:
3        Q   What part -- what part --
4        MS. BROWN:  Let him finish.
5    BY MS. PARFITT:
6        Q   What part do you agree with?
7        A   Well, the -- I think that it's -- it's
8    not -- well, so the study demonstrates that
9    asbestos can reach the ovary.  I guess if it's
10   definitely there, then -- and it got there somehow
11   and it wasn't through contamination, you know, of
12   the procedure that -- that led to it, you could --
13   you know, you could infer that there's some way
14   that it got there.
15       I think it doesn't tell us anything
16   about how to make sense of that.  And what I was
17   looking for that I remember is that they said that
18   it's unclear why so many women giving no exposure
19   history did have detectible asbestos in their
20   ovaries.
21       Q   Where do you see that?
22       A   I'm sorry.  I'm on 439.
23       Q   Thank you.
24       A   And in the Conclusion paragraph.
25       Q   Mm-hmm.  Yes.

Page 284

1        A   And it's about the middle of the
2    paragraph, and it says it is -- it says --
3    above it, it says:  "None of the exposed subjects
4    in the study was directly occupationally exposed
5    but all were passively exposed to household
6    contact.  It is unclear why so many of the women
7    giving no exposure history did have detectible
8    asbestos in their ovaries, although it is known
9    that there is a background level of asbestos in
10   the lung tissue of non-exposed individuals."
11       So I -- I don't know.  I just don't --
12   that this -- this cements the idea that -- that we
13   know something about how asbestos, you know, can
14   get to the ovaries.
15       Q   All right.  Let me direct your attention
16   to the bottom of 438, top of 439.
17       At the bottom of 438, it says "There
18   is," and then it goes on to the top of 439:
19   "There is evidence of transport of particulate
20   matter into the female perineum by the
21   transvaginal route."
22       A   I apologize, I -- I'm not with you, and
23   I just --
24       Q   Oh, sure.
25       A   I'm just trying to --

Page 285

1        Q   It's right here, upper corner, 439.
2        A   Got you.
3        Q   Okay?
4        A   Yep.
5        Q   All right, again.  "There is evidence of
6    transport of particulate matter into the female
7    perineum by the transvaginal route in both human
8    and animal studies."  It cites Egli and Newton,
9    1961.  It cites Henderson, 1986; Venter -- and I'm
10   sure I'll destroy this name -- Iturralde, 1979;
11   Whittemore, 1988.  "Suggested that vaginal
12   exposure to particulate matter such as asbestos
13   and talc was a potential risk factor for
14   intraperitoneal ovarian exposure.  Her conclusion
15   was based on finding that in talc exposed women, a
16   previous history of hysterectomy or tubal
17   ligation, which blocks perineum access, was
18   protective against ovarian cancer."
19       It goes on to say:  "Talc has been
20   implicated as a possible etiological agent in
21   ovarian cancer," citing Harlow '89 and '92, "and
22   is related to the asbestos problem in several
23   ways.  Aside from the chemical similarities
24   between the two, many cosmetic talcs contained
25   significant amounts of asbestos, particularly

72 (Pages 282 to 285)

Gregory B. Diette, M.D.

Page 286

1  prior to '70 -- 1976, Cramer, 1982. The
2  significance of this detection of talc in the
3  majority of exposed women and in all women giving
4  no exposure history is unclear and further studies
5  are underway to further elucidate this question."
6        Did I read that correctly?
7     A  Yes.
8     Q  Question:  Are there chemical
9  similarities between cosmetic talcs and asbestos?
10       MS. BROWN:  Objection to the form.
11       THE WITNESS:  So some of the same --
12  some of the same features chemically are present
13  in both.
14  BY MS. PARFITT:
15    Q  All right.  Set that aside for a minute.
16  We may come back to that.
17       Dr. Diette, for purposes of your
18  opinions in this case, you have stated that the
19  cohort studies lack statistical significance, and
20  only a subset of the case-control studies are
21  statistically significant.  Therefore, there is a
22  disparity and inconsistency between cohorts and
23  case control.
24       Have I summed it up pretty well?
25    A  That -- that's one of the -- one of the

Page 287

1  bits of evidence of inconsistency.
2     Q  Okay.  Would you agree that to disregard
3  study results based upon whether they are
4  statistically significant or not statistically
5  significant would be a mistake?
6        MS. BROWN:  Objection to the form.
7  Counsel, is there something you're reading from
8  that --
9        MS. PARFITT:  No.  Actually, my notes,
10  and he doesn't get those.  Thank you.
11       THE WITNESS:  Okay.  So "disregard" is
12  pretty severe.  Right.  So I don't think that
13  somebody should disregard any study, unless it's,
14  you know, fraudulent or, you know, created out of
15  nowhere.  So I think that people should regard the
16  findings and interpret them appropriately.
17       So I think that would be an overly
18  strong thing to do, which would be to disregard it
19  simply because it's statistically insignificant.
20  BY MS. PARFITT:
21    Q  Okay.  Do you know who Ken Rothman is?
22    A  I -- I know of him.  I don't know him
23  personally.
24    Q  Okay.  What does he do for a living?
25       MS. BROWN:  Objection to the form.

Page 288

1        If you know.
2        THE WITNESS:  Can I assume or --
3        MS. BROWN:  No, if you don't know, don't
4  answer.  Then you have no basis to answer the
5  question.
6  BY MS. PARFITT:
7     Q  My question is, do you know what Ken
8  Rothman's area of expertise is?
9        MS. BROWN:  Objection.
10       THE WITNESS:  Well, he's -- he's made a
11  career out of -- out of case-control studies and
12  articulating, you know, features of the design and
13  so forth.
14  BY MS. PARFITT:
15    Q  All right.  Is he an epidemiologist?
16    A  Well, that's what I was trying to
17  remember.  Like, I would use to be guessing.  Like,
18  I assume for him to be in that role, he would be,
19  but there are people that come to epidemiology
20  from other -- you know, other backgrounds, and so
21  I just don't know his credentials.
22    Q  Okay.  What about Sander Greenland, do
23  you know who he is?
24    A  I know the name, but I don't know him.
25    Q  Okay.  Have you ever -- do you know what

Page 289

1  kind of scientist Sander Greenland is?
2        MS. BROWN:  Objection.  Form.
3        THE WITNESS:  I do not.
4        MS. BROWN:  Foundation.
5  BY MS. PARFITT:
6     Q  Okay.  All right.  Do you know Timothy
7  Lash?
8        MS. BROWN:  Objection.  Foundation.
9        THE WITNESS:  I don't know the name.
10  BY MS. PARFITT:
11    Q  Okay.  Do you know what kind of
12  scientist Tim -- Timothy Lash is?
13       MS. BROWN:  Same objection.
14       THE WITNESS:  It would be hard to know
15  that --
16  BY MS. PARFITT:
17    Q  Okay.
18    A  -- without knowing him.
19    Q  Okay.  Let me show you what we will have
20  marked as Exhibit No. -- 61?  16.
21       MR. TISI:  We're not that high.
22       (Diette Exhibit No. 16 was marked
23        for identification.)
24  BY MS. PARFITT:
25    Q  And I will -- and I will represent,

Gregory B. Diette, M.D.

Page 290

1    Dr. Diette, that this is Chapter 2 out of the
2    Third Edition, Modern Epidemiology.
3         Do you see that?
4         A   I do.
5         Q   Okay.  And if you look at the front of
6    it, it has three authors.
7         Do you see that?
8         A   I do.
9         Q   Okay.  The first one is Ken Rothman.  Do
10   you see that?
11        A   Correct.
12        Q   The second one is Sander Greenland.
13        A   Correct.
14        Q   And the third author is Tim Lash.  Do
15   you see that?
16        A   I do.
17        Q   And they are -- the book that they have
18   authored is called Modern Epidemiology, Third
19   Edition.  Do you see that?
20        A   I do.
21        Q   Okay.  Let me -- let me direct your
22   attention to page 27.
23        MS. BROWN:  Counsel, are you going to
24   lay a foundation for the use of this document?
25        MS. PARFITT:  I can just ask a question.

Page 291

1    I can do that.
2    BY MS. PARFITT:
3         Q   Let me ask a question.
4         "To claim that literature, scientific
5    literature, or a set of results reported in
6    scientific literature is inconsistent simply
7    because some results are statistically
8    significant, and some are not, would be completely
9    fallacious, even if one accepts the use of
10   significant testing methods."
11        Do you agree with that statement?
12        MR. LOCKE:  Objection.
13        MS. BROWN:  Objection.  Form,
14   foundation.
15        THE WITNESS:  Is that a hybrid of a
16   couple of things?  Because I thought I was reading
17   with you, and then I might have left off.
18   BY MS. PARFITT:
19        Q   Well, why don't we do this.  We'll put
20   it back on the ELMO, and I'll represent that it is
21   a --
22        A   Yeah, I don't doubt you.  I just --
23        Q   Sure, no worries.  That's fine.
24        A   It goes on to a different sentence.
25        Q   That's fine.

Page 292

1         MS. BROWN:  I have a continuing
2    foundation.
3         MS. PARFITT:  That's fine, Counsel.
4         MS. BROWN:  -- objection to this
5    exhibit, for which no foundation has been laid.
6    BY MS. PARFITT:
7         Q   All right.  Again, I'm referring to the
8    category consistency which I represent that is in
9    Chapter 2 of the Rothman book, and we can just go
10   ahead and circle the paragraph that starts: "One
11   mistake in implementing the consistency criterion
12   is so common that it deserves special mention.  It
13   is sometimes claimed that a literature or set of
14   results is inconsistent simply because some
15   results are statistically significant, and some
16   are not."
17        Did I read that correctly?
18        A   You did.
19        Q   "This sort of evaluation is completely
20   fallacious, even if one accepts the use of
21   significant testing methods."
22        Did I read that correctly?
23        A   You did.
24        Q   All right.  Do you agree with that
25   statement?

Page 293

1         MR. LOCKE:  Objection.
2         THE WITNESS:  So wait a minute, I just
3    want to -- so there's a couple of statements
4    there.  I think the part that makes it agreeable
5    is to say that -- that if it's claimed that
6    results are -- and I'm paraphrasing --
7    BY MS. PARFITT:
8         Q   Sure.
9         A   -- but that the results are inconsistent
10   simply, and the word "simply" to me is really
11   important here because it suggests that somebody
12   would be not looking at the entire universe of
13   evidence that they have available.
14        So I think if you just took a quick look
15   at studies and said some were significant and some
16   weren't and left it at that, you know, it's a
17   pretty strong statement, but I think -- I think
18   that would be a mistake to only do that.
19        Q   All right.  Now, you're not a
20   statistician, correct?
21        A   I'm not a statistician.
22        Q   Okay.  And you're not a biostatistician.
23        A   I'm not a biostatistician.
24        Q   Okay.  Do you know who Daniel Ford is?
25        A   I do.

Gregory B. Diette, M.D.

Page 294

1    Q   Okay. Who is Daniel Ford?
2    A   If it's the one that --
3    Q   Daniel E. Ford.
4    A   I don't know his middle name, but
5  there's a Dan Ford at our -- at our place.
6    Q   Okay. Is the Dan Ford you know vice
7  dean for clinical investigation, Johns Hopkins
8  School of Medicine?
9    A   Yes.
10   Q   Okay. Is he a friend of yours?
11   A   We're friendly. I mean, we don't hang
12 out, though.
13   Q   Now, he is with the Institute for
14 Clinical and Translational Research; is that
15 correct?
16   A   He has been. I'm just trying to think
17 if that still exists. Because I know there was a
18 funding issue, so -- but he -- he certainly was in
19 that role, and he may still be.
20   Q   He may what?
21   A   He may still be. I just -- I just -- I
22 thought I had heard that the ICTRs were going to
23 be not funded anymore.
24   Q   Okay.
25   A   Maybe it's true, maybe not; but I'm just

Page 295

1  saying for sure he was part of that.
2    Q   Mm-hmm. Okay. Sure. Okay.
3    All right. Are you a member -- and I'm
4  assuming you're not because you're not a
5  statistician, but I should assume nothing.
6    Are you a member of the American
7  Statistical Association?
8    A   I am not.
9    Q   Okay. Do you know who they are?
10   A   Not -- not really. I mean, it -- it
11 sounds like the name gives them away, but I
12 don't -- I don't know, you know, who they are as
13 an entity otherwise.
14   Q   That's fair. Okay.
15   Are you aware that due to a widespread
16 misuse by scientists and researchers regarding
17 statistical significance and p-values, that the
18 American Statistical Association issued a
19 statement back in 2016 warning the scientific
20 community of this misuse and urging them to cease
21 and desist with the p-value?
22   MR. LOCKE: Objection.
23   MS. BROWN: Objection to the form, lacks
24 foundation, misrepresents the facts.
25 BY MS. PARFITT:

Page 296

1    Q   Do you know about that?
2    A   I'm aware of that.
3    Q   Okay. Now, are you -- did you read
4  Dr. Bowman's deposition?
5    A   I did.
6    Q   Okay. Did you see that in Dr. Bowman's
7  deposition?
8    A   I saw -- I'm just trying to remember. I
9  saw the Nature article, I think that is more
10 recently published than -- you said 2016?
11   Q   Originally, yes.
12   A   Yeah, but I can't remember if 2016 was
13 in her deposition, but for sure the more recent
14 one.
15   Q   The one in 2019?
16   A   Exactly right, yeah.
17   Q   All right. All right. Let me show you
18 then what's been marked as -- or will be marked as
19 17. And it is the March 2019 --
20   (Counsel conferring.)
21 BY MS. PARFITT:
22   Q   Okay. Let me show you what we will have
23 marked as 17, a study that appeared in The
24 American Statistician in 2019. It's Volume 73,
25 and it's called "Moving to a World Beyond P <

Page 297

1  0.05."
2    Do you see that?
3    A   Actually, I was just sort of flipping
4  through to see what I'm looking at. Oh, so the
5  title, yes.
6    Q   Okay. Is this a document you were
7  referring to?
8    A   No.
9    Q   No?
10   A   I was referring to the one in Nature
11 that I think reports about this.
12   Q   Yes. Okay. Let's go ahead and get that
13 marked, and we'll talk about all three.
14   (Diette Exhibit No. 17 was marked
15   for identification.)
16   MS. PARFITT: Let's have marked as
17 Exhibit No. 18.
18   (Diette Exhibit No. 18 was marked
19   for identification.)
20 BY MS. PARFITT:
21   Q   And I will represent that 18 is a Sander
22 Greenland article that appeared in Nature on
23 March 2019.
24   Okay. Is that the article you were
25 referring to?

75 (Pages 294 to 297)

Gregory B. Diette, M.D.

Page 298

1     A   Yes.
2     Q   Okay.  Have you had an opportunity to
3  read Exhibit No. 18?
4     A   I have.
5     Q   Okay.  Exhibit 17, which is the
6  Wasserstein article, have you had an opportunity
7  to read it prior to today?
8     A   This -- this one, no.
9     Q   Okay.  All right.  Let's first take a
10  moment and discuss what's been marked as 18.
11     Excuse me.  No, 18.  18.
12     Are you aware that due to the American
13  Statistical Society's concern of the misuse of
14  statistical significance and p-value, that they
15  literally used their March 2019 research paper and
16  devoted attention to this issue and attached
17  almost 40 papers on statistical inference?  Are
18  you aware of that?
19     MR. LOCKE:  Objection.
20     MS. BROWN:  Objection to the form,
21  misstates the facts.  Are you referring to
22  Exhibit 17?
23     MS. PARFITT:  No.  17.  17.
24     MS. BROWN:  Yes, 17.
25     MS. PARFITT:  No, I'm not referring to

Page 299

1  that at all.  I'm just -- I'm asking a question.
2     MS. BROWN:  Objection.  Lacks
3  foundation, misstates the facts.
4     THE WITNESS:  I saw that there was a --
5  a journal issue that had many articles.  I
6  didn't -- I don't know what the count was, but
7  there -- it's probably the same thing we're
8  talking about, but I'm not sure.
9  BY MS. PARFITT:
10     Q   Okay.  Did you have a chance to read
11  those 40 or so articles?
12     MS. BROWN:  Objection to the form.
13     THE WITNESS:  I -- I wish I had that
14  kind of time, but --
15  BY MS. PARFITT:
16     Q   You and me both.
17     A   Yeah.
18     Q   Okay.  All right.  Let's stay a few
19  minutes on 17, and we'll put it up on the ELMO.
20     And it starts --
21     MS. BROWN:  Counsel, he's never seen 17
22  before, so he's going to need a minute to
23  familiarize himself with it --
24  BY MS. PARFITT:
25     Q   Take a minute to familiarize yourself.

Page 300

1     MS. BROWN:  -- before you ask him any
2  questions about it.
3  BY MS. PARFITT:
4     Q   I just have a couple of questions about
5  it.
6     MS. BROWN:  Take as long as you need.
7     THE WITNESS:  (Peruses document.)
8  BY MS. PARFITT:
9     Q   And I just have a couple of questions
10  about it.
11     A   Sure.
12     MS. BROWN:  He's never seen it, so he
13  needs --
14     MS. PARFITT:  That's fine.
15     MS. BROWN:  -- as long as he needs.
16     MS. PARFITT:  He can take -- yeah.
17     THE WITNESS:  Well, I won't be able to
18  read it in --
19  BY MS. PARFITT:
20     Q   Okay.  Let me just --
21     A   -- in realtime today.
22     Q   -- ask you a couple of questions.  I'm
23  not expecting you to digest it.
24     All right.  The first paragraph, it
25  says -- do you have it up there?

Page 301

1     "Some of you exploring this special
2  issue of The American Statistician might be
3  wondering if it's a scolding from the pedantic
4  statisticians lecturing you about what not to do
5  with p-values, without offering any real ideas of
6  what to do about the very hard problem separating
7  signal from noise in data and making decisions
8  under uncertainty.  Fear not, in this issue,
9  thanks to 43 innovative and thought-provoking
10  papers from forward-looking statisticians, help is
11  on the way."
12     Do you see that?
13     A   I do.
14     Q   Okay.  Did I read that correctly?
15     A   You did.
16     Q   And is that the 43 papers that you were
17  speaking of that you didn't have time to read?
18     MS. BROWN:  Objection to the form, lacks
19  foundation.
20     THE WITNESS:  I -- I think so.  I mean,
21  this sounds familiar.  I think it's what I was
22  looking at, but I'm not -- not a hundred percent
23  sure.
24  BY MS. PARFITT:
25     Q   Okay.  If you'd look at right under

76 (Pages 298 to 301)

Gregory B. Diette, M.D.

Page 302

1  "'Don't' is Not Enough." Do you see that?
2      A  Yes.
3      Q  All right. The first sentence says:
4  "There's not much we can say here about the perils
5  of p-values and significance testing that hasn't
6  already -- that hasn't been said already for
7  decades."
8      Did I read that correctly?
9      A  Yes.
10     Q  And then it goes down to the first one:
11 "Don't base your conclusions solely on whether an
12 association or effect was found to be
13 statistically significant. The p-value passed
14 some arbitrary threshold such as $p < 0.05$."
15     Did I read that correctly?
16     A  Yes.
17     Q  Do you agree with that statement?
18     MR. LOCKE:  Objection.
19     THE WITNESS:  So there's a lot to this,
20 right. I mean because, I mean, the lead in to it,
21 it says -- it says that there's not much to say
22 here, you know --
23 BY MS. PARFITT:
24     Q  That hasn't been said.
25     A  -- hasn't been said for decades.

Page 303

1      MS. BROWN:  Wait, wait, let him finish.
2      THE WITNESS:  And -- and that's --
3  that's pretty -- well, I can't say it's true
4  because I haven't read this, so I don't know
5  what's in here, but the debate about p-values and
6  statistical significance isn't brand new. I mean,
7  I've been talking about it with colleagues for
8  decades, and I'm sure there were people decades
9  before me. So that -- that part rings me.
10     And I think -- you know, I don't know
11 when they're talking about conclusions. That's
12 a -- that's a pretty broad topic, but I think the
13 word "solely" is very helpful there, that we
14 shouldn't be making decisions solely on whether
15 something is statistically significant. And
16 there's more to it than that.
17 BY MS. PARFITT:
18     Q  Okay.
19     A  But that's a -- that's a super broad
20 statement, and I don't know, you know, in every
21 circumstance whether that would be agreeable or
22 not.
23     Q  Okay. Look at the last bullet there.
24 It states: "Don't conclude anything about
25 scientific or practical importance based on

Page 304

1  statistical significance or lack thereof."
2      Do you agree with that statement?
3      MS. BROWN:  Objection to the form.
4      And, Doctor, if you need to read the
5  whole article to answer these questions --
6      MS. PARFITT:  Counsel, don't coach the
7  witness.
8      MS. BROWN:  -- you should do that.
9      Yeah, but you are knowingly --
10 BY MS. PARFITT:
11     Q  Go ahead, Doctor.
12     MS. BROWN:  -- putting a document in
13 front of him that he's never seen, so we're not
14 going to sit here --
15 BY MS. PARFITT:
16     Q  I'm asking you a question, Dr. Diette --
17     MS. BROWN:  -- and play cherry-
18 picking statements to get --
19 BY MS. PARFITT:
20     Q  -- do you agree that one should not
21 conclude anything about scientific or practical
22 importance based on statistical significance or
23 lack thereof?  Do you agree with that?
24     MR. LOCKE:  Objection.
25     MS. BROWN:  Same objection.

Page 305

1      THE WITNESS:  So, anyway, I think by
2  saying "don't conclude anything," I think makes
3  this not a very agreeable statement for me.
4  BY MS. PARFITT:
5      Q  Okay. All right. Let's turn to what
6  you did read, and that's Exhibit 18.
7      Do you have that, Doctor?
8      A  I do.
9      Q  Okay. And this is an article that
10 appeared in Nature back in March of 2019, correct?
11     A  That's right.
12     Q  Okay. And you did have a chance to read
13 this; is that correct?
14     A  I did.
15     Q  Okay. And under the section "Pervasive
16 Problem," do you see that?
17     A  Yes.
18     Q  Okay. It states: "Let's be clear about
19 what must stop. We should never conclude there is
20 no difference or no association just because the
21 p-value is larger than the threshold, such as
22 0.05, or equivalently because a confidence
23 interval includes zero. Neither should we
24 conclude that two studies conflict because one had
25 a statistically significant result and the other

Gregory B. Diette, M.D.

Page 306

1    did not. These errors waste research efforts and
2    misinform policy decisions."
3           Did I read that correctly?
4       A   You did.
5       Q   Do you agree with that?
6           MS. BROWN:  Objection to the form.
7           MR. LOCKE:  Objection.
8           THE WITNESS:  To me it's overly broad,
9    and I think that -- I think that if we go through
10   and we find a sentence or two in here that are
11   agreeable or not, there's a -- there's a much,
12   much bigger proposition here about what's going
13   on, and I don't think it boils down to any one of
14   these sentences.
15          And I think this looks like a passionate
16   opinion piece, right. That's calling it an
17   article, but it's a commentary. And, you know,
18   these guys might believe that, but I don't -- I
19   don't think it's a mainstream view, and it's not
20   my view, you know, without any qualifications
21   that -- that that statement is correct either.
22      Q   Okay. Are you aware that over 800
23   statisticians and scientists signed on to this
24   document to push the concept of abandoning
25   statistical significance?

Page 307

1           MS. BROWN:  Objection to the form.
2           MR. LOCKE:  Objection.
3           THE WITNESS:  I saw that.
4    BY MS. PARFITT:
5       Q   Okay. You weren't one of those, were
6    you?
7           MS. BROWN:  Objection to the form.
8           THE WITNESS:  I'm not a statistician.
9    BY MS. PARFITT:
10      Q   Okay. Well, but you use statistics in
11   your practice?
12      A   I do.
13      Q   Okay. Did anyone say you had to be a
14   statistician to sign on to that proposition?
15      A   Well, I -- I thought I heard you say
16   statisticians. Maybe I -- I might have misheard.
17   I thought you said 800 statisticians.
18      Q   I said there are about 800 statisticians
19   and other scientists that --
20      A   Oh, and other scientists.
21      Q   -- yeah, that signed on to this.
22      A   No, I didn't hear right. So I just --
23   so I don't know what the criteria were for who
24   could sign or not sign.
25      Q   Okay. You didn't sign on to it, though;

Page 308

1    is that correct?
2       A   I didn't.
3           MS. BROWN:  Asked and answered.
4    BY MS. PARFITT:
5       Q   All right. Now, let me have marked now
6    as Exhibit No. 19.
7           (Diette Exhibit No. 19 was marked
8           for identification.)
9    BY MS. PARFITT:
10      Q   Do you have that, Doctor?
11          Take a look at that, if you will.
12      A   (Peruses document.) So is this meant to
13   be a couple of things?
14      Q   It's two things. I will represent to
15   you that the face sheet states "Johns Hopkins
16   Institute for Clinical and Translational
17   Research." The American Statistician special
18   issue, "Moving to a World Beyond $P < 0.05$." It's
19   dated March 25, 2019. It has The American
20   Statistician on the side.
21      A   What are we -- I'm confused, though.
22   This is -- this is Exhibit 17 with something
23   attached to it or --
24      Q   You know, that's exactly it. And if you
25   look at Exhibit 19 --

Page 309

1       A   Mm-hmm.
2       Q   -- it is moving -- it states "Moving to
3    the World Beyond P" -- it's a special issue of The
4    American Statistician. The lead article calls for
5    abandoning the use of status -- statistically
6    significant, and offers much, not just one thing,
7    to replace it, written by Ron Wasserstein, Allen
8    Shirm, and Nicole Lazar. The coeditors of this
9    special issue summarize the content of the issue's
10   43 articles.
11          These articles -- and put this up
12   there -- discuss the use of p-values and
13   statistical significance that Johns Hopkins'
14   researchers may find beneficial, and it attaches
15   the full article, which is what's been marked as
16   Exhibit No. 17.
17          Do you see that?
18      A   I do.
19      Q   Okay. Did anyone share with you at
20   Johns Hopkins that their Clinical and
21   Translational Research group was disseminating the
22   article by Wasserstein, "Moving to a World Beyond
23   $P < 0.05$," and urging individuals not only to
24   abandon the use of statistical significance, but
25   to discuss the use of p-values and statistical

Gregory B. Diette, M.D.

Page 310

1    significance with the researchers at Johns
2    Hopkins?
3            And that's a mouthful.  So let me make
4    it really clear.
5            MS. BROWN:  Let me object --
6            MS. PARFITT:  I move to strike the
7    question.
8            MS. BROWN:  You're going to strike it?
9            MS. PARFITT:  Yeah, let me strike it.
10   BY MS. PARFITT:
11       Q    Were you aware, Dr. Diette, that the
12   division of Clinical and Translational Research
13   over at Hopkins had distributed to its scientists
14   this group of 43 articles, including the
15   Wassertine -- Wasserstein, for purposes of
16   educating them with regard to this concern over
17   the misuse of statistical significance?
18           MS. BROWN:  I object to a complete
19   misrepresentation of the exhibit and to
20   foundation.
21           THE WITNESS:  So I mean, there's a lot
22   of things, right.  I'll try to answer as many as I
23   can.
24           So one is that I probably got something
25   because I'm -- I've been part of the ICTR, and I

Page 311

1    use the resources, I'm one of the people who
2    helped to write the grant to get it funded, and
3    so -- like I get a zillion things that fly by.
4            I don't know if I saw this or not, but I
5    probably wouldn't have clicked on if it came
6    through like an e-mail because I had already seen
7    it, like, as part of this -- as part of the Bowman
8    deposition.
9            MS. PARFITT:
10       Q    Mm-hmm.
11       A    But other than that, I mean, I think
12   it's -- I think they're smart to do it.  They
13   should always put stuff out there for people to
14   read.  It doesn't mean that we're going to get rid
15   of p of 0.05.  It doesn't mean we're going to get
16   rid of statistical significance.  They're just
17   saying it's an interesting read.
18       Q    Do you know any of the signatories to
19   this particular document?
20       A    I found one.  One that I know
21   personally, and I'm trying to remember if
22   there was anybody else that I saw.
23       Q    Well, let me show you what we'll have
24   marked as Exhibit No. 20.
25       A    Yeah, so let me just say, so I didn't

Page 312

1    read all 800, but I looked to see if there were
2    people from Hopkins in particular that signed it,
3    and I knew one of the two.
4        Q    Okay.  Let me show you what we'll have
5    marked as Exhibit No. 20.  And I will represent to
6    you that it is a list of the 800 signatories that
7    joined together to support this movement to
8    abandon p-value in statistical significance.
9            (Diette Exhibit No. 20 was marked
10           for identification.)
11           MS. PARFITT:  Again, Counsel, I
12   apologize.  Apparently, we only have one copy of
13   this document.
14           MS. BROWN:  So is it the blog soliciting
15   the signatures, or is it just the list?
16           MS. PARFITT:  It is the list of
17   signatories.
18           MS. BROWN:  Okay, that's fine.
19   BY MS. PARFITT:
20       Q    Do you see that?
21       A    I do.
22       Q    Okay.  Do you know an Elizabeth Ogburn?
23       A    I don't.  I saw her name on here, but
24   I -- I don't know her.
25       Q    All right.  Do you know Daniel

Page 313

1    Sharfenstein (phonetic)?
2        A    Sharfstein, and I know him.  Yeah.
3        Q    Okay.  Is that -- do you know anyone
4    else that might appear on that list?
5        A    I don't know.  I didn't read it.  I
6    just -- I literally just did a word search for
7    "Hopkins," and I came up with like one person
8    whose name is Hopkins who works in England, and
9    another one, something Hopkins Institute, which is
10   not, and then two from Johns Hopkins.
11       Q    Okay.  When did you do this research?
12       A    In the last week.  I mean, after --
13   after reading the Bowman deposition.
14       Q    All right.  So you read the Bowman
15   deposition, and then you -- what caused you then
16   to -- to go back and look at that or for that?
17       A    Well, because it sounds like an
18   interesting topic, and you, you know, who knows, maybe
19   one day it either will or won't change, but it's
20   an interesting thing to read about.  And so I
21   wanted to just sort of see what -- what you guys
22   were driving at.  And then since I saw that there
23   were 800 signatories, I just figured I would see
24   if there was anybody at Hopkins that was part of
25   it or not.

Gregory B. Diette, M.D.

Page 314

1        Q    Mm-hmm.  And you found a couple of
2    people from Hopkins?
3        A    Yeah, I found two.  One I know, one I
4    don't.
5        Q    All right.  Again, you were not one of
6    the signatories?
7        A    Still true, yeah.
8        Q    Okay.  Okay.  What position does
9    Dr. Sharfstein hold within the University?
10           MS. BROWN:  Objection.  Speculation.
11           THE WITNESS:  He's been in the
12   Department of Biostatistics, and I don't know
13   what -- what other ways to label what he -- what
14   his positions are.
15   BY MS. PARFITT:
16       Q    Okay.  From the time you saw the
17   discussion about statistical significance and a
18   movement away from that and did your bit of
19   research, did you ever call Dr. Sharfstein to talk
20   to him about it?
21       A    Not yet.  I'm hoping I'll just run into
22   him at some point and -- and ask him about that.
23       Q    Is the -- is your interest strong enough
24   that you might reach out to him?
25           MS. BROWN:  Objection to the form.

Page 315

1    What -- what interest are we talking about?
2    BY MS. PARFITT:
3        Q    Interest in this science that you have
4    indicated yourself seems to be pretty important.
5            MS. BROWN:  Objection.  That misstates
6    his testimony by a lot.
7            THE WITNESS:  So it -- it might be.  I
8    mean, the -- the reason there's no urgency for me
9    to do it is that I still live in the world in
10   2019, and I'm still living in a world where
11   hypothesis testing is the rule and p-values are
12   part of what you're required to report if you're
13   going to publish a paper in a credible journal.
14           And so, you know, whether -- whether
15   this gets traction or not, you know, we'll see.  I
16   don't know what the replacement is going to be.  I
17   don't know if chaos will ensue.  It's an
18   interesting topic to talk about, but it's sure not
19   ready for prime time.
20           So I think if I see Dan in the hall, I
21   might ask him about it, but there's no -- there's
22   no urgency to it.
23   BY MS. PARFITT:
24       Q    So what's the world you're living in
25   with regard to the relevance of statistical

Page 316

1    significance and p-values?
2        A    Yeah, well, I'd say the real world,
3    right.  And the real world --
4        Q    I'm sorry.  You're in the real world?
5        A    Real world, yeah.
6        Q    Okay.  And what's the real world doing?
7        A    Well, the real world, if I want to write
8    a grant, I have to provide people with a sample
9    size estimate of what it is that I'm looking for,
10   and the sample size estimate is almost always
11   based on hypothesis testing.  And you have to
12   declare a certain p-value that you find to be a
13   credible one.
14           So I can't just say, I've decided
15   because I read some editorial that I'm not going
16   to use a p-value of 0.05.  That I'm still stuck
17   with 0.05 as a -- as an estimate.  And so if I
18   want to have any success getting a grant, I'm
19   going to have to still use the rules that we've
20   used for years.
21           And if I publish a paper, I happened to
22   look because I thought it was curious, I went on
23   New England Journal's website --
24       Q    Yes.
25       A    -- and they have an extensive list of

Page 317

1    ways in order to represent your p-values and your
2    confidence intervals that you have to adhere to if
3    you want to publish your papers.  You know, Nature
4    said that they're not going to change their rules
5    based on this.
6            So, anyway, so it's like it's -- that's
7    the world that we live in right now.  If you want
8    to communicate about -- about clinical science,
9    then you're going to have to use the rules that
10   we've learned to -- that we've learned to use.
11       Q    Do you know if the rules you've just set
12   forth are the rules that Dr. -- or, excuse me,
13   that Dr. Rothman and Sander Greenland, esteemed
14   epidemiologists, promote in their practice?
15       A    I have no idea what they promote.
16       Q    Well, you read the article in Nature,
17   didn't you?
18       A    Yeah, but you said "their practice."  I
19   don't even know what that is even.
20       Q    Well, who is the author of the Nature
21   article?
22       A    We're talking about the -- the
23   commentary?
24       Q    That's right.
25       A    Yeah.  So it looks like Armhein,

Gregory B. Diette, M.D.

Page 318

1   Greenland and McShane.  Or maybe not.  Maybe
2   that's -- wait a minute, I could be wrong.  No,
3   it's -- it's those three.
4       Q   And again, you don't know -- do you know
5   any of them?  I know you don't know Dr. Greenland.
6   Do you know any of the others?
7       A   I do not.
8       Q   Okay.  So if I understand your opinion
9   today, you still believe in the strength of a
10  statistical significance versus not statistically
11  significant?
12      A   It's --
13          MS. BROWN:  Objection to the form.
14          THE WITNESS:  It's still a factor to
15  consider when either planning, conducting, or
16  interpreting a study.
17  BY MS. PARFITT:
18      Q   Okay.  And do you still live in the
19  world that there is a threshold of a p-value of
20  0.05?
21      A   It depends.
22      Q   Well, what do you mean "it depends"?
23      A   I'm going to explain.
24      Q   Please.
25      A   So that's why I used the example of p at

Page 319

1   0.05, right?  I could just say, I have decided
2   that now I only want to do studies with six people
3   in them, and I'll be happy to have a p-value of
4   0.5.  You'd have to wish me luck getting it
5   published anywhere because it's not going to
6   happen, right?
7           So if I still want to do research and I
8   still want to get it published, I'm going to have
9   to pick a threshold for a p-value that's agreeable
10  to the peer reviewers and to the editor.  And it
11  doesn't have to be 0.05.  In some circumstances it
12  might be 0.01.  It might be even lower than that.
13  But a -- but a p threshold is necessary, at least
14  in our current era, if you want to be able to
15  conduct and talk about your research.
16      Q   Do you -- do you think Dr. Sharfstein is
17  going to now have difficulty having his scientific
18  works published?
19          MS. BROWN:  Objection.  Based on what?
20  There's no foundation for that question.
21  BY MS. PARFITT:
22      Q   You can answer the question, Doctor.
23      A   Well, exactly that.  So -- so Sharfstein
24  has been involved in some of our research and some
25  critical illness stuff, and the approach that we

Page 320

1   took wasn't anything novel or different.  I mean,
2   I don't know at all what his plans are going
3   forward, but he still works at the University
4   where we still compete for NIH grants --
5       Q   Mm-hmm.
6       A   -- and I haven't seen any change in the
7   NIH's posture on this, and I haven't seen any, you
8   know, ground swell of support for just doing
9   whatever you feel like in order to publish your
10  paper.
11      Q   Well, are you suggesting that what
12  Dr. Greenland and others and Dr. Wasserstein have
13  suggested to do whatever you -- let me get your
14  words -- shall -- yeah.  Okay.
15          MS. PARFITT:  Tell you what, let's take
16  a quick break.  I want to find that part, and
17  we'll get back.  Let's take a quick break.
18          THE VIDEOGRAPHER:  The time is 2:44 p.m.
19  We're going off the record.
20          (Recess.)
21          THE VIDEOGRAPHER:  The time is 2:53
22  p.m., and we're back on the record.
23  BY MS. PARFITT:
24      Q   Dr. Diette, when we left just before the
25  break, you said:  "I haven't seen any ground swell

Page 321

1   of support for doing whatever you feel like in
2   order to publish your paper."
3           I'm not talking about the publication of
4   papers.  What I would like to know from you is, do
5   you agree, though, when you were evaluating the
6   consistency of evidence, that one should not
7   disregard studies that are nonstatistically
8   significant and give greater weight to those that
9   are statistically significant?
10          MS. BROWN:  Objection to the form of the
11  question.
12          THE WITNESS:  I hear two questions
13  there, and the first part I agree with, and the
14  second part, it depends.
15  BY MS. PARFITT:
16      Q   Okay.  Do you agree that when you are
17  evaluating and weighing evidence, studies, that
18  you should evaluate studies the same whether they
19  are statistically significant or not statistically
20  significant?
21          MS. BROWN:  Objection to the form.  In
22  what context?
23          THE WITNESS:  I don't know what
24  "evaluate the same" means.  I mean, I think any --
25  any study that you think should be evaluated

Gregory B. Diette, M.D.

Page 322

1  should be evaluated, you know, as thoroughly as
2  you can.
3      BY MS. PARFITT:
4          Q   When you're evaluating the consistency
5  of studies, is it proper epidemiology to consider
6  those studies whether or not they are
7  statistically significant or nonstatistically
8  significant?
9          MS. BROWN:  Objection to the form.
10         THE WITNESS:  It is.  And I think, you
11  know, regardless of what Dr. Rothman has written,
12  you know, it's part of the information that's
13  available to you, and I think to ignore it would
14  be, you know, not in your best interest.
15     BY MS. PARFITT:
16         Q   Okay.  And would you agree that one
17  should not conclude there is no association or no
18  difference just because a -- one study is
19  statistically significant and another study is
20  significant?
21         MS. BROWN:  Objection to the form.
22         THE WITNESS:  And I agree with you,
23  especially because you used "just because."
24     BY MS. PARFITT:
25         Q   All right.  So maybe -- what do you

Page 323

1  mean?
2          A   No, it's a good sentence.  I mean, I --
3  it -- I think that over and over what we're
4  talking about is that -- that you shouldn't be
5  wedded to the idea that statistical significance
6  is the only feature that you look at, but it
7  doesn't mean that you don't look at it.
8          And so when you say that, you know, if
9  you were just to hold up two studies, and one was
10  significant and the other one wasn't and -- that
11  wouldn't -- you know, you wouldn't be curious
12  enough.  You would need to know more about those
13  studies to reach the conclusion you do.
14         So I think, you know, looking at the
15  whole study, looking how it's built, looking how
16  it's interpreted, all that's important.
17         Q   All right.  So it would not be proper
18  to conclude the two studies conflict just because one
19  was significant and one was statistically
20  significant.
21         MS. BROWN:  Objection.  Misstates
22  testimony.
23         THE WITNESS:  It -- not -- not by
24  itself, but that is at least one indicator of
25  something that's different about those studies.

Page 324

1      BY MS. PARFITT:
2          Q   Okay.  Now, let's turn to -- your chart,
3  and specifically the studies that you set forth in
4  your report on pages 13 and 14.
5          And if you'd go to your report, 13 and
6  14.
7          A   I'm sorry, I've got somebody else's
8  thing here.
9          Q   That's okay.
10         A   Okay.
11         Q   Okay.  You got there?  All right.
12         What I would like -- all right.  So you
13  have that in front of you, correct, sir?
14         A   I do.
15         Q   Okay.  Now, what I'll have marked as --
16  for demonstrative purposes is a chart that we have
17  marked as Diette Exhibit 21.
18         (Diette Exhibit No. 21 was marked
19         for identification.)
20     BY MS. PARFITT:
21         Q   And let me hand that to you.
22         MS. BROWN:  Counsel, can you give a
23  representation for the record about what
24  Exhibit 21 is?
25         MS. PARFITT:  Yes, I was about to do

Page 325

1  that.
2          MS. BROWN:  Thank you.
3      BY MS. PARFITT:
4          Q   Dr. Diette, on pages 13 and 14, you
5  have -- of your report, you have listed I believe
6  25 case-control studies, 3 cohort studies and --
7  is that correct?
8          MR. LOCKE:  Objection.
9      BY MS. PARFITT:
10         Q   You've got 7 population studies on the
11  back.  That's on page 14.  You have 25
12  case-control -- hospital studies, rather, on
13  page 14, and 25 studies on page 13.  Is that
14  correct?
15         MR. LOCKE:  Do you have a copy for --
16         MS. PARFITT:  Beg your pardon?
17         MR. LOCKE:  Do you have a copy for me,
18  please?
19         MS. PARFITT:  Oh, Tom, I think we do,
20  yeah.
21         MR. LOCKE:  Thank you.  Is this a --
22  does this come from a published --
23         MS. PARFITT:  No.  Let me represent --
24  no, let me represent that Exhibit No -- Exhibit 21
25  is a demonstrative which lists all of the studies

82 (Pages 322 to 325)

Gregory B. Diette, M.D.

Page 326

 1    that Dr. Diette listed in his report on page 13
 2    and 14 and has put them on a graph.
 3          MS. BROWN:  Who -- who put them on a
 4    graph and what is the graph?
 5          MS. PARFITT:  Counsel --
 6          MS. BROWN:  Well, I'm going to have an
 7    objection to this document, and I just want to --
 8          MS. PARFITT:  You can.  You can object
 9    to this --
10          MS. BROWN:  -- make sure I'm properly
11    objecting, because I don't know what it is, who
12    made it, based on what, and to the extent the
13    doctor needs the underlying studies to answer your
14    questions.  We'll --
15          MS. PARFITT:  Counsel, no speaking
16    objections.
17          MS. BROWN:  I just want to object to
18    this.
19    BY MS. PARFITT:
20      Q   Dr. Diette --
21          MS. PARFITT:  I understand, Counsel.  I
22    know what you're doing.
23          MS. BROWN:  The name is Diette.
24          MS. PARFITT:  Diette?
25          MS. BROWN:  Diette.

Page 327

 1          MS. PARFITT:  Diette.
 2    BY MS. PARFITT:
 3      Q   I'm sorry, Dr. Diette.  I'm not doing it
 4    to annoy you.
 5      A   You've had it -- you've had it right all
 6    day.  You're doing --
 7      Q   Thank you.  Thank you.  I appreciate
 8    that.
 9          What I will represent to you, and you
10    can track it, Dr. Diette, that Exhibit No. 21
11    represents the sales studies you selected for
12    purposes of your expert report.  It lists them
13    study by study.  It plots them on a forest plot on
14    the right-hand side.
15          Do you see that?
16      A   I do.
17      Q   Okay.  And I'll represent that we took
18    your relative risks and confidence intervals, and
19    simply extracted those and put them on Exhibit 21
20    with one exception.
21          What I'd like you to do is look at
22    Hartge.  And we will have that marked as
23    Exhibit 22.
24          (Diette Exhibit No. 22 was marked
25          for identification.)

Page 328

 1          MS. PARFITT:  Yeah, there you go.
 2          There you go, Doctor.
 3    BY MS. PARFITT:
 4      Q   Doctor, I've handed you what's marked as
 5    Exhibit 22.  It is the -- an article by Patricia
 6    Hartge dated 1983 in JAMA.  Do you see that?
 7      A   I do.
 8      Q   Okay.  And at the top of the study, she
 9    has a table entitled "Estimated Relative Risk."
10          Do you see that?
11      A   I do.
12      Q   And I'll put this up on the ELMO.
13          MS. PARFITT:  Okay.  And it's hard to
14    see.  We'll have to zero in there.  There you go.
15    Okay.
16    BY MS. PARFITT:
17      Q   You'll see on your chart you had listed
18    for Hartge, 1983, a relative risk of 0.7 with a
19    confidence interval of 0.40 to 1.10.
20          Do you see that?
21      A   Uh --
22      Q   Look at your --
23      A   I do, yep.
24      Q   -- on page 14.
25          Okay.  Now, look at the table of the

Page 329

 1    Hartge study under "Genital Talc Use."
 2          Do you see that?
 3      A   I do.
 4      Q   Okay.  And do you see where Dr. Hartge
 5    reports that the relative risk for genital use
 6    talcum powder is not what you have as 0.7, but 2.5
 7    with a confidence interval of 0.7 to 10.
 8          Do you see that?
 9      A   I do.
10      Q   All right.  So that would be an error in
11    your chart; is that correct?
12          MS. BROWN:  Objection.
13          Doctor, take as long as you need to look
14    at what counsel is asking you about.
15          And --
16          MS. PARFITT:  Counsel --
17          MS. BROWN:  -- Counsel, do you mean
18    to --
19          MS. PARFITT:  Counsel --
20          MS. BROWN:  -- misrepresent the
21    paragraph?
22          MS. PARFITT:  No, Counsel.  And, listen,
23    if the Doctor doesn't have any questions -- he's a
24    very intelligent man as we've seen today --
25          MS. BROWN:  I know, but what you're

Gregory B. Diette, M.D.

Page 330

1   saying is not right.
2           MS. PARFITT: Counsel, that's it. No.
3   I'm sorry.
4           MS. BROWN: Are you intentionally
5   misrepresenting what's in the paper?
6           MS. PARFITT: Counsel, if you heard my
7   question -- I think Dr. Diette understands the
8   question.
9   BY MS. PARFITT:
10      Q   Dr. Diette, we have on the table a
11  genital use, which is 2.5 with a confidence
12  interval of 0.7 to 10.
13          Do you see that?
14      A   Yeah, I'm sorry. Can you give me just
15  one second?
16      Q   Okay. Of course I can.
17      A   Thank you. (Peruses document.)
18          Yeah, I'm with you.
19      Q   Okay. And the only correction I -- I
20  wish to make is that, instead of the 0.70 that you
21  have for Hartge, it should be 2.5 --
22          MS. BROWN: Objection.
23  BY MS. PARFITT:
24      Q   -- for the genital --
25          MS. PARFITT: Let me finish, Counsel.

Page 331

1   BY MS. PARFITT:
2       Q   -- for the genital use of talc. Do you
3   agree with that?
4           MS. BROWN: Objection to the form.
5           THE WITNESS: So, maybe. I'm just
6   trying to think about how I got --
7   BY MS. PARFITT:
8       Q   Sure.
9       A   -- got here. Because the -- you know,
10  the text says that it's -- there were ten users,
11  so I guess like seven cases and three controls.
12      Q   Mm-hmm.
13      A   It said -- specifically mentioned use on
14  sanitary napkins, underwear, or the genital area.
15          But then it says -- but estimated is
16  2.5, but the small number of exposed women yielded
17  an unreliable estimate. So I --
18          MS. BROWN: It's --
19          THE WITNESS: Yeah --
20          MS. PARFITT: You don't have to show the
21  doctor.
22          MS. BROWN: Do you want the truth on the
23  record, or do you want --
24          MS. PARFITT: You know, I really do want
25  the truth.

Page 332

1           MS. BROWN: Okay. Then let him --
2           MS. PARFITT: I just don't want you
3   coaching --
4           MS. BROWN: -- answer the question.
5           MS. PARFITT: -- and touching the paper
6   and pointing at things.
7           MS. BROWN: You are intentionally
8   misreading this document.
9   BY MS. PARFITT:
10      Q   Doctor -- all right, Dr. Diette, you're
11  the one I'm interested in hearing from, to be
12  perfectly candid.
13          My question is, are the -- is the
14  relative risk that you have listed for Hartge
15  0.70, or should it be 2.5?
16      A   You know, the -- the study report is
17  really tough I think to decide that either one of
18  them is ideal. And for a couple of reasons, and
19  one is just because this -- this genital with an
20  asterisk, it isn't literally just genital
21  application. It includes sanitary napkins.
22          And you can see in a lot of the studies
23  that people have sort of broken out sanitary
24  napkin use separate from like perineal
25  application.

Page 333

1           And so, you know, that's not an ideal
2   measure for this -- this chart either. I mean, I
3   get your point, the all over is something else.
4   But there's at least -- you know, there's more
5   than ten people at least in that particular --
6   that particular row. So I -- I'm not sure if
7   either of these is great, but they --
8       Q   Well, the analysis you went through, did
9   you go through that analysis for each and every
10  one of the studies that you listed when you made a
11  decision as to which odds ratio to select?
12      A   I did.
13      Q   You did.
14      A   I mean, I tried to pick the one that --
15  that fit the best.
16      Q   Okay. And is the one that fits the best
17  for Hartge the 0.70, or is the one that fits the
18  best for Hartge the 2.5?
19          MS. BROWN: Objection to the form.
20          THE WITNESS: So I don't know. I mean
21  other than the fact that you've got the word
22  "genital" there, I mean "all over" is kind of
23  confusing, right, because it doesn't say like "all
24  over except the genitals," right.
25          And so that's where it gets kind of

Gregory B. Diette, M.D.

Page 334

1    confusing is how you -- it's not a great study,
2    right. I mean, I'm not saying the study is not
3    great. I'm saying the report of the study doesn't
4    really tell us everything that you could really
5    wish to know.
6    BY MS. PARFITT:
7        Q   So would you like to keep your chart
8    with the 0.70, or do you think the chart should be
9    modified to say 2.5?
10       MS. BROWN: Objection to the form.
11       THE WITNESS: I mean, I'd be happy to
12   put both rows there and just with an asterisk, and
13   explain, you know, what each one of those is.
14   BY MS. PARFITT:
15       Q   Okay. Would you -- have you done that
16   for all the other studies that you've listed here,
17   wherein there may be data for sanitary napkins and
18   data for genital use and data for cornstarch? Did
19   you go through that analysis?
20       MS. BROWN: Objection to the form.
21       THE WITNESS: So, for this table I
22   haven't, but I have gone through all the sanitary
23   napkin findings that I can. And that's one of the
24   things you'll find in my handwritten notes from
25   the -- from the prior case.

Page 335

1        In terms of cornstarch, that's a
2    different question.
3    BY MS. PARFITT:
4        Q   And, Doctor, I --
5        MS. BROWN: Wait, he needs to finish.
6    He's got to --
7    BY MS. PARFITT:
8        Q   Doctor, that's really not my question.
9        MS. BROWN: No, no, no, no, no, he --
10   BY MS. PARFITT:
11       Q   My question is this --
12       MS. BROWN: Counsel.
13       MS. PARFITT: Counsel.
14   BY MS. PARFITT:
15       Q   My question is --
16       MS. BROWN: He has to finish the
17   question.
18   BY MS. PARFITT:
19       Q   You're not answering my question. Mine
20   is a very simple one.
21       My question was -- if you'll be patient
22   with me, my question was: The analysis that
23   you've just talked about that you're going through
24   with Hartge, did you go through a similar analysis
25   for each and every one of these studies; and if

Page 336

1    you did, where is that contained in your report?
2        MS. BROWN: And you should feel free to
3    answer both questions since counsel cut you off.
4        THE WITNESS: I have no idea about what
5    you mean by where it is in the report.
6    BY MS. PARFITT:
7        Q   Well, I only have RRs here. I have a
8    table. No analyses of the different case
9    controls. Just a table of their relative risks.
10       So, you've now gone through an analysis
11   of the Hartge case and said, You know, maybe this
12   is what we should have extracted, maybe we should
13   have looked at this, but I used my judgment and
14   put the 0.7.
15       And what I'm asking is, is that analyses
16   that you just did for us on the record the kind of
17   analysis that you did for all the other studies?
18   And if it was, where in the 51 pages of your
19   report or this chart have you included that
20   information?
21       MS. BROWN: Objection. Completely
22   misstates his testimony, as well as the article,
23   as well as the report, as well as the chart.
24       THE WITNESS: Let me just see. So
25   obviously it's not -- it's not documented, but I

Page 337

1    think part of what I'm trying to do is communicate
2    what the -- what the risks are that were reported
3    and what their confidence bounds were.
4        And so, you know, the papers stand for
5    themselves. They all exist. They're all cited.
6    We can look at anything we want.
7        I think in terms of the cornstarch
8    issue --
9    BY MS. PARFITT:
10       Q   Doctor, I'm not asking about --
11       MS. BROWN: Stop cutting him off.
12   BY MS. PARFITT:
13       Q   -- the cornstarch. We can talk about
14   that later. I'm not talking about cornstarch.
15       MS. BROWN: You cannot continue to cut
16   him off, or we'll have to call the Judge.
17       MS. PARFITT: I don't have a question
18   about cornstarch.
19       MS. BROWN: He's answering your
20   question.
21       MS. PARFITT: He is not.
22       MS. BROWN: You have to let him answer
23   or we have to call the Judge. You are
24   violating --
25       MS. PARFITT: You can do it in your

85 (Pages 334 to 337)

Gregory B. Diette, M.D.

Page 338

1    direct.
2           MS. BROWN: No, you have to let him
3    answer the question or --
4           MS. PARFITT: Counsel.
5           MS. BROWN: We're going off the record.
6           MS. PARFITT: Do you want to go -- we'll
7    go off the record right now.
8           MS. BROWN: Yeah, let's go. Fine. Do
9    we need to call the Judge? You have to let him
10   answer.
11          MS. PARFITT: We'll call her. We'll
12   call her.
13          THE VIDEOGRAPHER: The time is 3:09 p.m.
14   We're going off the record.
15          (A discussion was held off the record.)
16          THE VIDEOGRAPHER: The time is
17   3:10 p.m., and we're back on the record.
18          MS. PARFITT: Thank you.
19   BY MS. PARFITT:
20      Q   Okay. And, Dr. Diette, all I'm trying to -- to
21   ask, and obviously very poorly, is the analysis
22   that you just discussed that you went through with
23   Hartge, as we sat here today and you did it on the
24   record, did you do that for all the other studies?
25      A   I tried to.

Page 339

1       Q   Okay. And so you had to make
2    determinations as to what relative risks to
3    extract from those studies, correct?
4           MS. BROWN: Objection to the form.
5           THE WITNESS: I -- I had to work with
6    what they reported.
7    BY MS. PARFITT:
8       Q   Okay. And just like Hartge, they
9    reported different pieces of information:
10   Diaphragms used, no diaphragm, all over, genital,
11   legs, feet, correct?
12      A   Correct.
13      Q   And you had to decide what was the most
14   appropriate data to pull from those studies to
15   include on your chart for relative risks, correct?
16      A   For the most --
17          MS. BROWN: Objection to the form.
18          THE WITNESS: Yes, of course.
19   BY MS. PARFITT:
20      Q   Okay. So my question to you is, you
21   chose for the Hartge, based upon that analysis, to
22   use the -- any talc mentioned, which gave us a
23   relative risk of 0.7, as opposed to genital, which
24   would have represented a 2.5 risk.
25          MS. BROWN: Objection to the form.

Page 340

1    BY MS. PARFITT:
2       Q   Correct?
3       A   I did.
4       Q   Okay. And my last question is, is that
5    the position you wish to take today?
6           MS. BROWN: Objection to the form.
7    BY MS. PARFITT:
8       Q   Or would you modify that and use a
9    different relative risk? That's all.
10      A   I don't --
11          MS. BROWN: Objection.
12          THE WITNESS: I don't think anybody is
13   well served by looking at this other number, other
14   than if you're just trying to make a point and
15   be -- you know, for a plaintiff or something to
16   look at this 2.5.
17          I think if you take this one that says
18   there's a small number of exposed women, ten
19   people, you know, that yields an unreliable
20   estimate. I mean, somebody should fuss about that
21   too. So that's not -- that's not an ideal
22   measure.
23          If it helps, we can put them on the
24   table, and it wouldn't really change things,
25   right. You've got confidence bounds from 0.7 to

Page 341

1    10. I mean, that's an enormous confidence value.
2    So there's not a lot of information from those ten
3    people.
4    BY MS. PARFITT:
5       Q   And the reason I ask as well, as you
6    said earlier on in your deposition, you did not
7    know for all these studies their sample size.
8       A   Oh, no, no, no. I didn't memorize it,
9    but I've got all the studies, and it's a piece of
10   cake, we can just go look at them and look at the
11   sample size. I didn't want to, like -- I didn't
12   want to, like, make -- this is already a long
13   enough report. I don't need to put every bit of
14   data from every study in it to have it make sense
15   to me.
16      Q   So somewhere you have all the sample
17   sizes pulled together for the various cases and
18   controls for each one of these studies?
19      A   It's in every one of the studies.
20      Q   I know it's in each and every one of the
21   studies, but did you document it on any kind of
22   chart or anything like that?
23      A   For what?
24      Q   So that you could tell someone like me
25   and the Court why you chose the data that you did.

86 (Pages 338 to 341)

Gregory B. Diette, M.D.

Page 342

1      A   We can just look at the studies.  If I
2   documented the sample size next to each one of
3   these, it wouldn't tell you why I picked this
4   particular relative risk.
5      Q   It would -- it would not offer valid
6   information as to the relevance of those relative
7   risks?
8      A   Oh, my gosh.  I mean if you were
9   interested in it, I could find it for you.  It
10   wasn't -- it wasn't important for me to
11   communicate what I was trying to communicate.
12      Q   No, I -- it's a different question.
13         Is sample size important when one is
14   doing an analysis of a scientific study?
15      A   Yeah, that's why it's in the paper.
16      Q   Okay.  Because if the sample size is too
17   small, it may be underpowered; is that correct?
18         MS. BROWN:  Objection.
19         THE WITNESS:  Well, I don't know.  I
20   mean, if we're going to do power now, I think
21   that's going to be a different -- a different
22   conversation.
23         The sample size being small can have all
24   kinds of -- all kinds of impact.  This to me is
25   actually the most generous way to look at these

Page 343

1   data, rather than picking at the same size.  I
2   mean, I can do that too, right?  I can say, This
3   is a crummy study because it's got 23 people, or
4   this is crummy one -- that wasn't my goal.  It
5   wasn't to sort of tear down the -- the
6   case-control studies.
7         I was trying to have a balanced approach
8   here, I think unlike the plaintiffs' experts, and
9   I wasn't trying to say that this one particular
10   design is awful and the other one is good.  I was
11   just trying to represent something about it in
12   order to summarize it and communicate a point.
13   BY MS. PARFITT:
14      Q   Okay.  And your balanced approach was to
15   take the lower, the 0.7 relative risk, rather than
16   the 2.5 relative risk.
17      A   Oh, my goodness.
18         MS. BROWN:  Objection to the form.
19         THE WITNESS:  I -- I think -- I mean, I
20   think this little article, that doesn't even fit
21   on an entire page, gives us so little information
22   about what to do, and I think my point about there
23   being ten people that provide a relatively
24   uninformative risk, it's not great.  If you want
25   to use it, you're welcome to, but it doesn't -- it

Page 344

1   doesn't change anything about this exercise.
2   BY MS. PARFITT:
3      Q   Okay.  Well, I didn't select Hartge.
4   You selected Hartge.
5      A   Well, I selected it because it exists.
6   I mean, I -- my -- my goal was to find all the
7   studies that exist.
8      Q   Okay.
9      A   I mean, I didn't invent it, right?  I
10   just -- I just looked at --
11      Q   Well, I just didn't want the record to
12   reflect that I was selecting your data.
13      A   No, but you -- it sounds like you would
14   prefer me to use that 2.5 from the ten people,
15   instead of the 0.7 from the nearly hundred people.
16      Q   I have --
17      A   And I'm happy to look at them both.  I
18   mean they both tell us some information.  It's not
19   like, you know, one is ideal and the other isn't.
20   But it really doesn't change the basic premise
21   here.
22      Q   All right.  So on my chart I have them
23   both.  I have 0.7 and 2.5.  Do you see that?
24      A   Um --
25      Q   Right at the bottom there, "Genital use"

Page 345

1   and "Any talc use."  Do you see that?
2      A   I do.
3      Q   Okay.  All right.  So as I appreciate
4   your testimony, you had selected 25 population
5   case controls, 7 hospital -- and 7 hospital case
6   controls, correct?
7         MS. BROWN:  Objection.
8   BY MS. PARFITT:
9      Q   Do I have the numbers right?
10      A   I wasn't listening.  I'm sorry.
11         MS. BROWN:  Look at the realtime.  I
12   just think you misspoke.  You said seven hospitals
13   twice.  Is that what you meant?
14   BY MS. PARFITT:
15      Q   As I appreciate your testimony, you
16   selected -- no, this is populate -- 25 population
17   case controls and 7 hospital case controls.  I
18   said it twice.  Correct?
19      A   That's correct.
20      Q   Okay.  And that formed the basis for
21   your selection of case studies, correct?
22         MS. BROWN:  Objection to the form.
23         THE WITNESS:  Case-control studies.
24   BY MS. PARFITT:
25      Q   Case-control studies.

Gregory B. Diette, M.D.

Page 346

1    A   Correct.
2    Q   Yes.  Okay.
3        Now, looking at the chart, which is 21,
4    what is the point estimate -- wait.
5        What I would like you to do, rather, I
6    would like you to circle the point estimate for
7    every study that exceeds -- that has a 1.0.
8        MS. BROWN:  Objection.  Based on the
9    document you created as 21?
10       MS. PARFITT:  Which is identical to the
11   doctor's document, with the exception of I put two
12   numbers for Hartge.
13       MS. BROWN:  You put two numbers for
14   Moorman too.
15       MS. PARFITT:  Before and after 2014,
16   correct?
17       MS. BROWN:  Nope, Moorman is 2009.  You
18   have -- you've broken out Moorman by race.
19       MS. PARFITT:  I did.
20       MS. BROWN:  So I mean, my point here is
21   just if you wanted to use his report, he's happy
22   to answer your questions, but --
23       MS. PARFITT:  He did it -- but he did it
24   too.
25       MS. BROWN:  Okay.  That's fine.

Page 347

1        MS. PARFITT:  It's on his chart.
2    BY MS. PARFITT:
3    Q   I didn't do anything -- the only
4    modification I made to your chart, Doctor, is
5    Hartge, and there I kept your 0.70 and added the
6    genital 2.5.
7        And what I'd like you to do is circle in
8    that document every point estimate or odds ratio
9    that is 1.0 or above.
10   A   1.0 or higher?
11   Q   That's right.
12       MS. BROWN:  Objection to the exercise.
13       And, Doctor, if you need the articles,
14   we'll give them to you.
15       THE WITNESS:  So just as an example, if
16   we look at Jordan 2007, which has an odds ratio of
17   1.00 --
18   BY MS. PARFITT:
19   Q   Mm-hmm.
20   A   -- you find that one that would be
21   interesting for me to circle.
22   Q   If it has a 1.0, I'd like you to circle
23   it.
24   A   Sure.
25       So in terms of your -- like, it's going

Page 348

1    to be hard for me to read it off of your figure
2    because I don't know, like -- like, the Harlow and
3    Weiss one -- what is wrong with that one?  Or is
4    it --
5        MS. BROWN:  That looks wrong, doesn't
6    it?
7        THE WITNESS:  No, it's Harlow and Weiss
8    versus Harlow.
9        So what am I circling?  I'm circling
10   the -- the -- on the forest plot?
11   BY MS. PARFITT:
12   Q   On the forest plot, if you would be kind
13   enough to circle every relative risk where the
14   point estimate was 1.0 or above.
15   A   Oh, I did it wrong.
16   Q   That's all right.
17   A   Sorry.  I'm circling the ones that
18   are -- do you have another -- another copy of
19   this?
20       MS. MILLER:  You can have mine.
21       MR. LOCKE:  I didn't --
22       MS. PARFITT:  I'm sorry.  I'm sorry,
23   Tom?
24       MR. LOCKE:  I just couldn't hear -- you
25   trailed off at the end.

Page 349

1        MS. PARFITT:  Sure.
2    BY MS. PARFITT:
3    Q   You have -- and maybe I can shorten this
4    for you, how about that, in the interest of time.
5    A   Your call.
6    Q   We have -- thank you.  I appreciate
7    that.
8        We've got about 32 studies here.  How
9    many of those studies reflect an odds ratio
10   greater than 1.0?
11       MS. BROWN:  For a relative risk?
12       MS. PARFITT:  Correct.
13       THE WITNESS:  I don't know what to do
14   with Moorman, because it's one study, right.  Two
15   different odds ratios.
16   BY MS. PARFITT:
17   Q   Mm-hmm.
18   A   But it looks like above the dotted line,
19   it's -- there's 24 studies, I guess, and then down
20   below it, there's -- one, two, three, four,
21   five -- there's 5 that are above 1.0, and you said
22   above 1.0 this time, before you said --
23   Q   Above -- I did, above 1.0.
24   A   Because the including an odds ratio of
25   1.00 is evidence of something above 1.0 would

88 (Pages 346 to 349)

Gregory B. Diette, M.D.

Page 350

1  be --
2      Q   Right.  So we're doing above 1.0.
3      A   Okay.
4      Q   You pointed that out, and you're right.
5      A   Yeah.  So have I done it?  There's one,
6  two, three, four -- well, I guess Hartge is --
7  one, two, three, four, five --
8      Q   Sure.
9      A   -- there's five down below the dotted
10 line, and there were --
11     Q   Okay.  And if you can just identify
12 those where the point estimate does not exceed --
13 it's not above 1.0.
14         MS. BROWN:  Counsel, can you represent,
15 on the record, what this second up from the bottom
16 is?
17         MS. PARFITT:  Sure.  Hartge and Stewart,
18 '94.
19         MS. BROWN:  Underneath that.
20         MS. PARFITT:  Wong.
21         MS. BROWN:  No, above -- what is the
22 entry above Wong?
23         MS. PARFITT:  Oh, in his table --
24         THE WITNESS:  Oh, that too.
25         MS. PARFITT:  In his table he had RR

Page 351

1  0.03, RR 0.05.  It was just extracted from his
2  table.
3          MS. BROWN:  Oh, it's the second Hartge
4  and Stewart.
5          MS. PARFITT:  Yeah.
6          THE WITNESS:  And so you want where just
7  the midpoint is above the number 1.0?
8  BY MS. PARFITT:
9      Q   Correct.
10     A   So Cramer, Harlow, Harlow, Chen, Cramer,
11 Purdie, Chang, Cook, Green, Godard, Cramer, Ness,
12 Mills, Cramer, Gates, Merritt; the two odds ratios
13 for Moorman, Wu, Rosenblatt, Kurta, Kotsopoulos,
14 Wu, Cramer, Schildkraut; and then one of the two
15 Hartge's, Whittemore --
16     Q   And are you circling those, Doctor?
17     A   I'm not, no.
18     Q   Okay.  If you could do that because
19 we'll attach it as an exhibit.  Sorry.
20     A   Should I just finish saying them --
21     Q   Sure.
22     A   -- and then go back and do it?
23         So Rosenblatt, Tzonou, and that's it.
24 So -- (circling studies.)  Okay.
25     Q   Okay.  What does the -- does the fact

Page 352

1  that those studies have a relative risk in excess
2  of 1.0 demonstrate a positive result?
3          MS. BROWN:  Objection to the form.
4          THE WITNESS:  So some -- some of those,
5  yes, and some of those, no.
6  BY MS. PARFITT:
7      Q   All right.  Would it be fair to say that
8  they're certainly trending above the null; is that
9  correct?
10         MS. BROWN:  Objection to the form.
11         THE WITNESS:  Not necessarily.  I'm just
12 trying to imagine like -- I think I understand why
13 you're doing this -- but I'm just trying to
14 imagine like standing in front of colleagues like
15 with the Tzonou one and say, I've decided that a
16 relative risk of 1.05 is a positive risk.
17         I mean, you can only guess so close to
18 1.0.  I mean, 1.0 is basically null, right?
19 There's no -- there's no effect.  So you can hope
20 for, but you're rarely going to get a 1.00.  So if
21 you get like a 1.01, 1.02, 1.03, those are
22 basically 1.0.
23         I mean, you can -- you can say -- try to
24 make some point to somebody, Oh, it's a little bit
25 above 1.0; therefore, it's a positive association.

Page 353

1  But other than this setting, you're going to get
2  laughed out of the room.  I mean, this is -- this
3  is a 1.05.  So, you know, that's -- you call it
4  what you want.  I don't call that a positive
5  finding.
6  BY MS. PARFITT:
7      Q   Okay.  Now, what I'd like you to do is
8  look at the confidence intervals for each one of
9  those studies, and circle where the confidence
10 interval shows a relative risk of 1.2.
11         MS. BROWN:  Objection to the form of the
12 question.
13 BY MS. PARFITT:
14     Q   And again, if you will just circle
15 those.
16     A   I -- I think you'd be better off drawing
17 a line, right.  Because it -- I mean, this scale
18 here isn't really -- like there's no vertical
19 scale that's labeled here.  Right.  So you've got
20 1.0, 1.1 and 1.2.  I mean if you want, I think you
21 ought to just take a ruler and run it up from 1.2.
22     Q   Why don't you just go ahead and identify
23 them, if you will, and we can go ahead and do
24 that.  Let's see.
25     A   Well, like I can --

89 (Pages 350 to 353)

Gregory B. Diette, M.D.

Page 354

1      Q   My question is just simply this:  Would
2  you identify all studies where the confidence
3  interval is 1.2 or higher?
4          MS. BROWN:  Objection to the form.
5  BY MS. PARFITT:
6      Q   And you can just circle them.
7      A   And it doesn't have to mean anything to
8  me, right?
9      Q   Nope.  Just circle anything where the
10  confidence interval is above a 1.2.
11     A   So where the confidence interval
12  includes 1.2?
13     Q   1.2, correct.
14     A   Or where it's above 1.2?
15     Q   It's above 1.2.
16         MS. BROWN:  The entire interval?
17         THE WITNESS:  Well, so there's not many,
18  right?  So there's one --
19  BY MS. PARFITT:
20     Q   You understand that it includes 1.2?
21     A   I heard -- oh, that's different,
22  because there's only one where it's above 1.2.
23     Q   It includes the 1.2.
24     A   Or two that are above it.
25         So the two that are above it, don't

Page 355

1  include it, right, so we got to start over.
2      Q   Everywhere -- sure.  You go ahead and do
3  it.  Everywhere where the confidence interval is
4  above -- includes 1.2.
5      A   That's all right.  I'm just going to put
6  a little asterisk next to them, because I already
7  made a mark --
8      Q   Sure, that's fine.
9      A   -- next to the ones that are above 1.2.
10         Okay.
11     Q   Okay.  Let's go ahead and just put this
12  here.  I appreciate that.
13         Okay.  Here we go.  Let's see here.
14         Okay.  So let's just stay with that one
15  here for a moment.  Let me give you -- give you a
16  blank one here for a moment.  Is that all right?
17  So you have something in front of you.
18     A   Sure.
19     Q   Okay.  All right.
20         Dr. Diette, looking at the chart that we
21  just talked about, you have described in your
22  report that the case-control studies are
23  inconsistent.  Is that your testimony?
24     A   I think we should look literally at what
25  I wrote, because I talked about one aspect that

Page 356

1  was inconsistent.
2      Q   And that aspect --
3          MS. BROWN:  Are you looking at the
4  report?
5          THE WITNESS:  Yeah.
6  BY MS. PARFITT:
7      Q   -- was with regard to population study
8  versus hospital-based studies?
9      A   Well, I think I made a comment about
10  both, right?
11     Q   And if I can summarize your testimony,
12  but feel free to look, but your testimony from the
13  report -- or your writings and your report suggest
14  that the case-control studies are inconsistent,
15  and you focus on the fact that the hospital-based
16  controls were inconsistent with the population-
17  based controls.
18     A   That's one -- one of the areas of
19  inconsistency.
20     Q   Okay.  And you base that opinion on the
21  fact that there -- the hospital-based studies were
22  not statistically significant, but the
23  population-based studies were statistically
24  significant; is that correct?
25         MS. BROWN:  Objection to the form.

Page 357

1          THE WITNESS:  That's one piece of
2  evidence, right.  So one piece of evidence is that
3  the hospital-based ones, none of them were
4  statistically significant, and some of the
5  population-based ones were.
6  BY MS. PARFITT:
7      Q   All right.  And because you had some of
8  the population-based studies, you found
9  inconsistent because the confidence intervals were
10  not -- were such that they were not statistically
11  significant; is that correct?
12     A   That's a --
13         MS. BROWN:  Objection to the form.
14         THE WITNESS:  And as before, that's a
15  piece of -- a piece of the information here.
16  BY MS. PARFITT:
17     Q   Okay.  I've reviewed your report.  Other
18  than the distinction between the statistical
19  significance of studies versus the nonstatistical
20  significance of studies, how else did you discern
21  that they were different and not consistent?
22     A   Well, I have a section on consistency.
23  So it -- there's other things about these studies
24  that are inconsistent.
25         So, for example, the -- the

90 (Pages 354 to 357)

Gregory B. Diette, M.D.

Page 358

1  dose-response relationships are all over the
2  place.  So that I found to be an inconsistency.
3  The findings about certain kinds of ovarian
4  cancers, some showed a particular cell type and
5  some -- some didn't.
6          Let me just --
7      Q   Let me ask you --
8          MS. BROWN:  Wait, I don't think he's
9  finished.
10         MS. PARFITT:  No.  Let's just make sure.
11         THE WITNESS:  I think we've said it, but
12  I want to make it clear, right, because we were --
13  we were really just sort of focused very -- very
14  much on population-based and hospital-based case
15  controls.
16  BY MS. PARFITT:
17     Q   That's right.
18     A   But I think the fact that there is
19  basically, you know, not a signal from the cohort
20  studies is an inconsistency with studies of
21  another design, so another form of inconsistency.
22         I think that -- and what I've tried to
23  say here, right, because I think -- I think some
24  of these Hill criteria, it's hard to -- hard to
25  keep every -- every comment you want under one

Page 359

1  particular heading, and so I've tried to get at
2  this issue here too that if it were consistent
3  that talc caused or was associated with ovarian
4  cancer, I would expect to see it under a variety
5  of circumstances, not just perineal dusting.  And
6  so one of the inconsistencies is that, you know,
7  diaphragms and condoms, that we don't see that
8  signal.  So I'm just saying that that's an
9  inconsistency.  It's the opposite of consistency.
10         And I guess too -- I mean just while
11  we're even still on the -- on the types of
12  studies, I mean the Taher study that, I guess, you
13  know, even though it's not published yet, I mean
14  they've got a summary risk for the hospital-based
15  studies which is less than 1.0.  Right.  So now
16  it's not even just like -- if -- I don't know
17  whether we should like the Taher study or not, but
18  it's out there, right.  And so now we've got --
19     Q   It's out there.  It's a piece of
20  evidence.
21     A   Yeah, it's something that's out there,
22  so now we've got something that's unpublished from
23  2018 that's got not even a positive risk.  I mean,
24  this -- this exercise of going to look and see
25  what's over 1.0, there's a 0.94 or 6 or something

Page 360

1  like that.  So I'm -- that's more inconsistency.
2      Q   Okay.  Dr. Diette, what I'm trying to
3  get at here is, the underbelly, I guess, of your
4  opinions seem to be from your report that cohort
5  studies are inconsistent with the case-control
6  studies, which they themselves are inconsistent
7  because population-based studies and
8  hospital-based studies, some were statistically
9  significant and some were not.  Correct?
10     A   Exactly, yes.
11     Q   And that's really the -- the guts
12  of your report, correct?
13         MS. BROWN:  Objection to the form.
14         THE WITNESS:  I -- no.  I mean, those
15  are two very important points, but I'd say there's
16  a heck of a lot more than that in the report.
17  BY MS. PARFITT:
18     Q   Okay.  Did you go through -- let's --
19  let's talk a little bit about that.
20         You described these relative risks of
21  the case-control studies as small, weak -- small
22  and weak, correct?
23     A   Correct.
24     Q   Okay.  What type of -- those words
25  "small and weak," are those scientific words?

Page 361

1      A   So they're words that my colleagues and
2  I use.  I mean, it's a word that Dr. Rothman used
3  when he did his analysis in 2000 and called the
4  summary odds ratio or the risk -- risk of 1.3, he
5  called it weak.  I'm not sure whether he's citing
6  a particular definition, but, you know, it --
7  it's -- there's probably reasons, just like where
8  you talk about a p-value of 0.05 not being the
9  absolute line.  I think it's why people have
10  resisted trying to say that it has to be above an
11  exact specific number.
12         But I think we can all recognize risks
13  that are large.  You know, we know that a risk of
14  10 is a large risk.  We know that 20 is a large
15  risk.  We know that a relative risk of 1.01, it's
16  got to be tiny, right, because it can't be any
17  smaller than that on that particular scale.
18         So somewhere in there we have to use
19  some judgment, and I think if you got a 1.2 or
20  1.3, I don't know who -- I don't know who thinks
21  that's strong.  It doesn't make any sense.
22     Q   Do you agree that having a weak
23  association does not rule out a causal connection?
24         MS. BROWN:  Objection to the form.
25         THE WITNESS:  Wait a minute, say it

Gregory B. Diette, M.D.

Page 362

1    again because I think --
2    BY MS. PARFITT:
3        Q   Having a weak association would not rule
4    out a causal association.
5        A   That's correct.
6        Q   All right.  Would you also agree that
7    while the strength of an association is a
8    guideline for drawing an inference of causation,
9    there is no specified threshold required?
10       MS. BROWN:  Objection to the form.
11       THE WITNESS:  I don't think there's a
12   specified threshold.  I think it's a gradient,
13   right, that you have to use as you're applying
14   your judgment about all of the evidence.  And that
15   when you have a very small risk, you should be
16   more concerned about the distorting effects of
17   other factors, and if you have a larger risk, you
18   can be less worried about those distorting
19   factors.
20   BY MS. PARFITT:
21       Q   But you will agree with me under the
22   Bradford Hill factors, strong association or weak
23   association, neither are necessary for finding
24   causality, correct?
25       MS. BROWN:  Objection to the form.

Page 363

1        THE WITNESS:  So there isn't a single
2    one of his considerations that all by itself is
3    completely necessary, right.  It's a -- it's a
4    method to pull together a variety of, you know,
5    information about the studies.  But he -- he
6    certainly does give us some guidance about what
7    "strong" and "not strong" might mean and the
8    implications of that.
9    BY MS. PARFITT:
10       Q   But we can agree sitting here today that
11   those general terms, "weak," "small," do not
12   dictate whether or not there is causality.
13       MS. BROWN:  Objection to the form.
14       THE WITNESS:  They don't dictate it.
15   They inform it.
16   BY MS. PARFITT:
17       Q   You mentioned that the -- I want to come
18   back to that one in a second.
19       Now, you, yourself, have actually done
20   secondhand smoke studies, correct?
21       A   I've done studies that include
22   secondhand smoke as a measure.
23       Q   Okay.  What is your understanding of the
24   relative risks for secondhand smoke?
25       A   For what?

Page 364

1        Q   Secondhand smoke and lung cancer.
2        MR. LOCKE:  Objection.
3        THE WITNESS:  I think really the Surgeon
4    General has put it at -- it's either about 1.7 or
5    1.9, somewhere in there.
6    BY MS. PARFITT:
7        Q   Okay.  Let me show you -- I'm sorry.
8    1.7 or 1.9.
9        Let me show you a study by Kim.  And
10   it's entitled "Exposure to Secondhand Smoke and
11   the Risk of Cancer in Never Smokers."  And I'll
12   represent that it's in the International Journal
13   of Environment, 2018.  And this would be a
14   meta-analysis by Dr. Kim.
15       A   Do you know, is it something I cited or
16   is this new -- new to me or --
17       Q   I did not see it in your --
18       A   Okay.  Thank you.
19       Q   -- list of references.
20       In fact, good question.  None of the 167
21   articles that were in your curriculum vitae did I
22   see that you cited in support for your expert
23   report; is that correct?
24       A   That would -- I'm sure that's correct.
25       Q   Okay.  Okay.  Do you see that?

Page 365

1        A   I do, yes.
2        Q   Okay.  And if you look in the abstract,
3    do you see where the authors determined that the
4    relative risks for passive smoke exposure and lung
5    cancer in never users was a relative risk rather
6    than of 1.2.
7        Do you see that?  Take a moment.
8        A   Yeah.
9        Q   We'll put it on the ELMO.
10       A   So we're looking at the abstract?
11       Q   We are, mm-hmm.
12       A   And saying -- so odds ratio involving
13   never smokers with significant exposure to
14   secondhand compared to never smokers was 1.163.
15       Q   Okay.  Do you see where it says:
16   "Passive smoke exposure and lung cancer in never
17   users was a relative risk of 1.245"?
18       And we can go ahead and circle that.
19       A   That's for females?
20       Q   Yes.
21       A   For females, yeah, 1.245.
22       Q   Okay.  So we had a 1.245 for females,
23   and, I'm sorry, you said a 1.16 for secondhand all
24   comers, right?
25       A   Exactly right.

92 (Pages 362 to 365)

Gregory B. Diette, M.D.

Page 366

1      Q   Okay.  Let me show you as well the Lv
2   study, and it was a 2015 study.  "Risk of
3   All-Cause Mortality Associated With Secondhand
4   Smoke."
5      A   Do I have that?
6      Q   I'm getting that for you.  Hold on one
7   second.
8      A   Oh, I'm sorry.  I thought I --
9      Q   No, no worries.
10      A   I thought I missed it.
11      (Diette Exhibit No. 23 was marked
12      for identification.)
13   BY MS. PARFITT:
14      Q   Do you have that in front of you?
15      A   Yes.  So this is by Lv?
16      Q   That's right.
17      A   The last name, yeah.
18      Q   And now again, looking at the abstract
19   section, does it report the relative risk for
20   never smokers exposed to secondhand smoke versus
21   unexposed?
22      A   So the pooled relative risk for never
23   smokers compared to those -- is that -- so that
24   first sentence of the results --
25      Q   That's right --

Page 367

1      A   -- 1.18?
2      Q   Correct.  And they then report in the
3   all-cause mortality and RR was 1.23 for
4   cardiovascular diseases.  Do you see that?
5      A   Yeah, although -- exactly right, yep.
6      Q   Now, there have been -- and this
7   is work that you do as well, correct?
8      MS. BROWN:  Objection to the form.
9   BY MS. PARFITT:
10      Q   You do research work on secondhand
11   smoke?
12      A   I have done, yeah, and still do.
13      Q   Okay.  And are you aware that in the
14   United States and in other countries, there have
15   been health programs implemented to reduce
16   secondhand smoke based upon relative risks, like
17   you've just seen, 1.1, 0.8, 1.2?
18      MR. LOCKE:  Objection.
19      THE WITNESS:  I mean, I don't know if
20   the programs were based on these studies, and
21   there certainly have been higher relative risks
22   before.  But I -- but I agree that there are
23   programs to reduce secondhand smoke exposure.
24   BY MS. PARFITT:
25      Q   Okay.  And would you agree today that

Page 368

1   associations that are implementing those types of
2   programs to reduce secondhand smoke for fear of
3   lung cancer have accepted this type of data, 1.1,
4   1.2, for purposes of making those policy
5   decisions?
6      A   So I don't know --
7      MR. LOCKE:  Objection.
8      THE WITNESS:  Oops, sorry.
9      Like, I don't -- I don't know what
10   inputs they -- they used, and I don't -- I'm not
11   saying they wouldn't, but I don't know whether
12   they would use these risks to drive that or not.
13   BY MS. PARFITT:
14      Q   Okay.  You would agree with me, though,
15   that the risk of 1.1 and 1.2 are very -- are
16   actually less than the relative risks that we've
17   seen with talcum powder products and ovarian
18   cancer, correct?
19      MS. BROWN:  Objection to the form.
20      THE WITNESS:  So it's less than the
21   pooled odds ratio from the case-control studies in
22   the meta-analyses.
23   BY MS. PARFITT:
24      Q   Okay.  Now, you yourself have done
25   studies on indoor particulate matter, correct?

Page 369

1      A   Correct.
2      Q   Okay.  In particular, you published a
3   study with McCormack and Diette on common
4   household exposures?
5      A   I've published a bunch with her, so I
6   don't know which -- which particular one that is.
7      Q   All right.  It's Common -- it's Common
8   Household Products, 2008."  McCormack is the lead
9   article -- author.
10      A   What journal?
11      Q   It is in the Environmental Res,
12   Environmental --
13      A   Environmental research.
14      Q   -- Research.  And it's dated February
15   2008.  And take a minute to --
16      (Diette Exhibit No. 24 was marked
17      for identification.)
18   BY MS. PARFITT:
19      Q   Do you have that in front of you?
20      A   I do.
21      Q   Okay.  Now, if you look at the first
22   page under the abstract, about the third line
23   down -- excuse me, fourth line down, it says:
24   "There is a public health imperative to
25   characterize indoor source as being less

93 (Pages 366 to 369)

Gregory B. Diette, M.D.

Page 370

1    extensively characterized" -- excuse me. I'm
2    sorry.
3              "There is a public health imperative to
4    characterize indoor sources of PM" -- I assume
5    that's particulate matter?
6        A   Correct.
7        Q   -- "with this vulnerable population to
8    enable effective intervention strategies."
9              Did I read that correctly?
10       A   You did.
11       Q   Okay. You were the lead -- one of the
12   lead authors in that study?
13       A   Yeah, I was, by position, the senior
14   author, but I was the head of the -- the study
15   that produced this paper.
16       Q   All right. And what is -- and do you
17   have an opinion with regard to what the relative
18   risks are for indoor ambient particulate matter?
19       A   For what?
20       Q   For --
21       A   You mean qualitative, like what
22   illnesses they cause or --
23       Q   Yes, with regard -- I believe you
24   studied a bit of asthma, so I believe it would be
25   the relative risk of indoor particulates and

Page 371

1    asthma?
2        A   Well, there's not one single way to
3    answer that, right. So this -- this paper doesn't
4    look like the one that's actually quantified it,
5    right. We have other ones that look at the
6    increase in, say, symptoms, for example, or
7    exacerbations per very small increment in
8    particulate matter.
9              So like, I think if you -- if you're
10   looking at our studies, you're not going to find a
11   relative risk that's, like -- that's analogous to
12   these where this is the relative risk of an
13   outcome for secondhand smoke, yes/no. Ours are
14   reported not by that but by little tiny increments
15   or decrements of -- of particle concentrations.
16       Q   Do you know what the relative risk is
17   for indoor ambient air?
18       A   That's --
19           MS. BROWN: Objection to the form.
20           THE WITNESS: That's not a full
21   question.
22   BY MS. PARFITT:
23       Q   Do you -- is there a relative risk for
24   exposure to the lungs in indoor particulate
25   matter?

Page 372

1            MS. BROWN: Objection to the form. You
2    need the disease to link the --
3            MS. PARFITT: Lung. Lung.
4            MS. BROWN: You mean cancer? Objection
5    to the form.
6            THE WITNESS: Anyway, I can't answer it.
7    You need more in the sentence or the question in
8    order for me to be able to answer it.
9    BY MS. PARFITT:
10       Q   Okay. Are there any -- fair enough.
11           Are there any reported relative risks
12   between indoor particulate matter and lung
13   disease?
14           MS. BROWN: Objection to the form.
15           THE WITNESS: I'd want to be super
16   careful about what we're saying is lung disease,
17   because some people might think that that means
18   the risk of developing a particular lung disease,
19   and others might mean the worsening of an existing
20   disease or a lung function abnormality.
21   BY MS. PARFITT:
22       Q   Okay. Do you know what the relative
23   risk is between indoor particulate matter and
24   asthma?
25       A   The risk of developing asthma?

Page 373

1        Q   Correct.
2        A   It's not --
3            MS. BROWN: Objection to the form.
4            THE WITNESS: Sorry. It's not known.
5    BY MS. PARFITT:
6        Q   It's not known.
7        A   Not known.
8        Q   It's not been published.
9        A   Well, I can't say there's not a single
10   paper out there, but at this point the -- a
11   summary of the evidence is that we can't say for
12   sure that it's -- that it causes asthma.
13       Q   Have you reviewed in any of the
14   literature published data with regard to airborne
15   particles -- indoor airborne particles and asthma
16   as to what the relative risk may be?
17           MS. BROWN: Objection to form.
18           THE WITNESS: Relative risk of?
19   BY MS. PARFITT:
20       Q   Relative risk of asthma from exposure to
21   indoor air particulate.
22           MS. BROWN: Objection to the form.
23           THE WITNESS: So I -- I've read a ton of
24   stuff about it. I mean if you've got a particular
25   article, I'm happy to read it and interpret it.

94 (Pages 370 to 373)

Gregory B. Diette, M.D.

Page 374

1    But as of this point, I think we -- should I
2    explain or just --
3    BY MS. PARFITT:
4        Q   No, I -- all I really want to know in
5    the interest of time is whether or not you have
6    reviewed any of the scientific literature data
7    that reports what the relative risk is for indoor
8    particulate matter and the risk of getting asthma?
9        MS. BROWN:  Objection to the form.
10   BY MS. PARFITT:
11       Q   And if you haven't, that's fine.
12       A   Oh, my gosh, no, it's not that.  I have.
13   I just don't think that you can answer that
14   question.  I'm not saying there's not some study
15   out there that may estimate a risk for that, but
16   it isn't established.  Like, at this point, we
17   cannot say in 2019 that indoor particulate matter
18   causes asthma.
19       And -- and you have to say more to the
20   sentence.  So let's just talk about like adults
21   living in the city.  We can't say that.  You
22   know -- you know, there's -- there's studies that
23   have looked at the relative risk of indoor
24   cooking, which is predominantly particulate
25   matter, in developing countries, but even the

Page 375

1    asthma evidence is not fully developed.
2        So it's just -- it's one of those things
3    where you may find a paper that has an estimate,
4    but it hasn't been fully established yet.
5        Q   All right.  Do you -- I understand it's
6    not fully established, but are there reported
7    relative risks from the scientific literature?
8        MS. BROWN:  Objection.
9        THE WITNESS:  I'm sure there are.
10       MS. BROWN:  Objection --
11       THE WITNESS:  I'm sure there are, but --
12   BY MS. PARFITT:
13       Q   There are.  Do you know what they are?
14       MS. BROWN:  Objection to the form.
15       THE WITNESS:  Oh, my gosh.
16   BY MS. PARFITT:
17       Q   If you know.  If -- like, do you know
18   there is a range of relative risks between
19   exposure to indoor particulate matter and asthma?
20       MS. BROWN:  Objection to the form of the
21   question.
22       THE WITNESS:  I've got to see what
23   you're talking about, because I think that when
24   you ask it that way, there may be some estimate
25   based on a particular number of micrograms per

Page 376

1    meter cubed.  It may be from a particular source,
2    like traffic-related pollution or not.
3        I mean there's more to it.  There's not
4    just like some summary that -- that I can -- I can
5    make.  Maybe you can find somebody that can just
6    say particulate matter has this risk of causing
7    asthma.  I haven't seen it.
8        But it's not there aren't like a whole
9    bunch of studies looking at the relationship
10   between indoor and outdoor particulate matter and
11   lung disease as both, you know, developing newly
12   and worsening the existing ones.
13   BY MS. PARFITT:
14       Q   Right.  Does secondhand smoke cause lung
15   cancer?
16       MS. BROWN:  Objection to the form.
17       THE WITNESS:  It seems -- it seems that
18   that -- that has been established.
19       (Counsel conferring.)
20   BY MS. PARFITT:
21       Q   Okay.  Let's talk a little bit --
22       THE WITNESS:  We're just doing a time
23   check.  I'm just trying -- do you know roughly how
24   much we --
25       THE VIDEOGRAPHER:  Five hours, 34

Page 377

1    minutes.
2        THE WITNESS:  So a little under an hour
3    and a half?  Did you guys want to do a --
4        MS. PARFITT:  A quick break here?  Sure.
5        THE WITNESS:  -- or a break here or
6    wait?
7        MS. PARFITT:  No, that's fine.  We can
8    take a quick one now.  That's fine.
9        THE VIDEOGRAPHER:  The time is 3:50 p.m.
10   We're going off the record.
11       (Recess.)
12       THE VIDEOGRAPHER:  The time is 4:10 p.m.
13   We're back on the record.
14       We're on the record, by the way.
15       (A discussion was held off the record.)
16       (Diette Exhibit Nos. 25 and 26
17       were marked for identification.)
18   BY MS. PARFITT:
19       Q   Are you ready, Dr. Diette?
20       A   I am.  Thank you.
21       Q   Very good.
22       THE VIDEOGRAPHER:  Microphone, Counsel.
23   BY MS. PARFITT:
24       Q   Dr. Diette, I -- I asked you a little
25   bit earlier about the relative risk for secondhand

95 (Pages 374 to 377)

Gregory B. Diette, M.D.

Page 378

1    smoke and -- and lung cancer.
2         And what I would like you to do is --
3    and I apologize, I don't have copies of this -- so
4    I'm showing you what is the report of the Surgeon
5    General, I believe it was back in 2006, "The
6    Health Consequences of Involuntary Exposure to
7    Tobacco Smoke, A Report of the Surgeon General."
8         Have you read that in the past?
9    A    So definitely not every word, but I've
10   read big chunks of it.
11   Q    Okay.  I figured with your work you may
12   have.
13   A    Yeah.
14   Q    All right.  Let me direct your attention
15   to --
16        MS. PARFITT:  And I apologize to all, so
17   you have to look on the camera -- on the screen.
18        MS. BROWN:  Okay.  So just for the
19   record, we don't have copies of this, and so I
20   will object to the fact that we have no context or
21   ability to look at the document ourselves.
22        MS. PARFITT:  All right.
23   BY MS. PARFITT:
24   Q    And again, Doctor, you've reviewed this
25   report, correct, in the past?

Page 379

1    A    In the past, and I've read parts of it,
2    but as you know, I mean it's a humongous --
3    Q    It is big.
4    A    -- document, and so some parts
5    weren't -- weren't for me.
6    Q    All right.  I want to focus your
7    attention on the conclusions of the Surgeon
8    General's report.
9         And 1:  "The evidence is sufficient to
10   infer a causal relationship between secondhand
11   smoke exposure and lung cancer among lifetime
12   nonsmokers.  This conclusion extends to all
13   secondhand smoke exposure, regardless of location.
14        "2.  The pooled evidence that indicates"
15   -- sorry -- "the pooled evidence indicates a 20 to
16   30 percent" -- that would be a 1.2 or 1.3 relative
17   risk -- "increase in the risk of lung cancer from
18   secondhand smoke exposure associated with a
19   smoker."
20        Did I read that correctly?
21   A    You did.
22   Q    And is that what the -- are those the
23   numbers, 1.2 and 1.3, the relative risks that the
24   Surgeon General has concluded is --
25   A    Um -- I'm sorry.

Page 380

1    Q    That's all right.
2         -- is related to secondhand smoke and
3    lung cancer?
4         MS. BROWN:  Objection to the form.
5         THE WITNESS:  It looks like it there.  I
6    remember there's other numbers in there as well,
7    but I mean, I remember it being 1-point something
8    and --
9    BY MS. PARFITT:
10   Q    Does that refresh my memory?
11        MS. BROWN:  Well, let him finish,
12   please.
13        THE WITNESS:  I think there's somewhere
14   else in there where there's other estimates, but
15   still not like -- not sky high.  Still less than
16   2.0.
17   BY MS. PARFITT:
18   Q    But you don't disagree with the Surgeon
19   General's conclusion that the pooled evidence
20   indicates a 20 to 30 percent increase in the risk
21   of lung cancer from secondhand smoke exposure
22   associated with living with a smoker, correct?
23        MR. LOCKE:  Objection.
24        MS. BROWN:  Objection.  He doesn't have
25   the document, he can't review it.

Page 381

1    BY MS. PARFITT:
2    Q    Are you disputing that conclusion?
3         MS. BROWN:  Objection.  He has no basis
4    to do it, he doesn't have the document.
5    BY MS. PARFITT:
6    Q    Are you disputing that, Doctor?
7    A    I would --
8         MR. LOCKE:  Objection.
9         THE WITNESS:  I would say it fits with
10   what I understood to be true at the time that that
11   was published.
12   BY MS. PARFITT:
13   Q    Fair enough.  Thank you.  I appreciate
14   that.
15        Dr. Diette, is it fair that -- to say
16   that we don't have, and you've not reviewed, any
17   Johnson -- Johnson & Johnson specific epidemiology
18   with regard to a study of just Johnson & Johnson
19   Baby Powder?
20        MS. BROWN:  Objection to the form.
21        THE WITNESS:  That is correct.
22   BY MS. PARFITT:
23   Q    Okay.  And so what we rely on, and what
24   you've relied on, rather, is data and
25   epidemiological science on all comers, all brands,

Gregory B. Diette, M.D.

Page 382

```
 1    correct?
 2          MS. BROWN:  Objection to the form.
 3          MR. LOCKE:  Objection.
 4          THE WITNESS:  I -- I wouldn't
 5    characterize it exactly that way.  I mean I would
 6    say that I can't really sort between different
 7    brands based on the epidemiologic literature, but
 8    whatever all brands is, I don't -- you know, I
 9    don't know what that represents.
10    BY MS. PARFITT:
11          Q    And would it be fair then if one product
12    that contained -- one product, talcum powder
13    product contained asbestos, and another did not,
14    that would result in a conclusion that would draw
15    it towards the null?  Is that fair?
16          MS. BROWN:  Objection to the question.
17          THE WITNESS:  I don't understand that.
18    BY MS. PARFITT:
19          Q    Okay.
20          A    I mean I understand the idea of drawing
21    something to the null.  I just don't understand --
22          Q    Sure.
23          A    -- what preceded that.
24          Q    If you have a product like Johnson &
25    Johnson, and you -- and it has a carcinogen in it,
```

Page 383

```
 1    and you lump it together with other products that
 2    are not infected or contaminated with asbestos,
 3    what does that do to the overall relative risk --
 4          A    Oh.
 5          Q    -- when studying that product?
 6          MS. BROWN:  Objection to the incomplete
 7    hypothetical.
 8          THE WITNESS:  So concept and reality,
 9    right.  So the concept would be, if you knew that
10    there were enough asbestos that led to an exposure
11    that was enough in order to cause a disease from
12    one product, and it was pooled with another
13    product that didn't have that same amount or
14    didn't have any asbestos but you knew that there
15    was enough to cause disease, then it would -- it
16    would do exactly what you're saying, is it would
17    move it towards -- towards one.
18          The reality is there wouldn't be any
19    impact whatsoever because the epidemiology already
20    takes into account whatever those brands are, and
21    so it doesn't change the totality of the evidence
22    that we have available for us.
23          So concept, I mean you could sort of
24    imagine what you're saying to be true, but
25    reality, no.
```

Page 384

```
 1    BY MS. PARFITT:
 2          Q    Okay.  When you say it doesn't change
 3    the totality of the evidence that we have
 4    available for us, isn't it true that the presence
 5    of a carcinogen, like asbestos in talcum powder
 6    products, supports the biological -- biologically
 7    plausible mechanism for association between talcum
 8    powder products and ovarian cancer?
 9          MS. BROWN:  Objection to the form of the
10    question.
11          THE WITNESS:  I -- I'd say no.  And for
12    reasons, if you want them, or just leave it at no.
13    BY MS. PARFITT:
14          Q    Well, you've testified that asbestos is
15    a carcinogen.  Correct?
16          A    Correct.
17          Q    All right.  And the fact that asbestos
18    might be in the talcum powder product does not
19    impact your opinions with regard to the increased
20    biologically plausible mechanism for talc to cause
21    ovarian cancer.
22          MS. BROWN:  Objection to the form.  Are
23    you talking about a Johnson & Johnson product?
24          MS. PARFITT:  Just generally.
25          MS. BROWN:  Objection to the form.
```

Page 385

```
 1          THE WITNESS:  It -- it does not.
 2          As you ask these things, I'm trying to
 3    figure out if I'm supposed to explain what I'm
 4    saying or is --
 5          MS. BROWN:  No, you answered the
 6    question.
 7          THE WITNESS:  Okay.
 8          MS. BROWN:  She'll ask you another one
 9    if she has one.
10          THE WITNESS:  Okay.  All right.
11    BY MS. PARFITT:
12          Q    Does Johnson & Johnson sell baby powder
13    that's 99 percent asbestos and 1 percent
14    fragrance?
15          MS. BROWN:  Objection to the form of the
16    question.
17          THE WITNESS:  If they do, I'm not aware
18    of that.
19    BY MS. PARFITT:
20          Q    Okay.  And if I understand, the presence
21    of asbestos in a talcum powder product does not in
22    your mind impact the biologically plausible
23    mechanism for talcum powder products to cause
24    ovarian cancer.
25          MR. LOCKE:  Objection.
```

97 (Pages 382 to 385)

Gregory B. Diette, M.D.

Page 386

1      THE WITNESS: No, there's not enough
2  information in what you said there.
3  BY MS. PARFITT:
4      Q   What would you need?
5      A   So I would need a couple of things.  One
6  is I would need to have some estimate of what the
7  dose would be, and some assurance from somewhere,
8  which I don't have, that that represented a dose
9  that was sufficient to cause -- and by dose, I'm
10  talking about dose of asbestos, right -- that that
11  was a sufficient dose to cause ovarian cancer.
12      And based on what I've seen, I can't
13  make that link.  I can't -- I haven't seen
14  anything that says that there's a plausible
15  concentration or dose that people would be exposed
16  to that links to anything I can find in the
17  epidemiologic literature about how much, if any,
18  it would take in order to -- to cause ovarian
19  cancer.  And what I -- should I finish?
20      Q   Mm-hmm, yeah, finish.
21      A   Okay.  I'm sorry.
22      Q   I'm trying not to interpret you.
23      A   No, no, you're not.  I didn't mean -- I
24  didn't think you were.
25      Q   So doing better.

Page 387

1      A   I didn't think you were.
2      So I mean there's more, right.  I mean
3  so the -- if you look at IARC and what those
4  studies represented, they represent for the most
5  part -- and by IARC, I'm talking about IARC and
6  ovarian cancer and asbestos -- you know, mostly
7  circumstances that aren't typical of American
8  women.  For example, so women in Europe who were
9  working at a time and place when there was
10  different forms and lots of asbestos that may have
11  been sufficient to cause other asbestos-related
12  diseases.
13      So if you -- if those -- if those
14  findings are absolutely accurate -- you know, you
15  take away the issue of misclassification or
16  anything else -- if they're absolutely accurate,
17  you've got a relative risk in the neighborhood of
18  like 1.75 or something like that.
19      So I'm not saying that's not an
20  important risk, but it's not a huge risk, right?
21  So we're taking heavy industrial exposure to get
22  to a 1.75.  I haven't seen anything that could
23  tell me that anything we're talking about here
24  could possibly rise to the level of heavy
25  industrial exposure.

Page 388

1      And then I think if you -- if you pair
2  that with more modern studies, if you take like
3  the Reid study from Australia, you take women who
4  worked, you know, in and around a crocidolite
5  mine, they certainly had enough exposure to get
6  asbestos-related diseases, but they don't get
7  ovarian cancer.
8      And so I think that the -- you know, the
9  sum total of all that just -- it doesn't make
10  sense that just knowing the fact that there's some
11  particle -- even if it's true, that some particle
12  of asbestos is going to be enough to cause
13  disease.
14      Q   Okay.  Have you -- have you read -- I
15  didn't see it in your reliance list -- Reid, 2012?
16      A   I have two Reeds, I think, and if I only
17  listed one, I meant to include two.
18      Q   Yeah, you only listed 2011 Reid.  You
19  didn't list 2012 Reid.
20      A   I meant -- so I don't know which one is
21  there.  There's one from Whitnum, which is the
22  study of the women that -- you know, that I was
23  just describing, and a separate one is -- it's
24  basic -- basically like a meta-analysis or a
25  reanalysis of the ovarian cancer and asbestos

Page 389

1  literature.
2      Q   Okay.  Do you recall from your reading
3  that the scientists in Reid 2012 determined that
4  childhood exposure to asbestos was associated with
5  an increased risk of cancer mortality which was
6  3.5 times greater than the general population?  Do
7  you recall those numbers?
8      A   I don't, but cancer mortality to --
9      MS. BROWN:  Objection.
10      THE WITNESS:  Can you tell me which --
11  because I don't remember which year links to which
12  Reid study.
13  BY MS. PARFITT:
14      Q   That was the 2012 that I was speaking
15  of.
16      A   No, I understand that.  I heard the
17  year, but I don't know what the title is.
18      Q   Oh, the title is "All-cause mortality in
19  cancer incidence among adults exposed to blue
20  asbestos during childhood."
21      A   I think that's a third study then,
22  because I think the two I'm referring to are --
23  are two different ones.
24      Q   All right.  So did you read the 2012 or
25  that just wasn't one you read?

98 (Pages 386 to 389)

Gregory B. Diette, M.D.

Page 390

1    MS. BROWN:  Well, Counsel, can you show
2  it to him and he'll tell you?
3    MS. PARFITT:  Sure.
4    THE WITNESS:  I don't know if either of
5  the ones that I cite, you know, that I'm familiar
6  with are from 2012, but I don't think I read the
7  one that you're talking about.
8  BY MS. PARFITT:
9    Q    Okay.  From looking at your curriculum
10  vitae and the studies you cited, you cited Reid --
11  actually you cited three Reids.  You cited Reid
12  2011, you cited Reid 2008, and you cited Reid
13  2009.  The study that you did not cite was Reid
14  2012.
15    A    That -- that sounds believable.  That
16  makes sense.
17    Q    All right.  So for purposes of the
18  opinions in your report, you did not rely on Reid
19  2012, is that fair?
20    MS. BROWN:  Objection to the form of the
21  question.
22    THE WITNESS:  I -- I don't think I'm
23  familiar with that study.
24  BY MS. PARFITT:
25    Q    Okay.  Fair enough.

Page 391

1    Are you able to share with us,
2  Dr. Diette, what the minimum dose of asbestos is
3  necessary in order to cause an ovarian cancer?
4    MS. BROWN:  Objection to the form of the
5  question.
6    THE WITNESS:  I haven't seen that
7  published.  I can tell you that at least in one of
8  those Whitnum studies that women were exposed to
9  as much as 40 fiber/cc years cumulatively of
10  crocidolite, and -- and that apparently wasn't
11  enough to cause ovarian cancer.  But I didn't see,
12  you know, good measurements or estimates from
13  the -- the more historic to say what the exposures
14  were.
15  BY MS. PARFITT:
16    Q    Okay.  IARC looked at the issue of
17  asbestos and ovarian cancer, correct?
18    A    They did.
19    MS. BROWN:  Form.
20    THE WITNESS:  Sorry.
21  BY MS. PARFITT:
22    Q    All right.  IARC concluded that asbestos
23  causes ovarian cancer.
24    MS. BROWN:  Form.
25    MR. LOCKE:  Objection.

Page 392

1    THE WITNESS:  I'm not disagreeing with
2  you, I think that's the language they use, but
3  they -- they used their -- their strongest --
4  their strongest grading.
5  BY MS. PARFITT:
6    Q    How many of the IARC studies that formed
7  the basis for IARC's conclusion that asbestos
8  causes ovarian cancer was there information
9  concerning the exposure and the dose?
10    A    So I think you said something that you
11  didn't mean to, because I think you said how many
12  of the IARC studies that IARC considered.  I
13  think -- did you mean how many of the underlying
14  studies that IARC considered?
15    Q    Correct.
16    A    Okay.  And so there's at least five that
17  I remember that were like sort of factory worker
18  type studies, and then I think there were a couple
19  of more.  I'd have to go back, though, to look and
20  see what -- what they had about dose, if anything.
21  My -- I'm thinking like at least for the World
22  War II era ones, they probably didn't have good
23  measures at all, you know, if any.
24    Q    Okay.  Let me show you what I will have
25  marked as Exhibit 27.

Page 393

1    (Diette Exhibit No. 27 was marked
2    for identification.)
3    MR. ROSEN:  26, for the record, is the
4  Surgeon General's report, which we'll supplement
5  with a paper copy.
6    THE WITNESS:  The same one -- the same
7  one that we were talking about before the
8  secondhand smoke or involuntary smoke?
9    MR. ROSEN:  Right, so there won't be a
10  26 in the file.
11    THE WITNESS:  Got you.
12  BY MS. PARFITT:
13    Q    Let me show you what we have marked as
14  Exhibit 27.
15    Do you have that in front of you?
16    A    I have the "Arsenic, Metals, Fibres and
17  Dusts," 100C IARC.
18    Q    That's correct, that's the right one.
19    Okay.  Let me direct your attention to
20  the bottom of page 253.
21    Do you have that?
22    A    253?
23    Q    253, correct.
24    A    I do.
25    Q    All right.  And it says:  "An

Gregory B. Diette, M.D.

Page 394

1 examination of the association between asbestos
2 and ovarian cancer was not undertaken by the IOM,"
3 and then it has a 2000 -- a 2006 date. Correct?
4      A   Yes.
5      Q   Okay. Now, before we get to Table 2.8,
6 what I want you to do is turn over to page 256.
7          All right. And again, directing your
8 attention to the far right column. Are you there?
9 And it starts with, "Working group"?
10     A   I am. I'm sorry, I'm distracted because
11 I think there's --
12         MS. BROWN: It has a weird --
13         THE WITNESS: -- there's like a font
14 issue or something, like somebody's printer didn't
15 have the right --
16 BY MS. PARFITT:
17     Q   That might have been ours. I apologize.
18 Not ideal circumstances.
19         All right. Do you see where it says,
20 "The working group"?
21     A   I do.
22     Q   All right. "The working group noted
23 that a causal association between exposure to
24 asbestos and cancer of the ovary was clearly
25 established based on five strongly positive cohort

Page 395

1 mortality studies of women with heavy occupational
2 exposure to asbestos."
3          Do you see that?
4      A   I do.
5      Q   Okay. And then if you go -- and then it
6 cites those studies.
7          Do you see that?
8      A   I do.
9      Q   And go down to where it starts: "The
10 working group carefully considered the
11 possibilities that cases of peritoneal
12 mesothelioma may have been misdiagnosed as ovarian
13 cancer, and that these contributed to the observed
14 excesses."
15         Do you see that?
16     A   I do.
17     Q   Okay. Did I read that correctly?
18     A   Yes.
19     Q   Okay. In your report you stated that it
20 was your belief that perhaps the results were
21 limited by virtue of the fact that there may have
22 been misdiagnosis between peritoneal mesothelioma
23 and ovarian cancer cases.
24         Do you remember writing that?
25     A   I do.

Page 396

1      Q   Okay. Do you see where the working
2 group of IARC considered all of the data, and they
3 made a determination that there were not, at the
4 bottom, sufficient -- they ruled out the
5 possibility that there may have been a
6 misdiagnosis.
7          Do you see that?
8          MS. BROWN: Objection to the form.
9          THE WITNESS: I see that they've -- that
10 they reached that -- that conclusion.
11 BY MS. PARFITT:
12     Q   Okay. And that's different than the
13 conclusion you raised in your report, correct?
14     A   Well, it's different --
15         MS. BROWN: Objection.
16         THE WITNESS: It is different, yes.
17 BY MS. PARFITT:
18     Q   All okay. Right. Let's go back to
19 again page 253.
20         And you will see it references a table,
21 Table 2.8. Do you see that on the top of 254?
22     A   Okay.
23     Q   Okay. Got that.
24         Okay. Let me show you what we'll have
25 marked as Exhibit 28.

Page 397

1          (Diette Exhibit No. 28 was marked
2          for identification.)
3 BY MS. PARFITT:
4      Q   Okay. Diette Exhibit 28, if you will.
5 There you go.
6          MS. PARFITT: And, Counsel, I have a
7 copy for you.
8          MS. BROWN: Thank you.
9          MS. PARFITT: Of course.
10         Sorry, guys. I'm going to need one.
11 I'm sorry. I'll give you this one later.
12 BY MS. PARFITT:
13     Q   Okay. I will represent to you that that
14 is -- that is Table 2.8, which is referenced in
15 the IARC report on page 253 and 254.
16         And it says: "Epidemiological studies
17 of asbestos exposure and ovarian cancer," and then
18 in parens, "and for comparison, lung cancer and
19 mesothelioma."
20         Do you see that?
21     A   I do.
22     Q   All right. Look over at the first study
23 mentioned there, the Atkinson study from 1982.
24     A   Mm-hmm.
25     Q   All right. Do you see that the relative

Gregory B. Diette, M.D.

Page 398

1 risk for ovarian cancer and lung cancer, for
2 ovarian cancer it was 2.75, and for lung cancer it
3 was 2.41. Do you see that?
4     A   I do.
5     Q   Okay. Then move down to the Wignall and
6 Fox study. It's a 1982 study. Do you see that?
7     A   I don't -- oh, yeah, the next one down,
8 yeah.
9     Q   Okay, yeah. Do you see that the
10 relative risk for ovarian cancer were 2.13, and
11 for lung cancer 2.73?
12     A   Correct.
13     Q   And let's move down to Pira in 2005. Do
14 you see where the relative risk for ovarian cancer
15 were 2.61 and for lung cancer 2.82?
16     A   I do.
17     Q   All right. And then let's move to
18 Magnani, a 2008 study.
19         All right. Do you see -- and this is
20 one of the studies that the working group of IARC
21 looked at. They determined that the relative risk
22 for -- not determined -- they indicated that the
23 relative risk for ovarian cancer on the Magnani
24 study was 2.27, and for lung cancer 2.20.
25         Do you see that?

Page 399

1     A   I do.
2     Q   All right. And let's go on to the
3 Ferrante study. Do you see that?
4         MS. BROWN: Where -- where are you?
5         MS. PARFITT: On the last page.
6 BY MS. PARFITT:
7     Q   Do you see that? It's on the last page,
8 Ferrante, 2007. Do you see that?
9     A   I do.
10     Q   Okay. And the relative risk for ovarian
11 cancer was 1.43, and for lung cancer it was 1.17.
12         Now, I'll represent to you, Doctor --
13 or, Dr. Diette, is it fair to say that this
14 Table 2.8 of epidemiological exposures, asbestos
15 exposure and ovarian cancer formed part of the
16 bases for IARC's decision in their IARC report
17 that asbestos -- or ovarian -- asbestos causes
18 ovarian cancer?
19     A   I assume so, yeah.
20     Q   Okay. All right. Let's talk a little
21 bit -- do you intend to give an opinion in this
22 case that fibrous talc is a carcinogen?
23         MS. BROWN: Objection to the form.
24         THE WITNESS: I just want to correct
25 something real quick.

Page 400

1 BY MS. PARFITT:
2     Q   Sure.
3     A   In one of your questions a little while
4 back, you were asking me to agree that you were
5 reading fine, and you were for the relative risks.
6     Q   Yeah.
7     A   None of these are relative risks,
8 though. They're SMRs and SIRs. So just a
9 slightly different --
10     Q   I appreciate that. Thank you. Thank
11 you for the correction. Thank you.
12         Next question. Do you intend to give an
13 opinion that fibrous talc is a carcinogen?
14         MS. BROWN: Form.
15         THE WITNESS: I'm not sure I understand
16 what fibrous talc is.
17 BY MS. PARFITT:
18     Q   Okay. Let me direct your attention
19 to -- we'll go back to the IARC on ovarian
20 cancer -- or, excuse me, IARC on asbestos.
21 Paragraph 1.1 on page 219.
22         Are you there?
23     A   Paragraph 1, yes.
24     Q   Yes. Okay. Do you see where after it
25 has IARC, '73, and USGS, 2001, it states: "The

Page 401

1 conclusions reached in this monograph about
2 asbestos and its carcinogenic risks apply to these
3 six types of fibres wherever they are found, and
4 that includes talc containing asbestiform fibres."
5         Do you see that?
6     A   Yes.
7     Q   All right. Do you intend to give an
8 opinion in this case that talc containing
9 asbestiform fibers can cause ovarian cancer?
10         MS. BROWN: Objection to the form.
11 That's different than the original question.
12         MS. PARFITT: It is.
13         MS. BROWN: Did you mean it to be?
14         MS. PARFITT: No. I mean the new
15 question.
16         MS. BROWN: Okay.
17         THE WITNESS: So, because to me, the way
18 I have read this before and then also again now, I
19 think, although I can't know what they were
20 intending, but this to me says basically talc with
21 asbestos in it -- what we would agree is talc with
22 asbestos in it, as opposed to something else.
23         And I don't think you need the "talc
24 containing." I think you could say anything
25 containing asbestos, you know, could potentially

Gregory B. Diette, M.D.

Page 402

1   increase carcinogenic risk if there's enough of a
2   dose.
3   BY MS. PARFITT:
4        Q   Okay.  Did you see anywhere in the IARC
5   working group document that we've been talking
6   about that the working group determined that there
7   was a causal association between asbestos and
8   ovarian cancer, but it depended on the dose?
9        MR. LOCKE:  Objection.
10       MS. BROWN:  Objection to the form of the
11  question.
12       THE WITNESS:  I don't recall.
13  BY MS. PARFITT:
14       Q   Okay.  You've worked an secondhand smoke
15  studies, correct?
16       A   Yes.
17       Q   How do you determine the dose for those?
18       MS. BROWN:  Objection to the form.
19       THE WITNESS:  So the dose of secondhand
20  smoke?
21  BY MS. PARFITT:
22       Q   Mm-hmm.
23       A   So it depends, right.  So at the moment,
24  it -- so it depends upon which kind of study.  And
25  when you say "you," do you mean you in the broad

Page 403

1   sense or me, Greg Diette?
2        Q   Well, Greg Diette has been doing
3   research on secondhand smoke, and you, Greg
4   Diette, has indicated that dose is important to
5   you.  So what I'd like to know is how you measure
6   the dose in your secondhand smoke.
7        A   Yeah, so a lot of different --
8        MS. BROWN:  Objection.  Dose is
9   important to him as it relates to secondhand
10  smoke, is that what the question is asking?
11       MS. PARFITT:  No.
12  BY MS. PARFITT:
13       Q   I was just reiterating that you,
14  Dr. Diette, have done several secondhand smoke
15  studies, correct?
16       A   Yes.
17       Q   Okay.  And how do you measure the dose
18  in the studies that you have performed?
19       A   So different ways, depending upon the
20  studies.  So for some studies, it's simple enough
21  to ask, especially if you're talking about an
22  adult, whether or not they've had secondhand smoke
23  exposure from their parents, often broken down by
24  whether it's mother or father.  And for some --
25  some studies, that's a sufficient indicator of a

Page 404

1   sufficient dose.  It's not a measurement of dose.
2   It's an indicator of sufficient -- sufficient
3   exposure to be linkable to things like lung
4   cancer.
5        The same kind of question for being
6   around coworkers, and so a yes/no to that has been
7   sufficient.
8        In our other studies, we -- we get more
9   precise so that we'll -- and use a variety of
10  overlapping methods.  So one is to -- to query --
11  if it's a child study, to query the parent about
12  the number of cigarettes that are smoked per day
13  in the home, and with a very elaborate procedure
14  of asking not only the person who is answering the
15  questionnaire but about all the other people that
16  are in and out of the house that day, so we get a
17  count of cigarettes.
18       We also use different types of
19  particulate matter monitors, and we've established
20  that you can estimate about 1 microgram per meter
21  cubed of particulate matter per cigarette smoked
22  in the home.  So we've got an estimate that way.
23       We -- we collect nicotine and cotinine
24  from a variety of sources, so we've collected
25  hair, saliva, urine, and blood.  And so depending

Page 405

1   upon which study and which population, we can
2   estimate something about dose based on what
3   their -- what their sort of biomarker is.
4        Q   All right.  How much have you --
5   understanding those metrics, for lack of a better
6   word, how much smoke does a patient need to
7   actually inhale?
8        MS. BROWN:  For what?
9   BY MS. PARFITT:
10       Q   In order to determine whether or not
11  they have been impacted by secondhand smoke.
12       MS. BROWN:  Objection to the form.
13       THE WITNESS:  That's a complicated
14  question, I guess, because we don't -- at least in
15  our studies, we don't measure -- like I don't know
16  what that means, like how much they inhale.  I can
17  tell you, you know, what their absorbed dose is of
18  nicotine, right, which has some implication about
19  how much they might have inhaled, but I don't
20  relate that to like sort of a volume of smokey air
21  or something like that, the way that you might if
22  you were doing like a smoke machine, you know,
23  study.
24       So it's really -- it's implied, right.
25  If you find it in the urine and the blood, they

Gregory B. Diette, M.D.

Page 406

1    inhaled it enough in order to get that particular
2    fluid level high enough to -- for you to measure
3    it.  And same with saliva and same with hair.
4    BY MS. PARFITT:
5         Q.  Okay.
6         A.  I left one out too.  We also measure
7    airborne nicotine, and so that's another
8    indicator.  So I was talking about cotinine that's
9    measured in -- in the people, but we also have
10   nicotine matches, and we'll measure nicotine
11   directly in the environment.
12        Q.  Based upon -- I meant to ask this
13   earlier.  Based upon your study of ovarian cancer
14   and talcum powder products that you've done for
15   Johnson & Johnson, have you made any of these
16   recommendations to Johnson & Johnson as to how --
17   what kind of study they could perform in order to
18   ascertain dose?
19        MS. BROWN:  What?
20        MR. LOCKE:  Objection.
21        MS. BROWN:  Objection to the form of the
22   question.
23   BY MS. PARFITT:
24        Q.  Let me ask it again.
25        A.  Oh, no, I heard it.  I was just -- I

Page 407

1    guess the broad answer is no.  I mean I haven't
2    made any recommendations about studies to Johnson
3    & Johnson for -- for anything.
4         Q.  Okay.  And the reason I ask is, your
5    work appears to be reviewing and surveying the
6    literature for Johnson & Johnson in order to give
7    litigation opinions on whether or not talcum
8    powder products can cause ovarian cancer.
9         MR. LOCKE:  Objection.
10        MS. BROWN:  Objection to the form of the
11   question.
12   BY MS. PARFITT:
13        Q.  Correct?
14        A.  Can you say it again?
15        Q.  Sure.
16        A.  I spaced out a little bit.
17        Q.  No, that's all right.  It's getting late
18   in the day.
19        Your work for Johnson & Johnson appears
20   to be surveying the literature, preparing
21   litigation reports, and then giving testimony in a
22   court that the Johnson & Johnson product is safe.
23        And my question for you is, what have
24   you done in order to inform the scientific
25   community of the results of your -- your now

Page 408

1    couple-year study and, you know, tens of thousands
2    of dollars spent doing it?
3         MR. LOCKE:  Objection.
4         MS. BROWN:  Objection to the form.
5    There are multiple questions in there, Counsel.
6    Can you rephrase?
7    BY MS. PARFITT:
8         Q.  Do you understand the question?
9         A.  The -- the last part you said -- I'll
10   try to paraphrase it so we know we're talking
11   about the same thing.  I have not -- I have not
12   done anything to inform the medical community
13   about the findings so far from my -- you know,
14   from my work on these cases.
15        Q.  Do you intend to do so?
16        A.  I don't have any active intention to do
17   it right now.
18        Q.  Okay.  Do you intend to have your report
19   peer -- published?
20        A.  It's not in the right format for that.
21        Q.  Okay.  Do you intend to do any
22   meta-analysis of your work?
23        MS. BROWN:  Objection to the form.
24        THE WITNESS:  Not on that -- not on that
25   topic.

Page 409

1    BY MS. PARFITT:
2         Q.  Okay.  And if you saw with regard to
3    Health Canada, they have given -- they gave
4    individuals an opportunity to comment on the work
5    that they did and present that to them.
6         You saw that, correct?
7         A.  Yes.
8         Q.  Okay.  So you had an opportunity as
9    someone who's reviewed the literature to write to
10   Health Canada and inform them of your concern
11   about the manner in which they conducted their
12   study.  Fair?
13        MS. BROWN:  Objection to the form, lacks
14   foundation.
15        THE WITNESS:  I guess.  I actually don't
16   know who they're asking.  Like I haven't looked to
17   see whether they're looking for people outside of
18   Canada.
19        I don't even know who they are.  I mean
20   the only reason I've heard of Health Canada is
21   because of this litigation and because something,
22   you know, opportunistic came up.  But otherwise, I
23   mean I wouldn't be talking to Health Canada about
24   anything or reading whatever they've written.
25   BY MS. PARFITT:

103 (Pages 406 to 409)

Gregory B. Diette, M.D.

1      Q   Something opportunist came up.  Is that
2    the fact that you are being engaged in this
3    litigation --
4      A   No.
5        MS. BROWN:  Objection --
6    BY MS. PARFITT:
7      Q   -- as an expert witness?
8        MS. BROWN:  Objection to the form.
9        THE WITNESS:  Oh, no, I just see -- I
10   think the reason that I have it in front of me is
11   because it -- it seemed to help -- help
12   plaintiffs' experts to be able to say something
13   else about this -- this story.  And if -- if it
14   had said something else, then I probably wouldn't
15   even have heard about it.
16   BY MS. PARFITT:
17     Q   Okay.  This story, Dr. Diette, is about
18   women who are dying of ovarian cancer --
19        MS. BROWN:  Careful -- what's the
20   question?
21   BY MS. PARFITT:
22     Q   -- having been exposed to talcum powder
23   products.
24        Do you understand that?
25        MR. LOCKE:  Objection.

1        MS. BROWN:  Objection to the form of the
2    question.
3        THE WITNESS:  I understand the general
4    notion is about ovarian cancer and whether there
5    is or is not a risk from talcum powder.
6    BY MS. PARFITT:
7      Q   I appreciate that.
8        All right, Dr. Diette, do you agree that
9    there is scientific evidence published in the
10   peer-reviewed journal that talcum powder products
11   can migrate from the vagina to the peritoneal
12   capacity up through the ovaries?
13        MS. BROWN:  Objection to the form.
14        MR. LOCKE:  Objection.
15        THE WITNESS:  From the perineum?
16   BY MS. PARFITT:
17     Q   From the perineum.
18        MS. BROWN:  Objection.
19        THE WITNESS:  I have not seen that.
20   BY MS. PARFITT:
21     Q   Okay.  Do you have -- have you seen in
22   your review of the literature that talcum powder
23   products can migrate from the vagina to the
24   ovaries?
25        MR. LOCKE:  Objection.

1        MS. BROWN:  Objection.
2        THE WITNESS:  The only studies I've seen
3    are the ones that -- I think that were cited by --
4    by IARC with -- if that's what we're talking
5    about, is like women who were about to have
6    surgery for some other reason and -- and different
7    things placed either in their uterus or vagina,
8    although not necessarily talc.  I mean all kinds
9    of things, you know, carbon particles,
10   radiolabeled particles, different things that
11   aren't talc.
12        (Counsel conferring.)
13   BY MS. PARFITT:
14     Q   So sitting here today, is it your
15   testimony that you have not reviewed or seen in
16   the medical literature that particles of talc can
17   migrate to the ovaries, lymph nodes, of a woman's
18   body?
19        MS. BROWN:  Objection to the form of the
20   question.
21        MR. LOCKE:  Objection.
22        THE WITNESS:  So -- so the study would
23   be one where somebody applied talc to the perineum
24   and then demonstrated that it migrated from there
25   to the ovaries or into some lymph node somewhere?

1    BY MS. PARFITT:
2      Q   That's right.
3      A   I have not seen that study.
4      Q   Okay.  You've read the Schildkraut
5    study, correct?
6      A   Yes.
7      Q   Okay.  Do you agree with the authors of
8    the Schildkraut study that chronic inflammation
9    resulting from the use of exposure to baby powder,
10   whether through inhalation or through a
11   transvaginal route, may lead to an increased risk
12   of ovarian cancer?
13        MR. LOCKE:  Objection.
14        MS. BROWN:  Objection to the form of the
15   question.
16        THE WITNESS:  I've read the study.  I'd
17   like to see whether that's in the introduction or
18   the conclusion.
19   BY MS. PARFITT:
20     Q   Okay.  Let me show you Schildkraut.
21     A   Because it's certainly not a conclusion
22   of their study.
23        (Diette Exhibit No. 29 was marked
24        for identification.)
25        MS. BROWN:  Do you guys want a number on

Gregory B. Diette, M.D.

Page 414

1  this?
2      MS. PARFITT:  Sure.  What number are we
3  up to?
4      MS. BROWN:  Oh, 29.  I'm sorry.  It's
5  there.  My bad.
6  BY MS. PARFITT:
7      Q   Do you have that in front of you,
8  Doctor?
9      A   I do.
10     Q   Okay.  And if I can direct your
11 attention to pages 14, 16.
12     A   Got you.
13     Q   Do you have that?
14         Do you see where the authors state:
15 "Lung inhalation of powder could be a biologically
16 plausible mechanism for the association between
17 nongenital powder use and increased EOC risk,
18 particularly non-serous EOC."
19         Do you see that?
20     A   I do.  It's the top of the first column
21 in the -- the rest of the incomplete paragraph.
22     Q   Okay.  Do you see that?
23     A   I do.
24     Q   Okay.  Do you agree with that?
25     MR. LOCKE:  Objection.

Page 415

1      THE WITNESS:  Only -- well, no.  Only in
2  the broadest sense that lots of things could be,
3  but not because there's any evidence to show that
4  inhalation of powder is a way to get to the
5  ovaries.
6  BY MS. PARFITT:
7      Q   All right.  So you dispute that
8  inhalation of talcum powder products can cause
9  ovarian cancer.  Is that your testimony?
10     A   Inhalation?
11     Q   Inhalation.
12     A   I haven't seen any evidence that it can.
13 I mean there's not affirmative evidence to say
14 that it absolutely can't, but there's no evidence
15 that there's been talcum powder inhaled, leading
16 to other -- other diseases along the way, and I
17 haven't seen any study that has shown that it can
18 migrate from the lungs to the ovaries.  And so --
19 I mean people could say that, but it's not based
20 on -- on studies.
21     Q   Does the fact that talcum powder
22 products can be inhaled support a biologically
23 plausible mechanism for talcum powder products to
24 cause ovarian cancer?
25     A   No.

Page 416

1      MR. LOCKE:  Objection.
2  BY MS. PARFITT:
3      Q   Okay.  Do you agree that there is
4  reliable scientific literature in the
5  peer-reviewed studies to support that it is
6  biologically plausible for talc products to
7  migrate from the vagina to the ovaries following
8  perineal application?
9      A   I'm not aware of that study that has
10 shown that.
11     Q   Have you seen the Penninkilampi study?
12     A   Oh.
13     MS. BROWN:  Objection.
14     THE WITNESS:  Yes, I have.
15 BY MS. PARFITT:
16     Q   Okay.  Why don't we take a look at that.
17     Let's pull it up, and we'll make it
18 Exhibit No. 30.
19     (Diette Exhibit No. 30 was marked
20     for identification.)
21 BY MS. PARFITT:
22     Q   Right here.  And if I may, Doctor, let
23 me direct your attention to the discussion section
24 of Penninkilampi on page 45.
25     A   Page 45?

Page 417

1      Q   45.
2      A   Yep.
3      Q   Do you have that?
4      A   I'm there, yep.
5      Q   Okay.  It says:  "The present
6  meta-analysis" -- and it is meta-analysis,
7  correct?
8      A   Yeah, part of this study is a
9  meta-analysis.
10     Q   "The present meta-analysis reports a
11 positive association between perineal talc use and
12 ovarian cancer, specifically of the serous and
13 endometriode -- and endometrioid histology site --
14 subtypes.  The mechanism by which perineal talc
15 use may increase the risk of ovarian cancer is
16 uncertain.  It has been previously proposed that
17 talc as a foreign body may ascend from the vagina
18 through to the uterine tubes and instigate a
19 chronic inflammatory response, which may
20 predispose to the development of ovarian cancer."
21     Did I read that correctly?
22     A   You did.
23     Q   Okay.  Do you agree with that?
24     MR. LOCKE:  Objection.
25     MS. BROWN:  Objection to the form.

105 (Pages 414 to 417)

Gregory B. Diette, M.D.

Page 418

1        THE WITNESS:  So -- so I agree with a
2   lot of this, right.  So I agree that the mechanism
3   is uncertain.  Right.  I agree that it has been
4   previously proposed 20 years ago by the citation
5   that they have that that may ascend from the
6   vagina, and instigate a chronic inflammation
7   response.
8        They don't cite anything more modern
9   than that one from 20 years ago, though.  And
10  where it talks about it may be mutagenic and
11  promote carcinogenesis --
12  BY MS. PARFITT:
13      Q   Correct.
14      A   -- I don't -- I don't think that's well
15  supported either.
16      Q   Is migration of talc a biologically
17  plausible mechanism by which talc can reach the
18  ovaries?
19      MS. BROWN:  Objection to the form.
20      MR. LOCKE:  Objection.
21      THE WITNESS:  If it were true, it could
22  be supportive of that.  But I don't see any -- any
23  evidence that it's true.
24  BY MS. PARFITT:
25      Q   Is biological plausibility essential for

Page 419

1   causality?
2       A   No, it's -- it's one important criterion
3   to consider.
4       Q   Does biological plausibility mean it
5   must be proved?
6       MS. BROWN:  Objection.
7       THE WITNESS:  And I assume we're talking
8   about in the context of a Bradford Hill?
9   BY MS. PARFITT:
10      Q   Correct.
11      A   Yeah, so -- so the answer is, no, it
12  doesn't have to be proved.
13      Q   Look at the lower right-hand corner of
14  that article.
15      MS. BROWN:  Are we done with that
16  paragraph, Counsel?
17      MS. PARFITT:  We are.  Thank you very
18  much, yeah.
19  BY MS. PARFITT:
20      Q   And if you will go down to the lower
21  right, it starts with "We also found."
22      A   Okay.
23      Q   Do you see that?
24      Okay.  It says: "This finding also
25  supports the chronic" -- I'm sorry -- "chronic

Page 420

1   inflammatory hypothesis, as repeated exposure
2   would induce a longer period of chronic
3   inflammation, and therefore should increase the
4   predisposition to the development of ovarian
5   cancer."
6       Did I read that correctly?
7       A   You did.
8       Q   All right.  Do you agree with that
9   statement, that chronic inflammation as a
10  biologically plausible hypothesis could induce
11  carcinogenicity?
12      MR. LOCKE:  Objection.
13      MS. BROWN:  Counsel, are you
14  intentionally not reading the rest of that
15  paragraph?
16      MS. PARFITT:  No, I -- I'm getting
17  there.
18      MS. BROWN:  Okay.
19      MS. PARFITT:  Yeah.
20      THE WITNESS:  Well, I disagree with the
21  fact that the small difference between 3600, plus
22  or minus, lifetime applications supports a -- an
23  inflammatory theory, because that's got nothing
24  too do with inflammation.  It's really just a -- a
25  total number of applications.

Page 421

1   BY MS. PARFITT:
2       Q   Perhaps I can simplify my answer.  Do
3   you have an opinion as to whether or not chronic
4   inflammation can be a biologically plausible
5   method for promoting carcinogenesis?
6       MS. BROWN:  Objection to the form.
7       THE WITNESS:  In -- in all kinds of
8   cancer or ovarian cancer?
9   BY MS. PARFITT:
10      Q   In ovarian cancer.
11      A   So I -- I don't think there's strong
12  evidence to support that.
13      Q   Is there evidence at all?
14      MS. BROWN:  Let him finish.
15      THE WITNESS:  So not much.  I mean
16  there's -- I know that folks have looked at, you
17  know, whether NSAIDS and aspirin, whether that use
18  would lead to a limitation in risk, and it seems
19  like the -- the findings are kind of mixed.  And
20  sometimes aspirin in a particular dose is
21  protective and aspirin of another dose is not.
22  That NSAIDS are sometimes protective, but mostly
23  not.
24      Since preparing my report, I saw
25  Dr. Shih -- Shih's report talking about the stick

106 (Pages 418 to 421)

Gregory B. Diette, M.D.

Page 422

1    cells, like these precursor cells, and -- and at
2    least, you know, from histologic specimens, not
3    seeing evidence of inflammation.  And I haven't
4    really seen much that -- that would confirm that
5    there's a link between chronic inflammation.
6    BY MS. PARFITT:
7        Q   What I'm asking you is, based upon your
8    review, Dr. Diette, have you seen anything in the
9    peer-reviewed literature that there are
10   biologically plausible mechanisms of talc's
11   carcinogenicity demonstrated by chronic
12   inflammation from migration of the talc to the
13   ovaries?
14           MS. BROWN:  Objection.  I don't
15   understand that question.
16           MR. LOCKE:  Objection.
17           THE WITNESS:  Would you --
18   BY MS. PARFITT:
19       Q   The question -- let me rephrase it.
20       A   Okay.
21       Q   Is there -- are there studies in the
22   peer-reviewed literature that support an
23   association of inflammation and increased risk of
24   ovarian cancer?
25           MS. BROWN:  Objection to the form, asked

Page 423

1    and answered.
2    BY MS. PARFITT:
3        Q   Is there something in the literature?
4            MS. BROWN:  Objection.
5    BY MS. PARFITT:
6        Q   Not whether there is a lot or a little.
7    Is there anything in the peer-reviewed literature
8    that you've seen that supports an association
9    between inflammation and an increased risk of
10   ovarian cancer?
11           MS. BROWN:  Objection to the form.
12           THE WITNESS:  I've seen the paper where
13   C-reactive protein in the serum popped out of
14   dozens of different markers of inflammation and
15   predated the diagnosis of ovarian cancer.
16           I guess I haven't really seen something
17   that shows that chronic inflammation in the
18   ovaries is -- is a precursor to ovarian cancer or
19   that talc induces that particular chronic
20   inflammation that would in turn lead to cancer.
21   BY MS. PARFITT:
22       Q   Have you read Taher?  You've read the
23   Taher study, correct?
24           MR. LOCKE:  Objection.
25           THE WITNESS:  How do you spell it?

Page 424

1    BY MS. PARFITT:
2        Q   T-A-H-E-R.
3        A   Oh.
4        Q   2018.
5        A   Sorry, I was saying Taher.
6        Q   No, no problem.
7        A   But I don't now how you --
8        Q   You could be right on that.  Probably
9    are.
10       A   I don't know.
11           I did.
12       Q   Do you see where Taher authors found
13   that there was biologically plausible evidence of
14   inflammation from talc exposure?
15           MS. BROWN:  Objection.  Counsel, can we
16   see the article if you want to ask him about it?
17           MR. LOCKE:  Objection.
18   BY MS. PARFITT:
19       Q   You've read the article.  Do you know
20   the answer to that?
21           MS. BROWN:  But it's not a memory test.
22           MS. PARFITT:  No, it's not, but perhaps
23   he can answer.  I didn't ask you the question.
24   BY MS. PARFITT:
25       Q   Do you know the answer to that?

Page 425

1        A   Well, the paper wasn't about that, so I
2    don't -- I don't remember whether there was sort
3    of a preamble thing, but they -- they weren't
4    really analyzing that.  They were doing a
5    meta-analysis, you know, sort of combining the epi
6    studies.  So, I mean, I don't remember what their
7    statement was, but when you --
8        Q   All right.  Did you --
9        A   I'm sorry, I just want to say, but if
10   you say that they found it, by finding it, I don't
11   think they demonstrated it or it was a finding
12   from their study per se.
13       Q   Okay.  Have you read Langseth, 2008?
14       A   Langseth, 2008?
15       Q   Correct.
16       A   Is that a meta-analysis?
17       Q   Correct.
18       A   Yes.
19       Q   All right.  And do you see where the
20   Langseth authors also found migration and -- and
21   concluded that there was chronic inflammation that
22   was biologically plausible?
23           MS. BROWN:  No, I -- I object.  If
24   you're going to quote articles --
25   BY MS. PARFITT:

107 (Pages 422 to 425)

Gregory B. Diette, M.D.

Page 426

1    Q   Do you remember?
2         MS. BROWN:  -- I would request the
3    article.
4         MS. PARFITT:  I can do that.
5    BY MS. PARFITT:
6    Q   Do you know, Doctor?
7    A   I don't remember what they said.
8         (Counsel conferring.)
9         MS. PARFITT:  Doctor, if we can take a
10   quick break here --
11        THE WITNESS:  Sure.
12        MS. PARFITT:  -- right now, so maybe I
13   can --
14        THE WITNESS:  Yeah, it's a good time.
15        MS. PARFITT:  -- shorten things.
16        THE VIDEOGRAPHER:  The time is 4:59 p.m.
17   We're going off the record.
18        (Recess.)
19        THE VIDEOGRAPHER:  The time is 5:12 p.m.
20   and we're back on the record.
21        MS. PARFITT:  I apologize.
22   BY MS. PARFITT:
23   Q   Dr. Diette, and I apologize, I have only
24   one copy that isn't marked up, so we're going to
25   have to put this and substitute it on the -- on

Page 427

1    the ELMO, if I may.  We've done pretty good with
2    copies all day today.
3         So here we go.
4         MR. ROSEN:  This will be Exhibit 31.
5         (Diette Exhibit No. 31 was marked
6         for identification.)
7    BY MS. PARFITT:
8    Q   All right.  Dr. Diette, this is an
9    article from Ultrastructural Pathology, and it's
10   entitled "Correlative polarizing light and
11   scanning electron microscopy for the assessment of
12   talc in pelvic region lymph nodes."
13        Do you see that?
14   A   I do.
15   Q   And the lead author is Dr. McDonald,
16   along with Cramer and Godleski, and others.
17        Do you see that?
18   A   I do.
19   Q   All right.  This is published in 2019.
20        Have you had an opportunity to review
21   this article?
22   A   I have not seen this one.
23   Q   Okay.  I just have one question about
24   it.  And if --
25        MS. BROWN:  Well, I'm going to object.

Page 428

1    He doesn't have the article.
2         MS. PARFITT:  That's fine.
3         MS. BROWN:  And he's never read it.
4    BY MS. PARFITT:
5    Q   Look at the abstract, first sentence.
6    It says:  "Perineal talc use is associated with
7    ovarian carcinoma in many case-control studies.
8    Such talc may migrate to pelvic organs and
9    regional lymph nodes, with both clinical and legal
10   significance."
11        Did I read that correctly?
12   A   Yes.
13   Q   All right.  Would it be -- I believe you
14   had some concerns about the Heller study that we
15   talked about earlier because it involved some
16   unexposed -- what you testified were unexposed
17   women.
18        MS. BROWN:  Objection to the form.
19        THE WITNESS:  Correct, women who
20   reported not being perineal talc users.
21   BY MS. PARFITT:
22   Q   Right.  Okay.  You understand in this
23   study that what Drs. McDonald and Godleski were
24   doing were looking at particles in exposed women.
25        MS. BROWN:  No, he doesn't understand

Page 429

1    that because he doesn't have the study and he
2    hasn't read it.  I object.  It's not fair.
3         THE WITNESS:  I honestly have no idea
4    what they've done.
5    BY MS. PARFITT:
6    Q   Okay.  Well, do you dispute that talc
7    particles can migrate to the pelvic organs and
8    regional lymph nodes?
9    A   I don't -- I don't know.
10        MR. LOCKE:  Asked and answered.
11   BY MS. PARFITT:
12   Q   You don't know.  You don't know.  You
13   don't know one way or another?
14        MS. BROWN:  Objection, misstates his
15   private -- his prior testimony.
16        THE WITNESS:  Migrate from where to
17   where?  From --
18   BY MS. PARFITT:
19   Q   It says right here:  "Talc may migrate
20   to pelvic organs and regional lymph nodes."
21        MS. BROWN:  Right, but he can't --
22        THE WITNESS:  Oh, I saw the "to," but I
23   don't see the "from."
24   BY MS. PARFITT:
25   Q   Does it make a difference to you?

Gregory B. Diette, M.D.

Page 430

1      MS. BROWN: Of course.
2  BY MR. PARFITT:
3      Q  If it's from the vaginal area to the
4  ovaries and the lymph nodes, does that make a
5  difference whether --
6      MR. LOCKE: Objection.
7      MS. BROWN: Objection to the form, lacks
8  foundation, calls for speculation about a document
9  he told you he's never read.
10      MR. LOCKE: Does the witness have a
11  copy?
12      MS. BROWN: No. That's the objection.
13      MS. PARFITT: Tom, we didn't -- we only
14  have one copy of it.
15      MR. LOCKE: I think you need to disclose
16  to the witness that three of these authors are
17  paid experts, et cetera --
18      MS. PARFITT: Tom, Tom, Tom, Tom.
19      MR. LOCKE: Come on.
20      MS. BROWN: No, but to be fair, you
21  guys, if you want to ask him questions, he's got
22  to look at it. I'm going to take it off the ELMO
23  and give it to him if you're going to continue
24  asking him questions.
25  BY MS. PARFITT:

Page 431

1      Q  I'm not going to ask him any more
2  questions on it, Doctor.
3      A  Okay. Thank you.
4      Q  All right. Let me show you --
5      MR. LOCKE: Come on. Give him -- if
6  you're going to give him -- if you're going to ask
7  him about it --
8      MR. TISI: You're not even on record.
9      MS. PARFITT: Tom, it was just --
10      MS. BROWN: Hey, hey, hey, guys. It's
11  the end of the day.
12      MS. PARFITT: Okay. Let's don't --
13      MS. BROWN: Let's get through this.
14      (Diette Exhibit No. 32 was marked
15      for identification.)
16  BY MS. PARFITT:
17      Q  32. Let me show you what's been marked
18  as Plaintiffs' Exhibit 32.
19      I need a copy. There you go. Sorry.
20      A  Thank you.
21      Q  Okay. You previously testified that you
22  -- take a look at it. You read this before, the
23  FDA letter 2014?
24      A  I've seen this.
25      Q  Okay. Very good.

Page 432

1      You had testified earlier that you
2  disagree with Health Canada when they state that
3  talc can migrate to the ovaries; is that correct?
4      MR. LOCKE: Objection.
5      MS. BROWN: Objection. Misstates prior
6  testimony. I don't even think he said that.
7  BY MS. PARFITT:
8      Q  Well, let me ask you. In the Health
9  Canada report, they discuss the fact that it is
10  biologically plausible for talc to migrate to the
11  ovaries and cause an inflammatory process.
12      Do you agree or disagree with that?
13      MR. LOCKE: Objection.
14      MS. BROWN: Objection. Lacks
15  foundation. Do you want to show him where they
16  said that?
17      THE WITNESS: I don't remember their
18  statement about that.
19  BY MS. PARFITT:
20      Q  You don't. Okay.
21      How about this statement. Go down to --
22  I believe it's -- one, two, three -- the third
23  paragraph. Do you see that? It starts with
24  "While."
25      A  No.

Page 433

1      Q  No?
2      A  Oh, I'm on a different page.
3      Q  I'm sorry. Page 5. Page 5.
4      A  Okay.
5      Q  Okay. "While there exists no direct
6  proof of talc and ovarian carcinogenesis, the
7  potential for particles to migrate from the
8  perineum into the vagina to the peritoneal cavity
9  is indisputable."
10      Do you see that?
11      A  I do.
12      Q  Okay. Do you agree with the FDA?
13      MS. BROWN: Objection to the form.
14      THE WITNESS: So there's no citation for
15  that. I don't know how they get -- I mean I don't
16  know why they make that statement, and I -- it
17  certainly doesn't seem to be indisputable, because
18  there -- several of the articles that we've looked
19  at today and others say it's not clear what the
20  mechanism is or the biologic plausibility. So
21  it's -- it's obviously disputable, at the very
22  least, but there's no citation, so it's hard to
23  know how to -- how to process this.
24  BY MS. PARFITT:
25      Q  If this is the FDA's position with

109 (Pages 430 to 433)

Gregory B. Diette, M.D.

Page 434

1  regard to whether or not talc can migrate, do you
2  dispute that?
3          MS. BROWN: Objection. Misstates the
4  document.
5          THE WITNESS: I don't -- I don't dispute
6  that they said it obviously, because it's right
7  here, but there's just no citation for it, and
8  there's no information that tells who in
9  particular thinks that.
10 BY MS. PARFITT:
11     Q   Well, the Food and Drug Administration
12 is our regulatory body here in the United States,
13 correct?
14     A   It is one.
15         MR. LOCKE: Objection.
16 BY MS. PARFITT:
17     Q   All right. Would you agree that
18 dissemination of information that is accurate and
19 truthful is -- is something that they would
20 probably take quite seriously? Would you agree?
21         MS. BROWN: Objection.
22         THE WITNESS: I -- I hope so.
23 BY MS. PARFITT:
24     Q   Right. And would you agree that the FDA
25 would not be disseminating information about the

Page 435

1  potential for particulates to migrate from the
2  perineum, the vagina to the peritoneal cavity, and
3  say it's indisputable if they didn't have some
4  evidence?
5          MS. BROWN: Objection. Calls for
6  speculation.
7          MR. LOCKE: Objection.
8          THE WITNESS: I don't know why they
9  wrote it. I just think it would be odd to find
10 that the FDA knew this, and it's not out there
11 generally otherwise. I mean I don't -- I don't
12 know what they considered.
13 BY MS. PARFITT:
14     Q   When you say it's not out there
15 generally, we talked today about several
16 peer-reviewed articles that have in fact talked
17 about talcum powder part- -- particles migrating
18 to the ovaries, have we not?
19         MS. BROWN: Objection. We have not.
20         THE WITNESS: No, I was going to say, I
21 mean, you've said that a lot, but I mean -- but we
22 haven't looked at a study that shows that. I mean
23 we've talked about whether -- whether or not talc
24 applied to the perineum has been shown to migrate
25 to the ovaries, and a bunch of questions back, I

Page 436

1  think my answer was along the lines of I haven't
2  seen a study that shows that that's true.
3  BY MS. PARFITT:
4      Q   We talked about Schildkraut. We talked
5  about Schildkraut, didn't we?
6      A   Yeah, they didn't show that either,
7  though.
8      Q   When you say they didn't show it, have
9  they opined in medical -- or let me ask you this
10 question. I see the disconnect.
11         Is there evidence contained in
12 peer-reviewed scientific articles wherein it is
13 stated that talcum powder products can migrate to
14 the ovaries?
15         MS. BROWN: Objection.
16         MR. LOCKE: Objection.
17         MS. BROWN: Misstates everything we've
18 looked at and his testimony.
19         THE WITNESS: I think there's been
20 opinions of different people in different articles
21 that are both supportive and not supportive of
22 that statement.
23 BY MS. PARFITT:
24     Q   All right. So you've seen scientific
25 writers who have said talc can migrate to the

Page 437

1  ovaries, and you've seen scientific articles that
2  say that's more questionable. Is that fair?
3          MS. BROWN: Objection. Not fair.
4  Misstates prior --
5          THE WITNESS: It's sort of fair, but I
6  can't find anybody who's actually shown that it's
7  true. I mean, you know, people may write that,
8  but I mean I haven't seen a study that's shown
9  that you can actually apply talc to the perineum
10 and then find it in the ovaries.
11 BY MS. PARFITT:
12     Q   Okay. Let me show you what we'll have
13 marked as exhibit -- oh, thank you.
14         (Counsel conferring.)
15 BY MS. PARFITT:
16     Q   It's the end of the day, and we are
17 running out of copies, Doctor.
18         Let me show you --
19         (Diette Exhibit No. 33 was marked
20         for identification.)
21         MR. ROSEN: Exhibit 33.
22         MS. PARFITT: Beg your pardon? 33?
23         THE WITNESS: This one says 32 on it.
24         MR. ROSEN: Ah, you're correct.
25 BY MS. PARFITT:

110 (Pages 434 to 437)

Gregory B. Diette, M.D.

Page 438

1    Q   So I'm going to share this with you,
2  and -- actually, if we could put it on the ELMO,
3  and then I will give it to you so I can at least
4  identify it for counsel.
5    Is that fair?
6    A   Yeah.  We will see how it goes.
7    Q   All right.  Let me show you -- it is
8  marked September 30th, 2004, and I will represent
9  that it is to Bill Ashton from Richard Zazenski,
10 and it's a Luzenac document.
11   MS. BROWN:  What?  I'm going to object
12 on form and foundation.
13 BY MS. PARFITT:
14   Q   Okay.  Can you see that, Doctor?  I
15 don't want to strain your eyes too much.
16   MS. BROWN:  No, we need to give him --
17 he's never seen it.  He hasn't reviewed it.  His
18 opinions are not based on it.  If you want to ask
19 him questions about it, he needs to hold it and
20 look at it.
21 BY MS. PARFITT:
22   Q   I'm going to give it to you.  I'm going
23 to let you hold it in one moment.
24   Dr. Diette, this is a document I will
25 represent that's dated September 30, 2004, and

Page 439

1  that would have preceded any litigation.
2    And it states:  "Bill, I came across
3  this paper this morning published in the April
4  2004 journal Human Reproduction, an official
5  journal of the European Society for Human
6  Reproduction and Embryology.  It offers some
7  compelling evidence in support of the migration
8  hypothesis.  Combine this evidence with the theory
9  that the talc deposition on the ovarian epithelium
10 initiates epithelium inflammation, which leads to
11 epithelium carcinogenesis, and you have a
12 potential formula for NTP classifying talc as a
13 causative agent in ovarian cancer."
14   Now, did I read that correctly?
15   A   Yes.
16   Q   So let me -- because counsel wants you
17 to hold it, let me have you take --
18   MS. BROWN:  Well, only if you're going
19 to ask him questions about it.
20   MS. PARFITT:  I am.  I am.  But I can't
21 do both.
22 BY MS. PARFITT:
23   Q   I've got to hand it to you because she
24 says she wants you to hold it.
25   And attached to that is the article.

Page 440

1  Take a moment and take a look at that, to eyeball
2  that.
3    MS. BROWN:  Take as long as you need to
4  inform your response --
5    MS. PARFITT:  It's a one-page document.
6    MR. LOCKE:  No.  This -- this is a
7  document that he hasn't seen before.
8    MS. PARFITT:  That's correct.
9    MR. LOCKE:  Why don't we go off the
10 record.
11   MS. PARFITT:  It's one page, Doctor.
12   MS. BROWN:  Right, and that's just fair.
13   MS. MILLER:  If you're going to ask him
14 questions about what you just threw out there --
15   MS. BROWN:  That's fine.  That's fine,
16 but you understand there's no foundation.  He's
17 never relied it.
18   MS. PARFITT:  Okay, guys --
19   MS. BROWN:  So if we want to ask
20 questions --
21   THE REPORTER:  Excuse me.
22   MS. PARFITT:  I'm not having him --
23 whoa, whoa.
24   (A discussion was held off the record.)
25 BY MS. PARFITT:

Page 441

1    Q   Dr. Diette, I'm simply referring to the
2  cover letter.
3    A   Oh.
4    Q   And that's all, just one page.  Do you
5  see that?
6    A   I do.
7    Q   Okay.  And that's what I just read into
8  the record.  Do you see that?
9    A   I do.
10   Q   Okay.  And do you see back in 2004,
11 there was information with regard -- and I have to
12 see it, I can't be -- sorry.  I can't memorize it
13 either.
14   So you see back in 2004, the company's
15 being advised that there is indeed literature
16 compelling evidence in support of a migration
17 hypothesis --
18   MS. BROWN:  Object.
19 BY MS. PARFITT:
20   Q   -- that was shared between the two
21 companies.
22   Did J&J ever share with you this
23 document that they had in their company files that
24 they had support -- actually compelling evidence
25 of support of the migration hypothesis?

111 (Pages 438 to 441)

Gregory B. Diette, M.D.

Page 442

1          MS. BROWN:  Objection to the speech,
2    lacks foundation.  I also believe that's an Imerys
3    document.
4          THE WITNESS:  So a few things, right.
5    So one is I -- I've never seen that, so I don't
6    even know what it is.  I don't know who those
7    people are.  That -- I don't know what their
8    qualifications are to consider something to be
9    compelling evidence or if that's the word that was
10   used.
11   BY MS. PARFITT:
12        Q   Mm-hmm.
13        A   I have not seen the article that's
14   attached to the back of it.
15        Q   Okay.
16        A   But it's hard to say much about that.
17        Q   Yes.
18            Let me show you what we will have marked
19   as Exhibit 34, and I'll represent to you it's an
20   article by Roberta Ness, "Possible Role of Ovarian
21   Epithelial Inflammation."
22            (Diette Exhibit No. 34 was marked
23             for identification.)
24   BY MS. PARFITT:
25        Q   Have you seen this article before?

Page 443

1        A   I have.
2        Q   Okay.  Do you see on page 2 --
3          MS. PARFITT:  Where is the other one?
4          (Counsel conferring.)
5    BY MS. PARFITT:
6        Q   If I could -- you have in front of you
7    the Zazenski -- thank you.
8            Okay.  Now, do you see the graph, I'll
9    call it, it's the chart there on Zazenski?  And
10   then look at Figure No. 1.  Do you see that,
11   "Inflammation is a common mechanism underlying
12   ovarian cancer"?
13        A   I do.
14        Q   Okay.  And do you see that -- you can
15   look at it.  Do you see that that's the same
16   figure in the Zazenski letter as it is in
17   Dr. Ness's letter?  Do you see that?
18          MS. BROWN:  Objection to the form, lacks
19   foundation.
20   BY MS. PARFITT:
21        Q   Or Dr. Ness's report.
22          MS. BROWN:  Same objection.
23          THE WITNESS:  I mean it -- it looks the
24   same.
25            But what does that mean?  Does that mean

Page 444

1    it -- that this -- is this an e-mail or a fax?  It
2    has something from Ness's paper or Ness's paper
3    has something from this --
4    BY MS. PARFITT:
5        Q   They have something from Ness's paper,
6    correct.
7          MS. BROWN:  Well, objection.
8          THE WITNESS:  But this is --
9          MS. BROWN:  Don't -- don't speculate.
10   No one wants you to guess.
11          MS. PARFITT:  So we won't talk about --
12          MS. BROWN:  Just wait for a question,
13   and we'll do the best we can.
14   BY MS. PARFITT:
15        Q   Okay.  Do you see on the first page of
16   Dr. Ness's article, in the left-hand column
17   towards the bottom, where Dr. Ness states:
18   "Inflammation entails cell damage, oxidative
19   stress, and elevations of cytokines and
20   prostaglandins, all of which may be mutagenic.
21   The possibility that inflammation is a
22   pathophysiological contributor to the development
23   of ovarian cancer suggests a directed approach to
24   future research."
25            Do you see that?

Page 445

1        A   I do.
2        Q   Okay.  Do you agree with that statement?
3          MR. LOCKE:  Objection.
4          MS. BROWN:  Objection to the form.
5          THE WITNESS:  So, I haven't read this
6    article in a while.  It is from about 20 years
7    ago.  And so I don't know if 20 years ago that was
8    a reasonable thing to consider, but it sounds as
9    if 20 years have gone by and this still hasn't
10   been proven.  And so whether I agree with it still
11   now, I'm not sure.  I'm not sure if it would be a
12   fruitful endeavor or not.
13   BY MS. PARFITT:
14        Q   Does biological plausibility mean that
15   something must be proven?
16          MR. LOCKE:  Objection.  Asked --
17          MS. BROWN:  Objection.  Asked and
18   answered.
19          THE WITNESS:  It doesn't mean that
20   it's -- that it's been proven, but it's one of the
21   ways to provide supportive information about
22   whether or not an observed association is causal
23   or not.
24   BY MS. PARFITT:
25        Q   Okay.  So you agree that you do not --

112 (Pages 442 to 445)

Gregory B. Diette, M.D.

Page 446

1  one does not need to prove mechanism in order to
2  find causality, correct?
3      A   I need to prove --
4          MR. LOCKE:  Objection.
5          MS. BROWN:  Objection to form.
6          THE WITNESS:  Sorry.  Wow, sorry.
7  BY MS. PARFITT:
8      Q   We had a chorus.
9      A   Yeah.
10         No, you don't need to prove it, but
11  it's --
12     Q   You don't need to prove mechanism.
13     A   You don't need to prove mechanism in
14  order to establish causation, but it's hard to get
15  there for a low observed risk if you don't have
16  biological plausibility.
17     Q   I'll take that back -- yes, I'm sorry.
18         I hope I didn't ask you this before, but
19  is biological plausibility the same as proof of
20  mechanism?
21         MR. LOCKE:  Objection.
22         MS. BROWN:  Objection to the form of the
23  question.
24         THE WITNESS:  Proof of -- I don't know
25  if I would use the -- so "proof of mechanism"

Page 447

1  sounds like a term in a way, but maybe not one
2  that's in my vocabulary.  Like people talk about
3  proof of concept just as a study design, which --
4  I don't know if that's the same thing, but I
5  don't -- I don't -- I don't know "proof of
6  mechanism" as a -- as a term.
7          (Counsel conferring.)
8          MS. PARFITT:  Let's go off the record
9  for a moment.
10         THE VIDEOGRAPHER:  The time is 5:30 p.m.
11  We're going off the record.
12         (Recess.)
13         THE VIDEOGRAPHER:  The time is 5:37 p.m.
14  and we're back on the record.
15  BY MS. PARFITT:
16     Q   Doctor, what is your definition of
17  "biological plausibility"?
18         MS. BROWN:  Objection.  Asked and
19  answered.
20         THE WITNESS:  I don't have a single one.
21  I think it's in my report somewhere, or at least
22  what I tried to capture from Bradford Hill's
23  statement, but in a general sense, you know, being
24  evidence that whatever -- if we're talking about
25  an exposure, that there is a pathway by which that

Page 448

1  exposure can lead to the outcome that you're
2  interested in.
3  BY MS. PARFITT:
4      Q   Okay.  Doctor, from your review of the
5  peer-reviewed scientific literature, have you read
6  where study authors who have actually looked at
7  the issue of migration and other biological
8  plausible methods by which talc can get to the
9  ovary?
10     A   I guess --
11         MS. BROWN:  I object.  I don't
12  understand.
13         THE WITNESS:  I mean I've looked at both
14  the human and the animal studies that I could find
15  cited on the topic.  And -- and you said that
16  talc -- talc can get to the ovary?
17  BY MS. PARFITT:
18     Q   Mm-hmm.
19     A   Because, you know, some are not talc,
20  right.  There -- there are other kinds of
21  particles or substances.  And so I've looked at
22  both the animal and the human studies that I could
23  find.
24     Q   And in those studies that you have
25  reviewed, have you seen where those authors who

Page 449

1  have studied the issue of biological plausibility
2  and mechanisms by which talc can get to the ovary
3  have concluded in their articles that that is
4  indeed a pathway?
5          MS. BROWN:  Objection.
6          MR. LOCKE:  Objection.
7          MS. BROWN:  Misstates his testimony and
8  the documents.
9          THE WITNESS:  That there is -- well, I
10  guess we've got to -- we'd have to look at each
11  one, right.  Because, I mean, there's ones like,
12  for example, you know, if we're talking about
13  humans, like where women are basically placed
14  upside down in a -- in an usual position and
15  having something deposited directly into their
16  vagina, and then that may or may not then migrate
17  to their ovaries, but that wouldn't be the same as
18  saying that's a plausible mechanism for applying
19  something to the perineum and then finding it in
20  the ovaries.
21         And then I just want to -- I don't have
22  a lot to say about it, but I would just say with
23  the animals, it looks like certain animals that
24  application of -- of particles does, and then in
25  others it doesn't migrate.  And then so I -- I

113 (Pages 446 to 449)

Gregory B. Diette, M.D.

Page 450

1  took that as kind of mixed evidence that even in
2  animals, assuming that there is an appropriate
3  animal model, that they're not getting the same
4  answer based on which animal it is.
5  BY MS. PARFITT:
6      Q   Does exposure of a disease have to be
7  proven in order to have a biologically plausible
8  mechanism?
9          MS. BROWN:  Objection to the form.
10         MR. LOCKE:  Objection.
11         THE WITNESS:  So I don't know if I
12  understand that.  So are you saying that -- so say
13  it again.  I'm sorry.
14  BY MS. PARFITT:
15     Q   Sure.  It was probably a bad question.
16         MS. BROWN:  The realtime --
17  BY MS. PARFITT:
18     Q   Does one need -- does a scientist need
19  to know the precise mechanism in order to
20  determine whether or not it's biologically
21  plausible for some toxin to cause some disease?
22         MS. BROWN:  Objection to the form.
23         MR. LOCKE:  Objection.
24         THE WITNESS:  So "precise" might be a --
25  a term that matters, but -- but it can be a work

Page 451

1  in progress in the sense that you can have some
2  information or no information or lots of
3  information.  So there can be, you know, quite a
4  spectrum of information you would have about the
5  plausibility.
6  BY MS. PARFITT:
7      Q   I think what I'm asking is, does the
8  mechanism of disease need to be proven in order to
9  find causality?
10         MS. BROWN:  Objection to the form.
11         THE WITNESS:  I -- I think we keep doing
12  this over and over, because this -- I think -- I
13  think this is the same -- unless it's meant to be
14  different, like I don't know how to answer that
15  differently.  It's -- you know, obviously it
16  doesn't have to be proven, but it certainly is
17  important.  And when you have a very small
18  estimated risk, then it becomes even more
19  important.
20  BY MS. PARFITT:
21     Q   Okay.  Have you seen in the literature
22  that you've reviewed numerous authors who have
23  proposed a biologically plausible mechanism by
24  which talcum powder products can cause ovarian
25  cancer?

Page 452

1          MS. BROWN:  Objection to the form.
2          MR. LOCKE:  Objection.
3          THE WITNESS:  So I -- I looked -- for
4  all the things that we talked about -- I don't
5  know which ones we're talking about now in terms
6  of the epidemiology studies.
7  BY MS. PARFITT:
8      Q   Correct.
9      A   So I've seen some that do and some that
10  don't propose that.  Some I think are -- and I'm
11  paraphrasing -- but are sort of more along the
12  lines of we just don't know or there's a lot more
13  work needed, and -- and things of that sort.
14     Q   Are there a lot on the lines of
15  migration of talc -- excuse me.
16         Are there a lot of articles that you've
17  reviewed where they have -- authors have stated
18  that talc can migrate to the ovaries?
19     A   I wouldn't say --
20         MS. BROWN:  Objection.
21         THE WITNESS:  I wouldn't say a lot.  And
22  I haven't seen anything as strong as that FDA
23  statement, you know, I mean, where -- where
24  there's some, you know, certainty that is coupled
25  with that kind of a statement.

Page 453

1  BY MS. PARFITT:
2      Q   But you've certainly seen where the
3  authors have opined and discussed biologically
4  plausible mechanism by -- mechanisms by which
5  talcum powder products can cause ovarian cancer.
6          MR. LOCKE:  Objection.
7          MS. BROWN:  Objection.  Continues to
8  misstate his testimony.
9          THE WITNESS:  What's -- what's different
10  about that than what I already answered?
11  BY MS. PARFITT:
12     Q   Well, what I'm trying to get at is,
13  whether or not you believe it or don't believe it,
14  I'm simply trying to understand from you whether
15  or not in your read of the scientific literature
16  have you seen where authors who have actually
17  studied this topic where they have determined and
18  written in their reports that there are
19  biologically plausible mechanisms by which talc
20  can migrate to the ovaries?
21         MR. LOCKE:  Objection.
22         MS. BROWN:  No, objection.  He's
23  answered this a hundred times, and it's --
24  BY MS. PARFITT:
25     Q   And if it's no, then it's no.  If you've

114 (Pages 450 to 453)

Gregory B. Diette, M.D.

Page 454

1   seen it, you've seen it.  If you dispute it, you
2   dispute it.
3       A   Well, it's -- it's none of those.
4           But you just said reports.  Does that --
5   are we now talking about expert reports or are --
6       Q   No.
7       A   -- we still talking about --
8       Q   No, we're still talking --
9       A   Okay.  We're talking about like
10  peer-reviewed publications?
11      Q   That's right.
12      A   So I've seen a mixture, yeah.  It's like
13  when you look at the epi literature, I mean the --
14  the way I read it is like -- is, you know, an
15  epidemiologist is supposed to be able to get up to
16  speed without becoming an expert in absolutely
17  everything, right?
18          So I already told you I'm not a cancer
19  biologist, but I do count on the authors to set
20  the stage with the introduction and then interpret
21  their findings and the discussion and sort of take
22  us at least partway towards there.
23          So even the recent meta-analysis, if you
24  look at Berge or Burge (phonetic), however you say
25  that, and Penninkilampi, you know, they talk about

Page 455

1   there -- there being uncertainty about the
2   mechanism.  So I'm just saying even as recently as
3   the -- the very latest meta-analysis, there's
4   uncertainty expressed.
5       Q   Do you see uncertainty being expressed
6   by biologically plausible mechanisms?
7           MS. BROWN:  Objection.
8           THE WITNESS:  Well, I don't know if
9   they're plausible or not.  I mean that's the whole
10  point, right?  You know, I mean you can say
11  something, but it doesn't make it true.
12  BY MS. PARFITT:
13      Q   You reminded me of something.  In your
14  review of the various case-control studies, did
15  you exercise a process known as vote counting?
16          MS. BROWN:  Objection.
17          THE WITNESS:  No.
18  BY MS. PARFITT:
19      Q   You did not?
20      A   I did not.
21      Q   That would be improper to do so,
22  correct?
23          MS. BROWN:  Objection.
24          THE WITNESS:  Well, if we're talking --
25  so I guess, just to be clear, so vote counting

Page 456

1   probably means one thing in the world in general.
2   I think if you're talking about Rothman, yeah,
3   Rothman has written about that --
4   BY MS. PARFITT:
5       Q   Right.
6       A   -- and about it being simply a
7   competition of sort of counting those that are
8   significant and those that are not.
9           I didn't see that.  I think the way I
10  described it I think was -- was the way I
11  approached it, which said some of the information
12  that's available is that some of the studies were
13  statistically significant and some weren't.  It's
14  informative, but it's not literally the same as
15  saying, I'm just going to count them up and stop
16  there.
17      Q   Because that would be improper, correct?
18          MS. BROWN:  Objection.
19          THE WITNESS:  To only do that, yes.
20  BY MS. PARFITT:
21      Q   Okay.  All right.  Let me ask a couple
22  of question -- questions.
23          What is the minimal level of exposure to
24  cigarette smoke in terms of cigarette smoke at
25  home that's necessary to cause lung cancer?

Page 457

1           MS. BROWN:  Form.
2           THE WITNESS:  I do not know.
3   BY MS. PARFITT:
4       Q   Okay.  What is the minimal level of
5   exposure to asbestos fibers inhaled that is
6   sufficient to cause ovarian cancer?
7           MS. BROWN:  Form.
8           MR. LOCKE:  Objection.
9           THE WITNESS:  We -- we did that before.
10  I don't -- I don't have any more information than
11  what I did, like meaning, you know, I have some --
12  some guideposts like the -- the Whitnum 40
13  fiber/cc years of -- of crocidolite, which did not
14  seem to be adequate to cause it.
15          And then, you know, when we looked at
16  the IARC, I didn't -- even when you and I looked
17  at it together, I didn't see information that
18  talked about what dose would be required.
19  BY MS. PARFITT:
20      Q   Okay.  Same question.  What's the
21  minimal level of exposure to asbestos fibers
22  inhaled that is sufficient to cause mesothelioma?
23          MS. BROWN:  Objection.
24          MR. LOCKE:  Objection.
25          THE WITNESS:  Pleural or peritoneal

115 (Pages 454 to 457)

Gregory B. Diette, M.D.

Page 458

1    or --
2    BY MS. PARFITT:
3        Q   Pleural.
4        A   So the -- so the amount for pleural
5    mesothelioma is -- and did you say fiber type or
6    you didn't mention fiber type?
7        Q   I didn't.  I just said fibers.
8        A   Okay.  So it would matter fiber type.
9    If it's chrysotile predominant, then above 200 to
10   400 fiber/cc years would be, you know, one
11   estimate of the dose.  If it's crocidolite, you
12   know, you could divide that by 500.  And if it's
13   amosite, by a hundred, and other amphiboles, you
14   know, somewhere in between those sort of ranges.
15       And so, you know, I think for
16   amphiboles, above like the single digit fiber/cc
17   years, and for chrysotile, above the couple of
18   like 200 to 400 fiber/cc years.
19       Q   Is it true that the dose-response curve
20   for any genotoxic carcinogen intersects with zero?
21       MS. BROWN:  Objection to the form.
22       THE WITNESS:  Well, there's got to be a
23   zero point if there's zero exposure, right?  If
24   there's literally zero exposure, then there can't
25   be -- there can't be a signal from that zero.

Page 459

1    BY MS. PARFITT:
2        Q   What does the -- what does it mean if a
3    dose-response curve intersects zero?
4        MS. BROWN:  Form.
5    BY MS. PARFITT:
6        Q   What does that mean?
7        A   It's not a term that's familiar.  I
8    mean, it's just -- I'm not sure -- if you've got
9    zero exposure, you can't have any outcome from
10   that.  So I -- I assume that's what we're talking
11   about is just like a -- like a no exposure
12   estimate.
13       If you're talking about like -- the
14   place I've seen people talk about it is like with
15   low doses of things and what happens, you know,
16   below the concentration or the level at which
17   there's known effects, then what happens between
18   there and zero.  But if it's literally zero -- if
19   there's literally zero exposure, it's got to be
20   zero outcome.
21       (Counsel conferring.)
22   BY MS. PARFITT:
23       Q   Okay.  You reviewed the cohort studies
24   in this case, correct?
25       A   The three -- three cohort studies.

Page 460

1        Q   Okay.  You criticize the plaintiffs'
2    experts for what you called a muted examination of
3    the case-control studies that they reviewed.
4        Do you remember saying that in your
5    report?
6        A   I don't remember that word, but it's --
7    it makes a lot of sense to me.
8        Q   Okay.  Where in your port -- report did
9    you set forth all of the limitations and
10   weaknesses of the cohort studies of talcum --
11   talcum powder products and asbestos -- and ovarian
12   cancer?
13       A   Well, there's a bunch, right.  So --
14       Q   Well, where did you --
15       A   I'm telling you.
16       Q   -- provide us in your report that
17   information --
18       A   I'm telling you.
19       MS. BROWN:  Let him finish --
20       THE WITNESS:  I understand your
21   question.
22       MS. BROWN:  -- and answer your question.
23       THE WITNESS:  So one of the criticisms,
24   which I think is pretty profound, which is the
25   lack of a validated measure of talcum powder

Page 461

1    exposure that could have someone estimate whether
2    or not somebody is exposed at all or whether or
3    not there's a dose-response curve, and that applies to
4    all the studies, right.  So that's uniformly
5    applied to whether they're case-control studies
6    or -- or cohort studies.
7    BY MS. PARFITT:
8        Q   That would be the exposure
9    misclassification.
10       MS. BROWN:  Objection.
11       THE WITNESS:  No, no, no.  So it would
12   be -- you could misclassify it, but it -- but what
13   I'm talking about is, that in order to measure an
14   exposure, you need a valid measure of that
15   exposure.  That doesn't exist, or at least if it
16   exists, it hasn't been employed in the -- in the
17   published literature.  And that applies to the
18   cohort studies and the case controls.
19       What I -- what I did was I tried to
20   actually not denigrate any of the study designs.
21   I thought that was appalling.  You know, when you
22   talk about where this came from, you know, to sort
23   of single out the cohort studies repeatedly by
24   the -- by the plaintiffs' expert and say, you
25   know, This is a terrible design, or this is

Gregory B. Diette, M.D.

Page 462

1  terrible for whatever reason, it's extraordinary,
2  and it's -- to me it's unprecedented for -- for
3  epidemiologists or other healthcare professionals
4  to sort of look at cohort studies and find that
5  those are so awful, and that case-control studies
6  are suddenly so sturdy.  It doesn't make any
7  sense.
8      So -- so for me, like the task wasn't
9  really so much -- I wasn't trying to criticize
10  either form of the study, but just to point out
11  realistically that there are biases, that there
12  are confounding issues, and -- and things of
13  that -- that sort.
14  BY MS. PARFITT:
15      Q   In your review of the literature for
16  purposes of your opinions today, did you see
17  evidence from any of the studies that you read
18  that there was a dose-response associated between
19  talcum powder products and ovarian cancer?
20      A   So in total, no.  In a couple of
21  studies, there are purported dose-response
22  findings, right.  So the latest Cramer study is an
23  example.  There may have been another, but there
24  are so many studies that show absolutely the
25  opposite, meaning either flat dose-response,

Page 463

1  upside down dose-response, zig-zaggy, haphazard
2  dose-response.  So I would say looking at the
3  evidence in total, it's a mess.  I mean it's
4  certainly not supportive.
5      And I'll you the truth, if you go back
6  to -- like to 2000 -- and I know we're in a hurry,
7  so I will try to talk a little faster -- but the
8  Rothman -- the Rothman review, at least up until
9  2000, they -- they plotted out all the
10  dose-response they found, and they found an
11  inverse relationship overall, which is one of the
12  things they found to be inconsistent with there
13  being causation.
14      So I think, you know, from 1982, when
15  the first case-control study was published, to
16  2000, at least when it's assessed by Rothman and
17  his colleagues, is actually upside down.
18      Q   What about Terry?  Terry in 2013
19  reported a dose-response, did they not?
20      MS. BROWN:  Objection to the form.
21      THE WITNESS:  I don't remember what they
22  showed.  I don't -- I don't doubt you, but I --
23  but there's just -- there's a couple of studies
24  that have demonstrated that.
25  BY MS. PARFITT:

Page 464

1      Q   Okay.  So you would agree with me there
2  are studies in the peer-reviewed literature that
3  have demonstrated a dose-response between talcum
4  powder products and ovarian cancer?
5      MS. BROWN:  Objection --
6      MR. LOCKE:  Objection.
7      MS. BROWN:  -- to the form.
8      MS. PARFITT:  Let him answer, please.
9      MS. BROWN:  I get to object.
10      THE WITNESS:  I think just a couple.
11      MS. PARFITT:  Let's go off the record.
12      THE VIDEOGRAPHER:  The time is 5:53 p.m.
13  We're going off the record.
14      (Recess.)
15      THE VIDEOGRAPHER:  The time is 5:58 p.m.
16  We're back on the record.
17      MR. HEASLIP:  Can we go off for one
18  moment?  I apologize.
19      THE VIDEOGRAPHER:  The time is 5:58 p.m.
20  We're going back off the record.
21      (A discussion was held off the record.)
22      THE VIDEOGRAPHER:  The time is 5:59 p.m.
23  We're back on the record.
24      CROSS-EXAMINATION
25  BY MR. FINCH:

Page 465

1      Q   Good afternoon, Dr. Diette.  My name is
2  Nate Finch.  You and I have met before, correct?
3      A   Yes.
4      Q   You were asked a question about the
5  dose-response curve to genotoxic carcinogens.  Do
6  you recall that question?
7      A   I do.
8      Q   And your answer was something to the
9  effect of if the dose was zero, then it would be
10  an intersection of zero.
11      Do you recall that answer?
12      A   Something like that.
13      Q   All right.  I want you to assume that
14  we're talking about a dose-response curve where
15  there is a positive dose, not a dose of zero.
16  Your typical dose-response curve looks something
17  like this (indicating), right, with dose on the
18  X-axis and response on the Y-axis?
19      A   You can draw it that way.
20      MS. MILLER:  Is that a exhibit?
21      MR. FINCH:  You can mark it as an
22  exhibit.  It's got somebody's notes on the back of
23  it, but...
24  BY MR. FINCH:
25      Q   Isn't it true, Dr. Diette, that for a

Gregory B. Diette, M.D.

Page 466

1  genotoxic carcinogen where there is a positive
2  dose, the dose-response curve always intersects
3  with zero?
4          MS. BROWN: Objection to form.
5          THE WITNESS: That's not something that
6  I say. I mean I don't -- people may say that, but
7  I -- I think when we're talking about -- like zero
8  is zero, right. So zero exposure means zero risk.
9  BY MR. FINCH:
10      Q  I'm not -- I'm not talking about zero.
11         MS. BROWN: Wait, let him finish,
12  please.
13         THE WITNESS: Well, I know. That's what
14  I'm talking about when I -- when I hear that
15  question.
16  BY MR. FINCH:
17      Q  All right. So if someone were to
18  testify when you're talking about a genotoxic
19  carcinogen where there is a positive exposure,
20  there -- the dose-response curve intersects with
21  zero, meaning that there -- isn't it true that
22  that means that there -- at any level of exposure,
23  there's an excess risk of cancer for a genotoxic
24  carcinogen?
25         MS. BROWN: Objection to the form.

Page 467

1          THE WITNESS: So I don't know. That may
2  be part of some field that's not my field. But I
3  -- but in the fields that I work in, I recognize
4  that you need a certain amount of exposure in
5  order to cause a disease, including cancer.
6  BY MR. FINCH:
7      Q  Okay. But you cannot dispute that
8  genotoxic carcinogens, the dose-response curve
9  intersects with zero. You haven't studied that
10  issue; is that correct?
11         MR. LOCKE: Objection.
12         MS. BROWN: Objection to the form.
13         THE VIDEOGRAPHER: Seven hours.
14         MS. BROWN: You're done. Wait.
15         THE WITNESS: So I mean, my answer is
16  the same as it was before.
17         MS. BROWN: I can ask from here.
18         (A discussion was held off the record.)
19             CROSS-EXAMINATION
20  BY MS. BROWN:
21      Q  Good evening, Dr. Diette.
22      A  Hi.
23      Q  Just a couple of quick questions, and we
24  will get you on your way.
25         We had some discussion earlier today

Page 468

1  about the sort of mechanical process of writing
2  your report. Do you remember that?
3      A  I do.
4      Q  And to be clear, Doctor, did you write
5  every substantive word of the expert report that
6  we've marked as an exhibit in this case?
7      A  To the -- yes, everything substantive.
8      Q  Did MSA or Medical Science Affiliates
9  make any substantive contributions to your expert
10  report in this proceeding?
11      A  No.
12      Q  You spoke a little bit earlier today
13  about some administrative support that you
14  received from MSA. Do you remember that?
15      A  I do.
16      Q  And tell us what you meant by
17  "administrative support."
18      A  So by "administrative support," I meant,
19  you know, gathering -- like collating materials
20  for me, helping to -- to format the report, you
21  know, putting -- you know, putting the reference
22  citations in correctly. You know, creating the --
23  the list of reliance documents at the end. You
24  know, things of that sort. And then -- and then
25  generating invoices.

Page 469

1          I'm trying to think what else.
2  Whatever -- whatever I said earlier was the -- was
3  the full list, I think.
4      Q  You also mentioned earlier today
5  receiving some editorial support from the folks at
6  MSA. Tell us what you meant by that.
7      A  So to look for typos or -- I gave the
8  example of like where I had a really long
9  paragraph, and they broke it up with bullets to
10  make it look more readable, that sort of thing,
11  and -- and just making this actually have the
12  physical appearance that it does.
13      Q  Did MSA provide anything other than
14  administrative formatting type support in
15  connection with your report in this case?
16      A  No.
17      Q  If someone were to suggest that the
18  opinions in your expert report are not entirely
19  your own, would that be the truth?
20      A  I'm sorry. I was reading that going by,
21  and I didn't listen.
22      Q  Sure. If someone were to suggest that
23  some of the opinions in your expert report are not
24  entirely your own, would that be the truth?
25      A  No.

Gregory B. Diette, M.D.

| Page 470 | Page 472 |
|---|---|

**Page 470**

1          MS. PARFITT:  Objection.
2          THE WITNESS:  They're -- they're all my
3    opinions.
4    BY MS. BROWN:
5          Q   If someone were to suggest that MSA
6    wrote some of the substantive pieces of your
7    report, would that be the truth?
8          MS. PARFITT:  Objection.
9          THE WITNESS:  No.
10          MS. BROWN:  Thanks very much for your
11    time, Dr. Diette.  I have no further questions.
12          MS. PARFITT:  Anybody?  No.  Thank you.
13    Dr. Diette, thank you very much.
14          THE WITNESS:  Thank you.
15          MS. PARFITT:  I appreciate it.
16          THE VIDEOGRAPHER:  The time is 6:04
17    p.m., April 9th, 2019.  Going off the record,
18    completing the videotaped deposition.
19          (Whereupon, the deposition of
20          GREGORY B. DIETTE, M.D. was
21          concluded at 6:04 p.m.)
22
23
24
25

**Page 472**

1          INSTRUCTIONS TO WITNESS
2          Please read your deposition over carefully and
3    make any necessary corrections. You should state
4    the reason in the appropriate space on the errata
5    sheet for any corrections that are made.
6    After doing so, please sign the errata sheet
7    and date it.
8          You are signing same subject to the changes
9    you have noted on the errata sheet, which will be
10    attached to your deposition.  It is imperative
11    that you return the original errata sheet to the
12    deposing attorney within thirty (30) days of
13    receipt of the deposition transcript by you. If
14    you fail to do so, the deposition transcript may
15    be deemed to be accurate and may be used in court.
16
17
18
19
20
21
22
23
24
25

| Page 471 | Page 473 |
|---|---|

**Page 471**

1          CERTIFICATE OF CERTIFIED SHORTHAND REPORTER
2          The undersigned Certified Shorthand Reporter
3    does hereby certify:
4          That the foregoing proceeding was taken before
5    me at the time and place therein set forth, at
6    which time the witness was duly sworn; That the
7    testimony of the witness and all objections made
8    at the time of the examination were recorded
9    stenographically by me and were thereafter
10    transcribed, said transcript being a true and
11    correct copy of my shorthand notes thereof; That
12    the dismantling of the original transcript will
13    void the reporter's certificate.
14          In witness thereof, I have subscribed my name
15    this date:  April 10, 2019.
16
17          _____
18          LESLIE A. TODD, CSR, RPR
19          Certificate No. 5129
20    (The foregoing certification of
21    this transcript does not apply to any
22    reproduction of the same by any means,
23    unless under the direct control and/or
24    supervision of the certifying reporter.)
25

**Page 473**

1          - - - - - -
2          E R R A T A
3          - - - - - -
4    PAGE LINE CHANGE
5          _____
6    REASON: _____
7          _____
8    REASON: _____
9          _____
10    REASON: _____
11          _____
12    REASON: _____
13          _____
14    REASON: _____
15          _____
16    REASON: _____
17          _____
18    REASON: _____
19          _____
20    REASON: _____
21          _____
22    REASON: _____
23          _____
24    REASON: _____
25

Gregory B. Diette, M.D.

Page 474

```
 1              ACKNOWLEDGMENT OF DEPONENT
 2        I,_____, do hereby
 3     certify that I have read the foregoing pages, and
 4     that the same is a correct transcription of the
 5     answers given by me to the questions therein
 6     propounded, except for the corrections or changes
 7     in form or substance, if any, noted in the
 8     attached Errata Sheet.
 9
10     _____
11     GREGORY B. DIETTE, M.D.           DATE
12
13
14     Subscribed and sworn to
15     before me this
16     _____day of_____,20____.
17     My commission expires:_____
18     _____
19     Notary Public
20
21
22
23
24
25
```

Golkow Litigation Services - 877.370.DEPS

Gregory B. Diette, M.D.

**A**

**a.m** 1:18 13:7
  19:13 44:15,18
  89:7 151:17,20
**AACES** 11:11
**abandon** 309:24
  312:8
**abandoning**
  201:13 306:24
  309:5
**abide** 38:24
**ability** 378:21
**able** 36:17 69:9
  85:16 140:19
  158:1 207:21
  216:13 300:17
  319:14 372:8
  391:1 410:12
  454:15
**abnormality**
  372:20
**absolute** 361:9
**absolutely** 62:13
  65:23 84:8
  86:22 387:14
  387:16 415:14
  454:16 462:24
**absorbed**
  405:17
**absorption**
  266:21
**abstract** 282:9
  365:2,10
  366:18 369:22
  428:5
**Abstracts** 8:12
**absurd** 270:15
  271:2
**academic** 93:18
  149:11
**accepted** 92:1
  368:3
**accepts** 291:9
  292:20
**access** 10:13
  26:15 285:17

**accessory** 75:25
  76:13
**accompany**
  159:19
**account** 77:1
  255:8 383:20
**accounts** 36:6
  36:14
**accurate** 14:24
  100:1 139:12
  387:14,16
  434:18 472:15
**accurately**
  73:19 97:20
  274:19
**acknowledged**
  182:7
**ACKNOWLE...**
  474:1
**active** 408:16
**activities** 10:14
  205:8
**actual** 172:4
  203:21 264:19
**ADAM** 3:5
**add** 24:21 91:25
  96:16 97:7
  178:1,19
  179:22 234:20
**added** 347:5
**adding** 40:4
**addition** 134:13
  183:10 211:19
**additional** 25:16
  29:11 31:12
  92:13 178:10
**additions** 91:23
  139:15
**address** 31:2
  124:21 142:11
  142:15,19
**addressing**
  134:15
**adequacy** 57:1
**adequate** 457:14
**adhere** 317:2
**adjusted** 249:22

**administer**
  13:20
**administering**
  2:18
**Administration**
  228:1 434:11
**administrative**
  91:17 93:9
  154:19 158:6
  178:17 183:2,6
  468:13,17,18
  469:14
**admonishing**
  38:6,7 113:10
**adult** 403:22
**adults** 374:20
  389:19
**advance** 88:17
**advanced** 45:20
  45:25
**advertise** 189:4
**advertised**
  188:21
**advertisement**
  188:15
**advised** 441:15
**affidavit** 133:12
  135:14 197:12
  197:25 198:19
**affidavits** 130:7
  131:2,14
  134:14 135:1
  170:18 196:25
  197:6 198:18
**affiliate** 187:19
  187:23
**affiliated** 155:15
**Affiliates** 24:20
  25:18 31:18,21
  31:25 32:7
  33:4,5,20
  151:23 152:6
  152:10,18,23
  153:15 154:8
  155:10,16
  157:4,8 158:10
  159:8,21 162:5

  162:19 163:22
  164:10 165:6
  165:21 166:25
  168:3,18
  170:24 179:7
  179:14 188:21
  189:7 190:16
  190:19,20
  468:8
**Affiliates'**
  155:18 156:5
**Affiliations** 7:15
**affirmative**
  415:13
**afforded** 179:14
**afield** 270:12
**African** 11:10
**afternoon**
  204:25 205:1
  465:1
**age** 249:15
**agent** 285:20
  439:13
**ago** 51:2 108:17
  117:10 152:20
  153:10 189:18
  231:1 244:17
  418:4,9 445:7
  445:7
**agree** 34:23 35:3
  45:24 46:20
  47:12 84:6,9
  84:20 87:16,21
  88:8 107:23
  112:21 183:5
  213:2 216:4,4
  216:13,24,25
  217:8,14,15
  219:21 222:1,6
  225:25 226:3,9
  226:15 233:25
  235:3 236:23
  260:3,3,8
  272:13 274:25
  275:24 276:18
  276:19,21,25
  277:1,2,2,12

  278:9 282:19
  283:6 287:2
  291:11 292:24
  302:17 304:2
  304:20,23
  306:5 321:5,13
  321:16 322:16
  322:22 331:3
  361:22 362:6
  362:21 363:10
  367:22,25
  368:14 400:4
  401:21 411:8
  413:7 414:24
  416:3 417:23
  418:1,2,3
  420:8 432:12
  433:12 434:17
  434:20,24
  445:2,10,25
  464:1
**agreeable** 46:24
  293:4 303:21
  305:3 306:11
  319:9
**agreement**
  31:21 32:6
  33:18 153:22
  154:4 187:11
**agreements** 33:2
  156:8
**Ah** 437:24
**ahead** 16:6
  23:22 24:17
  25:22 26:20,21
  58:7 63:1
  162:8,9 192:22
  212:8 216:2
  218:14 270:5
  275:6 292:10
  297:12 304:11
  353:22,23
  355:2,11
  365:18
**air** 102:13
  107:21 371:17
  373:21 405:20

Gregory B. Diette, M.D.

**airborne** 373:14 373:15 406:7
**airway** 97:16 101:9
**al** 9:14 271:17
**alert** 47:19
**Ali** 19:15 27:9
**all-cause** 10:9 366:3 367:3 389:18
**allegation** 109:21
**allegations** 109:2,15,25 110:10
**Allen** 309:7
**allergen's** 107:25
**allergens** 102:15 102:19,23 103:7 107:22
**ALLISON** 4:17
**allowed** 62:11 166:5
**Alrighty** 231:10
**alter** 76:1,14
**ambient** 370:18 371:17
**America** 11:24 49:20
**American** 9:9 11:10 94:20 239:4 295:6,18 296:24 298:12 301:2 308:17 308:19 309:4 387:7
**amosite** 458:13
**amount** 23:14 23:15 40:8 90:7,19 176:4 178:19 179:23 180:1 280:25 383:13 458:4 467:4
**amounts** 282:15 285:25

**amphiboles** 458:13,16
**Amrhein** 9:5,14
**analogous** 371:11
**analyses** 77:12 336:8,15
**analysis** 76:1,15 145:23 148:22 149:5 251:12 252:16,24,25 267:24 268:15 268:23 269:16 270:14 271:1,4 333:8,9 334:19 335:22,24 336:10,17 338:21 339:21 342:14 361:3
**analyzing** 425:4
**and/or** 135:13 471:23
**angles** 200:25
**animal** 252:6 253:3 285:8 448:14,22 450:3,4
**animals** 254:7 254:12 449:23 449:23 450:2
**Ann** 235:22
**Anne** 2:16 8:5
**annoy** 53:9 327:4
**answer** 23:22 24:11 26:24 29:6 32:22 33:15,18,21 35:17 37:18,23 41:17 55:21 62:12,18,23 67:11 68:6,7 73:12,15 78:24 79:7 80:20 82:18 83:18 84:8,13 93:16 106:11 117:22

122:3 124:2 125:1 135:23 136:13 137:10 139:25 140:24 141:18 144:5 146:17 150:25 156:15 159:4 161:10 164:13 164:15 165:13 166:20 167:6 168:13 169:8 173:22 176:16 176:17,19 177:2,10 187:13 191:22 191:23 192:21 195:6 198:8 207:22 210:9 218:8 220:10 249:18 268:19 274:18,20,23 274:24 276:6 276:10,10 288:4,4 304:5 310:22 319:22 326:13 332:4 336:3 337:22 338:3,10 346:22 371:3 372:6,8 374:13 407:1 419:11 421:2 424:20 424:23,25 436:1 450:4 451:14 460:22 464:8 465:8,11 467:15
**answerable** 90:11
**answered** 35:8 57:14 68:12 74:25 117:21 127:22 146:13 147:24 150:15 161:10 184:12 210:8 217:21 218:7 219:1

220:9,18 224:3 228:21 232:7 251:6 261:17 308:3 385:5 423:1 429:10 445:18 447:19 453:10,23
**answering** 33:9 61:19 203:4 244:12 335:19 337:19 404:14
**answers** 14:23 37:13 106:24 193:2 474:5
**anybody** 15:12 56:24 153:6 164:19 192:19 196:11 266:10 266:13 311:22 313:24 340:12 437:6 470:12
**anymore** 29:24 30:17 153:1 294:23
**anyway** 49:8 79:4 305:1 317:6 372:6
**apart** 18:16
**apologize** 66:1 202:17 284:22 312:12 378:3 378:16 394:17 426:21,23 464:18
**appalling** 461:21
**apparently** 257:14 312:12 391:10
**appear** 31:15 147:7 172:4 232:1 313:4
**appearance** 469:12
**appearances** 4:1 5:1 13:18
**appeared**

296:23 297:22 305:10
**appears** 26:3 123:24 282:14 407:5,19
**appendices** 265:10
**Appendix** 7:8,19 66:4 121:4
**application** 266:22 270:25 332:21,25 416:8 449:24
**applications** 420:22,25
**applied** 149:13 250:18 412:23 435:24 461:5
**applies** 461:3,17
**apply** 74:7 401:2 437:9 471:21
**applying** 362:13 449:18
**appointment** 93:19 97:1,3 100:20
**appreciate** 40:11 67:24 88:25 114:10 114:11 140:13 183:10 184:3 190:13 251:1 327:7 345:3,15 349:6 355:12 381:13 400:10 411:7 470:15
**approach** 146:20 241:5 245:12 250:23 319:25 343:7 343:14 444:23
**approached** 456:11
**appropriate** 39:9 173:22 253:25 339:14 450:2 472:4

Gregory B. Diette, M.D.

| | | | | |
|---|---|---|---|---|
| **appropriately** 287:16 | 258:21 280:17 281:23 282:6 | 78:17 79:18,25 79:25 80:9 | 122:6 186:19 387:11 388:6 | 57:1,2 59:16 64:16 68:17 |
| **approximately** 36:20,22 45:21 46:2 121:10,15 213:25 | 296:9 297:22 297:24 298:6 304:5 305:9 306:17 309:4 | 84:6,11,17,22 87:18,25 89:14 89:17,21 90:13 90:18,19 | **asbestos/meso-** 207:10 **asbestosis** 122:10 | 77:19 83:16 109:10 132:20 135:21 136:11 136:15 146:6 |
| **April** 1:17 11:22 13:6 121:15 175:9 229:10 439:3 470:17 471:15 | 309:15,22 317:16,21 328:5 336:22 343:20 369:9 373:25 419:14 424:16,19 | 120:16 121:21 122:5,21,24 123:7,14,22,24 125:22,24 126:5,20 127:5 127:20,25 | **ascend** 417:17 418:5 **ascertain** 406:18 **ASHCRAFT** 3:6 **Ashton** 11:25 | 148:23 163:10 164:15 191:5 192:24 193:3 195:16 201:1 205:23 221:4 235:10 238:14 |
| **arbitrary** 251:19 302:14 **area** 51:17 59:4 75:7 128:20 151:15 184:10 190:17 203:1 214:24 216:21 217:10 218:3 219:8 220:12 221:6 236:15 237:16 260:23 276:1 279:2 280:4 288:8 331:14 430:3 | 426:3 427:9,21 428:1 439:25 442:13,20,25 444:16 445:6 **articles** 28:2,9 28:11,13,13,17 28:18,18 29:7 30:5,7,10 31:4 31:11 37:11 92:13,16 122:13 149:9 240:15,21 299:5,11 309:10,11 | 128:14,20 136:16,19,23 142:20 147:17 148:13 187:15 201:24 203:16 214:20 215:7 215:10 225:24 226:8,14 241:2 241:4,9 259:23 259:24 261:23 262:10 263:11 281:6,13,24 282:12,13 283:9,19 284:8 | 438:9 **aside** 44:3 134:25 206:4 208:23 231:10 285:23 286:15 **asked** 19:21 20:20 21:11 23:24 27:22,23 32:13 35:7 49:23,25 55:21 55:25 57:10,17 57:21 74:24 106:11,13 112:17 117:21 | 246:13 252:11 263:6 299:1 304:16 329:14 336:15 337:10 400:4 403:10 404:14 409:16 422:7 430:24 451:7 **aspect** 355:25 356:2 **aspects** 256:24 **aspirin** 421:17 421:20,21 **assemble** 244:20 |
| **areas** 19:3 80:15 100:22 203:14 356:18 **Armhein** 317:25 **ARPS** 5:10 **arrange** 162:15 **arrangement** 154:7 **arranging** 162:13 **arrive** 222:23 **arrived** 105:7 **Arsenic** 10:23 393:16 **article** 6:23 8:16 8:22 9:4,7 10:4 10:9 11:8,12 11:15 12:4 29:7 42:18 43:19 45:7,13 122:9 148:23 149:6,18 257:4 | 310:14 347:13 364:21 425:24 433:18 435:16 436:12,20 437:1 449:3 452:16 **articulate** 145:21 **articulating** 88:11 288:12 **asbestiform** 72:17,21 73:5 73:23,24 74:5 401:4,9 **asbestos** 8:16 11:5 41:14,20 64:25 72:6,23 73:20,21 74:1 74:8 75:24 76:12 77:1,16 77:22 78:4,11 | 284:9,13 285:12,22,25 286:9 382:13 383:2,10,14 384:5,14,17 385:13,21 386:10 387:6 387:10 388:12 388:25 389:4 389:20 391:2 391:17,22 392:7 394:1,24 395:2 397:17 399:14,17,17 400:20 401:2 401:21,22,25 402:7 457:5,21 460:11 **asbestos-** 121:21 123:22 **asbestos-related** | 127:21 147:23 148:1 150:15 155:6 181:16 181:25 184:20 184:21 185:7 187:2 193:12 195:9 196:16 199:13 200:5 200:14 210:9 218:7 220:18 224:2 228:21 232:7 251:5 261:17 262:6 262:10 275:18 276:9 308:3 377:24 422:25 429:10 445:16 445:17 447:18 465:4 **asking** 37:12 42:11 53:2 | **assert** 33:12 **asserted** 33:9 **asserting** 33:13 33:15 **assess** 266:20 **assessed** 463:16 **assessing** 239:10 **assessment** 8:11 11:18 144:8 256:9 264:23 265:3,19 267:6 268:11 272:17 273:20,24 274:12 275:25 277:22 427:11 **assistance** 159:18 178:11 179:7 250:11 **assistant** 93:10 250:15 **assistants** 91:17 |

Gregory B. Diette, M.D.

assisting 187:2
assists 23:17
associate 7:14
  94:5,12
associated 10:10
  10:15 359:3
  366:3 379:18
  380:22 389:4
  428:6 462:18
association 11:8
  127:10,19
  148:17 271:20
  273:15 278:3
  278:15 295:7
  295:18 302:12
  305:20 322:17
  352:25 361:23
  362:3,4,7,22
  362:23 384:7
  394:1,23 402:7
  414:16 417:11
  422:23 423:8
  445:22
associations
  236:19 368:1
assume 14:21
  21:13,18 70:23
  71:4 76:1
  78:16 79:16
  80:8 132:25
  135:21 147:4
  191:10 222:13
  234:8 235:10
  242:2 246:4
  288:2,18 295:5
  370:4 399:19
  419:7 459:10
  465:13
assuming 86:25
  119:2 205:22
  233:16 240:14
  295:4 450:2
assumption 78:8
  78:12 234:23
assurance 386:7
asterisk 332:20
  334:12 355:6

asthma 48:17
  96:9 97:17
  100:23 102:12
  103:3 104:17
  107:2,8,15
  143:2 370:24
  371:1 372:24
  372:25 373:12
  373:15,20
  374:8,18 375:1
  375:19 376:7
Atkinson 397:23
attach 351:19
attached 6:9 7:2
  8:2 9:2 10:2
  11:2 12:2 26:1
  42:5,14 43:7
  298:16 308:23
  439:25 442:14
  472:10 474:8
attaches 309:14
attachment
  18:12
attachments
  18:15,21
attack 107:9
attempting
  274:2
attend 104:8,23
  105:1 232:12
  232:15 261:5,8
  261:12,22
attention 14:19
  45:13 83:9
  100:6 121:3
  139:20 236:4
  256:5 271:10
  282:9 284:15
  290:22 298:16
  378:14 379:7
  393:19 394:8
  400:18 414:11
  416:23
attorney 27:4,7
  27:7 472:12
attorneys 49:18
  84:3

Australia 388:3
author 10:13
  224:9 225:8
  253:6 290:14
  317:20 369:9
  370:14 427:15
authored 290:18
authors 45:19
  240:13 245:15
  247:12 272:9
  290:6 365:3
  370:12 413:7
  414:14 424:12
  425:20 430:16
  448:6,25
  451:22 452:17
  453:3,16
  454:19
available 49:4
  49:15 212:18
  241:15 257:25
  258:2 271:21
  271:23 272:10
  277:18 278:5
  278:17 279:24
  293:13 322:13
  383:22 384:4
  456:12
Avenue 3:21
  5:11
average 47:14
avoid 51:17
  54:19,20
award 92:3
aware 15:9
  22:23 36:5
  38:14 41:21
  50:12,15 63:21
  63:22 64:22
  65:8 71:10,24
  75:3,19 81:19
  110:7 113:22
  168:16 188:20
  189:3 196:13
  197:1,5 198:17
  231:11,17
  232:13 264:20

295:15 296:2
298:12,18
306:22 310:11
367:13 385:17
416:9
awareness 63:25
  231:23
awful 70:7 237:5
  343:10 462:5
awkward
  116:23

_____

**B**

B 1:15 2:1 6:2,8
  7:1,9,14,20 8:1
  9:1 10:1 11:1
  12:1 13:22
  66:4 470:20
  474:11
baby 7:4 49:19
  50:19 51:7,15
  52:9 53:4,13
  53:13,25 54:1
  54:12 56:16
  58:18,23 74:15
  87:17 381:19
  385:12 413:9
back 14:9 16:22
  19:14,16 27:19
  39:8 44:19
  50:19 52:22
  54:10,17 56:15
  57:4,13 58:3
  70:8 77:24
  85:25 86:14,18
  89:7 93:12
  106:23 114:12
  117:2,16 139:9
  140:9,13
  144:21 149:3
  151:20 163:8
  166:23 185:7
  197:2 204:23
  227:23 229:15
  230:25 242:3
  261:13 280:14
  286:16 291:20

295:19 305:10
313:16 320:17
320:22 325:11
338:17 351:22
363:18 377:13
378:5 392:19
396:18 400:4
400:19 426:20
435:25 441:10
441:14 442:14
446:17 447:14
463:5 464:16
464:20,23
465:22
background
  90:18 100:15
  175:14 255:10
  284:9
backgrounds
  175:11 288:20
bad 277:6 414:5
  450:15
baked 77:15
  146:15
balanced 217:4
  237:4 238:4
  343:7,14
Baltimore 2:5
  10:17 13:9
Bank 3:22
Barnard 21:23
  22:9
base 302:11
  356:20
based 59:6
  212:16 285:15
  287:3 303:25
  304:22 316:11
  317:5 319:19
  326:12 339:21
  346:8 356:17
  367:16,20
  375:25 382:7
  386:12 394:25
  405:2 406:12
  406:13 415:19
  422:7 438:18

Gregory B. Diette, M.D.

450:4
**bases** 210:4
211:22,24
238:11 242:25
247:23 399:16
**basic** 344:20
388:24
**basically** 105:4
180:1 212:24
352:18,22
358:19 388:24
401:20 449:13
**basis** 243:16
253:16 288:4
345:20 381:3
392:7
**Bates** 8:17 9:21
**Baylen** 3:15
**Beach** 4:6
**bear** 65:25
122:8 181:25
**bearing** 123:16
**becoming**
454:16
**Bedrooms** 10:16
**Beg** 76:19
325:16 437:22
**beginning**
177:17
**begun** 102:20
**behalf** 3:3 4:16
5:15 55:17
136:16 158:5
**behavior** 264:2
264:3
**belief** 59:1
395:20
**believable**
390:15
**believe** 15:5
22:17 27:14
31:17 43:14
56:3 82:7,16
121:4,5 139:13
177:16 209:23
210:25 215:6
219:16 225:22

226:4,7 227:14
231:12 243:6
255:18 263:17
306:18 318:9
325:5 370:23
370:24 378:5
428:13 432:22
442:2 453:13
453:13
**belong** 145:21
174:19
**beneficial**
309:14
**Berge** 237:25
238:2 454:24
**best** 37:13 38:5
50:17 104:3
108:19 159:5
184:12 322:14
333:15,16,18
444:13
**better** 93:15
161:10 164:13
180:11 353:16
386:25 405:5
**beyond** 8:23
9:10 167:17,18
296:25 308:18
309:3,22
**bias** 239:17,22
**biases** 462:11
**BIDDLE** 5:4
**big** 195:21
378:10 379:3
**bigger** 306:12
**bill** 11:25 25:4,7
25:10,13
158:18,22,25
159:11,11,14
159:21 161:23
178:1,16,16,17
178:22 179:4
438:9 439:2
**billed** 40:3,6
159:22 160:1
161:13
**bills** 25:2 158:10

179:22,25
192:9,12,15
**binder** 164:25
164:25
**bio** 151:10
**biologic** 256:24
272:25 273:4
433:20
**biological** 384:6
418:25 419:4
445:14 446:16
446:19 447:17
448:7 449:1
**biologically**
89:22 384:6,20
385:22 414:15
415:22 416:6
418:16 420:10
421:4 422:10
424:13 425:22
432:10 450:7
450:20 451:23
453:3,19 455:6
**biologist** 253:20
253:20,24
254:16,21
255:1,6,16
454:19
**biology** 175:14
**biomarker**
405:3
**biostatistician**
293:22,23
**Biostatistics**
314:12
**bit** 24:24 27:4
59:21 73:12
77:25 115:6
121:1 158:8
186:1 205:3
230:11 238:7
241:23 245:12
314:18 341:13
352:24 360:19
370:24 376:21
377:25 399:21
407:16 468:12

**bits** 287:1
**blacked** 161:17
180:3
**blank** 355:16
**blocks** 285:17
**blog** 312:14
**blood** 404:25
405:25
**Bloomberg**
100:21 101:20
101:25
**blowing** 44:7
**blue** 389:19
**board** 94:16
**bodies** 209:2
239:7
**body** 11:9
211:12,15
228:7,12 246:7
412:18 417:17
434:12
**boils** 306:13
**bold** 174:18
**book** 290:17
292:9
**bottle** 7:4 51:7
51:12 52:8,22
52:25 53:3
**bottles** 49:19
50:1
**bottom** 54:22
76:8 96:25
172:4 211:10
256:7 284:16
284:17 344:25
350:15 393:20
396:4 444:17
**bought** 54:5,5
**bounds** 337:3
340:25
**Bowman** 311:7
313:13,14
**Bowman's**
296:4,6
**Bradford** 145:6
145:10,15,23
146:2,11,18,20

147:5,14
239:11,21,24
268:11,15,23
269:9,16
270:14 271:1,4
362:22 419:8
447:22
**brand** 303:6
**brands** 381:25
382:7,8 383:20
**break** 19:17
62:9 77:11
88:22 133:6
151:10 158:7
164:2 178:15
181:23 204:10
204:10,12
217:16 280:7
280:17 320:16
320:17,25
377:4,5 426:10
**breathing** 54:20
**breeze** 44:7
**Brief** 251:24
**briefly** 19:2
229:15
**bring** 16:24
27:23 34:7,9
34:10
**bringing** 100:6
**broad** 48:15
64:7 303:12,19
306:8 402:25
407:1
**broader** 95:24
**broadest** 415:2
**broadly** 147:11
**broke** 469:9
**broken** 332:23
346:18 403:23
**bronchoscopy**
123:12
**brought** 34:6
169:25
**Brown** 4:17 6:5
15:18 16:3,6
18:4 19:7,15

Gregory B. Diette, M.D.

Page 480

| | | | | |
|---|---|---|---|---|
| 19:16 20:22 | 103:18,21 | 167:4 168:19 | 232:7,17 233:1 | 314:10,25 |
| 21:17 22:7 | 104:2 105:10 | 169:4,7,13,20 | 233:4,12,15 | 315:5 318:13 |
| 23:19,22 24:10 | 106:6,22 107:4 | 170:15 171:16 | 234:2,17,22 | 319:19 321:10 |
| 24:14,17 26:9 | 107:16 108:8 | 172:11 173:18 | 235:5,7 236:25 | 321:21 322:9 |
| 27:11 28:21 | 108:23 109:4,9 | 174:6,10 175:5 | 244:2 245:25 | 322:21 323:21 |
| 29:1 31:6,22 | 109:18 110:1 | 175:12 176:2 | 246:10 247:24 | 324:22 325:2 |
| 32:8,13 33:6 | 110:12,15,24 | 176:15,22 | 248:7,17,23 | 326:3,6,10,17 |
| 33:14,23 35:7 | 111:5,11,19,23 | 177:9 178:12 | 249:6,11,17,24 | 326:23,25 |
| 35:17,25 36:24 | 112:5,13,24 | 178:24 179:8 | 250:6,21 251:5 | 329:12,17,20 |
| 37:14,17,20 | 113:2,9,12,14 | 179:17 180:5 | 254:17 255:2 | 329:25 330:4 |
| 38:1,8,11,14 | 113:18,22 | 180:25 181:9 | 255:15,22 | 330:22 331:4 |
| 38:18,21,23 | 114:1,13,16,20 | 182:18 183:1,7 | 256:1,17 258:4 | 331:18,22 |
| 39:1,6,11,19 | 115:1,4,13,25 | 184:4,18 | 258:14,25 | 332:1,4,7 |
| 40:16 41:15 | 117:11,20 | 186:10 187:10 | 259:8,10 260:5 | 333:19 334:10 |
| 42:8,19,25 | 118:1,25 119:9 | 187:20 188:5 | 260:10,25 | 334:20 335:5,9 |
| 43:12,20 44:13 | 120:17 123:25 | 188:11,23 | 261:2,16,24 | 335:12,16 |
| 45:5 47:6,22 | 124:23 125:8 | 189:2,21 190:8 | 262:19,24 | 336:2,21 |
| 48:11 49:5,21 | 125:14 126:21 | 190:22 191:9 | 263:20,24 | 337:11,15,19 |
| 50:4,21,24 | 127:13,21 | 192:4,10,12,17 | 264:4 265:2,20 | 337:22 338:2,5 |
| 51:9,19 52:23 | 128:21 129:9 | 192:20 193:1,5 | 266:1 267:18 | 338:8 339:4,17 |
| 54:2,14,25 | 129:15,18 | 193:20 194:1 | 268:2,12,18 | 339:25 340:6 |
| 55:8,16 56:2,8 | 130:2,11,15 | 194:11 195:5 | 270:2,5 271:7 | 340:11 342:18 |
| 56:19 57:14,23 | 131:5,11,17 | 195:14,18 | 272:2,16 | 343:18 345:7 |
| 58:14 59:5,12 | 132:12 133:10 | 196:2,7,10 | 273:23 274:1 | 345:11,22 |
| 60:4,17 61:4 | 134:21 135:3 | 197:13,17 | 274:17 275:4 | 346:8,13,17,20 |
| 61:13,18 62:4 | 135:16 136:10 | 198:7,21 199:3 | 275:13,15 | 346:25 347:12 |
| 62:10,21 63:24 | 137:9,22 139:5 | 199:16,18 | 276:3,13,16 | 348:5 349:11 |
| 64:6,9,14 65:1 | 140:5,11,23 | 201:12,15 | 277:20 278:7 | 350:14,19,21 |
| 65:12,19 66:18 | 141:13,18 | 202:5,9 203:3 | 278:11 279:8 | 351:3 352:3,10 |
| 67:15 68:11 | 143:3,6,20 | 203:7 204:9 | 279:13 280:3,6 | 353:11 354:4 |
| 69:14,20 70:22 | 144:1,4,20 | 205:10,17 | 281:8,15 | 354:16 356:3 |
| 72:8,19 73:7 | 145:7,16 | 206:10,19 | 282:21,24 | 356:25 357:13 |
| 73:15,18 74:13 | 146:13,24 | 207:18 208:20 | 283:4 286:10 | 358:8 360:13 |
| 74:17,24 75:8 | 147:8,18,23 | 209:3,9,20 | 287:6,25 288:3 | 361:24 362:10 |
| 75:10,17 76:18 | 148:18,25 | 210:11,17 | 288:9 289:2,4 | 362:25 363:13 |
| 76:20 78:20 | 149:15,23 | 215:16 216:10 | 289:8,13 | 367:8 368:19 |
| 79:2,21 80:16 | 150:15,21 | 217:21,25 | 290:23 291:13 | 371:19 372:1,4 |
| 80:24 82:1,11 | 151:6 152:11 | 218:6,12,15,19 | 292:1,4 295:23 | 372:14 373:3 |
| 82:17,22 83:2 | 153:17 154:10 | 218:23 219:11 | 298:20,24 | 373:17,22 |
| 83:13,21 85:3 | 155:1 156:6,16 | 220:17 221:19 | 299:2,12,21 | 374:9 375:8,10 |
| 85:9,14,20 | 156:19,24 | 222:8,25 223:7 | 300:1,6,12,15 | 375:14,20 |
| 86:2,11,24 | 157:10 158:11 | 223:24 224:1 | 301:18 303:1 | 376:16 378:18 |
| 87:1,8 88:5,7 | 158:14 159:3 | 225:2,17 226:2 | 304:3,8,12,17 | 380:4,11,24 |
| 90:1,15 95:11 | 159:13,23 | 227:12 228:8 | 304:25 306:6 | 381:3,20 382:2 |
| 96:17 97:22 | 160:7,9,16,19 | 228:13,21 | 307:1,7 308:3 | 382:16 383:6 |
| 98:7,11,13,15 | 160:23 161:21 | 229:22 230:19 | 310:5,8,18 | 384:9,22,25 |
| 99:6,10,15 | 166:1,4,9,11 | 231:3,19 232:3 | 312:14,18 | 385:5,8,15 |

Gregory B. Diette, M.D.

389:9 390:1,20
391:4,19,24
394:12 396:8
396:15 397:8
399:4,23
400:14 401:10
401:13,16
402:10,18
403:8 405:8,12
406:19,21
407:10 408:4
408:23 409:13
410:5,8,19
411:1,13,18
412:1,19
413:14,25
414:4 416:13
417:25 418:19
419:6,15
420:13,18
421:6,14
422:14,25
423:4,11
424:15,21
425:23 426:2
427:25 428:3
428:18,25
429:14,21
430:1,7,12,20
431:10,13
432:5,14
433:13 434:3
434:21 435:5
435:19 436:15
436:17 437:3
438:11,16
439:18 440:3
440:12,15,19
441:18 442:1
443:18,22
444:7,9,12
445:4,17 446:5
446:22 447:18
448:11 449:5,7
450:9,16,22
451:10 452:1
452:20 453:7

453:22 455:7
455:16,23
456:18 457:1,7
457:23 458:21
459:4 460:19
460:22 461:10
463:20 464:5,7
464:9 466:4,11
466:25 467:12
467:14,17,20
470:4,10
**Brown's** 18:8
55:20
**Bruce** 7:13 16:8
**built** 323:15
**bulk** 240:20
**bullet** 303:23
**bulleted** 181:21
**bullets** 469:9
**bunch** 70:13
91:25 253:2
369:5 376:9
435:25 460:13
**bundle** 86:16
**Burden** 8:17
281:25
**Burge** 454:24
**business** 24:21
178:19 191:11
193:11 266:14
**buy** 50:9

---
**C**

**C** 3:1 6:1 7:8
10:25 13:1
121:4
**C-reactive**
423:13
**cake** 341:10
**CALCAGNIE**
4:4
**California** 4:6
**call** 39:10 74:8
81:23 106:3,4
113:24 114:2
136:19 152:7
157:6,24

162:14,15
188:11 218:15
218:17,20
314:19 337:16
337:23 338:9
338:11,12
349:5 353:3,4
443:9
**call-in** 97:3
**called** 31:17
55:2 93:22
95:7 118:20
146:20 152:22
186:2 244:14
290:18 296:25
361:3,5 460:2
**calling** 306:16
**calls** 60:18 75:10
110:15 158:14
178:12,24
186:10 188:6
191:6 229:23
230:20 231:4
235:8 261:2
309:4 430:8
435:5
**camera** 19:19
113:16 378:17
**cameras** 19:17
**Canada** 8:14,14
264:22 265:17
266:5,11,18
267:6,15
268:10 272:13
273:20 274:12
275:25 278:10
279:1 409:3,10
409:18,20,23
432:2,9
**cancer** 6:24 7:23
9:16,20 10:5
11:5,6,9,10,13
12:6 28:14,19
34:24 35:5
36:6,7,9,14,15
36:20,23 39:16
40:13,21 41:11

41:14,21 45:8
45:9,20 46:1
46:23 51:18
55:7,15 59:10
59:18 60:3,15
61:3 62:3 63:8
63:12,18 75:6
76:3,14 79:11
79:15 89:24
90:14,20
104:24 109:22
111:3,10
115:24 116:7
117:1,4,19
118:10,21
119:3,7 122:7
122:8,19,21,24
123:6,8,13,14
123:18,19,23
124:18,22
125:3,7,13
126:5,10,15
127:12,20
129:7,13 130:1
131:1,14 132:8
134:10,16,19
135:6,15 136:8
136:17,20,21
137:21 138:8
140:22 142:12
147:22 148:17
149:22 150:13
150:20 151:4
163:3,7,14,19
164:12 165:25
167:3,12
172:24 187:7
199:12 200:1,4
200:6 201:5,10
201:24 202:22
202:23 203:2
209:19 210:23
211:20 212:22
214:4,11,12,25
215:9,15
216:22 217:11
218:4 219:9

220:13 221:7
225:5,13
226:12 228:17
233:23 234:15
234:21 236:17
237:19 240:16
240:24,25
241:5,9 248:5
250:4 253:20
253:23 254:14
254:16,21,25
255:6 263:16
271:20 272:15
273:22 274:15
275:2 276:2
278:4,23 279:3
285:18,21
359:4 364:1,11
365:5,16 368:3
368:18 372:4
376:15 378:1
379:11,17
380:3,21 384:8
384:21 385:24
386:11,19
387:6 388:7,25
389:5,8,19
391:3,11,17,23
392:8 394:2,24
395:13,23
397:17,18
398:1,1,2,2,10
398:11,14,15
398:23,24
399:11,11,15
399:18 400:20
401:9 402:8
404:4 406:13
407:8 410:18
411:4 413:12
415:9,24
417:12,15,20
420:5 421:8,8
421:10 422:24
423:10,15,18
423:20 439:13
443:12 444:23

451:25 453:5
454:18 456:25
457:6 460:12
462:19 464:4
466:23 467:5
**cancer/** 198:25
**cancers** 61:2,6
358:4
**candid** 332:12
**capacity** 411:12
**capture** 205:20
250:1 447:22
**carbon** 412:9
**carcinogen**
77:22 215:8
225:24 226:9
382:25 384:5
384:15 399:22
400:13 458:20
466:1,19,24
**carcinogenesis**
418:11 421:5
433:6 439:11
**carcinogenic**
215:6 225:23
401:2 402:1
**carcinogenicity**
420:11 422:11
**carcinogens** 8:9
10:25 120:12
231:15 235:25
260:22 465:5
467:8
**carcinoma**
428:7
**Cardiology** 10:8
**cardiovascular**
10:10 367:4
**care** 34:19,22
62:1,1,2 63:6,9
63:15 93:21,23
94:17 96:11
104:10 105:8
105:12,13
110:11 115:23
116:6,10,17,25
117:18,24,25

118:9,9,14
119:2 123:17
**career** 288:11
**careful** 224:4,21
247:13 372:16
410:19
**carefully** 194:13
395:10 472:2
**carrier** 141:22
**carries** 94:11
244:10
**case** 37:10 38:2
38:19 42:7,16
42:17,17 55:9
65:14 70:17
78:3 80:2
81:17,18
110:23 111:1,2
111:10 112:2,8
112:11,18
132:11 136:20
136:21 138:1,4
138:6,7,9
146:7 162:12
163:3,9 167:10
181:6 194:22
197:1 199:11
199:19,24,25
206:1,25
207:10,14
209:12 219:5
232:14 240:10
243:25 244:6
245:13 247:13
251:15,16
255:20 267:16
286:18,23
334:25 336:8
336:11 345:5,5
345:17,17,21
358:14 399:22
401:8 459:24
461:18 468:6
469:15
**case-** 131:21
142:5
**case-control**

142:9 144:14
245:11 246:15
247:4,16 251:4
267:25 268:7
270:9 286:20
288:11 325:6
325:12 343:6
345:23,25
355:22 356:14
360:5,21
368:21 428:7
455:14 460:3
461:5 462:5
463:15
**cases** 1:11 36:20
39:16 40:13
55:7,15,15
135:15 136:7
136:17 137:2,6
137:17,18
139:12,16,22
140:20,20
157:17 163:14
167:3,8,20,24
181:4,6 185:23
186:16,17,19
186:21,24
187:14,15
199:1 200:7,18
200:21 201:4
203:5,18 207:3
239:14 244:6,7
244:8 247:23
248:2,6,10
251:3,11
268:25 331:11
341:17 395:11
395:23 408:14
**categorically**
255:5
**causes** 35:2,6
**category** 100:14
162:10 292:8
**causal** 211:16
212:20 271:22
272:11,14
273:21 274:13
275:1 278:6

279:25 361:23
362:4 379:10
394:23 402:7
445:22
**causality** 60:2
265:19 275:25
362:24 363:12
419:1 446:2
451:9
**causation** 6:20
7:17 133:25
148:22 149:4
206:15,25,25
207:1,11,14
239:10 277:10
362:8 446:14
463:13
**causative** 126:9
439:13
**cause** 34:24
54:20 59:18
89:24 90:7,13
102:12 107:14
126:5 240:18
278:16 279:2
370:22 376:14
383:11,15
384:20 385:23
386:9,11,18
387:11 388:12
391:3,11 401:9
407:8 415:8,24
432:11 450:21
451:24 453:5
456:25 457:6
457:14,22
467:5
**caused** 313:15
359:3
**causes** 35:2,6
41:20 76:14
109:21 125:7
125:21 148:23
206:8 219:23
220:2 278:19
278:22 279:17
373:12 374:18

391:23 392:8
399:17
**causing** 76:3
376:6
**cavity** 433:8
435:2
**cease** 295:20
**cell** 358:4
444:18
**cell-based** 252:8
**cells** 422:1,1
**cements** 284:12
**center** 7:23 15:6
63:7 95:22
96:4 100:8
104:23 214:4
215:15 224:25
225:6,13
228:17
**certain** 16:24
28:8 126:3
244:25 268:23
316:12 358:3
449:23 467:4
**certainly** 16:20
21:19 48:21
56:10 90:24
100:2 104:17
108:1 129:21
143:7 149:5
164:18 166:10
201:18 222:17
226:3 260:1
261:4 294:18
352:8 363:6
367:21 388:5
413:21 433:17
451:16 453:2
463:4
**certainty** 452:24
**certificate** 471:1
471:13,19
**certification**
94:16 471:20
**certified** 119:25
471:1,2
**certify** 471:3

Gregory B. Diette, M.D.

474:3
certifying
    471:24
cetera 430:17
chance 17:2
    20:17 71:12
    99:8 193:9
    299:10 305:12
Chang 351:11
change 8:14
    77:17 93:8
    206:8 257:16
    280:9 313:19
    317:4 320:6
    340:24 344:1
    344:20 383:21
    384:2 473:4
changed 93:24
    174:15 257:12
changes 79:6
    472:8 474:6
chaos 315:17
Chapter 290:1
    292:9
characterizati...
    271:24 273:13
characterize
    260:12 369:25
    370:4 382:5
characterized
    370:1
charge 24:19
    25:17 177:17
    177:22 178:7
    197:11 198:5
    213:19
charged 23:14
    23:16 37:25
    40:9
charges 178:10
    197:21
chart 9:19
    247:16 251:4
    324:2,16
    328:17 329:11
    333:2 334:7,8
    336:19,23

339:15 341:22
344:22 346:3
347:1,4 355:20
443:9
check 376:23
checks 196:1,9
    196:12,19
chemical 8:12
    285:23 286:8
chemical-relat...
    187:15
chemically
    286:12
chemicals
    203:17
chemotherapy
    63:5
Chen 351:10
cherry- 304:17
chief 81:12
child 58:11
    404:11
child's 54:19
childhood 389:4
    389:20
Children 10:18
chorus 446:8
chose 97:25 98:4
    170:14 246:25
    339:21 341:25
CHRISTOPH...
    3:12
chronic 96:9
    97:16 101:10
    103:5 126:3
    413:8 417:19
    418:6 419:25
    419:25 420:2,9
    421:3 422:5,11
    423:17,19
    425:21
chrysotile 458:9
    458:17
chunks 181:23
    378:10
cigarette 404:21
    456:24,24

cigarettes
    404:12,17
circle 140:19
    292:10 346:6
    347:7,21,22
    348:13 353:9
    353:14 354:6,9
    365:18
circling 348:9,9
    348:17 351:16
    351:24
circumstance
    303:21
circumstances
    319:11 359:5
    387:7 394:18
citation 418:4
    433:14,22
    434:7
citations 468:22
cite 241:14
    273:2 390:5,13
    418:8
cited 222:12
    252:18 253:3,3
    337:5 364:15
    364:22 390:10
    390:10,11,11
    390:12,12
    412:3 448:15
cites 43:15
    237:24,25
    285:8,9 395:6
citing 222:15
    237:8 285:21
    361:5
city 48:18
    102:17 374:21
claim 291:4
claimed 292:13
    293:5
clarification
    25:1 27:3
    40:11 130:10
    179:5
clarified 167:8
clarify 20:12

23:12 40:2
55:11 99:2,5
99:12 103:22
104:5 122:2
130:14,16
clarity 58:10
    184:7
classification
    260:22
classifying
    439:12
clean 254:20
clear 26:10
    32:16 38:9
    105:12 106:25
    114:13 132:2,3
    161:22 163:6
    168:8 184:23
    195:20 209:16
    245:16 252:12
    271:22 305:18
    310:4 358:12
    433:19 455:25
    468:4
clearly 394:24
clicked 311:5
client 155:7
    157:3,6 190:14
    191:15 192:2
    193:10,16
    194:6 196:5
clients 155:12
    155:18 156:5
    189:15
Climate 8:14
clinic 63:10
    104:16 105:8
    105:12,12
clinical 9:8
    100:23 128:4
    128:10 246:21
    294:7,14
    308:16 309:20
    310:12 317:8
    428:9
clinician 59:1
    103:14

close 102:15,16
    352:17
CMO 38:2,15
    113:7,23 114:3
coach 78:25
    83:20 304:6
coaching 156:12
    332:3
coeditors 309:8
coffee 88:20
cognizant
    252:13
COHEN 3:20
cohort 141:12
    141:14,23
    142:1,11,15,19
    144:16 146:7
    233:8,11 238:3
    245:6 246:6,15
    267:16,24
    268:7 286:19
    325:6 358:19
    360:4 394:25
    459:23,25
    460:10 461:6
    461:18,23
    462:4
cohorts 233:3
    238:8 247:5
    286:22
coinvestigators
    232:25
cold 44:7
collating 468:19
colleague 82:23
    153:1,8
colleagues 303:7
    352:14 361:1
    463:17
collect 157:21
    404:23
collected 404:24
collecting
    157:18
collection
    242:24
collects 159:8

Gregory B. Diette, M.D.

**College** 94:21 239:4
**column** 45:18 394:8 414:20 444:16
**com-** 112:22
**Combine** 439:8
**combining** 425:5
**come** 21:2 77:24 104:1 106:13 108:12 152:21 164:25 170:18 177:23 203:20 227:22 278:19 286:16 288:19 325:22 363:17 430:19 431:5
**comers** 105:3 365:24 381:25
**comes** 80:2 90:8 96:20 172:1 191:14 196:14 205:22
**comm-** 229:21
**comment** 179:22 216:15 267:2 356:9 358:25 409:4
**commentary** 306:17 317:23
**comments** 14:5 14:11
**commercial** 73:22
**commission** 164:19 240:7 474:17
**commissioned** 266:24
**Committee** 231:13,13
**common** 10:14 49:13 292:12 369:3,7,7 443:11
**communicate**

317:8 337:1 342:11,11 343:12
**communicating** 223:21
**community** 120:10 188:22 208:15 209:1 209:17 229:21 295:20 407:25 408:12
**companies** 441:21
**company** 81:24 84:15 88:12 109:16 110:7 152:8 185:18 190:15 441:23
**company's** 441:14
**compared** 236:17 365:14 366:23
**comparison** 11:6 397:18
**compatible** 235:13 237:2
**compelling** 439:7 441:16 441:24 442:9
**compete** 320:4
**competent** 132:25
**competition** 456:7
**complain** 112:22,25
**complaint** 110:23 111:6,9 111:25 112:16 196:16,17
**complete** 21:8 86:24 99:23 191:18 206:5 244:20 310:18
**completed** 131:19 135:9,9

208:4
**completely** 47:9 291:8 292:19 336:21 363:3
**completing** 470:18
**complicated** 62:16 405:13
**complying** 114:1
**comprehensive** 7:23 214:4 215:15 224:25 225:13 228:17 238:25 264:24
**concentration** 386:15 459:16
**concentrations** 10:16 371:15
**concept** 306:24 383:8,9,23 447:3
**concern** 298:13 310:16 409:10
**concerned** 80:3 184:1,2 362:16
**concerning** 256:15 392:9
**concerns** 428:14
**conclude** 212:20 303:24 304:21 305:2,19,24 322:17 323:18
**concluded** 274:13,25 379:24 391:22 425:21 449:3 470:21
**concluding** 272:22
**conclusion** 212:10,11 277:3 278:12 279:22 283:24 285:14 323:13 379:12 380:19 381:2 382:14

392:7 396:10 396:13 413:18 413:21
**conclusions** 278:9 302:11 303:11 379:7 401:1
**conclusive** 273:8
**condescending** 113:17
**conditions** 106:21
**condoms** 359:7
**conduct** 319:15
**conducted** 147:21 151:3 168:3 231:14 409:11
**conducting** 318:15
**conferring** 58:8 138:19 211:3 213:5 267:10 282:1 296:20 376:19 412:12 426:8 437:14 443:4 447:7 459:21
**confidence** 305:22 317:2 327:18 328:19 329:7 330:11 337:3 340:25 341:1 353:8,9 354:2,10,11 355:3 357:9
**confidentiality** 156:8,17 187:11
**confirm** 197:9 422:4
**conflict** 196:6,15 196:19,23 305:24 323:18
**conflicts** 196:1,9 196:12
**confounding**

239:17,22 462:12
**confuse** 168:6
**confused** 24:8 308:21
**confusing** 333:23 334:1
**confusion** 24:6 245:13
**Congress** 235:4
**conjunction** 44:2 179:6
**connection** 211:16 361:23 469:15
**connotation** 71:22
**consequences** 10:19 40:25 63:11 378:6
**Consequently** 271:24
**consider** 22:9 29:17 122:6 229:16,19 231:1 252:2,16 267:23 318:15 322:5 419:3 442:8 445:8
**considerations** 146:19 239:11 363:2
**considered** 6:22 19:6 20:5,7 22:4,12,14 66:3,8 245:20 249:23 253:12 392:12,14 395:10 396:2 435:12
**consistency** 270:23 292:8 292:11 321:6 322:4 357:22 359:9
**consistent** 32:2 271:17 272:3

Gregory B. Diette, M.D.

278:1,2 357:21 359:2
**consistently** 172:9,23 236:13 237:14 271:19 272:3
**consists** 77:13
**constituents** 211:18
**consult** 106:4 225:13 233:9
**consultant** 188:2
**consulted** 105:25
**consulting** 117:25 135:18 136:11 152:8
**consumer** 8:7,9 231:14,16 232:11 235:24 235:25
**consumers** 78:18 80:14 84:22 87:20 223:14
**contact** 54:20 174:20 184:15 284:6
**contacted** 185:13
**contain** 75:5 78:4,11,17 84:6,17 211:19
**contained** 6:15 17:15 54:23 57:4 70:19,20 71:7,19 87:24 92:14 127:9 162:21 170:4 208:8 248:21 249:3 285:24 336:1 382:12 382:13 436:11
**containing** 401:4,8,24,25
**contains** 51:16

210:4 215:7 225:23
**contaminated** 383:2
**contamination** 283:11
**content** 176:14 177:8 191:9 309:9
**context** 46:10,12 83:16 111:3,4 134:20,25 156:24 170:20 180:20 193:19 193:22,22 200:3 263:5,7 321:22 378:20 419:8
**continue** 150:9 337:15 430:23
**Continued** 4:1 5:1 7:1 8:1 9:1 10:1 11:1 12:1
**continues** 50:13 453:7
**continuing** 292:1
**contract** 154:17 155:5
**contracted** 154:23 159:20 159:25
**contractor** 153:21 154:8 155:16 176:21
**contracts** 33:1 33:19
**contrary** 215:13
**contributed** 20:8,11 395:13
**contributions** 468:9
**contributor** 444:22
**control** 9:17 142:6 146:8 267:16 286:23

471:23
**controls** 224:8 245:13 248:12 251:15,16 331:11 336:9 341:18 345:5,6 345:17,17 356:16,17 358:15 461:18
**conversation** 173:22 174:2 176:6 266:12 342:22
**conversations** 175:22 176:18 176:24
**conveying** 33:2
**Cook** 351:11
**cooking** 374:24
**Cooper** 185:11 185:13,18 186:8,18,22 194:22 195:3,4 195:12
**cooperation** 26:16
**COPD** 96:10 103:3,4 104:17 143:1
**copies** 31:3 165:2 378:3,19 427:2 437:17
**copy** 17:13,23 32:5 82:14,21 85:21 86:12 88:17 91:3,3 112:16 134:8 139:3 140:11 154:4 312:12 325:15,17 348:18 393:5 397:7 426:24 430:11,14 431:19 471:11
**corner** 285:1 419:13
**cornstarch**

334:18 335:1 337:7,13,14,18
**corporate** 4:5 192:2 194:5
**Corporation** 110:11
**correct** 15:3,7 15:17 18:3 20:21 21:16 25:5,6,8,9,11 25:14,19,20,22 27:20 28:25 30:23 31:13,14 31:19 33:22,22 33:23 34:19 40:7 43:16,17 48:20 49:4 52:16 57:22 58:13 61:3,8 67:2 79:13 84:13,18,19,19 84:24 88:4 90:25 92:7 93:20 94:21 95:2,21 96:13 96:14 98:18,19 100:15 101:2 108:6,22,24 120:18,25 121:12,23 124:19 126:11 126:16 127:7 127:15 128:5 131:2,3,6 134:4,11,16,17 135:11 136:2,8 140:17 142:13 142:17,21 144:19 145:4 150:4,7,10,13 150:14 151:5 154:24 159:9 159:10,22 163:5 174:5 177:18 178:7,8 178:11 179:7 179:15 181:7

181:10 183:8 193:14,15 201:11 203:12 205:11 206:9 207:2,4 208:5 209:7,21 211:22 213:1 214:4 222:16 222:17,24 229:14,17 232:1,2,6,8,22 242:4,5 247:6 248:4,16 249:4 254:22,23 255:14,21 257:23 258:23 260:19 264:12 268:8 290:11 290:13 293:20 294:15 305:10 305:13 306:21 308:1 324:13 325:7,14 329:11 339:3 339:11,12,15 340:2 342:17 345:6,18,19,21 346:1,16 349:12 351:9 352:9 354:13 356:24 357:11 360:9,12,22,23 362:5,24 363:20 364:23 364:24 367:2,7 368:18,25 369:1 370:6 373:1 378:25 380:22 381:21 382:1 384:15 384:16 391:17 392:15 393:18 393:23 394:3 396:13 398:12 399:24 402:15 403:15 407:13 409:6 413:5

Gregory B. Diette, M.D.

417:7 418:13
419:10 423:23
425:15,17
428:19 432:3
434:13 437:24
440:8 444:6
446:2 452:8
455:22 456:17
459:24 465:2
467:10 471:11
474:4
**correcting**
101:18
**correction** 77:4
272:7 330:19
400:11
**corrections**
472:3,5 474:6
**correctly** 45:22
77:3 88:1
97:18 100:25
101:12 102:24
103:9 236:21
272:1,6 282:17
286:6 292:17
292:22 301:14
302:8,15 306:3
370:9 379:20
395:17 417:21
420:6 428:11
439:14 468:22
**Correlative**
11:16 427:10
**correspondence**
166:14
**cosmetic** 75:25
76:13 285:24
286:9
**cotinine** 404:23
406:8
**counsel** 7:5
13:18 17:8
19:7 24:11
26:9 27:11
31:3,23 33:6
33:11,20,23
35:17 37:15,17

37:19,21 38:17
38:22 42:8,8
42:12,25 47:13
52:23 53:2
57:23 58:8
61:13 62:21,24
65:21 66:18
68:13 70:23
78:20 80:17,21
80:21 82:11,19
82:20 83:13,19
85:3 86:2
88:16 89:10
98:10 99:8,10
100:9 103:22
109:10 112:13
113:9,11
114:14,18,20
114:25 115:1,3
126:21 130:17
132:16,25
133:10 135:21
136:10 138:19
139:4 140:6
154:3,12 159:3
160:12,22
161:2,21 166:1
166:16 169:4,6
193:6 204:10
211:3 213:5,6
217:22 218:10
218:12 227:12
227:24 228:4
234:3 255:23
267:10 273:25
275:15 277:20
280:3 282:1
287:7 290:23
292:3 296:20
299:21 304:6
312:11 324:22
326:5,15,21
329:14,16,17
329:19,22
330:2,6,25
335:12,13
336:3 338:4

350:14 376:19
377:22 390:1
397:6 408:5
412:12 419:16
420:13 424:15
426:8 437:14
438:4 439:16
443:4 447:7
459:21
**counsel's** 77:4
**count** 60:21
137:12 299:6
404:17 454:19
456:15
**counter** 237:22
**counting** 455:15
455:25 456:7
**countries**
367:14 374:25
**country** 249:9
**couple** 20:15
27:5 97:25
100:3 108:17
116:8 130:7
137:14 143:22
164:17 175:1
201:23 230:2
230:23 231:1
247:11 250:13
253:13 259:3
264:21 269:12
272:24 291:16
293:3 300:4,9
300:22 308:13
314:1 332:18
386:5 392:18
456:21 458:17
462:20 463:23
464:10 467:23
**couple-year**
408:1
**coupled** 452:24
**course** 19:19
42:2 62:24
106:12 155:14
160:24 166:16
167:5 189:17

205:8 246:9
247:2 259:3
330:16 339:18
397:9 430:1
**court** 1:1 2:17
13:14,19 71:17
112:18 134:9
146:1 156:10
161:2,3 205:15
341:25 407:22
472:15
**courtesy** 39:4
114:10
**cover** 206:22
441:2
**coworkers**
404:6
**Cramer** 222:14
286:1 351:10
351:10,11,12
351:14 427:16
462:22
**crazy** 269:20,23
269:24,25
270:7,15 271:2
**create** 168:23
198:13,13
224:11 250:10
250:14 266:3
**created** 170:20
267:1 287:14
346:9
**creating** 468:22
**credentials**
188:16 288:21
**credible** 224:12
255:7 260:15
260:17 315:13
316:13
**criteria** 93:23
239:9 245:24
246:18 271:18
278:2 307:23
358:24
**criterion** 269:9
292:11 419:2
**critical** 34:19,22

93:21 94:17
96:11 264:22
319:25
**critically** 105:14
**criticisms**
460:23
**criticize** 118:14
460:1 462:9
**critique** 256:24
**crocidolite**
388:4 391:10
457:13 458:11
**CROSS-EXA...**
464:24 467:19
**crossroads**
113:5
**crummy** 343:3,4
**CSR** 471:18
**cubed** 376:1
404:21
**cumulatively**
391:9
**cure** 39:18 40:15
**curious** 257:8
316:22 323:11
**current** 91:19
93:18 97:21
257:22 319:14
**currently** 128:3
128:9,19,24
129:2,5 136:6
137:5 187:3,4
203:2
**curriculum** 7:9
91:3,10,24
92:9 127:10,18
142:24 146:9
364:21 390:9
**curve** 458:19
459:3 465:5,14
465:16 466:2
466:20 467:8
**customers** 79:20
**cut** 61:19 275:16
336:3 337:15
**cutting** 337:11
**CV** 88:17 92:6

92:21,23 93:4
108:13,15
121:4,9,9
126:22 127:4
128:2 142:24
143:9
**CYNTHIA** 4:3
cytokines
444:19

---

**D**

**D** 4:9 5:9 13:1
**D.C** 3:9 4:13
5:12,19
damage 444:18
dampness
203:17
**Dan** 294:5,6
315:20
danger 78:19
79:9 84:23
**Daniel** 5:23 13:4
293:24 294:1,3
312:25
data 70:8 236:12
237:13 244:15
245:15 250:18
271:21 272:10
277:18 278:5
278:17,20
279:25 301:7
334:17,18,18
339:14 341:14
341:25 343:1
344:12 368:3
373:14 374:6
381:24 396:2
databases
242:16,18
date 13:6 22:19
22:20 66:25
68:21 92:6
140:2,16
179:25 394:3
471:15 472:7
474:11
dated 11:22,23

21:20 22:11
23:1 68:9
121:9 235:25
308:19 328:6
369:14 438:25
**Daubert** 6:20
7:17 70:24
71:13 133:25
206:15 207:16
207:17
day 21:21 39:5
158:2 195:9
264:18,19
275:16 313:19
327:6 404:12
404:16 407:18
427:2 431:11
437:16 474:16
days 158:3
472:12
deal 106:13
123:22 128:13
128:16 142:25
143:24
dealing 106:15
106:16 132:6
134:9
deals 48:22
106:19
dean 294:7
death 34:25 35:2
35:6
deaths 36:6,14
debate 78:13,15
303:5
decades 230:2
230:23 231:1
302:7,25 303:8
303:8
**December** 8:15
decide 27:9
161:3,3 332:17
339:13
decided 316:14
319:1 352:15
decision 333:11
399:16

decisions 301:7
303:14 306:2
368:5
declare 316:12
decrements
371:15
deemed 472:15
defend 184:17
184:21
**DEFENDANTS**
4:16
**Defendants'**
6:14 17:14
defending
132:25
defense 60:22
defer 254:15,24
255:19 256:14
define 73:5
definitely 22:10
283:10 378:9
definition
262:21 361:6
447:16
definitive
221:14
degree 94:23
95:6
degrees 175:15
deletions 91:23
deliberately
247:8
deliberating
261:14
deliver 164:21
demonstrate
352:2
demonstrated
412:24 422:11
425:11 463:24
464:3
demonstrates
282:12 283:8
demonstrating
270:20
demonstrative

324:16 325:25
denigrate
461:20
**DENNIS** 3:19
dep 172:7
department
11:21 15:9
34:18,20 47:21
56:13,14,14
93:4 94:3
100:20 118:23
118:23,24
119:1 314:12
**Departmental**
7:15
departure
271:23
depended 402:8
depending
403:19 404:25
depends 164:24
191:10 196:18
197:18 263:5
318:21,22
321:14 402:23
402:24
depo 172:8
deponent 13:16
474:1
depose 114:25
deposed 81:17
deposing 472:12
deposited
449:15
deposition 1:14
2:1 6:10,12,16
7:3,6 8:3 9:3
10:3 11:3 12:3
13:8 14:5,11
14:13 15:11
16:13,18,23,25
17:16 18:3
22:12 26:12,13
27:20 29:11,24
31:16 34:6,11
38:18 45:3
60:7 66:19

81:21,22 82:13
82:14 83:15,17
83:23 84:4
85:2 86:10
88:17 111:16
114:7,9,19,21
133:1,2 137:19
138:8 154:12
156:11 157:25
160:23 165:9
167:24 177:17
231:21 257:20
258:22 296:4,7
296:13 311:8
313:13,15
341:6 439:9
470:18,19
472:2,10,13,14
depositions
15:16,21 21:5
38:3 65:11,17
67:20 132:15
133:4 137:16
139:23 165:6
165:12,15
256:11
derivative
198:11
derived 271:23
dermal 266:20
describe 24:3
119:23 244:11
described
182:24 200:16
209:14 355:21
360:20 456:10
describing
196:21 388:23
description 74:7
189:24 244:16
deselect 244:25
251:22
deserves 292:12
design 288:12
343:10 358:21
447:3 461:25
designs 144:19

Gregory B. Diette, M.D.

267:15 461:20
**desist** 295:21
**destroy** 112:9
285:10
**detailed** 256:9
271:16 277:25
**details** 69:16
**detect** 46:22
**detectable**
283:19
**detected** 39:17
40:14
**detectible** 284:7
**detection** 47:2
286:2
**determination**
396:3
**determinations**
339:2
**determine**
191:16 402:17
405:10 450:20
**determined**
365:3 389:3
398:21,22
402:6 453:17
**determining**
251:3
**develop** 46:21
48:6
**developed** 48:23
375:1
**developing**
46:25 233:22
234:14,20
236:17 237:18
263:13 372:18
372:25 374:25
376:11
**development**
46:13 417:20
420:4 444:22
**develops** 47:18
**devoted** 298:16
**diabetes** 107:8
**diagnosed** 39:17
40:14 60:15

62:3 63:17
115:24 116:7
117:1 118:10
118:21
**diagnosis**
124:21 423:15
**dial** 106:23
**diaphragm**
339:10
**diaphragms**
339:10 359:7
**dictate** 173:4,10
173:13 363:12
363:14
**die** 36:22 41:4,9
**diet** 102:21,22
108:4
**dietary** 102:20
108:3
**Diette** 1:15 2:1
6:2,10,12,17
6:19 7:3,10,13
7:14,16,21 8:3
9:3,15 10:3
11:3 12:3
13:17,22 14:2
14:10 16:6,9
16:12,14,17
17:19,22,24
18:22,24 19:19
20:3 27:12,18
34:13,23 37:8
39:14 42:14
44:20 45:1,2
45:16 46:20
52:8,11 54:6
54:10 55:5
57:8 58:25
62:23 63:20
66:9 67:20
75:3 82:9 83:8
87:5 89:9,14
91:5 95:14
98:18,24
100:18 102:2
115:16 117:22
123:20 133:6

133:20,23,24
135:16 138:15
138:23 139:11
151:22 156:9
159:7 160:6,10
160:15 161:7
161:17 169:10
170:13 172:17
180:11 182:23
184:3 189:8
192:25 193:8
193:18 204:25
205:2 206:13
206:15 208:2
213:9 215:12
219:5,14
220:10 231:11
235:18 264:9
267:8 273:19
280:16 281:19
286:17 289:22
290:1 297:14
297:18 304:16
308:7 310:11
312:9 320:24
324:17,18
325:4 326:1,20
326:23,24,25
327:1,3,10,24
330:7,10
332:10 338:20
355:20 360:2
366:11 369:3
369:16 377:16
377:19,24
381:15 391:2
393:1 397:1,4
399:13 403:1,2
403:4,14
410:17 411:8
413:23 416:19
422:8 426:23
427:5,8 431:14
437:19 438:24
441:1 442:22
465:1,25
467:21 470:11

470:13,20
474:11
**Diette's** 32:2,6
**difference** 35:4
207:7 252:9,14
305:20 322:18
420:21 429:25
430:5
**different** 28:2
51:11 59:16
60:1 65:13
73:2 90:6
91:17 93:15
94:11 104:8
118:24 119:1
121:24 124:1
143:8,9,16
148:1 168:13
170:20 174:12
176:22 178:16
200:25 203:19
205:22 213:20
217:18 219:25
220:2 222:23
224:15 241:6
250:16 253:3
258:9 263:2
266:19 282:5
291:24 320:1
323:25 335:2
336:8 339:9
340:9 342:12
342:21,21
349:15 354:21
357:21 382:6
387:10 389:23
396:12,14,16
400:9 401:11
403:7,19
404:18 412:6
412:10 423:14
433:2 436:20
436:20 451:14
453:9
**differently**
177:20 241:3
451:15

**difficulty** 319:17
**digest** 300:23
**digit** 458:16
**direct** 13:25
45:12 65:25
83:9 85:5
121:3 236:4
268:17 271:9
271:10 282:8
284:15 290:21
338:1 378:14
393:19 400:18
414:10 416:23
433:5 471:23
**directed** 444:23
**directing** 394:7
**direction** 50:23
**directly** 158:20
158:25 195:4
284:4 406:11
449:15
**disagree** 45:24
88:3,9 216:14
217:7,8,15
219:21 223:4,6
223:9,10
233:25 273:19
274:11 275:24
276:19,19
380:18 420:20
432:2,12
**disagreeing**
392:1
**disaster** 171:1
**discern** 357:20
**disclose** 135:19
156:9 166:13
430:15
**disclosed** 135:19
135:22 136:4
137:10 156:10
203:8
**disclosing**
187:12
**disconnect** 43:1
436:10
**discuss** 127:4

173:16 174:10
176:16 260:22
298:10 309:12
309:25 432:9
**discussed**
157:17 176:25
260:24 338:22
453:3
**discussing**
141:11
**discussion**
314:17 338:15
377:15 416:23
440:24 454:21
464:21 467:18
467:25
**discussions**
173:20
**disease** 9:16
10:10 41:4
46:14 90:8
96:9,11 97:15
97:16,17
100:24 101:9
101:10,11
103:5 104:18
104:22 106:20
107:9 122:11
143:1 148:24
263:14,23
372:2,13,16,18
372:20 376:11
383:11,15
388:13 450:6
450:21 451:8
467:5
**diseases** 61:2
101:4 103:3,25
104:20 121:22
122:6,10
123:23 142:3
143:5 150:2,7
367:4 387:12
388:6 415:16
**dish** 252:8
**dismantling**
471:12

**disparities**
103:8
**disparity** 286:22
**dispense** 14:4,10
**displayed** 87:7
**disputable**
433:21
**dispute** 415:7
429:6 434:2,5
454:1,2 467:7
**disputing** 381:2
381:6
**disregard** 287:2
287:11,13,18
321:7
**disrespectful**
219:17
**disseminating**
309:21 434:25
**dissemination**
434:18
**distinct** 245:18
**distinction**
357:18
**distorting**
362:16,18
**distracted**
394:10
**distribute** 49:20
**distributed** 50:2
310:13
**District** 1:1,2
13:14,15
**diverge** 73:12
**diverse** 236:19
**divide** 458:12
**division** 34:21
93:20 310:12
**divorcing** 80:17
**doc** 61:20 63:7
**doc-** 216:1
**doctor** 26:19
35:21 39:6
42:6,21 83:2
83:15 85:16
87:12 97:4
99:18 130:14

133:16 137:9
140:25 141:23
146:25 159:3
166:12 177:2
187:10 190:10
213:12 229:8
237:10 256:4
268:19 270:5
274:8 275:6
282:24 304:4
304:11 305:7
308:10 319:22
326:13 328:2,4
329:13,23
331:21 332:10
335:4,8 337:10
347:4,13
351:16 378:24
381:6 399:12
414:8 416:22
426:6,9 431:2
437:17 438:14
440:11 447:16
448:4 468:4
**doctor's** 27:13
346:11
**document** 1:10
6:15 7:8,11,19
7:22 8:4 9:15
16:18 17:14,25
18:5,13,19
19:4 20:4 32:1
32:14 36:10
37:3 213:14
224:2 225:3
247:21 267:1
274:2 275:5
276:4,22 277:5
282:25 290:24
297:6 300:7
304:12 306:24
308:12 311:19
312:13 326:7
330:17 332:8
341:21 346:9
346:11 347:8
378:21 379:4

380:25 381:4
402:5 430:8
434:4 438:10
438:24 440:5,7
441:23 442:3
**documentable**
282:16
**documentation**
31:24 33:8
**documented**
273:2 336:25
342:2
**documents** 18:2
21:15 34:3
161:22 253:4
260:15,17
449:8 468:23
**doing** 21:4 38:3
38:12 40:3
63:19 83:13
99:13 135:17
153:7 155:6
163:25 187:13
192:15 197:2
275:15 316:6
320:8 321:1
326:22 327:3
342:14 350:2
352:13 376:22
386:25 403:2
405:22 408:2
425:4 428:24
451:11 472:6
**dollars** 408:2
**Don't'** 302:1
**dose** 80:2,4 90:9
125:23 126:6
386:7,8,9,10
386:11,15
391:2 392:9,20
402:2,8,17,19
403:4,6,8,17
404:1,1 405:2
405:17 406:18
421:20,21
457:18 458:11
465:9,15,15,17

466:2
**dose-response**
358:1 458:19
459:3 461:3
462:18,21,25
463:1,2,10,19
464:3 465:5,14
465:16 466:2
466:20 467:8
**doses** 459:15
**dotted** 349:18
350:9
**double** 132:24
**doubled** 215:4
222:5 223:18
**doubt** 96:20
129:20 182:4
291:22 463:22
**dozens** 423:14
**Dr** 8:4 13:16
14:2,10 16:6
16:12,17 17:22
17:24 18:22
19:19 20:3
27:12,18 32:2
32:6 34:13,23
37:8 39:14
42:14 45:1,7
45:16,18 46:20
52:8 54:6,10
55:5 57:8
58:25 62:23
63:20 67:4,14
67:20 69:10
70:18 71:7
75:3 81:7,16
81:22 82:12
83:8,8,15 84:4
87:5,16 88:4
89:9,14 98:18
100:18 102:2
115:16 117:22
123:20 133:6
133:23 135:16
139:11 151:22
156:9 159:7
160:6,10,15

161:7,17
169:10 170:13
172:17 180:11
182:23 184:3
189:8 192:25
193:8,18
204:25 205:2
206:13 215:12
219:5,14
220:10 228:23
229:10 231:11
232:13 233:9
233:19 234:8
234:11 255:21
256:10,11,15
257:4,21,22
258:20 264:9
266:25 273:19
280:16 286:17
290:1 296:4,6
304:16 310:11
314:9,19
317:12,13
318:5 319:16
320:12,12,24
322:11 325:4
326:1,20 327:3
327:10 329:4
330:7,10
332:10 338:20
355:20 360:2
361:2 364:14
377:19,24
381:15 391:2
399:13 403:14
410:17 411:8
421:25 422:8
426:23 427:8
427:15 438:24
441:1 443:17
443:21 444:16
444:17 465:1
465:25 467:21
470:11,13
**drabs** 21:2
**draft** 8:11 265:3
267:6 272:17

273:19,24
274:12
**drafts** 173:21
176:24
**draw** 382:14
465:19
**drawing** 353:16
362:8 382:20
**drawn** 272:14
**dribs** 21:2
**DRINKER** 5:4
**drive** 4:5 368:12
**driving** 201:22
313:22
**Drs** 65:11 68:9
71:18 72:5,15
72:16 428:23
**Drug** 228:1
434:11
**Duces** 6:13,17
**due** 295:15
298:12
**Dulaney** 2:6
13:9
**duly** 13:23 471:6
**dusting** 359:5
**Dusts** 10:24
393:17
**dying** 410:18

─────────
**E**

**E** 3:1,1 6:1,8 7:1
7:19 8:1 9:1
10:1 11:1 12:1
13:1,1 294:3
473:2
**e-mail** 164:22
311:6 444:1
**earlier** 46:23
70:5 115:6
179:21 197:20
202:20 259:24
264:21 341:6
377:25 406:13
428:15 432:1
467:25 468:12
469:2,4

**early** 17:12
105:20 242:3
**easier** 164:8
181:24
**Eastern** 13:14
**easy** 24:18 224:5
**Economic** 8:6
231:14 235:23
**economics** 94:25
**edit** 158:5
168:24 181:12
181:13
**editing** 162:16
162:16
**Edition** 8:20
290:2,19
**editor** 319:10
**editorial** 182:25
183:3,6 316:15
469:5
**editorialize**
169:7
**edits** 181:15
**educating**
310:16
**effect** 271:22
272:11,14
278:6 279:25
302:12 352:19
465:9
**effective** 370:8
**effects** 102:18
150:7 362:16
459:17
**effort** 26:16
133:11
**efforts** 182:24
256:10 306:1
**Egli** 285:8
**either** 22:14
46:22 55:14
92:1 161:18
165:15 202:10
248:16 249:19
250:8 254:8
257:21 260:2
306:21 313:19

318:15 332:17
333:2,7 364:4
390:4 412:7
418:15 436:6
441:13 462:10
462:25
**elaborate**
404:13
**elaboration**
211:24
**electrical** 186:20
**electron** 11:17
427:11
**electronic** 165:3
**Elevated** 10:15
**elevates** 263:13
**elevations**
444:19
**Elizabeth**
312:22
**ELMO** 45:14
58:6 83:12
85:23 87:7
102:8 211:2,5
212:9 236:7
271:11 291:20
299:19 328:12
365:9 427:1
430:22 438:2
**else's** 70:14
83:23 324:7
**elucidate** 286:5
**Embryology**
439:6
**employ** 243:24
**employed**
238:10 243:14
461:16
**enable** 370:8
**encompasses**
125:1
**endeavor**
445:12
**endeavored**
32:16
**endeavoring**
24:14

**endometriode**
417:13
**endometrioid**
417:13
**engage** 181:6
187:2 193:18
**engaged** 153:15
153:20 163:18
187:2 195:25
196:3,5 199:1
410:2
**engagements**
136:12
**engages** 194:6
**England** 313:8
316:23
**English** 94:24
94:25
**enormous** 341:1
**ensue** 315:17
**entails** 444:18
**entire** 18:19
80:24 191:11
221:21 246:7
276:21 277:3,5
293:12 343:21
354:16
**entirely** 245:16
283:1 469:18
469:24
**entirety** 265:8
**entities** 56:6
94:11 209:14
253:22 266:7
**entitled** 6:23 7:8
7:12,19 8:16
9:4,15 10:4,23
11:8,12 12:4
45:7 166:16
214:6 281:24
328:9 364:10
427:10
**entity** 33:4
193:17 224:8
224:18 295:13
**entry** 350:22
**environment**

Gregory B. Diette, M.D.

8:13 364:13
406:11
**environmental**
94:6 97:15
101:8 103:6
149:21 150:2,7
150:12 152:8
369:11,12,13
**EOC** 414:17,18
**epi** 78:22 94:6
144:13 425:5
454:13
**epidemiologic**
10:7 11:4
155:7 184:22
185:8 190:2
193:21 210:22
238:13 239:1
245:4 262:21
263:6 269:11
270:12,19
382:7 386:17
**epidemiological**
59:25 76:15
143:25 153:16
154:1 155:11
211:15 264:24
381:25 397:16
399:14
**epidemiologist**
34:15 49:8
59:14 229:17
229:20 253:19
288:15 454:15
**epidemiologists**
59:24 60:13
190:4 317:14
462:3
**epidemiology**
8:19 11:11
55:22 77:10,15
80:18 94:3,21
95:3 97:16
100:21 101:9
103:2 131:25
132:7 153:3,7
154:23 212:18

244:15 252:22
265:18 288:19
290:2,18 322:5
381:17 383:19
452:6
**epithelial** 6:24
12:5 45:8,20
46:1 234:20
236:17 442:21
**epithelium**
439:9,10,11
**Epstein** 11:20
**equipment**
186:20
**equivalently**
305:22
**equivocal**
221:18
**era** 319:14
392:22
**errata** 472:4,6,9
472:11 474:8
**error** 329:10
**errors** 306:1
**especially**
102:13,17,21
108:4 239:19
322:23 403:21
**ESQUIRE** 3:4,5
3:12,19 4:3,9
4:17,18 5:3,9
5:16
**essential** 418:25
**establish** 446:14
**established** 32:9
41:20,25
226:23 227:16
374:16 375:4,6
376:18 394:25
404:19
**establishes**
154:18
**esteemed** 317:13
**estimate** 23:7
137:13 316:9
316:10,17
331:17 340:20

346:4,6 347:8
348:14 350:12
374:15 375:3
375:24 386:6
404:20,22
405:2 458:11
459:12 461:1
**estimated** 9:19
45:21 46:1
328:9 331:15
451:18
**estimates** 248:1
380:14 391:12
**et** 9:14 271:17
430:17
**ethnic** 236:20
**etiological**
285:20
**Europe** 387:8
**European** 439:5
**evaluate** 184:21
321:18,24
**evaluated** 64:24
321:25 322:1
**evaluating**
123:2 321:5,17
322:4
**evaluation**
132:6 292:19
**evening** 467:21
**event** 270:17
**eventually**
205:14
**everybody**
57:16 175:13
**evidence** 59:13
59:17 89:18,23
210:22 211:16
212:19 214:25
216:22,25
217:5,11
221:22 222:1
234:12 236:18
237:7 239:16
268:11 273:3
284:19 285:5
287:1 293:13

321:6,17
349:25 357:2,2
359:20 362:14
373:11 375:1
379:9,14,15
380:19 383:21
384:3 411:9
415:3,12,13,14
418:23 421:12
421:13 422:3
424:13 435:4
436:11 439:7,8
441:16,24
442:9 447:24
450:1 462:17
463:3
**exacerbations**
371:7
**exact** 37:1,5
191:24 213:17
361:11
**exactly** 24:25
27:22 49:1
71:21 134:12
154:9 155:13
208:6 296:16
308:24 319:23
360:10 365:25
367:5 382:5
383:16
**examination** 6:2
13:25 394:1
460:2 471:8
**examined** 13:24
**examiner** 27:9
**examining** 8:7
102:20 235:24
**example** 29:16
48:16 60:6
105:19,20
106:14 118:6
122:7 123:15
156:10 157:16
157:19,25
167:21 169:23
170:17 172:17
172:19 181:17

190:25 194:17
194:22 215:24
226:20 238:2
239:15 254:4,6
254:7 263:11
318:25 347:15
357:25 371:6
387:8 449:12
462:23 469:8
**examples** 41:14
**exceed** 350:12
**exceeds** 346:7
**exception**
170:12 247:9
327:20 346:11
**Excerpt** 7:6 8:19
**excess** 352:1
466:23
**excesses** 395:14
**exclude** 313:12
199:18 246:2
**exclusion**
246:17
**excuse** 30:5
42:17 43:15
50:24 96:10
120:15 159:17
172:5 188:9
193:4 213:20
214:7 275:14
277:14 298:11
317:12 369:23
370:1 400:20
440:21 452:15
**executed** 264:10
**exercise** 91:13
216:10 251:2
251:10 268:25
344:1 347:12
359:24 455:15
**exhibit** 16:13,14
16:17 17:18,19
17:23,25 18:14
18:19,24 20:4
21:14 22:3
26:2,2,12 27:1
28:24 29:12

Gregory B. Diette, M.D.

43:6 44:20
45:2 52:3,9,11
52:21,25 54:4
54:7 82:7,8,9
86:6,8,14 91:4
91:4,5 95:10
95:13,14 98:23
98:24 100:9,10
101:20 121:5
132:9 133:18
133:20 134:8
138:16,16,18
138:22,23
139:2 213:4,7
213:9 235:17
235:18 267:7,8
281:19,23
289:20,22
292:5 297:14
297:17,18
298:3,5,22
305:6 308:6,7
308:22,25
309:16 310:19
311:24 312:5,9
324:17,18,24
325:24,24
327:10,19,23
327:24 328:5
351:19 366:11
369:16 377:16
392:25 393:1
393:14 396:25
397:1,4 413:23
416:18,19
427:4,5 431:14
431:18 437:13
437:19,21
442:19,22
465:20,22
468:6
**exhibits** 6:10 7:3
8:3 9:3 10:3
11:3 12:3 70:1
**exist** 337:5
344:7 461:15
**existing** 76:15

372:19 376:12
**exists** 81:3
294:17 344:5
433:5 461:16
**expect** 38:23
225:9 359:4
**expectancy**
119:7
**expecting** 73:1
300:23
**experiencing**
104:1
**expert** 6:19 7:12
7:16,20 21:20
22:10 42:5
51:6 55:17
56:1,22,23
57:3 60:6,12
66:9,10,23
67:14,21 68:8
69:12 71:4,7
75:24 76:12
81:10 108:22
109:17 119:21
120:10 131:4,9
133:24 134:9
135:23 136:15
137:1,5 139:13
139:24,25
140:21 145:25
162:3,22 168:1
168:18 169:17
172:5 173:5
180:16,19,23
181:13 183:14
184:16 185:19
186:4,24
187:19 191:9,9
202:7,25 203:8
205:4,7,16
206:14 208:23
227:25 228:5,6
232:14,21
233:7 256:18
257:9,20
264:10 327:12
364:22 410:7

454:5,16
461:24 468:5,9
469:18,23
**expertise** 52:15
52:19 57:2
78:14 96:6,8
96:16 100:23
191:17 193:19
194:7 229:20
288:8
**experts** 165:15
171:12 206:3
226:5 251:18
255:19 256:10
260:23 343:8
410:12 430:17
460:2
**expires** 474:17
**explain** 274:9,10
318:23 334:13
374:2 385:3
**explore** 25:23
71:11 186:1
**exploring** 301:1
**expose** 215:10
226:13
**exposed** 284:3,4
284:5 285:15
286:3 331:16
340:18 366:20
386:15 389:19
391:8 410:22
428:24 461:2
**exposure** 8:16
10:4,11,20
11:5 46:10,13
46:14 47:4
122:21 148:23
212:21 239:16
263:13 270:10
270:21 271:21
277:22 278:4
281:24 282:16
283:18 284:7
285:12,14
286:4 364:10
365:4,13,16

367:23 371:24
373:20 375:19
378:6 379:11
379:13,18
380:21 383:10
387:21,25
388:5 389:4
392:9 394:23
395:2 397:17
399:15 403:23
404:3 413:9
420:1 424:14
447:25 448:1
450:6 456:23
457:5,21
458:23,24
459:9,11,19
461:1,8,14,15
466:8,19,22
467:4
**exposures** 369:4
391:13 399:14
**express** 88:13
**expressed** 22:5
108:3 209:13
455:4,5
**extends** 379:12
**extensive** 212:17
316:25
**extensively**
370:1
**extent** 31:23
33:7 76:11
77:13 135:17
136:11 137:10
140:24 156:7
166:2 187:11
255:8 326:12
**external** 54:21
64:9
**extra** 92:24
**extract** 339:3
**extracted**
327:19 336:12
351:1
**extraordinary**
462:1

**eyeball** 440:1
**eyes** 54:21
438:15

___

**F**

**F** 5:18
**face** 54:19
161:23 226:6
308:15
**Facebook** 229:2
229:6
**Facsimile** 11:23
**fact** 14:19 15:10
35:11,14 36:5
41:3,23 50:12
72:12 77:16,17
84:14 150:9
171:2,7 198:9
257:2 279:1
333:21 351:25
356:15,21
358:18 364:20
378:20 384:17
388:10 395:21
410:2 415:21
420:21 432:9
435:16
**factor** 126:10,15
214:17 225:15
262:18,23
263:11,16
285:13 318:14
**factors** 7:24
102:12 107:14
125:12,18
145:6 214:6,7
239:20 263:9
263:18 362:17
362:19,22
**factory** 392:17
**facts** 295:24
298:21 299:3
**fail** 472:14
**fair** 14:14,24
18:7 20:18
22:2 34:8
37:13 41:10

Gregory B. Diette, M.D.

Page 493

48:3 49:2
50:11 55:12
66:20 106:18
107:13,20
119:5 120:8
121:19 124:16
124:20 126:7
126:12,17,25
127:3,8 129:11
132:20 136:25
142:10,14,18
142:22 144:17
150:17 152:3
182:16,25
185:5 191:19
193:19 194:10
197:11 201:25
205:6 207:25
208:8 210:3,7
214:2 215:12
221:18 223:21
231:9 243:23
248:22 257:2
258:19 260:24
268:1 270:4
276:22 295:14
352:7 372:10
381:13,15
382:11,15
390:19,25
399:13 409:12
429:2 430:20
437:2,3,5
438:5 440:12
**fallacious** 291:9
292:20
**falls** 184:9
**false** 218:4,25
**familiar** 191:11
231:6 265:4
301:21 390:5
390:23 459:7
**familiarize**
299:23,25
**family** 118:15
**far** 37:2 58:13
58:16 92:5

96:5 112:11
208:11 270:12
394:8 408:13
**faster** 463:7
**father** 403:24
**fax** 444:1
**FDA** 64:10
431:23 433:12
434:24 435:10
452:22
**FDA's** 433:25
**fear** 301:8 368:2
**feature** 323:6
**features** 286:12
288:12
**February** 21:13
21:16 22:6
140:17 208:4
264:11 369:14
**federal** 134:8
146:1 160:20
166:6
**feedback** 143:8
**feel** 73:14
221:17 320:9
321:1 336:2
356:12
**fees** 37:24
**feet** 339:11
**female** 36:7,15
284:20 285:6
**females** 365:19
365:21,22
**Ferrante** 399:3
399:8
**Fessler** 153:9
**fiber** 8:17 73:23
74:5 90:5,13
90:19 281:24
458:5,6,8
**fiber/cc** 391:9
457:13 458:10
458:16,18
**fibers** 72:17,22
73:5 126:20
127:6 401:9
457:5,21 458:7

**fibres** 10:24
393:16 401:3,4
**fibrous** 399:22
400:13,16
**field** 70:14 467:2
467:2
**fields** 467:3
**fifth** 34:24 35:5
36:2
**figure** 40:6
138:13 141:2
158:2 189:20
190:3 200:24
240:8 348:1
385:3 443:10
443:16
**figured** 313:23
378:11
**file** 146:1 180:13
393:10
**filed** 132:10
133:17
**files** 441:23
**filtered** 250:13
**Finch** 4:9 6:4
188:7,13
464:25 465:2
465:21,24
466:9,16 467:6
**find** 7:12 72:16
85:6 86:11
92:17 97:2
108:19 135:6
164:8 191:13
238:18,23
240:15 245:3,7
245:10 306:10
309:14 316:12
320:16 334:24
342:9 344:6
347:20 371:10
375:3 376:5
386:16 405:25
435:9 437:6,10
446:2 448:14
448:23 451:9
462:4

**finding** 163:25
277:2 285:15
353:5 362:23
419:24 425:10
425:11 449:19
**findings** 247:14
287:16 334:23
358:3 387:14
408:13 421:19
454:21 462:22
**fine** 14:3 38:20
45:23 53:15,15
53:19 68:6,6
68:22 74:10
122:17 151:14
156:21 166:10
204:18 215:20
215:22 218:19
291:23,25
292:3 300:14
312:18 338:8
346:25 355:8
374:11 377:7,8
400:5 428:2
440:15,15
**finish** 25:2 48:11
61:13,19 62:10
62:23 113:11
130:11,12,16
146:24 189:21
210:17 237:18
244:12 258:15
264:13 268:19
275:13,17
276:13 283:4
303:1 330:25
335:5,16
351:20 380:11
386:19,20
421:14 460:19
466:11
**finished** 28:5
146:25 227:10
227:10,14
358:9
**finishing** 235:1
258:14

**firm** 158:19,22
159:1 161:18
173:3 206:21
**firms** 192:9
**first** 13:23 19:4
20:4 21:14
28:10 55:12,13
55:21,24 62:10
137:19 152:17
184:15 185:6
189:25 198:11
200:14 211:8
212:5,13,14,15
215:1 216:19
234:16 241:24
242:3 274:5
275:9 278:13
278:14 290:9
298:9 300:24
302:3,10
321:13 366:24
369:21 397:22
414:20 428:5
444:15 463:15
**fit** 146:18
333:15 343:20
**fits** 333:16,17
381:9
**five** 52:5 117:21
349:21 350:7,9
376:25 392:16
394:25
**flashed** 188:13
**flat** 462:25
**flaws** 279:20
**flip** 76:6
**flipped** 67:9
**flipping** 297:3
**FLOM** 5:10
**Florida** 3:16
**flowed** 270:20
**fluid** 406:2
**FLW** 1:5
**fly** 311:3
**focus** 107:18
149:12 201:22
202:2,4 205:2

356:15 379:6
**focused** 358:13
**focuses** 102:11
  107:14
**Focusing** 247:15
**folks** 175:18
  176:12 177:6
  194:8,9 228:17
  421:16 469:5
**follow** 42:9
  62:11,24 85:15
  85:16 270:3
**followed** 146:2
**following** 25:21
  146:11 416:7
**follows** 13:24
**font** 394:13
**Food** 228:1
  434:11
**footnotes** 171:11
  171:15 172:1,4
**Ford** 293:24
  294:1,3,5,6
**foregoing** 471:4
  471:20 474:3
**foreign** 417:17
**forest** 327:13
  348:10,12
**forever** 112:8
  183:25
**form** 15:18 18:4
  20:22 21:17
  22:7 23:19
  35:25 36:24
  38:4 39:9,19
  41:15 42:19
  43:20 47:6,22
  49:5,21 50:25
  51:19 54:14,25
  55:8,16 56:2
  56:19 58:14
  59:12 60:4
  62:4 63:24
  65:12 67:15
  68:11,14 69:14
  69:20 72:8,19
  73:7 74:2 75:8

82:1 88:5 90:1
90:15 96:17
97:22 103:18
104:2 105:10
106:6 107:16
108:8,23 109:4
111:11 112:5
114:4,9 115:25
117:20 118:25
119:9 120:17
123:25 124:23
127:13 128:21
129:9,18 130:2
130:25 131:5
131:11 134:21
135:3 140:23
141:13 143:6
143:20 144:20
145:7,16 147:8
147:18,23
148:18,25
149:15,23
150:21 151:6
152:11 155:1
158:14 159:13
159:23 160:12
166:3 168:19
169:20 170:15
171:16 172:11
174:6 175:5,12
176:2 178:12
179:8,17
180:25 181:9
182:18 183:1,7
184:18 186:10
187:20 188:5
188:11 190:22
192:4,10,17
193:20 194:1
195:5 197:13
198:7,21 199:3
201:12 202:9
205:10,17
206:10,19
207:18 208:20
209:3,9,20
215:16 218:6

219:11 220:17
221:19 222:8
222:25 223:7
223:24 225:2
225:17 226:2
228:8,13
230:19 231:3
231:19 232:3
233:1,12 235:5
236:25 243:16
244:2 245:25
246:10 247:24
248:7,17,23
249:11,24
250:6 254:17
255:22 258:4
260:10,25
262:19 263:20
265:20 267:19
268:2,12 271:7
272:16 273:25
274:17 275:4
276:3 278:11
281:8,15
282:21 286:10
287:6,25 289:2
291:13 295:23
298:20 299:12
301:18 304:3
306:6 307:1,7
314:25 318:13
321:10,21
322:9,21 331:4
333:19 334:10
334:20 339:4
339:17,25
340:6 343:18
345:22 352:3
352:10 353:11
354:4 356:25
357:13 358:21
360:13 361:24
362:10,25
363:13 367:8
368:19 371:19
372:1,5,14
373:3,17,22

374:9 375:14
375:20 376:16
380:4 381:20
382:2 384:9,22
384:25 385:15
390:20 391:4
391:19,24
396:8 399:23
400:14 401:10
402:10,18
405:12 406:21
407:10 408:4
408:23 409:13
410:8 411:1,13
412:19 413:14
417:25 418:19
421:6 422:25
423:11 428:18
430:7 433:13
438:12 443:18
445:4 446:5,22
450:9,22
451:10 452:1
457:1,7 458:21
459:4 462:10
463:20 464:7
466:4,25
467:12 474:7
**formal** 15:24
**format** 93:4
  97:8 168:24
  176:23 184:1
  408:20 468:20
**formatting**
  469:14
**formed** 242:25
  247:23 253:16
  345:20 392:6
  399:15
**forms** 31:12
  73:22 387:10
**formula** 439:12
**Forrest** 197:2,7
  198:6,9
**forth** 21:6 39:9
  131:25 145:14
  205:15 239:17

239:23 243:12
243:24 269:13
270:24 288:13
317:12 324:3
460:9 471:5
**fortunately**
  227:6
**forward** 161:7
  320:3
**forward-looki...**
  301:10
**found** 72:5,11
  72:12 89:15
  182:13 213:20
  215:4,5 222:4
  222:6,18
  223:16,17,18
  242:14 244:23
  253:13 266:17
  273:20 274:12
  280:24,24
  281:5,13
  302:12 311:20
  314:1,3 357:8
  358:2 401:3
  419:21 424:12
  425:10,20
  463:10,10,12
**foundation**
  60:18 75:10
  210:12 215:17
  229:23 232:18
  233:4 234:3
  235:8 250:22
  272:17 289:4,8
  290:24 291:14
  292:2,5 295:24
  299:3 301:19
  310:20 319:20
  409:14 430:8
  432:15 438:12
  440:16 442:2
  443:19
**four** 22:18 40:8
  349:20 350:6,7
**fourth** 369:23
**Fox** 398:6

Gregory B. Diette, M.D.

**fragrance** 55:3 385:14
**framed** 235:12
**framework** 145:15,20 146:3,12
**Francis** 8:22
**frankly** 26:15 257:20
**fraudulent** 287:14
**free** 73:14 336:2 356:12
**frequently** 15:16,20 282:15
**friend** 228:25 294:10
**friendly** 294:11
**friends** 229:2,3 229:4
**front** 34:4 85:21 87:1,12 91:8 95:17 99:21,24 101:22 121:6 135:2 165:1 169:18 206:13 208:2 210:1 227:7 247:17 267:12 277:16 282:3 290:5 304:13 324:13 352:14 355:17 366:14 369:19 393:15 410:10 414:7 443:6
**fruitful** 445:12
**full** 82:14 162:7 182:6 236:8 243:8 252:19 309:15 371:20 469:3
**fully** 41:20 375:1,4,6
**function** 372:20
**fundamental** 205:21

**funded** 294:23 311:2
**funding** 148:6 148:10,12,15 294:18
**funds** 148:9
**further** 77:25 140:4 271:21 272:10 278:5 278:17,20 279:24 286:4,5 470:11
**fuss** 340:20
**future** 444:24

---

**G**

**G** 13:1
**gamut** 107:11
**GARBER** 4:3
**Gates** 351:12
**gathered** 164:16
**gathering** 468:19
**gears** 280:9
**GEIER** 3:19
**general** 6:20 7:17 10:22 40:17 71:24 79:7 105:2 107:6 133:25 141:25 147:17 200:17 203:10 206:15,24,25 207:13,20,20 211:25,25 212:25 223:3,8 226:22 227:15 243:4 244:22 363:11 364:4 378:5,7 379:24 389:6 411:3 447:23 456:1
**General's** 379:8 380:19 393:4
**generally** 48:9 64:19 67:10 77:8 109:19

142:2 146:17 182:24 207:3 213:15 235:13 237:3 238:12 253:21 260:14 262:23 263:1 384:24 435:11 435:15
**generating** 468:25
**generic** 75:4
**generous** 342:25
**genital** 51:17 59:3 75:7 80:15,15 214:24 216:21 217:10 218:3 219:8 220:12 221:6 233:23 236:15 237:6 272:14 273:22 274:14 276:1 279:2 329:1,5 330:11,24 331:2,14 332:19,20 333:22 334:18 339:10,23 344:25 347:6
**genitals** 333:24
**genotoxic** 458:20 465:5 466:1,18,23 467:8
**gentlemen** 15:25
**geologist** 120:6
**GEREL** 3:6
**getting** 24:7 32:10 47:3 70:16 113:5 114:11 130:6 175:19 177:4 182:23 199:23 202:11 316:18 319:4 366:6 374:8 407:17 420:16 450:3

**give** 15:16,20 23:8 29:15 37:24 92:24 114:11 122:16 137:25 140:13 152:1 162:7 164:13 193:6 202:19 204:10 216:6 218:8 232:1 234:4 256:4 282:22 321:8 324:22 330:14 347:14 355:15,15 363:6 397:11 399:21 400:12 401:7 407:6 430:23 431:5,6 438:3,16,22
**given** 137:16,20 138:7 139:18 255:21 409:3 474:5
**gives** 295:11 343:21
**giving** 14:23 56:17 78:2 105:20 207:10 234:3 283:18 284:7 286:3 407:21
**glad** 37:4 169:25 197:9
**glean** 253:14
**globally** 215:18
**go** 16:6 19:7 23:22 24:17 25:22 26:20,21 39:5,8 40:5 44:13 45:18 48:3 58:6 63:1 76:7 85:19,19 85:25 86:23 97:2 98:4 101:24 105:23 140:4 160:15 162:8,9 192:22

195:3,4 203:21 209:23 212:8 213:8 216:2 218:14,19 225:19 236:8 244:24 266:14 270:5 275:6,11 275:11 292:19 297:12 304:11 306:9 313:16 324:5 328:1,2 328:14 333:9 334:19 335:24 338:6,7,8 341:10 351:22 353:22,23 355:2,11,13 360:18 365:18 392:19 395:5,9 396:18 397:5 399:2 400:19 419:20 427:3 431:19 432:21 440:9 447:8 463:5 464:11 464:17
**go-to** 180:22
**goal** 21:24 251:21 343:4 344:6
**God-given** 15:25
**Godard** 351:11
**Godleski** 427:16 428:23
**goes** 85:8 117:2 158:18,19,25 159:1 179:24 223:23 226:11 244:21 258:13 258:19 284:18 285:19 291:24 302:10 438:6
**going** 14:21 19:11 26:21 27:8,10,12 28:6,22 31:22

Gregory B. Diette, M.D.

| | | | | |
|---|---|---|---|---|
| 32:18 33:6,14 | 355:5 359:24 | **gotten** 20:25 | **groups** 236:20 | 10:1 11:1 12:1 |
| 33:17 34:1 | 371:10 377:10 | 21:9 133:14,15 | **guess** 26:25 49:8 | **habit** 73:24 74:3 |
| 37:23 38:8 | 388:12 397:10 | 167:22 | 55:20 72:20 | **habitual** 214:23 |
| 39:3 44:1,3,16 | 425:24 426:17 | **governed** 156:8 | 105:8 132:9 | 216:20 217:9 |
| 47:12 58:6 | 426:24 427:25 | **government** | 147:25 152:12 | 217:24 218:2 |
| 64:13 77:24 | 430:22,23 | 35:13 | 152:19 158:21 | 219:7,22 |
| 78:2 82:12 | 431:1,6,6 | **grab** 204:16 | 159:4 197:18 | 220:11 221:5 |
| 83:4,14 85:24 | 435:20 438:1 | **gradient** 362:12 | 205:23 211:4 | **hair** 404:25 |
| 86:5,7,8,20 | 438:11,22,22 | **grading** 392:4 | 246:12 264:20 | 406:3 |
| 89:4 92:20 | 439:18 440:13 | **grant** 92:3 148:6 | 267:1 279:21 | **half** 204:15 |
| 93:17 96:2 | 447:11 456:15 | 311:2 316:8,18 | 283:9 331:11 | 377:3 |
| 99:11 112:21 | 464:13,20 | **grants** 148:10 | 349:19 350:6 | **halfway** 45:17 |
| 112:21,22,22 | 469:20 470:17 | 148:12,15 | 352:17 359:10 | **hall** 315:20 |
| 112:24,25 | **Golkow** 13:5 | 320:4 | 359:12 360:3 | **hand** 324:21 |
| 113:18,24 | **good** 14:2,3,4 | **graph** 326:2,4,4 | 405:14 407:1 | 439:23 |
| 114:17 115:10 | 15:23 16:11 | 443:8 | 409:15 423:16 | **handed** 85:5 |
| 132:22 135:16 | 17:11 19:15 | **great** 140:12 | 444:10 448:10 | 86:14 134:7 |
| 136:10,12 | 22:16 28:15 | 163:12 226:17 | 449:10 455:25 | 328:4 |
| 151:17 154:5 | 39:12 58:24 | 333:7 334:1,3 | **guessing** 288:17 | **handwritten** |
| 154:12 156:6 | 65:16 68:17 | 343:24 | **guidance** 33:20 | 334:24 |
| 158:22,23 | 88:20 89:12 | **greater** 321:8 | 363:6 | **hang** 216:6 |
| 162:14 166:1 | 100:4 124:14 | 349:10 389:6 | **guided** 146:11 | 294:11 |
| 167:19 173:18 | 130:10 139:9 | **Green** 351:11 | **guideline** 362:8 | **Hank** 153:9 |
| 182:13 193:6 | 151:9 152:4 | **Greenland** 8:20 | **guideposts** | **haphazard** |
| 195:22,22 | 170:1 171:7 | 9:5 288:22 | 457:12 | 463:1 |
| 199:24 204:8 | 174:17 204:5 | 289:1 290:12 | **guts** 360:11 | **happen** 54:23 |
| 204:20 206:1 | 204:25 205:1 | 297:22 317:13 | **guys** 21:4 185:2 | 93:17 181:19 |
| 212:25 215:25 | 223:10 227:8,8 | 318:1,5 320:12 | 226:25 306:18 | 319:6 |
| 216:1,1,3,13 | 227:8,8 230:18 | **Greg** 403:1,2,3 | 313:21 377:3 | **happened** 22:13 |
| 218:21 219:9 | 231:2 240:10 | **Gregory** 1:15 | 397:10 413:25 | 316:21 |
| 221:11 226:25 | 241:11 252:3 | 2:1 6:2,12,17 | 430:21 431:10 | **happens** 27:16 |
| 227:1 234:4 | 258:18 272:23 | 6:19 7:9,13,14 | 440:18 | 104:12 164:23 |
| 245:22 246:18 | 277:5 280:6 | 7:16,20 9:15 | **GYN** 60:20,21 | 194:16 459:15 |
| 256:23 280:8 | 323:2 327:6 | 13:16,22 16:2 | 60:25 61:6 | 459:17 |
| 290:23 294:22 | 343:10 364:20 | 16:8 66:8 | 63:14 107:10 | **happy** 39:11 |
| 299:22 304:14 | 377:21 391:12 | 100:18 133:24 | **gynecological** | 114:2 319:3 |
| 306:12 310:8 | 392:22 426:14 | 206:14 208:2 | 62:2 105:9 | 334:11 344:17 |
| 311:14,15 | 427:1 431:25 | 470:20 474:11 | 106:2 115:23 | 346:21 373:25 |
| 315:13,16 | 465:1 467:21 | **ground** 320:8,25 | 116:6,24 | **hard** 53:7 |
| 316:15,19 | **goodness** 343:17 | **group** 8:22 | 117:18 118:9 | 144:24 165:1 |
| 317:4,9 318:23 | **Google** 242:17 | 152:22 190:1 | **gynecologist** | 182:5 202:19 |
| 319:5,8,17 | 242:20,21,21 | 238:25 261:10 | 115:20 | 260:11 289:14 |
| 320:2,19 326:6 | 244:18 | 261:13 309:21 | **Gynecology** | 301:6 328:13 |
| 335:23 338:5 | **gosh** 342:8 | 310:14 394:9 | 239:5 | 348:1 358:24 |
| 338:14 342:20 | 374:12 375:15 | 394:20,22 | | 358:24 433:22 |
| 342:21 347:25 | **GOTSHAL** | 395:10 396:2 | **H** | 442:16 446:14 |
| 352:20 353:1 | 4:19 | 398:20 402:5,6 | **H** 6:8 7:1 8:1 9:1 | **Harlow** 285:21 |

348:2,7,8
351:10,10
**Hartge** 327:22
328:6,18 329:1
329:4 330:21
332:14 333:17
333:18 335:24
336:11 338:23
339:8,21 344:3
344:4 346:12
347:5 350:6,17
351:3
**Hartge's** 351:15
**Harvard** 215:3
222:4,12
223:17
**Hashtag** 100:22
**hazard** 271:24
273:12
**he'll** 218:18
390:2
**head** 107:11
154:14 197:10
240:10 241:11
370:14
**head-to-toe**
105:4
**headed** 8:4
**heading** 359:1
**headings** 171:2
174:18
**health** 8:8,14
10:19 11:21
46:21,25 47:18
47:20 48:6,15
48:23,25 94:7
95:2,6 100:22
101:21 102:1
103:7 107:14
231:15 235:24
260:18 264:21
265:17 266:5
266:11 267:6
267:14 268:10
272:13 273:20
274:12 275:24
278:10,25

367:15 369:24
370:3 378:6
409:3,10,20,23
432:2,8
**healthcare**
144:9 462:3
**hear** 15:14
115:6,8 220:7
260:6 307:22
321:12 348:24
466:14
**heard** 116:9
154:4 202:20
227:4 258:3
294:22 307:15
330:6 354:21
389:16 406:25
409:20 410:15
**hearing** 6:21
7:18 8:7 70:24
71:13 133:25
202:11 206:16
207:17 231:14
232:11 233:20
236:6 332:11
**heart** 107:9
**HEASLIP** 4:18
85:12 464:17
**heavy** 387:21,24
395:1
**heck** 360:16
**held** 2:1 13:8
338:15 377:15
440:24 464:21
467:18
**Heller** 273:2,5
280:17,18
281:23 282:6
428:14
**help** 27:4 122:2
133:11 157:24
158:1,5 162:15
168:18 172:19
175:3 176:1
180:7,15,23
185:19 186:3
186:23 193:12

193:25 197:9
301:10 410:11
410:11
**helped** 20:12,16
91:18 168:23
169:11,12
170:24 311:2
**helpful** 164:7,9
303:13
**helping** 468:20
**helps** 155:9
172:19 340:23
**Henderson**
285:9
**hey** 112:20,20
431:10,10,10
**Hi** 467:22
**high** 41:8,8
269:17 289:21
380:15 406:2
**higher** 155:25
215:9 226:13
226:22 282:15
347:10 354:3
367:21
**highlight** 70:10
**highlighted** 31:4
70:5
**highlights** 30:18
30:23 69:22,24
**highly** 36:2,3,16
37:20 256:13
**Hill** 145:6,10,15
145:23 146:2
146:11,19,20
147:5,14
239:11,21,24
268:11,15,23
269:9,16
270:14 271:1,4
271:18 278:1
358:24 362:22
419:8
**Hill's** 447:22
**hired** 224:11
**histologic** 422:2
**histology** 417:13

**historic** 391:13
**history** 282:16
283:19 284:7
285:16 286:4
**hold** 24:10,10
28:21 44:2
98:5 120:9
144:1 236:19
314:9 323:9
366:6 438:19
438:23 439:17
439:24
**holds** 100:20
**holler** 88:24
**Holmstock** 5:23
13:4
**home** 30:11
404:13,22
456:25
**homes** 102:17
**honestly** 55:19
73:18 88:9
96:19 133:1
230:3,21 429:3
**hope** 38:6
113:20,20
198:22 205:18
207:8 352:19
434:22 446:18
**hopefully** 205:4
**hoping** 133:16
314:21
**Hopkins** 7:11
9:7 15:6 34:19
48:7 93:19
95:9,21,24
96:21 98:4
100:8,19,21
104:9,25
118:20 205:9
208:9,14,19
209:1,17
213:21 223:14
224:6,7,22
225:10 230:2
294:7 308:15
309:20 310:2

310:13 312:2
313:7,8,9,10
313:24 314:2
**Hopkins'** 309:13
**hospital** 9:17
96:1,3 117:4
224:17 325:12
345:5,5,17
**hospital-based**
356:8,15,21
357:3 358:14
359:14 360:8
**hospitals** 345:12
**Hotel** 2:5 13:9
15:2
**hour** 23:14,24
24:19 177:18
177:22 204:16
377:2
**hourly** 23:10
24:2,6,21
178:20
**hours** 23:4,8,8
25:17 257:13
257:13 376:25
467:13
**house** 231:12
404:16
**household** 10:14
284:5 369:4,8
**huge** 387:20
**human** 10:25
11:21 285:7
439:4,5 448:14
448:22
**humans** 449:13
**humongous**
379:2
**hundred** 14:13
14:15 155:22
155:23 301:22
344:15 453:23
458:13
**hung** 199:24
**hurry** 463:6
**Hutfish** 4:20
**hybrid** 291:15

Gregory B. Diette, M.D.

hygienist 120:1
hypothesis
   89:19,23
   315:11 316:11
   420:1,10 439:8
   441:17,25
hypothetical
   78:21 79:3,22
   80:18 234:4
   235:7 383:7
hysterectomy
   285:16

**I**

IARC 10:23
   41:21 239:3
   241:11 252:18
   253:12 259:2,5
   259:6 260:4,8
   260:18,21
   261:8,12,21
   262:16 387:3,5
   387:5 391:16
   391:22 392:6
   392:12,12,14
   393:17 396:2
   397:15 398:20
   399:16 400:19
   400:20,25
   402:4 412:4
   457:16
IARC's 392:7
   399:16
ICTR 310:25
ICTRs 294:22
ICU 105:22
   143:13
idea 194:25
   230:3 284:12
   317:15 323:5
   336:4 382:20
   429:3
ideal 332:18
   333:1 340:21
   344:19 394:18
ideas 301:5
identical 213:22

346:10
identification
   16:15 17:20
   18:25 44:21
   52:12 82:10
   91:6 95:15
   98:25 133:21
   138:24 213:10
   235:19 267:9
   281:20 289:23
   297:15,19
   308:8 312:10
   324:19 327:25
   366:12 369:17
   377:17 393:2
   397:2 413:24
   416:20 427:6
   431:15 437:20
   442:23
identified 36:21
   134:6 241:12
identify 238:12
   246:16 247:22
   350:11 353:22
   354:2 438:4
identifying
   102:11 172:22
ignore 246:18
   322:13
II 226:19 392:22
iii 276:15
ill 105:14
illness 117:8
   319:25
illnesses 104:15
   370:22
imaginable
   117:8
imagine 104:12
   352:12,14
   383:24
Imerys 109:25
   110:5 442:2
impact 150:6
   342:24 383:19
   384:19 385:22
impacted

405:11
impacts 84:7
   97:15 101:9
   149:21 150:2
   150:13
impenetrable
   181:22
imperative
   46:21 369:24
   370:3 472:10
implemented
   367:15
implementing
   292:11 368:1
implicated
   285:20
implication
   160:10 405:18
implications
   363:8
implied 405:24
importance
   303:25 304:22
important 41:7
   53:17 254:6
   293:11 315:4
   323:16 342:10
   342:13 360:15
   387:20 403:4,9
   419:2 451:17
   451:19
impossible
   85:15 90:16
impressed
   185:22,25
   218:18
improper 83:22
   193:5 455:21
   456:17
imprudent
   79:18 80:12
   87:18
inappropriate
   160:17 161:1,5
incessant 115:14
incidence 46:22
   389:19

include 47:2
   100:23 101:6,8
   107:2,5 120:14
   120:15,20
   122:7 123:5,7
   133:12 146:17
   245:17 247:1,8
   247:9 251:3,21
   252:25 339:15
   355:1 363:21
   388:17
included 43:23
   146:5 225:14
   245:2,9,9
   246:20 249:3
   251:12 264:23
   268:4 336:19
includes 95:25
   101:3 107:22
   305:23 332:21
   354:12,20,23
   355:4 401:4
including
   102:16 237:23
   252:6 310:14
   349:24 467:5
inclusion 217:4
   245:24
inclusive 251:7
   251:9,9
incomplete 46:7
   78:21 79:2,21
   97:24 98:21
   235:7 383:6
   414:21
inconsistencies
   359:6
inconsistency
   286:22 287:1
   356:19 358:2
   358:20,21
   359:9 360:1
inconsistent
   291:6 292:14
   293:9 355:23
   356:1,14,16
   357:9,24 360:5

360:6 463:12
incorrect 121:12
   155:2 179:16
increase 102:22
   108:5 214:24
   216:21 217:2,3
   217:10 218:3
   219:8,24 220:1
   220:12 221:6,9
   221:9,10,14,15
   221:16 237:21
   371:6 379:17
   380:20 402:1
   417:15 420:3
increased 215:5
   222:6,18
   223:19 233:22
   234:14 236:16
   237:17 384:19
   389:5 413:11
   414:17 422:23
   423:9
increment 371:7
increments
   371:14
independent
   153:21 154:8
   154:16 155:15
   251:2
indicated
   165:17 254:14
   315:4 398:22
   403:4
indicates 19:5
   379:14,15
   380:20
indicating
   465:17
indicative
   271:22 272:10
   277:19 278:5
   278:17,21
   279:25
indicator 323:24
   403:25 404:2
   406:8
indisputable

Gregory B. Diette, M.D.

433:9,17 435:3
**individual**
193:17 244:19
**individuals** 47:4
47:19 60:14
75:6 106:20
215:14 232:15
284:10 309:23
409:4
**indoor** 368:25
369:25 370:4
370:18,25
371:17,24
372:12,23
373:15,21
374:7,17,23
375:19 376:10
**induce** 420:2,10
**induces** 423:19
**industrial**
119:25 387:21
387:25
**industry** 232:11
**infected** 383:2
**infer** 283:13
379:10
**inference**
298:17 362:8
**inflammation**
12:5 102:19
126:3 241:18
241:20 413:8
418:6 420:3,9
420:24 421:4
422:3,5,12,23
423:9,14,17,20
424:14 425:21
439:10 442:21
443:11 444:18
444:21
**inflammatory**
107:9 417:19
420:1,23
432:11
**inform** 71:23
363:15 407:24
408:12 409:10

440:4
**information**
9:12 16:24
22:17 47:3
56:18 57:12
59:25 71:6
75:16 91:16
98:17,19 102:1
162:21 164:22
165:24 166:17
167:1,2 172:1
172:2,10
175:23 224:25
225:7,15 237:6
237:22 238:1,5
239:6 248:21
249:2 253:14
253:22 266:12
266:17 272:22
279:20 322:12
336:20 339:9
341:2 342:6
343:21 344:18
357:15 363:5
386:2 392:8
434:8,18,25
441:11 445:21
451:2,2,3,4
456:11 457:10
457:17 460:17
**informative**
456:14
**informed** 30:8
30:10 59:2
**informing**
251:17
**informs** 270:13
**ingested** 266:21
**Ingham** 26:12
26:13 27:19,25
29:13 55:9
133:12 138:1,4
138:7 141:4,7
197:1,7,12
199:18
**Ingredients** 55:3
**inhalable**

102:23 108:6
**inhalation** 54:19
57:4,22 201:13
413:10 414:15
415:4,8,10,11
**inhale** 142:4
405:7,16
**inhaled** 266:22
405:19 406:1
415:15,22
457:5,22
**initial** 279:16
**initially** 250:12
**initials** 216:3
**initiates** 439:10
**inner** 48:18
102:17
**Inner-City**
10:17
**innovative**
301:9
**inpatient** 105:14
**input** 183:17
198:1 272:22
**inputs** 368:10
**inquired** 232:5
**inquiry** 31:16
**insert** 182:2
**insignificant**
287:19
**insist** 183:16
**instance** 194:6
264:1
**instigate** 417:18
418:6
**Institute** 9:7
294:13 308:16
313:9
**institution** 225:1
**instruct** 135:17
136:12 173:19
176:15,19
**instructing**
156:19 166:5
177:9 218:11
**instruction**
166:11 167:4

**INSTRUCTI...**
472:1
**intellectual**
183:17
**intelligent**
329:24
**intend** 399:21
400:12 401:7
408:15,18,21
**intending**
401:20
**intensive** 63:6
104:10 105:8
105:11,13
**intent** 198:23
**intention** 92:22
408:16
**intentionally**
274:2 330:4
332:7 420:14
**interest** 107:21
108:3 196:15
196:23 200:3
314:23 315:1,3
322:14 349:4
374:5
**interested**
102:13 108:1
150:10 153:6
155:6 163:19
185:8 195:10
332:11 342:9
448:2
**interesting**
150:3 311:17
313:18,20
315:18 347:21
**interests** 97:14
97:21 101:8,15
103:2,12 143:1
**interfaced**
174:21
**interject** 31:23
166:2
**internal** 34:21
64:9 94:18
105:2 107:7

**International**
10:8 45:9
364:12
**internist** 118:16
**interpret** 77:18
287:16 373:25
386:22 454:20
**interpreted**
239:6 323:16
**interpreting**
198:2 318:16
**interrupt** 39:1
243:17
**interruption**
251:24
**intersection**
465:10
**intersects**
458:20 459:3
466:2,20 467:9
**interstitial**
122:9,11
**interval** 305:23
328:19 329:7
330:12 353:10
354:3,10,11,16
355:3
**intervals** 317:2
327:18 353:8
357:9
**intervention**
370:8
**intraperitoneal**
285:14
**introduce** 15:24
**introduced**
152:17
**introduction**
413:17 454:20
**invent** 344:9
**inverse** 463:11
**investigating**
234:9
**investigation**
294:7
**invite** 261:5,5,12
261:21

Gregory B. Diette, M.D.

232:15 261:7
**invites** 260:22
**invoice** 23:1,5
24:20 34:5
158:24 161:14
161:24
**invoices** 22:18
22:21,25 40:4
40:8 158:4,13
179:2,12
468:25
**involuntary**
10:20 378:6
393:8
**involve** 33:8
157:17
**involved** 60:20
67:18 128:3,6
128:9 144:23
147:16 152:9
152:12 163:13
194:21 200:21
209:12 230:8,9
240:6 248:12
319:24 428:15
**involving**
199:11 254:16
365:12
**IOM** 394:2
**irregularities**
256:12
**issue** 9:10 41:19
47:20 79:7
81:4 129:25
135:18 142:11
142:16,20
150:19 166:8
199:2 225:4
241:10 246:23
251:23 261:14
294:18 298:16
299:5 301:2,8
308:18 309:3,9
337:8 359:2
387:15 391:16
394:14 448:7
449:1 467:10

**issue's** 309:9
**issued** 264:22
295:18
**issues** 25:1 57:4
134:10 145:22
254:16 256:22
257:17 462:12
**item** 66:9 67:19
150:25
**items** 20:19 22:3
22:4
**iterative** 91:13
238:19
**Iturralde**
285:10

---

**J**

**J&J** 19:16 157:3
159:16 184:15
184:25 185:1,2
210:9 441:22
**J&J's** 27:7
**JAMA** 328:6
**Jersey** 1:2 3:22
4:21 13:15
**JESSICA** 5:9
**JJCI** 53:17
**JNJ** 8:18 9:22
**job** 55:20 93:15
93:15 132:21
191:18
**jobs** 215:9
226:13
**Johns** 7:11 9:7
15:6 34:19
48:7 93:19
95:9,20,24
98:4 100:8,19
100:21 118:20
205:9 208:9,14
208:19,25
209:17 213:21
223:13 224:6,7
224:22 225:9
294:7 308:15
309:13,20
310:1 313:10

**Johnson** 1:4,4
4:16,16 13:11
13:11 49:17,18
49:19 50:1,1
50:12,13,19
51:6,6,7,15
53:4,12,25
55:6,6,14,14
55:17,18,25,25
56:5,6,13,13
57:10,10,20,20
63:22,22 64:4
64:4,23,24
65:3,3 69:11
72:17 74:11,11
74:21,21 75:15
75:15 78:3,10
78:16 79:17,19
79:19 80:8,13
80:13 81:13,13
81:17,17 84:10
84:10,16 87:17
87:19,19,23,24
108:22,22
109:3,3,7,8,16
109:16 136:8,9
136:16,16
137:1,1 150:18
150:18 151:3,3
157:9,9,12,13
157:17,18
158:10,10,20
158:21,24,24
158:25 159:1
161:19,19
165:16,16
381:17,17,17
381:18,18
382:24,25
384:23,23
385:12,12
406:15,15,16
406:16 407:2,3
407:6,6,19,19
407:22,22
**Johnson's** 7:4
49:19 50:19

51:7,15 52:8
53:4,13,13,21
53:25 54:1
56:16 69:11
72:18 74:15
78:3,9,10,17
79:17 80:9
84:16 87:17
**joined** 312:7
**joint** 100:20
**Jonathan**
185:11,12,13
185:17 186:22
194:22 195:3,4
195:12
**Jordan** 347:16
**journal** 10:8
45:9 123:21
125:18 126:13
127:9 144:18
145:14 147:6
299:5 315:13
364:12 369:10
411:10 439:4,5
**Journal's**
316:23
**journals** 121:16
**judge** 39:10 71:5
113:21 114:2
218:15,17
219:4,4 220:9
220:14 337:16
337:23 338:9
**judgment** 251:3
251:10 336:13
361:19 362:14
**July** 71:5,17
219:6
**jumbled** 202:12
**jump** 132:22
156:6
**June** 92:6,10
121:9,13
**jury** 16:1,3
70:17,23
205:15

**K**

**K** 3:5,7
**KATHERINE**
5:3
**keep** 27:11
53:14 54:18
85:23 112:7
164:14 168:12
177:13 242:9,9
334:7 358:25
451:11
**Ken** 287:21
288:7 290:9
**kept** 347:5
**key** 241:12
**keywords**
268:24
**Kim** 364:9,14
**Kimmel** 7:22
214:3 215:14
224:24 225:5
225:12 228:17
**kind** 29:24
46:10 56:21
57:12 63:8
70:11 74:2
97:2 104:7,11
104:18,24
105:4 154:19
181:15 195:2,7
212:2 240:19
242:10 254:7,8
257:10 266:7
269:7 289:1,11
299:14 333:22
333:25 336:16
341:21 348:12
402:24 404:5
406:17 421:19
450:1 452:25
**kinds** 64:17 97:7
126:3 162:11
209:13 224:14
224:15 266:19
342:24,24
358:3 412:8

Gregory B. Diette, M.D.

| | | | | |
|---|---|---|---|---|
| 421:7 448:20 | 144:12,13 | 235:9,10,11 | 320:2,8 321:4 | 451:3,14,15 |
| **knew** 153:1 | 147:10 149:2,4 | 237:2,18,20 | 321:23 322:1 | 452:5,12,23,24 |
| 155:8 185:20 | 153:19,24 | 238:2,19,22,23 | 322:11,12,14 | 454:14,25 |
| 186:6 312:3 | 155:19 157:5,6 | 239:3,13,22 | 323:8,11,12,14 | 455:8,10 457:2 |
| 383:9,14 | 157:13,15 | 240:4,6,14,17 | 326:11,22 | 457:11,15 |
| 435:10 | 158:2,5,17,18 | 245:19 247:12 | 329:25 331:9 | 458:10,12,14 |
| **know** 14:15,21 | 158:19,22,25 | 250:14,15 | 331:24 332:16 | 458:15 459:15 |
| 15:12,15,19,20 | 159:24 160:4 | 252:5,11 253:8 | 333:1,4,20 | 461:21,22,25 |
| 21:4,21 24:7 | 161:12,19 | 255:5 256:21 | 334:5,13 | 463:6,14 |
| 25:21 26:23 | 162:13 163:8 | 259:25 260:12 | 336:11 337:4 | 466:13 467:1 |
| 29:5,16,23 | 165:2 168:5,21 | 260:14 261:3 | 340:15,19 | 468:19,21,21 |
| 32:25 35:2,3 | 169:21,25 | 262:2 263:10 | 341:7,20 | 468:22,24 |
| 35:13 36:13,16 | 170:20 171:3,6 | 264:18,25 | 342:19 344:19 | **knowing** 163:20 |
| 36:19 37:3,8 | 171:24 172:20 | 265:11,22 | 348:2 349:13 | 289:18 388:10 |
| 37:21 41:6,10 | 174:18 175:20 | 266:3,4,5,6,10 | 353:3 358:19 | **knowingly** |
| 44:8 46:3,4,16 | 175:22,23,25 | 266:13,18 | 359:6,13,16 | 304:9 |
| 48:2,13,14,17 | 176:7,8 178:14 | 268:21,21 | 361:6,13,13,14 | **knowledge** |
| 48:22,25 49:7 | 178:15,23 | 269:10,19,19 | 361:15,20,20 | 40:20 255:11 |
| 49:14 50:8,16 | 182:7,10 | 270:14,22 | 363:4 364:15 | **known** 110:14 |
| 51:11,20,21 | 183:19 185:16 | 272:21 276:23 | 367:19 368:6,9 | 152:13 186:8 |
| 53:9,18 58:16 | 186:14,14 | 279:22 281:4 | 368:11 369:6 | 215:7 225:24 |
| 63:4,11 64:18 | 187:22,23 | 281:16,17 | 371:16 372:22 | 226:9 284:8 |
| 67:3,7 68:5,23 | 190:1,23,24,25 | 283:11,13 | 374:4,22,22 | 373:4,6,7 |
| 69:2,5 70:2,9 | 190:25 193:2 | 284:11,13,13 | 375:13,17,17 | 455:15 459:17 |
| 70:11 72:12,20 | 194:16 195:6 | 287:14,14,21 | 376:11,23 | **knows** 15:12 |
| 73:22,24 75:12 | 195:19 196:11 | 287:22,22 | 379:2 382:8,9 | 133:16 313:18 |
| 79:23 81:6,14 | 196:16,17,19 | 288:1,3,7,12 | 387:6,14 388:4 | **Kotsopoulos** |
| 82:4 83:3 88:9 | 196:19,22 | 288:20,21,23 | 388:8,20,22 | 351:11 |
| 88:23 90:5 | 197:19,21,24 | 288:24,24,25 | 389:17 390:4,5 | **Kurta** 351:13 |
| 91:15,15 94:9 | 198:1,2,9,12 | 289:6,9,11,14 | 391:12 392:23 | |
| 95:23,23 96:19 | 200:21 206:1,2 | 293:16,24 | 401:19,25 | **L** |
| 97:6,8,9,11,11 | 206:2,9,20 | 294:4,6,17 | 403:5 405:15 | **L** 4:3 |
| 97:24 100:4 | 207:21,22 | 295:9,12,12 | 405:17,22 | **label** 94:10 |
| 104:6 106:9 | 208:11 210:8 | 296:1 299:6 | 408:1,10,13 | 95:24 314:13 |
| 107:6,10 109:1 | 212:23 213:18 | 302:22 303:4 | 409:16,19,22 | **labeled** 239:10 |
| 109:7 110:5,8 | 213:19,21,21 | 303:10,10,20 | 412:9 421:16 | 353:19 |
| 110:21 113:7,8 | 216:12 217:19 | 303:20 306:17 | 421:17 422:2 | **lack** 286:19 |
| 115:5,10 | 219:19,25 | 306:20 307:23 | 424:10,19,25 | 304:1,23 405:5 |
| 116:22 117:5 | 220:23 222:15 | 308:24 311:4 | 425:5 426:6 | 460:25 |
| 118:2,7 119:22 | 224:6,7,8,9,10 | 311:18,20 | 429:9,12,12,13 | **lacks** 60:17 |
| 123:2,5,16,17 | 224:10,14,17 | 312:22,24,25 | 433:15,16,23 | 75:10 210:11 |
| 125:2,22 126:1 | 225:5,7,8,8,10 | 313:2,3,5,18 | 435:8,12 437:7 | 215:17 229:22 |
| 130:8 131:8,19 | 226:16,18 | 314:3,12 | 442:6,6,7 | 232:17 234:2 |
| 132:16 133:8 | 228:23 229:10 | 315:14,15,16 | 445:7 446:24 | 235:8 250:21 |
| 137:12 140:24 | 229:17,18,24 | 315:17 317:3 | 447:4,5,23 | 272:17 295:23 |
| 141:3 142:7 | 230:21,25 | 317:11,19 | 448:19 449:12 | 299:2 301:18 |
| 143:8,10,13 | 231:5 232:19 | 318:4,4,5,5,6 | 450:11,19 | 409:13 430:7 |

Gregory B. Diette, M.D.

432:14 442:2 443:18
**ladies** 15:25 112:20
**laid** 292:5
**Langseth** 425:13,14,20
**language** 225:14 226:16 279:5 392:2
**large** 86:11 123:3 361:13 361:14,14
**larger** 305:21 362:17
**Lash** 8:21 289:7 289:12 290:14
**late** 39:17 40:14 407:17
**lately** 229:25
**latency** 41:10,13 41:24 45:19,25 46:8,9
**latest** 455:3 462:22
**latters** 239:19
**laughed** 353:2
**law** 158:19,22 159:1 161:18 173:2 192:9 206:21
**lawsuit** 109:15
**lawsuits** 184:17
**lawyer** 185:7,10 194:12
**lawyer's** 18:5
**lawyers** 18:14 184:25 195:2 209:5,7,10,12 276:24
**lay** 290:24
**Lazar** 309:8
**lead** 126:4 302:20 309:4 369:8 370:11 370:12 413:11 421:18 423:20

427:15 448:1
**leading** 415:15
**leads** 439:10
**learned** 152:22 317:10,10
**leave** 93:10 185:2 237:10 256:9 384:12
**leaves** 217:2
**leaving** 237:5,12 237:22
**lecturing** 301:4
**led** 283:12 383:10
**leeway** 268:21
**left** 21:25 182:8 254:21 291:17 293:16 320:24 406:6
**left-hand** 45:18 444:16
**legal** 71:22 109:10,17 131:4,9 134:20 134:25 137:1 188:2 193:19 202:7 207:3 228:5 428:9
**legitimate** 270:25
**legs** 339:11
**Leslie** 1:25 2:16 13:20 471:18
**let's** 18:11,14 23:7 25:2 27:11,15 41:13 44:11,12 45:14 47:20 83:20 85:22,23 100:7 100:12 101:17 102:7 121:1 122:14 133:18 158:7 161:14 170:10 184:14 192:20 209:23 210:24 218:19 218:20 225:19

231:10 236:8 243:21 263:8 263:15 267:5 275:11 297:12 297:16 298:9 299:18 305:5 305:18 320:15 320:17 324:2 338:8 353:24 355:11,13,14 358:10 360:18 360:19 374:20 376:21 396:18 398:13,17 399:2,20 416:17 431:12 431:13 447:8 464:11
**letter** 11:20 431:23 441:2 443:16,17
**level** 272:20 284:9 387:24 406:2 456:23 457:4,21 459:16 466:22
**LEVIN** 3:13
**LHG** 1:5
**Liability** 1:7 13:12
**life** 119:6 203:10
**lifetime** 379:11 420:22
**lifted** 115:7
**ligation** 285:17
**light** 11:16 427:10
**limit** 52:18 97:9
**limitation** 421:18
**limitations** 460:9
**limited** 39:18 40:15 395:21
**line** 9:18 55:2 80:16,24 83:11 84:2 87:11

97:13 214:12 266:16 349:18 350:10 353:17 361:9 369:22 369:23 473:4
**lines** 436:1 452:12,14
**link** 172:24 240:14 372:2 386:13 422:5
**linkable** 404:3
**links** 386:16 389:11
**list** 20:20 21:8 21:14 35:12,14 43:2,7,9,10 65:21 67:21 138:13 139:12 139:16,22 157:20 162:8 165:18 182:6 182:11 188:16 244:6,18,20 247:1,25 248:10,13,15 248:20 249:12 249:19 252:19 253:11 269:11 312:6,15,16 313:4 316:25 364:19 388:15 388:19 468:23 469:3
**listed** 20:19 22:3 35:1 65:17 142:23 146:9 165:7 180:14 188:1 214:17 238:20 244:9 246:6 250:7 251:15 252:20 267:20,21 325:5 326:1 328:17 332:14 333:10 334:16 388:17,18
**listen** 39:4,21

106:24 113:5 194:13 329:22 469:21
**listening** 345:10
**listing** 268:23
**lists** 35:2 42:15 238:21 325:25 327:12
**literally** 26:25 27:21 34:20 93:14 107:24 119:2 123:14 172:21 183:21 206:21 208:12 213:16,22 216:14 217:15 230:23 273:8 279:16 298:15 313:6 332:20 355:24 456:14 458:24 459:18 459:19
**literature** 35:24 39:16 76:16 79:10,15 121:11,21 124:5 126:8,18 148:22 162:20 163:5,23 164:3 164:11 184:22 185:9 212:19 222:21,23 240:2 242:2,7 242:25 245:1 246:5,7 264:25 271:24 291:4,5 291:6 292:13 373:14 374:6 375:7 382:7 386:17 389:1 407:6,20 409:9 411:22 412:16 416:4 422:9,22 423:3,7 441:15 448:5 451:21 453:15 454:13 461:17 462:15

Gregory B. Diette, M.D.

Page 503

464:2
**litigation** 1:8
13:5,13 56:7
67:19 129:14
129:17 130:3,4
130:20 162:4
180:20 407:7
407:21 409:21
410:3 439:1
**little** 24:24
29:20 30:12
46:15,15 54:11
54:12 59:15,21
73:12 77:25
115:6 121:1
152:2 158:7
186:1 205:3
230:11 238:7
241:23 245:12
279:10 343:20
343:21 352:24
355:6 360:19
371:14 376:21
377:2,24
399:20 400:3
407:16 423:6
463:7 468:12
**live** 315:9 317:7
318:18
**living** 287:24
315:10,24
374:21 380:22
**LLC** 4:10
**LLP** 3:6 4:19
5:4,10,17
**local** 190:3
**location** 379:13
**locations** 104:9
**LOCKE** 5:16
73:6 88:6
89:25 110:18
118:12 145:8
186:12 191:20
192:3 200:9
202:1 217:12
218:5 220:16
223:25 231:18

232:16 234:1
235:6 248:24
261:1 265:1
271:6 274:16
291:12 293:1
295:22 298:19
302:18 304:24
306:7 307:2
325:8,15,17,21
348:21,24
364:2 367:18
368:7 380:23
381:8 382:3
385:25 391:25
402:9 406:20
407:9 408:3
410:25 411:14
411:25 412:21
413:13 414:25
416:1 417:24
418:20 420:12
422:16 423:24
424:17 429:10
430:6,10,15,19
431:5 432:4,13
434:15 435:7
436:16 440:6,9
445:3,16 446:4
446:21 449:6
450:10,23
452:2 453:6,21
457:8,24 464:6
467:11
**Logan** 5:5
**long** 24:9 39:5
82:17 83:2
93:16 117:9
152:9 170:11
174:24 181:22
268:18 300:6
300:15 329:13
341:12 440:3
469:8
**long-term** 59:10
**longer** 39:5
94:12 420:2
**Longo** 65:11

66:6,10,13,24
68:9 69:10
70:25 71:7,18
72:5,15,16
**Longo's** 67:4,14
70:18
**look** 20:17 29:7
30:13 37:4
41:7 52:22
54:10 56:15
69:16 87:6
96:3,5,21,25
100:7 102:3
121:17 123:1
138:12 141:2
143:9 144:21
147:12 149:3
153:25 161:14
168:16 171:1,6
171:10 173:17
174:11,16,17
176:9 179:1
181:17 182:21
183:21,25
196:16 213:13
222:22 226:18
238:21 251:20
252:23 254:6
257:18 267:15
267:19 272:24
272:24 277:14
290:5 293:14
301:25 303:23
308:11,25
313:16 316:22
323:6,7 327:21
328:22,25
329:13 337:6
340:16 341:10
341:10 342:1
342:25 344:17
345:11 347:16
353:8 355:24
356:12 359:24
365:2 369:21
371:4,5 378:17
378:21 387:3

392:19 397:22
416:16 419:13
428:5 430:22
431:22 438:20
440:1 443:10
443:15 449:10
454:13,24
462:4 469:7,10
**looked** 26:7
50:18 51:7,12
65:10 67:8
69:4,6 182:15
213:22 226:20
239:8 241:13
242:16 245:18
252:17,18,20
253:2 266:19
268:7 282:23
312:1 336:13
344:10 374:23
391:16 398:21
409:16 421:16
433:18 435:22
436:18 448:6
448:13,21
452:3 457:15
457:16
**looking** 28:8,10
28:16 104:4
130:21 153:2
172:14 211:7
213:23 239:13
239:23 242:11
252:22,25
283:17 293:12
297:4 301:22
316:9 323:14
323:15,15
340:13 346:3
355:20 356:3
365:10 366:18
371:10 376:9
390:9 409:17
428:24 463:2
**looks** 20:13 21:2
29:25 37:4
54:12 92:5

97:1 171:8
201:22 266:2
266:11,15
268:3 306:15
317:25 348:5
349:18 380:5
443:23 449:23
465:16
**loose** 46:15
**lost** 166:22
**lot** 21:2 62:6
70:7,9,10
99:23 168:22
169:2 200:25
207:22 224:4
237:6 302:19
310:21 315:6
332:22 341:2
360:16 403:7
418:2 423:6
435:21 449:22
452:12,14,16
452:21 460:7
**lots** 387:10
415:2 451:2
**loud** 115:9
**lousy** 47:9,15
**low** 93:3 149:10
269:17 446:15
459:15
**lower** 319:12
343:15 419:13
419:20
**luck** 319:4
**lucky** 105:1
**lump** 383:1
**lumping** 197:20
**lunch** 204:6,21
**lung** 11:6 97:15
100:24 101:9
103:3 106:20
122:7,8,10,11
122:18,20,24
123:2,5,7,13
123:14,18,19
123:23 126:5
143:1,5 150:7

Gregory B. Diette, M.D.

202:23 284:10
364:1 365:4,16
368:3 372:3,3
372:12,16,18
372:20 376:11
376:14 378:1
379:11,17
380:3,21
397:18 398:1,2
398:11,15,24
399:11 404:3
414:15 456:25
**lungs** 90:18
371:24 415:18
**Luzenac** 11:24
438:10
**Lv** 366:1,15
**lymph** 11:19
123:3 412:17
412:25 427:12
428:9 429:8,20
430:4

**M**

**M** 3:19 4:17,18
**M.D** 1:15 2:1
6:2,17 7:7,13
13:22 470:20
474:11
**machine** 405:22
**Maddie** 174:22
174:25
**Magnani** 398:18
398:23
**main** 174:22
240:23 242:21
252:21,21
**mainstream**
306:19
**majority** 142:23
245:20 286:3
**making** 28:8
44:8 115:14
234:6 301:7
303:14 368:4
469:11
**malignant** 45:20

45:25
**malpractice**
203:18
**man** 329:24
**management**
123:18
**MANGES** 4:19
**manner** 47:20
161:4 409:11
**Manuscript**
10:13
**Maple** 3:21
**March** 8:10
231:12 236:1
296:19 297:23
298:15 305:10
308:19
**mark** 16:12
18:14 66:11,24
69:19 86:5
91:2 355:7
465:21
**marked** 16:14
17:17,19 18:12
18:24 26:12
28:23 44:20
45:2 52:3,9,11
52:25 54:3
82:7,9 91:4,5
95:9,14 98:23
98:24 132:8,9
133:18,20
138:14,15,17
138:22,23
213:4,7,9
235:17,18
267:5,7,8
281:19,22
289:20,22
296:18,18,23
297:13,14,16
297:18 298:10
308:5,7 309:15
311:24 312:5,9
324:15,17,18
327:22,24
328:4 366:11

369:16 377:17
392:25 393:1
393:13 396:25
397:1 413:23
416:19 426:24
427:5 431:14
431:17 437:13
437:19 438:8
442:18,22
468:6
**markers** 423:14
**Marketing** 1:6
13:12
**marketplace**
75:5
**marking** 26:13
70:1
**markings** 30:14
30:17
**Maryland** 1:16
2:7,18 13:10
15:2
**masses** 123:2
**matches** 406:10
**matching** 85:4
**material** 18:22
159:8 242:10
242:11
**materials** 6:21
18:3 19:5 20:5
20:6,19,25
21:7 23:17
34:10 42:5,15
65:17 66:2,8
111:15 112:10
153:24 157:19
157:20 159:19
468:19
**maternity** 93:10
**matter** 10:16
13:10 21:1
27:25 60:7
67:7 68:25
102:14 103:7
120:11 124:18
134:9 163:10
167:9,16

168:15 180:4
284:20 285:6
285:12 368:25
370:5,18 371:8
371:25 372:12
372:23 374:8
374:17,25
375:19 376:6
376:10 404:19
404:21 458:8
**matters** 69:2
158:20 168:14
266:23 450:25
**Mc** 8:5
**MCBETH** 5:3
**McCormack**
369:3,8
**McDonald**
427:15 428:23
**McShane** 9:6
318:1
**McTiernan**
232:13 233:9
233:19 234:8
234:11 235:22
**MD** 6:12,19
7:10,14,16,21
9:16 206:15
**MDL** 1:4 13:13
38:2 55:9
111:3 131:10
135:1 199:20
**MEAGHER**
5:10
**mean** 15:13
20:10,25 21:19
21:23 27:1
29:6 34:9,10
35:3,3,11,11
35:12 37:1
40:5,24 41:21
46:10 47:25
48:9,14,14
49:11 50:16
51:22 52:18
55:9,9,20
56:22 60:8

64:9,16 69:21
70:11,11,24
73:21 75:19
77:6,8 79:24
82:22 88:9
91:13 96:20
106:9 107:6,10
108:19 112:8
118:17 126:22
131:23 132:15
136:19 142:8
143:15 144:22
144:23 145:19
146:16 147:13
147:25 149:17
150:24 153:20
155:25 158:21
162:24 163:25
163:25 164:7
164:14 168:22
169:12,14,22
170:5,25
171:25 172:10
172:20 174:16
175:20,20
176:5 179:20
180:7 182:5,8
187:4 191:23
195:1,8,17,20
196:12,19
197:8 198:12
198:22 199:16
199:19 201:16
202:20 203:9
203:18 205:18
205:21 208:11
209:4,11
211:24 215:19
216:11 217:16
221:22 224:21
225:5 230:22
237:5 241:22
242:13 243:17
244:8 245:3
249:15 252:7
253:7 258:7,7
260:1 263:1,4

Gregory B. Diette, M.D.

264:15,17
265:11 267:16
267:18 268:14
268:24 270:11
272:24 273:15
281:16 294:11
295:10 301:20
302:20,20
303:6 310:21
311:11,14,15
313:12 315:8
318:22 320:1
321:24 323:1,2
323:7 329:17
333:2,14,20,22
334:2,11 336:5
340:20 341:1
342:8,20 343:2
343:19 344:6,9
344:18 346:20
352:17,18,23
353:2,17,20
354:7 359:10
359:12,13,23
360:14 361:2
363:7 367:19
370:21 372:4
372:19 373:24
376:3 379:2
380:7 382:5,20
383:23 386:23
387:2,2 392:11
392:13 401:13
401:14 402:25
407:1 409:19
409:23 412:8
415:13,19
419:4 421:15
425:6 433:15
435:11,21,21
435:22 437:7,8
443:23,25,25
445:14,19
448:13 449:11
452:23 454:13
455:9,10 459:2
459:6,8 463:3

466:6 467:15
**meaning** 28:13
104:9 131:23
133:11 144:13
201:17 238:19
239:19 266:18
457:11 462:25
466:21
**means** 49:14
81:23 82:5
119:22 169:2
185:3 187:24
321:24 372:17
405:16 456:1
466:8,22
471:22
**meant** 64:16
130:19 256:19
259:15,16
308:12 345:13
388:17,20
406:12 451:13
468:16,18
469:6
**measure** 333:2
340:22 363:22
403:5,17
405:15 406:2,6
406:10 460:25
461:13,14
**measured** 406:9
**measurement**
404:1
**measurements**
391:12
**measures**
239:15,23
392:23
**mechanical**
468:1
**mechanism**
165:3 281:17
384:7,20
385:23 414:16
415:23 417:14
418:2,17
433:20 443:11

446:1,12,13,20
446:25 447:6
449:18 450:8
450:19 451:8
451:23 453:4
455:2
**mechanisms**
422:10 449:2
453:4,19 455:6
**medical** 15:6
24:19 25:18
30:4,5,10
31:11,17,21,25
32:6,11,14
33:3,4,19 34:1
37:11 39:16
56:13,18 57:12
81:12,16 95:21
95:22,25 96:3
96:4 100:8
104:7,11
105:22 117:5
120:9 141:23
151:23 152:5
152:10,18,22
153:15 154:7
154:16 155:10
155:16,18
156:4 157:3,8
158:9 159:7,20
161:12 162:5
162:19 163:21
164:10 165:5
165:21 166:25
167:21,22
168:3,17
170:23 176:14
177:8 178:22
179:7,14
188:20 189:6,8
190:15,19,20
194:9 215:3
222:4,21,23
223:16,17
228:12 229:21
408:12 412:16
436:9 468:8

**medicine** 7:11
34:18,21,22
52:16 57:3
61:1 63:17
93:4,20,23,25
94:6,18,19
95:9,24 96:11
96:12 98:5
100:18,19
105:2,5 107:7
143:5 189:1
201:10,19
205:9 294:8
**Medline** 242:17
244:17
**meeting** 157:23
**meetings** 260:21
261:23
**member** 94:20
295:3,6
**members**
208:14
**memorize** 41:7
341:8 441:12
**memorized**
36:25 37:5
**memory** 37:9
68:25 380:10
424:21
**mention** 292:12
458:6
**mentioned**
46:14 154:22
162:13 259:2
280:16 331:13
339:22 363:17
397:23 469:4
**Merlo** 228:23
**Merritt** 351:12
**meso-** 137:2
**meso/asbestos**
207:14
**mesothelioma**
11:7 55:15
124:6,10,13
125:19,21
128:25 137:3

142:16,20
148:10 201:25
207:10 263:8,9
395:12,22
397:19 457:22
458:5
**mess** 269:7
463:3
**met** 189:25
465:2
**meta-analyses**
238:20 240:11
244:19 251:16
267:17,25
268:8 368:22
**meta-analysis**
10:6,12 11:14
245:21 246:7
265:12 266:25
271:16 277:25
364:14 388:24
408:22 417:6,6
417:9,10 425:5
425:16 454:23
455:3
**Metals** 10:24
393:16
**meter** 376:1
404:20
**method** 244:23
363:4 421:5
**methodologic**
191:9
**methodology**
143:19,25
238:9 243:3,6
243:12,20,22
243:24 244:13
**methods** 143:18
143:22,22
144:7,13
253:25 266:13
291:10 292:21
404:10 448:8
**metrics** 405:5
**MHS** 6:13,17,20
7:10,17,21

Gregory B. Diette, M.D.

9:16 95:2
206:15
mic 14:9
Michelle 3:4
53:6
microgram
404:20
micrograms
375:25
Microphone
14:7 89:10
377:22
microscopy
11:17 427:11
middle 151:12
284:1 294:4
midpoint 351:7
migrate 281:3,7
411:11,23
412:17 415:18
416:7 428:8
429:7,16,19
432:3,10 433:7
434:1 435:1,24
436:13,25
449:16,25
452:18 453:20
migrated 412:24
migrating
435:17
migration 254:5
418:16 422:12
425:20 439:7
441:16,25
448:7 452:15
MILLER 5:9
27:6 53:6,9,12
53:16,20 67:17
86:5 111:6
112:17 116:15
116:18 132:14
132:19 204:5
348:20 440:13
465:20
million 263:1
Mills 351:12
mind 86:13

385:22
mine 21:22 85:7
85:9,12 95:6
153:2 188:17
208:12 215:25
335:19 348:20
388:5
mineral 74:2
75:25 76:13
120:4
mineralogist
73:10 119:15
120:4
minerals 73:25
120:15 125:24
minimal 456:23
457:4,21
minimum 391:2
minus 420:22
minute 25:24
200:13 247:7
251:1 286:15
293:2 299:22
299:25 318:2
361:25 369:15
minutes 299:19
377:1
misclassificati...
387:15 461:9
misclassify
461:12
misdiagnosed
395:12
misdiagnosis
395:22 396:6
misheard
307:16
misinform
306:2
mislead 274:2
misquote 280:17
misreading
332:8
misrepresent
329:20
misrepresenta...
310:19

misrepresenting
161:22 330:5
misrepresents
295:24
missed 100:5
182:16,22
366:10
missing 199:8
misspoke
126:22 345:12
misstate 453:8
misstates 20:23
67:16 88:7
129:19 132:12
150:22 151:7
153:17 172:12
176:3 224:2
225:3 256:17
264:4 265:2
272:17 274:1
275:5 276:4
279:8 298:21
299:3 315:5
323:21 336:22
429:14 432:5
434:3 436:17
437:4 449:7
misstating
279:14
mistake 287:5
292:11 293:18
mistaken 67:6
misuse 295:16
295:20 298:13
310:17
MITCHELL
3:13
mixed 421:19
450:1
mixture 454:12
mm-hmm 25:3
69:24 77:20,22
144:3 255:25
256:6 259:11
283:25 295:2
309:1 311:10
314:1 320:5

331:12 347:19
349:17 365:11
386:20 397:24
402:22 442:12
448:18
model 24:21
178:19 450:3
modern 8:19
290:2,18 388:2
418:8
modifiable
263:19 264:2,3
modification
347:4
modified 334:9
modify 340:8
mold 203:17
molecular
253:20 255:13
255:16
moment 24:25
29:10 34:2
44:11 151:23
209:25 216:6
238:8 241:7
244:17 256:4
298:10 355:15
355:16 365:7
402:23 438:23
440:1 447:9
464:18
money 179:23
179:24
monitors 404:19
monogram
259:6
monograms
259:6
monograph
10:23 259:8,9
259:9,10,19
401:1
monographs
239:3 259:23
month 231:12
months 264:21
Moorman

346:14,17,18
349:14 351:13
morbidity 40:21
40:23
morning 14:2,3
17:13 19:15
439:3
morphed 275:8
mortality 10:9
40:21 41:2
366:3 367:3
389:5,8,18
395:1
mother 403:24
MOTLEY 4:10
mouse 102:16
107:22,25
253:9,9
mouth 58:12
mouthful 310:3
move 19:3 39:7
46:17 101:17
151:15 161:7
176:7 190:14
280:8 310:6
383:17 398:5
398:13,17
movement
312:7 314:18
moving 8:23
9:10 280:3
296:25 308:18
309:2,2,22
MSA 40:4
166:14 173:1,2
173:4,16
174:21 175:3
175:18 176:1
176:12,20
177:6,14 178:3
178:4,9 180:12
180:18 181:7
181:12,13
182:1 185:14
185:18 186:3,9
186:23 187:1,5
187:18,19

Gregory B. Diette, M.D.

191:15,16,18
192:1,7,16
193:10,11,25
194:6,8,15,20
194:23 195:1,4
195:13 197:21
199:6 200:5,14
468:8,14 469:6
469:13 470:5
**MSA's** 195:23
**multidistrict** 129:17
**multiple** 171:11 408:5
**mutagenic** 418:10 444:20
**muted** 460:2
**mutual** 33:2

**N**

**N** 3:1 6:1,1 13:1
**N.W** 3:7 5:11,18
**name** 13:4 15:25
92:17 93:24
107:10 138:11
152:25 174:20
187:23 188:21
285:10 288:24
289:9 294:4
295:11 312:23
313:8 326:23
366:17 465:1
471:14
**named** 175:9
**names** 196:17 253:6
**napkin** 332:24 334:23
**napkins** 331:14 332:21 334:17
**narrative** 32:19
**narrow** 237:7
**Nate** 465:2
**NATHAN** 4:9
**National** 262:3,5 262:9
**nature** 103:25

109:15 135:18
271:25 273:13
296:9 297:10
297:22 305:10
317:3,16,20
**nearby** 48:18
**nearly** 344:15
**necessarily**
27:25 51:23
76:17,25
179:13 204:4
216:12,13
224:16 352:11
412:8
**necessary**
319:13 362:23
363:3 391:3
456:25 472:3
**need** 24:8 25:1
53:20 68:5
72:20 79:5
82:13,18 83:18
85:25 86:23
88:22 99:18
118:21 133:4
157:23 190:16
191:9 193:2,25
268:18 299:22
300:6 304:4
323:12 329:13
338:9 341:13
347:13 372:2,7
386:4,5,6
397:10 401:23
405:6 430:15
431:19 438:10
440:3 446:1,3
446:10,12,13
450:18,18
451:8 461:14
467:4
**needed** 191:18
194:8 255:9
452:13
**needless** 78:19
79:5 84:23
**needs** 83:5,17

85:20 92:4
275:17 300:13
300:15 326:13
335:5 438:19
**neighborhood**
387:17
**neither** 120:5
305:23 362:23
**neoplastic** 34:25
35:6
**Ness** 351:11
442:20 444:17
**Ness's** 443:17,21
444:2,2,5,16
**never** 10:6 57:21
184:20 189:10
189:11,12
192:1,6 236:18
266:6,12
299:21 300:12
304:13 305:19
364:11 365:5
365:13,14,16
366:20,22
428:3 430:9
438:17 440:17
442:5
**new** 1:2 3:22
4:21 5:11
13:15 36:20
93:15 182:1,4
303:6 316:23
364:16,16
401:14
**newly** 376:11
**Newport** 4:6
**Newton** 285:8
**nice** 93:13
181:23 204:13
**Nich-** 83:8
**Nicholson** 7:7
81:7,8,9,16,22
86:9 87:16
88:4
**Nicholson's**
82:12 83:15
84:4

**Nicole** 309:8
**nicotine** 404:23
405:18 406:7
406:10,10
**NIH** 10:13 320:4
**NIH's** 320:7
**NO2** 102:14
**node** 412:25
**nodes** 11:19
123:3 412:17
427:12 428:9
429:8,20 430:4
**noise** 301:7
**non-exposed**
284:10
**non-pulmonary**
199:2,15,17
200:6,20,23
**non-serous**
414:18
**nongenital**
414:17
**nonsense** 277:1
**nonsmokers**
379:12
**nonstatistical**
357:19
**nonstatistically**
321:7 322:7
**Nope** 346:17
354:9
**normal** 182:9
215:9 226:13
**normally** 15:5
**North** 2:5 13:9
**Nos** 377:16
**nose** 58:12
**Notary** 2:17
474:19
**notation** 216:2
**notations** 31:10
**note** 29:17 153:4
**noted** 13:18 68:2
128:2 394:22
472:9 474:7
**notes** 26:3,6,11
26:14 27:18,24

27:25 28:7
29:5,11 31:12
287:9 334:24
465:22 471:11
**notice** 2:16 6:11
6:15 16:13,18
16:23 17:15
27:23 29:1
**notion** 411:4
**novel** 320:1
**November** 67:1
67:13 68:9
69:12 70:20,20
71:1,8,19
**NSAIDS** 172:23
421:17,22
**NTP** 262:2,13
439:12
**nuanced** 217:1
256:20
**null** 352:8,18
382:15,21
**number** 8:13
20:3 26:13
32:14,19 33:1
35:13 37:6
40:23 41:6
97:3 122:15,16
122:18 123:1
123:15,16
138:16 172:15
179:4 183:12
247:22 248:1
248:11 249:22
282:13 331:16
340:13,18
351:7 361:11
375:25 404:12
413:25 414:2
420:25
**numbers** 37:1
257:16 345:9
346:12,13
379:23 380:6
389:7
**numeral** 276:15
**numerous**

Gregory B. Diette, M.D.

451:22
**NW** 4:11

**O**

**O** 6:1 13:1
**oath** 2:18 13:21
160:5,24
**object** 32:17
33:7 35:16
37:14 80:16,24
83:14 112:23
112:23,25
113:6 129:15
131:17 158:11
260:5 279:13
310:5,18 326:8
326:17 378:20
425:23 427:25
429:2 438:11
441:18 448:11
464:9
**objected** 154:3
**objecting** 32:5
33:21 35:19
83:21 160:10
326:11
**objection** 15:18
16:3 18:4
20:22 21:17
22:7 23:19
35:7,25 36:24
38:1,4 39:9,19
40:16 41:15
42:19 43:20
47:6,22 49:5
49:21 50:4,21
50:24 51:9,19
54:3,14,25
55:8,16 56:2,8
56:19 57:14,23
58:14 59:5,12
60:4,17 61:4
62:4 63:24
64:6 65:1,12
65:19 66:21
67:15 68:11
69:14,20 70:22

72:8,19 73:6,7
74:13,17,24
75:8 78:20
79:2,21 82:1
88:5,6 89:25
90:1,15 96:17
97:22 98:7
104:2 105:10
106:6,22 107:4
107:16 109:4,9
109:18 110:1
110:12,15,18
110:24 111:5
111:11,19,23
114:4,9 115:25
117:11,20
118:1,12,25
119:9 120:17
123:25 124:23
125:8,14
126:21 127:13
127:21 128:21
129:9,18 130:2
131:11 132:12
134:21 137:22
140:23 141:13
143:3,6 144:20
145:8,16
146:13 147:8
147:18,23
148:18,25
149:15,23
150:21 151:6
153:17 155:1
157:10 158:14
159:13,23
160:12 166:3
168:19 169:13
169:20 170:15
171:16 172:11
174:6 175:5,12
176:2,15
178:12,24
179:8,17
180:25 181:9
182:18 183:1,7
184:4,18

186:10,12
187:20 188:5
188:11,23
189:2 190:22
191:20,21
192:3,4,10,17
192:20 193:20
194:1,11 195:5
195:14,18
196:2,10
197:13,17
198:7,21 199:3
199:16 200:9
201:12 202:1,5
202:9 203:3
205:10 206:19
207:18 208:20
209:3,9,20
210:11 215:16
216:10 217:12
218:5,6 219:11
220:16,17
221:19 222:8
222:25 223:7
223:24,25
225:2,17 226:2
228:8,13
229:22 230:19
231:3,18,19
232:16,17
233:1,12 234:1
234:2 235:5,6
236:25 244:2
245:25 246:10
247:24 248:7
248:17,23,24
249:6,11,17,24
250:6,21 251:5
254:17 255:2
255:15,22
256:17 258:4
260:10,25
261:1,16,24
262:19,24
263:20,24
264:4 265:1,2
265:20 266:1

267:18,19
268:2,12 271:6
271:7 272:16
273:23,25
274:4,16,17
275:4 276:3
278:11 279:8
281:8,15
282:21 286:10
287:6,25 288:9
289:2,8,13
291:12,13
292:4 293:1
295:22,23
298:19,20
299:2,12
301:18 302:18
304:3,24,25
306:6,7 307:1
307:2,7 314:10
314:25 315:5
318:13 319:19
321:10,21
322:9,21
323:21 325:8
326:7 329:12
330:22 331:4
333:19 334:10
334:20 336:21
339:4,17,25
340:6,11
342:18 343:18
345:7,22 346:8
347:12 352:3
352:10 353:11
354:4 356:25
357:13 360:13
361:24 362:10
362:25 363:13
364:2 367:8,18
368:7,19
371:19 372:1,4
372:14 373:3
373:17,22
374:9 375:8,10
375:14,20
376:16 380:4

380:23,24
381:3,8,20
382:2,3,16
383:6 384:9,22
384:25 385:15
385:25 389:9
390:20 391:4
391:25 396:8
396:15 399:23
401:10 402:9
402:10,18
403:8 405:12
406:20,21
407:9,10 408:3
408:4,23
409:13 410:5,8
410:25 411:1
411:13,14,18
411:25 412:1
412:19,21
413:13,14
414:25 416:1
416:13 417:24
417:25 418:19
418:20 419:6
420:12 421:6
422:14,16,25
423:4,11,24
424:15,17
428:18 429:14
430:6,7,12
432:4,5,13,14
433:13 434:3
434:15,21
435:5,7,19
435:15,16
437:3 442:1
443:18,22
444:7 445:3,4
445:16,17
446:4,5,21,22
447:18 449:5,6
450:9,10,22,23
451:10 452:1,2
452:20 453:6,7
453:21,22
455:7,16,23

Gregory B. Diette, M.D.

| | | | | |
|---|---|---|---|---|
| 456:18 457:8 | **offering** 301:5 | 29:2,18 30:14 | 132:2,23 133:6 | 207:9,13,16,25 |
| 457:23,24 | **offers** 309:6 | 30:22 31:8 | 133:23,25 | 208:7,23 |
| 458:21 461:10 | 439:6 | 32:18 33:11,24 | 134:18,24 | 209:16,23 |
| 463:20 464:5,6 | **office** 30:11 | 34:8,12,17,23 | 135:13 136:5 | 210:3 212:1,4 |
| 466:4,25 | 154:20,22 | 35:22 38:16 | 136:22 137:5 | 212:15,23 |
| 467:11,12 | **officer** 81:12,16 | 40:10,20 43:12 | 137:19,25 | 213:3 214:2,15 |
| 470:1,8 | **official** 439:4 | 43:18 44:1,24 | 138:3,6,11,14 | 216:7 217:7,18 |
| **objectionable** | **officiated** 2:18 | 45:16 46:20,25 | 139:8,9 140:2 | 218:23 219:18 |
| 37:21 | **Ogburn** 312:22 | 47:17 48:4,5 | 140:7,10,16 | 220:4,7 221:12 |
| **objectioner** | **oh** 26:20 43:5 | 49:25 50:11 | 143:18 144:11 | 221:17 222:1 |
| 115:12 | 44:23 53:11 | 51:14 52:2,19 | 145:5,25 146:6 | 225:19 226:11 |
| **objections** 18:5 | 58:19 62:13 | 53:22 54:1,16 | 146:23 147:1 | 226:24 227:3,8 |
| 32:1,19 75:17 | 66:13,17 67:23 | 54:16,22 55:5 | 147:16 148:9 | 227:11,12,20 |
| 161:4 326:16 | 69:21 76:22 | 55:24 56:5,12 | 149:20 151:9 | 228:11,16 |
| 471:7 | 81:14 86:15 | 57:20 58:5,7 | 151:25 152:5 | 229:2,10,13,16 |
| **objective** 35:11 | 91:1 94:9 | 58:24 59:9,20 | 152:16 153:14 | 229:19 230:6 |
| 35:14 41:3 | 98:19 99:20 | 60:11,25 61:8 | 154:3,11,21 | 230:15 231:9 |
| **observed** 395:13 | 112:8 113:17 | 63:1 64:3 65:8 | 155:4,9,14 | 231:10,25 |
| 445:22 446:15 | 128:8 136:3 | 66:2,7 72:14 | 156:3 157:8 | 232:10,21 |
| **obstetrics** | 139:7,8 165:11 | 73:17 75:3,15 | 158:7 159:16 | 233:7,19 |
| 105:23 239:4 | 167:14 170:5 | 75:23 76:11 | 162:19 164:21 | 235:16 236:4 |
| **obstructing** | 174:7 175:4 | 77:6,21 81:15 | 165:14,23 | 236:12 237:10 |
| 133:4 | 182:11,13,17 | 81:21 82:6,20 | 168:8,11 169:2 | 238:7,9,16 |
| **obstructive** 96:9 | 186:15 188:10 | 83:10,24 84:1 | 170:23 171:6 | 239:25 241:1 |
| 97:17 100:23 | 209:8 212:15 | 85:13 87:9,15 | 171:11 173:13 | 241:21,25 |
| 101:10 103:5 | 220:25 240:25 | 88:15,16,20 | 174:14,24 | 242:9,23 243:5 |
| **obtaining** 154:4 | 242:8 264:15 | 91:2,10 92:5 | 175:2,17 | 244:5,24 |
| **obviously** 22:13 | 270:8 276:10 | 93:2,18 95:1,4 | 177:16 179:4 | 247:15,19 |
| 97:24 185:15 | 284:24 297:4 | 95:8 96:23 | 179:12,19 | 248:10 249:8 |
| 206:7 241:14 | 307:20 325:19 | 97:5 98:3,20 | 180:15,22 | 249:14 250:3 |
| 244:22 336:25 | 341:8 342:8 | 98:22 100:4,12 | 181:12,15,25 | 250:25 252:5 |
| 338:21 433:21 | 343:17 348:15 | 101:2,7 102:6 | 182:21 183:5 | 252:24 254:3 |
| 434:6 451:15 | 350:23,24 | 103:1,14 105:7 | 185:12,17,24 | 254:12 255:18 |
| **occupational** | 351:3 352:24 | 105:16 106:18 | 186:8,17,21 | 256:8 257:2,6 |
| 395:1 | 354:21 366:8 | 107:2 108:2,18 | 187:1,17 188:1 | 259:2,22 |
| **occupationally** | 374:12 375:15 | 109:1,24 110:5 | 188:19 189:6 | 260:21 261:7 |
| 284:4 | 383:4 389:18 | 111:21 113:1 | 189:11,15 | 261:12,21 |
| **odd** 435:9 | 398:7 406:25 | 115:22 116:12 | 190:7,13 | 262:5 263:15 |
| **odds** 333:11 | 410:9 414:4 | 117:9,15 118:8 | 191:13 193:14 | 264:9,13,20 |
| 347:8,16 349:9 | 416:12 424:3 | 118:19 119:5 | 193:24 194:4 | 265:6,12,17 |
| 349:15,24 | 429:22 433:2 | 119:15,21,25 | 194:19 195:12 | 267:5,14 |
| 351:12 361:4 | 437:13 441:3 | 120:3,8 121:8 | 196:25 197:5 | 268:10,17 |
| 365:12 368:21 | **okay** 16:11 | 121:19 122:12 | 198:17,25 | 269:14 270:7,8 |
| **offer** 179:20 | 17:11 20:10 | 125:5 126:5,7 | 199:10 201:15 | 271:9,12 272:9 |
| 342:5 | 23:15 24:24 | 128:2,9,13 | 201:21 202:14 | 273:18 277:18 |
| **offered** 158:3 | 25:23,25 27:11 | 129:11,24 | 203:14,20 | 278:25 279:24 |
| 184:11 | 27:15 28:3,10 | 130:24 131:8 | 204:17 205:13 | 280:2 281:2,13 |

Gregory B. Diette, M.D.

282:8,11 285:3
287:2,11,21,24
288:22,25
289:6,11,17,19
290:5,9,21
293:22,24
294:1,6,10,24
295:2,2,9,14
296:3,6,22
297:6,12,24
298:2,5,9
299:10,18
300:20 301:14
301:25 303:18
303:23 305:5,9
305:12,15,18
306:22 307:5
307:10,13,25
309:19 312:4
312:18,22
313:3,11 314:8
314:8,16 316:6
318:8,18
320:14 321:16
322:16 324:2,9
324:10,11,15
327:17 328:8
328:13,15,25
329:4 330:16
330:19 332:1
333:16 334:15
339:1,8,20
340:4 342:16
343:14 344:3,8
345:3,20 346:2
346:25 350:3
350:11 351:18
351:24,25
353:7 355:10
355:11,13,14
355:19 356:20
357:17 360:2
360:11,18,24
363:23 364:7
364:18,25,25
365:2,15,22
366:1 367:6,13

367:25 368:14
368:24 369:2
369:21 370:11
372:10,22
376:21 378:11
378:18 381:23
382:19 384:2
385:7,10,20
386:21 388:14
389:2 390:9,25
391:16 392:16
392:24 393:19
394:5 395:5,17
395:19 396:1
396:12,18,22
396:23,24
397:4,13 398:5
398:9 399:10
399:20 400:18
400:24 401:16
402:4,14
403:17 406:5
407:4 408:18
408:21 409:2,8
410:17 411:21
413:4,7,20
414:10,22,24
416:3,16 417:5
417:23 419:22
419:24 420:18
422:20 425:13
427:23 428:22
429:6 431:3,12
431:21,25
432:20 433:4,5
433:12 437:12
438:14 440:18
441:7,10
442:15 443:2,8
443:14 444:15
445:2,25 448:4
451:21 454:9
456:21 457:4
457:20 458:8
459:23 460:1,8
464:1 467:7
**omitted** 183:13

184:8
**onc** 63:14
**oncological** 62:2
**oncologist**
   115:16,17,18
**oncologists**
   60:20,22,25
**oncology** 63:7
   104:23
**one-page** 440:5
**ones** 30:8 61:6
   69:4 109:5
   123:11 147:13
   240:23 245:2
   247:10 252:7
   252:18,19,19
   253:5 259:24
   259:25 348:17
   355:9 357:3,5
   371:5 376:12
   389:23 390:5
   392:22 412:3
   449:11 452:5
**ongoing** 128:20
   128:24 129:3
**Oops** 368:8
**open** 181:19
   217:2
**opened** 69:5
**operation**
   191:11
**opined** 76:12
   436:9 453:3
**opinion** 35:4,10
   56:17 57:11,21
   59:1,9 60:1
   68:15 70:12
   71:15,24 72:2
   78:2,9 211:25
   212:16,25
   219:7 221:5
   243:1 252:2
   255:7 256:18
   271:3,4 281:2
   281:6 306:16
   318:8 356:20
   370:17 399:21

400:13 401:8
   421:3
**opinions** 22:5
   70:16 71:3
   76:2 88:13
   166:15 170:3,5
   183:20,20
   199:2,14 205:4
   205:13,19,21
   206:8 207:11
   207:14 208:8,9
   208:13,17,24
   208:25 209:18
   210:4 211:7,13
   215:13,13
   222:24 227:25
   228:2,7,12,18
   232:6 233:10
   238:10,11
   243:16 251:17
   255:4,20
   256:15 261:22
   286:18 360:4
   384:19 390:18
   407:7 436:20
   438:18 462:16
   469:18,23
   470:3
**opportunist**
   410:1
**opportunistic**
   409:22
**opportunity**
   114:6 193:9
   298:2,6 409:4
   409:8 427:20
**opposed** 185:1
   242:21 263:7
   339:23 401:22
**opposite** 359:9
   462:25
**Oral** 6:11,16
   17:15
**order** 47:1,19
   80:5 90:7
   176:1 180:12
   191:18 238:10

240:1 243:14
   317:1 320:9
   321:2 343:12
   372:8 383:11
   386:18 391:3
   405:10 406:1
   406:17 407:6
   407:24 446:1
   446:14 450:7
   450:19 451:8
   461:13 467:5
**ordinary** 205:8
**organ** 104:13,14
**organization**
   260:4,9,19
**organizations**
   260:12
**organize** 153:24
   157:22
**organs** 428:8
   429:7,20
**original** 147:17
   147:22 148:5
   149:12,14,17
   257:15 401:11
   471:12 472:11
**Originally**
   296:11
**ought** 353:21
**outcome** 270:11
   270:17 371:13
   448:1 459:9,20
**outcomes** 103:6
   270:9
**outdoor** 376:10
**outpatient**
   105:13
**outside** 134:19
   154:20,22
   208:25 409:17
**ovarian** 6:24
   8:17 9:20 11:5
   11:9,13 12:5
   28:14,18 34:24
   35:5 36:6,9,13
   36:20,23 39:16
   40:13,21 41:11

Gregory B. Diette, M.D.

41:14,21 45:8
45:20 46:1,22
51:18 55:7,15
59:10,18 60:3
60:15 61:2
62:3 63:12,18
75:6 76:3,14
79:11,15 89:24
109:21 111:3
111:10 115:24
116:7 117:1,4
117:19 118:10
118:21 119:3,7
124:18,22
125:2,7,12
126:10,15
127:12,20
129:7,13 130:1
131:1,14 132:8
134:10,16,19
135:5,15 136:8
136:17,20,21
137:21 138:8
140:22 142:12
147:22 148:17
149:22 150:13
150:20 151:4
163:7,13,19
164:12 165:25
167:3,12
172:24 187:7
198:25 199:11
200:1,4,6
201:5,9,24
202:22,22
203:2 209:18
210:23 211:20
212:22 214:11
214:12,24
215:8 216:21
217:10 218:3
219:9 220:12
221:7 226:12
233:23 234:15
234:21 236:17
237:19 240:16
240:25 241:5,9

247:23 248:5
250:4 263:16
271:20 272:15
273:22 274:15
275:2 276:2
278:4,22 279:3
281:24 282:14
285:14,18,21
358:3 359:3
368:17 384:8
384:21 385:24
386:11,18
387:6 388:7,25
391:3,11,17,23
392:8 394:2
395:12,23
397:17 398:1,2
398:10,14,23
399:10,15,17
399:18 400:19
401:9 402:8
406:13 407:8
410:18 411:4
413:12 415:9
415:24 417:12
417:15,20
420:4 421:8,10
422:24 423:10
423:15,18
428:7 433:6
439:9,13
442:20 443:12
444:23 451:24
453:5 457:6
460:11 462:19
464:4
**ovaries** 273:1
280:21,25
281:3,7,14
283:20 284:8
284:14 411:12
411:24 412:17
412:25 415:5
415:18 416:7
418:18 422:13
423:18 430:4
432:3,11

435:18,25
436:14 437:1
437:10 449:17
449:20 452:18
453:20
**ovary** 282:12
283:9 394:24
448:9,16 449:2
**overall** 383:3
463:11
**overbreak**
203:25
**overhead** 45:17
85:18,23
**overlap** 245:14
**overlapping**
404:10
**overly** 64:6
287:17 306:8
**Oversight**
231:13
**Overview** 102:3
102:10
**Ovulation** 6:23
45:8
**oxidative** 102:19
444:18

---

**P**

**p** 3:1,1 8:23 9:10
13:1 296:25
302:14 308:18
309:3,23
311:15 318:25
319:13
**p-value** 295:21
298:14 302:13
305:21 312:8
316:12,16
318:19 319:3,9
361:8
**p-values** 295:17
301:5 302:5
303:5 309:12
309:25 315:11
316:1 317:1
**P.A** 3:14

**p.m** 89:4 204:20
204:23 280:11
280:14 320:18
320:22 338:13
338:17 377:9
377:12 426:16
426:19 447:10
447:13 464:12
464:15,19,22
470:17,21
**page** 6:2,10 7:3
8:3 9:3 10:3
11:3 12:3 19:4
21:15 42:9,15
42:20,24 43:10
45:13 65:22
76:7 83:9,14
85:1 87:11
98:1 99:21,24
100:7 140:5,9
171:4 181:19
206:17,22
208:2 209:23
210:25 211:21
212:2,3 214:16
243:6,6,8
244:7,10,10,14
246:6 247:16
247:22 248:4
256:5 269:8
271:10,13,14
277:14,15
290:22 325:11
325:13,13
326:1 328:24
343:21 369:22
393:20 394:6
396:19 397:15
399:5,7 400:21
416:24,25
433:2,3,3
440:11 441:4
443:2 444:15
473:4
**pages** 26:3 85:4
86:9 99:22
170:11,11

172:5 324:4
325:4 336:18
414:11 474:3
**paid** 23:24
197:21 430:17
**pair** 388:1
**PAPANTONIO**
3:13
**paper** 29:21,22
30:2 124:12,12
144:18 145:10
147:14 182:3
182:12,13
257:15,23
264:9,14
276:25 277:1
298:15 315:13
316:21 320:10
321:2 330:5
332:5 342:15
370:15 371:3
373:10 375:3
393:5 423:12
425:1 439:3
444:2,2,5
**papers** 20:15
92:1 121:20
124:5,21
125:12 143:22
143:24 144:6
144:24 145:12
145:14,19,20
145:21 146:7
146:10 147:5
163:25 164:1
164:17 182:11
240:12 298:17
301:10,16
317:3 321:4
337:4
**paragraph** 76:9
101:7 176:9
181:22 212:6
212:14 236:8
244:21 271:14
277:21 282:10
283:24 284:2

Gregory B. Diette, M.D.

Page 512

| | | | | |
|---|---|---|---|---|
| 292:10 300:24 | 48:19 49:16,24 | 113:1,4,10,13 | 167:11 169:1,6 | 227:13 228:10 |
| 329:21 400:21 | 50:5,22 51:3 | 113:16,20,24 | 169:9,16,24 | 228:15,22 |
| 400:23 414:21 | 51:13 52:1,4,6 | 114:3,14,18,21 | 170:22 171:18 | 230:5,24 231:8 |
| 419:16 420:15 | 52:13 53:2,8 | 114:22,24 | 172:16 173:24 | 231:24 232:4,9 |
| 432:23 469:9 | 53:11,15,19,22 | 115:3,5,15 | 174:13 175:7 | 232:20 233:2,6 |
| **paragraphs** | 54:8,9,15 55:4 | 116:2,19 | 175:16 176:11 | 233:14,18 |
| 243:7,9 | 55:10,23 56:4 | 117:14,23 | 176:20 177:1 | 234:7,19,24 |
| **paraphrase** | 56:11,25 57:19 | 118:4,18 119:4 | 177:12 178:21 | 235:1,2,15,20 |
| 408:10 | 58:2,9,17 59:8 | 119:10 120:19 | 179:3,11,18 | 237:9 244:4 |
| **paraphrasing** | 59:19 60:10,24 | 124:3 125:4,10 | 180:9 181:3,11 | 246:3,24 248:3 |
| 293:6 452:11 | 61:7,15,20,22 | 125:16 126:23 | 182:20 183:4,9 | 248:9,19 249:1 |
| **pardon** 76:19 | 62:8,13,19,25 | 126:24 127:1,2 | 184:5 185:4 | 249:7,13,20 |
| 325:16 437:22 | 64:2,11 65:6 | 127:16,24 | 186:13 187:16 | 250:2,9,24 |
| **parens** 102:14 | 65:15,23,24 | 128:23 129:10 | 187:25 188:18 | 251:8,25 |
| 102:15,15,16 | 66:20,22 67:23 | 129:16,23 | 188:24 189:5 | 254:19 255:12 |
| 397:18 | 67:25 68:2,3 | 130:4,9,13,17 | 190:6,9 191:12 | 255:17,25 |
| **parent** 404:11 | 68:16,18 69:18 | 130:23 131:7 | 191:25 192:8 | 256:2,3 257:1 |
| **parentheses** | 69:23 71:2 | 131:13 132:1 | 192:14,18,23 | 258:5,16 259:1 |
| 211:18,19 | 72:13,24 74:9 | 132:16,23 | 193:4,7,23 | 259:9,11,14 |
| **parents** 16:7 | 74:14,20 75:2 | 133:5,14,22 | 194:3,18 | 260:7,16 261:6 |
| 403:23 | 75:14,20 76:19 | 134:23 135:4 | 195:11,15,24 | 261:20 262:1 |
| **Parfitt** 3:4 6:3 | 76:22,24 78:23 | 136:1,14 | 196:4,8,24 | 262:22 263:3 |
| 14:1,8 15:22 | 78:25 79:12 | 137:15,24 | 197:15 198:4 | 263:22,25 |
| 16:5,10,16 | 80:7,20 81:1 | 138:20,25 | 198:16,24 | 264:8 265:5,24 |
| 17:21 18:7,10 | 82:6,16,20,24 | 139:3,8,10 | 199:5,17,21,22 | 267:4,11,22 |
| 19:1,9,20,25 | 83:6,7,19,24 | 140:7,10,12,15 | 200:11 201:14 | 268:5,16 269:2 |
| 20:2 21:10 | 83:25 85:13,17 | 141:5,16,19,21 | 201:20 202:3,6 | 270:4,6 271:8 |
| 22:1,15 23:25 | 85:22 86:4,7 | 143:4,17,23 | 202:13 203:6 | 272:4,5 273:17 |
| 24:13,16,23 | 86:19,22,25 | 144:3,10 145:1 | 203:11 204:11 | 273:25 274:4,7 |
| 26:18 27:8,14 | 87:4,9,10 | 145:11,24 | 204:15,18,24 | 274:21 275:10 |
| 27:17 28:25 | 88:14,21,24 | 146:22 147:2,3 | 205:12 206:6 | 275:14,18,21 |
| 29:8 31:2,9 | 89:2,8,11 | 147:15,20 | 206:12,23 | 276:5,14 |
| 32:4,12,18,23 | 90:12,23 91:7 | 148:3,20 149:7 | 207:24 208:22 | 277:13,21,24 |
| 33:11,17,24,25 | 95:10,12,16 | 149:19 150:1 | 209:6,15,22 | 278:8,24 |
| 35:15,18,20 | 96:22 98:2,10 | 150:16 151:1,9 | 210:15,18 | 279:23 280:5,8 |
| 36:4 37:7,15 | 98:12,14,16 | 151:11,14,21 | 211:1,4,6 | 280:15 281:12 |
| 37:19 38:1,10 | 99:3,7,13,17 | 152:15 154:2 | 213:6,11 | 281:21 282:2 |
| 38:13,16,20,22 | 100:10,13 | 154:11,15 | 215:21 216:17 | 283:2,5 286:14 |
| 38:25 39:3,8 | 102:7,9 103:23 | 155:3 156:12 | 217:13,23 | 287:9,20 288:6 |
| 39:12,13,23 | 103:24 105:6 | 156:14,18,21 | 218:1,10,13,16 | 288:14 289:5 |
| 40:19 42:1,11 | 105:15 106:17 | 157:2,14 | 218:21 219:2 | 289:10,16,24 |
| 42:13,23 43:3 | 107:1,12,19 | 158:12,16 | 219:13,15 | 290:25 291:2 |
| 43:8,13,25 | 108:9,25 109:6 | 159:6,15 160:3 | 220:3,20 | 291:18 292:3,6 |
| 44:11,22,24,25 | 109:12,13,23 | 160:12,14,18 | 221:25 222:19 | 293:7 295:25 |
| 45:6,14,15 | 110:4,13,19,25 | 160:21 161:2,6 | 223:5,12 | 296:21 297:16 |
| 46:17,19 47:8 | 111:8,13,20 | 162:1 166:3,7 | 224:19 225:11 | 297:20 298:23 |
| 47:12,16 48:1 | 112:3,6,15,19 | 166:10,18 | 225:18 226:10 | 298:25 299:9 |

Gregory B. Diette, M.D.

Page 513

| | | | |
|---|---|---|---|
| 299:15,24 | 362:20 363:9 | 426:22 427:7 | 239:20 240:19 | 369:6 372:18 |
| 300:3,8,14,16 | 363:16 364:6 | 428:2,4,21 | 241:19 242:3 | 373:24 375:25 |
| 300:19 301:24 | 366:13 367:9 | 429:5,11,18,24 | 243:2 244:6 | 376:1 406:1 |
| 302:23 303:17 | 367:24 368:13 | 430:2,13,18,25 | 248:6 252:24 | 421:20 423:19 |
| 304:6,10,15,19 | 368:23 369:18 | 431:9,12,16 | 252:25 255:23 | 434:9 |
| 305:4 307:4,9 | 371:22 372:3,9 | 432:7,19 | 260:18 265:11 | **particularly** |
| 308:4,9 310:6 | 372:21 373:5 | 433:24 434:10 | 268:3 273:11 | 108:4 285:25 |
| 310:9,10 311:9 | 373:19 374:3 | 434:16,23 | 273:12 283:3,3 | 414:18 |
| 312:11,16,19 | 374:10 375:12 | 435:13 436:3 | 283:6 293:4 | **particulate** |
| 314:15 315:2 | 375:16 376:13 | 436:23 437:11 | 295:1 303:9 | 10:15 102:14 |
| 315:23 318:17 | 376:20 377:4,7 | 437:15,22,25 | 310:25 311:7,7 | 103:7 120:11 |
| 319:21 320:15 | 377:18,23 | 438:13,21 | 313:24 315:12 | 284:19 285:6 |
| 320:23 321:15 | 378:16,22,23 | 439:20,22 | 320:16 321:13 | 285:12 368:25 |
| 322:3,15,24 | 380:9,17 381:1 | 440:5,8,11,18 | 321:14 322:12 | 370:5,18 371:8 |
| 324:1,20,25 | 381:5,12,22 | 440:22,25 | 337:1 387:5 | 371:24 372:12 |
| 325:3,9,16,19 | 382:10,18 | 441:19 442:11 | 399:15 408:9 | 372:23 373:21 |
| 325:23 326:5,8 | 384:1,13,24 | 442:24 443:3,5 | 417:8 467:2 | 374:8,17,24 |
| 326:15,19,21 | 385:11,19 | 443:20 444:4 | **part-** 435:17 | 375:19 376:6 |
| 326:24 327:1,2 | 386:3 389:13 | 444:11,14 | **participants** | 376:10 404:19 |
| 328:1,3,13,16 | 390:3,8,24 | 445:13,24 | 249:15 270:10 | 404:21 |
| 329:16,19,22 | 391:15,21 | 446:7 447:8,15 | **participate** | **particulates** |
| 330:2,6,9,23 | 392:5 393:12 | 448:3,17 450:5 | 63:14 | 370:25 435:1 |
| 330:25 331:1,7 | 394:16 396:11 | 450:14,17 | **particle** 371:15 | **parts** 217:17 |
| 331:20,24 | 396:17 397:3,6 | 451:6,20 452:7 | 388:11,11 | 219:1 379:1,4 |
| 332:2,5,9 | 397:9,12 399:5 | 453:1,11,24 | **particles** 215:7 | **partway** 454:22 |
| 334:6,14 335:3 | 399:6 400:1,17 | 455:12,18 | 225:23 254:8 | **party** 64:10 |
| 335:7,10,13,14 | 401:12,14 | 456:4,20 457:3 | 373:15,15 | **pass** 52:20 |
| 335:18 336:6 | 402:3,13,21 | 457:19 458:2 | 412:9,10,16 | **passed** 302:13 |
| 337:9,12,17,21 | 403:11,12 | 459:1,5,22 | 428:24 429:7 | **passing** 86:13 |
| 337:25 338:4,6 | 405:9 406:4,23 | 461:7 462:14 | 433:7 435:17 | **passionate** |
| 338:11,18,19 | 407:12 408:7 | 463:25 464:8 | 448:21 449:24 | 306:15 |
| 339:7,19 340:1 | 409:1,25 410:6 | 464:11 470:1,8 | **particular** 46:9 | **passive** 365:4,16 |
| 340:7 341:4 | 410:16,21 | 470:12,15 | 68:21 69:3 | **passively** 284:5 |
| 343:13 344:2 | 411:6,16,20 | **part** 24:20 31:12 | 70:4 74:1,2 | **pathologist** |
| 345:8,14,24 | 412:13 413:1 | 31:13 43:6 | 92:14 105:24 | 119:11 |
| 346:10,15,19 | 413:19 414:2,6 | 46:18 48:10 | 107:21 133:3 | **Pathology** 11:15 |
| 346:23 347:1,2 | 415:6 416:2,15 | 60:7 63:6,15 | 163:10 172:21 | 427:9 |
| 347:18 348:11 | 416:21 418:12 | 65:17 70:12 | 176:9 181:6 | **pathophysiolo...** |
| 348:22 349:1,2 | 418:24 419:9 | 79:5 91:25 | 190:17 194:7 | 444:22 |
| 349:12,16 | 419:17,19 | 92:21 93:5 | 223:13 230:13 | **pathway** 447:25 |
| 350:17,20,23 | 420:16,19 | 117:6 123:13 | 233:11 238:6 | 449:4 |
| 350:25 351:5,8 | 421:1,9 422:6 | 138:16,17 | 240:7 270:17 | **patient** 104:24 |
| 352:6 353:6,13 | 422:18 423:2,5 | 149:11 195:19 | 277:11 311:19 | 335:21 405:6 |
| 354:5,19 356:6 | 423:21 424:1 | 197:22,25 | 312:2 333:5,6 | **patients** 103:17 |
| 357:6,16 | 424:18,22,24 | 202:23 221:23 | 342:4 343:9 | 104:1 105:21 |
| 358:10,16 | 425:25 426:4,5 | 222:3 225:19 | 358:4 359:1 | **Patricia** 328:5 |
| 360:17 362:2 | 426:9,12,15,21 | 226:8 230:9,13 | 361:6,17 369:2 | **patterns** 102:21 |

Gregory B. Diette, M.D.

108:3
**Pause** 19:12
44:17
**pay** 14:19
158:22
**paying** 139:19
**pays** 192:9,15
**PC** 3:20
**PCPC** 5:15
110:14
**pedantic** 301:3
**peer** 319:10
408:19
**peer-** 121:20
257:22
**peer-reviewed**
121:11,16
123:21 124:5
124:17,21
125:6,11,18
126:8,13,18
127:4,9,18
141:10,11
144:18 145:13
147:6 148:21
163:4 258:21
411:10 416:5
422:9,22 423:7
435:16 436:12
448:5 454:10
464:2
**pelvic** 11:18
107:9 427:12
428:8 429:7,20
**pending** 13:13
99:4 242:1
**Penninkilampi**
237:25 416:11
416:24 454:25
**Pennsylvania**
5:6
**Pensacola** 3:16
**people** 41:4
46:12 63:7,10
74:8 104:17
105:14 117:3,7
123:18 142:3

143:9,11 157:21
168:14 169:22
170:13 190:21
191:3 196:14
226:7 239:9
261:5 263:2
268:22 287:15
288:19 303:8
311:1,13 312:2
314:2 316:8
319:2 332:23
333:5 340:19
341:3 343:3,23
344:14,15
361:9 372:17
386:15 404:15
406:9 409:17
415:19 436:20
437:7 442:7
447:2 459:14
466:6
**people's** 255:5
**percent** 233:22
234:14 236:16
237:17 301:22
379:16 380:20
385:13,13
**percentage** 41:4
**Perfect** 19:25
38:16
**perfectly** 332:12
**perform** 268:10
406:17
**performed** 64:4
74:12,22
141:17,20
149:20 162:6
265:13 403:18
**perils** 302:4
**perineal** 11:12
76:20,22,25
211:17 212:21
266:22 271:20
278:4 332:24
359:5 416:8
417:11,14
428:6,20

**perineum**
284:20 285:7
285:17 411:15
411:17 412:23
433:8 435:2,24
437:9 449:19
**period** 21:1
41:13 45:19,25
117:16 420:2
**periods** 257:24
258:9
**peritoneal**
395:11,22
411:11 433:8
435:2 457:25
**peritoneum**
126:2
**person** 51:24
57:7 63:4 80:4
91:12,14
106:15 113:6
172:21 174:20
256:24 270:16
313:7 404:14
**Personal** 110:11
**personally**
266:11 287:23
311:21
**pertain** 245:8
**pertaining**
28:13
**pertains** 255:20
**Peruses** 213:13
282:25 300:7
308:12 330:17
**Pervasive**
305:15
**Petta** 174:22
**Pettenati** 174:23
174:25
**pharmacologist**
119:19
**phenolics**
186:20
**Philadelphia** 5:6
**phone** 19:21,23
157:24 162:14

162:14 173:15
**phonetic** 313:1
454:24
**photocopying**
178:17
**physical** 469:12
**physician** 34:15
118:22
**pick** 319:9
333:14
**picked** 342:3
**picking** 106:8
304:18 343:1
**picture** 54:11
**pictures** 51:10
**piece** 306:16
341:9 357:1,2
357:15,15
359:19
**pieces** 244:25
339:9 470:6
**piles** 30:12
**Pira** 398:13
**place** 49:12
78:18 84:22
92:14 93:15
97:2 153:23
294:5 358:2
387:9 459:14
471:5
**placed** 412:7
449:13
**places** 243:15
**PLACITELLA**
3:20
**plain** 242:21
**plaintiff** 165:16
171:13 340:15
**PLAINTIFFS**
3:3
**plaintiffs'** 6:14
7:5 17:14
18:13,20 26:2
28:24 29:12
31:13 45:2
60:23 76:12
133:18 226:5

251:17 343:8
410:12 431:18
460:1 461:24
**planning** 318:15
**plans** 257:6
320:2
**plastic** 186:20
**plausibility**
272:25 273:4
418:25 419:4
433:20 445:14
446:16,19
447:17 449:1
451:5
**plausible** 89:22
384:7,20
385:22 386:14
414:16 415:23
416:6 418:17
420:10 421:4
422:10 424:13
425:22 432:10
448:8 449:18
450:7,21
451:23 453:4
453:19 455:6,9
**play** 304:17
**Plaza** 4:5
**please** 14:20
15:24 24:16
78:25 81:2
83:19 98:12
104:4 113:2,4
113:17 115:14
122:4 130:17
141:18 156:12
160:15 162:9
167:6 169:6
211:8,11
214:22 218:10
219:17 225:21
246:12 318:24
325:18 380:12
464:8 466:12
472:2,6
**plenty** 14:16
143:7

pleural 457:25
  458:3,4
plot 327:13
  348:10,12
plots 327:13
plotted 463:9
plug 250:15
plus 144:24
  420:21
PM 370:4
pocket 158:23
point 42:9 43:24
  44:9 57:11
  65:21 93:3
  99:25 100:5
  106:10 163:12
  163:17 225:10
  230:4 253:12
  271:22 277:6,8
  314:22 333:3
  340:14 343:12
  343:22 346:4,6
  346:20 347:8
  348:14 350:12
  352:24 373:10
  374:1,16
  455:10 458:23
  462:10
pointed 350:4
pointing 332:6
points 238:2
  360:15
polarizing 11:16
  427:10
policy 8:7 84:10
  88:11 224:16
  231:14 235:24
  306:2 368:4
pollutant 107:25
pollutants
  102:13,18,23
  107:21 108:1,6
pollution 376:2
pooled 366:22
  368:21 379:14
  379:15 380:19
  383:12

poorly 338:21
popped 423:13
populate 92:21
  224:15 345:16
population
  325:10 345:4
  345:16 356:7
  370:7 389:6
  405:1
population-
  356:16
population-ba...
  356:23 357:5,8
  358:14 360:7
port 460:8
portions 173:5
  173:10
position 71:25
  84:15 99:11
  153:11 280:18
  314:8 340:5
  370:13 433:25
  449:14
positions 314:14
positive 226:21
  270:9 271:19
  278:3,15 352:2
  352:16,25
  353:4 359:23
  394:25 417:11
  465:15 466:1
  466:19
possibilities
  395:11
possibility 396:5
  444:21
possible 12:4
  22:8 51:1 63:8
  144:22 256:21
  285:20 442:20
possibly 387:24
post 23:1 29:12
post-medical
  95:1
posture 320:7
potent 221:23
potential 59:2

285:13 433:7
  435:1 439:12
potentially
  401:25
powder 1:5 7:4
  11:9 13:11
  28:14,19 49:3
  49:20 50:7,13
  50:19 51:8,15
  52:9 53:4,13
  53:14,25 54:1
  54:18 56:16
  57:13 59:3,11
  60:2 63:23
  64:5,25 69:11
  72:6,18 74:16
  74:23 75:4
  76:2 77:12,14
  77:15 78:3,10
  78:17 79:17
  80:9,13 84:11
  84:16,21 87:17
  89:15,18,19,22
  89:24 109:21
  111:2,9 120:21
  126:9,14
  127:11 128:17
  129:3,13,25
  130:25 131:15
  132:7 134:15
  134:19 135:5
  135:14 136:7
  136:21 137:2
  137:20 138:9
  140:22 142:12
  142:16 148:16
  149:22 150:20
  151:4 163:7,13
  163:18 164:12
  165:25 167:3
  167:12 187:6
  199:1,12,25
  200:4,10,22
  201:3,9,23
  202:21 203:1
  209:18 210:23
  211:17 212:21

214:19,23
  216:20 217:9
  218:2 219:8
  220:11 221:6,6
  231:16 233:23
  234:10,12,21
  236:14 237:15
  240:17 241:7
  241:10 262:7
  263:15,16
  264:1,2 266:17
  272:15 273:22
  274:14 275:2
  276:1 278:22
  279:2 280:23
  329:6 368:17
  381:19 382:12
  384:5,8,18
  385:12,21,23
  406:14 407:8
  410:22 411:5
  411:10,22
  413:9 414:15
  414:17 415:4,8
  415:15,21,23
  435:17 436:13
  451:24 453:5
  460:11,25
  462:19 464:4
powder/ovarian
  163:3
power 342:20
practical 303:25
  304:21
practice 61:1
  63:16 103:17
  106:19 182:10
  307:11 317:14
  317:18
Practices 1:6
  13:12
practitioner
  118:16
Pre-School
  10:17
preamble 425:3
preceded 270:11

270:18 382:23
  439:1
precise 246:12
  404:9 450:19
  450:24
precursor 422:1
  423:18
predated 423:15
predispose
  417:20
predisposition
  420:4
predominant
  458:9
predominantly
  374:24
prefer 344:14
pregnancy
  105:21,22
  106:14,15
pregnant 105:20
premise 344:20
preparation
  159:18 162:21
  180:23 197:12
  202:7
prepare 20:5
  129:21 158:4
  180:13,19
  185:19 186:24
  197:24
prepared 8:5
  18:13 27:19
  29:12 91:10
  92:10 111:17
  124:9 129:12
  129:25 130:25
  131:9,10 132:6
  134:14,18
  155:17 156:4
  162:3 171:15
  171:25 172:3
  172:13 196:25
  197:6 198:18
  201:8 205:8
  235:23
prepares 24:20

Gregory B. Diette, M.D.

**preparing** 22:25 23:17 29:19 43:24 202:25 257:19 407:20 421:24
**prescribes** 63:5
**presence** 64:25 72:5 75:24 77:1 89:17,21 273:1 384:4 385:20
**present** 5:22 17:22 19:24 71:5 75:25 76:13 133:23 238:10 282:14 286:12 409:5 417:5,10
**presented** 29:13 117:19
**presenting** 70:17 245:15
**presiding** 219:4
**pretty** 24:18 46:5 48:14 104:18 106:25 182:5 195:20 217:1 220:5 221:23,23 238:25 286:24 287:12 293:17 303:3,12 315:4 427:1 460:24
**prevent** 187:12
**preventive** 47:1
**previous** 285:16
**previously** 182:2 186:3 417:16 418:4 431:21
**primarily** 106:19 142:25 143:24
**primary** 117:24 117:25 118:8 118:14 124:13 145:20

**primates** 253:8
**prime** 315:19
**Princeton** 4:21
**principle** 270:13
**printer** 394:14
**prior** 18:3 43:24 56:6 150:17 236:6 257:19 264:5 286:1 298:7 334:25 429:15 432:5 437:4
**private** 429:15
**privilege** 33:9 33:10 156:20 161:25 166:5,7 166:13 177:11
**privileged** 176:19,25
**probably** 14:12 20:15 67:8 92:2 94:9 95:25 104:6 113:21 121:13 158:23 167:19 198:10 202:16 202:18 203:17 207:19 240:17 299:7 310:24 311:5 361:7 392:22 410:14 424:8 434:20 450:15 456:1
**problem** 58:20 104:7,11 105:9 106:3 107:10 133:3 285:22 301:6 305:16 424:6
**problematic** 102:17
**problems** 54:20
**procedure** 283:12 404:13
**procedure-rel...** 143:14
**proceed** 19:18

**proceeding** 468:10 471:4
**proceedings** 19:12 44:17
**process** 14:17 203:23 244:24 261:4 266:4,8 432:11 433:23 455:15 468:1
**PROCTOR** 3:14
**produce** 260:15 260:17
**produced** 26:10 26:14 370:15
**product** 33:8,12 33:16 49:13 50:19 51:17 53:17 54:17,23 56:16,18 57:5 72:18 74:12 78:18 79:20 84:7,23 87:24 111:9 137:2 171:8 173:19 176:16 180:6 183:22 274:14 382:11,12,13 382:24 383:5 383:12,13 384:18,23 385:21 407:22
**products** 1:5,7 8:9 13:11,12 49:3 50:7,14 59:3,11 60:2 63:23 64:5,25 69:11 72:6,18 74:23 75:4 76:2 77:2 78:4 78:10,17 79:17 80:9,14 84:6 84:12,17,21 89:15,18,19,22 89:24 110:11 111:2 120:21 126:9,14

127:11 128:17 129:3,13,25 131:1,15 132:7 134:15,19 135:5,10,15 136:7 137:20 140:22 142:12 142:16 148:16 149:11,22 150:20 151:5 163:19 164:12 165:25 167:3 167:13 187:7 199:12 200:1,4 201:9,24 203:1 209:18 211:17 211:18 231:16 231:17 233:24 234:10,13,21 235:25 236:15 237:15 261:15 262:7 266:19 272:15 273:22 275:2 276:1 279:2 368:17 369:8 383:1 384:6,8 385:23 406:14 407:8 410:23 411:10 411:23 415:8 415:22,23 416:6 436:13 451:24 453:5 460:11 462:19 464:4
**profession** 34:14
**professional** 171:8 183:21 183:23 203:10 251:10
**professionals** 462:3
**professor** 7:15 34:17 93:6,20 94:6,10,13,14 94:15 100:18
**profile** 103:16

103:20
**profound** 460:24
**program** 47:19 48:16,21,23,24 105:18 230:13 262:4,6,9
**programs** 46:21 47:1,2,2 48:6 367:15,20,23 368:2
**progress** 135:8 135:14 451:1
**project** 153:3,7 155:7 191:16 194:7 230:8,10
**projects** 156:7 187:3,6,9
**promise** 124:11
**promote** 317:14 317:15 418:11
**promoted** 93:6,7
**promoting** 421:5
**promotion** 93:5
**proof** 433:6 446:19,24,25 447:3,5
**proofread** 176:8
**proper** 271:3 322:5 323:17
**properly** 326:10
**proportion** 41:8
**propose** 452:10
**proposed** 417:16 418:4 451:23
**proposition** 226:23 227:15 306:12 307:14
**propounded** 18:2 474:6
**prospects** 39:18 40:15
**prostaglandins** 444:20
**protect** 156:16

protective
  285:18 421:21
  421:22
protein 423:13
protocol 38:19
  160:24
prove 446:1,3
  446:10,12,13
proved 419:5,12
proven 445:10
  445:15,20
  450:7 451:8,16
provide 18:23
  37:12 55:25
  61:6 62:2 63:8
  89:18,22
  109:17 180:18
  187:24 228:5
  316:8 343:23
  445:21 460:16
  469:13
provided 17:7
  17:13 71:4
  74:11 88:16
  115:22 116:5
  116:10,11,12
  116:13,24
  117:18 118:8
  134:24 139:23
  157:18,21
  165:14 167:2
  167:23 172:10
  180:12 184:10
  187:19 189:12
  194:24 207:13
provides 63:5
providing 32:5
  183:11 184:7
  227:24
provoke 102:12
  107:15
public 2:17 8:8
  10:13 46:21,25
  47:18,20 48:6
  48:15,23,25
  95:2,6 100:22
  101:21,25

107:14 141:11
  231:15 235:24
  267:2 369:24
  370:3 474:19
publication
  123:24 245:14
  321:3
publications
  121:2,11,15
  122:8 123:21
  124:9,16,17
  125:6,17
  126:18 127:4,9
  127:17,18
  141:10,11
  142:23 146:9
  245:8,10
  454:10
publicly 156:10
publish 143:18
  315:13 316:21
  317:3 320:9
  321:2
published 35:23
  45:9 92:1
  108:10 121:10
  121:16,20
  124:4 125:5,11
  125:17 126:8
  126:13 141:23
  142:5,11,15,19
  142:25 144:12
  144:18 145:5
  145:13 147:6
  148:21 230:16
  236:13 237:14
  257:3,25
  258:20 259:7
  264:22 296:10
  319:5,8,18
  325:22 359:13
  369:2,5 373:8
  373:14 381:11
  391:7 408:19
  411:9 427:19
  439:3 461:17
  463:15

PubMed 92:16
  92:17 108:20
  121:17
pull 18:16 29:21
  69:17,17
  339:14 363:4
  416:17
pulled 170:21
  172:2 341:17
pulmonary
  34:18,22 52:15
  57:3 63:11,17
  93:21,22 94:17
  94:18 96:9,10
  96:10,11 97:17
  101:10 103:5
  104:16,18,19
  104:22 106:20
  143:5 153:13
  201:6,10,18
  205:9
pulmonologist
  61:8,17,23,24
  61:25 106:4
pulmonology
  118:22 188:25
purchased 50:6
  53:1,4
Purdie 42:6,16
  43:14,15,18
  45:7,18 351:11
purported
  462:21
purpose 43:22
  97:12 162:2
  252:21
purposes 18:18
  22:4 43:19
  55:6 56:16
  70:16,24 71:3
  71:15 78:9
  79:16 93:5
  111:16,17
  168:1 175:18
  183:14 188:3
  194:21 242:12
  251:12 252:2

252:16 267:24
  268:6 286:17
  310:15 324:16
  327:12 368:4
  390:17 462:16
Pursuant 2:16
push 306:24
pushing 155:23
put 19:17 29:20
  30:1,2 35:12
  41:22 45:14,16
  52:24 58:6
  67:21 83:12
  86:7,8 97:25
  100:12 165:17
  169:18 170:14
  172:6,7,8,21
  175:19 211:1,4
  212:8 215:25
  216:3 236:7
  254:8,9 267:2
  271:11 291:19
  299:19 309:11
  311:13 326:2,3
  327:19 328:12
  334:12 336:14
  340:23 341:13
  346:11,13
  355:5,11 364:4
  365:9 426:25
  438:2
putative 47:3
puts 224:25
putting 203:24
  304:12 468:21
  468:21

_____
        Q
qualifications
  212:17 306:20
  442:8
qualify 90:3
qualitative
  271:25 273:13
  273:14 370:21
quality 144:8,8
  149:10 239:14

251:23 257:17
quantified 371:4
quarrel 278:25
  279:5,7,10
query 404:10,11
question 14:20
  14:22 23:20
  24:12 28:15
  32:4,21 33:10
  33:15,18,22
  36:11,12 37:22
  39:7,20 40:1
  40:12 41:16
  42:12 47:7,9,9
  47:23 49:6,18
  49:22 50:25
  55:1,13,21
  56:20,24 57:9
  61:16,21 62:6
  62:12,20 64:12
  65:16 66:19
  68:1,4,17 72:9
  72:22 73:4,8
  73:12,16 78:24
  79:6,11,16
  80:17,21,22
  82:2 83:18
  84:5,9,14,20
  85:1 90:2,11
  96:18 98:8,11
  98:13 99:4
  103:22 106:7
  106:11 107:17
  109:11 112:14
  113:3 114:23
  115:12 116:23
  118:3,14
  123:20 124:2
  125:3 127:14
  132:18,20
  133:8,9 135:24
  137:11 139:20
  144:2 145:17
  149:1,13 159:4
  161:8 164:10
  166:2,20 167:6
  168:20 169:5,8

170:1,12 172:3
173:22 174:9
176:17 177:2
177:10 184:19
187:13,21
188:19 191:6
191:24 192:5
192:21 193:2,3
199:8 200:2
210:14,16,19
210:20 215:17
217:19,21,24
218:7 219:6,12
220:8,11,14,18
220:21 221:15
221:20 222:9
223:1 224:1
225:3 230:20
231:20 233:15
234:18,22
241:24 242:1
243:10 244:12
252:11 254:18
258:13,17,19
260:6 261:16
265:21 273:18
274:9,11,24
275:7,19 276:2
276:4,9,12
278:7 279:14
279:16 286:5,8
288:5,7 290:25
291:3 299:1
304:16 310:7
319:20,22
321:11 330:7,8
332:4,13 335:2
335:8,11,15,17
335:19,21,22
337:17,20
338:3 339:20
340:4 342:12
353:12 354:1
364:20 371:21
372:7 374:14
375:21 382:16
384:10 385:6

385:16 390:21
391:5 400:12
401:11,15
402:11 403:10
404:5 405:14
406:22 407:11
407:23 408:8
410:20 411:2
412:20 413:15
422:15,19
424:23 427:23
436:10 444:12
446:23 450:15
456:22 457:20
460:21,22
465:4,6 466:15
**questionable**
256:13 437:2
**questioner**
19:18
**questioning**
80:25 83:22
165:19
**questionnaire**
404:15
**questions** 27:5
27:12 32:10
37:18 38:25
53:3 82:12,18
83:4,16 86:1
114:8,24
121:25 132:20
154:6 163:10
203:4,23
207:22 210:9
217:20 218:25
254:24 300:2,4
300:9,22 304:5
321:12 326:14
329:23 336:3
346:22 400:3
408:5 430:21
430:24 431:2
435:25 438:19
439:19 440:14
440:20 456:22
467:23 470:11

474:5
**quibble** 221:8
**quick** 44:5
293:14 320:16
320:17 377:4,8
399:25 426:10
467:23
**quickly** 112:1
151:15
**quit** 218:10
**quite** 90:6
434:20 451:3
**quote** 29:21 30:2
425:24
**quotes** 169:22
170:12

_____
**R**
_____
**R** 3:1 13:1 473:2
473:2
**rabbits** 253:8
**race** 236:19
346:18
**radiation**
115:18 125:23
**radiolabeled**
412:10
**radiologist**
119:13
**radiology**
143:14
**RAFFERTY**
3:14
**raise** 80:5
**raised** 396:13
**raising** 113:14
113:19 115:2
**range** 375:18
**ranges** 105:4
458:14
**rank** 93:6
**ranked** 36:2,3
36:16
**ranks** 34:24
35:5
**rarely** 352:20
**rate** 23:11,13

24:2,6,21,22
25:17 178:20
**rates** 215:8
226:12
**ratio** 333:11
347:8,16 349:9
349:24 361:4
365:12 368:21
**ratios** 349:15
351:12
**rats** 253:8
**reach** 184:15
190:15 191:15
194:15 195:13
228:16 233:9
279:21 282:12
283:9 314:24
323:13 418:17
**reached** 155:10
185:21 187:1
193:9,17,24
194:23 227:25
228:6,11
396:10 401:1
**reaches** 189:7
190:21 191:19
194:8
**read** 42:16
45:22,23 65:18
66:23 68:8,19
68:20 69:3,6
70:10 72:14,14
76:20 77:3
83:5,11,17
85:24 88:1
97:18 99:25
100:25 101:12
102:24 103:9
111:25 143:11
166:23 181:24
211:8 212:5
214:22 225:20
225:21 231:22
232:21 236:21
239:2 256:21
257:3,21,22
258:20 259:16

259:18,18,22
259:24 260:1
265:6,8,10,15
266:8 270:23
271:15 272:1,6
273:12 277:23
278:14 279:16
282:17 286:6
292:17,22
296:3 298:3,7
299:10 300:18
301:14,17
302:8,15 303:4
304:4 305:6,12
306:3 311:14
311:17 312:1
313:5,14,20
316:15 317:16
348:1 370:9
373:23,25
378:8,10 379:1
379:20 388:14
389:24,25
390:6 395:17
401:18 413:4
413:16 417:21
420:6 423:22
423:22 424:19
425:13 428:3
428:11 429:2
430:9 431:22
431:24 441:7
445:5 448:5
453:15 454:14
462:17 472:2
474:3
**readable** 469:10
**reader** 245:23
248:5,11 249:9
249:14,22
250:4,18
**reading** 28:1
69:1 76:18
79:9 85:15
87:6 198:2
253:24 287:7
291:16 313:13

Gregory B. Diette, M.D.

389:2 400:5 409:24 420:14 469:20
**readings** 128:3
**reads** 96:8 101:7 198:14
**ready** 44:22 315:19 377:19
**real** 44:5 133:3 301:5 316:2,3 316:4,5,6,7 399:25
**realistic** 270:12
**realistically** 462:11
**reality** 229:4 383:8,18,25
**realize** 27:15 99:22
**really** 21:6 53:7 53:7 68:13 70:10 77:17 93:7,17 105:3 114:10 133:15 149:10,10 180:10 191:23 201:21 210:21 221:13 229:15 231:6 237:6 240:10 252:21 258:19 269:15 293:10 295:10 310:4 331:24 332:17 334:4,4 335:8 340:24 344:20 353:18 358:13 360:11 364:3 374:4 382:6 405:24 420:24 422:4 423:16 425:4 462:9 469:8
**realtime** 300:21 345:11 450:16
**reanalysis** 388:25
**reason** 21:11

39:25 70:6 185:21 192:24 213:16 222:11 223:10 272:19 315:8 341:5 407:4 409:20 410:10 412:6 462:1 472:4 473:6,8,10,12 473:14,16,18 473:20,22,24
**reasonable** 79:19 87:19 445:8
**reasons** 332:18 361:7 384:12
**REATH** 5:4
**recall** 41:23 67:12 146:3 176:4 197:2,10 389:2,7 402:12 465:6,11
**recalled** 270:10
**receipt** 472:13
**receive** 102:2
**received** 20:17 21:16 95:2 148:9,12,15 175:23 229:20 468:14
**receiving** 187:18 469:5
**recess** 89:5 151:18 204:21 280:12 320:20 377:11 426:18 447:12 464:14
**recognize** 78:13 239:9 361:12 467:3
**recommendat...** 406:16 407:2
**record** 13:4,19 18:18 19:8,11 19:14,16 26:10 27:6 28:22 31:7 32:16

33:22 37:24 38:8 44:14,16 44:19 52:24 53:16,24 54:3 58:5,10 83:22 89:4,7 99:11 115:13 132:2 134:7 151:17 151:20 154:13 204:20,23 234:6 280:11 280:14 320:19 320:22 324:23 331:23 336:16 338:5,7,14,15 338:17,24 344:11 350:15 377:10,13,14 377:15 378:19 393:3 426:17 426:20 431:8 440:10,24 441:8 447:8,11 447:14 464:11 464:13,16,20 464:21,23 467:18 470:17
**recordation** 173:6 242:10
**recorded** 471:8
**records** 30:4 167:21,22 177:13
**Red** 3:22
**redacted** 161:24 180:5
**reduce** 32:19 46:22 172:9,23 367:15,23 368:2
**redundancy** 74:6
**redundant** 245:14 247:12
**Reeds** 388:16
**refer** 265:18
**reference** 66:2

152:1 238:21 244:18 468:21
**referenced** 397:14
**references** 66:10 171:6 364:19 396:20
**referrals** 104:19
**referred** 118:22 118:24 120:3
**referring** 28:23 43:1 65:5 237:7 255:24 282:6 292:7 297:7,10,25 298:21,25 389:22 441:1
**refill** 88:20
**reflect** 53:24 97:20 101:14 113:18 115:13 179:13 344:12 349:9
**reflected** 69:12
**Reform** 231:13
**refresh** 65:20 380:10
**refusing** 33:21
**regard** 14:5,11 31:17 33:18 35:6 49:18 57:3,11,21 60:1 76:2 84:11 96:16 120:10 126:14 129:6 157:12 159:18 175:24 176:13 177:7 225:14,15 233:10 251:11 256:15 280:18 287:15 310:16 315:25 356:7 370:17,23 373:14 381:18 384:19 409:2 434:1 441:11

**regarding** 31:24 32:11,14 76:16 124:17 127:10 127:19 173:20 295:16
**regardless** 280:25 322:11 379:13
**region** 11:19 427:12
**regional** 428:9 429:8,20
**Registry** 8:12
**regret** 44:8
**regulatory** 56:14 119:21 209:1 434:12
**Reid** 388:3,15 388:18,19 389:3,12 390:10,11,12 390:12,13,18
**Reids** 390:11
**reiterating** 403:13
**relate** 187:14 405:20
**related** 33:4 121:22 123:23 142:2 143:22 199:4 200:8,10 200:12 201:4 257:17 285:22 380:2
**relates** 1:10 403:9
**relationship** 127:11,19 153:20 154:17 157:5 200:16 210:22 212:20 273:21 274:13 275:1 376:9 379:10 463:11
**relationships** 358:1
**relative** 9:19

Gregory B. Diette, M.D.

327:18 328:9
328:18 329:5
332:14 336:9
339:2,15,23
340:9 342:4,6
343:15,16
348:13 349:11
352:1,16
353:10 360:20
361:15 363:24
365:4,5,17
366:19,22
367:16,21
368:16 370:17
370:25 371:11
371:12,16,23
372:11,22
373:16,18,20
374:7,23 375:7
375:18 377:25
379:16,23
383:3 387:17
397:25 398:10
398:14,21,23
399:10 400:5,7
**relatively**
343:23
**relevance**
315:25 342:6
**relevant** 145:22
211:15 238:13
**reliable** 416:4
**reliance** 34:5
43:2,7,9,10
65:21 165:18
388:15 468:23
**relied** 65:18
381:24 440:17
**rely** 71:9,21
72:1 166:15
233:3 255:10
381:23 390:18
**relying** 68:14
70:18,25 71:6
71:10,17 167:5
**remember**
22:10 27:22

32:21 36:2
53:23 60:20
63:19 69:3,7
69:15 138:11
144:24 145:2
152:25 153:5
158:3 161:8,9
164:4,17 171:4
182:8 197:14
197:22 231:22
242:22 247:10
252:19 253:6,8
265:9 283:17
288:17 296:8
296:12 311:21
380:6,7 389:11
392:17 395:24
425:2,6 426:1
426:7 432:17
460:4,6 463:21
468:2,14
**remind** 113:7
160:5
**reminded**
455:13
**reminds** 68:24
**removed** 280:22
**render** 256:13
**rendered** 161:13
**repeated** 420:1
**repeatedly**
461:23
**rephrase** 408:6
422:19
**replace** 309:7
**replacement**
315:16
**report** 6:19 7:16
10:21 21:12
22:5 29:19
30:8,11 42:6
42:14,22,24
43:7,24 66:4
66:10,23 67:14
68:8,19 70:21
70:25 71:4,7
75:24 76:4

94:10 111:17
129:12,14,21
129:21 130:8
130:21 131:4
131:20,22,23
132:5,8,10,14
133:24 134:7,9
134:13,25
135:1,13
138:17 145:25
152:3 153:16
154:24 155:12
155:17 158:5
159:19 162:3
162:22 163:21
163:21 165:7
168:2,18
169:11,12,17
170:4,10,14,14
171:12 172:5
172:12 173:5
173:11,16,21
174:4,10
175:19,24
176:1,14,24
177:8 180:13
181:13 182:22
183:15 184:9
186:24 193:12
198:6,9 201:8
203:21,24
205:4,6,7,7,16
206:14,14
208:9,23
209:24 210:4,8
210:25 212:2
227:25 228:6
232:21 233:8
235:13 237:2
238:11 242:12
242:16,23
243:11,23
244:7 248:15
248:18,22
249:3,8,21
250:3,17
253:17 255:19

255:23 256:1
256:11,18
257:10,20
258:1,11
264:10,14
267:6 268:7
315:12 324:4,5
325:5 326:1
327:12 332:16
334:3 336:1,5
336:19,23
341:13 346:21
355:22 356:4
356:13,13
357:17 360:4
360:12,16
364:23 366:19
367:2 378:4,7
378:25 379:8
390:18 393:4
395:19 396:13
397:15 399:16
408:18 421:24
421:25 432:9
443:21 447:21
460:5,8,16
468:2,5,10,20
469:15,18,23
470:7
**reported** 1:25
9:21 270:11
291:5 337:2
339:6,9 371:14
372:11 375:6
428:20 463:19
**reporter** 2:17
13:19 188:9
279:12 440:21
471:1,2,24
**reporter's**
471:13
**reporting**
247:13 270:9
**reports** 20:14,15
21:5,20 22:11
60:6,12 66:18
67:4,21 69:12

70:6 71:19
129:24 130:4
131:9 134:18
156:4 162:16
165:15,20
175:3 180:16
180:19 185:19
186:4 202:8,25
203:4 239:4
257:9 297:11
329:5 374:7
407:21 417:10
453:18 454:4,5
**repository** 92:20
**represent** 18:19
18:21 28:17,18
40:8 45:3,4
52:7,24 53:3
55:14 81:12,15
84:2 98:3
101:19 103:11
103:13 108:14
139:11 224:23
225:9 232:10
235:21 236:5
289:25 291:20
292:8 297:21
308:14 312:5
317:1 325:23
325:24 327:9
327:17 343:11
350:14 364:12
387:4 397:13
399:12 438:8
438:25 442:19
**representation**
54:4 324:23
**representative**
84:15 86:9
**represented**
242:15 339:24
386:8 387:4
**representing**
55:18 221:1
223:14
**represents**
17:25 18:5

Gregory B. Diette, M.D.

Page 521

21:15 28:7
81:24 224:7
327:11 382:9
**reproduced**
26:16
**reproduction**
439:4,6 471:22
**reproductive**
36:7,15 61:2
**reputation**
230:4
**request** 16:24
18:20,21 26:11
26:17 31:3,15
31:24 32:25
97:1 99:15
164:6 192:16
426:2
**requested**
155:11 199:13
231:25
**requests** 6:15
17:15 18:1,6
32:1,14 33:7
**require** 251:10
**required** 315:12
362:9 457:18
**reread** 67:6
**rereviewed**
259:5
**Res** 369:11
**research** 9:8
48:24 97:14,21
101:8,15
102:11 103:2
103:12 107:13
108:3 121:2
128:16,20,25
129:2,5 143:1
143:13 145:20
146:8 147:17
147:22 148:5
149:12,14,17
149:21 150:19
151:3 162:20
163:4,22,24
164:11 190:17

202:4 230:8,13
242:19 262:6
262:10,12,15
294:14 298:15
306:1 308:17
309:21 310:12
313:11 314:19
319:7,15,24
367:10 369:13
369:14 403:3
444:24
**researched**
119:6
**researcher**
34:16 224:13
**researchers**
215:6 225:22
226:4 295:16
309:14 310:1
**researching**
233:8
**resembles**
268:15
**residency** 117:6
117:9,12
**resisted** 273:16
361:10
**resonate** 215:20
215:23
**resonates**
215:22 216:4
217:5
**resources** 311:1
**respect** 67:19
**respected** 260:9
260:13
**respiratory**
142:3
**respond** 32:16
114:17
**response** 6:14
17:14 18:12,20
26:11 28:24
32:25 417:19
418:7 440:4
465:18
**responses** 18:1

**rest** 237:18
244:13 414:21
420:14
**result** 305:25
352:2 382:14
**resulting** 413:9
**results** 69:10
70:18 71:18
256:13 287:3
291:5,7 292:14
292:15 293:6,9
366:24 395:20
407:25
**retain** 194:15,20
**retained** 7:5
51:5 55:5,13
108:21 109:16
136:6,6,25
139:13 140:21
150:18 151:2
171:13 195:1
208:24 228:5
242:4
**retainer** 31:20
**retention** 56:12
**Retire** 9:4,12
**retrograde**
273:3
**return** 472:11
**reveal** 173:19
**review** 10:12,25
11:14 17:3
19:2 20:21
39:15 42:4
43:18 55:22
60:11 82:18
83:3 148:22
149:6,9 153:4
154:1 189:9
190:2 212:17
222:20 240:2,7
241:16 242:24
244:15 253:15
256:10 264:22
264:24 380:25
411:22 422:8
427:20 448:4

455:14 462:15
463:8
**reviewed** 6:22
19:5 20:5,6
42:5,6,15
43:21,23 59:7
59:24 65:18
66:3,8 77:9
80:18 82:13
83:16 111:16
121:21 124:15
157:21 244:18
245:1 246:8
247:2 250:19
251:11 257:23
357:17 373:13
374:6 378:24
381:16 409:9
412:15 438:17
448:25 451:22
452:17 459:23
460:3
**reviewers**
319:10
**reviewing** 30:6
37:11 67:13
185:8 407:5
**RICE** 4:10
**Richard** 4:18
11:25 438:9
**rid** 311:14,16
**ridiculous**
270:16
**right** 14:9,18
15:1,5,8,9,15
15:23 16:22
17:2,5,7,24
18:9,11 20:3
20:18 21:1,11
21:19 22:2,10
22:16 23:4,10
24:1 26:6,25
27:21 30:1,9
30:19 31:1,10
31:15,20 33:13
34:13 36:5,19
37:5,8 39:14

40:24 41:1,5
42:2,4 44:1
45:12,24 46:4
46:7,10,17
47:10 49:3,17
50:6,18 54:10
58:1,13,16,18
58:23,24 61:10
61:25 62:7
63:16,20 65:10
66:15 67:11
70:3 71:21,22
72:4 73:11,23
74:6,10 75:19
77:5 78:15,16
79:24 80:1,2
80:12 81:4,6
82:6 88:3,12
88:13,15 89:14
90:4,8 91:23
92:5,9,12 94:2
94:5,14,16
95:17,20 96:2
96:5,8,15
97:13 99:4
100:17 101:14
101:17,24
102:10 103:11
103:16 106:18
108:21 110:9
110:22 114:8
116:21 119:13
120:13,23,24
121:1,14
122:23,25
123:10 124:4,8
124:14 125:5
128:1,19
130:15 132:11
132:23 134:6
134:12 135:10
135:25 136:18
139:1,15,21
140:13,16,19
141:2,4,9,22
142:5,10
144:15 145:2

Gregory B. Diette, M.D.

145:12,19
149:13 150:24
151:8,22,24
152:3 154:9
155:13 157:3
157:15,19,24
159:2,25
162:10,18
163:2,17 165:5
168:10,17
169:23 170:9
170:19 174:17
177:23,25
178:6 181:4,18
182:10 189:18
189:19 191:2
194:13,16
198:5 203:16
203:20 205:2
206:13,18
207:6,25 208:6
208:17 209:11
210:7,14,24
211:21,23
213:24 214:5
214:10,22
215:11 216:9
216:18 218:20
218:20,22
222:20 224:5
225:5,25
226:17,17
227:5,6,20,20
228:4,25 232:5
236:23 237:5
239:18 242:6
242:15 247:21
253:22 254:4
254:24 255:13
256:20 257:19
258:25 261:18
264:19 267:5
267:14,23
268:24 269:7
269:20 271:2,9
271:12 272:23
273:6 275:8

276:24 278:16
280:2,21 282:5
282:8,19 284:2
284:15 285:1,5
286:15 287:12
288:15 289:6
292:7,24
293:19 295:3
296:16,17,17
298:9 299:18
300:24 301:25
302:3,20 305:5
305:11 306:16
307:22 308:5
310:22 312:25
313:14 314:5
316:3 317:7,24
319:1,6 322:25
323:17 324:11
324:12 327:5
329:10 330:1
332:10 333:23
333:24 334:2
338:7 340:25
343:2 344:9,22
344:25 345:3,9
347:11 348:16
349:14 350:2,4
352:7,18
353:17,19
354:8,18 355:1
355:5,16,19
356:10 357:2,7
358:12,17,23
359:15,18
361:16 362:6
362:13 363:3
365:24,25
366:16,25
367:5 369:7
370:16 371:3,5
375:5 376:14
378:14,22
379:6 380:1
383:9 384:17
385:10 386:10
387:2,20

389:24 390:17
391:22 393:9
393:18,25
394:7,8,15,19
394:22 396:18
397:22,25
398:17,19
399:2,20 401:7
402:23 405:4
405:18,24
407:17 408:17
408:20 411:8
413:2 415:7
416:22 418:2,3
419:21 420:8
424:8 425:8,19
426:12 427:8
427:19 428:13
428:22 429:19
429:21 431:4
434:6,17,24
436:24 438:7
440:12 442:4
448:20 449:11
454:11,17
455:10 456:5
456:21 458:23
460:13 461:4
462:22 465:13
465:17 466:8
466:17
**right-hand**
  327:14 419:13
**Rigler** 65:11
  66:6,11,15,24
  67:14 68:9
  70:25 71:8,18
  72:5,15,16
**Rigler's** 69:10
  70:19
**rings** 303:9
**rise** 387:24
**risk** 6:23 7:23
  8:8 9:20 10:5,9
  45:8 59:2,10
  79:8,10,15
  80:5 125:12,18

126:14 172:23
214:6,6,16,24
215:4,5 216:21
217:10 218:3
219:8,24 220:1
220:12 221:7
221:16 222:5,6
222:18 223:18
223:19 225:15
231:15 233:22
234:14 236:16
237:17 238:3
240:18 248:1,1
262:18,23
263:9,11,13,16
263:18 269:10
285:13 328:9
328:18 329:5
332:14 339:23
339:24 340:9
342:4 343:15
343:16,24
348:13 349:11
352:1,16,16
353:10 359:14
359:23 361:4,4
361:13,14,15
361:15 362:15
362:17 364:11
365:5,17 366:2
366:19,22
368:15 370:25
371:11,12,16
371:23 372:18
372:23,25
373:16,18,20
374:7,8,15,23
376:6 377:25
379:17,17
380:20 383:3
387:17,20,20
389:5 398:1,10
398:14,21,23
399:10 402:1
411:5 413:11
414:17 417:15
421:18 422:23

423:9 446:15
451:18 466:8
466:23
**risks** 235:25
  327:18 336:9
  337:2 339:2,15
  342:7 360:20
  361:12 363:24
  365:4 367:16
  367:21 368:12
  368:16 370:18
  372:11 375:7
  375:18 379:23
  400:5,7 401:2
**Road** 2:6 13:10
**Roberta** 442:20
**ROBINSON** 4:4
**role** 12:4 48:10
  117:25 154:21
  288:18 294:19
  442:20
**roll** 38:7
**Roman** 276:15
**Ron** 309:7
**room** 353:2
**ROSEN** 3:5
  52:5 85:19
  86:13 139:6
  393:3,9 427:4
  437:21,24
**Rosenblatt**
  351:13,23
**rotate** 117:7
**ROTH** 3:20
**Rothman** 8:20
  287:21 290:9
  292:9 317:13
  322:11 361:2
  456:2,3 463:8
  463:8,16
**Rothman's**
  288:8
**roughly** 376:23
**route** 284:21
  285:7 413:11
**row** 333:6
**rows** 334:12

**RPR** 471:18
**RR** 350:25
  351:1 367:3
**RRs** 336:7
**rubbing** 154:13
**rule** 251:19
  315:11 361:23
  362:3
**ruled** 396:4
**ruler** 353:21
**rules** 160:20
  166:6 316:19
  317:4,9,11,12
**run** 208:17
  237:22 314:21
  353:21
**running** 437:17

**S**

**S** 3:1 6:1,8 7:1
  8:1 9:1 10:1
  11:1 12:1 13:1
**Saed** 255:21
  256:2,15 257:4
**Saed's** 256:10
  256:11 257:21
  257:22 258:20
**safe** 46:5 407:22
**safety** 84:7
  234:10
**salad** 268:25
  269:4,5
**sales** 1:6 13:12
  327:11
**saliva** 404:25
  406:3
**sample** 248:25
  249:2 316:8,10
  341:7,11,16
  342:2,13,16,23
**Samuel** 11:20
**Sander** 288:22
  289:1 290:12
  297:21 317:13
**sanitary** 331:14
  332:21,23
  334:17,22

**sat** 179:9 338:23
**saw** 60:19,21
  65:10 69:17
  94:9 182:11
  230:1 231:20
  257:8 296:8,9
  299:4 307:3
  311:4,22
  312:23 313:22
  314:16 409:2,6
  421:24 429:22
**saying** 37:2 40:7
  53:14 82:25
  146:3 164:5
  182:13 189:24
  191:5 219:15
  220:2,8 224:6
  224:22,22
  227:1,10
  237:13 243:18
  251:19 277:4
  279:6 295:1
  305:2 311:17
  330:1 334:2,3
  351:20 359:8
  365:12 368:11
  372:16 374:14
  383:16,24
  385:4 387:19
  424:5 449:18
  450:12 455:2
  456:15 460:4
**says** 23:12 49:9
  50:20 54:18
  55:3 66:10,16
  76:11 84:1
  85:9 95:23
  96:25 97:13
  100:14 102:6
  102:11 103:7
  113:7 114:3
  121:10 189:7
  191:7 206:14
  207:16 214:19
  216:16 219:5
  220:9 273:12
  276:8,18 277:9

  277:22 278:22
  284:2,2,3,17
  300:25 302:3
  302:21,21
  331:10,15
  340:17 365:15
  369:23 386:14
  393:25 394:19
  397:16 401:20
  417:5 419:24
  428:6 429:19
  437:23 439:24
**scale** 353:17,19
  361:17
**scanning** 11:17
  427:11
**scenario** 193:14
  194:4,5
**schedule** 158:2
**Schildkraut**
  351:14 413:4,8
  413:20 436:4,5
**scholar** 242:20
  242:20 244:18
**school** 95:1,21
  95:25 96:4
  100:19,21
  101:21,25
  117:5 215:3
  222:4 223:17
  294:8
**schools** 223:16
**science** 24:19
  25:18 31:18,21
  31:25 32:6
  33:3,5,20 34:2
  56:14 151:23
  152:5,10,18,22
  153:15 154:8
  154:16 155:10
  155:16,18
  156:5 157:4,8
  158:10 159:7
  161:12 162:5
  162:19 163:21
  164:10 165:5
  165:21 166:25

  168:3,17
  170:24 175:14
  178:22 179:7
  179:14 188:20
  189:7 190:15
  190:19,20
  223:22,22
  264:23 315:3
  317:8 381:25
  468:8
**Sciences** 32:11
  32:15
**scientific** 30:7
  30:10 31:11
  35:24 37:11
  39:15 42:18
  56:17 57:12
  59:25 70:13
  120:9 146:8
  162:20 176:13
  177:7 189:9
  209:1 212:18
  222:21,22
  228:7 229:21
  234:11 257:3
  260:4,9 291:4
  291:6 295:19
  303:25 304:21
  319:17 342:14
  360:25 374:6
  375:7 407:24
  411:9 416:4
  436:12,24
  437:1 448:5
  453:15
**scientist** 58:25
  120:4 230:18
  231:2 289:1,12
  450:18
**scientists** 59:23
  60:13 222:22
  223:4,6 295:16
  306:23 307:19
  307:20 310:13
  389:3
**scolding** 301:3
**scoring** 250:18

**screen** 13:7
  85:24 378:17
**Screening** 8:11
**se** 30:21 48:24
  65:3 185:2
  195:1 425:12
**search** 92:17
  147:4,11 164:3
  164:18,20
  240:1,8,22,24
  241:1,4,8,17
  242:2,7 313:6
**searched** 246:21
**searches** 162:24
  238:21,22
  240:5 241:19
**sec** 282:22
**sec-** 100:7
**second** 19:8
  44:14 66:1,9
  96:24 97:13
  100:7 198:10
  214:12,16
  225:19 274:22
  290:12 321:14
  330:15 350:15
  351:3 363:18
  366:7
**secondhand**
  10:5,11 102:14
  107:22 363:20
  363:22,24
  364:1,10
  365:14,23
  366:3,20
  367:10,16,23
  368:2 371:13
  376:14 377:25
  379:10,13,18
  380:2,21 393:8
  402:14,19
  403:3,6,9,14
  403:22 405:11
**secretary**
  176:23
**section** 92:3
  176:7 243:20

Gregory B. Diette, M.D.

| | | | | |
|---|---|---|---|---|
| 243:22 244:14 | 327:15 328:6 | 111:9,21 | 57:6,9 72:1 | 162:5,17 |
| 268:13 278:12 | 328:10,14,17 | 205:25 213:12 | 91:14 112:1 | 180:18,22 |
| 282:9 305:15 | 328:20 329:2,4 | 213:17 214:1 | 207:20 239:5 | 189:12 |
| 357:22 366:19 | 329:8 330:13 | 222:21 226:5 | 283:16 341:14 | **services** 11:22 |
| 416:23 | 332:22 336:24 | 238:3 258:6 | 361:21 388:10 | 13:5 117:7 |
| **sections** 181:21 | 344:23 345:1 | 259:19 281:9 | 390:16 403:1 | 154:19 161:13 |
| **see** 16:22,25 | 353:24 355:13 | 281:10 299:21 | 415:2 447:23 | 180:12,24 |
| 23:7 26:4,7 | 359:4,7,24 | 300:12 304:13 | 451:1 460:7 | 181:7 186:23 |
| 37:4 42:6 | 364:17,22,25 | 311:6 320:6,7 | 462:7 | 187:18,19,24 |
| 44:12 45:10 | 365:3,7,15 | 320:25 329:24 | **sent** 67:19,22 | 192:15 194:6 |
| 50:20 54:11 | 367:4 375:22 | 367:17 368:17 | 153:4 161:23 | 194:24 195:23 |
| 58:7,19 59:13 | 388:15 391:11 | 376:7 386:12 | **sentence** 46:7,15 | 197:21 |
| 63:7,10 66:5,6 | 392:20 394:19 | 386:13 387:22 | 92:24 211:9 | **set** 24:14 44:3 |
| 66:12,13,15,25 | 395:3,7,15 | 391:6 411:19 | 212:14,15 | 47:1 86:24 |
| 67:9 69:6 | 396:1,7,9,20 | 411:21 412:2 | 215:1 223:13 | 89:13 145:14 |
| 74:22 79:14 | 396:21 397:20 | 412:15 413:3 | 227:18 235:14 | 157:24 205:15 |
| 81:4 96:5,6 | 397:25 398:3,6 | 415:12,17 | 276:7,18,20 | 231:10 243:11 |
| 100:1 102:3,10 | 398:9,14,19,25 | 416:11 422:4,8 | 278:14 280:1 | 243:23 286:15 |
| 103:17 104:6 | 399:3,7,8 | 423:8,12,16 | 291:24 302:3 | 291:5 292:13 |
| 104:16,17,18 | 400:24 401:5 | 427:22 431:24 | 306:10 323:2 | 317:11 324:3 |
| 104:24 105:9 | 402:4 409:17 | 436:2,24 437:1 | 366:24 372:7 | 454:19 460:9 |
| 105:24 117:3 | 410:9 413:17 | 437:8 438:17 | 374:20 428:5 | 471:5 |
| 118:21 121:18 | 414:14,19,22 | 440:7 442:5,13 | **sentences** 182:1 | **setting** 105:13 |
| 122:14 123:12 | 418:22 419:23 | 442:25 448:25 | 272:25 306:14 | 105:14 353:1 |
| 124:9,11 134:2 | 424:12,16 | 451:21 452:9 | **separate** 110:2 | **settings** 51:11 |
| 138:13 143:12 | 425:19 427:13 | 452:22 453:2 | 138:18 241:4 | **seven** 331:11 |
| 144:22 148:8 | 427:17 429:23 | 453:16 454:1,1 | 332:24 388:23 | 345:12 467:13 |
| 153:6 157:20 | 432:23 433:10 | 454:12 459:14 | **separately** 18:14 | **severe** 287:12 |
| 168:5 170:10 | 436:10 438:6 | **sees** 104:25 | 136:24 178:18 | **SEYFARTH** |
| 181:20 188:4 | 438:14 441:5,8 | 113:21 | 241:8 | 5:17 |
| 196:15 206:7 | 441:10,12,14 | **segment** 172:22 | **separating** | **Shannon** 175:9 |
| 213:13 214:8 | 443:2,8,10,14 | **select** 244:5,25 | 301:6 | **shape** 91:18 |
| 214:11,17,20 | 443:15,17 | 333:11 344:3 | **September** | 168:23 169:11 |
| 218:24 221:3 | 444:15,25 | **selected** 170:4 | 11:23 140:3 | 169:12 170:24 |
| 224:24 236:2,3 | 455:5 456:9 | 327:11 344:4,5 | 438:8,25 | 170:25 |
| 236:9 237:23 | 457:17 462:16 | 345:4,16 | **sequence** 20:25 | **shaping** 175:24 |
| 254:7 270:23 | **seeing** 41:23 | **selecting** 245:24 | **seriously** 434:20 | **share** 22:22 |
| 271:12 272:9 | 105:17 107:7,8 | 344:12 | **seriousness** | 71:16,17 |
| 272:11 277:10 | 108:14 422:3 | **selection** 251:11 | 133:11 | 156:25 165:4 |
| 283:21 290:3,7 | **seeks** 166:4 | 261:4 345:21 | **serous** 417:12 | 185:17 228:1,7 |
| 290:10,15,19 | **seen** 16:18,20,20 | **sell** 50:13 79:19 | **serum** 423:13 | 228:12,18 |
| 296:6 297:2,4 | 35:1,1,23 36:1 | 80:13 87:19 | **serve** 108:22 | 242:23 261:22 |
| 301:12 302:1 | 36:1,3 51:10 | 385:12 | **served** 18:6 | 309:19 391:1 |
| 305:16 309:17 | 51:12 60:5,8 | **selling** 87:24 | 203:5 340:13 | 438:1 441:22 |
| 312:1,20 | 64:23 65:2 | **send** 164:23 | **service** 8:12 | **shared** 75:15 |
| 313:21,23 | 67:3 74:18 | **senior** 370:13 | 105:2 107:7 | 208:13,24 |
| 315:15,20 | 83:3 110:22 | **sense** 46:8 56:23 | 157:18 159:20 | 209:17 441:20 |

Gregory B. Diette, M.D.

**Sharfenstein** 313:1
**Sharfstein** 313:2 314:9,19 319:16,23
**sharing** 71:16 205:14 212:25
**SHAW** 5:17
**She'll** 385:8
**sheet** 308:15 472:5,6,9,11 474:8
**Sheraton** 2:5 13:9 15:2
**Shih** 421:25
**Shih's** 421:25
**Shirm** 309:8
**shopping** 50:8
**short** 19:17
**shorten** 349:3 426:15
**shorthand** 471:1 471:2,11
**show** 17:17 45:1 52:2,20 80:3 95:8 98:22 138:21 139:1 154:13 213:3,6 235:16 281:22 289:19 296:17 296:22 311:23 312:4 331:20 364:7,9 366:1 390:1 392:24 393:13 396:24 413:20 415:3 431:4,17 432:15 436:6,8 437:12,18 438:7 442:18 462:24
**showed** 358:4 463:22
**Shower** 50:1,2 51:8,8,16,16 74:15,15
**showing** 9:19

378:4
**shown** 215:8 226:12,17,21 415:17 416:10 435:24 437:6,8
**shows** 236:14 237:14 281:10 281:18 353:10 423:17 435:22 436:2
**sick** 104:13
**sickest** 104:12
**side** 60:23 308:20 327:14
**Sidney** 7:22 214:3 215:14 224:24 225:5 225:12 228:16
**Siemiatycki** 172:7
**sign** 206:22 307:14,24,24 307:25 472:6
**signal** 301:7 358:19 359:8 458:25
**signatories** 311:18 312:6 312:17 313:23 314:6
**signature** 208:1
**signatures** 312:15
**signed** 264:10 306:23 307:21 312:2
**significance** 9:5 9:13 286:2,19 295:17 298:14 302:5 303:6 304:1,22 306:25 309:13 309:24 310:1 310:17 311:16 312:8 314:17 316:1 318:10 323:5 357:19

357:20 428:10
**significant** 233:21 234:13 236:16 237:16 237:21 269:13 271:19 278:3 278:15 285:25 286:21 287:4,5 291:8,10 292:15,21 293:15 302:13 303:15 305:25 309:6 318:11 321:8,9,19,20 322:7,8,19,20 323:10,19,20 356:22,24 357:4,11 360:9 365:13 456:8 456:13
**signing** 472:8
**silica** 259:7,12 259:15
**similar** 64:14 188:17 245:11 280:24 335:24
**similarities** 285:23 286:9
**similarly** 49:25 269:18
**simple** 61:16 62:17 64:21 335:20 403:20
**simplify** 201:7 421:2
**simply** 37:12 57:9 287:19 291:6 292:14 293:10,10 327:19 354:1 441:1 453:14 456:6
**Singh** 172:8
**single** 104:7 246:16 247:9 248:13 363:1 371:2 373:9

447:20 458:16 461:23
**sir** 141:6 324:13
**SIRs** 400:8
**sit** 304:14
**site** 417:13
**sitting** 15:1,10 68:4 69:9 121:14 363:10 412:14
**situations** 135:22
**six** 57:24 319:2 401:3
**size** 191:1 248:25 249:2 316:9,10 341:7 341:11 342:2 342:13,16,23 343:1
**sizes** 341:17
**SKADDEN** 5:10
**skilled** 51:21 52:15
**sky** 380:15
**sleep** 34:22 93:23,25 94:1
**slice** 237:7
**slightly** 400:9
**small** 271:18 278:2 282:13 331:16 340:18 342:17,23 360:21,21,25 362:15 363:11 371:7 420:21 451:17
**smaller** 205:19 361:17
**smart** 311:12
**Smith** 182:12,13
**smoke** 10:5,11 10:21 102:15 107:22 363:20 363:22,24 364:1,10 365:4 365:16 366:4

366:20 367:11 367:16,23 368:2 371:13 376:14 378:1,7 379:11,13,18 380:2,21 393:8 393:8 402:14 402:20 403:3,6 403:10,14,22 405:6,11,22 456:24,24
**smoked** 404:12 404:21
**smoker** 379:19 380:22
**smokers** 10:6 364:11 365:13 365:14 366:20 366:23
**smokey** 405:20
**SMRs** 400:8
**snack** 204:14
**snippet** 85:6
**snippets** 83:22 97:25
**Society** 439:5
**Society's** 298:13
**sold** 75:5
**solely** 302:11 303:13,14
**soliciting** 312:14
**somebody** 20:20 49:9 70:14 83:23 90:21 97:2,25 104:20 105:19 107:8 153:3 159:22 160:1,4 173:7 178:1 185:1 188:16 191:6 196:13,22 224:10,12 240:6 255:6 287:13 293:11 324:7 340:20 352:24 376:5 412:23 461:2

Gregory B. Diette, M.D.

**somebody's**
394:14 465:22
**someone's**
191:17
**somewhat**
221:18 256:20
**soon** 93:17
113:25 205:5
**sophisticated**
64:15
**sorry** 23:21
26:20 28:4
43:3 45:3
48:12 58:19
69:25 76:22
85:3 87:9
97:10 99:19
112:20 116:12
126:23 131:18
139:17,19
171:19 172:14
177:3 188:10
210:20 227:14
237:11 243:17
258:8,24 260:5
269:3,21
279:11,12
283:22 316:4
324:7 327:3
330:3,14
345:10 348:17
348:22,22
351:19 364:7
365:23 366:8
368:8 370:2
373:4 379:15
379:25 386:21
391:20 394:10
397:10,11
414:4 419:25
424:5 425:9
431:19 433:3
441:12 446:6,6
446:17 450:13
469:20
**sort** 24:3 49:12
64:18 70:7

78:14 91:18
92:21 110:8
123:16 130:20
144:16 146:15
152:13,16
158:1,4 168:25
175:14,15
176:10 181:23
185:3 195:2
211:24 230:7
241:3 252:7
257:11,17
266:25 267:3
268:24 292:19
297:3 313:21
332:23 343:5
358:13 382:6
383:23 392:17
405:3,20 425:2
425:5 437:5
452:11,13
454:21 456:7
458:14 461:22
462:4,13 468:1
468:24 469:10
**sorted** 242:13
**sorts** 104:14
143:15 181:16
223:9
**sounded** 116:16
199:7
**sounds** 55:19
88:11 118:14
120:13 152:4
164:14 235:12
258:8 295:11
301:21 313:17
344:13 390:15
445:8 447:1
**source** 126:19
127:5 225:7
369:25 376:1
**sources** 370:4
404:24
**South** 3:15
**space** 472:4
**spaced** 407:16

**spaces** 174:19
**speak** 98:6
113:13
**speaker** 115:11
**speaking** 64:19
109:20 115:9
142:2 207:3
213:15 260:14
301:17 326:15
389:14
**special** 9:9
292:12 301:1
308:17 309:3,9
**specialist** 120:4
188:25 254:15
255:14
**specialties** 194:9
**specialty** 260:24
**specific** 68:25
118:3 123:20
131:22 207:1
207:11 223:3
252:1 276:7,12
276:17 277:9
361:11 381:17
**specifically** 67:7
67:13 83:11
122:22 123:9
146:2 182:9
236:7 324:3
331:13 417:12
**specificity**
270:24
**specified** 362:9
362:12
**specimens** 422:2
**spectrum** 451:4
**speculate** 444:9
**speculation**
60:18 75:11
110:16 157:10
158:15 178:13
178:25 186:11
188:6,12
191:21 194:11
195:14 196:2
229:23 230:20

231:4 233:4
235:8 261:2
314:10 430:8
435:6
**speech** 37:17
98:7 114:16
193:6 442:1
**speeches** 37:24
92:13,19 113:3
114:15,15,18
115:14
**speed** 454:16
**spell** 423:25
**spend** 152:2
173:15 175:17
175:25 177:14
183:23
**spent** 23:5 37:10
408:2
**spill** 171:3
**split** 171:5
**spoke** 168:4
468:12
**spontaneously**
126:1
**spur** 206:2
**Square** 5:5
**stab** 103:20
**stack** 30:9
**staff** 171:17,20
171:21,23,24
172:10,21
173:1,1 208:18
**stage** 39:17
40:14 46:23
115:8 454:20
**stakes** 93:2
**stand** 337:4
**standards**
120:11
**standing** 352:14
**standpoint**
263:6
**start** 28:10 66:3
240:4,11
241:11 243:21
355:1

**started** 28:16
29:4,6 189:17
250:14
**starts** 48:25
225:20 236:9
292:10 299:20
394:9 395:9
419:21 432:23
**state** 2:17 38:3
45:19 75:23,23
111:3 112:17
272:10 414:14
432:2 472:3
**stated** 146:1,10
255:18 286:18
395:19 436:13
452:17
**statement** 8:4
36:10 37:21
38:11 46:5,18
46:24 77:7
172:25 217:2,4
217:9,14 220:6
221:22,24
222:7,16
224:17 226:1,6
226:15 235:3
235:22 236:5
236:24 238:6
246:5 273:8
277:9,11
278:22 282:20
291:11 292:25
293:17 295:19
302:17 303:20
304:2 305:3
306:21 420:9
425:7 432:18
432:21 433:16
436:22 445:2
447:23 452:23
452:25
**statements**
234:5 293:3
304:18
**states** 1:1 13:14
36:22 97:14

100:17 103:2
236:12 282:11
303:24 305:18
308:15 309:2
367:14 400:25
434:12 439:2
444:17
**statistical** 9:4,13
286:19 295:7
295:17,18
298:13,14,17
303:6 304:1,22
306:25 309:13
309:24,25
310:17 311:16
312:8 314:17
315:25 318:10
323:5 357:18
**statistically**
233:21 234:13
236:15 237:16
237:21 269:13
271:19 278:3
286:21 287:4,4
287:19 291:7
292:15 302:13
303:15 305:25
309:5 318:10
321:9,19,19
322:7,19
323:19 356:22
356:23 357:4
357:10 360:8
456:13
**statistician** 9:9
293:20,21
295:5 296:24
301:2 307:8,14
308:17,20
309:4
**statisticians**
301:4,10
306:23 307:16
307:17,18
**statistics** 307:10
**stats** 35:13
**status** 309:5

**stay** 299:18
355:14
**stenographic**
13:19
**stenographica...**
471:9
**Stewart** 350:17
351:4
**stick** 421:25
**sticker** 29:20
30:1 86:8
**stickies** 30:15,16
**stood** 280:19
**stop** 133:4
156:12 305:19
337:11 456:15
**stops** 48:25
**store** 50:10 53:5
**story** 254:11
410:13,17
**straight** 24:1,15
178:6
**Straighten**
155:4
**straightforward**
63:13
**strain** 438:15
**strategies** 370:8
**Street** 3:7,15
4:11,20 5:18
**strength** 269:8,8
269:17 318:9
362:7
**stress** 102:19
444:19
**strike** 42:3
46:17 47:8
63:21 64:22
72:15 89:15,19
219:21 275:22
310:6,8,9
**stringing** 273:7
**strong** 214:25
216:22,25
217:5,11
221:22 222:2
269:10 273:15

287:18 293:17
314:23 361:21
362:22 363:7,7
421:11 452:22
**strongest** 392:3
392:4
**strongly** 394:25
**struck** 256:12
257:11
**structure**
190:14
**stuck** 275:8
316:16
**studied** 77:14
150:6,12
370:24 449:1
453:17 467:9
**studies** 9:17,17
10:7 11:4
64:22,23 77:2
77:11,18
121:20 126:9
126:13 141:12
141:15,23
142:1,6,11,15
142:19 144:16
182:6 212:18
215:5 222:5,17
223:18 226:19
233:8 236:13
237:14 238:4
238:13,24
239:1,14
241:12 244:9
244:19,20
245:4,6,18,24
246:2,6,15,16
246:25 247:5
247:16 249:9
250:19 251:4
252:1,6,6,15
252:23 253:1,3
253:7,9,16
254:5 267:24
267:25 268:7,8
269:11 270:9
285:8 286:4,19

286:20 288:11
293:15 305:24
319:2 321:7,17
321:18 322:5,6
323:9,13,18,25
324:3 325:6,6
325:10,12,13
325:25 326:13
327:11 332:22
333:10 334:16
335:25 336:17
338:24 339:3
339:14 341:7,9
341:18,19,21
342:1 343:6
344:7 345:21
345:23,25
349:8,9,19
351:24 352:1
353:9 354:2
355:22 356:8
356:14,21,23
357:8,19,20,23
358:20,20
359:12,15
360:5,6,7,8,21
363:5,20,21
367:20 368:21
368:25 371:10
374:22 376:9
387:4 388:2
390:10 391:8
392:6,12,14,18
395:1,6 397:16
398:20 402:15
403:15,18,20
403:20,25
404:8 405:15
407:2 412:2
415:20 416:5
422:21 425:6
428:7 448:14
448:22,24
452:6 455:14
456:12 459:23
459:25 460:3
460:10 461:4,5

461:6,18,23
462:4,5,17,21
462:24 463:23
464:2
**study** 11:11
21:23 22:9
42:17,17 123:2
142:9 144:14
144:19 146:7
148:10,13,16
182:2,4,16
183:11 184:8
214:25 215:3
222:4,12,14
223:16 232:25
233:11,13,14
233:16 245:11
247:3,23 248:6
248:12 249:15
249:22 250:16
253:16 256:12
257:18 267:15
273:5 282:11
283:8 284:4
287:3,13
296:23 318:16
321:25 322:18
322:19 323:15
327:13,13
328:8 329:1
332:16 334:1,2
334:3 341:14
342:14 343:3
346:7 349:14
356:7 359:12
359:17 364:9
366:2,2 369:3
370:12,14
374:14 381:18
388:3,22
389:12,21
390:13,23
397:22,23
398:6,6,18,24
399:3 402:24
404:11 405:1
405:23 406:13

406:17 408:1
409:12 412:22
413:3,5,8,16
413:22 415:17
416:9,11 417:8
423:23 425:12
428:14,23
429:1 435:22
436:2 437:8
447:3 448:6
461:20 462:10
462:22 463:15
**studying** 102:18
383:5
**stuff** 30:13
70:13 108:12
108:19 181:1
183:18 198:1
200:15 277:5,6
311:13 319:25
373:24
**sturdy** 462:6
**style** 102:21
**subcommittee**
8:6 234:9
235:23
**subject** 124:17
126:19 127:5
128:14,17
472:8
**subjects** 282:13
284:3
**submitted** 21:12
21:21 236:6
262:12,15
**submitting** 23:5
**subscribed**
471:14 474:14
**subset** 286:20
**substance**
173:20 174:4
174:15 176:18
184:2 474:7
**substances**
448:21
**substantive**
183:13 184:10

468:5,7,9
470:6
**substitute**
426:25
**subtlety** 136:18
**subtypes** 417:14
**success** 316:18
**succinct** 70:12
**such-and-such**
276:25
**suddenly** 462:6
**sued** 109:8
**suffered** 250:5
**sufficient** 26:24
59:17 80:4
90:7 125:23
126:6 212:19
379:9 386:9,11
387:11 396:4
403:25 404:1,2
404:2,7 457:6
457:22
**suggest** 182:1
188:14 356:13
469:17,22
470:5
**suggested**
285:11 320:13
**suggesting**
160:25 320:11
**suggestions**
176:13 177:7
**suggests** 236:18
271:18 278:2
293:11 444:23
**Suite** 3:8 4:12
4:20 5:5
**sum** 388:9
**summaries**
165:9,20,23
167:1 168:2,9
168:16 170:6
**summarize**
165:6 309:9
343:12 356:11
**Summarizing**
236:10,12

**summary**
167:23 172:9
211:7,13
272:20 359:14
361:4 373:11
376:4
**summed** 286:24
**summer** 224:11
**super** 303:19
372:15
**superiors**
208:19
**supervision**
471:24
**supplement**
393:4
**supplemental**
6:21 19:5 20:4
20:6 21:15
34:5
**Supplementary**
9:12
**supply** 110:7
**support** 87:23
89:18,23
194:24 211:16
234:5 273:6,8
312:7 320:8
321:1 364:22
415:22 416:5
421:12 422:22
439:7 441:16
441:24,25
468:13,17,18
469:5,14
**supported**
418:15
**supportive**
246:19 418:22
436:21,21
445:21 463:4
**supports** 37:3
273:3 384:6
419:25 420:22
423:8
**supposed** 385:3
454:15

**sure** 16:2 20:14
21:7,24 24:13
26:8,10,15
30:24 32:15
39:24 41:19,22
44:6,10 46:4
47:17,24 48:2
49:1 53:8,23
63:3 64:21
65:21 68:20
71:14 76:7
79:5 81:10
86:19 88:21
91:1 92:3 93:1
93:2 103:20,22
103:23 108:12
111:12,14
113:18 116:3
117:2 118:5
122:1 135:7
141:8,19
151:11 155:21
164:16 166:23
167:15 170:5
170:16 173:3
173:23 175:4
175:10 177:4
182:6,17 199:9
201:2 211:14
213:16 226:22
227:15 230:25
243:15 245:19
281:5,10
284:24 285:10
291:23 293:8
295:1,2 296:13
299:8 300:11
301:23 303:8
315:18 326:10
331:8 333:6
347:24 349:1
350:8,17
351:21 355:2,8
355:18 358:10
361:5 364:24
373:12 375:9
375:11 377:4

382:22 390:3
400:2,15
407:15 414:2
426:11 445:11
445:11 450:15
459:8 469:22
**Surgeon** 10:21
364:3 378:4,7
379:7,24
380:18 393:4
**surgery** 63:6
412:6
**surprise** 147:7,9
198:19
**surprised** 15:13
15:17
**surveying** 407:5
407:20
**Susan** 7:6 81:9
**susceptibility**
102:22 108:5
**susceptible** 47:5
**suspected**
123:18 125:25
**swamp** 93:11
**swell** 320:8,25
**sworn** 13:23
471:6 474:14
**symptom**
104:21
**symptoms** 7:24
214:7 371:6
**system** 36:8,15
104:9,13,14
250:18
**systematic**
10:12 11:13
242:24

---

**T**

**T** 5:16 6:1,1,8
7:1 8:1 9:1
10:1 11:1 12:1
473:2
**T-A-H-E-R**
424:2
**table** 11:4 171:5

Gregory B. Diette, M.D.

Page 529

171:5 250:8,10
328:9,25
330:10 334:21
336:8,9 340:24
350:23,25
351:2 394:5
396:20,21
397:14 399:14
**tables** 257:14
**Taher** 266:25
271:17 278:1
359:12,17
423:22,23
424:5,12
**take** 23:9 41:13
42:20 44:11
56:15 82:17
92:20 99:11
103:19 136:5
139:8 153:3
154:12 183:25
190:4 203:22
204:2,12,15
209:25 213:13
216:18 255:8
257:18 263:8
263:15 268:18
282:24 298:9
299:25 300:6
300:16 308:11
320:15,17
329:13 340:5
340:17 343:15
353:21 365:7
369:15 377:8
386:18 387:15
388:2,3 416:16
426:9 430:22
431:22 434:20
439:17 440:1,1
440:3 446:17
454:21
**taken** 14:13
15:11 19:17
81:21,22
197:23 471:4
**takes** 383:20

**talc** 8:11 9:21
11:12,18 55:3
75:25 76:13,16
76:21,25 78:21
126:19 127:5
134:10 211:19
215:4,6 222:5
223:17 225:22
240:16 259:10
259:11,15,16
259:17,18,23
259:25 261:14
270:10 271:21
273:1 278:5
280:25 281:3
285:13,15,19
286:2 329:1
331:2 339:22
345:1 359:3
384:20 399:22
400:13,16
401:4,8,20,21
401:23 412:8
412:11,16,23
416:6 417:11
417:14,17
418:16,17
422:12 423:19
424:14 427:12
428:6,8,20
429:6,19 432:3
432:10 433:6
434:1 435:23
436:25 437:9
439:9,12 448:8
448:16,16,19
449:2 452:15
452:18 453:19
**talc's** 422:10
**Talc/Ovarian**
9:16
**talcs** 285:24
286:9
**talcum** 1:5
13:11 28:14,19
49:3 50:7,13
59:3,11 60:2

63:23 64:5,24
69:11 72:6,18
74:23 75:4
76:2 77:12,14
77:14 78:3,10
78:17 79:17
80:9,13 84:11
84:16,21 89:15
89:17,19,21,23
109:21 111:2,7
111:9 120:20
126:9,14,19
127:11 128:17
129:3,13,25
130:25 131:15
132:7 134:15
134:19 135:5
135:14 136:7
136:20 137:2
137:20 138:8
140:22 142:12
142:16 148:16
149:21 150:20
151:4 163:3,7
163:13,18
164:12 165:24
167:2,12 187:6
199:1,12,25
200:3,10,22
201:3,9,23
202:21 203:1
209:18 210:23
211:17 212:21
214:19,23
216:20 217:9
218:2 219:7
220:11 221:5
231:16 233:23
234:10,12,21
236:14 237:15
240:17 241:7
241:10 261:14
262:7 263:15
263:16 264:1,2
266:17 272:15
273:22 274:14
275:1 276:1

278:22 279:1
280:23 329:6
368:17 382:12
384:5,7,18
385:21,23
406:14 407:7
410:22 411:5
411:10,22
415:8,15,21,23
435:17 436:13
451:24 453:5
460:10,11,25
462:19 464:3
**talk** 24:24 31:5
31:6 34:1
40:10 44:2
46:8,9 59:15
59:20 71:12
80:19 86:20
99:9 121:1
125:6,12
151:22 156:22
163:6 177:21
184:14,16,24
184:25 211:22
216:2 219:16
238:7 239:21
243:3,5 250:25
297:13 314:19
315:18 319:15
337:13 360:19
361:8 374:20
376:21 399:20
444:11 447:2
454:25 459:14
461:22 463:7
**talk-** 28:17
**talked** 141:9
153:5 162:16
203:15 335:23
355:21,25
428:15 435:15
435:16,23
436:4,4 452:4
457:18
**talking** 28:12
40:24 47:25

58:1,11,22
69:25 72:21
73:25 74:1,4
79:25 80:6
81:3 90:4,9
99:21 111:1
117:15,17
118:7,19 135:9
136:24 163:9
167:7,9,10,15
167:16 170:7
170:19 174:16
192:13 195:8
197:19 199:25
201:3 223:2,11
241:6 244:17
245:3 246:14
247:4 262:20
263:10 276:23
280:20 299:8
303:7,11 315:1
317:22 321:3
323:4 337:14
375:23 384:23
386:10 387:5
387:23 390:7
393:7 402:5
403:21 406:8
408:10 409:23
412:4 419:7
421:25 447:24
449:12 452:5
454:5,7,8,9
455:24 456:2
459:10,13
461:13 465:14
466:7,10,14,18
**talks** 92:2
214:13 278:14
418:10
**task** 190:4 462:8
**tasks** 178:18
**Taylor** 8:22
**team** 175:18,25
**teaming** 132:24
**tear** 29:22 343:5
**technical** 196:20

| | | | | |
|---|---|---|---|---|
| 269:6 | 90:9 144:8 | 355:23 356:11 | **thereof** 304:1,23 | 463:12 468:24 |
| **Tecum** 6:13,18 | 224:22 225:9 | 356:12 407:21 | 471:11,14 | **think** 14:16 17:9 |
| **tell** 26:21 50:17 | 240:1,8,20 | 412:15 415:9 | **thing** 32:9 85:11 | 18:8 20:24 |
| 51:24 69:9 | 245:6 260:13 | 429:15 432:6 | 86:16 111:24 | 24:18 25:20 |
| 73:11 79:9 | 335:1 337:7 | 436:18 449:7 | 118:7 164:15 | 28:21 29:15 |
| 122:12 141:8 | 347:25 363:11 | 453:8 471:7 | 205:24 212:12 | 30:16,20 40:3 |
| 143:9 157:11 | 452:5 456:24 | **testing** 64:4,19 | 215:1,2 248:14 | 41:19 42:25 |
| 157:15 162:4 | **terrible** 461:25 | 69:10 70:8 | 277:3 287:18 | 43:21 46:3 |
| 179:1 183:16 | 462:1 | 74:12,22 | 299:7 309:6 | 48:8 49:13 |
| 186:2 192:24 | **Terry** 238:1 | 120:10,14,16 | 313:20 324:8 | 53:16 56:9 |
| 218:17 219:9 | 463:18,18 | 120:20 291:10 | 408:11 425:3 | 57:25 65:2 |
| 245:23 248:5 | **test** 37:9 70:18 | 292:21 302:5 | 445:8 447:4 | 67:4,6,8,18 |
| 248:11 249:8 | 71:18 207:22 | 315:11 316:11 | 456:1 469:10 | 68:12,13 70:15 |
| 249:14,21 | 424:21 | **tests** 64:17 72:17 | **things** 20:16 | 71:20 73:11,24 |
| 250:4,17 | **tested** 63:23 | **text** 265:11 | 21:3,19 52:17 | 74:4,18 75:21 |
| 273:14 277:11 | 64:24 72:7 | 331:10 | 59:15 61:11 | 77:9 79:5,7,23 |
| 283:15 320:15 | **testified** 13:24 | **thank** 19:19,20 | 64:18 69:1 | 85:18 88:12 |
| 334:4 341:24 | 159:16,17 | 19:25 35:18 | 73:2 92:3 97:7 | 90:10,17,20,21 |
| 342:3 344:18 | 177:16 206:24 | 39:2 44:24 | 104:19 116:8 | 90:22,24 93:22 |
| 387:23 389:10 | 207:9 233:19 | 45:5 54:8 58:6 | 117:3 125:22 | 97:6 106:9,12 |
| 390:2 391:7 | 234:8,11 | 63:2 74:10 | 130:19 142:2,3 | 106:23 107:25 |
| 405:17 468:16 | 384:14 428:16 | 76:23 80:23 | 143:11,16 | 109:19 112:20 |
| 469:6 | 431:21 432:1 | 87:8,22 88:25 | 144:16 146:18 | 113:5 116:9,20 |
| **telling** 160:13 | **testify** 137:1 | 89:13 100:5,11 | 158:3,6 162:11 | 117:2 118:2,16 |
| 460:15,18 | 138:3 160:11 | 101:18 119:5 | 162:12 168:22 | 120:13 121:17 |
| **tells** 434:8 | 466:18 | 127:1 139:5,9 | 168:25 169:3 | 124:25,25 |
| **temporality** | **testifying** | 147:1,2 188:12 | 170:6 171:3 | 126:21 130:7,8 |
| 269:19 270:19 | 160:24 206:3 | 210:2 215:11 | 175:15 176:10 | 131:16,21 |
| 270:19 | **testimony** 7:20 | 227:4,9 252:4 | 178:16 183:24 | 133:13 135:12 |
| **ten** 33:5 130:5 | 20:23 32:2 | 272:4 282:7 | 202:11 203:19 | 136:20 137:23 |
| 137:13 152:14 | 43:19,22 67:12 | 283:23 287:10 | 215:19 223:9 | 138:10 139:6 |
| 152:19,20 | 67:16 88:7 | 325:2,21 327:7 | 224:15 239:3 | 139:19 140:8 |
| 155:14,20,24 | 109:17 129:19 | 327:7 330:17 | 239:12 253:24 | 142:7,9 143:11 |
| 185:15 189:18 | 132:13 137:25 | 338:18 349:6 | 256:21 257:10 | 143:21 150:23 |
| 331:10 333:5 | 138:12 139:18 | 364:18 377:20 | 263:1 266:9,20 | 152:7 153:2,9 |
| 340:18 341:2 | 139:24,25 | 381:13 397:8 | 269:12 273:7 | 154:18 161:3,9 |
| 343:23 344:14 | 150:22 151:7 | 400:10,10,11 | 291:16 308:13 | 162:7,8,10,17 |
| **tend** 70:7 | 153:18 163:2 | 419:17 431:3 | 308:14 310:22 | 162:18,23 |
| **tens** 155:24 | 163:15 171:12 | 431:20 437:13 | 311:3 332:6 | 163:1,8 164:14 |
| 408:1 | 172:12 176:3 | 443:7 470:12 | 334:24 340:24 | 165:8 166:21 |
| **term** 196:20 | 191:15 205:25 | 470:13,14 | 357:23 375:2 | 167:22 170:17 |
| 269:6 447:1,6 | 206:8 232:1 | **thanks** 14:3 | 385:2 386:5 | 182:23 184:12 |
| 450:25 459:7 | 233:20 237:3 | 82:15 166:11 | 404:3 412:7,9 | 185:21 189:22 |
| **terminology** | 259:4 264:5 | 301:9 470:10 | 412:10 415:2 | 191:23 195:8 |
| 73:10 130:6 | 279:9,14 315:6 | **theory** 76:14 | 426:15 442:4 | 197:8,25 |
| **terms** 20:24 | 323:22 336:22 | 201:13,17 | 452:4,13 | 198:11 199:23 |
| 70:12 73:21 | 345:4,15 | 420:23 439:8 | 459:15 462:12 | 201:21 202:11 |

205:24 206:21
210:13 211:23
217:1,3,16
218:18,25
219:18 220:7,8
221:12 223:8
223:10 224:5
226:6,8 229:18
229:25 230:16
230:17,18
237:1,3,23
238:4 240:18
243:2 244:12
245:22 246:14
252:17 253:13
253:18 254:20
255:3,5 257:25
258:8 260:1
264:15,17
270:24 272:18
273:8 276:22
276:23 278:18
278:21 279:11
279:15,18,19
280:20,22
281:9 283:7,15
287:12,15,17
293:4,14,17,17
294:16 296:9
297:11 301:20
301:21 303:10
303:12 305:1,2
306:9,9,13,15
306:19 311:11
311:12 315:20
319:16 321:24
321:25 322:10
322:13 323:3
323:14 325:19
330:7 331:6
332:17 334:8
337:1,7 340:12
340:17 342:20
343:8,19,20,22
345:12 352:12
353:16,20
355:24 356:9

358:8,11,18,22
358:23,23
361:9,12,19
362:1,11,12
364:3 371:9
372:17 374:1
374:13 375:23
380:13 386:24
387:1 388:1,8
388:16 389:21
389:22 390:6
390:22 392:2
392:10,11,13
392:18 394:11
401:19,23,24
410:10 412:3
418:14 421:11
425:11 430:15
432:6 435:9
436:1,19
447:21 451:7
451:11,12,13
452:10 456:2,9
456:10 458:15
460:24 463:14
464:10 466:7
469:1,3
**thinking** 40:1
48:16 49:10
70:1 144:7
392:21
**thinks** 361:20
434:9
**third** 8:20 48:3
64:10 101:7
236:8 290:2,14
290:18 369:22
389:21 432:22
**third-party**
176:20
**thirty** 472:12
**THOMAS** 3:13
5:16
**thoroughly**
322:1
**thought** 66:19
69:25 72:22

116:12,16
190:10 206:2
227:9,11,16
238:24 241:6
251:22 254:6
257:18 291:16
294:22 307:15
307:17 316:22
366:8,10
461:21
**thought-prov...**
301:9
**thoughts** 126:2
233:10
**thousands** 408:1
**three** 22:18 23:7
43:14 57:14
183:12 245:7,8
245:8,9 267:15
290:6 297:13
318:3 331:11
349:20 350:6,7
390:11 430:16
432:22 459:25
459:25
**threshold**
302:14 305:21
318:19 319:9
319:13 362:9
362:12
**threw** 440:14
**throw** 29:23
**Tiernan** 8:5
**tight** 44:3
**Tim** 289:12
290:14
**time** 13:6 19:10
19:13 21:1
23:1 27:13,15
27:19 42:20
44:15,18 46:13
49:12 55:24
57:11 71:12
83:3 88:20,22
89:3,6 91:2,13
114:8 117:16
128:8 151:10

151:16,19
152:2 153:2
163:17 173:15
175:17,25
176:5 177:13
177:13 178:1,7
183:23,24
185:6,12
187:17 189:25
197:24 202:19
204:5,19,22
218:22 227:22
229:25 241:15
257:24 258:9
258:21 265:13
270:20,21
280:6,10,13
282:24 299:14
301:17 314:16
315:19 320:18
320:21 338:13
338:16 349:4
349:22 374:5
376:22 377:9
377:12 381:10
387:9 426:14
426:16,19
447:10,13
464:12,15,19
464:22 470:11
470:16 471:5,6
471:8
**timeline** 29:9
**times** 14:13 28:8
57:15,24
117:21 155:17
189:6 259:3
389:6 453:23
**Timothy** 289:6
289:12
**tiny** 361:16
371:14
**TISI** 3:12 100:9
132:21,24
289:21 431:8
**tissue** 282:14
284:10

**title** 297:5
389:17,18
**Tobacco** 10:20
378:7
**today** 13:16,20
15:2,13 19:22
19:24 22:22
27:9 34:6,7
43:19 53:7
68:5 69:9
71:16 75:5
111:17 121:14
130:22 145:3
157:25 160:11
161:4 205:14
205:23 257:21
298:7 300:21
318:9 329:24
338:23 340:5
363:10 367:25
412:14 427:2
433:19 435:15
462:16 467:25
468:12 469:4
**Today's** 13:6
**Todd** 1:25 2:16
13:20 471:18
**toe** 107:11
**told** 15:14 115:6
162:11 221:1
244:16 430:9
454:18
**tolerance** 84:10
**Tom** 325:19
348:23 430:13
430:18,18,18
430:18 431:9
**ton** 373:23
**tone** 106:7,9
113:14,19
115:2
**tools** 238:23
**top** 66:7 84:1
93:9 95:23
161:15 197:10
243:8 284:16
284:18 328:8

396:21 414:20
**topic** 48:15
77:10 123:22
124:13 128:25
129:3,12
131:12,24
134:15 140:21
144:13 150:3
151:4 156:3
163:23 164:11
189:9 199:14
200:3 203:1
223:3,11 232:6
240:7 245:10
303:12 313:18
315:18 408:25
448:15 453:17
**topics** 141:25
143:13,14,15
162:25 254:15
260:2
**tore** 30:3
**total** 179:23
388:9 420:25
462:20 463:3
**totality** 383:21
384:3
**totally** 204:18
**touched** 69:5
**touching** 332:5
**tough** 332:17
**Towson** 1:16 2:7
13:10 15:2
**Toxicological**
262:3,5
**toxicologist**
119:17
**Toxicology**
262:9
**toxin** 450:21
**toxins** 120:11
**Trabert** 22:9
**track** 327:10
**traction** 315:15
**traffic-related**
376:2
**trailed** 348:25

**trained** 52:15
**training** 117:5,6
230:1
**transcribed**
471:10
**transcript** 6:9
7:2 8:2 9:2
10:2 11:2 12:2
22:13 86:3
471:10,12,21
472:13,14
**transcription**
474:4
**transcripts** 60:8
167:24 231:21
**Translational**
9:8 294:14
308:16 309:21
310:12
**transport** 273:3
284:19 285:6
**transvaginal**
284:21 285:7
413:11
**traveled** 230:12
**treat** 60:14 62:1
62:1
**treatment** 61:6
63:12 115:23
116:6,25 118:9
**treats** 61:1
**trending** 352:8
**trial** 128:10
138:3 188:14
**trials** 128:4,6,12
128:16 246:21
**trick** 133:7
**tricky** 41:18
**tried** 238:12,18
238:24 239:2
240:13 245:17
245:19 246:1
246:16 247:8
251:7 333:14
338:25 358:22
359:1 447:22
461:19

**tripping** 184:24
**trouble** 87:5
**true** 41:24 90:22
90:24 103:15
108:7 121:13
218:4,25 226:6
226:6 257:24
294:25 303:3,9
314:7 381:10
383:24 384:4
388:11 418:21
418:23 436:2
437:7 455:11
458:19 465:25
466:21 471:10
**Trust** 219:17
**truth** 37:2
331:22,25
463:5 469:19
469:24 470:7
**truthful** 14:23
434:19
**truthfully** 73:19
160:11 274:18
**try** 32:19 38:5
48:3 55:20
111:25 115:10
133:6 149:11
179:21 183:24
198:12,14
216:15 266:16
310:22 352:23
408:10 463:7
**trying** 48:8 53:6
73:3 106:10,12
118:13 122:3
130:14 131:21
133:7 135:6
156:16 167:15
168:6,12
170:24 172:18
177:19,19
179:20 184:6
184:24 189:19
190:3 191:13
194:13 198:12
200:24 202:19

246:2 251:14
257:11 266:15
266:20 278:18
284:25 288:16
294:16 296:8
311:21 331:6
337:1 338:20
340:14 342:11
343:7,9,11
352:12,13
360:2 361:10
376:23 385:2
386:22 453:12
453:14 462:9
469:1
**tubal** 285:16
**tubes** 417:18
**TUESDAY** 1:17
**turn** 52:21
193:24 210:24
212:1,2 214:16
244:14 256:5
305:5 324:2
394:6 423:20
**turned** 227:2
**turns** 104:21
**twice** 245:15
345:13,18
**two** 22:18 43:15
73:2 92:25
101:3 112:21
121:24 131:4
139:7 183:11
196:25 217:17
218:25 243:7,8
256:11 258:9
285:24 305:24
306:10 308:14
312:3 313:10
314:3 321:12
323:9,18
346:11,13
349:14,20
350:6,7 351:12
351:14 354:24
354:25 360:15
388:16,17

389:22,23
432:22 441:20
**two-minute**
176:6
**two-sided** 140:8
**type** 56:7 64:8
102:1 134:25
158:6 165:24
167:1 180:18
188:2 250:4
269:16 358:4
360:24 368:3
392:18 458:5,6
458:8 469:14
**typed** 20:20
**types** 103:17
180:11 267:15
359:11 368:1
401:3 404:18
**typical** 387:7
465:16
**typically** 266:6
**typing** 20:9
91:15
**typo** 94:8
**typos** 168:24
176:9 181:17
469:7
**Tzonou** 351:23
352:15

---
**U**

**Uh** 328:21
**ultimately** 239:8
**Ultrastructural**
11:15 427:9
**Um** 344:24
379:25
**uncertain**
417:16 418:3
**uncertainty**
301:8 455:1,4
455:5
**unclear** 28:22
62:14,16
283:18 284:6
286:4

Gregory B. Diette, M.D.

Page 533

uncontroverted 233:20
underbelly 360:3
undergraduate 94:23
underlying 326:13 392:13 443:11
Underneath 350:19
underpinning 72:2
underpinnings 205:20 254:2
underpowered 342:17
undersigned 471:2
understand 14:6 14:12,17,20,22 24:5 29:13 32:10,13 37:9 41:17 60:12,15 64:12 67:11,23 73:9,25 81:25 82:3,4 103:21 109:20 121:8 124:24 133:9 135:7 144:4 154:11 162:2 167:14 177:20 179:21 180:8 180:10 191:14 207:6,17 232:24 233:5 251:14 253:21 253:24 254:1 254:10 255:9 256:22 257:17 266:8 318:8 326:21 352:12 354:20 375:5 382:17,20,21 385:20 389:16 400:15 408:8 410:24 411:3

422:15 428:22 428:25 440:16 448:12 450:12 453:14 460:20
understanding 17:24 39:15 40:13,18 51:14 52:14 59:22 64:3 72:4,10 109:2,14,24 110:3,10 130:24 158:9 166:19 170:25 176:21 178:9 180:11 363:23 405:5
understandings 33:3
understands 80:21 330:7
understood 61:12 70:15 80:22 144:5 156:22 203:6 381:10
undertaken 394:2
underway 286:5
underwear 331:14
unexposed 366:21 428:16 428:16
unfortunately 237:4
uniformly 461:4
uninformative 343:24
unique 247:14
unit 104:10 105:13,23,24 105:25 106:1
United 1:1 13:14 36:22 367:14 434:12
universe 251:14 293:12

university 15:6 93:19 100:19 153:12 208:10 223:14 224:17 314:9 320:3
unprecedented 462:2
unpublished 359:22
unravel 245:16
unreliable 331:17 340:19
update 242:6
updated 213:18
updating 92:4 92:23
upper 285:1
upside 449:14 463:1,17
urgency 315:8 315:22
urgent 93:8
urging 295:20 309:23
urine 404:25 405:25
usage 50:20
use 9:21 11:9,12 46:12 51:17 54:21 59:10 71:9 75:6 76:16,21,25 78:18 80:14 84:23 93:4 119:23 149:4 154:19 168:1 195:23 198:15 211:17 214:23 216:20 217:9 218:2 219:7,22 220:11 221:5 233:23 240:13 242:18 263:12 264:2 272:15 273:21 274:14 290:24 291:9 292:20 307:10

309:5,12,24,25 311:1 316:16 316:19 317:9 317:10 329:1,5 330:11 331:2 331:13 332:24 334:18 339:22 340:8 343:25 344:14,25 345:1 346:21 361:2,18 362:13 368:12 392:2 404:9,18 413:9 414:17 417:11,15 421:17 428:6 446:25
useful 29:23 239:9
users 280:23 281:1 331:10 365:5,17 428:20
USGS 400:25
usual 14:4,11 449:14
uterine 417:18
uterus 254:9 412:7
utilize 186:23

——————
V
——————

V 3:12
vagina 411:11 411:23 412:7 416:7 417:17 418:6 433:8 435:2 449:16
vaginal 285:11 430:3
vaginas 254:9 254:12
vague 111:23 149:24 220:5 230:11 231:4
Valentin 9:13
valid 239:15

342:5 461:14
validated 460:25
validity 239:22
Valley 2:6 13:10
value 341:1
variables 249:22
variety 203:18 359:4 363:4 404:9,24
various 165:15 171:12 242:25 341:17 455:14
vast 245:19
Venter 285:9
verbally 244:16
verify 20:16
version 213:17
versus 318:10 348:8 356:8 357:19 366:20
vertical 353:18
vice 294:6
video 13:7,8
videographer 5:23 13:3,5 14:7 19:10,13 19:23 44:15,18 44:23 89:3,6 89:10 151:16 151:19 204:19 204:22 280:10 280:13 320:18 320:21 338:13 338:16 376:25 377:9,12,22 426:16,19 447:10,13 464:12,15,19 464:22 467:13 470:16
videotaped 1:14 6:11,16 17:16 470:18
view 171:8 225:10 246:19 306:19,20

Gregory B. Diette, M.D.

| | | | | |
|---|---|---|---|---|
| **violates** 160:19 | 65:20 73:14 | 346:21 | 146:18 165:4 | 347:14 351:19 |
| **violating** 337:24 | 86:22 93:2,11 | **wanting** 172:24 | 172:17 183:22 | 365:9 393:4 |
| **violative** 160:21 | 93:16 96:15 | **wants** 223:15 | 190:5 196:21 | 396:24 400:19 |
| **virtually** 198:19 | 99:5,6 103:19 | 439:16,24 | 198:14 201:8 | 404:9 406:10 |
| **virtue** 395:21 | 114:25 122:14 | 444:10 | 207:19 211:23 | 416:17 437:12 |
| **vitae** 7:9 91:3,11 | 140:11 151:22 | **War** 226:19 | 215:4 217:16 | 444:13 |
| 91:24 92:10 | 152:16 159:4 | 392:22 | 219:1 222:5 | **we're** 14:9 19:11 |
| 127:10,19 | 160:5 161:15 | **warmer** 44:8 | 223:18 229:15 | 19:14,16 27:8 |
| 146:10 364:21 | 162:2,4 168:8 | **warning** 51:16 | 230:11 238:19 | 28:12 32:18 |
| 390:10 | 175:24 176:7 | 51:24 54:18 | 244:11 258:8 | 33:15 34:1 |
| **vitro** 252:1,6,14 | 180:8,10 | 57:2,22 58:1 | 263:12 275:8 | 37:23 44:1,16 |
| 252:15,23 | 183:17,19,20 | 58:12 75:6 | 283:13 301:11 | 44:23 47:24 |
| 253:15 | 183:21,22 | 295:19 | 342:25 371:2 | 58:1,5,22 |
| **vivo** 252:14 | 189:8 203:20 | **warnings** 51:22 | 375:24 377:14 | 72:21 73:25 |
| 253:1,15 | 203:21,22,25 | 56:22 | 382:5 401:17 | 74:1 77:24 |
| **vocabulary** | 204:2,10,11,12 | **Washington** 3:9 | 404:22 405:21 | 81:3,18 82:8 |
| 447:2 | 204:15 217:19 | 4:13 5:12,19 | 415:4,16 | 85:5 86:20 |
| **voice** 81:24 | 241:23 251:18 | **wasn't** 29:23 | 429:13 447:1 | 89:4,7 105:18 |
| 115:7,8 | 252:12 254:1 | 47:15 50:15 | 454:14 456:9 | 113:5,21 114:2 |
| **void** 471:13 | 276:18 279:13 | 61:14 139:19 | 456:10 465:19 | 118:7 130:21 |
| **volume** 10:24 | 293:3 316:7,18 | 156:25 179:23 | 467:24 | 136:24 151:17 |
| 195:21 296:24 | 317:3,7 319:2 | 188:15 216:12 | **ways** 46:11 | 156:16 163:9 |
| 405:20 | 319:7,8,14 | 231:6,6 246:2 | 115:11 219:19 | 167:7,9,9,15 |
| **vote** 455:15,25 | 320:16 326:7 | 246:19 250:20 | 223:23 224:5 | 167:16 170:7,9 |
| **vulnerable** | 326:17 331:22 | 250:23 252:21 | 285:23 314:13 | 172:14 183:18 |
| 370:7 | 331:23,24 | 253:23 283:11 | 317:1 403:19 | 197:19 199:23 |
| | 332:2 337:6 | 320:1 323:10 | 445:21 | 201:14 204:23 |
| **W** | 338:6 341:11 | 342:10,10 | **we'll** 14:10 19:2 | 209:10 213:23 |
| **wait** 61:18 62:21 | 341:12 343:24 | 343:4,5,9 | 19:18 25:23 | 216:3 223:11 |
| 68:23,23,23 | 344:11 351:6 | 345:10 389:25 | 29:9 40:10 | 229:4 245:3 |
| 144:1 200:13 | 353:4,20 | 391:10 425:1 | 52:9 59:20 | 246:14 247:4 |
| 210:17 234:17 | 358:12,25 | 462:8,9 | 83:12 91:3 | 263:10 280:14 |
| 234:17 247:7 | 363:17 372:15 | **Wasserstein** | 95:8 98:22 | 280:20 289:21 |
| 258:14 270:2 | 374:4 377:3 | 298:6 309:7,22 | 132:17 138:14 | 294:11 299:7 |
| 274:22 275:13 | 379:6 384:12 | 310:15 320:12 | 138:17,21 | 304:13 311:14 |
| 276:13,13 | 394:6 399:24 | **Wassertine** | 139:8 151:15 | 311:15 317:22 |
| 293:2 303:1,1 | 413:25 424:16 | 310:15 | 152:2,12 211:1 | 320:19,22 |
| 318:2 335:5 | 425:9 430:21 | **waste** 27:13,15 | 212:8 213:3,7 | 323:3 338:5,14 |
| 346:4 358:8 | 432:15 438:15 | 218:21 306:1 | 235:16 238:7 | 338:17 342:20 |
| 361:25 377:6 | 438:18 440:19 | **watered** 221:12 | 250:25 267:7 | 350:2 359:11 |
| 444:12 466:11 | 449:21 465:13 | **way** 17:9 39:9 | 271:11 275:11 | 365:10 372:16 |
| 467:14 | **wanted** 29:21 | 40:5 41:19 | 291:19 297:13 | 376:22 377:10 |
| **walk** 218:20 | 30:2 32:25 | 46:4 59:15,16 | 299:19 311:23 | 377:13,14 |
| **want** 18:17 | 40:1 99:16,25 | 69:7 71:20 | 312:4 315:15 | 387:21,23 |
| 20:14 24:6,24 | 190:2 194:23 | 73:3 74:6 | 320:17 326:14 | 408:10 412:4 |
| 27:14 32:15,22 | 251:20 253:20 | 75:12 105:18 | 328:14 337:16 | 419:7 426:17 |
| 42:9 62:9 | 275:19 313:21 | 107:24 108:19 | 338:6,11,11 | 426:20,24 |

Gregory B. Diette, M.D.

447:11,14,24
449:12 452:5
454:8,9 455:24
459:10 463:6
464:13,16,20
464:23 465:14
466:7
**we've** 57:23
58:11 85:4
157:17 226:4
316:19 317:10
317:10 329:24
349:8 358:11
359:18,22
368:16 402:5
404:19,22,24
427:1 433:18
435:23 436:17
449:10 468:6
**weak** 269:10
360:21,22,25
361:5,22 362:3
362:22 363:11
**weaknesses**
460:10
**web-based**
238:23
**website** 7:12
95:9 96:3 98:5
100:8 101:20
101:25 188:2
223:15 224:9
224:11 225:15
316:23
**websites** 213:20
224:15
**wedded** 323:5
**week** 17:6 93:14
133:1 313:12
**weighing** 321:17
**weight** 321:8
**WEIL** 4:19
**weird** 394:12
**Weiss** 348:3,7
**welcome** 89:2
343:25
**well-** 260:8

**well-respected**
260:4
**went** 93:10
150:24 203:23
233:20 316:22
333:8 338:22
**weren't** 50:15
230:9 241:15
246:22 293:16
307:5 379:5,5
425:3 456:13
**Western** 102:21
108:4
**Western-style**
102:22
**whatsoever**
383:19
**wheelhouse**
254:25
**WHI** 232:25
233:14,16
**whisper** 226:25
**Whitnum**
388:21 391:8
457:12
**Whittemore**
285:11 351:15
**whoa** 99:10
160:9,9,9
440:23,23
**widely** 49:4,14
**widespread**
295:15
**wielding** 253:22
**wife** 229:3,8
**Wignall** 398:5
**wildly** 161:1,5
**William** 66:10
66:16,24
**wish** 274:10
299:13 319:4
330:20 334:5
340:5
**withdraw** 61:20
62:19
**witness** 2:19
15:19 16:7

18:8 20:24
21:18 22:8
23:21,23 24:18
29:3 31:8
32:21 35:9
36:1,25 39:21
40:17 41:18
42:22 43:5,21
47:11,14,24
48:13 49:7,23
51:1,10,20
55:2,17,19
56:3,9,21
57:16,25 58:15
59:6,13 60:5
60:19 61:5
62:5,15 63:25
64:8 65:2,13
69:15,21 72:10
72:20 73:9,17
73:20 74:18
75:1,9,12,18
79:1,4,23 82:3
85:7,10 86:15
86:20 87:3
88:8,19,23,25
90:3,16 96:19
97:23 98:9
99:1,12 103:19
104:3 105:11
106:8,23 107:5
107:18 108:24
109:5,19 110:2
110:17 111:12
111:24 116:1
116:16 117:12
118:2,13 119:1
120:18 124:1
124:25 125:9
125:15 127:15
127:23 128:22
129:20 130:5
130:18 131:6
131:12,18
134:22 135:25
137:12,23
139:7 140:8

141:1,14,20
143:7,21 144:6
144:21 145:9
145:18 146:15
147:1,9,19,25
148:19 149:2
149:16,25
150:23 151:8
151:12 152:12
153:19 155:2
156:13,23
157:11 159:14
159:24 160:8
167:7 168:21
169:14,21
170:16 171:17
172:14 173:23
174:7,12 175:6
175:13 176:4
178:14 179:1,9
180:7 181:1,10
182:19 183:2,8
184:20 187:14
187:22 188:7
188:10,13
189:3,23
190:23 191:22
192:6,11
193:21 194:2
194:12 195:7
195:19 196:11
197:14,18
198:8,22 199:4
200:10 201:16
202:2,10 203:9
204:7,13,17
205:11,18
206:11,20,25
207:1,19
208:21 209:4
209:11,21
210:13 215:18
216:11 218:9
218:11,24
219:12,18
220:19 221:21
222:10 223:2,8

224:4 225:4
226:3 228:9,14
229:24 230:21
231:5,20 232:8
232:19 233:5
233:16 235:9
237:1 244:3
246:1,11
247:25 248:8
248:18,25
249:12,18,25
250:7,23 251:7
255:3,16
256:19 258:24
259:12 260:11
261:3,18,25
262:20,25
263:21 264:6
265:4,22 266:2
267:20 268:3
268:13,20
272:18 274:3,5
274:20 275:7
275:16 276:17
278:13 279:10
279:15 281:9
281:16 282:22
282:25 286:11
287:11 288:2
288:10 289:3,9
289:14 291:15
293:2 299:4,13
300:7,17
301:20 302:19
303:2 304:7
305:1 306:8
307:3,8 310:21
314:11 315:7
318:14 321:12
321:23 322:10
322:22 323:23
331:5,19
333:20 334:11
334:21 336:4
336:24 339:5
339:18 340:12
342:19 343:19

Gregory B. Diette, M.D.

345:23 347:15
348:7 349:13
350:24 351:6
352:4,11
354:17 356:5
357:1,14
358:11 360:14
361:25 362:11
363:1,14 364:3
367:19 368:8
368:20 371:20
372:6,15 373:4
373:18,23
375:9,11,15,22
376:17,22
377:2,5 380:5
380:13 381:9
381:21 382:4
382:17 383:8
384:11 385:1,7
385:10,17
386:1 389:10
390:4,22 391:6
391:20 392:1
393:6,11
394:13 396:9
396:16 399:24
400:15 401:17
402:12,19
405:13 408:24
409:15 410:7,9
411:3,15,19
412:2,22
413:16 415:1
416:14 418:1
418:21 419:7
420:20 421:7
421:15 422:17
423:12,25
426:11,14
428:19 429:3
429:16,22
430:10,16
432:17 433:14
434:5,22 435:8
435:20 436:19
437:5,23 442:4

443:23 444:8
445:5,19 446:6
446:24 447:20
448:13 449:9
450:11,24
451:11 452:3
452:21 453:9
455:8,17,24
456:19 457:2,9
457:25 458:22
460:20,23
461:11 463:21
464:10 466:5
466:13 467:1
467:15 470:2,9
470:14 471:6,7
471:14 472:1
**Wolfson** 71:5
219:4 220:9,15
**woman** 63:17
115:23 116:6
116:25 117:19
118:9 119:7
152:24 175:9
**woman's** 412:17
**women** 34:25
35:6 36:21
59:2 60:14
61:1 62:1,3
215:9 226:13
234:12 236:14
236:18 237:15
250:5 280:22
282:15 283:18
284:6 285:15
286:3,3 331:16
340:18 387:8,8
388:3,22 391:8
395:1 410:18
412:5 428:17
428:19,24
449:13
**wonderful** 114:6
**wondering**
204:3,8 301:3
**Wong** 350:20,22
**word** 46:12 53:7

69:7 71:9 97:9
123:12,23
124:10,12
125:2 147:4
168:22 169:17
169:18 170:13
170:14 187:22
240:24 241:1
241:17 268:24
269:3,4,5
270:15 272:3
273:16 293:10
303:13 313:6
333:21 361:2
378:9 405:6
442:9 460:6
468:5
**worded** 221:17
**words** 70:9
91:15 119:23
147:7 149:4
167:14 169:23
170:4,17,20
194:14 240:13
240:18 270:23
320:14 360:24
360:25 361:1
**work** 33:8,12,15
37:25 38:12
48:17 56:1
63:6 92:20
104:10 128:20
128:25 129:2,6
129:6 130:20
135:8,17 136:6
152:14 154:20
156:24 157:9
158:13 159:20
160:2 163:18
163:22,24
173:19 175:2
176:16 178:23
179:6,13 180:5
181:5 185:22
185:25 186:17
187:12 189:13
189:16 190:16

191:3,3,7
192:1,2 193:11
194:23,25
195:21 198:13
199:6 200:5
225:6 230:6
231:7,9 256:25
339:5 367:7,10
378:11 407:5
407:19 408:14
408:22 409:4
450:25 452:13
467:3
**work-product**
33:10 161:25
166:13 177:10
**worked** 23:16
56:5 69:8
152:24 174:24
182:5,5 185:18
186:3,9,15,22
190:5 192:6
195:20 229:13
230:10 388:4
402:14
**worked-out**
281:17
**worker** 392:17
**working** 176:23
183:18 185:1
185:14 187:5
202:21 261:10
261:13 387:9
394:9,20,22
395:10 396:1
398:20 402:5,6
**works** 81:25
105:19 129:6
153:13 313:8
319:18 320:3
**world** 8:23 9:10
57:17 80:1
81:4 90:19
98:6 135:6
226:19 260:18
265:18 268:22
270:16,20

296:25 308:18
309:3,22 315:9
315:10,24
316:2,3,4,5,6,7
317:7 318:19
392:21 456:1
**world-renown...**
260:23
**worried** 362:18
**worries** 177:4
291:23 366:9
**worsening**
372:19 376:12
**worth** 16:8
197:24 257:11
**wouldn't** 15:13
21:18 36:17
40:7 48:22
51:22,23 56:23
56:23 57:6,7
63:4 71:9 72:1
106:14 116:23
147:9 149:16
149:17 197:23
197:23 207:21
215:18 231:5
311:5 323:11
323:11 340:24
342:3 368:11
382:4 383:18
409:23 410:14
449:17 452:19
452:21
**Wow** 446:6
**write** 145:19
149:5,9 154:23
168:18,21
206:16 219:20
240:3 243:2
311:2 316:7
409:9 437:7
468:4
**writers** 436:25
**writing** 30:21
33:19 233:7
395:24 468:1
**writings** 33:2

Case 3:16-md-02738-MAS-RLS    Document 9737-8    Filed 05/07/19    Page 308 of 516 PageID: 39008
Gregory B. Diette, M.D.

Page 537

| | | | | |
|---|---|---|---|---|
| 170:3 356:13 | 170:2 171:14 | **years** 33:5 45:21 | **0** | **1.01** 352:21 |
| **written** 130:20 | 174:12 175:6 | 46:2 51:2 | **0.01** 319:12 | 361:15 |
| 130:25 134:25 | 178:5 179:10 | 108:17 152:14 | **0.03** 351:1 | **1.02** 352:21 |
| 145:9 309:7 | 179:25 180:14 | 152:19,20 | **0.05** 8:23 297:1 | **1.03** 352:21 |
| 322:11 409:24 | 181:14 182:19 | 155:14 175:1 | 302:14 305:22 | **1.05** 352:16 |
| 453:18 456:3 | 194:2 195:17 | 185:15 189:18 | 308:18 309:23 | 353:3 |
| **wrong** 53:14 | 195:17 199:21 | 201:23 316:20 | 311:15 316:16 | **1.1** 353:20 |
| 56:21 76:20 | 200:19 204:7,9 | 391:9 418:4,9 | 316:17 318:20 | 367:17 368:3 |
| 116:9 130:6 | 207:8 209:8,8 | 445:6,7,9 | 319:1,11 351:1 | 368:15 400:21 |
| 153:10 222:13 | 209:8 216:8,23 | 457:13 458:10 | 361:8 | **1.10** 328:19 |
| 258:1 270:15 | 220:21 221:11 | 458:17,18 | **0.05'** 9:11 | **1.16** 365:23 |
| 318:2 348:3,5 | 227:9,19,22 | **yell** 113:12 | **0.40** 328:19 | **1.163** 365:14 |
| 348:15 | 229:7 242:8 | 218:12 | **0.5** 319:4 | **1.17** 399:11 |
| **wrote** 181:21 | 243:13 245:5 | **yelling** 115:4 | **0.7** 328:18 329:6 | **1.18** 367:1 |
| 206:18 257:9 | 252:4,10,17 | 218:16 219:12 | 329:7 330:12 | **1.2** 353:10,20,21 |
| 355:25 435:9 | 254:13 257:13 | 219:14,16 | 336:14 339:23 | 354:3,10,12,13 |
| 470:6 | 259:16 264:7 | **yellow** 30:18,22 | 340:25 343:15 | 354:14,15,20 |
| **Wu** 351:13,14 | 265:14 269:6 | **yep** 204:18 | 344:15,23 | 354:22,23 |
| | 275:7 280:8 | 211:14 212:12 | **0.70** 330:20 | 355:4,9 361:19 |
| **X** | 282:25 291:22 | 212:15 215:3 | 332:15 333:17 | 365:6 367:17 |
| **x** 1:3,12 6:8 7:1 | 296:12,16 | 285:4 328:23 | 334:8 347:5 | 368:4,15 |
| 8:1 9:1 10:1 | 299:17 300:16 | 367:5 417:2,4 | **0.8** 367:17 | 379:16,23 |
| 11:1 12:1 | 304:9 307:21 | **yes/no** 371:13 | **0.94** 359:25 | **1.23** 367:3 |
| 54:12 58:12 | 310:9 311:25 | 404:6 | **000004999** 8:18 | **1.245** 365:17,21 |
| **X-axis** 465:18 | 313:2 314:3,7 | **yesterday** 17:12 | **000005003** 8:18 | 365:22 |
| | 316:2,5 317:18 | **yielded** 331:16 | **000013131** 9:22 | **1.3** 361:4,20 |
| **Y** | 317:25 320:14 | **yields** 340:19 | **07701** 3:22 | 379:16,23 |
| **Y-axis** 465:18 | 325:20 328:1 | **York** 5:11 | **08542-3792** 4:21 | **1.43** 399:11 |
| **yeah** 16:20 | 330:14,18 | | | **1.7** 364:4,8 |
| 26:23 28:20,20 | 331:19 338:8 | **Z** | **1** | **1.75** 387:18,22 |
| 30:7,24 32:12 | 342:15 350:5 | **Zambelli-Wei...** | **1** 6:11 11:22 | **1.9** 364:5,8 |
| 44:23 56:3 | 351:5 356:5 | 229:11 | 16:13,14,17 | **1/15/2018** 25:7 |
| 58:3,20,21,23 | 359:21 365:8 | **Zazenski** 11:25 | 379:9 385:13 | **1:52** 280:10 |
| 66:13 71:20 | 365:21 366:17 | 438:9 443:7,9 | 400:23 404:20 | **10** 7:16 133:19 |
| 75:22,22 76:10 | 367:5,12 | 443:16 | 443:10 | 133:20 134:8 |
| 77:5 79:14 | 370:13 378:13 | **zero** 84:10 | **1-point** 380:7 | 329:7 330:12 |
| 80:11 84:13 | 386:20 388:18 | 305:23 328:14 | **1.0** 346:7 347:9 | 341:1 361:14 |
| 85:9,20 87:9 | 398:7,8,9 | 458:20,23,23 | 347:10,22 | 471:15 |
| 91:1 93:16,22 | 399:19 400:6 | 458:24,25 | 348:14 349:10 | **10:07** 89:3 |
| 94:1 108:17 | 403:7 417:8 | 459:3,9,18,18 | 349:21,22,23 | **10:20** 89:7 |
| 111:8 116:4,21 | 419:11,18 | 459:19,20 | 349:25 350:2 | **100** 10:25 |
| 120:25 122:18 | 420:19 426:14 | 465:9,10,15 | 350:13 351:7 | **100,000** 37:10 |
| 123:1 128:11 | 436:6 438:6 | 466:3,7,8,8,8 | 352:2,18,18,22 | 40:3 |
| 131:19 132:4 | 446:9 454:12 | 466:10,21 | 352:25 353:20 | **1001** 4:12 |
| 136:3 141:7 | 456:2 | 467:9 | 359:15,25 | **100C** 259:19 |
| 146:15 151:15 | **year** 36:21 49:20 | **zig-zaggy** 463:1 | **1.00** 347:17 | 393:17 |
| 164:4 167:14 | 389:11,17 | **zillion** 311:3 | 349:25 352:20 | **11** 7:19 138:22 |

Gregory B. Diette, M.D.

138:23 139:2
**11:14** 151:17
**11:24** 151:20
**110** 172:6
**12** 7:22 8:10
213:4,4,7,9
280:22,22,23
**12/14/2018**
22:19 25:4
**12:08** 204:19
**12:43** 204:22
**127** 3:21
**12th** 231:12
236:1
**13** 8:4 235:17,18
244:7,10 246:6
247:1,16,22
248:4,10 251:4
324:4,5 325:4
325:13 326:1
**133** 7:18
**138** 7:21
**14** 6:3 8:11 33:1
68:9 69:12
71:8,19 87:11
244:7,10 246:6
247:1,16,22
248:4,11 251:4
267:7,8 324:4
324:6 325:4,11
325:13 326:2
328:24 414:11
**14,000** 36:21
**1440** 5:11
**14807-96-6** 8:13
**149** 172:7
**14th** 67:1,13
70:20,20 71:1
**15** 8:16 281:19
281:23
**16** 6:13 8:19
289:20,22
414:11
**16-2738** 1:5
**167** 121:10
147:5,12
364:20

**17** 4:20 6:18
8:22 296:19,23
297:14 298:5
298:22,23,23
298:24 299:19
299:21 308:22
309:16
**17,103.75** 25:5
**18** 6:22 9:4
140:3 297:17
297:18,21
298:3,10,11,11
305:6
**1825** 3:7
**19** 4:5 9:7 269:8
308:6,7,25
**19103-69896** 5:6
**1961** 285:9
**1976** 286:1
**1979** 285:10
**1982** 286:1
397:23 398:6
463:14
**1983** 328:6,18
**1986** 285:9
**1988** 285:11
**1990** 117:12
**1993** 117:13,16
**1995** 42:16
43:16
**1996** 281:23

_____
**2**
_____

**2** 6:14 17:18,19
17:23,25 18:19
22:3 83:11
84:2 123:15
209:23 210:25
290:1 292:9
379:14 443:2
**2.0** 380:16
**2.13** 398:10
**2.20** 398:24
**2.27** 398:24
**2.41** 398:3
**2.5** 329:6 330:11
330:21 331:16

332:15 333:18
334:9 339:24
340:16 343:16
344:14,23
347:6
**2.61** 398:15
**2.73** 398:11
**2.75** 398:2
**2.8** 11:4 394:5
396:21 397:14
399:14
**2.82** 398:15
**2/12/2019** 25:10
**2/25** 21:20 22:11
22:13
**2:04** 280:14
**2:44** 320:18
**2:53** 320:21
**20** 9:12 23:8
25:16 276:15
311:24 312:5,9
361:14 379:15
380:20 418:4,9
445:6,7,9
474:16
**20,973.75** 25:13
**200** 121:18
124:8,15
144:24 145:12
458:9,18
**2000** 5:5 361:3
394:3 463:6,9
463:16
**20004** 4:13
**20004-1454** 5:19
**20005** 5:12
**20006** 3:9
**2001** 400:25
**2003** 43:15
45:10
**2004** 11:24
438:8,25 439:4
441:10,14
**2005** 398:13
**2006** 261:13
378:5 394:3
**2007** 347:16

**399:**8
**2008** 369:8,15
390:12 398:18
425:13,14
**2009** 346:17
390:13
**201** 4:20
**2010** 259:7
**2011** 388:18
390:12
**2012** 259:19
388:15,19
389:3,14,24
390:6,14,19
**2013** 463:18
**2014** 11:22
139:13 346:15
431:23
**2015** 366:2
**2016** 295:19
296:10,12
**2017** 29:4,5
55:22 56:6,12
92:6,10 108:13
121:9,13
142:25 150:19
163:14 185:7
185:16 242:3
**2018** 8:15 67:1
67:13 68:9
69:13 70:21
71:1,8,19
197:3,6 271:17
359:23 364:13
424:4
**2019** 1:17 8:10
13:6 21:13,16
22:6 121:15
140:17 208:5
236:1 264:11
296:15,19,24
297:23 298:15
305:10 308:19
315:10 374:17
427:19 470:17
471:15
**202** 3:10 4:14

5:13,20
**21** 9:15 123:15
271:10,13,14
276:15 277:15
324:17,18,24
325:24 327:10
327:19 346:3,9
**21204** 2:7
**213** 7:24
**215** 5:7
**219** 400:21
**22** 9:19 233:22
234:14 236:16
237:17 327:23
327:24 328:5
**22,000** 36:20
**226** 172:8,15
**22nd** 140:17
**23** 10:4 20:19
343:3 366:11
**231** 45:13
**232-5507** 4:14
**235** 8:10
**24** 10:8 280:22
349:19 369:16
**25** 10:13 23:8
25:17 308:19
325:6,11,13
345:4,16
377:16
**253** 393:20,22
393:23 396:19
397:15
**254** 396:21
397:15
**256** 394:6
**25th** 21:13,16
22:6 208:4
264:11
**26** 10:19 377:16
393:3,10
**267** 8:15
**27** 10:23 290:22
392:25 393:1
393:14
**2738** 13:13
**28** 11:4 140:3

Gregory B. Diette, M.D.

276:15 277:14
396:25 397:1,4
**281** 8:18
**289** 8:21
**29** 11:8 413:23
414:4
**297** 8:23
**299** 9:6

---
**3**

**3** 6:19 18:15,20
18:24 20:4
21:14 22:3
76:7 123:16
325:6
**3.5** 389:6
**3/15/19** 22:20
**3/15/2019** 23:2,6
**3:09** 338:13
**3:10** 338:17
**3:50** 377:9
**30** 11:12,23
45:21 46:2
181:19 269:11
379:16 380:20
416:18,19
438:25 472:12
**30(b)(6)** 81:23
**308** 9:11
**30th** 438:8
**31** 11:15 181:20
233:22 234:14
236:16 237:17
427:4,5
**312** 9:14
**316** 3:15
**32** 11:20 349:8
431:14,17,18
437:23
**324** 9:18
**32502** 3:16
**327** 9:22
**33** 11:23 437:19
437:21,22
**34** 12:4 376:25
442:19,22
**35,375** 25:11

**36** 257:12
**36's** 86:16
**36-page** 86:17
**3600** 420:21
**366** 10:7
**369** 10:12
**37** 83:9 85:9,9,9
86:23
**371-7000** 5:13
**377** 10:18,22
**392** 10:25
**396** 11:7

---
**4**

**4** 6:23 44:20
45:2 243:6
**4:10** 377:12
**4:59** 426:16
**40** 45:21 46:2
298:17 299:11
391:9 457:12
**400** 23:13,16,24
24:19 25:17
177:22 178:7,7
458:10,18
**401** 4:11
**41** 85:8,19
**413** 11:11
**416** 11:14
**42** 256:5
**427** 11:19
**43** 301:9,16
309:10 310:14
**431** 11:22
**435-7000** 3:17
**437** 11:25
**438** 284:16,17
**439** 283:22
284:16,18
285:1
**44** 6:24
**442** 12:6
**45** 416:24,25
417:1
**46** 85:12
**463-2400** 5:20
**465** 6:4

**467** 6:5
**48** 85:1,7 87:11
257:12,13
**485** 23:13 24:2,6
177:18,23

---
**5**

**5** 7:4 35:13 52:7
52:10,11,21,25
54:4,7 122:18
243:8 349:21
433:3,3
**5,068.02** 25:8
**5:12** 426:19
**5:30** 447:10
**5:37** 447:13
**5:53** 464:12
**5:58** 464:15,19
**5:59** 464:22
**50** 156:1,2
**50,000** 197:16
197:23
**500** 458:12
**51** 170:11 172:5
212:3 336:18
**5129** 471:19
**52** 7:5
**53** 85:12
**58** 172:5

---
**6**

**6** 7:6 76:9 82:8,9
86:14 123:1
244:14 359:25
**6:04** 470:16,21
**609** 4:22
**61** 289:20

---
**7**

**7** 7:8 26:2 28:24
29:12 31:13
34:4 42:15,22
42:24 43:2,5
43:10 91:4,5
121:5 325:10
345:5,5,17
**70** 286:1

**700** 3:8
**72** 257:13
**720-1288** 4:7
**73** 296:24
400:25
**732** 3:23
**747-9003** 3:23
**783-6400** 3:10

---
**8**

**8** 7:11 95:11,13
95:14 100:9,10
**8:58** 1:18 13:7
**800** 306:22
307:17,18
312:1,6 313:23
**82** 7:7 222:14
**85** 25:18 178:1
178:10
**850** 3:17
**89** 285:21

---
**9**

**9** 1:17 7:14
98:23,24
101:20
**9:03** 19:10
**9:04** 19:13
**9:25** 44:15
**9:27** 44:18
**903** 2:6 13:9
**91** 7:10
**92** 285:21
**92660** 4:6
**94** 350:18
**949** 4:7
**95** 7:13
**975** 5:18
**98** 7:15
**986-1104** 4:22
**988-2706** 5:7
**99** 385:13
**9th** 4:11 13:6
470:17

Exhibit 10

**Report of Jonathan Borak, MD, DABT**
**February 25, 2019**

## I.      Introduction

**1.**      I am Clinical Professor of Epidemiology & Public Health and Clinical Professor of Medicine at Yale University, a faculty member of the Yale Occupational and Environmental Medicine Program, and Adjunct Associate Professor of Medicine at The Johns Hopkins University.  I am also President of Jonathan Borak & Company, a consulting firm in New Haven, Connecticut.

**2.**      I received my B.A. with honors from Amherst College in 1968 and my M.D. from New York University in 1972.  I am Board Certified in Internal Medicine, Preventive Medicine (Occupational Medicine) and Toxicology (American Board of Toxicology).  I am a Fellow of the American College of Physicians, the American College of Occupational and Environmental Medicine, the Royal College of Physicians of Canada, the Academy of Toxicological Sciences, and the American Industrial Hygiene Association.

**3.**      Among my Yale activities, I have directed and taught two required graduate-level courses (Principles of Toxicology and Principles of Risk Assessment) for nearly twenty years.  I also lecture in number of other graduate-level courses including occupational epidemiology, environmental exposure assessment, and environmental health.[1]  From 2002-2010 I was Director of the Yale University Interdisciplinary Risk Assessment Forum.  I also participate in the supervision and training of Fellows and other resident physicians in the Yale Occupational and Environmental Medicine Program.

**4.**      I served as an elected Director of the American College of Occupational and Environmental Medicine (ACOEM) from 1999-2002 and as Chair of the ACOEM Council on Scientific Affairs from 1999-2012.  I was a founding member of US EPA's National Advisory Committee to Develop Acute Exposure Guideline Levels for Hazardous Substances, a member of the National Research Council Committee on Toxicologic Assessment of Low-Level Exposures to Chemical Warfare Agents, a member of a National Institute of Environmental Health Sciences review panel on Partnerships for Environmental Public Health, and a member of an External Review Panel for the National Institute for Occupational Safety and Health.  I was President of the Occupational and Environmental Medicine Association of Connecticut, President of the Connecticut College of Emergency Physicians, and Chairman of the Connecticut State Medical Society Committees on Preventive Medicine and on Emergency Medical Services.

---

[1] Along with the principles of toxicology (e.g., dose-response; toxicokinetics) and risk assessment (e.g., bases for risk extrapolation), my teaching includes the following topics of possible relevance to the present matter: design, development and interpretation of epidemiological studies (e.g., cohort vs. case-control; prospective vs. retrospective); causal inference (e.g., Hill's Postulates, Koch's Postulates); and, biological models of cancer.

**5.** I am a member of the Editorial Boards of Journal of Occupational and Environmental Medicine, Journal of Occupational and Environmental Hygiene, and Occupational Medicine. I served as Associate Editor of OEM Report, as a member of the Editorial Board of the American Industrial Hygiene Association Journal, and currently serve as a peer reviewer for numerous medical and scientific publications.

**6.** I have written numerous books, monographs, book chapters, peer-reviewed articles and other publications on a range of topics in occupational medicine, toxicology, epidemiology and industrial hygiene. For example, I was Associate Editor of *A Practical Approach to Occupational and Environmental Medicine* (Lippincott, 2003), Editor and Course Director of *Core Curriculum in Environmental Medicine* (ACOEM, 1994), principal author of *Medical Management Guidelines for Acute Chemical Exposures* (ATSDR, 1994), and senior author of a textbook on toxic emergencies (*Hazardous Materials Exposure: Emergency Response and Patient Care*, Prentice-Hall, 1991).

**7.** I have received numerous awards from ACOEM including: the President's Award in 1994, 2000 and 2008; the Adolph G. Kammer Merit in Authorship Award in 2003; the Robert A. Kehoe Award of Merit in 2004;  and the George H. Gerchman Memorial Prize in 2005. I also received the Harriet Hardy Award from the New England College of Occupational and Environmental Medicine in 2012.

## II.   <u>Scope of Engagement</u>

**8.** In the present matter, I was asked by Tom Locke of Seyfarth Shaw to review published and peer-reviewed scientific literature relevant to the alleged association between perineal use of talc-containing powders and ovarian cancer. I was specifically asked to analyze the above materials from a chronological perspective in order to evaluate <u>whether</u>, <u>when</u> and by <u>whom</u> it had been determined that perineal use of talc-containing powder causes ovarian cancer.

**9.** I also considered expert reports produced in both the federal multi-district litigation (MDL") and prior talc-ovarian cancer litigation, expert depositions, and expert trial testimony concerning the alleged relationship between perineal use of talc-containing powders and ovarian cancer. To better understand those opinions, I reviewed the experts' peer-reviewed publications along with their opinions and testimony to determine when they first reached their conclusions. I also reviewed the broader published literature and the published opinions of well-regarded and authoritative agencies and institutions in order to determine whether there was general support for the experts' opinions.

**10.** The expert materials that I reviewed are listed in Attachment 1. Attachment 2, "Materials Considered", is a list of books, reports, and articles in my library that I have reviewed and that are relevant to my understanding of the issues raised in this litigation. Overall, I read numerous published studies concerning talc, asbestos and ovarian cancer, including many of the references authored by the experts listed in Attachment 1 and those cited in their expert reports and testimony.

### III.   Background

**11.**    The first epidemiological study suggesting a link between perineal talc exposure and ovarian cancer was a 1982 case-control study by Dr. Daniel Cramer, one of the experts identified by plaintiffs in prior talc litigation (1).  I reviewed the opinions of other experts who testified on behalf of plaintiffs in prior talc litigation.  Along with Dr. Cramer's opinions, I include in my report an analysis Drs. Colditz and Ness's opinions because all three wrote frequently regarding the possible link between perineal talc exposure and ovarian cancer and because their contributions were emphasized by plaintiffs, who described Dr. Cramer as "the expert" with a "massive amount of expertise", described Dr. Colditz as "the number one scientific expert in the world", and referred to Dr. Ness' "body of work investigating talcum powder and ovarian cancer" [Plaintiffs Response to Motion to Exclude, 07/18/2016; Kemp Hearing Opening Statement 08/08/2016].

**12.**    Between 1982 and 2000 another 16 case-control studies were published, and at least eight additional case-control studies were published after 2000.  There have also been at least four reports of cohort studies, at least eight meta-analysis and pooled analyses, as well as numerous systematic reviews all addressing the possible link between perineal talc use and ovarian cancer.[2]  In other words, the possible link between perineal talc use and ovarian cancer has been the subject of repeated study, reanalysis, and review.

Despite such extensive efforts, science has not established that perineal talc use causes ovarian cancer.  For example, a 2014 editorial in the prominent *Journal of the National Cancer Institute* concluded:  "Overall, the evidence regarding carcinogenicity of talc use remains inconclusive" (2).  Very recently, in a statement dated 12/21/18, the National Cancer Institute (NCI) concluded: "The weight of evidence does not support an association between perineal talc exposure and an increased risk of ovarian cancer" (3).

---

[2] Epidemiological studies, regardless of their design, are observational, not experimental.  Among the most common study designs are case-control and cohort studies.

   Case-control studies compare the experience (e.g., risk factors) of persons with a disease and a suitable control group without the disease.  They are often thought of as "retrospective" because disease status is determined retrospectively (i.e., subjects enter the study after diagnosis).  Risk status is usually determined retrospectively, but some case-control studies ("nested case-control study") are constructed using retrospective disease status, but prospectively determined risk status based on data from a previously initiated, prospective cohort study that included the case-control study subjects.

   Cohort studies evaluate the development of disease over time in a defined population of subjects (the "cohort") who were disease-free at the start of the study.  These studies aim to determine the risk factors that predict future disease development. Risk status is determined at the start of the study (i.e., before disease development) and may be periodically updated during the study.  In most cases, both disease and risk status are determined prospectively, but "retrospective cohort studies" can be constructed.

   Meta-analyses combine the results of independent, similar (but non-identical) studies to calculate quantitative summaries of the studies.  One component of meta-analyses is the determination of which studies are appropriate to combine.  A second is the arithmetic combination of the numerical information from those studies. Published guidelines provide recommendations for determining the appropriateness of studies and for the calculation of meta-analytical results.  Meta-analyses that reanalyze the underlying studies and combine the raw data from those studies are referred to as "pooled analyses".

**13**.     Nevertheless, many of plaintiffs' MDL experts have opined that perineal use of talc-containing powder can cause ovarian cancer.  Their opinions are contained in expert reports and deposition testimony.  To better understand those opinions, I reviewed their peer-reviewed publications along with their opinions and testimony to determine when they first reached their conclusions.  I also reviewed the broader published literature and the published opinions of well-regarded institutions in order to determine whether there was general support for plaintiffs' MDL experts' opinions.

**14**.     To facilitate my discussion, I compiled a non-exclusive "Chronology of Opinions" (Attachment 3) which presents statements quoted from the scientific literature, the opinions of well-regarded institutions, plaintiffs' MDL experts, and three of plaintiffs' former experts.  I will refer to those Attachment 3 statements in the discussion below.

## IV.     Discussion

*Prior to 2000*:

**15**.     Prior to 2000, the possibility that perineal talc use caused ovarian cancer was regarded, at best, as "equivocal" (4) and "viewed with skepticism" (5).  Contributing to that skepticism were the "weak" association between talc and cancer, "poor dose response relationships", potential bias and confounding, and an insufficiency of empirical data (4-7).  The proposed relationship was further obscured by a 1996 study of women undergoing "incidental oophorectomy", some reporting "frequent" applications of perineal talc and others reporting none.  All of the women had talc in their ovaries: "Talc particle counts were completely unrelated to reported levels of perineal talc exposure" (8).

**16**.     The IARC asbestos monographs in 1973 (9) and 1977 (10) did not mention ovarian cancer in any context.  In 1987, IARC noted that "some excess of ovary cancer has been reported in two studies, but not in another" (11); there was no further discussion of ovarian cancer.

**17**.     The opinions of the plaintiffs' prior experts reflect that skepticism.  For example, in deposition testimony, Dr. Cramer agreed that, in 2000, he viewed the association between talc and ovarian cancer as "still a hypothesis" [deposition re: Berg, p.22].  Likewise, in his deposition, Dr. Colditz testified that, in 2000, he was not of the opinion that "talc use can cause ovarian cancer" [deposition re: Hogans, p. 298].  Finally, as discussed below, Dr. Ness testified that evidence of the association was "insufficient" until at least 2004 [deposition re: Blaes, p. 255-6).  I have found no published evidence that any of the plaintiff's MDL experts expressed opinions about talc and ovarian cancer prior to 2000.

**18**.    In sum, Drs. Colditz, Cramer and Ness agreed that, prior to 2000, there was insufficient evidence that perineal talc use caused ovarian cancer. None of plaintiffs' MDL experts disagree with that view.[3]

*2000-2008*:

**19**.    In 2006, an IARC communication was published from a Monograph Working Group that evaluated the carcinogenicity of talc (12).  The IARC working group found that there was only "limited evidence for the carcinogenicity of perineal use of talc-based body powder" and classified this use as: "*possibly carcinogenic to humans (i.e., Group 2B)*".  Dr. Siemiatycki was the Chair of that meeting.

In 2008, a meta-analysis was published by three members of that IARC working group, including Dr. Siemiatycki.  Their analysis included 20 case-control studies, all but one published by 2004, and it identified eight studies deemed by the IARC working group to be "most informative".  The meta-analysis concluded:

> "The current body of experimental and epidemiological evidence is insufficient to establish a causal association between perineal use of talc and ovarian cancer risk" (13).

That year, Dr. Cramer co-authored a study that combined case-control and cohort data. The report described the association between perineal talc use and ovarian cancer as:

> "controversial due to the lack of a clear dose-response with increasing frequency or duration of talc use, the possibility of confounding or other biases, and the uncertain biological mechanism."  (14)

**20**.    Drs. Ness, Colditz and Cramer were asked about the opinions that they held around that time.  Dr. Ness testified that, based on the studies then available, there was insufficient evidence in 2004 that perineal talc use caused ovarian cancer (deposition re: Blaes, p. 255-6).  Dr. Colditz testified that because of persistent inconsistency among the published studies, in 2004 it was unclear whether talc altered cancer risk (deposition re: Hogans, p. 436).  Dr. Cramer, asked about his opinions prior to 2007, testified that "several things have happened since then … we've built up a case … a stronger biological argument  … These have all developed since 2007 in my mind" [deposition re: Blaes, p. 150-1].

Dr. Siemiatycki, in a 2016 expert report, "concurred with that evaluation" (i.e., the conclusion of the 2008 meta-analysis that the evidence was then "insufficient" to establish causation).

---

[3] With the exception of Dr. Siemiatycki, before 2018, none of plaintiffs' MDL experts published on the topic of perineal talc use and ovarian cancer. Below, I discuss Dr. Siemiatycki's prior publications on that topic. In my chronology, I note when plaintiffs' MDL experts published on that topic.

**21**.    Thus Drs. Colditz and Ness agreed that prior to 2004 there was insufficient evidence that perineal talc use caused ovarian cancer, Dr. Siemiatycki testified that that he held that opinion based on "the evidence" up to "2005, 2006", and Dr. Cramer agreed that there was insufficient evidence prior to 2007.

*2009-2012*:

**22**.    In 2010, IARC published *Monograph 93*, which included its complete assessment of talc.  As described above in its preliminary communication, IARC found only "*limited evidence* in humans" and concluded: "Perineal use of talc-based body powder is *possibly carcinogenic to humans* (Group 2B)" (15).  A 2011 case-control study concluded that "no stronger adjective than "possible" appears warranted at this time" (16).  That same year, an abstract co-authored by Dr. Cramer and published in *Proceedings of the American Association for Cancer Research* opined that "The etiology of ovarian cancer is poorly understood but there is clearly a heritable component." (17).

**23**.    In 2012, IARC published Monograph 100C which included an updated assessment of asbestos (18).  It noted that "a causal association between exposure to asbestos and cancer of the ovary was clearly established" and "asbestos causes … cancer of the … ovary".

**24**.    The 2011 version of the *Your Disease Risk* website (copyrighted 2013; on-line 2015) -- which Dr. Colditz directs at Siteman Cancer Center -- listed nine risk factors for ovarian cancer; it did <u>not</u> list talc (19).  In a deposition [re: Hogans], when asked about the level of evidence that was necessary before a risk would be included on that website, Dr. Colditz testified:

> "On Your Disease Risk website, the consensus opinion was that definite and probable causes should be included" [deposition re: Hogans, p. 67].

Dr. Colditz also testified that the website was reviewed and updated every three years, that the list of cancer risk factors considered in the review included talc, and that the then most recent review was completed in 2011 [deposition re: Hogans, p. 57-8].  It is notable that the website list of Contributors included Dr. Colditz, Dr. Cramer, and Dr. Susan Hankinson, a Member of the IARC Working Group on Talc (15), a co-author of the 2008 meta-analysis discussed above (13), and an author of at least three other reports on talc and ovarian cancer (13;14;20;21).

**25**.    Thus, in 2011 the Your Disease Risk review committee (including Drs. Colditz, Cramer and Hankinson) determined that the evidence linking perineal talc use and ovarian cancer was neither "definite" nor "probable".  That same year, Dr. Cramer believed the etiology of ovarian cancer was "poorly understood".

*2013-Current*:

**26**.    In 2013, "Talc-based body powder (perineal use of)" was listed on the California Safe Cosmetics Program Reportable Ingredients List as a carcinogen.  The listing was based on the conclusion of the IARC 2010 Monograph.  The California Health and Safety Code requires listing of substances categorized by IARC as Group 1, Group 2A, or Group 2B.  As discussed above, IARC found that there was only "*limited evidence* in humans" and concluded that "Perineal use of talc-based body powder is *possibly carcinogenic to humans* (Group 2B)" (15).

**27**.    In 2013, a large pooled analysis of 8 case-control studies (co-authored by Dr. Ness) found a "small-to-moderate" increased risk of ovarian cancer in perineal powder users, but also reported that among powder users there was "no significant trend in risk with increasing number of lifetime applications" (22).

**28**.    In a 2013 deposition, Dr. Cramer testified that he was "not aware" of "any peer-reviewed paper" that made the statement that talc causes ovarian cancer [deposition re: Berg, p. 211].

**29**.    In 2014, a large cohort study of postmenopausal women concluded that perineal powder use did not influence risk of ovarian cancer:

> "Ever use of perineal powder was not associated with risk of ovarian cancer compared with never use. Individually, ever use of powder on the genitals, sanitary napkins, or diaphragms was not associated with risk of ovarian cancer compared with never use, nor were there associations with increasing durations of use … Based on our results, perineal powder use does not appear to influence ovarian cancer risk."  (21)

An editorial published in the same issue as that cohort study report opined that: "Overall, the evidence regarding carcinogenicity of talc use remains inconclusive" (2).

**30**.    In 2015, Dr. Ness presented a poster at a meeting of the International Gynecologic Cancer Society which concluded that "Hill's tenets suggest that talc use causes ovarian cancer" (23).  Subsequently, however, she has not published the contents of that poster or its conclusion in the peer-reviewed literature.

**31**.    In 2015, Dr. Cramer testified that "probably" none of his published papers said that talc caused ovarian cancer [deposition re: Blaes, p. 112].  He also testified that he could not name anyone who had said in a peer-reviewed article that talc caused endometroid ovarian cancer: "nobody said that" [deposition re: Ristensund, p.93].   And, when asked about his opinion that talc carcinogenicity results from altered immune surveillance ("diminution of anti-MUC1 antibodies" (24)), he testified that it was only a hypothesis [deposition re: Blaes, p. 108].

**32**.    In 2016, Dr. Cramer published an updated case-control study that asserted that its findings "present a good case", but had not been confirmed:

> "We believe the observations made here present a good case for talc carcinogenicity and that re-analyses of existing data from already published studies might provide confirmatory evidence" (25).

**33**.    In 2016, Dr. Siemiatycki testified that he had reviewed evidence of an association between talc and ovarian cancer in 2005-2006 and in 2015-2016.  Following the earlier review, he concluded that the evidence was insufficient to classify talc as carcinogenic to humans and that it should be classified as only possibly carcinogenic to humans [deposition re: Oules, p. 111].

He also testified that if he had been asked about his opinion of that association at any time between those two reviews (i.e., between 2006 and 2016), "my spontaneous opinion would have been the opinion I had the last time I looked at the data, which was 2005, 2006" [deposition re: Oules, p. 181].

**34**.    In 2016, Dr. PM Webb, founding member of the Australian Ovarian Cancer Study (a member of the Ovarian Cancer Association Consortium  and a component of the large 2013 pooled analysis discussed above (22)) reviewed the epidemiology of ovarian epithelial ovarian cancer (26). She concluded that the association between talc and ovarian cancer was still "uncertain":

> "It is still uncertain whether the association is causal because there is little evidence that risk increases with increasing frequency and/or duration of talc use and the association does not appear to be weaker among women who have undergone procedures such as tubal ligation that would prevent talc from reaching the ovaries." (26)

**35**.    In 2016, Dr. Steven Narod, Professor of Public Health Sciences, Medicine, and Surgery at the University of Toronto, co-discoverer of the BRAC1 and BRAC2 genes, and the most cited researcher in the world in the field of breast cancer [4] published a Clinical Commentary on talc and ovarian cancer.  He opined that because the magnitude of the estimated risk ratio for ever use of talc and ovarian cancer was so small, it was not "helpful" to rely on such risk ratios for ascribing causation:

> "it would be challenging to convince the epidemiology community that there is a danger … Simply put, a risk ratio of this size falls outside the resolution of most epidemiologic studies."

> "The estimate of a risk ratio of 1.2 [5] … is not helpful in determining if a specific case is, or is not, the result of talc exposure." (27)

---

[4] http://www.dlsph.utoronto.ca/faculty-profile/narod-steven/

[5] "This estimate is the one generated from the large pooling study and is the level of risk that is under discussion in the media." (27)

On the other hand, he noted that it was not possible to conclude that there was no evidence of an association.

**36**.     Also in 2016, the Danish Ministry of Environment and Food published a criterion document *Talcum, cosmetic grade (non-fibrous): Evaluation of health hazards and proposal of a health-based quality criterion for ambient air* (28).  It did not consider ovarian cancer.

**37**.     In 2017, Berge and colleagues published an updated meta-analysis on perineal use of talc and ovarian cancer.  Their analytical findings were generally similar to those of earlier meta-analyses.  They concluded that their findings were not sufficient to interpret the association between talc and ovarian cancer as "causal":

> "Several aspects of our results, including the heterogeneity of results between case-control and cohort studies, and the lack of a dose-response with duration and frequency of use, however, do not support a causal interpretation of the association." (29)

That meta-analysis was published on the website of *European Journal of Cancer Prevention*.  As published, it indicated a copyright and publication date of 2017 and "Received 31 August 2016 Accepted 20 December 2016".

**38**.     In 2018, Berge and colleagues published a different version of their 2017 meta-analysis.  The conclusions were similar <u>except</u> that a significant change was made to the methodology and findings related to dose-response:

> "Several aspects of our results, including the heterogeneity of results between case–control and cohort studies, however, do not support a causal interpretation of the association." (30)

That meta-analysis was also published in *European Journal of Cancer Prevention*.  It was identical to the earlier version (e.g., same title, same authors, same text) <u>except</u> for the changes related to dose-response and changes of the copyright and publication date to 2018; it continued to indicate "Received 31 August 2016 Accepted 20 December 2016".

I have been unable to find information explaining the withdrawal, subsequent change and "re-publication" of this article.  This is surprising, especially considering the potential impact of the change.  It is also notable that both versions have identical DOI identification numbers, and that the prior version is no longer available on the internet.  I do not know whether this indicates a conscious effort to conceal the changes, but it is my experience that journals normally publish a correction notice or otherwise provide an explanation for such a change in a published report.[6]

---

[6] Dr. Siemiatycki testified that he had read, but did not understand the changes in the statistical methods underlying the revised dose-response conclusion of Berge 2018:

**39**.    In 2018, Penninkilampi and Eslick published results of another updated meta-analysis (31).  They began with a historical perspective:

> "… while perineal talc use has not been shown to be safe, in a similar regard, a certain causal link between talc use and ovarian cancer has not yet been established."

They noted the lack of a mechanistic explanation for the association between risk of ovarian cancer and talc:

> "The mechanism by which perineal talc use may increase the risk of ovarian cancer is uncertain."

And they concluded that their analytic findings were "suggestive of a causal association", but that further studies were necessary to establish a causal relationship.

**40.**    In a 2018 textbook chapter referenced in his expert report, Dr. Saed wrote that the cause of ovarian cancer was "under debate" and that its association with talc was only suggestive: [7]

> "Ovarian cancer … underlying pathophysiology is not clearly established ... The origin and causes of ovarian tumors remains [sic] under debate …"

> "Although there is strong epidemiological evidence to suggest an association between talc use and ovarian cancer, the direct link and precise mechanisms have yet to be elucidated."  (33)

**41**.    In an unpublished manuscript,[8] Dr. Saed and colleagues described the results of an *in vivo* study that evaluated the responses of cultured cells exposed to talc dissolved in DMSO.  The authors state:

> "Genital use of talcum powder and its associated risk of ovarian cancer is an important controversial topic ... This is the first study to clearly demonstrate that talc induces inflammation and alters the redox balance favoring a pro-oxidant state in normal and EOC cells."

---

> "… they've now used a different statistical procedure for evaluating dose-response by duration and frequency, which is embodied in their Table 3, which I don't fully understand." [deposition, p. 198]

[7] A similar view was expressed by Dr. Saed in a 2017 article:  "… the exact origin(s) and pathogenesis of ovarian cancer still remains [sic] under debate" (32), "talc" was not mentioned in that article.

[8] A copy of the following manuscript was produced in this litigation and provided to me: N Fletcher et al. "Molecular basis supporting the association of talcum powder use with increased risk of ovarian cancer." As of 2/22/19, it has not been indexed by the National Library of Medicine (NLM), it has not been published by any NLM-recognized journal, and it is apparently not available on the web.

The authors also wrote that their findings suggested that talc caused human cancer:

> "… we have shown that talc enhances cell proliferation and induces an inhibition in apoptosis … suggesting talc is a stimulus to the development of the oncogenic phenotype."

The authors did not directly extrapolate their findings, which were specific to the *in vitro* experimental setting, to the *in vivo* development of ovarian cancer in women who use talcum powder. [9]

**42.** In late 2018, a draft screening assessment of talc was published by Health Canada (38). Its assessment of health risks of perineal talcum powder relied extensively on an unpublished systematic review which is discussed below. [10]

Health Canada, in its characterization of risk to human health, stated that perineal use of talc posed a **potential** concern:

> "Given that there is the potential for perineal exposure to talc from the use of various self-care products, a potential concern for human health has been identified."

However, Health Canada also noted uncertainties and limitations to its statement:

> "There are limitations with the human epidemiological data ...  Ovarian cancer, in general, is not well understood and a comparable animal model is not available."

**43**. Health Canada relied on a review by Taher et al. which remains unpublished and is apparently still under peer review as of 2/22/19.  I include it in my discussion because it seems potentially relevant.

Taher et al. (39) concluded that talc was a possible cause of ovarian cancer:

---

[9] Talc is regarded as insoluble in water, in weak acids and in weak bases. It is only trivially soluble in tissue fluids (34). In this study, talc was dissolved in DMSO, an industrial solvent not found in the body, which was used as a carrier solvent: "DMSO can have a profound solubilizing effect on less soluble agents … increasing penetration simply by delivering a higher concentration …" than would otherwise be possible (35). The DMSO-talc mixture was then "filtered with a 0.2 µm syringe filter", hence talc crystals were removed. (Talc particles in both JNJ Baby Powder and in talc powders used for pleurodesis are almost entirely > 0.2 µm (36;37)). Thus, cells were exposed *in vitro* to supraphysiological concentrations of dissolved molecular talc, not crystalline talc particles.  From a toxicological perspective, the direct relevance of such *in vitro* exposures to those resulting from perineal application of talcum powder seems doubtful.

[10] The Health Canada draft cites the review as "Taher MK …, 2018 …[in preparation]".  It is not available on the web and has not been indexed by NLM (as of 2/01/19).  I was provided a typescript manuscript by Taher et al titled "Systematic Review and Meta-Analysis of the Association between Perineal Use of Talc Powder and Risk of Ovarian Cancer" (39) and a second manuscript titled "Supplementary Material" (40), which were apparently produced in this litigation.

"…perineal exposure to talc powder is a possible cause of ovarian cancer in humans."

This conclusion is essentially the same as that of the 2010 IARC assessment.

**44**.    During 2014-2019, statements about the causes and risk factors for ovarian cancer were published on the websites of a number of well-regarded agencies and institutions.  In some cases, statements underwent modification during that time span. Following are statements from some of those websites listed in chronologic order; the complete statements are presented in Attachment 4:

Brigham and Women's Hospital (2014): "The cause of ovarian cancer is not yet known".  The website did not list talc as a risk factor for ovarian cancer (41).

Cancer Council of Australia (2015):  "Inferred Risks: Perineal use of talc-based body powder: Not supported by relevant experimental findings." (42)

World Cancer Prevention Fund (2017):  "Some studies have found a link between talcum powder (talc) and ovarian cancer, but there's not enough evidence to be certain of this. Even if there were an increased risk, scientists estimate it would be small." (43)

Centers for Disease Control and Prevention (2018):  The website does not list talc as a cause or risk factor for ovarian cancer (44).

American Cancer Society (2018):  "It has been suggested that talcum powder might cause cancer in the ovaries … Many studies in women have looked at the possible link between talcum powder and cancer of the ovary. Findings have been mixed … For any individual woman, if there is an increased risk, the overall increase is likely to very be small."  (45)

National Cancer Institute (2018):  "Studies of women who used talcum powder (talc) dusted on the perineum (the area between the vagina and the anus) have not found clear evidence of an increased risk of ovarian cancer" (46).

Ovacome (2018):  "There have been worries for some years that using talcum powder on the genital area may increase the risk of ovarian cancer. However, so far this has not been proved by research." (47)

Siteman Cancer Center (Your Disease Risk) (2018):  As of March, 2017, this website listed nine risk factors for ovarian cancer; it did not list talc.  In 2018, the following statement was added:  "The regular use of talcum powder in the genital area has been linked to an increased risk of ovarian cancer. It is not clear exactly why this is." (48)

<u>National Cancer Institute</u> (2019): "The weight of evidence does not support an association between perineal talc exposure and an increased risk of ovarian cancer." (49)

<u>Brigham and Women's Hospital</u> (2019): "It's not clear if using talcum powder on the genital area raises the risk for ovarian cancer.  Talk with your healthcare provider if you decide that you want to use talcum powder." (50)

**45**.    In summary, I conclude that science has not established that perineal talc use causes ovarian cancer.  The most recent meta-analyses (including the unpublished Taher report) concluded that results were only "suggestive," that a causal link "has not yet been established," and that perineal exposure to talc powder is only "a possible cause of ovarian cancer in humans", affirming IARC's 2006 conclusion that perineal use of talc was "*possibly carcinogenic to humans (i.e., Group 2B)*".  As of 2/22/19, well regarded websites (including CDC, NCI, ACS, and Cancer Council of Australia) do not list talc as a cause of ovarian cancer.

## V.    <u>Conclusion</u>

**46**.    Outside of reports and testimony by litigation experts, the strongest published statement I have found regarding the proposed carcinogenicity of perineal talc is the 2010 IARC conclusion that the evidence is "*limited*" and that it is "*possibly carcinogenic to humans*", a conclusion that has been repeated in the most recent studies and reports.

**47**.    Accordingly, it is my opinion to a reasonable degree of scientific certainty that science has not established that perineal talc use causes ovarian cancer.

**48**.    I reserve the right to revise my opinion in the event that additional information becomes available.

February 25, 2019

Jonathan Borak  MD

Reference List

(1)  Cramer DW, Welch WR, Scully RE, Wojciechowski CA. Ovarian cancer and talc. A case-control study. Cancer 1982; 50:372-376.

(2)  Wentzensen N, Wacholder S. Talc use and ovarian cancer: epidemiology between a rock and a hard place. JNCI 2014; 106.

(3)  National Cancer Institute. Ovarian, Fallopian Tube, and Primary Peritoneal Cancer Prevention-for Health Professionals (PDQ®) (at:https://www.cancer.gov/types/ovarian/hp/ovarian-prevention-pdq#cit/section_3.46). Washington, DC: National Cancer Institute; 2018.

(4)  Gross AJ, Berg PH. A meta-analytical approach examining the potential relationship between talc exposure and ovarian cancer. J Expo Anal Environ Epidemiol 1995; 5:181-195.

(5)  Cramer DW, Liberman RF, Titus-Ernstoff L, Welch WR, Greenberg ER, Baron JA et al. Genital talc exposure and risk of ovarian cancer. Int J Cancer 1999; 81:351-356.

(6)  Harlow BL, Cramer DW, Bell DA, Welch WR. Perineal exposure to talc and ovarian cancer risk. Obstet Gynecol 1992; 80:19-26.

(7)  Harlow BL, Hartge PA. A review of perineal talc exposure and risk of ovarian cancer. Regul Toxicol Pharmacol 1995; 21:254-260.

(8)  Heller DS, Westhoff C, Gordon RE, Katz N. The relationship between perineal cosmetic talc usage and ovarian talc particle burden. Am J Obstet Gynecol 1996; 174:1507-1510.

(9)  International Agency for Research on Cancer. Asbestos. IARC Monogr Eval Carcinog Risks Hum 1973; 2.

(10)  International Agency for Research on Cancer. Asbestos. IARC Monogr Eval Carcinog Risks Hum 1977;(14):1-106.

(11)  International Agency for Research on Cancer. Overall Evaluations of Carcinogenicity: An updating of IARC Monographs Volumes 1 to 42. 7 ed. Lyon: IARc; 1987.

(12)  Baan R, Straif K, Grosse Y, Secretan B, El Ghissassi F, Cogliano V. Carcinogenicity of carbon black, titanium dioxide, and talc. Lancet Oncol 2006; 7:295-296.

(13)  Langseth H, Hankinson SE, Siemiatycki J, Weiderpass E. Perineal use of talc and risk of ovarian cancer. J Epidemiol Community Health 2008; 62:358-360.

(14) Gates MA, Tworoger SS, Terry KL, Titus-Ernstoff L, Rosner B, De Vivo I et al. Talc use, variants of the GSTM1, GSTT1, and NAT2 genes, and risk of epithelial ovarian cancer. Cancer Epidemiol Biomarkers Prev 2008; 17:2436-2444.

(15) International Agency for Research on Cancer. Carbon Black, Titanium Dioxide, and Talc. IARC Monogr Eval Carcinog Risks Chem Human 2010; 93:277-413.

(16) Rosenblatt KA, Weiss NS, Cushing-Haugen KL, Wicklund KG, Rossing MA. Genital powder exposure and the risk of epithelial ovarian cancer. Cancer Causes Control 2011; 22:737-742.

(17) Chen YA, Chen Z, Tsai Y-Y, Qu X, Iversen E, Barnholtz-Sloan J et al. Pathway and gene set analysis for epithelial ovarian cancer (EOC) genome wide association study (GWAS). [Abstract 4729] In Proceedings of the 102nd Annual Meeting of the American Association for Cancer Research, April 2-6, 2011. Cancer Res 2011; 71 (Suppl 8).

(18) International Agency for Research on Cancer. Asbestos (Chrysotile, Amosite, Crocidolite, Tremolite, Actinolite, and Anthophyllite). IARC Monogr Eval Carcinog Risks Chem Human 2012; 100C:219-309.

(19) Siteman Cancer Center. Your Disease Risk (at:http://www.yourdiseaserisk.wustl.edu/). St. Louis: Siteman Cancer Center; 2013.

(20) Gertig DM, Hunter DJ, Cramer DW, Colditz GA, Speizer FE, Willett WC et al. Prospective study of talc use and ovarian cancer. JNCI 2000; 92:249-252.

(21) Houghton SC, Reeves KW, Hankinson SE, Crawford L, Lane D, Wactawski-Wende J et al. Perineal powder use and risk of ovarian cancer. JNCI 2014; 106.

(22) Terry KL, Karageorgi S, Shvetsov YB, Merritt MA, Lurie G, Thompson PJ et al. Genital powder use and risk of ovarian cancer: a pooled analysis of 8,525 cases and 9,859 controls. Cancer Prev Res (Phila) 2013; 6:811-821.

(23) Ness R. Does talc exposure cause ovarian cancer? (IGCS-0015). International Journal of Gynecological Cancer 2015; 25 (Suppl 1):51.

(24) Cramer DW, Titus-Ernstoff L, McKolanis JR, Welch WR, Vitonis AF, Berkowitz RS et al. Conditions associated with antibodies against the tumor-associated antigen MUC1 and their relationship to risk for ovarian cancer. Cancer Epidemiol Biomarkers Prev 2005; 14:1125-1131.

(25) Cramer DW, Vitonis AF, Terry KL, Welch WR, Titus LJ. The association between talc use and ovarian cancer: a retrospective case-control study in two US states. Epidemiology 2016; 26:334-346.

(26) Webb PM, Jordan SJ. Epidemiology of epithelial ovarian cancer. Best Pract Res Clin Obstet Gynaecol 2016; still in print.

(27) Narod SA. Talc and ovarian cancer. Gynecol Oncol 2016; 141:410-412.

(28) Danish Environmental Protection Agency. Evaluation of Health Hazards by Exposure to Talcum, Cosmetic Grade (non-fibrous) and Proposal of a Health-based Quality Criterion for Ambient Air (ISBN: 978-87-93529-23-6). Denmark: Danish Environmental Protection Agency; 2016.

(29) Berge W, Mundt K, Luu H, Boffetta P. Genital use of talc and risk of ovarian cancer: a meta-analysis. Eur J Cancer Prev 2017; DOI:10.1097/CEJ.0000000000000340.

(30) Berge W, Mundt K, Luu H, Boffetta P. Genital use of talc and risk of ovarian cancer: a meta-analysis. Eur J Cancer Prev 2018; 27:248-257.

(31) Penninkilampi R, Eslick GD. Perineal talc use and ovarian cancer: A systematic review and meta-analysis. Epidemiology 2018; 29:41-49.

(32) Saed GM, Diamond MP, Fletcher NW. Updates of the role of oxidative stress in the pathogenesis of ovarian cancer. Gynecol Oncol 2017; 145:595-602.

(33) Saed GM, Morris RT, Fletcher NM. New Insights into the Pathogenesis of Ovarian Cancer: Oxidative Stress. In: Devaja O, Papadopoulos A, editors. Ovarian Cancer - From Pathogenesis to Treatment. 2018. 83-110.

(34) Jurinski JB, Rimstidt JD. Biodurability of talc. Am Mineral 2001; 86:392-399.

(35) Capriotti K, Capriotti JA. Dimethyl sulfoxide: history, chemistry, and clinical utility in dermatology. J Clin Aesthet Dermatol 2012; 5:24-26.

(36) Gilbert CR, Furman BR, Feller-Kopman DJ, Haouzi P. Description of particle size, distribution, and behavior of talc preparations commercially available within the United States. J Bronchology Interv Pulmonol 2018; 25:25-30.

(37) Klingler GA. Digital Computer Analysis of Particle Size Distribution in Dusts and Powders. (Project 7116) (AD-752209). Wright-Patterson Air Force Base, Ohio: Aerospace Research Laboratories, 1972.

(38) Talc (Chemical Abstracts Service Registry Number 14807-96-6). Environment and Climate Change Canada; 2018.

(39) Taher MK, Farhat N, Karyakina NA, Shilnikova N, Ramoju S, Gravel CA et al. Systematic Review and Meta-Analysis of the Association Between Perineal Use of Talc and Risk of Ovarian Cancer. 2018.

(40)  Taher MK, Farhat N, Karyakina NA, Shilnikova N, Ramoju S, Gravel CA et al. Systematic Review and Meta-Analysis of the Association between Perineal Use of Talc Powder and Risk of Ovarian Cancer. (Supplemental Material).  2018.

(41)  Brigham and Women's Hospital. Ovarian Cancer (at:http://healthlibrary.brighamandwomens.org/Library/DiseasesConditions/Adult/Gynecological/85,P00575). Boston: Brigham and Women's Hospital; 2014.

(42)  Cancer Council of Australia. Inferred Risk (at: https://www.cancer.org.au/about-cancer/causes-of-cancer/environmental-causes/inferred-risk.html). Sydney: Cancer Council of Australia; 2018.

(43)  World Cancer Research Fund. Can cosmetics and toiletries cause cancer? (https://www.wcrf.org/informed/articles/can-cosmetics-and-toiletries-cause-cancer). London: World Cancer Research Fund; 2017.

(44)  CDC. Ovarian Cancer (at: https://www.cdc.gov/cancer/ovarian/basic_info/risk_factors.htm). Atlanta: Centers for Disease Control and Prevention; 2018.

(45)  American Cancer Society. Ovarian Cancer (at:https://www.cancer.org/cancer/ovarian-cancer/causes-risks-prevention/risk-factors.html). 2019.

(46)  National Cancer Institute. Ovarian, Fallopian Tube, and Primary Peritoneal Cancer Prevention (PDQ) - Patient Version (at: https://www.cancer.gov/types/ovarian/patient/ovarian-prevention-pdq#section/_11). Washington, DC: National Cancer Institute; 2018.

(47)  Ovacome. Talcum powder and ovarian cancer: Fact Sheet 14 (at: https://www.ovacome.org.uk/talcum-powder-and-ovarian-cancer). London: Ovacome; 2018.

(48)  Siteman Cancer Center. Your Disease Risk (at:https://siteman.wustl.edu/prevention/ydr/). St. Louis: Siteman Cancer Center; 2019.

(49)  National Cancer Institute. Ovarian, Fallopian Tube, and Primary Peritoneal Cancer Prevention–for Health Professionals (PDQ®) (at:https://www.cancer.gov/types/ovarian/hp/ovarian-prevention-pdq#section/_9). Washington, DC: National Cancer Institute; 2019.

(50)  Brigham and Women's Hospital. Ovarian Cancer (http://healthlibrary.brighamandwomens.org/search/34,17170-1). Boston: Brigham and Women's Hospital; 2019.

# Attachment 1:
# Expert Reports, Testimony and other Related Materials

I have reviewed the following expert reports and testimony, listed alphabetically and chronologically according to the named experts' last name:

Kurt Barnhart: Testimony re: Ristesund (4/27/2016)
Alan Campion: MDL Report (11/16/18)
Arch Carson: MDL Report (11/16/18)
Lewis Chodosh: Testimony re: Ristesund (4/21/2016)
Lewis Chodosh: Testimony re: Ristesund (4/22/2016)
Daniel Clarke-Pearson: MDL Report (11/16/2018)
Graham Colditz: Report (07/31/2015)
Graham Colditz: Report (10/05/2016)
Graham Colditz: Deposition (re: Hogans) part 1: (09/19/2015)
Graham Colditz: Deposition (re: Hogans) part 2: (10/16/2015)
Graham Colditz: Testimony re: Kemp Hearing (08/16/2016)
Daniel Cramer: Report re: Berg (08/24/2011)
Daniel Cramer: Report re: Blaes (04/16/2015) and attachments
Daniel Cramer: Report re: Fox (07/31/2015) and attachments
Daniel Cramer: Report re: Pfau (07/31/2015) and attachments
Daniel Cramer: Report re: Ristesund (11/01/2015) and attachments
Daniel Cramer: Report re: Oules (10/04/2016)
Daniel Cramer: Deposition re: Berg (09/17/2012)
Daniel Cramer: Deposition re: Blaes (05/18/2015)
Daniel Cramer: Deposition re: Ristesund (11/13/2015)
Daniel Cramer: Testimony re: Ristesund (4/19/2016)
Daniel Cramer: Testimony re: Ristesund (4/20/2016)
Daniel Cramer: Testimony re: Kemp Hearing (08/08/2016)
Daniel Cramer: Testimony re: Oules (12/06/2016)
Michael M. Crowley: MDL Report (11/12/2018)
Mary J. Cunningham: Testimony re: Kemp Hearing (08/12/2016)
John Godleski:  Report re: Oules (07/21/2016)
John Godleski: Deposition re: Oules (12/05/2016)
John Godleski: Testimony re: Ristesund (4/18/2016)
John Godleski: Testimony re: Berg (09/26/2013)
John Godleski Testimony re: Kemp Hearing (08/09/2016)
David Hoel: Deposition re: Blais (09/01/2015)
Michael Huncharek: Report re: Berg (04/23/2012)
Sarah E. Kane: MDL Report (11/15/2018)
Robert Kurman: Testimony re: Ristesund (4/25/2016)
Anne McTiernan: MDL Report (11/16/2018)
Anne McTiernan: Deposition (01/28/2019)
Patricia G. Moorman: MDL Report (11/16/2018)
Joshua: Muscat: Report re: Berg (06/24/2012) and attachments
Joshua: Muscat: Trial Testimony re: Berg (10/01/2013)

Roberta Ness: Report re: Blaes (general causation) (04/2015)
Roberta Ness: Report re: Fox (08/2015)
Roberta Ness: Report re: Hancock (09/2015)
Roberta Ness: Report re: Pfau (08/2015)
Roberta Ness: Deposition re: Blaes (06/09/2015)
Roberta Ness: Deposition re: Fox (10/12/2015)
Roberta Ness: Deposition re: Hancock (09/2015)
Roberta Ness: Deposition re: Pfau (10/14/2015)
Curtis Omiecinski: Report (04/09/2015)
Curtis Omiecinski: Report (09/30/2016)
Curtis Omiecinski: Deposition re: Blaes (05/20/2015)
Curtis Omiecinski: Testimony re: Kemp Hearing (08/15/2016)
Laura Plunket: Report (10/05/2016)
Laura Plunket: Testimony re: Slemp (04/20/2017)
Laura Plunket: Testimony re: Slemp (04/21/2017)
Laura Plunket: MDL Report (11/16/2018)
Laura Plunket: Testimony re: Forrest (12/18/2018)
Gary Rosenthal: Report re: Berg (08/26/2011)
Gary Rosenthal: Report re: Blais (04/16/2015)
Gary Rosenthal: Deposition re: Berg (09/19/2012)
Gary Rosenthal: Deposition re: Blaes (06/11/2015)
Gary Rosenthal: Trial testimony re: Berg (09/27/2013)
Elaine F. Schumacher: Testimony re: Kemp Hearing (08/12/2016)
Ghassan M. Saed: MDL Report (11/16/2018)
Ghassan M. Saed: Deposition (01/23/2019 and 02/14/2019)
Jack Siemiatycki: Report (10/04/2016)
Jack Siemiatycki: Deposition re: Oules (12/15/2016 and 12/16/2016)
Jack Siemiatycki: MDL Report (11/16/2018)
Jack Siemiatycki: Deposition (01/29/2019)
Jack Siemiatycki: MDL Report: Addendum (02/01/2019)
Sonal Singh: MDL Report (11/16/2018)
Sonal Singh: Deposition (01/16/2019)
Ellen Blair Smith: MDL Report (11/16/18)
Rebecca Smith-Bindman: MDL Report (11/15/2018)
David Steinberg: Report re: Blais (04/17/2015)
David Steinberg: Report re: Oules (10/05/2016)
David Steinberg: Deposition re: Blais (06/01/2015)
David Steinberg: Testimony re: Kemp Hearing (08/15/2016)
Douglas Weed re: Testimony re: Kemp Hearing (08/11/2016)
William Welch: Report re: Oules (09/27/2016)
Judith Wolf: MDL Report (11/16/2018)
April Zambelli-Weiner: MDL Report (11/16/2018)
Judith Zelikoff: MDL Report (11/16/2018)

I have also reviewed the following other related materials:

Opinion of Judge Nelson Johnson, re: Kemp Hearing (09/02/2016)
Gilbert Balderrama:  Deposition re: Balderrama (11/24/2015)
Maurice Berkowitz:  Deposition re: Balderrama (01/05/2016)
Wei-Chien Lin:  Deposition re: Balderrama (01/04/2015)
Plaintiffs Amended Disclosure re: Carl (12/18/2015)
Plaintiffs Disclosure of General Expert Testimony re: Carl (12/18/2015)
Rothman KJ, Pastides H, Samet J:  Interpretation of epidemiologic studies on talc and ovarian cancer (Unpublished report, 11/28/2000).
Internet websites of agencies and institutions including:
American Cancer Society (ACS); Brigham and Women's Hospital; Centers for Disease Control and Prevention (CDC); Harvard School of Public Health; International Agency for Research on Cancer (IARC); National Cancer Institute (NCI); Ovacome; Siteman Cancer Center

# Attachment 2:
# Materials Considered

1   Hygienic Guide Series: Talc. Am Ind Hyg Assoc J 1982.
    Ref ID: 14787
2   Talc (Chemical Abstracts Service Registry Number 14807-96-6). Environment and Climate Change Canada; 2018.
    Ref ID: 37356
3   Aarestrup J, Trabert B, Ulrich LG, Wentzensen N, Sorensen TIA, Baker JL. Childhood overweight, tallness, and growth increase risk of ovarian cancer. Cancer Epidemiol Biomarkers Prev 2019; 28:183-188.
    Ref ID: 37427
4   Abbott SE, Bandera EV, Qin B, Peres LC, Moorman PG, Barnholtz-Sloan J et al. Recreational physical activity and ovarian cancer risk in African American women. Cancer Med 2016; 5:1319-1327.
    Ref ID: 35576
5   Abenhaim HA, Titus-Ernstoff L, Cramer DW. Ovarian cancer risk in relation to medical visits, pelvic examinations and type of health care provider. Can Med Assoc J 2007; 176:941-947.
    Ref ID: 35800
6   Abrao MS, Muzii L, Marana R. Anatomical causes of female infertility and their managment. Int J Gynecol Obstet 2013; 123 (suppl 2):S18-S24.
    Ref ID: 37213
7   Adams SV, Quraishi SM, Shafer MM, Passarelli MN, Freney EP, Chlebowski RT et al. Dietary cadmium exposure and risk of breast, endometrial, and ovarian cancer in the Women's Health Initiative. EHP 2014; 122:594-600.
    Ref ID: 36246
8   Agarwal AM, Grey TC. Pulmonary talc granulomatosis masquerading as massive pulmonary embolism. Int J Surg Pathol 2009; 17:454.
    Ref ID: 29484
9   Agic A, Xu H, Finas D, Banz C, Diedrich K, Hornung D. Is endometriosis associated with systemic subclinical inflammation? Gynecol Obstet Invest 2006; 62:139-147.
    Ref ID: 37207
10  Akinwunmi BO, Babic A, Vitonis AF, Cramer DW, Titus L, Tworoger SS et al. Chronic medical conditions and CA125 levels among women without ovarian cancer. Cancer Epidemiol Biomarkers Prev 2018; 27:1483-1490.
    Ref ID: 37308
11  Alberg AJ, Moorman PG, Crankshaw S, Wang F, Bandera EV, Barnholtz-Sloan JS et al. Socioeconomic Status in Relation to the Risk of Ovarian Cancer in African-American Women: A Population-Based Case-Control Study. Am J Epidemiol 2016; 184:274-283.
    Ref ID: 35687
12  Alexandrescu DT, Riordan NH, Ichim TE, Kauffman CL, Kabigting F, Dutton CT et al. On the missing link between inflammation and cancer. Dermatol Online J 2011; 17:1-6.
    Ref ID: 34909
13  Alfonso L, Ai G, Spitale RC, Bhat GJ. Molecular targets of aspirin and cancer prevention. Br J Cancer 2014; 111:61-67.
    Ref ID: 37222
14  Ali AT. Fertility drugs and ovarian cancer. Curr Cancer Drug Targets 2018; 18:567-576.
    Ref ID: 36342
15  Allaire GS, Goodman ZD, Ishak KG, Rabin L. Talc in liver tissue of intravenous drug abusers with chronic hepatitis. A comparative study. Am J Clin Pathol 1989; 92:583-588.
    Ref ID: 34945
16  American Cancer Society. Ovarian Cancer (at:https://www.cancer.org/cancer/ovarian-cancer/causes-risks-prevention/risk-factors.html). 2019.
    Ref ID: 37300
17  Anastasi E, Capoccia D, Granato T, Silecchia G, Rizzello M, Porpora MG et al. Implementing the Risk of Ovarian Malignancy Algorithm adding obesity as a predictive factor. Anticancer Res 2016; 36:6425-6429.
    Ref ID: 35987

18  Anderson EL, Sheehan PJ, Kalmes RM, Griffin JR. Assessment of health risk from historical use of cosmetic talcum powder. Risk Anal 2017; 37:918-929.
Ref ID: 35619

19  Anon. When is a carcinogen not a carcinogen? Lancet Oncol 2016; 17:681.
Ref ID: 36106

20  Aune D, Navarro Rosenblatt DA, Chan DS, Abar L, Vingeliene S, Vieira AR et al. Anthropometric factors and ovarian cancer risk: a systematic review and nonlinear dose-response meta-analysis of prospective studies. Int J Cancer 2015; 136:1888-1898.
Ref ID: 35271

21  Aune D, Navarro Rosenblatt DA, Chan DS, Vingeliene S, Abar L, Vieira AR et al. Anthropometric factors and endometrial cancer risk: a systematic review and dose-response meta-analysis of prospective studies. Ann Oncol 2015; 26:1635-1648.
Ref ID: 35270

22  Avgerinos KI, Spyrou N, Mantzoros CS, Dalamaga M. Obesity and cancer risk: Emerging biological mechanisms and perspectives. Metabolism 2019; 92:121-135.
Ref ID: 37253

23  Baan R, Straif K, Grosse Y, Secretan B, El Ghissassi F, Cogliano V. Carcinogenicity of carbon black, titanium dioxide, and talc. Lancet Oncol 2006; 7:295-296.
Ref ID: 24742

24  Baandrup L, Faber MT, Christensen J, Jensen A, Andersen KK, Friis S et al. Nonsteroidal anti-inflammatory drugs and risk of ovarian cancer: systematic review and meta-analysis of observational studies. Acta Obstet Gynecol Scand 2013; 92:245-255.
Ref ID: 34910

25  Babic A, Harris HR, Vitonis AF, Titus LJ, Jordan SJ, Webb PM et al. Menstrual pain and risk of epithelial ovarian cancer: results from the Ovarian Cancer Association Consortium. Int J Cancer 2017; still in print.
Ref ID: 36409

26  Bahar-Shany K, Brand H, Sapoznik S, Jacob-Hirsch J, Yung Y, Korach J et al. Exposure of fallopian tube epithelium to follicular fluid mimics carcinogenic changes in precursor lesions of serous papillary carcinoma. Gynecol Oncol 2014; 132:322-327.
Ref ID: 37241

27  Bandera EV, Qin B, Moorman PG, Alberg AJ, Barnholtz-Sloan JS, Bondy M et al. Obesity, weight gain, and ovarian cancer risk in African American women. Int J Cancer 2016; 139:593-600.
Ref ID: 35690

28  Barlow CA, Marsh GM, Benson S, Finley BL. The  mineralogy and epidemiology of cosmetic tale. Toxicol Appl Pharmacol 2018; 361:173.
Ref ID: 37321

29  Barnard ME, Hecht JL, Rice MS, Gupta M, Harris HR, Eliassen AH et al. Anti-Inflammatory drug use and ovarian cancer risk by COX1/COX2 expression and infiltration of tumor-associated macrophages. Cancer Epidemiol Biomarkers Prev 2018; 27:1509-1517.
Ref ID: 37307

30  Barnard ME, Poole EM, Curhan GC, Eliassen AH, Rosner BA, Terry KL et al. Association of analgesic use with risk of ovarian cancer in the Nurses' Health Studies. JAMA Oncol 2018; 4:1675-1682.
Ref ID: 37224

31  Baron RD, Milton R, Thorpe JA. Pleurodesis using small talc particles results in an unacceptably high rate of acute lung injury and hypoxia. Ann Thorac Surg 2007; 84:2136.
Ref ID: 27081

32  Belotte J, Fletcher NM, Saed MG, Abusamaan MS, Dyson G, Diamond MP et al. A single nucleotide polymorphism in catalase is strongly associated with ovarian cancer survival. PloS One 2015; 10:e0135739.
Ref ID: 37240

33  Beral V, Gaitskell K, Hermon C, Moser K, Reeves G, Peto R et al. Ovarian cancer and smoking: individual participant meta-analysis including 28,114 women with ovarian cancer from 51 epidemiological studies. Lancet Oncol 2012; 13:946-956.
Ref ID: 35279

34  Berge W, Mundt K, Luu H, Boffetta P. Genital use of talc and risk of ovarian cancer: a meta-analysis. Eur J Cancer Prev 2017; DOI:10.1097/CEJ.0000000000000340.
Ref ID: 37447

35  Berge W, Mundt K, Luu H, Boffetta P. Genital use of talc and risk of ovarian cancer: a meta-analysis. Eur J Cancer Prev 2018; 27:248-257.
Ref ID: 36032

36  Bethea TN, Palmer JR, Adams-Campbell LL, Rosenberg L. A prospective study of reproductive factors and exogenous hormone use in relation to ovarian cancer risk among Black women. Cancer Causes

Control 2017; 28:385-391.
Ref ID: 35983

37  Birmann BM, Barnard ME, Bertrand KA, Bao Y, Crous-Bou M, Wolpin BM et al. Nurses' health study contributions on the epidemiology of less common cancers: endometrial, ovarian, pancreatic, and hematologic. Am J Public Health 2016; 106:1608-1615.
Ref ID: 35624

38  Blount AM. Amphibole content of cosmetic and pharmaceutical talcs. EHP 1991; 94:225-230.
Ref ID: 36726

39  Boffetta P, Mundt KA, Thompson WJ. The epidemiologic evidence for elongate mineral particle (EMP)-related human cancer risk. Toxicol Appl Pharmacol 2018; 361:100-106.
Ref ID: 37114

40  Boice JD, Jr., Engholm G, Kleinerman RA, Blettner M, Stovall M, Lisco H et al. Radiation dose and second cancer risk in patients treated for cancer of the cervix. Radiat Res 1988; 116:3-55.
Ref ID: 37174

41  Bonovas S, Filioussi K, Sitaras NM. Do nonsteroidal anti-inflammatory drugs affect the risk of developing ovarian cancer? A meta-analysis. Br J Clin Pharmacol 2005; 60:194-203.
Ref ID: 35009

42  Boorman GA, Seely JC. The lack of an ovarian effect of lifetime talc exposure in F344/N rats and B6C3F1 mice. Regul Toxicol Pharmacol 1995; 21:242-243.
Ref ID: 34912

43  Boorman GA, Mantovani A. Inflammation and cancer. Lancet 2001; 357:539-545.
Ref ID: 34911

44  Booth M, Beral V, Smith P. Risk factors for ovarian cancer: a case-control study. Br J Cancer 1989; 60:592-598.
Ref ID: 34913

45  Boring CC, Squires TS, Tong T. Cancer statistics: 1991. CA Cancer J Clin 1991; 41:19-36.
Ref ID: 5502

46  Bosetti C, Rosato V, Gallus S, Cuzick J, La Vecchia C. Aspirin and cancer risk: a quantitative review to 2011. Ann Oncol 2012; 23:1403-1415.
Ref ID: 35038

47  Botesteanu DA, Lipkowitz S, Lee JM, Levy D. Mathematical models of breast and ovarian cancers. Wiley Interdiscip Rev Syst Biol Med 2016; 8:337-362.
Ref ID: 35580

48  Braem MG, Onland-Moret NC, Schouten LJ, Tjonneland A, Hansen L, Dahm CC et al. Coffee and tea consumption and the risk of ovarian cancer: a prospective cohort study and updated meta-analysis. Am J Clin Nutr 2012; 95:1172-1181.
Ref ID: 36421

49  Brigham and Women's Hospital. Ovarian Cancer (at:http://healthlibrary.brighamandwomens.org/Library/DiseasesConditions/Adult/Gynecological/85,P00575). Boston: Brigham and Women's Hospital; 2014.
Ref ID: 35309

50  Brigham and Women's Hospital. Ovarian Cancer (http://healthlibrary.brighamandwomens.org/search/34,17170-1). Boston: Brigham and Women's Hospital; 2019.
Ref ID: 36009

51  Brinton LA, Lamb EJ, Moghissi KS, Scoccia B, Althuis MD, Mabie JE et al. Ovarian cancer risk associated with varying causes of infertility. Fertil Steril 2004; 82:405-414.
Ref ID: 37280

52  Brinton LA, Westhoff CL, Scoccia B, Lamb EJ, Althuis MD, Mabie JE et al. Causes of infertility as predictors of subsequent cancer risk. Epidemiology 2005; 16:500-507.
Ref ID: 37219

53  Browning L, Patel MR, Horvath EB, Tawara K, Jorcyk CL. IL-6 and ovarian cancer: inflammatory cytokines in promotion of metastasis. Cancer Manag Res 2018; 10:6685-6693.
Ref ID: 37315

54  Brunham RC, Gottlieb SL, Paavonen J. Pelvic inflammatory disease. NEJM 2015; 372:2039-2048.
Ref ID: 37215

55  Bulun SE, Wan Y, Matei D. Epithelial mutations in endometriosis: Link to ovarian cancer. Endocrinology 2019; 160:626-638.
Ref ID: 37423

56  Burghaus S, Fasching PA, Haberle L, Rubner M, Buchner K, Blum S et al. Genetic risk factors for ovarian cancer and their role for endometriosis risk. Gynecol Oncol 2017; 145:142-147.
Ref ID: 36159

57  Buz'Zard AR, Lau BH. Pycnogenol reduces talc-induced neoplastic transformation in human ovarian cell cultures. Phytother Res 2007; 21:579-586.
Ref ID: 34914

58  Calaf GM, Urzua U, Termini L, Aguayo F. Oxidative stress in female cancers. Oncotarget 2018; 9:23824-23842.
Ref ID: 37239

59  Camargo MC, Stayner LT, Straif K, Reina M, Al-Alem U, Demers PA et al. Occupational exposure to asbestos and ovarian cancer: a meta-analysis. EHP 2018; 119:1211-1217.
Ref ID: 37151

60  Campion A, Smith KJ, Fedulov AV, Gregory D, Fan Y, Godleski JJ. Identification of Foreign Particles in Human Tissues using Raman Microscopy. Anal Chem 2018; 90:8362-8369.
Ref ID: 36817

61  Cannioto R, LaMonte MJ, Risch HA, Hong CC, Sucheston-Campbell LE, Eng KH et al. Chronic recreational physical inactivity and epithelial ovarian cancer risk: evidence from the Ovarian Cancer Association Consortium. Can Epidemiol Biomarkers Prev 2016; 25:1114-1124.
Ref ID: 35512

62  Cannioto RA, LaMonte MJ, Kelemen LE, Risch HA, Eng KH, Minlikeeva AN et al. Recreational physical inactivity and mortality in women with invasive epithelial ovarian cancer: evidence from the Ovarian Cancer Association Consortium. Br J Cancer 2016; 115:95-101.
Ref ID: 35583

63  Cannioto RA, Trabert B, Poole EM, Schildkraut JM. Ovarian cancer epidemiology in the era of collaborative team science. Cancer Causes Control 2017; 28:487-495.
Ref ID: 36288

64  Capriotti K, Capriotti JA. Dimethyl sulfoxide: history, chemistry, and clinical utility in dermatology. J Clin Aesthet Dermatol 2012; 5:24-26.
Ref ID: 37408

65  Cardenas C, Alvero AB, Yun B, Mor G. Redefining the origin and evolution of ovarian cancer: A hormonal connection. Endocr Relat Cancer 2016; 23:R411-R422.
Ref ID: 35628

66  Carr CJ. Talc: Consumer Uses and Health Perspectives. Proceedings of a workshop. Bethesda, Maryland, January 31-February 1, 1994. Regul Toxicol Pharmacol 1995; 21:211-215.
Ref ID: 35041

67  CDC. Ovarian Cancer (at: http://www.cdc.gov/cancer/ovarian/) (accessed 02/16). Atlanta: Centers for Disease Control and Prevention; 2016.
Ref ID: 35306

68  CDC. Ovarian Cancer (at: https://www.cdc.gov/cancer/ovarian/basic_info/risk_factors.htm). Atlanta: Centers for Disease Control and Prevention; 2018.
Ref ID: 37299

69  Chan DW, Liu VW, Tsao GS, Yao KM, Furukawa T, Chan KK et al. Loss of MKP3 mediated by oxidative stress enhances tumorigenicity and chemoresistance of ovarian cancer cells. Carcinogenesis 2008; 29:1742-1750.
Ref ID: 37266

70  Chang CJ, Tu YK, Chen PC, Yang HY. Occupational exposure to talc increases the risk of lung cancer: A meta-analysis of occupational cohort studies. Can Respir J 2017; 2017 (1270608).
Ref ID: 37186

71  Chang CJ, Tu YK, Chen PC, Yang HY. Talc exposure and risk of stomach cancer: Systematic review and meta-analysis of occupational cohort studies. J Formos Med Assoc 2018; still in print.
Ref ID: 37092

72  Chang S, Risch HA. Perineal talc exposure and risk of ovarian carcinoma. Cancer 1997; 79:2396-2401.
Ref ID: 34915

73  Charbonneau B, Goode EL, Kalli KR, Knutson KL, Derycke MS. The immune system in the pathogenesis of ovarian cancer. Crit Rev Immunol 2013; 33:137-164.
Ref ID: 37204

74  Chen F, Gaitskell K, Garcia MJ, Albukhari A, Tsaltas J, Ahmed AA. Serous tubal intraepithelial carcinomas associated with high-grade serous ovarian carcinomas: a systematic review. BJOG 2017; 124:872-878.
Ref ID: 36063

75  Chen QY, DesMarais T, Costa M. Metals and mechanisms of carcinogenesis. Annu Rev Pharmacol Toxicol 2019; 59:537-554.
Ref ID: 37429

76    Chen Y, Wu PC, Lang JH, Ge WJ, Hartge P, Brinton LA. Risk factors for epithelial ovarian cancer in Beijing, China. Int J Epidemiol 1992; 21:23-29.
Ref ID: 34949

77    Chen YA, Chen Z, Tsai Y-Y, Qu X, Iversen E, Barnholtz-Sloan J et al. Pathway and gene set analysis for epithelial ovarian cancer (EOC) genome wide association study (GWAS). [Abstract 4729] In Proceedings of the 102nd Annual Meeting of the American Association for Cancer Research, April 2-6, 2011. Cancer Res 2011; 71 (Suppl 8).
Ref ID: 35288

78    Chow E, Mahalingaiah S. Cosmetics use and age at menopause: is there a connection? Fertil Steril 2016; 106:978-990.
Ref ID: 35680

79    Chuffa LGA, Reiter RJ, Lupi Junior LA. Melatonin as a promising agent to treat ovarian cancer: molecular mechanisms. Carcinogenesis 2017; 38:945-952.
Ref ID: 36328

80    Cibula D, Widschwendter M, Majek O, Dusek L. Tubal ligation and the risk of ovarian cancer: review and meta-analysis. Hum Reprod Update 2011; 17:55-67.
Ref ID: 35521

81    Cirillo PM, Wang ET, Cedars MI, Chen LM, Cohn BA. Irregular menses predicts ovarian cancer: Prospective evidence from the Child Health and Development Studies. Int J Cancer 2016; 139:1009-1017.
Ref ID: 35402

82    Clendenen TV, Lundin E, Zeleniuch-Jacquotte A, Koenig KL, Berrino F, Lukanova A et al. Circulating inflammation markers and risk of epithelial ovarian cancer. Cancer Epidemiol Biomarkers Prev 2011; 20:799-810.
Ref ID: 37258

83    Clyde MA, Palmieri Weber R, Iversen ES, Poole EM, Doherty JA, Goodman MT et al. Risk prediction for epithelial ovarian cancer in 11 United States-based case-control studies: Incorporation of epidemiologic risk factors and 17 confirmed genetic loci. Am J Epidemiol 2016; 184:555-569.
Ref ID: 35776

84    Cobb LP, Gaillard S, Wang Y, Shih I, Secord AA. Adenocarcinoma of Mullerian origin: review of pathogenesis, molecular biology, and emerging treatment paradigms. Gynecol Oncol Res Pract 2015; 2:1.
Ref ID: 36071

85    Coggiola M, Bosio D, Pira E, Piolatto PG, La Vecchia C, Negri E et al. An update of mortality study of talc miners and millers in Italy. Am J Ind Med 2003; 44:63-69.
Ref ID: 37139

86    Colditz GA, Philpott SE, Hankinson SE. The impact of the nurses' health study on population health: prevention, translation, and control. Am J Public Health 2016; 26:e1-e6.
Ref ID: 35625

87    Cook LS, Kamb ML, Weiss NS. Perineal powder exposure and the risk of ovarian cancer. Am J Epidemiol 1997; 145:459-465.
Ref ID: 34953

88    Craig ER, Londono AI, Norian LA, Arend RC. Metabolic risk factors and mechanisms of disease in epithelial ovarian cancer: A review. Gynecol Oncol 2016; 143:674-683.
Ref ID: 35881

89    Cralley LJ, Key MM, Groth DH, Lainhart WS, Ligo RM. Fibrous and mineral content of cosmetic talcum products. Am Ind Hyg Assoc J 1968; 29:350-354.
Ref ID: 35300

90    Cramer DW, Welch WR, Scully RE, Wojciechowski CA. Ovarian cancer and talc. A case-control study. Cancer 1982; 50:372-376.
Ref ID: 29886

91    Cramer DW, Xu H. Epidemiologic evidence for uterine growth factors in the pathogenesis of ovarian cancer. Ann Epidemiol 1995; 5:310-314.
Ref ID: 34951

92    Cramer DW, Liberman RF, Titus-Ernstoff L, Welch WR, Greenberg ER, Baron JA et al. Genital talc exposure and risk of ovarian cancer. Int J Cancer 1999; 81:351-356.
Ref ID: 34917

93    Cramer DW. Perineal talc exposure and subsequent epithelial ovarian cancer: a case-control study. Obstet Gynecol 1999; 94:160-161.
Ref ID: 34916

94    Cramer DW, Titus-Ernstoff L, McKolanis JR, Welch WR, Vitonis AF, Berkowitz RS et al. Conditions associated with antibodies against the tumor-associated antigen MUC1 and their relationship to risk for

ovarian cancer. Cancer Epidemiol Biomarkers Prev 2005; 14:1125-1131.
Ref ID: 34918

95   Cramer DW, Welch WR, Berkowitz RS, Godleski JJ. Presence of talc in pelvic lymph nodes of a woman with ovarian cancer and long-term genital exposure to cosmetic talc. Obstet Gynecol 2007; 110:498-501.
Ref ID: 34922

96   Cramer DW, Finn OJ. Epidemiologic perspective on immune-surveillance in cancer. Curr Opin Immunol 2011; 23:265-271.
Ref ID: 35273

97   Cramer DW, Titus-Ernstoff L, Vitonis AF. Genital talc use and ovarian cancer: Influence of histologic type and menopausal status on strength and dose response of the association. [abstract LB-446] In Proceedings of the 102nd Annual Meeting of the American Association for Cancer Research, April 2-6, 2011. Cancer Res 2011; 71 (Suppl 8).
Ref ID: 35287

98   Cramer DW. The epidemiology of endometrial and ovarian cancer. Hematol Oncol Clin North Am 2012; 26:1-12.
Ref ID: 34934

99   Cramer DW, Vitonis AF, Terry KL, Welch WR, Titus LJ. The association between talc use and ovarian cancer: a retrospective case-control study in two US states. Epidemiology 2016; 26:334-346.
Ref ID: 35296

100  Cramer DW, Elias KM. A prognostically relevant miRNA signature for epithelial ovarian cancer. Lancet Oncol 2016; 17:1032-1033.
Ref ID: 35631

101  Cramer DW, Elias KM. Perspectives on ovarian cancer from SEER: today and tomorrow. JNCI 2019; 111:5-6.
Ref ID: 37428

102  Crawford L, Reeves KW, Luisi N, Balasubramanian R, Sturgeon SR. Perineal powder use and risk of endometrial cancer in postmenopausal women. Cancer Causes Control 2012; 23:1673-1680.
Ref ID: 35019

103  Danish Environmental Protection Agency. Evaluation of Health Hazards by Exposure to Talcum, Cosmetic Grade (non-fibrous) and Proposal of a Health-based Quality Criterion for Ambient Air (ISBN: 978-87-93529-23-6). Denmark: Danish Environmental Protection Agency; 2016.
Ref ID: 37359

104  Davies HE, Lee YC, Davies RJ. Pleurodesis for malignant pleural effusion: talc, toxicity and where next? Thorax 2008; 63:572-574.
Ref ID: 27765

105  Dean M, Davis DA, Burdette JE. Activin A stimulates migration of the fallopian tube epithelium, an origin of high-grade serous ovarian cancer, through non-canonical signaling. Cancer Lett 2017; 391:114-124.
Ref ID: 36155

106  Deng F, Xu X, Lv M, Ren B, Wang Y, Guo W et al. Age is associated with prognosis in serous ovarian carcinoma. J Ovarian Res 2017; 10:36.
Ref ID: 36327

107  Deutsche Forschungsgemeinschaft. Talc (without asbesto fibres) (respirable fraction). In: Deutsche Forschungsgemeinschaft, editor. The MAK-Collection Part I: MAK Value Documentation, Vol. 22. Vol. 22 ed. Weinheim: Wiley-VCH Verlag; 2006. 225-279.
Ref ID: 37363

108  Didziapetriene J, Bublevic J, Smailyte G, Kazbariene B, Stukas R. Significance of blood serum catalase activity and malondialdehyde level for survival prognosis of ovarian cancer patients. Medicina (Kaunas) 2014; 50:204-208.
Ref ID: 37265

109  Dinkelspiel HE, Matrai C, Pauk S, Pierre-Louis A, Chiu YL, Gupta D et al. Does the Presence of Endometriosis Affect Prognosis of Ovarian Cancer? Cancer Invest 2016; 34:148-154.
Ref ID: 35366

110  Dixon SC, Nagle CM, Thrift AP, Pharoah PD, Pearce CL, Zheng W et al. Adult body mass index and risk of ovarian cancer by subtype: a Mendelian randomization study. Int J Epidemiol 2016; 45:884-895.
Ref ID: 35632

111  Dixon SC, Nagle CM, Wentzensen N, Trabert B, Beeghly-Fadiel A, Schildkraut JM et al. Use of common analgesic medications and ovarian cancer survival: results from a pooled analysis in the Ovarian Cancer Association Consortium. Br J Cancer 2017; 116:1223-1228.
Ref ID: 36099

112  Donat-Vargas C, Akesson A, Berglund M, Glynn A, Wolk A, Kippler M. Dietary exposure to polychlorinated biphenyls and risk of breast, endometrial and ovarian cancer in a prospective cohort. Br J

Cancer 2016; 115:1113-1121.
Ref ID: 35772

113 Dovizio M, Bruno A, Tacconelli S, Patrignani P. Mode of Action of Aspirin as a Chemopreventive Agent. In: Chan AT, Detering E, editors. Prospects for Chemoprevention of Colorectal Neoplasia. Emerging Role of Anti-Inflammatory Drugs. New York: Springer; 2013. 39-65.
Ref ID: 37227

114 Drechsel DA, Barlow CA, Bare JL, Jacobs NF, Henshaw JL. Historical evolution of regulatory standards for occupational and consumer exposures to industrial talc. Regul Toxicol Pharmacol 2017; 92:251-267.
Ref ID: 36574

115 Earp MA, Kelmen LE, Magliocco AM, Swenerton KD, Chenevix-Trech G, et al. Genome-wide association study of subtype-specific epithelial ovarian cancer risk alleles using pooled DNA. Hum Genet 2014; 133:481-497.
Ref ID: 34935

116 Egilman D, Steffen J. Commentary on "Assessment of Health Risk from Historical Use of Cosmetic Talcum Powder". New Solut 2018; 28:400-409.
Ref ID: 37091

117 Eriksen KT, Halkjaer J, Sorensen M, Meliker JR, McElroy JA, Tjonneland A et al. Dietary cadmium intake and risk of breast, endometrial and ovarian cancer in Danish postmenopausal women: a prospective cohort study. PloS One 2014; 9:e100815.
Ref ID: 36245

118 Espey LL. Current status of the hypothesis that mammalian ovulation is comparable to an inflammatory reaction. Biol Reprod 1994; 50:233-238.
Ref ID: 37261

119 Esposito K, Chiodini P, Colao A, Lenzi A, Giugliano D. Metabolic syndrome and risk of cancer: a systematic review and meta-analysis. Diabetes Care 2012; 35:2402-2411.
Ref ID: 35274

120 etal, Wiegand KC, Shah SP, Al-Agha OM, Zhao Y, Tse K et al. ARID1A mutations in endometriosis-associated ovarian carcinomas. NEJM 2010; 363:1532-1543.
Ref ID: 35609

121 Faber MT, Kjaer SK, Dehlendorff C, Chang-Claude J, Andersen KK, Hogdall E et al. Cigarette smoking and risk of ovarian cancer: a pooled analysis of 21 case-control studies. Cancer Causes Control 2013; 24:989-1004.
Ref ID: 34936

122 Fairfield KM, Hunter DJ, Fuchs CS, Colditz GA, Hankinson SE. Aspirin, other NSAIDs, and ovarian cancer risk (United States). Cancer Causes Control 2002; 13:535-542.
Ref ID: 37270

123 Fedak KM, Bernal A, Capshaw ZA, Gross S. Applying the Bradford Hill criteria in the 21st century: how data integration has changed causal inference in molecular. Emerg Themes Epidemiol 2015; 12:14.
Ref ID: 37357

124 Ferrante D, Bertolotti M, Todesco A, Mirabelli D, Terracini B, Magnani C. Cancer mortality and incidence of mesothelioma in a cohort of wives of asbestos workers in Casale Monferrato, Italy. EHP 2007; 115:1401-1405.
Ref ID: 37187

125 Fiederling J, Shams AZ, Haug U. Validity of self-reported family history of cancer: A systematic literature review on selected cancers. Int J Cancer 2016; 138:1448-1460.
Ref ID: 35506

126 Finkelstein MM. Response to: 'The epidemiology of malignant mesothelioma in women: gender differences and modalities of asbestos exposure' by Marinaccio et al. Occup Environ Med 2018; 75:844.
Ref ID: 37115

127 Finley BL, Benson SM, Marsh GM. Cosmetic talc as a risk factor for pleural mesothelioma: a weight of evidence evaluation of the epidemiology. Inhal Toxicol 2017; 29:179-185.
Ref ID: 36336

128 Finley BL, Benson SM, Marsh GM. Response to letters regarding "Cosmetic talc as a risk factor for pleural mesothelioma: a weight of evidence evaluation of the epidemiology". Inhal Toxicol 2018; 21:1-4.
Ref ID: 36629

129 Fletcher NM, Belotte J, Saed MG, Memaj I, Diamond MP, Morris RT et al. Specific point mutations in key redox enzymes are associated with chemoresistance in epithelial ovarian cancer. Free Radic Biol Med 2017; 102:122-132.
Ref ID: 37264

130 Flume MM, Boyerz I, Bergfelds WF, Belsito VF, Hills RA, Klaassen CD et al. Safety assessment of talc as used in cosmetics. Int J Toxicol 2015; 34:66S-129S.
Ref ID: 35981

131 Food and Drug Administration. Talc (http://www.fda.gov/Cosmetics/ProductsIngredients/Ingredients/ucm293184.htm). Silver Spring: Food and Drug Administration; 2014.
Ref ID: 35017

132 Fortner RT, Schock H, Le Cornet C, Husing A, Vitonis AF, Johnson TS et al. Ovarian cancer early detection by circulating CA125 in the context of Anti-CA125 Autoantibody levels: Results from the EPIC cohort. Int J Cancer 2018; 142:1355-1360.
Ref ID: 36563

133 Fortner RT, Poole EM, Wentzensen NA, Trabert B, White E, Arslan AA et al. Ovarian cancer risk factors by tumor aggressiveness: an analysis from the ovarian cancer cohort consortium. Int J Cancer 2018; still in print.
Ref ID: 37312

134 Frank TS, Critchfield GC. Hereditary risk of women's cancers. Best Pract Res Clin Obstet Gynaecol 2002; 16:703-713.
Ref ID: 25595

135 Franzese E, Centonze S, Diana A, Carlino F, Guerrera LP, Di Napoli M et al. PARP inhibitors in ovarian cancer. Cancer Treat Rev 2018; 73:1-9.
Ref ID: 37316

136 Frey MK, Pothuri B. Homologous recombination deficiency (HRD) testing in ovarian cancer clinical practice: a review of the literature. Gynecol Oncol Res Pract 2017; 4:4.
Ref ID: 36378

137 Gaffney SH, Grespin M, Garnick L, Drechsel DA, Hazan R, Paustenbach DJ et al. Anthophyllite asbestos: state of the science review. J Appl Toxicol 2017; 37:38-49.
Ref ID: 35617

138 Gaitskell K, Coffey K, Green J, Pirie K, Reeves GK, Ahmed AA et al. Tubal ligation and incidence of 26 site-specific cancers in the Million Women Study. Br J Cancer 2016; 114:1033-1037.
Ref ID: 35401

139 Gaitskell K, Green J, Pirie K, Reeves G, et al. Tubal ligation and ovarian cancer risk in a large cohort: Substantial variation by histological type. Int J Cancer 2016; 138:1076-1084.
Ref ID: 35369

140 Gaitskell K, Green J, Pirie K, Barnes I, Hermon C, Reeves GK et al. Histological subtypes of ovarian cancer associated with parity and breastfeeding in the prospective Million Women Study. Int J Cancer 2018; 142:281-289.
Ref ID: 36440

141 Galic V, Coleman RL, Herzog TJ. Unmet needs in ovarian cancer: dividing histologic subtypes to exploit novel targets and pathways. Curr Cancer Drug Targets 2013; 13:698-707.
Ref ID: 35516

142 Garabrant DH, Pastula ST. A comparison of asbestos fiber potency and elongate mineral particle (EMP) potency for mesothelioma in humans. Toxicol Appl Pharmacol 2018; 361:127-136.
Ref ID: 37093

143 Garcia-Perez J, Lope V, Lopez-Abente G, Gonzalez-Sanchez M, Fernandez-Navarro P. Ovarian cancer mortality and industrial pollution. Environ Pollut 2015; 205:103-110.
Ref ID: 36243

144 Gates MA, Tworoger SS, Terry KL, Titus-Ernstoff L, Rosner B, De Vivo I et al. Talc use, variants of the GSTM1, GSTT1, and NAT2 genes, and risk of epithelial ovarian cancer. Cancer Epidemiol Biomarkers Prev 2008; 17:2436-2444.
Ref ID: 34937

145 Gates MA, Rosner BA, Hecht JL, Tworoger SS. Risk factors for epithelial ovarian cancer by histologic subtype. Am J Epidemiol 2010; 171:45-53.
Ref ID: 34960

146 Gaytan M, Morales C, Bellido C, Sanchez-Criado JE, Gaytan F. Non-steroidal anti-inflammatory drugs (NSAIDs) and ovulation: lessons from morphology. Histol Histopathol 2006; 21:541-556.
Ref ID: 37285

147 George SH, Garcia R, Slomovitz BM. Ovarian cancer: The fallopian tube as the site of origin and opportunities for prevention. Front Oncol 2016; 6 (Article 108).
Ref ID: 35515

148 Gertig DM, Hunter DJ, Cramer DW, Colditz GA, Speizer FE, Willett WC et al. Prospective study of talc use and ovarian cancer. JNCI 2000; 92:249-252.
Ref ID: 34919

149 Giannakeas V, Sopik V, Shestopaloff K, Iqbal J, Rosen B, Akbari M et al. A model for estimating ovarian cancer risk: Application for preventive oophorectomy. Gynecol Oncol 2015; 139:242-247.
Ref ID: 35286

150 Gilbert CR, Furman BR, Feller-Kopman DJ, Haouzi P. Description of particle size, distribution, and behavior of talc preparations commercially available within the United States. J Bronchology Interv Pulmonol 2018; 25:25-30.
Ref ID: 37448

151 Glass TA, Goodman SN, Hernan MA, Samet JM. Causal inference in public health. Annu Rev Public Health 2013; 34:61-75.
Ref ID: 34920

152 Godard B, Foulkes WD, Provencher D, Brunet J-S, Tonin PN, Mes-Masson A-M et al. Risk factors for familial and sporadic ovarian cancer among French Canadians: a case-control study. Am J Obstet Gynecol 1998; 179:403-410.
Ref ID: 16236

153 Gonzalez NL, O'Brien KM, D'Aloisio AA, Sandler DP, Weinberg CR. Douching, talc use, and risk of ovarian cancer. Epidemiology 2016; 27:797-802.
Ref ID: 35573

154 Gordon RE, Fitzgerald S, Millette J. Asbestos in commercial cosmetic talcum powder as a cause of mesothelioma in women. Int J Occup Environ Health 2014; 20:318-332.
Ref ID: 35347

155 Gordon RE, Fitzgerald S, Millette J. Corrigenda: Asbestos in commercial cosmetic talcum powder as a cause of mesothelioma in women. Int J Occup Environ Health 2015; 21:347-348.
Ref ID: 35349

156 Gordon RE. Response to RE: Asbestos in commercial cosmetic talcum powder as a cause of mesothelioma in women (Letter to the Editor). Int J Occup Environ Health 2015; 21:342-346.
Ref ID: 35351

157 Graham J, Graham R. Ovarian cancer and asbestos. Environ Res 1967; 1:115-128.
Ref ID: 35298

158 Grant D, Moorman PG, Akushevich L, Palmieri RT, Bentley rC, Schildkraut JM. Primary peritoneal and ovarian cancers: an epidemiological comparative analysis. Cancer Causes Control 2010; 21:991-998.
Ref ID: 37144

159 Green A, Purdie D, Bain C, Siskind V, Russell P, Quinn M et al. Tubal sterilisation, hysterectomy and decreased risk of ovarian cancer. Survey of Women's Health Study Group. Int J Cancer 1997; 71:948-951.
Ref ID: 34954

160 Greene AD, Lang SA, Kendziorski JA, Sroga-Rios JM, Herzog TJ, Burns K. Endometriosis: Where are We and Where are We Going? Reproduction 2016; 152:R63-R78.
Ref ID: 35511

161 Gross AJ, Berg PH. A meta-analytical approach examining the potential relationship between talc exposure and ovarian cancer. J Expo Anal Environ Epidemiol 1995; 5:181-195.
Ref ID: 34958

162 Gunderson CC, Ding K, Dvorak J, Moore KN, McMeekin DS, Benbrook DM. The pro-inflammatory effect of obesity on high grade serous ovarian cancer. Gynecol Oncol 2016; 143:40-45.
Ref ID: 35630

163 Gunter MJ, Murphy N, Cross AJ, Dossus L, Darton L, Fagherazzi G et al. Coffee Drinking and Mortality in 10 European Countries: A Multinational Cohort Study. Ann Intern Med 2017; 167:236-247.
Ref ID: 36369

164 Gupta M, Babic A, Beck AH, Terry K. TNF-a expression, risk factors, and inflammatory exposures in ovarian cancer: evidence for an inflammatory pathway of ovarian carcinogenesis? Hum Pathol 2016; 54:82-91.
Ref ID: 35689

165 Hamilton TC, Fox H, Buckley CH, Henderson WJ, Griffiths K. Effects of talc on the rat ovary. Br J Exp Pathol 1984; 65:101-106.
Ref ID: 36419

166 Hankinson SE, Hunter DJ, Colditz GA, Willett WC, Stampfer MJ, Rosner B et al. Tubal ligation, hysterectomy, and risk of ovarian cancer. A prospective study. J Am Med Assoc 1993; 270:2813-2818.
Ref ID: 35525

167 Hankinson SE, Danforth KN. Ovarian Cancer. In: Schottenfeld D, Fraumeni JF, Jr., editors. Cancer Epidemiology and Prevention. 3rd ed. New York: Oxford University Press; 2006. 1013-1026.
Ref ID: 37169

168 Hanley GE, McAlpine JN, Pearce CL, Miller D. The performance and safety of bilateral salpingectomy for ovarian cancer prevention in the United States. Am J Obstet Gynecol 2017; 216:270 e1-270 e9.
Ref ID: 35972

169 Hannibal CG, Rossing MA, Wicklund KG, Cushing-Haugen KL. Analgesic drug use and risk of epithelial ovarian cancer. Am J Epidemiol 2008; 167:1430-1437.
Ref ID: 37223

170 Hannibal CG, Dehlendorff C, Kjaer SK. Use of paracetamol, low-dose aspirin, or non-aspirin non-steroidal anti-inflammatory drugs and risk of ovarian borderline tumors in Denmark. Gynecol Oncol 2018; 151:513-518.
Ref ID: 37318

171 Hanson B, Johnstone E, Dorais J, Silver B, Peterson CM, Hotaling J. Female infertility, infertility-associated diagnoses, and comorbidities: a review. J Assist Reprod Genet 2016; still in print.
Ref ID: 35971

172 Harlow BL, Weiss NS. A case-control study of borderline ovarian tumors: the influence of perineal exposure to talc. Am J Epidemiol 1989; 130:390-394.
Ref ID: 34948

173 Harlow BL, Cramer DW, Bell DA, Welch WR. Perineal exposure to talc and ovarian cancer risk. Obstet Gynecol 1992; 80:19-26.
Ref ID: 34921

174 Harlow BL, Hartge PA. A review of perineal talc exposure and risk of ovarian cancer. Regul Toxicol Pharmacol 1995; 21:254-260.
Ref ID: 35020

175 Harris HR, Titus LJ, Cramer DW, Terry KL. Long and irregular menstrual cycles, polycystic ovary syndrome, and ovarian cancer risk in a population-based case-control study. Int J Cancer 2017; 140:285-291.
Ref ID: 35770

176 Harris HR, Babic A, Webb PM, Nagle CM, Jordan SJ, Risch HA et al. Polycystic ovary syndrome, oligomenorrhea, and risk of ovarian cancer histotypes: Evidence from the Ovarian Cancer Association Consortium. Cancer Epidemiol Biomarkers Prev 2018; 27:174-182.
Ref ID: 36564

177 Harris RE, Beebe-Donk J, Doss H, Burr Doss D. Aspirin, ibuprofen, and other non-steroidal anti-inflammatory drugs in cancer prevention: a critical review of non-selective COX-2 blockade (review). Oncol Rep 2005; 13:559-583.
Ref ID: 35012

178 Hartge P, Hoover R, Lesher LP, McGowan L. Talc and ovarian cancer. J Am Med Assoc 1983; 250:1844.
Ref ID: 34947

179 Hartge P, Stewart P. Occupation and ovarian cancer: a case-control study in the Washington, DC, metropolitan area, 1978-1981. JOM 1994; 36:924-927.
Ref ID: 34998

180 Hashmi AA, Hussain ZF, Bhagwani AR, Edhi MM, Faridi N, Hussain SD et al. Clinicopathologic features of ovarian neoplasms with emphasis on borderline ovarian tumors: an institutional perspective. BMC Res Notes 2016; 9:205.
Ref ID: 35405

181 Hefler-Frischmuth K, Hefler LA, Heinze G, Paseka V, Grimm C, Tempfer CB. Serum C-reactive protein in the differential diagnosis of ovarian masses. Eur J Obstet Gynecol Reprod Biol 2009; 147:65-68.
Ref ID: 37352

182 Heidemann LN, Hartwell D, Heidemann CH, Jochumsen KM. The relation between endometriosis and ovarian cancer - a review. Acta Obstet Gynecol Scand 2014; 93:20-31.
Ref ID: 37282

183 Helder-Woolderink JM, Blok EA, Vasen HF, Hollema H, Mourits MJ, De Bock GH. Ovarian cancer in Lynch syndrome: a systematic review. Eur J Cancer 2016; 55:65-73.
Ref ID: 35368

184 Heller DS, Westhoff C, Gordon RE, Katz N. The relationship between perineal cosmetic talc usage and ovarian talc particle burden. Am J Obstet Gynecol 1996; 174:1507-1510.
Ref ID: 34944

185 Heller DS, Gordon RE, Westhoff C, Gerber S. Asbestos exposure and ovarian fiber burden. Am J Ind Med 1996; 29:435-439.
Ref ID: 35297

186 Heller DS, Gordon RE, Clement PB, Turnnir R, Katz N. Presence of asbestos in peritoneal malignant mesotheliomas in women. Int J Gynecol Cancer 1999; 9:452-455.
Ref ID: 36693

187 Heller DS, Gordon RE, Katz N. Correlation of asbestos fiber burdens in fallopian tubes and ovarian tissue. Am J Obstet Gynecol 1999; 181:346-347.
Ref ID: 36199

188 Henderson WR, Joslin CA, Turnbull AC, Griffiths K. Talc and carcinoma of the ovary and cervix. J Obstet Gynaecol Br Commonw 1971; 78:266-272.
Ref ID: 35299

189 Henderson WR, Hamilton RC, Griffiths K. Talc in normal and malignant ovarian tissue. Lancet 1979; 1:499.
Ref ID: 34923

190 Hermann M, Enseleit F, Ruschitzka FT. Anti-inflammatory strategies in hypertension: focus on COX-1 and COX-2. Curr Hypertens Rep 2005; 7:52-60.
Ref ID: 37238

191 Houghton SC, Reeves KW, Hankinson SE, Crawford L, Lane D, Wactawski-Wende J et al. Perineal powder use and risk of ovarian cancer. JNCI 2014; 106.
Ref ID: 34925

192 Huang HS, Chu SC, Hsu CF, Chen PC, Ding DC, Chang MY et al. Mutagenic, surviving and tumorigenic effects of follicular fluid in the context of p53 loss: initiation of fimbria carcinogenesis. Carcinogenesis 2015; 36:1419-1428.
Ref ID: 37242

193 Huang T, Tworoger SS, Willett WC, Stampfer MJ, Rosner BA. Associations of early life and adulthood adiposity with risk of epithelial ovarian cancer. Ann Oncol 2018; still in print.
Ref ID: 37311

194 Huncharek M, Geschwind JF, Kupelnick B. Perineal application of cosmetic talc and risk of invasive epithelial ovarian cancer: a meta-analysis of 11,933 subjects from sixteen observational studies. Anticancer Res 2003; 23:1955-1960.
Ref ID: 34959

195 Huncharek M, Muscat J, Onitilo A, Kupelnick B. Use of cosmetic talc on contraceptive diaphragms and risk of ovarian cancer: a meta-analysis of nine observational studies. Eur J Cancer Prev 2007; 16:422-429.
Ref ID: 34997

196 Huncharek M, Muscat J. Perineal talc use and ovarian cancer risk: a case study of scientific standards in environmental epidemiology. Eur J Cancer Prev 2011; 20:501-507.
Ref ID: 34926

197 Huo X, Yao L, Han X, Li W, Liu J, Zhou L et al. Hysterectomy and risk of ovarian cancer: a systematic review and meta-analysis. Arch Gynecol Obstet 2019; still in print.
Ref ID: 37425

198 Ingerslev K, Hogdall E, Schnack TH, Skovrider-Ruminski W, Hogdall C, Blaakaer J. The potential role of infectious agents and pelvic inflammatory disease in ovarian carcinogenesis. Infect Agent Cancer 2017; 12:25.
Ref ID: 36284

199 International Agency for Research on Cancer. Talc. IARC Monogr Eval Carcinog Risks Chem Human 1987; 42:185-224.
Ref ID: 35310

200 International Agency for Research on Cancer. Carbon Black, Titanium Dioxide, and Talc. IARC Monogr Eval Carcinog Risks Chem Human 2010; 93:277-413.
Ref ID: 34933

201 Iversen L, Sivasubramaniam S, Lee AJ, Fielding S, Hannaford PC. Lifetime cancer risk and combined oral contraceptives: the Royal College of General Practitioners' Oral Contraception Study. Am J Obstet Gynecol 2017; 216:580.e1-580.e9.
Ref ID: 36064

202 Iwasaki Y, Takamori S, Mitsuoka M, Kashihara M, Nishi T, Murakami D et al. Experimental validation of talc pleurodesis for carcinomatous pleuritis in an animal model. Gen Thorac Cardiovasc Surg 2016; 64:409-413.
Ref ID: 35620

203 John EM, Whittemore AS, Harris R, Itnyre J. Characteristics relating to ovarian cancer risk: collaborative analysis of seven U.S. case-control studies. Epithelial ovarian cancer in black women. Collaborative Ovarian Cancer Group. JNCI 1993; 85:142-147.
Ref ID: 35275

204 Jordan SJ, Green AC, Whiteman DC, Webb PM. Risk factors for benign serous and mucinous epithelial ovarian tumors. Obstet Gynecol 2007; 109:647-654.
Ref ID: 34957

205 Journy NMY, Bernier MO, Doody MM, Alexander BH, Linet MS, Kitahara CM. Hyperthyroidism, Hypothyroidism, and Cause-Specific Mortality in a Large Cohort of Women. Thyroid 2017; 27:1001-1010.
Ref ID: 36370

11

206 Julin B, Wolk A, Akesson A. Dietary cadmium exposure and risk of epithelial ovarian cancer in a prospective cohort of Swedish women. Br J Cancer 2011; 105:441-444.
Ref ID: 36248

207 Jurinski JB, Rimstidt JD. Biodurability of talc. Am Mineral 2001; 86:392-399.
Ref ID: 36008

208 Kajiyama H, Suzuki S, Yoshihara M, Tamauchi S, Yoshikawa N, Niimi K et al. Endometriosis and cancer. Free Radic Biol Med 2019; 133:186-192.
Ref ID: 37314

209 Kaldawy A, Segev Y, Lavie O, Auslender R, Sopik V, Narod SA. Low-grade serous ovarian cancer: A review. Gynecol Oncol 2016; 143:433-438.
Ref ID: 35974

210 Kar SP, Berchuck A, Gayther SA, Goode EL, Moysich KB, Pearce CL et al. Common genetic variation and susceptibility to ovarian cancer: current insights and future directions. Cancer Epidemiol Biomarkers Prev 2018; 27:395-404.
Ref ID: 36326

211 Karageorgi S, Gates MA, Hankinson SE, De Vivo I. Perineal use of talcum powder and endometrial cancer risk. Cancer Epidemiol Biomarkers Prev 2010; 19:1269-1275.
Ref ID: 35083

212 Karihtala P, Soini Y, Vaskivuo L, Bloigu R, Puistola U. DNA adduct 8-hydroxydeoxyguanosine, a novel putative marker of prognostic significance in ovarian carcinoma. Int J Gynecol Cancer 2009; 19:1047-1051.
Ref ID: 37272

213 Karnezis AN, Cho KR, Gilks CB, Pearce CL, Huntsman DG. The disparate origins of ovarian cancers: pathogenesis and prevention strategies. Nat Rev Cancer 2017; 17:65-74.
Ref ID: 35968

214 Katz ME, Schwartz PE, Kapp DS, Luikart S. Epithelial carcinoma of the ovary: current strategies. Ann Intern Med 1981; 95:98-111.
Ref ID: 37171

215 Kelemen LE, Abbott S, Qin B, Peres LC, Moorman PG, Wallace K et al. Cigarette smoking and the association with serous ovarian cancer in African American women: African American Cancer Epidemiology Study (AACES). Cancer Causes Control 2017; 28:699-708.
Ref ID: 36287

216 Kim HS, Kim TH, Chung HH, Song YS. Risk and prognosis of ovarian cancer in women with endometriosis: a meta-analysis. Br J Cancer 2014; 110:1878-1890.
Ref ID: 37277

217 Kleppe M, Kraima AC, Kruitwagen RF, Van Gorp T, Smit NN, van Munsteren JC et al. Understanding lymphatic drainage pathways of the ovaries to predict sites for sentinel nodes in ovarian cancer. Int J Gynecol Cancer 2015; 25:1405-1414.
Ref ID: 35393

218 Klingler GA. Digital Computer Analysis of Particle Size Distribution in Dusts and Powders. (Project 7116) (AD-752209). Wright-Patterson Air Force Base, Ohio: Aerospace Research Laboratories, 1972.
Ref ID: 37449

219 Klinkebiel D, Zhang W, Akers SN, Odunsi K, Karpf AR. DNA methylome analyses implicate fallopian tube epithelia as the origin for high-grade serous ovarian cancer. Mol Cancer Res 2016; 14:787-794.
Ref ID: 35579

220 Kobayashi H, Sumimoto K, Kitanaka T, Yamada Y, Sado T, Sakata M et al. Ovarian endometrioma--risks factors of ovarian cancer development. Eur J Obstet Gynecol Reprod Biol 2008; 138:187-193.
Ref ID: 37288

221 Kobayashi H. Potential scenarios leading to ovarian cancer arising from endometriosis. Redox Rep 2016; 21:119-126.
Ref ID: 36242

222 Koushik A, Grundy A, Abrahamowicz M, Arseneau J, Gilbert L, Gotlieb WH et al. Hormonal and reproductive factors and the risk of ovarian cancer. Cancer Causes Control 2017; 28:393-403.
Ref ID: 36036

223 Kraima AC, Derks M, Smit NN, van Munsteren JC, Van der Velden J, Kenter GG et al. Lymphatic drainage pathways from the cervix uteri: implications for radical hysterectomy? Gynecol Oncol 2014; 132:107-113.
Ref ID: 35394

224 Kroeger PT, Drapkin R. Pathogenesis and heterogeneity of ovarian cancer. Curr Opin Obstet Gynecol 2017; 29:26-34.
Ref ID: 36065

225 Kroener L, Dumesic D, Al-Safi Z. Use of fertility medications and cancer risk: a review and update. Curr Opin Obstet Gynecol 2017; 29:195-201.
Ref ID: 36283

226 Kurman RJ, Shih I. The origin and pathogenesis of epithelial ovarian cancer: a proposed unifying theory. Am J Surg Pathol 2010; 34:433-443.
Ref ID: 37276

227 Kurman RJ, Shih I. The dualistic model of ovarian carcinogenesis: revisited, revised, and expanded. Am J Pathol 2016; 186:733-747.
Ref ID: 35598

228 Kurta M, Moysich KB, Weissfeld JL, Youk AO, Bunker CH, Edwards RP et al. Use of fertility drugs and risk of ovarian cancer: results from a U.S.-based case-control study. Cancer Epidemiol Biomarkers Prev 2012; 21:1282-1292.
Ref ID: 35277

229 Kvaskoff M, Mu F, Terry KL, Harris HR, Poole EM, Farland L et al. Endometriosis: a high-risk population for major chronic diseases? Hum Reprod Update 2015; 21:500-516.
Ref ID: 37279

230 La Vecchia C. Ovarian cancer: epidemiology and risk factors. Eur J Cancer 2017; 26:55-62.
Ref ID: 36033

231 Labidi-Galy SI, Papp E, Hallberg D, Niknafs N, Adleff V, Noe M et al. High grade serous ovarian carcinomas originate in the fallopian tube. Nat Commun 2017; 8:1093.
Ref ID: 36497

232 Landen CN, Jr., Birrer MJ, Sood AK. Early events in the pathogenesis of epithelial ovarian cancer. J Clin Oncol 2008; 26:995-1005.
Ref ID: 35590

233 Langer AM, Nolan RP. Asbestos in play sand. NEJM 1987; 316:882.
Ref ID: 37176

234 Langseth H, Kjaerheim K. Ovarian cancer and occupational exposure among pulp and paper employees in Norway. Scand J Work Environ Health 2004; 30:356-361.
Ref ID: 25533

235 Langseth H, Johansen BV, Nesland JM, Kjaerheim K. Asbestos fibers in ovarian tissue from Norwegian pulp and paper workers. Int J Gynecol Cancer 2007; 17:44-49.
Ref ID: 36692

236 Langseth H, Hankinson SE, Siemiatycki J, Weiderpass E. Perineal use of talc and risk of ovarian cancer. J Epidemiol Community Health 2008; 62:358-360.
Ref ID: 34927

237 Lau A, Kollara A, St John E, Tone AA, Virtanen C, Greenblatt EM et al. Altered expression of inflammation-associated genes in oviductal cells following follicular fluid exposure: Implications for ovarian carcinogenesis. Exp Biol Med (Maywood) 2014; 239:24-32.
Ref ID: 37243

238 Ledermann JA, Sessa C, Colombo N. appendix 7: Ovarian cancer: eUpdate published online September 2016 (http://www.esmo.org/Guidelines/Gynaecological-Malignancies). Ann Oncol 2016; 27 (suppl 5):v145.
Ref ID: 35771

239 Lee AW, Ness RB, Roman LD, Terry KL, Schildkraut JM, Chang-Claude J et al. Association Between Menopausal Estrogen-Only Therapy and Ovarian Carcinoma Risk. Obstet Gynecol 2016; 127:828-836.
Ref ID: 35514

240 Lee AW, Templeman C, Stram DA, Beesley J, Tyrer J, Berchuck A et al. Evidence of a genetic link between endometriosis and ovarian cancer. Fertil Steril 2016; 105:35-43.
Ref ID: 35517

241 Lee R, Van Orden D. Re: Asbestos in commercial cosmetic talcum powder as a cause of mesothelioma in women (Letter to the Editor). Int J Occup Environ Health 2015; 21:337-341.
Ref ID: 35352

242 Li J, Liu R, Tang S, Feng F, Liu C, Wang L et al. Impact of endometriosis on risk of ovarian, endometrial and cervical cancers: a meta-analysis. Arch Gynecol Obstet 2019; 299:35-46.
Ref ID: 37249

243 Li S, Miner K, Fannin R, Carl Barrett J, Davis BJ. Cyclooxygenase-1 and 2 in normal and malignant human ovarian epithelium. Gynecol Oncol 2004; 92:622-627.
Ref ID: 37274

244 Li Y, Zhang HL, Kang S, Zhou RM, Wang N. The effect of polymorphisms in PD-1 gene on the risk of epithelial ovarian cancer and patients' outcomes. Gynecol Oncol 2017; 144:140-145.
Ref ID: 35970

245 Liberti MV, Locasale JW. The Warburg Effect: How does it benefit cancer cells? Trends Biochem Sci 2016; 41:211-218.
Ref ID: 37230

246 Licaj I, Lukic M, Jareid M, Lund E, Braaten T, Gram IT. Epithelial ovarian cancer subtypes attributable to smoking in the Norwegian Women and Cancer Study, 2012. Cancer Med 2016; 5:720-727.
Ref ID: 35408

247 Licaj I, Jacobsen BK, Selmer RM, Maskarinec G, Weiderpass E, Gram IT. Smoking and risk of ovarian cancer by histological subtypes: an analysis among 300 000 Norwegian women. Br J Cancer 2017; 116:270-276.
Ref ID: 35984

248 Liede A, Mansfield CA, Metcalfe KA, Price MA, etal. Preferences for breast cancer risk reduction among BRCA1/BRCA2 mutation carriers: a discrete-choice experiment. Breast Cancer Res Treat 2017; 165:433-444.
Ref ID: 36324

249 Lim MC, Randall LM. Role and clinical application of next-generation sequencing (NGS) for ovarian cancer. J Gynecol Oncol 2017; 28:e51.
Ref ID: 36362

250 Lim MC, Pfaendler K. Type and risk of cancer related to endometriosis: ovarian cancer and beyond. BJOG 2018; 125:73.
Ref ID: 36426

251 Lin HW, Tu YY, Lin SY, Su WJ, Lin WL, Lin WZ et al. Risk of ovarian cancer in women with pelvic inflammatory disease: a population-based study. Lancet Oncol 2011; 12:900-904.
Ref ID: 37190

252 Lin SF, Gerry E, Shih IM. Tubal origin of ovarian cancer - the double-edged sword of haemoglobin. J Pathol 2017; 242:3-6.
Ref ID: 36038

253 Liu H, Zeng Z, Wang S, Li T, Mastriani E, Li QH et al. Main components of pomegranate, ellagic acid and luteolin, inhibit metastasis of ovarian cancer by down-regulating MMP2 and MMP9. Cancer Biol Ther 2017; 18:990-999.
Ref ID: 36559

254 Long Roche KC, Abu-Rustum NR, Nourmoussavi M, Zivanovic O. Risk-reducing salpingectomy: Let us be opportunistic. Cancer 2017; 123:1714-1720.
Ref ID: 36285

255 Lueth NA, Anderson KE, Harnack LJ, Fulkerson JA, Robien K. Coffee and caffeine intake and the risk of ovarian cancer: the Iowa Women's Health Study. Cancer Causes Control 2008; 19:1365-1372.
Ref ID: 36420

256 Lukic M, Licaj I, Lund E, Skeie G, Weiderpass E, Braaten T. Coffee consumption and the risk of cancer in the Norwegian Women and Cancer (NOWAC) Study. Eur J Epidemiol 2016; 31:905-916.
Ref ID: 35364

257 Lundberg FE, Iliadou AN, Rodriguez-Wallberg K, Gemzell-Danielsson K, Johansson ALV. The risk of breast and gynecological cancer in women with a diagnosis of infertlity: a nationwide population-based study. Eur J Epidemiol 2019; still in print.
Ref ID: 37424

258 Lundin E, Dossus L, Clenden T, Krogh V, Grankvist K, Wulff M et al. C-reactive protein and ovarian cancer: a prospective study nested in three cohorts (Sweden, USA, Italy). Cancer Causes Control 2009; 20:1151-1159.
Ref ID: 37212

259 Lynch JR, Ayer HE. Measurement of dust exposures in the asbestos textile industry. Am Ind Hyg Assoc J 1966; 27:431-437.
Ref ID: 37193

260 Maccio A, Lai P, Santona MC, Pagliara L, Melis GB, Mantovani G. High serum levels of soluble IL-2 receptor, cytokines, and C reactive protein correlate with impairment of T cell response in patients with advanced epithelial ovarian cancer. Gynecol Oncol 1998; 69:248-252.
Ref ID: 37350

261 Mallen AR, Townsend MK, Tworoger SS. Risk factors for ovarian carcinoma. Hematol Oncol Clin North Am 2018; 32:891-902.
Ref ID: 37320

262 Malmberg K, Klynning C, Floter-Radestad A, Carlson JW. Serous tubal intraepithelial carcinoma, chronic fallopian tube injury, and serous carcinoma development. Virchows Arch 2016; 468:707-713.
Ref ID: 35365

263 Mandel JH, Odo NU. Mesothelioma and other lung disease in taconite miners; the uncertain role of non-asbestiform EMP. Toxicol Appl Pharmacol 2018; 361:107-112.
Ref ID: 36733

264 Marchiori E, Zanetti G, Mano CM, Hochegger B, Irion KL. Talc-induced pulmonary granulomatosis or septic pulmonary embolism? A diagnostic challenge. Ann Thorac Surg 2010; 90:362-363.
Ref ID: 30250

265 Matulonis UA. Highlights in Ovarian Cancer From the 2017 American Society of Clinical Oncology Annual Meeting: Commentary. Clin Adv Hematol Oncol 2017; 15 (suppl 7):13-17.
Ref ID: 36415

266 Matulonis UA. Ovarian cancer. Hematol Oncol Clin North Am 2018; 32:xiii-xxiv.
Ref ID: 37319

267 May J, Skorupskaite K, Congiu M, Ghaoui N, Walker GA, Fegan S et al. Borderline ovarian tumors: Fifteen years' experience at a Scottish Tertiary Cancer Center. Int J Gynecol Cancer 2018; 28:1683-1691.
Ref ID: 37256

268 Mazurek JM, Wood JM, Schleiff PL, Weissman DN. Surveillance for Silicosis Deaths Among Persons Aged 15-44 Years - United States, 1999-2015. MMWR Morb Mortal Wkly Rep 2017; 66:747-752.
Ref ID: 36359

269 McAlpine JN, Lisonkova S, Joseph KS, McComb PF. Pelvic inflammation and the pathogenesis of ovarian cancer: a cohort study. Int J Gynecol Cancer 2014; 24:1406-1413.
Ref ID: 37205

270 McAlpine JN. Ovarian cancer and prevention. Clin Obstet Gynecol - still in print 2017; still in print.
Ref ID: 36427

271 McMahon CJ, Rofsky NM, Pedrosa I. Lymphatic metastases from pelvic tumors: anatomic classification, characterization, and staging. Radiology 2010; 254:31-46.
Ref ID: 35395

272 McSorley MA, Alberg AJ, Allen DS, Allen NE, Brinton LA, Dorgan JF et al. C-reactive protein concentrations and subsequent ovarian cancer risk. Obstet Gynecol 2007; 109:933-941.
Ref ID: 37260

273 Meinhold-Heerlein I, Fotopoulou C, Harter P, Kurzeder C, Mustea A, Wimberger P et al. The new WHO classification of ovarian, fallopian tube, and primary peritoneal cancer and its clinical implications. Arch Gynecol Obstet 2016; 293:695-700.
Ref ID: 35406

274 Meinhold-Heerlein I, Fotopoulou C, Harter P, Kurzeder C, Mustea A, Wimberger P et al. Erratum to: The new WHO classification of ovarian, fallopian tube, and primary peritoneal cancer and its clinical implications. Arch Gynecol Obstet 2016; 293:1367.
Ref ID: 35403

275 Menon U, McGuire AJ, Raikou M, Ryan A, Davies SK, Burnell M et al. The cost-effectiveness of screening for ovarian cancer: results from the UK Collaborative Trial of Ovarian Cancer Screening (UKCTOCS). Br J Cancer 2017; 117:619-627.
Ref ID: 36408

276 Merritt MA, Green AC, Nagle CM, Webb PM. Talcum powder, chronic pelvic inflammation and NSAIDs in relation to risk of epithelial ovarian cancer. Int J Cancer 2008; 122:170-176.
Ref ID: 35004

277 Meserve EEK, Mirkovic J, Conner JR, Yang E, Muto MG, Horowitz N et al. Frequency of "incidental" serous tubal intraepithelial carcinoma (STIC) in women without a history of or genetic risk factor for high-grade serous carcinoma: A six-year study. Gynecol Oncol 2017; 146:69-73.
Ref ID: 36371

278 Mills PK, Riordan DG, Cress RD, Young HA. Perineal talc exposure and epithelial ovarian cancer risk in the Central Valley of California. Int J Cancer 2004; 112:458-464.
Ref ID: 34956

279 Minlikeeva AN, Freudenheim JL, Cannioto RA, Eng KH, Szender JB, Mayor P et al. History of thyroid disease and survival of ovarian cancer patients: results from the Ovarian Cancer Association Consortium, a brief report. Br J Cancer 2017; 117:1063-1069.
Ref ID: 36428

280 Modugno F, Goughnour SL, Wallack D, Edwards RP, Odunsi K, Kelley JL et al. Breastfeeding factors and risk of epithelial ovarian cancer. Gynecol Oncol 2019; still in print.
Ref ID: 37422

281 Mogensen JB, Kjaer SK, Mellemkjaer L, Jensen A. Endometriosis and risks for ovarian, endometrial and breast cancers: A nationwide cohort study. Gynecol Oncol 2016; 143:87-92.
Ref ID: 35629

15

282 Moorman PG, Palmieri RT, Akushevich L, Berchuck A, Schildkraut JM. Ovarian cancer risk factors in African-American and white women. Am J Epidemiol 2009; 170:598-606.
Ref ID: 34999

283 Moorman PG, Alberg AJ, Bandera EV, Barnholtz-Sloan J, Bondy M, Cote ML et al. Reproductive factors and ovarian cancer risk in African-American women. Ann Epidemiol 2016; 26:654-662.
Ref ID: 35775

284 Moradi MM, Carson LF, Weinberg B, Haney AF, Twiggs LB, Ramakrishnan S. Serum and ascitic fluid levels of interleukin-1, interleukin-6, and tumor necrosis factor-alpha in patients with ovarian epithelial cancer. Cancer 1993; 72:2433-2440.
Ref ID: 37351

285 Morch LS, Dehlendorff C, Baandrup L, Friis S, Kjaer SK. Use of antidepressants and risk of epithelial ovarian cancer. Int J Cancer 2017; still in print.
Ref ID: 36412

286 Mossman BT. Assessment of the pathogenic potential of asbestiform vs. nonasbestiform particulates (cleavage fragments) in in vitro (cell or organ culture) models and bioassays. Regul Toxicol Pharmacol 2008; 52 (suppl 1):S200-S203.
Ref ID: 36694

287 Munkarah A, Ali-Fehmi R. COX-2: a protein with an active role in gynecological cancers. Curr Opin Obstet Gynecol 2005; 17:49-53.
Ref ID: 37271

288 Munksgaard PS, Blaakaer J. The association between endometriosis and gynecological cancers and breast cancer: a review of epidemiological data. Gynecol Oncol 2011; 123:157-163.
Ref ID: 37286

289 Munksgaard PS, Blaakaer J. The association between endometriosis and ovarian cancer: a review of histological, genetic and molecular alterations. Gynecol Oncol 2012; 124:164-169.
Ref ID: 37287

290 Murdoch WJ, Martinchick JF. Oxidative damage to DNA of ovarian surface epithelial cells affected by ovulation: carcinogenic implication and chemoprevention. Exp Biol Med (Maywood) 2004; 229:546-552.
Ref ID: 37236

291 Murphy MA, Trabert B, Yang HP, Park Y, Brinton LA, Hartge P et al. Non-steroidal anti-inflammatory drug use and ovarian cancer risk: findings from the NIH-AARP Diet and Health Study and systematic review. Cancer Causes Control 2012; 23:1839-1852.
Ref ID: 35037

292 Muscat J, Huncharek M, Cramer DW. Talc and anti-MUC1 antibodies. Cancer Epidemiol Biomarkers Prev 2005; 14:2679.
Ref ID: 34938

293 Muscat JE, Huncharek MS. Causation and disease: biomedical science in toxic tort litigation. JOM 1989; 31:997-1002.
Ref ID: 35272

294 Muscat JE, Huncharek MS. Perineal talc use and ovarian cancer: a critical review. Eur J Cancer Prev 2008; 17:139-146.
Ref ID: 34932

295 Nadler DL, Zurbenko IG. Estimating cancer latency times using a Weibull Model. Adv Epidemiol 2014; Article ID: 746769:1-8.
Ref ID: 37152

296 Nagle CM, Dixon SC, Jensen A, Kjaer SK, Modugno F, deFazio A et al. Obesity and survival among women with ovarian cancer: results from the Ovarian Cancer Association Consortium. Br J Cancer 2015; 113:817-826.
Ref ID: 35261

297 Nakonechny QB, Gilks CB. Ovarian cancer in hereditary cancer susceptibility syndromes. Surg Pathol Clin 2016; 9:189-199.
Ref ID: 35578

298 Narod SA, Sun P, Ghadirian P, Lynch H, Isaacs C, Garber J et al. Tubal ligation and risk of ovarian cancer in carriers of BRCA1 or BRCA2 mutations: a case-control study. Lancet 2001; 357:1467-1470.
Ref ID: 35522

299 Narod SA. Talc and ovarian cancer. Gynecol Oncol 2016; 141:410-412.
Ref ID: 35400

300 Nasioudis D, Sisti G, Kanninen TT, Holcomb K, Di Tommaso M, Fambrini M et al. Epidemiology and outcomes of squamous ovarian carcinoma: a population-based study. Gynecol Oncol 2016; 141:128-133.
Ref ID: 35410

301 Nasreen N, Mohammed KA, Dowling PA, Ward MJ, Galffy G, Antony VB. Talc induces apoptosis in human malignant mesothelioma cells in vitro. Am J Respir Crit Care Med 2000; 161:595-600.
Ref ID: 35107

302 Nasreen N, Mohammed KA, Brown S, Su Y, Sriram PS, Moudgil B et al. Talc mediates angiostasis in malignant pleural effusions via endostatin induction. Eur Respir J 2007; 29:761-769.
Ref ID: 35108

303 National Cancer Institute. Ovarian, Fallopian Tube, and Primary Peritoneal Cancer Prevention–for health professionals (PDQ®) (at:https://www.cancer.gov/types/ovarian/hp/ovarian-prevention-pdq#section/_9). Washington, DC: National Cancer Institute; 2017.
Ref ID: 36295

304 National Cancer Institute. Ovarian, Fallopian Tube, and Primary Peritoneal Cancer Prevention (PDQ®): Patient Version. Bethesda: National Cancer Institute; 2017.
Ref ID: 36411

305 National Cancer Institute. Ovarian, Fallopian Tube, and Primary Peritoneal Cancer Prevention (PDQ) - Patient Version (at: https://www.cancer.gov/types/ovarian/patient/ovarian-prevention-pdq#section/_11). Washington, DC: National Cancer Institute; 2018.
Ref ID: 36073

306 National Cancer Institute. Ovarian, Fallopian Tube, and Primary Peritoneal Cancer Prevention - Patient Version (PDQ®) (at:https://www.cancer.gov/types/ovarian/patient/ovarian-prevention-pdq#section/_11). Washington, DC: National Cancer Institute; 2018.
Ref ID: 37297

307 National Cancer Institute. Ovarian, Fallopian Tube, and Primary Peritoneal Cancer Prevention-for Health Professionals (PDQ®) (at:https://www.cancer.gov/types/ovarian/hp/ovarian-prevention-pdq#cit/section_3.46). Washington, DC: National Cancer Institute; 2018.
Ref ID: 37298

308 National Cancer Institute. Ovarian, Fallopian Tube, and Primary Peritoneal Cancer Prevention–for Health Professionals (PDQ®) (at:https://www.cancer.gov/types/ovarian/hp/ovarian-prevention-pdq#section/_9). Washington, DC: National Cancer Institute; 2019.
Ref ID: 35303

309 National Research Council. Health Risks from Exposure to Low Levels of Ionizing Radiation: BEIR VII Phase 2 (https://www.nap.edu/download/11340). Washington, DC: National Academies Press; 2006.
Ref ID: 37173

310 Ness R. Does talc exposure cause ovarian cancer? (IGCS-0015). International Journal of Gynecological Cancer 2015; 25 (Suppl 1):51.
Ref ID: 35308

311 Ness RB, Cottreau C. Possible role of ovarian epithelial inflammation in ovarian cancer. JNCI 1999; 91:1459-1467.
Ref ID: 34928

312 Ness RB, Grisso JA, Cottreau C, Klapper J, Vergona R, Wheeler JE et al. Factors related to inflammation of the ovarian epithelium and risk of ovarian cancer. Epidemiology 2000; 11:111-117.
Ref ID: 34929

313 Ness RB, Cramer DW, Goodman MT, Kjaer SK, Mallin K, Mosgaard BJ et al. Infertility, fertility drugs, and ovarian cancer: a pooled analysis of case-control studies. Am J Epidemiol 2002; 155:217-224.
Ref ID: 37278

314 Ness RB, Shen C, Bass D, Jackson C, Moysich K, Edwards R et al. Chlamydia trachomatis serology in women with and without ovarian cancer. Infect Dis Obstet Gynecol 2008; 2008(ID: 219672).
Ref ID: 37220

315 Ness RD. Endometriosis and ovarian cancer: thoughts on shared pathophysiology. Am J Obstet Gynecol 2003; 189:280-294.
Ref ID: 35518

316 Ni X, Ma J, Zhao Y, Wang Y, Wang S. Meta-analysis on the association between non-steroidal anti-inflammatory drug use and ovarian cancer. Br J Clin Pharmacol 2013; 75:26-35.
Ref ID: 35039

317 Nunez C, Bauman A, Egger S, Sitas F, Nair-Shalliker V. Obesity, physical activity and cancer risks: Results from the Cancer, Lifestyle and Evaluation of Risk Study (CLEAR). Cancer Epidemiol 2017; 47:56-63.
Ref ID: 36034

318 Oddone E, Ferrante D, Tunesi S, Magnani C. Mortality in asbestos cement workers in Pavia, Italy: A cohort study. Am J Ind Med 2017; 60:852-866.
Ref ID: 37166

319 Ohshimo S, Guzman J, Costabel U, Bonella F. Differential diagnosis of granulomatous lung disease: clues and pitfalls: Number 4 in the Series "Pathology for the clinician" Edited by Peter Dorfmüller and Alberto Cavazza. Eur Respir Rev 2017; 26:170012.
Ref ID: 36399

320 Olsen CM, Nagle CM, Whiteman DC, Ness R, Pearce CL, Pike MC et al. Obesity and risk of ovarian cancer subtypes: evidence from the Ovarian Cancer Association Consortium. Endocr Relat Cancer 2013; 20:251-262.
Ref ID: 35278

321 Ong JS, Cuellar-Partida G, Lu Y, al. Association of vitamin D levels and risk of ovarian cancer: a Mendelian randomization study. Int J Epidemiol 2016; still in print.
Ref ID: 35774

322 Ong JS, Hwang LD, Cuellar-Partida G, Martin NG, Chenevix-Trench G, Quinn MCJ et al. Assessment of moderate coffee consumption and risk of epithelial ovarian cancer: a Mendelian randomization study. Int J Epidemiol 2018; 47:450-459.
Ref ID: 36561

323 Ose J, Schock H, Tjonneland A, Hansen L, Overvad K, Dossus L et al. Inflammatory markers and risk of epithelial ovarian cancer by tumor subtypes: The EPIC Cohort. Cancer Epidemiol Biomarkers Prev 2015; 24:951-961.
Ref ID: 37328

324 Ose J, Poole EM, Schock H, Lehtinen M, Arslan AA, Zeleniuch-Jacquotte A et al. Androgens are differentially associated with ovarian cancer subtypes in the ovarian cancer cohort consortium. Cancer Res 2017; 77:3951-3960.
Ref ID: 36367

325 Ovacome. Talcum powder and ovarian cancer: Fact Sheet 14 (at: https://www.ovacome.org.uk/talcum-powder-and-ovarian-cancer). London: Ovacome; 2018.
Ref ID: 37302

326 Palmirotta R, Silvestris E, D'Oronzo S, Cardascia A, Silvestris F. Ovarian cancer: Novel molecular aspects for clinical assessment. Crit Rev Oncol Hematol 2017; 117:12-29.
Ref ID: 36430

327 Paoletti L, Caiazza S, Donelli G, Pocchiari F. Evaluation by electron microscopy techniques of asbestos contamination in industrial, cosmetic, and pharmaceutical talcs. Regul Toxicol Pharmacol 1984; 4:222-235.
Ref ID: 29887

328 Parazzini F, La Vecchia C, Negri E, Moroni S, dal Pino D, Fedele L. Pelvic inflammatory disease and risk of ovarian cancer. Cancer Epidemiol Biomarkers Prev 1996; 5:667-669.
Ref ID: 37203

329 Park HK, Ruterbusch JJ, Cote ML. Recent trends in ovarian cancer incidence and relative survival in the U.S. by race/ethnicity and histologic subtypes. Cancer Epidemiol Biomarkers Prev 2017; 26:1511-1518.
Ref ID: 36365

330 Park HK, Schildkraut JM, Alberg AJ, Bandera EV, Barnholtz-Sloan JS, Bondy M et al. Benign gynecologic conditions are associated with ovarian cancer risk in African-American women: a case-control study. Cancer Causes Control 2018; 29:1081-1091.
Ref ID: 37217

331 Park S, Park J, Lee E, Eom H, Shin MY, Kim J et al. Ovarian cancer in a former asbestos textile factory worker: a case report. Ann Occup Environ Med 2018; 30.
Ref ID: 37250

332 Patrignani P, Patrono C. Aspirin and cancer. J Am Coll Cardiol 2016; 68:967-976.
Ref ID: 37225

333 PDQ Adult Treatment Editorial Board. Ovarian Epithelial, Fallopian Tube, and Primary Peritoneal Cancer Treatment (PDQ®): Patient Version.
Authors (http://www.ncbi.nlm.nih.gov/books/NBK65718/?report=printable). Bethesda: National Cancer institute; 2017.
Ref ID: 35627

334 PDQ Adult Treatment Editorial Board. Ovarian Epithelial, Fallopian Tube, and Primary Peritoneal Cancer Treatment (PDQ): Health Professional Version. National Cancer Institution; 2017.
Ref ID: 36361

335 Pearce CL, Templeman C, Rossing MA, Lee A, Near AM, Webb PM et al. Association between endometriosis and risk of histological subtypes of ovarian cancer: a pooled analysis of case-control studies. Lancet Oncol 2012; 13(385):394.
Ref ID: 35282

336 Pearce CL, Rossing MA, Lee AW, Ness RB, Webb PM, et al. Combined and interactive effects of environmental and GWAS-identified risk factors in ovarian cancer. Cancer Epidemiol Biomarkers Prev

2013; 22:880-890.
Ref ID: 35264

337 Pearce CL, Stram DO, Ness RB, Stram DA, Roman LD, Templeman C et al. Population distribution of lifetime risk of ovarian cancer in the United States. Can Epidemiol Biomarkers Prev 2015; 24:671-767.
Ref ID: 35256

338 Penninkilampi R, Eslick GD. Perineal talc use and ovarian cancer: A systematic review and meta-analysis. Epidemiology 2018; 29:41-49.
Ref ID: 36581

339 Peres LC, Camacho F, Abbott SE, Alberg AJ, Bandera EV, Barnholtz-Sloan J et al. Analgesic medication use and risk of epithelial ovarian cancer in African American women. Br J Cancer 2016; 114:819-825.
Ref ID: 35363

340 Peres LC, Moorman PG, Alberg AJ, Bandera EV, Barnholtz-Sloan J, Bondy M et al. Lifetime number of ovulatory cycles and epithelial ovarian cancer risk in African American women. Cancer Causes Control 2017; 28:405-414.
Ref ID: 36102

341 Peres LC, Alberg AJ, Bandera EV, Barnholtz-Sloan J, Bondy M, Cote ML et al. Premenopausal hysterectomy and risk of ovarian cancer in African-American women. Am J Epidemiol 2017; 186:46-53.
Ref ID: 36153

342 Peres LC, Bandera EV, Qin B, Guertin KA, Shivappa N, Hebert JR et al. Dietary inflammatory index and risk of epithelial ovarian cancer in African American women. Int J Cancer 2017; 140:535-543.
Ref ID: 35882

343 Perets R, Drapkin R. It's totally tubular....Riding the new wave of ovarian cancer research. Cancer Res 2016; 76:10-17.
Ref ID: 36072

344 Phillips A, Balega J, Nevin J, Singh K, Elattar A, Kehoe S et al. Reporting 'Denominator' data is essential for benchmarking and quality standards in ovarian cancer. Gynecol Oncol 2017; 146:94-100.
Ref ID: 36154

345 Pierce SR, Clark LH. Current First-line Therapy for ovarian cancer: A comprehensive review. Obstet Gynecol Survey 2018; 73:650-657.
Ref ID: 37257

346 Pike MC. Age-related factors in cancers of the breast, ovary, and endometrium. J Chronic Dis 1987; 40 (suppl 2):59S-69S.
Ref ID: 37162

347 Pinheiro SP, Gates MA, De Vivo I, Rosner BA, Tworoger SS, Titus-Ernstoff L et al. Interaction between use of non-steroidal anti-inflammatory drugs and selected genetic polymorphisms in ovarian cancer risk. Int J Mol Epidemiol Genet 2010; 1:320-331.
Ref ID: 37208

348 Pira E, Pelucchi C, Buffoni L, Palmas A, Turbiglio M, Negri E et al. Cancer mortality in a cohort of asbestos textile workers. Br J Cancer 2005; 92:580-586.
Ref ID: 37167

349 Pira E, Romano C, Violante FS, Farioli A, Spatari G, La Vecchia C et al. Updated mortality study of a cohort of asbestos textile workers. Cancer Med 2016; 5:2623-2628.
Ref ID: 35626

350 Pira E, Coggiola M, Ciocan C, Romano C, La Vecchia C, Pelucchi C et al. Mortality of talc miners and millers from Val Chisone, Northern Italy: An Updated Cohort Study. J Occup Environ Med 2017; 59:659-664.
Ref ID: 36341

351 Poole EM, Lee IM, Ridker PM, Buring JE, Hankinson SE, Tworoger SS. A prospective study of circulating C-reactive protein, interleukin-6, and tumor necrosis factor a receptor 2 levels and risk of ovarian cancer. Am J Epidemiol 2013; 178:1256-1264.
Ref ID: 35587

352 Poole EM, Lin WT, Kvaskoff M, De Vivo I, Terry KL, Missmer SA. Endometriosis and risk of ovarian and endometrial cancers in a large prospective cohort of U.S. nurses. Cancer Causes Control 2017; 28:437-445.
Ref ID: 36101

353 Poorolajal J, Jenabi E, Masoumi SZ. Body mass index effects on risk of ovarian cancer: a meta-analysis. Asian Pac J Cancer Prev 2014; 15:7665-7671.
Ref ID: 35280

354 Praestegaard C, Kjaer SK, Nielsen TS, Jensen SM, Webb PM, Nagle CM et al. The association between socioeconomic status and tumour stage at diagnosis of ovarian cancer: A pooled analysis of 18 case-control studies. Cancer Epidemiol 2016; 41:71-79.
Ref ID: 35407

355 Purdie D, Green A, Bain C, Siskind V, Ward B, Hacker N et al. Reproductive and other factors and risk of epithelial ovarian cancer: an Australian case-control study. Survey of Women's Health Study Group. Int J Cancer 1995; 62:678-684.
Ref ID: 34952

356 Purdie DM, Brain CJ, Siskind V, Webb PM, Green AC. Ovulation and risk of epithelial ovarian cancer. Int J Cancer 2003; 104:228-232.
Ref ID: 37153

357 Pylvas M, Puistola U, Kauppila S, Soini Y, Karihtala P. Oxidative stress-induced antioxidant enzyme expression is an early phenomenon in ovarian carcinogenesis. Eur J Cancer 2010; 46:1661-1671.
Ref ID: 37269

358 Pylvas M, Puistola U, Laatio L, Kauppila S, Karihtala P. Elevated serum 8-OHdG is associated with poor prognosis in epithelial ovarian cancer. Anticancer Res 2011; 31:1411-1415.
Ref ID: 37234

359 Qin B, Moorman PG, Alberg AJ, Barnholtz-Sloan JS, Bondy M, Cote ML et al. Dairy, calcium, vitamin D and ovarian cancer risk in African-American women. Br J Cancer 2016; 115:1122-1130.
Ref ID: 35773

360 Qin B, Moorman PG, Kelemen LE, Alberg AJ, Barnholtz-Sloan JS, Bondy M et al. Dietary quality and ovarian cancer risk in African-American women. Am J Epidemiol 2017; 23:1-9.
Ref ID: 36282

361 Ramanakumar AV, Parent ME, Latreille B, Siemiatycki J. Risk of lung cancer following exposure to carbon black, titanium dioxide and talc: results from two case-control studies in Montreal. Int J Cancer 2008; 122:183-189.
Ref ID: 27143

362 Randall LM, Pothuri B. The genetic prediction of risk for gynecologic cancers. Gynecol Oncol 2016; 141:10-16.
Ref ID: 35409

363 Rasmussen CB, Faber MT, Jensen A, Hogdall E, Hogdall C, Blaakaer J et al. Pelvic inflammatory disease and risk of invasive ovarian cancer and ovarian borderline tumors. Cancer Causes Control 2013; 24:1459-1464.
Ref ID: 37202

364 Rasmussen CB, Jensen A, Albieri V, Andersen KK, Kjaer SK. Increased risk of borderline ovarian tumors in women with a history of pelvic inflammatory disease: A nationwide population-based cohort study. Gynecol Oncol 2016; 143:346-351.
Ref ID: 35686

365 Rasmussen CB, Kjaer SK, Albieri V, Bandera EV, Doherty JA, Hogdall E et al. Pelvic inflammatory disease and the risk of ovarian cancer and borderline ovarian tumors: A pooled analysis of 13 case-control studies. Am J Epidemiol 2017; 185:8-20.
Ref ID: 35989

366 Rasmussen CB, Jensen A, Albieri V, Andersen KK, Kjaer SK. Is pelvic inflammatory disease a risk factor for ovarian cancer? Cancer Epidemiol Biomarkers Prev 2017; 26:104-109.
Ref ID: 35769

367 Rasmussen EL, Hannibal CG, Dhlendorff C, Baandrup L, Junge J, Vang R et al. Parity, infertility, oral contraceptives, and hormone replacement therapy and the risk of ovarian serous borderline tumors: A nationwide case-control study. Gynecol Oncol 2017; 144:571-576.
Ref ID: 36037

368 Ray Chaudhuri A, Nussenzweig A. The multifaceted roles of PARP1 in DNA repair and chromatin remodelling. Nat Rev Mol Cell Biol 2017; 18:610-621.
Ref ID: 36498

369 Rayar AM, Lagarde N, Ferroud C, Zagury JF, Montes M, Sylla-Iyarreta Veitia M. Update on COX-2 selective inhibitors: Chemical classification, side effects and their use in cancers and neuronal diseases. Curr Top Med Chem 2017; 17:2935-2956.
Ref ID: 37229

370 Rehm S, Waalkes MP. Cadmium-induced ovarian toxicity in hamsters, mice, and rats. Fundam Appl Toxicol 1988; 10:635-647.
Ref ID: 36253

371 Reid A, de Klerk N, Musk AW. Does exposure to asbestos cause ovarian cancer? A systematic literature review and meta-analysis. Can Epidemiol Biomarkers Prev 2011; 20:1287-1295.
Ref ID: 36296

372 Reigstad MM, Storeng R, Myklebust TA, Oldereid NB, Omland AK, Robsahm TE et al. Cancer Risk in Women Treated with Fertility Drugs According to Parity status - A Registry-based Cohort Study. Cancer Epidemiol Biomarkers Prev 2017; 26:953-962.
Ref ID: 36035

373  Rice MS, Murphy MA, Tworoger SS. Tubal ligation, hysterectomy and ovarian cancer: A meta-analysis. J Ovarian Res 2012; 5:13.
Ref ID: 35520

374  Risch HA, Howe GR. Pelvic inflammatory disease and the risk of epithelial ovarian cancer. Cancer Epidemiol Biomarkers Prev 1995; 4:447-451.
Ref ID: 37200

375  Rodriguez-Panadero F, Montes-Worboys A. Mechanisms of pleurodesis. Respiration 2012; 83:91-98.
Ref ID: 35106

376  Rohl AN, Langer AM, Selikoff IJ, Tordini A, Klimentidis R, Bowes DR et al. Consumer talcums and powders: mineral and chemical characterization. J Toxicol Environ Health 1976; 2:255-284.
Ref ID: 37183

377  Roland IH, Yang WL, Yang DH, Daly MB, Ozols RF, Hamilton TC et al. Loss of surface and cyst epithelial basement membranes and preneoplastic morphologic changes in prophylactic oophorectomies. Cancer 2003; 98:2607-2623.
Ref ID: 37275

378  Romero R, Erez O, Huttemann M, Maymon E, Panaitescu B, Conde-Agudelo A et al. Metformin, the aspirin of the 21st century: its role in gestational diabetes, prevention of preeclampsia and cancer, and the promotion of longevity. Am J Obstet Gynecol 2017; 217:282-302.
Ref ID: 36325

379  Rosenberg K, Mechcatie E. Low-dose aspirin use associated with lower ovarian cancer risk. Am J Nurs 2019; 119:50.
Ref ID: 37426

380  Rosenblatt KA, Szklo M, Rosenshein NB. Mineral fiber exposure and the development of ovarian cancer. Gynecol Oncol 1992; 45:20-25.
Ref ID: 35276

381  Rosenblatt KA, Mathews WA, Daling JR, Voigt LF, Malone K. Characteristics of women who use perineal powders. Obstet Gynecol 1998; 92:753-756.
Ref ID: 35283

382  Rosenblatt KA, Weiss NS, Cushing-Haugen KL, Wicklund KG, Rossing MA. Genital powder exposure and the risk of epithelial ovarian cancer. Cancer Causes Control 2011; 22:737-742.
Ref ID: 34941

383  Rosenman KD. Talc. In: Bingham E, Cohrssen B, editors. Patty's Toxicology. 6th (Volume 5) ed. New York: John Wiley & Sons, Inc.; 2012. 257-272.
Ref ID: 36417

384  Rossing MA, Cushing-Haugen KL, Wicklund KG, Doherty JA, Weiss NS. Risk of epithelial ovarian cancer in relation to benign ovarian conditions and ovarian surgery. Cancer Causes Control 2008; 19:1357-1364.
Ref ID: 35519

385  Rothman KJ. Induction and latent periods. Am J Epidemiol 1981; 114:253-259.
Ref ID: 37259

386  Rubino GF, Scansetti G, Piolatto G, Romano CA. Mortality study of talc miners and millers. JOM 1976; 18:186-193.
Ref ID: 37140

387  Sadeghi R. Feasibility of sentinel node mapping in ovarian Tumorst What Is the evidence? Int J Gynecol Cancer 2018; 28:421-422.
Ref ID: 36560

388  Saed GM, Ali-Fehmi R, Jiang ZL, Fletcher NM, Diamond MP, Abu-Soud HM et al. Myeloperoxidase serves as a redox switch that regulates apoptosis in epithelial ovarian cancer. Gynecol Oncol 2010; 116:276-281.
Ref ID: 37263

389  Saed GM, Diamond MP, Fletcher NW. Updates of the role of oxidative stress in the pathogenesis of ovarian cancer. Gynecol Oncol 2017; 145:595-602.
Ref ID: 36330

390  Saed GM, Fletcher NM, Diamond MP, Morris RT, Gomez-Lopez N, Memaj I. Novel expression of CD11b in epithelial ovarian cancer: Potential therapeutic target. Gynecol Oncol 2018; 148:567-575.
Ref ID: 37232

391  Saed GM, Morris RT, Fletcher NM. New Insights into the Pathogenesis of Ovarian Cancer: Oxidative Stress. In: Devaja O, Papadopoulos A, editors. Ovarian Cancer - From Pathogenesis to Treatment. 2018. 83-110.
Ref ID: 37262

392  Samimi G, Minasian LM. Opportunistic salpingectomy: What about the role of the ovary in ovarian cancer? Cancer 2017; 123:1699-1702.
Ref ID: 36286

393 Sanchez M, Torres JV, Tormos C, Iradi A, Muniz P, Espinosa O et al. Impairment of antioxidant enzymes, lipid peroxidation and 8-oxo-2'-deoxyguanosine in advanced epithelial ovarian carcinoma of a Spanish community. Cancer Lett 2006; 233:28-35.
Ref ID: 37273

394 Saraswat L, Ayansina D, Cooper KG, Bhattacharya S, Horne AW, Bhattacharya S. Impact of endometriosis on risk of further gynaecological surgery and cancer: a national cohort study. BJOG 2018; 125:64-72.
Ref ID: 36432

395 Schildkraut JM, Abbott SE, Alberg AJ, Bandera EV, Barnholtz-Sloan JS, Bondy ML et al. Association between body powder use and ovarian cancer: the African American Cancer Epidemiology Study (AACES). Cancer Epidemiol Biomarkers Prev 2016; 25:1411-1417.
Ref ID: 35510

396 Scientific Association of European Talc Producers. What is talc? (https://www.eurotalc.eu/what-talc). Brussels: EuroTalc; 2019.
Ref ID: 37360

397 Seewaldt VL. Aspirin and chemoprevention- Have we arrived? JAMA Oncol 2019; 4:1668-1669.
Ref ID: 37233

398 Seidman JD, Cho KR, Ronnett BM, Kurman RJ. Surface Epithelial Tumors of the Ovary. In: Kurman RJ, Hedrick Ellenson L, Ronnett BM, editors. Blaustein's Pathology of the Female Genital Tract. 6th ed. Springer Science Business Media LLC: 2011. 680-784.
Ref ID: 35608

399 Shah VA, Cassell M, Poulose A, Sabates NR. Talc retinopathy. Ophthalmology 2008; 115:755.
Ref ID: 27422

400 Shan W, Liu J. Inflammation: a hidden path to breaking the spell of ovarian cancer. Cell Cycle 2009; 8:3107-3111.
Ref ID: 37231

401 Shen CC, Hu LY, Yang AC, Chiang YY, Hung JH, Tsai SJ. Risk of uterine, ovarian and breast cancer following pelvic inflammatory disease: a nationwide population-based retrospective cohort study. BMC Cancer 2016; 16:839.
Ref ID: 35973

402 Shen N, Weiderpass E, Antilla A, Goldberg MS, Vasama-Neuvonen KM, Boffetta P et al. Epidemiology of occupational and environmental risk factors related to ovarian cancer. Scand J Work Environ Health 1998; 24:175-182.
Ref ID: 36251

403 Shi LF, Wu Y, Li CY. Hormone therapy and risk of ovarian cancer in postmenopausal women: a systematic review and meta-analysis. Menopause 2016; 23:417-424.
Ref ID: 35411

404 Shih I, Kurman RJ. Ovarian tumorigenesis: a proposed model based on morphological and molecular genetic analysis. Am J Pathol 2004; 164:1511-1518.
Ref ID: 35599

405 Shimizu Y, Kato H, Schull WJ. Studies of the mortality of A-bomb survivors. 9. Mortality, 1950-1985: Part 2. Cancer mortality based on the recently revised doses (DS86). Radiat Res 1990; 121:120-141.
Ref ID: 37177

406 Shu XO, Brinton LA, Gao YT, Yuan JM. Population-based case-control study of ovarian cancer in Shanghai. Cancer Res 1989; 49:3670-3674.
Ref ID: 37201

407 Shukla A, Macpherson MB, Hillegass J, Ramos-Nino ME, Alexeeva V, Vacek PM et al. Alterations in gene expression in human mesothelial cells correlate with mineral pathogenicity. Am J Respir Cell Mol Biol 2009; 41:114-123.
Ref ID: 35637

408 Shushan A, Patiel O, Iscovich J, Elchalal U, Peretz T, Schenker JG. Human menopausal gonadotropin and the risk of epithelial ovarian cancer. Fertil Steril 1996; 65:13-18.
Ref ID: 35284

409 Sidaway P. Genetics: BRCA-mutant breast/ovarian cancer revealed. Nat Rev Clin Oncol 2017; 14:524.
Ref ID: 36383

410 Sieh W, Salvador S, McGuire V, Weber RP, Terry KL, Rossing MA et al. Tubal ligation and risk of ovarian cancer subtypes: a pooled analysis of case-control studies. Int J Epidemiol 2013; 42:579-589.
Ref ID: 35262

411 Simin J, Tamimi R, Lagergren J, Adami HO, Brusselaers N. Menopausal hormone therapy and cancer risk: An overestimated riskA? Eur J Cancer 2017; 84:60-68.
Ref ID: 36413

412 Siteman Cancer Center. Your Disease Risk (at:https://siteman.wustl.edu/prevention/ydr/). St. Louis: Siteman Cancer Center; 2019.
Ref ID: 37301

413 Slack R, Young C, Rushton L. Occupational cancer in Britain. Female cancers: breast, cervix and ovary. Br J Cancer 2012; 107 (suppl 1):S27-S32.
Ref ID: 36247

414 Smith G, Roberts R, Hall C, Nuki G. Reversible ovulatory failure associated with the development of luteinized unruptured follicles in women with inflammatory arthritis taking non-steroidal anti-inflammatory drugs. Br J Rheumatol 1996; 35:458-462.
Ref ID: 37283

415 Smith RA, Andrews KS, Brooks D, Fedewa SA, Manassaram-Baptiste D, Saslow D et al. Cancer screening in the United States, 2017: A review of current American Cancer Society guidelines and current issues in cancer screening. CA Cancer J Clin 2017; 67:100-121.
Ref ID: 36103

416 Sorensen RD, Schnack TH, Karlsen MA, Hogdall CK. Serous ovarian, fallopian tube and primary peritoneal cancers: a common disease or separate entities - a systematic review. Gynecol Oncol 2015; 136:571-581.
Ref ID: 35293

417 Spriggs DR, Longo DL. Progress in BRCA-mutated ovarian cancer. NEJM 2018; 379:2567-2568.
Ref ID: 37310

418 Srivastava SK, Ahmad A, Miree O, Patel GK, Singh S, Rocconi RP et al. Racial health disparities in ovarian cancer: not just black and white. J Ovarian Res 2017; 10:58.
Ref ID: 36429

419 Steiling W, Almeida JF, Assaf Vandecasteele H, Gilpin S, Kawamoto T, O'Keeffe L et al. Principles for the safety evaluation of cosmetic powders. Toxicol Lett 2018; 297:8-18.
Ref ID: 37184

420 Stern RC, Dash R, Bentley rC, Snyder MJ, Haney AF, Robboy SJ. Malignancy in endometriosis: frequency and comparison of ovarian and extraovarian types. Int J Gynecol Pathol 2001; 20:133-139.
Ref ID: 37281

421 Stewart LM, Holman CD, Aboagye-Sarfo P, Finn JC, Preen DB, Hart R. In vitro fertilization, endometriosis, nulliparity and ovarian cancer risk. Gynecol Oncol 2013; 128:260-264.
Ref ID: 37206

422 Stewart LM, Spilsbury K, Jordan S, Stewart C, Holman CD, Powell A et al. Risk of high-grade serous ovarian cancer associated with pelvic inflammatory disease, parity and breast cancer. Cancer Epidemiol 2018; 55:110-116.
Ref ID: 37218

423 Stewart SL, Harewood R, Matz M, Rim SH, Sabatino SA, Ward KC et al. Disparities in ovarian cancer survival in the United States (2001-2009): Findings from the CONCORD-2 study. Cancer 2017; 123 (suppl 24):5138-5159.
Ref ID: 37172

424 Stone S, Khamashta MA, Nelson-Piercy C. Nonsteroidal anti-inflammatory drugs and reversible female infertility: is there a link? Drug Safety 2002; 25:545-551.
Ref ID: 37284

425 Straif K, Keil U, Taeger D, Holthenrich D, Sun Y, Bungers M et al. Exposure to nitrosamines, carbon black, asbestos, and talc and mortality from stomach, lung, and laryngeal cancer in a cohort of rubber workers. Am J Epidemiol 2000; 152:297-306.
Ref ID: 22085

426 Stroup DF, Berlin JA, Morton SC, Olkin I, Williamson GD, Rennie D et al. Meta-analysis of observational studies in epidemiology: A proposal for reporting. J Am Med Assoc 2000; 283:2008-2012.
Ref ID: 29571

427 Swisher EM, Garcia RL, Kilgore MR, Norquist BM. Culprit or Bystander? The role of the fallopian tube in "Ovarian" high-grade serous carcinoma. Cancer Discov 2016; 6:1309-1311.
Ref ID: 36007

428 Tabung FK, Huang T, Giovannucci EL, Smith-Warner SA, Tworoger SS, Poole EM. The inflammatory potential of diet and ovarian cancer risk: results from two prospective cohort studies. Br J Cancer 2017; still in print.
Ref ID: 36414

429 Taher MK, Farhat N, Karyakina NA, Shilnikova N, Ramoju S, Gravel CA et al. Systematic Review and Meta-Analysis of the Association Between Perineal Use of Talc and Risk of Ovarian Cancer.   2018.
Ref Type: Report
Ref ID: 37372

430 Taher MK, Farhat N, Karyakina NA, Shilnikova N, Ramoju S, Gravel CA et al. Systematic Review and Meta-Analysis of the Association between Perineal Use of Talc Powder and Risk of Ovarian Cancer. (Supplemental Material).   2018.
Ref Type: Report
Ref ID: 37355

431 Taher MY, Davies DM, Maher J. The role of the interleukin (IL)-6/IL-6 receptor axis in cancer. Biochem Soc Trans 2018; 46:1449-1462.
Ref ID: 37313

432 Taniguchi F. New knowledge and insights about the malignant transformation of endometriosis. J Obstet Gynaecol Res 2017; 43:1093-1100.
Ref ID: 36363

433 Tarp S, Bartels EM, Bliddal H, Furst DE, Boers M, Danneskiold-Samsoe B et al. Effect of nonsteroidal antiinflammatory drugs on the C-reactive protein level in rheumatoid arthritis: a meta-analysis of randomized controlled trials. Arthritis Rheum 2012; 64:3511-3521.
Ref ID: 37237

434 Ten Haaf K, Jeon J, Tammemagi MC. Risk prediction models for selection of lung cancer screening candidates: A retrospective validation study. PloS Med 2017; 14:e1002277.
Ref ID: 36157

435 Terry KL, Karageorgi S, Shvetsov YB, Merritt MA, Lurie G, Thompson PJ et al. Genital powder use and risk of ovarian cancer: a pooled analysis of 8,525 cases and 9,859 controls. Cancer Prev Res (Phila) 2013; 6:811-821.
Ref ID: 34930

436 Terry PD, Qin B, Camacho F, Moorman PG, Alberg A, Barnholtz-Sloan JS et al. Supplemental selenium may decrease ovarian cancer risk in African-American women. J Nutr 147, 621-627. 2017.
Ref Type: Journal (Full)
Ref ID: 36160

437 Tew WP. Ovarian cancer in the older woman. J Geriatr Oncol 2016; 7:354-361.
Ref ID: 35688

438 Thompson DE, Mabuchi K, Ron E, Soda M, Tokunaga M, Ochikubo S et al. Cancer incidence in atomic bomb survivors. Part II: Solid tumors, 1958-1987. Radiat Res 1994; 137 (Suppl 2):S17-S67.
Ref ID: 37175

439 Thomsen LH, Henrichsen Schnack T, Buchardi K, Hummelshoj L, Missmer SA, Forman A et al. Risk factors of epithelial ovarian carcinomas among women with endometriosis: a systematic review. Acta Obstet Gynecol Scand 2017; 96:761-778.
Ref ID: 35684

440 Tokuoka S, Kawai K, Shimizu Y, Inai K, Ohe K, Fujikura T et al. Malignant and benign ovarian neoplasms among atomic bomb survivors, Hiroshima and Nagasaki, 1950-80. JNCI 1987; 79:47-57.
Ref ID: 37168

441 Toriola AT, Grankvist K, Agborsangaya CB, Lukanova A, Lehtinen M, Surcel HM. Changes in pre-diagnostic serum C-reactive protein concentrations and ovarian cancer risk: a longitudinal study. Ann Oncol 2011; 22:1916-1921.
Ref ID: 37211

442 Torpy JM, Burke AE, Golub RM. JAMA patient page. Ovarian cancer. J Am Med Assoc 2011; 305:2484.
Ref ID: 37163

443 Trabert B, Pinto L, Hartge P, Kemp T, Black A, Sherman ME et al. Pre-diagnostic serum levels of inflammation markers and risk of ovarian cancer in the prostate, lung, colorectal and ovarian cancer (PLCO) screening trial. Gynecol Oncol 2014; 135:297-304.
Ref ID: 37327

444 Trabert B. Body powder and ovarian cancer rsk - what Is the role of recall bias? Cancer Epidemiol Biomarkers Prev 2016; 25:1369-1370.
Ref ID: 35878

445 Trabert B, Poole EM, White E, Visvanathan K, Adami HO, Anderson GL et al. Analgesic use and ovarian cancer risk: An analysis in the ovarian cancer cohort consortium. JNCI 2019; 111:137-145.
Ref ID: 37226

446 Trabert B, Waterboer T, Idahl A, Brenner N, Brinton LA, Butt J et al. Antibodies against chlamydia trachomatis and ovarian cancer risk in two independent populations. JNCI 2019; 111:129-136.
Ref ID: 37214

447 Tschopp JM, Schnyder JM, Astoul P, Noppen M, Froudarakis M, Bolliger CT et al. Pleurodesis by talc poudrage under simple medical thoracoscopy: an international opinion. Thorax 2009; 64:273-274.
Ref ID: 28411

448  Tsevat DG, Wiesenfeld HC, Parks C, Peipert JF. Sexually transmitted diseases and infertility. Am J Obstet Gynecol 2017; 216:1-9.
     Ref ID: 37216

449  Tung KH, Wilkens LR, Wu AH, McDuffie K, Nomura AM, Kolonel LN et al. Effect of anovulation factors on pre- and postmenopausal ovarian cancer risk: revisiting the incessant ovulation hypothesis. Am J Epidemiol 2005; 161:321-329.
     Ref ID: 35281

450  Tworoger SS, Gertig DM, Gates MA, Hecht JL, Hankinson SE. Caffeine, alcohol, smoking, and the risk of incident epithelial ovarian cancer. Cancer 2008; 112:1169-1177.
     Ref ID: 36422

451  Tzonou A, Polychronopoulou A, Hsieh CC, Rebelakos A, Karakatsani A, Trichopoulos D. Hair dyes, analgesics, tranquilizers and perineal talc application as risk factors for ovarian cancer. Int J Cancer 1993; 55:408-410.
     Ref ID: 34950

452  U.S.Environmental Protection Agency. Health Assessment Document for Talc (EPA 600/8-91/217). Washington, DC: U.S. Environmental Protection Agency; 1992.
     Ref ID: 36343

453  Unknown. Ovarian cancer. Nat Rev Dis Primers 2016; 2 (Article # 16062).
     Ref ID: 35685

454  Urban N, Hawley S, Jane H, Karlan BY, Berg CD, Drescher S et al. Identifying post-menopausal women at elevated risk for epithelial ovarian cancer. Gynecol Oncol 2015; 139:253-260.
     Ref ID: 35285

455  Usset JL, Raghavan R, Tyrer JP, McGuire V, Sieh W, Webb P et al. Assessment of multifactor gene-environment interactions and ovarian cancer risk: candidate genes, obesity, and hormone-related risk factors. Cancer Epidemiol Biomarkers Prev 2016; 25:780-790.
     Ref ID: 35367

456  Vaughan LE, Prizment A, Blair CK, Thomas W, Anderson KE. Aspirin use and the incidence of breast, colon, ovarian, and pancreatic cancers in elderly women in the Iowa Women's Health Study. Cancer Causes Control 2016; 27:1395-1402.
     Ref ID: 35768

457  Verdoodt F, Kjaer SK, Friis S. Influence of aspirin and non-aspirin NSAID use on ovarian and endometrial cancer: Summary of epidemiologic evidence of cancer risk and prognosis. Maturitas 2017; 100:1-7.
     Ref ID: 36329

458  Verdoodt F, Kjaer Hansen M, Kjaer SK, Pottegard A, Friis S, Dehlendorff C. Statin use and mortality among ovarian cancer patients: A population-based cohort study. Int J Cancer 2017; 141:279-286.
     Ref ID: 36368

459  Visvanathan K, Shaw P, May BJ, Bahadirli-Talbott A, Kaushiva A, Risch H et al. Fallopian tube lesions in women at high risk for ovarian cancer: a multicenter study. Cancer Prev Res (Phila) 2018; 11:697-706.
     Ref ID: 37254

460  Vitale P, Panella A, Scilimati A, Perrone MG. COX-1 inhibitors: Beyond structure toward therapy. Med Res Rev 2016; 36:641-671.
     Ref ID: 37235

461  Wang C, Liang Z, Liu X, Zhang Q, Li S. The association between endometriosis, tubal ligation, hysterectomy and epithelial ovarian cancer: meta-analyses. Int J Environ Res Public Health 2016; 13:E1138.
     Ref ID: 35969

462  Wang J, Yang DL, Chen ZZ, Gou BF. Associations of body mass index with cancer incidence among populations, genders, and menopausal status: A systematic review and meta-analysis. Cancer Epidemiol 2016; 42:1-8.
     Ref ID: 35581

463  Wang L, Wang L, Zhang J, Wang B, Liu H. Association between diabetes mellitus and subsequent ovarian cancer in women: A systematic review and meta-analysis of cohort studies. Medicine (Baltimore) 2017; 96:e6396.
     Ref ID: 36161

464  Webb PM, Jordan SJ. Epidemiology of epithelial ovarian cancer. Best Pract Res Clin Obstet Gynaecol 2017; 41:3-14.
     Ref ID: 35883

465  Wehner AP. Cosmetic talc should not be listed as a carcinogen: comments on NTP's deliberations to list talc as a carcinogen. Regul Toxicol Pharmacol 2002; 36:40-50.
     Ref ID: 35042

466 Wentzensen N, Wacholder S. Talc use and ovarian cancer: epidemiology between a rock and a hard place. JNCI 2014; 106.
Ref ID: 34931

467 Wentzensen N, Poole EM, Trabert B, White E, Arslan AA, Patel AV et al. Ovarian cancer risk factors by histologic subtype: An analysis from the ovarian cancer cohort consortium. J Clin Oncol 2016; 34:2888-2898.
Ref ID: 35575

468 Wergeland E, Gjertsen F, Vos L, Grimsrud TK. Cause-specific mortality and cancer morbidity in 390 male workers exposed to high purity talc, a six-decade follow-up. Am J Ind Med 2017; 60:821-830.
Ref ID: 36364

469 White KL, Schildkraut JM, Palmieri RT, Iversen ES, Jr., Berchuck A, Vierkant RA et al. Ovarian cancer risk associated with inherited inflammation-related variants. Cancer Res 2012; 72:1064-1069.
Ref ID: 37209

470 Whittemore AS, Wu ML, Paffenbarger RS, Jr., Sarles DL, Kampert JB, Grosser S et al. Personal and environmental characteristics related to epithelial ovarian cancer. II. Exposures to talcum powder, tobacco, alcohol, and coffee. Am J Epidemiol 1988; 128:1228-1240.
Ref ID: 34942

471 Wild P. Lung cancer risk and talc not containing asbestiform fibres: a review of the epidemiological evidence. Occup Environ Med 2006; 63:4-9.
Ref ID: 37188

472 Williams KA, Terry KL, Tworoger SS, Vitonis AF, Titus LJ, Cramer DW. Polymorphisms of MUC16 (CA125) and MUC1 (CA15.3) in relation to ovarian cancer risk and survival. PLoS One 2014; 9:e88334.
Ref ID: 34943

473 Wong C, Hempling RE, Piver MS, Natarajan N, Mettlin CJ. Perineal talc exposure and subsequent epithelial ovarian cancer: a case-control study. Obstet Gynecol 1999; 93:372-376.
Ref ID: 34955

474 World Cancer Research Fund. Ovarian cancer. How common is ovarian cancer? (https://www.wcrf-uk.org/uk/preventing-cancer/cancer-types/ovarian-cancer). London: World Cancer Research Fund; 2017.
Ref ID: 37410

475 World Cancer Research Fund. Can cosmetics and toiletries cause cancer? (https://www.wcrf.org/informed/articles/can-cosmetics-and-toiletries-cause-cancer). London: World Cancer Research Fund; 2017.
Ref ID: 37409

476 World Health Organization. WHO Classification of Tumours of Female Reproductive Organs. 4th ed. Lyon: International Agency for Research on Cancer (IARC); 2014.
Ref ID: 35600

477 Worley MJ, Welch WR, Berkowitz RS, Ng SW. Endometriosis-associated ovarian cancer: a review of pathogenesis. Int J Mol Sci 2013; 14:5367-5379.
Ref ID: 37289

478 Wright JD. What is new in ovarian cancer? Best articles from the past year. Obstet Gynecol 2018; 132:1498-1499.
Ref ID: 37373

479 Wu AH, Pearce CL, Tseng CC, Pike MC. African Americans and Hispanics Remain at Lower Risk of Ovarian Cancer Than Non-Hispanic Whites after Considering Nongenetic Risk Factors and Oophorectomy Rates. Cancer Epidemiol Biomarkers Prev 2015; 24:1094-1100.
Ref ID: 35263

480 Wu AH, Pearce CL, Tseng CC, Templeman C, Pike MC. Markers of inflammation and risk of ovarian cancer in Los Angeles County. Int J Cancer 2009; 124:1409-1415.
Ref ID: 35000

481 Wu AH, Pearce CL, Tseng CC, Pike MC. African Americans and Hispanics remain at lower risk of ovarian cancer than Non-Hispanic Whites after considering nongenetic risk factors and oophorectomy rates. Cancer Epidemiol Biomarkers Prev 2015; 24:1094-1100.
Ref ID: 36039

482 Wu AH, Pearce CL, Lee A, Tseng C, Jotwani A, Patel P et al. Timing of births and oral contraceptive use influences ovarian cancer risk. Int J Cancer 2017; 141:2392-2399.
Ref ID: 36366

483 Wylie AG, Virta RL, Russek E. Characterizing and discriminating airborne amphibole cleavage fragments and amosite fibers: Implications for the NIOSH method. Am Ind Hyg Assoc J 1985; 46:197-201.
Ref ID: 37178

484 Xia H, Wang XJ, Zhou Q, Shi HZ, Tong ZH. Efficacy and safety of talc pleurodesis for malignant pleural effusion: a meta-analysis. PloS One 2014; 9:e87060.
Ref ID: 35109

485 Xu X, Wang Y, Guo W, Zhou Y, Lv C, Chen X et al. The significance of the alteration of 8-OHdG in serous ovarian carcinoma. J Ovarian Res 2013; 6:74.
Ref ID: 37268

486 Yaman M, Kaya G, Simsek M. Comparison of trace element concentrations in cancerous and noncancerous human endometrial and ovary tissues. Int J Gynecol Cancer 2007; 17:220-228.
Ref ID: 36249

487 Yanaranop M, Anakrat V, Siricharoenthai S, Nakrangsee S, Thinkhamrop B. Is the risk of ovarian malignancy algorithm better than other tests for predicting ovarian malignancy in women with pelvic masses? Gynecol Obstet Invest 2017; 82:47-53.
Ref ID: 35526

488 Yang HP, Murphy KR, Pfeifer RM, George N, Garcia-Closas M, Lissowska J et al. Lifetime number of ovulatory cycles and risks of ovarian and endometrial cancer among postmenopausal women. Am J Epidemiol 2016; 183:800-814.
Ref ID: 35513

489 Yin JG, Liu XY, Wang B, Wang DY, Wei M, Fang H et al. Gene expression profiling analysis of ovarian cancer. Oncol Lett 2016; 12:405-412.
Ref ID: 35574

490 Yu T, Ma P, Wu D, Shu Y, Gao W. Functions and mechanisms of microRNA-31 in human cancers. Biomed Pharmacother 2018; 108:1162-1169.
Ref ID: 37317

491 Yun WS, Bae JM. Primary peritoneal serous carcinoma, an extremely rare malignancy: A case report and review of the literature. Oncol Lett 2016; 11:4063-4065.
Ref ID: 35582

492 Zeng F, Wei H, Yeoh E, Zhang Z, Ren ZF, Colditz GA et al. Inflammatory markers of CRP, IL-6, TNF-a and soluble TNFR2 and the risk of ovarian cancer: a meta-analysis of prospective studies. Cancer Epidemiol Biomarkers Prev 2016; 25:1231-1239.
Ref ID: 35577

493 Zervomanolakis I, Ott HW, Hadziomerovic D, Mattle V, Seeber BE, Virgolini I et al. Physiology of upward transport in the human female genital tract. Ann NY Acad Sci 2007; 1101:1-20.
Ref ID: 37377

494 Zezenski R, Ashton WH, Briggs D, Chudkowski M, Kelse JW, MacEachern L et al. Talc: occurrence, characterization, and consumer applications. Regul Toxicol Pharmacol 1995; 21:218-229.
Ref ID: 37358

495 Zhan X, Wang J, Pan S, Lu C. Tea consumption and the risk of ovarian cancer: A meta-analysis of epidemiological studies. Oncotarget 2017; 8:37796-37806.
Ref ID: 36156

496 Zhang C, Wang X, Anaya Y, Parodi L, Cheng L, Anderson ML et al. Distinct molecular pathways in ovarian endometrioid adenocarcinoma with concurrent endometriosis. Int J Cancer 2018; 143:2505-2515.
Ref ID: 37252

497 Zhang D, Bai B, Xi Y, Wang T, Zhao Y. Is aspirin use associated with a decreased risk of ovarian cancer? A systematic review and meta-analysis of observational studies with dose-response analysis. Gynecol Oncol 2016; 142:368-377.
Ref ID: 35507

498 Zhang D, Li N, Xi Y, Zhao Y, Wang T. Diabetes mellitus and risk of ovarian cancer: A systematic review and meta-analysis of 15 cohort studies. Diabetes Res Clin Pract 2017; 130:43-52.
Ref ID: 36416

499 Zhang XY, Zhang PY. Recent perspectives of epithelial ovarian carcinoma. Oncol Lett 2016; 12:3055-3058.
Ref ID: 35967

500 Zhao C, Li S, Zhao M, Zhu H, Zhu X. Prognostic values of DNA mismatch repair genes in ovarian cancer patients treated with platinum-based chemotherapy. Arch Gynecol Obstet 2017; still in print.
Ref ID: 36496

501 Zhao Z, Xue J, Zhao X, Lu J, Liu P. Prognostic role of autophagy-related proteins in epithelial ovarian cancer: a meta-analysis of observational studies. Minerva Med 2017; 108:277-286.
Ref ID: 35975

502 Zheng G, Yu H, Hemminki A, Forsti A, Sundquist K, Hemminki K. Familial associations of female breast cancer with other cancers. Int J Cancer 2017; still in print.
Ref ID: 36410

503 Zhou Z, Zeng F, Yuan J, Tang J, Colditz GA, Tworoger SS et al. Pelvic inflammatory disease and the risk of ovarian cancer: a meta-analysis. Cancer Causes Control 2017; 28:415-428.
Ref ID: 36100
504 Zondervan KT, Becker CM, Koga K, Missmer SA, Taylor RN, Vigano P. Endometriosis. Nat Rev Dis Primers 2018; 4:9.
Ref ID: 37221

## Attachment 3:
## Chronology of Opinions

### 1982: Cramer et al (1)

"This provides some support for an association between talc and ovarian cancer … If talc is involved in the etiology of ovarian cancer, it is not clear whether this derives from the asbestos content of talc or from the uniqueness of the ovary which might make it susceptible to carcinogenesis from both talc and other particulates."

### 1986: IARC Monograph 42 (Talc) (2)

"There is inadequate evidence for the carcinogenicity to humans of talc not containing asbestiform fibres, while there is sufficient evidence for the carcinogenicity to humans of talc containing asbestiform fibres."

### 1987: IARC Monograph Supplement 7 (Asbestos) (3)

"Some excess of ovarian cancer has been reported in two studies but not in another; exposure to crocidolite was probably more predominant in the studies that showed excesses."

### 1992: Harlow, Cramer et al (4)

"Because the overall association between genital use of talc and ovarian cancer remains weak, it is unlikely that this exposure-disease pathway is the principal one involved in ovarian cancer etiology." (p. 26)

### 1995: Harlow & Hartage (5)

"Although several controlled epidemiological studies have investigated the talc and ovarian cancer association, few have collected enough details on methods and frequency of exposures to make a meaningful assessment." (p. 254)

### 1995: Gross & Berg (6)

"The conclusion reached herein is that the evidence regarding the risk of ovarian cancer associated with talc exposure is equivocal, and further examination of the relationship is required before a sound conclusion can be made." (p. 181)

### 1996: Heller et al. (7)

"Ovaries were studied from 24 women undergoing incidental oophorectomy who were interviewed regarding talc usage. Twelve subjects reported frequent perineal talc applications; the twelve controls reported no use. … Talc was identified in all 24 cases by either light or

electron microscopy. Talc particle counts were completely unrelated to reported levels of perineal talc exposure." (p. 1507)

## 1999: Cramer et al. (8)

"…the association is still viewed with skepticism based upon weak odds ratios, poor dose-response relationships and an incomplete understanding of the biological mechanism by which talc might lead to ovarian cancer." (p. 351)

"Despite the consistency noted above, the relatively weak odds ratios observed could reflect potential biases, especially recall and confounding … The most obvious weakness in the argument for biologic credibility of the talc and ovarian cancer association is the lack of a clear dose response ... we do not know precisely how use of talc in the genital area might induce ovarian cancer…"  (p. 354-6)

## 2000:  Gertig et al (9)  (Cramer and Colditz were co-authors)

"… the talc hypothesis …"  (p. 251)  **See Cramer testimony re: Berg (2013) below**

## 2000:  Cramer testimony re: Berg (09/25/2013; p. 228)

"Q: So what you're saying in this paper [Gertig 2000] in terms of your talc and ovarian cancer hypothesis as of 2000 is you're calling it a hypothesis, right, the talc hypothesis?
…
"Q. Do you agree that at this point in time it was still a hypothesis?
"A: That's fine to say … that's what I thought in 2000."

## 2000:  Colditz deposition re: Hogans (09/19/2015; p. 298)

"Q. But back in 2000, were you of the opinion that you write in your report in 2015 that epithelial [sic] talc use can cause ovarian cancer?
"A. Not in 2000.  I would not have put all the evidence together at that point to say that."

## 2004:  Ness deposition re: Blaes (06/09/15; p. 255-6)

"Q.  And when they discussed those studies in the same article that you've cited, they concluded that "The current body of experimental and epidemiologic evidence is insufficient to establish a causal association between perineal use of talc and ovarian cancer risk." And you disagree with that. Correct?
"A.  Based -- I -- based on studies -- I don't have an agreement or a disagreement.  Based on studies that ended in 2004 -- yes, 2004. So based on 11-year-old studies and no literature beyond that, yes, I feel that that was reasonable to say that there was insufficient evidence at that time."

## 2004:  Colditz deposition re: Hogans (10/16/2015; p. 436)

"Q. … it's still unclear if talc use truly alters cancer risk.  That was you opinion in 2004, correct?
"A. That was the summary of studies then, yes.

…
"Q. If we were here in 2004 you would not have the opinions you have today?
"A. In 2004 I believe the inconsistency was still an issue … more likely than not that would have been my opinion."

## 2005: **Cramer et al. (10)**

"Although our present finding may also meet with skepticism, a testable hypothesis is now suggested by the possible link between genital talc exposure and systemic diminution of anti-MUC1 antibodies."  (p. 1130)

## 2006: **Baan et al. (11)**

"In February, 2006, 19 scientists from eight countries met at the International Agency for Research on Cancer (IARC), Lyon, France, to reassess the carcinogenicity of … non-asbestiform talc.  These assessments will be published …  After careful assessment of the biases and possible confounding factors, the working group concluded that the epidemiological studies provided limited evidence for the carcinogenicity of perineal use of talc-based body powder, and classified this use as possibly carcinogenic to human beings (ie, group 2B)." (p. 296)

## 2007: **Cramer deposition re: Blaes (05/18/2015 p. 150-1)**

"Q:  Do you agree, though, that prior to 2007 you never said in any published document …that talc caused ovarian cancer?
…
"A:  There have been several things that have happened since then… We've built up a case showing that the risk is higher in women with certain characteristics or in women of certain age groups … a stronger biological argument.  These have all developed since 2007 in my mind."

## 2008: **Langseth et al. (12)**

"The current body of experimental and epidemiological evidence is insufficient to establish a causal association between perineal use of talc and ovarian cancer risk." (p. 359)

## 2008:  **Gates et al (13)  (Cramer was co-author)**

"Epidemiologic evidence suggests a possible association between genital use of talcum powder and risk of epithelial ovarian cancer; however … the association remains controversial due to the lack of a clear dose-response with increasing frequency or duration of talc use, the possibility of confounding or other biases, and the uncertain biological mechanism."  (p. 2436)

## 2010: **IARC Monograph 93  (14)**

**"6.1 Cancer in humans**
"Perineal use of talc-based body powder is *possibly carcinogenic to humans* (Group 2B)."

## 2011: Your Disease Risk.com (Siteman Cancer Center) (15)

This web site does not list talc as a "Risk Factor" for ovarian cancer.  (see Attachment #2)

## 2011:  Colditz deposition re: Hogans (09/19/2015; p. 67)

"Q. Sitting here today, do you know what level of evidence must be reached before a risk factor will be included on Your Disease Risk website?
"A. On Your Disease Risk website, the consensus opinion was that definite and probable causes should be included because the potential benefit to the public of acting on that knowledge would be sufficient to justify having it on the site."  (p.67)

Q. So the last review was in 2012?
A. Actually, it was 2011, I believe.  (p. 58)

## 2011: Rosenblatt et al (16)

"**Conclusions—**The International Agency for Research on Cancer has designated perineal exposure to talc (via the application of genital powders) as a possible carcinogen in women. A modest association of ovarian cancer with this exposure was seen in our study and in some previous ones, but that association generally has not been consistent within or among studies. Therefore, no stronger adjective than "possible" appears warranted at this time."  (p. 737)

## 2011:  Chen et al (17)  (Cramer was co-author)

"The etiology of ovarian cancer is poorly understood but there is clearly a heritable component."

## 2013:  Cramer testimony re: Berg (09/25/2013; p. 211)

"Q:  So as we sit here today, is there any peer-reviewed paper, peer-reviewed paper, not expert report, but any peer-reviewed paper that makes the statement that talc, in fact, causes ovarian cancer?
"A. I'm not aware of that."

## 2013:  Terry et al. (18)  (Ness was co-author)

"More work is needed to understand how genital powders may exert a carcinogenic effect, and which constituents (e.g., talc) may be involved."  (p. 820)

## 2014:  Houghton et al (19)

"Ever use of perineal powder was not associated with risk of ovarian cancer compared with never use. Individually, ever use of powder on the genitals sanitary napkins, or diaphragms was not associated with risk of ovarian cancer compared with never use, nor were there associations with increasing durations of use. Estimates did not differ when stratified by age or tubal ligation status.  "**Conclusion** Based on our results, perineal powder use does not appear to influence ovarian cancer risk."   (p. 1 of 6)

## 2014:  Wentzensen and Wacholder (20)

"Evidence on perineal talc use as a risk factor for ovarian cancer is more equivocal … The biological basis of possible talc carcinogenicity is not understood … Overall, the evidence regarding carcinogenicity of talc use remains inconclusive."  (p. 2 of 2)

## 2015:  Ness (21)

"Hill's tenets suggest that talc use causes ovarian cancer".

## 2015:  Cramer deposition re: Blaes (05/18/2015 p. 112)

"Q: … do you ever recall saying in any of your published papers that talc causes ovarian cancer?
"A:  I would have to review them and see, but probably I did not go to that extent to say it."

## 2015:  Cramer deposition re: Blaes (05/18/2015 p. 108)

"Q:  Do you consider the MUC1 hypothesis to be still a hypothesis?
"A:  Yes, it a hypothesis … but it's a viable hypothesis".

## 2015:  Cramer deposition re: Ristesund (11/13/2013; p. 93)

"Q:  Can you cite for me any authors you **[sic]** have published a peer reviewed piece of literature where they've said that endometrioid cancer is caused by perineal talc dusting?
 "A:  "Nobody has said, nobody said that – no, I cannot."

## 2015:  Cancer Council of Australia (22) (11/19/2015)

**"Perineal use of talc-based body powder**
Not supported by relevant experimental findings"          (see Attachment #2)

## 2016:  Webb (23)

"Talc is a natural mineral fiber similar to asbestos, a known carcinogen, and talc fibres have been detected in ovarian tissue. Case-control studies have consistently shown a 20-25% increased risk of ovarian cancer among women who used talc in the genital region. This would equate to a 1.6% lifetime risk of ovarian cancer for a talc-user compared to 1.3% for a non-user. However it is still uncertain whether the association is causal because there is little evidence that risk increases with increasing frequency and/or duration of talc use and the association does not appear to be weaker among women who have undergone procedures such as tubal ligation that would prevent talc from reaching the ovaries. Prospective studies have not reported significant associations overall, although one did report an association for serous cancers, but they had limited power to detect an effect of this magnitude."

## 2016:  Narod (24)

"For the sake of argument, let us suppose that the true risk ratio for ever use of talc and the development of ovarian cancer is 1.2. This estimate is the one generated from the large pooling study and is the level of risk that is under discussion in the media. It is possible that the true risk might be lower or higher than this single estimate. In this scenario, where talc increases the risk of ovarian cancer by 20% beyond the baseline of 1.3% lifetime, it would be challenging to convince the epidemiology community that there is a danger. Simply put, a risk ratio of this size falls outside the resolution of most epidemiologic studies;"

"I don't think we should try to ascribe any particular case of ovarian cancer to prior talc use. The estimate of a risk ratio of 1.2 provides information about the potential contribution of talc to the burden of ovarian cancer in the population, but is not helpful in determining if a specific case is, or is not, the result of talc exposure."

## 2016:  National Research Council (25)

"The use of perineal talcum powder has been associated with a 20 to 30 percent increased risk of ovarian cancer, although it also has been shown to vary by histologic subtype."

## 2016:  Brigham and Women's Hospital (26)

"It's not clear if using talcum powder on the genital area raises the risk for ovarian cancer. Talk with your healthcare provider if you decide that you want to use talcum powder."

(see Attachment #2)

## 2017:  Berge (27)

"… our meta-analysis identified as small but statistically significant association between genital talc use and risk of ovarian cancer; however, this association was limited to the serous histologic type, and to case-control studies.  The results by histologic type might argue for specificity of the association, in the absence, however, of a biologic rationale for an effect on serous carcinoma compared with other types.  Several aspects of our results, including the heterogeneity of results between case-control and cohort studies, and the lack of a dose-response with duration and frequency or use, however, do not support a causal interpretation of the association."

## 2018:  Berge (28)

"… our meta-analysis identified a small but statistically significant association between genital talc use and risk of ovarian cancer; however, this association was limited to the serous histologic type, and to case-control studies. The results by histologic type might argue for specificity of the association, in the absence, however, of a biologic rationale for an effect on serous carcinoma compared with other types.  Several aspects of our results, including the heterogeneity of results between case–control and cohort studies, however, do not support a causal interpretation of the association."

## 2018: Penninkilampi (29)

"In the present context, the association between talc use and ovarian cancer takes on considerable relevance, as the pharmaceutical and consumer products company Johnson & Johnson has recently had damages levied to the total of US$717 million against them in five law

suits. In these cases, juries decided that the use of talcum powder caused or contributed to the development of the plaintiff's ovarian cancer. The evidence for the association between perineal talc use and ovarian cancer is based on the body of knowledge from observational studies, and most of these have been retrospective case–control studies prone to recall bias. Hence, while perineal talc use has not been shown to be safe, in a similar regard, a certain causal link between talc use and ovarian cancer has not yet been established."

"The present meta-analysis reports a positive association between perineal talc use and ovarian cancer, specifically of the serous and endometrioid histologic subtypes. The mechanism by which perineal talc use may increase the risk of ovarian cancer is uncertain ... The potential mechanism by which genital talc is associated with an increased risk of ovarian cancer hence remains unclear."

"The results of this review indicate that perineal talc use is associated with a 24%–39% increased risk of ovarian cancer. While the results of case–control studies are prone to recall bias, especially with intense media attention following the commencement of litigation in 2014, the confirmation of an association in cohort studies between perineal talc use and serous invasive ovarian cancer is suggestive of a causal association.  Additional epidemiologic evidence from prospective studies with attention to effects within ovarian cancer subtype is warranted. There is a substantial need for further research on a potential mechanism by which ovarian cancer may be caused by talc, as this will allow a causal relationship to be established or rejected with more certainty."

## 2018:  Health Canada (30)

"The meta-analyses of the available human studies in the peer-reviewed literature indicate a consistent and statistically significant positive association between perineal exposure to talc and ovarian cancer. Further, available data are indicative of a causal effect. Given that there is potential for perineal exposure to talc from the use of various self-care products (e.g., body powder, baby powder, diaper and rash creams, genital antiperspirants and deodorants, body wipes, bath bombs), a potential concern for human health has been identified.

"There are limitations with the human epidemiological data. Potential sources of bias include selection bias due to low response rates or from limiting subjects, and exposure misclassification due to recall bias (Taher et al. 2018). Muscat and Huncharek (2008) also proposed that symptoms of ovarian cancer prior to diagnosis may increase the perineal use of talc and bias the results. However, Narod (2016) and Berge and colleagues (2018) put less emphasis on recall bias. In studies where the exposure is simple (e.g., never versus ever use), recall bias is unlikely to be an important source of bias (Narod 2016). The positive association is strongest for the serous histologic type (Berge et al. 2018; Taher et al. 2018); findings that the association may vary by histologic type detracts from the hypothesis of report bias, as this type of bias would likely operate for all histologic types (Berge el al. 2018).

"Ovarian cancer, in general, is not well understood (National Academy of Sciences, Engineering, and Medicine 2016), and a comparable animal model is not available. Health Canada has identified self-care products with the potential for perineal exposure (e.g., baby powder, body powders, diaper and rash creams, genital antiperspirants and deodorants, body wipes, bath

bombs); however, there is no indication exactly how the products are being used, the extent to which they would contribute to perineal exposure, and with what frequency and amount."

## 2018: Saed (31)

"Ovarian cancer is the leading cause of death from gynecologic malignancies yet the underlying pathophysiology is not clearly established … The origin and causes of ovarian tumors remains under debate. Injury to surface epithelial ovarian cells due to repeated ovulation is thought to induce tumorigenesis in these cells and is known as the "incessant ovulation hypothesis." Additionally, hormonal stimulation of the surface epithelium of the ovary has been described to initiate tumorigenesis in surface epithelial cells and is known as the "gonadotropin hypothesis." Moreover, the fallopian tube, and not the ovary, has been suggested to be the origin for most epithelial ovarian cancer. Nevertheless, many cases of ovarian cancer continue to be described as *de novo*."

"Although there is strong epidemiological evidence to suggest an association between talc use and ovarian cancer, the direct link and precise mechanisms have yet to be elucidated … there is a direct effect of talc on the molecular levels of oxidant and antioxidants, elucidating a potential mechanism for the development of ovarian cancer in response to talc."

## 2018:  Centers for Disease Control and Prevention (32)

This web site does <u>not</u> list talc as a "Risk Factor" for ovarian cancer and it does not discuss avoidance of talc as one of the ways that a woman can reduce her risk of ovarian cancer.  (see Attachment #2)

## 2018:  National Cancer Institute (33)

"Studies of women who used <u>talcum</u> powder (talc) dusted on the <u>perineum</u> (the area between the <u>vagina</u> and the <u>anus</u>) have not found clear evidence of an increased risk of ovarian cancer."

(see Attachment #2)

## 2018:  American Cancer Society (34) (04/11/2018)

"It has been suggested that talcum powder applied directly to the genital area or on sanitary napkins may be carcinogenic (cancer-causing) to the ovaries. Some, studies suggest a very slight increase in risk of ovarian cancer in women who used talc on the genital area. … Proving the safety of these newer products will require follow-up studies of women who have used them for many years." (see Attachment #2)

## 2018:  Your Disease Risk.com (Siteman Cancer Center) (35)

"The regular use of talcum powder in the genital area has been linked to an increased risk of ovarian cancer. It is not clear exactly why this is." (35)  (see Attachment #2)

## 2019:  Taher (36)

"In recent decades, there has been increasing concern that perineal exposure to talc, a commonly used personal care product, might be associated with an increased risk of ovarian cancer. However, the data describing this association is somewhat inconsistent."

"We conducted an extensive search, examination, assessment and analysis of evidence from published human and non-human original as well as all published reviews that considered the association between genital/perineal use of talc powder and risk of ovarian cancer ... Consistent with previous evaluations the IARC in 2010 (14), and subsequent evaluations by individual investigators (18;28;29), the present comprehensive evaluation of all currently available relevant data indicates that perineal exposure to talc powder is a possible cause of ovarian cancer in humans."

## 2019:  National Cancer Institute (37)

"The weight of evidence does not support an association between perineal talc exposure and an increased risk of ovarian cancer. Results from case-control and cohort studies are inconsistent."

(see Attachment #2)

## Chronology of Opinions: Reference List

(1) Cramer DW, Welch WR, Scully RE, Wojciechowski CA. Ovarian cancer and talc. A case-control study. Cancer 1982; 50:372-376.

(2) International Agency for Research on Cancer. Talc. IARC Monogr Eval Carcinog Risks Chem Human 1986; 42:185-224.

(3) International Agency for Research on Cancer. Overall Evaluations of Carcinogenicity: An updating of IARC Monographs Volumes 1 to 42. 7 ed. Lyon: IARc; 1987.

(4) Harlow BL, Cramer DW, Bell DA, Welch WR. Perineal exposure to talc and ovarian cancer risk. Obstet Gynecol 1992; 80:19-26.

(5) Harlow BL, Hartge PA. A review of perineal talc exposure and risk of ovarian cancer. Regul Toxicol Pharmacol 1995; 21:254-260.

(6) Gross AJ, Berg PH. A meta-analytical approach examining the potential relationship between talc exposure and ovarian cancer. J Expo Anal Environ Epidemiol 1995; 5:181-195.

(7) Heller DS, Westhoff C, Gordon RE, Katz N. The relationship between perineal cosmetic talc usage and ovarian talc particle burden. Am J Obstet Gynecol 1996; 174:1507-1510.

(8) Cramer DW, Liberman RF, Titus-Ernstoff L, Welch WR, Greenberg ER, Baron JA et al. Genital talc exposure and risk of ovarian cancer. Int J Cancer 1999; 81:351-356.

(9) Gertig DM, Hunter DJ, Cramer DW, Colditz GA, Speizer FE, Willett WC et al. Prospective study of talc use and ovarian cancer. JNCI 2000; 92:249-252.

(10) Cramer DW, Titus-Ernstoff L, McKolanis JR, Welch WR, Vitonis AF, Berkowitz RS et al. Conditions associated with antibodies against the tumor-associated antigen MUC1 and their relationship to risk for ovarian cancer. Cancer Epidemiol Biomarkers Prev 2005; 14:1125-1131.

(11) Baan R, Straif K, Grosse Y, Secretan B, El Ghissassi F, Cogliano V. Carcinogenicity of carbon black, titanium dioxide, and talc. Lancet Oncol 2006; 7:295-296.

(12) Langseth H, Hankinson SE, Siemiatycki J, Weiderpass E. Perineal use of talc and risk of ovarian cancer. J Epidemiol Community Health 2008; 62:358-360.

(13) Gates MA, Tworoger SS, Terry KL, Titus-Ernstoff L, Rosner B, De Vivo I et al. Talc use, variants of the GSTM1, GSTT1, and NAT2 genes, and risk of epithelial ovarian cancer. Cancer Epidemiol Biomarkers Prev 2008; 17:2436-2444.

(14)  International Agency for Research on Cancer. Carbon Black, Titanium Dioxide, and Talc. IARC Monogr Eval Carcinog Risks Chem Human 2010; 93:277-413.

(15)  Siteman Cancer Center. Your Disease Risk (at:http://www.yourdiseaserisk.wustl.edu/). St. Louis: Siteman Cancer Center; 2013.

(16)  Rosenblatt KA, Weiss NS, Cushing-Haugen KL, Wicklund KG, Rossing MA. Genital powder exposure and the risk of epithelial ovarian cancer. Cancer Causes Control 2011; 22:737-742.

(17)  Cramer DW, Titus-Ernstoff L, Vitonis AF. Genital talc use and ovarian cancer: Influence of histologic type and menopausal status on strength and dose response of the association. [abstract LB-446] In Proceedings of the 102nd Annual Meeting of the American Association for Cancer Research, April 2-6, 2011. Cancer Res 2011; 71 (Suppl 8).

(18)  Terry KL, Karageorgi S, Shvetsov YB, Merritt MA, Lurie G, Thompson PJ et al. Genital powder use and risk of ovarian cancer: a pooled analysis of 8,525 cases and 9,859 controls. Cancer Prev Res (Phila) 2013; 6:811-821.

(19)  Houghton SC, Reeves KW, Hankinson SE, Crawford L, Lane D, Wactawski-Wende J et al. Perineal powder use and risk of ovarian cancer. JNCI 2014; 106.

(20)  Wentzensen N, Wacholder S. Talc use and ovarian cancer: epidemiology between a rock and a hard place. JNCI 2014; 106.

(21)  Ness R. Does talc exposure cause ovarian cancer? (IGCS-0015). International Journal of Gynecological Cancer 2015; 25 (Suppl 1):51.

(22)  Cancer Council of Australia. Inferred Risk (at: https://www.cancer.org.au/about-cancer/causes-of-cancer/environmental-causes/inferred-risk.html). Sydney: Cancer Council of Australia; 2018.

(23)  Webb PM, Jordan SJ. Epidemiology of epithelial ovarian cancer. Best Pract Res Clin Obstet Gynaecol 2017; 41:3-14.

(24)  Narod SA. Talc and ovarian cancer. Gynecol Oncol 2016; 141:410-412.

(25)  National Academies of Sciences EaM. Ovarian Cancers: Evolving Paradigms in Research and Care. Washington, D.C.: The National Academies Press; 2016.

(26)  Brigham and Women's Hospital. Ovarian Cancer (http://healthlibrary.brighamandwomens.org/search/34,17170-1). Boston: Brigham and Women's Hospital; 2019.

(27) Berge W, Mundt K, Luu H, Boffetta P. Genital use of talc and risk of ovarian cancer: a meta-analysis. Eur J Cancer Prev 2017; DOI:10.1097/CEJ.0000000000000340.

(28) Berge W, Mundt K, Luu H, Boffetta P. Genital use of talc and risk of ovarian cancer: a meta-analysis. Eur J Cancer Prev 2018; 27:248-257.

(29) Penninkilampi R, Eslick GD. Perineal talc use and ovarian cancer: A systematic review and meta-analysis. Epidemiology 2018; 29:41-49.

(30) Talc (Chemical Abstracts Service Registry Number 14807-96-6). Environment and Climate Change Canada; 2018.

(31) Saed GM, Morris RT, Fletcher NM. New Insights into the Pathogenesis of Ovarian Cancer: Oxidative Stress. In: Devaja O, Papadopoulos A, editors. Ovarian Cancer - From Pathogenesis to Treatment. 2018. 83-110.

(32) CDC. Ovarian Cancer (at: https://www.cdc.gov/cancer/ovarian/basic_info/risk_factors.htm). Atlanta: Centers for Disease Control and Prevention; 2018.

(33) National Cancer Institute. Ovarian, Fallopian Tube, and Primary Peritoneal Cancer Prevention (PDQ) - Patient Version (at: https://www.cancer.gov/types/ovarian/patient/ovarian-prevention-pdq#section/_11). Washington, DC: National Cancer Institute; 2018.

(34) American Cancer Society. Ovarian Cancer (at: https://www.cancer.org/cancer/ovarian-cancer/causes-risks-prevention/risk-factors.html). 2019.

(35) Siteman Cancer Center. Your Disease Risk (at: https://siteman.wustl.edu/prevention/ydr/). St. Louis: Siteman Cancer Center; 2019.

(36) Taher MK, Farhat N, Karyakina NA, Shilnikova N, Ramoju S, Gravel CA et al. Systematic Review and Meta-Analysis of the Association Between Perineal Use of Talc and Risk of Ovarian Cancer.  2018.

(37) National Cancer Institute. Ovarian, Fallopian Tube, and Primary Peritoneal Cancer Prevention–for Health Professionals (PDQ®) (at: https://www.cancer.gov/types/ovarian/hp/ovarian-prevention-pdq#section/_9). Washington, DC: National Cancer Institute; 2019.

# Attachment 4:
# Web Pages

## 2013:  YourDiseaseRisk.com (Siteman Cancer Center)
http://www.yourdiseaserisk.wustl.edu/YDRDefault.aspx?ScreenControl=YDRGeneral&ScreenName=YDR OvarianRisk_List (**2013**)

### "Cancer - Ovarian Cancer"

**"Risk Factors**
Most scientists agree that these findings affect the risk of ovarian cancer.  Some may apply to you, but others may not.
Age
Family History
Jewish ethnicity
Height
Birth control pills
Number of births
Breastfeeding
Tied fallopian tubes
Hysterectomy"

## 2015:  Cancer Council of Australia  (accessed 02/22/19)
https://www.cancer.org.au/about-cancer/causes-of-cancer/environmental-causes/inferred-risk.html

### "Inferred Risks

**Perineal use of talc-based body powder**

| | |
|---|---|
| Situation | Perineal use of talc-based body powder |
| Exposure | Women using body powder |
| Carcinogen | Talc used in this manner |
| Principal route of exposure | Retrograde absorption via reproductive tract |
| Target organ | Ovary |
| Comment | Not supported by relevant experimental findings" |

## 2016:  Brigham and Women's Hospital (accessed 02/22/19)
http://healthlibrary.brighamandwomens.org/Search/34,17170-1

### "Use of talcum powder
It's not clear if using talcum powder on the genital area raises the risk for ovarian cancer. Talk with your healthcare provider if you decide that you want to use talcum powder."

**2017:  World Cancer Research Fund  (accessed 02/22/19)**

https://www.wcrf.org/informed/articles/can-cosmetics-and-toiletries-cause-cancer

"Some studies have found a link between talcum powder (talc) and ovarian cancer, but there's not enough evidence to be certain of this. Even if there were an increased risk, scientists estimate it would be small."

**2018:  National Cancer Institute (accessed 02/22/19)**

(http://www.cancer.gov/types/ovarian/patient/ovarian-prevention-pdq#section/_11)

**"It is not clear whether the following affect the risk of ovarian, fallopian tube, and primary peritoneal cancer:**

…

**"Talc**

Studies of women who used talcum powder (talc) dusted on the perineum (the area between the vagina and the anus) have not found clear evidence of an increased risk of ovarian cancer."

**2018:  Centers for Disease Control and Prevention (accessed 02/22/19)**

http://www.cdc.gov/cancer/ovarian/basic_info/risk_factors.htm

**"What Are the Risk Factors for Ovarian Cancer?**

There is no way to know for sure if you will get ovarian cancer. Most women get it without being at high risk. However, several factors may increase a woman's risk for ovarian cancer, including if you—

- Are middle-aged or older.
- Have close family members (such as your mother, sister, aunt, or grandmother) on either your mother's or your father's side, who have had ovarian cancer.
- Have a genetic mutation (abnormality) called BRCA1 or BRCA2, or one associated with Lynch syndrome.
- Have had breast, colorectal (colon), or cervical cancer, or melanoma.
- Have an Eastern European (Ashkenazi) Jewish background.
- Have never given birth or have had trouble getting pregnant.
- Have endometriosis (a condition where tissue from the lining of the uterus grows elsewhere in the body).

In addition, some studies suggest that women who take estrogen by itself (without progesterone) for 10 or more years may have an increased risk of ovarian cancer."

**"What Can I Do to Reduce My Risk of Ovarian Cancer?**

There is no known way to prevent ovarian cancer. But these things may lower a woman's chance of getting ovarian cancer.

- Having used birth control pills.
- Having had a tubal ligation (getting your tubes tied), both ovaries removed, or a hysterectomy (an operation in which the uterus, and sometimes the cervix, is removed).
- Having given birth.
- Breastfeeding. Some studies suggest that women who breastfeed for a year or more may have a modestly reduced risk of ovarian cancer."

### 2018:  American Cancer Society (accessed 02/22/19)
https://www.cancer.org/cancer/ovarian-cancer/causes-risks-prevention/risk-factors.html

"Talcum powder
"It has been suggested that talcum powder might cause cancer in the ovaries if the powder particles (applied to the genital area or on sanitary napkins, diaphragms, or condoms) were to travel through the vagina, uterus, and fallopian tubes to the ovary."

"Many studies in women have looked at the possible link between talcum powder and cancer of the ovary. Findings have been mixed, with some studies reporting a slightly increased risk and some reporting no increase. Many case-control studies have found a small increase in risk. But these types of studies can be biased because they often rely on a person's memory of talc use many years earlier.  One prospective cohort study, which would not have the same type of potential bias, has not found an increased risk. A second found a modest increase in risk of one type of ovarian cancer."

"For any individual woman, if there is an increased risk, the overall increase is likely to very be small. Still, talc is widely used in many products, so it is important to determine if the increased risk is real. Research in this area continues."

### 2018: Ovacome (accessed 02/22/19)
https://www.ovacome.org.uk/talcum-powder-and-ovarian-cancer

**"Is there a link between ovarian cancer and talcum powder?**
 There have been worries for some years that using talcum powder on the genital area may increase the risk of ovarian cancer. However, so far this has not been proved by research."

### 2018:  YourDiseaseRisk.com (Siteman Cancer Center) (accessed 02/22/19)
https://siteman.wustl.edu/prevention/ydr/

"Prevention Tips
Over 22,000 women in the United States are diagnosed with ovarian cancer each year. Though ovarian cancer has different subtypes, most scientists agree that these things affect the overall risk of ovarian cancer. Some may apply to you, but others may not. And some you can change, but others you cannot…"

*"Things you can change: …*
**Avoid talcum powder**
The regular use of talcum powder in the genital area has been linked to an increased risk of ovarian cancer. It is not clear exactly why this is."

**2019:  National Cancer Institute** (accessed 02/22/19)

http://www.cancer.gov/types/ovarian/hp/ovarian-prevention-pdq#section/_9) **(01/04/2019**

**"Factors with Inadequate Evidence of an Association Risk of Ovarian, Fallopian Tube, and Primary Peritoneal Cancer:  Perineal talc exposure**

"The weight of evidence does not support an association between perineal talc exposure and an increased risk of ovarian cancer. Results from case-control and cohort studies are inconsistent. A meta-analysis of 16 studies observed an increased risk with the use of talc (RR, 1.33; 95% CI, 1.16–1.45); however, a dose response relationship was not found. A pooled analysis from the Ovarian Cancer Association Consortium, composed of multiple case-control studies, included 8,525 cases and 9,859 controls, found a modest increased risk of epithelial ovarian cancer associated with genital powder use (OR, 1.24; 95% CI, 1.15–1.33), but the trend across increasing lifetime number of applications was not statistically significant (*P* trend = .17). A population-based case-control study of African American women in the United States found an association between genital powder use and risk of epithelial ovarian cancer (OR, 1.44; 95% CI, 1.11–1.86). In this study of 584 cases and 745 controls, a dose-response relationship for *any* genital powder use was reported. Specifically, among *any* genital powder use, daily powder use was associated with increased adjusted OR of developing ovarian cancer (OR, 1.71; 95% CI, 1.26–2.33) compared with less than daily use (OR, 1.12; 95% CI, 0.80–1.58). A cohort study among nurses did not observe a risk of ovarian cancer associated with perineal talc use (RR, 1.09; 95% CI, 0.86–1.37) and there was no evidence of increased risk with increasing frequency of use. Another prospective study, The Women's Health Initiative, examined the association between perineal powder use and the development of ovarian cancer among 61,576 women without a history of cancer at enrollment and who provided exposure information. Among this group, 429 cases of ovarian cancer occurred. Powder use on genitals, sanitary napkins, and diaphragms was examined individually and as a combined exposure. Women were followed for a mean of 12.4 years. An association of ovarian cancer with ever-use was not found when analyzed either by individual method of exposure or by overall combined exposure. The observed risk (hazard ratio) for combined exposure to perineal powder was 1.06 (95% CI, 0.87–1.28) and there was no increased risk observed for increasing duration of use."

Exhibit 11

Jonathan Borak, M.D., DABT

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF NEW JERSEY

- - -

IN RE:  JOHNSON &         :
JOHNSON TALCUM POWDER      :
PRODUCTS MARKETING,        :
SALES PRACTICES, AND       :   NO. 16-2738
PRODUCTS LIABILITY         :   (FLW) (LHG)
LITIGATION                 :
                           :
THIS DOCUMENT RELATES      :
TO ALL CASES               :

- - -

April 1, 2019

- - -

Videotaped deposition of
JONATHAN BORAK, M.D., DABT, taken
pursuant to notice, was held at the Omni
New Haven Hotel, 155 Temple Street, New
Haven, Connecticut, beginning at 9:07
a.m., on the above date, before Michelle
L. Gray, a Registered Professional
Reporter, Certified Shorthand Reporter,
Certified Realtime Reporter, and Notary
Public.

- - -

GOLKOW LITIGATION SERVICES
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

Jonathan Borak, M.D., DABT

Page 2

```
 1   APPEARANCES:
 2
     GOLOMB & HONIK P.C.
 3   BY:  RICHARD GOLOMB, ESQ.
          BENJAMIN ISSER, ESQ.
 4   1835 Market Street, Suite 2900
     Philadelphia, Pennsylvania 19103
 5   (215) 278-4449
     rgolomb@golombhonik.com
 6   bisser@golombhonik.com
 7    - and -
 8   ASHCRAFT & GEREL, LLP
     BY:  JAMES F. GREEN, ESQ.
 9   1825 K Street, NW, Suite 700
     Washington, D.C.  20006
10   (203) 783-6400
     Jgreen@ashcraftlaw.com
11
      - and -
12
     THE MENEO LAW GROUP
13   BY:  RON MICHAEL MENEO, ESQ.
     The Gold Building
14   234 Church Street, 6th Floor
     New Haven, Connecticut 06510
15   (203) 787-9222
     Rmm@meneolawgroup.com
16   Representing the Plaintiffs
17
     SEYFARTH SHAW, LLP
18   BY:  THOMAS T. LOCKE, ESQ.
     975 F Street, NW
19   Washington, D.C. 20004
     (202) 463-2400
20   tlocke@seyfarth.com
     Representing the Defendant, PCPC
21
22
23
24
```

Page 3

```
 1   APPEARANCES:  (Cont'd.)
 2
     SHOOK, HARDY & BACON, LLP
 3   BY:  MARK C. HEGARTY, ESQ.
     2555 Grand Boulevard
 4   Kansas City, Missouri 64108
     (816) 474-6550
 5   Mhegarty@shb.com
     Representing the Defendant, Johnson
 6   & Johnson entities
 7
     TUCKER ELLIS, LLP
 8   BY:  SANDRA J. WUNDERLICH, ESQ.
     100 South Fourth Street, Suite 600
 9   Saint Louis, Missouri 63102
     (314) 256-2550
10   Sandra.wunderlich@tuckerellis.com
     Representing the Defendant, PTI
11   Royston LLC and PTI Union LLC
12
13
     ALSO PRESENT:
14
15   VIDEOTAPE TECHNICIAN:
       Dan Lawlor
16
17
18
19
20
21
22
23
24
```

Page 4

```
 1          - - -
 2        I N D E X
 3          - - -
 4
     Testimony of:
 5
         JONATHAN BORAK, M.D., DABT
 6
       By Mr. Golomb        10
 7
 8
 9          - - -
10        E X H I B I T S
11          - - -
12
13   NO.      DESCRIPTION        PAGE
14   Borak-1    Notice of Deposition  13
15   Borak-2    Curriculum Vitae     31
16   Borak-3    The TASA Group      229
                Invoices
17
18   Borak-4    Specialists in      83
                Occupational &
                Environmental Health
19              Jonathan Borak & Company
20   Borak-5    Bibliography        116
                Profile Jonathan
21              Borak, MD
                Yale Website
22
     Borak-6    Deposition and      94
23              Trial Testimony
                List
24
```

Page 5

```
 1          - - -
 2        E X H I B I T S (Cont'd.)
 3          - - -
 4
 5   NO.      DESCRIPTION        PAGE
 6   Borak-7    Expert Report of    172
                Jonathan Borak, MD,
 7              DABT, 2/25/19
 8   Borak-8    Reference List      245
 9   Borak-9    Demonstrative       274
                Statistically
10              Significant Studies
                1982 to 2018
11
     Borak-10   Attachment 1        263
12              Expert Reports,
                Testimony and
13              Other Related Materials
14   Borak-14   Attachment 2        278
                Materials Considered
15
     Borak-15   Attachment 3        280
16              Chronology of
                Opinions
17
     Borak-16   Chronology of       286
18              Opinions: Reference
                List
19
     Borak-17   Attachment 4        292
20              Web Pages
21
     Borak-19   Report of           205
22              Jonathan Borak, MD
                DABT, 1/17/17
23
24
```

2  (Pages 2 to 5)

Jonathan Borak, M.D., DABT

## Page 6

```
 1          - - -
 2    E X H I B I T S (Cont'd.)
 3          - - -
 4
 5   NO.     DESCRIPTION      PAGE
 6   Borak-21  Affidavit of    314
           Jonathan Borak, MD,
 7         DABT
 8
     Borak-22  Chronic Beryllium   324
 9         Disease:  The Search
           For a Dose-Response
10
     Borak-25  Draft Screening    335
11         Assessment
           12/2018
12
     Borak-28  Demonstrative    158
13         Invoice Totals
14   Borak-29  Dr. Borak       352
           Supplemental
15         Materials
           Considered
16
     Borak-30  Technical Advisory   154
17         Service for Attorneys
           (TASA) Invoices
18
     Borak-31  NCI PDQ as of     255
19         8/8/14
20   Borak-32  High-Grade Serous   354
           Ovarian Cancer:
21         Basic Sciences
           (Lisio)
22
23
24
```

## Page 7

```
 1          - - -
 2    E X H I B I T S (Cont'd.)
 3          - - -
 4
 5   NO.     DESCRIPTION      PAGE
 6   Borak-33  Memorandum      230
           3/27/19
 7         RE:  Talc MDL
           Plaintiff Expert
 8         Invoices
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

## Page 8

```
 1          - - -
 2    DEPOSITION SUPPORT INDEX
 3          - - -
 4
 5   Direction to Witness Not to Answer
 6   PAGE  LINE
     None.
 7
 8   Request for Production of Documents
 9   PAGE  LINE
     None.
10
11   Stipulations
12   PAGE  LINE
     None.
13
     Questions Marked
14
     PAGE  LINE
15   None.
16
17
18
19
20
21
22
23
24
```

## Page 9

```
 1          - - -
 2       THE VIDEOGRAPHER:  We are
 3   now on the record.  My name is Dan
 4   Lawlor.  I'm a videographer with
 5   Golkow Litigation Services.
 6       Today's date is April 1st,
 7   2019, and the time is 9:07 a.m.
 8       This video deposition is
 9   being held in New Haven,
10   Connecticut, in the matter of
11   Talcum Powder Litigation, MDL
12   Number 2738.
13       The deponent is Jonathan
14   Borak.
15       Counsel will be noted on the
16   stenographic record.
17       The court reporter is
18   Michelle Gray who will now swear
19   in the witness.
20          - - -
21       ... JONATHAN BORAK, M.D., DABT,
22   having been first duly sworn, was
23   examined and testified as follows:
24          - - -
```

3  (Pages 6 to 9)

Jonathan Borak, M.D., DABT

Page 10

1              EXAMINATION
2                 - - -
3    BY MR. GOLOMB:
4         Q.   Good morning, Dr. Borak.
5         A.   Good morning, sir.
6         Q.   We were introduced briefly
7    before the deposition.  My name is
8    Richard Golomb.  I'm going to be asking
9    you some questions today.
10        A.   Thank you.
11        Q.   I know that you've testified
12   once before in the talc litigation in the
13   Oules case, correct?
14        A.   I believe it was the Oules
15   case, but yes, I have.
16        Q.   And Mr. Green, who is seated
17   to my right, he was the lawyer who took
18   your deposition?
19        A.   Yes, I recognize him.
20        Q.   And that was back in June of
21   2017?
22        A.   I don't remember.  But that
23   may be.
24        Q.   Okay.  Have you given any

Page 11

1    other testimony in the talc litigation,
2    other than in that case and here today?
3         A.   No, sir.
4         Q.   And other than -- other than
5    today and that other -- the case that
6    Mr. Green took your deposition, how many
7    times have you testified by deposition
8    before?
9         A.   I believe you were given a
10   list.  And I would -- I don't remember
11   the number.  There may be six or eight on
12   that list in the last four years.
13        Q.   Okay.  And we'll look at
14   that list.  But that list lists --
15   identifies, like you said, about six or
16   eight cases.  But I'm not sure, and I may
17   be wrong about this.  I'm not sure
18   whether or not it identifies whether you
19   testified by deposition, trial, or both.
20        A.   It indicates whichever.
21        Q.   Okay.  How many times have
22   you testified as an expert at trial?
23        A.   I would have to look at that
24   list.  I think once, maybe twice, in the

Page 12

1    last four years.
2         Q.   In the last --
3         A.   Four years.
4         Q.   Okay.  And is it identified
5    on that particular list which cases you
6    testified in?
7         A.   Yes, sir.
8         Q.   All right.  At any time
9    during the course of the day, if you want
10   to take a break, we will take breaks.
11   Just let us know.  We're not here to
12   torture anybody.  It's not a memory test.
13   If you want to take a break, just let
14   your attorney, Mr. Locke, know and we'll
15   take a break.  Okay?
16        A.   Thank you.
17        Q.   If -- it makes it a lot
18   easier for the court reporter if only one
19   of us is speaking at a time.  So if you
20   allow me to finish my question, I'll
21   allow you to finish your answer.  That
22   way you fully hear the question and
23   you -- and also one of us is only
24   speaking at a time.  Okay?

Page 13

1         A.   Yes.
2         Q.   Okay.  Have you seen the
3    notice of deposition in this case?
4         A.   Yes.
5         Q.   All right.  Let me just show
6    you -- and I have a couple of questions
7    about it.
8              (Document marked for
9              identification as Exhibit
10             Borak-1.)
11   BY MR. GOLOMB:
12        Q.   This is Exhibit 1, which is
13   the notice of deposition.
14             Have you seen that before?
15        A.   I believe I have.
16        Q.   All right.  Now, there is
17   also -- and I just got it last night, so
18   I'm sorry I don't have copies.  But
19   Mr. Locke, on behalf of Personal Care
20   Products Council, responded to that
21   notice of deposition and also made some
22   objections to the notice of deposition.
23             Have you seen that written
24   document which is called Defendant

4 (Pages 10 to 13)

Jonathan Borak, M.D., DABT

Page 14

1    Personal Care Products Council's
2    Responses and Objections to Plaintiffs'
3    Notice of Deposition of Jonathan Borak?
4        A.   I don't know.  May I see
5    what you're looking at?
6        Thank you.  It looks like
7    something that I've seen that was on my
8    computer.  Maybe last Friday it was sent
9    for me to look at.
10       Q.   Last Friday?
11       A.   Three days ago, yes, I think
12   so.
13       Q.   Okay.  I do -- I have some
14   questions about it.  If you look at the
15   notice of deposition, Exhibit 1, and go
16   to Question 7.  I just want to clarify a
17   couple of things.
18       A.   Seven should be easy to
19   find.
20       Q.   Okay.  You got that?
21       And the question is:  "All
22   articles, papers, and/or scientific or
23   technical publications written, prepared,
24   and/or presented by you or in which you

Page 15

1    participated in writing, preparing, or
2    presenting that relate to or concern
3    talcum powder products, talc, and/or
4    talcum powder."
5        I just want -- I want to be
6    clear that there are none, correct?
7        A.   Yes.
8        Q.   You haven't written any
9    articles, papers, scientific or technical
10   publications on talc, correct?
11       A.   Yes, I have not.
12       Q.   All right.  If you take a
13   look at Question 8.  And that's all
14   documents concerning any research that
15   you've undertaken that relates to or
16   concerns talcum powder products or talc,
17   regardless of the outcome of the
18   research.
19       And then there's an answer.
20   But I want to be clear, that you haven't
21   done any research on talc, correct?
22       A.   I have not done any
23   laboratory research.  I have not done any
24   epidemiological research on talc.

Page 16

1        Q.   Okay.  And in fact, the only
2    two, quote-unquote, my term, papers, that
3    you've done is the report that you wrote
4    in Oules and the report that you wrote in
5    this case?
6        A.   Those are the only two
7    documents that I've written that were
8    specific to talcum powder.
9        Q.   Have you written any
10   articles or published anything -- you
11   said specifically related to talc.
12       Have you written anything
13   generally related to talc?
14       A.   Only those things that I've
15   written that are relevant to particulates
16   and dust, but I don't know that they even
17   mention talc.
18       Q.   Okay.  Question Number 9 is,
19   "All communications between you and any
20   other expert retained or consulted by
21   defendants in connection with the talcum
22   powder litigation, talcum powder
23   products, or talc."
24       And I just want to be clear.

Page 17

1    You haven't had any communication, phone,
2    in person, any kind of oral
3    communication, written communication,
4    e-mail, et cetera, with any of the other
5    experts in the case?
6        A.   Yes, that's correct.
7        Q.   Question 10, "All scientific
8    or technical publications authored in
9    whole or in part by you which discuss
10   talcum powder products."  And I just want
11   to be clear.  The answer to that is there
12   are none, correct?
13       A.   Yes, that's correct.
14       Q.   If you go to Question 14.
15   The question is, "Documents related to
16   communications with employees and/or
17   representatives of any government,
18   regulatory, or trade organization and/or
19   agency which discusses talcum powder
20   products, talc, and/or talcum powder.
21   Such entities include without limitation
22   the Center For Regulatory Effectiveness,"
23   and then it goes onto list about 10 or 12
24   different organizations.

Jonathan Borak, M.D., DABT

Page 18

1        Do you see that?
2        A.   Yes, I do.
3        Q.   Okay.  First of all, are you
4    familiar with the Center For Regulatory
5    Effectiveness?
6        A.   No.
7        Q.   Are you familiar with the
8    Cosmetic Ingredient Review?
9        A.   I read some of their
10   documents.
11       Q.   Do you know what Health
12   Canada is?
13       A.   Yes.
14       Q.   Do you know what Industrial
15   Mineral Associations of North America is?
16       A.   No.  I can guess.
17       Q.   Do you know what the
18   International Agency for Research on
19   Cancer is?
20       A.   Yes.
21       Q.   Okay.  Have you ever
22   participated as a panel member for IARC?
23       A.   I have never been a panel
24   member.

Page 19

1        Q.   Have you ever attended an
2    IARC meeting?
3        A.   I have attended WHO
4    meetings, but I don't know whether they
5    were specifically IARC.  I don't think
6    so.
7        Q.   Do you read the IARC
8    publications?
9        A.   Of course.
10       Q.   Have you ever participated
11   in any way with the -- on behalf of the
12   National Cancer Institute?
13       A.   I published in JNCI.  I
14   don't know whether some committees that
15   I've been on were affiliated with NCI.
16       Q.   What kind of committees?
17       A.   There were some regulatory,
18   having to do with exposure limits, and I
19   think NCI was a participant.
20       Q.   Okay.  And exposure limits,
21   was that in the occupational area?
22       A.   Environmental.
23       Q.   Okay.  Now, you're -- you
24   are here as an expert on behalf of

Page 20

1    Personal Care Products Council, correct?
2        A.   That's my understanding.
3        Q.   All right.  Have you ever
4    had any contact whatsoever with the
5    Personal Care Products Council before
6    this litigation?
7        A.   I don't think I ever heard
8    of the name before.  I don't think I even
9    heard the name before.
10       Q.   Do you know what they do?
11       A.   Not really.
12       Q.   So if you just take a look
13   at these various organizations, A through
14   P.
15       A.   Yes.
16       Q.   Is it -- is it correct that
17   you have not had any communications of
18   any kinds with any of these organizations
19   as it relates to talc?
20       A.   Yes, that's correct.
21       Q.   Question 15 is, "All
22   communications with any employees,
23   editors, editorial boards, review boards,
24   agents, liaisons, or affiliates of any

Page 21

1    academic or other published journal
2    regarding talc, talcum powder products,
3    ovarian cancer, asbestos, or any
4    combination thereof."
5        And I just want to be clear
6    that your answers that you haven't had
7    any contact with any such boards,
8    correct?
9        A.   Yes, that's correct.
10       Q.   And anybody at any
11   publications that may have written on
12   talc or talc causing ovarian cancer?
13       A.   Your question is unclear to
14   me.  Are you asking me whether I've ever
15   communicated to editorial folks at
16   journals that have published on talc, or
17   have I communicated about talc with such
18   people?
19       Q.   Okay.  About talc.
20       A.   No, I have not.
21       Q.   Okay.  And you haven't
22   written any letters to an editor
23   concerning talc?
24       A.   I don't believe I have.

6  (Pages 18 to 21)

Jonathan Borak, M.D., DABT

Page 22

1    Q.   And no publication has
2    contacted you to get your thoughts on the
3    association between talc and ovarian
4    cancer; is that correct?
5    A.   No.
6    Q.   Is that correct?
7    A.   No -- yes, it's correct.
8    No, I have not.
9    Q.   Okay.  Question 17.  It
10   says, "All prior court orders directly or
11   indirectly ruling on, deciding, or
12   otherwise adjudicating your ability to
13   testify in any prior" -- "any prior
14   litigation regarding any subject matter."
15        Okay.  Let me explain to you
16   a little bit of the basis of that
17   question -- that question --
18   A.   Thank you.
19   Q.   -- and my question here.
20        Do you understand that
21   probably sometime over the summer a court
22   is going to read the reports and hear
23   testimony from experts on both sides of
24   this case?  Were you aware of that?

Page 23

1    A.   I think I was aware of that.
2    Q.   Okay.  And do you know what
3    a Daubert hearing is?
4    A.   I do.
5    Q.   All right.  And so you
6    generally understand that a Daubert
7    hearing is for a time when a court will
8    make a ruling to determine whether or not
9    an expert can testify before a jury, is
10   that your general understanding of what a
11   Daubert hearing is?
12   A.   Generally.  I have -- I have
13   a more specific idea, but yes.
14   Q.   Okay.  And so the defendants
15   will be filing Daubert motions to exclude
16   certain or all of our experts and we will
17   be doing the same with respect to their
18   experts.  Do you understand that?
19   A.   Yes.
20   Q.   All right.  And then the
21   court will be ruling on that.  Do you
22   understand that?
23   A.   Yes.
24   Q.   And so, this question,

Page 24

1    Question 17, refers to whether or not in
2    any prior cases your testimony, your
3    opinions, your reports, were subject to a
4    Daubert ruling before.  Do you know one
5    way or the other, whether or not they
6    were?
7    A.   I do not know one way or
8    another.
9    Q.   Have you ever been involved
10   in a case as an expert where the lawyer
11   who retained you said for whatever
12   reason, a court has determined you can't
13   testify?
14   A.   I have never had such a
15   thing happen.
16   Q.   Okay.  Take a look at
17   Question 18.  Says, "All documents
18   related to research, experiments,
19   testing, or any other study that's been
20   done or is planned to be done by you, at
21   your request or upon which you may rely
22   in this talcum powder litigation which
23   relates to talcum powder products, talc,
24   and/or talcum powder."

Page 25

1         And your -- I just want to
2    be clear.  Because at least to me, the
3    answer to this is -- is not clear, is
4    that there are -- there was no such
5    research, correct?
6    A.   Yes, there was no such
7    research.
8    Q.   And you didn't do any
9    testing as it relates to talc?
10   A.   Define testing.
11   Q.   Well, you didn't do -- you
12   didn't do any studies as it relates to
13   talc?
14   A.   I've done a great deal of
15   literature work related to talc.
16   Q.   Okay.  By -- by literature
17   work, you mean you've read studies?
18   A.   Yes.  In a systematic way.
19   Q.   All right.  You -- you
20   haven't, at least in your report, and
21   we're going to go through your report in
22   detail, you haven't -- you have -- you
23   have identified in your -- at least your
24   reference list, and we're going to go

7 (Pages 22 to 25)

Jonathan Borak, M.D., DABT

Page 26

1  through all this.  You have identified
2  50 -- 50 different journal articles,
3  studies, et cetera, as things that you
4  referred to in your report, correct?
5      A.  I think that's probably
6  about right, yes.
7      Q.  Okay.  And you've -- you've
8  identified by number the 50 various
9  studies, articles, et cetera, in the body
10  of your 13-page report, correct?
11      A.  I -- I have a certain number
12  of references cited in my report, that's
13  correct.
14      Q.  All right.  And we'll --
15  again we'll go through that.  But nine of
16  those references are to either
17  case-control studies or cohort studies?
18      A.  That may be.  I don't know
19  the number.
20      Q.  Okay.  Again, we're going
21  to -- we're going to go through this in
22  greater detail as the -- as the day goes
23  on.
24          With respect to those nine

Page 27

1  case studies and -- and/or cohort
2  studies, while you -- you have
3  extrapolated certain paragraphs and
4  referred to them in your reports, you
5  don't -- you didn't do anything to
6  analyze the underlying data in those
7  case-control and/or cohort studies,
8  correct?
9          MR. LOCKE:  Objection.
10          THE WITNESS:  What do you
11      mean by analyze?
12  BY MR. GOLOMB:
13      Q.  Well, you -- you know that
14  when you -- you've reviewed the -- you
15  reviewed all the case-control studies in
16  this case, correct?
17      A.  Yes, that's correct.
18      Q.  Okay.  And you've also seen
19  the various expert reports from the
20  various epidemiologists who have authored
21  reports and have testified or will be
22  testifying in this case much the same way
23  you're testifying today, correct?
24          MR. LOCKE:  Objection.

Page 28

1          THE WITNESS:  I don't know
2      if the word all is appropriate.
3      I've read them -- a lot of them.
4  BY MR. GOLOMB:
5      Q.  All right.  And you know
6  that in each and every one of those
7  epidemiology reports that were produced
8  on behalf of the plaintiffs, that they --
9  there are literally charts within the
10  body of their reports in which they
11  analyze various data from the
12  case-control studies, the more than
13  30 case-control studies.  And that --
14  that's what I mean by analyze the data.
15          Do you understand that?
16      A.  You mean --
17          MR. HEGARTY:  Objection.
18          MR. LOCKE:  Same objection,
19      form.
20          THE WITNESS:  You mean did I
21      make charts from the data from the
22      reports?
23  BY MR. GOLOMB:
24      Q.  Well, that's part of the

Page 29

1  question.  But why don't you answer that
2  part?
3      A.  Yes, I had to summarize some
4  of the data.  So to see it, I made charts
5  for myself to look at.
6      Q.  You made charts on the data,
7  but you didn't include them in the
8  report?
9      A.  They were not part of the
10  report.  They were just so that I could
11  keep track.  My report had to do with who
12  said what and when.
13      Q.  Okay.
14      A.  I was not asked to analyze
15  those individual studies.
16      Q.  Okay.  And, in fact, your --
17  your opinion in this case is limited to
18  whether or not the scientific data out
19  there, the scientific reports, whether or
20  not it answers the question whether or
21  not there is an association between talc
22  and ovarian cancer, correct?
23          MR. LOCKE:  Objection.
24          MR. HEGARTY:  Objection to

8 (Pages 26 to 29)

Jonathan Borak, M.D., DABT

Page 30

1    the form.
2         THE WITNESS: I -- I
3    would -- if you would give me a
4    copy of my report, I'll read what
5    I said I had done just to be
6    clear.
7    BY MR. GOLOMB:
8         Q.   Well -- well, we'll get to
9    your report.  When -- when was the last
10   time you read your report?
11        A.   Last night.
12        Q.   Okay.  And so are you -- are
13   you, based on your review of your report
14   last night, are you unable to answer my
15   question?
16        A.   The wording was clear in my
17   report, and I don't want to confuse
18   things.  So if you would like me to
19   respond to what I did in my report, I
20   will read it to you.
21        Q.   Okay.  Well, what -- what
22   were you asked to do in this case?
23        A.   I was asked to determine who
24   had said what and when regarding the

Page 31

1    association between talc and ovarian
2    cancer.
3         Q.   Okay.  And so you -- you
4    weren't asked to express an opinion on
5    the ultimate question of whether or not
6    talc causes ovarian cancer, correct?
7         MR. HEGARTY:  Objection.
8         MR. LOCKE:  Objection.
9         THE WITNESS:  I -- I was not
10   asked specifically to opine on
11   whether talc causes ovarian
12   cancer.
13   BY MR. GOLOMB:
14        Q.   Right.  Okay.  So let's take
15   a look at Exhibit 2, please.
16        (Document marked for
17   identification as Exhibit
18   Borak-2.)
19        MR. GOLOMB:  Tom, you are
20   going to keep track of the
21   originals?
22        MR. LOCKE:  Yes.  Put them
23   right here.
24        MR. GOLOMB:  Okay.  Thanks.

Page 32

1    BY MR. GOLOMB:
2         Q.   So what you have in front of
3    you is Exhibit 2, which is your
4    curriculum vitae, correct?
5         A.   Yes.
6         Q.   So as -- if I understand
7    correctly, you do not have a degree in
8    epidemiology; is that correct?
9         A.   Yes, that's correct.
10        Q.   So your -- so when -- when
11   we refer to you as Dr. Borak, you are --
12   you are literally a medical doctor, a --
13   an internist, correct?
14        A.   I'm an internist,
15   occupational physician, toxicologist, and
16   I spent 20 years as a professor of
17   epidemiology at Yale.
18        Q.   It's unclear to me from
19   your -- your CV of how you actually
20   became an epidemiologist.  How -- at
21   what -- first of all, at what point in
22   your career did you become an
23   epidemiologist?
24        A.   I studied epidemiology

Page 33

1    beginning in 1974 at McGill as part of a
2    Robert Wood Johnson funded postdoctoral
3    program in which I was a member.
4         Q.   All right.  So you -- you
5    graduated from Amherst in 1968, correct?
6         A.   That's right.
7         Q.   And what was your degree in?
8         A.   Economics.
9         Q.   And you then, with your
10   economic degree in 1968, you went to
11   medical school?
12        A.   That's correct.
13        Q.   And that was at NYU?
14        A.   Yes.
15        Q.   And you graduated from NYU
16   in 1972?
17        A.   Yes.
18        Q.   Where did you do your
19   residency?
20        A.   At Royal Victoria Hospital
21   in Montreal.
22        Q.   Why did you go to Montreal?
23        A.   Beautiful city.
24        Q.   I agree.  Except in January

9 (Pages 30 to 33)

Jonathan Borak, M.D., DABT

Page 34

1    when it's 20 below zero.
2        A.   If you're a skier, it's not
3    too bad.
4        Q.   When you're taking a
5    deposition till 11:30 at night, and it's
6    20 below, it's pretty bad.
7        A.   You have my empathy.
8        Q.   And then what was your
9    residency in?
10       A.   Internal medicine.
11       Q.   And when did you complete
12   your residency?
13       A.   Well, I completed my
14   training at McGill in 1977.
15       Q.   And --
16       A.   I did another year
17   postdoctoral training at Yale the
18   following year.
19       Q.   In what?
20       A.   Well, that was in
21   gastroenterology, funded as a health
22   physician economist.
23       Q.   And that was completed when?
24       A.   '78.

Page 35

1        Q.   What is a health physician
2    economist?
3        A.   Which part are you asking
4    about?  I'm a physician.
5        Q.   Yeah.
6        A.   I was trained as an
7    economist.  I had gone to graduate school
8    in economics at McGill, and I was doing
9    health economics.
10       Q.   Health -- okay.  And what is
11   that?
12       A.   The specifics, is that what
13   you're asking me?
14       Q.   Yes.
15       A.   I was concerned with the
16   cost effectiveness of several different
17   approaches to diagnostic challenges in
18   clinical medicine.
19       Q.   And with that as a
20   background, did you use that in your
21   employment?
22       A.   Well, the answer is I used a
23   lot of my background in my employment.
24   Can you be more specific?

Page 36

1        Q.   Well, when you completed --
2    when you completed this training in 1976,
3    what did you do?
4        A.   I didn't finish -- in 1977 I
5    left McGill.
6        Q.   What did you do?
7        A.   I came to Yale.  And I spent
8    a year, I just described to you.
9        Q.   I'm sorry?
10       A.   I spent a year, as I just
11   described it to you.
12       Q.   And after -- when you
13   completed that year, what did you do?
14       A.   I found myself at that point
15   with a graduate student significant
16   other, subsequently my wife, and I needed
17   to pay the rent, so I took a job in
18   emergency medicine.
19            And my economics came in, in
20   the sense of management skills and
21   organizational thought, and I became the
22   chair of a large emergency medicine
23   department in New Haven, Connecticut.
24   And I held that job as the director and

Page 37

1    as a clinician for about eight or
2    ten years.
3        Q.   For how many years?
4        A.   I said eight or ten, but I'm
5    looking to see the listing.
6        Q.   Well, if you look at Page 3
7    of your CV.
8        A.   Thank you.  Through '88.
9        Q.   That was as an associate
10   attending physician, department of
11   ambulatory services, Hospital of Saint
12   Raphael in New Haven?
13       A.   That's right.
14       Q.   And your CV identifies a
15   couple different jobs during a part of
16   that same period of time.
17       A.   Yes.
18       Q.   So were you doing emergency
19   medicine at more than one facility?
20       A.   No.  I -- from the period of
21   '78 through '79, I worked in
22   Massachusetts for a group, and I was
23   part-time at Saint Raphael.  And then
24   went there full-time and stayed there.

10 (Pages 34 to 37)

Jonathan Borak, M.D., DABT

Page 38

1    Q.   So -- and had you had any
2  training in epidemiology up until that
3  point?
4    A.   Yes.  I had been in -- in
5  graduate school classes in epidemiology.
6    Q.   Okay.  And your -- your CV,
7  and correct me if I'm wrong, identifies
8  for the first time epidemiology in terms
9  of your professional experience, it says
10 associate clinical professor of
11 epidemiology beginning in 1999 through
12 2007.
13        Is that the first time that
14 you had a professional title as an
15 epidemiologist?
16    A.   Yes, that's correct.
17    Q.   All right.  And how did you,
18 other than the classes that you took in
19 graduate study back in the '70s, how did
20 you become an epidemiologist 20-plus
21 years later?
22    A.   On the basis of the work
23 that I had been doing, I was invited to
24 join the faculty and teach.

Page 39

1    Q.   What work had you been
2  doing?
3    A.   I had been working in the
4  area of risk assessment and I'd been
5  doing epidemiological-type studies, not
6  as though one buys a ticket to get on the
7  train.
8    Q.   Does one get a degree in
9  epidemiology?
10    A.   Some do.
11    Q.   Okay.  Do people have
12 masters in epidemiology?
13    A.   Some do.
14    Q.   Do people have Ph.D.s in
15 epidemiology?
16    A.   Some do.
17    Q.   Do people go to work
18 professionally after getting those
19 various degrees, go to work as an
20 epidemiologist?
21    A.   Some do.
22    Q.   And I take it you took,
23 between 1978 and 1999, you took a
24 different path to become an

Page 40

1  epidemiologist?
2    A.   I took two sets of boards,
3  in occupational medicine and in
4  toxicology, both of which subsume
5  epidemiology concepts and practice.
6  Passed both of those.  I did not take a
7  course degree in epidemiology.
8    Q.   Are there -- are there
9  certifications specifically in
10 epidemiology?
11    A.   Probably.  I can't tell you
12 for sure.
13    Q.   But you don't have them, if
14 they exist, correct?
15        MR. LOCKE:  Objection.
16        THE WITNESS:  I've already
17    said that epidemiology is part of
18    the requirements and occupational
19    medicine is part of requirements
20    to take the boards or to pass the
21    boards in toxicology.  But I don't
22    have a specific diploma on my wall
23    that says epidemiology.
24 BY MR. GOLOMB:

Page 41

1    Q.   Okay.  So to be -- to be
2  clear, there are specific certifications
3  in epidemiology, correct?
4    A.   Yes, I think so.
5    Q.   All right.  And you have --
6  you have indicated in fact that you have
7  read, by virtue of your report, you have
8  read various epidemiology reports in this
9  case, correct?
10    A.   Yes.
11    Q.   And they include, as an
12 example, Dr. Jack Siemiatycki?
13    A.   Yes.
14    Q.   Did you know who
15 Dr. Siemiatycki was before you read his
16 report?
17    A.   Yes.
18    Q.   He is a world-renowned
19 epidemiologist.  Would you agree with
20 that?
21        MR. HEGARTY:  Objection.
22        MR. LOCKE:  Objection.
23        THE WITNESS:  He is well
24    published.

11 (Pages 38 to 41)

Jonathan Borak, M.D., DABT

Page 42

1    BY MR. GOLOMB:
2        Q.   And so if you read his
3    deposition, you know that he -- he has a
4    master's and a doctoral degree and is
5    specifically certified in epidemiology,
6    correct?
7        A.   I am not surprised, but I
8    don't remember.
9        Q.   All right.  And you also
10   read the testimony of Dr. Smith-Bindman?
11       A.   I'm sorry?
12       Q.   You read the testimony of
13   Dr. Smith-Bindman?
14       A.   Very possibly.  It's
15   probably on my list.  I don't recall it.
16       Q.   Okay.  And like
17   Dr. Siemiatycki, she also has a specific
18   certification and a Ph.D. in
19   epidemiology.  Do you recall reading that
20   testimony?
21       A.   I don't recall.  I'm sorry.
22       Q.   And do you know who
23   Dr. Sonal Singh is?
24       A.   I recall the name.

Page 43

1        Q.   All right.  You've indicated
2    that you've read his testimony as well?
3        A.   I think I have.
4        Q.   Okay.  And you know that
5    Dr. Singh also has a Ph.D. in
6    epidemiology and is specifically
7    certified in epidemiology, correct?
8        A.   I -- I don't have any reason
9    to challenge that.  But I don't know that
10   to be true.
11       Q.   Okay.  Do you know who
12   Dr. Ann McTiernan is?
13       A.   I have read her report.
14       Q.   Okay.  Did you know who
15   Dr. McTiernan was prior to -- before you
16   reading her report and/or testimony?
17       A.   No.
18       Q.   Did you read the
19   congressional testimony that
20   Dr. McTiernan gave before Congress?
21       A.   No, I think I've read
22   reference to it, but...
23       Q.   Okay.  So you were aware
24   that Dr. McTiernan was asked to testify

Page 44

1    before Congress this year on the
2    association between talc and ovarian
3    cancer?
4            MR. HEGARTY:  Objection.
5            MR. LOCKE:  Objection.
6            THE WITNESS:  I -- I don't
7        specifically recall when.
8    BY MR. GOLOMB:
9        Q.   Okay.  So your -- your CV,
10   it says between 1999 and 2007 that you
11   were an associate clinical professor of
12   epidemiologist -- epidemiology and public
13   health at Yale University.  And then from
14   2017 to -- I'm sorry, 2007 to 2017 it
15   says you're a clinical professor of
16   epidemiology.
17           What -- what's the
18   difference between associate clinical
19   professor and clinical professor from
20   a -- from a practical standpoint?
21       A.   It's a promotion.
22       Q.   Okay.  And then it -- it
23   goes to, rather than saying current like
24   it does for -- it says adjunct professor

Page 45

1    of medicine 2003 to current at Johns
2    Hopkins.  It also says 2008 to current,
3    clinical professor of medicine.  Your
4    stint as a clinical professor of
5    epidemiology ends in 2017?
6        A.   That's correct.
7        Q.   All right.  So you're --
8    you're no longer a professor of
9    epidemiology?
10       A.   I am not that now.
11       Q.   Why is that?
12       A.   Chose not to.  I did not
13   like working with a new chairman of the
14   department and I didn't need it.
15       Q.   All right.  From a practical
16   standpoint, what -- what were you doing
17   between 2007 to 2017 as it relates
18   specifically to epidemiology?
19       A.   I taught a number of
20   courses.
21       Q.   Well, as a clinical
22   professor, how many courses total,
23   whether dealing with epidemiology or
24   otherwise?

12 (Pages 42 to 45)

Jonathan Borak, M.D., DABT

Page 46

1      A.   I -- I have listed all of my
2   courses on my CV --
3      Q.   Well --
4      A.   -- if you turn the page it's
5   there with the -- with the years and the
6   names and the course numbers.
7      Q.   Okay.  But I'm asking you
8   without reference to the CV, during any
9   given semester, how many courses do you
10  teach?
11         A.   I --
12             MR. LOCKE:  Objection.
13             THE WITNESS:  Up until 2017
14      I taught a full course every
15      semester, and then lectured in a
16      number of other courses.
17  BY MR. GOLOMB:
18      Q.   When you say full course, a
19  single course?
20      A.   Foundations of toxicology.
21  Foundation of risk assessment.  Both of
22  which were required courses in the School
23  of Public Health and listed in other
24  schools at Yale.  And then I lectured in

Page 47

1   a number of courses in epidemiology and
2   public health.
3      Q.   Okay.  And so when --
4   given -- given your -- the distinction
5   you're making between courses and
6   lecture -- well, why don't you tell me,
7   what -- what's the difference?
8      A.   One of them I was the course
9   director.  And the courses that I taught
10  when I referred to it that way, I was
11  responsible for every minute of the
12  course and taught most of the courses and
13  read most of the papers and evaluated
14  most of the students and did not use
15  teaching assistants.
16          In other cases I'm called
17  upon because of my expertise to
18  participate in courses that are more
19  kaleidoscopic if you would.
20      Q.   Okay.  And -- and the latter
21  is, those are the lectures you gave?
22      A.   That's right.  If I was not
23  responsible for the course, I'm not
24  referring to it that way.

Page 48

1      Q.   Okay.  And so am I correct
2   then, given that distinction and
3   listening carefully to what you've been
4   saying over the last few minutes, is that
5   you -- you never specifically taught a
6   course in epidemiology?
7             MR. LOCKE:  Objection.
8             THE WITNESS:  I was never
9       the course director of a course
10      listed as epidemiology.
11  BY MR. GOLOMB:
12      Q.   Right.  You have lectured
13  from time to time --
14      A.   Regularly.
15      Q.   -- in -- in an area of
16  epidemiology?
17      A.   Yes, regularly.  Not from
18  time to time consistently, but not every
19  week.  Yes.
20      Q.   And -- and you have never --
21  you have never taught a course or -- or
22  lectured in a course that in any way had
23  anything to do with the association of
24  talc and ovarian cancer, correct?

Page 49

1      A.   I have never, on something
2   that was devoted to talc.  It may have
3   come up in some context casually.  But
4   not systematically.
5      Q.   And out -- outside of
6   your -- your teachings at Yale, I assume
7   that you have, on a number of occasions,
8   been asked to lecture outside of Yale to
9   different groups or organizations,
10  correct?
11      A.   Yes, that's correct.
12      Q.   And you've never lectured on
13  talc, ovarian cancer, or the association
14  of talc and ovarian cancer; is that
15  correct?
16      A.   Yes, that's correct.
17      Q.   Now, you -- on Page 2 of
18  your CV, you list your -- your
19  professional certifications.  Do you see
20  that, at the bottom of the page?
21      A.   Yes, sir.
22      Q.   And you identify your
23  various fellowships and where you are a
24  diplomat, including the college of

Jonathan Borak, M.D., DABT

Page 50

```
1    physicians, the occupational
2    environmental medicines, toxicology,
3    internal medicine, preventive medicine,
4    your license with the medical council of
5    Canada.
6          You have no professional
7    certification whatsoever specifically
8    related to epidemiology; is that correct?
9          MR. LOCKE:  Objection.
10         THE WITNESS:  Yes, sir.
11    You've asked that before.  But
12    yes, that's true.
13    BY MR. GOLOMB:
14    Q.   Okay.  And you are not a
15    member of the American College of
16    Epidemiologists; is that correct?
17    A.   Yes, that's correct.
18    Q.   You are not a member of the
19    American Association of Cancer Research?
20    A.   Yes, that's correct.
21    Q.   You are not a member of the
22    International Epidemiology Association?
23    A.   That's correct.
24    Q.   You are not a member of the
```

Page 51

```
1    Society For Epidemiological Research?
2    A.   Yes, that's correct.
3    Q.   You are not a member of the
4    International Society of Environmental
5    Epidemiologists?
6    A.   Yes, that's correct.
7    Q.   Do you read any of their --
8    their journals or periodicals?
9    A.   Yes.
10    Q.   You just chose not to be a
11    member?
12    A.   Yes.
13    Q.   You have an office at Yale?
14    A.   No.
15    Q.   Did you at one point have an
16    office at Yale?
17    A.   There was a shared office
18    floor, but my private office is on the
19    campus, so there was no reason to make --
20    take advantage of that.
21    Q.   Your -- when you say your
22    private office, is that Jonathan Borak &
23    Company?
24    A.   That's correct.
```

Page 52

```
1    Q.   When did you -- when did you
2    last have an office at Yale?
3    A.   I have never had an office
4    at Yale.  I was offered shared space but
5    never took it.
6    Q.   Why is that?
7    A.   I didn't need it.
8    Q.   How did -- do -- do students
9    come to you once in a -- once in a while
10    to talk about their class work and what's
11    going on in class?
12    A.   Well, not just once in a
13    while, but yes, they would come to me or
14    sometimes I would meet them on the
15    campus.
16    Q.   Okay.  So --
17    A.   That is to say, I would meet
18    them in the School of Public Health,
19    which is about three and a half blocks
20    from my office.
21    Q.   Okay.  And your -- your
22    office for Jonathan Borak & Company is
23    where?
24    A.   New Haven.  234 Church
```

Page 53

```
1    Street, New Haven.
2    Q.   And do you have employees?
3    A.   Yes.
4    Q.   How many employees?
5    A.   At the moment, four.  At the
6    moment, four.
7    Q.   All right.  And in your
8    office space, do you have a private
9    office?
10    A.   Yes.
11    Q.   And in your -- in your
12    private office, are there -- do you have
13    -- are there books?
14    A.   Yes.
15    Q.   And are there journals, or
16    periodicals that you read?
17    A.   Yes, although we have turned
18    to digital format so that I don't
19    actually retain the hard copies.  I've
20    got a lot of PDFs, but that's sort of the
21    same.
22    Q.   And what kind of books, like
23    by title, what books would we find in
24    your office?
```

Jonathan Borak, M.D., DABT

Page 54

1      A.   It's too many for me to
2  begin that.  Why don't you ask me a more
3  specific question.  Do you have this?  Do
4  you have that?  I will try to answer you.
5      Q.   Do you subscribe to the
6  American Journal of Epidemiology?
7      A.   No, I look at it online
8  through the Yale library.
9      Q.   Do you subscribe to the
10 International Journal of Epidemiology?
11     A.   No.  I read it online at the
12 Yale library.
13     Q.   Do you subscribe to the
14 Journal of Clinical Epidemiology?
15     A.   No.  I sometimes look at it
16 on the Yale library.
17     Q.   Do you subscribe to Clinical
18 Epidemiology?
19     A.   No.  I have occasionally
20 reviewed it directly online in the Yale
21 library.
22     Q.   Do you subscribe to
23 Epidemiology?
24     A.   I do not subscribe to it.  I

Page 55

1  read it online in the Yale library.
2      Q.   Do you subscribe to the
3  Journal of Epidemiology?
4      A.   I do not subscribe to it.  I
5  read it when I need to online through the
6  Yale library.
7      Q.   Do you subscribe to Cancer
8  Epidemiology?
9      A.   I do not subscribe to it.
10 When I need it, I read it online through
11 the Yale library.
12     Q.   Do you know who Dr. Ken
13 Rothman is?
14     A.   Yes.  We're old friends.
15     Q.   I'm sorry?
16     A.   I said we are old friends.
17     Q.   Okay.  And would we find his
18 book on Modern Epidemiology in your
19 office?
20     A.   At least two versions, maybe
21 three.
22     Q.   Okay.  So I -- am I correct
23 that you have high regard for
24 Dr. Rothman?

Page 56

1      A.   He is a very smart man, and
2  he likes Borges, a writer whom I think
3  very highly of.  We shared short stories
4  with one other.  I think he's a very
5  bright guy.
6      Q.   And are you familiar with
7  Dr. Rothman's writings on the hierarchy
8  or the weight of evidence in
9  epidemiology?
10          MR. HEGARTY:  Objection.
11          MR. LOCKE:  Objection.
12          THE WITNESS:  I don't know
13     what you mean by am I familiar.
14     I've read some of his work on
15     that.
16 BY MR. GOLOMB:
17     Q.   Okay.  And is his view on
18 the hierarchy of evidence in epidemiology
19 consistent with your own view?
20          MR. LOCKE:  Objection.
21          MR. HEGARTY:  Objection.
22          THE WITNESS:  Would you tell
23     me what it is specific that you're
24     asking me?

Page 57

1  BY MR. GOLOMB:
2      Q.   Well, do you know what his
3  view is on hierarchy of evidence?
4      A.   Perhaps you can ask me a
5  more specific question.
6      Q.   I don't think I can ask you
7  any more specifically than the question
8  that calls for a yes or no answer.  And
9  that is, are you familiar with
10 Dr. Rothman's writings on the hierarchy
11 of evidence as it relates to
12 epidemiology?
13     A.   I have read --
14          MR. LOCKE:  Objection.
15          MR. HEGARTY:  Objection.
16          THE WITNESS:  Excuse me.
17     I have read some of his
18     writings on that, but I'm not sure
19     what you have specifically in
20     mind.
21 BY MR. GOLOMB:
22     Q.   Do you -- do you hold any --
23 any position, like an editorial position,
24 with -- irrespective of whether or not it

15 (Pages 54 to 57)

Jonathan Borak, M.D., DABT

Page 58

1    has to do with epidemiology or not, with
2    any journal?
3        A.   Yes.
4        Q.   What?
5        A.   I'm on the editorial board
6    of the Journal of Occupational and
7    Environmental Health -- Medicine. I'm a
8    member of the editorial board of the
9    Journal of Occupational and Environmental
10   Health -- Hygiene. I'm on the editorial
11   board of Occupational Medicine.
12       Q.   Okay. Is it fair to say
13   that your research interests, your
14   teaching interest, is more related to
15   occupational and environmental health
16   than it is to epidemiology?
17           MR. LOCKE:  Objection.
18           THE WITNESS:  No. I don't
19       think that's true. I am not
20       focused on that.
21   BY MR. GOLOMB:
22       Q.   Not focused on?
23       A.   Occupational health, as
24   you've just described it.

Page 59

1        Q.   You are or not?
2        A.   I am not. I look at the
3    interface of epidemiology and toxicology
4    and its application to clinical practice.
5        Q.   Well -- and -- well, let me
6    ask you. Have you ever had a clinical
7    practice as an internist?
8        A.   Yes. But not in a number of
9    years.
10       Q.   When did you have --
11       A.   It was years ago. I
12   spent -- the most recent time that I
13   supported myself as a full-time clinician
14   was in the late '80s, when I was running
15   a large inner city trauma center and saw
16   patients probably 60, 65 percent of my
17   time and did so for about eight years.
18           I've never had an office
19   practice in internal medicine since I
20   left Montreal. I had one there.
21       Q.   And you left Montreal when?
22       A.   In the late '70s.
23       Q.   Have you written any books?
24       A.   Yes.

Page 60

1        Q.   And have you written any
2    books in epidemiology?
3        A.   Not specifically with that
4    title, no.
5        Q.   Have you written any book
6    chapters in epidemiology?
7        A.   I have written book chapters
8    that dealt with the epidemiological
9    aspects of certain kinds of exposures,
10   but not specifically on epidemiology.
11       Q.   Okay. And those -- those
12   chapters were more specifically related
13   to hazardous materials and the effects of
14   hazardous materials, correct?
15       A.   More or less. Not -- not
16   exclusively. But generally.
17       Q.   As an example, in just going
18   through your lists and doing some
19   independent research, you seem to have a
20   specific interest generally in
21   occupational/environmental health, but as
22   a subset of that in -- specifically in
23   beryllium exposure?
24           MR. LOCKE:  Objection.

Page 61

1    BY MR. GOLOMB:
2        Q.   Is that fair?
3        A.   I have been involved with
4    the issue of beryllium for a number of
5    years, but it's not from the clinical
6    practice. We don't see much of it in New
7    Haven.
8        Q.   And your -- you have written
9    some articles related to internal
10   medicine, correct?
11       A.   Yes.
12       Q.   You've written some articles
13   related to emergency medicine, correct?
14       A.   Yes.
15       Q.   You've written some articles
16   related to industrial accidents, correct?
17       A.   Long ago, yes.
18       Q.   You've written some articles
19   related, as you said, to beryllium
20   exposure, correct?
21       A.   Well, that's one of the
22   toxicants I was interested in, yes.
23       Q.   Okay. As best I can tell
24   from the list, and you can correct me if

16 (Pages 58 to 61)

Jonathan Borak, M.D., DABT

Page 62

1    I'm wrong, from the list of articles
2    you've got beginning on Page 9 of your
3    CV, beginning -- it says books and
4    monographs.
5            Do you see that?
6        A.   Yes.
7        Q.   And then -- well, on Page
8    11, begins a list of journal articles.
9    And that list goes on for 14 pages.  And
10   as best as I can tell, correct me if I'm
11   wrong, I can see two articles that are
12   specifically related to epidemiology.
13           The first is an article that
14   you wrote in 2004 entitled "Who is
15   Hispanic?  Implications of
16   Epidemiological Research in the United
17   States."  And that was an article that
18   you wrote for Environmental Health.  And
19   the second one --
20       A.   No, sir.  That was --
21       Q.   I'm sorry, for Epidemiology
22   Magazine.
23       A.   Thank you.
24       Q.   Right.  And the second

Page 63

1    article is -- that you wrote for
2    Environmental Health, which discussed
3    cancer for populations near a toxic waste
4    site.
5        A.   There was such a paper, yes.
6            MR. HEGARTY:  Objection.
7    BY MR. GOLOMB:
8        Q.   Okay.  There's -- I -- I
9    don't see any other articles that -- and
10   maybe you can help me out -- other than
11   those two articles that you've written
12   specifically on the issue of
13   epidemiology.
14           MR. LOCKE:  Objection.
15           MR. HEGARTY:  Objection.
16           THE WITNESS:  There are
17       various epidemiological concepts
18       that are central to a great
19       number, or to any -- a number of
20       these various papers, ranging
21       from -- I -- I'm just looking at
22       the list.  I'm looking at Page 15
23       right now.
24           So we wrote a number of

Page 64

1    papers, or at least two that had
2    to do with mortality disparities
3    in Appalachia looking at risk
4    factors.  And that was an
5    epidemiological study,
6    specifically epidemiological,
7    using databases.
8            The papers that we've done
9    on methylmethacrylate had to do
10   with a specific chemical, but it
11   looked at the epidemiological
12   aspects of the reports to
13   determine those which were valid
14   and how to interpret them.
15           Seafood arsenic and the use
16   of -- the -- the beryllium --
17   particularly the most recent one
18   on beryllium, which was a search
19   for a dose-response, a number of
20   these, all of them are steeped in
21   the concepts of epidemiology for
22   the purpose of interpretation and
23   understanding.
24   BY MR. GOLOMB:

Page 65

1        Q.   The article on dose-response
2    in -- in beryllium that you mentioned,
3    there -- there is no dose-response
4    relationship in beryllium exposure,
5    correct?
6        A.   No.
7        Q.   So --
8        A.   That's no, there is a
9    dose-response.
10       Q.   Okay.  And the -- as -- as I
11   recall, the -- the first time there was a
12   study done on beryllium exposure and the
13   ultimate diagnosis of whether it was
14   berylliosis or -- or chronic beryllium
15   disease, was in 1946, correct?
16           MR. LOCKE:  Objection.
17           THE WITNESS:  The report
18       from the Salem, I think it was a
19       Sylvania plant.  But anyway, the
20       plant was Sylvania, Salem -- I
21       don't know the name but the way
22       they describe it -- Harriet
23       Hardy's report from a -- a Salem,
24       Massachusetts, light bulb factory

17 (Pages 62 to 65)

Jonathan Borak, M.D., DABT

Page 66

1    was sometime in the late '40s.
2        There may have been cases reported
3    before that.
4    BY MR. GOLOMB:
5        Q.   And -- and beryllium, in
6    that case, the concern was on behalf of
7    people who worked in the fluorescent
8    light bulb factories who were being
9    exposed to beryllium dust, correct?
10       A.   I don't know that they knew
11   that they were being exposed at the time
12   to beryllium dust. But, yes, they were
13   workers in a fluorescent factory.
14       Q.   All right. And -- and we'll
15   take a closer look at this and your --
16   your article on beryllium and
17   dose-response. But it was concluded in
18   that 1946 study, that yes, in fact,
19   beryllium dust can cause chronic
20   beryllium disease and/or berylliosis, but
21   there was no dose-response found,
22   correct?
23       MR. LOCKE:  Objection.
24       THE WITNESS:  I -- I don't

Page 67

1    know that they even spoke of
2    dose-response at that time.
3    BY MR. GOLOMB:
4        Q.   Do you know what the -- do
5    you know what I mean when I say linear
6    dose-response?
7        MR. LOCKE:  Objection.
8        THE WITNESS:  A linear
9    dose -- do I know what a linear
10   dose-response is?
11   BY MR. GOLOMB:
12       Q.   Yeah.
13       A.   I think dose-response is --
14   follows a linear distribution.
15       Q.   Okay. And does -- does
16   beryllium exposure file -- follow a
17   linear distribution?
18       MR. LOCKE:  Objection.
19       THE WITNESS:  There is
20   evidence of a monotonic
21   dose-response. I don't know
22   whether it's linear.
23   BY MR. GOLOMB:
24       Q.   Okay. And when we say that

Page 68

1    it's not linear, what do -- what do you
2    mean?
3        MR. HEGARTY:  Objection.
4        THE WITNESS:  I mean that if
5    you look at the dose and response
6    rates for different groups, it
7    would be a linear, as opposed to a
8    curved distribution. And I think
9    that the beryllium data doesn't
10   allow you to sufficiently
11   differentiate between linear and
12   curvilinear, but there is evidence
13   that it's monotonic.
14   BY MR. GOLOMB:
15       Q.   Okay. And, in fact, you
16   know from your research in -- in
17   beryllium exposure, that as an example,
18   when we talk about linear dose-response,
19   that you could have a worker at a
20   beryllium plant who is exposed to
21   beryllium on a daily basis in large
22   amounts and never be effected in terms of
23   disease, berylliosis or chronic beryllium
24   disease, correct?

Page 69

1        MR. HEGARTY:  Objection.
2        MR. LOCKE:  Objection.
3        THE WITNESS:  Chronic
4    beryllium disease seems to be
5    something that manifests only in
6    those who are genetically
7    predisposed.
8        There are very few settings
9    in which those who are genetically
10   predisposed have been adequately
11   documented. And it is apparent
12   that the risk is associated with
13   that underlying diaphysis.
14   BY MR. GOLOMB:
15       Q.   And by -- by genetically
16   disposed, you refer to that as being
17   sensitized, correct?
18       MR. LOCKE:  Objection.
19       THE WITNESS:  No.
20   BY MR. GOLOMB:
21       Q.   You've never heard of --
22   you've never heard the term "beryllium
23   sensitivity"?
24       A.   Yeah --

18 (Pages 66 to 69)

Jonathan Borak, M.D., DABT

Page 70

1  MR. LOCKE: Objection.
2  THE WITNESS: -- but you're
3  misusing it, sir.
4  BY MR. GOLOMB:
5  Q.  Okay.  So let -- let me ask
6  you this, have -- have you ever been an
7  investigator or participated in a
8  clinical trial?
9  A.  Not since I left my
10  training.
11  Q.  When you left your training
12  in?
13  A.  In -- there may have been
14  some clinical trials going on at Yale
15  when I was a fellow at Yale.
16  Q.  Okay.
17  A.  And there were some clinical
18  trials going on when I was a resident in
19  Montreal.  But I have not undertaken any
20  on my own.
21  Q.  Have you participated in any
22  in your professional life?
23  A.  That's what I mean, I
24  participated, I contributed to them.

Page 71

1  Q.  Okay.  But you -- you were
2  never principal investigator?
3  A.  That's what I meant.
4  Q.  And you haven't participated
5  since your medical school training?
6  A.  Not that I'm aware of.
7  Q.  Have you ever been a
8  principal investigator in a cohort study?
9  A.  No.
10  Q.  Have you ever participated
11  in any way in a cohort study?
12  A.  Not that I can specifically
13  recall.  But it's possible that I have
14  seen patients who were part of a cohort
15  study and, therefore, indirectly
16  contributed.
17  Q.  Patients as an internist?
18  A.  Emergency physician, as an
19  occupational physician, toxicologist, I
20  don't know.
21  Q.  Okay.  So you -- you
22  wouldn't -- you wouldn't consider
23  yourself as a participant in a cohort
24  study if it just so happened that your

Page 72

1  patient was one of 100,000 people that
2  may have been a participant in a cohort
3  study, do you?
4  MR. LOCKE: Objection.
5  THE WITNESS: You're asking
6  me to define the word participant.
7  I have never had my name listed to
8  the best of my knowledge in such a
9  situation.
10  BY MR. GOLOMB:
11  Q.  Have you ever been a
12  principal investigator in a case-control
13  study?
14  A.  No, I don't think so.
15  Q.  Have you ever participated
16  in a case-control study?
17  A.  Yes.  But not to the point
18  of necessarily -- I'm trying to think if
19  I was -- would have been listed as a
20  participant or merely as a clinician who
21  was involved in such a study.
22  Q.  Have you ever performed a
23  meta-analysis?
24  A.  Yes.

Page 73

1  Q.  When?
2  A.  Regularly.  I've had some --
3  the one that's published here is on
4  cancer on the brain in rubber workers.
5  Q.  Can you go into your CV
6  and -- and point that out for me?
7  A.  How about on Page 14.  Borak
8  Slade, Russi, "Risks of Brain Tumors in
9  Rubber Workers: A Meta-analysis."
10  Q.  Okay.  I -- I'm sorry, but
11  can you show me where on the page that
12  is?
13  A.  One, two, three, four, five,
14  six -- seven up from the bottom on page
15  14.
16  Q.  Okay.  Borak, Slade, Russi?
17  That's the article you're referring to?
18  A.  Borak, Slade, Russi.
19  Q.  Okay.  Did you ever -- have
20  you ever done any other meta-analysis?
21  A.  I have never published one.
22  Q.  Okay.  Have you -- in
23  this --
24  A.  Let me step back for a

19 (Pages 70 to 73)

Jonathan Borak, M.D., DABT

Page 74

```
 1    moment.  We have done pooled analyses
 2    which were not amenable to quantitative
 3    meta-analysis.  I published two large
 4    papers a year ago or so, Fields, Borak
 5    and Lewis involved with mercury, in which
 6    we pooled large numbers of studies and
 7    found that they could not -- they were
 8    not amenable to quantitative
 9    meta-analysis.  We described them instead
10    as a different type of pooling.  It was
11    not, strictly speaking, a meta-analysis.
12    But meta-analysis means about analyses.
13    And we were evaluating the underlying
14    analyses.  We just couldn't pool them in
15    a mathematical way.
16         Q.   And that study -- that
17    article that you're now referring to,
18    what was the purpose of that article?
19    What were you trying to determine?
20         A.   The question was, do the
21    neurological effects of exposure to
22    elemental mercury persist after the end
23    of exposure.  And it's actually
24    surprisingly a question that cannot be
```

Page 75

```
 1    directly answered, because you would need
 2    a longitudinal study.  You would need to
 3    look at workers when they were being
 4    heavily exposed for example, and then
 5    you'd need to look at them years later.
 6    There were no such studies.
 7         And so we pooled the studies
 8    of workers who -- 45 or 50 studies who
 9    were actively being exposed to mercury.
10    And we looked to see what were the
11    neurological effects that could be seen
12    at various levels of ongoing exposure, so
13    as to try to get a sense of the
14    dose-effect relationship acutely, that is
15    to say, during exposure.
16         Q.   Am I correct that you, in
17    that, the purpose of that article was
18    not -- as an example, was not to look at
19    the exposure and the effect that it would
20    have on some possible disease?
21         MR. LOCKE:  Objection.
22    BY MR. GOLOMB:
23         Q.   Is that correct?
24         A.   No.
```

Page 76

```
 1         Q.   That's not correct?
 2         A.   No that's not correct.
 3         Q.   So you were -- did you do a
 4    causation analysis in that?
 5         A.   We then looked at a second
 6    set of studies that had looked at workers
 7    historically exposed, a long time since,
 8    at very high levels, but who had not been
 9    actively -- not evaluated while they were
10    actively exposed.
11         So essentially we had two
12    groups of studies, one of them looking at
13    workers -- because it's usually
14    workers -- looking at people who had been
15    exposed to relatively high levels of
16    mercury during the time that they were
17    being exposed, and exposed for a period
18    of time sufficient to reach relatively a
19    steady state.
20         Then we looked at groups of
21    workers who had done similar jobs, in
22    some cases, but who had not been
23    evaluated while they were being exposed,
24    but who were evaluated 10 or 15 or
```

Page 77

```
 1    20 years later.
 2         And the question that we
 3    were asking was, if tremor, for example,
 4    is manifested in workers who are
 5    currently being exposed, and presumably
 6    nonworkers -- I mean, just -- it's easier
 7    in an occupational setting -- what would
 8    be the likelihood of seeing tremor 15 or
 9    20 years later?  Okay.
10         And because there was no
11    longitudinal study to do that, we did
12    what we referred to as a synthetic
13    cohort.  We created a cohort by trying to
14    figure out what was the relationship
15    between exposure and response at the time
16    of the exposure.  And then we looked to
17    see if we knew what these workers --
18    20 years later, we knew what they had
19    been exposed to, but we didn't know what
20    their neurological outcome was.
21         Q.   My question was -- my
22    question was did you do a causation
23    analysis?
24         A.   I don't know what you mean
```

Jonathan Borak, M.D., DABT

Page 78

1    specifically by a causation analysis.
2         Q.   Okay.  What -- what do you
3    mean by causation analysis?
4         A.   I don't know.
5         Q.   Okay.  Have you ever heard
6    of the term "causation analysis"?
7         A.   I've heard it, but I've
8    never heard it defined clearly.
9         Q.   Let's just talk about, since
10   we talk about beryllium.  Does -- does
11   beryllium exposure -- can beryllium
12   exposure cause chronic beryllium disease?
13        MR. LOCKE:  Objection.
14        THE WITNESS:  In some
15        people, certain levels of exposure
16        can cause a chronic lung disease
17        called chronic beryllium disease.
18   BY MR. GOLOMB:
19        Q.   Okay.  And so in that case,
20   you can make -- you can, in certain
21   people, make a determination of an
22   exposure cause a disease, correct?
23        A.   Not directly.
24        MR. LOCKE:  Objection.

Page 79

1    BY MR. GOLOMB:
2         Q.   Okay.  Do you think there's
3    any exposure on earth that can cause a
4    disease?
5         A.   I don't understand your
6    question.
7         Q.   Okay.  Are you familiar with
8    cigarettes?
9         A.   I understand what they are,
10   yes.
11        Q.   Okay.  Are you -- do you
12   know that cigarettes have nicotine in
13   them?
14        A.   I understand so.
15        Q.   Okay.  Can cigarettes and
16   the nicotine in cigarettes cause lung
17   cancer?
18        MR. LOCKE:  Objection.
19        THE WITNESS:  Nicotine is
20        not carcinogenic.  Is that your
21        question?
22   BY MR. GOLOMB:
23        Q.   Can cigarettes cause lung
24   cancer?

Page 80

1         MR. LOCKE:  Objection.
2         THE WITNESS:  It depends
3         what you do with the cigarettes.
4    BY MR. GOLOMB:
5         Q.   Have you seen people smoke
6    cigarettes?
7         A.   Yes.
8         Q.   All right.  And so you know
9    what I mean by smoking a cigarette?
10        A.   Yes.
11        Q.   Okay.  You don't need any
12   further explanation on that?
13        MR. HEGARTY:  Objection.
14        THE WITNESS:  No, no.
15        That's clear.
16   BY MR. GOLOMB:
17        Q.   And do you have an -- you
18   have an opinion one way or the other as
19   to whether or not somebody who is smoking
20   cigarettes, whether that can cause lung
21   cancer?
22        MR. LOCKE:  Objection.
23        THE WITNESS:  It can,
24        dependent upon the quantity and

Page 81

1         other factors.
2    BY MR. GOLOMB:
3         Q.   But we -- so it can cause
4    lung cancer?
5         A.   Under some circumstances.
6         Q.   All right.  And so there is
7    an example of an exposure, in this case,
8    whatever it is that the smoke of a
9    cigarette does, there is a -- there is an
10   example of an exposure causing a disease?
11        A.   Yes.  But the problem with
12   your question is, for example, one
13   cigarette does not cause lung cancer.
14        Q.   Well, we can read back the
15   question.  Did I limit it to one
16   cigarette?
17        MR. LOCKE:  Objection.
18        THE WITNESS:  You didn't
19        qualify the question.
20   BY MR. GOLOMB:
21        Q.   Right.  Well, the
22   qualification was, it can cause lung
23   cancer.
24        A.   And the answer is, it can

21 (Pages 78 to 81)

Jonathan Borak, M.D., DABT

Page 82

1    not also.
2        Q.   Well, is that the answer to
3    that question?
4        A.   I -- no, the answer was it
5    depends upon the circumstances.
6        Q.   No, the answer to the
7    question, it can cause lung cancer -- is
8    the answer to that question, it also can
9    not?
10       MR. LOCKE:  Objection.
11       THE WITNESS:  It depends
12   upon how you use it.
13   BY MR. GOLOMB:
14       Q.   Okay.  Well, you're the one
15   who just answered the question --
16       A.   One cigarette --
17       Q.   I -- excuse me.
18       A.   No, you've been stepping on
19   me, sir.  One cigarette --
20       Q.   Let me finish my question.
21       A.   -- does not cause cancer.
22       Q.   Okay.  And we can agree on
23   that, and we can -- I think we can also
24   agree that that has absolutely nothing to

Page 83

1    do with my question.
2        MR. LOCKE:  Objection.
3    BY MR. GOLOMB:
4        Q.   Can we agree on that?
5        MR. LOCKE:  Objection.
6        THE WITNESS:  No, sir.  Read
7    back your question.
8    BY MR. GOLOMB:
9        Q.   You heard me say one
10   cigarette?
11       A.   Read back the question, sir.
12       Q.   We -- we're not going to
13   waste the time of -- of going back to
14   read the question.  The question was
15   pretty clear.
16       Let's look at Exhibit 3.
17   No, I'm sorry, let's go to 4.  We'll come
18   back to 3.
19       (Document marked for
20       identification as Exhibit
21       Borak-4.)
22       THE WITNESS:  Will you give
23   me enough time to fill my coffee
24   cup?

Page 84

1        MR. LOCKE:  Oh yes.
2        THE WITNESS:  Thank you.
3        MR. LOCKE:  The front page
4    of Exhibit 4 is not attached to
5    the other pages.  Is that all part
6    of Exhibit 4?
7        MR. GOLOMB:  It is.  I
8    don't -- sorry, I don't have an
9    extra copy of that.
10       It's the -- the website from
11   Jonathan Borak & Company.
12       THE WITNESS:  It, to be
13   clear, is the website formerly.
14   It has not been hosted or paid for
15   by me, for years.
16   BY MR. GOLOMB:
17       Q.   Doctor, what you have in
18   front of you has been marked as -- as
19   Exhibit 4.
20       Are you familiar with that?
21       MR. LOCKE:  Just -- just to
22   be clear so that we have a record.
23   I want to make sure that we know
24   that it's a one, two -- six-page

Page 85

1    document.
2    BY MR. GOLOMB:
3        Q.   Okay.  And so take -- take a
4    look at this six-page document.  We'll
5    try to describe what's there for the
6    record.
7        The -- the first page is the
8    homepage of -- of the website; is that
9    correct?
10       A.   Of the former website, yes.
11       Q.   Okay.  Well, we'll talk
12   about that.  And then the -- the
13   remaining pages, which are marked in the
14   lower right-hand corner as Pages 1
15   through 5.
16       Do you see that?
17       MR. LOCKE:  Not on our copy.
18   BY MR. GOLOMB:
19       Q.   Okay.  It -- they -- they --
20   it is a listing and a brief description
21   of "recent peer-reviewed scientific
22   reports."
23       Do you see that?
24       A.   That's what it says.

22 (Pages 82 to 85)

Jonathan Borak, M.D., DABT

Page 86

1    Q.   Okay.  Now --
2    A.   Doesn't say recent.  It says
3  peer-reviewed -- oh, it does, it does say
4  recent, sorry.
5    Q.   So you mentioned that this
6  is something that you formerly hosted.
7  What -- why don't you -- let's talk about
8  Jonathan Borak & Company, first of all.
9        When -- when was Jonathan
10  Borak & Company started?
11    A.   1988, something like that.
12    Q.   And in 1988, when you
13  started Jonathan Borak & Company, what
14  did it do?
15    A.   It provided consulting
16  services.
17    Q.   To whom?
18    A.   My first clients were
19  companies that made chemicals and wanted
20  to develop informational materials to
21  inform first responders in the event of
22  accidents.
23    Q.   And at some point did
24  Jonathan Borak & Company become involved

Page 87

1  in -- in litigation as a consultant?
2    A.   At -- at some point, yes.
3    Q.   When?
4    A.   I don't recall specifically.
5    Q.   Can you tell me generally
6  when it was?
7    A.   After 1988.
8    Q.   And was it before or after
9  2000?
10    A.   I think it was probably
11  before.
12    Q.   And when you first began
13  in -- in litigation services as a
14  consultant, give me some examples of what
15  type of litigation consulting you were
16  doing.
17    A.   One of the first was whether
18  mercury was a hazard and a risk in people
19  if they were exposed in a dining room.
20    Q.   In a?
21    A.   Dining room.
22    Q.   Okay.  And what, just very
23  generally, what was the litigation?  Was
24  that the litigation?

Page 88

1    A.   It was an administrative law
2  case.
3    Q.   And -- and who were you
4  providing consulting services for?
5    A.   I was providing services to
6  a law firm.  And they were providing
7  services to a mining company.  And they
8  were being adjudicated by the Mine Safety
9  and Health Administration.
10    Q.   And was the mining company
11  the -- the defendant in that particular
12  litigation?
13    A.   I think that's right.
14    Q.   All right.  In your -- in
15  your services over the years as a
16  consultant in litigation -- first of all,
17  approximately how many times have you
18  done that?
19    A.   I don't know the number, but
20  I very rarely have an opportunity to be
21  deposed or to testify.  A few times every
22  couple of years.
23    Q.   Okay.  For -- and a few
24  times every couple years for the last

Page 89

1  20 years or so?
2    A.   I'm sure that there are
3  large periods of time when I've done
4  none.  But I don't have that in front of
5  me.
6    Q.   Okay.  So have you served as
7  a consultant in litigation more or less
8  than 20 times?
9    A.   Let me step back and say
10  that my company often works for lawyers
11  in terms of regulatory issues and
12  enforcement issues, and in contract
13  issues and in safety issues.  It's often
14  through a lawyer or their outside law
15  firm that I'm approached.  I don't know
16  how many of those have ended up in
17  litigation and I certainly have not been
18  involved in the litigation the majority
19  of those.
20        I have lawyers who approach
21  me and ask me to provide literature
22  reviews.  And I will do that and have
23  done that over the years with some
24  regularity.

23 (Pages 86 to 89)

Jonathan Borak, M.D., DABT

Page 90

1        I assume that those are used
2 for people who have litigation concerns,
3 but I've not been asked to testify in
4 those situations.
5        Q.   And out of all the times you
6 have served in some capacity as a
7 consultant in -- in litigation, how many
8 of those times have you served on behalf
9 of a plaintiff in a -- in a -- in
10 litigation?
11        A.   In the last years it's been
12 more commonly defense.  In the early
13 years of my career it was more commonly
14 plaintiff.
15        Q.   Okay.  And when you say the
16 early years of your career, what -- what
17 years are you talking about?
18        A.   I began doing legal
19 consulting when I was running a trauma
20 center in an emergency room.
21        Q.   That was back in the '70s?
22        A.   That's correct.
23        Q.   And --
24        A.   More -- no, no.  In the

Page 91

1 '80s.
2        Q.   Okay.  And in those cases,
3 when you say that you were providing
4 litigation consulting services on behalf
5 of plaintiffs, was that as a result of
6 your having treated those patients in the
7 emergency room?
8        A.   No.
9        Q.   So give me some examples of
10 what you're talking about.
11        A.   I was approached by a man in
12 New York who did what this gentleman with
13 the video camera does, and he was
14 providing that service to my parents who
15 had a business that did what -- what this
16 lady here with the stenography does.  And
17 my father was boasting of his son the
18 doctor, and the guy with the camera said
19 I have a company that provides this
20 service, we would love to talk to your
21 son.
22        And I spoke to this guy and
23 he had a company that did this.  I never
24 saw it.  But he would send me medical

Page 92

1 records.  And I would review them and
2 tell him or his client whether there was
3 or was not an error that had been
4 committed based upon my judgment.  And it
5 represented both sides, defense and
6 plaintiffs, but more often plaintiffs.
7        Q.   Okay.  And so those were in
8 medical malpractice cases?
9        A.   And -- and personal injury.
10        Q.   Okay.  When -- when you say
11 personal injury, what do you mean?
12        A.   Automobile cases where the
13 question was not whether the doctor did
14 something wrong.
15        Q.   It was a question of what
16 the injury was?
17        A.   Yes.
18        Q.   And what effect it had on
19 the -- the individual who was injured?
20        A.   Stuff like that.
21        Q.   Okay.  And that was -- was
22 that as a treating physician?
23        A.   Was I?
24        Q.   Yeah.

Page 93

1        A.   No.
2        Q.   Okay.  So -- and
3 approximately how many times were you
4 related -- were you involved in -- in
5 that kind of litigation?
6        A.   I -- I -- involved in the
7 review, or involved in deposition and
8 testimony?
9        Q.   Either.
10        A.   Either.
11        Q.   Yeah.
12        A.   I would say that there were
13 a bunch of things that I reviewed and
14 rarely in deposition or testimony.
15        Q.   Okay.  And the last time you
16 did that was in the '80s?
17        A.   That I worked for this
18 fellow?  Yes, back in the '80s.
19        Q.   No.  When was the last time
20 you did any of this consulting work that
21 we're now talking about on behalf of
22 injured plaintiffs?
23        A.   Ah.
24        MR. HEGARTY:  Objection.

24 (Pages 90 to 93)

Jonathan Borak, M.D., DABT

Page 94

1    THE WITNESS:  I was deposed
2 in January, in a question of
3 whether an inmate in a New York
4 State prison was harmed as a
5 result of the actions of the
6 guards.  And I was representing
7 the plaintiff.
8 BY MR. GOLOMB:
9    Q.   In January of 2019?
10    A.   Yes.
11    Q.   And when was the last time
12 that you consulted on behalf of a
13 plaintiff before that?
14    A.   That's the last time that I
15 testified.  I see documents in a variety
16 of contexts in which there is probably a
17 plaintiff, but I've never been
18 representing them in a courtroom.
19    Q.   Let's take a look at
20 Exhibit 6.
21    (Document marked for
22    identification as Exhibit
23    Borak-6.)
24 BY MR. GOLOMB:

Page 95

1    Q.   Which is a list of your
2 deposition and trial testimony that you
3 submitted or that Mr. Locke submitted to
4 us as part of the production prior to
5 this deposition.  And we referred to this
6 list earlier today, correct?
7    A.   Yes.
8    Q.   And it lists nine separate
9 cases, correct?
10    A.   Correct.
11    Q.   And in eight of those cases,
12 you testified via deposition?
13    A.   Yes.  That's correct.
14    Q.   And one of those cases you
15 testified at trial, correct?
16    A.   Yes.  That's correct.
17    Q.   Now, have you ever given a
18 deposition as a consultant before June 4,
19 2015?
20    A.   Oh, yes.
21    Q.   Do you know why this list is
22 limited to cases on or after June 4,
23 2015?
24    A.   I was told that I should

Page 96

1 have a list of cases in the past four
2 years.
3    Q.   And the first case on that
4 list, is Cabot Corporation versus Arrow,
5 correct?
6    A.   Correct.
7    Q.   And who were you consulting
8 on behalf of in that case?
9    A.   In that case I was
10 consulting on behalf of Arrow.
11    Q.   And what does Arrow do?
12    A.   They make respirators.
13    Q.   And Cabot Corporation, the
14 plaintiff in that case, is a beryllium
15 manufacturer that was formerly in
16 Reading, Pennsylvania, correct?
17    A.   They have not been
18 associated with beryllium in probably
19 30 years.  But your memory is very good.
20    Q.   And just very generally,
21 what was that case about?
22    A.   Cabot sold a subsidiary to
23 Arrow.  The subsidiary manufactured
24 respirators.

Page 97

1    As part of the negotiated
2 transaction, Cabot retained liability for
3 future claims resulting from silica or
4 asbestos.
5    And Arrow accepted liability
6 for future claims, including historical
7 exposures, but future claims on -- a
8 couple kinds of things, for all other
9 exposures.
10    One day, they discovered
11 they had a large number -- Arrow
12 discovered there were a large number of
13 complainants with coal workers'
14 pneumoconiosis.  I don't know if they had
15 coal workers' pneumoconiosis.  I did not
16 deal with the medical records.  I was
17 asked to evaluate a simple question, to
18 ask can you get coal workers'
19 pneumoconiosis in the absence of silica.
20    Q.   Now, you were not acting as
21 an epidemiologist in that case, correct?
22    A.   I was looking at old reports
23 of exposure-related materials using,
24 among other things, epidemiological

25 (Pages 94 to 97)

Jonathan Borak, M.D., DABT

Page 98

1    skills.
2        Q.   And did you do a causation
3    analysis in that case?
4        A.   I don't know what you mean
5    by causation analysis.
6        Q.   You testified four times in
7    the Bair Hugger litigation?
8        A.   Yes.
9        Q.   What was your role in the
10   Bair Hugger litigation?
11       A.   If you mean was it on the
12   defense, yes.
13       Q.   No.  What did you do in the
14   case?
15       A.   Do you want to know what the
16   case is about?
17       Q.   I know what the case is
18   about.  What did you do?
19       A.   I opined that the evidence
20   did not indicate that Bair Hugger caused
21   infections.
22       Q.   And what did you do to come
23   up with that conclusion?
24       A.   I read a very large amount

Page 99

1    of the literature, and I evaluated some
2    of the original work that had been done
3    at a hospital called Wambeck, the only
4    report that suggests that there is an
5    association, which was a study which had
6    a number of important design flaws.
7            And I reevaluated that study
8    in part using a reanalysis that was
9    provided on the statistics by the
10   emeritus chair of biostatistics at Yale
11   Public Health.
12       Q.   And you -- your -- according
13   to Exhibit 6, you testified at trial on
14   May 23rd and May 24th of 2018, correct?
15       A.   Yes, that's correct.
16       Q.   And who was the lawyer that
17   retained your services in that case?
18       A.   It was a firm called
19   Blackwell Burke.
20       Q.   And do you recall who the
21   lawyer was representing the plaintiff in
22   that case?
23       A.   No, I don't.
24       Q.   Do you recall giving

Page 100

1    testimony in that case?
2        A.   I do.
3        Q.   And do you recall, as part
4    of that testimony that you gave, do you
5    recall the cross-examination in that
6    case?
7        A.   I guess, yes.
8        Q.   And where was that case
9    tried?
10       A.   Minneapolis.
11       Q.   And do you recall the result
12   in that case?
13       A.   Yes.
14       Q.   What was the result?
15       A.   A defense verdict.
16       Q.   And the -- you've given
17   testimony via deposition in three other
18   Bair Hugger cases, correct?
19       A.   Actually there are two Bair
20   Hugger cases, and one of them had three
21   hearings.
22       Q.   Okay.  When you say three --
23   so there's four cases listed here.
24       A.   Yeah, four dates.

Page 101

1        Q.   Right.  So three by
2    deposition, and one trial?
3        A.   Yes.
4        Q.   All right.  So when you say
5    there were two cases, what do you mean?
6        A.   Well, the deposition held on
7    February 15th was a two-hour deposition
8    related to an appeal of a court
9    determination that was related to the
10   first of those cases.
11       Q.   Now, in reaching your
12   conclusions in that case, did you do a
13   meta-analysis?
14       A.   I don't think there were any
15   data which would be amenable to a
16   meta-analysis.
17       Q.   So the answer is no?
18       A.   No.
19       Q.   Did you do a case-control
20   study?
21       A.   No.
22       Q.   Did you -- do you know who
23   Bradford Hill is?
24       A.   Yes.

26 (Pages 98 to 101)

Jonathan Borak, M.D., DABT

| Page 102 | Page 104 |
|---|---|
| 1    Q.  Did you do a Bradford Hill<br>2  analysis?<br>3    A.  I did a critique of a<br>4  Bradford Hill analysis in one of these.<br>5    Q.  Okay.  Do you understand the<br>6  difference between doing your own<br>7  Bradford Hill analysis and commenting on<br>8  somebody else's Bradford Hill analysis?<br>9    MR. LOCKE:  Objection.<br>10    THE WITNESS:  Not if you do<br>11  the critique properly.  You have<br>12  to go through all of the criteria<br>13  and all of the data.  It was a<br>14  response to something.<br>15  BY MR. GOLOMB:<br>16    Q.  Okay.  And is that what you<br>17  did in the Bair Hugger cases?<br>18    A.  In one.<br>19    Q.  In one.  Which one of these<br>20  four did you do that in?<br>21    A.  In the -- in the first one<br>22  a -- which is the one that has come back<br>23  again, where there was a question of<br>24  general causation, there was a Bradford | 1  in any beryllium exposure cases?<br>2    A.  Yes, I have at some point.<br>3    Q.  How many times?<br>4    A.  I think I was in court once.<br>5  I may have been deposed.  I don't recall.<br>6    Q.  Okay.  Have you testified at<br>7  deposition in a beryllium exposure case?<br>8    A.  That's what I'm trying to<br>9  recall.  I -- I would imagine -- I was in<br>10  court in a case in California.  I don't<br>11  believe -- no, I probably was deposed<br>12  there as well.  And that was years ago.<br>13    I do not know that I have<br>14  been deposed in other cases.  It's<br>15  possible.<br>16    Q.  Okay.  You -- I want to be<br>17  clear that when we -- when we talk about<br>18  testimony, there -- there can be<br>19  deposition testimony outside of the<br>20  courtroom and there can be trial<br>21  testimony inside of the courtroom.<br>22    You understand that, right?<br>23    A.  I do.<br>24    Q.  Okay.  And it -- and in some |

| Page 103 | Page 105 |
|---|---|
| 1  Hill argument put forth, and I responded<br>2  to that.<br>3    Q.  Okay.  And just to be clear,<br>4  in this case that brings us here today,<br>5  you did not do a Bradford Hill analysis,<br>6  correct?<br>7    A.  Yes.  I did not do a<br>8  Bradford Hill analysis.<br>9    Q.  And you weren't asked to do<br>10  a Bradford Hill analysis?<br>11    A.  That's correct.<br>12    Q.  And you did not -- while you<br>13  commented on, my words, the state of the<br>14  science, you were not asked nor did you<br>15  give an opinion on whether or not talc<br>16  can cause ovarian cancer, correct?<br>17    MR. LOCKE:  Objection.<br>18    MR. HEGARTY:  Objection.<br>19    THE WITNESS:  I did not -- I<br>20  was not asked to render such an<br>21  opinion.<br>22  BY MR. GOLOMB:<br>23    Q.  Correct.  Now, outside of<br>24  this list, did you -- have you testified | 1  cases you may have been deposed and not<br>2  testified at trial, right?<br>3    A.  Yes, yes, yes, yes, yes.<br>4    Q.  In other cases there may be<br>5  a scenario where you never gave a<br>6  deposition, but testified at trial?<br>7    A.  Yes, that's correct.<br>8    Q.  All right.  I mean there's a<br>9  number of states that -- well, let me<br>10  just --<br>11    A.  I -- I'm sorry.  My mouth<br>12  opens because I'm just thinking back to<br>13  things in my history.  I'm not trying to<br>14  contradict you.  I'm also trying to<br>15  remember whether you are the attorney who<br>16  worked with Honik and whom I may have<br>17  dealt with in Florida once.<br>18    Q.  I am.<br>19    A.  Very good.  That's why my<br>20  mouth opened.  And the answer is I've<br>21  been at least twice in the courtroom.<br>22    Q.  Okay.  And you've been at<br>23  least twice in a courtroom in beryllium<br>24  cases? |

27  (Pages 102 to 105)

Jonathan Borak, M.D., DABT

Page 106

1       A.   At least.
2       Q.   And there are other cases
3  where you may have testified both at
4  trial and at -- via deposition?
5       A.   Well, I'm not sure what you
6  mean by other cases.
7          I -- I may have been deposed
8  in those two cases.
9       Q.   Right.  And here --
10      A.   And I may have had other
11 depositions.
12      Q.   And who were you acting as a
13 consultant for in those cases?
14      A.   Some cases, probably
15 Materion, then known as Brush Wellman.
16 In the case where I first had the
17 opportunity to meet you, I was probably
18 working for an airplane maker.  I don't
19 remember whom.
20      Q.   Lockheed?
21      A.   That sounds right.  Maybe.
22          I may have even been deposed
23 once, I don't know, involving a -- an
24 aluminum maker.  It may have been Alco, I

Page 107

1  don't remember.
2       Q.   But -- so let's go back to
3  Exhibit 4 which is the Jonathan Borak &
4  Company website.  And let's look at
5  Pages 1 through 5 of the recent
6  peer-reviewed scientific studies.
7          First of all, let me ask you
8  this before I ask you about that.
9          You -- you mentioned before
10 that you no longer host this website?
11      A.   Correct.
12      Q.   When -- when did you stop
13 hosting this website?
14      A.   Probably at least three
15 years ago.  And one of the reasons that I
16 bring this specifically to your attention
17 is that I'm a little embarrassed having
18 put out something as though I were still
19 hosting, which says recent peer-reviewed
20 reports and the most recent is 2007.
21 This -- this was not curated even before
22 then.
23          But I am not responsible for
24 this website -- I can't get it down.

Page 108

1  That's the -- the wonderful giving
2  generosity of the internet.
3       Q.   Well, this is --
4       A.   But I stand by everything
5  that it says there in 2008.  I probably
6  wrote it all.
7       Q.   Well, what -- so why did you
8  take out -- down the website, or why did
9  you stop hosting the website?
10      A.   I stopped hosting it because
11 it became complicated.  It became
12 complicated because the person who --
13 you -- this is a bunch of irrelevancies.
14          The person who developed
15 this website was the webmeister at the
16 School of Forestry and Environmental
17 Studies at Yale.
18      Q.   I think they call them
19 webmaster.
20      A.   Okay.  And he retained
21 the -- the original software.  And I had
22 to go through him for updates and so
23 forth.  And then I retained for my
24 company somebody else to manage my -- he

Page 109

1  didn't manage my IT.  I had somebody I
2  hired to do my IT work.  He was sent -- I
3  understand he was sent the master
4  software and he lost it, no kidding.
5          And so it became necessary
6  for me either one day to totally
7  reconstruct the website or throw it away,
8  and I decided to throw it away.  Also
9  because a number of the people listed on
10 this website as working in my office were
11 no longer in my office and others who
12 were in my office were not on my website.
13 And so it no longer represented reality.
14      Q.   What was the purpose of the
15 website?
16      A.   It was like putting my CV
17 online.
18      Q.   All right.  Now, the -- this
19 list of recent peer-reviewed scientific
20 reports was, aside from your -- your
21 words, your embarrassment that there's
22 nothing on here since 2007, looking at
23 your -- your list of peer-reviewed
24 articles from your CV and looking at

28 (Pages 106 to 109)

Jonathan Borak, M.D., DABT

Page 110

```
 1    this, my impression at least, correct me
 2    if I'm wrong, this was never meant to be
 3    an all-inclusive list, right?
 4            MR. HEGARTY:  Objection.
 5            THE WITNESS:  It -- it was
 6        not meant to be an all-inclusive
 7        list.  There was a more recent
 8        list on the Yale website.
 9    BY MR. GOLOMB:
10        Q.   And -- and is that meant to
11    be an all-inclusive list?
12        A.   No.
13        Q.   All right.  And so when
14    looking at the Jonathan Borak site of
15    recent peer-reviewed scientific reports,
16    were -- were you the one who selected
17    what -- when the website was being
18    hosted, were you the one who was deciding
19    what to put up?
20        A.   I certainly was involved in
21    the decision.
22        Q.   Okay.  Because you -- you
23    didn't want to put up whatever the number
24    is, 100, 150, published articles that
```

Page 111

```
 1    you've done over the last 40 years,
 2    correct?
 3        A.   It -- it was not my goal.
 4        Q.   Right.  You wanted to put up
 5    articles that -- that you were, number
 6    one, proud of, and number two, that
 7    represented what your interests were?
 8            MR. HEGARTY:  Objection.
 9            MR. LOCKE:  Objection.
10            THE WITNESS:  You know what,
11        that sounds a little -- a little
12        cold.  I was putting up, generally
13        speaking, those things which I
14        thought were interesting and that
15        were recent.
16            I mean, this -- this
17        ten-year-old list doesn't reflect
18        much except what was interesting
19        to me in -- in that time.
20    BY MR. GOLOMB:
21        Q.   Okay.  But at least during
22    that period of time, this -- you -- you
23    chose these particular articles to go on
24    that website and you chose to leave other
```

Page 112

```
 1    articles during that same period of time
 2    off the website.  I think that
 3        A.   I think that I was meaning
 4    to indicate something about the scope of
 5    our interests in the office, which is why
 6    I've got a couple of these on beryllium
 7    and I've got one on hearing loss.  And
 8    I've got one on diesel.  And I've got one
 9    on seafood arsenic, and all of these were
10    topics that were being actively
11    considered in my office.
12            I also included some of the
13    people who worked for me, just to show
14    the sorts of things that they had
15    interests in.
16            And -- and this was just
17    meant to be representative.  It was not
18    meant to be inclusive.  And I don't know
19    that it has a great subliminal message,
20    but it may have.  I mean, I believe in
21    Freud.
22        Q.   And -- and most of -- most
23    of these articles are related to
24    toxicology and occupational and
```

Page 113

```
 1    environmental health, correct?
 2        A.   Well, the first one is about
 3    toxicology and risk assessment.
 4            The second one had to do
 5    with toxicology and environmental health.
 6            The third one had to do with
 7    hearing loss.  Mainly workplace.
 8            The fourth and fifth
 9    referred to -- the fourth referred to
10    beryllium in the workplace, and the fifth
11    referred to a test and its validity as a
12    clinical screening test.
13            There is a paper listed in
14    here that has to do with the incidence of
15    asthma among aluminum workers, that's an
16    epidemiological application to the
17    workplace.
18            I -- I -- it's difficult to
19    give you a single answer.  I'm not trying
20    to be...
21        Q.   In any of the articles you
22    just mentioned, did you do a Bradford
23    Hill analysis?
24            MR. LOCKE:  Objection.
```

29 (Pages 110 to 113)

Jonathan Borak, M.D., DABT

Page 114

1    THE WITNESS: It's a
2    complicated answer to a simple
3    question. I apologize.
4        I have been teaching
5    Bradford Hill and writing about
6    Bradford Hill. And it permeates
7    my -- my professional thinking.
8        It is hard for me to review
9    the scientific literature without
10   a little piece of Bradford Hill
11   back there somewhere in my
12   occipital. But I don't normally
13   sit down and say, one, two, three,
14   four, five, six, seven, eight,
15   nine, and try to match them up in
16   that sense.
17       So the answer is Bradford
18   Hill lives within me, but I rarely
19   put forth that kind of a formal,
20   one through nine Bradford Hill
21   analysis. Does that -- is that an
22   answer?
23   BY MR. GOLOMB:
24       Q.   And you certainly didn't do

Page 115

1    that in this case?
2        A.   In which case?
3        Q.   In the case that brings you
4    here today?
5        MR. LOCKE: Objection.
6        THE WITNESS: No, no, no,
7    no, no. I was -- I'm sorry.
8    Forgive me.
9        I was not asked a question
10   for the -- of inferring causation
11   from epidemiological evidence. I
12   was not asked to infer causation.
13   And so I did not use Bradford
14   Hill.
15   BY MR. GOLOMB:
16       Q.   Right. You were asked to --
17   to comment on what others had said, and
18   essentially what the evolution of the
19   literature shows us today?
20       MR. HEGARTY: Objection.
21       MR. LOCKE: Objection.
22       THE WITNESS: You -- you
23   misstate what I said. And if you
24   gave me the report I will read it

Page 116

1    to you.
2    BY MR. GOLOMB:
3        Q.   I'm not saying you said
4    anything. I'm asking you a question.
5        A.   Ask it again, sir.
6        MR. GOLOMB: Can you read it
7    back, please.
8        (Whereupon, the court
9    reporter read back the requested
10   portion of testimony.)
11       MR. LOCKE: Objection.
12       THE WITNESS: The literature
13   in part, but yes. Generically
14   that's what I did.
15   BY MR. GOLOMB:
16       Q.   Okay. Let's take a look at
17   Exhibit 5, which is the Yale website.
18       (Document marked for
19   identification as Exhibit
20   Borak-5.)
21       MR. LOCKE: I'm asking him
22   if he wanted a break.
23       THE WITNESS: I'm happy with
24   the water. Keep going. I'm

Page 117

1    kicking myself privately for the
2    fact that I did not recognize this
3    gentleman earlier.
4    BY MR. GOLOMB:
5        Q.   You mentioned before the
6    Yale website. In fact, Exhibit 5 is the
7    Yale website, correct?
8        MR. GOLOMB: Why don't we go
9    off the record and take a
10   five-minute break.
11       THE VIDEOGRAPHER: We're
12   going off the record. The time is
13   10:44.
14       (Short break.)
15       THE VIDEOGRAPHER: We're
16   going back on the record.
17   Beginning of Media File Number 2.
18   The time is 10:52.
19   BY MR. GOLOMB:
20       Q.   Doctor, before we broke, I
21   handed you a copy of Exhibit 5, which is
22   your biography from the Yale website.
23   Have you had a chance to take a look at
24   that?

30 (Pages 114 to 117)

Jonathan Borak, M.D., DABT

Page 118

1    A.   Yes, I did.
2    Q.   And do you agree that's what
3  this is?
4    A.   No.  It was.  It's an old
5  version of it.  It's been updated.
6    Q.   Okay.  And how did you
7  determine that this is an older version?
8    A.   The most recent publication
9  is 2012.  So it's at least six to
10  seven years old.
11    Q.   Okay.  Well, I will
12  represent to you that I printed this out
13  myself a little more than a week ago.
14    A.   I updated it less than a
15  month ago.
16    Q.   Have you gone --
17    A.   Unrelated to this particular
18  getting together that we have here today.
19    Q.   And have you been on the
20  website in the last week or so?
21    A.   No.
22    Q.   Okay.  You may want to do
23  that just to see if it's been updated.
24    A.   Yeah.  That's important.

Page 119

1  Thank you very much.
2    Q.   And so you are able to go on
3  it yourself to update the information?
4    A.   There is some method.  I've
5  got an e-mail somewhere with instructions
6  and I filed it.  And if I can find it, I
7  will do it.  Otherwise I'll ask for a new
8  copy.
9    Q.   Okay.  And so other than
10  going on -- and so when you say you
11  updated it, did you do that yourself by
12  following the instructions going on, and
13  so you're able to edit it yourself?
14    A.   Yes, that's correct.
15    Q.   And other than updating
16  it -- and I assume that you're referring
17  to the date of the most recent selected
18  publication on the one that I printed
19  out; is that correct?
20    A.   Well, that's what jumps out
21  at me right there.  To tell me how old
22  this listing is, yes.
23    Q.   Okay.  And that's from list
24  shows the last article of 2012?

Page 120

1    A.   That's correct.
2    Q.   All right.  And other than
3  when you went on a month ago or so and
4  updated the list of selected
5  publications, did you make any other
6  edits to the website?  As an example, you
7  see at the top of the page it says
8  "Research Interests"?
9    A.   I don't remember ever having
10  put that there.  So I don't -- I don't
11  know.
12    Q.   Okay.  Well, if you wanted
13  to change your research interests --
14    A.   Yes.
15    Q.   -- when you went on the --
16  when you went on the website to update
17  the selected publications, would you also
18  be able to update research interests?
19    A.   I would have to look to see
20  for sure.  I don't know.  I assume.  But
21  I don't know.
22    Q.   All right.  And so under
23  research interests, it says, "Chemicals
24  and drugs," correct?

Page 121

1    A.   That's what it says.
2    Q.   And then it says --
3  underneath that, the next paragraph is,
4  "Extensive research description."
5    Do you see that?
6    A.   Yes.
7    Q.   And it says, "Dr. Borak's
8  research interest in the areas of
9  environmental and industrial toxicology,
10  biological and clinical surveillance of
11  toxic exposures, environmental and
12  workplace exposure assessments and risk
13  assessments of susceptible populations."
14  Correct?
15    A.   That's what it says.
16    Q.   And then it says your,
17  "Recent research projects have focused on
18  issues such as the assessment of
19  occupational exposures to diesel
20  exhaust" --
21    A.   That's old.
22    Q.   -- "historical
23  reconstruction of silica particulate
24  exposures" --

31 (Pages 118 to 121)

Jonathan Borak, M.D., DABT

Page 122

1        A.   That's also sort of old,
2   although it's ongoing.
3        Q.   -- "respiratory
4   sensitization by reactive monomers" --
5        A.   Yes.  That's also old.
6        Q.   -- "and the clinical
7   assessment of beryllium-related
8   diseases."
9        A.   Yes.  That's also old, but
10  true.
11       Q.   Okay.  And so if I went on
12  the website a week ago rather than
13  getting this, what would it now say?
14       A.   I frankly don't know.  I'd
15  have to go look.
16       Q.   Okay.  So you don't remember
17  what the updates were that you made?
18       A.   I don't remember.  I can
19  tell you that the purpose of this website
20  is in the embrace and the context of the
21  occupational and environmental medicine,
22  and in part so that the applicants to the
23  program know what the faculty members do
24  so that they know what sort of resources

Page 123

1   there are in the program.
2        So, for example, in this
3   case, I would list things that were
4   particularly relevant and salient to
5   occupational and environmental medicine;
6   whereas, by contrast, when I had a web
7   page at the School of Public Health, it
8   would have listed work I did that was
9   more specific and relevant to general
10  public health.
11       But there's nothing -- these
12  are true publications.  And this is what
13  I probably listed then.
14       Q.   Okay.  And again, correct me
15  if I'm wrong.  When -- when these
16  selected publications went on -- let's
17  just assume we're dealing with a current
18  list.  And I'm not asking specifically
19  about the list as much as I am the
20  process of how things get on a website.
21  You're the one who selects the
22  publications to go on?
23       A.   When this was most recently
24  done, yes.

Page 124

1        Q.   And what about this list
2   that which had the most recent one of
3   2012?  Were you the one who selected
4   those publications at that time?
5        A.   Very possibly, but I don't
6   remember.
7        Q.   Okay.  And again, this is
8   obviously not meant to be a comprehensive
9   list?
10       A.   No.
11       Q.   And so, how do you -- how do
12  you -- just generally, how do you decide
13  what goes on the list and what does not
14  go on the list?
15       A.   Well, what I -- what I said,
16  but I'll repeat, because it's -- this was
17  meant to indicate the activities, my
18  activities, that were relevant to members
19  of the occupational and environmental
20  medicine program and its applicants.
21       Q.   Okay.  When -- well, strike
22  that.
23       So who was the TASA Group?
24       A.   I have never met the TASA

Page 125

1   Group, but they are a thing that's out
2   there.  It's a company of some sort that
3   provides consultation.
4        Q.   And do you know what -- what
5   kind of consultation they provide?
6        A.   I am here today working for
7   the TASA Group.
8        Q.   And how is it that you
9   want -- came -- came here today working
10  with TASA?
11       A.   Well, I came here today
12  because Mr. Locke invited me to come here
13  today.  That is not what you were asking
14  me.
15       I am working with Mr. Locke
16  because the TASA Group had given him my
17  name and we spoke, and he looked at my
18  resumé and asked me to do some stuff for
19  him.
20       Q.   And had you ever worked with
21  the TASA Group before?
22       A.   A couple of times.
23       Q.   All right.  And when did you
24  first work with the TASA Group?

32 (Pages 122 to 125)

Jonathan Borak, M.D., DABT

Page 126

1         A.   Well, let me say obviously
2    it was before I met Mr. Locke.  I don't
3    know how far in advance of that.
4         The next question you'll ask
5    me is how did I get to meet the TASA
6    Group.  The answer's that a colleague
7    friend of mine, a professor in Detroit,
8    called me some years ago, five, not
9    probably more than five, maybe less.  And
10   said that he had been approached by this
11   group with whom he had worked to help on
12   a project that was too big for him.  And
13   asked me whether I would be interested
14   and I said yes, I would.  And so he made
15   the introduction.
16        That original work had to do
17   with compiling a very large number of
18   essentially Workers' Compensation claims
19   in the railroad industry and trying to
20   make some interpretation or analysis of
21   what the data were.  It did not entail
22   any litigation that I was aware of, or at
23   least it didn't involve me in any
24   litigation, only in the analysis of a

Page 127

1    large amount of data, and I had an
2    infrastructure in my office to do that
3    work, and so I worked with the TASA Group
4    then.
5         And then periodically they
6    have called me and said we have somebody
7    who is looking for an X or a Y or a Z,
8    are you interested, can you help us.  And
9    sometimes I say yes, I can help you, and
10   sometimes I say no, I can't help you,
11   because it's not what I do.  And other
12   times I've said I'm sorry, I'm too busy,
13   but I'll give you some advice.
14        Q.   And when you say they call
15   you for your services as an X, a Y or a
16   Z, what is X, Y and Z?
17        A.   It could be as an internist.
18   It could be as a toxicologist.  It could
19   be as an occupational environmental
20   physician.  And it could be as an
21   epidemiologist.
22        Q.   Have you ever served as an
23   epidemiologist for TASA before the talc
24   cases?

Page 128

1         A.   Epidemiology permeates my
2    thinking scientifically, so it's hard to
3    differentiate.  I don't think that I'm
4    working as specifically an
5    epidemiologist, though I am doing that
6    here, but I'm not here simply as an
7    epidemiologist.
8         Q.   Okay.  You -- you understand
9    that you, through the lawyers, produced
10   your expert report in this case, correct?
11        A.   Yes.
12        Q.   And you are identified as an
13   epidemiologist?
14        A.   In part, yes.
15        Q.   And your -- your opinion,
16   according to your report, is as an
17   epidemiologist, do you understand that?
18        MR. LOCKE:  Objection.
19        THE WITNESS:  Show me where
20   it says that, sir.
21   BY MR. GOLOMB:
22        Q.   Well, do -- do you
23   understand that, yes or no?
24        A.   I -- I don't understand what

Page 129

1    you've just said to me.
2         Q.   Okay.  And in the prior case
3    when you were introduced by your friend
4    from Detroit to TASA did you -- you were
5    introduced as what in terms of X, Y or Z?
6         A.   I didn't hear the
7    introduction, but I was identified as a
8    physician, an occupational physician, a
9    toxicologist and an epidemiologist.
10        Q.   And did you -- did you speak
11   to somebody from TASA before you were
12   engaged?
13        A.   I must have.
14        Q.   Okay.  And you would have
15   worked out a fee arrangement with them,
16   correct?
17        A.   The arrangement I had with
18   them for fees, are you asking what is it?
19   Yes, I would --
20        Q.   No, I'm asking -- I'm asking
21   a very specific question about your
22   conversations with -- with TASA five
23   years ago when you were first introduced
24   to them.

33 (Pages 126 to 129)

Jonathan Borak, M.D., DABT

Page 130

1     A.   Fine.  Ask me again.
2     Q.   What was the fee
3  arrangement?
4     A.   I sent them my invoices and
5  they billed the client.
6     Q.   And the invoices that you --
7  that you bill, do they -- they include
8  the number of hours that you work?
9     A.   Yes, that's correct.
10     Q.   And is -- is the billing
11  that you provided to them in this project
12  five years ago, similar -- similar to the
13  bills that you provided in this case?
14     A.   The answer is yes, and I'm
15  not sure if five years is correct.  But
16  I'm not disagreeing.  I understand what
17  you -- yes, it's the same process.  And
18  then what TASA does with the bills, I
19  don't know.
20     Q.   And do -- are your -- your
21  bills identify the number of hours that
22  you worked?
23     A.   Yes, that's correct.  And
24  whomever else works on the project.

Page 131

1     Q.   And the -- and the bills
2  that you provide to TASA, are they on
3  Jonathan Borak & Company letterhead?
4     A.   Yes, of course.
5     Q.   And is there a calculation
6  of your number of hours on -- on the
7  Jonathan Borak bills that you provide to
8  TASA, is there a calculation of the bills
9  times your hourly rate, or just the
10  hours?
11     A.   I don't -- no, no, I think
12  it's both probably.  And the hourly
13  rate -- at least indicates, for example I
14  have a librarian.  I think that her time
15  goes at something like in the range of 45
16  to 60 an hour.  I don't actually
17  remember.  And so that is broken out.
18        And I have had other people
19  who have worked with me on some of these
20  projects, including this one at some
21  point.  And so it breaks out individuals,
22  and it says how many hours were spent and
23  what was the hourly rate.
24     Q.   Okay.  And -- and what was

Page 132

1  the hourly rate in the case, whether it
2  was five years ago, more or less, what
3  was your hourly rate in that case?
4     A.   Which case?
5     Q.   The case that your friend
6  from Detroit introduced you to the -- to
7  TASA.
8     A.   I think it is whatever it is
9  today.
10     Q.   Which is what?
11     A.   I think probably something
12  in the range of 550, to 600, I'm not
13  sure.
14     Q.   Okay.  And so if we looked
15  at your invoices that you provide on
16  Jonathan Borak stationary that you
17  provide to -- to TASA?  So you -- let me
18  just be clear.  Before -- as a
19  background, you -- your bills go to TASA,
20  not to Mr. Locke?
21     A.   That's correct.
22     Q.   All right.  And so if we
23  looked at your invoices, it would -- it
24  would show the number of hours, correct?

Page 133

1     A.   Yes.
2     Q.   And then it would be times
3  an hourly rate for you, times an hourly
4  rate for those hours identified for your
5  librarian, and then there would be a
6  total number of hours and a total dollar
7  amount?
8     A.   Essentially.
9     Q.   Okay.  And I'm assuming you
10  don't wait until the case is over to
11  bill, correct?
12     A.   Yes, I do not.
13     Q.   You bill on a monthly basis?
14     A.   Yes, I do.
15     Q.   And so, each month would
16  have a bill that includes the number of
17  hours, times an hourly rate for you,
18  times an hourly rate for your librarian?
19     A.   And whomever else, yes.
20     Q.   Okay.  And that bill -- that
21  would then go to TASA?
22     A.   Correct.
23     Q.   And does the bills that you
24  provide, do the bills that you provide to

34 (Pages 130 to 133)

Jonathan Borak, M.D., DABT

Page 134

1 TASA, do they break down the details of
2 what you did that month?
3 A. It indicates day by day.
4 Q. Okay. And is there a
5 description of what you did for that hour
6 or three hours or four hours?
7 A. It may indicate review of
8 topics, or phone calls, yes.
9 Q. Okay. And then as you
10 indicated earlier, once you send the
11 bills to TASA, you don't know what
12 happens then with those bills. You just
13 know that you get a check?
14 MR. HEGARTY: Objection.
15 THE WITNESS: Well, that's
16 simplistic, but yes.
17 BY MR. GOLOMB:
18 Q. Well, I want to -- I don't
19 want to know implicitly. I want to know
20 factually. Is that what happens?
21 A. I said simplistically. I
22 don't know what the process is between.
23 Eventually, yes, a check does arrive.
24 Q. Okay. I didn't ask you what

Page 135

1 the process was in between. My question
2 was, very specifically -- do you prepare
3 the bills yourself?
4 A. No.
5 Q. Okay. How do you -- how do
6 you -- who does prepare the bill?
7 A. There is somebody who does
8 that bookkeeping part of my work.
9 Q. Okay. And how do they get
10 the information to bill it, do you keep
11 time slips?
12 A. Yes.
13 Q. Do you keep time slips in
14 writing or do you keep time slips on the
15 computer?
16 A. On the computer.
17 Q. And if we wanted to see
18 those time slips, are they still
19 available?
20 A. I don't know. But probably.
21 Q. Okay. You didn't delete
22 them, did you?
23 A. I am not aware that I
24 deleted them.

Page 136

1 Q. Did you instruct anybody in
2 your office to delete them?
3 A. No.
4 Q. All right. So and nobody
5 would delete them without your
6 instruction, correct?
7 A. Yes.
8 Q. That's correct?
9 A. Yes, that's correct.
10 Q. So going back to my
11 question. My question was then, your
12 office prepares these detailed invoices
13 on Jonathan Borak & Company stationery,
14 it's got the number of hours for the
15 month, times your hourly rate for that
16 month, times your librarian's hourly rate
17 for that month. There's a dollar figure.
18 And then you send the bill to TASA.
19 You don't know what happens
20 with the bill after that, and you're not
21 involved with the bill after that. You
22 know, at some point you get a check?
23 MR. HEGARTY: Objection.
24 MR. LOCKE: Objection.

Page 137

1 THE WITNESS: I do not know
2 the mechanics of the process at
3 TASA.
4 BY MR. GOLOMB:
5 Q. Right. And is the -- is
6 the -- do you ever see the TASA bills?
7 A. No.
8 Q. Do you know what TASA does
9 with their bills?
10 A. What do you mean?
11 Q. TASA, I assume, wants to get
12 paid?
13 A. I assume they do.
14 Q. All right. So the check
15 that you receive, is that a check from
16 TASA?
17 A. Yes. It's a check from
18 TASA.
19 Q. So you don't get a check
20 from Mr. Locke or Mr. Locke's office?
21 A. I don't believe I have ever
22 gotten a check from Mr. Locke or
23 Mr. Locke's office.
24 Q. In this case, you don't --

35 (Pages 134 to 137)

Jonathan Borak, M.D., DABT

Page 138

1    you don't get a check from an insurance
2    company?
3        A.   I don't know what insurance
4    companies, no.
5        Q.   My question was, you don't
6    get a check from an insurance company?
7        A.   Not in this litigation.
8        Q.   Right.  Right.  You get your
9    check directly from TASA?
10       A.   That's correct.
11       Q.   By the way, do you know
12   whether or not, one way or the other,
13   whether or not TASA publishes a book of
14   the experts who they use?
15           MR. HEGARTY:  Objection.
16           THE WITNESS:  I do not.
17   BY MR. GOLOMB:
18       Q.   Okay.  Did you ever -- did
19   you ever send one of your CVs to TASA?
20       A.   Oh, yes.
21       Q.   Okay.  But you don't know
22   whether or not they publish a book of
23   their experts?
24       A.   No, I don't know.

Page 139

1        Q.   Okay.  Have you ever
2    advertised your services as a consultant?
3        A.   No.
4        Q.   In any form or fashion?
5        A.   I've always thought that I
6    was self-promoting in a certain sense
7    when I published articles in the
8    peer-reviewed scientific literature.  But
9    that's not what you mean, I'm sure.
10       Q.   No.  I mean -- I mean
11   whether or not you have paid for an
12   advertisement, as an example, in one of
13   these publications offering your services
14   as an expert.
15       A.   No, I've never done that.
16       Q.   All right.  If TASA was
17   publishing your services and offering
18   your services as an expert in a book that
19   they publish and send out to corporations
20   or lawyers, is that something that you'd
21   want to know?
22           MR. LOCKE:  Objection.
23           MR. HEGARTY:  Objection.
24           THE WITNESS:  It's

Page 140

1        interesting that you raise it.  It
2        doesn't surprise me, but I don't
3        know.
4    BY MR. GOLOMB:
5        Q.   Would you care one way or
6    the other?
7        A.   I would care if anybody was
8    saying false things about me.
9        Q.   Well, would you -- would you
10   care whether or not TASA was out there
11   offering your services to lawyers as a
12   consultant on an hourly basis?
13           MR. LOCKE:  Objection.
14           MR. HEGARTY:  Objection.
15           THE WITNESS:  I've assumed
16       that's what they were doing.
17       Otherwise, I don't think I would
18       be getting phone calls from them.
19       I get them, not many, but
20       occasionally.
21   BY MR. GOLOMB:
22       Q.   Okay.  Do you know anything
23   about who TASA serves?
24       A.   The only person besides me

Page 141

1    that I know that has worked with TASA was
2    my colleague in Detroit.
3        Q.   Okay.  So you never did --
4    as an example, you never did any
5    independent research to find out who TASA
6    was and what kind of company they were
7    and what their reputation was since they
8    were offering your services as an expert?
9            MR. HEGARTY:  Objection.
10           MR. LOCKE:  Objection.
11           THE WITNESS:  I was
12       introduced to them by a man whom I
13       held in high regard.  I regarded
14       that as being a due diligence.
15   BY MR. GOLOMB:
16       Q.   Okay.  When was the first
17   time that you were ever contacted to
18   serve as a consultant in the talc
19   litigation?
20       A.   I don't know the date.  But
21   it probably was in 2016 or 2017.  It's
22   possible.  I'm looking to Mr. Locke to
23   see whether he remembers.  I don't
24   remember.

36 (Pages 138 to 141)

Jonathan Borak, M.D., DABT

Page 142

1    Q.   Okay.  I'm pretty sure
2  Mr. Locke would tell you, even if he
3  does, he's not allowed to answer the
4  question on the record.
5    A.   In that case, I was looking
6  to see whether he smiled or grimaced.
7    Q.   Okay.  So let me just
8  represent to you that I have received on
9  two separate occasions invoices.  Some
10  are invoices from the TASA Group.  Some
11  are invoices from Jonathan Borak &
12  Company.  I have -- the first set of
13  bills that I have began in May of 2017,
14  and that is a set of invoices that are
15  marked for identification or marked as an
16  exhibit as Exhibit 3, which I will show
17  you at some point.
18       And then yesterday, I
19  received another set of invoices that
20  begin in August of 2015 that I saw for
21  the first time late last evening.
22       So while I have a hardcopy
23  of it, and we'll -- at some point we'll
24  show you that on the Elmo, and I don't

Page 143

1  have copies for everybody else, because
2  we just got it, and I didn't have time to
3  make the copies.  Okay.
4       I give you that as a way of
5  background because you'll know why there
6  are copies for you on some things and
7  others, but I also tell you that because
8  I want to know if the fact that the first
9  entry on what will be Exhibit 30 that I
10  received last night has -- the earliest
11  date is August 24th of 2015, and whether
12  or not that helps refresh your
13  recollection as to when you were first
14  contacted.
15    A.   I -- I'm going to --
16       MR. LOCKE:  Objection.  You
17  can answer.
18       THE WITNESS:  I will tell
19  you I don't have any specific
20  recall.  If you have such a
21  document that I will accept
22  pending my review of it that
23  that's correct, and that was the
24  first invoice, I don't remember.

Page 144

1  BY MR. GOLOMB:
2    Q.   Okay.  This was also an
3  invoice that you were questioned on by
4  Mr. Greenback back in June of 2017 in
5  your earlier deposition in the Oules
6  case.  Do you remember Mr. Green asking
7  you about invoices from that case?
8    A.   No, but I remember
9  Mr. Green.
10    Q.   Okay.  Everybody remembers
11  Mr. Green.
12    A.   Yeah, yeah, no, he is a
13  charming fellow.  He's got a nice smile.
14    Q.   Yes, yes, he is.  And he
15  knows good pizza when he sees it.
16    A.   Well, then he's in the right
17  town.
18    Q.   So I want to be clear that
19  in -- in this kind of the series of
20  questions that I'm going to be asking
21  you, I don't want to know any -- anything
22  about any conversations you may have had
23  with Mr. Locke or any of the lawyers in
24  Mr. Locke's office, okay?

Page 145

1    A.   Okay.
2    Q.   You understand that that's
3  privileged, correct?
4    A.   Yes.
5    Q.   All right.  So if we assume
6  for the sake of discussion that the first
7  contact that you had in the talc
8  litigation was back in August of 2015,
9  how were you contacted?
10    A.   By phone.
11    Q.   By whom?
12    A.   I assume -- I don't
13  remember.  Do you want me to -- to
14  assume?  I assume it was a call from
15  somebody at TASA.  But I don't remember.
16    Q.   Okay.  And tell me about
17  that conversation.
18    A.   I don't remember it.
19    Q.   You don't -- you
20  don't remember anything about the
21  conversation?
22    A.   I can -- I can conjecture,
23  but I don't remember.
24    Q.   Well, it's -- as long as

37 (Pages 142 to 145)

Jonathan Borak, M.D., DABT

Page 146

1    your conjecture is not pure speculation,
2    tell me what the -- what the conversation
3    was.
4         A.   Well, it's not pure
5    speculation.
6         MR. LOCKE:  Objection.
7    BY MR. GOLOMB:
8         Q.   Go ahead.
9         A.   I presume that somebody
10   would have called me and said we have a
11   client who is interested in the following
12   problem, would you be interested in
13   speaking with him.
14        Q.   Okay.  And -- and that
15   problem was, obviously, was the -- the
16   claims that talc was cause -- the
17   perineal use of talc was causing ovarian
18   cancer, correct?
19        MR. HEGARTY:  Objection.
20        MR. LOCKE:  Objection.
21        THE WITNESS:  It probably
22        had to do with the association
23        between talcum powder and ovarian
24        cancer.

Page 147

1    BY MR. GOLOMB:
2         Q.   Okay.  And you obviously
3    said that you would be interested?
4         A.   I obviously said I was
5    interested in speaking with this person,
6    yes.
7         Q.   And as of that -- as of that
8    time, in August of 2015, what -- what is
9    it about your educational background,
10   your professional background, that --
11   that you felt, yeah, I may be the guy for
12   this?
13        A.   I had done a lot of work on
14   particulates.  I had written on
15   carcinogenicity but not on ovarian
16   cancer.  I was interested in
17   environmental exposures and this seemed
18   to fit into that area of interest.
19        Q.   Okay.  And at that point had
20   you read anything about the association
21   between talc and ovarian cancer?
22        A.   I was aware that there was
23   talk of such an association.
24        Q.   When you say you were aware

Page 148

1    of talk, what does that mean?
2         A.   I mean I was aware that in
3    2010 IARC said there was a possibility.
4         Q.   Okay.  Do you -- do you read
5    the IARC monographs on a regular basis?
6         A.   When you say on a regular
7    basis, I often read them.  And I look to
8    see what is coming out, so that I know
9    what they have been dealing with, but I
10   don't subscribe to them.
11        Q.   Okay.  Okay.  So you -- but
12   in 2015 -- as you sat there in 2015 and
13   you were contacted by TASA, you
14   remembered that IARC had done something
15   on talc back in 2010?
16        A.   Not that specifically.
17        Q.   Then what -- what did you
18   recall?
19        A.   I was aware that it had been
20   an issue, that talc had been looked at by
21   IARC.
22        Q.   Okay.  And did you have any
23   opinion on it at that point?
24        MR. HEGARTY:  Objection.

Page 149

1         THE WITNESS:  By opinion,
2         you mean --
3    BY MR. GOLOMB:
4         Q.   Whether or not talc was
5    causing the ovarian cancer.
6         A.   I -- I had no opinion at
7    that time.
8         Q.   All right.  And had you
9    read -- did you read the IARC monogram --
10   monograph before August of 2015?
11        A.   I don't remember.  I have
12   certainly read it since then.
13        Q.   Well, you read that once you
14   were a paid consultant in this case.
15        MR. LOCKE:  Objection.
16        MR. HEGARTY:  Objection.
17        THE WITNESS:  I read that
18        after I became involved in this
19        case, but I probably read parts,
20        or was aware of it.  But I don't
21        remember.
22   BY MR. GOLOMB:
23        Q.   Okay.  Had you read any --
24   any of the other literature on the

38 (Pages 146 to 149)

Jonathan Borak, M.D., DABT

Page 150

```
 1    association between talc and ovarian
 2    cancer before August of 2015?
 3              MR. HEGARTY:  Objection.
 4              THE WITNESS:  If I had, it
 5         didn't stick specifically in my
 6         mind.  I couldn't give you the
 7         name of the author who wrote it.
 8    BY MR. GOLOMB:
 9         Q.   Okay.  And so when you --
10    you then said that yes, I'll be
11    interested in possibly getting involved.
12    What -- what happened next?
13              How -- how do you go from a
14    phone call with TASA to having a fee
15    agreement to act as a -- as a paid
16    consultant?
17              MR. HEGARTY:  Objection.
18              THE WITNESS:  I actually
19         don't remember the specifics, but
20         at some point Mr. Locke indicated
21         his concern was --
22    BY MR. GOLOMB:
23         Q.   Don't -- don't tell me about
24    conversations.
```

Page 152

```
 1         A.   I think I had several
 2    conversations.  So I think next was
 3    another conversation.
 4         Q.   All right.  And -- and that
 5    was in the Oules case, correct?  If --
 6              MR. LOCKE:  You can answer
 7         if you can.
 8    BY MR. GOLOMB:
 9         Q.   Or let me -- let me back up.
10              Or maybe it wasn't
11    specifically about the Oules case,
12    Mr. Locke just wanted you to generally
13    opine on the association between talc and
14    ovarian cancer without giving you the
15    name of the case.
16              MR. LOCKE:  Objection.
17              THE WITNESS:  As I recall
18         it, I was not involved in any
19         particular case.
20    BY MR. GOLOMB:
21         Q.   Okay.  And then at -- at
22    some point you said yes, I'll be
23    involved.  And you worked out an
24    arrangement of what your -- what your
```

Page 151

```
 1         A.   Sorry.
 2              MR. LOCKE:  Yeah.
 3    BY MR. GOLOMB:
 4         Q.   Let me back up --
 5         A.   At some point I
 6    understood --
 7         Q.   Let -- let me -- let me back
 8    up.  And I -- I want to -- I want -- I
 9    want to ask a very specific question,
10    because I want you to be careful you're
11    not telling me conversations with
12    Mr. Locke.
13              So once TASA contacted you
14    and you said yes, I'll be interested,
15    what -- in -- in talking with somebody,
16    was that somebody Mr. Locke?
17         A.   It was either Mr. Locke or
18    Mr. Locke's associate.
19         Q.   Okay.  Do you remember the
20    name of Mr. Locke's associate?
21         A.   I'm sorry, I don't.
22         Q.   Okay.  And then without
23    telling me about any of the
24    conversations, tell me what you did next.
```

Page 153

```
 1    fees would be, how you would bill, and
 2    what your job was in this particular
 3    case, right?
 4              MR. LOCKE:  Objection.
 5              THE WITNESS:  I -- I had --
 6         I've got to learn to be quiet for
 7         a minute.
 8    BY MR. GOLOMB:
 9         Q.   I'm sorry?
10         A.   I say I have to learn to be
11    quiet for the first 12 seconds.
12              I -- I had no conversation
13    with Mr. Locke about finances.
14         Q.   That all -- that was all
15    done with TASA?
16         A.   I had no conversation with
17    Mr. Locke about finances.
18         Q.   My -- my question was, that
19    was all done with TASA; is that correct?
20         A.   My conversations were --
21    about money were with TASA.
22         Q.   Right.  Your -- your --
23    without telling me the specifics of the
24    conversation, the -- the parameters of
```

39 (Pages 150 to 153)

Jonathan Borak, M.D., DABT

Page 154

1    your engagement, that's -- was --
2    that's -- was with Mr. Locke, correct?
3        A.   By parameters you mean --
4        Q.   Of what you were going to
5    do.
6        A.   We -- we spoke about the --
7    the issue, yes.
8        Q.   Okay.  So, let me just show
9    you what I've marked as Exhibit 30.
10            (Document marked for
11        identification as Exhibit
12        Borak-30.)
13   BY MR. GOLOMB:
14       Q.   And, again, I just saw this
15   for the first time last night, so I don't
16   have copies of it.
17            And we'll take time for
18   everybody to look at this, but it is
19   essentially 30-plus pages of invoices
20   both from TASA and from Jonathan Borak &
21   Company.  And they cover the period of
22   August 24, 2015, through April 10th of
23   2017.  Okay.
24       A.   Okay.

Page 155

1        MR. GOLOMB:  And let's go
2    off the video record, please.
3        MR. LOCKE:  What for?
4        MR. GOLOMB:  So that
5    everybody can look at these
6    invoices.
7        MR. LOCKE:  Well, first, is
8    that a page of this?
9        MR. GOLOMB:  No, this is
10   another page of another exhibit.
11       MR. LOCKE:  Okay.  Let me --
12   I'm not sure that everybody needs
13   to look at it.  Let me explain
14   why.
15       This was produced -- and I
16   say this because you're saying
17   that the first time you saw it was
18   last night.
19       I'm pretty sure that the
20   first portion of this was produced
21   in connection with the New Jersey
22   Atlantic County cases.
23       I think that there was
24   another portion that was produced

Page 156

1    in connection with the Oules
2    litigation.  You know, I'm
3    confident -- I don't believe that
4    every person in this room
5    necessarily was part of all of
6    those.  But many of the parties
7    were here, and in fact I recognize
8    at least two lawyers who were at
9    the earlier deposition, two
10   lawyers for the plaintiffs.
11       So why don't I just sort of
12   briefly pass this around so
13   everybody can see roughly what it
14   is.  But J&J has seen it before.
15   And on -- you can ask him whatever
16   questions you want about it.
17       MR. GOLOMB:  Okay.  That's
18   fine.  I just want to -- just --
19   not that it's really -- it doesn't
20   really matter.  It's -- but
21   it's -- I just want to correct the
22   record.  It was not in the New
23   Jersey litigation.  It was in the
24   D.C. litigation.

Page 157

1        MR. LOCKE:  Okay.  I know --
2    I know that Dr. Borak was offered
3    in the New Jersey litigation.  He
4    drafted and produced a report in
5    that litigation.
6        MR. GOLOMB:  That's fine.
7    BY MR. GOLOMB:
8        Q.   So the other thing that I
9    did last night when I got this is I --
10       MR. GOLOMB:  Can we turn on
11   the Elmo.
12   BY MR. GOLOMB:
13       Q.   I took the bills, and I
14   added them up.  And these are the bills,
15   the monthly bills that you produced from
16   August 24, 2015, through April 10th of
17   2017.  And those bills totaled
18   $289,701.50.
19       MR. LOCKE:  It's sideways
20   for us, and we can't see the
21   bottom.
22   BY MR. GOLOMB:
23       Q.   Well, I'm going to --
24       MR. LOCKE:  Okay.

Jonathan Borak, M.D., DABT

Page 158

1    BY MR. GOLOMB:
2        Q.   There you -- and this is my
3    handwriting. I apologize. And you can
4    see the total there of $289,701.50.
5            And I'm handing you
6    Exhibit 28.
7            (Document marked for
8            identification as Exhibit
9            Borak-28.)
10   BY MR. GOLOMB:
11       Q.   Which is the monthly totals.
12           Is that generally consistent
13   with your recollection of how much you
14   received to act as a consultant in this
15   litigation for that period of time?
16           MR. LOCKE:  Whoa.  Let me
17       just say, when you say this
18       litigation.
19           MR. GOLOMB:  The talc
20       litigation.
21           MR. LOCKE:  Okay.  All of
22       the talc litigation, whether it's
23       MDL, D.C., New Jersey?
24           MR. GOLOMB:  Well, this is

Page 159

1    the talc litigation from your
2    services between August of 2015
3    and April of 2017.
4        THE WITNESS:  I don't have
5    the number specifically in mind.
6    This is not completely out of
7    line.
8    BY MR. GOLOMB:
9        Q.   Okay.  We'll go into more
10   detail about this later. And then,
11   you've also produced additional bills
12   from April of 2017 through February of
13   2019, correct?
14       A.   Probably.
15       Q.   And those bills that are
16   generated are an additional $288,000?
17       A.   Is that right?
18       Q.   Yeah.  We'll go through it.
19   If you want to see that now, we can do it
20   now.
21       A.   No, no, no.  I do -- I'm
22   not -- you can show it to me or you can
23   not. I'm just surprised by that number.
24       Q.   So your -- since August of

Page 160

1    2015, you -- you have received almost
2    $600,000 to serve as an expert in this
3    litigation.
4            MR. HEGARTY:  Objection.
5            MR. LOCKE:  Objection.
6    BY MR. GOLOMB:
7        Q.   Is that correct?
8        A.   I provided a number of
9    consulting services to Mr. Locke. I'm
10   surprised by that number.
11       Q.   All right.  And but that --
12   those consulting services that you
13   provided did not include doing a
14   meta-analysis, because you never did
15   that, correct?
16           MR. LOCKE:  Objection.
17           THE WITNESS:  I did not do a
18       meta-analysis.
19   BY MR. GOLOMB:
20       Q.   You certainly didn't conduct
21   a case-control study of your own,
22   correct?
23       A.   I did not conduct a
24   case-control study of my own.

Page 161

1        Q.   You didn't conduct a cohort
2    study certainly?
3        A.   I did not perform a cohort
4    study of my own.
5        Q.   And you didn't perform a
6    Bradford Hill analysis?
7        A.   I did not undertake a
8    Bradford Hill analysis.
9        Q.   Okay.  And we can go through
10   the specifics of what other experts who
11   in fact did do a meta-analysis, in fact
12   did do a Bradford Hill analysis in this
13   case, looked at data in which ways that
14   you never looked at that data, who got a
15   fraction of what you received in this
16   case.  Were you aware of that?
17           MR. HEGARTY:  Objection.
18           MR. LOCKE:  Objection.
19           THE WITNESS:  Not
20       specifically.
21   BY MR. GOLOMB:
22       Q.   Okay.  You've indicated in
23   the attachments to your report that you
24   read the depositions of Dr. Siemiatycki.

41 (Pages 158 to 161)

Jonathan Borak, M.D., DABT

Page 162

```
 1    You've read the deposition of
 2    Dr. Smith-Bindman.  You read the
 3    deposition of Dr. Singh.  You read the
 4    deposition of Dr. McTiernan.  Do you
 5    remember that?
 6        A.   Yes.
 7        Q.   Okay.  And so -- and those
 8    various experts who did do meta-analysis,
 9    who did Bradford Hill, they, combined,
10    didn't receive what you received in this
11    case.
12            MR. LOCKE:  Objection.
13            MR. HEGARTY:  Objection.
14    BY MR. GOLOMB:
15        Q.   Are you aware of that?
16            MR. LOCKE:  Objection.
17            MR. HEGARTY:  Objection.
18            THE WITNESS:  I'm not aware
19    of it.  I'm not aware that they
20    worked as long, as many years on
21    the issue.
22    BY MR. GOLOMB:
23        Q.   You're not aware whether
24    they worked as -- the number of years?
```

Page 163

```
 1        A.   Yes.
 2            MR. GOLOMB:  That's the
 3    original of 28.
 4            And this is the original of
 5    30.
 6    BY MR. GOLOMB:
 7        Q.   Let's take a look at your
 8    report.  But let me just ask you this.
 9    So first of all, when did you first learn
10    that you were going to be deposed in this
11    case?
12            MR. LOCKE:  When you say
13    this case, are you talking about
14    the MDL?
15            MR. GOLOMB:  In the MDL.
16            THE WITNESS:  I don't
17    recall.
18    BY MR. GOLOMB:
19        Q.   Well, was it a month ago,
20    two months ago, three months ago?
21        A.   At some point I was asked to
22    provide available dates to Mr. Locke.
23        Q.   Okay.  Well, your report was
24    dated February 25th, correct?
```

Page 164

```
 1        A.   That's correct.
 2        Q.   All right.  And so, while
 3    you may have known that you were going to
 4    be -- we -- well, strike that.
 5            The -- the -- without
 6    telling me the specifics of the
 7    conversation, were you aware that you
 8    were going to be deposed before you
 9    produced your report?
10            And I don't mean that you
11    were going to be deposed before you
12    produced the report, but before you
13    produced the report, at some time in the
14    future, you were going to be deposed?
15        A.   I expected that it was a
16    possibility.
17        Q.   And had you already provided
18    dates for the deposition before your
19    report was actually produced?
20        A.   It is possible that I was
21    told the time span when it might happen,
22    but I don't recall the particulars.
23        Q.   And what -- with whom -- I
24    don't want to know the specifics of any
```

Page 165

```
 1    conversation.  But I just want to know
 2    who it was that you had the -- the first
 3    conversation with about your deposition
 4    here today.
 5        A.   You mean today's deposition?
 6        Q.   Yeah.
 7        A.   It was most probably with
 8    Mr. Locke, but I don't recall.
 9        Q.   And was that in -- by phone
10    or in person?
11        A.   It would have been by phone,
12    probably.
13        Q.   And did you -- was -- how
14    long did that conversation last?
15        A.   I have no recall.
16        Q.   Okay.  Is that something you
17    would have billed for?
18        A.   Probably not.  But I don't
19    know.
20        Q.   If you had a -- do you
21    understand what I mean if I -- if I refer
22    to a conversation as -- to discuss
23    logistics versus substance?
24        A.   I sort of know what you
```

42 (Pages 162 to 165)

Jonathan Borak, M.D., DABT

Page 166

1    mean, but I'm not sure that I do.
2        Q.   Okay.  Logistics, they want
3    to take your deposition, why don't you
4    look at your calendar, get me some dates,
5    I'll get -- and get back to me.
6        A.   That's logistics.
7        Q.   That's logistics.
8        A.   Okay.
9        Q.   Dates is talking about the
10   substance of -- your deposition
11   testimony, what they may ask, what you
12   should review?
13       A.   And that's an example of?
14       Q.   That's substance.
15       A.   Substance, okay.
16       Q.   Okay?
17       A.   Yes.
18       Q.   So if you had a -- if you
19   had a logistics question, is that
20   something that you would bill for?
21       A.   No.
22       Q.   If you had a substance
23   question, is that something you would
24   bill for?

Page 167

1        A.   It would depend on --
2        Q.   I'm sorry, a substance
3    conversation.
4        A.   It would depend upon the
5    length of time and whether it required
6    preparation.
7        Q.   Okay.  How many
8    conversations, either by phone or in
9    person, did you have to prepare for your
10   deposition?
11       A.   I don't recall a specific
12   number.
13       Q.   Generally.
14       A.   Mr. Locke was in New Haven
15   for two half days.  And we may have
16   spoken another two or three times.  I
17   spoke with him last night, but that was
18   largely to say are you comfortable.
19       Q.   The -- the two in -- the two
20   in-person meetings, where did they take
21   place?
22       A.   In my office.
23       Q.   And who was there?
24       A.   Me and he.

Page 168

1        Q.   Anybody else?
2        A.   Well, not participating in
3    that meeting.
4        Q.   Okay.  You hesitated.  What
5    do you mean?
6        A.   I -- well, I mean, my
7    librarian was there, my office manager,
8    people like that, that's not what you're
9    asking me.  My wife came in at some point
10   and said hello to him.
11       Q.   Okay.  Did any of those
12   other people participate in the substance
13   of the meeting?
14       A.   No.
15       Q.   All right.  And how long did
16   the -- the telephone conversations take
17   place?
18       A.   I specifically do not
19   remember.
20       Q.   Is -- would you have billed
21   for those conversations?
22       A.   If they were short
23   conversations, no.  If Mr. Locke said I'd
24   like to talk to you for an hour or two

Page 169

1    hours, then yes.
2        Q.   Did you have hour,
3    two-hour-long conversations with
4    Mr. Locke?
5        A.   It's possible, but I don't
6    specifically remember.
7        Q.   Okay.  Now, when you -- when
8    you looked at, as brief as it was, when
9    you looked at the bills pre April of
10   2017, you can see that there are not only
11   TASA bills, but bills from Jonathan
12   Borak & Company, correct?
13       A.   I haven't looked, but I
14   accept what you say.  I don't
15   understand -- that looked more like mine.
16            Okay.  Yes, I see some that
17   look like they are mine.  I...
18       Q.   Now, have you ever -- have
19   you ever seen those TASA bills before
20   June 8, 2017, when Mr. Green took your
21   deposition?
22       A.   No.
23       Q.   Okay.  Have you seen the
24   TASA bills post April of 2017?

43 (Pages 166 to 169)

Jonathan Borak, M.D., DABT

Page 170

1    A.   Not until you put them here
2  on the table.
3    Q.   Okay.  And I would assume,
4  correct me if I am wrong, that like that,
5  that period of time from 2015 through
6  April of 2017, that since 2017, there are
7  also Jonathan Borak & Company, bills?
8    A.   Yes.
9    Q.   Okay.  They haven't been
10  produced to us.
11    MR. LOCKE:  That's
12  incorrect.
13    MR. GOLOMB:  When were they
14  produced?
15    MR. LOCKE:  Last week after
16  we got your notice of deposition.
17    MR. GOLOMB:  Okay.  Who were
18  they produced to?
19    MR. LOCKE:  Mr. Green.  And
20  Leigh O'Dell, Michelle Parfitt.
21    MR GOLOMB:  Okay.
22    MR. LOCKE:  And a handful of
23  other -- Chris Tisi.
24    MR. GOLOMB:  All right.

Page 171

1  Well, during a break we'll -- I
2  have not seen those bills.  And so
3  I have the TASA bills from
4  April 26, 2017, through
5  February 25, 2019.
6  BY MR. GOLOMB:
7    Q.   Have you generated a bill
8  since 2 -- since February 25, 2019?
9    A.   I don't think so, but I
10  don't know.
11    Q.   Okay.  Do you know how many
12  hours you spent in the -- in the month of
13  March on the -- on this -- on the talc
14  litigation?
15    A.   The first two weeks of March
16  I actually was on vacation.  So that
17  immediately truncates the month.
18    I spent two -- I mean, there
19  were these two days in which Mr. Locke
20  was in New Haven.  And I probably put in
21  a day prior to that.  And I put in some
22  time in preparation for today.  I don't
23  know how much that is.
24    Q.   Okay.  So you had -- there

Page 172

1  were two meetings and three or so phone
2  conversations?
3    A.   That sounds right.  I mean,
4  about that.
5    Q.   Okay.  So let -- let's take
6  a look at your report which we've marked
7  as Exhibit 7.
8    (Document marked for
9  identification as Exhibit
10  Borak-7.)
11    THE WITNESS:  Thank you.
12  BY MR. GOLOMB:
13    Q.   And this is a two-sided copy
14  of your report Pages 1 through 13, which
15  is the -- on Page 13, is your -- your
16  signature?
17    MR. HEGARTY:  Mine goes 1
18  through 14.
19    MR. LOCKE:  Yeah, it goes
20  through 14, and it --
21    MR. GOLOMB:  Well, it's
22  two-sided because -- so it goes on
23  to the next attachment.  But
24  the -- the report is Pages 1

Page 173

1  through 13.
2    MR. LOCKE:  Okay.  You are
3  not including the reference
4  list and --
5    MR. GOLOMB:  I'm not
6  including the reference list.
7  That's a separate exhibit.
8    THE WITNESS:  Yes, that
9  looks like my handwriting.
10  BY MR. GOLOMB:
11    Q.   All right.  And did you
12  prepare the report yourself?
13    A.   Yes, mostly.  I also made
14  the mistake myself.
15    Q.   When you say yes mostly,
16  what do you mean?
17    A.   I probably had somebody in
18  my office review it for typos and -- and
19  other things like that.  But I did the
20  writing.
21    Q.   And did -- did you write
22  every word of it?
23    A.   To the best of my knowledge.
24    Q.   Were there drafts?

44 (Pages 170 to 173)

Jonathan Borak, M.D., DABT

Page 174

1    A.   It's an ongoing process.  I
2  don't write it in one sitting so that
3  from day-to-day it continues.
4    Q.   Okay.  So from day-to-day,
5  it may continue from -- and I'm being
6  very simplistic about this, but it may
7  continue from Page 1 to Page 2 to Page 3
8  until you ultimately get to your
9  conclusions on Page 13, correct?
10    A.   Yes, that's right.
11    Q.   And how long does that
12  process take?
13    A.   Weeks.  I don't know the
14  answer.  It depends upon -- you're saying
15  for this report or for a report when I
16  write one?
17    Q.   In this report.
18    A.   This report began with a
19  previous report and was then extended out
20  in time, and much of the process of
21  preparing this report was not physically
22  preparing the report, but keeping up with
23  the literature on a monthly basis to see
24  whether anything had changed and what had

Page 175

1  accumulated.
2    Q.   Okay.
3    A.   So if you're asking me how
4  long did it take to write this
5  physically, that's in some number of
6  hours.  But it was a lot of time spent in
7  determining what I was going to write.
8  And part of it, just so you understand my
9  process, is that I have a librarian who
10  pulls the literature monthly on talc,
11  talc and cancer, ovarian cancer, and I
12  get summaries of the literature from the
13  National Library of Medicine.  You've
14  used this also, I'm sure.  And I go
15  through them and I determine anything
16  that seems as though it might be relevant
17  to answering the question that I was
18  originally asked.
19    Q.   Now, you said that your
20  librarian pulls the talc-related
21  literature.
22    A.   She does not choose the
23  literature to pull.  She does the
24  physical process of it.  She provides me

Page 176

1  a list.  One will be a printout that
2  says, "Ovarian cancer, January, 2019."
3  It may be 600 articles.
4    Q.   Okay.  But that's -- my
5  point is, that's something that started
6  after you were retained as a consultant
7  in this case.  That's not something --
8    A.   Oh, yes.  I was not --
9    Q.   Let me just finish the
10  question --
11    A.   Sorry.  You're right.
12    Q.   -- for the court reporter.
13  That's not something that you did before
14  you were acting as a paid consultant in
15  this case, correct?
16        MR. LOCKE:  Objection.
17        MR. HEGARTY:  Objection.
18        THE WITNESS:  I did not do
19     that prior to becoming involved in
20     this case, not this case, in the
21     subject.
22  BY MR. GOLOMB:
23    Q.   In the -- in the talc
24  litigation.

Page 177

1    A.   In the subject of talc.  To
2  the best of my recollection, sir, I was
3  not specifically retained in a
4  litigation.  I was initially involved in
5  the issue of talc.
6    Q.   Okay.  And so -- but my
7  point is, is that your instruction to
8  your librarian to start this list and
9  pulling this literature did not happen
10  before April of -- May of 2015 when you
11  were first contacted to work as a
12  consultant in this case.
13    A.   Yes, I think that's correct.
14    Q.   All right.
15    A.   But the answer to your
16  question was how long it takes to write
17  this.  And I was explaining that on a
18  monthly basis, I go through this
19  literature, which is germane to this
20  report.  And on a monthly basis, I note
21  that which would be added to update the
22  report.  And so this has been a living
23  document.  And I can't give you a simple
24  answer as to whether it was 14 hours or

45 (Pages 174 to 177)

Jonathan Borak, M.D., DABT

Page 178

1    22 hours.  It was hours, including a lot
2    of time reading.
3         Q.   Let me just ask you a
4    question.  Going back to your CV, your CV
5    says, "2007 to 2017, clinical professor
6    of epidemiology and public health,"
7    correct?
8         A.   Yes.
9         Q.   And then it says from 2008
10   to current, clinical professor of
11   medicine, Yale University, correct?
12        A.   Yes.
13        Q.   It also says 2003 to
14   current, adjunct associate professor of
15   medicine, correct?
16        A.   At Johns Hopkins.
17        Q.   At Johns Hopkins.
18        A.   Yes.
19        Q.   Right.  And you told me
20   earlier in answer to a question that
21   you're no longer a clinical professor of
22   epidemiology at Yale, and you explained
23   that there was --
24        A.   Yes.

Page 179

1         Q.   -- some conflict with the
2    chairman or something?
3         A.   Yes.
4         MR. LOCKE:  First, let me
5    interpose an objection because you
6    missed a portion, but go ahead.
7         MR. GOLOMB:  Well, for
8    completeness's sake, what portion
9    did I miss.
10        MR. LOCKE:  Faculty member
11   of the Yale occupational
12   environmental medicine program.
13        MR. GOLOMB:  And you're
14   looking where?
15        MR. LOCKE:  In the first
16   paragraph that you're referring to
17   in his report.
18        MR. GOLOMB:  I'm not looking
19   at his report.  I'm looking at his
20   CV.
21        MR. LOCKE:  Okay.  I thought
22   you were comparing his report and
23   his CV.
24        MR. GOLOMB:  No.  Right now

Page 180

1    I'm asking him about his CV, to
2    confirm what his position is.
3         MR. LOCKE:  Okay.  What is
4    the question?
5    BY MR. GOLOMB:
6         Q.   So -- well, the question --
7    the question now is, for whatever reason,
8    this dispute with this chairman, you're
9    no longer a clinical professor of
10   epidemiology at Yale?
11        MR. LOCKE:  Objection.
12        You can answer.
13        THE WITNESS:  Yes.  I told
14   you a moment ago that I was
15   responsible for the paper, and I
16   was responsible for the mistake.
17   You didn't follow that.
18        The mistake was that I
19   carried over from an earlier
20   report that I was currently
21   clinical professor of epidemiology
22   and public health.
23   BY MR. GOLOMB:
24        Q.   So the mistake was that in

Page 181

1    the very first sentence of the report, in
2    a consultingship that you have been paid
3    almost $600,000 for, you identified
4    yourself as a clinical professor of
5    epidemiology, when in fact you're not.
6    That's the mistake?
7         MR. LOCKE:  Objection.
8         Objection.
9         THE WITNESS:  I provided my
10   CV correctly.  I did not even see
11   that when I read it 12 times.  And
12   it is my mistake.
13   BY MR. GOLOMB:
14        Q.   But you typed it?
15        A.   That was not typed.  That
16   was carried over from an earlier report.
17   That was my laziness of mind.  And I'm
18   responsible for that.
19        Q.   So let me understand what
20   you mean by carried over.  Do you mean
21   cut and paste?
22        A.   I had written an earlier
23   report, you're aware --
24        Q.   Right.

Jonathan Borak, M.D., DABT

Page 182

1      A.   -- which resembles much of
2   what is in this structure.
3      Q.   What do you -- define
4   "resemble."
5      A.   If you follow through many
6   of the paragraphs, it is laid out
7   similarly.  And the previous report was
8   something that I, on a monthly basis,
9   would update.  And so I had monthly, or
10  bimonthly or whatever, revisions of a
11  report that I had once written.
12     Q.   Right.
13     A.   And in the context of doing
14  it that way, I never looked back at that
15  first paragraph.  And it's my mistake.
16     Q.   All right.  And by
17  "resemble," would you agree that a -- two
18  reports that are over 85 percent
19  word-for-word verbatim the same, resemble
20  each other?
21        MR. LOCKE:  Objection.
22        MR. HEGARTY:  Objection.
23        THE WITNESS:  Yes, I would
24     say that.

Page 183

1   BY MR. GOLOMB:
2      Q.   All right.  And so I'm still
3   trying to understand what you mean by --
4   when you say in the very first paragraph,
5   where you identify yourself as a clinical
6   professor of epidemiology, when in fact
7   you're not a clinical professor of
8   epidemiology, what you are talking about
9   in this transition from the first report
10  to the second report.  And so let me ask
11  you a very specific question.
12        This report dated
13  February 25, 2019, which has been --
14  which has been marked as Exhibit 7, did
15  you type this report yourself?
16        MR. HEGARTY:  Objection.
17        THE WITNESS:  This comes off
18     my computer, yes.
19  BY MR. GOLOMB:
20     Q.   Okay.  Do you know what I
21  mean when I say cut and paste?
22        MR. LOCKE:  Objection.
23        THE WITNESS:  I understand
24     the phrase.  This was not cut and

Page 184

1   pasted.  This was a revision of an
2   earlier report.
3   BY MR. GOLOMB:
4      Q.   Okay.  When you say this
5   is -- so the record is clear, when you
6   say, "This is a revision of an earlier
7   report," this is the report of
8   February 25, 2019?
9      A.   Correct.
10     Q.   The earlier report is the
11  report in Oules?
12        MR. LOCKE:  Objection.
13        MR. HEGARTY:  Objection.
14  BY MR. GOLOMB:
15     Q.   Well, that we -- that we've
16  generally described as the Oules report
17  that -- when you were involved back in --
18  beginning in 2015.
19        MR. LOCKE:  Objection.
20     Again, it's actually from the New
21     Jersey, Atlantic County
22     litigation.  There was the first
23     report, and then there was a
24     second report for Oules.

Page 185

1        Or I think she pronounced
2        her name Oules, but I'm not sure.
3   BY MR. GOLOMB:
4      Q.   You were -- you were deposed
5   in the Oules case, correct?
6      A.   Yes, I think that's correct.
7      Q.   All right.  And you authored
8   a report in the Oules case?
9      A.   Yes, I think that's correct.
10     Q.   And the Oules report is
11  dated January 17, 2017.  Is that
12  consistent with your recollection?
13     A.   I don't doubt it.
14     Q.   Okay.  And in the -- in the
15  first paragraph of the Oules report,
16  you -- you wrote verbatim, "I am" -- "I
17  am a clinical professor of epidemiology
18  and public health, et cetera, et cetera."
19        And it is word for word what
20  you wrote in the February 25, 2019,
21  report in the MDL.
22     A.   What I just told you earlier
23  was that I took an earlier report, it may
24  have been the Oules report, and I was

47 (Pages 182 to 185)

Jonathan Borak, M.D., DABT

Page 186

1    updating it as I read over several years.
2    I never went back and redid that first
3    paragraph, because I never even looked at
4    it. That's my mistake.
5        Q.   And I'm not -- I'm -- I'm
6    sorry. I didn't mean to interrupt.
7            And I'm trying to figure
8    out, and this -- this is what, my words,
9    you seem to be dancing around.
10           And that is, how you updated
11   the report. You either typed it -- or
12   you said it's on your computer. But you
13   either typed it on your computer or you
14   lifted that paragraph from the earlier
15   report, Paragraph Number 1, identifying
16   yourself as a clinical -- professor of
17   epidemiology, and lifted it and put it in
18   Paragraph 1 of this report dated
19   February 2019.
20       A.   I did neither --
21           MR. LOCKE:  Objection.
22           MR. HEGARTY:  Objection.
23           THE WITNESS:  I did neither.
24   BY MR. GOLOMB:

Page 187

1        Q.   So, what did you do?
2        A.   I -- I typed this in
3    whenever it was, you are giving me a date
4    from 2015. And that is the paragraph
5    from 2015.
6            And I have just continued
7    revising that report in a Word file. And
8    what I'm telling you is mistakenly, I
9    never went back and changed that first
10   line. I feel like an idiot. You don't
11   have to beat me into feeling worse than I
12   feel about myself.
13           What I did was a stupid and
14   as trivial as anything that I can
15   imagine. I gave you my full and correct
16   CV. And I give you my apology for
17   misleading you by the stupidity of mine.
18       Q.   Okay. Well, you understand
19   that you're going to be subject to a
20   Daubert challenge in this case, right?
21           MR. LOCKE:  Objection.
22           MR. HEGARTY:  Objection.
23           THE WITNESS:  I don't know
24   that that's correct, but I'm not

Page 188

1    surprised by you.
2    BY MR. GOLOMB:
3        Q.   Okay. Take my word for it.
4        A.   Thank you.
5            MR. HEGARTY:  Objection.
6            MR. LOCKE:  Good luck.
7    BY MR. GOLOMB:
8        Q.   And -- and you understand
9    that part of -- part of the challenge is
10   your qualifications, correct?
11           MR. HEGARTY:  Objection.
12           MR. LOCKE:  Objection.
13           THE WITNESS:  I didn't know
14   that that was part of the Daubert
15   challenge.
16   BY MR. GOLOMB:
17       Q.   I'm just asking you a simple
18   yes or no question.
19           MR. LOCKE:  He didn't know.
20   He answered it.
21   BY MR. GOLOMB:
22       Q.   You -- you understand that
23   that -- that's part of the -- that
24   qualifications is part of the judge's

Page 189

1    consideration as to whether or not she
2    should allow you to testify as an
3    epidemiologist in front of a jury?
4            MR. HEGARTY:  Objection.
5            MR. LOCKE:  Objection.
6            THE WITNESS:  I -- I don't
7    know that's part of the four legs
8    of the Daubert decision. But
9    maybe it is.
10   BY MR. GOLOMB:
11       Q.   The four legs of a Daubert
12   decision? What's your understanding as
13   to what the four legs?
14       A.   Have to do with methodology
15   and -- and --
16           MR. HEGARTY:  Objection.
17           MR. LOCKE:  Objection. If
18   you want his legal opinion --
19           MR. GOLOMB:  No. I want
20   to -- he's -- he used the phrase,
21   not me. The four legs --
22           THE WITNESS:  It's your --
23           MR. GOLOMB:  Excuse me.
24   He used the phrase four legs

48 (Pages 186 to 189)

Jonathan Borak, M.D., DABT

Page 190

1    of a Daubert decision.
2    BY MR. GOLOMB:
3        Q.   And I just want to know what
4    your understanding is of the four legs of
5    a Daubert decision.
6        A.   I -- I have read that there
7    are criteria that are used in determining
8    whether an expert's testimony will be
9    permitted.
10       Q.   Okay.
11       A.   And that is based upon the
12   methodology.
13       Q.   And is that your -- only
14   methodology?
15       A.   I'm sorry?
16       Q.   Is it only methodology?
17           MR. LOCKE:  Objection.
18           MR. HEGARTY:  Objection.
19           THE WITNESS:  That is my
20       understanding, but I'm just a
21       country doctor.
22   BY MR. GOLOMB:
23       Q.   Okay.  So let -- let's talk
24   about your methodology in this case.

Page 191

1    So -- and for ease of reference, so we
2    don't have to have this back and forth.
3    Well, when -- when I talk about the --
4    the earlier report and your work before
5    the MDL, I'll refer to it as Oules, okay?
6           Can we agree on that?
7        A.   So Oules represents anything
8    that I did on talc prior to the MDL.
9        Q.   Correct.
10       A.   I'll accept that as a
11   nickname.
12           MR. LOCKE:  Well, I'm -- I'm
13       going to object, but --
14   BY MR. GOLOMB:
15       Q.   And that's a good way to put
16   it.  We'll call it -- we'll use it as a
17   nickname.  And anything post -- anything
18   that you've done for the MDL, we'll call
19   the MDL.
20           You with me?
21       A.   I am.
22           Let me ask you a question
23   for clarity.  What if I did something
24   during the time of the MDL that wasn't

Page 192

1    relevant to the MDL?
2        Q.   So -- well, I'm -- I'm using
3    it as a -- well -- well, okay.  That's a
4    fair question.  And we'll -- what we'll
5    do is we're going to -- we'll try to get
6    a date.  Okay?
7        A.   Try to get a what?
8        Q.   We'll try to fix a date.
9        A.   A date?
10       Q.   Yeah.
11       A.   Okay.
12       Q.   All right.  So you authored
13   your report in the Oules case on
14   January 17, 2017?
15       A.   I accept that as your
16   statement.
17       Q.   You were deposed in the
18   Oules case on June 8, 2017?
19       A.   Again, I accept that as
20   correct.  I don't know.
21       Q.   You authored your report.
22   February 25, 2019?
23       A.   Okay.
24       Q.   When did you first learn

Page 193

1    that you were going to be serving as an
2    expert in the MDL?
3        A.   I don't remember.
4        Q.   Was it before or after you
5    testified in June of 2017 in the Oules
6    case?
7        A.   I imagine it was after, but
8    I don't -- I don't remember specifically.
9        Q.   Okay.  So we'll go back to
10   your -- your -- I want to talk about your
11   methodology.  All right?
12           And so your -- the first
13   thing that you did when you first got
14   involved in the talc litigation was to --
15   to pull -- to pull the literature?
16       A.   Was that your question?
17           MR. HEGARTY:  Objection.
18   BY MR. GOLOMB:
19       Q.   Yeah.
20       A.   Yes.  The first thing I did
21   after my conversations was to read about
22   talc, about talc and ovarian cancer.
23       Q.   And as a -- as a -- as an
24   expert and as a professor, you want to

Jonathan Borak, M.D., DABT

Page 194

1  know before you review that literature,
2  you want to know what your role is going
3  to be, correct?
4          MR. LOCKE:  Objection.
5          THE WITNESS:  I don't
6      understand your question.
7  BY MR. GOLOMB:
8      Q.   You wanted to know why you
9  were serving as an expert?
10         MR. LOCKE:  Objection.
11         MR. HEGARTY:  Objection.
12         THE WITNESS:  I think it was
13     clear to me that there was a
14     factual question regarding whether
15     or not talc caused ovarian cancer.
16  BY MR. GOLOMB:
17     Q.   But that's not the question
18  that you ultimately answered.
19     A.   That I understood, however,
20  from the very beginning that there was
21  that question.  And then as I explained
22  in my report -- and I -- just to make it
23  as clear as possible, I was asked --
24     Q.   Tell me what page you are

Page 195

1  referring to.
2      A.   I'm on -- looking on Page 2.
3  I was asked by Mr. Locke, this
4  good-looking guy next to me, to review
5  the published and peer-reviewed
6  scientific literature --
7      Q.   What paragraph are you
8  reading?
9      A.   Eight.  I'll do it again.
10     "I was asked by Tom Locke to
11  review published and peer-reviewed
12  scientific literature relative to the
13  alleged association between perineal use
14  of talc-containing powders and ovarian
15  cancer.  I was specifically asked to
16  analyze the above materials from a
17  chronological perspective in order to
18  evaluate whether, when, and by whom it
19  had been determined that perineal use of
20  talc-containing powder causes ovarian
21  cancer."
22     Q.   Okay.  And when you say by
23  whom it has been determined, you're
24  talking about in the existing literature,

Page 196

1  correct?
2          MR. LOCKE:  Objection.
3          THE WITNESS:  I said that I
4      was asked to review the published
5      and peer-reviewed scientific
6      literature.
7  BY MR. GOLOMB:
8      Q.   Right.  And so -- and I just
9  want to be clear, and I think you've
10  answered this question at least once
11  already.
12         To be clear, you were asked
13  to -- not to determine whether or not
14  talc causes ovarian cancer or whether it
15  may cause ovarian cancer.  You were asked
16  simply to comment on what the state of
17  the literature was as of the date that
18  you wrote the report?
19         MR. HEGARTY:  Objection.
20         MR. LOCKE:  Objection.
21  BY MR. GOLOMB:
22     Q.   Is that correct?
23     A.   I was asked to evaluate,
24  whether, when, and by whom it had been

Page 197

1  determined.
2      Q.   Okay.  Which is just another
3  way of saying what I just said, correct?
4          MR. LOCKE:  Objection.
5          THE WITNESS:  I think it's a
6      little different.
7  BY MR. GOLOMB:
8      Q.   Okay.  And that's why you
9  didn't do your own meta-analysis, and
10  that's why you didn't do a Bradford Hill
11  analysis, because that wasn't relevant to
12  the question that was being asked of you?
13         MR. LOCKE:  Objection.
14         MR. HEGARTY:  Objection.
15         THE WITNESS:  It was not
16     necessary.
17  BY MR. GOLOMB:
18     Q.   Right, because that's not
19  what was being asked of you?
20     A.   I was asked to do something
21  different, yes.
22     Q.   Right.  So going back to the
23  earlier report, after you understood what
24  your job was --

50 (Pages 194 to 197)

Jonathan Borak, M.D., DABT

Page 198

1    A.   The earlier report?
2    Q.   Yeah, the January 2017
3  report.
4    A.   Okay.
5    Q.   You now -- the first thing
6  you do is to review the literature?
7         MR. LOCKE:  Objection.
8         THE WITNESS:  I'm sorry.
9         When is that?
10 BY MR. GOLOMB:
11   Q.   Before you wrote your report
12 in January of 2017.
13   A.   I read literature at the
14 very beginning of this project.
15   Q.   Right.  And you -- the
16 literature as it relates to this issue of
17 the causal link or the association
18 between talc and ovarian cancer goes back
19 to 1972, correct?
20        MR. HEGARTY:  Objection.
21        MR. LOCKE:  Objection.
22        THE WITNESS:  It may have
23        even gotten back in conversation
24        before that, but somewhere like

Page 199

1        that.
2  BY MR. GOLOMB:
3    Q.   And when you say in
4  conversation, what conversation are you
5  referring to?
6    A.   I don't know.  But I'm just
7  saying that I don't think it was born
8  anew in 1972.
9    Q.   Okay.  Now, you raised the
10 issue.  Let me ask you a question about
11 pre-1972.
12        If I understand correctly
13 from the various attachments to your
14 report, you have never looked at any
15 company documents.  By company documents,
16 I mean company documents from Johnson &
17 Johnson, company documents from Imerys or
18 any of their predecessors, company
19 documents from the Personal Care -- PCPC.
20 I don't remember what it stands for
21 anymore.
22        MR. HEGARTY:  Products
23        Council.
24        MR. GOLOMB:  Products

Page 200

1  Council.  Thank you.
2  BY MR. GOLOMB:
3    Q.   You didn't -- you never
4  reviewed any of those internal documents,
5  correct?
6         MR. LOCKE:  Objection.
7         MR. HEGARTY:  Objection.
8         THE WITNESS:  I think that's
9         correct.
10 BY MR. GOLOMB:
11   Q.   All right.  So when you talk
12 about pre-1972 literature, you're not
13 talking about internal documents that
14 maybe in 1965 identified a potential
15 problem for them?
16        MR. LOCKE:  Objection.
17        MR. HEGARTY:  Objection.
18        THE WITNESS:  I was not
19        doing that.
20 BY MR. GOLOMB:
21   Q.   Okay.  And so when you said
22 there was conversation, there may have
23 been conversation before 1972 about it,
24 what are you referring to?

Page 201

1    A.   I'm just speculating, and I
2  shouldn't speculate.
3    Q.   Okay.  So take me through
4  what it is that you do before you're
5  ready to -- ready to write your report.
6    A.   Could you be more specific?
7  Do what I do?  What do you mean?
8    Q.   You get an assignment.
9  You've had whatever introductory
10 conversations you've had with Mr. Locke.
11 You know what your job is.  You've got a
12 fee agreement with TASA.  And that is
13 somewhere in mid-2015, correct?
14        MR. HEGARTY:  Objection.
15        MR. LOCKE:  Objection.
16        THE WITNESS:  Maybe.
17 BY MR. GOLOMB:
18   Q.   And then in January of 2017
19 you write -- you sign off on a report?
20   A.   Yes.
21        MR. LOCKE:  Objection.
22 BY MR. GOLOMB:
23   Q.   And my question is, what do
24 you do in between?

51 (Pages 198 to 201)

Golkow Litigation Services - 877.370.DEPS

Jonathan Borak, M.D., DABT

Page 202

1    A.   Read a lot.
2    Q.   So what do you read?
3    A.   What did I do?
4         I probably began with the
5    2010 IARC report and the land -- I'm long
6    enough this morning that my memory is
7    starting to become a little bit --
8    Langseth, which was a meta-analysis by
9    members of that IARC committee.  And I
10   would have pulled most of the literature
11   that seemed specific to ovarian cancer,
12   and I would have read them.
13        Then what I discovered was I
14   was looking at a large number of
15   case-control studies.  By then there were
16   more than 20, maybe 25.  And so I
17   actually engaged somebody working for me
18   to build a table of them so that I could
19   keep them straight because otherwise it
20   became a memory game.
21        And the issue of concern to
22   me was which of the variety of
23   confounders and other factors were
24   considered and how had they been

Page 203

1    considered and how did those various
2    20-plus studies, how were they similar or
3    different.  I needed to know that before
4    I could probably read the determinations
5    made by IARC and Langseth and others.
6         And then I did the same
7    thing with literature that was on the
8    cohort studies, which of course was
9    easier because initially there were only
10   one or maybe two.
11        And then along the way, I
12   became intrigued to understand more about
13   the chemistry of talc and its biological
14   activities, and I read about that.
15        And as I did those various
16   things, I looked for statements which
17   said whether talc caused ovarian cancer
18   and when and by whom it was said, if it
19   had been said.
20        And that was the large piece
21   of what I was doing, but some of it
22   required some understanding of what these
23   various people were writing about.
24   Q.   And then in -- and then in

Page 204

1    your report of -- in your ten-page report
2    of January 17, 2017, you concluded,
3    "Accordingly, it is my opinion to a
4    reasonable degree of scientific certainty
5    that whether genital talc causes ovarian
6    cancer remains uncertain and unproven,"
7    correct?
8         MR. LOCKE:  Objection.  Go
9    ahead.
10        THE WITNESS:  I -- I may
11   have written that.  I --
12   BY MR. GOLOMB:
13   Q.   Okay.  Well --
14   A.   You can show it to me if
15   you'd like.
16   Q.   Yeah, why don't we take a
17   look at Exhibit 19.
18        MR. GOLOMB:  We've been
19   going about an hour and a half
20   now.
21        MR. LOCKE:  Well, we're
22   going to have lunch out there in
23   20 minutes or less.  So do you
24   want to continue till then and

Page 205

1    then we'll take a lunch break?
2         MR. GOLOMB:  Yeah, that's
3    fine.
4         THE WITNESS:  Thank you.
5         (Document marked for
6    identification as Exhibit
7    Borak-19.)
8    BY MR. GOLOMB:
9    Q.   Do you recognize this
10   report?
11   A.   Yes.
12        MR. LOCKE:  I just want to
13   be clear.  Unlike Exhibit 7, this
14   report includes a number of
15   attachments that Dr. Borak also
16   had with -- and when I say this
17   report, this Exhibit 19 includes a
18   number of attachments that
19   Dr. Borak also prepared for his
20   report, which is Exhibit 7 but are
21   not included with Exhibit 7.
22        MR. GOLOMB:  Right.  And
23   as -- the attachments to
24   Exhibit 7, which is the MDL

52 (Pages 202 to 205)

Jonathan Borak, M.D., DABT

Page 206

```
 1          report, I have separated, so that
 2          there are a number of follow-up
 3          exhibits we just haven't gotten
 4          to.
 5              MR. LOCKE:  Okay.
 6      BY MR. GOLOMB:
 7          Q.   So the January 17th report
 8      on Page 10.  That's your signature?
 9          A.   It's marked 17.  You said
10      January just now.
11          Q.   Well, let's go to Page 10.
12      I have a question about that.
13          A.   Oh, interesting.
14          Q.   Right.
15          A.   Same sloppiness.  Okay.
16              MR. LOCKE:  It's actually a
17          supplemental report, but...
18      BY MR. GOLOMB:
19          Q.   Well, let -- let's take one
20      thing at a time.  Page 10, that's your
21      signature?
22          A.   Yes, sir.
23          Q.   All right.  And on Page 1 at
24      the top of the page it says, "Report of
```

Page 207

```
 1      Jonathan Borak, M.D., D.A.B.T.,
 2      January 17, 2017," correct?
 3          A.   Yes.  And it was clearly
 4      revised 3/10/17.
 5          Q.   And --
 6          A.   And that is noted at the --
 7      at the bottom, as well as on the
 8      signature.  At the footer of the first
 9      page it has the corrected date.
10          Q.   Well, on Page 10, next to
11      your signature, it says March 10, 2017.
12          A.   Yes.  And that's what it
13      says in the footer on Page 1.
14          Q.   It says what?
15          A.   "Borak report, 3/10/17."
16          Q.   Right.  So why is the -- why
17      does the top of the page still say
18      January 17th?
19          A.   It was a supplement to that
20      earlier report, but it probably should
21      have been changed.  I'm telling you it's
22      probably because I'm sloppy.
23          Q.   Well, when you say -- when
24      you say supplement, what do you mean?
```

Page 208

```
 1          A.   I think that there either
 2      was an additional paper that came out or
 3      I was -- I -- I don't remember.
 4          Q.   Okay.  Well --
 5          A.   You are correct about the
 6      date.
 7          Q.   Let me ask you this.  Let
 8      me -- let me throw out another option for
 9      you.  And that is that your report was
10      really January 17, 2017.  You sent it to
11      somebody for review.  That other person
12      edited it, got it back to you, you
13      accepted the edits.  You dated the report
14      March 10, 2017, and forgot to change
15      Page 1.
16              MR. HEGARTY:  Objection.
17              MR. LOCKE:  Objection.
18      BY MR. GOLOMB:
19          Q.   Did that happen?
20              MR. LOCKE:  No.
21              THE WITNESS:  Almost
22          certainly not.
23      BY MR. GOLOMB:
24          Q.   Well, is there anything in
```

Page 209

```
 1      this report that indicates that there was
 2      a supplement?
 3          A.   I would have to look at it
 4      again.  I don't know.
 5              MR. LOCKE:  Or the cover
 6          that might have been sent with it.
 7              THE WITNESS:  I don't know.
 8      BY MR. GOLOMB:
 9          Q.   Well, once you author the
10      report, where does it go?
11          A.   The real question is after I
12      authored --
13          Q.   No, that's my question.  My
14      question is the real question.
15          A.   Okay.  Then you give me the
16      real question.
17          Q.   The real question is, once
18      you wrote your report dated January 17th,
19      2000 -- that says January 17th at the top
20      of the page, where did it go?
21              MR. LOCKE:  Objection.
22              THE WITNESS:  It would have
23          been a file on my computer.
24      BY MR. GOLOMB:
```

Jonathan Borak, M.D., DABT

Page 210

1        Q.   Well -- but it had to -- it
2    had to go to somebody outside of your
3    office.
4            MR. LOCKE:  Objection.
5    BY MR. GOLOMB:
6        Q.   Whether by e-mail, by
7    hardcopy or some other form of digital
8    communication.
9        A.   I think you're asking
10   whether I mailed it or in some fashion to
11   somebody in January.  And I don't
12   remember.
13       Q.   And would you -- would that
14   be on your computer?
15       A.   Almost certainly not.
16       Q.   You would have deleted the
17   information from your files?
18       A.   I -- I delete -- I delete
19   drafts.  I don't keep drafts as a matter
20   of principle.
21       Q.   Why do -- why do you delete
22   drafts?
23       A.   Because they accumulate.
24   When I write, I update whatever I'm

Page 211

1    writing on, day by day, so I can find
2    what I've done.  And when I'm done, I may
3    have 20 or 30 pieces.  And I dispose of
4    them, because otherwise they clutter
5    everything.
6        Q.   And do you have the
7    transmittal letters or transmittal
8    e-mails when you -- when you send your
9    reports to a third person?
10       A.   Generally, but I can't be
11   sure.
12       Q.   Would you delete those as
13   well?
14       A.   Not intentionally --
15           MR. LOCKE:  Objection.
16   BY MR. GOLOMB:
17       Q.   Excuse me?
18       A.   Not intentionally.
19           MR. LOCKE:  Objection.
20           MR. GOLOMB:  I heard you.  I
21   didn't hear him.
22           THE WITNESS:  Not
23   intentionally.
24   BY MR. GOLOMB:

Page 212

1        Q.   Okay.  So if -- if there
2    were drafts, draft reports, and
3    transmittal letter of some form where you
4    sent the report to a third party, they --
5    that -- maybe not the draft, but the
6    transmittal letter would still be in your
7    system?
8        A.   Possibly.
9        Q.   And when you -- in -- in
10   this case when you complete whether --
11   and whether it's in the -- the earlier
12   draft or 2017, or your report in -- the
13   MDL report in 2019, when you complete
14   your -- your report, does it go to TASA,
15   or does it go to Mr. Locke?
16           MR. LOCKE:  Objection.
17           THE WITNESS:  When the
18   report is completed?
19   BY MR. GOLOMB:
20       Q.   Yeah.
21       A.   I would send it to
22   Mr. Locke.
23       Q.   Okay.  And does -- does he
24   send something back to you?

Page 213

1            MR. LOCKE:  Objection.
2            MR. HEGARTY:  Objection.
3            MR. LOCKE:  You're not
4    entitled to get into our
5    communications.
6            MR. GOLOMB:  Are you
7    instructing him not to answer?
8            MR. LOCKE:  Correct.
9    BY MR. GOLOMB:
10       Q.   And so is that a possible
11   explanation as to why your report dated
12   January 17, 2017, wasn't signed off until
13   March of 2017?
14           MR. LOCKE:  Objection.
15   BY MR. GOLOMB:
16       Q.   Because somebody else was
17   looking at it and editing it?
18           MR. LOCKE:  Objection.
19           THE WITNESS:  It was
20   certainly not that.  But I don't
21   know why that happened.
22   BY MR. GOLOMB:
23       Q.   All right.  So your 2017
24   report is, whether it's January 17th or

54 (Pages 210 to 213)

Jonathan Borak, M.D., DABT

Page 214

1    March 10th, is followed by a deposition
2    that takes place on June 8, 2017.
3        A.   I accept that as the dates.
4        Q.   Did you review that earlier
5    deposition in the Oules case to assist
6    you in your preparation here today?
7        A.   Yes, I did.
8        Q.   Do you recall -- and I
9    imagine you would, since it was Mr. Green
10   taking the deposition.  Do you recall how
11   long that deposition took?
12       A.   No.
13       Q.   Is it fair to say that it
14   took hours?
15       A.   I don't know.
16       Q.   Okay.  If we look at the
17   deposition transcript -- so, the
18   deposition transcript indicates the date
19   of Thursday, June 8, 2017.  It began at
20   8:57 in the morning at the New Haven
21   Hotel.  Do you recall that?  Is that
22   consistent with your recollection?
23           MR. LOCKE:  Objection.
24       You're saying "if we look at."  We

Page 215

1        don't have the deposition.  If you
2        want to attach that or show him
3        the copy.
4            MR. GOLOMB:  I'm handing you
5        the --
6    BY MR. GOLOMB:
7        Q.   It was a simple question,
8    and here's what I'm referring to, which
9    is the front page of the deposition
10   transcript.
11       A.   That is the front page.
12   That appears to be the front page.  Yes,
13   correct.
14       Q.   At 8:57 a.m.?
15       A.   That's what it says.
16       Q.   Okay.  And if we look at the
17   final page of the deposition -- well,
18   near the final page, it says, "Whereupon,
19   the deposition was concluded at
20   12:18 p.m."
21           Is that consistent with your
22   recollection, that the deposition took
23   about three and a half, three and a
24   quarter hours?

Page 216

1        A.   I don't have a specific
2    recollection.  But I accept what you've
3    said as probably true.
4        Q.   Okay.  I'll just show you
5    that page.
6        A.   That's what it says.
7        Q.   Okay.  When did you last
8    read this deposition?
9        A.   Last week.
10       Q.   Last week.
11           Let me just ask you.  Let me
12   just -- I'm going to refer to Page 97 of
13   the -- I'll read it and then I'll show it
14   to you.  And this is from the Oules
15   deposition on June 8th of 2017, on Page
16   97.
17           The question was, "With
18   regard to 'accepted methods for proving
19   causality,' you have not done that --
20   examined that in your report.
21           And your answer was, "Yes,
22   that's correct.
23           "Question:  With respect to
24   risk factors of ovarian cancer, you have

Page 217

1    not provided risk factors for ovarian
2    cancer in your report; is that correct?
3           "Answer:  I have not listed
4    them.  That's correct.
5           "Question:  And then the
6    nature of talc from a toxicology
7    standpoint, you've not provided an
8    examination of the toxicology of talc in
9    your report; is that correct?"
10          And your answer was:
11   "That's correct."
12          And I just want to confirm
13   that that was true on June 8th of 2017 as
14   it referred to your earlier reports, and
15   that's true today as it applies to your
16   February 25, 2019, report; is that
17   correct?
18          MR. HEGARTY:  Objection.
19          MR. LOCKE:  Objection.
20      There are actually multiple
21      issues, I won't get into them,
22      but...
23          Yeah, and you're only
24      reading half a page of a 100-plus

Jonathan Borak, M.D., DABT

Page 218

1    page deposition, I'm sure.
2        MR. GOLOMB:  Feel free to --
3    on redirect, if you're going to do
4    one, to ask him whatever you want
5    about that deposition.
6        MR. LOCKE:  And you should
7    feel free to ask him questions
8    about his report here and not his
9    deposition there, but again...
10       MR. GOLOMB:  They're not
11   mutually exclusive.  That's going
12   to happen.  Be patient.
13       THE WITNESS:  You have read
14   this correctly.
15   BY MR. GOLOMB:
16       Q.   Okay.  And my -- and my
17   question was, that was true then as it
18   relates to your report and your testimony
19   in 2017, and that's true now as it
20   relates to your 2019 report and your
21   testimony here today?
22       MR. LOCKE:  Objection.  His
23   opinions are reflected in his
24   report, Exhibit 7.

Page 219

1        MR. HEGARTY:  Objection.
2        THE WITNESS:  I've explained
3    that I was not -- I explained that
4    I was asked to discuss whether,
5    when and by whom it had been
6    determined that perineal use of
7    talc-containing powder causes
8    ovarian cancer.
9        I was not asked to opine
10   about specific risk factors, other
11   than ovarian cancer.
12       And I was not asked to opine
13   on causality from the standpoint
14   of the methods used by those
15   authors, although I looked at them
16   and considered them.
17   BY MR. GOLOMB:
18       Q.   Right.  You were asked to
19   opine on what others have said about the
20   causality?
21       MR. LOCKE:  Objection.
22       THE WITNESS:  And I also
23   read the basis for their
24   conclusions.

Page 220

1    BY MR. GOLOMB:
2        Q.   Right.  And in fact, you
3    quoted in part some of the basis for
4    their conclusions in your report of 2019?
5        A.   I did quote from some of
6    them, yes.
7        Q.   Okay.  So let's go back to
8    Exhibit 7, which is your report dated
9    February 25, 2019.  On the first page you
10   have a footnote there.
11       Do you see that?
12       A.   Yes.
13       Q.   And the footnote says,
14   "Along with the principles of toxicology
15   e.g., dose-response, toxicokinetics, and
16   risk assessment, e.g., basis of risk
17   extrapolation, my teaching includes the
18   following topics of possible relevance to
19   the present matter:  Design, development
20   and interpretation of epidemiological
21   studies, e.g., cohort versus
22   case-control, prospective versus
23   retrospective, causal inference, e.g.,
24   Hill's Postulates, Koch's Postulates, and

Page 221

1    biological models of cancer."
2        Did I read that correctly?
3        A.   You read that correctly.
4        Q.   You -- you are not offering
5    an opinion on the hierarchy of evidence,
6    correct?
7        MR. LOCKE:  Objection.
8        THE WITNESS:  I am not
9    depending upon that.
10   BY MR. GOLOMB:
11       Q.   Well, not depending on it
12   and not offering an opinion on it at all
13   are two different questions, correct?
14       MR. LOCKE:  Objection.
15       THE WITNESS:  Yes.
16   BY MR. GOLOMB:
17       Q.   Do you offer an opinion
18   anywhere in this 13-page report about
19   your opinion of the hierarchy of
20   evidence?
21       A.   I have not specifically
22   opined about that.
23       Q.   Okay.  And you are, and
24   again, this may be repetitive, and I

56 (Pages 218 to 221)

Jonathan Borak, M.D., DABT

Page 222

1  apologize.  But you do not do a Bradford
2  Hill analysis?
3       MR. LOCKE:  Objection.
4       THE WITNESS:  Yes, I did not
5  do a Bradford Hill analysis.
6  BY MR. GOLOMB:
7       Q.   Okay.  And in fact, the only
8  place where Bradford Hill was even
9  referenced in the body of your report is
10 in the -- in this footnote where you
11 reference the -- Hill's postulates?
12      MR. LOCKE:  Objection.
13      THE WITNESS:  I did not do a
14 Bradford Hill analysis.
15 BY MR. GOLOMB:
16      Q.   My question was, the only
17 place in your report where Hill is even
18 mentioned is in that footnote.
19      A.   That is not a question.
20      Q.   That was my question?
21      A.   That's a statement.
22      Q.   Isn't that correct?
23      A.   Yes, that's correct.
24      Q.   Thank you.  And I just want

Page 223

1  to be clear.  When you go to Page 2 your
2  report, Paragraph 9, you mentioned that
3  you considered expert reports produced
4  both in the federal MDL, as well as prior
5  talc ovarian cancer litigation, right?
6  And so, which means to me, correct me if
7  I'm wrong, that means the expert reports
8  in Oules, in D.C., which we've already
9  referred to, correct?
10      MR. HEGARTY:  Objection.
11      THE WITNESS:  You've
12 previously referred to, correct.
13 BY MR. GOLOMB:
14      Q.   And Mr. Locke also referred
15 to a previous report in the New Jersey
16 state litigation.  Did you read -- did
17 you read the expert reports of the
18 plaintiffs' experts from the New Jersey
19 state court litigation?
20      A.   I very well may have.  I
21 have provided to you a list of materials
22 considered.  But I don't know them by the
23 names specifically.
24      Q.   Okay?

Page 224

1       A.   Although the names may be in
2  the specific, I'm not sure.  But you've
3  got that in your -- with your materials.
4       Q.   Well, I've asked you about
5  Dr. Smith-Bindman, do you remember --
6       A.   I remember her --
7       Q.   -- reviewing her expert
8  report?
9            Do you remember reviewing
10 her expert report?
11      A.   I -- I may very well.  I
12 have to look.  I don't remember.
13      Q.   Do you remember Dr. Moorman,
14 M-O-O-R-M-A-N?
15      A.   I -- I remember the name,
16 but I couldn't -- at the moment, I would
17 not be able to tell you the content of
18 the report.
19      Q.   Dr. McTiernan?
20      A.   I have reviewed
21 Dr. McTiernan's report.
22      Q.   Dr. Siemiatycki?
23      A.   I know I have read two of
24 those.

Page 225

1       Q.   Dr. Song?
2       A.   I think I have reviewed
3  that.
4       Q.   Dr. Colditz?
5       A.   I certainly have reviewed a
6  number of his things.
7       Q.   Did you know Dr. Colditz
8  before this litigation?
9       A.   Only by name.
10      Q.   And like Dr. Siemiatycki --
11      A.   When you say this
12 litigation, Mr. -- I thought Dr. Colditz
13 was not involved in this MDL.
14      Q.   Did -- did you know who
15 Dr. Colditz was before you were involved
16 in any form or fashion in the talc
17 litigation?
18      A.   Yes, of course.
19      Q.   Okay.  When you say yes of
20 course, what do you mean?
21      A.   I mean he's very well known.
22      Q.   Very well known, very well
23 respected, correct?
24      MR. HEGARTY:  Objection.

57 (Pages 222 to 225)

Jonathan Borak, M.D., DABT

Page 226

1      MR. LOCKE:  Objection.
2      THE WITNESS:  He's very well
3 known.
4 BY MR. GOLOMB:
5      Q.   Very well respected?
6      A.   Very possibly.
7      Q.   Dr. Cramer, did you read
8 his -- his reports?
9      A.   I've read a number of his
10 reports.
11     Q.   Okay.  And, in fact, you
12 know that Dr. Cramer has been studying
13 and researching the association between
14 talc and ovarian cancer since at least
15 1982, correct?
16     A.   Yes --
17     MR. HEGARTY:  Objection.
18     THE WITNESS:  -- Dr. Cramer
19 has been advocating causes of
20 ovarian cancer, different ones,
21 periodically, for a number of
22 years as well.
23 BY MR. GOLOMB:
24     Q.   Okay.  And -- and you -- and

Page 227

1 one of the reports you read was his 1999
2 study, correct?
3      A.   I'm sure that I did.  I
4 think I've read almost everything that
5 Dr. Cramer has written on ovarian cancer.
6      Q.   Okay.  And --
7      A.   But specifically is it on my
8 list?
9      MR. LOCKE:  It wouldn't be
10 there.
11     THE WITNESS:  Okay.
12 BY MR. GOLOMB:
13     Q.   Well, do -- do you recall --
14     A.   I know I had a Cramer '99 is
15 perhaps -- would you tell me whether you
16 are talking about the one which is
17 Number 5?
18     Q.   Well, I -- I just referred
19 to the 1999 study.  Is that something you
20 would --
21     A.   I understand.  I don't know
22 how many he wrote in 1999.  I have one of
23 his on my list from 1999.  I'm asking if
24 that's what you're asking me about.

Page 228

1      Q.   Well, did -- do you know as
2 you sit here today whether or not
3 Dr. Cramer wrote more than one article on
4 the association between talc and ovarian
5 cancer in 1999?
6      A.   I do not know.
7      Q.   Okay.
8      MR. LOCKE:  Would now be a
9 good time to take our lunch break?
10     MR. GOLOMB:  Sure.
11     MR. LOCKE:  Should we --
12 before we go, let me just check
13 and make sure it's out there.
14     THE VIDEOGRAPHER:  We are
15 going off record.  The time is
16 12:28 p.m.
17         - - -
18     (Lunch break.)
19         - - -
20     THE VIDEOGRAPHER:  We're
21 going back on record.  Beginning
22 of Media File Number 3.  The time
23 is 1:10.
24 BY MR. GOLOMB:

Page 229

1      Q.   Now, Dr. Borak, we were
2 talking about Exhibit 7 which is your
3 report.  And before I go back to that, I
4 know we -- we pretty exhaustively went
5 through your pre-MDL billing.  And I want
6 to talk a little bit about your -- the
7 billing from -- that begins May 26 of
8 2017 -- of 2017, which is about two weeks
9 before your Oules deposition.  And that
10 goes through February 25th of 2019, which
11 is Exhibit 3.
12     (Document marked for
13 identification as Exhibit
14 Borak-3.)
15 BY MR. GOLOMB:
16     Q.   And I just wanted to make
17 sure that -- because before you seemed a
18 little bit surprised at that total, which
19 is an additional $283,223.25.
20     A.   I -- I'm still surprised,
21 but thank you.
22     Q.   Okay.  Well, just to be
23 clear, you -- you submit your billing on
24 Jonathan Borak & Company to TASA and then

58 (Pages 226 to 229)

Jonathan Borak, M.D., DABT

Page 230

1    TASA sends their bill to Mr. Locke,
2    correct?
3         A.    That's correct.
4         Q.    All right.  And I also made
5    a statement before and I wanted to make
6    sure you knew where that came from.
7              MR. GOLOMB:  Let's mark --
8         we'll have this marked as
9         Exhibit 33.
10             (Document marked for
11        identification as Exhibit
12        Borak-33.)
13   BY MR. GOLOMB:
14        Q.    Which is a memorandum from
15   Benjamin Isser, who is the attorney
16   sitting to my right, who at my request
17   went through the invoices for all the
18   plaintiffs' experts on -- all the
19   plaintiff epidemiologists, and through
20   their testimony in the depositions they
21   came, because I made a statement to you
22   that your billing was -- was close to
23   $600,000 and was more than the -- all the
24   epidemiologists combined.  And I wanted

Page 231

1    you to see where that came from.
2              And as you can see, their
3    total billing between four of them is
4    less than $450,000.
5         A.    Yeah, so I see.
6         Q.    Okay.
7              MR. LOCKE:  I'm just going
8         to object.  You know, we haven't
9         had a chance to verify any of
10        that.
11   BY MR. GOLOMB:
12        Q.    Well, let's -- let's go back
13   to your report, Exhibit 7, February 25,
14   2019.
15             Beginning with the -- the
16   background on Page 3 under Subsection 3.
17        A.    Yes.
18        Q.    So, we talked about, my
19   words, the assignment you got from
20   Mr. Locke, followed by your review, as
21   you said, of a lot of reading.
22        A.    Yes.
23        Q.    Is there anything else that
24   you did before you were prepared to -- to

Page 232

1    start writing your report?
2              MR. LOCKE:  Objection.
3              THE WITNESS:  I wasn't asked
4         to write a report until I had done
5         a great deal of reading.  I don't
6         remember when I was first asked to
7         write a report.  I know when the
8         first report generally was
9         delivered.  You -- you've got a
10        report at least with Oules date on
11        it.  And I can't recall
12        specifically the steps that led up
13        to the day that I was asked to
14        write it.
15   BY MR. GOLOMB:
16        Q.    So you don't -- so you don't
17   remember what you did other than a lot of
18   reading before you started writing your
19   MDL report?
20             MR. LOCKE:  Objection.
21             THE WITNESS:  I -- I read a
22        great deal.  I organized that.
23        I'm not quite sure what else
24        you're asking about.

Page 233

1    BY MR. GOLOMB:
2         Q.    Okay.  Well, as we indicated
3    earlier, the literature went back at
4    least as far as 1972, right?
5              MR. LOCKE:  Objection.
6              THE WITNESS:  Please, go
7         ahead.
8    BY MR. GOLOMB:
9         Q.    Is that correct?
10        A.    I think that it -- at least
11   1972.
12        Q.    Okay.  Do you remember the
13   Henderson study?
14        A.    Yes.  I recall a study by
15   Henderson.
16        Q.    Do you recall what the
17   Henderson study is?
18        A.    I think it may have been a
19   report of histology of ovaries looking at
20   particulates.  But I'm not positive that
21   that's exactly how to describe it.
22        Q.    Okay.  And that was in 1972?
23        A.    I accept that.
24        Q.    Okay.  And Cramer's first

Jonathan Borak, M.D., DABT

Page 234

1    study was 1982.
2        A.   I think that's correct.
3        Q.   All right.  And so there was
4    a whole body of evidence between 1972
5    when the Henderson study came out -- and
6    by body of evidence I'm talking about at
7    least a couple dozen studies,
8    case-control studies as well as cohort
9    studies, that came out between 2000 --
10   I'm sorry, between 1972 and January of
11   2017, correct?
12           MR. LOCKE:  Objection.
13           THE WITNESS:  Oh yes.  Yes,
14       yes, yes.
15   BY MR. GOLOMB:
16       Q.   All right.  And that was all
17   stuff that you had reviewed to write your
18   January or February of 2017 report,
19   right?
20           MR. LOCKE:  Or March.
21       Objection.
22           THE WITNESS:  Yes.  I
23       reviewed a great deal of that.  I
24       provided to you lists of the

Page 235

1        materials that I've reviewed, if
2        that makes this easier for you.
3    BY MR. GOLOMB:
4        Q.   And well over 90 percent of
5    what you reviewed for your MDL report was
6    the same stuff that you had reviewed for
7    your 2017 report, and was the same stuff
8    that had been out there since 1972?
9            MR. LOCKE:  Objection.
10           THE WITNESS:  Are you asking
11       me a question?
12   BY MR. GOLOMB:
13       Q.   Isn't that true?
14       A.   I read a huge number of
15   expert reports and deposition transcripts
16   because Mr. Locke sent them to me, all
17   dated subsequent.
18       Q.   All dated subsequent to
19   what?
20       A.   To the Oules report.
21       Q.   Okay.  So --
22           MR. LOCKE:  Excuse me, can I
23       borrow that pen for a second?
24           THE WITNESS:  Absolutely.

Page 236

1        You can keep it.
2    BY MR. GOLOMB:
3        Q.   You had mentioned earlier
4    that you kept notes of when you read
5    stuff.  Do you remember that testimony
6    earlier today?
7        A.   Yes.
8        Q.   Okay.  And the notes that
9    you keep, are they handwritten notes or
10   are they on a computer?
11       A.   They're usually on a
12   computer.
13       Q.   All right.  And are those
14   notes -- would those notes still be
15   available?
16       A.   I suppose so, but I don't
17   know it.
18       Q.   Would those notes be
19   available to you from -- the notes that
20   you wrote before January of 2017 when you
21   went to write your 2019 report?
22       A.   The answer is possibly.
23       Q.   Okay.  So wouldn't it not be
24   common sense that you wouldn't need to

Page 237

1    re-read everything between 1972 and 2017
2    in order to generate a report in 2019?
3            MR. LOCKE:  Objection.
4            THE WITNESS:  I don't
5        understand what you're asking.
6    BY MR. GOLOMB:
7        Q.   All right.  You had a body
8    of literature.  You're -- put yourself in
9    January of 2017.  Are you with me?
10       A.   I am in 2017 with you, sir.
11       Q.   Okay.  You are writing a
12   report in the Oules case.
13       A.   Yes, sir.
14       Q.   And you've reviewed a body
15   of literature between 1972 and 2017 in
16   order to write your Oules report,
17   correct?
18           MR. LOCKE:  Objection.
19           THE WITNESS:  Yes.
20   BY MR. GOLOMB:
21       Q.   Now, forward from January of
22   2017, at some point you learn that
23   there's an MDL, and you learn that you've
24   now been retained by Mr. Locke to serve

60 (Pages 234 to 237)

Jonathan Borak, M.D., DABT

Page 238

1  as an expert, much the way that you did
2  in the Oules case, in the MDL, correct?
3       MR. LOCKE:  Objection.
4       THE WITNESS:  Not precisely
5  in that way, but I understand what
6  you're saying.  I'll agree with
7  you.
8  BY MR. GOLOMB:
9       Q.   What do you mean not
10 precisely in that way?
11      A.   In the interim period I was
12 asked by Mr. Locke to do other things.
13      Q.   Other things related to
14 talc?
15      A.   Related to talc, but not
16 related to the MDL.
17      Q.   Okay.  But my question is
18 very simply that if -- you know, we're
19 talking about a two-year time period, a
20 time period where you have extensive --
21 ostensibly extensive notes from the stuff
22 that you read between 1972 and 2017, and
23 now you're reading stuff now to write a
24 report in the MDL in 2019, correct?

Page 239

1       MR. LOCKE:  Objection.
2       THE WITNESS:  I am still
3  confused.  Are you asking me
4  whether in 2018 I re-read the
5  stuff that I had written about in
6  2017?
7  BY MR. GOLOMB:
8       Q.   Correct.
9       A.   No.
10      Q.   You didn't -- you didn't
11 re-read it?
12      A.   Well, I may have re-read it,
13 but I wasn't building up large amounts of
14 time by re-reading.
15      On a monthly basis, as I
16 described earlier, I had literature
17 searches done on talc, ovarian cancer,
18 talc and cancer, and I read anywhere
19 between 20 and 40 or more articles per
20 month to try to make sure that I was
21 current in terms of fulfilling the task
22 that I was asked to do, which was to
23 repeat -- to evaluate whether, when, and
24 by whom it had been determined that

Page 240

1  perineal talc -- that perineal use of
2  talc-containing powder caused ovarian
3  cancer.
4       And so in that context, I
5  reviewed large numbers of papers that
6  were potentially relevant to that.  In
7  addition I looked at papers that
8  described risk markers and other
9  considerations that would have
10 potentially influenced the interpretation
11 of the earlier papers that I had
12 reviewed.
13      Occasionally, I had to go
14 back and re-read, for example, to
15 remember the details.  In some cases, so
16 and so would write something and would
17 say something about a paper which I had
18 read earlier.  And it would be necessary
19 for me to go back and re-read the paper.
20      As a result, for example, I
21 suspect that I have read the Terry study,
22 and the Houghton study and the Gates
23 study and the Gertig study and the IARC
24 report and the Langseth study and all of

Page 241

1  those multiple times.
2       But I did that because
3  perhaps somebody in 2017 or 2018 said
4  something that related to one of those
5  studies, and the details were not clearly
6  in my head.
7       Q.   And then at some point in
8  late 2018, early 2019, you sat down to
9  begin to generate your February 25, 2019,
10 report, correct?
11      A.   Again, not exactly.  I had a
12 report that was the Oules report and may
13 have been updated for New Jersey.  I'm
14 sorry, the chronology of that is not
15 clear to me.  But whatever.
16      I had at some point a most
17 recent final report.  Okay.  And as I
18 continued to read, I would add or change
19 that earlier report, so that my writing
20 of a report was in a large sense an
21 ongoing process over a period of years,
22 because every month it was possible that
23 somebody was going to update something or
24 add something new.

Jonathan Borak, M.D., DABT

Page 242

1        In addition to which, as you
2    are already aware, my report also speaks
3    about certain websites which I looked at
4    with a periodic frequency to know when
5    those were changed.  And when they
6    changed, I changed my report.
7        Q.   And one of the websites that
8    you referred to in the background of your
9    report, under Paragraph Number 12, is the
10   NCI website, correct?
11       MR. LOCKE:  Objection.
12       THE WITNESS:  Paragraph
13       Number 12?
14   BY MR. GOLOMB:
15       Q.   Paragraph Number 12 on Page
16   3.
17       A.   Yes that's an example of
18   updating it.
19       Q.   Okay.  Well, that was 2014.
20   That predated both your reports, right?
21       MR. LOCKE:  Objection.
22       THE WITNESS:  The end of
23       that paragraph, which you were
24       just reading says, "Very recently,

Page 243

1        in a statement dated 12/21/18."
2    BY MR. GOLOMB:
3        Q.   Okay.  And had you reviewed
4    the website before 12/21/18?
5        A.   Yes.  But not that version
6    of the website.
7        Q.   That wasn't my question.  My
8    question was, had you -- had you reviewed
9    the NCI website between the date that you
10   use here in 2014 and December 21st, 2018?
11       MR. HEGARTY:  Objection.
12       THE WITNESS:  Forgive me.
13       2014 pertains to an editorial
14       published in the Journal of the
15       National Cancer Institute.  It has
16       nothing to do with the website.
17       So re-ask your question, please.
18   BY MR. GOLOMB:
19       Q.   My question is a very --
20   I'll make it as simple --
21       A.   It's not simple --
22       Q.   -- as possible?
23       A.   -- because you've miscited
24   one of the dates.  I just want clarity,

Page 244

1    and I'll answer.
2        Q.   And I'm going to give you
3    crystal clear clarity --
4        A.   Dynamite.
5        Q.   -- if I don't, just put up
6    your hand or, you know, do something and
7    let me know that it's not clear to you.
8        A.   Thank you.
9        Q.   Okay.  Did you review any
10   NCI website other than the one from
11   12/21/18 that's referred to in your
12   report?
13       A.   And to answer that, I asked
14   you to give me from my report the list of
15   the websites that I've cited.
16       The answer is yes, but to
17   give you details, I need to look at the
18   component of my report that summarized
19   what was published on various websites.
20       Q.   And where would it be in
21   your report?
22       A.   It would have been appendix
23   or exhibit, however I referred to it --
24   Number 2 was materials considered.

Page 245

1        Q.   Yeah.
2        A.   Number 3 was chronology.  It
3    may have been in the chronology or there
4    may have been a separate section that had
5    the websites.
6        Q.   All right.  Let -- let's
7    talk about your attachments for a second.
8    We'll come back to Paragraph 12 of your
9    report.
10       MR. GOLOMB:  Can I have
11       Exhibit 8, please.
12       (Document marked for
13       identification as Exhibit
14       Borak-8.)
15   BY MR. GOLOMB:
16       Q.   So this is your reference
17   list, correct?
18       A.   Yes, that's my reference
19   list.
20       MR. LOCKE:  With some marks
21       on it.
22       THE WITNESS:  With some
23       marks on it.
24   BY MR. GOLOMB:

62 (Pages 242 to 245)

Jonathan Borak, M.D., DABT

Page 246

1      Q.   And your reference list
2  begins, if you look at the lower
3  right-hand corner, of -- on Page 14 of
4  your report, correct?
5      A.   Yes.
6      Q.   So to be clear, Pages 1
7  through 13 are the body of your report
8  that includes your conclusions, correct?
9      A.   Yes.
10     Q.   And so the first page after
11 the body of your report in the signature
12 line is this reference list, correct?
13     A.   Yes.
14     Q.   And if I understand this
15 reference list correctly, as you go
16 through the body of your report, you
17 identify by number, 1 through 50, this --
18 the references that are Number 1 through
19 50 on this reference list?
20     A.   Correct.
21     Q.   Okay.  And so, if we look,
22 for -- as an example, if we look at
23 Page 3, Paragraph 12 of your report, the
24 second paragraph of Page 12 that begins

Page 247

1  with the word despite?
2      A.   Yes.
3      Q.   The last sentence says,
4  "Very recently in a statement dated
5  12/21/18, the National Cancer Institute
6  concluded 'the weight of evidence does
7  not support an association between
8  perineal talc exposure and an increased
9  risk of ovarian cancer.'"
10         And there's a Number 3,
11 correct?
12     A.   Yes, that's correct.
13     Q.   So hopefully if -- if this
14 is accurate, if you look at Number 3 on
15 your reference list, that will refer to
16 the National Cancer Institute website
17 dated 2018 and it does --
18     A.   Yes, that's correct.
19     Q.   -- right?
20     A.   Yes.
21     Q.   All right.  Now, on -- in
22 this reference list is the exclusive list
23 of -- of journals, websites, et cetera,
24 that you referred to in the body of your

Page 248

1  13-page report.
2      A.   These are the references I
3  specifically cited in the body of my
4  report.
5      Q.   Right.  And did you cite to
6  any other NCI website other than the one
7  dated 12/21/18?
8      A.   If you would give me the
9  list of the websites which I specified --
10     Q.   My -- my question is -- is
11 simply, in the body of your report, did
12 you refer to any other NCI website other
13 than the 2000 -- 12/21/18 website?
14         You've got -- you've got
15 Exhibit 7, the report, and Exhibit 8, the
16 reference list.
17     A.   I appreciate what you're
18 saying, and I'm looking for something
19 which I think will clarify, if I may.
20         There was an attachment
21 which included the text which I had
22 copied.  That was my cut and paste.  I
23 copied from those websites the full text
24 that was listed.  And it was an

Page 249

1  attachment.  But of course it's not
2  attached to this, which you've given me,
3  which is only 13 pages.  And such an
4  attachment was also included with the
5  Oules report.
6      Q.   My -- my question was very
7  simply, did you refer to any other -- any
8  other NCI website other than the 12/21/18
9  NCI website in the body of your 13-page
10 report.
11     A.   In the body of the report I
12 think I referred to a compilation of
13 website statements, but did not mention
14 the NCI by name.
15     Q.   Let -- let me define -- I
16 apologize.  I wasn't clear enough for
17 you.  So let me define what I mean by
18 body of the report.  Okay?
19     A.   Sure.
20     Q.   Do you see Page 1 of the
21 report?
22     A.   Yes.
23     Q.   Do you see your signature on
24 Page 13 of the report?

63 (Pages 246 to 249)

Jonathan Borak, M.D., DABT

Page 250

1    A.   Yes, sir.
2    Q.   Those two pages and
3  everything in between is what I'm
4  referring to as the body of the report.
5  Do you understand that?
6    A.   I hear you now.
7    Q.   Okay.  Now, with that as a
8  background, is there anything in the body
9  of the report that refers to the NCI
10  website other than that reference to
11  December 21, 2018?
12    A.   It does not name the NCI
13  website anywhere else.  It refers
14  indirectly in Paragraph 44 where it says,
15  "Following the statements from some of
16  those websites listed in chronological
17  order, the complete statements are
18  presented in Attachment 4."  And I
19  believe that I've got NCI 2018, 2019.  I
20  don't know whether I have an earlier NCI
21  statement on that Attachment 4.
22    Q.   Okay.  So, for the record,
23  you're referring to Page 12 of your
24  report, correct?

Page 251

1    A.   That's correct.
2    Q.   And about three-quarters of
3  the way down on Paragraph 44, it refers
4  to the National Cancer Institute 2018 --
5    A.   Yes.
6    Q.   -- correct?
7         And that's your reference
8  Number 46?
9    A.   Yes.
10    Q.   And then if you go to
11  Page 17, which includes the reference of
12  Number 46, that's 2018, right, it doesn't
13  say anything about 2019?
14    A.   If you look at reference
15  Number 49 --
16    Q.   Yeah.
17    A.   -- it refers to the National
18  Cancer Institute website.  And it's 2019.
19    Q.   Okay.
20    A.   But you're asking me about
21  older ones.  And I'm saying that I only
22  have here the most recent.  I may have
23  referred to older ones in my attachment,
24  I think it was 4, but I'm not sure.

Page 252

1    Q.   Okay.  And you know that --
2  do you know that ones that predate
3  December 21, 2018, identify perineal use
4  of talc as a risk of ovarian cancer?
5         MR. LOCKE:  Objection.
6         THE WITNESS:  I don't
7    remember that to be so.
8  BY MR. GOLOMB:
9    Q.   Okay.  You -- you've said,
10  correct me if I'm wrong, did you
11  review -- you reviewed some prior trial
12  testimony in this case?
13    A.   Which case?
14    Q.   You know that --
15    A.   There hasn't been a trial as
16  I understand it.
17    Q.   You know that no MDL cases
18  have been tried yet, correct?
19    A.   There have been depositions.
20    Q.   Do you know the difference
21  between a trial and deposition?
22    A.   I believe I do, sir.
23    Q.   Okay.  Trials -- for ease of
24  reference, trials are things that take

Page 253

1  place in -- in a courtroom in front of a
2  jury?
3    A.   Thank you.  I appreciate
4  that explanation.
5    Q.   Depositions are something
6  that take place like in a conference room
7  with just lawyers like here today?
8    A.   There are nonlawyers here
9  also.
10    Q.   All right.  And so you are
11  aware that there have been no actual
12  trials in the MDL yet?
13    A.   That is my understanding.
14    Q.   Okay.  And so the -- the
15  trials that have taken place have been
16  like in state court in St. Louis, state
17  court in Los Angeles, are you aware of
18  that?
19         MR. HEGARTY:  Objection.
20         THE WITNESS:  I am aware of
21    the fact that there have been
22    trials.  I don't have the
23    knowledge as to which courts they
24    were in.

64 (Pages 250 to 253)

Jonathan Borak, M.D., DABT

Page 254

BY MR. GOLOMB:
1
2    Q.   Okay.  And you -- and
3  we'll -- we'll -- and you've actually
4  referred to some of the -- the trial
5  testimony and, in fact, trial results
6  in -- throughout your -- your report, do
7  you recall that?
8    A.   I'm surprised that I
9  referred to the trial results.  Tell me
10  what you mean.  I may have.
11    Q.   Well, if you -- if you don't
12  recall that, then just tell me you don't
13  recall that.  We'll -- we'll go through
14  it.
15    A.   Please.  I don't recall
16  that.  I --
17    Q.   Do you recall reading --
18  referencing the Ritsesund case and -- and
19  referring to some of the testimony in the
20  Ritsesund case?
21        MR. HEGARTY:  Objection.
22        THE WITNESS:  I may very
23  well.  I'd have to look and see.
24  I don't remember.

Page 255

1  BY MR. GOLOMB:
2    Q.   Okay.  Does that name sound
3  familiar to you?
4    A.   It sounds like something I
5  have a file on, but I don't remember the
6  details.
7    Q.   Okay.  Let -- let me --
8        MR. GOLOMB:  Can we turn on
9  the Elmo.
10  BY MR. GOLOMB:
11    Q.   I've marked an Exhibit 31
12  which was previously marked as a trial
13  exhibit as Plaintiffs' Exhibit
14  Number 607.
15        Let me show it to you and
16  then I'll put it up on the Elmo.  It's a
17  seven-page exhibit, and ask you if you've
18  ever seen that before.
19        (Document marked for
20        identification as Exhibit
21        Borak-31.)
22        THE WITNESS:  I don't think
23  I recognize it.  I don't think
24  I've ever seen it.

Page 256

1  BY MR. GOLOMB:
2    Q.   Well, you're -- you're
3  now -- you're familiar with the NCI
4  website?
5    A.   Yes.
6    Q.   Okay.  And you know what a
7  PDQ is?
8    A.   Yes.
9    Q.   What's a PDQ?
10    A.   It's a document which NCI
11  prepares, I think probably for both
12  physicians and for patients.  But they
13  are kind of Q&As.
14    Q.   Okay.  And, in fact,
15  there -- there has been testimony in the
16  case that it's not for patients, it's for
17  physicians, it's for scientists --
18    A.   That may well be.
19    Q.   -- who have a logon to get
20  onto the PDQ.
21    A.   I'm sorry?
22        MR. HEGARTY:  Objection.
23        MR. LOCKE:  Objection.
24  BY MR. GOLOMB:

Page 257

1    Q.   Who have a login to get onto
2  the PDQ?
3    A.   I don't recognize that, but
4  it might be true.
5    Q.   Okay.  There -- there also
6  are things that are known as snapshots on
7  the NCI website.  Are you familiar with
8  that?
9        MR. HEGARTY:  Objection.
10        THE WITNESS:  Not by name.
11  BY MR. GOLOMB:
12    Q.   Okay.  And so were you aware
13  that in -- in 2014 that on the
14  physician's data query, the PDQ, that the
15  NCI actually did list talc as a risk of
16  ovarian cancer?
17        MR. HEGARTY:  Objection.
18        MR. LOCKE:  Objection.
19        THE WITNESS:  I don't think
20  I was aware of that.
21  BY MR. GOLOMB:
22    Q.   Were you aware in 2015 that
23  the PDQ identified talc as a risk of
24  ovarian cancer?

65 (Pages 254 to 257)

Jonathan Borak, M.D., DABT

Page 258

1     MR. HEGARTY:  Objection.
2     MR. LOCKE:  Objection.
3     THE WITNESS:  I'm surprised
4     by that.
5   BY MR. GOLOMB:
6     Q.   Were you aware in 2017 that
7   talc was listed as -- perineal use of
8   talc was listed as a -- as a risk of
9   cancer, of ovarian cancer?
10     MR. HEGARTY:  Objection.
11     MR. LOCKE:  Objection.
12     THE WITNESS:  I don't recall
13   that.
14   BY MR. GOLOMB:
15     Q.   Okay.  And so you -- you --
16   you don't -- you said you -- you haven't
17   heard the term "the snapshot," from the
18   NCI website?
19     A.   I -- I know the expression
20   snapshot, but not in the context as you
21   just used it.
22     Q.   Okay.  Let me -- let me ask
23   you a hypothetical question and see if it
24   at all refreshes your recollection.

Page 259

1     A.   Hypothetical question.
2     Q.   Hypothetical question.
3     The hypothetical begins
4   with:  I'm a woman.
5     A.   Okay.
6     Q.   And I am a woman that goes
7   on the NCI website, and has a fear that I
8   may have ovarian cancer.
9     And I go on the NCI website
10   to make a determination as to what are
11   the risks of ovarian cancer.  And I go
12   onto the homepage of the NCI website.
13   And on the upper right-hand corner, where
14   I can search, I type in the words ovarian
15   cancer.
16     And -- and when I hit
17   search, up on the -- on the search
18   results, on the very first search result
19   is -- is an article called "Snapshot of
20   Ovarian Cancer."
21     Are you with me?
22     MR. HEGARTY:  Objection.
23     MR. LOCKE:  Objection as
24   well.

Page 260

1   BY MR. GOLOMB:
2     Q.   Are you with me so far?
3     A.   I hear what you've said in
4   this hypothetical, yes.
5     Q.   Okay.  And I -- and I click
6   on that first result that says "Snapshot
7   of Ovarian Cancer."  And -- and in the
8   third paragraph of the "Snapshot of
9   Ovarian Cancer," it identifies risks of
10   ovarian cancer.  And one of the risks of
11   ovarian cancer is talc.
12     A.   Really?
13     MR. HEGARTY:  Objection.
14     MR. LOCKE:  Objection.
15   BY MR. GOLOMB:
16     Q.   And that was on -- on the
17   NCI website up until the point when
18   trials began in this particular
19   litigation.  Were you aware of that?
20     MR. HEGARTY:  Objection.
21     MR. LOCKE:  Objection.
22     THE WITNESS:  Of course not.
23   BY MR. GOLOMB:
24     Q.   Okay.  So you wouldn't know

Page 261

1   of any communications that may or may not
2   have existed between the defendants in
3   this case and the NCI in an effort to get
4   that off the website?
5     MR. HEGARTY:  Objection.
6     MR. LOCKE:  Objection.
7     THE WITNESS:  I'm astonished
8   by the possibility.
9   BY MR. GOLOMB:
10     Q.   But you didn't know that
11   that was included in the snapshot, right?
12     MR. LOCKE:  Objection.
13     MR. HEGARTY:  Objection.
14     THE WITNESS:  I wasn't aware
15   of the snapshot.
16   BY MR. GOLOMB:
17     Q.   And you weren't aware that
18   it was included in the -- in the PDQ?
19     MR. LOCKE:  Objection.
20     MR. HEGARTY:  Objection.
21     THE WITNESS:  No.
22   BY MR. GOLOMB:
23     Q.   Let's go back to Page 3 of
24   your report.  Actually let's go -- I'm

66 (Pages 258 to 261)

Jonathan Borak, M.D., DABT

Page 262

1    sorry, let's go to Page 4.
2        Okay.  Now, this is --
3    Paragraph 13 and 14 continue in the
4    background of your report, correct?
5        A.  I'm sorry?
6        Q.  Paragraph 13 and 14 on
7    Page 4 of your report continue with the
8    background section of your report?
9        A.  Oh, yeah, yeah, yeah, fine.
10   It's part of the section that I labeled
11   as background, yes, that's correct.
12       Q.  Okay.  And Paragraph 13, you
13   say, "Nevertheless, many of plaintiff MDL
14   experts have opined that perineal use of
15   talc containing powder can cause ovarian
16   cancer."
17       Did I read -- read that
18   correctly?
19       A.  You did.
20       Q.  All right.  And you then on
21   Paragraph 14 refer to a chronology of
22   opinions, correct?
23       A.  Yes.
24       Q.  All right.  So let's, first

Page 263

1    of all, go through some of the
2    attachments to your report.  Let's look
3    at Exhibit 10.
4        (Document marked for
5        identification as Exhibit
6        Borak-10.)
7        MR. GOLOMB:  Mark, I
8    apologize for not having copies of
9    these.  I thought I did.
10   BY MR. GOLOMB:
11       Q.  Attachment 1 is "Expert
12   Reports, Testimony and Other Related
13   Materials," correct?
14       A.  Correct, that's the title.
15       Q.  Now, if I -- if I understand
16   this correctly, and correct me if I'm
17   wrong, first of all, none of the -- on
18   the -- on the two-and-a-half-page list
19   that comes under this exhibit, none of --
20   none of these documents, and I use that
21   term loosely, but none of these documents
22   are referred to specifically in your
23   reference list of 1 through 50, correct?
24       MR. HEGARTY:  Objection.

Page 264

1        THE WITNESS:  I -- I don't
2    think that's correct, but I can
3    look.  I would be surprised.
4    BY MR. GOLOMB:
5        Q.  Okay.
6        A.  Oh, I think they referred --
7    let me look for a second.  When I was
8    quoting from a deposition, I would have
9    put -- for example, if you look at
10   Paragraph 20 of my report.
11   BY MR. GOLOMB:
12       Q.  Right.
13       A.  It speaks of deposition
14   transcript -- of deposition testimony.
15   And it says, Deposition Re: Blaes, Page
16   X, Y, Z.  Dr. Colditz said something or
17   other "(Deposition Re: Hogans, Page
18   436)."  And then later on it says,
19   "Deposition Re: Blaes, 150, 151."
20       That's simply to indicate,
21   yes, I cited and I believe that those are
22   all on this list.  But I did not put them
23   into my numbered reference list, into the
24   paragraph.

Page 265

1        MR. LOCKE:  For the record,
2    you're referring to Attachment 1
3    when you say "this list."
4        THE WITNESS:  I'm sorry.
5    Yes, that's correct.  I'm being
6    unclear.
7        You've given me a list from
8    my report.  The list is of expert
9    reports, testimony, and other
10   related materials that I reviewed.
11       You asked me whether I had
12   referenced any of these in my
13   report.
14       The answer was yes.  I
15   didn't put them in the numbered
16   reference list at the back of the
17   report.  I embedded into the
18   paragraph where I cited it, the
19   deposition and the page.
20   BY MR. GOLOMB:
21       Q.  And that's Paragraph 20 of
22   your report?
23       A.  And other places.  I just
24   pointed out one as an example.

67 (Pages 262 to 265)

Jonathan Borak, M.D., DABT

Page 266

1    Q.   Okay.  Where else in your
2  report, do you refer to a portion of the
3  deposition?  I see Paragraph 28.  I'll
4  help you out.
5         MR. LOCKE:  And 24.
6         THE WITNESS:  It's been done
7       multiple times.  I'm just trying
8       to differentiate between the way
9       in which I referenced a deposition
10      or a testimony and the way that I
11      referenced a published article.
12         It means nothing more than
13      that.  I'm just trying to say yes,
14      I did reference and did point to
15      some of those that were on that
16      list.  That's the whole purpose of
17      that comment.
18  BY MR. GOLOMB:
19    Q.   Okay.  So if I understand
20  Attachment 1, Exhibit 10 correctly, this
21  is -- these are not pulled from published
22  articles or journals.  This is all
23  litigation related?
24    A.   Yes.  That's -- pretty much.

Page 267

1         Under the "other," there is
2  a notation of websites that I looked at.
3  There is a notation of an unpublished
4  report by Rothman and Pastides.  The rest
5  of it was all litigation, I think.
6         And this was a list, which
7  in earlier days, was included in the body
8  of my report, but it got too damn long.
9    Q.   So let me ask you about the
10  Rothman reference there.
11         Do you -- you pull out a --
12  you reference in Exhibit 10 a Rothman
13  article from 2000.
14    A.   Well, it wasn't an article.
15  It was an unpublished piece, but yes.
16    Q.   Right.  And what was the
17  purpose of publishing -- of referring to
18  an unpublished report?
19    A.   Truthfulness.
20    Q.   Excuse me?
21    A.   Truthfulness.
22    Q.   Okay.
23    A.   I was given a copy of this
24  report, and I read it.  And I put it on

Page 268

1  my list, because I thought you might --
2  one day I would see you again after many
3  years, and you would ask me what did I
4  read.  And I would tell you.
5    Q.   All right.  And did you
6  refer to that Rothman article in the body
7  of your report?
8    A.   I don't believe so, but I'd
9  have to go look.  But I doubt it.
10    Q.   Okay.  And, you know, since
11  Dr. Rothman is a -- is, as you mentioned
12  earlier, a friend of yours, you know that
13  in addition to this unpublished report,
14  that he has written dozens and dozens of
15  published peer-reviewed articles directly
16  related to epidemiology, correct?
17         MR. HEGARTY:  Objection.
18         MR. LOCKE:  Objection.
19         THE WITNESS:  He is a very
20      well-published man.  I told you
21      before, I know him, I like him.
22      Exchanged literature.  And I have
23      several of his books on my shelf.
24  BY MR. GOLOMB:

Page 269

1    Q.   Okay.  And one of those
2  books is -- I asked you about your --
3    A.   Yes, yes.  You're going over
4  old stuff.  But you can ask me again
5  because I like Rothman.  I don't mind.
6    Q.   And one of -- one of those
7  books is Rothman on Modern Epidemiology?
8    A.   That's correct.
9    Q.   That's this book?
10    A.   May I see it?  Unfortunately
11  this one is too old to be on my shelf.
12    Q.   What -- has he revised this?
13    A.   Twice.
14    Q.   Do you have the revised
15  version of this on your shelf?
16    A.   Yes.
17    Q.   Okay.  So why did you refer
18  to an unpublished report from 2000 and
19  not any of the dozens and dozens of
20  articles that he's written since?
21         MR. HEGARTY:  Objection.
22         THE WITNESS:  Because I
23      specifically read it in the
24      context of this project, and I

68 (Pages 266 to 269)

Jonathan Borak, M.D., DABT

Page 270

1    said I have reviewed the
2    following.  I meant, and perhaps I
3    failed to say, that it was
4    specific to this question that was
5    raised.
6    BY MR. GOLOMB:
7        Q.   Yeah, but my question is a
8    little bit different.  Knowing that
9    Dr. Rothman literally wrote the book on
10   modern epidemiology, and having the book
11   itself, and knowing that he has written
12   versions of this book since 2000, and
13   knowing that he's written dozens and
14   dozens of articles since 2000
15   specifically on epidemiology, why is it
16   that, whether it was you or your
17   librarian, didn't get those other
18   articles from Dr. Rothman, read those
19   books and so that you could refer to
20   those in your report?
21       MR. LOCKE:  Objection.  I
22   think this is an
23   apples-and-oranges type of
24   comparison.  You also have his

Page 271

1    attachment with materials
2    considered.  Rothman may or may
3    not be on that.  But -- well,
4    that's my objection.
5        THE WITNESS:  I don't
6    believe that Ken Rothman has
7    written about the link between
8    talcum powder and ovarian cancer
9    in his textbooks.
10   BY MR. GOLOMB:
11       Q.   Okay.  Has he written about
12   anything else that may be relevant to --
13   to the litigation, like the
14   considerations of the weight of the
15   evidence, or considerations of hierarchy
16   of the evidence?
17       MR. LOCKE:  Objection.
18       MR. HEGARTY:  Objection.
19       THE WITNESS:  I was asked --
20   just to be clear, so that we don't
21   have any doubts, I was asked to
22   review the literature from a
23   chronological perspective in order
24   to evaluate whether, when, and by

Page 272

1    whom it had been determined that
2    perineal use of talc-containing
3    powder causes ovarian cancer.
4        I was not asked to review
5    the literature on weight of
6    evidence.
7    BY MR. GOLOMB:
8        Q.   Okay.  And so, at least as
9    it relates to your role in this
10   litigation, the weight of the evidence or
11   the hierarchy of the evidence was not a
12   relevant question?
13       MR. LOCKE:  Objection.
14       THE WITNESS:  It was not a
15   question that I was asked to opine
16   upon.
17   BY MR. GOLOMB:
18       Q.   Which made it irrelevant?
19       MR. LOCKE:  Objection.
20   BY MR. GOLOMB:
21       Q.   Correct?
22       A.   I wouldn't have used that
23   word.  It's an interesting question under
24   any circumstance, but it's not part of

Page 273

1    what I was asked to do.
2        Q.   Okay.  So you then,
3    beginning on Page 4, you begin your
4    discussion, under your subheading of
5    discussion, correct?
6        A.   Yes.  My section titled
7    discussion begins on Page 4.
8        Q.   And it begins with prior to
9    2000.
10       A.   That's where it begins.
11       Q.   All right.  And are you
12   aware that prior to 2000, that there were
13   14 separate studies that showed a
14   statistically significant increased risk
15   for ovarian cancer with the perineal use
16   of talc?
17       MR. LOCKE:  Objection.
18       MR. HEGARTY:  Objection.
19       THE WITNESS:  I indicate
20   that, just to give a date -- the
21   only place where I have a specific
22   statement like that, was that the
23   Langseth study in 2006 looked at
24   20-case-control studies, all but

Jonathan Borak, M.D., DABT

Page 274

1    one published by 2004.  I did not
2    break it down structurally before
3    that.
4    BY MR. GOLOMB:
5        Q.   Okay.  And -- and 14 of
6    those studies took place before 2000?
7            MR. LOCKE:  Objection.
8            THE WITNESS:  I -- I accept
9        your statement.  I don't know that
10       that's actually true.
11   BY MR. GOLOMB:
12       Q.   Okay.  Well, let -- let me
13   show you an exhibit we've prepared for --
14   and we'll mark the exhibit, Exhibit 9.
15           (Document marked for
16       identification as Exhibit
17       Borak-9.)
18   BY MR. GOLOMB:
19       Q.   You had mentioned earlier in
20   your testimony that there were something
21   like 25 separate case-control studies.
22   Do -- do you remember?
23       A.   More than that, but yes.
24       Q.   Okay.  And if we look at

Page 275

1    Exhibit 9 there, between 1982 and 2018,
2    there were actually 27.  So there were --
3    there were 27 separate studies that
4    showed a statistical significant
5    increased risk of ovarian cancer from the
6    perineal use of talc.
7            MR. LOCKE:  Objection.
8            MR. HEGARTY:  Objection.
9            THE WITNESS:  Can you step
10       back and ask the question?  I see
11       a group of studies.  You were
12       talking about something -- repeat
13       your question.  I'm unclear.
14           What I see here is a large
15       group of -- of studies, but they
16       are grouped by type.  I thought
17       you were asking something about
18       type.
19   BY MR. GOLOMB:
20       Q.   My -- my question -- you
21   have Exhibit 9 in front of you.
22       A.   I do.
23       Q.   All right.  That is a chart
24   that includes 27 separate studies that

Page 276

1    looked at the association between talc
2    and ovarian cancer.  Do you recognize the
3    names on that list?
4        A.   Yes.
5            MR. HEGARTY:  Objection.
6            THE WITNESS:  Sorry.
7    BY MR. GOLOMB:
8        Q.   And there were 27 separate
9    studies that showed an increased risk
10   somewhere between 1.17 and 2.49.
11           Do you see that?
12           MR. HEGARTY:  Objection.
13           MR. LOCKE:  Objection.
14           THE WITNESS:  I see the
15       numbers that you're referring to.
16       Yes.
17   BY MR. GOLOMB:
18       Q.   Okay.  And these are all
19   studies that you looked at as part of
20   your research into coming to your
21   conclusions, right?
22       A.   Yes.
23       Q.   And we -- and we know that
24   because if you look at the exhibit,

Page 277

1    you'll see under the first -- the -- the
2    first column -- well, the third column,
3    do you see where it says reference list?
4        A.   Yes.
5        Q.   All right.  And you see, as
6    an example, the X next to Penninkilampi?
7        A.   If that's how it's
8    pronounced.
9        Q.   Do you see that?
10       A.   Yes.
11       Q.   Okay.  And the X -- the X
12   means that -- that that is a study that
13   you referred to --
14       A.   Yes.
15       Q.   -- by name and by number, in
16   the body of your report.
17       A.   Yeah.  Shall I read what I
18   said about it?
19       Q.   No.
20       A.   Oh, okay.
21       Q.   We're just trying -- I'm
22   trying to get the background.
23       A.   No, no, no, I understand, I
24   understand.

70 (Pages 274 to 277)

Jonathan Borak, M.D., DABT

Page 278

1    Q.   Okay.
2    A.   I cited it in my report and
3  I read it --
4    Q.   The second list --
5    A.   -- and the paper concluded
6  that there was only a possibility of an
7  association.
8    Q.   The -- and it also showed an
9  increased risk of 1.31 with a confidence
10 interval above 95, right?
11       MR. LOCKE:  Objection.
12       THE WITNESS:  And it
13       concluded that -- that it was only
14       possible.  Yes.
15 BY MR. GOLOMB:
16    Q.   And the -- the second column
17 is Attachment 2, "Materials Considered."
18    A.   Yes.
19    Q.   All right.  Let -- let's
20 take a look at Exhibit 14, please.
21       (Document marked for
22       identification as Exhibit
23       Borak-14.)
24       THE WITNESS:  Yes, I

Page 279

1  recognize -- yes, I recognize
2  that.
3  BY MR. GOLOMB:
4    Q.   What is -- what is materials
5  considered?
6    A.   This reflects -- this is a
7  list.  This is a list of published
8  articles and perhaps websites that I have
9  listed in my database associated with the
10 key words of talc or ovarian cancer.  And
11 that I reviewed in the context of this
12 work that brings us all here together.
13    Q.   And this list includes 504
14 separate articles, correct?
15    A.   Yes, it did when I was
16 making this up as there -- there are
17 additional ones since then, but not many.
18    Q.   And so if I -- if I
19 understand your answer correctly, and
20 your prior answers, anything that was
21 captured in your -- the literature review
22 that was pulled by your librarian, and
23 then read by you, was included in this
24 list, Attachment 2, called materials

Page 280

1  considered?
2       MR. LOCKE:  Objection.
3       THE WITNESS:  Yes, that's
4       pretty much the case.
5  BY MR. GOLOMB:
6    Q.   All right.  Was there -- was
7  there ever a time when there was an
8  article that was pulled, you looked at
9  it, you looked at the first paragraph and
10 said this isn't related to what I'm
11 looking at?
12    A.   It's rarely the first
13 paragraph.  But yes, every month.
14    Q.   And -- and if we -- if we
15 looked at the -- the Borak & Company
16 invoices, a monthly invoice, and compared
17 it to this list, would we find billing
18 for each and every article that you
19 reviewed or read?
20       MR. LOCKE:  Objection.
21       THE WITNESS:  You might.
22 BY MR. GOLOMB:
23    Q.   So let's look at Exhibit 15,
24 which is Attachment 3 to your report,

Page 281

1  "The Chronology of Opinions."
2       (Document marked for
3       identification as Exhibit
4       Borak-15.)
5       THE WITNESS:  Thank you.
6  BY MR. GOLOMB:
7    Q.   What is that?
8       MR. LOCKE:  Did you hear the
9       question?
10       THE WITNESS:  I'm sorry.
11       Could you --
12 BY MR. GOLOMB:
13    Q.   What is that?
14    A.   Oh, I'm sorry, I didn't hear
15 your question.
16       This is a list of statements
17 from the primary resources that I
18 reviewed that I thought to be relevant to
19 the question of who said what and --
20 about whether there was an association
21 between -- whether there was an
22 association between perineal use and --
23 of talc containing powder and whether it
24 caused ovarian cancer.  And this

Jonathan Borak, M.D., DABT

Page 282

1 indicates those opinions which I thought
2 were germane to the question of whether
3 it was said, when it was said and by
4 whom.
5       Q.   And you -- you just called
6 them primary references.  What do you
7 mean by primary references?
8           MR. HEGARTY:  Objection.
9           THE WITNESS:  I -- I meant
10 in terms of those which I compiled
11 into a list of references.  There
12 were many, there were 504 papers.
13 Many of them said nothing about
14 talc.  Many of them offered
15 nothing more than a conjecture
16 about talc.
17       I was looking for those
18 statements that appeared to be
19 relatively encompassing and
20 specific.
21       And I listed them
22 chronologically, because that was
23 what I was asked to do.  I wasn't
24 asked to make a list.  But I was

Page 283

1 asked to approach this literature
2 in a chronological way.  And to my
3 thinking, this was a good way of
4 presenting it.
5 BY MR. GOLOMB:
6       Q.   Okay.  But when -- when you
7 say primary -- primary references, what
8 does that mean?
9           MR. LOCKE:  I think he said
10 primary resources.
11           MR. HEGARTY:  Objection.
12           THE WITNESS:  I --
13 BY MR. GOLOMB:
14       Q.   Okay.  Primary resources,
15 what does that mean?
16       A.   These were published papers,
17 in some cases depositions, that I thought
18 were salient and relevant to the
19 question.
20       Q.   Okay.  Well, you've --
21 you -- at least according to the earlier
22 attachment that we looked at, you -- you
23 looked at dozens and dozens of -- of
24 expert reports and deposition testimony

Page 284

1 and, in fact, trial testimony, correct?
2           MR. LOCKE:  Objection.
3           THE WITNESS:  I think so, I
4 don't know if there was trial
5 testimony.  But there may have
6 been.
7 BY MR. GOLOMB:
8       Q.   I'm sorry?
9       A.   I don't know that there was
10 trial testimony.  But there may have
11 been.  I'm not disagreeing with you.
12       Q.   And so just as an example,
13 on Page 5 of the exhibit --
14           MR. LOCKE:  Which exhibit?
15 15?
16           MR. GOLOMB:  Exhibit 15.
17 BY MR. GOLOMB:
18       Q.   You have a quote there from
19 Dr. Ness.
20       Do you see that?
21       A.   Yes.  At the top of the
22 page?
23       Q.   Right.
24       A.   Yes.

Page 285

1       Q.   And there it says, "Hill's
2 tenants suggest that talc use causes
3 ovarian cancer."  Right?
4       A.   That's what it says.
5       Q.   And then it says 21, right?
6       A.   Yes.
7       Q.   And 21, if we reference back
8 and look at Exhibit 7, to Reference
9 Number 21 in your report?
10           MR. LOCKE:  This is seven.
11           THE WITNESS:  Yeah, yeah,
12 yeah, but I don't have the --
13           MR. LOCKE:  It's actually --
14 it's Exhibit 8, list of
15 references.
16           MR. GOLOMB:  The report is
17 Exhibit 7.
18           MR. LOCKE:  Right.  But
19 Exhibit 8 is the references.
20           THE WITNESS:  Yeah, yeah,
21 yeah.  The answer is no.  On this
22 list it's Number 23.
23 BY MR. GOLOMB:
24       Q.   When you say "this list" --

72 (Pages 282 to 285)

Jonathan Borak, M.D., DABT

Page 286

```
 1        A.   I think that there was --
 2        Q.   -- what are you referring
 3   to?
 4        A.   -- probably would have been
 5   another list with this, but perhaps not.
 6        That referred specifically
 7   to --
 8        Q.   When you say "that," what
 9   are you referring to?
10        A.   The Ness quote that you
11   pointed to --
12        Q.   Yes.
13        A.   -- from 2015.  That comes
14   from -- no, it is not on this list.  That
15   was the list that was Exhibit 8.  And I
16   would have expected that there was
17   another list which went with this other
18   Attachment 3.
19        Q.   Well, let's look at
20   Exhibit 16.
21        (Document marked for
22        identification as Exhibit
23        Borak-16.)
24   BY MR. GOLOMB:
```

Page 287

```
 1        Q.   Exhibit 16 is entitled --
 2        MR. LOCKE:  You get the one
 3        that's marked as an exhibit.
 4   BY MR. GOLOMB:
 5        Q.   Exhibit 16 is entitled
 6   "Chronology of Opinions Reference List"?
 7        A.   Yes.  And Number 21, which
 8   appeared in the chronology of opinions,
 9   corresponds to Number 21 on the
10   appropriate reference list, which goes
11   with that chronology of opinions.
12        Q.   Okay.  And what is -- what
13   is the purpose combined of Attachment 3,
14   chronology of opinions, which is
15   Exhibit 15, and Exhibit 16, Chronology of
16   Opinions Reference List?
17        MR. LOCKE:  Objection.
18        THE WITNESS:  I have listed
19        a series of quotes and statements
20        in that which is Exhibit 15.
21        And Exhibit 16 is a list of
22        the references that pertain to the
23        statements in Exhibit 15.
24   BY MR. GOLOMB:
```

Page 288

```
 1        Q.   Okay.  So as an example,
 2   on -- let's go to Page 2 of Exhibit 15
 3   under Dr. Cramer.
 4        Do you see that?
 5        A.   Yes.
 6        Q.   Do you know how -- so there
 7   you quote, and it says, "The associations
 8   still viewed with skepticism based upon
 9   weak odds ratio, poor dose-response
10   relationship, and an incomplete
11   understanding of the biological mechanism
12   by which talc might lead to ovarian
13   cancer."
14        A.   Yes.
15        Q.   All right.  And what is the
16   import of that statement?
17        MR. LOCKE:  Objection.
18        THE WITNESS:  I think
19        it's --
20   BY MR. GOLOMB:
21        Q.   Asked another way, in an
22   11-page study, why is that the line that
23   you pulled out?
24        A.   Because at the time
```

Page 289

```
 1   Dr. Cramer was an expert in this
 2   litigation.
 3        Q.   Because what?
 4        A.   He was an expert at that
 5   time in this litigation.
 6        Q.   Dr. Cramer?
 7        A.   Not in 1999.  And it seemed
 8   a very succinct statement of the fact
 9   that this was unproven.
10        Q.   All right.  Do you recall in
11   the 1999 study from Dr. Cramer that he
12   also had a footnote in his -- in the
13   article that referred to the fact that
14   there are approximately 22,000 women who
15   are diagnosed per year from ovarian
16   cancer?  Do you recall?
17        MR. HEGARTY:  Objection.
18        MR. LOCKE:  Objection.
19        THE WITNESS:  I don't.  But
20        if you pull out the paper I'd be
21        happy to look at it.
22   BY MR. GOLOMB:
23        Q.   Do you recall that he also
24   said that approximately 14,000 women die
```

Page 290

```
 1    every year from ovarian cancer?
 2           MR. LOCKE:  Objection.
 3           MR. HEGARTY:  Objection.
 4           THE WITNESS:  I have no
 5    independent recollection of that.
 6    BY MR. GOLOMB:
 7       Q.   Do you have -- I mean, those
 8    are very common statistics that you can
 9    find in dozens and dozens of articles and
10    studies that you have identified as
11    references in your report.  It doesn't
12    sound familiar?
13           MR. HEGARTY:  Objection.
14           MR. LOCKE:  Objection.
15    That's a different question.
16           MR. GOLOMB:  That's the
17    question.
18           MR. LOCKE:  You're asking
19    about a footnote, or are you
20    asking about are those numbers
21    familiar to him?
22    BY MR. GOLOMB:
23       Q.   Are those familiar --
24    numbers familiar to you?
```

Page 291

```
 1       A.   They sound like the right
 2    dimension.  But I don't remember the
 3    specific numbers.
 4       Q.   Okay.  And are you aware
 5    that in the 1999 study, where you pull
 6    out those two lines, that Dr. Cramer's
 7    opinion was 10 percent or 1,400 women per
 8    year who die from ovarian cancer, die
 9    from perineal use of talc?
10           MR. LOCKE:  Objection.
11           MR. HEGARTY:  Objection.
12           THE WITNESS:  I don't think
13    I remember that statement.
14    BY MR. GOLOMB:
15       Q.   Okay.  Just so I'm clear,
16    the -- when -- I guess, then, Exhibit 15,
17    the chronology of opinions, and
18    Exhibit 16, the chronology of opinions
19    reference list, should be read together?
20       A.   Yes, correct.
21       Q.   And so the numbers on the
22    chronology of opinion, 1 through 37, have
23    nothing to do with -- bless you -- have
24    nothing to do with the numbers 1 through
```

Page 292

```
 1    50 that are identified in the first
 2    reference list and in the body of your
 3    report?
 4       A.   Yes, that's correct.  There
 5    are different reference lists for
 6    different parts.  Funny, I thought that
 7    made it easier.  Teach me.
 8       Q.   And if we look at
 9    Exhibit 17, that's your Attachment 4 of
10    the web pages?
11       A.   We don't have it yet.
12           MR. LOCKE:  It might be over
13    here.  Let me check.
14           THE WITNESS:  We don't have
15    it here.  It's coming.
16           (Document marked for
17    identification as Exhibit
18    Borak-17.)
19    BY MR. GOLOMB:
20       Q.   And so if I understand this
21    four-page document, these are websites
22    that you looked at as part of your
23    background research?
24       A.   Yes.
```

Page 293

```
 1       Q.   And what you -- just taking,
 2    let's look at the Cancer Council of
 3    Australia as an example.  It says,
 4    "Inferred risks."  And then underneath
 5    that it says, "Perineal use of talc-based
 6    body powder."
 7       Do you see that?
 8       A.   Yes.
 9       Q.   And so these are just quotes
10    from the websites that you put on this
11    list called web pages?
12       A.   These were websites that I
13    referred to in my report.  And I did this
14    because in my report, for brevity, I
15    didn't include it all.  I didn't want to
16    be accused of cherry-picking.
17       Q.   What do you mean by
18    cherry-picking?
19       A.   There were large lists, and
20    I picked out in the body of my report one
21    or two salient terms from paragraphs or
22    lists.  And just to be sure that nobody
23    thought that I was screwing around with
24    the data, I took the entire block from
```

Jonathan Borak, M.D., DABT

Page 294

1  that website and I included it here just
2  to show transparently where the things
3  came from.
4       Q.   Well, you -- you said, using
5  your -- your words, I'm quoting you,
6  screwing around with the data, in the --
7  I mean, you don't refer to the underlying
8  data at all, do you?
9       MR. LOCKE:  Objection.
10      MR. HEGARTY:  Objection.
11      THE WITNESS:  In this case,
12  the underlying data were that
13  which was found on the websites or
14  in the articles.
15 BY MR. GOLOMB:
16      Q.   Right.  I mean the
17 underlying data of the dozens of
18 case-control and cohort studies.
19      MR. LOCKE:  Objection.
20      THE WITNESS:  I didn't touch
21  those data.
22 BY MR. GOLOMB:
23      Q.   So, and I think this has
24  been pretty established -- well

Page 295

1  established.  But if we look at, as an
2  example, Page 2, under the National
3  Cancer Institute.  This is something that
4  you accessed three days before you wrote
5  your report, correct?
6       A.   Yes, that's correct.
7       Q.   But other than the -- the
8  12/21/18 National Cancer Institute dated
9  website, you didn't look at any of the
10 prior NCI websites?
11      A.   I don't specifically recall.
12      Q.   By the way, if you look at
13 the last one on Page 3,
14 yourdiseaserisk.com?
15      A.   Yes.
16      Q.   You see there it refers to
17 the stat that I had just gave you about
18 over 22,000 women a year?
19      A.   Oh, listen, I -- I don't
20 doubt for a minute that ovarian cancer is
21 an important disease for women even
22 though it is a relatively less common
23 cancer.  It's what, the ninth most
24 important cancer in the United States,

Page 296

1  fifth most important in women.  And I
2  think it's a very serious topic.  I
3  certainly didn't mean in any way to
4  suggest that I don't think this is of
5  major importance to people.
6       Q.   Going back to your report.
7  So in your discussion, and if you look
8  at -- as I ask you this question, I would
9  like you to look at Exhibit 7, which is
10 your report, and Exhibit 9, which is the
11 chart that we prepared.
12      Do you see that?
13      A.   Yes, I do.
14      Q.   Okay.  And now that we've
15 gone over Attachment 2, the materials
16 considered, and Attachment 3, the
17 chronology of opinions, it puts in
18 greater context this chart.  Okay?
19      MR. HEGARTY:  Objection.
20      MR. LOCKE:  Objection.
21 BY MR. GOLOMB:
22      Q.   Would you agree?
23      A.   I understood the chart when
24 you first showed it to me.

Page 297

1       Q.   Okay.  Now, we all -- we all
2  do.
3       A.   Wonderful.
4       Q.   Excuse me?
5       A.   I said wonderful.
6       Q.   Now, the reference list, 1
7  through -- you had 1 through 50 to the
8  body of your report includes nine of the
9  27 studies that show a statistically
10 significant increased risk of ovarian
11 cancer from the perineal use of talc --
12      A.   Correct.
13      MR. LOCKE:  Objection.
14      MR. HEGARTY:  Objection.
15 BY MR. GOLOMB:
16      Q.   And how is it that you
17 decided as an example to include
18 Penninkilampi but not include Huncharek
19 or Ness?
20      MR. HEGARTY:  Objection.
21      THE WITNESS:  I believe that
22 Ness is cited in my report.  I
23 think Huncharek and Muscat did not
24 strike me as being significant

Page 298

1    papers, although I've seen them
2    cited a lot.
3        And Penin -- whoever that is
4    pronounced -- Penninkilampi is a
5    fairly recent paper and so I
6    included it.
7    BY MR. GOLOMB:
8        Q.   Well, you included Harlow
9    1992, Gross 1995?
10       A.   I think those were more
11   important markers in the chronology.
12       Q.   And how did you determine
13   what was more important, that one thing
14   was more important than something else?
15       A.   Some of it had to do with
16   the comments of some of the experts in
17   their testimony.  Some of it had to do
18   with some of their publications.  Some of
19   it had to do with what lengths in
20   particular opined with regards to the
21   important papers when IARC looked at it.
22   And so that certainly -- by the time
23   the -- the Langseth and the IARC paper
24   came out, there was a hierarchy of these

Page 299

1    papers.  I mean, that was pretty clear.
2        Q.   But you've already indicated
3    that you didn't -- you didn't -- weren't
4    asked to opine and didn't consider the
5    hierarchy of the papers?
6        MR. LOCKE:  Objection.
7        MR. HEGARTY:  Objection.
8        THE WITNESS:  My
9    understanding before is you were
10   asking me about the hierarchy of
11   epidemiological formats.
12   BY MR. GOLOMB:
13       Q.   Okay.
14       A.   And what I'm saying here is
15   that some of these papers were
16   disregarded by Langseth for example, for
17   various and specific reasons.  And I
18   accepted that as I read, I was aware of
19   the papers, and I read them all.  But by
20   2006 those papers had been adjudicated,
21   so to speak, by the IARC group.  And so I
22   was looking for highlights in the
23   chronology prior to that.
24       Q.   All right.  Just a moment

Page 300

1    ago, you mentioned the fact that when I
2    asked you about Ness 2000 and why as an
3    example that was not cited in the -- in
4    the -- the body of your report, you said
5    that you thought it was.  Can you --
6        MR. LOCKE:  Objection.
7    BY MR. GOLOMB:
8        Q.   -- point that out for me?
9        MR. HEGARTY:  Objection.
10       THE WITNESS:  I -- I may not
11   have.  I'm thinking of the Ness
12   1999 paper on inflammation as
13   being an interesting benchmark,
14   but maybe I didn't cite it.
15       It is -- well, I've got one
16   Ness -- but that's not the same
17   one.  This is the one --
18   BY MR. GOLOMB:
19       Q.   You cite Ness in 2015.
20       A.   I thought I had cited their
21   1999 paper.  I'm surprised that I didn't.
22       Q.   Okay.  And you -- you cite
23   the 2006 IARC in the body of your report
24   there, Paragraph 19, correct?

Page 301

1        A.   Yes.  That's the Langseth
2    report.
3        Q.   And you're -- you're aware
4    that Dr. Siemiatycki was the chair of
5    that -- of that IARC panel?
6        A.   I think you'll find that I
7    stated that in my report.
8        Q.   Have -- have you ever served
9    as a panel member for IARC?
10       MR. LOCKE:  Objection.
11       THE WITNESS:  I -- I think
12   I've answered that earlier and
13   said no.
14   BY MR. GOLOMB:
15       Q.   And the -- the Langseth
16   paper that you referred to, that was the
17   2008 meta-analysis that was -- included
18   Dr. Siemiatycki?
19       A.   Yes, that's correct.
20       Q.   In the 1999 Cramer study,
21   you -- your quote that you picked out for
22   quotation in the exhibit --
23       A.   Which exhibit, sir?
24       Q.   Exhibit 15.

Jonathan Borak, M.D., DABT

Page 302

1    You begin with the
2  associations still viewed with
3  skepticism.
4        Do you see that?
5        A.   This is Cramer 1999.  Yes.
6        Q.   Okay.  And why did you
7  choose that line to include in your
8  chronology of opinions?
9        A.   I would have to look at his
10  paper to know what I cropped out before
11  that.  But let me make it clear that my
12  objective in doing this was to find
13  evidence, not to find negation.
14        Q.   I'm sorry?
15        A.   I say my purpose in this
16  project was to find evidence of a
17  positive relationship between ovarian
18  cancer and talc.  I was not looking to
19  cite or refer to people who were just
20  negative.
21        And I picked this because it
22  reflected, as I read it now, what looks
23  to me like Dr. Cramer's uncertainty and
24  doubt about the association, at least his

Page 303

1  concerns that the association was not
2  solid.
3        Q.   Okay.
4        A.   But if you show me the
5  paper, I will be happy to see what
6  preceded this quote.  And then it will
7  help me to understand what I was thinking
8  when I did this some years ago.
9        Q.   Well, on the final paragraph
10  of that report, of that -- of that
11  article, it says, "In summary, we have
12  demonstrated a consistent association
13  between talc and ovarian cancer.  It
14  appears unlikely to be explained by
15  recall or confounding.  Appropriate
16  warnings should be provided to women
17  about the potential risk of regular use
18  of talc in the genital area."
19        MR. LOCKE:  Objection.
20  BY MR. GOLOMB:
21        Q.   Why didn't you include that
22  in your chronology of opinions?
23        MR. HEGARTY:  Objection.
24        THE WITNESS:  Because that's

Page 304

1  not a statement regarding to
2  whether it causes it.  That was
3  simply -- he was giving his own
4  view and opinion with regard to a
5  public health issue.
6  BY MR. GOLOMB:
7        Q.   He was -- that's in his
8  summary?
9        A.   What you just read to me --
10        Q.   Right.
11        A.   -- was an opinion.
12        Q.   That was an opinion, much
13  the way your summary in your report is
14  your opinion?
15        MR. HEGARTY:  Objection.
16        MR. LOCKE:  Objection.
17        THE WITNESS:  My summary in
18  my report is a compilation of what
19  other people have said, and I've
20  said based upon this, I find no
21  evidence of scientific proof.  And
22  I've been looking for experts to
23  opine on scientific proof.  And I
24  have not found it.  That was my

Page 305

1  opinion.
2        And when Mr. Green at an
3  earlier time asked me whether that
4  could be refuted, I said yes, you
5  just have to find the report that
6  refutes it.  And I have not found
7  that.
8  BY MR. GOLOMB:
9        Q.   And you cite in the body of
10  your report the Langseth -- the Langseth,
11  which we've talked about a lot, correct?
12  Number 13.
13        A.   Langseth, yes, right.
14        Q.   And from the totality of the
15  Langseth report, the single quotation
16  that you cited in your report is, "The
17  current body of experimental and
18  epidemiological evidence is insufficient
19  to establish a causal association between
20  perineal use of talc and ovarian cancer,"
21  correct?
22        A.   Yes.  I said that and they
23  said that.
24        MR. LOCKE:  Are you

77 (Pages 302 to 305)

Jonathan Borak, M.D., DABT

Page 306

1    referring, when you're quoting, to
2    Exhibit 15 or Exhibit 7?
3        MR. GOLOMB: Exhibit 7. No.
4    I'm sorry, Exhibit 15.
5        THE WITNESS: Yes.
6        MR. GOLOMB: In his
7    chronology of opinions.
8        THE WITNESS: Yes, I quoted
9    that, and that's what they said.
10   BY MR. GOLOMB:
11       Q.   And what you didn't quote
12   was, "On balance, the epidemiological
13   evidence suggests that the use of
14   cosmetic talc in the perineal area may be
15   associated with ovarian cancer risk. The
16   mechanism of carcinogenicity may be
17   related to inflammation."
18       You didn't quote that,
19   correct?
20       MR. LOCKE: Objection.
21       MR. HEGARTY: Objection.
22       THE WITNESS: The conclusion
23   of the study was that it was
24   possible but not proven or known.

Page 307

1    And that led to an IARC II-B
2    categorization. And that does not
3    say that it was proven.
4    BY MR. GOLOMB:
5        Q.   And by proven, you mean
6    what?
7        A.   In the case of IARC what
8    does it mean?
9        Q.   No. You used -- you used
10   the word "proven." I'm asking you, what
11   does proven mean?
12       MR. LOCKE: Objection.
13       THE WITNESS: I think beyond
14   reasonable doubt.
15   BY MR. GOLOMB:
16       Q.   Okay. So in order -- in
17   order for -- from an epidemiological
18   standpoint, in order for an
19   epidemiologist to conclude that
20   something -- some product causes a
21   disease, it has to be beyond a reasonable
22   doubt?
23       MR. HEGARTY: Objection.
24       MR. LOCKE: Objection.

Page 308

1        You started with IARC.
2    We're now in a different area.
3        MR. GOLOMB: Is that an
4    objection?
5        MR. LOCKE: Yes.
6    BY MR. GOLOMB:
7        Q.   Okay. Can you answer my
8    question?
9        A.   Your question is that
10   epidemiologists almost never can prove
11   causation. They demonstrate association.
12       Q.   That wasn't my question
13   though. So --
14       A.   Of course it was. You asked
15   me whether epidemiological evidence was
16   sufficient to conclude causation. That's
17   not how you said it.
18       Q.   Okay. My question was
19   simply, is it your opinion as an
20   epidemiologist that in order to prove
21   causation, it must be proved beyond a
22   reasonable doubt?
23       MR. LOCKE: Objection.
24       MR. HEGARTY: Objection.

Page 309

1        THE WITNESS: I think there
2    has to be a substantial amount of
3    proof, yes.
4    BY MR. GOLOMB:
5        Q.   Okay. Substantial, do you
6    equate substantial amount of proof with
7    proof beyond a reasonable doubt?
8        MR. HEGARTY: Objection.
9        MR. LOCKE: Objection.
10       THE WITNESS: It's
11   semantical. I'm not trying to
12   define a legal or scientific
13   criterion. It depends upon the
14   totality of the information that's
15   available. And we know that there
16   are associations which are not
17   causal. And we know that there
18   are some causation is that have
19   less of different kinds of
20   evidence. I think you have to
21   look at all of the evidence.
22   BY MR. GOLOMB:
23       Q.   Name -- name a -- an
24   association that you can comfortably

Jonathan Borak, M.D., DABT

Page 310

1  conclude is also causation beyond a
2  reasonable doubt?
3        MR. LOCKE:  Objection.
4        THE WITNESS:  I think the
5  association of scrotal cancer in
6  chimney sweeps in England and the
7  causal relationship was pretty
8  definite.  And that was without
9  experimentation.
10  BY MR. GOLOMB:
11      Q.   Right.  But not every
12  chimney sweep gets scrotal cancer?
13      A.   Isn't that amazing?
14      Q.   Right.  Well, it's also
15  equally amazing that not every cigarette
16  smoker gets lung cancer.
17        MR. LOCKE:  Objection.
18        MR. HEGARTY:  Objection.
19        THE WITNESS:  It is true
20  that not every cigarette smoker
21  gets lung cancer.
22  BY MR. GOLOMB:
23      Q.   But do you believe that
24  smoking cigarettes has been proved beyond

Page 311

1  a reasonable doubt to cause lung cancer?
2        MR. LOCKE:  Objection.
3        THE WITNESS:  Depending upon
4  the circumstances of the smoking.
5  BY MR. GOLOMB:
6      Q.   Now, in your report, going
7  back to Exhibit 7.
8        MR. LOCKE:  Do you need to
9  take a break?
10        THE WITNESS:  No.  I'm just
11  looking at time fly.
12  BY MR. GOLOMB:
13      Q.   Go to Page 6 under Paragraph
14  22.
15      A.   Mm-hmm.  Yes.
16      Q.   About the Rosenblatt study,
17  you say, "A 2011 case-control study
18  concluded that no stronger adjective than
19  'possible' appears warranted at this
20  time."
21        Do you see that?
22      A.   Yes.
23      Q.   Now, it also says, "In
24  support of a inference that genital

Page 312

1  exposures to powders has the capacity to
2  cause ovarian cancer is the observation
3  of a 30 to 60 percent increase in risk
4  across most case-control studies.  In
5  this regard, our findings are similar to
6  prior studies.'"
7        But you didn't include that
8  in your report, did you?
9        MR. LOCKE:  Objection.
10        THE WITNESS:  The question,
11  sir, was whether, when and by whom
12  it was -- let me read it so
13  there's no question about my
14  intent -- whether when and by whom
15  it had been determined that
16  perineal use of talc-containing
17  powder caused ovarian cancer.
18        And the quote that I had in
19  my report was -- if I can find the
20  paragraph that you just pointed me
21  to, "No stronger adjective than
22  'possible.'"
23        And that's exactly the same
24  thing that IARC concluded and that

Page 313

1  was what I was addressing.
2  BY MR. GOLOMB:
3      Q.   Is that what Rosenblatt
4  said, what I just read to you, possible?
5      A.   I quoted this from
6  Rosenblatt.
7      Q.   Yeah.  The quote that I just
8  read is something that you did not -- not
9  quote in your report, correct?
10        MR. LOCKE:  Objection.
11        THE WITNESS:  It is not
12  quoted.
13  BY MR. GOLOMB:
14      Q.   Okay.  And that was the
15  statement that is essentially,
16  paraphrasing, talked about the consistent
17  findings of the 30 to 60 percent
18  increased risk?
19        MR. LOCKE:  Objection.
20        THE WITNESS:  Yes.  She may
21  very well have said that.  But
22  isn't it remarkable that despite
23  that, she still concluded no
24  stronger adjective than "possible"

79 (Pages 310 to 313)

Jonathan Borak, M.D., DABT

Page 314

1    appears warranted.
2    BY MR. GOLOMB:
3        Q.    And you don't know what's
4    before or after that statement, correct?
5            MR. LOCKE:  Objection.
6            THE WITNESS:  Not without
7        you handing me the paper to read.
8    BY MR. GOLOMB:
9        Q.    So earlier today I was
10   asking you about the beryllium cases?
11       A.    The what.
12       Q.    The beryllium?
13       A.    Beryllium, yes.
14       Q.    And, in fact, the case that
15   you were an expert in was Wanda
16   Washington versus Lockheed Martin.  Do
17   you recall that?
18       A.    Not by name.  Tell me some
19   context.
20       Q.    Well, let me show you what
21   we've marked as Exhibit 21.
22           (Document marked for
23        identification as Exhibit
24        Borak-21.)

Page 315

1    BY MR. GOLOMB:
2        Q.    Okay.  Does that look
3    familiar?
4        A.    I guess it does.  I don't
5    remember it.  But it looks like it's
6    mine.
7        Q.    Is that your signature on
8    Page 45?
9        A.    Yes.  I think so.
10       Q.    Okay.  Let me -- let me just
11   button down something on your report.
12   And we'll -- we'll come back to this on
13   Exhibit 7, and 8, the reference list.
14           I just want to make sure
15   that I'm clear that although you did cite
16   to nine studies that showed a
17   statistically significant increased risk,
18   somewhere between 1.22 and 1.92 --
19       A.    I'm sorry, are we talking
20   about beryllium?
21           MR. LOCKE:  No.  Just put
22        that one aside.  We're talking
23        about your report.
24           THE WITNESS:  You are

Page 316

1    confusing me.  I'm sorry.
2    BY MR. GOLOMB:
3        Q.    Okay.  I said before we get
4    to beryllium I want to button something
5    down --
6        A.    I misheard you.  I
7    apologize.
8        Q.    -- on Exhibit 7 and
9    Exhibit 8.
10       A.    I was changing glasses so I
11   could read.
12       Q.    For ease of reference, why
13   don't you put 7 and 8 in front of you.
14       A.    I have them.
15       Q.    Okay.
16       A.    No, I have 7 and 8 in front
17   of me.
18       Q.    Okay.  And so, in the body
19   of your report, Exhibit 7, and on your
20   reference list, you cite to nine
21   statistically significant studies that
22   showed an increased risk of ovarian
23   cancer from the perineal use of talc,
24   correct?

Page 317

1            MR. LOCKE:  Objection.
2            THE WITNESS:  It's possible.
3        Would you show me in the report
4        where I did that, or -- I -- I
5        want to be sure that we're clear.
6    BY MR. GOLOMB:
7        Q.    You want me to go through
8    your report --
9        A.    You just --
10       Q.    -- to point out which
11   studies?
12       A.    You just told me I quoted
13   nine, and I'm just looking to see where
14   that is.
15       Q.    Okay.  I'll do that.
16       A.    Thank you.
17       Q.    Penninkilampi, one.
18       A.    That's not an original
19   study.  That's a meta-analysis.
20       Q.    It's a -- it's a study that
21   you cite in your report.
22       A.    Yeah, yeah, yeah, yeah,
23   yeah.  But it's not an original study.
24   It's a meta-analysis.

80 (Pages 314 to 317)

Jonathan Borak, M.D., DABT

Page 318

1    Q.   I -- I didn't -- I --
2         MR. GOLOMB: Can we read
3    back my question?
4  BY MR. GOLOMB:
5    Q.   I don't think I said
6  anything about an original study or --
7  or -- but let's go back to the question.
8         MR. LOCKE: You said -- you
9    said you cite to nine
10   statistically significant studies.
11        THE WITNESS: Fine. It was
12   a statistically significant
13   meta-analysis.
14 BY MR. GOLOMB:
15   Q.   Okay. And a meta-analysis
16 is, in your opinion, that's not a study?
17        MR. LOCKE: Objection.
18        THE WITNESS: It is a
19   different kind of a study. I
20   thought you were talking about
21   things with original data as
22   opposed to reanalysis of data.
23 BY MR. GOLOMB:
24   Q.   I didn't -- I didn't qualify

Page 319

1  the question.
2         MR. LOCKE: Objection.
3         THE WITNESS: I understand.
4    I misunderstood.
5  BY MR. GOLOMB:
6    Q.   You cite to Penninkilampi.
7  You cite to Berge. You cite to Cramer
8  2016. You cite to Terry. You cite to
9  Langseth. You cite to Cramer '99. You
10 cite to Gross. You -- you cite to Harlow
11 '92. And you cite to Cramer '82. That's
12 nine.
13   A.   Okay.
14   Q.   All -- all various studies
15 that show a statistical increased risk
16 from the use of talc perineally.
17        MR. LOCKE: Objection.
18        MR. HEGARTY: Objection.
19 BY MR. GOLOMB:
20   Q.   Do you agree?
21        MR. LOCKE: Objection.
22        THE WITNESS: Yes. Although
23   several of them just restate the
24   same data as in some of the

Page 320

1    others. So in a sense it's double
2    counting when you do it that way.
3  BY MR. GOLOMB:
4    Q.   Okay. Well, let's talk
5  about the studies you didn't cite.
6         You didn't cite to --
7  there's a second Harlow study in '92.
8  There is a Cramer '95.
9         MR. LOCKE: Objection. Your
10   own Exhibit 9 shows that he did
11   include it.
12        MR. GOLOMB: That he did
13   include what?
14        MR. LOCKE: It's all in his
15   materials considered. You've got
16   Xs down the whole column --
17 BY MR. GOLOMB:
18   Q.   You didn't include it in
19 your reference list. You didn't include
20 it in the body of your report.
21   A.   Yes, I didn't.
22   Q.   You did not?
23   A.   I did not.
24   Q.   Right. You didn't cite --

Page 321

1  you didn't refer to Shusan '96, Chang
2  '97, Cook '97, Green '97, Godard '98,
3  Ness 2000, Huncharek 2003, Mills 2004.
4         Merritt 2008, Wu 2009,
5  Kurta, K-U-R-T-A, 2012, Liu 2015 or
6  Schildkraut 2016.
7         MR. LOCKE: Objection.
8  BY MR. GOLOMB:
9    Q.   You didn't refer to any of
10 those 17 studies --
11   A.   Most --
12   Q.   -- in the body of your
13 report?
14        MR. LOCKE: Objection.
15        THE WITNESS: Most of those
16   studies were subsumed in the
17   Langseth and subsequent
18   meta-analysis.
19 BY MR. GOLOMB:
20   Q.   What subsequent
21 meta-analyses?
22   A.   Well, you mentioned one
23 which was Penninkilampi, and others along
24 the way.

81 (Pages 318 to 321)

Jonathan Borak, M.D., DABT

Page 322

1      Q.   So Langseth was 2008.  So
2   it's your testimony that Wu, Kurta, Liu
3   and Schildkraut were all subsumed in
4   Penninkilampi?
5         MR. LOCKE:  Objection.
6         THE WITNESS:  No.  Those
7      three were probably subsequently,
8      but I think that they were
9      addressed in Penninkilampi.
10  BY MR. GOLOMB:
11     Q.   Okay.  So let's go back to
12  beryllium now.  Exhibit 21.  Are you with
13  me?
14         Does that refresh your
15  recollection about your role in the -- in
16  the Wanda Washington case?
17         MR. LOCKE:  Objection.
18         THE WITNESS:  I -- I see the
19     name Wanda Washington.  I see my
20     name on it.  I see Manatee County.
21     And I remember being involved in a
22     court case that I think had to do
23     with class certification.
24  BY MR. GOLOMB:

Page 323

1      Q.   I'm sorry?
2      A.   I remember it had something
3   to do with class certification.
4      Q.   All right.  And you remember
5   being deposed by my partner in this case?
6      A.   Probably.  I remember your
7   partner.
8      Q.   Now, when you said this was
9   a medical monitoring case, what -- what
10  does that mean?
11     A.   I didn't say medical
12  monitoring.
13         MR. HEGARTY:  Objection.
14  BY MR. GOLOMB:
15     Q.   What did you say?
16     A.   Class certification.
17     Q.   Oh, class certification.
18         And we -- I had asked you
19  earlier about the fact that there was --
20  we were talking about dose-response and
21  beryllium, remember that?
22     A.   I think I do.
23     Q.   Okay.  And you, in fact,
24  wrote an article called, "Chronic

Page 324

1   Beryllium Disease:  The search for a
2   dose-response," correct?
3      A.   That's correct.
4      Q.   Let's look at Paragraph 22.
5      A.   Paragraph --
6      Q.   I'm sorry.  Exhibit 22.
7         MR. LOCKE:  We -- we don't
8      have Exhibit 22 yet.  So just --
9      22.
10         MR. GOLOMB:  Yeah, I'm
11     getting it for you.
12         THE WITNESS:  Thank you.
13         (Document marked for
14     identification as Exhibit
15     Borak-22.)
16  BY MR. GOLOMB:
17     Q.   So this is an article
18  that -- that you had published in
19  November of 2016, correct?
20     A.   That seems right.
21     Q.   You can look --
22     A.   That's what it says on the
23  top of the page.  I don't recognize the
24  page because it's in a -- I have never

Page 325

1   seen it in this format.
2      Q.   Well, this is -- do you want
3   to look at it it to confirm that that, in
4   fact, is your article?  Or do you agree?
5      A.   No, no, no, I accept it.
6   I'm just telling you it's not familiar to
7   look at it, because it's in a different
8   format.  It's in an HTML format as
9   opposed to a pdf.
10     Q.   And it's an article that you
11  wrote for the Journal of Occupational
12  Environmental Medicine, correct?
13     A.   That's correct.
14     Q.   And it -- it indicates near
15  the top under author information that you
16  served as a paid expert in
17  beryllium-related litigation, correct?
18     A.   Yes.
19     Q.   It doesn't say by whom you
20  were paid though, right?
21     A.   No, it didn't.
22     Q.   Do you think it's of any
23  import for the reader of an article,
24  whether it's this article or any article,

82 (Pages 322 to 325)

Jonathan Borak, M.D., DABT

Page 326

1   really, that in -- in addition to letting
2   the reader know that you were paid as an
3   expert, that -- by -- by whom you were
4   paid?
5        MR. HEGARTY: Objection.
6        THE WITNESS: I -- now that
7   you point it out to me, I should
8   have probably said that I had been
9   paid primarily on the defense
10       side.
11  BY MR. GOLOMB:
12       Q.   And if you go to -- and
13  you -- you'll recall earlier in the
14  deposition I asked you about studies
15  concerning beryllium exposure and
16  beryllium disease dating back to 1946.
17       A.   Yes.
18       Q.   Right?  And you, I -- I
19  think, correct me if I'm wrong, you told
20  me that you don't recall when the studies
21  were, but you know that they went back
22  decades, correct?
23       MR. LOCKE: Objection.
24       THE WITNESS: More or less

Page 327

1   what I said.
2   BY MR. GOLOMB:
3        Q.   Okay.  And, in fact, I got
4   that information from the article that
5   you wrote?
6        A.   Fantastic.  I didn't know it
7   was actually read.
8        Q.   So if -- if you look at
9   Page 2 it says beryllium?  In big bold
10  letters, it says, "Beryllium uncertain
11  dose relatedness."
12       Do you see that?
13       A.   Yes.
14       Q.   And right underneath that it
15  says, CBD is an immunologically mediated
16  granulomatous disease that importantly
17  affects the lung.  The first clear
18  association between beryllium disease and
19  CBD was a 1946 report of chronic lung
20  disease in fluorescent light bulb workers
21  exposed to beryllium containing
22  phosphorous," right?
23       A.   Yes.
24       Q.   And that's the study that we

Page 328

1   were talking about from before 1946?
2        A.   Tabershaw and Hardy.
3        Q.   I'm sorry?
4        A.   Tabershaw and Hardy.
5        Q.   Right.
6        And if you go above that,
7   you see the paragraph that begins with
8   but until very recently?
9        A.   Yes.
10       Q.   "But until very recently the
11  dose relatedness of beryllium exposure
12  was 'obscure and unclear.'  In turn, the
13  lack of an objective dose-response curve
14  has complicated development of
15  appropriate health and safety programs
16  for beryllium exposed workers."
17       Did I read that correctly?
18       A.   You read that correctly.
19       Q.   Okay.  So while the --
20  the -- and I think you later on in the --
21  in the article on Page 3 where it says
22  the early studies?
23       A.   Yes.
24       Q.   "Since earliest reports, CBD

Page 329

1   has been viewed as a puzzling disease in
2   part due to the apparent lack of
3   classical dose-response between exposure
4   and disease."
5        A.   Yes.
6        Q.   Right?  So -- but between
7   1946 and very recently, there was no
8   question about the association between
9   beryllium exposure and beryllium disease,
10  but there was a question about
11  dose-response.  Is that accurate?
12       MR. HEGARTY: Objection.
13       MR. LOCKE: Objection.
14       THE WITNESS: It was
15  difficult to set up occupational
16  health and safety programs,
17  because, in some cases people got
18  chronic beryllium disease from
19  being neighbors of the Lorraine,
20  Ohio, plant which we are talking
21  about.  And in other cases, in the
22  Lorraine, Ohio, workers they did
23  not have a higher rated disease
24  despite the fact that they had

83 (Pages 326 to 329)

Jonathan Borak, M.D., DABT

Page 330

1    hugely higher levels of exposure.
2    BY MR. GOLOMB:
3        Q.   Right.  And the same thing
4    with the -- the Cabot plant in Reading,
5    Pennsylvania.  There were -- there were
6    workers who worked in the Cabot plant for
7    decades and never got chronic beryllium
8    disease, correct?
9        A.   Yes --
10           MR. LOCKE:  Objection.
11           THE WITNESS:  Yes, I think
12   that's true.
13   BY MR. GOLOMB:
14       Q.   Right.  And there were --
15   and there were neighbors who lived in the
16   adjacent neighborhood to the Cabot plant
17   that, in fact, did get chronic beryllium
18   disease from a much less volume of
19   exposure through the ambient air,
20   correct?
21           MR. LOCKE:  Objection.
22           MR. HEGARTY:  Objection.
23           THE WITNESS:  Although, when
24   you look at those people, none of

Page 331

1    them were exposed after the
2    implementation of the first
3    exposure limits in 1949-1950.  All
4    of the neighborhood cases were
5    people who lived in this very
6    narrow valley, down wind from the
7    plant, and all had first lived in
8    that valley prior to 1950, and at
9    the time when there was unchecked,
10   unlimited exposures.
11   BY MR. GOLOMB:
12       Q.   But the -- the bottom line
13   to this, is it not, Doctor, that between
14   1946 and well into the 2000s, there was
15   no question that -- that beryllium
16   exposure caused beryllium disease but
17   there certainly was a question as to
18   whether or not there was a dose --
19   dose-response relationship?
20           MR. LOCKE:  Objection.
21           THE WITNESS:  There were
22   questions about characterizing a
23   dose-response relationship.
24           MR. GOLOMB:  The -- well,

Page 332

1    let's take a break.  It's probably
2    a good time for a break.  And I --
3    I want to find something.
4            THE VIDEOGRAPHER:  Going off
5    the record.  The time is 2:49.
6            (Short break.)
7            THE VIDEOGRAPHER:  We are
8    going back on record.  Beginning
9    Media File Number 4.  The time is
10   2:59.
11   BY MR. GOLOMB:
12       Q.   Doctor, going back to
13   Exhibit 7, your report, Paragraph 42 on
14   Page 11.
15       A.   Bear with me, I'm sorry, I
16   have to sort through things to make sure
17   I have the right exhibit.
18           MR. LOCKE:  We -- which one
19   are you looking for?
20           THE WITNESS:  7.
21           MR. GOLOMB:  7.
22           MR. LOCKE:  Okay.
23           THE WITNESS:  And what page,
24   sir?

Page 333

1    BY MR. GOLOMB:
2        Q.   Page 11, Paragraph 42.
3        A.   11.  42.  Thank you.
4        Q.   And that refers to Health
5    Canada, correct?
6        A.   Yes, correct.
7        Q.   And Health Canada crudely is
8    the Canadian version of the FDA?
9            MR. HEGARTY:  Objection.
10           MR. LOCKE:  Objection.
11           THE WITNESS:  I wouldn't
12   have thought of them that way.  I
13   think of them as closer to
14   Department of Health & Human
15   Services in a certain sense.
16   BY MR. GOLOMB:
17       Q.   And you reviewed the Health
18   Canada assessment as part of -- deriving
19   at your opinion?
20       A.   I included it in -- in my
21   review, yes.
22       Q.   And you -- you quoted two
23   lines from the Health Canada assessment,
24   correct?

84 (Pages 330 to 333)

Jonathan Borak, M.D., DABT

Page 334

1    A.   I have two statements there
2  that I quoted, yes.
3    Q.   One is, "Given that there
4  is" -- "there is the potential for
5  perineal exposure to talc from the use of
6  various healthcare products, a potential
7  concern for human health has been
8  identified," correct?
9    A.   Yes, correct.
10   Q.   And the second -- the second
11 sentence that you quote from the Health
12 Canada assessment report is, "There are
13 limitations with the human
14 epidemiological data.  Ovarian cancer in
15 general is not well understood, and a
16 comparable animal model is not
17 available."
18       Is that --
19   A.   Yes --
20   Q.   -- the --
21   A.   -- I wrote that also.
22   Q.   Okay.  So let -- let's talk
23 a little bit about what else the -- the
24 Health Canada assessment says that you

Page 335

1  did not include in your report.
2        MR. GOLOMB:  Exhibit 25.
3        (Document marked for
4        identification as Exhibit
5        Borak-25.)
6  BY MR. GOLOMB:
7    Q.   Now, in the very -- in the
8  very beginning of that, there's a
9  synopsis, do you see that?
10   A.   Yes.
11   Q.   And on the second page of
12 that synopsis, at the -- at the second to
13 the last paragraph, the sentence begins,
14 the meta-analysis, do you see that?
15   A.   I see the paragraph that
16 starts with that word, yes.
17   Q.   And it says, "The
18 meta-analysis of the available human
19 studies in the peer-reviewed literature
20 indicate a consistent and statistically
21 significant positive association between
22 perineal exposure to talc and ovarian
23 cancer."
24       Did I read that correctly?

Page 336

1    A.   You did.
2    Q.   "Further available data are
3  indicative of a causal effect."
4        Did I read that correct?
5    A.   You did.
6    Q.   And then on the last
7  paragraph that begins with, "Based on."
8        Do you see that?
9    A.   "Based on the available
10 information" --
11   Q.   -- "it is proposed that
12 there is a potential for harm, human
13 health, in Canada at current levels of
14 exposure.  Therefore, on the basis of the
15 information presented in this draft
16 screening assessment, it is proposed to
17 conclude that talc meet the criteria
18 under Paragraph 64(c) of CEPA" --
19 C-E-P-A -- "and it is entering or may
20 enter the environment in a quantity or
21 concentration or under conditions that
22 constitute or may constitute a danger in
23 Canada to human life or health."
24       Did I read that correctly?

Page 337

1    A.   You did.
2    Q.   If you go to Page 16 of the
3  Canada health assessment.
4    A.   I'll be there in a moment.
5        Am I allowed to mark on
6  this?
7        MR. LOCKE:  You really
8        shouldn't.
9        THE WITNESS:  Okay.  I
10 won't.
11       Page 16?
12 BY MR. GOLOMB:
13   Q.   Yes.
14   A.   Yes.
15   Q.   Do you see where it says
16 human studies?
17   A.   Yes.
18   Q.   If you go to the -- and it
19 refers to Terry.  It refers to Berge.  It
20 refers to Penninkilampi.  It refers to
21 Taher, correct?
22   A.   Several meta-analyses, yes.
23   Q.   And then it says, "These
24 studies have consistently reported a

85 (Pages 334 to 337)

Jonathan Borak, M.D., DABT

Page 338

1    positive association with ovarian cancer
2    and perineal talc exposure," correct?
3        A.   That's what it says.
4        Q.   "Taher and colleagues
5    identified 27 studies, 24 case-control,
6    and three cohort, for a meta-analysis.
7    Ever versus never use of perineal talc
8    and the risk of ovarian cancer resulted
9    in a statistically significant pooled
10   odds ratio of 1.28," correct?
11       A.   That's what is -- right.
12       Q.   That means that there is a
13   28 percent increased risk of ovarian
14   cancer with the genital use of talc?
15           MR. LOCKE:  Objection.
16           MR. HEGARTY:  Objection.
17   BY MR. GOLOMB:
18       Q.   Correct?
19       A.   That's one way of reading
20   that, yes.
21       Q.   Go to Page 18.  You see it
22   says, "Mode of action"?
23       A.   I see that.
24           MR. LOCKE:  There's a

Page 339

1            handwritten note to that, next to
2            that, that was not part of the
3            original.
4            MR. GOLOMB:  That's my
5            handwriting.
6            MR. LOCKE:  Okay.
7    BY MR. GOLOMB:
8        Q.   Okay.  Do you recall reading
9    this section of the study?
10       A.   I'm sure that I did.  But I
11   don't recall it.
12       Q.   Okay.  It says, on
13   paragraph -- the second paragraph that
14   begins, "With respect."
15           Do you see that?
16       A.   Yes.
17       Q.   "With respect to the talc
18   specifically, local chronic irritation
19   leading to an inflammatory response is
20   one possible mechanism of tumor
21   progression that is frequently
22   hypothesized.  It is known that
23   persistent indications of inflammation,
24   including C-reactive protein, tumor

Page 340

1    necrosis factor, and other inflammatory
2    markers are detected in the blood of
3    women prior to diagnosis of ovarian
4    cancer."
5            Do you agree with that?
6            MR. HEGARTY:  Objection.
7            MR. LOCKE:  Objection.
8            THE WITNESS:  I agree that
9        that's what's written.
10   BY MR. GOLOMB:
11       Q.   Do you agree with the
12   statement or do you not have an opinion
13   on it one way or the other?
14       A.   Detected in the blood of
15   women prior to diagnosis, that is
16   generally correct, but it does not imply
17   what it -- it does not mean what it seems
18   to imply.
19       Q.   Do you agree with the
20   statement that with respect to talc
21   specifically, local chronic irritation,
22   leading to an inflammatory response, is
23   one possible mechanism of tumor
24   progression that is frequently

Page 341

1    hypothesized?
2        A.   It has been hypothesized,
3    perhaps frequently.  But to my knowledge,
4    there is no evidence that talc causes
5    inflammation and cancer of the ovary.
6        Q.   And if you go to Page 19.
7    The second-to-last paragraph.  Now,
8    you've read Taher before, right?
9    T-A-H-E-R?
10       A.   Yes, yes, yes.
11       Q.   It says, "The most recent
12   meta-analysis," and it refers to Taher
13   2018, "employed the Hill criteria to
14   assess the epidemiological evidence of a
15   causal relationship."
16           Correct?
17       A.   Yes.  That's what it says.
18       Q.   "These considerations form a
19   framework for evaluating evidence in
20   humans to help determine whether observed
21   associations are causal," correct?
22       A.   Yes.  Used for inference of
23   causation.
24       Q.   Now, that's something that

86 (Pages 338 to 341)

Jonathan Borak, M.D., DABT

Page 342

1 you did not do, because you weren't asked
2 to do that, correct?
3         MR. LOCKE:  Objection.
4         MR. HEGARTY:  Objection.
5         THE WITNESS:  I was not
6     inferring causation.  I was
7     reviewing what was presented.  And
8     you might add here, for the
9     record, that Taher concluded that
10     the risk was possible --
11 BY MR. GOLOMB:
12     Q.   And --
13     A.   -- based upon the Bradford
14 Hill analysis that you --
15     Q.   Yeah.  I know you keep
16 saying that.  And go to Page 21 of this
17 report.  That's the third time you said
18 that.
19     A.   I wasn't counting.  But
20 perhaps you're right.
21     Q.   "The most recent
22 meta-analysis detailed above, Taher" --
23         MR. LOCKE:  Okay.  Where are
24     you at?

Page 343

1         MR. GOLOMB:  Page 21.
2         MR. LOCKE:  Oh, middle of
3     the page.
4 BY MR. GOLOMB:
5     Q.   Just above 6.2.  "The most
6 recent analysis detailed above, and
7 consistent with the Hill criteria,
8 suggests a small, but consistent
9 statistically significant positive
10 association between ovarian cancer and
11 perineal exposure to talc."
12     A.   That's what it says.
13     Q.   Right.  It doesn't say
14 anything about being possible, correct?
15     A.   Ah, but Taher, which you're
16 quoting, specifically says it's only
17 possible.
18     Q.   You sure about that?
19     A.   I think so.
20     Q.   Let's look at -- so
21 yesterday -- well, before I go there, let
22 me ask you this.
23         So going back to seven of
24 your report.  You are, just to be clear,

Page 344

1 this -- the body of this 13-page report
2 includes the totality of your opinions in
3 this case, correct?
4         MR. LOCKE:  Objection.
5         THE WITNESS:  They include
6     my opinions with respect to
7     whether, when, and by whom it had
8     been determined that perineal use
9     of talc-containing powder causes
10     ovarian cancer.
11         If you ask me other
12     questions, it's possible that I
13     will have other opinions.
14 BY MR. GOLOMB:
15     Q.   Well --
16         MR. LOCKE:  Just so we
17     know -- and he also attached.  You
18     want to call Exhibit 7 his report,
19     but he's got pages and pages that
20     follow that, which we've gone
21     through, and they've been entered
22     in as exhibits.
23         MR. GOLOMB:  Fair enough.
24     Let's go through the list.

Page 345

1 BY MR. GOLOMB:
2     Q.   Where in Paragraph 8 -- I'm
3 sorry, Exhibit 8 --
4     A.   Which exhibit?
5     Q.   Exhibit 8.
6     A.   Exhibit 8.
7     Q.   Where in Exhibit 8 do you
8 express any opinions?
9     A.   Exhibit 8 was broken from
10 the original report and was part of 7.
11     Q.   Right.  My question was,
12 where -- I'm just responding to a point
13 that was made, a fair point, that was
14 made by Mr. Locke.  And my question to
15 you very simply is, where in Exhibit 8 do
16 you express an opinion on anything?
17     A.   There is no specific
18 opinions at all in Exhibit 8.
19         I did not submit Exhibit 8
20 as a separate standalone.
21     Q.   And take a look at
22 Exhibit 10 which is the -- the list of
23 expert reports, testimony, and other
24 related materials.

87 (Pages 342 to 345)

Jonathan Borak, M.D., DABT

Page 346

```
 1           Where in Exhibit 10 do you
 2    express an opinion on anything?
 3           A.   There is no opinion
 4    contained in Exhibit 10.
 5           That's not correct.  I have
 6    no opinion contained in Exhibit 10.  Most
 7    of Exhibit 10 reflects the opinions of a
 8    great number of people.  So we have to be
 9    careful how we use the word opinion
10    there.
11           Q.   Well, my -- my question was
12    about your opinion, right?
13           A.   I assume that that's what
14    you were asking, but we --
15           Q.   Well, you don't have to
16    assume it.  If you want the question
17    re-read, you can see that is specifically
18    my -- my question.
19           A.   Ask it back.  Just so I --
20    just for clarity.
21           Q.   Where in Exhibit 10 do you,
22    Dr. Jonathan Borak, express an opinion on
23    anything?
24           A.   That's a new question.  The
```

Page 347

```
 1    answer is I didn't do that in Exhibit 10.
 2           Q.   Same question for
 3    Exhibit 14.
 4           A.   Your question is, did I
 5    express any opinion --
 6           Q.   Where in Exhibit 14 do you,
 7    Dr. Jonathan Borak, express an opinion on
 8    anything?
 9           A.   I did not express any
10    opinions in Exhibit 14.
11           Q.   Exhibit 15, the chronology
12    of opinions.  Where do you, Dr. Jonathan
13    Borak, express an opinion on anything?
14           A.   Exhibit 15 does not contain
15    any of my specific opinions.
16           Q.   Exhibit 16, where do you,
17    Dr. Jonathan Borak, express an opinion on
18    anything?
19           A.   Exhibit 16 does not contain
20    any opinions of mine.
21           Q.   Exhibit 17, the web pages.
22    Where do you, Dr. Jonathan Borak, express
23    an opinion on anything?
24           A.   There are no opinions
```

Page 348

```
 1    expressed by me in Exhibit 17.
 2           Q.   Okay.  So going back to my
 3    original question then.  Exhibit 7, the
 4    totality of your opinions is on Page 13
 5    of this report where you say, "In
 6    summary, I conclude that science has not
 7    established that perineal use causes
 8    ovarian cancer" --
 9           MR. LOCKE:  Objection.
10           MR. GOLOMB:  I'm not -- I'm
11    not done, but --
12           MR. LOCKE:  Okay.
13           MR. GOLOMB:  -- I understand
14    by the pause that you could have
15    thought I was.
16    BY MR. GOLOMB:
17           Q.   You then go on to
18    Paragraph 47 and you say, "Accordingly,
19    it is my opinion to a reasonable degree
20    of scientific certainty that science has
21    not established that perineal talc use
22    causes ovarian cancer."
23           That's your opinion,
24    correct?
```

Page 349

```
 1           A.   Yes.  It's my opinion.
 2           MR. LOCKE:  Well, objection.
 3           THE WITNESS:  Excuse me.
 4           MR. LOCKE:  Go ahead.
 5           THE WITNESS:  No, no, no,
 6    please go ahead.
 7           MR. LOCKE:  No, that -- I
 8    was just going to say objection.
 9           THE WITNESS:  Okay.  Got it.
10    BY MR. GOLOMB:
11           Q.   That's your opinion
12    expressed within the four corners of this
13    report?
14           A.   Yes.
15           Q.   Nothing more, nothing less?
16           MR. HEGARTY:  Objection.
17           THE WITNESS:  My opinion is
18    that, in the strongest published
19    statement I found regarding
20    perineal talc and ovarian cancer
21    is the IARC conclusion that the
22    evidence is limited and that it is
23    possibly carcinogenic, yes.
24    BY MR. GOLOMB:
```

88 (Pages 346 to 349)

Jonathan Borak, M.D., DABT

Page 350

1      Q.   And -- and as you told us
2  earlier, that you -- you believe that in
3  order for there to be scientific
4  certainty, that there must be proof
5  beyond a reasonable doubt?
6           MR. GOLOMB:  Objection.
7           MR. HEGARTY:  Objection.
8  BY MR. GOLOMB:
9      Q.   That's what you told us?
10          MR. LOCKE:  Objection.
11          THE WITNESS:  Yes, but
12      that's separate from this
13      document.  This document was a
14      review of who said what, where and
15      when.
16  BY MR. GOLOMB:
17      Q.   Understood.
18      A.   Okay.
19      Q.   Okay.  And that is the
20  totality of what you were asked to do,
21  that is the totality of your opinions in
22  this case, and that is the totality of
23  what you wrote in your 13-page report
24  dated February 25, 2019?

Page 351

1           MR. LOCKE:  Objection.
2           MR. HEGARTY:  Objection.
3  BY MR. GOLOMB:
4      Q.   Correct?
5      A.   That is the totality of that
6  which I intended to opine upon.
7      Q.   So, we agree, correct?
8           MR. HEGARTY:  Objection.
9           MR. LOCKE:  Objection.
10          THE WITNESS:  It is possible
11      that I could be asked questions as
12      I was today about things that go
13      beyond the pages and about some of
14      those I have opinions.
15  BY MR. GOLOMB:
16      Q.   Now --
17      A.   But it was not my intention
18  to present those other opinions.
19      Q.   Now, so -- and you -- and
20  since February 25th of 2019, you haven't
21  drafted a supplemental report, correct?
22      A.   I -- I offered a supplement,
23  but it was merely an updating of some of
24  the materials I had reviewed.

Page 352

1      Q.   Okay.  And we're going to
2  look at the updated materials.  And so,
3  in fact, you did provide exhibit --
4  I'll -- I'll -- I haven't -- since I just
5  got this yesterday, I haven't had an
6  opportunity to -- to photocopy it.  But I
7  assume that everybody has this.
8           (Document marked for
9      identification as Exhibit
10     Borak-29.)
11  BY MR. GOLOMB:
12     Q.   It is Dr. Borak's
13  supplemental materials considered,
14  correct?
15     A.   Correct.  I think that's
16  right.
17     Q.   And these include some
18  expert reports, an expert deposition, and
19  one, two, three, four, five -- six
20  separate published scientific study --
21  literature?
22     A.   Yes, that's correct.  There
23  were actually for the record more
24  articles which I read and threw away.  An

Page 353

1  example you gave earlier where I might
2  have read something and found it was not
3  worth -- not useful.
4           But those were the ones that
5  I continued to maintain, because I
6  thought they were useful.
7      Q.   Okay.  Why -- why didn't you
8  include the ones that you, as you said,
9  threw away?
10     A.   Because they ultimately
11  turned out not to be about talc, or
12  perhaps they ultimately turned out to be
13  about something other than ovarian
14  cancer.
15          For reasons that they did
16  not -- they -- they were not relevant and
17  specific to the issues.
18     Q.   Okay.  And so, and these are
19  things that you reviewed since
20  February 25th?
21     A.   That's what I said.
22     Q.   Okay.  And you -- you
23  haven't and you don't intend to
24  supplement your report of February 25th,

Jonathan Borak, M.D., DABT

Page 354

1  based on your review of this?
2      A.   They -- I did not change my
3  opinions as a result of those reviews.
4      Q.   All right.  One -- one of
5  the articles that you -- you included was
6  Lisio, "High Grade Serous Ovarian Cancer:
7  Basic sciences, clinical and therapeutic
8  standpoints," correct?
9      A.   Yes.  I think that's right.
10  I -- I don't doubt it -- please go ahead.
11  I don't doubt it.
12      Q.   Okay.  That wasn't one of
13  the throwaway articles, that's one of the
14  articles that you included?
15      A.   Yes, that's correct.
16      Q.   All right.  And -- and what
17  is it that you got out of Lisio that --
18  that caused you to include it on here?
19      A.   I read it.  I read it during
20  this period of time because it was a very
21  recent publication.
22      Q.   Okay.  So let's take a look
23  at Lisio which we've marked as
24  Exhibit 32.

Page 356

1  smoking, and usage of perineal talc."
2      Is that it?
3  Q.   Yeah.
4      MR. GOLOMB:  If we take a --
5  let's take a short break.  I'm
6  going to take a look at my notes
7  and talk to my colleagues, we may
8  be done.
9      THE VIDEOGRAPHER:  Going off
10  the record.  The time is 3:20.
11      (Short break.)
12      THE VIDEOGRAPHER:  We're
13  going back on record.  Beginning
14  media file number five.  The time
15  is 3:26.
16      MR. GOLOMB:  Doctor, that's
17  all the questions we have.
18      MR. LOCKE:  Thank you.
19      THE WITNESS:  Thank you.
20  Nice to see you again.
21      MR. GOLOMB:  Nice seeing
22  you.
23      THE VIDEOGRAPHER:  This
24  concludes today's deposition.  We

Page 355

1      (Document marked for
2      identification as Exhibit
3      Borak-32.)
4  BY MR. GOLOMB:
5      Q.   I'm going to hand you --
6  haven't had a chance to mark this.  We
7  just got this list last night.
8      So just looking at the --
9  looking at the article, does that refresh
10  your memory as to really what it was --
11  what it was about?
12      A.   It looks -- it looks
13  certainly familiar.
14      Q.   Okay.  Can you go to Page 6.
15      A.   Bear with me a minute.
16  Page 6.  Yes.
17      Q.   Can you go to the -- do you
18  see the first full paragraph that begins
19  with the word other?
20      A.   Yes.
21      Q.   Can you just read that
22  sentence for us out loud?
23      A.   "Other potential risk
24  factors include obesity, diabetes,

Page 357

1  are going off record.  The time is
2  3:26.
3      (Excused.)
4      (Deposition concluded at
5  approximately 3:26 p.m.)

Jonathan Borak, M.D., DABT

Page 358

```
1
2        CERTIFICATE
3
4
5        I HEREBY CERTIFY that the
     witness was duly sworn by me and that the
6    deposition is a true record of the
     testimony given by the witness.
7
         It was requested before
8    completion of the deposition that the
     witness, JONATHAN BORAK, M.D., DABT, have
9    the opportunity to read and sign the
     deposition transcript.
10
11
12    _____
     MICHELLE L. GRAY,
13    A Registered Professional
     Reporter, Certified Shorthand
14    Reporter, Certified Realtime
     Reporter and Notary Public
15    Dated:  April 2, 2019
16
17
18        (The foregoing certification
19   of this transcript does not apply to any
20   reproduction of the same by any means,
21   unless under the direct control and/or
22   supervision of the certifying reporter.)
23
24
```

Page 359

INSTRUCTIONS TO WITNESS

```
1
2
3            Please read your deposition
4    over carefully and make any necessary
5    corrections.  You should state the reason
6    in the appropriate space on the errata
7    sheet for any corrections that are made.
8            After doing so, please sign
9    the errata sheet and date it.
10           You are signing same subject
11   to the changes you have noted on the
12   errata sheet, which will be attached to
13   your deposition.
14           It is imperative that you
15   return the original errata sheet to the
16   deposing attorney within thirty (30) days
17   of receipt of the deposition transcript
18   by you.  If you fail to do so, the
19   deposition transcript may be deemed to be
20   accurate and may be used in court.
21
22
23
24
```

Page 360

```
1        - - - - - -
2          E R R A T A
         - - - - - -
3
4    PAGE LINE CHANGE
5    ____ ____ _____
6        REASON:  _____
7    ____ ____ _____
8        REASON:  _____
9    ____ ____ _____
10       REASON:  _____
11   ____ ____ _____
12       REASON:  _____
13   ____ ____ _____
14       REASON:  _____
15   ____ ____ _____
16       REASON:  _____
17   ____ ____ _____
18       REASON:  _____
19   ____ ____ _____
20       REASON:  _____
21   ____ ____ _____
22       REASON:  _____
23   ____ ____ _____
24       REASON:  _____
```

Page 361

```
1
2        ACKNOWLEDGMENT OF DEPONENT
3
4        I,_____, do
5    hereby certify that I have read the
6    foregoing pages, 1 - 362, and that the
7    same is a correct transcription of the
8    answers given by me to the questions
9    therein propounded, except for the
10   corrections or changes in form or
11   substance, if any, noted in the attached
12   Errata Sheet.
13
14
15   _____
16   JONATHAN BORAK, M.D., DABT      DATE
17
18
19   Subscribed and sworn
     to before me this
20   _____ day of _____, 20____.
21   My commission expires:_____
22
23   _____
     Notary Public
24
```

91 (Pages 358 to 361)

Jonathan Borak, M.D., DABT

Page 362

```
 1              LAWYER'S NOTES
 2      PAGE LINE
 3      ____ ____ _____
 4      ____ ____ _____
 5      ____ ____ _____
 6      ____ ____ _____
 7      ____ ____ _____
 8      ____ ____ _____
 9      ____ ____ _____
10      ____ ____ _____
11      ____ ____ _____
12      ____ ____ _____
13      ____ ____ _____
14      ____ ____ _____
15      ____ ____ _____
16      ____ ____ _____
17      ____ ____ _____
18      ____ ____ _____
19      ____ ____ _____
20      ____ ____ _____
21      ____ ____ _____
22      ____ ____ _____
23      ____ ____ _____
24      ____ ____ _____
```

Golkow Litigation Services - 877.370.DEPS

Jonathan Borak, M.D., DABT

Page 363

**A**

**a.m** 1:15 9:7
    215:14
**ability** 22:12
**able** 119:2,13
    120:18 224:17
**absence** 97:19
**absolutely** 82:24
    235:24
**academic** 21:1
**accept** 143:21
    169:14 191:10
    192:15,19
    214:3 216:2
    233:23 274:8
    325:5
**accepted** 97:5
    208:13 216:18
    299:18
**accessed** 295:4
**accidents** 61:16
    86:22
**accumulate**
    210:23
**accumulated**
    175:1
**accurate** 247:14
    329:11 359:20
**accused** 293:16
**ACKNOWLE...**
    361:2
**act** 150:15
    158:14
**acting** 97:20
    106:12 176:14
**action** 338:22
**actions** 94:5
**actively** 75:9
    76:9,10 112:10
**activities** 124:17
    124:18 203:14
**actual** 253:11
**acutely** 75:14
**add** 241:18,24
    342:8
**added** 157:14

177:21
**addition** 240:7
    242:1 268:13
    326:1
**additional**
    159:11,16
    208:2 229:19
    279:17
**addressed** 322:9
**addressing**
    313:1
**adequately**
    69:10
**adjacent** 330:16
**adjective** 311:18
    312:21 313:24
**adjudicated**
    88:8 299:20
**adjudicating**
    22:12
**adjunct** 44:24
    178:14
**Administration**
    88:9
**administrative**
    88:1
**advance** 126:3
**advantage** 51:20
**advertised**
    139:2
**advertisement**
    139:12
**advice** 127:13
**Advisory** 6:16
**advocating**
    226:19
**Affidavit** 6:6
**affiliated** 19:15
**affiliates** 20:24
**agency** 17:19
    18:18
**agents** 20:24
**ago** 14:11 59:11
    61:17 74:4
    104:12 107:15
    118:13,15
    120:3 122:12

126:8 129:23
    130:12 132:2
    163:19,20,20
    180:14 300:1
    303:8
**agree** 33:24
    41:19 82:22,24
    83:4 118:2
    182:17 191:6
    238:6 296:22
    319:20 325:4
    340:5,8,11,19
    351:7
**agreement**
    150:15 201:12
**Ah** 93:23 343:15
**ahead** 146:8
    179:6 204:9
    233:7 349:4,6
    354:10
**air** 330:19
**airplane** 106:18
**Alco** 106:24
**all-inclusive**
    110:3,6,11
**alleged** 195:13
**allow** 12:20,21
    68:10 189:2
**allowed** 142:3
    337:5
**aluminum**
    106:24 113:15
**amazing** 310:13
    310:15
**ambient** 330:19
**ambulatory**
    37:11
**amenable** 74:2,8
    101:15
**America** 18:15
**American** 50:15
    50:19 54:6
**Amherst** 33:5
**amount** 98:24
    127:1 133:7
    309:2,6
**amounts** 68:22

239:13
**analyses** 74:1,12
    74:14
**analysis** 76:4
    77:23 78:1,3,6
    98:3,5 102:2,4
    102:7,8 103:5
    103:8,10
    113:23 114:21
    126:20,24
    161:6,8,12
    197:11 222:2,5
    222:14 342:14
    343:6
**analyze** 27:6,11
    28:11,14 29:14
    195:16
**and/or** 14:22,24
    15:3 17:18,20
    24:24 27:1,7
    43:16 66:20
    358:21
**anew** 199:8
**Angeles** 253:17
**animal** 334:16
**Ann** 43:12
**answer** 8:5
    12:21 15:19
    17:11 25:3
    29:1 30:14
    35:22 54:4
    57:8 81:24
    82:2,4,6,8
    101:17 105:20
    113:19 114:2
    114:17,22
    130:14 142:3
    143:17 152:6
    174:14 177:15
    177:24 178:20
    180:12 213:7
    216:21 217:3
    217:10 236:22
    244:1,13,16
    265:14 279:19
    285:21 308:7
    347:1

**answer's** 126:6
**answered** 75:1
    82:15 188:20
    194:18 196:10
    301:12
**answering**
    175:17
**answers** 21:6
    29:20 279:20
    361:8
**anybody** 12:12
    21:10 136:1
    140:7 168:1
**anymore** 199:21
**anyway** 65:19
**apologize** 114:3
    158:3 222:1
    249:16 263:8
    316:7
**apology** 187:16
**Appalachia** 64:3
**apparent** 69:11
    329:2
**appeal** 101:8
**APPEARAN...**
    2:1 3:1
**appeared**
    282:18 287:8
**appears** 215:12
    303:14 311:19
    314:1
**appendix**
    244:22
**apples-and-or...**
    270:23
**applicants**
    122:22 124:20
**application** 59:4
    113:16
**applies** 217:15
**apply** 358:19
**appreciate**
    248:17 253:3
**approach** 89:20
    283:1
**approached**
    89:15 91:11

Jonathan Borak, M.D., DABT

Page 364

126:10
approaches 35:17
appropriate 28:2 287:10 303:15 328:15 359:6
approximately 88:17 93:3 289:14,24 357:5
April 1:10 9:6 154:22 157:16 159:3,12 169:9 169:24 170:6 171:4 177:10 358:15
area 19:21 39:4 48:15 147:18 303:18 306:14 308:2
areas 121:8
argument 103:1
arrangement 129:15,17 130:3 152:24
arrive 134:23
Arrow 96:4,10 96:11,23 97:5 97:11
arsenic 64:15 112:9
article 62:13,17 63:1 65:1 66:16 73:17 74:17,18 75:17 119:24 228:3 259:19 266:11 267:13,14 268:6 280:8,18 289:13 303:11 323:24 324:17 325:4,10,23,24 325:24 327:4 328:21 355:9
articles 14:22 15:9 16:10

26:2,9 61:9,12 61:15,18 62:1 62:8,11 63:9 63:11 109:24 110:24 111:5 111:23 112:1 112:23 113:21 139:7 176:3 239:19 266:22 268:15 269:20 270:14,18 279:8,14 290:9 294:14 352:24 354:5,13,14
asbestos 21:3 97:4
ASHCRAFT 2:8
aside 109:20 315:22
asked 29:14 30:22,23 31:4 31:10 43:24 49:8 50:11 90:3 97:17 103:9,14,20 115:9,12,16 125:18 126:13 163:21 175:18 194:23 195:3 195:10,15 196:4,12,15,23 197:12,19,20 219:4,9,12,18 224:4 232:3,6 232:13 238:12 239:22 244:13 265:11 269:2 271:19,21 272:4,15 273:1 282:23,24 283:1 288:21 299:4 300:2 305:3 308:14 323:18 326:14 342:1 350:20 351:11

asking 10:8 21:14 35:3,13 46:7 56:24 72:5 77:3 116:4,21 123:18 125:13 129:18,20,20 144:6,20 168:9 175:3 180:1 188:17 210:9 227:23,24 232:24 235:10 237:5 239:3 251:20 275:17 290:18,20 299:10 307:10 314:10 346:14
aspects 60:9 64:12
assess 341:14
assessment 6:11 39:4 46:21 113:3 121:18 122:7 220:16 333:18,23 334:12,24 336:16 337:3
assessments 121:12,13
assignment 201:8 231:19
assist 214:5
assistants 47:15
associate 37:9 38:10 44:11,18 151:18,20 178:14
associated 69:12 96:18 279:9 306:15
association 22:3 29:21 31:1 44:2 48:23 49:13 50:19,22 99:5 146:22 147:20,23 150:1 152:13

195:13 198:17 226:13 228:4 247:7 276:1 278:7 281:20 281:22 302:24 303:1,12 305:19 308:11 309:24 310:5 327:18 329:8 335:21 338:1 343:10
associations 18:15 288:7 302:2 309:16 341:21
assume 49:6 90:1 119:16 120:20 123:17 137:11,13 145:5,12,14,14 170:3 346:13 346:16 352:7
assumed 140:15
assuming 133:9
asthma 113:15
astonished 261:7
Atlantic 155:22 184:21
attach 215:2
attached 84:4 249:2 344:17 359:12 361:11
attachment 5:11 5:14,15,19 172:23 248:20 249:1,4 250:18 250:21 251:23 263:11 265:2 266:20 271:1 278:17 279:24 280:24 283:22 286:18 287:13 292:9 296:15 296:16
attachments 161:23 199:13

205:15,18,23 245:7 263:2
attended 19:1,3
attending 37:10
attention 107:16
attorney 12:14 105:15 230:15 359:16
Attorneys 6:17
August 142:20 143:11 145:8 147:8 149:10 150:2 154:22 157:16 159:2 159:24
Australia 293:3
author 150:7 209:9 325:15
authored 17:8 27:20 185:7 192:12,21 209:12
authors 219:15
Automobile 92:12
available 135:19 163:22 236:15 236:19 309:15 334:17 335:18 336:2,9
aware 22:24 23:1 43:23 71:6 126:22 135:23 147:22 147:24 148:2 148:19 149:20 161:16 162:15 162:18,19,23 164:7 181:23 242:2 253:11 253:17,20 257:12,20,22 258:6 260:19 261:14,17 273:12 291:4 299:18 301:3

Jonathan Borak, M.D., DABT

**B**

**B** 4:10 5:2 6:2 7:2
**back** 10:20 38:19 73:24 81:14 83:7,11 83:13,18 89:9 90:21 93:18 102:22 105:12 107:2 114:11 116:7,9 117:16 136:10 144:4 145:8 148:15 151:4,7 152:9 166:5 178:4 182:14 184:17 186:2 187:9 191:2 193:9 197:22 198:18 198:23 208:12 212:24 220:7 228:21 229:3 231:12 233:3 240:14,19 245:8 261:23 265:16 275:10 285:7 296:6 311:7 315:12 318:3,7 322:11 326:16,21 332:8,12 343:23 346:19 348:2 356:13
**background** 35:20,23 132:19 143:5 147:9,10 231:16 242:8 250:8 262:4,8 262:11 277:22 292:23
**BACON** 3:2
**bad** 34:3,6
**Bair** 98:7,10,20 100:18,19 102:17

**balance** 306:12
**based** 30:13 92:4 190:11 288:8 304:20 336:7,9 342:13 354:1
**Basic** 6:21 354:7
**basis** 22:16 38:22 68:21 133:13 140:12 148:5,7 174:23 177:18,20 182:8 219:23 220:3,16 239:15 336:14
**Bear** 332:15 355:15
**beat** 187:11
**Beautiful** 33:23
**becoming** 176:19
**began** 87:12 90:18 142:13 174:18 202:4 214:19 260:18
**beginning** 1:15 33:1 38:11 62:2,3 117:17 184:18 194:20 198:14 228:21 231:15 273:3 332:8 335:8 356:13
**begins** 62:8 229:7 246:2,24 259:3 273:7,8 273:10 328:7 335:13 336:7 339:14 355:18
**behalf** 13:19 19:11,24 28:8 66:6 90:8 91:4 93:21 94:12 96:8,10
**believe** 10:14 11:9 13:15 21:24 104:11

112:20 137:21 156:3 250:19 252:22 264:21 268:8 271:6 297:21 310:23 350:2
**benchmark** 300:13
**Benjamin** 2:3 230:15
**Berge** 319:7 337:19
**berylliosis** 65:14 66:20 68:23
**beryllium** 6:8 60:23 61:4,19 64:16,18 65:2 65:4,12,14 66:5,9,12,16 66:19,20 67:16 68:9,17,20,21 68:23 69:4,22 78:10,11,11,12 78:17 96:14,18 104:1,7 105:23 112:6 113:10 314:10,12,13 315:20 316:4 322:12 323:21 324:1 326:15 326:16 327:9 327:10,18,21 328:11,16 329:9,9,18 330:7,17 331:15,16
**beryllium-rel...** 122:7 325:17
**best** 61:23 62:10 72:8 173:23 177:2
**beyond** 307:13 307:21 308:21 309:7 310:1,24 350:5 351:13
**Bibliography** 4:20

**big** 126:12 327:9
**bill** 130:7 133:11 133:13,16,20 135:6,10 136:18,20,21 153:1 166:20 166:24 171:7 230:1
**billed** 130:5 165:17 168:20
**billing** 130:10 229:5,7,23 230:22 231:3 280:17
**bills** 130:13,18 130:21 131:1,7 131:8 132:19 133:23,24 134:11,12 135:3 137:6,9 142:13 157:13 157:14,15,17 159:11,15 169:9,11,11,19 169:24 170:7 171:2,3
**bimonthly** 182:10
**biography** 117:22
**biological** 121:10 203:13 221:1 288:11
**biostatistics** 99:10
**bisser@golom...** 2:6
**bit** 22:16 202:7 229:6,18 270:8 334:23
**Blackwell** 99:19
**Blaes** 264:15,19
**bless** 291:23
**block** 293:24
**blocks** 52:19
**blood** 340:2,14
**board** 58:5,8,11

**boards** 20:23,23 21:7 40:2,20 40:21
**boasting** 91:17
**body** 26:9 28:10 222:9 234:4,6 237:7,14 246:7 246:11,16 247:24 248:3 248:11 249:9 249:11,18 250:4,8 267:7 268:6 277:16 292:2 293:6,20 297:8 300:4,23 305:9,17 316:18 320:20 321:12 344:1
**bold** 327:9
**book** 55:18 60:5 60:7 138:13,22 139:18 269:9 270:9,10,12
**bookkeeping** 135:8
**books** 53:13,22 53:23 59:23 60:2 62:3 268:23 269:2,7 270:19
**Borak** 1:13 4:5 4:19,21 5:6,22 6:6,14 9:14,21 10:4 14:3 32:11 51:22 52:22 73:7,16 73:18 74:4 84:11 86:8,10 86:13,24 107:3 110:14 131:3,7 132:16 136:13 142:11 154:20 157:2 169:12 170:7 205:15 205:19 207:1 207:15 229:1 229:24 280:15

346:22 347:7
347:13,17,22
358:8 361:16
**Borak's** 121:7
352:12
**Borak-1** 4:14
13:10
**Borak-10** 5:11
263:6
**Borak-14** 5:14
278:23
**Borak-15** 5:15
281:4
**Borak-16** 5:17
286:23
**Borak-17** 5:19
292:18
**Borak-19** 5:21
205:7
**Borak-2** 4:15
31:18
**Borak-21** 6:6
314:24
**Borak-22** 6:8
324:15
**Borak-25** 6:10
335:5
**Borak-28** 6:12
158:9
**Borak-29** 6:14
352:10
**Borak-3** 4:16
229:14
**Borak-30** 6:16
154:12
**Borak-31** 6:18
255:21
**Borak-32** 6:20
355:3
**Borak-33** 7:6
230:12
**Borak-4** 4:17
83:21
**Borak-5** 4:20
116:20
**Borak-6** 4:22
94:23

**Borak-7** 5:6
172:10
**Borak-8** 5:8
245:14
**Borak-9** 5:9
274:17
**Borges** 56:2
**born** 199:7
**borrow** 235:23
**bottom** 49:20
73:14 157:21
207:7 331:12
**Boulevard** 3:3
**Bradford**
101:23 102:1,4
102:7,8,24
103:5,8,10
113:22 114:5,6
114:10,17,20
115:13 161:6,8
161:12 162:9
197:10 222:1,5
222:8,14
342:13
**brain** 73:4,8
**break** 12:10,13
12:15 116:22
117:10,14
134:1 171:1
205:1 228:9,18
274:2 311:9
332:1,2,6
356:5,11
**breaks** 12:10
131:21
**brevity** 293:14
**brief** 85:20
169:8
**briefly** 10:6
156:12
**bright** 56:5
**bring** 107:16
**brings** 103:4
115:3 279:12
**broke** 117:20
**broken** 131:17
345:9

**Brush** 106:15
**build** 202:18
**building** 2:13
239:13
**bulb** 65:24 66:8
327:20
**bunch** 93:13
108:13
**Burke** 99:19
**business** 91:15
**busy** 127:12
**button** 315:11
316:4
**buys** 39:6

_____

**C**

_____

**C** 3:3
**C-E-P-A** 336:19
**C-reactive**
339:24
**Cabot** 96:4,13
96:22 97:2
330:4,6,16
**calculation**
131:5,8
**calendar** 166:4
**California**
104:10
**call** 108:18
127:14 145:14
150:14 191:16
191:18 344:18
**called** 13:24
47:16 78:17
99:3,18 126:8
127:6 146:10
259:19 279:24
282:5 293:11
323:24
**calls** 57:8 134:8
140:18
**camera** 91:13,18
**campus** 51:19
52:15
**Canada** 18:12
50:5 333:5,7
333:18,23

334:12,24
336:13,23
337:3
**Canadian** 333:8
**cancer** 6:20
18:19 19:12
21:3,12 22:4
29:22 31:2,6
31:12 44:3
48:24 49:13,14
50:19 55:7
63:3 73:4
79:17,24 80:21
81:4,13,23
82:7,21 103:16
146:18,24
147:16,21
149:5 150:2
152:14 175:11
175:11 176:2
193:22 194:15
195:15,21
196:14,15
198:18 202:11
203:17 204:6
216:24 217:2
219:8,11 221:1
223:5 226:14
226:20 227:5
228:5 239:17
239:18 240:3
243:15 247:5
247:16 251:4
251:18 252:4
257:16,24
258:9,9 259:8
259:11,15,20
260:7,9,10,11
262:16 271:8
272:3 273:15
275:5 276:2
279:10 281:24
285:3 288:13
289:16 290:1
291:8 293:2
295:3,8,20,23
295:24 297:11

302:18 303:13
305:20 306:15
310:5,12,16,21
311:1 312:2,17
316:23 334:14
335:23 338:1,8
338:14 340:4
341:5 343:10
344:10 348:8
348:22 349:20
353:14 354:6
**cancer.'** 247:9
**capacity** 90:6
312:1
**captured** 279:21
**carcinogenic**
79:20 349:23
**carcinogenicity**
147:15 306:16
**care** 13:19 14:1
20:1,5 140:5,7
140:10 199:19
**career** 32:22
90:13,16
**careful** 151:10
346:9
**carefully** 48:3
359:4
**carried** 180:19
181:16,20
**case** 10:13,15
11:2,5 13:3
16:5 17:5
22:24 24:10
27:1,16,22
29:17 30:22
41:9 66:6
78:19 81:7
88:2 96:3,8,9
96:14,21 97:21
98:3,14,16,17
99:17,22 100:1
100:6,8,12
101:12 103:4
104:7,10
106:16 115:1,2
115:3 123:3

128:10 129:2
130:13 132:1,3
132:4,5 133:10
137:24 142:5
144:6,7 149:14
149:19 152:5
152:11,15,19
153:3 161:13
161:16 162:11
163:11,13
176:7,15,20,20
177:12 185:5,8
187:20 190:24
192:13,18
193:6 212:10
214:5 237:12
238:2 252:12
252:13 254:18
254:20 256:16
261:3 280:4
294:11 307:7
314:14 322:16
322:22 323:5,9
344:3 350:22
**case-control**
26:17 27:7,15
28:12,13 72:12
72:16 101:19
160:21,24
202:15 220:22
234:8 274:21
294:18 311:17
312:4 338:5
**cases** 1:8 11:16
12:5 24:2
47:16 66:2
76:22 91:2
92:8,12 95:9
95:11,14,22
96:1 100:18,20
100:23 101:5
101:10 102:17
104:1,14 105:1
105:4,24 106:2
106:6,8,13,14
127:24 155:22
240:15 252:17

283:17 314:10
329:17,21
331:4
**casually** 49:3
**categorization**
307:2
**causal** 198:17
220:23 305:19
309:17 310:7
336:3 341:15
341:21
**causality** 219:13
219:20
**causality,'**
216:19
**causation** 76:4
77:22 78:1,3,6
98:2,5 102:24
115:10,12
308:11,16,21
309:18 310:1
341:23 342:6
**cause** 66:19
78:12,16 79:3
79:16,23 80:20
81:3,13,22
82:7,21 103:16
146:16 196:15
262:15 311:1
312:2
**caused** 98:20
194:15 203:17
240:2 281:24
312:17 331:16
354:18
**causes** 31:6,11
195:20 196:14
204:5 219:7
226:19 272:3
285:2 304:2
307:20 341:4
344:9 348:7,22
**causing** 21:12
78:22 81:10
146:17 149:5
**CBD** 327:15,19
328:24

**center** 17:22
18:4 59:15
90:20
**central** 63:18
**CEPA** 336:18
**certain** 23:16
26:11 27:3
60:9 78:15,20
139:6 242:3
333:15
**certainly** 89:17
110:20 144:24
149:12 160:20
161:2 208:22
210:15 213:20
225:5 296:3
298:22 331:17
355:13
**certainty** 204:4
348:20 350:4
**CERTIFICA...**
358:2
**certification**
42:18 50:7
322:23 323:3
323:16,17
358:18
**certifications**
40:9 41:2
49:19
**certified** 1:16,17
42:5 43:7
358:13,14
**certify** 358:5
361:5
**certifying**
358:22
**cetera** 17:4 26:3
26:9 185:18,18
247:23
**chair** 36:22
99:10 301:4
**chairman** 45:13
179:2 180:8
**challenge** 43:9
187:20 188:9
188:15

**challenges** 35:17
**chance** 117:23
231:9 355:6
**Chang** 321:1
**change** 120:13
208:14 241:18
354:2 360:4
**changed** 174:24
187:9 207:21
242:5,6,6
**changes** 359:11
361:10
**changing** 316:10
**chapters** 60:6,7
60:12
**characterizing**
331:22
**charming**
144:13
**chart** 275:23
296:11,18,23
**charts** 28:9,21
29:4,6
**check** 134:13,23
136:22 137:14
137:15,17,19
137:22 138:1,6
138:9 228:12
292:13
**chemical** 64:10
**chemicals** 86:19
120:23
**chemistry**
203:13
**cherry-picking**
293:16,18
**chimney** 310:6
310:12
**choose** 175:22
302:7
**chose** 45:12
51:10 111:23
111:24
**Chris** 170:23
**chronic** 6:8
65:14 66:19
68:23 69:3

78:12,16,17
323:24 327:19
329:18 330:7
330:17 339:18
340:21
**chronological**
195:17 250:16
271:23 283:2
**chronologically**
282:22
**chronology** 5:16
5:17 241:14
245:2,3 262:21
281:1 287:6,8
287:11,14,15
291:17,18,22
296:17 298:11
299:23 302:8
303:22 306:7
347:11
**Church** 2:14
52:24
**cigarette** 80:9
81:9,13,16
82:16,19 83:10
310:15,20
**cigarettes** 79:8
79:12,15,16,23
80:3,6,20
310:24
**circumstance**
272:24
**circumstances**
81:5 82:5
311:4
**cite** 248:5
300:14,19,22
302:19 305:9
315:15 316:20
317:21 318:9
319:6,7,7,8,8,9
319:10,10,11
320:5,6,24
**cited** 26:12
244:15 248:3
264:21 265:18
278:2 297:22

Jonathan Borak, M.D., DABT

Page 368

298:2 300:3,20 305:16
**city** 3:4 33:23 59:15
**claims** 97:3,6,7 126:18 146:16
**clarify** 14:16 248:19
**clarity** 191:23 243:24 244:3 346:20
**class** 52:10,11 322:23 323:3 323:16,17
**classes** 38:5,18
**classical** 329:3
**clear** 15:6,20 16:24 17:11 21:5 25:2,3 30:6,16 41:2 80:15 83:15 84:13,22 103:3 104:17 132:18 144:18 184:5 194:13,23 196:9,12 205:13 223:1 229:23 241:15 244:3,7 246:6 249:16 271:20 291:15 299:1 302:11 315:15 317:5 327:17 343:24
**clearly** 78:8 207:3 241:5
**click** 260:5
**client** 92:2 130:5 146:11
**clients** 86:18
**clinical** 35:18 38:10 44:11,15 44:18,19 45:3 45:4,21 54:14 54:17 59:4,6 61:5 70:8,14 70:17 113:12

121:10 122:6 178:5,10,21 180:9,21 181:4 183:5,7 185:17 186:16 354:7
**clinician** 37:1 59:13 72:20
**close** 230:22
**closer** 66:15 333:13
**clutter** 211:4
**coal** 97:13,15,18
**coffee** 83:23
**cohort** 26:17 27:1,7 71:8,11 71:14,23 72:2 77:13,13 161:1 161:3 203:8 220:21 234:8 294:18 338:6
**cold** 111:12
**Colditz** 225:4,7 225:12,15 264:16
**colleague** 126:6 141:2
**colleagues** 338:4 356:7
**college** 49:24 50:15
**column** 277:2,2 278:16 320:16
**combination** 21:4
**combined** 162:9 230:24 287:13
**come** 49:3 52:9 52:13 83:17 98:22 102:22 125:12 245:8 315:12
**comes** 183:17 263:19 286:13
**comfortable** 167:18
**comfortably** 309:24

**coming** 148:8 276:20 292:15
**comment** 115:17 196:16 266:17
**commented** 103:13
**commenting** 102:7
**comments** 298:16
**commission** 361:21
**committed** 92:4
**committee** 202:9
**committees** 19:14,16
**common** 236:24 290:8 295:22
**commonly** 90:12,13
**communicated** 21:15,17
**communication** 17:1,3,3 210:8
**communicatio...** 16:19 17:16 20:17,22 213:5 261:1
**companies** 86:19 138:4
**company** 4:19 51:23 52:22 84:11 86:8,10 86:13,24 88:7 88:10 89:10 91:19,23 107:4 108:24 125:2 131:3 136:13 138:2,6 141:6 142:12 154:21 169:12 170:7 199:15,15,16 199:17,18 229:24 280:15
**comparable**

334:16
**compared** 280:16
**comparing** 179:22
**comparison** 270:24
**Compensation** 126:18
**compilation** 249:12 304:18
**compiled** 282:10
**compiling** 126:17
**complainants** 97:13
**complete** 34:11 212:10,13 250:17
**completed** 34:13 34:23 36:1,2 36:13 212:18
**completely** 159:6
**completeness's** 179:8
**completion** 358:8
**complicated** 108:11,12 114:2 328:14
**component** 244:18
**comprehensive** 124:8
**computer** 14:8 135:15,16 183:18 186:12 186:13 209:23 210:14 236:10 236:12
**concentration** 336:21
**concepts** 40:5 63:17 64:21
**concern** 15:2 66:6 150:21

202:21 334:7
**concerned** 35:15
**concerning** 15:14 21:23 326:15
**concerns** 15:16 90:2 303:1
**conclude** 307:19 308:16 310:1 336:17 348:6
**concluded** 66:17 204:2 215:19 247:6 278:5,13 311:18 312:24 313:23 342:9 357:4
**concludes** 356:24
**conclusion** 98:23 306:22 349:21
**conclusions** 101:12 174:9 219:24 220:4 246:8 276:21
**conditions** 336:21
**conduct** 160:20 160:23 161:1
**conference** 253:6
**confidence** 278:9
**confident** 156:3
**confirm** 180:2 217:12 325:3
**conflict** 179:1
**confounders** 202:23
**confounding** 303:15
**confuse** 30:17
**confused** 239:3
**confusing** 316:1
**Congress** 43:20 44:1
**congressional**

43:19
conjecture
  145:22 146:1
  282:15
Connecticut
  1:15 2:14 9:10
  36:23
connection
  16:21 155:21
  156:1
consider 71:22
  299:4
consideration
  189:1
considerations
  240:9 271:14
  271:15 341:18
considered 5:14
  6:15 112:11
  202:24 203:1
  219:16 223:3
  223:22 244:24
  271:2 278:17
  279:5 280:1
  296:16 320:15
  352:13
consistent 56:19
  158:12 185:12
  214:22 215:21
  303:12 313:16
  335:20 343:7,8
consistently
  48:18 337:24
constitute
  336:22,22
consultant 87:1
  87:14 88:16
  89:7 90:7
  95:18 106:13
  139:2 140:12
  141:18 149:14
  150:16 158:14
  176:6,14
  177:12
consultation
  125:3,5
consulted 16:20

94:12
consulting 86:15
  87:15 88:4
  90:19 91:4
  93:20 96:7,10
  160:9,12
consultingship
  181:2
Cont'd 3:1 5:2
  6:2 7:2
contact 20:4
  21:7 145:7
contacted 22:2
  141:17 143:14
  145:9 148:13
  151:13 177:11
contain 347:14
  347:19
contained 346:4
  346:6
containing
  262:15 281:23
  327:21
content 224:17
context 49:3
  122:20 182:13
  240:4 258:20
  269:24 279:11
  296:18 314:19
contexts 94:16
continue 174:5,7
  204:24 262:3,7
continued 187:6
  241:18 353:5
continues 174:3
contract 89:12
contradict
  105:14
contrast 123:6
contributed
  70:24 71:16
control 358:21
conversation
  145:17,21
  146:2 152:3
  153:12,16,24
  164:7 165:1,3

165:14,22
167:3 198:23
199:4,4 200:22
200:23
conversations
  129:22 144:22
  150:24 151:11
  151:24 152:2
  153:20 167:8
  168:16,21,23
  169:3 172:2
  193:21 201:10
Cook 321:2
copied 248:22
  248:23
copies 13:18
  53:19 143:1,3
  143:6 154:16
  263:8
copy 30:4 84:9
  85:17 117:21
  119:8 172:13
  215:3 267:23
corner 85:14
  246:3 259:13
corners 349:12
Corporation
  96:4,13
corporations
  139:19
correct 10:13
  15:6,10,21
  17:6,12,13
  20:1,16,20
  21:8,9 22:4,6,7
  25:5 26:4,10
  26:13 27:8,16
  27:17,23 29:22
  31:6 32:4,8,9
  32:13 33:5,12
  38:7,16 40:14
  41:3,9 42:6
  43:7 45:6 48:1
  48:24 49:10,11
  49:15,16 50:8
  50:16,17,20,23
  51:2,6,24

55:22 60:14
61:10,13,16,20
61:24 62:10
65:5,15 66:9
66:22 68:24
69:17 75:16,23
76:1,2 78:22
85:9 90:22
95:6,9,10,13
95:15,16 96:5
96:6,16 97:21
99:14,15
100:18 103:6
103:11,16,23
105:7 107:11
110:1 111:2
113:1 117:7
119:14,19
120:1,24
121:14 123:14
128:10 129:16
130:9,15,23
132:21,24
133:11,22
136:6,8,9
138:10 143:23
145:3 146:18
152:5 153:19
154:2 156:21
159:13 160:7
160:15,22
163:24 164:1
169:12 170:4
174:9 176:15
177:13 178:7
178:11,15
184:9 185:5,6
185:9 187:15
187:24 188:10
191:9 192:20
194:3 196:1,22
197:3 198:19
200:5,9 201:13
204:7 207:2
208:5 213:8
215:13 216:22
217:2,4,9,11

217:17 221:6
221:13 222:22
222:23 223:6,9
223:12 225:23
226:15 227:2
230:2,3 233:9
234:2,11
237:17 238:2
238:24 239:8
241:10 242:10
245:17 246:4,8
246:12,20
247:11,12,18
250:24 251:1,6
252:10,18
262:4,11,22
263:13,14,16
263:23 264:2
265:5 268:16
269:8 272:21
273:5 279:14
284:1 291:20
292:4 295:5,6
297:12 300:24
301:19 305:11
305:21 306:19
313:9 314:4
316:24 324:2,3
324:19 325:12
325:13,17
326:19,22
330:8,20 333:5
333:6,24 334:8
334:9 336:4
337:21 338:2
338:10,18
340:16 341:16
341:21 342:2
343:14 344:3
346:5 348:24
351:4,7,21
352:14,15,22
354:8,15 361:7
corrected 207:9
corrections
  359:5,7 361:10
correctly 32:7

218:14 221:2,3
246:15 262:18
263:16 266:20
279:19 328:17
328:18 335:24
336:24
**corresponds**
287:9
**cosmetic** 18:8
306:14
**cost** 35:16
**council** 13:20
20:1,5 50:4
199:23 200:1
293:2
**Council's** 14:1
**Counsel** 9:15
**counting** 320:2
342:19
**country** 190:21
**County** 155:22
184:21 322:20
**couple** 13:6
14:17 37:15
88:22,24 97:8
112:6 125:22
234:7
**course** 12:9 19:9
40:7 46:6,14
46:18,19 47:8
47:12,23 48:6
48:9,9,21,22
131:4 203:8
225:18,20
249:1 260:22
308:14
**courses** 45:20,22
46:2,9,16,22
47:1,5,9,12,18
**court** 1:1 9:17
12:18 22:10,21
23:7,21 24:12
101:8 104:4,10
116:8 176:12
223:19 253:16
253:17 322:22
359:20

**courtroom**
94:18 104:20
104:21 105:21
105:23 253:1
**courts** 253:23
**cover** 154:21
209:5
**Cramer** 226:7
226:12,18
227:5,14 228:3
288:3 289:1,6
289:11 301:20
302:5 319:7,9
319:11 320:8
**Cramer's**
233:24 291:6
302:23
**created** 77:13
**criteria** 102:12
190:7 336:17
341:13 343:7
**criterion** 309:13
**critique** 102:3
102:11
**cropped** 302:10
**cross-examina...**
100:5
**crudely** 333:7
**crystal** 244:3
**cup** 83:24
**curated** 107:21
**current** 44:23
45:1,2 123:17
178:10,14
239:21 305:17
336:13
**currently** 77:5
180:20
**curriculum** 4:15
32:4
**curve** 328:13
**curved** 68:8
**curvilinear**
68:12
**cut** 181:21
183:21,24
248:22

**CV** 32:19 37:7
37:14 38:6
44:9 46:2,8
49:18 62:3
73:5 109:16,24
178:4,4 179:20
179:23 180:1
181:10 187:16
**CVs** 138:19

---

**D**

**D** 4:2
**D.A.B.T** 207:1
**D.C** 2:9,19
156:24 158:23
223:8
**DABT** 1:13 4:5
5:7,22 6:7 9:21
358:8 361:16
**daily** 68:21
**damn** 267:8
**Dan** 3:15 9:3
**dancing** 186:9
**danger** 336:22
**data** 27:6 28:11
28:14,21 29:4
29:6,18 68:9
101:15 102:13
126:21 127:1
161:13,14
257:14 293:24
294:6,8,12,17
294:21 318:21
318:22 319:24
334:14 336:2
**database** 279:9
**databases** 64:7
**date** 1:15 9:6
119:17 141:20
143:11 187:3
192:6,8,9
196:17 207:9
208:6 214:18
232:10 243:9
273:20 359:9
361:16
**dated** 163:24

183:12 185:11
186:18 208:13
209:18 213:11
220:8 235:17
235:18 243:1
247:4,17 248:7
295:8 350:24
358:15
**dates** 100:24
163:22 164:18
166:4,9 214:3
243:24
**dating** 326:16
**Daubert** 23:3,6
23:11,15 24:4
187:20 188:14
189:8,11 190:1
190:5
**day** 12:9 26:22
97:10 109:6
134:3,3 171:21
211:1,1 232:13
268:2 361:20
**day-to-day**
174:3,4
**days** 14:11
167:15 171:19
267:7 295:4
359:16
**deal** 25:14 97:16
232:5,22
234:23
**dealing** 45:23
123:17 148:9
**dealt** 60:8
105:17
**decades** 326:22
330:7
**December**
243:10 250:11
252:3
**decide** 124:12
**decided** 109:8
297:17
**deciding** 22:11
110:18
**decision** 110:21

189:8,12 190:1
190:5
**deemed** 359:19
**defendant** 2:20
3:5,10 13:24
88:11
**defendants**
16:21 23:14
261:2
**defense** 90:12
92:5 98:12
100:15 326:9
**define** 25:10
72:6 182:3
249:15,17
309:12
**defined** 78:8
**definite** 310:8
**degree** 32:7 33:7
33:10 39:8
40:7 42:4
204:4 348:19
**degrees** 39:19
**delete** 135:21
136:2,5 210:18
210:18,21
211:12
**deleted** 135:24
210:16
**delivered** 232:9
**demonstrate**
308:11
**demonstrated**
303:12
**Demonstrative**
5:9 6:12
**department**
36:23 37:10
45:14 333:14
**depend** 167:1,4
**dependent**
80:24
**depending**
221:9,11 311:3
**depends** 80:2
82:5,11 174:14
309:13

Jonathan Borak, M.D., DABT

deponent 9:13
361:2
deposed 88:21
94:1 104:5,11
104:14 105:1
106:7,22
163:10 164:8
164:11,14
185:4 192:17
323:5
deposing 359:16
deposition 1:13
4:14,22 8:2 9:8
10:7,18 11:6,7
11:19 13:3,13
13:21,22 14:3
14:15 34:5
42:3 93:7,14
95:2,5,12,18
100:17 101:2,6
101:7 104:7,19
105:6 106:4
144:5 156:9
162:1,3,4
164:18 165:3,5
166:3,10
167:10 169:21
170:16 214:1,5
214:10,11,17
214:18 215:1,9
215:17,19,22
216:8,15 218:1
218:5,9 229:9
235:15 252:21
264:8,13,14,15
264:17,19
265:19 266:3,9
283:24 326:14
352:18 356:24
357:4 358:6,8
358:9 359:3,13
359:17,19
depositions
106:11 161:24
230:20 252:19
253:5 283:17
deps@golkow...

1:21
deriving 333:18
describe 65:22
85:5 233:21
described 36:8
36:11 58:24
74:9 184:16
239:16 240:8
description 4:13
5:5 6:5 7:5
85:20 121:4
134:5
design 99:6
220:19
despite 247:1
313:22 329:24
detail 25:22
26:22 159:10
detailed 136:12
342:22 343:6
details 134:1
240:15 241:5
244:17 255:6
detected 340:2
340:14
determination
78:21 101:9
259:10
determinations
203:4
determine 23:8
30:23 64:13
74:19 118:7
175:15 196:13
298:12 341:20
determined
24:12 195:19
195:23 197:1
219:6 239:24
272:1 312:15
344:8
determining
175:7 190:7
Detroit 126:7
129:4 132:6
141:2
develop 86:20

developed
108:14
development
220:19 328:14
devoted 49:2
diabetes 355:24
diagnosed
289:15
diagnosis 65:13
340:3,15
diagnostic 35:17
diaphysis 69:13
die 289:24 291:8
291:8
diesel 112:8
121:19
difference 44:18
47:7 102:6
252:20
different 17:24
26:2 35:16
37:15 39:24
49:9 68:6
74:10 197:6,21
203:3 221:13
226:20 270:8
290:15 292:5,6
308:2 309:19
318:19 325:7
differentiate
68:11 128:3
266:8
difficult 113:18
329:15
digital 53:18
210:7
diligence 141:14
dimension 291:2
dining 87:19,21
diploma 40:22
diplomat 49:24
direct 358:21
Direction 8:5
directly 22:10
54:20 75:1
78:23 138:9
268:15

director 36:24
47:9 48:9
disagreeing
130:16 284:11
discovered
97:10,12
202:13
discuss 17:9
165:22 219:4
discussed 63:2
discusses 17:19
discussion 145:6
273:4,5,7
296:7
disease 6:9
65:15 66:20
68:23,24 69:4
75:20 78:12,16
78:17,22 79:4
81:10 295:21
307:21 324:1
326:16 327:16
327:18,20
329:1,4,9,18
329:23 330:8
330:18 331:16
diseases 122:8
disparities 64:2
dispose 211:3
disposed 69:16
dispute 180:8
disregarded
299:16
distinction 47:4
48:2
distribution
67:14,17 68:8
DISTRICT 1:1
1:2
doctor 32:12
84:17 91:18
92:13 117:20
190:21 331:13
332:12 356:16
doctoral 42:4
document 1:8
13:8,24 31:16

83:19 85:1,4
94:21 116:18
143:21 154:10
158:7 172:8
177:23 205:5
229:12 230:10
245:12 255:19
256:10 263:4
274:15 278:21
281:2 286:21
292:16,21
314:22 324:13
335:3 350:13
350:13 352:8
355:1
documented
69:11
documents 8:8
15:14 16:7
17:15 18:10
24:17 94:15
199:15,15,16
199:17,19
200:4,13
263:20,21
doing 23:17 35:8
37:18 38:23
39:2,5 45:16
60:18 87:16
90:18 102:6
128:5 140:16
160:13 182:13
200:19 203:21
302:12 359:8
dollar 133:6
136:17
dose 67:9 68:5
327:11 328:11
331:18
dose-effect
75:14
dose-response
6:9 64:19 65:1
65:3,9 66:17
66:21 67:2,6
67:10,13,21
68:18 220:15

Jonathan Borak, M.D., DABT

288:9 323:20
324:2 328:13
329:3,11
331:19,23
**double** 320:1
**doubt** 185:13
268:9 295:20
302:24 307:14
307:22 308:22
309:7 310:2
311:1 350:5
354:10,11
**doubts** 271:21
**dozen** 234:7
**dozens** 268:14
268:14 269:19
269:19 270:13
270:14 283:23
283:23 290:9,9
294:17
**Dr** 6:14 10:4
32:11 41:12,15
42:10,13,17,23
43:5,12,15,20
43:24 55:12,24
56:7 57:10
121:7 157:2
161:24 162:2,3
162:4 205:15
205:19 224:5
224:13,19,21
224:22 225:1,4
225:7,10,12,15
226:7,12,18
227:5 228:3
229:1 264:16
268:11 270:9
270:18 284:19
288:3 289:1,6
289:11 291:6
301:4,18
302:23 346:22
347:7,12,17,22
352:12
**draft** 6:10 212:2
212:5,12
336:15

**drafted** 157:4
351:21
**drafts** 173:24
210:19,19,22
212:2
**drugs** 120:24
**due** 141:14
329:2
**duly** 9:22 358:5
**dust** 16:16 66:9
66:12,19
**Dynamite** 244:4

———————
**E**

**E** 4:2,10 5:2 6:2
7:2 360:1
**e-mail** 17:4
119:5 210:6
**e-mails** 211:8
**e.g** 220:15,16,21
220:23
**earlier** 95:6
117:3 134:10
144:5 156:9
178:20 180:19
181:16,22
184:2,6,10
185:22,23
186:14 191:4
197:23 198:1
207:20 212:11
214:4 217:14
233:3 236:3,6
239:16 240:11
240:18 241:19
250:20 267:7
268:12 274:19
283:21 301:12
305:3 314:9
323:19 326:13
350:2 353:1
**earliest** 143:10
328:24
**early** 90:12,16
241:8 328:22
**earth** 79:3
**ease** 191:1

252:23 316:12
**easier** 12:18
77:6 203:9
235:2 292:7
**EASTERN** 1:2
**easy** 14:18
**economic** 33:10
**economics** 33:8
35:8,9 36:19
**economist** 34:22
35:2,7
**edit** 119:13
**edited** 208:12
**editing** 213:17
**editor** 21:22
**editorial** 20:23
21:15 57:23
58:5,8,10
243:13
**editors** 20:23
**edits** 120:6
208:13
**educational**
147:9
**effect** 75:19
92:18 336:3
**effected** 68:22
**effectiveness**
17:22 18:5
35:16
**effects** 60:13
74:21 75:11
**effort** 261:3
**eight** 11:11,16
37:1,4 59:17
95:11 114:14
195:9
**either** 26:16
93:9,10 109:6
151:17 167:8
186:11,13
208:1
**elemental** 74:22
**ELLIS** 3:7
**Elmo** 142:24
157:11 255:9
255:16

**else's** 102:8
**embarrassed**
107:17
**embarrassment**
109:21
**embedded**
265:17
**embrace** 122:20
**emergency**
36:18,22 37:18
61:13 71:18
90:20 91:7
**emeritus** 99:10
**empathy** 34:7
**employed**
341:13
**employees** 17:16
20:22 53:2,4
**employment**
35:21,23
**encompassing**
282:19
**ended** 89:16
**ends** 45:5
**enforcement**
89:12
**engaged** 129:12
202:17
**engagement**
154:1
**England** 310:6
**entail** 126:21
**enter** 336:20
**entered** 344:21
**entering** 336:19
**entire** 293:24
**entities** 3:6
17:21
**entitled** 62:14
213:4 287:1,5
**entry** 143:9
**environment**
336:20
**environmental**
4:18 19:22
50:2 51:4 58:7
58:9,15 62:18

63:2 108:16
113:1,5 121:9
121:11 122:21
123:5 124:19
127:19 147:17
179:12 325:12
**epidemiological**
15:24 51:1
60:8 62:16
63:17 64:5,6
64:11 97:24
113:16 115:11
220:20 299:11
305:18 306:12
307:17 308:15
334:14 341:14
**epidemiologic...**
39:5
**epidemiologist**
32:20,23 38:15
38:20 39:20
40:1 41:19
44:12 97:21
127:21,23
128:5,7,13,17
129:9 189:3
307:19 308:20
**epidemiologists**
27:20 50:16
51:5 230:19,24
308:10
**epidemiology**
28:7 32:8,17
32:24 38:2,5,8
38:11 39:9,12
39:15 40:5,7
40:10,17,23
41:3,8 42:5,19
43:6,7 44:12
44:16 45:5,9
45:18,23 47:1
48:6,10,16
50:8,22 54:6
54:10,14,18,23
55:3,8,18 56:9
56:18 57:12
58:1,16 59:3

Jonathan Borak, M.D., DABT

60:2,6,10
62:12,21 63:13
64:21 128:1
178:6,22
180:10,21
181:5 183:6,8
185:17 186:17
268:16 269:7
270:10,15
**equally** 310:15
**equate** 309:6
**errata** 359:6,9
359:12,15
361:12
**error** 92:3
**ESQ** 2:3,3,8,13
2:18 3:3,8
**essentially** 76:11
115:18 126:18
133:8 154:19
313:15
**establish** 305:19
**established**
294:24 295:1
348:7,21
**et** 17:4 26:3,9
185:18,18
247:23
**evaluate** 97:17
195:18 196:23
239:23 271:24
**evaluated** 47:13
76:9,23,24
99:1
**evaluating**
74:13 341:19
**evening** 142:21
**event** 86:21
**Eventually**
134:23
**everybody**
143:1 144:10
154:18 155:5
155:12 156:13
352:7
**evidence** 56:8,18
57:3,11 67:20

68:12 98:19
115:11 221:5
221:20 234:4,6
247:6 271:15
271:16 272:6
272:10,11
302:13,16
304:21 305:18
306:13 308:15
309:20,21
341:4,14,19
349:22
**evolution**
115:18
**exactly** 233:21
241:11 312:23
**examination**
10:1 217:8
**examined** 9:23
216:20
**example** 41:12
60:17 68:17
75:4,18 77:3
81:7,10,12
120:6 123:2
131:13 139:12
141:4 166:13
240:14,20
242:17 246:22
264:9 265:24
277:6 284:12
288:1 293:3
295:2 297:17
299:16 300:3
353:1
**examples** 87:14
91:9
**Exchanged**
268:22
**exclude** 23:15
**exclusive** 218:11
247:22
**exclusively**
60:16
**excuse** 57:16
82:17 189:23
211:17 235:22

267:20 297:4
349:3
**Excused** 357:3
**exhaust** 121:20
**exhaustively**
229:4
**exhibit** 13:9,12
14:15 31:15,17
32:3 83:16,20
84:4,6,19
94:20,22 99:13
107:3 116:17
116:19 117:6
117:21 142:16
142:16 143:9
154:9,11
155:10 158:6,8
172:7,9 173:7
183:14 204:17
205:6,13,17,20
205:21,24
218:24 220:8
229:2,11,13
230:9,11
231:13 244:23
245:11,13
248:15,15
255:11,13,13
255:17,20
263:3,5,19
266:20 267:12
274:13,14,14
274:16 275:1
275:21 276:24
278:20,22
280:23 281:3
284:13,14,16
285:8,14,17,19
286:15,20,22
287:1,3,5,15
287:15,20,21
287:23 288:2
291:16,18
292:9,17 296:9
296:10 301:22
301:23,24
306:2,2,3,4

311:7 314:21
314:23 315:13
316:8,9,19
320:10 322:12
324:6,8,14
332:13,17
335:2,4 344:18
345:3,4,5,6,7,9
345:15,18,19
345:22 346:1,4
346:6,7,21
347:1,3,6,10
347:11,14,16
347:19,21
348:1,3 352:3
352:9 354:24
355:2
**exhibits** 206:3
344:22
**exist** 40:14
**existed** 261:2
**existing** 195:24
**expected** 164:15
286:16
**experience** 38:9
**experimental**
305:17
**experimentati...**
310:9
**experiments**
24:18
**expert** 5:6,12
7:7 11:22
16:20 19:24
23:9 24:10
27:19 128:10
139:14,18
141:8 160:2
193:2,24 194:9
223:3,7,17
224:7,10
235:15 238:1
263:11 265:8
283:24 289:1,4
314:15 325:16
326:3 345:23
352:18,18

**expert's** 190:8
**expertise** 47:17
**experts** 17:5
22:23 23:16,18
138:14,23
161:10 162:8
223:18 230:18
262:14 298:16
304:22
**expires** 361:21
**explain** 22:15
155:13
**explained**
178:22 194:21
219:2,3 303:14
**explaining**
177:17
**explanation**
80:12 213:11
253:4
**exposed** 66:9,11
68:20 75:4,9
76:7,10,15,17
76:17,23 77:5
77:19 87:19
327:21 328:16
331:1
**exposure** 19:18
19:20 60:23
61:20 65:4,12
67:16 68:17
74:21,23 75:12
75:15,19 77:15
77:16 78:11,12
78:15,22 79:3
81:7,10 104:1
104:7 121:12
247:8 326:15
328:11 329:3,9
330:1,19 331:3
331:16 334:5
335:22 336:14
338:2 343:11
**exposure-rela...**
97:23
**exposures** 60:9
97:7,9 121:11

Jonathan Borak, M.D., DABT

121:19,24
147:17 312:1
331:10
**express** 31:4
345:8,16 346:2
346:22 347:5,7
347:9,13,17,22
**expressed** 348:1
349:12
**expression**
258:19
**extended** 174:19
**extensive** 121:4
238:20,21
**extra** 84:9
**extrapolated**
27:3
**extrapolation**
220:17

---

**F**

**F** 2:8,18
**facility** 37:19
**fact** 16:1 29:16
41:6 66:18
68:15 117:2,6
143:8 156:7
161:11,11
181:5 183:6
220:2 222:7
226:11 253:21
254:5 256:14
284:1 289:8,13
300:1 314:14
323:19,23
325:4 327:3
329:24 330:17
352:3
**factor** 340:1
**factories** 66:8
**factors** 64:4
81:1 202:23
216:24 217:1
219:10 355:24
**factory** 65:24
66:13
**factual** 194:14

**factually** 134:20
**faculty** 38:24
122:23 179:10
**fail** 359:18
**failed** 270:3
**fair** 58:12 61:2
192:4 214:13
344:23 345:13
**fairly** 298:5
**false** 140:8
**familiar** 18:4,7
56:6,13 57:9
79:7 84:20
255:3 256:3
257:7 290:12
290:21,23,24
315:3 325:6
355:13
**Fantastic** 327:6
**far** 126:3 233:4
260:2
**fashion** 139:4
210:10 225:16
**father** 91:17
**fax** 1:21
**FDA** 333:8
**fear** 259:7
**February** 101:7
159:12 163:24
171:5,8 183:13
184:8 185:20
186:19 192:22
217:16 220:9
229:10 231:13
234:18 241:9
350:24 351:20
353:20,24
**federal** 223:4
**fee** 129:15 130:2
150:14 201:12
**feel** 187:10,12
218:2,7
**feeling** 187:11
**fees** 129:18
153:1
**fellow** 70:15
93:18 144:13

**fellowships**
49:23
**felt** 147:11
**Fields** 74:4
**fifth** 113:8,10
296:1
**figure** 77:14
136:17 186:7
**file** 67:16 117:17
187:7 209:23
228:22 255:5
332:9 356:14
**filed** 119:6
**files** 210:17
**filing** 23:15
**fill** 83:23
**final** 215:17,18
241:17 303:9
**finances** 153:13
153:17
**find** 14:19 53:23
55:17 119:6
141:5 211:1
280:17 290:9
301:6 302:12
302:13,16
304:20 305:5
312:19 332:3
**findings** 312:5
313:17
**fine** 130:1
156:18 157:6
205:3 262:9
318:11
**finish** 12:20,21
36:4 82:20
176:9
**firm** 88:6 89:15
99:18
**first** 9:22 18:3
32:21 38:8,13
62:13 65:11
85:7 86:8,18
86:21 87:12,17
88:16 96:3
101:10 102:21
106:16 107:7

113:2 125:24
129:23 141:16
142:12,21
143:8,13,24
145:6 153:11
154:15 155:7
155:17,20
163:9,9 165:2
171:15 177:11
179:4,15 181:1
182:15 183:4,9
184:22 185:15
186:2 187:9
192:24 193:12
193:13,20
198:5 207:8
220:9 232:6,8
233:24 246:10
259:18 260:6
262:24 263:17
277:1,2 280:9
280:12 292:1
296:24 327:17
331:2,7 355:18
**fit** 147:18
**five** 73:13
114:14 126:8,9
129:22 130:12
130:15 132:2
352:19 356:14
**five-minute**
117:10
**fix** 192:8
**flaws** 99:6
**floor** 2:14 51:18
**Florida** 105:17
**fluorescent** 66:7
66:13 327:20
**FLW** 1:6
**fly** 311:11
**focused** 58:20
58:22 121:17
**folks** 21:15
**follow** 67:16
180:17 182:5
344:20
**follow-up** 206:2

**followed** 214:1
231:20
**following** 34:18
119:12 146:11
220:18 250:15
270:2
**follows** 9:23
67:14
**footer** 207:8,13
**footnote** 220:10
220:13 222:10
222:18 289:12
290:19
**foregoing**
358:18 361:6
**Forestry** 108:16
**Forgive** 115:8
243:12
**forgot** 208:14
**form** 28:19 30:1
139:4 210:7
212:3 225:12
341:18 361:10
**formal** 114:19
**format** 53:18
325:1,8,8
**formats** 299:11
**former** 85:10
**formerly** 84:13
86:6 96:15
**forth** 103:1
108:23 114:19
191:2
**forward** 237:21
**found** 36:14
66:21 74:7
294:13 304:24
305:6 349:19
353:2
**Foundation**
46:21
**Foundations**
46:20
**four** 11:12 12:1
12:3 53:5,6
73:13 96:1
98:6 100:23,24

Jonathan Borak, M.D., DABT

102:20 114:14
134:6 189:7,11
189:13,21,24
190:4 231:3
349:12 352:19
**four-page**
292:21
**fourth** 3:8 113:8
113:9
**fraction** 161:15
**framework**
341:19
**frankly** 122:14
**free** 218:2,7
**frequency** 242:4
**frequently**
339:21 340:24
341:3
**Freud** 112:21
**Friday** 14:8,10
**friend** 126:7
129:3 132:5
268:12
**friends** 55:14,16
**front** 32:2 84:3
84:18 89:4
189:3 215:9,11
215:12 253:1
275:21 316:13
316:16
**fulfilling** 239:21
**full** 46:14,18
187:15 248:23
355:18
**full-time** 37:24
59:13
**fully** 12:22
**funded** 33:2
34:21
**Funny** 292:6
**further** 80:12
336:2
**future** 97:3,6,7
164:14

———————
**G**
**game** 202:20

**gastroenterol...**
34:21
**Gates** 240:22
**general** 23:10
102:24 123:9
334:15
**generally** 16:13
23:6,12 60:16
60:20 87:5,23
96:20 111:12
124:12 152:12
158:12 167:13
184:16 211:10
232:8 340:16
**generate** 237:2
241:9
**generated**
159:16 171:7
**Generically**
116:13
**generosity** 108:2
**genetically** 69:6
69:9,15
**genital** 204:5
303:18 311:24
338:14
**gentleman**
91:12 117:3
**GEREL** 2:8
**germane** 177:19
282:2
**Gertig** 240:23
**getting** 39:18
118:18 122:13
140:18 150:11
324:11
**give** 30:3 83:22
87:14 91:9
103:15 113:19
127:13 143:4
150:6 177:23
187:16 209:15
244:2,14,17
248:8 273:20
**given** 10:24 11:9
46:9 47:4,4
48:2 95:17

100:16 125:16
249:2 265:7
267:23 334:3
358:6 361:8
**giving** 99:24
108:1 152:14
187:3 304:3
**glasses** 316:10
**go** 14:15 17:14
25:21,24 26:15
26:21 33:22
39:17,19 73:5
83:17 102:12
107:2 108:22
111:23 117:8
119:2 122:15
123:22 124:14
132:19 133:21
146:8 150:13
155:1 159:9,18
161:9 175:14
177:18 179:6
193:9 204:8
206:11 209:10
209:20 210:2
212:14,15
220:7 223:1
228:12 229:3
231:12 233:6
240:13,19
246:15 251:10
254:13 259:9
259:11 261:23
261:24 262:1
263:1 268:9
288:2 311:13
317:7 318:7
322:11 326:12
328:6 337:2,18
338:21 341:6
342:16 343:21
344:24 348:17
349:4,6 351:12
354:10 355:14
355:17
**goal** 111:3
**Godard** 321:2

**goes** 17:23 26:22
44:23 62:9
124:13 131:15
172:17,19,22
198:18 229:10
259:6 287:10
**going** 10:8 22:22
25:21,24 26:20
26:21 31:20
52:11 60:17
70:14,18 83:12
83:13 116:24
117:12,16
119:10,12
136:10 143:15
144:20 154:4
157:23 163:10
164:3,8,11,14
175:7 178:4
187:19 191:13
192:5 193:1
194:2 197:22
204:19,22
216:12 218:3
218:11 228:15
228:21 231:7
241:23 244:2
269:3 296:6
311:6 332:4,8
332:12 343:23
348:2 349:8
352:1 355:5
356:6,9,13
357:1
**Gold** 2:13
**Golkow** 1:20 9:5
**Golomb** 2:2,3
4:6 10:3,8
13:11 27:12
28:4,23 30:7
31:13,19,24
32:1 40:24
42:1 44:8
46:17 48:11
50:13 56:16
57:1,21 58:21
61:1 63:7

64:24 66:4
67:3,11,23
68:14 69:14,20
70:4 72:10
75:22 78:18
79:1,22 80:4
80:16 81:2,20
82:13 83:3,8
84:7,16 85:2
85:18 94:8,24
102:15 103:22
110:9 111:20
114:23 115:15
116:2,6,15
117:4,8,19
128:21 134:17
137:4 138:17
140:4,21
141:15 144:1
146:7 147:1
149:3,22 150:8
150:22 151:3
152:8,20 153:8
154:13 155:1,4
155:9 156:17
157:6,7,10,12
157:22 158:1
158:10,19,24
159:8 160:6,19
161:21 162:14
162:22 163:2,6
163:15,18
170:13,17,21
170:24 171:6
172:12,21
173:5,10
176:22 179:7
179:13,18,24
180:5,23
181:13 183:1
183:19 184:3
184:14 185:3
186:24 188:2,7
188:16,21
189:10,19,23
190:2,22
191:14 193:18

194:7,16 196:7
196:21 197:7
197:17 198:10
199:2,24 200:2
200:10,20
201:17,22
204:12,18
205:2,8,22
206:6,18
208:18,23
209:8,24 210:5
211:16,20,24
212:19 213:6,9
213:15,22
215:4,6 218:2
218:10,15
219:17 220:1
221:10,16
222:6,15
223:13 226:4
226:23 227:12
228:10,24
229:15 230:7
230:13 231:11
232:15 233:1,8
234:15 235:3
235:12 236:2
237:6,20 238:8
239:7 242:14
243:2,18
245:10,15,24
252:8 254:1
255:1,8,10
256:1,24
257:11,21
258:5,14 260:1
260:15,23
261:9,16,22
263:7,10 264:4
264:11 265:20
266:18 268:24
270:6 271:10
272:7,17,20
274:4,11,18
275:19 276:7
276:17 278:15
279:3 280:5,22

281:6,12 283:5
283:13 284:7
284:16,17
285:16,23
286:24 287:4
287:24 288:20
289:22 290:6
290:16,22
291:14 292:19
294:15,22
296:21 297:15
298:7 299:12
300:7,18
301:14 303:20
304:6 305:8
306:3,6,10
307:4,15 308:3
308:6 309:4,22
310:10,22
311:5,12 313:2
313:13 314:2,8
315:1 316:2
317:6 318:2,4
318:14,23
319:5,19 320:3
320:12,17
321:8,19
322:10,24
323:14 324:10
324:16 326:11
327:2 330:2,13
331:11,24
332:11,21
333:1,16 335:2
335:6 337:12
338:17 339:4,7
340:10 342:11
343:1,4 344:14
344:23 345:1
348:10,13,16
349:10,24
350:8,16 351:3
351:15 352:11
355:4 356:4,16
356:21
**good** 10:4,5
96:19 105:19

144:15 188:6
191:15 228:9
283:3 332:2
**good-looking**
195:4
**gotten** 137:22
198:23 206:3
**government**
17:17
**Grade** 354:6
**graduate** 35:7
36:15 38:5,19
**graduated** 33:5
33:15
**Grand** 3:3
**granulomatous**
327:16
**Gray** 1:16 9:18
358:12
**great** 25:14
63:18 112:19
232:5,22
234:23 346:8
**greater** 26:22
296:18
**Green** 2:8 10:16
11:6 144:6,9
144:11 169:20
170:19 214:9
305:2 321:2
**Greenback**
144:4
**grimaced** 142:6
**Gross** 298:9
319:10
**group** 2:12 4:16
37:22 124:23
125:1,7,16,21
125:24 126:6
126:11 127:3
142:10 275:11
275:15 299:21
**grouped** 275:16
**groups** 49:9
68:6 76:12,20
**guards** 94:6
**guess** 18:16

100:7 291:16
315:4
**guy** 56:5 91:18
91:22 147:11
195:4

**H**

**H** 4:10 5:2 6:2
7:2
**half** 52:19
167:15 204:19
215:23 217:24
**hand** 244:6
355:5
**handed** 117:21
**handful** 170:22
**handing** 158:5
215:4 314:7
**handwriting**
158:3 173:9
339:5
**handwritten**
236:9 339:1
**happen** 24:15
164:21 177:9
208:19 218:12
**happened** 71:24
150:12 213:21
**happens** 134:12
134:20 136:19
**happy** 116:23
289:21 303:5
**hard** 53:19
114:8 128:2
**hardcopy**
142:22 210:7
**Hardy** 3:2 328:2
328:4
**Hardy's** 65:23
**Harlow** 298:8
319:10 320:7
**harm** 336:12
**harmed** 94:4
**Harriet** 65:22
**Haven** 1:14,15
2:14 9:9 36:23
37:12 52:24

53:1 61:7
167:14 171:20
214:20
**hazard** 87:18
**hazardous** 60:13
60:14
**head** 241:6
**health** 4:18
18:11 34:21
35:1,9,10
44:13 46:23
47:2 52:18
58:7,10,15,23
60:21 62:18
63:2 88:9
99:11 113:1,5
123:7,10 178:6
180:22 185:18
304:5 328:15
329:16 333:4,7
333:14,17,23
334:7,11,24
336:13,23
337:3
**healthcare**
334:6
**hear** 12:22
22:22 129:6
211:21 250:6
260:3 281:8,14
**heard** 20:7,9
69:21,22 78:5
78:7,8 83:9
211:20 258:17
**hearing** 23:3,7
23:11 112:7
113:7
**hearings** 100:21
**heavily** 75:4
**HEGARTY** 3:3
28:17 29:24
31:7 41:21
44:4 56:10,21
57:15 63:6,15
68:3 69:1
80:13 93:24
103:18 110:4

111:8 115:20
134:14 136:23
138:15 139:23
140:14 141:9
146:19 148:24
149:16 150:3
150:17 160:4
161:17 162:13
162:17 172:17
176:17 182:22
183:16 184:13
186:22 187:22
188:5,11 189:4
189:16 190:18
193:17 194:11
196:19 197:14
198:20 199:22
200:7,17
201:14 208:16
213:2 217:18
219:1 223:10
225:24 226:17
243:11 253:19
254:21 256:22
257:9,17 258:1
258:10 259:22
260:13,20
261:5,13,20
263:24 268:17
269:21 271:18
273:18 275:8
276:5,12 282:8
283:11 289:17
290:3,13
291:11 294:10
296:19 297:14
297:20 299:7
300:9 303:23
304:15 306:21
307:23 308:24
309:8 310:18
319:18 323:13
326:5 329:12
330:22 333:9
338:16 340:6
342:4 349:16
350:7 351:2,8

**held** 1:14 9:9
36:24 101:6
141:13
**hello** 168:10
**help** 63:10
126:11 127:8,9
127:10 266:4
303:7 341:20
**helps** 143:12
**Henderson**
233:13,15,17
234:5
**hesitated** 168:4
**hierarchy** 56:7
56:18 57:3,10
221:5,19
271:15 272:11
298:24 299:5
299:10
**high** 55:23 76:8
76:15 141:13
354:6
**High-Grade**
6:20
**higher** 329:23
330:1
**highlights**
299:22
**highly** 56:3
**Hill** 101:23
102:1,4,7,8
103:1,5,8,10
113:23 114:5,6
114:10,18,20
115:14 161:6,8
161:12 162:9
197:10 222:2,5
222:8,14,17
341:13 342:14
343:7
**Hill's** 220:24
222:11 285:1
**hired** 109:2
**Hispanic** 62:15
**histology** 233:19
**historical** 97:6
121:22

**historically** 76:7
**history** 105:13
**hit** 259:16
**Hogans** 264:17
**hold** 57:22
**homepage** 85:8
259:12
**Honik** 2:2
105:16
**hopefully**
247:13
**Hopkins** 45:2
178:16,17
**hospital** 33:20
37:11 99:3
**host** 107:10
**hosted** 84:14
86:6 110:18
**hosting** 107:13
107:19 108:9
108:10
**Hotel** 1:14
214:21
**Houghton**
240:22
**hour** 131:16
134:5 168:24
169:2 204:19
**hourly** 131:9,12
131:23 132:1,3
133:3,3,17,18
136:15,16
140:12
**hours** 130:8,21
131:6,10,22
132:24 133:4,6
133:17 134:6,6
136:14 169:1
171:12 175:6
177:24 178:1,1
214:14 215:24
**HTML** 325:8
**huge** 235:14
**hugely** 330:1
**Hugger** 98:7,10
98:20 100:18
100:20 102:17

**human** 333:14
334:7,13
335:18 336:12
336:23 337:16
**humans** 341:20
**Huncharek**
297:18,23
321:3
**Hygiene** 58:10
**hypothesized**
339:22 341:1,2
**hypothetical**
258:23 259:1,2
259:3 260:4

**I**

**IARC** 18:22
19:2,5,7 148:3
148:5,14,21
149:9 202:5,9
203:5 240:23
298:21,23
299:21 300:23
301:5,9 307:1
307:7 308:1
312:24 349:21
**idea** 23:13
**identification**
13:9 31:17
83:20 94:22
116:19 142:15
154:11 158:8
172:9 205:6
229:13 230:11
245:13 255:20
263:5 274:16
278:22 281:3
286:22 292:17
314:23 324:14
335:4 352:9
355:2
**identified** 12:4
25:23 26:1,8
128:12 129:7
133:4 181:3
200:14 257:23
290:10 292:1

334:8 338:5
**identifies** 11:15
11:18 37:14
38:7 260:9
**identify** 49:22
130:21 183:5
246:17 252:3
**identifying**
186:15
**idiot** 187:10
**II-B** 307:1
**imagine** 104:9
187:15 193:7
214:9
**Imerys** 199:17
**immediately**
171:17
**immunologica...**
327:15
**imperative**
359:14
**implementation**
331:2
**Implications**
62:15
**implicitly**
134:19
**imply** 340:16,18
**import** 288:16
325:23
**importance**
296:5
**important** 99:6
118:24 295:21
295:24 296:1
298:11,13,14
298:21
**importantly**
327:16
**impression**
110:1
**in-person**
167:20
**incidence**
113:14
**include** 17:21
29:7 41:11

Jonathan Borak, M.D., DABT

130:7 160:13
293:15 297:17
297:18 302:7
303:21 312:7
320:11,13,18
320:19 335:1
344:5 352:17
353:8 354:18
355:24
**included** 112:12
205:21 248:21
249:4 261:11
261:18 267:7
279:23 294:1
298:6,8 301:17
333:20 354:5
354:14
**includes** 133:16
205:14,17
220:17 246:8
251:11 275:24
279:13 297:8
344:2
**including** 49:24
97:6 131:20
173:3,6 178:1
339:24
**inclusive** 112:18
**incomplete**
288:10
**incorrect** 170:12
**increase** 312:3
**increased** 247:8
273:14 275:5
276:9 278:9
297:10 313:18
315:17 316:22
319:15 338:13
**independent**
60:19 141:5
290:5
**INDEX** 8:2
**indicate** 98:20
112:4 124:17
134:7 264:20
273:19 335:20
**indicated** 41:6

43:1 134:10
150:20 161:22
233:2 299:2
**indicates** 11:20
131:13 134:3
209:1 214:18
282:1 325:14
**indications**
339:23
**indicative** 336:3
**indirectly** 22:11
71:15 250:14
**individual** 29:15
92:19
**individuals**
131:21
**industrial** 18:14
61:16 121:9
**industry** 126:19
**infections** 98:21
**infer** 115:12
**inference**
220:23 311:24
341:22
**Inferred** 293:4
**inferring** 115:10
342:6
**inflammation**
300:12 306:17
339:23 341:5
**inflammatory**
339:19 340:1
340:22
**influenced**
240:10
**inform** 86:21
**information**
119:3 135:10
210:17 309:14
325:15 327:4
336:10,15
**informational**
86:20
**infrastructure**
127:2
**Ingredient** 18:8
**initially** 177:4

203:9
**injured** 92:19
93:22
**injury** 92:9,11
92:16
**inmate** 94:3
**inner** 59:15
**inside** 104:21
**Institute** 19:12
243:15 247:5
247:16 251:4
251:18 295:3,8
**instruct** 136:1
**instructing**
213:7
**instruction**
136:6 177:7
**instructions**
119:5,12 359:1
**insufficient**
305:18
**insurance** 138:1
138:3,6
**intend** 353:23
**intended** 351:6
**intent** 312:14
**intention** 351:17
**intentionally**
211:14,18,23
**interest** 58:14
60:20 121:8
147:18
**interested** 61:22
126:13 127:8
146:11,12
147:3,5,16
150:11 151:14
**interesting**
111:14,18
140:1 206:13
272:23 300:13
**interests** 58:13
111:7 112:5,15
120:8,13,18,23
**interface** 59:3
**interim** 238:11
**internal** 34:10

50:3 59:19
61:9 200:4,13
**International**
18:18 50:22
51:4 54:10
**internet** 108:2
**internist** 32:13
32:14 59:7
71:17 127:17
**interpose** 179:5
**interpret** 64:14
**interpretation**
64:22 126:20
220:20 240:10
**interrupt** 186:6
**interval** 278:10
**intrigued**
203:12
**introduced** 10:6
129:3,5,23
132:6 141:12
**introduction**
126:15 129:7
**introductory**
201:9
**investigator**
70:7 71:2,8
72:12
**invited** 38:23
125:12
**invoice** 6:13
143:24 144:3
280:16
**invoices** 4:16
6:17 7:8 130:4
130:6 132:15
132:23 136:12
142:9,10,11,14
142:19 144:7
154:19 155:6
230:17 280:16
**involve** 126:23
**involved** 24:9
61:3 72:21
74:5 86:24
89:18 93:4,6,7
110:20 136:21

149:18 150:11
152:18,23
176:19 177:4
184:17 193:14
225:13,15
322:21
**involving**
106:23
**irrelevancies**
108:13
**irrelevant**
272:18
**irrespective**
57:24
**irritation**
339:18 340:21
**Isser** 2:3 230:15
**issue** 61:4 63:12
148:20 154:7
162:21 177:5
198:16 199:10
202:21 304:5
**issues** 89:11,12
89:13,13
121:18 217:21
353:17

---

**J**

**J** 3:8
**J&J** 156:14
**Jack** 41:12
**JAMES** 2:8
**January** 33:24
94:2,9 176:2
185:11 192:14
198:2,12
201:18 204:2
206:7,10 207:2
207:18 208:10
209:18,19
210:11 213:12
213:24 234:10
234:18 236:20
237:9,21
**Jersey** 1:2
155:21 156:23
157:3 158:23

184:21 223:15
223:18 241:13
**Jgreen@ashc...**
2:10
**JNCI** 19:13
**job** 36:17,24
153:2 197:24
201:11
**jobs** 37:15 76:21
**Johns** 45:1
178:16,17
**Johnson** 1:4,5
3:5,6 33:2
199:16,17
**join** 38:24
**Jonathan** 1:13
4:5,19,20 5:6
5:22 6:6 9:13
9:21 14:3
51:22 52:22
84:11 86:8,9
86:13,24 107:3
110:14 131:3,7
132:16 136:13
142:11 154:20
169:11 170:7
207:1 229:24
346:22 347:7
347:12,17,22
358:8 361:16
**journal** 21:1
26:2 54:6,10
54:14 55:3
58:2,6,9 62:8
243:14 325:11
**journals** 21:16
51:8 53:15
247:23 266:22
**judge's** 188:24
**judgment** 92:4
**jumps** 119:20
**June** 10:20
95:18,22 144:4
169:20 192:18
193:5 214:2,19
216:15 217:13
**jury** 23:9 189:3

253:2
———————
**K**
**K** 2:9
**K-U-R-T-A**
321:5
**kaleidoscopic**
47:19
**Kansas** 3:4
**keep** 29:11
31:20 116:24
135:10,13,14
202:19 210:19
236:1,9 342:15
**keeping** 174:22
**Ken** 55:12 271:6
**kept** 236:4
**key** 279:10
**kicking** 117:1
**kidding** 109:4
**kind** 17:2 19:16
53:22 93:5
114:19 125:5
141:6 144:19
256:13 318:19
**kinds** 20:18 60:9
97:8 309:19
**knew** 66:10
77:17,18 230:6
**know** 10:11
12:11,14 14:4
16:16 18:11,14
18:17 19:4,14
20:10 23:2
24:4,7 26:18
27:13 28:1,5
41:14 42:3,22
43:4,9,11,14
55:12 56:12
57:2 65:21
66:10 67:1,4,5
67:9,21 68:16
71:20 77:19,24
78:4 79:12
80:8 84:23
88:19 89:15
95:21 97:14

98:4,15,17
101:22 104:13
106:23 111:10
112:18 120:11
120:20,21
122:14,23,24
125:4 126:3
130:19 134:11
134:13,19,19
134:22 135:20
136:19,22
137:1,8 138:3
138:11,21,24
139:21 140:3
140:22 141:1
141:20 143:5,8
144:21 148:8
156:2 157:1,2
164:24 165:1
165:19,24
171:10,11,23
174:13 183:20
187:23 188:13
188:19 189:7
190:3 192:20
194:1,2,8
199:6 201:11
203:3 209:4,7
213:21 214:15
223:22 224:23
225:7,14
226:12 227:14
227:21 228:1,6
229:4 231:8
232:7 236:17
238:18 242:4
244:6,7 250:20
252:1,2,14,17
252:20 256:6
258:19 260:24
261:10 268:10
268:12,21
274:9 276:23
284:4,9 288:6
302:10 309:15
309:17 314:3
326:2,21 327:6

342:15 344:17
**knowing** 270:8
270:11,13
**knowledge** 72:8
173:23 253:23
341:3
**known** 106:15
164:3 225:21
225:22 226:3
257:6 306:24
339:22
**knows** 144:15
**Koch's** 220:24
**Kurta** 321:5
322:2

———————
**L**
**L** 1:16 358:12
**labeled** 262:10
**laboratory**
15:23
**lack** 328:13
329:2
**lady** 91:16
**laid** 182:6
**land** 202:5
**Langseth** 202:8
203:5 240:24
273:23 298:23
299:16 301:1
301:15 305:10
305:10,13,15
319:9 321:17
322:1
**large** 36:22
59:15 68:21
74:3,6 89:3
97:11,12 98:24
126:17 127:1
202:14 203:20
239:13 240:5
241:20 275:14
293:19
**largely** 167:18
**late** 59:14,22
66:1 142:21
241:8

**law** 2:12 88:1,6
89:14
**Lawlor** 3:15 9:4
**lawyer** 10:17
24:10 89:14
99:16,21
**LAWYER'S**
362:1
**lawyers** 89:10
89:20 128:9
139:20 140:11
144:23 156:8
156:10 253:7
**laziness** 181:17
**lead** 288:12
**leading** 339:19
340:22
**learn** 153:6,10
163:9 192:24
237:22,23
**leave** 111:24
**lecture** 47:6
49:8
**lectured** 46:15
46:24 48:12,22
49:12
**lectures** 47:21
**led** 232:12 307:1
**left** 36:5 59:20
59:21 70:9,11
**legal** 90:18
189:18 309:12
**legs** 189:7,11,13
189:21,24
190:4
**Leigh** 170:20
**length** 167:5
**lengths** 298:19
**let's** 31:14 78:9
83:16,17 86:7
94:19 107:2,4
116:16 123:16
155:1 163:7
172:5 190:23
206:11,19
220:7 230:7
231:12,12

Jonathan Borak, M.D., DABT

Page 380

245:6 261:23
261:24 262:1
262:24 263:2
278:19 280:23
286:19 288:2
293:2 318:7
320:4 322:11
324:4 332:1
334:22 343:20
344:24 354:22
356:5
**letter** 212:3,6
**letterhead** 131:3
**letters** 21:22
211:7 327:10
**letting** 326:1
**levels** 75:12 76:8
76:15 78:15
330:1 336:13
**Lewis** 74:5
**LHG** 1:6
**liability** 1:6 97:2
97:5
**liaisons** 20:24
**librarian** 131:14
133:5,18 168:7
175:9,20 177:8
270:17 279:22
**librarian's**
136:16
**library** 54:8,12
54:16,21 55:1
55:6,11 175:13
**license** 50:4
**life** 70:22 336:23
**lifted** 186:14,17
**light** 65:24 66:8
327:20
**likelihood** 77:8
**likes** 56:2
**limit** 81:15
**limitation** 17:21
**limitations**
334:13
**limited** 29:17
95:22 349:22
**limits** 19:18,20

331:3
**line** 8:6,9,12,14
159:7 187:10
246:12 288:22
302:7 331:12
360:4 362:2
**linear** 67:5,8,9
67:14,17,22
68:1,7,11,18
**lines** 291:6
333:23
**link** 198:17
271:7
**Lisio** 6:21 354:6
354:17,23
**list** 4:23 5:8,18
11:10,12,14,14
11:24 12:5
17:23 25:24
42:15 49:18
61:24 62:1,8,9
63:22 95:1,6
95:21 96:1,4
103:24 109:19
109:23 110:3,7
110:8,11
111:17 119:23
120:4 123:3,18
123:19 124:1,9
124:13,14
173:4,6 176:1
177:8 223:21
227:8,23
244:14 245:17
245:19 246:1
246:12,15,19
247:15,22,22
248:9,16
257:15 263:18
263:23 264:22
264:23 265:3,7
265:8,16
266:16 267:6
268:1 276:3
277:3 278:4
279:7,7,13,24
280:17 281:16

282:11,24
285:14,22,24
286:5,14,15,17
287:6,10,16,21
291:19 292:2
293:11 297:6
315:13 316:20
320:19 344:24
345:22 355:7
**listed** 46:1,23
48:10 72:7,19
100:23 109:9
113:13 123:8
123:13 217:3
248:24 250:16
258:7,8 279:9
282:21 287:18
**listen** 295:19
**listening** 48:3
**listing** 37:5
85:20 119:22
**lists** 11:14 60:18
95:8 234:24
292:5 293:19
293:22
**literally** 28:9
32:12 270:9
**literature** 25:15
25:16 89:21
99:1 114:9
115:19 116:12
139:8 149:24
174:23 175:10
175:12,21,23
177:9,19
193:15 194:1
195:6,12,24
196:6,17 198:6
198:13,16
200:12 202:10
203:7 233:3
237:8,15
239:16 268:22
271:22 272:5
279:21 283:1
335:19 352:21
**litigation** 1:7,20

9:5,11 10:12
11:1 16:22
20:6 22:14
24:22 87:1,13
87:15,23,24
88:12,16 89:7
89:17,18 90:2
90:7,10 91:4
93:5 98:7,10
126:22,24
138:7 141:19
145:8 156:2,23
156:24 157:3,5
158:15,18,20
158:22 159:1
160:3 171:14
176:24 177:4
184:22 193:14
223:5,16,19
225:8,12,17
260:19 266:23
267:5 271:13
272:10 289:2,5
325:17
**little** 22:16
107:17 111:11
111:11 114:10
118:13 197:6
202:7 229:6,18
270:8 334:23
**Liu** 321:5 322:2
**lived** 330:15
331:5,7
**lives** 114:18
**living** 177:22
**LLC** 3:11,11
**LLP** 2:8,17 3:2
3:7
**local** 339:18
340:21
**Locke** 2:18
12:14 13:19
27:9,24 28:18
29:23 31:8,22
40:15 41:22
44:5 46:12
48:7 50:9

56:11,20 57:14
58:17 60:24
63:14 65:16
66:23 67:7,18
69:2,18 70:1
72:4 75:21
78:13,24 79:18
80:1,22 81:17
82:10 83:2,5
84:1,3,21
85:17 95:3
102:9 103:17
111:9 113:24
115:5,21
116:11,21
125:12,15
126:2 128:18
132:20 136:24
137:20,22
139:22 140:13
141:10,22
142:2 143:16
144:23 146:6
146:20 149:15
150:20 151:2
151:12,16,17
152:6,12,16
153:4,13,17
154:2 155:3,7
155:11 157:1
157:19,24
158:16,21
160:5,9,16
161:18 162:12
162:16 163:12
163:22 165:8
167:14 168:23
169:4 170:11
170:15,19,22
171:19 172:19
173:2 176:16
179:4,10,15,21
180:3,11 181:7
182:21 183:22
184:12,19
186:21 187:21
188:6,12,19

Jonathan Borak, M.D., DABT

189:5,17
190:17 191:12
194:4,10 195:3
195:10 196:2
196:20 197:4
197:13 198:7
198:21 200:6
200:16 201:10
201:15,21
204:8,21
205:12 206:5
206:16 208:17
208:20 209:5
209:21 210:4
211:15,19
212:15,16,22
213:1,3,8,14
213:18 214:23
217:19 218:6
218:22 219:21
221:7,14 222:3
222:12 223:14
226:1 227:9
228:8,11 230:1
231:7,20 232:2
232:20 233:5
234:12,20
235:9,16,22
237:3,18,24
238:3,12 239:1
242:11,21
245:20 252:5
256:23 257:18
258:2,11
259:23 260:14
260:21 261:6
261:12,19
265:1 266:5
268:18 270:21
271:17 272:13
272:19 273:17
274:7 275:7
276:13 278:11
280:2,20 281:8
283:9 284:2,14
285:10,13,18
287:2,17

288:17 289:18
290:2,14,18
291:10 292:12
294:9,19
296:20 297:13
299:6 300:6
301:10 303:19
304:16 305:24
306:20 307:12
307:24 308:5
308:23 309:9
310:3,17 311:2
311:8 312:9
313:10,19
314:5 315:21
317:1 318:8,17
319:2,17,21
320:9,14 321:7
321:14 322:5
322:17 324:7
326:23 329:13
330:10,21
331:20 332:18
332:22 333:10
337:7 338:15
338:24 339:6
340:7 342:3,23
343:2 344:4,16
345:14 348:9
348:12 349:2,4
349:7 350:6,10
351:1,9 356:18
**Locke's** 137:20
137:23 144:24
151:18,20
**Lockheed**
106:20 314:16
**login** 257:1
**logistics** 165:23
166:2,6,7,19
**logon** 256:19
**long** 61:17 76:7
145:24 162:20
165:14 168:15
174:11 175:4
177:16 202:5
214:11 267:8

**longer** 45:8
107:10 109:11
109:13 178:21
180:9
**longitudinal**
75:2 77:11
**look** 11:13,23
14:9,14 15:13
20:12 24:16
29:5 31:15
37:6 54:7,15
59:2 66:15
68:5 75:3,5,18
83:16 85:4
94:19 107:4
116:16 117:23
120:19 122:15
148:7 154:18
155:5,13 163:7
166:4 169:17
172:6 204:17
209:3 214:16
214:24 215:16
224:12 244:17
246:2,21,22
247:14 251:14
254:23 263:2
264:3,7,9
268:9 274:24
276:24 278:20
280:23 285:8
286:19 289:21
292:8 293:2
295:1,9,12
296:7,9 302:9
309:21 315:2
324:4,21 325:3
325:7 327:8
330:24 343:20
345:21 352:2
354:22 356:6
**looked** 64:11
75:10 76:5,6
76:20 77:16
125:17 132:14
132:23 148:20
161:13,14

169:8,9,13,15
182:14 186:3
199:14 203:16
219:15 240:7
242:3 267:2
273:23 276:1
276:19 280:8,9
280:15 283:22
283:23 292:22
298:21
**looking** 14:5
37:5 63:21,22
64:3 76:12,14
97:22 109:22
109:24 110:14
127:7 141:22
142:5 179:14
179:18,19
195:2 202:14
213:17 233:19
248:18 280:11
282:17 299:22
302:18 304:22
311:11 317:13
332:19 355:8,9
**looks** 14:6 173:9
302:22 315:5
355:12,12
**loosely** 263:21
**Lorraine** 329:19
329:22
**Los** 253:17
**loss** 112:7 113:7
**lost** 109:4
**lot** 12:17 28:3
35:23 53:20
147:13 175:6
178:1 202:1
231:21 232:17
298:2 305:11
**loud** 355:22
**Louis** 3:9 253:16
**love** 91:20
**lower** 85:14
246:2
**luck** 188:6
**lunch** 204:22

205:1 228:9,18
**lung** 78:16 79:16
79:23 80:20
81:4,13,22
82:7 310:16,21
311:1 327:17
327:19

_____

**M**
**M-O-O-R-M-...**
224:14
**M.D** 1:13 4:5
9:21 207:1
358:8 361:16
**Magazine** 62:22
**mailed** 210:10
**maintain** 353:5
**major** 296:5
**majority** 89:18
**maker** 106:18
106:24
**making** 47:5
279:16
**malpractice**
92:8
**man** 56:1 91:11
141:12 268:20
**manage** 108:24
109:1
**management**
36:20
**manager** 168:7
**Manatee** 322:20
**manifested** 77:4
**manifests** 69:5
**manufactured**
96:23
**manufacturer**
96:15
**March** 171:13
171:15 207:11
208:14 213:13
214:1 234:20
**mark** 3:3 230:7
263:7 274:14
337:5 355:6
**marked** 8:13

13:8 31:16
83:19 84:18
85:13 94:21
116:18 142:15
142:15 154:9
154:10 158:7
172:6,8 183:14
205:5 206:9
229:12 230:8
230:10 245:12
255:11,12,19
263:4 274:15
278:21 281:2
286:21 287:3
292:16 314:21
314:22 324:13
335:3 352:8
354:23 355:1
**markers** 240:8
298:11 340:2
**Market** 2:4
**MARKETING**
1:5
**marks** 245:20
245:23
**Martin** 314:16
**Massachusetts**
37:22 65:24
**master** 109:3
**master's** 42:4
**masters** 39:12
**match** 114:15
**materials** 5:13
5:14 6:15
60:13,14 86:20
97:23 195:16
223:21 224:3
235:1 244:24
263:13 265:10
271:1 278:17
279:4,24
296:15 320:15
345:24 351:24
352:2,13
**Materion**
106:15
**mathematical**

74:15
**matter** 9:10
22:14 156:20
210:19 220:19
**McGill** 33:1
34:14 35:8
36:5
**McTiernan**
43:12,15,20,24
162:4 224:19
**McTiernan's**
224:21
**MD** 4:21 5:6,22
6:6
**MDL** 7:7 9:11
158:23 163:14
163:15 185:21
191:5,8,18,19
191:24 192:1
193:2 205:24
212:13 223:4
225:13 232:19
235:5 237:23
238:2,16,24
252:17 253:12
262:13
**mean** 25:17
27:11 28:14,16
28:20 56:13
67:5 68:2,4
70:23 77:6,24
78:3 80:9
92:11 98:4,11
101:5 105:8
106:6 111:16
112:20 137:10
139:9,10,10
148:1,2 149:2
154:3 164:10
165:5,21 166:1
168:5,6 171:18
172:3 173:16
181:20,20
183:3,21 186:6
199:16 201:7
207:24 225:20
225:21 238:9

249:17 254:10
282:7 283:8,15
290:7 293:17
294:7,16 296:3
299:1 307:5,8
307:11 323:10
340:17
**meaning** 112:3
**means** 74:12
223:6,7 266:12
277:12 338:12
358:20
**meant** 71:3
110:2,6,10
112:17,18
124:8,17 270:2
282:9
**mechanics**
137:2
**mechanism**
288:11 306:16
339:20 340:23
**media** 117:17
228:22 332:9
356:14
**mediated**
327:15
**medical** 32:12
33:11 50:4
71:5 91:24
92:8 97:16
323:9,11
**medicine** 34:10
35:18 36:18,22
37:19 40:3,19
45:1,3 50:3,3
58:7,11 59:19
61:10,13
122:21 123:5
124:20 175:13
178:11,15
179:12 325:12
**medicines** 50:2
**meet** 52:14,17
106:17 126:5
336:17
**meeting** 19:2

168:3,13
**meetings** 19:4
167:20 172:1
**member** 18:22
18:24 33:3
50:15,18,21,24
51:3,11 58:8
179:10 301:9
**members**
122:23 124:18
202:9
**memorandum**
7:6 230:14
**memory** 12:12
96:19 202:6,20
355:10
**MENEO** 2:12
2:13
**mention** 16:17
249:13
**mentioned** 65:2
86:5 107:9
113:22 117:5
222:18 223:2
236:3 268:11
274:19 300:1
321:22
**mercury** 74:5,22
75:9 76:16
87:18
**merely** 72:20
351:23
**Merritt** 321:4
**message** 112:19
**met** 124:24
126:2
**meta-analyses**
321:21 337:22
**meta-analysis**
72:23 73:9,20
74:3,9,11,12
101:13,16
160:14,18
161:11 162:8
197:9 202:8
301:17 317:19
317:24 318:13

318:15 321:18
335:14,18
338:6 341:12
342:22
**method** 119:4
**methodology**
189:14 190:12
190:14,16,24
193:11
**methods** 216:18
219:14
**methylmethac...**
64:9
**Mhegarty@sh...**
3:5
**MICHAEL** 2:13
**Michelle** 1:15
9:18 170:20
358:12
**mid-2015**
201:13
**middle** 343:2
**Mills** 321:3
**mind** 57:20
150:6 159:5
181:17 269:5
**mine** 88:8 126:7
169:15,17
172:17 187:17
315:6 347:20
**Mineral** 18:15
**mining** 88:7,10
**Minneapolis**
100:10
**minute** 47:11
153:7 295:20
355:15
**minutes** 48:4
204:23
**miscited** 243:23
**misheard** 316:6
**misleading**
187:17
**missed** 179:6
**Missouri** 3:4,9
**misstate** 115:23
**mistake** 173:14

180:16,18,24
181:6,12
182:15 186:4
**mistakenly**
187:8
**misunderstood**
319:4
**misusing** 70:3
**Mm-hmm**
311:15
**Mode** 338:22
**model** 334:16
**models** 221:1
**modern** 55:18
269:7 270:10
**moment** 53:5,6
74:1 180:14
224:16 299:24
337:4
**money** 153:21
**monitoring**
323:9,12
**monogram**
149:9
**monograph**
149:10
**monographs**
62:4 148:5
**monomers**
122:4
**monotonic**
67:20 68:13
**month** 118:15
120:3 133:15
134:2 136:15
136:16,17
163:19 171:12
171:17 239:20
241:22 280:13
**monthly** 133:13
157:15 158:11
174:23 175:10
177:18,20
182:8,9 239:15
280:16
**months** 163:20
163:20

**Montreal** 33:21
33:22 59:20,21
70:19
**Moorman**
224:13
**morning** 10:4,5
202:6 214:20
**mortality** 64:2
**motions** 23:15
**mouth** 105:11
105:20
**multiple** 217:20
241:1 266:7
**Muscat** 297:23
**mutually** 218:11

---

**N**

**N** 4:2
**name** 9:3 10:7
20:8,9 42:24
65:21 72:7
125:17 150:7
151:20 152:15
185:2 224:15
225:9 249:14
250:12 255:2
257:10 277:15
309:23,23
314:18 322:19
322:20
**names** 46:6
223:23 224:1
276:3
**narrow** 331:6
**National** 19:12
175:13 243:15
247:5,16 251:4
251:17 295:2,8
**nature** 217:6
**NCI** 6:18 19:15
19:19 242:10
243:9 244:10
248:6,12 249:8
249:9,14 250:9
250:12,19,20
256:3,10 257:7
257:15 258:18

259:7,9,12
260:17 261:3
295:10
**near** 63:3
215:18 325:14
**necessarily**
72:18 156:5
**necessary** 109:5
197:16 240:18
359:4
**necrosis** 340:1
**need** 45:14 52:7
55:5,10 75:1,2
75:5 80:11
236:24 244:17
311:8
**needed** 36:16
203:3
**needs** 155:12
**negation** 302:13
**negative** 302:20
**negotiated** 97:1
**neighborhood**
330:16 331:4
**neighbors**
329:19 330:15
**neither** 186:20
186:23
**Ness** 284:19
286:10 297:19
297:22 300:2
300:11,16,19
321:3
**neurological**
74:21 75:11
77:20
**never** 18:23
24:14 48:5,8
48:20,21 49:1
49:12 52:3,5
59:18 68:22
69:21,22 71:2
72:7 73:21
78:8 91:23
94:17 105:5
110:2 124:24
139:15 141:3,4

160:14 161:14
182:14 186:2,3
187:9 199:14
200:3 308:10
324:24 330:7
338:7
**Nevertheless**
262:13
**new** 1:2,14,14
2:14 9:9 36:23
37:12 45:13
52:24 53:1
61:6 91:12
94:3 119:7
155:21 156:22
157:3 158:23
167:14 171:20
184:20 214:20
223:15,18
241:13,24
346:24
**nice** 144:13
356:20,21
**nickname**
191:11,17
**nicotine** 79:12
79:16,19
**night** 13:17
30:11,14 34:5
143:10 154:15
155:18 157:9
167:17 355:7
**nine** 26:15,24
95:8 114:15,20
297:8 315:16
316:20 317:13
318:9 319:12
**ninth** 295:23
**nonlawyers**
253:8
**nonworkers**
77:6
**normally** 114:12
**North** 18:15
**Notary** 1:17
358:14 361:23
**notation** 267:2,3

**note** 177:20
339:1
**noted** 9:15 207:6
359:11 361:11
**notes** 236:4,8,9
236:14,14,18
236:19 238:21
356:6 362:1
**notice** 1:14 4:14
13:3,13,21,22
14:3,15 170:16
**November**
324:19
**number** 9:12
11:11 16:18
26:8,11,19
45:19 46:16
47:1 49:7 59:8
61:4 63:19,19
63:24 64:19
88:19 97:11,12
99:6 105:9
109:9 110:23
111:5,6 117:17
126:17 130:8
130:21 131:6
132:24 133:6
133:16 136:14
159:5,23 160:8
160:10 162:24
167:12 175:5
186:15 202:14
205:14,18
206:2 225:6
226:9,21
227:17 228:22
235:14 242:9
242:13,15
244:24 245:2
246:17,18
247:10,14
251:8,12,15
255:14 277:15
285:9,22 287:7
287:9 305:12
332:9 346:8
356:14

Jonathan Borak, M.D., DABT

**numbered**
264:23 265:15
**numbers** 46:6
74:6 240:5
276:15 290:20
290:24 291:3
291:21,24
**NW** 2:9,18
**NYU** 33:13,15

---

**O**

**O'Dell** 170:20
**obesity** 355:24
**object** 191:13
231:8
**objection** 27:9
27:24 28:17,18
29:23,24 31:7
31:8 40:15
41:21,22 44:4
44:5 46:12
48:7 50:9
56:10,11,20,21
57:14,15 58:17
60:24 63:6,14
63:15 65:16
66:23 67:7,18
68:3 69:1,2,18
70:1 72:4
75:21 78:13,24
79:18 80:1,13
80:22 81:17
82:10 83:2,5
93:24 102:9
103:17,18
110:4 111:8,9
113:24 115:5
115:20,21
116:11 128:18
134:14 136:23
136:24 138:15
139:22,23
140:13,14
141:9,10
143:16 146:6
146:19,20
148:24 149:15

149:16 150:3
150:17 152:16
153:4 160:4,5
160:16 161:17
161:18 162:12
162:13,16,17
176:16,17
179:5 180:11
181:7,8 182:21
182:22 183:16
183:22 184:12
184:13,19
186:21,22
187:21,22
188:5,11,12
189:4,5,16,17
190:17,18
193:17 194:4
194:10,11
196:2,19,20
197:4,13,14
198:7,20,21
200:6,7,16,17
201:14,15,21
204:8 208:16
208:17 209:21
210:4 211:15
211:19 212:16
213:1,2,14,18
214:23 217:18
217:19 218:22
219:1,21 221:7
221:14 222:3
222:12 223:10
225:24 226:1
226:17 232:2
232:20 233:5
234:12,21
235:9 237:3,18
238:3 239:1
242:11,21
243:11 252:5
253:19 254:21
256:22,23
257:9,17,18
258:1,2,10,11
259:22,23

260:13,14,20
260:21 261:5,6
261:12,13,19
261:20 263:24
268:17,18
269:21 270:21
271:4,17,18
272:13,19
273:17,18
274:7 275:7,8
276:5,12,13
278:11 280:2
280:20 282:8
283:11 284:2
287:17 288:17
289:17,18
290:2,3,13,14
291:10,11
294:9,10,19
296:19,20
297:13,14,20
299:6,7 300:6
300:9 301:10
303:19,23
304:15,16
306:20,21
307:12,23,24
308:4,23,24
309:8,9 310:3
310:17,18
311:2 312:9
313:10,19
314:5 317:1
318:17 319:2
319:17,18,21
320:9 321:7,14
322:5,17
323:13 326:5
326:23 329:12
329:13 330:10
330:21,22
331:20 333:9
333:10 338:15
338:16 340:6,7
342:3,4 344:4
348:9 349:2,8
349:16 350:6,7

350:10 351:1,2
351:8,9
**objections** 13:22
14:2
**objective** 302:12
328:13
**obscure** 328:12
**observation**
312:2
**observed** 341:20
**obviously** 124:8
126:1 146:15
147:2,4
**occasionally**
54:19 140:20
240:13
**occasions** 49:7
142:9
**occipital** 114:12
**occupational**
4:18 19:21
32:15 40:3,18
50:1 58:6,9,11
58:15,23 71:19
77:7 112:24
121:19 122:21
123:5 124:19
127:19 129:8
179:11 325:11
329:15
**occupational/...**
60:21
**odds** 288:9
338:10
**offer** 221:17
**offered** 52:4
157:2 282:14
351:22
**offering** 139:13
139:17 140:11
141:8 221:4,12
**office** 51:13,16
51:17,18,22
52:2,3,20,22
53:8,9,12,24
55:19 59:18
109:10,11,12

112:5,11 127:2
136:2,12
137:20,23
144:24 167:22
168:7 173:18
210:3
**oh** 84:1 86:3
95:20 138:20
176:8 206:13
234:13 262:9
264:6 277:20
281:14 295:19
323:17 343:2
**Ohio** 329:20,22
**okay** 10:24
11:13,21 12:4
12:15,24 13:2
14:13,20 16:1
16:18 18:3,21
19:20,23 21:19
21:21 22:9,15
23:2,14 24:16
25:16 26:7,20
27:18 29:13,16
30:12,21 31:3
31:14,24 35:10
38:6 39:11
41:1 42:16
43:4,11,14,23
44:9,22 46:7
47:3,20 48:1
50:14 52:16,21
55:17,22 56:17
58:12 60:11
61:23 63:8
65:10 67:15,24
68:15 70:5,16
71:1,7,21
73:10,16,19,22
77:9 78:2,5,19
79:2,7,11,15
80:11 82:14,22
85:3,11,19
86:1 87:22
88:23 89:6
90:15 91:2
92:7,10,21

---

Jonathan Borak, M.D., DABT

| | | | | |
|---|---|---|---|---|
| 93:2,15 100:22 | 192:3,6,11,23 | 315:10 316:3 | **opined** 98:19 | **orders** 22:10 |
| 102:5,16 103:3 | 193:9 195:22 | 316:15,18 | 221:22 262:14 | **organization** |
| 104:6,16,24 | 197:2,8 198:4 | 317:15 318:15 | 298:20 | 17:18 |
| 105:22 108:20 | 199:9 200:21 | 319:13 320:4 | **opinion** 29:17 | **organizational** |
| 110:22 111:21 | 201:3 204:13 | 322:11 323:23 | 31:4 80:18 | 36:21 |
| 116:16 118:6 | 206:5,15 208:4 | 327:3 328:19 | 103:15,21 | **organizations** |
| 118:11,22 | 209:15 212:1 | 332:22 334:22 | 128:15 148:23 | 17:24 20:13,18 |
| 119:9,23 | 212:23 214:16 | 337:9 339:6,8 | 149:1,6 189:18 | 49:9 |
| 120:12 122:11 | 215:16 216:4,7 | 339:12 342:23 | 204:3 221:5,12 | **organized** |
| 122:16 123:14 | 218:16 220:7 | 348:2,12 349:9 | 221:17,19 | 232:22 |
| 124:7,21 128:8 | 221:23 222:7 | 350:18,19 | 291:7,22 304:4 | **original** 99:2 |
| 129:2,14 | 223:24 225:19 | 352:1 353:7,18 | 304:11,12,14 | 108:21 126:16 |
| 131:24 132:14 | 226:11,24 | 353:22 354:12 | 305:1 308:19 | 163:3,4 317:18 |
| 133:9,20 134:4 | 227:6,11 228:7 | 354:22 355:14 | 318:16 333:19 | 317:23 318:6 |
| 134:9,24 135:5 | 229:22 231:6 | **old** 55:14,16 | 340:12 345:16 | 318:21 339:3 |
| 135:9,21 | 233:2,12,22,24 | 97:22 118:4,10 | 346:2,3,6,9,12 | 345:10 348:3 |
| 138:18,21 | 235:21 236:8 | 119:21 121:21 | 346:22 347:5,7 | 359:15 |
| 139:1 140:22 | 236:23 237:11 | 122:1,5,9 | 347:13,17,23 | **originally** |
| 141:3,16 142:1 | 238:17 241:17 | 269:4,11 | 348:19,23 | 175:18 |
| 142:7 143:3 | 242:19 243:3 | **older** 118:7 | 349:1,11,17 | **originals** 31:21 |
| 144:2,10,24 | 244:9 246:21 | 251:21,23 | **opinions** 5:16,18 | **ostensibly** |
| 145:1,16 | 249:18 250:7 | **Omni** 1:14 | 24:3 218:23 | 238:21 |
| 146:14 147:2 | 250:22 251:19 | **once** 10:12 | 262:22 281:1 | **Oules** 10:13,14 |
| 147:19 148:4 | 252:1,9,23 | 11:24 52:9,9 | 282:1 287:6,8 | 16:4 144:5 |
| 148:11,11,22 | 253:14 254:2 | 52:12 104:4 | 287:11,14,16 | 152:5,11 156:1 |
| 149:23 150:9 | 255:2,7 256:6 | 105:17 106:23 | 291:17,18 | 184:11,16,24 |
| 151:19,22 | 256:14 257:5 | 134:10 149:13 | 296:17 302:8 | 185:2,5,8,10 |
| 152:21 154:8 | 257:12 258:15 | 151:13 182:11 | 303:22 306:7 | 185:15,24 |
| 154:23,24 | 258:22 259:5 | 196:10 209:9 | 344:2,6,13 | 191:5,7 192:13 |
| 155:11 156:17 | 260:5,24 262:2 | 209:17 | 345:8,18 346:7 | 192:18 193:5 |
| 157:1,24 | 262:12 264:5 | **ones** 226:20 | 347:10,12,15 | 214:5 216:14 |
| 158:21 159:9 | 266:1,19 | 251:21,23 | 347:20,24 | 223:8 229:9 |
| 161:9,22 162:7 | 267:22 268:10 | 252:2 279:17 | 348:4 350:21 | 232:10 235:20 |
| 163:23 165:16 | 269:1,17 | 353:4,8 | 351:14,18 | 237:12,16 |
| 166:2,8,15,16 | 271:11 272:8 | **ongoing** 75:12 | 354:3 | 238:2 241:12 |
| 167:7 168:4,11 | 273:2 274:5,12 | 122:2 174:1 | **opportunity** | 249:5 |
| 169:7,16,23 | 274:24 276:18 | 241:21 | 88:20 106:17 | **outcome** 15:17 |
| 170:3,9,17,21 | 277:11,20 | **online** 54:7,11 | 352:6 358:9 | 77:20 |
| 171:11,24 | 278:1 283:6,14 | 54:20 55:1,5 | **opposed** 68:7 | **outside** 49:5,8 |
| 172:5 173:2 | 283:20 287:12 | 55:10 109:17 | 318:22 325:9 | 89:14 103:23 |
| 174:4 175:2 | 288:1 291:4,15 | **opened** 105:20 | **option** 208:8 | 104:19 210:2 |
| 176:4 177:6 | 296:14,18 | **opens** 105:12 | **oral** 17:2 | **ovarian** 6:20 |
| 179:21 180:3 | 297:1 299:13 | **opine** 31:10 | **order** 195:17 | 21:3,12 22:3 |
| 183:20 184:4 | 300:22 302:6 | 152:13 219:9 | 237:2,16 | 29:22 31:1,6 |
| 185:14 187:18 | 303:3 307:16 | 219:12,19 | 250:17 271:23 | 31:11 44:2 |
| 188:3 190:10 | 308:7,18 309:5 | 272:15 299:4 | 307:16,17,18 | 48:24 49:13,14 |
| 190:23 191:5 | 313:14 315:2 | 304:23 351:6 | 308:20 350:3 | 103:16 146:17 |

Jonathan Borak, M.D., DABT

146:23 147:15
147:21 149:5
150:1 152:14
175:11 176:2
193:22 194:15
195:14,20
196:14,15
198:18 202:11
203:17 204:5
216:24 217:1
219:8,11 223:5
226:14,20
227:5 228:4
239:17 240:2
247:9 252:4
257:16,24
258:9 259:8,11
259:14,20
260:7,9,10,11
262:15 271:8
272:3 273:15
275:5 276:2
279:10 281:24
285:3 288:12
289:15 290:1
291:8 295:20
297:10 302:17
303:13 305:20
306:15 312:2
312:17 316:22
334:14 335:22
338:1,8,13
340:3 343:10
344:10 348:8
348:22 349:20
353:13 354:6
**ovaries** 233:19
**ovary** 341:5

———————
**P**
**P** 20:14
**P.C** 2:2
**p.m** 215:20
228:16 357:5
**page** 4:13 5:5
6:5 7:5 8:6,9
8:12,14 37:6

46:4 49:17,20
62:2,7 63:22
73:7,11,14
84:3 85:7
120:7 123:7
155:8,10
172:15 174:7,7
174:7,9 194:24
195:2 206:8,11
206:20,23,24
207:9,10,13,17
208:15 209:20
215:9,11,12,17
215:18 216:5
216:12,15
217:24 218:1
220:9 223:1
231:16 242:15
246:3,10,23,24
249:20,24
250:23 251:11
261:23 262:1,7
264:15,17
265:19 273:3,7
284:13,22
288:2 295:2,13
311:13 315:8
324:23,24
327:9 328:21
332:14,23
333:2 335:11
337:2,11
338:21 341:6
342:16 343:1,3
348:4 355:14
355:16 360:4
362:2
**pages** 5:20 62:9
84:5 85:13,14
107:5 154:19
172:14,24
246:6 249:3
250:2 292:10
293:11 344:19
344:19 347:21
351:13 361:6
**paid** 84:14

137:12 139:11
149:14 150:15
176:14 181:2
325:16,20
326:2,4,9
**panel** 18:22,23
301:5,9
**paper** 63:5
113:13 180:15
208:2 240:17
240:19 278:5
289:20 298:5
298:23 300:12
300:21 301:16
302:10 303:5
314:7
**papers** 14:22
15:9 16:2
47:13 63:20
64:1,8 74:4
240:5,7,11
282:12 283:16
298:1,21 299:1
299:5,15,19,20
**paragraph**
121:3 179:16
182:15 183:4
185:15 186:3
186:14,15,18
187:4 195:7
223:2 242:9,12
242:15,23
245:8 246:23
246:24 250:14
251:3 260:8
262:3,6,12,21
264:10,24
265:18,21
266:3 280:9,13
300:24 303:9
311:13 312:20
324:4,5 328:7
332:13 333:2
335:13,15
336:7,18
339:13,13
341:7 345:2

348:18 355:18
**paragraphs**
27:3 182:6
293:21
**parameters**
153:24 154:3
**paraphrasing**
313:16
**parents** 91:14
**Parfitt** 170:20
**part** 17:9 28:24
29:2,9 33:1
35:3 37:15
40:17,19 71:14
84:5 95:4 97:1
99:8 100:3
116:13 122:22
128:14 135:8
156:5 175:8
188:9,9,14,23
188:24 189:7
220:3 262:10
272:24 276:19
292:22 329:2
333:18 339:2
345:10
**part-time** 37:23
**participant**
19:19 71:23
72:2,6,20
**participate**
47:18 168:12
**participated**
15:1 18:22
19:10 70:7,21
70:24 71:4,10
72:15
**participating**
168:2
**particular** 12:5
88:11 111:23
118:17 152:19
153:2 260:18
298:20
**particularly**
64:17 123:4
**particulars**

164:22
**particulate**
121:23
**particulates**
16:15 147:14
233:20
**parties** 156:6
**partner** 323:5,7
**parts** 149:19
292:6
**party** 212:4
**pass** 40:20
156:12
**Passed** 40:6
**paste** 181:21
183:21 248:22
**pasted** 184:1
**Pastides** 267:4
**path** 39:24
**patient** 72:1
218:12
**patients** 59:16
71:14,17 91:6
256:12,16
**pause** 348:14
**pay** 36:17
**PCPC** 2:20
199:19
**pdf** 325:9
**PDFs** 53:20
**PDQ** 6:18 256:7
256:9,20 257:2
257:14,23
261:18
**peer-reviewed**
85:21 86:3
107:6,19
109:19,23
110:15 139:8
195:5,11 196:5
268:15 335:19
**pen** 235:23
**pending** 143:22
**Penin** 298:3
**Penninkilampi**
277:6 297:18
298:4 317:17

319:6 321:23
322:4,9 337:20
**Pennsylvania**
2:4 96:16
330:5
**people** 21:18
39:11,14,17
66:7 72:1
76:14 78:15,21
80:5 87:18
90:2 109:9
112:13 131:18
168:8,12
203:23 296:5
302:19 304:19
329:17 330:24
331:5 346:8
**percent** 59:16
182:18 235:4
291:7 312:3
313:17 338:13
**perform** 161:3,5
**performed**
72:22
**perineal** 146:17
195:13,19
219:6 240:1,1
247:8 252:3
258:7 262:14
272:2 273:15
275:6 281:22
291:9 293:5
297:11 305:20
306:14 312:16
316:23 334:5
335:22 338:2,7
343:11 344:8
348:7,21
349:20 356:1
**perineally**
319:16
**period** 37:16,20
76:17 111:22
112:1 154:21
158:15 170:5
238:11,19,20
241:21 354:20

**periodic** 242:4
**periodically**
127:5 226:21
**periodicals** 51:8
53:16
**periods** 89:3
**permeates** 114:6
128:1
**permitted** 190:9
**persist** 74:22
**persistent**
339:23
**person** 17:2
108:12,14
140:24 147:5
156:4 165:10
167:9 208:11
211:9
**personal** 13:19
14:1 20:1,5
92:9,11 199:19
**perspective**
195:17 271:23
**pertain** 287:22
**pertains** 243:13
**ph** 1:21
**Ph.D** 42:18 43:5
**Ph.D.s** 39:14
**Philadelphia** 2:4
**phone** 17:1
134:8 140:18
145:10 150:14
165:9,11 167:8
172:1
**phosphorous**
327:22
**photocopy**
352:6
**phrase** 183:24
189:20,24
**physical** 175:24
**physically**
174:21 175:5
**physician** 32:15
34:22 35:1,4
37:10 71:18,19
92:22 127:20

129:8,8
**physician's**
257:14
**physicians** 50:1
256:12,17
**picked** 293:20
301:21 302:21
**piece** 114:10
203:20 267:15
**pieces** 211:3
**pizza** 144:15
**place** 167:21
168:17 214:2
222:8,17 253:1
253:6,15
273:21 274:6
**places** 265:23
**plaintiff** 7:7
90:9,14 94:7
94:13,17 96:14
99:21 230:19
262:13
**plaintiffs** 2:16
28:8 91:5 92:6
92:6 93:22
156:10
**plaintiffs'** 14:2
223:18 230:18
255:13
**planned** 24:20
**plant** 65:19,20
68:20 329:20
330:4,6,16
331:7
**please** 31:15
116:7 155:2
233:6 243:17
245:11 254:15
278:20 349:6
354:10 359:3,8
**pneumoconiosis**
97:14,15,19
**point** 32:21
36:14 38:3
51:15 72:17
73:6 86:23
87:2 104:2

131:21 136:22
142:17,23
147:19 148:23
150:20 151:5
152:22 163:21
168:9 176:5
177:7 237:22
241:7,16
260:17 266:14
300:8 317:10
326:7 345:12
345:13
**pointed** 265:24
286:11 312:20
**pool** 74:14
**pooled** 74:1,6
75:7 338:9
**pooling** 74:10
**poor** 288:9
**populations**
63:3 121:13
**portion** 116:10
155:20,24
179:6,8 266:2
**position** 57:23
57:23 180:2
**positive** 233:20
302:17 335:21
338:1 343:9
**possibility** 148:3
164:16 261:8
278:6
**possible** 71:13
75:20 104:15
141:22 164:20
169:5 194:23
213:10 220:18
241:22 243:22
278:14 306:24
313:4,24 317:2
339:20 340:23
342:10 343:14
343:17 344:12
351:10
**possible'** 311:19
**possible.'** 312:22
**possibly** 42:14

124:5 150:11
212:8 226:6
236:22 349:23
**post** 169:24
191:17
**postdoctoral**
33:2 34:17
**postulates**
220:24,24
222:11
**potential** 200:14
303:17 334:4,6
336:12 355:23
**potentially**
240:6,10
**powder** 1:5 9:11
15:3,4,16 16:8
16:22,22 17:10
17:19,20 21:2
24:22,23,24
146:23 195:20
219:7 240:2
262:15 271:8
272:3 281:23
293:6 312:17
344:9
**powders** 195:14
312:1
**practical** 44:20
45:15
**practice** 40:5
59:4,7,19 61:6
**PRACTICES**
1:6
**pre** 169:9
**pre-1972** 199:11
200:12
**pre-MDL** 229:5
**preceded** 303:6
**precisely** 238:4
238:10
**predate** 252:2
**predated** 242:20
**predecessors**
199:18
**predisposed**
69:7,10

Jonathan Borak, M.D., DABT

Page 388

preparation
  167:6 171:22
  214:6
prepare 135:2,6
  167:9 173:12
prepared 14:23
  205:19 231:24
  274:13 296:11
prepares 136:12
  256:11
preparing 15:1
  174:21,22
present 3:13
  220:19 351:18
presented 14:24
  250:18 336:15
  342:7
presenting 15:2
  283:4
presumably
  77:5
presume 146:9
pretty 34:6
  83:15 142:1
  155:19 229:4
  266:24 280:4
  294:24 299:1
  310:7
preventive 50:3
previous 174:19
  182:7 223:15
previously
  223:12 255:12
primarily 326:9
primary 281:17
  282:6,7 283:7
  283:7,10,14
principal 71:2,8
  72:12
principle 210:20
principles
  220:14
printed 118:12
  119:18
printout 176:1
prior 22:10,13
  22:13 24:2

43:15 95:4
129:2 171:21
176:19 191:8
223:4 252:11
273:8,12
279:20 295:10
299:23 312:6
331:8 340:3,15
prison 94:4
private 51:18,22
  53:8,12
privately 117:1
privileged 145:3
probably 22:21
  26:5 40:11
  42:15 59:16
  87:10 94:16
  96:18 104:11
  106:14,17
  107:14 108:5
  123:13 126:9
  131:12 132:11
  135:20 141:21
  146:21 149:19
  159:14 165:7
  165:12,18
  171:20 173:17
  202:4 203:4
  207:20,22
  216:3 256:11
  286:4 322:7
  323:6 326:8
  332:1
problem 81:11
  146:12,15
  200:15
process 123:20
  130:17 134:22
  135:1 137:2
  174:1,12,20
  175:9,24
  241:21
produced 28:7
  128:9 155:15
  155:20,24
  157:4,15
  159:11 164:9

164:12,13,19
170:10,14,18
223:3
product 307:20
production 8:8
  95:4
products 1:5,6
  13:20 14:1
  15:3,16 16:23
  17:10,20 20:1
  20:5 21:2
  24:23 199:22
  199:24 334:6
professional
  1:16 38:9,14
  49:19 50:6
  70:22 114:7
  147:10 358:13
professionally
  39:18
professor 32:16
  38:10 44:11,15
  44:19,19,24
  45:3,4,8,22
  126:7 178:5,10
  178:14,21
  180:9,21 181:4
  183:6,7 185:17
  186:16 193:24
Profile 4:20
program 33:3
  122:23 123:1
  124:20 179:12
programs
  328:15 329:16
progression
  339:21 340:24
project 126:12
  130:11,24
  198:14 269:24
  302:16
projects 121:17
  131:20
promotion
  44:21
pronounced
  185:1 277:8

298:4
proof 304:21,23
  309:3,6,7
  350:4
properly 102:11
proposed
  336:11,16
propounded
  361:9
prospective
  220:22
protein 339:24
proud 111:6
prove 308:10,20
proved 308:21
  310:24
proven 306:24
  307:3,5,10,11
provide 89:21
  125:5 131:2,7
  132:15,17
  133:24,24
  163:22 352:3
provided 86:15
  99:9 130:11,13
  160:8,13
  164:17 181:9
  217:1,7 223:21
  234:24 303:16
provides 91:19
  125:3 175:24
providing 88:4,5
  88:6 91:3,14
proving 216:18
PTI 3:10,11
public 1:17
  44:12 46:23
  47:2 52:18
  99:11 123:7,10
  178:6 180:22
  185:18 304:5
  358:14 361:23
publication 22:1
  118:8 119:18
  354:21
publications
  14:23 15:10

17:8 19:8
21:11 120:5,17
123:12,16,22
124:4 139:13
298:18
publish 138:22
  139:19
published 16:10
  19:13 21:1,16
  41:24 73:3,21
  74:3 110:24
  139:7 195:5,11
  196:4 243:14
  244:19 266:11
  266:21 268:15
  274:1 279:7
  283:16 324:18
  349:18 352:20
publishes
  138:13
publishing
  139:17 267:17
pull 175:23
  193:15,15
  267:11 289:20
  291:5
pulled 202:10
  266:21 279:22
  280:8 288:23
pulling 177:9
pulls 175:10,20
pure 146:1,4
purpose 64:22
  74:18 75:17
  109:14 122:19
  266:16 267:17
  287:13 302:15
pursuant 1:14
put 31:22 103:1
  107:18 110:19
  110:23 111:4
  114:19 120:10
  170:1 171:20
  171:21 186:17
  191:15 237:8
  244:5 255:16
  264:9,22

Jonathan Borak, M.D., DABT

265:15 267:24
293:10 315:21
316:13
**puts** 296:17
**putting** 109:16
111:12
**puzzling** 329:1

**Q**

**Q&As** 256:13
**qualification**
81:22
**qualifications**
188:10,24
**qualify** 81:19
318:24
**quantitative**
74:2,8
**quantity** 80:24
336:20
**quarter** 215:24
**query** 257:14
**question** 12:20
12:22 14:16,21
15:13 16:18
17:7,14,15
20:21 21:13
22:9,17,17,19
23:24 24:1,17
29:1,20 30:15
31:5 54:3 57:5
57:7 74:20,24
77:2,21,22
79:6,21 81:12
81:15,19 82:3
82:7,8,15,20
83:1,7,11,14
83:14 92:13,15
94:2 97:17
102:23 114:3
115:9 116:4
126:4 129:21
135:1 136:11
136:11 138:5
142:4 151:9
153:18 166:19
166:23 175:17

176:10 177:16
178:4,20 180:4
180:6,7 183:11
188:18 191:22
192:4 193:16
194:6,14,17,21
196:10 197:12
199:10 201:23
206:12 209:11
209:13,14,14
209:16,17
215:7 216:17
216:23 217:5
218:17 222:16
222:19,20
235:11 238:17
243:7,8,17,19
248:10 249:6
258:23 259:1,2
270:4,7 272:12
272:15,23
275:10,13,20
281:9,15,19
282:2 283:19
290:15,17
296:8 308:8,9
308:12,18
312:10,13
318:3,7 319:1
329:8,10
331:15,17
345:11,14
346:11,16,18
346:24 347:2,4
348:3
**questioned**
144:3
**questions** 8:13
10:9 13:6
14:14 144:20
156:16 218:7
221:13 331:22
344:12 351:11
356:17 361:8
**quiet** 153:6,11
**quite** 232:23
**quotation**

301:22 305:15
**quote** 220:5
284:18 286:10
288:7 301:21
303:6 306:11
306:18 312:18
313:7,9 334:11
**quote-unquote**
16:2
**quoted** 220:3
306:8 313:5,12
317:12 333:22
334:2
**quotes** 287:19
293:9
**quoting** 264:8
294:5 306:1
343:16

**R**

**R** 360:1,1
**railroad** 126:19
**raise** 140:1
**raised** 199:9
270:5
**range** 131:15
132:12
**ranging** 63:20
**Raphael** 37:12
37:23
**rarely** 88:20
93:14 114:18
280:12
**rate** 131:9,13,23
132:1,3 133:3
133:4,17,18
136:15,16
**rated** 329:23
**rates** 68:6
**ratio** 288:9
338:10
**re-ask** 243:17
**re-read** 237:1
239:4,11,12
240:14,19
346:17
**re-reading**

239:14
**reach** 76:18
**reaching** 101:11
**reactive** 122:4
**read** 18:9 19:7
22:22 25:17
28:3 30:4,10
30:20 41:7,8
41:15 42:2,10
42:12 43:2,13
43:18,21 47:13
51:7 53:16
54:11 55:1,5
55:10 56:14
57:13,17 81:14
83:6,11,14
98:24 115:24
116:6,9 147:20
148:4,7 149:9
149:9,12,13,17
149:19,23
161:24 162:1,2
162:3 181:11
186:1 190:6
193:21 198:13
202:1,2,12
203:4,14 216:8
216:13 218:13
219:23 221:2,3
223:16,17
224:23 226:7,9
227:1,4 232:21
235:14 236:4
238:22 239:18
240:18,21
241:18 262:17
262:17 267:24
268:4 269:23
270:18 277:17
278:3 279:23
280:19 291:19
299:18,19
302:22 304:9
312:12 313:4,8
314:7 316:11
318:2 327:7
328:17,18

335:24 336:4
336:24 341:8
352:24 353:2
354:19,19
355:21 358:9
359:3 361:5
**reader** 325:23
326:2
**reading** 42:19
43:16 96:16
178:2 195:8
217:24 231:21
232:5,18
238:23 242:24
254:17 330:4
338:19 339:8
**ready** 201:5,5
**real** 209:11,14
209:16,17
**reality** 109:13
**really** 20:11
156:19,20
208:10 260:12
326:1 337:7
355:10
**Realtime** 1:17
358:14
**reanalysis** 99:8
318:22
**reason** 24:12
43:8 51:19
180:7 359:5
360:6,8,10,12
360:14,16,18
360:20,22,24
**reasonable**
204:4 307:14
307:21 308:22
309:7 310:2
311:1 348:19
350:5
**reasons** 107:15
299:17 353:15
**recall** 42:15,19
42:21,24 44:7
65:11 71:13
87:4 99:20,24

100:3,5,11
104:5,9 143:20
148:18 152:17
163:17 164:22
165:8,15
167:11 214:8
214:10,21
227:13 232:11
233:14,16
254:7,12,13,15
254:17 258:12
289:10,16,23
295:11 303:15
314:17 326:13
326:20 339:8
339:11
**receipt** 359:17
**receive** 137:15
162:10
**received** 142:8
142:19 143:10
158:14 160:1
161:15 162:10
**recognize** 10:19
117:2 156:7
205:9 255:23
257:3 276:2
279:1,1 324:23
**recollection**
143:13 158:13
177:2 185:12
214:22 215:22
216:2 258:24
290:5 322:15
**reconstruct**
109:7
**reconstruction**
121:23
**record** 9:3,16
84:22 85:6
117:9,12,16
142:4 155:2
156:22 184:5
228:15,21
250:22 265:1
332:5,8 342:9
352:23 356:10

356:13 357:1
358:6
**records** 92:1
97:16
**redid** 186:2
**redirect** 218:3
**reevaluated**
99:7
**refer** 32:11
69:16 165:21
191:5 216:12
247:15 248:12
249:7 262:21
266:2 268:6
269:17 270:19
294:7 302:19
321:1,9
**reference** 5:8,18
25:24 43:22
46:8 173:3,6
191:1 222:11
245:16,18
246:1,12,15,19
247:15,22
248:16 250:10
251:7,11,14
252:24 263:23
264:23 265:16
266:14 267:10
267:12 277:3
285:7,8 287:6
287:10,16
291:19 292:2,5
297:6 315:13
316:12,20
320:19
**referenced**
222:9 265:12
266:9,11
**references** 26:12
26:16 246:18
248:2 282:6,7
282:11 283:7
285:15,19
287:22 290:11
**referencing**
254:18

**referred** 26:4
27:4 47:10
77:12 95:5
113:9,9,11
217:14 223:9
223:12,14
227:18 242:8
244:11,23
247:24 249:12
251:23 254:4,9
263:22 264:6
277:13 286:6
289:13 293:13
301:16
**referring** 47:24
73:17 74:17
119:16 179:16
195:1 199:5
200:24 215:8
250:4,23
254:19 265:2
267:17 276:15
286:2,9 306:1
**refers** 24:1
250:9,13 251:3
251:17 295:16
333:4 337:19
337:19,20,20
341:12
**reflect** 111:17
**reflected** 218:23
302:22
**reflects** 279:6
346:7
**refresh** 143:12
322:14 355:9
**refreshes** 258:24
**refuted** 305:4
**refutes** 305:6
**regard** 55:23
141:13 216:18
304:4 312:5
**regarded** 141:13
**regarding** 21:2
22:14 30:24
194:14 304:1
349:19

**regardless** 15:17
**regards** 298:20
**Registered** 1:16
358:13
**regular** 148:5,6
303:17
**regularity** 89:24
**regularly** 48:14
48:17 73:2
**regulatory**
17:18,22 18:4
19:17 89:11
**relate** 15:2
**related** 5:13
16:11,13 17:15
24:18 25:15
50:8 58:14
60:12 61:9,13
61:16,19 62:12
93:4 101:8,9
112:23 238:13
238:15,16
241:4 263:12
265:10 266:23
268:16 280:10
306:17 345:24
**relatedness**
327:11 328:11
**relates** 1:8 15:15
20:19 24:23
25:9,12 45:17
57:11 198:16
218:18,20
272:9
**relationship**
65:4 75:14
77:14 288:10
302:17 310:7
331:19,23
341:15
**relative** 195:12
**relatively** 76:15
76:18 282:19
295:22
**relevance**
220:18
**relevant** 16:15

123:4,9 124:18
175:16 192:1
197:11 240:6
271:12 272:12
281:18 283:18
353:16
**rely** 24:21
**remaining** 85:13
**remains** 204:6
**remarkable**
313:22
**remember**
10:22 11:10
42:8 105:15
106:19 107:1
120:9 122:16
122:18 124:6
131:17 141:24
143:24 144:6,8
145:13,15,18
145:20,23
149:11,21
150:19 151:19
162:5 168:19
169:6 193:3,8
199:20 208:3
210:12 224:5,6
224:9,12,13,15
232:6,17
233:12 236:5
240:15 252:7
254:24 255:5
274:22 291:2
291:13 315:5
322:21 323:2,4
323:6,21
**remembered**
148:14
**remembers**
141:23 144:10
**render** 103:20
**rent** 36:17
**repeat** 124:16
239:23 275:12
**repetitive**
221:24
**report** 5:6,21

Jonathan Borak, M.D., DABT

Page 391

| | | | | |
|---|---|---|---|---|
| 16:3,4 25:20 | 223:15 224:8 | 344:1,18 | **requested** 116:9 | 339:19 340:22 |
| 25:21 26:4,10 | 224:10,18,21 | 345:10 348:5 | 358:7 | **Responses** 14:2 |
| 26:12 29:8,10 | 229:3 231:13 | 349:13 350:23 | **required** 46:22 | **responsible** |
| 29:11 30:4,9 | 232:1,4,7,8,10 | 351:21 353:24 | 167:5 203:22 | 47:11,23 |
| 30:10,13,17,19 | 232:19 233:19 | **reported** 66:2 | **requirements** | 107:23 180:15 |
| 41:7,16 43:13 | 234:18 235:5,7 | 337:24 | 40:18,19 | 180:16 181:18 |
| 43:16 65:17,23 | 235:20 236:21 | **reporter** 1:16,16 | **research** 15:14 | **rest** 267:4 |
| 99:4 115:24 | 237:2,12,16 | 1:17 9:17 | 15:18,21,23,24 | **restate** 319:23 |
| 128:10,16 | 238:24 240:24 | 12:18 116:9 | 18:18 24:18 | **result** 91:5 94:5 |
| 157:4 161:23 | 241:10,12,12 | 176:12 358:13 | 25:5,7 50:19 | 100:11,14 |
| 163:8,23 164:9 | 241:17,19,20 | 358:14,14,22 | 51:1 58:13 | 240:20 259:18 |
| 164:12,13,19 | 242:2,6,9 | **reports** 5:12 | 60:19 62:16 | 260:6 354:3 |
| 172:6,14,24 | 244:12,14,18 | 22:22 24:3 | 68:16 120:8,13 | **resulted** 338:8 |
| 173:12 174:15 | 244:21 245:9 | 27:4,19,21 | 120:18,23 | **resulting** 97:3 |
| 174:15,17,18 | 246:4,7,11,16 | 28:7,10,22 | 121:4,8,17 | **results** 254:5,9 |
| 174:19,21,22 | 246:23 248:1,4 | 29:19 41:8 | 141:5 276:20 | 259:18 |
| 177:20,22 | 248:11,15 | 64:12 85:22 | 292:23 | **resumé** 125:18 |
| 179:17,19,22 | 249:5,10,11,18 | 97:22 107:20 | **researching** | **retain** 53:19 |
| 180:20 181:1 | 249:21,24 | 109:20 110:15 | 226:13 | **retained** 16:20 |
| 181:16,23 | 250:4,9,24 | 182:18 211:9 | **resemble** 182:4 | 24:11 97:2 |
| 182:7,11 183:9 | 254:6 261:24 | 212:2 217:14 | 182:17,19 | 99:17 108:20 |
| 183:10,12,15 | 262:4,7,8 | 223:3,7,17 | **resembles** 182:1 | 108:23 176:6 |
| 184:2,7,7,10 | 263:2 264:10 | 226:8,10 227:1 | **residency** 33:19 | 177:3 237:24 |
| 184:11,16,23 | 265:8,13,17,22 | 235:15 242:20 | 34:9,12 | **retrospective** |
| 184:24 185:8 | 266:2 267:4,8 | 263:12 265:9 | **resident** 70:18 | 220:23 |
| 185:10,15,21 | 267:18,24 | 283:24 328:24 | **resources** | **return** 359:15 |
| 185:23,24 | 268:7,13 | 345:23 352:18 | 122:24 281:17 | **review** 18:8 |
| 186:11,15,18 | 269:18 270:20 | **represent** | 283:10,14 | 20:23 30:13 |
| 187:7 191:4 | 277:16 278:2 | 118:12 142:8 | **respect** 23:17 | 92:1 93:7 |
| 192:13,21 | 280:24 285:9 | **representative** | 26:24 216:23 | 114:8 134:7 |
| 194:22 196:18 | 285:16 290:11 | 112:17 | 339:14,17 | 143:22 166:12 |
| 197:23 198:1,3 | 292:3 293:13 | **representatives** | 340:20 344:6 | 173:18 194:1 |
| 198:11 199:14 | 293:14,20 | 17:17 | **respected** | 195:4,11 196:4 |
| 201:5,19 202:5 | 295:5 296:6,10 | **represented** | 225:23 226:5 | 198:6 208:11 |
| 204:1,1 205:10 | 297:8,22 300:4 | 92:5 109:13 | **respirators** | 214:4 231:20 |
| 205:14,17,20 | 300:23 301:2,7 | 111:7 | 96:12,24 | 244:9 252:11 |
| 206:1,7,17,24 | 303:10 304:13 | **representing** | **respiratory** | 271:22 272:4 |
| 207:15,20 | 304:18 305:5 | 2:16,20 3:5,10 | 122:3 | 279:21 333:21 |
| 208:9,13 209:1 | 305:10,15,16 | 94:6,18 99:21 | **respond** 30:19 | 350:14 354:1 |
| 209:10,18 | 311:6 312:8,19 | **represents** | **responded** | **reviewed** 27:14 |
| 212:4,12,13,14 | 313:9 315:11 | 191:7 | 13:20 103:1 | 27:15 54:20 |
| 212:18 213:11 | 315:23 316:19 | **reproduction** | **responders** | 93:13 200:4 |
| 213:24 216:20 | 317:3,8,21 | 358:20 | 86:21 | 224:20 225:2,5 |
| 217:2,9,16 | 320:20 321:13 | **reputation** | **responding** | 234:17,23 |
| 218:8,18,20,24 | 327:19 332:13 | 141:7 | 345:12 | 235:1,5,6 |
| 220:4,8 221:18 | 334:12 335:1 | **request** 8:8 | **response** 68:5 | 237:14 240:5 |
| 222:9,17 223:2 | 342:17 343:24 | 24:21 230:16 | 77:15 102:14 | 240:12 243:3,8 |

252:11 265:10
270:1 279:11
280:19 281:18
333:17 351:24
353:19
**reviewing** 224:7
224:9 342:7
**reviews** 89:22
354:3
**revised** 207:4
269:12,14
**revising** 187:7
**revision** 184:1,6
**revisions** 182:10
**rgolomb@gol...**
2:5
**Richard** 2:3
10:8
**right** 10:17 12:8
13:5,16 15:12
20:3 23:5,20
25:19 26:6,14
28:5 31:14,23
33:4,6 37:13
38:17 41:5
42:9 43:1 45:7
45:15 47:22
48:12 53:7
62:24 63:23
66:14 80:8
81:6,21 88:13
88:14 101:1,4
104:22 105:2,8
106:9,21
109:18 110:3
110:13 111:4
115:16 119:21
120:2,22
125:23 132:22
136:4 137:5,14
138:8,8 139:16
144:16 145:5
149:8 152:4
153:3,22
159:17 160:11
164:2 168:15
170:24 172:3

173:11 174:10
176:11 177:14
178:19 179:24
181:24 182:12
182:16 183:2
185:7 187:20
192:12 193:11
196:8 197:18
197:22 198:15
200:11 205:22
206:14,23
207:16 213:23
219:18 220:2
223:5 230:4,16
233:4 234:3,16
234:19 236:13
237:7 242:20
245:6 247:19
247:21 248:5
251:12 253:10
261:11 262:20
262:24 264:12
267:16 268:5
273:11 275:23
276:21 277:5
278:10,19
280:6 284:23
285:3,5,18
288:15 289:10
291:1 294:16
299:24 304:10
305:13 310:11
310:14 320:24
323:4 324:20
325:20 326:18
327:14,22
328:5 329:6
330:3,14
332:17 338:11
341:8 342:20
343:13 345:11
346:12 352:16
354:4,9,16
**right-hand**
85:14 246:3
259:13
**risk** 39:4 46:21

64:3 69:12
87:18 113:3
121:12 216:24
217:1 219:10
220:16,16
240:8 247:9
252:4 257:15
257:23 258:8
273:14 275:5
276:9 278:9
297:10 303:17
306:15 312:3
313:18 315:17
316:22 319:15
338:8,13
342:10 355:23
**risks** 73:8
259:11 260:9
260:10 293:4
**Ritsesund**
254:18,20
**Rmm@meneo...**
2:15
**Robert** 33:2
**role** 98:9 194:2
272:9 322:15
**RON** 2:13
**room** 87:19,21
90:20 91:7
156:4 253:6
**Rosenblatt**
311:16 313:3,6
**Rothman** 55:13
55:24 267:4,10
267:12 268:6
268:11 269:5,7
270:9,18 271:2
271:6
**Rothman's** 56:7
57:10
**roughly** 156:13
**Royal** 33:20
**Royston** 3:11
**rubber** 73:4,9
**ruling** 22:11
23:8,21 24:4
**running** 59:14

90:19
**Russi** 73:8,16,18
_____
**S**
**S** 4:10 5:2 6:2
7:2
**safety** 88:8
89:13 328:15
329:16
**Saint** 3:9 37:11
37:23
**sake** 145:6 179:8
**Salem** 65:18,20
65:23
**SALES** 1:6
**salient** 123:4
283:18 293:21
**SANDRA** 3:8
**Sandra.wund...**
3:10
**sat** 148:12 241:8
**saw** 59:15 91:24
142:20 154:14
155:17
**saying** 44:23
48:4 116:3
140:8 155:16
174:14 197:3
199:7 214:24
238:6 248:18
251:21 299:14
342:16
**says** 22:10 24:17
38:9 40:23
44:10,15,24
45:2 62:3
85:24 86:2
107:19 108:5
120:7,23 121:1
121:2,7,15,16
128:20 131:22
176:2 178:5,9
178:13 206:24
207:11,13,14
209:19 215:15
215:18 216:6
220:13 242:24

247:3 250:14
260:6 264:15
264:18 277:3
285:1,4,5
288:7 293:3,5
303:11 311:23
324:22 327:9
327:10,15
328:21 334:24
335:17 337:15
337:23 338:3
338:22 339:12
341:11,17
343:12,16
**scenario** 105:5
**Schildkraut**
321:6 322:3
**school** 33:11
35:7 38:5
46:22 52:18
71:5 108:16
123:7
**schools** 46:24
**science** 103:14
348:6,20
**sciences** 6:21
354:7
**scientific** 14:22
15:9 17:7
29:18,19 85:21
107:6 109:19
110:15 114:9
139:8 195:6,12
196:5 204:4
304:21,23
309:12 348:20
350:3 352:20
**scientifically**
128:2
**scientists** 256:17
**scope** 112:4
**screening** 6:10
113:12 336:16
**screwing** 293:23
294:6
**scrotal** 310:5,12
**seafood** 64:15

112:9
**search** 6:9 64:18
259:14,17,17
259:18 324:1
**searches** 239:17
**seated** 10:16
**second** 62:19,24
76:5 113:4
183:10 184:24
235:23 245:7
246:24 264:7
278:4,16 320:7
334:10,10
335:11,12
339:13
**second-to-last**
341:7
**seconds** 153:11
**section** 245:4
262:8,10 273:6
339:9
**see** 14:4 18:1
29:4 37:5
49:19 61:6
62:5,11 63:9
75:10 77:17
85:16,23 94:15
118:23 120:7
120:19 121:5
135:17 137:6
141:23 142:6
148:8 156:13
157:20 158:4
159:19 169:10
169:16 174:23
181:10 220:11
231:1,2,5
249:20,23
254:23 258:23
266:3 268:2
269:10 275:10
275:14 276:11
276:14 277:1,3
277:5,9 284:20
288:4 293:7
295:16 296:12
302:4 303:5

311:21 317:13
322:18,19,20
327:12 328:7
335:9,14,15
336:8 337:15
338:21,23
339:15 346:17
355:18 356:20
**seeing** 77:8
356:21
**seen** 13:2,14,23
14:7 27:18
71:14 75:11
80:5 156:14
169:19,23
171:2 255:18
255:24 298:1
325:1
**sees** 144:15
**selected** 110:16
119:17 120:4
120:17 123:16
124:3
**selects** 123:21
**self-promoting**
139:6
**semantical**
309:11
**semester** 46:9
46:15
**send** 91:24
134:10 136:18
138:19 139:19
211:8 212:21
212:24
**sends** 230:1
**sense** 36:20
75:13 114:16
139:6 236:24
241:20 320:1
333:15
**sensitivity** 69:23
**sensitization**
122:4
**sensitized** 69:17
**sent** 14:8 109:2
109:3 130:4

208:10 209:6
212:4 235:16
**sentence** 181:1
247:3 334:11
335:13 355:22
**separate** 95:8
142:9 173:7
245:4 273:13
274:21 275:3
275:24 276:8
279:14 345:20
350:12 352:20
**separated** 206:1
**series** 144:19
287:19
**serious** 296:2
**Serous** 6:20
354:6
**serve** 141:18
160:2 237:24
**served** 89:6 90:6
90:8 127:22
301:8 325:16
**serves** 140:23
**service** 6:17
91:14,20
**services** 1:20 9:5
37:11 86:16
87:13 88:4,5,7
88:15 91:4
99:17 127:15
139:2,13,17,18
140:11 141:8
159:2 160:9,12
333:15
**serving** 193:1
194:9
**set** 76:6 142:12
142:14,19
329:15
**sets** 40:2
**setting** 77:7
**settings** 69:8
**seven** 14:18
73:14 114:14
118:10 285:10
343:23

**seven-page**
255:17
**SEYFARTH**
2:17
**shared** 51:17
52:4 56:3
**SHAW** 2:17
**sheet** 359:7,9,12
359:15 361:12
**shelf** 268:23
269:11,15
**SHOOK** 3:2
**short** 56:3
117:14 168:22
332:6 356:5,11
**Shorthand** 1:16
358:13
**show** 13:5 73:11
112:13 128:19
132:24 142:16
142:24 154:8
159:22 204:14
215:2 216:4,13
255:15 274:13
294:2 297:9
303:4 314:20
317:3 319:15
**showed** 273:13
275:4 276:9
278:8 296:24
315:16 316:22
**shows** 115:19
119:24 320:10
**Shusan** 321:1
**side** 326:10
**sides** 22:23 92:5
**sideways** 157:19
**Siemiatycki**
41:12,15 42:17
161:24 224:22
225:10 301:4
301:18
**sign** 201:19
358:9 359:8
**signature**
172:16 206:8
206:21 207:8

207:11 246:11
249:23 315:7
**signed** 213:12
**significant** 5:10
36:15 273:14
275:4 297:10
297:24 315:17
316:21 318:10
318:12 335:21
338:9 343:9
**signing** 359:10
**silica** 97:3,19
121:23
**similar** 76:21
130:12,12
203:2 312:5
**similarly** 182:7
**simple** 97:17
114:2 177:23
188:17 215:7
243:20,21
**simplistic**
134:16 174:6
**simplistically**
134:21
**simply** 128:6
196:16 238:18
248:11 249:7
264:20 304:3
308:19 345:15
**Singh** 42:23
43:5 162:3
**single** 46:19
113:19 305:15
**sir** 10:5 11:3
12:7 49:21
50:10 62:20
70:3 82:19
83:6,11 116:5
128:20 177:2
206:22 237:10
237:13 250:1
252:22 301:23
312:11 332:24
**sit** 114:13 228:2
**site** 63:4 110:14
**sitting** 174:2

230:16
**situation** 72:9
**situations** 90:4
**six** 11:11,15
73:14 114:14
118:9 352:19
**six-page** 84:24
85:4
**skepticism**
288:8 302:3
**skier** 34:2
**skills** 36:20 98:1
**Slade** 73:8,16,18
**slips** 135:11,13
135:14,18
**sloppiness**
206:15
**sloppy** 207:22
**small** 343:8
**smart** 56:1
**smile** 144:13
**smiled** 142:6
**Smith-Bindman**
42:10,13 162:2
224:5
**smoke** 80:5 81:8
**smoker** 310:16
310:20
**smoking** 80:9,19
310:24 311:4
356:1
**snapshot** 258:17
258:20 259:19
260:6,8 261:11
261:15
**snapshots** 257:6
**Society** 51:1,4
**software** 108:21
109:4
**sold** 96:22
**solid** 303:2
**somebody** 80:19
102:8 108:24
109:1 127:6
129:11 135:7
145:15 146:9
151:15,16

173:17 202:17
208:11 210:2
210:11 213:16
241:3,23
**son** 91:17,21
**Sonal** 42:23
**Song** 225:1
**sorry** 13:18 36:9
42:11,21 44:14
55:15 62:21
73:10 83:17
84:8 86:4
105:11 115:7
127:12 151:1
151:21 153:9
167:2 176:11
186:6 190:15
198:8 234:10
241:14 256:21
262:1,5 265:4
276:6 281:10
281:14 284:8
302:14 306:4
315:19 316:1
323:1 324:6
328:3 332:15
345:3
**sort** 53:20 122:1
122:24 125:2
156:11 165:24
332:16
**sorts** 112:14
**sound** 255:2
290:12 291:1
**sounds** 106:21
111:11 172:3
255:4
**South** 3:8
**space** 52:4 53:8
359:6
**span** 164:21
**speak** 129:10
299:21
**speaking** 12:19
12:24 74:11
111:13 146:13
147:5

**speaks** 242:2
264:13
**Specialists** 4:17
**specific** 16:8
23:13 35:24
40:22 41:2
42:17 54:3
56:23 57:5
60:20 64:10
123:9 129:21
143:19 151:9
167:11 183:11
201:6 202:11
216:1 219:10
224:2 270:4
273:21 282:20
291:3 299:17
345:17 347:15
353:17
**specifically**
16:11 19:5
31:10 40:9
42:5 43:6 44:7
45:18 48:5
50:7 57:7,19
60:3,10,12,22
62:12 63:12
64:6 71:12
78:1 87:4
107:16 123:18
128:4 135:2
148:16 150:5
152:11 159:5
161:20 168:18
169:6 177:3
193:8 195:15
221:21 223:23
227:7 232:12
248:3 263:22
269:23 270:15
286:6 295:11
339:18 340:21
343:16 346:17
**specifics** 35:12
150:19 153:23
161:10 164:6
164:24

**specified** 248:9
**speculate** 201:2
**speculating**
201:1
**speculation**
146:1,5
**spent** 32:16 36:7
36:10 59:12
131:22 171:12
171:18 175:6
**spoke** 67:1
91:22 125:17
154:6 167:17
**spoken** 167:16
**St** 253:16
**stand** 108:4
**standalone**
345:20
**standpoint**
44:20 45:16
217:7 219:13
307:18
**standpoints**
354:8
**stands** 199:20
**start** 177:8
232:1
**started** 86:10,13
176:5 232:18
308:1
**starting** 202:7
**starts** 335:16
**stat** 295:17
**state** 76:19 94:4
103:13 196:16
223:16,19
253:16,16
359:5
**stated** 301:7
**statement**
192:16 222:21
230:5,21 243:1
247:4 250:21
273:22 274:9
288:16 289:8
291:13 304:1
313:15 314:4

340:12,20
349:19
**statements**
203:16 249:13
250:15,17
281:16 282:18
287:19,23
334:1
**states** 1:1 62:17
105:9 295:24
**stationary**
132:16
**stationery**
136:13
**statistical** 275:4
319:15
**statistically** 5:9
273:14 297:9
315:17 316:21
318:10,12
335:20 338:9
343:9
**statistics** 99:9
290:8
**stayed** 37:24
**steady** 76:19
**steeped** 64:20
**stenographic**
9:16
**stenography**
91:16
**step** 73:24 89:9
275:9
**stepping** 82:18
**steps** 232:12
**stick** 150:5
**stint** 45:4
**Stipulations**
8:11
**stop** 107:12
108:9
**stopped** 108:10
**stories** 56:3
**straight** 202:19
**Street** 1:14 2:4,9
2:14,18 3:8
53:1

Jonathan Borak, M.D., DABT

**strictly** 74:11
**strike** 124:21
  164:4 297:24
**stronger** 311:18
  312:21 313:24
**strongest** 349:18
**structurally**
  274:2
**structure** 182:2
**student** 36:15
**students** 47:14
  52:8
**studied** 32:24
**studies** 5:10
  25:12,17 26:3
  26:9,17,17
  27:1,2,7,15
  28:12,13 29:15
  39:5 74:6 75:6
  75:7,8 76:6,12
  107:6 108:17
  202:15 203:2,8
  220:21 234:7,8
  234:9 241:5
  273:13,24
  274:6,21 275:3
  275:11,15,24
  276:9,19
  290:10 294:18
  297:9 312:4,6
  315:16 316:21
  317:11 318:10
  319:14 320:5
  321:10,16
  326:14,20
  328:22 335:19
  337:16,24
  338:5
**study** 24:19
  38:19 64:5
  65:12 66:18
  71:8,11,15,24
  72:3,13,16,21
  74:16 75:2
  77:11 99:5,7
  101:20 160:21
  160:24 161:2,4

227:2,19
233:13,14,17
234:1,5 240:21
240:22,23,23
240:24 273:23
277:12 288:22
289:11 291:5
301:20 306:23
311:16,17
317:19,20,23
318:6,16,19
320:7 327:24
339:9 352:20
**studying** 226:12
**stuff** 92:20
  125:18 234:17
  235:6,7 236:5
  238:21,23
  239:5 269:4
**stupid** 187:13
**stupidity** 187:17
**subheading**
  273:4
**subject** 22:14
  24:3 176:21
  177:1 187:19
  359:10
**subliminal**
  112:19
**submit** 229:23
  345:19
**submitted** 95:3
  95:3
**subscribe** 54:5,9
  54:13,17,22,24
  55:2,4,7,9
  148:10
**Subscribed**
  361:19
**Subsection**
  231:16
**subsequent**
  235:17,18
  321:17,20
**subsequently**
  36:16 322:7
**subset** 60:22

**subsidiary**
  96:22,23
**substance**
  165:23 166:10
  166:14,15,22
  167:2 168:12
  361:11
**substantial**
  309:2,5,6
**subsume** 40:4
**subsumed**
  321:16 322:3
**succinct** 289:8
**sufficient** 76:18
  308:16
**sufficiently**
  68:10
**suggest** 285:2
  296:4
**suggests** 99:4
  306:13 343:8
**Suite** 2:4,9 3:8
**summaries**
  175:12
**summarize** 29:3
**summarized**
  244:18
**summary**
  303:11 304:8
  304:13,17
  348:6
**summer** 22:21
**supervision**
  358:22
**supplement**
  207:19,24
  209:2 351:22
  353:24
**supplemental**
  6:14 206:17
  351:21 352:13
**support** 8:2
  247:7 311:24
**supported** 59:13
**suppose** 236:16
**sure** 11:16,17
  40:12 57:18

84:23 89:2
106:5 120:20
130:15 132:13
139:9 142:1
155:12,19
166:1 175:14
185:2 211:11
218:1 224:2
227:3 228:10
228:13 229:17
230:6 232:23
239:20 249:19
251:24 293:22
315:14 317:5
332:16 339:10
343:18
**surprise** 140:2
**surprised** 42:7
  159:23 160:10
  188:1 229:18
  229:20 254:8
  258:3 264:3
  300:21
**surprisingly**
  74:24
**surveillance**
  121:10
**susceptible**
  121:13
**suspect** 240:21
**swear** 9:18
**sweep** 310:12
**sweeps** 310:6
**sworn** 9:22
  358:5 361:19
**Sylvania** 65:19
  65:20
**synopsis** 335:9
  335:12
**synthetic** 77:12
**system** 212:7
**systematic**
  25:18
**systematically**
  49:4

---
**T**

**T** 2:18 4:10 5:2
  6:2 7:2 360:1
**T-A-H-E-R**
  341:9
**Tabershaw**
  328:2,4
**table** 170:2
  202:18
**Taher** 337:21
  338:4 341:8,12
  342:9,22
  343:15
**take** 12:10,10,13
  12:15 15:12
  20:12 24:16
  31:14 39:22
  40:6,20 51:20
  66:15 85:3,3
  94:19 108:8
  116:16 117:9
  117:23 154:17
  163:7 166:3
  167:20 168:16
  172:5 174:12
  175:4 188:3
  201:3 204:16
  205:1 206:19
  228:9 252:24
  253:6 278:20
  311:9 332:1
  345:21 354:22
  356:4,5,6
**taken** 1:13
  253:15
**takes** 177:16
  214:2
**talc** 7:7 10:12
  11:1 15:3,10
  15:16,21,24
  16:11,13,17,23
  17:20 20:19
  21:2,12,12,16
  21:17,19,23
  22:3 24:23
  25:9,13,15
  29:21 31:1,6
  31:11 44:2

Jonathan Borak, M.D., DABT

48:24 49:2,13
49:14 103:15
127:23 141:18
145:7 146:16
146:17 147:21
148:15,20
149:4 150:1
152:13 158:19
158:22 159:1
171:13 175:10
175:11 176:23
177:1,5 191:8
193:14,22,22
194:15 196:14
198:18 203:13
203:17 204:5
217:6,8 223:5
225:16 226:14
228:4 238:14
238:15 239:17
239:18 240:1
247:8 252:4
257:15,23
258:7,8 260:11
262:15 273:16
275:6 276:1
279:10 281:23
282:14,16
285:2 288:12
291:9 297:11
302:18 303:13
303:18 305:20
306:14 316:23
319:16 334:5
335:22 336:17
338:2,7,14
339:17 340:20
341:4 343:11
348:21 349:20
353:11 356:1
**talc-based** 293:5
**talc-containing**
195:14,20
219:7 240:2
272:2 312:16
344:9
**talc-related**

175:20
**talcum** 1:5 9:11
15:3,4,16 16:8
16:21,22 17:10
17:19,20 21:2
24:22,23,24
146:23 271:8
**talk** 52:10 68:18
78:9,10 85:11
86:7 91:20
104:17 147:23
148:1 168:24
190:23 191:3
193:10 200:11
229:6 245:7
320:4 334:22
356:7
**talked** 231:18
305:11 313:16
**talking** 90:17
91:10 93:21
151:15 163:13
166:9 183:8
195:24 200:13
227:16 229:2
234:6 238:19
275:12 315:19
315:22 318:20
323:20 328:1
329:20
**TASA** 4:16 6:17
124:23,24
125:7,10,16,21
125:24 126:5
127:3,23 129:4
129:11,22
130:18 131:2,8
132:7,17,19
133:21 134:1
134:11 136:18
137:3,6,8,11
137:16,18
138:9,13,19
139:16 140:10
140:23 141:1,5
142:10 145:15
148:13 150:14

151:13 153:15
153:19,21
154:20 169:11
169:19,24
171:3 201:12
212:14 229:24
230:1
**task** 239:21
**taught** 45:19
46:14 47:9,12
48:5,21
**teach** 38:24
46:10 292:7
**teaching** 47:15
58:14 114:4
220:17
**teachings** 49:6
**technical** 6:16
14:23 15:9
17:8
**TECHNICIAN**
3:15
**telephone**
168:16
**tell** 40:11 47:6
56:22 61:23
62:10 87:5
92:2 119:21
122:19 142:2
143:7,18
145:16 146:2
150:23 151:24
194:24 224:17
227:15 254:9
254:12 268:4
314:18
**telling** 151:11,23
153:23 164:6
187:8 207:21
325:6
**Temple** 1:14
**ten** 37:2,4
**ten-page** 204:1
**ten-year-old**
111:17
**tenants** 285:2
**term** 16:2 69:22

78:6 258:17
263:21
**terms** 38:8
68:22 89:11
129:5 239:21
282:10 293:21
**Terry** 240:21
319:8 337:19
**test** 12:12
113:11,12
**testified** 9:23
10:11 11:7,19
11:22 12:6
27:21 94:15
95:12,15 98:6
99:13 103:24
104:6 105:2,6
106:3 193:5
**testify** 22:13
23:9 24:13
43:24 88:21
90:3 189:2
**testifying** 27:22
27:23
**testimony** 4:4,23
5:12 11:1
22:23 24:2
42:10,12,20
43:2,16,19
93:8,14 95:2
100:1,4,17
104:18,19,21
116:10 166:11
190:8 218:18
218:21 230:20
236:5 252:12
254:5,19
256:15 263:12
264:14 265:9
266:10 274:20
283:24 284:1,5
284:10 298:17
322:2 345:23
358:6
**testing** 24:19
25:9,10
**text** 248:21,23

**textbooks** 271:9
**thank** 10:10
12:16 14:6
22:18 37:8
62:23 84:2
119:1 172:11
188:4 200:1
205:4 222:24
229:21 244:8
253:3 281:5
317:16 324:12
333:3 356:18
356:19
**Thanks** 31:24
**therapeutic**
354:7
**thereof** 21:4
**thing** 24:15
125:1 157:8
193:13,20
198:5 203:7
206:20 298:13
312:24 330:3
**things** 14:17
16:14 26:3
30:18 93:13
97:8,24 105:13
111:13 112:14
123:3,20 140:8
143:6 173:19
203:16 225:6
238:12,13
252:24 257:6
294:2 318:21
332:16 351:12
353:19
**think** 11:24
14:11 19:5,19
20:7,8 23:1
26:5 41:4 43:3
43:21 56:2,4
57:6 58:19
65:18 67:13
68:8 72:14,18
79:2 82:23
87:10 88:13
101:14 104:4

Jonathan Borak, M.D., DABT

108:18 112:3
128:3 131:11
131:14 132:8
132:11 140:17
152:1,2 155:23
171:9 177:13
185:1,6,9
194:12 196:9
197:5 199:7
200:8 208:1
210:9 225:2
227:4 233:10
233:18 234:2
248:19 249:12
251:24 255:22
255:23 256:11
257:19 264:2,6
267:5 270:22
283:9 284:3
286:1 288:18
291:12 294:23
296:2,4 297:23
298:10 301:6
301:11 307:13
309:1,20 310:4
315:9 318:5
322:8,22
323:22 325:22
326:19 328:20
330:11 333:13
343:19 352:15
354:9
**thinking** 105:12
114:7 128:2
283:3 300:11
303:7
**third** 113:6
211:9 212:4
260:8 277:2
342:17
**thirty** 359:16
**THOMAS** 2:18
**thought** 36:21
111:14 139:5
179:21 225:12
263:9 268:1
275:16 281:18

282:1 283:17
292:6 293:23
300:5,20
318:20 333:12
348:15 353:6
**thoughts** 22:2
**three** 14:11
52:19 55:21
73:13 100:17
100:20,22
101:1 107:14
114:13 134:6
163:20 167:16
172:1 215:23
215:23 295:4
322:7 338:6
352:19
**three-quarters**
251:2
**threw** 352:24
353:9
**throw** 109:7,8
208:8
**throwaway**
354:13
**Thursday**
214:19
**ticket** 39:6
**till** 34:5 204:24
**time** 9:7 12:8,19
12:24 23:7
30:10 37:16
38:8,13 48:13
48:13,18,18
59:12,17 65:11
66:11 67:2
76:7,16,18
77:15 83:13,23
89:3 93:15,19
94:11,14
111:19,22
112:1 117:12
117:18 124:4
131:14 135:11
135:13,14,18
141:17 142:21
143:2 147:8

149:7 154:15
154:17 155:17
158:15 164:13
164:21 167:5
170:5 171:22
174:20 175:6
178:2 191:24
206:20 228:9
228:15,22
238:19,20
239:14 280:7
288:24 289:5
298:22 305:3
311:11,20
331:9 332:2,5
332:9 342:17
354:20 356:10
356:14 357:1
**times** 11:7,21
88:17,21,24
89:8 90:5,8
93:3 98:6
104:3 125:22
127:12 131:9
133:2,3,17,18
136:15,16
167:16 181:11
241:1 266:7
**Tisi** 170:23
**title** 38:14 53:23
60:4 263:14
**titled** 273:6
**tlocke@seyfar...**
2:20
**today** 10:9 11:2
11:5 27:23
95:6 103:4
115:4,19
118:18 125:6,9
125:11,13
132:9 165:4
171:22 214:6
217:15 218:21
228:2 236:6
253:7 314:9
351:12
**today's** 9:6

165:5 356:24
**told** 95:24
164:21 178:19
180:13 185:22
268:20 317:12
326:19 350:1,9
**Tom** 31:19
195:10
**top** 120:7 206:24
207:17 209:19
284:21 324:23
325:15
**topic** 296:2
**topics** 112:10
134:8 220:18
**torture** 12:12
**total** 45:22
133:6,6 158:4
229:18 231:3
**totaled** 157:17
**totality** 305:14
309:14 344:2
348:4 350:20
350:21,22
351:5
**totally** 109:6
**totals** 6:13
158:11
**touch** 294:20
**town** 144:17
**toxic** 63:3
121:11
**toxicants** 61:22
**toxicokinetics**
220:15
**toxicologist**
32:15 71:19
127:18 129:9
**toxicology** 40:4
40:21 46:20
50:2 59:3
112:24 113:3,5
121:9 217:6,8
220:14
**track** 29:11
31:20
**trade** 17:18

**train** 39:7
**trained** 35:6
**training** 34:14
34:17 36:2
38:2 70:10,11
71:5
**transaction** 97:2
**transcript**
214:17,18
215:10 264:14
358:9,19
359:17,19
**transcription**
361:7
**transcripts**
235:15
**transition** 183:9
**transmittal**
211:7,7 212:3
212:6
**transparently**
294:2
**trauma** 59:15
90:19
**treated** 91:6
**treating** 92:22
**tremor** 77:3,8
**trial** 4:23 11:19
11:22 70:8
95:2,15 99:13
101:2 104:20
105:2,6 106:4
252:11,15,21
254:4,5,9
255:12 284:1,4
284:10
**trials** 70:14,18
252:23,24
253:12,15,22
260:18
**tried** 100:9
252:18
**trivial** 187:14
**true** 43:10 50:12
58:19 122:10
123:12 216:3
217:13,15

Jonathan Borak, M.D., DABT

218:17,19
235:13 257:4
274:10 310:19
330:12 358:6
**truncates**
171:17
**Truthfulness**
267:19,21
**try** 54:4 75:13
85:5 114:15
192:5,7,8
239:20
**trying** 72:18
74:19 77:13
104:8 105:13
105:14 113:19
126:19 183:3
186:7 266:7,13
277:21,22
309:11
**TUCKER** 3:7
**tumor** 339:20,24
340:23
**Tumors** 73:8
**turn** 46:4 157:10
255:8 328:12
**turned** 53:17
353:11,12
**twice** 11:24
105:21,23
269:13
**two** 16:2,6 40:2
55:20 62:11
63:11 64:1
73:13 74:3
76:11 84:24
100:19 101:5
106:8 111:6
114:13 142:9
156:8,9 163:20
167:15,16,19
167:19 168:24
171:15,18,19
172:1 182:17
203:10 221:13
224:23 229:8
250:2 291:6

293:21 333:22
334:1 352:19
**two-and-a-hal...**
263:18
**two-hour** 101:7
**two-hour-long**
169:3
**two-sided**
172:13,22
**two-year** 238:19
**type** 74:10 87:15
183:15 259:14
270:23 275:16
275:18
**typed** 181:14,15
186:11,13
187:2
**typos** 173:18

___

### U

**ultimate** 31:5
65:13
**ultimately** 174:8
194:18 353:10
353:12
**unable** 30:14
**uncertain** 204:6
327:10
**uncertainty**
302:23
**unchecked**
331:9
**unclear** 21:13
32:18 265:6
275:13
**unclear.'** 328:12
**underlying** 27:6
69:13 74:13
294:7,12,17
**underneath**
121:3 293:4
327:14
**understand**
22:20 23:6,18
23:22 28:15
32:6 79:5,9,14
102:5 104:22

109:3 128:8,17
128:23,24
130:16 145:2
165:21 169:15
175:8 181:19
183:3,23
187:18 188:8
188:22 194:6
199:12 203:12
227:21 237:5
238:5 246:14
250:5 252:16
263:15 266:19
277:23,24
279:19 292:20
303:7 319:3
348:13
**understanding**
20:2 23:10
64:23 189:12
190:4,20
203:22 253:13
288:11 299:9
**understood**
151:6 194:1
197:23 296:23
334:15 350:17
**undertake** 161:7
**undertaken**
15:15 70:19
**Unfortunately**
269:10
**Union** 3:11
**United** 1:1 62:16
295:24
**University**
44:13 178:11
**unlimited**
331:10
**unproven** 204:6
289:9
**unpublished**
267:3,15,18
268:13 269:18
**Unrelated**
118:17
**update** 119:3

120:16,18
177:21 182:9
210:24 241:23
**updated** 118:5
118:14,23
119:11 120:4
186:10 241:13
352:2
**updates** 108:22
122:17
**updating** 119:15
186:1 242:18
351:23
**upper** 259:13
**usage** 356:1
**use** 35:20 47:14
64:15 82:12
115:13 138:14
146:17 191:16
195:13,19
219:6 240:1
243:10 252:3
258:7 262:14
263:20 272:2
273:15 275:6
281:22 285:2
291:9 293:5
297:11 303:17
305:20 306:13
312:16 316:23
319:16 334:5
338:7,14 344:8
346:9 348:7,21
**useful** 353:3,6
**usually** 76:13
236:11

___

### V

**vacation** 171:16
**valid** 64:13
**validity** 113:11
**valley** 331:6,8
**variety** 94:15
202:22
**various** 20:13
26:8 27:19,20
28:11 39:19

41:8 49:23
63:17,20 75:12
162:8 199:13
203:1,15,23
244:19 299:17
319:14 334:6
**verbatim** 182:19
185:16
**verdict** 100:15
**verify** 231:9
**version** 118:5,7
243:5 269:15
333:8
**versions** 55:20
270:12
**versus** 96:4
165:23 220:21
220:22 314:16
338:7
**Victoria** 33:20
**video** 9:8 91:13
155:2
**videographer**
9:2,4 117:11
117:15 228:14
228:20 332:4,7
356:9,12,23
**VIDEOTAPE**
3:15
**Videotaped** 1:13
**view** 56:17,19
57:3 304:4
**viewed** 288:8
302:2 329:1
**virtue** 41:7
**vitae** 4:15 32:4
**volume** 330:18

___

### W

**wait** 133:10
**wall** 40:22
**Wambeck** 99:3
**Wanda** 314:15
322:16,19
**want** 12:9,13
14:16 15:5,5
15:20 16:24

17:10 21:5
25:1 30:17
84:23 98:15
104:16 110:23
118:22 125:9
134:18,19,19
139:21 143:8
144:18,21
145:13 151:8,8
151:9,10
156:16,18,21
159:19 164:24
165:1 166:2
189:18,19
190:3 193:10
193:24 194:2
196:9 204:24
205:12 215:2
217:12 218:4
222:24 229:5
243:24 293:15
315:14 316:4
317:5,7 325:2
332:3 344:18
346:16
**wanted** 86:19
111:4 116:22
120:12 135:17
152:12 194:8
229:16 230:5
230:24
**wants** 137:11
**warnings**
303:16
**warranted**
311:19 314:1
**Washington** 2:9
2:19 314:16
322:16,19
**wasn't** 152:10
191:24 197:11
213:12 232:3
239:13 243:7
249:16 261:14
267:14 282:23
308:12 342:19
354:12

**waste** 63:3 83:13
**water** 116:24
**way** 12:22 19:11
24:5,7 25:18
27:22 47:10,24
48:22 65:21
71:11 74:15
80:18 138:11
138:12 140:5
143:4 182:14
191:15 197:3
203:11 238:1,5
238:10 251:3
266:8,10 283:2
283:3 288:21
295:12 296:3
304:13 320:2
321:24 333:12
338:19 340:13
**ways** 161:13
**we'll** 11:13
12:14 26:14,15
30:8 66:14
83:17 85:4,11
142:23,23
154:17 159:9
159:18 171:1
191:16,16,18
192:4,4,5,8
193:9 205:1
230:8 245:8
254:3,3,13,13
274:14 315:12
315:12
**we're** 12:11
25:21,24 26:20
26:21 55:14
83:12 93:21
117:11,15
123:17 192:5
204:21 228:20
238:18 277:21
308:2 315:22
317:5 352:1
356:12
**we've** 64:8 172:6
184:15 204:18

223:8 274:13
296:14 305:11
314:21 344:20
354:23
**weak** 288:9
**web** 5:20 123:6
292:10 293:11
347:21
**webmaster**
108:19
**webmeister**
108:15
**website** 4:21
84:10,13 85:8
85:10 107:4,10
107:13,24
108:8,9,15
109:7,10,12,15
110:8,17
111:24 112:2
116:17 117:6,7
117:22 118:20
120:6,16
122:12,19
123:20 242:10
243:4,6,9,16
244:10 247:16
248:6,12,13
249:8,9,13
250:10,13
251:18 256:4
257:7 258:18
259:7,9,12
260:17 261:4
294:1 295:9
**websites** 242:3,7
244:15,19
245:5 247:23
248:9,23
250:16 267:2
279:8 292:21
293:10,12
294:13 295:10
**week** 48:19
118:13,20
122:12 170:15
216:9,10

**weeks** 171:15
174:13 229:8
**weight** 56:8
247:6 271:14
272:5,10
**well-published**
268:20
**Wellman** 106:15
**went** 33:10
37:24 120:3,15
120:16 122:11
123:16 186:2
187:9 229:4
230:17 233:3
236:21 286:17
326:21
**weren't** 31:4
103:9 261:17
299:3 342:1
**whatsoever** 20:4
50:7
**whichever** 11:20
**Whoa** 158:16
**wife** 36:16 168:9
**wind** 331:6
**witness** 8:5 9:19
27:10 28:1,20
30:2 31:9
40:16 41:23
44:6 46:13
48:8 50:10
56:12,22 57:16
58:18 63:16
65:17 66:24
67:8,19 68:4
69:3,19 70:2
72:5 78:14
79:19 80:2,14
80:23 81:18
82:11 83:6,22
84:2,12 94:1
102:10 103:19
110:5 111:10
114:1 115:6,22
116:12,23
128:19 134:15
137:1 138:16

139:24 140:15
141:11 143:18
146:21 149:1
149:17 150:4
150:18 152:17
153:5 159:4
160:17 161:19
162:18 163:16
172:11 173:8
176:18 180:13
181:9 182:23
183:17,23
186:23 187:23
188:13 189:6
189:22 190:19
194:5,12 196:3
197:5,15 198:8
198:22 200:8
200:18 201:16
204:10 205:4
208:21 209:7
209:22 211:22
212:17 213:19
218:13 219:2
219:22 221:8
221:15 222:4
222:13 223:11
226:2,18
227:11 232:3
232:21 233:6
234:13,22
235:10,24
237:4,19 238:4
239:2 242:12
242:22 243:12
245:22 252:6
253:20 254:22
255:22 257:10
257:19 258:3
258:12 260:22
261:7,14,21
264:1 265:4
266:6 268:19
269:22 271:5
271:19 272:14
273:19 274:8
275:9 276:6,14

Jonathan Borak, M.D., DABT

278:12,24
280:3,21 281:5
281:10 282:9
283:12 284:3
285:11,20
287:18 288:18
289:19 290:4
291:12 292:14
294:11,20
297:21 299:8
300:10 301:11
303:24 304:17
306:5,8,22
307:13 309:1
309:10 310:4
310:19 311:3
311:10 312:10
313:11,20
314:6 315:24
317:2 318:11
318:18 319:3
319:22 321:15
322:6,18
324:12 326:6
326:24 329:14
330:11,23
331:21 332:20
332:23 333:11
337:9 340:8
342:5 344:5
349:3,5,9,17
350:11 351:10
356:19 358:5,6
358:8 359:1
**woman** 259:4,6
**women** 289:14
289:24 291:7
295:18,21
296:1 303:16
340:3,15
**wonderful** 108:1
297:3,5
**Wood** 33:2
**word** 28:2 72:6
173:22 185:19
185:19 187:7
188:3 247:1

272:23 307:10
335:16 346:9
355:19
**word-for-word**
182:19
**wording** 30:16
**words** 103:13
109:21 186:8
231:19 259:14
279:10 294:5
**work** 25:15,17
38:22 39:1,17
39:19 52:10
56:14 93:20
99:2 109:2
123:8 125:24
126:16 127:3
130:8 135:8
147:13 177:11
191:4 279:12
**worked** 37:21
66:7 93:17
105:16 112:13
125:20 126:11
127:3 129:15
130:22 131:19
141:1 152:23
162:20,24
330:6
**worker** 68:19
**workers** 66:13
73:4,9 75:3,8
76:6,13,14,21
77:4,17 113:15
327:20 328:16
329:22 330:6
**workers'** 97:13
97:15,18
126:18
**working** 39:3
45:13 106:18
109:10 125:6,9
125:15 128:4
202:17
**workplace**
113:7,10,17
121:12

**works** 89:10
130:24
**world-renown...**
41:18
**worse** 187:11
**worth** 353:3
**wouldn't** 71:22
71:22 227:9
236:23,24
260:24 272:22
333:11
**write** 173:21
174:2,16 175:4
175:7 177:16
201:5,19
210:24 232:4,7
232:14 234:17
236:21 237:16
238:23 240:16
**writer** 56:2
**writing** 15:1
114:5 135:14
173:20 203:23
211:1 232:1,18
237:11 241:19
**writings** 56:7
57:10,18
**written** 13:23
14:23 15:8
16:7,9,12,15
17:3 21:11,22
59:23 60:1,5,7
61:8,12,15,18
63:11 147:14
181:22 182:11
204:11 227:5
239:5 268:14
269:20 270:11
270:13 271:7
271:11 340:9
**wrong** 11:17
38:7 62:1,11
92:14 110:2
123:15 170:4
223:7 252:10
263:17 326:19
**wrote** 16:3,4

62:14,18 63:1
63:24 108:6
150:7 185:16
185:20 196:18
198:11 209:18
227:22 228:3
236:20 270:9
295:4 323:24
325:11 327:5
334:21 350:23
**Wu** 321:4 322:2
**WUNDERLI...**
3:8

___

**X**

**X** 4:2,10 5:2 6:2
7:2 127:7,15
127:16 129:5
264:16 277:6
277:11,11
**Xs** 320:16

___

**Y**

**Y** 127:7,15,16
129:5 264:16
**Yale** 4:21 32:17
34:17 36:7
44:13 46:24
49:6,8 51:13
51:16 52:2,4
54:8,12,16,20
55:1,6,11
70:14,15 99:10
108:17 110:8
116:17 117:6,7
117:22 178:11
178:22 179:11
180:10
**yeah** 35:5 67:12
69:24 92:24
93:11 100:24
118:24 144:12
144:12 147:11
151:2 159:18
165:6 172:19
192:10 193:19
198:2 204:16

205:2 212:20
217:23 231:5
245:1 251:16
262:9,9,9
270:7 277:17
285:11,11,12
285:20,20,21
313:7 317:22
317:22,22,22
317:23 324:10
342:15 356:3
**year** 34:16,18
36:8,10,13
44:1 74:4
289:15 290:1
291:8 295:18
**years** 11:12 12:1
12:3 32:16
37:2,3 38:21
46:5 59:9,11
59:17 61:5
75:5 77:1,9,18
84:15 88:15,22
88:24 89:1,23
90:11,13,16,17
96:2,19 104:12
107:15 111:1
118:10 126:8
129:23 130:12
130:15 132:2
162:20,24
186:1 226:22
241:21 268:3
303:8
**yesterday**
142:18 343:21
352:5
**York** 91:12 94:3
**yourdiseaseris...**
295:14

___

**Z**

**Z** 127:7,16,16
129:5 264:16
**zero** 34:1

___

**0**

**06510** 2:14

---
**1**
---

**1** 1:10 5:11
13:12 14:15
85:14 107:5
172:14,17,24
174:7 186:15
186:18 206:23
207:13 208:15
246:6,17,18
249:20 263:11
263:23 265:2
266:20 291:22
291:24 297:6,7
361:6
**1,400** 291:7
**1.17** 276:10
**1.22** 315:18
**1.28** 338:10
**1.31** 278:9
**1.92** 315:18
**1/17/17** 5:22
**1:10** 228:23
**10** 4:6 17:7,23
76:24 206:8,11
206:20 207:10
207:11 208:14
263:3 266:20
267:12 291:7
345:22 346:1,4
346:6,7,21
347:1
**10:44** 117:13
**10:52** 117:18
**100** 3:8 110:24
**100-plus** 217:24
**100,000** 72:1
**10th** 154:22
157:16 214:1
**11** 62:8 332:14
333:2,3
**11-page** 288:22
**11:30** 34:5
**116** 4:20
**12** 17:23 153:11
181:11 242:9

**242**:13,15
245:8 246:23
246:24 250:23
**12/2018** 6:11
**12/21/18** 243:1,4
244:11 247:5
248:7,13 249:8
295:8
**12:18** 215:20
**12:28** 228:16
**13** 4:14 172:14
172:15 173:1
174:9 246:7
249:3,24 262:3
262:6,12
305:12 348:4
**13-page** 26:10
221:18 248:1
249:9 344:1
350:23
**14** 17:14 62:9
73:7,15 172:18
172:20 177:24
246:3 262:3,6
262:21 273:13
274:5 278:20
347:3,6,10
**14,000** 289:24
**15** 20:21 63:22
76:24 77:8
280:23 284:15
284:16 287:15
287:20,23
288:2 291:16
301:24 306:2,4
347:11,14
**150** 110:24
264:19
**151** 264:19
**154** 6:16
**155** 1:14
**158** 6:12
**15th** 101:7
**16** 286:20 287:1
287:5,15,21
291:18 337:2
337:11 347:16

**347**:19
**16-2738** 1:6
**17** 22:9 24:1
185:11 192:14
204:2 206:9
207:2 208:10
213:12 251:11
292:9 321:10
347:21 348:1
**172** 5:6
**17th** 206:7
207:18 209:18
209:19 213:24
**18** 24:17 338:21
**1825** 2:9
**1835** 2:4
**19** 204:17
205:17 300:24
341:6
**19103** 2:4
**1946** 65:15
66:18 326:16
327:19 328:1
329:7 331:14
**1949-1950** 331:3
**1950** 331:8
**1965** 200:14
**1968** 33:5,10
**1972** 33:16
198:19 199:8
200:23 233:4
233:11,22
234:4,10 235:8
237:1,15
238:22
**1974** 33:1
**1976** 36:2
**1977** 34:14 36:4
**1978** 39:23
**1982** 5:10
226:15 234:1
275:1
**1988** 86:11,12
87:7
**1992** 298:9
**1995** 298:9
**1999** 38:11

**39**:23 44:10
227:1,19,22,23
228:5 289:7,11
291:5 300:12
300:21 301:20
302:5
**1st** 9:6

---
**2**
---

**2** 5:14 31:15
32:3 49:17
117:17 171:8
174:7 195:2
223:1 244:24
278:17 279:24
288:2 295:2
296:15 327:9
358:15
**2.49** 276:10
**2/25/19** 5:7
**2:49** 332:5
**2:59** 332:10
**20** 32:16 34:1,6
77:1,9,18 89:1
89:8 202:16
204:23 211:3
239:19 264:10
265:21 361:20
**20-case-control**
273:24
**20-plus** 38:20
203:2
**2000** 87:9
209:19 234:9
248:13 267:13
269:18 270:12
270:14 273:9
273:12 274:6
300:2 321:3
**20004** 2:19
**20006** 2:9
**2000s** 331:14
**2003** 45:1
178:13 321:3
**2004** 62:14
274:1 321:3
**2006** 273:23

**299**:20 300:23
**2007** 38:12
44:10,14 45:17
107:20 109:22
178:5
**2008** 45:2 108:5
178:9 301:17
321:4 322:1
**2009** 321:4
**2010** 148:3,15
202:5
**2011** 311:17
**2012** 118:9
119:24 124:3
321:5
**2014** 242:19
243:10,13
257:13
**2015** 95:19,23
142:20 143:11
145:8 147:8
148:12,12
149:10 150:2
154:22 157:16
159:2 160:1
170:5 177:10
184:18 187:4,5
257:22 286:13
300:19 321:5
**2016** 141:21
319:8 321:6
324:19
**2017** 10:21
44:14,14 45:5
45:17 46:13
141:21 142:13
144:4 154:23
157:17 159:3
159:12 169:10
169:20,24
170:6,6 171:4
178:5 185:11
192:14,18
193:5 198:2,12
201:18 204:2
207:2,11
208:10,14

Jonathan Borak, M.D., DABT

212:12 213:12
213:13,23
214:2,19
216:15 217:13
218:19 229:8,8
234:11,18
235:7 236:20
237:1,9,10,15
237:22 238:22
239:6 241:3
258:6
**2018** 5:10 99:14
239:4 241:3,8
243:10 247:17
250:11,19
251:4,12 252:3
275:1 341:13
**2019** 1:10 9:7
94:9 159:13
171:5,8 176:2
183:13 184:8
185:20 186:19
192:22 212:13
217:16 218:20
220:4,9 229:10
231:14 236:21
237:2 238:24
241:8,9 250:19
251:13,18
350:24 351:20
358:15
**202** 2:19
**203** 2:10,15
**205** 5:21
**21** 250:11 252:3
285:5,7,9
287:7,9 314:21
322:12 342:16
343:1
**215** 2:5
**21st** 243:10
**22** 178:1 311:14
324:4,6,8,9
**22,000** 289:14
295:18
**229** 4:16
**23** 285:22

**230** 7:6
**234** 2:14 52:24
**23rd** 99:14
**24** 154:22
157:16 266:5
338:5
**245** 5:8
**24th** 99:14
143:11
**25** 171:5,8
183:13 184:8
185:20 192:22
202:16 217:16
220:9 231:13
241:9 274:21
335:2 350:24
**255** 6:18
**2555** 3:3
**256-2550** 3:9
**25th** 163:24
229:10 351:20
353:20,24
**26** 171:4 229:7
**263** 5:11
**27** 275:2,3,24
276:8 297:9
338:5
**2738** 9:12
**274** 5:9
**278** 5:14
**278-4449** 2:5
**28** 158:6 163:3
266:3 338:13
**280** 5:15
**283,223.25**
229:19
**286** 5:17
**288,000** 159:16
**289,701.50**
157:18 158:4
**2900** 2:4
**292** 5:19

_____ **3** _____

**3** 5:15 37:6
83:16,18
142:16 174:7

228:22 229:11
231:16,16
242:16 245:2
246:23 247:10
247:14 261:23
280:24 286:18
287:13 295:13
296:16 328:21
**3/10/17** 207:4,15
**3/27/19** 7:6
**3:20** 356:10
**3:26** 356:15
357:2,5
**30** 28:13 96:19
143:9 154:9
163:5 211:3
312:3 313:17
359:16
**30-plus** 154:19
**31** 4:15 255:11
**314** 3:9 6:6
**32** 354:24
**324** 6:8
**33** 230:9
**335** 6:10
**352** 6:14
**354** 6:20
**362** 361:6
**37** 291:22

_____ **4** _____

**4** 5:19 83:17
84:4,6,19
95:18,22 107:3
250:18,21
251:24 262:1,7
273:3,7 292:9
332:9
**40** 111:1 239:19
**40s** 66:1
**42** 332:13 333:2
333:3
**436** 264:18
**44** 250:14 251:3
**45** 75:8 131:15
315:8
**450,000** 231:4

**46** 251:8,12
**463-2400** 2:19
**47** 348:18
**474-6550** 3:4
**49** 251:15

_____ **5** _____

**5** 85:15 107:5
116:17 117:6
117:21 227:17
284:13
**50** 26:2,2,8 75:8
246:17,19
263:23 292:1
297:7
**504** 279:13
282:12
**550** 132:12

_____ **6** _____

**6** 94:20 99:13
311:13 355:14
355:16
**6.2** 343:5
**60** 59:16 131:16
312:3 313:17
**600** 3:8 132:12
176:3
**600,000** 160:2
181:3 230:23
**607** 255:14
**63102** 3:9
**64(c)** 336:18
**64108** 3:4
**65** 59:16
**6th** 2:14

_____ **7** _____

**7** 14:16 172:7
183:14 205:13
205:20,21,24
218:24 220:8
229:2 231:13
248:15 285:8
285:17 296:9
306:2,3 311:7
315:13 316:8

316:13,16,19
332:13,20,21
344:18 345:10
348:3
**700** 2:9
**70s** 38:19 59:22
90:21
**78** 34:24 37:21
**783-6400** 2:10
**787-9222** 2:15
**79** 37:21

_____ **8** _____

**8** 15:13 169:20
192:18 214:2
214:19 245:11
248:15 285:14
285:19 286:15
315:13 316:9
316:13,16
345:2,3,5,6,7,9
345:15,18,19
**8/8/14** 6:19
**8:57** 214:20
215:14
**80s** 59:14 91:1
93:16,18
**816** 3:4
**82** 319:11
**83** 4:17
**85** 182:18
**877.370.3377**
1:21
**88** 37:8
**8th** 216:15
217:13

_____ **9** _____

**9** 16:18 62:2
223:2 274:14
275:1,21
296:10 320:10
**9:07** 1:15 9:7
**90** 235:4
**917.591.5672**
1:21
**92** 319:11 320:7

Jonathan Borak, M.D., DABT

Page 403

**94** 4:22
**95** 278:10 320:8
**96** 321:1
**97** 216:12,16
  321:2,2,2
**975** 2:18
**98** 321:2
**99** 227:14 319:9

Exhibit 12

M   J   y 4 965

# President's Address

**The Environment and Disease:
Association or Causation?**

O    M

. How

. H

. T

D

. O

. W

. H

1   *h.*

. T

T

*o o s*

D 19    2

*h*

T

Case 3:16-md-02738-MAS-RLS   Document 9737-8   Filed 05/07/19   Page 512 of 516 PageID: 39212

as great. On the other hand the death rate from coronary thrombosis in smokers is no more than twice, possibly less, the death rate in non-smokers. Though there is good evidence to support causation it is surely much easier in this case to think of some features of life that may go hand-in-hand with smoking – features that might conceivably be the real underlying cause or, at the least, an important contributor, whether it be lack of exercise, nature of diet or other factors. But to explain the pronounced excess in cancer of the lung in any other environmental terms requires some feature of life so intimately linked with cigarette smoking and with the amount of smoking that ·such a feature should be easily detectable. If we cannot detect it or reasonably infer a specific one, then in such circumstances I think we are reasonably entitled to reject the vague contention of the armchair critic 'you can't prove it, there *may* be such a feature'.

Certainly in this situation I would reject the argument sometimes advanced that what matters is the absolute difference between the death rates of our various groups and not the ratio of one to other. That depends upon what we want to know. If we want to know how many extra deaths from cancer of the lung will take place through smoking (i.e. presuming causation), then obviously we must use the absolute differences between the death rates – 0·07 per 1,000 per year in non-smoking doctors, 0·57 in those smoking 1–14 cigarettes daily, 1·39 for 15–24 cigarettes daily and 2·27 for 25 or more daily. But it does not follow here, or in more specifically occupational problems, that this best measure of the effect upon mortality is also the best measure in relation to ætiology. In this respect the ratios of 8, 20 and 32 to 1 are far more informative. It does not, of course, follow that the differences revealed by ratios are of any practical importance. Maybe they are, maybe they are not; but that is another point altogether.

We may recall John Snow's classic analysis of the opening weeks of the cholera epidemic of 1854 (Snow 1855). The death rate that he recorded in the customers supplied with the grossly polluted water of the Southwark and Vauxhall Company was in truth quite low – 71 deaths in each 10,000 houses. What stands out vividly is the fact that the small rate is 14 times the figure of 5 deaths per 10,000 houses supplied with the sewage-free water of the rival Lambeth Company.

In thus putting emphasis upon the strength of an association we must, nevertheless, look at the obverse of the coin. We must not be too ready to dismiss a cause-and-effect hypothesis merely on the grounds that the observed association appears to be slight. There are many occasions in medicine when this is in truth so. Relatively few persons harbouring the meningococcus fall sick of meningococcal meningitis. Relatively few persons occupationally exposed to rat's urine contract Weil's disease.

(2) *Consistency:* Next on my list of features to be specially considered I would place the *consistency* of the observed association. Has it been repeatedly observed by different persons, in different places, circumstances and times?

This requirement may be of special importance for those rare hazards singled out in the Section's terms of reference. With many alert minds at work in industry today many an environmental association may be thrown up. Some of them on the customary tests of statistical significance will appear to be unlikely to be due to chance. Nevertheless whether chance is the explanation or whether a true hazard has been revealed may sometimes be answered only by a repetition of the circumstances and the observations.

Returning to my more general example, the Advisory Committee to the Surgeon-General of the United States Public Health Service found the association of smoking with cancer of the lung in 29 retrospective and 7 prospective inquiries (US Department of Health, Education & Welfare 1964). The lesson here is that broadly the same answer has been reached in quite a wide variety of situations and techniques. In other words we can justifiably infer that the association is not due to some constant error or fallacy that permeates every inquiry. And we have indeed to be on our guard against that.

Take, for instance, an example given by Heady (1958). Patients admitted to hospital for operation for peptic ulcer are questioned about recent domestic anxieties or crises that may have precipitated the acute illness. As controls, patients admitted for operation for a simple hernia are similarly quizzed. But, as Heady points out, the two groups may not be *in pari materia*. If your wife ran off with the lodger last week you still have to take your perforated ulcer to hospital without delay. But with a hernia you might prefer to stay at home for a while – to mourn (or celebrate) the event. No number of exact repetitions would remove or necessarily reveal that fallacy.

We have, therefore, the somewhat paradoxical position that the different results of a different inquiry certainly cannot be held to refute the

original evidence; yet the same results from precisely the same form of inquiry will not invariably greatly strengthen the original evidence. I would myself put a good deal of weight upon similar results reached in quite different ways, e.g. prospectively and retrospectively.

Once again looking at the obverse of the coin there will be occasions when repetition is absent or impossible and yet we should not hesitate to draw conclusions. The experience of the nickel refiners of South Wales is an outstanding example. I quote from the Alfred Watson Memorial Lecture that I gave in 1962 to the Institute of Actuaries:

'The population at risk, workers and pensioners, numbered about one thousand. During the ten years 1929 to 1938, sixteen of them had died from cancer of the lung, eleven of them had died from cancer of the nasal sinuses. At the age specific death rates of England and Wales at that time, one might have anticipated one death from cancer of the  lung (to compare with the 16), and a fraction of a death from cancer of the nose (to compare with the 11). In all other bodily sites cancer had appeared on the death certificate 11 times and one would have expected it to do so 10–11 times. There had been 67 deaths from all other causes of mortality and over the ten years' period 72 would have been expected at the national death rates. Finally division of the population at risk in relation to their jobs showed that the excess of cancer of the lung and nose had fallen wholly upon the workers employed in the chemical processes.

'More recently my colleague, Dr Richard Doll, has brought this story a stage further. In the nine years 1948 to 1956 there had been, he found, 48 deaths from cancer of the lung and 13 deaths from cancer of the nose. He assessed the numbers expected at normal rates of mortality as, respectively 10 and 0·1.

'In 1923, long before any special hazard had been recognized, certain changes in the refinery took place. No case of cancer of the nose has been observed in any man who first entered the refinery after that year, and in these men there has been no excess of cancer of the lung. In other words, the excess in both sites is uniquely a feature in men who entered the refinery in, roughly, the first 23 years of the present century.

'No causal agent of these neoplasms has been identified. Until recently no animal experimentation had given any clue or any support to this wholly statistical evidence. Yet I wonder if any of us would hesitate to accept it as proof of a grave industrial hazard?' (Hill 1962).

In relation to my present discussion I know of no parallel investigation. We have (or certainly had) to make up our minds on a unique event; and there is no difficulty in doing so.

(3) *S  c  city* One reason, needless to say, is the specificity of the association, the third characteristic which invariably we must consider. If, as here, the association is limited to specific workers and to particular sites and types of disease and there is no association between the work and other modes of dying, then clearly that is a strong argument in favour of causation.

We must not, however, over-emphasize the importance of the characteristic. Even in my present example there is a cause and effect relationship with two different sites of cancer – the lung and the nose. Milk as a carrier of infection and, in that sense, the cause of disease can produce such a disparate galaxy as scarlet fever, diphtheria, tuberculosis, undulant fever, sore throat, dysentery and typhoid fever. Before the discovery of the underlying factor, the bacterial origin of disease, harm would have been done by pushing too firmly the need for specificity as a necessary feature before convicting the dairy.

Coming to modern times the prospective investigations of smoking and cancer of the lung have been criticized for not showing specificity – in other words the death rate of smokers is higher than the death rate of non-smokers from many causes of death (though in fact the results of Doll & Hill, 1964, do not show that). But here surely one must return to my first characteristic, the strength of the association. If other causes of death are raised 10, 20 or even 50% in smokers whereas cancer of the lung is raised 900–1,000% we have specificity – a specificity in the magnitude of the association.

We must also keep in mind that diseases may have more than one cause. It has always been possible to acquire a cancer of the scrotum without sweeping chimneys or taking to mule-spinning in Lancashire. One-to-one relationships are not frequent. Indeed I believe that multi-causation is generally more likely than single causation though possibly if we knew all the answers we might get back to a single factor.

In short, if specificity exists we may be able to draw conclusions without hesitation; if it is not apparent, we are not thereby necessarily left sitting irresolutely on the fence.

(4) *T    orality* My fourth characteristic is the temporal relationship of the association – which is the cart and which the horse? This is a question which might be particularly relevant with diseases of slow development. Does a particular diet lead to disease or do the early stages of the disease lead to those peculiar dietetic habits? Does a

particular occupation or occupational environment promote infection by the tubercle bacillus or are the men and women who select that kind of work more liable to contract tuberculosis whatever the environment – or, indeed, have they already contracted it? This temporal problem may not arise often but it certainly needs to be remembered, particularly with selective factors at work in industry.

(5) *Biological gradient:* Fifthly, if the association is one which can reveal a biological gradient, or dose-response curve, then we should look most carefully for such evidence. For instance, the fact that the death rate from cancer of the lung rises linearly with the number of cigarettes smoked daily, adds a very great deal to the simpler evidence that cigarette smokers have a higher death rate than non-smokers. That comparison would be weakened, though not necessarily destroyed, if it depended upon, say, a much heavier death rate in light smokers and a lower rate in heavier smokers. We should then need to envisage some much more complex relationship to satisfy the cause-and-effect hypothesis. The clear dose-response curve admits of a simple explanation and obviously puts the case in a clearer light.

The same would clearly be true of an alleged dust hazard in industry. The dustier the environment the greater the incidence of disease we would expect to see. Often the difficulty is to secure some satisfactory quantitative measure of the environment which will permit us to explore this dose-response. But we should invariably seek it.

(6) *Plausibility:* It will be helpful if the causation we suspect is biologically plausible. But this is a feature I am convinced we cannot demand. What is biologically plausible depends upon the biological knowledge of the day.

To quote again from my Alfred Watson Memorial Lecture (Hill 1962), there was

'. . . no biological knowledge to support (or to refute) Pott's observation in the 18th century of the excess of cancer in chimney sweeps. It was lack of biological knowledge in the 19th that led a prize essayist writing on the value and the fallacy of statistics to conclude, amongst other "absurd" associations, that "it could be no more ridiculous for the stranger who passed the night in the steerage of an emigrant ship to ascribe the typhus, which he there contracted, to the vermin with which bodies of the sick might be infected". And coming to nearer times, in the 20th century there was no biological knowledge to support the evidence against rubella.'

In short, the association we observe may be one new to science or medicine and we must not dismiss it too light-heartedly as just too odd. As Sherlock Holmes advised Dr Watson, 'when you have eliminated the impossible, whatever remains, *however improbable*, must be the truth.'

(7) *Coherence:* On the other hand the cause-and-effect interpretation of our data should not seriously conflict with the generally known facts of the natural history and biology of the disease – in the expression of the Advisory Committee to the Surgeon-General it should have coherence.

Thus in the discussion of lung cancer the Committee finds its association with cigarette smoking coherent with the temporal rise that has taken place in the two variables over the last generation and with the sex difference in mortality – features that might well apply in an occupational problem. The known urban/rural ratio of lung cancer mortality does not detract from coherence, nor the restriction of the effect to the lung.

Personally, I regard as greatly contributing to coherence the histopathological evidence from the bronchial epithelium of smokers and the isolation from cigarette smoke of factors carcinogenic for the skin of laboratory animals. Nevertheless, while such laboratory evidence can enormously strengthen the hypothesis and, indeed, may determine the actual causative agent, the lack of such evidence cannot nullify the epidemiological observations in man. Arsenic can undoubtedly cause cancer of the skin in man but it has never been possible to demonstrate such an effect on any other animal. In a wider field John Snow's epidemiological observations on the conveyance of cholera by the water from the Broad Street pump would have been put almost beyond dispute if Robert Koch had been then around to isolate the vibrio from the baby's nappies, the well itself and the gentleman in delicate health from Brighton. Yet the fact that Koch's work was to be awaited another thirty years did not really weaken the epidemiological case though it made it more difficult to establish against the criticisms of the day – both just and unjust.

(8) *Experiment:* Occasionally it is possible to appeal to experimental, or semi-experimental, evidence. For example, because of an observed association some preventive action is taken. Does it in fact prevent? The dust in the workshop is reduced, lubricating oils are changed, persons stop smoking cigarettes. Is the frequency of the associated events affected? Here the strongest

Case 3:16-md-02738-MAS-RLS   Document 9737-8   Filed 05/07/19   Page 515 of 516 PageID: 39215

support for the causation hypothesis may be revealed.

(9) *Analogy:* In some circumstances it would be fair to judge by analogy. With the effects of thalidomide and rubella before us we would surely be ready to accept slighter but similar evidence with another drug or another viral disease in pregnancy.

Here then are nine different viewpoints from all of which we should study association before we cry causation. What I do not believe – and this has been suggested – is that we can usefully lay down some hard-and-fast rules of evidence that *must* be obeyed before we accept cause and effect. None of my nine viewpoints can bring indisputable evidence for or against the cause-and-effect hypothesis and none can be required as a *sine qua non*. What they can do, with greater or less strength, is to help us to make up our minds on the fundamental question – is there any other way of explaining the set of facts before us, is there any other answer equally, or more, likely than cause and effect?

*Tests of Significance*

No formal tests of significance can answer those questions. Such tests can, and should, remind us of the effects that the play of chance can create, and they will instruct us in the likely magnitude of those effects. Beyond that they contribute nothing to the 'proof' of our hypothesis.

Nearly forty years ago, amongst the studies of occupational health that I made for the Industrial Health Research Board of the Medical Research Council was one that concerned the workers in the cotton-spinning mills of Lancashire (Hill 1930). The question that I had to answer, by the use of the National Health Insurance records of that time, was this: Do the workers in the cardroom of the spinning mill, who tend the machines that clean the raw cotton, have a sickness experience in any way different from that of other operatives in the same mills who are relatively unexposed to the dust and fibre that were features of the cardroom? The answer was an unqualified 'Yes'. From age 30 to age 60 the cardroom workers suffered over three times as much from respiratory causes of illness whereas from non-respiratory causes their experience was not different from that of the other workers. This pronounced difference with the respiratory causes was derived not from abnormally long periods of sickness but rather from an excessive number of repeated absences from work of the cardroom workers.

All this has rightly passed into the limbo of forgotten things. What interests me today is this: My results were set out for men and women separately and for half a dozen age groups in 36 tables. So there were plenty of sums. Yet I cannot find that anywhere I thought it necessary to use a test of significance. The evidence was so clear-cut, the differences between the groups were mainly so large, the contrast between respiratory and non-respiratory causes of illness so specific, that no formal tests could really contribute anything of value to the argument. So why use them?

Would we think or act that way today? I rather doubt it. Between the two world wars there was a strong case for emphasizing to the clinician and other research workers the importance of not overlooking the effects of the play of chance upon their data. Perhaps too often generalities were based upon two men and a laboratory dog while the treatment of choice was deduced from a difference between two bedfuls of patients and might easily have no true meaning. It was therefore a useful corrective for statisticians to stress, and to teach the need for, tests of significance merely to serve as guides to caution before drawing a conclusion, before inflating the particular to the general.

I wonder whether the pendulum has not swung too far – not only with the attentive pupils but even with the statisticians themselves. To decline to draw conclusions without standard errors can surely be just as silly? Fortunately I believe we have not yet gone so far as our friends in the USA where, I am told, some editors of journals will return an article because tests of significance have not been applied. Yet there are innumerable situations in which they are totally unnecessary – because the difference is grotesquely obvious, because it is negligible, or because, whether it be formally significant or not, it is too small to be of any practical importance. What is worse than the glitter of the *t* table diverts attention from the inadequacies of the fare. Only a tithe, and an unknown tithe, of the factory personnel volunteer for some procedure or interview, 20% of patients treated in some particular way are lost to sight, 30% of a randomly-drawn sample are never contacted. The sample may, indeed, be akin to that of the man who, according to Swift, 'had a mind to sell his house and carried a piece of brick in his pocket, which he showed as a pattern to encourage purchasers'. The writer, the editor and the reader are unmoved. The magic formulæ are there.

Of course I exaggerate. Yet too often I suspect we waste a deal of time, we grasp the shadow and



*The Ca e for Act on*

8 30

D & A ( 6 ) *Brit m J.* 3 60

( 62) *Inst Actu* 7