# Exhibit 75

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

IN RE: JOHNSON & JOHNSON TALCUM POWDER PRODUCTS MARKETING, SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION

*THIS DOCUMENT RELATES TO ALL CASES*

MDL NO. 16-2738 (FLW) (LHG)

## EXPERT REPORT OF CHRISTIAN MERLO, MD, MPH
## FOR GENERAL CAUSATION *DAUBERT* HEARING



Date: February 25, 2019

Christian Merlo, M.D., M.P.H.

| Authors | Risk Reserve/ Risk/Hazard Ratio | CI, % | Statistically significant association? |
|---|---|---|---|
| **Hospital-based case-control studies** | | | |
| Hartge et al. (1983) | 0.70 | 0.04-1.10 | No |
| Whittemore et al. (1988) | 1.45 | 0.81-2.60 | No |
| Booth et al. (1989) | 1.30 | 0.80-1.90 | No |
| Rosenblatt et al. (1992) | 1.70 | 0.70-3.90 | No |
| Tzonou et al. (1993) | 1.05 | 0.28-3.98 | No |
| Hartge and Stewart (1994) | 0.30 (5-9 years of talc exposure) 0.50 (10+ years) | 0.10-1.40 0.20-1.50 | No |
| Wong et al. (1999) | 1.13 | 0.88-1.44 | No |
| **Population-based case-control studies** | | | |
| Cramer et al. (1982) | 1.92 | 1.27-2.89 | Weak |
| Harlow and Weiss. (1989) | 1.10 | 0.70-2.10 | No |
| Harlow et al. (1992) | 1.50 | 1.00-2.10 | Weak |
| Chen et al. (1992) | 3.90 | 0.90-10.6 | No |
| Cramer and Xu (1995) | 1.60 | 1.20-2.10 | Weak |
| Purdie et al. (1995) | 1.27 | 1.04-1.54 | Weak |
| Green et al. (1997) | 1.30 | 1.10-1.60 | Weak |
| Shushan et al. (1996) | 1.97 | 1.06-3.66 | Weak |
| Chang and Risch (1997) | 1.42 | 1.08-1.86 | Weak |
| Cook et al. (1997) | 1.60 | 0.90-2.80 | No |
| Godard et al. (1998) | 2.49 | 0.94-6.58 | No |
| Cramer et al. (1999) | 1.60 | 1.18-2.15 | Weak |
| Ness et al. (2000) | 1.50 | 1.10-2.00 | Weak |
| Mills et al. (2004) | 1.37 | 1.02-1.85 | Weak |
| Pike et al. (2004) | 1.60 | 1.18-2.18 | Weak |
| Jordan et al. (2007) | 1.00 | 0.40-2.10 | No |
| Gates et al. (2008) | 1.36 | 1.14-1.63 | Weak |
| Merritt et al. (2008) | 1.17 | 1.01-1.36 | Weak |
| Moorman et al. (2009) | Afr. Am.: 1.19 Caucasian: 1.04 | Afr. Am: 1.68-2.09 Caucasian: 0.82-1.33 | No |
| Wu et al. (2009) | 1.53 | 1.13-2.09 | Weak |
| Rosenblatt. (2011) | 1.27 | 0.97-1.66 | No |
| Kurta et al. (2012) | 1.40 | 1.16-1.69 | Weak |
| Wu et al. (2015) | 1.46 | 1.27-1.69 | Weak |
| Schildkraut et al. (2016) | 1.44 | 1.11-1.86 | Weak |
| **Pooled case-control studies** | | | |
| Terry et al. (2013) | 1.24 | 1.15-1.33 | Weak |

P1.0215.2

| Author | Odds Ratio/Relative Risk/Hazard Ratio | 95% CI | Statistically Significant Association? |
|---|---|---|---|
| Cramer et al. (2016) | 1.33 | 1.16-1.52 | Weak |
| **Cohort studies** | | | |
| Gertig et al. (2000) | 1.09 | 0.86-1.37 | No |
| Gates et al. (2010) | 1.06 | 0.89-1.28 | No |
| Houghton et al. (2014) | 1.12 | 0.92-1.36 | No |
| Gonzalez et al. (2016) | 0.73 | 0.44-1.20 | No |

P1.0215.3

# Exhibit 76

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

IN RE: JOHNSON & JOHNSON TALCUM
POWDER PRODUCTS MARKETING, SALES
PRACTICES AND PRODUCTS LIABILITY
LITIGATION

*THIS DOCUMENT RELATES TO ALL CASES*

MDL NO. 16-2738 (FLW) (LHG)

**EXPERT REPORT OF CHRISTIAN MERLO, MD, MPH
FOR GENERAL CAUSATION *DAUBERT* HEARING**

Date: February 25, 2019

Christian Merlo, M.D., M.P.H.

P1.0215



EXHIBIT 37
WIT: merlo
DATE: 4-18-19
C. Campbell, RDR CRR CSR #13921

| Author | Odds Ratio/Relative Risk/Hazard Ratio | 95% C.I. | Statistically Significant Association? |
|---|---|---|---|
| **Hospital-based case-control studies** | | | |
| Hartge et al. (1983) | 0.70 | 0.04-1.10 | No |
| Whittemore et al. (1988) | 1.45 | 0.81-2.60 | No |
| Booth et al. (1989) | 1.30 | 0.80-1.90 | No |
| Rosenblatt et al. (1992) | 1.70 | 0.70-3.90 | No |
| Tzonou et al. (1993) | 1.05 | 0.28-3.98 | No |
| Hartge and Stewart (1994) | 0.30 (5-9 years of talc exposure) 0.50 (10+ years) | 0.10-1.40 0.20-1.50 | No |
| Wong et al. (1999) | 1.13 | 0.88-1.44 | No |
| **Population-based case-control studies** | | | |
| Cramer et al. (1982) | 1.92 | 1.27-2.89 | Weak |
| Harlow and Weiss. (1989) | 1.10 | 0.70-2.10 | No |
| Harlow et al. (1992) | 1.50 | 1.00-2.10 | Weak |
| Chen et al. (1992) | 3.90 | 0.90-10.6 | No |
| Cramer and Xu (1995) | 1.60 | 1.20-2.10 | Weak |
| Purdie et al. (1995) | 1.27 | 1.04-1.54 | Weak |
| Green et al. (1997) | 1.30 | 1.10-1.60 | Weak |
| Shushan et al. (1996) | 1.97 | 1.06-3.66 | Weak |
| Chang and Risch (1997) | 1.42 | 1.08-1.86 | Weak |
| Cook et al. (1997) | 1.60 | 0.90-2.80 | No |
| Godard et al. (1998) | 2.49 | 0.94-6.58 | No |
| Cramer et al. (1999) | 1.60 | 1.18-2.15 | Weak |
| Ness et al. (2000) | 1.50 | 1.10-2.00 | Weak |
| Mills et al. (2004) | 1.37 | 1.02-1.85 | Weak |
| Pike et al. (2004) | 1.60 | 1.18-2.18 | Weak |
| Jordan et al. (2007) | 1.00 | 0.40-2.10 | No |
| Gates et al. (2008) | 1.36 | 1.14-1.63 | Weak |
| Merritt et al. (2008) | 1.17 | 1.01-1.36 | Weak |
| Moorman et al. (2009) | Afr. Am.: 1.19 Caucasian: 1.04 | Afr. Am: 0.68-2.09 Caucasian: 0.82-1.33 | No |
| Wu et al. (2009) | 1.53 | 1.13-2.09 | Weak |
| Rosenblatt. (2011) | 1.27 | 0.97-1.66 | No |
| Kurta et al. (2012) | 1.40 | 1.16-1.69 | Weak |
| Wu et al. (2015) | 1.46 | 1.27-1.69 | Weak |
| Schildkraut et al. (2016) | 1.44 | 1.11-1.86 | Weak |
| **Pooled case-control studies** | | | |
| Terry et al. (2013) | 1.24 | 1.15-1.33 | Weak |

34

P1.0215.2

| Author | Odds Ratio/Relative Risk/Hazard Ratio | 95% CI | Statistically Significant Association? |
|---|---|---|---|
| Cramer et al. (2016) | 1.33 | 1.16-1.52 | Weak |
| Cohort studies | | | |
| Gertig et al. (2000) | 1.09 | 0.86-1.37 | No |
| Gates et al. (2010) | 1.06 | 0.89-1.28 | No |
| Houghton et al. (2014) | 1.12 | 0.92-1.36 | No |
| Gonzalez et al. (2016) | 0.73 | 0.44-1.20 | No |

# Exhibit 77

# SPECIAL ARTICLES

# Applying Bradford Hill's Criteria for Causation to Neuropsychiatry: Challenges and Opportunities

**Robert van Reekum, M.D., F.R.C.P.C.**
**David L. Streiner, Ph.D., C.Psych.**
**David K. Conn, M.B., F.R.C.P.C.**

*scientific implications. Sir Austin Bradford Hill*

*tion, consistency, specificity, temporal sequence,*

E‌xtant research activity because it influences the de‌livery of good medical care. A finding of causation in‌fluences decisions related to prognosis, diagnosis, and treatment, and it may have medical-legal ramifications. E





( J 2001; 13:318–325) C

7, 2000; 8, 2000; 25, 2000.
F    D    K -    A
G    , B    C    G    C ,    ; D
D .    , D    , C    . A    , B
C    G    C , 3560 B    , 6A
2E1, C    .
C    2001 A    , I .



( ).
.[2,3] H -
,
B
.
-
. I
,
,
.
. , B H
B -
. E
, -
injury (TBI), are briefly presented to highlight the po-
.
B H [2]
1)
, 2) -
sistency of the findings across research sites and meth-
odologies, 3) the demonstration of specificity of the
,
4) -
,
, 5) ,
, 6) ,
the outcome, 7) coherence of the findings, such that the
-
, 8) , 9)
.
B H
1)
, 2)
, 3) -
B -
( . .,
,
function that might explain this finding), and 4) sug-
( . .,
).
-
.

## APPLICATIONS OF THE CRITERIA TO NEUROPSYCHIATRY

### 1. Strength of the Association

C A B,
A B
.
judged clinically significant by the reader of the argu-
ment. This is a necessary, but not sufficient, criterion in
.
A B
, B A.
possibility that some unidentified third factor, C, is in
A B, -
A B. F ,
,
. (
)
,
, .
-
.
-
. A -
A
B,
.
. C -
,
? B
medical history and examination findings, demo-
, -
B ,
-
. F ,
,
,
( . . .),
?
, -
( -
). ,
, , -
, . G

**CRITERIA FOR CAUSATION**

B            ,                           . I

possible on potential determinants identified from the                                    .
,
,                    2. Consistency of the Evidence
,
-                                                       ,
ables. Direct comparisons of the identified significant                     -

.  I   A          B,

interest, is then required in further research to confirm                           .
,
the role of the preliminarily identified causative agents.     I                ,
(  . .,          ,              ,              )
-     available, and they should all lead to consistent findings
. D                     -           A          B. I
findings are inconsistent, then it is very important to
. A                    -     be at the heart of the discrepant findings. If no reason-
essary for the final assignment of case status, but this                              ,
.                    . C
-     findings is a necessary criterion for causation in neuro-
dated for specific neuropsychiatric disorders remain          ,
(                    ).     findings is available (i.e., an argument of causation will
"B        "                                                  .
—   -     ).

. F          ,     3. Specificity
.            '                    -
,     ,     -               . C          -
-                    ,     -
.     ,
often very difficult, as the causative agent may produce
,     -     -
,     ,     -
.          ?     in neuropsychiatry; that is, if specificity can be demon-
B              -     ,
. A     if specificity is lacking, then this in no way detracts from
A          '          (AD).     -     .
? C          -
,          ,          . B          ,     -     4. Temporal Sequence
.     C          A          B,          A
-          B.
B -     ,
.     difficult to establish in neuropsychiatry.
. I     -     A              -          ,
. I     -     (              )
-
I          .          .
4                    ,

B                    -

.

,                    -

                     -

. A                                  -

,            ,        -

                     . B

(                    -

B            )

( . .,              -

)

.                    -

,                    -

,                    -

        "    "      .

,                    -

I                    -

            . F    ,

            . I    ,

establishing a finding of new-onset cases or some new-

E            .

we know when the causative agent first appeared, and

                    . F    -

        AD

            .5   -   -

        ,

    AD,6        ,

            ,    AD.

,        ,

changes of AD first produce the late-onset depression,
                                AD.

            ,    -

A                    -

gument of causation, it is often very difficult to be cer-

,

.

### 5. Biological Gradient

E                                -

may be difficult to establish, in neuropsychiatric con-

                . B

        . H        ,

variable influencing the impact of the lesion on the func-

        .            ,

( . .,        )

                ( . .,        )

                    . F        ,

    . A            ,

                BI

        .

        ? I    BI

    BI,

                ,            . H    -

        ,

reflect the degree of cortical involvement brought about

                        . D    -

of the insult, but both clearly may be influenced by non-

            ,

        ,

        -    -        .

C                                -

        ,

    ,                    . F    -

                A        ,        -

                                ,

                                -

B        . F                    ,

"        "            . B        -

to be satisfied in the future. At present, however, given

                    ,

                ,            -

CRITERIA FOR CAUSATION

cal gradient should be considered supportive of an argument for causation in neuropsychiatry, but the absence of a biological gradient may not preclude the determination of a causative relationship.

## 6. Biologic Rationale

There is a greater likelihood of a causative relationship being present if it makes biological sense that A causes B. Whether or not it makes sense that a putative causative agent causes the outcome of interest is important to us as humans because we need to fit research findings into our understanding of our world and ourselves. But how we understand our world and ourselves is clearly a function of the state of our belief systems at present, and "reality" changes as new belief systems evolve. Although it once made sense that body fluids such as bile were determinants of Behavior, this does not make sense today.

Many of our perceptions about determinants of Behavior are influenced today by post-psychoanalytic thought and by cultural expectations (such as the expectation that we be "in control" of our emotions). Modern neuropsychiatry is once again shifting the focus back to biological processes as determinants of Behavior, but our judgment as to whether arguments of causation for changes in brain function affecting Behavior are valid will continue to be influenced by our preconceived notions of the world and ourselves. Interestingly, it seems that we are much more likely to accept the role of the brain in determining changes in cognitive function than we are to accept its role in determining changes in mood and behavior. It may be that such possibilities threaten us, in the sense of undermining our need for self-control. Whatever our reasons for not considering certain arguments of causation to be biologically plausible, we need to constantly remind ourselves that just because the argument doesn't make sense to us does not necessarily mean that it isn't true. A biologic rationale is necessary for establishing an argument for causation, but it may not be accepted by everyone in the here and now.

## 7. Coherence

This is similar to the biologic rationale criterion. It stipulates that there is a greater likelihood that A causes B if this postulated causal relationship is consistent with what is already known about the disease or disorder. Clearly the relevance of this criterion will depend to a large extent on the amount of knowledge that we have at the moment. As with the biologic rationale criterion, if this criterion is met, then it is supportive of an argument of causation; if not, then we may simply not yet

know enough, or we may need to revisit that which we think we know.

## 8. Experimental Evidence

Experimental evidence is the most compelling evidence of causation. If it can be shown that experimentally (ideally randomly) inducing the causative agent consistently produces the outcome, at greater rates than in a nonexposed control sample, this is clear and compelling evidence of causation. However, it is obvious that such evidence will be rare in neuropsychiatry, as it is grossly unethical to induce most forms of brain dysfunction experimentally in humans. Transient alterations in brain function, such as with apomorphine or transcranial magnetic stimulation, are sometimes the exception to this ethical concern and may yield important results in the future. Experimental approaches are often applied to nonhuman species, but this practice is also increasingly considered to raise ethical concerns. Further, the nonhuman brain has important differences in brain structure and function that may mislead researchers investigating causation in humans.

Some experimental evidence in humans, however, may be forthcoming from results of treatment studies. Indeed, the dopamine hypothesis of schizophrenia was born from observations of response to treatment with dopamine-active agents such as chlorpromazine. The problem with this type of thinking is that conditions may respond to a treatment that does not necessarily address the causative agent. For example, few believe that headaches are caused by an absence of aspirin, despite the fact that headaches may decrease with aspirin. While there is no "hypoaspirinemia" theory of headaches, this type of experimental evidence may provide important leads into causative relationships. The role of prostaglandins in the formation of pain responses is an example that flows from the observation that aspirin relieves pain.

These limitations on the use of experimental evidence limit the utility of this criterion for causation in neuropsychiatry, rendering it a helpful but not a necessary criterion at present.

## 9. Analogous Evidence

This approach takes the form of thinking that if some condition similar to A causes an outcome similar to B, then this is evidence that A causes B. While analogous evidence is helpful, there are clearly major limitations to this approach in neuropsychiatry. Although different types of insults to the brain may share certain features, they also usually have important differences as well. Furthermore, the nature of the lesion may influence the expression of the outcome of interest in important ways.

Case 3:16-md-02738-MAS-RLS Document 9737-16 Filed 05/07/19 Page 15 of 449 PageID: 40339

F , . . H

## EXAMPLES

### 1. Can Stroke Cause Depression?

B . B H .

found significant

.[7] A

.[8]

[7] ( . 105).

*specificity* B . I

H ,

studied during the first few weeks following a stroke.[7]

. B

poststroke depression recover from it within the first

[2] .

I ,

assessed within the first six months following stroke. It

C F 5- . F

significantly shorter duration of depression than pa- .[9] F

The remaining criteria can be briefly reviewed as fol- . I

ders; however, the findings related to biologic plausi-

. I BI ( )

then this finding is supportive of this criterion.

.[7,10] H [10]

gues that depression following stroke is a nonspecific

. H

specificity, that we have argued is not a particularly .[7]

tween stroke and depression. In the first, depression

. I

sion is a specific symptom of the neurological disease

CRITERIA FOR CAUSATION

. F

BI

SUMMARY

**2. Can TBI Cause Psychiatric Disorders?**

.[11]

BI

. I

B        H '

,

BI

. C

.[12–19]

,            ( . .,

).                             - BI (

)                    ,

. D

first time after TBI. There was little evidence of a

of the findings, a biologic rationale, and the appropriate

BI

sible to achieve (although not without potential diffi-

,

).

BI

evidence, and specificity criteria are not necessarily ap-

,            ,        BI

BI.

. E

; BI

. A

BI

tified, such as presence of pre-TBI psychiatric disorders

B        H '

ment of causation. How is it that we finally become con-

A            B?

viewed systematically and to find its place in the ar-

H

,            "        ,"

( . .,

BI

. C

).

,                                          ,                              -        "          '                                                "     -

    B        . A                                    -
                                                      -
     (                          )

---

**References**

1. H   AB:                              :                           ?
       1965; 58:293–300

2.        D   ,           G   ,        B       H: D   E              .
       ,  BC  D       , 1989

3. D          C        E                       B              : H
   C  AJ 1981; 124:985–990

4. C             J    ,        ,G   K,       :                    I -
       :                    1994; 44:2308–2314

5.        E   ,  C        J   ,       ,   :
   A                    E.  E   J              E4
                          E.  E   J       1996; 334:752–758

6.           ,       ,       ,C              :                -
   A         ,           :                        . J
              1999; 24:413–430

7.        CG,           GJ,       J   ,     : D
       ? J                C                1998; 10:103–107

8.        ,          ,          B,     :
                          . A       J          1992; 26:208–
   217

9.          E,           G, B           ,     : D         -
              . B        1988; 111:375–387

10. H        A: D                        . J
    C          1996; 8:453–457

11.              ,  C           ,           J: C
                              ? J                    C
    2000; 12:316–327

12.           ,  C              BK,              : D
                . A                        1998; 79:90–103

13. D       ,          I, K          C,     :              1
                . A   J                 1999; 156:374–
    378

14. B       A,              ,C       ,       :                   -
                  . B    I 1998; 12:177–190

15.        JE, K           ,           J   ,     :                   :
                . J  A   A       C    A                1998;
    37:832–840

16.           , B        I, F           A,     :             -
                . B    I 1996; 10:319–327

17. F   J   , K       J   ,       J   ,     :                       .
    A   J                1995; 152:1493–1499

18. J       E,            G,            E,     : D              -
                . J                      C
    1993; 5:369–374

19. F       J   ,           E, F           A   ,     : D
                  . A   J                 1992;
    149:918–923

Exhibit 78

*The Journal of Obstetrics and Gynaecology of the British Commonwealth*
March 1971, Vol. **78**, pp. 266–272.

# TALC AND CARCINOMA OF THE OVARY AND CERVIX

BY

W. J. Henderson, *Electron Microscopist*
*Tenovus Institute for Cancer Research*

C. A. F. Joslin, *Consultant Radiotherapist*
*Velindre Memorial Centre for Cancer Research*

A. C. Turnbull, *Professor of Obstetrics and Gynaecology*
*Welsh National School of Medicine*

AND

K. Griffiths, *Director*

*Tenovus Institute for Cancer Research, Welsh National School of Medicine, Cardiff*

## Summary

An extraction-replication technique was used to examine tissue from patients with ovarian and cervical tumours. In both conditions talc particles were found deeply embedded within the tumour tissue. The close association of talc to the asbestos group of minerals is of interest.

The development in this laboratory of an extraction-replication technique (Henderson, 1969) for the study of foreign particles within tissues has allowed the *in situ* identification of crocidolite asbestos within the tissue of various mesotheliomas (Henderson *et al.*, 1969) removed from patients who had been concerned with the manipulation of asbestos in industry. This technique has now been applied to the study of tissue from ovarian and cervical carcinoma.

### Materials and Methods

#### Tissue

The tissue studied was obtained from patients with cancer of either the ovary or the cervix, and was first prepared as paraffin sections for normal routine histological examination but was unstained. Sections were then stained for histological assessment in the usual manner, and adjacent unstained tissue prepared for electron microscopy.

#### Replication Technique

The extraction-replication procedure has been described (Henderson, 1969). Sections of tissue were immersed in xylene and in ethanol, and the dehydrated tissue was then embedded by

impressing the section on to the surface of a thin sheet of acetone-softened cellulose acetate, mounted on a glass slide, and left to harden. On removing the slide, the embedded tissue was left in the cellulose acetate. The tissue was then outlined with thin strips of Scotch tape to form a shallow well, and a 10 per cent (v/v) polyvinyl alcohol (PVA) solution applied. When the PVA had hardened it was stripped from the section providing a replica of the tissue surface. Foreign particles associated with the tissue are often removed with the PVA during this stripping process.

A complete sequential examination through the embedded tissue is possible by taking successive strippings. These surface replicas were then preshadowed with platinum, a carbon film deposited for strength, and the PVA removed by floating the replica in a hot water bath. Replicas were mounted on electron microscope grids for examination, using the AEI-6B microscope.

### Results

No asbestos particles were found in any of the tissue studied. Particles of talc were identified in approximately 75 per cent (10 of 13) of the

266



FIG. 5



FIG. 1
Typical decoration pattern on a particle of natural talc. Numerous crystal lattice planes are shown (a). (×30 000.) Scale refers to 1·0 μ.

FIG. 2
Commercial talc preparations illustrating the decoration pattern. (×40 000.)

IMERYS 079380

NOTICE: THIS MATERIAL MAY BE PROTECTED BY COPYRIGHT LAW (TITLE 17 U.S. Code)

Protected Document – Subject to Protective Order



FIG. 1
Typical decoration pattern on a particle of natural talc. Numerous crystal lattice planes are shown (a). (×30 000.) Scale refers to 1·0 μ.



FIG. 2
Commercial talc preparations illustrating the decoration pattern. (×48 000.)

NOTICE: THIS MATERIAL MAY PROTECTED BY COPYRIGHT LAW (TITLE 17 U.S. Code)



FIG. 3
Micrograph of tissue from a serous papillary cystadeno-carcinoma of the ovary removed from a 27-year-old female. No previous abdominal operations had been carried out. The decoration pattern and lattice planes are shown. (×30 000.)



FIG. 4
Micrograph of tissue from a squamous-cell carcinoma of the cervix from a 62-year-old female. C—capillary. R—red cell. The particle of talc can be seen in the wall of the capillary. (×3500.)

FIG. 5
A higher magnification of the talc particles outlined in Fig 4. The typical decoration pattern is shown. (×40 000.)

ovarian tumours. Using the replication technique identification of talc is possible because of the characteristic "decoration" pattern produced by the evaporation of platinum *in vacuo* on the crystal surface. Figure 1 shows this pattern on a particle of *natural* talc and the distinctive lattice planes of the crystals. Anthophyllite asbestos, which is known to be converted naturally to talc, is the only crystalline material which is at present indistinguishable from talc by using the replication technique. The decoration pattern on material from a commercial talc preparation is also demonstrated in Figure 2.

Material found within the ovarian tumours

and identified as talc is illustrated in Figure 3. The talc particles were found deep within the tumour tissue. Some were as small as 1000Å in size but they were generally within a range from 1000Å to 2 μ.

Talc particles were also found embedded within tumours of the cervix. Figure 4 shows one such particle embedded in a capillary wall within the tumour, and Figure 5 illustrates the decoration pattern of the particle at a higher magnification. Crystals as large as 5 μ, were found in tissue from the cervical tumours and were generally larger than those seen in the ovarian tumours. Talc crystals were found in

NOTICE: THIS MATERIAL MAY BE PROTECTED BY COPYRIGHT LAW (TITLE 17 U.S. Code)

Protected Document – Subject to Protective Order

IMERYS 079382

268   HENDERSON, JOSLIN, TURNBULL AND GRIFFITHS



·5

Fig. 3

Micrograph of tissue from a serous papillary cystadeno-carcinoma of the ovary removed from a 27-year-old female. No previous abdominal operations had been carried out. The decoration pattern and lattice planes are shown. (×30 000.)

ovarian tumours. Using the replication technique identification of talc is possible because of the characteristic "decoration pattern" induced by the evaporation of platinum *in vacuo* on the crystal surface. Figure 1 shows this pattern on a particle of *natural* talc and the distinctive lattice planes of the crystals. Anthophylite asbestos, which is known to be converted naturally to talc, is the only crystalline material which is at present indistinguishable from talc by using the replication technique. The decoration pattern on material from a commercial talc preparation is also demonstrated in Figure 2.

Material found within the ovarian tumours and identified as talc is illustrated in Figure 3. The talc particles were found deep within the tumour tissue. Some were as small as 1000Å in size but they were generally within a range from 1000Å to 2 $\mu$.

Talc particles were also found embedded within tumours of the cervix. Figure 4 shows one such particle embedded in a capillary wall within the tumour, and Figure 5 illustrates the decoration pattern of the particle at a higher magnification. Crystals as large as 5 $\mu$ were found in tissue from the cervical tumours and were generally larger than those seen in the ovarian tumours. Talc crystals were found in

NOTICE: THIS MATERIAL MAY PROTECTED BY COPYRIGHT LAW (TITLE 17 U.S. Code)

Protected Document – Subject to Protective Order

IMERYS 079383



Fig. 4
Micrograph of tissue from a squamous-cell carcinoma of the cervix from a 62-year-old female. C—capillary, R—red cell. The particle of talc can be seen in the wall of the capillary. (×3500.)

Fig. 5
A higher magnification of the talc particles outlined in Fig. 4. The typical decoration pattern is shown. (×40 000.)

NOTICE: THIS MATERIAL MAY PROTECTED BY COPYRIGHT LAW (TITLE 17 U.S. Code)

approximately 50 per cent of the cervical tumours examined (12 of 21) but it must be realized that these particles are extremely minute, often with the dimensions of viruses, and only small regions of the tumour tissue could be studied. Approximately ten replication "strippings" for electron-microscope examination are usually taken from each thin section of the tissue. Figure 6 illustrates the use of the technique in the examination of pneumoconiotic lung tissue from a patient whose industrial history indicated long exposure to Norwegian talc.

Many particles of talc were found concentrated in the deeper layers of a primary carcinoma of the endometrium (Fig. 7) whereas extensive studies of a secondary tumour in the ovary in the same patient did not show the presence of talc. Application of the technique to "normal" ovarian tissue removed from patients with breast cancer has also shown talc particles in 5 of 12 such tissues studied. Extensive study at high magnification with the electron microscope is, however, required for evaluation of a replica and particles could easily be missed.

The application of electron-microscope microanalysis (EMMA-AEI, Harlow, England) to the particles extracted by the replication technique has provided preliminary evidence that the crystals contain magnesium and silicon, talc being a magnesium silicate.

## DISCUSSION

The possibility that the increasing incidence of carcinoma in western society may be related to a corresponding increase in the use of asbestos (Graham and Graham, 1967) is of interest, especially with regard to pleural and peritoneal mesotheliomas in workers exposed to crocidolite asbestos in industry (Wagner et al., 1960; Elwood and Cochrane, 1964). There have been a number of reports about the relationship between asbestos and carcinogenesis (Smith et al., 1965; Jacob and Anspach, 1965). However, the identification of asbestos fibres within tissue is extremely difficult. Fine particles embedded within tumour tissue are usually beyond the limits of resolution of the optical microscope, and tissue incineration, followed by electron microscopy of the isolated particles, may be unreliable if chemical changes are induced by the procedure. Using normal light microscopy, identification of asbestos particles is based on the presence of characteristic ferritin bodies on some of the fibres, although these cannot easily be distinguished from similar bodies around elastin fibres (Henderson et al., 1970). This procedure may not, however, be as unreliable as the use of polarized light for the demonstration of brightly illuminated "birefringent crystals of asbestos".

The replication technique (Henderson, 1969) failed to show asbestos fibres in the ovarian neoplasms studied. On the other hand, there was good evidence for the presence of talc, often indistinguishable from anthophyllite asbestos, within the ovarian tissue. (Anthophyllite is converted naturally to talc.) The talc particles were found localized deep within tumour tissues, and not universally dispersed throughout the tumour. The talc particles in the ovary were generally much smaller than those found in the tissue from the tumours of the cervix.

The relationship between asbestos and mesotheliomas appears well established, and the replication technique has provided unequivocal evidence for the presence of fibres within such tumours. This technique has also produced evidence for the presence of talc in tissue from pneumoconiotic lungs of a patient with an industrial history of exposure to Norwegian talc (Henderson et al., 1970). The presence of mica, kaolin and asbestos fibres were also identified in tissue from these pneumoconiotic lung tissue. Although it is impossible to incriminate talc as a primary cause of carcinomatous changes within either the cervix or the ovary on the preliminary observations described here, the possibility that talc may be related to other predisposing factors should not be disregarded and further investigations are obviously required.

## ACKNOWLEDGMENTS

The authors gratefully acknowledge the generous financial support of the Tenovus Organization. They also thank Dr. J. W. Dobbie, Department of Pathology, Royal Infirmary, Glasgow, for supplying a number of tissue sections, and also Mr. D. E. Evans, Department of Geology, National Museum of Wales, for the natural minerals required for reference purposes.



Fig. 6
Talc particles found in tissue from a pneumoconiotic lung. (×30,000.)



Fig. 7
Micrograph from the deepest part of an extensive papillary adenocarcinoma entirely replacing the endometrium in a 58-year-old woman, 8 years postmenopausal. Both ovaries were enlarged by hilar metastases, showing histological features similar to the primary endometrial lesion. Numerous talc particles were found in the primary endometrial carcinoma, but none in the metastatic ovarian tumours. (×26,000.)

IMERYS 079385

NOTICE: THIS MATERIAL MAY PROTECTED BY COPYRIGHT LAW (TITLE 17 U.S. Code)

Protected Document – Subject to Protective Order



Fig. 6
Talc particles found in tissue from a pneumoconiotic lung. (×30 000.)



Fig. 7
Micrograph from the deepest part of an extensive papillary adenocarcinoma entirely replacing the endometrium in a 58-year-old woman, 8 years postmenopausal. Both ovaries were enlarged by hilar metastasis, showing histological features similar to the primary endometrial lesion. Numerous talc particles were found in the primary endometrial carcinoma, but none in the metastatic ovarian tumours. (×26 000.)

NOTICE: THIS MATERIAL MAY PROTECTED BY COPYRIGHT LAW (TITLE 17 U.S. Code)

Protected Document – Subject to Protective Order

272   HENDERSON, JOSLIN, TURNBULL AND GRIFFITHS

## REFERENCES

Elwood, P. C., and Cochrane, A. L. (1964): *British Journal of Industrial Medicine*, 21, 304.

Graham, J., and Graham, R. (1967): *Environmental Research*, 1, 115.

Henderson, W. J. (1969): *Journal of Microscopy*, 89, 369.

Henderson, W. J., Gough, J., and Harse, J. (1970): *Journal of Clinical Pathology*, 23, 104.

Henderson, W. J., Harse, J., and Griffiths, K. (1969): *European Journal of Cancer*, 5, 621.

Jacob, G., and Anspach, M. (1965): *Annals of New York Academy of Sciences*, 132, 536.

Keal, E. E. (1960): *Lancet*, 2, 1211.

Smith, W. E., Miller, L., Elsasser, R. E., and Hubert, D. D. (1965): *Annals of New York Academy of Sciences*, 132, 456.

Wagner, J. C., Sleggs, C. A., and Marchand, P. (1960): *British Journal of Industrial Medicine*, 12, 260.

NOTICE: THIS MATERIAL MAY PROTECTED BY COPYRIGHT LAW (TITLE 17 U.S. Code)

IMERYS 079387

# Exhibit 79

# The relationship between perineal cosmetic talc usage and ovarian talc particle burden

**Debra S. Heller, MD,[a] Carolyn Westhoff, MD,[b] Ronald E. Gordon, PhD,[c] and Norman Katz, AAS[c]**

*New York, New York*

**OBJECTIVE:** Epidemiologic studies support the hypothesis of a dose-related risk of epithelial ovarian cancer with perineal talc exposure. Frequency and duration of talc usage has not been previously correlated with ovarian talc content.

**STUDY DESIGN:** Ovaries were studied from 24 women undergoing incidental oophorectomy who were interviewed regarding talc usage. Twelve subjects reported frequent perineal talc applications; the twelve controls reported no use. Ovarian tissue blocks were digested and analyzed by polarized light microscopy and analytic electron microscopy to identify and quantify talc.

**RESULTS:** Talc was identified in all 24 cases by either light or electron microscopy. Talc particle counts were completely unrelated to reported levels of perineal talc exposure.

**CONCLUSIONS:** The detection of talc in all ovaries demonstrates that it can reach the upper genital tract. Widespread exposure to talc during diapering may contribute to the ubiquitous presence of talc in ovarian tissue. (AM J OBSTET GYNECOL 1996;174:1507-10.)

**Key words:** Talc, ovary

Epidemiologic evidence suggests that perineal exposure to talc is associated with an increased risk of epithelial ovarian cancer in a dose-related fashion.[1-5] Other epidemiologic studies have shown no increased risk of ovarian cancer associated with talc.[6, 7] Studies show access of particulate matter into the female peritoneal cavity through the transvaginal route.[8-10] A few reports have identified talc in ovarian tissue,[11, 12] both benign and malignant, but these data were not correlated with an exposure history. Other potential genital tract exposures in a woman's life include surgical gloves,[13] condoms, and diaphragms. Diapering with talc during infancy is another potential exposure. Epidemiologic studies have not linked these exposures to an increased risk of ovarian cancer.[1, 2]

If transvaginal transport of perineally applied talc occurs, women with the heaviest exposures may show the largest talc particle burdens in their ovaries. Tissue digestion techniques are an accepted analytic adjunct in the identification and quantification of asbestos in the lungs of occupationally exposed individuals[14, 15] and are useful in the identification and quantification of talc as well.

*From the Division of Obstetrics and Gynecology Pathology[a] and the Department of Obstetrics and Gynecology,[b] College of Physicians and Surgeons, Columbia University, and the Department of Pathology, Mount Sinai School of Medicine.[c]*

*Supported by a Columbia University Cancer Center institutional research grant and by National Institutes of Health grant No. CA50658.*

*Received for publication August 10, 1995; revised September 26, 1995; accepted October 19, 1995.*

*Reprint requests: Debra S. Heller, MD, Obstetrics and Gynecology Pathology-P&S 16-404, College of Physicians and Surgeons, 630 W. 168th St., New York, NY 10032.*

*Copyright © 1996 by Mosby–Year Book, Inc.*

*0002-9378/96 $5.00 + 0   6/1/70003*

The goal of this pathoepidemiologic study was to correlate the history of perineal talc usage with the talc particle burden found in the ovaries.

## Material and methods

In a case control study of benign ovarian neoplasms at Columbia Presbyterian Medical Center, women undergoing surgery from 1992 to 1993 were interviewed regarding various factors, including talc usage. Subjects were also questioned regarding possible occupational exposures to asbestos, and mothers were contacted regarding diapering history whenever feasible.

Subjects were categorized for talc exposures as follows. Women who reported no direct application of talc to the perineum or to underwear were considered unexposed. For women who reported talc application to underwear or the perineum, the total number of lifetime applications was estimated as the average frequency of use times the number of years of use. For instance, a woman who reported perineal talc application twice per day for 10 years was considered to have 7240 applications. To simplify the classification of exposed and unexposed women, subjects who reported tubal ligation, diaphragm use, or feminine hygiene spray use were excluded from this analysis.

Interviewed subjects from the parent case control study who had a normal contralateral ovary in the surgical specimen were eligible for this substudy. Sections of normal ovary from the 12 women who reported the largest number of perineal talc applications were analyzed. For each of these subjects the unexposed woman closest in age was selected as a control. In addition, the ovaries of two stillborn fetuses were analyzed as negative controls.

1508   Heller et al.

May 1996
Am J Obstet Gynecol

**Table I.** Talc particle counts in women who reported perineal cosmetic talc usage

| Subject No. | age (yr) | Lifetime talc applications* | EM talc particle counts† | Polarized light microscopic counts† | Asbestos detected | Talc use with diapering |
|---|---|---|---|---|---|---|
| 1 | 49 | 4,784 | 1,600,288 | 96 | No | Yes |
| 2 | 49 | 5,475 | 0 | 54 | No | Unknown |
| 3 | 57 | 6,552 | 0 | 100 | Yes | No |
| 4 | 31 | 8,144 | 0 | 114 | No | Unknown |
| 5 | 43 | 10,556 | 0 | 464 | Yes | Unknown |
| 6 | 45 | 11,284 | 151,300 | 300 | No | Yes |
| 7 | 50 | 11,648 | 236,406 | 345 | No | Yes |
| 8 | 57 | 15,600 | 0 | 75 | No | Yes |
| 9 | 66 | 18,980 | 0 | 250 | Yes | Yes |
| 10 | 47 | 21,840 | 1,576,000 | 111 | No | Unknown |
| 11 | 44 | 23,660 | 0 | 348 | No | Yes |
| 12 | 44 | 39,312 | 7,565,000 | 26 | Yes | Unknown |

*EM*, Electron microscopy.
*Frequency of use × Years of use.
†Per gram wet tissue weight.

Ovarian tissue in blocks was deparaffinized, rehydrated, blotted dry, and weighed. Digestion with 5% potassium hydroxide was performed at 70° C for 2 to 4 hours. After complete digestion, the tissue was centrifuged at 12,000 revolutions/min for 20 minutes. The potassium hydroxide was removed, leaving a pellet to which approximately 20 ml of distilled water was added. The pellet was resuspended by use of a microultrasonic cell disrupter at 50 W for 5 seconds. Centrifugation, distilled water wash, and microultrasonic cell disrupter were repeated three times. The distilled water was removed, and the pellet was resuspended in 5 to 10 ml of distilled water. Drops of 10 µl of the final suspension were placed on nickel formvar and carbon-coated locator grids and air-dried. Transmission electron microscopy to identify particles and their size was performed. The identity of the particles was determined by energy-dispersive spectroscopy and confirmed by electron diffraction. Grids were viewed at both 10,000 and 19,000 diameters. All talc particles observed were counted. Cytospin slides for polarized light microscopy were prepared from the same final suspension as the electron microscopy grids. Polarized light microscopy counted larger talc particles (limits of detection approximately 1 µm), whereas electron microscopy detected smaller ones (limits of detection approximately 0.5 nm).

Routinely, all solutions are checked for detectable limits of contaminating particles; all places where particles could have contaminated the specimen, such as paraffin, are also controlled for.

Associations between talc exposure and talc particle count in the 12 exposed subjects were assessed with Spearman's rank correlation coefficient.

### Results

Detailed results can be seen in Tables I and II. The mean age of the patients was 49 years (range 29 to 66 years). For eight exposed subjects, a control was found who was within 4 years of her age. Talc particle counts were not related to age in either the exposed or unexposed subjects ($p > 0.25$). The mean number of lifetime exposures for the women reporting perineal talc use was 14,820 (range 4784 to 39,312). Talc was detected in all ovaries by either polarized light or electron microscopy. There was a wide range of values, as shown by the large SDs. Table III shows that talc particles were observed to a similar extent with both exposed and unexposed subjects.

Neither the light microscopic nor electron microscopic values correlated with reported perineal talc usage ($p$ values 0.37 and 0.45). There was a negative correlation between the values obtained by light microscopy and electron microscopy ($r = -0.34$, $p = 0.05$). An attempt to contact mothers of subjects was successful for 11 of the 24 subjects. Ten of these reported using talc to diaper their babies, which indicates that lifetime talc exposure may be underestimated for nearly all the subjects. Analyses of two fetal ovaries and a pair of surgical gloves was completely negative for talc.

In one subject we studied both ovaries; on the right side we detected no talc by electron microscopy and 556 particles by light microscopy, and on the left side we detected 1,669,000 particles per gram of wet weight by electron microscopy and 6 particles by light microscopy. Hematoxylin-eosin stained slides from the analyzed sections of tissue were examined. There was no evidence of response to talc, such as foreign body giant cell reactions or fibrosis in the tissue. Asbestos was detected in ovaries of five of the subjects with no talc exposure and in four ovaries of the talc-exposed subjects.

### Comment

If transvaginal transport of perineally applied talc occurs, we would expect women with the heaviest exposures to show the largest talc particle burden in their ovaries.

Volume 174, Number 5
Am J Obstet Gynecol

**Table II.** Talc particle counts in women without history of perineal cosmetic talc usage

| Subject No. | Age (yr) | Reported exposure history | EM talc particle count* | Polarized light microscopic talc particle counts* | Asbestos detected | Talc use with diapering |
|---|---|---|---|---|---|---|
| 1 | 63 | 0 | 1,350,000 | 89 | No | Yes |
| 2 | 57 | 0 | 315,250 | 111 | No | Yes |
| 3 | 29 | 0 | 0 | 42 | No | Unknown |
| 4 | 48 | 0 | 1,669,000 | 6 | Yes | Unknown |
| 5 | 59 | 0 | 315,208 | 166 | Yes | Yes |
| 6 | 40 | 0 | 0 | 69 | Yes | Yes |
| 7 | 43 | 0 | 0 | 566 | Yes | Unknown |
| 8 | 64 | 0 | 0 | 420 | Yes | Yes |
| 9 | 49 | 0 | 0 | 53 | No | Unknown |
| 10 | 54 | 0 | 0 | 1139 | No | Unknown |
| 11 | 32 | 0 | 63,042 | 2200 | No | Unknown |
| 12 | 58 | 0 | 472,813 | 0 | No | Unknown |

*EM,* Electron microscopy.
*Per gram wet tissue weight.

**Table III.** Comparison of particle burdens between reported exposed and nonexposed subjects

| Talc exposure | No. of subjects with talc by EM | No. of subjects with talc by light microscopy | Mean EM particle count* | SD | Mean light microscopic particle count* | SD |
|---|---|---|---|---|---|---|
| Reported talc use (n = 12) | 5/12 | 12/12 | 927,416 | 2,174,888 | 190 | 144 |
| No reported talc use (n = 12) | 6/12 | 11/12 | 348,776 | 570,055 | 405 | 655 |

*EM,* Electron microscopy.
*Per gram wet tissue weight.

Tissue digestion techniques have been used to identify and quantify particle burdens of various organic materials in human tissue. The most notable use of this technique is in the identification of asbestos in the lungs of occupationally exposed individuals.[14, 15] Other studies have examined other organs as well. In the 1979 report of Henderson et al.[11] ovaries were studied after an oxygen incineration procedure. They found 6900 to 55,100 talc particles per gram of wet weight in three normal ovaries, 17,400 to 24,300 in three cystic ovaries, and 6400 to 24,500 in three ovarian adenocarcinomas. No exposure histories were stated.

Our study attempted to correlate ovarian talc particle burden with exposure history. Our results do not support a linear dose-related ovarian talc particle burden. However, the mean electron microscopic particle count was much higher in talc users. Perhaps perineal talc does contribute to the ovarian particle burden; however, factors other than dosage may contribute. Other factors to consider include method of application, type of talc, and the possible contribution of inhaled talc particles. The range of talc particle values obtained in this study was wide, as evidenced by the large SDs. This spread of values was also present in the study of Henderson et al.[11] and in much of the asbestos fiber burden literature. Talc may be unevenly distributed throughout the ovarian paren-

chyma. This is supported by the discrepant counts we obtained on the one subject who had analysis of both ovaries. The lack of correspondence between polarized light and electron microscopy counts was due to measurement of different size particles.

Undocumented exposures to talc may partly explain the lack of correlation between adult histories of perineal cosmetic talc applications and ovarian burdens. Although both examination and surgical gloves in the past were dusted with talc, we cannot document this exposure. The gloves we currently use are talc free, according to the company and to our analyses. Ten of the 11 available mothers reported using talc while diapering their babies; this ubiquitous exposure may also contribute to the ovarian particle burdens.

Talc as a possible etiologic agent in the development of epithelial ovarian cancer may be related to asbestos exposure in several ways. Aside from the chemical similarities between the two, many cosmetic talcs contained significant amounts of asbestos, particularly before 1976.[1] Although tremolite asbestos has been documented as a containment of some talc preparations, the types of asbestos detected here are more commonly associated with an environmental (chrysotile) or occupational (chrysotile and crocidolite) exposure.[16]

The detection of talc in all the ovaries demonstrates

1510   Helier et al.

May 1996
Am J Obstet Gynecol

that talc can reach the upper genital tract. However, the quantity detected in this study did not correlate well with the reported exposure. Further study is required to elucidate whether the presence of talc in ovarian tissue is pathogenic.

## REFERENCES

1. Cramer D, Welch W, Scully RE. Ovarian cancer and talc: a case control study. Cancer 1982;50:372-6.
2. Harlow B, Cramer D, Bell D, Welch W. Perineal exposure to talc and ovarian cancer risk. Obstet Gynecol 1992;80:19-26.
3. Harlow B, Weiss N. A case-control study of borderline ovarian tumors: the influence of perineal exposure to talc. Am J Epidemiol 1989;130:390-4.
4. Longo D, Young R. Cosmetic talc and ovarian cancer. Lancet 1979;2:349-51.
5. Scully RE. Ovarian tumors—a review. Am J Pathol 1977;87:686-720.
6. Hartge P, Stewart P. Occupation and ovarian cancer: a case-control study in the Washington DC metropolitan area 1978-81. J Occup Med 1994;36:924-7.
7. Tzonou A, Polychronopoulou A, Hsieh CC, et al. Hair dyes, analgesics, tranquilizers and perineal talc application as risk factors for ovarian cancer. Int J Cancer 1993;55:408-10.
8. Egli G, Newton M. The transport of carbon particles in the human female reproductive tract. Fertil Steril 1961;2:151-5.
9. Henderson W, Hamilton T, Baylis M, Pierrepoint CG, Griffiths K. The demonstration of the migration of talc from the vagina and posterior uterus to the ovary in the rat. Environ Res 1986;40:247-50.
10. Scully RE. Atlas of tumor pathology, second series, fascicle 16: tumors of the ovary and maldeveloped gonads. Washington, DC: Armed Forces Institute of Pathology, 1979.
11. Henderson W, Hamilton T, Griffith K. Talc in normal and malignant ovarian tissue. Lancet 1979;5:499.
12. Henderson W, Joslin C, Turnbull A, Griffiths K. Talc and carcinoma of the ovary and cervix. J Obstet Gynaecol Br Commonw 1971;78:266-72.
13. Henderson W, Melville-Jones C, Barr W, Griffiths K. Identification of talc on surgeons' gloves and in tissue for starch granulomas. Br J Surg 1975;62:941-4.
14. Heller D, Gordon R. Demonstration of asbestos fibers in a ten year old sputum sample. Am J Ind Med 1991;20:415-9.
15. Roggli V, Pratt P. Number of asbestos bodies on iron-stained tissue sections in relation to asbestos body counts in lung tissue digests. Hum Pathol 1983;14:355-61.
16. Heller D, Gordon RE, Westhoff C, Gerber S. Asbestos exposure and ovarian fiber burden. Am J Ind Med (in press).

# Exhibit 80

# Asbestos in commercial cosmetic talcum powder as a cause of mesothelioma in women

## Ronald E. Gordon[1], Sean Fitzgerald[2], James Millette[3]

[1]Department of Pathology, Icahn School of Medicine at Mount Sinai, New York, USA, [2]SAI Laboratory, Greensboro, NC, USA, [3]MVA Inc., Duluth, GA, USA

**Background:** Cosmetic talcum powder products have been used for decades. The inhalation of talc may cause lung fibrosis in the form of granulomatose nodules called talcosis. Exposure to talc has also been suggested as a causative factor in the development of ovarian carcinomas, gynecological tumors, and mesothelioma.

**Purpose:** To investigate one historic brand of cosmetic talcum powder associated with mesothelioma in women.

**Methods:** Transmission electron microscope (TEM) formvar-coated grids were prepared with concentrations of one brand of talcum powder directly, on filters, from air collections on filters in glovebox and simulated bathroom exposures and human fiber burden analyses. The grids were analyzed on an analytic TEM using energy-dispersive spectrometer (EDS) and selected-area electron diffraction (SAED) to determine asbestos fiber number and type.

**Results:** This brand of talcum powder contained asbestos and the application of talcum powder released inhalable asbestos fibers. Lung and lymph node tissues removed at autopsy revealed pleural mesothelioma. Digestions of the tissues were found to contain anthophyllite and tremolite asbestos.

**Discussion:** Through many applications of this particular brand of talcum powder, the deceased inhaled asbestos fibers, which then accumulated in her lungs and likely caused or contributed to her mesothelioma as well as other women with the same scenario.

**Keywords:** Asbestos, Talcum powder, Chamber test, TEM, SEM, EDS, SAED, Mesothelioma

## Introduction

Malignant mesothelioma occurs in both the peritoneum and in the lung pleura.[1] Mesothelioma cases have been attributed to direct occupational exposure, indirect exposure and secondary exposure.[1] A higher rate of "idiopathic" mesothelioma has been reported in women, as no link between asbestos exposure and patients has been identified.[2] Previous research suggests that ovarian cancer and peritoneal mesothelioma may be directly attributed to the use of talcum powder contaminated with asbestos or from exposure to partners occupationally exposed to asbestos.[3–7] Using talcum powder in closed spaces may increase the likelihood of inhaling the powder laced with asbestos. Repeated applications increase the opportunities for inhalation and the asbestos could become concentrated in the peripheral airways and alveoli of the lungs of the talcum powder users. This has been supported by the presence of granulomas in the lungs of some talcum powder users.[8]

In 1976, Rohl and Langer tested 20 consumer products labeled as talc or talcum powder, including body powders, baby powders, facial talcums, and a pharmaceutical talc.[6] Of the 20 products tested, 10 were found to contain tremolite and anthophyllite, principally asbestiform. The product with the highest asbestos content was the same product tested in this study. Both asbestiform anthophyllite and asbestiform tremolite were found in the Rohl and Langer tests. Given that asbestos has been determined as the primary cause of mesothelioma, it is important to note that cosmetic talc contained asbestos in the past.[6] The contamination results from the mining process, since ore specimens taken directly from the mines have repeatedly been tested and shown to contain asbestos, most often anthophyllite and tremolite but also serpentine chrysotile asbestos.[6,9,10]

In part from the review of corporate documents and the sworn testimony of those responsible for the sourcing of talc used in the products studied here, it was determined that three mines provided the raw material for use as talcum powder. The talc used by this cosmetic company that manufactured and

Correspondence to: R. E. Gordon, Department of Pathology, Icahn School of Medicine at Mount Sinai, 1 Gustave L. Levy Place, New York 10509, USA. Email: Ronald.Gordon@mountsinai.org

© W. S. Maney & Son Ltd 2014
DOI 10.1179/2049396714Y.0000000081    International Journal of Occupational and Environmental Health    2014    VOL. 000    NO. 000    1

distributed the talcum powder was from three distinct regions: the Willow Creek mine in Southwest Montana, the Regal mine near Murphy, North Carolina, and imported talc from the Val Chisone region of the Italian Piedmont.[11–16] The specific geology of talc is an important indicator of whether a talc source may be contaminated with asbestos. These three mines all contained asbestos fibers; anthophyllite, and tremolite.[11–18] The Val Chisone talc from Italy was studied by Pooley in 1972.[18] Mine sample had intergrowths with serpentine-type, chrysotile asbestos along with tremolite and anthophyllite asbestos. The talc from Italy was named 'American Ground Italian' and designated as AGI 1615.[19–21] This talc was diluted with a talc from another source to make it acceptable based on X-ray diffraction (XRD) protocols. However, it contained asbestiform tremolite and anthophyllite.[22]

In this study, three laboratories analyzed a specific brand of talc from more than 50 containers of this cosmetic talcum powder product of different sizes and colors, produced over a 50-year time span to determine the presence of asbestos. The authors conducted independent product testing in unassociated laboratories in North Carolina, Georgia, and New York. A fourth laboratory, which also tested this product, will herein be referred to as Laboratory D. The lung and lymph node tissues from a woman who died from mesothelioma and testified to only using this specific brand of talcum powder were analyzed for the presence of asbestos and talc. This is the first report that explores the hypothesis that a specific brand of talcum powder coming from asbestos contaminated mines can find its way into the finished product that can be inhaled during use and cause or contribute to the development of mesothelioma

## Materials and Methods
### Laboratory A: product testing
In Laboratory A, over 50 containers of this particular brand of talcum powder were acquired from a variety of sources for bulk testing. Some of the containers were purchased online, while others were provided directly from the manufacturer. All of the containers were verified to be the correct brand and product.

Laboratory A tested talcum powder from each of the 50 samples using transmission electron microscope (TEM) methods. The procedure for testing by Lab A was as follows: 0.01 g of talcum powder was removed from its vial and suspended in 1 ml of distilled water with one to two drops of ethanol by brief sonication. From this suspension, 10 µl aliquots were removed and placed on a series of five formvar-coated nickel grids (100 grid openings each). In some cases, it was necessary to prepare additional sets of

five grids from the same 0.01 g sample of powder. The drops were allowed to dry in a covered Petri dish. The grids were then examined and analyzed with a Hitachi H-7000 STEM equipped with an Evex energy-dispersive spectrometer (EDS), for elemental composition and relative amounts of elements. The microscope was equipped with a tilt stage and a rotary specimen holder, which was employed with selected-area electron diffraction (SAED) analyses, as described below. Structures seen as fibers measuring at least five micrometers in length with aspect ratios of 5 : 1 or greater were analyzed to determine if they were regulated asbestos mineral fibers. We used EDS to chemically establish the presence of asbestos fibers and the crystalline structure was assessed using SAED. All 100 grid openings were observed and analyzed on each of the five grids for each product sample (at least 500 grid openings per sample analyzed).

Analyses were performed using a modification of the techniques described by Yamate *et al.*, and similarly adopted techniques used by the Environmental Protection Agency (EPA), American Society for Testing and Materials (ASTM), and International Organization for Standardization.[23–26] All techniques required the use of a TEM equipped with an EDS system. Only in Yamate level III is the tilt and rotary stage optional to perform advanced SAED zone axis analysis. Yamate *et al.* stated that zone axis diffraction analysis is useful in differentiating between otherwise unidentifiable fibers.[23] In the Laboratory A analysis, zone axis analyses were not necessary as the identified amphiboles clearly demonstrated that they were asbestiform tremolite and anthophyllite confirmed by morphology, EDS chemistry, and characteristic 5.3 Å inter-row repeats on diffraction without tilting. Both asbestiform and non-asbestiform particles and fibers were present. However, in most cases this manuscript will refer to asbestiform fibers and state when they are tremolite, anthophylite, or chrysotile type asbestos. A non-asbestos tremolite, anthophylite will not be referred to as asbestos.

To calculate the fiber concentrations per gram of talcum powder, we first determined the number of asbestos fibers on average per grid opening. This number was multiplied by 552. The product of that equation was multiplied by 100, and then divided by 0.01 to yield the fibers/gram talcum powder value. The constant, 552, is the number of grid opening areas on the entire grid. One hundred is the number of 10 µl drops in 1 ml that the talcum powder was dispersed and the 0.01 was the weight of the talcum powder dispersed. Quality control procedures, which included testing of blanks from water, working in a clean hood environment, and working with only one



**Figure 1    Pouring of powder into hands in glovebox.**

sample at a time ensured that no laboratory contamination of samples.

### Laboratory B: asbestos releasability testing

To determine if the user could inhale asbestos during a talcum powder application, Laboratory B assessed asbestos releasability by air sample. Air samples were generated during simulation in a glove box, consistent with normal product use in a controlled environment. These three samples included the same samples tested by Laboratory A. Environmental and personal air samples were collected using standard airborne asbestos techniques, using high-volume air pumps for environmental (stationary) samples inside and outside of the controlled area, and low-volume air pumps for personal samples taken at a distance comparable to the breathing zone of the person simulating application. Standard TEM 385 mm² effective filter area 25 mm cassettes with 0.45 μm MCE filters were used on the flow-calibrated high (7–12 l/min) and low volume (1–4 l/min) air pumps (Figs. 1 and 2).

The resulting air samples were analyzed for airborne asbestos following the analytical procedures described in the U.S. Environmental Protection Agency Code of Federal Regulations *40 CFR part 763, subpart E, Appendix A* — AHERA for direct preparation of MCE filters.[24] All final analyses by Laboratory B were conducted on a JEOL 2000FX TEM equipped with an energy-dispersive X-ray analyzer detector and SAED at magnifications up to ×50 000, using the fiber counting criteria specified by Yamate *et al.*'s protocols.[23]

### Laboratory C: product bulk testing and bathroom-sized chamber releasability

**Bulk methods**

Laboratory C examined nine samples under an Olympus SZ-40 stereomicroscope at magnifications from ×7 to ×40. Portions of the particulate found in the sample were mounted in Cargille refractive index liquids for analysis by polarized light microscopy (PLM) using an Olympus BH-2 PLM with a magnification range from ×100 to ×1000. The PLM analysis followed the procedures for bulk analysis of building materials described by the US EPA in 1993.[24] Characterization of the fibers was performed using a Philips EM420 100 kV TEM equipped with an Oxford INCA EDS x-ray analysis system and capable of SAED work involving tilting of amphibole fibers. Zone axis determinations were also conducted. We used TEM asbestos fiber counting criteria of fibers greater than 0.5 μm in length with at least a 5 : 1 aspect ratio as described in Asbestos Hazard Emergency Response Act (AHERA) and ASTM methods: D6281, D5755,



**Figure 2    TEM cassettes in simulation area in glovebox.**

D5756, and D648.[24–28] Data were recorded using the ASTM D6281 format. XRD analysis was performed by an outside laboratory (DCM Science Laboratory, Inc., Wheat Ridge, CO, USA) scanning over a range of 3–45° 2Θ using 40 kV, 25 mA Cu $K_\alpha$ radiation. Mineral phases were identified with the aid of computer-assisted programs accessing a CD-ROM powder diffraction database.

### Air testing

Tests to determine airborne levels of asbestos fibers resulting from application of this brand of talcum powder were performed in a testing chamber. The chamber was built to match the bathroom of the patient that used this brand of cosmetic talc. Her bathroom was measured at 7 feet, 9 inches high by 5 feet by 4 feet, 1 inch. All talc products used in these chamber tests had previously been tested in Laboratories A, B, or both.

### Air test — shaker container

Using Personal Protective Equipment, a volunteer applied one of the bulk tested cosmetic talcum powders to his body using a shaker container. This particular talcum powder contained approximately 0.1% by weight and approximately 18 million anthophyllite asbestos fibers per gram. The container was weighed before and after the testing to determine the approximate weight of material applied. The talcum user wore a respirator and a bathing suit. The volunteer twisted the top of the container and shook material onto his hand. He applied the talc under his arm and around the shoulder and upper arm area. He then shook the talcum powder onto his other hand and applied it to the other underarm, shoulder and upper arm area. He shook out additional material and applied it to his neck and upper torso. He shook out and applied material two more times for a total of five applications. The total talcum application time was approximately 1 min and amounted to 0.37 g of the talcum powder. Two air samples were collected in the applier's breathing zone at 0.5 l per minute (lpm) and two additional air samples were collected in the breathing zone at 1.0 lpm with commercial open-face air cassettes. The five-minute sampling time included the application time and a waiting period. The bystander in the test chamber had two air cassettes in his breathing zone for the five-minute period including application and the additional waiting time. The bystander wore a respirator and full protective clothing. These air samples were collected at rates of one and 2 lpm. No activities were conducted during the waiting period other than checking the pumps and cassettes. The air filters and two additional blank filters were analyzed by phase contrast microscopy (PCM) using National Institute for Occupational Safety and Health (NIOSH) Method 7400.[29] Two air

samples and two blanks were also analyzed by NIOSH Method 7402 via transmission electron microscopy to determine the percentage of asbestos fibers among the fibers counted by PCM.[29] An air sample collected from within the test chamber before the study was analyzed by a more sensitive TEM procedure following the EPA AHERA method.[24]

### Air testing puff applicator

In this test, a volunteer applied a different cosmetic talcum powder sample using a puff applicator. This particular talcum powder contained approximately 0.05% anthophyllite asbestos (approximately 70 million asbestos fibers per gram). The container was weighed before and after the testing to determine the approximate weight of material applied. The talcum user wore a respirator and a bathing suit. The talc user opened the puff container and applied the talcum powder as described above only this time with a powder puff. He then repeated the process for a total of six applications. The talcum application time was approximately 1 minute. Two air samples were collected in the applier's breathing zone at 0.5 lpm for a sampling period of 4 minutes. One air sample was collected for a shorter period (3.3 minutes) that included the application period. Another air sample was to be collected after the application period but this sample was voided because the volunteer hit the air cassette and the cassette fell off the vacuum hose. The bystander in this test followed the same protocol as described above. Both air samples were collected at a rate of 0.5 lpm. No activities were conducted during the waiting period other than checking the pumps and cassettes. The air filters and two additional blank filters were analyzed by PCM using NIOSH Method 7400 as described above.[29] One air sample and two blanks were also analyzed by NIOSH Method 7402 via TEM to determine the percentage of asbestos fibers among the fibers counted by PCM.[30] An air sample collected from within was tested as described above by EPA AHERA method.[24]

## Human Tissue Analysis
### TEM

Tissue samples from a woman with no other known exposure to asbestos other than her use of the product tested was supplied to Laboratory A. Human tissue analysis was performed according to the techniques described in Wu *et al.*[29] Lung and lymph node tissue was received fixed in formalin. Half of the tissue was removed from the lung and the lymph node tissue. Two grams of lung tissue were divided twice. The two halves of the lymph node weighed 0.16 g together. The two specimen types were separated throughout the study. The tissue from each was first digested in a 5% solution of potassium

hydroxide (KOH) for approximately hour at 60°C. The dissolved lung and lymph node material was then centrifuged in a high-speed centrifuge to separate the inorganic material from the dissolved organic tissue. The solute material containing the dissolved organic material and KOH was removed and distilled water was added. The inorganic material was re-suspended in the water by brief sonication. The material was re-centrifuged and the process of washing the inorganic material was performed five times. After the fifth wash, the distilled water was removed and replaced with 10 ml of fresh distilled water and the inorganic material was re-suspended by brief sonication. Ten microliter samples were removed from the suspension and placed on formvar-coated nickel grids on a metal mesh in a covered glass Petri dish to dry. Five grids were initially prepared and an additional set of five grids was prepared for each tissue type for a second analysis. The dried grids were observed with a transmission electron microscope. Four hundred grid openings on at least four grids were analyzed, and a fifth grid was used if grid openings were broken in the initial four examined grids. The fiber concentrations per gram wet weight lung or lymph node tissues were calculated from the number of fibers observed, the area analyzed, the aliquot ratio, and the total weight of the tissue sample digested.

### Light microscopy
**Tissue sections**

Small lung tissue samples were put into 10% phosphate-buffered formalin and processed for embedding in paraffin. Five micrometer paraffin sections were cut, mounted on glass slides and stained with hemotoxylin, eosin, and an iron stain. The tissue was evaluated for the presence of altered morphology and/or ferruginous bodies; two characteristics often seen in lung tissues that are a byproduct of iron-rich protein deposits on asbestos fibers resulting from macrophage frustrated phagocytosis.

### Digested lung and lymph node tissue

Two hundred and fifty microliters of digested lung and lymph node material suspension used for TEM analyses was placed in a cytocentrifuge and the slides were cover slipped and observed by phase contrast light microscopy. The entire area was counted for ferruginous bodies and calculated back to the weight of the tissue to determine the concentration of bodies per gram of wet weight tissue.

### Scanning electron microscopy (SEM)

SEM samples were prepared by taking 250 µl of the suspended inorganic material used for the TEM and light microscopy analyses and placed on a 0.1 µm pore size Nucleopore filter mounted on a carbon planchette on an aluminum SEM stub. The material

was allowed to dry in a covered Petri dish. The stub was then coated with vaporized carbon and observed with a Hitachi S-4300 field emission scanning electron microscope equipped with an Evex EDS system. The entire filter sample surface was scanned for fibers and asbestos bodies.

## Results

All three laboratories confirmed in multiple tests the presence of asbestiform anthophyllite and asbestiform tremolite in the talcum powder products, just as had been found and described by Rohl and Langer over three decades ago.[6]

Initial bulk analyses of 50 samples of this product in Laboratory A showed that all of the samples contained asbestos fibers. Eighty percent contained only anthophyllite asbestos, 8% only tremolite asbestos, 8% anthophyllite and tremolite asbestos and 4% anthophyllite, tremolite, and chrysotile asbestos. The range in asbestos concentrations of fibers >5 µm in length were calculated to be, at a minimum, between 1840 and 1 104 000 fibers per gram of talcum powder. More than 80% of the tested cans and plastic containers contained over 10 000 asbestos fibers/gram of talcum powder. Four of the containers had less than 5000 fibers per gram and six containers had more than 250 000 fibers per gram. However, it should be noted that there were many asbestos fibers that also had aspect ratios less than 8 : 1. These fibers were generally found to be shorter than 5 µm and were noted, but not counted in the original product testing or in the lung and lymph node tissue testing by Laboratory A. There were also a number of fibrous talc particles that were easily distinguishable from asbestos by morphology. If there was a question regarding their identity, both EDS and SAED were employed to recognize such fibers as talc. All the fibers that were actually counted in bulk and tissue preparations were 5 µm or greater in length, with aspect ratios for the most part greater than 10 : 1. The majority of asbestos structures counted demonstrated aspects ratios >15 : 1, with many >20 : 1. A minimum of four fibers was identified in each sample, making the concentration determinations of asbestos statistically significant and reproducible.

Laboratory C. using PLM, TEM, and XRD, tested nine samples of the specific brand of talcum powder described above. Generally, the PLM analysis showed that the samples contained both platy and fibrous talc, less than 1% by volume of the PLM visible amphibole fibers and some quartz. The majority of the PLM amphibole particles had low aspect ratios (length to width) but some were >10 : 1. By XRD, one of the talcum powder samples was found to contain 4% anthophyllite. No amphibole

*Gordon et al.*   Asbestos in commercial cosmetic talcum powder



Figure 3   Application of powder from shaker in bathroom-sized chamber.



Figure 4   Application with powder puff in bathroom-sized chamber.

minerals were detected in the other eight samples by XRD. The XRD detection limit was approximately 2% by weight. In TEM analysis, all nine samples were positive for amphibole asbestos (primarily anthophyllite), and were confirmed with zone-axis electron diffraction measurements. At least five asbestos fibers per sample were recorded in each sample, with concentrations ranging from 0.004 to 0.9% by weight and from 3 to 200 million asbestos fibers per gram of fibers greater than 0.5 μm in length with at least a 5:1 aspect ratio.

### Air monitoring

Releasability of asbestos into the air from the products was assessed by glove box simulation testing by Laboratory B, and by full chamber testing by Laboratory C. In a manner consistent with methods used by the EPA, NIOSH or ASTM, study product body powders and dusting powders were applied hand to hand and hand to arm. Consistent with bulk testing results, anthophyllite and tremolite asbestos was repeatedly found in the air tests resulting from these simulations (Figs. 6–8).

### Shaker container test

The shaker application test used 0.37 g of talcum powder (Fig. 3). For the talc user, the average PCM fiber concentration in his breathing zone during application was 4.8 F/cc (3.1, 7.3, 3.9, and 4.9 F/cc). The asbestos to total fiber percentage as determined by TEM was 40%. Therefore, the asbestos concentration in the breathing zone of the talc user during application was 1.9 F/cc. For the bystander the PCM fiber concentration was 1.35 F/cc (0.9 and 1.8 F/cc) and the TEM derived percentage of asbestos was 35%, which results in a bystander asbestos concentration of 0.5 F/cc. No asbestos fibers were found in the sample collected in the chamber before the testing or in the blank filters.

### Puff application

The puff application test used 6.25 g of talcum powder (Figs. 4 and 5). For the talc user, the average

PCM fiber concentration in his breathing zone during the 5-minute sampling period was 20 F/cc (23.6 and 16.5 F/cc). The asbestos to total fiber percentage as determined by TEM was 21%. Therefore, the asbestos concentrations in the breathing zone of the talcum powder user were 5 and 3.5 F/cc. The short term sample in the breathing zone of the applier had a PCM value of 60 F/cc. Using the TEM-derived percentage of asbestos of 10%, result for the short-term sample was an asbestos concentration of 13 F/cc. For the bystander, the PCM fiber concentration was 11.7 F/cc (13.7 and 9.7 F/cc). Using the minimum TEM-derived percentage of asbestos of 36% results in a bystander asbestos concentration of 4.9 and 3.5 F/cc. No asbestos fibers were found in the sample collected in the chamber before the testing or in the blank filters.

The tests performed independently by Laboratory C using a bathroom-sized room confirmed the findings for asbestos fiber release found by Laboratory B's glovebox testing. Samples showed that significant concentrations of anthophyllite, tremolite, and occasionally chrysotile asbestos were released in the simulated application of several iterations of the products. This confirmed not only



Figure 5   Application with a powder puff in bathroom-sized chamber.



**Figure 6   Tremolite asbestos from TEM analysis of releasability air testing of product (images, EDS, and SAED).**

the presence of asbestos in the talcum powders, but also that the asbestos contained in the friable powders was easily aerosolized in a manner consistent with the products intended use; confirming the hypothesis that the cosmetic powders are capable agents of exposure to asbestos

### Human tissue analysis

Electron microscopic analysis of the lung tissue revealed amphibole type asbestos fibers in a calculated concentration of 1380 and 4150 fibers per gram wet weight, respectively, with a limit of detection of 690 fibers per gram wet weight. All fibers counted

*Gordon et al.*    Asbestos in commercial cosmetic talcum powder



**Figure 7**    Anthophyllite asbestos from TEM analysis of releasability air testing of product (images, EDS, and SAED).

were 5 μm or greater in length and had aspect ratios of 20 : 1 or greater. The amphiboles were identified by EDS and SAED analysis as anthophyllite (Fig. 9) and tremolite (Fig. 10) asbestos. The asbestos fibers were seen in a ratio of 1 : 1 and 2 : 1, respectively (anthophyllite/tremolite). There were many anthophyllite and tremolite asbestos fibers less than 5 μm in length that were not counted. The majority of these smaller asbestos fibers were of the anthophyllite type. Light microscopic analysis of the cytocentrifuge preparation revealed a calculated concentration of 140 asbestos bodies per gram wet weight of lung

tissue by phase contrast light microscopy in both samples.

Electron microscopic analysis of the lymph node tissue revealed amphibole asbestos fibers in a calculated concentration of 12 738 fibers per gram wet weight, with a limit of detection of 2123 fibers per gram wet weight. All counted fibers were at least 5 μm in length with aspect ratios of 10 : 1 or greater. The amphiboles were identified by EDS and SAED analysis as anthophyllite and tremolite and they were seen in a ratio of 5 : 1 anthophyllite/tremolite. There were many anthophyllite and tremolite fibers less



**Figure 8** Chrysotile asbestos from TEM analysis of releasability air testing of product (image and SAED).

than 5 µm in length that were not counted. We also observed but did not count tremolite cleavage fragments. Light microscopic analysis of the cytocentrifuge preparation revealed a calculated concentration of 92 asbestos bodies per gram wet weight of lymph node tissue by phase contrast light microscopy (Fig. 11).

Histological sections of the tissue showed focal areas of mild parenchymal fibrosis and a more generalized pleural fibrosis. Although many ferruginous bodies were identified in the cytocentrifuge preparation, most were relatively small and not seen in the H&E-stained paraffin sections. These macrophages were clustered and contained a combination of fibrous and platy talc and small asbestos bodies.

In addition to the fibrous and platy talc described above, other inorganic materials were seen. Aluminum silicates and magnesium aluminum silicates in both fibrous and platy form were identified. We elected not to count these fragments. Their presence supports the hypothesis that the lung and lymph node samples match findings from the tested talcum powder.

The two analyses performed on the lung tissue were from two separate tissue digestions. The second was prepared with tissue not previously analyzed, but

saved from the original half of the tissue retained by Laboratory A. The results proved to be completely reproducible with no finding of any additional fiber types other than those reported above.

*Confirmation of interlaboratory analyses*
After several years of independent testing in separate laboratories, the authors became aware of one another's work through litigation. The finding that this historic brand of cosmetic talcum powder contained asbestos fibers with generally the same morphological and chemical assemblage was confirmed. A fourth laboratory (Laboratory D) tested many of the same samples, but did not report asbestos findings. Owing to the inconsistency with the other laboratories, re-examination of results from Laboratory D was warranted.

Two of the three authors of this study went to the Laboratory D and were supplied with the prepared filters on TEM grids or SEM stubs previously analyzed by Laboratory D. They were also supplied with both TEM and SEM microscopes to re-analyze the specimens, along with data and locator sheets, allowing for the same grid openings and areas to be observed as in the initial analyses.

*Reanalysis of subject product samples*
One author re-analyzed the TEM preparations of 20 study products of talcum powder prepared by Laboratory D. Asbestos structures were found in the re-analysis, some of which were named in the original analysis as cleavage fragments, intergrowths, or fibrous talc rather than as asbestos. Although the author–reviewer agreed with many of the non-asbestos fibers identified, he concluded the original analyses were incomplete. Additional analyses by the author–reviewers showed some of the incompletely analyzed fibers to be asbestos. In other cases, asbestos found on re-analysis was located on areas of the filter where no fibers were recorded in the original bench sheets or reports. In some instances, the overall distribution of particulates on the preparations was inhomogeneous, in contrast with the method of choosing grid openings for the original analysis by skipping every other opening in a "checkerboard" fashion. Furthermore, the methods named on the analytical count sheets were not the same as the methods cited in the reports from Laboratory D.

Laboratory D reported no asbestos fibers in the 20 samples analyzed. In contrast, asbestos fibers were identified in all 20 of the same products in Laboratory A and in 16 of 20 products tested by Laboratory B. In the re-analysis of those same 20 products originally analyzed by Laboratory D via TEM, eight were found to contain asbestiform anthophyllite, six asbestiform tremolite, and two were found to contain chrysotile fibers. These findings were significant because re-analysis was not a

*Gordon et al.*   Asbestos in commercial cosmetic talcum powder



**Figure 9   This asbestos fiber is a representative sample removed from the lung tissue of the patient exposed to cosmetic talcum powder. Anthophyllite asbestos fiber is observed and its SAED pattern is demonstrated beside it with the EDS spectra.**

complete replication of the original analysis due to time constraints, damage, or unsuitable preparations. It was apparent that the technicians in Laboratory D missed fibers and misidentified asbestos fibers as non-asbestos.

### Re-analysis of human tissue

Laboratory D also performed fiber burden analysis on human tissue with differing results than the study of the authors. Similar to the re-evaluation of bulk analyses, two author–reviewers analyzed the human tissue sample preparations of Laboratory D together and found significant differences in their analyses compared to the technicians who originally analyzed

the grids and stubs. We determined that the technicians misidentified anthophyllite asbestos fibers that had been coated with iron and protein (anthophyllite asbestos bodies) as either cleavage fragments or as amosite fibers (Fig. 12). Furthermore, it is the authors' consensus that there are no generally accepted criteria to classify individual fibers as cleavage fragments by TEM when the sample contains attributes of an asbestos fiber or countable structure. When Laboratory D technicians initially looked for asbestos bodies to determine the fiber core, they concluded that most were amosite. However, when the two author–reviewers examined



**Figure 10** This asbestos fiber is a representative sample removed from the lung tissue of the patient exposed to cosmetic talcum powder. Tremolite asbestos fiber with its corresponding EDS spectra.

the same structures, it was clear that the cores were either anthophyllite or could not be determined because there was exposed fiber core. In previous studies of human tissue having anthophyllite and anthophyllite bodies (Fig. 11), it was common to find that the entire anthophyllite core, even if quite long, was completely coated.

*Zone axis confirmation in bulk, tissue, and air*

Laboratories A, B, and C confirmed original amphibole asbestos structures by zone axis diffraction. Laboratories A, B, C, and D re-analyzed archived preparations with the intent of confirming amphiboles by zone axis diffraction. In all four sets of re-analyzed preparations, anthophyllite and tremolite asbestos were consistently



**Figure 11** These are asbestos bodies from the patients lung tissue taken by SEM. It is possible to see in the one to the left that the fiber is almost completely covered by the iron protein coating. This is compared to the one at the right which appears to have much more fiber exposed. However, upon EDS testing, it was determined that in both cases, these were anthophyllite fibers and they were both entirely coated, although much thicker is some areas as opposed to others.

*Gordon et al.*   Asbestos in commercial cosmetic talcum powder



**Figure 12**   Tremolite and anthophyllite asbestos from re-analyses of 'Lab D' preparations (images, EDS, and SAED).

confirmed by zone axis diffraction pattern measurements. This included confirmation of asbestiform amphiboles, including anthophyllite and tremolite asbestos from the original product testing, from the releasability air tests, and from TEM preparations of lung and lymph node tissues.

## Discussion

Historically, many mesotheliomas, particularly abdominal mesothelioma in women, have been labeled idiopathic due to a lack of an identifiable source for asbestos exposure. Further, there has been an increase in the number of idiopathic pleural and abdominal mesotheliomas in women using this specific brand of talcum powder. There have been a few studies that have examined talcum powder and its potential to cause ovarian tumors.[3–5] The studies were inconclusive, but suggested that talc, asbestos, or both may cause these cancers through vaginal exposure.[4] These studies attributed asbestos found within the women's lesions to result from contact with their partners. There was no consideration for the potential of the asbestos being a contaminant in the women's talcum powder.[3,4] However, it has been reported that cosmetic talcum was contaminated with asbestos, and that asbestos was found in the mines from which the talc originated.[6,9] Our findings indicate that historic talcum powder exposure is a causative factor in the development of mesotheliomas and possibly lung cancers in women.

Talc has been identified as a causative for mesotheliomas in New York talc miners.[31] In recent years, more than 10 women developed mesothelioma and their only source of asbestos exposure was the use of one brand of talcum powder. This study demonstrates that the brand of talcum powder tested contained asbestos. Furthermore, we have traced the asbestos in the talc to the mines from which it originated, into the milled grades, into the product, and finally into the lung and lymph nodes of the users of those products, including one woman who developed mesothelioma.

Based on the testing and re-testing conducted by the authors, it is evident that this product line has been consistently contaminated with asbestos tainted talc derivatives. The amount of asbestos was variable based on the time of manufacture and the talc source. There have been numerous publications that have indicated that the talc in many talc deposits had asbestos contamination.[32–35] The most common types of asbestos were tremolite and anthophyllite. These are the same asbestos fiber types found in the autopsied lungs and lymph nodes tested here for asbestos presence. In a few containers tested in this study, chrysotile was also found, consistent with the source ore geology.

Most, if not all, testing of cosmetic talc was performed using techniques designed for light microscopy, PLM, or by TEM criteria designed to test air and water samples. Testing determined if asbestos levels were above the EPA standards under AHERA or the Occupational Safety and Health Agency standards. These protocols are based on the parameters described in the Yamate method.[23] There are significant limitations to these methods. PLM analysis misses small fine asbestos fibers or fibrils because the limits of the resolution are approximately 0.2–0.5 μm for different forms of light microscopy. Based on our findings, approximately 90% of the fibers identified fall into this category. Determining the number of TEM grid openings to be counted during the analysis requires stopping factors, or limits on the quantity of analysis to be performed. The Draft Yamate method (1984) gives the guidelines of ''100 fibers or 10 grid openings, whichever is first.''[23] This counting rule was instituted for cost limitation purposes. The Draft Yamate method describes that while this guideline of using 10 full-grid openings represents a judicious compromise between a reasonable experimental effort and a fairly low value of the detection limit, the analysis of additional TEM grid openings reduces the detection limit and improves the precision of the estimates. In the talc described here, a very low level of detection was desired and therefore, in some cases, as many as 500 plus grid openings were analyzed to reduce the detection limit and improve sensitivity of the test. TEM testing has been adequate for evaluating building material asbestos abatement projects, local air sampling, and potential water contamination with asbestos.[23] However, these criteria are not acceptable for assessing asbestos fiber burden analyses in human tissues and for low asbestos content products that are used intermittently in small quantities over long periods of time, such as cosmetic talcum powder.[36] Talc related asbestos exposures can be heavy at times, above 4000 F/cc. The inhaled asbestos fibers are extremely variable in the causation of asbestos related tumors and fiber burdens found in the deceased woman were within the reported ranges for amphiboles as causative factors in the development of such a tumor.[37]

Therefore, it is imperative to analyze products such as talcum powder for small amounts of asbestos fibers. This requires that the limits of detection be lower than levels required in a typical Yamate analysis. The author–reviewers observed that the Laboratory D analyses were done using Yamate methodology and no more than 10–25 grid openings on bulk TEM grid preparations were observed.[24] Based on Laboratory D's protocols for testing, millions of fibers/gram of talc would have to present in order to find fibers. Lower concentrations in the ranges found by Laboratories A, B, and C demonstrated that fibers were detectable and present at levels sufficient to cause mesotheliomas.

Although long narrow asbestos fibers are highly carcinogenic, shorter, narrow fibers are also dangerous.[36–38] It is now more common to find shorter narrow fibers in human tissue digestions than long narrow fibers, especially for chrysotile.[39] This

Gordon et al.   Asbestos in commercial cosmetic talcum powder

study provides evidence that low concentrations of asbestos in raw materials do not necessarily correlate to low health risk.[38,39] Examples of recent studies of low asbestos content producing significant airborne concentrations in simulated activity include activity-based monitoring of asbestos as it naturally occurs in several sites, as conducted by the EPA and Agency for Toxic Substances and Disease Registry, and vermiculite-containing attic insulation studies.[40] These studies have repeatedly shown that substantial airborne concentrations could be derived from materials with only a fraction of a percent asbestos content.[36] This has been especially true when a product was in a friable state, or where the obvious use of material intimates aerosolization of fibers. Significant airborne concentration can be easily generated from such conditions when asbestos is a constituent.[40–43]

The talc application studies were simulations of exposures to talc used by a deceased woman who had mesothelioma. The air volume in the testing space was 158 cubic feet. This is in the range of the chamber sizes used by talcum powder manufacturers in the 1970s in their studies of the quantity of talcum powder used in normal application. The space used by Russell was 171 cubic feet and the space used by Aylott was between 152 and 163 cubic feet. The amount of material used in the shaker test was 0.37 g. The amount used for the puff applicator test was 6.25 g.[44,45] The shaker test was a light application and the puff a heavy application. However, the heavy application was within the ranges published by Russell of $8.84 \pm 8.32$ g and Aylott of $2.5 \pm 12.5$ g. The "talcing times," or the duration of talcum powder application, were approximately 55 seconds for the shaker test and approximately 57 seconds for the puff applicator test.[44,45] These were within the ranges published by Russell of $83 \pm 33$ seconds and Aylott of 28–78 seconds for adult dusting.[44,45] Laboratories A and B determined that the contaminated talcum powder released inhalable asbestos into the air.

Another issue in this study was the documentation and identification of cleavage fragments. The scientific community has not generally adopted cleavage fragment differentiation criteria.[46] It is unclear how to identify a cleavage fragment once the stone or material has been finely ground. Two criteria for distinguishing cleavage fragments from asbestos fibers have been proposed. The first is that the ends of cleavage fragments have oblique angles and second is that the aspect ratios are all less than $20 : 1$. The ends criterion has not been validated with known asbestos/cleavage fragment standards and while an aspect ratio of $20 : 1$ suggests that a fiber is likely to be an asbestos fiber, some fibers with aspect ratios below

$20 : 1$ are also asbestos. As the fiber aspect ratio increases, the percentage of asbestos fibers versus cleavage fragments also increases.[47] However, this criteria falls short when the fiber is extremely thin and is the smallest unit of diameter of a fiber. When these small fibers are removed and analyzed from human tissue, these criteria have to be discarded because enzymes with basic and acidic molecules within cells can leach elements from the surface, causing a breakdown of the fibers, especially when thin in diameter. van Orden et al. propose criteria to identify cleavage fragments by SEM.[46] The criteria are based on surface contours which identify a cleavage fragment.[46] However, this method has not been verified and is not generally accepted. There were no photographs of TEM or high-resolution high-magnification SEM provided by Laboratory D, which classified potential asbestos fibers as cleavage fragments

In conclusion, we found that a specific brand of talcum powder contained identifiable asbestos fibers with the potential to be released into the air and inhaled during normal personal talcum powder application. We also found that asbestos fibers consistent with those found in the same cosmetic talc product were present in the lungs and lymph node tissues of a woman who used this brand of talc powder and developed and died from mesothelioma.

## Disclaimer Statements

**Contributors** All authors did studies relevant to the manuscript and all contributed and accepted all the writing.

**Funding** The work done was paid for by attorneys for litigation purposes. No funds were for writing of this manuscript.

**Conflicts of interest** Funding for all Labs was provided as part of litigation. No funds were for writing this article. Laboratories are available for defense or plaintiff litigation.

**Ethics approval** Ethical consent was not needed.

## References

1 Robinson BM. Malignant pleural mesothelioma: an epidemiological perspective. Ann Cardiothorac Surg. 2012;1:491–6.
2 Ilgren EB, Wagner JC. Background incidence of mesothelioma: animal and human evidence. Regul Toxicol Pharmacol. 1991;13:133–49.
3 Heller DS, Gordon RE, Katz N. Correlation of asbestos fiber burdens in fallopian tubes and ovarian tissue. Am J Obstet Gynecol. 1999;181:346–7.
4 Heller DS, Gordon RE, Westhoff C, Gerber S. Asbestos exposure and ovarian fiber burden. Am J Ind Med. 1996;29:435–9.
5 Heller DS, Westhoff C, Gordon RE, Katz N. The relationship between peritoneal cosmetic talc usage and ovarian talc particles burden. Am J Obstet Gynecol. 1996;174:1507–10.

6 Rohl A, Langer A. Consumer talcum's and powders: mineral and chemical characteristics. J Toxicol Environ Health. 1976;2:255–84.

7 Kleinfeld M, Messite J, Langer AM. A study of workers exposed to asbestiform minerals in commercial talc manufacture. Environ Res. 1973;6:132–43.

8 Porro FW, Patten JR, Hobbs AA. Pneumoconiosis in the talc industry. Am J Roentgen. 1942;42:507–24.

9 Paoletti L, Caiazza S, Donelli G, Pocchiari F. Evaluation by electron microscopy techniques of asbestos contamination in industrial, cosmetic and pharmaceutical talcs. Regul Toxicol Pharmacol. 1984;4:222–35.

10 Luckewicz W. Differential thermal analysis of chrysotile asbestos in pure talc and talc containing other minerals. J Soc Cosmet Chem 1974;26:431–7.

11 Weeks RL. Willow Creek Mine Evaluation, 1984; Berg RB. Talc and chlorite deposits in Montana. Montana Bur Mines Geol Mem. 1979;(45).

12 van Gosen B, Lowers HA, Sutley SJ, Gent CA. Using the geologic setting of talc deposits as an indicator of amphibole asbestos content. Environ Geol. 2004;45:920–30.

13 Hopkins OB. A report on the asbestos, talc, and soapstone deposits of Georgia. Geol Surv Georg Bull. 1948;(29).

14 van Horn EC. Talc deposits of the Murphy marble belt. North Carolina Department of Conserv Dev Bull. 1948;(56).

15 Pratt JH. Mining industry in North Carolina. USGS Contributions to Economic Geology annual report. Reston, VA: USGS; 1902.

16 McCrone LC. Analysis of talc by X-ray diffraction and polarized light microscopy, under contract to NIOSH. Atlanta, GA: NIOSH; 1977.

17 Pooley FD. Report of Investigation of Italian mine samples and related powders. Cardiff: University of Cardiff Department of Mineral Exploration; 1972.

18 Grieger GR. Cover letter explanation of analytical results, item MA2270. Westmont, IL: McCrone Associates; 1971.

19 ES Laboratories analytical report WCD 6/72-1. Doral, FL: ES Laboratories; 1972.

20 Department of Chemistry report of analytical results. New York: New York University; 1972.

21 McCrone Associates. Report of analytical results, item MA5500, Talc 1615. Westmont, IL: McCrone Associates; 1977.

22 AHERA. Appendix A to Subpart E — Interim transmission electron microscopy analytical methods, U.S. EPA, 40 CFR Part 763. Asbestos-containing materials in schools, final rule and notice. Fed Reg. 1987;52(210):41857–94.

23 US Environmental Protection Agency. 'Test Method EPA/600/R-93/116 — Method for the determination of asbestos in bulk building materials. Washington, DC: US Environmental Protection Agency; 1993.

24 American Society for Testing and Materials. Standard test method for airborne asbestos concentration in ambient and indoor atmospheres as determined by transmission electron microscopy direct transfer. ASTM D6281-09. West Conshohocken, PA: ASTM; 2009.

25 American Society for Testing and Materials. Standard test method for microvacuum sampling and indirect analysis of dust by transmission electron microscopy for asbestos structure number surface loading. ASTM D5756. West Conshohocken, PA: ASTM; 2003.

26 American Society for Testing and Materials Standard test method for microvacuum sampling and indirect analysis of dust by transmission electron microscopy for asbestos mass surface loading. ASTM D5756. West Conshohocken, PA: ASTM; 2003.

27 American Society for Testing and Materials. Standard test method for wipe sampling of surfaces, indirect preparation, and analysis for asbestos structure number concentration by transmission electron microscopy. ASTM D6480-99. West Conshohocken, PA: ASTM; 1999.

28 National Institute of Occupational Safety and Health. Asbestos and other fibers by phase contrast microscopy (PCM). Method 7400, NIOSH Manual of Analytical Methods. 4th ed. Atlanta, GA: NIOSH; 1994.

29 National Institute of Occupational Safety and Health. Asbestos fibers by transmission electron microscopy (TEM). Method 7402, NIOSH Manual of Analytical Methods. 4th ed. Atlanta, GA: NIOSH; 1994.

30 Wu M, Gordon RE, Herbert R, Padilla M, Moline J, Mendelson D, *et al.* Case Report: Lung disease in World Trade Center responders exposed to dust and smoke: Carbon nanotubes found in the lungs of World Trade Center patients and dust samples. Envron Health Perspect. 2010;118:499–504.

31 Hull MJ. Abraham JL. Case BW. Mesotheliomas among workers in asbestiform fiberbearing talc mines in New York State. Ann Occup Hyg. 2002;46:132–5.

32 Bateman AM. The formation of mineral deposits. New York: John Wiley & Sons, Inc.; 1951.

33 Lamey CA. Metallic and Industrial mineral deposits. New York: McGraw-Hill Book Co.; 1966.

34 Loomis FB. Field book of common rocks and minerals. New York: G.P. Putnam's Sons; 1948.

35 Nititakis JM, McEwen GN, Jr. editors. CTFA compendium method J 4-1. Asbestiform amphiboles minerals in cosmetic talc. In: Cosmetic ingredients test methods. Washington, DC: Cosmetic, Toiletry and Fragrance Association; 1990.

36 Ewing WM, Hays SM, Hatfield R, Longo WE, Millette JA, Zonolite attic insulation exposure studies. Int J Occup Environ Health. 2010;16:279–90.

37 Davis JM, Addison J, Bolton RE, Donaldson K, Jones AD, Smith T. The pathogenicity of long versus short fibre samples of amosite administered to rats by inhalation and intraperitoneal injection. Brit J Exp Pathol. 1986;67:415–30.

38 Suzuki Y, Yuen SR, Ashley R. Short, thin asbestos fibers contribute to the development of human malignant mesothelioma: pathologic evidence. Int J Hyg Environ Health. 2005;208:201–10.

39 Dodson RF, Atkinson MA, Levin JL. Asbestos fiber length as related to potential pathogenicity: a critical review. Am J Ind Med. 2003;44:291–7.

40 EPA. Toxicological review of Libby amphibole asbestos. Washington, DC: EPA; 2001.

41 EPA. Memorandum to superfund national policy managers, EPA regions 1–10. Washington, DC: EPA; 2004.

42 Ewing WM, Hays SM, Hatfield R, Longo WE, Millette JR. Zonolite attic insulation exposure studies. Int J Occup Environ Health. 2010;16:279–90.

43 Hart JF, Spear TM, Ward TJ, Baldwin CE, Salo MN, Elashheb MI. An evaluation of potential occupational exposure to asbestiform amphiboles near a former vermiculite mine. J Environ Public Health. 2009;2009:189509.

44 Russell RS, Merz RD, Sherman WT, Sivertson JN. The determination of respirable particles in talcum powder. Food Cosmet Toxicol. 1979;17:117–9, ,121–2.

45 Aylott RI, Byrne GA, Middleton JD, Roberts ME. Normal use levels of respirable cosmetic talc: preliminary study. Int J Cosmet Sci. 1979;1(3):177–86.

46 van Orden DR, Allison KA, Lee RJ. Differentiationg amphibole asbestos from non-asbestos in a complex mineral environment. Indoor Built Environ. 2008;17:58–68.

47 Ilgren EB. The biology of cleavage fragments: a brief synthesis and analysis of current knowledge. Indoor Built Environ. 2004;13:343–56.

# Exhibit 81

**International Journal of Applied and Natural Sciences (IJANS)**
**ISSN 2319-4014**
**Vol. 2, Issue 2, May 2013, 45-52**
**© IASET**



# DETERMINATION OF TOXIC HEAVY METALS IN DIFFERENT BRANDS OF TALCUM POWDER

## GHANA REHMAN, IFTIKHAR HUSSAIN BUKHARI, MUHAMMAD RIAZ, NASIR RASOOL, AMNA KHALID, UZMA SATTAR & HAFIZA SUMAIRA MANZOOR

Department of Chemistry, Government College University, Faisalabad, Pakistan

## ABSTRACT

Talcum powder is a cosmetic product made from finely ground talc, an extremely soft mineral. One of the most common uses of talcum powder is in baby care, Talcum powders are widely used all over the world to keep the body dry due to sweat, for fragrance and for beauty purposes. The present research work is done for the determination of heavy metals like Cd, Co, Pb, Cu and Cr in 30 different brands of talcum powder. Determination of heavy metals was done by atomic absorption spectrophotometer and pretreatment of samples was done by acid digestion by using Conc. $HNO_3$ and $H_2O_2$. The lead contents in all brands were in the range of 0.0006-1.05 ppm, while cadmium contents were in the range of 0.001-0.080 ppm and chromium contents were 0.08-0.35 ppm, copper contents were 0.07-0.35 ppm, cobalt contents were 0.003- 0.180 ppm ranges were present. The lead concentration was extremely high in all brands followed by the cadmium. Cadmium concentrations were low in all brands. All the metals are present with in safe limits in under study all the brands.

**KEYWORDS:** Acid Digestion, Atomic Absorption Spectrometer, Heavy Metals Talcum Powder, Toxic

## INTRODUCTION

Skin is thought to be the largest organ of our body and has many important functions. As the primary interface between us and our environment, the skin serves several distinct functions which are protection, sensation, thermoregulation and communication. Skin is also self-repairing after injury. A long time ago it was thought that skin is impermeable barrier but now a day we know it differently. Substances that come in contact with skin are penetrating and ultimately find their way in the bloodstream. Toxins and other harmful products accumulate into the fundamental organs over a period of time causing many problems in bodies [1]. Because the skin having the property of absorbing the thing so anything which is applied on the body comes into contact with skin and penetrate into the body. Likewise when powder is applied on body to keep the body dry due to sweat then the harmful thing present in it penetrate into the body [2]. Some of the harmful compounds are soluble in water they dissolve in the sweat and penetrate into body. Talcum powder comes in direct contact with only our skin and causes many skin problems and babies sometimes inhale it then they have to suffer the problem of inhalation. Out of 35 heavy metals some are useful for our health but in small quantities and the higher quantity of these metals becomes harmful for our health [3]. Other than these useful heavy metals are dangerous to our health their small quantities are bearable and show no effects on the body. But higher quantities are much dangerous for human health [4].

In trace amounts some heavy metals are essential for a healthy life. These heavy metals are present in our body in trace amounts e.g. Fe, Mn, Cu and Zn. These heavy metals are present in our food stuff, in vegetables and fruits. In industries the heavy metals have much importance as these are used in manufacturing of dyes, steel, alloys, batteries and much more. Many products of these in our daily life and add to quality of life when used properly [5]. These trace metals are of biological importance in trace quantities. But the large quantities are of these metals are of main concern. So the

Case 3:16-md-02738-MAS-RLS   Document 9737-16   Filed 05/07/19   Page 50 of 449 PageID: 40374

need of proper understanding about the amount and oxidation states of these metals are of much importance [6]. Heavy metals when are not metabolized by body and gathered in soft tissues of our body then they become toxic. Heavy metals are entered into body by inhalation, ingestion and absorption through the skin when humans become in contact with heavy metals in industrial and agricultural environments. The most common way of heavy metal exposure is by industrial environment through inhalation in adults. In children the most common route of exposure is ingestion.

Increasing industrialization in the world is the main cause of heavy metal pollution [7]. The Agency for Toxic Substances and Disease Registry (ATSDR) has formed a list in 2001 known as "Top 20 Hazardous Substances" in collaboration with the US Environmental protection Agency. The heavy metals are in this list due to their hazardous effects. Arsenic, Lead and Mercury are ranked at 1st, 2nd and 3rd in the list. Researchers done this study to check the presence or absence and the quantity of these toxic metals in collected talcum powder samples by using Atomic Absorption Spectrometry (AAS). The concentration of heavy metals is to be measured in ppm. The resultant values are compared with the tolerable values given by World Health Organization (WHO) [6]

Cosmetics are the products use for the personal care and change the look of our face and body. Cosmetics are used for personal hygiene and for beauty purposes since start of civilization. It is a part of our routine life and these are not only used by the upper class of the society but also used by the middle and low class of the society. Recently there is a great change in cosmetics industries have been seen by the production of cosmetics of various types for beauty and care purposes.

These products are produced for the beauty purposes of hair, skin, nails, teeth and body [8] Cosmetics include: Creams, hair oils, Hair dyes, Kajal, Lotions, Perfumes, Lipsticks , Talcum powders, Face powders. Beauty consciousness of the people has increased the demand of beauty products in the market. As the demand of cosmetics increased the side effects of cosmetics also come forward due to the use of these [9]. Cosmetics are used to keep the beauty of body parts and give fragrance. The side effects of cosmetics are the main cause of attention of the researchers and clinician to check out the probable reason behind these side effects. Due to use of cosmetic products users observe the skin irritation and skin allergy type problems so the researcher find out the reason of these problems. Then they reach to the problem that it caused due to the heavy metals present in beauty products. Heavy metals contamination is one of the main causes for these side effects of cosmetic products.

Talc is an important industrial mineral. It is hydrated magnesium silicate. Talc is an important industrial mineral. It is hydrated magnesium silicate and its chemical formula is $H_2Mg_3(SiO_3)_4$. Talc is an important industrial mineral. It is hydrated magnesium silicate. Talc name is derived from an Arabic word *talq*, meaning "pure." Talc is naturally occurring pearly white mineral and it found in deposits all over the world. Now a day's talc is used in many different industries and used in consumer products like plastic, lubricants, paints. Talc is an important raw material for the manufacturing of talcum powder. Talc contains 4.8% $H_2O$, 31.7% $MgO$, 63.5% $SiO_2$. Talc is a secondary mineral manufactured by the metamorphism of the different rocks. Talc is used in many industries as it is the softest mineral on this earth. Due to its softness it is used in many industries.

Talc is not present on the earth but it is manufactured by the magnesium rocks through different reactions. In anything in which talc mineral is present it is known as talcum. Talc has property of absorbing moisture so it is also used on places where we want to keep the place dry [10].   Talcum powder is the source of talcosis disease. Talcosis diseasis occurred due to the abundant use of talcum powder Talcosis is a silicate induced disease of lungs. It is mostly found in the people which are exposed to the talc and also experienced in the peoples using cosmetic talcum powder in excess.

## MATERIAL AND METHODS

### Study Plan

An experimental process of research was done to evaluate the presence or absence of heavy metals in different samples of talcum powder collected from local market; and the concentration of each heavy metal which  present in the samples [6].

### Collection of Samples

Most popular thirty samples of different brands of talcum powders widely used in Faisalabad were purchased from cosmetic shops, open markets and super markets in and around towns and cities around Faisalabad. Total thirty different brands are of thirty different manufacturing companies. The talcum powder brands studied are: Black cat, D&S Products, Black Beauty, Medicam Valentine,  White Lily, Nisa Floral, Blue Diamond, Olivia, Touch Me, Medora, Wild Flower, Max Lavander, Mother Care, Genny Energetic, Johnson's baby powder, Dove, Poison, Goree black, Tibet, Havoc, Corel, One Man Show, Follow Me, Enchanter and  Sensation.

### Sample Preparation for Analysis

Preparation of samples for heavy metal analysis was done by standard procedure. Each of talcum powder samples was analyzed by using the acid digestion protocol.

### Preparation of Powder Samples for Analysis

Following method was followed for the wet digestion of the collected talcum powder samples. Accurately weighed powder samples (1g) were placed in digestion flasks and concentrated nitric acid (10 ml) was added. The digestion flasks were heated (70 to 80 $^{o}$C) on a hot plate for 30 minutes. After cooling, 5 mL of $H_2O_2$ was added in the flasks and heated vigorously till the white fumes appeared and mixture volume reduced to 2-3 ml. Finally, the contents were diluted up to desired volume by adding de-ionized water.

## RESULTS AND DISCUSSIONS

The concentration of heavy metals was determined by atomic absorption spectrometer. Metals are essential nutrients due to their functioning in metabolism. Metal play an important role in many enzymes, as antioxidants and catalysts in human life [11].

Some of these trace elements like manganese (Mn), cadmium (Cd), chromium (Cr), zinc (Zn) and copper (Cu) are necessary micronutrients and perform various types of biochemical functions in all living organism. Humans need a specific amount of micronutrients like Zn and Fe, but excess uptake of non essential metals like Pb and Cd can be highly harmful. Living beings cannot synthesize minerals element, these are usually required through food [12].

The present research work is focused on the determination of concentration of heavy metals in talcum powder brands. Table 1 tells about the mean concentration of lead, cadmium, cobalt, chromium and copper. It also tells about the standard deviation in the readings.

Heavy metals are common contamination in various brands of talcum powder. Heavy metals cause many problems in our body like pain , unconsciousness, and stomach problems. Heavy metals present in the talcum powder are come from the contaminated environment where it manufactured. Heavy metals come from the fragrant materials added in talcum powder. In present research work the heavy metals are determined by AAS in this technique the heavy metals are determined qualitatively and quantitatively. Quantity of heavy metals is determined in ppm. There are many of heavy

Ghana Rehman, Iftikhar Hussain Bukhari, Muhammad Riaz, Nasir Rasool, Amna Khalid, Uzma Sattar & Hafiza Sumaira Manzoor

metals are present in cosmetic talcum powder and the manufacturers also don't know about these heavy metals. There are some heavy metals and their effects

Cadmium is a heavy metal which is present in talcum powder. The safe limit of cadmium is 0.9ppm to 3ppm. When a large amount of talcum powder is inhaled then the amount of heavy metal is also becomes high in the body. Cadmium higher concentrations are harmful for the health and the target organs of cadmium are bones, brain and nervous system. Figure 1 shows the amount of cadmium in 30 different brands of talcum which is in the range of 0.001-0.080 ppm. This concentration is in the safe limit.

Cobalt is a heavy metal present in talcum powder. The safe limit of cobalt is 1 ppm. The target organs of cobalt are kidney, brain and bones. When cobalt value becomes high then it effects the functioning of different organs of human beings. Figure 2 shows about that the concentration of cobalt in different brands of talcum powder present in the range of 0.003- 0.180 ppm.

Figure 3 shows the concentration of chromium in the talcum powder brans. Chromium is a heavy metal present in talcum powder it is harmful in small amounts for the human beings. The safe limit of chromium is less than 5ppm. This is really harmful for infants if they inhaled it along with talcum powder. The concentration of chromium is present in the range of 0.08-0.35 ppm

**Table 1:  Concentration in ppm of Heavy Metals in Different Brands of Talcum Powder by Mean ± Standard Deviation**

| Sample | Pb | Cd | Co | Cr | Cu |
|---|---|---|---|---|---|
| P1 | 0.016±0.005 | 0.013±0.006 | 0.013±0.005 | 0.127±0.005 | 0.35±0.001 |
| P2 | 0.203±0.130 | 0.001±0.001 | 0.023±0.005 | 0.22±0.01 | 0.226±0.005 |
| P3 | 1.053±0.056 | 0.08±0.01 | 0.02±0.01 | 0.14±0.01 | 0.286±0.015 |
| P4 | 0.001±0.001 | 0.006±0.005 | 0.013±0.006 | 0.24±0.01 | 0.25±0.01 |
| P5 | 0.166±0.005 | 0.003±0.005 | 0.023±0.006 | 0.123±0.006 | 0.146±0.006 |
| P6 | 0.16±0.008 | 0.023±0.005 | 0.007±0.005 | 0.187±0.006 | 0.286±0.005 |
| P7 | 0.013±0.005 | 0.033±0.005 | 0.01±0.001 | 0.26±0.01 | 0.19±0.001 |
| P8 | 0.24±0.029 | 0.013±0.005 | 0.001±0.001 | 0.11±0.01 | 0.216±0.005 |
| P9 | 0.001±0.001 | 0.001±0.001 | 0.016±0.001 | 0.30±0.01 | 0.213±0.005 |
| P10 | 0.011±0.008 | 0.03±0.001 | 0.013±0.005 | 0.237±0.005 | 0.227±0.006 |
| P11 | 0.163±0.005 | 0.013±0.006 | 0.003±0.006 | 0.157±0.006 | 0.186±0.005 |
| P12 | 0.047±0.005 | 0.013±0.006 | 0.013±0.005 | 0.127±0.006 | 0.11±0.01 |
| P13 | 0.38±0.008 | 0.02±0.01 | 0.013±0.005 | 0.146±0.006 | 0.21±0.01 |
| P14 | 0.001±0.001 | 0.016±0.005 | 0.013±0.005 | 0.143±0.006 | 0.183±0.005 |
| P15 | 0.013±0.005 | 0.033±0.005 | 0.027±0.006 | 0.35±0.01 | 0.08±0.01 |
| P16 | 0.08±0.008 | 0.001±0.001 | 0.09±0.01 | 0.19±0.01 | 0.086±0.005 |
| P17 | 0.126±0.005 | 0.002±0.005 | 0.006±0.005 | 0.083±0.005 | 0.079±0.061 |
| P18 | 0.35±0.008 | 0.013±0.006 | 0.013±0.005 | 0.12±0.01 | 0.18±0.01 |
| P19 | 0.15±0.008 | 0.02±0.01 | 0.18±0.02 | 0.21±0.01 | 0.336±0.005 |
| P20 | 0.09±0.008 | 0.02±0.01 | 0.013±0.005 | 0.186±0.006 | 0.187±0.006 |
| P21 | 0.07±0.008 | 0.02±0.01 | 0.006±0.005 | 0.11±0.01 | 0.143±0.005 |
| P22 | 0.17±0.008 | 0.04±0.01 | 0.013±0.006 | 0.20±0.01 | 0.18±0.01 |
| P23 | 0.54±0.008 | 0.02±0.01 | 0.006±0.005 | 0.147±0.006 | 0.187±0.006 |
| P24 | 0.176±0.013 | 0.013±0.006 | 0.013±0.006 | 0.133±0.006 | 0.123±0.006 |
| P25 | 0.27±0.008 | 0.027±0.005 | 0.01±0.01 | 0.143±0.006 | 0.147±0.005 |
| P26 | 0.17±0.008 | 0.003±0.005 | 0.023±0.005 | 0.20±0.01 | 0.173±0.005 |
| P27 | 0.08±0.008 | 0.013±0.005 | 0.09±0.01 | 0.143±0.005 | 0.26±0.001 |
| P28 | 0.013±0.005 | 0.013±0.005 | 0.013±0.005 | 0.19±0.01 | 0.236±0.005 |
| P29 | 0.29±0.008 | 0.02±0.01 | 0.016±0.005 | 0.173±0.007 | 0.186±0.005 |
| P30 | 0.19±0.008 | 0.027±0.008 | 0.003±0.006 | 0.27±0.01 | 0.167±0.008 |



**Figure 1: Concentrations of Cd in ppm 30 Different Brands of Talcum Powder Sample**



**Figure 2: Concentrations of Co in ppm in 30 Different Brands of Talcum Powder Samples**



**Figure 3: Concentrations of Cr in ppm 30 Different Brands of Talcum Powder Samples**

Ghana Rehman, Iftikhar Hussain Bukhari, Muhammad Riaz, Nasir Rasool, Amna Khalid, Uzma Sattar & Hafiza Sumaira Manzoor



**Figure 4: Concentrations of Cu in ppm 30 Different Brands of Talcum Powder Samples**



**Figure 5: Concentrations of Pb in ppm in 30 Different Brands of Talcum Powder Samples**

Copper is present in small amounts useful for our health but its higher amounts are dangerous for the health. The safe limit of copper is13 ppm. Figure 4 tells that the concentration of copper is present in the range of 0.07-0.35 ppm. When it is inhaled above than the bearable limit then it causes many health problems in the body. The target organs of copper are liver, kidney and brain. It effects the functioning of these target organs.

Figure 5 tells about the concentration of lead in different brands of talcum powder. The concentration is in the range of 0.0006-1.05 ppm in all brands under study. Lead is a heavy metal present in our body in small quantity. The safe limit of lead is 20ppm by FDA. In trace amounts it is useful or many metabolic processes in the body of human being. The target organs of lead are bone, brain and kidney. Lead heavy metal effect the functioning of these organs.

## CONCLUSIONS

All the metals are present in safe limits in 30 brands of talcum powder. But the excess use of talcum powder affects the health of consumer. When infants inhale the talcum powder in excess amount accidently then the heavy metals present in it affect them.

## ACKNOWLEDGEMENTS

The authors are highly thankful to Dr. Raja Adil Sarfraz Hi Tech Laboratory University of Agriculture, Faisalabad, Pakistan for providing the facility regarding the analysis of heavy metals in samples by atomic absorption spectrophotometer.

## REFERENCES

1. Fayez-Hassan M., El Wahab M.A. and Nada A., 2005, International Atomic Energy Agency, 145: 1-6

2. Omolaoye J.A., Uzairu A. and Gimba C.E., 2010, Archives of Applied Science Research, 2: 76-84

3. Shaw W., 2001, Biological Treatments for Autism and PDD, Great Plains Laboratory Inc., Lenexa, KS, USA, 1-225

4. Tokalioglu S., Kartal S. and Elci L., 2000, Analytica Chimica Acta, 413: 33-40

5. Roberts J.R., 1999, Metal Toxicity in Children: Training manual on pediatric environmental health: Putting it into practice, San Francisco, California, USA,

6. Cruz G.C., Din Z., Feri C.D., Balaoing A.M., Gonzales E.M., Navidad H.M., Schlaaff M.F. and Winter J., 2009, International Scientific Research Journal, 1: 40-51

7. Alonso K., 1988, Southern Medical Journal, 81: 546

8. Chauhan A.S., Bhadauria R., Singh A.K., Lodhi S.S., Chaturvedi D.K. and Tomar V.K., 2010, Journal of Chemistry and Pharmaceutical Research, 6: 92-97

9. Novak N. and Bieber T., 2008, Allergy, 55: 103-107

10. Nnorom I.C., 2011, Toxicological & Environmental Chemistry, 93: 1135-1148

11. Ciftci H., Ozkaya A. and Kariptas E., 2009, Journal of Food Agriculture Environment, 7: 72-74

12. Dhiman A., Nanda A. and Ahmad S., 2011, Toxicology international, 18: 163

Exhibit 82

Check for updates

*Original Article*

Reproductive Sciences
1-10
© The Author(s) 2019
Article reuse guidelines:
sagepub.com/journals-permissions
DOI: 10.1177/1933719119831773
journals.sagepub.com/home/rsx

$\circledS$SAGE

# Molecular Basis Supporting the Association of Talcum Powder Use With Increased Risk of Ovarian Cancer

Nicole M. Fletcher, PhD[1], Amy K. Harper, MD[2], Ira Memaj, BS[1], Rong Fan, MS[1], Robert T. Morris, MD[2], and Ghassan M. Saed, PhD[1,2]

## Abstract

Genital use of talcum powder and its associated risk of ovarian cancer is an important controversial topic. Epithelial ovarian cancer (EOC) cells are known to manifest a persistent prooxidant state. Here we demonstrated that talc induces significant changes in key redox enzymes and enhances the prooxidant state in normal and EOC cells. Using real-time reverse transcription polymerase chain reaction and enzyme-linked immunosorbent assay, levels of CA-125, caspase-3, nitrate/nitrite, and selected key redox enzymes, including myeloperoxidase (MPO), inducible nitric oxide synthase (iNOS), superoxide dismutase (SOD), catalase (CAT), glutathione peroxidase (GPX), and glutathione reductase (GSR), were determined. TaqMan genotype analysis utilizing the QuantStudio 12K Flex was used to assess single-nucleotide polymorphisms in genes corresponding to target enzymes. Cell proliferation was determined by MTT proliferation assay. In all talc-treated cells, there was a significant dose-dependent increase in prooxidant iNOS, nitrate/nitrite, and MPO with a concomitant decrease in antioxidants CAT, SOD, GSR, and GPX ($P < .05$). Remarkably, talc exposure induced specific point mutations that are known to alter the activity in some of these key enzymes. Talc exposure also resulted in a significant increase in inflammation as determined by increased tumor marker CA-125 ($P < .05$). More importantly, talc exposure significantly induced cell proliferation and decreased apoptosis in cancer cells and to a greater degree in normal cells ($P < .05$). These findings are the first to confirm the cellular effect of talc and provide a molecular mechanism to previous reports linking genital use to increased ovarian cancer risk.

## Keywords

talc, epithelial ovarian cancer, oxidative stress, single-nucleotide polymorphism, cell proliferation

## Introduction

Ovarian cancer is the most lethal gynecologic malignancy and ranks fifth in cancer deaths among women diagnosed with cancer.[1] Epithelial ovarian cancer (EOC) has long been considered a heterogeneous disease with respect to histopathology, molecular biology, and clinical outcome.[1,2] Although surgical techniques and treatments have advanced over the years, the prognosis of EOC remains poor, with a 5-year survival rate of 50% in advanced stage.[2] This is largely due to the lack of early warning symptoms and screening methods and the development of chemoresistance.[1,2] Moreover, ovarian cancer is known to be associated with germline mutations in the *BRCA1* or *BRCA2* genes, but with a rate of only 20 % to 40%, suggesting the presence of other unknown mutations in other predisposition genes.[3] Additional genetic variations including single-nucleotide polymorphisms (SNPs) have been hypothesized to act as low to moderate penetrant alleles that contribute to ovarian cancer risk.[3,4]

The pathophysiology of EOC is not fully understood but has been strongly associated with inflammation and the resultant oxidative stress.[5] We have previously characterized EOC cells to manifest a persistent prooxidant state as evident by the upregulation of key oxidants and downregulation of key antioxidants, which is further enhanced in chemoresistant EOC cells.[6] The expression of key prooxidant/inflammatory enzymes such as inducible nitric oxide synthase (iNOS), nicotinamide adenine dinucleotide phosphate (NAD(P)H) oxidase, and myeloperoxidase (MPO), as well as an increase in nitric oxide (NO) levels, was increased in EOC tissues and cells.[6] Additionally, we have shown that EOC cells manifest lower apoptosis, which

[1] Department of Obstetrics and Gynecology, Wayne State University School of Medicine, Detroit, MI, USA
[2] Department of Gynecologic Oncology, Karmanos Cancer Institute, Detroit, MI, USA

**Corresponding Author:**
Ghassan M. Saed, Departments of Obstetrics and Gynecology and Oncology, Karmanos Cancer Institute, Wayne State University School of Medicine, Detroit, MI 48201, USA.
Email: gsaed@med.wayne.edu

was markedly induced by inhibiting iNOS, indicating a strong link between apoptosis and NO/iNOS pathways in these cells.[6]

The cellular redox balance is maintained by key antioxidants including catalase (CAT), superoxide dismutase (SOD), or by glutathione peroxidase (GPX) coupled with glutathione reductase (GSR).[5] Other important scavengers include thioredoxin coupled with thioredoxin reductase, and glutaredoxin, which utilizes glutathione (GSH) as a substrate.[7] We have previously reported that a genotype switch in key antioxidants is a potential mechanism leading to the acquisition of chemoresistance in EOC cells.[7] We have studied the effects of genetic polymorphisms in key redox genes on the acquisition of the oncogenic phenotype in EOC cells, including genes that control the levels of cellular reactive oxygen species and oxidative damage and SNPs for genes involved in carcinogen metabolism (detoxification and/or activation), antioxidants, and DNA repair pathways.[4,6] Several function-altering SNPs have been identified in key antioxidants, including CAT, GPX, GSR, and SOD.[4]

Several studies have suggested the possible association between genital use of talcum powder and risk of EOC.[7-12] Association between the use of cosmetic talc in genital hygiene and ovarian cancer was first described in 1982 by Cramer et al, and many subsequent studies supported this finding.[7-12] Talc and asbestos are both silicate minerals; the carcinogenic effects of asbestos have been extensively studied and documented in the medical literature.[7-12] Asbestos fibers in the lung initiate an inflammatory and scarring process, and it has been proposed that ground talc, as a foreign body, might initiate a similar inflammatory response.[7] The objective of this study was to determine the effects of talcum powder on the expression of key redox enzymes, CA-125 levels, and cell proliferation and apoptosis in normal and EOC cells.

## Material and Methods

### Cell Lines

Ovarian cancer cells SKOV-3 (ATCC), A2780 (Sigma Aldrich, St Louis, Missouri), and TOV112D (a kind gift from Gen Sheng Wu at Wayne State University, Detroit, Michigan) and normal cells human macrophages (EL-1; ATCC, Manassas, Virginia), human primary normal ovarian epithelial cells (Cell Biologics, Chicago, Illinois), human ovarian epithelial cells (HOSEpiC; ScienCell Research Laboratories, Inc, Carlsbad, California), and immortalized human fallopian tube secretory epithelial cells (FT33; Applied Biological Materials, Richmond, British Columbia, Canada) were used. All cells were grown in media and conditions following manufacturer's protocol. EL-1 cells were grown in IMDM media (ATCC) supplemented with 0.1 mM hypoxanthine and 0.1 mM thymidine solution (H-T, ATCC) and 0.05 mM β-mercaptoethanol. SKOV-3 EOC cells were grown in HyClone McCoy's 5A medium (Fisher Scientific, Waltham, Massachusetts), A2780 EOC cells were grown in HyClone RPMI-1640 (Fisher Scientific), and both TOV112D EOC cells were grown in MCDB105

(Cell Applications, San Diego, California) and Medium 199 (Fisher Scientific; 1:1). All media were supplemented with fetal bovine serum (Innovative Research, Novi, Michigan) and penicillin/streptomycin (Fisher Scientific), per their manufacturer specifications. Human primary normal ovarian epithelial cells were grown in complete human epithelial cell medium (Cell Biologics).

### Treatment of Cells

Talcum baby powder (Johnson & Johnson, New Brunswick, NJ, #30027477, Lot#13717RA) was dissolved in dimethyl sulfoxide (DMSO; Sigma Aldrich) at a concentration of 500 mg in 10 mL and was filtered with a 0.2 μm syringe filter (Corning). Sterile DMSO was used as a control for all treatments. Cells were seeded in 100-mm cell culture dishes (3 $\times$ 10[6]) and were treated 24 hours later with 5, 20, or 100 μg/mL of talc for 72 hours. Cell pellets were collected for RNA, DNA, and protein extraction. Cell culture media were collected for CA-125 analysis by enzyme-linked immunosorbent assay (ELISA).

### Real-Time Reverse Transcription Polymerase Chain Reaction

Total RNA was extracted from all cells using the RNeasy mini kit (Qiagen, Valencia, California). Measurement of the amount of RNA in each sample was performed using a Nanodrop spectrophotometer (Thermo Fisher Scientific, Waltham, Massachusetts). A 20 μL complementary DNA reaction volume containing 0.5 μg RNA was prepared using the SuperScript VILO Master Mix Kit (Life Technologies, Carlsbad, California). Optimal oligonucleotide primer pairs were selected for each target using Beacon designer (Premier Biosoft, Inc; Table 1). Quantitative reverse transcription polymerase chain reaction (RT-PCR) was performed using the EXPRESS SYBR GreenER qPCR supermix kit (Life Technologies) and the Cepheid 1.2f detection system (Sunnyvale, CA) previously described.[6] Standards with known concentrations and lengths were designed specifically for β-actin (79 bp), CAT (105 bp), NOS2 (89 bp), GSR (103 bp), GPX1 (100 bp), MPO (79 bp), and SOD3 (84 bp), allowing for construction of a standard curve using a 10-fold dilution series.[6] All samples were normalized to β-actin. A final melting curve analysis was performed to demonstrate specificity of the PCR product.

### Protein Detection

Cell pellets were lysed utilizing cell lysis buffer (20 mM Tris–HCl [pH 7.5], 150 mM NaCl, 1 mM $Na_2$EDTA, 1 mM EGTA, 1% Triton, 2.5 sodium pyrophosphate, 1 mM β-glycerophosphate, 1 mM $Na_3VO_4$, 1 μg/mL leupeptin) containing a cocktail of protease inhibitors. Samples were centrifuged at 13 000 rpm for 10 minutes at 4 C. Total protein concentration of cell lysates from control and talc-treated cells was measured with the Pierce BCA protein assay kit (Thermo Scientific, Rockford, Illinois).

**Table 1.** Real-Time RT-PCR Oligionucleotide Primers.

| Accession Number | Gene | Sense (5'-3') | Antisense (3'-5') | Amplicon (bp) | Annealing Time (seconds) and Temperature ( C) |
|---|---|---|---|---|---|
| NM_001101 | β-actin | ATGACTTAGTTGCGTTACAC | AATAAAGCCATGCCAATCTC | 79 | 10, 64 |
| NM_001752 | CAT | GGTTGAACAGATAGCCTTC | CGGTGAGTGTCAGGATAG | 105 | 10, 63 |
| NM_003102 | SOD3 | GTGTTCCTGCCTGCTCCT | TCCGCCGAGTCAGAGTTG | 84 | 60, 64 |
| NM_000637 | GSR | TCACCAAGTCCCATATAGAAATC | TGTGGCGATCAGGATGTG | 116 | 10, 63 |
| NM_000581 | GPX1 | GGACTACACCCAGATGAAC | GAGCCCTTGCGAGGTGTAG | 91 | 10, 66 |
| NM_000625 | NOS2 | GAGGACCACATCTACCAAGGAGGAG | CCAGGCAGGCGGAATAGG | 89 | 30, 59 |
| NM_000250 | MPO | CACTTGTATCCTCTGGTTCTTCAT | TCTATATGCTTCTCACGCCTAGTA | 79 | 60, 63 |

Abbreviation: RT-PCR, reverse transcription polymerase chain reaction.

## Detection of Protein/Activity by ELISA

The following ELISA kits were used (Cayman Chemical, Ann Arbor, Michigan): CAT, SOD, GSR, GPX, and MPO. Nitrite ($NO_2$ )/nitrate ($NO_3$ ) were determined spectrophotometrically by Griess assay as previously reported.[6] CA-125 protein levels were measured in cell media by ELISA (Ray Biotech, Norcross, Georgia).

## TaqMan SNP Genotyping Assay

DNA was isolated utilizing the EZ1 DNA tissue kit (Qiagen) for EOC cells. The TaqMan SNP genotyping assay set (Applied Biosystems, Carlsbad, California; NCBI dbSNP genome build 37, MAF source 1000 genomes) was used to genotype the SNPs (Table 1). The Applied Genomics Technology Center (AGTC, Wayne State University) performed these assays. Analysis was done utilizing the QuantStudio 12 K Flex real-time PCR system (Applied Biosystems).

## Cell Proliferation and Apoptosis

Cell proliferation was assessed with the TACS MTT cell proliferation assay (Trevigen, Gaithersburg, Maryland) after treatment with talc (100 µg/mL) for 24 hours. The Caspase-3 Colorimetric Activity Assay Kit (Chemicon, Temecula, California) was used to determine levels of caspase-3 activity after treatment of normal and EOC cells with various doses of talc as previously described.[6] Equal concentrations of cell lysate were used. The assay is based on spectrophotometric detection of the chromophore p-nitroaniline (pNA) after cleavage from the labeled substrate DEVD-pNA. The free pNA can be quantified using a spectrophotometer or a microtiter plate reader at 405 nm. Comparison of the absorbance of pNA from an apoptotic sample with its control allows determination of the percentage increase in caspase-3 activity.

## Statistical Analysis

Normality was examined using the Kolmogorov-Smirnov test and by visual inspection of quantile–quantile plots. Because most of the data were not normally distributed, differences in distributions were examined using the Kruskal-Wallis test. Generalized linear models were fit to examine pairwise differences in estimated least squares mean expression values by exposure to 0, 5, 20, or 100 µg/mL of talc. We used the Tukey-Kramer adjustment for multiple comparisons, and the regression models were fit using log2 transformed analyte expression values after adding a numeric constant "1" to meet model assumptions while avoiding negative transformed values. $P$ values below .05 are statistically significant.

## Results

### Talc Treatment Decreased the Expression of Antioxidant Enzymes SOD and CAT in Normal and EOC Cells

Real-time RT-PCR and ELISA assays were utilized to determine the CAT and SOD messenger RNA (mRNA) and protein levels in cells before and after 72 hours talc treatment, respectively (Figure 1). The CAT (Figure 1A and C) and SOD (Figure 1B and D) mRNA and protein levels were significantly decreased in a dose-dependent manner in talc-treated cells compared to controls ($P < .05$).

### Talc Treatment Increased the Expression of Prooxidants iNOS, $NO_2$ /$NO_3$ , and MPO in Normal and EOC Cells

Real-time RT-PCR and $NO_2$ /$NO_3$ assays were utilized to determine the iNOS mRNA and NO levels in cells before and after 72 hours talc treatment, respectively (Figure 2). The iNOS mRNA and NO levels were significantly increased in a dose-dependent manner in talc-treated cells as compared to their controls (Figure 2A and C, $P < .05$). As expected, there was no detectable MPO in normal ovarian and fallopian tube cells, and thus, talc treatment did not have any effect. However, MPO mRNA and protein levels were significantly increased in a dose-dependent manner in talc-treated ovarian cancer cells and macrophages compared to controls (Figure 2B and D, $P < .05$).

### Talc Treatment Decreased the Expression of Antioxidant Enzymes, GPX and GSR, in Normal and EOC Cells

Real-time RT-PCR and ELISA assays were utilized to determine the GPX and GSR mRNA and protein levels in cells before and

*Reproductive Sciences XX(X)*



**Figure 1.** Decreased expression and activity of key antioxidant enzymes, CAT and SOD3. The mRNA (real-time RT-PCR) and protein/activity levels (ELISA) of CAT (A and C) and SOD3 (B and D) were determined in macrophages (EL-1), human primary ovarian epithelial cells (normal ovarian), fallopian tube (FT33), and ovarian cancer (SKOV-3, TOV112D, and A2780) cell lines before and after treatment with various doses of talc over 72 hours. Experiments were performed in triplicate. Expression is depicted as the mean, with error bars representing standard deviation. All changes in response to talc treatment were significant ($P < .05$) in all cells and in all doses as compared to controls. CAT indicates catalase; SOD3, superoxide dismutase 3; mRNA, messenger RNA; RT-PCR, reverse transcription polymerase chain reaction; ELISA, enzyme-linked immunosorbent assay.

after 72 hours of talc treatment, respectively (Figure 3). The GPX (Figure 3A and C) and GSR (Figure 3B and D) mRNA and protein levels were significantly decreased in a dose-dependent manner in talc-treated cells compared to controls ($P < .05$).

### Talc Exposure Induced Known Genotype Switches in Key Oxidant and Antioxidant Enzymes

Talc treatment was associated with a genotype switch in *NOS2* from the common C/C genotype in untreated cells to T/T, the SNP genotype, in talc-treated cells, except in A2780 and TOV112D (Table 2). Additionally, the observed decrease in CAT expression and activity was associated with a genotype switch from common C/C genotype in CAT in untreated cells to C/T, the SNP genotype, in TOV112D and all normal talc-treated cells. However, there was no detectable genotype switch in CAT in A2780, SKOV3, and TOV112D (Table 2). Remarkably, there was no observed genotype switch in the selected SNP for SOD3 and GSR in all talc-treated cells. All cells, except for HOSEpiC cells, manifest the SNP genotype of

*GPX1* (C/T). Intriguingly, talc treatment reversed this SNP genotype to the normal genotype (Table 2).

### Talc Treatment Increased CA-125 Levels in Normal and EOC Cells

CA-125 ELISA assay was performed in protein isolated from cell media before and after talc treatment. CA-125 levels were significantly increased in a dose-dependent manner in all cells (Figure 4, $P < .05$). There was no detectable CA-125 protein in macrophages.

### Talc Treatment Increased Cell Proliferation and Decreased Apoptosis

MTT cell proliferation assay was used to determine cell viability, and caspase-3 activity assay was utilized to determine apoptosis of all cell lines after 24 hours of talc treatment (Figure 5). Cell proliferation was significantly increased from the baseline in all talc-treated cells ($P < .05$), but to a greater degree in normal



**Figure 2.** Increased expression and activity of key prooxidants, iNOS, NO$_2$ /NO$_3$ , and MPO. The mRNA (real-time RT-PCR) and protein/activity levels (ELISA) of iNOS (A and C) and MPO (B and D) were determined in macrophages (EL-1), human primary ovarian epithelial cells (normal ovarian), fallopian tube (FT33), and ovarian cancer (SKOV-3, TOV112D, and A2780) cell lines before and after treatment with various doses of talc over 72 hours. As expected, there was no detectable MPO in normal ovarian and fallopian tube cells, and thus, talc treatment did not have any effect. Experiments were performed in triplicate. Expression is depicted as the mean, with error bars representing standard deviation. All changes in response to talc treatment were significant ($P < .05$) in iNOS and MPO-positive cells and in all doses as compared to controls. iNOS indicates inducible nitric oxide synthase; MPO, myeloperoxidase; mRNA, messenger RNA; RT-PCR, reverse transcription polymerase chain reaction; ELISA, enzyme-linked immunosorbent assay.

as compared to cancer cells. As anticipated, caspase-3 was significantly reduced in cancer as compared to normal cells. Talc treatment resulted in decreased caspase-3 activity in all cells as compared to controls (Figure 6, $P < .05$), indicating a decrease in apoptosis.

## Discussion

The claim that regular use of talcum powder for hygiene purpose is associated with an increased risk of ovarian cancer is based on several reports confirming the presence of talc particles in the ovaries and other parts of the female reproductive tract as well as in lymphatic vessels and tissues of the pelvis.[7-12] The ability of talc particles to migrate through the genital tract to the distal fallopian tube and ovaries is well accepted.[10] To date, the exact mechanism is not fully understood, though several studies have pointed toward the peristaltic pump feature of the uterus and fallopian tubes, which is known to enhance transport of sperm into the oviduct ipsilateral to the ovary bearing the dominant follicle.[8-12]

There are reports supporting the epidemiologic association of talc use and risk of ovarian cancer.[11,12] Recent studies have shown that risks for EOC from genital talc use vary by histologic subtype, menopausal status at diagnosis, hormone therapy use, weight, and smoking. These observations suggest that estrogen and/or prolactin may play a role via macrophage activity and inflammatory response to talc. There has been debate as to the significance of the epidemiologic studies based on the fact that the reported epidemiologic risk of talc use and risk of ovarian cancer, although consistent, are relatively modest (30%-40%), and there is inconsistent increase in risk with duration of use. This observation is due, in part, to the challenges in quantifying exposure as well as the failure of epidemiological studies to obtain necessary information about the frequency and duration of usage.[11-13]

In this study, we have shown beyond doubt that talc alters key redox and inflammatory markers, enhances cell proliferation, and inhibits apoptosis, which are hallmarks of ovarian cancer. More importantly, this effect is also manifested by talc in normal cells, including surface ovarian epithelium,



**Figure 3.** Decreased expression and activity of key antioxidant enzymes, GSR and GPX. The mRNA (real-time RT-PCR) and protein/activity levels (ELISA) of GSR (A and C) and GPX (B and D) were determined in macrophages (EL-1), human primary ovarian epithelial cells (normal ovarian), fallopian tube (FT33), and ovarian cancer (SKOV-3, TOV112D, and A2780) cell lines before and after treatment with various doses of talc over 72 hours. Experiments were performed in triplicate. Expression is depicted as the mean, with error bars representing standard deviation. All changes in response to talc treatment were significant ($P < .05$) in all cells and in all doses as compared to controls. GSR indicates glutathione reductase; GPX, glutathione peroxidase; mRNA, messenger RNA; RT-PCR, reverse transcription polymerase chain reaction; ELISA, enzyme-linked immunosorbent assay.

fallopian tube, and macrophages. Oxidative stress has been implicated in the pathogenesis of ovarian cancer, specifically by increased expression of several key prooxidant enzymes such as iNOS, MPO, and NAD(P)H oxidase in EOC tissues and cells as compared to normal cells indicating an enhanced redox state, as we have recently demonstrated (Figure 7).[6] This redox state is further enhanced in chemoresistant EOC cells as evident by a further increase in iNOS and $NO_2^-/NO_3^-$ and a decrease in GSR levels, suggesting a shift toward a prooxidant state.[6] Antioxidant enzymes, key regulators of cellular redox balance, are differentially expressed in various cancers, including ovarian.[6,14] Specifically, GPX expression is reduced in prostate, bladder, kidney, and estrogen receptor negative breast cancer cell lines, though GPX is increased in other cancerous tissues from breast.[14] Glutathione reductase levels, on the other hand, are elevated in lung cancer, although differentially expressed in breast and kidney cancer.[5,15] Similarly, CAT was decreased in breast, bladder, and lung cancer while increased in brain cancer.[16-18] Superoxide dismutase is expressed in lung, colorectal, gastric ovarian, and breast

cancer, while decreased activity and expression have been reported in colorectal carcinomas and pancreatic cancer cells.[18-21] Collectively, this differential expression of antioxidants demonstrates the unique and complex redox microenvironment in cancer. Glutathione reductase is a flavoprotein that catalyzes the NADPH-dependent reduction of oxidized glutathione (GSSG) to GSH. This enzyme is essential for the GSH redox cycle that maintains adequate levels of reduced cellular GSH. A high GSH to GSSG ratio is essential for protection against oxidative stress (Figure 5). Treatment with talc significantly reduced GSR in normal and cancer cells, altering the redox balance (Figure 3A and C). Likewise, GPX is an enzyme that detoxifies reactive electrophilic intermediates and thus plays an important role in protecting cells from cytotoxic and carcinogenic agents. Overexpression of GPX is triggered by exogenous chemical agents and reactive oxygen species and is thus thought to represent an adaptive response to stress.[15] Indeed, treatment of normal and cancer cells with talc significantly reduced GPX, which compromised the overall cell response to stress (Figure 3B and D).

**Table 2.** SNP Characteristics (A) and SNP Genotyping of Key Redox Enzymes in Untreated and Talc-Treated (100 μg/mL) Human Primary Ovarian Epithelial Cells (Normal Ovarian), Human Ovarian Surface Epithelial Cells (HOSEpiC), Fallopian Tube (FT33), and Ovarian Cancer (A2780, SKOV-3, TOV112D) Cell Lines (B).

| | Gene (rs Number) | | | | |
|---|---|---|---|---|---|
| | *CAT* (rs769217) | *NOS₂* (rs2297518) | *GSR* (rs8190955) | *GPX1* (rs3448) | *SOD3* (rs2536512) |
| **A** | | | | | |
| MAF | 0.123 | 0.173 | 0.191 | 0.176 | 0.476 |
| SNP | C-262T | C2087T | G201T | C-1040T | A377T |
| Chromosome location | 11p13 | 17q11.2 | 8p12 | 3q21.31 | 4p15.2 |
| Amino acid switch | Isoleucine to Threonine | Serine to Leucine | Unknown | Unknown | Alanine to threonine |
| Effect on activity | Decrease | Increase | Unknown | Unknown | Decrease |
| **B** | | | | | |
| A2780: Control | C/C | C/C | G/G | C/T | A/A |
| A2780: Talc | C/C | C/C | G/G | C/C | A/A |
| SKOV-3: Control | C/C | C/C | G/G | C/T | A/A |
| SKOV-3: Talc | C/C | T/T | G/G | C/C | A/A |
| TOV112D: Control | C/C | C/C | G/G | C/T | A/A |
| TOV112D: Talc | C/T | C/C | G/G | C/C | A/A |
| HOSEpiC: Control | C/C | C/C | G/G | C/T | A/A |
| HOSEpiC: Talc | C/T | T/T | G/G | C/T | A/A |
| FT33: Control | C/C | C/C | G/G | C/T | A/A |
| FT33: Talc | C/T | T/T | G/G | C/C | A/A |
| Normal ovarian: Control | C/C | C/C | G/G | C/T | A/A |
| Normal ovarian: Talc | C/T | T/T | G/G | C/C | A/A |

Abbreviation: SNP, single-nucleotide polymorphism.



**Figure 4.** Increased CA-125 levels in response to talc treatment. The level of ovarian cancer biomarker CA-125 was determined by ELISA before and after 72 hours of talc treatment (100 μg/mL) in macrophages (EL-1), human primary ovarian epithelial cells (normal ovarian), fallopian tube (FT33), and ovarian cancer (SKOV-3, TOV112D, and A2780) cells. Experiments were performed in triplicate. Expression is depicted as the mean, with error bars representing standard deviation. All changes in response to talc treatment were significant ($P < .05$) in all cells as compared to controls. ELISA indicates enzyme-linked immunosorbent assay.

We have previously reported that EOC cells manifest increased cell proliferations and decreased apoptosis.[6] In this study, we have shown that talc enhances cell proliferation and induces an inhibition in apoptosis in EOC cells, but more importantly in normal cells, suggesting talc is a stimulus to the development of the oncogenic phenotype. We also previously reported a cross talk between iNOS and MPO in ovarian cancer, which contributed to the lower apoptosis observed in ovarian cancer cells.[6,22] Myeloperoxidase, an abundant hemoprotein, previously known to be present solely in neutrophils and monocytes, is a key oxidant enzyme that utilizes NO produced by iNOS as a 1-electron substrate generating NO⁺, a labile nitrosylating species.[6,23,24] We were the first to report that MPO was expressed by EOC cells and tissues and that silencing MPO gene expression utilizing MPO-specific siRNA induced apoptosis in EOC cells through a mechanism that involved the S-nitrosylation of caspase-3 by MPO.[22] Additionally, we have compelling evidence that MPO serves as a source of free iron under oxidative stress, where both NO⁺ and superoxide are elevated.[6] Iron reacts with hydrogen peroxide ($H_2O_2$) and catalyzes the generation of highly reactive hydroxyl radical (HO ), thereby increasing oxidative stress, which in turn increases free iron concentrations by the Fenton and Haber-Weiss reaction.[6,24] We have previously highlighted the potential benefits of the combination of serum MPO and free iron as biomarkers for early detection and prognosis of ovarian cancer.[25] Collectively, we now have substantial evidence demonstrating that altered oxidative stress may play a role in maintaining the oncogenic phenotype of EOC cells. Treatment of normal or ovarian cancer cells with talc resulted in a significant increase in MPO and iNOS, supporting the role of talc in the enhancement of a prooxidant state that is a major cause in the development and maintenance of the oncogenic phenotype (Figure 2).

Furthermore, CA-125, which exists as a membrane-bound and secreted protein in EOC cells, has been established as a

*Reproductive Sciences XX(X)*



**Figure 5.** Increased cell proliferation in response to talc treatment. Cell proliferation was determined by MTT cell proliferation assay after 24 hours of talc treatment (100 μg/mL) in macrophages (EL-1), human primary ovarian epithelial cells (normal ovarian), fallopian tube (FT33), and ovarian cancer (SKOV-3, TOV112D, and A2780) cells. Experiments were performed in triplicate. Cell proliferation is depicted as the mean, with error bars representing standard deviation. All changes in response to talc treatment were significant ($P < .05$) in all cells as compared to controls.



**Figure 6.** Decreased apoptosis in response to talc treatment. Caspase-3 activity was used to measure the degree of apoptosis in all cells. Caspase-3 activity assay was utilized to determine caspase-3 activity in macrophages (EL-1), human primary ovarian epithelial cells (normal ovarian), fallopian tube (FT33), and ovarian cancer (SKOV-3, TOV112D, and A2780) cell lines before and after treatment with various doses of talc over 72 hours. Experiments were performed in triplicate. Expression is depicted as the mean, with error bars representing standard error. All changes in response to talc treatment were significant ($P < .05$) in all cells and in all doses as compared to controls.



**Figure 7.** Epithelial ovarian cancer (EOC) cells have been reported to manifest a persistent prooxidant state as evident by the upregulation (green arrows) of key oxidants iNOS, NO, $NO^+$, ONOO, OH, $O_2^+$, and MPO (blue) and downregulation (red arrows) of key antioxidants SOD, CAT, GPX, and GSR (orange). This redox state was also shown to be further enhanced in chemoresistant EOC cells. In this study, talcum powder altered the redox state, as indicated by the arrows, of both normal and EOC cells to create an enhanced prooxidant state. iNOS indicates inducible nitric oxide synthase; MPO, myeloperoxidase; SOD, superoxide dismutase; CAT, catalase; GPX, glutathione peroxidase; GSR, glutathione reductase.

biomarker for disease progression and response to treatment.[2] CA-125 expression was significantly increased from nearly undetectable levels in controls to values approaching clinical significance (35 U/mL in postmenopausal women[26]) in talc-treated cells (Figure 4, $P < .05$) without the physiologic effects on the tumor microenvironment one would expect to be present in the human body, thus highlighting the implications of the prooxidant states caused by talc alone.

To elucidate the mechanism by which talc alters the redox balance to favor a prooxidant state not only in ovarian cancer cells, but more importantly in normal cells, we have examined selected known gene mutations corresponding to SNPs known to be associated with altered enzymatic activity and increased cancer risk.[6,27] Our results show that the *CAT* SNP (rs769217) resulting in decreased enzymatic activity was induced in all normal cell lines tested and in TOV112D EOC lines, but was not detected in A2780 or SKOV-3 cell lines (Table 2). Nevertheless, our results confirm a decrease in CAT expression and enzymatic activity in all talc-treated cells (Figure 1), indicating the existence of other *CAT* SNPs. The *SOD3* (rs2536512) and *GSR* (rs8190955) SNP genotypes were not detected in any cell line, yet SOD3 and GSR activity and expression were decreased in all talc-treated cells, again suggesting the presence of other SNPs. Our results have also shown that all cells, except for HOSEpiC cells, manifest the SNP genotype of *GPX1* (C/T) before talc treatment. Intriguingly, talc treatment reversed this SNP genotype to the normal genotype (Table 2). Consistent with this finding, we have previously reported that acquisition

of chemoresistance by ovarian cancer cells is associated with a switch from the *GPX1* SNP genotype to the normal *GPX1* genotype.[6] It is not understood why a *GPX1* SNP genotype predominates in untreated normal and ovarian cancer cells. Our results showed that talc treatment was associated with a genotype switch from common C/C genotype in *NOS2* in untreated cells to T/T, the SNP genotype, in talc-treated cells, except in A2780 and TOV112D (Table 2). Nevertheless, our results confirm an increase in iNOS expression and enzymatic activity in all talc-treated cells (Figure 2), again suggesting the existence of other *NOS2* SNPs. Collectively, these findings support the notion that talc treatment induced gene point mutations that happen to correspond to SNPs in locations with functional effects, thus altering overall redox balance for the initiation and development of ovarian cancer. Future studies examining such SNPs are important to fully elucidate a genotype switch mechanism induced by talc exposure.

In summary, this is the first study to clearly demonstrate that talc induces inflammation and alters the redox balance favoring a prooxidant state in normal and EOC cells. We have shown a dose-dependent significant increase in key prooxidants, iNOS, $NO_2$ /$NO_3$, and MPO, and a concomitant decrease in key antioxidant enzymes, CAT, SOD, GPX, and GSR, in all talc-treated cells (both normal and ovarian cancer) compared to their controls. Additionally, there was a significant increase in CA-125 levels in all the talc-treated cells compared to their controls, except in macrophages. The mechanism by which talc alters the cellular redox and inflammatory balance involves the induction of specific mutations in key oxidant and antioxidant enzymes that correlate with alterations in their activities. The fact that these mutations happen to correspond to known SNPs of these enzymes indicate a genetic predisposition to developing ovarian cancer with genital talcum powder use.

### Authors' Note

Ghassan M. Saed is also affiliated with Department of Gynecologic Oncology, Karmanos Cancer Institute, Detroit, MI, USA.

### Acknowledgment

Special thanks to Imaan Singh for her technical contributions in acquiring the data and in development of graphics.

### Declaration of Conflicting Interests

The author(s) declared the following potential conflicts of interest with respect to the research, authorship, and/or publication of this article: Dr. Saed has served as a paid consultant and expert witness in the talcum powder litigation.

### Funding

The author(s) received no financial support for the research, authorship, and/or publication of this article.

### References

1. Berek JS, Bertelsen K, du Bois A, et al. Epithelial ovarian cancer (advanced stage): consensus conference (1998) [in French]. *Gynecol Obstet Fertil*. 2000;28(7-8):576-583.

2. Jelovac D, Armstrong DK. Recent progress in the diagnosis and treatment of ovarian cancer. *CA Cancer J Clin*. 2011;61(3):183-203.

3. Prat J, Ribe A, Gallardo A. Hereditary ovarian cancer. *Hum Pathol*. 2005;36(8):861-870.

4. Ramus SJ, Vierkant RA, Johnatty SE, et al. Consortium analysis of 7 candidate SNPs for ovarian cancer. *Int J Cancer*. 2008; 123(2):380-388.

5. Reuter S, Gupta SC, Chaturvedi MM, Aggarwal BB. Oxidative stress, inflammation, and cancer: how are they linked? *Free Radic Biol Med*. 2010;49(11):1603-1616.

6. Fletcher NM, Belotte J, Saed MG, et al. Specific point mutations in key redox enzymes are associated with chemoresistance in epithelial ovarian cancer. *Free Radic Biol Med*. 2016;102:122-132.

7. Cramer DW, Welch WR, Scully RE. Wojciechowski CA. Ovarian cancer and talc: a case-control study. *Cancer*. 1982;50:372-376.

8. Cramer DW, Liberman RF, Titus-Ernstoff L, et al. Genital talc exposure and risk of ovarian cancer. *Int J Cancer*. 1999;81: 351-356.

9. Ness RB, Grisso JA, Cottreau C, et al. Factors related to inflammation of the ovarian epithelium and risk of ovarian cancer. *Epidemiology*. 2000;11:111-117.

10. Henderson WJ, Joslin CA, Turnbull AC, Griffiths K. Talc and carcinoma of the ovary and cervix. *J Obstet Gynaecol Br Commonw*. 1971;78:266-272.

11. Terry KL, Karageorgi S, Shvetsov YB, et al. Genital powder use and risk of ovarian cancer: a pooled analysis of 8,525 cases and 9,859 controls. *Cancer Prev Res (Phila)*. 2013;6(8):811-821.

12. Penninkilampi R, Eslick GD. Perineal talc use and ovarian cancer: a systematic review and meta-analysis. *Epidemiology*. 2018; 29(1):41-49.

13. Reid BM, Permuth JB, Sellers TA. Epidemiology of ovarian cancer: a review. *Cancer Biol Med*. 2017;14(1):9-32.

14. Brigelius-Flohe R, Kipp A. Glutathione peroxidases in different stages of carcinogenesis. *Biochim Biophys Acta*. 2009;1790(11): 1555-1568.

15. Sun Y. Free radicals, antioxidant enzymes, and carcinogenesis. *Free Radic Biol Med*. 1990;8(6):583-599.

16. Popov B, Gadjeva V, Valkanov P, Popova S, Tolekova A. Lipid peroxidation, superoxide dismutase and catalase activities in brain tumor tissues. *Arch Physiol Biochem*. 2003;111(5):455-459.

17. Ray G, Batra S, Shukla NK, et al. Lipid peroxidation, free radical production and antioxidant status in breast cancer. *Breast Cancer Res Treat*. 2000;59(2):163-170.

18. Chung-man Ho J, Zheng S, Comhair SA, Farver C, Erzurum SC. Differential expression of manganese superoxide dismutase and catalase in lung cancer. *Cancer Res*. 2001;61(23):8578-8585.

19. Radenkovic S, Milosevic Z, Konjevic G, et al. Lactate dehydrogenase, catalase, and superoxide dismutase in tumor tissue of breast cancer patients in respect to mammographic findings. *Cell Biochem Biophys*. 2013;66(2):287-295.

20. Hu Y, Rosen DG, Zhou Y, et al. Mitochondrial manganese-superoxide dismutase expression in ovarian cancer: role in cell proliferation and response to oxidative stress. *J Biol Chem*. 2005; 280(47):39485-39492.

21. Svensk AM, Soini Y, Paakko P, Hiravikoski P, Kinnula VL. Differential expression of superoxide dismutases in lung cancer. *Am J Clin Pathol*. 2004;122(3):395-404.

22. Saed GM, Ali-Fehmi R, Jiang ZL, et al. Myeloperoxidase serves as a redox switch that regulates apoptosis in epithelial ovarian cancer. *Gynecol Oncol*. 2010;116(2):276-281.

23. Galijasevic S, Saed GM, Hazen SL, Abu-Soud HM. Myeloperoxidase metabolizes thiocyanate in a reaction driven by nitric oxide. *Biochemistry*. 2006;45(4):1255-1262.

24. Galijasevic S, Maitra D, Lu T, Sliskovic I, Abdulhamid I, Abu-Soud HM. Myeloperoxidase interaction with peroxynitrite: chloride deficiency and heme depletion. *Free Radic Biol Med*. 2009; 47(4):431-439.

25. Fletcher NM, Jiang Z, Ali-Fehmi R, et al. Myeloperoxidase and free iron levels: potential biomarkers for early detection and prognosis of ovarian cancer. *Cancer Biomark*. 2011;10(5):267-275.

26. Scholler N, Urban N. CA125 in ovarian cancer. *Biomark Med*. 2007;1(4):513-523.

27. Belotte J, Fletcher NM, Saed MG, et al. A single nucleotide polymorphism in catalase is strongly associated with ovarian cancer survival. *PLoS One*. 2015;10(8):e0135739.

# Exhibit 83



# Ovarian, Fallopian Tube, and Primary Peritoneal Cancer Prevention (PDQ®)–Health Professional Version

Go to Patient Version

## Who Is at Risk?

Ovarian cancer is a rare disease, with carcinomas comprising approximately 90% of tumors and germ cell and stromal tumors accounting for the remainder. Ovarian carcinoma is a disease that predominantly affects postmenopausal women. Ovarian carcinomas consist of several histopathologic types, with high-grade serous being both the most common and most lethal. The category of ovarian borderline tumor or tumor of low-malignant potential, which historically had been considered in the context of ovarian cancer, is now generally considered a nonmalignant entity, although it has a postulated relationship with the development of some histologic subtypes of low-grade ovarian carcinomas.[1]

Risk factors for ovarian cancer include a family history of breast and/or ovarian cancer and inheritance of deleterious mutations in *BRCA1*, *BRCA2*, and selected other high-penetrance genes.[2-6] (Refer to the PDQ summary on Genetics of Breast and Gynecologic Cancers for more information.) Other risk factors for ovarian cancer include obesity, tall height, endometriosis, and the use of postmenopausal hormone therapy.[7-9]

Associations of some risk factors with ovarian cancer vary by histopathologic subtype. The association of endometriosis with ovarian cancer is stronger for nonserous subtypes, especially clear cell carcinoma and endometrioid subtypes.[10] Further, among carriers of deleterious mutations in *BRCA1* or *BRCA2*, increasing evidence suggests that many tumors previously classified as ovarian high-grade serous carcinoma may develop from malignant cells arising in the tubal epithelium (serous tubal intraepithelial carcinoma [STIC]), although these tumors continue to be referred to as *ovarian* cancers in most writings. It is hypothesized that high-grade serous carcinomas among individuals who are not carriers of mutations in *BRCA1* or *BRCA2* may also develop in the fallopian tube, but few STICs have been identified among these women in the absence of concurrent high-stage disease. Further, data suggest that the distinction of high-grade serous carcinomas from other histologic types of high-grade carcinomas, particularly endometrioid carcinomas, is not reliable. Reported rates of mucinous carcinoma diagnoses have declined dramatically, but expert pathology reviews suggest that this reflects increased recognition of metastases from occult gastrointestinal primary tumors to the ovary, rather than a true decline in rates of ovarian primary tumors.[11]

Factors associated with a decreased risk of ovarian cancer include multiparity, use of oral contraceptives, multiple pregnancies, breastfeeding, tubal ligation, and salpingectomy.[12-15] Compared with nulliparous women, the risk of ovarian cancer is reduced by 30% to 60% among parous women, with additive protection for each additional birth. [16,17]

## References

1. Kurman RJ, Carcangiu ML, Young RH, eds.: WHO Classification of Tumours of Female Reproductive Organs. 4th ed. Lyon, France: International Agency for Research on Cancer, 2014.

2. Bolton KL, Ganda C, Berchuck A, et al.: Role of common genetic variants in ovarian cancer susceptibility and outcome: progress to date from the Ovarian Cancer Association Consortium (OCAC). J Intern Med 271 (4): 366-78, 2012. [PUBMED Abstract]

**P2.0060**

3. Weissman SM, Weiss SM, Newlin AC: Genetic testing by cancer site: ovary. Cancer J 18 (4): 320-7, 2012 Jul-Aug. [PUBMED Abstract]

4. Hunn J, Rodriguez GC: Ovarian cancer: etiology, risk factors, and epidemiology. Clin Obstet Gynecol 55 (1): 3-23, 2012. [PUBMED Abstract]

5. Pal T, Akbari MR, Sun P, et al.: Frequency of mutations in mismatch repair genes in a population-based study of women with ovarian cancer. Br J Cancer 107 (10): 1783-90, 2012. [PUBMED Abstract]

6. Gayther SA, Pharoah PD: The inherited genetics of ovarian and endometrial cancer. Curr Opin Genet Dev 20 (3): 231-8, 2010. [PUBMED Abstract]

7. Lacey JV Jr, Brinton LA, Leitzmann MF, et al.: Menopausal hormone therapy and ovarian cancer risk in the National Institutes of Health-AARP Diet and Health Study Cohort. J Natl Cancer Inst 98 (19): 1397-405, 2006. [PUBMED Abstract]

8. Trabert B, Wentzensen N, Yang HP, et al.: Ovarian cancer and menopausal hormone therapy in the NIH-AARP diet and health study. Br J Cancer 107 (7): 1181-7, 2012. [PUBMED Abstract]

9. Lahmann PH, Cust AE, Friedenreich CM, et al.: Anthropometric measures and epithelial ovarian cancer risk in the European Prospective Investigation into Cancer and Nutrition. Int J Cancer 126 (10): 2404-15, 2010. [PUBMED Abstract]

10. Poole EM, Lin WT, Kvaskoff M, et al.: Endometriosis and risk of ovarian and endometrial cancers in a large prospective cohort of U.S. nurses. Cancer Causes Control 28 (5): 437-445, 2017. [PUBMED Abstract]

11. Seidman JD, Kurman RJ, Ronnett BM: Primary and metastatic mucinous adenocarcinomas in the ovaries: incidence in routine practice with a new approach to improve intraoperative diagnosis. Am J Surg Pathol 27 (7): 985-93, 2003. [PUBMED Abstract]

12. Garg PP, Kerlikowske K, Subak L, et al.: Hormone replacement therapy and the risk of epithelial ovarian carcinoma: a meta-analysis. Obstet Gynecol 92 (3): 472-9, 1998. [PUBMED Abstract]

13. Lacey JV Jr, Mink PJ, Lubin JH, et al.: Menopausal hormone replacement therapy and risk of ovarian cancer. JAMA 288 (3): 334-41, 2002. [PUBMED Abstract]

14. Mills PK, Riordan DG, Cress RD, et al.: Hormone replacement therapy and invasive and borderline epithelial ovarian cancer risk. Cancer Detect Prev 29 (2): 124-32, 2005. [PUBMED Abstract]

15. Calle EE, Rodriguez C, Walker-Thurmond K, et al.: Overweight, obesity, and mortality from cancer in a prospectively studied cohort of U.S. adults. N Engl J Med 348 (17): 1625-38, 2003. [PUBMED Abstract]

16. Permuth-Wey J, Sellers TA: Epidemiology of ovarian cancer. Methods Mol Biol 472: 413-37, 2009. [PUBMED Abstract]

17. Wentzensen N, Poole EM, Trabert B, et al.: Ovarian Cancer Risk Factors by Histologic Subtype: An Analysis From the Ovarian Cancer Cohort Consortium. J Clin Oncol 34 (24): 2888-98, 2016. [PUBMED Abstract]

## Overview

Note: Separate PDQ summaries on Ovarian, Fallopian Tube, and Primary Peritoneal Cancer Screening and Ovarian Epithelial, Fallopian Tube, and Primary Peritoneal Cancer Treatment are also available.

### Factors With Adequate Evidence of an Increased Risk of Ovarian, Fallopian Tube, and Primary Peritoneal Cancer

P2.0060.2

### Family history and inherited susceptibility to ovarian, fallopian tube, and primary peritoneal cancer

Based on solid evidence, women with a family history of ovarian cancer, especially in a first-degree relative, and those with an inherited predisposition to ovarian cancer, such as a *BRCA1* or *BRCA2* mutation, have an increased risk of developing ovarian cancer. (Refer to the PDQ summary on Genetics of Breast and Gynecologic Cancers for more information.)

### Endometriosis

Based on fair evidence, self-reported and laparoscopically confirmed endometriosis is associated with an increased risk of ovarian cancer.[1,2] The association is stronger with nonserous histologic subtypes, specifically endometrioid and clear cell carcinomas.[2,3]

**Magnitude of Effect**: Modest with observed relative risks (RRs) of 1.8 to 2.4.

>    **Study Design**: Cohort and case-control studies.
>
>    **Internal Validity**: Good.
>
>    **Consistency**: Fair.
>
>    **External Validity**: Good.

### Hormone replacement therapy

Based on fair evidence, current or recent hormone therapy is associated with a small increased risk of ovarian cancer. Risks attenuate after hormone therapy is discontinued. Risks did not differ by preparation type (estrogen only vs. combined estrogen/progestin).[4,5]

**Magnitude of Effect**: Modest with observed RRs of 1.20 to 1.8.

>    **Study Design**: One randomized clinical trial, cohort and case-control studies.
>
>    **Internal Validity**: Good.
>
>    **Consistency**: Fair.
>
>    **External Validity**: Good.

### Obesity and height

Based on fair evidence, increases in height and body mass index (BMI) are associated with a modest increased risk of ovarian cancer.

**Magnitude of Effect**: Based on an overview analysis of 25,157 women with ovarian cancer and 81,211 women without ovarian cancer from 47 epidemiological studies, the RR of ovarian cancer per 5 cm increase in height is 1.07 (95% confidence interval [CI], 1.05–1.09). The RR of ovarian cancer per 5 kg/m$^2$ increase in BMI is 1.10 (95% CI, 1.07–1.13) among never-users of hormone therapy and 0.95 (95% CI, 0.92–0.99) among ever-users of hormone therapy.[6]

>    **Study Design**: Cohort and case-control studies.
>
>    **Internal Validity**: Good.
>
>    **Consistency**: Good.
>
>    **External Validity**: Good.

### Factors With Adequate Evidence of a Decreased Risk of Ovarian, Fallopian Tube, and Primary Peritoneal Cancer

P2.0060.3

## Oral contraceptives: benefits

Based on solid evidence, oral contraceptive use is associated with a decreased risk of developing ovarian cancer.

**Magnitude of Effect**: The degree of risk reduction varies by duration of oral contraceptive use and time since last use. For 1 to 4 years of oral contraceptive use, the RR reduction is 22%, and for 15 or more years of use, the RR reduction is 56%. The reduction in risk persisted for more than 30 years after use was discontinued, but the degree of reduction attenuated over time. The risk reduction per 5 years of oral contraceptive use was 29% for women who discontinued use less than 10 years ago and decreased to 15% for women who discontinued use 20 to 29 years ago. Ten years of use reduced cancer incidence before age 75 years from 1.2 to 0.8 per 100 users and reduced mortality from 0.7 to 0.5 per 100 users. The number needed-to-treat for 5 years was estimated to be about 185 women.

> **Study Design**: Multiple case-control and cohort studies; meta-analyses.
>
> **Internal Validity**: Good.
>
> **Consistency**: Good.
>
> **External Validity**: Good.

## Oral contraceptives: harms

Based on solid evidence, combined current use of estrogen-progestin oral contraceptive use is associated with an increased risk of venous thromboembolism, particularly among smokers, for whom use is contraindicated. Oral contraceptives are not associated with a long-term increased risk of breast cancer but may be associated with a short-term increased risk while a woman is taking oral contraceptives. The risk of breast cancer declines with time since last use.

**Magnitude of Effect**: The risks may vary by preparation. Overall, the absolute risk of venous thromboembolism is about three events per 10,000 women per year while taking oral contraceptives. The risk is modified by smoking. Breast cancer risk among long-term (>10 years) current users is estimated at one extra case per year per 100,000 women. The risk dissipates with time since last use.

> **Study Design**: Observational studies.
>
> **Internal Validity**: Good.
>
> **Consistency**: Good.
>
> **External Validity**: Good.

## Tubal ligation: benefits

Based on solid evidence, tubal ligation is associated with a decreased risk of ovarian cancer.

**Magnitude of Effect**: Adjusting for other forms of contraception, tubal ligation provides a relative reduction in the odds of developing ovarian cancer of about 30%.

> **Study Design**: Multiple case-control studies and cohort studies.
>
> **Internal Validity**: Good.
>
> **Consistency**: Good.
>
> **External Validity**: Good.

## Tubal ligation: harms

Based on fair evidence, harms include surgical risks, including the following:[7]

P2.0060.4

- Major morbidity including blood transfusion, reoperation, or hospital readmission (rate of 1.0 per 100 procedures).
- Minor morbidity including postoperative fever, urinary tract infections, or wound infections (rate of 6.0 per 100 procedures).

## Multiparity

Based on good evidence, multiparity is associated with a decreased risk of ovarian cancer.

**Magnitude of Effect**: Based on good evidence from multiple observational epidemiological studies, parous women have an approximately 30% lower ovarian cancer risk than nulliparous women.[6,8,9]

> **Study Design**: Observational epidemiologic studies.
>
> **Internal Validity**: Good.
>
> **Consistency**: Good.
>
> **External Validity**: Good.

## Salpingectomy

Based on limited data, salpingectomy is associated with a decrease in risk of ovarian cancer.

**Magnitude of Effect**: Approximately 50% decrease for bilateral salpingectomy, less protection for unilateral salpingectomy.

> **Study Design**: Observational epidemiologic studies from several different countries.
>
> **Internal Validity**: Good.
>
> **Consistency**: Good.
>
> **External Validity**: Good.

## Breastfeeding

Based on solid evidence, breastfeeding is associated with a decreased risk of ovarian cancer.

**Magnitude of Effect**: 2% decrease with every month of breastfeeding.[10]

> **Study Design**: Multiple case-control and cohort studies; meta-analysis.
>
> **Internal Validity**: Good.
>
> **Consistency**: Good.
>
> **External Validity**: Good.

## Risk–reducing bilateral salpingo–oophorectomy: benefits

Based on solid evidence, risk-reducing bilateral salpingo-oophorectomy is associated with a decreased risk of ovarian cancer. Peritoneal carcinomatosis has been reported rarely following surgery. Risk-reducing surgery is generally reserved for women at high risk of developing ovarian cancer, such as women who have an inherited susceptibility to ovarian cancer.

**Magnitude of Effect**: 90% reduction in risk of ovarian cancer observed among women with a *BRCA1* or *BRCA2* mutation.

> **Study Design**: Multiple case-control studies.
>
> **Internal Validity**: Good.

**P2.0060.5**

**Consistency**: Good.

**External Validity**: Good.

### Risk-reducing bilateral salpingo-oophorectomy: harms

Based on solid evidence, prophylactic oophorectomy among women who are still menstruating at the time of surgery is associated with infertility, vasomotor symptoms, decreased sexual interest, vaginal dryness, urinary frequency, decreased bone-mineral density, and increased cardiovascular disease.

**Magnitude of Effect**: Reported prevalence of vasomotor symptoms varies from 41% to 61.4% among women who underwent oophorectomy before natural menopause. Women with bilateral oophorectomy who did not take hormone therapy were twice as likely to have moderate or severe hot flashes compared with women who underwent natural menopause. The RR of cardiovascular disease among women with bilateral oophorectomy and early menopause was 4.55 (95% CI, 2.56–9.01).

**Study Design**: Cohort and case-control studies.

**Internal Validity**: Good.

**Consistency**: Good.

**External Validity**: Good.

## Areas of Uncertainty

### Ovarian hyperstimulation for infertility treatment

Evidence is poor to determine the association between ovarian hyperstimulation and the risk of ovarian cancer. Risk of ovarian cancer may be increased among women who remain nulligravid after being treated with ovarian stimulating medications.

**Magnitude of Effect**: Uncertain—risk of invasive ovarian cancer may be increased among women who remain nulligravid after treatment; risk of borderline ovarian tumors may be increased among women treated with infertility drugs.

**Study Design**: Cohort and case-control studies; systematic review.

**Internal Validity**: Fair.

**Consistency**: Poor.

**External Validity**: Fair.

*References*

1. Poole EM, Lin WT, Kvaskoff M, et al.: Endometriosis and risk of ovarian and endometrial cancers in a large prospective cohort of U.S. nurses. Cancer Causes Control 28 (5): 437-445, 2017. [PUBMED Abstract]

2. Pearce CL, Templeman C, Rossing MA, et al.: Association between endometriosis and risk of histological subtypes of ovarian cancer: a pooled analysis of case-control studies. Lancet Oncol 13 (4): 385-94, 2012. [PUBMED Abstract]

3. Mogensen JB, Kjær SK, Mellemkjær L, et al.: Endometriosis and risks for ovarian, endometrial and breast cancers: A nationwide cohort study. Gynecol Oncol 143 (1): 87-92, 2016. [PUBMED Abstract]

4. Mørch LS, Løkkegaard E, Andreasen AH, et al.: Hormone therapy and ovarian cancer. JAMA 302 (3): 298-305, 2009. [PUBMED Abstract]

5. Beral V, Gaitskell K, Hermon C, et al.: Menopausal hormone use and ovarian cancer risk: individual participant meta-analysis of 52 epidemiological studies. Lancet 385 (9980): 1835-42, 2015. [PUBMED Abstract]

**P2.0060.6**

6. Braem MG, Onland-Moret NC, van den Brandt PA, et al.: Reproductive and hormonal factors in association with ovarian cancer in the Netherlands cohort study. Am J Epidemiol 172 (10): 1181-9, 2010. [PUBMED Abstract]

7. Lawrie TA, Kulier R, Nardin JM: Techniques for the interruption of tubal patency for female sterilisation. Cochrane Database Syst Rev (9): CD003034, 2015. [PUBMED Abstract]

8. Fortner RT, Ose J, Merritt MA, et al.: Reproductive and hormone-related risk factors for epithelial ovarian cancer by histologic pathways, invasiveness and histologic subtypes: Results from the EPIC cohort. Int J Cancer 137 (5): 1196-208, 2015. [PUBMED Abstract]

9. Yang HP, Trabert B, Murphy MA, et al.: Ovarian cancer risk factors by histologic subtypes in the NIH-AARP Diet and Health Study. Int J Cancer 131 (4): 938-48, 2012. [PUBMED Abstract]

10. Feng LP, Chen HL, Shen MY: Breastfeeding and the risk of ovarian cancer: a meta-analysis. J Midwifery Womens Health 59 (4): 428-37, 2014 Jul-Aug. [PUBMED Abstract]

## Description of the Evidence

### Incidence and Mortality

In 2019, it is estimated that 22,530 new cases of ovarian cancer will be diagnosed and 13,980 deaths due to ovarian cancer will occur.[1] Incidence and mortality rates are higher among whites than among blacks, but statistically significant decreases in incidence and mortality rates have been observed among both whites and blacks.[2] In 2014, the overall incidence rate for ovarian carcinoma among women aged 65 years and older was 41.9 cases per 100,000 women-years.[3] Given that the Surveillance, Epidemiology, and End Results Program does not adjust for oophorectomy or salpingectomy, racial differences in the prevalence of women who had undergone these procedures could bias racial rate comparisons. A statistically significant decrease in delayed adjusted incidence of 0.9% among whites from 1987 to 2012 and 0.2% among blacks from 1992 to 2012 was observed. A statistically significant decrease in mortality rates of 2.0% per year among whites from 2002 to 2012 and 1.3% per year among blacks from 1992 to 2012 was observed. The population lifetime risk of ovarian cancer is 1.3%; the population lifetime risk of dying from ovarian cancer is 0.97%.[2]

### Histology and Pathogenesis of Ovarian, Fallopian Tube, and Primary Peritoneal Cancer

Ovarian carcinoma is a biologically and clinically heterogeneous class of tumors that includes several major subtypes: serous, mucinous, endometrioid, and clear cell. Classification of ovarian carcinomas into type I and type II tumors has been proposed. In this system, type I tumors include the following:[4]

1. Endometriosis-related subtypes, such as endometrioid, clear cell, and seromucinous.

2. Low-grade serous.

3. Mucinous and malignant Brenner tumors.

Among type I tumors, endometrioid and clear cell carcinomas are numerically predominant and most important clinically. In general, type I ovarian carcinomas present at a lower stage than type II tumors and portend a better prognosis.

Type II tumors are comprised mainly of high-grade serous carcinomas, the most common and lethal of all ovarian carcinoma subtypes. These cancers usually present with symptomatic bulky stage III or IV disease and ascites. Many, but possibly not all, high-grade serous carcinomas appear to arise from malignant *in situ* lesions in the epithelium of the fallopian tube fimbria, which spread to the ovaries secondarily, but continue to be referred to as ovarian carcinomas. Evidence for a tubal origin is based mainly on examination of risk-reducing salpingo-oophorectomy

P2.0060.7

specimens, performed among *BRCA1/BRCA2* mutation carriers, in which incidental low-volume disease enables recognition of serous tubal intraepithelial carcinoma (STIC). However, not all women with high-grade serous carcinomas have identifiable STIC and few studies of the fallopian tubes among women who are not carriers of *BRCA1/BRCA2* mutations have been performed, suggesting that pathogenesis of these tumors is not fully known. Serous carcinomas can be further divided on the basis of molecular characteristics.[5]

The heterogeneity in the etiology and pathogenesis of different ovarian cancer subtypes and variability in the classification of tumors over time and between studies pose challenges for interpretation of etiologic data. Ovarian cancer is a rare cancer, thus sample size and power of studies to detect moderate associations by cancer subtype is limited. However, clearer subtyping of cancers may assist in improving our understanding of the etiology of ovarian malignancies in future studies.

## Factors With Adequate Evidence of an Increased Risk of Ovarian, Fallopian Tube, and Primary Peritoneal Cancer

### Family history and inherited susceptibility to ovarian, fallopian tube, and primary peritoneal cancer

Some women are at an increased risk because of an inherited mutation, with the magnitude of that risk dependent on the affected gene and specific mutation. Underlying ovarian cancer risk can be assessed through accurate pedigrees and/or genetic markers of risk. Because of uncertainties about cancer risks associated with certain specific gene mutations, genetic information may be difficult to interpret outside of families with a high incidence of ovarian cancer.

This summary does not address multiple genetic syndromes or women who are at high risk because of inherited genetic factors. (Refer to the PDQ summaries on Genetics of Breast and Gynecologic Cancers and Genetics of Colorectal Cancer for specific information related to ovarian cancer risk associated with multiple genetic syndromes and ovarian cancer in *BRCA1/BRCA2* mutation carriers.)

### Hormone replacement therapy/hormone therapy

A meta-analysis of 52 studies (17 prospective and 35 retrospective) including 21,488 ovarian cancers found increased risks with current or recent hormone replacement use in prospective studies (relative risk [RR], 1.37; 95% confidence interval [CI], 1.29–1.46), with similar results for retrospective designs. Significant relationships were found for serous and endometrioid subtypes.[6] Recent use was strongly related to risk even among women who had used hormone replacement for less than 5 years (RR, 1.41; 95% CI, 1.32–1.50). Risk declined among women who had discontinued use, with greater effects for longer periods of cessation. Risks did not differ by preparation types (estrogen only vs. combined estrogen/progestin). Risks also did not differ by age at use.[7,8]

### Obesity and height

Ovarian cancer risk increases with increasing height and weight (body mass index [BMI]).[9] The Collaborative Group on Epidemiological Studies of Ovarian Cancer compiled individual data, both published and unpublished, from 47 epidemiological studies including 12,157 women with ovarian cancer and 81,311 controls. RR increased significantly with increasing height (1.07 per 5 cm height) and with increasing BMI (1.10 per 5 kg/m$^2$). These findings were unaffected by other factors known to be associated with ovarian cancer risk, with the exception that ever-users of hormone therapy had no increased risk with increasing BMI. Given that height, weight, and BMI are thought to be strongly correlated, separating out the individual effects can be difficult. Ovarian cancer mortality has also been shown to be increased in obese women.[10,11]

## Factors With Adequate Evidence of a Decreased Risk of Ovarian, Fallopian Tube, and Primary Peritoneal Cancer

### Oral contraceptives

**P2.0060.8**

A collaborative analysis was performed of individual data from 23,257 women with ovarian cancer and 87,303 women without ovarian cancer from 45 studies in 21 countries.[12] The studies included 13 prospective studies, 19 population-based case-control studies, and 12 hospital-based case-control studies. Oral contraceptive use was associated with a dose-response effect by duration of use, without observed changes in risk reduction by decade of use from the 1960s to 1980s, over which time the amount of estrogen in oral contraceptives was approximately halved. No risk reduction was observed for women who used oral contraceptives for less than 1 year. The risk reduction associated with use from 1 to 4 years, 5 to 9 years, 10 to 14 years, and 15 years or more was 0.78 (99% CI, 0.73–0.893), 0.64 (99% CI, 0.59–0.69), 0.56 (99% CI, 0.50–0.62), and 0.42 (99% CI, 0.36–0.49), respectively. The observed risk reduction persisted after cessation of oral contraceptive therapy but attenuated over time since last use. The proportional reduction in risk per 5 years of use was 29% (95% CI, 23%–34%) for women who had discontinued use within the last 10 years; the reduction in risk was 15% (95% CI, 9%–21%) for women who discontinued use 20 to 29 years ago.

A meta-analysis, in which the primary analysis was restricted to 24 case-control and cohort studies published since 2000 to reflect more recent types of oral contraceptive preparations, also observed a dose-response by duration of use.[13] The risk reduction among women using oral contraceptives for more than 1 year but less than 5 years was 0.77 (95% CI, 0.66–0.89), and for women using oral contraceptives for more than 10 years, the risk reduction was 0.43 (95% CI, 0.37–0.51). The authors estimated that 185 women needed to be treated for 5 years to prevent one case of ovarian cancer. Based on an estimated lifetime risk of 1.38% and prevalence of ever-use of oral contraceptives of 83%, the authors estimated a lifetime reduction of ovarian cancer attributable to oral contraceptives of 0.54%.

(Refer to the PDQ summary on Genetics of Breast and Gynecologic Cancers for specific information related to ovarian cancer risk among BRCA1/BRCA2 mutation carriers.)

## Depot–medroxyprogesterone acetate

Limited information is available on the use of injectable progestational contraceptives (depot-medroxyprogesterone acetate [DMPA]) and the risk of ovarian cancer; studies are confounded by the use of other contraceptive methods, particularly oral contraceptives. A hospital-based study conducted in Mexico and Thailand, with 224 cases and 1,781 controls (the World Health Organization Collaborative Study of Neoplasia and Steroid Contraceptives), did not observe an association between DMPA and ovarian cancer (RR, 1.07; 95% CI, 0.6–1.8).[14] However, only 22 of the cases had ever used DMPA and nine of these had used it for 6 months or less.

A subsequent multicenter study conducted in 12 hospitals in Thailand, including 330 cases and 982 matched controls, observed a statistically significant decreased risk of ovarian cancer associated with DMPA use, controlling for oral contraceptive use and other associated factors (odds ratio [OR], 0.52; 95% CI, 0.33–0.88). A dose-response association was observed but the sample size was limited in longer-term use categories.[15]

## Tubal ligation

A meta-analysis of 16 case-control studies, three retrospective studies, and two prospective cohort studies observed a decreased risk of ovarian cancer associated with tubal ligation (RR, 0.66; 95% CI, 0.60–0.73).[16] The reduced risk was observed up to 14 years after tubal ligation. A population-based case-control study of 902 cases and 1,802 controls published subsequent to the meta-analysis observed an adjusted OR of 0.62 (95% CI, 0.51–0.75) associated with a history of a tubal ligation.[17] The association was adjusted for oral contraceptive use, which was also associated with a lower risk of ovarian cancer (OR, 0.62; 95% CI, 0.47–0.85) and other risk factors.[17]

Another pooling project with primary data from 13 population-based case-control studies examined the association between tubal ligation and ovarian cancer risk and included 7,942 epithelial ovarian cancers, and 13,904 controls.[18] Overall, tubal ligation was associated with a 29% reduction in risk (OR, 0.71; 95% CI, 0.66–0.77). The observed risk reduction varied by subtype of invasive cancers and was 52% (OR, 0.48; 95% CI, 0.40–49) for endometrioid cancer; 48%

Case 3:16-md-02738-MAS-RLS   Document 9737-16   Filed 05/07/19   Page 78 of 449 PageID: 40402

3/15/2019          Ovarian, Fallopian Tube, & Primary Peritoneal Cancer Prevention (PDQ®)—Health Professional Version - National Cancer Institute

(OR, 0.52; 95% CI, 0.40–0.67) for clear cell cancer; 32% (OR, 0.68; 95% CI, 0.52–89) for mucinous cancer; and 19% (OR, 0.81; 95% CI, 0.74–0.89) for serous cancer.

A pooled analysis from 21 prospective cohort studies examined 14 hormonal, reproductive, and lifestyle factors by histologic subtype among 5,584 invasive ovarian cancers within a total sample of 1.3 million women. Overall, tubal ligation was associated with an 18% reduction in risk (OR, 0.82; 95% CI, 0.73–0.93). The observed risk reduction varied by subtype of invasive cancer and was 40% (OR, 0.60; 95% CI, 0.41–88) for endometrioid cancer; 65% (OR, 0.35; 95% CI, 0.18–0.69) for clear cell cancer; and 9% (OR, 0.91; 95% CI, 0.79–1.06) for serous cancer. There was a nonsignificant increase in risk of 1% (OR, 1.01; 95% CI, 0.60–1.71) for mucinous cancer.[19]

## Breastfeeding

A meta-analysis [20] that included five prospective studies and 30 case-control studies examined the association between breastfeeding and the risk of ovarian cancer. Any breastfeeding was associated with a decreased risk of ovarian cancer (RR, 0.76; 95% CI, 0.69–0.83). The risk of ovarian cancer decreased 8% for every 5-month increase in duration of breastfeeding (95% CI, 0.90–0.95). Another meta-analysis that included five prospective studies and 35 case-control studies found that any breastfeeding was associated with a decreased risk of ovarian cancer (RR, 0.70; 95% CI, 0.64–0.76). These results are consistent with a previous meta-analysis and further support the prior finding of a suggested association between increased duration of breastfeeding and greater levels of protection.[21] Another meta-analysis of 19 studies, including four cohort and 15 case-control studies found an overall decreased risk of ovarian cancer with an OR of 0.66 (95% CI, 0.57–0.76) and an association with duration (2% decrease per month). The benefit of breastfeeding was greatest for the first 8 to 10 months.[22]

## Risk-reducing salpingo-oophorectomy

Risk-reducing surgery is an option considered by women who are at high risk of ovarian cancer, such as those with an inherited susceptibility to cancer. (Refer to the Oral contraceptives section in the PDQ summary on Genetics of Breast and Gynecologic Cancers for more information on this as a risk-reducing intervention.) Among women in the general population, opportunistic salpingectomy, oophorectomy, or salpingo-oophorectomy have been considered as possible interventions at the time of surgery for other benign indications. Salpingectomy has also been discussed as a preferred means of sterilization.[23,24]

### Harms

Risks associated with benign oophorectomy (with or without salpingectomy or hysterectomy) have been analyzed in six published studies. Studies of three cohorts found that oophorectomy performed before menopause (age 45 or 50 years) was associated with increased overall mortality, likely related to cardiovascular disease. This finding was noted particularly among individuals not using hormone replacement. In the Women's Health Initiative, bilateral salpingo-oophorectomy was not associated with increased mortality. In the National Health and Nutrition Examination Survey (NHANES III), oophorectomy overall was not related to mortality, but mortality was increased among obese women younger than 40 years who did not use hormone replacement. The California Teachers Study did not find a mortality risk with oophorectomy, but only 3% of women did not use hormone replacement. Overall, data suggest that oophorectomy among younger women likely increases overall mortality and that this risk may be attenuated with hormone replacement.[25-30]

### Salpingectomy

Data relating salpingectomy to risk of ovarian/tubal cancer are limited, but consistent. A meta-analysis of three studies found an OR of 0.51 (95% CI, 0.35–0.71) for risk of these cancers among women who had undergone salpingectomy, compared with women who had intact fallopian tubes.[31] These studies included a Swedish record linkage study conducted from 1973 to 2009 with a mean follow-up of 23 years, which found the following hazard ratios (HRs) for risk of ovarian cancer compared with women who had not undergone surgery:

P2.0060.10

- For hysterectomy, the HR was 0.79 (95% CI, 0.70–0.88).

- For hysterectomy with bilateral salpingo-oophorectomy, the HR was 0.06 (95% CI, 0.03–0.12).

- For salpingectomy, the HR was 0.65 (95% CI, 0.52–0.81).

- For sterilization procedures, the HR was 0.72 (95% CI, 0.64–0.81).

Protection for bilateral salpingectomy was approximately twice that for unilateral salpingectomy.[32] This report included limited covariate data but results were similar to other smaller studies included in the meta-analysis.

Limited data based on circulating surrogate markers of ovarian reserve suggest that salpingectomy does not have an adverse effect on ovarian function.[33,34]

## Factors With Inadequate Evidence of an Association Risk of Ovarian, Fallopian Tube, and Primary Peritoneal Cancer

### Dietary factors

No consistent association has been observed between a variety of dietary factors and the risk of ovarian cancer.

A systematic review and meta-analysis that included 23 case-control studies and three cohort studies found no evidence of an association between alcohol use and epithelial ovarian cancer.[35]

A case-control study of the Healthy Eating Index (HEI), based on current U.S. Department of Agriculture dietary guidelines, found no association between the highest HEI score and ovarian cancer risk for any specific food group.[36] A systematic review of the role of diet in ovarian cancer included only prospective studies, with at least 200 reported cases in the publications.[37] Twenty-four publications from ten cohort studies were reviewed and no dietary factors were consistently associated with the risk of ovarian cancer.

### Aspirin and nonsteroidal anti-inflammatory drugs

A systematic review and meta-analysis of 21 observational studies found a decreased risk of invasive ovarian cancer associated with aspirin use (RR, 0.88; 95% CI, 0.79–0.98), but no statistically significant association with nonsteroidal anti-inflammatory drugs (NSAIDs).[38] A study published subsequent to that review examined NSAID use and ovarian cancer risk in the National Institutes of Health-AARP Diet and Health Study. No association was observed between the development of ovarian cancer and regular aspirin use (RR, 1.06; 95% CI, 0.87–1.29) or NSAID use (RR, 0.93; 95% CI, 0.74–1.15).[39] A population-based case-control study [40] of 902 incident cases and 1,802 population controls observed a decreased risk of ovarian cancer associated with continual use (0.71; 95% CI, 0.53–0.97) or low-dose daily use (0.72; 95% CI, 0.53–0.97). In that study, selective cyclo-oxygenase-2 NSAIDs but not nonselective NSAIDs were associated with a decreased risk of ovarian cancer (OR, 0.60; 95% CI, 0.39–0.94). A cohort analysis of about 200,000 women in the Nurses' Health Studies, which used detailed data about the intensity and duration of aspirin use over time, showed a reduced HR for ovarian cancer of 0.77 (95% CI, 0.61–0.96) for low-dose aspirin use (≤100 mg/d) but no reduction for standard-dose aspirin use (HR, 1.17; 95% CI, 0.92–1.49).[41]

### Perineal talc exposure

The weight of evidence does not support an association between perineal talc exposure and an increased risk of ovarian cancer. Results from case-control and cohort studies are inconsistent. A meta-analysis of 16 studies observed an increased risk with the use of talc (RR, 1.33; 95% CI, 1.16–1.45); however, a dose response relationship was not found.[42] A pooled analysis from the Ovarian Cancer Association Consortium, composed of multiple case-control studies, included 8,525 cases and 9,859 controls, found a modest increased risk of epithelial ovarian cancer associated with genital powder use (OR, 1.24; 95% CI, 1.15–1.33), but the trend across increasing lifetime number of applications was not statistically significant ($P$ trend = .17).[43] A population-based case-control study of African American women in the United States found an association between genital powder use and risk of epithelial ovarian cancer (OR, 1.44; 95%

CI, 1.11–1.86).[44] In this study of 584 cases and 745 controls, a dose-response relationship for *any* genital powder use was reported. Specifically, among *any* genital powder use, daily powder use was associated with increased adjusted OR of developing ovarian cancer (OR, 1.71; 95% CI, 1.26–2.33) compared with less than daily use (OR, 1.12; 95% CI, 0.80–1.58). A cohort study among nurses did not observe a risk of ovarian cancer associated with perineal talc use (RR, 1.09; 95% CI, 0.86–1.37) and there was no evidence of increased risk with increasing frequency of use.[45] Another prospective study, The Women's Health Initiative, examined the association between perineal powder use and the development of ovarian cancer among 61,576 women without a history of cancer at enrollment and who provided exposure information. Among this group, 429 cases of ovarian cancer occurred. Powder use on genitals, sanitary napkins, and diaphragms was examined individually and as a combined exposure. Women were followed for a mean of 12.4 years. An association of ovarian cancer with ever-use was not found when analyzed either by individual method of exposure or by overall combined exposure. The observed risk (hazard ratio) for combined exposure to perineal powder was 1.06 (95% CI, 0.87–1.28) and there was no increased risk observed for increasing duration of use.[46]

## Areas of Uncertainty

### Ovarian hyperstimulation due to infertility treatment

Controversy persists concerning the association between ovarian hyperstimulation and ovarian cancer. Results of a systematic review and meta-analysis of nine cohort studies comprised 109,969 women who were exposed to ovarian hyperstimulation for infertility treatment (i.e., *in vitro* fertilization [IVF]), with 76 incident ovarian cancer cases observed, provided inconclusive evidence for an association.[47] An increased risk of ovarian cancer was observed when the comparison group was the general population (RR, 1.50; 95% CI, 1.17–1.92), but no statistically significant increased risk was observed when the reference group was unexposed infertile women (RR, 1.26; 95% CI, 0.62–2.55). A major limitation was that only one of the cohort studies included in the meta-analysis had a follow-up period longer than 10 years for those exposed to IVF.

A Cochrane systematic review that included 11 case-control studies and 14 cohort studies, for a total of 186,972 women, was also indeterminate for an association. Summary statistics were not calculated because of methodological and clinical heterogeneity. Among seven cohort studies that compared treated women with untreated subfertile women, no excess risk was noted in association with hyperstimulation medications. Two cohorts noted an increased risk of twofold to fivefold when treated women were compared with the general population. An increased risk of borderline ovarian tumors was noted in three case-control studies and two cohort studies. Overall, the authors concluded there was no convincing evidence that an increased risk of invasive ovarian tumors was associated with fertility drug treatments.[48]

After the Cochrane review, a follow-up study of an infertility cohort [49] was published. A retrospective cohort of 9,825 women enrolled between 1965 and 1988 was followed through 2010. Ovarian cancer occurred in 85 women. Overall, there was no association between ovarian cancer and clomiphene citrate (RR, 1.34; 95% CI, 0.86–2.07) or gonadotropins (RR, 1.00; 95% CI, 0.48–2.08). Among the subgroup of women who remained nulligravid after treatment, an increased risk of ovarian cancer was associated with clomiphene citrate (RR, 3.63; 95% CI, 1.36–9.72); no increased risk was observed among women who successfully conceived after being treated, compared with women who were not treated.

### References

1. American Cancer Society: Cancer Facts and Figures 2019. Atlanta, Ga: American Cancer Society, 2019. Available online. Last accessed January 23, 2019.

2. Howlader N, Noone AM, Krapcho M, et al., eds.: SEER Cancer Statistics Review, 1975-2012. Bethesda, Md: National Cancer Institute, 2015. Also available online. Last accessed January 31, 2019.

3. Howlader N, Noone AM, Krapcho M, et al., eds.: SEER Cancer Statistics Review (CSR) 1975-2014. Bethesda, Md: National Cancer Institute. Also available online. Last accessed February 8, 2019.

4. Kurman RJ, Shih IeM: The Dualistic Model of Ovarian Carcinogenesis: Revisited, Revised, and Expanded. Am J Pathol 186 (4): 733-47, 2016. [PUBMED Abstract]

P2.0060.12

5. Cancer Genome Atlas Research Network: Integrated genomic analyses of ovarian carcinoma. Nature 474 (7353): 609-15, 2011. [PUBMED Abstract]

6. Beral V, Gaitskell K, Hermon C, et al.: Menopausal hormone use and ovarian cancer risk: individual participant meta-analysis of 52 epidemiological studies. Lancet 385 (9980): 1835-42, 2015. [PUBMED Abstract]

7. Lacey JV Jr, Brinton LA, Leitzmann MF, et al.: Menopausal hormone therapy and ovarian cancer risk in the National Institutes of Health-AARP Diet and Health Study Cohort. J Natl Cancer Inst 98 (19): 1397-405, 2006. [PUBMED Abstract]

8. Trabert B, Wentzensen N, Yang HP, et al.: Ovarian cancer and menopausal hormone therapy in the NIH-AARP diet and health study. Br J Cancer 107 (7): 1181-7, 2012. [PUBMED Abstract]

9. Collaborative Group on Epidemiological Studies of Ovarian Cancer: Ovarian cancer and body size: individual participant meta-analysis including 25,157 women with ovarian cancer from 47 epidemiological studies. PLoS Med 9 (4): e1001200, 2012. [PUBMED Abstract]

10. Calle EE, Rodriguez C, Walker-Thurmond K, et al.: Overweight, obesity, and mortality from cancer in a prospectively studied cohort of U.S. adults. N Engl J Med 348 (17): 1625-38, 2003. [PUBMED Abstract]

11. Aune D, Navarro Rosenblatt DA, Chan DS, et al.: Anthropometric factors and ovarian cancer risk: a systematic review and nonlinear dose-response meta-analysis of prospective studies. Int J Cancer 136 (8): 1888-98, 2015. [PUBMED Abstract]

12. Collaborative Group on Epidemiological Studies of Ovarian Cancer, Beral V, Doll R, et al.: Ovarian cancer and oral contraceptives: collaborative reanalysis of data from 45 epidemiological studies including 23,257 women with ovarian cancer and 87,303 controls. Lancet 371 (9609): 303-14, 2008. [PUBMED Abstract]

13. Havrilesky LJ, Moorman PG, Lowery WJ, et al.: Oral contraceptive pills as primary prevention for ovarian cancer: a systematic review and meta-analysis. Obstet Gynecol 122 (1): 139-47, 2013. [PUBMED Abstract]

14. Depot-medroxyprogesterone acetate (DMPA) and risk of epithelial ovarian cancer. The WHO Collaborative Study of Neoplasia and Steroid Contraceptives. Int J Cancer 49 (2): 191-5, 1991. [PUBMED Abstract]

15. Wilailak S, Vipupinyo C, Suraseranivong V, et al.: Depot medroxyprogesterone acetate and epithelial ovarian cancer: a multicentre case-control study. BJOG 119 (6): 672-7, 2012. [PUBMED Abstract]

16. Cibula D, Widschwendter M, Májek O, et al.: Tubal ligation and the risk of ovarian cancer: review and meta-analysis. Hum Reprod Update 17 (1): 55-67, 2011 Jan-Feb. [PUBMED Abstract]

17. Ness RB, Dodge RC, Edwards RP, et al.: Contraception methods, beyond oral contraceptives and tubal ligation, and risk of ovarian cancer. Ann Epidemiol 21 (3): 188-96, 2011. [PUBMED Abstract]

18. Sieh W, Salvador S, McGuire V, et al.: Tubal ligation and risk of ovarian cancer subtypes: a pooled analysis of case-control studies. Int J Epidemiol 42 (2): 579-89, 2013. [PUBMED Abstract]

19. Wentzensen N, Poole EM, Trabert B, et al.: Ovarian Cancer Risk Factors by Histologic Subtype: An Analysis From the Ovarian Cancer Cohort Consortium. J Clin Oncol 34 (24): 2888-98, 2016. [PUBMED Abstract]

20. Luan NN, Wu QJ, Gong TT, et al.: Breastfeeding and ovarian cancer risk: a meta-analysis of epidemiologic studies. Am J Clin Nutr 98 (4): 1020-31, 2013. [PUBMED Abstract]

21. Li DP, Du C, Zhang ZM, et al.: Breastfeeding and ovarian cancer risk: a systematic review and meta-analysis of 40 epidemiological studies. Asian Pac J Cancer Prev 15 (12): 4829-37, 2014. [PUBMED Abstract]

22. Feng LP, Chen HL, Shen MY: Breastfeeding and the risk of ovarian cancer: a meta-analysis. J Midwifery Womens Health 59 (4): 428-37, 2014 Jul-Aug. [PUBMED Abstract]

23. Hanley GE, McAlpine JN, Kwon JS, et al.: Opportunistic salpingectomy for ovarian cancer prevention. Gynecol Oncol Res Pract 2: 5, 2015. [PUBMED Abstract]

P2.0060.13

24. Daly MB, Dresher CW, Yates MS, et al.: Salpingectomy as a means to reduce ovarian cancer risk. Cancer Prev Res (Phila) 8 (5): 342-8, 2015. [PUBMED Abstract]

25. Duan L, Xu X, Koebnick C, et al.: Bilateral oophorectomy is not associated with increased mortality: the California Teachers Study. Fertil Steril 97 (1): 111-7, 2012. [PUBMED Abstract]

26. Rocca WA, Grossardt BR, de Andrade M, et al.: Survival patterns after oophorectomy in premenopausal women: a population-based cohort study. Lancet Oncol 7 (10): 821-8, 2006. [PUBMED Abstract]

27. McCarthy AM, Menke A, Ouyang P, et al.: Bilateral oophorectomy, body mass index, and mortality in U.S. women aged 40 years and older. Cancer Prev Res (Phila) 5 (6): 847-54, 2012. [PUBMED Abstract]

28. Rivera CM, Grossardt BR, Rhodes DJ, et al.: Increased cardiovascular mortality after early bilateral oophorectomy. Menopause 16 (1): 15-23, 2009 Jan-Feb. [PUBMED Abstract]

29. Parker WH, Feskanich D, Broder MS, et al.: Long-term mortality associated with oophorectomy compared with ovarian conservation in the nurses' health study. Obstet Gynecol 121 (4): 709-16, 2013. [PUBMED Abstract]

30. Jacoby VL, Grady D, Wactawski-Wende J, et al.: Oophorectomy vs ovarian conservation with hysterectomy: cardiovascular disease, hip fracture, and cancer in the Women's Health Initiative Observational Study. Arch Intern Med 171 (8): 760-8, 2011. [PUBMED Abstract]

31. Yoon SH, Kim SN, Shim SH, et al.: Bilateral salpingectomy can reduce the risk of ovarian cancer in the general population: A meta-analysis. Eur J Cancer 55: 38-46, 2016. [PUBMED Abstract]

32. Falconer H, Yin L, Grönberg H, et al.: Ovarian cancer risk after salpingectomy: a nationwide population-based study. J Natl Cancer Inst 107 (2): , 2015. [PUBMED Abstract]

33. Findley AD, Siedhoff MT, Hobbs KA, et al.: Short-term effects of salpingectomy during laparoscopic hysterectomy on ovarian reserve: a pilot randomized controlled trial. Fertil Steril 100 (6): 1704-8, 2013. [PUBMED Abstract]

34. Venturella R, Lico D, Borelli M, et al.: 3 to 5 Years Later: Long-term Effects of Prophylactic Bilateral Salpingectomy on Ovarian Function. J Minim Invasive Gynecol 24 (1): 145-150, 2017. [PUBMED Abstract]

35. Rota M, Pasquali E, Scotti L, et al.: Alcohol drinking and epithelial ovarian cancer risk. a systematic review and meta-analysis. Gynecol Oncol 125 (3): 758-63, 2012. [PUBMED Abstract]

36. Chandran U, Bandera EV, Williams-King MG, et al.: Healthy eating index and ovarian cancer risk. Cancer Causes Control 22 (4): 563-71, 2011. [PUBMED Abstract]

37. Crane TE, Khulpateea BR, Alberts DS, et al.: Dietary intake and ovarian cancer risk: a systematic review. Cancer Epidemiol Biomarkers Prev 23 (2): 255-73, 2014. [PUBMED Abstract]

38. Baandrup L, Faber MT, Christensen J, et al.: Nonsteroidal anti-inflammatory drugs and risk of ovarian cancer: systematic review and meta-analysis of observational studies. Acta Obstet Gynecol Scand 92 (3): 245-55, 2013. [PUBMED Abstract]

39. Murphy MA, Trabert B, Yang HP, et al.: Non-steroidal anti-inflammatory drug use and ovarian cancer risk: findings from the NIH-AARP Diet and Health Study and systematic review. Cancer Causes Control 23 (11): 1839-52, 2012. [PUBMED Abstract]

40. Lo-Ciganic WH, Zgibor JC, Bunker CH, et al.: Aspirin, nonaspirin nonsteroidal anti-inflammatory drugs, or acetaminophen and risk of ovarian cancer. Epidemiology 23 (2): 311-9, 2012. [PUBMED Abstract]

41. Barnard ME, Poole EM, Curhan GC, et al.: Association of Analgesic Use With Risk of Ovarian Cancer in the Nurses' Health Studies. JAMA Oncol 4 (12): 1675-1682, 2018. [PUBMED Abstract]

42. Huncharek M, Geschwind JF, Kupelnick B: Perineal application of cosmetic talc and risk of invasive epithelial ovarian cancer: a meta-analysis of 11,933 subjects from sixteen observational studies. Anticancer Res 23 (2C): 1955-60, 2003 Mar-Apr. [PUBMED Abstract]

P2.0060.14

43. Terry KL, Karageorgi S, Shvetsov YB, et al.: Genital powder use and risk of ovarian cancer: a pooled analysis of 8,525 cases and 9,859 controls. Cancer Prev Res (Phila) 6 (8): 811-21, 2013. [PUBMED Abstract]

44. Schildkraut JM, Abbott SE, Alberg AJ, et al.: Association between Body Powder Use and Ovarian Cancer: The African American Cancer Epidemiology Study (AACES). Cancer Epidemiol Biomarkers Prev 25 (10): 1411-1417, 2016. [PUBMED Abstract]

45. Gertig DM, Hunter DJ, Cramer DW, et al.: Prospective study of talc use and ovarian cancer. J Natl Cancer Inst 92 (3): 249-52, 2000. [PUBMED Abstract]

46. Houghton SC, Reeves KW, Hankinson SE, et al.: Perineal powder use and risk of ovarian cancer. J Natl Cancer Inst 106 (9): , 2014. [PUBMED Abstract]

47. Siristatidis C, Sergentanis TN, Kanavidis P, et al.: Controlled ovarian hyperstimulation for IVF: impact on ovarian, endometrial and cervical cancer--a systematic review and meta-analysis. Hum Reprod Update 19 (2): 105-23, 2013 Mar-Apr. [PUBMED Abstract]

48. Rizzuto I, Behrens RF, Smith LA: Risk of ovarian cancer in women treated with ovarian stimulating drugs for infertility. Cochrane Database Syst Rev 8: CD008215, 2013. [PUBMED Abstract]

49. Trabert B, Lamb EJ, Scoccia B, et al.: Ovulation-inducing drugs and ovarian cancer risk: results from an extended follow-up of a large United States infertility cohort. Fertil Steril 100 (6): 1660-6, 2013. [PUBMED Abstract]

## Changes to This Summary (03/01/2019)

The PDQ cancer information summaries are reviewed regularly and updated as new information becomes available. This section describes the latest changes made to this summary as of the date above.

### Description of the Evidence

Updated statistics with estimated new cases and deaths for 2019 (cited American Cancer Society as reference 1).

Added text about a cohort analysis of about 200,000 women in the Nurses' Health Studies, which used detailed data about the intensity and duration of aspirin use over time, that showed a reduced hazard ratio for ovarian cancer of 0.77 for low-dose aspirin use but no reduction for standard-dose aspirin use (cited Barnard et al. as reference 41).

This summary is written and maintained by the PDQ Screening and Prevention Editorial Board, which is editorially independent of NCI. The summary reflects an independent review of the literature and does not represent a policy statement of NCI or NIH. More information about summary policies and the role of the PDQ Editorial Boards in maintaining the PDQ summaries can be found on the About This PDQ Summary and PDQ® - NCI's Comprehensive Cancer Database pages.

## About This PDQ Summary

### Purpose of This Summary

This PDQ cancer information summary for health professionals provides comprehensive, peer-reviewed, evidence-based information about ovarian, fallopian tube, and primary peritoneal cancer prevention. It is intended as a resource to inform and assist clinicians who care for cancer patients. It does not provide formal guidelines or recommendations for making health care decisions.

P2.0060.15

## Reviewers and Updates

This summary is reviewed regularly and updated as necessary by the PDQ Screening and Prevention Editorial Board, which is editorially independent of the National Cancer Institute (NCI). The summary reflects an independent review of the literature and does not represent a policy statement of NCI or the National Institutes of Health (NIH).

Board members review recently published articles each month to determine whether an article should:

- be discussed at a meeting,
- be cited with text, or
- replace or update an existing article that is already cited.

Changes to the summaries are made through a consensus process in which Board members evaluate the strength of the evidence in the published articles and determine how the article should be included in the summary.

Any comments or questions about the summary content should be submitted to Cancer.gov through the NCI website's Email Us. Do not contact the individual Board Members with questions or comments about the summaries. Board members will not respond to individual inquiries.

## Levels of Evidence

Some of the reference citations in this summary are accompanied by a level-of-evidence designation. These designations are intended to help readers assess the strength of the evidence supporting the use of specific interventions or approaches. The PDQ Screening and Prevention Editorial Board uses a formal evidence ranking system in developing its level-of-evidence designations.

## Permission to Use This Summary

PDQ is a registered trademark. Although the content of PDQ documents can be used freely as text, it cannot be identified as an NCI PDQ cancer information summary unless it is presented in its entirety and is regularly updated. However, an author would be permitted to write a sentence such as "NCI's PDQ cancer information summary about breast cancer prevention states the risks succinctly: [include excerpt from the summary]."

The preferred citation for this PDQ summary is:

PDQ® Screening and Prevention Editorial Board. PDQ Ovarian, Fallopian Tube, and Primary Peritoneal Cancer Prevention. Bethesda, MD: National Cancer Institute. Updated <MM/DD/YYYY>. Available at: https://www.cancer.gov/types/ovarian/hp/ovarian-prevention-pdq. Accessed <MM/DD/YYYY>. [PMID: 26389359]

Images in this summary are used with permission of the author(s), artist, and/or publisher for use within the PDQ summaries only. Permission to use images outside the context of PDQ information must be obtained from the owner(s) and cannot be granted by the National Cancer Institute. Information about using the illustrations in this summary, along with many other cancer-related images, is available in Visuals Online, a collection of over 2,000 scientific images.

## Disclaimer

The information in these summaries should not be used as a basis for insurance reimbursement determinations. More information on insurance coverage is available on Cancer.gov on the Managing Cancer Care page.

## Contact Us

More information about contacting us or receiving help with the Cancer.gov website can be found on our Contact Us for Help page. Questions can also be submitted to Cancer.gov through the website's Email Us.

P2.0060.16

**Updated:** March 1, 2019

---

*If you would like to reproduce some or all of this content, see Reuse of NCI Information for guidance about copyright and permissions. In the case of permitted digital reproduction, please credit the National Cancer Institute as the source and link to the original NCI product using the original product's title; e.g., "Ovarian, Fallopian Tube, and Primary Peritoneal Cancer Prevention (PDQ®)–Health Professional Version was originally published by the National Cancer Institute."*

P2.0060.17

Exhibit 84

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| IN RE JOHNSON & JOHNSON TALCUM POWDER PRODUCTS MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION *THIS DOCUMENT RELATES TO ALL CASES* | MDL NO. 16-2738 (FLW) (LHG) |

**RULE 26 EXPERT REPORT OF
PATRICIA G. MOORMAN, MSPH, PHD**

Date:   November 16, 2018

Patricia G. Moorman, MSPH, PhD

**Scientific Review of the Epidemiologic Evidence on Talc Use and Ovarian Cancer**

Patricia G. Moorman, MSPH, PhD

Professor, Department of Community and Family Medicine

Cancer Control and Population Sciences, Duke Cancer Institute

Duke University School of Medicine

Durham, NC

1

**Table of Contents**

Background and Qualifications of Patricia G. Moorman, MSPH, PhD ........................................... 3

Education ............................................................................................................................... 3

Professional Experience .......................................................................................................... 3

Compensation and Testimony .................................................................................................. 4

Research Interests and Experience ........................................................................................... 4

Purpose ................................................................................................................................. 7

Role and Importance of Epidemiologic Studies ......................................................................... 7

Methodology .......................................................................................................................... 9

Epidemiologic Studies Reviewed ............................................................................................ 11

Strength and Consistency of the Association .......................................................................... 11

Temporality .......................................................................................................................... 29

Biological Gradient ............................................................................................................... 29

Biologic Plausibility .............................................................................................................. 32

Specificity ............................................................................................................................ 37

Coherence ............................................................................................................................ 37

Experiment ........................................................................................................................... 38

Analogy ................................................................................................................................ 38

Conclusion ............................................................................................................................ 38

    References ....................................................................................................................... 41

    Additional Materials and Data Considered ........................................................................ 50

**Background and Qualifications of Patricia G. Moorman, MSPH, PhD**

I am a tenured professor in the Department of Community and Family Medicine, Duke University School of Medicine, Durham, NC and a member of the Cancer Control and Population Sciences Program in the Duke Cancer Institute. I am an epidemiologist with more than 25 years of experience in conducting research on women's health issues including ovarian cancer, breast cancer and menopause. Attached as Exhibit A to this report is a current copy of my curriculum vitae.

**Education**

I received a Bachelor of Science degree with distinction in pharmacy from the University of Kansas in 1980. I pursued graduate studies in epidemiology in the School of Public Health at the University of North Carolina-Chapel Hill, earning a Master of Science in Public Health (MSPH) in 1989 and a Doctor of Philosophy (PhD) degree in 1993.

**Professional Experience**

I have held positions in academic institutions since I completed my PhD, beginning as a research assistant professor in the Department of Epidemiology at the University of North Carolina-Chapel Hill from 1994 through 1996. From 1997 to 2000, I was an associate research scientist in the Chronic Disease Epidemiology division of the Yale University School of Public Health. I came to Duke University School of Medicine as an assistant professor in 2000, progressing through the academic ranks from associate professor, associate professor with tenure to my current position as professor in Community and Family Medicine. I also serve as the director of the Clinical Research Unit for the Department of Community Medicine and am a member of the Senior Faculty Advisory Committee for the Office for Research Mentoring in the School of Medicine. In addition, I am an adjunct faculty member in the Department of Epidemiology at the University of North Carolina-Chapel Hill.

3

**Compensation and Testimony**

My hourly billing is $400. I have given deposition testimony in one case (Gail Ingham, et al., v. Johnson & Johnson, et al., Case No. 1522-CC10417-01, Circuit Court of the City of St. Louis, Division 10) and have not testified at trial in the last four years.

**Research Interests and Experience**

My primary research interests are in the area of women's health issues, with a particular focus on studying racial differences in risk factors and outcomes. I have had funding from the National Institutes of Health (NIH) for more than 20 years, which has supported my research in ovarian cancer, breast cancer and ovarian function after hysterectomy. Three of the key studies in my research career are: 1) the African American Cancer Epidemiology Study (AACES), a multi-center, case-control study of ovarian cancer in African American women,[1] 2) the Carolina Breast Cancer Study, which is one of the largest studies focused on understanding racial differences in breast cancer risk and outcomes,[2] and 3) the Prospective Research on Ovarian Function (PROOF) Study, a cohort study designed to examine risk for ovarian failure after premenopausal hysterectomy.[3]

Each of these studies involved primary data collection, meaning that the investigative team designed the data collection procedures, developed the surveys, recruited study participants and obtained questionnaire data and biological specimens from the participating women. Each study has made unique contributions to the scientific literature.

AACES has enrolled more than four times as many African-American women with ovarian cancer than any other study and is providing the most comprehensive epidemiologic data on ovarian cancer risk factors in this population to date.[4-6] The Carolina Breast Cancer Study likewise provided key data on risk factors in African American women and was the first study to describe the markedly higher prevalence of the poor-prognosis basal subtype of breast cancer in young African American women.[7-11] The PROOF study is the largest prospective study of ovarian function after pre-menopausal hysterectomy and demonstrated that women

4

undergoing hysterectomy with ovarian conservation were at significantly increased risk for earlier menopause as compared to women who did not have a hysterectomy.[3,12]

Our study team published an analysis of talc exposure and ovarian cancer in 2016, using data from AACES. [13] This peer-reviewed paper, published in *Cancer Epidemiology, Biomarkers and Prevention*, was the first epidemiologic study of talc use and ovarian cancer that was focused exclusively on African American women. Our analyses found both a high prevalence of talc use in this study population and a statistically significantly increased risk for ovarian cancer among talc users. This paper was published prior to my involvement in litigation related to talc and ovarian cancer.

I have also been a co-investigator on the North Carolina Ovarian Cancer Study, which was a precursor to the AACES study. Data from this study were included in Terry, et al.'s [14] 2013 analysis of genital powder use and ovarian cancer that pooled from data from eight case-control studies. I am currently an investigator in the Ovarian Cancer in Women of African Ancestry (OCWAA) consortium. The OCWAA consortium, which was initiated in 2016, is a multi-center collaboration that aims to bring together data from case-control and cohort studies to evaluate similarities and differences between African American and white women in ovarian cancer risk factors and outcomes.

In addition to these studies, I am an investigator with the Evidence Synthesis Group in the Duke Clinical Research Institute, a team of researchers that conducts evidence reviews of the scientific literature. I have worked with this group on a number of systematic reviews and meta-analyses on women's health issues including an evaluation of the benefits and risks of oral contraceptive use for primary prevention of ovarian cancer [15-17] funded by the Agency for Healthcare Research Quality, and an evaluation of the benefits and harms of breast cancer screening[18] funded by the American Cancer Society to help inform their screening mammography recommendations.[19]

I am an author on more than 130 scientific publications, with more than 50 of them directly related to ovarian cancer. The ovarian cancer papers address a wide variety of risk factors including reproductive and hormonal factors, lifestyle characteristics, genetic factors, and talcum powder products. The main focus of the manuscripts on which I have been the lead

5

author has been ovarian cancer risk factors in African American women and the effects of reproductive characteristics, hormones and other medications on risk for ovarian cancer.[5,17,20-23] The papers have been published in some of the leading journals in the field of epidemiology, gynecology and cancer including the *American Journal of Epidemiology, Cancer Epidemiology Biomarkers and Prevention, Obstetrics & Gynecology* and *Journal of Clinical Oncology*.

My teaching experience includes courses in Cancer Epidemiology for graduate students in public health and Evidence-Based Medicine for physician assistant students. A primary emphasis of these courses has been for the students to gain an understanding of the advantages and disadvantages of different types of studies used in clinical and epidemiologic research. In particular, the Evidence-Based Medicine course is designed to help the students learn how to critically appraise the medical literature and apply findings to clinical practice. In addition, I have mentored at the individual level public health graduate students and medical students.

I serve as an editorial reviewer for numerous journals and have served as a peer reviewer of grant applications on several dozen study sections over that past twenty years. I have reviewed NIH grants for a variety of funding mechanisms ranging from small grants (R03) to large multi-project applications (SPORE grants and Program Projects). I also have served as both peer reviewer and study section chair for the Susan G. Komen for the Cure Foundation and the Department of Defense Ovarian Cancer and Breast Cancer Research Programs.

In summary, in a career spanning more than 25 years, I have devoted my efforts to understanding factors that affect risk for ovarian cancer, breast cancer and menopause. I have conducted original research, giving me a deep appreciation of the advantages and disadvantages of different study designs and the challenges of collecting high-quality data for making etiologic inferences. I also have conducted research involving synthesis of the published literature, with the goal of informing decisions based on the best available evidence. A large proportion of my publications have focused on the epidemiology of ovarian cancer, and many of the others focused on breast cancer or menopause have relevance to ovarian cancer because of shared risk factors for the conditions. Based on my education, experience, and expertise, I

6

am highly qualified to assess the literature on the use of talc in relation to ovarian cancer and provide an expert opinion to a reasonable degree of medical certainty.


**Purpose**

The purpose of this report is to summarize the epidemiologic evidence related to talc use and ovarian cancer risk and to make a judgment as to whether there is sufficient evidence, based on the totality of evidence from epidemiologic investigations as well as laboratory and mechanistic studies, to conclude with a reasonable degree of scientific certainty that talcum powder use Is a causal factor for ovarian cancer.

Throughout the report, the term "talc" will be used to refer to talcum powder products, recognizing that commercial talc products can contain asbestos, talc containing asbestiform fibers (e.g., talc occurring in a fibrous habit), heavy metals such as nickel, chromium and cobalt and fragrances.


**Role and Importance of Epidemiologic Studies**

It is important to bear in mind that epidemiologic research on factors that are thought to increase risk for cancer in human populations will consist of observational rather than experimental studies. As with most other now-known carcinogens, including cigarette smoke, it is both ethically wrong and pragmatically impossible to conduct randomized controlled trials to investigate whether a given exposure increases risk for cancer in humans. The judgment as to whether talc causes ovarian cancer will be based on epidemiologic studies in which the investigators collected and analyzed information on exposures (i.e., talc use and other risk factors) that the study participants chose to use, rather than studies in which exposures were randomly assigned to the study subjects in an experimental setting.

Observational study designs used in the study of talc and ovarian cancer include cohort and case-control studies, both of which are well-established and generally accepted methods for studying cancer etiology. In a prospective cohort study, a large group of individuals (the cohort) is identified and exposure to various factors hypothesized to affect risk of disease is

assessed at the time of enrollment (baseline). The cohort is followed over time and the analyses focus on whether the exposed group is more or less likely to develop the outcome of interest than the unexposed group. Some of the prominent advantages of cohort studies are that multiple outcomes/diseases can be assessed within the cohort and exposure assessment precedes the development of the disease, limiting recall bias. However, a primary disadvantage of cohort studies, particularly in relation to cancer etiology studies, is that they must enroll tens of thousands of subjects and follow them for long periods of time to accrue enough cases to have a well-powered study. In addition, if cohort studies do not update exposure information after the baseline assessment, the exposure of some individuals in the cohort may be misclassified.

Case-control studies identify individuals with the disease of interest and an appropriate control group of individuals without the disease and assess exposures that are thought to increase or decrease the risk of the disease. The investigators then analyze whether cases are more likely than the controls to have a given exposure. Case-control studies focus on a single disease, therefore they typically collect more detailed risk factor information for that disease than cohort studies. A major advantage of case-control studies is that they are a more efficient design for studying diseases that are less common or have a long latency period. Therefore, they are very commonly used for etiologic studies of cancer. A disadvantage of case-control studies is that they collect exposure information for the cases after they have already been diagnosed with the disease, which raises concerns that cases may recall exposures differently from controls.

Cohort studies and case-control studies each have advantages and disadvantages for assessing talc as a risk factor for ovarian cancer, and one study design is not clearly superior to the other. In addition, specific details related to the conduct of the study such as methods of exposure assessment, length of follow-up and choice of control group can impact the validity of the findings and the interpretation of results. Therefore, rather than making a judgment based only on the overall study design, the evaluation and interpretation of the findings of the studies must consider the strengths and weaknesses of the individual studies. As the results of the

studies are described and evaluated in this report, specific advantages and disadvantages of individual studies will be discussed in more detail.

In contrast to studies on laboratory animals, studies on humans are subject to more variation in exposure assessment and it is impossible to control all other factors that may contribute to disease risk. For these reasons, judgments on causality from epidemiologic research typically are not based on a single study or even a few studies, but are based on the totality of evidence from multiple studies conducted in different study populations, in different locations and across different time periods. Evidence from the epidemiologic investigations is combined with relevant studies from other disciplines, including pathology, animal and mechanistic studies, to make an assessment of the evidence for a causal association between genital exposure to talcum powder and ovarian cancer.

**Methodology**

The methodology I used to assess the epidemiologic evidence on talc use as a causal risk factor for ovarian cancer involved conducting a literature search on PubMed using the terms "ovarian cancer" and "talc" to identify all relevant original studies, systematic reviews, meta-analyses, editorials and commentaries (search most recently updated on October 29, 2018). The search I did returned 131 articles, all of which were systematically considered and assessed as to their relevance to talc as a risk factor for ovarian cancer. Twenty-nine articles were not directly relevant to the question at hand (mostly addressing talc in the treatment of malignant pleural effusions). Of the remaining 101 articles, 36 were reports of original epidemiologic studies directly addressing genital talc exposure and ovarian cancer or meta-analyses of such studies.[14,24-56] Other articles retrieved included studies of occupational talc exposure,[57-62] other original research articles that were not specifically epidemiologic studies of genital talc and ovarian cancer (e.g., studies of endometrial cancer, pathology studies, animal studies, etc.)[63-80] and reviews, commentaries and letters [60,81-120] I also examined reference lists from key articles to identify any additional relevant studies. In addition, I reviewed relevant studies as well as documents provided during the course of discovery process.

The primary focus of my review is the epidemiologic studies of genital talc exposure and ovarian cancer and the meta-analyses, with supporting information from other types of publications, including animal, pathology and mechanistic studies used as appropriate to address biological mechanisms underlying the association between talc use and ovarian cancer.

As I evaluated the individual epidemiologic studies (case-control and cohort studies) that described the risk for ovarian cancer associated with talc use, I did not weight one design more heavily than the other because there are advantages and disadvantages to each design for evaluating talc as a cause of ovarian cancer. I considered the potential biases of individual studies, both those that supported and those that did not support an association between talc and ovarian cancer, and how those biases may have impacted the findings. As I describe in this report, some biases have the potential to lead to an overestimate of the relative risk (e.g. recall bias in case-control studies) while others could result in an underestimate of the relative risk (e.g. incomplete ascertainment of talc use in the cohort studies).

I also considered the studies that combined data from multiple studies – meta-analyses or pooled analyses from multiple case-control studies. These types of analyses are often considered to be some of the strongest evidence for a causal association between an exposure and disease as they provide an estimate of the relative risk that is more statistically robust than individual studies. Data from meta-analyses are particularly important for evaluating exposure-disease relationships such as talc and ovarian cancer where the relative risks from most individual studies are approximately 1.2 to 1.5.

As is standard in epidemiologic research, my assessment of whether there is a causal association between talc use and ovarian cancer was guided by the aspects of a causal relationship described by Bradford Hill during the 1960's. Sir Austin Bradford Hill's writings on causal inference provide an accepted framework for assessing whether a given exposure is a cause of a specific outcome.[121] The aspects of the associations that Hill described are: Strength, Consistency, Specificity, Temporality, Biological Gradient, Plausibility, Coherence, Experiment and Analogy. As his writings clearly state, these viewpoints or perspectives should be taken into account when assessing causality, but are not to be considered absolute criteria and not all must be checked off to make a conclusion of a causal relationship. Specifically, he states "What

I do not believe is that we can usefully lay down some hard-and-fast rules of evidence that must be obeyed before we accept cause and effect. None of my nine viewpoints can bring indisputable evidence for or against the cause-and-effect hypothesis and none can be required as a *sine qua non*." This list of viewpoints was used to guide my assessment of the scientific literature on talc use and ovarian cancer.

It is important to point out that, in the end of this process, the assessment of whether a substance is or is not a causal risk factor for a given disease or condition involves scientific judgment that is made by considering and weighing the evidence. In any given case, it is not unusual for scientists and epidemiologists to weigh the Hill factors differently in reaching a conclusion on the causal inference in question. For example, scientists for many years debated the evidence that cigarette smoking causes lung cancer or asbestos causes lung disease.

**Epidemiologic Studies Reviewed**

Since 1982, when the first case-control study describing an increased risk for ovarian cancer associated with talc use was reported by Cramer, et al., [50] more than two dozen additional reports of epidemiologic studies have been published.[13,14,24-36,38-44,46-49,51-55,122,123] In some instances, data from a particular study were included in more than one publication, due either to an additional analysis of data from a cohort study with longer duration of follow-up (e.g., [31,34]) or to analyses that combined data from more than one study (e.g., [14,25]). Included in these publications are seven meta-analyses published between 1992 and 2018 that combined overall results from nine to 27 studies [35,51,52,54-56] and a pooled analysis published in 2013 that combined individual level data from eight case-control studies.[14]

**Strength and Consistency of the Association**

The first two aspects of the causal relationship described by Bradford Hill, strength and consistency of association, are deeply intertwined. While Bradford Hill referenced the assumption that a larger relative risk is more likely to reflect a causal association, Hill also clearly stated that we should not be "too quick to dismiss a cause-and-effect hypothesis merely

on the grounds that the observed association appears to be slight. There are many occasions in medicine when this is in truth so." [121]

Seven meta-analyses of genital talc exposure and ovarian cancer [35,44,51,52,54-56] calculated summary relative risks that were very consistent across the publications, ranging from 1.22 to 1.36, all with 95% confidence intervals excluding 1, indicating that women who reported talc use were at statistically significant increased risk for ovarian cancer. Similarly, the pooled analysis of eight case-control studies reported an overall odds ratio of 1.24 (95% confidence interval (CI) 1.15 – 1.33).[14]

To put this in context, it is useful to compare the epidemiologic data related to the strength of the association between genital talc use and ovarian cancer with some other well-accepted exposure-disease associations that have relative risks of similar magnitude and are generally accepted to be causal associations. Some examples of such associations and the relative risks from these exposures estimated from meta-analyses are:

1. Oral contraceptive use and breast cancer, relative risk 1.08 (95% CI 1.003-1.165) for ever versus never use and relative risk 1.21 (95% CI 1.04-1.41) for current or recent use versus never use[16]

2. Menopausal estrogen use and breast cancer, relative risk 1.20 (95% CI 1.06-1.37) for more than 5 years use versus no use[124]

3. Passive smoking (also referred to as environmental tobacco exposure or secondhand smoke) and lung cancer, relative risk 1.27 (95% CI 1.17-1.37) for ever versus never exposure to a spouse who smoked[125]

4. Residential radon exposure and lung cancer, relative risk 1.29 (95% CI 1.10-1.51) for highest versus lowest exposure[126]

5. Trichloroethylene exposure and kidney cancer, relative risk 1.32 (95% CI 1.17-1.50) for occupational exposure.[127]

Each of these exposure/disease associations is widely accepted as a causal relationship in the scientific community and has been judged to be a causal association by the International Agency for Research on Cancer (IARC). [128-130] [131] The estimates of the relative risks for these associations from meta-analyses or pooled analyses are approximately 1.25,[16,124-126,132,133]

12

which is in the range of estimates of the relative risk from meta-analyses and pooled analyses for the association between genital talc use and ovarian cancer. Therefore, we have evidence of well-established causal associations in which the magnitude of the relative risk is very similar to what has been reported for genital talc use and ovarian cancer.

It is instructive to compare in more detail the epidemiologic data on passive smoke exposure to that of talc and ovarian cancer. Passive smoke exposure, like talc, is a very common exposure in the population that can only be assessed retrospectively through self-report, therefore it is difficult to determine the precise level of exposure. In a meta-analysis of 55 studies published between 1981 and 2006 that examined the risk for lung cancer in never smoking women with passive smoke exposure from their spouses, Taylor, et al. [125] reported a pooled relative risk of 1.27 (95% CI 1.17-1.37). The relative risks from individual studies ranged from 0.66 to 2.57, with 44 of the 55 (80%) individual studies reporting a relative risk or odds ratio >1. In the individual studies, only 10 of 55 (18%) reported statistically significant associations (2 of 7 cohort studies, 3 of 25 case-control studies with population-based controls and 5 of 23 case-control studies). These data show that among the many epidemiologic studies that assessed passive smoke exposure as a risk factor for lung cancer, not all had statistically significant findings and some even reported relative risks less than one, yet the overall conclusion from the totality of the evidence is that passive smoke exposure is causally associated with lung cancer.

The most recent meta-analysis published in 2018 on talc and ovarian cancer by Pennikilampi et al. reported a pooled relative risk of 1.31 (95% CI 1.24-1.39) with values from individual studies ranging from 0.73 to 3.90.[56] This result is consistent with other meta-analyses performed. Twenty-four of the 26 (92%) studies reported a relative risk or odds ratio >1, and statistically significant associations were reported in 14 of the 26 (54%) studies. This comparison illustrates that as compared to the well-established causal association between passive smoke exposure and lung cancer, the association between talc and ovarian cancer has a pooled relative risk estimate of similar magnitude with a greater proportion of the studies reporting relative risks >1 and a greater proportion reporting statistically significant

associations suggesting the evidence for talc and ovarian cancer is as significant as for passive smoke exposure and lung cancer.

These comparisons also illustrate the importance of meta-analyses in epidemiologic research when considering exposures for which the strength of association is approximately 1.5 or less. Individual studies, especially those with smaller samples sizes, may not detect a statistically significant increased risk. When the increased risks in this range are seen repeatedly, even when individual studies are not statistically significant, meta-analysis allows the data to be aggregated to make a conclusion that is more robust statistically. When combining these studies through meta-analysis, the totality of the data shows that there is indeed a statistically significant link between genital talc use and ovarian cancer. This observation has been quite consistent, with findings replicated in studies conducted by different teams of investigators, in different geographic locations within and outside the United States, in different race/ethnic groups and over a span of several decades.

In conjunction with the strength of the association, it is also critical to consider the prevalence of the exposure in the population when evaluating its public health impact. A risk factor that is less strongly associated with a disease but has a high prevalence in the population can be responsible for more cases of the disease than a risk factor that is more strongly associated with the disease but has a low prevalence in the population. A measure of the contribution of a risk factor to a disease is the population attributable fraction (PAF), which is defined as the proportion by which the incidence rates of the outcome in the population would be reduced if the exposure was eliminated.[134] Wu et al. [26] calculated the PAF for ovarian cancer related to talc exposure in their multi-ethnic case-control study in Los Angeles. The odds ratio for genital talc use was 1.46 (95% CI 1.27 – 1.69) and the prevalence of use was 41% among the cases and 31% among the controls. The PAFs for the different ethnic groups ranged from 12.2 to 15.1%, which is interpreted as the proportion of ovarian cancer cases that theoretically could be prevented if genital talc use in the population could be eliminated and there were no changes in other risk factors. In other words, of the estimated 22,440 cases of ovarian cancer diagnosed in 2017,[135] approximately 3,300 of them could theoretically have been prevented if women had not used genital talc. The PAF calculation demonstrates that even with an

14

estimated relative risk for genital talc use of less than 1.5, its high prevalence of use means that it contributes to a substantial proportion of the ovarian cancer cases in the population.

The overall associations seen in the talc-ovarian cancer meta-analyses as well as in many of the individual studies are statistically significant, indicating an increase in risk of approximately 25 to 30%. While not as high as other relationships like smoking and lung cancer, these relative risks are in line with other generally accepted causal relationships (e.g., second hand smoke and lung cancer). I consider the strength of the association seen in the talc-ovarian cancer epidemiologic studies, to be an important factor in favor of a causal relationship between talc and ovarian cancer, particularly when considered along with the consistency of the association sees across these studies.

As described above, among the more than two dozen studies that have reported on the association between talc use and ovarian cancer, the vast majority of them reported relative risks or odds ratios greater than one, indicating strong consistency in the direction of the effect. The findings from the multiple studies are summarized in seven meta-analyses published since 1992, including two published in 2017-18, that combined overall results from six to 27 studies assessing genital talc exposure and ovarian cancer [35,51,52,54,55][56][44] and in a pooled analysis published in 2013 that combined individual level data from eight case-control studies. [14] Of the 27 studies included in Berge et al.'s 2017 meta-analysis [51], 24 were case-control studies (18 population-based,[13,23,25,29,30,32,33,38,39,41,42,44,45,47,50,123,136,137] 5 hospital based, [36,43,46,49,122] and 1 with both hospital and population controls [48]) and three were prospective cohort studies [24,27,31]. The calculated overall relative risks for all studies combined in these meta-analyses were 1.3 (95% CI 1.1 – 1.6),[44] 1.27 (95% CI 1.09-1.48),[55] 1.36 (95% CI 1.24-1.49),[35] 1.33 (95% CI 1.16-1.45),[54] 1.35 (95% CI 1.26 - 1.46),[52] 1.22 (95% CI 1.13-1.30)[51] and 1.31 (95% CI 1.24-1.39)[56] and 1.24 (95% CI 1.15-1.33) in the pooled analysis of eight case-control studies.[14] The conclusions from these analyses were quite consistent, even with additional data accumulating over time, indicating that women who used talc products as compared to women who reported no talc use were at 22 to 36% increased risk for ovarian cancer.

When considering the consistency from a number of different studies and meta-analysis, an epidemiologist should evaluate potential sources of bias including but not limited

15

to publication bias, recall bias, selection bias and information bias. I discuss each of these below.

Publication Bias: When considering a body of epidemiologic evidence from multiple studies, several concerns arise about the completeness of the published data and whether there is selective publishing of studies that find significant positive associations. These concerns were addressed by two distinct analyses conducted in the most recent meta-analyses by Berge, et al. (2017) and Penninkilampi and Eslick (2018).[51,56] The first approach reported was a funnel plot, which is a graphical technique that plots the relative risks derived from the studies on one axis and the standard error of the relative risk (an indicator of the size of the study) on the other. The concept driving this approach is that studies should cluster around the "true" relative risk in the population. Due to random statistical variation, some studies will have relative risks that are higher than the true relative risk and some will be lower than the true relative risk. As sample sizes increase, there should be more precise estimates of the relative risk, therefore larger studies would be expected to produce estimates closer to the true relative risk whereas smaller studies may produce results that deviate further from the relative risk in the overall population. When the study results are plotted, one would expect them to fall into a funnel shape, with the larger studies at the point of the funnel, clustered around the true relative risk in the population, and smaller studies, with more variation in results, showing greater deviation from the average, forming the wide part of the funnel. Notably, in these meta-analyses, the two studies with the highest relative risk estimates (Chen, et al [45] with a relative risk of 3.90 and Godard, et al. [38] with a relative risk of 2.49) and the two studies with the lowest relative risks (Hartge, et al. [49] and Gonzalez, et al. [24]) all had a modest number of cases (<=170).

A funnel plot provides a method for assessing publication bias, i.e., the bias that results from studies with statistically significant findings being more likely to be published than studies that show no association. If one is concerned that studies that showed no association between the exposure and outcome are less likely to be published, the funnel plot allows the visual assessment of this potential bias. A lack of symmetry in the funnel plot, with a deficit of studies showing no association between the exposure and outcome, would be an indication of

16

publication bias. The papers by Berge, et al. [51] and Penninkilampi and Eslick [56] which are the only meta-analyses that specifically addressed publication bias, concluded that there was no serious publication bias based on both visual inspection of the funnel plot and a statistical assessment of the data from the funnel plot. Therefore, there is a high level of confidence that there has not been preferential publication of studies that found a positive association between talc and ovarian cancer.

A second approach used by Berge, et al. [51] was a cumulative meta-analysis, in which they showed the estimated summary relative risks over time from the first published report in 1982 through the most recently published studies in 2016. The plot showed that after the first initial reports, the overall summary estimates stabilized with estimates in the range of 1.2 to 1.25 over the last 25 years even as more and more data accrued from additional published studies.

These quantitative analyses indicate that it is unlikely that there is publication bias in the talc and ovarian cancer literature (i.e., the analyses do not suggest that studies that found talc use to be a risk factor for ovarian cancer were more likely to be published than those that found no association). Furthermore, from a qualitative perspective, it is also unlikely that there is a substantial risk for publication bias. Given the considerable public health interest in the risk for ovarian cancer associated with a widely-used cosmetic product, it is probable that any well-designed and conducted study that addressed this question would be published, even if it had null findings. Notably, one of the most recent studies, the Sister Study,[24] was published even though it found no increased risk for ovarian cancer associated with talc use.

While the overall conclusions from the meta-analysis and pooled analyses are quite consistent, with an overall statistically significant estimate of the relative risk in the range of approximately 1.2 to 1.3, it is important to consider possible reasons for heterogeneity of the estimates between individual studies.

Among the individual studies that have examined the association between talc use and ovarian cancer, the majority have been case-control studies, with only three prospective cohort studies addressing this research question. The meta-analysis by Berge, et al.[51] noted that the summary relative risk was driven by the stronger associations observed for case-control studies

17

(relative risk = 1.26 (95%CI 1.17 – 1.35) than for cohort studies (relative risk = 1.02 (95% CI 0.85 – 1.20), which leads one to try to understand possible reasons for the differences by study design and to consider the relative advantages and disadvantages of the different study designs, specifically in relation to the study of talc and ovarian cancer. While the cohort studies do not show a statistically significant association for ever use of talc and ovarian cancer overall, the recent meta-analysis by Penninkilampi and Eslick[56] reported a statistically significant association with the invasive serous subtype of ovarian cancer, which is both the most common subtype and the one with the worst prognosis.

Case-Control Studies – Strengths and Weaknesses: Case-control studies, which are very commonly used in cancer epidemiology, have particular advantages for studying a relatively uncommon cancer like ovarian cancer, which has an annual incidence (number of new cases) in the United States of approximately 11 cases per 100,000 women.[138] In this study design, women with ovarian cancer (the case group) are identified by the research team, typically through a cancer registry, shortly after receiving their diagnosis. A control group of women who do not have the disease are also identified and recruited for the study. Both the cases and the controls provide information on their past exposure history. In a typical case-control study, the study participants complete an extensive questionnaire focusing on a broad range of exposures that are hypothesized to either increase or decrease the risk for cancer. In regard to ovarian cancer, a typical questionnaire will include questions on demographic characteristics, reproductive characteristics like pregnancy and contraception, medical characteristics, family history of cancer and lifestyle characteristics such as dietary factors, smoking history, physical activity and talc use. Notably, some of the factors queried about are expected to increase risk (e.g., family history of ovarian or breast cancer, estrogen use during menopause, talc), whereas others are associated with reduced risk (e.g., oral contraceptive use, pregnancies).

One major advantage of a case-control study is that it is possible to identify and recruit a large number of cases within a relatively short timeframe. To illustrate this point, I will use the example of AACES, the case-control study that my colleagues and I initiated in 2010 to study ovarian cancer in African American women and which was the source of the data we used for our 2016 paper on talc and ovarian cancer.[1,13] We have enrolled more than 600 women with

18

ovarian cancer and more than 700 control women over a period of approximately 6 years, making it by far the largest study of ovarian cancer in African American women. When the grant application was originally submitted to the National Cancer Institute, one reviewer expressed the opinion that a cohort study would be preferable to the case-control design we proposed. In our response to the review, we pointed out that a prospective cohort study was not feasible for studying ovarian cancer in this population if we hoped to obtain meaningful information in a reasonable timeframe. The Black Women's Health Study, a large prospective cohort study, enrolled approximately 60,000 women starting in 1995 with the goal of studying a wide variety of health outcomes in this population.(https://www.bu.edu/bwhs/) In regard to ovarian cancer, after 18 years of follow-up, only 115 cases of ovarian cancer had been diagnosed among women in the cohort.[139] Although a cohort of 60,000 women is a very large epidemiologic cohort, it is still inadequate to study a relatively uncommon disease like ovarian cancer in a time-efficient manner. We successfully made the argument to the reviewers that a case-control study was the only feasible way to investigate the etiology of ovarian cancer in a timely manner in the African American population. This example illustrates why it is to be expected that the majority of the epidemiologic studies of ovarian cancer would be case-control studies.

Although case-control studies are commonly used in epidemiologic studies of cancer, there are potential biases associated with this study design, including selection bias and recall bias. In this study design, the investigator must select a control group of individuals without the disease being studied as a comparison group to determine the relative frequency of the exposures in the case group as compared to the control group. The goal of selecting a control group is to identify a group that is representative of the population from which the cases arose. This is often stated in textbooks as if someone in the control group were to develop the disease being studied, s/he would have been selected as a case for the study. There are many possible strategies for identifying and recruiting population-based controls, including the use of town registry books,[25,50] telephone recruitment through random digit dialing [13,25,29], neighborhood recruitment,[30] driver's license records [25] and electoral rolls.[123] In hospital-based case-control studies, controls are typically selected from other hospitalized patients, with different studies

applying different criteria for eligible diagnoses among the controls, including other cancer diagnoses or specific non-cancer diagnoses. [36,43,46,49,122]

Among the studies included in the recent meta-analyses, six were hospital-based case-control studies.[36,43,46,48,49,122] The individuals that comprised the control group varied between these studies including patients with non-gynecologic malignancies,[36] patients treated for conditions other than gynecologic or malignant diseases,[122] patients treated for conditions other than those related to reproductive history or oral contraceptive use,[46] patients treated for conditions other than gynecologic, psychiatric, or malignant diseases or pregnancy,[49] both hospital patients and population-based controls [48] and hospital visitors.[43] While the use of hospital controls may be efficient, concerns are often raised as to whether the controls are representative of the population from which the cases arose in terms of the exposures they experienced or their underlying risk for cancer. This is a particular concern with the study by Wong, et al, [36] which is the largest of the hospital-based case-control studies and one that found no association between talc use and ovarian cancer (OR=0.92, 95% CI 0.24-3.62). The control group in this study was "female patients treated for non-gynecologic malignancies during the same period". Standard epidemiologic textbooks (e.g., Rothman, *Modern Epidemiology*[140]) state that controls should be selected from the same source population or study base that gives rise to the cases. It is difficult to make the argument that other cancer patients represent the source population from which the ovarian cancer cases arose, which suggests that this was a poor choice of a control group that could have led to biased findings.

Another of the hospital-based studies, the study by Tzonou et al.[43] which reported a relative risk of 1.05, also had a significant limitation. This study was conducted in Greece, and the overall prevalence of talc use in the study population was 3.5%. Given the small sample size and the low prevalence of exposure, this population was ill-suited to study the relation between talc use and ovarian cancer.

As noted in the meta-analysis by Penninkilampi and Eslick, [56] the hospital-based studies were older (published before 2000) and with the exception of the Wong study [36], all were smaller studies that included fewer than 200 cases. The summary odds ratios from the hospital-based studies was lower but not significantly different than the summary odds ratio from

population-based studies (OR 1.22 versus 1.33, respectively),[56] a result that is not surprising given the important limitations in some of the hospital-based studies.

While there is no ideal method for control selection, arguably population-based control recruitment is more likely to result in a control group that is representative of the population from which cases arose. All of the larger case-control studies that investigated talc use and ovarian cancer (i.e., those with more than 500 cases) were population-based,[13,23,25,29,30,33,42,123,137] which should have minimized selection bias.

Recall Bias: Recall bias is another possible bias in case-control studies. Recall bias is defined as systematic error due to differences in accuracy or completeness of recall of prior events or experiences.[134] It is a concern with case-control studies because information on exposures is obtained through interviews or questionnaires completed after the cases have already been diagnosed with the disease. It is thought that people affected with a disease may have given more thought to possible causes of that disease and have more accurate recall of risk factors than a person serving as a control in the study.

A distinction is made between *recall bias*, which arises from cases recalling exposures differently than controls, and *inaccurate recall* of an exposure that is difficult to remember with precision. Recall bias, which is considered differential misclassification between cases and controls, can result in either an overestimate or underestimate of the true relative risk. Inaccurate recall that occurs to a similar degree in cases and controls is considered non-differential misclassification, and for a dichotomous outcome (e.g., ever vs. never use of talc) will typically result in an underestimate of the true relative risk. An exposure like talc use, especially when assessing use over many years, is clearly one that is subject to a certain amount of inaccurate recall. However, inaccurate recall alone would not result in the consistently increased relative risks observed in the vast majority of the case-control studies of talc use and ovarian cancer.

Therefore, recall bias, which theoretically could result in a biased estimate of the relative risk, must be considered. Situations where recall bias would be considered a particular threat to a study's validity would be: 1) the exposure of interest is one that could be considered sensitive (e.g., illicit drug use, induced abortions), 2) the study hypotheses are known to the

21

study subjects or interviewers, or 3) there has been considerable media attention focused on an exposure.

In regard to the first situation, genital talc use, while addressing a rather personal topic, would not be considered a particularly sensitive topic. One would not expect that women would be disinclined to report its use out of embarrassment or a desire to report what is perceived to be more socially acceptable as has been reported for exposures like induced abortion.[141]

As to the second point regarding the blinding of the interviewers and the study participants to the study hypotheses, this is standard practice in epidemiologic research. In addition, in the typical case-control study, the investigators are collecting a tremendous amount of questionnaire data to address numerous hypotheses and there is not a particular focus on a single exposure. As an example, the questionnaires from AACES and the North Carolina Ovarian Cancer study each took approximately 1 - 1.5 hours to administer and collected information on a large number of exposures including pregnancy history, contraceptive and hormone use, family history of cancer, medical history, psychosocial factors and lifestyle factors. Data were collected on factors that were expected to be associated with increased risk (e.g., family history of cancer, history of infertility, menopausal hormone use, talc use) as well as those expected to be associated with decreased risk (e.g., oral contraceptive use, pregnancies, physical activity). Given the broad range of hypotheses and the numerous exposures that the cases and controls were queried about and the fact that neither cases nor controls were told in advance of the interview about the specific topics that would be covered, it is unlikely that the women with ovarian cancer would have given more thought to their talc use resulting in substantial systematic over-reporting of talc use among cases. This is supported by studies of other cancers that used empirical data to assess the likely effect of recall bias on relative risk estimates when investigators examined numerous exposures and concluded that recall bias did not consistently lead to increased estimates of the relative risk. [142-144]

Further evidence that recall bias in case-control studies does not inevitably lead to an overestimate of the association between a risk factor and exposure comes from a recent review of meta-analyses of observational studies by Lanza et al.[145] This review analyzed a random

22

sample of 23 meta-analyses of observational studies addressing different exposure/disease associations published in 2013 and compared findings from case-control studies and cohort studies within individual meta-analyses to determine if conclusions from case-control studies were significantly different from those from cohort studies. The authors concluded that there was no significant difference in effect estimates between the case-control and cohort studies, suggesting that the study design did not have an important impact on the conclusions of the meta-analyses. Although recall bias *theoretically* could lead to an overestimate of the association between a risk factor and disease, the empirical evidence indicates that in practice the effect is small in most situations.

The third situation of the effect of media attention on an exposure deserves consideration as there has been reporting in the lay press in recent years about lawsuits involving talc and ovarian cancer. This concern is not relevant to the vast majority of the studies as virtually all of the data collection in the epidemiologic studies of talc and ovarian cancer occurred prior to such litigation. However one notable exception is AACES,[13] which began enrollment in 2010 and included data collected up through August, 2015. At the recommendation of the reviewer who critiqued the manuscript when it was submitted for publication, our group examined the association between talc and ovarian cancer stratified by the date of enrollment. The odds ratio for genital talc use and ovarian cancer was 1.44 for the overall study population and 1.19 for the participants interviewed before 2014. These data do give some credence to the idea that recall bias could have led to the higher odds ratios when including women interviewed during the time when there was more media attention focused on this exposure, however the fact that the association was attenuated but not eliminated when considering the full study population suggests that the association is not due entirely to recall bias.

Another way to approach the issue of whether recall bias is a likely explanation for the association between talc use and ovarian cancer is to consider whether the association was observed for other gynecologic cancers. The data are admittedly very sparse in this regard, however the only published case-control study of talc use and endometrial cancer reported an odds ratio of 0.88 (95% CI 0.68 – 1.14).[67] A study of ovarian cancer that was conducted by

several of the same investigators as the endometrial cancer study used similar methodology, was conducted in a similar timeframe (early to mid-2000s) in the same geographic region (Australia) and reported a similar prevalence of talc use in the study population. In contrast to their endometrial cancer study in which the investigators observed a non-significant inverse association with talc use, the investigators found a statistically significant increased risk for ovarian cancer associated with talc use (odds ratio=1.17, 95% CI 1.01 – 1.36).[123] While this comparison clearly needs to be interpreted cautiously because there is only a single published case-control study of talc use and endometrial cancer, it does provide evidence to suggest that the association between talc and ovarian cancer observed in most case-control studies is not due simply to recall bias.

Cohort Studies – Strengths and Weaknesses: In contrast to the case-control study, the prospective cohort study design is less susceptible to the selection bias and recall bias described above. Women who develop cancer and the comparison group are from the same population (the cohort) so the bias that could arise from improperly selecting a control group is minimized. Similarly, because the exposure information is collected before the diagnosis of cancer, one would not expect that recall of exposures would differ between the women who went on to develop cancer and those who remained free of cancer.

Despite these advantages, cohort studies do have some important disadvantages in relation to studying cancer etiology. The first is that even with large cohorts, it takes many years for a reasonable number of cancers to develop within the cohort, especially for an uncommon cancer like ovarian cancer. When considering the statistical power of a study to assess the association between an exposure and a disease, the size of the cohort is not the only driver of study power. A more critical consideration is the number of cases that develop within the cohort, which in turn is dependent on the length of follow-up of the larger cohort. Therefore, a large cohort with a relatively short duration of follow-up during which time a small number of cases developed among cohort will have low statistical power. In contrast, the total sample size of a case-control study is likely to be much smaller than a cohort study, but if it has a larger number of cases, it will have greater statistical power than the cohort study.

24

Among the three cohort studies included in the most recent meta-analysis,[56] the Nurses' Health Study reported 307 cases in a cohort of 78,630 women after approximately 14 years of follow-up;[34,146] the Women's Health Initiative reported 429 cases in a cohort of 61,576 women after a mean of 12.4 years of follow-up[27] and the Sister Study reported 154 cases in a cohort of 41,654 women after a mean of 6.6 years of follow-up.[24] Even with tens of thousands of women in these studies, the number of ovarian cancer cases within each cohort is smaller than the number of ovarian cancer cases in many of the case-control studies. In particular, the number of cases within the Sister Study is smaller than the number of cases in any of the case-control studies published since 1993. As described in a commentary by Narod[81], the lack of a significant overall association between ever use of talc and ovarian cancer in the cohort studies may be due to the fact that the despite the large size of the cohorts, the studies were not adequately powered to detect a relative risk of approximately 1.2.

Another limitation of cohort studies that is of greater relevance to the question of talc use and ovarian cancer is information bias related to exposure assessment. Cohort studies are typically designed to examine many different outcomes that develop within the study population over time. The Nurses' Health Study (http://www.nurseshealthstudy.org/selected-publications) and Women's Health Initiative (https://www.nhlbi.nih.gov/whi/references.htm) have reported on many different outcomes including, but not limited to, multiple types of cancer, cardiovascular diseases, fractures, gastrointestinal conditions and mental health. In contrast, case-control studies focus on a single disease, such as ovarian cancer. Because cohort studies are designed to examine diverse outcomes, the questionnaires must obtain data on risk factors that are relevant to a wider variety of diseases. To keep the questionnaire to a manageable length, a cohort study will typically query about more risk factors but in less detail than a case-control study that is focused on a single disease. This is the case with the talc questions, with the cohort studies collecting less detailed information on talc use, especially in regard to duration and frequency of use, than most of the case-control studies.

It is also worth noting that cohort studies are also subject to recall errors, especially when assessing exposures that began early in life. When the cohort studies assessed talc use, they were asking women to recall their past use of the products up to the point of interview,

25

similar to how exposure is assessed in the case-control studies. In the Nurses' Health Study, the cohort members were aged 36 to 61 at the time talc use was assessed in 1982, and in the Women's Health Initiative, the mean age at enrollment was 63. Because many women initiate use of talc at a young age, the study participants would have been recalling exposures over several decades, and it stands to reason that there would be some errors in recall. Therefore, in cohort studies as in case-control studies, reported talc use was subject to some degree of inaccurate recall. This likely resulted in non-differential misclassification of the exposure, which usually results in an underestimate of the true relative risk.

Another concern with exposure assessment in cohort studies that is highly relevant to the question of talc use in relation to ovarian cancer is that risk factor information can change over time. If the questionnaire data that were collected when the cohort was assembled do not include a comprehensive exposure history to that time point and are not updated over time, the information may not reflect the complete exposure history of an individual in the time before she was diagnosed with cancer. This could result in some talc users being incorrectly identified as non-users or in incorrect estimates of the duration of exposure.

Incomplete exposure assessment is a potential problem for each of the three cohort studies that have reported on talc use and ovarian cancer, however it is a particular issue for the Sister Study [24] which reported a non-significant inverse association between talc use and ovarian cancer (relative risk of 0.73, 95% CI 0.44 – 1.20). Each of the cohort studies assessed talc use at a single point in time and did not update the information at subsequent follow-up interviews. The Nurses' Health Study collected limited information on talc exposure in 1982, and did not collect additional data on talc use in subsequent questionnaires between 1982 and when the results were described in papers published in 2000 [34] and 2010. [146] Similarly, the Women's Health Initiative collected information on talc exposure when the women were enrolled into the study and did not obtain updated information during the years the cohort was followed. Therefore, any use of talc after that single exposure assessment was not captured, and there would be a certain amount of misclassification of the exposure in both the women who subsequently developed ovarian cancer and those who did not. If the misclassification was non-differential, meaning that the degree of misclassification was similar between the women

who developed ovarian cancer and those who did not, the predicted effect would be a bias towards the null.[140] In other words, non-differential misclassification of talc exposure (as a dichotomous variable) would mean that the observed relative risk was not as strong as it would have been if there had been not misclassification.

The degree of misclassification of exposure in the Sister Study [24] is apparently much greater than in the other cohort studies. Use of talc was assessed through questions about personal care products used only in the 12 months prior to enrollment, including genital talc use in the form of powder or spray applied to a sanitary napkin, underwear, diaphragm, cervical cap or vaginal area. This assessment is essentially a "snapshot" of talc use during a short period of time, capturing neither the cumulative use of talc up to that point nor any subsequent use of talc after the baseline interview. Not surprisingly, the reported prevalence of talc use was quite low in this study. The 14% prevalence reported in the Sister Study was markedly lower than the other two cohort studies (40.2% in the Nurses' Health Study [34] and 52.6% in the Women's Health Initiative [27]) as well as in nearly all of the case-control studies. In addition to underestimating the prevalence of talc use in their population, their assessment of talc only during the year prior to enrollment probably did not capture exposure during the most relevant period of the woman's life. As the authors acknowledged in their paper, if latency (the time between exposure and diagnosis of cancer) is 15 to 20 years, the exposure assessments do not accurately reflect the period of risk. The limitations in the assessment of talc use raise serious questions about the validity of the findings from the Sister Study for this particular exposure. It is impossible to predict the direction or the magnitude of the association between talc use and ovarian cancer if the Sister Study had conducted a more complete assessment of the exposure.

A further limitation of the exposure assessment in the Nurses' Health Study and Women's Health Initiative is that neither assessed both the frequency and duration of use of talc. This additional limitation has ramifications for assessing dose-response gradients, which will be discussed in a later section of this report.

While cohort studies are often considered a stronger study design for assessing causal relationships between an exposure and outcome, this is not absolutely true for all exposures and outcomes. Rather than making a judgement about the quality of evidence based solely on

study design, it is important to consider study design from a more nuanced perspective and consider whether a cohort or case-control study provides the most optimal assessment of the exposure and outcome. As described above, each of the three cohort studies that has addressed talc use and ovarian cancer risk had substantial limitations in their assessment of talc use within their study population, which weakens their conclusions that talc use is not significantly associated with ovarian cancer risk.

In addition, the Sister Study,[24] which is a study that was designed primarily to examine breast cancer outcomes among women who had a sister with breast cancer, the small number of ovarian cancer cases despite the large size of the cohort and the inadequate assessment of talc exposure arguably make it a much weaker study than some of the larger, well-designed population-based, case-control studies. Notably, this study, with a relative risk estimate of 0.73 (95% CI 0.44 – 1.20) [24] could be considered an outlier as it is only one of two studies that reported a relative risk substantially less than 1, the other being Hartge's 1983 hospital-based case-control study.[49]

Uncontrolled Confounding in Observational Studies: Uncontrolled confounding is a potential concern in both case-control and cohort studies since they are observational studies. If a factor is associated with talc use *and* is a risk factor for ovarian cancer and is not accounted for in the statistical analysis, it could confound the association between talc use and ovarian cancer. In other words, if there is confounding, the increased risk observed with talc use could be due to the failure to account for the other risk factor. Vaginal douching, which was found to be associated with ovarian cancer risk in the Sister Study, was examined as a potential confounder of the association between talc use and ovarian cancer.[24] Their analyses showed that adjusting for douching using statistical modelling had a negligible effect on the association between talc use and ovarian cancer, providing no evidence of confounding. Other studies have either found an association between talc and ovarian cancer when controlling for douching [44] or found no association between douching and ovarian cancer,[49] thus the available data do not support that douching is a confounder of the association between talc and ovarian cancer. Although uncontrolled confounding is a theoretical possibility, to my knowledge, in the more

than 30 years of research on talc and ovarian cancer no such confounder has been identified that could account for the increased risk associated with talc use.

Overall, the meta-analyses indicate a high level of consistency in findings, especially from the case-control studies. Although weaker associations were observed in the cohort studies, the most recent meta-analysis did report statistically significant associations with invasive serous ovarian cancer in the cohort studies as well as in the case-control studies that reported on histologic subtype.[56] As a whole, the weaker associations observed for the cohort studies could be plausibly explained by limited methods used for talc exposure assessment, the limitations described above, including the most recent cohort study by Gonzalez, et al.,[24] which will have the predicted effect of biasing the results towards the null (i.e., showing an effect that is weaker than the true effect).

Taken as a whole, the overwhelming statistical strength of these studies, whose results are replicated over decades across a wide variety of populations and investigators, further supported by consistent meta-analysis, weighs very heavily in favor of a causal inference.

**Temporality**

Temporality is the only consideration that is an absolute criterion when making a judgment of causality. This criterion states that a cause (the exposure) must precede the effect (the outcome of interest) in time. Both the cohort and case-control studies that examined talc use in relation to ovarian cancer assessed talc exposure that preceded the diagnosis. In cohort studies, the questionnaire data are obtained before any women in the cohort have a diagnosis of ovarian cancer, and in the case-control studies, women with ovarian cancer are asked to report on exposures that occurred before their diagnosis and controls are asked to report on exposures that occurred in a similar time frame. Therefore, there is no question that the exposure assessment captured talc exposure that preceded the diagnosis of ovarian cancer. Nevertheless, this factor is not highly weighted; while its absence would be fatal to a causal inference, its presence is not particularly compelling support for causation.

**Biological Gradient**

Associations that show evidence of a biological gradient, or dose-response relationship, are considered to have stronger evidence of causality. While the inconsistencies in reported dose-response trends for talc and ovarian cancer have been noted in some meta-analyses and reviews, e.g.,[51,54] there are several considerations about this exposure that should be taken into account.

First, for an association like talc and ovarian cancer, the dose that is most relevant is the amount of talc that actually reaches the fallopian tubes and ovaries. The epidemiologic data rely on measures of external application as a surrogate of the level of exposure, not the actual exposure in the upper genital tract.

Second, there is some inherent inaccuracy in the measurement of the exposure, as the participants in most studies were asked to recall their duration and/or frequency of use over many years.

Third, the dose of talc exposure has been assessed differently across the studies. Some studies assessed only duration of use (months or years), some assessed only frequency of use (e.g., number of days per month) and some used measures of both duration and frequency to come up with a measure of total dose (estimated lifetime number of applications). The limitations of relying on duration or frequency alone as a measure of talc dose are apparent. For certain exposures, oral contraceptive use for example, duration of use is a good measure of total exposure because the pills are taken once daily. In contrast, patterns of talc exposure may be more inconsistent. Some women may use it daily, others only during their menstrual periods, others may apply it only during certain times of the year and others may have still different patterns of use. Measures of exposure based only on duration of use or only on frequency of use could result in inaccurate estimates of total exposure and obscure a dose-response relationship.

Some of the meta-analyses have cited the lack of a clear dose-response relationship as an argument against talc being a cause of ovarian cancer, and when considering measures of either years of talc use or number of applications of talc per month, there is considerable heterogeneity across studies. When considering the studies that examined dose-response associations considering both dose and frequency to estimate the total number of applications

of talc,[13,14,25,29,30,32,35,41], the majority [13,14,25,30,32] did find significant trends of higher risk with more lifetime applications of talc.

Terry, et al. [14] noted in the pooled analysis of eight case-control studies that the trend for increasing risk for non-mucinous ovarian cancers with an increasing number of genital powder applications was significant when non-users were included in the analysis, but the trend was not significant when the analysis was restricted to ever users. The authors therefore concluded that the significant trend was largely due to the comparison of women who had ever used talc versus those who had never used it, suggesting that the dose-response relationship was not a simple linear increase in risk with greater exposure to talc.

While there is evidence of a dose response relationship in the majority of the studies that considered both frequency and duration of use (i.e., total number of applications), these observations are less consistent than the overall association between talc and ovarian cancer. There are several possible reasons why not all studies observed dose-response relationships, even when an overall association was observed in the study. First, there is likely to be greater inaccuracy in the recall of duration of use as compared to ever/never use, which would tend to obscure a dose-response relationship. Second, when "ever-users" were stratified into duration of use categories, it often resulted in strata with small numbers of women, resulting in less stable relative risk estimates within the duration categories. Third, as noted by Terry, et al.[14], the dose-response relationship may not be a simple linear trend. In many of the studies, even the women in the lowest exposed category had hundreds of episode of talc exposure. Because there could have been considerable exposure even among the women in the "low" exposure categories, greater exposure may not have resulted in substantially increased risk and thus a linear trend may not have been apparent.

Overall, biological gradient was given lesser weight in my assessment of the literature, based on: 1) some of the studies that assessed a dose-response relationship evaluated only duration or frequency of use and not total number of applications, 2) duration and frequency of use are subject to more misclassification than ever use of talc, 3) small sample sizes within strata lead to unstable estimates, and 4) there is the possibility of a non-linear dose-response relationship. Nonetheless, even with these limitations, there was still evidence of a dose-

31

response relationship in the majority of studies that evaluated it based on the total number of applications.

**Biologic Plausibility**

Biological plausibility refers to whether there is a reasonable biological mechanism through which the exposure could lead to the disease. Hill is quick to point out that biological plausibility depends on the current state of scientific knowledge. Specifically, Hill wrote "It will be helpful if the causation we suspect is biologically plausible. But this is a feature I am convinced we cannot demand. What is biologically plausible depends upon the biological knowledge of the day." It is clear that from these statements that the consideration of biological plausibility does not require that that there is a *proven* biological mechanism to make a judgment of causality between an exposure and disease. Therefore, for this Hill consideration, a scientist looks for biological evidence that might explain the associations that are observed in the epidemiologic studies. In other words, one has to see whether the observed association "makes sense" biologically. In this case, I have considered both clinical plausibility and biological plausibility. Both of these show that the association seen in the epidemiologic studies "makes sense."

It is probably safe to say that our understanding of the complex biological processes that lead from exposure to disease is incomplete for all cancers. In some instances, the precise biological mechanisms by which an exposure leads to disease remain unclear and in others, some mechanisms are well-established but there is not a complete understanding of why some exposed individuals develop the disease and others do not. An example of the former is alcohol consumption as a cause of breast cancer. While alcohol is considered by IARC to be an established cause of breast cancer, [128] recent publications still describe the association as one in which the exact biological pathways are unclear, even though several possible mechanisms have been hypothesized (i.e., metabolism to acetaldehyde or effects on estrogen levels).[147,148] An example of the latter is smoking and lung cancer. Mechanisms of carcinogenesis from constituents of tobacco smoke have been well-described,[149] however it remains unclear as to why some smokers are more susceptible to developing lung cancer. In short, it is important to

recognize that biological plausibility depends on the current state of knowledge and may evolve over time as new evidence emerges.

When considering the likelihood of talcum powder products causing ovarian cancer, there is robust data that leads to the conclusion that there are biologically plausible mechanisms by which this exposure could lead to ovarian cancer. Specifically, 1) talcum powder products can migrate from the perineum through the genital tract to the ovaries and fallopian tubes, 2) talcum powder products can become imbedded in the ovarian tissue; 3) talcum powder products can induce an inflammatory response, and 4) the inflammatory response can result in increased oxidative stress and expression of cytokines, mutagenesis, and cell proliferation.

Pathology studies have demonstrated that particles may ascend the female genital tract from the vagina to the fallopian tubes and ovaries,[150,151] and talc particles have been identified in ovarian tissue.[71,76,78,79] In fact, the FDA's 2014 response to the Citizen's Petition requesting a cancer warning label on cosmetic talc products states that "the potential for particulates to migrate from the perineum and vagina to the peritoneal cavity is indisputable".[152] Therefore, it is highly plausible that application of talcum powder products to the genital area can result in exposure to the ovaries.

It is also plausible that inhalation of talc products could also be a route of exposure leading to cancer. Studies of asbestos exposure indicate that inhalation of asbestos fibers can result in exposures to the peritoneal tissue, through transport through the lymphatic system and/or blood.[153-155] There is strong evidence that such exposure can result in cancer, most notably mesothelioma. Inhalation of talcum powder products could result in similar peritoneal exposure.

Given the evidence that external application of talcum powder products can reach the ovaries either through upward migration through the genital tract or through inhalation and subsequent transport through the lymphatic system and/or blood, there are plausible biological pathways by which talc could lead to the development of ovarian cancer.

It is well-established through several lines of evidence that talc can cause inflammation. The inflammatory properties of talc are exploited for clinical use in talc pleurodesis, a treatment

for malignant pleural effusions or pneumothorax that involves instillation of talc into the pleural space.(https:www.uptodate.com/contents/talc-pleurodesis) The resultant inflammation and fibrosis result in adhesion of the layers of the pleura, closing the pleural space. The inflammatory properties of talc are also evident in that chronic or acute exposure to talc through inhalation which can result in pulmonary talcosis, a chronic inflammation of the lower respiratory tract.[156,157] Animal studies also confirm that talc causes inflammation, as experiments in rats treated with intra-vaginal or perineal talc showed inflammatory changes in the genital tract.[70] Although neoplastic changes were not observed in this experiment, this could be explained by the small number of animals (n=7) in each group or the duration of the experiment (3 months).

Inflammation has been identified as one of the hallmarks of cancer, with both extrinsic and intrinsic pathways described.[158,159] Talc would be characterized as being involved in an extrinsic pathway, in which an exposure or condition results in chronic, non-resolving inflammatory responses. Chronic inflammation can lead to a cascade of cellular events that could result in damage to DNA, increased cell division and generation of inflammatory mediators.

Recent work by Saed, Fletcher, et al. [160,161] describes the role of oxidative stress in the pathogenesis of ovarian cancer and the effects of talc on the oxidative state of ovarian cancer cell lines. Oxidative stress results when the balance between oxidant and anti-oxidant enzymes and molecules in cells is altered, resulting in an excess of reactive oxygen species or reactive nitrogen species. Oxidative stress, which can result from numerous factors including exposure to carcinogens, infection and chronic inflammation, has been shown to affect the initiation, promotion and progression of several types of cancer. Saed, et al. have reported that talc can generate a pro-oxidant state in both normal ovarian epithelial cells and ovarian cancer cells. Exposure to talc resulted in an increase in mRNA levels of certain pro-oxidant enzymes and a decrease in the mRNA of several anti-oxidant enzymes, suggesting a possible cellular mechanism by which exposure to talc could contribute to the development of ovarian cancer.

There is also evidence in the medical literature that talc products contain additional constituents that are known ovarian carcinogens, particularly asbestos.[162-166]

34

Asbestos is one of the most established carcinogens in our environment, and is associated with a variety of cancers including mesothelioma, lung, larynx and ovarian.[167,168] IARC has stated that "a causal association between exposure to asbestos and cancer of the ovary was clearly established," based on strongly positive cohort mortality studies of women with occupational exposure to asbestos as well as studies of women with environmental exposure to asbestos.[169] The Occupational Safety and Health Administration has stated that "there is no safe level of asbestos exposure for any type of asbestos fiber" and that asbestos exposures as short as a few days have resulted in cancer (mesothelioma), indicating that even low levels of exposure may be carcinogenic. (https://www.osha.gov/SLTC/asbestos/)

Although it has been often stated that talc products manufactured after 1976 are asbestos-free, evidence from published scientific reports, [57,162] analyses performed on samples manufactured and packaged at different time points after 1976,[170-173] and internal documents and testimony from the defendants demonstrate that statement is inaccurate.[174,175] There is evidence that products manufactured after 1976 are not asbestos-free. Studies from Longo, et al. show that talc products can contain asbestos and talc containing asbestiform fibers (e.g., talc occurring in a fibrous habit).[170,171] Therefore it is reasonable to conclude that women who regularly used talc products, both before and after 1976, were likely exposed to asbestos and talc containing asbestiform fibers through their use of these products.

Analyses of talcum powder products also demonstrate the presence of other constituents such as chromium and nickel which are well established carcinogens, and cobalt which is considered a possible carcinogen.[169,174] I have also reviewed a report analyzing the 150+ known fragrance ingredients in talcum powder products, many of which have been determined harmful to humans.[176] The presence of these substances provide further evidence that exposure to talc products could result in cancer

It is also plausible that even among women recently diagnosed with ovarian cancer, exposure to the pre-1976 talc products, which are generally understood to have contained asbestos and talc containing asbestiform fibers, increased their risk for ovarian cancer. It is well-established that many cancer risk factors have a long latency, which the National Cancer Institute defines as "the time that passes between being exposed to something that can cause

35

disease and having symptoms". Numerous examples of cancer risk factors with prolonged latency periods exist. For example, lung cancer typically is not diagnosed among cigarette smokers for several decades after initial exposure [177] and having severe sunburns during childhood is a risk factor for melanoma,[178] which has a median age of diagnosis of 63 years. [135]

It has also been reported that the latency period between exposure to asbestos and mesothelioma (the cancer most strongly linked to asbestos exposure), ranges from 15 to more than 70 years.[179,180] The median latency has been estimated at 22 to 32 years, with longer latency periods estimated for women than for men.[179,180] Thus, it is not unreasonable to conclude that exposure to talc products early in a woman's life could result in ovarian cancer decades later.

Further, other established risk factors for ovarian cancer also demonstrate long latency periods. Oral contraceptive use and history of pregnancy are two of the factors that are most consistently reported in association with ovarian cancer (both of which reduce risk). Although, these are "exposures" that typically occur when women are in their teens, twenties or thirties, the median age of diagnosis of ovarian cancer is 61 years, suggesting that events and exposures from early in a woman's reproductive life can influence her risk for ovarian cancer decades later.

The totality of this evidence indicates that there are plausible biological pathways by which use of talc products could lead to ovarian cancer. There is clear evidence that external applications of these products can result in exposure to the ovaries, through upward migration through the genital tract or inhalation exposure. Once exposed, there are plausible biological mechanisms, by which talc itself or constituents of the talcum powder product could lead to carcinogenic transformation of ovarian cells. This includes credible evidence that talc products contain asbestos fibers, a known ovarian carcinogen, regardless of whether they were manufactured before or after 1976. While it is likely that advances in scientific knowledge may further refine our understanding of how talc exposure can lead to ovarian cancer, our current knowledge is adequate to conclude that there are plausible biological pathways leading from talc exposure to ovarian cancer.

I have considered the biologic plausibility that would support and detract from the hypothesis that talcum powder products can cause ovarian cancer. The more persuasive evidence is that talc can migrate to the ovaries through the genital tract and become imbedded in ovarian tissue. It is also plausible that talc could reach the peritoneal cavity through an inhalation route. Regardless of the route of exposure, it is clear that talcum powder products, including constituents like asbestos and fibrous talc, may cause an inflammatory response and oxidative stress that could lead to cell damage. These biologically plausible mechanisms are a persuasive explanation for the consistent increased risk we have observed in the epidemiologic studies. *Simply put, the observed association "makes sense" biologically.* Along with consistency and strength, I considered this a strong factor favoring a causal inference.

**Specificity**

As described by Hill,[121], if specificity exists between an exposure characteristic and disease, it provides strong evidence of causality. However, he also stated that "one-to-one relationships are not frequent …multi-causation of disease is generally more likely that single causation". Clearly, ovarian cancer has multiple causes, with talc exposure among many known risk factors. From the standpoint of there being a "one-to-one relationship" between talc and ovarian cancer, there is not a high level of specificity. However, given that talcum powder products are particularly associated with epithelial ovarian cancer, especially serous ovarian cancer, it does support that it is a fairly specific relationship. This aspect was given only modest weight, because talc is one of many possible causes of ovarian cancer.

**Coherence**

It is recognized that the plausibility depends on the current state of biological knowledge. Knowledge of the biological mechanisms for ovarian carcinogenesis (and virtually any other disease) is incomplete and will continue to evolve as further research continues. Coherence, as described by Hill, means that, even if the knowledge of biology of the disease is not well-defined, the "data should not seriously conflict with the generally known facts of the natural history and biology of the disease".[121] Given the current state of knowledge of ovarian

37

carcinogenesis, the postulated mechanisms by which talc exposure leads to ovarian cancer do not conflict with the current state of knowledge on ovarian carcinogenesis. This aspect was given considerable weight as it is important that the overall evidence fit together in a coherent manner. Taking into account the plausible pathways by which talc products could reach the target tissue, the expected latency period between exposure and disease, and biological mechanisms that are consistent with our knowledge of carcinogenesis, the data are consistent with the natural history and biology of ovarian cancer.

**Experiment**

As described above, the epidemiologic data on talc use and ovarian cancer are from observational studies, therefore there are no clear cut experimental data on which a causal assessment can be made. Hill acknowledged that experimental data are often not available for the exposure/disease associations under study, but in some circumstances, experimental or semi-experimental evidence is available.[121] For example, if a preventive action is taken to remove the exposure and the incidence of disease declines, there is strong support for a causal relationship. No such experimental evidence is available for talc use and ovarian cancer.

**Analogy**

The final viewpoint defined by Hill [121] is analogy, whereby evidence of an association with one risk factor would suggest that a similar risk factor could also plausibly be associated with the disease. Because this viewpoint is rather vague, it is often not incorporated into causal assessments. Nevertheless, while I did not weight it heavily, the similarity between asbestos and asbestiform talc – both of which are widely accepted as causing ovarian cancer – is supportive of this viewpoint.

**Conclusion**

Epidemiologic evidence linking genital talc use to ovarian cancer has been accruing since 1982.[50] As I evaluated this evidence, I considered the results from individual studies with different designs (case-control and cohort) as well as meta-analyses and a pooled analysis of

multiple case-control studies. In my evaluation of the data, I considered the strengths and weaknesses of individual studies, recognizing that there are advantages and disadvantages of both case-control and cohort studies for evaluating talc as a risk factor for ovarian cancer. I used the Bradford Hill framework as a guide for making my weight of the evidence assessment of whether there is evidence for a causal association between talc use and ovarian cancer.

The epidemiologic evidence I evaluated was derived from more than two dozen studies conducted in many different settings. The vast majority of studies reported relative risks or odds ratios greater than one, indicating that women with ovarian cancer were more likely to have used talc products than women without ovarian cancer. Meta-analyses, which combine findings across multiple studies to come up with an overall estimate of risk that is more statistically robust, have consistently reported that there is a statistically significant increased risk for ovarian cancer among women who reported genital talc use. While meta-analyses have noted that the relative risk estimates from case-control studies have been larger than from cohort studies, limitations in all of the cohort studies could explain the weaker associations observed in these studies. It is also noteworthy that the most recent meta-analysis [56] reported significantly increased risks for invasive serous ovarian cancer, which is the most common subtype as well as the one with the worst prognosis, in both cohort and case-control studies.

The epidemiologic studies that have examined talc use in relation to ovarian cancer risk have been conducted in very diverse populations, both within and outside the United States and in women of different race/ethnicities. The consistency of the findings across populations adds credibility to the findings of increased risk of ovarian cancer among talc users.

The relative risk estimates in most studies and the summary relative risk estimates from the meta-analyses are of a magnitude (~1.25-1.30) that is comparable to other common exposures that are causally related to cancer (e.g., passive smoke exposure and lung cancer, oral contraceptive use and breast cancer, menopausal estrogen use and breast cancer, residential radon exposure and lung cancer). Additional evidence supportive of talc being an ovarian cancer risk factor are biologically plausible mechanisms based on inflammation pathways, oxidative stress and the presence of asbestos, asbestiform talc, and other known

carcinogens in talcum powder products. Evidence of a dose-response relationship exists in many of the studies that considered both duration and frequency of exposure.

Based on the evidence in total, it is my opinion with a reasonable degree of scientific certainty that use of talcum powder products can cause ovarian cancer. I reserve the right to modify or refine my opinions based on additional scientific evidence that may emerge on this topic.

## References

1. Schildkraut JM, Alberg AJ, Bandera EV, et al. A multi-center population-based case-control study of ovarian cancer in African-American women: the African American Cancer Epidemiology Study (AACES). *BMC cancer.* 2014;14:688.

2. Newman B, Moorman PG, Millikan R, et al. The Carolina Breast Cancer Study: integrating population-based epidemiology and molecular biology. *Breast Cancer Res Treat.* 1995;35(1):51-60.

3. Moorman PG, Myers ER, Schildkraut JM, Iversen ES, Wang F, Warren N. Effect of hysterectomy with ovarian preservation on ovarian function. *Obstet Gynecol.* 2011;118(6):1271-1279.

4. Alberg AJ, Moorman PG, Crankshaw S, et al. Socioeconomic Status in Relation to the Risk of Ovarian Cancer in African-American Women: A Population-Based Case-Control Study. *Am J Epidemiol.* 2016;184(4):274-283.

5. Moorman PG, Alberg AJ, Bandera EV, et al. Reproductive factors and ovarian cancer risk in African-American women. *Ann Epidemiol.* 2016;26(9):654-662.

6. Erondu CO, Alberg AJ, Bandera EV, et al. The Association Between Body Mass Index and Presenting Symptoms in African American Women with Ovarian Cancer. *J Womens Health (Larchmt).* 2016;25(6):571-578.

7. Newman B, Mu H, Butler LM, Millikan RC, Moorman PG, King MC. Frequency of breast cancer attributable to BRCA1 in a population-based series of American women. *JAMA.* 1998;279(12):915-921.

8. Moorman PG, Kuwabara H, Millikan RC, Newman B. Menopausal hormones and breast cancer in a biracial population. *Am J Public Health.* 2000;90(6):966-971.

9. Moorman PG, Millikan RC, Newman B. Oral contraceptives and breast cancer among African-american women and white women. *J Natl Med Assoc.* 2001;93(9):329-334.

10. Carey LA, Perou CM, Livasy CA, et al. Race, breast cancer subtypes, and survival in the Carolina Breast Cancer Study. *JAMA.* 2006;295(21):2492-2502.

11. Millikan RC, Newman B, Tse CK, et al. Epidemiology of basal-like breast cancer. *Breast Cancer Res Treat.* 2008;109(1):123-139.

12. Trabuco EC, Moorman PG, Algeciras-Schimnich A, Weaver AL, Cliby WA. Association of Ovary-Sparing Hysterectomy With Ovarian Reserve. *Obstet Gynecol.* 2016;127(5):819-827.

13. Schildkraut JM, Abbott SE, Alberg AJ, et al. Association between Body Powder Use and Ovarian Cancer: The African American Cancer Epidemiology Study (AACES). *Cancer Epidemiol Biomarkers Prev.* 2016;25(10):1411-1417.

14. Terry KL, Karageorgi S, Shvetsov YB, et al. Genital powder use and risk of ovarian cancer: a pooled analysis of 8,525 cases and 9,859 controls. *Cancer prevention research.* 2013;6(8):811-821.

15. Havrilesky LJ, Moorman PG, Lowery WJ, et al. Oral contraceptive pills as primary prevention for ovarian cancer: a systematic review and meta-analysis. *Obstet Gynecol.* 2013;122(1):139-147.

16. Gierisch JM, Coeytaux RR, Urrutia RP, et al. Oral contraceptive use and risk of breast, cervical, colorectal, and endometrial cancers: a systematic review. *Cancer Epidemiol Biomarkers Prev.* 2013;22(11):1931-1943.

17.    Moorman PG, Havrilesky LJ, Gierisch JM, et al. Oral contraceptives and risk of ovarian cancer and breast cancer among high-risk women: a systematic review and meta-analysis. *J Clin Oncol.* 2013;31(33):4188-4198.

18.    Myers ER, Moorman P, Gierisch JM, et al. Benefits and Harms of Breast Cancer Screening: A Systematic Review. *JAMA.* 2015;314(15):1615-1634.

19.    Oeffinger KC, Fontham ET, Etzioni R, et al. Breast Cancer Screening for Women at Average Risk: 2015 Guideline Update From the American Cancer Society. *JAMA.* 2015;314(15):1599-1614.

20.    Moorman PG, Calingaert B, Palmieri RT, et al. Hormonal risk factors for ovarian cancer in premenopausal and postmenopausal women. *Am J Epidemiol.* 2008;167(9):1059-1069.

21.    Moorman PG, Berchuck A, Calingaert B, Halabi S, Schildkraut JM. Antidepressant medication use [corrected] and risk of ovarian cancer. *Obstet Gynecol.* 2005;105(4):725-730.

22.    Moorman PG, Schildkraut JM, Calingaert B, Halabi S, Berchuck A. Menopausal hormones and risk of ovarian cancer. *Am J Obstet Gynecol.* 2005;193(1):76-82.

23.    Moorman PG, Palmieri RT, Akushevich L, Berchuck A, Schildkraut JM. Ovarian Cancer Risk Factors in African-American and White Women. *Am J Epidemiol.* 2009.

24.    Gonzalez NL, O'Brien KM, D'Aloisio AA, Sandler DP, Weinberg CR. Douching, Talc Use, and Risk of Ovarian Cancer. *Epidemiology.* 2016;27(6):797-802.

25.    Cramer DW, Vitonis AF, Terry KL, Welch WR, Titus LJ. The Association Between Talc Use and Ovarian Cancer: A Systematic Case-Control Study in Two US States. *Epidemiology.* 2016;27(3):334-346.

26.    Wu AH, Pearce CL, Tseng CC, Pike MC. African Americans and Hispanics Remain at Lower Risk of Ovarian Cancer Than Non-Hispanic Whites after Considering Nongenetic Risk Factors and Oophorectomy Rates. *Cancer Epidemiol Biomarkers Prev.* 2015;24(7):1094-1100.

27.    Houghton SC, Reeves KW, Hankinson SE, et al. Perineal powder use and risk of ovarian cancer. *J Natl Cancer Inst.* 2014;106(9).

28.    Kurta ML, Moysich KB, Weissfeld JL, et al. Use of fertility drugs and risk of ovarian cancer: results from a U.S.-based case-control study. *Cancer Epidemiol Biomarkers Prev.* 2012;21(8):1282-1292.

29.    Rosenblatt KA, Weiss NS, Cushing-Haugen KL, Wicklund KG, Rossing MA. Genital powder exposure and the risk of epithelial ovarian cancer. *Cancer Causes Control.* 2011;22(5):737-742.

30.    Wu AH, Pearce CL, Tseng CC, Templeman C, Pike MC. Markers of inflammation and risk of ovarian cancer in Los Angeles County. *Int J Cancer.* 2009;124(6):1409-1415.

31.    Gates MA, Tworoger SS, Terry KL, et al. Talc use, variants of the GSTM1, GSTT1, and NAT2 genes, and risk of epithelial ovarian cancer. *Cancer Epidemiol Biomarkers Prev.* 2008;17(9):2436-2444.

32.    Mills PK, Riordan DG, Cress RD, Young HA. Perineal talc exposure and epithelial ovarian cancer risk in the Central Valley of California. *Int J Cancer.* 2004;112(3):458-464.

33.    Ness RB, Grisso JA, Cottreau C, et al. Factors related to inflammation of the ovarian epithelium and risk of ovarian cancer. *Epidemiology.* 2000;11(2):111-117.

34. Gertig DM, Hunter DJ, Cramer DW, et al. Prospective study of talc use and ovarian cancer. *J Natl Cancer Inst.* 2000;92(3):249-252.

35. Cramer DW, Liberman RF, Titus-Ernstoff L, et al. Genital talc exposure and risk of ovarian cancer. *Int J Cancer.* 1999;81(3):351-356.

36. Wong C, Hempling RE, Piver MS, Natarajan N, Mettlin CJ. Perineal talc exposure and subsequent epithelial ovarian cancer: a case-control study. *Obstet Gynecol.* 1999;93(3):372-376.

37. Rosenblatt KA, Mathews WA, Daling JR, Voigt LF, Malone K. Characteristics of women who use perineal powders. *Obstet Gynecol.* 1998;92(5):753-756.

38. Godard B, Foulkes WD, Provencher D, et al. Risk factors for familial and sporadic ovarian cancer among French Canadians: a case-control study. *Am J Obstet Gynecol.* 1998;179(2):403-410.

39. Chang S, Risch HA. Perineal talc exposure and risk of ovarian carcinoma. *Cancer.* 1997;79(12):2396-2401.

40. Green A, Purdie D, Bain C, et al. Tubal sterilisation, hysterectomy and decreased risk of ovarian cancer. Survey of Women's Health Study Group. *Int J Cancer.* 1997;71(6):948-951.

41. Cook LS, Kamb ML, Weiss NS. Perineal powder exposure and the risk of ovarian cancer. *Am J Epidemiol.* 1997;145(5):459-465.

42. Purdie D, Green A, Bain C, et al. Reproductive and other factors and risk of epithelial ovarian cancer: an Australian case-control study. Survey of Women's Health Study Group. *Int J Cancer.* 1995;62(6):678-684.

43. Tzonou A, Polychronopoulou A, Hsieh CC, Rebelakos A, Karakatsani A, Trichopoulos D. Hair dyes, analgesics, tranquilizers and perineal talc application as risk factors for ovarian cancer. *Int J Cancer.* 1993;55(3):408-410.

44. Harlow BL, Cramer DW, Bell DA, Welch WR. Perineal exposure to talc and ovarian cancer risk. *Obstet Gynecol.* 1992;80(1):19-26.

45. Chen Y, Wu PC, Lang JH, Ge WJ, Hartge P, Brinton LA. Risk factors for epithelial ovarian cancer in Beijing, China. *Int J Epidemiol.* 1992;21(1):23-29.

46. Booth M, Beral V, Smith P. Risk factors for ovarian cancer: a case-control study. *Br J Cancer.* 1989;60(4):592-598.

47. Harlow BL, Weiss NS. A case-control study of borderline ovarian tumors: the influence of perineal exposure to talc. *Am J Epidemiol.* 1989;130(2):390-394.

48. Whittemore AS, Wu ML, Paffenbarger RS, Jr., et al. Personal and environmental characteristics related to epithelial ovarian cancer. II. Exposures to talcum powder, tobacco, alcohol, and coffee. *Am J Epidemiol.* 1988;128(6):1228-1240.

49. Hartge P, Hoover R, Lesher LP, McGowan L. Talc and ovarian cancer. *JAMA.* 1983;250(14):1844.

50. Cramer DW, Welch WR, Scully RE, Wojciechowski CA. Ovarian cancer and talc: a case-control study. *Cancer.* 1982;50(2):372-376.

51. Berge W, Mundt K, Luu H, Boffetta P. Genital use of talc and risk of ovarian cancer: a meta-analysis. *Eur J Cancer Prev.* 2017 (published in 2018).

52. Langseth H, Hankinson SE, Siemiatycki J, Weiderpass E. Perineal use of talc and risk of ovarian cancer. *J Epidemiol Community Health.* 2008;62(4):358-360.

53.  Huncharek M, Muscat J, Onitilo A, Kupelnick B. Use of cosmetic talc on contraceptive diaphragms and risk of ovarian cancer: a meta-analysis of nine observational studies. *Eur J Cancer Prev.* 2007;16(5):422-429.

54.  Huncharek M, Geschwind JF, Kupelnick B. Perineal application of cosmetic talc and risk of invasive epithelial ovarian cancer: a meta-analysis of 11,933 subjects from sixteen observational studies. *Anticancer Res.* 2003;23(2C):1955-1960.

55.  Gross AJ, Berg PH. A meta-analytical approach examining the potential relationship between talc exposure and ovarian cancer. *J Expo Anal Environ Epidemiol.* 1995;5(2):181-195.

56.  Penninkilampi R, Eslick GD. Perineal Talc Use and Ovarian Cancer: A Systematic Review and Meta-Analysis. *Epidemiology.* 2018;29(1):41-49.

57.  Gordon R, Fitzgerald S, Millette J. Asbestos in commercial cosmetic talcum powder as a cause of mesothelioma in women. *Int J Occup Environ Health.* 2015;21(4):347-348.

58.  Hartge P, Stewart P. Occupation and ovarian cancer: a case-control study in the Washington, DC, metropolitan area, 1978-1981. *J Occup Med.* 1994;36(8):924-927.

59.  Langseth H, Kjaerheim K. Ovarian cancer and occupational exposure among pulp and paper employees in Norway. *Scand J Work Environ Health.* 2004;30(5):356-361.

60.  Bulbulyan MA, Ilychova SA, Zahm SH, Astashevsky SV, Zaridze DG. Cancer mortality among women in the Russian printing industry. *Am J Ind Med.* 1999;36(1):166-171.

61.  Langseth H, Andersen A. Cancer incidence among women in the Norwegian pulp and paper industry. *Am J Ind Med.* 1999;36(1):108-113.

62.  Shen N, Weiderpass E, Antilla A, et al. Epidemiology of occupational and environmental risk factors related to ovarian cancer. *Scand J Work Environ Health.* 1998;24(3):175-182.

63.  Urban N, Hawley S, Janes H, et al. Identifying post-menopausal women at elevated risk for epithelial ovarian cancer. *Gynecol Oncol.* 2015;139(2):253-260.

64.  Trabert B, Pinto L, Hartge P, et al. Pre-diagnostic serum levels of inflammation markers and risk of ovarian cancer in the prostate, lung, colorectal and ovarian cancer (PLCO) screening trial. *Gynecol Oncol.* 2014;135(2):297-304.

65.  Williams KA, Labidi-Galy SI, Terry KL, et al. Prognostic significance and predictors of the neutrophil-to-lymphocyte ratio in ovarian cancer. *Gynecol Oncol.* 2014;132(3):542-550.

66.  Crawford L, Reeves KW, Luisi N, Balasubramanian R, Sturgeon SR. Perineal powder use and risk of endometrial cancer in postmenopausal women. *Cancer Causes Control.* 2012;23(10):1673-1680.

67.  Neill AS, Nagle CM, Spurdle AB, Webb PM. Use of talcum powder and endometrial cancer risk. *Cancer Causes Control.* 2012;23(3):513-519.

68.  Vitonis AF, Titus-Ernstoff L, Cramer DW. Assessing ovarian cancer risk when considering elective oophorectomy at the time of hysterectomy. *Obstet Gynecol.* 2011;117(5):1042-1050.

69.  Karageorgi S, Gates MA, Hankinson SE, De Vivo I. Perineal use of talcum powder and endometrial cancer risk. *Cancer Epidemiol Biomarkers Prev.* 2010;19(5):1269-1275.

70.  Keskin N, Teksen YA, Ongun EG, Ozay Y, Saygili H. Does long-term talc exposure have a carcinogenic effect on the female genital system of rats? An experimental pilot study. *Arch Gynecol Obstet.* 2009;280(6):925-931.

71.     Cramer DW, Welch WR, Berkowitz RS, Godleski JJ. Presence of talc in pelvic lymph nodes of a woman with ovarian cancer and long-term genital exposure to cosmetic talc. *Obstet Gynecol.* 2007;110(2 Pt 2):498-501.

72.     Buzzard AR, Lau BH. Pycnogenol reduces talc-induced neoplastic transformation in human ovarian cell cultures. *Phytother Res.* 2007;21(6):579-586.

73.     Muscat J, Huncharek M, Cramer DW. Talc and anti-MUC1 antibodies. *Cancer Epidemiol Biomarkers Prev.* 2005;14(11 Pt 1):2679; author reply 2680.

74.     Cramer DW, Titus-Ernstoff L, McKolanis JR, et al. Conditions associated with antibodies against the tumor-associated antigen MUC1 and their relationship to risk for ovarian cancer. *Cancer Epidemiol Biomarkers Prev.* 2005;14(5):1125-1131.

75.     Eltabbakh GH, Piver MS, Natarajan N, Mettlin CJ. Epidemiologic differences between women with extraovarian primary peritoneal carcinoma and women with epithelial ovarian cancer. *Obstet Gynecol.* 1998;91(2):254-259.

76.     Heller DS, Westhoff C, Gordon RE, Katz N. The relationship between perineal cosmetic talc usage and ovarian talc particle burden. *Am J Obstet Gynecol.* 1996;174(5):1507-1510.

77.     Boorman GA, Seely JC. The lack of an ovarian effect of lifetime talc exposure in F344/N rats and B6C3F1 mice. *Regul Toxicol Pharmacol.* 1995;21(2):242-243.

78.     Henderson WJ, Hamilton TC, Griffiths K. Talc in normal and malignant ovarian tissue. *Lancet.* 1979;1(8114):499.

79.     Henderson WJ, Joslin CA, Turnbull AC, Griffiths K. Talc and carcinoma of the ovary and cervix. *J Obstet Gynaecol Br Commonw.* 1971;78(3):266-272.

80.     Rasmussen CB, Kjaer SK, Albieri V, et al. Pelvic Inflammatory Disease and the Risk of Ovarian Cancer and Borderline Ovarian Tumors: A Pooled Analysis of 13 Case-Control Studies. *Am J Epidemiol.* 2017;185(1):8-20.

81.     Narod SA. Talc and ovarian cancer. *Gynecol Oncol.* 2016;141(3):410-412.

82.     Ness R. DOES TALC EXPOSURE CAUSE OVARIAN CANCER?: IGCS-0015 Ovarian Cancer. *Int J Gynecol Cancer.* 2015;25 Suppl 1:51.

83.     Wentzensen N, Wacholder S. Talc use and ovarian cancer: epidemiology between a rock and a hard place. *J Natl Cancer Inst.* 2014;106(9).

84.     Hunn J, Rodriguez GC. Ovarian cancer: etiology, risk factors, and epidemiology. *Clin Obstet Gynecol.* 2012;55(1):3-23.

85.     Cramer DW. The epidemiology of endometrial and ovarian cancer. *Hematol Oncol Clin North Am.* 2012;26(1):1-12.

86.     Huncharek M, Muscat J. Perineal talc use and ovarian cancer risk: a case study of scientific standards in environmental epidemiology. *Eur J Cancer Prev.* 2011;20(6):501-507.

87.     Cramer DW, Finn OJ. Epidemiologic perspective on immune-surveillance in cancer. *Curr Opin Immunol.* 2011;23(2):265-271.

88.     Sueblinvong T, Carney ME. Current understanding of risk factors for ovarian cancer. *Curr Treat Options Oncol.* 2009;10(1-2):67-81.

89.     Ainsworth S. Not safe for babies' bottom? *Pract Midwife.* 2009;12(4):42.

90.     Sueblinvong T, Carney ME. Ovarian cancer: risks. *Hawaii Med J.* 2009;68(2):40-46.

91.     Muscat JE, Huncharek MS. Perineal talc use and ovarian cancer: a critical review. *Eur J Cancer Prev.* 2008;17(2):139-146.

92.     Salehi F, Dunfield L, Phillips KP, Krewski D, Vanderhyden BC. Risk factors for ovarian cancer: an overview with emphasis on hormonal factors. *J Toxicol Environ Health B Crit Rev.* 2008;11(3-4):301-321.

93.     Horiuchi A, Konishi I. [Prevention of ovarian cancer development]. *Nihon Rinsho.* 2004;62 Suppl 10:597-600.

94.     Tamaya T. [Epidemiology of ovarian cancer]. *Nihon Rinsho.* 2004;62 Suppl 10:435-440.

95.     Wehner AP. Cosmetic talc should not be listed as a carcinogen: comments on NTP's deliberations to list talc as a carcinogen. *Regul Toxicol Pharmacol.* 2002;36(1):40-50.

96.     Sagae S, Mori M, Moore MA. Risk Factors for Ovarian Cancers: Do Subtypes Require Separate Treatment in Epidemiological Studies? *Asian Pac J Cancer Prev.* 2002;3(1):5-16.

97.     La Vecchia C. Epidemiology of ovarian cancer: a summary review. *Eur J Cancer Prev.* 2001;10(2):125-129.

98.     Meisler JG. Toward optimal health: the experts discuss ovarian cancer. *J Womens Health Gend Based Med.* 2000;9(7):705-710.

99.     Whysner J, Mohan M. Perineal application of talc and cornstarch powders: evaluation of ovarian cancer risk. *Am J Obstet Gynecol.* 2000;182(3):720-724.

100.    Ness RB, Cottreau C. Possible role of ovarian epithelial inflammation in ovarian cancer. *J Natl Cancer Inst.* 1999;91(17):1459-1467.

101.    Daly M, Obrams GI. Epidemiology and risk assessment for ovarian cancer. *Semin Oncol.* 1998;25(3):255-264.

102.    Muscat JE, Wynder EL. Re: "Perineal powder exposure and the risk of ovarian cancer". *Am J Epidemiol.* 1997;146(9):786.

103.    Cramer DW, Xu H. Epidemiologic evidence for uterine growth factors in the pathogenesis of ovarian cancer. *Ann Epidemiol.* 1995;5(4):310-314.

104.    Harlow BL, Hartge PA. A review of perineal talc exposure and risk of ovarian cancer. *Regul Toxicol Pharmacol.* 1995;21(2):254-260.

105.    Kasper CS, Chandler PJ, Jr. Possible morbidity in women from talc on condoms. *JAMA.* 1995;273(11):846-847.

106.    Tortolero-Luna G, Mitchell MF. The epidemiology of ovarian cancer. *J Cell Biochem Suppl.* 1995;23:200-207.

107.    Wehner AP. Biological effects of cosmetic talc. *Food Chem Toxicol.* 1994;32(12):1173-1184.

108.    Shoham Z. Epidemiology, etiology, and fertility drugs in ovarian epithelial carcinoma: where are we today? *Fertil Steril.* 1994;62(3):433-448.

109.    Baker TR, Piver MS. Etiology, biology, and epidemiology of ovarian cancer. *Semin Surg Oncol.* 1994;10(4):242-248.

110.    Herbst AL. The epidemiology of ovarian carcinoma and the current status of tumor markers to detect disease. *Am J Obstet Gynecol.* 1994;170(4):1099-1105; discussion 1105-1097.

111.    Lauchlan SC. The secondary mullerian system revisited. *Int J Gynecol Pathol.* 1994;13(1):73-79.

112.    Natow AJ. Talc: need we beware? *Cutis.* 1986;37(5):328-329.

113. Greene MH, Clark JW, Blayney DW. The epidemiology of ovarian cancer. *Semin Oncol.* 1984;11(3):209-226.

114. Longo DL, Young RC. Cosmetic talc and ovarian cancer. *Lancet.* 1979;2(8138):349-351.

115. Newhouse ML. Cosmetic talc and ovarian cancer. *Lancet.* 1979;2(8141):528.

116. Longo DL, Young RC. Cosmetic talc and ovarian cancer. *Lancet.* 1979;2(8150):1011-1012.

117. Pelfrene A, Shubik P. [Is talc a carcinogen? Review of current data]. *Nouv Presse Med.* 1975;4(11):801-803.

118. Griffiths K, Chandler JA, Henderson WJ, Joslin CA. Ovarian cancer: some new analytical approaches. *Postgrad Med J.* 1973;49(568):69-72.

119. Reid BM, Permuth JB, Sellers TA. Epidemiology of ovarian cancer: a review. *Cancer Biol Med.* 2017;14(1):9-32.

120. Oncology L. When is a carcinogen not a carcinogen? *1.      Lancet Oncology.* 2016;17:681.

121. Hill AB. The environment and disease: association or causation? 1965. *J R Soc Med.* 2015;108(1):32-37.

122. Rosenblatt KA, Szklo M, Rosenshein NB. Mineral fiber exposure and the development of ovarian cancer. *Gynecol Oncol.* 1992;45(1):20-25.

123. Merritt MA, Green AC, Nagle CM, Webb PM, Australian Cancer S, Australian Ovarian Cancer Study G. Talcum powder, chronic pelvic inflammation and NSAIDs in relation to risk of epithelial ovarian cancer. *Int J Cancer.* 2008;122(1):170-176.

124. Shah NR, Borenstein J, Dubois RW. Postmenopausal hormone therapy and breast cancer: a systematic review and meta-analysis. *Menopause.* 2005;12(6):668-678.

125. Taylor R, Najafi F, Dobson A. Meta-analysis of studies of passive smoking and lung cancer: effects of study type and continent. *Int J Epidemiol.* 2007;36(5):1048-1059.

126. Zhang ZL, Sun J, Dong JY, et al. Residential radon and lung cancer risk: an updated meta-analysis of case-control studies. *Asian Pac J Cancer Prev.* 2012;13(6):2459-2465.

127. Karami S, Lan Q, Rothman N, et al. Occupational trichloroethylene exposure and kidney cancer risk: a meta-analysis. *Occup Environ Med.* 2012;69(12):858-867.

128. IARC IAfRoC. *A review of human carcinogens.  Part E: Personal habits and indoor combustions / IARC Working Group on the Evaluation of Carcinogenic Risks to Humans.* Vol 100E. Lyon, France2009.

129. IARC IAfRoC. *A review of human carcinogens.  Part A: Pharmaceuticals / IARC Working Group on the Evaluation of Carcinogenic Risks to Humans* Vol 100A. Lyon, France2008.

130. IARC IAfRoC. A review of human carcinogens. Part D Radiation. 2012;100D:241-283.

131. International Agency for Research on Cancer I. *Tricholorethylene, tetrachloroethylene and some other chlorinated agents.* Vol 106. Lyon, France: International Agency for Research on Cancer; 2016.

132. Collaborative Group on Hormonal Factors in Breast C. Breast cancer and hormonal contraceptives: collaborative reanalysis of individual data on 53 297 women with breast cancer and 100 239 women without breast cancer from 54 epidemiological studies. *Lancet.* 1996;347(9017):1713-1727.

133. Chan DS, Lau R, Aune D, et al. Red and processed meat and colorectal cancer incidence: meta-analysis of prospective studies. *PLoS One.* 2011;6(6):e20456.

134. Porta M. *A dictionary of epidemiology.* 6th edition ed: Oxford University Press; 2014.

135. Siegel RL, Miller KD, Jemal A. Cancer Statistics, 2017. *CA Cancer J Clin.* 2017;67(1):7-30.
136. Goodman MT, Lurie G, Thompson PJ, McDuffie KE, Carney ME. Association of two common single-nucleotide polymorphisms in the CYP19A1 locus and ovarian cancer risk. *Endocrine-related cancer.* 2008;15(4):1055-1060.
137. Lo-Ciganic WH, Zgibor JC, Bunker CH, Moysich KB, Edwards RP, Ness RB. Aspirin, nonaspirin nonsteroidal anti-inflammatory drugs, or acetaminophen and risk of ovarian cancer. *Epidemiology.* 2012;23(2):311-319.
138. Howlader N NA, Krapcho M, Garshell J, Miller D, Altekruse SF, Kosary CL, Yu M, Ruhl J, Tatalovich Z,Mariotto A, Lewis DR, Chen HS, Feuer EJ, Cronin KA (eds). . SEER Cancer Statistics Review, 1975-2012. In: Institute NC, ed. Bethesda, MD2015.
139. Bethea TN, Palmer JR, Adams-Campbell LL, Rosenberg L. A prospective study of reproductive factors and exogenous hormone use in relation to ovarian cancer risk among Black women. *Cancer Causes Control.* 2016.
140. Rothman KJ GS. *Modern Epidemiology.* Philadelphia, PA: Lippincott-Raven; 1998.
141. Lindefors-Harris BM, Eklund G, Adami HO, Meirik O. Response bias in a case-control study: analysis utilizing comparative data concerning legal abortions from two independent Swedish studies. *Am J Epidemiol.* 1991;134(9):1003-1008.
142. Parr CL, Hjartaker A, Laake P, Lund E, Veierod MB. Recall bias in melanoma risk factors and measurement error effects: a nested case-control study within the Norwegian Women and Cancer Study. *Am J Epidemiol.* 2009;169(3):257-266.
143. Gefeller O. Invited commentary: Recall bias in melanoma -- much ado about almost nothing? *Am J Epidemiol.* 2009;169(3):267-270; discussion 271-262.
144. Infante-Rivard C, Jacques L. Empirical study of parental recall bias. *Am J Epidemiol.* 2000;152(5):480-486.
145. Lanza A, Ravaud P, Riveros C, Dechartres A. Comparison of Estimates between Cohort and Case-Control Studies in Meta-Analyses of Therapeutic Interventions: A Meta-Epidemiological Study. *PLoS One.* 2016;11(5):e0154877.
146. Gates MA, Rosner BA, Hecht JL, Tworoger SS. Risk factors for epithelial ovarian cancer by histologic subtype. *Am J Epidemiol.* 2010;171(1):45-53.
147. Liu Y, Nguyen N, Colditz GA. Links between alcohol consumption and breast cancer: a look at the evidence. *Womens Health (Lond).* 2015;11(1):65-77.
148. Ratna A, Mandrekar P. Alcohol and Cancer: Mechanisms and Therapies. *Biomolecules.* 2017;7(3).
149. Hecht SS. Lung carcinogenesis by tobacco smoke. *Int J Cancer.* 2012;131(12):2724-2732.
150. Sjosten AC, Ellis H, Edelstam GA. Retrograde migration of glove powder in the human female genital tract. *Hum Reprod.* 2004;19(4):991-995.
151. Mostafa SA, Bargeron CB, Flower RW, Rosenshein NB, Parmley TH, Woodruff JD. Foreign body granulomas in normal ovaries. *Obstet Gynecol.* 1985;66(5):701-702.
152. FDA Response to Citizen's Petition (April 1, 2014), JNJ00049048-JNJ000489054
153. Bunderson-Schelvan M, Pfau JC, Crouch R, Holian A. Nonpulmonary outcomes of asbestos exposure. *J Toxicol Environ Health B Crit Rev.* 2011;14(1-4):122-152.
154. Suzuki Y, Kohyama N. Translocation of inhaled asbestos fibers from the lung to other tissues. *Am J Ind Med.* 1991;19(6):701-704.

155. Miserocchi G, Sancini G, Mantegazza F, Chiappino G. Translocation pathways for inhaled asbestos fibers. *Environ Health.* 2008;7:4.

156. Marchiori E, Lourenco S, Gasparetto TD, Zanetti G, Mano CM, Nobre LF. Pulmonary talcosis: imaging findings. *Lung.* 2010;188(2):165-171.

157. Frank C LJ. An uncommon hazard: pulmonary talcosis as a result of recurrent aspiration of baby powder. *Respiratory Med CME.* 2011;4:109-111.

158. Balkwill FR, Mantovani A. Cancer-related inflammation: common themes and therapeutic opportunities. *Semin Cancer Biol.* 2012;22(1):33-40.

159. Colotta F, Allavena P, Sica A, Garlanda C, Mantovani A. Cancer-related inflammation, the seventh hallmark of cancer: links to genetic instability. *Carcinogenesis.* 2009;30(7):1073-1081.

160. Saed GM, Diamond MP, Fletcher NM. Updates of the role of oxidative stress in the pathogenesis of ovarian cancer. *Gynecol Oncol.* 2017;145(3):595-602.

161. Saed GM MR, Fletcher NM. . New insights into the pathogenesis of ovarian cancer: oxidative stress. In: Devaja O PA, ed. *Ovarian Cancer*. Rijeka: IntechOpen; 2018:83-110.

162. Blount AM. Amphibole content of cosmetic and pharmaceutical talcs. *Environ Health Perspect.* 1991;94:225-230.

163. Paoletti L, Caiazza S, Donelli G, Pocchiari F. Evaluation by electron microscopy techniques of asbestos contamination in industrial, cosmetic, and pharmaceutical talcs. *Regul Toxicol Pharmacol.* 1984;4(3):222-235.

164. Cralley LJ, Key MM, Groth DH, Lainhart WS, Ligo RM. Fibrous and mineral content of cosmetic talcum products. *Am Ind Hyg Assoc J.* 1968;29(4):350-354.

165. Rohl AN, Langer AM, Selikoff IJ, et al. Consumer talcums and powders: mineral and chemical characterization. *J Toxicol Environ Health.* 1976;2(2):255-284.

166. Deposition of Alice Blount, *Ingham v. Johnson & Johnson, et al.* (Circuit Court of the City of St. Louis, Missouri) (April 13, 2018).

167. International Agency for Research on Cancer  I. Overall evaluations of carcinogenicity: an updating of IARC Monographs Volumes 1 to 42. 1987.

168. International Agency for Research on Cancer I. A review of human carcinogens: arsenic, metals, fibres and dusts. 2012;100C.

169. IARC IAfRoC. IARC Monographs on the Evaluation of Carcinogenic Risks to Humans-Arsenic, Metals, Fibres and Dusts. 2012;100C:219-310.

170. Analysis of Johnson & Johnson Baby Powder & Valiant Shower to Shower Products for Amphibole (Tremolite) Asbestos, Expert Report of William Longo, PhD and Mark Rigler, PhD (August 2, 2017).

171. Expert Report of William Longo, PhD and Mark Rigler, PhD, *In re: Talcum Power Prod. Liab. Litig.,* MDL No. 2738 (November 14, 2018).

172. TEM Analysis of Historical 1978 Johnson's Baby Powder Sample for Amphibole Asbestos, Expert Report of William Longo, PhD and Mark Rigler, PhD (February 16, 2018).

173. MAS Project #14-1683, Analysis of William Longo, PhD and Mark Rigler, PhD (April 28, 2017).

174. Deposition and Exhibits of Julie Pier, *In re: Talcum Power Prod. Liab. Litig.,* MDL No. 2738 (September 12 and 13, 2018).

175. Deposition and Exhibits of John Hopkins, PhD, *In re: Talcum Power Prod. Liab. Litig.,* MDL No. 2738 (August 16 and 17, 2018; October 26, 2018; and November 5, 2018).

176. Expert Report of Michael Crowley, PhD, *In re: Talcum Power Prod. Liab. Litig.,* MDL No. 2738 (November 12, 2018).

177. Weiss W. Cigarette smoking and lung cancer trends. A light at the end of the tunnel? *Chest.* 1997;111(5):1414-1416.

178. Dennis LK, Vanbeek MJ, Beane Freeman LE, Smith BJ, Dawson DV, Coughlin JA. Sunburns and risk of cutaneous melanoma: does age matter? A comprehensive meta-analysis. *Ann Epidemiol.* 2008;18(8):614-627.

179. Lanphear BP, Buncher CR. Latent period for malignant mesothelioma of occupational origin. *J Occup Med.* 1992;34(7):718-721.

180. Frost G. The latency period of mesothelioma among a cohort of British asbestos workers (1978-2005). *Br J Cancer.* 2013;109(7):1965-1973.


**Additional Materials and Data Considered**

1. 21 CFR 740.1(a)

2. Affidavit of Gregory Diette, MD, in support of Defendants' Motion to Exclude Plaintiffs' Experts' General Causation Opinions, April 2018

3. Begg, March. Cause and association: missing the forrest for the trees

4. Bouvard, et al. Carcinogenicity of consumption of red and processed meat.

5. Camargo, et al. Occupational Exposure to Asbestos and Ovarian Cancer: A Meta-analysis

6. Cancer Prevention Coalition Citizen's Petition, May 13, 2008

7. "Cancer Prevention Coalition Citizen's Petiton to FDA, 11/17/1994

8. http://www.preventcancer.com/press/petitions/nov17_94.htm"

9. Cancer.gov - A Snapshot of Ovarian Cancer

10. Carr CJ. Talc: consumer uses and health perspectives

11. CIR - Final Report - Safety assessment re Talc

12. Coldtiz Highest Ranking Researcher 2016; http://www.webometrics.info/en/node/58

13. Cramer, et al. Determinants of ovarian cancer risk. II. Inferences regarding pathogenesis.

14. Current Intelligence Bulletin 62 - Asbestos fibers and other elongate mineral particles: state of the science and roadmap for research

15. Cuzick, et al. Aspirin and non-steriodal anti-inflammatory drugs for cancer prevention: an international consensus statement

16. Czul, et al. An uncommon hazard: pulmonary talcosis as a result of recurrent aspiration of baby powder.

17. Dement, Shuler, Zumwalde - NIOSH - "Fiber exposure during use of baby powders"

18. Denise Simpson - Filed Complaint, DC Superior Court

19. Doll R, Hill A. Smoking and Carcinoma of the lung: preliminary report. BMJ 1950; 2:739-48

20. Egli, G. E., and M. Newton. 1961. "The transport of carbon particles in the human female reproductive tract." Fertility and Steritity 12 (April): 151-55

21. John Hopkins - Deposition Exhibit 28

22. Julie Pier - Deposition Exhibit 47

23.     Deposition Transcript - Shripal Sharma

24.     Deposition Transcript & Exhibits - Joshua Muscat

25.     Deposition Transcript of Alice Blount

26.     Dydek, Thomas - Educational Report

27.     EPA. Risk Assessment Forum, US EPA. "Guidelines for Carcinogen Risk Assessment"

28.     Expert Report of Jack Siemiatycki, Oules v. Johnson & Johnson

29.     Fair warning TalcDoc 15

30.     Fair warning TalcDoc 5 - Exhibit 113 (JNJNL91_000022019)

31.     Fathalla, et al. Incessant ovulation and ovarian cancer - a hypothesis re-visited

32.     Fathalla, et al. Incessant ovulation--a factor in ovarian neoplasia?

33.     FDA Letter from Stephen Musser to Samuel Epstein re: Docket Numbers 94P-0420 and FDA-2008-P-0309-0001/CP

34.     Fedak, Kristen M., Autumn Bernal, Zachary A. Capshaw, and Sherilyn Gross. 2015. "Applying the Bradford Hill Criteria in the 21st century: how data intergration has changed causal inference in molecular epidemiology." Emerging Themes in Epidemiology 12 (14). https://doi.org/10.1186/s12982-015-0037-4

35.     Ferrante, et al. Cancer Mortality and Incidence of Mesothelioma in a Cohort of Wives of Asbestos Workers in Casale Monferrato, Italy

36.     Finnish Institute of Occupational Health. Asbestos, Asbestosis, and Cancer; Helsinki Criteria

37.     Fiume M, Boyer I et al. Safety assessment of talc used in cosmetics

38.     Fletcher, Belotte, Saed et al. Specific point mutations in key redox enzymes are associated with chemoresistance in epithelial ovarian cancer

39.     Fletcher, Memaj, Saed. Talcum powder enhances oxidative stress in ovarian cancer cells - Abstract

40.     Fletcher, Saed. Talcum powder enhances cancer antigen 125 levels in ovarian cancer cells - Abstract

41.     Folkins, Ann K., Elke A., Jarboe, Jonathan L. Hecht, Michael G. Muto, and Christopher P. Crum. 2018. "Chapter 24 - assessing pelvic epithelial cancer risk and intercepting early malignacny." In diagnostic gynecologic and obstetric pathology (third edition)), 844-64. Philadelphia: content repository only! https://doi.org/10.1016/B978-0-323-44732-4.00024-8.

42.     Galea, Rogers. Moving beyond the cause constraint: a public health of consequence, May 2018

43.     Germani. Cohort Mortality Study of Women Compensated for Asbestosis in Italy

44.     Gloyne. Two cases of squamous carcinoma of the lung occurring in asbestosis

45.     Gordon, et al. Asbestos in commercial cosmetic talcum powder as a cause of mesothelioma in women

46.     Hamilton et al. Effects of talc on the rat ovary. British journal of experimental pathology

47.     Haque, et al. Assessment of Asbestos Burden in the Placenta and Tissue Digests of Stillborn Infants in South Texas

48.     Haque, et al. Is there transplacental Transfer of Asbestos: A Study of 40 Still born infants

49.     Harper A, G Saed. Talc induces a pro-oxidant state in normal and ovarian cancer cells through gene point mutations in key redox enzymes - Abstract, Society of Gynecologic Oncology, 2018, in press.

50.     Heller, et al. Asbestos Exposure and Ovarian Fiber Burden

51.     Heller, et al. Correlation of asbestos fiber burdens in fallopian tubes and ovarian tissue

52.     Hernan.  The C-Word: scientific euphemisms do not improve causal inference from observational data

53.     Hunn, et al. Ovarian cancer: etiology, risk factors, and epidemiology.

54.     IARC - Table 2.8 - Epidemiologic studies of asbestos exposure and ovarian cancer

55.     IARC Monograph - Arsenic, Metals, Fibers, and Dust

56.     IARC Monograph 42 - Evaluation of the Carcinogenic risk of chemicals to humans (1987)

57.     IARC Monographs on the Evaluation of Carcinogenic Risks to Humans, Vol. 93, Carbon Black, Titanium Dioxide and Talc (2010)

58.     IARC. Asbestos

59.     IARC. IARC Monographs on the Evaluation of Carcinogenic Risks to Humans-Arsenic, Metals, Fibres and Dusts. (2012)

60.     IARC. Mechanisms of Mineral Fiber Carcinogensis

61.     IOM (National Academies of Sciences, Engineering and Medicine). Ovarian Cancers: Evolving paradigms in research and care

62.     Kemp Hearing Transcript (Carl & Balderrama) - Curtis Omiencinski

63.     Kemp Hearing Transcript (Carl & Balderrama) - Douglas Weed

64.     Kemp Hearing Transcript (Carl & Balderrama) - Graham Colditz

65.     Letter from Personal Care Products Council to FDA re: Commnets on citizen's petition to the Commissioner of the Food and Drug Administration seeking a cancer warning on Talc products

66.     "Levin. ""Baby powder battles: Johnson & Johnson internal documents reveal asbestos worries""

67.     https://www.fairwarning.org/2018/01/talc-documents-reveal/print"

68.     Lockey. Nonasbestos fibrous minerals

69.     Longo, Reigler, Egeland. MAS Project 14-1852: Below the Waist Application of Johnson & Johnson Baby Powder, Sept. 2017

70.     Lu, et al. Inflammation, a key event in cancer development

71.     Lundin, Dossus, Clendenen et al.  C-reactive protein and ovarian cancer: a prospective study nested in three cohorts (Sweden, USA, Italy)

72.     Magnani, et al. Cancer risk after cessation of asbestos exposure: a cohort study of Italian asbestos cement workers

73.     Mallen, Townsend, Tworoger. Risk factors for ovarian carcinoma

74.     Mayer P.Talc and Condoms-Reply, JAMA. 1995; 274(16):1269-1270. doi:10.1001/jama.1995.03530160021025

75.     Medscape - Chustecka, Zosia "Talc use in genital area linked to increased risk of ovarian cancer"

76.     Moller, et al. Oxidatively damaged DNA in animals exposed to particles, Critical Reviews in Toxicology, 43:2, 96-118

77.     Moller, et al. Role of oxidative damage in toxicity of particulates, Free Radical Researchm 44:1, 1-46

78.     Moon, Park, Choi,et al. Risk assessment of baby powder exposure through inhalation

79.     Ness. Does talc exposure cause ovarian cancer?

80.     NTP Technical Report on the Toxicology and Carcinogenesis  Studies of Talc (CAS No. 14807-96-6) in F3344/N Rats and B6C3F, Mice (Inhalation Studies) June 23-24, 1992

81.     P-0920 Photo of Spring Fresh with Lavendar, purchased in Montgomery, AL

82.     P-0922 Photo of Angel of Mine purchased in Montgomery, AL

83.     Paoletti, Caiazza, Donelli, Pocchiari. Evaluation of Electron Microscopy Techniques of Asbestos: Contamination in industrial, cosmetic, and pharmaceutical talcs

84.     Park, Schildkraut, et al. Benighn gynecologic conditions are associated with ovarian cancer risk in African-American women:  a case-control study

85.     Patricia Moorman Affidavit re Ingham, et al. executed May 2018

86.     Pira, et al. Updated mortality study of a cohort of asbestos textile workers

87.     Purdie, David M., Christopher Bain, Victor Siskind, Penelope M. Webb, and Adele C. Green. 2003. "Ovulation and risk of epithelial ovarian cancer". International Journal of Cancer. Journal International du Cancer 104(2):228-32

88.     Reference Manual on Scientific Evidence (rev 2011)

89.     Reid, de Klerk, Musk. Does exposure to asbestos cause ovarian cancer? A systematic literature review and meta-analysis

90.     Reuters, et al. - Talc linked to OCVA risk in Africam American women

91.     Risch, et al. Hormonal etiology of epithelial ovarian cancer, with a hypothesis concerning the role of androgens and progesterone.

92.     Ristesund Trial Transcript - Daniel Cramer

93.     Ristesund Trial Transcript - Graham Colditz

94.     Ristesund Trial Transcript - John Godleski

95.     Rohl. Asbestos in Talc

96.     Ross. Geology, asbestos and health

97.     Rothman, Pastides, Samet. Interpretation of epidemiologic studies of talc and ovarian cancer

98.     Sanford Health. Ovarian Cancer Prevention (PDQ):  Prevention- Patient Information (NCI) (Sanford Health website). (06/12/2013)

99.     Shukla, MacPherson, et al. Alterations in gene expression in human mesothelial cells correlated with mineral pathogenicity

100.    Shushan et al. Human menopausal gonadotropin and the risk of epithelial ovarian cancer

101.    Siteman Cancer Center - Siteman (WUSTL Cancer Center - Your disease risk

102.    Siteman Cancer Center - Siteman (WUSTL) Cancer News in Context

103.    Sjoesten, A.C.E., J.Ellis, and G.a.B. Edelstam. 2004. "Retrograde Migration of Glove Powder in the human female genital tract." Human Reproduction 19 (4):991-95. Https://doi.org/10.1093/humrep/deh156

104.    Straif. Update of the scientific evidence on asbestos and cancer (Powerpoint)

105.    Tossavainen, et al. Retention of Asbestos Fibers in the Human Body

106.    Trabert et al. Aspirin, nonaspirin nonsteriodal anti-inflammatory drug, and acetaminophen use and risk of invasive epithelial ovarian cancer: a pooled analysis in the Ovarian Cancer Association Consortium

107.    Trabert, Britton, Elizabeth M. Poole, Emily White, Kala Visvanathan, Hans-Olov Adami, Garnet L. Anderson, Theodore M. Brasky, et al. 2019."Analgesic use and ovarian cancer risk: an

analysis in the ovarian cancer cohort consortium." Journal of the National Cancer Institute 111(2). Https//doi.org/10.1093/jnci/djy100

108.    Trial Transcript of John Hopkins, Berg v. Johnson & Johnson, et al. (Oct. 2013)

109.    US Dept. of Health & Human Service - Public Health Service, Agency for Toxic Substances and Disease Registry - "Toxicological profile for asbestos"

110.    Van Gosen, Lowers et al. Using the geologic setting of talc deposits as an indicator of amphibole asbestos content

111.    Vasama-Neuvonen, et al. Ovarian Cancer and Occupational Exposures in Finland

112.    Venter, Iturralde. Migration of a particulate radioactive tracer from the vagina to the peritoneal cavity and ovaries

113.    Virta. The phase relationship of talc and amphiboles in a fibrous talc sample

114.    Wang. \Cause-specific mortality in a Chinese chrysotile textile worker cohort

115.    webometrics - Coldtiz Highest Ranking Researcher 2016; http://www.webometrics.info/en/node/58

116.    Wehner, Hall et al. Do particles translocate from the vagina to the oviducts and beyond?

117.    Werner. Presence of asbestos in talc samples

118.    Wignall, et al. Mortality of Female Gas Mask Assemblers

119.    Wu, et al. Timing of births and oral contraceptive use influences ovarian cancer risk

120.    Wu, Anna H., Celeste L. Pearce, Chiu-Chen Tseng, and Malcom C. Pike. 2015. "Afican Americans and Hispanics remain at lower risk of ovarian cancer than non-hispanic whites after considering nongenetic risk factors and oophorectomy rates." Cancer Epidemiology, Biomakers & Prevention: A Publicationb of the American Association for Cancer Research, Cosponsored by the American Society of Preventive Oncology 24(7): 1094-1100

121.    Wu, Song, Wei Zhu, Patricia Thompson, and Yusuf A. Hannun. 2018. "Evaluating intrisic and non-intrinsic cancer risk factors." Nature Communications 9(1):3490. Https://doi.org/10.1038/s41467-078-05467-z

122.    Wynder E, Graham E. Tobacco smoking as a possible etiologic factor in bronchogenic carcinoma, JAMA 1950;143:329-36.

123.    Zhang, et al. Residential radon and lung cancer risk: an updated meta- analysis of case-control studies.

124.    Zuckerman D, D Shapiro. Talcum powder and ovarian cancer, National Center for Health Research, May 7, 2018. http//www.center4research.org/talcum-powder-ovarian-cancer/

125.    IMERYS210136-IMERYS210144

126.    IMERYS210236-IMERYS210137

127.    IMERYS211157-IMERYS211165

128.    IMERYS219720-IMERYS219722

129.    IMERYS241994-IMERYS242004

130.    IMERYS241039

131.    IMERYS242050

132.    IMERYS287251-IMERYS287255

133.    IMERYS299323

134.    IMERYS322241-IMERYS322242

135.    IMERYS325084

136.    IMERYS422289-IMERYS422290

137. IMERYS-A0021350
138. JNJ000066174-WIND-04055-0452
139. JNJ000087166-JNJ000087230
140. JNJ000087166-JNJ000087230
141. JNJ000089413-JNJ000089414
142. JNJ000089413-JNJ000089417
143. JNJ000251888-JNJ000251890
144. JNJ000261010-JNJ000261027
145. JNJ000270070-JNJ000270071
146. JNJ000270588-JNJ000270591
147. JNJ000294461
148. JNJ000346006-JNJ000346014
149. JNJ000375379-JNJ000375380
150. JNJ000375383-JNJ000375384
151. JNJ000526231-JNJ000526676
152. JNJ000637879-JNJ000637881
153. JNJAZ55_000003357
154. JNJMX68_000004996-JNJMX68_000005044
155. JNJNL61_000006431-JNJNL61_000006432
156. JNJNL61_000020359
157. JNJNL61_000052427
158. JNJNL61_000061857
159. JNJNL61_000063473
160. JNJTALC000090136
161. MBS-CRE000271
162. PFE-HUG00007079
163. PFE-HUG00007124
164. PFE-HUG00007194
165. WCD000254-WCD000255

# EXHIBIT A

### *Duke University Medical Center*
### *Curriculum Vitae*

*Date Prepared: October 2018*

**Patricia Gripka Moorman, M.S.P.H., Ph.D.**

| | |
|---|---|
| **Primary academic department:** | Department of Community and Family Medicine<br>Duke University Medical Center |
| **Present academic rank and title:** | Professor with tenure, September 2014 |
| **Date and rank of first Duke faculty appointment:** | July 1, 2000, Assistant Professor |
| **Medical licensure:** | N/A |
| **Date of birth:** | December 19, 1957 |
| **Place of birth:** | Kansas City, Kansas, USA |
| **Citizen of:** | United States of America |

## EDUCATION

| | Institution | Year | Degree |
|---|---|---|---|
| **High School** | Bishop Ward High School<br>Kansas City, KS | 1975 | Diploma |
| **College** | University of Kansas<br>Lawrence, KS | 1980 | B.S. with distinction, Pharmacy |
| **Graduate School** | University of North Carolina – Chapel Hill<br>Chapel Hill, NC | 1989 | M.S.P.H., Epidemiology |
| | University of North Carolina – Chapel Hill<br>Chapel Hill, NC | 1993 | Ph.D., Epidemiology |

**PROFESSIONAL TRAINING AND ACADEMIC CAREER**

| Institution | Position/Title | Dates |
|---|---|---|
| Shalinsky Drugs, Kansas City, KS | Pharmacist | 1980-1981 |
| Community Pharmacy, Wrentham, MA | Pharmacist, Manager | 1981-1982 |
| Revco Drugs, Durham/Raleigh, NC | Pharmacist, Manager | 1983-1993 |
| Department of Epidemiology University of North Carolina - Chapel Hill | Graduate Research Assistant Teaching Assistant | 1987-1993 |
| Burroughs Wellcome Research Triangle Park, NC | Epidemiology Research Associate Summer Intern | 1988 |
| Department of Epidemiology Lineberger Comprehensive Cancer Center University of North Carolina - Chapel Hill | Research Assistant Professor | 1994-1996 |
| Dept. of Epidemiology and Public Health Yale Comprehensive Cancer Center Yale University School of Medicine New Haven, CT | Associate Research Scientist | 1997-2000 |
| Department of Epidemiology University of North Carolina - Chapel Hill | Adjunct Assistant Professor Adjunct Associate Professor | 2000-2005 2005-present |
| Dept. of Community and Family Medicine Duke University Medical Center | Assistant Professor Associate Professor (non-tenured) Associate Professor (tenured) Professor (tenured) Clinical Research Unit Director (formerly Site-Based Research Director) | 2000-2004 2004-2008 2008-2014 2014-present 2009-present |

**PUBLICATIONS**

**Refereed Publications**

1. Aldrich TE, Vann D, **Moorman PG**, Newman B. Rapid reporting of cancer incidence in a population-based study of breast cancer: one constructive use of a central cancer registry. *Breast Cancer Res Treat.* 1995; 35: 61-64.

2. Newman B, **Moorman PG**, Millikan R, Qaqish BF, Geradts J, Aldrich TE, Liu ET. The Carolina Breast Cancer Study: integrating population-based epidemiology and molecular biology. *Breast Cancer Res Treat.* 1995: 51-60.

3. Newman B, Mu H, Butler L, Millikan RC, **Moorman PG**, King M-C. Frequency of breast cancer attributable to BRCA1 in a population-based series of American women. *JAMA.* 1998; 279: 915-21.

4.   Millikan RC, Pittman GS, Newman B, Tse C-K J, Rockhill B, Savitz D, **Moorman PG**, Bell DA. Cigarette smoking, N-acetyltransferases 1 (NAT1) and 2 (NAT2) and breast cancer risk. *Cancer Epidemiol Biomarkers Pre*v. 1998; 7: 371-8.

5.   **Moorman PG**, Hulka BS, Hiatt RA, Krieger N, Newman B, Vogelman JH, Orentreich N. Association between high-density lipoprotein cholesterol and breast cancer varies by menopausal status. *Cancer Epidemiol Biomarkers Prev* 1998; 7: 483-8.

6.   Rockhill B, **Moorman PG**, Newman B.  Age at menarche, time to regular cycling, and breast cancer. *Cancer Causes Control.* 1998; 9: 447-53.

7.   Millikan RC, Pittman GS, Tse C-K J, Duell E, Newman B, Savitz D, **Moorman PG**, Boissy RJ, Bell DA. Catechol-O-Methyltransferase (COMT) and breast cancer risk.  *Carcinogenesis.* 1998; 19: 1943-7.

8.   Marcus PM, Baird DD, Millikan RC, **Moorman PG**, Qaqish B, Newman B.  Adolescent reproductive events and subsequent breast cancer risk.  *Am J Public Health.* 1999; 89: 1244-7. (PMCID: PMC1508686)

9.   Marcus PM, Newman B, **Moorman PG**, Millikan RC, Baird DD, Sternfeld B, Qaqish B. Physical activity at age 12 and adult breast cancer risk (United States).  *Cancer Causes Control.* 1999; 10: 293-302.

10.  Furberg H, Newman B, **Moorman PG**, Millikan RC.  Lactation and breast cancer risk. *Int J Cancer.* 1999; 28; 396-402.

11.  **Moorman PG**, Newman B, Millikan RC, Tse C-K, Sandler DP.  Participation rates in a case-control study: the impact of age, race, and race of interviewer. *Ann Epidemiol.* 1999; 9: 188-95.

12.  Hall IJ, Newman B, Millikan RC, **Moorman PG**.  Body size and breast cancer risk in black and white women: the Carolina Breast Cancer Study. *Am J Epidemiol.* 2000; 151: 754-64.

13.  Huang W-Y, Newman B, Millikan RC, Schell MJ, Hulka BS, **Moorman PG**.  Hormone-related factors and risk of breast cancer by estrogen receptor and progesterone receptor status. *Am J Epidemiol.* 2000; 151: 703-14.

14.  Kinney AY, Millikan RC, Lin YH, **Moorman PG**, Newman B.  Lifetime alcohol consumption and breast cancer among black and white women in North Carolina. *Cancer Causes Control*, 2000; 11: 345-57.

15.  **Moorman PG**, Kuwabara H, Millikan RC, Newman B.  Menopausal hormones and breast cancer in a biracial population. *Am J Public Health*. 2000; 90: 966-70. (PMCID: PMC1446270)

16.  Marcus PM, Newman B, Millikan RC, **Moorman PG**, Baird DD, Qaqish B.  The associations of adolescent cigarette smoking, alcoholic beverage consumption, environmental tobacco smoke, and ionizing radiation with subsequent breast cancer risk. *Cancer Causes Control*. 2000; 11: 271-8.

17.  **Moorman PG**, Jones BA, Millikan RC, Hall IJ, Newman B.  Race, anthropometric factors, and stage at diagnosis of breast cancer. *Am J Epidemiol*. 2001; 153: 284-91.

18.  **Moorman PG,** Ricciuti MF, Millikan RC, Newman B. Vitamin supplement use and breast cancer in a North Carolina population. *Public Health Nutrition*. 2001; 4: 821-8.

19.  **Moorman PG**, Hamza A, Marks JR, Olson JA, Jr. Prognostic significance of the number of lymph nodes examined in patients with node negative breast carcinoma. *Cancer.* 2001; 91: 2258-62.

20.  **Moorman PG,** Millikan RC, Newman B.  Oral contraceptives and breast cancer among black women and white women. *J Natl Med Assoc*. 2001; 93: 329-34. (PMCID: PMC2593962)

21. Schildkraut JM, Calingaert B, Marchbanks PA, **Moorman PG**, Rodrigues GC. The impact of progestin and estrogen potency in oral contraceptives on ovarian cancer risk. *J Natl Cancer Inst*. 2002; 94: 32-8.

22. Plummer P, Jackson S, Konarski J, Mahanna E, Dunmore C, Regan G, Mattingly D, Parker B, Williams S, Andrews C, Vannappagari V, Hall S, Deming S, Hodgson E, **Moorman P**, Newman B, Millikan R.  Making epidemiologic studies responsive to the needs of participants and communities: the Carolina Breast Cancer Study. *Environ Mol Mutagen*. 2002; 39: 96-101.

23. **Moorman PG**, Schildkraut JM, Calingaert B, Halabi S, Vine MF, Berchuck A.  Ovulation and ovarian cancer: a comparison of two methods for calculating lifetime ovulatory cycles.  *Cancer Causes Control*. 2002; 13: 807-811.

24. Lancaster JM,  Wenham RM, Halabi S, Calingaert B, Marks JR, **Moorman PG**, Bentley RC, Berchuck A, Schildkraut JM.  No relationship between ovarian cancer risk and progesterone receptor gene polymorphism (PROGINS) in a population-based, case-control study in North Carolina. *Cancer Epidemiol Biomarkers Prev*. 2003; 12: 226-7.

25. **Moorman PG**, Grubber JM, Millikan RC, Newman B. The relationships between antidepressant medications and invasive breast cancer and carcinoma *in situ* of the breast. *Epidemiology*. 2003; 14: 307-314.

26. **Moorman PG**, Grubber JM, Millikan RC, Newman B. Association between non-steroidal anti-inflammatory drugs (NSAIDs) and invasive breast cancer and carcinoma *in situ* of the breast. *Cancer Causes Control*. 2003; 14: 915-22.

27. Millikan RC, Player J, de Cotret AR, **Moorman P**, Pittman G, Vannappagari V, Tse C-KJ, Keku T. Manganese superoxide dismutase Ala-9Val polymorphism and risk of breast cancer in a population-based case-control study of African Americans and whites. *Breast Cancer Res*. 2004; 6: 264-74.

28. **Moorman PG**, Terry PD.  Consumption of dairy products and the risk of breast cancer: a review of the literature.  *Am J Clin Nutr*. 2004; 80: 5-14.

29. **Moorman PG**, Skinner CS, Evans JP, Newman B, Sorenson JR, Calingaert B, Susswein L, Steadman TS, Hoyo C, Schildkraut JM. Racial differences in enrolment in a cancer genetics registry. *Cancer Epidemiol Biomarkers Prev*. 2004; 13: 1349-54.

30. Hall IJ, **Moorman PG,** Millikan RC, Newman B. Comparative analysis of breast cancer risk factors among African-American women and white women.  *Am J Epidemiol*. 2005; 161: 40-51.

31. Schildkraut JM, Demark-Wahnefried W, Wenham RW, Grubber J, Jeffreys AS, Grambow SC,  Marks J, **Moorman PG**, Hoyo C, Ali S, Walther PJ.  IGF1 (CA)19 repeat and IGFBP3 -202 A/C genotypes and the risk of prostate cancer in black and white men.  *Cancer Epidemiol Biomarkers Prev*. 2005;14: 403-8

32. **Moorman PG**, Berchuck A, Calingaert B, Halabi S, Schildkraut JM. Antidepressant medication use and risk of ovarian cancer.  *Obstet Gynecol*. 2005; 105: 725-30.

33. Spillman MA, Schildkraut JM, Halabi S, **Moorman P**, Calingaert B, Bentley RC, Marks JR, Murphy S, Berchuck A,. Transforming growth factor beta receptor I polyalanine repeat polymorphism does not increase ovarian cancer risk.  *Gynecol Oncol*. 2005; 97: 543-9.

34. Hoyo C, Yarnall KSH, Skinner CS, **Moorman PG**, Sellers D, Reid L. Pain predicts non-adherence to Pap smear screening among middle aged African American women.  *Prev Med*. 2005; 41: 439-45.

35.  **Moorman PG**, Schildkraut JM, Calingaert B, Halabi S, Berchuck A. Menopausal hormones and risk of ovarian cancer. *Am J Obstet Gynecol*. 2005; 193: 76-82.

36.  Hoyo C, Berchuck A, Halabi S, Bentley RC, **Moorman P**, Calingaert B, Schildkraut J. Anthropometric measurements and epithelial ovarian cancer risk in African American and white women.  *Cancer Causes Control.* 2005; 16: 955-63.

37.  Sansbury LB, Millikan RC, Schroeder JC, **Moorman PG**, North KE, Sandler RS. Use of nonsteroidal anti-inflammatory drugs and risk of colon cancer in a population-based, case-control study of African Americans and Whites.  *Am J Epidemiol.* 2005; 162: 548-58.

38.  **Moorman PG**, Sesay J, Nwosu V, Grubber-Kane J, René de Cotret A, Worley K, Millikan R. COX2 polymorphism (Val511Ala), NSAID use and breast cancer in African-American women. *Cancer Epidemiol Biomarkers Prev.* 2005;14: 3013-4.

39.  Schildkraut JM, **Moorman PG**, Halabi S, Calingaert B, Marks JR, Berchuck A. Analgesic drug use and ovarian cancer.  *Epidemiology.* 2006; 17: 104-7.

40.  Sansbury LB, Millikan RC, Schroeder JC, North KE, **Moorman PG**, Keku TO, René de Cotret A, Player J, Sandler RS. COX-2 polymorphism, use of nonsteroidal anti-inflammatory drugs, and risk of colon cancer in African Americans (United States). *Cancer Causes Control.* 2006; 17: 257-66.

41.  Carey LA, Perou CM, Livasy CA, Dressler LG, Cowan D, Conway K, Karaca G, Troester MA, Tse CK, Edmiston S, Deming SL, Geradts J, Cheang MCU, Nielsen TO, **Moorman PG**, Earp HS, Millikan RC. Race, breast cancer subtypes, and survival in the Carolina Breast Cancer Study, *JAMA.* 2006; 295: 2492-502.

42.  Schildkraut JM, Murphy SK, Palmieri RT, Iversen E, **Moorman PG**, Huang Z, Halabi S, Calingaert B, Gusberg A, Marks J, Berchuck A. Trinucleotide repeat polymorphisms in the androgen receptor gene and risk of ovarian cancer. *Cancer Epidemiol Biomarkers Prev.* 2007;16: 473-480.

43.  Shantakumar S, Terry MB, Teitelbaum SL, Britton JA, Millikan RC, **Moorman PG**, Neugut AI, Gammon MD. Reproductive factors and breast cancer risk among older women.  *Breast Cancer Res Treat.* 2007; 102:365-74.

44.  Trivers KF, Gammon MD, Abrahamson PE, Lund MJ, Flagg EW, Kaufman JS, **Moorman PG**, Cai J, Olshan AF, Porter PL, Brinton LA, Eley JW, Coates RJ. Association between reproductive factors and breast cancer survival in younger women.  *Breast Cancer Res Treat.* 2007; 103: 93-102.

45.  Shantakumar S, Terry MB, Paykin A, Teitelbaum SL, Britton JA, Millikan RC, **Moorman PG**, Kritchevsky SB, Neugut AI, Gammon MD. Age and menopausal effects of hormonal birth control and hormone replacement therapy in relation to breast cancer risk.  *Am J Epidemiol.* 2007; 165: 1187-98.

46.  Coniglio D, Menezes P, **Moorman P**, Morgan P, Schmidt M. Evaluation of student confidence in utilizing EBM skills following completion of an EBM curriculum.  *J Physician Assistant Educ.* 2007; 18: 7-13.

47.  Trivers KF, Gammon MD, Abrahamson PE, Lund MJ, Flagg EW, **Moorman PG**, Kaufman JS, Cai J, Porter PL, Brinton LA, Eley JW, Coates RW. Oral contraceptives and breast cancer survival in younger women. *Cancer Epidemiol Biomarkers Prev.* 2007; 16: 1822-7.

48.  Conway K, Parrish E, Edmiston SN, Tolbert D, Tse C-K, **Moorman P**, Newman B, Millikan RC.  Risk factors for breast cancer characterized by the estrogen receptor alpha A908G (K303R) Mutation. *Breast Cancer Res.* 2007; 9: R36.

49. Schildkraut JM, **Moorman PG**, Bland AE, Halabi S, Calingaert, Whitaker R, Lee PS, Elkins-Williams T, Bentley RC, Marks JR, Berchuck A. Cyclin E Overexpression in epithelial ovarian cancer characterizes an etiologic subgroup. *Cancer Epidemiol Biomarkers Prev.* 2008; 17; 585-93.

50. Millikan RC, Newman B, Tse C-K, **Moorman P**, Conway K, Smith LV, Labbok M, Geradts J, Bense JT, Jackson S, Nyante S, Livasy C, Carey L, Earp HS, Perou CM.  Epidemiology of basal-like breast cancer. *Breast Cancer Res Treat.* 2008; 109: 123-39. (PMCID: PMC2443103)

51. Ramus SJ, Vierkant RA, Johnatty S, Pike MC, Van Den BergDJ, Wu AH, Pearce CL, Menon U, Gentry-Maharaj A, Gayther SA, DiCioccio R, McGuire V, Whittemore AS, Song H, Easton DF, Pharoah PDP, Chanock S, Lissowska J, Brinton L, Garcia-Closas M, Terry KL, Cramer DW, Tworoger SS, Hankinson SE, Berchuck A, **Moorman PG**, Schildkraut J, Cunningham JM, Kruger Kjaer S, Blaeker J, Hogdall C, Hogdall E, Moysich KB, Edwards RP, Ness RB, Carney ME, Lurie G, Goodman MT, Wang-Gohrke S, Kropp S, Chang-Claude J, The Australian Ovarian Cancer Study Group, The Australian Cancer Study (Ovarian Cancer), Webb PM, Chen X, Beesley J, Chenevix-Trench G, Goode EL, on behalf of the Ovarian Cancer Association Consortium (OCAC).  Consortium analysis of seven candidate SNPs for ovarian cancer. *Int J Cancer.* 2008; 123: 380-8. (PMCID: PMC2667795)

52. **Moorman PG**, Calingaert B, Palmieri RT, Iversen ES, Bentley RC, Halabi S, Berchuck A, Schildkraut JM. Hormonal risk factors for ovarian cancer in pre-menopausal and postmenopausal women.  *Am J Epidemiol.* 2008; 167: 1059-69. (PMCID: PMC18303003)

53. Palmieri RT, Wilson MA, Iversen ES, Clyde MA, Calingaert B, **Moorman PG**, Poole C, Anderson R, Anderson S, Anton-Culver H, Australian Cancer Study (Ovarian Cancer Group), Australian Ovarian Cancer Study Group, Beesley J, Hogdall E, Brewster W, Carney ME, Chen X, Chenevix-Trench G, Chang-Claude J, Cunningham JM, DiCioccio RA, Doherty JA, Easton DF, Edlund CK, Gayther SA, Gentry-Maharaj A, Goode EL, Goodman MT, Kruger Kjaer S, Hogdall CK, Hopkins MP, Jenison EL, Blaakaer J, Lurie G, McGuire V, Menon U, Moysich KB, Ness RB, Pearce CL, Pharoah PDP, Pike MC, Ramus SJ, Rossing MA, Song H, Terada KY, Van Den Berg D, Vierkant RA, Wang-Gohrke S, Webb PM, Whittemore AS, Wu AH, Ziogas A, Berchuck A, Schildkraut JM, on behalf of the Ovarian Cancer Association Consortium.  Polymorphism in the *IL18* gene and epithelial ovarian cancer in non-Hispanic white women. *Cancer Epidemiol Biomarkers Prev.* 2008;17:3567-72. (PMCID: PMC2667795)

54. **Moorman PG**, Schildkraut JM, Iversen ES, Myers ER, Gradison M, Warren-White N, Wang F.  A prospective study of weight gain after pre-menopausal hysterectomy. *J Women's Health*. 2009; 18: 699-708. (PMCID: PMC2851125)

55. Song H, Ramus SJ, Kjaer SK, DiCioccio RA, Chenevix-Trench G, Pearce CL, Hogdall E, Whittemore AS, McGuire V, Hogdall C, Blaakaer J, Wu AH, Van Den Berg DJ, Stram DO, Menon U, Gentry-Maharaj A, Jacobs IJ, Webb PM, Beesley J, Chen X; Australian Cancer (Ovarian) Study; Australian Ovarian Cancer Study Group, Rossing MA, Doherty JA, Chang-Claude J, Wang-Gohrke S, Goodman MT, Lurie G, Thompson PJ, Carney ME, Ness RB, Moysich K, Goode EL, Vierkant RA, Cunningham JM, Anderson S, Schildkraut JM, Berchuck A, Iversen ES, **Moorman PG**, Garcia-Closas M, Chanock S, Lissowska J, Brinton L, Anton-Culver H, Ziogas A, Brewster WR, Ponder BA, Easton DF, Gayther SA, Pharoah PD; Ovarian Cancer Association Consortium (OCAC). Association between invasive ovarian cancer susceptibility and 11 best candidate SNPs from breast cancer genome-wide association study. *Hum Mol Genet*. 2009: 18: 2297-304. (PMCID: PMC2685754)

56. Il'yasova D, McCarthy B, Marcello J, Schildkraut JM, **Moorman PG**, Krishnamachari B, Ali-Osman F, Bigner DD, Davis F.  Association between glioma and history of allergies, asthma and eczema: a

case-control study with three groups of controls.  *Cancer Epidemiol Biomarkers Prev*. 2009; 18:1232-8. (PMCID: PMC2700947)

57.  Schildkraut JM, Goode EL, Clyde MA, Iversen ED, **Moorman PG**, Berchuck A, Marks JR, Lissowska J, Brinton L, Peplonska B, Cunningham JM, Vierkant RA, Rider DN, Australian Cancer Study (Ovarian Cancer), Australian Ovarian Cancer Study Group, Chenevix-Trench G, Webb PM, Beesley J, Chen X, Phelan C, Sutphen R, Sellers TA, Pearce L, Wu AH, Van Den Berg D, Conti D, Elund CK, Anderson R, Goodman MR, Lurie G, Carney ME, Thompson PJ, Gayther SA, Ramus SJ, Jacobs I, Kruger Kjaer S, Hogdal E, Blaakaer J, Hogdall C, Easton DF, Song H, Pharoah PDP, Whittemore AS, McGuire V, Quaye L, Shadforth D, Anton-Culver H, Ziogas A, Terry KL, Cramer DW, Hankinson SE, Tworoger SS, Calingaert B, Chanock S, Garcia-Closas M on behalf of the Ovarian Cancer Association Consortium. Single Nucleotide Polymorphisms in the TP53 Region and Susceptibility to Invasive Epithelial Ovarian Cancer.  *Cancer Research*. 2009, 69: 2349-57. (PMCID: PMC2666150)

58.  Pearce CL, Near AM, Van Den Berg DJ, Ramus SJ, Gentry-Maharaj A, Menon U, Gayther SA, Anderson AR, Edlund CK, Wu AH, Chen X, Beesley J, Webb PM, Holt SK, Chen C, Doherty JA, Rossing MA, Whittemore AS, McGuire V, Dicioccio RA, Goodman MT, Lurie G, Carney ME, Wilkens LR, Ness RB, Moysich KB, Edwards R, Jennison E, Kjaer SK, Hogdall E, Hogdall CK, Goode EL, Sellers TA, Vierkant RA, Cunningham JC, Schildkraut JM, Berchuck A, **Moorman PG**, Iversen ES, Cramer DW, Terry KL, Vitonis AF, Titus-Ernstoff L, Song H, Pharoah PD, Spurdle AB, Anton-Culver H, Ziogas A, Brewster W, Galitovskiy V, Chenevix-Trench G; Australian Cancer Study (Ovarian Cancer)6; Australian Ovarian Cancer Study Group627. Validating genetic risk associations for ovarian cancer through the international Ovarian Cancer Association Consortium. *Br J Cancer*. 2009; 100: 412-20. (PMCID: PMC2634713)

59.  **Moorman PG**, Palmieri RT, Akushevich L, Berchuck A, Schildkraut JM. Ovarian cancer risk factors in African-American and white women.  *Am J Epidemiol*. 2009; 170: 598-606. (PMCID: PMC2732987)

60.  Song H, Ramus SJ, Tyrer J, Bolton KL, Gentry-Maharaj  A, Wozniak E, Anton-Culver H, Chang-Claude J, Cramer DW, DiCioccio R, Dörk T, Goode EL, Goodman MT, Schildkraut JM, Sellers T, Baglietto L, Beckmann MW, Beesley J, Blaakaer J, Carney ME, Chanock S, Chen Z, Cunningham JM, Dicks E, Doherty JA, Duerst M, Ekici AB,  Fenstermacher D, Fridley BL, Giles G, Gore ME, De Vivo I, Hillemanns P, Hogdall C, Hogdall E, Iversen ES , Jacobs IJ, Jakubowska A, Li D, Lissowska J, Lubiński J, Lurie G, McGuire V, McLaughlin J, Mędrek K, **Moorman PG**, Moysich K, Narod S, Phelan C, Pye C, Risch H, Runnebaum IB, Severi G[1], Southey M, Stram DO, Thiel FC, Terry KL, Tsai Y, Tworoger SS, Van Den Berg DJ, Vierkant RA, Wang-Gohrke S, Webb PM, Wilkens LR, Wu AH, Yang H, Brewster W, Ziogas A, Australian Cancer (Ovarian) Study, The Australian Ovarian Cancer Study Group, The Ovarian Cancer Association Consortium, Houlston R, Tomlinson I, Whittemore AS, Rossing MA, Ponder BAJ, Pearce CL, Ness RB, Menon U, Krüger Kjaer S, Gronwald J, Garcia-Closas M, Fasching PA, Easton DF, Chenevix-Trench G, Berchuck A, Pharoah PDP, Gayther SA.  A genome-wide association study identified a novel ovarian cancer susceptibility locus on 9p22.2. *Nature Genetics*. 2009; 41: 996-1000. (PMCID: PMC2844110)

61.  Doherty JA, Rossing MA, Cushing-Haugen KL, Chen C, Van Den Berg DJ, Wu AH, Pike MC, Ness RB, Moysich K, Chenevix-Trench G, Webb PM, Chang-Claude J, Wang-Gohrke S, Goodman MT, Lurie G, Hogdall E, Kruger Kjaer S, Goode EL, Cunningham JM, Berchuck A, **Moorman PG**, Schildkraut JM, Cramer DW, Terry KL, Garcia-Closas M, Lissowska J, Song H, Pharoah PDP, McGuire V, Whittemore AS, Gayther SA, Ramus SJ, Anton-Culver H, The Australian Ovarian Cancer Study Group, The Australian Cancer Study (Ovarian Cancer), and Pearce CL on behalf of the Ovarian Cancer Association Consortium (OCAC).  ESR1/SYNE1 polymorphism and invasive epithelial ovarian cancer

7

risk: an Ovarian Cancer Association Consortium study. *Cancer Epidemiol Biomarkers Prev*. 2010; 19: 245-50. (PMCID: PMC2863004)

62.  Grant DJ, **Moorman PG**, Akushevich L, Palmieri RT, Bentley RC, Schildkraut JM.  Primary peritoneal and ovarian cancers: an epidemiological comparative analysis. *Cancer Causes Control*. 2010; 21: 991-8. (PMCID: PMC2883093)

63.  Schildkraut J, Iversen E, Williams M, Clyde M, **Moorman P**, Palmieri R, Whitaker R, Bentley R, Marks J, Berchuck A.  Association between DNA damage response and repair genes and risk of invasive serous ovarian cancer. *Plos One*. 2010; 5: e10061. (PMCID: PMC2851649)

64.  **Moorman PG**, Iversen ES, Marcom PK, Marks JR, Wang F, Kathleen Cunningham Consortium for Research into Familial Breast Cancer (kConFab), Lee E, Ursin G, Rebbeck TR, Domchek SM, Arun B, Susswein L, Isaacs C, Garber JE, Visvanathan K, Griffin CA, Sutphen R, Brzosowicz J, Gruber S, Finkelstein DM, Schildkraut JM. Evaluation of established breast cancer risk factors as modifiers of BRCA1 or BRCA2: a multi-center case-only analysis. *Breast Cancer Research Treat*. 2010; 124: 441-51. (PMCID: PMC2925060)

65.  Kelemen L, Goodman M, McGuire V, Rossing MA, Webb P, Kobel M, Anton-Culver H, Beesley J, Berchuck A, Brar S, Carney M, Chang-Claude J, Chenevix-Trench G, Cramer D, Cunningham J, DiCioccio R, Doherty J, Easton D, Fredericksen Z, Fridley B, Gates M, Gayther S, Genry-Maharaj A, Hogdall E, Kjaer S, Lurie G, Menon U, **Moorman P**, Moysich K, Ness R, Palmieri R. Pearce C, Pharoah P, Ramus S, Song H, Stram D, Tworoger S, Van Den Berg D, Vierkant R, Wang-Gohrke S, Whittemore A, Wilkens L, Wu A, Schildkraut J, Sellers T, Goode E. Genetic variation in TYMS in the one-carbon transfer pathway is associated with ovarian carcinoma types in the Ovarian Cancer Association Consortium (OCAC). *Cancer Epidemiol Biomarkers Prev*. 2010; 19: 1822-30. (PMCID: PMC3013232)

66.  Warren-White N, **Moorman P**, Dunn MJ, Mitchell CS, Fisher A, Floyd MF. Southeast Raleigh minority faith-based health promotion project. *Calif J Health Promotion.* (Special Issue, Obesity Prevention) 2009; 7: 87-98.

67.  Witt KL, **Moorman PG**, Kovalchuk O, Holland N, Block G, Andreassen PR.  Genetics and women's health issues – the commitment of EMS to women scientists and gender-associated disease topics. *Environ Mol Mutagen.* 2010; 51: 774-80.

68.  Johnatty SE, Beesley J, Chen Z, Macgregor S, Duffy DL, Spurdle AB, DeFazio A, Gava N, Webb PM, Australian Ovarian Cancer Study Group, Australian Cancer Study (Ovarian Cancer), Rossing MA, Doherty JA, Goodman MT, Lurie G, Thompson PJ, Wilkens LR, Ness RB, Moysich KB, Chang-Claude J, Wang-Gohrke S, Cramer DW, Terry KL, Hankinson SE, Tworoger SS, Garcia-Closas M, Yang H, Lissowska J, Chanock SJ, Pharoah PD, Song H, Whittemore AS, Pearce CL, Stram DO, Wu AH, Pike MC, Gayther SA, Ramus SJ, Menon U, Gentry-Maharaj A, Anton-Culver H, Ziogas A, Hogdall E, Kjaer SK, Hogdall C, Berchuck A, Schildkraut JM, Iversen ES, **Moorman PG**, Phelan CM, Sellers TA, Cunningham JM, Vierkant RA, Rider DN, Goode EL, Haviv I, Chenevix-Trench G, Ovarian Cancer Association Consortium.  Evaluation of candidate stromal epithelial cross-talk genes identifies association between risk of serous ovarian cancer and TERT, a cancer susceptibility "hot spot". *PLoS Genetics*. 2010; 6: e1001016. (PMCID: PMC2900295)

69.  Bolton KL, Tyrer J, Song H, Ramus SJ, Notaridou M, Jones C, Sher T, Gentry-Maharaj A, Wozniak E, Tsai YY, Weidhaas J, Paik D, Van Den Berg DJ, Stram DO, Pearce CL, Wu AH, Brewster W, Anton-Culver H, Ziogas A, Narod SA, Levine DA, Kaye SB, Brown R, Paul J, Flanagan J, Sieh W, McGuire V, Whittemore AS, Campbell I, Gore ME, Lissowska J, Yang HP, Medrek K, Gronwald J, Lubinski J,

Jakubowska A, Le ND, Cook LS, Kelemen LE, Brook-Wilson A, Massuger LF, Kiemeney LA, Aben KK, van Altena AM, Houlston R, Tomlinson I, Palmieri RT, **Moorman PG**, Schildkraut J, Iversen ES, Phelan C, Vierkant RA, Cunningham JM, Goode EL, Fridley BL, Kruger-Kjaer S, Blaeker J, Hogdall E, Hogdall C, Gross J, Karlan BY, Ness RB, Edwards RP, Odunsi K, Moyisch KB, Baker JA, Modugno F, Heikkinenen T, Butzow R, Nevanlinna H, Leminen A, Bogdanova N, Antonenkova N, Doerk T, Hillemanns P, Dürst M, Runnebaum I, Thompson PJ, Carney ME, Goodman MT, Lurie G, Wang-Gohrke S, Hein R, Chang-Claude J, Rossing MA, Cushing-Haugen KL, Doherty J, Chen C, Rafnar T, Besenbacher S, Sulem P, Stefansson K, Birrer MJ, Terry KL, Hernandez D, Cramer DW, Vergote I, Amant F, Lambrechts D, Despierre E, Fasching PA, Beckmann MW, Thiel FC, Ekici AB, Chen X; Australian Ovarian Cancer Study Group; Australian Cancer Study (Ovarian Cancer); Ovarian Cancer Association Consortium, Johnatty SE, Webb PM, Beesley J, Chanock S, Garcia-Closas M, Sellers T, Easton DF, Berchuck A, Chenevix-Trench G, Pharoah PD, Gayther SA. Common variants at 19p13 are associated with susceptibility to ovarian cancer. *Nat Genet*. 2010;42:880-4. (PMCID: PMC3125495)

70. Notaridou M, Quaye L, Dafou D, Jones C, Song H, Høgdall E, Kjaer SK, Christensen L, Høgdall C, Blaakaer J, McGuire V, Wu AH, Van Den Berg DJ, Pike MC, Gentry-Maharaj A, Wozniak E, Sher T, Jacobs IJ, Tyrer J, Schildkraut JM, **Moorman PG**, Iversen ES, Jakubowska A, Medrek K, Lubiński J, Ness RB, Moysich KB, Lurie G, Wilkens LR, Carney ME, Wang-Gohrke S, Doherty JA, Rossing MA, Beckmann MW, Thiel FC, Ekici AB, Chen X, Beesley J, Gronwald J, Fasching PA, Chang-Claude J, Goodman MT, Chenevix-Trench G, Berchuck A, Pearce CL, Whittemore AS, Menon U, Pharoah PD, Gayther SA, Ramus SJ; The Australian Ovarian Cancer Study Group/Australian Cancer Study (Ovarian Cancer); on behalf of the Ovarian Cancer Association Consortium.  Common alleles in candidate susceptibility genes associated with risk and development of epithelial ovarian cancer. *Int J Cancer*. 2011; 128: 2063-74. (PMCID: PMC3098608)

71. Near AM, Wu AH, Templeman C, Van Den Berg DJ, Doherty JA, Rossing MA, Goode EL, Cunningham JM, Vierkant RA, Fridley BL, Chenevix-Trench G, Webb PM; the Australian Cancer Study (Ovarian Cancer) (ACS).,; the Australian Ovarian Cancer Study Group (AOCS)., Kjær SK, Hogdall E, Gayther SA, Ramus SJ, Menon U, Gentry-Maharaj A, Schildkraut JM, **Moorman PG**, Palmieri RT, Ness RB, Moysich K, Cramer DW, Terry KL, Vitonis AF, Pike MC, Berchuck A, Pearce CL; on behalf of the Ovarian Cancer Association Consortium. Progesterone receptor gene polymorphisms and risk of endometriosis: results from an international collaborative effort. *Fertil Steril*. 2011; 95: 40-5. (PMCID: PMC3176720)

72. **Moorman PG**, Jones LW, Akushevich L, Schildkraut JM.  Recreational physical activity and ovarian cancer risk and survival.  *Annals Epidemiol*. 2011; 21: 178-87. (PMCID: PMC3035989)

73. Pearce CL, Doherty JA, Van Den Berg DJ, Moysich K, Hsu C, Cushing-Haugen KL, Conti DV, Ramus SJ, Gentry-Maharaj A, Menon U, Gayther SA, Pharoah PD, Song H, Kjaer SK, Hogdall E, Hogdall C, Whittemore AS, McGuire V, Sieh W, Gronwald J, Medrek K, Jakubowska A, Lubinski J, Chenevix-Trench G; AOCS/ACS Study Group, Beesley J, Webb PM, Berchuck A, Schildkraut JM, **Moorman PG**, Edlund CK, Stram DO, Pike MC, Ness RB, Rossing MA, Wu AH. Genetic variation in insulin-like growth factor 2 may play a role in ovarian cancer risk. *Hum Mol Genet*. 2011; 20: 2263-72. (PMCID: PMC3090188)

74. **Moorman PG,** Myers ER, Schildkraut JM, Wang F.  Reported symptoms before and one year after hysterectomy in African American and White women. *J Women's Health*. 2011; 20: 1035-42. (PMCID: PMC3130512)

75. Ziogas A, Horick NK, Kinney AY, Lowery JR, Domchek SM, Isaacs C, Griffin CA, **Moorman PG**, Edwards KL, Hill DA, Berg JS, Tomlinson GE, Anton-Culver H, Strong LC, Kasten CH, Finkelstein DM, Plon SE. Clinically relevant changes in family history of cancer over time. *JAMA.* 2011; 306: 172-8. (PMCID: PMC3367662)
    (Article was selected by Epidemiology and Genomics Research Program (EGRP) of the National Cancer Institute as one of their Research Highlights from EGRP Grantees 2011.)

76. **Moorman PG**, Myers ER, Schildkraut JM, Iversen ES, Wang F, Warren N.  Effect of hysterectomy with ovarian preservation on ovarian function.  *Obstet Gynecol*. 2011; 118: 1271-9. (PMCID: PMC3223258)
    (Article was selected by journal as "Breaking News" and a journal club article for December 2011 issue.)

77. **Moorman PG**, Leppert P, Myers ER, Wang F. Comparison of characteristics of fibroids in African American and white women undergoing pre-menopausal hysterectomy. *Fertil Steril*. 2013; 99: 768-76. (PMCID: PMC3632655)

78. Havrilesky LJ, Gierisch JM, **Moorman PG**, Coeytaux RR, Peragallo Urrutia  R, Lowery WJ, Dinan M, McBroom AJ, Wing L, Musty MD, Lallinger KR, Hasselblad V, Sanders GD, Myers ER. Oral Contraceptive Use for the Primary Prevention of Ovarian Cancer. Evidence Report/Technology Assessment No. 212. (Prepared by the Duke Evidence-based  Practice Center under Contract No. 290-2007-10066-I.) *AHRQ Publication No. 13-E002-EF*. Rockville, MD: Agency for Healthcare Research and Quality. June 2013. www.effectivehealthcare.ahrq.gov/reports/final.cfm. (PMCID: PMC4781074)

79. Olsen CM, Nagle CM, Whiteman DC, Ness R, Pearce CL, Pike MC, Rossing MA, Terry KA, Wu AH, the Australian Cancer Study (Ovarian Cancer), Australian Ovarian Cancer Study Group, Risch HA, Yu H, Doherty JA, Chang-Claude J, Hein R, Nickels S, Wang-Gohrke S, Goodman MT, Carney ME, Matsuno RK, Lurie G, Moysich K, Kjaer SK, Jensen A, Hogdall E, Goode EL, Fridley BL, Vierkant RA, Larson MC, Schildkraut J, Hoyo C, **Moorman P**, Weber RP, Cramer DW, Vitonis AF, Bandera EV, Olson SH, Rodriguez-Rodriguez L, King M, Brinton LA, Yang H, Garcia-Closas M, Lissowska J, Anton-Culver H, Ziogas A, Gayther SA, Ramus SJ, Menon U, Gentry-Maharaj A, Webb PM on behalf of the Ovarian Cancer Association Consortium.  Obesity and risk of ovarian cancer subtypes: evidence from the Ovarian Cancer Association Consortium. *Endocrine Related Cancer*. 2013; 20: 251-62. (PMCID:  PMC3857135)

80. Pearce CL, Rossing MA, Lee A, Ness R, Webb PM for Australian Cancer Study (Ovarian Cancer) and Australian Ovarian Cancer Study Group, Nagle CM, Stram D, Chang-Claude J, Hein R, Lurie G, Thompson PJ, Carney ME, Goodman MT,  Moysich K, Hogdall E, Jensen A, Goode EL, Fridley BL, Cunningham J,  Vierkant RA, Palmieri RT, Ziogas A, Anton-Culver H, Gayther SA, Gentry-Maharaj A, Menon U, Ramus SJ, Berchuck A, Doherty JA, Iversen E, McGuire V, **Moorman P**, Pharoah P, Pike MC, Risch H, Sieh W, Stram D, Terry KL,  Whittemore A, Wu AH, Schildkraut JM, Kjaer SK on behalf of the Ovarian Cancer Association Consortium. Combined and interactive effects of environmental and GWAS-identified risk factors in ovarian cancer. *Cancer Epidemiol Biomarkers Prev*. 2013; 22: 880-90. (PMCID:  PMC3963289)

81. Havrilesky LJ, **Moorman PG**, Lowery WJ, Gierisch JM, Coeytaux RR, Peragallo Urrutia R, Dinan M, McBroom AJ, Hasselblad V, Sanders GD, Myers ER. Oral contraceptive pills as primary prevention for ovarian cancer: A systematic review and meta-Analysis. *Obstet Gynecol*. 2013; 122: 139-47.

82. Peragallo Urrutia R, Coeytaux RR, Gierisch JM, Havrilesky LJ, **Moorman PG**, Lowery WJ, Dinan M, McBroom AJ, Wing E, Musty MD, Lallinger KR, Hasselblad V, Sanders GD, Myers ER.

Thromboembolic events and association with oral contraceptive use: a systematic review and meta-analysis. *Obstet Gynecol* 2013; 122: 380-9.

83. Gierisch JM, Coeytaux RR, Urrutia RP, Havrilesky LJ, **Moorman PG**, Lowery WJ, Dinan M, McBroom AJ, Hasselblad V, Sanders GD, Myers ER. Oral contraceptive use and risk of breast, cervical,colorectal and endometrial cancer: a systematic review. *Cancer Epidemiol Biomarkers Prev* 2013; 22: 1931-43.

84. Fish LJ, **Moorman PG**, Wordlaw-Stinson L, Vidal A, Smith JS, Hoyo C.  HPV and cervical cancer knowledge associated with greater adherence to follow-up colposcopy. *Am J Health Education* 2013; 44: 293-8. (PMCID: PMC4075768)

85. **Moorman PG**, Havrilesky LJ, Gierisch JM, Coeytaux RR, Lowery WJ, Urrutia RP, McBroom AJ, Wing E, Musty MD, Lallinger KR, Hasselblad V, Sanders GD, Myers ER. A systematic review and meta-analysis of the association between Oral contraceptives and risk of ovarian and breast cancer among high-risk women: a systematic review and meta-analysis. *J Clin Oncology* 2013; 31: 4188-98.

86. Allott EH, Abern MR, Gerber L, Keto CJ, Aronson WJ, Terris MK, Kane CJ, Amling CL, Cooperberg MR, **Moorman PG**, Freedland SJ.  Metformin does not affect risk of biochemical recurrence following radical prostatectomy: results from the SEARCH database. *Prostate Cancer Prostatic Diseases* 2013; 16: 391-7. (PMCID: PMC3830588)

87. Wordlaw-Stinson L, Jones S, Little S, Fish L, Vidal A, Smith JS, Hoyo C, **Moorman PG**. Challenges and recommendations to recruiting women who do not adhere to follow-up gynecological care. *Open J Prev Med* 2014; 4: 123-8. (PMCID: PMC4075769)

88. Hill DA, Horick NK, Isaacs C, Domchek SM, Tomlinson GE, Lowery JT, Kinney AY, Berg JS, Edwards KL, **Moorman PG**, Plon SE, Strong LC, Ziogas A, Griffin CA, Kasten CH, Finkelstein DM for the Cancer Genetics Network. Long-term risk of medical conditions associated with breast cancer treatment. *Breast Cancer Res Treat* 2014: 145: 233-43. (PMCID: PMC4096572)

89. Gaines AR, Turner EL, **Moorman PG,** Freedland SJ, Keto CJ, McPhail ME, Grant DJ, Vidal AC, Hoyo C. The association between race and prostate cancer risk on initial biopsy in an equal access, multiethnic cohort.  *Cancer Causes Control* 2014; 25: 1029-35. (PMCID: PMC4117308)

90. Davidson BA, **Moorman PG.** Risk-benefit assessment of the combined oral contraceptive pill in women with a family history of cancer.  *Expert Opinion Drug Safety* 2014; 10: 1375-82.

91. Allott EH, Tse CK, Olshan AF, Carey LA, **Moorman PG**, Troester MA.  Non-steroidal anti-inflammatory drug use, hormone receptor status, and breast cancer-specific mortality in the Carolina Breast Cancer Study.  *Breast Cancer Res Treat* 2014; 147: 415-21. (PMCID: PMC4462196)

92. Schildkraut JM, Alberg AJ, Bandera EV, Barnholtz-Sloan J, Bondy M, Cote ML, Funkhouser E, Peters E, Schwartz AG, Terry P, Wallace K, Akushevich L, Wang F, Crankshaw S, **Moorman PG**. A Multi-Center Population-Based Case-Control Study of Ovarian Cancer in African-American Women: The African American Cancer Epidemiology Study (AACES). *BMC Cancer* 2014; 14: 688. (PMCID: PMC4182887)

93. Myers ER, **Moorman P**, Gierisch JM, Havrilesky LJ, Grimm LJ, Ghate S, Davidson B, Chatterjee Montgomery R, Crowley MJ, McCrory DC, Kendrick A, Sanders GD. Benefits and Harms of Breast Cancer Screening: A Systematic Review. *JAMA* 2015; 314: 1615-34.

94. Qin B, **Moorman PG**, Alberg AJ, Barnholtz-Sloan JS, Bondy M, Cote ML, Funkhouser E, Peters ES,

Schwartz AG, Terry P, Schildkraut JM, Bandera EV.  Dietary carbohydrate intake, glycemic load, glycemic index and ovarian cancer risk in African-American women.  *Br J Nutr* 2016, 115: 694-702. (PMCID: PMC4844174)

95.    Erondu CO, Alberg AJ, Bandera EV, Barnholtz-Sloan J, Bondy M, Cote ML, Funkhouser E, Peters E, Schwartz AG, Terry PD, Wallace K, Akushevich L, Wang F, Crankshaw S, Berchuck A, Schildkraut JM, **Moorman PG**. The association between body mass index and presenting symptoms in African American women with ovarian cancer.  *J Women's Health* 2016; 25: 571-8. (PMCID: 4900212)

96.    Alberg AJ, **Moorman PG**, Crankshaw S, Wang F, Bandera EV, Barnholtz-Sloan J, Bondy M, Cartmell KB, Cote ML, Ford ME, Funkhouser E, Keleman L, Peters ES, Schwartz AG, Sterba KR, Terry P, Wallace K, Schildkraut JM. Socioeconomic status in relation to the risk of ovarian cancer in African American women: a population-based case-control study.  *Am J Epidemiol* 2016, 184: 274-83. (PMCID: PMC4983652)

97.    Peres L, Camacho F, Abbott S, Alberg A, Bandera E, Barnholtz-Sloan JS, Bondy M, Cote M, Crankshaw S, Funkhouser E, **Moorman P**, Peters E, Schwartz AG, Terry P, Wang F,  Schildkraut J. Analgesic medication use and risk of epithelial ovarian cancer in African American women.  *Br J Cancer* 2016; 114: 819-25.

98.    Abbott SE, Bandera EV, Qin B, **Moorman PG**, Barnholtz-Sloan J, Schwartz AG, Funkhouser E, Peters ES, Cote ML, Alberg AJ, Terry P, Bondy M, Crankshaw S, Wang F, Camacho F, Schildkraut JM. Recreational physical activity and ovarian cancer risk in African American women.  *Cancer Med* 2016; 5: 1319-27.(PMCID: PMC4924390)

99.    Trabuco E, **Moorman PG**, Algeciras-Schimnich A, Weaver AL, Cliby W.  Association of ovary-sparing hysterectomy with ovarian reserve.  *Obstet Gynecol* 2016; 127: 819-27. (PMCID: PMC5004761)

100.   Bandera EV, Qin B, **Moorman PG**, Alberg AJ, Barnholtz-Sloan J, Bondy M, Cote ML, Funkhouser E, Peters ES, Schwartz AG, Terry P, Schildkraut JM. Obesity, weight gain, and ovarian cancer risk in African American women. *Int J Cancer*  2016; 139: 593-600. (PMCID: PMC4982766)

101.   Schildkraut JM, Abbott SE, Alberg AJ, Bandera EV, Barnholtz-Sloan J, Bondy M, Cote M, Funkhouser E, Peres LC, Peters ES, Schwartz AG, Terry P, Crankshaw S, Camacho F, Wang F, **Moorman PG**.  Association between body powder use and ovarian cancer: the African American Cancer Epidemiology Study (AACES).  *Cancer Epidemiol Biomarkers Prev* 2016; 25: 1411-17. (PMCID: PMC5050086)

102.   **Moorman PG**, Alberg AJ, Bandera EV, Barnholtz-Sloan J,  Bondy M, Cote ML, Funkhouser E,  Peters ES, Schwartz AG, Terry P, Crankshaw S, Wang F, Schildkraut JM. Reproductive factors and ovarian cancer risk in African American Women.  *Ann Epidemiol* 2016: 26: 654-62. (PMCID: PMC5035608)

103.   Qin B, **Moorman PG**, Alberg AJ, Barnholtz-Sloan JS, Bondy M, Cote ML, Funkhouser E, Peters ES, Schwartz AG, Terry P, Schildkraut JM, Bandera EV.  Dietary quality and ovarian cancer risk in African-American women.  *Am J Epidemiol* 2017; 185: 1281-89.

104.   Peres LC, Alberg AJ, Bandera EV, Barnholtz-Sloan J, Bondy M, Cote ML, Funkhouser E, **Moorman PG**, Peters ES, Schwartz AG, Terry P, Abbott SE, Camacho F, Wang F, Schildkraut JM. Premenopausal hysterectomy and risk of ovarian cancer in African American women. *Am J Epidemiol* 2017; 186: 46-53.

105.   Qin B, **Moorman PG**, Alberg AJ, Barnholtz-Sloan JS, Bondy M, Cote ML, Funkhouser E, Peters ES, Schwartz AG, Terry P, Schildkraut JM, Bandera EV.  Dairy, calcium, vitamin D and ovarian cancer risk in African American women.  *Br J Cancer* 2016; 115: 1122-1130. (PMCID: PMC5117784)

106. Horick NK, Manful A, Lowery J, Domchek S, **Moorman P**, Griffin C, Visvanathan K, Isaacs C, Kinney A, Finkelstein DM. Physical and psychological health in rare cancer survivors. *J Cancer Surviv* 2017; 11: 158-65.

107. Peres LC, Bandera EV, Qin B, Guertin KA, Shivappa N, Hebert JR, Abbott SE, Alberg AJ, Barnholtz-Sloan J, Bondy M, Cote ML, Funkhouser E, **Moorman PG**, Peters ES, Schwartz AG, Terry PD, Camacho F, Wang F, Schildkraut JM.  Dietary inflammatory index and risk of epithelial ovarian cancer in African American women.  *Int J Cancer* 2017; 140: 535-43. (PMCID: PMC5159198)

108. Peres LC, **Moorman PG**, Alberg AJ, Bandera EV, Barnholtz-Sloan J, Bondy M, Cote ML, Funkhouser E, Peters ES, Schwartz AG, Terry PD, Abbott SE, Camacho F, Wang F, Schildkraut JM.  Lifetime number of ovulatory cycles and epithelial ovarian cancer risk in African American women.  *Cancer Causes Control* 2017; 28: 405-14. (PMCID: PMC5410663)

109. Terry PD, Qin B, Camacho F, **Moorman PG**, Alberg AJ, Barnholtz-Sloan JS, Bondy M, Cote ML, Funkhouser E, Guertin KA, Peters ES, Schwartz AG, Schildkraut JM, Bandera EV. Supplemental selenium may decrease ovarian cancer risk in African-American women. *J Nutrition* 2017; 147: 621-7. (PMCID: PMC5368582)

110. Kelemen LE, Abbott S, Qin B, Peres LC, **Moorman P**, Wallace K, Bandera E, Barnholtz-Sloan J, Bondy M, Cartmell K, Cote M, Funkhouser E, Paddock L, Peters E, Schwartz A, Terry P, Alberg A, Schildkraut J. Cigarette smoking and the association with serous ovarian cancer in African American women:  African American Cancer Epidemiology Study (AACES).  *Cancer Causes Control* 2017; 28: 699-708.

111. Wang Y, Freedman JA, Liu H, **Moorman P**, Hyslop T, George D, Lee NH, Patierno SR, Wei Q. Associations between RNA splicing regulatory variants of stemness-related genes and racial disparities in susceptibility to prostate cancer.  *Int J Cancer* 2017; 141: 731-43.(PMCID: PMC5512873)

112. McNamara C, Abbott SE, Bandera EV, Qin B, Peres LC, Camacho F, **Moorman PG**, Alberg A, Barnholtz-Sloan JS, Bondy M, Cote ML, Funkhouser E, Peters ES, Schwartz AG, Schildkraut JM, Terry P. Tubal ligation and ovarian cancer risk in African-American women.  *Cancer Causes Control* 2017; 28: 1033-41.(PMCID: PMC5635599)

113. Barrett NJ,  Ingraham KL, Vann Hawkins T, **Moorman PG**.  Engaging African Americans in research: the recruiter's perspective.  *Ethn Dis* 2017; 27: 453-462. (PMCID: PMC5720956)

114. DeBono NL, Robinson WR, Lund J, Tse CK, **Moorman PG**, Olshan AF, Troester MA.  Race, menopausal hormone therapy and invasive breast cancer in the Carolina Breast Cancer Study.  *J Women's Health* 2018; 27: 3770386.

115. Abbott SE, Camacho F, Peres LC, Alberg AJ, Bandera EV, Bondy M, Cote ML, Funkhouser E, **Moorman PG**, Peters ES, Qin B, Schwartz AG, Barnholtz-Sloan J, Terry P, Schildkraut JM. Recreational physical activity and survival in African American women with ovarian cancer.  *Cancer Causes Control*  2018; 29: 77-86.

116. Peres LC, Risch H, Terry KL, Webb PM, Goodman MT, Wu AH, Alberg AJ, Bandera EV, Barnholtz-Sloan J, Bondy M, Cote ML, Funkhouser E, **Moorman PG**, Peters ES, Schwartz AG, Terry PD, Manichaikul A, Abbott SE, Camacho F, Jordan SJ, Nagle CM, Australian Ovarian Cancer Study Group, Rossing MA, Doherty JA, Modugno F, Moysich K, Ness R, Berchuck A, Cook L, Le N,  Brooks-Wilson A, Sieh W, Whittemore A, McGuire V, Rothstein J, Anton-Culver H, Ziogas A, Pearce CL, Tseng C, Pike M, Schildkraut JM, on behalf of the African American Cancer Epidemiology Study and the Ovarian Cancer Association Consortium. Racial/ethnic differences in the epidemiology of

ovarian cancer: A pooled analysis of 12 case-control studies. *Int J Epidemiol* 2017; 47: 460-472.

117. Mills AM,  Peres LC, Meiss A, Ring KL, Modesitt SC, Abbott SE, Alberg AJ, Bandera EV, Barnholtz-Sloan J, Bondy ML, Cote ML, Funkhouser E, **Moorman PG**, Peters ES, Schwartz AG, Terry PD, Schildkraut JM. Targetable immune regulatory molecule expression in high-grade serous ovarian carcinomas in African-American women: a study of PD-L1 and IDO in 112 Cases from the African American Cancer Epidemiology Study (AACES), *Int J Gynecol Pathology* 2018, in press.

118. Freedman JA, Wang Y, Li X, Liu H, **Moorman PG**, George DJ, Lee NH, Hyslop T, Wei Q, Patierno SR. Single nucleotide polymorphisms of stemness pathway genes predicted to regulate RNA splicing, microRNA and oncogenic signaling are associate with prostate cancer survival. *Carcinogenesis* 2018; 39: 879-888.

119. Anderson RT, Peres LC, Camacho F, Bandera EV, Funkhouser E, **Moorman PG**, Paddock LE, Peters ES, Abbott SE, Alberg AA, Barnholtz-Sloan J, Bondy M, Cote ML, Schwartz AG, Terry P, Schildkraut JM. Individual, social and societal correlates of Health-Related Quality of Life among African-American survivors of ovarian cancer: results from the AACES Study. *J Women's Health*, 2018, in press.

120. Park HK, Schildkraut JM, Alberg AJ, Bandera EV, Barnholtz-Sloan JS, Bondy M, Crankshaw S, Funkhouser E, **Moorman PG**, Peters ES, Terry P, Wang F, Ruterbusch JJ, Schwartz AG, Cote ML. Benign gynecologic conditions are associated with ovarian cancer risk in African-American women: a case-control study. *Cancer Causes Control*, 2018, in press.

121. **Moorman PG**, Barrett NJ, Wang F, Alberg AA, Bandera EV, Barnholtz-Sloan J, Bondy M, Cote ML, Funkhouser E, Kelemen L, Peres LC, Peters ES, Schwartz AG, Terry P, Crankshaw S, Abbott SE, Schildkraut JM. Effect of cultural, folk and religious beliefs and practices on delays in diagnosis in ovarian cancer in African American women. *J Women's Health*, 2018, in press.

122. Qian D, Liu H, Wang X, Ge J, Luo S, Patz EF Jr, **Moorman PG**, Su L, Shen S, Christiani DC, Wei Q. Potentially functional genetic variants in the complement-related immunity gene-set are associated with non-small cell lung cancer survival. *Int J Cancer* 2018, in press.

---

**Letters**

1. **Moorman PG**.  Letter re:  Breast cancer risk factors. *Drug Topics*. 2002; 146: 16.

2. **Moorman PG**. Letter re: Association of frequency and duration of aspirin use and hormone receptor status with breast cancer risk. *JAMA*. 2004; 292: 1426.

3. Schildkraut JM, **Moorman PG**, Calingaert B, Berchuck A.  Letter re:  Cyclin E overexpression relates to ovarian cancer histology but not to risk factors. *Cancer Epidemiol Biomarkers Prev*. 2008; 17: 1841-2.

4. **Moorman PG**.  Letter re: Age at Menopause:  Imputing age at menopause for women with a hysterectomy with application to risk of postmenopausal breast cancer. *Annals Epidemiol*. 2011; 21: 797.

5. Myers ER, **Moorman P**, Sanders GD.  Response re:  Breast cancer screening:  benefit or harm? *JAMA* 2016; 315: 1402-3.

6. Trabuco EC, **Moorman PG**, Cliby WA. In reply re: Association of ovary-sparing hysterectomy with ovarian reserve. *Obstet Gynecol* 2016; 128: 655-6.

---

**Book Chapters and Invited Papers**

---

1. **Moorman PG**, Hames CG, Tyroler HA.  Socioeconomic status and morbidity and mortality in hypertensive blacks.  In Brest AN and Saunders E (eds):  *Cardiovascular Clinics:  Cardiovascular Diseases in Blacks*.  FA Davis Company, Philadelphia, 1991, 179-93.

2. **Moorman PG**, Hulka BS.  Menopausal hormones and the risk of breast cancer. *Endocrinologist.* 1992; 2: 189-94.  (Article was awarded annual editorial prize by journal.)

3. Hulka BS, **Moorman PG**.  Breast cancer:  Hormones and other risk factors, *Maturitas.* 2001; 38: 103-13.

4. **Moorman PG**, Terry PD.  Dairy products and breast cancer.  2003.  United Kingdom Dairy Council.  (Invited paper)

5. **Moorman PG**, Berchuck A.  Comment on:  Hormone replacement therapy does not increase risk for ovarian cancer in women with BRCA mutations.  *North American Menopause Society First to Know*. Feb. 15, 2006. www.menopause.org/news.html.

6. **Moorman PG**, Hamilton RJ.  Statins and cancer risk:  what do we know and where do we go from here? *Epidemiology.* 2007; 18: 194-6. (Invited paper)

7. Hulka BS, **Moorman PG**.  Breast cancer:  hormones and other risk factors.  *Maturitas.* 2008; 61: 203-213.
   (Republished 2001 article of same title in an issue of the journal's top 10 downloaded articles for the period 2000-2008).

8. **Moorman PG**.  Ovarian failure after pre-menopausal hysterectomy.  *European Obstetrics & Gynecology*. 2012; 7: 35-8. (Invited paper)

9. **Moorman PG**.  Genetic markers for ovarian cancer risk: are we close to seeing a clinical impact? *Personalized Medicine.* 2012; 9:  565-7. (Invited paper)

10. **Moorman PG**.  Should women at high risk for cancer use oral contraceptive pills?  *Personalized Medicine*. 2015, 12: 533-5.  (Invited paper)

---

**Technical Reports**

---

1. **Moorman PG**, Goldstein K, Coeytaux R, Myers ER, Strauss J, Van Houtven C, Shepherd-Banigan M, Brancu M, Von Isenberg M, Van Noord M, Conklin J, Lallinger K, Schmidt R, McBroom Brooks A, Sanders-Schmidler G.  Topic Brief:  Nutritional needs of older women.  Prepared for Office of Women's Health and Agency for Healthcare Research Quality (AHRQ), 2017.

2. Myers ER, Strauss J, Van Houtven C, Goldstein K, Shepherd-Banigan M, Brancu M, **Moorman PG**, Coeytaux R, Von Isenberg M, Van Noord M, Conklin J, Lallinger K, Schmidt R, McBroom Brooks A, Sanders-Schmidler G.  Topic Brief:  Maternal Health.  Prepared for Office of Women's Health and Agency for Healthcare Research Quality (AHRQ), 2017.

3. Strauss J, Brancu M, Myers ER,  Anderson S, Van Houtven C, Goldstein K, Shepherd-Banigan M, **Moorman PG**, Coeytaux R, Von Isenberg M, Van Noord M, Conklin J, Lallinger K, Schmidt R, McBroom Brooks A, Sanders-Schmidler G.  Topic Brief:  Women's Mental Health.  Prepared for Office of Women's Health and Agency for Healthcare Research Quality (AHRQ), 2017.

4.   Goldstein K, Coeytaux R, Myers ER, Strauss J, Van Houtven C, Shepherd-Banigan M, Brancu M, **Moorman PG**, Von Isenberg M, Van Noord M, Conklin J, Lallinger K, Schmidt R, McBroom Brooks A, Sanders-Schmidler G.  Topic Brief:  Girls' Health and Obesity.  Prepared for Office of Women's Health and Agency for Healthcare Research Quality (AHRQ), 2017.

5.   Shepherd-Banigan M, Van Houtven C,  Brancu M, Goldstein K, **Moorman PG**, Strauss J, Coeytaux R, Von Isenberg M, Van Noord M, Conklin J, Lallinger K, Schmidt R, McBroom Brooks A, Myers ER, Sanders-Schmidler G.  Topic Brief:  Family Caregivers for Older Adults.  Prepared for Office of Women's Health and Agency for Healthcare Research Quality (AHRQ), 2017.

---

### Non-authored Publications (acknowledged for contributions)

1.   Newman B, Millikan RC, King M-C. Genetic epidemiology of breast and ovarian cancers.  *Epidemiol Rev*. 1997; 19: 69-79.

2.   Millikan R, Pittman G, Tse C-K, Savitz DA, Newman B, Bell D. Glutathione S-transferases M1, Ti, and P1 and breast cancer. *Cancer Epidemiol Biomarkers Prev*. 2000; 9: 567-73.

3.   Krajcik RA, Massardo S, Orentreich N. No association between serum levels of tumor necrosis factor-α (TNF- α) or the soluble receptors sTNFR1 and sTNFR2 and breast cancer risk. *Cancer Epidemiol Biomarkers Prev*. 2003; 12: 945-6.

4.   Trivers KF, Stewart SL, Peipins L, Rim SH, White MC.  Expanding the public health research agenda for ovarian cancer. *J Womens Health*. 2009; 18: 1299-305.

5.   Soubry A, Il'yasova D, Sedjo R, Wang F, Byers T, Rosen C, Yashin A, Ukraintseva S, Haffner S, D'Agostino R Jr. Increase in circulating levels of IGF-1 and IGF-1/IGFBP-3 molar ratio over a decade is associated with colorectal adenomatous polyps. *Int J Cancer*. 2012; 131: 512-7.

---

### Presentations and Published Abstracts (selected)

**Moorman PG**, Newman B, Butler LM, Ostermeyer EA, Friedman LS, Millikan RC, Liu ET, King MC. Inherited susceptibility at BRCA1 in a population-based sample.  Society for Epidemiologic Research, Boston, MA, June 1996

Rockhill B, Newman B, **Moorman P**, Millikan R, Weinberg C. Summary attributable fraction and breast cancer risk factors. Society for Epidemiologic Research, Boston, MA, June 1996.

Furberg H, Newman B, **Moorman P**, Millikan R. Lactation and breast cancer risk. Society for Epidemiologic Research, Edmonton, Alberta, Canada, June 1997.

Marcus PM, Newman B, Millikan RC, **Moorman PG**, Baird DD, Sternfeld B, Qaqish B. The association of adolescent body mass index (BMI) and physical activity with breast cancer risk. Society for Epidemiologic Research, Edmonton, Alberta, Canada, June 1997.

Huang WY, Newman B, Millikan RC, Schell MJ, **Moorman PG**. Hormone-related factors and risk of breast cancer by estrogen receptor and progesterone receptor status. Society for Epidemiologic Research, Chicago, MD, 1998.

Hall IJ, Newman B, Millikan RC, **Moorman PG**.  Evaluating body size and breast cancer risk among black women. Society for Epidemiologic Research, Chicago, MD, 1998.

Marcus PM, Newman B, Millikan RC, Baird DD, **Moorman PG,** Qaqish B. Breast cancer epidemiology: the case for adolescent exposures. Society for Epidemiologic Research, Baltimore, MD, 1999.

**Moorman PG**.  Menopausal hormones and risk of breast cancer.  Carolina Breast Cancer Study Participant Symposium, Chapel Hill, NC, April 2000

**Moorman PG**, Jones BA, Millikan RC, Hall IJ, Newman B.  Race, anthropometric factors, and stage at diagnosis of breast cancer.  Society for Epidemiologic Research, Seattle, WA, June 2000.

Hall IJ, Newman B, Millikan RC, **Moorman PG**. Comparative analysis of breast cancer risk factors among African-American women and white women. Congress of Epidemiology, Toronto, Ontario, Canada, June 2001.

**Moorman PG**, et al.  Nuts and bolts of field studies: things they didn't teach you in school.  Congress of Epidemiology, Toronto, Ontario, Canada, June 2001. (Invited talk)

**Moorman PG**, Calingaert B, Vine M, Halabi S, Berchuck A, Schildkraut JM. Comparison of two methods for calculating lifetime ovulatory cycles.  Congress of Epidemiology, Toronto, Ontario, Canada, June 2001.

Plummer P, Jackson S, Konarski J, Mahanna E, Dunmore C, Regan G, Mattingly D, Parker B, Williams S, Andrews C, Vannapppagari V, HallS, Deming S, Hodgson E, **Moorman P**, Newman B, Millikan R. Making epidemiologic studies responsive to the needs of participants and communities: the Carolina Breast Cancer Study experience. Conference on Breast Cancer and Environmental Mutagens, Research Triangle Park, NC, September 2001.

**Moorman PG**. Population-based study of breast cancer among African-American and White women in North Carolina. North Carolina Central University, Durham, NC, January 2003. (Invited talk)

**Moorman PG**. Medication use and breast cancer risk. Psychiatry and Behavioral Sciences Grand Rounds, Memorial Sloan-Kettering Cancer Center, New York, NY, March 2003. (Invited talk)

Sansbury L, Millikan R, Schroeder J, **Moorman P**, North K, Sandler R. Use of non-steroidal anti-inflammatory drugs, cyclooxygenase-2 Val411Ala polymorphism and association with colon cancer in a population-based study of African Americans and whites. 3rd Annual AACR International Conference, Seattle, WA, October 2004.

Schildkraut JM, Berchuck A, Murphy S, Marks J, **Moorman P**, Calingaert B, Halabi S. Trinucleotide repeat polymorphisms in the androgen receptor gene and risk of ovarian cancer. 3rd Annual AACR International Conference, Seattle, WA, October 2004.

**Moorman PG,** Sesay J, Nwosu V, Millikan R. Non-steroidal anti-inflammatory drugs, COX2 polymorphism and breast cancer: a study of gene-environment interactions.  Triangle Cancer and Disparities Symposium, North Carolina Central University, Durham, NC, March 2005.

**Moorman PG**.  Racial disparities in breast cancer: problem or opportunity?  Johnson C. Smith University, Charlotte, NC, September 2005. (Invited talk)

Trivers K, Gammon M, Abrahamson P, Lund MJ, Kaufman J, **Moorman P**, Cai JW, Porter P, Brinton L, Eley JW. Reproductive factors and breast cancer survival in women less than 55 years of age. 4th Annual Conference on Frontiers in Cancer Prevention Research, Baltimore, MD, November 2005.

**Moorman PG**.  The role of epidemiology in the drug development process.  University of Ferrara, Ferrara, Italy, May 2006. (Invited talk)

**Moorman PG.**  Racial disparities in breast cancer:  risk factors through survival.  Women's Health Research Symposium - Untying the Pink Ribbon:  Advances in Breast Cancer.  University of Maryland School of Medicine.  Baltimore, MD, March 2008. (Invited talk)

**Moorman PG,** JM Schildkraut JM, ES Iversen ES, ER Myers ER, M Gradison M1, N Warren-White N, F Wang.  Weight gain after pre-menopausal hysterectomy.  Society for Epidemiologic Research, Chicago, IL, June 2008.

**Moorman PG.** Non-steroidal anti-inflammatory drugs (NSAIDs) as chemopreventives for cancer:  are they ready for prime time?  Genetics and Environmental Mutagenesis Society 26th Annual Fall Meeting. Research Triangle Park, NC, October 2008. (Invited talk)

**Moorman PG.**  Introduction to cancer epidemiology.  Osher Lifelong Learning Institute lecture series. Chapel Hill, NC, September 2009. (Invited talk)

**Moorman PG.**  Challenges of epidemiologic research in the genomic era:  the example of ovarian cancer. Environmental  Mutagen Society Annual Meeting, St. Louis, MO, October  2009 (Invited talk)

**Moorman PG.**  Epidemiology in clinical research:  beyond randomized controlled trials.  Duke University Health System Clinical Education and Professional Development Series, Durham, NC, January 2010. (Invited talk)

**Moorman PG.**  Epidemiology in clinical research:  beyond randomized controlled trials. Association of Clinical Research Professionals, Durham, NC, June 2010. (Invited talk)

**Moorman PG.** The role of epidemiology in understanding disparities in breast cancer.  Duke Oncology Symposium – Advances in Surgical and Treatment Options for Breast and Colorectal Cancer.  Raleigh, NC, May 2011. (Invited talk)

Østbye T, **Moorman P**. Measurement dilemmas: validity, reliability and messy data. Family Medicine Research Seminar Series, Duke University Medical Center, December 2011.

**Moorman P**, Østbye T. Research that can tell you something: internal and external validity in study design. Family Medicine Research Seminar Series, Duke University Medical Center, November 2011.

Myers ER, Havrilesky LJ, Gierisch J, **Moorman PG**, Dinan MA, Coeytaux R, Urrutia RP, Lowery WJ, Hasselblad V, McBroom AJ, Sanders GD. Using net benefits and acceptability curves to quantify uncertainty about tradeoffs between harms and benefits of oral contraceptives. Society for Medical Decision Making, Phoenix, AZ, October 2012.

Myers ER, Havrilesky LJ, Gierisch J, **Moorman PG**, Dinan MA, Coeytaux R, Urrutia RP, Lowery WJ, Hasselblad V, McBroom AJ, Sanders GD. Net effects of current patterns of oral contraceptive use on potentially fatal outcomes in the United States. Society for Medical Decision Making, Phoenix, AZ, October 2012.

Stouder A, Melcher B, Morgan PA, **Moorman PG**, Lin L, Stem J. Satisfaction Guaranteed?  An Analysis of Lecturer Characteristics Associated with Physician Assistant Student Satisfaction. Physician Assistant Education Association Annual Education Forum, Seattle, WA, November 2012.

**Moorman PG.**  The African American Cancer Epidemiology Study (AACES).  Ovarian Cancer in Women of African Ancestry Emerging Consortium Meeting.  Bethesda, MD, April 2013.

**Moorman PG.**  Ovarian Cancer:  What You Need to Know.  Duke Cancer Institute, Cancer Awareness Workshop.  Durham, NC, May, August and October 2014.

**Moorman PG.**  Ovarian Cancer in African American Women:  The Challenges of Studying a Less Common

Cancer in a Minority Population.  Duke Cancer Institute Cancer Control and Population Sciences Seminar Series.  Durham, NC, July 2014.

## CONSULTANT APPOINTMENTS

National Institutes of Health, Center for Scientific Review
- Epidemiology and Disease Control Subcommittee 2 (EDC-2):  Oct. 2000, Feb. 2001
- Special Emphasis Panels: Nov. 2001, Mar. 2002, Nov. 2002, Nov. 2003, July 2004, Nov. 2004, June 2005, Mar. 2006, Nov. 2006, Mar. 2007, July 2007, Nov. 2008, June 2009, July 2009, July 2010, Oct. 2010, Sept. 2011, Dec. 2013, Mar. 2017, Nov. 2017
- Small Grants Program for Cancer Epidemiology: Nov. 2001, Mar. 2003, June 2016, Mar. 2017, June 2017, June 2018, Nov. 2018
- National Cancer Institute, Program Project Review: Jan. 2003, Aug. 2003, Dec. 2003.
- SPORE (Specialized Program of Research Excellence) Review: Breast Cancer Feb. 2005, Ovarian Cancer June 2008, Feb. 2009.

Centers for Disease Control and Prevention.  Defining the Public Health Research Agenda for Ovarian Cancer.  Invited panel participant.  Nov. 2008.

Susan G. Komen for the Cure, Study Section Chair for Post-Doctoral Fellowship in Risk and Prevention, 2010.

Susan G. Komen Breast Cancer Foundation, Study Section Chair for Risk, Prevention and Epidemiology, Member of Programmatic Review Committee, 2005 – 2007.

Susan G. Komen for the Cure/Susan G. Komen Breast Cancer Foundation, Scientific Reviewer, 2003 - 2011.

Department of Defense Breast Cancer Research Program Scientific Peer Review, 1998, 2005, 2007, 2008, 2009, 2013.

Department of Defense Breast Cancer Research Program, Study Section Chair for Training - Epidemiology and Prevention, 2013.

Department of Defense Ovarian Cancer Research Program Scientific Peer Review, 2015, 2016.

Department of Defense Ovarian Cancer Research Program, Study Section Chair for Investigator Initiated Research II, 2018.

National Cancer Institute, Center for Global Health, Data Monitoring Committee for United States – Latin American Cancer Research Network, 2013

CODA, Inc., Research Triangle Park, NC.  IRB member, 2004.

National Institute of Environmental Health Sciences Special Emphasis Panel, Technical Evaluation of Support Services for Epidemiology, NIEHS Epidemiology Branch.  May 1998.

## PROFESSIONAL AWARDS AND SPECIAL RECOGNITIONS

Honorary Physician Assistant, Duke University Medical Center Physician Assistant Program - 2018

Certificate of Appreciation, Duke University Medical Center Physician Assistant Program – 2008

Delta Omega, Public Health Honorary – 1994

*The Endocrinologist*, Editorial Prize for Volume II – 1993

Research Service Award, National Cancer Institute - 1988-91

Edward E. Smissman Award for Medicinal Chemistry, University of Kansas – 1980

Walter F. Enz Award for Pharmaceutical Chemistry, University of Kansas – 1980

Watkins-Berger Scholarship, University of Kansas - 1975-1980

State of Kansas Scholarship, University of Kansas - 1976-1980

## ORGANIZATIONS AND PARTICIPATION

University of North Carolina School of Public Health Alumni Association, Epidemiology Section President, 2001-2002.

Society for Epidemiologic Research

American Pharmaceutical Association

## TEACHING RESPONSIBILITIES

### Courses Taught

Evidence Based Medicine-I, Duke University, Department of Community and Family Medicine, Physician Assistant program.   Primary instructor, 2004-2017.

Evidence Based Medicine-II, Duke University, Department of Community and Family Medicine, Physician Assistant program.  Co-Instructor, 2003-2018.

Evidence Based Medicine-I, Duke University, Department of Community and Family Medicine, Physician Assistant program.  Lecturer and seminar instructor, 2003.

Epidemiology and Research Methods (PAP 255), Duke University, Department of Community and Family Medicine, Physician Assistant program.  Seminar instructor, 2001-2002.

Epidemiology of Cancer (CDE 532B), Yale University, Department of Epidemiology and Public Health. Course director, 1997-2000.

Co-developer of departmental Master's Comprehensive Examination, University of North Carolina-Chapel Hill, Department of Epidemiology, 1995-1996.

Cancer Epidemiology (EPID 233), University of North Carolina-Chapel Hill, Department of Epidemiology, Teaching Assistant, 1992-1993.

Principles of Epidemiology (EPID 160), University of North Carolina-Chapel Hill, Department of Epidemiology, Teaching Assistant, 1990.

### Student Mentoring

Helena Furberg, MSPH, University of North Carolina, 1996, Committee Member

Pamela M. Marcus, PhD, University of North Carolina, 1997, Committee Member

Stella Chang, MPH, Yale University, 1997, Committee Member

Mary Riciutti, MPH, Yale University, 1999, Committee Chair

Edward A. Lew, MPH, Yale University, 1999, Committee Member

Shelley Goodstine, MPH, Yale University, 1999, Committee Member

Rupal Desai, MPH, Yale University, 1999, Committee Member

Pei-Yu Lin, MPH, Yale University, 2000, Committee Chair

Lisa Calvocoressi, Ph.D., Yale University, 2003, Dissertation Reader

Rebecca Cleveland, Ph.D., University of North Carolina, 2003, Committee Member

Leah Sansbury, Ph.D., University of North Carolina, 2004, Committee Member

Sumitra Shantakumar White, Ph.D., University of North Carolina, 2006, Committee Member

Katrina Trivers, Ph.D., University of North Carolina, 2006, Committee Member

Amy Dailey, Ph.D., Yale University, 2006, Dissertation Reader

Enid Rivera, M.D., Duke University, 2008, 3rd year Medical Student Preceptor

Alexis Gaines, Duke University, 2013, Master's Committee Member

Chioma Erondu, Duke University, 2013-14, 3rd year Medical Student Preceptor

Tolulope Teniola, Duke University 2016-17, 3rd year Medical Student Preceptor

Tengteng Wang, University of North Carolina, 2018, Committee Member


**COMMITTEES AND SERVICE**

Standing Committee on Misconduct in Research, Duke University School of Medicine, 2017-present

Senior Faculty Advisory Committee, Office for Research Mentoring, Duke University School of Medicine, 2016-present

Academy of Mentors, Office of Faculty Mentoring, Duke University School of Medicine, 2014-16

Society for Epidemiologic Research.  Reviewer for Tyroler and Lilienfeld Prize Papers, 2015

Appointments, Promotions and Tenure Committee, Department of Community and Family Medicine, Duke University Medical Center.  Committee Member, 2008-2018

Quality Assurance Sub-Committee for Clinical Research Units, Duke University Medical Center, Committee Chair, 2013-2014

Quality Assurance Sub-Committee for Clinical Research Units (formerly Site-based Research Units), Duke University Medical Center, Committee Member, 2011-2013

Path to Independence Faculty Mentoring Program, Duke University School of Medicine, Peer Reviewer, 2012-2018

Society for Epidemiologic Research.  Abstract reviewer for annual meeting, 2011

Cancer Prevention, Detection and Control Research Program, Duke University Medical Center, Cancer Control Pilot Study application reviewer,  2010, 2011

Executive Council, Department of Community and Family Medicine, Duke University Medical Center 2009-present

Education Committee, Department of Community and Family Medicine, Duke University Medical Center, 2009-2017

Faculty Search Committee, Cancer Prevention, Detection and Control Research Program, 2010

Duke Cancer Institute, Editorial Advisory Committee Member, 2010-2011

Duke Comprehensive Cancer Center Annual Meeting, Judge for poster presentations, 2009

Director Search Committee, Cancer Prevention, Detection and Control Research Program, 2009

Partners Allied in Research (PAIR) Pilot Grant application reviewer, Cancer Prevention, Detection and Control Research Program, 2005

**Editorial Reviewer**

American Journal of Epidemiology
Archives of Gynecology and Obstetrics
Breast Diseases
Cancer
Cancer Causes and Control
Cancer Research
Epidemiology
Gynecologic Oncology
International Journal of Epidemiology
Journal of Community Development
J of the Women's American Medical Assn
Lancet
Nutrition and Cancer
Public Health Nutrition
Women and Health

Annals of Epidemiology
Breast Cancer Research and Treatment
British Medical Journal-Cancer
Cancer Biomarkers
Cancer Epidemiology Biomarkers and Prevention
Clinical Breast Cancer
Ethnicity and Disease
International Journal of Cancer
JAMA
Journal of the National Cancer Institute
Journal of Women's Health
Lancet Oncology
Pharmacogenomics
Trends in Molecular Medicine

## CURRENT RESEARCH

Epidemiology of breast and ovarian cancer
Ovarian function after hysterectomy
Racial differences in disease risk and outcomes
Medication use and cancer risk
Etiologic factors for uterine fibroids

## EXTERNAL SUPPORT - PAST

| Principal Investigator | % effort | Title of Project and Funding Source | Total Costs | Duration |
|---|---|---|---|---|
| Barbara Hulka | 25% | High-Density Lipoprotein Cholesterol and Breast Cancer, National Cancer Institute, R03, Supported dissertation research | $72,234 | 1992 – 1993 |

| | | | | |
|---|---|---|---|---|
| Beth Newman | 100% | Carolina Breast Cancer Study, Project 2 SPORE in Breast Cancer, National Cancer Institute, P50. | $1,275,000 | 1992 – 1995 |
| Beth Newman | 50% | Carolina Breast Cancer Study, Project 2 SPORE in Breast Cancer, National Cancer Institute, P50. | $2,511,146 | 1995 - 1996 |
| Patricia Moorman | 50% | Medication Use and Breast Cancer in a Bi-racial Population, National Cancer Institute, R29-FIRST Award. | $498,302 | 1996 – 2002 |
| Patricia Moorman | 0% | Carolina Breast Cancer Study Participant Symposium, North Carolina Division of American Cancer Society Small Grant. | $2500 | 1997 |
| Patricia Moorman | 0% | Carolina Breast Cancer Study Participant Symposium, Susan G. Komen Breast Cancer Foundation Small Grant. | $5000 | 1997 |
| Joellen Schildkraut | 10% | Carolina Georgia Center, Cancer Genetics Network, National Cancer Institute, U-24. | $4,028,129 | 2002 – 2004 |
| Patricia Moorman | 0% | Non-steroidal Anti-Inflammatory Drugs and Breast Cancer: A Study of Gene-Environment Interactions among African-American and White Women, Minority Serving Institution Partnership Grant, Pilot Funds. | $28,040 | 2003 – 2004 |
| Celette Skinner | 5% | Partnerships to Eliminate Disparities in Cancer Outcomes and Research, National Cancer Institute, National Cancer Institute. | $517,743 | 2002 – 2006 |
| Patricia Moorman | 0% | Diversity Supplement to RO1 AG020162 Ovarian Failure Among Hysterectomized Women, National Institute on Aging (Note: Grant was awarded but post-doc accepted another position.) | $169,720 | 2006 |
| Andrew Berchuck | 5% | Biological Basis for Chemoprevention of Ovarian Cancer, Department of Defense. | $824,000 | 2002 – 2007 |
| Stephen Freedland | 5% | Weight Loss and Gain and Cancer Free Survival after Radical Prostatectomy in a Multiethnic Cohort. Prostate Cancer Foundation. | $100,000 | 2007-2009 |
| Joellen Schildkraut | 10% | Genetic Modifiers of BRCA1 and BRCA2, Project 3 SPORE in Breast Cancer. National Cancer Institute. | $1,795,862 | 2003 – 2009 |
| Joellen Schildkraut | 10% | Molecular Epidemiology of Ovarian Cancer. National Cancer Institute. | $3,750,000 | 2003 – 2010 |

| Name | % | Title / Institution | Amount | Years |
|---|---|---|---|---|
| Patricia Moorman | 40% | Ovarian Failure among Hysterectomized Women. National Institute on Aging. | $3,781,480 | 2003 - 2010 |
| Patricia Moorman (Sub-contract PI) | 3% | Cancer Genetics Network. National Cancer Institute. | ~$25,000 | 2010 – 2012 |
| Laura Havrilesky | 15% | Oral Contraceptive Use for the Primary Prevention of Ovarian Cancer. Agency for Healthcare Research and Quality | $486,476 | 2010 - 2012 |
| Jeffrey Marks | 5% | Atlantic Breast and Gynecologic Clinical Validation Center. National Cancer Institute | >$1,500,000 | 2010 - 2013 |
| Cathrine Hoyo | 5% | Disparities in Cervical Cancer Precursors and Deregulation of Imprinted Genes National Cancer Institute | ~$200,000 | 2012 – 2013 |
| Emanuel Trabuco (Moorman, Duke PI) | 2% | Anti-Müllerian Hormone as a Marker of Ovarian Reserve in Women with and without Hysterectomy. Mayo Clinic Internal Funds | $100,000 | 2012 – 2013 |
| Evan Myers | 10% | Systematic Review of Cancer Screening Literature for Updating American Cancer Society Breast Cancer Screening Guidelines American Cancer Society | ~$400,000 | 2013 - 2014 |
| Joellen Schildkraut | 9% | Cancer Education and Career Development Training Grant. National Cancer Institute | ~$1,400,000 | 2009 – 2014 |
| Patricia Moorman (Sub-contract PI) | 5% | Rare Cancer Genetics Network National Cancer Institute | ~$240,000 | 2010 – 2016 |
| Joellen Schildkraut (Moorman, co-PI) | 20% | Epidemiology of Ovarian Cancer in African American Women National Cancer Institute | ~$12,000,000 | 2010 – 2017 |
| Gillian Sanders | 10% | Management of Infertility Evidence-Based Practice Center | | 2015-2016 |
| Gillian Sanders | 10% | Management of Labor Dystocia Evidence-Based Practice Center | | 2016 |
| Gillian Sanders | 15% | Office of Women's Health – Topic Development Evidence-Based Practice Center | | 2016 |
| Evan Myers | 5% | Comparing Management Options for Management: Patient-centered Results for Uterine Fibroids (COMPARE-UF) PCORI | ~$19,000,000 | 2014 – 2018 |

**EXTERNAL SUPPORT - CURRENT**

| Principal Investigator | % effort | Title of Project and Funding Source | Total Costs | Duration |
|---|---|---|---|---|
| Joellen Schildkraut (Moorman, sub-contract PI) | 13% | Exploring Factors Related to Racial Disparities in Ovarian Cancer Incidence and Survival:  The OCWAA (Ovarian Cancer in Women of African Ancestry) Consortium National Cancer Institute | ~$450,000 | 2017 - 2021 |

**PERSONAL INFORMATION**

**Work address:**  DUMC Box 2715, 2424 Erwin Road, Suite 602, Durham, NC 27705

**Work phone #:**  (919) 681-4557

**E-mail address:**  patricia.moorman@duke.edu

**Home address:**  3 Skipwith Court,  Durham, NC 27707

**Home phone #:**  (919) 419-9301

**Marital status:**  Married

**Spouse's name:**  Allan R. Moorman, Ph.D.

# Exhibit 85

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW JERSEY

--------------------------------X

IN RE:  JOHNSON & JOHNSON

TALCUM POWDER PRODUCTS          MDL No.:
MARKETING, SALES PRACTICES,
AND PRODUCTS LIABILITY          16-2738 (FLW)(LHG)
LITIGATION


THIS DOCUMENT RELATES TO
ALL CASES
--------------------------------X

VIDEOTAPED DEPOSITION OF

PATRICIA G. MOORMAN, M.S.P.H., PH.D.

_____

FRIDAY, JANUARY 25, 2019

9:04 A.M.

_____


Taken by the Defendants
at Cambria Hotel & Suites Durham
2306 Elba Street
Durham, North Carolina 27705



- - -

Reported by Sophie Brock, RPR, RMR, RDR, CRR

- - -



GOLKOW LITIGATION SERVICES
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

Patricia G. Moorman, M.S.P.H., Ph.D.

## Page 2

```
 1              A P P E A R A N C E S
 2   ON BEHALF OF THE PLAINTIFFS:
 3        ASHCRAFT & GEREL, LLP
              4900 Seminary Road
 4            Alexandria, Virginia 22311
              Telephone: (703) 931-5500
 5        By:  MICHELLE A. PARFITT, ESQ.
                mparfitt@ashcraftlaw.com
 6
          - and -
 7
          MUELLER LAW, LLC
 8            404 W 7th Street
              Austin, Texas 78701
 9            Telephone: (512) 478-1236
          By:  STEVE FARIES, ESQ.
10              steve.faries@muellerlaw.com
11        - and -
12        NAPOLI SHKOLNIK PLLC
              400 Broadhollow Road, Suite 305
13            Melville, New York 11747
              Telephone: (631) 224-1133
14        By:  ALASTAIR J.M. FINDEIS, ESQ.
                afindeis@napolilaw.com
15
16   ON BEHALF OF THE DEFENDANTS JOHNSON & JOHNSON:
17        SHOOK, HARDY & BACON L.L.P.
              600 Travis Street, Suite 3400
18            Houston, Texas 77002
              Telephone: (713) 227-8008
19        By:  SCOTT A. JAMES, ESQ.
                sjames@shb.com
20
          - and -
21
          DRINKER BIDDLE & REATH, LLP
22            600 Campus Drive
              Florham Park, New Jersey 07932-1047
23            Telephone: (973) 549-7164
          By:  JESSICA L. BRENNAN, ESQ.
24              jessica.brennan@dbr.com
25
```

## Page 3

```
 1          A P P E A R A N C E S  (Continued)
 2   ON BEHALF OF THE DEFENDANT IMERYS TALC AMERICA, INC.:
 3        GORDON & REES, LLP
              816 Congress Avenue, Suite 1510
 4            Austin, Texas 78701
              Telephone: (512) 391-0197
 5        By:  JENNIFER A. FOSTER, ESQ.
                jfoster@gordonrees.com
 6
          - and -
 7
          COUGHLIN DUFFY LLP
 8            350 Mount Kemble Avenue
              Morristown, New Jersey 07962
 9            Telephone: (973) 267-0058
          By:  JONATHAN F. DONATH, ESQ.
10              jdonath@coughlinduffy.com
11
          ON BEHALF OF THE DEFENDANT PERSONAL CARE PRODUCTS
12   COUNCIL:
13        SEYFARTH SHAW LLP
              975 F Street, N.W.
14            Washington, DC 20004-1454
              Telephone: (202) 463-2400
15        By:  RENÉE B. APPEL, ESQ.
                rappel@seyfarth.com
16
17   ON BEHALF OF THE DEFENDANT PTI:
18        TUCKER ELLIS LLP
              233 South Wacker Drive
19            Chicago, Illinois 60606
              Telephone: (312) 624-6300
20        By:  JAMES W. MIZGALA, ESQ.
                james.mizgala@tuckerellis.com
21
22   VIDEOGRAPHER:
23        Brad Smith
24
25
```

## Page 4

```
 1              INDEX OF EXAMINATIONS
 2                                           PAGE
 3   BY MR. JAMES . . . . . . . . . . . . . . 9, 302, 315
 4   BY MS. FOSTER . . . . . . . . . . . . . . . . . 280
 5   BY MS. APPEL . . . . . . . . . . . . . . . . . . 294
 6   BY MS. PARFITT . . . . . . . . . . . . . . 310
 7
 8              INDEX OF EXHIBITS
 9   NUMBER        DESCRIPTION        MARKED
10   Exhibit 1   Invoices of Patricia G. Moorman,  . . .15
                 Ph.D.
11
     Exhibit 2   Errata Page from Deposition . . . . . .17
12               Transcript of Patricia Moorman,
                 Ph.D.
13
     Exhibit 3   Curriculum Vitae of Patricia  . . . . .20
14               Moorman, M.S.P.H, Ph.D.
15   Exhibit 4   Notice of Oral and Videotaped . . . . .32
                 Deposition of Patricia G. Moorman
16               and Duces Tecum
17   Exhibit 5   Binder of Materials Considered  . . . .35
18   Exhibit 6   Plaintiffs' Steering Committee's  . . .36
                 Response and Objections to the
19               Notice of Oral and Videotaped
                 Deposition of Patricia G. Moorman
20               and Duces Tecum
21   Exhibit 7   Rule 26 Expert Report of Patricia  . . .37
                 G. Moorman, M.S.P.H., Ph.D.
22
     Exhibit 8   Additional Materials to . . . . . . . .41
23               Dr. Patricia Moorman
24   Exhibit 9   Reliance Materials of Patricia  . . . .45
                 Moorman, Ph.D., Produced March 5,
25               2018
```

## Page 5

```
 1          INDEX OF EXHIBITS (Continued)
 2   NUMBER         DESCRIPTION          MARKED
 3   Exhibit 10  References and Materials . . . . . . . .49
                 Considered List for the MDL Report
 4
     Exhibit 11  Deposition Transcript of Patricia . . .61
 5               Moorman, M.S.P.H., Ph.D., dated
                 March 12, 2018
 6
     Exhibit 12  FDA Action Related to Talc  . . . . . .77
 7
     Exhibit 13  FDA Letter dated April 1, 2014  . . . .84
 8
     Exhibit 14  IARC Monographs Document titled . . . .91
 9               "Arsenic, Metals, Fibres, and
                 Dusts, Volume 100 C, A Review of
10               Human Carcinogens"
11   Exhibit 15  AACR Journal Article titled "Does . . 107
                 Exposure to Asbestos Cause Ovarian
12               Cancer? A Systematic Literature
                 Review and Meta-analysis," by
13               Alison Reid, et al.
14   Exhibit 16  American Journal of Epidemiology  . . 136
                 Article titled "Ovarian Cancer Risk
15               Factors in African-American and
                 White Women," by Patricia G.
16               Moorman, et al.
17   Exhibit 17  Cancer Causes Control Article . . . . 139
                 titled "Primary peritoneal and
18               ovarian cancers: an epidemiological
                 comparative analysis," by Delores
19               J. Grant, et al.
20   Exhibit 18  Printout from ACOG's Website: . . . . 149
                 "Talc Use and Ovarian Cancer"
21
22
23
24
25
```

2 (Pages 2 to 5)

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 6

INDEX OF EXHIBITS (Continued)
NUMBER        DESCRIPTION        MARKED
Exhibit 19  National Cancer Institute PDQ . . . . 151
            titled "Ovarian, Fallopian Tube,
            and Primary Peritoneal Cancer
            Prevention (PDQ®) - Health
            Professional Version
Exhibit 20  Epidemiology Article titled . . . . . 165
            "Perineal Talc Use and Ovarian
            Cancer, A Systematic Review and
            Meta-Analysis," by
            Ross Penninkilampi, et al.
Exhibit 21  Review Article titled "Genital  . . . 169
            use of talc and risk of ovarian
            cancer: a meta-analysis," by
            Wera Berge, et al.
Exhibit 22  Research Report titled "Perineal . . 173
            use of talc and risk of ovarian
            cancer," by H. Langseth, et al.
Exhibit 23  Anticancer Research Article . . . . . 175
            titled "Perineal Application of
            Cosmetic Talc and Risk of Invasive
            Epithelial Ovarian Cancer: A
            Meta-analysis of 11,933 Subjects
            from Sixteen Observational
            Studies," by Michael Huncharek,
            et al.
Exhibit 24  AACR Journal Research Article . . . . 180
            titled "Genital Powder Use and Risk
            of Ovarian Cancer: A Pooled
            Analysis of 8,525 Cases and 9,859
            Controls," by Kathryn L. Terry,
            et al.
Exhibit 25  JNCI Article titled "Perineal . . . . 202
            Powder Use and Risk of Ovarian
            Cancer," by Serena C. Houghton,
            et al.

Page 7

INDEX OF EXHIBITS (Continued)
NUMBER        DESCRIPTION        MARKED
Exhibit 26  Journal of the National Cancer . . . 205
            Institute Article, titled
            "Prospective Study of Talc Use and
            Ovarian Cancer," by Dorota M.
            Gertig, et al.
Exhibit 27  PLOS ONE Research Article titled . . 227
            "Comparison of Estimates between
            Cohort and Case-Control Studies in
            Meta-Analyses of Therapeutic
            Interventions: A
            Meta-Epidemiological Study," by Amy
            Lanza, et al.
Exhibit 28  AACR Journal Research Article . . . . 234
            titled "Association between Body
            Powder Use and Ovarian Cancer: The
            African American Cancer
            Epidemiology Study (AACES)," by
            Joellen M. Schildkraut, et al.
Exhibit 29  AACR Journal Article titled "Body . . 237
            Powder and Ovarian Cancer Risk -
            What is the Role of Recall Bias?"
            by Britton Trabert
Exhibit 30  International Journal of Cancer . . . 273
            Article titled "Perineal Talc
            Exposure and Epithelial Ovarian
            Cancer Risk in the Central Valley
            of California," by Paul K. Mills,
            et al.
Exhibit 31  Paper titled "Systematic Review . . . 307
            and Meta-Analysis of the
            Association between Perineal Use of
            Talc and Risk of Ovarian Cancer,"
            by Mohamed Kadry Taher, et al.

Page 8

                    P R O C E E D I N G S
            THE VIDEOGRAPHER:  We are now on
record.  Today's date is January 25th, 2019, and the
time is approximately 9:04 a.m.  This is the
videotaped deposition of Dr. Patricia Moorman.
            Could counsel please now introduce
themselves for the record, and then our court reporter
will swear in the witness.
            MR. JAMES:  Scott James for the Johnson
& Johnson Defendants.
            MS. BRENNAN:  Jessica Brennan for the
Johnson & Johnson Defendants.
            MS. FOSTER:  Jennifer Foster for Imerys
Talc America, Inc.
            MR. DONATH:  Jonathan Donath for Imerys
Talc, Inc.
            MS. APPEL:  Renée Appel, here for
Personal Care Products Council.
            MR. MIZGALA:  James Mizgala for PTI.
            MR. FINDEIS:  Alastair Findeis,
Plaintiffs' Steering Committee.
            MR. FARIES:  Steve Faries for the
Plaintiffs.
            MS. PARFITT:  Michelle Parfitt for the
Plaintiffs.

Page 9

Whereupon,
      PATRICIA G. MOORMAN, M.S.P.H., PH.D.
      having first been duly sworn/affirmed,
      was examined and testified as follows:
            EXAMINATION BY COUNSEL FOR THE
            JOHNSON & JOHNSON DEFENDANTS
BY MR. JAMES:
      Q.  Good morning, Dr. Moorman.
      A.  Good morning.
      Q.  My name is Scott James.  We've had the
pleasure of meeting before the deposition.  I'm
counsel for the J&J Defendants in this matter.
          Do you understand that?
      A.  I do.
      Q.  Super.  Could you state your name for the
record, please.
      A.  My name is Patricia Moorman.
      Q.  And you have been deposed before in a talc
ovarian cancer case; correct?
      A.  Yes, I have.
      Q.  And you've testified on behalf of the
Plaintiffs in that case; correct?
      A.  Yes, I did.
      Q.  And the allegations in that case were that
cosmetic talc powders cause ovarian cancer; correct?

                              3  (Pages 6 to 9)

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 10

1    A. That's correct.
2    Q. You were deposed in the Ingham case.
3      Do you recall the name of the case?
4    A. Yes, I do.
5    Q. And you were last deposed in that case in
6  March of 2018. Do you recall that?
7    A. Yes, I do.
8    Q. Has there been any change in your employment
9  status since your March 2018 deposition?
10   A. I am still a professor at Duke University,
11  yes.
12   Q. Has there been any change in your work or
13  teaching activities since your deposition?
14   A. Yes.
15   Q. What are those changes?
16   A. I am in a preretirement transition, and so
17  I have been reducing my effort. And so I do not --
18  I'm not doing as much teaching as I was a year ago.
19   Q. Other than that fairly significant change,
20  are there any other changes in your teaching or work
21  activities since the deposition?
22   A. No.
23   Q. Have you done any new expert witness work
24  since the last deposition other than the talc MDL that
25  we're here about today?

Page 11

1    A. No, I have not.
2    Q. And you understand that we are taking your
3  deposition today in the talc MDL; correct?
4    A. Yes.
5    Q. Who first contacted you about serving as an
6  expert in the talc MDL?
7    A. It was -- let's see -- Jeff Gibson was the
8  first person who contacted me about talc litigation.
9    Q. When you say "talc litigation," are you
10  referring to the Ingham case?
11   A. I'm afraid that I'm a little unclear on --
12  you know, there are multiple attorneys, multiple
13  cases, and I don't know who was the Defendant and when
14  he first approached me.
15   Q. Understood.
16   A. Or the Plaintiff, rather. I'm sorry.
17   Q. Do you recall the time frame that Mr. Gibson
18  contacted you?
19   A. It was in summer of 2016.
20   Q. Are you retained in any talc cases other than
21  the talc MDL and the Ingham case?
22   A. Not to my knowledge, no.
23   Q. Sitting here today, do you have the ability
24  to distinguish as to whether any attorney contacted
25  you specifically about the talc MDL?

Page 12

1    A. I'm afraid I'm a little bit unclear about the
2  particular cases. I understand that this is an MDL
3  case. I have been in touch with attorneys about
4  various cases since, you know, 2016, but I'm a little
5  bit unclear about the distinctions.
6    Q. In preparing for today's deposition for the
7  talc MDL, did you meet with counsel?
8    A. Yes.
9    Q. Okay. And who did you meet with?
10   A. I have met with the individuals here,
11  Michelle Parfitt, Steve Faries, Alastair, and -- I'm
12  blanking on his last name all of a sudden -- and Jeff
13  Gibson.
14   Q. Are those the only attorneys that you've met
15  with regard to your deposition today?
16   A. Yes.
17   Q. In preparing your MDL talc report, are there
18  any other attorneys that you worked with other than
19  the ones that you just mentioned with regard to the
20  MDL?
21      MS. PARFITT: Objection. Form.
22      You may answer.
23      I just wanted to make sure that -- I believe
24  he's asking the names of people, not the
25  communications.

Page 13

1      MR. JAMES: Yes.
2      THE WITNESS: Okay. I believe that on
3  teleconferences, Chris Tisi was also on one of the --
4  at least one of the teleconferences, probably more
5  than one.
6  BY MR. JAMES:
7    Q. Was Mr. Tisi involved in teleconferences
8  pertaining to the report that you authored?
9    A. Yes.
10   Q. And, again, I'm not asking you about the
11  substance of the communications, just the
12  identification of the attorneys that you've worked
13  with. Okay?
14   A. Okay.
15   Q. Are there any other attorneys that you've
16  worked with on the MDL report?
17   A. None that I recall.
18   Q. Are you working with any of the counsel that
19  you just identified on any other litigation or
20  matters?
21   A. No, I am not.
22   Q. Okay. Today at the deposition, we'll follow
23  the same ground rules as the Ingham deposition. So
24  I know that you're familiar with them, but as a
25  reminder, my questions will be verbal and I ask that

4 (Pages 10 to 13)

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 14

1    your answers be verbal as well.  Okay?
2        A.  Okay.
3        Q.  And that's so the court reporter can take
4    down what you're saying and can take down what I'm
5    saying as well.
6            Also, Michelle has told you this, but
7    anytime you need a break, just let us know and we'll
8    be happy to accommodate you.  Okay?
9        A.  Okay.
10       Q.  And if you have any -- if you have any -- let
11   me rephrase that.
12           If you don't understand any questions that
13   I ask you, please ask me to rephrase.  Okay?
14       A.  Okay.
15       Q.  Great.
16           What are you charging Plaintiffs' counsels
17   in the MDL?
18       A.  My rate is $400 per hour.
19       Q.  How much have you invoiced in the MDL to
20   date?
21       A.  For the MDL, I believe it is 21,000.
22       Q.  Okay.  And prior -- sorry.  Did I cut you
23   off?
24       A.  No, you did not.
25       Q.  This morning, your counsel handed me a copy

Page 15

1    of the invoices that you furnished in the MDL, and I'm
2    going to mark this as Exhibit No. 1.
3        (Exhibit No. 1 was marked for identification.)
4    BY MR. JAMES:
5        Q.  Exhibit No. 1 is containing four invoices.
6    I'm going to hand those to you and ask you to confirm
7    that those are the invoices that you have prepared for
8    your work in the MDL.
9        A.  There are some for -- that work that was done
10   with the Ingham case, and my understanding, that's not
11   part of the MDL.
12       Q.  That's fair.  Yes.
13       A.  Okay.
14       Q.  So are the invoices that I've handed you as
15   part of Exhibit 1, are those the invoices related to
16   the work that you've done on the MDL?
17       A.  I -- I'm sorry.  I'm -- I'm trying to answer
18   your question, but the ones for prior -- other than
19   the Ashcraft & Gerel, my understanding was that these
20   were for, like, the Ingham case and the state cases,
21   not the MDL.
22       Q.  Okay.  Let me ask it this way:  Are these the
23   invoices that you've submitted to Michelle Parfitt?
24       A.  They've been submitted to the people noted on
25   there.  So --

Page 16

1            MS. PARFITT:  And I've just got to add
2    some clarity to that.
3            MR. JAMES:  Sure.
4            MS. PARFITT:  There might be some
5    overlap.  I think that's the problem.  There might
6    just be some overlap.
7    BY MR. JAMES:
8        Q.  Are there any invoices that you have prepared
9    for your work in the talc litigation that you have not
10   produced to us today in the MDL, be it Exhibit 1 or in
11   your work in Ingham?
12       A.  These are the only invoices related to the
13   talc litigation, period.
14       Q.  And do you have an estimate of -- when you
15   say that these are the only invoices for the talc
16   litigation -- and if these questions continue to be
17   confusing, let me know -- but are there other invoices
18   that you submitted in the Ingham case that are not
19   part of Exhibit 1?
20       A.  No.  These are all the invoices submitted.
21       Q.  We got there finally.  Sorry about that.
22       A.  Okay.
23       Q.  Have you discussed your work in this
24   litigation with any other experts who are working on
25   behalf of the Plaintiffs?

Page 17

1        A.  No.  To my knowledge, I have not.
2        Q.  Have you had any emails or other
3    communications with Plaintiffs' experts in the talc
4    litigation?
5        A.  No, I have not.
6        Q.  And you recall giving your testimony in the
7    Ingham case in March 2018; correct?
8        A.  Yes, I do.
9        Q.  After that testimony that you provided, you
10   also had an opportunity to review that testimony;
11   correct?
12       A.  I did.
13       Q.  And do you recall preparing a single
14   correction to the Ingham transcript?
15       A.  Yes.
16       Q.  And so I have with me a copy of what we refer
17   to as an errata sheet, which is the correction sheet
18   that you signed in Ingham.  I'm going to mark that as
19   Exhibit No. 2.  Okay?
20       (Exhibit No. 2 was marked for identification.)
21   BY MR. JAMES:
22       Q.  And the way that we're configured, there's
23   some space between me and your counsel.  So when
24   I have exhibits, as I will throughout the day --
25   we may have to figure out how to approach this, but I

5 (Pages 14 to 17)

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 18

1  may hand them to you and ask that you hand them over
2  since we're all miked up.
3      Okay.  And do you recognize your handwriting
4  on that Exhibit?
5      A.  I do.
6      Q.  Does that reflect the correction that you
7  made to your testimony?
8      A.  Yes, it does.
9      Q.  And if you flip over to the other side of
10  Exhibit 2, does that contain your signature?
11      A.  Yes, it does.
12      Q.  By signing that errata sheet, you confirmed
13  that the testimony that you gave in Ingham was true
14  and correct; correct?
15      A.  Yes.
16      Q.  Do you still stand behind the testimony that
17  you provided in Ingham today?
18      A.  Yes, I do.
19      Q.  Subject to the one correction that you made;
20  correct?
21      A.  Yes, I do.
22      Q.  Sitting here today, do you believe there are
23  any other changes or corrections that you need to make
24  to your testimony in Ingham?
25      A.  I can't think of any, no.

Page 19

1      Q.  Did you review your Ingham deposition in
2  preparation for today's deposition?
3      A.  I did within the last few weeks, yes.
4      Q.  And so when you've reread the transcript in
5  the last few weeks, did you see anything in that
6  transcript that you wanted to correct?
7      A.  No.
8      Q.  Since your Ingham deposition in March of
9  2018, have you authored any publications or articles
10  pertaining to talc, asbestos, or ovarian cancer risk
11  factors?
12      A.  Yes, I have.
13      Q.  Okay.  And let's break up that, then.
14      Have you authored any articles pertaining to
15  talc?
16      A.  I have not authored any articles that
17  directly address talc as the main focus of the paper.
18  Talc has been mentioned in at least one paper as a
19  potential confounder.
20      Q.  And what was the name of that article,
21  please.
22      A.  If you'll give me just a moment, let me
23  look --
24      Q.  Dr. Moorman, are you looking at a copy of
25  your CV?

Page 20

1      A.  I am.
2      Q.  Okay.  So for purposes of the record, this
3  morning, before the deposition, your counsel handed me
4  a copy of your updated CV.
5      Is that what you're looking at right now?
6      A.  Yes, it is.
7      Q.  Okay.  I'm going to mark a copy of that as
8  Exhibit No. 3.
9      (Exhibit No. 3 was marked for identification.)
10      MR. JAMES:  Michelle, you have a copy,
11  I presume?
12      MS. PARFITT:  Actually, I think I gave
13  them all to you.  Sorry.
14      MR. JAMES:  Again, apologies for having
15  to handle it that way.
16      THE WITNESS:  Oh, I'm sorry.
17      MS. PARFITT:  Thank you.
18      THE WITNESS:  Okay.  The article that
19  I was referring to is -- the first author is Park.
20  The title of the article is "Benign gynecologic
21  conditions are associated with ovarian cancer risk in
22  African-American women:  A case-control study."
23      And I was a coauthor on that paper, and talc
24  was included as a potential confounder.
25

Page 21

1  BY MR. JAMES:
2      Q.  And, for the record, can you tell us the
3  number of the item you're looking at on your CV?
4      A.  Okay.  On page 14, it is Article No. 120.
5      Q.  And in that paper, Dr. Moorman, did you say
6  that you described talc as a potential confounder?
7      A.  Yes.
8      Q.  In that paper, did you include a disclosure
9  of your involvement in this talc litigation as an
10  expert for the Plaintiffs?
11      A.  I disclosed it -- actually, I had a
12  discussion with the senior author on this paper, who's
13  Michele Cote, and disclosed what I was doing.  And she
14  was -- she actually said she had also done some work
15  related to talc and ovarian cancer and she was going
16  to check with the editor and see if it required a
17  disclosure.  And so there was no disclosure.  So
18  apparently the editor did not feel it was warranted.
19      Q.  So the article, as published, does not
20  contain a disclosure of your involvement in the
21  litigation; correct?
22      A.  That is correct.
23      Q.  Did you review the disclosure requirements of
24  the journal in which the article was published?
25      A.  I can't remember if I specifically looked at

6 (Pages 18 to 21)

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 22

1  that journal's requirements.  I don't recall if I did
2  or not.
3       Q.  Do you believe that it is important -- for an
4  author who's working on an article for a publication
5  pertaining to an issue that she's testifying about in
6  litigation, do you believe it's important to disclose
7  that to the reader of the article?
8       A.  I think that it is important to disclose it
9  in conjunction with the journal's policies, as I
10  described.  I did disclose it to the corresponding
11  author, who said she was going to discuss it with the
12  editor.  So I think that I did what was appropriate.
13       Q.  Did you communicate your involvement in the
14  litigation to anyone with the journal?
15       A.  I did not.  It is typical that the
16  communication with the journal is through the
17  corresponding author.
18       Q.  Have you attempted to amend any disclosures
19  in your prior papers since the last deposition?
20       MS. PARFITT:  Objection.  Form.
21       THE WITNESS:  I do --
22       MR. JAMES:  You're looking at your
23  counsel.  Michelle can correct me if I'm wrong.  She's
24  allowed to make the objections.  And once she does,
25  unless she tells you not to answer, you may answer.

Page 23

1       MS. PARFITT:  That's fine.
2       THE WITNESS:  Okay.  Yes.  In my last
3  deposition, there was an article that I was one of 40
4  authors that looked at about 20 different risk factors
5  for ovarian cancer.  I acknowledged in my deposition
6  that it was an oversight.  In my career, you know,
7  spanning 25 years, I've never had to make disclosures
8  about potential conflicts of interest.  I acknowledged
9  that it was an oversight on my part.  When it was
10  brought to my attention, I contacted the journal, and
11  they said, "Okay.  What's your disclosure?"  And
12  I disclosed it.
13  BY MR. JAMES:
14       Q.  So just to be clear, this was after the
15  deposition; correct?
16       A.  It was.
17       Q.  Is this the Peres paper?
18       A.  Yes.
19       Q.  Did they respond to you in any way about the
20  reported conflict?
21       A.  The editor just said, "Okay.  What is your
22  disclosure?"
23       And I gave it to him.  And I believe that
24  they subsequently published a correction to the
25  article.

Page 24

1       Q.  Did they communicate with you about the
2  disclosure in a written format?
3       A.  It was an email communication.
4       Q.  Was it a single email, or was it multiple
5  emails?
6       A.  As I recall, I sent an email to the editor
7  disclosing the situation, and he -- I think he
8  responded that, yes, it should be disclosed.  And then
9  I believe there was another email from -- I don't
10  know -- an editorial assistant or someone asking
11  specifically what was the -- what was the wording of
12  the disclosure that I wanted to make, and I gave them
13  that.
14       So it was, you know, two or three emails,
15  but...
16       Q.  Do you still have that email traffic in your
17  possession?
18       A.  Probably.
19       Q.  It's on your computer?
20       A.  I would think so.
21       Q.  Okay.  Could you ensure that you preserve
22  that email traffic for us, please.
23       A.  Yes.
24       MR. JAMES:  And then, Michelle, we will
25  request a copy of the email traffic.

Page 25

1       MS. PARFITT:  We'll certainly take it
2  under advisement, sure.
3  BY MR. JAMES:
4       Q.  Do you have any similar written
5  communications about the disclosure with the paper
6  that we just discussed, the Park paper?
7       A.  No, I do not.  That was a telephone
8  conference.
9       Q.  Other than the Park article that you just
10  identified, have you authored any other articles since
11  your last deposition concerning talc, asbestos, or
12  risk factors for ovarian cancer?
13       A.  As you can see on my CV, since the last
14  deposition, Article No. 121 is a paper on effect of
15  cultural, folk, and religious beliefs on delays in
16  diagnosis of ovarian cancer.  I was first author on
17  that paper.
18       Article 119, first author Anderson, was
19  looking at individual, social, and societal correlates
20  of health-related quality of life among
21  African-American survivors of ovarian cancer.
22       And I was a coauthor on a paper by Mills
23  that was looking at immune regulatory molecular
24  expression.
25       Q.  Since your Ingham deposition, have you

7 (Pages 22 to 25)

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 26

1  authored any articles that pertain to talc or asbestos
2  other than the Park article?
3      A. No.
4      Q. Are you currently working on any articles or
5  publications that pertain to the issues addressed in
6  your expert report?
7      A. I am a coauthor on a paper that is in
8  preparation that is describing the OCWAA Consortium,
9  which stands for Ovarian Cancer in Women of African
10  Ancestry. And this is a relatively newly formed
11  consortium, and it's describing the overall structure
12  of the consortium and some of the factors that we
13  intend to consider. And in the draft of the paper,
14  talc is included along with a long list of other risk
15  factors that we will be considering.
16      Q. Is that paper in draft form?
17      A. It is in draft form. It's being -- yeah, it
18  has not been submitted yet.
19      Q. So it has not been submitted for peer review?
20      A. No, it has not.
21      Q. Is talc mentioned in the context of a
22  potential confounder, like the Park paper?
23      MS. PARFITT: Object to form.
24      THE WITNESS: Talc is mentioned in that
25  paper as one of many ovarian cancer risk factors that

Page 27

1  we hope to examine in this -- within this consortium.
2  BY MR. JAMES:
3      Q. So one of the purposes of that paper, as
4  you've described, is that you will be looking at the
5  association between talc and ovarian cancer; is that
6  correct?
7      MS. PARFITT: Objection. Form.
8      THE WITNESS: It is -- the purpose of
9  the paper is to describe the consortium. So there is
10  relatively little data about risk factors for ovarian
11  cancer among African -- African-American women, or
12  women of African ancestry. And so the purpose of the
13  paper is not focused just on talc, but it is
14  describing how the consortium hopes to compare risk
15  factors for ovarian cancer between African-American
16  and white women. So talc is among a long list of risk
17  factors that will be considered as we progress with
18  this consortium.
19  BY MR. JAMES:
20      Q. Have you yet disclosed your involvement in
21  the litigation with respect to that paper?
22      A. The -- I will disclose it when the paper will
23  be submitted, which is the typical time when such a
24  disclosure would be made.
25      Q. Have you engaged in any written

Page 28

1  communications or written paperwork about your
2  conflict for that paper? Your litigation disclosure
3  for that paper? Is there anything in writing about
4  that to anyone or the journal itself, or a journal?
5      A. At this point, no, because it is still in
6  draft form. It's not ready to be submitted.
7      Q. Okay. Other than the papers we have
8  discussed this morning, are there any other papers
9  that you -- that are works in progress that discuss
10  talc or asbestos that you're working on?
11      A. Another paper that is in progress is looking
12  at infertility as a risk factor for ovarian cancer.
13  And talc is, again, considered as a potential
14  confounder of that association.
15      So, again, draft form. It hasn't been
16  disclosed yet because it's not at the point where one
17  would disclose that.
18      Q. Okay. And you answered my next question, and
19  that's fine. So thank you.
20      Can you identify the coauthors on the paper
21  that you've just -- that you just mentioned, the
22  infertility paper?
23      A. The infertility paper? Okay. This was work
24  that was done with a medical student, Tolu Teniola is
25  the medical student that I was working with. And then

Page 29

1  all of the AACES -- this is, again, African American
2  Cancer Epidemiology Study, which is an ovarian cancer
3  study that I've worked on for about the last nine or
4  ten years, and so all of the collaborators on that
5  study.
6      And when you look at the CV, the papers that
7  come from AACES, it's Dr. Schildkraut, Dr. Bondy,
8  Dr. Cote. It's a large multicenter study; there are
9  many coauthors, and so they would all be included.
10      Q. And with respect to the other
11  work-in-progress paper that you have identified, can
12  you identify the coauthors on that paper?
13      MS. PARFITT: Are you speaking of the
14  infertility paper?
15      MR. JAMES: The first question was
16  about the infertility. So now we're back to the first
17  work-in-progress paper that you identified.
18      THE WITNESS: Okay. So the study
19  describing the OCWAA Consortium, is that what you're
20  asking me about?
21  BY MR. JAMES:
22      Q. Yes, Doctor. Thank you for clearing that up.
23      A. Okay. So it includes -- again, this is a
24  multicenter study -- quite a few coauthors. They
25  would include Dr. Schildkraut, Lynn Rosenberg, Traci

8 (Pages 26 to 29)

Patricia G. Moorman, M.S.P.H., Ph.D.

---

Page 30

1  Bethea, Wendy Setiawan.
2      Again, it's a large consortium with a lot of
3  coauthors.  There would be probably at least a dozen,
4  probably more.
5      Q.  For both work-in-progress papers, are you
6  aware of whether any of those coauthors are experts
7  for the Plaintiffs in the talc litigation?
8      A.  I am not aware of -- if any of them are.
9      Q.  Have you -- are there any other works in
10  progress that pertain to talc or asbestos that you're
11  working on?
12      A.  No, I do not believe so.
13      Q.  Have you submitted the substance of your
14  opinions in the MDL report to anyone for peer review?
15      A.  No, I have not.
16      Q.  Have you engaged in any internet postings,
17  blogs, chatroom postings concerning your opinions in
18  this litigation?
19      A.  No, I have not.
20      Q.  Have you given any presentations, speeches,
21  or lectures concerning talc or asbestos or ovarian
22  cancer risk factors since your March 2018 deposition?
23      A.  No, I have not.
24      Q.  Have you given any interviews, public
25  statements, or other public speaking engagements

---

Page 31

1  concerning talc, asbestos, or ovarian cancer risk
2  factors since your Ingham deposition?
3      A.  No, I have not.
4      Q.  Since your Ingham deposition -- and I'm
5  structuring my questions sometimes this way in hopes
6  of expediting.  Okay?
7      So since your Ingham deposition, have you
8  discussed your opinions in this litigation with any of
9  your professional colleagues?
10      A.  To some extent, yes.
11      Q.  Okay.  And can you tell me who that is?
12      A.  I already mentioned Dr. Cote, Michele Cote,
13  described the work that I was doing.
14      I have mentioned some of the work that I'm
15  doing to some of my colleagues within my department,
16  Dr. Truls Ostbye for one, Dr. Kat Pollak for another.
17      Q.  And when you say that you've mentioned your
18  litigation work with your department colleagues, what
19  have you told them?
20      A.  I have basically described that I have been
21  working as an expert witness in this -- in this case,
22  and expressing my opinion, you know, that -- working
23  for the Plaintiffs and my opinion that talc is a cause
24  of ovarian cancer.
25      Q.  And have you engaged in any written

---

Page 32

1  communications with your professional colleagues about
2  your opinions?
3      A.  No, I have not.
4      Q.  And when I say "about your opinions," I mean
5  about your opinions in this litigation.
6      Is there any written communications, emails,
7  or other writings expressing your opinions in this
8  litigation to your professional colleagues?
9      A.  No, I do not believe so.
10      Q.  Have you had any discussions, since your
11  Ingham deposition, with any healthcare professionals
12  who treat ovarian cancer patients about your
13  litigation opinions?
14      A.  No, I have not.
15      Q.  Have you prepared any letters to the editor
16  about any of the publications that you cite in your
17  MDL report?
18      A.  No, I have not.
19      Q.  Okay.  I am going to hand you a copy of the
20  deposition notice for this case.  I'm going to mark
21  that as Exhibit No. 4.
22      (Exhibit No. 4 was marked for identification.)
23      MR. JAMES:  Michelle, do you need a
24  copy?
25      MS. PARFITT:  I believe I might have

---

Page 33

1  given you mine.  If you would be so kind, I appreciate
2  that.
3      MR. JAMES:  Dr. Moorman.
4      THE WITNESS:  Thank you.
5  BY MR. JAMES:
6      Q.  Okay.  Dr. Moorman, have you seen the
7  deposition notice that I just handed you before?
8      A.  Yes, I have.
9      Q.  Okay.  And you understand from your prior
10  deposition, that this is a document that formally
11  notices the time and place and why we're here; right?
12      A.  Yes.
13      Q.  And if you turn to page 3 of the notice, you
14  see that there is a section for definitions, and then
15  it follows with a list of document requests; correct?
16      A.  Yes.
17      Q.  Okay.  And your counsel this morning has
18  produced to me a copy of your invoices, a copy of your
19  updated CV, an additional-materials-considered list,
20  and has also indicated that the references to your MDL
21  report are going to be available to us on a thumb
22  drive.
23      Other than those materials that I just
24  described, are there any other materials that you've
25  brought with you today that respond to this deposition

---

9 (Pages 30 to 33)

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 34

1   notice?
2       A. No, there are no other documents.
3           MR. JAMES: Michelle, is there anything
4   else that you brought with you that is responsive to
5   the deposition notice?
6           MS. PARFITT: You know, the only thing
7   that might -- I believe you asked this, Mr. James --
8   any notes that she might have taken.
9           MR. JAMES: Yes, I was going to ask
10  that.
11          MS. PARFITT: So why don't we just wait
12  for that. I do have something for that.
13          MR. JAMES: Okay. Fair enough.
14  BY MR. JAMES:
15      Q. Dr. Moorman, did you provide to your counsel
16  any working copies of materials that you've reviewed
17  for purposes of preparing your report or preparing for
18  today's deposition?
19      A. Can you tell me what you mean by "working
20  copies"?
21      Q. Sure. Have you made any notes on any of the
22  materials that you reviewed for purposes of your work
23  on the MDL?
24      A. Yes. In this notebook here, there are
25  articles. Most of them are the epidemiologic studies.

Page 35

1   And on some of them, I have notes that basically help
2   me kind of categorize and -- categorize the articles
3   and some of the main things that they looked at. You
4   know, did they address dose-response? Did they look
5   at histology? Those types of things. It was just to
6   kind of help me sort them out.
7       Q. And you brought that binder with you here
8   today; correct?
9       A. Correct.
10          MR. JAMES: Michelle, I'm going to mark
11  that as Exhibit No. 5.
12          MS. PARFITT: You can. What I would
13  ask, last evening we didn't have the ability to get
14  everything copied. So what we will do is, we can mark
15  that, and we'll make some arrangements to get that
16  copied so we can get the originals back to
17  Dr. Moorman.
18          MR. JAMES: Sure. That's fine.
19          So I'm going to mark this binder
20  Exhibit No. 5.
21      (Exhibit No. 5 was marked for identification.)
22  BY MR. JAMES:
23      Q. Dr. Moorman, other than what you've provided
24  to me in Exhibit No. 5, are there any other notes or
25  working copies of materials considered that you have

Page 36

1   in your possession that are not contained in this
2   binder?
3       A. No. It's there and the report. That's it.
4           MS. PARFITT: Mr. James, if we could,
5   do you mind, could she have that back? In the event
6   you start to ask her questions about it, she may want
7   hers instead, and then we'll make sure you get it.
8       Thank you.
9   BY MR. JAMES:
10      Q. And before we commenced this morning, your
11  counsel, Ms. Parfitt, handed me a copy of the
12  objections that they have lodged -- that the
13  Plaintiffs have lodged to the deposition.
14          MR. JAMES: Ms. Parfitt, do you want to
15  mention that on the record?
16          MS. PARFITT: Yes. If we could kindly
17  have marked as Exhibit No. -- I believe it's 6 now.
18  This is the Plaintiffs Steering Committee's Response
19  and Objections to the Oral and Video Deposition of
20  Dr. Patricia Moorman.
21      Thank you.
22      (Exhibit No. 6 was marked for identification.)
23  BY MR. JAMES:
24      Q. Dr. Moorman, I'm just going to hand you a
25  copy of this because it looks like you're keeping a

Page 37

1   pile over there for us of all the exhibits. Okay?
2   I'm not going to ask any questions about it.
3       A. Okay.
4       Q. Okay. Dr. Moorman, in anticipation -- or in
5   preparation for your work on the MDL, or in
6   conjunction with your work on the MDL, you also
7   authored an expert report; correct?
8       A. That is correct.
9       Q. I'm going to mark a copy of that as
10  Exhibit No. 7. And we'll be talking about this
11  throughout the day today. Okay?
12      A. Okay.
13      (Exhibit No. 7 was marked for identification.)
14      Q. Okay. I'm handing you Exhibit 7. Is that a
15  copy of your report that you've authored in the MDL?
16      A. Yes, it is.
17      Q. Do you agree that the report defines the
18  scope of the opinions that you intend to offer in the
19  MDL?
20      A. Yes.
21          MS. PARFITT: If I may, Scott, may
22  I just see a copy of that report?
23          MR. JAMES: I have extra copies as
24  well, Michelle. If you need anything, just let me
25  know.

10 (Pages 34 to 37)

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 38

1    MS. PARFITT:  Thank you.  That would be
2  great.
3    MR. FARIES:  I'll be the runner on this
4  one.
5    MR. JAMES:  Thank you.
6  BY MR. JAMES:
7    Q.  Did you review your report prior to -- in
8  preparation -- let me start that over.
9    Did you review your report in preparation
10  for today's deposition?
11    A.  Yes, I did.
12    Q.  Are there any changes that you want to make
13  to the report today?
14    A.  No, there are not.
15    Q.  Did you write the report?
16    A.  Yes, I did.
17    Q.  Okay.  Are all parts of the report in your
18  wording?
19    A.  Yes.
20    Q.  Okay.  If you can turn with me, Dr. Moorman,
21  to page 41.  And you see here that there is a list of
22  references; correct?
23    A.  Yes.
24    Q.  Okay.  And if you also turn to page 50, do
25  you see that there's a separate list that begins on

Page 39

1  page 50, halfway down, that's titled "Additional
2  materials and data considered"?
3    A.  I'm sorry --
4    Q.  On page 50.
5    A.  -- let me get to the right page.
6    Yes.
7    Q.  Can you explain to me the difference between
8  the reference list and the additional materials and
9  data considered list?
10    A.  Okay.  The reference list are the references
11  to support the opinions and the statements in the
12  report that I wrote.  There are some other materials
13  that I was provided, might have read, but they just
14  did not meet the level of actually needing to be
15  referenced in the report to support a certain
16  statement.
17    Some of these I might have read in more
18  detail than others, but I feel like the reference list
19  are the ones that actually supported the statements
20  that I made in my report.
21    Q.  As described by you just now, are there items
22  on the additional materials and data considered list
23  that you have not reviewed at all?
24    A.  There are -- along the way, there seem to be
25  some -- like, for example, item 62, comparing a

Page 40

1  transcript for Curtis Omiencinski, I do not recall
2  reviewing that at all.  It might have been provided to
3  me, but I don't recall reviewing it.
4    Q.  Is there any way sitting here today that we
5  can efficiently identify which items on the additional
6  materials list that you have reviewed and which you
7  haven't?
8    A.  I don't know what you mean by "efficiently."
9  You know, it's kind of hard to recall exactly.  You
10  know, there are lots of articles here.  That might
11  have been provided to me.  I don't know how I could go
12  through it in just a few minutes to say did I look at
13  it or not.  It would just take some time.
14    Q.  Did Plaintiffs' counsel provide you all the
15  items on this list, the additional materials list?
16    A.  No, I don't believe so.  I mean, some of the
17  articles I've had -- like, again, some of them just
18  kind of jump out at me, like the reference 31,
19  Fathalla, "Incessant ovulation and ovarian cancer, a
20  hypothesis," that is an article that I have probably
21  referred to dozens of times.
22    Q.  So the additional materials list contains a
23  mixture of items that you had on your own and items
24  that were provided to you; is that fair?
25    A.  That is correct.

Page 41

1    Q.  Now, do you intend to rely on any materials
2  for your opinions in this case that are not identified
3  in the reference list or the additional materials
4  list?
5    MS. PARFITT:  Objection.  Form.
6    THE WITNESS:  I mean, I am relying on
7  the expertise that I developed over more than 25 years
8  as an epidemiologist.  And so there may be
9  publications, knowledge that I have that is not
10  specifically listed here.  But, in general, I think
11  that is a fairly comprehensive list.  I don't know
12  that I could say that it is completely exhaustive.
13  BY MR. JAMES:
14    Q.  All right.  I'm going to mark now as
15  Exhibit No. 8 a copy of a list entitled "Additional
16  Materials to Dr. Patricia Moorman."
17    (Exhibit No. 8 was marked for identification.)
18  BY MR. JAMES:
19    Q.  Have you seen a copy of Exhibit 8 before,
20  Dr. Moorman?
21    A.  I don't think that I have seen this
22  particular list.
23    MS. PARFITT:  And for the record, this
24  list was compiled by Plaintiffs' counsel, Mr. James,
25  and I'm not sure whether or not my office -- the

11 (Pages 38 to 41)

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 42

1   materials were sent, but I'm not sure whether the list
2   was sent to Dr. Moorman.
3            MR. JAMES:  Okay.
4   BY MR. JAMES:
5       Q.  Looking at this list, Dr. Moorman, this list
6   was furnished to us this week.
7            Do you understand that?
8            MS. PARFITT:  Objection.
9            THE WITNESS:  I -- if you say so.
10  BY MR. JAMES:
11      Q.  Fair enough.  This list -- does this list
12  include items that you were provided after you
13  authored your MDL report?
14      A.  Yes.
15      Q.  This list of materials did not form the
16  opinions that you included in your MDL report;
17  correct?
18           MS. PARFITT:  Objection.  Form.
19           THE WITNESS:  I did not have access,
20  you know, to these expert reports and all before
21  I wrote my report, no.  So they did not inform my
22  report.
23  BY MR. JAMES:
24      Q.  Have you reviewed the materials on this list
25  as Exhibit No. 8 in their entirety?

Page 43

1       A.  No, not in their entirety.
2       Q.  Have you reviewed some and not reviewed
3   others?  Is that fair?
4       A.  I have -- yes, I have reviewed some of them.
5   I have not reviewed all of them.
6       Q.  Okay.  Is there any way for us to, again,
7   efficiently determine today which of these you've
8   reviewed and which ones you haven't?
9       A.  I -- again, I could go through them and, to
10  the best of my knowledge, tell you which ones
11  I reviewed.  Again, some of them I reviewed in more
12  detail, read more completely; others I looked at
13  more -- in a more cursory way.
14      Q.  Did your review of any of these additional
15  materials change the opinions that you've included in
16  your MDL report?
17      A.  No, they did not change my opinion.
18      Q.  Did you review all of these expert reports
19  listed?
20      A.  I did not review all of them.  I reviewed
21  some of them.
22      Q.  Okay.  And these are the Plaintiffs' expert
23  reports that are listed on this list; correct?
24      A.  That is my understanding.
25      Q.  Okay.  Which of the Plaintiffs' expert

Page 44

1   reports have you reviewed?
2       A.  Again, I have reviewed them in different
3   levels of detail and completeness.  But I have looked
4   at the report of Anne McTiernan, April
5   Zambelli-Weiner, Daniel Clarke-Pearson, David Kessler,
6   Jack Siemiatycki, Michael Crowley, Rebecca
7   Smith-Bindman, and Sonal Singh, you know, to some
8   extent.
9            And I might have looked at some of the
10  others, but those were the ones that I specifically
11  recall looking at to some extent.
12      Q.  Did you ask for Plaintiffs' counsel to
13  furnish you the expert reports in the litigation?
14      A.  I did not.  They provided them to me without
15  asking.
16      Q.  Why did you review the reports of the other
17  experts?
18      A.  Intellectual curiosity is the main thing.
19  I'm always interested to learn other people's
20  perspectives.  And also to see if there was any
21  additional evidence that I might consider.
22      Q.  And after reviewing those reports, did you
23  find any additional evidence that you might consider
24  that you didn't list in your MDL report?
25      A.  I really didn't.  I thought that there was a

Page 45

1   remarkable level of consistency in the opinions,
2   particularly among the people who were reviewing the
3   epidemiologic literature.
4       Q.  Dr. Moorman, I am going to now hand you a
5   copy of the reliance materials -- which is the title
6   of the list -- that you cited in the Ingham case.
7   Okay?  I'm going to mark that as Exhibit No. 9.
8            (Exhibit No. 9 was marked for identification.)
9   BY MR. JAMES:
10      Q.  Does that list look familiar to you?
11      A.  Yes.
12      Q.  And you see on the front of that list, it
13  says it was produced on March 5th, 2018; correct?
14      A.  That is correct.
15      Q.  And did you prepare this list?
16      A.  I did not personally prepare it, no.
17      Q.  Do you know that the reliance list that you
18  produced in Ingham and the reliance list that you have
19  attached as a reference list and a materials
20  considered list to your MDL report are substantially
21  different?
22      A.  I would --
23           MS. PARFITT:  Objection.  Form.
24           THE WITNESS:  I would not be surprised
25  to say that there are some different references cited,

12  (Pages 42 to 45)

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 46

1  yes.
2  BY MR. JAMES:
3      Q. Do you understand that there's a large number
4  of additional references that you have now cited in
5  your MDL report?
6      A. I -- the reference list is longer, yes.
7      Q. Do you have any idea by how much?
8      MS. PARFITT: Objection. Form.
9      THE WITNESS: No, I do not.
10 BY MR. JAMES:
11     Q. Would it surprise you to find out that there
12 are 94 new items listed in your MDL report that were
13 not listed in your March 2018 report?
14     MS. PARFITT: Objection. Form.
15     THE WITNESS: I -- you know, as you go
16 along, I think that it is not unusual to include more
17 references. I didn't know the exact number of new
18 items.
19 BY MR. JAMES:
20     Q. Again, did you prepare the lists that are
21 attached to your MDL report?
22     A. The -- the list of references, I prepared
23 that. The list of additional items, I think that was
24 a combination of some of what I had prepared and
25 I think what counsel had provided to me.

Page 47

1      Q. When you provided your opinion in March of
2  2018 in the Ingham case, did you do so based on a
3  comprehensive review of the literature?
4      A. I think that -- yes, I believe that it was a
5  comprehensive review, particularly of the
6  epidemiologic data.
7      Q. Why did you expand your list of references
8  and materials considered for the MDL?
9      A. I think just as you acquire, you know, become
10 aware of more references, maybe if there were any new
11 publications, or just as I expanded the knowledge,
12 I think that it would be appropriate to include more
13 references.
14     Q. Do you know that a number -- a large number
15 of the new references and materials considered were
16 available in the public domain or in the -- in this
17 litigation at the time that you gave your March 2018
18 deposition?
19     MS. PARFITT: Objection. Form.
20     THE WITNESS: It would not surprise me
21 to say that -- to see that some of them were there.
22 BY MR. JAMES:
23     Q. So, to be clear, the additional materials
24 that you have added between March 2018 and your MDL
25 report, those materials are not simply materials that

Page 48

1  have become part of the public domain since that time.
2      Do you understand that?
3      MS. PARFITT: Objection. Form.
4      THE WITNESS: I understand that some of
5  them had been published before my deposition in March
6  2018.
7  BY MR. JAMES:
8      Q. Are there specific topics of the new
9  materials that you added between your Ingham
10 deposition and your MDL report?
11     A. I'm trying to think what they might be. I --
12 some -- I think that some of the work, for example, by
13 Fletcher and Saed describing some of their work
14 related to possible biological mechanisms by which
15 talc exposure could lead to ovarian cancer -- I think
16 that was some work that I, perhaps, had not been aware
17 of previously. And so that's one thought that comes
18 to mind.
19     Q. All of the items that you added from March
20 2018 Ingham list to your MDL list, were all of those
21 items provided to you by Plaintiffs' counsel?
22     MS. PARFITT: Objection. Asked and
23 answered.
24     THE WITNESS: I don't -- I don't think
25 so.

Page 49

1  BY MR. JAMES:
2      Q. Would you say the majority of the items that
3  you've added from March 2018 to your MDL report were
4  provided to you by Plaintiffs' counsel?
5      MS. PARFITT: Objection. Form.
6      THE WITNESS: I don't know what
7  quantity, what fraction was provided by counsel and
8  which I identified.
9      MR. JAMES: Okay. I'm going to mark as
10 Exhibit No. 10 a copy of your references and materials
11 considered list for the MDL report.
12     (Exhibit No. 10 was marked for identification.)
13 BY MR. JAMES:
14     Q. Okay. Dr. Moorman --
15     MS. PARFITT: Just one correction,
16 Mr. James. I think Exhibit 10 is just identified as
17 "references." I believe you characterized it as
18 "references and material considered."
19     MR. JAMES: Yeah. I think if you keep
20 flipping, Michelle -- or Ms. Parfitt -- it contains
21 both.
22     MS. PARFITT: Fair enough.
23 BY MR. JAMES:
24     Q. Okay. And you see, Dr. Moorman, if you've
25 had a chance to flip through it while counsel have

13 (Pages 46 to 49)

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 50

1  been talking, you see that this Exhibit 10 includes
2  some highlighting; right?
3      A. Yes.
4      Q. The highlighting, I'll state for the record,
5  represents our effort to capture the items that have
6  been added between Ingham and your MDL report.
7        Do you see that highlighting?
8      A. Mm-hmm.
9      Q. Again, I think we discussed this earlier, but
10  does it surprise you to find out that there are 94 new
11  items on the two MDL lists?
12        MS. PARFITT: Objection. Asked and
13  answered.
14        THE WITNESS: Again, I believe that
15  I answered that question previously.
16  BY MR. JAMES:
17      Q. 13 of the 20 references that are new were
18  available to you as of March 2018. Did you know that?
19        MS. PARFITT: Objection. Asked and
20  answered.
21        THE WITNESS: Again, I answered the
22  question when you asked it previously.
23  BY MR. JAMES:
24      Q. I don't think that we've talked specifically
25  about the references, but the references -- the

Page 51

1  references that you've cited to your MDL report, those
2  are materials that you say form the opinions issued in
3  your MDL report; correct?
4      A. Yes.
5      Q. And you added 20 new references from your
6  Ingham list to your MDL report. Do you know that?
7      A. I know that there are new references, yes.
8      Q. And did you know that 13 of the 20 new
9  references -- again, the references are the list of
10  materials that formed your MDL report -- those were
11  available before March 2018? Did you know that?
12      A. I am aware that some of them were available.
13        Would like to make the point that many of
14  the points that I make in my report can be supported
15  by many, many references. And so the fact that
16  I added new references, that's really not too
17  surprising. It's -- again, if I felt like wanted to
18  emphasize a point more strongly, including additional
19  references, I don't think that would be surprising to
20  add additional references.
21      Q. Did you change your standards or search terms
22  that you used in the Ingham literature review for the
23  MDL review?
24        MS. PARFITT: Objection to form.
25        THE WITNESS: When we talk about

Page 52

1  "search terms" or the primary search that was done, it
2  was very simple. It was "talc" or "talcum powder" and
3  "ovarian cancer." But many times, the initial search
4  will not generate all of the articles that you would
5  need to describe the science. There may be additional
6  articles, either things that I was aware of or
7  different searches that might be done.
8        But the overall search term to find the
9  literature on talc and ovarian cancer, I did not
10  change that.
11        Would it be a good time to take a break?
12  We've been going for over an hour.
13        MR. JAMES: For sure.
14        MS. PARFITT: Certainly.
15        THE VIDEOGRAPHER: Going off record at
16  10:05 a.m.
17        (Recess taken from 10:05 a.m. to 10:18 a.m.)
18        THE VIDEOGRAPHER: Back on record at
19  10:18 a.m.
20  BY MR. JAMES:
21      Q. Dr. Moorman, are you ready to proceed?
22      A. I am.
23      Q. Great. Dr. Moorman, do you consider yourself
24  to be an expert in animal studies and talc?
25      A. No, I do not.

Page 53

1      Q. Do you consider yourself to be an expert in
2  cell studies and talc?
3      A. No, I do not.
4      Q. Okay. Do you consider yourself to be an
5  expert in cytotoxicity studies and talc?
6      A. No, I do not.
7      Q. Do you consider yourself to be an expert in
8  mutagenicity studies and talc?
9      A. No, I do not.
10      Q. Do you consider yourself to be an expert in
11  genotoxicity studies and talc?
12      A. No, I do not.
13      Q. Do you consider yourself to be an expert in
14  mineral testing methods?
15      A. No, I do not.
16      Q. Okay. Do you consider yourself an expert in
17  mineral characterization?
18      A. No, I do not.
19      Q. Do you consider yourself to be an expert in
20  cancer biology?
21      A. I am not a cancer biologist; however, I
22  consider cancer biology frequently in my work.
23      Q. Do you consider yourself to be an expert in
24  geology?
25      A. No, I do not.

14 (Pages 50 to 53)

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 54

1    Q. And do you consider yourself to be an expert
2  in mining?
3    A. No, I do not.
4    Q. Do you have expertise in pathology?
5    A. I -- once again, I am not a pathologist.
6  Sometimes rely on pathology and have collaborated with
7  pathologists, but I am not an expert pathologist.
8    Q. And would you agree do that not have
9  expertise in pathology?
10     MS. PARFITT: Objection. Asked and
11 answered.
12     THE WITNESS: You asked that I -- I do
13 not have expertise in pathology. I stated that I am
14 not a pathologist, but I do know some pathology from
15 my work in ovarian cancer and other cancers over the
16 years. So to say that I have no expertise isn't --
17 I don't think that is correct. But we both -- I
18 acknowledge that I am not a trained pathologist.
19 BY MR. JAMES:
20   Q. Do you recall being asked in Ingham if you
21 considered yourself to have expertise in pathology?
22   A. I don't recall that question, specifically.
23   Q. I'm going to hand you a copy of the
24 transcript from Ingham that I brought with me, and I'm
25 going to refer you --

Page 55

1       MR. JAMES: And, Ms. Parfitt, I have
2  two copies, unfortunately, not three. And this will
3  be just a couple questions, Ms. Parfitt. So if you
4  bear with me --
5       MS. PARFITT: You can just direct me to
6  the page.
7       MR. JAMES: Sure. Looking at page 280.
8       MS. PARFITT: Just bear with us both --
9  me. All right.
10      MR. JAMES: I'm looking at lines 12
11 through 14.
12      MS. PARFITT: Thank you.
13 BY MR. JAMES:
14   Q. Do you see the question, Dr. Moorman, where
15 you were asked if you have expertise in pathology?
16     Do you see that question?
17   A. I do.
18   Q. Okay. And you answered that you do not;
19 correct?
20     MS. PARFITT: Objection.
21     THE WITNESS: Yes, that is how
22 I answered. I think that the more qualified answer
23 that I gave today is probably a more accurate
24 representation.
25

Page 56

1  BY MR. JAMES:
2    Q. Have you done anything between your March
3  deposition and today in regards to obtaining expertise
4  in pathology?
5    A. No, I have not.
6    Q. Dr. Moorman, that's all I have on the
7  transcript for right now.
8       Dr. Moorman, do you agree that, prior to
9  offering expert opinion on a particular topic, an
10 expert should be conducted to -- expected to conduct a
11 comprehensive review of the medical and scientific
12 literature on that topic?
13   A. I'm sorry, I'm reading the question.
14     I -- I think that it is important to be
15 comprehensive. I think it's also important to
16 recognize that there are expertise in different areas.
17 And so we recognize that my expertise is in
18 epidemiology, and I have supplemented that with
19 other -- information from other areas as well.
20   Q. And with respect to the epidemiology on talc
21 and ovarian cancer, do you believe you conducted a
22 comprehensive review of that body of literature?
23   A. I believe that I have.
24   Q. Do you believe you conducted a comprehensive
25 review of the literature and scientific evidence on

Page 57

1  mechanism?
2    A. I considered the scientific mechanisms and,
3  again, recognizing what my expertise is. As I have
4  indicated earlier, I am not a cancer biologist. I'm
5  not a laboratory scientist. I consider some of that
6  data, but I recognize that I am not -- you know, that
7  is not my major area of expertise.
8    Q. And I do understand from your MDL report that
9  you considered biology; correct?
10   A. I did consider biology.
11   Q. And so my precise question is whether you
12 conducted a comprehensive review on the issue of
13 mechanism.
14     MS. PARFITT: Objection. Asked and
15 answered.
16     THE WITNESS: I considered it, and,
17 again, I think that there is information out there
18 that a cancer biologist would have the expertise to
19 review it in more detail because of their training,
20 which is different than the training and expertise
21 that I have.
22     MR. JAMES: I object to the
23 nonresponsive portion of the answer.
24 BY MR. JAMES:
25   Q. Dr. Moorman, did you conduct a comprehensive

15 (Pages 54 to 57)

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 58

1  review of all of the literature on animal studies and
2  talc?
3          MS. PARFITT:  Objection.  Form.
4          THE WITNESS:  I don't believe that -- I
5  cannot say that I considered -- identified or
6  considered every animal study.
7          MR. JAMES:  Object to the nonresponsive
8  answer.
9  BY MR. JAMES:
10     Q.  Did you conduct a comprehensive review of the
11 literature on animal studies and talc?
12         MS. PARFITT:  Asked and answered.
13 Objection.
14         THE WITNESS:  I -- I believe that I
15 answered your question.  I said that I don't think
16 that I identified or considered every animal study
17 related to talc and ovarian cancer.
18 BY MR. JAMES:
19     Q.  Did you conduct a comprehensive review of
20 cell studies and talc?
21     A.  Once again, I considered some of that
22 literature.  Whether it was comprehensive or not, I --
23 I don't think that I have the expertise to say that
24 I considered all of the cell studies and talc.
25     Q.  Did you conduct a comprehensive review on the

Page 59

1  issue of migration in this case?
2      A.  I believe -- again, I considered every study
3  that I was aware of on migration of talc.  It's a
4  little bit outside my area of expertise, so I am not
5  sure that I identified every single study in that
6  regard.
7      Q.  And with the methods that you applied in this
8  case, was it your intention to capture every study
9  pertaining to the issue of migration?
10         MS. PARFITT:  Objection.  Form.
11         THE WITNESS:  I tried -- you know, my
12 intent was to read the articles that I was aware of,
13 that were brought to my attention.  Because it is a
14 little bit outside my area of expertise, I cannot say
15 with 100 percent certainty that I identified every
16 single study related to migration.
17 BY MR. JAMES:
18     Q.  But you testified that your intent was to
19 read the articles that you are aware of or that were
20 brought to your attention.
21         When you say brought to your attention, was
22 that by Plaintiffs' counsel?
23     A.  It's some -- some of them could have been
24 brought to my attention in that way.  Some of them
25 could have been -- like, an article that I read might

Page 60

1  have referred to another article.
2      Q.  Did you conduct a comprehensive review of the
3  genotoxicity studies that are relevant to talc and
4  ovarian cancer?
5      A.  My answer to this question is similar to the
6  answers that I have given there.
7          I have read some of the mechanistic studies.
8  I would not say that I necessarily identified every
9  relevant genotoxicity study.
10     Q.  And I'm not asking you, Dr. Moorman, if you
11 did find 100 percent of the studies.  I'm asking you
12 if part of your review in this case began with the
13 intention to capture that body of literature.
14         MS. PARFITT:  Objection.  Asked and
15 answered several times.
16         THE WITNESS:  My intent was, as an
17 epidemiologist, was to be very comprehensive in my
18 area of expertise.  There were certainly some other
19 related areas where I reviewed the literature, but
20 there are experts that will speak to that more
21 directly because of their expertise.
22 BY MR. JAMES:
23     Q.  Okay.  So will you agree with me today that
24 you have not conducted a comprehensive review of the
25 cell studies and talc?

Page 61

1          MS. PARFITT:  Objection.  Misstates her
2  testimony.
3          You may answer, Dr. Moorman.
4          THE WITNESS:  I -- I think that --
5  I think that it is fair to say that I have probably
6  not reviewed every cell study and talc.
7  BY MR. JAMES:
8      Q.  Okay.  Dr. Moorman, I'm going to refer you
9  back to the Ingham transcript, please, that's in front
10 of you.
11         MS. PARFITT:  Are we marking this,
12 Scott?
13         MR. JAMES:  We can.  Sure.
14         Dr. Moorman, when we finish this, I'll take
15 that back from you and mark it as Exhibit No. 11.
16 Okay?
17     (Exhibit No. 11 was marked for identification.)
18 BY MR. JAMES:
19     Q.  Dr. Moorman, if you look at page 35 of your
20 transcript, please.  And if you look at lines -- it's
21 lines 11 through 17.  It's a question and answer.  If
22 you could review that for me.
23     A.  Okay.
24     Q.  And do you see that on line 16, you answered
25 in Ingham:

16  (Pages 58 to 61)

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 62

1        "I have not done a comprehensive
2    review of those studies."
3        And there, you're referring to cell studies;
4    correct?
5        A. Yes, that is what it says here.
6        Q. Is that a truthful answer?
7        A. I think --
8        MS. PARFITT: Objection. Form.
9        Go ahead.
10        THE WITNESS: I think that we -- you
11    know, as you have asked me the questions and I have
12    responded to them, that it's -- I have looked at some
13    of these studies. I would not have looked at all of
14    them.
15    BY MR. JAMES:
16        Q. As an epidemiologist, do you understand the
17    significance of the term "comprehensive review"?
18        A. Yes, I understand the term.
19        Q. Okay. And you understand that you have
20    testified that you conducted a comprehensive review of
21    the epidemiology literature for talc and ovarian
22    cancer; correct?
23        MS. PARFITT: Asked and answered.
24        THE WITNESS: Yes.
25

Page 63

1    BY MR. JAMES:
2        Q. And so I'm asking if you have applied the
3    same comprehensive review to these other areas,
4    including cell studies, animal studies, and mechanism
5    studies.
6        MS. PARFITT: Objection. Form. Asked
7    and answered.
8    BY MR. JAMES:
9        Q. Have you conducted the same comprehensive
10    review on that body of literature that you've
11    conducted on the epidemiology?
12        MS. PARFITT: Objection.
13        THE WITNESS: Once again, I have
14    answered the question. This is not my primary area of
15    expertise. And so I have not done the review to the
16    depth and the -- as comprehensive as I have done in my
17    area of expertise, which is epidemiology.
18    BY MR. JAMES:
19        Q. Have you done a comprehensive review of the
20    epidemiology on the relationship between asbestos and
21    ovarian cancer?
22        A. I believe that I have looked at a pretty
23    comprehensive -- I've had a pretty comprehensive look
24    at the asbestos and ovarian cancer. I believe that
25    I have looked at the talcum -- talc and ovarian cancer

Page 64

1    literature in greater detail.
2        Q. Have you undertaken a comprehensive review of
3    literature pertaining to the allegation that asbestos
4    may contaminate talcum powder products?
5        MS. PARFITT: Objection. Form.
6        THE WITNESS: A comprehensive review of
7    the literature pertaining to the allegation that
8    asbestos may contaminate talcum powder?
9        I have read quite a few articles and
10    documents addressing that. Whether or not I have read
11    every document addressing that, I'm not absolutely
12    sure.
13    BY MR. JAMES:
14        Q. Okay. Dr. Moorman, you're answering a
15    question that I didn't ask. And so I object to the
16    nonresponsiveness again.
17        Did you conduct a comprehensive review of
18    the body of literature assessing whether asbestos
19    contaminates talcum powder products?
20        A. I believe that I have answered your question.
21    It's --
22        Q. Could you please answer it again.
23        A. I have read many articles on it. I do not
24    know that I have read every article related to that
25    topic, again. So...

Page 65

1        Q. You understand that if you were going to
2    publish an opinion in peer-reviewed literature about
3    the allegation that asbestos contaminates talcum
4    powder products, you would be expected to conduct a
5    comprehensive review of that literature; correct?
6        MS. PARFITT: Objection. Form.
7        THE WITNESS: If I were to publish an
8    opinion in a peer-reviewed literature, you would want
9    to have a comprehensive review of the literature, yes.
10    BY MR. JAMES:
11        Q. And have you conducted a comprehensive review
12    of the literature on that topic, such that you would
13    feel comfortable providing an opinion for a
14    peer-reviewed journal?
15        MS. PARFITT: Objection. Form.
16    BY MR. JAMES:
17        Q. And the topic being the allegation that
18    asbestos contaminates talcum powder products.
19        MS. PARFITT: Objection. Form.
20        THE WITNESS: I think that I'm maybe
21    having some difficulty answering this question because
22    it would seem like this would be a topic that would be
23    more appropriately addressed by a mineralogist. And
24    I -- I actually cannot see myself writing a
25    peer-reviewed article about this because it seems

17 (Pages 62 to 65)

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 66

1  somewhat -- it's related to the epidemiology of talc
2  and ovarian cancer, but I would not be writing an
3  article focused solely on that.
4  BY MR. JAMES:
5      Q. You understand that, in your expert report,
6  you have opined with -- that there's "credible
7  evidence" there has been asbestos in talcum power
8  products.
9          Do you recall making that conclusion in your
10 report?
11     A. Yes.
12     Q. So to support that conclusion that you
13 believe there's "credible evidence" in talcum powder
14 products, did you conduct a systematic review of the
15 literature to support that conclusion?
16     A. I did not --
17         MS. PARFITT: I'm going to object to
18 the form of the question. Some words were left out.
19         You may answer.
20         THE WITNESS: In my report, I cited
21 literature that did support that opinion.
22         Did I conduct a systematic review that
23 identified possibly every piece of literature that
24 addressed the topic? No, I did not do that.
25

Page 67

1  BY MR. JAMES:
2      Q. Do you believe that the standards for
3  providing opinions in litigation reports differ from
4  the standards for providing opinions in published
5  literature?
6          MS. PARFITT: Objection. Form.
7          THE WITNESS: No. No. I think that
8  one is trying to provide evidence to support one's
9  opinions.
10 BY MR. JAMES:
11     Q. With respect to the issue of asbestos
12 contamination, Dr. Moorman, you said you did review
13 some articles.
14         How did you characterize that?
15     A. I said that I reviewed some -- some articles
16 and some -- some documents. I don't think that
17 I reviewed every article or document that is available
18 on that topic.
19     Q. With respect to documents, are you referring
20 to company documents provided to you by Plaintiffs'
21 counsel?
22     A. That -- that's part of what I reviewed, some
23 of those documents provided by counsel.
24     Q. And looking at those documents provided the
25 basis for your opinion; is that right?

Page 68

1      A. It was part of the basis for my opinion,
2  along with some peer-reviewed literature.
3      Q. Okay. With respect to the company documents,
4  were those documents hand-selected for you by
5  Plaintiffs' counsel?
6          MS. PARFITT: Objection. Form.
7          THE WITNESS: They were provided to me
8  by Plaintiffs' counsel.
9  BY MR. JAMES:
10     Q. Okay. When you saw those documents, did you
11 ask if there were additional documents that would
12 address the issue of asbestos contamination?
13     A. I don't know that I asked if there were
14 additional documents. It was my impression that there
15 were probably many other documents related to this
16 that were not provided to me.
17     Q. And as a scientist, wouldn't you be
18 interested in knowing if there are other documents
19 that have been produced in this litigation that rebut
20 the claim that asbestos contaminates talcum powder
21 products?
22         MS. PARFITT: Objection. Form.
23         THE WITNESS: This is an interesting
24 question because the claim had been made that
25 asbestos -- or, rather, that talcum -- talcum powder

Page 69

1  products had been asbestos-free since 1976. And it
2  is -- the documents provided, including the
3  peer-reviewed as well as the other, saying that --
4  provide evidence that that is not an accurate
5  statement.
6          We're not saying that every container of
7  talcum powder contains asbestos, but what I was saying
8  in my report is that there is evidence that some
9  talcum powder products have asbestos in them.
10         MR. DONATH: Move to strike,
11 nonresponsive.
12 BY MR. JAMES:
13     Q. So are you changing your report -- because in
14 the report, you say that there is "credible evidence."
15         Do you recall making that conclusion?
16     A. Yes.
17     Q. As a scientist, you understand that to give
18 something credit, you would necessarily need to
19 consider both sides of the story; correct?
20         MS. PARFITT: Objection. Misstates her
21 testimony. She's...
22         You can answer, Dr. Moorman.
23         THE WITNESS: I'm sorry?
24         MS. PARFITT: I said it misstates what
25 you're trying to suggest to the ladies and gentlemen

18 (Pages 66 to 69)

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 70

1  of the jury.
2      But if you can answer that question again,
3  please try and answer Mr. James' question.  And
4  look -- if you need to look at the question, please
5  do.
6          THE WITNESS:  I think that I did -- it
7  says "As a scientist, you understand that to give
8  something credit, you would necessarily need to
9  consider both sides of the story."
10         And I think that I did consider both sides
11  of the story.
12         I think that, as I stated, the evidence does
13  not suggest that every container of talcum powder has
14  detectable asbestos in it.  But my statement that
15  there is credible evidence that some talcum powder
16  products contain asbestos, I think that that statement
17  is absolutely true.  There is some evidence to
18  indicate that some talcum powder -- or asbestos has
19  been identified in some talcum powder products.
20  BY MR. JAMES:
21      Q.  Do you understand what Johnson & Johnson's
22  position is with respect to that claim?
23      A.  I -- I don't know specifically.  Perhaps you
24  could -- could tell me.
25      Q.  You understand that Johnson & Johnson's

Page 71

1  position is that talcum powder products have not been
2  contaminated with asbestos?  Do you know that that's
3  Johnson & Johnson's position?
4      A.  I -- if you are telling me that now, I don't
5  know that I have -- I -- I'm trying to think what
6  I have read.  I think that, yes, I have probably read
7  statements from the company that describes that as
8  their position.
9      Q.  And do you know what Johnson & Johnson bases
10  their position on?
11      A.  Not specifically.
12      Q.  Wouldn't that be pretty important to
13  understand before making an opinion about whether
14  there's credible evidence of asbestos contamination?
15         MS. PARFITT:  Objection.  Form.
16         THE WITNESS:  Again, I think that when
17  one is trying to make a statement that there is no
18  asbestos contained in talc products, if you are
19  finding evidence from multiple sources that there is
20  asbestos contained in some talc products, that
21  supports the statement that I made in report that
22  there is credible evidence that not all talc products
23  are asbestos-free.
24  BY MR. JAMES:
25      Q.  How many hours did you spend reviewing

Page 72

1  company documents and other materials to support your
2  conclusions about asbestos contamination?
3      A.  I -- I wouldn't be able to quantify that.
4  I don't know specifically.
5      Q.  Can you give us an estimate?
6      A.  I think it would be pretty difficult to come
7  up with an estimate.  You know, I read some documents
8  from the company.  I read documents -- some
9  peer-reviewed literature.  I reviewed documents
10  provided by Plaintiffs' counsel.
11         Perhaps -- I don't know.  Perhaps ten -- ten
12  hours or so.
13      Q.  When you said that you reviewed company
14  documents, again, those are the documents provided to
15  you by Plaintiffs' counsel; correct?
16      A.  Yes.
17         MS. PARFITT:  Objection.  Form.
18         THE WITNESS:  Yes, the Plaintiff
19  provided those documents to me.
20  BY MR. JAMES:
21      Q.  And you did not ask Plaintiffs' counsel to
22  provide you additional documents once you saw the
23  first batch of documents; correct?
24         MS. PARFITT:  Objection.  Form.
25         THE WITNESS:  I did not ask, no.

Page 73

1  BY MR. JAMES:
2      Q.  You also looked at litigation reports from
3  Plaintiffs' expert regarding asbestos contamination;
4  correct?
5      A.  Yes, I did.
6      Q.  And you understand those experts are paid
7  litigation experts by the Plaintiffs; correct?
8         MS. PARFITT:  Objection.  Form.
9         THE WITNESS:  Yes, I understand that
10  they are paid by the Plaintiffs.
11  BY MR. JAMES:
12      Q.  One of those experts is Longo; correct?
13      A.  That is correct.
14         MS. PARFITT:  Is that Dr. Longo?
15         MR. JAMES:  Thank you, Michelle.
16  BY MR. JAMES:
17      Q.  Dr. Longo; is that correct?
18      A.  That is correct.
19      Q.  Okay.  So you reviewed Dr. Longo's reports?
20      A.  I looked at them, yes.
21      Q.  Okay.  Do you understand that in this
22  litigation, Johnson & Johnson has presented experts to
23  rebut Dr. Longo's findings?
24         MS. PARFITT:  Objection.  Just let the
25  record reflect that the defense expert reports have

19 (Pages 70 to 73)

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 74

1  not yet been provided in this litigation, in the MDL
2  litigation, so it would have been difficult to provide
3  that to Dr. Moorman.
4  BY MR. JAMES:
5      Q.  You can still answer the question.
6      A.  It would not surprise me to know that there
7  were reports provided by -- that was done for the
8  defense, but I have not seen them.
9      Q.  Did you ask to see them?
10         MS. PARFITT:  Objection.  Form.
11         THE WITNESS:  I did not ask to see --
12  no, I did not.
13  BY MR. JAMES:
14     Q.  And counsel just made a note on the record
15  about these litigation reports from the defense not
16  being made available yet in the MDL.
17         Do you understand that the defense has
18  presented experts, for example, in the Ingham case to
19  rebut Dr. Longo's findings?
20     A.  I was not specifically aware of that.  It
21  would not surprise me, however.
22     Q.  You understand Dr. Longo's litigation reports
23  that you reviewed, those are not peer-reviewed.
24         Do you understand that?
25         MS. PARFITT:  Objection.  Form.

Page 75

1         THE WITNESS:  Yes, I know that they are
2  not peer-reviewed.
3  BY MR. JAMES:
4      Q.  With regard to the literature that you've
5  referenced having reviewed pertaining to the
6  allegation that talcum powder products are
7  contaminated with asbestos, what does that literature
8  say about Johnson & Johnson products specifically?
9      A.  I'm trying to recall specifically.  I believe
10  that some of the articles were not specific about the
11  particular brand names that they tested.  I think they
12  just described them as commercially available
13  products.  But I believe that -- I want to say that
14  I recall at least one that described the products as
15  being Johnson & Johnson.
16     Q.  With respect to everything that you reviewed
17  pertaining to your claim in your report of "credible
18  evidence" of contamination of talcum powder products,
19  what did everything you reviewed tell us about the
20  amount of contamination in the products?
21         Do you have any opinions about amount?
22     A.  My opinions are that most of the
23  analyses that detected asbestos fibers in talcum
24  powder products detected low levels, and putting that
25  in the context that asbestos has been characterized as

Page 76

1  there's no safe level of asbestos, that any level of
2  asbestos in a talcum powder product is bad for the
3  health of the people who use it.
4      Q.  Do you intend to offer any opinions about the
5  purported amount of contamination in talcum powder
6  products over the course of history?
7         MS. PARFITT:  Objection.  Form.
8         THE WITNESS:  I am not going to offer
9  an opinion about the quantity of asbestos in talcum
10  powder products.
11  BY MR. JAMES:
12     Q.  Have you, in the course of forming your
13  opinions in this case, ever reviewed the FDA testing
14  of talcum powder products for the presence of
15  asbestos?
16     A.  I recall reviewing a document from FDA, yes.
17     Q.  Okay.  And that document is not discussed in
18  your report, is it?
19     A.  No, I don't think that I specifically
20  reference that.
21     Q.  Why is that?
22     A.  I don't -- I don't know why I didn't
23  reference it.  I read it, but...
24         MR. JAMES:  I'm marking Exhibit No. 11
25  [sic], talc testing information from the FDA, that I'm

Page 77

1  handing you, Dr. Moorman.
2  (Exhibit No. 12 was marked for identification.)
3         MR. JAMES:  I provided an extra copy if
4  you want to hand one to your counsel, please.  Thank
5  you much.
6         MR. FARIES:  This is 12.
7         MS. PARFITT:  11 is the transcript.
8         MR. JAMES:  Got it.  Thank you.  I'll
9  fix the sticker once we finish the question.
10         MS. PARFITT:  No worries.
11  BY MR. JAMES:
12     Q.  Okay.  Dr. Moorman, is this the document that
13  you had seen before?
14     A.  I'm not sure if this is the same one or if
15  I -- no, I -- actually, I think that I did see this.
16     Q.  And if you look over on page 2 of the
17  exhibit -- it's page 2 of 8 -- do you see at the
18  bottom, it says in the section "The results of FDA's
19  survey" -- do you see where I'm reading?
20     A.  Yes.
21     Q.  And the FDA here says (as read):
22         "The survey found no asbestos
23         fibers or structures in any of the
24         samples of cosmetic-grade raw
25         material talc or cosmetic products

20  (Pages 74 to 77)

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 78

1     containing talc."
2     Did I read that correctly?
3     A. You did.
4          MS. PARFITT: Are you going to complete
5   this paragraph, or are you going to leave it at that?
6          MR. JAMES: Michelle, you'll have an
7   opportunity to ask your questions.
8          MS. PARFITT: Well, just for
9   completeness. Certainly, if that's how you'd like to
10  handle it, that's fine.
11         MR. JAMES: Okay. That's how it works.
12         MS. PARFITT: Oh, I -- Scott, you don't
13  have to educate me on how it works. I get how you're
14  working, and we'll make it work on our side too.
15  Thank you.
16  BY MR. JAMES:
17     Q. Dr. Moorman, is that conclusion cited
18  anywhere in your report?
19     A. That --
20         MS. PARFITT: Objection to the partial
21  conclusion.
22     Please answer.
23         THE WITNESS: Right. It's -- I did not
24  put it in there. However, I considered as I was, you
25  know, evaluating this literature, what it goes on to

Page 79

1   say (as read):
2          "The results were limited by the
3          fact that only four talc suppliers
4          submitted samples and by the
5          number of products tested."
6   BY MR. JAMES:
7      Q. Okay.
8      A. And so it goes on to say, you know,
9   (as read):
10         "They do not prove that most or
11         all talc or talc-containing
12         cosmetic products currently
13         marketed in the US are likely to
14         be free of asbestos
15         contamination."
16     So...
17     Q. You're offering opinions in the MDL -- let me
18  re-ask this.
19     Are you offering opinions in the MDL that
20  Johnson & Johnson talcum powder products have been
21  contaminated with asbestos at some point in time?
22     A. In my opinion, I am referring to talcum
23  powder products. Okay? I don't believe in my report,
24  I ever specifically say Johnson & Johnson talcum
25  powder products, but I do recognize that a large

Page 80

1   proportion of the talcum powder products in the US are
2   Johnson & Johnson products.
3      Q. Do you know if the FDA test results
4   specifically pertain to Johnson & Johnson products?
5      A. I'm -- I believe that some of the products
6   tested -- I believe that some of them were Johnson &
7   Johnson products, if I'm not mistaken. But I can't
8   say that with certainty.
9          Actually, when I look at the report, I do
10  see that they list Johnson's baby powder.
11     Q. And, Dr. Moorman, you're referring to page 7;
12  correct?
13     A. Yes.
14     Q. Okay. Do you understand that the FDA also
15  tested samples provided to them by the supplier of
16  talc for Johnson & Johnson products? Did you know
17  that?
18     A. I -- I think that I knew that. I believe
19  I did know that.
20     Q. Again, that's not quoted anywhere in your
21  report either, is it?
22     A. No, that is --
23         MS. PARFITT: Object to form.
24         THE WITNESS: -- not.
25

Page 81

1   BY MR. JAMES:
2      Q. Before offering opinions about "credible
3   evidence," don't you think it would be important to
4   mention the findings of the FDA on such an important
5   issue?
6          MS. PARFITT: Objection. Form.
7          THE WITNESS: As I have stated before,
8   my opinion was that there is credible evidence that --
9   from peer-reviewed articles, from some other sources
10  as well, that asbestos has been found in talcum powder
11  products. I believe that that evidence is credible.
12     I did not make the statement that it is in
13  all products, but I think that my statement that there
14  is credible evidence that some talcum powder products
15  contain asbestos I think is accurate.
16  BY MR. JAMES:
17     Q. And is that a conclusion that you would feel
18  comfortable providing in published peer-reviewed
19  literature?
20         MS. PARFITT: Objection. Form.
21         THE WITNESS: To say that there is
22  credible evidence that some talcum powder products
23  contain asbestos, I think that that -- I would feel
24  comfortable saying that based on peer-reviewed
25  literature that has found that.

21 (Pages 78 to 81)

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 82

1  BY MR. JAMES:
2      Q. But you never undertook an effort to conduct
3  a comprehensive review of the literature on the topic,
4  did you?
5          MS. PARFITT: Objection. Form. Asked
6  and answered several times.
7          THE WITNESS: Yes, I feel like I -- you
8  have asked that, and I think that I have answered it.
9  BY MR. JAMES:
10     Q. What's your answer?
11     A. My answer is that I have found evidence
12 that -- from peer-reviewed literature, from other
13 documents, that some asbestos has been detected in
14 some talcum powder products.
15     Q. With regard to the company documents that you
16 reviewed that were provided to you by Plaintiffs'
17 counsel, do you consider yourself an expert in
18 reviewing the information conveyed by those documents?
19         MS. PARFITT: Objection. Form.
20         THE WITNESS: As I have indicated
21 previously, I am not a mineralogist or a geologist,
22 and so I would not consider myself an expert in
23 reviewing those types of documents.
24 BY MR. JAMES:
25     Q. Do you have any knowledge about the

Page 83

1  specifications that are used by Johnson & Johnson in
2  manufacturing its talcum powder products?
3      A. No, I do not.
4      Q. Do you have any expertise in the sufficiency
5  of the specifications to detect the presence of
6  asbestos?
7      A. No, I do not.
8      Q. Did you know that Johnson & Johnson produces
9  its talcum powder products in accordance with
10 specifications set out by the US Pharmaceopeial
11 Convention?
12         MS. PARFITT: Objection. Form.
13         THE WITNESS: I was not specifically
14 aware of that. I don't know what their specifications
15 are.
16 BY MR. JAMES:
17     Q. Did Plaintiffs' counsel provide to you those
18 specifications?
19     A. Not that I recall.
20     Q. Did you know that the specifications provide
21 mechanisms to test for the absence of asbestos?
22         MS. PARFITT: Objection. Form.
23         THE WITNESS: I have already stated
24 that I -- I don't know what those specifications are.
25

Page 84

1  BY MR. JAMES:
2      Q. Dr. Moorman, have you seen a 2014 letter from
3  the FDA addressing a request for a warning on talcum
4  powder products?
5      A. Yes, I have.
6      Q. Do you know that within that letter, the FDA
7  comments on the issue of alleged asbestos
8  contamination?
9          MS. PARFITT: Objection. Form.
10         THE WITNESS: If I could see the
11 document. It has been a while since I have actually
12 looked at it.
13 BY MR. JAMES:
14     Q. Absolutely.
15         MR. JAMES: And if counsel could remind
16 me, are we now on 13?
17         MS. PARFITT: We are indeed.
18         MR. JAMES: Thank you.
19         MS. PARFITT: You are very welcome.
20 (Exhibit No. 13 was marked for identification.)
21 BY MR. JAMES:
22     Q. Okay. Dr. Moorman, I'm handing you a copy of
23 the 2014 FDA letter with an extra copy to pass to your
24 counsel.
25         MS. PARFITT: Thank you.

Page 85

1  BY MR. JAMES:
2      Q. Dr. Moorman, if you could turn to the second
3  page of the letter. Is this the letter that you've
4  seen before, Dr. Moorman?
5      A. Yes, it is.
6      Q. And do you see that, in the section entitled
7  "Chemistry Findings," there's a discussion there by
8  the FDA pertaining to asbestos; correct?
9      A. Yes, I see that.
10     Q. And do you see that at the bottom of the
11 letter, the very last sentence, the FDA says
12 (as read):
13         "You have not provided evidence
14         that asbestos-contaminated
15         talc-containing cosmetic products
16         are currently being marketed,
17         since the data submitted is almost
18         40 years old."
19         Do you see that?
20     A. I do see that.
21     Q. Okay. And you said that you have reviewed
22 this letter in its entirety before?
23     A. I have read it, yes.
24     Q. Do you have any reason to quarrel with the
25 scientists at the FDA that have looked at the issue of

22 (Pages 82 to 85)

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 86

1  asbestos contamination in talcum powder products?
2         MS. PARFITT:  Objection.  Form.
3         THE WITNESS:  I don't know who those
4  scientists are.  I don't know any scientists at the
5  FDA who would have done -- would have done this.  I --
6  so I can't say that I have a quarrel with them because
7  I don't know them.
8  BY MR. JAMES:
9     Q.  Do you have any opinions about the type of
10 asbestos that is alleged to contaminate talcum powder
11 products?
12    A.  I am certainly aware that there are different
13 types of asbestos.  Again, from a health perspective,
14 there is no safe form of asbestos.  So if there are
15 different types, it really doesn't make a lot of
16 difference in terms of the potential health effects.
17        MR. JAMES:  Object to the nonresponsive
18 portion.
19 BY MR. JAMES:
20    Q.  Do you intend to offer any opinions about the
21 type of asbestos that Plaintiffs contend contaminates
22 talcum powder products?
23    A.  No, I am not going to specifically address
24 the types of asbestos in talcum powder products.
25    Q.  Do you hold the opinion that asbestos causes

Page 87

1  ovarian cancer?
2     A.  Yes.
3     Q.  Do you hold the opinion that exposure to
4  asbestos through use of talcum powder products causes
5  ovarian cancer?
6     A.  My opinion is based on exposure to talcum
7  powder products and whatever is contained within them.
8  And so if there is asbestos within talcum powder
9  products, which we have some evidence to suggest that
10 that is the case, then that provides a potential
11 biological mechanism by which talcum powder products
12 could cause ovarian cancer.
13    Q.  The opinion that you have pertaining to
14 asbestos and ovarian cancer, did you form that opinion
15 in the context of litigation?
16        MS. PARFITT:  Objection.  Form.
17        THE WITNESS:  I'm not sure how -- could
18 you perhaps restate the question?
19 BY MR. JAMES:
20    Q.  Absolutely.
21    A.  I'm not sure --
22    Q.  Absolutely.
23    A.  -- what you're asking.
24    Q.  Did you form the opinion that -- did you
25 form -- let me start over.

Page 88

1         Did you form your opinions about asbestos
2  and talcum powder that are contained within your MDL
3  report after being retained as an expert?
4         MS. PARFITT:  Object to form.
5         THE WITNESS:  I -- it is often -- has
6  often been reported in the literature that talcum
7  powder contained asbestos prior to 1976, and that
8  products produced after that did not contain asbestos.
9         And as I became involved in this litigation,
10 I was made aware of and discovered some of the
11 articles that showed that talcum powder products after
12 1976 contained asbestos.
13        And so my opinion was that -- my opinion
14 that asbestos in current or recently marketed talcum
15 powder products could explain -- was part of the
16 biological mechanism by which exposure to talcum
17 powder, that was -- that was formed as I became aware
18 of more of the available information, when I became
19 involved in this litigation.
20 BY MR. JAMES:
21    Q.  Setting aside the issue of asbestos in talcum
22 powder, do you believe that asbestos is a cause of
23 ovarian cancer?
24    A.  Yes, I do.
25    Q.  How many studies have explored the link

Page 89

1  between asbestos and ovarian cancer?
2         MS. PARFITT:  Objection.  Form.
3         THE WITNESS:  In terms of epidemiologic
4  literature, there have been a couple of meta-analyses;
5  and the exact number, I don't have that off the top of
6  my head, but I want to say approximately a dozen
7  studies.
8  BY MR. JAMES:
9     Q.  Did you review the entire body of literature
10 looking at a purported link between asbestos and
11 ovarian cancer?
12        MS. PARFITT:  Objection.  Form.
13        THE WITNESS:  I know that I looked at
14 the meta-analyses.  I looked at some data from IARC,
15 and I believe that I have looked in some degree at,
16 I think, all of the epidemiologic studies about
17 asbestos and ovarian cancer.
18 BY MR. JAMES:
19    Q.  So did you look at all of the studies that
20 are discussed in the IARC monograph?
21        MS. PARFITT:  Objection.  Form.
22        THE WITNESS:  I have -- the IARC
23 monograph, as they typically do, they look at many of
24 the animal studies, some of the laboratory studies.
25 I have not looked at all of them.  I have looked at

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 90

1  the epidemiologic studies, which, again, is my area of
2  expertise.
3  BY MR. JAMES:
4      Q. And we're speaking currently about the IARC
5  monograph on asbestos; correct?
6      A. Correct.
7      Q. On page 34 of your report, if that you have
8  handy, Dr. Moorman -- actually, I think I have the
9  wrong page number.  Give me one second.
10         Okay.  It's actually page 35.  My apologies.
11         And you see -- I'm looking at the first --
12  the top paragraph.  And you state in the second
13  sentence -- do you see where I am?  It starts with
14  "IARC"?
15      A. Yes.
16      Q. Says (as read):
17         "IARC has stated that a causal
18         association between exposure to
19         asbestos and cancer of the ovary
20         was clearly established based on
21         strongly positive cohort mortality
22         studies of women with occupational
23         exposure to asbestos, as well as
24         studies of women with
25         environmental exposure to

Page 91

1         asbestos."
2      A. Yes.
3      Q. Do you see where I was reading?
4      A. Yes.
5      Q. To be clear, Dr. Moorman, that's not
6  precisely how IARC has stated that, is it?
7         MS. PARFITT: Objection.  Form.
8         THE WITNESS: I --
9  BY MR. JAMES:
10      Q. I'm sorry, Doctor.
11         If I may, Dr. Moorman, I'll just provide you
12  a copy.  Is that okay?
13      A. Okay.
14      Q. I'm going to mark as Exhibit 14 a copy of
15  the -- what we're referring to as the asbestos
16  monograph that's 100C.
17      (Exhibit No. 14 was marked for identification.)
18         MS. PARFITT: Mr. James, just for the
19  record, that's not the entire 100C monograph, is it?
20         MR. JAMES: Thank you.  Thank you.  Let
21  me clarify.  This is excerpts of -- Exhibit 14 is
22  excerpts of the monograph.
23         MS. PARFITT: Thank you.
24  BY MR. JAMES:
25      Q. Okay.  And if we turn to page 254,

Page 92

1  Dr. Moorman.
2      A. Yes.
3      Q. Actually, 256 is where it carries into.  And
4  on page 256, there's a section entitled "syntheses."
5         Do you see where I am, Dr. Moorman?
6      A. Yes.
7      Q. Okay.  And if you look at the right-hand
8  column, it's the first full paragraph in the middle of
9  the page.
10      A. Yes.
11      Q. And there, the IARC states that (as read):
12         "The working group noted that a
13         causal association between
14         exposure to asbestos and cancer of
15         the ovary was clearly established
16         based on five strongly positive
17         cohort mortality studies of women
18         with heavy occupational exposure
19         to asbestos."
20         Do you see that?
21      A. Yes.
22      Q. Okay.  And so the IARC then goes on to say,
23  in the next sentence, that the conclusion (as read):
24         "Received additional support from
25         studies showing that women and

Page 93

1         girls with environmental, but not
2         occupational exposure to asbestos,
3         had positive, but nonsignificant,
4         increases in both ovarian cancer
5         incidence and mortality."
6         Do you see that?
7      A. Yes.
8      Q. And so the IARC's conclusion here with
9  respect to asbestos and ovarian cancer.
10         Again, this conclusion is being made outside
11  the context of talcum powders; correct?
12      A. Right.  This is based on asbestos exposure.
13      Q. And the way that IARC has structured this
14  paragraph is that they have said that they've based
15  their conclusion on the occupational studies; correct?
16         MS. PARFITT: Objection.  Form.
17         THE WITNESS: Yes.
18  BY MR. JAMES:
19      Q. And then they do note the additional support
20  after that sentence; correct?
21         MS. PARFITT: Objection to form.
22         THE WITNESS: Yes.
23  BY MR. JAMES:
24      Q. Okay.  And just to be clear, the IARC here
25  acknowledges that the non-occupational studies report

24 (Pages 90 to 93)

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 94

1  nonstatistically significant associations; correct?
2      A. They note "positive, though nonsignificant
3  increases."
4          Yes, that's what it states.
5      Q. And if you turn with me to page 280 of the
6  same monograph, Dr. Moorman, with respect to talcum
7  powder, specifically, on the right-hand column of
8  page 280, it's the third full paragraph down, the IARC
9  monograph states (as read):
10          "The association between exposure
11          to talc, potential or retrograde
12          translocation to the ovarian
13          epithelium, and the development of
14          an ovarian cancer is
15          controversial."
16          Do you see where I was reading that?
17      A. I do see that.
18      Q. So in the same monograph where they're
19  talking about asbestos and ovarian cancer in general,
20  the IARC calls out the issue of talcum powder as a
21  controversial association; correct?
22          MS. PARFITT: Objection. Form.
23          THE WITNESS: That's what it states,
24  yes.
25

Page 95

1  BY MR. JAMES:
2      Q. Did you cite that conclusion in your report?
3          MS. PARFITT: Objection. Form.
4          THE WITNESS: I did not specifically
5  cite this, because, you know, again, this was a
6  conclusion made IARC 2010, and additional data has
7  accumulated. And so I think that we're seeing that if
8  they had -- you know, of course, I have no way of
9  knowing what they would conclude, but I think that, in
10  light of additional evidence that has arisen since the
11  time that this report was written, a different
12  conclusion could have been reached.
13          MR. JAMES: Okay. And I object to the
14  nonresponsive portion of that answer.
15  BY MR. JAMES:
16      Q. And for purposes of the record, Dr. Moorman,
17  the monograph that we're looking at here together was
18  published in 2012; correct?
19      A. That is correct.
20      Q. I think that you're probably thinking of the
21  other monograph, which is the 2010 monograph; correct?
22  When you said 2010?
23      A. Well, I was looking at what was stated in
24  that paragraph.
25      Q. Fair enough. Fair enough.

Page 96

1      A. Yes.
2      Q. The IARC has not concluded that the presence
3  of asbestos in talc powders renders such powders as
4  carcinogenic, has it?
5          MS. PARFITT: Objection. Form.
6          THE WITNESS: I can't recall if they
7  have made that conclusion or not.
8  BY MR. JAMES:
9      Q. You understand that when the IARC separately
10  assessed talcum powders in the other monograph that
11  we're talking about, they classified perineal talc use
12  as a 2B do you know that?
13          MS. PARFITT: And you're referring to
14  the 2010 monograph?
15          MR. JAMES: Yes, and I think that's
16  what I said, and if I didn't, my apologies.
17          THE WITNESS: Yes, to be a possible
18  carcinogenic.
19  BY MR. JAMES:
20      Q. Okay. And by designating perineal talc use
21  as a 2B, the IARC is not concluding that it is, in
22  fact, a carcinogenic; correct?
23      A. What they are concluding is that it is a
24  possible carcinogen.
25      Q. IARC has multiple classifications; correct?

Page 97

1      A. That is correct.
2      Q. If they characterize -- if they -- if they
3  characterize something as a carcinogen, they label it
4  as a Group 1; correct?
5      A. That is correct.
6      Q. If they characterize something as a probable
7  carcinogen, they label it a 2A; correct?
8      A. That is correct.
9      Q. And if they characterize something as a
10  possible, it's a 2B; correct?
11      A. That is correct.
12      Q. And the IARC has settled on 2B with talc --
13  and with perineal talc use; correct?
14          MS. PARFITT: Objection. Form.
15          THE WITNESS: Once again, at the time
16  of the report, that's what they decided on.
17  BY MR. JAMES:
18      Q. The opinions that you're offering in
19  litigation in this MDL report are contrary to those
20  reached by IARC; correct?
21          MS. PARFITT: Objection. Form.
22          THE WITNESS: No. I don't think that
23  they are contrary. I think possible carcinogen --
24  they are not saying it is not a carcinogen; they're
25  saying a possible carcinogen.

25 (Pages 94 to 97)

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 98

1    And I -- my report, with the additional
2  information that has been published since the time
3  that this report was done, I think that it strengthens
4  the conclusions. And that's why I felt comfortable
5  saying that it is a cause of ovarian cancer.
6  BY MR. JAMES:
7    Q. And so what you're saying is different than
8  what the IARC said in 2010; correct?
9        MS. PARFITT: Objection. Misstates her
10  testimony. Asked and answered.
11        THE WITNESS: I'm saying that there is
12  additional evidence that has arisen, and it
13  strengthens the -- it strengthens the evidence for the
14  association between talc and ovarian cancer.
15  BY MR. JAMES:
16    Q. And in 2010, IARC did not determine that
17  perineal talc use was carcinogenic; correct?
18    A. They said --
19        MS. PARFITT: Objection. Misstates
20  testimony.
21        THE WITNESS: -- it was a possible
22  carcinogen.
23        MR. JAMES: I didn't misstate any
24  testimony. I didn't state anything about her
25  testimony. I asked a question.

Page 99

1        MS. PARFITT: You actually
2  misrepresented her answer in your question. That was
3  my objection. You can go ahead.
4        MR. JAMES: If you'd like to read the
5  realtime, I didn't say anything about what she
6  testified to. I asked a question --
7        MS. PARFITT: You said, "In 2010" --
8        (Over-speaking.)
9        MR. JAMES: But if you want to continue
10  to do that all day --
11        MS. PARFITT: -- "IARC did not
12  determine that peritoneal [sic] talc was carcinogenic;
13  correct?"
14        Just before that, she had said that it was
15  carcinogenic.
16        MR. JAMES: But I wasn't misstating her
17  testimony.
18        MS. PARFITT: Well, when you say that,
19  and she answered the question before that that's not
20  what IARC said, and then you say that is what IARC
21  says, you are misstating her testimony.
22        MR. MIZGALA: It's "perineal," not
23  "peritoneal."
24        MR. JAMES: Let's just move on. If you
25  continue to --

Page 100

1        MR. MIZGALA: There's a big difference.
2        MR. JAMES: Let's just move on.
3        MS. PARFITT: I didn't say
4  "peritoneal." That may be what the court reporter --
5        And, Sophie, the record should reflect that
6  when we are saying -- for the most part, when someone
7  wants to say something, it's "perineal" --
8        MR. JAMES: May we continue?
9        MS. PARFITT: I appreciate it. Thank
10  you.
11        I just want to help the court reporter out,
12  Scott. I'm sure you want a very clear record.
13        And, James, thank you very much for making
14  sure it is clear.
15        So, Sophie, thank you. When we say
16  "perineal," we mean "perineal." Not your fault at
17  all.
18        Thank you.
19        MR. JAMES: Are we good?
20        MS. PARFITT: We are so good.
21  BY MR. JAMES:
22    Q. In 2010, the IARC declared talc -- perineal
23  talc a 2B; correct?
24    A. That is correct.
25    Q. Okay. In 2010, the evidence that was before

Page 101

1  the IARC -- was the evidence at that time sufficient
2  for IARC to have said something more than 2B?
3        MS. PARFITT: Objection. Form.
4        THE WITNESS: I'm not quite sure.
5  BY MR. JAMES:
6    Q. You want me to rephrase?
7    A. Yes, if you wouldn't mind.
8    Q. You alluded to evidence that has -- and if
9  I'm misstating your testimony, Ms. Parfitt, please
10  object, because now I actually am talking about your
11  testimony.
12    A. Okay.
13    Q. But you alluded earlier that evidence has
14  developed since the 2010 monograph; correct?
15    A. Right.
16    Q. And so my question is, in your expert
17  assessment in 2010, when the IARC declared perineal
18  talc use to be a 2B, was the evidence at that snapshot
19  in time sufficient to support something more than 2B,
20  less than 2B, or did the IARC get it right?
21        MS. PARFITT: Objection. Form.
22        THE WITNESS: I -- I think that their
23  statement that it is a possible carcinogen -- I don't
24  know if you can -- you know, possible versus probable,
25  it's -- I don't know that there is any checklist to

26 (Pages 98 to 101)

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 102

1    say this level of evidence would lead it to possible
2    versus probable.
3            And so to say whether or not they got it
4    right, I don't know how to answer that question.
5    I think that they certainly are indicating that there
6    was evidence indicating a problem, and now we have
7    more evidence that strengthens the -- I think there's
8    greater evidence that talc can cause ovarian cancer.
9    BY MR. JAMES:
10       Q. If someone had asked you to assess the body
11   of scientific and medical literature in 2010 on the
12   claim that talcum powder products cause ovarian
13   cancer, would you have opined in 2010 that the
14   evidence was sufficient to state that talcum powder
15   products generally cause ovarian cancer?
16           MS. PARFITT: Objection. Form.
17           THE WITNESS: I think that it is
18   impossible to say with certainty what -- at that point
19   in time what would I have opined? I think that, as we
20   are well aware, the body of literature has continued
21   to grow over time. I think that it has only
22   strengthened over time. At what point would I have
23   been able to opine that talc is a cause of ovarian
24   cancer? I can't pinpoint that exactly.
25

Page 103

1    BY MR. JAMES:
2        Q. And when you say in 2010 IARC declared talc a
3    2B, I think the phrasing that you used was that they
4    were saying that there was, quote, a problem.
5            Is that what you said?
6        A. I think that I said something to that effect.
7        Q. Okay. You understand that the IARC's
8    classification system does have a checklist of sorts
9    to determine if something is a 1, a 2A, or a 2B;
10   correct? Or a 3 and so on and so forth.
11       A. I am not familiar with the exact checklist.
12   Yes.
13       Q. Do you understand that, if IARC declares
14   something a 2B, it's concluding that chance, bias, and
15   confounding cannot be ruled out? Did you know that?
16       A. Again, off the top of my head, I cannot
17   recall exactly what are their -- you know, as you put
18   it, what is their checklist.
19       Q. Returning now back to the body of literature
20   on asbestos and ovarian cancer, you have testified
21   that you have reviewed that body of literature;
22   correct?
23       A. Yes.
24       Q. Do you recognize any limitations to that body
25   of literature?

Page 104

1            MS. PARFITT: Objection to form.
2            THE WITNESS: I -- when I look at some
3    of the studies, there are limitations, as there are
4    with -- I would say, with any study of humans and
5    cancer.
6            One of the things that comes to mind as a
7    possible limitation is that, in the occupational
8    studies, the cohorts are relatively small for looking
9    at cancer outcomes. So in many -- maybe the
10   majority -- of them, they had a few hundred people in
11   the cohort; and, when you looked at the expected
12   versus the observed number of cases, we're talking
13   about a handful of cases.
14           So it might be, you know, two or three
15   observed cases versus .6 expected or something like
16   that.
17           So that is a limitation of all of -- as
18   I recall, all of the occupational cohort studies that
19   the sample cites of the cohort.
20   BY MR. JAMES:
21       Q. Would you also acknowledge that another
22   limitation to that body of literature is the fact that
23   it's in the occupational context?
24           MS. PARFITT: Objection. Form.
25           THE WITNESS: I don't necessarily

Page 105

1    consider that a limitation. That is where people had
2    exposure to this -- to asbestos in an occupational
3    setting. So if you want to look at the health effects
4    of that exposure, that's exactly where you would do
5    the study.
6    BY MR. JAMES:
7        Q. Do you agree that the body of literature in
8    the occupational context, which looks at exposure to
9    asbestos in the occupational setting, is different
10   than the allegation that exposure to contaminated
11   talcum powder products causes ovarian cancer?
12       A. The -- I agree that there is some difference
13   in the exposure, but it's part of the body of
14   literature. It's -- people exposed in this way, they
15   are at increased risk for ovarian cancer. So they may
16   have different levels of exposure, different routes of
17   exposure, but it's all part of the body of literature.
18       Q. You would agree that someone that's exposed
19   to asbestos-containing products in a factory
20   environment for a full workday is experiencing a
21   different level of exposure to someone who is using
22   allegedly contaminated asbestos talcum powder
23   products?
24           MS. PARFITT: Objection. Form.
25

27 (Pages 102 to 105)

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 106

1  BY MR. JAMES:
2      Q.  Let me rephrase that, because I jumbled that
3  up.
4          Would you agree that the level of exposure
5  that someone would experience in the occupational
6  setting to asbestos products is qualitatively
7  different than what Plaintiffs are alleging in this
8  case, which is exposure to talcum powder products that
9  are allegedly contaminated with asbestos?
10     A.  I acknowledge that the exposures are
11 different.  It's how they are applied -- or, you know,
12 the -- you know, we're talking about exposure to the
13 genital area when we're talking about talcum powder
14 products that may contain asbestos, where we would not
15 expect to have genital exposure of asbestos in an
16 occupational setting.
17         So, yes, there are differences.
18     Q.  Do you acknowledge another limitation in the
19 body of literature that IARC looked at to be
20 misclassification?
21     A.  In epidemiology, we -- we recognize that
22 there is likely to be misclassification in any
23 epidemiologic study that you do.  This is not a
24 situation like with laboratory studies of animals
25 where you can control every exposure, measure it very

Page 107

1  accurately.
2          So some potential misclassification is
3  possible, as it is in any epidemiologic study.
4      Q.  And the issue of misclassification has been
5  specifically acknowledged in this body of literature;
6  correct?
7          MS. PARFITT:  Objection to form.
8          THE WITNESS:  Can you be more specific
9  about which misclassification you're referring to?
10 BY MR. JAMES:
11     Q.  Sure.  So what I'm referring to is
12 misclassification of disease.
13         Do you -- do you recall that, in this body
14 of literature, there is discussion that, given the
15 small number of cases which you described earlier,
16 misclassification -- the potential for disease
17 misclassification is a limitation to this body of
18 literature?
19     A.  I am aware that this is an issue that has
20 been discussed in this literature, yes.
21         MR. JAMES:  And I'm going to mark as
22 Exhibit No. 15 the Reid paper.
23         (Exhibit No. 15 was marked for identification.)
24 BY MR. JAMES:
25     Q.  And, Dr. Moorman, you've seen this Reid

Page 108

1  meta-analysis before; correct?
2      A.  I have.
3      Q.  You don't have any discussion of the Reid
4  paper in your report; correct?
5      A.  I don't -- I don't believe I do.
6      Q.  Do you understand that the Reid paper
7  conflicts in part with the claim that asbestos is a
8  cause of ovarian cancer?
9          MS. PARFITT:  Objection.
10         THE WITNESS:  I know what they -- what
11 these authors concluded.
12 BY MR. JAMES:
13     Q.  And if you look with me on page 1294,
14 Dr. Moorman, in the "conclusions" section, you see at
15 the bottom of that paragraph, with the sentence
16 beginning with the word "however" -- it's sort of
17 three-fourths of the way down -- the authors state
18 (as read):
19         "However, the authors of this
20         article suggest that the IARC
21         decision to determine asbestos
22         exposure as a cause of ovarian
23         cancer was premature and not
24         wholly supported by the evidence."
25     Do you see where I read that?

Page 109

1      A.  I do see that.
2      Q.  Okay.  And so you acknowledge here that the
3  authors of this paper have called into question the
4  IARC decision; correct?
5          MS. PARFITT:  Objection.  Form.
6          THE WITNESS:  I see what they have
7  stated here, that --
8  BY MR. JAMES:
9      Q.  And --
10     A.  -- that is their opinion, yes.
11     Q.  Excuse me, Doctor.  My apologies.
12     A.  Yes.
13     Q.  And, again, this paper is assessing the
14 IARC's conclusion about asbestos and ovarian cancer in
15 general; correct?
16         MS. PARFITT:  Objection.  Form.
17 BY MR. JAMES:
18     Q.  It's not -- this article isn't pertaining to
19 the issue of alleged asbestos contamination in talcum
20 powder products, is it?
21     A.  Right.  This is focused just on asbestos and
22 ovarian cancer.
23     Q.  And if you look at the bottom of that -- the
24 very last sentence in that paragraph, you see where
25 the authors there discuss the potential problem of

28 (Pages 106 to 109)

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 110

1  misclassification?
2       A. I'm sorry, where are you?
3       Q. It's the very last sentence, Doctor.
4       A. Yes, I see what is written there.
5       Q. So this article conflicts with your
6  litigation opinion; correct?
7            MS. PARFITT: Objection. Form.
8            THE WITNESS: This reflects the opinion
9  of these authors. There was another meta-analysis of
10 asbestos and ovarian cancer that I believe was
11 published in the same year. And as I recall, the
12 conclusions of those authors, while acknowledging
13 potential misclassification of disease, they felt like
14 the evidence was adequate to rule that out as a
15 possible source of bias that would explain the
16 association that was observed.
17 BY MR. JAMES:
18      Q. And you're speaking of the Camargo article,
19 I believe?
20      A. Yes.
21      Q. And have you separately assessed the issue of
22 misclassification and whether, in your mind, that
23 presents a significant enough problem to call into
24 question the IARC conclusions?
25           MS. PARFITT: Objection. Form.

Page 111

1            THE WITNESS: Let me read your...
2  I believe that I was convinced by the
3  information presented in the Camargo article that
4  I don't think that misclassification was enough of a
5  problem to change the conclusion.
6  BY MR. JAMES:
7       Q. Are you familiar with -- did you undertake a
8  Bradford Hill analysis of the literature on asbestos
9  and ovarian cancer to reach the conclusion that
10 asbestos is a cause of ovarian cancer?
11      A. I didn't -- did not do the Bradford Hill
12 analysis as I did with the talcum powder products and
13 ovarian cancer. I felt like it was pretty well
14 accepted.
15      Q. Did you consider a body of literature
16 commonly referred to as the "miners and millers
17 studies"?
18      A. Please -- I'm sorry. When you talk about the
19 miners and millers studies, I'm not sure that I'm on
20 the same page with you.
21      Q. Are you familiar -- are you aware of the fact
22 that there's a body of literature that has looked at
23 cancer incidence rates in miners and millers of talc?
24      A. Yes, I am aware of some of those articles.
25 Yes.

Page 112

1       Q. Did you review those articles?
2       A. I did look at them, and as I recall, almost
3  all of those -- the miners and -- almost all of the
4  miners, and probably the millers, they were focusing
5  primarily on males who were the people who were mostly
6  involved in that type of work.
7       Q. You would agree with me that if talcum
8  powder, that is used in cosmetic talc products, is, in
9  fact, contaminated with asbestos, then you would
10 expect to see increased cancer incidence rates, for
11 example, of mesothelioma, in cosmetic talc miners and
12 millers; correct?
13           MS. PARFITT: Objection. Form.
14           THE WITNESS: I wouldn't be surprised
15 to see that, yes.
16 BY MR. JAMES:
17      Q. And did you know that that body of literature
18 reports no increased cancer incidence in talc miners
19 and millers?
20      A. It has been a while since I have looked at
21 those papers, so I don't remember exactly what they
22 reported.
23      Q. And those papers are not discussed in your
24 report; correct?
25      A. Once again, I was focusing primarily on

Page 113

1  ovarian cancer. And as many of these were on male
2  subjects, I had looked at them, but they were of
3  somewhat lesser importance to my review.
4       Q. If --
5            MS. PARFITT: I don't want to
6  interrupt, and maybe a few follow-up questions. We're
7  probably into about an hour and 20 minutes or so. But
8  I don't want to interrupt your flow either.
9            MR. JAMES: I can finish up in a few,
10 or if you need a break now, we can take it now.
11           THE WITNESS: Let's finish up in a few.
12           MR. JAMES: And when I say "finish up,"
13 I just mean this line. I apologize for that. That
14 was misleading, I think.
15           Sure. Give me a couple more, and then we'll
16 take a break.
17           THE WITNESS: Yeah, we can go a few
18 more minutes.
19           MS. PARFITT: Thank you, Scott.
20 BY MR. JAMES:
21      Q. If asbestos-contaminated talcum powder
22 products have existed on the market for some period of
23 time, wouldn't you expect to find higher incidence
24 rates of other cancers of talcum powder users?
25           MS. PARFITT: Objection. Form.

29 (Pages 110 to 113)

Patricia G. Moorman, M.S.P.H., Ph.D.

1   THE WITNESS: It depends.
2   BY MR. JAMES:
3   Q. For example -- oh, I'm sorry. I thought you
4   were done.
5   A. I am done. Go ahead.
6   Q. For example, if asbestos has contaminated
7   talcum powder products for some period of time,
8   wouldn't you expect to see higher rates of
9   mesothelioma in users of cosmetic talcum powder
10  products?
11  A. You know, mesothelioma is an exceedingly rare
12  cancer, and I don't know -- I don't know to what
13  extent it has been -- talcum powder products --
14  cosmetic talcum powder products has been examined as a
15  risk factor for that.
16  Q. Are you aware of any data showing that users
17  of cosmetic talcum powder products are at greater risk
18  of mesothelioma, asbestosis, or any other
19  asbestos-related diseases?
20  MS. PARFITT: Objection. Form.
21  THE WITNESS: I can't think of that
22  data right offhand, no.
23  MR. JAMES: Okay. And how about now
24  for a break?
25  THE WITNESS: Okay.

1   MS. PARFITT: Thank you.
2   THE VIDEOGRAPHER: Going off record at
3   11:45 a.m.
4   (Recess taken from 11:45 a.m. to 12:39 p.m.)
5   THE VIDEOGRAPHER: Back on record at
6   12:39 p.m.
7   BY MR. JAMES:
8   Q. Dr. Moorman, you include in your MDL report
9   references to "talc occurring in the fibrous habit."
10  Do you recall referring to that in your
11  report?
12  A. Yes, I do.
13  Q. That terminology is new to the MDL for you,
14  isn't it?
15  MS. PARFITT: Objection. Form.
16  BY MR. JAMES:
17  Q. I'll clarify.
18  A. Please. Please do.
19  Q. You did not -- in your Ingham testimony,
20  where you provided your opinions in the Ingham case,
21  you did not refer to "fibrous talc," did you?
22  A. No, I don't believe I did.
23  Q. So that -- sorry.
24  So that's a new component of your opinion in
25  the MDL?

1   MS. PARFITT: Objection. Form.
2   THE WITNESS: I considered it as part
3   of the constituents of the talcum powder products. My
4   overall opinion is based on exposure to talcum powder
5   products and whatever constituents are in there,
6   including the fibrous talc.
7   BY MR. JAMES:
8   Q. Given that you have opined in your MDL report
9   for the first time on fibrous talc and did not provide
10  that opinion in the Ingham case, can you tell me what
11  you're basing your opinion on with regard to the
12  fibrous talc?
13  MS. PARFITT: Objection.
14  Hey, Scott, if I can ask -- I'm sorry, it
15  isn't rolling. Is there some reason? I don't want to
16  interrupt. We'll deal with it.
17  THE COURT REPORTER: I can come over
18  and do it, but we'll have to go off.
19  MS. PARFITT: Sorry about that.
20  THE VIDEOGRAPHER: Going off the record
21  at 12:40 p.m.
22  (Off the record.)
23  THE VIDEOGRAPHER: Back on record at
24  12:41 p.m.
25

1   BY MR. JAMES:
2   Q. Dr. Moorman, before the quick break -- I'll
3   just restate the question.
4   A. Okay.
5   Q. So what do you base your opinions on with
6   regard to fibrous talc?
7   A. Okay. My opinion, I guess, is -- again, it's
8   always been based on the constituents of the talcum
9   powder products. And so maybe clarifying based on
10  maybe further reading on the constituents of, like,
11  asbestiform talc, that this again contributes to the
12  biological plausibility of it, that this is another
13  potential constituent of the talcum powder product
14  that could contribute to ovarian cancer risk.
15  Q. So one component of your opinion is that
16  there is fibrous talc in talcum powder products;
17  correct?
18  A. Yes.
19  Q. Okay. And given that that is a new opinion,
20  I am attempting to source the bases for that opinion.
21  Are the opinions that you have about the
22  presence of fibrous talc in talcum powder products
23  based upon the same materials that you rely on for
24  your opinions about the presence of asbestos in talcum
25  powder products?

30 (Pages 114 to 117)

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 118

1        MS. PARFITT: Objection. Form. As far
2  as a new opinion.
3        THE WITNESS: I'm sorry, let me read
4  that.
5        So my opinions about the presence of fibrous
6  talc in talcum powder products is based on some of the
7  same materials that have done analyses of talcum
8  powder products, yeah.
9  BY MR. JAMES:
10   Q.  Would that include the Longo -- Dr. Longo
11  litigation testing?
12   A.  I believe that he did make some mention of
13  that in his report, yes.
14   Q.  And other -- would that include other
15  litigation reports that you reviewed?
16       MS. PARFITT: Objection. Form.
17       THE WITNESS: I'm -- precisely where
18  the information came from, that there is fibrous talc
19  in talcum powder products, I -- I don't recall exactly
20  where -- where I gleaned that information.
21  BY MR. JAMES:
22   Q.  And did you -- did you ask counsel if there
23  was any information provided by Johnson & Johnson in
24  the talc litigation rebutting the claim that there's
25  fibrous talc present in the products?

Page 119

1        MS. PARFITT: Objection. Form.
2        THE WITNESS: No, I did not
3  specifically ask them for that information.
4  BY MR. JAMES:
5   Q.  Have you relied on any epidemiology
6  substantiating a claim that fibrous talc is
7  carcinogenic?
8   A.  I am not aware of any epidemiologic
9  literature that specifically addressed that question.
10   Q.  Turning to your opinions on heavy metals,
11  Dr. Moorman, you have opined in your report about
12  chromium, nickel, and cobalt; correct?
13   A.  Yes, I have.
14   Q.  Yet your opinions in the MDL report about the
15  alleged presence of chromium, nickel, and cobalt in
16  talcum powder products is new in the sense that you
17  did not express that opinion in the Ingham case;
18  correct?
19       MS. PARFITT: Objection. Misstates her
20  testimony -- our testimony.
21       THE WITNESS: I think the gist of my
22  opinions are based on talcum powder products and
23  whatever constituents are in there; so talc, asbestos,
24  any fragrances or other contaminants that may be in
25  there. So it's based on the product.

Page 120

1  BY MR. JAMES:
2   Q.  Would you defer to others with regard to the
3  question of whether heavy metals are in the talcum
4  powder products?
5   A.  I -- by deferring to others, okay, I clearly
6  do not do the analyses of those -- of those -- those
7  types of analyses myself, so I am relying on a report.
8  In this case, it was a report done by Dr. Crowley.
9   Q.  Just to clarify, and Ms. Parfitt can correct
10  me if I'm wrong, but when you refer to Dr. Crowley's
11  report, are you referring to Dr. Crowley's report
12  about fragrances?
13   A.  And I believe that it was not just
14  fragrances, but it was a number of substances that he
15  analyzed in that -- that he addressed in his analysis.
16   Q.  Did you do any independent searching for
17  materials or scientific literature on the allegation
18  that heavy metals in cosmetic talc powders cause
19  ovarian cancer?
20       MS. PARFITT: Objection.
21       THE WITNESS: Okay. I'm reading your
22  question again.
23       No. I -- the -- what I looked at in regards
24  to heavy metals -- again, we have this report
25  indicating that these can be found in some talcum

Page 121

1  powder products, and then again we have data
2  indicating that these heavy metals can cause certain
3  types of cancer.
4        So it contributes to the biological
5  plausibility that there are substances in the talcum
6  powder products that could lead to cancer.
7  BY MR. JAMES:
8   Q.  With regard to opinions about the presence of
9  heavy metals in talcum powder products, did you ask to
10  see any information or materials presented in the talc
11  litigation by Johnson & Johnson as to that claim?
12   A.  No, I did not.
13   Q.  Did you do any separate analysis of the
14  talcum powder products to determine the presence of
15  heavy metals in these products?
16   A.  I did not do any analyses of talcum powder
17  products.
18   Q.  Do you have any knowledge concerning the
19  testing that is performed by Johnson & Johnson and
20  third parties with respect to constituent elements in
21  the products?
22   A.  No. This is outside my area of expertise.
23   Q.  Do you have any information about allowable
24  levels of constituent elements in the talcum powder
25  products?

31 (Pages 118 to 121)

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 122

1  A. No, I do not.
2  Q. Do you have any basis to believe that if
3  talcum powder products exceeded allowable levels for
4  constituent elements, that those products went to
5  market?
6  MS. PARFITT: Objection. Form.
7  THE WITNESS: No, I -- I don't have any
8  information in that regard.
9  BY MR. JAMES:
10  Q. Okay. Turning to -- with -- to your opinion
11  on -- strike that.
12  Do you hold the independent opinion that
13  cadmium, chromium, and cobalt cause ovarian cancer?
14  MS. PARFITT: Objection. Form.
15  THE WITNESS: I do -- I am not aware of
16  papers that have directly addressed those metals in
17  relation to ovarian cancer risk. I am basing it more
18  on the conclusions from IARC that they do have
19  carcinogenic potential.
20  BY MR. JAMES:
21  Q. And is the same true for nickel?
22  A. Yes.
23  Q. With regard to the alleged carcinogenicity of
24  the constituent metal elements that you've identified
25  in your report, did you consider anything other than

Page 123

1  the IARC monograph that you cited?
2  A. No, I did not.
3  Q. Did the IARC monograph that you cited include
4  any assertion that the presence of these metals in
5  talcum powder products rendered those powders carcinogenic?
6  A. I do not believe so.
7  Q. Did the IARC 2010 monograph on talc include
8  any assertion that the presence of heavy metals in
9  those powders supports the 2B conclusion?
10  MS. PARFITT: Objection. Form.
11  THE WITNESS: I don't recall any
12  mention of heavy metals in that monograph.
13  BY MR. JAMES:
14  Q. Returning back to fragrances, in your MDL
15  report, you refer to a report by Crowley. Did I say
16  that right?
17  A. I've never met the man, so I don't know how
18  it's pronounced, but yes, that's what I said.
19  Q. And that's the report you identified for the
20  basis of your fragrance opinions; correct?
21  A. Yes.
22  Q. Do you have -- do you hold the independent
23  opinion that the fragrance ingredients in talcum
24  powder products renders those products carcinogenic?
25  MS. PARFITT: Objection.

Page 124

1  THE WITNESS: I -- I think that we do
2  not have the data to specifically address that
3  question specifically in regard to ovarian cancer.
4  BY MR. JAMES:
5  Q. With regard to the opinions you've expressed
6  as to fragrances, is the sole basis of those opinions
7  the value of work?
8  A. That's the only document that I referred to.
9  Q. And you understand --
10  MR. JAMES: Ms. Parfitt, is it
11  Dr. Crowley?
12  MS. PARFITT: Dr. Crowley.
13  BY MR. JAMES:
14  Q. Okay. Do you understand that Dr. Crowley is
15  a paid expert in this litigation for the Plaintiffs?
16  A. I do understand that.
17  Q. Do you know if Dr. Crowley conducted any sort
18  of risk assessment with regard to his calculations?
19  A. I do not know that.
20  Q. If Johnson & Johnson talcum powder products
21  were not contaminated with asbestos, if you would
22  accept that proposition from me, would you still hold
23  the opinion that talcum powder products are a general
24  cause of ovarian cancer?
25  MS. PARFITT: Objection. Form.

Page 125

1  You can answer.
2  THE WITNESS: Okay. The opinion
3  I formed is based primarily on the epidemiologic data;
4  and the epidemiologic data is based on talcum powder
5  products, whatever is contained in them. And in study
6  after study, we see increased risk for ovarian cancer.
7  So whatever is contained in the talcum powder products
8  leads me to conclude that it can cause ovarian cancer.
9  BY MR. JAMES:
10  Q. And just to make sure that I understand your
11  answer --
12  A. Yes.
13  Q. -- if the talcum powder products were not
14  contaminated with asbestos, would you still reach the
15  general cause opinion that you've offered in this
16  case?
17  MS. PARFITT: Objection. Form.
18  THE WITNESS: I am -- I think that I've
19  answered the question that it's based on talcum powder
20  products, whatever is contained them -- in them. If
21  it is shown that there is no asbestos, that doesn't
22  change the fact that these dozens of epidemiological
23  studies have led to the conclusion of increased risk.
24  BY MR. JAMES:
25  Q. And does that same answer hold true if

32 (Pages 122 to 125)

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 126

1  I asked you the same question with respect to heavy
2  metals, fibrous talc, and fragrance ingredients?
3       MS. PARFITT: Objection. Form.
4       THE WITNESS: Yes. I am basing my
5  opinion on the use of talcum powder products and
6  whatever are -- whatever their constituents are.
7  BY MR. JAMES:
8       Q. As a professional epidemiologist -- is that a
9  fair way to say it?
10      A. Yes.
11      Q. Okay. As a professional epidemiologist, part
12 of your day-in, day-out work is to look at literature
13 on purported associations and make conclusions about
14 the strengths or weaknesses of that literature;
15 correct?
16      A. Yes.
17      Q. And you have done that before you were
18 brought into the talc litigation on a variety of
19 different exposures or other things evaluated for
20 associations; correct?
21      A. That is correct.
22      Q. And setting aside the issue of talcum powder
23 products, have you ever before, in assessing other
24 exposures or other associations, relied upon company
25 documents to reach your conclusions?

Page 127

1       A. I -- I'm trying to think.
2       We have -- my colleagues and I have
3  published systematic reviews of oral contraceptive use
4  and ovarian cancer and other cancer risk. And as part
5  of that procedure -- this was through the Agency for
6  Healthcare Research and Quality, or AHRQ -- and as
7  part of that procedure trying to ensure that we have
8  all relevant documents, I believe that there was an
9  effort to see if there were any company document
10 studies that would be relevant to that systematic
11 review.
12      Q. What about any internal company testing
13 documents? Have you ever looked at any internal
14 company testing documents in assessing any association
15 that you've considered throughout your career?
16      A. No --
17      MS. PARFITT: Objection.
18      THE WITNESS: -- I did not.
19 BY MR. JAMES:
20      Q. Have you ever considered any paid litigation
21 expert reports in assessing any other association that
22 you've looked at through your career?
23      MS. PARFITT: Objection. Form.
24      THE WITNESS: I -- I can't think of
25 another instance where I have done that.

Page 128

1  BY MR. JAMES:
2       Q. On page 4 of your -- actually, it's page 5 of
3  your report, Dr. Moorman. You refer on the top of
4  that page, in the first full paragraph, to the
5  Schildkraut 2016 study; correct?
6       A. First paragraph? Yes, that is correct.
7       Q. And you say in that paragraph -- and if
8  you're looking at the same paragraph as I am -- you
9  say there that (as read):
10          "This was the first study of talc
11          use and ovarian cancer focused
12          exclusively on African-American
13          women."
14       Correct?
15      A. Yes, I do.
16      Q. And to be clear, Dr. Moorman, that study did
17 not look exclusively at talc use, did it?
18      A. No. The purpose of the African American
19 cancer epidemiology study was to look at the
20 epidemiology of ovarian cancer in African American
21 broadly. So we've looked at a number of exposures.
22      Q. And specific to the issue of powder, the
23 Schildkraut 2016 study -- and I guess is the
24 underlying study, the AACES -- looks at body powder,
25 not talc per se; correct?

Page 129

1       A. That was how the question was asked in the
2  questionnaire, yes.
3       Q. Okay. And so the statements in your report
4  that state that the study looked at talc powder should
5  be clarified; correct?
6       MS. PARFITT: Objection. Form.
7       THE WITNESS: I think to be absolutely
8  precise, we should have -- I should have said body
9  powder. But based on other literature, most body
10 powder use is talcum powder product use. So I agree,
11 I could have been more precise in my language there.
12 BY MR. JAMES:
13      Q. And you understand body powders are made up
14 of a variety of constituents; correct?
15      A. Yes.
16      Q. There are baby powders that are made of
17 things other than talc; correct?
18      A. I believe so, that there are cornstarch
19 powders as well.
20      Q. And there are deodorizing powders that are
21 made of things other than talc; correct?
22      A. I believe so, yes.
23      Q. And you know cornstarch, if there's a baby
24 powder made of cornstarch, that product does not
25 contain talc; correct?

33 (Pages 126 to 129)

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 130

1    A. Yes.
2    Q. Or -- I should clarify.
3        If the version of the baby powder one is
4    purchasing is labeled as a cornstarch product, it's
5    cornstarch, not talc; correct?
6    A. That is correct.
7    Q. So the study participants in this study are
8    not limited to talc users; correct?
9    A. That is correct.
10   Q. You also say in the report, in conjunction
11   with these statements, that the study found a high
12   prevalence of talc use; correct?
13   A. Yes.
14   Q. And we're looking at the same paragraph,
15   Dr. Moorman. And, again, to be clear, the study
16   didn't find that. The study, instead, found a high
17   prevalence of powder use; correct?
18       MS. PARFITT: Objection.
19       THE WITNESS: Again, once I -- as I
20   acknowledged earlier, I could have been more precise
21   in the language, that it's -- I think that it -- based
22   on our knowledge of the sales and other studies that
23   have specifically reported on the types of powder use,
24   the majority of the powder use would have been talc.
25

Page 131

1    BY MR. JAMES:
2    Q. You're not offering opinions on the MDL
3    litigation about cornstarch, are you?
4    A. No, I am not.
5    Q. And you understand that the body of
6    epidemiological literature that has developed over the
7    last several decades has included findings looking at
8    talc powders versus cornstarch powders versus non-talc
9    powders; correct?
10   A. Some studies, yes, have looked at the
11   different powders.
12   Q. And your -- the Schildkraut 2016 study didn't
13   undertake the effort to make that distinction, did it?
14       MS. PARFITT: Objection.
15       THE WITNESS: I've already acknowledged
16   that the question in the questionnaire just asked
17   about body powder use.
18   BY MR. JAMES:
19   Q. You state that this study found a
20   statistically significant increase for risk among talc
21   users; right?
22   A. Yes. We're in the same paragraph. Right?
23   Q. Yes, Doctor. Thank you.
24   A. Yes.
25   Q. But you did not know in this paragraph, or

Page 132

1    anywhere else in your report, that for any genital use
2    of body powder with an interview date before 2014, the
3    results were not statistically significant; correct?
4        MS. PARFITT: Objection.
5        THE WITNESS: If you would give me just
6    a moment to look through the report, I'd like to
7    verify how I addressed that.
8        I -- on page 23, I acknowledged that there
9    was an attenuation of the odds ratio when comparing
10   the women who were interviewed in the later time frame
11   than in the earlier time frame.
12   BY MR. JAMES:
13   Q. Okay. And I'm looking at where you're
14   looking, I believe, and it's the middle paragraph on
15   page 23; correct?
16   A. That is correct.
17   Q. And there you say (as read):
18       "The fact that the association was
19       attenuated but not eliminated when
20       considering the full study
21       population suggested that the
22       association was not due entirely
23       to recall bias."
24       Did I read that correctly?
25   A. That is correct.

Page 133

1    Q. Okay. And, again, here you do not report --
2    let me start over.
3        The association for talc users before 2014
4    date was not statistically significant; correct?
5        MS. PARFITT: Objection. Form.
6        THE WITNESS: Yes. The -- the odds
7    ratio was elevated but not statistically significant.
8    BY MR. JAMES:
9    Q. And you don't call that out in your report,
10   do you?
11       MS. PARFITT: Objection. Form.
12       THE WITNESS: No. It's as it's
13   written.
14   BY MR. JAMES:
15   Q. And as it's written, it says, "The
16   association was attenuated but not eliminated."
17       That's the wording you used; correct?
18   A. Yes.
19   Q. Okay. But if the association is not
20   statistically significant, would you still refer to
21   that association as attenuated and not eliminated? Is
22   that the proper way to refer to it?
23   A. If the association was eliminated, if there
24   was no association, we would have had an odds ratio of
25   1. We have an odds ratio of 1.19.

34 (Pages 130 to 133)

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 134

1    It is -- I acknowledge that it was not
2  statistically significant, but it was not eliminated.
3  It was attenuated.  I think that my statement in my
4  report is accurate.
5      Q.  So for any epidemiologic study that has an
6  odds ratio that crosses 1 but is reported to be above
7  1 with the odds ratio crossing 1 -- do you understand
8  what I'm asking? -- would you refer to that as an
9  association, an null association, a not statistically
10  significant association?  What terminology would you
11  use?
12      A.  I would refer to it as a non-statistically
13  significant association.  If the data show 19 percent
14  increased risk, it's not statistically significant.
15      Q.  And by saying that, what you're saying is
16  that the odds ratio that -- could fall with any --
17  within the range identified; correct?
18      MS. PARFITT:  Objection.  Form.
19      THE WITNESS:  The -- when you report a
20  95 percent confidence interval, it gives a range of
21  values which is statistically compatible with what you
22  found.  Like, if the study were repeated again with
23  other samples, you might find an odds ratio that was a
24  bit higher or a bit lower.
25      But I think that it's very important to make

Page 135

1  the distinction between no association and no
2  statistically significant association.
3  BY MR. JAMES:
4      Q.  But you didn't make that distinction in your
5  report?
6      MS. PARFITT:  Objection.
7      THE WITNESS:  You've asked the
8  question, and I've acknowledged that I did not address
9  statistical significance in that sentence.
10  BY MR. JAMES:
11      Q.  On the same page of your report, if we go
12  back to page 5, you refer to a 2009 paper entitled
13  "Ovarian Cancer Risk Factors in African-American and
14  White Women"; correct?
15      A.  Let me get to page 5.  Which paragraph are
16  you --
17      Q.  So it's the second paragraph.  In fact, you
18  refer to it here as the North Carolina Ovarian Cancer
19  Study; correct?
20      A.  Right.  Right.  Okay.  Yes.
21      Q.  My apologies.  I -- with -- in conjunction
22  that study, you published a paper in 2009; correct?
23      A.  Right.  Talc was not the primary focus of it,
24  but it was one of the risk factors that we looked at.
25      Q.  And do you recall the results of that study

Page 136

1  with respect to talc?
2      A.  If you -- I know you have it right in front
3  of you.  So if I could see it, so I could report it
4  accurately.  I think I know what I found, but that was
5  paper that was done ten years ago.
6      MR. JAMES:  Okay.  And, Dr. Moorman,
7  I'm marking as Exhibit 16 a paper entitled "Ovarian
8  Cancer Risk Factors in African-American and White
9  Women."
10      I'm handing you two copies to pass along.
11  (Exhibit No. 16 was marked for identification.)
12      THE WITNESS:  Okay.  So we reported on
13  talc use for white women and for African-American
14  women.  Neither association was statistically
15  significant, again, particularly for the African
16  American, which can be a reflection of the relatively
17  small sample size for African-American women.  It was
18  an odds ratio of 1.19; in the white women, it was
19  1.04.
20  BY MR. JAMES:
21      Q.  And those two associations reported in your
22  paper in 2009 are not reported in your report, are
23  they?
24      A.  I did not -- I do not believe that I reported
25  those specific odds ratios.  Data from the

Page 137

1  North Carolina ovarian cancer study was included in
2  the meta-analyses that I did describe.
3      Q.  And with respect to odds ratio of 1.04 for
4  white women -- do you see that?  Are we looking at the
5  same table together?  Table 2?
6      A.  Yes.
7      Q.  Okay.  And the 1.04 association there is very
8  close to the null; correct?
9      MS. PARFITT:  Objection.  Form.
10      THE WITNESS:  Yes, it's close to 1.
11  BY MR. JAMES:
12      Q.  And it has the odds ratio that crosses 1;
13  correct?  The odds ratio range?  Is that a fair way to
14  say it?
15      A.  No.
16      Q.  Okay.  Tell me how to say it.
17      A.  The 95 percent confidence interval --
18      Q.  That's right.
19      A.  -- does cross 1.
20      Q.  So we have the 1.04 with the CI crossing 1;
21  correct?
22      A.  Yes.
23      Q.  Would you refer to the 1.04 as an association
24  that is attenuated but not eliminated?
25      A.  Well, first of all, I would not refer to it

35 (Pages 134 to 137)

Patricia G. Moorman, M.S.P.H., Ph.D.

| Page 138 |
| --- |

1    as attenuated because that implies that there's a
2    comparison with something else; and in the other
3    paper, it was comparing the full study population to a
4    subset.  So I would never refer to this as attenuated.
5           This is what was shown in this particular
6    study.  It's an odds ratio of 1.04.  It's very close
7    to 1.
8       Q.  Fair enough.  And fair point about
9    attenuated.
10          Would you refer to a 1.04 with a CI that
11   crosses 1 as a positive association, as professional
12   epidemiologist?
13      A.  When I would look at that, I would say that
14   there's little evidence of an association, very close
15   to 1, in this study population -- in this study.
16      Q.  You've also published another study coming
17   out of the North Carolina Ovarian Cancer Study;
18   correct?
19      A.  I have published quite a few papers that came
20   out of the North Carolina Ovarian Cancer Study.
21      Q.  And do you recall publishing a paper in 2010
22   entitled "Primary peritoneal and ovarian cancers:  An
23   epidemiologic comparative analysis"?
24      A.  I was a coauthor on that paper, yes.
25      Q.  Okay.  And is this paper discussed in your

| Page 139 |
| --- |

1    expert report at all?
2       A.  I don't think that I specifically addressed
3    it.  Again, the data from the North Carolina Ovarian
4    Cancer Study was included in the Terry analysis --
5           MR. JAMES:  And I've marked the study
6    that I just referenced as Exhibit No. 17.  I'm going
7    to hand you two copies.
8           (Exhibit No. 17 was marked for identification.)
9    BY MR. JAMES:
10      Q.  And, Dr. Moorman, if we turn to page 995,
11   there is a Table 2 continued onto page.  And if you
12   look down, this paper does report odds ratios for talc
13   use; correct?
14      A.  Yes, it does.
15      Q.  And for -- if you look over to the right, all
16   the way to the right, you see that you've reported a
17   1.15 not statistically significant association for
18   serous invasive ovarian cancer; correct?
19      A.  That's correct.
20      Q.  And that's with a CI that crosses 1; correct?
21      A.  That is correct.
22      Q.  And if you look to the left of that, you've
23   reported here a .76 odds ratio for the relationship
24   between talc use and primary peritoneal cancer;
25   correct?

| Page 140 |
| --- |

1       A.  Yes, that's what's reported there based on a
2    quite small sample size.
3       Q.  And, again, both of these associations are
4    not statistically significant; correct?
5       A.  That is correct.
6       Q.  And also I see over here to the left, the
7    category listed here is labeled "Talc use"; correct?
8       A.  Yes.
9       Q.  So this paper looks specifically at talcum
10   powders; is that right?
11      A.  I -- I believe that, in that questionnaire,
12   it was specifically asking about talc use.
13      Q.  And, again, the results of this study are not
14   reported in your report; correct?
15      A.  As I said before when you asked that, the
16   data from the North Carolina Ovarian Cancer are
17   included in the Terry paper that combined data from
18   multiple studies.
19      Q.  On page 11 of your report, Dr. Moorman, you
20   state, in the -- I guess it's the second paragraph
21   down from the top, starting with the "it is important"
22   language.
23      A.  Mm-hmm.
24      Q.  Okay.  And if you look down to the second
25   sentence, you note there that (as read):

| Page 141 |
| --- |

1           "It is not unusual for scientists
2           and epidemiologists to weigh the
3           Hill factors differently in
4           reaching the conclusion."
5           Correct?
6       A.  Yes, I state that.
7       Q.  And then in the next sentence, you go on to
8    provide examples of that; correct?
9       A.  Correct.
10      Q.  And you note there (as read):
11          "The evidence that cigarette
12          smoking causes lung cancer or
13          asbestos causes lung disease."
14          Right?
15      A.  Yes.
16      Q.  And those are the examples that you're
17   providing to support the prior sentence that
18   epidemiologists can sometimes weigh things
19   differently; is that right?
20      A.  I give that as an example, yes.
21      Q.  For the two examples that you've provided
22   there, has the medical and scientific community
23   accepted that smoking causes lung cancer and that
24   asbestos causes lung disease?
25      A.  I think that, yes, that is true.  Now, the

36 (Pages 138 to 141)

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 142

1  point that I am making here is that some scientists,
2  especially in the early years when the data were
3  accumulating related to smoking and lung cancer, some
4  people weighted the evidence differently.
5        For example, some of the studies looked at
6  whether people reported whether or not they inhaled or
7  not, and some funny results were observed there. And
8  some scientists thought that was really important
9  evidence against an association, whereas others
10  thought it was -- it was not to be regarded very
11  seriously.
12     Q. Do you regard the body of evidence on smoking
13  and asbestos to be equivalent to the body of evidence
14  on talc and ovarian cancer with regard to evaluating
15  cause?
16        MS. PARFITT: Objection.
17        THE WITNESS: Could you clarify what
18  you mean by "equivalent"?
19  BY MR. JAMES:
20     Q. Sure. By providing these two examples
21  here -- first, the smoking example, and second, the
22  asbestos example -- are you suggesting that the body
23  of evidence to support the causal conclusion with
24  respect to asbestos and smoking is qualitatively
25  and/or quantitatively the same or similar to the body

Page 143

1  of evidence we have in 2019 as to talc and ovarian
2  cancer?
3     A. To say that it is the same is -- I don't know
4  that you can say that it's the same. It's different
5  studies done in different time frames. The assessment
6  of the exposure is a bit different.
7        So there are similarities and, you know, the
8  criteria that I applied to come to my conclusion of
9  causality, I think, are similar to what has been
10  applied to smoking and lung cancer. But the data are
11  different. There are different studies, different
12  time frame.
13     Q. Would you say that the data on smoking and
14  lung cancer is stronger than the data on talc and
15  ovarian cancer --
16        MS. PARFITT: Objection.
17  BY MR. JAMES:
18     Q. -- to support a causal conclusion?
19     A. I'm not sure why one would make such a
20  comparison of what is stronger or not. I mean,
21  clearly, we know that smoking and lung cancer is one
22  of the strongest associations between an exposure and
23  a cancer.
24        The odds ratio that is associated with talc
25  use and ovarian cancer is not as large, but I think

Page 144

1  that the criteria that I applied to come to a
2  conclusion of causality are based on strong data.
3        MR. JAMES: Object to the nonresponsive
4  answer.
5        THE WITNESS: Maybe you can clarify
6  your question, because I'm -- maybe I didn't
7  understand what you were asking.
8  BY MR. JAMES:
9     Q. Sure. Dr. Moorman, you provided these
10  examples in your report; correct?
11     A. These are examples to make the point that, as
12  we have said here, that some people weigh different
13  parts of the evidence a bit differently.
14     Q. And so if someone who's reading your report
15  gets an impression that you are equating the body of
16  scientific and medical evidence on the issue of
17  smoking and lung cancer to the body of scientific
18  evidence on talc and ovarian cancer, then they would
19  be getting the wrong impression; is that correct?
20        MS. PARFITT: Objection.
21        THE WITNESS: I don't think that I am
22  equating the evidence for the two. I am -- equating
23  the evidence for the two types of cancer. I was using
24  that to illustrate -- to support the sentence right
25  before that, is that, when we look at these Hill

Page 145

1  factors, scientists can look at them and they might
2  weight one more heavily than another.
3  BY MR. JAMES:
4     Q. And you -- you believe that the medical
5  community accepts that smoking is a cause of lung
6  cancer; correct?
7     A. Yes, in general, I think that's true.
8     Q. Does the medical community believe that talc
9  is a cause of ovarian cancer? Is that the medical
10  community's consensus?
11        MS. PARFITT: Objection. Form.
12        THE WITNESS: I'm not sure who you mean
13  by "the medical community." I -- I think that there
14  are certainly -- there's plenty of evidence to support
15  my conclusion. We have evidence very recently from
16  Health Canada that they have come to the same
17  conclusion. So...
18  BY MR. JAMES:
19     Q. Did Health Canada come to a causal
20  conclusion?
21     A. That was my reading of their document.
22     Q. When's the last time you've read the
23  documents from Health Canada?
24     A. Probably within the last few days.
25     Q. Did Plaintiffs' counsel provide those to you?

37 (Pages 142 to 145)

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 146

1    A. Yes, they did.
2    Q. Okay. And your recollection is that the
3  Health Canada documents state that talc is a cause of
4  ovarian cancer?
5    A. I definitely recall them using the "causal"
6  language in the document. If -- we can pull it up if
7  we want to confirm the precise language.
8    Q. Other than identifying Health Canada, which
9  you've just done, are there any other bodies or
10  scientific organizations or medical organizations that
11  you can cite to that have concluded that talc is a
12  cause of ovarian cancer?
13    A. We've already discussed the IARC conclusion
14  that it's possibly carcinogenic.
15    Q. And so, again, I'm asking you about -- sorry.
16    A. Sorry. Go ahead.
17    Q. Sorry. My apologies.
18    A. Okay.
19    Q. Were you done?
20    A. I'm finished.
21    Q. So my question, I think, is different than
22  that the one you're answering.
23    A. Yeah.
24    Q. So I'm asking you if you're aware of any
25  scientific or medical bodies that have concluded that

Page 147

1  talc is a general cause of ovarian cancer.
2    A. I'm not aware of a -- I'm not aware of a
3  statement that has been published, other than the ones
4  that I mentioned.
5    Q. And by others that you mentioned, you're
6  referring to the Health Canada document?
7    A. Yes.
8    Q. Okay. And we will turn back to that, and
9  that way we can have a copy in front of us both.
10  Okay?
11    A. Okay.
12    Q. With regard to IARC, again, you understand
13  that they have concluded "possible." Correct?
14    A. They conclude possible at that point in time,
15  which was 2010.
16    Q. Have you ever looked to see if any medical
17  organizations that represent the gynecologic oncology
18  community have concluded that talc is a cause of
19  ovarian cancer?
20    A. I am aware that, in a recent article in
21  Obstetrics and Gynecology, which is one of the leading
22  journals in the field, they were summarizing some of
23  the information that is new. They were describing the
24  Penninkilampi meta-analysis, and their conclusion was
25  that talc is associated with increased risk for

Page 148

1  ovarian cancer. So...
2    Q. And when you say talc -- sorry. I think
3  you're dropping off a bit, and so I'm jumping in too
4  quickly. And I apologize.
5    Are you done?
6    A. I'm finished, yes.
7    Q. You're referring there to a journal article;
8  is that right?
9    A. It was a summary of -- I think it was
10  something like "What's new in ovarian cancer." It was
11  published maybe --
12    Q. And do you believe the article that you're
13  referring to represents the consensus view of the
14  medical community?
15        MS. PARFITT: Objection. Form.
16        THE WITNESS: I don't know that it does
17  or not. It wasn't presented as the official opinion
18  of that organization.
19  BY MR. JAMES:
20    Q. And the article that you were mentioning, you
21  said increased risk -- or increased association. Is
22  that what you said? I don't have the realtime in
23  front of me right now.
24    A. I don't have it in front of me either.
25    Q. Okay.

Page 149

1    A. I am recalling something like there is --
2  I don't know what the phrasing was. It's associated
3  with increased risk or there is an increased risk of
4  ovarian cancer with talc use.
5    Q. Do you recall if that article made a
6  statement on causality?
7    A. I don't recall.
8    Q. Have you consulted information provided by
9  the ACOG or the SGO with respect to the talc ovarian
10  cancer hypothesis?
11        MS. PARFITT: Objection.
12        THE WITNESS: I don't recall if I have
13  or not.
14  BY MR. JAMES:
15    Q. Would you be interested to know the positions
16  by the leading organizations for the gynecologic
17  oncology community on this issue?
18        MS. PARFITT: Objection. Form.
19        THE WITNESS: Of course. Any
20  information is important to know.
21        MR. JAMES: I'm going to mark as
22  Exhibit No. 18 a copy of a statement issued by ACOG on
23  talc use and ovarian cancer.
24    (Exhibit No. 18 was marked for identification.)
25        MR. JAMES: I'm handing you two copies

38 (Pages 146 to 149)

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 150

1  again.
2  BY MR. JAMES:
3       Q.  Dr. Moorman, have you seen this statement
4  before?
5       A.  I don't recall if I have or not.  I might
6  have.
7       Q.  Do you see at the bottom of the statement --
8  it's a single paragraph -- the statement concludes
9  with the quote (as read):
10           "There was no medical consensus
11           that talcum powder causes ovarian
12           cancer."
13           Do you see where I was reading?
14       A.  I do see that.
15       Q.  Do you disagree with that statement?
16       A.  Again, going back to the recent conclusion
17  from Health Canada, I think that that is some evidence
18  of medical consensus.  And I do acknowledge that
19  this -- what is said here, that -- yeah, I acknowledge
20  what they have written here, yes.
21       Q.  Have you, in preparing your report for this
22  litigation, have you taken a look to see what the
23  National Cancer Institute has said about the purported
24  association between talc and ovarian cancer?
25       A.  Yes, I have.

Page 151

1       Q.  Okay.  And what do they say?
2       A.  I -- when you are -- I think you are
3  referring to the PDQ --
4       Q.  Yes.
5       A.  -- from NCI.
6       Q.  Would you like a copy of it?
7       A.  I would very much like a copy.
8       Q.  Fair enough.
9           Okay.  Dr. Moorman, I'm going to hand you a
10  copy of the NCI PDQ on "Ovarian, Fallopian Tube, and
11  Primary Peritoneal Cancer, Health Professional
12  Version."
13       (Exhibit No. 19 was marked for identification.)
14           THE WITNESS:  Thank you.
15  BY MR. JAMES:
16       Q.  And if you turn to -- this is not paginated,
17  unfortunately -- have you gotten there already?  Or
18  I can count for us.  I flipped seven times to get
19  there.  Looks like you beat me to it.
20       A.  Okay.
21       Q.  And do you see here that is this the PDQ you
22  were thinking of, Dr. Moorman?
23       A.  Yes.
24       Q.  Okay.  And in here, do you see that the NCI
25  has listed perineal talc exposure as a factor with

Page 152

1  inadequate evidence of an association?
2       A.  Yes.
3           And if I may address this document --
4       Q.  If you could give me just one second, and
5  then --
6       A.  Okay.
7       Q.  -- I'll let you finish, if you don't mind.
8       A.  Okay.
9       Q.  Have you considered this before?
10       A.  Have I --
11           MS. PARFITT:  Objection.
12  BY MR. JAMES:
13       Q.  Yes.
14       A.  -- considered it?
15       Q.  In forming your opinions in this case?
16       A.  Yes.
17       Q.  Okay.  It's not cited or discussed in your
18  report, is it?
19       A.  I don't know that I have, but again, it's one
20  of the documents that I have -- I have seen in my --
21  in my work.
22       Q.  And so within your report, you do discuss
23  findings of IARC; correct?
24       A.  Yes.
25       Q.  But you don't discuss findings of the NCI; is

Page 153

1  that right?
2       A.  I don't think that I specifically addressed
3  it.
4       Q.  Is that because it conflicts with your
5  litigation opinion?
6           MS. PARFITT:  Objection.
7           THE WITNESS:  No.
8           May I ask --
9  BY MR. JAMES:
10       Q.  And, Dr. Moorman, you said you wanted to
11  comment, and now is fine.
12       A.  Let's see.  I wanted -- when did you print
13  out this version of the PDQ, if I may ask you?
14       Q.  So do you understand that this is a -- this
15  is a -- well, if you turn to the back page of the copy
16  that I handed you --
17       A.  Mm-hmm.
18       Q.  -- the very back --
19       A.  Okay.
20       Q.  -- it says "Updated: December 21, 2018."
21       A.  Okay.
22       Q.  All the way on the back page.
23       A.  Yeah.
24       Q.  Got it.
25       A.  Okay.  One of the -- I have looked at this

39 (Pages 150 to 153)

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 154

1  very recently, and on the online version, there were
2  some rather what I considered kind of interesting
3  conclusions that were made. I'm actually not seeing
4  it in this version here. But, for example, they --
5  I'm sorry. I don't see it even mentioned here.
6      But on the online version, they had listed
7  DMPA -- depot medroxyprogesterone acetate -- as
8  something that was adequate evidence of reduced
9  effect. And they were basing that -- there are very
10  few studies on that to begin with, and as they
11  summarized it, again, the last time I looked at it
12  online, they said it was inconsistent data, but they
13  still summarized that there was adequate evidence.
14      And then in regard to things like comparing
15  the evidence for something like breastfeeding, they
16  said (as read):
17      "Based on solid evidence,
18       breastfeeding is associated with
19       decreased risk of ovarian cancer."
20      If we compare the evidence to breastfeeding
21  to the evidence for talcum -- talc use, again, the
22  online version that I last looked at, it gave a little
23  bit more detail about the meta-analyses and so on.
24      So the meta-analyses for breastfeeding and
25  the meta-analyses for talc, there were a lot of

Page 155

1  similarities. There are roughly 30 studies addressing
2  each of them. For breastfeeding, it's about a
3  25 percent reduction in risk; for talc, about a
4  25 percent increased risk.
5      When you look at the overall number of
6  studies, roughly 90 percent of them support
7  breastfeeding -- in terms of just looking at the
8  direction of the effect -- about 90 percent of them
9  support that breastfeeding is associated with reduced
10  risk. When you look at the meta-analyses for talc,
11  about 90 percent of the studies have an odds ratio
12  greater than 1.
13      And so when we look at the overall body of
14  evidence, to me, I think it's comparable for
15  breastfeeding versus talc, but they conclude that the
16  evidence is adequate for breastfeeding but not
17  adequate for talc. And they don't really describe
18  their methodology for how they reach their
19  conclusions.
20      So it leaves me just a little bit baffled
21  about why is one adequate evidence and one inadequate
22  evidence.
23      Q. If the NCI's PDQ that's available on their
24  website as of today classifies talc as a factor with
25  inadequate evidence of an association, do you disagree

Page 156

1  with the NCI?
2      A. Okay. Just looking at this, and it came
3  up -- it says "with inadequate evidence of an
4  association."
5      Did you say "adequate" or "inadequate"?
6      Q. I said "inadequate."
7      A. Okay. My judgment based on the evidence is
8  that there is adequate evidence. So I would disagree
9  with the NCI in the conclusion that they reached.
10      Q. With regard to your discussion that we've had
11  just now on the body of evidence to look at
12  breastfeeding and ovarian cancer risk --
13      A. Yes.
14      Q. -- and this is a yes-or-no question -- did
15  you conduct a comprehensive review of the scientific
16  medical literature and evidence surrounding the
17  association between breastfeeding and ovarian cancer?
18      A. I did not do as comprehensive a review of
19  that literature as I did for the talc.
20      Q. And have you, in the course of your career,
21  ever looked comprehensively at the body of scientific
22  and medical evidence surrounding the association of
23  breastfeeding and ovarian cancer to the cell studies,
24  the plausibility, the dose-response, have you done all
25  of that with respect to breastfeeding and ovarian

Page 157

1  cancer?
2      A. I -- in the course of looking at ovarian
3  cancer, I have actually never written a paper that was
4  strictly focused on breastfeeding and ovarian cancer,
5  and that is typically where one would go through the
6  very comprehensive review.
7      I am familiar with much of the literature,
8  but the degree to which I reviewed the literature was
9  not in the same level of detail as I did the talc
10  literature.
11      Q. And do you know if the scientists at the NCI
12  who have commented on the association between
13  breastfeeding and ovarian cancer have conducted an
14  examination of the scientific and medical literature
15  that is more comprehensive, less comprehensive, or the
16  same that you've conducted?
17      MS. PARFITT: Objection to form.
18      THE WITNESS: They do not describe
19  their methodology, and so I can't say if it was more
20  or less comprehensive.
21  BY MR. JAMES:
22      Q. Okay. Dr. Moorman, on page 10 of your
23  report --
24      A. Yes.
25      Q. -- you have the -- it's the third full

40 (Pages 154 to 157)

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 158

1  paragraph down, and you make the statement that
2  meta-analyses are "considered to be some of the
3  strongest evidence for a causal association."
4        Do you see where I'm reading that?
5  A. Yes, I do.
6  Q. Okay.  So that's -- so you've made that
7  comment.
8        And then further down, you say (as read):
9        "Data from meta-analyses are
10        particularly important for
11        evaluating exposure-disease
12        relationships such as talc and
13        ovarian cancer where the relative
14        risks for most individuals are
15        approximately 1.2 to 1.5."
16        Do you see where I've read that?
17  A. Yes, I do.
18  Q. Can you cite any published authority for the
19  statement that meta-analyses are considered to be some
20  of the strongest evidence for causal association?
21  A. I'm trying to think of whether it's a
22  published source.  It's something that I have seen,
23  for example, multiple times in lectures and so on
24  where it will give a hierarchy of evidence.  And
25  meta-analyses combining data from multiple studies is

Page 159

1  often put at kind of the top of the pyramid for making
2  causal assessments.
3        I want to say that maybe some of the
4  evidence-based medicine -- I know that there are
5  online summaries of evidence-based medicine that would
6  describe meta-analyses as kind of some of the
7  strongest evidence for causality.
8  Q. Meta-analyses combine data from underlying
9  studies; correct?
10  A. That is correct.
11  Q. Meta-analyses do not correct for bias and
12  confounding in underlying studies; correct?
13  A. The meta-analysis itself -- no.  They combine
14  the data.  They...
15  Q. And -- were you finished?
16  A. Yeah.  They do not correct for the bias.
17  Q. Meta-analyses, for example, do not eliminate
18  recall bias if there is a recall bias problem in the
19  underlying studies; correct?
20  A. That is correct.  Meta-analyses cannot do
21  that.
22  Q. And the meta-analyses studies that you
23  reviewed and discussed in your report all concede that
24  point, don't they?
25  A. They acknowledge that they are combining the

Page 160

1  data as reported.  It could not correct the bias.
2  Q. So to the extent the meta-analyses are
3  collecting data from underlying studies that are
4  flawed by recall bias or confounding, those
5  inaccuracies carry over into the meta-analyses;
6  correct?
7        MS. PARFITT:  Objection.
8        THE WITNESS:  I would not characterize
9  it as "carry over."  We recognize when we combine the
10  data from the meta-analyses, it is combining the
11  reported data.  If there were biases that either led
12  to an underestimate or an overestimate of the relative
13  risk, they are not correcting that.
14  BY MR. JAMES:
15  Q. And do you caution the reader of your MDL
16  report about that limitation to meta-analyses anywhere
17  in your report?
18  A. I do not specifically make that caution, no.
19  Q. The meta-analyses that we have on the talc
20  ovarian cancer issue, they are progressed over a
21  period of time; correct?
22  A. That is correct.
23  Q. And we know that there's been two recent
24  meta-analyses.  And all of the meta-analyses that have
25  been published on this association are in some ways

Page 161

1  overlapping; correct?
2        MS. PARFITT:  Objection to form.
3        THE WITNESS:  The meta-analyses, their
4  intent is to combine all the published data.  So, yes,
5  there is some overlap.  More recent ones would have
6  included studies that had been published in prior
7  meta-analyses.
8  BY MR. JAMES:
9  Q. And recognizing that meta-analyses can differ
10  here and there for various -- various reasons, the
11  talc ovarian cancer meta-analyses generally pull data
12  from the same body of literature; is that fair?
13  A. Yes.
14  Q. And any suggestion that because you have
15  multiple meta-analyses reaching around the same odds
16  ratio and that that somehow demonstrates consistency,
17  isn't that a little bit misleading?
18        MS. PARFITT:  Objection.  Form.
19        THE WITNESS:  I think that when we look
20  at it, when we see that, early on, you see some
21  meta-analyses were done, I want to say maybe in the
22  '90s, and then as more data are added in, you -- they
23  still settled in on roughly the same summary odds
24  ratio as even more data were accumulated.
25        Sometimes there is a concern that early on

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 162

1 the studies with positive associations are published,
2 and then after -- as time goes on, other studies are
3 done that didn't find that association. So you would
4 expect that the summary odds ratio might become
5 attenuated as more studies were added.
6         And that's not the situation with the talc
7 literature. It's been pretty consistent from the
8 meta-analyses done in the 1990s to the 2000s to 2018.
9 BY MR. JAMES:
10        Q. And the 2018 meta-analyses that they are
11 grabbing in the studies from decades prior, they're
12 grabbing in the same studies that the 1990s
13 meta-analyses grabbed in; right?
14        MS. PARFITT: Objection. Form.
15        THE WITNESS: Yeah. The purpose is to
16 include all of the published data. So yes, of course.
17 BY MR. JAMES:
18        Q. And in your report, you place significant
19 emphasis -- if that's a fair word -- on meta-analyses.
20 Is that a fair way to describe it?
21        MS. PARFITT: Objection.
22        THE WITNESS: Yes, I think I -- I think
23 that's fair to characterize it that way.
24 BY MR. JAMES:
25        Q. You -- did you read the conclusions of all of

Page 163

1 the meta-analyses performed to date?
2        A. I did.
3        Q. Do any of the authors of the meta-analyses
4 performed to date conclude causation?
5        A. If I may take a minute to address the issue
6 of how causation is reported in the epidemiologic
7 literature.
8        Q. With all due respect, Doctor, if you could
9 just answer the question.
10        A. I think that they typically refer to, like,
11 increased risk. I don't know that any of them refer
12 to -- made the conclusion of -- I don't know that they
13 used the word "causal."
14        Q. In fact, many of the meta-analyses
15 specifically caution against a causal interpretation,
16 don't they?
17        MS. PARFITT: Objection.
18        THE WITNESS: Once again, if -- may
19 I take a moment to address how the word --
20 BY MR. JAMES:
21        Q. Because my time is limited --
22        A. Okay.
23        Q. -- I'm really going to have to respectfully
24 ask you to answer my question to the extent that
25 you're able, and then your counsel will have an

Page 164

1 opportunity to ask questions afterwards.
2        A. Some of them did raise some concerns about
3 whether or not it could be a causal association.
4        Q. We're going to take a look at the studies
5 shortly as I grab these folders out.
6        Did you report in your report for the MDL
7 any of the cautionary language from these
8 meta-analyses about causation?
9        A. I -- in my report, when you look at some of
10 the cautionary language, they will refer to perhaps
11 concerns about recall bias or things like that.
12        In my report, I went through potential
13 biases and how I weighed that and whether I thought it
14 was an important concern in the studies that
15 contributed to the meta-analyses.
16        Q. Did you talk about any weaknesses or problems
17 with the meta-analyses themselves?
18        A. I don't believe I did in my report.
19        Q. And just -- okay.
20        MR. JAMES: I'm going to mark as
21 Exhibit No. 20 a meta-analysis that I think that
22 you've mentioned this morning. It's the Penninkilampi
23 study.
24        THE WITNESS: Yes.
25        MR. JAMES: I'm going to hand you two

Page 165

1 copies again.
2        (Exhibit No. 20 was marked for identification.)
3        MR. JAMES: It's marked as Exhibit 20.
4        THE WITNESS: Would this be a good time
5 to take a break before we get into --
6        MR. JAMES: Absolutely.
7        THE WITNESS: Okay.
8        THE VIDEOGRAPHER: Going off record at
9 1:48 p.m.
10        (Recess taken from 1:48 p.m. to 2:03 p.m.)
11        THE VIDEOGRAPHER: Back on record at
12 2:03 p.m.
13 BY MR. JAMES:
14        Q. Dr. Moorman, I handed you had a copy of the
15 Penninkilampi paper.
16        A. I'm sorry, the papers were moved while
17 I was...
18        Q. It was marked as Exhibit 20, I believe.
19        Here, I have an extra, if that would speed
20 things along. I'm sure it's somewhere in there.
21        A. It got moved around. Oh, here it is.
22        Q. Okay. Again, Dr. Moorman, this is one of the
23 meta-analyses that you reviewed to inform your
24 opinions in this case; correct?
25        A. That is correct.

42 (Pages 162 to 165)

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 166

1    Q. It's also one of the more recent
2  meta-analyses on the issue; correct?
3    A. That's correct.
4    Q. And what did the Penninkilampi authors say
5  about causation?
6    A. Okay. They describe perineal talc is
7  associated with a 24 to 39 percent increased risk of
8  ovarian cancer.
9        And this is a very typical way that it would
10  be described in the epidemiologic literature. It --
11  as described very eloquently in some articles in the
12  American Journal of Public Health last spring, they
13  noted that, to the detriment of the science, that
14  epidemiologists are frequently loathe -- or don't
15  often use the word "causal" when they describe a risk
16  factor; and, in part, this is because we are relying
17  on observational data. This is not an experimental
18  study.
19        And so, many times, reviewers, if they refer
20  to "we found that talc caused ovarian cancer," they
21  would object to that, saying that it wasn't a
22  randomized controlled trial.
23        But in this series of articles in the
24  American Journal of Public Health, they indicated that
25  the tendency not to use the word "causal" is to the

Page 167

1  detriment of the science. It's like "Why would we be
2  looking at risk factors for a disease if we didn't
3  think that it caused the disease?"
4        So I think that when an epidemiologist sees
5  an increased risk of ovarian cancer, we are thinking
6  that this is -- this causes ovarian cancer.
7    Q. But epidemiologists, including many of the
8  meta-analyses that we're about to review, have talked
9  about cause, haven't they?
10      MS. PARFITT: Objection.
11      THE WITNESS: Some of them have
12  addressed, yes.
13  BY MR. JAMES:
14    Q. For example, Penninkilampi doesn't seem shy
15  of the word "cause." If we look at page 42,
16  Dr. Moorman, we see, in the top paragraph in the
17  left-hand column, at the bottom of that paragraph, the
18  Penninkilampi authors write, quote -- this is the last
19  sentence --
20    A. Wait. Page 42?
21    Q. Page 42.
22    A. Yes.
23    Q. It's the top left paragraph. The bottom last
24  sentence of that paragraph, the authors state
25  (as read):

Page 168

1        "Hence, while perineal talc use
2        has not been shown to be safe, in
3        a similar regard, a certain causal
4        link between talc use and ovarian
5        cancer has not yet been
6        established."
7      That's what the authors say; correct?
8    A. That's what they say, yes.
9    Q. Okay. So they caution that causation has not
10  been established; correct?
11      MS. PARFITT: Objection.
12      THE WITNESS: They say a certain causal
13  link has not been established -- not yet been
14  established.
15  BY MR. JAMES:
16    Q. And you're here today testifying about what
17  you believe to be evidence supporting the causal link;
18  correct?
19    A. Yes, I am -- I am.
20    Q. Okay. And so where in your report do you
21  advise the reader that the Penninkilampi authors
22  expressed reservations about causation?
23    A. I do not have anything like that in my
24  report.
25      MR. JAMES: The next meta-analysis that

Page 169

1  we can look at is the Berg -- or Berge meta-analysis.
2  I'm going to mark that as Exhibit 21.
3      (Exhibit No. 21 was marked for identification.)
4  BY MR. JAMES:
5    Q. Do the Berge authors conclude that the
6  evidence is sufficient to support a causation
7  conclusion?
8    A. They do not make that conclusion, no.
9    Q. In fact, they actually -- they do address
10  causation, don't they?
11    A. They state their opinion, yes.
12    Q. Okay. And their opinion is expressed several
13  times throughout the article. The first is in the
14  abstract of the article; correct?
15        If we look at the abstract, it's the first
16  page of the article, page 248, the last sentence of
17  the abstract. Do you see that?
18    A. Yes, I do.
19    Q. They say (as read):
20        "The heterogeneity of results by
21        study design, however, detracts
22        from a causal interpretation of
23        this association."
24      Correct?
25    A. That's what it says, yes.

43 (Pages 166 to 169)

Patricia G. Moorman, M.S.P.H., Ph.D.

| Page 170 | Page 172 |
|---|---|
| 1   Q. Where do you advise the reader of your MDL<br>2 report that the authors of the Berge meta-analyses<br>3 expressed reservations about causation?<br>4      MS. PARFITT: Objection. Form.<br>5      THE WITNESS: That is not in my report.<br>6 BY MR. JAMES:<br>7   Q. Do you see at the very end of article, at<br>8 the very last page on 256, before the acknowledgment<br>9 section, again, the authors conclude the article with<br>10 a statement that the results (as read):<br>11      "do not support a causal<br>12      interpretation of the<br>13      association."<br>14   Do you see where I'm reading?<br>15   A. They say some -- several aspects of the<br>16 results there.<br>17   Q. Fair enough.<br>18   A. Yes.<br>19   Q. So let's just read the sentence in full. So<br>20 they say (as read):<br>21      "Several aspects of our results,<br>22      including the heterogeneity of<br>23      results between case-control and<br>24      cohort studies, however, do not<br>25      support a causal interpretation of | 1      MR. JAMES: And I'm going to reserve<br>2 the time that it takes --<br>3      MS. PARFITT: No, you're not going to<br>4 reserve the time. You asked her a question; she was<br>5 answering it.<br>6      MR. JAMES: It was a yes-or-no<br>7 question.<br>8      MS. PARFITT: You can object -- it was<br>9 not, Scott. Let's have her finish her statement, and<br>10 you can decide what you want to do it with it. But<br>11 she's going to finish her comment.<br>12   Dr. Moorman, please.<br>13      THE WITNESS: So I think that in my<br>14 report, I did address the aspects of the heterogeneity<br>15 of the results, although I might not specifically have<br>16 addressed -- said anything specifically about the<br>17 limitation of the Berge.<br>18 BY MS. PARFITT:<br>19   Q. Right. So my question, which was very<br>20 precise, is where do you note in your MDL report the<br>21 causation reservations of the Berge authors?<br>22      MS. PARFITT: Objection.<br>23      THE WITNESS: And as I stated before,<br>24 that is not in -- that specific reservations of the<br>25 Berge authors, I do not have that in my -- in my |

| Page 171 | Page 173 |
|---|---|
| 1      the association."<br>2   That's what they say; correct?<br>3   A. Right.<br>4   Q. And, again, do you advise the readers of your<br>5 MDL report that those are the conclusions of the Berge<br>6 meta-analysis?<br>7      MS. PARFITT: Objection. Form.<br>8      THE WITNESS: I do not specifically do<br>9 that. But in my report, I think that I really address<br>10 some of the heterogeneity of the results between<br>11 case-control and cohort studies and why some of the<br>12 differences might be observed and, for example, some<br>13 of the biases in the cohort studies would lead to an<br>14 underestimate of the --<br>15 BY MR. JAMES:<br>16   Q. And, Dr. Moorman --<br>17      MS. PARFITT: Excuse me --<br>18 BY MR. JAMES:<br>19   Q. -- I'm going to ask you questions about that.<br>20      MS. PARFITT: -- Mr. James, she was in<br>21 the middle of her sentence.<br>22      MR. JAMES: I object to the<br>23 nonresponsive portion of her answer.<br>24      MS. PARFITT: You may, but let her<br>25 complete her answer. | 1 report.<br>2 BY MS. PARFITT:<br>3   Q. The next meta-analyses is -- and I'm working<br>4 backwards chronologically -- is the Langseth<br>5 meta-analyses.<br>6   Are you familiar with that paper?<br>7   A. Yes, I have seen that paper.<br>8      MR. JAMES: And I'm going to mark the<br>9 Langseth paper as Exhibit No. 23.<br>10   (Exhibit No. 22 was marked for identification.)<br>11      MR. JAMES: I'm handing two copies.<br>12      MR. DONATH: 23 or 22?<br>13      MS. BRENNAN: 22.<br>14      MR. JAMES: It's 22. So we'll sub<br>15 stickers.<br>16 BY MR. JAMES:<br>17   Q. So Langseth is 22. Did the authors of<br>18 Langseth conclude that causation is shown? Yes or no,<br>19 please.<br>20   A. They -- if I may take just a moment to read<br>21 through it --<br>22   Q. Sure.<br>23   A. -- as it...<br>24   No, they do not.<br>25   Q. And, in fact, the authors do address the |

44 (Pages 170 to 173)

Patricia G. Moorman, M.S.P.H., Ph.D.

<table>
<tr><td>

Page 174

1  issue of causation on page 359 of the article;
2  correct, under the section "Proposal to research
3  community."
4        Do you see where I am?
5    A. I do see that.
6    Q. Okay. And the authors state (as read):
7        "The current body of experimental
8         and epidemiological evidence is
9         insufficient to establish a causal
10        association between perineal use
11        of talc and ovarian cancer risk."
12   A. That is correct. And, again, noting the date
13  of this paper, 2008. So quite a lot of evidence has
14  emerged since then. And one of the authors on the
15  paper has since concluded that there is sufficient
16  evidence for causality.
17   Q. And you're talking about a paid expert in
18  this case; correct?
19        MS. PARFITT: Objection.
20        THE WITNESS: Dr. Siemiatycki, who's a
21  paid expert, well-respected epidemiologist.
22  BY MR. JAMES:
23   Q. And he's a paid expert in this litigation for
24  the Plaintiffs; correct?
25        MS. PARFITT: Objection.

</td><td>

Page 176

1  conclude that the evidence was sufficient to support
2  causation?
3    A. No, they did not.
4    Q. Okay. And, in fact, the authors did address
5  causation in their paper in the abstract; correct?
6        MS. PARFITT: Objection. Form.
7        THE WITNESS: Yes, they do.
8  BY MR. JAMES:
9    Q. Okay. And at page 195 in the conclusion of
10  the abstract, the authors say (as read):
11        "The available observational data
12        do not support the existence of a
13        causal relationship between
14        perineal talc exposure and
15        increased risk of epithelial
16        ovarian cancer. Selection bias
17        and uncontrolled confounding may
18        account for the positive
19        associations seen in prior
20        epidemiological studies."
21      That's what the authors say; correct?
22   A. That is what these authors say.
23   Q. And did you report to the reader of your MDL
24  report the Huncharek authors' reserved judgment on
25  causation?

</td></tr>
<tr><td>

Page 175

1        THE WITNESS: That is correct.
2  BY MR. JAMES:
3    Q. Where in your report -- and this is a
4  yes-or-no question, or actually it's not "yes" or
5  "no." You tell me if it exists or not.
6        Where in your report do you show to the
7  reader of the report that the Langseth authors
8  reserved judgment on causation?
9        MS. PARFITT: Objection to form.
10        THE WITNESS: I did not specifically
11  include that in my report.
12  BY MR. JAMES:
13   Q. Dr. Moorman, have you reviewed the Huncharek
14  2003 meta-analyses?
15   A. Yes, I have.
16        MR. JAMES: And I'm going to mark the
17  Huncharek 2003 meta-analyses as Exhibit No. 23, and
18  we'll switch stickers at the break.
19   (Exhibit No. 23 was marked for identification.)
20  BY MR. JAMES:
21   Q. I'm handing you two copies, Dr. Moorman.
22      Is this another meta-analysis that you
23  reviewed in forming your opinions in this case?
24   A. Yes, it is.
25   Q. Okay. Did the authors of this meta-analysis

</td><td>

Page 177

1        MS. PARFITT: Objection.
2        THE WITNESS: As with the other
3  meta-analysis, this is now 16 years old, and I did not
4  specifically report that, but I did consider in my
5  report the biases and uncontrolled confounding that
6  they were concerned about.
7  BY MR. JAMES:
8    Q. Do any of the -- there are a handful of
9  meta-analyses that precede the Huncharek 2003
10  meta-analyses; correct?
11   A. That is correct.
12   Q. Do any of those meta-analyses conclude
13  causation?
14        MS. PARFITT: Objection. Form.
15        THE WITNESS: I don't believe that they
16  do.
17  BY MR. JAMES:
18   Q. And returning back to our discussion on the
19  Langseth meta-analyses, you noted sort of -- when I
20  asked you a question about their conclusions on
21  causation, you noted the timing of the article;
22  correct?
23   A. Yes.
24   Q. You noted that the article was published
25  in --

</td></tr>
</table>

45 (Pages 174 to 177)

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 178

1      A. 2008.
2      Q. -- 2008?
3      A. Yes.
4      Q. That is right?
5      So is your opinion that the evidence in 2008
6  was, in fact, insufficient to support a causal
7  conclusion but has now transitioned to a status where
8  it is sufficient?
9          MS. PARFITT: Objection. Form.
10         THE WITNESS: You have asked me that
11 question in -- that or a similar question before.
12         There is a growing body of evidence.
13 I would be hard-pressed to say at what point in time,
14 you know, it reached the tipping point where there is
15 enough evidence to say that there is this causal
16 association.
17         At this point in time, I feel very confident
18 in saying that, but I can't say when sufficient data
19 accumulated to say that. I think that's an impossible
20 answer -- or an impossible question to answer.
21 BY MR. JAMES:
22     Q. And the reason I asked it again is because
23 you made the qualification in discussing the Langseth
24 paper. When I asked you about the authors'
25 conclusions on causation, you specifically noted that

Page 179

1  it was a paper from the 2008 time frame; correct?
2      A. Right. And I think that -- I think that it
3  is obvious that one of the authors, considering all
4  the additional data that's accumulated, would -- has
5  made a different conclusion at this point in time.
6      Q. And the author you're referring to there is
7  the author that we were discussing as a paid expert in
8  this case; correct?
9          MS. PARFITT: Objection. Form.
10         THE WITNESS: Yes. We established he
11 is a paid expert and, at the same time, a very
12 well-respected epidemiologist.
13 BY MR. JAMES:
14     Q. There's also a pooled analysis that you
15 looked at to inform your opinions in this case;
16 correct?
17     A. Yes.
18     Q. Okay. And the pooled analysis is the Terry
19 2013 paper?
20     A. That is correct.
21     Q. Okay. Did the Terry 2013 paper conclude
22 cause?
23         MS. PARFITT: Objection. Form.
24 BY MR. JAMES:
25     Q. It's yes or no.

Page 180

1      A. No --
2          MS. PARFITT: Objection.
3          THE WITNESS: -- for the same reasons
4  I described prior.
5          MR. JAMES: And I'm going to mark the
6  2013 Terry paper as Exhibit 24.
7      (Exhibit No. 24 was marked for identification.)
8          MR. JAMES: I think I'm back on track
9  on the numbers. I'm handing you two copies.
10 BY MR. JAMES:
11     Q. And again, Dr. Moorman, you've used this
12 paper to inform your opinions in the case; correct?
13     A. That is correct.
14     Q. And if you look at the last page of the text
15 on 820 with me, you see in the last paragraph, which
16 is -- the last paragraph on page 820, the authors
17 state at the top right-hand column (as read):
18         "More work is needed to understand
19         how genital powders may exert a
20         carcinogenic effect and which
21         constituents may be involved."
22         Do you see that sentence?
23     A. Yes, I do.
24     Q. There, the authors are again noting that --
25 let me rephrase it this way.

Page 181

1          The authors there are reserving judgment on
2  causation; correct?
3          MS. PARFITT: Objection. Form.
4          THE WITNESS: I don't think that that
5  is how I would necessarily interpret that.
6  BY MR. JAMES:
7      Q. Okay.
8      A. I think that, first of all, basically, any
9  scientific paper concludes with "more work is needed."
10 And so it's talking about, you know, trying to advance
11 scientific knowledge by understanding the biological
12 mechanism.
13         But I don't see anything -- any statement
14 there related to causal. It says "small to moderate
15 increased risk of ovarian cancer." And as I've stated
16 previously, basically, when we talk about risk
17 factors, we are thinking that this is something that
18 causes this cancer.
19     Q. So in your professional opinion, the word
20 "risk factor" is equivalent to "causation"?
21     A. Not always equivalent. And if I may give an
22 example.
23         Women who have higher educational level are
24 at increased risk for breast cancer. And so higher
25 education level, we might describe it as a risk factor

46 (Pages 178 to 181)

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 182

1   for breast cancer.  But, clearly, going to college is
2   not going to cause breast cancer.  It's the other
3   factors that are associated with it, like your
4   childbearing patterns, alcohol use, other things.
5          But when we talk about a risk factor and
6   there is a plausible biological mechanism to get from
7   that exposure to cancer, I think that "risk factor"
8   and "cause" are pretty synonymous.
9       Q.  But to say something is associated in
10  epidemiologic literature is not to say that it's
11  causal.
12         Do you agree with that?
13         MS. PARFITT:  Objection.
14         THE WITNESS:  Yes.  That's kind of
15  epi 101, that everything that is associated is not
16  necessarily a cause.
17  BY MR. JAMES:
18      Q.  To reach a causal conclusion, it's -- one
19  must undertake a more in-depth analysis; correct?
20      A.  As I did for this, and as all of us in this
21  room are well aware, the Bradford Hill framework is a
22  framework for taking the data and leading to making a
23  judgment on causality.
24      Q.  So if a paper refers to something as a risk
25  factor or a potential risk factor or a modifiable risk

Page 183

1   factor, that terminology by itself does not suggest
2   that the authors of that paper have concluded
3   causation; correct?
4       A.  I -- I think that I have answered that
5   question already.
6          When they're -- if they refer to it as a
7   risk factor, they may or may not have gone through the
8   full Bradford Hill evaluation of it.  And then, also,
9   some things that we refer to as risk factors, where
10  there is not a plausible biological mechanism, we
11  wouldn't equate risk factor and cause in that
12  situation as well.
13      Q.  So you -- returning back to the Penninkilampi
14  meta-analysis, which I believe will be somewhere in
15  that pile --
16      A.  Mm-hmm.
17      Q.  -- you cite Penninkilampi 14 times in your
18  report.
19         Were you aware of that?
20      A.  I don't know how many times I've cited it.
21      Q.  It's one of the most cited articles in your
22  report.
23         Were you aware of that?
24      A.  I know that I referred to it frequently
25  because it is one of the most up-to-date, most recent

Page 184

1   meta-analyses.
2       Q.  Are you aware of any flaws in the
3   Penninkilampi study?
4          MS. PARFITT:  Objection.  Form.
5          THE WITNESS:  Overall, I felt like it
6   seemed to be a very well done meta-analysis.  When we
7   look at judgments of meta-analyses, we like to see
8   things like, you know, what were the search terms they
9   used?  What were the criteria for including or
10  excluding studies?  Were the study questions defined
11  in advance?
12         And when I look through all of that,
13  I judged it overall to be a very well done
14  meta-analysis.
15  BY MR. JAMES:
16      Q.  And so your answer to the question that
17  I asked is no; correct?
18         MS. PARFITT:  Objection.
19         THE WITNESS:  I -- I don't see any
20  serious problems with any -- you characterized it as
21  "flaws."  I don't -- I don't see anything that I would
22  characterize as a flaw in their methodology.
23  BY MR. JAMES:
24      Q.  If you look at page 47 with me, Dr. Moorman,
25  in the "Conclusions" section.

Page 185

1          The conclusions section, I think you had
2   previously read in the first sentence of the
3   conclusions, the percentage increased risk reported in
4   the paper.
5          The second sentence says (as read):
6          "While the results of case-control
7          studies are prone to recall bias,
8          especially with intense media
9          attention following the
10         commencement of litigation in
11         2014, the confirmation of an
12         association in cohort studies
13         between perineal talc use and
14         serous invasive ovarian cancer is
15         suggestive of a causal
16         association."
17      Q.  Do you see where I was reading?
18      A.  Yes, I do.
19      Q.  Okay.  So here we see that Penninkilampi is
20  acknowledging the recall bias problems of the
21  case-control studies; correct?
22      A.  They are acknowledging that it is a
23  possibility.
24      Q.  Okay.
25      A.  Okay.

47 (Pages 182 to 185)

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 186

1    MS. PARFITT:  Wait.  Are you still --
2  thank you.
3    Please, finish.
4    THE WITNESS:  Yes.  And, you know, this
5  is, again, one of the things that I addressed in my
6  report.  I very carefully considered recall bias and
7  how it could have contributed or not to the elevated
8  risk that has been seen across so many studies.
9  BY MR. JAMES:
10    Q.  And one of the -- so within the sentence
11  "after acknowledging the recall bias" that we just
12  discussed, the Penninkilampi authors emphasize the
13  confirmation of an association in cohort studies.
14    Do you see that?
15    A.  I do.
16    Q.  Okay.  Are there cohort studies that support
17  the association?
18    A.  There are three cohort studies that have
19  examined talc use and ovarian cancer, and you're
20  probably very much aware of them:  the Gonzalez study,
21  the Houghton -- which was from the Sister Study -- the
22  Houghton study, the Women's Health
23  Initiative; and the Nurses' Health Study, which has
24  been published in several of them.
25    And as they indicate in here, when you look

Page 187

1  at the studies that reported on invasive serous -- and
2  if you will give me just a second here -- find it on
3  this paper.  Okay.
4    When they report in Table 2 that combining
5  the two studies that reported on the histologic
6  subtypes, there was a significantly increased risk of
7  serous invasive cancer in the cohort studies as well
8  in the case-control studies.
9    Q.  Sorry.
10    A.  Okay.
11    Q.  You did pause there.
12    A.  I did.
13    The one study that really found no
14  association whatsoever with talc was the Gonzalez
15  study, the Sister Study, that has numerous problems
16  with it, most specifically in their assessment of the
17  talc exposure, the sample size, the duration of
18  follow-up.
19    Q.  And returning to my question about this
20  article, were you aware that the Penninkilampi authors
21  didn't factor in the Gates 2010 data at all?
22    A.  When one does a meta-analysis, sometimes when
23  data are reported in a couple of reports, you have to
24  make a decision about which one to include.
25    I believe they used data from the -- I'm not

Page 188

1  entirely sure of their rationale for why they looked
2  at one rather than the other.  There were some
3  differences between the studies; like the later study,
4  the unexposed group was actually women who had used it
5  for less than once a week rather than never used.  And
6  so they don't really go into the detail why they made
7  that decision.
8    But investigators will make a judgment
9  sometimes about which of a -- which studies to include
10  when there's more than one publication from a given
11  study.
12    Q.  And do you know that with respect to the NHS
13  cohort, they have published two studies arising from
14  the NHS cohort looking at the issue of talc and the
15  ovarian cancer association; correct?
16    MS. PARFITT:  Objection.  Form.
17    THE WITNESS:  They actually -- they
18  have published two studies, and data from the Nurses'
19  Health Study was also included in at least one other
20  publication.  I believe Cramer was -- I'm not sure if
21  he was the first author or one of the authors where
22  they combined data.
23  BY MR. JAMES:
24    Q.  The NHS cohort has published two papers with
25  respect to the talc/ovarian cancer association;

Page 189

1  correct?
2    A.  I just answered the question.  It's -- data
3  from it was also in another -- in another publication.
4    Q.  The Gertig 2000 paper reported on the
5  talc/ovarian cancer association; correct?
6    A.  Yes.
7    Q.  And that's an NHS publication; correct?
8    A.  It is.
9    Q.  The Gates 2010 paper reported on talc/ovarian
10  cancer association; correct?
11    A.  That is correct.
12    Q.  And that's an NHS publication; correct?
13    A.  Correct.
14    Q.  An NHS publication of 2010 offered an
15  additional ten years of follow-up to the talc/ovarian
16  cancer hypothesis; correct?
17    MS. PARFITT:  Objection.  Form.
18    THE WITNESS:  It was additional
19  follow-up, but no update on exposure during that
20  time -- period of follow-up.
21  BY MR. JAMES:
22    Q.  For that period of follow-up, they followed
23  the study participants for an additional ten years;
24  correct?
25    MS. PARFITT:  Objection.  Form.

48  (Pages 186 to 189)

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 190

1    THE WITNESS: Yes. I answered that
2  already. Yes.
3  BY MR. JAMES:
4    Q. And you agree more follow-up for a cohort is
5  better; correct?
6    MS. PARFITT: Objection. Form.
7    THE WITNESS: In general, longer
8  follow-up would be desirable. However, when they're
9  not updating exposure information, that could -- that
10 creates a bias, a possible bias.
11 BY MR. JAMES:
12   Q. Do you think the 2010 data and the Gates
13 paper with respect to the talc ovarian cancer issue is
14 superior to the 2000 data in the Gertig 2000 paper?
15   MS. PARFITT: Objection. Form.
16   THE WITNESS: I already made the point
17 that how they define the unexposed group was different
18 between the two studies; and so including some women
19 who had low levels of exposure in their unexposed
20 group, that could potentially have had the effect of
21 attenuating the association.
22   And so, you know, longer follow-up is
23 generally better, but some of the other things they
24 did, that's -- they were not so good.
25

Page 191

1  BY MR. JAMES:
2    Q. Elsewhere in your report, you do complain
3  about lack of follow-up in the cohort studies, don't
4  you?
5    A. I do mention that as one of the limitations,
6  yes.
7    Q. And you specifically discuss the NHS cohort
8  as having a period of -- I believe you say it's
9  14 years; is that right?
10   A. From -- yeah. I -- I can't remember
11 specifically. It's from the 1980s to -- I don't
12 remember the exact date of the last -- the last date
13 of follow-up in their papers.
14   Q. And, again, that's the exposure period that
15 Penninkilampi is looking at as well; correct?
16   Or excuse me, not the exposure period, the
17 period of time that they follow the study
18 participants; correct?
19   Penninkilampi is looking at from
20 questionnaire to 2000; correct?
21   A. Correct.
22   Q. Okay. And when you say in your report that
23 the NHS study has a 14-year follow-up period, that's
24 what you're looking at too, as well; correct?
25   A. Right. From the time of exposures --

Page 192

1    Q. So one of your complaints --
2    A. So I --
3    Q. Sorry.
4    A. Okay.
5    Q. One of your issues with the cohort studies is
6  lack of follow-up; correct?
7    A. For -- yes, for -- there are -- it's one of
8  several concerns I have about the cohort studies.
9    Q. And the Penninkilampi study did not factor in
10 the additional period of follow-up through the 2010
11 paper; correct?
12   A. I don't believe they did. I think they went
13 with the earlier study.
14   Q. In fact, they didn't even cite to the Gates
15 2010 data, did they?
16   MS. PARFITT: Objection.
17   THE WITNESS: No, they -- they didn't.
18 BY MR. JAMES:
19   Q. And they didn't offer any explanation about
20 why they went with the earlier study, did they?
21   A. Not that I recall.
22   Q. And do you understand that in the 2010 NHS
23 paper through Gates, the association with serous
24 ovarian cancer washed out?
25   MS. PARFITT: Objection to form.

Page 193

1    THE WITNESS: "Washed out," I don't
2  like that term. But again, I fully acknowledge that
3  the later study showed weaker associations, yes.
4  BY MR. JAMES:
5    Q. And the association for serous invasive
6  ovarian cancer in the Gates 2010 paper was not
7  statistically significant; correct?
8    A. I believe that is correct.
9    Q. So when you include the critique in your
10 report about the follow-up being a 14-year period, you
11 also, like Penninkilampi, aren't crediting the
12 additional ten years of follow-up that the Gates paper
13 published on; correct?
14   MS. PARFITT: Objection to form.
15   THE WITNESS: "Aren't crediting the
16 additional ten years of follow-up."
17   You know, as I have stated before, when
18 people do meta-analyses, they will make decisions
19 about which studies to include. I acknowledge that
20 Penninkilampi didn't describe in detail why they went
21 with the Gertig rather than a later study.
22   My understanding, however, is that other
23 people -- other meta-analyses have looked at -- have
24 included the later study, and the overall conclusions
25 were not changed in any real way.

49 (Pages 190 to 193)

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 194

1  BY MR. JAMES:
2     Q. Well, Penninkilampi, you say, didn't describe
3  in detail about why they went with the earlier study,
4  but, in truth, they didn't describe it at all.
5         MS. PARFITT: Objection.
6         THE WITNESS: That's -- that's correct.
7  BY MR. JAMES:
8     Q. And when you refer to other studies that
9  have, in fact, looked at the Gates 2010 cohort data
10 that provides a longer period of follow-up, those
11 papers have necessarily noted that the serous
12 relationship found in Gertig 2000 disappeared in 2010;
13 correct?
14        MS. PARFITT: Objection. Form.
15        THE WITNESS: Can you -- can we -- tell
16 me which -- specifically which article you're --
17 BY MR. JAMES:
18    Q. Sure. Let's turn to the Berge article.
19    A. Okay.
20    Q. The Berge article was marked as
21 Exhibit No. 21. And you have it before you, Doctor?
22    A. I do.
23    Q. Okay. And if you turn to Figure 2, which is
24 on page 254, do you see that there that in the forest
25 plot, they have listed the cohort studies at the

Page 195

1  bottom; correct?
2     A. Correct.
3     Q. Okay. And there they report data from the
4  Gates 2010 study; correct?
5     A. Correct.
6     Q. Okay. They do not report the data from the
7  Gertig 2000 paper; correct?
8     A. That is correct.
9     Q. And if you look at the conclusions of the
10 Berge authors -- and we talked about this before --
11 but if you look at the abstract of the paper,
12 Dr. Moorman, the authors say (as read):
13        "The heterogeneity of results by
14        study design, however, detracts
15        from a causal interpretation of
16        this association."
17 Do you see that?
18    A. Yes. You've asked that before. Yes.
19    Q. And what the authors there are saying is that
20 the results from the case-control studies, the
21 meta-analyses of the case-control studies, and the
22 results of the meta-analyses of the cohort studies are
23 different; right?
24        MS. PARFITT: Objection.
25        THE WITNESS: They -- yes.

Page 196

1  BY MR. JAMES:
2     Q. They're heterogeneous. Did I pronounce that
3  correctly?
4     A. No. Heterogeneous.
5     Q. Heterogeneous. Thank you. I figured I got
6  that wrong.
7        So what they're saying there is that the
8  results by the study design are different; right?
9     A. That's -- yes, that's what they are saying.
10    Q. And here we see, again, that this study used
11 the more recent data; correct?
12        MS. PARFITT: Objection. Form.
13        THE WITNESS: It used the more recent
14 publication from the Nurses' Health Study, yes.
15 BY MR. JAMES:
16    Q. Which includes the more recent data; correct?
17        MS. PARFITT: Objection.
18        THE WITNESS: Yes.
19 BY MR. JAMES:
20    Q. On page 8 of your report, Dr. Moorman, you
21 say at the bottom paragraph (as read):
22        "Cohort studies and case-control
23        studies each have advantages and
24        disadvantages for assessing talc
25        as a risk factor for ovarian

Page 197

1        cancer, and one study design is
2        not clearly superior to the
3        other."
4     Do you see where I was reading that?
5     A. Yes, I do.
6     Q. So your expert opinion in this case is that
7  the cohort studies on talc ovarian cancer and the
8  case-control studies on talc ovarian cancer are on
9  equal footing?
10    A. I think -- again, using terminology like
11 "equal footing," it's -- I wouldn't really describe it
12 like that.
13        I think that case-control studies and cohort
14 studies are both well-established, well-accepted
15 methods for studying cancer epidemiology. There are
16 strengths and weaknesses to each design, as I have
17 indicated here. And some of them very -- some of the
18 strengths and weaknesses are very specific to this
19 exposure and outcome.
20    Q. Doesn't the body of talc ovarian cancer
21 literature that you've looked at for your MDL opinions
22 emphasize the importance of cohort data on the issue?
23        MS. PARFITT: Objection. Form.
24        THE WITNESS: I considered all of the
25 epidemiologic data; and when we look at the body of

50 (Pages 194 to 197)

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 198

1  literature, more of the literature comes from
2  case-control studies than from cohort studies.  So all
3  of the data are important.  There just happen to be
4  more case-control studies than cohort studies.
5  BY MR. JAMES:
6      Q.  But your testimony is that the cohorts are
7  not superior to the case-controls, and the
8  case-controls are not superior to the cohorts;
9  correct?
10      A.  As I describe in my report -- the same page,
11  I say (as read):
12          "Rather than making a judgment
13          based only on the overall study
14          design, the evaluation and
15          interpretation of the findings of
16          the studies must consider the
17          strengths and weaknesses of the
18          individual studies."
19          And I think that I did consider that.
20  I considered strengths and weaknesses of the cohort
21  studies.  I considered strengths and weaknesses of the
22  case-control studies.
23      Q.  And you're not claiming that the study design
24  of these studies -- the cohort versus the
25  case-control -- one is superior to the other?  You're

Page 199

1  not claiming that?
2          MS. PARFITT:  Objection.  Asked and
3  answered several times.
4          THE WITNESS:  Right.  I -- again,
5  I think that I have answered that, that they -- the
6  study designs are both well-accepted study designs;
7  they have advantages and disadvantages; and so you
8  have to look at some of the specific characteristics
9  of the individual studies.
10  BY MR. JAMES:
11      Q.  And so the body of talc literature that
12  you've looked at, whether it be cohort studies,
13  meta-analyses, case-control studies, are you aware
14  that body of literature has generally emphasized
15  the importance of cohort data on this topic?
16          MS. PARFITT:  Objection.  Misstates the
17  record -- scientific record.
18          THE WITNESS:  I am aware -- I have read
19  some studies that mistakenly say that the cohort
20  studies, because they involve 40,000 or 60,000 people,
21  that they provide more of the evidence than all the
22  case-control studies, which are generally smaller.
23          However, just, again, to take the example of
24  the Gonzalez sisters study, that's a cohort with
25  40,000 people in it, but there were only 154 cases.

Page 200

1  And it's the number of cases rather than the overall
2  size of the cohort that contributes to the statistical
3  power.  And that doesn't address all the other
4  problems with that study.
5          But sometimes people will mistakenly say
6  these large studies -- you know, this large study,
7  40,000 people, and they didn't find an association.
8  But they're not looking into all the limitations of
9  that particular study.
10  BY MR. JAMES:
11      Q.  Okay, Dr. Moorman, I'm going to object to the
12  nonresponsive nature of your answer.
13      A.  I -- I think that I was responsive, but
14  please ask your question again.
15      Q.  Okay.  So the question that I asked you is
16  whether you are aware that the body of literature that
17  you've looked at has generally emphasized the
18  importance of cohort data on this topic.  The answer
19  is yes or the answer is no.
20          MS. PARFITT:  The answer is -- first,
21  I object to the question.  And the witness has
22  answered the question several times.  Your time.
23  You're on your clock.
24  BY MR. JAMES:
25      Q.  Are you aware that the body of literature has

Page 201

1  emphasized the importance of cohort data?  Are you
2  aware of that?  Yes or no?
3          MS. PARFITT:  Objection.
4          THE WITNESS:  I -- I disagree that --
5  your characterization of it.
6  BY MR. JAMES:
7      Q.  Then, the answer is no.
8      A.  No.  You asked am I aware --
9      Q.  The answer is yes or it's no, Dr. Moorman.
10  I have limited time to ask questions today.
11          Were you aware -- are you aware that the
12  body of literature on talc and ovarian cancer has
13  emphasized the importance of cohort data on this
14  topic?
15          MS. PARFITT:  Objection.  Form.
16          THE WITNESS:  I don't think --
17          MS. PARFITT:  Asked and answered.
18          THE WITNESS:  -- the statement is true.
19  I think that the --
20  BY MR. JAMES:
21      Q.  So then the answer is no.
22          MS. PARFITT:  Stop.  Let her answer.
23          THE WITNESS:  No.  You're asking me if
24  I'm aware --
25          MS. PARFITT:  Why do you ask her the

51 (Pages 198 to 201)

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 202

1    same question?
2         THE WITNESS:  -- that this has
3    emphasized that.  And I don't think that is it at all.
4         I think that the body of literature
5    emphasizes again and again and again that of the
6    roughly 25 to 30 studies, only three of them are
7    cohort studies.
8         It's part of the data on the topic, but it's
9    just part of it.  So to say that it has emphasized the
10   importance of cohort data, I don't agree with that
11   statement.
12   BY MR. JAMES:
13        Q.  I marked the Houghton WHI study as
14   Exhibit No. 25, and I'm going to hand you two copies.
15        (Exhibit No. 25 was marked for identification.)
16             THE WITNESS:  Thank you.
17   BY MR. JAMES:
18        Q.  All right.  Dr. Moorman, you see here in the
19   abstract, the "Background" section of the paper, the
20   authors of the WHI study in 2014 say that (as read):
21             "The purpose of this analysis was
22             to assess perineal powder use and
23             risk of ovarian cancer
24             prospectively."
25        Correct?

Page 203

1         A.  That is what it says, yes.
2         Q.  Okay.  And if we look towards page 5, we see,
3    at the top of the left-hand column, the authors there
4    emphasize (as read):
5             "The prospective nature of our
6             study would eliminate the
7             potential for recall bias."
8         Do you see that?
9         A.  I do see that.
10        Q.  Do you agree with that general proposition?
11   "Yes" or "no"?
12        A.  It eliminates the potential for recall bias.
13   It does not eliminate the potential for inaccurate
14   recall.
15        Q.  And if you look at page 4, it's the preceding
16   set of sentences, the authors note -- quote -- at the
17   bottom of the right column (as read):
18             "One potential reason that
19             case-control studies have found
20             slight increases in risk is the
21             potential for an overestimation of
22             the true association due to recall
23             bias, because the participants are
24             aware of their ovarian cancer
25             status when reporting powder

Page 204

1             exposure."
2         Do you see where I read that?
3         A.  I do.
4         Q.  Okay.  Again, do you agree with that
5    statement as a general proposition?
6         A.  I would like to point out there are --
7    potential reason, a potential for an overestimation.
8    And in my own report, I acknowledge the potential for
9    recall bias, and I go back to explain why I don't
10   think that recall bias is a full explanation for this
11   association.
12        Q.  Nevertheless, you will agree with me that the
13   authors of this paper are acknowledging the importance
14   of cohort data?  Agree?
15             MS. PARFITT:  Objection.
16             THE WITNESS:  As you would expect the
17   investigators on a cohort study to do.
18   BY MR. JAMES:
19        Q.  And the answer was yes --
20        A.  Yes.
21        Q.  -- comma, as you would expect?
22             MS. PARFITT:  Objection.
23             THE WITNESS:  Yes.
24             MR. JAMES:  I'm going to mark as the
25   next exhibit the Gertig 2000 paper, which is

Page 205

1    Exhibit No. 26.
2         (Exhibit No. 26 was marked for identification.)
3    BY MR. JAMES:
4         Q.  Again, this is the NHS 2000 paper; correct?
5         A.  That is correct.
6         Q.  And we see that in the abstract of this
7    cohort paper, the authors state at the -- well, it's
8    not in the abstract -- it's right above the "Methods"
9    section, the authors state (as read):
10             "Despite the relative consistency
11             among studies, the limited
12             supporting biologic evidence,
13             together with the possibility of
14             recall and selection bias in
15             case-control studies, has raised
16             questions about the plausibility
17             of the association.  We,
18             therefore, prospectively examined
19             the relationship between perineal
20             talc use and ovarian cancer risk
21             in a large cohort of US women."
22        Do you see where I read that?
23        A.  Yes, I do.
24        Q.  And again, methodologically, the authors of
25   this cohort paper are emphasizing the importance of

52 (Pages 202 to 205)

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 206

1  cohort data on the topic; correct?
2         MS. PARFITT: Objection.
3         THE WITNESS: Yes. Again, they
4  emphasize the importance of doing it prospectively, as
5  you would expect the investigators on a cohort study
6  to do.
7  BY MR. JAMES:
8      Q. Do you think that's just because there's some
9  sort of subjective bias the authors of that cohort
10 paper have towards cohorts? Do you think that's just
11 their personal opinion?
12        MS. PARFITT: Objection.
13        THE WITNESS: I have no way of knowing
14 what their opinion is.
15 BY MR. JAMES:
16     Q. A number of the meta-analyses that we've
17 looked at today and that you looked at to inform your
18 report have also talked about the benefits of cohort
19 data. And I've asked that question before, and that's
20 where we -- that's where we sort of ran into issues,
21 so I'll just strike that question.
22        If you can turn to -- back to the
23 Penninkilampi study. And the Penninkilampi study is
24 the recent meta-analysis that you cited 14 times in
25 your report; correct?

Page 207

1         MS. PARFITT: Objection. Form.
2         THE WITNESS: As stated below -- or
3  stated above, I have cited it. I don't know how many
4  times.
5  BY MR. JAMES:
6      Q. And meta-analyses also are what you refer to
7  in your report as some of the strongest evidence;
8  correct?
9      A. Yes, that is correct.
10     Q. Okay. And so the authors of this
11 meta-analysis, on page 47 in the conclusion section,
12 which we have looked at already, again note that
13 case-control studies are "prone to recall bias";
14 right?
15     A. That's what it says, yes.
16     Q. Okay. And then if you continue on past the
17 section that we've already read -- and actually, it
18 begins at the bottom of page 47 and carries to 48 --
19 but the authors state (as read):
20        "Additional epidemiologic evidence
21        from prospective studies with
22        attention to effects within
23        ovarian cancer subtype is
24        warranted."
25        So here the authors of Penninkilampi are

Page 208

1  again stressing the desire for cohort data on this
2  topic; correct?
3         MS. PARFITT: Objection. Misstates the
4  evidence.
5         THE WITNESS: When -- if we were to
6  look at a cohort study where women were enrolled in
7  the study early in their life when they started using
8  talc and they were followed throughout their life and
9  exposure information was updated throughout the period
10 of follow-up and you followed them for 50 years, that
11 would be a wonderful way -- a stronger design than to
12 do a case-control study. So I could not disagree with
13 that.
14        But we're being asked to make a judgment on
15 the data that we have here -- here and now, not
16 something that's decades away.
17 BY MR. JAMES:
18     Q. Do you agree that case-control studies are
19 low-level evidence?
20     A. No, I do not agree with that.
21     Q. Do you know that the Penninkilampi authors
22 referred to case-control studies as low-level
23 evidence?
24     A. I see that in their paper.
25     Q. Do you --

Page 209

1      A. I --
2      Q. I'm sorry.
3      A. I will disagree with that. It's -- just
4  using the example of my own study, the AACES study.
5  Of all the studies that have looked at talc and
6  ovarian cancer, I believe that one is the one that has
7  been most recently funded. So about 2009, 2010. It's
8  quite an expensive study, and I can't imagine that the
9  National Cancer Institute would have invested that
10 much money in the study if they thought that we were
11 only going to get low-level evidence.
12        MS. PARFITT: Scott, we've been going
13 about an hour and ten.
14        You may want to keep going? Just let me
15 know.
16        THE WITNESS: I could use a break.
17        MR. JAMES: May I finish this line? Is
18 that okay with you?
19        THE WITNESS: Yes.
20        MR. JAMES: Everyone?
21        MS. PARFITT: Sure.
22 BY MR. JAMES:
23     Q. Dr. Moorman, if you can turn with me to the
24 Langseth study. It's Exhibit 22. And this will be
25 the last series of questions, and then we'll take our

53 (Pages 206 to 209)

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 210

1  break.
2      A.  Langseth -- okay.  The exhibit number is
3  incorrect.
4      Q.  Oh, you're right.  And I'm going to fix that
5  at break.  Thank you.
6      A.  Okay.
7      Q.  If you turn with me to page -- well, you
8  don't have to turn.  It's page 358.  It's the first
9  page of the article.  And, again, Langseth is one of
10  the meta-analyses upon which you rely; correct?
11     A.  Correct.
12     Q.  And the meta-analyses authors here say, in
13  the left-hand column at the bottom, the second
14  sentence of the bottom paragraph, they say (as read):
15         "In the cohort study, arguably the
16         strongest study because of its
17         partly prospective ascertainment
18         of exposure, there was no
19         association between cosmetic talc
20         use and risk of all subtypes of
21         ovarian cancer combined."
22     Do you see that?
23     A.  Yes.
24     Q.  Okay.  You agree with the Langseth authors
25  that the cohort study is arguably the strongest study

Page 211

1  because of its prospective nature?
2      A.  I really can't say that I agree with that,
3  because the prospective aspect of it is certainly a
4  positive for the study, but the way they did exposure
5  assessment kind of weakened the study.
6         So I think that there were some very well
7  done case-control studies, so I wouldn't necessarily
8  say this was the strongest study.
9         MR. JAMES:  And now is a good time for
10  the break.
11        THE WITNESS:  Okay.
12        MR. JAMES:  Thank you.
13        THE VIDEOGRAPHER:  Going off record at
14  3:02 p.m.
15     (Recess taken from 3:02 p.m. to 3:16 p.m.)
16        THE VIDEOGRAPHER:  Back on record at
17  3:16 p.m.
18  BY MR. JAMES:
19     Q.  Dr. Moorman, on page 25 of your report, you
20  make a comment about power and the cohort studies;
21  correct?
22     A.  Can you --
23     Q.  It's the bottom of first paragraph, where you
24  cite the Narod article.
25     A.  Yes.

Page 212

1      Q.  And you cite Narod for your comments about
2  power in the cohorts; correct?
3      A.  Yes.
4      Q.  Have you analyzed the calculations performed
5  by Narod?  Have you separately analyzed his
6  calculations?
7      A.  No, I did not.
8      Q.  Have you considered any other commentaries or
9  articles looking at the issue of power in the cohort
10  studies in the talc ovarian cancer literature?
11     A.  I -- I'm trying to remember specifically.  It
12  seems like the Sister Study might have mentioned power
13  as a limitation of their study because of the number
14  of cases.
15     Q.  Did you consider -- let me just hand this to
16  you.  We already have it marked.  It's the Berge
17  article, which is Exhibit 21.
18     A.  Okay.
19     Q.  And I'm turning to page 253.  And at the
20  far -- the right column, top paragraph, and halfway
21  down through that paragraph, the authors state
22  (as read):
23         "It should be noted that the
24         cohort studies included in the
25         meta-analyses comprised a total of

Page 213

1          429 cases of ovarian cancer
2          exposed to genital talc and 943
3          unexposed cases.  The statistical
4          power of the meta-analysis of
5          these cohort studies to detect a
6          relative risk of 1.25, similar to
7          the result of meta-analyses of
8          case-control studies, was .99.
9          Thus low power of cohort studies
10         cannot be invoked as an
11         explanation of the heterogeneity
12         of results."
13     You see where I was reading?
14     A.  I do.
15     Q.  Have you considered this portion of the Berge
16  article before?
17     A.  I have looked at this article, and I have
18  considered all aspects of it, as I did all of the
19  other meta-analyses and articles.
20     Q.  You did not cite the Berge article with
21  regard to the issue of power in your report; correct?
22        MS. PARFITT:  Objection.  Form.
23        THE WITNESS:  No, I -- I did not.
24  BY MR. JAMES:
25     Q.  Okay.  And why is that?

54 (Pages 210 to 213)

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 214

1     A. I can't cite any specific reason.
2     Q. Is that because this conflicts with your
3  litigation opinion on power?
4        MS. PARFITT: Objection. Form.
5        THE WITNESS: No. I -- I don't -- that
6  was not my reason, no.
7  BY MR. JAMES:
8     Q. Do you have any reason to disagree with the
9  power analysis set forth in the Berge paper?
10    A. I -- I don't have a reason to disagree with
11 the power issue, but I think that it's only one part
12 of the picture, that there are other factors that
13 could contribute to differences in the findings
14 between the cohort studies and the case-control
15 studies.
16    Q. With respect to this precise power
17 calculation in the Berge paper, do you have any
18 criticisms of this power calculation?
19    A. They do not provide much detail on how they
20 calculated it, so there's really -- I can't say if
21 they did it correctly or not. But I -- I just can't
22 comment on it. It's just a single sentence there.
23    Q. Similar to the Narod sentence that you
24 reviewed?
25    A. I --

Page 215

1     Q. Let me rephrase it if it helps.
2        Did you separately assess the Berge --
3  excuse me -- the power calculation in either the Narod
4  article or the Berge article?
5     A. If I may go back to my report for just a
6  moment.
7     Q. Sure.
8     A. I think that this statement that I have
9  here -- I'm -- I think my intent in my report was
10 indicating that the lack of statistical significance
11 in the individual studies was a power concern.
12       Berge was talking about the statistical
13 power for the combined studies. So I think that there
14 is some distinction there between what I'm referring
15 to individual studies versus what Berge is describing
16 as the power of the combined analysis.
17    Q. Well, Berge is saying that the low power of
18 cohort studies cannot be invoked as an explanation for
19 the heterogeneity of results.
20       Do you agree or disagree with that
21 statement?
22    A. When they are combining them, I -- I don't
23 disagree with that. I think there are other reasons
24 that can explain the heterogeneity.
25    Q. On page 25, we've touched upon this already,

Page 216

1  but with respect to the issue of follow-up -- it's the
2  paragraph above the Narod comment.
3        Do you see where I am?
4     A. Yes.
5     Q. Okay. And there, we talk about -- excuse me.
6  There, you talk about the follow-up for the cohort
7  studies; correct?
8     A. Yes.
9     Q. Okay. And with respect to the NHS follow-up,
10 there is where you report 14 years of follow-up;
11 right?
12    A. Correct.
13    Q. And as we discussed earlier today, that does
14 not account for the additional ten years of data as
15 reflected by the Gates 2010 paper; correct?
16    A. What I am referring here, I'm describing the
17 three cohort studies in the most recent meta-analyses
18 and what they reported in that meta-analysis --
19    Q. Understood.
20    A. Okay.
21    Q. So you're referring there to the
22 Penninkilampi meta-analysis; correct?
23    A. I believe that is the case. Let me check the
24 reference. Yes.
25    Q. So Penninkilampi reports the 14 years of

Page 217

1  follow-up; correct?
2     A. I believe so.
3     Q. And we know that the Penninkilampi paper did
4  not include the additional 10 years of follow-up as
5  reflected by the Gates 2010 paper; correct?
6     A. Yes. We have already -- you've already asked
7  and I've already answered that.
8     Q. And then the next one you discuss is the WHI
9  study where you are reporting Penninkilampi's
10 reporting of 12.4 years of follow-up; correct?
11    A. That is correct.
12    Q. And do you know that the follow-up period in
13 the WHI -- do you know that the WHI asked about
14 duration of talc use?
15    A. May I go back to that study?
16    Q. Sure.
17    A. Do you --
18    Q. It's 25.
19    A. Yes, they describe in their exposure
20 assessment, that they did ask about duration of use
21 using five categories from less than a year all the
22 way up to 20 or more years.
23    Q. And so we know that they -- they followed the
24 study participants for, according to Penninkilampi,
25 12.4 years. But, in addition to that, they also asked

Patricia G. Moorman, M.S.P.H., Ph.D.

| Page 218 |
| --- |

1  about the -- study participants about their prior
2  duration of usage; correct?
3      A. They asked about that, but I think that one
4  has to consider some of the caveats that go along with
5  that. These -- may I continue?
6      These women, they report that they were, on
7  average, 63 years of age when they -- at baseline, so
8  at the start of enrollment in the cohort. So they
9  were asking them to recall an exposure that went back,
10 for many women, that probably started in their teens
11 or twenties. So there was certainly the possibilities
12 of some inaccurate recall because they were asking
13 them to recall an exposure that went back quite a few
14 years.
15      Another consideration with this study is
16 they excluded roughly -- let's see -- the cohort
17 was -- they started off with 90-some-thousand women in
18 the cohort, and they excluded any history of any women
19 with cancer at baseline, which is appropriate to do,
20 but the potential concern about that is, if there were
21 talc users who had developed ovarian -- or had
22 developed ovarian cancer before the follow-up began,
23 that would never be captured.
24      MR. JAMES: Okay. Dr. Moorman, just
25 very respectfully, I'm going to have to object to the

| Page 219 |
| --- |

1  nonresponsive portion of the answer.
2  BY MR. JAMES:
3      Q. So the question that I asked is not the
4  question that you ended up answering.
5      A. I did answer your question, I believe.
6      Q. Okay. I didn't ask you for your critiques of
7  the WHI. I asked you about the follow-up issue.
8  Okay? Do we need to look at the question again?
9      I asked -- my question is:
10     "Question: But in addition to that,
11     they also asked about -- the study
12     participants about their prior
13     duration of usage; correct?"
14     A. And I answered it but thought that there were
15 important relevant considerations.
16     MR. JAMES: Can we go off the record
17 for a second --
18     MS. PARFITT: Yes.
19     MR. JAMES: -- please?
20     THE VIDEOGRAPHER: Off record at 3:29.
21     (Discussion off the record.)
22     THE VIDEOGRAPHER: Back on record at
23 3:31 p.m.
24 BY MR. JAMES:
25     Q. On page 25 of your report, Dr. Moorman --

| Page 220 |
| --- |

1  excuse me -- page 26, you discuss updating exposure
2  information in the cohort studies.
3      A. Yes.
4      Q. Do you have any basis to dispute the accuracy
5  of the reported talc use at the time it was initially
6  ascertained in the cohort studies?
7      A. The accuracy of the reported talc use at the
8  time that they started follow-up in the cohorts.
9      Q. Correct.
10     A. I believe that, when you are asking people to
11 recall exposures that occurred over a long period of
12 time, there will be some inadvertent inaccuracies.
13     Q. And are you saying with respect to questions
14 about duration?
15     A. It could be with ever use or with duration.
16 Some women who used it might have forgotten and never
17 reported it. So that's just kind of an inherent
18 problem anytime you ask someone to recall exposures,
19 particularly if they might have occurred decades ago.
20     Q. Is that true for the case-control studies as
21 well?
22     A. Yes. In my report, I indicate that -- I make
23 the distinction between recall bias and inaccurate
24 recall and indicate that inaccurate recall --
25 specifically on page 21, make the distinction between

| Page 221 |
| --- |

1  recall bias and inaccurate recall that is difficult --
2  inaccurate recall and exposure that is difficult to
3  remember with precision.
4      And that's an issue with any type of study
5  when you're asking people to recall past exposures.
6      Q. And transitioning to the topic that you
7  brought up, which is the recall bias. We can stay on
8  page 216 your report.
9      A. Yes.
10     Q. And there, you address -- at the bottom
11 paragraph, you say that (as read):
12     "Recall bias, which theoretically
13     could result in the bias estimate
14     of the relative risk, must be
15     considered."
16     Do you see where I am?
17     A. I do.
18     Q. And you cite three situations where recall
19 bias would be a "particular threat" to a study's
20 validity; right?
21     A. Yes.
22     Q. And with -- let's walk through those three
23 together.
24     The first is -- the first threat that you
25 identify is "if the exposure of interest is one that

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 222

1   could be considered sensitive"; right?
2       A. Yes.
3       Q. Okay. And then you address that reason in
4   turn on the next page, on page 22 of your report?
5       A. Yes.
6       Q. And you state there that (as read):
7           "In regard to the situation,
8           genital talc use would 'not be
9           considered a particularly
10          sensitive topic.'"
11      Right?
12      A. That's what I state in my report, yes.
13      Q. Okay. And what basis do you have for that
14  statement? Do you cite to anything? Have you
15  conducted any studies to support that statement? What
16  scientific basis do you have for that statement?
17      A. This is based on my professional judgment,
18  based on years and years of doing studies where we
19  collect data, getting feedback from interviewers. In
20  our studies, we ask about a lot of personal things,
21  you know, their menstrual history, their contraceptive
22  history, those kind of things.
23          And I have never gotten the impression that
24  these were things that women considered sensitive and
25  did not want to reveal, whereas when you get into

Page 223

1   other topics, say -- like, I give the example of
2   induced abortion, that, I have heard from some of our
3   interviewers, that sometimes that evokes strong
4   emotions in the women.
5           And so I think that, you know, there are
6   some exposures that are sensitive, as I describe, that
7   women might be hesitant to report. And I contrast
8   that with things that are personal but not
9   particularly sensitive.
10          When a woman has agreed to be in a study,
11  she knows that we're going to be asking some of these
12  questions. And I have never heard any comments from
13  any of the interviewers in the many studies I've done
14  that this was a question that women felt uncomfortable
15  with.
16      Q. Do you acknowledge the possibility that a
17  person's use of a cosmetic talcum powder in their
18  genital region could be viewed by some as a sensitive
19  topic?
20      A. I -- again, I -- I kind of make the
21  distinction between something that is personal -- and
22  we ask them a lot of personal questions, but it's --
23  I don't see any aspect of that that would seem
24  particularly sensitive, why someone might be
25  embarrassed or feel that someone was going to judge

Page 224

1   them, or any reason why a woman, if she's telling you
2   her whole pregnancy and menstrual history, why she
3   would feel embarrassed about her use of genital talc?
4       Q. And do you have any empirical data to support
5   that opinion?
6       A. I am unaware of any empirical data that
7   specifically addresses that.
8       Q. Okay. The second situation you identify on
9   page 21 and then discuss on page 22 is if -- is if the
10  study hypotheses are known to the study subjects or
11  interviewers.
12          Do you see that?
13      A. Yes.
14      Q. Okay. And your analysis is on page 22.
15          What did you do to evaluate this factor?
16      A. Whether the study hypotheses are known to the
17  study subjects or interviewers?
18      Q. Correct. With respect to the talc ovarian
19  cancer literature.
20      A. Okay. Again, this is based on my experience
21  in having done epidemiologic studies for many years.
22  As I state here, it's standard practice in
23  epidemiologic research where we're not discussing the
24  hypotheses with the interviewers. We're asking a lot
25  of questions. Some thought to increase risk; some

Page 225

1   thought to decrease risk. It's standard that you
2   would not really discuss the hypotheses with the
3   interviewers.
4           And, similarly, when we invite or ask women
5   to be in our studies, we will tell them that, you
6   know, it is a study of ovarian cancer, but we're not
7   telling them which factors we think might be
8   associated with increased risk and which ones might be
9   associated with decreased risk.
10      Q. To support this statement, did you conduct
11  any post-interview interviews?
12      A. Can you restate that? Tell me -- I'm not
13  sure what you're asking.
14      Q. So to determine if study hypotheses were
15  known to the study subjects at the time that they were
16  asked the questions, there would be methods or ways to
17  which you could find that out; correct?
18      A. We -- I'm thinking about it. I have never
19  known that to be -- I've never known a study that has
20  done that.
21          In one breast cancer study, at the end of
22  the interview, we asked the women if they had any
23  ideas about what caused breast cancer. And, you know,
24  we thought it might maybe raise some new ideas, but we
25  found that it was largely -- we didn't see anything

57 (Pages 222 to 225)

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 226

1    that was usable.  I think that the most common
2    response was that women thought it was stress.  So --
3        Q.  But you don't have any evidence of anything
4    similar being done in the talc ovarian cancer
5    literature; correct?
6        A.  Not to my knowledge.
7        Q.  At the bottom of page 22, and then carrying
8    over through 23, you cite to the Lanza study; correct?
9        A.  That's correct.
10       Q.  And you cite Lanza for the proposition
11   that -- to provide "further evidence that recall bias
12   in case-control studies does not inevitably lead to an
13   overestimate."
14       Do you see where I was reading?  It's at the
15   bottom of 22.
16       A.  Yes.  Yes, I see where you're reading.
17       Q.  Lanza did not pertain to talc and ovarian
18   cancer; correct?
19       A.  As I state in my report, yes.  It's looking
20   at a variety of meta-analyses that looked at both
21   case-control studies and cohort studies.  And the
22   point of that paper was to determine if recall bias
23   seemed to lead to a consistently increased risk.  And
24   their conclusion, as I state in here, there's no
25   significant difference in the effect estimates between

Page 227

1    the case-control and cohort studies, suggesting that
2    the study design didn't have an important impact on
3    the conclusions of the meta-analyses.
4        MR. JAMES:  Okay.  I marked Lanza as
5    Exhibit 27.  I'll hand you two copies.
6        (Exhibit No. 27 was marked for identification.)
7    BY MR. JAMES:
8        Q.  And so Lanza concerns therapeutic
9    interventions; correct?
10       A.  Yes.
11       Q.  And isn't -- and correct me if I'm wrong
12   here, but looking at Lanza, isn't what Lanza doing is
13   they're comparing the odds ratios reached in both the
14   case-control studies and in the prospective studies on
15   a completely different body of literature; right?
16       A.  It is not dealing with talc and ovarian
17   cancer, if that is your question.
18       Q.  And they're looking at whether the results of
19   the case-control studies on that separate body of
20   literature and the results of the prospective cohort
21   studies on that separate body of literature reached
22   different results; right?
23       A.  Yes.
24       Q.  Okay.  And so the author's conclusions in the
25   abstract here are -- which you note in your report --

Page 228

1    are that the estimates did not differ between
2    case-control and prospective or retrospective cohort
3    studies; correct?
4        A.  Where are you reading, please?
5        Q.  I'm in the "Results" section.
6        A.  Okay.  Yes.
7        Q.  And then they say, "Heterogeneity was also
8    low," below that; right?
9        A.  Yes.
10       Q.  Again, if I'm understanding this paper
11   correctly, the situation in this talc and ovarian cancer
12   is completely different, isn't it?  Where we do have
13   heterogeneity between the prospective studies and the
14   retrospective case-control studies; right?
15       MS. PARFITT:  Objection.  Form.
16       THE WITNESS:  We have one example in
17   the talc and the -- and the ovarian cancer -- in the
18   meta-analyses, they did note some heterogeneity
19   between the cohort studies and the case-control
20   studies.
21       I think that the point that I was trying to
22   get with that is in the observational studies, there's
23   always concern, as several of these people have -- as
24   several of the meta-analyses and other papers have
25   reported, that the stronger association due to --

Page 229

1    among the case-control studies was due to some kind of
2    recall bias.
3        So the point is, if it was recall bias, you
4    would expect to see that case-control studies always
5    had higher estimates than the cohort studies; and this
6    study is making the point that in this wide variety of
7    interventions that they looked at, that doesn't seem
8    to be the case at all.  Okay.
9    BY MR. JAMES:
10       Q.  So, again, this study is saying, "Look, the
11   results of case-control studies and the results of
12   prospective cohort studies on these therapeutic
13   interventions are similar, same ballpark, and so thus,
14   we can conclude that recall bias in this body of
15   literature must not be a big deal."
16       Is that a layman's fair way to describe the
17   results of this paper?
18       MS. PARFITT:  Objection.  Form.
19       THE WITNESS:  Yeah.  I -- I mean,
20   I think that it's one part of the -- I think that,
21   overall, that's a pretty fair summary of the point
22   that this paper is making.  So...
23   BY MR. JAMES:
24       Q.  And if you acknowledge that in the talc
25   ovarian cancer literature, there is a disparity

58 (Pages 226 to 229)

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 230

1   between the retrospective case-control studies and the
2   prospective cohort studies, then Lanza isn't really
3   applicable at all, is it?
4           MS. PARFITT:  Objection.
5           THE WITNESS:  It is -- I think that it
6   is very applicable because it's trying to get at the
7   recall -- is recall bias -- is that a problem in
8   case-control studies that is going to inevitably lead
9   to higher risk estimates than what you would get in
10  cohort studies?
11          And as we have seen in these articles, we
12  see recall bias is frequently cited as a potential
13  reason that we saw stronger associations in
14  case-control studies than in cohort studies.
15          And I think this paper is really pointing
16  out that that's not inevitable, that you're always
17  going to have higher estimates with case-control
18  studies than cohort studies.
19          Specifically in relation to the
20  heterogeneity between the cohort studies and the
21  case-control studies in talc, I think that we have to
22  consider other biases that may be operating.
23  BY MR. JAMES:
24      Q.  I mean, the justification for the Lanza
25  conclusions is that the results in the two study

Page 231

1   designs are pretty much the same.  So these two study
2   designs didn't reach different results.  And so in
3   this body of literature, we don't really need to be
4   worried about recall bias.  Recall bias was not
5   operating to create a disparity of results in this
6   body of literature.
7           But, in contrast, in the talc ovarian cancer
8   world, there is a disparity in the results by study
9   design; right?
10      A.  We've already acknowledged there is some
11  heterogeneity in results.  Is it due to recall bias?
12  Is it -- do we have to assume that recall bias is in
13  play here and that explains the higher -- or the
14  stronger associations generally reported in the
15  case-control studies.
16          And this article is addressing one -- one
17  potential bias, the recall bias.  And I don't --
18  I think that it provides support that we cannot just
19  do a knee-jerk reaction of "case-control studies, they
20  have the potential for recall bias, that leads to
21  higher estimates, and therefore, these studies are
22  biased."
23          There are other biases in play in the cohort
24  studies that I think are very plausible explanations
25  for why there might be some differences.

Page 232

1       Q.  If you're looking at Lanza objectively,
2   doesn't it say exactly the opposite of what you're
3   saying here, Doctor?
4           I mean, again, the justification for Lanza
5   is the results are the same, and so recall bias isn't
6   a problem.  But that justification doesn't exist in
7   the world of talc ovarian cancer.
8           That will be my last question on that.
9       A.  No.  I think that this addresses the recall
10  bias in the -- you know, I acknowledge it doesn't
11  directly address talc and ovarian cancer in this
12  paper; but it does address this -- this commonly-cited
13  thing that, you know, recall bias in case-control
14  studies could lead to higher risk estimates.  And it's
15  saying that's not necessarily the case always.
16      Q.  I promised that was my last question --
17      A.  Okay.
18      Q.  -- so we'll move on.
19          The third factor that you discuss as a
20  particular threat for recall bias is if there is
21  considerable media attention.
22          Do you see where I've returned back to on
23  page 22?
24          21 is where you -- 21 through 22 is where
25  you lay out the three reasons.  At the top of 22, you

Page 233

1   say "considerable media attention."
2       A.  Yes.
3       Q.  And then you evaluate the media attention
4   factor on the following page; right?
5       A.  On page 23, yes.
6       Q.  On 23, you say that, for the media attention
7   concern, you say in the middle of the first full
8   paragraph (as read):
9               "The concern is not relevant to
10          the vast majority of the studies
11          as virtually all the data
12          collection in the epidemiologic
13          studies of talc and ovarian cancer
14          occurred prior to such
15          litigation."
16          Do you see that?
17      A.  Yes, I do.
18      Q.  And you agree that media attention is not
19  limited to litigation; correct?
20      A.  Yes.
21      Q.  Did you undertake any effort to analyze the
22  extent of publicity or media attention to the talc
23  ovarian cancer issue prior to 2014?
24      A.  I did not do any specific analysis of that.
25  I personally was unaware of any media attention on

59 (Pages 230 to 233)

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 234

1   this topic prior to the litigation.
2        Q. Then I believe on page 23, you go on to
3   discuss the Schildkraut 2016 paper; correct?
4        A. Yes.
5        Q. Okay. And if we can pull that back out. It
6   is the exhibit -- did I mark it?
7             MS. PARFITT: I don't think so.
8             MR. JAMES: Okay. I'll mark it as the
9   next one, so you don't have to fish for it here. It's
10  Exhibit 28.
11  (Exhibit No. 28 was marked for identification.)
12            MR. JAMES: Which is the Schildkraut
13  2016 paper. I'll hand you two copies.
14  BY MR. JAMES:
15       Q. And so we touched upon this a bit earlier,
16  Dr. Moorman, where we talked about the phraseology
17  where you say the association was "attenuated but not
18  eliminated."
19            Do you recall that exchange we had earlier?
20            THE WITNESS: Yes, I do.
21  BY MR. JAMES:
22       Q. Okay. And in this 2016 paper, again, you,
23  among the authors, compared the odds ratios for talc
24  and ovarian cancer for participants before 2014 and
25  for participants after 2014; correct?

Page 235

1        A. Correct.
2        Q. And if we look at page 1414 -- I'm looking
3   for my place here.
4             If you look at Table 2, Dr. Moorman, you see
5   there where you have broken out the data on interview
6   date after 2014; right?
7        A. Yes.
8        Q. And then above that is the interview date
9   before 2014; correct?
10       A. Yes.
11       Q. And we see that the odds ratio here for
12  interview date after 2014 is 2.91; correct?
13       A. That is correct.
14       Q. That's well in excess of any odds ratio
15  reported in any of the meta-analyses; correct?
16       A. For the overall summary odds ratio, yes.
17       Q. And before 2014, we see that the odds ratio
18  is a 1.19 that is not statistically significant, which
19  is what we discussed earlier; correct?
20       A. Yes, we discussed that earlier.
21       Q. And you also report in this article a
22  distinction between the pre-2014 interviewees and the
23  post-2014 interviewees based upon their reported talc
24  usage; right?
25       A. Yes.

Page 236

1        Q. And you -- I believe this table reflects --
2   though I'm still looking for it, and maybe you can
3   help me with it -- but the data in this table reflects
4   that pre-2014 interviewees reported talc usage at the
5   rate of 36 percent, and post-2014 interviewees
6   reported rates -- excuse me, reported usage at the
7   rate of 51 percent.
8        A. Yes, I see that in the table.
9        Q. And so that's a significant disparity in
10  reported usage rates; would you agree with that?
11            MS. PARFITT: Objection. Form.
12            THE WITNESS: Clearly, it is what it
13  is. It's 36 percent as -- versus 51 percent. Okay.
14  BY MR. JAMES:
15       Q. And so we have your paper here showing that
16  before 2014, before the onset of the litigation, you
17  had study participants reporting talc usage at a lower
18  rate; right?
19       A. Than -- yes.
20       Q. And if you isolated the association analysis
21  to those -- to that group, you also have a
22  non-statistically significant association; correct?
23       A. And again, when you stratify -- we've already
24  covered that. I acknowledge that prior to 2014, it
25  was not statistically significant. We also indicated

Page 237

1   certainly in the range of what many other studies have
2   seen. But when you stratify like that, you are
3   getting into smaller sample sizes. So there's
4   statistical significance that -- the fact that it's no
5   longer statistically significant is not all that
6   surprising.
7        Q. Have you seen the Trabert editorial that
8   followed the publication of the Schildkraut article?
9        A. I'm sure that I have read it at some point,
10  but --
11       Q. Okay. I'm going to -- I'm sorry.
12       A. -- please, let's -- I haven't looked at it
13  quite some time.
14       Q. So I'm going to mark as Exhibit 29 an
15  editorial by Britton Trabert entitled "Body Powder and
16  Ovarian Cancer Risk -- What is the Role of Recall
17  Bias?"
18            I'll hand you two copies.
19  (Exhibit No. 29 was marked for identification.)
20  BY MR. JAMES:
21       Q. Dr. Moorman, does this editorial look
22  familiar to you? Have you seen it before?
23       A. Yes, I have seen it before.
24       Q. Have you ever spoken with or communicated
25  with Britton Trabert about this editorial?

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 238

1    A. No, I have not.
2    Q. And you see that in the right-hand column,
3  about midway down, Dr. Trabert refers to the data
4  points that we were just discussing; correct?
5    A. Yes.
6    Q. And if you look to the second page of the
7  editorial, Trabert reports, at the last paragraph of
8  the article (as read):
9       "The current study highlights the
10      concern over recall bias in
11      case-control studies, particularly
12      once an exposure becomes the
13      subject of considerable media
14      coverage."
15      Do you see where I was reading that?
16   A. Yes, I do.
17   Q. Do you agree with Dr. Trabert's concerns
18  about media coverage impacting the results of the
19  Schildkraut study?
20   A. I -- I think that the investigators on our
21  study, they had that concern.  That's why we did those
22  analyses.  So...
23   Q. So do you acknowledge the possibility that
24  the results of the 2016 study may reflect recall bias
25  in the study?

Page 239

1    A. In this discussion -- if I may take just a
2  moment to --
3    Q. Certainly.
4    A. Okay.  You know, I think that
5  Dr. Schildkraut, who did the major writing of this
6  article -- and I think all of the coauthors were in
7  agreement -- that we were concerned about the recall
8  bias.  As I said, that was some of the reason for
9  doing those analyses.
10      I think that it's also important to point
11  out here the other possibility.  There may have been
12  some recall bias.  But she also makes the statement
13  that (as read):
14      "It is possible that the lawsuit
15      sharpened memories of body powder
16      use and improved the accuracy of
17      reported use for both cases and
18      controls interviewed in 2014 or
19      later."
20      I think that that goes to say that anytime
21  someone -- you know, there's some memory trigger, it
22  could have made actually more accurate recall.
23      So we --
24   Q. And Dr. --
25   A. I'm sorry.  So we acknowledge both the

Page 240

1  possibility of recall bias, but I think that we looked
2  at the other side of the coin as well.
3    Q. And can you tell me where you're reading that
4  sentence from, Dr. Moorman?
5    A. Let's see.  The -- it is on page 1416, the
6  right-hand column, and it's about -- probably about
7  eight or nine lines down.
8       So I think that this sentence -- or this
9  whole paragraph gives a pretty balanced assessment of
10  the data, that we thoughtfully considered the issue of
11  recall bias, but we also considered that maybe the
12  greater publicity led to -- was kind of a memory
13  trigger that led to more accurate recall.
14   Q. And in your report, do you include a caution
15  on the Schildkraut 2016 study about the potential for
16  recall bias based upon the 2014 pre- and post-data?
17   A. I -- let's see.  We have discussed that
18  section of the report a couple of times already.  And
19  I state that there is the possibility that recall bias
20  could have led to the higher odds ratios when
21  including women interviewed during the time when there
22  was more media attention focused on this exposure.
23   Q. And you're at page 23; right?
24   A. Yes.
25   Q. Okay.  And then you conclude the middle

Page 241

1  paragraph with the statement that -- the "attenuated
2  but not eliminated" statement.  But I'm not going to
3  ask about that again.  But you go on in that sentence
4  to say (as read):
5       "The association is not due
6       entirely to recall bias."
7       Do you see that phrasing that I just read?
8    A. Yes.
9    Q. So are you conveying in that wording that you
10  think some portion of the odds ratio that you are
11  seeing in these case-control studies that you're
12  relying on or the meta-analyses that you're relying
13  on, that some portion of that odds ratio is
14  attributable to recall bias?
15      MS. PARFITT:  Objection.
16      THE WITNESS:  I think that probably
17  every meta-analysis published, probably every
18  case-control study that was published, we acknowledge
19  this as a -- recall bias is a potential bias.  But
20  I think that we went on to give evidence --
21  I explained why I did not think that it was a complete
22  explanation.
23      Can we completely rule out any possibility
24  of recall bias?  I don't know that we can do it.  But
25  I think that as -- for some of the reasons

61 (Pages 238 to 241)

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 242

1    I articulated.
2        I know that Dan Cramer in his 2016 paper
3    also went into great detail considering the issue of
4    recall bias. And I don't think that we can attribute
5    this association to recall bias.
6    BY MR. JAMES:
7        Q. Can you cite to any publication that has
8    analyzed the literature and ruled out recall bias --
9            MS. PARFITT: Objection.
10   BY MR. JAMES:
11       Q. -- as a method -- as a basis for the elevated
12   odds ratio of the 1.2 to 1.3 that you're citing in
13   your report?
14           MS. PARFITT: Objection.
15           THE WITNESS: Okay. I went back to the
16   Dan Cramer article, and I'm hoping that I'm recalling
17   that particular article, the date of it, accurately.
18   But he did analyze the data and the degree of
19   misclassification that would have had to occur for
20   recall bias to account for this association. He gave
21   other reasons for why it seemed unlikely that recall
22   bias would account for this association.
23       So I think he did a pretty thorough
24   analysis -- a thoughtful analysis of it.
25

Page 243

1    BY MR. JAMES:
2        Q. Can you cite any other publications other
3    than the Cramer 2016 paper, sitting here today, that
4    have addressed recall bias in the fashion that you
5    just described?
6        A. The Cramer article is the one that I -- that
7    comes to mind as the one that addressed it most
8    thoroughly.
9        Q. Have you ever published the three factors
10   that you have addressed with regard to recall bias?
11       A. The three factors are --
12       Q. Sure. So --
13       A. Okay.
14       Q. Within your report, you -- we just walked
15   through the three factors that you've considered, the
16   three factors that you deemed to be a particular
17   threat to case-control studies for recall bias;
18   correct? We just walked through those three?
19       A. Yes.
20       Q. Have you ever published those three in any
21   article or journal or anything else?
22       A. I have not published that. That is just
23   based on my general epidemiologic knowledge from doing
24   this type of research and teaching in this field for
25   the last couple of decades.

Page 244

1        Q. Okay. Dr. Moorman, on page 11 of your
2    report, you talk about -- this is where you begin your
3    analysis of the Bradford Hill factors.
4        A. Yes.
5        Q. And are you there with me?
6        A. Yes, I am.
7        Q. Okay. You say, in page 11 -- you have a
8    section titled "Strength and consistency of the
9    association"; correct?
10       A. Correct.
11       Q. You say in the first sentence that strength
12   and consistency are "deeply intertwined." Correct?
13       A. Yes.
14       Q. Can you cite to any publication where you
15   have combined the analysis of strength and consistency
16   before?
17       A. I -- I can't cite any publication that
18   specifically addresses that, no.
19       Q. Can you cite any published authority that
20   states these two Bradford Hill criteria are deeply
21   intertwined?
22       A. I -- I think that as I was -- I cannot cite a
23   published authority.
24       I think that, again, this is based on when
25   I was looking at these and how I was weighting these

Page 245

1    considerations.
2        Q. Do you agree that strength is an important
3    criteria in and of itself?
4        A. I think that the strength of the association
5    is an important criteria, but I think that we also
6    have to bear in mind that as -- that there are many
7    well-established causal associations that are
8    certainly not in the order of magnitude of what we
9    see, for example, with smoking and lung cancer.
10       Q. Do you think the criteria of strength is met
11   with the talc and ovarian cancer literature?
12       A. When -- as I go through my report, I give
13   numerous examples of well-accepted causal associations
14   that are of a similar magnitude as what we see with
15   talc and ovarian cancer, and so I think that the data
16   are strong enough.
17       Q. And I think that I'm going to ask my question
18   again.
19       A. Okay.
20       Q. Do you think that the criteria of strength is
21   met with the talc and ovarian cancer literature?
22       A. Okay --
23           MS. PARFITT: Objection. Asked and
24   answered.
25       Try again, Dr. Moorman.

62 (Pages 242 to 245)

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 246

1      THE WITNESS: Okay. So, once again,
2   I -- we have to use -- we have to be careful of --
3   Dr. Hill did not refer to these as "criteria," but
4   guidelines or viewpoints I think was the terminology
5   he used. And I do think that the criteria of strength
6   has been met.
7   BY MR. JAMES:
8      Q. Can you cite to a single study in the talc
9   ovarian cancer literature that refers to the
10  association as a strong association?
11     A. I -- I cannot, off the top of my head, think
12  of anyone that refers to it as a strong association.
13  I do, once again, want to say that we see evidence of
14  causal associations of similar magnitude; so I think
15  that it is strong enough to be a causal association.
16     Q. Do you understand that a number of the papers
17  that you have cited in your reference list or
18  materials-considered list refer to the association as
19  weak?
20     MS. PARFITT: Objection.
21     THE WITNESS: Which papers are you
22  referring to specifically?
23  BY MR. JAMES:
24     Q. If an author in the talc ovarian cancer
25  literature has referred to the association as a weak

Page 247

1   association, would you agree or disagree with that
2   characterization?
3      MS. PARFITT: Object to form.
4      THE WITNESS: I would disagree with
5   the -- I would disagree with that.
6   BY MR. JAMES:
7      Q. If an author or authors in the talc ovarian
8   cancer literature have referred to the association as
9   modest, would you agree or disagree with that?
10     A. Once again, I think that many of the risk
11  factors that we are considering are not going to be
12  the odds ratios of 10 or greater that we saw with
13  this.
14     And when you read the papers written by
15  Dr. -- by Bradford Hill, he certainly makes the point
16  that some weaker associations can certainly be real.
17     Q. So is this a weaker association?
18     A. Weaker is in comparison to what? It's not --
19  it's weaker than smoking and lung cancer. It is --
20  I keep making the point that it -- we fully
21  acknowledge that it is not a tenfold increased risk.
22  It's a 25 to 30 percent increased risk.
23     Q. Would you call the association modest?
24     MS. PARFITT: Objection. Asked and
25  answered.

Page 248

1      MR. JAMES: It hasn't been answered.
2      MS. PARFITT: It's been asked.
3      THE WITNESS: I don't think that we
4   have any actual definition of what is modest. I think
5   that the association is what it is, a 25 to 30 percent
6   increased risk.
7   BY MR. JAMES:
8      Q. As an epidemiologist, you're not capable of
9   discerning whether an association is modest or not
10  modest?
11     MS. PARFITT: Objection.
12     THE WITNESS: As I have said before,
13  I don't think there is any clear definition of that
14  adjective.
15  BY MR. JAMES:
16     Q. Is there a definition in the epidemiologic
17  community of a weak association? Are you able to
18  understand what that would mean in the epidemiologic
19  community?
20     A. Once again, there is no -- to my knowledge,
21  there is nothing that would say, you know, an odds
22  ratio in this range is weak, this is modest, this is
23  moderate, this is strong.
24     And, again, going back to Bradford Hill, he
25  certainly emphasizes that there are some associations

Page 249

1   that are not in the magnitude of smoking and lung
2   cancer, but they are certainly real.
3      Q. And I think you're conflating -- or you're
4   misunderstanding my question, because you're answering
5   the question about whether the association is real or
6   not real, and my question for you is whether the
7   association is weak, modest, or strong.
8      How would you characterize it?
9      A. And I would -- as I have said, there is no
10  absolute terminology that would say what is a weak
11  association, what is modest, and what is strong. So
12  I think that it is more accurate just to describe it
13  as it is, a 25 to 30 percent increased risk of ovarian
14  cancer.
15     Q. Well, in assessing the Bradford Hill factors
16  or considerations or criteria -- in assessing that and
17  determining whether the association is strong or not
18  strong, as an epidemiologist, don't you need to be
19  capable of determining whether the association is
20  strong or not strong?
21     A. Once again, it is an adjective that is not
22  well defined. And --
23     Q. And do you -- I'm sorry.
24     A. I -- I -- I keep going back to I think that
25  the association that we see is what it is, a 25 to

63  (Pages 246 to 249)

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 250

1  30 percent increased risk. It is consistent with
2  other factors that we consider causal associations.
3  They have a similar strength of association.
4      Q. And I do -- I do intend to go to that very
5  next topic next --
6      A. Okay.
7      Q. -- but in assessing strength, what I'm asking
8  is whether, in all of the papers that you've cited,
9  when the epidemiologists that you've cited refer to
10 the association as weak or modest or small, is that
11 terminology that you can accept, or is that
12 terminology that you reject?
13     A. I say that it is terminology that is
14 imprecise. What one would consider modest, someone
15 else might consider moderate. It's imprecise
16 terminology.
17     Q. And certainly in the epidemiology world, if
18 you have a small or modest or weak association, what
19 you're saying is that that doesn't bar a causal
20 conclusion. But wouldn't you agree with me that if
21 the association is small or modest or weak, it makes
22 the other considerations more important?
23         MS. PARFITT: Objection.
24         THE WITNESS: I think that all of the
25 considerations are important. It's --

Page 251

1  BY MR. JAMES:
2      Q. Do you agree that, with a small association,
3  there's more concern for recall bias?
4          MS. PARFITT: Objection.
5          THE WITNESS: I think that with a
6  smaller association, there is more concern that it
7  could be due to bias from various reasons.
8  BY MR. JAMES:
9      Q. Can you cite to any scientific agency or
10 organization that has described the talc ovarian
11 cancer association as strong?
12     A. I do not recall anyone describing it that
13 way.
14     Q. Okay. And then we will turn now to page 12
15 of your report, Dr. Moorman, where you cite a number
16 of other exposures.
17     A. Yes.
18     Q. And do you see where I am?
19     A. Yes.
20     Q. And you say on page 12 that (as read):
21         "Well-accepted exposure to these
22         associations have relative risks
23         of similar magnitude and are
24         generally accepted to be causal."
25     Do you see where I was reading?

Page 252

1      A. Yes.
2      Q. And these associations that you've listed,
3  you have concluded are generally accepted to be
4  causal; correct?
5      A. I think so, yes.
6      Q. And below that, you state that the IARC has
7  reached a causal conclusion with respect to each of
8  these associations; is that right?
9      A. Yes, that is what I state.
10     Q. And so to state that, are you saying that all
11 five of these exposures and associations have been
12 classified by IARC as Category 1?
13     A. I don't recall if -- I don't recall the
14 classifications, specifically, for all of these.
15     Q. Well, to say that the IARC has made a causal
16 judgment on these associations, you are necessarily
17 saying that they have classified these associations as
18 Category 1; correct?
19     A. I -- you know, I answered the question.
20 I don't recall which IARC category that each of these
21 exposures is right off the top of my head.
22     Q. But do you say in the report that they are
23 judged to be causal by IARC; correct?
24     A. I do say that in my report.
25     Q. And IARC has not judged talc ovarian cancer

Page 253

1  to be a causal association, has it?
2      A. As we have discussed several times today,
3  they describe it as possibly carcinogenic.
4      Q. Can you cite to any publication that assesses
5  the strength of an epidemiologic association by
6  considering "similar magnitude" odds ratios from
7  unrelated exposures to diseases?
8      A. I -- off the top of my head, I can't cite any
9  such publication.
10     Q. Have any scientific agencies that have looked
11 at this issue assessed strength of the talc ovarian
12 cancer relationship by considering similar magnitude
13 associations of unrelated exposures to diseases?
14     A. I know that in the Health Canada report, they
15 went through assessing the strength of the
16 association. I don't recall if they kind of
17 considered it in relation to other exposures that have
18 a similar magnitude of association.
19     Q. With regard to the associations that you have
20 identified on page 12, did you review the entire body
21 of scientific and medical literature pertaining to
22 those associations?
23     A. In -- let's see. Since when I cited these,
24 I did not go through the same level of detail like
25 I have done for the talc and ovarian cancer.

64 (Pages 250 to 253)

Patricia G. Moorman, M.S.P.H., Ph.D.

**Page 254**

1    The oral contraceptive use and breast cancer
2    that I cite, I was part of a team of researchers that
3    did a systematic review and meta-analysis of oral
4    contraceptives in relation to ovarian cancer as well
5    as breast cancer and some other cancers.
6        The other ones, again, I did not go in --
7    did not review the body of literature in the same
8    detail as I did the talc and ovarian cancer.
9        Q.  Did you assess, in any of these bodies of
10   literature, the risks for recall bias?
11       A.  I did not.
12       Q.  Did you consider, in these bodies of
13   literature, biologic mechanism for these five
14   exposures that you've identified?
15       A.  I considered biologic mechanism, again, not
16   in the level of detail with the talc and ovarian
17   cancer.
18       Q.  Did you assess them in a manner sufficient to
19   which you would opine in a published article or a
20   litigation report about the evidence supporting
21   causation?
22       A.  I'm reading your question again.
23       Q.  So am I.
24       A.  I'm not sure.
25       Q.  For these five exposures and diseases that

**Page 255**

1    you've cited on page 12, did you assess the body of
2    scientific and medical literature and evidence in a
3    manner sufficient to which you would feel comfortable
4    offering an opinion in the published literature or in
5    a litigation report about causation?
6        A.  I think that I have answered the question
7    repeatedly that I did not do it in the detail that
8    I did the talc and ovarian cancer.  If I were to put
9    in published literature or a litigation report,
10   I would want to make sure that I had done it as
11   absolutely thoroughly as possible.
12       Q.  Your comparison of the odds ratios to these
13   five exposures -- you acknowledge that there are
14   exposures that you have not identified in your report
15   that are in the 1.2 to 1.3 range that are not causal
16   or have not proven to be causal; correct?
17       MS. PARFITT:  Objection.  Form.
18       THE WITNESS:  I acknowledge that -- of
19   course, that there are reports of exposures that have
20   reported relative risk in this range, and it could
21   either be something that was associated with another
22   risk factor and it was not the causal factor or the
23   level of evidence was not adequate.  Maybe people --
24   there were fewer articles, people have not gone
25   through the whole evaluation of the causal criteria.

**Page 256**

1    BY MR. JAMES:
2        Q.  So in your report, when you are assessing
3    strength, and you discuss the fact that there are
4    similar magnitude odds ratios from other exposures
5    upon which one could conclude causation, you do not
6    also remark that there are similar magnitude ratios
7    upon one which could not conclude causation.
8        Why is that?  Why did you lay out the
9    analysis this way?
10       A.  What I was trying to do here is to make the
11   point that an association in the range of a 25 to
12   30 percent increased risk is something that there are
13   multiple examples of this being generally accepted as
14   a causal association.
15       I -- it was not my intent to describe the
16   entire universe of exposures and some that might be in
17   this range.
18       Q.  There are certainly examples that you didn't
19   cite in the 1.2 to 1.3 range that are not causal;
20   right?
21       A.  Did you have something specific in mind that
22   you are --
23       Q.  I'm asking you, actually.
24       Did you just go searching for similar
25   magnitude ratios upon which one could reach a

**Page 257**

1    causation conclusion?
2        A.  I -- I think that I was trying to get at that
3    is this association strong enough to be causal?  And
4    we have evidence from these other exposures that, yes,
5    it's certainly possible.
6        The point is that you do not -- or you do
7    not dismiss an association of 1.25 or 1.3 as it
8    couldn't possibly be causal.  We have evidence to
9    suggest that it -- there are many examples of it.
10       Q.  But in your report, Dr. Moorman, you're not
11   just not dismissing it.  You're not just using the
12   similar magnitude odds ratios to not dismiss the
13   possibility that this is a real association.  You're
14   using the similar magnitude ratios in an effort to
15   ascribe strength to the association; correct?
16       A.  Right.  I am saying that I think this is
17   strong enough to be a real association, and I think
18   that we have other examples of similar magnitude
19   associations that are generally accepted as causal
20   associations.
21       Q.  But if there are other odds ratios for other
22   exposures to diseases that you did not identify in
23   your report in the 1.2 to 1.3 range that are not
24   causal, then the magnitude ratio that you have here in
25   the top ovarian cancer literature, in that instance,

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 258

1 is not strong enough to support causation?
2 MS. PARFITT: Objection. Form.
3 BY MR. JAMES:
4 Q. I'll just restate it because it's confusing.
5 A. Yeah, it is.
6 Q. To support strength in your report, why do
7 you select only similar magnitude ratios that, by your
8 estimation, are Category 1 -- by your estimation, have
9 been declared by IARC to be causal associations? Why
10 do you only select associations by which one has -- by
11 which IARC has concluded causation? Why don't you
12 also acknowledge that there are associations of a
13 similar magnitude that don't support causation?
14 MS. PARFITT: Objection.
15 THE WITNESS: I'm not really sure --
16 I'm still not really sure what you're getting at with
17 this question.
18 I think that I was trying to make the point
19 that the association we see here is strong enough to
20 be accepted as a causal association. I'm not -- I'm
21 not saying that every association of this magnitude
22 has gone through the same process of assessing all of
23 the Bradford Hill viewpoints and have come to the same
24 conclusion, but I am saying that we have multiple
25 examples of where an association of this magnitude is

Page 259

1 causal.
2 MS. PARFITT: Scott, is this a breaking
3 point or no?
4 MR. JAMES: How long have we been
5 going?
6 MR. FARIES: About an hour and 15.
7 MS. BRENNAN: Yeah, we've been going
8 about an hour and 15.
9 MR. JAMES: Sure. Are we ready for a
10 break?
11 MS. PARFITT: Sure. Just a short one,
12 yeah. Thank you.
13 THE VIDEOGRAPHER: Going off the record
14 at 4:33 p.m.
15 (Recess taken from 4:33 p.m. to 4:46 p.m.)
16 THE VIDEOGRAPHER: Back on record at
17 4:47 p.m.
18 BY MR. JAMES:
19 Q. Dr. Moorman, on page 13 to 14 of your report,
20 and really the top of page 14, you have a sentence
21 stating that (as read):
22 "The evidence for talc and ovarian
23 cancer is as significant as for
24 passive smoke exposure and lung
25 cancer."

Page 260

1 Do you see where I'm reading that?
2 A. Yes.
3 Q. There, are you referring to epidemiologic
4 literature?
5 A. What -- you're taking one sentence and --
6 I think that I discussed what I considered related to
7 the passive smoke exposure and lung cancer and
8 described it in more detail on page 13, the first full
9 paragraph.
10 Q. And is it fair to say that that body of
11 evidence that you're referring to there is the
12 epidemiologic literature?
13 A. Yes.
14 Q. You're not referring there to any sort of
15 mechanistic studies or plausibility studies or
16 anything like that; correct?
17 A. No. I was looking at -- basically, I was
18 comparing the two -- or the meta-analyses for the two
19 topics.
20 Q. On page 14, Dr. Moorman, you discuss the
21 "prevalence of exposure."
22 Do you see where I am? It's the --
23 A. It's about halfway down?
24 Q. Yeah, second full paragraph.
25 A. Yes.

Page 261

1 Q. And you say that it's critical to consider
2 the prevalence of exposure in conjunction with
3 considering strength; correct?
4 A. I say (as read):
5 "It's critical to consider the
6 prevalence of the exposure in the
7 population when evaluating its
8 public health impact."
9 Q. Before that, you say "in conjunction with the
10 strength of the association." Right?
11 A. Yes.
12 Q. Okay. Do you think that the prevalence of
13 exposure in the population, that that impacts your
14 analysis on whether an association is strong or not
15 strong?
16 A. I think that the way that I stated it here
17 is, you know, as an epidemiologist, a public health
18 professional, I'm interested in the public health
19 impact and how many cases of disease could be
20 attributable to this exposure.
21 So I go through and describe that factor
22 that has a stronger association but is less common in
23 the population could have potentially less public
24 health impact than a risk factor that is -- doesn't
25 have as high an odds ratio but you have many more

66 (Pages 258 to 261)

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 262

1  exposed people in the population.
2      Q.  Moving on to consistency, Dr. Moorman, is
3  consistency met on this body of literature?
4      A.  I do feel that consistency is met.
5      Q.  And on page 14, you -- I think it's page 14.
6  Yes.  In the first full paragraph, you discuss your --
7  you see the last sentence of that paragraph, where you
8  say (as read):
9          "This observation has been quite
10         consistent with findings
11         replicated in studies conducted by
12         different teams of investigators
13         in different geographic locations
14         and different race ethnic groups
15         over a span of several decades."
16     Do you see that?
17     A.  Yes, I do.
18     Q.  Is that reflective of -- is that the basis
19  upon which you conclude consistency is met?
20     A.  It is part of the basis of it.  I think that,
21  when we look at the overall meta-analyses, we look at
22  the direction of the effect in all the studies and of
23  these, like, 27 different studies, like, 90 percent of
24  them show an increased -- or an odds ratio greater
25  than 1.

Page 263

1      When we look at epidemiologic data, for
2  reasons that we have discussed earlier today, it is
3  very uncommon for every single study to reach the same
4  conclusion.  Some are going to have higher risk; some
5  are going to be lower risk.  And the level of
6  consistency seen here, where virtually every study is
7  showing an odds ratio greater than 1, I consider that
8  quite consistent.
9      Q.  You understand that Bradford Hill, when he
10  describes consistency, he talks about consistency
11  across study design.
12     Were you aware of that?
13     A.  Yes, I am.  And I actually do -- the way that
14  I described consistency, where even, you know -- two
15  of the three cohort studies -- and we've already
16  discussed the concerns I have about the Sister Study,
17  which is really quite an outlier when we look at this
18  whole body of literature.  But both the Houghton study
19  and the Nurses' Health Study, they are consistent in
20  terms of the direction of the effect.  And we have
21  discussed the statistical significance at all.
22     But in terms of the direction of the effect,
23  I think that it is consistent.
24     Q.  So is your position that the cohorts
25  demonstrate an association between talc and ovarian

Page 264

1  cancer?
2      A.  They -- if we can go back to them, we see
3  that there are multiple studies from the Nurses'
4  Health Study, and then the Houghton study.  They are
5  showing a relative risk in most cases, I think, 1.12
6  to 1.19.  And, again, we have discussed some of the
7  biases that might result in an attenuation of the
8  association.
9      And so I acknowledge that, with the
10  exception of the serous invasive cancer in one of the
11  studies, the associations have not been statistically
12  significant, but they are certainly kind of in the
13  direction of -- as the case-control studies.
14     Q.  Doctor, let's turn back briefly to the
15  Houghton study.  It's Exhibit 25.
16     Are you with me?
17     Dr. Moorman, if we look at the Houghton
18  study on the first page in the results section of the
19  abstract.  Do you see where I'm looking?
20     A.  Yes.
21     Q.  Okay.  The authors there, they report
22  every-use odds ratio as a 1.06.
23     Do you see that?
24     A.  I do see that --
25     Q.  Okay.  I'm running out of time, Dr. Moorman,

Page 265

1  so I really am going to ask you to answer my precise
2  question.
3      Do you see where the authors, they say
4  there -- the authors say that it's "not associated
5  with risk of ovarian cancer compared with never-use."
6      Do you see that?
7      A.  Yes, that is what they state.
8      Q.  Okay.  And a 1.06 is -- again, it's not a
9  statistically significant association; correct?
10     A.  With the confidence interval that they
11  report.  That's what tells you whether or not it's
12  statistically significant.  And with that confidence
13  interval, no, it is not statistically significant.
14     Q.  And it's also very close to the null, isn't
15  it?
16     A.  Yes.  It's the 1.06, yes.
17     Q.  And the conclusion of the authors here is
18  that (as read):
19         "Perineal powder use does not
20         appear to influence ovarian cancer
21         risk."
22     Correct?
23     A.  That's what they state, yes.
24     Q.  So this is one of the cohorts that you're
25  talking about today; correct?

67 (Pages 262 to 265)

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 266

1      A. Right. And --
2      Q. And the authors here conclude that there's
3  not an association between ovarian cancer risk and
4  perineal talc use, don't they?
5          MS. PARFITT: Objection. Form.
6          THE WITNESS: Okay. Yes, I acknowledge
7  that's their conclusion. And I think that -- I'm
8  sorry -- the data that I was referring to comes from
9  Table 3. And I, again, acknowledge that it was not
10 statistically significant, but he said only genital
11 powder use -- which is mostly what we're
12 considering -- it had a hazard ratio of 1.4 or 1.3 --
13 I'm sorry -- 1.14 or 1.13.
14         And so, again, it's in the direction of
15 effect, and, as we have discussed, biases could have
16 led to some attenuation.
17 BY MR. JAMES:
18     Q. Are you saying that you believe that there's
19 consistency among -- or between the case-control
20 studies and the cohort studies in the talc ovarian
21 cancer literature?
22     A. I am saying that -- as I have pointed out
23 here and with also the Nurses' Health Study, I am
24 saying that there is consistency in the direction of
25 the effect that they observed, and acknowledging that

Page 267

1  these were not statistically significant findings.
2      Q. So even though the authors report that
3  there's not an association, you're claiming today that
4  the cohort studies are consistent with the
5  case-control studies in finding a association?
6          MS. PARFITT: Objection. Form.
7          THE WITNESS: I think that I have
8  answered the question already that, in terms of the
9  direction of the effect, that the Houghton study for
10 the genital powder use and as well as some of the data
11 from the Nurses' Health Study, is consistent that
12 there -- the odds ratio is greater than 1.
13 BY MR. JAMES:
14     Q. So as long as the odds ratio, even if it's
15 statistically insignificant, exceeds 1, then you are
16 claiming that that's reflective of an association that
17 is consistent with the case-control studies?
18         MS. PARFITT: Objection. Form.
19         THE WITNESS: I am saying that there is
20 consistency in the direction of the effect.
21         If I may clarify. If you look at something
22 like alcohol use and ovarian cancer, which is a fact,
23 which overall there seems to be little association
24 between alcohol and ovarian cancer, if you look at the
25 meta-analyses from there, the overall estimate is

Page 268

1  right around 1. About half the studies have odds
2  ratios greater than 1; about half have odds ratios
3  less than 1. So in that case, I would say there is no
4  consistency.
5          I contrast it with this where, when you look
6  at the forest plots from the meta-analyses, nearly all
7  of the studies have odds ratios greater than 1.
8  BY MR. JAMES:
9      Q. And you're including in that testimony the
10 cohort studies?
11     A. Yes.
12     Q. Odds ratios that are not statistically
13 significant, in your mind, demonstrate consistency
14 by -- among study design. Is that your testimony?
15         MS. PARFITT: Objection. Form.
16         THE WITNESS: I'm sorry --
17 BY MR. JAMES:
18     Q. Your testimony here today is that the results
19 reached by the cohort studies and the case-control
20 studies are consistent. Is that your testimony?
21     A. My testimony, as I have stated repeatedly,
22 that there is a great deal of consistency in the
23 direction of the effect, that nearly all of the
24 studies report an odds ratio greater than 1. And
25 I acknowledge that not all studies are statistically

Page 269

1  significant, but I'm just saying that the direction of
2  the effect is very consistent.
3      Q. And we talked earlier today about the Berge
4  paper; correct?
5      A. Yes, we did.
6      Q. And they have performed an analysis for
7  heterogeneity on the -- by study design; right?
8      A. If I could go back to that.
9      Q. Sure.
10     A. Okay.
11     Q. Dr. Moorman, if we look at the abstract of
12 the paper, at the beginning, this is the point we
13 discussed earlier. Here, the authors say (as read):
14         "The heterogeneity of results by
15         study design detracts from a
16         causal interpretation."
17         Correct?
18     A. That is the statement that they make in their
19 abstract, yes.
20     Q. Okay. And then we looked earlier also at the
21 Figure 2; correct?
22     A. Yes, we did.
23     Q. Okay. And, again, that reflects an analysis
24 of the cohorts as compared to the case-controls;
25 correct?

68 (Pages 266 to 269)

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 270

1    A. Yes.
2    Q. If you look at page 253 of the Berge article,
3 and we look at the right column, the first -- the
4 second full paragraph, the authors there state
5 (as read):
6            "The fact that the association
7         between genital talc use and risk
8         of ovarian cancer is present in
9         case-control but not in cohort
10        studies can be attributed to bias
11        in the former type of studies."
12       Do you see that?
13   A. I do see what they say.
14       I -- I think that they are not considering
15 that there is also potential bias in the cohort
16 studies. They say "bias in the former type of
17 studies," not acknowledging the biases in the cohort
18 studies.
19       When you look at these data for the cohort
20 studies, you look at the Gonzalez study, which again,
21 I have referred to it as kind of an outlier with its
22 relative risk of .73, there are many problems with
23 that study. They assessed exposure in the past 12
24 months. The level of exposure is very different than
25 many of the other studies.

Page 271

1        And so part of the heterogeneity by study
2 design could be attributed to this Gonzalez study that
3 has very significant biases.
4    Q. If other experts for Plaintiffs in this MDL
5 litigation have conceded that there is not consistency
6 between the cohorts and the case-controls, then you
7 would differ with those experts; correct?
8        MS. PARFITT: Objection. Form.
9        THE WITNESS: I have --
10       MS. PARFITT: Misstates the evidence.
11 Thank you.
12       THE WITNESS: I have answered the
13 question, I think I've answered it repeatedly, why
14 I think that the aspect of consistency is met.
15 BY MR. JAMES:
16   Q. Okay. On dose-response -- on page 30, you
17 include discussion of dose-response in the literature.
18   A. Yes.
19   Q. And you acknowledge in your report that there
20 are inconsistencies in reported dose-response;
21 correct?
22   A. I -- what I state is (as read):
23            "While the inconsistency in
24         reported dose-response trends for
25         talc and ovarian cancer have been

Page 272

1         noted in some meta-analysis and
2         reviews, there are considerations
3         about those that should be taken
4         into account."
5    Q. Do you believe that there are inconsistencies
6 in the literature with regard to dose-response? Yes
7 or no.
8    A. I think that, yes, that there -- that across
9 the studies, some have found a dose-response, some
10 have not.
11   Q. At the bottom of page 30, you say that
12 (as read):
13            "When considering the studies that
14         examine dose-response associations
15         considering both dose and
16         frequency to estimate the total
17         number of applications of talc,
18         the majority did find significant
19         trends of higher risk with more
20         lifetime applications of talc."
21       Do you see that, where I read that?
22   A. Yes.
23   Q. Okay. And so for that proposition, you're
24 citing to eight studies. If you look at the
25 footnotes, you would agree with me that that's

Page 273

1 reflective of eight studies cited; correct?
2    A. Yes.
3    Q. And you're saying that five of the eight
4 studies that have looked at dose and frequency
5 together did find significant trends; correct?
6    A. Yes.
7    Q. Among those studies that you cite for that
8 proposition that the majority of those studies reflect
9 a dose-response, you cited to the Mills study;
10 correct?
11   A. I believe so.
12       MS. PARFITT: And, Dr. Moorman, you
13 have your binder in front of you as well if you need
14 it.
15       MR. JAMES: Okay. I'm going to mark
16 Mills as Exhibit 30.
17   (Exhibit No. 30 was marked for identification.)
18 BY MR. JAMES:
19   Q. I'm going to hand you two copies.
20       And, again, this is one of the papers you've
21 cited for the proposition that there's a dose-response
22 in the majority of studies that have looked at
23 frequency times duration; correct?
24   A. Okay. Yes.
25   Q. And we're looking at Table 2 as the relevant

69 (Pages 270 to 273)

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 274

1    table with the data; correct?
2        A. Yes.
3        Q. And if you look at Table 2, you go down to
4    the cumulative use category, it says "frequency times
5    duration"; correct?
6        A. Yes.
7        Q. And if I'm looking at this correctly,
8    Dr. Moorman, doesn't the data in that table reflect an
9    actual decrease in the odds ratio for the highest
10   exposure category?
11       MS. PARFITT: Objection. Form.
12       THE WITNESS: It is -- the highest
13   category, yes, does report an odds ratio of 1.06.
14   BY MR. JAMES:
15       Q. And based upon that, is it fair to say that
16   this paper reflects a dose-response when measuring
17   frequency times duration?
18       A. They looked at the -- they did a test for
19   trend, and we have a p-value of .051, so right at
20   borderline statistically significant. Some people
21   would argue that you should never use two decimal
22   points for p-values. But nonetheless, it's -- the
23   trend test was what I was referring to here, and it
24   was right at borderline statistical significance.
25       Q. And if you look at page 463 of the article,

Page 275

1    the third full paragraph down -- 463 in the left
2    column -- the authors -- this is in the authors'
3    words. They say (as read):
4            "As in other studies, the present
5            study did not find a clear
6            dose-response based on duration of
7            use or cumulative use."
8    Do you see that?
9        A. Right. And they go on to say that -- again,
10   I was basing what I said here based on their test for
11   trend, and -- and I think they do acknowledge that in
12   that category where they had relatively few exposed
13   cases, they didn't -- it was not a perfectly linear
14   association.
15       Q. So the authors are concluding that there's
16   not dose-response for cumulative use; correct?
17       MS. PARFITT: Objection.
18   BY MR. JAMES:
19       Q. Yes or no? That's what the authors conclude
20   in the text that we just read together?
21       A. I -- what we read -- yes. I'm trying --
22   let's see.
23       Yeah, I think that they are acknowledging
24   that it was not a perfect linear increase. My report
25   was basing it on the test for trend that they did.

Page 276

1        Q. And they're not just acknowledging that
2    there's not a perfect linear increase; they're saying
3    that there's no dose-response for cumulative use.
4        A. They say there is not a clear dose-response.
5    I think -- you know, again, that's what they say. My
6    conclusion here was, again, based on the test for
7    trend that they did. I don't think that it was
8    inaccurate, what I said here.
9        Q. Another paper that you cite for the majority
10   claim is the Terry 2013 paper; correct?
11       A. Yes.
12       Q. And do you know what the authors concluded in
13   that paper about dose-response for cumulative use?
14       A. May we look at that article?
15       Q. Sure. It's Exhibit 24. And if we look at
16   the abstract first together, the abstract says, the
17   second sentence from the bottom (as read):
18           "Among genital powder users, we
19           observed no significant trend in
20           risk with increasing number of
21           lifetime applications assessed in
22           quartiles."
23   Did I read that correctly?
24       MS. PARFITT: In the abstract?
25       THE WITNESS: I'm sorry, I wasn't quite

Page 277

1    there with you. Could you --
2    BY MR. JAMES:
3        Q. Understood. No worries.
4        A. Okay.
5        Q. So second sentence from the bottom of the
6    abstract, the author's conclusions on dose-response
7    are as follows (as read):
8            "Among genital powder users, we
9            observed no significant trend in
10           risk with increasing number of
11           lifetime applications assessed in
12           quartiles."
13       A. That's what they describe, and --
14       Q. I just asked, is that -- did I read that
15   correctly?
16       A. You did read that correctly.
17       Q. So the authors of the paper that you've cited
18   as one of the five papers that finds dose-response by
19   measuring lifetime of cumulative use says the exact
20   opposite; correct?
21       MS. PARFITT: Objection.
22       THE WITNESS: If I may take just a
23   moment. I want to find the part of this paper that
24   supported the statement that I made in my report.
25       MR. JAMES: Sure. Let's go off the

70 (Pages 274 to 277)

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 278

1  record.
2          THE VIDEOGRAPHER:  Going off record at
3  5:14 p.m.
4              (Off the record.)
5          THE VIDEOGRAPHER:  Back on record at
6  5:15 p.m.
7          THE WITNESS:  Okay.  On page 817, it
8  reads (as read):
9              "Although a significant increase
10             in risk with an increasing number
11             of genital powder applications was
12             found for non-mucinous epithelial
13             ovarian cancer when non-users were
14             included in the analysis."
15         And it then goes on (as read):
16             "Note trend in cumulative use was
17             evident in analyses restricted to
18             ever-users of genital powders."
19         And so, again, my -- the statement that
20  I had here, "a significant trend with increasing
21  number of genital powder applications," they make the
22  distinction of looking at the trend when you include
23  non-users, and that's a pretty standard thing to do in
24  epidemiology.  It's -- you look -- can look as
25  non-users as your reference group and then assess a

Page 279

1  trend.
2          I know what they say here, but I -- but
3  I think that what I stated in my report is accurate,
4  that they did find that a significant trend.  So
5  I don't think that I'm misstating what -- the data in
6  the paper.
7  BY MR. JAMES:
8      Q.  So the results that are reported by the
9  authors in the abstract you disagree with; correct?
10         MS. PARFITT:  Objection.  Form.
11  BY MR. JAMES:
12     Q.  The statements in the abstract pertaining to
13  dose-response, do you disagree with those statements?
14     A.  What they say is "among genital powder
15  users."  And so the statement that they make is
16  accurate, but I think that they are citing data
17  that -- it's one way to look at the data, but I think
18  that considering the non-users in their test for trend
19  is also a very well-accepted way to do that, to do a
20  test for trend.
21         And so I think that both -- they reported
22  one aspect of their analysis, and I reported what
23  I think accurately reflects another aspect of their
24  analysis.
25     Q.  Okay.  I am getting close to the end of my

Page 280

1  questions, Dr. Moorman.
2          MR. JAMES:  Michelle, is it fine if
3  I have some time to review my notes while the others
4  are asking questions and then come back?
5          MS. PARFITT:  Sure.
6          MR. JAMES:  Is that okay with you?
7          MS. PARFITT:  That's fine.  Sure.
8          MS. FOSTER:  Can we go off and I'll
9  switch.
10         THE VIDEOGRAPHER:  Going off the record
11  at 5:18 p.m.
12             (Off the record.)
13         THE VIDEOGRAPHER:  Back on record at
14  5:20 p.m.
15     CROSS-EXAMINATION BY COUNSEL FOR THE DEFENDANT
16             IMERYS TALC AMERICA, INC.
17  BY MS. FOSTER:
18     Q.  Good evening, Dr. Moorman.  We met a long
19  time ago this morning.  My name is Jennifer Foster.
20  I represent one of the Defendants in this action,
21  Imerys Talc America, Inc.  Do you understand that?
22     A.  Yes, I do.
23     Q.  And before you got involved in this
24  litigation, did you know who Imerys Talc America, Inc.
25  was?

Page 281

1      A.  No, I did not.
2      Q.  Had you ever heard of them before?
3      A.  No.
4      Q.  And do you have an understanding of who they
5  are now that you've become involved in the litigation?
6      A.  I do.
7      Q.  And you understand that Imerys mines and
8  supplies talc to Johnson & Johnson for use in some of
9  its talcum powder products?
10     A.  That is my understanding, yes.
11     Q.  Do you understand that Imerys does not sell
12  talcum powder products directly to consumers?
13     A.  That was my understanding, yes.
14     Q.  And based on some testimony earlier today
15  about the basis of your opinions being grounded in
16  epidemiology studies about talcum powder products, am
17  I correct that you wouldn't have any personal
18  knowledge with respect to the composition of the talc
19  that Imerys mines and supplies to Johnson & Johnson?
20         MS. PARFITT:  Objection.
21         THE WITNESS:  No, I would not have that
22  personal knowledge.
23  BY MS. FOSTER:
24     Q.  And you have no opinions about any talc
25  mining practices that Imerys employs; correct?

71 (Pages 278 to 281)

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 282

1    A. I know nothing about their mining practices.
2    Q. And you have no opinions about Imerys's
3 compliance with any applicable standards or
4 specifications regarding the mining of talc; correct?
5    A. I do not know anything about that.
6    Q. And I'm going to be hopping around a lot
7 because Mr. James covered a lot of ground, so just
8 bear with me. If I go somewhere and you don't know
9 what I'm talking about, please just tell me you don't
10 know what I'm talking about --
11    A. Okay.
12    Q. -- and I'll rephrase so that we can get on
13 the same page.
14    One of the first things you talked about
15 this morning when you were talking to Mr. James is
16 that you have entered a period I think you called
17 preretirement transition. Do I have that right?
18    A. Yes.
19    Q. Okay. And do you have a retirement date in
20 mind?
21    A. That's still somewhat being discussed with my
22 husband.
23    Q. Okay. So you don't have a set "I'm going to
24 retire in a year," for example?
25    A. The exact date is not defined yet.

Page 283

1    Q. And when you do retire, are you still going
2 to have any involvement with what you've defined as
3 the AACES study, the African American Cancer
4 Epidemiology Study?
5    A. That is still to be determined as well.
6    Q. And am I correct that that study is still
7 ongoing?
8    A. The funding for that study ended -- I think
9 it was 2015/2016. I don't recall the exact date. And
10 so we have not collected any data for that study since
11 that time.
12    We have continued to do analysis of data
13 that we have collected, and we are also trying to
14 secure funding to continue data collection with that
15 study.
16    Q. That was going to be my question. Who have
17 you made that request to for additional funding?
18    A. The grant application was submitted to
19 National Cancer Institute.
20    Q. And that's who funded the original research;
21 correct?
22    A. That is correct.
23    Q. And you also mentioned a publication that is
24 in draft form regarding something called the OCWAA
25 Consortium; is that correct?

Page 284

1    A. Yes, that is.
2    Q. And is that a study that's designed to
3 collect new data from study participants, or is that
4 going to be an evaluation of data that you already
5 have collected from other studies?
6    A. It is a consortium that is planning to
7 analyze data that have already been collected. It
8 involves -- I believe it is a total of seven studies;
9 some case-control, some cohort studies.
10    Q. And -- were you finished? I'm sorry.
11    A. Go ahead.
12    Q. And how were the studies selected to be
13 included in that consortium?
14    A. It was -- the purpose of that was to try to
15 put more data together, especially related to women of
16 African ancestry. So they're all US studies, so
17 African American. Recognizing that the AACES study,
18 with about 600 cases, we still have some issues with
19 statistical power. So we contacted -- Dr. Schildkraut
20 is the PI on this study as well.
21    And so studies that had a reasonable number
22 of African American study participants, they were
23 contacted to see if they were interested in
24 participating in such a study.
25    And so it includes studies such as the Black

Page 285

1 Women's Health Study Cohort, that's out of Boston
2 University; the Multiethnic Cohort, which is out of
3 California; the Southern Community Cohort Study; the
4 Women's Health Initiative; as well as a Los Angeles
5 case-control study and a case-control study out of
6 Chicago, in addition to the AACES study.
7    I think that that's most of them.
8    Q. Okay. Are you involved in any current
9 research where the intent is to collect new data for
10 evaluation of risk factors for ovarian cancer?
11    A. Other than what I described to you, that we
12 hope to -- that we are applying for funding to
13 continue the AACES study, I'm not currently doing any
14 data collection related to ovarian cancers.
15    Q. Are the coauthors and coinvestigators that
16 you worked with on the AACES and the North Carolina
17 Ovarian Cancer Study aware of your involvement in the
18 talcum powder litigation?
19    A. Some of them are. I -- you know, as --
20 I have disclosed it on one publication, and if they've
21 read it, they are aware. I've discussed it with some
22 of them but not all of them. You know, I haven't had
23 a conversation, per se, with all of them.
24    Q. And you mentioned earlier, with respect to
25 some of the new publications that are in draft form

72 (Pages 282 to 285)

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 286

1    that are currently in the peer review process, that
2    they have talc as a -- as a confounding factor under
3    investigation; correct?
4        A. I think -- I'm going to reread your --
5        Q. I can rephrase it.
6        I think when you were talking earlier about
7    the studies that you have in draft, the question was
8    whether or not you had any publications that, you
9    know, mentioned talc. And I thought your testimony
10   was that talc was listed as a possible confounding
11   factor in some of the studies that were in draft form.
12   Is that correct?
13       A. Right. I mentioned that specifically in
14   relation to the infertility and ovarian cancer paper
15   that is in draft form, it's -- talc is considered as a
16   confounder there.
17       In regard to the description of the OCWAA
18   study, that paper, we are listing it as one of the
19   factors that we are likely to evaluate as a risk
20   factor for ovarian cancer.
21       Q. Okay. And my question is have you ever
22   included asbestos as a risk factor under investigation
23   in your epidemiology studies?
24       A. If I am not mistaken, I think that we had a
25   question on the AACES questionnaire that we asked if

Page 287

1    women had ever been -- ever had a job where they were
2    exposed to asbestos, and I don't know that we have
3    analyzed that data yet.
4        Q. Okay. And you had some discussion with
5    Mr. James earlier today about different types of
6    terminology that might be used to describe
7    associations in the epidemiology literature.
8        Do you recall that?
9        A. Yes.
10       Q. And you were talking about weak associations,
11   modest associations, strong associations. Do you
12   remember that general discussion?
13       A. Yes.
14       Q. Now, as an epidemiologist, how would you
15   define a weak positive association?
16       A. As we have said before, there is no absolute
17   cut-point what's a weak association, what's a modest,
18   what's a moderate association. I -- I can't put a
19   number on that. I don't think any epidemiologist
20   could.
21       Q. In papers that you've authored that have used
22   the words "weak positive association," what do the
23   authors mean by that?
24       MS. PARFITT: Objection. Form.
25       THE WITNESS: I'm -- I'm not -- if --

Page 288

1    did you have a particular paper in -- in mind?
2    BY MS. FOSTER:
3        Q. Not with 20 minutes left, no.
4        A. I'm sorry. I just -- you know, you're asking
5    me what did they mean, and I'm not even sure which
6    paper might have described something as a weak
7    positive association, and I'm not sure who would have
8    used that terminology or what was going through their
9    mind when they chose those words.
10       Q. I assume there are standard epidemiology
11   textbooks that you use in your field; correct?
12       A. Yes.
13       Q. Okay. And what are some of your go-to
14   epidemiology textbooks?
15       A. Let's see. Ken Rothman's Modern Epidemiology
16   is -- different editions of it have been around since
17   I was in school 30 years ago. I still refer to them.
18       When I have taught the physician assistant
19   students, the textbook that we use, which is a little
20   bit lower-level textbook, was going to us. Those are
21   probably my go-to ones.
22       Q. Okay. Do any of the standard epidemiology
23   textbooks use terms like "weak," "modest," "strong,"
24   to describe associations?
25       A. I -- I imagine that in the textbooks, they

Page 289

1    might use that. But the point that I have been trying
2    to make is that there is no numerical value to go
3    along with those descriptors.
4        Q. All right. Switching topics, I want to talk
5    a little bit about some of the things that you
6    reviewed before you came and gave your deposition
7    today.
8        Now, you confirmed earlier that you reviewed
9    the reports of some of the other Plaintiffs' experts
10   in this case; correct?
11       A. Yes.
12       Q. And you reviewed those all between the time
13   that you finished your report and when you came here
14   to testify; correct?
15       A. That is correct.
16       Q. And those were all provided to you by
17   Plaintiffs' counsel; correct?
18       A. That is correct.
19       Q. And how did you choose which of the 22 expert
20   reports that you were going to sit down and read?
21       A. I knew which of the ones that were more of
22   the epidemiology-focused ones. And because that is my
23   area of expertise, those were the ones that I went to
24   first.
25       Also, some of it was, you know, some of the

73 (Pages 286 to 289)

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 290

1  names that I recognized:  David Kessler, former chair
2  of the -- former head of the FDA; Daniel
3  Clarke-Pearson, who is a gynecologic oncologist who
4  was formerly at Duke.  He's now at UNC.
5      Q. Do you know Dr. Clarke-Pearson?
6      A. Only by reputation.
7      Q. You haven't talked to him about your opinions
8  in this litigation?
9      A. No, I have not.
10     Q. And you haven't talked to any other
11  Plaintiffs' expert about your opinions in this
12  litigation?
13     A. No, I have not.
14     Q. In reviewing those reports, did you work
15  under the assumption that the authors of those reports
16  had employed generally accepted methodologies in
17  forming their conclusions?
18     A. I -- I assumed that they had.  You know, some
19  of the experts, they are names that I know, even if
20  I don't know the individual personally.  You knows,
21  Dr. Siematycki, Dr. McTiernan, these are very
22  well-known epidemiologists.  And so my assumption is
23  that they use generally accepted methodologies.
24     Q. I noticed on the
25  additional-materials-provided list -- I think it was

Page 291

1  marked as Exhibit 8 earlier.  It's a document that
2  I believe you said counsel had prepared, and it has
3  the expert reports on it.  It also has a couple of
4  deposition transcripts on it from Dr. Plunkett and
5  Dr. Singh.
6      Did you review either of those before you
7  came and testified today?
8      A. Dr. Plunkett and Dr. Singh, S-I-N-G-H?
9      Q. Yes.
10     A. I don't believe that I read Dr. Plunkett's
11  deposition.  I did read a fair bit of Dr. Singh's
12  deposition.
13     Q. When did you do that?
14     A. Probably a week or so ago.
15     Q. Do you have any intention of reading the rest
16  of the reports that Plaintiffs' counsel sent to you
17  after you're closed here today?
18     A. I think that it is possible that I will read
19  some of them, time permitting.
20     Q. You testified about a literature search that
21  you conducted on talcum powder and ovarian cancer.
22  When did you first conduct that search?
23     A. I believe that probably the first time I did
24  that search was not long after I was contacted about
25  possible involvement in this.  So probably summer of

Page 292

1  2016, and then updated it to make sure that my report
2  reflected the current literature.
3      Q. Did you do any kind of Bradford Hill analysis
4  of the claimed association between talcum powder usage
5  and ovarian cancer before you were retained as an
6  expert in the talcum powder litigation?
7      A. Doing -- considering the talcum powder -- or
8  considering the Bradford Hill criteria, this is
9  something that we do in our work all the time.  It's
10  probably not as formalized as what was done here.
11     As you're aware, I was a coauthor, but I was
12  not the lead author on the AACES study of talc and
13  ovarian cancer.  And in regard to the North Carolina
14  Ovarian Cancer Study, that was not the major focus of
15  the -- those papers that reported on talc and -- that
16  reported on talc as a risk factor.
17     So have I done the Bradford Hill criteria?
18  Certainly not in the detail that I have done for the
19  report that I prepared.
20     Q. And when you were -- when Mr. James asked you
21  about the NCI PDQ -- and you all looked at that as an
22  exhibit to the deposition.
23     Do you recall that earlier today?
24     A. Yes, I do.
25     Q. And one of the things that you mentioned is

Page 293

1  you see some kind of inconsistency in the way that NCI
2  evaluates data as to whether there is adequate
3  evidence of association or inadequate evidence of
4  association and specifically used the example of the
5  way that they evaluated the breastfeeding data.
6      Do you remember that?
7      A. Right.  What I -- I think the point that
8  I was trying to make when I was asked about that is
9  that the NCI PDQ, they do not describe their
10  methodology.  So we're kind of left at what method did
11  they use to evaluate the data?  Did they do a complete
12  systematic review, or was it -- was it something less
13  than a complete systematic review?
14     And my point is that, from the information
15  provided, we don't know what methods they used.
16     Q. Have you ever tried to communicate with any
17  of the editorial board members who write the NCI PDQ?
18     A. No, I have not.
19     Q. And you haven't submitted your report to
20  IARC; correct?
21     A. My --
22     Q. Your expert report.  You haven't submitted a
23  copy of your expert report to IARC for their
24  consideration; correct?
25     A. No, I have not.

74 (Pages 290 to 293)

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 294

```
1        Q.  Being conscious of the fact that we have
2   limited time left, I'm going to -- okay.  One last
3   question.
4              In terms of the expert report that you
5   provided in the MDL litigation that we've been talking
6   about all day today, are all of the opinions that you
7   intend to give in this litigation contained within
8   that report?
9        A.  I believe they are, yes.
10             MS. FOSTER:  I don't have anything else
11  for you.  So I'm going to pass you on to my colleague
12  here.  Thank you very much.
13             THE WITNESS:  Okay.
14  CROSS-EXAMINATION BY COUNSEL FOR THE DEFENDANTS
15         PERSONAL CARE PRODUCTS COUNCIL
16  BY MS. APPEL:
17       Q.  Hi, Dr. Moorman.  You can you hear me okay?
18       A.  I can, yes.
19       Q.  And just as a reminder from this morning,
20  I am Renée Appel, and I represent Personal Care
21  Products Council.  And I just have a handful of
22  questions to follow up on.
23             When did you first form your opinion in your
24  expert report that talcum powder products can cause
25  ovarian cancer?
```

Page 295

```
1        A.  I think that we have talked about this, that
2   the literature on talc and ovarian cancer has been
3   accruing since 1982, and to say at what point I formed
4   my opinion that it causes ovarian cancer, I can't
5   pinpoint that date.
6             I can say that I have considered talc as a
7   risk factor for ovarian cancer for quite some time.
8   Just over my career, it just seems like it has been an
9   accumulating volume of evidence.
10       Q.  Did you hold that opinion before you were
11  retained as an expert in the talc litigation dating
12  back to the Ingham case?
13       A.  I think that, yes, I did.
14       Q.  But, sitting here today, you can't recall a
15  specific year or point in time in which you formed
16  that opinion?
17             MS. PARFITT:  Objection.
18             THE WITNESS:  I think that I've
19  answered that.  I can't pinpoint at what point that
20  I concluded it was a risk factor for ovarian cancer.
21  It's been something that I've considered a risk factor
22  for ovarian cancer for quite -- quite a number of
23  years.
24  BY MS. APPEL:
25       Q.  And when you refer to "it," Doctor, are you
```

Page 296

```
1   referring to talcum powder products?
2        A.  Yes, because all of the literature is -- the
3   epidemiologic literature is based on talcum powder
4   products, whatever the women reported that they used.
5        Q.  So is it correct, Dr. Moorman, that you had
6   not formed an opinion as to whether pure talc is a
7   risk factor for forming ovarian cancer?
8             MS. PARFITT:  Objection.
9             THE WITNESS:  Again, my opinion is
10  based on the product that women have used, and my
11  understanding is that all of the products, they have
12  other constituents in them.  So they may contain, you
13  know, as we have discussed previously, fragrances, for
14  example.  We have also talked about that there are
15  other -- there's evidence to suggest other
16  constituents, such as asbestos or possibly heavy
17  metals.
18  BY MS. APPEL:
19       Q.  And as to those constituents, would you defer
20  to other experts to opine on them, based on the
21  examples you just provided, fragrances or heavy
22  metals?
23             MS. PARFITT:  Objection.  Form.
24             THE WITNESS:  You're asking me defer to
25  other estimates to opine on them in what sense?  Opine
```

Page 297

```
1   on them in what sense?
2   BY MS. APPEL:
3        Q.  Sure.  Would you defer to other experts to
4   opine on whether those particular constituents in
5   isolation are a risk factor for ovarian cancer?
6             MS. PARFITT:  Objection.  Form.  Asked
7   and answered.
8             THE WITNESS:  Okay.  Those particular
9   constituents in isolation are a risk factor for
10  ovarian cancer.
11             I think that we have discussed this
12  previously today, that what is the evidence about, for
13  example, the heavy metals in isolation in ovarian
14  cancer and limited to -- limited epidemiologic data in
15  that regard.
16             So I don't know that I'm deferring to other
17  experts, but, as I phrased it earlier today, I --
18  the -- whether or not these substances are in talc
19  products, it adds to the biologic plausibility, but
20  the epidemiologic data is based on the talc products.
21  That's what the women were exposed to.
22  BY MS. APPEL:
23       Q.  Okay.  So in forming your opinion, you are
24  assuming that those constituents that you've
25  mentioned -- heavy metals, asbestos -- that they are
```

75 (Pages 294 to 297)

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 298

1    in the talc powder product that you've rendered an
2    opinion about today?
3         MS. PARFITT: Objection. Misstates her
4    earlier opinions.
5         You might want to read that.
6         THE WITNESS: I -- I am not making,
7    really, any assumptions that these are in the
8    products. My -- you know, my focus on the
9    epidemiologic data is based on the use of the talc
10   products, whatever is contained in them.
11   BY MS. APPEL:
12        Q. In your report on page 30, you've indicated
13   that -- second paragraph, I'm reading from. And I'll
14   give you a moment to turn to it. (As read):
15             "For an association like talc and
16             ovarian cancer, the dose that is
17             most relevant is the amount of
18             talc that actually reaches the
19             fallopian tubes and ovaries."
20        Did I read that correctly?
21        A. Yes, you did.
22        Q. There is, in fact, though, no dose that has
23   been determined that actually reaches the fallopian
24   tubes and the ovaries in any of the studies that
25   you've relied upon; correct?

Page 299

1         MS. PARFITT: Objection. Form.
2         THE WITNESS: Let's see.
3    BY MS. APPEL:
4         Q. I can rephrase if you don't understand.
5         A. If you wouldn't mind, please.
6         Q. Absolutely.
7         In the studies that you've relied upon in
8    forming your opinion, none of those studies have
9    determined a particular dose of talc that actually
10   reaches the fallopian tubes and ovaries; correct?
11        MS. PARFITT: Objection.
12        THE WITNESS: Okay. So if we are
13   talking about the epidemiologic studies, there -- no,
14   of course, they did not measure what dose of talc
15   reached the ovaries and fallopian tubes. That would
16   not be feasible to do for -- reflecting the many, many
17   years of use, and also it would be completely
18   unfeasible to do something like that in an
19   epidemiologic study.
20   BY MS. APPEL:
21        Q. But you maintain the opinion that a
22   determination of that amount -- the amount being what
23   talc reaches the fallopian tubes and ovaries -- is
24   important to making a determination about an
25   association between talc and ovarian cancer; correct?

Page 300

1         MS. PARFITT: Objection. Form.
2         THE WITNESS: I think that the sentence
3    that followed the one that you're reading is that, for
4    all the pragmatic reasons, we rely on the measures of
5    external application as a surrogate of the level of
6    exposure. There's no way that we could measure what
7    dose of talc reached the ovaries or the fallopian
8    tubes for something that women might have applied over
9    20, 30, 40 years of their lives.
10   BY MS. APPEL:
11        Q. Earlier today, you had discussed the
12   hierarchy of scientific evidence.
13        Do you recall that discussion?
14        A. I don't think that I used that terminology,
15   but I think that -- in talking about the
16   meta-analyses, yes. Yes.
17        Q. In terms of that hierarchy, that you
18   understand that I'm referring to based on that prior
19   discussion, where do cohort studies fall in comparison
20   to case-control studies?
21        MS. PARFITT: Objection. Asked and
22   answered.
23        THE WITNESS: Okay. If you have a
24   cohort study that was able to determine exposure
25   completely and accurately, and follow women for a

Page 301

1    sufficient period of time, I think most people would
2    consider that a -- generally a stronger design than a
3    case-control study.
4         But, as I have indicated in my report, you
5    can't rely just on what is the stronger study design,
6    in general. You look -- have to look at the strengths
7    and limitations of the individual studies.
8         Cohort studies have some strengths; they
9    have some notable weaknesses. And I've described
10   those weaknesses several times over the course of
11   today. And I also acknowledge that case-control
12   studies have some weaknesses, but they also have
13   noticeable strengths too.
14   BY MS. APPEL:
15        Q. Is it accurate, Dr. Moorman, that, when you
16   were previously discussing meta-analyses and where
17   that falls on the hierarchy, you were envisioning a
18   pyramid graphic? Is that correct?
19        A. I have -- yes, I have seen graphics that
20   depict it like that.
21        Q. And in those particular graphics, where is
22   cohort studies listed in comparison to case-control
23   studies?
24        MS. PARFITT: Objection.
25        THE WITNESS: As I have said, that in

76 (Pages 298 to 301)

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 302

1    that pyramid, it is -- typically, the cohort study is
2    ranked as a stronger study design. But, again, I
3    cannot emphasize strongly enough that you have to
4    consider strengths and weaknesses of individual.
5    BY MS. APPEL:
6         Q.  And, Dr. Moorman, have you considered
7    publishing your expert report or the findings that you
8    arrived at in your expert report?
9         A.  I have considered it.  I have not actually
10   done anything to translate it into a manuscript.
11        MS. APPEL:  Okay.  Thank you,
12   Dr. Moorman.  That concludes my questions.
13        THE WITNESS:  Okay.
14        MR. JAMES:  I think there's about eight
15   minutes.  Off the record.
16        THE VIDEOGRAPHER:  Going off the record
17   at 5:50 p.m.
18        (Discussion off the record.)
19        THE VIDEOGRAPHER:  Back on record at
20   5:51 p.m.
21   FURTHER EXAMINATION BY COUNSEL FOR THE
22        JOHNSON & JOHNSON DEFENDANTS
23   BY MR. JAMES:
24        Q.  Dr. Moorman, in regard to your general cause
25   opinion, do you hold the opinion that the evidence is

Page 303

1    sufficient to support a general cause opinion for all
2    subtypes of ovarian cancer or do you distinguish among
3    the subtypes?
4         A.  Okay.  The majority of the studies looked at
5    epithelial ovarian cancer as a whole.  Some of the
6    studies did look at subtypes.  As we are aware, the
7    serous subtype is the vast majority, probably about
8    60 -- maybe "vast majority" is overstating it.  But
9    serous subtypes are roughly 60 percent of ovarian
10   cancer cases.  And so the studies that looked at the
11   subtypes tended to focus on that.
12        The other subtypes -- the mucinous, the
13   clear cell, and the other subtypes -- they are a much
14   smaller percentage of epithelial ovarian cancer.  And
15   so there's really not adequate data to make a
16   conclusion about these subtypes.
17        Q.  With regard to inhalation, which you touch
18   upon in your report, do you hold the opinion that
19   inhalation of talcum powder products can cause ovarian
20   cancer?
21        A.  I have stated that that is a possible route
22   of exposure to the ovaries.  The epidemiologic studies
23   have not specifically addressed the risk associated
24   with inhalation only of talcum powder products.
25        Q.  So is there evidence upon which you believe

Page 304

1    is sufficient to conclude that inhaled talcum powder
2    can cause ovarian cancer?
3         A.  I do not think that there are epidemiologic
4    studies that have actually looked at inhaled talcum
5    powder in relation to ovarian cancer.
6         Q.  And so is your answer that -- let me just ask
7    this again.
8         Do you believe there's sufficient evidence
9    upon which you can conclude that inhaled talc powder
10   causes ovarian cancer?
11        MS. PARFITT:  Objection.
12        THE WITNESS:  I think that I answered
13   that when I said that I don't think that there are
14   epidemiologic studies that have looked at that.  So
15   I can't say that there is sufficient evidence.
16   BY MR. JAMES:
17        Q.  Dr. Moorman, are you generally aware that, in
18   the African-American population, there is a lower
19   incidence of ovarian cancer?
20        A.  Yes.
21        Q.  And you have -- have you also seen in the
22   literature that there is at least some discussion in
23   the literature that the prevalence of talcum powder
24   used in the African-American populations may be
25   higher?

Page 305

1         A.  Yes.
2         Q.  If both of those things are true, can you
3    provide us an explanation as to why -- why that would
4    be the case?
5         A.  There are many causes of ovarian cancer.  And
6    some of the risk factors are more common in
7    African-American women; some are less common.
8         So when you consider the whole spectrum of
9    risk factors, you know, breastfeeding, pregnancy, oral
10   contraceptive use, to pinpoint one factor like talc
11   that is used more frequently in African Americans and
12   then say that that conflicts with the lower incidence
13   of ovarian cancer that we see in African-American
14   women, it doesn't take into account the full spectrum
15   of risk factors.
16        Q.  With regard to the Health Canada assessment
17   that we discussed much earlier today, do you
18   understand that that assessment is in draft form
19   currently?
20        MS. PARFITT:  Objection.
21        THE WITNESS:  My understanding is that
22   the scientific assessment they did is complete and
23   that they are -- that there is a period of comment
24   that -- so, I'm sorry, I want to make sure...
25

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 306

1   BY MR. JAMES:
2       Q.  Do you understand that right now that
3   assessment is currently in the process of a comment
4   period?
5           MS. PARFITT:  Objection.  Form.
6           THE WITNESS:  My understanding is the
7   assessment of the risk that they did, that is
8   complete, and then they are assessing -- or it is in a
9   comment period.  And I think that, you know,
10  potentially, if there were some serious concerns
11  raised, they might revisit the risk assessment that
12  they did.  But my understanding is what they published
13  is their -- that they felt like the risk assessment
14  was complete.
15  BY MR. JAMES:
16      Q.  And to be very quick here, I understand that
17  one of the materials provided to you in the additional
18  materials list was the Taher paper; correct?
19      A.  Yes.
20      Q.  And do you understand that the Taher paper is
21  one of the items discussed in the Health Canada
22  assessment?
23      A.  Yes.
24      Q.  And do you understand the Taher paper's
25  conclusion is consistent with the IARC's conclusion of

Page 307

1   possible cause?
2           MS. PARFITT:  Objection.  Form.
3   Misstates the evidence.
4           THE WITNESS:  If you have the Taher
5   paper -- again, just recalling exactly what they
6   stated, I -- too many papers to remember all the
7   detail.
8   BY MR. JAMES:
9       Q.  When is the last time you reviewed the Taher
10  paper?
11      A.  I would say probably a week or two ago.
12          MR. JAMES:  So if Michelle doesn't cut
13  me off, I will hand you a copy of it.  I'm going to
14  mark it as Exhibit 31.
15      (Exhibit No. 31 was marked for identification.)
16  BY MR. JAMES:
17      Q.  I'll hand you two copies.
18          Okay.  And, Dr. Moorman, again, because I'm
19  running out of time, I'll direct you to the precise
20  portion of the article that founds my question.  It's
21  on page 49, and it's in the conclusion section of the
22  paper.
23          And you see in the last sentence -- in the
24  last sentence, they report that the data indicates
25  "possible cause of ovarian cancer"?

Page 308

1       A.  Yes, I --
2           MS. PARFITT:  Is the question is that
3   what it says?
4   BY MR. JAMES:
5       Q.  That is the question.
6           We had a discussion earlier today about
7   possible cause; correct?
8       A.  Yes.
9           MS. PARFITT:  Objection.
10  BY MR. JAMES:
11      Q.  And, Dr. Moorman, with respect to the
12  Bradford Hill analysis --
13          MS. PARFITT:  Can we stop for a minute?
14          Are you going to tell us when we're off and
15  when we're done?
16          THE VIDEOGRAPHER:  Just one minute.
17          MS. PARFITT:  Thank you.  Oh, that's
18  good.
19  BY MR. JAMES:
20      Q.  With respect to your Bradford Hill
21  analysis -- and this should be my last question --
22      A.  Okay.
23      Q.  -- you will agree with me that in order to
24  reach a causal conclusion, you must rely on items
25  other than the cohorts, case controls, and

Page 309

1   meta-analyses of the epidemiologic literature;
2   correct?
3           MS. PARFITT:  Objection.  Form.
4           THE WITNESS:  The -- some of the
5   Bradford Hill aspects which I discussed in my
6   report were the biological plausibility, and so I did
7   rely on literature other than the epidemiologic
8   literature.
9   BY MR. JAMES:
10      Q.  And those are necessary as part of your
11  methodology to reach a causal conclusion; correct?
12          MS. PARFITT:  Objection.  Form.
13          THE WITNESS:  They are a consideration.
14  When you do a Bradford Hill analysis, of course you
15  take into account the biological plausibility and the
16  data that may come from cancer biology studies, animal
17  studies, and so on.  So yes, it should be considered.
18          MR. JAMES:  Okay.  Dr. Moorman, thank
19  you for your time.
20          THE WITNESS:  Okay.
21          MS. PARFITT:  Can we go off the record,
22  please.
23          THE VIDEOGRAPHER:  Going off the record
24  at 6:01 p.m.
25      (Recess taken from 6:01 p.m. to 6:14 p.m.)

78  (Pages 306 to 309)

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 310

1    THE VIDEOGRAPHER: Back on record at
2  6:15 p.m.
3    CROSS-EXAMINATION BY COUNSEL FOR THE PLAINTIFF
4  BY MS. PARFITT:
5    Q. Dr. Moorman, good evening.
6    A. Good evening.
7    Q. I just have a few questions to follow up with
8  counsel for J&J and then for PCPC.
9       Dr. Moorman, you were asked not too long ago
10 by Mr. James a question with regard to your general
11 causation opinions as they relate to does talc -- do
12 talcum powder products cause ovarian cancer.
13      Do you remember that discussion?
14   A. Yes, I do.
15   Q. All right. And I believe the question dealt
16 with subtypes of epithelial ovarian cancer.
17      Do you remember that?
18   A. Yes.
19   Q. All right. And I believe your testimony was
20 that there's really not adequate data to make a
21 conclusion about the subtypes.
22      Did you mean, when you said that, that
23 there's not adequate data to make a conclusion about
24 these other subtypes, that that was because the
25 non-serous subtypes were relatively rare?

Page 311

1    A. Yes, but the bulk of the literature is
2  addressing epithelial ovarian cancer, which includes
3  all of the subtypes.
4    Q. All right. So that the ladies and gentlemen
5  are clear as to what your opinion is, is it your
6  opinion that talcum powder products can cause -- or
7  exposure -- let me strike that.
8       Is it your opinion that exposure to talcum
9  powder products can cause ovarian cancer? Is that
10 your opinion?
11   A. That is my opinion.
12   Q. All right. And does that include all types
13 of epithelial ovarian cancer?
14   A. That -- yes. The data are based -- are
15 largely based on all types of epithelial ovarian
16 cancer. Yes.
17   Q. You were questioned a little earlier, and
18 briefly, about the Health Canada assessment. Do you
19 recall those discussions?
20   A. Yes.
21   Q. Okay. And have you had an opportunity to
22 review the recommendations of Health Canada?
23   A. I have, yes.
24   Q. All right. Based upon your review of the
25 Health Canada assessment, what is your understanding

Page 312

1  of the opinion of Health Canada vis-à-vis exposure to
2  talcum powder products and ovarian cancer?
3    A. My -- my understanding is that Health Canada
4  indicated that talcum powder products can cause
5  ovarian cancer.
6    Q. Mr. James showed you a study, the Taher
7  study.
8    A. Yes.
9    Q. And you had an opportunity to review the
10 Taher study as well; correct?
11   A. Yes.
12   Q. Is the Taher study a -- one of the pieces of
13 evidence that you looked at in your review of the
14 Health Canada assessment?
15   A. One of -- it's one of the pieces of evidence,
16 but not the sole body of evidence that they
17 considered.
18   Q. Okay. And is the Taher study also considered
19 a meta-analysis?
20   A. Yes.
21   Q. Okay. For purposes of rendering your
22 opinions in this case, that talcum powder products can
23 cause ovarian cancer, you have shared with the ladies
24 and gentlemen of the jury that you have reviewed
25 multiple meta-analyses; correct?

Page 313

1    A. That is correct.
2    Q. And I believe that you spent time today talking
3  with us with regard to the various meta-analyses that
4  you've looked at, examined, and assessed; correct?
5    A. That is correct.
6    Q. Okay. Based upon the totality of the
7  meta-analyses that you have reviewed, what is your
8  opinion with regard to whether or not they demonstrate
9  that talcum powder products can cause ovarian cancer?
10   A. I think that the meta-analyses show
11 consistent conclusions of a 25 to 30 percent increased
12 risk for ovarian cancer; and that coupled with the
13 other criteria that I considered -- the biological
14 plausibility and the various other Bradford Hill
15 criteria -- that I came to the conclusion that talc is
16 a cause of ovarian cancer.
17   Q. Dr. Moorman, is it fair to say that the
18 method -- method of review and your methodology and
19 the analysis that you performed, for purposes of the
20 preparation of your report and the opinions that you
21 shared today, is the type of methodology and the type
22 of process that is generally accepted in your
23 scientific community of epidemiologists?
24      MS. FOSTER: Objection to form.
25      THE WITNESS: I think that the methods

Patricia G. Moorman, M.S.P.H., Ph.D.

| Page 314 |
| --- |

1  that I used are what I do routinely in my work as an
2  epidemiologist and that is routinely done when we
3  conduct systematic reviews.
4  BY MS. PARFITT:
5      Q. You were questioned numerous times today with
6  regard to the IARC review of talcum powder products
7  and ovarian cancer. Do you recall those discussions?
8      A. Yes, I do.
9      Q. The IARC committee put out a monograph in
10  2010. Is that your understanding?
11     A. That is my understanding, yes.
12     Q. Do you have any knowledge as to when the IARC
13  committee met to make their findings as it pertained
14  to the role of talcum powder products in ovarian
15  cancer?
16     A. I don't recall the exact date, but I believe
17  that it was quite a bit earlier than that. I'm not
18  sure of the exact date.
19     Q. Okay. But it preceded the monograph that
20  came out in 2010?
21     A. Yes.
22         MS. PARFITT: Dr. Moorman, I have no
23  further questions. Thank you very much. I appreciate
24  it. A long day.
25         MR. JAMES: Dr. Moorman, just a handful

| Page 315 |
| --- |

1  more questions. Okay?
2         THE VIDEOGRAPHER: Mr. James.
3         MR. JAMES: Oh, of course.
4      Can we go off just for one second?
5      How long did Ms. Parfitt go?
6         THE VIDEOGRAPHER: Going off record at
7  6:22 p.m.
8      (Discussion off the record.)
9         THE VIDEOGRAPHER: Back on record at
10  6:23 p.m.
11     FURTHER EXAMINATION BY COUNSEL FOR THE
12         JOHNSON & JOHNSON DEFENDANTS
13  BY MR. JAMES:
14     Q. Dr. Moorman, since the IARC published its
15  monograph in 2010, we have had the publication of
16  additional cohort data on the talc ovarian cancer
17  association; correct?
18     A. Correct.
19     Q. With regard to the subtypes issue, do you
20  believe that different subtypes of ovarian cancer have
21  different risk profiles?
22         MS. PARFITT: Objection. Form.
23      You can answer.
24  BY MR. JAMES:
25     Q. And I'm talking about in general.

| Page 316 |
| --- |

1      A. The most pronounced difference that we are
2  aware of is that smoking seems to be more strongly
3  associated with mucinous ovarian cancer than with
4  other subtypes.
5      But in most -- for most other risk factors,
6  there -- the risk factors seem to be pretty consistent
7  across the subtypes.
8      Q. Are you aware that many clinicians consider
9  the various subtypes of ovarian cancer to be different
10  diseases?
11         MS. PARFITT: Objection. Form.
12         THE WITNESS: I think that clinicians
13  recognize that they -- there are differences. Again,
14  going to pathologists, they can distinguish between
15  them.
16      But in terms of how they treat them, it's
17  my -- I'm not aware of any real difference in how they
18  would treat the different subtypes of ovarian cancer.
19  BY MR. JAMES:
20     Q. And other than smoking, which is the factor
21  that you just mentioned, can you think of any other
22  risk factors that have a different impact on a
23  specific subtype of ovarian cancer as opposed to
24  another subtype?
25     A. That is the only one that comes to mind.

| Page 317 |
| --- |

1         MR. JAMES: That's all I have. Thank
2  you again for your time.
3         THE WITNESS: Okay.
4         MS. PARFITT: Thank you.
5         THE VIDEOGRAPHER: This concludes the
6  deposition of Dr. Patricia Moorman. The time going
7  off record is 6:25 p.m.
8      (Whereupon, at 6:25 p.m., the deposition ceased.
9         Signature was reserved.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

80  (Pages 314 to 317)

Patricia G. Moorman, M.S.P.H., Ph.D.

## Page 318

1      ACKNOWLEDGMENT OF DEPONENT

2      I, PATRICIA G. MOORMAN, M.S.P.H., PH.D., do

3   hereby acknowledge that I have read and examined the

4   foregoing testimony, and the same is a true, correct,

5   and complete transcription of the testimony given by me,

6   and any corrections appear on the attached errata sheet

7   signed by me.

8

9   _____   _____

10      (DATE)            (SIGNATURE)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## Page 320

1   STATE OF NORTH CAROLINA  )

2                           ) C E R T I F I C A T E

2   COUNTY OF ORANGE        )

3      I, Sophie Brock, Court Reporter and Notary Public,

4   the officer before whom the foregoing proceeding was

5   conducted, do hereby certify that the witness(es) whose

6   testimony appears in the foregoing proceeding were duly

7   sworn by me; that the testimony of said witness(es) were

8   taken by me to the best of my ability and thereafter

9   transcribed under my supervision; and that the foregoing

10   pages, inclusive, constitute a true and accurate

11   transcription of the testimony of the witness(es).

12      I do further certify that I am neither counsel for,

13   related to, nor employed by any of the parties to this

14   action, and further, that I am not a relative or

15   employee of any attorney or counsel employed by the

16   parties thereof, nor financially or otherwise interested

17   in the outcome of said action.

18      This, the 26th day of January, 2019.

19

20

21

22      _____

     Sophie Brock, RDR, CRR

23      Notary Number: 200834000001

24

25

## Page 319

1      E R R A T A

2   CASE NAME:  TALCUM POWDER LITIGATION MDL NO. 2738

3   WITNESS NAME:  PATRICIA G. MOORMAN, M.S.P.H., PH.D.

4   CASE NUMBER:  16-2738 (FLW)(LHG)

5   PAGE  LINE      READS        SHOULD READ

6   ____ ____ _____ _____

7   ____ ____ _____ _____

8   ____ ____ _____ _____

9   ____ ____ _____ _____

10   ____ ____ _____ _____

11   ____ ____ _____ _____

12   ____ ____ _____ _____

13   ____ ____ _____ _____

14   ____ ____ _____ _____

15   ____ ____ _____ _____

16   ____ ____ _____ _____

17   ____ ____ _____ _____

18   ____ ____ _____ _____

19   ____ ____ _____ _____

20   ____ ____ _____ _____

21   ____ ____ _____ _____

22   ____ ____ _____ _____

23   ____ ____ _____ _____

24   ____ ____ _____ _____

25   ____ ____ _____ _____

81 (Pages 318 to 320)

Patricia G. Moorman, M.S.P.H., Ph.D.

**A**

**AACES**
7:12 29:1,7 128:24
209:4 283:3
284:17 285:6,13
285:16 286:25
292:12
**AACR**
5:11 6:18 7:10,13
**ability**
11:23 35:13 320:8
**able**
72:3 102:23 163:25
248:17 300:24
**abortion**
223:2
**absence**
83:21
**absolute**
249:10 287:16
**absolutely**
64:11 70:17 84:14
87:20,22 129:7
165:6 255:11
299:6
**abstract**
169:14,15,17 176:5
176:10 195:11
202:19 205:6,8
227:25 264:19
269:11,19 276:16
276:16,24 277:6
279:9,12
**accept**
124:22 250:11
**accepted**
111:14 141:23
251:24 252:3
256:13 257:19
258:20 290:16,23
313:22
**accepts**
145:5
**access**
42:19
**accommodate**

**14:8**
**account**
176:18 216:14
242:20,22 272:4
305:14 309:15
**accruing**
295:3
**accumulated**
95:7 161:24 178:19
179:4
**accumulating**
142:3 295:9
**accuracy**
220:4,7 239:16
**accurate**
55:23 69:4 81:15
134:4 239:22
240:13 249:12
279:3,16 301:15
320:10
**accurately**
107:1 136:4 242:17
279:23 300:25
**acetate**
154:7
**acknowledge**
54:18 104:21
106:10,18 109:2
134:1 150:18,19
159:25 193:2,19
204:8 223:16
229:24 232:10
236:24 238:23
239:25 241:18
247:21 255:13,18
258:12 264:9
266:6,9 268:25
271:19 275:11
301:11 318:3
**acknowledged**
23:5,8 107:5
130:20 131:15
132:8 135:8
231:10
**acknowledges**
93:25

**acknowledging**
110:12 185:20,22
186:11 204:13
266:25 270:17
275:23 276:1
**acknowledgment**
170:8 318:1
**ACOG**
149:9,22
**ACOG's**
5:20
**acquire**
47:9
**action**
5:6 280:20 320:14
320:17
**activities**
10:13,21
**actual**
248:4 274:9
**add**
16:1 51:20
**added**
47:24 48:9,19 49:3
50:6 51:5,16
161:22 162:5
**addition**
217:25 219:10
285:6
**additional**
4:22 39:1,8,22 40:5
40:15,22 41:3,15
43:14 44:21,23
46:4,23 47:23
51:18,20 52:5
68:11,14 72:22
92:24 93:19 95:6
95:10 98:1,12
179:4 189:15,18
189:23 192:10
193:12,16 207:20
216:14 217:4
283:17 306:17
315:16
**additional-mater...**
33:19

**additional-mater...**
290:25
**address**
19:17 35:4 68:12
86:23 124:2 135:8
152:3 163:5,19
169:9 171:9
172:14 173:25
176:4 200:3
221:10 222:3
232:11,12
**addressed**
26:5 65:23 66:24
119:9 120:15
122:16 132:7
139:2 153:2
167:12 172:16
186:5 243:4,7,10
303:23
**addresses**
224:7 232:9 244:18
**addressing**
64:10,11 84:3
155:1 231:16
311:2
**adds**
297:19
**adequate**
110:14 154:8,13
155:16,17,21
156:5,8 255:23
293:2 303:15
310:20,23
**adjective**
248:14 249:21
**advance**
181:10 184:11
**advantages**
196:23 199:7
**advise**
168:21 170:1 171:4
**advisement**
25:2
**afindeis@napolil...**
2:14
**afraid**

**11:11 12:1**
**African**
7:11 26:9 27:11,12
29:1 128:18,20
136:15 283:3
284:16,17,22
305:11
**African-American**
5:15 20:22 25:21
27:11,15 128:12
135:13 136:8,13
136:17 304:18,24
305:7,13
**age**
218:7
**agencies**
253:10
**agency**
127:5 251:9
**ago**
10:18 136:5 220:19
280:19 288:17
291:14 307:11
310:9
**agree**
37:17 54:8 56:8
60:23 105:7,12,18
106:4 112:7
129:10 182:12
190:4 202:10
203:10 204:4,12
204:14 208:18,20
210:24 211:2
215:20 233:18
236:10 238:17
245:2 247:1,9
250:20 251:2
272:25 308:23
**agreed**
223:10
**agreement**
239:7
**ahead**
62:9 99:3 114:5
146:16 284:11
**AHRQ**

Patricia G. Moorman, M.S.P.H., Ph.D.

127:6
**al**
5:13,16,19 6:8,10
    6:12,17,20,23 7:5
    7:9,12,18,21
**Alastair**
2:14 8:20 12:11
**alcohol**
182:4 267:22,24
**Alexandria**
2:4
**Alison**
5:13
**allegation**
64:3,7 65:3,17 75:6
    105:10 120:17
**allegations**
9:24
**alleged**
84:7 86:10 109:19
    119:15 122:23
**allegedly**
105:22 106:9
**alleging**
106:7
**allowable**
121:23 122:3
**allowed**
22:24
**alluded**
101:8,13
**amend**
22:18
**America**
3:2 8:14 280:16,21
    280:24
**American**
5:14 7:11 29:1
    128:18,20 136:16
    166:12,24 283:3
    284:17,22
**Americans**
305:11
**amount**
75:20,21 76:5
    298:17 299:22,22

**Amy**
7:8
**analyses**
75:23 118:7 120:6
    120:7 121:16
    238:22 239:9
    278:17
**analysis**
5:18 6:19 111:8,12
    120:15 121:13
    138:23 139:4
    179:14,18 182:19
    202:21 214:9
    215:16 224:14
    233:24 236:20
    242:24,24 244:3
    244:15 256:9
    261:14 269:6,23
    278:14 279:22,24
    283:12 292:3
    308:12,21 309:14
    313:19
**analyze**
233:21 242:18
    284:7
**analyzed**
120:15 212:4,5
    242:8 287:3
**ancestry**
26:10 27:12 284:16
**Anderson**
25:18
**and/or**
142:25
**Angeles**
285:4
**animal**
52:24 58:1,6,11,16
    63:4 89:24 309:16
**animals**
106:24
**Anne**
44:4
**answer**
12:22 15:17 22:25
    22:25 55:22 57:23

58:8 60:5 61:3,21
    62:6 64:22 66:19
    69:22 70:2,3 74:5
    78:22 82:10,11
    95:14 99:2 102:4
    125:1,11,25 144:4
    163:9,24 171:23
    171:25 178:20,20
    184:16 200:12,18
    200:19,20 201:7,9
    201:21,22 204:19
    219:1,5 265:1
    304:6 315:23
**answered**
28:18 48:23 50:13
    50:15,20,21 54:11
    55:18,22 57:15
    58:12,15 60:15
    61:24 62:23 63:7
    63:14 64:20 82:6
    82:8 98:10 99:19
    125:19 183:4
    189:2 190:1 199:3
    199:5 200:22
    201:17 217:7
    219:14 245:24
    247:25 248:1
    252:19 255:6
    267:8 271:12,13
    295:19 297:7
    300:22 304:12
**answering**
64:14 65:21 146:22
    172:5 219:4 249:4
**answers**
14:1 60:6
**Anticancer**
6:13
**anticipation**
37:4
**anytime**
14:7 220:18 239:20
**apologies**
20:14 90:10 96:16
    109:11 135:21
    146:17

**apologize**
113:13 148:4
**apparently**
21:18
**appear**
265:20 318:6
**appears**
320:6
**Appel**
3:15 4:5 8:17,17
    294:16,20 295:24
    296:18 297:2,22
    298:11 299:3,20
    300:10 301:14
    302:5,11
**applicable**
230:3,6 282:3
**application**
6:14 283:18 300:5
**applications**
272:17,20 276:21
    277:11 278:11,21
**applied**
59:7 63:2 106:11
    143:8,10 144:1
    300:8
**applying**
285:12
**appreciate**
33:1 100:9 314:23
**approach**
17:25
**approached**
11:14
**appropriate**
22:12 47:12 218:19
**appropriately**
65:23
**approximately**
8:4 89:6 158:15
**April**
5:7 44:4
**area**
57:7 59:4,14 60:18
    63:14,17 90:1
    106:13 121:22

289:23
**areas**
56:16,19 60:19
    63:3
**arguably**
210:15,25
**argue**
274:21
**arisen**
95:10 98:12
**arising**
188:13
**arrangements**
35:15
**arrived**
302:8
**Arsenic**
5:9
**article**
5:11,14,17 6:6,9,13
    6:18,21 7:3,6,10
    7:13,16 19:20
    20:18,20 21:4,19
    21:24 22:4,7 23:3
    23:25 25:9,14,18
    26:2 40:20 59:25
    60:1 64:24 65:25
    66:3 67:17 108:20
    109:18 110:5,18
    111:3 147:20
    148:7,12,20 149:5
    169:13,14,16
    170:7,9 174:1
    177:21,24 187:20
    194:16,18,20
    210:9 211:24
    212:17 213:16,17
    213:20 215:4,4
    231:16 235:21
    237:8 238:8 239:6
    242:16,17 243:6
    243:21 254:19
    270:2 274:25
    276:14 307:20
**articles**
19:9,14,16 25:10

Patricia G. Moorman, M.S.P.H., Ph.D.

26:1,4 34:25 35:2
40:10,17 52:4,6
59:12,19 64:9,23
67:13,15 75:10
81:9 88:11 111:24
112:1 166:11,23
183:21 212:9
213:19 230:11
255:24
**articulated**
242:1
**asbestiform**
117:11
**asbestos**
5:11 19:10 25:11
26:1 28:10 30:10
30:21 31:1 63:20
63:24 64:3,8,18
65:3,18 66:7
67:11 68:12,20,25
69:7,9 70:14,16
70:18 71:2,14,18
71:20 72:2 73:3
75:7,23,25 76:1,2
76:9,15 77:22
79:14,21 81:10,15
81:23 82:13 83:6
83:21 84:7 85:8
86:1,10,13,14,21
86:24,25 87:4,8
87:14 88:1,7,8,12
88:14,21,22 89:1
89:10,17 90:5,19
90:23 91:1,15
92:14,19 93:2,9
93:12 94:19 96:3
103:20 105:2,9,22
106:6,9,14,15
108:7,21 109:14
109:19,21 110:10
111:8,10 112:9
114:6 117:24
119:23 124:21
125:14,21 141:13
141:24 142:13,22
142:24 286:22

287:2 296:16
297:25
**asbestosis**
114:18
**asbestos-containi...**
105:19
**asbestos-contami...**
85:14 113:21
**asbestos-free**
69:1 71:23
**asbestos-related**
114:19
**ascertained**
220:6
**ascertainment**
210:17
**ascribe**
257:15
**Ashcraft**
2:3 15:19
**aside**
88:21 126:22
**asked**
34:7 48:22 50:12
50:19,22 54:10,12
54:20 55:15 57:14
58:12 60:14 62:11
62:23 63:6 68:13
82:5,8 98:10,25
99:6 102:10 126:1
129:1 131:16
135:7 140:15
172:4 177:20
178:10,22,24
184:17 195:18
199:2 200:15
201:8,17 206:19
208:14 217:6,13
217:25 218:3
219:3,7,9,11
225:16,22 245:23
247:24 248:2
277:14 286:25
292:20 293:8
297:6 300:21
310:9

**asking**
12:24 13:10 24:10
29:20 44:15 60:10
60:11 63:2 87:23
134:8 140:12
144:7 146:15,24
201:23 218:9,12
220:10 221:5
223:11 224:24
225:13 250:7
256:23 280:4
288:4 296:24
**aspect**
211:3 223:23
271:14 279:22,23
**aspects**
170:15,21 172:14
213:18 309:5
**assertion**
123:4,8
**assess**
102:10 202:22
215:2 254:9,18
255:1 278:25
**assessed**
96:10 110:21
253:11 270:23
276:21 277:11
313:4
**assesses**
253:4
**assessing**
64:18 109:13
126:23 127:14,21
196:24 249:15,16
250:7 253:15
256:2 258:22
306:8
**assessment**
101:17 124:18
143:5 187:16
211:5 217:20
240:9 305:16,18
305:22 306:3,7,11
306:13,22 311:18
311:25 312:14

**assessments**
159:2
**assistant**
24:10 288:18
**associated**
20:21 143:25
147:25 149:2
154:18 155:9
166:7 182:3,9,15
225:8,9 255:21
265:4 303:23
316:3
**association**
7:10,20 27:5 28:14
90:18 92:13 94:10
94:21 98:14
110:16 127:14,21
132:18,22 133:3
133:16,19,21,23
133:24 134:9,9,10
134:13 135:1,2
136:14 137:7,23
138:11,14 139:17
142:9 148:21
150:24 152:1
155:25 156:4,17
156:22 157:12
158:3,20 160:25
162:3 164:3
169:23 170:13
171:1 174:10
178:16 185:12,16
186:13,17 187:14
188:15,25 189:5
189:10 190:21
192:23 193:5
195:16 200:7
203:22 204:11
205:17 210:19
228:25 234:17
236:20,22 241:5
242:5,20,22 244:9
245:4 246:10,10
246:12,15,18,25
247:1,8,17,23
248:5,9,17 249:5

249:7,11,17,19,25
250:3,10,18,21
251:2,6,11 253:1
253:5,16,18
256:11,14 257:3,7
257:13,15,17
258:19,20,21,25
261:10,14,22
263:25 264:8
265:9 266:3 267:3
267:5,16,23 270:6
275:14 287:15,17
287:18,22 288:7
292:4 293:3,4
298:15 299:25
315:17
**associations**
94:1 126:13,20,24
136:21 140:3
143:22 162:1
176:19 193:3
230:13 231:14
245:7,13 246:14
247:16 248:25
250:2 251:22
252:2,8,11,16,17
253:13,19,22
257:19,20 258:9
258:10,12 264:11
272:14 287:7,10
287:11,11 288:24
**assume**
231:12 288:10
**assumed**
290:18
**assuming**
297:24
**assumption**
290:15,22
**assumptions**
298:7
**attached**
45:19 46:21 318:6
**attempted**
22:18
**attempting**

Patricia G. Moorman, M.S.P.H., Ph.D.

117:20
**attention**
23:10 59:13,20,21
59:24 185:9
207:22 232:21
233:1,3,6,18,22
233:25 240:22
**attenuated**
132:19 133:16,21
134:3 137:24
138:1,4,9 162:5
234:17 241:1
**attenuating**
190:21
**attenuation**
132:9 264:7 266:16
**attorney**
11:24 320:15
**attorneys**
11:12 12:3,14,18
13:12,15
**attributable**
241:14 261:20
**attribute**
242:4
**attributed**
270:10 271:2
**Austin**
2:8 3:4
**author**
20:19 21:12 22:4
22:11,17 25:16,18
179:6,7 188:21
246:24 247:7
292:12
**authored**
13:8 19:9,14,16
25:10 26:1 37:7
37:15 42:13
287:21
**authority**
158:18 244:19,23
**authors**
23:4 108:11,17,19
109:3,25 110:9,12
163:3 166:4

167:18,24 168:7
168:21 169:5
170:2,9 172:21,25
173:17,25 174:6
174:14 175:7,25
176:4,10,21,22,24
178:24 179:3
180:16,24 181:1
183:2 186:12
187:20 188:21
195:10,12,19
202:20 203:3,16
204:13 205:7,9,24
206:9 207:10,19
207:25 208:21
210:12,24 212:21
234:23 247:7
264:21 265:3,4,17
266:2 267:2
269:13 270:4
275:2,2,15,19
276:12 277:17
279:9 287:23
290:15
**author's**
227:24 277:6
**available**
33:21 47:16 50:18
51:11,12 67:17
74:16 75:12 88:18
155:23 176:11
**Avenue**
3:3,8
**average**
218:7
**aware**
30:6,8 47:10 48:16
51:12 52:6 59:3
59:12,19 74:20
83:14 86:12 88:10
88:17 102:20
107:19 111:21,24
114:16 119:8
122:15 146:24
147:2,2,20 182:21
183:19,23 184:2

186:20 187:20
199:13,18 200:16
200:25 201:2,8,11
201:11,24 203:24
263:12 285:17,21
292:11 303:6
304:17 316:2,8,17
**a.m**
1:15 8:4 52:16,17
52:17,19 115:3,4

_____

**B**

**B**
3:15
**baby**
80:10 129:16,23
130:3
**back**
29:16 35:16 36:5
52:18 61:9,15
103:19 115:5
116:23 123:14
135:12 147:8
150:16 153:15,18
153:22 165:11
177:18 180:8
183:13 204:9
206:22 211:16
215:5 217:15
218:9,13 219:22
232:22 234:5
242:15 248:24
249:24 259:16
264:2,14 269:8
278:5 280:4,13
295:12 302:19
310:1 315:9
**Background**
202:19
**backwards**
173:4
**BACON**
2:17
**bad**
76:2
**baffled**

155:20
**balanced**
240:9
**ballpark**
229:13
**bar**
250:19
**base**
117:5
**based**
47:2 81:24 87:6
90:20 92:16 93:12
93:14 116:4 117:8
117:9,23 118:6
119:22,25 125:3,4
125:19 129:9
130:21 140:1
144:2 154:17
156:7 198:13
222:17,18 224:20
235:23 240:16
243:23 244:24
274:15 275:6,10
276:6 281:14
296:3,10,20
297:20 298:9
300:18 311:14,15
311:24 313:6
**baseline**
218:7,19
**bases**
71:9 117:20
**basically**
31:20 35:1 181:8
181:16 260:17
**basing**
116:11 122:17
126:4 154:9
275:10,25
**basis**
67:25 68:1 122:2
123:20 124:6
220:4 222:13,16
242:11 262:18,20
281:15
**batch**

72:23
**bear**
55:4,8 245:6 282:8
**beat**
151:19
**began**
60:12 218:22
**beginning**
108:16 269:12
**begins**
38:25 207:18
**behalf**
2:2,16 3:2,11,17
9:21 16:25
**beliefs**
25:15
**believe**
12:23 13:2 14:21
18:22 22:3,6
23:23 24:9 30:12
32:9,25 34:7
36:17 40:16 47:4
49:17 50:14 56:21
56:23,24 58:4,14
59:2 63:22,24
64:20 66:13 67:2
75:9,13 79:23
80:5,6,18 81:11
88:22 89:15 108:5
110:10,19 111:2
115:22 118:12
120:13 122:2
123:6 127:8
129:18,22 132:14
136:24 140:11
145:4,8 148:12
164:18 165:18
168:17 177:15
183:14 187:25
188:20 191:8
192:12 193:8
209:6 216:23
217:2 219:5
220:10 234:2
236:1 266:18
272:5 273:11

Patricia G. Moorman, M.S.P.H., Ph.D.

284:8 291:2,10,23
294:9 303:25
304:8 310:15,19
313:2 314:16
315:20
**benefits**
206:18
**Benign**
20:20
**Berg**
169:1
**Berge**
6:10 169:1,5 170:2
172:25 194:18,20
195:10 212:16
213:15,20 214:9
214:17 215:2,4,12
215:15,17 269:3
270:2
**best**
43:10 320:8
**Bethea**
30:1
**better**
190:5,23
**bias**
7:14 103:14 110:15
132:23 159:11,16
159:18,18 160:1,4
164:11 176:16
185:7,20 186:6,11
190:10,10 203:7
203:12,23 204:9
204:10 205:14
206:9 207:13
220:23 221:1,7,12
221:13,19 226:11
226:22 229:2,3,14
230:7,12 231:4,4
231:11,12,17,17
231:20 232:5,10
232:13,20 237:17
238:10,24 239:8
239:12 240:1,11
240:16,19 241:6

241:14,19,19,24
242:4,5,8,20,22
243:4,10,17 251:3
251:7 254:10
270:10,15,16
**biased**
231:22
**biases**
160:11 164:13
171:13 177:5
230:22 231:23
264:7 266:15
270:17 271:3
**BIDDLE**
2:21
**big**
100:1 229:15
**binder**
4:17 35:7,19 36:2
273:13
**biologic**
205:12 254:13,15
297:19
**biological**
48:14 87:11 88:16
117:12 121:4
181:11 182:6
183:10 309:6,15
313:13
**biologist**
53:21 57:4,18
**biology**
53:20,22 57:9,10
309:16
**bit**
12:1,5 59:4,14
134:24,24 143:6
144:13 148:3
154:23 155:20
161:17 234:15
288:20 289:5
291:11 314:17
**Black**
284:25
**blanking**
12:12

**blogs**
30:17
**board**
293:17
**bodies**
146:9,25 254:9,12
**body**
7:10,13 56:22
60:13 63:10 64:18
89:9 102:10,20
103:19,21,24
104:22 105:7,13
105:17 106:19
107:5,13,17
111:15,22 112:17
128:24 129:8,9,13
131:5,17 132:2
142:12,13,22,25
144:15,17 155:13
156:11,21 161:12
174:7 178:12
197:20,25 199:11
199:14 200:16,25
201:12 202:4
227:15,19,21
229:14 231:3,6
237:15 239:15
253:20 254:7
255:1 260:10
262:3 263:18
312:16
**Bondy**
29:7
**borderline**
274:20,24
**Boston**
285:1
**bottom**
77:18 85:10 108:15
109:23 150:7
167:17,23 195:1
196:21 203:17
207:18 210:13,14
211:23 221:10
226:7,15 272:11
276:17 277:5

**Brad**
3:23
**Bradford**
111:8,11 182:21
183:8 244:3,20
247:15 248:24
249:15 258:23
263:9 292:3,8,17
308:12,20 309:5
309:14 313:14
**brand**
75:11
**break**
14:7 19:13 52:11
113:10,16 114:24
117:2 165:5
175:18 209:16
210:1,5 211:10
259:10
**breaking**
259:2
**breast**
181:24 182:1,2
225:21,23 254:1,5
**breastfeeding**
154:15,18,20,24
155:2,7,9,15,16
156:12,17,23,25
157:4,13 293:5
305:9
**Brennan**
2:23 8:11,11
173:13 259:7
**briefly**
264:14 311:18
**Britton**
7:15 237:15,25
**Broadhollow**
2:12
**broadly**
128:21
**Brock**
1:21 320:3,22
**broken**
235:5
**brought**

23:10 33:25 34:4
35:7 54:24 59:13
59:20,21,24
126:18 221:7
**bulk**
311:1

——————————————
**C**
**C**
2:1 3:1 5:9 6:22 8:1
320:1,1
**cadmium**
122:13
**calculated**
214:20
**calculation**
214:17,18 215:3
**calculations**
124:18 212:4,6
**California**
7:18 285:3
**call**
110:23 133:9
247:23
**called**
109:3 282:16
283:24
**calls**
94:20
**Camargo**
110:18 111:3
**Cambria**
1:17
**Campus**
2:22
**Canada**
145:16,19,23 146:3
146:8 147:6
150:17 253:14
305:16 306:21
311:18,22,25
312:1,3,14
**cancer**
5:12,14,17,20 6:3,4
6:7,10,12,15,19
6:22 7:3,4,11,11

Patricia G. Moorman, M.S.P.H., Ph.D.

7:14,16,17,21
9:19,25 19:10
20:21 21:15 23:5
25:12,16,21 26:9
26:25 27:5,11,15
28:12 29:2,2
30:22 31:1,24
32:12 40:19 48:15
52:3,9 53:20,21
53:22 54:15 56:21
57:4,18 58:17
60:4 62:22 63:21
63:24,25 66:2
87:1,5,12,14
88:23 89:1,11,17
90:19 92:14 93:4
93:9 94:14,19
98:5,14 102:8,13
102:15,24 103:20
104:5,9 105:11,15
108:8,23 109:14
109:22 110:10
111:9,10,13,23
112:10,18 113:1
114:12 117:14
120:19 121:3,6
122:13,17 124:3
124:24 125:6,8
127:4,4 128:11,19
128:20 135:13,18
136:8 137:1
138:17,20 139:4
139:18,24 140:16
141:12,23 142:3
142:14 143:2,10
143:14,15,21,23
143:25 144:17,18
144:23 145:6,9
146:4,12 147:1,19
148:1,10 149:4,10
149:23 150:12,23
150:24 151:11
154:19 156:12,17
156:23 157:1,3,4
157:13 158:13
160:20 161:11

166:8,20 167:5,6
168:5 174:11
176:16 181:15,18
181:24 182:1,2,7
185:14 186:19
187:7 188:15,25
189:5,10,16
190:13 192:24
193:6 197:1,7,8
197:15,20 201:12
202:23 203:24
205:20 207:23
209:6,9 210:21
212:10 213:1
218:19,22 224:19
225:6,21,23 226:4
226:18 227:17
228:11,17 229:25
231:7 232:7,11
233:13,23 234:24
237:16 245:9,11
245:15,21 246:9
246:24 247:8,19
249:2,14 251:11
252:25 253:12,25
254:1,4,5,8,17
255:8 257:25
259:23,25 260:7
264:1,10 265:5,20
266:3,21 267:22
267:24 270:8
271:25 278:13
283:3,19 285:10
285:17 286:14,20
291:21 292:5,13
292:14 294:25
295:2,4,7,20,22
296:7 297:5,10,14
298:16 299:25
303:2,5,10,14,20
304:2,5,10,19
305:5,13 307:25
309:16 310:12,16
311:2,9,13,16
312:2,5,23 313:9
313:12,16 314:7

314:15 315:16,20
316:3,9,18,23
**cancers**
5:18 54:15 113:24
  138:22 254:5
  285:14
**capable**
248:8 249:19
**capture**
50:5 59:8 60:13
**captured**
218:23
**carcinogen**
96:24 97:3,7,23,24
  97:25 98:22
  101:23
**carcinogenic**
96:4,18,22 98:17
  99:12,15 119:7
  122:19 123:5,24
  146:14 180:20
  253:3
**carcinogenicity**
122:23
**Carcinogens**
5:10
**Care**
3:11 8:18 294:15
  294:20
**career**
23:6 127:15,22
  156:20 295:8
**careful**
246:2
**carefully**
186:6
**Carolina**
1:18 135:18 137:1
  138:17,20 139:3
  140:16 285:16
  292:13 320:1
**carries**
92:3 207:18
**carry**
160:5,9
**carrying**

226:7
**case**
9:19,22,24 10:2,3,5
  11:10,21 12:3
  15:10,20 16:18
  17:7 31:21 32:20
  41:2 45:6 47:2
  59:1,8 60:12
  74:18 76:13 87:10
  106:8 115:20
  116:10 119:17
  120:8 125:16
  152:15 165:24
  174:18 175:23
  179:8,15 180:12
  197:6 216:23
  229:8 232:15
  268:3 289:10
  295:12 305:4
  308:25 312:22
  319:2,4
**cases**
1:9 6:19 11:13,20
  12:2,4 15:20
  104:12,13,15
  107:15 199:25
  200:1 212:14
  213:1,3 239:17
  261:19 264:5
  275:13 284:18
  303:10
**case-control**
7:7 20:22 170:23
  171:11 185:6,21
  187:8 195:20,21
  196:22 197:8,13
  198:2,4,22,25
  199:13,22 203:19
  205:15 207:13
  208:12,18,22
  211:7 213:8
  214:14 220:20
  226:12,21 227:1
  227:14,19 228:2
  228:14,19 229:1,4
  229:11 230:1,8,14

230:17,21 231:15
  231:19 232:13
  238:11 241:11,18
  243:17 264:13
  266:19 267:5,17
  268:19 270:9
  284:9 285:5,5
  300:20 301:3,11
  301:22
**case-controls**
198:7,8 269:24
  271:6
**categories**
217:21
**categorize**
35:2,2
**category**
140:7 252:12,18,20
  258:8 274:4,10,13
  275:12
**causal**
90:17 92:13 142:23
  143:18 145:19
  146:5 158:3,20
  159:2 163:13,15
  164:3 166:15,25
  168:3,12,17
  169:22 170:11,25
  174:9 176:13
  178:6,15 181:14
  182:11,18 185:15
  195:15 245:7,13
  246:14,15 250:2
  250:19 251:24
  252:4,7,15,23
  253:1 255:15,16
  255:22,25 256:14
  256:19 257:3,8,19
  257:24 258:9,20
  259:1 269:16
  308:24 309:11
**causality**
143:9 144:2 149:6
  159:7 174:16
  182:23
**causation**

163:4,6 164:8
166:5 168:9,22
169:6,10 170:3
172:21 173:18
174:1 175:8 176:2
176:5,25 177:13
177:21 178:25
181:2,20 183:3
254:21 255:5
256:5,7 257:1
258:1,11,13
310:11
**cause**
5:11 9:25 31:23
87:12 88:22 98:5
102:8,12,15,23
108:8,22 111:10
120:18 121:2
122:13 124:24
125:8,15 142:15
145:5,9 146:3,12
147:1,18 167:9,15
179:22 182:2,8,16
183:11 294:24
302:24 303:1,19
304:2 307:1,25
308:7 310:12
311:6,9 312:4,23
313:9,16
**caused**
166:20 167:3
225:23
**causes**
5:17 86:25 87:4
105:11 141:12,13
141:23,24 150:11
167:6 181:18
295:4 304:10
305:5
**caution**
160:15,18 163:15
168:9 240:14
**cautionary**
164:7,10
**caveats**
218:4

**ceased**
317:8
**cell**
53:2 58:20,24
60:25 61:6 62:3
63:4 156:23
303:13
**Central**
7:17
**certain**
39:15 121:2 168:3
168:12
**certainly**
25:1 52:14 60:18
78:9 86:12 102:5
145:14 211:3
218:11 237:1
239:3 245:8
247:15,16 248:25
249:2 250:17
256:18 257:5
264:12 292:18
**certainty**
59:15 80:8 102:18
**certify**
320:5,12
**chair**
290:1
**chance**
49:25 103:14
**change**
10:8,12,19 43:15
43:17 51:21 52:10
111:5 125:22
**changed**
193:25
**changes**
10:15,20 18:23
38:12
**changing**
69:13
**characteristics**
199:8
**characterization**
53:17 201:5 247:2
**characterize**

67:14 97:2,3,6,9
160:8 162:23
184:22 249:8
**characterized**
49:17 75:25 184:20
**charging**
14:16
**chatroom**
30:17
**check**
21:16 216:23
**checklist**
101:25 103:8,11,18
**Chemistry**
85:7
**Chicago**
3:19 285:6
**childbearing**
182:4
**choose**
289:19
**chose**
288:9
**Chris**
13:3
**chromium**
119:12,15 122:13
**chronologically**
173:4
**CI**
137:20 138:10
139:20
**cigarette**
141:11
**cite**
32:16 95:2,5
146:11 158:18
183:17 192:14
211:24 212:1
213:20 214:1
221:18 222:14
226:8,10 242:7
243:2 244:14,17
244:19,22 246:8
251:9,15 253:4,8
254:2 256:19

273:7 276:9
**cited**
45:6,25 46:4 51:1
66:20 78:17 123:1
123:3 152:17
183:20,21 206:24
207:3 230:12
246:17 250:8,9
253:23 255:1
273:1,9,21 277:17
**cites**
104:19
**citing**
242:12 272:24
279:16
**claim**
68:20,24 70:22
75:17 102:12
108:7 118:24
119:6 121:11
276:10
**claimed**
292:4
**claiming**
198:23 199:1 267:3
267:16
**clarified**
129:5
**clarify**
91:17 115:17 120:9
130:2 142:17
144:5 267:21
**clarifying**
117:9
**clarity**
16:2
**Clarke-Pearson**
44:5 290:3,5
**classification**
103:8
**classifications**
96:25 252:14
**classified**
96:11 252:12,17
**classifies**
155:24

**clear**
23:14 47:23 91:5
93:24 100:12,14
128:16 130:15
248:13 275:5
276:4 303:13
311:5
**clearing**
29:22
**clearly**
90:20 92:15 120:5
143:21 182:1
197:2 236:12
**clinicians**
316:8,12
**clock**
200:23
**close**
137:8,10 138:6,14
265:14 279:25
**closed**
291:17
**coauthor**
20:23 25:22 26:7
138:24 292:11
**coauthors**
28:20 29:9,12,24
30:3,6 239:6
285:15
**cobalt**
119:12,15 122:13
**cohort**
7:7 90:21 92:17
104:11,18,19
170:24 171:11,13
185:12 186:13,16
186:18 187:7
188:13,14,24
190:4 191:3,7
192:5,8 194:9,25
195:22 196:22
197:7,13,22 198:2
198:4,20,24
199:12,15,19,24
200:2,18 201:1,13
202:7,10 204:14

Case 3:16-md-02738-MAS-RLS   Document 9737-16   Filed 05/07/19   Page 259 of 449 PageID: 40583
Patricia G. Moorman, M.S.P.H., Ph.D.

Page 328

204:17 205:7,21
205:25 206:1,5,9
206:18 208:1,6
210:15,25 211:20
212:9,24 213:5,9
214:14 215:18
216:6,17 218:8,16
218:18 220:2,6
226:21 227:1,20
228:2,19 229:5,12
230:2,10,14,18,20
231:23 263:15
266:20 267:4
268:10,19 270:9
270:15,17,19
284:9 285:1,2,3
300:19,24 301:8
301:22 302:1
315:16
**cohorts**
104:8 198:6,8
206:10 212:2
220:8 263:24
265:24 269:24
271:6 308:25
**coin**
240:2
**coinvestigators**
285:15
**collaborated**
54:6
**collaborators**
29:4
**colleague**
294:11
**colleagues**
31:9,15,18 32:1,8
127:2
**collect**
222:19 284:3 285:9
**collected**
283:10,13 284:5,7
**collecting**
160:3
**collection**
233:12 283:14

285:14
**college**
182:1
**column**
92:8 94:7 167:17
180:17 203:3,17
210:13 212:20
238:2 240:6 270:3
275:2
**combination**
46:24
**combine**
159:8,13 160:9
161:4
**combined**
140:17 188:22
210:21 215:13,16
244:15
**combining**
158:25 159:25
160:10 187:4
215:22
**come**
29:7 72:6 116:17
143:8 144:1
145:16,19 258:23
280:4 309:16
**comes**
48:17 104:6 198:1
243:7 266:8
316:25
**comfortable**
65:13 81:18,24
98:4 255:3
**coming**
138:16
**comma**
204:21
**commenced**
36:10
**commencement**
185:10
**comment**
153:11 158:7
172:11 211:20
214:22 216:2

305:23 306:3,9
**commentaries**
212:8
**commented**
157:12
**comments**
84:7 212:1 223:12
**commercially**
75:12
**committee**
8:21 314:9,13
**Committee's**
4:18 36:18
**common**
226:1 261:22 305:6
305:7
**commonly**
111:16
**commonly-cited**
232:12
**communicate**
22:13 24:1 293:16
**communicated**
237:24
**communication**
22:16 24:3
**communications**
12:25 13:11 17:3
25:5 28:1 32:1,6
**community**
141:22 145:5,8,13
147:18 148:14
149:17 174:3
248:17,19 285:3
313:23
**community's**
145:10
**company**
67:20 68:3 71:7
72:1,8,13 82:15
126:24 127:9,12
127:14
**comparable**
155:14
**comparative**
5:18 138:23

**compare**
27:14 154:20
**compared**
234:23 265:5
269:24
**comparing**
39:25 132:9 138:3
154:14 227:13
260:18
**comparison**
7:6 138:2 143:20
247:18 255:12
300:19 301:22
**compatible**
134:21
**compiled**
41:24
**complain**
191:2
**complaints**
192:1
**complete**
78:4 171:25 241:21
293:11,13 305:22
306:8,14 318:5
**completely**
41:12 43:12 227:15
228:12 241:23
299:17 300:25
**completeness**
44:3 78:9
**compliance**
282:3
**component**
115:24 117:15
**composition**
281:18
**comprehensive**
41:11 47:3,5 56:11
56:15,22,24 57:12
57:25 58:10,19,22
58:25 60:2,17,24
62:1,17,20 63:3,9
63:16,19,23,23
64:2,6,17 65:5,9
65:11 82:3 156:15

156:18 157:6,15
157:15,20
**comprehensively**
156:21
**comprised**
212:25
**computer**
24:19
**concede**
159:23
**conceded**
271:5
**concern**
161:25 164:14
215:11 218:20
228:23 233:7,9
238:10,21 251:3,6
**concerned**
177:6 239:7
**concerning**
25:11 30:17,21
31:1 121:18
**concerns**
164:2,11 192:8
227:8 238:17
263:16 306:10
**conclude**
95:9 125:8 147:14
155:15 163:4
169:5 170:9
173:18 176:1
177:12 179:21
229:14 240:25
256:5,7 262:19
266:2 275:19
304:1,9
**concluded**
96:2 108:11 146:11
146:25 147:13,18
174:15 183:2
252:3 258:11
276:12 295:20
**concludes**
150:8 181:9 302:12
317:5
**concluding**

Patricia G. Moorman, M.S.P.H., Ph.D.

96:21,23 103:14
275:15
**conclusion**
66:9,12,15 69:15
78:17,21 81:17
92:23 93:8,10,15
95:2,6,12 96:7
109:14 111:5,9
123:9 125:23
141:4 142:23
143:8,18 144:2
145:15,17,20
146:13 147:24
150:16 156:9
163:12 169:7,8
176:9 178:7 179:5
182:18 207:11
226:24 250:20
252:7 257:1
258:24 263:4
265:17 266:7
276:6 303:16
306:25,25 307:21
308:24 309:11
310:21,23 313:15
**conclusions**
72:2 98:4 108:14
110:12,24 122:18
126:13,25 154:3
155:19 162:25
171:5 177:20
178:25 184:25
185:1,3 193:24
195:9 227:3,24
230:25 277:6
290:17 313:11
**conditions**
20:21
**conduct**
56:10 57:25 58:10
58:19,25 60:2
64:17 65:4 66:14
66:22 82:2 156:15
225:10 291:22
314:3
**conducted**

56:10,21,24 57:12
60:24 62:20 63:9
63:11 65:11
124:17 157:13,16
222:15 262:11
291:21 320:5
**conference**
25:8
**confidence**
134:20 137:17
265:10,12
**confident**
178:17
**configured**
17:22
**confirm**
15:6 146:7
**confirmation**
185:11 186:13
**confirmed**
18:12 289:8
**conflating**
249:3
**conflict**
23:20 28:2
**conflicts**
23:8 108:7 110:5
153:4 214:2
305:12
**confounder**
19:19 20:24 21:6
26:22 28:14
286:16
**confounding**
103:15 159:12
160:4 176:17
177:5 286:2,10
**confusing**
16:17 258:4
**Congress**
3:3
**conjunction**
22:9 37:6 130:10
135:21 261:2,9
**conscious**
294:1

**consensus**
145:10 148:13
150:10,18
**consider**
26:13 44:21,23
52:23 53:1,4,7,10
53:13,16,19,22,23
54:1 57:5,10
69:19 70:9,10
82:17,22 105:1
111:15 122:25
177:4 198:16,19
212:15 218:4
230:22 250:2,14
250:15 254:12
261:1,5 263:7
301:2 302:4 305:8
316:8
**considerable**
232:21 233:1
238:13
**consideration**
218:15 293:24
309:13
**considerations**
219:15 245:1
249:16 250:22,25
272:2
**considered**
4:17 5:3 27:17
28:13 35:25 39:2
39:9,22 45:20
47:8,15 49:11,18
54:21 57:2,9,16
58:5,6,16,21,24
59:2 78:24 116:2
127:15,20 152:9
152:14 154:2
158:2,19 186:6
197:24 198:20,21
212:8 213:15,18
221:15 222:1,9,24
240:10,11 243:15
253:17 254:15
260:6 286:15
295:6,21 302:6,9

309:17 312:17,18
313:13
**considering**
26:15 132:20 179:3
242:3 247:11
253:6,12 261:3
266:12 270:14
272:13,15 279:18
292:7,8
**consistency**
45:1 161:16 205:10
244:8,12,15 262:2
262:3,4,19 263:6
263:10,10,14
266:19,24 267:20
268:4,13,22 271:5
271:14
**consistent**
162:7 250:1 262:10
263:8,19,23 267:4
267:11,17 268:20
269:2 306:25
313:11 316:6
**consistently**
226:23
**consortium**
26:8,11,12 27:1,9
27:14,18 29:19
30:2 283:25 284:6
284:13
**constituent**
117:13 121:20,24
122:4,24
**constituents**
116:3,5 117:8,10
119:23 126:6
129:14 180:21
296:12,16,19
297:4,9,24
**constitute**
320:10
**consulted**
149:8
**consumers**
281:12
**contacted**

11:5,8,18,24 23:10
284:19,23 291:24
**contain**
18:10 21:20 70:16
81:15,23 88:8
106:14 129:25
296:12
**contained**
36:1 71:18,20 87:7
88:2,7,12 125:5,7
125:20 294:7
298:10
**container**
69:6 70:13
**containing**
15:5 78:1
**contains**
40:22 49:20 69:7
**contaminants**
119:24
**contaminate**
64:4,8 86:10
**contaminated**
71:2 75:7 79:21
105:10,22 106:9
112:9 114:6
124:21 125:14
**contaminates**
64:19 65:3,18
68:20 86:21
**contamination**
67:12 68:12 71:14
72:2 73:3 75:18
75:20 76:5 79:15
84:8 86:1 109:19
**contend**
86:21
**context**
26:21 75:25 87:15
93:11 104:23
105:8
**continue**
16:16 99:9,25
100:8 207:16
218:5 283:14
285:13

Patricia G. Moorman, M.S.P.H., Ph.D.

**continued**
3:1 5:1 6:1 7:1
    102:20 139:11
    283:12
**contraceptive**
127:3 222:21 254:1
    305:10
**contraceptives**
254:4
**contrary**
97:19,23
**contrast**
223:7 231:7 268:5
**contribute**
117:14 214:13
**contributed**
164:15 186:7
**contributes**
117:11 121:4 200:2
**control**
5:17 106:25
**controlled**
166:22
**controls**
6:20 239:18 308:25
**controversial**
94:15,21
**Convention**
83:11
**conversation**
285:23
**conveyed**
82:18
**conveying**
241:9
**convinced**
111:2
**copied**
35:14,16
**copies**
34:16,20 35:25
    37:23 55:2 136:10
    139:7 149:25
    165:1 173:11
    175:21 180:9
    202:14 227:5

234:13 237:18
273:19 307:17
**copy**
14:25 17:16 19:24
20:4,7,10 24:25
32:19,24 33:18,18
36:11,25 37:9,15
37:22 41:15,19
45:5 49:10 54:23
77:3 84:22,23
91:12,14 147:9
149:22 151:6,7,10
153:15 165:14
293:23 307:13
**cornstarch**
129:18,23,24 130:4
130:5 131:3,8
**correct**
9:19,22,25 10:1
11:3 17:7,11
18:14,14,20 19:6
21:21,22 22:23
23:15 27:6 33:15
35:8,9 37:7,8
38:22 40:25 42:17
43:23 45:13,14
51:3 54:17 55:19
57:9 62:4,22 65:5
69:19 72:15,23
73:4,7,12,13,17
73:18 80:12 85:8
90:5,6 93:11,15
93:20 94:1,21
95:18,19,21 96:22
96:25 97:1,4,5,7,8
97:10,11,13,20
98:8,17 99:13
100:23,24 101:14
103:10,22 107:6
108:1,4 109:4,15
110:6 112:12,24
117:17 119:12,18
120:9 123:20
126:15,20,21
128:5,6,14,25
129:5,14,17,21,25

130:5,6,8,9,12,17
131:9 132:3,15,16
132:25 133:4,17
134:17 135:14,19
135:22 137:8,13
137:21 138:18
139:13,18,19,20
139:21,25 140:4,5
140:7,14 141:5,8
141:9 144:10,19
145:6 147:13
152:23 159:9,10
159:11,12,16,19
159:20 160:1,6,21
160:22 161:1
165:24,25 166:2,3
168:7,10,18
169:14,24 171:2
174:2,12,18,24
175:1 176:5,21
177:10,11,22
179:1,8,16,20
180:12,13 181:2
182:19 183:3
184:17 185:21
188:15 189:1,5,7
189:10,11,12,13
189:16,24 190:5
191:15,18,20,21
191:24 192:6,11
193:7,8,13 194:6
194:13 195:1,2,4
195:5,7,8 196:11
196:16 198:9
202:25 205:4,5
206:1,25 207:8,9
208:2 210:10,11
211:21 212:2
213:21 216:7,12
216:15,22 217:1,5
217:10,11 218:2
219:13 220:9
224:18 225:17
226:5,8,9,18
227:9,11 228:3
233:19 234:3,25

235:1,9,12,13,15
235:19 236:22
238:4 243:18
244:9,10,12 252:4
252:18,23 255:16
257:15 260:16
261:3 265:9,22,25
269:4,17,21,25
271:7,21 273:1,5
273:10,23 274:1,5
275:16 276:10
277:20 279:9
281:17,25 282:4
283:6,21,22,25
286:3,12 288:11
289:10,14,15,17
289:18 293:20,24
296:5 298:25
299:10,25 301:18
306:18 308:7
309:2,11 312:10
312:25 313:1,4,5
315:17,18 318:4
**correcting**
160:13
**correction**
17:14,17 18:6,19
23:24 49:15
**corrections**
18:23 318:6
**correctly**
78:2 132:24 196:3
214:21 228:11
274:7 276:23
277:15,16 298:20
**correlates**
25:19
**corresponding**
22:10,17
**cosmetic**
6:14 9:25 77:25
79:12 85:15 112:8
112:11 114:9,14
114:17 120:18
210:19 223:17
**cosmetic-grade**

77:24
**Cote**
21:13 29:8 31:12
    31:12
**COUGHLIN**
3:7
**Council**
3:12 8:18 294:15
    294:21
**counsel**
8:6 9:5,12 12:7
    13:18 14:25 17:23
    20:3 22:23 33:17
    34:15 36:11 40:14
    41:24 44:12 46:25
    48:21 49:4,7,25
    59:22 67:21,23
    68:5,8 72:10,15
    72:21 74:14 77:4
    82:17 83:17 84:15
    84:24 118:22
    145:25 163:25
    280:15 289:17
    291:2,16 294:14
    302:21 310:3,8
    315:11 320:12,15
**counsels**
14:16
**count**
151:18
**COUNTY**
320:2
**couple**
55:3 89:4 113:15
    187:23 240:18
    243:25 291:3
**coupled**
313:12
**course**
76:6,12 95:8
    149:19 156:20
    157:2 162:16
    255:19 299:14
    315:3
**court**

Patricia G. Moorman, M.S.P.H., Ph.D.

1:1 8:7 14:3
100:4,11 116:17
320:3
**coverage**
238:14,18
**covered**
236:24 282:7
**Cramer**
188:20 242:2,16
243:3,6
**create**
231:5
**creates**
190:10
**credible**
66:6,13 69:14
70:15 71:14,22
75:17 81:2,8,11
81:14,22
**credit**
69:18 70:8
**crediting**
193:11,15
**criteria**
143:8 144:1 184:9
244:20 245:3,5,10
245:20 246:3,5
249:16 255:25
292:8,17 313:13
313:15
**critical**
261:1,5
**criticisms**
214:18
**critique**
193:9
**critiques**
219:6
**cross**
137:19
**crosses**
134:6 137:12
138:11 139:20
**crossing**
134:7 137:20
**CROSS-EXAMI...**

280:15 294:14
310:3
**Crowley**
44:6 120:8 123:15
124:11,12,14,17
**Crowley's**
120:10,11
**CRR**
1:21 320:22
**cultural**
25:15
**cumulative**
274:4 275:7,16
276:3,13 277:19
278:16
**curiosity**
44:18
**current**
88:14 174:7 238:9
285:8 292:2
**currently**
26:4 79:12 85:16
90:4 285:13 286:1
305:19 306:3
**Curriculum**
4:13
**cursory**
43:13
**Curtis**
40:1
**cut**
14:22 307:12
**cut-point**
287:17
**CV**
19:25 20:4 21:3
25:13 29:6 33:19
**cytotoxicity**
53:5

─────────
**D**
─────────
**D**
8:1
**Dan**
242:2,16
**Daniel**

44:5 290:2
**data**
27:10 39:2,9,22
47:6 57:6 85:17
89:14 95:6 114:16
114:22 121:1
124:2 125:3,4
134:13 136:25
139:3 140:16,17
142:2 143:10,13
143:14 144:2
154:12 158:9,25
159:8,14 160:1,3
160:10,11 161:4
161:11,22,24
162:16 166:17
176:11 178:18
179:4 182:22
187:21,23,25
188:18,22 189:2
190:12,14 192:15
194:9 195:3,6
196:11,16 197:22
197:25 198:3
199:15 200:18
201:1,13 202:8,10
204:14 206:1,19
208:1,15 216:14
222:19 224:4,6
233:11 235:5
236:3 238:3
240:10 242:18
245:15 263:1
266:8 267:10
270:19 274:1,8
279:5,16,17
283:10,12,14
284:3,4,7,15
285:9,14 287:3
293:2,5,11 297:14
297:20 298:9
303:15 307:24
309:16 310:20,23
311:14 315:16
**date**
8:3 14:20 132:2

133:4 163:1,4
174:12 191:12,12
235:6,8,12 242:17
282:19,25 283:9
295:5 314:16,18
318:10
**dated**
5:5,7
**dating**
295:11
**David**
44:5 290:1
**day**
17:24 37:11 99:10
294:6 314:24
320:18
**days**
145:24
**day-in**
126:12
**day-out**
126:12
**DC**
3:14
**deal**
116:16 229:15
268:22
**dealing**
227:16
**dealt**
310:15
**decades**
131:7 162:11
208:16 220:19
243:25 262:15
**December**
153:20
**decide**
172:10
**decided**
97:16
**decimal**
274:21
**decision**
108:21 109:4
187:24 188:7

**decisions**
193:18
**declared**
100:22 101:17
103:2 258:9
**declares**
103:13
**decrease**
225:1 274:9
**decreased**
154:19 225:9
**deemed**
243:16
**deeply**
244:12,20
**Defendant**
3:2,11,17 11:13
280:15
**Defendants**
1:16 2:16 8:10,12
9:6,12 280:20
294:14 302:22
315:12
**defense**
73:25 74:8,15,17
**defer**
120:2 296:19,24
297:3
**deferring**
120:5 297:16
**define**
190:17 287:15
**defined**
184:10 249:22
282:25 283:2
**defines**
37:17
**definitely**
146:5
**definition**
248:4,13,16
**definitions**
33:14
**degree**
89:15 157:8 242:18
**delays**

25:15
**Delores**
5:18
**demonstrate**
263:25 268:13
313:8
**demonstrates**
161:16
**deodorizing**
129:20
**department**
31:15,18
**depends**
114:1
**depict**
301:20
**DEPONENT**
318:1
**deposed**
9:18 10:2,5
**deposition**
1:11 4:11,15,19 5:4
8:5 9:11 10:9,13
10:21,24 11:3
12:6,15 13:22,23
19:1,2,8 20:3
22:19 23:3,5,15
25:11,14,25 30:22
31:2,4,7 32:11,20
33:7,10,25 34:5
34:18 36:13,19
38:10 47:18 48:5
48:10 56:3 289:6
291:4,11,12
292:22 317:6,8
**depot**
154:7
**deps@golkow.com**
1:25
**depth**
63:16
**describe**
27:9 52:5 137:2
155:17 157:18
159:6 162:20
166:6,15 181:25

193:20 194:2,4
197:11 198:10
217:19 223:6
229:16 249:12
253:3 256:15
261:21 277:13
287:6 288:24
293:9
**described**
21:6 22:10 27:4
31:13,20 33:24
39:21 75:12,14
107:15 166:10,11
180:4 243:5
251:10 260:8
263:14 285:11
288:6 301:9
**describes**
71:7 263:10
**describing**
26:8,11 27:14
29:19 48:13
147:23 215:15
216:16 251:12
**description**
4:9 5:2 6:2 7:2
286:17
**descriptors**
289:3
**design**
169:21 195:14
196:8 197:1,16
198:14,23 208:11
227:2 231:9
263:11 268:14
269:7,15 271:2
301:2,5 302:2
**designating**
96:20
**designed**
284:2
**designs**
199:6,6 231:1,2
**desirable**
190:8
**desire**

208:1
**Despite**
205:10
**detail**
39:18 43:12 44:3
57:19 64:1 154:23
157:9 188:6
193:20 194:3
214:19 242:3
253:24 254:8,16
255:7 260:8
292:18 307:7
**detect**
83:5 213:5
**detectable**
70:14
**detected**
75:23,24 82:13
**determination**
299:22,24
**determine**
43:7 98:16 99:12
103:9 108:21
121:14 225:14
226:22 300:24
**determined**
283:5 298:23 299:9
**determining**
249:17,19
**detracts**
169:21 195:14
269:15
**detriment**
166:13 167:1
**developed**
41:7 101:14 131:6
218:21,22
**development**
94:13
**diagnosis**
25:16
**differ**
67:3 161:9 228:1
271:7
**difference**
39:7 86:16 100:1

105:12 226:25
316:1,17
**differences**
106:17 171:12
188:3 214:13
231:25 316:13
**different**
23:4 44:2 45:21,25
52:7 56:16 57:20
86:12,15 95:11
98:7 105:9,16,16
105:21 106:7,11
126:19 131:11
143:4,5,6,11,11
143:11 144:12
146:21 179:5
190:17 195:23
196:8 227:15,22
228:12 231:2
262:12,13,14,23
270:24 287:5
288:16 315:20,21
316:9,18,22
**differently**
141:3,19 142:4
144:13
**difficult**
72:6 74:2 221:1,2
**difficulty**
65:21
**direct**
55:5 307:19
**direction**
155:8 262:22
263:20,22 264:13
266:14,24 267:9
267:20 268:23
269:1
**directly**
19:17 60:21 122:16
232:11 281:12
**disadvantages**
196:24 199:7
**disagree**
150:15 155:25
156:8 201:4

208:12 209:3
214:8,10 215:20
215:23 247:1,4,5
247:9 279:9,13
**disappeared**
194:12
**discerning**
248:9
**disclose**
22:6,8,10 27:22
28:17
**disclosed**
21:11,13 23:12
24:8 27:20 28:16
285:20
**disclosing**
24:7
**disclosure**
21:8,17,17,20,23
23:11,22 24:2,12
25:5 27:24 28:2
**disclosures**
22:18 23:7
**discovered**
88:10
**discuss**
22:11 28:9 109:25
152:22,25 191:7
217:8 220:1 224:9
225:2 232:19
234:3 256:3
260:20 262:6
**discussed**
16:23 25:6 28:8
31:8 50:9 76:17
89:20 107:20
112:23 138:25
146:13 152:17
159:23 186:12
216:13 235:19,20
240:17 253:2
260:6 263:2,16,21
264:6 266:15
269:13 282:21
285:21 296:13
297:11 300:11

Patricia G. Moorman, M.S.P.H., Ph.D.

305:17 306:21 309:5

**discussing**
178:23 179:7
224:23 238:4
301:16

**discussion**
21:12 85:7 107:14
108:3 156:10
177:18 219:21
239:1 271:17
287:4,12 300:13
300:19 302:18
304:22 308:6
310:13 315:8

**discussions**
32:10 311:19 314:7

**disease**
107:12,16 110:13
141:13,24 167:2,3
261:19

**diseases**
114:19 253:7,13
254:25 257:22
316:10

**dismiss**
257:7,12

**dismissing**
257:11

**disparity**
229:25 231:5,8
236:9

**dispute**
220:4

**distinction**
131:13 135:1,4
215:14 220:23,25
223:21 235:22
278:22

**distinctions**
12:5

**distinguish**
11:24 303:2 316:14

**DISTRICT**
1:1,2

**DMPA**

154:7

**Doctor**
29:22 91:10 109:11
110:3 131:23
163:8 194:21
232:3 264:14
295:25

**document**
1:9 5:8 33:10,15
64:11 67:17 76:16
76:17 77:12 84:11
124:8 127:9
145:21 146:6
147:6 152:3 291:1

**documents**
34:2 64:10 67:16
67:19,20,23,24
68:3,4,10,11,14
68:15,18 69:2
72:1,7,8,9,14,14
72:19,22,23 82:13
82:15,18,23
126:25 127:8,13
127:14 145:23
146:3 152:20

**doing**
10:18 21:13 31:13
31:15 206:4
222:18 227:12
239:9 243:23
285:13 292:7

**domain**
47:16 48:1

**Donath**
3:9 8:15,15 69:10
173:12

**Dorota**
7:4

**dose**
272:15 273:4
298:16,22 299:9
299:14 300:7

**dose-response**
35:4 156:24 271:16
271:17,20,24
272:6,9,14 273:9

273:21 274:16
275:6,16 276:3,4
276:13 277:6,18
279:13

**dozen**
30:3 89:6

**dozens**
40:21 125:22

**Dr**
4:23 8:5 9:8 19:24
21:5 29:7,7,8,25
31:12,16,16 33:3
33:6 34:15 35:17
35:23 36:20,24
37:4 38:20 41:16
41:20 42:2,5 45:4
49:14,24 52:21,23
55:14 56:6,8
57:25 60:10 61:3
61:8,14,19 64:14
67:12 69:22 73:14
73:17,19,23 74:3
74:19,22 77:1,12
78:17 80:11 84:2
84:22 85:2,4 90:8
91:5,11 92:1,5
94:6 95:16 107:25
108:14 115:8
117:2 118:10
119:11 120:8,10
120:11 124:11,12
124:14,17 128:3
128:16 130:15
136:6 139:10
140:19 144:9
150:3 151:9,22
153:10 157:22
165:14,22 167:16
171:16 172:12
174:20 175:13,21
180:11 184:24
195:12 196:20
200:11 201:9
202:18 209:23
211:19 218:24
219:25 234:16

235:4 237:21
238:3,17 239:5,24
240:4 244:1
245:25 246:3
247:15 251:15
257:10 259:19
260:20 262:2
264:17,25 269:11
273:12 274:8
280:1,18 284:19
290:5,21,21 291:4
291:5,8,8,10,11
294:17 296:5
301:15 302:6,12
302:24 304:17
307:18 308:11
309:18 310:5,9
313:17 314:22,25
315:14 317:6

**draft**
26:13,16,17 28:6
28:15 283:24
285:25 286:7,11
286:15 305:18

**DRINKER**
2:21

**drive**
2:22 3:18 33:22

**dropping**
148:3

**Duces**
4:16,20

**due**
132:22 163:8
203:22 228:25
229:1 231:11
241:5 251:7

**DUFFY**
3:7

**Duke**
10:10 290:4

**duly**
9:3 320:6

**duration**
187:17 217:14,20
218:2 219:13

220:14,15 273:23
274:5,17 275:6

**Durham**
1:17,18

**Dusts**
5:9

**E**

**E**
2:1,1 3:1,1 8:1,1
319:1 320:1,1

**earlier**
50:9 57:4 101:13
107:15 130:20
132:11 192:13,20
194:3 216:13
234:15,19 235:19
235:20 263:2
269:3,13,20
281:14 285:24
286:6 287:5 289:8
291:1 292:23
297:17 298:4
300:11 305:17
308:6 311:17
314:17

**early**
142:2 161:20,25
208:7

**editions**
288:16

**editor**
21:16,18 22:12
23:21 24:6 32:15

**editorial**
24:10 237:7,15,21
237:25 238:7
293:17

**educate**
78:13

**education**
181:25

**educational**
181:23

**effect**
25:14 103:6 154:9

Patricia G. Moorman, M.S.P.H., Ph.D.

155:8 180:20
190:20 226:25
262:22 263:20,22
266:15,25 267:9
267:20 268:23
269:2
**effects**
86:16 105:3 207:22
**efficiently**
40:5,8 43:7
**effort**
10:17 50:5 82:2
127:9 131:13
233:21 257:14
**eight**
240:7 272:24 273:1
273:3 302:14
**either**
52:6 80:21 113:8
148:24 160:11
215:3 255:21
291:6
**Elba**
1:17
**elements**
121:20,24 122:4,24
**elevated**
133:7 186:7 242:11
**eliminate**
159:17 203:6,13
**eliminated**
132:19 133:16,21
133:23 134:2
137:24 234:18
241:2
**eliminates**
203:12
**ELLIS**
3:18
**eloquently**
166:11
**email**
24:3,4,6,9,16,22,25
**emails**
17:2 24:5,14 32:6
**embarrassed**

223:25 224:3
**emerged**
174:14
**emotions**
223:4
**emphasis**
162:19
**emphasize**
51:18 186:12
197:22 203:4
206:4 302:3
**emphasized**
199:14 200:17
201:1,13 202:3,9
**emphasizes**
202:5 248:25
**emphasizing**
205:25
**empirical**
224:4,6
**employed**
290:16 320:13,15
**employee**
320:15
**employment**
10:8
**employs**
281:25
**ended**
219:4 283:8
**engaged**
27:25 30:16 31:25
**engagements**
30:25
**enrolled**
208:6
**enrollment**
218:8
**ensure**
24:21 127:7
**entered**
282:16
**entire**
89:9 91:19 253:20
256:16
**entirely**

132:22 188:1 241:6
**entirety**
42:25 43:1 85:22
**entitled**
41:15 85:6 92:4
135:12 136:7
138:22 237:15
**environment**
105:20
**environmental**
90:25 93:1
**envisioning**
301:17
**epi**
182:15
**epidemiologic**
34:25 45:3 47:6
89:3,16 90:1
106:23 107:3
119:8 125:3,4,22
134:5 138:23
163:6 166:10
182:10 197:25
207:20 224:21,23
233:12 243:23
248:16,18 253:5
260:3,12 263:1
296:3 297:14,20
298:9 299:13,19
303:22 304:3,14
309:1,7
**epidemiological**
5:18 131:6 174:8
176:20
**epidemiologist**
41:8 60:17 62:16
126:8,11 138:12
167:4 174:21
179:12 248:8
249:18 261:17
287:14,19 314:2
**epidemiologists**
141:2,18 166:14
167:7 250:9
290:22 313:23
**epidemiology**

5:14 6:6 7:12 29:2
56:18,20 62:21
63:11,17,20 66:1
106:21 119:5
128:19,20 197:15
250:17 278:24
281:16 283:4
286:23 287:7
288:10,14,15,22
**epidemiology-foc...**
289:22
**epithelial**
6:15 7:17 176:15
278:12 303:5,14
310:16 311:2,13
311:15
**epithelium**
94:13
**equal**
197:9,11
**equate**
183:11
**equating**
144:15,22,22
**equivalent**
142:13,18 181:20
181:21
**errata**
4:11 17:17 18:12
318:6
**especially**
142:2 185:8 284:15
**ESQ**
2:5,9,14,19,23 3:5
3:9,15,20
**establish**
174:9
**established**
90:20 92:15 168:6
168:10,13,14
179:10
**estimate**
16:14 72:5,7
221:13 267:25
272:16
**estimates**

7:6 226:25 228:1
229:5 230:9,17
231:21 232:14
296:25
**estimation**
258:8,8
**et**
5:13,16,19 6:8,10
6:12,17,20,23 7:5
7:9,12,18,21
**ethnic**
262:14
**evaluate**
224:15 233:3
286:19 293:11
**evaluated**
126:19 293:5
**evaluates**
293:2
**evaluating**
78:25 142:14
158:11 261:7
**evaluation**
183:8 198:14
255:25 284:4
285:10
**evening**
35:13 280:18 310:5
310:6
**event**
36:5
**every-use**
264:22
**ever-users**
278:18
**evidence**
44:21,23 56:25
66:7,13 67:8 69:4
69:8,14 70:12,15
70:17 71:14,19,22
75:18 81:3,8,11
81:14,22 82:11
85:13 87:9 95:10
98:12,13 100:25
101:1,8,13,18
102:1,6,7,8,14

Patricia G. Moorman, M.S.P.H., Ph.D.

108:24 110:14
138:14 141:11
142:4,9,12,13,23
143:1 144:13,16
144:18,22,23
145:14,15 150:17
152:1 154:8,13,15
154:17,20,21
155:14,16,21,22
155:25 156:3,7,8
156:11,16,22
158:3,20,24 159:7
168:17 169:6
174:8,13,16 176:1
178:5,12,15
199:21 205:12
207:7,20 208:4,19
208:23 209:11
226:3,11 241:20
246:13 254:20
255:2,23 257:4,8
259:22 260:11
271:10 293:3,3
295:9 296:15
297:12 300:12
302:25 303:25
304:8,15 307:3
312:13,15,16
**evidence-based**
159:4,5
**evident**
278:17
**evokes**
223:3
**exact**
46:17 89:5 103:11
191:12 277:19
282:25 283:9
314:16,18
**exactly**
40:9 102:24 103:17
105:4 112:21
118:19 232:2
307:5
**examination**
9:5 157:14 302:21

315:11
**EXAMINATIONS**
4:1
**examine**
27:1 272:14
**examined**
9:4 114:14 186:19
205:18 313:4
318:3
**example**
39:25 48:12 74:18
112:11 114:3,6
141:20 142:5,21
142:22 154:4
158:23 159:17
167:14 171:12
181:22 199:23
209:4 223:1
228:16 245:9
282:24 293:4
296:14 297:13
**examples**
141:8,16,21 142:20
144:10,11 245:13
256:13,18 257:9
257:18 258:25
296:21
**exceeded**
122:3
**exceedingly**
114:11
**exceeds**
267:15
**exception**
264:10
**excerpts**
91:21,22
**excess**
235:14
**exchange**
234:19
**excluded**
218:16,18
**excluding**
184:10
**exclusively**

128:12,17
**excuse**
109:11 171:17
191:16 215:3
216:5 220:1 236:6
**exert**
180:19
**exhaustive**
41:12
**exhibit**
4:10,11,13,15,17
4:18,21,22,24 5:3
5:4,6,7,8,11,14,17
5:20 6:3,6,9,11,13
6:18,21 7:3,6,10
7:13,16,19 15:2,3
15:5,15 16:10,19
17:19,20 18:4,10
20:8,9 32:21,22
35:11,20,21,24
36:17,22 37:10,13
37:14 41:15,17,19
42:25 45:7,8
49:10,12,16 50:1
61:15,17 76:24
77:2,17 84:20
91:14,17,21
107:22,23 136:7
136:11 139:6,8
149:22,24 151:13
164:21 165:2,3,18
169:2,3 173:9,10
175:17,19 180:6,7
194:21 202:14,15
204:25 205:1,2
209:24 210:2
212:17 227:5,6
234:6,10,11
237:14,19 264:15
273:16,17 276:15
291:1 292:22
307:14,15
**exhibits**
4:8 5:1 6:1 7:1
17:24 37:1
**exist**

232:6
**existed**
113:22
**existence**
176:12
**exists**
175:5
**expand**
47:7
**expanded**
47:11
**expect**
106:15 112:10
113:23 114:8
162:4 204:16,21
206:5 229:4
**expected**
56:10 65:4 104:11
104:15
**expediting**
31:6
**expensive**
209:8
**experience**
106:5 224:20
**experiencing**
105:20
**experimental**
166:17 174:7
**expert**
4:21 10:23 11:6
21:10 26:6 31:21
37:7 42:20 43:18
43:22,25 44:13
52:24 53:1,5,7,10
53:13,16,19,23
54:1,7 56:9,10
66:5 73:3,25
82:17,22 88:3
101:16 124:15
127:21 139:1
174:17,21,23
179:7,11 197:6
289:19 290:11
291:3 292:6
293:22,23 294:4

294:24 295:11
302:7,8
**expertise**
41:7 54:4,9,13,16
54:21 55:15 56:3
56:16,17 57:3,7
57:18,20 58:23
59:4,14 60:18,21
63:15,17 83:4
90:2 121:22
289:23
**experts**
16:24 17:3 30:6
44:17 60:20 73:6
73:7,12,22 74:18
271:4,7 289:9
290:19 296:20
297:3,17
**explain**
39:7 88:15 110:15
204:9 215:24
**explained**
241:21
**explains**
231:13
**explanation**
192:19 204:10
213:11 215:18
241:22 305:3
**explanations**
231:24
**explored**
88:25
**exposed**
105:14,18 213:2
262:1 275:12
287:2 297:21
**exposure**
5:11 7:17 48:15
87:3,6 88:16
90:18,23,25 92:14
92:18 93:2,12
94:10 105:2,4,8
105:10,13,16,17
105:21 106:4,8,12
106:15,25 108:22

116:4 143:6,22
151:25 176:14
182:7 187:17
189:19 190:9,19
191:14,16 197:19
204:1 208:9
210:18 211:4
217:19 218:9,13
220:1 221:2,25
238:12 240:22
251:21 259:24
260:7,21 261:2,6
261:13,20 270:23
270:24 274:10
300:6,24 303:22
311:7,8 312:1
**exposures**
106:10 126:19,24
128:21 191:25
220:11,18 221:5
223:6 251:16
252:11,21 253:7
253:13,17 254:14
254:25 255:13,14
255:19 256:4,16
257:4,22
**exposure-disease**
158:11
**express**
119:17
**expressed**
124:5 168:22
169:12 170:3
**expressing**
31:22 32:7
**expression**
25:24
**extent**
31:10 44:8,11
114:13 160:2
163:24 233:22
**external**
300:5
**extra**
37:23 77:3 84:23
165:19

**F**

**F**
3:9,13 320:1
**fact**
51:15 79:3 96:22
104:22 111:21
112:9 125:22
132:18 135:17
163:14 169:9
173:25 176:4
178:6 192:14
194:9 237:4 256:3
267:22 270:6
294:1 298:22
**factor**
28:12 114:15
151:25 155:24
166:16 181:20,25
182:5,7,25,25
183:1,7,11 187:21
192:9 196:25
224:15 232:19
233:4 255:22,22
261:21,24 286:2
286:11,20,22
292:16 295:7,20
295:21 296:7
297:5,9 305:10
316:20
**factors**
5:15 19:11 23:4
25:12 26:12,15,25
27:10,15,17 30:22
31:2 135:13,24
136:8 141:3 145:1
167:2 181:17
182:3 183:9
214:12 225:7
243:9,11,15,16
244:3 247:11
249:15 250:2
285:10 286:19
305:6,9,15 316:5
316:6,22
**factory**
105:19

**fair**
15:12 34:13 40:24
42:11 43:3 49:22
61:5 95:25,25
126:9 137:13
138:8,8 151:8
161:12 162:19,20
162:23 170:17
229:16,21 260:10
274:15 291:11
313:17
**fairly**
10:19 41:11
**fall**
134:16 300:19
**fallopian**
6:3 151:10 298:19
298:23 299:10,15
299:23 300:7
**falls**
301:17
**familiar**
13:24 45:10 103:11
111:7,21 157:7
173:6 237:22
**far**
118:1 212:20
**Faries**
2:9 8:22,22 12:11
38:3 77:6 259:6
**fashion**
243:4
**Fathalla**
40:19
**fault**
100:16
**fax**
1:24
**FDA**
5:6,7 76:13,16,25
77:21 80:3,14
81:4 84:3,6,23
85:8,11,25 86:5
290:2
**FDA's**
77:18

**feasible**
299:16
**feedback**
222:19
**feel**
21:18 39:18 65:13
81:17,23 82:7
178:17 223:25
224:3 255:3 262:4
**felt**
51:17 98:4 110:13
111:13 184:5
223:14 306:13
**fewer**
255:24
**fibers**
75:23 77:23
**Fibres**
5:9
**fibrous**
115:9,21 116:6,9
116:12 117:6,16
117:22 118:5,18
118:25 119:6
126:2
**field**
147:22 243:24
288:11
**figure**
17:25 194:23
269:21
**figured**
196:5
**finally**
16:21
**financially**
320:16
**find**
44:23 46:11 50:10
52:8 60:11 113:23
130:16 134:23
162:3 187:2 200:7
225:17 272:18
273:5 275:5
277:23 279:4
**Findeis**

2:14 8:20,20
**finding**
71:19 267:5
**findings**
73:23 74:19 81:4
85:7 131:7 152:23
152:25 198:15
214:13 262:10
267:1 302:7
314:13
**finds**
277:18
**fine**
23:1 28:19 35:18
78:10 153:11
280:2,7
**finish**
61:14 77:9 113:9
113:11,12 152:7
172:9,11 186:3
209:17
**finished**
146:20 148:6
159:15 284:10
289:13
**first**
9:3 11:5,8,14 20:19
25:16,18 29:15,16
72:23 90:11 92:8
116:9 128:4,6,10
137:25 142:21
169:13,15 181:8
185:2 188:21
200:20 210:8
211:23 221:24,24
233:7 244:11
260:8 262:6
264:18 270:3
276:16 282:14
289:24 291:22,23
294:23
**fish**
234:9
**five**
92:16 217:21
252:11 254:13,25

Patricia G. Moorman, M.S.P.H., Ph.D.

255:13 273:3
277:18
**fix**
77:9 210:4
**flaw**
184:22
**flawed**
160:4
**flaws**
184:2,21
**Fletcher**
48:13
**flip**
18:9 49:25
**flipped**
151:18
**flipping**
49:20
**Florham**
2:22
**flow**
113:8
**FLW**
1:7 319:4
**focus**
19:17 135:23
292:14 298:8
303:11
**focused**
27:13 66:3 109:21
128:11 157:4
240:22
**focusing**
112:4,25
**folders**
164:5
**folk**
25:15
**follow**
13:22 191:17
294:22 300:25
310:7
**followed**
189:22 208:8,10
217:23 237:8
300:3

**following**
185:9 233:4
**follows**
9:4 33:15 277:7
**follow-up**
113:6 187:18
189:15,19,20,22
190:4,8,22 191:3
191:13,23 192:6
192:10 193:10,12
193:16 194:10
208:10 216:1,6,9
216:10 217:1,4,10
217:12 218:22
219:7 220:8
**footing**
197:9,11
**footnotes**
272:25
**foregoing**
318:4 320:4,6,9
**forest**
194:24 268:6
**forgotten**
220:16
**form**
12:21 22:20 26:16
26:17,23 27:7
28:6,15 41:5
42:15,18 45:23
46:8,14 47:19
48:3 49:5 51:2,24
58:3 59:10 62:8
63:6 64:5 65:6,15
65:19 66:18 67:6
68:6,22 71:15
72:17,24 73:8
74:10,25 76:7
80:23 81:6,20
82:5,19 83:12,22
84:9 86:2,14
87:14,16,24,25
88:1,4 89:2,12,21
91:7 93:16,21
94:22 95:3 96:5
97:14,21 101:3,21

102:16 104:1,24
105:24 107:7
109:5,16 110:7,25
112:13 113:25
114:20 115:15
116:1 118:1,16
119:1 122:6,14
123:10 124:25
125:17 126:3
127:23 129:6
133:5,11 134:18
137:9 145:11
148:15 149:18
157:17 161:2,18
162:14 170:4
171:7 175:9 176:6
177:14 178:9
179:9,23 181:3
184:4 188:16
189:17,25 190:6
190:15 192:25
193:14 194:14
196:12 197:23
201:15 207:1
213:22 214:4
228:15 229:18
236:11 247:3
255:17 258:2
266:5 267:6,18
268:15 271:8
274:11 279:10
283:24 285:25
286:11,15 287:24
294:23 296:23
297:6 299:1 300:1
305:18 306:5
307:2 309:3,12
313:24 315:22
316:11
**formalized**
292:10
**formally**
33:10
**format**
24:2
**formed**

26:10 51:10 88:17
125:3 295:3,15
296:6
**former**
270:11,16 290:1,2
**formerly**
290:4
**forming**
76:12 152:15
175:23 290:17
296:7 297:23
299:8
**forth**
103:10 214:9
**Foster**
3:5 4:4 8:13,13
280:8,17,19
281:23 288:2
294:10 313:24
**found**
77:22 81:10,25
82:11 120:25
130:11,16 131:19
134:22 136:4
166:20 187:13
194:12 203:19
225:25 272:9
278:12
**founds**
307:20
**four**
15:5 79:3
**fraction**
49:7
**fragrance**
123:20,23 126:2
**fragrances**
119:24 120:12,14
123:14 124:6
296:13,21
**frame**
11:17 132:10,11
143:12 179:1
**frames**
143:5
**framework**

182:21,22
**free**
79:14
**frequency**
272:16 273:4,23
274:4,17
**frequently**
53:22 166:14
183:24 230:12
305:11
**FRIDAY**
1:14
**front**
45:12 61:9 136:2
147:9 148:23,24
273:13
**full**
92:8 94:8 105:20
128:4 132:20
138:3 157:25
170:19 183:8
204:10 233:7
260:8,24 262:6
270:4 275:1
305:14
**fully**
193:2 247:20
**funded**
209:7 283:20
**funding**
283:8,14,17 285:12
**funny**
142:7
**furnish**
44:13
**furnished**
15:1 42:6
**further**
117:10 158:8
226:11 302:21
314:23 315:11
320:12,14

---
**G**
---
**G**
1:12 4:10,15,19,21

Patricia G. Moorman, M.S.P.H., Ph.D.

**5:15 8:1 9:2**
318:2 319:3
**Gates**
187:21 189:9
190:12 192:14,23
193:6,12 194:9
195:4 216:15
217:5
**general**
41:10 94:19 109:15
124:23 125:15
145:7 147:1 190:7
203:10 204:5
243:23 287:12
301:6 302:24
303:1 310:10
315:25
**generally**
102:15 161:11
190:23 199:14,22
200:17 231:14
251:24 252:3
256:13 257:19
290:16,23 301:2
304:17 313:22
**generate**
52:4
**genital**
6:9,18 106:13,15
132:1 180:19
213:2 222:8
223:18 224:3
266:10 267:10
270:7 276:18
277:8 278:11,18
278:21 279:14
**genotoxicity**
53:11 60:3,9
**gentlemen**
69:25 311:4 312:24
**geographic**
262:13
**geologist**
82:21
**geology**
53:24

**Gerel**
2:3 15:19
**Gertig**
7:5 189:4 190:14
193:21 194:12
195:7 204:25
**getting**
144:19 222:19
237:3 258:16
279:25
**Gibson**
11:7,17 12:13
**girls**
93:1
**gist**
119:21
**give**
19:22 69:17 70:7
72:5 90:9 113:15
132:5 141:20
152:4 158:24
181:21 187:2
223:1 241:20
245:12 294:7
298:14
**given**
30:20,24 33:1 60:6
107:14 116:8
117:19 188:10
318:5
**gives**
134:20 240:9
**giving**
17:6
**gleaned**
118:20
**go**
40:11 43:9 46:15
62:9 99:3 113:17
114:5 116:18
135:11 141:7
146:16 157:5
188:6 204:9 215:5
217:15 218:4
219:16 234:2
241:3 245:12

**250:4 253:24**
254:6 256:24
261:21 264:2
269:8 274:3 275:9
277:25 280:8
282:8 284:11
289:2 309:21
315:4,5
**goes**
78:25 79:8 92:22
162:2 239:20
278:15
**going**
15:2,6 17:18 20:7
21:15 22:11 32:19
32:20 33:21 34:9
35:10,19 36:24
37:2,9 41:14 45:4
45:7 49:9 52:12
52:15 54:23,25
61:8 65:1 66:17
76:8 78:4,5 86:23
91:14 107:21
115:2 116:20
139:6 149:21
150:16 151:9
163:23 164:4,20
164:25 165:8
169:2 171:19
172:1,3,11 173:8
175:16 180:5
182:1,2 200:11
202:14 204:24
209:11,12,14
210:4 211:13
218:25 223:11,25
230:8,17 237:11
237:14 241:2
245:17 247:11
248:24 249:24
259:5,7,13 263:4
263:5 265:1
273:15,19 278:2
280:10 282:6,23
283:1,16 284:4
286:4 288:8,20

**289:20 294:2,11**
302:16 307:13
308:14 309:23
315:6 316:14
317:6
**GOLKOW**
1:24
**Gonzalez**
186:20 187:14
199:24 270:20
271:2
**good**
9:8,9 52:11 100:19
100:20 165:4
190:24 211:9
280:18 308:18
310:5,6
**GORDON**
3:3
**gotten**
151:17 222:23
**go-to**
288:13,21
**grab**
164:5
**grabbed**
162:13
**grabbing**
162:11,12
**grant**
5:19 283:18
**graphic**
301:18
**graphics**
301:19,21
**great**
14:15 38:2 52:23
242:3 268:22
**greater**
64:1 102:8 114:17
155:12 240:12
247:12 262:24
263:7 267:12
268:2,7,24
**ground**
13:23 282:7

**grounded**
281:15
**group**
92:12 97:4 188:4
190:17,20 236:21
278:25
**groups**
262:14
**grow**
102:21
**growing**
178:12
**guess**
117:7 128:23
140:20
**guidelines**
246:4
**gynecologic**
20:20 147:17
149:16 290:3
**Gynecology**
147:21

───────────
         **H**
───────────

**H**
6:12
**habit**
115:9
**half**
268:1,2
**halfway**
39:1 212:20 260:23
**hand**
15:6 18:1,1 32:19
36:24 45:4 54:23
77:4 139:7 151:9
164:25 202:14
212:15 227:5
234:13 237:18
273:19 307:13,17
**handed**
14:25 15:14 20:3
33:7 36:11 153:16
165:14
**handful**
104:13 177:8

Patricia G. Moorman, M.S.P.H., Ph.D.

294:21 314:25
**handing**
37:14 77:1 84:22
    136:10 149:25
    173:11 175:21
    180:9
**handle**
20:15 78:10
**handwriting**
18:3
**handy**
90:8
**hand-selected**
68:4
**happen**
198:3
**happy**
14:8
**hard**
40:9
**HARDY**
2:17
**hard-pressed**
178:13
**hazard**
266:12
**head**
89:6 103:16 246:11
    252:21 253:8
    290:2
**health**
6:4 76:3 86:13,16
    105:3 145:16,19
    145:23 146:3,8
    147:6 150:17
    151:11 166:12,24
    186:22,23 188:19
    196:14 253:14
    261:8,17,18,24
    263:19 264:4
    266:23 267:11
    285:1,4 305:16
    306:21 311:18,22
    311:25 312:1,3,14
**healthcare**
32:11 127:6

**health-related**
25:20
**hear**
294:17
**heard**
223:2,12 281:2
**heavily**
145:2
**heavy**
92:18 119:10 120:3
    120:18,24 121:2,9
    121:15 123:8,12
    126:1 296:16,21
    297:13,25
**help**
35:1,6 100:11
    236:3
**helps**
215:1
**hesitant**
223:7
**heterogeneity**
169:20 170:22
    171:10 172:14
    195:13 213:11
    215:19,24 228:7
    228:13,18 230:20
    231:11 269:7,14
    271:1
**heterogeneous**
196:2,4,5
**Hey**
116:14
**Hi**
294:17
**hierarchy**
158:24 300:12,17
    301:17
**high**
130:11,16 261:25
**higher**
113:23 114:8
    134:24 181:23,24
    229:5 230:9,17
    231:13,21 232:14
    240:20 263:4

272:19 304:25
**highest**
274:9,12
**highlighting**
50:2,4,7
**highlights**
238:9
**Hill**
111:8,11 141:3
    144:25 182:21
    183:8 244:3,20
    246:3 247:15
    248:24 249:15
    258:23 263:9
    292:3,8,17 308:12
    308:20 309:5,14
    313:14
**histologic**
187:5
**histology**
35:5
**history**
76:6 218:18 222:21
    222:22 224:2
**hold**
86:25 87:3 122:12
    123:22 124:22
    125:25 295:10
    302:25 303:18
**hope**
27:1 285:12
**hopes**
27:14 31:5
**hoping**
242:16
**hopping**
282:6
**Hotel**
1:17
**Houghton**
6:22 186:21,22
    202:13 263:18
    264:4,15,17 267:9
**hour**
14:18 52:12 113:7
    209:13 259:6,8

**hours**
71:25 72:12
**Houston**
2:18
**Human**
5:10
**humans**
104:4
**Huncharek**
6:16 175:13,17
    176:24 177:9
**hundred**
104:10
**husband**
282:22
**hypotheses**
224:10,16,24 225:2
    225:14
**hypothesis**
40:20 149:10
    189:16

**I**

**IARC**
5:8 89:14,20,22
    90:4,14,17 91:6
    92:11,22 93:13,24
    94:8,20 95:6 96:2
    96:9,21,25 97:12
    97:20 98:8,16
    99:11,20,20
    100:22 101:1,2,17
    101:20 103:2,13
    106:19 108:20
    109:4 110:24
    122:18 123:1,3,7
    146:13 147:12
    152:23 252:6,12
    252:15,20,23,25
    258:9,11 293:20
    293:23 314:6,9,12
    315:14
**IARC's**
93:8 103:7 109:14
    306:25
**idea**

46:7
**ideas**
225:23,24
**identification**
13:12 15:3 17:20
    20:9 32:22 35:21
    36:22 37:13 41:17
    45:8 49:12 61:17
    77:2 84:20 91:17
    107:23 136:11
    139:8 149:24
    151:13 165:2
    169:3 173:10
    175:19 180:7
    202:15 205:2
    227:6 234:11
    237:19 273:17
    307:15
**identified**
13:19 25:10 29:11
    29:17 41:2 49:8
    49:16 58:5,16
    59:5,15 60:8
    66:23 70:19
    122:24 123:19
    134:17 253:20
    254:14 255:14
**identify**
28:20 29:12 40:5
    221:25 224:8
    257:22
**identifying**
146:8
**Illinois**
3:19
**illustrate**
144:24
**imagine**
209:8 288:25
**Imerys**
3:2 8:13,15 280:16
    280:21,24 281:7
    281:11,19,25
**Imerys's**
282:2
**immune**

25:23
**impact**
227:2 261:8,19,24
316:22
**impacting**
238:18
**impacts**
261:13
**implies**
138:1
**importance**
113:3 197:22
199:15 200:18
201:1,13 202:10
204:13 205:25
206:4
**important**
22:3,6,8 56:14,15
71:12 81:3,4
134:25 140:21
142:8 149:20
158:10 164:14
198:3 219:15
227:2 239:10
245:2,5 250:22,25
299:24
**impossible**
102:18 178:19,20
**imprecise**
250:14,15
**impression**
68:14 144:15,19
222:23
**improved**
239:16
**inaccuracies**
160:5 220:12
**inaccurate**
203:13 218:12
220:23,24 221:1,2
276:8
**inadequate**
152:1 155:21,25
156:3,5,6 293:3
**inadvertent**
220:12

**Incessant**
40:19
**incidence**
93:5 111:23 112:10
112:18 113:23
304:19 305:12
**include**
21:8 29:25 42:12
46:16 47:12 115:8
118:10,14 123:3,7
162:16 175:11
187:24 188:9
193:9,19 217:4
240:14 271:17
278:22 311:12
**included**
20:24 26:14 29:9
42:16 43:15 131:7
137:1 139:4
140:17 161:6
188:19 193:24
212:24 278:14
284:13 286:22
**includes**
29:23 50:1 196:16
284:25 311:2
**including**
51:18 63:4 69:2
116:6 167:7
170:22 184:9
190:18 240:21
268:9
**inclusive**
320:10
**inconsistencies**
271:20 272:5
**inconsistency**
271:23 293:1
**inconsistent**
154:12
**incorrect**
210:3
**increase**
131:20 224:25
275:24 276:2
278:9

**increased**
105:15 112:10,18
125:6,23 134:14
147:25 148:21,21
149:3,3 155:4
163:11 166:7
167:5 176:15
181:15,24 185:3
187:6 225:8
226:23 247:21,22
248:6 249:13
250:1 256:12
262:24 313:11
**increases**
93:4 94:3 203:20
**increasing**
276:20 277:10
278:10,20
**independent**
120:16 122:12
123:22
**INDEX**
4:1,8 5:1 6:1 7:1
**indicate**
70:18 186:25
220:22,24
**indicated**
33:20 57:4 82:20
166:24 197:17
236:25 298:12
301:4 312:4
**indicates**
307:24
**indicating**
102:5,6 120:25
121:2 215:10
**individual**
25:19 198:18 199:9
215:11,15 290:20
301:7 302:4
**individuals**
12:10 158:14
**induced**
223:2
**inevitable**
230:16

**inevitably**
226:12 230:8
**infertility**
28:12,22,23 29:14
29:16 286:14
**influence**
265:20
**inform**
42:21 165:23
179:15 180:12
206:17
**information**
56:19 57:17 76:25
82:18 88:18 98:2
111:3 118:18,20
118:23 119:3
121:10,23 122:8
147:23 149:8,20
190:9 208:9 220:2
293:14
**Ingham**
10:2 11:10,21
13:23 15:10,20
16:11,18 17:7,14
17:18 18:13,17,24
19:1,8 25:25 31:2
31:4,7 32:11 45:6
45:18 47:2 48:9
48:20 50:6 51:6
51:22 54:20,24
61:9,25 74:18
115:19,20 116:10
119:17 295:12
**ingredients**
123:23 126:2
**inhalation**
303:17,19,24
**inhaled**
142:6 304:1,4,9
**inherent**
220:17
**initial**
52:3
**initially**
220:5
**Initiative**

186:23 285:4
**insignificant**
267:15
**instance**
127:25 257:25
**Institute**
6:3 7:3 150:23
209:9 283:19
**insufficient**
174:9 178:6
**Intellectual**
44:18
**intend**
26:13 37:18 41:1
76:4 86:20 250:4
294:7
**intense**
185:8
**intent**
59:12,18 60:16
161:4 215:9
256:15 285:9
**intention**
59:8 60:13 291:15
**interest**
23:8 221:25
**interested**
44:19 68:18 149:15
261:18 284:23
320:16
**interesting**
68:23 154:2
**internal**
127:12,13
**International**
7:16
**internet**
30:16
**interpret**
181:5
**interpretation**
163:15 169:22
170:12,25 195:15
198:15 269:16
**interrupt**
113:6,8 116:16

Patricia G. Moorman, M.S.P.H., Ph.D.

**intertwined**
244:12,21
**interval**
134:20 137:17
265:10,13
**interventions**
7:8 227:9 229:7,13
**interview**
132:2 225:22 235:5
235:8,12
**interviewed**
132:10 239:18
240:21
**interviewees**
235:22,23 236:4,5
**interviewers**
222:19 223:3,13
224:11,17,24
225:3
**interviews**
30:24 225:11
**introduce**
8:6
**invasive**
6:14 139:18 185:14
187:1,7 193:5
264:10
**invested**
209:9
**investigation**
286:3,22
**investigators**
188:8 204:17 206:5
238:20 262:12
**invite**
225:4
**invoiced**
14:19
**invoices**
4:10 15:1,5,7,14,15
15:23 16:8,12,15
16:17,20 33:18
**invoked**
213:10 215:18
**involve**
199:20

**involved**
13:7 88:9,19 112:6
180:21 280:23
281:5 285:8
**involvement**
21:9,20 22:13
27:20 283:2
285:17 291:25
**involves**
284:8
**in-depth**
182:19
**isolated**
236:20
**isolation**
297:5,9,13
**issue**
22:5 57:12 59:1,9
67:11 68:12 81:5
84:7 85:25 88:21
94:20 107:4,19
109:19 110:21
126:22 128:22
144:16 149:17
160:20 163:5
166:2 174:1
188:14 190:13
197:22 212:9
213:21 214:11
216:1 219:7 221:4
233:23 240:10
242:3 253:11
315:19
**issued**
51:2 149:22
**issues**
26:5 192:5 206:20
284:18
**item**
21:3 39:25
**items**
39:21 40:5,15,23
40:23 42:12 46:12
46:18,23 48:19,21
49:2 50:5,11
306:21 308:24

**J**

**J**
5:19
**Jack**
44:6
**James**
2:19 3:20 4:3 8:9,9
8:19 9:7,10 13:1,6
15:4 16:3,7 17:21
20:10,14 21:1
22:22 23:13 24:24
25:3 27:2,19
29:15,21 32:23
33:3,5 34:3,7,9,13
34:14 35:10,18,22
36:4,9,14,23
37:23 38:5,6
41:13,18,24 42:3
42:4,10,23 45:9
46:2,10,19 47:22
48:7 49:1,9,13,16
49:19,23 50:16,23
52:13,20 54:19
55:1,7,10,13 56:1
57:22,24 58:7,9
58:18 59:17 60:22
61:7,13,18 62:15
63:1,8,18 64:13
65:10,16 66:4
67:1,10 68:9
69:12 70:3,20
71:24 72:20 73:1
73:11,15,16 74:4
74:13 75:3 76:11
76:24 77:3,8,11
78:6,11,16 79:6
81:1,16 82:1,9,24
83:16 84:1,13,15
84:18,21 85:1
86:8,17,19 87:19
88:20 89:8,18
90:3 91:9,18,20
91:24 93:18,23
95:1,13,15 96:8
96:15,19 97:17
98:6,15,23 99:4,9

99:16,24 100:2,8
100:13,19,21
101:5 102:9 103:1
104:20 105:6
106:1 107:10,21
107:24 108:12
109:8,17 110:17
111:6 112:16
113:9,12,20 114:2
114:23 115:7,16
116:7 117:1 118:9
118:21 119:4
120:1 121:7 122:9
122:20 123:13
124:4,10,13 125:9
125:24 126:7
127:19 128:1
129:12 131:1,18
132:12 133:8,14
135:3,10 136:6,20
137:11 139:5,9
142:19 143:17
144:3,8 145:3,18
148:19 149:14,21
149:25 150:2
151:15 152:12
153:9 157:21
160:14 161:8
162:9,17,24
163:20 164:20,25
165:3,6,13 167:13
168:15,25 169:4
170:6 171:15,18
171:20,22 172:1,6
173:8,11,14,16
174:22 175:2,12
175:16,20 176:8
177:7,17 178:21
179:13,24 180:5,8
180:10 181:6
182:17 184:15,23
186:9 188:23
189:21 190:3,11
191:1 192:18
193:4 194:1,7,17
196:1,15,19 198:5

199:10 200:10,24
201:6,20 202:12
202:17 204:18,24
205:3 206:7,15
207:5 208:17
209:17,20,22
211:9,12,18
213:24 214:7
218:24 219:2,16
219:19,24 227:4,7
229:9,23 230:23
234:8,12,14,21
236:14 237:20
242:6,10 243:1
246:7,23 247:6
248:1,7,15 251:1
251:8 256:1 258:3
259:4,9,18 266:17
267:13 268:8,17
271:15 273:15,18
274:14 275:18
277:2,25 279:7,11
280:2,6 282:7,15
287:5 292:20
302:14,23 304:16
306:1,15 307:8,12
307:16 308:4,10
308:19 309:9,18
310:10 312:6
314:25 315:2,3,13
315:24 316:19
317:1
**james.mizgala@t...**
3:20
**January**
1:14 8:3 320:18
**jdonath@coughl...**
3:10
**Jeff**
11:7 12:12
**Jennifer**
3:5 8:13 280:19
**Jersey**
1:2 2:22 3:8
**Jessica**
2:23 8:11

Patricia G. Moorman, M.S.P.H., Ph.D.

jessica.brennan...
2:24
jfoster@gordonr...
3:5
**JNCI**
6:21
**job**
287:1
**Joellen**
7:12
**Johnson**
1:5,5 2:16,16 8:9
8:10,12,12 9:6,6
70:21,25 71:3,9,9
73:22,22 75:8,8
75:15,15 79:20,20
79:24,24 80:2,2,4
80:4,6,7,16,16
83:1,1,8,8 118:23
118:23 121:11,11
121:19,19 124:20
124:20 281:8,8,19
281:19 302:22,22
315:12,12
**Johnson's**
70:21,25 71:3
80:10
**Jonathan**
3:9 8:15
**journal**
5:11,14 6:18 7:3,10
7:13,16 21:24
22:14,16 23:10
28:4,4 65:14
148:7 166:12,24
243:21
**journals**
147:22
**journal's**
22:1,9
**judge**
223:25
**judged**
184:13 252:23,25
**judgment**
156:7 175:8 176:24

181:1 182:23
188:8 198:12
208:14 222:17
252:16
**judgments**
184:7
**jumbled**
106:2
**jump**
40:18
**jumping**
148:3
**jury**
70:1 312:24
**justification**
230:24 232:4,6
**J&J**
9:12 310:8
**J.M**
2:14

**K**

**K**
7:18
**Kadry**
7:21
**Kat**
31:16
**Kathryn**
6:20
**keep**
49:19 209:14
247:20 249:24
**keeping**
36:25
**Kemble**
3:8
**Ken**
288:15
**Kessler**
44:5 290:1
**kind**
33:1 35:2,6 40:9,18
154:2 159:1,6
182:14 211:5
220:17 222:22

223:20 229:1
240:12 253:16
264:12 270:21
292:3 293:1,10
**kindly**
36:16
**knee-jerk**
231:19
**knew**
80:18 289:21
**know**
11:12,13 12:4
13:24 14:7 16:17
23:6 24:10,14
31:22 34:6 35:4
37:25 40:8,9,10
40:11 41:11 42:20
44:7 45:17 46:15
46:17 47:9,14
49:6 50:18 51:6,7
51:8,11 54:14
57:6 59:11 62:11
64:24 68:13 70:23
71:2,5,9 72:4,7,11
74:6 75:1 76:22
78:25 79:8 80:3
80:16,19 83:8,14
83:20,24 84:6
86:3,4,7 89:13
95:5,8 96:12
101:24,24,25
102:4 103:15,17
104:14 106:11,12
108:10 112:17
114:11,12,12
123:17 124:17,19
129:23 131:25
136:2,4 143:3,7
143:21 148:16
149:2,15,20
152:19 157:11
159:4 160:23
163:11,12 178:14
181:10 183:20,24
184:8 186:4
188:12 190:22

193:17 200:6
207:3 208:21
209:15 217:3,12
217:13,23 222:21
223:5 225:6,23
232:10,13 239:4
239:21 241:24
242:2 248:21
252:19 253:14
261:17 263:14
276:5,12 279:2
280:24 282:1,5,8
282:10 285:19,22
286:9 287:2 288:4
289:25 290:5,18
290:19,20 293:15
296:13 297:16
298:8 305:9 306:9
**knowing**
68:18 95:9 206:13
**knowledge**
11:22 17:1 41:9
43:10 47:11 82:25
121:18 130:22
181:11 226:6
243:23 248:20
281:18,22 314:12
**known**
224:10,16 225:15
225:19,19
**knows**
223:11 290:20

**L**

**L**
2:23 6:20
**label**
97:3,7
**labeled**
130:4 140:7
**laboratory**
57:5 89:24 106:24
**lack**
191:3 192:6 215:10
**ladies**
69:25 311:4 312:23

**Langseth**
6:12 173:4,9,17,18
175:7 177:19
178:23 209:24
210:2,9,24
**language**
129:11 130:21
140:22 146:6,7
164:7,10
**Lanza**
7:9 226:8,10,17
227:4,8,12,12
230:2,24 232:1,4
**large**
29:8 30:2 46:3
47:14 79:25
143:25 200:6,6
205:21
**largely**
225:25 311:15
**LAW**
2:7
**lawsuit**
239:14
**lay**
232:25 256:8
**layman's**
229:16
**lead**
48:15 102:1 121:6
171:13 226:12,23
230:8 232:14
292:12
**leading**
147:21 149:16
182:22
**leads**
125:8 231:20
**learn**
44:19
**leave**
78:5
**leaves**
155:20
**lectures**
30:21 158:23

Patricia G. Moorman, M.S.P.H., Ph.D.

led
125:23 160:11
240:12,13,20
266:16
left
66:18 139:22 140:6
167:23 275:1
288:3 293:10
294:2
left-hand
167:17 203:3
210:13
lesser
113:3
letter
5:7 84:2,6,23 85:3
85:3,11,22
letters
32:15
let's
11:7 19:13 99:24
100:2 113:11
153:12 170:19
172:9 194:18
218:16 221:22
237:12 240:5,17
253:23 264:14
275:22 277:25
288:15 299:2
level
39:14 45:1 76:1,1
102:1 105:21
106:4 157:9
181:23,25 253:24
254:16 255:23
263:5 270:24
300:5
levels
44:3 75:24 105:16
121:24 122:3
190:19
LHG
1:7 319:4
LIABILITY
1:7
life

25:20 208:7,8
lifetime
272:20 276:21
277:11,19
light
95:10
limitation
104:7,17,22 105:1
106:18 107:17
160:16 172:17
212:13
limitations
103:24 104:3 191:5
200:8 301:7
limited
79:2 130:8 163:21
201:10 205:11
233:19 294:2
297:14,14
line
61:24 113:13
209:17 319:5
linear
275:13,24 276:2
lines
55:10 61:20,21
240:7
link
88:25 89:10 168:4
168:13,17
list
5:3 26:14 27:16
33:15,19 38:21,25
39:8,9,10,18,22
40:6,15,15,22
41:3,4,11,15,22
41:24 42:1,5,5,11
42:11,15,24 43:23
44:24 45:6,10,12
45:15,17,18,19,20
46:6,22,23 47:7
48:20,20 49:11
51:6,9 80:10
246:17,18 290:25
306:18
listed

41:10 43:19,23
46:12,13 140:7
151:25 154:6
194:25 252:2
286:10 301:22
listing
286:18
lists
46:20 50:11
literature
5:12 45:3 47:3
51:22 52:9 56:12
56:22,25 58:1,11
58:22 60:13,19
62:21 63:10 64:1
64:3,7,18 65:2,5,8
65:9,12 66:15,21
66:23 67:5 68:2
72:9 75:4,7 78:25
81:19,25 82:3,12
88:6 89:4,9
102:11,20 103:19
103:21,25 104:22
105:7,14,17
106:19 107:5,14
107:18,20 111:8
111:15,22 112:17
119:9 120:17
126:12,14 129:9
131:6 156:16,19
157:7,8,10,14
161:12 162:7
163:7 166:10
182:10 197:21
198:1,1 199:11,14
200:16,25 201:12
202:4 212:10
224:19 226:5
227:15,20,21
229:15,25 231:3,6
242:8 245:11,21
246:9,25 247:8
253:21 254:7,10
254:13 255:2,4,9
257:25 260:4,12
262:3 263:18

266:21 271:17
272:6 287:7
291:20 292:2
295:2 296:2,3
304:22,23 309:1,7
309:8 311:1
litigation
1:7,24 11:8,9 13:19
16:9,13,16,24
17:4 21:9,21 22:6
22:14 27:21 28:2
30:7,18 31:8,18
32:5,8,13 44:13
47:17 67:3 68:19
73:2,7,22 74:1,2
74:15,22 87:15
88:9,19 97:19
110:6 118:11,15
118:24 121:11
124:15 126:18
127:20 131:3
150:22 153:5
174:23 185:10
214:3 233:15,19
234:1 236:16
254:20 255:5,9
271:5 280:24
281:5 285:18
290:8,12 292:6
294:5,7 295:11
319:2
little
11:11 12:1,4 27:10
59:4,14 138:14
154:22 155:20
161:17 267:23
288:19 289:5
311:17
lives
300:9
LLC
2:7
LLP
2:3,21 3:3,7,13,18
loathe
166:14

locations
262:13
lodged
36:12,13
long
26:14 27:16 220:11
259:4 267:14
280:18 291:24
310:9 314:24
315:5
longer
46:6 190:7,22
194:10 237:5
Longo
73:12,14,17 118:10
118:10
Longo's
73:19,23 74:19,22
look
19:23 29:6 35:4
40:12 45:10 61:19
61:20 63:23 70:4
70:4 77:16 80:9
89:19,23 92:7
104:2 105:3
108:13 109:23
112:2 126:12
128:17,19 132:6
138:13 139:12,15
139:22 140:24
144:25 145:1
150:22 155:5,10
155:13 156:11
161:19 164:4,9
167:15 169:1,15
180:14 184:7,12
184:24 186:25
195:9,11 197:25
199:8 203:2,15
208:6 219:8
229:10 235:2,4
237:21 238:6
262:21,21 263:1
263:17 264:17
267:21,24 268:5
269:11 270:2,3,19

Patricia G. Moorman, M.S.P.H., Ph.D.

270:20 272:24
274:3,25 276:14
276:15 278:24,24
279:17 301:6,6
303:6
**looked**
21:25 23:4 35:3
43:12 44:3,9
62:12,13 63:22,25
73:2,20 84:12
85:25 89:13,14,15
89:25,25 104:11
106:19 111:22
112:20 113:2
120:23 127:13,22
128:21 129:4
131:10 135:24
142:5 147:16
153:25 154:11,22
156:21 179:15
188:1 193:23
194:9 197:21
199:12 200:17
206:17,17 207:12
209:5 213:17
226:20 229:7
237:12 240:1
253:10 269:20
273:4,22 274:18
292:21 303:4,10
304:4,14 312:13
313:4
**looking**
19:24 20:5 21:3
22:22 25:19,23
27:4 28:11 42:5
44:11 55:7,10
67:24 89:10 90:11
95:17,23 104:8
128:8 130:14
131:7 132:13,14
137:4 155:7 156:2
157:2 167:2
188:14 191:15,19
191:24 200:8
212:9 226:19

227:12,18 232:1
235:2 236:2
244:25 260:17
264:19 273:25
274:7 278:22
**looks**
36:25 105:8 128:24
140:9 151:19
**Los**
285:4
**lot**
30:2 86:15 154:25
174:13 222:20
223:22 224:24
282:6,7
**lots**
40:10
**low**
75:24 190:19 213:9
215:17 228:8
**lower**
134:24 236:17
263:5 304:18
305:12
**lower-level**
288:20
**low-level**
208:19,22 209:11
**lung**
141:12,13,23,24
142:3 143:10,14
143:21 144:17
145:5 245:9
247:19 249:1
259:24 260:7
**Lynn**
29:25
**L.L.P**
2:17

---

**M**

**M**
7:4,12
**magnitude**
245:8,14 246:14
249:1 251:23

253:6,12,18 256:4
256:6,25 257:12
257:14,18,24
258:7,13,21,25
**main**
19:17 35:3 44:18
**maintain**
299:21
**major**
57:7 239:5 292:14
**majority**
49:2 104:10 130:24
233:10 272:18
273:8,22 276:9
303:4,7,8
**making**
66:9 69:15 71:13
100:13 142:1
159:1 182:22
198:12 229:6,22
247:20 298:6
299:24
**male**
113:1
**males**
112:5
**man**
123:17
**manner**
254:18 255:3
**manufacturing**
83:2
**manuscript**
302:10
**March**
4:24 5:5 10:6,9
17:7 19:8 30:22
45:13 46:13 47:1
47:17,24 48:5,19
49:3 50:18 51:11
56:2
**mark**
15:2 17:18 20:7
32:20 35:10,14,19
37:9 41:14 45:7
49:9 61:15 91:14

107:21 149:21
164:20 169:2
173:8 175:16
180:5 204:24
234:6,8 237:14
273:15 307:14
**marked**
4:9 5:2 6:2 7:2 15:3
17:20 20:9 32:22
35:21 36:17,22
37:13 41:17 45:8
49:12 61:17 77:2
84:20 91:17
107:23 136:11
139:5,8 149:24
151:13 165:2,3,18
169:3 173:10
175:19 180:7
194:20 202:13,15
205:2 212:16
227:4,6 234:11
237:19 273:17
291:1 307:15
**market**
113:22 122:5
**marketed**
79:13 85:16 88:14
**MARKETING**
1:6
**marking**
61:11 76:24 136:7
**material**
49:18 77:25
**materials**
4:17,22,24 5:3
33:23,24 34:16,22
35:25 39:2,8,12
39:22 40:6,15,22
41:1,3,16 42:1,15
42:24 43:15 45:5
45:19 47:8,15,23
47:25,25 48:9
49:10 51:2,10
72:1 117:23 118:7
120:17 121:10
306:17,18

**materials-consid...**
246:18
**matter**
9:12
**matters**
13:20
**McTiernan**
44:4 290:21
**MDL**
1:6 5:3 10:24 11:3
11:6,21,25 12:2,7
12:17,20 13:16
14:17,19,21 15:1
15:8,11,16,21
16:10 30:14 32:17
33:20 34:23 37:5
37:6,15,19 42:13
42:16 43:16 44:24
45:20 46:5,12,21
47:8,24 48:10,20
49:3,11 50:6,11
51:1,3,6,10,23
57:8 74:1,16
79:17,19 88:2
97:19 115:8,13,25
116:8 119:14
123:14 131:2
160:15 164:6
170:1 171:5
172:20 176:23
197:21 271:4
294:5 319:2
**mean**
32:4 34:19 40:8,16
41:6 100:16
113:13 142:18
143:20 145:12
229:19 230:24
232:4 248:18
287:23 288:5
310:22
**measure**
106:25 299:14
300:6
**measures**
300:4

Patricia G. Moorman, M.S.P.H., Ph.D.

measuring
274:16 277:19
mechanism
57:1,13 63:4 87:11
88:16 181:12
182:6 183:10
254:13,15
mechanisms
48:14 57:2 83:21
mechanistic
60:7 260:15
media
185:8 232:21 233:1
233:3,6,18,22,25
238:13,18 240:22
medical
28:24,25 56:11
102:11 141:22
144:16 145:4,8,9
145:13 146:10,25
147:16 148:14
150:10,18 156:16
156:22 157:14
253:21 255:2
medicine
159:4,5
medroxyprogeste...
154:7
meet
12:7,9 39:14
meeting
9:11
Melville
2:13
members
293:17
memories
239:15
memory
239:21 240:12
menstrual
222:21 224:2
mention
36:15 81:4 118:12
123:12 191:5
mentioned

12:19 19:18 26:21
26:24 28:21 31:12
31:14,17 147:4,5
154:5 164:22
212:12 283:23
285:24 286:9,13
292:25 297:25
316:21
mentioning
148:20
mesothelioma
112:11 114:9,11,18
met
12:10,14 123:17
245:10,21 246:6
262:3,4,19 271:14
280:18 314:13
metal
122:24
metals
5:9 119:10 120:3
120:18,24 121:2,9
121:15 122:16
123:4,8,12 126:2
296:17,22 297:13
297:25
meta-analyses
7:7 89:4,14 137:2
154:23,24,25
155:10 158:2,9,19
158:25 159:6,8,11
159:17,20,22
160:2,5,10,16,19
160:24,24 161:3,7
161:9,11,15,21
162:8,10,13,19
163:1,3,14 164:8
164:15,17 165:23
166:2 167:8 170:2
173:3,5 175:14,17
177:9,10,12,19
184:1,7 193:18,23
195:21,22 199:13
206:16 207:6
210:10,12 212:25
213:7,19 216:17

226:20 227:3
228:18,24 235:15
241:12 260:18
262:21 267:25
268:6 300:16
301:16 309:1
312:25 313:3,7,10
meta-analysis
5:12 6:7,10,15 7:20
108:1 110:9
147:24 159:13
164:21 168:25
169:1 171:6
175:22,25 177:3
183:14 184:6,14
187:22 206:24
207:11 213:4
216:18,22 241:17
254:3 272:1
312:19
Meta-Epidemiol...
7:8
method
242:11 293:10
313:18,18
methodologically
205:24
methodologies
290:16,23
methodology
155:18 157:19
184:22 293:10
309:11 313:18,21
methods
53:14 59:7 197:15
205:8 225:16
293:15 313:25
Michael
6:16 44:6
Michele
21:13 31:12
Michelle
2:5 8:24 12:11 14:6
15:23 20:10 22:23
24:24 32:23 34:3
35:10 37:24 49:20

73:15 78:6 280:2
307:12
middle
92:8 132:14 171:21
233:7 240:25
midway
238:3
migration
59:1,3,9,16
miked
18:2
millers
111:16,19,23 112:4
112:12,19
Mills
7:18 25:22 273:9
273:16
mind
36:5 48:18 101:7
104:6 110:22
152:7 243:7 245:6
256:21 268:13
282:20 288:1,9
299:5 316:25
mine
33:1
mineral
53:14,17
mineralogist
65:23 82:21
miners
111:16,19,23 112:3
112:4,11,18
mines
281:7,19
mining
54:2 281:25 282:1
282:4
minute
163:5 308:13,16
minutes
40:12 113:7,18
288:3 302:15
misclassification
106:20,22 107:2,4
107:9,12,16,17

110:1,13,22 111:4
242:19
misleading
113:14 161:17
misrepresented
99:2
misstate
98:23
misstates
61:1 69:20,24 98:9
98:19 119:19
199:16 208:3
271:10 298:3
307:3
misstating
99:16,21 101:9
279:5
mistaken
80:7 286:24
mistakenly
199:19 200:5
misunderstanding
249:4
mixture
40:23
Mizgala
3:20 8:19,19 99:22
100:1
Mm-hmm
50:8 140:23 153:17
183:16
moderate
181:14 248:23
250:15 287:18
Modern
288:15
modest
247:9,23 248:4,9
248:10,22 249:7
249:11 250:10,14
250:18,21 287:11
287:17 288:23
modifiable
182:25
Mohamed
7:21

Case 3:16-md-02738-MAS-RLS Document 9737-16 Filed 05/07/19 Page 277 of 449 PageID: 40601
Patricia G. Moorman, M.S.P.H., Ph.D.

Page 346

molecular
25:23
moment
19:22 132:6 163:19
173:20 215:6
239:2 277:23
298:14
money
209:10
monograph
89:20,23 90:5
91:16,19,22 94:6
94:9,18 95:17,21
95:21 96:10,14
101:14 123:1,3,7
123:12 314:9,19
315:15
Monographs
5:8
months
270:24
Moorman
1:12 4:10,12,14,15
4:19,21,23,24 5:5
5:16 8:5 9:2,8,17
19:24 21:5 33:3,6
34:15 35:17,23
36:20,24 37:4
38:20 41:16,20
42:2,5 45:4 49:14
49:24 52:21,23
55:14 56:6,8
57:25 60:10 61:3
61:8,14,19 64:14
67:12 69:22 74:3
77:1,12 78:17
80:11 84:2,22
85:2,4 90:8 91:5
91:11 92:1,5 94:6
95:16 107:25
108:14 115:8
117:2 119:11
128:3,16 130:15
136:6 139:10
140:19 144:9
150:3 151:9,22

153:10 157:22
165:14,22 167:16
171:16 172:12
175:13,21 180:11
184:24 195:12
196:20 200:11
201:9 202:18
209:23 211:19
218:24 219:25
234:16 235:4
237:21 240:4
244:1 245:25
251:15 257:10
259:19 260:20
262:2 264:17,25
269:11 273:12
274:8 280:1,18
294:17 296:5
301:15 302:6,12
302:24 304:17
307:18 308:11
309:18 310:5,9
313:17 314:22,25
315:14 317:6
318:2 319:3
morning
9:8,9 14:25 20:3
28:8 33:17 36:10
164:22 280:19
282:15 294:19
Morristown
3:8
mortality
90:21 92:17 93:5
Mount
3:8
move
69:10 99:24 100:2
232:18
moved
165:16,21
Moving
262:2
mparfitt@ashcra...
2:5
mucinous

303:12 316:3
MUELLER
2:7
multicenter
29:8,24
Multiethnic
285:2
multiple
11:12,12 24:4
71:19 96:25
140:18 158:23,25
161:15 256:13
258:24 264:3
312:25
mutagenicity
53:8
M.S.P.H
1:12 4:14,21 5:5
9:2 318:2 319:3

――――――――――

**N**

N
2:1 3:1 8:1
name
9:10,15,17 10:3
12:12 19:20
280:19 319:2,3
names
12:24 75:11 290:1
290:19
NAPOLI
2:12
Narod
211:24 212:1,5
214:23 215:3
216:2
National
6:3 7:3 150:23
209:9 283:19
nature
200:12 203:5 211:1
NCI
151:5,10,24 152:25
156:1,9 157:11
292:21 293:1,9,17
NCI's

155:23
nearly
268:6,23
necessarily
60:8 69:18 70:8
104:25 181:5
182:16 194:11
211:7 232:15
252:16
necessary
309:10
need
14:7 18:23 32:23
37:24 52:5 69:18
70:4,8 113:10
219:8 231:3
249:18 273:13
needed
180:18 181:9
needing
39:14
neither
136:14 320:12
never
23:7 82:2 123:17
138:4 157:3 188:5
218:23 220:16
222:23 223:12
225:18,19 274:21
Nevertheless
204:12
never-use
265:5
new
1:2 2:13,22 3:8
10:23 46:12,17
47:10,15 48:8
50:10,17 51:5,7,8
51:16 115:13,24
117:19 118:2
119:16 147:23
148:10 225:24
284:3 285:9,25
newly
26:10
NHS

188:12,14,24 189:7
189:12,14 191:7
191:23 192:22
205:4 216:9
nickel
119:12,15 122:21
nine
29:3 240:7
nonresponsive
57:23 58:7 69:11
86:17 95:14 144:3
171:23 200:12
219:1
nonresponsiveness
64:16
nonsignificant
93:3 94:2
nonstatistically
94:1
non-mucinous
278:12
non-occupational
93:25
non-serous
310:25
non-statistically
134:12 236:22
non-talc
131:8
non-users
278:13,23,25
279:18
North
1:18 135:18 137:1
138:17,20 139:3
140:16 285:16
292:13 320:1
notable
301:9
Notary
320:3,23
note
74:14 93:19 94:2
140:25 141:10
172:20 203:16
207:12 227:25

228:18 278:16
**notebook**
34:24
**noted**
15:24 92:12 166:13
177:19,21,24
178:25 194:11
212:23 272:1
**notes**
34:8,21 35:1,24
280:3
**notice**
4:15,19 32:20 33:7
33:13 34:1,5
**noticeable**
301:13
**noticed**
290:24
**notices**
33:11
**noting**
174:12 180:24
**null**
134:9 137:8 265:14
**number**
4:9 5:2 6:2 7:2 21:3
46:3,17 47:14,14
79:5 89:5 90:9
104:12 107:15
120:14 128:21
155:5 200:1
206:16 210:2
212:13 246:16
251:15 272:17
276:20 277:10
278:10,21 284:21
287:19 295:22
319:4 320:23
**numbers**
180:9
**numerical**
289:2
**numerous**
187:15 245:13
314:5
**Nurses**

186:23 188:18
196:14 263:19
264:3 266:23
267:11
**N.W**
3:13

_____

**O**
**O**
8:1
**object**
26:23 57:22 58:7
64:15 66:17 80:23
86:17 88:4 95:13
101:10 144:3
166:21 171:22
172:8 200:11,21
218:25 247:3
**objection**
12:21 22:20 27:7
41:5 42:8,18
45:23 46:8,14
47:19 48:3,22
49:5 50:12,19
51:24 54:10 55:20
57:14 58:3,13
59:10 60:14 61:1
62:8 63:6,12 64:5
65:6,15,19 67:6
68:6,22 69:20
71:15 72:17,24
73:8,24 74:10,25
76:7 78:20 81:6
81:20 82:5,19
83:12,22 84:9
86:2 87:16 89:2
89:12,21 91:7
93:16,21 94:22
95:3 96:5 97:14
97:21 98:9,19
99:3 101:3,21
102:16 104:1,24
105:24 107:7
108:9 109:5,16
110:7,25 112:13
113:25 114:20

115:15 116:1,13
118:1,16 119:1,19
120:20 122:6,14
123:10,25 124:25
125:17 126:3
127:17,23 129:6
130:18 131:14
132:4 133:5,11
134:18 135:6
137:9 142:16
143:16 144:20
145:11 148:15
149:11,18 152:11
153:6 157:17
160:7 161:2,18
162:14,21 163:17
167:10 168:11
170:4 171:7
172:22 174:19,25
175:9 176:6 177:1
177:14 178:9
179:9,23 180:2
181:3 182:13
184:4,18 188:16
189:17,25 190:6
190:15 192:16,25
193:14 194:5,14
195:24 196:12,17
197:23 199:2,16
201:3,15 204:15
204:22 206:2,12
207:1 208:3
213:22 214:4
228:15 229:18
230:4 236:11
241:15 242:9,14
245:23 246:20
247:24 248:11
250:23 251:4
255:17 258:2,14
266:5 267:6,18
268:15 271:8
274:11 275:17
277:21 279:10
281:20 287:24
295:17 296:8,23

297:6 298:3 299:1
299:11 300:1,21
301:24 304:11
305:20 306:5
307:2 308:9 309:3
309:12 313:24
315:22 316:11
**objections**
4:18 22:24 36:12
36:19
**objectively**
232:1
**observation**
262:9
**observational**
6:16 166:17 176:11
228:22
**observed**
104:12,15 110:16
142:7 171:12
266:25 276:19
277:9
**Obstetrics**
147:21
**obtaining**
56:3
**obvious**
179:3
**occupational**
90:22 92:18 93:2
93:15 104:7,18,23
105:2,8,9 106:5
106:16
**occur**
242:19
**occurred**
220:11,19 233:14
**occurring**
115:9
**OCWAA**
26:8 29:19 283:24
286:17
**odds**
132:9 133:6,24,25
134:6,7,16,23
136:18,25 137:3

137:12,13 138:6
139:12,23 143:24
155:11 161:15,23
162:4 227:13
234:23 235:11,14
235:16,17 240:20
241:10,13 242:12
247:12 248:21
253:6 255:12
256:4 257:12,21
261:25 262:24
263:7 264:22
267:12,14 268:1,2
268:7,12,24 274:9
274:13
**offer**
37:18 76:4,8 86:20
192:19
**offered**
125:15 189:14
**offering**
56:9 79:17,19 81:2
97:18 131:2 255:4
**offhand**
114:22
**office**
41:25
**officer**
320:4
**official**
148:17
**oh**
20:16 78:12 114:3
165:21 210:4
308:17 315:3
**okay**
12:9 13:2,13,14,22
14:1,2,8,9,13,14
14:22 15:13,22
16:22 17:19 18:3
19:13 20:2,7,18
21:4 23:2,11,21
24:21 28:7,18,23
29:18,23 31:6,11
32:19 33:6,9,17
34:13 37:1,3,4,11

Patricia G. Moorman, M.S.P.H., Ph.D.

37:12,14 38:17,20
38:24 39:10 42:3
43:6,22,25 45:7
49:9,14,24 53:4
53:16 55:18 60:23
61:8,16,23 62:19
64:14 68:3,10
73:19,21 76:17
77:12 78:11 79:7
79:23 80:14 84:22
85:21 90:10 91:12
91:13,25 92:7,22
93:24 95:13 96:20
100:25 101:12
103:7 109:2
114:23,25 117:4,7
117:19 120:5,21
122:10 124:14
125:2 126:11
129:3 132:13
133:1,19 135:20
136:6,12 137:7,16
138:25 140:24
146:2,18 147:8,10
147:11 148:25
151:1,9,20,24
152:6,8,17 153:19
153:21,25 156:2,7
157:22 158:6
163:22 164:19
165:7,22 166:6
168:9,20 169:12
174:6 175:25
176:4,9 179:18,21
181:7 185:19,24
185:25 186:16
187:3,10 191:22
192:4 194:19,23
195:3,6 200:11,15
203:2 204:4
207:10,16 209:18
210:2,6,24 211:11
212:18 213:25
216:5,9,20 218:24
219:6,8 222:3,13
224:8,14,20 227:4

227:24 228:6
229:8 232:17
234:5,8,22 236:13
237:11 239:4
240:25 242:15
243:13 244:1,7
245:19,22 246:1
250:6 251:14
261:12 264:21,25
265:8 266:6
269:10,20,23
271:16 272:23
273:15,24 277:4
278:7 279:25
280:6 282:11,19
282:23 285:8
286:21 287:4
288:13,22 294:2
294:13,17 297:8
297:23 299:12
300:23 302:11,13
303:4 307:18
308:22 309:18,20
311:21 312:18,21
313:6 314:19
315:1 317:3
**old**
85:18 177:3
**Omiencinski**
40:1
**once**
22:24 54:5 58:21
  63:13 72:22 77:9
  97:15 112:25
  130:19 163:18
  188:5 238:12
  246:1,13 247:10
  248:20 249:21
**oncologist**
290:3
**oncology**
147:17 149:17
**ones**
12:19 15:18 39:19
  43:8,10 44:10
  147:3 161:5 225:8

254:6 288:21
  289:21,22,23
**one's**
67:8
**ongoing**
283:7
**online**
154:1,6,12,22
  159:5
**onset**
236:16
**operating**
230:22 231:5
**opine**
102:23 254:19
  296:20,25,25
  297:4
**opined**
66:6 102:13,19
  116:8 119:11
**opinion**
31:22,23 43:17
  47:1 56:9 65:2,8
  65:13 66:21 67:25
  68:1 71:13 76:9
  79:22 81:8 86:25
  87:3,6,13,14,24
  88:13,13 109:10
  110:6,8 115:24
  116:4,10,11 117:7
  117:15,19,20
  118:2 119:17
  122:10,12 123:23
  124:23 125:2,15
  126:5 148:17
  153:5 169:11,12
  178:5 181:19
  197:6 206:11,14
  214:3 224:5 255:4
  294:23 295:4,10
  295:16 296:6,9
  297:23 298:2
  299:8,21 302:25
  302:25 303:1,18
  311:5,6,8,10,11
  312:1 313:8

**opinions**
30:14,17 31:8 32:2
  32:4,5,7,13 37:18
  39:11 41:2 42:16
  43:15 45:1 51:2
  67:3,4,9 75:21,22
  76:4,13 79:17,19
  81:2 86:9,20 88:1
  97:18 115:20
  117:5,21,24 118:5
  119:10,14,22
  121:8 123:20
  124:5,6 131:2
  152:15 165:24
  175:23 179:15
  180:12 197:21
  281:15,24 282:2
  290:7,11 294:6
  298:4 310:11
  312:22 313:20
**opportunity**
17:10 78:7 164:1
  311:21 312:9
**opposed**
316:23
**opposite**
232:2 277:20
**oral**
4:15,19 36:19
  127:3 254:1,3
  305:9
**ORANGE**
320:2
**order**
245:8 308:23
**organization**
148:18 251:10
**organizations**
146:10,10 147:17
  149:16
**original**
283:20
**originals**
35:16
**Ostbye**
31:16

**outcome**
197:19 320:17
**outcomes**
104:9
**outlier**
263:17 270:21
**outside**
59:4,14 93:10
  121:22
**ovarian**
5:11,14,18,20 6:3,6
  6:9,12,15,19,22
  7:4,11,14,17,21
  9:19,25 19:10
  20:21 21:15 23:5
  25:12,16,21 26:9
  26:25 27:5,10,15
  28:12 29:2 30:21
  31:1,24 32:12
  40:19 48:15 52:3
  52:9 54:15 56:21
  58:17 60:4 62:21
  63:21,24,25 66:2
  87:1,5,12,14
  88:23 89:1,11,17
  93:4,9 94:12,14
  94:19 98:5,14
  102:8,12,15,23
  103:20 105:11,15
  108:8,22 109:14
  109:22 110:10
  111:9,10,13 113:1
  117:14 120:19
  122:13,17 124:3
  124:24 125:6,8
  127:4 128:11,20
  135:13,18 136:7
  137:1 138:17,20
  138:22 139:3,18
  140:16 142:14
  143:1,15,25
  144:18 145:9
  146:4,12 147:1,19
  148:1,10 149:4,9
  149:23 150:11,24
  151:10 154:19

156:12,17,23,25
157:2,4,13 158:13
160:20 161:11
166:8,20 167:5,6
168:4 174:11
176:16 181:15
185:14 186:19
188:15 190:13
192:24 193:6
196:25 197:7,8,20
201:12 202:23
203:24 205:20
207:23 209:6
210:21 212:10
213:1 218:21,22
224:18 225:6
226:4,17 227:16
228:11,17 229:25
231:7 232:7,11
233:13,23 234:24
237:16 245:11,15
245:21 246:9,24
247:7 249:13
251:10 252:25
253:11,25 254:4,8
254:16 255:8
257:25 259:22
263:25 265:5,20
266:3,20 267:22
267:24 270:8
271:25 278:13
285:10,14,17
286:14,20 291:21
292:5,13,14
294:25 295:2,4,7
295:20,22 296:7
297:5,10,13
298:16 299:25
303:2,5,9,14,19
304:2,5,10,19
305:5,13 307:25
310:12,16 311:2,9
311:13,15 312:2,5
312:23 313:9,12
313:16 314:7,14
315:16,20 316:3,9

316:18,23
**ovaries**
298:19,24 299:10
299:15,23 300:7
303:22
**ovary**
90:19 92:15
**overall**
26:11 52:8 116:4
155:5,13 184:5,13
193:24 198:13
200:1 229:21
235:16 262:21
267:23,25
**overestimate**
160:12 226:13
**overestimation**
203:21 204:7
**overlap**
16:5,6 161:5
**overlapping**
161:1
**oversight**
23:6,9
**overstating**
303:8
**Over-speaking**
99:8
**ovulation**
40:19

**P**

**P**
2:1,1 3:1,1 8:1
**page**
4:2,11 21:4 33:13
38:21,24 39:1,4,5
55:6,7 61:19
77:16,17 80:11
85:3 90:7,9,10
91:25 92:4,9 94:5
94:8 108:13
111:20 128:2,2,4
132:8,15 135:11
135:12,15 139:10
139:11 140:19

153:15,22 157:22
167:15,20,21
169:16,16 170:8
174:1 176:9
180:14,16 184:24
194:24 196:20
198:10 203:2,15
207:11,18 210:7,8
210:9 211:19
212:19 215:25
219:25 220:1,25
221:8 222:4,4
224:9,9,14 226:7
232:23 233:4,5
234:2 235:2 238:6
240:5,23 244:1,7
251:14,20 253:20
255:1 259:19,20
260:8,20 262:5,5
264:18 270:2
271:16 272:11
274:25 278:7
282:13 298:12
307:21 319:5
**pages**
320:10
**paginated**
151:16
**paid**
73:6,10 124:15
127:20 174:17,21
174:23 179:7,11
**paper**
7:19 19:17,18
20:23 21:5,8,12
23:17 25:5,6,14
25:17,22 26:7,13
26:16,22,25 27:3
27:9,13,21,22
28:2,3,11,20,22
28:23 29:11,12,14
29:17 107:22
108:4,6 109:3,13
135:12,22 136:5,7
136:22 138:3,21
138:24,25 139:12

140:9,17 157:3
165:15 173:6,7,9
174:13,15 176:5
178:24 179:1,19
179:21 180:6,12
181:9 182:24
183:2 185:4 187:3
189:4,9 190:13,14
192:11,23 193:6
193:12 195:7,11
202:19 204:13,25
205:4,7,25 206:10
208:24 214:9,17
216:15 217:3,5
226:22 228:10
229:17,22 230:15
232:12 234:3,13
234:22 236:15
242:2 243:3 269:4
269:12 274:16
276:9,10,13
277:17,23 279:6
286:14,18 288:1,6
306:18,20 307:5
307:10,22
**papers**
22:19 28:7,8 29:6
30:5 112:21,23
122:16 138:19
165:16 188:24
191:13 194:11
228:24 246:16,21
247:14 250:8
273:20 277:18
287:21 292:15
307:6
**paperwork**
28:1
**paper's**
306:24
**paragraph**
78:5 90:12 92:8
93:14 94:8 95:24
108:15 109:24
128:4,6,7,8
130:14 131:22,25

132:14 135:15,17
140:20 150:8
158:1 167:16,17
167:23,24 180:15
180:16 196:21
210:14 211:23
212:20,21 216:2
221:11 233:8
238:7 240:9 241:1
260:9,24 262:6,7
270:4 275:1
298:13
**Parfitt**
2:5 4:6 8:24,24
12:11,21 15:23
16:1,4 20:12,17
22:20 23:1 25:1
26:23 27:7 29:13
32:25 34:6,11
35:12 36:4,11,14
36:16 37:21 38:1
41:5,23 42:8,18
45:23 46:8,14
47:19 48:3,22
49:5,15,20,22
50:12,19 51:24
52:14 54:10 55:1
55:3,5,8,12,20
57:14 58:3,12
59:10 60:14 61:1
61:11 62:8,23
63:6,12 64:5 65:6
65:15,19 66:17
67:6 68:6,22
69:20,24 71:15
72:17,24 73:8,14
73:24 74:10,25
76:7 77:7,10 78:4
78:8,12,20 80:23
81:6,20 82:5,19
83:12,22 84:9,17
84:19,25 86:2
87:16 88:4 89:2
89:12,21 91:7,18
91:23 93:16,21
94:22 95:3 96:5

Patricia G. Moorman, M.S.P.H., Ph.D.

96:13 97:14,21
98:9,19 99:1,7,11
99:18 100:3,9,20
101:3,9,21 102:16
104:1,24 105:24
107:7 108:9 109:5
109:16 110:7,25
112:13 113:5,19
113:25 114:20
115:1,15 116:1,13
116:19 118:1,16
119:1,19 120:9,20
122:6,14 123:10
123:25 124:10,12
124:25 125:17
126:3 127:17,23
129:6 130:18
131:14 132:4
133:5,11 134:18
135:6 137:9
142:16 143:16
144:20 145:11
148:15 149:11,18
152:11 153:6
157:17 160:7
161:2,18 162:14
162:21 163:17
167:10 168:11
170:4 171:7,17,20
171:24 172:3,8,18
172:22 173:2
174:19,25 175:9
176:6 177:1,14
178:9 179:9,23
180:2 181:3
182:13 184:4,18
186:1 188:16
189:17,25 190:6
190:15 192:16,25
193:14 194:5,14
195:24 196:12,17
197:23 199:2,16
200:20 201:3,15
201:17,22,25
204:15,22 206:2
206:12 207:1

208:3 209:12,21
213:22 214:4
219:18 228:15
229:18 230:4
234:7 236:11
241:15 242:9,14
245:23 246:20
247:3,24 248:2,11
250:23 251:4
255:17 258:2,14
259:2,11 266:5
267:6,18 268:15
271:8,10 273:12
274:11 275:17
276:24 277:21
279:10 280:5,7
281:20 287:24
295:17 296:8,23
297:6 298:3 299:1
299:11 300:1,21
301:24 304:11
305:20 306:5
307:2 308:2,9,13
308:17 309:3,12
309:21 310:4
314:4,22 315:5,22
316:11 317:4
**Park**
2:22 20:19 25:6,9
26:2,22
**part**
15:11,15 16:19
23:9 48:1 60:12
67:22 68:1 88:15
100:6 105:13,17
108:7 116:2
126:11 127:4,7
166:16 202:8,9
214:11 229:20
254:2 262:20
271:1 277:23
309:10
**partial**
78:20
**participants**
130:7 189:23

191:18 203:23
217:24 218:1
219:12 234:24,25
236:17 284:3,22
**participating**
284:24
**particular**
12:2 41:22 56:9
75:11 138:5 200:9
221:19 232:20
242:17 243:16
288:1 297:4,8
299:9 301:21
**particularly**
45:2 47:5 136:15
158:10 220:19
222:9 223:9,24
238:11
**parties**
121:20 320:13,16
**partly**
210:17
**parts**
38:17 144:13
**pass**
84:23 136:10
294:11
**passive**
259:24 260:7
**pathologist**
54:5,7,14,18
**pathologists**
54:7 316:14
**pathology**
54:4,6,9,13,14,21
55:15 56:4
**patients**
32:12
**Patricia**
1:12 4:10,12,13,15
4:19,21,23,24 5:4
5:15 8:5 9:2,17
36:20 41:16 317:6
318:2 319:3
**patterns**
182:4

**Paul**
7:18
**pause**
187:11
**PCPC**
310:8
**PDQ**
6:3,4 151:3,10,21
153:13 155:23
292:21 293:9,17
**peer**
26:19 30:14 286:1
**peer-reviewed**
65:2,8,14,25 68:2
69:3 72:9 74:23
75:2 81:9,18,24
82:12
**Penninkilampi**
6:8 147:24 164:22
165:15 166:4
167:14,18 168:21
183:13,17 184:3
185:19 186:12
187:20 191:15,19
192:9 193:11,20
194:2 206:23,23
207:25 208:21
216:22,25 217:3
217:24
**Penninkilampi's**
217:9
**people**
12:24 15:24 45:2
76:3 104:10 105:1
105:14 112:5
142:4,6 144:12
193:18,23 199:20
199:25 200:5,7
220:10 221:5
228:23 255:23,24
262:1 274:20
301:1
**people's**
44:19
**percent**
59:15 60:11 134:13

134:20 137:17
155:3,4,6,8,11
166:7 236:5,7,13
236:13 247:22
248:5 249:13
250:1 256:12
262:23 303:9
313:11
**percentage**
185:3 303:14
**Peres**
23:17
**perfect**
275:24 276:2
**perfectly**
275:13
**performed**
121:19 163:1,4
212:4 269:6
313:19
**perineal**
6:6,11,14,21 7:16
7:20 96:11,20
97:13 98:17 99:22
100:7,16,16,22
101:17 151:25
166:6 168:1
174:10 176:14
185:13 202:22
205:19 265:19
266:4
**period**
16:13 113:22 114:7
160:21 189:20,22
191:8,14,16,17,23
192:10 193:10
194:10 208:9
217:12 220:11
282:16 301:1
305:23 306:4,9
**peritoneal**
5:17 6:4 99:12,23
100:4 138:22
139:24 151:11
**permitting**
291:19

Patricia G. Moorman, M.S.P.H., Ph.D.

person
11:8
personal
3:11 8:18 206:11
  222:20 223:8,21
  223:22 281:17,22
  294:15,20
personally
45:16 233:25
  290:20
person's
223:17
perspective
86:13
perspectives
44:20
pertain
26:1,5 30:10 80:4
  226:17
pertained
314:13
pertaining
13:8 19:10,14 22:5
  59:9 64:3,7 75:5
  75:17 85:8 87:13
  109:18 253:21
  279:12
ph
1:24
Pharmacopeial
83:10
phrased
297:17
phraseology
234:16
phrasing
103:3 149:2 241:7
physician
288:18
Ph.D
1:12 4:10,12,14,21
  4:24 5:5 9:2
  318:2 319:3
PI
284:20
picture

214:12
piece
66:23
pieces
312:12,15
pile
37:1 183:15
pinpoint
102:24 295:5,19
  305:10
place
33:11 162:18 235:3
Plaintiff
11:16 72:18 310:3
Plaintiffs
2:2 4:18 8:21,23,25
  9:22 14:16 16:25
  17:3 21:10 30:7
  31:23 36:13,18
  40:14 41:24 43:22
  43:25 44:12 48:21
  49:4 59:22 67:20
  68:5,8 72:10,15
  72:21 73:3,7,10
  82:16 83:17 86:21
  106:7 124:15
  145:25 174:24
  271:4 289:9,17
  290:11 291:16
planning
284:6
plausibility
117:12 121:5
  156:24 205:16
  260:15 297:19
  309:6,15 313:14
plausible
182:6 183:10
  231:24
play
231:13,23
please
8:6 9:16 14:13
  19:21 24:22 61:9
  61:20 64:22 70:3
  70:4 77:4 78:22

101:9 111:18
115:18,18 172:12
173:19 186:3
200:14 219:19
228:4 237:12
282:9 299:5
309:22
pleasure
9:11
plenty
145:14
PLLC
2:12
PLOS
7:6
plot
194:25
plots
268:6
Plunkett
291:4,8
Plunkett's
291:10
point
28:5,16 51:13,18
  79:21 102:18,22
  138:8 142:1
  144:11 147:14
  159:24 178:13,14
  178:17 179:5
  190:16 204:6
  226:22 228:21
  229:3,6,21 237:9
  239:10 247:15,20
  256:11 257:6
  258:18 259:3
  269:12 289:1
  293:7,14 295:3,15
  295:19
pointed
266:22
pointing
230:15
points
51:14 238:4 274:22
policies

22:9
Pollak
31:16
pooled
6:19 179:14,18
population
132:21 138:3,15
  261:7,13,23 262:1
  304:18
populations
304:24
portion
57:23 86:18 95:14
  171:23 213:15
  219:1 241:10,13
  307:20
position
70:22 71:1,3,8,10
  263:24
positions
149:15
positive
90:21 92:16 93:3
  94:2 138:11 162:1
  176:18 211:4
  287:15,22 288:7
possession
24:17 36:1
possibilities
218:11
possibility
185:23 205:13
  223:16 238:23
  239:11 240:1,19
  241:23 257:13
possible
48:14 96:17,24
  97:10,23,25 98:21
  101:23,24 102:1
  104:7 107:3
  110:15 147:13,14
  190:10 239:14
  255:11 257:5
  286:10 291:18,25
  303:21 307:1,25
  308:7

possibly
66:23 146:14 253:3
  257:8 296:16
postings
30:16,17
post-data
240:16
post-interview
225:11
post-2014
235:23 236:5
potential
19:19 20:24 21:6
  23:8 26:22 28:13
  86:16 87:10 94:11
  107:2,16 109:25
  110:13 117:13
  122:19 164:12
  182:25 203:7,12
  203:13,18,21
  204:7,7,8 218:20
  230:12 231:17,20
  240:15 241:19
  270:15
potentially
190:20 261:23
  306:10
powder
1:6 6:18,22 7:11,14
  52:2 64:4,8,19
  65:4,18 66:13
  68:20,25 69:7,9
  70:13,15,18,19
  71:1 75:6,18,24
  76:2,5,10,14
  79:20,23,25 80:1
  80:10 81:10,14,22
  82:14 83:2,9 84:4
  86:1,10,22,24
  87:4,7,8,11 88:2,7
  88:11,15,17,22
  94:7,20 102:12,14
  105:11,22 106:8
  106:13 109:20
  111:12 112:8
  113:21,24 114:7,9

Patricia G. Moorman, M.S.P.H., Ph.D.

114:13,14,17
116:3,4 117:9,13
117:16,22,25
118:6,8,19 119:16
119:22 120:4
121:1,6,9,14,16
121:24 122:3
123:24 124:20,23
125:4,7,13,19
126:5,22 128:22
128:24 129:4,9,10
129:10,24 130:3
130:17,23,24
131:17 132:2
150:11 202:22
203:25 223:17
237:15 239:15
265:19 266:11
267:10 276:18
277:8 278:11,21
279:14 281:9,12
281:16 285:18
291:21 292:4,6,7
294:24 296:1,3
298:1 303:19,24
304:1,5,9,23
310:12 311:6,9
312:2,4,22 313:9
314:6,14 319:2
**powders**
9:25 93:11 96:3,3
96:10 120:18
123:5,5,9 129:13
129:16,19,20
131:8,8,9,11
140:10 180:19
278:18
**power**
66:7 200:3 211:20
212:2,9,12 213:4
213:9,21 214:3,9
214:11,16,18
215:3,11,13,16,17
284:19
**practice**
224:22

**practices**
1:6 281:25 282:1
**pragmatic**
300:4
**pre**
240:16
**precede**
177:9
**preceded**
314:19
**preceding**
203:15
**precise**
57:11 129:8,11
130:20 146:7
172:20 214:16
265:1 307:19
**precisely**
91:6 118:17
**precision**
221:3
**pregnancy**
224:2 305:9
**premature**
108:23
**preparation**
19:2 26:8 37:5 38:8
38:9 313:20
**prepare**
45:15,16 46:20
**prepared**
15:7 16:8 32:15
46:22,24 291:2
292:19
**preparing**
12:6,17 17:13
34:17,17 150:21
**preretirement**
10:16 282:17
**presence**
76:14 83:5 96:2
117:22,24 118:5
119:15 121:8,14
123:4,8
**present**
118:25 270:8 275:4

**presentations**
30:20
**presented**
73:22 74:18 111:3
121:10 148:17
**presents**
110:23
**preserve**
24:21
**presume**
20:11
**pretty**
63:22,23 71:12
72:6 111:13 162:7
182:8 229:21
231:1 240:9
242:23 278:23
316:6
**prevalence**
130:12,17 260:21
261:2,6,12 304:23
**Prevention**
6:4
**previously**
48:17 50:15,22
82:21 181:16
185:2 296:13
297:12 301:16
**pre-2014**
235:22 236:4
**primarily**
112:5,25 125:3
**primary**
5:17 6:4 52:1 63:14
135:23 138:22
139:24 151:11
**print**
153:12
**Printout**
5:20
**prior**
14:22 15:18 22:19
33:9 38:7 56:8
88:7 141:17 161:6
162:11 176:19
180:4 218:1

219:12 233:14,23
234:1 236:24
300:18
**probable**
97:6 101:24 102:2
**probably**
13:4 24:18 30:3,4
40:20 55:23 61:5
68:15 71:6 95:20
112:4 113:7
145:24 186:20
218:10 240:6
241:16,17 288:21
291:14,23,25
292:10 303:7
307:11
**problem**
16:5 102:6 103:4
109:25 110:23
111:5 159:18
220:18 230:7
232:6
**problems**
164:16 184:20
185:20 187:15
200:4 270:22
**procedure**
127:5,7
**proceed**
52:21
**proceeding**
320:4,6
**process**
258:22 286:1 306:3
313:22
**produced**
4:24 16:10 33:18
45:13,18 68:19
88:8
**produces**
83:8
**product**
76:2 117:13 119:25
129:10,24 130:4
296:10 298:1
**products**

1:6,7 3:11 8:18
64:4,19 65:4,18
66:8,14 68:21
69:1,9 70:16,19
71:1,18,20,22
75:6,8,13,14,18
75:20,24 76:6,10
76:14 77:25 79:5
79:12,20,23,25
80:1,2,4,5,7,16
81:11,13,14,22
82:14 83:2,9 84:4
85:15 86:1,11,22
86:24 87:4,7,9,11
88:8,11,15 102:12
102:15 105:11,19
105:23 106:6,8,14
109:20 111:12
112:8 113:22
114:7,10,13,14,17
116:3,5 117:9,16
117:22,25 118:6,8
118:19,25 119:16
119:22 120:4
121:1,6,9,14,15
121:17,21,25
122:3,4 123:24,24
124:20,23 125:5,7
125:13,20 126:5
126:23 281:9,12
281:16 294:15,21
294:24 296:1,4,11
297:19,20 298:8
298:10 303:19,24
310:12 311:6,9
312:2,4,22 313:9
314:6,14
**professional**
6:5 31:9 32:1,8
126:8,11 138:11
151:11 181:19
222:17 261:18
**professionals**
32:11
**professor**
10:10

**profiles**
315:21
**progress**
27:17 28:9,11
30:10
**progressed**
160:20
**promised**
232:16
**prone**
185:7 207:13
**pronounce**
196:2
**pronounced**
123:18 316:1
**proper**
133:22
**proportion**
80:1
**Proposal**
174:2
**proposition**
124:22 203:10
204:5 226:10
272:23 273:8,21
**prospective**
7:4 203:5 207:21
210:17 211:1,3
227:14,20 228:2
228:13 229:12
230:2
**prospectively**
202:24 205:18
206:4
**prove**
79:10
**proven**
255:16
**provide**
34:15 40:14 67:8
69:4 72:22 74:2
83:17,20 91:11
116:9 141:8
145:25 199:21
214:19 226:11
305:3

**provided**
17:9 18:17 35:23
39:13 40:2,11,24
42:12 44:14 46:25
47:1 48:21 49:4,7
67:20,23,24 68:7
68:16 69:2 72:10
72:14,19 74:1,7
77:3 80:15 82:16
85:13 115:20
118:23 141:21
144:9 149:8
289:16 293:15
294:5 296:21
306:17
**provides**
87:10 194:10
231:18
**providing**
65:13 67:3,4 81:18
141:17 142:20
**PTI**
3:17 8:19
**public**
30:24,25 47:16
48:1 166:12,24
261:8,17,18,23
320:3
**publication**
22:4 188:10,20
189:3,7,12,14
196:14 237:8
242:7 244:14,17
253:4,9 283:23
285:20 315:15
**publications**
19:19 26:5 32:16
41:9 47:11 243:2
285:25 286:8
**publicity**
233:22 240:12
**publish**
65:2,7
**published**
21:19,24 23:24
48:5 67:4 81:18

95:18 98:2 110:11
127:3 135:22
138:16,19 147:3
148:11 158:18,22
160:25 161:4,6
162:1,16 177:24
186:24 188:13,18
188:24 193:13
241:17,18 243:9
243:20,22 244:19
244:23 254:19
255:4,9 306:12
315:14
**publishing**
138:21 302:7
**pull**
146:6 161:11 234:5
**purchasing**
130:4
**pure**
296:6
**purported**
76:5 89:10 126:13
150:23
**purpose**
27:8,12 128:18
162:15 202:21
284:14
**purposes**
20:2 27:3 34:17,22
95:16 312:21
313:19
**put**
78:24 103:17 159:1
255:8 284:15
287:18 314:9
**putting**
75:24
**pyramid**
159:1 301:18 302:1
**p-value**
274:19
**p-values**
274:22
**p.m**
115:4,6 116:21,24

165:9,10,10,12
211:14,15,15,17
219:23 259:14,15
259:15,17 278:3,6
280:11,14 302:17
302:20 309:24,25
309:25 310:2
315:7,10 317:7,8

_____

**Q**

**qualification**
178:23
**qualified**
55:22
**qualitatively**
106:6 142:24
**quality**
25:20 127:6
**quantify**
72:3
**quantitatively**
142:25
**quantity**
49:7 76:9
**quarrel**
85:24 86:6
**quartiles**
276:22 277:12
**question**
15:18 28:18 29:15
50:15,22 54:22
55:14,16 56:13
57:11 58:15 60:5
61:21 63:14 64:15
64:20 65:21 66:18
68:24 70:2,3,4
74:5 77:9 87:18
98:25 99:2,6,19
101:16 102:4
109:3 110:24
117:3 119:9 120:3
120:22 124:3
125:19 126:1
129:1 131:16
135:8 144:6
146:21 156:14

163:9,24 172:4,7
172:19 175:4
177:20 178:11,11
178:20 183:5
184:16 187:19
189:2 200:14,15
200:21,22 202:1
206:19,21 219:3,4
219:5,8,9,10
223:14 227:17
232:8,16 245:17
249:4,5,6 252:19
254:22 255:6
258:17 265:2
267:8 271:13
283:16 286:7,21
286:25 294:3
307:20 308:2,5,21
310:10,15
**questioned**
311:17 314:5
**questionnaire**
129:2 131:16
140:11 191:20
286:25
**questions**
13:25 14:12 16:16
31:5 36:6 37:2
55:3 62:11 78:7
113:6 164:1
171:19 184:10
201:10 205:16
209:25 220:13
223:12,22 224:25
225:16 280:1,4
294:22 302:12
310:7 314:23
315:1
**quick**
117:2 306:16
**quickly**
148:4
**quite**
29:24 64:9 101:4
138:19 140:2
174:13 209:8

Patricia G. Moorman, M.S.P.H., Ph.D.

218:13 237:13
262:9 263:8,17
276:25 295:7,22
295:22 314:17
**quote**
103:4 150:9 167:18
203:16
**quoted**
80:20

**R**

**R**
2:1 3:1 8:1 319:1,1
320:1
**race**
262:14
**raise**
164:2 225:24
**raised**
205:15 306:11
**ran**
206:20
**randomized**
166:22
**range**
134:17,20 137:13
237:1 248:22
255:15,20 256:11
256:17,19 257:23
**ranked**
302:2
**rappel@seyfarth...**
3:15
**rare**
114:11 310:25
**rate**
14:18 236:5,7,18
**rates**
111:23 112:10
113:24 114:8
236:6,10
**ratio**
132:9 133:7,24,25
134:6,7,16,23
136:18 137:3,12
137:13 138:6

139:23 143:24
155:11 161:16,24
162:4 235:11,14
235:16,17 241:10
241:13 242:12
248:22 257:24
261:25 262:24
263:7 264:22
266:12 267:12,14
268:24 274:9,13
**rationale**
188:1
**ratios**
136:25 139:12
227:13 234:23
240:20 247:12
253:6 255:12
256:4,6,25 257:12
257:14,21 258:7
268:2,2,7,12
**raw**
77:24
**RDR**
1:21 320:22
**reach**
111:9 125:14
126:25 155:18
182:18 231:2
256:25 263:3
308:24 309:11
**reached**
95:12 97:20 156:9
178:14 227:13,21
252:7 268:19
299:15 300:7
**reaches**
298:18,23 299:10
299:23
**reaching**
141:4 161:15
**reaction**
231:19
**read**
39:13,17 43:12
59:12,19,25 60:7
64:9,10,23,24

71:6,6 72:7,8
76:23 77:21 78:2
79:1,9 85:12,23
90:16 92:11,23
94:9 99:4 108:18
108:25 111:1
118:3 128:9
132:17,24 140:25
141:10 145:22
150:9 154:16
158:8,16 162:25
167:25 169:19
170:10,19,20
173:20 174:6
176:10 180:17
185:2,5 195:12
196:21 198:11
199:18 202:20
203:4,17 204:2
205:9,22 207:17
207:19 210:14
212:22 221:11
222:6 233:8 237:9
238:8 239:13
241:4,7 247:14
251:20 259:21
261:4 262:8
265:18 269:13
270:5 271:22
272:12,21 275:3
275:20,21 276:17
276:23 277:7,14
277:16 278:8,15
285:21 289:20
291:10,11,18
298:5,14,20 318:3
319:5
**reader**
22:7 160:15 168:21
170:1 175:7
176:23
**readers**
171:4
**reading**
56:13 77:19 91:3
94:16 117:10

120:21 144:14
145:21 150:13
158:4 170:14
185:17 197:4
213:13 226:14,16
228:4 238:15
240:3 251:25
254:22 260:1
291:15 298:13
300:3
**reads**
278:8 319:5
**ready**
28:6 52:21 259:9
**real**
193:25 247:16
249:2,5,6 257:13
257:17 316:17
**really**
44:25 51:16 86:15
142:8 155:17
163:23 171:9
187:13 188:6
197:11 211:2
214:20 225:2
230:2,15 231:3
258:15,16 259:20
263:17 265:1
298:7 303:15
310:20
**realtime**
99:5 148:22
**reason**
85:24 116:15
178:22 203:18
204:7 214:1,6,8
214:10 222:3
224:1 230:13
239:8
**reasonable**
284:21
**reasons**
161:10 180:3
215:23 232:25
241:25 242:21
251:7 263:2 300:4

**REATH**
2:21
**Rebecca**
44:6
**rebut**
68:19 73:23 74:19
**rebutting**
118:24
**recall**
7:14 10:3,6 11:17
13:17 17:6,13
22:1 24:6 40:1,3,9
44:11 54:20,22
66:9 69:15 75:9
75:14 76:16 83:19
96:6 103:17
104:18 107:13
110:11 112:2
115:10 118:19
123:11 132:23
135:25 138:21
146:5 149:5,7,12
150:5 159:18,18
160:4 164:11
185:7,20 186:6,11
192:21 203:7,12
203:14,22 204:9
204:10 205:14
207:13 218:9,12
218:13 220:11,18
220:23,24,24
221:1,1,2,5,7,12
221:18 226:11,22
229:2,3,14 230:7
230:7,12 231:4,4
231:11,12,17,20
232:5,9,13,20
234:19 237:16
238:10,24 239:7
239:12,22 240:1
240:11,13,16,19
241:6,14,19,24
242:4,5,8,20,21
243:4,10,17 251:3
251:12 252:13,13
252:20 253:16

Patricia G. Moorman, M.S.P.H., Ph.D.

254:10 283:9
287:8 292:23
295:14 300:13
311:19 314:7,16
**recalling**
149:1 242:16 307:5
**Received**
92:24
**Recess**
52:17 115:4 165:10
211:15 259:15
309:25
**recognize**
18:3 56:16,17 57:6
79:25 103:24
106:21 160:9
316:13
**recognized**
290:1
**recognizing**
57:1 161:9 284:17
**recollection**
146:2
**recommendations**
311:22
**record**
8:3,7 9:16 20:2
21:2 36:15 41:23
50:4 52:15,18
73:25 74:14 91:19
95:16 100:5,12
115:2,5 116:20,22
116:23 165:8,11
199:17,17 211:13
211:16 219:16,20
219:21,22 259:13
259:16 278:1,2,4
278:5 280:10,12
280:13 302:15,16
302:18,19 309:21
309:23 310:1
315:6,8,9 317:7
**reduced**
154:8 155:9
**reducing**
10:17

**reduction**
155:3
**REES**
3:3
**refer**
17:16 54:25 61:8
115:21 120:10
123:15 128:3
133:20,22 134:8
134:12 135:12,18
137:23,25 138:4
138:10 163:10,11
164:10 166:19
183:6,9 194:8
207:6 246:3,18
250:9 288:17
295:25
**reference**
39:8,10,18 40:18
41:3 45:19 46:6
76:20,23 216:24
246:17 278:25
**referenced**
39:15 75:5 139:6
**references**
5:3 33:20 38:22
39:10 45:25 46:4
46:17,22 47:7,10
47:13,15 49:10,17
49:18 50:17,25,25
51:1,5,7,9,9,15,16
51:19,20 115:9
**referred**
40:21 60:1 111:16
124:8 183:24
208:22 246:25
247:8 270:21
**referring**
11:10 20:19 62:3
67:19 79:22 80:11
91:15 96:13 107:9
107:11 115:10
120:11 147:6
148:7,13 151:3
179:6 215:14
216:16,21 246:22

260:3,11,14 266:8
274:23 296:1
300:18
**refers**
182:24 238:3 246:9
246:12
**reflect**
18:6 73:25 100:5
238:24 273:8
274:8
**reflected**
216:15 217:5 292:2
**reflecting**
299:16
**reflection**
136:16
**reflective**
262:18 267:16
273:1
**reflects**
110:8 236:1,3
269:23 274:16
279:23
**regard**
12:15,19 59:6 75:4
82:15 116:11
117:6 120:2 121:8
122:8,23 124:3,5
124:18 142:12,14
147:12 154:14
156:10 168:3
213:21 222:7
243:10 253:19
272:6 286:17
292:13 297:15
302:24 303:17
305:16 310:10
313:3,8 314:6
315:19
**regarded**
142:10
**regarding**
73:3 282:4 283:24
**regards**
56:3 120:23
**region**

223:18
**regulatory**
25:23
**Reid**
5:13 107:22,25
108:3,6
**reject**
250:12
**relate**
310:11
**related**
5:6 15:15 16:12
21:15 48:14 58:17
59:16 60:19 64:24
66:1 68:15 142:3
181:14 260:6
284:15 285:14
320:13
**RELATES**
1:9
**relation**
122:17 230:19
253:17 254:4
286:14 304:5
**relationship**
63:20 139:23
176:13 194:12
205:19 253:12
**relationships**
158:12
**relative**
158:13 160:12
205:10 213:6
221:14 251:22
255:20 264:5
270:22 320:14
**relatively**
26:10 27:10 104:8
136:16 275:12
310:25
**relevant**
60:3,9 127:8,10
219:15 233:9
273:25 298:17
**reliance**
4:24 45:5,17,18

**relied**
119:5 126:24
298:25 299:7
**religious**
25:15
**rely**
41:1 54:6 117:23
210:10 300:4
301:5 308:24
309:7
**relying**
41:6 120:7 166:16
241:12,12
**remark**
256:6
**remarkable**
45:1
**remember**
21:25 112:21
191:10,12 212:11
221:3 287:12
293:6 307:6
310:13,17
**remind**
84:15
**reminder**
13:25 294:19
**rendered**
123:5 298:1
**rendering**
312:21
**renders**
96:3 123:24
**RENÉE**
3:15
**Renée**
8:17 294:20
**repeated**
134:22
**repeatedly**
255:7 268:21
271:13
**rephrase**
14:11,13 101:6
106:2 180:25
215:1 282:12

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 356

286:5 299:4
**replicated**
262:11
**report**
4:21 5:3 6:11 12:17
13:8,16 26:6
30:14 32:17 33:21
34:17 36:3 37:7
37:15,17,22 38:7
38:9,13,15,17
39:12,15,20 42:13
42:16,21,22 43:16
44:4,24 45:20
46:5,12,13,21
47:25 48:10 49:3
49:11 50:6 51:1,3
51:6,10,14 57:8
66:5,10,20 69:8
69:13,14 71:21
75:17 76:18 78:18
79:23 80:9,21
88:3 90:7 93:25
95:2,11 97:16,19
98:1,3 108:4
112:24 115:8,11
116:8 118:13
119:11,14 120:7,8
120:11,11,24
122:25 123:15,15
123:19 128:3
129:3 130:10
132:1,6 133:1,9
134:4,19 135:5,11
136:3,22 139:1,12
140:14,19 144:10
144:14 150:21
152:18,22 157:23
159:23 160:16,17
162:18 164:6,6,9
164:12,18 168:20
168:24 170:2,5
171:5,9 172:14,20
173:1 175:3,6,7
175:11 176:23,24
177:4,5 183:18,22
186:6 187:4 191:2

191:22 193:10
195:3,6 196:20
198:10 204:8
206:18,25 207:7
211:19 213:21
215:5,9 216:10
218:6 219:25
220:22 221:8
222:4,12 223:7
226:19 227:25
235:21 240:14,18
242:13 243:14
244:2 245:12
251:15 252:22,24
253:14 254:20
255:5,9,14 256:2
257:10,23 258:6
259:19 264:21
265:11 267:2
268:24 271:19
274:13 275:24
277:24 279:3
289:13 292:1,19
293:19,22,23
294:4,8,24 298:12
301:4 302:7,8
303:18 307:24
309:6 313:20
**reported**
1:21 23:20 88:6
112:22 130:23
134:6 136:12,21
136:22,24 139:16
139:23 140:1,14
142:6 160:1,11
163:6 185:3 187:1
187:5,23 189:4,9
216:18 220:5,7,17
228:25 231:14
235:15,23 236:4,6
236:6,10 239:17
255:20 271:20,24
279:8,21,22
292:15,16 296:4
**reporter**
8:7 14:3 100:4,11

116:17 320:3
**reporting**
203:25 217:9,10
236:17
**reports**
42:20 43:18,23
44:1,13,16,22
67:3 73:2,19,25
74:7,15,22 112:18
118:15 127:21
187:23 216:25
238:7 255:19
289:9,20 290:14
290:15 291:3,16
**represent**
147:17 280:20
294:20
**representation**
55:24
**represents**
50:5 148:13
**reputation**
290:6
**request**
24:25 84:3 283:17
**requests**
33:15
**required**
21:16
**requirements**
21:23 22:1
**reread**
19:4 286:4
**research**
6:11,13,18 7:6,10
127:6 174:2
224:23 243:24
283:20 285:9
**researchers**
254:2
**reservations**
168:22 170:3
172:21,24
**reserve**
172:1,4
**reserved**

175:8 176:24 317:9
**reserving**
181:1
**respect**
27:21 29:10 56:20
67:11,19 68:3
70:22 75:16 93:9
94:6 121:20 126:1
136:1 137:3
142:24 149:9
156:25 163:8
188:12,25 190:13
214:16 216:1,9
220:13 224:18
252:7 281:18
285:24 308:11,20
**respectfully**
163:23 218:25
**respond**
23:19 33:25
**responded**
24:8 62:12
**response**
4:18 36:18 226:2
**responsive**
34:4 200:13
**rest**
291:15
**restate**
87:18 117:3 225:12
258:4
**restricted**
278:17
**result**
213:7 221:13 264:7
**results**
77:18 79:2 80:3
132:3 135:25
140:13 142:7
169:20 170:10,16
170:21,23 171:10
172:15 185:6
195:13,20,22
196:8 213:12
215:19 227:18,20
227:22 228:5

229:11,11,17
230:25 231:2,5,8
231:11 232:5
238:18,24 264:18
268:18 269:14
279:8
**retained**
11:20 88:3 292:5
295:11
**retire**
282:24 283:1
**retirement**
282:19
**retrograde**
94:11
**retrospective**
228:2,14 230:1
**returned**
232:22
**returning**
103:19 123:14
177:18 183:13
187:19
**reveal**
222:25
**review**
5:9,12 6:7,9 7:19
17:10 19:1 21:23
26:19 30:14 38:7
38:9 43:14,18,20
44:16 47:3,5
51:22,23 56:11,22
56:25 57:12,19
58:1,10,19,25
60:2,12,24 61:22
62:2,17,20 63:3
63:10,15,19 64:2
64:6,17 65:5,9,11
66:14,22 67:12
82:3 89:9 112:1
113:3 127:11
156:15,18 157:6
167:8 253:20
254:3,7 280:3
286:1 291:6
293:12,13 311:22

Patricia G. Moorman, M.S.P.H., Ph.D.

311:24 312:9,13
313:18 314:6
**reviewed**
34:16,22 39:23
  40:6 42:24 43:2,2
43:4,5,8,11,11,20
44:1,2 60:19 61:6
67:15,17,22 72:9
72:13 73:19 74:23
75:5,16,19 76:13
82:16 85:21
103:21 118:15
157:8 159:23
165:23 175:13,23
214:24 289:6,8,12
307:9 312:24
313:7
**reviewers**
166:19
**reviewing**
40:2,3 44:22 45:2
  71:25 76:16 82:18
82:23 290:14
**reviews**
127:3 272:2 314:3
**revisit**
306:11
**re-ask**
79:18
**right**
20:5 33:11 39:5
  41:14 50:2 55:9
56:7 67:25 78:23
93:12 101:15,20
102:4 109:21
114:22 123:16
131:21,22 135:20
135:20,23 136:2
137:18 139:15,16
140:10 141:14,19
144:24 148:8,23
153:1 162:13
171:3 172:19
178:4 179:2 191:9
191:25 195:23
196:8 199:4

202:18 203:17
205:8 207:14
210:4 212:20
216:11 221:20
222:1,11 227:15
227:22 228:8,14
231:9 233:4 235:6
235:24 236:18
240:23 252:8,21
256:20 257:16
261:10 266:1
268:1 269:7 270:3
274:19,24 275:9
282:17 286:13
289:4 293:7 306:2
310:15,19 311:4
311:12,24
**right-hand**
92:7 94:7 180:17
  238:2 240:6
**risk**
5:14 6:9,12,14,18
  6:22 7:14,17,21
19:10 20:21 23:4
25:12 26:14,25
27:10,14,16 28:12
30:22 31:1 105:15
114:15,17 117:14
122:17 124:18
125:6,23 127:4
131:20 134:14
135:13,24 136:8
147:25 148:21
149:3,3 154:19
155:3,4,10 156:12
160:13 163:11
166:7,15 167:2,5
174:11 176:15
181:15,16,20,24
181:25 182:5,7,24
182:25,25 183:7,9
183:11 185:3
186:8 187:6
196:25 202:23
203:20 205:20
210:20 213:6

221:14 224:25
225:1,8,9 226:23
230:9 232:14
237:16 247:10,21
247:22 248:6
249:13 250:1
255:20,22 256:12
261:24 263:4,5
264:5 265:5,21
266:3 270:7,22
272:19 276:20
277:10 278:10
285:10 286:19,22
292:16 295:7,20
295:21 296:7
297:5,9 303:23
305:6,9,15 306:7
306:11,13 313:12
315:21 316:5,6,22
**risks**
158:14 251:22
  254:10
**RMR**
1:21
**Road**
2:3,12
**role**
7:14 237:16 314:14
**rolling**
116:15
**room**
182:21
**Rosenberg**
29:25
**Ross**
6:8
**Rothman's**
288:15
**roughly**
155:1,6 161:23
  202:6 218:16
303:9
**route**
303:21
**routes**
105:16

**routinely**
314:1,2
**RPR**
1:21
**rule**
4:21 110:14 241:23
**ruled**
103:15 242:8
**rules**
13:23
**runner**
38:3
**running**
264:25 307:19

---

**S**

**S**
2:1 3:1 8:1
**Saed**
48:13
**safe**
76:1 86:14 168:2
**sales**
1:6 130:22
**sample**
104:19 136:17
  140:2 187:17
237:3
**samples**
77:24 79:4 80:15
  134:23
**saw**
68:10 72:22 230:13
  247:12
**saying**
14:4,5 69:3,6,7
  81:24 97:24,25
98:5,7,11 100:6
103:4 134:15,15
166:21 178:18
195:19 196:7,9
215:17 220:13
229:10 232:3,15
250:19 252:10,17
257:16 258:21,24
266:18,22,24

267:19 269:1
273:3 276:2
**says**
45:13 62:5 70:7
  77:18,21 85:11
90:16 99:21
133:15 153:20
156:3 169:25
181:14 185:5
203:1 207:15
274:4 276:16
277:19 308:3
**Schildkraut**
7:12 29:7,25 128:5
  128:23 131:12
234:3,12 237:8
238:19 239:5
240:15 284:19
**school**
288:17
**science**
52:5 166:13 167:1
**scientific**
56:11,25 57:2
  102:11 120:17
141:22 144:16,17
146:10,25 156:15
156:21 157:14
181:9,11 199:17
222:16 251:9
253:10,21 255:2
300:12 305:22
313:23
**scientist**
57:5 68:17 69:17
  70:7
**scientists**
85:25 86:4,4 141:1
  142:1,8 145:1
157:11
**scope**
37:18
**Scott**
2:19 8:9 9:10 37:21
  61:12 78:12
100:12 113:19

116:14 172:9
209:12 259:2
**se**
128:25 285:23
**search**
51:21 52:1,1,3,8
184:8 291:20,22
291:24
**searches**
52:7
**searching**
120:16 256:24
**second**
85:2 90:9,12
135:17 140:20,24
142:21 152:4
185:5 187:2
210:13 219:17
224:8 238:6
260:24 270:4
276:17 277:5
298:13 315:4
**section**
33:14 77:18 85:6
92:4 108:14 170:9
174:2 184:25
185:1 202:19
205:9 207:11,17
228:5 240:18
244:8 264:18
307:21
**secure**
283:14
**see**
11:7 19:5 21:16
25:13 33:14 37:22
38:21,25 44:20
45:12 47:21 49:24
50:1,7 55:14,16
61:24 65:24 74:9
74:11 77:15,17,19
80:10 84:10 85:9
85:9,10,19,20
90:11,13 91:3
92:5,20 93:6
94:16,17 108:14

108:25 109:1,6,24
110:4 112:10,15
114:8 121:10
125:6 127:9 136:3
137:4 139:16
140:6 147:16
150:7,13,14,22
151:21,24 153:12
154:5 158:4,16
161:20,20 167:16
169:17 170:7,14
174:4,5 180:15,22
181:13 184:7,19
184:21 185:17,19
186:14 194:24
195:17 196:10
197:4 202:18
203:2,8,9 204:2
205:6,22 208:24
210:22 213:13
216:3 218:16
221:16 223:23
224:12 225:25
226:14,16 229:4
230:12 232:22
233:16 235:4,11
235:17 236:8
238:2,15 240:5,17
241:7 245:9,14
246:13 249:25
251:18,25 253:23
258:19 260:1,22
262:7,16 264:2,19
264:23,24 265:3,6
270:12,13 272:21
275:8,22 284:23
288:15 293:1
299:2 305:13
307:23
**seeing**
95:7 154:3 241:11
**seen**
33:6 41:19,21 74:8
77:13 84:2 85:4
107:25 150:3
152:20 158:22

173:7 176:19
186:8 230:11
237:2,7,22,23
263:6 301:19
304:21
**sees**
167:4
**select**
258:7,10
**selected**
284:12
**selection**
176:16 205:14
**sell**
281:11
**Seminary**
2:3
**senior**
21:12
**sense**
119:16 296:25
297:1
**sensitive**
222:1,10,24 223:6
223:9,18,24
**sent**
24:6 42:1,2 291:16
**sentence**
85:11 90:13 92:23
93:20 108:15
109:24 110:3
135:9 140:25
141:7,17 144:24
167:19,24 169:16
170:19 171:21
180:22 185:2,5
186:10 210:14
214:22,23 240:4,8
241:3 244:11
259:20 260:5
262:7 276:17
277:5 300:2
307:23,24
**sentences**
203:16
**separate**

38:25 121:13
227:19,21
**separately**
96:9 110:21 212:5
215:2
**Serena**
6:22
**series**
166:23 209:25
**serious**
184:20 306:10
**seriously**
142:11
**serous**
139:18 185:14
187:1,7 192:23
193:5 194:11
264:10 303:7,9
**SERVICES**
1:24
**serving**
11:5
**set**
83:10 203:16 214:9
282:23
**Setiawan**
30:1
**setting**
88:21 105:3,9
106:6,16 126:22
**settled**
97:12 161:23
**seven**
151:18 284:8
**SEYFARTH**
3:13
**SGO**
149:9
**shared**
312:23 313:21
**sharpened**
239:15
**SHAW**
3:13
**sheet**
17:17,17 18:12

318:6
**SHKOLNIK**
2:12
**SHOOK**
2:17
**short**
259:11
**shortly**
164:5
**show**
134:13 175:6
262:24 313:10
**showed**
88:11 193:3 312:6
**showing**
92:25 114:16
236:15 263:7
264:5
**shown**
125:21 138:5 168:2
173:18
**shy**
167:14
**sic**
76:25 99:12
**side**
18:9 78:14 240:2
**sides**
69:19 70:9,10
**Siemiatycki**
44:6 174:20 290:21
**signature**
18:10 317:9 318:10
**signed**
17:18 318:7
**significance**
62:17 135:9 215:10
237:4 263:21
274:24
**significant**
10:19 94:1 110:23
131:20 132:3
133:4,7,20 134:2
134:10,13,14
135:2 136:15
139:17 140:4

Patricia G. Moorman, M.S.P.H., Ph.D.

162:18 193:7
226:25 235:18
236:9,22,25 237:5
259:23 264:12
265:9,12,13
266:10 267:1
268:13 269:1
271:3 272:18
273:5 274:20
276:19 277:9
278:9,20 279:4
**significantly**
187:6
**signing**
18:12
**similar**
25:4 60:5 142:25
143:9 168:3
178:11 213:6
214:23 226:4
229:13 245:14
246:14 250:3
251:23 253:6,12
253:18 256:4,6,24
257:12,14,18
258:7,13
**similarities**
143:7 155:1
**similarly**
225:4
**simple**
52:2
**simply**
47:25
**Singh**
44:7 291:5,8
**Singh's**
291:11
**single**
17:13 24:4 59:5,16
150:8 214:22
246:8 263:3
**Sister**
186:21 187:15
212:12 263:16
**sisters**

199:24
**sit**
289:20
**sitting**
11:23 18:22 40:4
243:3 295:14
**situation**
24:7 106:24 162:6
183:12 222:7
224:8 228:11
**situations**
221:18
**Sixteen**
6:16
**size**
136:17 140:2
187:17 200:2
**sizes**
237:3
**sjames@shb.com**
2:19
**slight**
203:20
**small**
104:8 107:15
136:17 140:2
181:14 250:10,18
250:21 251:2
**smaller**
199:22 237:3 251:6
303:14
**Smith**
3:23
**Smith-Bindman**
44:7
**smoke**
259:24 260:7
**smoking**
141:12,23 142:3,11
142:21,24 143:10
143:13,21 144:17
145:5 245:9
247:19 249:1
316:2,20
**snapshot**
101:18

**social**
25:19
**societal**
25:19
**sole**
124:6 312:16
**solely**
66:3
**solid**
154:17
**somewhat**
66:1 113:3 282:21
**Sonal**
44:7
**Sophie**
1:21 100:5,15
320:3,22
**sorry**
11:16 14:22 15:17
16:21 20:13,16
39:3 56:13 69:23
91:10 110:2
111:18 114:3
115:23 116:14,19
118:3 146:15,16
146:17 148:2
154:5 165:16
187:9 192:3 209:2
237:11 239:25
249:23 266:8,13
268:16 276:25
284:10 288:4
305:24
**sort**
35:6 108:16 124:17
177:19 206:9,20
260:14
**sorts**
103:8
**source**
110:15 117:20
158:22
**sources**
71:19 81:9
**South**
3:18

**Southern**
285:3
**space**
17:23
**span**
262:15
**spanning**
23:7
**speak**
60:20
**speaking**
29:13 30:25 90:4
110:18
**specific**
48:8 75:10 107:8
128:22 136:25
172:24 197:18
199:8 214:1
233:24 256:21
295:15 316:23
**specifically**
11:25 21:25 24:11
41:10 44:10 50:24
54:22 70:23 71:11
72:4 74:20 75:8,9
76:19 79:24 80:4
83:13 86:23 94:7
95:4 107:5 119:3
119:9 124:2,3
130:23 139:2
140:9,12 153:2
160:18 163:15
171:8 172:15,16
175:10 177:4
178:25 187:16
191:7,11 194:16
212:11 220:25
224:7 230:19
244:18 246:22
252:14 286:13
293:4 303:23
**specifications**
83:1,5,10,14,18,20
83:24 282:4
**spectrum**
305:8,14

**speeches**
30:20
**speed**
165:19
**spend**
71:25
**spent**
313:2
**spoken**
237:24
**spring**
166:12
**stand**
18:16
**standard**
224:22 225:1
278:23 288:10,22
**standards**
51:21 67:2,4 282:3
**stands**
26:9
**start**
36:6 38:8 87:25
133:2 218:8
**started**
208:7 218:10,17
220:8
**starting**
140:21
**starts**
90:13
**state**
9:15 15:20 50:4
90:12 98:24
102:14 108:17
129:4 131:19
140:20 141:6
146:3 167:24
169:11 174:6
180:17 205:7,9
207:19 212:21
222:6,12 224:22
226:19,24 240:19
252:6,9,10 265:7
265:23 270:4
271:22 320:1

Patricia G. Moorman, M.S.P.H., Ph.D.

stated
54:13 70:12 81:7
    83:23 90:17 91:6
    95:23 109:7
    172:23 181:15
    193:17 207:2,3
    261:16 268:21
    279:3 303:21
    307:6
statement
39:16 69:5 70:14
    70:16 71:17,21
    81:12,13 101:23
    134:3 147:3 149:6
    149:22 150:3,7,8
    150:15 158:1,19
    170:10 172:9
    181:13 201:18
    202:11 204:5
    215:8,21 222:14
    222:15,16 225:10
    239:12 241:1,2
    269:18 277:24
    278:19 279:15
statements
30:25 39:11,19
    71:7 129:3 130:11
    279:12,13
states
1:1 92:11 94:4,9,23
    244:20
stating
259:21
statistical
135:9 200:2 213:3
    215:10,12 237:4
    263:21 274:24
    284:19
statistically
131:20 132:3 133:4
    133:7,20 134:2,9
    134:14,21 135:2
    136:14 139:17
    140:4 193:7
    235:18 236:25
    237:5 264:11

265:9,12,13
    266:10 267:1,15
    268:12,25 274:20
status
10:9 178:7 203:25
stay
221:7
Steering
4:18 8:21 36:18
Steve
2:9 8:22 12:11
steve.faries@mu...
2:10
sticker
77:9
stickers
173:15 175:18
stop
201:22 308:13
story
69:19 70:9,11
stratify
236:23 237:2
Street
1:17 2:8,17 3:13
strength
244:8,11,15 245:2
    245:4,10,20 246:5
    250:3,7 253:5,11
    253:15 256:3
    257:15 258:6
    261:3,10
strengthened
102:22
strengthens
98:3,13,13 102:7
strengths
126:14 197:16,18
    198:17,20,21
    301:6,8,13 302:4
stress
226:2
stressing
208:1
strictly
157:4

strike
69:10 122:11
    206:21 311:7
strong
144:2 223:3 245:16
    246:10,12,15
    248:23 249:7,11
    249:17,18,20,20
    251:11 257:3,17
    258:1,19 261:14
    261:15 287:11
    288:23
stronger
143:14,20 208:11
    228:25 230:13
    231:14 261:22
    301:2,5 302:2
strongest
143:22 158:3,20
    159:7 207:7
    210:16,25 211:8
strongly
51:18 90:21 92:16
    302:3 316:2
structure
26:11
structured
93:13
structures
77:23
structuring
31:5
student
28:24,25
students
288:19
studies
6:16 7:7 34:25
    52:24 53:2,5,8,11
    58:1,11,20,24
    60:3,7,11,25 62:2
    62:3,13 63:4,4,5
    88:25 89:7,16,19
    89:24,24 90:1,22
    90:24 92:17,25
    93:15,25 104:3,8

104:18 106:24
    111:17,19 125:23
    127:10 130:22
    131:10 140:18
    142:5 143:5,11
    154:10 155:1,6,11
    156:23 158:25
    159:9,12,19,22
    160:3 161:6 162:1
    162:2,5,11,12
    164:4,14 170:24
    171:11,13 176:20
    184:10 185:7,12
    185:21 186:8,13
    186:16,18 187:1,5
    187:7,8 188:3,9
    188:13,18 190:18
    191:3 192:5,8
    193:19 194:8,25
    195:20,21,22
    196:22,23 197:7,8
    197:13,14 198:2,2
    198:4,4,16,18,21
    198:22,24 199:9
    199:12,13,19,20
    199:22 200:6
    202:6,7 203:19
    205:11,15 207:13
    207:21 208:18,22
    209:5 211:7,20
    212:10,24 213:5,8
    213:9 214:14,15
    215:11,13,15,18
    216:7,17 220:2,6
    220:20 222:15,18
    222:20 223:13
    224:21 225:5
    226:12,21,21
    227:1,14,14,19,21
    228:3,13,14,19,20
    228:22 229:1,4,5
    229:11,12 230:1,2
    230:8,10,14,14,18
    230:18,20,21
    231:15,19,21,24
    232:14 233:10,13

237:1 238:11
    241:11 243:17
    260:15,15 262:11
    262:22,23 263:15
    264:3,11,13
    266:20,20 267:4,5
    267:17 268:1,7,10
    268:19,20,24,25
    270:10,11,16,17
    270:18,20,25
    272:9,13,24 273:1
    273:4,7,8,22
    275:4 281:16
    284:5,8,9,12,16
    284:21,25 286:7
    286:11,23 298:24
    299:7,8,13 300:19
    300:20 301:7,8,12
    301:22,23 303:4,6
    303:10,22 304:4
    304:14 309:16,17
study
7:4,8,12 20:22 29:2
    29:3,5,8,18,24
    58:6,16 59:2,5,8
    59:16 60:9 61:6
    104:4 105:5
    106:23 107:3
    125:5,6 128:5,10
    128:16,19,23,24
    129:4 130:7,7,11
    130:15,16 131:12
    131:19 132:20
    134:5,22 135:19
    135:22,25 137:1
    138:3,6,15,15,16
    138:17,20 139:4,5
    140:13 164:23
    166:18 169:21
    184:3,10 186:20
    186:21,22,23
    187:13,15,15
    188:3,11,19
    189:23 191:17,23
    192:9,13,20 193:3
    193:21,24 194:3

Case 3:16-md-02738-MAS-RLS   Document 9737-16   Filed 05/07/19   Page 292 of 449 PageID:
40616
Patricia G. Moorman, M.S.P.H., Ph.D.

Page 361

195:4,14 196:8,10
196:14 197:1
198:13,23 199:6,6
199:24 200:4,6,9
202:13,20 203:6
204:17 206:5,23
206:23 208:6,7,12
209:4,4,8,10,24
210:15,16,25,25
211:4,5,8 212:12
212:13 217:9,15
217:24 218:1,15
219:11 221:4
223:10 224:10,10
224:16,17 225:6
225:14,15,19,21
226:8 227:2 229:6
229:10 230:25
231:1,8 236:17
238:9,19,21,24,25
240:15 241:18
246:8 263:3,6,11
263:16,18,19
264:4,4,15,18
266:23 267:9,11
268:14 269:7,15
270:20,23 271:1,2
273:9 275:5 283:3
283:4,6,8,10,15
284:2,3,17,20,22
284:24 285:1,3,5
285:5,6,13,17
286:18 292:12,14
299:19 300:24
301:3,5 302:1,2
312:6,7,10,12,18
**studying**
197:15
**study's**
221:19
**sub**
173:14
**subject**
18:19 238:13
**subjective**
206:9

**subjects**
6:15 113:2 224:10
224:17 225:15
**submitted**
15:23,24 16:18,20
26:18,19 27:23
28:6 30:13 79:4
85:17 283:18
293:19,22
**subsequently**
23:24
**subset**
138:4
**substance**
13:11 30:13
**substances**
120:14 121:5
297:18
**substantially**
45:20
**substantiating**
119:6
**subtype**
207:23 303:7
316:23,24
**subtypes**
187:6 210:20 303:2
303:3,6,9,11,12
303:13,16 310:16
310:21,24,25
311:3 315:19,20
316:4,7,9,18
**sudden**
12:12
**sufficiency**
83:4
**sufficient**
101:1,19 102:14
169:6 174:15
176:1 178:8,18
254:18 255:3
301:1 303:1 304:1
304:8,15
**suggest**
69:25 70:13 87:9
108:20 183:1

257:9 296:15
**suggested**
132:21
**suggesting**
142:22 227:1
**suggestion**
161:14
**suggestive**
185:15
**Suite**
2:12,17 3:3
**Suites**
1:17
**summaries**
159:5
**summarized**
154:11,13
**summarizing**
147:22
**summary**
148:9 161:23 162:4
229:21 235:16
**summer**
11:19 291:25
**Super**
9:15
**superior**
190:14 197:2 198:7
198:8,25
**supervision**
320:9
**supplemented**
56:18
**supplier**
80:15
**suppliers**
79:3
**supplies**
281:8,19
**support**
39:11,15 66:12,15
66:21 67:8 72:1
92:24 93:19
101:19 141:17
142:23 143:18
144:24 145:14

155:6,9 169:6
170:11,25 176:1
176:12 178:6
186:16 222:15
224:4 225:10
231:18 258:1,6,13
303:1
**supported**
39:19 51:14 108:24
277:24
**supporting**
168:17 205:12
254:20
**supports**
71:21 123:9
**sure**
12:23 16:3 25:2
34:21 35:18 36:7
41:25 42:1 52:13
55:7 59:5 61:13
64:12 77:14 87:17
87:21 100:12,14
101:4 107:11
111:19 113:15
125:10 142:20
143:19 144:9
145:12 165:20
173:22 188:1,20
194:18 209:21
215:7 217:16
225:13 237:9
243:12 254:24
255:10 258:15,16
259:9,11 269:9
276:15 277:25
280:5,7 288:5,7
292:1 297:3
305:24 314:18
**surprise**
46:11 47:20 50:10
74:6,21
**surprised**
45:24 112:14
**surprising**
51:17,19 237:6
**surrogate**

300:5
**surrounding**
156:16,22
**survey**
77:19,22
**survivors**
25:21
**swear**
8:8
**switch**
175:18 280:9
**Switching**
289:4
**sworn**
320:7
**sworn/affirmed**
9:3
**synonymous**
182:8
**syntheses**
92:4
**system**
103:8
**systematic**
5:12 6:7 7:19 66:14
66:22 127:3,10
254:3 293:12,13
314:3
**S-I-N-G-H**
291:8

___ T ___

**T**
319:1 320:1,1
**table**
137:5,5 139:11
187:4 235:4 236:1
236:3,8 266:9
273:25 274:1,3,8
**Taher**
7:21 306:18,20,24
307:4,9 312:6,10
312:12,18
**take**
14:3,4 25:1 40:13
52:11 61:14

Patricia G. Moorman, M.S.P.H., Ph.D.

113:10,16 163:5
163:19 164:4
165:5 173:20
199:23 209:25
239:1 277:22
305:14 309:15
**taken**
1:16 34:8 52:17
115:4 150:22
165:10 211:15
259:15 272:3
309:25 320:8
**takes**
172:2
**talc**
3:2 5:6,20 6:6,9,12
6:14 7:4,16,25
8:14,16 9:18,25
10:24 11:3,6,8,9
11:20,21,25 12:7
12:17 16:9,13,15
17:3 19:10,15,17
19:18 20:23 21:6
21:9,15 25:11
26:1,14,21,24
27:5,13,16 28:10
28:13 30:7,10,21
31:1,23 48:15
52:2,9,24 53:2,5,8
53:11 56:20 58:2
58:11,17,20,24
59:3 60:3,25 61:6
62:21 63:25 66:1
71:18,20,22 76:25
77:25 78:1 79:3
79:11 80:16 94:11
96:3,11,20 97:12
97:13 98:14,17
99:12 100:22,23
101:18 102:8,23
103:2 111:23
112:8,11,18 115:9
115:21 116:6,9,12
117:6,11,16,22
118:6,18,24,25
119:6,23 120:18

121:10 123:7
126:2,18 128:10
128:17,25 129:4
129:17,21,25
130:5,8,12,24
131:8,20 133:3
135:23 136:1,13
139:12,24 140:7
140:12 142:14
143:1,14,24
144:18 145:8
146:3,11 147:1,18
147:25 148:2
149:4,9,23 150:24
151:25 154:21,25
155:3,10,15,17,24
156:19 157:9
158:12 160:19
161:11 162:6
166:6,20 168:1,4
174:11 176:14
185:13 186:19
187:14,17 188:14
190:13 196:24
197:7,8,20 199:11
201:12 205:20
208:8 209:5
210:19 212:10
213:2 217:14
218:21 220:5,7
222:8 224:3,18
226:4,17 227:16
228:11,17 229:24
230:21 231:7
232:7,11 233:13
233:22 234:23
235:23 236:4,17
245:11,15,21
246:8,24 247:7
251:10 252:25
253:11,25 254:8
254:16 255:8
259:22 263:25
266:4,20 270:7
271:25 272:17,20
280:16,21,24

281:8,18,24 282:4
286:2,9,10,15
292:12,15,16
295:2,6,11 296:6
297:18,20 298:1,9
298:15,18 299:9
299:14,23,25
300:7 304:9
305:10 310:11
313:15 315:16
**talcum**
1:6 52:2 63:25 64:4
64:8,19 65:3,18
66:7,13 68:20,25
68:25 69:7,9
70:13,15,18,19
71:1 75:6,18,23
76:2,5,9,14 79:20
79:22,24 80:1
81:10,14,22 82:14
83:2,9 84:3 86:1
86:10,22,24 87:4
87:6,8,11 88:2,6
88:11,14,16,21
93:11 94:6,20
96:10 102:12,14
105:11,22 106:8
106:13 109:19
111:12 112:7
113:21,24 114:7,9
114:13,14,17
116:3,4 117:8,13
117:16,22,24
118:6,7,19 119:16
119:22 120:3,25
121:5,9,14,16,24
122:3 123:5,23
124:20,23 125:4,7
125:13,19 126:5
126:22 129:10
140:9 150:11
154:21 223:17
281:9,12,16
285:18 291:21
292:4,6,7 294:24
296:1,3 303:19,24

304:1,4,23 310:12
311:6,8 312:2,4
312:22 313:9
314:6,14 319:2
**talc-containing**
79:11 85:15
**talc/ovarian**
188:25 189:5,9,15
**talk**
51:25 111:18
164:16 181:16
182:5 216:5,6
244:2 289:4
**talked**
50:24 167:8 195:10
206:18 234:16
269:3 282:14
290:7,10 295:1
296:14
**talking**
37:10 50:1 94:19
96:11 101:10
104:12 106:12,13
174:17 181:10
215:12 265:25
282:9,10,15 286:6
287:10 294:5
299:13 300:15
313:2 315:25
**talks**
263:10
**taught**
288:18
**teaching**
10:13,18,20 243:24
**team**
254:2
**teams**
262:12
**Tecum**
4:16,20
**teens**
218:10
**teleconferences**
13:3,4,7
**telephone**

2:4,9,13,18,23 3:4
3:9,14,19 25:7
**tell**
21:2 31:11 34:19
43:10 70:24 75:19
116:10 137:16
175:5 194:15
225:5,12 240:3
282:9 308:14
**telling**
71:4 224:1 225:7
**tells**
22:25 265:11
**ten**
29:4 72:11,11
136:5 189:15,23
193:12,16 209:13
216:14
**tended**
303:11
**tendency**
166:25
**tenfold**
247:21
**Teniola**
28:24
**term**
52:8 62:17,18
193:2
**terminology**
115:13 134:10
183:1 197:10
246:4 249:10
250:11,12,13,16
287:6 288:8
300:14
**terms**
51:21 52:1 86:16
89:3 155:7 184:8
263:20,22 267:8
288:23 294:4
300:17 316:16
**Terry**
6:20 139:4 140:17
179:18,21 180:6
276:10

Patricia G. Moorman, M.S.P.H., Ph.D.

**test**
80:3 83:21 274:18
274:23 275:10,25
276:6 279:18,20
**tested**
75:11 79:5 80:6,15
**testified**
9:4,21 59:18 62:20
99:6 103:20 291:7
291:20
**testify**
289:14
**testifying**
22:5 168:16
**testimony**
17:6,9,10 18:7,13
18:16,24 61:2
69:21 98:10,20,24
98:25 99:17,21
101:9,11 115:19
119:20,20 198:6
268:9,14,18,20,21
281:14 286:9
310:19 318:4,5
320:6,7,11
**testing**
53:14 76:13,25
118:11 121:19
127:12,14
**Texas**
2:8,18 3:4
**text**
180:14 275:20
**textbook**
288:19,20
**textbooks**
288:11,14,23,25
**thank**
20:17 28:19 29:22
33:4 36:8,21 38:1
38:5 55:12 73:15
77:4,8 78:15
84:18,25 91:20,20
91:23 100:9,13,15
100:18 113:19
115:1 131:23

151:14 186:2
196:5 202:16
210:5 211:12
259:12 271:11
294:12 302:11
308:17 309:18
314:23 317:1,4
**theoretically**
221:12
**therapeutic**
7:7 227:8 229:12
**thereof**
320:16
**thing**
34:6 44:18 232:13
278:23
**things**
35:3,5 52:6 104:6
126:19 129:17,21
141:18 154:14
164:11 165:20
182:4 183:9 184:8
186:5 190:23
222:20,22,24
223:8 282:14
289:5 292:25
305:2
**think**
16:5 18:25 20:12
22:8,12 24:7,20
41:10,21 46:16,23
46:25 47:4,9,12
48:11,12,15,24
49:16,19 50:9,24
51:19 54:17 55:22
56:14,15 57:17
58:15,23 61:4,5
62:7,10 65:20
67:7,16 70:6,10
70:12,16 71:5,6
71:16 72:6 75:11
76:19 77:15 80:18
81:3,13,15,23
82:8 89:16 90:8
95:7,9,20 96:15
97:22,23 98:3

101:22 102:5,7,17
102:19,21 103:3,6
111:4 113:14
114:21 119:21
124:1 125:18
127:1,24 129:7
130:21 134:3,25
136:4 139:2
141:25 143:9,25
144:21 145:7,13
146:21 148:2,9
150:17 151:2
153:2 155:14
158:21 161:19
162:22,22 163:10
164:21 167:3,4
171:9 172:13
178:19 179:2,2
180:8 181:4,8
182:7 183:4 185:1
190:12 192:12
197:10,13 198:19
199:5 200:13
201:16,19 202:3,4
204:10 206:8,10
211:6 214:11
215:8,9,13,23
218:3 223:5 225:7
226:1 228:21
229:20,20 230:5
230:15,21 231:18
231:24 232:9
234:7 238:20
239:4,6,10,20
240:1,8 241:10,16
241:20,21,25
242:4,23 244:22
244:24 245:4,5,10
245:15,17,20
246:4,5,11,14
247:10 248:3,4,13
249:3,12,24
250:24 251:5
252:5 255:6 257:2
257:16,17 258:18
260:6 261:12,16

262:5,20 263:23
264:5 266:7 267:7
270:14 271:13,14
272:8 275:11,23
276:5,7 279:3,5
279:16,17,21,23
282:16 283:8
285:7 286:4,6,24
287:19 290:25
291:18 293:7
295:1,13,18
297:11 300:2,14
300:15 301:1
302:14 304:3,12
304:13 306:9
309:5 313:10,25
316:12,21
**thinking**
95:20 151:22 167:5
181:17 225:18
**third**
94:8 121:20 157:25
232:19 275:1
**thorough**
242:23
**thoroughly**
243:8 255:11
**thought**
44:25 48:17 114:3
142:8,10 164:13
209:10 219:14
224:25 225:1,24
226:2 286:9
**thoughtful**
242:24
**thoughtfully**
240:10
**threat**
221:19,24 232:20
243:17
**three**
24:14 55:2 104:14
186:18 202:6
216:17 221:18,22
232:25 243:9,11
243:15,16,18,20

263:15
**three-fourths**
108:17
**thumb**
33:21
**time**
8:4 11:17 27:23
33:11 40:13 47:17
48:1 52:11 79:21
95:11 97:15 98:2
101:1,19 102:19
102:21,22 113:23
114:7 116:9
132:10,11 143:5
143:12 145:22
147:14 154:11
160:21 162:2
163:21 165:4
172:2,4 178:13,17
179:1,5,11 189:20
191:17,25 200:22
201:10 211:9
220:5,8,12 225:15
237:13 240:21
264:25 280:3,19
283:11 289:12
291:19,23 292:9
294:2 295:7,15
301:1 307:9,19
309:19 313:2
317:2,6
**times**
40:21 52:3 60:15
82:6 151:18
158:23 166:19
169:13 183:17,20
199:3 200:22
206:24 207:4
240:18 253:2
273:23 274:4,17
301:10 314:5
**timing**
177:21
**tipping**
178:14
**Tisi**

Case 3:16-md-02738-MAS-RLS Document 9737-16 Filed 05/07/19 Page 295 of 449 PageID: 40619
Patricia G. Moorman, M.S.P.H., Ph.D.

Page 364

13:3,7
**title**
20:20 45:5
**titled**
5:8,11,14,17 6:3,6
6:9,11,14,18,21
7:3,6,10,13,16,19
39:1 244:8
**today**
10:25 11:3,23
12:15 13:22 16:10
18:17,22 33:25
35:8 37:11 38:13
40:4 43:7 55:23
56:3 60:23 155:24
168:16 201:10
206:17 216:13
243:3 253:2 263:2
265:25 267:3
268:18 269:3
281:14 287:5
289:7 291:7,17
292:23 294:6
295:14 297:12,17
298:2 300:11
301:11 305:17
308:6 313:2,21
314:5
**today's**
8:3 12:6 19:2 34:18
38:10
**told**
14:6 31:19
**Tolu**
28:24
**top**
89:5 90:12 103:16
128:3 140:21
159:1 167:16,23
180:17 203:3
212:20 232:25
246:11 252:21
253:8 257:25
259:20
**topic**
56:9,12 64:25

65:12,17,22 66:24
67:18 82:3 199:15
200:18 201:14
202:8 206:1 208:2
221:6 222:10
223:19 234:1
250:5
**topics**
48:8 223:1 260:19
289:4
**total**
212:25 272:16
284:8
**totality**
313:6
**touch**
12:3 303:17
**touched**
215:25 234:15
**Trabert**
7:15 237:7,15,25
238:3,7
**Trabert's**
238:17
**Traci**
29:25
**track**
180:8
**traffic**
24:16,22,25
**trained**
54:18
**training**
57:19,20
**transcribed**
320:9
**transcript**
4:12 5:4 17:14 19:4
19:6 40:1 54:24
56:7 61:9,20 77:7
**transcription**
318:5 320:11
**transcripts**
291:4
**transition**
10:16 282:17

**transitioned**
178:7
**transitioning**
221:6
**translate**
302:10
**translocation**
94:12
**Travis**
2:17
**treat**
32:12 316:16,18
**trend**
274:19,23 275:11
275:25 276:7,19
277:9 278:16,20
278:22 279:1,4,18
279:20
**trends**
271:24 272:19
273:5
**trial**
166:22
**tried**
59:11 293:16
**trigger**
239:21 240:13
**true**
18:13 70:17 122:21
125:25 141:25
145:7 201:18
203:22 220:20
305:2 318:4
320:10
**Truls**
31:16
**truth**
194:4
**truthful**
62:6
**try**
70:3 245:25 284:14
**trying**
15:17 48:11 67:8
69:25 71:5,17
75:9 127:1,7

158:21 181:10
212:11 228:21
230:6 256:10
257:2 258:18
275:21 283:13
289:1 293:8
**Tube**
6:3 151:10
**tubes**
298:19,24 299:10
299:15,23 300:8
**TUCKER**
3:18
**turn**
33:13 38:20,24
85:2 91:25 94:5
139:10 147:8
151:16 153:15
194:18,23 206:22
209:23 210:7,8
222:4 251:14
264:14 298:14
**turning**
119:10 122:10
212:19
**twenties**
218:11
**two**
24:14 50:11 55:2
104:14 136:10,21
139:7 141:21
142:20 144:22,23
149:25 160:23
164:25 173:11
175:21 180:9
187:5 188:13,18
188:24 190:18
202:14 227:5
230:25 231:1
234:13 237:18
244:20 260:18,18
263:14 273:19
274:21 307:11,17
**type**
86:9,21 112:6
221:4 243:24

270:11,16 313:21
313:21
**types**
35:5 82:23 86:13
86:15,24 120:7
121:3 130:23
144:23 287:5
311:12,15
**typical**
22:15 27:23 166:9
**typically**
89:23 157:5 163:10
302:1

---

**U**

**unaware**
224:6 233:25
**UNC**
290:4
**unclear**
11:11 12:1,5
**uncomfortable**
223:14
**uncommon**
263:3
**uncontrolled**
176:17 177:5
**underestimate**
160:12 171:14
**underlying**
128:24 159:8,12,19
160:3
**understand**
9:13 11:2 12:2
14:12 33:9 42:7
46:3 48:2,4 57:8
62:16,18,19 65:1
66:5 69:17 70:7
70:21,25 71:13
73:6,9,21 74:17
74:22,24 80:14
96:9 103:7,13
108:6 124:9,14,16
125:10 129:13
131:5 134:7 144:7
147:12 153:14

Patricia G. Moorman, M.S.P.H., Ph.D.

180:18 192:22
246:16 248:18
263:9 280:21
281:7,11 299:4
300:18 305:18
306:2,16,20,24
**understanding**
15:10,19 43:24
181:11 193:22
228:10 281:4,10
281:13 296:11
305:21 306:6,12
311:25 312:3
314:10,11
**Understood**
11:15 216:19 277:3
**undertake**
111:7 131:13
182:19 233:21
**undertaken**
64:2
**undertook**
82:2
**unexposed**
188:4 190:17,19
213:3
**unfeasible**
299:18
**unfortunately**
55:2 151:17
**UNITED**
1:1
**universe**
256:16
**University**
10:10 285:2
**unrelated**
253:7,13
**unusual**
46:16 141:1
**update**
189:19
**updated**
20:4 33:19 153:20
208:9 292:1
**updating**

190:9 220:1
**up-to-date**
183:25
**usable**
226:1
**usage**
218:2 219:13
235:24 236:4,6,10
236:17 292:4
**use**
5:20 6:6,9,12,18,22
7:4,11,20 76:3
87:4 96:11,20
97:13 98:17
101:18 126:5
127:3 128:11,17
129:10,10 130:12
130:17,23,24
131:17 132:1
134:11 136:13
139:13,24 140:7
140:12 143:25
149:4,23 154:21
166:15,25 168:1,4
174:10 182:4
185:13 186:19
202:22 205:20
209:16 210:20
217:14,20 220:5,7
220:15 222:8
223:17 224:3
239:16,17 246:2
254:1 265:19
266:4,11 267:10
267:22 270:7
274:4,21 275:7,7
275:16 276:3,13
277:19 278:16
281:8 288:11,19
288:23 289:1
290:23 293:11
298:9 299:17
305:10
**users**
113:24 114:9,16
130:8 131:21

133:3 218:21
276:18 277:8
279:15

**V**

**validity**
221:20
**Valley**
7:17
**value**
124:7 289:2
**values**
134:21
**variety**
126:18 129:14
226:20 229:6
**various**
12:4 161:10,10
251:7 313:3,14
316:9
**vast**
233:10 303:7,8
**verbal**
13:25 14:1
**verify**
132:7
**version**
6:5 130:3 151:12
153:13 154:1,4,6
154:22
**versus**
101:24 102:2
104:12,15 131:8,8
155:15 198:24
215:15 236:13
**Video**
36:19
**VIDEOGRAPH...**
3:22 8:2 52:15,18
115:2,5 116:20,23
165:8,11 211:13
211:16 219:20,22
259:13,16 278:2,5
280:10,13 302:16
302:19 308:16
309:23 310:1

315:2,6,9 317:5
**videotaped**
1:11 4:15,19 8:5
**view**
148:13
**viewed**
223:18
**viewpoints**
246:4 258:23
**Virginia**
2:4
**virtually**
233:11 263:6
**vis-à-vis**
312:1
**Vitae**
4:13
**volume**
5:9 295:9

**W**

**W**
2:8 3:20
**Wacker**
3:18
**wait**
34:11 167:20 186:1
**walk**
221:22
**walked**
243:14,18
**want**
36:6,14 38:12 65:8
75:13 77:4 89:6
99:9 100:11,12
101:6 105:3 113:5
113:8 116:15
146:7 159:3
161:21 172:10
209:14 222:25
246:13 255:10
277:23 289:4
298:5 305:24
**wanted**
12:23 19:6 24:12
51:17 153:10,12

**wants**
100:7
**warning**
84:3
**warranted**
21:18 207:24
**washed**
192:24 193:1
**Washington**
3:14
**wasn't**
99:16 148:17
166:21 276:25
**way**
15:22 17:22 20:15
23:19 31:5 39:24
40:4 43:6,13
59:24 93:13 95:8
105:14 108:17
126:9 133:22
137:13 139:16
147:9 153:22
162:20,23 166:9
180:25 193:25
206:13 208:11
211:4 217:22
229:16 251:13
256:9 261:16
263:13 279:17,19
293:1,5 300:6
**ways**
160:25 225:16
**weak**
246:19,25 248:17
248:22 249:7,10
250:10,18,21
287:10,15,17,22
288:6,23
**weakened**
211:5
**weaker**
193:3 247:16,17,18
247:19
**weaknesses**
126:14 164:16
197:16,18 198:17

198:20,21 301:9
301:10,12 302:4
**website**
5:20 155:24
**week**
42:6 188:5 291:14
307:11
**weeks**
19:3,5
**weigh**
141:2,18 144:12
**weighed**
164:13
**weight**
145:2
**weighted**
142:4
**weighting**
244:25
**welcome**
84:19
**well-accepted**
197:14 199:6
245:13 251:21
279:19
**well-established**
197:14 245:7
**well-known**
290:22
**well-respected**
174:21 179:12
**Wendy**
30:1
**went**
122:4 164:12
192:12,20 193:20
194:3 218:9,13
241:20 242:3,15
253:15 289:23
**Wera**
6:10
**we'll**
13:22 14:7 25:1
35:15 36:7 37:10
78:14 113:15
116:16,18 173:14

175:18 209:25
232:18
**we're**
10:25 17:22 18:2
29:16 33:11 69:6
90:4 91:15 95:7
95:17 96:11
104:12 106:12,13
113:6 130:14
131:22 164:4
167:8 208:14
223:11 224:23,24
225:6 266:11
273:25 293:10
308:14,15
**we've**
9:10 50:24 52:12
128:21 146:13
156:10 206:16
207:17 209:12
215:25 231:10
236:23 259:7
263:15 294:5
**whatsoever**
187:14
**When's**
145:22
**WHI**
202:13,20 217:8,13
217:13 219:7
**white**
5:15 27:16 135:14
136:8,13,18 137:4
**wholly**
108:24
**wide**
229:6
**witness**
8:8 10:23 13:2
20:16,18 22:21
23:2 26:24 27:8
29:18 31:21 33:4
41:6 42:9,19
45:24 46:9,15
47:20 48:4,24
49:6 50:14,21

51:25 54:12 55:21
57:16 58:4,14
59:11 60:16 61:4
62:10,24 63:13
64:6 65:7,20
66:20 67:7 68:7
68:23 69:23 70:6
71:16 72:18,25
73:9 74:11 75:1
76:8 78:23 80:24
81:7,21 82:7,20
83:13,23 84:10
86:3 87:17 88:5
89:3,13,22 91:8
93:17,22 94:23
95:4 96:6,17
97:15,22 98:11,21
101:4,22 102:17
104:2,25 107:8
108:10 109:6
110:8 111:1
112:14 113:11,17
114:1,21,25 116:2
118:3,17 119:2,21
120:21 122:7,15
123:11 124:1
125:2,18 126:4
127:18,24 129:7
130:19 131:15
132:5 133:6,12
134:19 135:7
136:12 137:10
142:17 144:5,21
145:12 148:16
149:12,19 151:14
153:7 157:18
160:8 161:3,19
162:15,22 163:18
164:24 165:4,7
167:11 168:12
170:5 171:8
172:13,23 174:20
175:1,10 176:7
177:2,15 178:10
179:10 180:3
181:4 182:14

184:5,19 186:4
188:17 189:18
190:1,7,16 192:17
193:1,15 194:6,15
195:25 196:13,18
197:24 199:4,18
200:21 201:4,16
201:18,23 202:2
202:16 204:16,23
206:3,13 207:2
208:5 209:16,19
211:11 213:23
214:5 228:16
229:19 230:5
234:20 236:12
241:16 242:15
246:1,21 247:4
248:3,12 250:24
251:5 255:18
258:15 266:6
267:7,19 268:16
271:9,12 274:12
276:25 277:22
278:7 281:21
287:25 294:13
295:18 296:9,24
297:8 298:6 299:2
299:12 300:2,23
301:25 302:13
304:12 305:21
306:6 307:4 309:4
309:13,20 313:25
316:12 317:3
319:3
**witness(es)**
320:5,7,11
**woman**
223:10 224:1
**women**
5:15 20:22 26:9
27:11,12,16 90:22
90:24 92:17,25
128:13 132:10
135:14 136:9,13
136:14,17,18
137:4 181:23

188:4 190:18
205:21 208:6
218:6,10,17,18
220:16 222:24
223:4,7,14 225:4
225:22 226:2
240:21 284:15
287:1 296:4,10
297:21 300:8,25
305:7,14
**Women's**
186:22 285:1,4
**wonderful**
208:11
**word**
108:16 162:19
163:13,19 166:15
166:25 167:15
181:19
**wording**
24:11 38:18 133:17
241:9
**words**
66:18 275:3 287:22
288:9
**work**
10:12,20,23 15:8,9
15:16 16:9,11,23
21:14 28:23 31:13
31:14,18 34:22
37:5,6 48:12,13
48:16 53:22 54:15
78:14 112:6 124:7
126:12 152:21
180:18 181:9
290:14 292:9
314:1
**workday**
105:20
**worked**
12:18 13:12,16
29:3 285:16
**working**
13:18 16:24 22:4
26:4 28:10,25
30:11 31:21,22

34:16,19 35:25
78:14 92:12 173:3
**works**
28:9 30:9 78:11,13
**work-in-progress**
29:11,17 30:5
**world**
231:8 232:7 250:17
**worried**
231:4
**worries**
77:10 277:3
**wouldn't**
68:17 71:12 72:3
101:7 112:14
113:23 114:8
183:11 197:11
211:7 250:20
281:17 299:5
**write**
38:15 167:18
293:17
**writing**
28:3 65:24 66:2
239:5
**writings**
32:7
**written**
24:2 25:4 27:25
28:1 31:25 32:6
95:11 110:4
133:13,15 150:20
157:3 247:14
**wrong**
22:23 90:9 120:10
144:19 196:6
227:11
**wrote**
39:12 42:21

---

**X**

X
1:3,10

---

**Y**

**yeah**

26:17 49:19 113:17
118:8 146:23
150:19 153:23
159:16 162:15
191:10 229:19
258:5 259:7,12
260:24 275:23
**year**
10:18 110:11
217:21 282:24
295:15
**years**
23:7 29:4 41:7
54:16 85:18 136:5
142:2 177:3
189:15,23 191:9
193:12,16 208:10
216:10,14,25
217:4,10,22,25
218:7,14 222:18
222:18 224:21
288:17 295:23
299:17 300:9
**yes-or-no**
156:14 172:6 175:4
**York**
2:13

---

**Z**

**Zambelli-Weiner**
44:5

---

**$**

**$400**
14:18

---

**0**

**051**
274:19
**07932-1047**
2:22
**07962**
3:8

---

**1**

**1**
4:10 5:7 15:2,3,5

15:15 16:10,19
97:4 103:9 133:25
134:6,7,7 137:10
137:12,19,20
138:7,11,15
139:20 155:12
252:12,18 258:8
262:25 263:7
267:12,15 268:1,2
268:3,7,24
**1.04**
136:19 137:3,7,20
137:23 138:6,10
**1.06**
264:22 265:8,16
274:13
**1.12**
264:5
**1.13**
266:13
**1.14**
266:13
**1.15**
139:17
**1.19**
133:25 136:18
235:18 264:6
**1.2**
158:15 242:12
255:15 256:19
257:23
**1.25**
213:6 257:7
**1.3**
242:12 255:15
256:19 257:7,23
266:12
**1.4**
266:12
**1.5**
158:15
**1:48**
165:9,10
**10**
5:3 49:10,12,16
50:1 157:22 217:4

247:12
**10:05**
52:16,17
**10:18**
52:17,19
**100**
5:9 59:15 60:11
**100C**
91:16,19
**101**
182:15
**107**
5:11
**11**
5:4 61:15,17,21
76:24 77:7 140:19
244:1,7
**11,933**
6:15
**11:45**
115:3,4
**11747**
2:13
**119**
25:18
**12**
5:5,6 55:10 77:2,6
251:14,20 253:20
255:1 270:23
**12.4**
217:10,25
**12:39**
115:4,6
**12:40**
116:21
**12:41**
116:24
**120**
21:4
**121**
25:14
**1294**
108:13
**13**
5:7 50:17 51:8
84:16,20 259:19

260:8
**136**
5:14
**139**
5:17
**14**
5:8 21:4 55:11
91:14,17,21
183:17 191:9
206:24 216:10,25
259:19,20 260:20
262:5,5
**14-year**
191:23 193:10
**1414**
235:2
**1416**
240:5
**149**
5:20
**15**
4:10 5:11 107:22
107:23 259:6,8
**151**
6:3
**1510**
3:3
**154**
199:25
**16**
5:14 61:24 136:7
136:11 177:3
**16-2738**
1:7 319:4
**165**
6:6
**169**
6:9
**17**
4:11 5:17 61:21
139:6,8
**173**
6:11
**175**
6:13
**18**

5:20 149:22,24
**180**
6:18
**19**
6:3 134:13 151:13
**195**
176:9
**1976**
69:1 88:7,12
**1980s**
191:11
**1982**
295:3
**1990s**
162:8,12

---
**2**
**2**
4:11 17:19,20
 18:10 77:16,17
 137:5 139:11
 187:4 194:23
 235:4 269:21
 273:25 274:3
**2A**
97:7 103:9
**2B**
96:12,21 97:10,12
 100:23 101:2,18
 101:19,20 103:3,9
 103:14 123:9
**2.91**
235:12
**2:03**
165:10,12
**20**
4:13 6:6 23:4 50:17
 51:5,8 113:7
 164:21 165:2,3,18
 217:22 288:3
 300:9
**2000**
189:4 190:14,14
 191:20 194:12
 195:7 204:25
 205:4

**2000s**
162:8
**20004-1454**
3:14
**2003**
175:14,17 177:9
**2008**
174:13 178:1,2,5
 179:1
**200834000001**
320:23
**2009**
135:12,22 136:22
 209:7
**2010**
95:6,21,22 96:14
 98:8,16 99:7
 100:22,25 101:14
 101:17 102:11,13
 103:2 123:7
 138:21 147:15
 187:21 189:9,14
 190:12 192:10,15
 192:22 193:6
 194:9,12 195:4
 209:7 216:15
 217:5 314:10,20
 315:15
**2012**
95:18
**2013**
179:19,21 180:6
 276:10
**2014**
5:7 84:2,23 132:2
 133:3 185:11
 202:20 233:23
 234:24,25 235:6,9
 235:12,17 236:16
 236:24 239:18
 240:16
**2015/2016**
283:9
**2016**
11:19 12:4 128:5
 128:23 131:12

234:3,13,22
238:24 240:15
242:2 243:3 292:1
**2018**
4:25 5:5 10:6,9
 17:7 19:9 30:22
 45:13 46:13 47:2
 47:17,24 48:6,20
 49:3 50:18 51:11
 153:20 162:8,10
**2019**
1:14 8:3 143:1
 320:18
**202**
3:14 6:21
**205**
7:3
**21**
6:9 153:20 169:2,3
 194:21 212:17
 220:25 224:9
 232:24,24
**21,000**
14:21
**216**
221:8
**22**
6:11 173:10,12,13
 173:14,17 209:24
 222:4 224:9,14
 226:7,15 232:23
 232:24,25 289:19
**22311**
2:4
**224-1133**
2:13
**227**
7:6
**227-8008**
2:18
**23**
6:13 132:8,15
 173:9,12 175:17
 175:19 226:8
 233:5,6 234:2
 240:23

**2306**
1:17
**233**
3:18
**234**
7:10
**237**
7:13
**24**
6:18 166:7 180:6,7
 276:15
**248**
169:16
**25**
1:14 6:21 23:7 41:7
 155:3,4 202:6,14
 202:15 211:19
 215:25 217:18
 219:25 247:22
 248:5 249:13,25
 256:11 264:15
 313:11
**25th**
8:3
**253**
212:19 270:2
**254**
91:25 194:24
**256**
92:3,4 170:8
**26**
4:21 7:3 205:1,2
 220:1
**26th**
320:18
**267-0058**
3:9
**27**
7:6 227:5,6 262:23
**273**
7:16
**2738**
319:2
**27705**
1:18
**28**

7:10 234:10,11
**280**
4:4 55:7 94:5,8
**29**
7:13 237:14,19
**294**
4:5

---
**3**
**3**
4:13 20:8,9 33:13
 103:10 266:9
**3:02**
211:14,15
**3:16**
211:15,17
**3:29**
219:20
**3:31**
219:23
**30**
7:16 155:1 202:6
 247:22 248:5
 249:13 250:1
 256:12 271:16
 272:11 273:16,17
 288:17 298:12
 300:9 313:11
**302**
4:3
**305**
2:12
**307**
7:19
**31**
7:19 40:18 307:14
 307:15
**310**
4:6
**312**
3:19
**315**
4:3
**32**
4:15
**34**

Patricia G. Moorman, M.S.P.H., Ph.D.

90:7
**3400**
2:17
**35**
4:17 61:19 90:10
**350**
3:8
**358**
210:8
**359**
174:1
**36**
4:18 236:5,13
**37**
4:21
**39**
166:7
**391-0197**
3:4

**4**

**4**
4:15 32:21,22
  128:2 203:15
**4:33**
259:14,15
**4:46**
259:15
**4:47**
259:17
**40**
23:3 85:18 300:9
**40,000**
199:20,25 200:7
**400**
2:12
**404**
2:8
**41**
4:22 38:21
**42**
167:15,20,21
**429**
213:1
**45**
4:24

**463**
274:25 275:1
**463-2400**
3:14
**47**
184:24 207:11,18
**478-1236**
2:9
**48**
207:18
**49**
5:3 307:21
**4900**
2:3

**5**

**5**
4:17,24 35:11,20
  35:21,24 128:2
  135:12,15 203:2
**5th**
45:13
**5:14**
278:3
**5:15**
278:6
**5:18**
280:11
**5:20**
280:14
**5:50**
302:17
**5:51**
302:20
**50**
38:24 39:1,4
  208:10
**51**
236:7,13
**512**
2:9 3:4
**549-7164**
2:23

**6**

**6**

4:18 36:17,22
  104:15
**6:01**
309:24,25
**6:14**
309:25
**6:15**
310:2
**6:22**
315:7
**6:23**
315:10
**6:25**
317:7,8
**60**
303:8,9
**60,000**
199:20
**600**
2:17,22 284:18
**60606**
3:19
**61**
5:4
**62**
39:25
**624-6300**
3:19
**63**
218:7
**631**
2:13

**7**

**7**
4:21 37:10,13,14
  80:11
**7th**
2:8
**703**
2:4
**713**
2:18
**73**
270:22
**76**

139:23
**77**
5:6
**77002**
2:18
**78701**
2:8 3:4

**8**

**8**
4:22 41:15,17,19
  42:25 77:17
  196:20 291:1
**8,525**
6:19
**816**
3:3
**817**
278:7
**820**
180:15,16
**84**
5:7
**877.370.3377**
1:24

**9**

**9**
4:3,24 45:7,8
**9,859**
6:19
**9:04**
1:15 8:4
**90**
155:6,8,11 262:23
**90s**
161:22
**90-some-thousand**
218:17
**91**
5:8
**917.591.5672**
1:24
**931-5500**
2:4
**94**

46:12 50:10
**943**
213:2
**95**
134:20 137:17
**973**
2:23 3:9
**975**
3:13
**99**
213:8
**995**
139:10

# Exhibit 86

Jack Siemiatycki, Ph.D.

UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY


------------------------------x

IN RE JOHNSON & JOHNSON          ) MDL No.

TALCUM POWDER PRODUCTS           ) 16-2738 (FLW)(LHG)

MARKETING SALES PRACTICES,       )

AND PRODUCTS LIABILITY           )

LITIGATION                       )

                                 )

THIS DOCUMENT RELATES TO         )

ALL CASES                        )

------------------------------x




VIDEOTAPED DEPOSITION OF

JACK SIEMIATYCKI, Ph.D.

MONTREAL, CANADA

THURSDAY, JANUARY 31, 2019

9:49 A.M.




Reported by: Leslie A. Todd

Jack Siemiatycki, Ph.D.

|  | Page 2 |
|---|---|
| 1 | Deposition of JACK SIEMIATYCKI, Ph.D., held at |
| 2 | the offices of: |
| 3 | |
| 4 | |
| 5 | CHUM Research Center |
| 6 | Montreal, Canada |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | Pursuant to notice, before Leslie Anne Todd, |
| 13 | Court Reporter and Notary Public in and for the |
| 14 | District of Columbia, who officiated in |
| 15 | administering the oath to the witness. |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

|  | Page 4 |
|---|---|
| 1 | APPEARANCES (Continued): |
| 2 | |
| 3 | RICHARD GOLOMB, ESQUIRE |
| 4 | GOLOMB & HONIK, LLP |
| 5 | 1835 Market Street |
| 6 | Suite 2900 |
| 7 | Philadelphia, Pennsylvania 19103 |
| 8 | (215) 278-4449 |
| 9 | rgolomb@golombhonik.com |
| 10 | ON BEHALF OF THE JOHNSON & JOHNSON DEFENDANTS: |
| 11 | KIMBERLY OLVEY BRANSCOME, ESQUIRE |
| 12 | KIRKLAND & ELLIS LLP |
| 13 | 333 South Hope Street |
| 14 | Los Angeles, California 90071 |
| 15 | (213) 680-8370 |
| 16 | kimberly.branscome@kirkland.com |
| 17 | JESSICA BRENNAN, ESQUIRE |
| 18 | DRINKER BIDDLE & REATH LLP |
| 19 | 600 Campus Drive |
| 20 | Florham Park, New Jersey 07932 |
| 21 | (973) 540-1000 |
| 22 | jessica.brennan@dbr.com |
| 23 | |
| 24 | |
| 25 | |

|  | Page 3 |
|---|---|
| 1 | A P P E A R A N C E S |
| 2 | |
| 3 | ON BEHALF OF THE PLAINTIFFS: |
| 4 | CHRISTOPHER V. TISI, ESQUIRE |
| 5 | LEVIN PAPANTONIO, LLP |
| 6 | 316 South Baylen Street |
| 7 | Pensacola, Florida 32502 |
| 8 | (850) 435-7184 |
| 9 | ctisi@levinlaw.com |
| 10 | MICHELLE A. PARFITT, ESQUIRE |
| 11 | ASHCRAFT & GEREL, LLP |
| 12 | 4900 Seminary Road, Suite 650 |
| 13 | Alexandria, Virginia 22311 |
| 14 | (703) 997-1774 |
| 15 | MParfitt@ashcraftlaw.com |
| 16 | ALASTAIR J.M. FINDEIS, ESQUIRE |
| 17 | NAPOLI SHKOLNIK, PLLC |
| 18 | 360 Lexington Avenue |
| 19 | 11th Floor |
| 20 | New York, New York 10017 |
| 21 | (212) 397-1000 |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

|  | Page 5 |
|---|---|
| 1 | APPEARANCES (Continued): |
| 2 | |
| 3 | ON BEHALF OF THE PCPC: |
| 4 | RENEE APPEL, ESQUIRE (Telephonically) |
| 5 | SEYFARTH SHAW LLP |
| 6 | 975 F Street, N.W. |
| 7 | Washington, DC 20004 |
| 8 | (202) 828-5371 |
| 9 | rappel@seyfarth.com |
| 10 | ON BEHALF OF THE IMERYS DEFENDANTS: |
| 11 | MICHAEL R. KLATT, ESQUIRE |
| 12 | GORDON & REES SCULLY MANSUKHANI, LLP |
| 13 | 816 Congress Avenue, Suite 1510 |
| 14 | Austin, Texas 78701 |
| 15 | (512) 391-0183 |
| 16 | mklatt@grsm.com |
| 17 | ON BEHALF OF PTI: |
| 18 | CAROLINE M. TINSLEY, ESQUIRE (for PTI) |
| 19 | TUCKER ELLIS, LLP |
| 20 | 100 South 4th Street, Suite 600 |
| 21 | St. Louis, Missouri 63102 |
| 22 | (314) 571-4965 |
| 23 | caroline.tinsley@tuckerellis.com |
| 24 | ALSO PRESENT: |
| 25 | FABIO DEFELICE (Videographer) |

2 (Pages 2 to 5)

Jack Siemiatycki, Ph.D.

Page 6

```
 1          C O N T E N T S
 2  EXAMINATION OF JACK SIEMIATYCKI, Ph.D.     PAGE
 3    By Ms. Branscome          9, 322
 4    By Mr. Klatt            274, 336
 5    By Ms. Parfitt          290
 6
 7          E X H I B I T S
 8          (Attached to transcript)
 9  SIEMIATYCKI DEPOSITION EXHIBITS          PAGE
10  No. 1   Notice of Oral and Videotaped
11         Deposition of Jack Siemiatycki
12         and Duces Tecum (not attached)    15
13  No. 2   Plaintiffs' Steering Committee's
14         Response and Objections to the
15         Notice of Oral and Videotaped
16         Deposition of Jack Siemiatycki
17         and Duces Tecum          16
18  No. 3   Addendum to Expert Report of
19         Jack Siemiatycki, MSc, PhD, on
20         Talcum Powder Use and Ovarian
21         Cancer          17
22  No. 4   Binder containing various studies   43
23  No. 5   Binder containing original
24         epidemiological studies       46
25  No. 6   Binder containing meta-analyses   46
```

Page 7

```
 1        E X H I B I T S (Continued)
 2          (Attached to transcript)
 3  SIEMIATYCKI DEPOSITION EXHIBITS          PAGE
 4  No. 7   JS EpiTech Inc. bill for
 5         Professional Services, August 9 -
 6         November 16, 2018          46
 7  No. 8   JS EpiTech Inc. bill for
 8         Professional Services, July 1 -
 9         August 2, 2018          48
10  No. 9   Report of Jack Siemiatycki dated
11         October 4th, 2016 (not attached)  58
12  No. 10  Expert Report of Jack Siemiatycki
13         Msc, PhDn Talcum Powder Use and
14         Ovarian Cancer (not attached)    61
15  No. 11  Expert Report of Jack Siemiatycki
16         MSc, PhD on Talcum Powder Use and
17         Ovarian Cancer (with handwritten
18         notations)          110
19  No. 12  Berge 2012 report (not attached)  194
20  No. 13  Schildkraut report (not attached)  214
21  No. 14  Anita Koushik information from
22         Environepi website        278
23  No. 15  Pages from Environepi website
24         discussing Group Research Topics  285
25
```

Page 8

```
 1        E X H I B I T S (Continued)
 2          (Attached to transcript)
 3  SIEMIATYCKI DEPOSITION EXHIBITS          PAGE
 4  No. 16  Excerpt from the book entitled
 5         Risk Factors For Cancer in the
 6         Workplace by Dr. Jack Siemiatycki
 7         (Not attached)          309
 8  No. 17  Article entitled "Degree of
 9         Confounding Bias Related to
10         Smoking, Ethnic Group, and
11         Socioeconomic Status in Estimates
12         of the Associations Between
13         Occupation and Cancer," Journal of
14         Occupation Medicine/Volume 30
15         No. 8/August 1988        317
16
```

Page 9

```
 1          P R O C E E D I N G S
 2          ------------------
 3       THE VIDEOGRAPHER:  Good morning.  We're
 4  now on the record.  My name is Fabio DeFelice.
 5  I'm the videographer for Golkow Litigation
 6  Services.  Today's date is January 31st of 2019.
 7  The time is 9:49 a.m.
 8       This video deposition is being held at
 9  the CHUM Research Center in Montreal, Canada, in
10  the matter In Re:  Johnson & Johnson Talcum Powder
11  Products in the United States District Court for
12  the Eastern District of New Jersey.  The case
13  number is 16-2738.
14       The deponent is Jack Siemiatycki, Ph.D.
15       The counsel will be noted on the
16  stenographic record.  The court reporter is Leslie
17  Todd, and will now swear in the witness.
18       JACK SIEMIATYCKI, Ph.D.,
19       and having been first duly sworn,
20       was examined and testified as follows:
21          DIRECT EXAMINATION
22  BY MS. BRANSCOME:
23    Q   Good morning, Dr. Siemiatycki.
24    A   Good morning.  Nice to meet you.
25    Q   We met just before the deposition
```

3 (Pages 6 to 9)

Jack Siemiatycki, Ph.D.

Page 10

1  started, but my name is Kimberly Branscome, and I
2  am here to ask you questions today on behalf of
3  Johnson & Johnson.
4       Is that all right?
5    A  Thank you.  Yes.
6    Q  All right.  We are taking your
7  deposition today in the case of In Re:  Johnson &
8  Johnson Talc Litigation, MDL.
9       Is it your understanding that you have
10  been designated as a testifying expert in that
11  case?
12    A  Yes.
13    Q  When were you first contacted about
14  serving as an expert witness in the MDL
15  litigation?
16    A  I believe it was in the spring or summer
17  of 2018, but I'm not positive about that.
18    Q  Who contacted you?
19    A  Ms. Parfitt.
20    Q  Have you communicated with any other
21  lawyers regarding your work on the talc MDL?
22    A  I've had a couple of meetings with
23  Ms. Parfitt and her colleagues that she works
24  with.
25    Q  Can you identify the individuals with

Page 11

1  whom you have met in addition to Ms. Parfitt?
2    A  Yes, there are two, and they are here
3  present.  Chris Tisi and Alastair --
4       MR. FINDEIS:  Findeis.
5       THE WITNESS:  Say that again.
6       MS. PARFITT:  Findeis.
7       THE WITNESS:  And that's -- thank you.
8  BY MS. BRANSCOME:
9    Q  How many meetings have you had to
10  prepare for your expert opinions in the MDL?
11    A  One yesterday and one about a month --
12  about three weeks ago.
13    Q  Where did those meetings take place?
14    A  Here.
15    Q  And by "here," do you mean in Montreal?
16    A  In Montreal, yes.
17    Q  How long did each meeting last?
18    A  Yesterday's was about four, five hours
19  maybe.  Four or five hours.  And the earlier one,
20  I guess all told, about ten hours maybe.
21    Q  Did the ten-hour meeting take place over
22  one day?
23    A  Over two days.
24    Q  In addition to the attorneys that you
25  just identified for the record and yourself, was

Page 12

1  anyone else present at those meetings?
2    A  No.
3    Q  You didn't have anyone from your team,
4  for example, present?
5    A  No.
6       MS. PARFITT:  Objection.  Form.
7  BY MS. BRANSCOME:
8    Q  What did you do to prepare for your
9  deposition today?
10    A  Do you mean from the beginning of my
11  involvement in the MDL case back last summer or do
12  you mean just in the last few days?
13    Q  Let's take it more broadly.
14       What have you done to develop your
15  opinions in this case, and then specifically to
16  prepare for your deposition?
17    A  I reviewed -- I rereviewed the
18  literature about talc and ovarian cancer,
19  scientific literature.  I evaluated it, I wrote a
20  report about it.  And in the last few days, I went
21  over all of the -- not all, but a lot of the
22  material that I had gone through initially and
23  just clarified for myself, looked for any issues
24  that I had missed the first time around, things
25  like that.

Page 13

1    Q  As part of your review of materials in
2  preparation for today, did you identify anything
3  in your review that changed the opinions that you
4  have offered in the expert report in the MDL?
5    A  No.  Those opinions remain valid.
6    Q  When you say that you rereviewed the
7  scientific literature in preparation for the
8  development of your opinions in the MDL, what did
9  you mean by "rereviewed"?
10    A  Well, I had reviewed -- I've reviewed
11  evidence around talc and ovarian cancer on a few
12  different occasions.  The first time was in 2006
13  when I was on an international review committee on
14  the topic.  Then in 2015, '16, '17, in preparation
15  for another litigation regarding talc and ovarian
16  cancer.  Then in the summer/fall of 2018, in
17  preparation for writing a report that was
18  submitted for this case.  And then in the last
19  week or two, roughly speaking, I went over all of
20  that.  So I refer to that as a rereview.
21    Q  Have you ever discussed your deposition
22  with any of -- of the other experts designated by
23  the plaintiffs in the MDL?
24    A  No, I haven't.
25    Q  Have you discussed your expert opinions

4 (Pages 10 to 13)

Jack Siemiatycki, Ph.D.

Page 14

1  with any of the other experts designated by the
2  plaintiffs in the MDL?
3       A  No, I haven't.
4       Q   Are you aware of the list of experts
5  that have been designated by the plaintiffs in the
6  MDL?
7       A  I'm aware of at least some of them.  I'm
8  not sure if I'm aware of all of them, but I'm
9  aware of some of them.
10       Q   Who specifically are you aware of?
11       A  Singh, McTiernan, Laura Plunkett.  And
12  there are a few more, and I could look it up.
13       Q   I'd like to start by just marking the
14  deposition notice for your deposition as
15  Exhibit 1.
16          Dr. Siemiatycki, you will see two large
17  binders over there in front of you.  This will be
18  tab 1.
19          So I'd like --
20       A  I see it.
21       Q   I'd like to mark for identification
22  the document behind tab 1, which is
23  Dr. Siemiatycki's deposition notice as Exhibit 1
24  to this deposition.
25          MS. PARFITT:  Do you want to give me --

Page 15

1          Do you want me to just mark them?  Will
2  that help you, instead of reaching across the
3  table?  It's up to you.  I can put the stickers on
4  it.
5          (A discussion was held off the record.)
6          (Exhibit No. 1 was marked for
7          identification.)
8  BY MS. BRANSCOME:
9       Q   Dr. Siemiatycki, are you familiar with
10  the document that we have just marked as
11  deposition Exhibit 1?
12       A  I've seen something like this.  I'm --
13  not reading through it, I'm not sure if it's
14  exactly the same document that I have seen before,
15  but I guess this is kind of the standard format of
16  notice that is sent to experts ahead of time.  So
17  I've seen -- I've seen that.
18       Q   Do you understand that what has been
19  marked as Exhibit 1, which is the notice for your
20  deposition, requests that you bring certain
21  documents with you to this deposition?
22       A  Yes.
23       Q   All right.  And just for completeness
24  and at the request of plaintiffs' counsel, I will
25  also mark as Exhibit 2 the general objections to

Page 16

1  your deposition that were submitted by plaintiffs'
2  counsel in the MDL.  And this one we actually will
3  need to mark a copy, because it's not in your
4  binder.
5          (Exhibit No. 2 was marked for
6          identification.)
7          MS. BRANSCOME:  Do you have an extra
8  copy, Michelle?
9          MS. PARFITT:  I do.  Not a worry.  I got
10  it.
11  BY MS. BRANSCOME:
12       Q   Dr. Siemiatycki, have you ever seen the
13  document that has been marked as Exhibit 2, which
14  is the plaintiffs' general objections to your
15  deposition notice?
16       A  I'm not sure.
17          MS. PARFITT:  I will represent for the
18  record that's not been provided to
19  Dr. Siemiatycki.
20  BY MS. BRANSCOME:
21       Q   All right.  So if you could,
22  Dr. Siemiatycki, did you bring any materials with
23  you today to the deposition?
24       A   Yes, I brought a lot of documents, just
25  in case.

Page 17

1       Q   Can you identify for me, and we can
2  start with a general category first, if that's
3  helpful, the materials that you brought with you
4  today to your deposition?
5       A   Well, I brought my report.  I brought an
6  addendum to my report, which I think has been
7  provided to you.
8          MS. PARFITT:  Yes, that was the table.
9          THE WITNESS:  It's a long -- it's a set
10  of --
11          MS. PARFITT:  I have a copy of that if
12  you wish to have it marked.  Do you want it -- if
13  you give me a number, I will put it on this one.
14  BY MS. BRANSCOME:
15       Q   Let's see.  Yeah, let's go ahead and
16  mark the addendum to your expert report as
17  Exhibit 3.
18          (Exhibit No. 3 was marked for
19          identification.)
20  BY MS. BRANSCOME:
21       Q   Dr. Siemiatycki, could you just confirm
22  for the record that what we have marked as
23  Exhibit 3 is in fact the complete addendum to your
24  MDL expert report?
25       A  I -- I believe it is.  I believe it is.

5 (Pages 14 to 17)

Jack Siemiatycki, Ph.D.

Page 18

1      Q   What else did you bring with you today?
2      A   I'm not sure if this is the right time
3   to mention it, but there were a couple of -- in
4   the past few days I picked up a couple of typos in
5   my report, and I've hand scribbled them on my
6   copy, and I can tell you about those very quickly,
7   but I'm not sure if this is now the right time for
8   this or later.
9      Q   I will ask you about any corrections
10  that you have, but it is good to know that the
11  report you brought with you has some handwriting
12  on it, so we will make sure to mark that copy.
13     A   Okay.
14     Q   What else did you bring with you today?
15     A   I brought -- well, I brought three
16  binders of material that were part of the -- the
17  references to my report.
18         MS. PARFITT:  And if I may, I provided
19  counsel in advance of the deposition a thumb drive
20  that contains all of Dr. Siemiatycki's report but
21  also the references related to that report.
22         THE WITNESS:  I brought a couple of
23  binders -- well, more than a couple.  It looks
24  like five binders of different documents that I
25  thought might be useful in answering questions

Page 19

1   that you might ask.  So it was -- I was just
2   speculating on the types of questions you might
3   ask and brought documents that might help to
4   answer or to support arguments or statements that
5   I would make.  I brought five --
6          MS. PARFITT:  You can get --
7          THE WITNESS:  -- which --
8          MS. PARFITT:  -- the texts --
9          THE WITNESS:  The textbooks.  I brought
10  five books with me, again in the same spirit that
11  things might come up that it would be helpful to
12  refer to material in these books.  One -- should I
13  tell you what they are?
14  BY MS. BRANSCOME:
15     Q   If you would, please, identify each of
16  the books --
17     A   Okay.
18     Q   -- for the record, and we will return to
19  the eight binders that you just mentioned.
20     A   One is a book called Risk Factors for
21  Cancer in the Workplace.  And it's a book that I
22  wrote 30 years ago about occupational causes of
23  cancer.
24         The other one -- the next one is the
25  monograph of IARC, which is the International

Page 20

1   Agency for Research on Cancer, of the meeting held
2   in Lyon in 2006.  The book was published in 2010,
3   and it contains an evaluation of talc
4   carcinogenicity as of 2006.
5          The next one is a textbook of
6   epidemiology that is probably considered the most
7   respected one in the field at this point, authored
8   by Rothman, T -- R-O-T-H-M-A-N, Greenland,
9   G-R-E-E-N-L-A-N-D, and Lash, L-A-S-H.
10         MR. KLATT:  Dr. Siemiatycki, is there a
11  particular edition or is there --
12         THE WITNESS:  Oh, yeah.  Yeah, this one
13  is third edition.  Thank you.
14         The fourth one is kind of a handbook
15  called Dictionary of Epidemiology, edited by
16  Porta, P-O-R-T-A, which is kind of a very basic
17  book of definitions.
18         And the fifth one is called An
19  Introduction to Meta-Analysis.  The first author
20  is Borenstein, B-O-R-E-N-S-T-E-I-N.
21  BY MS. BRANSCOME:
22     Q   All right.  Focusing first on the books
23  that you brought with you, why did you bring with
24  you a book about Risk Factors --
25     A   For cancer.

Page 21

1      Q   -- for Cancer in the Workplace?
2      A   Because it has -- in that book I -- I
3   described my research.  I described the research
4   findings from my projects in this area.  I also
5   described the process of conducting epidemiologic
6   research and drawing inferences from epidemiologic
7   data, and how -- what are the considerations that
8   would be used in drawing inferences from
9   epidemiologic data for cancer causation.  And I
10  thought this might come up during the day.
11     Q   Do the methodological principles that
12  you outline in your book, Risk Factors for Cancer
13  in the Workplace, are those still current in your
14  view today?
15     A   Yes.
16     Q   And why specifically did you want to
17  have this book available to you during your
18  deposition?
19     A   In case any of the statements that I've
20  made in my report about evaluating causation and
21  how epidemiology is used for evaluating causation
22  are challenged.  And specifically, I was
23  anticipating that there may be challenges to the
24  fact that my approach to this question might be
25  new and just sort of concocted in the context of

6 (Pages 18 to 21)

Jack Siemiatycki, Ph.D.

Page 22

1  the litigation, and I wanted to show that in my
2  own sort of intellectual history, these ideas have
3  been there forever but certainly for the last 30
4  years, and that these are commonly held views.
5      Q   Are there specific chapters within the
6  book that you brought with you that you would
7  direct someone to to gain information about the
8  methodology that you applied in the MDL?
9          MS. PARFITT:  Objection.  Form.
10         THE WITNESS:  I'm sorry.  Could you
11 repeat the question?
12 BY MS. BRANSCOME:
13     Q   Understanding that what you brought with
14 you --
15     A   Yes.
16     Q   -- is a complete book --
17     A   Yes.
18     Q   -- are there specific chapters that you
19 contend contain an explanation of the methodology
20 that is similar to what you have applied in your
21 analysis in the MDL?
22         MS. PARFITT:  Objection.  Form, broad.
23         THE WITNESS:  So I would say there are
24 two chapters that have relevance to the issue at
25 hand.  The last chapter contains a discussion of

Page 23

1  causality and how to use epidemiology in the
2  process of determining causality.
3          The first -- the second chapter contains
4  information -- excuse me, I think it's the second
5  chapter -- contains information about different
6  epidemiologic research designs, and it's a
7  discussion of case-controlled studies, cohort
8  studies, and other types of epidemiologic designs
9  and their relative advantages and disadvantages.
10 BY MS. BRANSCOME:
11     Q   Is there a description of the
12 methodology that you have applied in your analysis
13 in the MDL that is directly described in the book
14 that you just referenced?
15         MS. PARFITT:  Objection.  Form.
16         THE WITNESS:  I'm not sure what you mean
17 by "directly," and I'm not sure what you mean by
18 "methodology."
19 BY MS. BRANSCOME:
20     Q   Did you apply a specific methodology in
21 reaching your opinions here in the MDL?
22     A   What do you mean by "a specific
23 methodology"?
24     Q   Did you -- did you use a methodology in
25 forming your opinions --

Page 24

1      A   Yeah.
2      Q   -- in the MDL?
3      A   I -- yes, I -- I collected as much
4  information, data from different research studies
5  as possible.  I evaluated those studies.  I
6  ordered them according to the types of evidence
7  that they provide.  I tried to synthesize the
8  evidence in particular in the basket of
9  epidemiologic research on the topic.  And I
10 juxtaposed the information from epidemiologic
11 evidence with evidence derived from other domains
12 which are provided by other experts.  And I made a
13 professional judgment about how all of that fits
14 with different ways of understanding the
15 relationship between perennial use of talc and the
16 risk of ovarian cancer.
17     Q   Is the methodology that you just
18 described that you used in forming your opinions
19 in the MDL described in the textbook that you
20 brought with you about risk factors in the
21 workplace?
22     A   It is implicit.  It is implicit in the
23 work of epidemiologists, and it's implicit in the
24 way we synthesize information.  So, in
25 epidemiologic practice, the role of -- there's no

Page 25

1  cookbook recipe in how you start the day and
2  finish the day.  You collect data.  You use your
3  best judgment about how to synthesize and
4  integrate it.  And I guess it comes under the
5  rubric of weight of evidence.  You look at all of
6  the evidence, and you (weigh it according to your
7  professional judgment.
8          And most of the agencies that have any
9  policies or statements about synthesizing
10 information will talk about collecting
11 information, evaluating it, weighing it, and
12 making a judgment about it.
13     Q   If someone were reviewing just your
14 report in the MDL, would they be able to replicate
15 the weight that you gave different pieces of
16 evidence that you considered?
17     A   The synthesis of scientific information
18 is not an automated process.  It can't be done by
19 a robot.  And in every description of how such
20 evidence is synthesized and integrated, the final
21 step always involves professional judgment, and as
22 it should, because there are too many moving parts
23 in all of this to be able to, a priori, set up an
24 algorithm that allows you to automate and arrive
25 at some score that tells you, yes or no, this

7 (Pages 22 to 25)

Jack Siemiatycki, Ph.D.

Page 26

1    agent is dangerous or not dangerous or something
2    like that.
3        So in line with everything I've done in
4    my career, everything that I've been involved with
5    in international and national agencies, whether
6    it's USNCI or the World Health Organization or
7    other agencies, the process depends critically on
8    judgment of the people who are making the
9    decisions or who are making the evaluations.
10   Q   Respectfully, Dr. Siemiatycki, that was
11   not my question.
12       My question was, could someone by
13   reviewing the report that you have provided in the
14   MDL replicate your analysis in the sense that they
15   would understand the weight that you gave to each
16   piece of evidence you considered?
17   A   I think to a considerable extent I've
18   given fairly explicit information in the report on
19   all of the components of information that I used
20   and the relative weight, but -- not in a
21   quantitative way, but the relative importance that
22   I attribute to different parts of the evidence
23   package.
24   Q   You did not do any type of scoring
25   system, for example, in considering the various

Page 27

1    underlying studies that you evaluated.  Is that
2    fair?
3    A   No -- no, I did not, because I don't
4    consider that a valid procedure.
5    Q   Why is that not a valid procedure?
6    A   Because I don't think epidemiologic
7    studies can be summarized in single-digit scores.
8    There are too many different aspects of a study,
9    and any attempt to do so, I think is flawed and --
10   Q   Why is the attempt to assigning a score,
11   single digit or otherwise, a flawed methodology?
12   A   Because there are so many -- a study can
13   be good in one dimension, mediocre in a third,
14   excellent in a fourth, bad in a fifth, so-so in a
15   sixth, and so on.
16       There are so many dimensions of a study,
17   and each one of them can be rated.  And that's --
18   that is something that I do do.  I evaluate
19   everything from participation rate to the
20   population in which the study was carried out, to
21   the way the questions were asked in the
22   questionnaire, to the way the information from the
23   questionnaire was -- was coded and categorized, to
24   the way the design of the -- whether its case
25   controlled or otherwise, how the subjects were

Page 28

1    selected, when they were selected, when they were
2    followed up, how -- all of these things may have a
3    different score, and you may have a hundred
4    dimensions to evaluate on each study.  And nobody
5    has come up with a -- a usable, useful,
6    replicatable method for integrating all of this.
7    There have been some attempts and there are some
8    scoring systems out there.  The fact that there
9    are scoring -- that someone has published a
10   scoring system, and that even a committee has,
11   does not mean that it's valid.
12       But I -- my professional opinion, and
13   that of I think many other people -- because
14   typically studies are not scored in this way.
15   That's -- when people review evidence.  Or if
16   they -- anyway, typically they are not, and my
17   feeling is that there is no valid way really of
18   doing it.
19       But the -- in order to sort of complete
20   the answer to I think what's behind your question
21   of why I didn't do such a thing in my report with
22   all of the studies is that I adopted early on -- I
23   made a decision early on to avoid excluding
24   studies from my analysis based on my opinion about
25   the quality of the study.  This is a decision that

Page 29

1    other meta-analyses have also made implicitly.  I
2    don't know if they've made it explicitly, but
3    there are no studies that have -- as far as I
4    know, there are no meta-analyses that have
5    literally excluded studies on the basis of quality
6    or -- or done a systematic attempt to do this.
7        And I made a decision early on that if I
8    tried to -- if I went down the road of eliminating
9    some studies from my analysis, this would be
10   criticized as some form of cherry-picking, and in
11   an attempt to avoid that criticism, I decided I
12   would include all pieces of evidence,
13   notwithstanding my opinion of the overall quality
14   of the study.
15   Q   Okay.  Dr. Siemiatycki, that was a very
16   long answer, but I will try to unpack a few --
17   A   Yes.
18   Q   -- portions of that.
19       So you would agree that in order for a
20   methodology to be valid, it has to be a process
21   that can be replicated?
22       MS. PARFITT: Objection.  Form.
23       THE WITNESS: What do you mean by
24   "replicated"?  You mean that someone else
25   following exactly the same steps and the -- making

8 (Pages 26 to 29)

Jack Siemiatycki, Ph.D.

Page 30

1  the same assumptions as the -- the person who did
2  the analysis would be able to end up with the same
3  statistical estimates at the end?  Is that what
4  you mean?  Or do you mean that they would make the
5  same judgments?
6  BY MS. BRANSCOME:
7      Q   Well, Dr. Siemiatycki, you indicated one
8  of the reasons why you don't agree with using a
9  quantitative point system was that a methodology
10  had not been developed that was, I believe you
11  said, useful and usable and replicable.
12          What did you mean by the word
13  "replicable" when you used it in your own answer?
14      A   Did I use the word "replicable" in that
15  sentence?  Can I -- can I read that?  (Peruses
16  monitor.)
17          I'm not sure what I had in mind with the
18  use -- the word -- yes, you can produce a
19  replicable system, but it doesn't mean that it's
20  valid.  So useful and usable, yes.  I don't think
21  that there is one that would capture, for
22  observational epidemiology, the -- all of the
23  components that are necessary really to tease out
24  good and/or bad studies.
25  BY MS. BRANSCOME:

Page 31

1      Q   My question to you, though,
2  Dr. Siemiatycki, is that, is it important for a
3  methodology to be replicable?
4      A   It is important -- the most important is
5  for it to be valid.  The replicability is an issue
6  that involves judgment.  Different scientists may
7  have different judgments about the value of
8  different components of evidence.  That diversity
9  of judgment is not a bad thing, and there's no
10  benefit to science in forcing everyone to have the
11  same judgment within some scoring system.
12          So science progresses from collection of
13  data and from different scientists evaluating the
14  data, and from the same information base different
15  scientists can make different judgments about it,
16  and in that sense, the final evaluations are not
17  necessarily replicable because different
18  scientists can make different judgments.
19          But they are understandable.  You need
20  the different processes to be sufficiently
21  understandable that different readers and so on of
22  reports can understand how you came to the
23  conclusions.
24      Q   And so it is important to be able to
25  understand what weight a particular scientist is

Page 32

1  giving to the pieces of evidence that he or she is
2  considering in reaching their ultimate conclusion.
3  Is that fair?
4          MS. PARFITT:  Objection.  Form.
5          THE WITNESS:  It depends what you mean
6  by "weight."  If you mean by "weight" a
7  quantitative number, then, no, that's not
8  necessary.
9          If you mean sort of a heuristic,
10  qualitative understanding of the relative
11  importance of different components of evidence,
12  then I would say yes.  It's important to know what
13  played into a -- a reviewer's opinion.
14  BY MS. BRANSCOME:
15      Q   You also indicated that you do in fact
16  rate studies.  What did you mean by that?
17      A   Sorry.  Can we read back where I said
18  that?  I -- (peruses monitor.)
19          I haven't found it, but I -- I think I
20  meant it as a synonym for evaluate.  I think I
21  meant I evaluate different studies.
22      Q   Okay.  If I could direct your
23  attention --
24      A   Yes.
25      Q   -- to pages -- page 19, lines 6

Page 33

1  through 8.
2      A   Of -- 19 of -- of what?
3      Q   Of the transcript that's --
4      A   Okay.
5      Q   -- in front of you, which understanding
6  is just a rough, but if you want to review your
7  answer.
8      A   Sure.  (Peruses document.)
9          Yes, here by "rated," I meant evaluated.
10      Q   Did you rank the different pieces of
11  evidence that you considered in forming your
12  opinion with respect to talc and the risk of
13  ovarian cancer?
14      A   I -- I've never done that in the
15  hundreds and hundreds of evaluations I've carried
16  out, nor in this one do I actually put a score on
17  different components of -- of a study.  Yeah.
18      Q   My question is slightly different,
19  Dr. Siemiatycki.
20          It's ranking them relative to each
21  other.  So whether or not you're assigning a
22  specific quantitative number to the study, do you
23  evaluate this is, for instance, the most important
24  study and this is the least important study on a
25  particular topic?

9 (Pages 30 to 33)

Jack Siemiatycki, Ph.D.

Page 34

1    MS. PARFITT: Objection. Form.
2    THE WITNESS: You mean overall or in --
3 in each dimension that the -- that a study is
4 comprised of?
5 BY MS. BRANSCOME:
6    Q   Did you do any type of ranking of that
7 nature, be it in a subtopic or overall?
8    A   Not -- not explicitly, no.
9    Q   You mentioned at the -- at the end of
10 your answer that you made a decision not to
11 exclude studies because you would not want to face
12 the criticism of cherry-picking; is that correct?
13    A   Yes, I said that.
14    Q   What is your understanding of the
15 criticism of cherry-picking?
16    A   My understanding is that one would --
17 one might look at a body of evidence, have a
18 preconceived notion about the topic, the
19 hypothesis under consideration, and use those
20 studies that support that hypothesis and discard
21 the other ones in some way.
22    Q   Is that good science, in your opinion?
23    A   No, that's not good science.
24    Q   Why not?
25    A   Because it doesn't produce an objective

Page 35

1 portrait of reality.
2    Q   If a scientist were to selectively
3 identify studies that were supportive of his or
4 her preconceived notion, would you consider that
5 analysis to be a valid one?
6    MS. PARFITT: Objection. Form.
7    THE WITNESS: Do you mean -- just -- I'm
8 just trying to parse your question. You said if a
9 scientist were to identify studies that were
10 supportive, et cetera, but also that were in
11 opposition or to exclude ones that are in
12 opposition?
13 BY MS. BRANSCOME:
14    Q   Fair enough.
15    So referring back to the scenario that
16 you have described as cherry- picking --
17    A   Yes.
18    Q   -- if a scientist were to engage in
19 cherry-picking, would you consider the ultimate
20 conclusion that that scientist reached with
21 respect to causation or increased risk of an agent
22 to be a valid one?
23    A   It should be suspect --
24    MS. PARFITT: Objection. Form.
25    THE WITNESS: It would be a suspect

Page 36

1 conclusion.
2 BY MS. BRANSCOME:
3    Q   When I asked you the question of whether
4 or not the methodology you applied here in forming
5 your opinion in the MDL is contained in the book
6 that you wrote about Risk Factors for Cancer in
7 the Workplace, you said it was implicit.
8    Is that methodology explicitly described
9 in that textbook or any of the other textbooks you
10 brought with you today?
11    A   I'm not sure that the methodology -- you
12 know, I think it -- the collection of data, the
13 evaluation of data, the judgment about the
14 collection of data is a part of the scientific
15 method, and it is so engrained and implicit in
16 epidemiology and in other sciences that you don't
17 really need to -- and scientists don't write in
18 their books or in their -- unless they're talking
19 to first-year students -- talk about this. It's
20 so elementary that those aspects are not really
21 described. One goes further in describing
22 specific methodologies that would pertain to the
23 topic under consideration.
24    Q   Are there different ways to perform a
25 meta-analysis?

Page 37

1    A   Yes.
2    Q   Okay. Did the method that you chosen in
3 developing your meta-analysis, is that explicitly
4 described in any of the materials you either
5 brought here with you today or of which you are
6 aware in the scientific community?
7    A   So it partly depends what you mean by "a
8 meta-analysis." And in my lexicon, meta-analysis
9 is a statistical procedure for summarizing a body
10 of -- a set of results from individual studies.
11 And that procedure is pretty standard -- has been
12 pretty standard since the 1980s and 1990s, and
13 there are some refinements since then.
14    Sorry, I may have lost the thread of
15 your question.
16    Q   If I were to try to look at a piece of
17 scientific literature, be it in a book or an
18 article, to find a published description of the
19 method that you used to perform your meta-analysis
20 in the MDL, where would I look?
21    A   The meta-analysis was conducted using a
22 software that is well known, that is commercially
23 available, and I think everyone would recognize
24 the validity of the statistical procedures under
25 those -- under that.

10 (Pages 34 to 37)

Jack Siemiatycki, Ph.D.

Page 38

1      If you're asking about which -- you
2  know, there are decisions to be made about which
3  studies to include, about which results from
4  studies to include, and all of that sort of thing,
5  which is not strictly part of the statistics of
6  meta-analysis, it's sort of the step before
7  meta-analysis, and that part is utterly unique to
8  each situation.
9      So if you're doing a meta-analysis of
10  clinical trials that have all been designed
11  basically in an identical way for an
12  antihypertensive medication, and whether the study
13  is done in Australia or California or Canada, the
14  design is pretty standard, and a lot of it can
15  be -- you can -- and you end up basically with a
16  single result from the study, what is the impact
17  on blood pressure -- the average impact on blood
18  pressure among people who use it who were given
19  the drug, the experimental group versus a
20  comparison group, et cetera, that is one type of
21  preparation for a meta-analysis.
22      If you're dealing with observational
23  epidemiology, as we are in the case of ovarian
24  cancer, and some of the particularities of the
25  literature in this domain, there are a lot of

Page 39

1  decisions that need to be made in the run-up to
2  the meta-analysis.
3      Q   So in the situation where you are
4  dealing with observational epidemiology, would it
5  be fair to say that you are applying unique
6  judgment in the selection of the studies that you
7  include in your meta-analysis and, more
8  specifically, what data from those studies you
9  include.
10      MS. PARFITT: Objection. Form.
11      THE WITNESS: Any meta-analysis in this
12  area would absolutely need to apply professional
13  judgments to those things.
14  BY MS. BRANSCOME:
15      Q   Okay.
16      A   Mine included and every -- everyone
17  else's included.
18      Q   All right. So, Dr. Siemiatycki, getting
19  back to the materials that you brought with you
20  today, you mentioned that you brought three
21  binders of scientific literature. Was that
22  correct?
23      A   Three binders of the references to my
24  report.
25      Q   Okay. So that's what I wanted to

Page 40

1  clarify.
2      So the three -- the three binders that
3  you referred to as sort of this first set of
4  materials, are those all references that are
5  identified specifically in your report from the
6  MDL?
7      A   Yes, I believe so. And just to be
8  clear, when I was sent this material from the
9  lawyers' office, it arrived in four binders. I'm
10  not sure if you received the same four binders. I
11  have re- -- I've taken some things out of there,
12  so I have three binders of those things. Just --
13  I don't know if there's confusion just between the
14  three and four, but...
15      Q   What did you remove from the set of
16  materials that you were provided by plaintiffs'
17  counsel?
18      A   I removed the IARC reports, which I have
19  in books, so I didn't need to carry around
20  hundreds and hundreds of pages extra.
21      I removed some other -- there was
22  another report with, you know, thousands of --
23  hundreds or -- at least of pages where I thought
24  the relevant material was in -- contained in about
25  20 pages. So I kept -- in material that I carry

Page 41

1  around, I kept the 20 pages and put the rest away
2  in a box.
3      Q   Do you remember which document that was?
4      A   If you give me a minute, I'll try to
5  recreate that.
6      Q   We can check that at the break if you
7  want --
8      A   Yeah. Sure, sure.
9      Q   -- to identify that document.
10      So then you -- you spoke about an
11  additional five binders --
12      A   Yeah.
13      Q   -- that you brought with you that
14  contain documents that might help you answer
15  questions during the deposition.
16      Can you describe the contents of those
17  five binders. I'm trying to avoid marking all of
18  these as exhibits.
19      A   Yeah. Please.
20      Okay. Let me just reach down and look
21  at their covers.
22      Yeah, so one contains the recent
23  manuscript of a study by Taher, et al., a Canadian
24  meta-analysis of the issue, plus -- let me see if
25  there's anything else in there. I -- I think

11 (Pages 38 to 41)

Jack Siemiatycki, Ph.D.

Page 42

1    that's it.  It's such a -- such a big report with
2    all the appendices and so on, that it takes up a
3    whole binder.
4           Another one, a smaller one, contains the
5    meta -- the main meta-analyses that have been done
6    in this area, apart from the Taher one.  So the
7    Berge, Penninkilampi, a few other older ones,
8    Langseth and some of the older ones.
9       Q    Are those materials that are in the set
10   of meta-analysis, the second binder, if you will,
11   are they replicated also in the other set of three
12   binders that you brought with you?
13      A    Yes, they are.
14      Q    Okay.
15      A    Yes, they are.
16          Sorry.  There's -- there's another one
17   in -- like that which contains all of the original
18   epidemiology studies that I used or that were
19   available to be used in the meta-analysis.  And I
20   had this binder in my previous -- in the previous
21   case that I testified on, and I thought I -- I'd
22   like to have one binder here just of the
23   epidemiology studies because the thick binders,
24   it's harder for me to find articles, so it would
25   be easier for me to find them in this binder.  So

Page 43

1    all of these are in the big binders.
2           And there's another one with Health
3    Canada weight of evidence guidelines.  Also
4    guidelines from a European agency on weight of
5    evidence and evaluation.  I think there might be
6    something from FDA about that, and also some of
7    the information regarding agency -- what agencies
8    have put on their websites, if anything, about
9    talc, which would include the National Cancer
10   Institute and some other agencies.
11          So these are mainly -- well, partly
12   printouts from websites.  Partly the Canadian Risk
13   Management scope for talc published very recently
14   from the Canadian Department of Health.  And this
15   sort of information.  Not -- not all of those are
16   in the thick binders.
17      Q    Are all of the documents in the binder
18   that you are holding there, which I think is your
19   fifth binder, are all of those documents
20   identified within your report or in your reference
21   materials?
22      A    No.
23      Q    I would like to mark that binder as
24   Exhibit 4.
25          (Exhibit No. 4 was marked for

Page 44

1          identification.)
2    BY MS. BRANSCOME:
3       Q    Now, Dr. Siemiatycki, with the exception
4    of a copy of your report, which you previously
5    testified has some handwritten annotations on it,
6    do any of the other materials that you brought
7    with you today have any notes, handwritten or
8    typed, or highlighting or any other form of
9    annotation?
10      A    Yes.  The -- the epidemiology studies
11   and probably the meta-analyses, the previous
12   meta-analyses.  I -- I tend to scribble notes when
13   I'm reading an article on the side, so some of
14   those may very well have scribbled notes on -- in
15   the margins or things underlined.
16      Q    Dealing first with the binder of the
17   original epidemiological studies that you said you
18   had at a prior deposition, have you annotated that
19   in any way since you brought that to another
20   deposition?
21      A    Since today?  Sorry.
22          MS. BRANSCOME:  Michelle, perhaps you
23   could help me.
24          MS. PARFITT:  Sure.  Yeah, absolutely.
25          MS. BRANSCOME:  Has that specific binder

Page 45

1    been marked as an exhibit at a prior deposition?
2          MS. PARFITT:  Let me see which one.
3          Ms. Branscome, I don't want to
4    represent -- and I would tell you that these were
5    all the studies that he's had over the course of
6    the last few years.  I can't imagine it wasn't
7    asked for in prior depositions, but I can't -- I
8    can't represent --
9          MS. BRANSCOME:  Okay.
10          MS. PARFITT:  -- one way or another.  I
11   really can't.
12          MS. BRANSCOME:  Let's go ahead.  I would
13   like to mark the binder --
14          MS. PARFITT:  I will tell you this --
15   maybe I can.  There are pink numbers, number 10,
16   number 14, which suggest to me that they might
17   have been referenced in a deposition at one point
18   in time as an exhibit.
19          THE WITNESS:  Not -- some of them, but
20   not all of them, have those numbers.
21          MS. PARFITT:  Okay.
22          THE WITNESS:  They also have numbers in
23   the corner of my -- my team's personal filing
24   system of articles, so things like that.
25          MS. BRANSCOME:  Out of an abundance of

12 (Pages 42 to 45)

Jack Siemiatycki, Ph.D.

Page 46

1  caution, we will mark the binder that has been
2  described as containing the original
3  epidemiological studies as Exhibit 5, and the
4  binder that contains the meta-analyses as
5  Exhibit 6.
6          (Exhibit Nos. 5 and 6 were marked
7          for identification.)
8  BY MS. BRANSCOME:
9      Q   Did you bring anything else with you to
10 the deposition today?
11     A   Cell phone, glasses, et cetera, but no.
12     Q   I was provided before the deposition
13 began with a single piece of paper that I
14 understand to be a bill for professional services.
15         If we could mark a copy of that as
16 Exhibit 7.
17         MS. BRANSCOME:  Michelle, I don't know
18 if you have an extra copy.
19         MS. PARFITT:  I do.
20         (Exhibit No. 7 was marked for
21         identification.)
22         MS. PARFITT:  I have additional copies
23 for counsel, if you would like.
24         MS. BRANSCOME:  I think we passed one
25 around.

Page 47

1  BY MS. BRANSCOME:
2      Q   Dr. Siemiatycki, do you recognize the
3  document that's been placed in front of you that's
4  been marked as Exhibit 7?
5      A   Yes, I do.
6      Q   And could you describe for the record
7  what this document is.
8      A   It's a bill for services that I sent to
9  Ms. Parfitt dated November 18, 2018, in which I
10 billed for work done between August and November
11 2018 on the MDL case.
12     Q   Is it correct that this is a bill that
13 covers 56 hours that you billed in connection with
14 your work on this case in the month of July
15 through August 2nd, 2018?
16     A   Sorry, do -- July?  Is this the same --
17         MS. PARFITT:  August.  I have August to
18 November.
19         THE WITNESS:  Do you have a bill labeled
20 July?
21         MS. PARFITT:  We have July to August,
22 and here's the August --
23 BY MS. BRANSCOME:
24     Q   Sorry, we had different pieces of paper,
25 Dr. Siemiatycki.

Page 48

1      A   Okay.
2      Q   So why don't we mark as Exhibit 8 the
3  bill for professional services that covers the
4  month of July.
5          (Exhibit No. 8 was marked for
6          identification.)
7          MS. PARFITT:  Sure.  I don't have extras
8  of those.  Does anyone have a clamp?  If I could
9  have one of those?  Thank you.
10         MR. TISI:  Number 7, for the record, is
11 the one that goes to November.
12         MS. BRANSCOME:  We'll -- we'll clear it
13 up.
14         MR. TISI:  Thank you.
15         THE WITNESS:  Got it.
16 BY MS. BRANSCOME:
17     Q   So, Dr. Siemiatycki, you have two
18 exhibits in front of you there, an Exhibit 7 and
19 an Exhibit 8.
20         Do they both contain bills for
21 professional services for the work that you have
22 done in connection with this litigation?
23     A   Yes, they do.
24     Q   And what has been marked as Exhibit 7
25 covers a work period of August 9th through

Page 49

1  November 16th, 2018, during which you billed 136
2  hours; is that correct?
3      A   That's correct.
4      Q   And then Exhibit 8 covers the period of
5  time July 1st through August 2nd, 2018, over which
6  you billed 56 hours; is that correct?
7      A   That's correct.
8      Q   And you bill for your time at $450 an
9  hour, correct?
10     A   That's correct.
11     Q   Do the two bills for professional
12 services that have been marked as Exhibits 7 and 8
13 contain any time for work done by others at your
14 direction?
15     A   They contain work that has been done by
16 a couple of -- by one research assistant, and I
17 make an arrangement with her to reimburse her for
18 her time.  So it's -- it's covered in these, yes.
19     Q   Okay.  And so how is your research
20 assistant's time billed to plaintiffs' counsel?
21     A   It's not billed.  I -- I adjust the
22 billable hours to reflect the time that she works
23 for me.
24     Q   So if I was looking at Exhibit 7 and
25 Exhibit 8, how much in terms of hours of this

13 (Pages 46 to 49)

Jack Siemiatycki, Ph.D.

Page 50

1  reflects your personal time?
2      A   Between 95 percent and 98 percent,
3  almost all of it.
4      Q   And do the two exhibits that you have in
5  front of you there, Exhibit 7 and Exhibit 8, does
6  that cover all of the work that you have done in
7  connection with forming your opinions in this
8  case, meaning the MDL?
9      A   In forming the opinions for the report,
10 yes.
11     Q   These bills do not include time that you
12 spent preparing for today's deposition, correct?
13     A   That's correct.
14     Q   About how much time have you spent
15 preparing for today's deposition?
16     A   I would say the time since November 18,
17 which is referenced here, to today, there are
18 actually two components.  One was preparing for
19 the deposition.  Another was a bit of a flurry of
20 activity in December, I think it was, when a
21 couple of reports from Health Canada and from
22 the Taher group were published, and I reviewed and
23 tried to think about that information as well.
24         So just to be as precise as possible, I
25 just want to make that clear.  It's not -- it

Page 51

1  wasn't only preparation.  But I -- I guess we're
2  talking about a couple of weeks' work in -- since
3  November, but between six and ten days maybe,
4  something in that ballpark.
5      Q   And how would -- what would that be in
6  terms of hours?
7      A   Between 40 and 60 hours or -- subject to
8  revision, I could -- I could look that up.
9      Q   Have you billed plaintiffs' counsel for
10 that time yet?
11     A   No, I haven't.
12     Q   Presumably you will be billing them for
13 the time you spend here today during your
14 deposition as well, correct?
15     A   I -- I presume so as well.
16     Q   You referenced a flurry of activity in
17 December related to the Health Canada information
18 becoming public.
19         Did you produce or generate any type of
20 written work product in connection with your
21 review of those materials?
22     A   No, I didn't.
23     Q   Did you take any notes while reviewing
24 the materials that came out in December -- around
25 December 2018 related to the Taher manuscript and

Page 52

1  paper and the Health Canada statement?
2      A   No, I didn't.
3      Q   Did you annotate any of the materials
4  that you reviewed?
5      A   I'm -- I'm not sure.  I typically have a
6  pen in my hand when I'm reading, so I couldn't say
7  that I never underlined anything or -- I just
8  don't recall making any -- and I don't know that I
9  could find -- if I did look at it in December, I'm
10 not sure I could find that copy because I -- I
11 tend to print things over when -- and I -- there
12 was nothing written that I wanted to retain.  I
13 didn't write anything that I have used or -- yeah.
14         MS. BRANSCOME:  We've been going for a
15 little over an hour.  Is now a good time to take a
16 break?
17         THE WITNESS:  It's a great time.
18         THE VIDEOGRAPHER:  We are going off the
19 record at 10:55 a.m.
20         (Recess.)
21         THE VIDEOGRAPHER:  This begins disc
22 number 2 in the deposition of Jack Siemiatycki.
23 We're going back on the record at 11:15 a.m.
24 BY MS. BRANSCOME:
25     Q   Before we took the break,

Page 53

1  Dr. Siemiatycki, we were looking at the two bills
2  for professional services that have been marked as
3  Exhibit 7 and Exhibit 8.
4          And so in addition to the 56 hours that
5  are on Exhibit 8, the 136 hours on Exhibit 7, and
6  the approximately 40 to 60 hours you have spent
7  since mid-November of 2018, how much time have you
8  spent in connection with your opinions across all
9  talc litigation?
10         MS. PARFITT:  Objection to form.
11         THE WITNESS:  Including the previous
12 case that I was involved in, you're saying?
13 BY MS. BRANSCOME:
14     Q   Yes.
15     A   Whew.  I -- four to six weeks maybe
16 or -- I spent, I think, nearly two weeks in LA
17 while that case was going on, so that's one big
18 block of time.  And then I -- at least a month
19 full time, the equivalent of, before that.  But,
20 I'm sorry, I can't be more precise.
21     Q   What would that be in terms of hours?
22     A   Hours.  Let's say eight hours a day --
23 30, 40 -- 400 hours plus or minus 200.
24     Q   So a range of between 200 and 600 hours,
25 do you think?

14 (Pages 50 to 53)

Jack Siemiatycki, Ph.D.

Page 54

1     MS. PARFITT:  Object.
2     THE WITNESS:  It would be more than 200
3  for sure.  So -- to the best of my recollection,
4  it might be between 400 and 600.  But...
5  BY MS. BRANSCOME:
6     Q   How much have you billed to date for all
7  of the work you've done in connection with talc
8  litigation?
9     A   Well, I -- I don't remember.
10     MS. PARFITT:  Don't guess.
11     THE WITNESS:  I don't remember a total.
12  BY MS. BRANSCOME:
13     Q   Do you charge $450 per hour for all
14  types of work that you have done in connection
15  with the talc litigation?
16     A   Yes, I do.
17     Q   Do the fees that you charge in
18  connection with your work as an expert witness in
19  the talc litigation go directly to you personally?
20     A   Yes, they do.  Well, they go to a
21  corporation that -- that I control, as you see in
22  the bills.
23     Q   Do you pay anyone else for the -- using
24  the funds that the corporation has received for
25  the expert work you've done in connection with the

Page 55

1  talc litigation?
2     MS. PARFITT:  Objection.  Form.
3     THE WITNESS:  Yes, when I ask someone to
4  do some specific tasks, I pay them for that.
5  BY MS. BRANSCOME:
6     Q   And are the fees that you pay to other
7  individuals for tasks that they do in support of
8  your work, do those fees get billed to plaintiffs'
9  counsel?
10     A   No, they don't.
11     Q   Can you give me an approximation of how
12  much you have paid to others from the fees you
13  have billed to plaintiffs' counsel?
14     A   In MDL or in total?
15     Q   In all of the talc litigation.
16     A   My guesstimate would be that it's in the
17  order of 2 or 3 or 4 percent -- maybe 2 percent of
18  the total that I've billed.
19     Q   So it's fair to say that approximately
20  96 to 98 percent of all the fees that have been
21  billed to plaintiffs' counsel for your work as an
22  expert in the talc litigation will come to you
23  personally?
24     A   Yes.
25     Q   What percent of your professional time

Page 56

1  do you currently spend performing work in
2  connection with litigation?
3     A   By presently, can you give me a time
4  frame?  You don't mean today, I presume.  When you
5  say -- do you mean in the last year?  In the last
6  10 years?
7     Q   Let's say over -- over the past 12
8  months, what percent of your professional time was
9  spent performing work in connection with
10  litigation?
11     A   Ten to 20 percent ballpark.
12     Q   And has that percentage of time spent on
13  work in connection with litigation changed over
14  the past five years, for example?
15     A   Yes, it's very variable depending on
16  requests for participation in litigation.  So in
17  the past five years, my main contact with
18  litigation has been in the ovarian cancer cases,
19  but at -- around five years ago, I was also
20  working on two other cases in Canada.
21     Sorry, what was the question?
22     Q   Sure.  How -- I'll ask a new one.
23     How has the percentage of time that --
24     A   Oh, oh.
25     Q   -- you spend in connection with work

Page 57

1  done related to litigation changed?
2     A   Any litigation, right?
3     Q   Yes.
4     A   Or -- or talc litigation?
5     Q   I'll start with all litigation.
6     A   So it's -- as I said, it's very variable
7  from month to month.  And -- and -- I mean, I
8  guess over the past five years, it has kind of
9  averaged out at about 10 percent of my time, 10 to
10  20 percent of my time.
11     Q   And over the past two years, has all of
12  the litigation work you've been doing, has that
13  been exclusively focused on talc?
14     A   Yes.
15     Q   The report that -- sorry, the report you
16  prepared in connection with the MDL is not the
17  first expert report you have generated with
18  respect to a potential link between talc and
19  ovarian cancer, correct?
20     A   That's correct.
21     Q   You produced a report in connection with
22  the talcum powder litigation dated October 4th,
23  2016, correct?
24     A   That's correct.
25     Q   If you could turn in your binder there

15 (Pages 54 to 57)

Jack Siemiatycki, Ph.D.

Page 58

1   to tab 2.
2       A   In this big binder?
3       Q   Yes, please.
4           Is the document behind tab 2 your expert
5   report dated October 4th, 2016, that related to
6   the talcum powder litigation?
7       A   Yes, it is.
8       MS. BRANSCOME:  I would like to mark
9   that as Exhibit 9.
10          (Exhibit No. 9 was marked for
11          identification.)
12  BY MS. BRANSCOME:
13      Q   The report marked as Exhibit 9 was not
14  drafted for a particular case; is that correct?
15      A   I -- I -- I'd have to defer -- I'm not
16  exactly sure sometimes whether these reports refer
17  to a specific case or not.
18      Q   Okay.  Let me do it this way:  What was
19  the question that you were attempting to answer in
20  the report that has been marked as Exhibit 9?
21      A   So the question was the generic question
22  of whether there is a causal relationship between
23  use of talcum powder products and ovarian cancer.
24      Q   And specifically, the report marked as
25  Exhibit 9, were you looking specifically at

Page 59

1   perineal or genital use of talc?
2       A   That was the focus, yes.
3       Q   Did your 2016 report address any cancer
4   risk associated with the inhalation of talc?
5       A   Not that I recall.  It certainly wasn't
6   a focus.  There may have been some reason to
7   allude to that issue, but I can't recall that
8   it -- that there was.
9       Q   Okay.  You had your deposition taken on
10  December 15th and 16th, 2016, correct?
11      A   I believe so.
12      Q   And that deposition was for two specific
13  cases, the Oules and the Daniels case, correct?
14      A   I guess so.  But again, I -- that --
15  I'm -- I don't recall exactly which cases.
16      Q   You also have testified at trial in a
17  case involving allegations about Johnson's Baby
18  Powder, correct?
19      A   That's correct.
20      Q   And that was the Echeverria case?
21      A   Yes, it was.
22      Q   And you testified in trial in August of
23  2017, correct?
24      A   Correct.
25      Q   You did not issue an expert report

Page 60

1   specific to the Echeverria case, correct?
2       A   Correct.
3       Q   So the expert report that described the
4   opinions that you were offering in that case is
5   the one that we have just marked as Exhibit 9.  Is
6   that fair?
7       MS. PARFITT:  Objection.  Form.
8       THE WITNESS:  I -- I'm -- I'm hesitating
9   because I'm not sure what the significance of the
10  phrase "the expert report that you offered" is.  I
11  didn't -- I didn't in a sense offer this report
12  for -- at that trial.  I testified at that trial,
13  and they had this expert report available to them.
14  BY MS. BRANSCOME:
15      Q   Okay.  Let me ask it this way:  You
16  generated an expert report specific to the MDL,
17  correct?
18      A   Yes.
19      Q   And we are going to look at that --
20      A   Yes.
21      Q   -- but that is a report that is dated at
22  some point in 2018, correct?
23      A   Correct.
24      Q   Did you generate an expert report at any
25  time in between the expert report that you

Page 61

1   generated there in October 2016 and the expert
2   report you have supplied that's dated November
3   2018?
4       A   No, I did not.
5       Q   All right.  So if I may, I would like to
6   actually mark your copy of your 2018 report.  And
7   that will be marked as Exhibit 10, if you have
8   that in front of you.
9           (Exhibit No. 10 was marked for
10          identification.)
11          (Counsel conferring.)
12  BY MS. BRANSCOME:
13      Q   To be clear, for the record, I'm marking
14  as Exhibit 10 your MDL expert report, but it is
15  your copy.
16      A   Yes.
17      Q   Okay.  And as I understand it, the copy
18  that you brought with you here today that's now
19  been marked as Exhibit 10 contains some
20  corrections.  Is that -- is that fair?
21      A   Yes.
22      Q   Could you please walk me through the
23  corrections that you have made to your 2018 MDL
24  report that has been marked as deposition
25  Exhibit 10.

16 (Pages 58 to 61)

Jack Siemiatycki, Ph.D.

Page 62

1       A   Yes.  So the first is on page 47.  And
2   in the first full paragraph that begins with
3   "Table 9," on the fourth line --
4       Q   Let me pause you there for a moment,
5   Dr. Siemiatycki.  Are we both looking at page 47?
6       A   Now, I -- I'm not sure whether I printed
7   this in a way that is not -- does not correspond
8   to the version that you have.  I'm sorry.  I
9   printed this just for my own use, so I didn't --
10      Q   No, looking at it, it looks similar.
11      A   Oh, okay.
12      Q   So why don't you direct me to the
13  specific correction.  I thought you were referring
14  to the image of Table 9.
15          MS. PARFITT:  No, no.  I think we're
16  all on the same -- it's the same one you have --
17          THE WITNESS:  Okay.
18          MS. PARFITT:  -- on your thumb drives.
19          THE WITNESS:  Okay.
20  BY MS. BRANSCOME:
21      Q   All right, we'll start again.  So,
22  Dr. Siemiatycki, if you could identify for me the
23  corrections that you are making to your MDL report
24  from November 2018.
25      A   Right.  So on page 47, the first full

Page 63

1   paragraph, the fourth line, there are some
2   numbers.  It says "1.25," and then in parentheses,
3   there is a 1.0 that was really a literal typo.
4   Someone's -- my fingers were too heavy, and the
5   one -- the first 1.0 should be dropped, and so the
6   correct number is 1.15 to 1.36.  Okay?
7           The next one -- I'm sorry.  Oh, the next
8   one is on page 45, so a couple of pages earlier,
9   in the second line -- are you with me? -- the
10  sentence that begins "While the Terry 2013."  It
11  should be the Berge -- "While the Berge" -- the
12  first Terry -- I'm just thinking out loud again.
13  Whether in fact the Terry was the correct --
14  anyway, yesterday when I was correcting this
15  quickly, I thought that it -- that I had
16  miswritten "Terry 2013" in that sentence and that
17  it should have been Berge 2018.
18          Do you mind if I look at this again at
19  lunchtime and just verify which I was referring
20  to?  I'm now confusing myself about that.
21      Q   Not a problem.  We can come back to that
22  after -- either the next break or the lunch break.
23      A   And that -- those are the only
24  corrections I picked up as I was going through it.
25      Q   I noticed as you were flipping through

Page 64

1   your copy of your report that there were other
2   handwritten annotations.
3       A   Yeah.
4       Q   Can you please walk me through -- unless
5   it's voluminous, in which case we can do it after
6   a break -- any notations that you have made in
7   your copy of your MDL report.
8       A   It's not voluminous.  I didn't make
9   many.  One is on page 49.  And in the middle of
10  the page in italics, there is a misconception
11  counting, et cetera, and just before that, I was
12  talking about hospital-based studies and
13  population-based studies.  So the section that
14  begins on page 48 is about hospital-based versus
15  general population-based studies.  And I made a
16  note to myself after that -- at the end of that
17  section, also --
18          I mean, do you want me to quote what I
19  wrote?
20      Q   Yes, please.
21      A   Sure.  I said:  "Also the basin for
22  hospital controls may differ from the basin for
23  cases."
24      Q   And what did you mean by that?
25      A   So, you're familiar with the idea, a

Page 65

1   hospital-based study?  There are actually
2   different types of hospital-based studies, which
3   is something that has not come out in, really, in
4   any of the discussion of this literature.
5           But one of the problems with hospital-
6   based studies is that when you choose a control
7   group, let's say for a series of ovarian cancer
8   cases from a given hospital, and you go to a
9   different ward in that hospital to look for
10  controls who are not -- don't have ovarian
11  cancer -- the reasons for referral and the --
12  pattern of patients coming to hospitals differs
13  for different diseases.  So serious -- it
14  generally is the case that serious diseases in
15  specialized hospitals tend to come from a wider
16  geographic and social area than cases of traffic
17  accident injuries or things that are treated in
18  general hospitals more easily.
19          And if you just take a series of cases
20  of ovarian cancer and go to the emergency
21  department to choose controls or you go to the GI
22  surgery department where they do appendectomies
23  routinely or something like that, you're picking
24  up populations who are quite different.
25          And this is one of the disadvantages of

17 (Pages 62 to 65)

Jack Siemiatycki, Ph.D.

Page 66

1   a hospital-based control strategy, and it's one of
2   the reasons why, in general, epidemiologists favor
3   population-based studies rather than hospital --
4   case control studies, population-based case
5   control studies, rather than hospital-based case
6   control studies, because the cases and the
7   controls -- one of the requisites in a case
8   control design is that the patients -- the cases
9   and the controls should represent the same study
10  base, the same basin of people who if they were
11  cases with the disease in question, ovarian
12  cancer, this is where they would end up, and all
13  of them would end up there.
14      Q   Are there any studies that were relevant
15  to your analysis for your MDL report that you
16  think this particular criticism that you have just
17  explained applies to?
18      A   I'm not sure.  I didn't examine them
19  from that point of view.
20          In this section of my report, it was
21  kind of a generic discussion of the issue of -- of
22  the merits of hospital-based versus population-
23  based studies.
24      Q   Okay.  Do you have any other annotations
25  that you made in your copy of your MDL report?

Page 67

1       A   At the bottom of that same page, 49, I
2   wrote, quote, "Borenstein."  And right now I'm --
3   oh, yes.  So this misconception about counting the
4   number of statistically significant results as a
5   valid way of assessing consistency of results
6   among different studies is a basic flaw in the
7   conduct and interpretation of how to review a
8   series of studies.
9           It's well known.  I've known and I -- I
10  said it in my report that this is absolutely not
11  the way to synthesize evidence from multiple
12  studies, to count the number of significant ones.
13  And in addition to me saying it and many others, I
14  thought that I could -- if you asked me questions
15  about it or challenged my opinion on that score, I
16  could quote the textbook on meta-analysis, which
17  gives some good examples of why that's wrong.
18          MS. PARFITT:  Let's stop here for a
19  minute --
20          MS. BRANSCOME:  If we could go off the
21  record.
22          MS. PARFITT:  -- and go off the record.
23          THE VIDEOGRAPHER:  We're going off the
24  record at 11:39 a.m.
25          (Pause.)

Page 68

1           THE VIDEOGRAPHER:  We're going back on
2   the record at 11:41 a.m.
3   BY MS. BRANSCOME:
4       Q   Do you have any other annotations there
5   with you on your copy of your report?
6       A   No.  I have one other green sticky on
7   page 67, but there's nothing written on that page,
8   and I don't remember why I put that sticky there.
9       Q   Okay.  The report that we just marked as
10  Exhibit 10, does that define the scope of your
11  opinions in the MDL?
12      A   The scope of my opinions.  It defines my
13  opinions, yes.
14      Q   Does it contain all of the opinions that
15  you intend to offer at any trial or hearing in the
16  MDL?
17      A   I mean, I guess if I'm asked a question
18  that veers off from something I said in my report,
19  and I address the question, would that be
20  considered going off -- you know, offering an
21  opinion that is not in my report?
22          It's just that -- I'm just not sure
23  about the technicality of your question.  I mean,
24  I will offer -- I will answer questions even if
25  they lead off the content of my report.

Page 69

1       Q   As you sit here today --
2       A   Yes.
3       Q   -- does the report that has been marked
4   as Exhibit 10 contain all of the opinions that you
5   have formed as of today about which you would
6   intend to testify at trial or a hearing on this
7   matter?
8       A   I -- I believe so.
9       Q   What was the question that you were
10  asked to answer in connection with the report you
11  generated in 2018?
12      A   I guess I -- I'll just refer back to
13  what it says in the report:  "Can application of
14  talcum powder products in the perineal region
15  cause ovarian cancer?"
16      Q   Is that question different from the
17  question you were answering in your 2016 report?
18      A   I -- I don't see them as different.
19      Q   You would agree with me, though, that
20  there are differences between the report that you
21  produced in November 2018 and the report that you
22  produced in October 2016?
23          MS. PARFITT:  Objection.  Form.  Vague.
24          THE WITNESS:  Yes, there are some
25  differences.

18 (Pages 66 to 69)

Jack Siemiatycki, Ph.D.

Page 70

1   BY MS. BRANSCOME:
2       Q   When you began drafting the report
3   that's been marked there as Exhibit 10, your MDL
4   report, did you begin by using your 2016 report as
5   an initial draft?
6       A   Yes.  But I also had some ideas about
7   new things that I would want to do.  Sort of
8   coming out of the Echeverria experience, I
9   realized that there were -- there were a couple of
10  errors in that -- my original report that I wanted
11  to correct.  There were ways of doing the analyses
12  that, on reflection, I thought were not optimal
13  and that I could improve on, even if I anticipated
14  that the bottom line results would not change
15  much.  But when I came to actually drafting the
16  text, I certainly used the previous report as a
17  primary source for revising -- for -- for drafting
18  the new one.
19      Q   You mentioned that you wanted to make
20  some modifications because there were things in
21  the 2016 report that were either not optimal or
22  were errors.
23          Were any of the modifications that you
24  made done at the suggestion of plaintiffs'
25  counsel?

Page 71

1          MS. PARFITT:  Objection.
2          THE WITNESS:  No.
3   BY MS. BRANSCOME:
4       Q   So any of the changes that you made
5   between your 2016 report and the MDL report in
6   2018, were those all at your own prompting?
7       A   Yes.
8          MS. PARFITT:  Objection.  Form.
9          THE WITNESS:  Yes.
10  BY MS. BRANSCOME:
11      Q   Did you work in the same computer file
12  to draft the 2018 report from start to finish?
13         MS. PARFITT:  Objection.  Form.
14         THE WITNESS:  You're -- you're referring
15  to the text, not the statistical analyses, which
16  were done in a separate -- I mean, they -- they --
17  the statistical analyses were based on the
18  addendum that I presented to you, and those are
19  kept on a FileMaker software, which is not on my
20  personal computer, but that my assistant has
21  access to.
22         But as far as the text is concerned --
23  yeah, I think it was the same computer, but I've
24  changed computers since then, so I'm just
25  hesitating because I'm trying to think of the time

Page 72

1   sequence, and I use both of them now but in
2   different places.
3          But -- so is your question, is it
4   exactly the same computer that all the files were
5   kept on or -- is that the sense of your question?
6   BY MS. BRANSCOME:
7       Q   How about I ask it this way:  Can you
8   describe for me the process by which you drafted
9   your 2018 report that's been marked as Exhibit 10?
10      A   So I guess there were two parallel
11  things going on, or maybe more.  One was to do
12  some reanalyses of the statistical meta-analysis.
13  And so that I initiated at a certain point
14  between -- probably in 2018.
15         At the same time, and I'm not sure if
16  this was after or before the statistical analyses
17  were started, I looked at the old draft.  I
18  reviewed what was there, what I thought were
19  weaknesses in the way of expressing things or
20  things that could be brought to the report that
21  would enhance the clarity or the force of the --
22  the exposition, and I started redrafting.  So I'm
23  not sure if that answers your question.
24      Q   Did you personally type the words that
25  are contained in Exhibit 10?

Page 73

1       A   All -- maybe all of them, and maybe
2   there were some paragraphs that I handwrote
3   because I was on a plane or a train, and when I
4   got back to the office, I asked someone to type up
5   that paragraph or two.  But basically it was done
6   by me.
7       Q   And did you save draft versions along
8   the way?
9          MS. PARFITT:  Objection.  Form.
10         THE WITNESS:  Not really.  Not --
11  certainly not systematically.  I didn't save any
12  reason to save discarded versions of things.
13  Yeah.
14  BY MS. BRANSCOME:
15      Q   Did you conduct a new literature review
16  in connection with the 2018 report?
17      A   I knew that I had all of the literature
18  that was pertinent and published as of 2016.
19  Updating what was available was partly done by
20  asking my research assistant to do a PubMed search
21  of anything new on the topic; asking the lawyers
22  if they had come across anything new in the past
23  year; my own antenna of knowing a lot of
24  epidemiologists and people who work in this area,
25  whether they are aware of anything.  So sort of an

19 (Pages 70 to 73)

Jack Siemiatycki, Ph.D.

Page 74

1  informal updating process from many branches.
2      Q   Did plaintiffs' counsel provide you with
3  studies that had come out since you had generated
4  your 2016 report?
5      A   I think they sort of pointed me to a
6  couple of things that I didn't have at the time.
7  I think one was the Penninkilampi review.
8          We're talking about the epidemiology
9  literature or everything?  Because the
10 epidemiology literature I was pretty much in
11 control of through my networks and my people and
12 so on.
13         The stuff that I asked counsel to help
14 with was identifying literature in the areas of
15 toxicology, composition of talcum powder products,
16 mechanistic research that would bear on the issue.
17 So I asked them if they would provide me any new
18 data that they had available on those topics.
19     Q   Do you consider yourself an expert in
20 toxicology?
21     A   No.  I'm sufficiently familiar to be
22 able to integrate the expertise of -- of real
23 experts.
24     Q   Do you consider yourself an expert on
25 the composition of talc?

Page 75

1      A   No.
2      Q   And do you consider yourself an expert
3  on potential biological mechanisms of the
4  development of ovarian cancer?
5      A   No.
6      Q   Other than being aware of the opinions
7  of others in those particular fields, are you
8  offering any expert opinions in toxicology, the
9  composition of talc, or the biological mechanism
10 by which ovarian cancer may develop?
11     A   I'm --
12         MS. PARFITT:  Objection.  Form.
13         Go ahead.
14         THE WITNESS:  I'm -- I reviewed the
15 information that I was provided, and I took note
16 of the types of evidence that are available in
17 those domains, and I used it mainly in thinking
18 about biological plausibility of the association.
19 It -- those areas of evidence did not in any way
20 influence my opinions about the strength and
21 consistency and so on of the epidemiological
22 evidence.
23 BY MS. BRANSCOME:
24     Q   Did you -- oh, before I forget, what is
25 the name of the software that you used to do the

Page 76

1  statistical analysis for your meta-analysis?
2      A   It's -- I think it's called
3  Meta-Analysis, but -- it's called Comprehensive
4  Meta-Analysis, Version 3.  It's listed in my
5  report on page 34.
6      Q   And is that the only software that you
7  used to perform the statistical analyses in your
8  report?
9      A   It's the only software that I used to
10 perform the meta-analyses.  Are there any other --
11 I'm just trying to think if there are any other
12 analyses in the report besides meta-analyses or
13 statistical.
14         There were a couple of studies, and I --
15 I couldn't point them out just this minute, that
16 did not provide full information allowing -- that
17 didn't provide full information on odds ratios or
18 relative risks in a format that was useful for the
19 meta-analysis.  And -- but they did provide the
20 numbers of cases and controls who were exposed and
21 unexposed.  And that would typically -- I think in
22 at least one instance, maybe two, but at least one
23 instance, there was a situation where they
24 provided odds ratio estimates in different
25 categories of usage of talc or either different

Page 77

1  durations or different amounts used per day or
2  something like that, but didn't summarize that in
3  an overall ever-used-it-at-all versus
4  never-used-it, which was what I was looking to use
5  in the meta-analysis.
6          And I think in those -- in that
7  instance, I did almost a hand calculation.
8  Because it's pretty straightforward how you do
9  this, just re- -- picking the numbers in their
10 tables and recalculating the overall odds ratio.
11         But this is a few years ago, and I --
12 I -- I would have to go back and review that, but
13 it was -- I think in the other meta-analyses,
14 Berge and Penninkilampi, which were carried out
15 completely independently of mine, and I didn't
16 know about theirs, I think they had to do
17 something similar and arrived at the same answers.
18         So -- but, no, I mean there was no -- no
19 other statistical package used.  That kind of
20 calculation can be done by hand.
21     Q   How would -- how would I, if I'm looking
22 at your report, identify which studies you
23 actually calculated the odds ratio or relative
24 risk that you input into your meta-analyses?
25     A   I -- I -- I'd have to look at it at

Jack Siemiatycki, Ph.D.

Page 78

1    lunchtime, if you don't mind, and see if there was
2    one.
3            There was one.  I don't know if that was
4    retained in the end or if -- I'm sorry.  It's --
5        Q    When you say you don't know if a study
6    was retained in the end, are there studies that
7    you considered including in your meta-analysis and
8    ultimately did not?
9        A    Only if they didn't provide evidence on
10   the relationship between talcum powder used in the
11   perineal area and ovarian cancer.
12       Q    All right.  If you wouldn't mind looking
13   at that at lunch, we will come back --
14       A    Yes.  Thank you.
15       Q    -- to that after the lunch break.
16           THE WITNESS:  Someone make a note for
17   me.
18   BY MS. BRANSCOME:
19       Q    Did you --
20           MS. PARFITT:  Yes, a note.
21   BY MS. BRANSCOME:
22       Q    Did you personally conduct the
23   meta-analysis that was performed as part of your
24   2018 report?
25       A    No, I did not do the --

Page 79

1        Q    Who did that?
2        A    My student.
3        Q    And what is your student's name?
4        A    Mengting, M-E-N-G-T-I-N-G, Xu, X-U.
5        Q    And -- and what are -- is it Mr. or
6    Dr. Xu?
7        A    It's -- she's a Ph.D. student at the
8    moment.  She will be a doctor.
9        Q    What are her qualifications for
10   conducting a meta-analysis?
11       A    She is very skilled at statistical
12   analyses and at -- at computer packages.  I'm not
13   sure if she's taken a course in meta-analysis
14   specifically, but it's not rocket science to do
15   that with a package like the one we have.
16       Q    Did you verify that the meta-analysis
17   was performed correctly using the software?
18       A    I looked at the results in various ways
19   to assure myself that everything looked good.  By
20   looking good, I mean that there was internal
21   coherence, like she carried out many different
22   meta-analyses under different conditions and --
23   not different conditions, but including some
24   studies and excluding studies -- these are called
25   sensitivity analyses -- and the pattern of results

Page 80

1    from one to another was perfectly in line with
2    what I would expect.
3            Furthermore, the results that we
4    obtained are almost identical to the results that
5    others have independently obtained doing
6    meta-analyses on these topics using basically the
7    same studies.  Sometimes the difference of --
8    minor differences of which result from each study
9    they selected, but basically the results are so
10   similar that I'm confident that there was no
11   glitch.
12       Q    Did you save the results of these
13   sensitivity analyses?
14       A    Do you mean the output from the computer
15   software for each one?  Is that what you're --
16       Q    Is there any way from the materials that
17   you have produced in connection with your report
18   for someone to replicate the sensitivity analyses
19   that you performed?
20           MS. PARFITT:  Objection.  Form.
21           THE WITNESS:  Well -- I reproduced in
22   the report a few plots of -- that come straight
23   out of the program.  So for those, it's absolutely
24   replicatable.  Anybody can then go to the package
25   and put -- punch in the same input, and they'll --

Page 81

1    they'll get the same output.  For the -- I didn't
2    do that for every single sensitivity analysis,
3    just for economy -- to save the reader the burden
4    of that.  But I'm pretty sure -- I'm pretty sure
5    that Mengting kept files of each of those
6    analyses.
7    BY MS. BRANSCOME:
8        Q    Did anyone else -- you mentioned a
9    research assistant helped you with PubMed
10   searches.  Who was the research assistant?
11       A    She's a woman, who was with me for 30
12   years or so, who was basically the bibliographic
13   expert in our team and helped people find articles
14   and do things necessary, like PubMed searches and
15   so on.  So she -- while she was here -- she
16   retired a year or so ago.  While she was here, I
17   asked her to look at the ovarian cancer/talc
18   thing, and she dug out some -- she found some
19   articles for me.
20       Q    Is that Sally Campbell?
21       A    Yes, it is.
22       Q    Okay.  After Ms. Campbell retired, did
23   anyone else help you perform literature searches?
24       A    Not in a routine way for sure.  If I
25   wanted to find a specific article that I knew

21 (Pages 78 to 81)

Jack Siemiatycki, Ph.D.

Page 82

1  about, I would typically ask my student Mengting
2  to dig it out and print it for me.
3      Q   So in addition to Ms. Campbell and
4  Ms. Xu --
5      A   Xu, yes.
6      Q   -- did anyone else help prepare the
7  materials that are in your 2018 report?
8      A   Yes.  So I have another research
9  assistant who's been with me even longer than
10 Sally Campbell, who retired a month ago, and her
11 name is Lesley Richardson.  And she set up and
12 maintained the database system in which we
13 integrated all of the results that are in that
14 addendum that I provided you, and that involved
15 reviewing each article and taking every single
16 result and plugging it into this software.
17     Q   Did Ms. Richardson exercise any of her
18 own judgment in selecting which data to include in
19 the meta-analyses?
20     A   The instruction was to extract
21 everything.  Simple instructions can become
22 difficult in operation.  And some of the
23 frustration in this area and some of the reason
24 why there is some variability in which studies and
25 which results are included in different

Page 83

1  meta-analyses occur because authors are sometimes
2  cryptic about what they say about their data and
3  their results.  And specifically things like what
4  kind of talc use a certain table describes is not
5  always perfectly clear.
6          And so she would need to make a judgment
7  sometimes as to whether this result pertained to
8  all use of talc in the perineal area or only
9  powdering, excluding sanitary napkins or other --
10 sometimes it -- there's ambiguity in the write-up
11 of these things that therefore requires --
12 required some judgment on her part.  And several
13 of these things she would ask my opinion about,
14 and we would discuss it and say, Well, it looks
15 like this or it looks like that, and let's go with
16 this interpretation.
17     Q   Okay.  And at the end of the day,
18 despite receiving help from others in developing
19 your 2018 report, do you personally stand behind
20 everything that is in the report?
21     A   Yes.  Barring more typos.  I know that
22 every time I look at anything I've ever written
23 or, you know, things that are expressed not in the
24 most clear way.  But, yes, I stand behind
25 everything.

Page 84

1      Q   Okay.  And you mentioned reviewing the
2  materials that came out in connection with Health
3  Canada and the Taher manuscript, and we'll talk
4  about that in more detail, but did anything you
5  reviewed since the production of your 2018 report,
6  has any of that changed your opinions or any of
7  the information that is contained in your MDL
8  report?
9      A   It doesn't really change anything.  I
10 would say that the Health Canada report reinforces
11 the notion that this issue is becoming a front
12 burner issue for public health agencies.  But
13 it -- since I didn't explicitly address that
14 question in my report, I would say it doesn't
15 change anything that's in my report.
16     Q   Do you intend to offer expert opinions
17 about the different positions of the different
18 public agencies and the relative importance of a
19 potential connection between talc and ovarian
20 cancer?
21         MS. PARFITT:  Objection.  Form.
22         THE WITNESS:  Did I intend -- while
23 writing my report, do you mean, to make -- no.  I
24 don't think that those agencies and those
25 positions necessarily reflect the most up-to-date

Page 85

1  science, and I think the most up-to-date science
2  is in the science community through publications
3  and so on, and public health policies tend to lag
4  behind scientific knowledge.
5  BY MS. BRANSCOME:
6      Q   Are there instances where public health
7  policies are more conservative than the scientific
8  literature out of sort of a principle of
9  precaution?
10         MS. PARFITT:  Objection.  Form.
11         THE WITNESS:  Sorry, I'm not sure I
12 understand the question.
13 BY MS. BRANSCOME:
14     Q   Sure.
15         Are there examples where the public
16 health policy is actually, for instance, more
17 protective than the science might support because
18 the public health agency is exercising an
19 abundance of caution?
20         MS. PARFITT:  Objection.  Form.
21         THE WITNESS:  I -- I believe so.  I
22 mean, I've not done any kind of survey of how
23 public health policy in, you know, Sweden over
24 Argentina or everywhere -- you're talking about
25 generally in the world public health or are you

22  (Pages 82 to 85)

Jack Siemiatycki, Ph.D.

Page 86

1   talking about United States or -- but I -- I
2   imagine there are instances like that, and I think
3   there is a strand in public health to be
4   precautionary in developing policies.  But I'm not
5   sure it's universal.  I just don't know.
6   BY MS. BRANSCOME:
7       Q    You have a References section in your
8   report.  It begins at page 109, if you need to
9   refer to it.
10          How did you maintain all of the
11  documents that are identified under that list?
12  It's quite voluminous.
13      A    So let me --
14      Q    And by that, I mean did you keep hard
15  copies?  Do you keep electronic copies?
16      A    Okay.  So the first thing I'll point out
17  is that I deliberately didn't call it a reference
18  section.  You'll see that it's called a
19  Bibliography.
20      Q    Could you turn to page 109 in your
21  report.
22      A    That -- that's where I am.
23      Q    Could you turn to the page right before
24  that.
25      A    Oh.  Ah, yes, I see that.

Page 87

1       Q    What is the page -- you have that as
2   page 108?
3       A    Yes, I have that page with the word
4   "References" on page 108.  Section 16.
5       Q    Perhaps we could check at the break.  My
6   page numbering got off of yours at some point.
7       A    Okay.
8       Q    But in any event, you do have a
9   Section 16 that's titled "References," correct?
10      A    Yes.  Yes, I do.  I do.
11          Okay.  My -- my conscious volition was
12  to call this a bibliography, and the word
13  "references" got in -- into the heading of this
14  section.
15          And the reason for that distinction is
16  that I have not -- not everything that is listed
17  is referred to in the text of my report.  So
18  technically speaking, a reference section should
19  be those materials that you refer to in your
20  report.  And this is not what I have here.  And
21  that's why I -- consciously I wanted to call this
22  a bibliography, and somehow the word "references"
23  got -- when they -- when we were compiling it --
24  anyways.
25      Q    Okay.  So my question again --

Page 88

1       A    So, yeah, yeah.
2       Q    -- Dr. Siemiatycki, is how -- how do you
3   maintain all of the documents that are listed in
4   your reference section?  Do you main hard copies?
5   Do you keep electronic copies?
6       A    It's a bit of a mix and match of
7   electronic and hard copies.  And these are all the
8   materials that were collected over the years, you
9   know, I would say from the beginning of my
10  involvement in the previous trial and so on, that
11  concern talc and ovarian cancer, including
12  materials that were provided by the lawyers and
13  materials that we found.
14          I prefer to work with paper -- I prefer
15  to read paper, but at a certain point, that gets
16  overwhelming, and the material -- I can't tell you
17  right now for sure that everything here is -- that
18  I have it electronically in a file or that I have
19  it in paper.
20      Q    There are different sections of your
21  References section.  You have Bibliography Part A,
22  B, so on and so forth.  Who made the decision of
23  which articles or documents fell into which of
24  the -- of each category?
25      A    I -- I guess I made it, but it was

Page 89

1   pretty self-evident.  The material in Part A is
2   material that is generally publicly available.
3   It's easy to identify that.  And the materials in
4   Part B is material that is not publicly available.
5   And all of that came from the lawyers, I think.
6       Q    So that was going to be one of my
7   questions.  Did all of the materials identified in
8   Bibliography Part B come to you from plaintiffs'
9   counsel?
10      A    Okay.  So let me look through this
11  quickly.
12          MS. PARFITT:  Mm-hmm.  Go ahead.
13          THE WITNESS:  (Peruses document.)
14          I think so.  I -- I think all of it came
15  from plaintiffs' counsel.
16  BY MS. BRANSCOME:
17      Q    I'm not going to ask you about all of
18  these, but I noticed on page, at least in my copy,
19  135, maybe 134 on yours, there's reference to the
20  Berg v. Johnson & Johnson case.
21          Do you see that?
22      A    Yes, I see that.
23      Q    What relevance is it to you as an
24  epidemiologist evaluating the potential risk of
25  ovarian cancer from perineal use of talc to look

23  (Pages 86 to 89)

Jack Siemiatycki, Ph.D.

Page 90

1  at the final jury instructions, judgment, and
2  verdict form from the Berg case?
3      A   I'm not sure.  I relied on plaintiffs'
4  counsel to decide what they thought it would be
5  pertinent for me to be aware of.  So these were
6  documents that they thought would be pertinent for
7  me to -- to be aware of, and I can't say why, and
8  I don't remember -- frankly, I don't remember
9  these documents.
10     Q   As a scientist, do you typically
11 consider jury instructions in forming an opinion
12 with respect to risk of the use of a product in
13 epidemiology?
14     MS. PARFITT:  Objection.
15     THE WITNESS:  Outside of a legal -- no,
16 we wouldn't have access to it or -- no, it never
17 comes up.
18 BY MS. BRANSCOME:
19     Q   As you sit here today, can you come up
20 with any reason why the jury instructions in a
21 case would be relevant to you in evaluating the
22 question you were asked to answer, which is
23 whether or not there is a risk of ovarian cancer
24 from the perineal use of talc?
25     MS. PARFITT:  Objection.  Form.

Page 91

1      THE WITNESS:  You're asking me to
2  speculate as to why plaintiffs' counsel would have
3  sent this to me?
4  BY MS. BRANSCOME:
5      Q   I'm asking --
6      A   Is that what you're asking?
7      Q   I'm asking if you, as the scientist
8  whose name is on this expert report, can you think
9  of any reason why that would be informative to you
10 as a scientist?
11     A   If I had it in front of me, I might
12 recognize something in there that would make it
13 relevant.  But I -- I don't know what is typically
14 in such jury instructions.  I don't know how --
15 what the sweep is of those things.  I'm just not
16 sure.  So I -- I can't answer the question.
17     Q   As you sit here today, do you recall
18 reading the final jury instructions from Berg --
19     A   I don't --
20     Q   -- v. Johnson & Johnson?
21     A   I don't actually recall reading it.
22     Q   Okay.  So is there any way for someone
23 reviewing your report to identify within the
24 reference section, Part B, which of these
25 documents you, Dr. Siemiatycki, found relevant and

Page 92

1  informative of your opinions?
2      A   No.  There's no way for anyone else to
3  know that.
4      Q   Okay.  Did you ask plaintiffs' counsel
5  for specific company documents, using that term
6  loosely, to refer to documents that are kept
7  internally within the various companies at issue
8  in this litigation?
9      A   I asked to be sent any information they
10 had about the composition of talcum powder
11 products, historically as well as currently, but
12 actually mainly historic -- I was mainly
13 interested to know what was the history of the
14 composition of talcum powder products.
15         And so many of these materials that they
16 sent me -- and I can't tell you which ones because
17 I don't identify them with these obscure numbers,
18 they don't mean anything to me -- but some of them
19 dealt with internal company documents or internal
20 reports that discussed different types of talc --
21 of powdering products, whether talc products or
22 cornstarch products in different eras, when they
23 started and when, what the market share was in
24 different eras.  So I was interested in that to
25 get a sense of what were the women exposed to who

Page 93

1  were part of these epidemiologic studies.
2      Q   Do you rely on any of the information
3  that you obtained from documents in Part B of your
4  reference list as a basis for forming your expert
5  opinion in the MDL?
6      A   No.  No.
7      Q   Have you viewed any of the deposition
8  transcripts of the depositions that have been
9  taken in the MDL?
10     A   I have looked at a few of them.
11     Q   And which deposition transcripts have
12 you reviewed?
13     A   Plunkett, McTiernan, is it?  And Singh.
14 Not fully -- not the entire transcripts, but
15 portions thereof.  Blount.  I've seen excerpts
16 from, is it, Hopkins?  And a table from Pier, but
17 not the full text.  I didn't review the full text
18 -- transcript.  There may be one or two more, and
19 I can't recall right now.
20     Q   Okay.  Focussing specifically on the
21 expert deposition transcripts from the MDL, did
22 you ask specifically for Drs. Plunkett, McTiernan
23 and Singh's deposition transcripts?
24     A   I didn't know who the other experts
25 were, so I didn't ask for them by name.  And I

Jack Siemiatycki, Ph.D.

Page 94

1    think that I asked if they could share with me
2    transcripts of depositions and reports.  So I also
3    had some of the reports from those experts.  I'm
4    not sure I had all of them but at least some of
5    them.
6         Q    Well, what materials had you reviewed
7    with respect to other experts in the MDL before
8    you completed your report that we've marked as
9    Exhibit 10?
10        A    None.  All of what I've just described
11   was after I completed my report.
12        Q    Did you rely on the work or opinions of
13   any other expert witnesses in forming your own
14   opinions in the MDL?
15        A    No, I don't think I did.
16        Q    So understanding that more depositions
17   have been taken than just Drs. Plunkett, McTiernan
18   and Singh, what specifically was your request to
19   plaintiffs' counsel for which deposition
20   transcripts you would like to see?
21            MS. PARFITT:  Objection.  Asked and
22   answered, form.
23            THE WITNESS:  I'm not sure if my request
24   was to see the ones that they thought were most
25   relevant to -- to me or whether I specifically

Page 95

1    said the epidemiology ones, but I think probably
2    the former, because they sent me, for example,
3    Dr. Plunkett, who is not an epidemiologist.  Yeah.
4    BY MS. BRANSCOME:
5         Q    Which expert reports have you reviewed
6    that are from the MDL?
7         A    I looked at the Plunkett report.  I
8    think I looked at the Singh and the McTiernan
9    report.  But just dipping into it, not -- not
10   reading it fully.  Yeah.
11        Q    Any other reports?
12        A    Not that I recall offhand.
13        Q    Okay.  The Blount transcript, the
14   Hopkins transcript, and the table from Julie
15   Pier's deposition, were those items that were
16   provided to you by plaintiffs' counsel?
17        A    Yes.
18        Q    Did you request them specifically or
19   were they simply given to you?
20            MS. PARFITT:  Objection.  Form.
21            THE WITNESS:  I requested them to
22   provide me with information that would help me to
23   understand the issue.  And one of the issues that
24   has come up in the past few months was the issue
25   of asbestos in talcum powder products, and I think

Page 96

1    I specifically asked at some point to be provided
2    with information that would inform on the presence
3    of asbestos fibers in talcum powder products.
4    BY MS. BRANSCOME:
5         Q    Did you review that material before
6    completing your MDL report?
7            MS. PARFITT:  Do you understand the
8    question?
9            THE WITNESS:  Yeah.
10           Yes, I think I did look at that before
11   completing my report.
12   BY MS. BRANSCOME:
13        Q    When you say the asbestos is an issue
14   that has come up in the last few months, what do
15   you mean by that?
16        A    Well, my understanding back in 2016,
17   '17, was that while asbestos had been detected in
18   talcum powder products as far back as the '70s --
19   1970s, there was an industry directive or promise
20   or instruction that they would somehow get rid of
21   the problem of asbestos contamination.
22        Q    And what was your basis for that
23   understanding?
24        A    I guess things I've read, and possibly
25   in some of the company documents, possibly in

Page 97

1    publications.  I think there have been various
2    publications that have said so that have -- and I
3    can't right now point to those, but that for the
4    last 10 or 20 years have said that asbestos
5    contamination may have been a problem up to the
6    1970s, but that the industry has basically managed
7    to eliminate that contamination.  So I've read
8    that, and it seemed to be repeated often enough
9    that I came to take it as a fact.
10           And then I received some -- I guess I
11   received some reports from plaintiffs' counsel of
12   some new studies carried out more recently in
13   the -- by Longo and his team, and some others, put
14   in question whether asbestos fibers were present
15   in talcum powder products.  And so this caused me
16   to revisit that whole thing.
17           My opinions offered in 2016, '17, about
18   talc and ovarian cancer were premised on the
19   assumption that whereas there may have been some
20   contamination up to the 1970s, it was basically a
21   nonissue after the 1970s.  So the opinions I
22   expressed in -- in 2016, '17, were independent of
23   any hypotheses about asbestos in talc.
24           When I saw the reports from Longo and
25   maybe others in the fall -- I think it was in the

25 (Pages 94 to 97)

Jack Siemiatycki, Ph.D.

Page 98

1  fall of 2018, I specifically asked counsel to
2  provide me with other information that they had,
3  and I made a point of saying, you know, Are there
4  studies that contradict these -- is there evidence
5  that contradicts these evidence -- these claims of
6  asbestos contamination? And they sent me some
7  material at that point.
8      Q   Okay. The work that Dr. Longo had
9  conducted with respect to analyzing talcum powder
10 products, to your knowledge, has that ever been
11 published?
12     A   I'm not sure. I -- to my knowledge, no,
13 but maybe it has been. I don't know.
14     Q   Okay. What were you -- when you
15 referred to the study that Dr. Longo conducted,
16 what -- are you referring to the work that he has
17 done in connection with litigation on behalf of
18 plaintiffs' counsel?
19     A   I'm referring to a few reports that I
20 think are dated or -- not -- 2017, 2018. I guess
21 they're connected to litigation, but I'm -- I'm
22 not absolutely certain of that. But those are --
23 that's what I'm referring to.
24     Q   Separate and apart from your role as an
25 expert witness, when you're evaluating a

Page 99

1  scientific question, do you typically consult
2  expert reports that are generated for purposes of
3  litigation?
4          MS. PARFITT: Objection. Form.
5          THE WITNESS: I would -- if I had
6  access -- I mean, usually we don't know about such
7  reports if we're not in the litigation process.
8  So it's a hypothetical question, I guess. It --
9  it just doesn't come up in reality that I would be
10 looking at carcinogenicity of diesel engine
11 emissions, and I would have access to reports
12 produced in litigation that are not published.
13 I -- I don't know that I -- I wouldn't have access
14 to such information unless I was part of the
15 litigation. But...
16 BY MS. BRANSCOME:
17     Q   Okay. When you're evaluating scientific
18 literature, do you place a different amount of
19 weight on a study that has been peer reviewed as
20 compared to one that has not?
21     A   Yes, it's one of the considerations.
22     Q   Okay. And --
23     A   There -- there are many considerations
24 that I weigh, including my knowledge of and
25 evaluation of the skill and reputation and quality

Page 100

1  of the investigators. I know many of the people
2  in the area that I work in, and I can -- I can
3  have a gut feeling about the quality of their
4  work.
5      Q   Do you know anything about Dr. Longo's
6  qualifications such that you could render an
7  opinion about the quality of his work?
8      A   It's in a different area than mine, so
9  the answer is I -- I couldn't render an opinion
10 about it.
11     Q   When you asked for evidence that might
12 contradict the work that Dr. Longo had done in
13 connection with litigation, what specifically were
14 you provided by plaintiffs' counsel?
15     A   I'm sorry, without digging around and
16 looking at e-mail exchanges, offhand I can't tell
17 you. I was provided with a batch of -- of
18 documents. I can't remember how many were on one
19 side or the other side. I remember there -- well,
20 in my report I refer to a few pieces of evidence
21 that -- yes. So -- can I -- well, on page 30 in
22 my copy --
23     Q   Okay.
24         MS. PARFITT: Why don't you give the
25 category, the title.

Page 101

1          THE WITNESS: Oh, the -- so it's in
2  Section 5.3.2, "What were women exposed to in body
3  powders?"
4  BY MS. BRANSCOME:
5      Q   Were you provided, for example, with the
6  expert reports generated by the expert retained by
7  Johnson & Johnson and Imerys to rebut Dr. Longo's
8  report?
9      A   Can you give me the author's name or --
10     Q   Sure. Were you provided any reports by
11 Dr. Matthew Sanchez?
12     A   I don't recall. I don't recall that.
13     Q   Are you offering an expert opinion about
14 the contents of any of the talcum powder products
15 sold or manufactured by Johnson & Johnson?
16     A   I only take note of what has been
17 provided in the various documents I have access
18 to.
19     Q   What does that mean?
20     A   It means -- can I read the sentence?
21 Basically, I think it summarizes what I mean. And
22 I'll start -- so I'll start on the sentence that
23 on my copy is on the bottom of page 29, still in
24 that Section 5.3.2.
25     "So representatives of the industry have

26 (Pages 98 to 101)

Jack Siemiatycki, Ph.D.

| Page 102 |
|---|

1  claimed that talcum powders were free of asbestos
2  fibers since the 1980s" -- and there are a couple
3  of references there --
4          MS. PARFITT:  Read them.
5          THE WITNESS:  "Hopkins 2018, Pier 2018.
6  -- "but this assertion has increasingly
7  come under doubt as a number of labs have reported
8  finding asbestos fibers in talcum powder
9  products."  And it references Blount, '91;
10  Paoletti, '84; Gordon, 2014; Longo, et al., 2017
11  and 2018; Blount deposition, 2018; Pier
12  deposition, 2018.
13          "These various studies that have
14  reported finding asbestos in historic talcum
15  powder samples have been challenged by other
16  reports that failed to find meaningful amounts of
17  asbestos in historic talcum powder samples."  And
18  the two citations are CIR 2013 and Anderson 2017.
19  BY MS. BRANSCOME:
20      Q   So what I'm trying to understand,
21  Dr. Siemiatycki, is what role this information
22  plays in your opinions, if any.
23      A   Not much.  You know, I would say that
24  the -- my opinions about the association are
25  driven by the strength and consistency of the

| Page 103 |
|---|

1  epidemiologic evidence.  And this information
2  about asbestos contamination of talcum powder
3  products would be capable of moving the dial in
4  the direction of increasing my belief that there
5  is a causal assoc- -- a causal relationship, if it
6  is demonstrated that there were in fact asbestos
7  fibers contaminating.
8          So if it is shown that they are present,
9  that would increase my level of belief.  If it is
10  not shown, if it is not demonstrated, it would not
11  detract from my finding based on the epidemiologic
12  evidence.  It could move the dial in one
13  direction.  It wouldn't move the dial in another,
14  because there -- there are different conceivable
15  ways that talcum powder products could increase
16  the risk of ovarian cancer.  This is one.  I'm not
17  capable of adjudicating whether this one is
18  correct or not.
19      Q   So as you sit here today,
20  Dr. Siemiatycki, do you have an opinion to a
21  reasonable degree of scientific certainty that
22  there are in fact contaminants like asbestos or
23  heavy metals in Johnson & Johnson's talcum powder
24  products?
25          MS. PARFITT:  Objection.  Form.  Asked

| Page 104 |
|---|

1  and answered.
2          THE WITNESS:  You know, I would say the
3  sentences that I read summarize my opinion on that
4  question.
5  BY MS. BRANSCOME:
6      Q   So in your opinion, is it -- is it a
7  question for debate in the scientific community at
8  the moment?
9          MS. PARFITT:  Objection.  Form.
10  Misstates his testimony.
11          THE WITNESS:  It's not an area in which
12  I feel confident to pronounce that the issue has
13  been resolved or not.
14          MS. BRANSCOME:  Is now a good time for a
15  break?  I don't now how long --
16          MR. TISI:  We've been going about an
17  hour and 25 minutes.
18          MS. PARFITT:  We have lunch at 1:00, and
19  I don't think it's here.
20          (A discussion was held off the record.)
21          MS. BRANSCOME:  We can go off the
22  record.
23          THE VIDEOGRAPHER:  This ends disc number
24  in the deposition of Jack Siemiatycki.  We're
25  going off the record at 12:42 p.m.

| Page 105 |
|---|

1          (Lunch recess.)
2          THE VIDEOGRAPHER:  This begins disc
3  number 3 in the deposition of Jack Siemiatycki.
4  We're going back on the record at 1:46 p.m.
5  BY MS. BRANSCOME:
6      Q   Good afternoon, Dr. Siemiatycki.
7          Did you have a chance to look at the
8  various subjects we were going to return to after
9  the lunch break?
10      A   I did.
11      Q   Okay.  So we'll take them one at a time.
12      A   Yes, please.
13      Q   Let's start first with, did you identify
14  the document that you had been provided by
15  plaintiffs' counsel that you said you took out all
16  but about 20 pages that you found relevant?
17      A   Right.  So I -- I think I mentioned the
18  IARC monographs as being two of them, and I think
19  the third one was the Reference Manual on
20  Scientific Evidence.  There was a huge pack of
21  pages that were sent to me, and I took out most of
22  them, but I retained some that I thought were
23  relevant.
24      Q   What portions of the Reference Manual on
25  Scientific Evidence did you retain?

27 (Pages 102 to 105)

Jack Siemiatycki, Ph.D.

Page 106

1      A   I think it was the Epidemiology section
2   and maybe the Statistics section.
3      Q   All right.  During the break, you were
4   also going to check which of the epidemiological
5   studies that you included in your meta-analysis.
6         Did you or someone at your direction
7   independently calculate an odds ratio or relative
8   risk figure that was not published in the report
9   itself?
10     A   Sorry, what?  That was not published in
11  the original report.  So I'm not sure.  The answer
12  is in the time I had available, I couldn't really
13  identify anything like that, and I'm not sure if
14  that occurred at all, and it -- the impact of
15  that, if -- if it had occurred, would have been
16  negligible.
17     Q   If --
18     A   It would have meant -- I'm sorry.  It
19  would have meant that most likely I added -- I put
20  together a two-by-two table by aggregating across
21  two or three or four levels of exposure.  If -- if
22  it had happened, I think that's what would have
23  happened.  And the impact of that would be to
24  produce an odds ratio estimate that is not
25  adjusted for the covariates that they adjusted for

Page 107

1   in their analysis by the categories of dose or
2   whatever they adjusted for.
3      Q   Is there any way by examining your 2018
4   report and the addendum that an outside reader
5   could determine which studies, if any, were
6   subject to this independent calculation?
7      A   So the one thing I didn't check during
8   the break was whether there's a note in the
9   addendum, and it would take me a while, I'd have
10  to go through each study and see if there's any
11  notation in the margin that would indicate that
12  this was done.  So I -- I -- I'm not sure of the
13  answer to your question.
14     Q   If an adjustment like that or an
15  independent calculation had been done, would it be
16  your expectation that a notation would have been
17  made in the addendum?
18     A   Yes.  Yes.
19     Q   All right.  Did you look at anything
20  else over the lunch break?
21     A   Well, we looked to see -- the page --
22  pagination discrepancy between the different
23  versions, and I think Ms. Parfitt could fill you
24  in on -- or maybe she has.  I don't know.
25         MS. PARFITT:  No.  No, I haven't.  I

Page 108

1   think what it is, we've got the signature page on
2   the one report, and then the one he has in his
3   binder appears to not have a signature page on it,
4   and the font seems to be -- when the signature
5   page was put in, the font was slightly larger,
6   which sort of throws off the page numbers.  Same
7   report.
8         MS. BRANSCOME:  So what I would --
9         MS. PARFITT:  Single --
10        MS. BRANSCOME:  -- request so that we
11  keep the record clean going forward and not every
12  question has to say page 108 in mine and page 107
13  in your copy is that we actually mark the version
14  of the report that has been produced to us as
15  Exhibit 11 -- well, let me just, Ms. Parfitt,
16  would you be comfortable marking his copy as
17  Exhibit 11 and switching them and putting the new
18  clean copy as Exhibit 10?  I'm only thinking that
19  there are many prior questions --
20        MS. PARFITT:  Sure, I'm fine with that.
21        MS. BRANSCOME:  -- that refer to his
22  report --
23        MS. PARFITT:  As long as his --
24        MS. BRANSCOME:  -- as Exhibit 10.
25        MS. PARFITT:  Yeah, and just so the

Page 109

1   record is clear, and what appears to have happened
2   is there was a signature page that was put on the
3   report to represent the matter was filed in the
4   United States District Court, the District of New
5   Jersey, in light of the prior report that was in a
6   state court, and that has thrown off not only the
7   page numbers but I think even it might have been a
8   different font.
9         Sure, so we will put on --
10        THE WITNESS:  So do you want to modify
11  the -- this?
12        MS. PARFITT:  Sure.  I think what we're
13  going to do is the one that Dr. Siemiatycki has
14  brought will be now Exhibit 11, and the one that's
15  in -- on the thumb drive and --
16        MS. BRANSCOME:  It is tab 3 in the
17  binder in front of you will be the correct
18  Exhibit 10.
19        MS. PARFITT:  And this will be
20  Exhibit 11.
21        MR. TISI:  And Exhibit 11 will be his
22  copy, the one that he brought.
23        MS. PARFITT:  And this will be 3 -- 3,
24  correct?
25        MS. BRANSCOME:  11 -- I mean 10.  It's

28 (Pages 106 to 109)

Jack Siemiatycki, Ph.D.

Page 110

1    tab 3.
2            MS. PARFITT: 11 -- 10.  Tab 3, correct.
3        (Exhibit No. 11 was marked for
4        identification.)
5    BY MS. BRANSCOME:
6        Q    So, Dr. Siemiatycki, can you confirm
7    that Exhibit 10 is a complete copy of your report
8    that was submitted in the MDL?  It is a clean copy
9    and does not contain any annotations.
10       A    Yes.
11       Q    Can you also confirm that what we have
12   now marked as Exhibit 11 is the copy of your MDL
13   report that you brought with you here today?  It
14   does contain handwritten annotations and the page
15   numbers are just slightly misaligned.
16       A    Yes.
17       Q    Okay.  So if you could, in Exhibit --
18   oh, there was one other --
19       A    There was one other, and -- and there's
20   another -- yet another one that I -- a correction
21   to be made, a small one.
22            So do you want to point out what that --
23       Q    Yes.  So, Dr. Siemiatycki, do you have
24   any corrections that you would like to make to
25   your report at this time?

Page 111

1        A    So the one outstanding one that we had
2    highlighted -- or we've gone through the three of
3    them.
4            MS. PARFITT: 45.
5            THE WITNESS:  Have we --
6            MS. PARFITT:  No, 45.  Page --
7            MR. TISI:  No, 47.  45.
8            MS. PARFITT:  Page 45.  Excuse me, it's
9    47.
10           THE WITNESS:  Oh, yes, that -- the
11   question of whether that sentence should refer to
12   Berge or Terry on that page.  It's Berge 2018, not
13   Terry.  I was right the first time.
14           MS. PARFITT:  Oh, and it is page 45,
15   just for the record.  It is not 47.  That was the
16   first correction is on page 45.
17           THE WITNESS:  In this version.
18   BY MS. BRANSCOME:
19       Q    So just to be clear, Dr. Siemiatycki, on
20   the third line of page 45 of Exhibit 10, the
21   reference to Terry 2013 in the sentence beginning
22   with the word "while" should in fact be Berge
23   2018?
24       A    Yes.
25       Q    Do you have any other corrections you

Page 112

1    would like to make at this time?
2        A    Yes.  I'd like to make one -- oh, yes.
3    Well, page 72 in this version.
4            MS. PARFITT:  Just refer to the exhibit
5    number, so 11.
6            THE WITNESS:  Exhibit 11, page 72,
7    Table 2.  Table 2 of the report.
8    BY MS. BRANSCOME:
9        Q    What is the correction you would like to
10   make?
11       A    The correction is -- there's a column
12   called "Included in main meta-analysis," and I
13   think in your copy, as in mine in this version,
14   there are a bunch of question marks.  In the
15   original Word document that I submitted, these
16   were not question marks.  They were tick marks,
17   checkmarks.  And somehow in the translation of
18   Word to PDF, this -- the tick mark -- the tick
19   marks got changed to these funny little question
20   marks.  So they should all be tick marks.
21       Q    Are there any other corrections you
22   would like to make to your report?
23       A    Not that I'm aware of at this time.
24       Q    Okay.  So if you could turn to
25   Exhibit 10 -- which is in front of you there -- if

Page 113

1    you could turn to your Conclusion section.  It
2    should be on page 69.
3        A    Yes.
4        Q    You state in the second paragraph below
5    the Conclusion section that:  "Based on the
6    totality of the evidence, it is my opinion to a
7    reasonable degree of scientific certainty that the
8    perineal use of talcum powder products can cause
9    ovarian cancer."
10           First, did I read that correctly?
11       A    Yes, you did.
12       Q    Does that conclusion accurately
13   summarize your opinion in this case as to whether
14   or not perineal use of talcum powder can cause
15   ovarian cancer?
16       A    Yes, it does.
17       Q    You state that your opinion is to a
18   reasonable degree of scientific certainty,
19   correct?
20       A    Correct.
21       Q    Is that a phrase that you have ever used
22   in a scientific publication?
23       A    I don't think so.
24       Q    Why did you use it here?
25       A    I've seen this phrase used in all of the

29 (Pages 110 to 113)

Jack Siemiatycki, Ph.D.

| Page 114 |
|---|
| 1   expert opinions in the legal cases that I've seen, |
| 2   and I inferred that it's a -- a formula that is |
| 3   de rigueur in legal communications for this sort |
| 4   of thing. |
| 5      Q   When you say "to a reasonable degree of |
| 6   scientific certainty," what do you mean by that |
| 7   phrase? |
| 8      A   So my -- you know, I think somewhere |
| 9   else in the document, I -- I phrase it in a way |
| 10   that I'm comfortable with, which is a way that |
| 11   also is sort of derivative from my understanding |
| 12   of legal jargon and precedence.  I think that it's |
| 13   more likely than not that there is a causal |
| 14   relationship. |
| 15      Q   You anticipated where I was going with |
| 16   my question.  Do those two sentences mean anything |
| 17   different to you? |
| 18      A   No. |
| 19      Q   What is your understanding of "more |
| 20   likely than not"? |
| 21      A   From a strictly mathematical point of |
| 22   view, it implies that I feel that there's greater |
| 23   than 50 percent probability that this thesis is |
| 24   true.  And I wouldn't put a more quantitative |
| 25   meaning onto it. |

| Page 115 |
|---|
| 1      Q   Is your opinion that perineal use of |
| 2   talcum powder products can cause ovarian cancer, |
| 3   is it specific to a single brand or manufacturer |
| 4   of talcum powder? |
| 5      A   No, it isn't. |
| 6      Q   Why not? |
| 7      A   Because as I understand it, the |
| 8   epidemiologic evidence that supports the thesis of |
| 9   a causal relationship is derived from evidence |
| 10   among women who used all types of talcum powder |
| 11   products that were available in their consumer |
| 12   area of purchase of these products.  And whatever |
| 13   was the frequency distribution of different |
| 14   manufacturers and types of powdering that were |
| 15   available in the consumer -- various consumer |
| 16   markets were the types that lead to the overall |
| 17   inference about causality, and there's no way for |
| 18   me to parse out which particular manufacturer |
| 19   would have been more or less responsible for any |
| 20   of this. |
| 21      Q   If in fact, and we're just talking |
| 22   hypothetically, the biological mechanism by which |
| 23   some talcum powder products can cause ovarian |
| 24   cancer is related to a contaminant in that talcum |
| 25   powder product, does the epidemiological evidence |

| Page 116 |
|---|
| 1   that exists today enable a scientist to parse that |
| 2   out? |
| 3      MS. PARFITT:  Objection.  Form. |
| 4      THE WITNESS:  I'm not sure I understand |
| 5   the premise of the question, the "if" part. |
| 6   BY MS. BRANSCOME: |
| 7      Q   Okay.  So if the biological mechanism by |
| 8   which a talcum powder product can cause ovarian |
| 9   cancer is because of a particular contaminant in |
| 10   that talcum powder product, but that contaminant |
| 11   does not exist in all talcum powder products, |
| 12   would the epidemiological evidence that exists |
| 13   today allow you to see that distinction? |
| 14      MS. PARFITT:  Objection.  Form. |
| 15      THE WITNESS:  The epidemiologic evidence |
| 16   as -- as it exists today would not allow one to |
| 17   parse out anything about the particular |
| 18   manufacturer, the particular product, if I |
| 19   understand your question correctly. |
| 20   BY MS. BRANSCOME: |
| 21      Q   And so therefore, the epidemiological |
| 22   evidence as it exists today does not have a level |
| 23   of detail by which someone reviewing that data |
| 24   could determine if there were different |
| 25   contaminants present in different talcum powder |

| Page 117 |
|---|
| 1   products that were used by individuals who |
| 2   developed ovarian cancer -- |
| 3      MS. PARFITT:  Objection.  Form. |
| 4   BY MS. BRANSCOME: |
| 5      Q   -- correct? |
| 6      MS. PARFITT:  Objection.  Form. |
| 7      THE WITNESS:  May I read the -- |
| 8      MS. PARFITT:  Yes, you can. |
| 9   BY MS. BRANSCOME: |
| 10      Q   Of course. |
| 11      A   Just to make sure I understand. |
| 12   (Peruses document.) |
| 13      So I -- I don't think that the |
| 14   epidemiological evidence would allow you to |
| 15   attribute causality to a specific type or -- or |
| 16   not.  If one knew -- if part of your hypothetical |
| 17   is the knowledge of what the constituents were of |
| 18   different products used in different markets, and |
| 19   the biological mechanism has been established to a |
| 20   high degree of certainty, there might be some room |
| 21   for making inferences about this.  But that seems |
| 22   like a tenuous possibility. |
| 23      Q   But you agree that the current |
| 24   epidemiological evidence as it exists does not |
| 25   enable someone to distinguish between brands of |

30 (Pages 114 to 117)

Jack Siemiatycki, Ph.D.

Page 118

```
 1   cosmetic talc products, for example?
 2        MS. PARFITT: Objection. Form.
 3        THE WITNESS: I don't think it does.
 4   BY MS. BRANSCOME:
 5     Q    Does -- is your opinion that perineal
 6   use of talcum powder products can cause ovarian
 7   cancer, is that limited to talcum powder products
 8   manufactured during a certain time period?
 9     A    The evidence as it exists today pertains
10   to products manufactured over half a century,
11   roughly speaking, so I don't think that there's
12   any way to link it to products manufactured in a
13   particular time period.
14        In -- in answer to that question,
15   actually, and to the previous one, hypothetically,
16   one might imagine looking at the different
17   study -- the 30-odd studies that have been carried
18   out in different communities and different cities
19   and different countries, and if one could obtain
20   reliable, reasonably precise and time relevant
21   information on market shares of products in
22   different markets at different times, that could
23   give a first approximation of whether certain
24   company products are more closely linked to the
25   excesses that are seen in the epidemiological
```

Page 119

```
 1   studies.
 2     Q    The application, though, of a market
 3   share analysis to the users of talcum powder
 4   products, if you're looking at causality, would
 5   require that the individuals who developed ovarian
 6   cancer had purchased their talcum powder according
 7   to the market share, correct?
 8        MS. PARFITT: Objection. Form.
 9        THE WITNESS: Approximately, yes.
10   BY MS. BRANSCOME:
11     Q    So, for example, if one type of talcum
12   powder product or one time period of talcum powder
13   product is the only type that actually causes
14   ovarian cancer, so all of the positives were
15   derived from those users, you -- you could not
16   determine that simply by applying market share,
17   for example?
18        MS. PARFITT: Objection. Form.
19        THE WITNESS: That -- that's true,
20   except in the circumstance that market share were
21   very, very high in most of the communities that
22   have been investigated. So if one company
23   produced 90 percent or 85 percent or something of
24   the product in a certain area -- that was consumed
25   in a certain area, and there's an excess risk of
```

Page 120

```
 1   ovarian cancer in that area, it would be
 2   improbable that the product of that company were
 3   not part of the responsibility, but one of the
 4   companies that produced 5 or 10 percent of the
 5   market share.
 6   BY MS. BRANSCOME:
 7     Q    Okay.  But as you sit here today, based
 8   on the analysis that you have done, you are not
 9   able to draw an opinion specifically about an
10   increased risk of ovarian cancer that is tied to a
11   particular brand or a particular time period,
12   correct?
13        MS. PARFITT: Objection. Form.
14        THE WITNESS:  That's correct, in part
15   because I don't have data on market share at
16   different times and in different places.
17   BY MS. BRANSCOME:
18     Q    Okay.  In forming your opinion that
19   perineal talc use can cause ovarian cancer, did
20   you reach an opinion about how much talcum powder
21   is needed to cause ovarian cancer?
22     A    No.
23     Q    Is there an amount of talcum powder that
24   can be used perineally without increasing a risk
25   for ovarian cancer?
```

Page 121

```
 1     A    So let me go back to the previous
 2   question, and clarify what do you mean by amount?
 3   Do you mean like the amount in grams?  The amount
 4   in number of applications?  The amount in number
 5   of day -- days on which the powder is applied?
 6   These are all different metrics of exposure, and
 7   the answer might depend on what kind of -- you
 8   know, we're starting with these studies.  There
 9   are now some hints about the dose-response
10   relationship and what kind of levels of exposure
11   in terms of number of applications in use,
12   observable excess risks.
13     Q    So let me ask it this way:  Did you
14   calculate how much talcum powder is needed to
15   cause ovarian cancer in any of the forms, be it
16   frequency of application, the amount in grams that
17   was used?
18     A    I--
19        MS. PARFITT: Objection. Form.
20        THE WITNESS:  I did not carry out such a
21   calculation.  I'm -- my emphasis was on
22   determining whether there's a dose-response
23   relationship.  Going beyond that might involve
24   trying to quantify the dose-response relationship
25   to the extent of determining what the shape of
```

31 (Pages 118 to 121)

Jack Siemiatycki, Ph.D.

Page 122

1    such a relationship is and how the curve looks,
2    whether there's a threshold effect, and so on.
3    But I don't think there's enough data now to be
4    able to make such estimates.
5    BY MS. BRANSCOME:
6        Q   Can you rule out the possibility that
7    there is a threshold below which perineal use of
8    talc presents no risk of ovary -- of ovarian
9    cancer?
10       MS. PARFITT: Objection.  Form.
11       THE WITNESS:  No, I -- I don't think --
12   I can't, and I don't think it's possible to do
13   that with most carcinogens.  It's -- it's an
14   extremely difficult and controversial issue of how
15   to detect sort of a minimum level of exposure
16   produces a carcinogenic effect.
17   BY MS. BRANSCOME:
18       Q   In your view, has a dose-response
19   relationship for the perineal application of talc
20   and the development of ovarian cancer been
21   established in the scientific literature?
22       A   My view is that the data are certainly
23   compatible with the notion of a dose-response
24   relationship.  It -- it trends in that direction
25   of that conclusion.  It's not definitive yet.

Page 123

1    It's not definitive.  But I believe the bulk of
2    the evidence, especially from the Terry study and
3    partly from, I think it's the, Schildkraut study,
4    which are the most powerful ones for that
5    question, but certainly the Terry study is by far
6    the most important one, does tend to indicate
7    dose-response relationship.
8        Q   Is the data that exists today also
9    compatible with no dose-response relationship?
10       MS. PARFITT: Objection.  Form.
11       THE WITNESS:  Yes.  It could be -- in
12   other words, it could be a chance finding.  Is --
13   that's what you're saying.  I think it's unlikely,
14   but it's -- it can't be ruled out.
15   BY MS. BRANSCOME:
16       Q   Are you offering an expert opinion that
17   the inhalation of talc increases or presents any
18   risk of ovarian cancer?
19       A   I -- I don't have an opinion on -- on
20   that.  No.
21       Q   Aside from your participation in the
22   IARC panel in 2006 and the Langseth article on
23   2008, has all of your work on talc and ovarian
24   cancer been in connection with litigation?
25       A   On talc and -- sorry, work on talc and

Page 124

1    ovarian cancer, is that the question?  Almost.
2    But the one qualification I would make in
3    answering that question is that I have a colleague
4    who started working with -- in my academic
5    department about 12 years ago, and she was
6    interested in ovarian cancer as a topic of
7    research, and she wanted to organize a case-
8    control study of ovarian cancer in relation to
9    various factors, and she asked me to kind of
10   mentor her -- she was just starting out -- mentor
11   her in getting grants, in setting up the study,
12   and this sort of thing, and this is what I did
13   with her.
14       So I worked on grant applications with
15   her on some aspects of setting up her study, and
16   that has been going on now for -- I don't know --
17   I think since 2010 maybe that she started.  So --
18   but that has not -- I've been what we call a
19   coinvestigator on that project, not a principal
20   investigator.
21       But apart from that, the next stage in
22   my involvement with talc and ovarian cancer was in
23   the litigation.
24       Q   What is your colleague's name?
25       A   Anita Koushik.

Page 125

1        Q   If you had to give me your best
2    estimate, how many hours total have you spent
3    assisting her with the case-control study?
4        MS. PARFITT: Objection.  Form,
5    misstates his testimony.
6        THE WITNESS:  It's very hard to answer
7    that.  I mean, ten years ago discussions over
8    coffee about studies and how to write grant
9    applications and reviewing and revising and so on.
10   I -- I don't -- not a trivial amount and not an
11   overwhelming amount.
12   BY MS. BRANSCOME:
13       Q   When was the last time that you spent
14   hours in connection with that case-control study?
15       MS. PARFITT: Objection.  Form.
16       THE WITNESS:  There was a manuscript
17   that came -- a publication that came from that
18   study.  It was -- the study was only completed in
19   the field, the data collection, around two years
20   ago, and spending a year cleaning data and so on,
21   and then starting to analyze it.
22       And there was an analysis of
23   reproductive and hormonal factors in relation to
24   ovarian cancer, and I helped her review and revise
25   that manuscript.  That would have been a year and

32 (Pages 122 to 125)

Jack Siemiatycki, Ph.D.

|  | Page 126 |
|---|---|

1  a half ago or so, and I don't know, maybe I spent
2  three or four days on it at the time.
3  BY MS. BRANSCOME:
4      Q    Did that study reach any conclusions
5  with respect to a potential link between perineal
6  use of talc and ovarian cancer?
7      A    The talc information was collected in
8  the questionnaire and has not yet been analyzed.
9      Q    Other than what we just discussed with
10  respect to the case-control study and then your
11  work in connection with the IARC panel and the
12  Langseth paper, have you ever done any original
13  research on the association between perineal
14  talcum powder use and ovarian cancer?
15      A    No.  No, I haven't.
16          It's common -- it's common for me to be
17  asked to review information on which I have not
18  directly worked.  You know, topics.  You know, I
19  recently was asked by the government of France to
20  evaluate a problem of possible cancer risks
21  related to a pesticide that's used in the banana
22  industry in Guadeloupe and Martinique.  I've never
23  studied that pesticide and I've never been to
24  Martinique.  But the kind of expertise that I have
25  can be applied to studying different sorts of

|  | Page 127 |
|---|---|

1  problems.
2      Q    You have not published the meta-analyses
3  that you -- meta-analysis you performed in
4  connection with the MDL, have you?
5      A    No, I haven't.
6      Q    Have you ever published in any peer-
7  reviewed article the opinion that the perineal use
8  of talcum powder can cause ovarian cancer?
9      A    I -- I've never had occasion to opine
10  about this in any publication, and one doesn't
11  just announce to the New England Journal of
12  Medicine that you want to, you know, write an
13  article about opining about something like this.
14  There has to be some sort of platform basis of
15  research evaluation and so on.
16          And my involvement in this case might
17  lead to such a publication, but in the past I
18  would have not -- I had no reason to publish or to
19  try to publish such an opinion.
20      Q    But you had formed an opinion with
21  respect to the perineal use of talcum powder and
22  an increased risk of ovarian cancer at the time
23  that you published your report in October of 2016.
24          And by "published," I mean within the
25  litigation context, correct?

|  | Page 128 |
|---|---|

1      A    That's correct.
2      Q    Have you done anything since 2016 to
3  publicly announce your view that the perineal use
4  of talc can cause ovarian cancer?
5      A    No, I've not had really an opportunity.
6  And in a way the -- the publication by Berge,
7  which appeared as a -- after I completed my
8  meta-analyses, and they -- they kind of beat me to
9  the punch with one type of publication output that
10  I might have produced.  So I'm thinking about
11  different ways of communicating my results and my
12  opinions, but mainly my results.
13          I mean, the other part of the answer
14  to -- another part of the answer to your question
15  is that I'm not particularly a fan of individual
16  scientists going into press with opinions before
17  some sort of consensus starts to appear.  I mean,
18  you can -- you can publish hypotheses and ideas,
19  but proclaiming conclusions is something that
20  should come later in the scientific process.  I
21  mean, I -- I think it's best if IARC or an agency
22  like IARC would take on that role, and that would
23  be my hope actually.
24      Q    In your opinion, has consensus formed
25  that peri- -- perineal use of talc can cause

|  | Page 129 |
|---|---|

1  ovarian cancer?
2      A    I think among people who have reviewed
3  the evidence who -- sort of competent scientists
4  who have reviewed the evidence, I think there's
5  starting to be a ground swell of consensus about
6  it.  You know, I've never done a survey, so I
7  can't say if it's majority or minority.
8          If your denominator is all medical
9  researchers, then the answer is, well, most of
10  them have never heard of this issue, so it's
11  not -- they wouldn't be susceptible to holding
12  such an opinion.  But among the people who have
13  reviewed, are familiar with the issues, I think
14  there's certainly a much higher level of
15  receptivity to this thesis than there was ten
16  years ago.
17      Q    Has a consensus been reached that
18  perineal use of talc probably causes ovarian
19  cancer?
20          MS. PARFITT:  Objection.  Asked and
21  answered.  Form.
22          THE WITNESS:  I can't answer that
23  question.  I -- it's too -- are you trying to make
24  the distinction between probably and -- I -- so --
25  BY MS. BRANSCOME:

33 (Pages 126 to 129)

Jack Siemiatycki, Ph.D.

Page 130

1      Q   Well, what do you understand the phrase
2   "can cause ovarian cancer" to mean?
3      A   Well, it's a synonym with "is a risk
4   factor for" or -- that's how I understand it.
5      Q   All right.  And is that in your mind the
6   same as "it probably causes cancer"?
7          MS. PARFITT: Objection. Form.
8          THE WITNESS: "It probably can cause,"
9   is that what you said, or "probably does cause"?
10  BY MS. BRANSCOME:
11     Q   Probably does cause.
12     A   So I don't think any risk factor can be
13  described as -- in a way with the wording "does
14  cause." You know, smoking does not cause lung
15  cancer.  It can cause lung cancer when there's a
16  constellation of other favorable circumstances.
17  You know, this is part of multifactorial causation
18  of disease.  So, you know, each factor in itself
19  is not the cause, but it's part of a constellation
20  of factors that together can cause the disease.
21  So each of them can cause the disease.
22     Q   So -- you -- you state in your report
23  that -- let me see if I can get the exact
24  language.
25          And perhaps you can get me there more

Page 131

1   quickly.  You talk about that now you would give a
2   different rating under the IARC standard.
3          Ah, here we go.  Page 67 in your 2018
4   report.  You state: "It is now my professional
5   opinion based on the totality of the evidence,
6   that to a reasonable degree of scientific
7   certainty, the causal relationship between
8   perineal talc powder exposure and ovarian cancer
9   is," quote, "probable."
10         Did I read that correctly?
11     A   You did.
12     Q   Do you hold that opinion?
13     A   Yes, I do.
14     Q   What do you mean when you say a "causal
15  relationship between perineal talc powder exposure
16  and ovarian cancer is," quote, "probable"?
17     A   I mean it's more likely than not.
18     Q   Okay.  Has a consensus been reached in
19  the scientific community, understanding we're
20  looking at those who have an interest in this
21  issue, been reached that the causal relationship
22  between perineal talc powder and ovarian cancer is
23  probable?
24         MS. PARFITT: Objection. Form, asked
25  and answered.

Page 132

1          THE WITNESS: I don't know -- I haven't
2   carried out a survey among people.  I don't know
3   whether a consensus has been reached.  I don't
4   know what proportion of that community would
5   subscribe to this point of view or not.
6   BY MS. BRANSCOME:
7      Q   Okay.  Setting aside conducting a survey
8   of individuals in the scientific community, would
9   you say that the scientific literature reflects a
10  consensus that the causal relationship between
11  perineal talc powder exposure and ovarian cancer
12  is probable?
13         MS. PARFITT: Objection. Form.
14         THE WITNESS: I think the scientific
15  literature supports that conclusion.  I'm not sure
16  that it reflects it.
17         So there's kind of a lag period between
18  the production of research findings and the
19  consens- -- a consensus building around it and
20  being expressed in print.  You know, if we take
21  sort of the classic smoking and lung cancer
22  historical example, evidence was accumulating
23  rapidly in the 1950s.  There were several studies
24  through the 1950s and early 1960s, and it was only
25  in 1964, so many years after some of this evidence

Page 133

1   had been published and been accepted by many
2   scientists, but rejected by others -- there was
3   still controversy around it -- that the Surgeon
4   General's report reflected and created a
5   consensus.
6   BY MS. BRANSCOME:
7      Q   So in early 2019, are we still in the
8   lag period or the period in which the production
9   of research findings is still behind consensus
10  building in the literature?
11         MS. PARFITT: Objection. Form,
12  misstates his testimony.
13         THE WITNESS: Does that mean I should
14  answer or --
15         MS. PARFITT: I'm objecting.  I said it
16  misstates your prior testimony.
17         THE WITNESS: Okay.  Sorry.  Let me read
18  the question again. (Peruses monitor.)
19         So I can't point to hallmark
20  publications analogous to the Surgeon General's
21  report for smoking and lung cancer that would
22  reflect such a bend in the road kind of general
23  perception of the talc ovarian cancer issue.  It
24  doesn't mean that the evidence isn't there, but
25  the process of recognizing and generalizing and so

34 (Pages 130 to 133)

Jack Siemiatycki, Ph.D.

Page 134

1  on is not -- has not been achieved yet.
2  BY MS. BRANSCOME:
3      Q   Okay.  Have you ever given a lecture,
4  either to students or to other scientists, in
5  which you have presented your view that the
6  perineal use of talcum powder can cause ovarian
7  cancer?
8      A   I have to my students -- I mean to the
9  students in my department.  I teach epidemiologic
10  methods.  I don't teach about ovarian cancer.  I
11  don't teach about talc.  That's not what I'm paid
12  to do.  I'm paid to teach about the methodology
13  and the conduct of -- and the interpretation of
14  epidemiologic -- and I've used the talc/ovarian
15  cancer as an example and walked my students
16  through the evidence.  So, yes, I have.
17      Q   When did you start teaching that as part
18  of your epidemiological methods course?
19      A   Probably two years ago.  As soon as I
20  started gathering the information and synthesizing
21  it, so two -- two or three years ago.
22      Q   Other than presenting to your students
23  your analysis of talc and ovarian cancer as an
24  illustration of an epidemiological method, have
25  you presented your opinion that perineal use of

Page 135

1  talcum powder can cause ovarian cancer in any
2  other context outside of litigation?
3      A   No, I haven't.
4      Q   Have you spoken with other scientists
5  about the issue of whether perineal use of talcum
6  powder can cause ovarian cancer?  Setting aside
7  your students.
8      A   Yeah.  Yes, I've spoken to -- to
9  colleagues, friends over -- over coffee, over
10  drinks at conferences, you know, what are you up
11  to, what are you doing, and then describe my
12  involvement in this case.  And then we dig a
13  little further into, Well, what -- what do you
14  think, and so on.  So I -- I have discussed it in
15  that kind of format.
16      Q   Have you ever spoken with any of the
17  authors on any of the papers that you cite in your
18  report about the potential link between perineal
19  use of talc and ovarian cancer?
20      A   I don't think so.  I can quickly scroll
21  through the list to see if anything jogs my --
22  yeah -- no, let me --
23      Q   If you can do that quickly, we could do
24  it now, or we can save that for the next break.
25      A   It will take just three minutes, I

Page 136

1  think.  (Peruses document.)
2      Q   Okay.
3      A   No, I've never spoken to any of them
4  about -- I -- I crossed paths with Dr. Cramer in
5  Los Angeles for a -- you know, we were in the same
6  hotel.  He was leaving, I was coming, that sort of
7  thing, but I don't think we had any substantive
8  discussion, and I can't -- I know some of the
9  others, but I've never spoken to them about this
10  issue.
11      Q   Do you know personally or professionally
12  any of the other plaintiffs' experts in the MDL?
13      A   No, I don't.
14      Q   You were chair of the working group --
15  the IARC Working Group that published the
16  monograph on talc in 2006 -- or, well, that met in
17  2006, and then was subsequently published in 2010,
18  correct?
19      A   That's correct.
20      Q   And there were roughly 20 members of
21  that working group?
22      A   I think so.
23      Q   In 2006, you agreed with the IARC
24  classification of, quote, "possible" describing
25  the relationship between perineal talc use and

Page 137

1  ovarian cancer, correct?
2          MS. PARFITT:  Objection.  Form.
3          THE WITNESS:  That's correct.  I could
4  read the exact wording of what "to be" means, but
5  that's the gist of it.
6  BY MS. BRANSCOME:
7      Q   Okay.  IARC has not changed its
8  clarification of talc, and specifically with
9  respect to the peri- -- perineal use of talc since
10  it published the 2010 monograph, correct?
11      A   Technically correct, but actually,
12  what -- the correct statement is IARC has not
13  evaluated talc since 2006 -- has not reevaluated.
14  So there are no changes made to IARC evaluations
15  except through a formal complete reevaluation, and
16  there has not been a formal complete reevaluation
17  of talc since the 2006 meeting.  So there's no
18  opportunity for IARC to change anything in one
19  direction or another failing another complete
20  evaluation.
21      Q   What, if you know, can initiate a formal
22  complete evaluation of a constituent like talc?
23      A   Well, it comes I think from different
24  sources.  I'm not entirely certain.  I know that
25  there is now a public process whereby public

35 (Pages 134 to 137)

Jack Siemiatycki, Ph.D.

Page 138

1  parties can write to the monograph program and
2  make suggestions for chemicals to be evaluated.
3  There are -- they get requests from governments.
4  They get requests from groups of scientists.  They
5  have their own internal scientific staff that has
6  its antenna out for different problems that arise,
7  and they generally have sort of a five-year
8  program of agents that they are going to evaluate
9  in every -- in the next five-year period.
10       These things are not quick and easy to
11  organize, and so there's a lot of lead time.
12  There's a lot of, in a way, competition for agents
13  to get onto the list to be evaluated.  There are a
14  lot of interested parties that would like the
15  agent that they are exposed to or the "et cetera"
16  to be evaluated.  So the exact mechanics of how
17  they make decisions, I haven't been involved in
18  that process, but that's, roughly speaking, how
19  it's done.
20       Q   Have you ever submitted a request to
21  IARC for them to conduct a complete evaluation of
22  talc?
23       A   Have I ever?
24       Q   Have you since the publication of the
25  monograph in 2010 submitted a request to IARC for

Page 139

1  them to conduct another complete evaluation of
2  talc?
3       A   I had a quick word with the director of
4  the monograph program a few months ago, and I
5  suggested it might be time for that.  But I'm
6  intending to submit a more formal request along
7  those lines.  So...
8       Q   Okay.  Who -- who specifically did you
9  speak with a few months ago?
10       A   The director of the monograph program is
11  Kurt Straif, S-T-R-A-I-F.
12       Q   And how did you have occasion to be
13  speaking with the director?
14       A   We're acquaintances, and I met him at a
15  conference in August, I saw him when I was in Lyon
16  in November at a meeting that he organized.  So
17  I've seen him a few times in the last six months.
18       Q   When did you have this conversation with
19  the director?
20       A   I think it was in the summer.
21       Q   So the summer of 2018?
22       A   Yeah.
23       Q   And what specifically did you discuss
24  with him?
25       A   I -- I think it might have been a one

Page 140

1  sentence -- you know, in the context of a
2  conversation about many things, as we do when we
3  catch up when we meet.  What -- you know, what's
4  on the agenda for the monograph program?  By the
5  way, I think talc might be an interesting thing to
6  put on a list for you to consider.  And probably
7  the conversation ended -- that part of the
8  conversation ended and moved on to other things.
9  But...
10       MR. KLATT:  Should we take a break?
11       MS. BRANSCOME:  I understand the noise,
12  but I -- I don't know that Dr. Siemiatycki was
13  finished with his answer.
14       MS. PARFITT:  We'll keep going.  I
15  didn't -- I was trying to keep a clean record for
16  you.  That's fine.  Keep going.
17       MS. BRANSCOME:  Well, we -- we can
18  pause.  I just was trying to let him finish his
19  answer.
20       MS. PARFITT:  We'll keep it paused here
21  on the screen.  Just a little bit more activity.
22       THE VIDEOGRAPHER:  We will pause for a
23  second.  We're going off the record, 2:41 a.m. --
24  p.m.
25       (Pause.)

Page 141

1       THE VIDEOGRAPHER:  We're going back on
2  the record at 2:43 p.m.
3  BY MS. BRANSCOME:
4       Q   When you spoke with the director of the
5  monograph program for IARC last summer, did you
6  inform him that you have been serving as an expert
7  witness on behalf of plaintiffs in litigation
8  involving talcum powder products and the claim
9  that they cause ovarian cancer?
10       A   I'm not sure if I told him at that time,
11  but I certainly have told him since then.
12       Q   When you were talking to him about the
13  possibility of including talc in a formal,
14  complete evaluation subsequent to the one that was
15  done in 2006 and published in 2010, did you tell
16  him anything about your opinions with respect to
17  the likelihood that perineal use of talc can cause
18  ovarian cancer?
19       A   I don't think I did.
20       Q   What did he say about -- if anything,
21  about conducting a formal evaluation of talc?
22       A   I -- I can't remember if he said
23  anything about it.
24       Q   Have you had any conversations with him
25  other than the conversation you had last summer

36 (Pages 138 to 141)

Jack Siemiatycki, Ph.D.

Page 142

1  about IARC conducting another examination of talc
2  and its potential carcino- -- carcinogenicity --
3  whoops, butchered that one -- about it's ability
4  to cause cancer?
5      A   No.  I don't think I did.
6      Q   Now, you said you have an -- you have
7  the intention to submit something formal to IARC;
8  is that correct?
9      A   Yes.  I've been thinking about it, and
10 I -- when I have time, I'll look into the process.
11     Q   What specifically would you request that
12 IARC do at this time with respect to talc?
13     A   Carry out an evaluation like they did in
14 2006 but with up-to-date data.
15     Q   What data specifically do you think an
16 IARC Working Group would need to consider that was
17 not available in 2006?  What are the key pieces of
18 data that you think should be considered by a
19 working group?
20     A   So from an epidemiological database
21 point of view, there have been a number of
22 publications, as you know, since 2006, including
23 some cohort studies, various case-control studies,
24 various meta-analyses, a pooled analysis from the
25 Terry group.  All of that information bears on the

Page 143

1  evaluation of cancer risk.  It -- it may or may
2  not change the view of a working group vis-à-vis
3  the view held by the 2006 working group, but
4  there's enough new information there that it could
5  potentially change points of view.
6          And in the mechanism area, I understand
7  that there has been additional work on various
8  possible areas of -- concerning the migration of
9  particles around the body and how this might
10 influence the -- the biological plausibility of
11 such a -- a process.  The possible role, roles of
12 inflammation or oxidative stress.  There have been
13 developments -- there are new publications in
14 those areas that might influence a new working
15 group or a working group looking at it with new
16 eyes.
17          For all of those reasons, I think it
18 would be timely, and in any case, if a decision
19 were made today to do this, such a meeting would
20 probably not be held before 2022 or 2023 at the
21 earliest.  They have a horizon of priorities that
22 they're working on.  So -- and by then, there
23 would likely be additional work that would be
24 available.
25          So it's an area where I think there is

Page 144

1  sufficient growth in the information base that
2  would justify it.  And the question is whether
3  there are other priorities -- that they have
4  things with even higher priorities for them to
5  look at.
6      Q   We agree the perineal use of talc
7  currently is classified by IARC as a Group 2B
8  chemical, correct?
9      A   Correct.
10     Q   So the classification or the definition
11 of a Group 2A chemical still applies when there is
12 limited evidence of carcinogenicity in humans and
13 then sufficient evidence of carcinogenicity in
14 experimental animals, correct?
15     A   Yes.
16     Q   Has there been developments in the
17 experimental animal data since the IARC Working
18 Group evaluated the risks associated with the
19 perineal use of talc in 2006?
20     A   I'm not aware whether there has been.
21 I -- it does not spring to mind.  I can't think of
22 any examples.
23     Q   Now, I noticed in your report you have a
24 description, it's on page 24, of the different
25 categories that IARC might rate a chemical.

Page 145

1          Do you see where I am?
2      A   Yes, I see where you are.
3      Q   Okay.  And there's a rating system that
4  IARC uses that ranges from 1 to 4, correct?
5      A   Yes.
6      Q   That -- you have indicated here on
7  page 24 on your report that number 4 is not a
8  carcinogen.  Is that accurate?  Is that an
9  accurate description of category 4?
10     A   The wording is longer than that, but
11 this is my potted version of what that longer
12 version means.
13     Q   The actual definition is that it is
14 probably not carcinogenic, correct?
15     A   Correct.
16         MS. BRANSCOME:  Would now be a good time
17 for a break?
18         MS. PARFITT:  I think so.  We can take a
19 break.  Thank you.
20         THE VIDEOGRAPHER:  We are going off the
21 record at 2:51 p.m.
22         (Recess.)
23         THE VIDEOGRAPHER:  This is the beginning
24 disc number 4 in the deposition of Jack
25 Siemiatycki.  We're going back on the record at

37 (Pages 142 to 145)

Jack Siemiatycki, Ph.D.

Page 146

```
 1   3:27 p.m.
 2   BY MS. BRANSCOME:
 3       Q   Good afternoon, again, Dr. Siemiatycki.
 4       A   Hi.
 5       Q   Do you still agree with the IARC
 6   characterization that the case-control studies
 7   evaluating a potential connection between perineal
 8   talc powder exposure and ovarian cancer are
 9   unusually consistent?
10       A   Unusually -- they're very consistent.
11   I'm not sure I would choose the word "unusually."
12   Sometimes when 20 people write a document,
13   everyone doesn't agree with every word, but they
14   are very consistent.
15       Q   Do you agree with the IARC determination
16   that the excess in risk in those case-control
17   studies is, quote, modest?
18       A   That the what, the increase in risk?
19       Q   Or the excess of risk.
20       A   Yeah, the -- I mean, the terminology
21   around strength of association -- weak, modest,
22   strong, very strong, medium, et cetera -- it
23   doesn't have -- there are no regulations. There's
24   no epidemiologic handbook that says if a relative
25   risk is in this range, you call it weak or
```

Page 147

```
 1   moderate and so on and so forth.
 2       So the term "moderate" -- actually, the
 3   terminology around strength of associations was
 4   probably most influenced by the smoking and lung
 5   cancer situation in the '50s and '60s where there
 6   were relative risks of ten approximately, ten
 7   times as high of risk for smokers as for
 8   nonsmokers of getting lung cancer, and that was
 9   considered a benchmark for strong associations.
10   And it was not known then whether most carcinogens
11   would fall -- most carcinogens that would be
12   discovered later than that era would fall into the
13   category, you know, of relative risks, around ten
14   or around five or around two or whatever.
15       So the -- the use of the terms "strong,"
16   "medium," "weak" has kind of been -- what's the
17   word? -- benchmarked, I guess, by the smoking-lung
18   cancer association.  And things that --
19   subsequently relative risks that were less than in
20   that order of magnitude of ten or so where people
21   didn't refer to them as strong because they were
22   not as strong as smoking and lung cancer.
23       It has subsequently turned out that the
24   level of relative risk for smoking and lung cancer
25   is exceptional among known carcinogens, and that
```

Page 148

```
 1   this -- there are not many that have such high
 2   relative risks.
 3       I'm just giving you a bit of background
 4   because the terminology is controversial, and I
 5   know it plays into the case of how we -- how we
 6   characterize the associations around talc and
 7   ovarian cancer.
 8       There are a lot of associations that are
 9   much less than -- with relative risks much lower
10   than ten that are very well accepted as being
11   causal associations.  And so the idea that
12   associations have to be, quote/un- -- quote,
13   strong in the sense that the smoking-lung cancer
14   association was strong is not really tenable any
15   more.  There are so many -- most known carcinogens
16   don't have such strong -- don't have such high
17   relative risks.  So where you draw the line
18   between strong, moderate, weak, and so on, is a
19   kind of -- is a vague notion.
20       If you're asking me how I would
21   characterize it or how it's characterized -- I'm
22   not sure whether you want to go -- to ask how I
23   would characterize it or how it's characterized by
24   other people or --
25       Q   So, respectfully, Dr. Siemiatycki, my
```

Page 149

```
 1   question was, do you agree with the IARC
 2   classification of the increase in risk as, quote,
 3   modest?
 4       A   So there was no such classification.  It
 5   was a word used in a sentence, I guess.  There
 6   is -- they never classified the association as
 7   being strong, weak, moderate or whatever.  It was
 8   part of a narrative about the -- the body of
 9   evidence.
10       Do I agree that -- yeah, I would use
11   that term today.
12       I'm sorry if I digressed from your
13   question.
14       Q   You would agree that the point estimate
15   of the meta-analysis that you conducted in 2018
16   that's contained in your report marked Exhibit 10
17   is actually lower than the point estimate that was
18   reported in the Langseth 2008 study, correct?
19       A   That's correct.
20       Q   And the Langseth 2008 paper, the
21   meta-analysis that you and your coauthors
22   conducted resulted in a 1.35 relative risk,
23   correct?
24       A   That's correct.
25       Q   And in Exhibit 10, your report in the
```

38  (Pages 146 to 149)

Jack Siemiatycki, Ph.D.

Page 150

1    MDL, the relative risk point for your 2018
2    meta-analysis is 1.28, correct?
3        A   In the 2018 -- yes, that's correct.
4        Q   Is it your opinion -- well, let me just
5    ask you, what classification should perineal use
6    of talc get with respect to ovarian cancer under
7    the IARC scale?
8            MS. PARFITT: Objection. Form.
9            THE WITNESS: I -- I'm very reluctant to
10   answer that question because it takes a lot of
11   input from different disciplines to produce an
12   IARC evaluation and then IARC classification. And
13   I feel it's presumptuous for any one person from
14   one discipline to take on that function.
15           What I can say is that in this
16   situation, the epidemiologic evidence alone is
17   sufficient to make the -- make me think that it's
18   more likely than not that there is a causal
19   association. How that proposition would feed into
20   an IARC evaluation is something that would -- that
21   a multidisciplinary group would need to work out,
22   but I think there's at least enough evidence to
23   say it's more likely than not.
24   BY MS. BRANSCOME:
25       Q   Because you would agree that a work --

Page 151

1    an IARC Working Group, for example, if a former --
2    formal evaluation was done on talc, in order to
3    classify talc as say a Group 2A, that working
4    group would need to consider multiple lines of
5    evidence, correct?
6            MS. PARFITT: Objection. Form.
7            THE WITNESS: That's correct.
8    BY MS. BRANSCOME:
9        Q   And simply the determination, if it were
10   the case that the epidemiological evidence might
11   support the conclusion that perineal use of talc
12   more likely than not can cause ovarian cancer,
13   would not by itself be sufficient for a Group 2A
14   rating. Is that fair?
15           MS. PARFITT: Objection. Form.
16           THE WITNESS: The IARC classification
17   was developed in the 1970s. It was not developed
18   in order to fit into a template that can be used
19   in the courtroom. So terms like "more likely than
20   not" or, you know, whatever terminology would be
21   used in a courtroom around this sort of thing does
22   not fit perfectly on the IARC classification
23   scale.
24           I understand why courts use IARC
25   evaluations as an input to understanding

Page 152

1    causality, but it's not a one-to-one kind of
2    relationship.
3            Now I've lost the thread. I'm sorry.
4    BY MS. BRANSCOME:
5        Q   That's okay. I'm going to ask you the
6    question again.
7            Simply the fact that the epidemiological
8    evidence --
9        A   Yeah.
10       Q   -- may support a conclusion that more
11   likely than not perineal talc use can cause
12   ovarian cancer, that fact alone is not sufficient
13   to result in a Group 2A classification of a
14   chemical under IARC.
15           MS. PARFITT: Objection. Form.
16   BY MS. BRANSCOME:
17       Q   Is that fair?
18       A   It's fair -- in principle, it's a fair
19   statement. My feeling is that if that occurred in
20   a meeting, and if -- you know, in an IARC Working
21   Group, the group is subdivided into four
22   subgroups: Initially, an epidemiology group,
23   animal experimentation group, other biological
24   mechanisms, and then expose -- an exposure group.
25           If the epidemiology group came back, had

Page 153

1    a feeling that there likely -- it was more likely
2    than not that there is a causal association, they
3    have the prerogative to categorize the evidence as
4    being sufficient or limited. And it's not clear
5    how they would categorize the epidemiologic
6    evidence. That would feed into the final
7    evaluation.
8        Q   So you would say, as you sit here today,
9    based on what you know about the epidemiological
10   evidence with respect to the perineal use of talc
11   and ovarian cancer, it's not clear whether that
12   would satisfy the criteria for sufficient evidence
13   of carcinogenicity. Is that fair?
14           MS. PARFITT: Objection. Misstates his
15   testimony.
16           THE WITNESS: For -- for a particular
17   working group. Because the other particularity of
18   the IARC process, as with other -- from high level
19   scientific processes, is that it depends a lot on
20   scientific judgment. There's -- there are
21   guidelines for how to combine animal evidence and
22   basic biology evidence in epidemiology, but all of
23   these guidelines are just models of how the final
24   evaluation might be determined.
25           Each working group is sovereign and can

39 (Pages 150 to 153)

Jack Siemiatycki, Ph.D.

Page 154

1   take the entire body of evidence and make a
2   decision outside the -- the template -- the -- the
3   typical template. So a working group could look
4   at the evidence and decide is it Group 1, it's
5   Group 2B, Group 2A, based on the totality of
6   evidence.
7          In general, if the epidemiology is
8   convincing, it would be Group 1 or Group 2A if
9   it's convincing but not -- or let's say if it's --
10  if it indicates a risk but it's not definitive.
11  BY MS. BRANSCOME:
12      Q   So you would say if the epidemiology
13  indicates a risk but is not definitive, you think
14  there's a possibility a chemical would be
15  classified as Group 1?
16          MS. PARFITT: Objection. Form.
17          THE WITNESS: It depends how close to
18  definitive it is. So if the feeling of the group
19  is that it's almost certain on the basis of
20  epidemiologic evidence, then they could classify
21  it as Group 1, and they would classify the
22  epidemiologic evidence as sufficient in that case.
23  BY MS. BRANSCOME:
24      Q   Okay. On the scale of definitiveness,
25  where would you place the evidence of the perineal

Page 155

1   use of talc and ovarian cancer as of today?
2       A   Based on the epidemiologic evidence.
3       Q   Correct.
4       A   I -- I go back to more likely than not.
5   Not -- not definite, but more likely than not.
6       Q   Is it possible to have a situation where
7   the epidemiological evidence is supportive of a
8   causal association, but the group working on
9   biological mechanism determines that there isn't a
10  sufficient mechanism by which that chemical could
11  have caused that outcome?
12      A   That can happen.
13      Q   And what would the explanation for an
14  inconsistency like that be?
15      A   It would require quite a high level of
16  understanding of the mechanistic evidence.
17          So -- I -- I don't know if it has
18  happened, so I'm -- I'm trying to think through
19  memory whether I can think of any examples. I'm
20  not sure that it has happened.
21          THE VIDEOGRAPHER: Excuse me, Counsel.
22  The microphone just fell.
23          THE WITNESS: Oh, I'm sorry.
24          MS. BRANSCOME: That's okay. You just
25  knocked off your microphone.

Page 156

1          (A discussion was held off the record.)
2   BY MS. BRANSCOME:
3       Q   Do you remember what you were answering
4   or should we --
5       A   I prefer if -- I'm sorry. If you could
6   ask again and --
7       Q   Let me ask it a different way. Is it
8   possible for a confounding variable to essentially
9   infect all of the epidemiology on a particular --
10  looking at a particular causal relationship?
11          MS. PARFITT: Objection. Form.
12          THE WITNESS: It is possible.
13  BY MS. BRANSCOME:
14      Q   Okay. If that were to happen and you
15  see evidence in the epidemiology that shows a
16  consistent increase in risk but there's the
17  potential for a confounding variable, would it be
18  important to look at the potential biological
19  mechanism to see whether or not the agent might be
20  causing the outcome?
21      A   So the confounding factor is -- is a
22  factor that could be captured in epidemiologic
23  studies but hasn't been. Is that what you are
24  alluding to? And the biologic -- but the biologic
25  mechanism that you're referring to would involve

Page 157

1   that confounding factor or is this -- are you --
2   are you confounding "confounding" with -- with
3   biologic mechanism issues?
4       Q   Okay. Let me -- let me give you a
5   specific hypothetical.
6       A   Yes.
7       Q   Okay. So let's say hypothetically, for
8   example, recall bias --
9       A   Okay.
10      Q   -- affects the epidemiology related to
11  looking at the causal relationship, and whether
12  you agree with it or not, but we'll just say
13  hypothetically that affected the epidemiology of
14  talc use and ovarian cancer.
15      A   Can I just interrupt for a
16  terminological thing? So typically we don't refer
17  to recall bias as a confounding factor.
18      Q   Ah.
19      A   We refer to it as a bias, a type of
20  bias, but -- you know, that's just technical, but
21  for the record, if we're going to be discussing
22  this further.
23      Q   I appreciate the clarification.
24      A   Thank you.
25      Q   Well, first of all, let me just ask you,

40 (Pages 154 to 157)

Jack Siemiatycki, Ph.D.

Page 158

1   is recall bias something that could affect the
2   reliability of conclusions drawn from
3   epidemiological studies that rely on recall to
4   define exposure to the agent?
5        A   Yes, it could, hypothetically.
6        Q   Okay.  Is recall bias something that
7   potentially could affect the epidemiological
8   studies of the perineal use of talc?
9        A   Yes, theoretically, it could.
10       Q   Okay.  In situations where there is a
11  potential bias or a confounding variable that has
12  not been identified, how should epidemiological
13  evidence be evaluated in comparison to the other
14  categories of evidence that are considered, for
15  example, by an IARC Working Group?
16       A   Well, these things would typically be
17  evaluated in a -- a nonquantitative way.  You
18  can't really quantify what is the potential impact
19  of a confounder that you don't know about or that
20  you haven't measured.  It's kind of a theoretical
21  thing.
22           And the same with -- with recall bias
23  where there could be some evidence about it.  And
24  certainly when I reviewed the evidence on this
25  topic, the possibility of recall bias was one of

Page 159

1   the main stumbling blocks to arriving at an
2   opinion, as it was for the IARC panel in 2006.
3   You know, we are all aware of that hypothetical
4   possibility, and we think about whether something
5   of that magnitude -- something like that could
6   artifactually generate an appearance of a relative
7   risk.
8           My own way of dealing with that was to
9   look at the phenomenon of recall bias from the
10  perspective of both my own research, which has
11  mainly involved case-control studies, some cohort
12  studies but mainly case-control studies, and
13  research that I've read about, experienced,
14  reviewed for journals, et cetera.
15          And if the phenomenon of recall bias
16  were sort of a general across-the-board phenomenon
17  that infects and in a way discredits all
18  case-control studies -- interviewing cases, people
19  who are sick people, interviewing people who are
20  well and comparing the responses -- if this were
21  an inherent systemic problem, what we would
22  observe in general would be a plethora of fake
23  excess risks.  Because almost everything you would
24  ask people about, whether it's smoking, alcohol
25  consumption, physical activity, diet, workplace

Page 160

1   exposures, all -- you know, environmental things
2   that they've been exposed to, et cetera, there --
3   there's no reason why exposure to talc would be
4   the one item in epidemiologic questionnaires that
5   would provoke recall bias where nothing else does.
6           So if it's a part of a general
7   phenomenon, this recall bias, which is certainly a
8   hypothetical possibility, we would see that most
9   of the associations that were tested in case-
10  control studies would be found to be high risks,
11  maybe significantly high risks.
12          That's not what we observed.  That's not
13  what I've observed in my research.  I have
14  estimated -- and in the book that I showed this
15  morning, there are literally thousands of odds
16  ratio estimates in there.  But in all of my
17  research on over nearly four decades, I've
18  published a lot of evidence, and I can show some
19  examples, where there's no difference between
20  cases and controls because there is no effect,
21  there's no causal association between the two
22  things, and the case -- although people were --
23  cases were asked about, let's say, alcohol
24  consumption, and controls were asked about alcohol
25  consumptions, the cases didn't overreport.  They

Page 161

1   didn't say, Oh, well, they want to know if this
2   caused my cancer, and therefore I'm going to tell
3   them, yes, I consumed a lot of beer and wine and
4   so on, or smoking or whatever.
5           So we don't see this as a general
6   phenomenon that people overreport -- that cases
7   overreport compared to controls.
8        Q   Have you looked at the phenomenon of
9   recall bias specifically when the agent being
10  investigated is part of public wide -- wide scale
11  litigation?
12          MS. PARFITT:  Object to form.
13          THE WITNESS:  So I haven't personally --
14  let me just think if any of my research has
15  involved situations analogous to that.
16          Yes.  Cell phones and brain cancer.  So
17  I was involved in a large cell phone and brain
18  cancer study, and we asked cases about their use
19  of cell phones, and we asked controls about their
20  use of cell phones.  And while the interpretation
21  of the results of the study were somewhat
22  controversial, there was no generalized phenomenon
23  of cases reporting more cell phone use than
24  controls in that particular study.
25          So that -- I can't think of another

Jack Siemiatycki, Ph.D.

Page 162

1    example in my career of sort of one of these
2    generally suspected things. I mean, I've studied
3    a lot of occupational exposures, but those tend to
4    be more obscure, and people don't, you know, have
5    the same visceral reaction maybe to were you
6    exposed to formaldehyde or benzene or this or
7    that.
8    BY MS. BRANSCOME:
9        Q    For purposes of your meta-analysis, you
10   looked at the binary question of ever having used
11   talc and never having used talc, correct?
12       A    Among other -- not only that, but that
13   in addition to, yeah.
14       Q    Yes. For example, you were not -- your
15   data isn't stratified based off of having used it
16   to a certain degree of frequency, correct?
17       A    The -- the meta-analysis, no.
18       Q    Okay.
19       A    I -- I looked at dose-response
20   information within the studies that provided it,
21   but I didn't do any meta-analyses of the -- of the
22   dose-response data.
23       Q    Okay. So I -- I asked you sort of the
24   broad question about what has changed in the
25   scientific literature with respect to perineal use

Page 164

1        A    Yeah.
2        Q    Are those areas in which you contend
3    there is developments in the scientific literature
4    that is relevant to the question of the connection
5    between perineal use of talc and ovarian cancer?
6        A    Yes.
7        Q    Okay. So I just wanted to talk to you
8    about which of those categories you are
9    independently offering an expert opinion as
10   opposed to you are deferring to others. Does that
11   make sense?
12       A    Yes.
13       Q    All right. So you are offering an
14   expert opinion about developments in the
15   epidemiology, correct?
16       A    Correct.
17       Q    Are you testifying as an expert in
18   developments in the scientific literature with
19   respect to toxicology?
20       A    No.
21       Q    Are you testifying as an expert with
22   respect to developments in the scientific
23   literature in molecular biology?
24       A    No. I -- I'm aware that there have been
25   some publications since 2006 in that domain, but

Page 163

1    of talc since the 2006 IARC Working Group, but I
2    want to point you now sort of specific to what you
3    say in your report and ask you some more detailed
4    questions about what's changed.
5        So if you could turn to page 67 of
6    Exhibit 10 there.
7        A    Yes.
8        Q    Sorry, just one moment. My pencil has
9    died on me. Just give me one second. All right.
10       All right. So you have a Section 9 here
11   that says: "Contrast with IARC monograph and
12   other reviews." Do you see that?
13       A    I do.
14       Q    All right. And you asked the question
15   in your report: "What has changed in the years
16   since the IARC review?" Correct?
17       A    Correct.
18       Q    All right. And you talk about
19   additional studies and scientific literature
20   addressing a variety of topics, including
21   epidemiology, toxicology, molecular biology and
22   mechanistic studies; is that correct?
23       A    Sorry, are -- you're saying that I
24   referred to those domains?
25       Q    Yes.

Page 165

1    I'm not offering an opinion about those.
2        Q    Are you offering an opinion with respect
3    to the biological mechanism by which the perineal
4    use of talc may or may not cause ovarian cancer?
5        A    Not an opinion. Again, I'm -- I'm
6    acknowledging that there is new evidence, and I
7    mention some of that, yes.
8        Q    But as an expert, you're not here to
9    opine on the strengths and weaknesses of that
10   evidence or how it might be weighted against other
11   evidence that's in the field related to biological
12   mechanism; is that fair?
13       MS. PARFITT: Objection. Form.
14       THE WITNESS: That's correct.
15   BY MS. BRANSCOME:
16       Q    Okay. Now, you state in your report
17   that: "The various possible biases" -- this is
18   still on page 67 -- "that are on the table remain
19   substantially similar to the ones that were
20   considered by the IARC panel." Correct?
21       A    Correct, I said that.
22       Q    Okay. What are the various possible
23   biases that you refer to there?
24       A    Well, I -- I'd have to go back to the
25   IARC 2006 report to give you a full answer, but I

42 (Pages 162 to 165)

Jack Siemiatycki, Ph.D.

Page 166

1   guess the main things that were highlighted at the
2   time were measurement error, how to assess
3   exposure to talc, and what the impact of
4   measurement error might be on the estimates,
5   recall bias and the possible impact that that
6   might have.
7       Q    What do you mean by "measurement error"?
8       A    Measurement error is closely related to
9   recall bias, but it's not the same thing.
10  Measurement -- recall bias refers to differences
11  between cases and controls in the way they
12  respond.  Measurement error refers to inaccurate
13  recall and reporting, irrespective of whether
14  there are cases and controls.  There can be
15  exactly the same degree of error in -- in recall
16  between cases and controls.
17      So it's not differential.  It's not --
18  it's not a recall bias between the two groups.
19  But if there's error, if some people report high
20  use, and in fact they had medium use and all --
21  all this sort of thing, that impacts the estimates
22  of relative risk -- even though those errors are
23  the same in the cases and controls, that impacts
24  the estimates of relative risk, and that generally
25  impacts it in the direction of attenuating the

Page 167

1   relative risk estimates, lowering them from what
2   they really are.
3       So that's one error -- one type of error
4   that is -- that permeates epidemiology and that is
5   present, and that we have to be conscious of and
6   try to evaluate.
7       Q    Could there be measurement error related
8   to misdiagnoses?
9       A    Yes.
10      Q    And if there was misdiagnoses in the
11  sense that someone was diagnosed with ovarian
12  cancer but in fact had a different form of cancer,
13  that could actually result in an artificially
14  inflated relative risk, correct?
15      MS. PARFITT:  Objection.  Form.
16      THE WITNESS:  So that kind of error in
17  diagnosis has subtly different meaning in the
18  context of a case-control study and a cohort
19  study.  And if -- if you want, I'll -- I could try
20  to answer your question in -- in each context.
21  BY MS. BRANSCOME:
22      Q    Okay.
23      A    So it has an effect in both contexts,
24  but it's a slightly different effect.
25      So in the context of a cohort study, if

Page 168

1   there is error in diagnose -- I guess you -- what
2   you're alluding to -- let me make sure, you're
3   alluding to possible misdiagnosis between
4   mesothelioma and ovarian cancer.  Is that where
5   you're going?
6       Q    That -- that is one possibility, yes.
7       A    So in the case of a -- in this situation
8   of a cohort study, following up a group of women,
9   some of them really get mesotheliomas that are not
10  linked to talc exposure, but those women are
11  classified as ovarian cancers erroneously.
12  They -- that error would have the effect of
13  reducing the apparent risk compared to the real
14  risk of talc and ovarian cancer.  In that context,
15  it would have that effect.
16      In the context of a case-control study,
17  where you start with a group of women who have
18  been diagnosed with ovarian cancer but in truth
19  some of them had peritoneal mesotheliomas, and you
20  compare them to controls, the women who -- and
21  assuming that talc has no effect on peritoneal
22  mesothelioma, which is another assumption to make,
23  but -- but assuming that talc has no effect on ovarian
24  cancer, just for the sake of argument, lumping in
25  the mesotheliomas with the ovarian cancer cases

Page 169

1   would again create a reduction in the estimate of
2   relative risk.
3       So in both situations -- I would have to
4   work it out on a pad of paper, but I think in both
5   cases -- and I did write something about this in
6   my report, so if you don't --
7       Q    Feel free to take a look.  Sure.
8       A    -- mind.  Thinking out loud in the
9   middle of a deposition is sometimes harder than
10  thinking out loud at home.  (Peruses document.)
11      So I'm looking at page 57,
12  Section 7.2.5, at the bottom of the page and then
13  going on to the next page, and see if what I said
14  then is -- corresponds roughly to what I just
15  said.
16      I think basically it -- it agrees with
17  what I just said.  Basically the effect would be
18  to attenuate estimates in this situation.
19      Q    So we discussed -- of the various
20  possible biases that might affect the
21  epidemiology, we talked about measurement error,
22  recall bias, diagnostic error.
23      Are there any other potential biases
24  that should be considered when evaluating the
25  epidemiology on the use of talc peritoneally?

43 (Pages 166 to 169)

Jack Siemiatycki, Ph.D.

Page 170

1     A   Yes.  So I -- I did list a bunch of
2   possible biases in my report.  And one of them --
3   if you don't mind, I'll just go through the titles
4   of the different things that -- starting on
5   page 53.
6           Bias due to nonresponse or
7   nonparticipation.  If you carry out a case-control
8   study, and you get -- you identify a group of a
9   hundred women who are cases, and you ask them to
10   participate and only 50 agree to participate, and
11   the ones who agree to participate happen to be the
12   only ones who used talcum powder, and the other 50
13   that you don't know about never used it, that
14   would be a problem.  And -- but it also depends
15   what happens among the controls.  Among the
16   controls, do you get the same nonresponse bias?
17   So there's a -- that is one possible bias in
18   case-control studies.
19           The second one I listed was recall or
20   reporting bias that we've discussed.
21           The third one is what I call
22   nondifferential or random error, which we
23   discussed.  It's error in reporting that is equal
24   in cases and controls, but it has an impact on
25   relative risk estimates.

Page 171

1           The fourth one, which we haven't
2   discussed, has to do -- it's mainly a problem for
3   cohort studies.  And if you carry out a cohort
4   study of -- focused on cancer, and you collect
5   information about exposure, and then follow them
6   for two years to find out how many of them got
7   cancer, and whether there is a difference between
8   the people who were exposed and the people who are
9   not exposed, well, that would be pretty hopeless
10   because it takes more than two years for cancers
11   to develop and be diagnosed.  So short follow-up
12   periods in cohort studies would be a source of
13   bias in cohort studies.
14           Diagnostic errors, we've just discussed.
15           Initiation of powdering as a result of
16   ovarian cancer, is it possible that some women
17   who -- that there is a statistical association
18   between powdering and ovarian cancer, but it's
19   because the women who get ovarian cancer in the
20   early stages, to relieve symptoms or to deal with
21   discomfort start to use powdering.  And so that is
22   a potential bias.
23           Confounding is the next category, and
24   that's -- it's a huge category of potential
25   distortion that is a little bit different from the

Page 172

1   other biases.  And this is why I corrected you at
2   the beginning when we were talking about
3   confounding and bias.  I mean it's not -- I'm not
4   criticizing you in any way for this.  It's --
5   there is terminological gray zones in
6   epidemiology, so it's not always clear.  But --
7     Q   Would it be fair to describe a
8   confounding variable in the context of ovarian
9   cancer as something that as of now is unknown that
10   makes a particular individual more likely to
11   develop ovarian cancer that also, for whatever
12   reason, makes them more likely to use talcum
13   powder?
14     A   Yes.  That would be a correct
15   interpretation of "confounding."
16     Q   And that is something that should be
17   taken into account in evaluating the epidemi- --
18   epidemiological literature, correct?
19     A   That's correct.
20     Q   And you would agree that the scientific
21   community at large has not yet understood all of
22   the potential factors that might contribute to a
23   susceptibility to develop ovarian cancer, correct?
24         MS. PARFITT:  Objection.  Form.
25         THE WITNESS:  Sorry, I -- I was hearing

Page 173

1   two things with my two ears.
2         MS. PARFITT:  Sorry.
3         THE WITNESS:  Can you repeat the last
4   part?
5   BY MS. BRANSCOME:
6     Q   Yeah.  You would agree that all of the
7   factors that might make someone susceptible to
8   developing ovarian cancer are not currently known.
9     A   That's correct.
10         So are -- are you -- are you getting at
11   the potential impact of confounding as -- from
12   unknown factors as something that hasn't been
13   properly evaluated or that is part of this
14   picture?
15     Q   I am simply asking you --
16     A   Yes.
17     Q   -- questions about your opinions.
18     A   Yes, yeah.
19     Q   But you agree that the possibility of an
20   unknown confounding variable is something that, as
21   an epidemiologist, you would at least consider
22   when looking at the strength of association
23   established by epidemiological studies, correct?
24     A   I would consider it, and I've considered
25   it in the context of this literature, and in my

44 (Pages 170 to 173)

Jack Siemiatycki, Ph.D.

Page 174

1  opinion, it's unlikely that any confounding factor
2  or factors would create the pattern of results
3  that we see.
4        And if I could give you one piece of
5  evidence about why I -- you know, that illustrates
6  why I think that.  A confounding factor can only
7  bias the result by a certain amount; not as strong
8  as its own relationship to the risk factor.
9        So if there's a risk fact- -- if the
10  relative risk that we see around 1.3 -- ballpark,
11  let's for the sake of argument say 1.3 -- is due
12  to a confounding factor, that confounding factor
13  would have to have an association with ovarian
14  cancer much strong -- stronger than 1.3, but much
15  stronger than 1.3.
16        And I can -- just to illustrate that, I
17  actually have a publication -- I think I gave you
18  a copy of that publication of mine that
19  illustrates my own research on occupational causes
20  of cancer --
21        THE VIDEOGRAPHER:  Sorry.
22        THE WITNESS:  Am I again disconnected?
23  Okay.  When I get excited...
24        Yes, that's the one.  If I could --
25        MS. PARFITT:  Make a copy.

Page 175

1        THE WITNESS:  Do you have any copies?
2        MS. PARFITT:  I'm looking to see.
3        THE WITNESS:  So -- well, if I could
4  just read a couple of sentences from the abstract
5  of this, I'll tell you what this is about.  It's
6  a study of --
7  BY MS. BRANSCOME:
8        Q   Could you, please, Dr. Siemiatycki,
9  identify for me --
10        A   Oh.
11        Q   -- what is the paper from which you are
12  reading.
13        A   Yes.  This is a paper called "Degree of
14  confounding bias related to smoking, ethnic group,
15  and socioeconomic status in estimates of the
16  associations between occupation and cancer."
17        Q   Is this something that you cite to or
18  reference anywhere in the report that you
19  submitted in the MDL?
20        A   It's only in my CV, which is I think
21  part of the record.
22        Q   What led you to specially identifying
23  this article, which you seem to have handy today
24  here at the deposition?
25        A   Because I was thinking about how to

Page 176

1  illustrate the potential impact of confounding in
2  this issue of ovarian cancer and talc, and what --
3  to explain why I believe that the excess risks
4  that we observe are unlikely to be explained by
5  confounding.
6        Q   Okay.  You would agree, though, that if
7  there was a confounding variable that had a
8  relationship with, in this case, ovarian cancer
9  that was stronger than 1.3, it could explain an
10  increase of 1.3 associated with the use of talc if
11  it was similarly connected to the use of talcum
12  powder products --
13        MS. PARFITT:  Objection.  Form.
14  BY MS. BRANSCOME:
15        Q   -- correct?
16        MS. PARFITT:  Objection.  Form.
17        THE WITNESS:  Well, one of the points
18  that I want to illustrate is that not only would
19  it have to be stronger than 1.3, it would have to
20  be a lot stronger than 1.3.
21  BY MS. BRANSCOME:
22        Q   How strong would it need to be?
23        MS. PARFITT:  Objection.  Form.
24        THE WITNESS:  I'll answer that by -- by
25  showing you what -- what we found when we were

Page 177

1  examining the associations between different
2  occupations and lung cancer.
3        So occupation and lung cancer, there are
4  some true associations there, as you probably
5  know, but -- and we collected information about
6  people's occupations.  We also collected
7  information about their smoking history, their
8  socioeconomic status, their ethnicity and so on.
9  A lot of factors.
10        But the most important part of this was
11  looking at the association between lung cancer and
12  smoking and -- lung cancer and occupation.  We
13  chose I think 15 occupations, estimated the odds
14  ratios for 15 different associations between
15  occupations and lung cancer, and we controlled for
16  smoking or we didn't control for smoking.  We
17  compared the results when you control for smoking
18  and when you don't compare -- control for smoking.
19  BY MS. BRANSCOME:
20        Q   Respectfully, Dr. Siemiatycki, I only
21  have seven hours to ask you questions.
22        A   Okay.
23        Q   Your -- your -- counsel for the
24  plaintiffs can ask you to fully explain other
25  research that you've done.

45 (Pages 174 to 177)

Jack Siemiatycki, Ph.D.

Page 178

1    A   Okay.
2    Q   It sounds very interesting.
3    A   Thank you.
4    Q   But my question to you is, in your
5  opinion, how strong would an association have to
6  be with a confounding variable in order to play a
7  significant role in a 1.3 relative risk?
8    A   My --
9        MS. PARFITT: Objection. Form.
10       THE WITNESS: -- guess, it would have to
11 be in the order of 3 to 5. Because it also
12 depends on the association between a talc
13 powdering behavior and this unknown confounder.
14 BY MS. BRANSCOME:
15   Q   Okay. Are there limitations to
16 performing a meta-analysis?
17       MR. TISI: Do you want to mark that or
18 no?
19       MS. BRANSCOME: No.
20       THE WITNESS: Are there --
21 BY MS. BRANSCOME:
22   Q   -- limitations to performing a
23 meta-analysis?
24   A   I -- I'm not sure what -- like --
25   Q   I believe you referenced earlier that

Page 179

1  you teach a class on epidemiological
2  methodologies; is that correct?
3    A   Yes.
4    Q   Okay. So presumably, when you teach a
5  class you discuss the strengths and the
6  limitations of different types of analyses. Fair?
7    A   It comes into the course, yes.
8    Q   Okay. So in the context of looking at
9  the strengths and the weaknesses of different
10 types of analyses, are there any weaknesses or
11 limitations to a meta-analysis?
12   A   Weakness, okay. Because the word
13 "limitation" doesn't always mean weaknesses.
14       Meta-analysis depends on having reliable
15 data. So the basic studies that you use and the
16 basic data that you use in a meta-analysis has to
17 be sufficiently reliable to support a good
18 meta-analysis.
19       The data have to be sufficiently
20 comparable in nature. So putting apples and
21 oranges and grapes into the same meta-analysis
22 would be a problem. Different kinds of apples,
23 yes, but different -- et cetera. So you have to
24 be careful that you're really measuring the same
25 thing, have the same outcomes.

Page 180

1        In -- one of the differences between --
2  as I mentioned earlier, between -- some types of
3  meta-analyses are carried out on clinical trials,
4  in fact, I would say the bulk of meta-analysis is
5  conducted in clinical trials research where the
6  research protocols are really very standardized
7  from one study to another, and that enhances the
8  ability to make inferences from the results of a
9  meta-analysis.
10       In observational epidemiology, this
11 isn't true. We have very different kinds of study
12 design and problems that arise in different
13 studies, and this leads in itself to variability
14 and heterogeneity. And it is sometimes imagined
15 that heterogeneity is a reflection -- some sort of
16 a reflection of different risks in different
17 populations or something like that. It's mainly
18 -- it's at least in part a reflection of the fact
19 that different study designs and different -- just
20 not just the overall architecture of the design,
21 but the implementation, how people were
22 interviewed, what the questions were and so on,
23 influences the results of a study. That varies
24 from study to study, and that creates
25 heterogeneity. So --

Page 181

1    Q   Does heterogeneity -- do you want
2  heterogeneity in a meta-analysis? Is it a good
3  thing or does it weaken the meta-analysis?
4    A   It depends on the purpose of the
5  meta-analysis. So some meta-analyses have as one
6  of their objectives to identify populations in
7  which the effect of the drug or the -- whatever
8  you're studying is different from one population
9  to another. That is a situation where you want to
10 identify heterogeneity, and you want to try to
11 target heterogeneity and the different
12 populations, different studies, the different
13 methods of administering medication, or whatever
14 the differences are between studies.
15       In observational epidemiology, it's
16 rarely the case that heterogeneity -- that a
17 formal evaluation of heterogeneity is -- is useful
18 or actionable. Usually the bottom line result
19 doesn't change. For example, there are
20 meta-analyses of smoking and lung cancer where the
21 meta-analysis demonstrates heterogeneity of the
22 results. The results are always between a
23 relative risk of 5 or 6 and a relative risk of 10
24 or 12.
25       Now, for the question of -- for the

46 (Pages 178 to 181)

Jack Siemiatycki, Ph.D.

Page 182

1    qualitative question does smoking cause lung
2    cancer, it really doesn't matter if the relative
3    risk is 5 or 12. So that heterogeneity has
4    absolutely no bearing on the question that is
5    being asked, and the best answer ignore -- would
6    ignore heterogeneity. It doesn't really matter.
7         If you're trying to find out in which
8    populations does smoking have a greater impact,
9    then you might want to say, Okay, let's -- which
10   are the populations where the relative risks were
11   5 and which are populations where the relative
12   risks are 12? Can we identify differences between
13   it? Are they different countries, different
14   ethnic groups, and so on and so forth.
15        So it's a longwinded answer, and I'm not
16   sure if that gets to the question that you were
17   asking.
18        Q    Well, you said in your report -- and
19   it's on page 17, if you want to look at it -- you
20   stated -- it's at the top of the page.
21        A    Yes.
22        Q    "Unless a significant methodological
23   flaw can be identified that has caused the
24   heterogeneity, the best overall estimate remains
25   the meta-estimate."

Page 183

1         Did I read that correctly?
2         A    Yeah. I guess we should read the
3    beginning of the sentence just to -- oh, yes. Oh,
4    yes, I see. Sorry. Yes, I agree with you.
5         Q    So what is the basis for that statement?
6         A    The basis is that it's correct. Are you
7    offering an alternative to this that I should
8    consider?
9         Q    Is there -- I guess my question is, is
10   it -- is it correct because you think it is
11   correct? Or can you point me to something that
12   would support that principle and explain it more
13   fully?
14        A    I -- I haven't looked for any
15   documentary evidence that this has been written up
16   in this way anywhere. I've been interpreting
17   meta-analyses in this way, and I believe this to
18   be true.
19        Q    Okay. So we talked about a few
20   different things that you articulated as potential
21   weaknesses to a meta-analysis. Are there any
22   other weaknesses to a meta-analysis?
23        A    Possibly. Are there any that you can
24   identify? I will be happy to -- you know, I'm
25   just -- to meta-analysis as a concept, I think one

Page 184

1    of the weaknesses is that it is sometimes
2    fetishized, and that people put too much -- you
3    know, have sort of a magical belief in the value
4    of meta-analysis result, which is not justified.
5    Often the results of certain critical studies are
6    as valuable or more valuable than those of a
7    meta-analysis, especially when -- especially in
8    observational epidemiology when it's hard to
9    really identify all of the parameters that
10   influence the quality of a study.
11        And so determining what studies to
12   include and which data from each study to include
13   is tricky. It requires judgment. Those judgments
14   can be wrong. They can be contested. Sometimes
15   one very good study is as powerful, but -- it's
16   part of -- a meta-analysis is part of a package of
17   information that I would look at in evaluating the
18   risks.
19        Q    Okay. You mentioned the concept that a
20   scientific judgment needs to be used in
21   determining what studies and, more specifically,
22   what data within those studies to include in a
23   meta-analysis, correct?
24        A    That's correct.
25        Q    And you would agree that -- and I

Page 185

1    believe you just referenced it -- that there can
2    be errors in judgment in determining what studies
3    to include or not include or what data to include
4    or not include, correct?
5         A    I --
6         MS. PARFITT: Objection. Form.
7         THE WITNESS: I would not characterize
8    these things as errors in judgment. There can be
9    differences in judgment that are legitimate
10   that -- where people, equally well motivated and
11   well trained and experienced, can arrive at
12   different judgments on some of these things.
13   BY MS. BRANSCOME:
14        Q    Did you have a specific methodology that
15   you used in determining which relative risk or
16   odds ratio to include from each of the studies
17   that you include in your meta-analysis?
18        A    Carefully reading the study, carefully
19   reading the tables and the reports of what is in
20   the paper, understanding what is there, and then
21   making a determination on that basis.
22        Q    And those were, to use your words,
23   quote, judgment calls; is that fair?
24        A    Yes.
25        Q    Okay.

47 (Pages 182 to 185)

Jack Siemiatycki, Ph.D.

Page 186

1     A   There is no alternative to judgment in
2   science.
3     Q   The meta-analysis in your MDL report is
4   different than the meta-analysis in your 2016
5   report; is that correct?
6     A   The bottom line result, you're saying?
7   Well, yes, but also in the 2016 report, I
8   presented I think eight different estimates,
9   depending on scenarios of which studies to include
10   and which result from which studies to include,
11   because there were some borderline judgments where
12   I thought the best thing would be just -- just
13   provide all of the different options.
14        In 2018, I adopted a different strategy.
15   I thought, well, the best service I can provide
16   the court is to give my best estimate of which
17   studies and which data to include, and then to
18   provide a set of alternatives that I call
19   sensitivity analyses.  So that's one difference
20   between the two reports.
21     Q   Okay.
22     A   But there were some differences in which
23   studies were included and which result in which
24   studies were included from the one to the other.
25     Q   Well, let me start at the very basic

Page 187

1   level.  Are there any studies that are included in
2   your 2018 meta-analysis that were not available at
3   the time that you did your 2016 meta-analysis?
4     A   I don't think so.
5     Q   Okay.  So you mention that you made some
6   changes to which studies you included and even
7   within that, some of your numbers are slightly
8   different.
9        Can you explain to me what changes you
10   made with respect to which studies to include?
11     A   So somewhere I did the side-by-side
12   comparison, and I don't think I have -- I don't
13   think I have that with me.  So it would take me a
14   bit of time to just compare the two and see how --
15   how they compare.
16     Q   So you generated actually a side-by-side
17   comparison of your 2016 meta-analysis and your
18   2018 meta-analysis?
19     A   Well, of -- of the studies that went
20   into them.  Well, generated is a kind of a
21   highfalutin word.  I listed on a piece of paper,
22   and then I -- beside it I listed the other ones.
23   So I'm pretty sure I did that at some point just
24   to make sure.  If I didn't do it on paper, I did
25   it in my mind.  I wanted to know, you know, what

Page 188

1   is the difference doing it this way or doing it
2   that way.
3     Q   Okay.
4     A   But it's largely overlapped.  I mean,
5   I'll look at it and see if I can quickly recognize
6   which studies might have been --
7     Q   Well, I can point you --
8     A   Okay.  If you've done it, that's great.
9     Q   Yeah.  So you included Green 1997 in
10   your 2016 meta-analysis, correct?
11     A   Yes.
12     Q   And you did not include Green 1997 in
13   your 2018 meta-analysis, correct?
14     A   Correct.
15     Q   Why did you -- did including Green 1997
16   in your earlier report, do you consider that to be
17   a flaw?
18        MS. PARFITT:  Objection to form.
19        THE WITNESS:  I don't consider any of
20   these things flaws.  They were judgment calls, and
21   I -- actually, in that case, I learned in between
22   some information that I didn't know in 2016 that
23   made that decision the right one.
24   BY MS. BRANSCOME:
25     Q   What information did you learn?

Page 189

1     A   Well, a case-control study was carried
2   out in Australia by a team that involved Green and
3   Purdie, and the publication in 1995, I think it
4   was, described their analysis -- sorry, do you
5   want me to stop while you're --
6     Q   Keep going.
7     A   The paper in Purdie 1995, I think it is,
8   described the association between talc and ovarian
9   cancer.  I had that in my database.
10        And I also had -- a couple of years
11   later, there was a paper by Green that was not
12   focused on talc.  It was focused on risks that
13   were related to -- other -- well, to other
14   gynecological issues in relation to ovarian
15   cancer.  But in there she -- in the text, not in
16   any table but in the text, she provided a result
17   on talc and ovarian cancer.
18        Because that paper was published in
19   2000 -- 1997, the Green, et al., paper, I
20   assumed that that was an extension of the 2000 --
21   of the data that was used for the 1995 paper, and
22   that it actually included more information and
23   more up-to-date information than the 1995 paper
24   published two years earlier.  I had some doubts
25   about that.  But that was the decision I made in

48 (Pages 186 to 189)

Jack Siemiatycki, Ph.D.

Page 190

1  2016.  In general, when there were different
2  reports from the same study at different
3  intervals, I took the most recent one as being the
4  more definitive one.
5        When I started analyzing for the 2018
6  report, I had lingering -- I remained with the
7  lingering doubts about the Green study -- the
8  Green report and whether it actually was an
9  updated version of the talc results from 2016 --
10 from my 2016 report.
11       And I wrote to Adele Green, who I know
12 as an acquaintance, not well but enough to write
13 and say, You know, what's going on with these --
14 what was going on with these two papers?  Is it
15 the fact that the result -- which one has the most
16 definitive result on talc and ovarian cancer, the
17 earlier one or the more recent one?  And she wrote
18 back and said, The earlier one does.  That the
19 later one -- and I can't remember the exact
20 explanation, but it had to do with some cases
21 being dropped because of reasons having nothing to
22 do with talc but having to do with other
23 hypotheses that she was examining.
24       So in any case, the two results are
25 identical.  So it makes no difference.  But that

Page 191

1  is, in answer to your question, why did it change,
2  it wasn't capricious issues.  It wasn't wrong.  It
3  was the right thing to do.
4     Q   Did you retain copies of the e-mail
5  correspondence that you had with Green?
6     A   I imagine that I did, but I -- this
7  would have been eight months ago maybe or
8  something.
9     Q   Would it be fair to say that you relied
10 on Green's representation of which dataset was
11 more fulsome in determining what to use in your
12 2018 metadata?
13    A   Yes.
14    Q   And that was something she communicated
15 to you by e-mail, correct?
16    A   That's right.
17       MS. BRANSCOME:  We can meet and confer
18 about this offline, but we would request
19 production of those e-mails.
20       MS. PARFITT:  We'll take it under
21 advisement.  Thank you.
22       MS. BRANSCOME:  Okay.
23 BY MS. BRANSCOME:
24    Q   Do you agree that in terms of the trend
25 for relative risk, with the addition of newer

Page 192

1  studies over time, the relative risk for the
2  association between peritoneal use of -- I mean
3  perineal use of talc and the development of
4  ovarian cancer has actually gone down?
5        MS. PARFITT:  Objection.  Form.
6        THE WITNESS:  I -- I haven't evaluated
7  that, and I have no reason to agree or disagree
8  with it.  If you want me to spend a bit of time
9  looking to see if I can --
10 BY MS. BRANSCOME:
11    Q   Well, for example --
12    A   -- confirm or --
13    Q   You are familiar with the Berge 2018
14 paper, correct?
15    A   Yeah, yeah.
16    Q   And the authors in that paper said:  "We
17 confirm the trend toward lower overall risk
18 estimates as more evidence accumulated."
19       MS. PARFITT:  Can we get that article in
20 front of him?
21       MS. BRANSCOME:  Of course.
22       MS. PARFITT:  Thank you.
23       MS. BRANSCOME:  It is tab 48.
24       (A discussion was held off the record.)
25       MS. PARFITT:  It's tab 18?

Page 193

1        THE WITNESS:  Tab 48?
2  BY MS. BRANSCOME:
3     Q   Tab 48.
4     A   I don't have a tab 48.
5     Q   It may be in your second binder.
6     A   Oh.
7        MS. PARFITT:  I will take this one out.
8  And I'll take this one for you.
9        THE WITNESS:  Thank you.
10       MS. PARFITT:  Of course.
11       THE WITNESS:  Thank you.
12 BY MS. BRANSCOME:
13    Q   Dr. Siemiatycki, are you familiar with
14 the article that is located there behind tab 48?
15    A   Yes, I am.
16    Q   Berge is the lead author on this
17 publication titled "Genital use of talc and risk
18 of ovarian cancer:  A meta-analysis."  Correct?
19    A   Yes, correct.
20    Q   I believe earlier you said that Berge
21 "beat you to the punch" might have been the phrase
22 that you used.
23       What did you mean by that?
24    A   If this had never appeared, I might have
25 worked on a manuscript to submit for publication

49  (Pages 190 to 193)

Jack Siemiatycki, Ph.D.

| Page 194 |
| --- |

1  on my meta-analysis before today, sometime in the
2  past.
3      Q   Do you rely on Berge 2018?
4          MS. BRANSCOME:  Let's go ahead and mark
5  that actually as Exhibit 12.
6          (Exhibit No. 12 was marked for
7          identification.)
8          MR. TISI:  How long have we been going?
9  How long have we been going?
10         MS. BRANSCOME:  Just under five hours.
11         MR. TISI:  No, how long have we been
12  going on this one?
13         MS. BRANSCOME:  We can take a break
14  if -- do you need a break?
15         MR. TISI:  I'm just asking.
16         MS. PARFITT:  Do you want a break?
17         THE WITNESS:  No, let's finish -- let's
18  finish with this.
19         MS. PARFITT:  Okay.
20         (A discussion was held off the record.)
21  BY MS. BRANSCOME:
22      Q   Do you rely in forming your opinions on
23  this case on the Berge article that we just marked
24  as Exhibit 12?
25      A   I formed my opinions before knowing

| Page 195 |
| --- |

1  about this article.
2      Q   Do you believe that the Berge 2018 study
3  supports the conclusions that you have reached in
4  your own meta-analysis?
5      A   Yes, I think it does.
6      Q   In what way?
7      A   Well, let me preface that also by saying
8  that there's been a bit of a -- a history to this
9  article of -- I thought the publication -- there
10  was a version published in 2017, which I thought
11  was the definitive version that I've always kept
12  in my binders as the Berge article, and it's only
13  very recently that I actually came upon this
14  particular version, which is not greatly changed
15  from the 2017 but slightly changed, and I haven't
16  fully digested the small changes that have been
17  made.
18      Q   If you could -- sorry for the multiple
19  binders, but if you want to look at your first
20  binder, tab 13, we can see if that's the paper
21  that you previously had reviewed as the Berge
22  paper.
23      A   I -- I don't mind answering questions in
24  relation to this version.  Just -- I just wanted
25  to point out that there are a couple of things

| Page 196 |
| --- |

1  here that I'm -- I haven't fully integrated into
2  my evaluation of this paper.  But I know what's in
3  it.  I know what's the other one.  I know what's
4  in this one.
5      Q   Okay.  So back to my question,
6  Dr. Siemiatycki.
7      A   Yeah.
8      Q   You stated that you believe that the
9  Berge 2018 study supports the conclusions that you
10  have reached in this litigation, and my question
11  to you was, what do you mean by that?
12      A   Well, it supports it in a few ways.
13  One -- and from my point of view, the most
14  important one, but probably not for anyone else --
15  is that they carried out a search of the
16  literature using a much more intensive and -- a
17  much more intensive procedure than I had.  I had
18  full confidence in the procedure that I had used,
19  but it was not as long, as lengthy, as costly, et
20  cetera, et cetera, as what -- and the bottom line
21  was that they didn't find any papers -- relevant
22  papers that I hadn't found.  So I was very
23  reassured by this.
24         The second thing is that the bottom line
25  meta-analysis result -- well, no, the second thing

| Page 197 |
| --- |

1  is that the actual results that they chose from
2  the different studies were very similar in most
3  cases to the ones I had chosen from the different
4  study.  So there was a degree of corroboration
5  there that I was happy about.
6         They adopted a different strategy in one
7  important respect, and that concerned how to deal
8  with the Terry paper and the various components of
9  the Terry paper.  And with all due respect to this
10  team, I don't think that there -- theirs was in
11  error.  I prefer my approach that maintained the
12  integrity of the pooled analysis, which has some
13  advantages.  But there's -- you know, I wouldn't
14  expect any large differences on the bottom line
15  estimates from their strategy or my strategy.  And
16  the bottom line results were very similar.
17         They -- also in the previous version,
18  their evaluation of dose-response was, in my view,
19  deficient in not devoting adequate weight to what
20  I think is the most important evidence around
21  dose-response in this area, which is the Terry
22  pooled analysis.  They focused on studies which
23  provided results by duration of exposure and by
24  frequency of exposure.  And I think it's the
25  combination of those two which is the most

50 (Pages 194 to 197)

Jack Siemiatycki, Ph.D.

Page 198

1   important metric.
2        And the fact that the Terry analysis was
3   able to combine an enormous dataset for evaluating
4   dose-response, much greater than any of the
5   studies looking at duration or any of the studies
6   looking at frequency, meant that in my view they
7   missed an opportunity to properly evaluate
8   dose-response by cumulative exposure.
9        I note very recently that they have --
10  they've now used a different statistical procedure
11  for evaluating dose-response by duration and
12  frequency, which is embodied in their Table 3,
13  which I don't fully understand.  It seemed -- this
14  was the new part of this study, which I haven't --
15  I looked quickly in the method section to see a
16  description of exactly what they did, and I
17  couldn't find it, but I don't deny that it's
18  somewhere in the article.  I just haven't had time
19  to properly evaluate that part of it.
20  Q   As you sit here today, do you have any
21  criticisms of the statistical analysis that they
22  performed?
23  A   All of it?  You're referring to all of
24  it?  Well, I --
25       MS. PARFITT:  Objection.  Form.

Page 199

1        THE WITNESS:  I note that their bottom
2   line meta-relative risk is lower than the one that
3   I estimated.  And I'm not sure why that is.  To me
4   the -- the difference in -- minor differences
5   in the studies included or excluded is not
6   sufficient to explain that, and I wonder if it's
7   software issue, of them having used a different
8   software for meta-analysis than I used.  But it's
9   not a criticism necessarily.  I just note this
10  discrepancy.
11  BY MS. BRANSCOME:
12  Q   Are there any studies that you included
13  in your meta-analysis in 2018 that the Berge
14  authors failed to consider that you think they
15  should have included?
16  A   So I'll go back to my report, because I
17  do have a table outlining that in my report.
18       MS. PARFITT:  You want your report?
19       THE WITNESS:  Yeah, my report, back to
20  my report.
21       MS. PARFITT:  Let me get you that.
22  BY MS. BRANSCOME:
23  Q   And we'll take a break after we finish
24  this paper.
25  A   Thank you.

Page 200

1        That's 2016.  Okay.
2   Q   Dr. Siemiatycki, if you could just
3   identify for the record where you're looking so I
4   can follow along and the record reflects it.
5   A   Right.  I'm looking in my report of 2018
6   in the appendix, page 103, Appendix B.
7   Q   So looking at Appendix B, which also
8   helpfully compares Penninkilampi as well, are
9   there studies specifically focused on the Berge
10  2018 that in your opinion the authors should have
11  included in their meta-analysis?
12       MS. PARFITT:  Objection.  Form.
13       THE WITNESS:  Okay.  Well, just
14  following this table, I see that Gates 2008 was in
15  my report, but not in theirs.  Now, it wasn't in
16  my main analysis; it was in one of my sensitivity
17  analyses.  So I have no -- my main analysis and
18  their main analysis concurred about Gates.
19       The next one that I see that was in my
20  analysis but not in theirs was what I call
21  Schildkraut B.  And Schildkraut B, for the record,
22  is -- there's no such study, but I've named it
23  Schildkraut B.  It's the result of the analysis of
24  the Schildkraut study of cases that were
25  interviewed before 2014, I think it was.

Page 201

1   BY MS. BRANSCOME:
2   Q   And we will discuss that in more detail,
3   but do you consider it an error for the Berge
4   authors to just have taken the Schildkraut 2016
5   data as a whole?
6   A   No, I don't consider it an error.  In
7   fact, I used it -- not in my main analysis but in
8   one of my sensitivity analyses.
9        The same with Shushan.  So Shushan '96
10  was in my -- one of my sensitivity analyses, not
11  in my main analysis, and they did not include it
12  in their main analysis.  So we agreed on the main
13  analyses there.
14       Terry, I included in mine, and they
15  didn't include Terry.  They included the component
16  parts of Terry.
17       So there was no -- there was no study
18  that was in my main analysis that was not in
19  theirs.
20  Q   Okay.  And looking quickly back at the
21  Berge article, coming full circle to the question
22  that I started with, if you could look on page 253
23  of that paper.
24       MS. PARFITT:  Yes, 253.
25  BY MS. BRANSCOME:

51 (Pages 198 to 201)

Jack Siemiatycki, Ph.D.

Page 202

1    Q   Under the Discussion section, do you see
2  where I am?
3    A   Yes, I do.
4    Q   All right.  The second paragraph under
5  Discussion from the Berge paper states:  "This
6  meta-analysis suggests that genital powder use is
7  associated with a small increased risk of
8  developing ovarian cancer.  However, this positive
9  association appears to be limited to the serous
10  histological type and to case-control studies."
11        Did I read that correctly?
12    A   You read it correctly.
13    Q   It continues on:  "This estimate is
14  somewhat lower than that of previous
15  meta-analysis," and in parentheses, it refers
16  specifically to Huncharek and Langseth, colon, "In
17  our cumulative meta-analysis, we confirmed the
18  trend toward lower overall risk estimates as more
19  evidence accumulated."
20        First, did I read that correctly?
21    A   You read it correctly.
22    Q   Do you have any basis to disagree with
23  the statement by the Berge authors in this
24  paragraph in the Discussion section?
25        MS. PARFITT:  Objection.  Form.

Page 203

1        THE WITNESS:  So there are a few
2  statements in this paragraph, not just one.
3        Do you want me to take them one by one?
4  BY MS. BRANSCOME:
5    Q   Sure.
6    A   So whether "the positive association
7  appears to be limited to the serous histological
8  type," I have some problem with that.  I -- I was
9  looking in their publication for which studies --
10  let me just see if I can -- which studies provided
11  evidence on serous type, and I couldn't find that.
12        In my -- in my analysis, the evidence
13  that I was able to -- to compile that's in this
14  addendum and meta-analyze showed an approximately
15  similar meta-relative risk between serous and all
16  ovarian cancers.
17        So there is no -- I found no evidence
18  that this -- that there was a particular peak of
19  risk for serous types compared to other types.
20    Q   As you sit here today --
21        MS. PARFITT:  Are you done -- are you
22  done with your -- is that --
23        THE WITNESS:  Yeah, for -- for that
24  point on serous, yes.
25        MS. PARFITT:  Thank you.

Page 204

1  BY MS. BRANSCOME:
2    Q   Based on the evidence that's available
3  today, do you think there is strong enough
4  epidemiological evidence to reach a conclusion
5  about the association between talc -- genital talc
6  use and other specific subtypes of ovarian cancer?
7    A   I think it becomes very fragile to draw
8  inferences about other types.  And in the absence
9  of reliable evidence about other types, you know,
10  especially those that have a smaller fraction of
11  all ovarian cancers than serous type, I think the
12  prudent thing to do is to consider that all
13  ovarian cancers are affected the same way.
14        The same way as with -- we do with lung
15  cancer and smoking and histologic types of lung
16  cancer.  While there is some variability in the
17  degree of relative risk between smoking and
18  adenocarcinoma or squamous cell carcinoma or other
19  types, small cell, large cell, for lung cancer,
20  there is some variability in the degree of
21  relative risk.  Generally speaking, we say smoking
22  causes cancer.  Smoking causes all kinds of --
23  causes lung cancer, all kinds of lung cancer.
24    Q   Are you qualified to evaluate the
25  reasonableness of making an extrapolation from one

Page 205

1  subtype of ovarian cancer to all types of ovarian
2  cancer in terms of what is biologically plausible?
3        MS. PARFITT:  Objection to form.
4        THE WITNESS:  My inferences would be
5  based on the statistical and epidemiological
6  evidence, and if there is biological,
7  physiological evidence that would indicate that
8  talcum powder is more likely to influence one type
9  of ovarian cancer than another, I would be
10  absolutely open to that interpretation.
11  BY MS. BRANSCOME:
12    Q   All right.  So moving along in that
13  paragraph, are there --
14    A   Okay.
15    Q   -- any other sentences or portions of
16  sentences with which you disagree?
17    A   So, the statement about case-control
18  studies and whether the positive association is
19  limited to case-control studies is -- is a bit
20  contentious.  And I understand very well that the
21  evidence does not -- if we only had the cohort
22  studies, if that's all the evidence that existed,
23  it would be fair to say that that evidence does
24  not argue for an association with -- between
25  ovarian cancer and -- so I would -- I'm not -- I

Jack Siemiatycki, Ph.D.

Page 206

1  guess if I were writing this, I would qualify it
2  somehow, and -- no, I think I'll just leave --
3  leave that there, and you may have follow-up
4  questions about the case-control/cohort
5  comparison.
6      Q   Is there anything else in this paragraph
7  in the Discussion section of Berge 2018 with which
8  you disagree?
9      MS. PARFITT:  And can you refer him to
10 the left-hand side of the discussion or the
11 entire --
12     MS. BRANSCOME:  The second full
13 paragraph in the Discussion section.
14     MS. PARFITT:  Which starts with "An
15 important."
16     THE WITNESS:  So I -- I think what --
17 BY MS. BRANSCOME:
18     Q   No, it begins with "This meta-analysis
19 suggests."
20     A   Yeah.  Yeah.
21     So your question -- the question is
22 about that sentence that says:  "This estimate is
23 somewhat lower.  In our cumulative meta-analysis,
24 we confirmed the trend towards lower," da, da, da,
25 and that refers I guess specifically to Figure 4

Page 207

1  on the following page.
2      Certainly the confidence intervals, if
3  you look at the confidence intervals of the
4  meta-estimates in that Figure 4, from 1988 through
5  2016, everything is embedded in everything.  So
6  from the point of view of statistical variability,
7  it would be difficult to argue that there is a
8  real statistical -- statistically meaningful
9  difference between the trendline from -- through
10 that whole period.
11     There is a tendency by eye for a
12 decline.  I don't know in their paper, in the text
13 whether they've characterized the decline with any
14 regression coefficients or not.  I don't remember.
15 It seems to me like a rather weak trend to make a
16 big point about.  So I wouldn't disagree with
17 the -- the point they're making, but I think it's
18 not strongly supported.  There isn't a strong
19 trend downwards in this line, in this figure.
20     Q   So you would agree with the authors that
21 there is a downward trend in the risk assessment
22 over time as more evidence accumulated, but you
23 might disagree with them about the strength of
24 that trend.  Is that fair?
25     MS. PARFITT:  Objection.  Form,

Page 208

1  misstates his testimony.
2      THE WITNESS:  It requires looking at
3  which studies were included in each of these
4  meta-analyses, and which results were chosen by
5  the meta-analysis people who did these
6  meta-analyses from each paper.  The meta-analysis
7  is somewhat sensitive to which studies are
8  selected and -- so the same study might have been
9  selected in the 2004 meta-analysis as in the 2016,
10 but they chose -- they decided to choose an
11 estimate from -- a result from that paper that
12 they thought was the most reasonable one and
13 that's different.
14     So one would have to do side-by-side
15 comparisons of which studies were included and
16 which results before concluding that this is
17 because of a downward trend.  You also need to
18 know when the data were collected.
19     You know, I'm not sure if the -- if you
20 are implying or if they are implying that -- you
21 know, I -- a declining trend, if there is one, in
22 meta-analyses -- these are the years of the
23 meta-analysis, not the years that women were
24 exposed.  So there's no implication -- direct
25 implication here that the risks to women are

Page 209

1  declining over time.  So if it's only the fact
2  that meta-analyses carried out at different points
3  in time showed very slightly different results, I
4  don't find that a noteworthy observation.  But...
5  BY MS. BRANSCOME:
6      Q   And you agree that meta-analyses are
7  sensitive to the judgments applied by the authors
8  of those studies, correct?
9      A   Yes, they are, but to -- to a degree.  I
10 mean you have to weigh the -- the degree of
11 bias -- or not the bias, but the -- the influence
12 of particular decisions that you might make.
13     I've done an analysis looking at what
14 happens when you include or exclude studies, and
15 you could exclude any study from my meta-analysis
16 and you'd find the same result.  So if any of
17 these studies in my meta-analysis are completely
18 wrong, if they were completely invented, if the
19 women were never actually interviewed but the
20 investigator just wrote a paper on a Sunday
21 afternoon, and you're suspicious that this study
22 was -- or badly -- whatever, if you take any one
23 of these studies and take it out of the mix, it
24 wouldn't affect the meta-relative risk.
25     MS. BRANSCOME:  Okay.  I think this is a

53 (Pages 206 to 209)

Jack Siemiatycki, Ph.D.

Page 210

1  good place to take a break.
2      MS. PARFITT:  Very good.  Thank you.
3      THE VIDEOGRAPHER:  We're going off the
4  record at 5:07 p.m.
5      (Recess.)
6      THE VIDEOGRAPHER:  This begins disc
7  number 5 in the deposition of Jack Siemiatycki.
8  We're going back on the record at 5:36 p.m.
9  BY MS. BRANSCOME:
10     Q    One of the decisions that you had to
11  make in conducting your meta-analysis was how to
12  treat the Schildkraut 2006 study, correct?
13     A    2000 --
14     Q    -- '16.
15     A    Thank you.  Yes.
16     Q    Okay.  For purposes of your
17  meta-analysis, you divided Schildkraut 2016 into
18  two sets of results, correct?
19     A    "Divided" isn't quite the right word.
20     Q    How would you describe it?
21     A    Because they're not separate, one
22  includes the other.
23     Q    Okay.
24     A    So just the word "divided" -- I'm not
25  sure what the right word is, but there were two

Page 211

1  sets of results reported, and I used both sets of
2  results.  One is embedded -- one set is embedded
3  in the other.
4      Q    So correct me if I'm wrong, Schildkraut
5  2016-A shows results from all subjects who were
6  interviewed in the study from 2010 through 2015.
7  Schildkraut 2016-B is a subset of that that
8  includes the results for subjects who were
9  interviewed before 2014, correct?
10     MS. PARFITT:  And, Counsel, if we could
11  get Schildkraut in front of him, would that be all
12  right?
13     MS. BRANSCOME:  Sure.
14  BY MS. BRANSCOME:
15     Q    If you need to reference it --
16     MS. PARFITT:  Sure.
17  BY MS. BRANSCOME:
18     Q    -- to answer my questions, certainly.
19     A    If you're going -- yes, I think you're
20  right in what you said, but if you want me to look
21  at specific results in the paper, maybe I should
22  have it in front of me.
23     Q    I was going to direct you there when we
24  got to those questions.
25     A    Okay.

Page 212

1      Q    But if it's your preference to look at
2  the paper now, it is tab 15.
3      A    It's in this binder, I think.
4      MS. PARFITT:  Here it is.  Thank you.
5      THE WITNESS:  Thank you.
6      Okay.  The -- so one includes all --
7  Schildkraut A includes all of the cases
8  interviewed the whole period, and the
9  Schildkraut B includes cases after 2014, but I'm
10  not sure if it includes 2014.  But...
11  BY MS. BRANSCOME:
12     Q    Let me ask a clarification on that one,
13  Dr. Siemiatycki.
14     Schildkraut 2016-B shows results for
15  individuals interviewed before 2014, correct?
16     A    I'm sorry, which one, B?  Schildkraut B?
17     Q    Schildkraut 2016-B.
18     A    B.
19     Q    I believe you just stated after, so I --
20     A    I see.  Okay.
21     Q    -- wanted to seek clarification there.
22     A    Okay.  Yeah, I'm --
23     Q    If it's helpful --
24     A    It's late in the day.  Let me --
25     Q    Sure.  If it's helpful to you to

Page 213

1  reference in your report, you discuss your
2  separation of Schildkraut on page 74, Note 6.
3      A    That's why I wanted my report in a small
4  binder, rather than -- before 2014, yes.
5      Q    And the reason that you divided --
6  separated the study into those two groups, one
7  which is inclusive of the other, is to account for
8  the possibility that publicity surrounding two
9  class action lawsuits on talc and ovarian cancer
10  in 2014 may have induced bias in the validity of
11  reporting talc exposure; is that correct?
12     A    That's correct.
13     Q    Okay.  But in your main meta-analysis
14  you use Schildkraut A, which includes all subjects
15  interviewed from 2010 to 2015, correct?
16     A    That's correct.
17     Q    When you substituted Schildkraut B,
18  which included only subjects interviewed before
19  2014, for Schildkraut A, all subjects interviewed
20  from 2010 to 2015, the relative risk estimate for
21  the meta-analysis goes down, correct?
22     A    Yes.  From 1.28 to 1.27.
23     MS. BRANSCOME:  If we could mark
24  Schildkraut as Exhibit 13.
25     THE WITNESS:  There's a label here

54 (Pages 210 to 213)

Jack Siemiatycki, Ph.D.

| Page 214 |
| --- |

1   already.
2       MS. PARFITT:  There is.  I will go ahead
3   and just -- you don't care -- there's a defense
4   label of 1436.  Can I go ahead and put the exhibit
5   over top of it?  Does it matter to you?  Okay.
6   This will be 13.
7       (Exhibit No. 13 was marked for
8       identification.)
9   BY MS. BRANSCOME:
10      Q   All right.  If you could,
11  Dr. Siemiatycki, please turn to Table 2, which is
12  on page 1414 of Exhibit 13.
13      A   I see it.
14      Q   Before doing that, can you just simply
15  confirm that Exhibit 13 is in fact the Schildkraut
16  study?
17      A   Yes, it is.
18      Q   And we see in Table 2 that there is a
19  category for interview date less than 2014, and
20  then another category for interview date greater
21  than 2014.  Correct?
22      A   Yes, I see that.
23      Q   All right.  And we see that there are
24  odds ratios for any genital use for both of these
25  categories, correct?

| Page 215 |
| --- |

1       A   Yes, I see that.
2       Q   And the odds ratio for any genital use
3   for individuals who were interviewed after 2014 is
4   higher than the odds ratio for any genital use for
5   those individuals who were interviewed before
6   2014, correct?
7       A   That's correct.
8       Q   And it also shows the number of
9   individuals that fell in those respective
10  categories, correct?
11      A   Yes, correct.
12      Q   And so just simply looking at the
13  reported data, the percentage of women with --
14  with ovarian cancer who reported any genital use
15  of talc who were interviewed before 2014 was
16  36.5 percent, correct?
17      A   Can you run that by me again?  Show me
18  where the --
19      Q   Sure.
20      A   So interview date before 2014, any
21  genital use, the percentage 36.5, number 128, is
22  that what --
23      Q   Yes.
24      A   -- you are looking at?  Okay.
25      Q   Was that correct?

| Page 216 |
| --- |

1       A   Yes, that's correct.
2       Q   All right.  And the -- those are for the
3   cases, meaning individuals who had been diagnosed
4   or reported as diagnosed with ovarian cancer,
5   correct?
6       A   Correct.
7       Q   And if you compare that against the
8   controls, 34 percent is the reported number for
9   women without ovarian cancer who reported any
10  genital use of talcum powder that were interviewed
11  before 2014, correct?
12      A   That's correct.
13      Q   And if we look at those same
14  percentages for the individuals who were
15  interviewed after 2014, the percentage of cases,
16  meaning individuals who have been diagnosed or
17  reported as diagnosed with ovarian cancer who
18  claim to have used talc genitally at any point in
19  time, goes up to 51.5 percent compared to a
20  control of 34.4 percent, correct?
21      A   That's correct.
22      Q   All right.  And so if we compare
23  individuals interviewed before 2014 who have been
24  diagnosed or reported as diagnosed with ovarian
25  cancer to those individuals in the same category

| Page 217 |
| --- |

1   who were interviewed after 2014, you see at least
2   a 12 percent increase in those figures; is that
3   correct?
4       A   12 percent representing which -- which
5   two numbers?
6       Q   Representing the difference between the
7   cases who reported genital use of talcum powder --
8       A   The 36.5?
9       Q   -- as compared to the 51.5 percent.
10      A   So you -- you said it's 12 percent?  I
11  think it's like 14 percent.
12      Q   It is.
13      A   Okay.
14      Q   That is correct.
15          But if you do the same comparison for
16  the control group, you don't see a similar
17  increase or a similar difference in the reporting
18  percentages for individuals interviewed before
19  2014 as after 2014, correct?
20      A   That's correct.
21      Q   Okay.  Are those results compatible with
22  the existence of recall bias for individuals
23  interviewed after 2014?
24      A   I would say they are compatible with
25  recall bias.

55 (Pages 214 to 217)

Jack Siemiatycki, Ph.D.

Page 218

1    Q   Okay.  Was litigation-related recall
2  bias considered by IARC as a possible bias that
3  could explain the association between perineal
4  talc use and ovarian cancer?
5    A   In 2006?
6    Q   Correct.
7    A   I -- I can't remember verbatim the
8  discussions, and I can't remember a discussion of
9  litigation-related impact on response bias.  I
10  doubt if there would have been any at that time,
11  but -- and I don't recall any discussion of it.
12    Q   And at least the Schildkraut authors are
13  identifying 2014 as a significant year with
14  respect to widespread knowledge of lawsuits
15  involving talcum powder and a claim of ovarian
16  cancer --
17    MS. PARFITT:  Objection.  Form.
18  BY MS. BRANSCOME:
19    Q   -- correct?
20    MS. PARFITT:  Objection.  Form.
21    THE WITNESS:  I -- if you may, I think
22  what they refer to is localized publicity, not
23  widespread publicity.
24  BY MS. BRANSCOME:
25    Q   If you can, can you refer me to the

Page 219

1  language in the paper that references that.
2    A   So I see a mention of it in the -- on
3  page 1412, second column, last paragraph, about
4  seven or eight lines from the bottom, the sentence
5  beginning:  "Two class action lawsuits were filed
6  in 2014 concerning possible carcinogenic effects
7  of body powder, which may have influenced recall."
8    Now, there's a reference there, but the
9  reference doesn't indicate where those class
10  actions were.  And now I'm going to look in the
11  Discussion section to see if there's any
12  indication.  If anyone knows whether there is or
13  if there is not -- I haven't looked for this
14  specifically.  I just have a vague memory of them
15  referring to localized publicity, but... (peruses
16  document.)
17    Well, in my very quick scanning, I don't
18  see reference to these being local.  You people
19  might know whether these two lawsuits that they
20  refer to in the Reference section, whether they
21  were local in this area.  And this is North
22  Carolina, is it?
23    Q   Well, so that's -- that's a question I
24  have for you, Dr. Siemiatycki.  On page 1412, the
25  paragraph -- the last full paragraph on the second

Page 220

1  column seems to suggest that data was collected
2  from a number --
3    A   Oh.
4    Q   -- of different states across the United
5  States, correct?
6    A   Correct.  Correct.
7    Q   And so at least based on your review as
8  you sit here today, the authors do not seem to
9  have limited the potential effect of publicity of
10  the class action lawsuits to a precise region,
11  correct?
12    A   That seems to be the case.
13    Q   Okay.
14    A   Yes.
15    Q   And so your understanding or your
16  testimony earlier that the publicity was only
17  localized, you're not able to point me to anything
18  in the article to support that, correct?
19    A   That's correct.
20    Q   And in fact, in the two portions of the
21  Schildkraut article that discuss the publicity,
22  there is no specific reference to it being limited
23  to an area, correct?
24    MS. PARFITT:  Objection.  Form.
25    THE WITNESS:  In the two -- sorry.

Page 221

1  BY MS. BRANSCOME:
2    Q   So there's one discussion of the
3  potential public -- the potential effect of
4  publicity, which is on page 1412.
5    A   Yeah.
6    Q   And then there is a second discussion of
7  it on page 1416 --
8    A   Yes.
9    Q   -- in the Discussion section, and
10  neither of those two sections talk about awareness
11  of the class action lawsuits being limited to a
12  specific geographic region, correct?
13    A   That's correct.
14    Q   In fact, the language that the authors
15  use is a heightened awareness of the exposure as a
16  result of two recent class action lawsuits, and
17  they discuss just publicity, correct?
18    A   Yes, I think so.
19    Q   Okay.  Are you relying --
20    A   In that second paragraph in the
21  discussion, the authors seem to discount the --
22  the recall bias hypothesis or to minimize it, and
23  I -- I -- I don't support -- or the opposite of
24  what they're saying.  I just note that they don't
25  seem to be enthusiastic about that hypothesis that

56 (Pages 218 to 221)

Jack Siemiatycki, Ph.D.

Page 222

1  it's strictly due to response bias.
2        But go ahead and --
3        Q   The authors do recognize, though, that
4  there is a possibility of recall bias may have
5  caused some inflation of the odds ratios, correct?
6        A   Yes.
7        MS. PARFITT:  Wait, that's part --
8  that's part of the sentence.  Objection.
9        THE WITNESS:  Yeah.  Yeah.
10  BY MS. BRANSCOME:
11        Q   Are you relying on Penninkilampi 2018
12  for your opinions in this litigation?
13        A   My opinions were informed before I knew
14  about that article.
15        Q   Do you believe that the Penninkilampi
16  2018 study supports your conclusions in this
17  litigation?
18        A   It's consistent with my conclusions.  A
19  little bit like Berge, the fact that they didn't
20  pick up any studies that I hadn't -- that I had
21  not picked up reassures me that there was nothing
22  amiss in my search of the literature.
23        There were some differences in which
24  studies they included in their meta-analysis and
25  which data.  I'm happy with the decisions -- the

Page 223

1  judgments I had made about it.  So there are some
2  minor variations there.  But essentially they
3  found the same thing that I found, because we're
4  all working with the same data.
5        Q   Okay.  Did you do an independent
6  verification that the data Penninkilampi reports
7  in his article is indeed accurate?
8        MS. PARFITT:  Objection.  Form.
9        THE WITNESS:  By the data, you mean the
10  results that he put into his meta-analysis?
11  BY MS. BRANSCOME:
12        Q   For example, did you look at the
13  reported data in the tables in the Penninkilampi
14  article and compare it to the underlying studies
15  to see if they matched?
16        A   I don't recall doing that comparison.
17  I'm not sure why I would want to.
18        Q   If there were errors in the reporting of
19  any of the odds ratios or confidence intervals in
20  the Penninkilampi 2018 paper, would that call into
21  reliability the meta-analysis, in your opinion?
22        MS. PARFITT:  Objection.  Form.
23        THE WITNESS:  It depends on the nature
24  of the errors.  If there was one decimal point
25  typo sort of thing, it would have absolutely no

Page 224

1  impact on the bottom line result.  Some errors
2  might have large effects, so it would depend what
3  the errors were.
4        But since his studies were mostly the
5  same as the ones I had used and the same ones that
6  Berge had used, and since the results that he had
7  taken out of those studies were mostly the same
8  ones I had taken out and that Berge had taken out,
9  I fully expected his bottom line meta-analysis to
10  produce the same results.
11  BY MS. BRANSCOME:
12        Q   The Penninkilampi study does not
13  consider or include the Gates 2010 cohort study,
14  correct?
15        A   Correct.
16        Q   Do you think Gates 2010 - and if you
17  would prefer to refer to Penninkilampi, it is
18  tab 20.
19        A   Yeah.
20        Q   In your opinion, is --
21        MS. PARFITT:  I have a clean one right
22  here with the -- if we use two books, we can do it
23  to save time, but --
24        THE WITNESS:  Sorry?
25        MS. PARFITT:  Do you want that?

Page 225

1        THE WITNESS:  No.  I'm actually looking
2  for my copy of the Gates 2010.
3        You're going to ask me about his use
4  of -- Gates 2010?
5  BY MS. BRANSCOME:
6        Q   I was simply just going to ask you, is
7  Gates 2010 a significant study, in your opinion,
8  to leave out of a meta-analysis on this topic?
9        MS. PARFITT:  Objection.  Form.
10        THE WITNESS:  A significant study.
11  It -- in my view there are flaws with that study,
12  but there are flaws with many epidemiologic
13  studies.  It's not -- that's not a reason to
14  exclude them.  I would include it but take note of
15  the flaws, including the fact that their reference
16  category for their odds ratios for their relative
17  risk estimates was not an unexposed group, but it
18  was a group that combined women who had never used
19  talc with women who had used it occasionally.
20  BY MS. BRANSCOME:
21        Q   Are there any other errors in the Gates
22  2010 study?  And if you'd like to refer to it --
23        MS. PARFITT:  Thank you.
24        THE WITNESS:  Okay.  Let me find my copy
25  of -- yeah, here we are -- Gates 2010.

57 (Pages 222 to 225)

Jack Siemiatycki, Ph.D.

Page 226

1      Well, yes, there are some flaws with it,
2  but they're related to the fact that this builds
3  on the Nurses' Health Study, which is a good and
4  well deservedly recognized, good prospective
5  cohort study which focused on many factors in
6  women's lives, including predominantly nutritional
7  reproductive, hormonal factors, and all kinds of
8  diseases, all heart disease, diabetes, et cetera,
9  et cetera.  There have been hundreds and hundreds
10  of publications that have come out of it.
11      Their collect- -- the collection of talc
12  information in the Nurses' Health Study was very
13  weak.  The questionnaire was conducted in 1982.
14  It was part of a biannual follow-up mailed
15  questionnaire.  The question itself and the
16  structure of the question itself I find very weak
17  from the point of view of designing questions for
18  questionnaires.  I mean, I -- I could read it into
19  the record, but it's in the -- it's in the -- it's
20  quoted in the Gertig paper, and it's actually --
21  I've seen that page of the questionnaire, and
22  it's -- I find it ambiguous as to how women would
23  answer that question.
24      And it's only one question for that
25  point in time.  There was never any follow-up.  So

Page 227

1  between 1982 and 2007 or so, when the follow-up of
2  the -- for the Gates analysis ended, they had no
3  idea whether women were exposed -- whether women
4  who had been exposed in 1982 were in exactly the
5  same exposure category in 1990, in 2000, in 2005
6  and so on.  They made the assumption that women's
7  exposure status was stable for 25 years.  And so
8  that's a major weakness of the analysis of talc
9  and ovarian cancer in -- from this study.
10  BY MS. BRANSCOME:
11      Q   So in your view, was it proper for the
12  Penninkilampi authors to leave Gates 2010 out of
13  their meta-analysis?
14      A   That's not what I said.  That's not what
15  I said.
16      I -- I think to go down the road of
17  making value judgments about each of these studies
18  and including them or not including them would end
19  up in the need for many days of deposition and
20  cross-examination, because each of those -- any
21  decision about any study can be argued umpteen
22  ways.  And that's why I took the decision early on
23  not to make exclusions based on my judgment of the
24  quality of the study.
25      Q   Do you personally know any of the

Page 228

1  authors of the Penninkilampi 2018 publication?
2      A   No, I don't.
3      Q   Do you know or have any information
4  about the source or sources of funding for the
5  Penninkilampi article?
6      A   No, I don't, no.  I -- I would add,
7  though, that the inclusion or exclusion of Gates
8  2010 probably didn't affect the bottom line result
9  of their meta-analysis by more than 0.01 decimal
10  point of the odds ratio.
11      Q   But did they publish any type of
12  sensitivity analysis that would let you
13  specifically draw that conclusion?
14      A   Well, I -- I have done one myself where
15  I dropped each of the studies in order to see what
16  would be the impact if that study had been
17  dropped.  And there's hardly -- no study has more
18  than a 1 decimal -- you know, 0.01 decimal point
19  on the odds ratio.
20      So we could argue about the merits of
21  any of these studies or demerits, but the impact
22  of including them or excluding an individual study
23  is pretty minimal.
24      Q   Shushan 1996 is one of the studies you
25  did not include in your main meta-analysis,

Page 229

1  correct?
2      A   Correct.
3      Q   And you reported that you did not
4  include it because the report was quite cryptic
5  regarding the data collection and the talc
6  exposure variable, correct?
7      A   That's correct.
8      Q   What did you mean by the report was
9  quite cryptic regarding the data collection?
10      A   So I have to take a couple of minutes to
11  review that -- to look at that paper to answer
12  your question.
13      Well, so the first thing that strikes
14  me -- and I haven't read the description of how
15  they collected the data.  The first thing that
16  strikes me is they have a table, Table 2 on
17  page 15, with some information about these various
18  variables, including talc exposure.  And the two
19  categories of talc exposure that they describe in
20  this table, one is called "Never - seldom," and
21  the other one is called "Moderate - a lot."  I
22  don't know what that means.  So that's one
23  element -- how they present it and how they
24  analyze the data.
25      But I think actually how they collected

Jack Siemiatycki, Ph.D.

Page 230

1  the data also led me to describe the -- the
2  information on exposure as being cryptic.
3      Q   Okay.  Are you familiar with the 2018
4  paper by Mohamed Taher and others entitled "The
5  systematic review and meta-analysis:  The
6  association between perineal use of talc and risk
7  of ovarian cancer"?
8      A   Yes, I am.
9      Q   Okay.  Have you read the Taher 2018
10 manuscript?
11     A   Yes.  I haven't read all the appendices,
12 but I basically read enough that I know what's in
13 it.
14     Q   Did you have access to the Taher 2018
15 article before it was published?
16     A   I don't think it's been published.
17     Q   How did you get access to the Taher
18 manuscript and the appendices?
19     A   I heard about -- I first heard about the
20 Canadian Department of Health advisory, or
21 whatever the word is, about talc and ovarian
22 cancer in the public media.  And I -- I think in
23 the news report that I saw, there was a reference
24 to Taher -- the Taher paper.  That's how I first
25 learned about something by them.

Page 231

1      And I wrote to Ms. Parfitt -- I sent a
2  message to Ms. Parfitt asking her if she knows
3  anything about this and has that information, and
4  she wrote back, I think, and said, No, I thought
5  you might have -- know something about it and have
6  information.
7          MS. PARFITT:  And -- and,
8  Dr. Siemiatycki, you're not to discuss --
9          THE WITNESS:  Okay.
10         MS. PARFITT:  -- discuss our
11 communications.
12         THE WITNESS:  Okay.
13         Subsequently, Ms. Parfitt sent me the
14 Taher paper.
15 BY MS. BRANSCOME:
16     Q   And when -- when did you first request
17 the Taher paper and appendices from Ms. Parfitt?
18     A   I think in December 2018.
19     Q   When were you provided with the Taher
20 manuscript and the appendices and supplemental
21 tables?
22     A   Within a few days after that.
23     Q   Do you know personally any of the
24 authors on the Taher manuscript?
25     A   I know one of them.

Page 232

1      Q   Which author do you know?
2      A   Daniel Krewski.
3      Q   You have published many papers with, is
4  it, Dr. Krewski?
5      A   Yes.
6      Q   Is that correct?
7      A   Yes.  Yes, it is.
8      Q   How many papers have you published with
9  him?
10     A   I'll look at my CV and count.
11     Q   Would it be fair to say over 20?
12     A   Oh, I would be surprised if it was that
13 high.  But if you've counted, I won't contradict
14 what you -- what you say.
15     Q   Let's do it this way:  Would all of the
16 papers that you have coauthored with Dr. Krewski
17 be listed on your CV?
18     A   Yes.
19     Q   Have you discussed your opinion on talc
20 and ovary -- ovarian cancer with Dr. Krewski?
21     A   No.
22     Q   Have you discussed your opinion on talc
23 and ovarian cancer with any of the authors of the
24 Taher manuscript?
25     A   No.

Page 233

1      Q   Have you spoken to or otherwise
2  communicated with Dr. Krewski about your
3  involvement as an expert in this litigation?
4      A   No, I haven't.
5      Q   Do you know if the Taher manuscript has
6  been accepted for publication?
7      A   I don't know if it's been submitted for
8  publication.
9      Q   Do you know anything about the source or
10 sources of funding for the Taher 2018 manuscript?
11     A   I don't have any privileged information
12 about that, but I seem to recall in the manuscript
13 they're saying something about funding from Health
14 Canada.
15     Q   Is it fair to say that your knowledge
16 with respect to the source or sources of funding
17 of the Taher manuscript is limited to what is
18 written in the manuscript itself?
19     A   Yes.
20     Q   Did you attend the National Cancer
21 Institute directors meeting held in Lyon, France,
22 on July 11th through 13th, 2018?
23     A   No, I did not.
24     Q   Now, the Taher 2018 manuscript contains
25 a meta-analysis, correct?

59 (Pages 230 to 233)

Jack Siemiatycki, Ph.D.

Page 234

1    A   Correct.
2    Q   And Taher 2018 calculates an overall
3    relative risk of 1.28, correct?
4        MS. PARFITT:  If we could just get that
5    in front of him.
6        MS. BRANSCOME:  Oh, of course.
7        MS. PARFITT:  Do you have your copy?  I
8    appreciate that.
9        MS. BRANSCOME:  It is tab --
10        MS. PARFITT:  I think he may have it as
11    well and --
12        THE WITNESS:  I have it --
13        MS. PARFITT:  Make that a little easier
14    and more quicker.
15        MR. TISI:  Do you want to mark it?
16        MS. BRANSCOME:  We have already marked
17    Dr. Siemiatycki's binder.
18        MR. TISI:  Okay.  We can --
19        MS. BRANSCOME:  I believe that contains
20    the -- the manuscript and the exhibits.
21        MS. PARFITT:  And that is binder 6,
22    Exhibit 6.
23        MR. TISI:  You said binder, going with
24    his or the one --
25        MS. PARFITT:  Exhibit 6.

Page 235

1        MS. BRANSCOME:  Exhibit 6 is
2    Dr. Siemiatycki's copy of the Taher manuscript
3    with the appendices and supplemental tables.
4    BY MS. BRANSCOME:
5    Q   Is that correct?
6    A   That's correct.
7        MR. TISI:  And that's in his binder,
8    Exhibit 6.
9        THE WITNESS:  I don't -- I didn't bring
10    the supplemental tables and appendices with me.
11    BY MS. BRANSCOME:
12    Q   Okay.  So could you just describe for
13    the record the contents of Exhibit 6.  It is
14    marked, but just so that I can follow along.
15    A   This document?
16        MR. TISI:  No, the whole thing.
17        THE WITNESS:  Oh, the whole -- the whole
18    thing.  It contains various meta-analyses, so the
19    Berge, Penninkilampi, Huncharek, just the meta --
20    main meta-analyses that have been done.
21        MS. PARFITT:  And, Counsel --
22        THE WITNESS:  Langseth.
23        MS. PARFITT:  Right.
24        -- in light of the fact he has his in
25    front of him, Exhibit 6, is there a corresponding

Page 236

1    one in the binders you gave him?  That may help.
2        MS. BRANSCOME:  It's tab 31.
3        MS. PARFITT:  Thank you.
4        Tab 31.  I appreciate that.
5        No, you can keep yours.
6        THE WITNESS:  Okay.
7        MS. PARFITT:  There you go, just for the
8    record.  Okay.  Thank you.
9    BY MS. BRANSCOME:
10    Q   So my question to you, Dr. Siemiatycki,
11    is Taher 2018 calculates an overall relative risk
12    of 1.28.  Is that correct?
13    A   That's what it says in the abstract,
14    yes.
15    Q   And the confidence interval that they
16    report is 1.2 to 1.37, correct?
17    A   Yes.
18    Q   So the overall relative risk as well as
19    the confidence interval reported in the Taher 2018
20    paper is very similar to the overall relative risk
21    and confidence interval that you report in your
22    analysis for the MDL, correct?
23    A   That's correct.  Which is not
24    surprising.
25    Q   And if you could turn to page 49 of the

Page 237

1    Taher paper.  You see the Conclusion section?
2    A   Yes.
3    Q   The authors of the Taher paper state in
4    the Conclusion section:  "Consistent with previous
5    evaluations, the IARC in 2010 and subsequent
6    evaluations by individual investigators, the
7    present comprehensive evaluation of all currently
8    available relevant data indicates that perineal
9    exposure to talc powder is a possible cause of
10    ovarian cancer in humans."
11        First, did I read that correctly?
12    A   Yes.
13    Q   Okay.  Do you agree first that the Taher
14    2018 paper represents a comprehensive evaluation
15    of all currently available relevant data?
16    A   Yes.  I haven't -- I haven't done the
17    same comparison between which studies and which
18    data points from each study they used compared to
19    the ones that I've used.  I did that for the Berge
20    and for the Penninkilampi, comparing theirs with
21    mine.  I haven't done that for theirs.  So I -- I
22    assume that they used basically the same studies
23    and the same results from each study.
24        But, you know, to answer -- I'm quite
25    sure that they did this comprehensive evaluation

60  (Pages 234 to 237)

Jack Siemiatycki, Ph.D.

| Page 238 |
| --- |

1  of all currently available, but to answer that
2  strictly, I would want to do a comparison of the
3  two.  But I'm willing to accept.
4      Q   Okay.  And we see here even in this
5  sentence that we just read that there's a
6  reference there to the IARC publication in 2010.
7  We've already discussed that, correct?
8      A   Yes.
9      Q   And then there's a reference to
10 subsequent evaluations by individual
11 investigators, and there's a reference there to
12 articles or studies 3, 5 and 69.  Do you see that?
13     A   I see that.
14     Q   And looking at the reference pages,
15 beginning on page 51, would you agree that
16 reference 3 is the Berge analysis, this citation
17 is 2017, correct?
18     A   Correct.
19     Q   Five is Penninkilampi, correct?
20     A   Correct.
21     Q   And the last reference, which is 69, is
22 to the Terry meta-analysis.  Do you see that?
23     A   Terry is not a meta-analysis.  It's a
24 pooled analysis.  But I see that, yes.
25     Q   Okay.  So the reference in the Taher

| Page 239 |
| --- |

1  manuscript to reference 69 is to the Terry pooled
2  analysis from 2013, correct?
3      A   Correct.
4      Q   And so you agree that at least the Taher
5  authors considered the Berge, Penninkilampi, and
6  Terry studies.
7          MS. PARFITT: Objection.  Form.
8          THE WITNESS: Were aware of.  I'm not
9  sure what you mean by considered.  They -- they
10 referenced it.  I don't know that they considered
11 it in their -- I don't imagine that there's any
12 place in their statistical analysis where they
13 introduced data from any of those papers.  They're
14 just acknowledging that those other meta-analyses
15 found the same thing that they found.
16 BY MS. BRANSCOME:
17     Q   So perhaps we have a different
18 understanding of the word "considered."
19     A   Okay.
20     Q   Would you agree that a fair reading of
21 their Conclusion paragraph would indicate that the
22 Taher authors were first aware --
23     A   Yes.
24     Q   -- of Terry, Berge and Penninkilampi?
25     A   Yes.

| Page 240 |
| --- |

1      Q   And that they examined those studies
2  closely enough at least to reach the conclusion in
3  their own mind that their results were consistent
4  with those findings.
5          MS. PARFITT: Objection.  Form.
6          THE WITNESS: Yes.
7  BY MS. BRANSCOME:
8      Q   Are there any scientific publications
9  that were available to you during your review in
10 connection with your formation of opinions in the
11 MDL that were not available to the authors of the
12 Taher manuscript?
13         MS. PARFITT: Objection.  Form.
14         THE WITNESS: So are you talking about
15 the meta-analysis that -- are you talking about
16 studies that went into meta-analysis or are you
17 talking about the, you know, 200 or 300 references
18 in my bibliography?
19 BY MS. BRANSCOME:
20     Q   Fair enough.
21         Are there any studies that you included
22 in your meta-analysis that, at least to your
23 knowledge, were available to you and were not
24 available to the Taher authors?
25         MS. PARFITT: Objection.  Form.

| Page 241 |
| --- |

1          THE WITNESS: Oh, they would have been
2  available because all of my -- the studies I used
3  are in publicly available literature, and I'm sure
4  they were available.
5  BY MS. BRANSCOME:
6      Q   Okay.  Do you have any criticisms of the
7  Taher 2018 meta-analysis?
8      A   I haven't evaluated it closely enough
9  to -- to formulate criticisms or praise or --
10     Q   Now, you testified earlier that there
11 was a flurry of activity in December surrounding
12 the information from Health Canada and the Taher
13 manuscript.
14         Is there a reason why you have not
15 reviewed the Taher manuscript in detail and formed
16 an opinion about whether you agree or disagree
17 with its analysis?
18         MS. PARFITT: Objection.  Fully
19 misstates his testimony.  Form.
20         THE WITNESS: I -- I thought that it
21 would have absolutely no bearing on the results
22 and the opinions that I expressed in my report,
23 plus I didn't have time to do such a review.  And
24 so the combination of those two things made it a
25 simple decision not to devote precious time and

61 (Pages 238 to 241)

Jack Siemiatycki, Ph.D.

Page 242

1    effort to a -- a futile activity.
2        I'm not uninterested in what they did or
3    what they found, but I can predict pretty quickly
4    what they did and what they found, and I -- I know
5    the studies that they reviewed, that they had
6    access to. There's nothing that they would find
7    that I wouldn't be able to predict.
8        MS. BRANSCOME: Okay.
9        Now may be a good time to take a break.
10       MS. PARFITT: Sure. Okay. Very good.
11       MS. BRANSCOME: Let's go off the record.
12       MR. TISI: Are we switching examiners
13   too?
14       MS. BRANSCOME: I don't know. That's
15   why --
16       MS. PARFITT: Oh, fair enough. Fair
17   enough.
18       THE VIDEOGRAPHER: We're going off the
19   record at 6:22 p.m.
20       (Recess.)
21       THE VIDEOGRAPHER: This begins disc
22   number 5 in the deposition of Jack Siemiatycki.
23   We are going back on the record at 6:40 p.m.
24   BY MS. BRANSCOME:
25       Q   So, Dr. Siemiatycki, if you could open

Page 243

1    back up to the Taher manuscript again. I believe
2    it's in your binder that's been marked as
3    Exhibit 6, and specifically, if you could go to
4    Figure 3 on page 39.
5        Have you looked at Figure 3 from the
6    Taher 2018 manuscript before now?
7        A   No, I haven't. I may have glanced at it
8    going through it, but I haven't examined it.
9        Q   Did you look at anything in the Taher
10   manuscript to support your opinion that there is
11   at least evidence compatible with the dose-
12   response relationship between perineal use of talc
13   and ovarian cancer?
14       A   I didn't look for that in this paper.
15       Q   If you could look at page 25 of the
16   Taher paper.
17       Do you see here that the authors of the
18   Taher manuscript describe the summary of evidence
19   for each of the Hill criteria of causation? Do
20   you see that?
21       A   I see that.
22       Q   And you are familiar with the Hill --
23   the Hill criteria of causation, correct?
24       A   I'm familiar with what they call the
25   Hill criteria and what some people call the Hill

Page 244

1    criteria, but which are not criteria and shouldn't
2    be called criteria.
3        Q   Understanding that you have specific
4    views about the appropriateness and application of
5    it, you are at least familiar with what is
6    sometimes referred to as a Bradford Hill analysis
7    or the Hill criteria, correct?
8        A   I don't -- again, the phrase "Bradford
9    Hill analysis" doesn't mean anything. I don't
10   think you would find that phrase in any
11   epidemiology or statistics textbook.
12       Q   Are you saying as you sit here today,
13   Dr. Siemiatycki, you've never heard of the Hill
14   criteria?
15       MS. PARFITT: Objection. Misstates his
16   testimony.
17       THE WITNESS: No, I've heard of it, and
18   I'm saying that it's a misnomer. And so I'd
19   prefer if the correct terminology is used when --
20   if you're asking me questions about it.
21   BY MS. BRANSCOME:
22       Q   The authors of the Taher manuscript use
23   the term "Hill criteria" --
24       A   Yes.
25       Q   -- in their Table 2, correct?

Page 245

1        A   Yes, they do.
2        Q   And there is a discussion under the --
3    what they refer to as a criterion for strength of
4    association, correct?
5        A   Yes.
6        Q   And the Taher authors report that out of
7    30 epidi- -- epidil- -- epidemiological studies --
8    it's late in the day -- six reported positive
9    association of statistical significance with a
10   risk value, relative risk or odds ratio of 1.5 or
11   greater.
12       Is that description of the
13   epidemiological studies accurate?
14       A   I don't know. I haven't counted. I
15   haven't done that kind of counting, which is
16   irrelevant and wrong from a statistical and
17   epidemiological point of view to do it. So I
18   haven't done it, and I can't confirm that there
19   are six that report odds ratios greater than 1.5.
20   I could do that if you want me to. I can look
21   through studies and see.
22       But there's no -- there's no scientific
23   purpose in doing that. It's a meaningless piece
24   of information.
25       Q   Would you criticize the Taher authors

62 (Pages 242 to 245)

Jack Siemiatycki, Ph.D.

Page 246

1    for their discussion of the Hill criteria?
2        A    Yes.
3        Q    And you have explained your criticisms
4    about the Hill criteria in both your trial
5    testimony and in your prior deposition testimony,
6    correct?
7        A    I can't remember the details, but I -- I
8    guess if I was asked about it, I explained what I
9    thought about it.
10       My criticism -- I'm not sure what you
11   mean by my criticisms of the term or of the
12   concepts that the paper that Hill wrote in 1965,
13   the ways -- the umpteen different ways that other
14   people have interpreted it.   What -- what are you
15   referring to when you say I criticized?   What did
16   I criticize?
17       Q    Have your views with respect to the use
18   and application of the so-called Hill criterion
19   changed since you testified in the Echeverria
20   trial?
21       MS. PARFITT:  Objection.  Form.
22       THE WITNESS:  They -- they haven't
23   changed in 40 years.
24   BY MS. BRANSCOME:
25       Q    Okay.  Thank you.

Page 247

1        Now, we have just discussed three
2    meta-analyses:  The Berge meta-analyses, the
3    Penninkilampi meta-analyses, and the Taher
4    meta-analyses.  Correct?
5        A    Yes.
6        Q    Would you agree that none of the authors
7    of those three meta-analyses concluded that talc
8    was a probable cause of ovarian cancer?
9        MS. PARFITT:  Objection.  Form.
10       THE WITNESS:  The purpose of those
11   meta-analyses was to estimate the meta-estimate of
12   relative risk.  In terms of the conclusion about
13   probable causation, I think they all commented on
14   it in their discussions.
15       And can you specify your question again,
16   whether they concluded that it was a probable
17   cause?
18   BY MS. BRANSCOME:
19       Q    Correct.
20       A    I'd have to look at the way they -- what
21   conclusions they drew, I'd have to look at that.
22       Q    Okay.  If we could look at the Berge
23   paper, which should be tab --
24       A    Let me see, I think I have the latest
25   issue of the Berge paper.

Page 248

1        Q    48 in my binder, but I don't know if you
2    have a copy in yours, which might be faster.
3        A    No, this -- I have the -- I have the
4    current Berge paper.  So...
5        Q    At page 9, I believe.
6        Well, that's confusing to say page 9.
7        A    Okay, I see that.
8        Q    Okay.  In reviewing the conclusion that
9    the Berge authors reached, would -- did the Berge
10   authors conclude that genital talc use was a
11   probable cause of ovarian cancer?
12       A    They did not indicate that they
13   concluded that.
14       Q    Okay.  And same for the Penninkilampi
15   study.
16       MS. PARFITT:  Had you finished?  Had you
17   finished your statement.
18       THE WITNESS:  Not quite.
19       There's a difference between the
20   findings of a study and the inferences that are
21   drawn from those findings.  So the findings of
22   their meta-analyses and the findings of the
23   Penninkilampi meta-analyses and findings of the
24   Taher meta-analyses are the same as my findings.
25   All four agree on the findings.

Page 249

1        Interpreting and making inferences is a
2    whole other bailiwick, a whole other activity, and
3    they don't -- didn't conclude in this section that
4    it's a probable cause.  From the same evidence, I
5    do conclude that it's a probable cause.
6    BY MS. BRANSCOME:
7        Q    Right.  And the same is true for the
8    Penninkilampi officer -- authors, correct?
9        A    Sorry, I have to go through it.
10   (Peruses document.)
11       I don't really agree with your
12   statement.  I don't think they conclude that it's
13   probable or not probable.  I don't see -- can you
14   point me to a statement that would imply that it's
15   not -- that they think it's not probable?
16       Q    Do the authors of the Penninkilampi
17   paper use the phrase, quote, suggestive of a
18   causal association, in the Conclusion section?
19       A    Yes, they do.
20       Q    Okay.  Would you say that "suggestive of
21   a causal association" is equivalent to probable
22   causation?
23       MS. PARFITT:  Objection.  Form.
24       THE WITNESS:  That's a semantic
25   question, and how different people and different

63 (Pages 246 to 249)

Jack Siemiatycki, Ph.D.

Page 250

1  cultures -- and I think these people are
2  Australians -- how Australians tend to use the
3  word "suggestive."  I -- I don't read this in a
4  way as to suggest that they don't think it's
5  probable.
6  BY MS. BRANSCOME:
7      Q   So you don't know from reviewing the
8  Conclusion section one way or the other whether
9  the Penninkilampi authors view perineal use of
10 talc as a probable cause of ovarian cancer.
11     MS. PARFITT:  Objection.  Form.
12 misstates his testimony.
13         Just answer the question.
14     THE WITNESS:  Yes, that's right, I -- I
15 don't.
16 BY MS. BRANSCOME:
17     Q   Okay.  And as we just looked at in the
18 Taher manuscript, the Taher authors describe that
19 the data indicates perineal exposure to talc
20 powder is a possible cause of ovarian cancer in
21 humans, correct?
22         And if you need the reference, it's
23 page 49.
24     A   That's correct.
25         Possible does not preclude probable, by

Page 251

1  the way.  I'm not -- I'm not assume-- are you
2  assuming that they had in mind the IARC
3  classification system and that these two
4  categories are mutually exclusive?
5      Q   My question to you, Dr. Siemiatycki, is
6  did any of the authors of the three other
7  meta-analyses, Berge, Penninkilampi or Taher,
8  conclude in their papers that perineal talc use is
9  a probable cause of ovarian cancer?
10     MS. PARFITT:  Objection.  Form.  Asked
11 and answered.
12     THE WITNESS:  They did not use that
13 word.  But I would not infer that they don't think
14 it's a probable cause from the write-up of
15 their -- from their write-up.  It is possible that
16 they consider the description of this as a --
17 where is the word "possible"?  Is that in the
18 Conclusion?
19 BY MS. BRANSCOME:
20     Q   It is.
21     A   Oh, yeah, possible cause.
22         You know, they are -- I mean, I can't
23 speak for them because I haven't spoken to any of
24 them about this, but I don't think they're
25 speaking to a legal audience.  And the word

Page 252

1  "possible" here can cover a range of possibilities
2  that includes probable.
3          So if something is possible, that means
4  it could happen, and in their view or in some of
5  their -- those authors' view, the possibility or
6  the probability of -- of such a thing happening
7  might be greater than 50 percent, and they might
8  still describe it as a possible cause of ovarian
9  cancer.
10     Q   You would be --
11     MR. KLATT:  Object.  Nonresponsive.
12 Sorry.
13 BY MS. BRANSCOME:
14     Q   You would be purely speculating to opine
15 that the Taher authors, for example, when they
16 used the term "possible" to describe the
17 association, they actually meant probable,
18 correct?
19     MS. PARFITT:  Objection.  Form.
20     THE WITNESS:  I didn't say they -- they
21 actually -- I meant -- I said that it could
22 include probable.
23         And so you are -- the sense of your
24 question is to suppose or assume that their use of
25 the word "possible" excludes the concept of

Page 253

1  probable, that they did not think it's -- because
2  they used the word "possible," they absolutely
3  denied that it's probable.  And I -- that's what
4  I'm disagreeing with.
5  BY MS. BRANSCOME:
6      Q   Where I'm coming from is not relevant to
7  the question that I'm asking, Dr. Siemiatycki.
8  The question that I'm asking you is, do any of the
9  authors of the three meta-analyses that we just
10 reviewed, Berge, Penninkilampi, and Taher,
11 describe in their papers the association between
12 perineal use of talc and ovarian cancer as a
13 probable causal association?
14     MS. PARFITT:  Objection.  Form.
15 BY MS. BRANSCOME:
16     Q   Do any of them use that term?
17     MS. PARFITT:  Objection.  Form.
18     THE WITNESS:  None of them use that
19 term, but that doesn't preclude that they -- some
20 of them believe it is probable.
21     MR. KLATT:  Object.  Nonresponsive.
22 BY MS. BRANSCOME:
23     Q   You have no basis for concluding or even
24 suggesting that any of these authors have the
25 opinion that it is a probable causal association

64 (Pages 250 to 253)

Jack Siemiatycki, Ph.D.

Page 254

1  other than speculating based off of what you're
2  reading on the page, correct?
3          MS. PARFITT: Objection. Form.
4          THE WITNESS: Correct. Nor do I have
5  any basis for assuming that they don't think it's
6  probable on the basis of what I read.
7  BY MS. BRANSCOME:
8      Q   When you write scientific manuscripts,
9  Dr. Siemiatycki, are you careful about your word
10  choice, particularly in your conclusion section?
11          MS. PARFITT: Objection. Form.
12          THE WITNESS: I try to be. I try to be.
13  BY MS. BRANSCOME:
14      Q   Okay. If you could turn to tab 33 in
15  your binder.
16          Are you familiar with the document that
17  is located behind tab 33 in your binder there?
18      A   I -- I think so. I -- mine had a
19  different cover page when I printed it off, but
20  that's fine. I'm -- I assume it's the same one
21  I -- I had.
22          MR. TISI: It's not. It's not.
23          MS. PARFITT: What are you referring to?
24          MR. TISI: The draft article is not --
25          MS. PARFITT: Yeah, I know that.

Page 255

1          THE WITNESS: Is it the Draft Screening
2  Assessment?
3          MR. TISI: No, that's not the same.
4          THE WITNESS: No?
5          MR. TISI: It's not.
6          MS. PARFITT: Do you have a copy of
7  yours?
8          THE WITNESS: Yeah.
9          MS. BRANSCOME: Can we go off the record
10  while we figure this out?
11          MS. PARFITT: Sure, that would be fine.
12          THE VIDEOGRAPHER: We're going off the
13  record at 6:58 p.m.
14          (Pause in the proceedings.)
15          THE VIDEOGRAPHER: We're back on the
16  record at 7:01 p.m.
17  BY MS. BRANSCOME:
18      Q   Dr. Siemiatycki, you have a document in
19  front of you that is labeled a "Draft Screening
20  Assessment" dated December 2018; is that correct?
21      A   Yes, I do.
22      Q   And this is a screening assessment by
23  the Environment and Climate Change Canada, Health
24  Canada, correct?
25      A   It's a branch of Health Canada or a

Page 256

1  bureau or division. I'm not quite sure.
2      Q   Okay. And the document that you're
3  looking at there is contained within a binder that
4  we have previously marked as Exhibit 4, correct?
5      A   Correct.
6      Q   All right. Is this an item -- is this
7  an item.
8          Is this Draft Screening Assessment a
9  document that you considered in forming your
10  opinions in this case?
11      A   No, it isn't.
12      Q   Why not?
13      A   Because I was only aware of it a month
14  or -- a month and a half or two months after I
15  completed my report, and two years after I formed
16  the main part of my opinion.
17      Q   How did you obtain a copy of the Draft
18  Screening Assessment by Health Canada?
19      A   I think that this was on the internet.
20  I think I --
21          THE WITNESS: Yeah, some other -- there
22  should be a light button that we can press.
23          Excuse me. Excuse me, just maybe off
24  the record for a second.
25          (A discussion was held off the record.)

Page 257

1          THE VIDEOGRAPHER: We are going off the
2  record at 7:03 p.m.
3          (Pause in the proceedings.)
4          THE VIDEOGRAPHER: We are back on the
5  record at 7:03 p.m.
6  BY MS. BRANSCOME:
7      Q   Dr. Siemiatycki, we paused because the
8  lights turned off, but my question to you is, how
9  did you obtain a copy of the Draft Screening
10  Assessment by Health Canada?
11      A   Either it was sent to me by Ms. Parfitt
12  or her staff, or I found it on the internet. And
13  I can't quite remember now.
14      Q   Do you remember when you first obtained
15  a copy of the Draft Screening Assessment?
16      A   My guess is just before I went on
17  vacation for Christmas and New Years. So it would
18  have been mid -- mid to -- mid-December, I guess,
19  something like that.
20      Q   Are you familiar with the process by
21  which draft screening assessments are generated by
22  Health Canada?
23      A   No, not really. I was involved with
24  this department of Health Canada 30 years ago, and
25  I haven't been involved since. I don't know how

65 (Pages 254 to 257)

Jack Siemiatycki, Ph.D.

| Page 258 |
|---|

1  they function really to produce these evaluations
2  and reports.
3      Q   Did you have any involvement, even
4  tangentially, in the development of the Draft
5  Screening Assessment by Health Canada?
6      A   No.
7      Q   Were you ever asked to consult on any of
8  the content that ultimately ended up in the Draft
9  Screening Assessment?
10     A   No, I wasn't.
11     Q   Were you ever contacted about
12 potentially being involved in a Draft Screening
13 Assessment of talc for Health Canada?
14     A   No. Never.
15     Q   You are aware that this is in fact a
16 draft assessment by Health Canada, correct?
17         MS. PARFITT: Objection. Form.
18         THE WITNESS: I see that's what it says
19 on the cover page.
20 BY MS. BRANSCOME:
21     Q   Are you aware of what further steps in
22 the process must be taken before the draft
23 assessment is potentially accepted or modified?
24         MS. PARFITT: Objection. Form.
25         THE WITNESS: I'm not familiar with the

| Page 259 |
|---|

1  details, no.
2  BY MS. BRANSCOME:
3      Q   What are you familiar with, if not the
4  details?
5      A   I remember seeing that there's a public
6  consultation opportunity, and -- so I guess there
7  will be a period of time during which they will
8  accept public recommendations and comments. And I
9  don't know if it's the same committee that will
10 then review all of that or a committee that's
11 higher up on the administrative pecking order. I
12 don't -- I don't know what happens internally.
13     Q   Do you intend to submit anything for
14 the -- during the public comment period?
15     A   I -- yeah, I hope to do so. I hope to
16 do so.
17     Q   What specifically do you intend to
18 submit?
19     A   I'm not sure yet. I -- I would probably
20 submit an opinion supporting the notion that
21 perineal use of talc is more likely than not
22 related to ovarian cancer.
23     Q   In your submission, do you intend to
24 disclose your role in litigation involving talcum
25 powder products?

| Page 260 |
|---|

1      A   Yes.
2      Q   Do you believe --
3      A   If I make such a submission, yes.
4      Q   Why -- well, first of all, do you think
5  it's important to disclose your involvement in the
6  litigation if you were to submit something for
7  public comment?
8      A   Yes, I think it is.
9      Q   And why is that?
10     A   Because there's a potential conflict of
11 interest, and they should know about it.
12     Q   Would you also notify IARC of your role
13 in litigation involving talcum powder products if
14 you submitted something to them to suggest that a
15 formal evaluation of talc be conducted?
16     A   Yes, I would.
17     Q   Is that for the same reason?
18     A   Yes, it is.
19     Q   Is the Draft Screening Assessment the
20 type of material that you think it is reliable to
21 base an expert opinion on?
22         MS. PARFITT: Objection. Form.
23         THE WITNESS: An expert opinion about
24 what?
25 BY MS. BRANSCOME:

| Page 261 |
|---|

1      Q   About the potential relationship between
2  talc and ovarian cancer.
3          MS. PARFITT: Objection. Form.
4          THE WITNESS: Are you asking if it would
5  influence my opinion on the issue or --
6  BY MS. BRANSCOME:
7      Q   So under- -- understanding that the
8  Draft Screening Assessment came out after you had
9  formed your opinion, I'm asking you that if that
10 had not been the case, if it had come out while
11 you were still forming your expert opinion, is
12 this something that you would rely on?
13     A   I would take cognizance of it, and I'm
14 not sure whether it would persuade me in one
15 direction or another on the strength of the
16 evidence, but it -- it would certainly give me --
17 increase my comfort level to draw inferences to
18 see what inferences other people draw. I won't
19 necessarily follow their opinions, but I find it
20 useful to know what inferences they would draw
21 from it.
22     Q   Is a Draft Screening Assessment the type
23 of report or publication that you see cited in
24 published scientific literature?
25         MS. PARFITT: Objection. Form.

66 (Pages 258 to 261)

Jack Siemiatycki, Ph.D.

Page 262

1    THE WITNESS: Not -- not -- in
2  scientific literature, not so much, no.
3  BY MS. BRANSCOME:
4    Q   The draft assessment -- first of all,
5  are you familiar with the proposal with respect to
6  talc that's contained in the draft assessment?
7    A   Which proposal are you referring to?
8    Q   I could refer you specifically to
9  page --
10    MR. TISI:  I spilled coffee on it too.
11  Sorry.  You get what you get.
12  BY MS. BRANSCOME:
13    Q   -- on page 29.
14    A   The Conclusion section?
15    Q   Yes.  Have you reviewed this before?
16    A   I -- I might have looked at it quickly.
17  But let me -- let me review it -- let me read it
18  now.  (Peruses document.)
19    You know, it refers to the fit of the --
20  their findings and conclusions with various
21  articles of law in the Canadian Environmental
22  Protection Act.  I would have to know what those
23  articles of law are that this conforms to, that
24  these sentences purportedly conform to.  I -- I
25  have no reason to doubt what they say, but I -- I

Page 263

1  can't confirm.
2    Q   So as you sit here today, are you
3  capable or prepared to offer an opinion as to how
4  the conclusions in the Draft Screening Assessment
5  relate to other pieces of literature that we've
6  discussed today?
7    MS. PARFITT:  Objection.  Form.
8    THE WITNESS:  How they relate to -- or
9  whether they're concordant with other pieces?
10  It's difficult for me to say without studying this
11  document more and seeing what the conformity is
12  with the Canadian pieces of legislation that they
13  refer to.  So I -- I can't -- I can't give you
14  much more than that.
15  BY MS. BRANSCOME:
16    Q   So as you sit here today, could you --
17  do you have an opinion as to how the proposal in
18  the Draft Screening Assessment with respect to
19  talc relates to the current IARC classification of
20  talc?
21    MS. PARFITT:  Objection.  Form.
22    THE WITNESS:  By proposal, you mean the
23  conclusion?
24    MS. PARFITT:  The entire document.
25    THE WITNESS:  You're -- you're

Page 264

1  describing the conclusion as a proposal?  Or --
2  yeah.
3  BY MS. BRANSCOME:
4    Q   Focusing specifically on the second
5  paragraph where it says:  "It is proposed to
6  conclude that talc meets the criteria under
7  paragraph 64(c) of CEPA as it is entering or may
8  enter the environment in a quantity or
9  concentration or under conditions that constitute
10  or may constitute a danger in Canada to human life
11  or health."
12    MS. PARFITT:  Objection.  Form.
13    THE WITNESS:  It's not a way of
14  describing scientific evidence that I'm intimately
15  familiar with.  So I would need to review this
16  document in more detail and be aware of the
17  paragraph 64(c) of the CEPA.
18  BY MS. BRANSCOME:
19    Q   And that is not something you --
20    A   So I'm not --
21    Q   -- have done as of today?
22    A   It's not something I base -- today I
23  couldn't say I agree with this or I don't agree
24  with this.
25    Q   Okay.  And so this is not -- the Draft

Page 265

1  Screening Assessment by Health Canada is not
2  something that you are relying upon in any way in
3  offering your expert opinions in this case; is
4  that correct?
5    MS. PARFITT:  Objection.  Form,
6  misstates his testimony.
7    THE WITNESS:  No.  As I said, I didn't
8  rely on this to form my opinion.
9  BY MS. BRANSCOME:
10    Q   Okay.
11    MS. BRANSCOME:  Could we go off the
12  record just briefly?
13    MS. PARFITT:  Of course.
14    THE VIDEOGRAPHER:  We're going off the
15  record at 7:15 p.m.
16    (Pause in the proceedings.)
17    THE VIDEOGRAPHER:  We're back on the
18  record at 7:16 p.m.
19  BY MS. BRANSCOME:
20    Q   Dr. Siemiatycki, can you describe -- can
21  you identify for me specifically the pieces of
22  evidence that you would cite to in support of your
23  opinion that there is evidence consistent with a
24  dose-response relationship that was not considered
25  by the IARC 2006 working group?

67 (Pages 262 to 265)

Jack Siemiatycki, Ph.D.

Page 266

```
 1      A   Can --
 2      Q   And I'm just looking for an
 3  identification of the papers.
 4      A   Let me just dig out -- I keep hiding
 5  things from myself.
 6          MS. PARFITT:  Okay.
 7          THE WITNESS:  Oh, there.
 8          The primary pieces of evidence -- the
 9  primary piece of evidence is the analysis carried
10  out in the Terry, et al., paper where they
11  combined ten different studies from eight
12  different research teams.  They had by far the
13  largest sample size of any conglomeration of
14  studies ever conducted, enough to properly
15  evaluate dose-response.  And that's one of them.
16          The second one is the Schildkraut study,
17  which is much smaller than the Terry study in
18  terms of numbers.
19          And the third -- a third one, which was
20  not part of the evidence that influenced my
21  evaluation, is the latest version of the Berge
22  paper which has some dose-response results in a
23  table whose origin I don't completely understand,
24  but ostensibly it gives dose-response trends that
25  are significant and meaningful for duration and
```

Page 267

```
 1  frequency of exposure.  But I would put less
 2  weight on that until I fully understand what --
 3  how they derived those estimates.
 4  BY MS. BRANSCOME:
 5      Q   Okay.  So the pieces of evidence that
 6  you would cite to in support of the idea that
 7  there has been a development that is supportive of
 8  a dose-response relationship between perineal talc
 9  and ovarian cancer since the IARC classification
10  of talc as a 2B would be the Terry, the
11  Schildkraut, and potentially the Berge analysis;
12  is that correct?
13          MS. PARFITT:  Objection --
14          THE WITNESS:  Yes.
15          MS. PARFITT:  -- to the reference of
16  "potentially the Berge."  Form.
17  BY MS. BRANSCOME:
18      Q   You did not rely in any way on the
19  analysis in the Berge 2018 paper for your
20  conclusion that there is evidence compatible with
21  a dose-response relationship between perineal talc
22  use and ovarian cancer, correct?
23      A   That's correct.
24      Q   Okay.  So looking first at the Terry
25  2013 paper.  This is tab 14 or you're welcome to
```

Page 268

```
 1  use your own copy if that's more convenient.
 2      A   Yep.  There we go.  Okay.
 3      Q   Did the authors of the Terry 2013 paper,
 4  did they conclude in their manuscript that they
 5  had observed a statistically significant dose-
 6  response relationship between the perineal use of
 7  talc and ovarian cancer?
 8      A   They reported two different ways of
 9  calculating the statistical significance of a
10  trend.  One of them was significant, and the other
11  was formal, in terms of the conventional 0.05
12  statistical significance level, was not
13  significant at that level.
14      Q   And in fact in the abstract, the authors
15  of the Terry paper state that:  "Among genital
16  powder users, we observed no significant trend,
17  p equals 0.17, in risk with increasing number of
18  lifetime applications," in parentheses, "assessed
19  in quartiles."
20          Did I read that correctly?
21      A   That's correct.
22      Q   Okay.  Now, in your 2016 report --
23      A   Yeah.
24      Q   -- you had the statement that:  "The
25  appropriate statistical test for trend is one that
```

Page 269

```
 1  excludes the baseline unexposed category."
 2          Do you remember having that sentence in
 3  your 2016 report?
 4      A   I remember the -- the idea being there,
 5  yes.
 6      Q   Okay.  And you would agree that if you
 7  apply that statistical test for trend, meaning you
 8  exclude the baseline unexposed category, the Terry
 9  2013 paper does not demonstrate a dose-response
10  relationship, correct?
11          MS. PARFITT:  Objection.
12          THE WITNESS:  No.
13          MS. PARFITT:  Misstates testimony.
14          THE WITNESS:  So I would not conclude --
15  I would say that it demonstrates dose-response,
16  but not at a statistical -- at a 0.05 statistical
17  significance level.
18          And I would also -- I can't remember the
19  wording and the context in the 2016 report that
20  you're referring to, but I would imagine that I
21  preceded that statement with some mention of the
22  fact that it depends if you are using the overall
23  risk among all exposed people compared to
24  unexposed people as a complementary piece of
25  information.
```

68 (Pages 266 to 269)

Jack Siemiatycki, Ph.D.

Page 270

1    And it's only in the context when you
2   are using the -- all the exposed compared to all
3   the unexposed, and at the same time carrying out
4   an analysis of the different levels of exposure,
5   that including the unexposed among the -- in that
6   trend analysis becomes overlapping information
7   with the overall -- the significance of the
8   overall estimate.
9   BY MS. BRANSCOME:
10   Q   Okay.
11   A   This -- I'm not quite finished.  Sorry.
12   So -- and because I don't want you to
13   think that I believe or believed that on its own
14   there is no evidence of dose-response.  There is
15   evidence of dose-response in the Terry analysis.
16   The choice of which p-value to report on the trend
17   analysis depends completely on how one combines
18   that information with the ever exposed/never
19   exposed information and the p-value for that.
20   That when we want completely independent and
21   separate strands of evidence to corroborate each
22   other, then it's appropriate to exclude the
23   unexposed from the p-value computation.
24   When you are using -- when you are not
25   using the binary exposed/unexposed as part of the

Page 271

1   package of information to demonstrate causation,
2   then the correct p-value is the one that includes
3   the unexposed.  So it depends how you use these
4   things.
5   If I didn't qualify that statement that
6   you read before, then I was in error.
7   Q   If you did not have the Terry 2013
8   study --
9   A   Yes.
10   Q   -- set that aside for a moment, you did
11   not have that data, would it still be your opinion
12   that the perineal use of talc probably causes
13   ovarian cancer?
14   A   So --
15   MS. PARFITT: Objection.  Form.
16   THE WITNESS:  So just to be clear what
17   the hypothetical supposition is, so the Terry
18   paper doesn't exist, but the studies underlying
19   the Terry paper still do exist, correct?  Or they
20   don't exist either?
21   So there are ten studies underlying the
22   Terry reanalysis.  Is your hypothetical question
23   about the possibility that none of those studies
24   existed or that they existed, but nobody actually
25   put them together to combine an analysis?  What

Page 272

1   are you positing?
2   BY MS. BRANSCOME:
3   Q   Of those ten studies, which, if any of
4   them, postdate 2006?  Do you know?
5   A   Most of them do.  I would say -- I think
6   the only one -- ones that were published before
7   2006 were a study by Chang and one or two of the
8   components of Cramer's studies.  I think the rest
9   were all published post-2006.
10   Q   Okay.  Did you independently do an
11   analysis of the potential dose-response
12   relationship of perineal talc use and ovarian
13   cancer?
14   MS. PARFITT: Objection.  Form.
15   THE WITNESS:  By "independently," you
16   mean trying to replicate the Terry analysis?  No.
17   I don't see why I would be motivated to do
18   something that someone else has already done.
19   BY MS. BRANSCOME:
20   Q   Okay.  So you are relying on the data as
21   reported by Terry 2013 that you consider to be
22   evidence in support of a dose-response
23   relationship, correct?
24   A   That's correct.
25   Q   Okay.  But the authors themselves do not

Page 273

1   conclude that there has been a statistically
2   significant dose-response relationship established
3   for the perineal use of talc and ovarian cancer,
4   correct?
5   MS. PARFITT: Objection.  Form,
6   misstates the evidence.
7   THE WITNESS:  I -- I didn't review what
8   they concluded in the Discussion section.  If you
9   want, I could review that.  And I -- I don't
10   remember what -- what kind of narrative inferences
11   they made about it.
12   BY MS. BRANSCOME:
13   Q   Okay.
14   A   You're asking me to confirm that they
15   didn't conclude, so I would want -- their data in
16   my mind indicates dose-response.  How they
17   interpret it -- as I said before, they're two
18   separate things, the production of findings from
19   research and the interpretation of those findings.
20   I am as capable of interpreting -- they
21   aren't as capable of interpreting my findings from
22   my studies as I am or they are as capable -- they
23   have the right to.  I have the right to interpret
24   their findings.  It's a different activity
25   producing findings and then interpreting them.  So

69 (Pages 270 to 273)

Jack Siemiatycki, Ph.D.

|  | Page 274 |
|---|---|

1  how they interpreted their findings, I don't quite
2  remember exactly what they said about it.
3       Q.  Okay.
4            MS. BRANSCOME:  I am going to pass to
5  counsel for Imerys at this time.
6            MR. KLATT:  Can we go off the record for
7  just a couple of minutes?  Let me get organized.
8            THE VIDEOGRAPHER:  We are going off the
9  record at 7:31 p.m.
10           (Pause in the proceedings.)
11           THE VIDEOGRAPHER:  We are going back on
12  the record at 7:32 p.m.
13           DIRECT EXAMINATION
14  BY MR. KLATT:
15      Q.  Good afternoon -- good evening,
16  Dr. Siemiatycki.
17      A.  Good evening.  How are you?
18      Q.  I'm Mike Klatt.  I represent Imerys Talc
19  America in this case.
20  I don't know if you recall or not, but
21  you and I had met about two years ago when you
22  were giving a deposition in the Oules and Swan
23  cases.  Do you recall that?
24      A.  I do recall that.
25      Q.  Okay.

|  | Page 275 |
|---|---|

1       A.  Very fondly.
2       Q.  Thank you.
3            I just have a few questions for you, and
4  I want to go back and just make sure the record is
5  clear on something.
6            Your testimony is you've had no contact
7  or communications whatsoever with anyone with
8  Health Canada regarding talc; is that correct?
9       A.  That's correct.
10      Q.  And you've had no contact or
11  communications whatsoever with Dr. Krewski or
12  anyone else who's an author of the Taher
13  meta-analysis regarding talc?
14      A.  That's correct.
15      Q.  That's correct.  Okay.
16           A minute ago I believe you told
17  Ms. Branscome that if you continued to interact
18  with IARC or have contact with Health Canada
19  regarding the issue of talc and ovarian cancer,
20  it's incumbent upon you to have a conflict of
21  interest disclosure, correct?
22      A.  Yes.  I said that.
23      Q.  And you would agree with me it would be
24  important in evaluating any potential bias you
25  have for the people at Health Canada and the

|  | Page 276 |
|---|---|

1  people at IARC and the public generally to know
2  that you had been a retained and paid expert by
3  plaintiffs' counsel in the talc ovarian cancer
4  litigation; is that correct?
5       A.  Sir, can you -- I think I already said
6  that, but could you repeat?  Maybe I'm
7  misunderstanding.
8       Q.  Yes.  I'm just saying such a conflict of
9  interest disclosure on your part, it would be
10  important to disclose not merely that you had been
11  a consultant or merely that you had been involved
12  in litigation involving ovarian cancer, but it
13  would be important to specifically disclose that
14  you had been a retained and paid expert by
15  plaintiffs' counsel in the talc/ovarian cancer
16  litigation.  Correct?
17           MS. PARFITT:  Objection.  Form, asked
18  and answered.
19           THE WITNESS:  I -- I'm not sure I
20  understand the distinction between this last
21  affirmation and the one before.  I -- yes, it --
22  BY MR. KLATT:
23      Q.  Well, we've had -- we've had other
24  conflict of interest disclosures, and I put that
25  in quotes, where people said that they had been a

|  | Page 277 |
|---|---|

1  consultant, period.  That wouldn't be sufficient,
2  would it?
3       A.  I would --
4            MS. PARFITT:  Objection.  Form.
5            THE WITNESS:  I would not do that.
6  BY MR. KLATT:
7       Q.  And we've had people say, I've been
8  involved as an expert in ovarian cancer
9  litigation.  That wouldn't be sufficient either,
10  correct?
11           MS. PARFITT:  Objection.  Form.
12           THE WITNESS:  I would not do that.
13  BY MR. KLATT:
14      Q.  What you would do is you would say, I
15  have been a retained and paid expert by
16  plaintiffs' counsel in the talc/ovarian cancer
17  lawsuits, or something essentially equivalent to
18  that.
19      A.  I -- I would say something essentially
20  equivalent.  It's quite possible that if there was
21  a submission to a journal, for example, or a
22  manuscript, the journal may have a formulaic way
23  of expressing that.  So...
24      Q.  But wouldn't it be important to the
25  readers to know which side of the litigation you

70 (Pages 274 to 277)

Jack Siemiatycki, Ph.D.

## Page 278

1  had been on in evaluating your bias?
2      MS. PARFITT:  Objection.  Form, asked
3  and answered.
4      THE WITNESS:  I -- I would -- I would
5  disclose the nature of my involvement.
6  BY MR. KLATT:
7      Q   Including which side?
8      A   Including which side I was consulting
9  for.
10     Q   Okay.
11     MR. KLATT:  Can we mark this as the next
12 exhibit?
13     MS. PARFITT:  14.
14     (Exhibit No. 14 was marked for
15     identification.)
16 BY MR. KLATT:
17     Q   Dr. Siemiatycki, you said earlier that
18 you worked with Dr. Koushik; is that correct?
19     A   Yes.
20     Q   And what is your professional
21 relationship with Dr. Koushik?
22     A   We are members of the same academic
23 department.  We are down the hall from each other.
24 Our offices are nearby each other.  We have worked
25 together on various projects.

## Page 279

1      Q   For how long?
2      A   Ten -- 10 or 12 years now.
3      Q   And she's very well educated, correct?
4      MS. PARFITT:  Objection.
5      THE WITNESS:  I'm not sure what you mean
6  by that.  She has a --
7  BY MR. KLATT:
8      Q   Well, she has a Bachelor --
9      A   She has a --
10     Q   -- of Science in pharmacology from the
11 University of Alberta.
12     A   Correct.
13     Q   She has a Master's in community health
14 and epidemiological from Queen's University in
15 Kingston, Ontario?
16     A   Uh-huh.
17     Q   She has a Ph.D. in epidemiology from --
18 in epidemiology and biostatistics from McGill
19 University here in Montreal, correct?
20     A   Correct.
21     Q   And she's had a postdoctoral fellowship
22 at Harvard in the U.S., correct?
23     A   Correct.
24     Q   And she is the principal investigator of
25 the Prevention of Ovarian Cancer in Quebec, the

## Page 280

1  PROVAQ study, correct?
2      A   Correct.
3      Q   And that's the study she is working on
4  with you, correct?
5      A   More I'm working on with her, but she's
6  the lead on that.
7      Q   And with the help of others in your
8  group as well --
9      A   With the help of others, yes.
10     Q   -- correct?
11     And what I've handed you --
12     MR. KLATT:  And what was the exhibit
13 number?
14     MR. TISI:  14.
15 BY MR. KLATT:
16     Q   Exhibit 14 is Dr. Koushik's web pages
17 from the Environ Epi website.  You're familiar
18 with that website, correct?
19     A   Yes, I am.
20     Q   And you'll turn to the back page of the
21 exhibit, the final page, and you will see it's
22 copyrighted 2019, correct?
23     A   Correct.
24     Q   And let's just see what Dr. Koushik says
25 about her research on the first page.  She says:

## Page 281

1  "My research program focuses on the epidemiology
2  of ovarian and lung cancers."  Correct?
3      A   Mm-hmm, yes.
4      Q   "Ovarian cancer is by far the most
5  deadly of all gynecologic cancer.  Most patients
6  are diagnosed at advanced stages, leading to the
7  poor prognosis, and we are currently limited in
8  our ability to detect disease early."  Correct?
9      A   Correct.
10     Q   She says:  "There is overwhelming
11 evidence that healthy lifestyle choices can reduce
12 the risk of several cancers.  However, we do not
13 yet know of any effective ways to prevent the
14 onset of ovarian cancer."
15     Would you agree with that?
16     MS. PARFITT:  Objection.  Form.
17     THE WITNESS:  I'm sorry, I'm trying to
18 think of what this sentence really means.  It's
19 kind of a -- it's kind of a stock sentence that is
20 used in -- by epidemiologists when they're looking
21 for funding and trying to convince funders that
22 we don't know a lot, and therefore they need to
23 give us money.  So I can imagine part of this is
24 cut-and-pasted from that sort of document.
25 BY MR. KLATT:

Jack Siemiatycki, Ph.D.

Page 282

1      Q   Well, what it means is --
2          MS. PARFITT:  Wait, wait.  Please let
3   him finish.
4   BY MR. KLATT:
5      Q   Go ahead.
6          MS. PARFITT:  Thanks, Mike.
7          THE WITNESS:  There are some risk
8   factors that are well established for -- for
9   ovarian cancer, which Anita is very well aware of,
10  genetic and certain reproductive and hormonal
11  factors.
12         The evidence on talc is accumulating,
13  and in my view is sufficient.  Anita has not
14  reviewed that evidence.  And --
15  BY MR. KLATT:
16     Q   Have you talked to Dr. Koushik at all
17  about your involvement in the talc ovarian cancer
18  litigation?
19     A   She's aware that I'm involved in this.
20     Q   Well, let's go on to see what she says
21  here.
22         After saying:  "However, we do not yet
23  know of any effective ways to prevent the onset of
24  ovarian cancer," she says, "the evidence on some
25  lifestyle factors, such as alcohol intake,

Page 283

1   physical activity, and smoking, is suggestive but
2   currently remains unclear."  Correct?
3      A   Correct.
4      Q   She doesn't say one word about talc,
5   does she?
6      A   No.
7          MS. PARFITT:  Objection.  Form.
8          THE WITNESS:  Not here, no.
9   BY MR. KLATT:
10     Q   And then she goes on to say:  "More
11  research is greatly needed, especially in light of
12  recent discoveries that demonstrate that ovarian
13  cancer is a heterogeneous disease."  She says:  "I
14  am the principal investigator of the Prevention of
15  Ovarian Cancer in Quebec, PROVAQ study, a
16  population-based case-control study conducted in
17  2011, 2016."
18         And one of the things she's evaluating
19  in that study is talc, correct?
20     A   Correct.
21     Q   "This study provides" -- and I'm reading
22  on -- "This study provides a rich data source for
23  the study of multiple hypotheses on lifestyle
24  factors and ovarian cancer.  Current projects
25  focus on associations with shift work, caffeine

Page 284

1   intake, and recreational physical activity."
2   Correct?
3      A   Correct.
4      Q   She doesn't say a word about talc there,
5   does she?
6          MS. PARFITT:  Objection.  Form.
7          THE WITNESS:  She doesn't there because
8   she hasn't started those analyses yet.  She has
9   started analyses -- or her -- with students on
10  those other factors.
11  BY MR. KLATT:
12     Q   And then flipping over to the next page,
13  Dr. Koushik says:  "Healthy lifestyle choices may
14  also positively impact the health of ovarian
15  cancer survivors.  Indeed, until we know how to
16  prevent ovarian cancers from occurring in the
17  first place, cancer control through tertiary
18  prevention aimed at improving prognosis and
19  quality of life among those diagnosed is
20  critical."  Correct?
21     A   Correct.
22     Q   And again, no mention at all of talc,
23  correct?
24         MS. PARFITT:  Objection.  Form.
25         THE WITNESS:  Correct.

Page 285

1          MR. KLATT:  Let's mark that.
2          MS. PARFITT:  This is now 15.
3          MR. KLATT:  Have we marked that?
4          MS. PARFITT:  I just now did.  I was
5   looking for the stickers.  I'm going to get one --
6   here they are.
7          THE WITNESS:  I have a different cover.
8          MS. PARFITT:  It's a different one.
9   That's yours.
10         THE WITNESS:  Oh.
11         MS. PARFITT:  This is different, this is
12  a new item.  Let me just put an exhibit on this
13  one.
14         (Exhibit No. 15 was marked for
15         identification.)
16         MS. PARFITT:  Thank you.
17         Okay.  You're done with this.  And he's
18  just showing you this one.
19         Do we have an extra copy, Mike, or is
20  this it?
21         MR. KLATT:  I've got an extra copy if
22  you need it.
23         MS. PARFITT:  Okay, that would be great.
24  I will give him that one.  Thank you very much.
25  BY MR. KLATT:

72 (Pages 282 to 285)

Jack Siemiatycki, Ph.D.

Page 286

1      Q    So, Dr. Siemiatycki, I'm now showing you
2   what we marked as exhibit -- what?
3          MS. PARFITT:  15.
4          MR. KLATT:  15?
5          MS. PARFITT:  Yes.
6   BY MR. KLATT:
7      Q    And it's from the Environ Epi website,
8   your website, and it's the web pages discussing
9   group research topics, correct?
10     A    I -- I have to tell you I don't look at
11  this website, and I haven't actually constituted
12  it.  It's my secretary or my assistant who does
13  this.  So I'm looking at it afresh to see what's
14  there.  Yeah.
15     Q    Okay.  Let's -- let's turn to the very
16  back page, and again the copyright is 2019.
17  That's this year, correct?
18     A    Yeah.  Yes.
19     Q    And then if you will flip over to --
20  let's see.  Well, let's start -- let's see.
21          Go first page, second page, third
22  page -- the fourth page, there's a discussion
23  there of the PROVAQ study of Dr. Koushik that we
24  just talked about, correct?
25     A    Yes.

Page 287

1      Q    And the topic says:  "Prevention of
2   Ovarian Cancer in Quebec, the PROVAQ study, a
3   case-control study of modifiable and genetic
4   factors associated with the risk of ovarian
5   cancer."  Correct?
6      A    I see that.
7      Q    And it says Anita Koushik, that's
8   Dr. Koushik, who we've just been talking about,
9   and it says Jack Siemiatycki.  That's you,
10  correct?
11     A    That's right.
12     Q    And then it goes on to describe what the
13  PROVAQ study is, and it says -- and I'll skip the
14  first few sentences -- it says:  "Primary
15  prevention thus offers the most promising approach
16  to reducing the morbidity and mortality associated
17  with this deadly disease.  Established preventive
18  factors for ovarian cancer include high parity,
19  long duration of lactation, oral contraceptive
20  use, and tubal ligation."  Correct?
21     A    That's what it says.
22     Q    Talc is not included in that list of
23  established preventive factors, is it?
24     A    It's not listed there, no.
25     Q    "However, the ability to modify these

Page 288

1   reproductive factors is limited.  There is
2   suggestive evidence that modifiable factors in the
3   vitamin D pathway, (sun exposure, diet), and
4   inflammation pathway (antiinflammatory medication
5   use, talc use for feminine hygiene) may play a
6   role in ovarian cancer risk, though this research
7   has been limited by small sample sizes, crude
8   exposure measurement and lack of control for
9   important confounders."  Correct?
10     A    That's what it says.
11     Q    Did I read that correctly?
12     A    Yes, you did.
13     Q    So on this public website, your
14  Environmental Epi website, Dr. Jack Siemiatycki
15  doesn't say talc use causes ovarian cancer,
16  correct?
17          MS. PARFITT:  Objection.  Form.
18          THE WITNESS:  I don't say anything on
19  that website.
20  BY MR. KLATT:
21     Q    Well, you -- your group doesn't say talc
22  causes ovarian cancer, does it?
23          MR. TISI:  Objection.  Form.
24          THE WITNESS:  In my opinion, this was
25  created somewhere around 2009, 2010, 2012, in that

Page 289

1   ballpark.  This feels to me like a cut and paste
2   from the grant application of 2009 or 2010 that
3   hasn't been changed.
4          There's not really a lot of motivation
5   for us to -- besides just sort of putting our
6   names and faces up there, our institution asks us
7   to put something on this institutional website
8   for a researcher.  I haven't -- I've never looked
9   at this.
10  BY MR. KLATT:
11     Q    You or your organization --
12          MS. PARFITT:  Wait.  Mike -- Mike,
13  excuse me, I think we're done.
14          THE WITNESS:  I've never contributed to
15  this or looked at it.
16          MS. PARFITT:  No, no, Mike,
17  unfortunately, your time is up.
18          MR. KLATT:  You've --
19          MS. PARFITT:  Mike, no more questions.
20  I have a few questions.  I think we're --
21          MR. KLATT:  Are we -- are we done?
22          THE VIDEOGRAPHER:  Yes.
23          MR. KLATT:  All right.
24          MS. PARFITT:  Thank you.  I do have a
25  few.

73 (Pages 286 to 289)

Jack Siemiatycki, Ph.D.

Page 290

1    Dr. Siemiatycki, I'm going to stay right
2  over here for a moment, okay?  And we can get
3  through this.  Okay?
4         MR. KLATT:  Here, I'll give this back to
5  you.
6         THE WITNESS:  Hi.
7         MS. PARFITT:  Tell me when you are
8  ready.
9         THE WITNESS:  Who are you?
10        MS. PARFITT:  I know.
11        MR. TISI:  Are we back on?  Are we back
12 on?
13        THE VIDEOGRAPHER:  I didn't stop.
14 Sorry, I --
15        MR. TISI:  Oh, I thought we were off.
16        MS. PARFITT:  Okay.  We didn't -- we
17 didn't know that.
18             CROSS-EXAMINATION
19 BY MS. PARFITT:
20    Q   Dr. Siemiatycki, good evening --
21        Okay.  Dr. Siemiatycki, good evening.  I
22 know it's been a long day, and I have a few
23 questions, and I will be wrapping -- or jumping
24 around a bit, so hopefully try and keep pace with
25 me, and I'll try and speak slowly and -- so that

Page 291

1  we can move through the remainder of your
2  deposition.
3         Dr. Siemiatycki, do you have an opinion
4  as to whether the elimination of talcum powder use
5  in the genital area is a lifestyle activity that
6  is modifiable?
7         If you need me to ask the question
8  again, I'm happy to.
9    A   Yeah, I'm trying to think of how the
10 word "modifiable" is used.
11    Q   Is it preventable?  Is the use of talcum
12 powder products in the genital area a preventable
13 activity?
14    A   Yes.
15        MS. BRANSCOME:  Objection.
16 BY MS. PARFITT:
17    Q   All right.  Thank you.
18        All right.  You were asked some
19 questions about the Taher article.  You remember
20 that?
21    A   Yes.
22    Q   All right.  And is it your understanding
23 that the Taher article is a meta-analysis that was
24 formed as part of the Health Canada
25 recommendation?

Page 292

1         MS. BRANSCOME:  Objection.
2         THE WITNESS:  I think it was ordered --
3  it was contracted in order to underpin the Health
4  Canada evaluation.  That's my --
5  BY MS. PARFITT:
6    Q   All right.  Now, it was not the only
7  study or research that was conducted by Health
8  Canada; is that correct?  It was the meta-analysis
9  that was conducted by them.
10        MS. BRANSCOME:  Objection.
11        THE WITNESS:  Sorry, I -- what --
12 BY MS. PARFITT:
13    Q   The Taher study --
14    A   Study.
15    Q   -- is a meta-analysis; is that correct?
16    A   Yes.  Yes.
17    Q   All right.  And the Taher meta-analysis
18 was one part of the information that formulated
19 part of the Health Canada draft assessment?
20    A   That's my understanding, yes.
21    Q   All right.  Now, Daniel Krewski, you
22 indicated, was one of the authors of the Taher
23 paper.
24    A   Yes.  He's listed.
25    Q   And I believe you testified that you

Page 293

1  know Daniel Krewski.
2    A   Yes, I do.
3    Q   And I believe Mr. Klatt asked you
4  whether or not you had reached out or perhaps
5  Ms. Branscome asked you whether or not you have
6  had any communication with anyone, verbal, oral,
7  written, that had anything to do with Health
8  Canada.  Do you remember that?
9    A   Yes, I do remember.
10    Q   All right.  And it's been many hours,
11 but it was my understanding in response to that
12 question, you did indicate that you had sent an
13 e-mail to Daniel Krewski; is that correct?
14        MS. BRANSCOME:  Objection.
15        THE WITNESS:  I don't remember saying
16 that.
17 BY MS. PARFITT:
18    Q   Okay, let me ask you.  Have you ever
19 reached out to any member or author of the Taher
20 meta-analysis?
21    A   I -- when I learned about it, I sent an
22 e-mail to Dan Krewski asking if his report was
23 intended for publication; and if so, when it would
24 appear, and I haven't -- I didn't have any
25 response.

74 (Pages 290 to 293)

Jack Siemiatycki, Ph.D.

Page 294

1      Q    All right.  So you have had no
2  communication with any of the authors of the Taher
3  study or any of the members of Health Canada?
4      A    No.
5      Q    Okay.  Now, you were asked some
6  questions with regard to the Schildkraut study in
7  particular.  Now, what I'd like you to do is, if
8  you can get that in front of you, and I believe
9  it's part of the documentation in your binder,
10  number 4.
11         And what I'd ask you to also do, if you
12  will, is pull out your paper, your Terry paper --
13  your copy of the Terry paper, and maybe we'll go
14  there first.
15      A    Terry?
16      Q    If you get the Terry.  Do you have the
17  Terry in front of you?
18      A    Yeah, I've got it in front of me, yes.
19      Q    Okay.  Now, Ms. Branscome asked you and
20  referred you to the abstract of the Terry paper.
21  Do you recall that --
22      A    Yes.
23      Q    -- examination?
24      A    Yes.
25      Q    And I believe she focused your attention

Page 295

1  on the very last sentence of the Terry paper, the
2  next to last sentence which started with "Among
3  genital powder users."
4         Do you see that?
5      A    I see that.
6      Q    All right.  And she asked you whether or
7  not indeed the abstract section of the Terry paper
8  said: "Among genital powder users, we observed no
9  significant trend, p equals 0.17, in risk with
10  increasing numbers of lifetime applications
11  (assessed in quartiles)."
12      A    I see that.
13      Q    All right.  You've had an opportunity to
14  read this --
15      A    I've read it --
16      Q    -- article?
17      A    -- several times over the last three
18  years.
19      Q    All right.  Let me direct your attention
20  to the actual paper, and specifically to -- not
21  the abstract of the paper but to the section
22  that's entitled -- I believe it's the Discussion
23  section and it's over on page 817.
24      A    Yes.
25      Q    All right.  Do you have that in front of

Page 296

1  you?
2      A    Yes, I do.
3      Q    And I believe it's a continuation of the
4  Results section --
5      A    Yes.
6      Q    -- which starts on 815 and continues all
7  the way over to the end of the document.  Do you
8  see that?
9      A    I do.
10      Q    All right.  And specifically about
11  halfway down on page 817 of the Results section of
12  the Terry paper, what did the authors find as it
13  pertains to whether or not there is evidence
14  demonstrating dose-response as it relates to
15  genital powder use and ovarian cancer?
16      A    So are you referring to the sentence
17  that begins "Although a significant increase"?
18      Q    Correct.
19      A    Or before that?
20      Q    Whatever you need to read, but I was
21  specifically --
22      A    Okay.
23      Q    -- referring to the "although."  And you
24  can read that paragraph, please.
25      A    Okay.  So I'll start at the beginning of

Page 297

1  that paragraph.
2      Q    Please, if you will.
3      A    Read out loud?
4      Q    If you will.
5      A    "We evaluated cumulative genital powder
6  exposure as a composite variable of frequency and
7  duration of use.  We have observed similar
8  increased risks of all nonmucinous subtypes of
9  epithelial ovarian cancer combined across
10  quartiles of genital powder compared with nonuse."
11  The OR in the first quartile is 1.18 with
12  confidence intervals.  In the second quartile, it
13  was 1.22.  In the third quartile, it's 1.22.  And
14  the fourth quartile it's 1.37.
15         I didn't read the confidence intervals.
16      Q    Are the confidence intervals for the
17  quartiles you just discussed all statistically
18  significant?
19      A    Yes, they are.
20      Q    All right.  Please continue.
21      A    "Although a significant increase in risk
22  with an increasing number of genital powder
23  applications was found for nonmucinous epithelial
24  ovarian cancer when nonusers were included in the
25  analysis with a p-value that's extremely small,"

75 (Pages 294 to 297)

Jack Siemiatycki, Ph.D.

Page 298

1  highly significant, "no trend in cumulative use
2  was evident in analyses restricted to ever users
3  of genital powder for trend .17. Taken together,
4  these observations suggest that the significant
5  trend test largely reflects the comparison of ever
6  regular use with never use."
7      Q    Okay, and if you would stop there.
8          What is the significance of the findings
9  of the authors in that paragraph you just read as
10  it pertains to whether or not this study shows a
11  dose-response increase?
12     A    Well, so my interpretation is that
13  overall there is, for users compared to nonusers,
14  a highly significant trend, and four -- among the
15  four - there are four quartiles, and there is a
16  fifth group called nonusers -- they have a
17  relative risk of 1.0. And in those five groups,
18  the relative risk -- the relative risk estimates
19  go from 1.0 to 1.18 to 1.22, 1.22, 1.3,
20  something, 7. Those five values indicate to me a
21  tendency of increasing risk with increasing
22  exposure. Whether it is -- whether there's formal
23  proof of that in a -- from a statistical
24  significance point of view is a secondary issue as
25  to compared with whether the data are compatible

Page 299

1  with dose-response.
2          So as you may recall, in the IARC 2006
3  evaluation and in -- I guess in the Langseth
4  paper, I think we indicated that we were very
5  concerned about the consistency of increased
6  risks, but found no evidence of dose-response, and
7  that held back any inference that the
8  categorization should be greater than a 2B.
9          The findings from Terry turn on its head
10  the assumptions that were made at IARC that there
11  was no evidence of dose-response. Now there is
12  evidence of dose-response, whether or not it's
13  significant by one test or another test.
14     Q    All right. Thank you.
15          All right. Let me direct your
16  attention, if I may, to the Health Canada
17  document, specifically the Draft Screening
18  Assessment dated December 2018. Again, I believe
19  it's in your notebook 4.
20     A    6 -- yeah. Yes.
21     Q    All right.
22     A    Okay, I have it.
23     Q    Now -- now --
24     A    Sorry, the Taher or the Draft Screening
25  Assessment?

Page 300

1      Q    The Draft Screening Assessment, right.
2      A    Yes.
3      Q    Okay. And specifically, let me direct
4  your attention to Roman number -- Roman numeral
5  III of that document.
6      A    Yes.
7      Q    Okay.
8          MS. BRANSCOME: Michelle, would you mind
9  helping me follow along?
10         MS. PARFITT: Oh, I'm sure.
11         MR. TISI: I can give you my copy.
12         MS. PARFITT: Sure. Absolutely.
13         MR. KLATT: You may want those.
14         MS. BRANSCOME: Thank you. What page
15  are we on?
16         MS. PARFITT: Counsel, I'm on Roman
17  numeral III.
18         MS. BRANSCOME: Oh, the page -- I had a
19  section number that I couldn't find --
20         MS. PARFITT: No. At the bottom it has
21  a Roman numeral III.
22  BY MS. PARFITT:
23     Q    Dr. Siemiatycki, referring you to the --
24  first, second, third -- fourth full paragraph of
25  the Draft Screening Assessment, the fourth full --

Page 301

1      A    Begins with "full"?
2      Q    No, it begins with "The meta-analysis."
3      A    "The meta-analysis." Yep.
4      Q    Correct.
5          Would you please -- does it state: "The
6  meta-analysis of the" -- am I reading this
7  correctly?
8          "The meta-analysis of the available
9  human studies in the peer-reviewed literature
10  indicate a consistent and statistically
11  significant positive association between perineal
12  exposure to talc and ovarian cancer."
13         Did I read that correctly?
14     A    Yes, you did.
15     Q    All right. Is that your opinion,
16  Dr. Siemiatycki, based upon your review of the
17  totality of the literature on talc powder --
18  talcum powder use and ovarian cancer in the
19  genital area?
20     A    Yes, it is.
21     Q    All right. It goes on to say: "Further
22  available data are indicative of a causal effect."
23         Did I read that correctly?
24     A    Yes, you did.
25     Q    All right. Is it your opinion based

76 (Pages 298 to 301)

Jack Siemiatycki, Ph.D.

Page 302

1   upon the totality of not only the epidemiological
2   data and findings but mechanistic data, animal and
3   in vivo data, that indeed the data is indicative
4   of a causal effect?
5           MS. BRANSCOME:  Objection.
6           MR. KLATT:  Objection.  Form.
7           THE WITNESS:  I believe it is more
8   likely than not that there is a causal
9   relationship between exposure to talc powder and
10  ovarian cancer.  And if those two sentences are
11  taken to be equivalent, then I agree with the
12  sentence.
13  BY MS. PARFITT:
14      Q   Well, let me ask you this,
15  Dr. Siemiatycki:  You've read the draft
16  assessment, and do you have -- is it fair to say
17  that the methodology that the authors performed
18  throughout the course of this particular draft
19  assessment is the same type of methodology that
20  you have performed for purposes of preparing your
21  report and offering the opinions that you have and
22  will continue to offer the court in -- in the
23  litigation involving talcum powder use and ovarian
24  cancer?
25          MS. BRANSCOME:  Objection.

Page 303

1           THE WITNESS:  The authors of this report
2   I think include a group -- a multidisciplinary
3   group, including toxicologists and possibly
4   environmental scientists.  I'm not familiar with
5   them, so I can't say for sure.  And in that sense,
6   they cover a broader disciplinary background than
7   I cover myself.  So in that sense, they have a
8   broader scope to evaluate the totality of the
9   evidence than I have.
10          Their evaluation of the epidemiologic
11  evidence seems in line with my own, and I have no
12  reason to doubt the validity of their toxicologic
13  analyses of the evidence.
14  BY MS. PARFITT:
15      Q   All right.  Dr. Siemiatycki,
16  specifically let me refer you to page 15, and it's
17  entitled "Perineal Exposure to Talc."  And let me
18  know when you get there.
19      A   Yes, I'm there.
20      Q   All right.  Based upon your review of
21  that section beginning on page 15, and I believe
22  it goes all the way through page 21, are you able
23  to -- do you have a sense as to the methodology
24  again that the authors of the draft assessment
25  employed in order to arrive at their causal

Page 304

1   assessment?
2           MS. BRANSCOME:  Objection.
3           THE WITNESS:  When you say
4   "methodology" --
5   BY MS. PARFITT:
6       Q   Mm-hmm.
7       A   -- I'm not sure if you're referring to
8   sort of high level methodology like collecting
9   original data, evaluating it, weighing it, and
10  making inferences on the basis of that data.
11  BY MS. PARFITT:
12      Q   What I'm asking is, did the authors
13  perform a Bradford Hill-like causality assessment
14  in the performance of their study entitled Draft
15  Screening Assessment?
16          MR. KLATT:  Objection.  Form.
17          THE WITNESS:  You're saying in the pages
18  between 15 and --
19  BY MS. PARFITT:
20      Q   Correct.  I'll shorten it by --
21      A   -- 21?
22      Q   Correct.  Correct.
23          And if I can refer your attention to or
24  direct you to page 20.
25      A   They commented on various considerations

Page 305

1   that Bradford Hill mentioned in his article.
2       Q   And which ones did they provide
3   information and findings on?
4       A   They commented on the strength of the
5   association, on consistency, specificity,
6   temporality, biological gradient, biological
7   plausibility, and coherence.
8       Q   And what did the authors conclude --
9   after looking at the various Bradford Hill
10  factors, what did they conclude in that last
11  paragraph of their Bradford Hill assessment?
12      A   "Suggests a small but consistent
13  statistically significant positive association
14  between ovarian cancer and perineal exposure to
15  talc.  Further available data are indicative of a
16  causal effect."
17          Is it -- is that what you're referring
18  to?
19      Q   Yes.  And do you agree with the authors
20  of the draft report of December 2018, when they
21  conclude that:  "The most recent meta-analysis
22  detailed, Taher 2018, and consistent with the Hill
23  criteria suggest a small but consistent
24  statistically significant positive association
25  between ovarian cancer and perineal exposure to

77 (Pages 302 to 305)

Jack Siemiatycki, Ph.D.

| | Page 306 | | Page 308 |
|---|---|---|---|

**Page 306**

1    talc.  Further available data are indicative of a
2    causal effect"?
3        A   Yes.
4            MR. KLATT:  Objection to form.
5    BY MS. PARFITT:
6        Q   Thank you.  All right.
7            Let me ask a couple other questions, and
8    I need you -- if you will, can you reach over
9    there, I believe it was exhibit number -- do you
10   see your book on occupational diseases?  I think
11   it's under -- there you go.  Okay.
12           Okay.  Now, you were asked many hours
13   ago some questions regarding the book Risk Factors
14   for Cancer in the Workplace.
15           Do you recall that?
16       A   Yes, I do.
17       Q   All right.  And that is indeed a book
18   that was authored by you, Jack Siemiatycki,
19   correct?
20       A   Correct.
21       Q   All right.  And I believe you were asked
22   whether there was anything in your book that
23   described the methodology that you have employed
24   over the course, and I believe you said the last
25   four decades or almost four decades.

**Page 308**

1    you have copies in that binder that you had
2    printed out.
3            MS. BRANSCOME:  May I have a copy if he
4    is going to read from it?
5            MS. PARFITT:  Absolutely.  And I thought
6    we had -- do you have any copies in there?
7            THE WITNESS:  Oh, for this --
8            MS. PARFITT:  No.
9            MR. TISI:  It wasn't marked.  It was in
10   the stuff you printed out.
11           MS. PARFITT:  I think I've got one here.
12           (A discussion was held off the record.)
13           MS. PARFITT:  Ms. Branscome, here you
14   go.  Here's copies.
15           And let's have this marked as now
16   exhibit -- I'm not sure what we're up to.
17           MR. TISI:  We're up to 18.  18.
18           MS. PARFITT:  18.  Okay.
19           And for the record, we are marking the
20   face sheet of the book Risk Factors for Cancer in
21   the Workplace by Jack Siemiatycki, and
22   specifically the table --
23           MS. BRENNAN:  I have 16.
24           MR. TISI:  No, because he marked --
25           MS. BRENNAN:  Yeah, 14 --

| | Page 307 | | Page 309 |
|---|---|---|---|

**Page 307**

1            Do you recall those questions?
2        A   Yes, I do.
3            MS. BRANSCOME:  Objection.
4    BY MS. PARFITT:
5        Q   All right.  Where in that book, if there
6    is something in that book, does it describe the
7    methodology that you have employed over the course
8    of the last four decades that you still employ
9    today in your analysis and opinions and findings
10   in the talcum powder product litigation and
11   ovarian cancer?
12           MS. BRANSCOME:  Object to form.
13           THE WITNESS:  I'm looking for -- well, I
14   guess the main thing I would -- I would summarize
15   that --
16   BY MS. PARFITT:
17       Q   And could you tell us for the record --
18       A   Yes.
19       Q   -- Dr. Siemiatycki, where you are?
20       A   Where I'm reading?
21       Q   Yes, please.
22       A   Thank you.  I'm looking at page 298 in
23   this book, and I -- did you provide a copy of that
24   chapter?
25           MR. TISI:  Doctor, you have copies --

**Page 309**

1            MR. KLATT:  Actually, it should be 16.
2            MS. PARFITT:  16?  Thank you.  16.
3            All right.  We are now marking as
4    Exhibit 16 the book entitled Risk Factors for
5    Cancer in the Workplace by Dr. Jack Siemiatycki,
6    which specifically includes the table of contents,
7    Chapter 7, "Interpretation of Findings," pages 297
8    through 308.
9            MR. DONATH:  Is that an excerpt, not the
10   whole thing?
11           MS. PARFITT:  It is -- it is not.  We'll
12   make the book available, but it's just the
13   excerpt.
14           (Exhibit No. 16 was marked for
15           identification.)
16           MS. BRANSCOME:  Did someone just join
17   the line?
18           THE REPORTER:  They hung up.
19           THE WITNESS:  Shall I read a couple of
20   paragraphs from this?
21   BY MS. PARFITT:
22       Q   Well, the question was -- the question
23   was whether or not there was any bases or writings
24   that discussed the methodology that you've
25   employed over the last four decades, and you

78 (Pages 306 to 309)

Jack Siemiatycki, Ph.D.

<table>
<tr><td>

Page 310

1  commented that it was in your book.
2      MS. BRANSCOME:  Object --
3  BY MS. PARFITT:
4      Q   So please tell us what's in your book.
5      MS. BRANSCOME:  Object to form.
6      THE WITNESS:  Well, I -- I won't read
7  the whole book.
8  BY MS. PARFITT:
9      Q   I appreciate that.  We all --
10     A   I have a phone book downstairs that I
11 could -- no, I will just read a couple of
12 paragraphs that talk about interpreting and
13 conducting epidemiologic research in general, not
14 specifically related to this particular study --
15 set of studies that I describe in the book.
16         "The main purpose of epidemiology is to
17 find the cause of disease.  Despite some
18 controversy concerning the validity of drawing
19 causal inferences in epidemiology.  There is a
20 consensus that sanctions and provides guidelines
21 for the practice.  The evaluation of causality
22 between a putative risk factor and disease is a
23 complex and subjective process.  Equally competent
24 scientists examining the same information can
25 arrive at different conclusions.  However, as

</td><td>

Page 312

1  Is that what you were --
2      Q   That's what I wanted to know.
3      A   -- asking?
4      Q   Thank you.  All right.
5         Now, do you recall, Dr. Siemiatycki,
6  that you were asked some questions about the
7  mechanism underlying exposure to talc and genital
8  use of talcum powder products and ovarian cancer?
9  Do you remember Ms. Branscome asked you some
10 questions about that?
11     A   The mechanism of exposure or the
12 mechanism of carcinogenesis?
13     Q   The mechanism of exposure --
14     A   Okay.
15     Q   -- between talcum powder products and
16 ovarian cancer.  Do you remember there were a
17 series of questions that were asked about that?
18     MS. BRANSCOME:  Object to form.
19     THE WITNESS:  I'm -- I'm not --
20 BY MS. PARFITT:
21     Q   Okay.  Let me -- okay.  Let me -- let me
22 do this.  Let me refer you to your report, if you
23 will, and I believe it's been marked as -- I think
24 this is 10 -- as 10.
25         Do you have your report in front of you?

</td></tr>
<tr><td>

Page 311

1  additional evidence is accumulated, beliefs and
2  consensuses may change.  The criteria that are
3  most relevant to the problem of evaluating
4  causality between cancer and an antecedent
5  occupational exposure may be paraphrased as
6  follows:
7         Number 1:  "Is sampling variability a
8  plausible explanation for the observed
9  association?"
10        Number 2:  "How strong is the
11 association and is there a dose-response
12 relationship?"
13        Number 3:  "Is bias or confounding a
14 plausible explanation for the observed
15 association?"
16        Number 4:  "Is the association
17 biologically plausible?"
18        Number 5:  "Is there relevant supporting
19 evidence from other epidemiologic studies or from
20 non-human test systems, such as animal
21 experimentation or tests of mutagenicity?"
22        I'll stop there.  But in answer to your
23 question, this text, published 30 years ago now,
24 encapsulates my approach to how to interpret and
25 use epidemiologic evidence in assessing causality.

</td><td>

Page 313

1      A   Yes.
2      Q   Very good.  Okay.
3         All right.  And specifically I'm
4  referring to page 64 and 65.
5      A   So I'm one or two pages off, so just
6  tell me which section.
7      Q   Okay.  I believe it's -- it's under
8  "Biological Plausibility."  Do you see that in the
9  lower part?  Let's see.
10     A   "Biological Plausibility" -- (reading to
11 himself.)  Strength.  Okay.  I've got it
12 somewhere -- consistency.  Here.
13     Q   Okay.
14     A   "Biological Plausibility," yes.
15     Q   Now, I specific -- I believe
16 specifically the question that you were asked is
17 whether or not you will be testifying with regard
18 to the mechanism and the biological mechanism for
19 causing cancer with genital use of talcum powder
20 products.  Do you remember that?
21     A   Yes.
22     Q   Okay.  Now, in the course of your
23 analysis and in looking at that issue of
24 biological mechanism for causing cancer, what did
25 you consult and review and assess for purposes of

</td></tr>
</table>

79 (Pages 310 to 313)

Jack Siemiatycki, Ph.D.

| Page 314 | Page 316 |
|---|---|

**Page 314**

1  formulating your opinions on that topic?
2        MS. BRANSCOME: Objection.
3        THE WITNESS: I actually started with
4  the IARC 2006 report where there was a high level
5  subgroup of toxicologists and basic scientists who
6  reviewed the evidence. So I read that material.
7        I've read various articles concerning
8  migration of particles, articles about
9  inflammation as a carcinogenic process, oxidative
10  stress as part of the carcinogenic process. And
11  towards the end, started looking at articles about
12  asbestos in talc as filling in some of the
13  information about what the content of talcum
14  powder products were. I at one point was looking
15  at company documents to try to figure out what
16  were the time relationships of using talc versus
17  using substitutes for talc. So all of those kinds
18  of things I was looking for.
19  BY MS. PARFITT:
20        Q   So for purposes of evaluating the
21  evidence and opining on the issue of talcum powder
22  products and ovarian cancer, did you consider the
23  issue of biological plausibility?
24        MS. BRANSCOME: Objection.
25        THE WITNESS: Yes, I considered it.

**Page 315**

1  BY MS. PARFITT:
2        Q   All right. And what was the basis of
3  your opinion as to whether or not there was
4  biological plausibility between talcum powder
5  product use in the genital area and ovarian
6  cancer?
7        MS. BRANSCOME: Objection. Assumes he
8  formed an opinion.
9        THE WITNESS: Well, my --
10  BY MS. PARFITT:
11        Q   Dr. Siemiatycki, did you formulate an
12  opinion with regard to whether there was
13  biological plausibility between the use of talcum
14  powder products and ovarian cancer?
15        A   Yes, I did.
16        Q   Okay.
17        A   And the first part of the discussion is
18  what one means by "plausibility." And so one
19  issue that I took off the table quite soon is the
20  notion that biological plausibility is synonymous
21  with biological proof. Neither Bradford Hill nor
22  anyone else who has described the use of
23  biological plausibility as a criterion has ever
24  claimed that biological proof of a mechanism is
25  necessary before you can opine about the -- about

**Page 316**

1  causality.
2        So the bar for establishing plausibility
3  for me is, are there credible scientists who are
4  persuaded or have reasonable confidence that there
5  is a mechanism that can explain the observation.
6  And if so, I would defer to that point of view as
7  being plausible.
8        I would not accept that one or more
9  scientists developing a mechanistic theory are
10  definitely proven, but if there is a credible
11  point of view in the scientific community about
12  the mechanism, I would call that plausible. It
13  doesn't mean it's proven. It's plausible.
14        And to my satisfaction, when I looked at
15  the different reports, including reports of
16  experts in the litigations, I was reasonably
17  assured that there are plausible theories and
18  plausible hypotheses.
19        Q   All right. In your section of your
20  expert report on page 64 through 66, did the
21  factors you identify under the subtitle
22  "Biological Plausibility" provide support for your
23  opinions that indeed there is biological
24  plausibility between the use of genital use of
25  talcum powder products and ovarian cancer?

**Page 317**

1        A   I think they provide evidence of
2  plausibility for those theories.
3        Q   And did you consider those for purposes
4  of opining that talcum powder products in the
5  genital area, used, can cause ovarian cancer?
6        A   Yes, I considered them.
7        Q   All right. Dr. Siemiatycki, I'm not
8  sure of the -- I don't think we marked it as an
9  exhibit, so let me do that now. I believe we're
10  up to 17.
11        (A discussion was held off the record.)
12        (Exhibit No. 17 was marked for
13        identification.)
14  BY MS. PARFITT:
15        Q   All right. Dr. Siemiatycki, do you
16  recall the discussion you had with Ms. Branscome,
17  again several hours ago, on the issue of
18  confounding and how that can impact study designs?
19        A   Oh, yes.
20        Q   All right. Let me show you a document
21  we have marked as Exhibit No. 17, and it's
22  entitled "Degree of confounding bias related to
23  smoking ethnic group, and socioeconomic status and
24  estimates of the association between occupation
25  and cancer," and I believe that's an article that

Jack Siemiatycki, Ph.D.

Page 318

1  you were an author, correct?
2      A   That's correct, yes.
3      Q   All right.  What, if any, support did
4  that particular article that you wrote, I guess
5  back in 1988, provide, if any, for the opinions
6  that you've rendered in this case on the topic of
7  confounding and bias?
8      A   In this study we evaluated 75
9  associations, 25 occupations in relation to lung
10 cancer, to bladder cancer and to stomach cancer,
11 each of them.  And we looked at the association
12 between each occupation and each of the three
13 types of cancer, adjusting for the smoking history
14 of the patients and the subjects.  But another set
15 of analyses not adjusting for their smoking
16 histories, and their socioeconomic status and
17 their ethnic group.  These are factors that are
18 strongly associated with cancer and with different
19 occupations.  We wanted to see how large a
20 confounding bias could be generated by not having
21 proper confounder information.
22      And so I will just read a couple of
23 sentences from the abstract of this article.
24      "Of the 75 associations studied, only
25 one OR was distorted by more than 40 percent.  A

Page 319

1  40 percent distortion would correspond to an odds
2  ratio of 1.4 when comparing unadjusted with
3  adjusted estimates.  Three were distorted by
4  between 30 percent and 40 percent, and four others
5  by between 20 percent and 30 percent."
6      So of these 75 associations, not taking
7  account of very powerful confounders -- smoking is
8  the most powerful confounder we know.  Ethnicity
9  and socioeconomic status are important
10 confounders.  They have strong relative risks with
11 these different cancers.  Not taking them into
12 account could create artifactual odds ratios,
13 maximum of 1.4, even though the original odds
14 ratios of the confounders with these cancers could
15 be as high as 10.
16     So there's a very -- the confounding
17 effect, at most, would be 10 percent or 20
18 percent, but the likelihood that there is some
19 unknown confounder with -- with ovarian cancer
20 that is artifactually creating across the board,
21 across all these studies, an artifactual relative
22 risk of around 1.3 would require some -- that
23 unknown confounder to have an extremely high
24 relative risk, certainly higher than 2, maybe
25 higher than 3 or 4, which is not inconceivable but

Page 320

1  low probability.
2      And this is part of what leads me and
3  what led me in my report to opine that confounding
4  is unlikely to be the explanation for the observed
5  relative risks.
6      Q   Thank you.  All right.
7      THE VIDEOGRAPHER:  Excuse me, Counsel.
8      MS. PARFITT:  Off the record, yes.
9      THE VIDEOGRAPHER:  Off the record?
10     MS. PARFITT:  Yeah, it's a good time,
11 because you're running out of tape.  I could tell.
12     THE VIDEOGRAPHER:  Going off the record
13 at 8:27 p.m.
14     (Recess.)
15     THE VIDEOGRAPHER:  We're going back on
16 the record at 8:31 p.m.
17     MS. PARFITT:  Thank you.
18 BY MS. PARFITT:
19     Q   Dr. Siemiatycki, just one last question.
20     Let me direct your attention to again
21 the documents in your Exhibit No. 4, specifically
22 the "Weight of Evidence:  General Principles and
23 Current Applications at Health Canada," which
24 formed part of the Health Canada recommendation.
25 All right?

Page 321

1      A   I'm not sure if it formed part of the
2  recommendation or if it's a background document.
3      Q   Very good.  I think you're probably
4  right.
5      All right.  And you have -- you have had
6  a chance to review that, correct?
7      A   Yes.
8      Q   All right.  Specifically let me direct
9  your attention to page 7 of that document.  And
10 I'm going to go down to the very last paragraph,
11 and it starts with:  "The majority of risk
12 assessment reports, however, provide a logical
13 narrative description of the relative strengths or
14 weakness of various lines of evidence considered.
15 For most risk assessments, individual lines of
16 evidence are polled and integrated into a final
17 conclusion based on best professional judgment and
18 not mathematical formula."
19     Did I read that correctly?
20     A   Yes, you did.
21     Q   Do you agree with the statement by
22 Health Canada in their "Weight of Evidence:
23 General Principles"?
24     A   Yes, I do.
25     MS. PARFITT:  All right.  I have no

81 (Pages 318 to 321)

Jack Siemiatycki, Ph.D.

Page 322

1  further questions.  Thank you.
2       THE WITNESS:  This is also in conformity
3  with all guidelines from agencies and experts who
4  understand science.
5       MS. PARFITT:  Very good.
6       THE WITNESS:  The best data is
7  collected, compiled, and then interpreted by human
8  expert judgment.
9       MS. PARFITT:  Thank you very much,
10  Dr. Siemiatycki.  I believe counsel has some
11  follow-up.
12       MS. BRANSCOME:  I do, but I think I need
13  to take a break to confer amongst ourselves.
14       MS. PARFITT:  Go ahead.
15       THE VIDEOGRAPHER:  We're going off the
16  record at 8:33 p.m.
17       (Recess.)
18       THE VIDEOGRAPHER:  We are going back on
19  the record at 8:46 p.m.
20       REDIRECT EXAMINATION
21  BY MS. BRANSCOME:
22    Q   Good evening, Dr. Siemiatycki.
23       I have some follow-up questions to the
24  questions that were just asked to you by
25  plaintiffs' counsel.

Page 323

1       Both myself and counsel for Imerys asked
2  you very specifically if you had contact with
3  any of the authors in connection with the Taher
4  paper or the Health Canada paper.  Do you recall
5  the questions that we asked you?
6    A   I -- I recall that you asked questions
7  about it, yes.
8    Q   Yeah.  Is there a reason why during my
9  questioning and questioning by counsel for Imerys
10  you did not recall having sent an e-mail to
11  Dr. Krewski with respect to the potential
12  publication of the Taher paper?
13    A   I -- I guess I consider -- well, two
14  parts.  I consider a contact sort of a one-way
15  process, and there was no two-way process.  I sent
16  him a message.  He never responded.
17       And number two, it -- it dropped off of
18  my memory screen.  I -- I just forgot about it
19  until she asked.
20    Q   When did you contact Dr. Krewski about
21  the Taher paper?
22    A   In December, when I first learned about
23  it.
24    Q   What specifically did you ask him?
25    A   My recollection, I asked him if -- the

Page 324

1  gist of it was whether the paper has been or will
2  be submitted for publication.  I don't recall if
3  there were other important components.  It was a
4  brief message, besides pleasantries of people
5  who've known each other for 30 years.
6       But, you know, I said I -- I've learned
7  about this work that you were involved with.  I
8  can't remember what else I said.
9    Q   In your e-mail communication to
10  Dr. Krewski, did you alert him to the fact that
11  you were serving as a -- an expert on behalf of
12  plaintiffs' counsel in litigation involving talcum
13  powder?
14    A   I don't recall.  Your question used the
15  plural, and in my -- you said "in your
16  communications."  That's what I heard.  No?  Okay.
17    Q   I meant it in the singular.
18    A   You meant it in the singular, so I guess
19  the record will reflect.
20       In my one message to Dr. Krewski -- let
21  me -- if I may.
22    Q   My question again, Dr. Siemiatycki --
23    A   Yeah, please.
24    Q   -- is in your e-mail to Dr. Krewski with
25  respect to the Taher paper, did you notify him in

Page 325

1  that e-mail that you were serving as an expert
2  witness retained on behalf of plaintiffs' counsel
3  in litigation involving talcum powder?
4    A   I -- I -- I don't recall if I did or
5  not.  I -- I wouldn't have thought it was a
6  crucial thing to indicate in this first message
7  asking him if his paper was in press or in
8  publication or something like that.
9    Q   Why did you want to know whether it had
10  been submitted for publication?
11    A   I wanted to know what the status of that
12  report was.  I had no -- I didn't follow up my --
13  it wasn't an important issue for me.  I was -- it
14  was kind of an idle gesture of, you know, Hi, I
15  haven't heard from you for a while.  I see that
16  you have this thing.  Are you sending it for
17  publication?  Something like that.
18       And I -- the motivation, was there a
19  specific ulterior motive?  No, there was no --
20  there was nothing I would have done differently.
21  I guess if he had told me yes, it's about to be
22  submitted, I would have wanted to see the final
23  version, because the version that I saw was
24  obviously an early manuscript.  It was much too
25  long for a -- for a publication submission.  But

82 (Pages 322 to 325)

Jack Siemiatycki, Ph.D.

Page 326

1    it wasn't a big deal for me to -- to have
2    information about that manuscript.
3         Q    Including communications in which you
4    unilaterally reached out to individuals but may
5    not have received a response, have you
6    communicated in any form with any of the
7    participants in the development of the Health
8    Canada Draft Screening Assessment or the Taher
9    paper, other than what we have discussed with
10   respect to Dr. Krewski?
11        A    No.
12        Q    The Health Canada Draft Screening
13   Assessment, you were asked a number of questions
14   about that by counsel for plaintiffs.  Is that a
15   document that you have reviewed closely in forming
16   your opinions in this case?
17        MS. PARFITT:  Objection.  Form.
18        THE WITNESS:  I wouldn't say that I
19   reviewed it closely the way I've reviewed the
20   evidence before submitting my report.  No.
21   BY MS. BRANSCOME:
22        Q    All right.  I want to talk to you about
23   Exhibit 17.  You have that over there.  It's the
24   "Degree of confounding bias related to smoking."
25        A    Oh, yeah.

Page 327

1         Q    All right.  Dr. Siemiatycki, is
2    Exhibit 17 an article that you identified to
3    address the likelihood that a confounding variable
4    could explain the increased risk that you have
5    found in your meta-analysis with respect to the
6    use of talc?
7         A    Yes.
8         Q    Okay.  So I just want to direct you to
9    page 623.  In the right-hand column, do you see a
10   paragraph that begins "One of the criteria"?
11        A    Yes.
12        Q    Does it state:  "One of the criteria
13   used by epidemiologists to distinguish true from
14   false associations is the strength of the
15   association"?  Did I read that correctly?
16        A    Yes, you did.
17        Q    And again, this is an article on which
18   you are the lead author, correct?
19        A    Correct.
20        Q    It continues on:  "That is, among two
21   relative risk assessments which have equal levels
22   of statistical significance but one of which is
23   much greater than 1, while the other is closer
24   to 1, the larger one is considered more likely to
25   reflect a true association than the smaller one."

Page 328

1         Did I read that correctly?
2         MS. PARFITT:  Counsel, just with one
3    correction.  It came out as "estimates."  The
4    article says "estimates," and it came out on the
5    transcript as "assessments."
6         MS. BRANSCOME:  Okay.
7         THE WITNESS:  That -- do you understand
8    what she's indicated?
9    BY MS. BRANSCOME:
10        Q    Yes.  Did I read it correctly?
11        A    You misread one word.
12        Q    Okay.
13        A    But it's not important, but if you want
14   to have it for the record.
15        Q    Well, we can continue on.
16        A    Yes.
17        Q    "This consideration follows from the
18   recognition that some degree of bias is quite
19   likely in any non-experimental study."
20        Did I read that correctly?
21        A    Yes.
22        Q    "Small excess relative risks, even if
23   they are statistically significant, are often
24   interpreted with great caution, if not
25   skepticism."

Page 329

1         Did I read that correctly?
2         A    Yes.
3         Q    "Although there has been no explicit
4    consensus on what level of excess relative risk
5    should be considered too small to be taken
6    seriously, we believe that many epidemiologists
7    use a cut point in the range of 1.2 to 1.5 for
8    this purpose.  Our results indicate that a cut
9    point in this range is reasonable for studies of
10   cancer occupation associations."
11        Did I read that correctly?
12        A    Yes, you did.
13        Q    And the references in those sentences to
14   the words "we" and "our" would include you,
15   Dr. Siemiatycki, correct?
16        A    Correct.
17        Q    And then if we could turn the page to
18   page 624, the paragraph at the top on the
19   left-hand column, I direct your attention to the
20   last complete sentence of that paragraph.
21        "On the other hand, our results also
22   imply that relative risk estimates as low as 1.2
23   for lung cancer associations or 1.1 for bladder or
24   stomach cancer associations run a fair chance of
25   being attributable to confounding bias, even if

83 (Pages 326 to 329)

Jack Siemiatycki, Ph.D.

Page 330

1    they are," quote, "statistically significant."
2        Did I read that correctly?
3        A   Yes, you did.
4        Q   Is that a conclusion that you and your
5    authors reached in the paper that's been
6    identified as Exhibit 17?
7        A   Yes, it was.
8        Q   Your opinion with respect to the
9    existence of biological plausibility of the
10   perineal use of talc and ovarian cancer is limited
11   to the evaluation of whether or not there are
12   credible scientists who are persuaded that there
13   is a mechanism; is that correct?
14       MS. PARFITT:  Objection.  Form.
15       THE WITNESS:  Can you repeat that?  I'm
16   sorry.
17   BY MS. BRANSCOME:
18       Q   Your opinion with respect to the
19   existence of biological plausibility of the
20   perineal use of talc and its potential to cause
21   ovarian cancer is limited to an evaluation of
22   whether or not there are credible scientists who
23   are persuaded that there is a mechanism, correct?
24       MS. PARFITT:  Objection.  Form.
25   Misstates his testimony.

Page 331

1        THE WITNESS:  I would say is based on,
2    rather than is limited to.
3    BY MS. BRANSCOME:
4        Q   Do you have expertise that would allow
5    you to determine what the most likely biological
6    mechanism is, if there is one, for perineal use of
7    talc to cause ovarian cancer?
8        A   No, I wouldn't pretend to -- to have
9    that kind of expertise.
10       Q   Okay.  Is it also true that you are not
11   qualified to opine on the ability or not of talc
12   particles to migrate to the ovaries from the use,
13   the perineal application of talc?
14       MS. PARFITT:  Objection.  Form.
15       THE WITNESS:  Not on the basis of my
16   research, not on the basis of my training, but on
17   the basis of my reading of literature concerning
18   that issue, I have an opinion based on what I've
19   read from experts in the -- that field.
20   BY MS. BRANSCOME:
21       Q   But in forming that opinion, you are
22   relying on --
23       A   Yes.
24       Q   -- the expertise of others, correct?
25       A   Yes.

Page 332

1        MS. PARFITT:  Object to form.
2        THE WITNESS:  Correct.
3    BY MS. BRANSCOME:
4        Q   You indicated in response to questions
5    by plaintiffs' counsel that you were persuaded by
6    the opinions of other experts in the litigation
7    with respect to biological plausibility.  Who are
8    those experts?
9        A   I -- I think I indicated that such
10   experts contributed to the information that I had,
11   not that they were the only ones who persuaded me.
12   So there was literature and there were depositions
13   and reports.
14       So -- I'm trying to remember the names
15   of the various expert reports that I have read and
16   depositions.  I do -- there's the Plunkett, the
17   Saed papers, but I don't know if there was a
18   report by Saed.  There was -- let me look in my
19   list of references.  (Peruses document.)
20       I'm sorry, I'm drawing a blank on the
21   names of the people whose reports and testimonies
22   I've read in the last month or two.
23       Q   When were you provided with copies of
24   these expert reports?
25       A   In the fall.  Some before November 15th

Page 333

1    and some after November 15th.  And -- but also
2    I'm -- I'm reflecting on the various reports and
3    testimonies from the earlier trial, and I read
4    various expert reports from that time.
5        Q   Did you draft the section in your MDL
6    expert report related to biologic plausibility?
7        A   Yes, I did.
8        Q   You personally summarized each of the
9    various studies that you refer to in that section?
10       A   What do you mean by summarized the
11   studies?  I -- I summarized the evidence that's
12   captured there, and I provided references for
13   those statements, yes.
14       Q   You're the original author of the
15   language in that section is my question.
16       A   Yes.  Yes.
17       Q   Can you identify for me which expert
18   reports related to biological plausibility you had
19   reviewed before forming your opinion as
20   represented in the MDL report?
21       A   As I said, it's partly a number of
22   reports that I had seen in the previous trial, and
23   I -- I'm drawing a blank on the names of -- of the
24   people.
25       Q   You understand that there will be

84  (Pages 330 to 333)

Jack Siemiatycki, Ph.D.

Page 334

1  experts retained by defense counsel who will
2  provide reports addressing biological
3  plausibility, correct?
4       A  I assume so, yeah.
5       Q  Okay.  Are you qualified to evaluate
6  between competing expert reports who is correct
7  about the biological mechanism?
8       MS. PARFITT: Objection. Form.
9  BY MS. BRANSCOME:
10      Q  To the extent one exists.
11      MS. PARFITT: Objection. Form.
12      THE WITNESS:  No -- no, I wouldn't be.
13  I mean I -- I can read reports from people outside
14  my area and form an opinion about the general
15  coherence and -- and form an initial sense of the
16  credibility of the various reports.  And I'd be
17  happy to review the reports of the experts for the
18  defense on these issues.
19  BY MS. BRANSCOME:
20      Q  But to the extent, for example, that
21  there are credible experts on both sides of the
22  debate, whether or not there has been an
23  established biological mechanism and whether or
24  not there have not been, you are not qualified to
25  evaluate between the two credible experts?

Page 335

1       MS. PARFITT: Objection. Form.
2       THE WITNESS:  That's correct.  And I've
3  never pretended that -- make -- that it is
4  necessary for me to establish the correct
5  biological mechanism before drawing inferences
6  about causality.
7  BY MS. BRANSCOME:
8       Q  It is your conclusion that more likely
9  than not perineal use of talc can cause ovarian
10  cancer is based on the epidemiological evidence,
11  correct?
12      MS. PARFITT: Objection. Misstates his
13  evidence and testimony today.
14      THE WITNESS:  In part -- in large part.
15  Yes.
16  BY MS. BRANSCOME:
17      Q  Okay.  Well, my question now is about
18  the, in small part, the evidence in addition to
19  that.  What evidence are you considering that you
20  are qualified to independently evaluate?
21      A  I am qualified to evaluate whether there
22  is a plausible theory about it.  Not to establish
23  whether that theory is correct or not.
24      MS. BRANSCOME: Okay.  All right.  If we
25  could just go off the record very briefly.

Page 336

1       THE VIDEOGRAPHER:  We are going off the
2  record at 9:05 p.m.
3       (Pause in the proceedings.)
4       THE VIDEOGRAPHER:  We're back on the
5  record at 9:06 p.m.
6       MS. BRANSCOME:  At this time I will pass
7  questioning to counsel for Imerys.
8       MS. PARFITT: Thank you.
9       REDIRECT EXAMINATION
10  BY MR. KLATT:
11      Q  Dr. Siemiatycki, a few more questions,
12  sir.
13      I'm going to read a statement and ask if
14  you agree with it.  Okay?
15      A  Yes.
16      Q  "When a pronounced binary association is
17  present, use of the never or no category in
18  assessing trend can induce a trend where none
19  exists."
20      A  Okay.  Can you -- yeah, thank you.
21      Q  And my question is, do you agree or
22  disagree with that statement?
23      A  Yes, I agree it can -- I agree with it.
24  There are some qualifiers that I would add to that
25  sentence, but I agree with it.

Page 337

1       Q  Could you look at your report, please,
2  sir, in the case on page 65, the discussion of
3  biologic plausibility.
4       A  Yes.
5       Q  And actually I think your biologic
6  plausibility discussion actually begins near the
7  bottom of the previous page, 64, and there's a
8  general discussion on the rest of 64 and the first
9  paragraph or two of 65.  Is that correct?
10      A  I -- I believe it's correct.  The
11  version I have in front of me is that version that
12  has a slightly different formatting, so -- but I'm
13  with you.
14      Q  Okay.
15      MS. PARFITT:  And I believe, just for
16  completeness, it starts on 60 --
17      THE WITNESS:  Mine starts on --
18      MS. PARFITT:  His document starts on 65,
19  goes all the way over to 66.  Mike, yours probably
20  starts on the bottom of 64, goes all the way over
21  to the top of 66.
22  BY MR. KLATT:
23      Q  And what I'm focusing on is the
24  paragraph that you wrote that begins with
25  "Insofar" --

85 (Pages 334 to 337)

Jack Siemiatycki, Ph.D.

Page 338

1    A   Yes.
2    Q   -- which is where your specific
3  discussion of biologic plausibility regarding
4  talcum powder products begins.
5    A   Yes.
6    Q   Do you -- do you see that paragraph,
7  sir?
8    A   Yes, I do.
9    Q   And moving down, did you read the
10  articles that you cited here carefully?
11    A   I read them.  I'm not capable of fully
12  understanding articles in areas that are outside
13  my area of -- of expertise.  But to the --
14    Q   Well --
15    MS. PARFITT:  Wait, let him finish.
16    THE WITNESS:  To the extent that I was
17  able to understand them, I read these articles.
18  BY MR. KLATT:
19    Q   I'm focusing on the sentence that you
20  wrote in your report saying:  "First of all, there
21  are two possible routes that talcum powder
22  products can take to reach the ovaries."
23    Do you see where I am?
24    A   Yes, I do.
25    Q   The next sentence says:  "There is

Page 339

1  published evidence that talcum powder products and
2  its constituents and contaminants that are applied
3  to the vaginal area can migrate from there to the
4  fallopian tubes and ovaries," citing Venter 1979,
5  Henderson 1986, Heller 1996, "or to pelvic lymph
6  nodes," citing Cramer 2007.
7    Is that correct?
8    A   Yes, that's correct.
9    Q   Do you recall, Dr. Siemiatycki, that the
10  Venter 1979 article has nothing to do with talc at
11  all?
12    MS. PARFITT:  Objection.  Form.
13    THE WITNESS:  Is that the article about
14  asbestos?
15  BY MR. KLATT:
16    Q   Venter 1979 is the article about albumin
17  microspheres.
18    A   Oh, yeah.  Yes.
19    Q   Do you recall that article?
20    A   I do.  Well, I don't recall it well, but
21  I recall reading it a year or two ago.
22    Q   And in Venter, nothing was applied to
23  the perineal area, correct?  These albumin
24  microspheres were actually injected at the top of
25  the vaginal vault, correct?

Page 340

1    A   I think so.  Is this --
2    Q   And the --
3    A   Is this the South African study?
4    Q   I believe you're right.
5    A   Okay.
6    Q   And the women were not women using
7  perineal talc.  They were women who were being
8  prepared to undergo gynecologic surgery, correct?
9    A   Correct.
10    Q   And after this solution of albumin
11  microspheres was injected at the top of the
12  vaginal vault, the women were tilted in a head
13  down/pelvis up position for two hours beforehand,
14  correct?
15    A   Correct.
16    Q   So --
17    A   Now I'm saying correct, but I don't
18  remember the details that you're quoting.  I
19  remember the article.  I'm -- I -- it doesn't --
20  my recollection doesn't contradict anything you're
21  saying.
22    Q   So Venter doesn't tell us anything at
23  all about dry talc particles applied externally to
24  the genital area being able to migrate up the
25  vagina, across the cervix, up the uterus, up the

Page 341

1  fallopian tubes to the ovaries, correct?
2    MS. PARFITT:  Objection.  Form.
3    THE WITNESS:  I guess I use this as a
4  reference because some other experts used it as a
5  reference for such a statement.  And I read the
6  article, and it sounded plausible.
7  BY MR. KLATT:
8    Q   But you'd agree with me that the Venter
9  1979 article doesn't involve talc particles,
10  doesn't involve external application, and is a
11  very artificial situation compared to the
12  situation of women applying talc to the --
13    MS. PARFITT:  Objection.
14  BY MR. KLATT:
15    Q   -- external genital area?
16    MS. PARFITT:  I'm sorry, Michael.
17  Objection.  Form.
18    THE WITNESS:  I -- I -- I don't disagree
19  with what you said.
20  BY MR. KLATT:
21    Q   And then the other two articles you
22  cite, Henderson 1986 and Heller 1996, say nothing
23  at all about migration of talc particles.  They
24  simply observe talc particles in tissue already
25  without any reference to how they got there,

86 (Pages 338 to 341)

Jack Siemiatycki, Ph.D.

Page 342

1    correct?
2         MS. PARFITT:  Do you need to see the
3    articles?
4         THE WITNESS:  Yes, I think I need to see
5    those articles.
6         MS. PARFITT:  Do we have Henderson or
7    Heller?
8         MR. KLATT:  I'm sorry, I don't have them
9    with me.
10        MS. PARFITT:  Okay.  Let's see.  In your
11   report -- they're in your report.
12   BY MR. KLATT:
13       Q    And you might want to pull Cramer 2007
14   while you're at it, because again my question is
15   the same, it doesn't say anything at all about
16   migration.  It simply identifies particles already
17   in tissue without saying how they got there.
18        MS. PARFITT:  Okay.  Well, let's wait
19   for a question and let's get the articles.  Let's
20   see.  It would be tab -- it's a big binder.
21   BY MR. KLATT:
22       Q    Can I -- can I --
23        THE WITNESS:  I have it in my office.
24   BY MR. KLATT:
25       Q    Can I short-circuit this?

Page 343

1        A    Yes.
2        Q    I think this -- I can short-circuit
3    this.  If you just look at Cramer 2007.  Do you
4    have that handy?
5        MS. PARFITT:  Cramer 2007.  Do you have
6    it?  I don't, Michael.
7         THE WITNESS:  It would be in my office.
8         MR. KLATT:  Could we go off for a second
9    while you are looking?
10        THE VIDEOGRAPHER:  We're going off the
11   record at 9:15 p.m.
12        (Pause in the proceedings.)
13        THE VIDEOGRAPHER:  We are back on the
14   record at 9:17 p.m.
15   BY MR. KLATT:
16       Q    So, Dr. Siemiatycki, at my request,
17   you've pulled the 2007 article, first author
18   Cramer, called "Presence of talc in pelvic lymph
19   nodes of a woman with ovarian cancer and long-term
20   genital exposure to cosmetic talc," correct?
21       A    That's correct.
22       Q    And my question was simply, this -- this
23   article says nothing about talc migrating.  It
24   simply observes that talc was found in a lymph
25   node.  Is that correct?

Page 344

1         MS. PARFITT:  Objection.  Form.
2         Make sure you've read the article.
3         THE WITNESS:  (Peruses document.)  So
4    I -- I've skimmed it quickly.  I haven't read
5    everything, but I don't see that it -- sorry, are
6    we on?
7         MS. PARFITT:  Yes.
8         THE VIDEOGRAPHER:  We're on the record.
9         THE WITNESS:  I don't see that it
10   directly addresses talc moving from the vagina
11   into pelvic lymph nodes, but it certainly concerns
12   the detection of talc in pelvic lymph nodes.
13   BY MR. KLATT:
14       Q    But it says nothing in the article
15   itself about establishing migration, correct?
16        MS. PARFITT:  Objection.  Misstates his
17   testimony.
18   BY MR. KLATT:
19       Q    That you -- that you see.
20        MS. PARFITT:  Objection.  Form,
21   misstates his testimony.
22        THE WITNESS:  I -- I guess, you know --
23   the question I would have is if it gets to the
24   pelvic lymph nodes, it has to migrate there from
25   somewhere.  It's not deposited there deliberately.

Page 345

1    BY MR. KLATT:
2        Q    Well --
3        A    That was my interpretation of -- of
4    this.
5        Q    Well, look at the very first page of
6    this article, Cramer.  You see at the very top
7    under where the authors are listed?
8        A    Yes, I do.
9        Q    It says "Background"?
10       A    Yeah.
11       Q    "Although epidemiologic studies suggest
12   talc use may increase ovarian cancer risk, there
13   is no proof that talc used externally reaches the
14   pelvis."  Correct?
15        MS. PARFITT:  Objection.  Form.
16   BY MR. KLATT:
17       Q    That's what it says.
18       A    That's the background to this study.
19   That's not --
20       Q    And it's 2007, correct?
21       A    Correct.
22       Q    Which is after the Henderson study that
23   you cite.  Correct?
24       A    Correct.
25       Q    And so after -- and what -- so we have

Jack Siemiatycki, Ph.D.

| Page 346 | Page 348 |
|---|---|

**Page 346**

1  Venter that you cited and Henderson, and what
2  else?
3      A    Heller -- Heller?
4      Q    What was the third?  Heller, yes.  Thank
5  you.  1995.  And here is --
6          MS. PARFITT:  No, excuse me.  1996, I
7  believe.
8  BY MR. KLATT:
9      Q    Excuse me, 1996.
10          And here in 2007, we have Dr. Cramer
11  saying that there's no proof that externally
12  applied talc reaches the ovaries, correct?
13          MS. PARFITT:  Objection.  Misstates the
14  science and the article and his testimony.  Form.
15  BY MR. KLATT:
16      Q    I'm just asking what the article -- what
17  Dr. Cramer and Dr. Godleski said in the Background
18  section to this article that you cite in 2007.
19          MS. PARFITT:  Objection.  Form.
20          THE WITNESS:  You want me to comment on
21  whether their background -- the Background section
22  of this abstract contradicts the thesis that there
23  was evidence of migration before 2007?  Is that
24  correct?
25  BY MR. KLATT:

**Page 348**

1  proof.  They haven't -- they didn't say there is
2  no evidence.  They said, There is no proof.
3  BY MR. KLATT:
4      Q    Do you understand -- my question,
5  Dr. Siemiatycki, was simply, did Dr. Cramer say
6  there was no proof?  Correct?
7          MS. PARFITT:  Objection.
8          THE WITNESS:  He said there was no
9  proof.
10          MS. PARFITT:  Asked and answered.
11          THE WITNESS:  He didn't say there was no
12  evidence.
13  BY MR. KLATT:
14      Q    Okay.  Can you go back -- let's see,
15  let's go back to your expert report on biologic
16  plausibility.
17          MS. PARFITT:  Right here.
18  BY MR. KLATT:
19      Q    Oh, one other thing.  When you were just
20  scanning Cramer 2007, I saw you were looking on
21  the page where he discussed the Heller paper.  Did
22  you see that?
23          MS. PARFITT:  Just give him a moment to
24  get that again.  I think it was 17.
25          THE WITNESS:  Sorry.  No. 17?

| Page 347 | Page 349 |
|---|---|

**Page 347**

1      Q    I'm -- my question is, you cited Venter
2  and Henderson and Heller for evidence of
3  migration, correct?
4      A    Right.  Right.
5      Q    And those all predate well before 2007,
6  correct?
7      A    Correct.
8      Q    And here we have Dr. Cramer saying in
9  2007 there is no proof that talc used externally
10  reaches the pelvis, correct?
11          MS. PARFITT:  Objection.  Form,
12  misstates the article.
13  BY MR. KLATT:
14      Q    Is that what he said?
15      A    That's what it says.
16      Q    And you --
17          MS. PARFITT:  Wait.  Wait.  Wait.  Wait,
18  you let him finish.  He said, That's what he said
19  -- finish, please.  Thank you, Michael.
20          THE WITNESS:  The -- the word "proof" in
21  that sentence is a red flag.  I'm not sure what
22  they mean -- they meant by proof.  They might
23  have -- well have said, There is evidence that,
24  but it is not yet conclusive.  That is one
25  interpretation of a sentence like, There is no

**Page 349**

1          MS. PARFITT:  Yeah.
2          THE WITNESS:  You have very good eyes if
3  you saw me looking at the Heller.  I actually
4  wasn't, but --
5  BY MR. KLATT:
6      Q    I thought you were on that page.
7      A    Well, I was -- I scanned each of the
8  four pages.  There aren't that many pages.  The --
9  I see mention of the Heller article.
10      Q    On page 500?
11      A    Yes, I do see that.
12      Q    Do you see where Dr. Cramer in 2007 is
13  suggesting that the explanation for the Heller
14  study may be contamination that was introduced
15  during the processing of the tissue specimens?
16      A    So I see that he says it might have been
17  introduced during processing, and it's a potential
18  weakness.  He doesn't affirm that it is.  He says
19  it might be.
20      Q    So contamination is another explanation
21  potentially for why you might find talc in ovarian
22  or gynecologic tissues?
23          MS. PARFITT:  Objection.  Form.
24          THE WITNESS:  I -- I guess so.  Not
25  being an expert in pathology and physiology, I --

88 (Pages 346 to 349)

Jack Siemiatycki, Ph.D.

Page 350

1  that seems like a plausible -- seems to me like a
2  plausible alternative explanation.
3  BY MR. KLATT:
4      Q   You go on and comment in the next
5  paragraph of your biologic plausibility on two
6  trace heavy metals, chromium and nickel compounds,
7  correct?
8      A   So where are we -- oh, yeah. Yes.
9      Q   You're aware that IARC has made
10  determinations regarding chromium and nickel
11  compounds, correct?
12     A   Yes, correct.
13     Q   And neither one of the determinations
14  found they were linked to ovarian cancer at all,
15  correct?
16     A   That's correct.
17     Q   They found they were related to nasal,
18  sinus and lung cancers in people, primarily
19  workers, who had breathed the fumes, correct?
20     A   That's correct.
21     Q   So that's no way analogous to any trace
22  heavy metals in talc, correct?
23         MS. PARFITT: Objection. Form.
24         THE WITNESS: It's -- it's not directly
25  relevant. It may be indirectly relevant. The

Page 351

1  evidence that allowed IARC to make determinations
2  about lung cancer risks is evidence from
3  industrial cohorts of males.
4          And so there has never been an
5  evaluation of ovarian cancer risks in relation to
6  exposed women to chromium and nickel. It's terra
7  incognita basically.
8  BY MR. KLATT:
9      Q   And so following up on that, you're not
10  aware of any evidence at all that women who have
11  used externally applied talcum powder to the
12  genital area have higher blood or tissue levels of
13  chromium or nickel compounds than women who've
14  never ever used talc at all, correct?
15         MS. PARFITT: Objection. Form.
16         THE WITNESS: I've -- I'm not aware of
17  any evidence.
18         MR. KLATT: I think that's all the
19  questions I have.
20         MS. PARFITT: I have no further
21  questions.
22         Dr. Siemiatycki, you are done. We will
23  read and sign.
24         Thank you, Leslie.
25         Thank you all.

Page 352

1          THE VIDEOGRAPHER: This ends -- this
2  ends the deposition of Jack Siemiatycki.
3          We are going off the record at 9:28 p.m.
4          (Whereupon, the deposition
5  of JACK SIEMIATYCKI, Ph.D. was
6  concluded at 9:28 p.m.)

Page 353

1      CERTIFICATE OF CERTIFIED SHORTHAND REPORTER
2      The undersigned Certified Shorthand Reporter
3  does hereby certify:
4      That the foregoing proceeding was taken before
5  me at the time and place therein set forth, at
6  which time the witness was duly sworn; That the
7  testimony of the witness and all objections made
8  at the time of the examination were recorded
9  stenographically by me and were thereafter
10  transcribed, said transcript being a true and
11  correct copy of my shorthand notes thereof; That
12  the dismantling of the original transcript will
13  void the reporter's certificate.
14      In witness thereof, I have subscribed my name
15  this date: February 4, 2019.
16
17      _____
18      LESLIE A. TODD, CSR, RPR
19      Certificate No. 5129
20
21  (The foregoing certification of
22  this transcript does not apply to any
23  reproduction of the same by any means,
24  unless under the direct control and/or
25  supervision of the certifying reporter.)

Jack Siemiatycki, Ph.D.

| | |
|---|---|
| Page 354 | Page 356 |

**Page 354**

1    INSTRUCTIONS TO WITNESS
2       Please read your deposition over carefully and
3    make any necessary corrections. You should state
4    the reason in the appropriate space on the errata
5    sheet for any corrections that are made.
6    After doing so, please sign the errata sheet
7    and date it.
8       You are signing same subject to the changes
9    you have noted on the errata sheet, which will be
10   attached to your deposition.  It is imperative
11   that you return the original errata sheet to the
12   deposing attorney within thirty (30) days of
13   receipt of the deposition transcript by you. If
14   you fail to do so, the deposition transcript may
15   be deemed to be accurate and may be used in court.
16
17
18
19
20
21
22
23
24
25

**Page 356**

1          ACKNOWLEDGMENT OF DEPONENT
2       I,_____, do hereby
3    certify that I have read the foregoing pages, and
4    that the same is a correct transcription of the
5    answers given by me to the questions therein
6    propounded, except for the corrections or changes
7    in form or substance, if any, noted in the
8    attached Errata Sheet.
9
10   _____
11   JACK SIEMIATYCKI, Ph.D.            DATE
12
13
14   Subscribed and sworn to
15   before me this
16   _____day of_____,20___.
17   My commission expires:_____
18   _____
19   Notary Public
20
21
22
23
24
25

**Page 355**

1          - - - - - -
2          E R R A T A
3          - - - - - -
4    PAGE LINE CHANGE
5    ___ ___ _____
6    REASON: _____
7    ___ ___ _____
8    REASON: _____
9    ___ ___ _____
10   REASON: _____
11   ___ ___ _____
12   REASON: _____
13   ___ ___ _____
14   REASON: _____
15   ___ ___ _____
16   REASON: _____
17   ___ ___ _____
18   REASON: _____
19   ___ ___ _____
20   REASON: _____
21   ___ ___ _____
22   REASON: _____
23   ___ ___ _____
24   REASON: _____
25

Golkow Litigation Services - 1.877.370.DEPS

**A**

**ability**
142:3 180:8 281:8
287:25 331:11
**able**
25:14,23 30:2
31:24 74:22 120:9
122:4 198:3
203:13 220:17
242:7 303:22
338:17 340:24
**absence**
204:8
**absolutely**
39:12 44:24 67:10
80:23 98:22 182:4
205:10 223:25
241:21 253:2
300:12 308:5
**abstract**
175:4 236:13
268:14 294:20
295:7,21 318:23
346:22
**abundance**
45:25 85:19
**academic**
124:4 278:22
**accept**
238:3 259:8 316:8
**accepted**
133:1 148:10 233:6
258:23
**access**
71:21 90:16 99:6
99:11,13 101:17
230:14,17 242:6
**accident**
65:17
**account**
172:17 213:7 319:7
319:12
**accumulated**
192:18 202:19
207:22 311:1
**accumulating**

132:22 282:12
**accurate**
145:8,9 223:7
245:13 354:15
**accurately**
113:12
**achieved**
134:1
**acknowledging**
165:6 239:14
**ACKNOWLED...**
356:1
**acquaintance**
190:12
**acquaintances**
139:14
**across-the-board**
159:16
**Act**
262:22
**action**
213:9 219:5 220:10
221:11,16
**actionable**
181:18
**actions**
219:10
**activity**
50:20 51:16 140:21
159:25 241:11
242:1 249:2
273:24 283:1
284:1 291:5,13
**actual**
145:13 197:1
295:20
**add**
228:6 336:24
**added**
106:19
**addendum**
6:18 17:6,16,23
71:18 82:14 107:4
107:9,17 203:14
**addition**
11:1,24 53:4 67:13

82:3 162:13
191:25 335:18
**additional**
41:11 46:22 143:7
143:23 163:19
311:1
**address**
59:3 68:19 84:13
327:3
**addresses**
344:10
**addressing**
163:20 334:2
**Adele**
190:11
**adenocarcinoma**
204:18
**adequate**
197:19
**adjudicating**
103:17
**adjust**
49:21
**adjusted**
106:25,25 107:2
319:3
**adjusting**
318:13,15
**adjustment**
107:14
**administering**
2:15 181:13
**administrative**
259:11
**adopted**
28:22 186:14 197:6
**advance**
18:19
**advanced**
281:6
**advantages**
23:9 197:13
**advisement**
191:21
**advisory**
230:20

**affect**
158:1,7 169:20
209:24 228:8
**affirm**
349:18
**affirmation**
276:21
**afresh**
286:13
**African**
340:3
**afternoon**
105:6 146:3 209:21
274:15
**agencies**
25:8 26:5,7 43:7,10
84:12,18,24 322:3
**agency**
20:1 43:4,7 85:18
128:21
**agenda**
140:4
**agent**
26:1 35:21 138:15
156:19 158:4
161:9
**agents**
138:8,12
**aggregating**
106:20
**ago**
11:12 19:22 56:19
77:11 81:16 82:10
124:5 125:7,20
126:1 129:16
134:19,21 139:4,9
191:7 257:24
274:21 275:16
306:13 311:23
317:17 339:21
**agree**
29:19 30:8 69:19
117:23 144:6
146:5,13,15 149:1
149:10,14 150:25
157:12 170:10,11

172:20 173:6,19
176:6 183:4
184:25 191:24
192:7 207:20
209:6 237:13
238:15 239:4,20
241:16 247:6
248:25 249:11
264:23,23 269:6
275:23 281:15
302:11 305:19
321:21 336:14,21
336:23,23,25
341:8
**agreed**
136:23 201:12
**agrees**
169:16
**Ah**
86:25 131:3 157:18
**ahead**
15:16 17:15 45:12
75:13 89:12 194:4
214:2,4 222:2
282:5 322:14
**aimed**
284:18
**al**
41:23 102:10
189:19 266:10
**Alastair**
3:16 11:3
**Alberta**
279:11
**albumin**
339:16,23 340:10
**alcohol**
159:24 160:23,24
282:25
**alert**
324:10
**Alexandria**
3:13
**algorithm**
25:24
**allegations**

59:17
**allow**
116:13,16 117:14
331:4
**allowed**
351:1
**allowing**
76:16
**allows**
25:24
**allude**
59:7
**alluding**
156:24 168:2,3
**alternative**
183:7 186:1 350:2
**alternatives**
186:18
**ambiguity**
83:10
**ambiguous**
226:22
**America**
274:19
**amiss**
222:22
**amount**
99:18 120:23 121:2
121:3,3,4,16
125:10,11 174:7
**amounts**
77:1 102:16
**analogous**
133:20 161:15
350:21
**analyses**
70:11 71:15,17
72:16 76:7,12
79:12,25 80:13,18
81:6 179:6,10
186:19 200:17
201:8,10,13 284:8
284:9 298:2
303:13 318:15
**analysis**
22:21 23:12 26:14

28:24 29:9 30:2
35:5 66:15 76:1
81:2 107:1 119:3
120:8 125:22
134:23 142:24
189:4 197:12,22
198:2,21 200:16
200:17,18,20,23
201:7,11,12,18
203:12 209:13
227:2,8 228:12
236:22 238:16,24
239:2,12 241:17
244:6,9 266:9
267:11,19 270:4,6
270:15,17 271:25
272:11,16 297:25
307:9 313:23
**analyze**
125:21 229:24
**analyzed**
126:8
**analyzing**
98:9 190:5
**Anderson**
102:18
**and/or**
30:24 353:24
**Angeles**
4:14 136:5
**animal**
144:17 152:23
153:21 302:2
311:20
**animals**
144:14
**Anita**
7:21 124:25 282:9
282:13 287:7
**Anne**
2:12
**annotate**
52:3
**annotated**
44:18
**annotation**

44:9
**annotations**
44:5 64:2 66:24
68:4 110:9,14
**announce**
127:11 128:3
**answer**
19:4 28:20 29:16
30:13 33:7 34:10
41:14 58:19 68:24
69:10 90:22 91:16
100:9 106:11
107:13 118:14
121:7 125:6
128:13,14 129:9
129:22 133:14
140:13,19 150:10
165:25 167:20
176:24 182:5,15
191:1 211:18
226:23 229:11
237:24 238:1
250:13 311:22
**answered**
94:22 104:1 129:21
131:25 251:11
276:18 278:3
348:10
**answering**
18:25 69:17 124:3
156:3 195:23
**answers**
72:23 77:17 356:5
**antecedent**
311:4
**antenna**
73:23 138:6
**anticipated**
70:13 114:15
**anticipating**
21:23
**antihypertensive**
38:12
**antiinflammatory**
288:4
**Anybody**

80:24
**anyway**
28:16 63:14
**anyways**
87:24
**apart**
42:6 98:24 124:21
**apparent**
168:13
**appear**
128:17 293:24
**appearance**
159:6
**APPEARANCES**
4:1 5:1
**appeared**
128:7 193:24
**appears**
108:3 109:1 202:9
203:7
**APPEL**
5:4
**appendectomies**
65:22
**appendices**
42:2 230:11,18
231:17,20 235:3
235:10
**appendix**
200:6,6,7
**apples**
179:20,22
**application**
69:13 119:2 121:16
122:19 244:4
246:18 289:2
331:13 341:10
**applications**
121:4,11 124:14
125:9 268:18
295:10 297:23
320:23
**applied**
22:8,20 23:12 36:4
121:5 126:25
209:7 339:2,22

340:23 346:12
351:11
**applies**
66:17 144:11
**apply**
23:20 39:12 269:7
353:22
**applying**
39:5 119:16 341:12
**appreciate**
157:23 234:8 236:4
310:9
**approach**
21:24 197:11
287:15 311:24
**appropriate**
268:25 270:22
354:4
**appropriateness**
244:4
**approximately**
53:6 55:19 119:9
147:6 203:14
**approximation**
55:11 118:23
**architecture**
180:20
**area**
21:4 39:12 42:6
65:16 73:24 78:11
82:23 83:8 100:2
100:8 104:11
115:12 119:24,25
120:1 143:6,25
197:21 219:21
220:23 291:5,12
301:19 315:5
317:5 334:14
338:13 339:3,23
340:24 341:15
351:12
**areas**
74:14 75:19 143:8
143:14 164:2
338:12
**Argentina**

85:24
**argue**
205:24 207:7
228:20
**argued**
227:21
**argument**
168:24 174:11
**arguments**
19:4
**arrangement**
49:17
**arrive**
25:24 185:11
303:25 310:25
**arrived**
40:9 77:17
**arriving**
159:1
**article**
8:8 37:18 44:13
81:25 82:15
123:22 127:7,13
175:23 192:19
193:14 194:23
195:1,9,12 198:18
201:21 220:18,21
222:14 223:7,14
228:5 230:15
254:24 291:19,23
295:16 305:1
317:25 318:4,23
327:2,17 328:4
339:10,13,16,19
340:19 341:6,9
343:17,23 344:2
344:14 345:6
346:14,16,18
347:12 349:9
**articles**
42:24 45:24 81:13
81:19 88:23
238:12 262:21,23
314:7,8,11 338:10
338:12,17 341:21
342:3,5,19

**articulated**
183:20
**artifactual**
319:12,21
**artifactually**
159:6 319:20
**artificial**
341:11
**artificially**
167:13
**asbestos**
95:25 96:3,13,17
96:21 97:4,14,23
98:6 102:1,8,14
102:17 103:2,6,22
314:12 339:14
**ASHCRAFT**
3:11
**aside**
123:21 132:7 135:6
271:10
**asked**
27:21 36:3 45:7
67:14 68:17 69:10
73:4 74:13,17
81:17 90:22 92:9
94:1,21 96:1 98:1
100:11 103:25
124:9 126:17,19
129:20 131:24
160:23,24 161:18
161:19 162:23
163:14 182:5
246:8 251:10
258:7 276:17
278:2 291:18
293:3,5 294:5,19
295:6 306:12,21
312:6,9,17 313:16
322:24 323:1,5,6
323:19,25 326:13
348:10
**asking**
38:1 73:20,21 91:1
91:5,6,7 148:20
173:15 182:17

194:15 231:2
244:20 253:7,8
261:4,9 273:14
293:22 304:12
312:3 325:7
346:16
**asks**
289:6
**aspects**
27:8 36:20 124:15
**assertion**
102:6
**assess**
166:2 313:25
**assessed**
268:18 295:11
**assessing**
67:5 311:25 336:18
**assessment**
207:21 255:2,20,22
256:8,18 257:10
257:15 258:5,9,13
258:16,23 260:19
261:8,22 262:4,6
263:4,18 265:1
292:19 299:18,25
300:1,25 302:16
302:19 303:24
304:1,13,15
305:11 321:12
326:8,13
**assessments**
257:21 321:15
327:21 328:5
**assigning**
27:10 33:21
**assistant**
49:16 71:20 73:20
81:9,10 82:9
286:12
**assistant's**
49:20
**assisting**
125:3
**assoc**
103:5

**associated**
59:4 144:18 176:10
202:7 287:4,16
318:18
**association**
75:18 102:24
126:13 146:21
147:18 148:14
149:6 150:19
153:2 155:8
160:21 171:17
173:22 174:13
177:11 178:5,12
189:8 192:2 202:9
203:6 204:5
205:18,24 218:3
230:6 245:4,9
249:18,21 252:17
253:11,13,25
301:11 305:5,13
305:24 311:9,11
311:15,16 317:24
318:11 327:15,25
336:16
**associations**
8:12 147:3,9 148:6
148:8,11,12 160:9
175:16 177:1,4,14
283:25 318:9,24
319:6 327:14
329:10,23,24
**assume**
237:22 251:1
252:24 254:20
334:4
**assumed**
189:20
**Assumes**
315:7
**assuming**
168:21,23 251:2
254:5
**assumption**
97:19 168:22 227:6
**assumptions**
30:1 299:10

**assure**
79:19
**assured**
316:17
**attached**
6:8,12 7:2,11,14,19
7:20 8:2,7 354:10
356:8
**attempt**
27:9,10 29:6,11
**attempting**
58:19
**attempts**
28:7
**attend**
233:20
**attention**
32:23 294:25
295:19 299:16
300:4 304:23
320:20 321:9
329:19
**attenuate**
169:18
**attenuating**
166:25
**attorney**
354:12
**attorneys**
11:24
**attributable**
329:25
**attribute**
26:22 117:15
**audience**
251:25
**August**
7:5,9 47:10,15,17
47:17,21,22 48:25
49:5 59:22 139:15
**Austin**
5:14
**Australia**
38:13 189:2
**Australians**
250:2,2

**author**
20:19 193:16 232:1
275:12 293:19
318:1 327:18
333:14 343:17
**authored**
20:7 306:18
**authors**
83:1 135:17 192:16
199:14 200:10
201:4 202:23
207:20 209:7
218:12 220:8
221:14,21 222:3
227:12 228:1
231:24 232:23
237:3 239:5,22
240:11,24 243:17
244:22 245:6,25
247:6 248:9,10
249:8,16 250:9,18
251:6 252:5,15
253:9,24 268:3,14
272:25 292:22
294:2 296:12
298:9 302:17
303:1,24 304:12
305:8,19 323:3
330:5 345:7
**author's**
101:9
**automate**
25:24
**automated**
25:18
**available**
21:17 37:23 42:19
60:13 73:19 74:18
75:16 89:2,4
106:12 115:11,15
142:17 143:24
187:2 204:2 237:8
237:15 238:1
240:9,11,23,24
241:2,3,4 301:8
301:22 305:15

306:1 309:12
**Avenue**
3:18 5:13
**average**
38:17
**averaged**
57:9
**avoid**
28:23 29:11 41:17
**aware**
14:4,7,8,9,10 37:6
73:25 75:6 90:5,7
112:23 144:20
159:3 164:24
239:8,22 256:13
258:15,21 264:16
282:9,19 350:9
351:10,16
**awareness**
221:10,15
**a.m**
1:20 9:7 52:19,23
67:24 68:2 140:23

___

**B**

**B**
6:7 7:1 8:1 88:22
89:4,8 91:24 93:3
200:6,7,21,21,23
212:9,16,16,18
213:17
**Baby**
59:17
**Bachelor**
279:8
**back**
12:11 32:17 35:15
39:19 52:23 63:21
68:1 69:12 73:4
77:12 78:13 96:16
96:18 105:4 121:1
141:1 145:25
152:25 155:4
165:24 190:18
196:5 199:16,19
201:20 210:8

231:4 242:23
243:1 255:15
257:4 265:17
274:11 275:4
280:20 286:16
290:4,11,11 299:7
318:5 320:15
322:18 336:4
343:13 348:14,15
**background**
148:3 303:6 321:2
345:9,18 346:17
346:21,21
**bad**
27:14 30:24 31:9
**badly**
209:22
**bailiwick**
249:2
**ballpark**
51:4 56:11 174:10
289:1
**banana**
126:21
**bar**
316:2
**Barring**
83:21
**base**
31:14 66:10 144:1
260:21 264:22
**based**
28:24 65:6 66:23
71:17 103:11
113:5 120:7 131:5
153:9 154:5 155:2
162:15 204:2
205:5 220:7
227:23 254:1
301:16,25 303:20
321:17 331:1,18
335:10
**baseline**
269:1,8
**bases**
309:23

**basic**
20:16 67:6 153:22
179:15,16 186:25
314:5
**basically**
38:11,15 73:5 80:6
80:9 81:12 97:6
97:20 101:21
169:16,17 230:12
237:22 351:7
**basin**
64:21,22 66:10
**basis**
29:5 93:4 96:22
127:14 154:19
183:5,6 185:21
202:22 253:23
254:5,6 304:10
315:2 331:15,16
331:17
**basket**
24:8
**batch**
100:17
**Baylen**
3:6
**bear**
74:16
**bearing**
182:4 241:21
**bears**
142:25
**beat**
128:8 193:21
**becoming**
51:18 84:11
**beer**
161:3
**began**
46:13 70:2
**beginning**
12:10 88:9 111:21
145:23 172:2
183:3 219:5
238:15 296:25
303:21

**begins**
52:21 62:2 63:10
64:14 86:8 105:2
206:18 210:6
242:21 296:17
301:1,2 327:10
337:6,24 338:4
**behalf**
3:3 4:10 5:3,10,17
10:2 98:17 141:7
324:11 325:2
**behavior**
178:13
**belief**
103:4,9 184:3
**beliefs**
311:1
**believe**
10:16 17:25,25
30:10 40:7 59:11
69:8 85:21 123:1
176:3 178:25
183:17 185:1
193:20 195:2
196:8 212:19
222:15 234:19
243:1 248:5
253:20 260:2
270:13 275:16
292:25 293:3
294:8,25 295:22
296:3 299:18
302:7 303:21
306:9,21,24
312:23 313:7,15
317:9,25 322:10
329:6 337:10,15
340:4 346:7
**believed**
270:13
**benchmark**
147:9
**benchmarked**
147:17
**bend**
133:22

**benefit**
31:10
**benzene**
162:6
**Berg**
89:20 90:2 91:18
**Berge**
7:19 42:7 63:11,11
63:17 77:14
111:12,12,22
128:6 192:13
193:16,20 194:3
194:23 195:2,12
195:21 196:9
199:13 200:9
201:3,21 202:5,23
206:7 222:19
224:6,8 235:19
237:19 238:16
239:5,24 247:2,22
247:25 248:4,9,9
251:7 253:10
266:21 267:11,16
267:19
**best**
25:3 54:3 125:1
128:21 182:5,24
186:12,15,16
321:17 322:6
**beyond**
121:23
**biannual**
226:14
**bias**
8:9 157:8,17,19,20
158:1,6,11,22,25
159:9,15 160:5,7
161:9 166:5,9,10
166:18 169:22
170:6,16,17,20
171:13,22 172:3
174:7 175:14
209:11,11 213:10
217:22,25 218:2,2
218:9 221:22
222:1,4 275:24

278:1 311:13
317:22 318:7,20
326:24 328:18
329:25
**biases**
165:17,23 169:20
169:23 170:2
172:1
**bibliographic**
81:12
**bibliography**
86:19 87:12,22
88:21 89:8 240:18
**BIDDLE**
4:18
**big**
42:1 43:1 53:17
58:2 207:16 326:1
342:20
**bill**
7:4,7 46:14 47:8,12
47:19 48:3 49:8
**billable**
49:22
**billed**
47:10,13 49:1,6,20
49:21 51:9 54:6
55:8,13,18,21
**billing**
51:12
**bills**
48:20 49:11 50:11
53:1 54:22
**binary**
162:10 270:25
336:16
**binder**
6:22,23,25 16:4
42:3,10,20,22,25
43:17,19,23 44:16
44:25 45:13 46:1
46:4 57:25 58:2
108:3 109:17
193:5 195:20
212:3 213:4
234:17,21,23

235:7 243:2 248:1
254:15,17 256:3
294:9 308:1
342:20
**binders**
14:17 18:16,23,24
19:19 39:21,23
40:2,9,10,12
41:11,17 42:12,23
43:1,16 195:12,19
236:1
**biologic**
156:24,24 157:3
333:6 337:3,5
338:3 348:15
350:5
**biological**
75:3,9,18 115:22
116:7 117:19
143:10 152:23
155:9 156:18
165:3,11 205:6
305:6,6 313:8,10
313:14,18,24
314:23 315:4,13
315:20,21,23,24
316:22,23 330:9
330:19 331:5
332:7 333:18
334:2,7,23 335:5
**biologically**
205:2 311:17
**biology**
153:22 163:21
164:23
**biostatistics**
279:18
**bit**
50:19 88:6 140:21
148:3 171:25
187:14 192:8
195:8 205:19
222:19 290:24
**bladder**
318:10 329:23
**blank**

332:20 333:23
**block**
53:18
**blocks**
159:1
**blood**
38:17,17 351:12
**Blount**
93:15 95:13 102:9
102:11
**board**
319:20
**body**
34:17 37:9 101:2
143:9 149:8 154:1
219:7
**book**
8:4 19:20,21 20:2
20:17,24 21:2,12
21:17 22:6,16
23:13 36:5 37:17
160:14 306:10,13
306:17,22 307:5,6
307:23 308:20
309:4,12 310:1,4
310:7,10,15
**books**
19:10,12,16 20:22
36:18 40:19
224:22
**borderline**
186:11
**Borenstein**
20:20 67:2
**bottom**
67:1 70:14 101:23
169:12 181:18
186:6 196:20,24
197:14,16 199:1
219:4 224:1,9
228:8 300:20
337:7,20
**box**
41:2
**Bradford**
244:6,8 304:13

305:1,9,11 315:21
**brain**
161:16,17
**branch**
255:25
**branches**
74:1
**brand**
115:3 120:11
**brands**
117:25
**Branscome**
4:11 6:3 9:22 10:1
11:8 12:7 15:8
16:7,11,20 17:14
17:20 19:14 20:21
22:12 23:10,19
30:6,25 32:14
34:5 35:13 36:2
39:14 44:2,22,25
45:3,9,12,25 46:8
46:17,24 47:1,23
48:12,16 52:14,24
53:13 54:5,12
55:5 58:8,12
60:14 61:12 62:20
67:20 68:3 70:1
71:3,10 72:6
73:14 75:23 78:18
78:21 81:7 85:5
85:13 86:6 89:16
90:18 91:4 95:4
96:4,12 99:16
101:4 102:19
104:5,14,21 105:5
108:8,10,21,24
109:16,25 110:5
111:18 112:8
116:6,20 117:4,9
118:4 119:10
120:6,17 122:5,17
123:15 125:12
126:3 129:25
130:10 132:6
133:6 134:2 137:6
140:11,17 141:3

145:16 146:2
150:24 151:8
152:4,16 154:11
154:23 155:24
156:2,13 162:8
165:15 167:21
173:5 175:7
176:14,21 177:19
178:14,19,21
185:13 188:24
191:17,22,23
192:10,21,23
193:2,12 194:4,10
194:13,21 199:11
199:22 201:1,25
203:4 204:1
205:11 206:12,17
209:5,25 210:9
211:13,14,17
212:11 213:23
214:9 218:18,24
221:1 222:10
223:11 224:11
225:5,20 227:10
231:15 234:6,9,16
234:19 235:1,4,11
236:2,9 239:16
240:7,19 241:5
242:8,11,14,24
244:21 246:24
247:18 249:6
250:6,16 251:19
252:13 253:5,15
253:22 254:7,13
255:9,17 257:6
258:20 259:2
260:25 261:6
262:3,12 263:15
264:3,18 265:9,11
265:19 267:4,17
270:9 272:2,19
273:12 274:4
275:17 291:15
292:1,10 293:5,14
294:19 300:8,14
300:18 302:5,25

304:2 307:3,12
308:3,13 309:16
310:2,5 312:9,18
314:2,24 315:7
317:16 322:12,21
326:21 328:6,9
330:17 331:3,20
332:3 334:9,19
335:7,16,24 336:6
**break**
41:6 52:16,25
63:22,22 64:6
78:15 87:5 104:15
105:9 106:3 107:8
107:20 135:24
140:10 145:17,19
194:13,14,16
199:23 210:1
242:9 322:13
**breathed**
350:19
**BRENNAN**
4:17 308:23,25
**brief**
324:4
**briefly**
265:12 335:25
**bring**
15:20 16:22 18:1
18:14 20:23 46:9
235:9
**broad**
22:22 162:24
**broader**
303:6,8
**broadly**
12:13
**brought**
16:24 17:3,5,5
18:11,15,15,22
19:3,5,9 20:23
22:6,13 24:20
36:10 37:5 39:19
39:20 41:13 42:12
44:6,19 61:18
72:20 109:14,22

110:13
**building**
132:19 133:10
**builds**
226:2
**bulk**
123:1 180:4
**bunch**
112:14 170:1
**burden**
81:3
**bureau**
256:1
**burner**
84:12
**butchered**
142:3
**button**
256:22
**B-O-R-E-N-S-T-...**
20:20

———————
**C**
———————
**C**
3:1 6:1 9:1
**caffeine**
283:25
**calculate**
106:7 121:14
**calculated**
77:23
**calculates**
234:2 236:11
**calculating**
268:9
**calculation**
77:7,20 107:6,15
121:21
**California**
4:14 38:13
**call**
86:17 87:12,21
124:18 146:25
170:21 186:18
200:20 223:20
243:24,25 316:12

**called**
19:20 20:15,18
76:2,3 79:24
86:18 112:12
175:13 229:20,21
244:2 298:16
343:18
**calls**
185:23 188:20
**Campbell**
81:20,22 82:3,10
**Campus**
4:19
**Canada**
1:18 2:6 9:9 38:13
43:3 50:21 51:17
52:1 56:20 84:3
84:10 233:14
241:12 255:23,24
255:25 256:18
257:10,22,24
258:5,13,16
264:10 265:1
275:8,18,25
291:24 292:4,8,19
293:8 294:3
299:16 320:23,24
321:22 323:4
326:8,12
**Canadian**
41:23 43:12,14
230:20 262:21
263:12
**cancer**
6:21 7:14,17 8:5,13
12:18 13:11,16
19:21,23 20:1,25
21:1,9,12 24:16
33:13 36:6 38:24
43:9 56:18 57:19
58:23 59:3 65:7
65:11,20 66:12
69:15 75:4,10
78:11 84:20 88:11
89:25 90:23 97:18
103:16 113:9,15

115:2,24 116:9
117:2 118:7 119:6
119:14 120:1,10
120:19,21,25
121:15 122:9,20
123:18,24 124:1,6
124:8,22 125:24
126:6,14,20 127:8
127:22 128:4
129:1,19 130:2,6
130:15,15 131:8
131:16,22 132:11
132:21 133:21,23
134:7,10,15,23
135:1,6,19 137:1
141:9,18 142:4
143:1 146:8 147:5
147:8,18,22,24
148:7,13 150:6
151:12 152:12
153:11 155:1
157:14 161:2,16
161:18 164:5
165:4 167:12,12
168:4,14,18,24,25
171:4,7,16,18,19
172:9,11,23 173:8
174:14,20 175:16
176:2,8 177:2,3
177:11,12,15
181:20 182:2
189:9,15,17
190:16 192:4
193:18 202:8
204:6,15,16,19,22
204:23,23 205:1,2
205:9,25 213:9
215:14 216:4,9,17
216:25 218:4,16
227:9 230:7,22
232:20,23 233:20
237:10 243:13
247:8 248:11
250:10,20 251:9
252:9 253:12
259:22 261:2

Jack Siemiatycki, Ph.D.

267:9,22 268:7
271:13 272:13
273:3 275:19
276:3,12,15 277:8
277:16 279:25
281:4,5,14 282:9
282:17,24 283:13
283:15,24 284:15
284:17 287:2,5,18
288:6,15,22
296:15 297:9,24
301:12,18 302:10
302:24 305:14,25
306:14 307:11
308:20 309:5
311:4 312:8,16
313:19,24 314:22
315:6,14 316:25
317:5,25 318:10
318:10,10,13,18
319:19 329:10,23
329:24 330:10,21
331:7 335:10
343:19 345:12
350:14 351:2,5
**cancers**
168:11 171:10
203:16 204:11,13
281:2,12 284:16
319:11,14 350:18
**cancer/talc**
81:17
**capable**
103:3,17 263:3
273:20,21,22
338:11
**capricious**
191:2
**capture**
30:21
**captured**
156:22 333:12
**carcino**
142:2
**carcinogen**
145:8

**carcinogenesis**
312:12
**carcinogenic**
122:16 145:14
219:6 314:9,10
**carcinogenicity**
20:4 99:10 142:2
144:12,13 153:13
**carcinogens**
122:13 147:10,11
147:25 148:15
**carcinoma**
204:18
**care**
214:3
**career**
26:4 162:1
**careful**
179:24 254:9
**carefully**
185:18,18 338:10
354:2
**Carolina**
219:22
**CAROLINE**
5:18
**caroline.tinsley...**
5:23
**carried**
27:20 33:15 77:14
79:21 97:12
118:17 132:2
180:3 189:1
196:15 209:2
266:9
**carry**
40:19,25 121:20
142:13 170:7
171:3
**carrying**
270:3
**case**
9:12 10:7,11 12:11
12:15 13:18 16:25
21:19 27:24 38:23
42:21 47:11,14

50:8 53:12,17
58:14,17 59:13,17
59:20 60:1,4 64:5
65:14 66:4,4,5,7
89:20 90:2,21
113:13 124:7
127:16 135:12
143:18 148:5
151:10 154:22
160:9,22 168:7
176:8 181:16
188:21 190:24
194:23 220:12
256:10 261:10
265:3 274:19
318:6 326:16
337:2
**cases**
1:12 56:18,20
59:13,15 64:23
65:8,16,19 66:6,8
66:11 76:20 114:1
159:18 160:20,23
160:25 161:6,18
161:23 166:11,14
166:16,23 168:25
169:5 170:9,24
190:20 197:3
200:24 212:7,9
216:3,15 217:7
274:23
**case-control**
125:3,14 126:10
142:23 146:6,16
159:11,12,18
167:18 168:16
170:7,18 189:1
202:10 205:17,19
283:16 287:3
**case-controlled**
23:7
**case-control/coh...**
206:4
**catch**
140:3
**categories**

76:25 107:1 144:25
158:14 164:8
214:25 215:10
229:19 251:4
**categorization**
299:8
**categorize**
153:3,5
**categorized**
27:23
**category**
17:2 88:24 100:25
145:9 147:13
171:23,24 214:19
214:20 216:25
225:16 227:5
269:1,8 336:17
**causal**
58:22 103:5,5
114:13 115:9
131:7,14,21
132:10 148:11
150:18 153:2
155:8 156:10
157:11 160:21
249:18,21 253:13
253:25 301:22
302:4,8 303:25
305:16 306:2
310:19
**causality**
23:1,2 115:17
117:15 119:4
152:1 304:13
310:21 311:4,25
316:1 335:6
**causation**
21:9,20,21 35:21
130:17 243:19,23
247:13 249:22
271:1
**cause**
69:15 113:8,14
115:2,23 116:8
118:6 120:19,21
121:15 127:8

128:4,25 130:2,8
130:9,11,14,14,15
130:19,20,21
134:6 135:1,6
141:9,17 142:4
151:12 152:11
165:4 182:1 237:9
247:8,17 248:11
249:4,5 250:10,20
251:9,14,21 252:8
310:17 317:5
330:20 331:7
335:9
**caused**
97:15 155:11 161:2
182:23 222:5
**causes**
19:22 119:13
129:18 130:6
174:19 204:22,22
204:23 271:12
288:15,22
**causing**
156:20 313:19,24
**caution**
46:1 85:19 328:24
**cell**
46:11 161:16,17,19
161:20,23 204:18
204:19,19
**Center**
2:5 9:9
**century**
118:10
**CEPA**
264:7,17
**certain**
15:20 72:13 83:4
88:15 98:22 118:8
118:23 119:24,25
137:24 154:19
162:16 174:7
184:5 282:10
**certainly**
22:3 59:5 70:16
73:11 122:22

123:5 129:14
141:11 158:24
160:7 207:2
211:18 261:16
319:24 344:11
**certainty**
103:21 113:7,18
114:6 117:20
131:7
**certificate**
353:1,13,19
**certification**
353:21
**Certified**
353:1,2
**certify**
353:3 356:3
**certifying**
353:25
**cervix**
340:25
**cetera**
35:10 38:20 46:11
64:11 138:15
146:22 159:14
160:2 179:23
196:20,20 226:8,9
**chair**
136:14
**challenged**
21:22 67:15 102:15
**challenges**
21:23
**chance**
105:7 123:12 321:6
329:24
**Chang**
272:7
**change**
70:14 84:9,15
137:18 143:2,5
181:19 191:1
255:23 311:2
355:4
**changed**
13:3 56:13 57:1

71:24 84:6 112:19
137:7 162:24
163:4,15 195:14
195:15 246:19,23
289:3
**changes**
71:4 137:14 187:6
187:9 195:16
354:8 356:6
**chapter**
22:25 23:3,5
307:24 309:7
**chapters**
22:5,18,24
**characterization**
146:6
**characterize**
148:6,21,23 185:7
**characterized**
148:21,23 207:13
**charge**
54:13,17
**check**
41:6 87:5 106:4
107:7
**checkmarks**
112:17
**chemical**
144:8,11,25 152:14
154:14 155:10
**chemicals**
138:2
**cherry**
35:16
**cherry-picking**
29:10 34:12,15
35:19
**choice**
254:10 270:16
**choices**
281:11 284:13
**choose**
65:6,21 146:11
208:10
**chose**
37:2 177:13 197:1

208:10
**chosen**
197:3 208:4
**Chris**
11:3
**Christmas**
257:17
**CHRISTOPHER**
3:4
**chromium**
350:6,10 351:6,13
**CHUM**
2:5 9:9
**CIR**
102:18
**circle**
201:21
**circumstance**
119:20
**circumstances**
130:16
**citation**
238:16
**citations**
102:18
**cite**
135:17 175:17
265:22 267:6
341:22 345:23
346:18
**cited**
261:23 338:10
346:1 347:1
**cities**
118:18
**citing**
339:4,6
**claim**
141:8 216:18
218:15
**claimed**
102:1 315:24
**claims**
98:5
**clamp**
48:8

**clarification**
137:8 157:23
212:12,21
**clarified**
12:23
**clarify**
40:1 121:2
**clarity**
72:21
**class**
179:1,5 213:9
219:5,9 220:10
221:11,16
**classic**
132:21
**classification**
136:24 144:10
149:2,4 150:5,12
151:16,22 152:13
251:3 263:19
267:9
**classified**
144:7 149:6 154:15
168:11
**classify**
151:3 154:20,21
**clean**
108:11,18 110:8
140:15 224:21
**cleaning**
125:20
**clear**
40:8 48:12 50:25
61:13 83:5,24
109:1 111:19
153:4,11 172:6
271:16 275:5
**Climate**
255:23
**clinical**
38:10 180:3,5
**close**
154:17
**closely**
118:24 166:8 240:2
241:8 326:15,19

**closer**
327:23
**coauthored**
232:16
**coauthors**
149:21
**coded**
27:23
**coefficients**
207:14
**coffee**
125:8 135:9 262:10
**cognizance**
261:13
**coherence**
79:21 305:7 334:15
**cohort**
23:7 142:23 159:11
167:18,25 168:8
171:3,3,12,13
205:21 224:13
226:5
**cohorts**
351:3
**coinvestigator**
124:19
**colleague**
124:3
**colleagues**
10:23 135:9
**colleague's**
124:24
**collect**
25:2 171:4 226:11
**collected**
24:3 88:8 126:7
177:5,6 208:18
220:1 229:15,25
322:7
**collecting**
25:10 304:8
**collection**
31:12 36:12,14
125:19 226:11
229:5,9
**colon**

202:16
**Columbia**
2:14
**column**
112:11 219:3 220:1
327:9 329:19
**combination**
197:25 241:24
**combine**
153:21 198:3
271:25
**combined**
225:18 266:11
297:9
**combines**
270:17
**come**
19:11 21:10 28:5
55:22 63:21 65:3
65:15 73:22 74:3
78:13 80:22 89:8
90:19 95:24 96:14
99:9 102:7 128:20
226:10 261:10
**comes**
25:4 90:17 137:23
179:7
**comfort**
261:17
**comfortable**
108:16 114:10
**coming**
65:12 70:8 136:6
201:21 253:6
**comment**
259:14 260:7
346:20 350:4
**commented**
247:13 304:25
305:4 310:1
**comments**
259:8
**commercially**
37:22
**commission**
356:17

**committee**
13:13 28:10 259:9
259:10
**Committee's**
6:13
**common**
126:16,16
**commonly**
22:4
**communicated**
10:20 191:14 233:2
326:6
**communicating**
128:11
**communication**
293:6 294:2 324:9
**communications**
114:3 231:11 275:7
275:11 324:16
326:3
**communities**
118:18 119:21
**community**
37:6 85:2 104:7
131:19 132:4,8
172:21 279:13
316:11
**companies**
92:7 120:4
**company**
92:5,19 96:25
118:24 119:22
120:2 314:15
**comparable**
179:20
**compare**
168:20 177:18
187:14,15 216:7
216:22 223:14
**compared**
99:20 161:7 168:13
177:17 203:19
216:19 217:9
237:18 269:23
270:2 297:10
298:13,25 341:11

**compares**
200:8
**comparing**
159:20 237:20
319:2
**comparison**
38:20 158:13
187:12,17 206:5
217:15 223:16
237:17 238:2
298:5
**comparisons**
208:15
**compatible**
122:23 123:9
217:21,24 243:11
267:20 298:25
**competent**
129:3 310:23
**competing**
334:6
**competition**
138:12
**compile**
203:13
**compiled**
322:7
**compiling**
87:23
**complementary**
269:24
**complete**
17:23 22:16 28:19
110:7 137:15,16
137:19,22 138:21
139:1 141:14
329:20
**completed**
94:8,11 125:18
128:7 256:15
**completely**
77:15 209:17,18
266:23 270:17,20
**completeness**
15:23 337:16
**completing**

96:6,11
**complex**
310:23
**component**
201:15
**components**
26:19 30:23 31:8
32:11 33:17 50:18
197:8 272:8 324:3
**composite**
297:6
**composition**
74:15,25 75:9
92:10,14
**compounds**
350:6,11 351:13
**comprehensive**
76:3 237:7,14,25
**comprised**
34:4
**computation**
270:23
**computer**
71:11,20,23 72:4
79:12 80:14
**computers**
71:24
**conceivable**
103:14
**concentration**
264:9
**concept**
183:25 184:19
252:25
**concepts**
246:12
**concern**
88:11
**concerned**
71:22 197:7 299:5
**concerning**
143:8 219:6 310:18
314:7 331:17
**concerns**
344:11
**conclude**

248:10 249:3,5,12
251:8 264:6 268:4
269:14 273:1,15
305:8,10,21
**concluded**
247:7,16 248:13
273:8 352:6
**concluding**
208:16 253:23
**conclusion**
32:2 35:20 36:1
113:1,5,12 122:25
132:15 151:11
152:10 204:4
228:13 237:1,4
239:21 240:2
247:12 248:8
249:18 250:8
251:18 254:10
262:14 263:23
264:1 267:20
321:17 330:4
335:8
**conclusions**
31:23 126:4 128:19
158:2 195:3 196:9
222:16,18 247:21
262:20 263:4
310:25
**conclusive**
347:24
**concocted**
21:25
**concordant**
263:9
**concurred**
200:18
**conditions**
79:22,23 264:9
**conduct**
67:7 73:15 78:22
134:13 138:21
139:1
**conducted**
37:21 98:9,15
149:15,22 180:5

226:13 260:15
266:14 283:16
292:7,9
**conducting**
21:5 79:10 132:7
141:21 142:1
210:11 310:13
**confer**
191:17 322:13
**conference**
139:15
**conferences**
135:10
**conferring**
61:11
**confidence**
196:18 207:2,3
223:19 236:15,19
236:21 297:12,15
297:16 316:4
**confident**
80:10 104:12
**confirm**
17:21 110:6,11
192:12,17 214:15
245:18 263:1
273:14
**confirmed**
202:17 206:24
**conflict**
260:10 275:20
276:8,24
**conform**
262:24
**conformity**
263:11 322:2
**conforms**
262:23
**confounder**
158:19 178:13
318:21 319:8,19
319:23
**confounders**
288:9 319:7,10,14
**confounding**
8:9 156:8,17,21

157:1,2,2,17
158:11 171:23
172:3,8,15 173:11
173:20 174:1,6,12
174:12 175:14
176:1,5,7 178:6
311:13 317:18,22
318:7,20 319:16
320:3 326:24
327:3 329:25
**confusing**
63:20 248:6
**confusion**
40:13
**conglomeration**
266:13
**Congress**
5:13
**connected**
98:21 176:11
**connection**
47:13 48:22 50:7
51:20 53:8 54:7
54:14,18,25 56:2
56:9,13,25 57:16
57:21 69:10 73:16
80:17 84:2,19
98:17 100:13
123:24 125:14
126:11 127:4
146:7 164:4
240:10 323:3
**conscious**
87:11 167:5
**consciously**
87:21
**consens**
132:19
**consensus**
128:17,24 129:5,17
131:18 132:3,10
132:19 133:5,9
310:20 329:4
**consensuses**
311:2
**conservative**

85:7
**consider**
27:4 35:4,19 74:19
74:24 75:2 90:11
140:6 142:16
151:4 173:21,24
183:8 188:16,19
199:14 201:3,6
204:12 224:13
251:16 272:21
314:22 317:3
323:13,14
**considerable**
26:17
**consideration**
34:19 36:23 328:17
**considerations**
21:7 99:21,23
304:25
**considered**
20:6 25:16 26:16
33:11 68:20 78:7
142:18 147:9
158:14 165:20
169:24 173:24
218:2 239:5,9,10
239:18 256:9
265:24 314:25
317:6 321:14
327:24 329:5
**considering**
26:25 32:2 335:19
**consistency**
67:5 75:21 102:25
299:5 305:5
313:12
**consistent**
146:9,10,14 156:16
222:18 237:4
240:3 265:23
301:10 305:12,22
305:23
**constellation**
130:16,19
**constituent**
137:22

**constituents**
117:17 339:2
**constitute**
264:9,10
**constituted**
286:11
**consult**
99:1 258:7 313:25
**consultant**
276:11 277:1
**consultation**
259:6
**consulting**
278:8
**consumed**
119:24 161:3
**consumer**
115:11,15,15
**consumption**
159:25 160:24
**consumptions**
160:25
**contact**
56:17 275:6,10,18
323:2,14,20
**contacted**
10:13,18 258:11
**contain**
22:19 41:14 48:20
49:13,15 68:14
69:4 110:9,14
**contained**
36:5 40:24 72:25
84:7 149:16 256:3
262:6
**containing**
6:22,23,25 46:2
**contains**
18:20 20:3 22:25
23:3,5 41:22 42:4
42:17 46:4 61:19
233:24 234:19
235:18
**contaminant**
115:24 116:9,10
**contaminants**

103:22 116:25
339:2
**contaminating**
103:7
**contamination**
96:21 97:5,7,20
98:6 103:2 349:14
349:20
**contend**
22:19 164:2
**content**
68:25 258:8 314:13
**contentious**
205:20
**contents**
41:16 101:14
235:13 309:6
**contested**
184:14
**context**
21:25 127:25 135:2
140:1 167:18,20
167:25 168:14,16
172:8 173:25
179:8 269:19
270:1
**contexts**
167:23
**continuation**
296:3
**continue**
297:20 302:22
328:15
**continued**
4:1 5:1 7:1 8:1
275:17
**continues**
202:13 296:6
327:20
**contraceptive**
287:19
**contracted**
292:3
**contradict**
98:4 100:12 232:13
340:20

**contradicts**
98:5 346:22
**Contrast**
163:11
**contribute**
172:22
**contributed**
289:14 332:10
**control**
54:21 65:6 66:1,4,5
66:6,8 74:11
124:8 160:10
177:16,17,18
216:20 217:16
284:17 288:8
353:24
**controlled**
27:25 177:15
**controls**
64:22 65:10,21
66:7,9 76:20
160:20,24 161:7
161:19,24 166:11
166:14,16,23
168:20 170:15,16
170:24 216:8
**controversial**
122:14 148:4
161:22
**controversy**
133:3 310:18
**convenient**
268:1
**conventional**
268:11
**conversation**
139:18 140:2,7,8
141:25
**conversations**
141:24
**convince**
281:21
**convincing**
154:8,9
**cookbook**
25:1

**copies**
46:22 86:15,15
88:4,5,7 175:1
191:4 307:25
308:1,6,14 332:23
**copy**
16:3,8 17:11 18:6
18:12 44:4 46:15
46:18 52:10 61:6
61:15,17 64:1,7
66:25 68:5 89:18
100:22 101:23
108:13,16,18
109:22 110:7,8,12
112:13 174:18,25
225:2,24 234:7
235:2 248:2 255:6
256:17 257:9,15
268:1 285:19,21
294:13 300:11
307:23 308:3
353:11
**copyright**
286:16
**copyrighted**
280:22
**corner**
45:23
**cornstarch**
92:22
**corporation**
54:21,24
**correct**
34:12 39:22 47:12
49:2,3,6,7,9,10
50:12,13 51:14
57:19,20,23,24
58:14 59:10,13,18
59:19,23,24 60:1
60:2,17,22,23
63:6,13 70:11
87:9 103:18
109:17,24 110:2
113:19,20 117:5
119:7 120:12,14
127:25 128:1

136:18,19 137:1,3
137:10,11,12
142:8 144:8,9,14
145:4,14,15
149:18,19,23,24
150:2,3 151:5,7
155:3 162:11,16
163:16,17,22
164:15,16 165:14
165:20,21 167:14
172:14,18,19,23
173:9,23 176:15
179:2 183:6,10,11
184:23,24 185:4
186:5 188:10,13
188:14 191:15
192:14 193:18,19
209:8 210:12,18
211:4,9 212:15
213:11,12,15,16
213:21 214:21,25
215:6,7,10,11,16
215:25 216:1,5,6
216:11,12,20,21
217:3,14,19,20
218:6,19 220:5,6
220:6,11,18,19,23
221:12,13,17
222:5 224:14,15
229:1,2,6,7 232:6
233:25 234:1,3
235:5,6 236:12,16
236:22,23 238:7
238:17,18,19,20
239:2,3 243:23
244:7,19,25 245:4
246:6 247:4,19
249:8 250:21,24
252:18 254:2,4
255:20,24 256:4,5
258:16 265:4
267:12,22,23
268:21 269:10
271:2,19 272:23
272:24 273:4
275:8,9,14,15,21

276:4,16 277:10
278:18 279:3,12
279:19,20,22,23
280:1,2,4,10,18
280:22,23 281:2,8
281:9 283:2,3,19
283:20 284:2,3,20
284:21,23,25
286:9,17,24 287:5
287:10,20 288:9
288:16 292:8,15
293:13 296:18
301:4 304:20,22
304:22 306:19,20
318:1,2 321:6
327:18,19 329:15
329:16 330:13,23
331:24 332:2
334:3,6 335:2,4
335:11,23 337:9
337:10 339:7,8,23
339:25 340:8,9,14
340:15,17 341:1
342:1 343:20,21
343:25 344:15
345:14,20,21,23
345:24 346:12,24
347:3,6,7,10
348:6 350:7,11,12
350:15,16,19,20
350:22 351:14
353:11 356:4
**corrected**
172:1
**correcting**
63:14
**correction**
62:13 110:20
111:16 112:9,11
328:3
**corrections**
18:9 61:20,23
62:23 63:24
110:24 111:25
112:21 354:3,5
356:6

**correctly**
79:17 113:10
116:19 131:10
183:1 202:11,12
202:20,21 237:11
268:20 288:11
301:7,13,23
321:19 327:15
328:1,10,20 329:1
329:11 330:2
**correspond**
62:7 319:1
**correspondence**
191:5
**corresponding**
235:25
**corresponds**
169:14
**corroborate**
270:21
**corroboration**
197:4
**cosmetic**
118:1 343:20
**costly**
196:19
**counsel**
9:15 15:24 16:2
18:19 40:17 46:23
49:20 51:9 55:9
55:13,21 61:11
70:25 74:2,13
89:9,15 90:4 91:2
92:4 94:19 95:16
97:11 98:1,18
100:14 105:15
155:21 177:23
211:10 235:21
274:5 276:3,15
277:16 300:16
320:7 322:10,25
323:1,9 324:12
325:2 326:14
328:2 332:5 334:1
336:7
**count**

67:12 232:10
**counted**
232:13 245:14
**counting**
64:11 67:3 245:15
**countries**
118:19 182:13
**couple**
10:22 18:3,4,22,23
  49:16 50:21 51:2
  63:8 70:9 74:6
  76:14 102:2 175:4
  189:10 195:25
  229:10 274:7
  306:7 309:19
  310:11 318:22
**course**
45:5 79:13 117:10
  134:18 179:7
  192:21 193:10
  234:6 265:13
  302:18 306:24
  307:7 313:22
**court**
1:1 2:13 9:11,16
  109:4,6 186:16
  302:22 354:15
**courtroom**
151:19,21
**courts**
151:24
**covariates**
106:25
**cover**
50:6 252:1 254:19
  258:19 285:7
  303:6,7
**covered**
49:18
**covers**
41:21 47:13 48:3
  48:25 49:4
**Cramer**
136:4 339:6 342:13
  343:3,5,18 345:6
  346:10,17 347:8

348:5,20 349:12
**Cramer's**
272:8
**create**
169:1 174:2 319:12
**created**
133:4 288:25
**creates**
180:24
**creating**
319:20
**credibility**
334:16
**credible**
316:3,10 330:12,22
  334:21,25
**criteria**
153:12 243:19,23
  243:25 244:1,1,2
  244:7,14,23 246:1
  246:4 265:6
  305:23 311:2
  327:10,12
**criterion**
245:3 246:18
  315:23
**critical**
184:5 284:20
**critically**
26:7
**criticism**
29:11 34:12,15
  66:16 199:9
  246:10
**criticisms**
198:21 241:6,9
  246:3,11
**criticize**
245:25 246:16
**criticized**
29:10 246:15
**criticizing**
172:4
**crossed**
136:4
**cross-examination**

227:20 290:18
**crucial**
325:6
**crude**
288:7
**cryptic**
83:2 229:4,9 230:2
**CSR**
353:18
**ctisi@levinlaw.c...**
3:9
**cultures**
250:1
**cumulative**
198:8 202:17
  206:23 297:5
  298:1
**current**
21:13 117:23 248:4
  263:19 283:24
  320:23
**currently**
56:1 92:11 144:7
  173:8 237:7,15
  238:1 281:7 283:2
**curve**
122:1
**cut**
289:1 329:7,8
**cut-and-pasted**
281:24
**CV**
175:20 232:10,17

———————————

**D**

**D**
9:1 288:3
**da**
206:24,24,24
**Dan**
293:22
**danger**
264:10
**dangerous**
26:1,1
**Daniel**

232:2 292:21 293:1
  293:13
**Daniels**
59:13
**data**
21:7,9 24:4 25:2
  31:13,14 36:12,13
  36:14 39:8 74:18
  82:18 83:2 116:23
  120:15 122:3,22
  123:8 125:19,20
  142:14,15,18
  144:17 162:15,22
  179:15,16,19
  184:12,22 185:3
  186:17 189:21
  201:5 208:18
  215:13 220:1
  222:25 223:4,6,9
  223:13 229:5,9,15
  229:24 230:1
  237:8,15,18
  239:13 250:19
  271:11 272:20
  273:15 283:22
  298:25 301:22
  302:2,2,3,3 304:9
  304:10 305:15
  306:1 322:6
**database**
82:12 142:20 189:9
**dataset**
191:10 198:3
**date**
9:6 54:6 214:19,20
  215:20 353:15
  354:7 356:11
**dated**
7:10 47:9 57:22
  58:5 60:21 61:2
  98:20 255:20
  299:18
**day**
11:22 21:10 25:1,2
  53:22 77:1 83:17
  121:5 212:24

245:8 290:22
  356:16
**days**
11:23 12:12,20
  18:4 51:3 121:5
  126:2 227:19
  231:22 354:12
**DC**
5:7
**de**
114:3
**deadly**
281:5 287:17
**deal**
171:20 197:7 326:1
**dealing**
38:22 39:4 44:16
  159:8
**dealt**
92:19
**debate**
104:7 334:22
**decades**
160:17 306:25,25
  307:8 309:25
**December**
50:20 51:17,24,25
  52:9 59:10 231:18
  241:11 255:20
  299:18 305:20
  323:22
**decide**
90:4 154:4
**decided**
29:11 208:10
**decimal**
223:24 228:9,18,18
**decision**
28:23,25 29:7
  34:10 88:22
  143:18 154:2
  188:23 189:25
  227:21,22 241:25
**decisions**
26:9 38:2 39:1
  138:17 209:12

210:10 222:25
**decline**
207:12,13
**declining**
208:21 209:1
**deemed**
354:15
**DeFelice**
5:25 9:4
**DEFENDANTS**
4:10 5:10
**defense**
214:3 334:1,18
**defer**
58:15 316:6
**deferring**
164:10
**deficient**
197:19
**define**
68:10 158:4
**defines**
68:12
**definite**
155:5
**definitely**
316:10
**definition**
144:10 145:13
**definitions**
20:17
**definitive**
122:25 123:1
154:10,13,18
190:4,16 195:11
**definitiveness**
154:24
**degree**
8:8 103:21 113:7
113:18 114:5
117:20 131:6
162:16 166:15
175:13 197:4
204:17,20 209:9
209:10 317:22
326:24 328:18

**deliberately**
86:17 344:25
**demerits**
228:21
**demonstrate**
269:9 271:1 283:12
**demonstrated**
103:6,10
**demonstrates**
181:21 269:15
**demonstrating**
296:14
**denied**
253:3
**denominator**
129:8
**deny**
198:17
**department**
43:14 65:21,22
124:5 134:9
230:20 257:24
278:23
**depend**
121:7 224:2
**depending**
56:15 186:9
**depends**
26:7 32:5 37:7
153:19 154:17
170:14 178:12
179:14 181:4
223:23 269:22
270:17 271:3
**deponent**
9:14 356:1
**deposing**
354:12
**deposited**
344:25
**deposition**
1:16 2:1 6:9,11,16
7:3 8:3 9:8,25
10:7 12:9,16
13:21 14:14,14,23
14:24 15:11,20,21

16:1,15,23 17:4
18:19 21:18 41:15
44:18,20 45:1,17
46:10,12 50:12,15
50:19 51:14 52:22
59:9,12 61:24
93:7,11,21,23
94:19 95:15
102:11,12 104:24
105:3 145:24
169:9 175:24
210:7 227:19
242:22 246:5
274:22 291:2
352:2,4 354:2,10
354:13,14
**depositions**
45:7 93:8 94:2,16
332:12,16
**derivative**
114:11
**derived**
24:11 115:9 119:15
267:3
**describe**
41:16 47:6 72:8
135:11 172:7
210:20 229:19
230:1 235:12
243:18 250:18
252:8,16 253:11
265:20 287:12
307:6 310:15
**described**
21:3,3,5 23:13
24:18,19 35:16
36:8,21 37:4 46:2
60:3 94:10 130:13
189:4,8 306:23
315:22
**describes**
83:4
**describing**
36:21 136:24 264:1
264:14
**description**

23:11 25:19 37:18
144:24 145:9
198:16 229:14
245:12 251:16
321:13
**deservedly**
226:4
**design**
27:24 38:14 66:8
180:12,20
**designated**
10:10 13:22 14:1,5
**designed**
38:10
**designing**
226:17
**designs**
23:6,8 180:19
317:18
**despite**
83:18 310:17
**detail**
84:4 116:23 201:2
241:15 264:16
**detailed**
163:3 305:22
**details**
246:7 259:1,4
340:18
**detect**
122:15 281:8
**detected**
96:17
**detection**
344:12
**determination**
146:15 151:9
185:21
**determinations**
350:10,13 351:1
**determine**
107:5 116:24
119:16 331:5
**determined**
153:24
**determines**

155:9
**determining**
23:2 121:22,25
184:11,21 185:2
185:15 191:11
**detract**
103:11
**develop**
12:14 75:10 171:11
172:11,23
**developed**
30:10 117:2 119:5
151:17,17
**developing**
37:3 83:18 86:4
173:8 202:8 316:9
**development**
13:8 75:4 122:20
192:3 258:4 267:7
326:7
**developments**
143:13 144:16
164:3,14,18,22
**devote**
241:25
**devoting**
197:19
**diabetes**
226:8
**diagnose**
168:1
**diagnosed**
167:11 168:3,16
171:11 216:3,4,16
216:17,24,24
281:6 284:19
**diagnosis**
167:17
**diagnostic**
169:22 171:14
**dial**
103:3,12,13
**Dictionary**
20:15
**died**
163:9

Jack Siemiatycki, Ph.D.

**diesel**
99:10
**diet**
159:25 288:3
**differ**
64:22
**difference**
80:7 160:19 171:7
  186:19 188:1
  190:25 199:4
  207:9 217:6,17
  248:19
**differences**
69:20,25 80:8
  166:10 180:1
  181:14 182:12
  185:9 186:22
  197:14 199:4
  222:23
**different**
13:12 18:24 23:5
  24:4,14 25:15
  26:22 27:8 28:3
  31:6,7,8,13,14,15
  31:17,18,20,21
  32:11,21 33:10,17
  33:18 36:24 47:24
  65:2,9,13,24 67:6
  69:16,18 72:2
  76:24,25 77:1
  79:21,22,23 82:25
  84:17,17 88:20
  92:20,22,24 99:18
  100:8 103:14
  107:22 109:8
  114:17 115:13
  116:24,25 117:18
  117:18 118:16,18
  118:18,19,22,22
  120:16,16 121:6
  126:25 128:11
  131:2 137:23
  138:6 144:24
  150:11 156:7
  167:12,17,24
  170:4 171:25

177:1,14 179:6,9
179:22,23 180:11
180:12,16,16,19
180:19 181:8,11
181:12,12 182:13
182:13 183:20
185:12 186:4,8,13
186:14 187:8
190:1,2 197:2,3,6
198:10 199:7
208:13 209:2,3
220:4 239:17
246:13 249:25,25
254:19 266:11,12
268:8 270:4
273:24 285:7,8,11
310:25 316:15
318:18 319:11
337:12
**differential**
166:17
**differently**
325:20
**differs**
65:12
**difficult**
82:22 122:14 207:7
  263:10
**dig**
82:2 135:12 266:4
**digested**
195:16
**digging**
100:15
**digit**
27:11
**digressed**
149:12
**dimension**
27:13 34:3
**dimensions**
27:16 28:4
**dipping**
95:9
**direct**
9:21 22:7 32:22

62:12 208:24
211:23 274:13
295:19 299:15
300:3 304:24
320:20 321:8
327:8 329:19
353:24
**direction**
49:14 103:4,13
  106:6 122:24
  137:19 166:25
  261:15
**directive**
96:19
**directly**
23:13,17 54:19
  126:18 344:10
  350:24
**director**
139:3,10,13,19
  141:4
**directors**
233:21
**disadvantages**
23:9 65:25
**disagree**
192:7 202:22
  205:16 206:8
  207:16,23 241:16
  336:22 341:18
**disagreeing**
253:4
**disc**
52:21 104:23 105:2
  145:24 210:6
  242:21
**discard**
34:20
**discarded**
73:12
**disciplinary**
303:6
**discipline**
150:14
**disciplines**
150:11

**disclose**
259:24 260:5
  276:10,13 278:5
**disclosure**
275:21 276:9
**disclosures**
276:24
**discomfort**
171:21
**disconnected**
174:22
**discount**
221:21
**discovered**
147:12
**discoveries**
283:12
**discredits**
159:17
**discrepancy**
107:22 199:10
**discuss**
83:14 139:23 179:5
  201:2 213:1
  220:21 221:17
  231:8,10
**discussed**
13:21,25 92:20
  126:9 135:14
  169:19 170:20,23
  171:2,14 232:19
  232:22 238:7
  247:1 263:6
  297:17 309:24
  326:9 348:21
**discussing**
7:24 157:21 286:8
**discussion**
15:5 22:25 23:7
  65:4 66:21 104:20
  136:8 156:1
  192:24 194:20
  202:1,5,24 206:7
  206:10,13 218:8
  218:11 219:11
  221:2,6,9,21

245:2 246:1
256:25 273:8
286:22 295:22
308:12 315:17
317:11,16 337:2,6
337:8 338:3
**discussions**
125:7 218:8 247:14
**disease**
66:11 130:18,20,21
  226:8 281:8
  283:13 287:17
  310:17,22
**diseases**
65:13,14 226:8
  306:10
**dismantling**
353:12
**distinction**
87:15 116:13
  129:24 276:20
**distinguish**
117:25 327:13
**distorted**
318:25 319:3
**distortion**
171:25 319:1
**distribution**
115:13
**District**
1:1,2 2:14 9:11,12
  109:4,4
**diversity**
31:8
**divided**
210:17,19,24 213:5
**division**
256:1
**doctor**
79:8 307:25
**document**
1:11 14:22 15:10
  15:14 16:13 33:8
  41:3,9 47:3,7 58:4
  89:13 105:14
  112:15 114:9

117:12 136:1
146:12 169:10
219:16 235:15
249:10 254:16
255:18 256:2,9
262:18 263:11,24
264:16 281:24
296:7 299:17
300:5 317:20
321:2,9 326:15
332:19 337:18
344:3
**documentary**
183:15
**documentation**
294:9
**documents**
15:21 16:24 18:24
  19:3 41:14 43:17
  43:19 86:11 88:3
  88:23 90:6,9
  91:25 92:5,6,19
  93:3 96:25 100:18
  101:17 314:15
  320:21
**doing**
28:18 38:9 57:12
  70:11 80:5 135:11
  188:1,1 214:14
  223:16 245:23
  354:6
**domain**
38:25 164:25
**domains**
24:11 75:17 163:24
**DONATH**
309:9
**dose**
107:1 243:11 268:5
**dose-response**
121:9,22,24 122:18
  122:23 123:7,9
  162:19,22 197:18
  197:21 198:4,8,11
  265:24 266:15,22
  266:24 267:8,21

269:9,15 270:14
270:15 272:11,22
273:2,16 296:14
298:11 299:1,6,11
299:12 311:11
**doubt**
102:7 218:10
  262:25 303:12
**doubts**
189:24 190:7
**downstairs**
310:10
**downward**
207:21 208:17
**downwards**
207:19
**down/pelvis**
340:13
**Dr**
8:6 9:23 14:16,23
  15:9 16:12,19,22
  17:21 18:20 20:10
  26:10 29:15 30:7
  31:2 33:19 39:18
  44:3 47:2,25
  48:17 53:1 62:5
  62:22 79:6 88:2
  91:25 95:3 98:8
  98:15 100:5,12
  101:7,11 102:21
  103:20 105:6
  109:13 110:6,23
  111:19 136:4
  140:12 146:3
  148:25 175:8
  177:20 193:13
  196:6 200:2
  212:13 214:11
  219:24 231:8
  232:4,16,20 233:2
  234:17 235:2
  236:10 242:25
  244:13 251:5
  253:7 254:9
  255:18 257:7
  265:20 274:16

275:11 278:17,18
278:21 280:16,24
282:16 284:13
286:1,23 287:8
288:14 290:1,20
290:21 291:3
300:23 301:16
302:15 303:15
307:19 309:5
312:5 315:11
317:7,15 320:19
322:10,22 323:11
323:20 324:10,20
324:22,24 326:10
327:1 329:15
336:11 339:9
343:16 346:10,17
346:17 347:8
348:5,5 349:12
351:22
**draft**
70:5 71:12 72:17
  73:7 254:24 255:1
  255:19 256:8,17
  257:9,15,21 258:4
  258:8,12,16,22
  260:19 261:8,22
  262:4,6 263:4,18
  264:25 292:19
  299:17,24 300:1
  300:25 302:15,18
  303:24 304:14
  305:20 326:8,12
  333:5
**drafted**
58:14 72:8
**drafting**
70:2,15,17
**draw**
120:9 148:17 204:7
  228:13 261:17,18
  261:20
**drawing**
21:6,8 310:18
  332:20 333:23
  335:5

**drawn**
158:2 248:21
**drew**
247:21
**DRINKER**
4:18
**drinks**
135:10
**drive**
4:19 18:19 109:15
**driven**
102:25
**drives**
62:18
**dropped**
63:5 190:21 228:15
  228:17 323:17
**Drs**
93:22 94:17
**drug**
38:19 181:7
**dry**
340:23
**Duces**
6:12,17
**due**
170:6 174:11 197:9
  222:1
**dug**
81:18
**duly**
9:19 353:6
**duration**
197:23 198:5,11
  266:25 287:19
  297:7
**durations**
77:1

---
**E**
---

**E**
3:1,1 6:1,7 7:1 8:1
  9:1,1 355:2
**earlier**
11:19 63:8 178:25
  180:2 188:16

189:24 190:17,18
193:20 220:16
241:10 278:17
333:3
**earliest**
143:21
**early**
28:22,23 29:7
  132:24 133:7
  171:20 227:22
  281:8 325:24
**ears**
173:1
**easier**
42:25 234:13
**easily**
65:18
**Eastern**
9:12
**easy**
89:3 138:10
**Echeverria**
59:20 60:1 70:8
  246:19
**economy**
81:3
**edited**
20:15
**edition**
20:11,13
**educated**
279:3
**effect**
122:2,16 160:20
  167:23,24 168:12
  168:15,21 169:17
  181:7 220:9 221:3
  301:22 302:4
  305:16 306:2
  319:17
**effective**
281:13 282:23
**effects**
219:6 224:2
**effort**
242:1

eight
19:19 53:22 186:8
    191:7 219:4
    266:11
either
37:4 63:22 70:21
    76:25 134:4
    257:11 271:20
    277:9
electronic
86:15 88:5,7
electronically
88:18
element
229:23
elementary
36:20
eliminate
97:7
eliminating
29:8
elimination
291:4
ELLIS
4:12 5:19
else's
39:17
embedded
207:5 211:2,2
embodied
198:12
emergency
65:20
emissions
99:11
emphasis
121:21
employ
307:8
employed
303:25 306:23
    307:7 309:25
enable
116:1 117:25
encapsulates
311:24

ended
140:7,8 227:2
    258:8
ends
104:23 352:1,2
engage
35:18
engine
99:10
England
127:11
engrained
36:15
enhance
72:21
enhances
180:7
enormous
198:3
enter
264:8
entering
264:7
enthusiastic
221:25
entire
93:14 154:1 206:11
    263:24
entirely
137:24
entitled
8:4,8 230:4 295:22
    303:17 304:14
    309:4 317:22
Environ
280:17 286:7
Environepi
7:22,23
environment
255:23 264:8
environmental
160:1 262:21
    288:14 303:4
Epi
280:17 286:7
    288:14

epidemi
172:17
epidemiologic
21:5,6,9 23:6,8
    24:9,10,25 27:6
    93:1 103:1,11
    115:8 116:15
    134:9,14 146:24
    150:16 153:5
    154:20,22 155:2
    156:22 160:4
    225:12 303:10
    310:13 311:19,25
    345:11
epidemiological
6:24 44:17 46:3
    75:21 106:4
    115:25 116:12,21
    117:14,24 118:25
    134:18,24 142:20
    151:10 152:7
    153:9 155:7 158:3
    158:7,12 172:18
    173:23 179:1
    204:4 205:5 245:7
    245:13,17 279:14
    302:1 335:10
epidemiologist
89:24 95:3 173:21
epidemiologists
24:23 66:2 73:24
    281:20 327:13
    329:6
epidemiology
20:6,15 21:21 23:1
    30:22 36:16 38:23
    39:4 42:18,23
    44:10 74:8,10
    90:13 95:1 106:1
    152:22,25 153:22
    154:7,12 156:9,15
    157:10,13 163:21
    164:15 167:4
    169:21,25 172:6
    180:10 181:15
    184:8 244:11

    279:17,18 281:1
    310:16,19
epidi
245:7
epidil
245:7
EpiTech
7:4,7
epithelial
297:9,23
equal
170:23 327:21
equally
185:10 310:23
equals
268:17 295:9
equivalent
53:19 249:21
    277:17,20 302:11
era
147:12
eras
92:22,24
errata
354:4,6,9,11 356:8
erroneously
168:11
error
166:2,4,7,8,12,15
    166:19 167:3,3,7
    167:16 168:1,12
    169:21,22 170:22
    170:23 197:11
    201:3,6 271:6
errors
70:10,22 166:22
    171:14 185:2,8
    223:18,24 224:1,3
    225:21
especially
123:2 184:7,7
    204:10 283:11
ESQUIRE
3:4,10,16 4:3,11,17
    5:4,11,18
essentially

156:8 223:2 277:17
    277:19
establish
335:4,22
established
117:19 122:21
    173:23 273:2
    282:8 287:17,23
    334:23
establishing
316:2 344:15
estimate
106:24 125:2
    149:14,17 169:1
    182:24 186:16
    202:13 206:22
    208:11 213:20
    247:11 270:8
estimated
160:14 177:13
    199:3
estimates
8:11 30:3 76:24
    122:4 160:16
    166:4,21,24 167:1
    169:18 170:25
    175:15 186:8
    192:18 197:15
    202:18 225:17
    267:3 298:18
    317:24 319:3
    328:3,4 329:22
et
35:10 38:20 41:23
    46:11 64:11
    102:10 138:15
    146:22 159:14
    160:2 179:23
    189:19 196:19,20
    226:8,9 266:10
ethnic
8:10 175:14 182:14
    317:23 318:17
ethnicity
177:8 319:8
European

43:4
evaluate
  27:18 28:4 32:20
  32:21 33:23
  126:20 138:8
  167:6 198:7,19
  204:24 266:15
  303:8 334:5,25
  335:20,21
evaluated
  12:19 24:5 27:1
  33:9 137:13 138:2
  138:13,16 144:18
  158:13,17 173:13
  192:6 241:8 297:5
  318:8
evaluating
  21:20,21 25:11
  31:13 89:24 90:21
  98:25 99:17 146:7
  169:24 172:17
  184:17 198:3,11
  275:24 278:1
  283:18 304:9
  311:3 314:20
evaluation
  20:3 36:13 43:5
  99:25 127:15
  137:20,22 138:21
  139:1 141:14,21
  142:13 143:1
  150:12,20 151:2
  153:7,24 181:17
  196:2 197:18
  237:7,14,25
  260:15 266:21
  292:4 299:3
  303:10 310:21
  330:11,21 351:5
evaluations
  26:9 31:16 33:15
  137:14 151:25
  237:5,6 238:10
  258:1
evening
  274:15,17 290:20

290:21 322:22
event
  87:8
ever-used-it-at-all
  77:3
evidence
  13:11 24:6,8,11,11
  25:5,6,16,20
  26:16,22 28:15
  29:12 31:8 32:1
  32:11 33:11 34:17
  43:3,5 67:11
  75:16,19,22 78:9
  98:4,5 100:11,20
  103:1,12 105:20
  105:25 113:6
  115:8,9,25 116:12
  116:15,22 117:14
  117:24 118:9
  123:2 129:3,4
  131:5 132:22,25
  133:24 134:16
  144:12,13 149:9
  150:16,22 151:5
  151:10 152:8
  153:3,6,10,12,21
  153:22 154:1,4,6
  154:20,22,25
  155:2,7,16 156:15
  158:13,14,23,24
  160:18 165:6,10
  165:11 174:5
  183:15 192:18
  197:20 202:19
  203:11,12,17
  204:2,4,9 205:6,7
  205:21,22,23
  207:22 243:11,18
  249:4 261:16
  264:14 265:22,23
  266:8,9,20 267:5
  267:20 270:14,15
  270:21 272:22
  273:6 281:11
  282:12,14,24
  288:2 296:13

299:6,11,12 303:9
  303:11,13 311:1
  311:19,25 314:6
  314:21 317:1
  320:22 321:14,16
  321:22 326:20
  333:11 335:10,13
  335:18,19 339:1
  346:23 347:2,23
  348:2,12 351:1,2
  351:10,17
evident
  298:2
exact
  130:23 137:4
  138:16 190:19
exactly
  15:14 29:25 58:16
  59:15 72:4 166:15
  198:16 227:4
  274:2
examination
  6:2 9:21 142:1
  274:13 294:23
  322:20 336:9
  353:8
examine
  66:18
examined
  9:20 240:1 243:8
examiners
  242:12
examining
  107:3 177:1 190:23
  310:24
example
  12:4 26:25 56:14
  95:2 101:5 118:1
  119:11,17 132:22
  134:15 151:1
  157:8 158:15
  162:1,14 181:19
  192:11 223:12
  252:15 277:21
  334:20
examples

67:17 85:15 144:22
  155:19 160:19
excellent
  27:14
exception
  44:3
exceptional
  147:25
excerpt
  8:4 309:9,13
excerpts
  93:15
excess
  119:25 121:12
  146:16,19 159:23
  176:3 328:22
  329:4
excesses
  118:25
exchanges
  100:16
excited
  174:23
exclude
  34:11 35:11 209:14
  209:15 225:14
  269:8 270:22
excluded
  29:5 199:5
excludes
  252:25 269:1
excluding
  28:23 79:24 83:9
  228:22
exclusion
  228:7
exclusions
  227:23
exclusive
  251:4
exclusively
  57:13
excuse
  23:4 111:8 155:21
  256:23,23 289:13
  320:7 346:6,9

exercise
  82:17
exercising
  85:18
exhibit
  14:15,23 15:6,11
  15:19,25 16:5,13
  17:17,18,23 43:24
  43:25 45:1,18
  46:3,5,6,16,20
  47:4 48:2,5,18,19
  48:24 49:4,24,25
  50:5,5 53:3,3,5,5
  58:9,10,13,20,25
  60:5 61:7,9,14,19
  61:25 68:10 69:4
  70:3 72:9,25 94:9
  108:15,17,18,24
  109:14,18,20,25
  110:3,7,12,17
  111:20 112:4,6,25
  149:16,25 163:6
  194:5,6,24 213:24
  214:4,7,12,15
  234:22,25 235:1,8
  235:13,25 243:3
  256:4 278:12,14
  280:12,16,21
  285:12,14 286:2
  306:9 308:16
  309:4,14 317:9,12
  317:21 320:21
  326:23 327:2
  330:6
exhibits
  6:9 7:3 8:3 41:18
  48:18 49:12 50:4
  234:20
exist
  116:11 271:18,19
  271:20
existed
  205:22 271:24,24
existence
  217:22 330:9,19
exists

116:1,12,16,22
117:24 118:9
123:8 334:10
336:19
**expect**
80:2 197:14
**expectation**
107:16
**expected**
224:9
**experience**
70:8
**experienced**
159:13 185:11
**experimental**
38:19 144:14,17
**experimentation**
152:23 311:21
**expert**
6:18 7:12,15 10:10
10:14 11:10 13:4
13:25 17:16,24
54:18,25 55:22
57:17 58:4 59:25
60:3,10,13,16,24
60:25 61:1,14
74:19,24 75:2,8
81:13 84:16 91:8
93:4,21 94:13
95:5 98:25 99:2
101:6,6,13 114:1
123:16 141:6
164:9,14,17,21
165:8 233:3
260:21,23 261:11
265:3 276:2,14
277:8,15 316:20
322:8 324:11
325:1 332:15,24
333:4,6,17 334:6
348:15 349:25
**expertise**
74:22 126:24 331:4
331:9,24 338:13
**experts**
13:22 14:1,4 15:16

24:12 74:23 93:24
94:3,7 136:12
316:16 322:3
331:19 332:6,8,10
334:1,17,21,25
341:4
**expires**
356:17
**explain**
176:3,9 177:24
183:12 187:9
199:6 218:3 316:5
327:4
**explained**
66:17 176:4 246:3
246:8
**explanation**
22:19 155:13
190:20 311:8,14
320:4 349:13,20
350:2
**explicit**
26:18 329:3
**explicitly**
29:2 34:8 36:8 37:3
84:13
**expose**
152:24
**exposed**
76:20 92:25 101:2
138:15 160:2
162:6 171:8,9
208:24 227:3,4
269:23 270:2,19
351:6
**exposed/never**
270:18
**exposed/unexpos...**
270:25
**exposition**
72:22
**exposure**
106:21 121:6,10
122:15 131:8,15
132:11 146:8
152:24 158:4

160:3 166:3
168:10 171:5
197:23,24 198:8
213:11 221:15
227:5,7 229:6,18
229:19 230:2
237:9 250:19
267:1 270:4 288:3
288:8 297:6
298:22 301:12
302:9 303:17
305:14,25 311:5
312:7,11,13
343:20
**exposures**
160:1 162:3
**expressed**
83:23 97:22 132:20
241:22
**expressing**
72:19 277:23
**extension**
189:20
**extent**
26:17 121:25
334:10,20 338:16
**external**
341:10,15
**externally**
340:23 345:13
346:11 347:9
351:11
**extra**
16:7 40:20 46:18
285:19,21
**extract**
82:20
**extrapolation**
204:25
**extras**
48:7
**extremely**
122:14 297:25
319:23
**eye**
207:11

**eyes**
143:16 349:2
**e-mail**
100:16 191:4,15
293:13,22 323:10
324:9,24 325:1
**e-mails**
191:19

───────────
**F**

**F**
5:6
**Fabio**
5:25 9:4
**face**
34:11 308:20
**faces**
289:6
**fact**
17:23 21:24 28:8
32:15 63:13 97:9
103:6,22 111:22
115:21 152:7,12
166:20 167:12
174:9 180:4,18
190:15 198:2
201:7 209:1
214:15 220:20
221:14 222:19
225:15 226:2
235:24 258:15
268:14 269:22
324:10
**factor**
130:4,12,18 156:21
156:22 157:1,17
174:1,6,8,12,12
310:22
**factors**
8:5 19:20 20:24
21:12 24:20 36:6
124:9 125:23
130:20 172:22
173:7,12 174:2
177:9 226:5,7
282:8,11,25

283:24 284:10
287:4,18,23 288:1
288:2 305:10
306:13 308:20
309:4 316:21
318:17
**fail**
354:14
**failed**
102:16 199:14
**failing**
137:19
**fair**
27:2 32:3 35:14
39:5 55:19 60:6
61:20 151:14
152:17,18,18
153:13 165:12
172:7 179:6
185:23 191:9
205:23 207:24
232:11 233:15
239:20 240:20
242:16,16 302:16
329:24
**fairly**
26:18
**fake**
159:22
**fall**
97:25 98:1 147:11
147:12 332:25
**fallopian**
339:4 341:1
**false**
327:14
**familiar**
15:9 64:25 74:21
129:13 192:13
193:13 230:3
243:22,24 244:5
254:16 257:20
258:25 259:3
262:5 264:15
280:17 303:4
**fan**

128:15
**far**
29:3 71:22 96:18
  123:5 266:12
  281:4
**faster**
248:2
**favor**
66:2
**favorable**
130:16
**FDA**
43:6
**February**
353:15
**feed**
150:19 153:6
**feel**
104:12 114:22
  150:13 169:7
**feeling**
28:17 100:3 152:19
  153:1 154:18
**feels**
289:1
**fees**
54:17 55:6,8,12,20
**fell**
88:23 155:22 215:9
**fellowship**
279:21
**feminine**
288:5
**fetishized**
184:2
**fibers**
96:3 97:14 102:2,8
  103:7
**field**
20:7 125:19 165:11
  331:19
**fields**
75:7
**fifth**
20:18 27:14 43:19
  298:16

**figure**
106:8 206:25 207:4
  207:19 243:4,5
  255:10 314:15
**figures**
217:2
**file**
71:11 88:18
**filed**
109:3 219:5
**FileMaker**
71:19
**files**
72:4 81:5
**filing**
45:23
**fill**
107:23
**filling**
314:12
**final**
25:20 31:16 90:1
  91:18 153:6,23
  280:21 321:16
  325:22
**find**
37:18 42:24,25
  52:9,10 81:13,25
  102:16 171:6
  182:7 196:21
  198:17 203:11
  209:4,16 225:24
  226:16,22 242:6
  244:10 261:19
  296:12 300:19
  310:17 349:21
**Findeis**
3:16 11:4,4,6
**finding**
102:8,14 103:11
  123:12
**findings**
21:4 132:18 133:9
  240:4 248:20,21
  248:21,22,23,24
  248:25 262:20

273:18,19,21,24
273:25 274:1
298:8 299:9 302:2
305:3 307:9 309:7
**fine**
108:20 140:16
  254:20 255:11
**fingers**
63:4
**finish**
25:2 71:12 140:18
  194:17,18 199:23
  282:3 338:15
  347:18,19
**finished**
140:13 248:16,17
  270:11
**first**
9:19 10:13 12:24
  13:12 17:2 20:19
  20:22 23:3 40:3
  44:16 57:17 62:1
  62:2,25 63:5,12
  86:16 105:13
  111:13,16 113:10
  118:23 157:25
  195:19 202:20
  229:13,15 230:19
  230:24 231:16
  237:11,13 239:22
  257:14 260:4
  262:4 267:24
  280:25 284:17
  286:21 287:14
  294:14 297:11
  300:24 315:17
  323:22 325:6
  337:8 338:20
  343:17 345:5
**first-year**
36:19
**fit**
151:18,22 262:19
**fits**
24:13
**five**

11:18,19 18:24
  19:5,10 41:11,17
  56:14,17,19 57:8
  147:14 194:10
  238:19 298:17,20
**five-year**
138:7,9
**flag**
347:21
**flaw**
67:6 182:23 188:17
**flawed**
27:9,11
**flaws**
188:20 225:11,12
  225:15 226:1
**flip**
286:19
**flipping**
63:25 284:12
**Floor**
3:19
**Florham**
4:20
**Florida**
3:7
**flurry**
50:19 51:16 241:11
**FLW**
1:6
**focus**
59:2,6 283:25
**focused**
57:13 171:4 189:12
  189:12 197:22
  200:9 226:5
  294:25
**focuses**
281:1
**focusing**
20:22 264:4 337:23
  338:19
**Focussing**
93:20
**follow**
171:5 200:4 235:14

261:19 300:9
325:12
**followed**
28:2
**following**
29:25 168:8 200:14
  207:1 351:9
**follows**
9:20 311:6 328:17
**follow-up**
171:11 206:3
  226:14,25 227:1
  322:11,23
**fondly**
275:1
**font**
108:4,5 109:8
**force**
72:21
**forcing**
31:10
**foregoing**
353:4,21 356:3
**forever**
22:3
**forget**
75:24
**forgot**
323:18
**form**
12:6 22:9,22 23:15
  29:10,22 32:4
  34:1 35:6,24
  39:10 44:8 53:10
  55:2 60:7 69:23
  71:8,13 73:9
  75:12 80:20 84:21
  85:10,20 90:2,25
  94:22 95:20 99:4
  103:25 104:9
  116:3,14 117:3,6
  118:2 119:8,18
  120:13 121:19
  122:10 123:10
  125:4,15 129:21
  130:7 131:24

Jack Siemiatycki, Ph.D.

132:13 133:11
137:2 150:8 151:6
151:15 152:15
154:16 156:11
161:12 165:13
167:12,15 172:24
176:13,16,23
178:9 185:6
188:18 192:5
198:25 200:12
202:25 205:3
207:25 218:17,20
220:24 223:8,22
225:9 239:7 240:5
240:13,25 241:19
246:21 247:9
249:23 250:11
251:10 252:19
253:14,17 254:3
254:11 258:17,24
260:22 261:3,25
263:7,21 264:12
265:5,8 267:16
271:15 272:14
273:5 276:17
277:4,11 278:2
281:16 283:7
284:6,24 288:17
288:23 302:6
304:16 306:4
307:12 310:5
312:18 326:6,17
330:14,24 331:14
332:1 334:8,11,14
334:15 335:1
339:12 341:2,17
344:1,20 345:15
346:14,19 347:11
349:23 350:23
351:15 356:7
**formal**
137:15,16,21 139:6
141:13,21 142:7
151:2 181:17
260:15 268:11
298:22

**formaldehyde**
162:6
**format**
15:15 76:18 135:15
**formation**
240:10
**formatting**
337:12
**formed**
69:5 127:20 128:24
194:25 241:15
256:15 261:9
291:24 315:8
320:24 321:1
**former**
95:2 151:1
**forming**
23:25 24:18 33:11
36:4 50:7,9 90:11
93:4 94:13 120:18
194:22 256:9
261:11 326:15
331:21 333:19
**forms**
121:15
**formula**
114:2 321:18
**formulaic**
277:22
**formulate**
241:9 315:11
**formulated**
292:18
**formulating**
314:1
**forth**
88:22 147:1 182:14
353:5
**forward**
108:11
**found**
32:19 81:18 88:13
91:25 105:16
160:10 176:25
196:22 203:17
223:3,3 239:15,15

242:3,4 257:12
297:23 299:6
327:5 343:24
350:14,17
**four**
11:18,19 40:9,10
40:14 53:15
106:21 126:2
152:21 160:17
248:25 298:14,15
298:15 306:25,25
307:8 309:25
319:4 349:8
**fourth**
20:14 27:14 62:3
63:1 171:1 286:22
297:14 300:24,25
**fraction**
204:10
**fragile**
204:7
**frame**
56:4
**France**
126:19 233:21
**frankly**
90:8
**free**
102:1 169:7
**frequency**
115:13 121:16
162:16 197:24
198:6,12 267:1
297:6
**friends**
135:9
**front**
14:17 33:5 47:3
48:18 50:5 61:8
84:11 91:11
109:17 112:25
192:20 211:11,22
234:5 235:25
255:19 294:8,17
294:18 295:25
312:25 337:11

**frustration**
82:23
**full**
53:19 62:2,25
76:16,17 93:17,17
165:25 196:18
201:21 206:12
219:25 300:24,25
301:1
**fully**
93:14 95:10 177:24
183:13 195:16
196:1 198:13
224:9 241:18
267:2 338:11
**fulsome**
191:11
**fumes**
350:19
**function**
150:14 258:1
**funders**
281:21
**funding**
228:4 233:10,13,16
281:21
**funds**
54:24
**funny**
112:19
**further**
36:21 135:13
157:22 258:21
301:21 305:15
306:1 322:1
351:20
**Furthermore**
80:3
**futile**
242:1

――――――――
**G**
――――――――
**G**
9:1
**gain**
22:7

**Gates**
200:14,18 224:13
224:16 225:2,4,7
225:21,25 227:2
227:12 228:7
**gathering**
134:20
**general**
15:25 16:14 17:2
64:15 65:18 66:2
133:22 154:7
159:16,22 160:6
161:5 190:1
310:13 320:22
321:23 334:14
337:8
**generalized**
161:22
**generalizing**
133:25
**generally**
65:14 85:25 89:2
138:7 162:2
166:24 204:21
276:1
**General's**
133:4,20
**generate**
51:19 60:24 159:6
**generated**
57:17 60:16 61:1
69:11 74:3 99:2
101:6 187:16,20
257:21 318:20
**generic**
58:21 66:21
**genetic**
282:10 287:3
**genital**
59:1 193:17 202:6
204:5 214:24
215:2,4,14,21
216:10 217:7
248:10 268:15
291:5,12 295:3,8
296:15 297:5,10

297:22 298:3
301:19 312:7
313:19 315:5
316:24 317:5
340:24 341:15
343:20 351:12
**genitally**
216:18
**geographic**
65:16 221:12
**GEREL**
3:11
**Gertig**
226:20
**gesture**
325:14
**getting**
39:18 124:11 147:8
173:10
**GI**
65:21
**gist**
137:5 324:1
**give**
14:25 17:13 41:4
55:11 56:3 100:24
101:9 118:23
125:1 131:1 157:4
163:9 165:25
174:4 186:16
261:16 263:13
281:23 285:24
290:4 300:11
348:23
**given**
26:18 38:18 65:8
95:19 134:3 356:5
**gives**
67:17 266:24
**giving**
32:1 148:3 274:22
**glanced**
243:7
**glasses**
46:11
**glitch**

80:11
**go**
17:15 45:12 54:19
54:20 65:8,20,21
67:20,22 75:13
77:12 80:24 83:15
89:12 104:21
107:10 121:1
131:3 148:22
155:4 165:24
170:3 194:4
199:16 214:2,4
222:2 227:16
236:7 242:11
243:3 249:9 255:9
265:11 268:2
274:6 275:4 282:5
282:20 286:21
294:13 298:19
306:11 308:14
321:10 322:14
335:25 343:8
348:14,15 350:4
**Godleski**
346:17
**goes**
36:21 48:11 213:21
216:19 283:10
287:12 301:21
303:22 337:19,20
**going**
52:14,18,23 53:17
60:19 63:24 67:23
68:1,20 72:11
89:6,17 104:16,25
105:4,8 106:4
108:11 109:13
114:15 121:23
124:16 128:16
138:8 140:14,16
140:23 141:1
145:20,25 152:5
157:21 161:2
168:5 169:13
189:6 190:13,14
194:8,9,12 210:3

210:8 211:19,23
219:10 225:3,6
234:23 242:18,23
243:8 255:12
257:1 265:14
274:4,8,11 285:5
290:1 308:4
320:12,15 321:10
322:15,18 336:1
336:13 343:10
352:3
**Golkow**
9:5
**GOLOMB**
4:3,4
**good**
9:3,23,24 18:10
27:13 30:24 34:22
34:23 52:15 67:17
79:19,20 104:14
105:6 145:16
146:3 179:17
181:2 184:15
210:1,2 226:3,4
242:9,10 274:15
274:15,17 290:20
290:21 313:2
320:10 321:3
322:5,22 349:2
**Gordon**
5:12 102:10
**government**
126:19
**governments**
138:3
**gradient**
305:6
**grams**
121:3,16
**grant**
124:14 125:8 289:2
**grants**
124:11
**grapes**
179:21
**gray**

172:5
**great**
52:17 188:8 285:23
328:24
**greater**
114:22 182:8 198:4
214:20 245:11,19
252:7 299:8
327:23
**greatly**
195:14 283:11
**green**
68:6 188:9,12,15
189:2,11,19 190:7
190:8,11 191:5
**Greenland**
20:8
**Green's**
191:10
**ground**
129:5
**group**
7:24 8:10 38:19,20
50:22 65:7 136:14
136:15,21 142:16
142:19,25 143:2,3
143:15,15 144:7
144:11,18 150:21
151:1,3,4,13
152:13,21,21,22
152:23,24,25
153:17,25 154:3,4
154:5,5,8,8,15,18
154:21 155:8
158:15 163:1
168:8,17 170:8
175:14 217:16
225:17,18 265:25
280:8 286:9
288:21 298:16
303:2,3 317:23
318:17
**groups**
138:4 166:18
182:14 213:6
298:17

**growth**
144:1
**Guadeloupe**
126:22
**guess**
11:20 15:15 25:4
51:1 54:10 57:8
59:14 68:17 69:12
72:10 88:25 96:24
97:10 98:20 99:8
147:17 149:5
166:1 168:1
178:10 183:2,9
206:1,25 246:8
257:16,18 259:6
299:3 307:14
318:4 323:13
324:18 325:21
341:3 344:22
349:24
**guesstimate**
55:16
**guidelines**
43:3,4 153:21,23
310:20 322:3
**gut**
100:3
**gynecologic**
281:5 340:8 349:22
**gynecological**
189:14
**G-R-E-E-N-L-A-...**
20:9

---

**H**

**H**
6:7 7:1 8:1
**half**
118:10 126:1
256:14
**halfway**
296:11
**hall**
278:23
**hallmark**
133:19

Jack Siemiatycki, Ph.D.

hand
18:5 22:25 52:6
77:7,20 329:21
handbook
20:14 146:24
handed
280:11
handwriting
18:11
handwritten
7:17 44:5,7 64:2
110:14
handwrote
73:2
handy
175:23 343:4
happen
155:12 156:14
170:11 252:4
happened
106:22,23 109:1
155:18,20
happening
252:6
happens
170:15 209:14
259:12
happy
183:24 197:5
222:25 291:8
334:17
hard
86:14 88:4,7 125:6
184:8
harder
42:24 169:9
Harvard
279:22
head
299:9 340:12
heading
87:13
health
26:6 43:2,14 50:21
51:17 52:1 84:2
84:10,12 85:3,6

85:16,18,23,25
86:3 226:3,12
230:20 233:13
241:12 255:23,25
256:18 257:10,22
257:24 258:5,13
258:16 264:11
265:1 275:8,18,25
279:13 284:14
291:24 292:3,7,19
293:7 294:3
299:16 320:23,24
321:22 323:4
326:7,12
healthy
281:11 284:13
heard
129:10 230:19,19
244:13,17 324:16
325:15
hearing
68:15 69:6 172:25
heart
226:8
heavy
63:4 103:23 350:6
350:22
heightened
221:15
held
2:1 9:8 15:5 20:1
22:4 104:20 143:3
143:20 156:1
192:24 194:20
233:21 256:25
299:7 308:12
317:11
Heller
339:5 341:22 342:7
346:3,3,4 347:2
348:21 349:3,9,13
help
15:2 19:3 41:14
44:23 74:13 81:23
82:6 83:18 95:22
236:1 280:7,9

helped
81:9,13 125:24
helpful
17:3 19:11 212:23
212:25
helpfully
200:8
helping
300:9
Henderson
339:5 341:22 342:6
345:22 346:1
347:2
hesitating
60:8 71:25
heterogeneity
180:14,15,25 181:1
181:2,10,11,16,17
181:21 182:3,6,24
heterogeneous
283:13
heuristic
32:9
Hi
146:4 290:6 325:14
hiding
266:4
high
117:20 119:21
147:7 148:1,16
153:18 155:15
160:10,11 166:19
232:13 287:18
304:8 314:4
319:15,23
higher
129:14 144:4 215:4
259:11 319:24,25
351:12
highfalutin
187:21
highlighted
111:2 166:1
highlighting
44:8
highly

298:1,14
Hill
243:19,22,23,25,25
244:6,7,9,13,23
246:1,4,12,18
305:1,9,11,22
315:21
Hill-like
304:13
hints
121:9
histologic
204:15
histological
202:10 203:7
historic
92:12 102:14,17
historical
132:22
historically
92:11
histories
318:16
history
22:2 92:13 177:7
195:8 318:13
hold
131:12
holding
43:18 129:11
home
169:10
HONIK
4:4
hope
4:13 128:23 259:15
259:15
hopefully
290:24
hopeless
171:9
Hopkins
93:16 95:14 102:5
horizon
143:21
hormonal

125:23 226:7
282:10
hospital
64:22 65:5,8,9 66:3
hospitals
65:12,15,18
hospital-based
64:12,14 65:1,2
66:1,5,22
hotel
136:6
hour
49:6 52:15 54:13
104:17
hours
11:18,19,20 47:13
49:2,6,22,25 51:6
51:7 53:4,5,6,21
53:22,22,23,24
125:2,14 177:21
194:10 293:10
306:12 317:17
340:13
huge
105:20 171:24
human
264:10 301:9 322:7
humans
144:12 237:10
250:21
Huncharek
202:16 235:19
hundred
28:3 170:9
hundreds
33:15,15 40:20,20
40:23 226:9,9
hung
309:18
hygiene
288:5
hypotheses
97:23 128:18
190:23 283:23
316:18
hypothesis

Jack Siemiatycki, Ph.D.

34:19,20 221:22
221:25
**hypothetical**
99:8 117:16 157:5
159:3 160:8
271:17,22
**hypothetically**
115:22 118:15
157:7,13 158:5

## I

**IARC**
19:25 40:18 105:18
123:22 126:11
128:21,22 131:2
136:15,23 137:7
137:12,14,18
138:21,25 141:5
142:1,7,12,16
144:7,17,25 145:4
146:5,15 149:1
150:7,12,12,20
151:1,16,22,24
152:14,20 153:18
158:15 159:2
163:1,11,16
165:20,25 218:2
237:5 238:6 251:2
260:12 263:19
265:25 267:9
275:18 276:1
299:2,10 314:4
350:9 351:1
**idea**
64:25 148:11 227:3
267:6 269:4
**ideas**
22:2 70:6 128:18
**identical**
38:11 80:4 190:25
**identification**
14:21 15:7 16:6
17:19 44:1 46:7
46:21 48:6 58:11
61:10 110:4 194:7
214:8 266:3

278:15 285:15
309:15 317:13
**identified**
11:25 40:5 43:20
86:11 89:7 158:12
182:23 327:2
330:6
**identifies**
342:16
**identify**
10:25 13:2 17:1
19:15 35:3,9 41:9
62:22 77:22 89:3
91:23 92:17
105:13 106:13
170:8 175:9 181:6
181:10 182:12
183:24 184:9
200:3 265:21
316:21 333:17
**identifying**
74:14 175:22
218:13
**idle**
325:14
**ignore**
182:5,6
**III**
300:5,17,21
**illustrate**
174:16 176:1,18
**illustrates**
174:5,19
**illustration**
134:24
**image**
62:14
**imagine**
45:6 86:2 118:16
191:6 239:11
269:20 281:23
**imagined**
180:14
**Imerys**
5:10 101:7 274:5
274:18 323:1,9

336:7
**impact**
38:16,17 106:14,23
158:18 166:3,5
170:24 173:11
176:1 182:8 218:9
224:1 228:16,21
284:14 317:18
**impacts**
166:21,23,25
**imperative**
354:10
**implementation**
180:21
**implication**
208:24,25
**implicit**
24:22,22,23 36:7
36:15
**implicitly**
29:1
**implies**
114:22
**imply**
249:14 329:22
**implying**
208:20,20
**importance**
26:21 32:11 84:18
**important**
31:2,4,4,24 32:12
33:23,24 123:6
156:18 177:10
196:14 197:7,20
198:1 206:15
260:5 275:24
276:10,13 277:24
288:9 319:9 324:3
325:13 328:13
**improbable**
120:2
**improve**
70:13
**improving**
284:18
**inaccurate**

166:12
**include**
29:12 38:3,4 39:7,9
43:9 50:11 82:18
184:12,12,22
185:3,3,3,4,16,17
186:9,10,17
187:10 188:12
201:11,15 209:14
224:13 225:14
228:25 229:4
252:22 287:18
303:2 329:14
**included**
39:16,17 82:25
106:5 112:12
186:23,24 187:1,6
188:9 189:22
199:5,12,15
200:11 201:14,15
208:3,15 213:18
222:24 240:21
287:22 297:24
**includes**
210:22 211:8 212:6
212:7,9,10 213:14
252:2 271:2 309:6
**including**
53:11 78:7 79:23
88:11 99:24
141:13 142:22
163:20 188:15
225:15 226:6
227:18,18 228:22
229:18 270:5
278:7,8 303:3
316:15 326:3
**inclusion**
228:7
**inclusive**
213:7
**incognita**
351:7
**inconceivable**
319:25
**inconsistency**

155:14
**increase**
103:9,15 146:18
149:2 156:16
176:10 217:2,17
261:17 296:17
297:21 298:11
345:12
**increased**
35:21 120:10
127:22 202:7
297:8 299:5 327:4
**increases**
123:17
**increasing**
103:4 120:24
268:17 295:10
297:22 298:21,21
**increasingly**
102:6
**incumbent**
275:20
**independent**
97:22 107:6,15
223:5 270:20
**independently**
77:15 80:5 106:7
164:9 272:10,15
335:20
**indicate**
107:11 123:6 205:7
219:9 239:21
248:12 293:12
298:20 301:10
325:6 329:8
**indicated**
30:7 32:15 145:6
292:22 299:4
328:8 332:4,9
**indicates**
154:10,13 237:8
250:19 273:16
**indication**
219:12
**indicative**
301:22 302:3

**indirectly**
350:25
**individual**
37:10 128:15
    172:10 228:22
    237:6 238:10
    321:15
**individuals**
10:25 55:7 117:1
    119:5 132:8
    212:15 215:3,5,9
    216:3,14,16,23,25
    217:18,22 326:4
**induce**
336:18
**induced**
213:10
**industrial**
351:3
**industry**
96:19 97:6 101:25
    126:22
**infect**
156:9
**infects**
159:17
**infer**
251:13
**inference**
115:17 299:7
**inferences**
21:6,8 117:21
    180:8 204:8 205:4
    248:20 249:1
    261:17,18,20
    273:10 304:10
    310:19 335:5
**inferred**
114:2
**inflammation**
143:12 288:4 314:9
**inflated**
167:14
**inflation**
222:5
**influence**

75:20 143:10,14
    184:10 205:8
    209:11 261:5
**influenced**
147:4 219:7 266:20
**influences**
180:23
**inform**
96:2 141:6
**informal**
74:1
**information**
7:21 22:7 23:4,5
    24:4,10,24 25:10
    25:11,17 26:18,19
    27:22 31:14 43:7
    43:15 50:23 51:17
    75:15 76:16,17
    84:7 92:9 93:2
    95:22 96:2 98:2
    99:14 102:21
    103:1 118:21
    126:7,17 134:20
    142:25 143:4
    144:1 162:20
    171:5 177:5,7
    184:17 188:22,25
    189:22,23 226:12
    228:3 229:17
    230:2 231:3,6
    233:11 241:12
    245:24 269:25
    270:6,18,19 271:1
    292:18 305:3
    310:24 314:13
    318:21 326:2
    332:10
**informative**
91:9 92:1
**informed**
222:13
**inhalation**
59:4 123:17
**inherent**
159:21
**initial**

70:5 334:15
**initially**
12:22 152:22
**initiate**
137:21
**initiated**
72:13
**Initiation**
171:15
**injected**
339:24 340:11
**injuries**
65:17
**input**
77:24 80:25 150:11
    151:25
**Insofar**
337:25
**instance**
33:23 76:22,23
    77:7 85:16
**instances**
85:6 86:2
**Institute**
43:10 233:21
**institution**
289:6
**institutional**
289:7
**instruction**
82:20 96:20
**instructions**
82:21 90:1,11,20
    91:14,18 354:1
**intake**
282:25 284:1
**integrate**
25:4 74:22
**integrated**
25:20 82:13 196:1
    321:16
**integrating**
28:6
**integrity**
197:12
**intellectual**

22:2
**intend**
68:15 69:6 84:16
    84:22 259:13,17
    259:23
**intended**
293:23
**intending**
139:6
**intensive**
196:16,17
**intention**
142:7
**interact**
275:17
**interest**
131:20 260:11
    275:21 276:9,24
**interested**
92:13,24 124:6
    138:14
**interesting**
140:5 178:2
**internal**
79:20 92:19,19
    138:5
**internally**
92:7 259:12
**international**
13:13 19:25 26:5
**internet**
256:19 257:12
**interpret**
273:17,23 311:24
**interpretation**
67:7 83:16 134:13
    161:20 172:15
    205:10 273:19
    298:12 309:7
    345:3 347:25
**interpreted**
246:14 274:1 322:7
    328:24
**interpreting**
183:16 249:1
    273:20,21,25

310:12
**interrupt**
157:15
**interval**
236:15,19,21
**intervals**
190:3 207:2,3
    223:19 297:12,15
    297:16
**interview**
214:19,20 215:20
**interviewed**
180:22 200:25
    209:19 211:6,9
    212:8,15 213:15
    213:18,19 215:3,5
    215:15 216:10,15
    216:23 217:1,18
    217:23
**interviewing**
159:18,19
**intimately**
264:14
**introduced**
239:13 349:14,17
**Introduction**
20:19
**invented**
209:18
**investigated**
119:22 161:10
**investigator**
124:20 209:20
    279:24 283:14
**investigators**
100:1 237:6 238:11
**involve**
121:23 156:25
    341:9,10
**involved**
26:4 53:12 82:14
    138:17 159:11
    161:15,17 189:2
    257:23,25 258:12
    276:11 277:8
    282:19 324:7

**involvement**
12:11 88:10 124:22
  127:16 135:12
  233:3 258:3 260:5
  278:5 282:17
**involves**
25:21 31:6
**involving**
59:17 141:8 218:15
  259:24 260:13
  276:12 302:23
  324:12 325:3
**irrelevant**
245:16
**irrespective**
166:13
**issue**
22:24 31:5 41:24
  59:7,25 66:21
  74:16 84:11,12
  92:7 95:23,24
  96:13 104:12
  122:14 129:10
  131:21 133:23
  135:5 136:10
  176:2 199:7
  247:25 261:5
  275:19 298:24
  313:23 314:21,23
  315:19 317:17
  325:13 331:18
**issues**
12:23 95:23 129:13
  157:3 189:14
  191:2 334:18
**italics**
64:10
**item**
160:4 256:6,7
  285:12
**items**
95:15

**J**

**Jack**
1:17 2:1 6:2,11,16

6:19 7:10,12,15
  8:6 9:14,18 52:22
  104:24 105:3
  145:24 210:7
  242:22 287:9
  288:14 306:18
  308:21 309:5
  352:2,5 356:11
**January**
1:19 9:6
**jargon**
114:12
**Jersey**
1:2 4:20 9:12 109:5
**JESSICA**
4:17
**jessica.brennan...**
4:22
**jogs**
135:21
**Johnson**
1:5,5 4:10,10 9:10
  9:10 10:3,3,7,8
  89:20,20 91:20,20
  101:7,7,15,15
  103:23
**Johnson's**
59:17 103:23
**join**
309:16
**journal**
8:13 127:11 277:21
  277:22
**journals**
159:14
**JS**
7:4,7
**judgment**
24:13 25:3,7,12,21
  26:8 31:6,9,11
  36:13 39:6 82:18
  83:6,12 90:1
  153:20 184:13,20
  185:2,8,9,23
  186:1 188:20
  227:23 321:17

322:8
**judgments**
30:5 31:7,15,18
  39:13 184:13
  185:12 186:11
  209:7 223:1
  227:17
**Julie**
95:14
**July**
7:8 47:14,16,20,21
  48:4 49:5 233:22
**jumping**
290:23
**jury**
90:1,11,20 91:14
  91:18
**justified**
184:4
**justify**
144:2
**juxtaposed**
24:10
**J.M**
3:16

**K**

**keep**
86:14,15 88:5
  108:11 140:14,15
  140:16,20 189:6
  236:5 266:4
  290:24
**kept**
40:25 41:1 71:19
  72:5 81:5 92:6
  195:11
**key**
142:17
**Kimberly**
4:11 10:1
**kimberly.bransc...**
4:16
**kind**
15:15 20:14,16
  57:8 66:21 77:19

83:4 85:22 121:7
  121:10 124:9
  126:24 128:8
  132:17 133:22
  135:15 147:16
  148:19 152:1
  158:20 167:16
  187:20 245:15
  273:10 281:19,19
  325:14 331:9
**kinds**
179:22 180:11
  204:22,23 226:7
  314:17
**Kingston**
279:15
**KIRKLAND**
4:12
**Klatt**
5:11 6:4 20:10
  140:10 252:11
  253:21 274:6,14
  274:18 276:22
  277:6,13 278:6,11
  278:16 279:7
  280:12,15 281:25
  282:4,15 283:9
  284:11 285:1,3,21
  285:25 286:4,6
  288:20 289:10,18
  289:21,23 290:4
  293:3 300:13
  302:6 304:16
  306:4 309:1
  336:10 337:22
  338:18 339:15
  341:7,14,20 342:8
  342:12,21,24
  343:8,15 344:13
  344:18 345:1,16
  346:8,15,25
  347:13 348:3,13
  348:18 349:5
  350:3 351:8,18
**knew**
73:17 81:25 117:16

222:13
**knocked**
155:25
**know**
18:10 29:2,4 32:12
  36:12 38:2 40:13
  40:22 46:17 52:8
  68:20 77:16 78:3
  78:5 83:21,23
  85:23 86:5 88:9
  91:13,14 92:3,13
  93:24 98:3,13
  99:6,13 100:1,5
  102:23 104:2
  107:24 114:8
  121:8 124:16
  126:1,18,18
  127:12 129:6
  130:14,17,18
  132:1,2,4,20
  135:10 136:5,8,11
  137:21,24 140:1,3
  140:12 142:22
  147:13 148:5
  151:20 152:20
  153:9 155:17
  157:20 158:19
  159:3 160:1 161:1
  162:4 170:13
  174:5 177:5
  183:24 184:3
  187:25,25 188:22
  190:11,13 196:2,3
  196:3 197:13
  204:9 207:12
  208:18,19,21
  219:19 227:25
  228:3,18 229:22
  230:12 231:5,23
  231:25 232:1
  233:5,7,9 237:24
  239:10 240:17
  242:4,14 245:14
  248:1 250:7
  251:22 254:25
  257:25 259:9,12

260:11 261:20
262:19,22 272:4
274:20 276:1
277:25 281:13,22
282:23 284:15
290:10,17,22
293:1 303:18
312:2 319:8 324:6
325:9,11,14
332:17 344:22
**knowing**
73:23 194:25
**knowledge**
85:4 98:10,12
99:24 117:17
218:14 233:15
240:23
**known**
37:22 67:9,9
147:10,25 148:15
173:8 324:5
**knows**
219:12 231:2
**Koushik**
7:21 124:25 278:18
278:21 280:24
282:16 284:13
286:23 287:7,8
**Koushik's**
280:16
**Krewski**
232:2,4,16,20
233:2 275:11
292:21 293:1,13
293:22 323:11,20
324:10,20,24
326:10
**Kurt**
139:11

_____
**L**
_____
**LA**
53:16
**label**
213:25 214:4
**labeled**

47:19 255:19
**labs**
102:7
**lack**
288:8
**lactation**
287:19
**lag**
85:3 132:17 133:8
**Langseth**
42:8 123:22 126:12
149:18,20 202:16
235:22 299:3
**language**
130:24 219:1
221:14 333:15
**large**
14:16 161:17
172:21 197:14
204:19 224:2
318:19 335:14
**largely**
188:4 298:5
**larger**
108:5 327:24
**largest**
266:13
**Lash**
20:9
**late**
212:24 245:8
**latest**
247:24 266:21
**Laura**
14:11
**law**
262:21,23
**lawsuits**
213:9 218:14 219:5
219:19 220:10
221:11,16 277:17
**lawyers**
10:21 40:9 73:21
88:12 89:5
**lead**
68:25 115:16

127:17 138:11
193:16 280:6
327:18
**leading**
281:6
**leads**
180:13 320:2
**learn**
188:25
**learned**
188:21 230:25
293:21 323:22
324:6
**leave**
206:2,3 225:8
227:12
**leaving**
136:6
**lecture**
134:3
**led**
175:22 230:1 320:3
**left-hand**
206:10 329:19
**legal**
90:15 114:1,3,12
251:25
**legislation**
263:12
**legitimate**
185:9
**lengthy**
196:19
**Lesley**
82:11
**Leslie**
1:25 2:12 9:16
351:24 353:18
**let's**
12:13 17:15,15
45:12 53:22 56:7
65:7 67:18 83:15
105:13 154:9
157:7 160:23
174:11 182:9
194:4,17,17

232:15 242:11
280:24 282:20
285:1 286:15,15
286:20,20,20
308:15 313:9
342:10,18,19,19
348:14,15
**level**
103:9 116:22
122:15 129:14
147:24 153:18
155:15 187:1
261:17 268:12,13
269:17 304:8
314:4 329:4
**levels**
106:21 121:10
270:4 327:21
351:12
**LEVIN**
3:5
**lexicon**
37:8
**Lexington**
3:18
**LHG**
1:6
**LIABILITY**
1:8
**life**
264:10 284:19
**lifestyle**
281:11 282:25
283:23 284:13
291:5
**lifetime**
268:18 295:10
**ligation**
287:20
**light**
109:5 235:24
256:22 283:11
**lights**
257:8
**likelihood**
141:17 319:18

327:3
**limitation**
179:13
**limitations**
178:15,22 179:6,11
**limited**
118:7 144:12 153:4
202:9 203:7
205:19 220:9,22
221:11 233:17
281:7 288:1,7
330:10,21 331:2
**line**
26:3 62:3 63:1,9
70:14 80:1 111:20
148:17 181:18
186:6 196:20,24
197:14,16 199:2
207:19 224:1,9
228:8 303:11
309:17 355:4
**lines**
32:25 139:7 151:4
219:4 321:14,15
**lingering**
190:6,7
**link**
57:18 118:12 126:5
135:18
**linked**
118:24 168:10
350:14
**list**
14:4 86:11 93:4
135:21 138:13
140:6 170:1
287:22 332:19
**listed**
76:4 87:16 88:3
170:19 187:21,22
232:17 287:24
292:24 345:7
**literal**
63:3
**literally**
29:5 160:15

**literature**
12:18,19 13:7
37:17 38:25 39:21
65:4 73:15,17
74:9,10,14 81:23
85:8 99:18 122:21
132:9,15 133:10
162:25 163:19
164:3,18,23
172:18 173:25
196:16 222:22
241:3 261:24
262:2 263:5 301:9
301:17 331:17
332:12
**litigation**
1:9 9:5 10:8,15
13:15 22:1 48:22
53:9 54:8,15,19
55:1,15,22 56:2
56:10,13,16,18
57:1,2,4,5,12,22
58:6 92:8 98:17
98:21 99:3,7,12
99:15 100:13
123:24 124:23
127:25 135:2
141:7 161:11
196:10 222:12,17
233:3 259:24
260:6,13 276:4,12
276:16 277:9,25
282:18 302:23
307:10 324:12
325:3 332:6
**litigations**
316:16
**litigation-related**
218:1,9
**little**
52:15 112:19
135:13 140:21
171:25 222:19
234:13
**lives**
226:6

**LLP**
3:5,11 4:4,12,18
5:5,12,19
**local**
219:18,21
**localized**
218:22 219:15
220:17
**located**
193:14 254:17
**logical**
321:12
**long**
11:17 17:9 29:16
104:15 108:23
194:8,9,11 196:19
279:1 287:19
290:22 325:25
**longer**
82:9 145:10,11
**Longo**
97:13,24 98:8,15
100:12 102:10
**Longo's**
100:5 101:7
**longwinded**
182:15
**long-term**
343:19
**look**
14:12 25:5 34:17
37:16,20 41:20
51:8 52:9 60:19
63:18 65:9 77:25
81:17 83:22 89:10
89:25 96:10 105:7
107:19 142:10
144:5 154:3
156:18 159:9
169:7 182:19
184:17 188:5
195:19 201:22
207:3 211:20
212:1 216:13
219:10 223:12
229:11 232:10

243:9,14,15
245:20 247:20,21
247:22 286:10
332:18 337:1
343:3 345:5
**looked**
12:23 72:17 79:18
79:19 93:10 95:7
95:8 107:21 161:8
162:10,19 183:14
198:15 219:13
243:5 250:17
262:16 289:8,15
316:14 318:11
**looking**
49:24 53:1 58:25
62:5,10 77:4,21
78:12 79:20 99:10
100:16 118:16
119:4 131:20
143:15 156:10
157:11 169:11
173:22 175:2
177:11 179:8
192:9 198:5,6
200:3,5,7 201:20
203:9 208:2
209:13 215:12,24
225:1 238:14
256:3 266:2
267:24 281:20
285:5 286:13
305:9 307:13,22
313:23 314:11,14
314:18 343:9
348:20 349:3
**looks**
18:23 62:10 83:14
83:15 122:1
**loosely**
92:6
**Los**
4:14 136:5
**lost**
37:14 152:3
**lot**

12:21 16:24 38:14
38:25 73:23
138:11,12,14
148:8 150:10
153:19 160:18
161:3 162:3
176:20 177:9
229:21 281:22
289:4
**loud**
63:12 169:8,10
297:3
**Louis**
5:21
**low**
320:1 329:22
**lower**
148:9 149:17
192:17 199:2
202:14,18 206:23
206:24 313:9
**lowering**
167:1
**lumping**
168:24
**lunch**
63:22 78:13,15
104:18 105:1,9
107:20
**lunchtime**
63:19 78:1
**lung**
130:14,15 132:21
133:21 147:4,8,22
147:24 177:2,3,11
177:12,15 181:20
182:1 204:14,15
204:19,23,23
281:2 318:9
329:23 350:18
351:2
**lymph**
339:5 343:18,24
344:11,12,24
**Lyon**
20:2 139:15 233:21

**L-A-S-H**
20:9

**M**

**M**
5:18
**magical**
184:3
**magnitude**
147:20 159:5
**mailed**
226:14
**main**
42:5 56:17 88:4
112:12 159:1
166:1 200:16,17
200:18 201:7,11
201:12,12,18
213:13 228:25
235:20 256:16
307:14 310:16
**maintain**
86:10 88:3
**maintained**
82:12 197:11
**major**
227:8
**majority**
129:7 321:11
**making**
25:12 26:8,9 29:25
52:8 62:23 117:21
185:21 204:25
207:17 227:17
249:1 304:10
**males**
351:3
**managed**
97:6
**Management**
43:13
**MANSUKHANI**
5:12
**Manual**
105:19,24
**manufactured**

101:15 118:8,10
118:12
**manufacturer**
115:3,18 116:18
**manufacturers**
115:14
**manuscript**
41:23 51:25 84:3
125:16,25 193:25
230:10,18 231:20
231:24 232:24
233:5,10,12,17,18
233:24 234:20
235:2 239:1
240:12 241:13,15
243:1,6,10,18
244:22 250:18
268:4 277:22
325:24 326:2
**manuscripts**
254:8
**margin**
107:11
**margins**
44:15
**mark**
14:21 15:1,25 16:3
17:16 18:12 43:23
45:13 46:1,15
48:2 58:8 61:6
108:13 112:18
178:17 194:4
213:23 234:15
278:11 285:1
**marked**
15:6,10,19 16:5,13
17:12,18,22 43:25
45:1 46:6,20 47:4
48:5,24 49:12
53:2 58:10,13,20
58:24 60:5 61:7,9
61:19,24 68:19
69:3 70:3 72:9
94:8 110:3,12
149:16 194:6,23
214:7 234:16

235:14 243:2
256:4 278:14
285:3,14 286:2
308:9,15,24
309:14 312:23
317:8,12,21
**market**
4:5 92:23 118:21
119:2,7,16,20
120:5,15
**MARKETING**
1:7
**markets**
115:16 117:18
118:22
**marking**
14:13 41:17 61:13
108:16 308:19
309:3
**marks**
112:14,16,16,19,20
112:20
**Martinique**
126:22,24
**Master's**
279:13
**match**
88:6
**matched**
223:15
**material**
12:22 18:16 19:12
40:8,24,25 88:16
89:1,2,4 96:5 98:7
260:20 314:6
**materials**
13:1 16:22 17:3
37:4 39:19 40:4
40:16 42:9 43:21
44:6 51:21,24
52:3 80:16 82:7
84:2 87:19 88:8
88:12,13 89:3,7
92:15 94:6
**mathematical**
114:21 321:18

**matter**
9:10 69:7 109:3
182:2,6 214:5
**Matthew**
101:11
**maximum**
319:13
**McGill**
279:18
**McTiernan**
14:11 93:13,22
94:17 95:8
**MDL**
1:5 10:8,14,21
11:10 12:11 13:4
13:8,23 14:2,6
16:2 17:24 22:8
22:21 23:13,21
24:2,19 25:14
26:14 36:5 37:20
40:6 47:11 50:8
55:14 57:16 60:16
61:14,23 62:23
64:7 66:15,25
68:11,16 70:3
71:5 84:7 93:5,9
93:21 94:7,14
95:6 96:6 110:8
110:12 127:4
136:12 150:1
175:19 186:3
236:22 240:11
333:5,20
**mean**
11:15 12:10,12
13:9 23:16,17,22
28:11 29:23,24
30:4,4,12,19 32:5
32:6,9,16 34:2
35:7 37:7 56:4,5
57:7 64:18,24
68:17,23 71:16
77:18 79:20 80:14
84:23 85:22 86:14
92:18 96:15 99:6
101:19,21 109:25

114:6,16 121:2,3
125:7 127:24
128:13,17,21
130:2 131:14,17
133:13,24 134:8
146:20 162:2
166:7 172:3
179:13 188:4
192:2 193:23
196:11 209:10
223:9 226:18
229:8 239:9 244:9
246:11 251:22
263:22 272:16
279:5 316:13
333:10 334:13
347:22
**meaning**
50:8 114:25 167:17
216:3,16 269:7
**meaningful**
102:16 207:8
266:25
**meaningless**
245:23
**means**
101:20 137:4
145:12 229:22
252:3 281:18
282:1 315:18
353:23
**meant**
32:20,21 33:9
106:18,19 198:6
252:17,21 324:17
324:18 347:22
**measured**
158:20
**measurement**
166:2,4,7,8,10,12
167:7 169:21
**measuring**
179:24
**mechanics**
138:16

**mechanism**
75:9 115:22 116:7
117:19 143:6
155:9,10 156:19
156:25 157:3
165:3,12 312:7,11
312:12,13 313:18
313:18,24 315:24
316:5,12 330:13
330:23 331:6
334:7,23 335:5
**mechanisms**
75:3 152:24
**mechanistic**
74:16 155:16
163:22 302:2
316:9
**media**
230:22
**medical**
129:8
**medication**
38:12 181:13 288:4
**Medicine**
127:12
**Medicine/Volume**
8:14
**mediocre**
27:13
**medium**
146:22 147:16
166:20
**meet**
9:24 140:3 191:17
**meeting**
11:17,21 20:1
137:17 139:16
143:19 152:20
233:21
**meetings**
10:22 11:9,13 12:1
**meets**
264:6
**member**
293:19
**members**

294:3
**memory**
155:19 219:14
323:18
**Mengting**
79:4 81:5 82:1
**mention**
18:3 165:7 187:5
219:2 269:21
284:22 349:9
**mentioned**
19:19 34:9 39:20
70:19 81:8 84:1
105:17 180:2
184:19 305:1
**mentor**
124:10,10
**merely**
276:10,11
**merits**
66:22 228:20
**mesothelioma**
168:4,22
**mesotheliomas**
168:9,19,25
**message**
231:2 323:16 324:4
324:20 325:6
**met**
9:25 11:1 136:16
139:14 274:21
**meta**
42:5 235:19
**metadata**
191:12
**metals**
103:23 350:6,22
**meta-analyses**
6:25 29:1,4 42:5
44:11,12 46:4
76:10,12 77:13,24
79:22 80:6 82:19
83:1 127:2 128:8
142:24 162:21
180:3 181:5,20
183:17 208:4,6,22

209:2,6 235:18,20
239:14 247:2,2,3
247:4,7,11 248:22
248:23,24 251:7
253:9
**meta-analysis**
20:19 36:25 37:3,8
37:8,19,21 38:6,7
38:9,21 39:2,7,11
41:24 42:10,19
67:16 72:12 76:1
76:3,4,19 77:5
78:7,23 79:10,13
79:16 106:5
112:12 127:3
149:15,21 150:2
162:9,17 178:16
178:23 179:11,14
179:16,18,21
180:4,9 181:2,3,5
181:21 183:21,22
183:25 184:4,7,16
184:23 185:17
186:3,4 187:2,3
187:17,18 188:10
188:13 193:18
194:1 195:4
196:25 199:8,13
200:11 202:6,15
202:17 206:18,23
208:5,6,9,23
209:15,17 210:11
210:17 213:13,21
222:24 223:10,21
224:9 225:8
227:13 228:9,25
230:5 233:25
238:22,23 240:15
240:16,22 241:7
275:13 291:23
292:8,15,17
293:20 301:2,3,6
301:8 305:21
327:5
**meta-analyze**
203:14

**meta-estimate**
182:25 247:11
**meta-estimates**
207:4
**meta-relative**
199:2 203:15
209:24
**method**
28:6 36:15 37:2,19
134:24 198:15
**methodological**
21:11 182:22
**methodologies**
36:22 179:2
**methodology**
22:8,19 23:12,18
23:20,23,24 24:17
27:11 29:20 30:9
31:3 36:4,8,11
134:12 185:14
302:17,19 303:23
304:4,8 306:23
307:7 309:24
**methods**
134:10,18 181:13
**metric**
198:1
**metrics**
121:6
**Michael**
5:11 341:16 343:6
347:19
**Michelle**
3:10 16:8 44:22
46:17 300:8
**microphone**
155:22,25
**microspheres**
339:17,24 340:11
**mid**
257:18,18
**middle**
64:9 169:9
**mid-December**
257:18
**mid-November**

53:7
**migrate**
331:12 339:3
340:24 344:24
**migrating**
343:23
**migration**
143:8 314:8 341:23
342:16 344:15
346:23 347:3
**Mike**
274:18 282:6
285:19 289:12,12
289:16,19 337:19
**mind**
30:17 63:18 78:1
78:12 130:5
144:21 169:8
170:3 187:25
195:23 240:3
251:2 273:16
300:8
**mine**
39:16 77:15 100:8
108:12 112:13
174:18 201:14
237:21 254:18
337:17
**minimal**
228:23
**minimize**
221:22
**minimum**
122:15
**minor**
80:8 199:4 223:2
**minority**
129:7
**minus**
53:23
**minute**
41:4 67:19 76:15
275:16
**minutes**
104:17 135:25
229:10 274:7

**misaligned**
110:15
**misconception**
64:10 67:3
**misdiagnoses**
167:8,10
**misdiagnosis**
168:3
**misnomer**
244:18
**misread**
328:11
**missed**
12:24 198:7
**Missouri**
5:21
**misstates**
104:10 125:5
133:12,16 153:14
208:1 241:19
244:15 250:12
265:6 269:13
273:6 330:25
335:12 344:16,21
346:13 347:12
**misunderstanding**
276:7
**miswritten**
63:16
**mix**
88:6 209:23
**mklatt@grsm.com**
5:16
**Mm-hmm**
89:12 281:3 304:6
**models**
153:23
**moderate**
147:1,2 148:18
149:7 229:21
**modest**
146:17,21 149:3
**modifiable**
287:3 288:2 291:6
291:10
**modifications**

70:20,23
**modified**
258:23
**modify**
109:10 287:25
**Mohamed**
230:4
**molecular**
163:21 164:23
**moment**
62:4 79:8 104:8
163:8 271:10
290:2 348:23
**money**
281:23
**monitor**
30:16 32:18 133:18
**monograph**
19:25 136:16
137:10 138:1,25
139:4,10 140:4
141:5 163:11
**monographs**
105:18
**month**
11:11 47:14 48:4
53:18 57:7,7
82:10 256:13,14
332:22
**months**
56:8 95:24 96:14
139:4,9,17 191:7
256:14
**Montreal**
1:18 2:6 9:9 11:15
11:16 279:19
**morbidity**
287:16
**morning**
9:3,23,24 160:15
**mortality**
287:16
**motivated**
185:10 272:17
**motivation**
289:4 325:18

**motive**
325:19
**move**
103:12,13 291:1
**moved**
140:8
**moving**
25:22 103:3 205:12
338:9 344:10
**MParfitt@ashcr...**
3:15
**MSc**
6:19 7:13,16
**multidisciplinary**
150:21 303:2
**multifactorial**
130:17
**multiple**
67:11 151:4 195:18
283:23
**mutagenicity**
311:21
**mutually**
251:4
**M-E-N-G-T-I-N-G**
79:4

— N —

**N**
3:1 6:1,1 9:1
**name**
9:4 10:1 75:25 79:3
82:11 91:8 93:25
101:9 124:24
353:14
**named**
200:22
**names**
289:6 332:14,21
333:23
**napkins**
83:9
**NAPOLI**
3:17
**narrative**
149:8 273:10

321:13
**nasal**
350:17
**national**
26:5 43:9 233:20
**nature**
34:7 179:20 223:23
278:5
**near**
337:6
**nearby**
278:24
**nearly**
53:16 160:17
**necessarily**
31:17 84:25 199:9
261:19
**necessary**
30:23 32:8 81:14
315:25 335:4
354:3
**need**
16:3 31:19 36:17
39:1,12 40:19
83:6 86:8 142:16
150:21 151:4
176:22 194:14
208:17 211:15
227:19 250:22
264:15 281:22
285:22 291:7
296:20 306:8
322:12 342:2,4
**needed**
120:21 121:14
283:11
**needs**
184:20
**negligible**
106:16
**neither**
221:10 315:21
350:13
**networks**
74:11
**never**

33:14 52:7 90:16
126:22,23 127:9
129:6,10 136:3,9
149:6 162:11
170:13 193:24
209:19 225:18
226:25 229:20
244:13 258:14
289:8,14 298:6
323:16 335:3
336:17 351:4,14
**never-used-it**
77:4
**new**
1:2 3:20,20 4:20
9:12 21:25 56:22
70:7,18 73:15,21
73:22 74:17 97:12
108:17 109:4
127:11 143:4,13
143:14,15 165:6
198:14 257:17
285:12
**newer**
191:25
**news**
230:23
**Nice**
9:24
**nickel**
350:6,10 351:6,13
**node**
343:25
**nodes**
339:6 343:19
344:11,12,24
**noise**
140:11
**nondifferential**
170:22
**nonissue**
97:21
**nonmucinous**
297:8,23
**nonparticipation**
170:7

**nonquantitative**
158:17
**nonresponse**
170:6,16
**Nonresponsive**
252:11 253:21
**nonsmokers**
147:8
**nonuse**
297:10
**nonusers**
297:24 298:13,16
**non-experimental**
328:19
**non-human**
311:20
**North**
219:21
**Nos**
46:6
**Notary**
2:13 356:19
**notation**
107:11,16
**notations**
7:18 64:6
**note**
64:16 75:15 78:16
78:20 101:16
107:8 198:9 199:1
199:9 213:2
221:24 225:14
**notebook**
299:19
**noted**
9:15 354:9 356:7
**notes**
44:7,12,14 51:23
353:11
**noteworthy**
209:4
**notice**
2:12 6:10,15 14:14
14:23 15:16,19
16:15
**noticed**

63:25 89:18
144:23
**notify**
260:12 324:25
**notion**
34:18 35:4 84:11
122:23 148:19
259:20 315:20
**notwithstanding**
29:13
**November**
7:6 47:9,10,18
48:11 49:1 50:16
51:3 61:2 62:24
69:21 139:16
332:25 333:1
**number**
9:13 17:13 32:7
33:22 45:15,16
48:10 52:22 63:6
67:4,12 102:7
104:23 105:3
112:5 121:4,4,11
142:21 145:7,24
210:7 215:8,21
216:8 220:2
242:22 268:17
280:13 294:10
297:22 300:4,19
306:9 311:7,10,13
311:16,18 323:17
326:13 333:21
**numbering**
87:6
**numbers**
45:15,20,22 63:2
76:20 77:9 92:17
108:6 109:7
110:15 187:7
217:5 266:18
295:10
**numeral**
300:4,17,21
**Nurses**
226:3,12
**nutritional**

226:6
**N.W**
5:6

**O**

**O**
6:1 9:1
**oath**
2:15
**Object**
54:1 161:12 252:11
253:21 307:12
310:2,5 312:18
332:1
**objecting**
133:15
**Objection**
12:6 22:9,22 23:15
29:22 32:4 34:1
35:6,24 39:10
53:10 55:2 60:7
69:23 71:1,8,13
73:9 75:12 80:20
84:21 85:10,20
90:14,25 94:21
95:20 99:4 103:25
104:9 116:3,14
117:3,6 118:2
119:8,18 120:13
121:19 122:10
123:10 125:4,15
129:20 130:7
131:24 132:13
133:11 137:2
150:8 151:6,15
152:15 153:14
154:16 156:11
165:13 167:15
172:24 176:13,16
176:23 178:9
185:6 188:18
192:5 198:25
200:12 202:25
205:3 207:25
218:17,20 220:24
222:8 223:8,22

225:9 239:7 240:5
240:13,25 241:18
244:15 246:21
247:9 249:23
250:11 251:10
252:19 253:14,17
254:3,11 258:17
258:24 260:22
261:3,25 263:7,21
264:12 265:5
267:13 269:11
271:15 272:14
273:5 276:17
277:4,11 278:2
279:4 281:16
283:7 284:6,24
288:17,23 291:15
292:1,10 293:14
302:5,6,25 304:2
304:16 306:4
307:3 314:2,24
315:7 326:17
330:14,24 331:14
334:8,11 335:1,12
339:12 341:2,13
341:17 344:1,16
344:20 345:15
346:13,19 347:11
348:7 349:23
350:23 351:15
**objections**
6:14 15:25 16:14
353:7
**objective**
34:25
**objectives**
181:6
**obscure**
92:17 162:4
**observable**
121:12
**observation**
209:4 316:5
**observational**
30:22 38:22 39:4
180:10 181:15

184:8
**observations**
298:4
**observe**
159:22 176:4
341:24
**observed**
160:12,13 268:5,16
295:8 297:7 311:8
311:14 320:4
**observes**
343:24
**obtain**
118:19 256:17
257:9
**obtained**
80:4,5 93:3 257:14
**obviously**
325:24
**occasion**
127:9 139:12
**occasionally**
225:19
**occasions**
13:12
**occupation**
8:13,14 175:16
177:3,12 317:24
318:12 329:10
**occupational**
19:22 162:3 174:19
306:10 311:5
**occupations**
177:2,6,13,15
318:9,19
**occur**
83:1
**occurred**
106:14,15 152:19
**occurring**
284:16
**October**
7:11 57:22 58:5
61:1 69:22 127:23
**odds**
76:17,24 77:10,23

106:7,24 160:15
177:13 185:16
214:24 215:2,4
222:5 223:19
225:16 228:10,19
245:10,19 319:1
319:12,13
**offer**
60:11 68:15,24
84:16 263:3
302:22
**offered**
13:4 60:10 97:17
**offering**
60:4 68:20 75:8
101:13 123:16
164:9,13 165:1,2
183:7 265:3
302:21
**offers**
287:15
**offhand**
95:12 100:16
**office**
40:9 73:4 342:23
343:7
**officer**
249:8
**offices**
2:2 278:24
**officiated**
2:14
**offline**
191:18
**oh**
20:12 56:24,24
62:11 63:7 67:3
75:24 86:25 101:1
110:18 111:10,14
112:2 155:23
161:1 175:10
183:3,3 193:6
220:3 232:12
234:6 235:17
241:1 242:16
251:21 266:7

300:10,18 308:7
317:19 326:25
339:18 348:19
350:8
**okay**
18:13 19:17 29:15
32:22 33:4 37:2
39:15,25 41:20
42:14 45:9,21
48:1 49:19 58:18
59:9 60:15 61:17
62:11,17,19 63:6
66:24 68:9 81:22
83:17 84:1 86:16
87:7,11,25 89:10
91:22 92:4 93:20
95:13 98:8,14
99:17,22 100:23
105:11 110:17
112:24 116:7
120:7,18 131:18
132:7 133:17
134:3 136:2 137:7
139:8 145:3 152:5
154:24 155:24
156:14 157:4,7,9
158:6,10 162:18
162:23 164:7
165:16,22 167:22
174:23 176:6
177:22 178:1,15
179:4,8,12 182:9
183:19 184:19
185:25 186:21
187:5 188:3,8
191:22 194:19
196:5 200:1,13
201:20 205:14
209:25 210:16,23
211:25 212:6,20
212:22 213:13
214:5 215:24
217:13,21 218:1
220:13 221:19
223:5 225:24
230:3,9 231:9,12

234:18 235:12
236:6,8 237:13
238:4,25 239:19
241:6 242:8,10
246:25 247:22
248:7,8,14 249:20
250:17 254:14
256:2 264:25
265:10 266:6
267:5,24 268:2,22
269:6 270:10
272:10,20,25
273:13 274:3,25
275:15 278:10
285:17,23 286:15
290:2,3,16,21
293:18 294:5,19
296:22,25 298:7
299:22 300:3,7
306:11,12 308:18
312:14,21,21
313:2,7,11,13,22
315:16 324:16
327:8 328:6,12
331:10 334:5
335:17,24 336:14
336:20 337:14
340:5 342:10,18
348:14
**old**
72:17
**older**
42:7,8
**OLVEY**
4:11
**ones**
34:21 35:11 42:7,8
67:12 92:16 94:24
95:1 123:4 165:19
170:11,12 187:22
197:3 224:5,5,8
237:19 272:6
305:2 332:11
**one-to-one**
152:1
**onset**

281:14 282:23
**Ontario**
279:15
**open**
205:10 242:25
**operation**
82:22
**opine**
127:9 165:9 252:14
315:25 320:3
331:11
**opining**
127:13 314:21
317:4
**opinion**
28:12,24 29:13
32:13 33:12 34:22
36:5 67:15 68:21
83:13 90:11 93:5
100:7,9 101:13
103:20 104:3,6
113:6,13,17 115:1
118:5 120:9,18,20
123:16,19 127:7
127:19,20 128:24
129:12 131:5,12
134:25 150:4
159:2 164:9,14
165:1,2,5 174:1
178:5 200:10
223:21 224:20
225:7 232:19,22
241:16 243:10
253:25 256:16
259:20 260:21,23
261:5,9,11 263:3
263:17 265:8,23
271:11 288:24
291:3 301:15,25
315:3,8,12 330:8
330:18 331:18,21
333:19 334:14
**opinions**
11:10 12:15 13:3,5
13:8,25 23:21,25
24:18 50:7,9 53:8

60:4 68:11,12,13
68:14 69:4 75:6,8
75:20 84:6,16
92:1 94:12,14
97:17,21 102:22
102:24 114:1
128:12,16 141:16
173:17 194:22,25
222:12,13 240:10
241:22 256:10
261:19 265:3
302:21 307:9
314:1 316:23
318:5 326:16
332:6
**opportunity**
128:5 137:18 198:7
259:6 295:13
**opposed**
164:10
**opposite**
221:23
**opposition**
35:11,12
**optimal**
70:12,21
**options**
186:13
**oral**
6:10,15 287:19
293:6
**oranges**
179:21
**order**
28:19 29:19 55:17
147:20 151:2,18
178:6,11 228:15
259:11 292:3
303:25
**ordered**
24:6 292:2
**organization**
26:6 289:11
**organize**
124:7 138:11
**organized**

139:16 274:7
**origin**
266:23
**original**
6:23 42:17 44:17
46:2 70:10 106:11
112:15 126:12
304:9 319:13
333:14 353:12
354:11
**ostensibly**
266:24
**Oules**
59:13 274:22
**outcome**
155:11 156:20
**outcomes**
179:25
**outline**
21:12
**outlining**
199:17
**output**
80:14 81:1 128:9
**outside**
90:15 107:4 135:2
154:2 334:13
338:12
**outstanding**
111:1
**ovarian**
6:20 7:14,17 12:18
13:11,15 24:16
33:13 38:23 56:18
57:19 58:23 65:7
65:10,20 66:11
69:15 75:4,10
78:11 81:17 84:19
88:11 89:25 90:23
97:18 103:16
113:9,15 115:2,23
116:8 117:2 118:6
119:5,14 120:1,10
120:19,21,25
121:15 122:8,20
123:18,23 124:1,6

124:8,22 125:24
126:6,14 127:8,22
128:4 129:1,18
130:2 131:8,16,22
132:11 133:23
134:6,10,23 135:1
135:6,19 137:1
141:9,18 146:8
148:7 150:6
151:12 152:12
153:11 155:1
157:14 164:5
165:4 167:11
168:4,11,14,18,23
168:25 171:16,18
171:19 172:8,11
172:23 173:8
174:13 176:2,8
189:8,14,17
190:16 192:4
193:18 202:8
203:16 204:6,11
204:13 205:1,1,9
205:25 213:9
215:14 216:4,9,17
216:24 218:4,15
227:9 230:7,21
232:20,23 237:10
243:13 247:8
248:11 250:10,20
251:9 252:8
253:12 259:22
261:2 267:9,22
268:7 271:13
272:12 273:3
275:19 276:3,12
277:8 279:25
281:2,4,14 282:9
282:17,24 283:12
283:15,24 284:14
284:16 287:2,4,18
288:6,15,22
296:15 297:9,24
301:12,18 302:10
302:23 305:14,25
307:11 312:8,16

314:22 315:5,14
316:25 317:5
319:19 330:10,21
331:7 335:9
343:19 345:12
349:21 350:14
351:5
**ovaries**
331:12 338:22
339:4 341:1
346:12
**ovary**
122:8 232:20
**overall**
29:13 34:2,7 77:3
77:10 115:16
180:20 182:24
192:17 202:18
234:2 236:11,18
236:20 269:22
270:7,8 298:13
**overlapped**
188:4
**overlapping**
270:6
**overreport**
160:25 161:6,7
**overwhelming**
88:16 125:11
281:10
**oxidative**
143:12 314:9

_____
**P**
**p**
3:1,1 9:1 268:17
295:9
**pace**
290:24
**pack**
105:20
**package**
26:23 77:19 79:15
80:24 184:16
271:1
**packages**

79:12
**pad**
169:4
**page**
6:2,9 7:3 8:3 32:25
62:1,5,25 63:8
64:9,10,14 67:1
68:7,7 76:5 86:8
86:20,23 87:1,2,3
87:4,6 89:18
100:21 101:23
107:21 108:1,3,5
108:6,12,12 109:2
109:7 110:14
111:6,8,12,14,16
111:20 112:3,6
113:2 131:3
144:24 145:7
163:5 165:18
169:11,12,13
170:5 182:19,20
200:6 201:22
207:1 213:2
214:12 219:3,24
221:4,7 226:21
229:17 236:25
238:15 243:4,15
248:5,6 250:23
254:2,19 258:19
262:9,13 280:20
280:21,25 284:12
286:16,21,21,22
286:22 295:23
296:11 300:14,18
303:16,21,22
304:24 307:22
313:4 316:20
321:9 327:9
329:17,18 337:2,7
345:5 348:21
349:6,10 355:4
**pages**
7:23 32:25 40:20
40:23,25 41:1
63:8 105:16,21
238:14 280:16

286:8 304:17
309:7 313:5 349:8
349:8 356:3
**pagination**
107:22
**paid**
55:12 134:11,12
276:2,14 277:15
**panel**
123:22 126:11
159:2 165:20
**Paoletti**
102:10
**PAPANTONIO**
3:5
**paper**
46:13 47:24 52:1
88:14,15,19
126:12 149:20
169:4 175:11,13
185:20 187:21,24
189:7,11,18,19,21
189:23 192:14,16
195:20,22 196:2
197:8,9 199:24
201:23 202:5
207:12 208:6,11
209:20 211:21
212:2 219:1
223:20 226:20
229:11 230:4,24
231:14,17 236:20
237:1,3,14 243:14
243:16 246:12
247:23,25 248:4
249:17 266:10,22
267:19,25 268:3
271:18,19 292:23
294:12,12,13,20
295:1,7,20,21
296:12 299:4
323:4,4,12,21
324:1,25 325:7
326:9 330:5
348:21

**papers**
135:17 190:14
196:21,22 232:3,8
232:16 239:13
251:8 253:11
266:3 332:17
**paragraph**
62:2 63:1 73:5
113:4 202:4,24
203:2 205:13
206:6,13 219:3,25
219:25 221:20
239:21 264:5,7,17
296:24 297:1
298:9 300:24
305:11 321:10
327:10 329:18,20
337:9,24 338:6
350:5
**paragraphs**
73:2 309:20 310:12
**parallel**
72:10
**parameters**
184:9
**paraphrased**
311:5
**parentheses**
63:2 202:15 268:18
**Parfitt**
3:10 6:5 10:19,23
11:1,6 12:6 14:25
16:9,17 17:8,11
18:18 19:6,8 22:9
22:22 23:15 29:22
32:4 34:1 35:6,24
39:10 44:24 45:2
45:10,14,21 46:19
46:22 47:9,17,21
48:7 53:10 54:1
54:10 55:2 60:7
62:15,18 67:18,22
69:23 71:1,8,13
73:9 75:12 78:20
80:20 84:21 85:10
85:20 89:12 90:14

Jack Siemiatycki, Ph.D.

90:25 94:21 95:20
96:7 99:4 100:24
102:4 103:25
104:9,18 107:23
107:25 108:9,15
108:20,23,25
109:12,19,23
110:2 111:4,6,8
111:14 112:4
116:3,14 117:3,6
117:8 118:2 119:8
119:18 120:13
121:19 122:10
123:10 125:4,15
129:20 130:7
131:24 132:13
133:11,15 137:2
140:14,20 145:18
150:8 151:6,15
152:15 153:14
154:16 156:11
161:12 165:13
167:15 172:24
173:2 174:25
175:2 176:13,16
176:23 178:9
185:6 188:18
191:20 192:5,19
192:22,25 193:7
193:10 194:16,19
198:25 199:18,21
200:12 201:24
202:25 203:21,25
205:3 206:9,14
207:25 210:2
211:10,16 212:4
214:2 218:17,20
220:24 222:7
223:8,22 224:21
224:25 225:9,23
231:1,2,7,10,13
231:17 234:4,7,10
234:13,21,25
235:21,23 236:3,7
239:7 240:5,13,25
241:18 242:10,16

244:15 246:21
247:9 248:16
249:23 250:11
251:10 252:19
253:14,17 254:3
254:11,23,25
255:6,11 257:11
258:17,24 260:22
261:3,25 263:7,21
263:24 264:12
265:5,13 266:6
267:13,15 269:11
269:13 271:15
272:14 273:5
276:17 277:4,11
278:2,13 279:4
281:16 282:2,6
283:7 284:6,24
285:2,4,8,11,16
285:23 286:3,5
288:17 289:12,16
289:19,24 290:7
290:10,16,19
291:16 292:5,12
293:17 300:10,12
300:16,20,22
302:13 303:14
304:5,11,19 306:5
307:4,16 308:5,8
308:11,13,18
309:2,11,21 310:3
310:8 312:20
314:19 315:1,10
317:14 320:8,10
320:17,18 321:25
322:5,9,14 326:17
328:2 330:14,24
331:14 332:1
334:8,11 335:1,12
336:8 337:15,18
338:15 339:12
341:2,13,16 342:2
342:6,10,18 343:5
344:1,7,16,20
345:15 346:6,13
346:19 347:11,17

348:7,10,17,23
349:1,23 350:23
351:15,20
**parity**
287:18
**Park**
4:20
**parse**
35:8 115:18 116:1
116:17
**part**
13:1 18:16 36:14
38:5,7 78:23
83:12 88:21 89:1
89:4,8 91:24 93:1
93:3 99:14 116:5
117:16 120:3,14
128:13,14 130:17
130:19 134:17
140:7 149:8 160:6
161:10 173:4,13
175:21 177:10
180:18 184:16,16
198:14,19 222:7,8
226:14 256:16
266:20 270:25
276:9 281:23
291:24 292:18,19
294:9 313:9
314:10 315:17
320:2,24 321:1
335:14,14,18
**participants**
326:7
**participate**
170:10,10,11
**participation**
27:19 56:16 123:21
**particles**
143:9 314:8 331:12
340:23 341:9,23
341:24 342:16
**particular**
20:11 24:8 31:25
33:25 58:14 66:16
75:7 115:18 116:9

116:17,18 118:13
120:11,11 153:16
156:9,10 161:24
172:10 195:14
203:18 209:12
294:7 302:18
310:14 318:4
**particularities**
38:24
**particularity**
153:17
**particularly**
128:15 254:10
**parties**
138:1,14
**partly**
37:7 43:11,12
73:19 123:3
333:21
**parts**
25:22 26:22 201:16
323:14
**pass**
274:4 336:6
**passed**
46:24
**paste**
289:1
**pathology**
349:25
**paths**
136:4
**pathway**
288:3,4
**patients**
65:12 66:8 281:5
318:14
**pattern**
65:12 79:25 174:2
**pause**
62:4 67:25 140:18
140:22,25 255:14
257:3 265:16
274:10 336:3
343:12
**paused**

140:20 257:7
**pay**
54:23 55:4,6
**PCPC**
5:3
**PDF**
112:18
**peak**
203:18
**pecking**
259:11
**peer**
99:19 127:6
**peer-reviewed**
301:9
**pelvic**
339:5 343:18
344:11,12,24
**pelvis**
345:14 347:10
**pen**
52:6
**pencil**
163:8
**Penninkilampi**
42:7 74:7 77:14
200:8 222:11,15
223:6,13,20
224:12,17 227:12
228:1,5 235:19
237:20 238:19
239:5,24 247:3
248:14,23 249:8
249:16 250:9
251:17 253:10
**Pennsylvania**
4:7
**Pensacola**
3:7
**people**
26:8 28:13,15
38:18 66:10 73:24
74:11 81:13 100:1
129:2,12 132:2
146:12 147:20
148:24 159:18,19

159:19,24 160:22
161:6 162:4
166:19 171:8,8
180:21 184:2
185:10 208:5
219:18 243:25
246:14 249:25
250:1 261:18
269:23,24 275:25
276:1,25 277:7
324:4 332:21
333:24 334:13
350:18
**people's**
177:6
**percent**
50:2,2 55:17,17,20
55:25 56:8,11
57:9,10 114:23
119:23,23 120:4
215:16 216:8,19
216:20 217:2,4,9
217:10,11 252:7
318:25 319:1,4,4
319:5,5,17,18
**percentage**
56:12,23 215:13,21
216:15
**percentages**
216:14 217:18
**perception**
133:23
**perennial**
24:15
**perfectly**
80:1 83:5 151:22
**perform**
36:24 37:19 76:7
76:10 81:23
304:13
**performance**
304:14
**performed**
78:23 79:17 80:19
127:3 198:22
302:17,20

**performing**
56:1,9 178:16,22
**peri**
128:25 137:9
**perineal**
59:1 69:14 78:11
83:8 89:25 90:24
113:8,14 115:1
118:5 120:19
122:7,19 126:5,13
127:7,21 128:3,25
129:18 131:8,15
131:22 132:11
134:6,25 135:5,18
136:25 137:9
141:17 144:6,19
146:7 150:5
151:11 152:11
153:10 154:25
158:8 162:25
164:5 165:3 192:3
218:3 230:6 237:8
243:12 250:9,19
251:8 253:12
259:21 267:8,21
268:6 271:12
272:12 273:3
301:11 303:17
305:14,25 330:10
330:20 331:6,13
335:9 339:23
340:7
**perineally**
120:24
**period**
48:25 49:4 118:8
118:13 119:12
120:11 132:17
133:8,8 138:9
207:10 212:8
259:7,14 277:1
**periods**
171:12
**peritoneal**
168:19,21 192:2
**peritoneally**

169:25
**permeates**
167:4
**person**
30:1 150:13
**personal**
45:23 50:1 71:20
**personally**
54:19 55:23 72:24
78:22 83:19
136:11 161:13
227:25 231:23
333:8
**perspective**
159:10
**persuade**
261:14
**persuaded**
316:4 330:12,23
332:5,11
**pertain**
36:22
**pertained**
83:7
**pertains**
118:9 296:13
298:10
**pertinent**
73:18 90:5,6
**peruses**
30:15 32:18 33:8
89:13 117:12
133:18 136:1
169:10 219:15
249:10 262:18
332:19 344:3
**pesticide**
126:21,23
**pharmacology**
279:10
**PhD**
6:19 7:16
**PhDn**
7:13
**phenomenon**
159:9,15,16 160:7

161:6,8,22
**Philadelphia**
4:7
**phone**
46:11 161:17,23
310:10
**phones**
161:16,19,20
**phrase**
60:10 113:21,25
114:7,9 130:1
193:21 244:8,10
249:17
**physical**
159:25 283:1 284:1
**physiological**
205:7
**physiology**
349:25
**Ph.D**
1:17 2:1 6:2 9:14
9:18 79:7 279:17
352:5 356:11
**pick**
222:20
**picked**
18:4 63:24 222:21
**picking**
35:16 65:23 77:9
**picture**
173:14
**piece**
26:16 37:16 46:13
174:4 187:21
245:23 266:9
269:24
**pieces**
25:15 29:12 32:1
33:10 47:24
100:20 142:17
263:5,9,12 265:21
266:8 267:5
**Pier**
93:16 102:5,11
**Pier's**
95:15

**pink**
45:15
**place**
11:13,21 99:18
154:25 210:1
239:12 284:17
353:5
**placed**
47:3
**places**
72:2 120:16
**plaintiffs**
3:3 6:13 13:23 14:2
14:5 15:24 16:1
16:14 40:16 49:20
51:9 55:8,13,21
70:24 74:2 89:8
89:15 90:3 91:2
92:4 94:19 95:16
97:11 98:18
100:14 105:15
136:12 141:7
177:24 276:3,15
277:16 322:25
324:12 325:2
326:14 332:5
**plane**
73:3
**platform**
127:14
**plausibility**
75:18 143:10 305:7
313:8,10,14
314:23 315:4,13
315:18,20,23
316:2,22,24 317:2
330:9,19 332:7
333:6,18 334:3
337:3,6 338:3
348:16 350:5
**plausible**
205:2 311:8,14,17
316:7,12,13,17,18
335:22 341:6
350:1,2
**play**

178:6 288:5
**played**
32:13
**plays**
102:22 148:5
**pleasantries**
324:4
**please**
19:15 41:19 58:3
61:22 64:4,20
105:12 175:8
214:11 282:2
296:24 297:2,20
301:5 307:21
310:4 324:23
337:1 347:19
354:2,6
**plethora**
159:22
**PLLC**
3:17
**plots**
80:22
**plugging**
82:16
**Plunkett**
14:11 93:13,22
94:17 95:3,7
332:16
**plural**
324:15
**plus**
41:24 53:23 241:23
**point**
20:7 30:9 45:17
60:22 66:19 72:13
76:15 86:16 87:6
88:15 96:1 97:3
98:3,7 110:22
114:21 132:5
133:19 142:21
149:14,17 150:1
163:2 183:11
187:23 188:7
195:25 196:13
203:24 207:6,16

207:17 216:18
220:17 223:24
226:17,25 228:10
228:18 245:17
249:14 298:24
314:14 316:6,11
329:7,9
**pointed**
74:5
**points**
143:5 176:17 209:2
237:18
**policies**
25:9 85:3,7 86:4
**policy**
85:16,23
**polled**
321:16
**pooled**
142:24 197:12,22
238:24 239:1
**poor**
281:7
**population**
27:20 66:22 181:8
**populations**
65:24 180:17 181:6
181:12 182:8,10
182:11
**population-based**
64:13,15 66:3,4
283:16
**Porta**
20:16
**portions**
29:18 93:15 105:24
205:15 220:20
**portrait**
35:1
**positing**
272:1
**position**
340:13
**positions**
84:17,25
**positive**

10:17 202:8 203:6
205:18 245:8
301:11 305:13,24
**positively**
284:14
**positives**
119:14
**possibilities**
252:1
**possibility**
117:22 122:6
141:13 154:14
158:25 159:4
160:8 168:6
173:19 213:8
222:4 252:5
271:23
**possible**
24:5 50:24 122:12
126:20 136:24
143:8,11 155:6
156:8,12 165:17
165:22 166:5
168:3 169:20
170:2,17 171:16
218:2 219:6 237:9
250:20,25 251:15
251:17,21 252:1,3
252:8,16,25 253:2
277:20 338:21
**possibly**
96:24,25 183:23
303:3
**postdate**
272:4
**postdoctoral**
279:21
**post-2006**
272:9
**potential**
57:18 75:3 84:19
89:24 126:5
135:18 142:2
146:7 156:17,18
158:11,18 169:23
171:22,24 172:22

173:11 176:1
183:20 220:9
221:3,3 260:10
261:1 272:11
275:24 323:11
330:20 349:17
**potentially**
143:5 158:7 258:12
258:23 267:11,16
349:21
**potted**
145:11
**powder**
1:6 6:20 7:13,16
9:10 57:22 58:6
58:23 59:18 69:14
74:15 78:10 92:10
92:14 95:25 96:3
96:18 97:15 98:9
101:14 102:8,15
102:17 103:2,15
103:23 113:8,14
115:2,4,10,23,25
116:8,10,11,25
118:6,7 119:3,6
119:12,12 120:20
120:23 121:5,14
126:14 127:8,21
131:8,15,22
132:11 134:6
135:1,6 141:8
146:8 170:12
172:13 176:12
202:6 205:8
216:10 217:7
218:15 219:7
237:9 250:20
259:25 260:13
268:16 291:4,12
295:3,8 296:15
297:5,10,22 298:3
301:17,18 302:9
302:23 307:10
312:8,15 313:19
314:14,21 315:4
315:14 316:25

317:4 324:13
325:3 338:4,21
339:1 351:11
**powdering**
83:9 92:21 115:14
171:15,18,21
178:13
**powders**
101:3 102:1
**powerful**
123:4 184:15 319:7
319:8
**practice**
24:25 310:21
**PRACTICES**
1:7
**praise**
241:9
**precaution**
85:9
**precautionary**
86:4
**preceded**
269:21
**precedence**
114:12
**precious**
241:25
**precise**
50:24 53:20 118:20
220:10
**preclude**
250:25 253:19
**preconceived**
34:18 35:4
**predate**
347:5
**predict**
242:3,7
**predominantly**
226:6
**preface**
195:7
**prefer**
88:14,14 156:5
197:11 224:17

244:19
**preference**
212:1
**premise**
116:5
**premised**
97:18
**preparation**
13:2,7,14,17 38:21
   51:1
**prepare**
11:10 12:8,16 82:6
**prepared**
57:16 263:3 340:8
**preparing**
50:12,15,18 302:20
**prerogative**
153:3
**presence**
96:2 343:18
**present**
5:24 11:3 12:1,4
   97:14 103:8
   116:25 167:5
   229:23 237:7
   336:17
**presented**
71:18 134:5,25
   186:8
**presenting**
134:22
**presently**
56:3
**presents**
122:8 123:17
**press**
128:16 256:22
   325:7
**pressure**
38:17,18
**presumably**
51:12 179:4
**presume**
51:15 56:4
**presumptuous**
150:13

**pretend**
331:8
**pretended**
335:3
**pretty**
37:11,12 38:14
   74:10 77:8 81:4,4
   89:1 171:9 187:23
   228:23 242:3
**prevent**
281:13 282:23
   284:16
**preventable**
291:11,12
**prevention**
279:25 283:14
   284:18 287:1,15
**preventive**
287:17,23
**previous**
42:20,20 44:11
   53:11 70:16 88:10
   118:15 121:1
   197:17 202:14
   237:4 333:22
   337:7
**previously**
44:4 195:21 256:4
**primarily**
350:18
**primary**
70:17 266:8,9
   287:14
**principal**
124:19 279:24
   283:14
**principle**
85:8 152:18 183:12
**principles**
21:11 320:22
   321:23
**print**
52:11 82:2 132:20
**printed**
62:6,9 254:19
   308:2,10

**printouts**
43:12
**prior**
44:18 45:1,7
   108:19 109:5
   133:16 246:5
**priori**
25:23
**priorities**
143:21 144:3,4
**privileged**
233:11
**probability**
114:23 252:6 320:1
**probable**
131:9,16,23 132:12
   247:8,13,16
   248:11 249:4,5,13
   249:13,15,21
   250:5,10,25 251:9
   251:14 252:2,17
   252:22 253:1,3,13
   253:20,25 254:6
**probably**
20:6 44:11 72:14
   95:1 129:18,24
   130:6,8,9,11
   134:19 140:6
   143:20 145:14
   147:4 177:4
   196:14 228:8
   259:19 271:12
   321:3 337:19
**problem**
63:21 96:21 97:5
   126:20 159:21
   170:14 171:2
   179:22 203:8
   311:3
**problems**
65:5 127:1 138:6
   180:12
**procedure**
27:4,5 37:9,11
   196:17,18 198:10
**procedures**

37:24
**proceeding**
353:4
**proceedings**
255:14 257:3
   265:16 274:10
   336:3 343:12
**process**
21:5 23:2 25:18
   26:7 29:20 72:8
   74:1 99:7 128:20
   133:25 137:25
   138:18 142:10
   143:11 153:18
   257:20 258:22
   310:23 314:9,10
   323:15,15
**processes**
31:20 153:19
**processing**
349:15,17
**proclaiming**
128:19
**produce**
30:18 34:25 51:19
   106:24 150:11
   224:10 258:1
**produced**
57:21 69:21,22
   80:17 99:12
   108:14 119:23
   120:4 128:10
**produces**
122:16
**producing**
273:25
**product**
51:20 90:12 115:25
   116:8,10,18
   119:12,13,24
   120:2 307:10
   315:5
**production**
84:5 132:18 133:8
   191:19 273:18
**products**

1:6,8 9:11 58:23
   69:14 74:15 92:11
   92:14,21,21,22
   95:25 96:3,18
   97:15 98:10
   101:14 102:9
   103:3,15,24 113:8
   115:2,11,12,23
   116:11 117:1,18
   118:1,6,7,10,12
   118:21,24 119:4
   141:8 176:12
   259:25 260:13
   291:12 312:8,15
   313:20 314:14,22
   315:14 316:25
   317:4 338:4,22
   339:1
**professional**
7:5,8 24:13 25:7,21
   28:12 39:12 46:14
   48:3,21 49:11
   53:2 55:25 56:8
   131:4 278:20
   321:17
**professionally**
136:11
**prognosis**
281:7 284:18
**program**
80:23 138:1,8
   139:4,10 140:4
   141:5 281:1
**progresses**
31:12
**project**
124:19
**projects**
21:4 278:25 283:24
**promise**
96:19
**promising**
287:15
**prompting**
71:6
**pronounce**

Jack Siemiatycki, Ph.D.

104:12
pronounced
336:16
proof
298:23 315:21,24
345:13 346:11
347:9,20,22 348:1
348:2,6,9
proper
227:11 318:21
properly
173:13 198:7,19
266:14
proportion
132:4
proposal
262:5,7 263:17,22
264:1
proposed
264:5
proposition
150:19
propounded
356:6
prospective
226:4
Protection
262:22
protective
85:17
protocols
180:6
PROVAQ
280:1 283:15
286:23 287:2,13
proven
316:10,13
provide
24:7 74:2,17 76:16
76:17,19 78:9
95:22 98:2 186:13
186:15,18 305:2
307:23 316:22
317:1 318:5
321:12 334:2
provided

16:18 17:7 18:18
24:12 26:13 40:16
46:12 75:15 76:24
82:14 88:12 95:16
96:1 100:14,17
101:5,10,17
105:14 162:20
189:16 197:23
203:10 231:19
332:23 333:12
provides
283:21,22 310:20
provoke
160:5
prudent
204:12
PTI
5:17,18
public
2:13 51:18 84:12
84:18 85:3,6,15
85:18,23,25 86:3
137:25,25 161:10
221:3 230:22
259:5,8,14 260:7
276:1 288:13
356:19
publication
113:22 125:17
127:10,17 128:6,9
138:24 174:17,18
189:3 193:17,25
195:9 203:9 228:1
233:6,8 238:6
261:23 293:23
323:12 324:2
325:8,10,17,25
publications
85:2 97:1,2 133:20
142:22 143:13
164:25 226:10
240:8
publicity
213:8 218:22,23
219:15 220:9,16
220:21 221:4,17

publicly
89:2,4 128:3 241:3
publish
127:18,19 128:18
228:11
published
20:2 28:9 37:18
43:13 50:22 73:18
98:11 99:12 106:8
106:10 127:2,6,23
127:24 133:1
136:15,17 137:10
141:15 160:18
189:18,24 195:10
230:15,16 232:3,8
261:24 272:6,9
311:23 339:1
PubMed
73:20 81:9,14
pull
294:12 342:13
pulled
343:17
punch
80:25 128:9 193:21
purchase
115:12
purchased
119:6
Purdie
189:3,7
purely
252:14
purportedly
262:24
purpose
181:4 245:23
247:10 310:16
329:8
purposes
99:2 162:9 210:16
302:20 313:25
314:20 317:3
Pursuant
2:12
put

15:3 17:13 33:16
41:1 43:8 68:8
80:25 97:13
106:19 108:5
109:2,9 114:24
140:6 184:2 214:4
223:10 267:1
271:25 276:24
285:12 289:7
putative
310:22
putting
108:17 179:20
289:5
P-O-R-T-A
20:16
p-value
270:16,19,23 271:2
297:25
p.m
104:25 105:4
140:24 141:2
145:21 146:1
210:4,8 242:19,23
255:13,16 257:2,5
265:15,18 274:9
274:12 320:13,16
322:16,19 336:2,5
343:11,14 352:3,6
_____
          Q
qualification
124:2
qualifications
79:9 100:6
qualified
204:24 331:11
334:5,24 335:20
335:21
qualifiers
336:24
qualify
206:1 271:5
qualitative
32:10 182:1
quality

28:25 29:5,13
99:25 100:3,7
184:10 227:24
284:19
quantify
121:24 158:18
quantitative
26:21 30:9 32:7
33:22 114:24
quantity
264:8
quartile
297:11,12,13,14
quartiles
268:19 295:11
297:10,17 298:15
Quebec
279:25 283:15
287:2
Queen's
279:14
question
21:24 22:11 26:11
26:12 28:20 31:1
33:18 35:8 36:3
37:15 56:21 58:19
58:21,21 66:11
68:17,19,23 69:9
69:16,17 72:3,5
72:23 84:14 85:12
87:25 90:22 91:16
96:8 97:14 99:1,8
104:4,7 107:13
108:12 111:11
112:14,16,19
114:16 116:5,19
118:14 121:2
123:5 124:1,3
128:14 129:23
133:18 144:2
149:1,13 150:10
152:6 162:10,24
163:14 164:4
167:20 178:4
181:25 182:1,4,16
183:9 191:1 196:5

196:10 201:21
206:21,21 219:23
226:15,16,23,24
229:12 236:10
247:15 249:25
250:13 251:5
252:24 253:7,8
257:8 271:22
291:7 293:12
309:22,22 311:23
313:16 320:19
324:14,22 333:15
335:17 336:21
342:14,19 343:22
344:23 347:1
348:4
**questioning**
323:9,9 336:7
**questionnaire**
27:22,23 126:8
226:13,15,21
**questionnaires**
160:4 226:18
**questions**
10:2 18:25 19:2
27:21 41:15 67:14
68:24 89:7 108:19
163:4 173:17
177:21 180:22
195:23 206:4
211:18,24 226:17
244:20 275:3
289:19,20 290:23
291:19 294:6
306:7,13 307:1
312:6,10,17 322:1
322:23,24 323:5,6
326:13 332:4
336:11 351:19,21
356:5
**quick**
138:10 139:3
219:17
**quicker**
234:14
**quickly**

18:6 63:15 89:11
131:1 135:20,23
188:5 198:15
201:20 242:3
262:16 344:4
**quite**
65:24 86:12 155:15
210:19 229:4,9
237:24 248:18
256:1 257:13
270:11 274:1
277:20 315:19
328:18
**quote**
64:18 67:2,16
131:9,16 136:24
146:17 148:12
149:2 185:23
249:17 330:1
**quoted**
226:20
**quotes**
276:25
**quote/un**
148:12
**quoting**
340:18

---

**R**

**R**
3:1 5:11 9:1 355:2
355:2
**random**
170:22
**range**
53:24 146:25 252:1
329:7,9
**ranges**
145:4
**rank**
33:10
**ranking**
33:20 34:6
**rapidly**
132:23
**rappel@seyfarth...**

5:9
**rarely**
181:16
**rate**
27:19 32:16 144:25
**rated**
27:17 33:9
**rating**
131:2 145:3 151:14
**ratio**
76:24 77:10,23
106:7,24 160:16
185:16 215:2,4
228:10,19 245:10
319:2
**ratios**
76:17 177:14
214:24 222:5
223:19 225:16
245:19 319:12,14
**reach**
41:20 120:20 126:4
204:4 240:2 306:8
338:22
**reached**
35:20 129:17
131:18,21 132:3
195:3 196:10
248:9 293:4,19
326:4 330:5
**reaches**
345:13 346:12
347:10
**reaching**
15:2 23:21 32:2
**reaction**
162:5
**read**
30:15 32:17 88:15
96:24 97:7 101:20
102:4 104:3
113:10 117:7
131:10 133:17
137:4 159:13
175:4 183:1,2
202:11,12,20,21

226:18 229:14
230:9,11,12
237:11 238:5
250:3 254:6
262:17 268:20
271:6 288:11
295:14,15 296:20
296:24 297:3,15
298:9 301:13,23
302:15 308:4
309:19 310:6,11
314:6,7 318:22
321:19 327:15
328:1,10,20 329:1
329:11 330:2
331:19 332:15,22
333:3 334:13
336:13 338:9,11
338:17 341:5
344:2,4 351:23
354:2 356:3
**reader**
81:3 107:4
**readers**
31:21 277:25
**reading**
15:13 44:13 52:6
91:18,21 95:10
175:12 185:18,19
239:20 254:2
283:21 301:6
307:20 313:10
331:17 339:21
**ready**
290:8
**real**
74:22 168:13 207:8
**reality**
35:1 99:9
**realized**
70:9
**really**
28:17 30:23 36:17
36:20 45:11 63:3
65:3 73:10 84:9
106:12 128:5

148:14 158:18
167:2 168:9
179:24 180:6
182:2,6 184:9
249:11 257:23
258:1 281:18
289:4
**reanalyses**
72:12
**reanalysis**
271:22
**reason**
59:6 73:12 82:23
87:15 90:20 91:9
127:18 160:3
172:12 192:7
213:5 225:13
241:14 260:17
262:25 303:12
323:8 354:4 355:6
355:8,10,12,14,16
355:18,20,22,24
**reasonable**
103:21 113:7,18
114:5 131:6
208:12 316:4
329:9
**reasonableness**
204:25
**reasonably**
118:20 316:16
**reasons**
30:8 65:11 66:2
143:17 190:21
**reassured**
196:23
**reassures**
222:21
**REATH**
4:18
**rebut**
101:7
**recalculating**
77:10
**recall**
52:8 59:5,7,15

91:17,21 93:19
95:12 101:12,12
157:8,17 158:1,3
158:6,22,25 159:9
159:15 160:5,7
161:9 166:5,9,10
166:13,15,18
169:22 170:19
217:22,25 218:1
218:11 219:7
221:22 222:4
223:16 233:12
274:20,23,24
294:21 299:2
306:15 307:1
312:5 317:16
323:4,6,10 324:2
324:14 325:4
339:9,19,20,21
**receipt**
354:13
**received**
40:10 54:24 97:10
97:11 326:5
**receiving**
83:18
**receptivity**
129:15
**recess**
52:20 105:1 145:22
210:5 242:20
320:14 322:17
**recipe**
25:1
**recognition**
328:18
**recognize**
37:23 47:2 91:12
188:5 222:3
**recognized**
226:4
**recognizing**
133:25
**recollection**
54:3 323:25 340:20
**recommendation**

291:25 320:24
321:2
**recommendations**
259:8
**record**
9:4,16 11:25 15:5
16:18 17:22 19:18
47:6 48:10 52:19
52:23 61:13 67:21
67:22,24 68:2
104:20,22,25
105:4 108:11
109:1 111:15
140:15,23 141:2
145:21,25 156:1
157:21 175:21
192:24 194:20
200:3,4,21 210:4
210:8 226:19
235:13 236:8
242:11,19,23
255:9,13,16
256:24,25 257:2,5
265:12,15,18
274:6,9,12 275:4
307:17 308:12,19
317:11 320:8,9,12
320:16 322:16,19
324:19 328:14
335:25 336:2,5
343:11,14 344:8
352:3
**recorded**
353:8
**recreate**
41:5
**recreational**
284:1
**red**
347:21
**REDIRECT**
322:20 336:9
**redrafting**
72:22
**reduce**
281:11

**reducing**
168:13 287:16
**reduction**
169:1
**REES**
5:12
**reevaluated**
137:13
**reevaluation**
137:15,16
**refer**
13:20 19:12 58:16
69:12 86:9 87:19
92:6 100:20
108:21 111:11
112:4 147:21
157:16,19 165:23
206:9 218:22,25
219:20 224:17
225:22 245:3
262:8 263:13
303:16 304:23
312:22 333:9
**reference**
43:20 86:17 87:18
88:4 89:19 91:24
93:4 105:19,24
111:21 175:18
211:15 213:1
219:8,9,18,20
220:22 225:15
230:23 238:6,9,11
238:14,16,21,25
239:1 250:22
267:15 341:4,5,25
**referenced**
23:14 45:17 50:17
51:16 178:25
185:1 239:10
**references**
18:17,21 39:23
40:4 86:7 87:4,9
87:13,22 88:21
102:3,9 219:1
240:17 329:13
332:19 333:12

**referral**
65:11
**referred**
40:3 87:17 98:15
163:24 244:6
294:20
**referring**
35:15 62:13 63:19
71:14 98:16,19,23
156:25 198:23
219:15 246:15
254:23 262:7
269:20 296:16,23
300:23 304:7
305:17 313:4
**refers**
166:10,12 202:15
206:25 262:19
**refinements**
37:13
**reflect**
49:22 84:25 133:22
324:19 327:25
**reflected**
133:4
**reflecting**
333:2
**reflection**
70:12 180:15,16,18
**reflects**
50:1 132:9,16
200:4 298:5
**regard**
294:6 313:17
315:12
**regarding**
10:21 13:15 43:7
229:5,9 275:8,13
275:19 306:13
338:3 350:10
**region**
69:14 220:10
221:12
**regression**
207:14
**regular**

298:6
**regulations**
146:23
**reimburse**
49:17
**reinforces**
84:10
**rejected**
133:2
**relate**
263:5,8
**related**
8:9 18:21 51:17,25
57:1 58:5 115:24
126:21 157:10
165:11 166:8
167:7 175:14
189:13 226:2
259:22 310:14
317:22 326:24
333:6,18 350:17
**relates**
1:11 263:19 296:14
**relation**
124:8 125:23
189:14 195:24
318:9 351:5
**relationship**
24:15 58:22 78:10
103:5 114:14
115:9 121:10,23
121:24 122:1,19
122:24 123:7,9
131:7,15,21
132:10 136:25
152:2 156:10
157:11 174:8
176:8 243:12
261:1 265:24
267:8,21 268:6
269:10 272:12,23
273:2 278:21
302:9 311:12
**relationships**
314:16
**relative**

23:9 26:20,21
32:10 33:20 76:18
77:23 84:18 106:7
146:24 147:6,13
147:19,24 148:2,9
148:17 149:22
150:1 159:6
166:22,24 167:1
167:14 169:2
170:25 174:10
178:7 181:23,23
182:2,10,11
185:15 191:25
192:1 204:17,21
213:20 225:16
234:3 236:11,18
236:20 245:10
247:12 298:17,18
298:18 319:10,21
319:24 320:5
321:13 327:3
328:22 329:4,22
**relevance**
22:24 89:23
**relevant**
40:24 66:14 90:21
91:13,25 94:25
105:16,23 118:20
164:4 196:21
237:8,15 253:6
311:3,18 350:25
350:25
**reliability**
158:2 223:21
**reliable**
118:20 179:14,17
204:9 260:20
**relied**
90:3 191:9
**relieve**
171:20
**reluctant**
150:9
**rely**
93:2 94:12 158:3
194:3,22 261:12

265:8 267:18
**relying**
221:19 222:11
265:2 272:20
331:22
**remain**
13:5 165:18
**remainder**
291:1
**remained**
190:6
**remains**
182:24 283:2
**remember**
41:3 54:9,11 68:8
90:8,8 100:18,19
141:22 156:3
190:19 207:14
218:7,8 246:7
257:13,14 259:5
269:2,4,18 273:10
274:2 291:19
293:8,9,15 312:9
312:16 313:20
324:8 332:14
340:18,19
**remove**
40:15
**removed**
40:18,21
**render**
100:6,9
**rendered**
318:6
**RENEE**
5:4
**repeat**
22:11 173:3 276:6
330:15
**repeated**
97:8
**replicability**
31:5
**replicable**
30:11,13,14,19
31:3,17

**replicatable**
28:6 80:24
**replicate**
25:14 26:14 80:18
272:16
**replicated**
29:21,24 42:11
**report**
6:18 7:10,12,15,19
7:20 12:20 13:4
13:17 17:5,6,16
17:24 18:5,11,17
18:20,21 21:20
25:14 26:13,18
28:21 39:24 40:5
40:22 42:1 43:20
44:4 50:9 57:15
57:15,17,21 58:5
58:13,20,24 59:3
59:25 60:3,10,11
60:13,16,21,24,25
61:2,6,14,24
62:23 64:1,7
66:15,20,25 67:10
68:5,9,18,21,25
69:3,10,13,17,20
69:21 70:2,4,4,10
70:16,21 71:5,5
71:12 72:9,20
73:16 74:4 76:5,8
76:12 77:22 78:24
80:17,22 82:7
83:19,20 84:5,8
84:10,14,15,23
86:8,21 87:17,20
91:8,23 94:8,11
95:7,9 96:6,11
100:20 101:8
106:8,11 107:4
108:2,7,14,22
109:3,5 110:7,13
110:25 112:7,22
127:23 130:22
131:4 133:4,21
135:18 144:23
145:7 149:16,25

163:3,15 165:16
165:25 166:19
169:6 170:2
175:18 182:18
186:3,5,7 188:16
190:6,8,10 199:16
199:17,18,19,20
200:5,15 213:1,3
229:4,8 230:23
236:16,21 241:22
245:6,19 256:15
261:23 268:22
269:3,19 270:16
293:22 302:21
303:1 305:20
312:22,25 314:4
316:20 320:3
325:12 326:20
332:18 333:6,20
337:1 338:20
342:11,11 348:15
**reported**
1:25 102:7,14
149:18 211:1
215:13,14 216:4,8
216:9,17,24 217:7
223:13 229:3
236:19 245:8
268:8 272:21
**reporter**
2:13 9:16 309:18
353:1,2,25
**reporter's**
353:13
**reporting**
161:23 166:13
170:20,23 213:11
217:17 223:18
**reports**
31:22 40:18 50:21
58:16 92:20 94:2
94:3 95:5,11
97:11,24 98:19
99:2,7,11 101:6
101:10 102:16
185:19 186:20

190:2 223:6 258:2
316:15,15 321:12
332:13,15,21,24
333:2,4,18,22
334:2,6,13,16,17
**represent**
16:17 45:4,8 66:9
109:3 274:18
**representation**
191:10
**representatives**
101:25
**represented**
333:20
**representing**
217:4,6
**represents**
237:14
**reproduced**
80:21
**reproduction**
353:23
**reproductive**
125:23 226:7
282:10 288:1
**reputation**
99:25
**request**
15:24 94:18,23
95:18 108:10
138:20,25 139:6
142:11 191:18
231:16 343:16
**requested**
95:21
**requests**
15:20 56:16 138:3
138:4
**require**
119:5 155:15
319:22
**required**
83:12
**requires**
83:11 184:13 208:2
**requisites**

66:7
**rereview**
13:20
**rereviewed**
12:17 13:6,9
**research**
2:5 7:24 9:9 20:1
  21:3,3,6 23:6 24:4
  24:9 49:16,19
  73:20 74:16 81:9
  81:10 82:8 124:7
  126:13 127:15
  132:18 133:9
  159:10,13 160:13
  160:17 161:14
  174:19 177:25
  180:5,6 266:12
  273:19 280:25
  281:1 283:11
  286:9 288:6 292:7
  310:13 331:16
**researcher**
289:8
**researchers**
129:9
**resolved**
104:13
**respect**
33:12 35:21 57:18
  90:12 94:7 98:9
  126:5,10 127:21
  137:9 141:16
  142:12 150:6
  153:10 162:25
  164:19,22 165:2
  187:10 197:7,9
  218:14 233:16
  246:17 262:5
  263:18 323:11
  324:25 326:10
  327:5 330:8,18
  332:7
**respected**
20:7
**respectfully**
26:10 148:25

177:20
**respective**
215:9
**respond**
166:12
**responded**
323:16
**response**
6:14 218:9 222:1
  243:12 268:6
  293:11,25 326:5
  332:4
**responses**
159:20
**responsibility**
120:3
**responsible**
115:19
**rest**
41:1 272:8 337:8
**restricted**
298:2
**result**
38:16 80:8 82:16
  83:7 152:13
  167:13 171:15
  174:7 181:18
  184:4 186:6,10,23
  189:16 190:15,16
  196:25 200:23
  208:11 209:16
  221:16 224:1
  228:8
**resulted**
149:22
**results**
37:10 38:3 67:4,5
  70:14 79:18,25
  80:3,4,9,12 82:13
  82:25 83:3 128:11
  128:12 161:21
  174:2 177:17
  180:8,23 181:22
  181:22 184:5
  190:9,24 197:1,16
  197:23 208:4,16

209:3 210:18
  211:1,2,5,8,21
  212:14 217:21
  223:10 224:6,10
  237:23 240:3
  241:21 266:22
  296:4,11 329:8,21
**retain**
52:12 105:25 191:4
**retained**
78:4,6 101:6
  105:22 276:2,14
  277:15 325:2
  334:1
**retired**
81:16,22 82:10
**return**
19:18 105:8 354:11
**review**
13:1,3,13 28:15
  33:6 51:21 67:7
  73:15 74:7 77:12
  93:17 96:5 125:24
  126:17 163:16
  220:7 229:11
  230:5 240:9
  241:23 259:10
  262:17 264:15
  273:7,9 301:16
  303:20 313:25
  321:6 334:17
**reviewed**
12:17 13:10,10
  50:22 52:4 72:18
  75:14 84:5 93:12
  94:6 95:5 99:19
  127:7 129:2,4,13
  158:24 159:14
  195:21 241:15
  242:5 253:10
  262:15 282:14
  314:6 326:15,19
  326:19 333:19
**reviewer's**
32:13
**reviewing**

25:13 26:13 51:23
  82:15 84:1 91:23
  116:23 125:9
  248:8 250:7
**reviews**
163:12
**revise**
125:24
**revising**
70:17 125:9
**revision**
51:8
**revisit**
97:16
**rgolomb@golom...**
4:9
**rich**
283:22
**RICHARD**
4:3
**Richardson**
82:11,17
**rid**
96:20
**right**
10:4,6 15:23 16:21
  18:2,7 20:22
  39:18 57:2 61:5
  62:21,25 67:2
  78:12 86:23 88:17
  93:19 97:3 105:17
  106:3 107:19
  111:13 130:5
  163:9,10,14,18
  164:13 188:23
  191:3,16 200:5
  202:4 205:12
  210:19,25 211:12
  211:20 214:10,23
  216:2,22 224:21
  235:23 249:7
  250:14 256:6
  273:23,23 287:11
  289:23 290:1
  291:17,18,22
  292:6,17,21

293:10 294:1
  295:6,13,19,25
  296:10 297:20
  299:14,15,21
  300:1 301:15,21
  301:25 303:15,20
  306:6,17,21 307:5
  309:3 312:4 313:3
  315:2 316:19
  317:7,15,20 318:3
  320:6,25 321:4,5
  321:8,25 326:22
  327:1 335:24
  340:4 347:4,4
  348:17
**right-hand**
327:9
**rigueur**
114:3
**risk**
8:5 19:20 20:24
  21:12 24:16,20
  33:12 35:21 36:6
  43:12 59:4 77:24
  89:24 90:12,23
  103:16 106:8
  119:25 120:10,24
  122:8 123:18
  127:22 130:3,12
  143:1 146:16,18
  146:19,25 147:7
  147:24 149:2,22
  150:1 154:10,13
  156:16 159:7
  166:22,24 167:1
  167:14 168:13,14
  169:2 170:25
  174:8,9,10 178:7
  181:23,23 182:3
  185:15 191:25
  192:1,17 193:17
  199:2 202:7,18
  203:15,19 204:17
  204:21 207:21
  209:24 213:20
  225:17 230:6

234:3 236:11,18
236:20 245:10,10
247:12 268:17
269:23 281:12
282:7 287:4 288:6
295:9 297:21
298:17,18,18,21
306:13 308:20
309:4 310:22
319:22,24 321:11
321:15 327:4,21
329:4,22 345:12
**risks**
76:18 121:12
126:20 144:18
147:6,13,19 148:2
148:9,17 159:23
160:10,11 176:3
180:16 182:10,12
184:18 189:12
208:25 297:8
299:6 319:10
320:5 328:22
351:2,5
**road**
3:12 29:8 133:22
227:16
**robot**
25:19
**rocket**
79:14
**role**
24:25 98:24 102:21
128:22 143:11
178:7 259:24
260:12 288:6
**roles**
143:11
**Roman**
300:4,4,16,21
**room**
117:20
**Rothman**
20:8
**rough**
33:6

**roughly**
13:19 118:11
136:20 138:18
169:14
**routes**
338:21
**routine**
81:24
**routinely**
65:23
**RPR**
353:18
**rubric**
25:5
**rule**
122:6
**ruled**
123:14
**run**
215:17 329:24
**running**
320:11
**run-up**
39:1
**R-O-T-H-M-A-N**
20:8

**S**

**S**
3:1 6:1,7 7:1 8:1
9:1
**Saed**
332:17,18
**sake**
168:24 174:11
**SALES**
1:7
**Sally**
81:20 82:10
**sample**
266:13 288:7
**samples**
102:15,17
**sampling**
311:7
**Sanchez**

101:11
**sanctions**
310:20
**sanitary**
83:9
**satisfaction**
316:14
**satisfy**
153:12
**save**
73:7,12 80:12 81:3
135:24 224:23
**saw**
97:24 139:15
230:23 325:23
348:20 349:3
**saying**
53:12 67:13 98:3
123:13 163:23
186:6 195:7
221:24 233:13
244:12,18 276:8
282:22 293:15
304:17 338:20
340:17,21 342:17
346:11 347:8
**says**
63:2 69:13 146:24
163:11 206:22
236:13 258:18
264:5 280:24,25
281:10 282:20,24
283:13 284:13
287:1,7,9,13,14
287:21 288:10
328:4 338:25
343:23 344:14
345:9,17 347:15
349:16,18
**scale**
150:7 151:23
154:24 161:10
**scanned**
349:7
**scanning**
219:17 348:20

**scenario**
35:15
**scenarios**
186:9
**Schildkraut**
7:20 123:3 200:21
200:21,23,24
201:4 210:12,17
211:4,7,11 212:7
212:9,14,16,17
213:2,14,17,19,24
214:15 218:12
220:21 266:16
267:11 294:6
**science**
31:10,12 34:22,23
79:14 85:1,1,2,17
186:2 279:10
322:4 346:14
**sciences**
36:16
**scientific**
12:19 13:7 25:17
36:14 37:6,17
39:21 85:4,7 99:1
99:17 103:21
104:7 105:20,25
113:7,18,22 114:6
122:21 128:20
131:6,19 132:8,9
132:14 138:5
153:19,20 162:25
163:19 164:3,18
164:22 172:20
184:20 240:8
245:22 254:8
261:24 262:2
264:14 316:11
**scientist**
31:25 35:2,9,18,20
90:10 91:7,10
116:1
**scientists**
31:6,13,15,18
36:17 128:16
129:3 133:2 134:4

135:4 138:4 303:4
310:24 314:5
316:3,9 330:12,22
**scope**
43:13 68:10,12
303:8
**score**
25:25 27:10 28:3
33:16 67:15
**scored**
28:14
**scores**
27:7
**scoring**
26:24 28:8,9,10
31:11
**screen**
140:21 323:18
**screening**
255:1,19,22 256:8
256:18 257:9,15
257:21 258:5,9,21
260:19 261:8,22
263:4,18 265:1
299:17,24 300:1
300:25 304:15
326:8,12
**scribble**
44:12
**scribbled**
18:5 44:14
**scroll**
135:20
**SCULLY**
5:12
**search**
73:20 196:15
222:22
**searches**
81:10,14,23
**second**
23:3,4 42:10 63:9
113:4 140:23
163:9 170:19
193:5 196:24,25
202:4 206:12

219:3,25 221:6,20
256:24 264:4
266:16 286:21
297:12 300:24
343:8
**secondary**
298:24
**secretary**
286:12
**section**
64:13,17 66:20
86:7,18 87:4,9,14
87:18 88:4,21
91:24 101:2,24
106:1,2 113:1,5
163:10 169:12
198:15 202:1,24
206:7,13 219:11
219:20 221:9
237:1,4 249:3,18
250:8 254:10
262:14 273:8
295:7,21,23 296:4
296:11 300:19
303:21 313:6
316:19 333:5,9,15
346:18,21
**sections**
88:20 221:10
**see**
14:16,20 17:15
41:24 45:2 54:21
69:18 73:11 78:1
86:18,25 89:21,22
94:20,24 107:10
107:21 116:13
130:23 135:21
145:1,2 156:15,19
160:8 161:5
163:12 169:13
174:3,10 175:2
183:4 187:14
188:5 192:9
195:20 198:15
200:14,19 202:1
203:10 212:20

214:13,18,22,23
215:1 217:1,16
219:2,11,18
223:15 228:15
237:1 238:4,12,13
238:22,24 243:17
243:20,21 245:21
247:24 248:7
249:13 258:18
261:18,23 272:17
280:21,24 282:20
286:13,20,20
287:6 295:4,5,12
296:8 306:10
313:8,9 318:19
325:15,22 327:9
338:6,23 342:2,4
342:10,20 344:5,9
344:19 345:6
348:14,22 349:9
349:11,12,16
**seeing**
259:5 263:11
**seek**
212:21
**seen**
15:12,14,17,17
16:12 93:15
113:25 114:1
118:25 139:17
226:21 333:22
**seldom**
229:20
**selected**
28:1,1 80:9 208:8,9
**selecting**
82:18
**selection**
39:6
**selectively**
35:2
**self-evident**
89:1
**semantic**
249:24
**Seminary**

3:12
**sending**
325:16
**sense**
26:14 31:16 60:11
72:5 92:25 148:13
164:11 167:11
252:23 303:5,7,23
334:15
**sensitive**
208:7 209:7
**sensitivity**
79:25 80:13,18
81:2 186:19
200:16 201:8,10
228:12
**sent**
15:16 40:8 47:8
91:3 92:9,16 95:2
98:6 105:21 231:1
231:13 257:11
293:12,21 323:10
323:15
**sentence**
30:15 63:10,16
101:20,22 111:11
111:21 140:1
149:5 183:3
206:22 219:4
222:8 238:5 269:2
281:18,19 295:1,2
296:16 302:12
329:20 336:25
338:19,25 347:21
347:25
**sentences**
104:3 114:16 175:4
205:15,16 262:24
287:14 302:10
318:23 329:13
**separate**
71:16 98:24 210:21
270:21 273:18
**separated**
213:6
**separation**

213:2
**sequence**
72:1
**series**
65:7,19 67:8
312:17
**serious**
65:13,14
**seriously**
329:6
**serous**
202:9 203:7,11,15
203:19,24 204:11
**service**
186:15
**services**
7:5,8 9:6 46:14
47:8 48:3,21
49:12 53:2
**serving**
10:14 141:6 324:11
325:1
**set**
17:9 25:23 37:10
40:3,15 42:9,11
82:11 186:18
211:2 271:10
310:15 318:14
353:5
**sets**
210:18 211:1,1
**setting**
124:11,15 132:7
135:6
**seven**
177:21 219:4
**SEYFARTH**
5:5
**shape**
121:25
**share**
92:23 94:1 119:3,7
119:16,20 120:5
120:15
**shares**
118:21

**SHAW**
5:5
**sheet**
308:20 354:5,6,9
354:11 356:8
**shift**
283:25
**SHKOLNIK**
3:17
**short**
171:11
**shorten**
304:20
**shorthand**
353:1,2,11
**short-circuit**
342:25 343:2
**show**
22:1 160:18 215:17
317:20
**showed**
160:14 203:14
209:3
**showing**
176:25 285:18
286:1
**shown**
103:8,10
**shows**
156:15 211:5
212:14 215:8
298:10
**Shushan**
201:9,9 228:24
**sick**
159:19
**side**
44:13 100:19,19
206:10 277:25
278:7,8
**sides**
334:21
**side-by-side**
187:11,16 208:14
**Siemiatycki**
1:17 2:1 6:2,9,11

6:16,19 7:3,10,12
7:15 8:3,6 9:14,18
9:23 14:16 15:9
16:12,19,22 17:21
20:10 26:10 29:15
30:7 31:2 33:19
39:18 44:3 47:2
47:25 48:17 52:22
53:1 62:5,22 88:2
91:25 102:21
103:20 104:24
105:3,6 109:13
110:6,23 111:19
140:12 145:25
146:3 148:25
175:8 177:20
193:13 196:6
200:2 210:7
212:13 214:11
219:24 231:8
236:10 242:22,25
244:13 251:5
253:7 254:9
255:18 257:7
265:20 274:16
278:17 286:1
287:9 288:14
290:1,20,21 291:3
300:23 301:16
302:15 303:15
306:18 307:19
308:21 309:5
312:5 315:11
317:7,15 320:19
322:10,22 324:22
327:1 329:15
336:11 339:9
343:16 348:5
351:22 352:2,5
356:11
**Siemiatycki's**
14:23 18:20 234:17
235:2
**sign**
351:23 354:6
**signature**

108:1,3,4 109:2
**significance**
60:9 245:9 268:9
268:12 269:17
270:7 298:8,24
327:22
**significant**
67:4,12 178:7
182:22 218:13
225:7,10 266:25
268:5,10,13,16
273:2 295:9
296:17 297:18,21
298:1,4,14 299:13
301:11 305:13,24
328:23 330:1
**significantly**
160:11
**signing**
354:8
**similar**
22:20 62:10 77:17
80:10 165:19
197:2,16 203:15
217:16,17 236:20
297:7
**similarly**
176:11
**simple**
82:21 241:25
**simply**
95:19 119:16 151:9
152:7 173:15
214:14 215:12
225:6 341:24
342:16 343:22,24
348:5
**Singh**
14:11 93:13 94:18
95:8
**Singh's**
93:23
**single**
27:11 38:16 46:13
81:2 82:15 108:9
115:3

**single-digit**
27:7
**singular**
324:17,18
**sinus**
350:18
**sir**
276:5 336:12 337:2
338:7
**sit**
69:1 90:19 91:17
103:19 120:7
153:8 198:20
203:20 220:8
244:12 263:2,16
**situation**
38:8 39:3 76:23
147:5 150:16
155:6 168:7
169:18 181:9
341:11,12
**situations**
158:10 161:15
169:3
**six**
51:3 53:15 139:17
245:8,19
**sixth**
27:15
**size**
266:13
**sizes**
288:7
**skepticism**
328:25
**skill**
99:25
**skilled**
79:11
**skimmed**
344:4
**skip**
287:13
**slightly**
33:18 108:5 110:15
167:24 187:7

195:15 209:3
337:12
**slowly**
290:25
**small**
110:21 195:16
202:7 204:19
213:3 288:7
297:25 305:12,23
328:22 329:5
335:18
**smaller**
42:4 204:10 266:17
327:25
**smokers**
147:7
**smoking**
8:10 130:14 132:21
133:21 147:4,22
147:24 159:24
161:4 175:14
177:7,12,16,16,17
177:18 181:20
182:1,8 204:15,17
204:21,22 283:1
317:23 318:13,15
319:7 326:24
**smoking-lung**
147:17 148:13
**social**
65:16
**socioeconomic**
8:11 175:15 177:8
317:23 318:16
319:9
**software**
37:22 71:19 75:25
76:6,9 79:17
80:15 82:16 199:7
199:8
**sold**
101:15
**solution**
340:10
**Someone's**
63:4

**somewhat**
161:21 202:14
206:23 208:7
**soon**
134:19 315:19
**sorry**
22:10 32:17 37:14
42:16 44:21 47:16
47:24 53:20 56:21
57:15 62:8 63:7
78:4 85:11 100:15
106:10,18 123:25
133:17 149:12
152:3 155:23
156:5 163:8,23
172:25 173:2
174:21 183:4
189:4 195:18
212:16 220:25
224:24 249:9
252:12 262:11
270:11 281:17
290:14 292:11
299:24 330:16
332:20 341:16
342:8 344:5
348:25
**sort**
21:25 22:2 28:19
32:9 38:4,6 40:3
43:15 70:7 73:25
74:5 85:8 108:6
114:3,11 122:15
124:12 127:14
128:17 129:3
132:21 136:6
138:7 151:21
159:16 162:1,23
163:2 166:21
180:15 184:3
223:25 281:24
289:5 304:8
323:14
**sorts**
126:25
**sounded**

341:6
**sounds**
178:2
**source**
70:17 171:12 228:4
233:9,16 283:22
**sources**
137:24 228:4
233:10,16
**South**
3:6 4:13 5:20 340:3
**sovereign**
153:25
**so-called**
246:18
**so-so**
27:14
**space**
354:4
**speak**
139:9 251:23
290:25
**speaking**
13:19 87:18 118:11
138:18 139:13
204:21 251:25
**specialized**
65:15
**specially**
175:22
**specific**
22:5,18 23:20,22
33:22 36:22 44:25
55:4 58:17 59:12
60:1,16 62:13
81:25 92:5 115:3
117:15 157:5
163:2 185:14
204:6 211:21
220:22 221:12
244:3 313:15
325:19 338:2
**specifically**
12:15 14:10 21:16
21:22 39:8 40:5
58:24,25 79:14

83:3 93:20,22
94:18,25 95:18
96:1 98:1 100:13
120:9 137:8 139:8
139:23 142:11,15
161:9 184:21
200:9 202:16
206:25 219:14
228:13 243:3
259:17 262:8
264:4 265:21
276:13 295:20
296:10,21 299:17
300:3 303:16
308:22 309:6
310:14 313:3,16
320:21 321:8
323:2,24
**specificity**
305:5
**specify**
247:15
**specimens**
349:15
**speculate**
91:2
**speculating**
19:2 252:14 254:1
**spend**
51:13 56:1,25
192:8
**spending**
125:20
**spent**
50:12,14 53:6,8,16
56:9,12 125:2,13
126:1
**spilled**
262:10
**spirit**
19:10
**spoke**
41:10 141:4
**spoken**
135:4,8,16 136:3,9
233:1 251:23

**spring**
10:16 144:21
**squamous**
204:18
**St**
5:21
**stable**
227:7
**staff**
138:5 257:12
**stage**
124:21
**stages**
171:20 281:6
**stand**
83:19,24
**standard**
15:15 37:11,12
38:14 131:2
**standardized**
180:6
**start**
14:13 17:2 25:1
57:5 62:21 71:12
101:22,22 105:13
134:17 168:17
171:21 186:25
286:20 296:25
**started**
10:1 72:17,22
92:23 124:4,17
134:20 190:5
201:22 284:8,9
295:2 314:3,11
**starting**
121:8 124:10
125:21 129:5
170:4
**starts**
128:17 206:14
296:6 321:11
337:16,17,18,20
**state**
109:6 113:4,17
130:22 131:4
165:16 237:3

268:15 301:5
327:12 354:3
**stated**
182:20 196:8
212:19
**statement**
52:1 137:12 152:19
183:5 202:23
205:17 248:17
249:12,14 268:24
269:21 271:5
321:21 336:13,22
341:5
**statements**
19:4 21:19 25:9
203:2 333:13
**states**
1:1 9:11 86:1 109:4
202:5 220:4,5
**statistical**
30:3 37:9,24 71:15
71:17 72:12,16
76:1,7,13 77:19
79:11 171:17
198:10,21 205:5
207:6,8 239:12
245:9,16 268:9,12
268:25 269:7,16
269:16 298:23
327:22
**statistically**
67:4 207:8 268:5
273:1 297:17
301:10 305:13,24
328:23 330:1
**statistics**
38:5 106:2 244:11
**status**
8:11 175:15 177:8
227:7 317:23
318:16 319:9
325:11
**stay**
290:1
**Steering**
6:13

**stenographic**
9:16
**stenographically**
353:9
**step**
25:21 38:6
**steps**
29:25 258:21
**stickers**
15:3 285:5
**sticky**
68:6,8
**stock**
281:19
**stomach**
318:10 329:24
**stop**
67:18 189:5 290:13
298:7 311:22
**Straif**
139:11
**straight**
80:22
**straightforward**
77:8
**strand**
86:3
**strands**
270:21
**strategy**
66:1 186:14 197:6
197:15,15
**stratified**
162:15
**Street**
3:6 4:5,13 5:6,20
**strength**
75:20 102:25
146:21 147:3
173:22 207:23
245:3 261:15
305:4 313:11
327:14
**strengths**
165:9 179:5,9
321:13

Jack Siemiatycki, Ph.D.

**stress**
143:12 314:10
**strictly**
38:5 114:21 222:1
238:2
**strikes**
229:13,16
**strong**
146:22,22 147:9,15
147:21,22 148:13
148:14,16,18
149:7 174:7,14
176:22 178:5
204:3 207:18
311:10 319:10
**stronger**
174:14,15 176:9,19
176:20
**strongly**
207:18 318:18
**structure**
226:16
**student**
79:2,7 82:1
**students**
36:19 134:4,8,9,15
134:22 135:7
284:9
**student's**
79:3
**studied**
126:23 162:2
318:24
**studies**
6:22,24 23:7,8 24:4
24:5 27:1,7 28:14
28:22,24 29:3,5,9
30:24 32:16,21
34:11,20 35:3,9
37:10 38:3,4 39:6
39:8 42:18,23
44:10,17 45:5
46:3 64:12,13,15
65:2,6 66:3,4,5,6
66:14,23 67:6,8
67:12 74:3 76:14

77:22 78:6 79:24
79:24 80:7 82:24
93:1 97:12 98:4
102:13 106:5
107:5 118:17
119:1 121:8 125:8
132:23 142:23,23
146:6,17 156:23
158:3,8 159:11,12
159:12,18 160:10
162:20 163:19,22
170:18 171:3,12
171:13 173:23
179:15 180:13
181:12,14 184:5
184:11,21,22
185:2,16 186:9,10
186:17,23,24
187:1,6,10,19
188:6 192:1 197:2
197:22 198:5,5
199:5,12 200:9
202:10 203:9,10
205:18,19,22
208:3,7,15 209:8
209:14,17,23
222:20,24 223:14
224:4,7 225:13
227:17 228:15,21
228:24 237:17,22
238:12 239:6
240:1,16,21 241:2
242:5 245:7,13,21
266:11,14 271:18
271:21,23 272:3,8
273:22 301:9
310:15 311:19
319:21 329:9
333:9,11 345:11
**study**
27:8,12,16,20 28:4
28:25 29:14 33:17
33:22,24,24 34:3
38:12,16 41:23
65:1 66:9 78:5
80:8 98:15 99:19

107:10 118:17
123:2,3,5 124:8
124:11,15 125:3
125:14,18,18
126:4,10 149:18
161:18,21,24
167:18,19,25
168:8,16 170:8
171:4 175:6 180:7
180:11,19,23,24
180:24 184:10,12
184:15 185:18
189:1 190:2,7
195:2 196:9 197:4
198:14 200:22,24
201:17 208:8
209:15,21 210:12
211:6 213:6
214:16 222:16
224:12,13 225:7
225:10,11,22
226:3,5,12 227:9
227:21,24 228:16
228:17,22 237:18
237:23 248:15,20
266:16,17 271:8
272:7 280:1,3
283:15,16,19,21
283:22,23 286:23
287:2,3,13 292:7
292:13,14 294:3,6
298:10 304:14
310:14 317:18
318:8 328:19
340:3 345:18,22
349:14
**studying**
126:25 181:8
263:10
**stuff**
74:13 308:10
**stumbling**
159:1
**subdivided**
152:21
**subgroup**

314:5
**subgroups**
152:22
**subject**
51:7 107:6 354:8
**subjective**
310:23
**subjects**
27:25 105:8 211:5
211:8 213:14,18
213:19 318:14
**submission**
259:23 260:3
277:21 325:25
**submit**
139:6 142:7 193:25
259:13,18,20
260:6
**submitted**
13:18 16:1 110:8
112:15 138:20,25
175:19 233:7
260:14 324:2
325:10,22
**submitting**
326:20
**subscribe**
132:5
**subscribed**
353:14 356:14
**subsequent**
141:14 237:5
238:10
**subsequently**
136:17 147:19,23
231:13
**subset**
211:7
**substance**
356:7
**substantially**
165:19
**substantive**
136:7
**substituted**
213:17

**substitutes**
314:17
**subtitle**
316:21
**subtly**
167:17
**subtopic**
34:7
**subtype**
205:1
**subtypes**
204:6 297:8
**sufficient**
144:1,13 150:17
151:13 152:12
153:4,12 154:22
155:10 199:6
277:1,9 282:13
**sufficiently**
31:20 74:21 179:17
179:19
**suggest**
45:16 220:1 250:4
260:14 298:4
305:23 345:11
**suggested**
139:5
**suggesting**
253:24 349:13
**suggestion**
70:24
**suggestions**
138:2
**suggestive**
249:17,20 250:3
283:1 288:2
**suggests**
202:6 206:19
305:12
**Suite**
3:12 4:6 5:13,20
**summarize**
77:2 104:3 113:13
307:14
**summarized**
27:7 333:8,10,11

Case 3:16-md-02738-MAS-RLS   Document 9737-16   Filed 05/07/19   Page 439 of 449 PageID: 40763
Jack Siemiatycki, Ph.D.

Page 404

summarizes
101:21
summarizing
37:9
summary
243:18
summer
10:16 12:11 139:20
139:21 141:5,25
summer/fall
13:16
sun
288:3
Sunday
209:20
supervision
353:25
supplemental
231:20 235:3,10
supplied
61:2
support
19:4 34:20 55:7
85:17 151:11
152:10 179:17
183:12 220:18
221:23 243:10
265:22 267:6
272:22 316:22
318:3
supported
207:18
supporting
259:20 311:18
supportive
35:3,10 155:7
267:7
supports
115:8 132:15 195:3
196:9,12 222:16
suppose
252:24
supposition
271:17
sure
14:8 15:13 16:16

18:2,7,12 23:16
23:17 30:17 33:8
36:11 40:10 41:8
41:8 44:24 48:7
52:5,10 54:3
56:22 58:16 60:9
62:6 64:21 66:18
68:22 72:15,23
79:13 81:4,4,24
85:11,14 86:5
88:17 90:3 91:16
94:4,23 98:12
101:10 106:11,13
107:12 108:20
109:9,12 116:4
117:11 132:15
141:10 146:11
148:22 155:20
168:2 169:7
178:24 182:16
187:23,24 199:3
203:5 208:19
210:25 211:13,16
212:10,25 215:19
223:17 237:25
239:9 241:3
242:10 246:10
255:11 256:1
259:19 261:14
275:4 276:19
279:5 300:10,12
303:5 304:7
308:16 317:8
321:1 344:2
347:21
Surgeon
133:3,20
surgery
65:22 340:8
surprised
232:12
surprising
236:24
surrounding
213:8 241:11
survey

85:22 129:6 132:2
132:7
survivors
284:15
susceptibility
172:23
susceptible
129:11 173:7
suspect
35:23,25
suspected
162:2
suspicious
209:21
Swan
274:22
swear
9:17
Sweden
85:23
sweep
91:15
swell
129:5
switching
108:17 242:12
sworn
9:19 353:6 356:14
symptoms
171:20
synonym
32:20 130:3
synonymous
315:20
synthesis
25:17
synthesize
24:7,24 25:3 67:11
synthesized
25:20
synthesizing
25:9 134:20
system
26:25 28:10 30:9
30:19 31:11 45:24
82:12 145:3 251:3

systematic
29:6 230:5
systematically
73:11
systemic
159:21
systems
28:8 311:20
S-T-R-A-I-F
139:11

─────────
**T**
─────────
T
6:1,1,7 7:1 8:1 20:8
355:2
tab
14:18,22 58:1,4
109:16 110:1,2
192:23,25 193:1,3
193:4,14 195:20
212:2 224:18
234:9 236:2,4
247:23 254:14,17
267:25 342:20
table
15:3 17:8 62:3,14
83:4 93:16 95:14
106:20 112:7,7
165:18 189:16
198:12 199:17
200:14 214:11,18
229:16,16,20
244:25 266:23
308:22 309:6
315:19
tables
77:10 185:19
223:13 231:21
235:3,10
Taher
41:23 42:6 50:22
51:25 84:3 230:4
230:9,14,17,24,24
231:14,17,19,24
232:24 233:5,10
233:17,24 234:2

235:2 236:11,19
237:1,3,13 238:25
239:4,22 240:12
240:24 241:7,12
241:15 243:1,6,9
243:16,18 244:22
245:6,25 247:3
248:24 250:18,18
251:7 252:15
253:10 275:12
291:19,23 292:13
292:17,22 293:19
294:2 299:24
305:22 323:3,12
323:21 324:25
326:8
take
11:13,21 12:13
51:23 52:15 65:19
97:9 101:16
105:11 107:9
128:22 132:20
135:25 140:10
145:18 150:14
154:1 169:7
187:13 191:20
193:7,8 194:13
199:23 203:3
209:22,23 210:1
225:14 229:10
242:9 261:13
322:13 338:22
taken
40:11 59:9 79:13
93:9 94:17 172:17
201:4 224:7,8,8
258:22 298:3
302:11 329:5
353:4
takes
42:2 150:10 171:10
talc
10:8,21 12:18
13:11,15 20:3
24:15 33:12 43:9
43:13 53:9 54:7

Jack Siemiatycki, Ph.D.

| | | | | |
|---|---|---|---|---|
| 54:15,19 55:1,15 | 272:12 273:3 | 315:13 316:25 | 68:23 | 157:16 172:5 |
| 55:22 57:4,13,18 | 274:18 275:8,13 | 317:4 324:12 | **technically** | **terminology** |
| 59:1,4 74:25 75:9 | 275:19 276:3 | 325:3 338:4,21 | 87:18 137:11 | 146:20 147:3 148:4 |
| 76:25 83:4,8 | 282:12,17 283:4 | 339:1 351:11 | **Tecum** | 151:20 244:19 |
| 84:19 88:11 89:25 | 283:19 284:4,22 | **talc/ovarian** | 6:12,17 | **terms** |
| 90:24 92:20,21 | 287:22 288:5,15 | 134:14 276:15 | **Telephonically** | 49:25 51:6 53:21 |
| 97:18,23 118:1 | 288:21 301:12,17 | 277:16 | 5:4 | 121:11 147:15 |
| 120:19 122:8,19 | 302:9 303:17 | **talk** | **tell** | 151:19 191:24 |
| 123:17,23,25,25 | 305:15 306:1 | 25:10 36:19 84:3 | 18:6 19:13 45:4,14 | 205:2 247:12 |
| 124:22 126:6,7 | 312:7 314:12,16 | 131:1 163:18 | 88:16 92:16 | 266:18 268:11 |
| 128:4,25 129:18 | 314:17 327:6 | 164:7 221:10 | 100:16 141:15 | **terra** |
| 131:8,15,22 | 330:10,20 331:7 | 310:12 326:22 | 161:2 175:5 | 351:6 |
| 132:11 133:23 | 331:11,13 335:9 | **talked** | 286:10 290:7 | **Terry** |
| 134:11,23 135:19 | 339:10 340:7,23 | 169:21 183:19 | 307:17 310:4 | 63:10,12,13,16 |
| 136:16,25 137:8,9 | 341:9,12,23,24 | 282:16 286:24 | 313:6 320:11 | 111:12,13,21 |
| 137:13,17,22 | 343:18,20,23,24 | **talking** | 340:22 | 123:2,5 142:25 |
| 138:22 139:2 | 344:10,12 345:12 | 36:18 51:2 64:12 | **tells** | 197:8,9,21 198:2 |
| 140:5 141:13,17 | 345:13 346:12 | 74:8 85:24 86:1 | 25:25 | 201:14,15,16 |
| 141:21 142:1,12 | 347:9 349:21 | 115:21 141:12 | **template** | 238:22,23 239:1,6 |
| 144:6,19 146:8 | 350:22 351:14 | 172:2 240:14,15 | 151:18 154:2,3 | 239:24 266:10,17 |
| 148:6 150:6 151:2 | **talcum** | 240:17 287:8 | **temporality** | 267:10,24 268:3 |
| 151:3,11 152:11 | 1:6 6:20 7:13,16 | **tangentially** | 305:6 | 268:15 269:8 |
| 153:10 155:1 | 9:10 57:22 58:6 | 258:4 | **ten** | 270:15 271:7,17 |
| 157:14 158:8 | 58:23 69:14 74:15 | **tape** | 11:20 51:3 56:11 | 271:19,22 272:16 |
| 160:3 162:11,11 | 78:10 92:10,14 | 320:11 | 125:7 129:15 | 272:21 294:12,13 |
| 163:1 164:5 165:4 | 95:25 96:3,18 | **target** | 147:6,6,13,20 | 294:15,16,17,20 |
| 166:3 168:10,14 | 97:15 98:9 101:14 | 181:11 | 148:10 266:11 | 295:1,7 296:12 |
| 168:21 169:25 | 102:1,8,14,17 | **tasks** | 271:21 272:3 | 299:9 |
| 176:2,10 178:12 | 103:2,15,23 113:8 | 55:4,7 | 279:2 | **tertiary** |
| 189:8,12,17 190:9 | 113:14 115:2,4,10 | **teach** | **tenable** | 284:17 |
| 190:16,22 192:3 | 115:23,24 116:8 | 134:9,10,11,12 | 148:14 | **test** |
| 193:17 204:5,5 | 116:10,11,25 | 179:1,4 | **tend** | 268:25 269:7 298:5 |
| 213:9,11 215:15 | 118:6,7 119:3,6 | **teaching** | 44:12 52:11 65:15 | 299:13,13 311:20 |
| 216:18 218:4 | 119:11,12 120:20 | 134:17 | 85:3 123:6 162:3 | **tested** |
| 225:19 226:11 | 120:23 121:14 | **team** | 250:2 | 160:9 |
| 227:8 229:5,18,19 | 126:14 127:8,21 | 12:3 81:13 97:13 | **tendency** | **testified** |
| 230:6,21 232:19 | 134:6 135:1,5 | 189:2 197:10 | 207:11 298:21 | 9:20 42:21 44:5 |
| 232:22 237:9 | 141:8 170:12 | **teams** | **tenuous** | 59:16,22 60:12 |
| 243:12 247:7 | 172:12 176:11 | 266:12 | 117:22 | 241:10 246:19 |
| 248:10 250:10,19 | 205:8 216:10 | **team's** | **ten-hour** | 292:25 |
| 251:8 253:12 | 217:7 218:15 | 45:23 | 11:21 | **testify** |
| 258:13 259:21 | 259:24 260:13 | **tease** | **term** | 69:6 |
| 260:15 261:2 | 291:4,11 301:18 | 30:23 | 92:5 147:2 149:11 | **testifying** |
| 262:6 263:19,20 | 302:23 307:10 | **technical** | 244:23 246:11 | 10:10 164:17,21 |
| 264:6 267:8,10,21 | 312:8,15 313:19 | 157:20 | 252:16 253:16,19 | 313:17 |
| 268:7 271:12 | 314:13,21 315:4 | **technicality** | **terminological** | **testimonies** |

332:21 333:3
**testimony**
104:10 125:5
  133:12,16 153:15
  208:1 220:16
  241:19 244:16
  246:5,5 250:12
  265:6 269:13
  275:6 330:25
  335:13 344:17,21
  346:14 353:7
**tests**
311:21
**Texas**
5:14
**text**
70:16 71:15,22
  87:17 93:17,17
  189:15,16 207:12
  311:23
**textbook**
20:5 24:19 36:9
  67:16 244:11
**textbooks**
19:9 36:9
**texts**
19:8
**thank**
10:5 11:7 20:13
  48:9,14 78:14
  145:19 157:24
  178:3 191:21
  192:22 193:9,11
  199:25 203:25
  210:2,15 212:4,5
  225:23 236:3,8
  246:25 275:2
  285:16,24 289:24
  291:17 299:14
  300:14 306:6
  307:22 309:2
  312:4 320:6,17
  322:1,9 336:8,20
  346:4 347:19
  351:24,25
**Thanks**

282:6
**theirs**
77:16 197:10
  200:15,20 201:19
  237:20,21
**theoretical**
158:20
**theoretically**
158:9
**theories**
316:17 317:2
**theory**
316:9 335:22,23
**thereof**
93:15 353:11,14
**thesis**
114:23 115:8
  129:15 346:22
**thick**
42:23 43:16
**thing**
28:21 31:9 38:4
  81:18 86:16 97:16
  107:7 114:4
  124:12 136:7
  140:5 151:21
  157:16 158:21
  166:9,21 179:25
  181:3 186:12
  191:3 196:24,25
  204:12 223:3,25
  229:13,15 235:16
  235:18 239:15
  252:6 307:14
  309:10 325:6,16
  348:19
**things**
12:24 19:11 28:2
  39:13 40:11,12
  44:15 45:24 52:11
  65:17 70:7,20
  72:11,19,20 73:12
  74:6 81:14 83:3
  83:11,13,23 91:15
  96:24 138:10
  140:2,8 144:4

147:18 158:16
160:1,22 162:2
166:1 170:4 173:1
183:20 185:8,12
188:20 195:25
241:24 266:5
271:4 273:18
283:18 314:18
**think**
17:6 23:4 26:17
  27:6,9 28:13,20
  30:20 32:19,20
  36:12 37:23 41:25
  43:5,18 46:24
  50:20,23 53:16,25
  62:15 66:16 71:23
  71:25 74:5,7 76:2
  76:11,21 77:6,13
  77:16 84:24 85:1
  86:2 89:5,14,14
  91:8 94:1,15 95:1
  95:8,25 96:10
  97:1,25 98:20
  101:21 104:19
  105:17,18 106:1
  106:22 107:23
  108:1 109:7,12
  112:13 113:23
  114:8,12 117:13
  118:3,11 122:3,11
  122:12 123:3,13
  124:17 128:21
  129:2,4,13 130:12
  132:14 135:14,20
  136:1,7,22 137:23
  139:20,25 140:5
  141:19 142:5,15
  142:18 143:17,25
  144:21 145:18
  150:17,22 154:13
  155:18,19 159:4
  161:14,25 169:4
  169:16 174:6,17
  175:20 177:13
  183:10,25 186:8
  187:4,12,13 189:3

189:7 195:5
197:10,20,24
199:14 200:25
204:3,7,11 206:2
206:16 207:17
209:25 211:19
212:3 217:11
218:21 221:18
224:16 227:16
229:25 230:16,22
231:4,18 234:10
244:10 247:13,24
249:12,15 250:1,4
251:13,24 253:1
254:5,18 256:19
256:20 260:4,8,20
270:13 272:5,8
276:5 281:18
289:13,20 291:9
292:2 299:4 303:2
306:10 308:11
312:23 317:1,8
321:3 322:12
332:9 337:5 340:1
342:4 343:2
348:24 351:18
**thinking**
63:12 75:17 108:18
  128:10 142:9
  169:8,10 175:25
**third**
20:13 27:13 105:19
  111:20 170:21
  266:19,19 286:21
  297:13 300:24
  346:4
**thirty**
354:12
**thought**
18:25 21:10 40:23
  42:21 62:13 63:15
  67:14 70:12 72:18
  90:4,6 94:24
  105:22 186:12,15
  195:9,10 208:12
  231:4 241:20

246:9 290:15
308:5 325:5 349:6
**thousands**
40:22 160:15
**thread**
37:14 152:3
**three**
11:12 18:15 39:20
  39:23 40:2,2,12
  40:14 42:11
  106:21 111:2
  126:2 134:21
  135:25 247:1,7
  251:6 253:9
  295:17 318:12
  319:3
**threshold**
122:2,7
**thrown**
109:6
**throws**
108:6
**thumb**
18:19 62:18 109:15
**THURSDAY**
1:19
**tick**
112:16,18,18,20
**tied**
120:10
**tilted**
340:12
**time**
9:7 12:24 13:12
  15:16 18:2,7
  45:18 49:5,8,13
  49:18,20,22 50:1
  50:11,14,16 51:10
  51:13 52:15,17
  53:7,18,19 55:25
  56:3,8,12,23 57:9
  57:10 60:25 71:25
  72:15 74:6 83:22
  104:14 105:11
  106:12 110:25
  111:13 112:1,23

Jack Siemiatycki, Ph.D.

118:8,13,20
119:12 120:11
125:13 126:2
127:22 138:11
139:5 141:10
142:10,12 145:16
166:2 187:3,14
192:1,8 198:18
207:22 209:1,3
216:19 218:10
224:23 226:25
241:23,25 242:9
259:7 270:3 274:5
289:17 314:16
320:10 333:4
336:6 353:5,6,8
**timely**
143:18
**times**
118:22 120:16
139:17 147:7
295:17
**TINSLEY**
5:18
**Tisi**
3:4 11:3 48:10,14
104:16 109:21
111:7 178:17
194:8,11,15
234:15,18,23
235:7,16 242:12
254:22,24 255:3,5
262:10 280:14
288:23 290:11,15
300:11 307:25
308:9,17,24
**tissue**
341:24 342:17
349:15 351:12
**tissues**
349:22
**title**
100:25
**titled**
87:9 193:17
**titles**

170:3
**today**
10:2,7 12:9 13:2
16:23 17:4 18:1
18:14 21:14 36:10
37:5 39:20 44:7
44:21 46:10 50:17
51:13 56:4 61:18
69:1,5 90:19
91:17 103:19
110:13 116:1,13
116:16,22 118:9
120:7 123:8
143:19 149:11
153:8 155:1
175:23 194:1
198:20 203:20
204:3 220:8
244:12 263:2,6,16
264:21,22 307:9
335:13
**today's**
9:6 50:12,15
**Todd**
1:25 2:12 9:1
353:18
**told**
11:20 141:10,11
275:16 325:21
**top**
182:20 214:5
329:18 337:21
339:24 340:11
345:6
**topic**
13:14 24:9 33:25
34:18 36:23 73:21
124:6 158:25
225:8 287:1 314:1
318:6
**topics**
7:24 74:18 80:6
126:18 163:20
286:9
**total**
54:11 55:14,18

125:2
**totality**
113:6 131:5 154:5
301:17 302:1
303:8
**toxicologic**
303:12
**toxicologists**
303:3 314:5
**toxicology**
74:15,20 75:8
163:21 164:19
**trace**
350:6,21
**traffic**
65:16
**train**
73:3
**trained**
185:11
**training**
331:16
**transcribed**
353:10
**transcript**
6:8 7:2 8:2 33:3
93:18 95:13,14
328:5 353:10,12
353:22 354:13,14
**transcription**
356:4
**transcripts**
93:8,11,14,21,23
94:2,20
**translation**
112:17
**treat**
210:12
**treated**
65:17
**trend**
191:24 192:17
202:18 206:24
207:15,19,21,24
208:17,21 268:10
268:16,25 269:7

270:6,16 295:9
298:1,3,5,14
336:18,18
**trendline**
207:9
**trends**
122:24 266:24
**trial**
59:16,22 60:12,12
68:15 69:6 88:10
246:4,20 333:3,22
**trials**
38:10 180:3,5
**tricky**
184:13
**tried**
24:7 29:8 50:23
**trivial**
125:10
**true**
114:24 119:19
177:4 180:11
183:18 249:7
327:13,25 331:10
353:10
**truth**
168:18
**try**
29:16 37:16 41:4
127:19 167:6,19
181:10 254:12,12
290:24,25 314:15
**trying**
35:8 41:17 71:25
76:11 102:20
121:24 129:23
140:15,18 155:18
182:7 272:16
281:17,21 291:9
332:14
**tubal**
287:20
**tubes**
339:4 341:1
**TUCKER**
5:19

**turn**
57:25 86:20,23
112:24 113:1
163:5 214:11
236:25 254:14
280:20 286:15
299:9 329:17
**turned**
147:23 257:8
**two**
11:2,23 13:19
14:16 22:24 48:17
49:11 50:4,18
53:1,16 56:20
57:11 59:12 72:10
73:5 76:22 93:18
102:18 105:18
106:21 114:16
125:19 134:19,21
134:21 147:14
160:21 166:18
171:6,10 173:1,1
186:20 187:14
189:24 190:14,24
197:25 210:18,25
213:6,8 217:5
219:5,19 220:20
220:25 221:10,16
224:22 229:18
238:3 241:24
251:3 256:14,15
268:8 272:7
273:17 274:21
302:10 313:5
323:13,17 327:20
332:22 334:25
337:9 338:21
339:21 340:13
341:21 350:5
**two-by-two**
106:20
**two-way**
323:14,15
**type**
26:24 34:6 38:20
51:19 72:24 73:4

117:15 119:11,13
128:9 157:19
167:3 202:10
203:8,11 204:11
205:8 228:11
260:20 261:22
302:19
**typed**
44:8
**types**
19:2 23:8 24:6
54:14 65:2 75:16
92:20 115:10,14
115:16 179:6,10
180:2 203:19,19
204:8,9,15,19
205:1 318:13
**typical**
154:3
**typically**
28:14,16 52:5
76:21 82:1 90:10
91:13 99:1 157:16
158:16
**typo**
63:3 223:25
**typos**
18:4 83:21

**U**

**Uh-huh**
279:16
**ulterior**
325:19
**ultimate**
32:2 35:19
**ultimately**
78:8 258:8
**umpteen**
227:21 246:13
**unadjusted**
319:2
**unclear**
283:2
**undergo**
340:8

**underlined**
44:15 52:7
**underlying**
27:1 223:14 271:18
271:21 312:7
**underpin**
292:3
**undersigned**
353:2
**understand**
15:18 26:15 31:22
31:25 46:14 61:17
85:12 95:23 96:7
102:20 115:7
116:4,19 117:11
130:1,4 140:11
143:6 151:24
198:13 205:20
266:23 267:2
276:20 322:4
328:7 333:25
338:17 348:4
**understandable**
31:19,21
**understanding**
10:9 22:13 24:14
32:10 33:5 34:14
34:16 94:16 96:16
96:23 114:11,19
131:19 151:25
155:16 185:20
220:15 239:18
244:3 261:7
291:22 292:20
293:11 338:12
**understood**
172:21
**unexposed**
76:21 225:17 269:1
269:8,24 270:3,5
270:23 271:3
**unfortunately**
289:17
**unilaterally**
326:4
**uninterested**

242:2
**unique**
38:7 39:5
**United**
1:1 9:11 86:1 109:4
220:4
**universal**
86:5
**University**
279:11,14,19
**unknown**
172:9 173:12,20
178:13 319:19,23
**unpack**
29:16
**unusually**
146:9,10,11
**updated**
190:9
**updating**
73:19 74:1
**up-to-date**
84:25 85:1 142:14
189:23
**usable**
28:5 30:11,20
**usage**
76:25
**use**
6:20 7:13,16 23:1
23:24 24:15 25:2
30:14,18 34:19
38:18 58:23 59:1
62:9 72:1 77:4
83:4,8 89:25
90:12,24 113:8,14
113:24 115:1
118:6 120:19
121:11 122:7
126:6,14 127:7,21
128:3,25 129:18
134:6,25 135:5,19
136:25 137:9
141:17 144:6,19
147:15 149:10
150:5 151:11,24

152:11 153:10
155:1 157:14
158:8 161:18,20
161:23 162:25
164:5 165:4
166:20,20 169:25
171:21 172:12
176:10,11 179:15
179:16 185:22
191:11 192:2,3
193:17 202:6
204:6 213:14
214:24 215:2,4,14
215:21 216:10
217:7 218:4
221:15 224:22
225:3 230:6
243:12 244:22
246:17 248:10
249:17 250:2,9
251:8,12 252:24
253:12,16,18
259:21 267:22
268:1,6 271:3,12
272:12 273:3
287:20 288:5,5,15
291:4,11 296:15
297:7 298:1,6,6
301:18 302:23
311:25 312:8
313:19 315:5,13
315:22 316:24,24
327:6 329:7
330:10,20 331:6
331:12 335:9
336:17 341:3
345:12
**useful**
18:25 28:5 30:11
30:20 76:18
181:17 261:20
**users**
119:3,15 268:16
295:3,8 298:2,13
**uses**
145:4

**USNCI**
26:6
**usually**
99:6 181:18
**uterus**
340:25
**utterly**
38:7
**U.S**
279:22

**V**

**v**
3:4 89:20 91:20
**vacation**
257:17
**vagina**
340:25 344:10
**vaginal**
339:3,25 340:12
**vague**
69:23 148:19
219:14
**valid**
13:5 27:4,5 28:11
28:17 29:20 30:20
31:5 35:5,22 67:5
**validity**
37:24 213:10
303:12 310:18
**valuable**
184:6,6
**value**
31:7 184:3 227:17
245:10
**values**
298:20
**variability**
82:24 180:13
204:16,20 207:6
311:7
**variable**
56:15 57:6 156:8
156:17 158:11
172:8 173:20
176:7 178:6 229:6

297:6 327:3
**variables**
229:18
**variations**
223:2
**varies**
180:23
**variety**
163:20
**various**
6:22 26:25 79:18
92:7 97:1 101:17
102:13 105:8
115:15 124:9
142:23,24 143:7
165:17,22 169:19
197:8 229:17
235:18 262:20
278:25 304:25
305:9 314:7
321:14 332:15
333:2,4,9 334:16
**vault**
339:25 340:12
**veers**
68:18
**Venter**
339:4,10,16,22
340:22 341:8
346:1 347:1
**verbal**
293:6
**verbatim**
218:7
**verdict**
90:2
**verification**
223:6
**verify**
63:19 79:16
**version**
62:8 76:4 108:13
111:17 112:3,13
145:11,12 190:9
195:10,11,14,24
197:17 266:21

325:23,23 337:11
337:11
**versions**
73:7,12 107:23
**versus**
38:19 64:14 66:22
77:3 314:16
**video**
9:8
**videographer**
5:25 9:3,5 52:18,21
67:23 68:1 104:23
105:2 140:22
141:1 145:20,23
155:21 174:21
210:3,6 242:18,21
255:12,15 257:1,4
265:14,17 274:8
274:11 289:22
290:13 320:7,9,12
320:15 322:15,18
336:1,4 343:10,13
344:8 352:1
**Videotaped**
1:16 6:10,15
**view**
21:14 66:19 114:22
122:18,22 128:3
132:5 134:5
142:21 143:2,3,5
196:13 197:18
198:6 207:6
225:11 226:17
227:11 245:17
250:9 252:4,5
282:13 298:24
316:6,11
**viewed**
93:7
**views**
22:4 244:4 246:17
**Virginia**
3:13
**visceral**
162:5
**vis-à-vis**

143:2
**vitamin**
288:3
**vivo**
302:3
**void**
353:13
**volition**
87:11
**voluminous**
64:5,8 86:12

---

## W

**wait**
222:7 282:2,2
289:12 338:15
342:18 347:17,17
347:17,17
**walk**
61:22 64:4
**walked**
134:15
**want**
14:25 15:1 17:12
21:16 33:6 34:11
41:7 45:3 50:25
64:18 70:7 109:10
110:22 127:12
148:22 161:1
163:2 167:19
176:18 178:17
181:1,9,10 182:9
182:19 189:5
192:8 194:16
195:19 199:18
203:3 211:20
223:17 224:25
234:15 238:2
245:20 270:12,20
273:9,15 275:4
300:13 325:9
326:22 327:8
328:13 342:13
346:20
**wanted**
22:1 39:25 52:12

70:10,19 81:25
87:21 124:7 164:7
187:25 195:24
212:21 213:3
312:2 318:19
325:11,22
**ward**
65:9
**Washington**
5:7
**wasn't**
45:6 51:1 59:5
191:2,2 200:15
258:10 308:9
325:13 326:1
349:4
**way**
24:24 26:21 27:21
27:22,24 28:14,17
34:21 38:11 44:19
45:10 58:18 60:15
62:7 65:5,11 72:7
72:19 73:8 75:19
80:16 81:24 83:24
91:22 92:2 107:3
114:9,10 115:17
118:12 121:13
128:6 130:13
138:12 140:5
156:7 158:17
159:8,17 166:11
172:4 183:16,17
188:1,2 195:6
204:13,14 232:15
247:20 250:4,8
251:1 264:13
265:2 267:18
277:22 296:7
303:22 326:19
337:19,20 350:21
**ways**
24:14 36:24 70:11
79:18 103:15
128:11 196:12
227:22 246:13,13
268:8 281:13

282:23
**weak**
146:21,25 147:16
148:18 149:7
207:15 226:13,16
**weaken**
181:3
**weakness**
179:12 227:8
321:14 349:18
**weaknesses**
72:19 165:9 179:9
179:10,13 183:21
183:22 184:1
**web**
280:16 286:8
**website**
7:22,23 280:17,18
286:7,8,11 288:13
288:14,19 289:7
**websites**
43:8,12
**week**
13:19
**weeks**
11:12 51:2 53:15
53:16
**weigh**
25:6 99:24 209:10
**weighing**
25:11 304:9
**weight**
25:5,15 26:15,20
31:25 32:6,6 43:3
43:4 99:19 197:19
267:2 320:22
321:22
**weighted**
165:10
**welcome**
267:25
**went**
12:20 13:19 29:8
187:19 240:16
257:16
**we'll**

Jack Siemiatycki, Ph.D.

48:12,12 62:21
84:3 105:11
140:14,20 157:12
191:20 199:23
294:13 309:11
**we're**
9:3 51:1 52:23
62:15 67:23 68:1
74:8 99:7 104:24
105:4 109:12
115:21 121:8
131:19 139:14
140:23 141:1
145:25 157:21
210:3,8 223:3
242:18 255:12,15
265:14,17 289:13
289:20 308:16,17
317:9 320:15
322:15 336:4
343:10 344:8
**we've**
52:14 94:8 104:16
108:1 111:2
170:20 171:14
238:7 263:5
276:23,23 277:7
287:8
**whatsoever**
275:7,11
**Whew**
53:15
**whoops**
142:3
**who've**
324:5 351:13
**wide**
161:10,10
**wider**
65:15
**widespread**
218:14,23
**willing**
238:3
**wine**
161:3

**wish**
17:12
**witness**
2:15 9:17 10:14
11:5,7 17:9 18:22
19:7,9 20:12
22:10,23 23:16
29:23 32:5 34:2
35:7,25 39:11
45:19,22 47:19
48:15 52:17 53:11
54:2,11,18 55:3
60:8 62:17,19
69:14 71:2,9,14
73:10 75:14 78:16
80:21 84:22 85:11
85:21 89:13 90:15
91:1 94:23 95:21
96:9 98:25 99:5
101:1 102:5 104:2
104:11 109:10
111:5,10,17 112:6
116:4,15 117:7
118:3 119:9,19
120:14 121:20
122:11 123:11
125:6,16 129:22
130:8 132:1,14
133:13,17 137:3
141:7 150:9 151:7
151:16 153:16
154:17 155:23
156:12 161:13
165:14 167:16
172:25 173:3
174:22 175:1,3
176:17,24 178:10
178:20 185:7
188:19 192:6
193:1,9,11 194:17
199:1,19 200:13
203:1,23 205:4
206:16 208:2
212:5 213:25
218:21 220:25
222:9 223:9,23

224:24 225:1,10
225:24 231:9,12
234:12 235:9,17
235:22 236:6
239:8 240:6,14
241:1,20 244:17
246:22 247:10
248:18 249:24
250:14 251:12
252:20 253:18
254:4,12 255:1,4
255:8 256:21
258:18,25 260:23
261:4 262:1 263:8
263:22,25 264:13
265:7 266:7
267:14 269:12,14
271:16 272:15
273:7 276:19
277:5,12 278:4
279:5 281:17
282:7 283:8 284:7
284:25 285:7,10
288:18,24 289:14
290:6,9 292:2,11
293:15 302:7
303:1 304:3,17
307:13 308:7
309:19 310:6
312:19 314:3,25
315:9 322:2,6
325:2 326:18
328:7 330:15
331:1,15 332:2
334:12 335:2,14
337:17 338:16
339:13 341:3,18
342:4,23 343:7
344:3,9,22 346:20
347:20 348:8,11
348:25 349:2,24
350:24 351:16
353:6,7,14 354:1
**witnesses**
94:13
**woman**

81:11 343:19
**women**
92:25 101:2 115:10
168:8,10,17,20
170:9 171:16,19
208:23,25 209:19
215:13 216:9
225:18,19 226:22
227:3,3 340:6,6,7
340:12 341:12
351:6,10,13
**women's**
226:6 227:6
**wonder**
199:6
**word**
30:12,14,18 87:3
87:12,22 111:22
112:15,18 139:3
146:11,13 147:17
149:5 179:12
187:21 210:19,24
210:25 230:21
239:18 250:3
251:13,17,25
252:25 253:2
254:9 283:4 284:4
291:10 328:11
347:20
**wording**
130:13 137:4
145:10 269:19
**words**
72:24 123:12
185:22 329:14
**work**
10:21 24:23 47:10
47:14 48:21,25
49:13,15 50:6
51:2,20 54:7,14
54:18,25 55:8,21
56:1,9,13,25
57:12 71:11 73:24
88:14 94:12 98:8
98:16 100:2,4,7
100:12 123:23,25

126:11 143:7,23
150:21,25 169:4
283:25 324:7
**worked**
124:14 126:18
193:25 278:18,24
**workers**
350:19
**working**
56:20 124:4 136:14
136:15,21 142:16
142:19 143:2,3,14
143:15,22 144:17
151:1,3 152:20
153:17,25 154:3
155:8 158:15
163:1 223:4
265:25 280:3,5
**workplace**
8:6 19:21 21:1,13
24:21 36:7 159:25
306:14 308:21
309:5
**works**
10:23 49:22
**world**
26:6 85:25
**worry**
16:9
**wouldn't**
78:12 90:16 99:13
103:13 114:24
129:11 197:13
207:16 209:24
242:7 277:1,9,24
325:5 326:18
331:8 334:12
**wrapping**
290:23
**write**
36:17 52:13 125:8
127:12 138:1
146:12 169:5
190:12 254:8
**write-up**
83:10 251:14,15

Jack Siemiatycki, Ph.D.

**writing**
13:17 84:23 206:1
**writings**
309:23
**written**
51:20 52:12 68:7
   83:22 183:15
   233:18 293:7
**wrong**
67:17 184:14 191:2
   209:18 211:4
   245:16
**wrote**
12:19 19:22 36:6
   64:19 67:2 190:11
   190:17 209:20
   231:1,4 246:12
   318:4 337:24
   338:20

**X**

**x**
1:4,13 6:7 7:1 8:1
**Xu**
79:4,6 82:4,5
**X-U**
79:4

**Y**

**yeah**
17:15 20:12,12
   24:1 33:17 41:8
   41:12,19,22 44:24
   52:13 64:3 71:23
   73:13 88:1,1 95:3
   95:10 96:9 108:25
   135:8,22 139:22
   146:20 149:10
   152:9 162:13
   164:1 173:6,18
   183:2 188:9
   192:15,15 196:7
   199:19 203:23
   206:20,20 212:22
   221:5 222:9,9
   224:19 225:25

251:21 254:25
255:8 256:21
259:15 264:2
268:23 286:14,18
291:9 294:18
299:20 308:25
320:10 323:8
324:23 326:25
334:4 336:20
339:18 345:10
349:1 350:8
**year**
56:5 73:23 81:16
   125:20,25 218:13
   286:17 339:21
**years**
19:22 22:4 45:6
   56:6,14,17,19
   57:8,11 77:11
   81:12 88:8 97:4
   124:5 125:7,19
   129:16 132:25
   134:19,21 163:15
   171:6,10 189:10
   189:24 208:22,23
   227:7 246:23
   256:15 257:17,24
   274:21 279:2
   295:18 311:23
   324:5
**Yep**
268:2 301:3
**yesterday**
11:11 63:14
**Yesterday's**
11:18
**York**
3:20,20

**Z**

**zones**
172:5

**$**

**$450**
49:8 54:13

**0**

**0.01**
228:9,18
**0.05**
268:11 269:16
**0.17**
268:17 295:9
**07932**
4:20

**1**

**1**
6:10 7:8 14:15,18
   14:22,23 15:6,11
   15:19 145:4 154:4
   154:8,15,21
   228:18 311:7
   327:23,24
**1st**
49:5
**1.0**
63:3,5 298:17,19
**1.1**
329:23
**1.15**
63:6
**1.18**
297:11 298:19
**1.2**
236:16 329:7,22
**1.22**
297:13,13 298:19
   298:19
**1.25**
63:2
**1.27**
213:22
**1.28**
150:2 213:22 234:3
   236:12
**1.3**
174:10,11,14,15
   176:9,10,19,20
   178:7 298:19
   319:22
**1.35**

149:22
**1.36**
63:6
**1.37**
236:16 297:14
**1.4**
319:2,13
**1.5**
245:10,19 329:7
**1:00**
104:18
**1:46**
105:4
**10**
7:12 45:15 56:6
   57:9,9 61:7,9,14
   61:19,25 68:10
   69:4 70:3 72:9,25
   94:9 97:4 108:18
   108:24 109:18,25
   110:2,7 111:20
   112:25 120:4
   149:16,25 163:6
   181:23 279:2
   312:24,24 319:15
   319:17
**10:55**
52:19
**100**
5:20
**10017**
3:20
**103**
200:6
**107**
108:12
**108**
87:2,4 108:12
**109**
86:8,20
**11**
7:15 108:15,17
   109:14,20,21,25
   110:2,3,12 112:5
   112:6
**11th**

3:19 233:22
**11:15**
52:23
**11:39**
67:24
**11:41**
68:2
**110**
7:18
**12**
7:19 56:7 124:5
   181:24 182:3,12
   194:5,6,24 217:2
   217:4,10 279:2
**12:42**
104:25
**128**
215:21
**13**
7:20 195:20 213:24
   214:6,7,12,15
**13th**
233:22
**134**
89:19
**135**
89:19
**136**
49:1 53:5
**14**
7:21 45:16 217:11
   267:25 278:13,14
   280:14,16 308:25
**1412**
219:3,24 221:4
**1414**
214:12
**1416**
221:7
**1436**
214:4
**15**
6:12 7:23 177:13
   177:14 212:2
   229:17 285:2,14
   286:3,4 303:16,21

Jack Siemiatycki, Ph.D.

304:18
**15th**
59:10 332:25 333:1
**1510**
5:13
**16**
6:17 7:6 8:4 13:14
87:4,9 210:14
308:23 309:1,2,2
309:4,14
**16th**
49:1 59:10
**16-2738**
1:6 9:13
**17**
6:21 8:8 13:14
96:17 97:17,22
182:19 298:3
317:10,12,21
326:23 327:2
330:6 348:24,25
**18**
47:9 50:16 192:25
308:17,17,18
**1835**
4:5
**19**
32:25 33:2
**19103**
4:7
**194**
7:19
**1950s**
132:23,24
**1960s**
132:24
**1964**
132:25
**1965**
246:12
**1970s**
96:19 97:6,20,21
151:17
**1979**
339:4,10,16 341:9
**1980s**

37:12 102:2
**1982**
226:13 227:1,4
**1986**
339:5 341:22
**1988**
8:15 207:4 318:5
**1990**
227:5
**1990s**
37:12
**1995**
189:3,7,21,23
346:5
**1996**
228:24 339:5
341:22 346:6,9
**1997**
188:9,12,15 189:19

——————————

**2**

**2**
6:13 7:9 15:25 16:5
16:13 52:22 55:17
55:17 58:1,4
112:7,7 214:11,18
229:16 244:25
311:10 319:24
**2A**
144:11 151:3,13
152:13 154:5,8
**2B**
144:7 154:5 267:10
299:8
**2nd**
47:15 49:5
**2:41**
140:23
**2:43**
141:2
**2:51**
145:21
**20**
40:25 41:1 56:11
57:10 97:4 105:16
136:20 146:12

224:18 232:11
304:24 319:5,17
356:16
**200**
53:23,24 54:2
240:17
**2000**
189:19,20 210:13
227:5
**20004**
5:7
**2004**
208:9
**2005**
227:5
**2006**
13:12 20:2,4
123:22 136:16,17
136:23 137:13,17
141:15 142:14,17
142:22 143:3
144:19 159:2
163:1 164:25
165:25 210:12
218:5 265:25
272:4,7 299:2
314:4
**2007**
227:1 339:6 342:13
343:3,5,17 345:20
346:10,18,23
347:5,9 348:20
349:12
**2008**
123:23 149:18,20
200:14
**2009**
288:25 289:2
**2010**
20:2 124:17 136:17
137:10 138:25
141:15 211:6
213:15,20 224:13
224:16 225:2,4,7
225:22,25 227:12
228:8 237:5 238:6

288:25 289:2
**2011**
283:17
**2012**
7:19 288:25
**2013**
63:10,16 102:18
111:21 239:2
267:25 268:3
269:9 271:7
272:21
**2014**
102:10 200:25
211:9 212:9,10,15
213:4,10,19
214:19,21 215:3,6
215:15,20 216:11
216:15,23 217:1
217:19,19,23
218:13 219:6
**2015**
13:14 211:6 213:15
213:20
**2016**
7:11 57:23 58:5
59:3,10 61:1
69:17,22 70:4,21
71:5 73:18 74:4
96:16 97:17,22
127:23 128:2
186:4,7 187:3,17
188:10,22 190:1,9
190:10 200:1
201:4 207:5 208:9
210:17 268:22
269:3,19 283:17
**2016-A**
211:5
**2016-B**
211:7 212:14,17
**2017**
59:23 98:20 102:10
102:18 195:10,15
238:17
**2018**
7:6,9 10:17 13:16

47:9,11,15 49:1,5
51:25 53:7 60:22
61:3,6,23 62:24
63:17 69:11,21
71:6,12 72:9,14
73:16 78:24 82:7
83:19 84:5 98:1
98:20 102:5,5,11
102:11,12 107:3
111:12,23 131:3
139:21 149:15
150:1,3 186:14
187:2,18 188:13
190:5 191:12
192:13 194:3
195:2 196:9
199:13 200:5,10
206:7 222:11,16
223:20 228:1
230:3,9,14 231:18
233:10,22,24
234:2 236:11,19
237:14 241:7
243:6 255:20
267:19 299:18
305:20,22
**2019**
1:19 9:6 133:7
280:22 286:16
353:15
**202**
5:8
**2022**
143:20
**2023**
143:20
**21**
303:22 304:21
**212**
3:21
**213**
4:15
**214**
7:20
**215**
4:8

Jack Siemiatycki, Ph.D.

**22311**
3:13
**24**
144:24 145:7
**25**
104:17 227:7
243:15 318:9
**253**
201:22,24
**274**
6:4
**278**
7:22
**278-4449**
4:8
**285**
7:24
**29**
101:23 262:13
**290**
6:5
**2900**
4:6
**297**
309:7
**298**
307:22

---
**3**
---

**3**
6:18 17:17,18,23
55:17 76:4 105:3
109:16,23,23
110:1,2 178:11
198:12 238:12,16
243:4,5 311:13
319:25
**3:27**
146:1
**30**
8:14 19:22 22:3
53:23 81:11
100:21 245:7
257:24 311:23
319:4,5 324:5
354:12

**30-odd**
118:17
**300**
240:17
**308**
309:8
**309**
8:7
**31**
1:19 236:2,4
**31st**
9:6
**314**
5:22
**316**
3:6
**317**
8:15
**322**
6:3
**32502**
3:7
**33**
254:14,17
**333**
4:13
**336**
6:4
**34**
76:5 216:8
**34.4**
216:20
**36.5**
215:16,21 217:8
**360**
3:18
**39**
243:4
**391-0183**
5:15
**397-1000**
3:21

---
**4**
---

**4**
6:22 43:24,25

**55:17 145:4,7,9**
145:24 206:25
207:4 256:4
294:10 299:19
311:16 319:25
320:21 353:15
**4th**
5:20 7:11 57:22
58:5
**40**
51:7 53:6,23
246:23 318:25
319:1,4
**400**
53:23 54:4
**43**
6:22
**435-7184**
3:8
**45**
63:8 111:4,6,7,8,14
111:16,20
**46**
6:24,25 7:6
**47**
62:1,5,25 111:7,9
111:15
**48**
7:9 64:14 192:23
193:1,3,4,14
248:1
**49**
64:9 67:1 236:25
250:23
**4900**
3:12

---
**5**
---

**5**
6:23 46:3,6 120:4
178:11 181:23
182:3,11 210:7
238:12 242:22
311:18
**5.3.2**
101:2,24

**5:07**
210:4
**5:36**
210:8
**50**
114:23 170:10,12
252:7
**50s**
147:5
**500**
349:10
**51**
238:15
**51.5**
216:19 217:9
**512**
5:15
**5129**
353:19
**53**
170:5
**540-1000**
4:21
**56**
47:13 49:6 53:4
**57**
169:11
**571-4965**
5:22
**58**
7:11

---
**6**
---

**6**
6:25 32:25 46:5,6
181:23 213:2
234:21,22,25
235:1,8,13,25
243:3 299:20
**6:22**
242:19
**6:40**
242:23
**6:58**
255:13
**60**

**51:7 53:6 337:16**
**60s**
147:5
**600**
4:19 5:20 53:24
54:4
**61**
7:14
**623**
327:9
**624**
329:18
**63102**
5:21
**64**
313:4 316:20 337:7
337:8,20
**64(c)**
264:7,17
**65**
313:4 337:2,9,18
**650**
3:12
**66**
316:20 337:19,21
**67**
68:7 131:3 163:5
165:18
**680-8370**
4:15
**69**
113:2 238:12,21
239:1

---
**7**
---

**7**
7:4 46:16,20 47:4
48:10,18,24 49:12
49:24 50:5 53:3,5
298:20 309:7
321:9
**7.2.5**
169:12
**7:01**
255:16
**7:03**

257:2,5
**7:15**
265:15
**7:16**
265:18
**7:31**
274:9
**7:32**
274:12
**70s**
96:18
**703**
3:14
**72**
112:3,6
**74**
213:2
**75**
318:8,24 319:6
**78701**
5:14

**8**

**8**
7:7 33:1 48:2,5,19
49:4,12,25 50:5
53:3,5
**8/August**
8:15
**8:27**
320:13
**8:31**
320:16
**8:33**
322:16
**8:46**
322:19
**815**
296:6
**816**
5:13
**817**
295:23 296:11
**828-5371**
5:8
**84**

102:10
**85**
119:23
**850**
3:8

**9**

**9**
6:3 7:5,10 58:9,10
58:13,20,25 60:5
62:3,14 163:10
248:5,6
**9th**
48:25
**9:05**
336:2
**9:06**
336:5
**9:15**
343:11
**9:17**
343:14
**9:28**
352:3,6
**9:49**
1:20 9:7
**90**
119:23
**90071**
4:14
**91**
102:9
**95**
50:2
**96**
55:20 201:9
**973**
4:21
**975**
5:6
**98**
50:2 55:20
**997-1774**
3:14