# Exhibit Q

Kelly Tuttle, Ph.D.

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW JERSEY


------------------------ )
IN RE JOHNSON & JOHNSON  )
TALCUM POWDER PRODUCTS   )
MARKETING, SALES         )   MDL NO.
PRACTICES, AND PRODUCTS  )   16-2738 (FLW) (LHG)
LIABILITY LITIGATION     )
                         )
------------------------ )
                         )
THIS DOCUMENT RELATES TO )
ALL CASES                )
                         )
------------------------

— — —

Thursday, April 11, 2019
— — —


        Videotaped Deposition of KELLY TUTTLE,

Ph.D., held at the Hilton Fort Worth,

815 Main Street, Fort Worth, Texas,

commencing at 9:08 a.m., on the above date,

before Michael E. Miller, Certified Court

Reporter, Registered Diplomate Reporter,

Certified Realtime Reporter and Notary

Public.

— — —

GOLKOW LITIGATION SERVICES
877.370.3377 ph | fax 917.591.5672
deps@golkow.com

Kelly Tuttle, Ph.D.

Page 2

```
 1
 2   A P P E A R A N C E S:
 3   LUNDY LUNDY SOILEAU & SOUTH, LLP
       BY:  RUDIE R. SOILEAU, JR., ESQUIRE
 4        rudiesoileau@gmail.com
          KRISTIE M. HIGHTOWER, ESQUIRE
 5        khightower@lundylawllp.com
          501 Broad Street
 6        Lake Charles, Louisiana 70801
          (337) 802-4352
 7     Counsel for Plaintiffs' Steering
       Committee
 8
 9   BEASLEY ALLEN, PC
       BY:  P. LEIGH O'DELL, ESQUIRE
10        leigh.odell@beasleyallen.com
          218 Commerce Street
11        Montgomery, Alabama 36103-4160
          (334) 269-2343
12     Counsel for Plaintiffs' Steering
       Committee
13
     ASHCRAFT & GEREL LLP
14     BY:  MICHELLE PARFITT, ESQUIRE
          mparf@aol.com
15        4900 Seminary Road
          Suite 650
16        Alexandria, Virginia 22311
          (703) 931-5500
17     Counsel for Plaintiffs' Steering
       Committee
18
     TUCKER ELLIS LLP
19     BY:  MICHAEL C. ZELLERS, ESQUIRE
          michael.zellers@tuckerellis.com
20        515 South Flower Street
          42nd Floor
21        Los Angeles, California 90071
          (213) 430-3400
22     Counsel for Johnson & Johnson
       Defendants
23
24
```

Page 3

```
 1
 2   A P P E A R A N C E S:
 3   DRINKER BIDDLE & REATH, LLP
       BY:  JACK N. FROST, JR., ESQUIRE
 4        jack.frost@dbr.com
          600 Campus Drive
 5        Florham Park, New Jersey 07932
          (973) 549-7000
 6     Counsel for Johnson & Johnson
       Defendants
 7
     TUCKER ELLIS LLP
 8     BY:  MICHAEL ANDERTON, ESQUIRE
          michael.anderton@tuckerellis.com
 9        950 Main Avenue, Suite 1100
          Cleveland, Ohio 44113-7213
10        (216) 696-3675
       Counsel for PTI Royston LLC and PTI
11     Union LLC
12   SEYFARTH SHAW, LLP
       BY:  REBECCA WOODS, ESQUIRE
13        rwoods@seyfarth.com
          975 F Street, N.W.
14        Washington, D.C. 20004-1454
          (202) 463-2400
15     Counsel for Personal Care Products
16
17   ALSO PRESENT:
18     DEBBIE DRONETT, Paralegal
19
20   VIDEOGRAPHER:
21     DAVID LANE,
          Golkow Litigation Services
22
23
24
```

Page 4

```
 1              INDEX
 2
     APPEARANCES              2
 3
     PROCEEDINGS              8
 4
 5
 6   EXAMINATION OF KELLY TUTTLE, Ph.D.:
 7     BY MR. SOILEAU          8
 8
 9   CERTIFICATE             432
10   ERRATA                 434
11   ACKNOWLEDGMENT OF DEPONENT   435
12   LAWYER'S NOTES            436
13
```

Page 5

```
        DEPOSITION EXHIBITS
           KELLY TUTTLE, Ph.D.
             April 11, 2019
NUMBER        DESCRIPTION      PAGE
Tuttle-1   Tuttle Expert Report      9
Tuttle-2   Tuttle Previous Four Years  12
           Testimony

Tuttle-3   Chapter from Reference    17
           Guide on Toxicology
Tuttle-4   Excerpt from The Basic    20
           Science of Poisons

Tuttle-5   Tuttle Curriculum Vitae   26

Tuttle-6   21 C.F.R. 740             50

Tuttle-7   1965 Hill Publication     72

Tuttle-8   Excerpt from Modern       82
           Toxicology Third Edition
Tuttle-9   CTEH Billing Summary      93
Tuttle-10  CTEH Billing Summary      93
Tuttle-11  Tuttle Supplemental      102
           Materials Reviewed and
           Considered
Tuttle-12  Excerpt from IARC        141
           Monograph 93

Tuttle-13  Egli and Newton Publication  157

Tuttle-14  1971 Henderson et al     159
           Publication
Tuttle-15  1979 Venter et al        164
           Publication
```

Kelly Tuttle, Ph.D.

---

Page 6

1        DEPOSITION EXHIBITS
2
3   Tuttle-16   1986 Henderson et al      166
              Publication
4   Tuttle-17   2004 Kissler et al        170
              Publication
5
6   Tuttle-18   2004 Sj?sten et al        172
              Publication
7   Tuttle-19   2019 McDonald et al       174
              Publication
8
9   Tuttle-20   Ovarian Cancer Prevention 197
              (PDR) Patient Information
10  Tuttle-21   Health Canada Draft       201
              Screening Assessment
11
12  Tuttle-22   2004 Fax Transmission of  217
              Sj?sten Publication
13  Tuttle-23   4/1/14 FDA Letter         224
14  Tuttle-24   1994 Wehner Publication   249
15  Tuttle-25   3/17/97 Wehner Letter     261
16  Tuttle-26   Handwritten Statement     273
17  Tuttle-27   9/17/97 Wehner Letter     280
18  Tuttle-28   Appendix C to Tuttle Expert 284
              Report
19
20  Tuttle-29   10/7/04 Wehner Letter     293
21  Tuttle-30   2014 Nony et al Publication 320
22  Tuttle-31   2/17/77 Schneider Letter  340
23
24

---

Page 7

1        DEPOSITION EXHIBITS
2
3   Tuttle-32   Health Canada Risk        348
              Assessment Framework Study
4   Tuttle-33   Global Harmonized System of 351
              Classification and Labeling
5             of Chemicals
6   Tuttle-34   IARC Monograph on Asbestos 362
7   Tuttle-35   Listing of BioVentures     386
              Spinoff Companies
8
9   Tuttle-36   NTP Study, Toxicology and  398
              Carcinogenesis Studies of
10            Talc
11  Tuttle-37   2016 Schildkraut et al     415
              Publication
12  Tuttle-38   Article, Retire Statistical 419
              Significance
13
14
15
16
17
18
19
20
21
22
23
24

---

Page 8

1        PROCEEDINGS
2        (April 11, 2019 at 9:08 a.m.)
3        THE VIDEOGRAPHER:  We're now on
4   the record.  My name is David Lane,
5   videographer for Golkow Litigation
6   Services.  Today's date is April 11th,
7   2019.  The time is 9:08 a.m.
8        This deposition is taking place
9   in Fort Worth, Texas, in the matter of
10  Talcum Powder Litigation MDL.  Our
11  deponent today is Kelly Tuttle Ph.D.
12  Our counsel will be noted on the
13  stenographic record.
14        The court reporter today is
15  Mike Miller, who will now swear in the
16  witness.
17        KELLY TUTTLE, Ph.D.,
18        having been duly sworn,
19        testified as follows:
20  BY MR. SOILEAU:
21      Q.   Good morning, Dr. Tuttle.
22      A.   Good morning.
23      Q.   I am Rudie Soileau.  We met
24  just a few moments ago.  I'm an attorney from

---

Page 9

1   Lake Charles, Louisiana.  I'm appearing today
2   on behalf of women and the families of women
3   who maintain that the use of Johnson &
4   Johnson talcum powder products led to the
5   development of ovarian cancer.
6        (Whereupon, Deposition Exhibit
7        Tuttle-1, Tuttle Expert Report, was
8        marked for identification.)
9   BY MR. SOILEAU:
10      Q.   Let me begin by handing you an
11  exhibit that I have marked as Tuttle
12  Exhibit 1 and ask you to identify that for
13  me.
14      A.   This is the report that I
15  drafted regarding this litigation.
16      Q.   Very good.  You understand that
17  you are under oath today?
18      A.   I do.
19      Q.   And you have been deposed
20  previously?
21      A.   Yes, I have.
22      Q.   Dr. Tuttle, I intend for all of
23  my questions today to be clear and fair.  If
24  a question is for any reason not clear to you

3 (Pages 6 to 9)

Kelly Tuttle, Ph.D.

Page 10

1  or if it does not seem fair, tell me.  And if
2  you tell me that, I'll do whatever is
3  necessary to make sure that my questions seem
4  clear and fair, okay?
5      A.   Sounds good.
6      Q.   If you do not say anything, I'm
7  going to assume that my questions are clear
8  and you are answering the question I've
9  asked.  Fair enough?
10     A.   Yes.
11          MR. FROST:  Rudie, I just have
12     one question on the report.  I just
13     want to make sure it's purposeful.  I
14     note that the appendices are not in
15     the back of the one that's marked as
16     Exhibit 1.  I just want to make sure
17     that's purposeful.
18          MR. SOILEAU:  Yes.
19          MR. FROST:  Okay.
20          MR. SOILEAU:  I included the
21     entire -- and let me ask the doctor.
22  BY MR. SOILEAU:
23     Q.   Exhibit 1 is the entirety of
24  the report itself as well as your references,

Page 11

1  but none of the appendices, correct?
2          MR. FROST:  Didn't mean to
3     interrupt your flow.  I just wanted to
4     make sure that that was on purpose.
5          MR. SOILEAU:  That's fine.
6      A.   Cursory glance through, yes,
7  this appears to be my complete report, with
8  the exception of the appendices.
9  BY MR. SOILEAU:
10     Q.   Very good.
11          Were you asked, Doctor, by the
12  attorneys for Johnson & Johnson to review
13  available information and offer an opinion
14  addressing any relationship between Johnson &
15  Johnson talcum powder products and ovarian
16  cancer?
17     A.   I was asked by attorneys to
18  look at the scientific literature and the
19  body of science to determine whether the body
20  of science supports a causal association
21  between perineal talcum powder exposure and
22  ovarian cancer.
23     Q.   Very good.
24          Let me show you one of the

Page 12

1  appendices that counsel referred to a moment
2  ago.
3          (Whereupon, Deposition Exhibit
4     Tuttle-2, Tuttle Previous Four Years
5     Testimony, was marked for
6     identification.)
7  BY MR. SOILEAU:
8      Q.   I've marked this document as
9  Tuttle Exhibit 2.  Do you recognize that?
10     A.   Yes, I do.
11     Q.   Do each of the instances listed
12  in Appendix E, which is now Tuttle Exhibit 2,
13  arise from a release, a spill or some other
14  unintended event?
15     A.   No, they do not.
16     Q.   Which one does not?
17     A.   Let's see.  There are several
18  on here that are related to a spill or
19  release or emergency response, and then there
20  are others that are toxic tort litigation.
21     Q.   Which of the captions that are
22  listed on Tuttle Exhibit 2 involve toxic tort
23  litigation?
24     A.   So I'll just start at the

Page 13

1  beginning.  The first one, Baukholt v.
2  A.O. Smith.  The second one, Wilson v.
3  Eighty-Eight Oil.  The third, Readwin v.
4  Aurora Pumps.  Then going to the fifth,
5  Hudson v. Covestro.  Then going to the second
6  page, the second one, Messel v. Aurora Pump;
7  the third, Howe v. Aurora Pump; and the
8  fourth, Bradd v. Aurora Pump.
9      Q.   Do the four matters that
10  reference Aurora Pump all involve the same
11  issue generally from the perspective of a
12  toxicologist?
13     A.   Yes, generally.
14     Q.   And what was the substance or
15  agent involved in the four Aurora Pump cases?
16     A.   Those were involved in asbestos
17  litigation.
18     Q.   Were the plaintiffs in the
19  Aurora Pump litigations that are listed on
20  Tuttle Exhibit 2 workers who had been
21  occupationally exposed to asbestos?
22     A.   I would have to go back and
23  look at the individual cases.  I don't
24  recall.

Kelly Tuttle, Ph.D.

Page 14

1    Q.    Okay.  The Baukholt matter, the
2  first one listed on Exhibit 2, what did that
3  litigation involve?
4    A.    That also was asbestos
5  litigation.
6    Q.    And what about Wilson v. 88
7  Oil?
8    A.    That involved a number of
9  potential industrial hygiene and
10  toxicological exposures resulting from an oil
11  transloading facility.
12    Q.    Hudson, which is also on the
13  first page of Tuttle Exhibit 2, what was the
14  agent or substance at issue in the Hudson
15  matter, Doctor?
16    A.    Hudson v. Covestro involved
17  spray foam insulation.
18    Q.    Was there any allegation that
19  the spray foam included as a constituent
20  asbestos fibers?
21    A.    No.
22    Q.    Okay.  Have you ever been asked
23  to review available information and offer an
24  expert opinion involving a manufactured

Page 15

1  retail product other than this case?
2    A.    In regards to litigation, not
3  that I recall specifically.  I guess the
4  spray foam insulation would be considered a
5  manufactured product.
6    Q.    But not one sold retail,
7  correct?
8    A.    Not that I can recall, no.
9    Q.    The product that we're talking
10  about now, talcum powder products, you
11  understand those were manufactured by
12  Johnson & Johnson?
13    MR. FROST:  Objection.
14  BY MR. SOILEAU:
15    Q.    Is that your understanding?
16    A.    My understanding is that talcum
17  powder is -- or talc specifically is
18  naturally occurring and is sold in any number
19  of options.  In this particular case my
20  research is around perineal talcum powder and
21  it is my understanding that Johnson & Johnson
22  sells talcum powder products.
23    Q.    From your perspective and your
24  work in this case, would it be appropriate to

Page 16

1  consider Johnson & Johnson the manufacturer
2  of the talcum powder products that we are
3  discussing today?
4    MR. FROST:  Objection.
5    A.    So I was asked to review the
6  body of science and the scientific
7  literature, and so in regards to the
8  scientific literature, a lot of the studies
9  and things are -- do not specify what form of
10  talcum powder is involved in their studies or
11  in their assessments, so this is an
12  assessment of the body of science as a whole.
13  BY MR. SOILEAU:
14    Q.    I see.
15    So from your perspective, has
16  the work that you've done in this case
17  focused on the body of science and not the
18  actual products that Johnson & Johnson sells
19  to citizen consumers?
20    MR. FROST:  Objection.
21    A.    Well, as I said, I assessed the
22  body of science, and a large number of
23  studies do not specify the type of talcum
24  powder.  That being said, there are examples

Page 17

1  such as the FDA and others where Johnson &
2  Johnson products specifically were tested or
3  examined.
4    But in regards to
5  epidemiologically or otherwise, it revolves
6  around talcum powder products as a whole and
7  the scientific literature as a whole.
8  BY MR. SOILEAU:
9    Q.    Do you agree that the essence
10  of toxicology is the study of adverse effects
11  of agents on organisms?
12    A.    Toxicology is the study of the
13  dose and response of various products, either
14  man-made or natural, and their potential
15  adverse effects on the environment, on the
16  human body, on animals.
17    (Whereupon, Deposition Exhibit
18    Tuttle-3, Chapter from Reference Guide
19    on Toxicology, was marked for
20    identification.)
21  BY MR. SOILEAU:
22    Q.    Let me show you an additional
23  exhibit.  I've marked this as Exhibit 3.
24  This is a chapter from the reference manual

Kelly Tuttle, Ph.D.

Page 18

1    that is noted in your report and included in
2    your reference materials.
3         Do you recognize this chapter?
4    A.   Yes.
5    Q.   Do you have a copy of the
6    reference manual somewhere at home or in your
7    office?
8    A.   It's in our corporate office in
9    Little Rock, Arkansas, yes.
10   Q.   Where do you office?
11   A.   I office out of my home here
12   outside of Fort Worth.
13   Q.   I see.
14        Turn to page 636, if you would.
15   I'm going to put this on the ELMO as well,
16   but I'm focusing on the second full paragraph
17   on page 636, and the second sentence which
18   says:  It -- referring to toxicology -- it is
19   the study of the adverse effects of chemical
20   and physical agents on living organisms.
21        Did I read that correctly?
22   A.   Yes, you read that correctly.
23   Q.   Do you agree with that
24   statement?

Page 19

1    A.   As I said, toxicology is the
2    study of compounds and their potential for
3    adverse health effects on living organisms as
4    well as the environment.
5    Q.   Is that a yes to my question?
6    A.   Well, again, I said that
7    toxicology is the study of the potential
8    adverse health effects of chemicals, be them
9    man-made or naturally occurring, on living
10   organisms, including the environment.
11   Q.   Yes, Doctor.  I did hear your
12   answer, but my question was:  Do you agree
13   with the summary statement that I read from
14   the reference manual, Tuttle Exhibit 3?
15        MR. FROST:  Objection.
16   A.   Again, as I said, in addition,
17   I said that toxicology is the study of
18   adverse effects of chemical and physical
19   agents, be them natural or man-made, on
20   living organisms, that includes animals and
21   the environment.
22   BY MR. SOILEAU:
23   Q.   Let me show you another exhibit
24   then.

Page 20

1         (Whereupon, Deposition Exhibit
2    Tuttle-4, Excerpt from The Basic
3    Science of Poisons, was marked for
4    identification.)
5    BY MR. SOILEAU:
6    Q.   I'll mark this as Exhibit 4.
7    This is a one-page excerpt from a textbook.
8    The cover of the textbook is on the first
9    page.
10        You recognize that textbook?
11   A.   Yes, I do.
12   Q.   This is the ninth edition, I
13   believe, but you cite the eighth edition as a
14   textbook in your reference manual, correct?
15   A.   Yes.  The ninth edition is
16   brand-new.  I actually just received it the
17   other day.
18   Q.   I see.
19        Do you consider the Casarett &
20   Doull textbook on toxicology to be a
21   generally accepted and authoritative textbook
22   for the field of toxicology?
23   A.   I think as I state in my
24   report, Casarett & Doull's is a commonly used

Page 21

1    toxicological textbook in teaching and
2    education for toxicology.
3    Q.   Do you consider it
4    authoritative for your work as a
5    toxicologist?
6         MR. FROST:  Objection.
7    A.   Again, it's commonly used for
8    teaching toxicological principles.  As far as
9    being authoritative, that's very general.
10   Casarett & Doull's covers a wide range of
11   topics and a wide range of toxicological
12   principles.  I couldn't say specifically,
13   without getting into some specifics in the
14   textbook, on whether it would be
15   authoritative or not, but it is commonly used
16   for teaching toxicological principles.
17   BY MR. SOILEAU:
18   Q.   Right.  Doctor, we're not, of
19   course, teaching today, at least that's not
20   our primary purpose.  We're here today to
21   discuss your expert testimony.
22        I need to ask you:  Do you
23   consider it to be reliance material for your
24   work as a toxicologist?

6 (Pages 18 to 21)

Kelly Tuttle, Ph.D.

Page 22

1    A.   I cite Casarett & Doull's in my
2  report regarding toxicological principles.  I
3  certainly refer to it.  I also refer to the
4  science that it cites and the basis for what
5  it includes in the textbook.
6    Q.   Let's look at page 2 of Tuttle
7  Exhibit 4.  In the first paragraph, the third
8  sentence, I want to put it on the ELMO and
9  read it:  Toxicology arose as a way to
10 understand, prevent, mitigate and treat the
11 potentially harmful consequences of many of
12 the substances we are exposed to.
13     Did I read that correctly?
14    A.   Yes, you read that correctly.
15    Q.   Do you agree with that
16 statement from the Casarett text?
17    A.   I have not -- as I said
18 earlier, this is the new edition, which I
19 haven't -- I'm not versed in, I haven't read.
20 I just received it.
21     Without going into more detail,
22 I can't say whether I agree or disagree.
23    Q.   So you're not able to agree or
24 disagree with this statement?  Just to be

Page 23

1  clear, I'm not asking you if it actually
2  appears in the ninth edition.  I'm simply
3  asking you if this statement, which I have
4  read to you from the ninth edition, is a
5  statement that you can agree with.
6    A.   Well, as I said, I -- without
7  reading more in, and I'm not familiar with
8  this new edition of the textbook, I haven't
9  reviewed it, I can't agree or disagree.
10    Q.   All right.  Let me ask you
11 about another statement.  Just below the
12 statement that I read is a statement that is
13 in italics.  And it says:  Toxicology is the
14 study of adverse effects of chemical,
15 physical or biological agents on living
16 organisms and the ecosystem, including the
17 prevention and amelioration of such adverse
18 effects.
19     Can you agree or disagree with
20 that statement?
21    A.   Well, again, that's the
22 definition of toxicology as described in the
23 textbook, and I believe that's an iteration
24 of what I said earlier about toxicology being

Page 24

1  the study of potential adverse effects of
2  agents, be them natural or man-made, on
3  living organisms and the environment.
4    Q.   Do you agree that the science
5  of toxicology includes the prevention of
6  adverse effects?
7    A.   It depends.  You know, I
8  believe that classically and I think it even
9  said in the reference manual we discussed
10 earlier that toxicology is the study of
11 poisons.  A lot of that revolves around dose
12 and understanding the role of dose in
13 exposures to products.
14     It certainly can be involved in
15 the prevention of adverse effects.
16    Q.   I asked if you agree that the
17 science of toxicology includes the prevention
18 of adverse effects and you said in part, it
19 depends.  What does it depend on?
20     MR. FROST:  Objection.
21    A.   Well, as I said, you know,
22 classically, and then the key tenet of
23 toxicology is the dose makes the poison.  The
24 dose plays a key role in assessing whether an

Page 25

1  agent can be harmful or have a potential
2  adverse effect.
3     So depending on the scenarios
4  of the questions being asked or how
5  toxicology is being applied, it can certainly
6  be involved in the prevention of or the
7  research to prevent the adverse effects.
8  BY MR. SOILEAU:
9    Q.   Do you recognize the second
10 statement I read, the italicized paragraph
11 from the Casarett textbook?
12     MR. FROST:  Objection.
13    A.   I'm sorry, it's stated here in
14 this new edition of the Casarett textbook.
15 BY MR. SOILEAU:
16    Q.   Yes.  Do you recognize it
17 independent of the textbook?
18    A.   Not specifically, no.
19    Q.   Do you see in the second
20 paragraph from that page, just above the
21 quoted language, it says According to the
22 Society of Toxicology?
23    A.   Yes, I do.
24    Q.   You recognize that entity that

7 (Pages 22 to 25)

Kelly Tuttle, Ph.D.

Page 26

```
 1    is the Society of Toxicology?
 2         A.   I do.  I'm a member of the
 3    Society of Toxicology.
 4         Q.    Right.  That's what I was going
 5    to ask.
 6              Let me go ahead and show you
 7    what I will mark as Tuttle Exhibit 5.
 8              (Whereupon, Deposition Exhibit
 9    Tuttle-5, Tuttle Curriculum Vitae, was
10    marked for identification.)
11    BY MR. SOILEAU:
12         Q.    An additional attachment to
13    your report.  Do you recognize this?
14         A.    Yes, I do.
15         Q.    Is this essentially your CV?
16         A.    Yes.
17         Q.    And it includes, as you just
18    noted, your membership in the Society of
19    Toxicology or SOT, the same entity that is
20    referenced in this excerpt from Casarett,
21    which is Tuttle Exhibit 4, correct?
22         A.    Yes, that's correct.
23         Q.    Separate from the case that
24    brings us here today, Dr. Tuttle, have you
```

Page 27

```
 1    ever applied the Bradford Hill methodology or
 2    a like methodology to the issue of a causal
 3    relationship for a manufactured retail
 4    product like talcum powder?
 5         A.    I use the Hill criteria
 6    throughout my work as a toxicologist.
 7         Q.    Understood.
 8         A.    I can't provide a specific
 9    example where I've used it for a manufactured
10    product.  I use it regularly in assessing the
11    scientific literature in the body of science.
12         Q.    In this instance, you have used
13    the Hill methodology in part to answer the
14    question that you described for me earlier,
15    that is, the question that the J&J attorneys
16    posed to you following your retention.  Fair?
17         A.    As I said, the attorneys asked
18    me to assess the body of science and look at
19    the scientific evidence regarding a causal
20    association between talcum powder and ovarian
21    cancer, for which the Hill criteria is one of
22    the methodologies that I used in my report
23    and discuss in my report.
24         Q.    Yes, Doctor.  Did you use the
```

Page 28

```
 1    Hill methodology to answer the question that
 2    the J&J attorneys put to you, the same
 3    question you just summarized?
 4         A.    As I said, the Hill criteria is
 5    one of the methodologies that I include in my
 6    report for assessing the body of science and
 7    the scientific literature.
 8         Q.    Lawyers are sometimes funny
 9    about words.  I understand that you're
10    familiar with the methodology and you cite it
11    in your report.
12              I wanted to know specifically:
13    Did you apply, did you use, did you take the
14    body of science that you referenced earlier
15    and apply the Bradford Hill methodology to
16    arrive at an answer to the question posed by
17    the J&J attorneys?
18         MR. FROST:  Objection.
19         A.    Well, again as I said, the
20    Hill criteria is one of the methodologies
21    that I use in my report in assessing the body
22    of science and the scientific literature to
23    see what the scientific evidence supports.
24              ///
```

Page 29

```
 1    BY MR. SOILEAU:
 2         Q.    You say it is one of the
 3    methodologies that you use in your report.
 4    For what purpose did you use it in your
 5    report and in connection with your work in
 6    this matter?  Let's approach it from that
 7    angle.
 8         MR. FROST:  Objection.
 9         A.    Again, I used it to assess the
10    body of science and the scientific evidence
11    regarding whether the scientific evidence
12    supported a causal association between talcum
13    powder exposure perineally and ovarian
14    cancer.
15    BY MR. SOILEAU:
16         Q.    So you used the Hill
17    methodology to determine whether the
18    scientific evidence supported a causal
19    relationship or association between talcum
20    powder exposure and ovarian cancer?
21         MR. FROST:  Objection.
22    BY MR. SOILEAU:
23         Q.    Is that correct?
24         A.    As I said the Hill criteria is
```

8 (Pages 26 to 29)

Kelly Tuttle, Ph.D.

Page 30

1    one of the methodologies I discuss and use in
2    my report.
3        Q.    I still don't know what you
4    used it for.  Can you help me?
5        A.    Sure.
6        MR. FROST:  Objection.
7        A.    I used it to assess the body of
8    science and the scientific evidence to
9    determine whether the scientific -- what the
10   scientific evidence supports regarding the
11   potential for perineal talcum powder exposure
12   to be causally associated with ovarian
13   cancer.
14   BY MR. SOILEAU:
15       Q.    And in this case, when we talk
16   about talcum powder exposure, what products
17   are we talking about?
18       A.    Again, when we talked a little
19   bit about this previously, in regards to
20   perineal talcum powder exposure, we're
21   dealing with cosmetic talc products.  Brands
22   and manufacturers in some of the scientific
23   literature are not specified, so I can't
24   speak to that.

Page 31

1        As I mentioned earlier, there
2    is some testing specific to Johnson &
3    Johnson, which is the product specifically
4    involved today, but it is my -- generally
5    speaking, I'm referring to cosmetic talcum
6    powder products.
7        Q.    I really want to understand
8    whether a part of your focus and the work
9    that you did in this project was on specific
10   products, talcum powder products, sold by
11   Johnson & Johnson.  Was it?
12       MR. FROST:  Objection.
13       A.    I'm sorry, can you clarify that
14   question for me a little, please?
15   BY MR. SOILEAU:
16       Q.    Sure.  I wanted to know whether
17   in this project you had a specific focus on
18   particular products sold by Johnson &
19   Johnson, specific talcum powder products sold
20   by Johnson & Johnson?
21       MR. FROST:  Objection.
22       A.    So in regards to the body of
23   science, as I said, we -- I assessed the
24   scientific evidence and the body of science

Page 32

1    regarding perineal talcum powder exposure.
2    And in those studies and studies that I cite,
3    they do not specify a manufacturer or
4    product.
5        Other places in my report,
6    there is research specific to Johnson &
7    Johnson that is addressed and discussed in my
8    report.
9    BY MR. SOILEAU:
10       Q.    Do you know what products are
11   at issue in this case?
12       A.    It is my understanding that the
13   Johnson & Johnson baby powder and
14   Shower to Shower products are involved in
15   this litigation.
16       Q.    How were you first contacted to
17   work in this litigation on behalf of
18   Johnson & Johnson?
19       A.    I was first contacted in
20   November of last year, either by Mr. Frost or
21   Ms. Jessica Miller.  I can't remember exactly
22   who.
23       Q.    Very good.
24       Had you had any prior work or

Page 33

1    relationship with Johnson & Johnson before
2    that contact in -- I think you said November
3    of 2018?
4        A.    I think I had met them via
5    e-mail in maybe the month prior, but no.
6        Q.    The e-mail that you're
7    referring to during the month of October of
8    2018, that e-mail was related to your
9    retention ultimately in this project?
10       A.    Yes.
11       Q.    So no other work that you have
12   done for Johnson & Johnson in your
13   professional career, regardless of whether it
14   pertained to talcum powder products or some
15   other issue?
16       A.    I have not done any work for
17   Johnson & Johnson previously.
18       Q.    Okay.  Do you know Dr. Nadia
19   Moore?
20       A.    I am familiar with Dr. Moore's
21   name.  I do not know her personally.
22       Q.    Do you only know her name
23   through this litigation?
24       A.    I believe so.

Kelly Tuttle, Ph.D.

Page 34

1      Q.    Did you review her deposition?
2      A.    Yes, I reviewed her deposition.
3      Q.    What is her area of expertise?
4      A.    She's a toxicologist.
5      Q.    Do you know whether CTEH has
6   provided any services to Johnson & Johnson
7   other than the project that brings you and I
8   together here today?
9      A.    Not that I'm aware of.
10      Q.    When you were first retained by
11   the attorneys for Johnson & Johnson, what
12   familiarity or knowledge did you have about
13   the company Johnson & Johnson?
14      A.    I know the name Johnson &
15   Johnson.  I use their products personally.
16   Beyond that, I don't know that I had any
17   knowledge.  I had done some personal research
18   previously about talcum powder in regards to
19   what I'd seen in the news, but beyond that,
20   nothing specific.
21      Q.    Very good.
22           Nothing really that was aimed
23   at the company Johnson & Johnson, only at
24   talcum powder and some talcum powder

Page 35

1   products, fair?
2      A.    I'm sorry, what do you mean,
3   the...
4      Q.    I asked you if you had any
5   familiarity, and I think what you told me
6   basically, and I just wanted to make sure I
7   understood, that you really didn't have any
8   specific familiarity with the company,
9   although you had looked at the products and
10   had some familiarity with particular
11   products, talcum powder products, fair?
12      A.    As I said, I know the name
13   Johnson & Johnson.  I use their products, and
14   I had seen some of the news articles in
15   previous years regarding Johnson & Johnson.
16      Q.    Okay.  Which products
17   manufactured by Johnson & Johnson have you
18   used, Doctor?
19      A.    Oh.  I would have to go through
20   my bathroom and see what all products are
21   there, but I --
22      Q.    That's fair.  Let me interrupt
23   and narrow my question.  I don't want to
24   interrupt you today, but I realize that was a

Page 36

1   broad question because Johnson & Johnson
2   manufactures lots of products, right?
3      A.    Yes.
4      Q.    I meant to include, but I
5   admittedly did not, what talcum powder
6   products manufactured by Johnson & Johnson
7   have you used in the past?
8      A.    I have talcum powder, the baby
9   powder, for my son.
10      Q.    You're the mother of a newborn?
11      A.    Yes.
12      Q.    And it's your first child?
13      A.    It is.
14      Q.    And you use Johnson & Johnson's
15   baby powder on your newborn baby?
16      A.    Yes, I do.
17      Q.    And do you use the talcum
18   powder?
19      A.    I do.
20      Q.    Okay.  Had you previously used
21   any Johnson & Johnson talcum powder products?
22      A.    Again, I would have to go back
23   and look specifically.  I haven't looked at
24   the ingredients in all the products that I

Page 37

1   use in my bathroom, so I'm not sure.
2      Q.    Well, have you used
3   Shower to Shower?
4      A.    No, I haven't.
5      Q.    Have you used any like talcum
6   powder product, and I just mean a talcum
7   powder product that's used for personal use?
8      A.    Again, I would have to look at
9   the ingredients of the products that I have
10   in my bathroom.  I don't know the specific
11   ingredients for everything that's in my
12   bathroom.
13      Q.    When did you do the personal
14   research that you referenced a few moments
15   ago?
16      A.    A few years ago when I had seen
17   some news articles coming out, I just briefly
18   on my own time got into the scientific
19   literature and kind of looked at the issue
20   that was being discussed.
21      Q.    Were you working for CTEH at
22   that time?
23      A.    I believe so, yes.
24      Q.    Were you married?

10 (Pages 34 to 37)

Kelly Tuttle, Ph.D.

1    A.   I don't think so, no.
2    Q.   Okay.  And I don't -- perhaps
3  it's apparent, but I don't think you know
4  exactly when you did this research.  Maybe I
5  should have asked.
6         Do you know exactly when you
7  began to conduct this personal research?
8    A.   Not exactly, no.
9    Q.   Is it fair to say that your
10 best estimate would be sometime after you
11 went to work with CTEH but before you were
12 married?
13   A.   Yes, I believe so.
14   Q.   Are there any other events that
15 would help us pin it down more specifically?
16   A.   No, not specifically.  It's a
17 common practice of mine, so I don't know that
18 I could really specify when I particularly
19 researched it.
20   Q.   What steps did you undertake,
21 Doctor, when you conducted this personal
22 research into talcum powder products?
23   A.   It was just a very general
24 cursory dive into the scientific literature,

1  November of last year?
2    A.   I don't know that there was
3  necessarily a conclusion.  As I said, I saw
4  it.  It triggered my interest.  I looked into
5  the scientific literature.  You know, it
6  certainly wasn't something that I was doing
7  formally or with any particular endpoint in
8  mind.  It was more of just a general
9  examination.
10   Q.   Did you print any articles that
11 you discovered through your PubMed or other
12 personal research?
13   A.   I don't think I did, no.
14   Q.   Did you at some point weigh the
15 evidence that you had seen in order to
16 research a conclusion on the safety of talcum
17 powder products?
18        MR. FROST:  Objection.
19   A.   As I said, it wasn't a formal
20 assessment.  There wasn't really a
21 conclusion.  It was a general look at the
22 body of science to see what the body of
23 science said on the matter.
24        ///

1  some PubMed searches, some Google Scholar
2  searches, just looking at the body of
3  science.
4    Q.   You say cursory dive, but a
5  cursory dive as a toxicologist, right?
6    A.   Yes.
7    Q.   So you did look into PubMed and
8  Google Scholar, you said?
9    A.   Yes.
10   Q.   Okay.  And did you make notes?
11   A.   No, I didn't make any notes.
12   Q.   Did you do anything to -- well,
13 strike that.
14        How long did you continue to
15 conduct this personal research?
16   A.   I don't know how long I spent
17 doing it.  As I said, it was just a matter of
18 personal interest.  It's a common practice of
19 mine to try to, you know, read the literature
20 on a regular basis, so I don't know how long
21 I spent.
22   Q.   Did you conclude this personal
23 research at some point prior to the time that
24 you were contacted in October of -- or

1  BY MR. SOILEAU:
2    Q.   For what purpose?
3    A.   For personal interest.
4    Q.   Well, was it simple curiosity,
5  or were you also interested in the safety of
6  the talcum powder products?
7    A.   Well, again, it is curiosity.
8  As a toxicologist, I have just a general
9  interest in toxicological matters and
10 toxicological research, and I certainly --
11 whenever I see things in media or other
12 sources, I like to see what the scientific
13 basis is for the statements that are being
14 made to see if the science supports it or
15 doesn't support it.
16   Q.   And what conclusion did you
17 reach?
18        MR. FROST:  Objection.
19   A.   Again, you know, there wasn't
20 really an end goal of making a conclusion.
21 You know, as I said, when I reviewed the
22 scientific literature, I certainly didn't see
23 the body of science showing a strong evidence
24 to support anything in regards to the

11 (Pages 38 to 41)

Kelly Tuttle, Ph.D.

Page 42

1    statements that I was -- you know, the
2    general nuances that were being put forth in
3    the media.
4    BY MR. SOILEAU:
5        Q.    Did you rely on that personal
6    research in deciding to use Johnson &
7    Johnson's baby powder on your newborn?
8             MR. FROST:  Objection.
9        A.    I certainly used my -- you
10   know, I certainly looked at the scientific
11   knowledge and the body of science in regards
12   to using Johnson & Johnson baby powder on my
13   newborn.  I mean, I knew the literature
14   before I had my son.
15   BY MR. SOILEAU:
16       Q.    What had you heard through news
17   articles that triggered this personal
18   research?
19       A.    Goodness, it was so many years
20   ago.  I remember seeing something about a
21   large case that had just come to an end
22   regarding talcum powder and ovarian cancer.
23       Q.    Did you reach an opinion based
24   on your personal research that the use of

Page 43

1    talcum powder products was safe?
2             MR. FROST:  Objection.
3        A.    Well, again, at the time, I was
4    doing it more for personal interest as
5    opposed to any general conclusions, but as I
6    said, my impression at the time was that the
7    scientific evidence did not support the
8    statements being made in the media.
9    BY MR. SOILEAU:
10       Q.    But did you determine that the
11   use of talcum powder products based on your
12   own personal research was safe?
13            MR. FROST:  Objection.
14       A.    Again, that wasn't the specific
15   end goal.  There wasn't a specific end goal
16   in my assessment of the scientific
17   literature.  I had seen the media statements
18   that had piqued my interest.  I did a general
19   look into the body of science to see if the
20   body of science supported the statements
21   being made by the media.
22   BY MR. SOILEAU:
23       Q.    So you heard some statements or
24   read some statements in the media, fair?

Page 44

1        A.    Yes.
2        Q.    Those did not come from
3    scientists, did they?
4        A.    I don't remember at this point
5    who was making the statements, but they were
6    in the general media.
7        Q.    Okay.  Certainly they did not
8    appear in scientific literature, fair?
9        A.    The ones that piqued my
10   interest were -- I don't believe -- no, I
11   don't believe they were in the scientific
12   literature.
13       Q.    So then you turned as a
14   toxicologist to the scientific literature to
15   conduct this personal research in response to
16   the media reports, correct?
17            MR. FROST:  Objection.
18       A.    As I said, not necessarily in
19   response.  The media reports piqued my
20   interest, and so I looked at the body of
21   science regarding it.
22   BY MR. SOILEAU:
23       Q.    All right.  You had not looked
24   at the body of science regarding talcum

Page 45

1    powder products before you came into contact
2    with these media reports; is that correct?
3        A.    Not that I recall.
4        Q.    Okay.  So you became aware of
5    the media reports, and then that piqued your
6    interest and you turned to the scientific
7    literature?
8        A.    Regarding the role of talcum
9    powder in ovarian cancer, yes.
10       Q.    Okay.  And when you turned to
11   the literature, you turned to the scientific
12   literature, correct?
13       A.    That's correct.
14       Q.    And when you looked at the
15   scientific literature, you looked at that
16   literature as a toxicologist, right?
17            MR. FROST:  Objection.
18       A.    I applied my -- excuse me --
19   training and expertise as a toxicologist in
20   reading the literature.  I don't know what it
21   means to look at it as a tox- -- as a
22   toxicologist.
23   BY MR. SOILEAU:
24       Q.    Well, the Casarett exhibit we

12 (Pages 42 to 45)

Kelly Tuttle, Ph.D.

Page 46

1    looked at before said that toxicology offers
2    a way to understand, prevent, mitigate and
3    treat the potentially harmful consequences of
4    substances.
5            Do you recall that?  You have
6    it there.
7        A.   Yes, I recall us discussing it,
8    yes.
9        Q.   I mean, isn't that what you
10   were doing, looking at scientific literature
11   to understand and potentially prevent any
12   potentially harmful consequences of this
13   particular product, talcum powder?
14           MR. FROST:  Objection.
15       A.   As I said, I was looking at the
16   scientific literature to see whether the
17   scientific evidence was supportive of what
18   had been -- what I had read or seen in the
19   media at the time.
20   BY MR. SOILEAU:
21       Q.   Okay.  Do you know as we sit
22   here today whether Johnson & Johnson employs
23   toxicologists?
24       A.   I don't know who Johnson &

Page 47

1    Johnson employs.
2        Q.   Well, of course, to be clear,
3    you understand I'm not asking you for the
4    names of particular toxicologists, right?
5        A.   Yes, I understand.
6        Q.   Okay.  But do you have any -- a
7    sense of whether they have their own
8    scientists on staff, including toxicologists?
9            MR. FROST:  Objection.
10       A.   Again, I don't know who
11   Johnson & Johnson specifically employs on
12   their staff.
13   BY MR. SOILEAU:
14       Q.   Would you expect that Johnson &
15   Johnson would have, as part of its team,
16   scientists, including toxicologists with
17   training and background similar to yours?
18           MR. FROST:  Objection.
19       A.   Again, I don't know who
20   Johnson & Johnson hires or directly employs,
21   so I can't speak to what their training and
22   experience would be.
23   BY MR. SOILEAU:
24       Q.   I understand that, Doctor.  I'm

Page 48

1    really just asking about your expectation,
2    and if you don't know and you don't have one,
3    you can certainly tell me that.
4            But would you have, based on
5    your education, experience and background,
6    any expectation whether a company like
7    Johnson & Johnson would employ scientists,
8    including toxicologists, to look at any
9    hazards that may be included within their
10   products?
11           MR. FROST:  Objection.
12       A.   I'm sorry.  That...
13   BY MR. SOILEAU:
14       Q.   Too long?
15       A.   Yes.
16       Q.   All right.  You have education,
17   experience, training and other background in
18   the area of toxicology, right?
19       A.   Yes, that's correct.
20       Q.   And we've talked a little bit
21   about what toxicology is.  I'm simply asking
22   you as a professional:  Would you expect that
23   a company like Johnson & Johnson that sells
24   talcum powder products among its product

Page 49

1    lines would have, within its company,
2    scientists, including scientists with a
3    background similar to yours, to assess any
4    hazard their products might present?
5            MR. FROST:  Objection.
6        A.   And again, I don't know who
7    Johnson & Johnson hires directly or how they
8    do their manufacturing process or testing
9    processes.
10   BY MR. SOILEAU:
11       Q.   From your perspective, do you
12   have any expertise in the regulatory area?
13       A.   So in regards to my training
14   and expertise in toxicology, that involves a
15   wide range of subcategories, including
16   regulatory aspects of toxicology and
17   regulations regarding toxicological aspects.
18       Q.   Okay.  Let me show you an
19   additional exhibit.
20           (Comments off the stenographic
21   record.)
22           MR. SOILEAU:  I'm sorry,
23   Doctor, I have a -- here we go.  I
24   have a natural ability to lose items,

13 (Pages 46 to 49)

Kelly Tuttle, Ph.D.

Page 50

1    and I lost our exhibit stickers for a
2    moment, but I have found them.
3        (Whereupon, Deposition Exhibit
4        Tuttle-6, 21 C.F.R. 740, was marked
5        for identification.)
6    BY MR. SOILEAU:
7        Q.   Let me show you a document I'll
8    mark as Tuttle Exhibit 6. It's a two-page
9    document. And I just want to know if this is
10   something that, first, is familiar to you.
11       And not necessarily the
12   document, Doctor, but to be specific, this
13   document shows a copy of a regulation from
14   the Code of Federal Regulations Title 21,
15   740, Section 740.1.
16       Are you familiar with this
17   section from the Code of Federal Regulations?
18       A.   I would need to look at it.
19   Looks like it's a very brief paragraph. I'm
20   familiar with the Code of Federal Regulations
21   and the general documents.
22       Q.   Well, let me ask you this:
23   This document says, and specifically subpart
24   (a) of Section 740.1 says that the label of a

Page 51

1    cosmetic product shall bear a warning
2    statement whenever necessary or appropriate
3    to prevent a health hazard that may be
4    associated with the product.
5        Do you agree with that?
6        MR. FROST: Objection to form.
7        A.   Well, this is one subpart of
8    the entire part 740 that was -- was not
9    provided for review to put the additional
10   context for this, so I can't -- without
11   knowing more or being able to read the entire
12   regulations regarding this for context, I
13   can't agree or disagree.
14   BY MR. SOILEAU:
15       Q.   Okay. Very well.
16       Let me ask you this: As a
17   toxicologist with your training and
18   background and the experience that you bring
19   to this project, so I can't -- do you believe that a
20   manufacturer has an obligation to identify
21   hazards that may be associated with its
22   products?
23       MR. FROST: Objection.
24       A.   It depends.

Page 52

1    BY MR. SOILEAU:
2        Q.   Well, could you agree that good
3    practices of a company include an obligation
4    to identify hazards that may be associated
5    with the products that it presents for sale
6    to citizen consumers?
7        A.   Well, again --
8        MR. FROST: Objection.
9        A.   -- that's a very broad
10   statement. It depends. You have to look at
11   specifics, specifically what questions you're
12   wanting to answer, what the regulations say
13   regarding individual products and assessments
14   and things. So, you know, that's overly
15   broad to just say yes or no.
16   BY MR. SOILEAU:
17       Q.   Okay. One of the things I want
18   to understand today as we talk is the scope
19   of your expertise and the issues or topics
20   that you might address through your
21   testimony, and I know you told me that you
22   have some contact with regulatory matters.
23       I'm really not asking you to
24   interpret or list regulations right now. I'm

Page 53

1    just asking you as a toxicologist with your
2    training and background, do you have an
3    understanding about good practices for a
4    company like Johnson & Johnson?
5        MR. FROST: Objection.
6        A.   Well, as I said, as part of my
7    training and experience in working in
8    toxicology, I work with regulatory guidelines
9    and regulatory standards. You know, I can't
10   speak to what good practices would be. You
11   know, that's kind of a general term.
12       As I said, I spend a lot of
13   time reading regulations and looking at
14   regulations, but regarding good practices for
15   a company or anything like that, I would need
16   to look at the regulations.
17   BY MR. SOILEAU:
18       Q.   Do you ever work directly with
19   companies, companies like Johnson & Johnson,
20   who present for sale to citizen consumers
21   products like talcum powder products that are
22   at issue in this case?
23       MR. FROST: Objection.
24       A.   I have worked with companies in

14 (Pages 50 to 53)

Kelly Tuttle, Ph.D.

Page 54

1    regards to product information and product --
2    and regulations regarding products.  I don't
3    think that I've been involved with any that
4    were direct-to-consumer products.
5    BY MR. SOILEAU:
6        Q.   What about warning?  Have you
7    ever worked on a warning?  For example, a
8    company brings you some item that may be a
9    retail product, it may be used in industry,
10   asked you to assist that company in preparing
11   an appropriate warning associated with the
12   product.
13            Ever done that?
14       A.   So I've worked with companies
15   in the generation of material safety data
16   sheets under the Global Harmonization
17   Standard as well as any warnings or labels
18   required by the Global Harmonization
19   Standard.
20       Q.   What companies have you worked
21   with on the issue of warnings?
22            MR. FROST:  Objection to the
23       extent it's not confidential.
24       A.   I'm trying to --

Page 55

1    BY MR. SOILEAU:
2        Q.   Yeah.  Go ahead.  If there's
3    some issue of confidentiality, I'm not asking
4    about the product, the warning or any of the
5    product data that you might have reviewed.
6            I'm just asking you:  What
7    companies have you provided input on warnings
8    to?
9        A.   I don't know that I can recall
10   all of them.  As you said, I don't know if
11   there's anything regarding confidentiality.
12   I have done some work with Nucor Steel
13   previously.
14       Q.   Well, can we agree that an
15   initial step is to determine whether any
16   hazard exists in the particular product or
17   item that you are looking at and considering?
18            Did that question make sense to
19   you?
20       A.   Could you clarify it for me,
21   please?
22       Q.   Sure.
23            Can we agree that an initial
24   step in determining an appropriate warning

Page 56

1    for a product is to identify from the
2    perspective of a toxicologist any potential
3    hazard the product might present?
4        A.   So that's a little broad.  In
5    regards to hazards and labeling, the Global
6    Harmonization Standard puts forth some
7    guidelines regarding that, but you assess the
8    body of science, the scientific literature
9    and the information available.  It would,
10   again, depend on the product, what was being
11   manufactured, what we were looking at, what
12   was the question.
13       Q.   You say in part it would depend
14   on the product.  I mean, from a fundamental
15   level, I mean, isn't it true that you need to
16   know if there are any hazards presented by a
17   product before you consider what, if any,
18   warnings are appropriate or necessary?
19       A.   Well, it's not just quite as
20   simple as that.  Like I said, you have to
21   look at the scientific literature regarding
22   what the science shows.  There's some
23   guidelines set forth in the Global
24   Harmonization Standard regarding how hazard

Page 57

1    statements and labels are used based on the
2    body of science and the scientific evidence.
3        Q.   Have you at any time, in this
4    project or otherwise, taken any steps or
5    undertaken any work as a toxicologist to
6    identify any hazards associated with talcum
7    powder products?
8            MR. FROST:  Objection.
9        A.   Well, as I said in this
10   particular case, I was asked to assess the
11   body of science regarding a -- whether the
12   body of science supports the evidence for a
13   causal association between talcum powder
14   applied perineally and ovarian cancer.
15   BY MR. SOILEAU:
16       Q.   Do you recognize the words
17   "hazard assessment"?
18       A.   Yes.
19       Q.   What do those words mean to you
20   as a toxicologist?
21       A.   Well, I don't know that I have
22   a personal view.  They are defined in various
23   regulations and guidelines.  I don't know
24   that I personally have a definition.  I would

15 (Pages 54 to 57)

Kelly Tuttle, Ph.D.

Page 58

1  refer to those for a specific definition.
2      Q.   Is hazard assessment something
3  that you as a toxicologist have been trained
4  to perform?
5      A.   Yes, I have performed hazard
6  assessments.
7      Q.   Is there a methodology that you
8  are familiar with that is used for the
9  performance of hazard assessments?
10     A.   I believe I touched on that
11 briefly in my report, though not in depth.
12 It would depend.  There are some guidelines
13 in the regulatory agencies in regards to
14 hazard assessment.
15     Q.   There's one than more -- I'm
16 sorry, I tangled that up.  I apologize.
17          There's more than one
18 methodology out there can be used
19 appropriately by toxicologists to conduct a
20 hazard assessment, correct?
21      MR. FROST:  Objection.
22     A.   I would have to look at the
23 methodologies in question.  I'd have to look
24 at the guidelines to see what methodologies

Page 59

1  you're discussing, if there are differences
2  in them or anything else.
3  BY MR. SOILEAU:
4      Q.   Okay.  Very well.
5          Doctor, is there, however, a
6  particular methodology that you use and
7  employ and consider appropriate for hazard
8  assessment?
9      A.   Well, as I said, it would
10 depend.  I'd have to go look at the
11 regulations to see what is put forth in those
12 regulations regarding the methodologies for
13 hazard assessment.  I can't just speak to it
14 generally.
15     Q.   Okay.  Have you ever performed
16 a hazard assessment?
17     A.   It's been a while, but yes.
18     Q.   Okay.  Are you familiar with
19 the NRC risk assessment methodology?
20     A.   Vaguely, yes.
21     Q.   Is it generally accepted from
22 your perspective as a toxicologist as one of
23 the methodologies that might be used for
24 hazard or risk assessment by a toxicologist?

Page 60

1      MR. FROST:  Objection.
2      A.   Well, again, regarding risk
3  assessment, I would need to look at the
4  methodologies you're discussing specifically
5  so I could actually refer to them.  You
6  referred to multiple methodologies.  I would
7  need to see them to be able to compare them
8  and see what the guidelines and regulations
9  say.
10 BY MR. SOILEAU:
11     Q.   Right.  But I'm not asking you
12 now about all of the methodologies.  I was
13 just asking you if you recognized the NRC
14 risk assessment methodology as one of the
15 methodologies that a toxicologist might use
16 to perform an assessment?
17     A.   And as I said, I'd need to see
18 the methodology to be able to answer that
19 appropriately.
20     Q.   Okay.  As we sit here today,
21 you would not have any criticism of the use
22 of the NRC risk assessment methodology for
23 risk or hazard assessment, would you?
24      MR. FROST:  Objection.

Page 61

1      A.   Again, without having the
2  methodology in front of me so I could look at
3  it specifically, I couldn't say one way or
4  the other.
5  BY MR. SOILEAU:
6      Q.   Fair enough.
7          Did you make any -- well, let's
8  ask this first.
9          Did you have any conversations,
10 any discussions with any representatives of
11 Johnson & Johnson, other than the attorneys
12 retained to defend Johnson & Johnson?  Any
13 representatives of Johnson & Johnson other
14 than their retained defense attorneys?
15     A.   No, I have not.
16     Q.   Did you take any steps to find
17 out if the folks at Johnson & Johnson thought
18 that their talcum powder products were safe?
19      MR. FROST:  Objection.
20     A.   No, I did not.
21 BY MR. SOILEAU:
22     Q.   Have you assumed in your work
23 during this case that the folks at Johnson &
24 Johnson believed that their talcum powder

16  (Pages 58 to 61)

Kelly Tuttle, Ph.D.

Page 62

1    products are safe?
2          MR. FROST:  Objection.
3      A.    I was not asked to look at what
4    Johnson & Johnson thought.  I was asked to
5    examine the body of science and the
6    scientific evidence.
7    BY MR. SOILEAU:
8      Q.    Can you -- strike that.
9            Wouldn't you expect that
10   Johnson & Johnson would have its own body of
11   scientific evidence and scientific
12   information addressing talcum powder
13   products?
14         MR. FROST:  Objection.
15   BY MR. SOILEAU:
16     Q.    Its talcum powder products?
17     A.    Again, I was asked to assess
18   the scientific literature and the body of
19   evidence regarding a -- whether the evidence
20   supported a causal association between
21   perineal talcum powder application and
22   ovarian cancer.
23           It wouldn't really -- what
24   Johnson & Johnson thought or anything

Page 63

1    wouldn't play a role in the assessment of the
2    scientific literature.
3      Q.    Was the scientific literature,
4    the body of evidence that you considered, was
5    it provided to you, or did you take any steps
6    to generate or assimilate that body of
7    scientific literature and evidence?
8      A.    No, the literature was not
9    provided to me.  I did the literature reviews
10   myself as well as -- we have an information
11   specialist at CTEH that helps with
12   interlibrary loans and PubMed searches and
13   things of that nature.
14     Q.    An information specialist?
15     A.    Yes.
16     Q.    Who is that?
17     A.    Her name is Samantha Nation.
18     Q.    Was it your intention in
19   gathering scientific literature and evidence
20   to be thorough and complete?
21     A.    It was certainly my intent to
22   look at the body of science as a whole.
23     Q.    And when you say as a whole,
24   the entire available body of science?  Would

Page 64

1    that be fair, to say that you intended to
2    look at the entire available body of science
3    as a whole?
4          MR. FROST:  Objection.
5      A.    Well, the entire body of
6    science can -- you know, when you're
7    searching PubMed and searching Google Scholar
8    or looking at these sources, you're sifting
9    through thousands to millions of scientific
10   articles on a range of topics.  So we
11   certainly attempt to be comprehensive and
12   address the topic as put forth in the
13   scientific literature thoroughly.
14           But when you're dealing with
15   that many publications and that sheer amount
16   of data, you know, there's no guarantee that
17   you have found literally every applicable
18   publication in the scientific literature.
19   BY MR. SOILEAU:
20     Q.    That makes sense.
21           Can we agree that in gathering
22   the scientific literature, it is your
23   intention and you aspire to gather all of the
24   relevant scientific information?

Page 65

1          MR. FROST:  Objection.
2      A.    We certainly attempt to gather
3    as much, you know, applicable and, you know,
4    the scientific evidence that discusses the
5    question we're trying to answer as best we
6    can.
7    BY MR. SOILEAU:
8      Q.    But for the reasons you
9    outlined a moment ago, it can be hard to find
10   studies on a particular question or issue,
11   fair?
12     A.    Well, I said it can certainly
13   be hard to say that you have found every
14   article that has ever been published on any
15   given topic.
16     Q.    Wouldn't you expect that
17   Johnson & Johnson would be an excellent
18   source for relevant scientific literature and
19   evidence on the question of any relationship
20   between perineal application of talcum powder
21   products and ovarian cancer?
22         MR. FROST:  Objection.
23     A.    I don't know what Johnson &
24   Johnson maintains as far as scientific

17 (Pages 62 to 65)

Kelly Tuttle, Ph.D.

Page 66

1  literature or what they would do as far as
2  being a source for that kind of thing.  I
3  went to my established databases and did the
4  searches myself to find the literature.
5  BY MR. SOILEAU:
6      Q.   Do you know how long Johnson &
7  Johnson as a company has been marketing to
8  the public talcum powder products?
9          MR. FROST:  Objection.
10     A.   No, I do not.
11 BY MR. SOILEAU:
12     Q.   Okay.  And you said you don't
13 know what Johnson & Johnson maintains.  Did
14 you ask at any point?
15     A.   No, I did not.
16     Q.   So as we sit here today, you do
17 not know whether Johnson & Johnson believes
18 its talcum powder products are safe?
19         MR. FROST:  Objection.
20     A.   Well, as I said, I was asked to
21 look at the body of science and the
22 scientific evidence regarding whether
23 perineal talc exposure was causally
24 associated with ovarian cancer, regarding --

Page 67

1  I'm not -- you know, I am not aware of
2  Johnson & Johnson, their opinions or thoughts
3  regarding anything of that nature.
4  BY MR. SOILEAU:
5      Q.   Okay.  That's fair.
6          So Johnson & Johnson's position
7  or what Johnson & Johnson thinks about the
8  safety of its talcum powder products is
9  simply a question that you were not asked to
10 look at and have not looked at, fair?
11     A.   Again, I looked at the body of
12 science, I looked at what the scientific
13 evidence shows.  What Johnson & Johnson
14 thought or does, you know, is separate from
15 that.  That's not something that I would be
16 looking at when looking at the scientific
17 evidence.
18     Q.   But as we sit here today,
19 Doctor, you don't know what scientific
20 evidence or what literature Johnson & Johnson
21 has itself gathered or might have in its
22 possession, do you?
23         MR. FROST:  Objection.
24     A.   As I said, I went to the

Page 68

1  peer-reviewed scientific literature.  I do
2  not know, as I said, what Johnson & Johnson
3  has done or maintained.
4  BY MR. SOILEAU:
5      Q.   Okay.  Were you provided with
6  Johnson & Johnson documents that might speak
7  to any relationship between perineal
8  application of talcum powder products and
9  ovarian cancer?
10         MR. FROST:  Objection.
11     A.   I am not -- as I said, I'm not
12 aware of what Johnson & Johnson has.  The
13 materials that were provided to me are listed
14 in my report under the materials reviewed and
15 relied upon.
16 BY MR. SOILEAU:
17     Q.   All right.  Look at page 2 of
18 your report, if you would, Section 3.0.
19         Do you have that page, Doctor?
20     A.   Yes, I do.
21     Q.   You see that 3.0 has a number
22 of bulleted items?
23     A.   Yes.
24     Q.   The last one says, quote "Other

Page 69

1  Provided Documents," closed quotes.
2          Do you see that?
3      A.   Yes, I do.
4      Q.   Are there any other provided
5  documents that you have not identified for us
6  as we sit here today?
7      A.   Let's see.
8      Q.   To be fair, I do have your
9  supplemental list that we received this week,
10 and we may look at that today.
11     A.   Yes.
12     Q.   And I understand that there's a
13 supplemental list you have produced.  We'll
14 attach it perhaps later.  It's not included
15 in Exhibit 1, your report, but certainly
16 those things that are on the supplemental
17 list have been identified to us.  So that's
18 understood.
19     A.   Okay.
20     Q.   I just want to make sure that
21 as to Other Provided Documents under
22 Section 3.0 of your report, there's not
23 anything that's not been identified to us as
24 we sit here today.

18 (Pages 66 to 69)

Kelly Tuttle, Ph.D.

Page 70

1          Does that make sense?
2          A.   Yes.  I'm just reviewing the
3    list to see if there's anything that comes to
4    my mind that was provided --
5          Q.   Sure.
6          A.   -- that may have been...
7          Q.   This is my opportunity to talk
8    to you and to be fair and complete.  I would
9    not want to be in a courtroom later and hear
10   that, well, aha, under Section 3.0 on page 2,
11   I said other provided documents and there
12   were some other documents we never identified
13   for you, and we meant to reference that
14   through that generic language.
15         A.   Sure.
16         Q.   There's nothing like that, is
17   there?
18         A.   No, I don't believe so.  I
19   believe everything that was provided is cited
20   here, and then the scientific literature in
21   my references, I'm trying to think if there
22   was any instance where we were unable to pull
23   an article that we had found, you know, in
24   our PubMed searches that we went to the

Page 71

1    attorneys to get a copy of, but I don't think
2    that we had to do that.
3          Q.   Okay.
4          A.   But if we had, it would have
5    been cited in the references earlier in the
6    report.
7          Q.   Exactly.  Right.  If you had
8    run into that obstacle, it still would have
9    made -- that is, that literature that was not
10   immediately available to you would have made
11   its way into the reference list that begins
12   at page 72 of your report, correct?
13              I didn't mean for you to check
14   the page.
15         A.   Yes.
16         Q.   I'm just trying to identify the
17   reference list.
18              You put in the reference list,
19   as supplemented by the list we got this week,
20   all of the materials that you're relying on,
21   fair?
22         A.   Yes.
23         Q.   Okay.  Let's look at pages 4
24   and 5 of your report, if you will.

Page 72

1          At pages 4 and 5 of your
2    report, you list and discuss the nine Hill
3    aspects, don't you?
4          A.   Yes, I list and briefly discuss
5    the nine Hill -- excuse me -- the nine Hill
6    criteria.
7          Q.   Okay.  Very well.  Let me show
8    you a document that I will mark as Tuttle
9    Exhibit 7.
10              (Whereupon, Deposition Exhibit
11         Tuttle-7, 1965 Hill Publication, was
12         marked for identification.)
13   BY MR. SOILEAU:
14         Q.   Do you recognize Tuttle
15   Exhibit 7?
16         A.   Yes, I do.
17         Q.   What is Tuttle Exhibit 7?
18         A.   So this is the 1965 Hill
19   article entitled The Environment and Disease:
20   Association or Causation, that I cite in my
21   report.
22         Q.   Do you consider this sort of a
23   seminal paper?
24         A.   It certainly is, as I state in

Page 73

1    my report, one of the -- well, I mean,
2    obviously it's now the criteria is known as
3    the Hill criteria, and that, with the other
4    reference I cite, is some of the literature
5    that established methodology for establishing
6    whether an association is merely correlative
7    or if it is causative.
8          Q.   You said again, known as the
9    Hill criteria.  Do you know whether Sir
10   Austin Bradford Hill ever used the word
11   "criteria" in this paper?
12         A.   Not off the top of my head, no,
13   I don't know if he used that word
14   specifically.  I would need to look through
15   it specifically for that particular word.
16         Q.   All right.  You do say that
17   Hill -- this I see at page 5 of your report.
18              You say that Hill concludes
19   that these nine viewpoints should be studied
20   noting none of the viewpoints provides
21   indisputable evidence, correct?
22         A.   Yes, I state that Sir Hill
23   stressed that the nine viewpoints should be
24   examined as a whole and that no -- as I said,

19 (Pages 70 to 73)

Kelly Tuttle, Ph.D.

Page 74

1  no one viewpoint alone could provide
2  indisputable evidence.
3      Q.   But that's not all he said, is
4  it?
5          MR. FROST: Objection.
6  BY MR. SOILEAU:
7      Q.   Well, let me ask you:  Didn't
8  he go on to say that while none of his nine
9  viewpoints can bring indisputable evidence
10 for or against the cause and effect
11 hypothesis, none can be required as a sine
12 qua non?
13     A.   I'm sorry, can you refer me to
14 where you are in this article, please?
15     Q.   Sure.  Do you recognize that
16 from the Hill paper, the language I just
17 read?
18     A.   I'd like to be able to see it
19 on the page, if you don't mind.
20     Q.   And I'm glad to show it to you,
21 but I wanted to ask if you recognized it
22 first before we look at it in the paper.
23         Do you?
24     A.   Briefly.  As I said, I'd need

Page 75

1  to see it in the actual article so I can kind
2  of see the entire sentence as a whole.
3      Q.   Okay.  Let me -- let's look at
4  it.  I'm looking at page -- it says 11 at the
5  top left and 299 to the top right.  I believe
6  this comes out of an occupational medicine
7  textbook and that's why there are two
8  different page numbers.
9          Do you see page 11 at the top
10 left?
11     A.   Yes, I do.
12     Q.   And you see a paragraph that
13 begins with here then are nine different
14 viewpoints from all of which we could
15 study -- I'm sorry, we should study
16 association before we cry causation.
17         Do you see that?
18     A.   Yes, I see that paragraph.
19     Q.   And Sir Bradford Hill goes on
20 to say:  What I do not believe, and this has
21 been suggested, is that we can usefully lay
22 down some hard-and-fast rules of evidence
23 that must be obeyed before we accept cause
24 and effect.

Page 76

1      Did I read that correctly?
2      A.   Yes, you did.  And as I said,
3  and he says it here, the nine different
4  viewpoints must all be studied before you can
5  make a determination regarding causal
6  association, which is what I believe I said,
7  you can't pull one viewpoint, as we were
8  saying earlier, and provide from one
9  viewpoint indisputable evidence.
10     Q.   Right.  And the word "must" in
11 the quote I just read, that is emphasized in
12 the original paper from Sir Bradford Hill,
13 isn't it; that is, what I do not believe is
14 that we can usefully lay down some
15 hard-and-fast rules of evidence that must be
16 obeyed?  He emphasized the word "must."
17     A.   Yes, it is italicized here in
18 this report.
19     Q.   All right.  The next sentence
20 includes the "none of the nine viewpoints
21 bring indisputable evidence" that you quote
22 from in your paper, your report, correct?
23     A.   Let me double-check my quote to
24 make sure it's --

Page 77

1      Q.   Sure.
2      A.   Yes.
3      Q.   But you only used the first
4  part of this sentence which reads, quote,
5  "None of my nine viewpoints can bring
6  indisputable evidence."
7          You don't use the rest of the
8  sentence, do you, in your report?
9      A.   In my report, I specifically
10 just quote the indisputable evidence words,
11 since I was taking that directly from his
12 report.
13     Q.   Well, from a scientific
14 approach, Doctor, do you think it's fair to
15 quote Sir Bradford Hill on the indisputable
16 evidence that may or may not be offered by
17 any of his viewpoints and omit the language
18 where he says "none can be required as a sine
19 qua non?
20         MR. FROST: Objection.
21 BY MR. SOILEAU:
22     Q.   Do you think that's good
23 practice?
24         MR. FROST: Objection.

Kelly Tuttle, Ph.D.

Page 78

1     A.    Well, again, I think if you --
2  as I said, I took "indisputable evidence"
3  directly from his report, which is why it is
4  put in quotations and cited for accuracy.
5  BY MR. SOILEAU:
6     Q.    I understand that.
7     A.    But again, as I said, you can't
8  take any single of these viewpoints put forth
9  by Hill and be -- as it says, bring
10 indisputable evidence.  You can't take any
11 single criteria in a vacuum and make a
12 determination regarding a causal association.
13 All nine should be studied -- should be
14 studied, which is what he states at the
15 beginning of that paragraph.
16    Q.    Certainly.  And none can be
17 required, fair?
18        MR. FROST:  Objection.
19    A.    As I said, he states at the
20 beginning that all of which they should study
21 before establishing a causal opinion.
22 BY MR. SOILEAU:
23    Q.    Doesn't Sir Austin Bradford
24 Hill also teach us that none can be required

Page 79

1  before we determine cause and effect?
2        MR. FROST:  Objection.
3     A.    Again, as I said before, you
4  can't take one in a vacuum and use one
5  criteria to either prove or dis-- -- the Hill
6  criteria.  You have to take all nine and look
7  at the context of all nine as a whole.
8  BY MR. SOILEAU:
9     Q.    You cannot take one criteria to
10 prove -- you said to either prove or.  Isn't
11 it more complete and correct to say you can't
12 take one in a vacuum, one criteria, to either
13 prove or disprove causation?
14        MR. FROST:  Objection.
15    A.    No, I stopped myself because
16 that's inaccurate.  Scientifically, you can't
17 prove a negative.
18 BY MR. SOILEAU:
19    Q.    Well, okay.  I'm sorry, I feel
20 like I cut you off.  I didn't mean to.  Go
21 ahead.
22    A.    Thank you.
23        So you can't take one criteria
24 in a vacuum, you can't take one criteria out

Page 80

1  of the nine without assessing the other nine
2  and assessing the body of science as a whole,
3  which is what Sir Hill is stating here when
4  he says the nine different viewpoints from
5  all -- all of which we should study
6  association before we cry causation.
7     Q.    What does sine qua non mean?
8  Do you know?  How is your Latin?
9     A.    My Latin is very rusty.  I took
10 Latin in undergrad but that was a while ago.
11    Q.    You don't know what it means?
12    A.    Not off the top of my head, no.
13    Q.    Very well.
14        Are you familiar with a
15 textbook called Modern Epidemiology?
16    A.    Maybe vaguely.
17    Q.    Do you know who the authors
18 are?
19    A.    No, I do not.
20    Q.    Do you know whether there is a
21 textbook that is universally accepted in the
22 United States as a leading textbook on
23 epidemiology?
24        MR. FROST:  Objection.

Page 81

1     A.    No, I'm not aware of that.
2  BY MR. SOILEAU:
3     Q.    Have you heard the name Sander
4  Greenland?
5     A.    No, I don't believe I have.
6     Q.    Have you heard the name Kenneth
7  Rothman?
8     A.    Maybe vaguely, but I'm not
9  familiar with him.
10    Q.    Okay.  Do you own a copy of
11 Modern Epidemiology?
12    A.    I don't believe so, no.
13    Q.    Do you know whether you ever
14 studied a course that required the use of the
15 textbook Modern Epidemiology in your various
16 educational endeavors?
17    A.    I certainly studied
18 epidemiology as part of my training and
19 expertise in toxicology.  I don't recall
20 having a textbook on epidemiology solely.
21    Q.    All right.  Let me show you an
22 excerpt from a textbook called Modern
23 Epidemiology, Third Edition.  I will mark
24 this as Exhibit 8.

Kelly Tuttle, Ph.D.

Page 82

1          (Whereupon, Deposition Exhibit
2     Tuttle-8, Excerpt from Modern
3     Toxicology Third Edition, was marked
4     for identification.)
5     BY MR. SOILEAU:
6          Q.    I don't suppose it does, but
7     let me just ask.  Does the first page of
8     Tuttle Exhibit 8, which is the cover of the
9     textbook, happen to trigger any recollection?
10         A.    No, it does not.
11         Q.    All right.  Then let's turn to
12    the excerpt that I have from page 26 of
13    Modern Epidemiology, and I have here just a
14    section called or labeled Causal Criteria.
15    It's under Section 1 of Basic Concepts of the
16    textbook Modern Epidemiology.
17              And I'd like you to look.  You
18    see in the last paragraph of this document a
19    reference to Hill.  You see that?
20         A.    Yes, I do.
21         Q.    And just for context, if you go
22    one paragraph up, you will see a reference as
23    well to the viewpoints proposed by Sir Austin
24    Bradford Hill dated 1965.

Page 83

1          A.    Yes, I see that.
2          Q.    And if we come back down to the
3     final paragraph, you see that the nine
4     viewpoints are included in the middle of that
5     paragraph?
6          A.    Yes, I see them listed.
7          Q.    Okay.  We're talking about the
8     same paper that is now Tuttle Exhibit 7,
9     correct?
10         A.    I believe so.  I would need to
11    look at the references to be specific.  I
12    don't know if Sir Hill published anything
13    else in that year.
14         Q.    Okay.  Very well.
15              Can we agree that the nine
16    viewpoints that are listed in the final
17    paragraph of Tuttle Exhibit 8 are identical
18    to the nine viewpoints that you included in
19    your report beginning at pages 4 and 5?
20              Do you need to check them?
21         A.    I'm just looking to make sure
22    that the wording is the same.
23         Q.    Absolutely.  Do that.
24         A.    Yes, I believe so.

Page 84

1          Q.    Okay.  I want to read to you
2     the end of this paragraph from the Modern
3     Epidemiology textbook.  It says:  Hill
4     emphasized that causal inferences cannot be
5     based on a set of rules, condemned emphasis
6     on statistical significance testing, and
7     recognized the importance of many other
8     factors in decision-making, citing Phillips
9     and Goodman, 2004.  Nonetheless, the
10    misguided but popular view that his
11    considerations should be used as criteria for
12    causal inference makes it necessary to
13    examine them in detail.
14              Do you agree or disagree with
15    that summary statement about Hill?
16              MR. FROST:  Objection.
17         A.    Well --
18    BY MR. SOILEAU:
19         Q.    Or I'm sorry, or if you're not
20    able to offer a comment, certainly that can
21    be the answer.  It need not be
22    agree/disagree.  It can be I don't have an
23    answer or position.
24              Go ahead, I'm sorry.

Page 85

1          A.    As I said, I'm not familiar
2     with this textbook.  The statement regarding
3     Hill does not cite Hill's work; it cites
4     another article that I'm not familiar with
5     and don't know the title.  I would need to
6     see that article, the basis for that
7     statement, before I could provide any
8     discussion on it.
9          Q.    Okay.  And in fairness to you,
10    you're not really familiar with these
11    authors, Rothman, Greenland and Lash, to
12    react to the fact that it's their textbook,
13    fair?
14         A.    No.  As I said, I'm not
15    familiar with this textbook and I'm not
16    familiar with the authors.
17         Q.    Okay.  Very well.
18              Let's focus for a few minutes,
19    if we could -- I'm going to check.
20              MR. SOILEAU:  Everybody doing
21    okay time-wise, break-wise, my
22    reporter?  All right.  If someone
23    needs a break, let me know.
24    Otherwise, we'll keep going.

22  (Pages 82 to 85)

Kelly Tuttle, Ph.D.

Page 86

1        THE WITNESS:  I'm nearing the
2   time I will need a break, just a very
3   brief one.
4        MR. SOILEAU:  You want to go
5   ahead and take it now?  It's a stop
6   spot.  Let's do that.  Let's take a
7   quick break.  We'll go off the record.
8        THE VIDEOGRAPHER:  Going off
9   record, 10:24 a.m.
10        (Recess taken, 10:24 a.m. to
11   10:34 a.m.)
12        THE VIDEOGRAPHER:  We're back
13   on the record at 10:34 a.m.
14   BY MR. SOILEAU:
15   Q.   Okay.  Doctor, we had a short
16   break.  Are you ready to proceed?
17   A.   Yes, I am.
18   Q.   Very well.
19        Let's focus on one of the
20   Hugh -- that's going to be tough because none
21   of us have looked at Hugh.
22        Let's look at one of the Hill
23   viewpoints, okay?  Plausibility.
24        You say at page 30 of your

Page 87

1   report, in part:  The plausibility of a
2   relationship -- let me let you get there.  Do
3   you see it?
4   A.   Yes, I'm there.
5   Q.   Okay.  On page 30 you have a
6   subheading for one of the Hill viewpoints and
7   that is plausibility, which I believe is
8   number 6, correct?
9   A.   Of the --
10   Q.   Of the nine.
11   A.   I don't apply a number to them,
12   but it looks like it's number six as far as
13   the list.
14   Q.   I tell you what.  Look at
15   page 5 of your report for a moment.  Do you
16   see plausibility there?
17   A.   Yes.
18   Q.   It's number 6?
19   A.   Yes, it's listed as number 6.
20   Q.   Very good.  Let's go back to
21   page 30 now of your report, if we could.  And
22   under the subheading Plausibility, you say in
23   part, and I will quote:  The plausibility of
24   a relationship between talc exposure and

Page 88

1   ovarian cancer relies solely on the proximity
2   of talc particles to the ovaries, and the
3   proposed migration to the ovaries.
4        Did I read that sentence
5   correctly?
6   A.   Yes, you read that sentence
7   correctly.  I believe I discuss -- I state in
8   the next sentence I discuss it in greater
9   detail later in the report.
10   Q.   Sure.
11        When you say in that sentence,
12   Doctor, the proximity of talc particles to
13   the ovaries, what do you mean?
14   A.   So I'm referring to the
15   hypothesis that perineal application of
16   talcum powder can migrate from the perineum
17   to the ovaries.
18   Q.   Do you agree that perineal
19   application of talcum powder will put talc
20   particles and talcum powder in proximity to
21   the ovaries?
22        MR. FROST:  Objection.
23   A.   Again, as I discuss in my
24   report, the scientific evidence has not

Page 89

1   established that perineal application of
2   talcum powder will allow talcum particles to
3   migrate from the genital area to the ovaries.
4   BY MR. SOILEAU:
5   Q.   Okay.  So the issue you have is
6   with the idea of migration, fair?
7   A.   What I address in my report is
8   the hypothesis that the perineal application
9   of talcum powder will allow talc particles to
10   migrate from the genital area to the ovaries.
11   Q.   How did the talcum particles --
12   let me resay that.
13        How do the talc particles come
14   to be in close proximity to the ovaries?
15        MR. FROST:  Objection.
16   BY MR. SOILEAU:
17   Q.   Do you have an understanding?
18   A.   Well, as I said for -- for --
19   as I'm discussing in the report and as I
20   discuss later in the report, I am examining
21   the scientific evidence for the hypothesis
22   that external application of talcum powder to
23   the genital area will allow talc particles to
24   migrate through the female reproductive tract

Kelly Tuttle, Ph.D.

Page 90

1    to the ovaries.
2         Q.    Why do you say talc particles
3    as opposed to talcum powder?
4         A.    Because that's what I refer to
5    specifically in my report and in assessing
6    some of the scientific literature, they're
7    looking for talc particles in the ovaries,
8    and so that's why I used the term "talc
9    particles."
10        Q.    Okay.  So your statement here
11   that plausibility relies solely on something,
12   it's really that the plausibility of a
13   relationship relies solely on the proposed
14   migration theory?  Is that a fair summary of
15   what you're telling us there?
16             MR. FROST:  Objection.
17   BY MR. SOILEAU:
18        Q.    You say solely and then I see
19   talc particles in proximity to the ovaries
20   and proposed migration.  I see more than one
21   thing.  I just want to understand what you
22   mean when you say relies solely on.  Relies
23   solely on what?
24        A.    So in relation to the -- again,

Page 91

1    the assessment of the scientific literature
2    regarding perineal application of talcum
3    powder and ovarian cancer there is the
4    proposed migration that the external perineal
5    application of talcum powder will cause talc
6    particles to migrate throughout the female
7    reproductive tract to the ovaries.
8             And secondarily to that is that
9    the presence of talc particles at the ovaries
10   is -- I'm sorry, I'm trying to make sure I'm
11   speaking very clearly -- that the presence of
12   talc particles at the ovaries is sufficient
13   to -- or insufficient to establish a causal
14   association with ovarian cancer.
15        Q.    Would the presence of talc
16   particles at the ovaries be important from
17   your perspective as a toxicologist?
18             MR. FROST:  Objection.
19        A.    Well, again, not assessing
20   necessarily the migration, the presence of a
21   material at an organ or at a tissue does not
22   mean that it will exert an adverse effect.
23   BY MR. SOILEAU:
24        Q.    Well, it doesn't mean that it

Page 92

1    will, is what you're telling me?
2             MR. FROST:  Objection.
3         A.    I'm saying that the mere
4    presence of a particle or chemical or
5    anything when looking at toxicology, the mere
6    presence of a material does not mean that the
7    material will cause an adverse effect on the
8    tissue or organ that it's located at.
9    BY MR. SOILEAU:
10        Q.    But it might?
11             MR. FROST:  Objection.
12        A.    Again, it depends.  You have to
13   look at the scientific evidence, you have to
14   look at the scientific literature, you have
15   to look at dose and frequency of exposures
16   and all those different parameters.
17   BY MR. SOILEAU:
18        Q.    Okay.  I'll tell you what.
19   We'll come back to that issue in a moment.
20             I meant to ask you:  How many
21   hours have you spent with the J&J attorneys
22   thus far during this project?
23        A.    I couldn't give you an exact
24   number.  I would estimate we have probably

Page 93

1    spent between 20 and 25 hours together.
2         Q.    Okay.  That includes the time
3    yesterday?
4         A.    Yes.
5         Q.    Let me show you a couple of
6    exhibits that I will mark separately as
7    Tuttle Exhibit 9 and Tuttle Exhibit 10.
8             (Whereupon, Deposition Exhibit
9    Tuttle-9, CTEH Billing Summary, was
10   marked for identification.)
11            (Whereupon, Deposition Exhibit
12   Tuttle-10, CTEH Billing Summary, was
13   marked for identification.)
14   BY MR. SOILEAU:
15        Q.    Take a look at these two
16   documents and identify them for me.
17             MR. SOILEAU:  And for the
18   purposes of counsel --
19             MR. FROST:  I was going to say,
20   do you mind telling me which one is 9
21   and which one is 10?
22             MR. SOILEAU:  Exactly.
23   BY MR. SOILEAU:
24        Q.    Why don't you help us because

24 (Pages 90 to 93)

Kelly Tuttle, Ph.D.

Page 94

1   you have them there as I've already marked
2   them.
3        A.   So these -- I'm sorry.
4        Q.   Yes.
5             MR. SOILEAU:  Before you do
6   that, we have different invoice
7   numbers.  And, Mr. Frost, if you can
8   look over at Exhibit 9 and if you'll
9   look at the invoice number and tell us
10  which one is Exhibit 9 and which one
11  is Exhibit 10 so I don't get it wrong.
12            MR. FROST:  Exhibit 9 is
13  316304.
14            MR. SOILEAU:  Very good.  And
15  then I will deduce that the other one
16  is 10.
17            MR. FROST:  I'm going to make
18  that same assumption.
19  BY MR. SOILEAU:
20       Q.   Very good.
21            Okay, Doctor, and I apologize
22  for interrupting you.  Go ahead.  You were
23  going to tell me what these are.
24       A.   These are invoices provided by

Page 95

1   CTEH regarding my work on the Johnson &
2   Johnson Daubert challenge.
3        Q.   The Johnson & Johnson Daubert
4   challenge.
5             Is this, to your knowledge, the
6   only file that CTEH has opened for Johnson &
7   Johnson?
8        A.   To my knowledge, yes.  I don't
9   know what other individuals in the company
10  are working on, but to my knowledge, yes.
11       Q.   Well, fair.  But -- I think
12  we're together.
13            As we sit here, you don't have
14  any knowledge and you're not aware of anyone
15  else working at CTEH on a Johnson & Johnson
16  talcum powder project other than the team
17  that's worked with you on this Johnson &
18  Johnson Daubert challenge; is that fair?
19       A.   I'm sorry, can you restate
20  that?  I got a little confused there towards
21  the end.
22       Q.   Yeah.  I'll come back to it.
23            How do I know who all at CTEH
24  has worked on this project?

Page 96

1        A.   So all of our time is billed
2   and documented in our invoices.
3        Q.   Right.  But how do I know whose
4   time I'm looking at?
5        A.   The first page is just a
6   summary of the hours that were billed that
7   particular day, and in the subsequent pages,
8   they break that down by employee.
9        Q.   Right.  But you see that my
10  copy is redacted.
11       A.   Yes, I do.
12       Q.   Is there any way for me to know
13  the names of the folks at CTEH who have
14  worked on this Johnson & Johnson Daubert
15  challenge project?
16       A.   It would be -- I could probably
17  tell you most of them.  We have a team that
18  supports -- I have a team that has supported
19  me in my drafting of my report in this case,
20  and that's their additional time that would
21  be itemized in this invoice.
22       Q.   All right.  Do that for me, if
23  you would, if you would give me names and
24  titles or job positions.  I know you gave us

Page 97

1   one already.  You gave us Samantha Nation?
2        A.   Nation.
3        Q.   And she was an information
4   specialist?
5        A.   Yes.
6        Q.   Do you happen to know her rate?
7        A.   Not off the top of my head, no.
8        Q.   Okay.  Who else has worked on
9   this project at CTEH?
10       A.   So in addition to Samantha, we
11  have also had a health scientist, Dana
12  Cubanski.
13       Q.   How do you spell her last name?
14       A.   C-U-B-A-N-S-K-I.
15       Q.   Very well.
16            And what does that mean, health
17  scientist?  How is she degreed, for example?
18       A.   She -- and I don't remember
19  specifically.  She has a master's in science.
20  I don't remember her exact field for her
21  degree.
22       Q.   All right.  Who else?
23       A.   In addition to Dana, Dr. Scott
24  Malm, M-A-L-M, who is a toxicologist.

Kelly Tuttle, Ph.D.

Page 98

1    Q.   What role does he play on this?
2         A.   He just provided some support
3    for me reviewing my report, you know, looking
4    at presentation, you know, typos, you know,
5    checking, double-checking the report for me.
6         Q.   Sort of a peer review?  Not
7    formally, but sort of?
8         A.   Not really a peer review.
9    Mainly just assisting with looking at
10   formatting, presentation issues, making --
11   trying to help make sure when you're writing
12   a report and dealing with something of this
13   size, making sure there's no typos or making
14   sure that I don't use inappropriate
15   punctuation or my sentences end and I don't
16   just kind of jump off onto another thought
17   process or things like that.
18        Q.   But he is a Ph.D. toxicologist?
19        A.   Yes, he is.
20        Q.   If I were comparing the two of
21   you on some sort of company chart, is one
22   superior or -- to the other, overseeing the
23   other, or are you sort of on parallel
24   platforms?

Page 99

1         A.   I don't oversee Dr. Malm.  He
2    has been with the company for a shorter
3    period of time than I, but beyond that,
4    there's no --
5         Q.   Y'all are just colleagues?
6         A.   Yes.
7         Q.   Who else?
8         A.   Dr. Michael Reilly.
9         Q.   Last name?
10        A.   R-E-I-L-L-Y, I believe.
11        Q.   All right.  And his position?
12        A.   He is also a toxicologist.
13        Q.   Simply another colleague to you
14   and Dr. Malm?
15        A.   Yes.
16        Q.   And he is a Ph.D. toxicologist?
17        A.   Yes, he is.
18        Q.   And what role did Dr. Reilly
19   have?
20        A.   He did the same type of support
21   work for me as Dr. Malm.
22        Q.   Any others at CTEH who have
23   worked on this Johnson & Johnson Daubert
24   challenge project?

Page 100

1         A.   I think all that's left is some
2    support staff who assisted with organizing
3    the file of materials, you know, with the
4    references and things like that.
5         Q.   Is their time billed as well?
6         A.   I believe so, yes.
7         Q.   Okay.  Their work would have
8    been clerical or administrative, as opposed
9    to substantive?
10        A.   Yes.
11        Q.   They were not reviewing your
12   report or your work or your opinions and
13   offering substantive comment, were they?
14        A.   No, they were not.  And as I
15   said earlier, you know, those who did review
16   my report were reviewing it for, you know,
17   clarity, for presentation issues, for
18   punctuation, formatting, things of that
19   nature.
20        Q.   Right.  I was just really
21   referring to that last group of people who
22   are thus far unidentified and understanding
23   their role as more administrative or
24   clerical.  That's fair, right?

Page 101

1         A.   Yes, that's fair.
2         Q.   And I didn't mean to include,
3    just so that we are together, Dr. Malm or the
4    other persons at CTEH who may have worked
5    with you.
6              Is there any way for me to look
7    at Exhibit 9 and Exhibit 10 and know, for
8    example, how many hours you have?
9         A.   With the numbers redacted --
10        Q.   I'm sorry, the what?
11        A.   I'm sorry, not the numbers
12   redacted.  With the names and times redacted,
13   generally speaking, looking at Exhibit 9, I
14   believe right here at the page 3 of 4 and
15   page 4, where the hourly rate put forth by
16   CTEH is listed as $305 an hour, that would be
17   my time that I billed for this particular
18   invoice.
19        Q.   Would Dr. Malm, for example,
20   have the same rate?
21        A.   No, he would not.
22        Q.   What is his rate?
23        A.   I don't know specifically.
24        Q.   Are you the only person at CTEH

26 (Pages 98 to 101)

Kelly Tuttle, Ph.D.

Page 102

1    who worked on the Johnson & Johnson Daubert
2    challenge project who billed at $305 an hour?
3        A.   I believe so, yes.
4        Q.   So to your understanding, I can
5    at least look for the itemized pages, look at
6    the rate, and when I see $305 an hour, you
7    would suggest I could assume correctly that
8    that is you?
9        A.   Yes, I believe so.
10       Q.   And as to the other rates
11   shown, I could correctly assume at least that
12   it is someone other than you, someone at CTEH
13   other than you, fair?
14       A.   Yes, that's correct.
15       Q.   Okay.  Let me show you
16   something we made reference to earlier and
17   I'll make part of our record, marked as
18   Exhibit 11.
19           (Whereupon, Deposition Exhibit
20           Tuttle-11, Tuttle Supplemental
21           Materials Reviewed and Considered, was
22           marked for identification.)
23   BY MR. SOILEAU:
24       Q.   It's a one-page document.

Page 103

1            Do you recognize this document,
2    Doctor?
3        A.   Yes, I do.
4        Q.   And this is the supplemental
5    materials reviewed and considered?
6        A.   Yes, it is.
7        Q.   And how was it determined to
8    your knowledge what supplemental materials
9    you would review and consider?
10           MR. FROST:  Objection.
11   BY MR. SOILEAU:
12       Q.   I'm just asking you -- how
13   about this so that we don't step into
14   anything we're not supposed to step into.
15           Who determined what
16   supplemental materials you were to look at?
17       A.   I did.  As far as, I believe,
18   all the materials provided here were ones
19   that I read or reviewed.
20       Q.   Did you -- I'm sorry, go ahead.
21       A.   No.  And so they were ones that
22   I chose to read and review.
23       Q.   Okay.  Did you have a greater
24   library of documents available and select

Page 104

1    these from that broader library?
2        A.   I believe the attorneys
3    provided all of the defense expert reports
4    that are related to the MDL litigation.
5    These are the subset that I read specifically
6    or reviewed specifically.  I don't believe I
7    received all of the depositions, but I think
8    I received -- but the ones that I reviewed
9    are provided here.
10       Q.   Okay.  There are 12 items
11   listed on Tuttle Exhibit 11?
12       A.   Yes.
13       Q.   And I believe each one of the
14   12 is either a deposition or an expert
15   report, with the exception of item 11.
16   Agree?
17       A.   Yes, that's correct.
18       Q.   How did 11, the Taher,
19   T-A-H-E-R, the Taher paper, come to be among
20   the supplemental materials reviewed and
21   considered?
22           MR. FROST:  Objection.
23       A.   It was discussed in the
24   Health Canada draft assessment that I

Page 105

1    mentioned in my report, and it was discussed
2    in, I believe, at least one if not other --
3    other depositions, and I did not have a copy
4    as it's unpublished, so I can't access it in
5    the peer-reviewed literature.
6    BY MR. SOILEAU:
7        Q.   Okay.  You had, in preparing
8    your original report, looked at
9    Health Canada, the draft assessment from
10   Health Canada?
11       A.   Yes, I cite it in my report.
12       Q.   Okay.  And so when you signed
13   your report, you would have been aware of the
14   Taher paper, fair?
15       A.   As I said, I saw that it was
16   cited in the Health Canada draft assessment,
17   but as it's unpublished, it was inaccessible
18   in the peer-reviewed scientific literature.
19       Q.   Okay.  And you had seen that
20   before you signed your report, fair?
21       A.   The Health Canada draft
22   assessment, yes.
23       Q.   Right.  And the reference to
24   Taher, the unpublished paper?

27 (Pages 102 to 105)

Kelly Tuttle, Ph.D.

Page 106

1    A.    Yes, I saw the reference in the
2    Health Canada report.
3        Q.    Okay.  Had you requested the
4    Taher paper before you signed your report?
5        A.    I don't believe so, no.
6        Q.    What caused you to decide to
7    request the Taher paper after you signed your
8    report?
9        A.    As I said, it was unpublished,
10   so that's why it would not have been included
11   in my review of the scientific literature.
12   It was included later because, as I said, I
13   saw that it had been discussed more in
14   detail, and so -- and since I couldn't
15   receive a copy of it through normal
16   scientific literature means, the attorneys
17   provided me a copy.
18       Q.    You said you saw that it had
19   been discussed more in detail.  Where?
20       A.    I don't recall specifically,
21   but in some of these supplemental materials
22   that I reviewed.
23       Q.    Some of the supplemental
24   materials listed on Tuttle Exhibit 11?

Page 107

1        A.    Yes.
2        Q.    During your preparation for
3    your deposition testimony, have you been
4    videotaped?
5            MR. FROST:  Objection.
6            She can answer.
7            MR. SOILEAU:  Okay.
8        A.    No, I have not.
9    BY MR. SOILEAU:
10       Q.    Okay.  Let's turn to the issue
11   of migration.  You say at page 57 of your
12   report, Section 11.5, that Dr. Plunkett's
13   migration theory whereby talc particles
14   supposedly migrate through the body either
15   through perineal application or inhalation,
16   and arrive at foreign tissues such as the
17   ovaries, is severely flawed.
18           Did I read that correctly from
19   your report?  Did you find it in time?
20       A.    I got to the page, but you were
21   about halfway through the sentence.
22       Q.    All right.  Let's just see if
23   we can agree on this.
24           At Section 11.5, and I think

Page 108

1    particularly in the heading, you do say that
2    Dr. Plunkett's migration theory is, in your
3    opinion, severely flawed, correct?
4        A.    11.5 does state Dr. Plunkett's
5    theory of particle migration from the genital
6    area to the ovary has not been accomplished
7    in the scientific literature and is severely
8    flawed.
9        Q.    Very well.
10           Turn to page 60 of your report.
11   You say in Section 12.2 of your report,
12   referring to Dr. Zelikoff, that the opinion
13   that talcum powder can reach the ovaries by
14   means of migration through the female
15   reproductive tract after perineal application
16   is not scientifically sound, correct?
17           MR. FROST:  Objection.
18       A.    Can you --
19   BY MR. SOILEAU:
20       Q.    Do you say that -- sure.  I can
21   help you find it if you need me to.  I'm
22   asking you if you labeled Dr. Zelikoff's
23   opinion on migration as not scientifically
24   sound.

Page 109

1            MR. FROST:  Objection.
2        A.    In the first paragraph under
3    12.2, I say:  In her expert report,
4    Dr. Zelikoff opines that talcum powder can
5    reach the ovaries by means of migration
6    through the female reproductive tract after
7    perineal application as well as through
8    inhalation.  Neither opinion is
9    scientifically sound.
10   BY MR. SOILEAU:
11       Q.    Okay.  So it is correct that
12   you have labeled Dr. Zelikoff's opinion on
13   migration as not scientifically sound and
14   Dr. Plunkett's theory of migration as
15   severely flawed, correct?
16       A.    It's stated as not
17   scientifically supported, as stated in my
18   report.
19       Q.    Are those things synonymous to
20   you?
21       A.    I'm sorry, what things?
22       Q.    Not scientifically supported
23   and unsound or severely flawed, are all of
24   those three things synonymous for you in

28 (Pages 106 to 109)

Kelly Tuttle, Ph.D.

Page 110

1    your -- in your -- when you use those words?
2        A.   So in looking at Dr. Plunkett
3    and Dr. Zelikoff in regards to migration,
4    it's looking at the methodology applied and
5    looking at the scientific evidence that
6    supports or doesn't support their statements,
7    and what I am saying here is that based on
8    the scientific evidence, there's no
9    scientific evidence that establishes that
10   perineal application of talcum powder can
11   migrate through the female reproductive tract
12   and reach the ovaries.
13       Q.   No scientific evidence to
14   establish that perineal application of talcum
15   powder can migrate to the ovaries; is that
16   correct?
17       A.   I believe I said no scientific
18   evidence that supports that perineal
19   application of talcum powder can migrate
20   through the reproductive tract to the
21   ovaries.
22       Q.   Thank you.  No scientific
23   evidence that supports that perineal
24   application of talcum powder can migrate.

Page 111

1           And what you're saying is, is
2    that no scientific evidence to support this
3    idea that after perineal application, the
4    talcum powder can migrate through the
5    reproductive tract to the ovaries?
6        A.   As I said, there's no
7    scientific evidence to support that perineal
8    application of talcum powder will migrate
9    from the genital area through the female
10   reproductive tract to the ovaries.
11       Q.   Right.  I guess I was just
12   understanding.  I think it's clear the thing
13   that migrates would be the talcum powder
14   product; is that right?
15          You talk about perineal
16   application of talcum powder and then you
17   talk about migration from the genital area
18   through the reproductive tract to the
19   ovaries.  What's migrating under this theory
20   as you understand it?
21       A.   Under the hypothesis as I
22   understand it is that the talcum powder would
23   migrate through the female reproductive
24   tract, or as I state, we discussed earlier in

Page 112

1    regards to talc particles based on, you know,
2    looking at some of the scientific literature
3    that looks at talc particles.
4        Q.   Very well.
5           Doctor, have you formed an
6    opinion that migration of talcum powder to
7    the ovaries after perineal application is not
8    plausible?
9           MR. FROST:  Objection.
10       A.   So what I did was assess the
11   body of science to see what the scientific
12   evidence supports, and the scientific
13   evidence does not support the hypothesis that
14   perineal application of talcum powder can
15   cause talcum powder to migrate from the
16   genital area to the ovaries.
17   BY MR. SOILEAU:
18       Q.   You brought up the issue of
19   migration in your report, specifically under
20   the topic of Hill's plausibility viewpoint,
21   didn't you?
22       A.   Yes, I did.
23       Q.   Do you have an opinion on
24   whether migration is a plausible explanation?

Page 113

1           MR. FROST:  Objection.
2        A.   Well, as I said, it's not about
3    my opinions about what the scientific
4    evidence shows, and the scientific evidence
5    doesn't support that, that mechanism.
6    BY MR. SOILEAU:
7        Q.   Have you conducted a thorough
8    review of the available scientific evidence
9    and then formed an opinion on migration based
10   upon that review?
11       A.   Well, as I said, I assessed the
12   body of science, and as we discussed earlier,
13   it's impossible to say out of the millions of
14   scientific literature that I reviewed every
15   single article in the realm of scientific
16   literature, but I looked at the body of
17   science and saw -- assessed it in the context
18   of the Hill criteria and found that it does
19   not support the hypothesis that perineal
20   application of talcum powder can migrate from
21   the genital area to the ovaries.
22       Q.   What I understand you to be
23   telling me is that you did not find
24   scientific evidence to support the migration

29 (Pages 110 to 113)

Kelly Tuttle, Ph.D.

Page 114

1   theory.
2           Have I understood you
3   correctly?
4           A.   Yes, I believe so.  As I --
5   just to reiterate for clarity, in assessing
6   the body of science, I found no scientific
7   studies that supported the perineal
8   application of talcum powder that could
9   migrate from the genital area to the ovaries.
10          Q.   In your evaluation of the
11  scientific evidence, did you conclude that
12  the plausibility viewpoint fails on that
13  basis?
14          MR. FROST:  Objection.
15          A.   I would need to return back to
16  get my exact wording regarding the
17  plausibility on page 30.
18  BY MR. SOILEAU:
19          Q.   Go ahead and do that, and I'll
20  reset my question.
21          You had discussed with me
22  earlier the nine viewpoints that Sir Austin
23  Bradford Hill provided in his 1965 paper,
24  correct?

Page 115

1           A.   Yes.
2           Q.   And you had stressed -- or
3   said -- maybe stressed is unfair, but you had
4   specifically said at some point that each of
5   those nine viewpoints should be considered,
6   correct?
7           A.   Yes, that's accurate.  I said
8   we should look at all nine criteria as a
9   whole for the context, and that you can't
10  take one criteria in a vacuum.
11          Q.   Right.  But the application of
12  Hill methodology would include a review of
13  each of the viewpoints as part of the whole
14  application of the methodology.
15          Do I have it right?
16          A.   Yes, that's correct.
17          Q.   Okay.  And your paper includes
18  the plausibility viewpoint, a discussion of
19  plausibility?
20          A.   Yes, it does.
21          Q.   So did the scientific evidence
22  that you looked at -- that you looked at as
23  you reviewed the literature and the available
24  scientific evidence satisfy or fail to

Page 116

1   satisfy plausibility under the Hill
2   viewpoints?
3           A.   So as I note in Section 30 and
4   as I discuss elsewhere in my report, the
5   scientific evidence -- there's no scientific
6   evidence to support that migration theory
7   that perineal application of talcum powder
8   applied to the genital area can migrate
9   through the female reproductive tract to the
10  ovaries.
11          Q.   Okay.  And I'm sorry if you
12  told me this before, but this issue of
13  migration is one of the things that you
14  reviewed as you did your overall literature
15  search, correct?
16          A.   Yes, that's correct.
17          Q.   And to be complete, I
18  understand you've told me that there are
19  thousands of papers, the possibility of
20  missing one is there, and I understand also
21  that your review of literature was not
22  limited to migration.  That's fair as well?
23          A.   Yes, that's accurate.
24          Q.   Okay.  I just wanted to make

Page 117

1   sure it included migration.  I appreciate
2   your patience with my questions.
3           In looking at the body of your
4   report, I found three things that you listed
5   in opposition to this theory of migration.
6   One of them was gravity, is that correct,
7   that you list gravity as a fact that stands
8   in opposition to the migration theory?
9           MR. FROST:  Objection.
10          A.   I need to -- refer to me -- or
11  sorry -- refer me specifically to where I
12  discuss gravity.  I do know that I mention
13  gravity.  I don't know that I present it as a
14  fact in opposition of the migration theory.
15          As I said, I looked at the body
16  of science and found the scientific evidence
17  does not support the migration theory.
18  BY MR. SOILEAU:
19          Q.   Okay.  When you review a body
20  of scientific literature in general, do you
21  weigh available evidence as part of your
22  methodology?
23          A.   It depends.  You know, I look
24  at the body of science as a whole.  In this

Kelly Tuttle, Ph.D.

Page 118

1    particular case, you know, we -- I cite the
2    available scientific literature as well as
3    discussing issues that may be part of the
4    study or the body -- you know, how the
5    scientific study was performed.
6            But generally speaking, I try
7    to look at all -- everything that's been
8    published in the scientific literature as
9    well as I can.
10       Q.   Right.  You don't start with
11   the answer and look for literature to support
12   the hypothesized answer only, right?
13           MR. FROST:  Objection.
14       A.   Exactly.  I do not go to the
15   scientific literature only looking for things
16   that will support or disprove a particular
17   hypothesis.  I try to look at the body of
18   science as a whole.
19   BY MR. SOILEAU:
20       Q.   Right.  And you've discussed
21   that process with us some today and we may
22   talk about it more, but as you gather the
23   available literature, the body of scientific
24   evidence, do you at some point in this

Page 119

1    process weigh the evidence to see what it
2    tells you?
3        A.   Well, again, we're speaking in
4    generalities.
5        Q.   Yes.
6        A.   In the case of plausibility, as
7    I said, the scientific evidence doesn't
8    support the migration theory that perineal
9    application can migrate to the ovaries.
10       Q.   Okay.  But you do recognize as
11   part of a methodology in the scientific
12   process for the analysis of a causal
13   relationship the idea of weighing evidence,
14   don't you?
15           MR. FROST:  Objection.
16       A.   Again, I'm familiar with the
17   term "weight of evidence."  I'm familiar with
18   assessing the body of science.  You know, as
19   far as what I did here, I assessed the body
20   of science as a whole, and as far as weighing
21   individual things, that's very general.  We'd
22   have to probably get more specific into the
23   body of science and what we were doing.
24           ///

Page 120

1    BY MR. SOILEAU:
2        Q.   Fair enough.
3            Doctor, during your work in
4    this project and specifically the generation
5    of your expert report, did you at any point
6    weigh the evidence on the issue of migration?
7            MR. FROST:  Objection.
8        A.   As I said, the scientific
9    evidence does not support the hypothesis that
10   perineal application of talcum powder can
11   cause talcum powder to migrate through the
12   female reproductive tract to the ovaries.
13   BY MR. SOILEAU:
14       Q.   Okay.  There was really no
15   evidence to weigh.  Let me back up a step.
16           Sometimes when you look at an
17   issue and you gather the available scientific
18   literature, it is fair to say that at times
19   you have competing literature, true?
20       A.   Again -- again, that's very
21   broad.
22       Q.   Yes, ma'am.
23       A.   We have to kind of look at a
24   body of literature specifically for a

Page 121

1    topic --
2        Q.   I understand.
3        A.   -- and see what the science
4    says.
5        Q.   It was a general question,
6    Doctor, and it's simply that when you gather
7    the available literature, there are times for
8    some issues where there is competing evidence
9    on both sides of a question, fair?
10       A.   Again, you have to look at the
11   science as a whole as far as -- as competing.
12   You know, again, you're speaking in
13   generalities as regards to whether, you know,
14   on a given topic science can have different,
15   you know, viewpoints or different evidence.
16       Q.   Sure.
17       A.   The science is the science.
18   You have to just look at the body of science
19   as it stands and look at what it shows.
20       Q.   I mean, that is the art of the
21   scientific process, isn't it, gathering the
22   evidence and looking at it and seeing what it
23   teaches?
24           MR. FROST:  Objection.

31 (Pages 118 to 121)

Kelly Tuttle, Ph.D.

Page 122

1       A.   I'm sorry, can you repeat the
2   first part of that question?
3   BY MR. SOILEAU:
4       Q.   Determination of a causal
5   relationship of a substance like talcum
6   powder is, for you as a toxicologist,
7   different than engineering, isn't it?
8            MR. FROST:  Objection.
9       A.   I'm sorry.  I don't think I
10  understand the question.
11  BY MR. SOILEAU:
12      Q.   Okay.  I guess in my mind three
13  engineers doing the same engineering
14  calculation will come up with the exact same
15  answer if they've done it appropriately and
16  competently, but that scientists looking at
17  evidence may have different thoughts or
18  opinions even though they look at the same
19  body of evidence.
20           Do you agree with that?
21           MR. FROST:  Objection.
22      A.   Again, we're speaking in
23  generalities, but, no, if scientists are
24  looking at the same body of science and

Page 123

1   applying the same methodology, they should
2   arrive at the same conclusions.
3   BY MR. SOILEAU:
4       Q.   Okay.  Very well.
5            Is gravity in this context part
6   of the body of evidence that you assembled
7   when you examined the issue of migration of
8   talcum powder through perineal application?
9            MR. FROST:  Objection.
10      A.   Well, as I said, you need to
11  refer me to where I specifically address
12  gravity.
13  BY MR. SOILEAU:
14      Q.   Oh, I'm sorry.
15      A.   I recall that I mention it, but
16  as I said, I don't think I used it as a fact.
17  I state that the scientific evidence does not
18  support the migration theory.
19      Q.   Sure.  I'll point you to it.
20      A.   Thank you.
21           MR. FROST:  Do you want help?
22  BY MR. SOILEAU:
23      Q.   Look at page 57.
24           MR. FROST:  I did a word

Page 124

1   search.
2            MR. SOILEAU:  I started to do
3   that, but I made a pledge to myself
4   that I would not open a computer and
5   be further distracted.  I think it was
6   probably a good decision, but I
7   appreciate your help.  I don't mind
8   you doing that.  Saves us some time.
9   BY MR. SOILEAU:
10      Q.   Do you have page 57?
11      A.   I do.
12      Q.   You say in the second paragraph
13  of Section 11.5, which begins on page 57 of
14  your report, I quote, "First, Dr. Plunkett's
15  migration theory for perineal application
16  would require talc to migrate upwards -
17  against gravity."
18           And I'm stopping in
19  mid-sentence.  I just want to you ask about
20  the gravity.  We can continue in a moment,
21  and I'll acknowledge that the report speaks
22  for itself and continues.
23           But that's the gravity
24  reference that I've seen.

Page 125

1       A.   Yes, I see it.
2       Q.   Do you have any scientific
3   literature to support the idea that gravity
4   is an answer or scientific evidence in
5   opposition to the migration theory, or is
6   this just sort of common sense?
7       A.   Well, you know, again, you say
8   that this is just one small portion of looks
9   like at least four on that page, different
10  points I discuss --
11      Q.   That's true.
12      A.   -- in relation to the migration
13  theory.
14      Q.   But if I ask you about them all
15  at once I'll get in trouble, so I have to
16  break them down and ask one at a time.
17      A.   I understand.
18      Q.   But that's fine.  It's fair
19  that there are several paragraphs and you say
20  first, second, third and fourth on page 57.
21  So I'm on first, and specifically, gravity.
22           What's the role of gravity in
23  all this?
24      A.   So again, gravity is just one

Kelly Tuttle, Ph.D.

Page 126

1    small portion here, and, you know, it is part
2    common sense.  I can't provide you with a
3    specific reference in regards to the gravity
4    aspect.  That mainly is just one part of the
5    multiple things that I discuss here as far as
6    the scientific literature not supporting the
7    hypothesis that talcum powder can migrate
8    from external perineal application to the
9    ovaries.
10           Q.    I see.
11                 If I put a straw in this cup of
12   water and the straw is narrow enough in its
13   diameter, will the water always stay at the
14   same level outside the straw and inside the
15   straw or will it be different?
16           MR. FROST:  Objection.
17   BY MR. SOILEAU:
18           Q.    Or you don't know?
19           A.    I don't know.
20           Q.    Do you know whether gravity
21   would keep the levels the same?
22           MR. FROST:  Objection.
23           A.    Again, I -- we can put a straw
24   in the cup of water and perform the

Page 127

1    experiment.
2    BY MR. SOILEAU:
3            Q.    Okay.  Is there anything more
4    you can tell me about your reference to
5    gravity or scientific support for the
6    reference to gravity in our discussion of
7    this migration topic?
8            A.    Well, as I said, I referred to
9    it very generally in this sentence as part of
10   an overall context regarding the other points
11   that I used to address the migration theory.
12   I know that there are others involved in this
13   litigation that get into this in more detail
14   than I do, so I would have to refer to them.
15           Q.    Very well, Doctor.
16                 In retrospect, do you think the
17   inclusion of gravity in this discussion of
18   migration of talcum powder products following
19   perineal application is appropriate
20   scientifically?
21           MR. FROST:  Objection.
22           A.    Well, again, it's one part of
23   the different argument -- different things in
24   examining the scientific evidence.  You know,

Page 128

1    gravity is, again as I said, just one part of
2    what I referred to here as far as looking at
3    the scientific evidence and whether it can
4    support the hypothesis of migration or not,
5    and gravity is one of the arguments against
6    the supportion of an upward migration.
7    BY MR. SOILEAU:
8            Q.    I certainly understand it is
9    one and only one of several points you make,
10   but do you think, as we sit here today, the
11   inclusion of gravity is appropriate in this
12   discussion?
13           MR. FROST:  Objection.
14           A.    Well, again, gravity is a
15   scientific concept and is part of --
16   BY MR. SOILEAU:
17           Q.    Sure.
18           A.    We have the law of gravity.
19           Q.    Newton was right.
20           A.    And so I included it here as
21   one of several different things, and as I
22   said, I think there are others who get into
23   the nuances of migration theory much more in
24   depth than I do.

Page 129

1            Q.    Okay.  You stand by the
2    inclusion of gravity.  How about that?  Is
3    that fair?  In your report?
4            A.    Yes, I included gravity in
5    there and I do believe, as I said, as part of
6    the scientific evidence and what I address
7    elsewhere in my report it is part of that
8    assessment.
9            Q.    You say that there are others.
10   Who are you talking about?  Are you talking
11   about other experts?
12           A.    Yes, I believe there are other
13   experts involved that get more into the
14   science of the migration theory and discuss
15   those nuances and stuff in more detail than I
16   do.
17           Q.    Do you consider yourself to be
18   one of the experts on behalf of Johnson &
19   Johnson possessing appropriate education,
20   background, training and experience to offer
21   opinions on the migration theory?
22           MR. FROST:  Objection.
23           A.    So as a toxicologist,
24   toxicology is a very broad scientific field

Kelly Tuttle, Ph.D.

Page 130

1    of study.  It encompasses a large number of
2    different scientific fields, including
3    epidemiology, anatomy and physiology,
4    chemistry, molecular biology, cancer biology,
5    any number of different fields that all come
6    under that umbrella in being able to research
7    and understand how chemicals or materials can
8    have a potential adverse effect on people or
9    the environment or animals.
10   BY MR. SOILEAU:
11       Q.    I've heard that.  I appreciate
12   that.  I didn't cut you off, did I?
13       A.    Go ahead.
14       Q.    But do you feel comfortable
15   discussing the migration theory within the
16   boundaries of your expertise as you view --
17   as you view your expertise in this case?
18       MR. FROST:  Objection.
19       A.    Well, as I said, I reviewed the
20   scientific literature regarding the migration
21   theory and whether there's any scientific
22   evidence to support the perineal application
23   of talcum powder can reach the ovaries --
24           ///

Page 131

1    BY MR. SOILEAU:
2        Q.    Understood.
3        A.    -- and found no scientific
4    evidence to support that.
5            And as far as my training and
6    expertise, I am -- you know, I review those
7    types of studies as part of my ongoing work
8    as a toxicologist.  I'm not a gynecologist,
9    so as I said, there are others involved that
10   get into this in more detail than I do, and I
11   would have to refer to their work and the
12   data that they use in what they provide, but
13   ultimately, I would look at the scientific
14   literature and generate my own conclusions.
15       Q.    Right.  But, I mean, at home, I
16   see my sink and the plumbing and I see water
17   and I figure out there's a leak, but if it
18   comes to who's going to figure out why it's
19   leaking and fixing it, it's going to be a
20   plumber; it's not me.
21           So I'm just trying to figure
22   out, although you've looked at the
23   literature, is this migration issue -- are
24   you a plumber?  Are you able to speak to

Page 132

1    migration or should we turn to some of these
2    others to discuss that issue?
3        MR. FROST:  Objection.
4    BY MR. SOILEAU:
5        Q.    I just want to know your
6    perspective.
7        A.    No.  And as I said, I'll try to
8    be a little clearer.  Maybe I'm not being
9    very clear.
10           As part of my training and
11   expertise in toxicology, you know, anatomy
12   and physiology and molecular biology and
13   things like that play -- are an important
14   part of the overall science of toxicology.
15           So that being said, I have
16   reviewed scientific literature regarding
17   whether it supports the migration theory or
18   not, and I have addressed it in my report and
19   summarized it in my report.
20       Q.    Yes.
21       A.    I am aware that there are
22   others involved in this litigation that, you
23   know, focus on the migration theory much more
24   specifically than I do and get into more

Page 133

1    detail.
2        Q.    Okay.
3        A.    And I would certainly refer to
4    their work, but I would always ultimately go
5    back to the science in forming my own
6    opinions.
7        Q.    I just want to make sure you're
8    comfortable speaking with me today about
9    migration as an issue in this case, staying
10   within your own view of the boundaries or
11   limits of your expertise.
12           So are you comfortable talking
13   about migration with me today?
14       MR. FROST:  Objection.
15       A.    As I said, I will certainly --
16   I address migration in my report and discuss
17   it in my report.  I'm happy to discuss what
18   I've included in my report if --
19   BY MR. SOILEAU:
20       Q.    Okay.
21       A.    -- you know, if in the
22   toxicological implications and methodologies
23   that I use here as far as the scientific
24   evidence.

Kelly Tuttle, Ph.D.

Page 134

1      Q.   I want to ask one other
2  question about that.  You think -- I think
3  you said refer to others, but it almost feels
4  like you mean defer.
5          Do you defer to other experts
6  on the migration?
7          MR. FROST:  Objection.
8  BY MR. SOILEAU:
9      Q.   Or just you would refer to
10 their opinions too?
11         MR. FROST:  Objection.
12 BY MR. SOILEAU:
13     Q.   I feel like that was an unclear
14 question.  Did you follow it or you want me
15 to kind of resay it?
16         MR. FROST:  Objection.
17     A.   You can clarify for me, please.
18 BY MR. SOILEAU:
19     Q.   You used the word "refer" in
20 talking about others, and as I understand it,
21 other experts for Johnson & Johnson.  Would
22 you defer to those other experts on the issue
23 of migration?
24         MR. FROST:  Objection.

Page 135

1      A.   Again, I would refer, and I --
2  that is correct.  I would refer to their
3  reports and things, but I would ultimately go
4  to the science they cite and the basis for
5  their reports in forming my own opinions.
6  BY MR. SOILEAU:
7      Q.   Very well.
8          Let's turn back to page 57,
9  where we were a moment ago, still under that
10 second paragraph that begins with the words
11 "First, Dr. Plunkett's migration theory."
12         Let me know when you're there.
13     A.   Yes, I'm there.
14     Q.   We read through against gravity
15 and stopped.  I want to go a little more, and
16 I'll start at the beginning for context.
17         "First, Dr. Plunkett's
18 migration theory for perineal application
19 would require talc to migrate upwards -
20 against gravity and the downward flow of
21 bodily fluids in the female reproductive
22 tract," dash.
23         Did I read that portion
24 correctly?

Page 136

1      A.   Yes, you read that portion
2  correctly.  This sentence does continue.
3      Q.   Right.  As I said before, it
4  does continue.  I want to acknowledge that
5  and certainly the report will speak more
6  fully for itself.
7          But I want to focus first on
8  these words, "downward flow of bodily
9  fluids."  What role or what significance, if
10 any, do you place in the downward flow of
11 fluids in the context of migration of talcum
12 powder following perineal application?
13     A.   Well, again, similar to
14 gravity, this is just one small nu- -- seven
15 or eight words taken out of the whole page on
16 where I look at the -- Dr. Plunkett's theory
17 of particle migration, and it's in
18 conjunction with the statement around
19 gravity.
20         This is, again, just one small
21 portion of it, where we -- and we move on to
22 look at, you know, the scientific literature
23 and scientific evidence that does not support
24 that the particles applied perineally can

Page 137

1  migrate to the ovaries.
2          So again, it's just one part of
3  the evidence that doesn't support the
4  hypothesis.
5      Q.   Okay.  Is there any scientific
6  evidence or literature cited in your report,
7  Doctor, that supports the relevance of this
8  downward flow of bodily fluids in the context
9  of an analysis of migration?
10     A.   I don't believe I cite anything
11 in that particular sentence.  You know, I --
12 again, I didn't get into great detail
13 regarding the downward flow of bodily fluids,
14 the female reproductive tract and the fluids
15 generated there.  They have their own defense
16 mechanisms against the introduction of
17 foreign bodies and things like that.
18         Again, I think that others in
19 the -- involved in this litigation get into
20 much more detail regarding that than I do.
21 I'm speaking very generally here before I
22 move into, you know, the complete argument,
23 which I -- as we said, has, I believe, four
24 different addressings here, but looking at

Kelly Tuttle, Ph.D.

Page 138

1    the scientific literature as a whole.
2        Q.    Do the ovaries have the ability
3    to clear foreign particles?
4        A.    I don't know.
5        Q.    We're outside of your area now?
6        A.    Yes, I have not researched
7    that.  I could -- would certainly be happy to
8    research it, but it's not something I
9    researched in this litigation.
10       Q.    Separate from researching it or
11   reviewing available literature, is it
12   something -- is it a question that you
13   believe falls within -- falls properly within
14   your expertise, your education, training and
15   expertise as a toxicologist?
16           MR. FROST:  Objection.
17       A.    Well, again, as I said before,
18   you know, toxicology covers a wide range of
19   sciences, and the potential effect of adverse
20   health effects in the body is definitely in
21   the realm of toxicology and study of
22   research.
23           I did not research ovaries and
24   their ability to clear materials.  That's not

Page 139

1    something I specifically looked at in this
2    litigation.  It's something that I would
3    certainly -- could research and look at the
4    scientific evidence, but I didn't do it in
5    this case.
6    BY MR. SOILEAU:
7        Q.    Wouldn't you think that that would
8    be important?
9            MR. FROST:  Objection.
10       A.    Well, again, as I state in the
11   evidence that we put forward here and I think
12   we discussed it earlier, one, scientific
13   evidence doesn't support the talcum powder
14   applied perineally can migrate to the
15   ovaries, but secondarily, we discussed
16   earlier that the presence of a chemical or
17   particle or something at an organ does not
18   necessarily mean that an adverse health
19   effect will occur.  You need more
20   information.
21           So as I said, as far as looking
22   at the scientific evidence, there's no
23   evidence to support that it would migrate to
24   begin with.

Page 140

1    BY MR. SOILEAU:
2        Q.    Does the respiratory have
3    the -- I'm sorry.
4            Does the respiratory system
5    have the ability to clear foreign particles?
6            MR. FROST:  Objection.
7        A.    The respiratory system?
8    BY MR. SOILEAU:
9        Q.    Yes.
10       A.    Again, that's not something I
11   address in my report.
12       Q.    No, it's not.
13           Do you know, as we sit here
14   today?
15           MR. FROST:  Objection.
16       A.    Generally speaking, and as I
17   said, I don't address that specifically in my
18   report, but the human body has -- has many
19   defense mechanisms for removing materials
20   from -- from its -- from the body.
21   BY MR. SOILEAU:
22       Q.    What defense mechanisms do the
23   ovaries have?
24           MR. FROST:  Objection.

Page 141

1        A.    Again, I haven't researched
2    that specifically to address it.  As I said,
3    the human body has many defense mechanisms.
4    BY MR. SOILEAU:
5        Q.    Okay.  Let me show you the next
6    exhibit, which I will mark as Tuttle
7    Exhibit 12.
8            (Whereupon, Deposition Exhibit
9    Tuttle-12, Excerpt from IARC
10   Monograph 93, was marked for
11   identification.)
12   BY MR. SOILEAU:
13       Q.    Do you recognize, Doctor, the
14   exhibit that I have presented to you?
15       A.    Let me -- I'm trying to keep my
16   report in order.
17       Q.    Sure.
18       A.    Yes, I do.
19       Q.    What is this?
20       A.    This is the 2010 International
21   Agency for Research on Cancer monograph that
22   includes, among -- talc as well as titanium
23   dioxide and carbon black.
24       Q.    It is cited in your report?

36 (Pages 138 to 141)

Kelly Tuttle, Ph.D.

Page 142

1      A.    Yes, it is.
2      Q.    You have a quote at page 57,
3  same page we were at earlier.  Let me let you
4  turn to that.  It's still Section 11.5, the
5  section that discusses Dr. Plunkett and her,
6  as you describe in your report, theory of
7  particle migration.
8            You say that IARC has concluded
9  that the evidence for retrograde transport of
10  talc to the ovaries in normal women is weak.
11           Do you see that?
12     A.    Yes, I see where I state that
13  in my report.
14     Q.    All right.  And you actually
15  quote it.  You have quote marks in your
16  report for the words, "the evidence for
17  retrograde transport of talc to the ovaries
18  in normal women is weak," closed quotes,
19  right?
20     A.    Yes.
21     Q.    And that is taken from the IARC
22  Monograph No. 93, which is now Tuttle
23  Exhibit 12?
24     A.    That is the citation I believe.

Page 143

1  It says IARC 2010.  I can refer to their
2  reference list to be specific, but...
3      Q.    Go ahead and look if you need
4  to.  Do you have it?
5      A.    Yes.
6      Q.    Okay.
7      A.    And yes, the IARC 2010
8  reference is referring to the carbon black,
9  titanium dioxide and talc monograph.
10     Q.    Right.  That monograph that is
11  IARC Monograph No. 93 has three sections, one
12  for carbon black, one for titanium dioxide
13  and one for talc, right?
14     A.    Yes, I believe so.  It's a very
15  large document, and we have a small subset,
16  but I believe those are the three addressed
17  specifically.  I can't remember if this
18  monograph discusses anything as a subset.
19     Q.    Okay.  That's fine.  Why don't
20  you turn to page 411.  Take your time.
21     A.    Okay.
22     Q.    Do you see at the top of the
23  page it says Talc?
24     A.    Yes.

Page 144

1      Q.    Okay.  Now, in your quote, it
2  says "the evidence for retrograde transport
3  of talc to the ovaries in normal women."
4            Why does it say "normal women"
5  in the quote you use that you cite and
6  reference in your report?
7      A.    I would need to refer to the
8  IARC document and get -- pull out the
9  original quote to pull the additional context
10  for normal women.
11     Q.    Do you know as we sit here
12  right now without looking at the IARC
13  monograph?
14     A.    Off the top of my head, I can
15  assume, but I would prefer not to assume.
16     Q.    Sure.  No, that sounds more of
17  a guess than, you know -- an educated guess,
18  but a guess, so let's not do that.
19           Did you independently review
20  any literature on this issue that was
21  referenced in or cited by IARC in its
22  Monograph 93?
23     A.    I would need to look at the
24  references and compare them, but generally

Page 145

1  speaking, that is part of -- you know, when
2  looking at some of these documents, you look
3  at the data and the science and the reference
4  they use to cite for what they state in their
5  documents, or in this case, in the monograph.
6      Q.    All right.  I don't have your
7  testimony right now.  My realtime stopped,
8  but let me see if I can understand better.
9  There are two scenarios in my mind.  One is
10  you rely upon IARC and its monograph for the
11  statement that is quoted in your report.
12           Another possibility is that you
13  do not simply rely on the IARC monograph, but
14  you independently pull, review and consider
15  any literature cited by IARC in its monograph
16  to form an independent scientific opinion,
17  your own, that is, about what that literature
18  might show.
19           Which of those two scenarios
20  did you employ here as to IARC Monograph 93
21  and your discussion of IARC in the context of
22  migration?
23           MR. FROST:  Objection.
24     A.    So again, the quotations and

Kelly Tuttle, Ph.D.

Page 146

1    the wording as put forth in my report would
2    be directed to the IARC monograph itself.
3    Had that been taken from something else, it
4    would have been cited to that.
5            With that being said, when
6    reviewing the IARC monograph or any document
7    like it that summarizes a body of science,
8    you know, I try to go to the data that is --
9    they're reviewing and form my own opinions.
10   BY MR. SOILEAU:
11       Q.   Okay.  Let's take a look at the
12   paragraph on 411 from which you took your
13   quote.
14       A.   And if I may, before you ask a
15   question, we're getting close to the time
16   that I'm going to need a break to go nurse.
17       Q.   Okay.  Let's -- if you need to
18   stop, stop.  I'm going to try to do two
19   questions and stop, okay?
20       A.   Okay.
21       Q.   Lawyers are bad about
22   estimating questions.
23           Let's look down here toward the
24   bottom of 411.  Where it says:  On balance,

Page 147

1    the working group believed that the evidence
2    for retrograde transport of talc to the
3    ovaries in normal women is weak.
4            And I've highlighted it here on
5    the page just to try to help you find it.
6            I just want to know, is this
7    the source statement for the quotation in
8    your report?
9        A.   It appears to be, yes.
10       Q.   Okay.  All right.  Then let me
11   break a record and stop there and only ask
12   one question.  We'll take our break now.  I
13   promised you.
14           THE VIDEOGRAPHER:  Going off
15   the record at 11:34 a.m.
16           (Recess taken, 11:34 a.m. to
17   12:22 p.m.)
18           THE VIDEOGRAPHER:  We're back
19   on the record at 12:24 p.m.
20   BY MR. SOILEAU:
21       Q.   Good afternoon, Doctor.  Are
22   you ready to proceed?
23       A.   Yes, I am.
24       Q.   Very good.

Page 148

1            Let's go back to page 411 of
2    the monograph, and we had looked at the
3    sentence on page 411 that I believe we
4    recognized as the source sentence for the
5    quote that you have in your report on
6    page 57, which we discussed before the break.
7    I want to direct you to some additional
8    language in that same paragraph.
9            Do you see the third sentence
10   that begins -- third sentence of the
11   paragraph that begins:  These have been
12   conducted in women who were about to undergo
13   gynecological surgery, most of whom had
14   diseases or complications of the reproductive
15   tract and organs that required surgery.
16           Did I read that correctly?
17       A.   Yes, you read that correctly,
18   but as you said, you took the third sentence
19   down and it doesn't specify what "these" are.
20   I think prior to that it says:  Several
21   studies have been conducted in women to
22   assess potential retrograde movement of
23   particles through the reproductive tract to
24   the ovaries.

Page 149

1        Q.   Okay.  Let's go back to the
2    beginning of the paragraph.  That's fair.
3            It says, quote, "Perineal
4    exposure to cosmetic talc in women is of
5    concern because of its possible association
6    with ovarian cancer," period.
7            And then next, the sentence you
8    just referenced:  Several studies have been
9    conducted in women to assess potential
10   retrograde movement of particles through the
11   reproductive tract to the ovaries.
12           Have I read it correctly thus
13   far?
14       A.   Yes, you have.
15       Q.   When it says retrograde
16   movement, is that, in your view, synonymous
17   with the issue of migration that we are
18   discussing?
19       A.   Well, again, it's referring to
20   several different studies.  As it says, as it
21   goes through, it goes -- looking at the
22   transport of talc to the ovaries where it
23   says, you know, at the end, again, that the
24   evidence in normal women is weak, and then

38 (Pages 146 to 149)

Kelly Tuttle, Ph.D.

Page 150

1 also that evidence in animals with no
2 retrograde transport of talc to the ovaries.
3    Q.    Okay.  Doctor, that was not my
4 question.  My question was simply:  When IARC
5 uses the word retrograde movement of
6 particles, do you recognize that as being
7 synonymous for our purposes with the theory
8 of migration of talc particles?
9    A.    Well, again, without seeing the
10 specific studies that they're talking about,
11 you know, I don't know what each individual
12 study was looking at in regards to what
13 they're defining as retrograde movement.
14        As I've said before, I -- the
15 scientific evidence doesn't support a
16 transport from external perineal application
17 and so I'd have to look at each individual
18 study that they're referencing here, which
19 they don't cite at the end of this particular
20 sentence.
21    Q.    Right.  You have not actually
22 looked at any studies in connection with this
23 IARC section, have you?
24    A.    Well, as I said before, you

Page 151

1 know, there are no particular references
2 listed right here in this paragraph for me to
3 refer to.
4    Q.    Right.
5    A.    But that being said, as I said
6 previously, I'm looking at the IARC or
7 looking at any, you know, government or
8 agency documents such as this, go through the
9 references and look at the body of science
10 that they refer to in looking at the body of
11 science for scientific evidence.
12        So in order to discuss, you
13 know, retrograde movement as stated here, I
14 would need to go back and look at their
15 references and look at the studies that they
16 are citing.
17    Q.    I think I follow you, but I
18 want to ask:  Do you know what retrograde
19 movement of particles means as used here in
20 this paragraph from which you have taken your
21 quotation in your report?
22    A.    Well, again, I don't have a
23 specific definition.  As it says here, it
24 says movement of particles through the

Page 152

1 reproductive tract to the ovaries.
2    Q.    Okay.
3    A.    It does not specify from
4 perineal application, doesn't specify from
5 the external application, but merely through
6 the reproductive tract to the ovaries.
7    Q.    What are the first two words of
8 the paragraph?
9    A.    Of the paragraph, is perineal
10 exposure, but the sentence that we're
11 discussing just says several studies for
12 potential retrograde movement.
13    Q.    Okay.  Let's continue in the
14 paragraph.  Does it go on to say:  The
15 findings reported in these studies may be
16 confounded by the various levels of
17 dysfunction in clearance from the female
18 reproductive tract due to underlying
19 pathologies.
20        Did I read that correctly?
21    A.    Yes, you read that correctly.
22    Q.    What does confounded mean as
23 used in that sentence?  Do you know?
24    A.    Well, I think we discussed

Page 153

1 confounding generally speaking, but -- and
2 again, we'd have to look at each individual
3 study to see what the individuals say.  Just
4 saying that the findings reported in these
5 studies may be confounded may be another term
6 for it -- you know, may be affected or may --
7 you know, these other issues as far as this
8 IARC says may be involved in the studies, but
9 as I said, we have to look at the individual
10 studies to discuss it specifically.
11    Q.    Okay.  You said we discussed
12 confounding, but I don't think we did.
13        Do you know what confounding
14 is?
15        MR. FROST:  Objection.
16    A.    As I said, I mentioned
17 confounding in my report as far as talcum
18 powder and ovarian cancer.  In this
19 particular sentence, they mention other
20 things that may be involved in the studies
21 that the IARC is citing, but without looking
22 at those individual studies, I can't discuss,
23 you know, these different things that they
24 state may be confounding or may be involved

Golkow Litigation Services - 877.370.DEPS

Kelly Tuttle, Ph.D.

Page 154

1  in the studies that they're using.
2  BY MR. SOILEAU:
3      Q.   Okay.  I think I follow you.  I
4  believe you're telling me that without
5  looking at the individual studies, you can't
6  really be specific about how or why there may
7  be confounding.  You can't put any meat on
8  those bones absent reference to the specific
9  study; is that fair?
10     A.   Right.  This is a general
11 statement about the studies in general, which
12 again, are not cited in this particular
13 paragraph, so we can't go to the references,
14 which I don't think are in -- included
15 here --
16     Q.   Right.
17     A.   -- for the basis why they say
18 the studies may be confounded and state these
19 issues.
20     Q.   But can you offer a basic
21 definition of the term "confounding" as it is
22 used, not with reference to any particular
23 study, but as a general principle?  What does
24 it mean that something may confound a study?

Page 155

1          MR. FROST:  Objection.
2  BY MR. SOILEAU:
3      Q.   Do you know?
4      A.   Sorry, I'm trying -- I believe
5  I talk a little bit about confounding in the
6  causation section of my report, especially in
7  regards to specific causation, when looking
8  at confounding factors.
9      Q.   Right.  You understand here
10 we're really focused on general causation, or
11 do you understand that in this -- this
12 Daubert proceeding that is referenced in your
13 invoice as the Daubert challenge process?
14         You understand we're really
15 looking at general causation as opposed to a
16 particular woman?
17     A.   Well, again, it is my
18 understanding that we're looking at the
19 scientific evidence to establish whether
20 there is a causal association, which again,
21 would be general causation --
22     Q.   Right.
23     A.   -- as far as what the
24 scientific evidence supports.

Page 156

1      Q.   But I'm not sure if you've told
2  me what the word "confound" means in this
3  context.  Are you able to offer a definition
4  of confound?
5      A.   And any definition I would
6  offer right now would be, you know, my
7  interpretation or my kind of summation
8  without having, you know, what I have in my
9  report right in front of me, and I don't want
10 to misquote what the scientific definition
11 for confounding is.
12     Q.   Yes, Doctor, I appreciate that.
13         Do you have an understanding of
14 the principle of confounding within this
15 context, the general principle?
16         MR. FROST:  Objection.
17     A.   Well, again, we're speaking in
18 generalities, and without looking at these
19 studies, confounding may mean something
20 slightly different depending on the study and
21 what the authors are doing as far as they
22 state here, assessing potential retrograde
23 movement of particles.
24              ///

Page 157

1  BY MR. SOILEAU:
2      Q.   You have used the word
3  "confounded" before in your own writings,
4  haven't you?
5      A.   Yes, I have.
6      Q.   When you use the word
7  "confounded" in your own writings, what do
8  you mean by that word?
9      A.   Well, again, it would depend on
10 the context.  I'd have to, you know, as I
11 said, I've certainly used it on numerous
12 occasions, and -- but I would need to see the
13 context of how I was using it to be able to
14 accurately describe what I meant by it when I
15 used it in a sentence.
16     Q.   Let's do this.  I'm going to
17 show you another exhibit.  I'll mark this as
18 Tuttle Exhibit 13.
19         (Whereupon, Deposition Exhibit
20 Tuttle-13, Egli and Newton
21 Publication, was marked for
22 identification.)
23 BY MR. SOILEAU:
24     Q.   Perhaps it will save time.

Kelly Tuttle, Ph.D.

Page 158

1  Could you -- I think you're going to.  Go
2  ahead and turn to the references that begin
3  at page 72, I believe, of your report, and
4  conveniently, it's alphabetized, so if you
5  can go to the Es and see if this report by
6  G.E. Egli, E-G-L-I, Dr. Egli is one of the
7  reference materials that you considered in
8  this matter?
9       A.   It is not one of the references
10 that I cite.
11      Q.   Is it by chance familiar to you
12 generally for whatever reason?
13      A.   If I may, I'm just briefly
14 looking at it.
15      Q.   Let me direct you -- and you
16 may do that, but I'm going to direct you to
17 page 153, and there's some language under
18 Discussion that says at page 153 of Tuttle
19 Exhibit 13, the Egli paper, that this study
20 indicates that in two cases under the
21 conditions outlined, inert carbon particles
22 placed in the posterior fornix of the vagina
23 were found 28 and 34 minutes later in both
24 tubes.

Page 159

1            Do you see that?
2       A.   Yes, I see that.  I'm not
3  familiar with this article, but I note that
4  it's dealing with, as you said, inert carbon
5  particles and dealing with a vaginal
6  application as opposed to a perineal.
7       Q.   Okay.  Do you know what the
8  posterior fornix of the vagina is?
9       A.   Not specifically, no, I don't
10 know.
11      Q.   Okay.  Are you familiar with
12 carbon particles generally as a substance or
13 agent?
14      A.   Yes, generally.
15      Q.   Okay.  Let me show you an
16 additional paper.  I'll mark this as Tuttle
17 Exhibit 14.
18           (Whereupon, Deposition Exhibit
19 Tuttle-14, 1971 Henderson et al
20 Publication, was marked for
21 identification.)
22 BY MR. SOILEAU:
23      Q.   Tuttle Exhibit 14, the lead
24 author is W.J. Henderson.  It is a 1971

Page 160

1  paper.  I think Egli was 1961.  That was
2  Tuttle Exhibit 13.  So Exhibit 14 is
3  Henderson 1971.
4            Can you look and see if that is
5  referenced among the materials that you
6  reviewed in your consideration of the
7  scientific evidence and literature in this
8  matter?
9       A.   No, it is not.
10      Q.   Could you turn to page 268.
11      A.   If you don't mind, since this
12 is something -- you know, that, as with the
13 Egli study, that I have not seen, if you can
14 give me just a moment to familiarize myself
15 with it somewhat.
16      Q.   Sure.  I tell you what I'm
17 going to do.  I'm going to show you what I'm
18 interested in for reference without asking
19 you any questions about it, and then you can
20 take some time if you need to to look at this
21 paper, okay?
22      A.   Thank you.
23      Q.   So I'm looking at -- on page 3
24 of 7, which is 268, I've highlighted some

Page 161

1  language here that says:  The talc particles
2  were found deep within the tumor tissue.
3  Talc particles were also found embedded
4  within tumors of the cervix.
5            And second -- there are a
6  number of photographs or images, perhaps is a
7  better word, included in this paper.  When
8  you get into the discussion on page 271, the
9  language that appears on the second column:
10 There was good evidence for the presence of
11 talc, often indistinguishable from
12 anthophyllite asbestos within the ovarian
13 tissue.
14           It also says, after the
15 parenthetical:  The talc particles were found
16 localized deep within tumor tissues.  And it
17 continues.
18           Those are the two sections that
19 I'm focused on in my review of this
20 scientific paper.
21      A.   Okay.  And I apologize, you
22 were moving a little too fast for me.  Can I
23 get you to direct me to where they are on the
24 page on 268 and -- oh.

41 (Pages 158 to 161)

Kelly Tuttle, Ph.D.

Page 162

1      Q.    I'm going to loan you my
2  highlighted copy of Tuttle Exhibit 14.
3      A.    Thank you.
4           (Document review.)
5  BY MR. SOILEAU:
6      Q.    As you're reviewing that paper,
7  is it at all familiar to you?
8      A.    As I said, no, I don't cite it
9  in my report.
10      Q.    Okay.  I understand that.  And
11  your review thus far has not caused it -- it
12  doesn't ring a bell.  How about that?
13      A.    Correct.
14      Q.    I note in the summary of the
15  Henderson '71 paper it says:  An
16  extraction-replication technique was used to
17  examine tissue from patients with ovarian and
18  cervical tumors.  In both conditions talc
19  particles were found deeply embedded within
20  the tumor tissue.  The close association of
21  talc to the asbestos group of minerals is of
22  interest.
23           That's on the first page.
24           Is there anything you wanted to

Page 163

1  add about this paper right now?  I'm going to
2  move to another one.
3      A.    Certainly.  The article appears
4  to be the development of a method regarding
5  the study of foreign particles within
6  tissues, and I would note in -- after reading
7  the snippets that you pulled from page 268
8  and 271, that the overall premise of this
9  study was the development of a method, and
10  they actually conclude at the end that
11  although it is impossible to incriminate talc
12  as a primary cause of carcinomatous changes
13  within either the cervix or the ovary on the
14  preliminary observations described here, and
15  then they go on to say that further
16  investigations are obviously required.
17      Q.    Well, you just left out
18  something, didn't you?
19      A.    If you like, I can read it in
20  its entirety.
21      Q.    Didn't you omit the words:  The
22  possibility that talc may be related to other
23  predisposing factors should not be
24  disregarded?

Page 164

1      A.    Yes, and we said "and further
2  investigations are obviously required."
3      Q.    Very well.
4           Let me show you a document that
5  I'll mark as Tuttle Exhibit 15.  This is a
6  paper by Venter from 1979.  And tell me first
7  if it is included among your reference
8  materials that list the studies and
9  scientific evidence that you considered
10  following your gathering process.
11           (Whereupon, Deposition Exhibit
12           Tuttle-15, 1979 Venter et al
13           Publication, was marked for
14           identification.)
15      A.    No, it is not.
16  BY MR. SOILEAU:
17      Q.    Okay.  I'm looking here on the
18  first page.  There's a reference to
19  migration.  It says:  Such migration could
20  well explain the etiological role of chemical
21  substances in certain gynecological diseases.
22           Do you see that?  The first
23  page, second column.
24      A.    Oh, okay.

Page 165

1      Q.    Third sentence.  The prior
2  sentence says:  Will a chemical substance
3  deposited in the vagina later appear in the
4  peritoneal cavity.
5      A.    Yes, I see it.
6      Q.    Okay.  Let me show you another
7  paper that I will mark as Tuttle Exhibit 16.
8      A.    Well, if I may --
9      Q.    Sure.  You want to add
10  something about that one?
11      A.    -- I'm not familiar with this
12  article, so I don't know what the premise is.
13  I notice that what you said was deposited in
14  the vagina, which is, again, different from
15  perineal application is what we were
16  discussing, and --
17      Q.    Okay.
18      A.    -- in this particular case.  So
19  I just wanted to point out that, again, this
20  doesn't seem to be -- I haven't had time to
21  review it or look at this report and see what
22  the actual objectives of it were.
23      Q.    I understand.  And I want to
24  allow you the opportunity to offer those

Kelly Tuttle, Ph.D.

Page 166

```
 1    comments.  I understand that you've not
 2    reviewed it.
 3            Really what I'm trying to do is
 4    verify that these studies that I have here
 5    are not studies that is -- that these studies
 6    that I have here are studies you have not
 7    considered in offering the opinions that you
 8    offer today.
 9            Let me show you --
10            MR. FROST:  Objection.
11    BY MR. SOILEAU:
12        Q.    -- what I've marked as Tuttle
13    Exhibit 16.
14            (Whereupon, Deposition Exhibit
15            Tuttle-16, 1986 Henderson et al
16            Publication, was marked for
17            identification.)
18    BY MR. SOILEAU:
19        Q.    When we say perineal, I mean,
20    perineume, perineal -- perineal means
21    involving the perineum; is that right?
22        A.    When we refer to perineal
23    application, generally we're referring to the
24    application of talcum powder to the exterior
```

Page 167

```
 1    genitalia.
 2        Q.    The perineum?
 3        A.    Yes.
 4        Q.    Does it include the opening of
 5    the vagina?
 6        A.    It includes the external
 7    opening.
 8        Q.    Right.  Okay.  I just want to
 9    make sure that that's clear, that we are
10    talking about an area that includes the
11    external opening of the vagina.
12            MR. FROST:  Objection.
13    BY MR. SOILEAU:
14        Q.    Is that right, to your
15    understanding of the perineum?
16        A.    Again, as I said, it involves
17    the external genitalia of the female body.
18        Q.    Including the vagina?
19        A.    Yes, including the vagina.
20        Q.    Okay.  Let's turn to
21    Exhibit 16, the Henderson paper from 1986.
22    Could you tell me if that is included among
23    the materials, evidence, scientific
24    literature that you considered in connection
```

Page 168

```
 1    with your work in this matter?
 2        A.    Again, it is not cited in my
 3    report.
 4        Q.    Do you see in this 1986 paper
 5    by Henderson and others, which we've marked
 6    as Tuttle Exhibit 16, on the first page,
 7    second paragraph of the introduction:  Direct
 8    communication between the external
 9    environment and the peritoneal cavity exists
10    in the female via her genital tract.
11            Do you see that statement,
12    first of all?
13        A.    Yes, I see that statement, but
14    it's included in the introduction with no
15    citations for it, so I don't know where
16    they're basing -- you know, what that is
17    based on.
18        Q.    Okay.  Do you agree or disagree
19    with that statement as I read it?
20            MR. FROST:  Objection.
21        A.    As I just said, it's in the
22    introduction.  There's no reference cited to
23    it.  I don't know the basis for this
24    statement, so I can't agree or disagree, and,
```

Page 169

```
 1    you know, without reading this, having a
 2    moment to read this article or any of the
 3    articles that we've discussed, I -- you know,
 4    I can't discuss it in detail other than to
 5    say a cursory glance of all of these don't
 6    look at, as we were just saying, the perineal
 7    application of talc particles, but merely
 8    variations of either particles that are not
 9    talc or scenarios where either it's a method
10    development and is not looking at how -- talc
11    migration, period, other than just looking at
12    a method development, and, you know, a lot of
13    these are looking at vaginal introduction or
14    something that doesn't -- that already kind
15    of takes one step past the external
16    application.
17    BY MR. SOILEAU:
18        Q.    Okay.  Do any of these papers
19    that I have shown you thus far impact or move
20    your opinion on migration?
21            MR. FROST:  Objection.  Sorry,
22    I had food in my mouth.  Objection.
23            MR. SOILEAU:  Noted.  We'll
24    accept that.
```

Kelly Tuttle, Ph.D.

Page 170

1     A.    As I said before, I haven't had
2  an opportunity to read these, look at their
3  data, their scientific evidence.  Some of
4  these, I can't -- you know, I don't know what
5  the purpose of these studies are or what they
6  were being used for.
7  BY MR. SOILEAU:
8     Q.    Very well.
9           Let me show you another
10 article.  This one I've marked as Tuttle
11 Exhibit 17.  It is by Kissler, K-I-S-S-L-E-R.
12          (Whereupon, Deposition Exhibit
13          Tuttle-17, 2004 Kissler et al
14          Publication, was marked for
15          identification.)
16 BY MR. SOILEAU:
17    Q.    Is this one included among the
18 materials that you have reviewed, Doctor?
19    A.    No, it is not.
20    Q.    Look at the first page under
21 the abstract, really the last sentence.  It
22 says, quote, "Directed uterine contractility
23 and intact uterotubal transport function are
24 considered necessary for intact sperm

Page 171

1  transport mainly due to the side bearing the
2  dominant follicle to maximize fertility."
3           Do you see that sentence?
4     A.    Yes, I see that, and this
5  appears to, again, without having an
6  opportunity to review it, this appears to be
7  something that examines sperm transport,
8  and...
9     Q.    Right.
10    A.    And again, uterine
11 contractibility, but nothing about perineal
12 application of talcum powder or talc particle
13 migration from the external genitalia.
14    Q.    Okay.  What is directed uterine
15 contractility, if you know?
16          MR. FROST:  Objection.
17    A.    I haven't read the article.  I
18 don't know.
19 BY MR. SOILEAU:
20    Q.    Okay.  And I'm -- to be clear,
21 to be fair, I'm not asking you what meaning
22 it has in the article.  I'm asking you
23 generally, what is directed uterine
24 contractility?  Do you know?

Page 172

1           MR. FROST:  Objection.
2     A.    Again, I -- no, I don't know.
3  I haven't -- I haven't researched that.
4  BY MR. SOILEAU:
5     Q.    All right.  Let me show you
6  what I will mark as Tuttle Exhibit 18.
7           (Whereupon, Deposition Exhibit
8           Tuttle-18, 2004 Sj?sten et al
9           Publication, was marked for
10          identification.)
11 BY MR. SOILEAU:
12    Q.    It is a 2004 paper, the lead
13 author is Sj?sten, I think is the
14 pronunciation.  It is spelled S-J-O-S-T-E-N;
15 the O has the double dots over it.  We've
16 exhausted my knowledge of that language.  I
17 believe it's the correct pronunciation.
18          Is this one included among the
19 materials that you've reviewed, the one that
20 I've marked as Tuttle Exhibit 18?
21    A.    No, it is not.
22    Q.    Look at the conclusion on
23 page 1 of Tuttle Exhibit 18, the Sj?sten
24 article.  Conclusions:  This study has

Page 173

1  pointed out a retrograde migration of starch
2  also in humans after a gynecological
3  examination with powdered gloves.
4  Consequently, powder or other potentially
5  harmful substance that can migrate from the
6  vagina should be avoided.
7           Did I read that correctly?
8           MR. FROST:  Objection.
9     A.    Yes, you read that correctly,
10 but again, with -- I haven't had a chance to
11 review this.  It appears, as you said, a
12 gynecological examination, which would be,
13 again -- it states it in your sentence, from
14 the vagina as opposed to from the external
15 genitalia, to the ovaries.  And as you
16 mentioned, it's looking at starch and not
17 talcum powder.
18          But I would need some time to
19 review this briefly to discuss it.
20 BY MR. SOILEAU:
21    Q.    Do you recognize the journal
22 that this article was apparently published in
23 in 2004?
24    A.    Not specifically, no.

44  (Pages 170 to 173)

Kelly Tuttle, Ph.D.

Page 174

1    Q.    Okay.  It's Human Reproduction.
2  That's not familiar to you, is it?
3    A.    Not specifically, no.
4    Q.    And, I'm sorry, you told me
5  this was not included among the materials you
6  reviewed, right?
7        MR. FROST:  Objection.
8    A.    That's correct.
9  BY MR. SOILEAU:
10   Q.    I'm sorry if I asked that
11 before.
12       Let me show you an additional
13 study.  I'll mark this one as Tuttle
14 Exhibit 19.
15       (Whereupon, Deposition Exhibit
16       Tuttle-19, 2019 McDonald et al
17       Publication, was marked for
18       identification.)
19 BY MR. SOILEAU:
20   Q.    This is a 2019 paper, the lead
21 author is McDonald.  It was published, I
22 believe, in Ultrastructural Pathology.
23       Is this paper included in the
24 materials that you reviewed and considered in

Page 175

1  forming the opinions that you offer today,
2  Doctor?
3    A.    No, it is not.
4    Q.    All right.  If you would look
5  to page 12 under Discussion, the second
6  paragraph, where it states:  Talc, when
7  applied to the perineum, is believed to
8  migrate to the upper genital tract, passing
9  through the open tract to the fallopian tubes
10 and eventually reaching the ovaries.  End the
11 quote.
12       Let me let you find that.  I'm
13 showing it on the screen, highlighted, but
14 again, page 12, second paragraph of
15 Discussion of Tuttle Exhibit 19.
16       Now, this statement is on
17 point, isn't it?
18       MR. FROST:  Objection.
19 BY MR. SOILEAU:
20   Q.    Well, this statement -- let me
21 be more specific.  That's probably fair.
22       This statement is talking about
23 talc and it's talking about talc applied to
24 the perineum and it's talking about the

Page 176

1  perineal application of talc and the
2  migration of talc into the upper genital
3  tract through the fallopian tubes eventually
4  and ultimately reaching the ovaries, right?
5    A.    So again, you haven't given me
6  an opportunity to read this article in its
7  entirety, but I notice that after it makes
8  that statement it cites two different
9  residences, and if we go back and look --
10   Q.    Sure.
11   A.    -- it cites number 11, which is
12 a Cramer study, which I don't believe we've
13 discussed yet, but it's -- number 16 is
14 the -- I believe it's the Henderson study we
15 briefly touched on.
16   Q.    Yes.
17   A.    And again, none of the studies
18 that you've shown me, I haven't had a chance
19 to review them in detail, but none of them
20 look at -- as this statement implies, talc
21 when applied to perineum, to the external
22 genitalia, and, you know, as it says here, is
23 believed.
24   Q.    Okay.

Page 177

1    A.    So again, we're taking one
2  sentence out of context, and these are all
3  articles that I haven't had a chance to read
4  in depth or look at the data or the
5  information or even the objectives of these
6  articles herein.
7        But none of them as stated have
8  looked at the external perineal application
9  of talcum powder and its potential or
10 hypothetical migration.
11   Q.    What do you mean you have not
12 had a chance?  "I've not had a chance to
13 read."  Why not?
14   A.    Well, as I'm saying, as you've
15 put them in front of me, you haven't given me
16 an opportunity to look at them.
17   Q.    Oh.
18   A.    They weren't cited in my
19 report.
20   Q.    I understand.  But there's no
21 reason to think that they would not have been
22 available to you prior to today, correct?
23       MR. FROST:  Objection.
24   A.    Well, as I said in cursory --

Kelly Tuttle, Ph.D.

Page 178

1   as we've gone through these, there have --
2   without having a chance to actually look at
3   them in detail, I can't speak to it
4   specifically.  We can go through each one,
5   I'd be happy to.
6          In the case of the others not
7   previously -- sorry, looking at the others
8   we've previously discussed, again, none of
9   them looked at external perineal application
10  and talcum powder or they looked at particles
11  that were not talcum powder, or in the case
12  of some of them, they were just method
13  developments and things.  But I would need to
14  be able to look at them specifically.
15         And then in the case of this
16  McDonald one, actually, this one would not
17  have been available via PubMed search judging
18  by the article history on the front page
19  saying that it was accepted in March of this
20  year.
21         So again, I'd need to be able
22  to read it and review it to discuss it.
23  BY MR. SOILEAU:
24     Q.   Can we agree that the McDonald

Page 179

1   paper does address talc, application of talc
2   to the perineum and migration of talc
3   following perineal application to the
4   ovaries?
5          MR. FROST:  Objection.
6   BY MR. SOILEAU:
7      Q.   That's what this is talking
8   about, isn't it?
9          MR. FROST:  Objection.
10     A.   Again, I haven't had a chance
11  to read anything on it yet except for the one
12  sentence that we pulled that was referenced
13  to two other publications, which as we were
14  discussing, don't look at perineal
15  application.  I'm happy to take a minute to
16  look at this so we can discuss it.
17  BY MR. SOILEAU:
18     Q.   I just really wanted to know
19  that this sentence is -- this sentence I'm
20  quoting from the McDonald paper, which is
21  Tuttle Exhibit 19, is talking about the thing
22  you and I are talking about right now,
23  migration of talc to the ovaries following
24  perineal application.

Page 180

1          That sentence, whether you
2   agree with it or disagree -- and I understand
3   you've not seen this paper before today, but
4   that topic sentence puts it squarely on point
5   for the discussion we're having right now,
6   doesn't it, Doctor?
7          MR. FROST:  Objection.
8      A.   Well, again, you've taken one
9   sentence out of the second paragraph of the
10  discussion -- of a discussion of an article
11  that goes on for over two pages.  It cites
12  two references, neither of which support --
13  or well, excuse me, the one that we've looked
14  at so far does not support the statement, and
15  as it says, it just is believed.
16         So without being able to look
17  at the entire document, you know, no, I can't
18  speak to whether it is applicable to the
19  external perineal application of talcum
20  powder and migration or not.
21  BY MR. SOILEAU:
22     Q.   Okay.  Let's do this for a
23  moment.  Let's go back to Tuttle Exhibit 12.
24  It's the excerpt from the IARC Monograph 93

Page 181

1   that you have before you.  And by the way,
2   you're correct, this isn't the entire
3   monograph.  I keep calling it the monograph,
4   and I think you clarified that at some point,
5   and I want to sort of stand in agreement with
6   you.  This is a section of that monograph.
7          But it starts with the
8   discussion of mechanistic and other relevant
9   data on talc and continues, beginning at
10  page 391, for our exhibit, so...
11         I want you to turn to page 392.
12  Do you recall when we were looking at the
13  paragraph from which you took the quote that
14  you used in your report, that is the IARC
15  language that you quoted and included in your
16  report, you made the point that they didn't
17  show any studies there?
18     A.   Yes, that --
19     Q.   Remember on page 411?
20     A.   Yes, that's correct.
21     Q.   Okay.  But now if we go back to
22  page 392, they are talking about studies
23  here, aren't they?
24     A.   Yes, generally speaking, I see

Kelly Tuttle, Ph.D.

Page 182

1  several citations throughout the text.
2      Q.    Right.  And if you go to the
3  last paragraph on page 392, isn't it true
4  that the first study referenced in this IARC
5  monograph is Egli and Newton from 1961?
6      A.    Yes, it is.
7      Q.    And isn't that the same paper
8  that I presented to you earlier, Egli and
9  Newton, 1961, which is now Tuttle Exhibit 13?
10     A.    Well, I would normally refer to
11  the references of the monograph to confirm
12  that.  As I think I've said before, I don't
13  know if Egli published anything else in that
14  year.
15     Q.    Well, read what it says.  Egli
16  and Newton, 1961 found that inert carbon
17  particles deposited in the vagina in two of
18  three patients traveled to the fallopian
19  tubes in about 30 minutes.
20          Isn't that consistent with the
21  Egli paper that we reviewed and that is
22  Tuttle Exhibit 13?
23          MR. FROST:  Objection.
24     A.    Well, again, I wasn't -- I

Page 183

1  didn't get a chance to sit here and review
2  the Egli paper.  I do know that it looked
3  at -- you know, is based on the title and
4  what little chance I did get to look at it,
5  it does involve inert carbon particles that
6  were deposited in the vagina and looking at
7  the fallopian tubes, but...
8  BY MR. SOILEAU:
9      Q.    Well, let's do this.  When I
10  showed you the Egli paper from 1961 that we
11  marked as Tuttle Exhibit 13, you reviewed
12  your reference materials at my request,
13  didn't you?
14     A.    Yes, I did.
15     Q.    And when you did that, you
16  found no Egli paper from 1961, correct?
17     A.    That's correct.  I didn't cite
18  it in my report.
19     Q.    That's correct.
20          So regardless of how many
21  papers Dr. Egli and Newton -- Drs. Egli and
22  Newton published in 1961, if it's one or more
23  than one, you didn't cite any of them in your
24  reference materials.  We can agree on that,

Page 184

1  can't we?
2      A.    That's correct, I did not cite
3  them in my report.
4      Q.    So doesn't that tell us that
5  you didn't look at an Egli and Newton paper
6  from 1961?
7      A.    Well, again, as I said, when
8  looking at the -- what limited information
9  I'm given, you know, this -- the Egli and
10  Newton report, one, does not look at talc
11  particles; two, does not like at perineal
12  application; and three, in this particular
13  statement as put forth by IARC, doesn't look
14  at the ovaries but at the fallopian tubes.
15          So I am again, you know, not
16  seeing anything based on what I've been able
17  to review for this article that it would
18  support the migration theory of perineal
19  application of talcum powder and migration to
20  the ovaries.  So I don't see why I would have
21  found it or cited it in my report.
22     Q.    Okay, Doctor.  But, no, that's
23  not my point.  My point -- let me clarify --
24  is you have used this monograph, Volume 93,

Page 185

1  and specifically some words on page 411 that
2  you quote in your report to say that the
3  working group believed that the evidence for
4  retrograde transport of talc to the ovaries
5  in normal women is weak.
6          You drew upon that and quoted
7  it in your report, didn't you?
8      A.    Yes, I quoted that in my
9  report.
10     Q.    Right.  And I think we looked
11  at it.  It's at page 57 of your report,
12  correct?
13     A.    Yes, it's on page 57.
14     Q.    And that Section 11.5 of your
15  report, one of the sections that is quite
16  critical of Dr. Plunkett, fair?
17          MR. FROST:  Objection.
18     A.    I'm not critical of
19  Dr. Plunkett, merely of the methodology
20  and -- the methodology used in Dr. Plunkett's
21  report.  And as I -- you know, as we've said
22  before, this particular page has about four
23  different topics that I address in addressing
24  the theory of particle migration from the

Kelly Tuttle, Ph.D.

Page 186

1    genital area to the ovaries.
2    BY MR. SOILEAU:
3        Q.    Well, you did say in the topic
4    sentence or title to Section 11.5 that
5    Dr. Plunkett's theory of particle migration
6    was severely flawed, didn't you?
7            MR. FROST:  Objection.
8        A.    As I -- I think I've said
9    before, I state that the theory has not been
10   established in the scientific literature and
11   is severely flawed.
12   BY MR. SOILEAU:
13       Q.    You did use the words "severely
14   flawed" in referring to Dr. Plunkett and her
15   discussion of particle migration, didn't you?
16   Did you use those words, "severely flawed"?
17       A.    I used severely flawed, but not
18   in reference to Dr. Plunkett, but rather to
19   the scientific -- you know, the theory of
20   particle migration.
21       Q.    Okay.  Very well.
22            But my point is:  In
23   criticizing Dr. Plunkett, you quoted IARC,
24   correct?

Page 187

1            MR. FROST:  Objection.
2    BY MR. SOILEAU:
3        Q.    Second paragraph, page 57 of
4    your report, Section 11.5.  You said:
5    Indeed, IARC has concluded.
6            And then we get back to the
7    quote.
8        A.    Yes, I quote IARC there in that
9    first -- that second paragraph under the
10   heading 11.5.  But again, I'm not critical of
11   Dr. Plunkett, but merely the methodologies
12   used.
13       Q.    Yes.  Well, speaking of
14   methodology, though, Dr. Tuttle, we've gone
15   now to the source document, the IARC
16   Monograph 93, and we've found at 411 the
17   source sentence for your quotation, fair?
18       A.    Yes.
19       Q.    And you told me, in looking
20   together at 411, you did not see any studies
21   cited, correct?
22       A.    Yes, that's correct.
23       Q.    But if we go back to 392, we do
24   find studies, beginning with the Egli and

Page 188

1    Newton study, referenced by IARC in this
2    discussion, fair?
3        A.    In that particular paragraph.
4    There are paragraphs before that that again
5    cite several other articles, and there are
6    other articles cited afterwards.  We've only
7    looked at the handful that you've presented
8    to me that I haven't cited.  We haven't gone
9    through all the references in the IARC
10   monograph to see which ones I cited and which
11   ones I did not.
12       Q.    Sure.  That's fine.  And my
13   time is a bit limited, but we can agree that
14   we know that this first study at the
15   beginning of this paragraph, Egli and Newton,
16   is cited by IARC, correct?
17       A.    Yes, it is cited by IARC.
18       Q.    And you did not look at it, did
19   you?
20            MR. FROST:  Objection.
21       A.    Again, I did not cite it in my
22   report.  As I said previously, when looking
23   at the IARC documents and looking at any of
24   these documents, you look at the data and the

Page 189

1    references cited by them.  I don't claim to
2    have cited every reference that IARC cites in
3    their monograph in my report.
4    BY MR. SOILEAU:
5        Q.    But you quoted IARC for the
6    conclusion, yet you didn't independently
7    review the studies upon which their
8    conclusion was based, did you?
9            MR. FROST:  Objection.
10       A.    Well, again, you're stating
11   that, you handed me just a small handful of
12   studies.  We can go through all the
13   references that they cite and then look also
14   at my report and see which references they
15   cite and which ones I cite and which ones
16   they do and I do not.
17            As I said before, you know, you
18   look at the data and you look at the
19   scientific evidence, and the example you keep
20   using of Egli and Newton, as I said before,
21   one, is looking at inert carbon particles;
22   two, looking at deposition in the vagina as
23   opposed to external perineal application; and
24   three, as it says in two of three patients

Kelly Tuttle, Ph.D.

## Page 190

1  traveled to the fallopian tubes.  It doesn't
2  mention the ovaries specifically here.
3  BY MR. SOILEAU:
4      Q.   Do you see the reference later
5  in that same paragraph of page 392 of the
6  IARC Monograph 93 to Henderson, et al, 1971?
7      A.   Yes, I do.
8      Q.   And I've presented you with a
9  Henderson 1971 paper.  It's now marked as
10  Tuttle Exhibit 14, right?
11      A.   I don't recall the exhibit
12  number, but yes, you presented Henderson 1971
13  to me.
14      Q.   Right.  And you confirmed that
15  you did not look at that paper either, right?
16      MR. FROST:  Objection.
17      A.   Again, I did not cite it in my
18  report.
19  BY MR. SOILEAU:
20      Q.   And if it's not cited, you
21  didn't look at it.  I mean, if you looked at
22  it, you would have cited it, right?
23      A.   Well, as I said, I would need
24  to refamiliarize -- or I would need to go

## Page 191

1  back and look at these articles that you are
2  placing in front of me because I don't cite
3  them in my report, which means -- meaning
4  that I don't reference them.
5      That being said, you know, I
6  need to look at them and look at what the
7  basis for them is and understand, and then I
8  can have a better ability to discuss why they
9  weren't cited or why they weren't referenced
10  in my report.
11      Q.   Is it possible that you pulled
12  the Henderson 1971 paper, looked at it,
13  considered it, then set it aside and did not
14  include it in your references of materials
15  considered?
16      MR. FROST:  Objection.
17  BY MR. SOILEAU:
18      Q.   I just need to know if I can
19  rely on the references as a complete listing
20  of the scientific literature, the scientific
21  evidence that was gathered and considered.
22      A.   Well, as I've said before, in
23  going through the scientific evidence, you're
24  dealing with thousands upon millions of

## Page 192

1  articles, so it would be -- I can't say
2  specifically that I looked at it, read it and
3  placed it to the side.
4      But that being said, I could
5  very easily have looked at it and said this
6  is not addressing external perineal
7  application of talcum powder and migration to
8  the ovaries; therefore, it's no evidence that
9  supports the migration theory, and therefore
10  didn't cite it in my report.
11      Q.   And then you would kick it out
12  of the materials considered?
13      A.   Again, in the references, those
14  are the references that I cite in my report,
15  those are the references that I put into the
16  report.
17      Q.   That are helpful?
18      MR. FROST:  Objection.
19      A.   No, they're the references that
20  I cite in the report.
21  BY MR. SOILEAU:
22      Q.   Well, I understand there are
23  thousands of papers out there.  I'm just
24  trying to understand what we have, because I

## Page 193

1  may have misunderstood what your reference
2  list is.
3      I would have assumed that if
4  you did a search of the thousands of papers
5  and you found Henderson 1971, and for the
6  reasons you've told us, you didn't think it
7  proved migration or even supported migration,
8  you would nonetheless include it among the
9  reference materials as something that you had
10  identified and considered.  Am I wrong?
11      MR. FROST:  Objection.
12      A.   Again, without giving me an
13  opportunity to read Henderson, I can't speak
14  to it specifically.  What I'm saying is that
15  in doing an assessment of science, I'd need
16  to know, you know, what Henderson is actually
17  looking at, what their tests are, what -- you
18  know, and have an opportunity to actually
19  review the article.
20  BY MR. SOILEAU:
21      Q.   Right.  But I might have
22  thought you did that before you formed your
23  opinion.
24      MR. FROST:  Objection.

Kelly Tuttle, Ph.D.

Page 194

1    BY MR. SOILEAU:
2        Q.    Well, see, here's my problem.
3    Based on your testimony this afternoon, I'm
4    no longer comfortable that I know whether you
5    looked at Henderson or not because it seems
6    you're telling me you may have found the
7    Henderson '71 paper, which is now Tuttle
8    Exhibit 14, looked at it, concluded it did
9    not support a relationship between perineal
10   application and migration, and therefore set
11   it aside so that it didn't make it into the
12   reference list.  Is that possible?
13           MR. FROST:  Objection,
14       misstates testimony.
15   BY MR. SOILEAU:
16       Q.    I don't mean to state your
17   testimony or rephrase your testimony.  It's a
18   question:  Is it possible that in reviewing
19   available literature, Henderson '71 was
20   found, the same Henderson '71 that is now
21   Tuttle Exhibit 14, that it was found, that
22   you looked at it, and then you cast it away
23   and therefore did not put it on the reference
24   list.  Is that possible?

Page 195

1            MR. FROST:  Objection.
2        A.    So I'll try to be very clear.
3    BY MR. SOILEAU:
4        Q.    Good.  That will help.
5        A.    What I'm trying to explain is
6    that in looking at the migration theory and
7    the theory that external application of talc
8    can migrate to the ovaries and looking at the
9    scientific literature, and in my references
10   or looking at IARC, I attempted to look at
11   the scientific literature that actually
12   examined the external application of talc and
13   the potential for migration to the ovaries.
14           So if the -- if there's studies
15   that look at other -- other things as we've
16   talked about, vaginal insertion or, you
17   know -- and again, I would need to look at
18   these articles specifically to be able to
19   speak to Henderson, which is the one we're
20   discussing right now.
21           But generally speaking, there
22   is no scientific evidence that has examined
23   that external perineal application and
24   migration through the female reproductive

Page 196

1    tract to the ovaries.
2        Q.    If I understand your testimony,
3    you're telling me that if you had come across
4    Henderson, you would not have considered it
5    relevant to the migration issue and therefore
6    it would not have been listed; is that fair?
7        A.    Again, you'd need to let me
8    actually read Henderson and look at it to be
9    able to say I don't cite it in my report, so
10   I'm not familiar with the, you know,
11   objectives or methods that were used in the
12   study.
13       Q.    Very well.
14           As we sit here today, last
15   question on this.  I want to move on.  Last
16   question on this, Doctor.
17           Do you know whether you ever
18   saw Henderson or not in the context of this
19   project, Henderson '71, Tuttle Exhibit 14, do
20   you know whether you ever looked at it before
21   or not?
22           MR. FROST:  Objection.
23       A.    I don't recall.
24           ///

Page 197

1    BY MR. SOILEAU:
2        Q.    Okay.  Let me show you
3    something that's been marked as Tuttle
4    Exhibit 20.
5           (Whereupon, Deposition Exhibit
6        Tuttle-20, Ovarian Cancer Prevention
7        (PDR) Patient Information, was marked
8        for identification.)
9    BY MR. SOILEAU:
10       Q.    Do you know if you've seen this
11   item previously?
12       A.    I think I have seen it before,
13   yes.
14       Q.    Do you know who NCI is or what
15   NCI is?  It's not a trick question.  It's on
16   here.  I should say:  Do you recognize NCI as
17   the National Cancer Institute?  The print is
18   very small, but if you look below the
19   heading -- let me show you where.  It's on
20   there.
21           Do you see that?
22       A.    Yes.
23       Q.    Not to read, just to locate.
24   Go ahead and look at your copy.  So let me

50 (Pages 194 to 197)

Kelly Tuttle, Ph.D.

Page 198

1   get a fair question to you, because I don't
2   think we have one on the table at this
3   moment.
4           Doctor, do you recognize the
5   entity known as the National Cancer
6   Institute?
7       A.   Yes, I'm familiar with the
8   National Cancer Institute.
9       Q.   Do you recognize PDQ as
10  something associated with the National Cancer
11  Institute?  You'll see that it appears here
12  on the top title of this document, PDQ, and
13  it has the R for restricted use.
14          Do you know what that is?
15      A.   I don't think the R is
16  restricted.  I thought it was a registered.
17      Q.   Oh, registered.  I'm sorry,
18  you're right.  It's later in the day.  You're
19  doing better than me.  That's why you're
20  answering questions and I'm asking them.
21          Okay.  Registered.  So NCI has
22  registered PDQ.  Do you know what it means?
23      A.   Not specifically.  This appears
24  to be a website with some patient

Page 199

1   information.
2       Q.   Okay.
3       A.   I do not know what PDQ stands
4   for.
5       Q.   Very well.
6           Look at page 3 of this item
7   under Talc, and see what the National Cancer
8   Institute has said about talc.
9           MR. FROST:  Objection.
10  BY MR. SOILEAU:
11      Q.   Talc.  The use of talc may
12  increase the risk of ovarian cancer.  Talcum
13  powder dusted on the perineum (the area
14  between the vagina and the anus) may reach
15  the ovaries by entering the vagina.
16          That's the end of the quote.
17          Have you considered this
18  before, this language from the NCI website,
19  as you examined scientific evidence and
20  reached your opinions?
21          MR. FROST:  Objection to form.
22      A.   Well, as I mentioned, this
23  appears to be a website for general patient
24  information.  I don't see any references

Page 200

1   behind the -- that talc section as you
2   described it.  I haven't had a chance to look
3   at it in more detail.  This isn't something
4   that -- it's not a scientific article.  I
5   don't see any data included here.
6   BY MR. SOILEAU:
7       Q.   Would you give any weight to
8   this statement by the National Cancer
9   Institute?
10          MR. FROST:  Objection.
11      A.   As I've said previously, with
12  any agency with statements, I want to look at
13  the science and the data that they are using
14  or citing, and with this website, this isn't
15  a study, and I don't see any citations or
16  anything specifically that they put forward
17  for that section other than those sentences.
18  BY MR. SOILEAU:
19      Q.   Did you, in your report,
20  actually cite governmental and agency
21  summaries?
22      A.   I'd have to look specifically,
23  but I -- as I've -- you know, we stated
24  before, I cite IARC and I cite other

Page 201

1   government agencies as well.
2       Q.   Look at the table of contents,
3   II, and see what 7.3.3 is.  I'm sorry, did
4   you see?
5       A.   Yes.
6       Q.   It's a review of governmental
7   and agency summaries, isn't it?
8       A.   Yes, that's what the title is.
9       Q.   Okay.  Let me show you a new
10  exhibit.  I'm sorry, I've been annoyed at the
11  little ding that I'm hearing, and I didn't
12  know where it was coming from and now I know,
13  it's coming from my pocket.  I apologize to
14  everyone.  I was listening to some music at
15  the break, so I turned the sound back on.
16          (Whereupon, Deposition Exhibit
17      Tuttle-21, Health Canada Draft
18      Screening Assessment, was marked for
19      identification.)
20  BY MR. SOILEAU:
21      Q.   I've marked an exhibit as
22  Tuttle Exhibit 21, and I'm going to ask you,
23  Doctor, if you recognize this as the draft
24  assessment from Health Canada?

Kelly Tuttle, Ph.D.

Page 202

1      A.   Yes.
2      Q.   Now, this is something that
3  appears in your reference materials, isn't
4  it?
5      A.   Yes, I believe it does.
6      Q.   And I think you told me that
7  you added Taher, the Taher paper, to your
8  supplemental materials after you saw some
9  discussion of both Health Canada and Taher in
10  some of the depositions, I assume; is that
11  right?
12      A.   In some -- yes.
13      Q.   Somewhere?
14      A.   Either in depositions or the
15  reports. I don't recall specifically.
16      Q.   Okay. But regardless, you've
17  now looked at both Taher and Health Canada,
18  and you had included Health Canada in the
19  reference materials for your original report?
20      A.   That's correct.
21      Q.   Okay. Let's go to pages 19, 20
22  and 21, and I'm really starting on the bottom
23  of 19. You see the sentence that says: The
24  most recent meta-analysis, Taher, et al.

Page 203

1  2018?
2      A.   Yes, I see that.
3      Q.   That's the Taher paper that you
4  added in your supplemental materials?
5      A.   I believe so, yes.
6      Q.   And it goes on to say, in part,
7  employed the Hill criteria, Hill 1965, and of
8  course, that's the Sir Arthur Bradford Hill
9  paper that we've discussed?
10      A.   Again, without flipping to the
11  references, I believe so.
12      Q.   Okay. Look at the next
13  paragraph, 19. You see Strength as a topic?
14      A.   Yes.
15      Q.   And then on page 20 you see the
16  topics of Consistency, Specificity,
17  Temporality and Biological Gradient?
18      A.   Yes.
19      Q.   Do you recognize those topics
20  from the Hill paper?
21      A.   Yes. Those are all some of
22  the -- a portion of the nine viewpoints put
23  forth by the Hill criteria.
24      Q.   Very well.

Page 204

1      Let's turn to page 21 now, if
2  we could. And you see a paragraph near the
3  top of page 21 that begins with the words
4  Biological Plausibility?
5      A.   Yes.
6      Q.   And that's what we're talking
7  about. I mean, that's -- we sort of launched
8  into a long discussion before our most recent
9  break, but we were talking about plausibility
10  or, as you say in your report at page 5,
11  biological plausibility under the Hill paper
12  and viewpoints, fair?
13      A.   Yes.
14      Q.   Okay. So you have considered
15  what Health Canada has said about biological
16  plausibility and specifically migration,
17  correct?
18      MR. FROST: Objection.
19      A.   I would -- again, I would need
20  to look at my report. If -- I certainly am
21  familiar with the Health Canada document, but
22  again, I don't know. I'm sorry, I don't know
23  that I understand what you're referring to as
24  far as how I used the Health Canada document.

Page 205

1  BY MR. SOILEAU:
2      Q.   That's fine. That's a fault
3  with my questioning then, and let me fix it.
4      If something is on the
5  reference list that is attached to your
6  report, Doctor, does it mean that you
7  reviewed it, or is it possible that it's on
8  the list but you never looked at it?
9      MR. FROST: Objection.
10      A.   So everything that is cited in
11  my report I have reviewed or read. Now,
12  there's a large number of articles on there,
13  so, you know, it may have been some time
14  since they've been read or anything like
15  that.
16  BY MR. SOILEAU:
17      Q.   Okay. And I -- to be fair, I
18  particularly didn't ask how much time or how
19  in depth you read each one, but I did want to
20  note that you did at least consider to some
21  extent each of the items included in the
22  reference materials; is that fair? You did?
23      A.   Yes, as I said, if they're
24  cited in my report, I've referred to them, I

Kelly Tuttle, Ph.D.

Page 206

1    have at least read them.  As I said, it may
2    have been some time previously.  It may have
3    been a brief review versus an in-depth, but I
4    have read all the articles that I cite in my
5    report.
6        Q.    Okay.  Let's look at what
7    Health Canada said on page 21 under
8    Biological plausibility.  Particles of talc
9    are hypothesized to migrate into the pelvis
10   and ovarian tissue, causing irritation and
11   inflammation.  The presence of talc in the
12   ovaries has been documented (Heller,
13   H-E-L-L-E-R, et al, 1996b).  This evidence of
14   retrograde transport supports the biological
15   plausibility of the association between
16   perineal talc application and ovarian
17   exposure.
18            Did I read that portion of the
19   paragraph correctly?
20       A.    Yes, but you stopped
21   mid-sentence there at the end.
22       Q.    Let me keep going then.  We'll
23   go all the way to the end of the paragraph.
24            However, the specific

Page 207

1    mechanism(s) and cascade of molecular events
2    by which talc may cause ovarian cancer have
3    not been identified (Taher et al, 2018).
4            Now, we've read the entire
5    section on biological plausibility, correct?
6        A.    Well, we've read that entire
7    paragraph where it specifically addresses
8    biological plausibility in that specific --
9        Q.    Fair.  Right.  I didn't mean to
10   say that there's no mention of plausibility
11   elsewhere in the paper.  I just meant that
12   we've gone through the Hill viewpoints.  We
13   got to biological plausibility, and I just
14   read the section on biological plausibility.
15           The next thing in Health Canada
16   on page 21 is Coherence, another viewpoint,
17   right?
18       A.    Yes.  As I said, on that
19   particular page.  I don't recall if it's
20   discussed in more detail elsewhere in the
21   report, but in this particular section,
22   you've read the entirety of the plausibility
23   paragraph.
24       Q.    Thank you.

Page 208

1        Did you give any weight to this
2    statement by Health Canada?
3        MR. FROST:  Objection.
4        A.    Well, again, as I've stated
5    before, in any of the government or
6    regulatory agencies, when reviewing their
7    documents and summaries, I try to look at the
8    data that either supports or doesn't support
9    their statements or the references they cite.
10           In this particular paragraph,
11   they cite the Heller study, which I believe I
12   cite in my report.
13       Q.    You do.
14       A.    And as well as the Taher
15   meta-analysis, and to be clear, the Heller
16   study, I would need to have it in front of
17   me, but it states here, only looks at the
18   presence of talc in the ovaries.  It does not
19   document or assess external application and
20   migration, and the Taher study, as I
21   understand, is a meta-analysis of the
22   epidemiological studies, so again, does not
23   assess the migration theory.
24       Q.    Doctor, in your opinion, has

Page 209

1    talc been found in ovarian tissue?
2        A.    Well, I --
3        MR. FROST:  Objection.
4        THE WITNESS:  Sorry.
5        A.    Again, as I stated, there have
6    been studies that have looked at talc in
7    ovarian tissue -- we'd have to look at those
8    individual studies, you know, but -- has seen
9    it, but again, has not been looking at the
10   external perineal application and migration.
11   BY MR. SOILEAU:
12       Q.    Yes, Doctor.  This is a
13   different question, though.  I'm not asking
14   you about the migration at this moment.  I'm
15   asking you specifically, based on your review
16   of the scientific evidence and literature,
17   has talc been found in the ovaries of women?
18       MR. FROST:  Objection.
19       A.    Again, I'd have to look at the
20   scientific evidence from a different angle as
21   you said because as I said before, I've been
22   looking at the evidence for migration theory
23   from external application.
24           I certainly am aware, as you

Kelly Tuttle, Ph.D.

Page 210

1 say, like in the Heller study and in other
2 studies, they have been looking for and
3 through their various methods have surmised
4 that they have identified talc in the
5 ovaries, but that was not my specific
6 objective. It was looking at the migration
7 theory rather than just the presence of talc
8 in the ovaries, because we kind of discussed
9 that earlier, that the presence of talc in
10 the ovaries is not sufficient to indicate, or
11 of any chemical on an organ, to indicate that
12 an adverse health effect will occur.
13 BY MR. SOILEAU:
14     Q.   Do you believe that talc has
15 been found in the ovaries of women who have
16 had their ovarian tissue examined based on
17 your review of the scientific evidence?
18         MR. FROST:  Objection.
19 BY MR. SOILEAU:
20     Q.   I'm not asking about migration.
21 I'm not asking about carcinogenicity right
22 now. I'm asking you, based on your review of
23 the scientific evidence, has talc, talc
24 particles as you say in your report, been

Page 211

1 found in -- embedded in ovarian tissue?
2         MR. FROST:  Objection.
3     A.   Well, again, in this particular
4 report and in this -- because I did not do an
5 assessment regarding just the presence of
6 talc in the ovarian tissue. We can refer to
7 my report where I discuss it in more detail
8 regarding those things.
9         I think others involved in this
10 litigation get more in detail into that. I
11 merely looked at it through the lens of the
12 Hill criteria as far as the migration theory
13 that perineal application can migrate to the
14 ovaries.
15     Q.   You say this particular report.
16 You're talking about the report that you
17 authored and signed in this litigation?
18     A.   Yes, I'm referring to -- to the
19 objectives of my scientific -- the research
20 that I put in my report.
21     Q.   You did look at Heller, didn't
22 you?
23         MR. FROST:  Objection.
24         ///

Page 212

1 BY MR. SOILEAU:
2     Q.   That is the Heller paper cited
3 at page 21?
4     A.   Yes, I cited it in my report.
5     Q.   If I asked you to assume that
6 talc particles have been identified in
7 ovarian tissue, what explanation would you
8 offer to help us understand how it got there?
9         MR. FROST:  Objection, outside
10     of the scope of this witness' opinions
11     being offered in this case.
12 BY MR. SOILEAU:
13     Q.   Well, do you think that's
14 outside the scope of your expertise or
15 opinions, talking about how it gets there?
16     A.   Well, as I said, I was asked to
17 look at the potential causal association
18 between perineal talcum powder exposure and
19 ovarian cancer. A small subset of that in
20 Hill criteria is biological plausibility.
21         So I assessed the scientific
22 evidence on whether the mechanism of external
23 application and migration to the ovaries has
24 been -- if there's been any evidence in the

Page 213

1 scientific literature to support that
2 external migration, which I state my opinion
3 has not.
4         But regarding just the -- you
5 know, alternative -- as you said, the
6 presence of talc in the ovaries and how it
7 gets there is -- I don't believe I -- beyond
8 the realm of talcum powder and external
9 migration, I'm not sure that I assess any of
10 that in my report, and I didn't look at
11 alternative talc exposures or other potential
12 sources of talc or things of that nature.
13     Q.   Let me understand, Doctor. You
14 looked to see if talcum powder applied to the
15 perineum could migrate through the vaginal
16 tract to the ovaries, fair?
17     A.   So what I looked at is we --
18 you have the hypothesis --
19     Q.   Yes.
20     A.   -- that talcum powder applied
21 to the perineum can enter the vagina and pass
22 through the female reproductive tract to the
23 ovaries.
24         What I have done under the

Kelly Tuttle, Ph.D.

Page 214

1  biological plausibility is look to see if
2  there's any data to support that hypothesis
3  that the external application of talcum
4  powder can enter the vagina and migrate to
5  the ovaries.
6        Q.   Well, wouldn't evidence of talc
7  in the ovaries be relevant to the discussion
8  and investigation of whether talcum powder
9  can migrate through the vagina to the
10  ovaries?
11        MR. FROST:  Objection.
12        A.   Well, it would depend.  You
13  know, as we talked about with some of the
14  studies that you placed in front of me
15  earlier, we're talking about, you know,
16  vaginal insertion or, you know, other
17  scenarios that are different from just
18  perineal application.
19        So it would depend on the
20  nature of the study and the nature of the
21  assessment to determine whether it would be
22  applicable.
23  BY MR. SOILEAU:
24        Q.   But you haven't looked.

Page 215

1        MR. FROST:  Objection.
2  BY MR. SOILEAU:
3        Q.   You haven't looked at the
4  scientific literature and evidence to form an
5  opinion on whether talc is found in the
6  ovaries of women; is that correct?
7        MR. FROST:  Objection.
8        A.   Again, I looked at the
9  scientific evidence to see whether there have
10  been any scientific evidence to support that
11  talcum powder applied externally to the
12  perineum can enter the vagina and transport
13  through the female reproductive tract to the
14  ovaries.
15        I think that there are others
16  involved in this litigation that get more
17  into some of the questions you're asking, and
18  so I would probably -- have to refer to their
19  work and then again look at what they cite to
20  do that type of assessment.
21  BY MR. SOILEAU:
22        Q.   You would have to rely on what
23  they say?
24        A.   No, I said I would refer to

Page 216

1  their -- what they did.  I know they went
2  more -- as I said, I believe there are others
3  who have gone into more detail, and so I
4  would refer to their work.  Because as I
5  said, I just looked at the scientific
6  evidence for an external application
7  migration hypothesis.
8        Q.   We talked about Johnson &
9  Johnson documents.  Were you provided with
10  any Imerys documents?
11        A.   I believe there are some Imerys
12  documents put in my -- on my materials relied
13  and reviewed upon.  Anything I was provided
14  is listed there on my report.
15        Q.   Okay.  Those are the materials
16  regarding the analysis of the content of the
17  talcum powder products and the makeup of
18  fragrances?
19        A.   Yes, that's correct.  I believe
20  so.
21        And by that, I simply mean the
22  appendices on those issues, and those, you're
23  telling me, might include some reference to
24  Imerys documents in part.

Page 217

1        Do I have it right?
2        A.   I'm sorry.
3        Q.   You want me to try again?
4        A.   Please.
5        Q.   It's possible that you have
6  some Imerys documents referenced in some of
7  the appendices to your report, fair?
8        A.   Yes, and...
9        Q.   Let me show you a document that
10  I've marked as Tuttle Exhibit 22.  It's Bates
11  numbered as JNJ_000704 through 709
12  consecutively, and ask if you've seen this
13  document before.
14        (Whereupon, Deposition Exhibit
15  Tuttle-22, 2004 Fax Transmission of
16  Sj?sten Publication, was marked for
17  identification.)
18        A.   No, I'm not familiar with this
19  document.
20  BY MR. SOILEAU:
21        Q.   Okay.  Let's look at on the
22  first page, you see what I've highlighted on
23  the screen just to give us a sense of where
24  I'm at?  I'm reading here.  I tell you what.

55 (Pages 214 to 217)

Kelly Tuttle, Ph.D.

Page 218

1    I'll read the entire note.
2            I came across this paper this
3    morning published in the April 2004 journal,
4    Human Reproduction, an official journal of
5    the European Society for Human Reproduction
6    and Embryology.  It offers some compelling
7    evidence in support of the, quote, migration,
8    closed quote, hypothesis.  Combine this, open
9    quotes, evidence, closed quotes, with the
10   theory that talc deposition on the ovarian
11   epithelium initiates epithelium
12   inflammation - which leads to epithelium
13   carcinogenesis - and you have a potential
14   formula for NTP classifying talc as a
15   causative agent in ovarian cancer.
16           Did I read that correctly,
17   Doctor?
18       A.   Yes, you read that correctly,
19   but this appears to be a personal
20   communication with some personal conclusions
21   and opinions.  I don't know, you know, the
22   basis for all of those statements or
23   conclusions.  As you say, he attaches the --
24   and I'm not going to be able to pronounce the

Page 219

1    last name, but the S-J- --
2        Q.   Sj?sten?
3        A.   Yes, that we discussed earlier.
4        Q.   Right.  So this is the paper we
5    discussed earlier, which is now Tuttle
6    Exhibit 18, that is, the Tuttle Exhibit 18 is
7    apparently attached to this note from Richard
8    J. Zazenski, Z-A-Z-E-N-S-K-I, director of
9    product safety, to Bill Ashton, fair?
10           MR. FROST:  Objection.
11       A.   That's -- it appears that, yes,
12   the article is attached to this
13   communication.
14   BY MR. SOILEAU:
15       Q.   And this Sj?sten paper is from
16   2004?
17       A.   Again, this was not something I
18   cited in my report, so I'm not --
19       Q.   I understand that.  Go ahead.
20   I'm sorry.
21       A.   -- very familiar with it.  In
22   the communiqué? it says published in
23   April 2004.  I --
24       Q.   Right.  And you have the paper.

Page 220

1        A.   I've not seen the public -- the
2    publication date on the papers attached right
3    here on the top.
4        Q.   Right.  But I gave you the
5    paper as Tuttle Exhibit 18, if it helps.  It
6    will be much easier to read, I think, than
7    the small print on what is now Tuttle
8    Exhibit 22.
9            This is a pretty important
10   statement if it's accurate, isn't it?
11           MR. FROST:  Objection.
12   BY MR. SOILEAU:
13       Q.   Well, if -- I mean, doesn't
14   this statement on Tuttle Exhibit 22 cause you
15   to want to pause and revisit the question of
16   migration?
17           MR. FROST:  Objection.
18       A.   Again, as I said earlier, this
19   is a personal communiqué?.  There are several
20   statements and "mays" and, you know,
21   "potential" and, you know, things, and this
22   is just one article that they cite.  I don't
23   know the context of this conversation.  I
24   don't know Mr. Zazenski, I don't know what

Page 221

1    he's basing these statements on.
2            And again, it's a personal
3    communication.  It's not a scientific article
4    or a scientific journal beyond the one
5    article that they -- he attaches in this
6    communication.
7    BY MR. SOILEAU:
8        Q.   Right.  I understand what
9    you're saying, Doctor, but doesn't this
10   document at least cause you to wonder, to
11   want to pause and do more investigation, to
12   find out who Mr. Zazenski is, for example?
13           MR. FROST:  Objection.
14       A.   Again, it's an internal
15   communication.  It's not a scientific
16   document.  You know, it's not something that
17   I would refer to in doing a review of the
18   scientific literature.
19   BY MR. SOILEAU:
20       Q.   If he was available, would you
21   not want to ask him why he finds this paper
22   to be compelling evidence in support of
23   migration, the migration hypothesis?
24           MR. FROST:  Objection.

56 (Pages 218 to 221)

Kelly Tuttle, Ph.D.

Page 222

1      A.   Again, he makes several
2  statements, and -- without knowing the
3  references or the basis for his opinions, but
4  again, it's a -- his opinions.  It's a
5  personal communication.  It's not something I
6  would use in doing a scientific assessment.
7  BY MR. SOILEAU:
8      Q.   Do you know who NTP is?  It's
9  referenced at the second-to-last line of this
10  note to Mr. Ashton.
11      A.   I know from my experience who
12  NTP would be, but I don't know if it's the
13  same organization, you know, as the --
14  Mr. Zazenski is referring to.
15      Q.   Who do you know it to be?
16      A.   I know NTP to be the National
17  Toxicology Program.
18      Q.   It would make sense, wouldn't
19  it, that that is who he is referring to?  You
20  have a potential formula for NTP classifying
21  talc as a causative agent in ovarian cancer.
22      MR. FROST:  Objection.
23      A.   Again, I know who -- that's who
24  I would think NTP meant, but I'm not aware.

Page 223

1  There may be other organizations that have
2  that same acronym.  I don't know.
3  BY MR. SOILEAU:
4      Q.   Let me show you another
5  statement in the Hill paper.  He quotes
6  Holmes and Watson and says, quote, "When you
7  have eliminated the impossible, whatever
8  remains, however improbable, must be the
9  truth."
10      Do you see that?
11      A.   I'm sorry, can you refer me to
12  the --
13      Q.   The exhibit number?
14      A.   Yes, please.
15      Q.   I'll be glad to.  It is Tuttle
16  Exhibit 7.
17      A.   Thank you.
18      Q.   The paragraph says, in full, at
19  the top of page 10 on the right column:  In
20  short, the association we observe may be one
21  new to science or medicine, and we must not
22  dismiss it too lightheartedly as just too
23  odd.  As Sherlock Holmes advised Dr. Watson,
24  quote, "When you have eliminated the

Page 224

1  impossible, whatever remains, however
2  improbable, must be the truth."
3      A.   I'm sorry, is there a question?
4      Q.   Do you think that's good
5  guidance?
6      MR. FROST:  Objection.
7      A.   Well, again, you're taking the
8  summary statement of what he discusses in
9  plausibility where, you know, he says that it
10  depends on the biological knowledge of the
11  day, and he quotes several things, and that
12  is his summary statement regarding, you know,
13  looking at plausibility.
14  BY MR. SOILEAU:
15      Q.   All right.  Let's look at one
16  more.  I'll mark this as Tuttle Exhibit 23.
17      (Whereupon, Deposition Exhibit
18      Tuttle-23, 4/1/14 FDA Letter, was
19      marked for identification.)
20      THE WITNESS:  And if we may
21      after this one, can we take a short
22      break?
23      MR. SOILEAU:  Absolutely.  I
24      thought it was about time myself.

Page 225

1  BY MR. SOILEAU:
2      Q.   Here is Exhibit 23.  It is a
3  letter from the Food and Drug Administration.
4  I have a date of April 1, 2014.  It's from
5  the Department of Health and Human Services.
6  Certainly you recognize the Food and Drug
7  Administration, correct?
8      A.   Yes.
9      Q.   Just as an entity?
10      A.   Yes, I'm familiar with the
11  Food and Drug Administration or FDA.
12      Q.   Okay.  And do you recognize
13  that the Food and Drug Administration has
14  some jurisdiction or authority in connection
15  with cosmetic products?
16      MR. FROST:  Objection.
17  BY MR. SOILEAU:
18      Q.   If you know.  You may not know.
19      A.   I -- you know, I know that the
20  FDA has done several things in regards to
21  cosmetic products regarding a specifical --
22  specific authority or regulations.  I
23  don't -- we'd have to be more specific.
24  That's a very kind of general, overarching...

57 (Pages 222 to 225)

Kelly Tuttle, Ph.D.

Page 226

1    Q.    Okay.  Do you know whether
2  Shower to Shower and Johnson's baby powder
3  fall under the authority of the Food and Drug
4  Administration?
5        MR. FROST:  Objection.
6    A.    Specifically, I don't know.  I
7  didn't look at that.
8  BY MR. SOILEAU:
9    Q.    Okay.  Let's look at page 5 of
10  7.  And I'm going to direct you to this
11  paragraph, which is the third full paragraph.
12  It begins with:  While there exists no direct
13  proof of talc in ovarian carcinogenesis.
14        By the way, we looked at
15  something earlier.  Isn't it true that in
16  cancer, the mechanism, the exact mechanism is
17  often not known --
18        MR. FROST:  Objection.
19  BY MR. SOILEAU:
20    Q.    -- but the association, the
21  relationship, the causal relationship can be
22  established?
23    A.    Well, that's a very broad
24  statement.  Previously when we were talking

Page 227

1  about the Hill criteria, as I said before,
2  you don't take any one particular criteria in
3  a vacuum.  You look at all nine viewpoints,
4  the context and the body as itself.
5        And in areas where the strength
6  and consistency in association are very
7  strong, the evidence regarding a mechanism
8  may be not as strong --
9    Q.    Exactly.
10    A.    -- and you have a very strong
11  evidence forward.  If you don't have a strong
12  association or strong consistency or, you
13  know, strong strength of the association,
14  then the burden on the other criteria becomes
15  much greater as far as looking at the nine
16  criteria as a whole.
17    Q.    So, for example, in smoking we
18  may not know the exact mechanism of the
19  carcinogenicity, but given the strength of
20  the association, there is no doubt that there
21  is a proper conclusion that smoking causes
22  lung cancer, as an example, fair?
23    A.    I haven't researched the
24  mechanisms regarding cigarette smoking and

Page 228

1  lung cancer.
2    Q.    Never mind.
3        It says, going on in this
4  paragraph:  The potential for particles to
5  migrate from the perineum and vagina to the
6  peritoneal cavity is indisputable.  It is
7  therefore plausible that perineal talc (and
8  other particulate) that reaches the
9  endometrial cavity, fallopian tubes, ovaries
10  and peritoneum, may elicit a foreign body
11  type reaction and inflammatory response that
12  in some exposed women may progress to
13  epithelial cancers.
14        Do you see that?
15    A.    Yes, but you ended before the
16  last sentence of that paragraph.
17    Q.    Sure.  It goes on to say:
18  However, there has been no conclusive
19  evidence to support causality.
20        All right, now we've read the
21  entire paragraph and a couple of stops and
22  the document will speak for itself.
23        But it does say the potential
24  for particulates to migrate from the perineum

Page 229

1  to the peritoneal cavity is indisputable,
2  doesn't it?
3        MR. FROST:  Objection.
4    A.    Again, that's what it states
5  here, but it doesn't provide any basis for
6  that statement.
7  BY MR. SOILEAU:
8    Q.    And certainly you disagree with
9  that?
10    A.    As I said, it's not for me to
11  agree or disagree.  There's no basis for the
12  statement as put forward here for me to look
13  at the data that they used for this
14  particular statement, and as I've said
15  before, the scientific evidence does not
16  support the external application migration
17  theory for talcum powder.
18    Q.    Well, Doctor, you've been put
19  forward as an expert witness in this case,
20  and you have told me that migration is
21  something that you have examined and will
22  comment on, and I'm simply asking:  Is the
23  position that you have adopted in this
24  litigation on behalf of J&J in conflict with

Kelly Tuttle, Ph.D.

Page 230

1    what the FDA says here?
2         MR. FROST:  Objection.
3         A.   Well, as I said, this is one
4    paragraph taken out of the entire document,
5    and so without looking at the context and
6    there's no references cited for me to look at
7    their basis for this statement.
8         As I've said before, the
9    scientific evidence does not support the
10   migration theory that external application of
11   talc can migrate to the ovaries.
12   BY MR. SOILEAU:
13        Q.   Can you say whether this
14   paragraph conflicts with the opinions you
15   have offered in this case and that we are
16   discussing today?
17        MR. FROST:  Objection.
18        A.   Again, without looking at
19   the -- you know, the document in its
20   entirety, we're taking it out of context, I
21   certainly agree with the statement there's
22   been no evidence to support causality at the
23   end of the paragraph and that there's no
24   direct proof of talc and ovarian

Page 231

1    carcinogenesis.
2    BY MR. SOILEAU:
3         Q.   So you agree -- I'm sorry.
4         A.   These -- well, these -- again,
5    the scientific basis for this is not put in
6    here.  There's no references.  We would need
7    to look at all the data beyond -- you know,
8    this is just a letter regarding, if I
9    remember correctly, a petition, where they're
10   addressing a petition, rather than a document
11   that is doing any -- any testing.
12        I think they summarize some
13   information in here, but I'm not seeing, you
14   know, references or you know, a set of
15   scientific data to refer to or review as far
16   as the scientific evidence.
17        Q.   But you're telling me at the
18   same time, you certainly agree with the
19   statement that there's been no evidence to
20   support causality?
21        A.   Well, as I --
22        Q.   Is that right?
23        A.   As I said before, I have not
24   found any scientific evidence that -- or,

Page 232

1    excuse me, the scientific evidence does not
2    support the external application of --
3    migration theory that the external
4    application can migrate through the female
5    reproductive tract and reach the ovaries.
6         But as I have -- I think I've
7    also said before that the scientific evidence
8    does not support a causal association between
9    perineal talcum powder exposure and ovarian
10   carcinogenesis.
11        Q.   Whether you agree or not, in
12   this paragraph, the FDA is telling us that it
13   is biologically plausible, that is, migration
14   of talcum powder through the vagina to the
15   ovaries is biologically plausible.  FDA is
16   telling us that here, whether you agree or
17   not, isn't it?
18        MR. FROST:  Objection.
19        A.   Again, we've quoted the
20   paragraph out of this letter --
21   BY MR. SOILEAU:
22        Q.   Right.
23        A.   -- again, addressing petitions.
24   There's -- again, we haven't looked at the

Page 233

1    scientific data behind the statements or
2    behind any -- any of the other things that
3    we've discussed.
4         Q.   Shouldn't you have done that
5    before today?
6         MR. FROST:  Objection.
7         A.   Well, as I said previously,
8    I've assessed the body of science in my
9    report and looked at the external application
10   of perineal talc and the potential migration
11   to the ovaries as well as the other nine
12   viewpoints of the Hill criteria and the --
13   whether the scientific evidence is supportive
14   of a causal association between perineal
15   talcum powder exposure and ovarian cancer,
16   for which the scientific evidence doesn't
17   support that causal association.
18        And the scientific evidence
19   does not support the hypothesis that the
20   external application of talcum powder cannot
21   migrate -- or that can migrate to the ovary
22   after external application.
23   BY MR. SOILEAU:
24        Q.   Had you seen this document

59 (Pages 230 to 233)

Kelly Tuttle, Ph.D.

Page 234

1  before today?
2      A.  Yes, I believe so.
3      Q.  Can you at least tell me then,
4  having reviewed this document previously and
5  having it before you today, that the FDA,
6  regardless of whether you agree or disagree,
7  that the FDA is finding biological
8  plausibility in the context of that topic
9  that we've discussed today in this letter?
10  They're saying it is therefore plausible?
11      MR. FROST:  Objection.
12      A.  Well, again, this is -- this is
13  a letter.  This is a response to a petition.
14  I don't see that this is a research article
15  or a -- you know --
16  BY MR. SOILEAU:
17      Q.  Can you even say, though,
18  Doctor, what the letter says?  Yes, it's a
19  letter.  Yes, it's a letter though from the
20  FDA.  No, it doesn't cite literature.  But
21  I'm asking you:  Does the letter say it is
22  biologically plausible?
23      MR. FROST:  Objection.
24      A.  Again, you know, we have read

Page 235

1  the paragraph, and in the paragraph it
2  doesn't say biologically plausible.
3  BY MR. SOILEAU:
4      Q.  Okay.  I mean, look at page 28
5  of your report.  Aren't you citing in the
6  paragraph that begins:  In 2014, the FDA --
7  aren't you citing this very letter that I've
8  marked as Tuttle Exhibit 23?
9      A.  Yes, I am.  It's in the
10  subsection we were discussing earlier
11  entitled Governmental and Agency Summaries.
12      Q.  Right.  And you quoted from
13  this letter.
14      A.  Yes, I do.
15      Q.  Even though the letter doesn't
16  include any citation or authority.
17      A.  Well, again, as I've said
18  before, with governmental agencies and
19  documents, I refer to them, I look at their
20  information, and then I think it's important
21  to look at the scientific data.
22      But again, this, again, also
23  finds that data submitted presented
24  conclusive evidence -- or excuse me, did not

Page 236

1  find that the data submitted presented
2  conclusive evidence of a causal association.
3      Q.  What methodology is it, Doctor,
4  that allows you to quote this letter for that
5  position, yet ignore the statement of
6  plausibility in the same letter by FDA?
7      MR. FROST:  Objection.
8      A.  So again, I was asked to opine
9  on the overarching scientific data, the body
10  of science, regarding the causal association
11  between talcum powder and ovarian cancer and
12  the scientific evidence of whether it
13  supported the hypothesis that there's an
14  association.
15      In looking at the body of
16  evidence and looking at the Hill criteria and
17  looking at all the criteria, that was my
18  objective of which biological plausibility,
19  you know, I address, again, is one portion.
20  BY MR. SOILEAU:
21      Q.  Right, but in doing that, you
22  cited --
23      MR. FROST:  Let her finish her
24      answer.

Page 237

1      MR. SOILEAU:  Go ahead, if
2      you're not finished.
3      A.  And as I said previously and we
4  talked about previously with the Hill
5  criteria, you can't take one criteria in a
6  vacuum and just examine that solely for the
7  establishment of causation.  You need to look
8  at the entire context.
9      So in this particular scenario
10  where I was looking at this letter, I do cite
11  that their -- you know, their overarchal
12  conclusion regarding causal association, but
13  again, my research is in the scientific
14  literature and the peer-reviewed literature
15  as far as these provide context and
16  information.
17  BY MR. SOILEAU:
18      Q.  But what you have done is you
19  have, in fact, taken one statement from the
20  FDA letter -- you've taken a statement from
21  that letter from the FDA, cited it in support
22  of no evidence of a causal association, and
23  ignored its statement about biological
24  plausibility when you tell us later that

Kelly Tuttle, Ph.D.

Page 238

1    there's no evidence of plausible theory.
2            Haven't you done the very
3    thing -- you need me to say it over?  You
4    took one part of this FDA letter and put it
5    in your report and relied on it, didn't you?
6        MR. FROST:  Objection.
7        A.    Well, again, as I stated
8    before, when looking at governmental agency
9    summaries and documents, you know, while I
10   refer to them and I look at their
11   conclusions, I look at the scientific data
12   that is the basis for those conclusions.
13           And in this particular section
14   that you're referring to with the FDA quote
15   that I used, the government and --
16   governmental and agency summaries, if -- I'm
17   jumping ahead in my report a little bit, but
18   I was looking at the --
19   BY MR. SOILEAU:
20       Q.    Right.
21       A.    -- determinations regarding a
22   causal association.  In this particular
23   section, I'm addressing causal association,
24   not biological plausibility, which I indicate

Page 239

1    later in my report.
2        Q.    Yes, Doctor.
3        A.    Which I state that no
4    scientific evidence supports the migration
5    theory.
6        Q.    I got that.
7        A.    What is stated here is not
8    scientific evidence.  It's a sentence in a
9    letter.
10       Q.    Yes.  But these are all apples
11   from the same tree, the tree of this letter,
12   and you have used one of the apples that you
13   selected on causation and ignored an apple on
14   plausibility as part of your methodology,
15   haven't you?
16       MR. FROST:  Objection.
17       A.    No.  Again, as I said, I looked
18   at the body of science and the scientific
19   evidence.  The citing of this particular
20   quote for the FDA article under the
21   governmental agencies, as I said, it's about
22   the science and the body of science.
23           It's not about, you know, each
24   individual governmental agency of which, you

Page 240

1    know, I refer to several in this particular
2    section, and I cite several in my report.
3        MR. SOILEAU:  All right.  Let's
4    take our next break now.  Thank you.
5        THE VIDEOGRAPHER:  Going off
6    the record at 1:56 p.m.
7        (Recess taken, 1:56 p.m. to
8    2:07 p.m.)
9        THE VIDEOGRAPHER:  We're back
10   on the record at 2:07 p.m.
11   BY MR. SOILEAU:
12       Q.    Okay.  Doctor, are you ready to
13   proceed?
14       A.    Yes, I am.
15       Q.    Very well.  Thank you.
16           Would you consider evidence of
17   talc in the ovaries of women to be important,
18   relevant evidence that you would want to
19   consider in your evaluation of the causality
20   question that you described earlier?
21       MR. FROST:  Objection.
22       A.    So I think we discussed that
23   earlier in that the presence of talc in the
24   ovaries is -- does not necessarily mean that

Page 241

1    an adverse health effect will occur.  We have
2    to look at the body of science as a whole and
3    the scientific literature beyond -- beyond
4    that to see if there is a causal association.
5    BY MR. SOILEAU:
6        Q.    I understand that the presence
7    of talc in the ovaries does not end the
8    causal association analysis, but I'm asking
9    you if it is one step, one part of the
10   evidence that you, as a toxicologist, would
11   want to know about and to consider in your
12   work on this project.
13       A.    So again, as I stated before, I
14   wanted to assess the hypothesis on whether
15   external perineal application of talcum
16   powder can cause migration to the ovaries,
17   for which the scientific evidence does not
18   support that hypothesis.
19       Q.    I've heard that from you, but
20   that's not the question I'm asking you.  I
21   really need you to answer my question; and
22   that is:  If there is evidence, okay -- if
23   there is evidence of talc in ovaries, do you
24   simply say, well, that does not necessarily

61 (Pages 238 to 241)

Kelly Tuttle, Ph.D.

Page 242

1    mean that an adverse health effect will
2    occur, so we don't need to look at it?
3        MR. FROST:  Objection.
4    BY MR. SOILEAU:
5        Q.   Is that consistent with the
6    methodology that you've used here?
7        MR. FROST:  Objection.
8        A.   No.  So what I'm saying is that
9    the question that we are asking or the
10   question that I was asking in doing my
11   literature -- assessing the body of science
12   is whether the perineal application of talcum
13   powder is causally associated with ovarian
14   cancer.
15            The subpart of that, as we've
16   been discussing, is whether the migration
17   theory that the external application of
18   talcum powder can migrate from the external
19   genitals to the ovaries.
20            When you ask about just the
21   presence of talc in the ovaries, that is --
22   you know, we need to look at the mechanism,
23   not just the mere presence.  That's what I
24   mean when I say the presence does not mean an

Page 243

1    adverse health effect will occur.
2            We have to look at the
3    scientific literature.  We've talked a little
4    bit about the plausibility, but also the Hill
5    criteria, the epidemiology, the evidence,
6    because the -- as opposed to just the mere
7    presence.
8    BY MR. SOILEAU:
9        Q.   You said that one part is
10   migration, the issue of migration.  Did I get
11   that right?
12       MR. FROST:  Objection.
13       A.   I --
14   BY MR. SOILEAU:
15       Q.   You said -- I'm sorry, I'm
16   going to use your words so that we have it
17   more fairly and correctly.
18            The subpart as we've been
19   discussing is migration.  That's not a full
20   quote, but I'm using your words to structure
21   my question, to be fair.
22            The subpart that we've been
23   discussing is migration, the migration
24   theory.  I'm simply asking is the presence of

Page 244

1    ovarian tissue with talc, that is, the
2    presence of talc in ovarian tissue, another
3    subpart that you would and should consider in
4    your analysis of these issues?
5        A.   So again -- and I don't have my
6    words in front of me, but as I was talking
7    about the question we're looking at is the
8    association between talcum powder use
9    perineally and ovarian cancer and whether
10   there is scientific evidence that supports a
11   causal association.
12            So the presence of talc in the
13   ovaries or evidence noting talc in the
14   ovaries, as I said, we have to look at --
15   that's one part of -- but as we were talking
16   about with biological plausibility, we have
17   to look at the hypothesis that talc, when
18   applied externally to the perineum, can
19   migrate to the ovaries.  And the scientific
20   evidence does not support that hypothesis.
21            In regards to just the presence
22   or absence of talcum powder on the ovaries,
23   that's just a very, very general, you know,
24   looking at the scientific literature, is it

Page 245

1    there, isn't there type of scenario as
2    opposed to the specific question we're
3    looking at regarding talcum powder use
4    perineally and ovarian cancer, which is what
5    I assessed the scientific literature for.
6            And as I've said previously,
7    you know, there are others that get into the
8    biological plausibility, the migration theory
9    in more detail than I do.  But in the context
10   of my report and in the context of the body
11   of science, we're specifically looking at
12   that relationship between perineal
13   application and ovarian cancer.
14       Q.   Doctor, was it purposeful that
15   you changed my question from talc in the
16   ovarian tissue to talc on the ovary?
17       MR. FROST:  Objection.
18       A.   I'm sorry.  That was not
19   intentional.
20   BY MR. SOILEAU:
21       Q.   Okay.  Do you recognize a
22   distinction there between talc in the ovarian
23   tissue versus talc on the ovary?
24       A.   Again, that was just a -- I --

Kelly Tuttle, Ph.D.

Page 246

1    no, there was --
2          Q.   Okay.
3          A.   -- that was not intentional to
4    change it in that manner.
5          Q.   Okay.  Well, in my review of
6    the literature I've seen that distinction
7    made, and that's why I was wondering if you
8    were moving to a different issue.  I was
9    confused.  It was a long answer.
10         Is evidence of talc in the
11   ovarian tissue evidence that you would
12   consider in your analysis of the causation
13   question?
14         MR. FROST:  Objection.
15         A.   Again, I would need more
16   information.  As I was talking about, we --
17   in the causation question we're assessing,
18   we're looking at perineal application of
19   talcum powder and ovarian cancer.
20         So just saying if the talc is
21   present or not, we would need more
22   information as far as using that, the
23   scientific evidence for that in assessing a
24   causal relationship between talcum powder and

Page 247

1    ovarian cancer.
2          Q.   So to be clear, if all I have
3    is there is evidence of talc, talc particles
4    in the ovarian tissue, that standing alone is
5    not enough to move the ball for you?
6          MR. FROST:  Objection.
7          A.   Again, you have to have more
8    information.  You have to look at the
9    context.  You have to look at the studies
10   that you're referencing for scientific
11   evidence.  You have to look at it in the
12   context of the question and the scientific
13   evidence as a whole.
14   BY MR. SOILEAU:
15         Q.   Right.  And what I want to
16   understand is the boundaries around, the
17   fence line around the scientific evidence as
18   a whole and what it takes to get within those
19   boundaries.
20         And what I hear you telling me
21   is evidence of talc particles in ovarian
22   tissue, just that, none of the other things
23   you mentioned, context, so forth, that's not
24   enough to get within that body of evidence

Page 248

1    for you.
2          Do I have it correct now?
3          MR. FROST:  Objection.
4          A.   Well, as I said, I need more
5    information about the scientific evidence
6    that you're purporting.
7    BY MR. SOILEAU:
8          Q.   Right.  You need more
9    information in order for that evidence to get
10   inside the fence, to get within the body of
11   scientific evidence that you're considering,
12   fair?
13         MR. FROST:  Objection.
14         A.   I'm saying that I would need
15   more evidence about -- about the evidence.
16   You've made the statement of evidence that
17   talc present in the ovaries, but I would need
18   to look at the studies, look at the questions
19   that are being asked in the studies, you
20   know, what the data they used, the dataset
21   itself, because again, we're looking at a
22   specific question regarding perineal
23   application of talcum powder and ovarian
24   cancer, not just the potential presence of

Page 249

1    talc particles on or in the ovaries.
2    BY MR. SOILEAU:
3          Q.   Do you recognize the name
4    A.P. Wehner?
5          A.   No, I do not.
6          Q.   You do not?
7          A.   Huh-uh.
8          Q.   Let me show you what I'll mark
9    as Tuttle Exhibit 24.
10         (Whereupon, Deposition Exhibit
11         Tuttle-24, 1994 Wehner Publication,
12         was marked for identification.)
13   BY MR. SOILEAU:
14         Q.   It bears a JNJ Bates-numbering
15   of 14178 through 14189.  It's a Wehner 1994
16   paper.
17         Do you understand generally
18   what is meant by the words "hygienic talc
19   use"?
20         A.   I -- again, I know what I would
21   think it would mean as hygienic talc use, but
22   if somebody was using it, I would probably
23   want to know what their definition was when
24   they used it.  I wouldn't want to assume my

Kelly Tuttle, Ph.D.

Page 250

1  definition.
2       Q.    What's your understanding?  I
3  mean, you're here as an expert witness for
4  Johnson & Johnson on these talcum powder
5  products.  What's your understanding of
6  hygienic use, hygienic talc use?
7       A.    That would be -- again, my
8  understanding and I would have to see how it
9  was used in context, but for personal hygiene
10  purposes.
11       Q.    Does that mean application to
12  the genital area?
13            MR. FROST:  Objection.
14       A.    Again, I would have to see the
15  context in which it was being used.
16  BY MR. SOILEAU:
17       Q.    Okay.  And you do not know who
18  A.P. Wehner is, as you know at what I
19  have marked as Tuttle Exhibit 24?
20       A.    Again, I'm not familiar with
21  the name off the top of my head.
22       Q.    Okay.  You see that this is a
23  1994 paper from Wehner entitled Biological
24  effects of cosmetic talc?

Page 251

1       A.    Yes, I see that.
2       Q.    Do you know if A.P. Wehner has
3  any association with Johnson & Johnson or any
4  connection to Johnson & Johnson?
5            MR. FROST:  Objection.
6       A.    I don't know.
7  BY MR. SOILEAU:
8       Q.    Do you know if you cited any
9  papers by A.P. Wehner in your reference
10  materials?
11       A.    I'd need to go to the reference
12  section of my report and look.
13       Q.    Take a look and see if you see
14  about four there.
15       A.    Thank you.
16       Q.    Would that surprise you?
17  W-E-H-N-E-R.
18       A.    Thank you.  I -- yes, I do cite
19  one two, three, four A.P. Wehner reports in
20  my reference materials.
21       Q.    Do you know how you came to
22  have those four reports?
23       A.    Again, I know how I came to
24  find all of the reports that I cite, and

Page 252

1  those are through the PubMed, Google Scholar,
2  you know, scientific literature searches that
3  we discussed previously.
4       Q.    Let's look at -- well, first I
5  should be clear.
6            Is this paper, the Biological
7  effects of cosmetic talc, from 1994, the same
8  paper I now have marked as Tuttle Exhibit 24,
9  one of the four papers that you cite in your
10  reference materials attached to your report?
11       A.    Yes, it is.
12       Q.    Okay.  And doesn't Wehner
13  address the presence of large numbers of talc
14  particles in normal and diseased ovarian
15  tissue in this paper, or do you know?
16       A.    Again, I would need to
17  refamiliarize myself with this report.  It
18  does appear to be a review article.  If you
19  can refer me to that specific area you're
20  discussing, I can flip to it.
21       Q.    Sure.  Let's look at the
22  discussion which begins on page 1181 of the
23  paper.  You see the heading Hygienic talc use
24  and ovarian cancer?

Page 253

1       A.    Yes.
2       Q.    If you could follow along:  The
3  presence of large numbers of talc particles
4  in normal and diseased ovarian tissue seems
5  indisputable.  Although it is difficult to
6  imagine how inanimate particles without
7  locomotion of their own can breach the
8  formidable cervical barrier and migrate
9  upstream -- upstream is in quotes -- against
10  the ciliary beat of the fallopian epithelium
11  to the ovaries.
12            I read that sentence correctly?
13       A.    Yes, you read that sentence
14  correctly.  Again, it's one sentence out of
15  this whole paragraph.
16       Q.    But now I'm using a paper that
17  you cited and relied upon.  This paper is not
18  new to you?
19       A.    Correct.  Again, I cite a lot
20  of different articles.  As I mentioned
21  before, I read them all, but it's a large
22  number of articles.  I unfortunately do not
23  have a photographic memory where I can
24  remember everything written verbatim.

64  (Pages 250 to 253)

Kelly Tuttle, Ph.D.

Page 254

1      Q.   Do you consider this important
2   scientific evidence?
3      A.   So --
4          MR. FROST:  Objection.
5          THE WITNESS:  Sorry.
6   BY MR. SOILEAU:
7      Q.   Well, you've talked today a
8   number of times about the body of scientific
9   evidence, so perhaps I could use your words
10  and frame my question this way.
11          Is this statement in the Wehner
12  article part of the body of evidence,
13  scientific evidence, that you have considered
14  in forming your opinions?
15     A.   Well, again, I read and cited
16  this article.  It is a review article, so it
17  does not do any research in and of its own.
18  There are no -- there's no datasets included
19  in this article.  There's no methodology or
20  experiments that were performed by Dr. Wehner
21  in this article.
22          This is a review article that
23  is reviewing the body of science.  And in
24  this particular sentence, again, there's no

Page 255

1   citations for that particular sentence.  You
2   know, and the paragraph goes on in discussing
3   epidemiological evidence and other
4   components, but...
5      Q.   So did you rely on this article
6   in forming your opinions, or not?
7      A.   Again, I reviewed and cited
8   this article, but there's no data in here.
9   There are references to cite.  There's -- but
10  there's no experiments that were performed
11  for examination or to determine the basis for
12  that statement.  And again, they don't cite
13  any references specifically here for me to
14  refer to.
15     Q.   Why did you list this article
16  in your references?
17          MR. FROST:  Objection.
18     A.   Because again, it is a review
19  article that is titled the Biological effects
20  of cosmetic talc.  I believe I probably cite
21  several review articles in the references of
22  my report.
23  BY MR. SOILEAU:
24     Q.   Yes.

Page 256

1      A.   And they're useful for, you
2   know, looking at a review of the literature,
3   finding articles and, you know, scientific
4   publications that have done experiments and
5   provided data points.
6      Q.   So is the Wehner paper that is
7   Tuttle Exhibit 24 in or out for the body of
8   evidence that you considered, the body of
9   scientific evidence?
10          MR. FROST:  Objection.
11     A.   Well, again, as I said, it's a
12  reference that I referred to and that I cite
13  in my report, and looking at all of the
14  references that we -- I cite in my report and
15  the scientific data, it's looking at the body
16  as a whole of the scientific data and what
17  supports those conclusions.
18          As I said, this is a review
19  article so they're reviewing scientific
20  evidence and coming up with their opinions
21  and hypotheses, again, looking at this one
22  sentence out of context.  There's no
23  references cited here.  I know that later in
24  this same paragraph it discusses that the

Page 257

1   epidemiological evidence linking hygienic
2   talc use with an increased risk of ovarian
3   cancer generally is weak, is sometimes
4   inconsistent, discusses confounding
5   variables.
6          And again, these are summary
7   statements taken out of the discussion, but
8   there's no references taken, and we can't
9   just look at that one statement without
10  looking at the context of the entire
11  document.
12          And as I said for you, if you
13  go over to the next page and look at 1182
14  under Conclusion, it looks -- as they say,
15  there's no conclusive evidence in the
16  literature reviewed to indicate that cosmetic
17  talc, when used as intended, presents a
18  health hazard.
19  BY MR. SOILEAU:
20     Q.   I think that answer was over 30
21  lines, Doctor, and really, I did not hear an
22  answer.
23          Is this paper part of the body
24  of evidence that you considered part of the

65 (Pages 254 to 257)

Kelly Tuttle, Ph.D.

Page 258

1    body of scientific evidence, using your words
2    throughout your testimony today?
3         MR. FROST: Objection.
4         A.   Well, again as I said --
5    BY MR. SOILEAU:
6         Q.   If you could tell me it is, it
7    isn't or for some reason you can't tell me,
8    and then give me that long answer if you need
9    to again. But I need to know: Is it -- I'm
10   looking at that fence line. I need to know
11   if it's inside the fence or outside the
12   fence. Can you tell me?
13        MR. FROST: Objection.
14        A.   Well, I'll try to simplify my
15   answer, that it's --
16   BY MR. SOILEAU:
17        Q.   It's real simple. Yes, no, in,
18   out. Go ahead.
19        MR. FROST: Objection.
20        A.   In regards to the fence, as I
21   said, it's a review article that I cite in my
22   report. I certainly read it, reviewed it, as
23   I said I cited probably several review
24   articles in the report.

Page 259

1         So as far as being in the
2    scientific literature, yes, but this does not
3    produce any experiments or new datasets. It
4    merely is also reviewing the scientific
5    literature.
6         Q.   You think Wehner knew what he
7    was talking about?
8         MR. FROST: Objection.
9         A.   As I don't know Dr. Wehner...
10   BY MR. SOILEAU:
11        Q.   Doesn't it kind of remind you
12   of the Hill statement when he says: It's
13   difficult to imagine how inanimate particles
14   without locomotion of their own can breach
15   the formidable cervical barrier, yet it's
16   there?
17        Do you recall the statement by
18   Hill, the Holmes/Watson statement, when you
19   rule out the impossible, the improbable
20   remains?
21        MR. FROST: Objection. Is that
22   a question?
23   BY MR. SOILEAU:
24        Q.   Sure. I mean, isn't this what

Page 260

1    science is all about? We've got -- we've got
2    talcum powder applied to the genital area,
3    and we've got, according to Wehner,
4    indisputable evidence of large numbers of
5    talc particles in normal and diseased ovarian
6    tissue. As a scientist, we need to kind of
7    scratch our head and figure out how it's
8    getting there, don't we?
9         MR. FROST: Objection.
10        A.   Well, as I said before, when we
11   were talking about just the presence of talc
12   particles, we need more information, you
13   know, we need more information on the studies
14   that they're examining.
15        When we're looking at the
16   question of perineal application of talcum
17   powder, there is no evidence to support that
18   the migration occurs externally from the body
19   into the female reproductive tract to the
20   ovaries.
21   BY MR. SOILEAU:
22        Q.   No evidence.
23        A.   And as I've said, you know,
24   previously, there are others who get into

Page 261

1    much more detail regarding the scientific
2    literature regarding that hypothetic
3    mechanism and the science regarding it.
4         But here again, we're talking
5    about just the presence with no additional
6    context regarding where that presence is
7    found, what the studies are, what the context
8    is.
9         Q.   Let's look at Exhibit 25. Do
10   you know who John Hopkins is, Dr. John
11   Hopkins?
12        (Whereupon, Deposition Exhibit
13   Tuttle-25, 3/17/97 Wehner Letter, was
14   marked for identification.)
15        A.   I don't know Dr. John Hopkins
16   personally, but yes I know who Dr. John
17   Hopkins is.
18   BY MR. SOILEAU:
19        Q.   Okay. Have you seen this
20   letter that I've marked as Tuttle Exhibit 25
21   before?
22        A.   No, I have not.
23        Q.   Do you know who CTFA is?
24        A.   No, I'm not familiar with that

Kelly Tuttle, Ph.D.

Page 262

1    acronym.
2        Q.    Okay.  That hasn't come up at
3    any point during your work on this project?
4        A.    Not -- as I said, it doesn't --
5    if it has, I -- yeah, I'm not super familiar
6    with it, so I don't know what the acronym
7    stands for.  I apologize.
8        Q.    That's okay.
9        You see at the top we have sort
10   of a header for Alfred P. Wehner, Diplomate,
11   Academy of Toxicological Science?
12       You see that?
13       A.    Yes, I see that.
14       Q.    Do you know what that is,
15   Diplomate, Academy of Toxicological Science?
16       A.    Judging from the context here,
17   it would seem he has a diploma from the
18   Academy of Toxicological Sciences, but I'm --
19   I'm not familiar specifically what that
20   means.
21       Q.    Okay.  Let's look at the
22   beginning of this letter.  He says:  A
23   postscriptum to my comment faxed to you on
24   March 16th.  The date of this letter is

Page 263

1    March 17, 1997.
2        Quote, The CTFA response
3    statement of March 10 states in its last
4    sentence of its last full paragraph: "The
5    determination of this workshop was that the
6    scientific evidence did not demonstrate any
7    real association between talc use in consumer
8    products and ovarian tumors."
9        I read that correctly, didn't
10   I, Doctor?
11       MR. FROST:  Objection.
12   BY MR. SOILEAU:
13       Q.    I know I stopped without
14   reading the whole letter, but I read that
15   part correctly?
16       A.    Yes, I believe so, yes.
17       Q.    And that statement in quotes,
18   the determination of this workshop statement,
19   that's consistent with what you're telling us
20   today in your opinions and your testimony in
21   this case?
22       MR. FROST:  Objection.
23       A.    Again, you know, this is in
24   quotations.  It's citing something that I'm

Page 264

1    unfamiliar with.
2    BY MR. SOILEAU:
3        Q.    Right.
4        A.    This is a postscript to
5    apparently some previous communications.  I
6    can't really speak to this without knowing
7    more information.
8        Q.    I'm simply asking you if this
9    statement is consistent with your position,
10   your opinions in this litigation, that is,
11   that the scientific evidence did not
12   demonstrate any real association between talc
13   use in consumer products and ovarian tumors.
14       Isn't that what you're telling
15   us today?
16       MR. FROST:  Objection.
17       A.    Well, as I've said previously,
18   it's not my opinion.  The scientific evidence
19   does not establish a causal association
20   between talcum powder exposure perineally and
21   ovarian cancer.
22   BY MR. SOILEAU:
23       Q.    So you have not formed an
24   independent expert opinion that the evidence

Page 265

1    does or does not support a causal
2    relationship?
3        MR. FROST:  Objection.
4        A.    Again, as I said, it's not my
5    opinion.  The scientific evidence is the
6    scientific evidence, and it does not
7    establish a causal association.
8    BY MR. SOILEAU:
9        Q.    So are you telling me that you
10   have, through your work in this case, simply
11   gathered scientific information and that the
12   scientific information, the body of
13   scientific evidence that you have gathered,
14   does not support a causal relationship,
15   period?
16       MR. FROST:  Objection.
17       A.    As I said before, I have
18   assessed scientific literature and looked at
19   the scientific evidence, and through the
20   context of the methodologies that we've
21   previously discussed and that are listed in
22   my report, the scientific evidence does not
23   support a causal association between perineal
24   talcum powder exposure and ovarian cancer.

67 (Pages 262 to 265)

Kelly Tuttle, Ph.D.

Page 266

1    BY MR. SOILEAU:
2         Q.    I'm not a scientist, but when I
3    hear someone say I've assessed the scientific
4    literature, looked at the evidence and used
5    methodologies, it sounds like they're forming
6    an opinion.
7              MR. FROST:  Objection.
8    BY MR. SOILEAU:
9         Q.    Did you reach an independent
10   opinion in this case or not?
11             MR. FROST:  Objection.
12        A.    Well, again, as I said, the
13   science doesn't support a causal association.
14   BY MR. SOILEAU:
15        Q.    It sounds like you're telling
16   me the science is what the science is and
17   there's no room for opinion.
18             MR. FROST:  Objection.
19   BY MR. SOILEAU:
20        Q.    Is that -- do I have it right
21   now?
22        A.    Well, again, as I said -- yes,
23   the science is the science.  The science does
24   not change when you're looking at the body of

Page 267

1    science, and when you apply the methodologies
2    as put forward in the scientific literature,
3    there is no causal association.
4    BY MR. SOILEAU:
5         Q.    So, therefore, it does not
6    require an opinion on your part, simply a
7    matter of gathering, assessing scientific
8    evidence and applying the methodology to
9    arrive at the answer.
10        Do I have it correct now?
11             MR. FROST:  Objection.
12        A.    Again, as I said, it's not
13   about my opinion.  It is about the
14   application of the scientific methodologies
15   as put forward in the scientific literature
16   and the body of science, and the body of
17   science does not support a causal
18   association.
19   BY MR. SOILEAU:
20        Q.    And you've come to that point,
21   to that conclusion without injecting any
22   opinion on your part, correct?
23        A.    Again, I use my training and
24   expertise as a toxicologist in reviewing the

Page 268

1    scientific literature and applying the
2    methodology, but essentially, it is what the
3    science shows or the data supports when you
4    look at the method, you know, when you apply
5    the methodology, again, as put forward again
6    in the scientific literature.
7         Q.    Doctor, in that process you
8    just described for me, is there any part that
9    is subjective opinion?
10             MR. FROST:  Objection.
11        A.    Again, it's an evaluation of
12   the body of science and the application of
13   the scientific methodology.  It's what the
14   scientific evidence says, what the scientific
15   evidence supports or doesn't support in the
16   case of here, and again, the scientific
17   evidence does not support a causal
18   association between talcum powder exposure
19   perineally and ovarian cancer.
20   BY MR. SOILEAU:
21        Q.    I've very clearly heard you
22   tell me that over and over, but I need you to
23   answer my question, and that is:  Does this
24   process, this evaluation of the body of

Page 269

1    science, the application of scientific
2    methodology, does it include any subjective
3    opinion that you bring to the process?
4              MR. FROST:  Objection.
5         A.    And again, you know, it's using
6    scientifically validated methods, scientific
7    data, to see what the science supports, what
8    the scientific data points to.
9         As I said before, it's not
10   about my opinions.  It's about what the
11   scientific evidence shows.
12   BY MR. SOILEAU:
13        Q.    Is that a no?
14             MR. FROST:  Objection.
15        A.    I'm trying to be clear, and I'm
16   sorry, I guess I'm not being.  But it's not
17   about my personal opinions.  It's not about
18   the opinions.  It's about the scientific data
19   and what the body of science shows.
20   BY MR. SOILEAU:
21        Q.    So there is no part of that
22   process that is opinion?
23             MR. FROST:  Objection.
24   ///

68 (Pages 266 to 269)

Kelly Tuttle, Ph.D.

Page 270

1 BY MR. SOILEAU:
2    Q.   Do I have it right now?
3    A.   Again, I -- you're -- as I
4 said, I used my training and expertise and my
5 training in toxicology to look at the
6 scientific evidence, but again, it's what the
7 evidence shows.
8    Q.   Right.  And only what the
9 evidence shows.
10    A.   Yes.  Again, it's based on the
11 body of science and the scientific evidence
12 and using scientifically -- methodologies
13 that are put forward in the scientific
14 literature.
15    Q.   And no part of that process
16 includes your own personal opinions, whether
17 based on training, education, or experience
18 or not; it's the collection of the data,
19 assessing the data and applying the
20 methodology, not injecting opinion.
21    Do I have it correct?
22    MR. FROST:  Objection.
23    A.   Well, again, I think I stated
24 earlier, my training and expertise in

Page 271

1 toxicology are involved in how I assessed the
2 scientific evidence.
3    As far as I am a toxicologist,
4 I do toxicological research, and I research
5 the methods and all the things that are cited
6 in my report.
7    But ultimately, it's taking the
8 scientifically validated methods, the methods
9 established in the scientific literature,
10 applying that to the scientific literature
11 and the body of science and seeing what the
12 science supports and what the scientific
13 evidence shows.
14 BY MR. SOILEAU:
15    Q.   When I make gumbo I use all the
16 ingredients people use, but it's my opinion,
17 my subjective opinion that determines when
18 it's been browned enough.
19    You see the difference?
20    MR. FROST:  Objection.
21 BY MR. SOILEAU:
22    Q.   It's not just the ingredients.
23    MR. FROST:  Objection.
24    A.   Well, again -- and I think we

Page 272

1 discussed this also earlier, you know, as
2 scientists, when you look at a body of
3 science and you apply a certain methodology,
4 there -- your conclusions or what the science
5 shows should be the same because the body of
6 science is not changing between individual
7 scientists.
8 BY MR. SOILEAU:
9    Q.   Do you agree with the statement
10 in Tuttle Exhibit 25 that the scientific
11 evidence does not demonstrate any
12 association, any real association between
13 talc use in consumer products and ovarian
14 tumors?
15    MR. FROST:  Objection.
16    A.   Well, again, this is a
17 quotation.  There's -- I don't know the --
18 you know, I'm not familiar with this CTFA
19 response statement or the data it uses for
20 these determinations.  This is a postscript
21 to some previous comments.
22    Without the context of this
23 statement, you know, regardless of what it
24 states, I can't agree or disagree.  I -- this

Page 273

1 is taken out of context, and again, I haven't
2 seen this before or the CTFA response.
3 BY MR. SOILEAU:
4    Q.   I hear what you're saying about
5 the CTFA, the document, the folks referenced
6 in here in the details.  I really want to
7 step away from that.  So what I've done is
8 I've just made a statement that is not
9 referenced anywhere.  It's -- I've marked it
10 as Tuttle Exhibit 26.
11    (Whereupon, Deposition Exhibit
12    Tuttle-26, Handwritten Statement, was
13    marked for identification.)
14 BY MR. SOILEAU:
15    Q.   And it simply says -- can you
16 read it for me?  Because that's the only copy
17 I have.
18    MR. FROST:  Before we get to
19 that, I'm going to object to the use
20 of any sort of handwritten statements
21 where you're then asking our witness
22 to check agree or disagree after
23 something's written down.
24    MR. SOILEAU:  Well, she doesn't

69 (Pages 270 to 273)

Kelly Tuttle, Ph.D.

Page 274

1    have to check it, but I'm just trying
2    to make the point of what the question
3    is asking.
4    BY MR. SOILEAU:
5        Q.    Could you read the body of the
6    statement on that page, Tuttle Exhibit 26?
7        A.    So the statement written is:
8    Scientific evidence demonstrates an
9    association between talc use in consumer
10   products and ovarian tumors.
11           And then there is the options
12   written below it to agree or disagree.
13       Q.    And do you -- can you agree or
14   disagree with that statement, or you do not
15   know?
16           MR. FROST:  Objection.
17       A.    Well, again -- and this goes
18   back to what we're just discussing.  This is
19   a statement that you've written on a sheet of
20   paper.  There's no context.  There's no data,
21   there's no information for me to look at or
22   examine.  You know, you've been discussing
23   the body of science.
24           You know, I can't agree or

Page 275

1    disagree with just a statement written on a
2    piece of paper with no additional information
3    or context.
4    BY MR. SOILEAU:
5        Q.    Do you know how many hours you
6    have billed for your work on behalf of
7    Johnson & Johnson in this project?
8        A.    I don't know an exact number.
9    I think I've billed probably around 250 to
10   300 hours.
11       Q.    So you say I can't disagree --
12   wait a minute.  Let me get your words
13   correct.
14           I can't agree or disagree with
15   just a statement written on a piece of paper
16   with no additional information or context,
17   but you've got hundreds of hours spent
18   studying this very issue, right?
19           MR. FROST:  Objection.
20       A.    Again, I have been assessing
21   the scientific literature regarding, you
22   know, whether it supports a causal
23   association between perineal talcum powder
24   use and ovarian cancer.

Page 276

1    BY MR. SOILEAU:
2        Q.    And that's what's written on
3    Tuttle Exhibit 26, isn't it, scientific
4    evidence demonstrates?
5            MR. FROST:  Objection,
6    misstates the document.
7    BY MR. SOILEAU:
8        Q.    What's it say?
9        A.    Again, it says:  Scientific
10   evidence demonstrates an association between
11   talc use in consumer products and ovarian
12   tumors.
13       Q.    I've got approximately
14   255 hours for you if I've deciphered the
15   hourly rate correctly.  I mean, you've done a
16   lot of work looking at this issue.
17           Are you prepared as we sit here
18   today at your deposition to say that you
19   agree or disagree with that statement on
20   Tuttle Exhibit 26?
21           MR. FROST:  Objection.
22   BY MR. SOILEAU:
23       Q.    If you cannot, tell me that,
24   but I need to know if you're in a position

Page 277

1    that allows you to agree or disagree.  We can
2    talk about why or why not in the time we have
3    left.
4            MR. FROST:  Objection.
5        A.    Well, again, as I said, you
6    know, I looked at the scientific evidence.
7    In fact, we said this several times.  In all
8    of these articles, in all of these agency
9    reports and anything that I cite in my
10   review, you know, any statement that's made
11   that's something of this nature, I would want
12   to see the data behind that assumption
13   because it's about the scientific data, not
14   about the conclusions or assumptions of, you
15   know, in any one article or any one
16   handwritten document about the data and what
17   the data supports or doesn't support.
18   BY MR. SOILEAU:
19       Q.    Yes, Doctor, but right now the
20   intent of my question is not about that
21   handwritten document or the data.  It's about
22   your opinion.  And I want to know your
23   opinion.  This is my chance to talk to you.
24           Do you have an opinion to

Kelly Tuttle, Ph.D.

Page 278

1    offer?
2          MR. FROST:  Objection.
3          A.    Again, the opinions and data
4    that I provide are summarized in my report,
5    and regarding this handwritten statement,
6    again, you know, I -- as it's written on this
7    sheet of paper, I can't agree or disagree.
8    BY MR. SOILEAU:
9          Q.    Okay.  Now, in Tuttle
10   Exhibit 25, the statement says that the
11   scientific evidence did not demonstrate any
12   real association, so that's sort of the
13   opposite of what I wrote on Tuttle
14   Exhibit 26, right?  We can at least agree on
15   that.
16          One says demonstrate, one says
17   did not demonstrate, fair?
18          A.    Yes, that's fair.
19          Q.    Now, what does Alfred P.
20   Wehner say about that --
21          MR. FROST:  Objection.
22   BY MR. SOILEAU:
23          Q.    -- in Tuttle Exhibit 25?
24          A.    I'm sorry, can you --

Page 279

1          Q.    Help you?
2          A.    What do you mean by what does
3    he say by that?
4          Q.    Well, doesn't Alfred P. Wehner
5    say this statement, the statement about the
6    determination of the workshop was that
7    scientific evidence did not demonstrate any
8    real association.  He says this statement is
9    technically and factually incorrect, doesn't
10   he?
11          A.    Yes, that's what's stated, and
12   he goes on to specify later in the
13   postscript, he says:  In summary, yes, there
14   are those studies showing a weak association,
15   but their biological significance is
16   questionable for several reasons as
17   repeatedly outlined.  The data are
18   inconsistent and therefore inconclusive.
19   None of the authors claims to have
20   demonstrated causality.
21          And again, it continues on with
22   the rest of his letter.
23          Q.    Let's look at one or two more
24   before we move on.  This is marked as Tuttle

Page 280

1    Exhibit 27.
2          (Whereupon, Deposition Exhibit
3    Tuttle-27, 9/17/97 Wehner Letter, was
4    marked for identification.)
5          THE WITNESS:  If I may, I think
6    we're again getting close to time that
7    I will need to take an extended break.
8          MR. SOILEAU:  Do we have time
9    to take a quick look at Exhibit 27 or
10   not?
11          THE WITNESS:  What time did we
12   start?
13          MR. FROST:  I don't actually
14   remember.
15          THE VIDEOGRAPHER:  We've been
16   going 38 minutes.
17          THE WITNESS:  38?  Okay.  Yeah,
18   we can go a few more minutes.
19          MR. SOILEAU:  Okay.  Thank you.
20   BY MR. SOILEAU:
21          Q.    Have you seen this before, the
22   document marked as Tuttle Exhibit 27?
23          A.    No, I have not.
24          Q.    Let me sort of guide you to a

Page 281

1    place.  You see he begins with an old German
2    saying, and then there's a paragraph.  Down
3    in this paragraph it says:  Several
4    investigators have independently reported
5    talc particles in ovarian tissue.
6          It goes on to say:  Simply
7    citing the Battelle study and stating that it
8    demonstrated that talc does not translate --
9    open paren, sic, exclamation, close paren --
10   through the cervix to the uterine cavity and
11   beyond does not address the problem, does not
12   refute these findings, and therefore does not
13   serve CTFA's best interest.
14          Do you see that?
15          A.    Yes, I see that.  Again, we're
16   looking at what appears to be some personal
17   correspondence.
18          Q.    Okay.  You see it's addressed
19   to someone who is, at least according to this
20   letter, in the position of manager
21   preclinical toxicology with J&J Consumer
22   Products?
23          A.    Yes, I see that.
24          Q.    All right.  And the letter is

71 (Pages 278 to 281)

Kelly Tuttle, Ph.D.

Page 282

1    dated September 17, 1997?
2        A.   Yes, it is.
3        Q.   And then if you look on page 2
4    at the first -- well, the second paragraph,
5    we see a similar statement to what we talked
6    about in the last exhibit from Wehner.  It
7    says, starting:  The response statement dated
8    November 17, 1994 is just as bad.  The second
9    sentence in the third paragraph reads:  "The
10   workshop concluded that, although some of
11   these studies suggested a weak association
12   might exist, when taken together, the results
13   of the studies are insufficient to
14   demonstrate any real association."
15       That's a quote.
16       And then he says:  This
17   statement is also inaccurate, to phrase it
18   euphemistically.
19       Again, you've not seen this,
20   you don't know who he is?
21       A.   Correct.  I have not seen this
22   before.  I'm not familiar with the CTFA and
23   statement that they're referring to or, you
24   know...

Page 283

1        Q.   Does this raise a red flag in
2    your assessment of the body of scientific
3    evidence?
4        MR. FROST:  Objection.
5        A.   Again, this is -- this is a
6    personal correspondence that's looking at
7    response statements of a working group.
8    There's no data here.  There's no reference.
9    I mean, it -- as you said, it referenced a
10   Battelle study previously, but you're
11   jumping, taking these out of context.
12       I -- I don't know what these
13   letters are addressing or what the CTFA is
14   addressing.
15   BY MR. SOILEAU:
16       Q.   Okay.  How about Battelle?  Do
17   you recognize Battelle at all?
18       A.   Again, the name sounds
19   familiar.  I'm not again able to recall
20   anything specific.
21       MR. SOILEAU:  Okay.  We can
22   stop there and you can take the next
23   break.
24       THE VIDEOGRAPHER:  Going off

Page 284

1    the record at 2:49 p.m.
2        (Recess taken, 2:49 p.m. to
3    3:35 p.m.)
4        THE VIDEOGRAPHER:  We're back
5    on the record at 3:35 p.m.
6    BY MR. SOILEAU:
7        Q.   Doctor, are you ready to
8    proceed?
9        A.   Yes, I am.
10       Q.   Very well.  Thank you.
11       Let me show you what I will
12   mark as Appendix C -- I'm sorry, that's not
13   correct.
14       I will mark it as Tuttle
15   Exhibit 28.  It is Appendix C to your report.
16   I do not have a binder clip on this, so I'm
17   going to give you the folder.  Watch out,
18   it's loose.
19       (Whereupon, Deposition Exhibit
20   Tuttle-28, Appendix C to Tuttle Expert
21   Report, was marked for
22   identification.)
23   BY MR. SOILEAU:
24       Q.   This of course is Appendix C to

Page 285

1    your expert report in this case.
2        A.   Yes, it is.
3        Q.   Who prepared this document?
4        A.   Myself and my support team.
5        Q.   Step me through how it was
6    prepared.
7        A.   So generally speaking, we
8    reviewed the Imerys and J&J documents as
9    cited by Dr. Cook and Dr. Krekeler and tried
10   to generate kind of a single table summary of
11   those documents, ultimately culminating in a
12   brief discussion of them in the report
13   regarding specifically heavy metal analysis
14   in the talcum powder samples.
15       Q.   Okay.  Let's see if I can break
16   that down into a few questions that I have.
17       Is it correct that all of the
18   source documents that led to the chart that
19   is Appendix C came from Drs. Cook and
20   Krekeler?
21       A.   Yes, I believe.
22       Q.   Did you obtain, request or
23   gather any other documents other than
24   documents that you had through Drs. Cook and

Kelly Tuttle, Ph.D.

Page 286

1    Krekeler in order to be able to generate
2    Appendix C?
3         A.    No.
4         Q.    Did you include in Appendix C
5    all of the data available through the Cook
6    and Krekeler documents?
7              MR. FROST:  Objection.
8         A.    I guess I'm not sure.  I would
9    need to look at all the data provided by
10   Drs. Cook and Krekeler, compared with the
11   documents we cite.  As I said, we summarized
12   them in regards to specific testing
13   documents, so there may have been some they
14   used that were used for alternative purposes
15   that aren't included in this table.  I'm not
16   sure, because it's such a large number of
17   documents.
18   BY MR. SOILEAU:
19        Q.    You told me that Appendix C was
20   prepared by you and your support team.  Who
21   took the lead in the preparation of
22   Appendix C?
23        A.    Again, it was my document and
24   my summary of the reports.  I believe that

Page 287

1    Dana Cubanski assisted me with the actual
2    generation of the table.
3         Q.    In terms of what information
4    was to be included or not included in the
5    table, who made that decision?
6         A.    Again, this is -- it was my
7    table.  In regards to what was included or
8    not included, that would have been my
9    decision.
10        Q.    And did you tell me that the
11   primary purpose for Appendix C was to collect
12   together in one document data that had been
13   provided by Dr. Cook and then Dr. Krekeler?
14        A.    Again, as I recall, it was to
15   assess some -- the testing materials
16   regarding talcum powder.  In -- you know, in
17   these documents, there's other products
18   beyond just the consumer product of talcum
19   powder that are referenced by Dr. Cook and
20   Dr. Krekeler for the intents and purposes of
21   some of the -- specifically the tables
22   regarding heavy metals in that portion of my
23   report.
24        Q.    Have you ever conducted the

Page 288

1    type of testing that is necessary to generate
2    the data that we see in the table that is
3    Appendix C?
4              MR. FROST:  Objection.
5         A.    Throughout the table there are
6    several different methods noted, depending on
7    the document.  There's -- and some of these
8    methods I'm familiar with, some of these
9    methods I have had samples analyzed for.
10             I have not done that type of
11   analysis myself in regards to these samples,
12   but again, there's several different methods
13   in here, but some of them I have submitted
14   samples of my own in the course of my work
15   for analysis by similar methods.
16   BY MR. SOILEAU:
17        Q.    So you have requested testing
18   of materials at times in your work that would
19   be of the same type of testing that we see
20   reflected in some of these documents?
21        A.    Yes, that's correct.  As I
22   said, there's a number of methodologies, some
23   of which I have used in my own line of work.
24        Q.    Yes, but I guess what I'm

Page 289

1    wondering, Doctor, you're not qualified to
2    actually do the testing yourself.  In other
3    words, you request this information from
4    someone, you receive the information and use
5    it, but the actual performance of the test
6    itself, is that something that falls within
7    your qualifications?
8         A.    I have done some of these
9    methods over the course of my Ph.D.  I don't
10   do lab work in my work at CTEH at this time.
11        Q.    You mentioned that you had a
12   paragraph in your report that relied on
13   Appendix C, I think.  Is that at page 45?
14   Take a look.
15        A.    Yes, I believe that is the
16   summary table that I was referring to.
17        Q.    In the paragraph at the top of
18   page 45 of your report, you say, quote, "In
19   the case of crude talc ore, which had some of
20   the highest detections for heavy metals, this
21   is not comparable to the final product, which
22   is processed via magnetic separation and acid
23   washing to remove minerals and metals."
24             What is the basis for your

73 (Pages 286 to 289)

Kelly Tuttle, Ph.D.

Page 290

1    conclusion that the talc referenced in the
2    samples discussed in this paragraph had not
3    gone through the steps necessary to bring it
4    to a point to be comparable to the final
5    product?  In other words, what's the basis
6    for this statement I just quoted from your
7    report at page 45?
8            MR. FROST:  Objection.
9        A.    So in the -- going through the
10   Imerys and J&J documents, it was clear that
11   there was a wide variety of different
12   products that were being assessed and sampled
13   from ore materials down to baby powders.
14           And the reason this statement
15   is there, and I cite the reference is that --
16   and it is my understanding, and again, I
17   don't go into this in too great detail beyond
18   what you see here, but that the materials as
19   mined and the different grades do not
20   represent what is present in the final form.
21           And in going through the
22   materials, I tried to separate out the other
23   samples that were, as I put in here,
24   historical talc drill samples, mine sludge,

Page 291

1    grade 66 talc and other species from samples
2    that stated baby powder or cosmetic talc.
3        Q.    What steps had yet to be
4    undertaken, in other words, what additional
5    steps would this product still have undergone
6    based on your understanding?
7            MR. FROST:  Objection.
8    BY MR. SOILEAU:
9        Q.    What was left to do?
10       A.    As I said, I'm not versed on
11   the step-by-step process of talc
12   manufacturing.  As I said, I cite this
13   reference here that discusses it.  I
14   understand there is some processing that goes
15   into generating a baby powder, but I did not
16   research that in depth.  I'm not versed in
17   that process.
18   BY MR. SOILEAU:
19       Q.    What is the basis for that
20   understanding?
21           MR. FROST:  Objection.
22       A.    Well, again, I cite the Fiume
23   study here that briefly states there is a
24   process, and I'm aware there is a process and

Page 292

1    I know that there are others involved in this
2    litigation that address that process and the
3    difference, you know, between mined talc and
4    talcum product in more detail than I do.  I
5    didn't assess that specifically for my
6    purposes.
7            When looking through these
8    documents, I tried to identify samples that
9    were specific for baby powder that could be
10   separated out from the other samples to look
11   at the testing regarding heavy metals.
12   BY MR. SOILEAU:
13       Q.    Have you attempted to identify
14   the particular mines or sources for the talc
15   that is used in Johnson & Johnson talcum
16   powder products?
17       A.    No, I have not.
18       Q.    Do you have any education in
19   geology?
20       A.    Maybe some very cursory, but
21   not an extensive education in geology, no.
22   I'm not a geologist.
23       Q.    Same question about
24   mineralogist.

Page 293

1        A.    I'm not a mineralogist, no.
2        Q.    Okay.  We had looked at a few
3    documents from A.P. Wehner before we took our
4    break.  I'm going to show you one more that
5    I've marked as Tuttle Exhibit 29.
6            (Whereupon, Deposition Exhibit
7    Tuttle-29, 10/7/04 Wehner Letter, was
8    marked for identification.)
9    BY MR. SOILEAU:
10       Q.    This is a two-page document.
11   It's a letter.  It's addressed to Richard
12   Zazenski, Z-A-Z-E-N-S-K-I.  You may recognize
13   his name from some of the other documents we
14   looked at earlier today.  And it is signed by
15   Alfred P. Wehner.
16           Do you see in the first
17   paragraph that he is referencing a copy of
18   the retrograde migration paper by Sj?sten
19   which has been added, he says, to the paper
20   by Mills on perineal talc exposure and
21   epithelial ovarian cancer risk?
22       A.    Yes, I see that.
23       Q.    I suppose you don't know if the
24   Sj?sten, S-J-O-S-T-E-N, paper referenced here

74 (Pages 290 to 293)

Kelly Tuttle, Ph.D.

Page 294

1    in the Wehner October 7, 2004 letter is the
2    same paper I showed you today that you had
3    not seen previously?
4         A.   It doesn't specify the year,
5    and again, these are personal communications
6    so I have no way to know what they're
7    discussing specifically.
8         Q.   It says in part in here in the
9    third paragraph:  The study generally is very
10   similar to 14 or so previous retrospective
11   case-control studies with all the inherent
12   well-discussed and published weaknesses of
13   such studies.  Its ORs are well below 2.0.
14        Do you see that part of the
15   letter on the first page?
16        A.   Yes, I see -- I see that part
17   of the letter.
18        Q.   Do you know what an OR is?
19        A.   I believe it refers to an odds
20   ratio.
21        Q.   Okay.  And what is the
22   significance of an odds ratio that is below
23   or well below 2.0?
24        A.   In my training, odds ratios of

Page 295

1    2.0 was kind of the -- I'm trying to think of
2    the best way to describe it, is the kind of
3    established -- the level you start looking
4    for when you're performing experiments.
5         As far as 2.0, you would like
6    to see odds ratios above 2.0 in regards to
7    looking at biological impacts or potential
8    relationships.
9         Q.   Does that mean that as long as
10   you are at or below 2.0 in your opinion, you
11   do not have evidence of a biological impact
12   or potential relationship?
13        A.   Well, as I said, 2.0 is kind
14   of -- as I said, what I was taught and what
15   we practice in our -- in my Ph.D. training
16   and expertise as regards to when doing
17   research and doing analysis of relationships,
18   odds ratios above 2.0, you know, we kind of
19   were -- it's rather hard to describe, but
20   it's kind of the area we were looking for
21   from a point of biological significance.
22        Q.   Okay.  Does that mean that
23   taking the converse, that odds ratios that
24   were not above 2.0, according to your

Page 296

1    training, did not have biological
2    significance?
3         MR. FROST:  Objection.
4         A.   We're speaking in very broad
5    terms.  You know, it depends on the science
6    and the data.  You know, I'm speaking
7    generally when I say that the odds ratio of
8    2.0 is kind of what we used when doing my
9    research for my Ph.D.  It's what was taught
10   in -- when analyzing scientific data.
11   BY MR. SOILEAU:
12        Q.   Are we in an area that is --
13   well, is this area comfortable to you, that
14   is, within your expertise, comfortably within
15   your expertise, when we start talking about
16   odds ratios?
17        MR. FROST:  Objection.
18        A.   I'm familiar with odds ratios.
19   I use odds ratios.  You know, I'm familiar
20   with confidence intervals, I have training
21   and experience in them as part of my work in
22   toxicology.
23   BY MR. SOILEAU:
24        Q.   Right.

Page 297

1         The beginning of that statement
2    sort of sounded like my plumbing.  I used the
3    plumbing.  I'm familiar with the plumbing.  I
4    can do some things, but I'm not a plumber.
5         I'm just trying to understand
6    if, you know, when we start talking about
7    odds ratios, if that is an area -- and I'm
8    going to take some letter -- I'm sorry, some
9    language from this letter where he says
10   recognized epidemiologists and statisticians.
11        I mean, is that who you would
12   point me to or is this something that you
13   feel you're well versed to discuss as an
14   expert?
15        MR. FROST:  Objection.
16   BY MR. SOILEAU:
17        Q.   Odds ratios, that is?
18        MR. FROST:  Objection.
19        A.   I guess it would depend on the
20   specific question.  As I said, I have
21   training and expertise in odds ratios and
22   statistical analysis.  I assess them, I use
23   them.  I'm not a statistician, so if there
24   were things that we -- you know, getting into

75 (Pages 294 to 297)

Kelly Tuttle, Ph.D.

Page 298

```
1    more detail regarding odds ratios or
2    something, I would probably refer you to
3    others that get more into the statistical
4    analysis and the methodology surrounding
5    statistical analysis.
6    BY MR. SOILEAU:
7        Q.   When I asked you earlier about
8    the converse of greater than 2.0 odds ratios,
9    and I think you told me something like it's
10   going to depend on some of the context or
11   circumstances.  You said you know it depends
12   on the science and the data.
13            Is that sort of one of those
14   areas where opinion comes into play, there's
15   a subjective element to assess the data and
16   decide if it is significant even though it's
17   below 2.0?
18            MR. FROST:  Objection.
19       A.   No, that's not what I'm saying.
20   BY MR. SOILEAU:
21       Q.   Okay.
22       A.   I'm saying you need to know the
23   context of the data itself to generally speak
24   to an odds ratio, regardless whether it's
```

Page 299

```
1    above 2.0 or below 2.0, it requires more
2    context about the science and the data.
3        Q.   Based on your training, could
4    an odds ratio of 1.6 be relevant, important
5    scientific evidence on the issue of
6    causation?
7            MR. FROST:  Objection.
8        A.   Again, it depends.
9    BY MR. SOILEAU:
10       Q.   Well, could it ever?  When I
11   hear you say it depends, that means it might,
12   it might not.  So I'm just trying to be
13   complete and fair.  That means, yes, it could
14   be, but, no, it might not be.  And that's
15   fine, but that's specifically what I'm
16   asking.
17            Is it possible?  You understand
18   possible just means possible.  Is it possible
19   that under the appropriate circumstances an
20   odds ratio of 1.6 could offer evidence of a
21   cause relationship?
22            MR. FROST:  Objection.
23       A.   Again, it would -- it would --
24   it would depend.  You'd have to look at the
```

Page 300

```
1    context.  When we're talking about cause
2    relationships, we always have to bring it
3    back to the Hill criteria and the nine
4    viewpoints as a whole.
5            As we said earlier, strength,
6    which would be, you know, odds ratios is
7    definitely a -- one of viewpoints of the Hill
8    criteria and one of the key viewpoints, and
9    as we talked about previously, when you're
10   looking at them, you have to look at them as
11   a whole and look at them in context when
12   you're establishing your -- whether they
13   support a causal association.
14            And odds ratio, again, you
15   know, you need to look at the context of the
16   study that developed the odds ratio, you need
17   to look at other studies also as well to look
18   at their odds ratios, and in general, look at
19   the data to -- let's see what the data
20   supports.
21            So as far as whether one
22   particular odds ratio, you know, is or is not
23   involved in causal, you have to look at the
24   entire body of science in the context of the
```

Page 301

```
1    causal assessment.
2    BY MR. SOILEAU:
3        Q.   So you couldn't just go, well,
4    it's 1.6 or it's 1.4, 1.5, so I'm going to
5    rule out any significance for that study?
6            You can't just out of hand do
7    it; you have to look at the data, look at the
8    study and decide what weight, if any, it's
9    entitled to, fair?
10            MR. FROST:  Objection.
11       A.   Again, you have to look at the
12   data and the science.  You know, odds -- as I
13   said, odds ratios are useful and there's --
14   we talked about the 2.0 or below 2.0, but you
15   have to look at that as well as the
16   scientific data as a whole.
17   BY MR. SOILEAU:
18       Q.   Look at the second page of
19   Exhibit 29.  The middle paragraph includes a
20   statement:  I would recommend to have this
21   study evaluated by a reputable epidemiologist
22   well familiar with the talc issue (e.g.,
23   Dr. Huncharek, H-U-N-C-H-A-R-E-K, comes to
24   mind).
```

76 (Pages 298 to 301)

Kelly Tuttle, Ph.D.

Page 302

1          Do you recognize that name from
2     your work in this litigation?
3          A.   Yes, I believe so.
4          Q.   How?
5          A.   I think I cite some
6     Huncharek -- I'm not sure if I'm saying it
7     right -- references in my report.
8          Q.   Do you want to check?
9          A.   Certainly.
10         Q.   Look at page 77, see if you see
11    three different references.
12         A.   Yes, I do.
13         Q.   Do you know anything else about
14    Dr. Huncharek?
15         A.   No, I don't.
16         Q.   Do you even know if he's --
17    well, the letter says he's a doctor, but you
18    don't even know that, I guess.
19         A.   When I look at scientific
20    articles, I don't really research the
21    authors.  I look at the science and the data.
22         Q.   Do you look at the publication
23    to see where it was published?
24         A.   Obviously when citing them and

Page 303

1     stuff, I look at the journals where they have
2     been published, but I don't necessarily, as
3     far as assessing the journals themselves.
4          Q.   Do you still maintain as we sit
5     here this afternoon that there is no
6     scientific evidence to support the theory of
7     migration and that Drs. Plunkett and Zelikoff
8     were scientifically unsound and flawed in
9     their opinions?
10         MR. FROST:  Objection,
11    misstates testimony, misstates
12    opinion.
13         A.   Well, again, I would refer to
14    the opinions in my report.  The scientific
15    evidence does not support the hypothesis that
16    external application of talcum powder can
17    migrate through the female reproductive tract
18    to the ovaries, and in the opinions of my
19    report, I do not criticize Dr. Plunkett or
20    Dr. Zelikoff.  I merely am critical of the
21    methodologies, and as I said, the scientific
22    evidence does not support the hypotheses.
23    BY MR. SOILEAU:
24         Q.   Does that mean that you stand

Page 304

1     by what you said in your report on these
2     issues, migration?
3          A.   Yes, my report -- my report is
4     my work, and I stand by what I write in my
5     report, yes.
6          Q.   And nothing that we've
7     discussed today causes you to want to pause
8     and revisit any of your opinions or analysis
9     of the migration issue?
10         A.   Well, as I've said before,
11    you've -- you've shown me some personal
12    correspondence that would have no bearing on
13    a scientific investigation, and the articles
14    you've provided me, I haven't had a chance to
15    read in depth.  But generally speaking, none
16    of them looked at external perineal
17    application and the successful migration from
18    external application to the ovaries.
19         Q.   So you do not feel as we sit
20    here today any need to say I'd like to
21    revisit that issue?
22         A.   Well, as I state in my report,
23    you know, if new evidence comes available, I
24    always reserve the right, but based on what

Page 305

1     you've presented to me and what I have seen
2     in the scientific evidence, there's nothing
3     to support the proposed migration theory of
4     external application of talcum powder
5     migrates to the ovaries.
6          Q.   The issue of plausibility, it
7     includes -- the plausibility under the Hill
8     viewpoints, that includes mechanism, right?
9          A.   I -- the biological
10    plausibility -- we can refer to the Hill to
11    look at it distinctly, but yes, it generally
12    refers to a proposed mechanism of exposure or
13    of toxicity.
14         Q.   Okay.  So a proposed mechanism
15    of toxicity.
16         What does the word "toxicity"
17    mean?
18         A.   Of adverse health effect, how
19    the adverse health effect is caused by a
20    certain dose of product.
21         Q.   Okay.  And will you agree that
22    investigators have studied proposed
23    mechanisms by which talc might initiate or
24    contribute to a carcinogenic process?

77  (Pages 302 to 305)

Kelly Tuttle, Ph.D.

Page 306

1    MR. FROST:  Objection.
2    A.    I am aware there have been some
3  mechanistic studies regarding talcum powder
4  and ovarian cells in vitro and in vivo.
5  BY MR. SOILEAU:
6    Q.    Well, let me ask you this:  Can
7  you agree with this statement:  Investigators
8  have studied proposed mechanisms by which
9  talc might initiate or contribute to a
10  carcinogenic process?
11    MR. FROST:  Objection.
12  BY MR. SOILEAU:
13    Q.    Can you agree with that?
14    A.    Again, I'm aware that research
15  has been done both in vitro and in vivo.  I
16  do not get into that in my report.  I don't
17  do a detailed research regarding the genetic
18  mechanistic research regarding talcum powder
19  and ovarian cancer.
20    Q.    Would you look at your report
21  at page 27, please, Doctor?  Do you find
22  there a one-paragraph section numbered 7.3.3
23  and entitled Studies on Talc, Inflammation
24  and Ovarian Cancer?

Page 307

1    A.    Yes, I see it.
2    Q.    Would you read that statement,
3  the first sentence of that paragraph into the
4  record, please?
5    A.    Investigators have studied
6  proposed mechanisms by which talc might
7  initiate or contribute to a carcinogenic
8  process, including whether talc causes
9  inflammation or whether inflammation is
10  itself related to the initiation of ovarian
11  cancer.
12    Q.    So, Doctor, let me ask you
13  again.  Can you agree with this statement:
14  Investigators have studied proposed
15  mechanisms by which talc might initiate or
16  contribute to a carcinogenic process?
17    MR. FROST:  Objection.
18    A.    Again, that's what I state in
19  the first half of that sentence of my report,
20  and as I stated previously, I'm aware that
21  there have been in vitro and in vivo studies
22  looking at genetic mechanisms.
23  BY MR. SOILEAU:
24    Q.    Precisely, the statement is

Page 308

1  taken verbatim from your report, right?
2    MR. FROST:  Objection.
3    A.    Again, it's the first half of
4  that sentence in the paragraph discussing
5  studies on talc, inflammation and ovarian
6  cancer.
7  BY MR. SOILEAU:
8    Q.    How about this:  The words that
9  I presented to you are, in fact, your words,
10  Doctor.
11    MR. FROST:  Objection.
12    A.    Again, as I stated, that is
13  what I've written in the first half of that
14  sentence on that paragraph regarding on
15  studies on talc, inflammation and ovarian
16  cancer.
17  BY MR. SOILEAU:
18    Q.    Right.  That's why I say these
19  words are your words, fair?
20    MR. FROST:  Objection.
21    A.    Again, that's the first half of
22  the sentence that is written there, along
23  with the rest of the paragraph.
24    ///

Page 309

1  BY MR. SOILEAU:
2    Q.    I mean, you don't suggest I
3  have to read the whole report to you for it
4  to be your words.  I'm not saying that's the
5  entirety of your report.  I'm just saying --
6  well, did you write those words?
7    A.    Yes, I wrote those words.
8    Q.    Okay.  So they are your words?
9    A.    Again, yes, those are the words
10  that I wrote, that is the first half of that
11  sentence in that paragraph.
12    Q.    Well, once we get past this,
13  I'm going to keep going on the sentence where
14  we got hung up.  Let's see if we can keep
15  going.
16    And when investigators have
17  studied proposed mechanisms by which talc
18  might initiate or contribute to a
19  carcinogenic process, can you agree that has
20  included whether talc causes inflammation?
21    A.    I'm sorry, can you repeat that
22  for me?
23    Q.    Sure.
24    A.    I was -- I thought you were

Golkow Litigation Services - 877.370.DEPS

Kelly Tuttle, Ph.D.

Page 310

1    quoting my report.
2        Q.    Well, I sort of took it from
3    your report, but I'm simply asking you if
4    investigators who have studied proposed
5    mechanisms by which talc might initiate or
6    contribute to a carcinogenic process have
7    included within those studies the question of
8    whether talc causes inflammation?
9        A.    And again, I'm aware of studies
10   that have looked at whether talc causes
11   inflammation.
12       Q.    And also whether inflammation
13   is itself related to the initiation of
14   ovarian cancer, fair?
15       A.    Yes.  Again, I'm aware that
16   investigators have studied that.
17       Q.    You will agree with me that
18   when large numbers of foreign particles of
19   any composition deposit on tissue, an initial
20   response can be irritation?
21           MR. FROST:  Objection.
22       A.    Well, you're speaking in broad
23   strokes --
24                ///

Page 311

1    BY MR. SOILEAU:
2        Q.    Yes.
3        A.    -- again, and, you know, as you
4    said, can cause inflammation.  Depending on
5    the scenario, the exposure, the particles,
6    yes, acute inflammation can occur.
7        Q.    Well, isn't the initial
8    response irritation?
9            MR. FROST:  Objection.
10       A.    We were just discussing
11   inflammation, so now we jumped to irritation.
12   Is there -- I'm afraid you're kind of -- I'm
13   not sure how you define irritation versus
14   inflammation.
15   BY MR. SOILEAU:
16       Q.    Well, I was just asking, if you
17   have a large number of foreign particles of
18   any composition deposit on tissue, if the
19   initial response is irration?  Go ahead.  You
20   want to answer it or you want me to rephrase
21   it?
22       A.    I was going to say it depends.
23       Q.    Let's put it in the lungs.
24   You've done a lot of work on inhalation

Page 312

1    issues, haven't you?
2        A.    Inhalation toxicology is
3    something we do a lot of at CTEH, yes.
4        Q.    Right.  And the work that
5    you've done on asbestos and some chemical
6    releases that are referenced in some of the
7    materials that I've been provided with or
8    gathered, a lot of those involve inhalation;
9    not suggesting that it's limited to just
10   inhalation, but inhalation has been an issue
11   in a lot of those projects that you've worked
12   on?
13       A.    Yes.
14       Q.    Okay.  If large numbers of
15   foreign particles of any composition deposit
16   in the airways, will the initial response be
17   irritation?
18       A.    Again, it depends.  Depends on
19   the foreign particle, depends on the dose,
20   but certainly there are circumstances where
21   foreign bodies may deposit on the lung and
22   cause irritation.
23       Q.    And it's possible that
24   irritation will be followed by inflammation?

Page 313

1        A.    Again, it depends on the
2    scenario and the dose and a number of other
3    factors.  Again, when you're talking about
4    the lung, there are certainly conditions for
5    which foreign bodies will deposit in the lung
6    and cause inflammation, an acute inflammatory
7    response.
8        Q.    Okay.  And if you get an
9    inflammatory response, are there macrophages
10   that then play a central role?
11       A.    There are a large number of
12   different components involved in the
13   inflammatory process, and I have not
14   refreshed my memory recently enough to be
15   able to recall all of them involved.
16   Macrophages are certainly involved.
17       Q.    Well, isn't it fair to say that
18   the macrophages in the lungs in the
19   respiratory system would play a central role
20   if you had a deposition of foreign particles
21   that triggered irritation followed by
22   inflammation?
23           MR. FROST:  Objection.
24       A.    As I said, there's a large

79 (Pages 310 to 313)

Kelly Tuttle, Ph.D.

Page 314

1   number of different cells and cytokines and
2   things involved in the inflammatory response.
3   I can't say whether macrophages play a
4   central role without refreshing my knowledge
5   about the inflammatory response and the
6   individual cells involved in it.
7   BY MR. SOILEAU:
8       Q.   Earlier you spoke about defense
9   systems, I believe, in the body.  Is it true
10  that different organs have different levels,
11  different degrees of defense systems?
12      A.   Again, that's a very general
13  statement.  As far as -- as I said
14  previously, the body has a number of
15  different defense mechanisms.
16      Q.   But are the body's defense
17  mechanisms, if you know, the same for
18  different organs?  For example, in the lungs
19  in the lungs as in the kidneys as in the ovaries
20  as in the brain, or does it vary from organ
21  to organ, if you know?
22      A.   Yeah, I have not done a
23  detailed assessment of the different target
24  organs' defense mechanisms.  I would say that

Page 315

1   there are some that are the same and some
2   that vary.  But we would have to kind of
3   compare -- pick two organs and actually
4   compare the defense mechanisms.
5       Q.   Lungs and ovaries.
6       A.   Well, again as I said, I
7   haven't done a detailed research for every
8   defense mechanism and I said earlier that I
9   have not studied specifically the defense
10  mechanisms of the ovaries.
11      Q.   Okay.  Are we, from your
12  perspective, still within your area of
13  expertise?
14          MR. FROST:  Objection.
15      A.   Well, as I said, you know, I
16  address inflammation briefly in my report.  I
17  do not get into the detailed mechanisms of
18  inflammation.  As I said previously, I have
19  not researched the defense mechanisms of the
20  ovary.  I don't address the defense
21  mechanisms of the ovary in my report.
22  BY MR. SOILEAU:
23      Q.   Do you know what the word
24  phagocytize means?

Page 316

1       A.   Yes, I believe so.
2       Q.   Does that involve the effect or
3   process of the macrophages in the body, if we
4   go back to our foreign particles in the
5   lungs, the macrophages' response to these
6   foreign particles in the body?
7           MR. FROST:  Objection.
8   BY MR. SOILEAU:
9       Q.   Is that generally what we're
10  talking about?
11      A.   And again, as I said, I haven't
12  brushed up on my knowledge of the detailed --
13  the complex inflammatory process.  Phagocy --
14  phagocytize, I'm sorry if I am not saying
15  1999 right, but --
16      Q.   I had to practice.
17  Phagocytize.
18      A.   I don't recall and can't say
19  that it's specific to macrophages, but it
20  certainly involves the uptake of material,
21  generally speaking, into cells, and not
22  necessarily foreign bodies.  It can be
23  involving other products as well.
24      Q.   This process that I'm sort of

Page 317

1   stepping through here, foreign particles,
2   irritation, inflammatory responses,
3   macrophages, phagocytize, other defense
4   mechanisms, this is a process that can unfold
5   in the body when it's confronted with some
6   foreign agent.  You know that as a
7   toxicologist, right?
8           MR. FROST:  Objection.
9       A.   Inflammation can occur in the
10  body for a number of reasons.  It's a healthy
11  response in the human body beyond just
12  foreign bodies.
13  BY MR. SOILEAU:
14      Q.   Right.  But it can also be a
15  response to foreign particles, can it not?
16      A.   Again, depending on the
17  situation and the dose and stuff, there are
18  certainly instances where foreign bodies can
19  induce acute inflammation.
20      Q.   Okay.  And it can trigger what
21  we would call a cascade, that is, a cascade
22  of responses and reactions within the tissue,
23  if the dose is sufficient to trigger
24  toxicity?

80 (Pages 314 to 317)

Kelly Tuttle, Ph.D.

Page 318

1          MR. FROST:  Objection.
2     BY MR. SOILEAU:
3          Q.    The dose of the foreign
4     particle, right?
5          MR. FROST:  Objection.
6          A.    You're getting a little out of
7     what I cover in my report and what I have
8     done.  As I said, I haven't done a refresher
9     course on inflammatory response.  That would
10    depend, because depending on the chemical and
11    the exposure of issue, you know, as far as
12    whether the inflammatory response is involved
13    in the mechanism of toxicity.
14          So I don't -- I can't speak to
15    that specifically without doing some
16    additional research, having a specific
17    scenario.
18    BY MR. SOILEAU:
19          Q.    Do you -- I'm sorry, I didn't
20    mean to step over your words.
21          Do you recognize the term
22    "cascade," Doctor, in this context?
23          A.    Yes, but as I said, we're
24    getting a little out of the realm of what I

Page 319

1     discuss in my opinions.
2          Q.    In some scenarios -- I
3     understand that.  You do have a section on
4     inflammation and talc, but you haven't
5     discussed some of these issues that I'm
6     bringing up that center upon the body's
7     response to foreign particles and
8     inflammation and this cascade, fair?
9          MR. FROST:  Objection.
10    BY MR. SOILEAU:
11          Q.    That's what you're telling me
12    right?
13          A.    Again, yes.  As I said, you're
14    discussing the cascades and the intricate
15    mechanisms of the inflammatory responses is
16    not something that I do in my report and not
17    something that I research in depth in my
18    report.  I believe there are others who get
19    more into the mechanisms and pathways
20    regarding inflammation than I do.
21          Q.    Well, is it something that
22    you've written on?
23          A.    You mean in my report, or do
24    you mean generally or --

Page 320

1          Q.    Generally.
2          A.    I think I --
3          Q.    Let me show you -- go ahead,
4     I'm sorry, you have an answer?
5          A.    Yeah, I was going to say I
6     think I have done some inflammation work in
7     my Ph.D.  I can't remember if I specifically
8     addressed it in one of my publications or
9     not.  But as I said before, I have -- I'm
10    aware of inflammation, but I haven't brushed
11    up on the intricate genetic roles and all the
12    complexities of it.
13          Q.    Let me show you an article that
14    I read and make sure it's one that you are an
15    author -- one of the authors of.
16          (Whereupon, Deposition Exhibit
17    Tuttle-30, 2014 Nony et al
18    Publication, was marked for
19    identification.)
20    BY MR. SOILEAU:
21          Q.    I've marked it as Tuttle
22    Exhibit 30.  Do you recognize this article?
23          A.    Yes, I do.
24          Q.    Are you, in fact, one of the

Page 321

1     three authors of this article?
2          A.    I am.
3          Q.    Would you turn to page 2,
4     Mechanisms of Toxicity?  You see it?
5          A.    Yes.
6          Q.    It does say:  When large
7     numbers of foreign particles of any
8     composition deposit in the airways or the
9     bronchial alveolar region of the lung, the
10    initial response is irritation.  Doesn't it?
11          A.    Yes, that's what it states
12    right here, it says the initial response is
13    irritation followed by inflammation.
14          Q.    And it says:  Followed by
15    inflammation in which the AMs, that's capital
16    A, capital M, little s, play a central role.
17    Do you know what the AMs are there?
18          A.    If I remember correctly, and
19    I'm sure we probably elucidated earlier, I
20    believe it refers to activated macrophages.
21          Q.    Okay.  It could be -- I can't
22    say the word very well.  Alveolar?
23          A.    Alveolar?
24          Q.    I tell you what.  Go up to the

Kelly Tuttle, Ph.D.

Page 322

1  paragraph before, right in the middle, and
2  let me show you on the screen.  You see right
3  here?
4        MR. SOILEAU:  Oops.
5        (Comments off the stenographic
6     record.)
7  BY MR. SOILEAU:
8     Q.   So what does AM stand for?
9     A.   Alveolar macrophages.
10    Q.   Alveolar, thank you.  Now I can
11  say it correctly.
12        And then it goes on to say,
13  still under Mechanisms of Toxicity near the
14  bottom of the page:  The AMs migrate to sites
15  of dust deposition and attempt to phagocytize
16  the particles, destroy them or translocate
17  them to the -- what's that word?
18    A.   Mucociliary.
19    Q.   Escalator.
20        What does that mean?
21    A.   So it's one of the defense
22  mechanisms that we were discussing, and
23  again, it's been a few years since this was
24  drafted, so I will try to speak accurately.

Page 323

1     Q.   Okay.
2     A.   But when you think of -- to put
3  it in layman's terms, coughing up a loogie.
4     Q.   Okay.  Right.  This is one of
5  the things the respiratory system can do to
6  expel things that have come into it, foreign
7  things that have come into the respiratory
8  system?
9        MR. FROST:  Objection.
10  BY MR. SOILEAU:
11    Q.   Is that right?
12    A.   Again, it's one of the defense
13  mechanisms.
14    Q.   Yeah.
15    A.   In this particular chapter
16  where we're referring to foreign particles, I
17  think it can also be used in other scenarios
18  within the lung as well.
19    Q.   Sure.  Let me finish this
20  paragraph.
21        Simultaneously, the phagocytes
22  release a complex series of chemical
23  messengers that activate and attract
24  inflammatory cells stimulating mucous

Page 324

1  secretion to generate -- generation of
2  reactive oxygen species (ROS), and release of
3  inflammatory mediators.
4        What are reactive oxygen
5  species?
6     A.   So I don't know that I can
7  really define that very clearly just, as I
8  said, off the cuff.  You know, reactive
9  oxygen species, you know, I probably prefer
10  to refer to a definition in front of me to
11  make sure I'm speaking accurately regarding
12  them.
13    Q.   Okay.  Do you know if reactive
14  oxygen species are significant to the
15  carcinogenic process?
16        MR. FROST:  Objection.
17    A.   It would depend.  I have not
18  done a specific assessment of that in this
19  case, and it would depend.  I'd need more
20  information or I'd need to be able to
21  research that.
22  BY MR. SOILEAU:
23    Q.   Let's look at the last
24  sentence:  The cascade continues as long as

Page 325

1  the irritant particles persist, subsiding
2  only when and if the particles are cleared
3  from the lung.
4        Do you agree with that
5  statement?
6        MR. FROST:  Objection.
7     A.   Well, again, as I said before,
8  when exposed in the lung, as I stated
9  previously, foreign particles at a sufficient
10  dose can certainly cause irritation followed
11  by inflammation.
12        As far as the cascade statement
13  in this particular context, looking at this,
14  you know, the response is there to remove
15  these foreign particles, so as long as the
16  particles are there, and then when they're
17  removed, the inflammatory response ends.
18        Cascade, again, what you asked
19  earlier involved cascade and toxicity, and
20  this is a little bit of a different scenario
21  that we're looking at in this article, just
22  the general inflammatory response.
23  BY MR. SOILEAU:
24    Q.   Well, this is not discussing

Kelly Tuttle, Ph.D.

Page 326

1    mechanism of toxicity in this article?
2        A.    Again, yes, this is discussing
3    mechanism of toxicity very generally in
4    regards to foreign particles.
5        Q.    That's what I thought.  That's
6    what I understood.
7            Let's go back for a moment to
8    Exhibit 23, that FDA response that we
9    discussed earlier.  I'm going back to page 5
10   of 7.  I'm revisiting language we looked at
11   earlier.
12           I'm going to go to the middle
13   of that paragraph.  It is, therefore,
14   plausible that perineal talc (and other
15   particulate) that reaches the endometrial
16   cavity, fallopian tubes, ovaries and
17   peritoneum, may elicit a foreign body type
18   reaction and inflammatory response that, in
19   some exposed women, may progress to
20   epithelial cancers.
21           You see that language that I
22   just read?
23       A.    Yes.  Again, that's one
24   sentence in that paragraph that I believe

Page 327

1    we've revisited -- we visited previously.
2        Q.    Isn't the foreign body type
3    reaction and inflammatory response that is
4    noted here in the FDA paper from 2014
5    referring to the same sort of foreign body
6    type reaction and inflammatory response that
7    you discuss in Tuttle Exhibit 30 under
8    Mechanism of Toxicity?
9            MR. FROST:  Objection.
10       A.    I don't know.  As previously
11   stated, this is a letter.  They don't cite
12   references.  We're talking about the ovaries
13   and other avenues of the female reproductive
14   system compared to the lung, which is what we
15   were discussing in this synthetic vitreous
16   fibers study.
17           So as we said before, the
18   inflammatory response is diverse and
19   complicated so, no, I don't know.
20   BY MR. SOILEAU:
21       Q.    What about from Exhibit 22,
22   which is the cover transmission to Mr. Ashton
23   from Zaren- -- Zazenski, I'm sorry,
24   Z-A-R-E-N-S-K-I -- a name we saw in another

Page 328

1    document.
2            When he says in this paragraph,
3    in part:  Combine this evidence with the
4    theory that talc deposition on the ovarian
5    epithelium initiates epithelium inflammation.
6            Is that in the same genre as
7    the same thing, the same mechanism that we've
8    talked about in each of these articles where
9    there's a foreign body present on tissue and
10   the reaction of the tissue is inflammation?
11           MR. FROST:  Objection.
12       A.    Well, again, as I said
13   previously with the FDA letter, this is the
14   personal correspondence.  He refers to a
15   theory.  Without more information about what
16   is he referring to, I can't speak to what he
17   is -- what is he speaking to.
18   BY MR. SOILEAU:
19       Q.    But that is what you said in
20   the article that you helped write, Tuttle
21   Exhibit 30, an inflammatory process that you
22   describe under Mechanism of Toxicity.  You
23   know what that means.
24           You helped write -- you signed

Page 329

1    off on Mechanism of Toxicity under article --
2    I'm sorry, under Tuttle Exhibit 30.
3            MR. FROST:  Is there a
4    question?  Objection.
5    BY MR. SOILEAU:
6        Q.    You're telling me that the FDA
7    letter and Exhibit 22 that I've shown you,
8    which talk about inflammation, that you
9    don't -- you don't seem to know enough about
10   them to comment on them.  And I was just
11   asking, you know enough to comment about
12   Exhibit 30, your article, don't you?
13           MR. FROST:  Objection,
14   misstates testimony.
15       A.    Well, again, as I said, we
16   wrote this, you know, several years ago,
17   looks like in 2014, and, you know, we're
18   speaking very generally about the
19   inflammatory process in the lung in this
20   particular area.
21           As we discussed previously,
22   when looking at the defense mechanisms of the
23   body, I have not done -- I've not compared
24   all the organs of the body and their various

Kelly Tuttle, Ph.D.

Page 330

1    defense mechanisms, and I think I've said
2    several times that the inflammatory response
3    is very complex and there's a lot of
4    different cells and cytokines and things
5    involved, which we don't discuss in this
6    Mechanisms of Toxicity.  It's a very general
7    paragraph that we're discussing.
8            And I have not, I think I said
9    earlier, brushed up on my understanding of
10   the mechanistic toxicology or the mechanisms
11   revolving inflammation in regards to my
12   report or the assessment of talcum powder and
13   ovarian cancer.
14   BY MR. SOILEAU:
15       Q.   Well, given that, Doctor, isn't
16   it is it fair to say that you cannot offer
17   opinions on the existence or nonexistence of
18   a plausible mechanism for ovarian cancer that
19   involves foreign particles, inflammation and
20   a cascade of events that results in
21   carcinogenicity?
22           MR. FROST:  Objection.
23   BY MR. SOILEAU:
24       Q.   Well, you're not in a position

Page 331

1    to comment on that today?
2            MR. FROST:  Objection.
3        A.   There were --
4            THE WITNESS:  I'm sorry.
5        A.   There were multiple parts to
6    that question.  Can we break it --
7    BY MR. SOILEAU:
8        Q.   Right.  But they all go back to
9    what we're talking about.
10           Isn't it fair to say, Doctor,
11   that you're not in a position today, you do
12   not have a foundation from which to offer an
13   opinion on the existence or nonexistence of a
14   plausible mechanism for talc particles to
15   trigger ovarian cancer?
16           MR. FROST:  Objection.
17       A.   So that's a -- that's a
18   different question than what you were asking
19   previously.
20   BY MR. SOILEAU:
21       Q.   It is, but you've told me
22   today -- let's back up for a step or two and
23   I'll lay it out better.
24           You've told me you've not

Page 332

1    looked at the defense mechanisms of the
2    ovary, correct?
3            MR. FROST:  Objection.
4        A.   I said I've not done research
5    into the defense mechanisms of the ovary or
6    any, you know, specifics in regards to the
7    defense mechanisms of the ovary.
8    BY MR. SOILEAU:
9        Q.   You looked at migration, right?
10       A.   I looked at the scientific
11   evidence of whether there was any support for
12   the theory of external migration from
13   perineal application of talc to the ovaries.
14       Q.   And you found no evidence?
15       A.   That's correct, the scientific
16   evidence does not support the migration
17   theory.
18       Q.   You did not look at evidence
19   involving the existence of talc within
20   ovarian tissue, did you?
21           MR. FROST:  Objection.
22       A.   As I think we discussed
23   previously in the -- as far as the presence
24   of talc in ovarian tissue, we -- in regards

Page 333

1    to the migration theory, I looked at
2    scientific evidence on whether there was any
3    evidence to support the theory that external
4    application of talc would migrate to the
5    ovaries.
6    BY MR. SOILEAU:
7        Q.   Do you have an opinion, Doctor,
8    as to whether there is evidence to support a
9    potential mechanism for talc to cause ovarian
10   cancer following perineal application?
11           MR. FROST:  Objection.
12       A.   As I state in my report when
13   looking at the biological plausibility in the
14   Hill criteria, I base my scientific evidence
15   of the migration theory that the talc will
16   reach the ovaries based on perineal
17   application for which the scientific evidence
18   doesn't support that.
19   BY MR. SOILEAU:
20       Q.   Here's what I hear you telling
21   me, and you've been over it a few times, many
22   times today, and that is, you do not see
23   scientific evidence to support the ability of
24   talcum powder applied to the perineum to

Kelly Tuttle, Ph.D.

Page 334

1  migrate to the ovaries.  Therefore, you've
2  not looked at any mechanistic issues
3  involving talc reaching the ovaries because
4  you don't believe it happens.
5        MR. FROST:  Objection.
6  BY MR. SOILEAU:
7        Q.   And I'm just trying to figure
8  out if you have an opinion, one way or
9  another, about any potential mechanism.  And
10  from what you've told me, it wouldn't seem
11  like you had developed a foundation from
12  which to speak to that.
13        MR. FROST:  Objection.
14        A.   Well, as I said, I didn't do an
15  extensive review regarding the genetic
16  mechanisms of inflammation, and again,
17  inflammation is not the same as the
18  initiation of cancer.
19             And so, you know, I did not do
20  a detailed review regarding the inflammatory
21  process.  We talked -- we quoted a few
22  sentences from the paragraph that I have on
23  page 27 where I look briefly at some of the
24  studies that look at talc inflammation and

Page 335

1  ovarian cancer, but I have not done a
2  detailed assessment of the inflammatory
3  process or the genetic mechanism; therefore,
4  I think there are others that do that.
5  BY MR. SOILEAU:
6        Q.   It can be though, right?
7        MR. FROST:  Objection.
8        A.   I'm sorry?
9  BY MR. SOILEAU:
10        Q.   It can be.  Inflammation can be
11  a step in the development of cancer?
12        MR. FROST:  Objection.
13  BY MR. SOILEAU:
14        Q.   Isn't that true?
15        MR. FROST:  Objection.
16        A.   I would need more information
17  because I think you're referring to promotion
18  as opposed to initiation.
19  BY MR. SOILEAU:
20        Q.   I was just asking if
21  inflammation can be an initial step in the
22  body that ultimately develops into a cancer.
23        MR. FROST:  Objection.
24             ///

Page 336

1  BY MR. SOILEAU:
2        Q.   Do you know?
3        A.   Again, I --
4        MR. FROST:  Objection.
5        A.   I am aware generally that there
6  are a very few number of cancers for which
7  initiation [sic] may be involved in the
8  initiation process.  I think that there's
9  somebody else, another expert, that discusses
10  that specifically.
11             In my report when I discussed
12  carcinogenesis, inflammation is more
13  associated with promotion rather than
14  initiation.
15  BY MR. SOILEAU:
16        Q.   Today is my opportunity to talk
17  to you.  Should I expect that you would come
18  into the courtroom and offer an opinion for
19  or against the existence of a plausible
20  mechanism for the development of ovarian
21  cancer triggered by talc on the ovaries?
22        MR. FROST:  Objection.
23  Objection.
24        A.   I'm sorry, can you...

Page 337

1  BY MR. SOILEAU:
2        Q.   I'm just trying to figure out
3  if you have an opinion one way or another on
4  the question of:  Is there a plausible
5  mechanism for talc to produce or contribute
6  as a significant factor to the development of
7  ovarian cancer?
8        MR. FROST:  Objection.
9        A.   So again, you know, my opinions
10  in my report are stated, and I briefly touch
11  upon inflammation.  That being said, my --
12  the scientific evidence does not support a
13  causal association between talc and ovarian
14  cancer.  In regards to a plausible mechanism,
15  we already discussed migration in depth.  I
16  don't, I believe, get into migration or, as I
17  said, the mechanistics of inflammation in
18  great detail in my report.
19             I look at the scientific
20  literature very generally.  There are others
21  that get more in depth as far as mechanisms
22  than I do.
23  BY MR. SOILEAU:
24        Q.   Well, you've just got that one

85  (Pages 334 to 337)

Kelly Tuttle, Ph.D.

Page 338

1    paragraph on inflammation, right?
2         MR. FROST:  Objection.
3         A.    I would need to go through.  As
4    I said, I think in the carcinogenesis portion
5    of my report, I discuss inflammation briefly
6    as well in a general role --
7    BY MR. SOILEAU:
8         Q.    Right.
9         A.    -- regarding carcinogenicity.
10        Q.    That's true.  Right.  And
11   that's fair.
12        I meant in the context of talc,
13   you only have this one paragraph at page 27,
14   7.3.3.
15        A.    I -- as I said, I don't get
16   into the mechanisms of inflammation in great
17   detail.  I do believe that in discussing
18   fragrant chemicals, there's also some
19   references to irritation and potentially
20   inflammation, but without doing a quick word
21   search on it, I can't speak that this is the
22   only place that I mention inflammation other
23   than what we discussed in the --
24        Q.    Okay.  Just to be clear, I

Page 339

1    didn't really -- I really meant specifically
2    inflammation and talc.  I know that
3    inflammation is discussed elsewhere when you
4    talk about carcinogenicity.
5         What is cytotoxicity?
6         A.    Goodness.  That is --
7         Q.    Did I step out of your area?
8         MR. FROST:  Objection.
9         A.    I'm not comfortable answering
10   it off the cuff.  I'm not sure that I can
11   define it very clearly and scientifically.
12   BY MR. SOILEAU:
13        Q.    What relevance, if any, does
14   cytotoxicity have for discussion like the one
15   we're having today?
16        MR. FROST:  Objection.
17        A.    Again, we're getting a little
18   out of what I did in regards to my report and
19   what I researched for --
20   BY MR. SOILEAU:
21        Q.    Okay.  All right.
22        A.    -- the scientific literature.
23        Q.    Are we getting out of your area
24   of expertise?

Page 340

1         MR. FROST:  Objection.
2         A.    As I said, I have experience
3    and expertise in inflammation and researching
4    inflammation.  As I said previously, I did
5    not research -- brush up on the mechanisms of
6    the -- the inflammatory process and the
7    mechanisms, I don't get into that, into my --
8    in my report in this case.
9    BY MR. SOILEAU:
10        Q.    Is talc cytotoxic?
11        A.    I don't know.
12        Q.    Okay.  Let me show you an
13   exhibit I will mark as Tuttle Exhibit 31.
14        (Whereupon, Deposition Exhibit
15        Tuttle-31, 2/17/77 Schneider Letter,
16        was marked for identification.)
17        MR. SOILEAU:  The only copies
18   we have, for the record, have some
19   highlighting on them, and we've not
20   been able to get that off.  So every
21   copy will have the same highlighting.
22   It's not highlighting that I applied.
23   And I really suspect you guys know
24   that already.  What that's?

Page 341

1         MR. FROST:  I believe I've seen
2    this highlighting before.
3         MR. SOILEAU:  Yes.  I thought
4    as much.
5         MR. FROST:  Is this 31?
6         THE WITNESS:  Yes.
7         MR. FROST:  I believe this was
8    highlighted once for trial.
9         MR. SOILEAU:  I think everyone
10   in the room knows more about these
11   exhibits than I do, so I appreciate
12   that.  Trying to keep up.
13   BY MR. SOILEAU:
14        Q.    Do you see the name Battelle at
15   the top?
16        A.    Yes, I do.
17        Q.    The third page of this
18   three-page document, it's signed by
19   R.P. Schneider, Ph.D., assistant manager,
20   molecular biology and biophysics.
21        Do you recognize that name?
22        A.    Not off the top of my head, no.
23        Q.    It begins saying -- what about
24   William Sherman?  I'm sorry, William Sherman,

Kelly Tuttle, Ph.D.

Page 342

1    Ph.D., manager of biomedical evaluations,
2    Johnson & Johnson Baby Products Company.
3        Do you know who that is?
4        A.   No, I don't.
5        Q.   Okay.  And this goes all the
6    way back to February 17, 1977.
7        It says:  Dear Bill, as I
8    related to you on the telephone, we have
9    spent more time studying the effects of talc
10   than we anticipated.  Since we have found a
11   cytotoxic effect, I felt that we should
12   pursue it in more detail and obtain data
13   which can be compared to other studies.  This
14   has required doing more short-term incubation
15   experiments in the absence of serum.
16       Is a cytotoxic effect for talc
17   significant to you as a toxicologist?
18       MR. FROST:  Objection.
19       A.   It depends.  I would need more
20   information.  I would need to see the studies
21   that they're discussing.  You know, this is,
22   again, a personal communication.  This isn't
23   a research article where they're discussing
24   the studies that they're performing.

Page 343

1    BY MR. SOILEAU:
2        Q.   Okay.  But I'm simply asking
3    you a general question right now, Dr. Tuttle.
4        If talc is cytotoxic, is that
5    relevant to your opinions in this case?
6        MR. FROST:  Objection.
7        A.   Again, you know, my opinions
8    are -- you know, cytotoxic, again, it would
9    depend on these studies and what information
10   is being shown.  But as I said previously, I
11   assessed the scientific literature regarding
12   the -- whether the exposure to talcum powder
13   perineally, what -- the scientific evidence
14   showed a causal association between perineal
15   talcum powder exposure and ovarian cancer.
16   BY MR. SOILEAU:
17       Q.   We said at the beginning of our
18   discussion today, and I think we agreed that
19   toxicology includes the study of adverse
20   effects of agents on organisms, right?
21       A.   Generally speaking, yes, the
22   science of toxicology is the study of
23   potential adverse health effects relating to
24   dose and exposure metrics on living

Page 344

1    organisms, including the environment.
2        Q.   And at a most basic level,
3    doesn't cytotoxic mean that it is toxic --
4    the agent or substance is toxic to the cells
5    of the body?
6        MR. FROST:  Objection.
7        A.   Again, as I said earlier, I'm
8    not sure that I can accurately define
9    cytotoxicity just off the cuff without
10   referring to a document.
11   BY MR. SOILEAU:
12       Q.   Okay.
13       A.   I don't want to use layman
14   terms and then be inaccurate or misspeak.
15       Q.   I can show it to you if we need
16   to, but the Wehner document, one of the
17   Wehner documents we looked at earlier, talked
18   about intended or normal use of talcum powder
19   products.
20       Have you seen that phrase in
21   your work on this project, intended or normal
22   use of talcum powder products?
23       A.   I didn't specifically look for
24   that phrase in my assessment of the

Page 345

1    scientific literature, so I couldn't say.
2        Q.   Do you have an understanding
3    whether genital application of talcum powder
4    products is considered a normal and intended
5    use of the product?
6        MR. FROST:  Objection.
7    BY MR. SOILEAU:
8        Q.   I'm just asking if you have an
9    understanding.
10       MR. FROST:  Objection.
11       A.   I'm -- I don't know.  As I
12   said, I didn't look for that phrase in my
13   assessment of the scientific literature.  I
14   merely looked at whether the scientific
15   evidence for the perineal use of talcum
16   powder, if the scientific evidence supported
17   a causal association with ovarian cancer.
18   BY MR. SOILEAU:
19       Q.   But you did not consider the
20   possibility that talc was cytotoxic, correct?
21       MR. FROST:  Objection.
22       A.   Well, again, in looking at
23   whether there is a causal association when
24   you're looking at the epidemiological studies

87 (Pages 342 to 345)

Kelly Tuttle, Ph.D.

Page 346

1    or, you know, the study cited in the report,
2    you know, looking for that causal
3    association, as I said before, I didn't get
4    into the genetic mechanisms as far as we
5    discussed with inflammation or cytotoxicity,
6    but looking at the body of evidence to see
7    whether there is a causal association.
8    BY MR. SOILEAU:
9        Q.    Back on the Health Canada study
10    for just a moment.  I think we discussed that
11    you had cited it in your report, of course,
12    the draft assessment?
13        A.    Yes.  Can you refer me to which
14    exhibit number it is?
15        Q.    I can.  My question is more
16    general, but I'm glad to tell you which
17    exhibit number it is.
18            I'm going to tell you my
19    question is:  Are you familiar with the
20    methodology that Health Canada uses?
21            I think you'll find that it's
22    Exhibit 21.
23        A.    Thank you.
24            And can you repeat your

Page 347

1    question for me, please?
2        Q.    Sure.  Are you familiar with
3    the methodology that Health Canada used in
4    preparing the draft assessment?
5        A.    I am not specifically familiar
6    with the methodology.  As I look at the
7    assessment, I would need to refamiliarize --
8    I think that they go through their
9    methodology in other documents on their
10    website.
11        Q.    I think so.  I think you're
12    correct.
13            As we sit here today, do you
14    have any criticism of the methodology used by
15    Health Canada in its draft assessment?
16            MR. FROST:  Objection.
17        A.    Well, as I said before, without
18    having the other documents where they discuss
19    their methodology in detail, I can't discuss
20    it.
21    BY MR. SOILEAU:
22        Q.    Let me show you a document I've
23    marked as Exhibit 32, Tuttle Exhibit 32.
24            (Whereupon, Deposition Exhibit

Page 348

1    Tuttle-32, Health Canada Risk
2    Assessment Framework Study, was marked
3    for identification.)
4    BY MR. SOILEAU:
5        Q.    Have you seen this before?  It
6    says Risk Assessment Framework Summary, and
7    it's -- well, it speaks for itself.
8            Have you seen that before or do
9    you know?
10        A.    No, I don't believe I have.
11        Q.    I'm really just asking whether,
12    as we sit here today, having had the
13    opportunity to look at the Health Canada
14    draft assessment, if you have any criticisms
15    of their methodology or the manner in which
16    they applied their methodology to the
17    evidence that they looked at?
18            MR. FROST:  Objection.
19        A.    Well, as I said, I -- the
20    methodology -- I haven't reviewed the
21    Exhibit 32 that you provided to me before.  I
22    haven't seen it, so I can't discuss the
23    methodology that Health Canada used without
24    some time to look at the methodology.

Page 349

1    BY MR. SOILEAU:
2        Q.    You had not considered the
3    actual methodology used by Health Canada when
4    you considered their draft assessment on
5    talc?
6            MR. FROST:  Objection.
7        A.    As I said, in their draft
8    assessment, they don't really go into their
9    methodology.  As I said, I think it was
10    present elsewhere on their framework, but
11    I --
12    BY MR. SOILEAU:
13        Q.    My question -- I'm sorry, go
14    ahead.
15        A.    No, but I did not review their
16    methodology for their draft screening
17    assessment.
18        Q.    Right.  That really was my
19    question, that in connection with your review
20    of that document, you did not determine the
21    methodology.
22            MR. FROST:  Objection.
23        A.    I -- again, I didn't review the
24    methodology that they used.

88  (Pages 346 to 349)

Kelly Tuttle, Ph.D.

Page 350

1    BY MR. SOILEAU:
2         Q.   Okay.  So you would not have
3    any criticisms of it, obviously, because it's
4    not something you've looked at, fair?
5              MR. FROST:  Objection.
6         A.   Again, I would need to look at
7    it to be able to discuss it.
8    BY MR. SOILEAU:
9         Q.   Okay.  You say in your
10   report -- turning to your report, at page 34.
11   Let me let you find that.  I'm looking at the
12   fourth paragraph, the second sentence right
13   after footnote 4:  This by definition renders
14   the products tested as
15   nonasbestos-containing.
16             You see that?
17        A.   Yes, I see that.
18        Q.   And then you cite a document,
19   United Nations, 2017?
20        A.   Yes.
21        Q.   All right.  Let me show you a
22   document that I have here.
23             THE WITNESS:  If I may, while
24   he's doing that, how long have we been

Page 351

1    going?
2              THE VIDEOGRAPHER:  One hour and
3    10 minutes.
4              MR. SOILEAU:  I only have two
5    copies of this.  I'm going to give one
6    to the witness and one to counsel to
7    sort of share.
8              MR. FROST:  Sure.
9              MR. SOILEAU:  Let me go ahead
10   and put a number on it.  This will be
11   identified as Tuttle Exhibit 33.
12             (Whereupon, Deposition Exhibit
13   Tuttle-33, Global Harmonized System of
14   Classification and Labeling of
15   Chemicals, was marked for
16   identification.)
17             MR. SOILEAU:  I could not find
18   a way to make this smaller under the
19   circumstances.
20   BY MR. SOILEAU:
21        Q.   My question, Doctor, my first
22   question applicable to this exhibit, Tuttle
23   Exhibit 33:  Is this the exhibit that you
24   reference at page 34 of your report when you

Page 352

1    say:  This by definition renders the product
2    tested as nonasbestos-containing?
3         A.   It is one of the references
4    that I cite in that paragraph regarding
5    asbestos-containing, yes.
6         Q.   Well, it is the -- let's be
7    more specific.
8              The sentence that I read:  This
9    by definition renders the products tested as
10   nonasbestos-containing (United Nations,
11   2017).
12             So there's one citation and
13   only one citation, and it is part of that
14   sentence, that is, the parenthetical is
15   inserted before the period, agreed?
16        A.   For that specific sentence,
17   yes.
18        Q.   Okay.  And so my question to
19   you is whether Tuttle Exhibit 33 that I have
20   marked and presented to you here today is, in
21   fact, the United Nations 2017 document that
22   you reference in that sentence on page 34 of
23   your report?
24        A.   Well, the cover page says that

Page 353

1    it is.  It is a large and sizable document,
2    so I don't know if it's here in its entirety.
3    But the cover page says it is the Globally
4    Harmonized System of Classification and
5    Labeling of Chemicals.
6         Q.   All right, Doctor.  Are you
7    familiar with that document?
8         A.   Yes.
9         Q.   For example, have you used it
10   before?
11        A.   Yes, I've used this document.
12        Q.   Do you maintain, Doctor, that
13   this exhibit, Tuttle Exhibit 33, the United
14   Nations document, includes a definition of
15   the term "nonasbestos-containing"?
16        A.   No, I don't believe it provides
17   a verbatim definition of
18   nonasbestos-containing.
19        Q.   Do you know if the term
20   "asbestos" or the words "asbestos-containing"
21   appear anywhere in the document?
22        A.   No.  I -- I don't know
23   specifically.  I would have to do a check if
24   they reference asbestos-containing in the

89 (Pages 350 to 353)

Kelly Tuttle, Ph.D.

Page 354

1    document, but in regards to, you know, the
2    classification and labeling as far as the
3    information provided, I don't believe so.
4         Q.   I can only tell you that I did
5    and I couldn't find those words, and I'm not
6    going to ask you to do it right now.
7              But why do you reference a
8    definition citing this paper if there is no
9    actual definition of nonasbestos-containing,
10   that terminology, in this document?
11             MR. FROST:  Objection.
12        A.   So again, this is one of the
13   references I cite, and the reason I cite it
14   is when you go through the Global
15   Harmonization Standard, it is a standard
16   that, as it states on the label, provides the
17   guidelines that the United Nations and OSHA,
18   the Occupational Safety and Health
19   Administration, have put forth regarding
20   classification and labeling of chemicals.
21             And the reason that that is
22   important -- and I think I discuss it in more
23   detail in other parts of my report --
24   actually, I do at the bottom of that same

Page 355

1    page, they provide information regarding
2    substances and concentration limits in
3    regards to hazard labels, hazard
4    identifications, and for -- in this
5    particular case we're referring to asbestos,
6    and they provide for carcinogens a .1% cutoff
7    in regards to labeling or including a
8    material as being present in a compound on an
9    MSDS or on a hazard label or identification
10   label.
11   BY MR. SOILEAU:
12        Q.   Is asbestos a carcinogen?
13        A.   IARC has classified asbestos as
14   a known human carcinogen.
15        Q.   Is asbestos a known carcinogen
16   for ovarian cancer?
17        A.   I believe I discussed this in
18   my report.  I believe IARC found that the
19   heavy occupational levels of asbestos
20   exposure associated with ovarian cancer, I
21   can't remember offhand if they also
22   classified it as a Group 1, but they
23   certainly said that heavy occupational
24   exposures are associated with ovarian cancer.

Page 356

1         Q.   I appreciate that.  I'm
2    really -- I was asking you whether, as a
3    carcinogen, asbestos included -- or it was
4    determined that asbestos caused, among the
5    cancers it causes, ovarian cancer?
6              MR. FROST:  Objection.
7              MR. SOILEAU:  Yeah, that's not
8    really a question, so it's okay.
9    BY MR. SOILEAU:
10        Q.   I'm still a little lost -- I
11   guess we can just agree on this:  That
12   document, Tuttle Exhibit 33, does not include
13   a specific definition of
14   nonasbestos-containing, agreed?
15             MR. FROST:  Objection.
16        A.   Again, as I said, this provides
17   guidelines regarding whether components need
18   to be listed as an ingredient on an MSDS or
19   need to be listed or taken into account when
20   assessing labeling or hazard assessment
21   guidelines and things like that for which
22   they have a .1% cutoff for carcinogens such
23   as asbestos.
24             ///

Page 357

1    BY MR. SOILEAU:
2         Q.   There's no definition of
3    nonasbestos-containing in Tuttle Exhibit 33,
4    is there, Doctor?
5              MR. FROST:  Objection.
6         A.   Again, as I said, it provides
7    guidelines on whether something is required
8    to be included on an MSDS as an ingredient or
9    a component of a product, and guidelines
10   regarding the labeling and hazard
11   identification.
12   BY MR. SOILEAU:
13        Q.   Is it your testimony to this
14   court, Doctor, that as you suggest on page 34
15   of your report, Tuttle Exhibit 33 includes a
16   definition of nonasbestos-containing?
17             MR. FROST:  Objection,
18   misstates the report, misstates her
19   testimony.
20        A.   Again, so as I state in that
21   one sentence and later on again I cite
22   something, the EPA guidelines, which do offer
23   a specific definition for
24   asbestos-containing, which is actually more

90  (Pages 354 to 357)

Kelly Tuttle, Ph.D.

Page 358

1    lenient than the Global Harmonization
2    Standard.
3         What the Global Harmonization
4    Standard does is provide guidelines over what
5    is required to be listed as an ingredient or
6    component in regards to labeling.
7         MR. SOILEAU:  I think I'm just
8    required to move to strike as
9    nonresponsive.
10   BY MR. SOILEAU:
11        Q.   You didn't cite EPA in that
12   sentence, did you?
13        MR. FROST:  Objection.
14        A.   No, I cite it in the next
15   sentence, I believe.
16   BY MR. SOILEAU:
17        Q.   Well, you cite many, many
18   articles through your report.  I mean, you've
19   got pages and pages of references that you
20   cite through your report, right?
21        A.   Yes, that's true.
22        Q.   But I'm only asking about one
23   sentence.  You understand that?
24        A.   Well, again, you're asking

Page 359

1    about an asbestos-containing definition, and
2    in the very next sentence in my report --
3         Q.   No.  No, I'm asking you:  You
4    say this by definition -- and you used the
5    words "nonasbestos-containing."  You open
6    paren, United Nations, comma, 2017, close
7    paren, period.  It is the only citation you
8    offer for that sentence.
9         And I'm asking you if you can
10   at least acknowledge for the record that that
11   document, in its many, many pages, Tuttle
12   Exhibit 33 does not include a definition of
13   nonasbestos-containing.
14        MR. FROST:  Objection.
15   BY MR. SOILEAU:
16        Q.   That's all I'm asking.  It's
17   very straightforward.
18        A.   Well, again, the reason it is
19   the only reference cited in that particular
20   point is we are talking about the .1% cutoff.
21   In the next sentence we go to the 1% cutoff
22   established by US EPA that does actually
23   define asbestos-containing.
24        What the Global Harmonization

Page 360

1    Standard does, as I said previously, provides
2    guidelines on whether materials have to be
3    included as an ingredient in a material
4    safety data sheet or on a label or a hazard
5    label put on a product.
6         Q.   Is that the best answer you can
7    offer to the question I asked?
8         MR. FROST:  Objection.
9         A.   I'm trying to be as clear as I
10   can be.
11   BY MR. SOILEAU:
12        Q.   I have to disagree with you,
13   Doctor.  I'm asking you if the document in
14   front of you includes a definition of
15   nonasbestos-containing, and it can be no, yes
16   or I don't know.
17        MR. FROST:  Objection, asked
18   and answered.
19   BY MR. SOILEAU:
20        Q.   But it is the one document --
21        MR. SOILEAU:  It has been
22   asked, but it has not been answered.
23        MR. FROST:  Disagree.
24   Objection.

Page 361

1         MR. SOILEAU:  Well, you're
2    stipulating that it's not in there?
3         MR. FROST:  I'm not testifying
4    here today.
5         MR. SOILEAU:  Do you stipulate
6    that she has testified it's not in
7    there?
8         MR. FROST:  I -- the record
9    says what it says.
10        MR. SOILEAU:  Very good.  I
11   agree.
12        MR. FROST:  I stipulate that
13   you've asked this question several
14   times and the witness has given
15   answers to it several times.
16        MR. SOILEAU:  I will agree with
17   that.
18   BY MR. SOILEAU:
19        Q.   It's not in there, is it,
20   Doctor?
21        MR. FROST:  Objection.
22        A.   So --
23   BY MR. SOILEAU:
24        Q.   You can't say it?

Kelly Tuttle, Ph.D.

Page 362

1    A.    Again, as I said before, I
2  don't believe the word "asbestos-containing"
3  specifically occurs in this document, but
4  that being said, there are guidelines
5  regarding whether the -- and again, it's
6  that .1%, whether a material is required
7  under the Global Harmonization Standard to be
8  listed as an ingredient of a product on a
9  material safety data sheet or on a label.
10   Q.    Let's look at what I have
11 marked as Tuttle Exhibit 34.
12       (Whereupon, Deposition Exhibit
13       Tuttle-34, IARC Monograph on Asbestos,
14       was marked for identification.)
15       THE WITNESS:  If I may, I'm
16 going to need a short break in the
17 near future.
18       MR. SOILEAU:  We're going to
19 take it as soon as we look at this.  I
20 was thinking the same.
21       THE WITNESS:  Okay.
22 BY MR. SOILEAU:
23   Q.    Do you recognize the document
24 that I have given you as Tuttle Exhibit 34?

Page 363

1    A.    Yes, I do.
2    Q.    What is it?
3    A.    I believe it is the IARC
4  monograph for asbestos.
5    Q.    All right.
6       MR. FROST:  Again, I just want
7  to -- for the record, this is the
8  2012, the 100C?  It doesn't have a
9  cover on it.
10      MR. SOILEAU:  I believe that
11 this is 100C, and I'm sorry, I don't
12 see it.
13      MR. FROST:  That's okay.  I
14 just wanted to make the record clear
15 because there are two asbestos
16 monographs.
17      MR. SOILEAU:  I agree.
18      THE WITNESS:  That's true.
19 Thank you.
20      MR. FROST:  Well, that's true.
21 There are some older ones.
22      MR. SOILEAU:  I think what
23 we'll do is go ahead and take a break
24 because I have a page reference here

Page 364

1  and I don't see what I want to ask you
2  about, and I don't want you to sit
3  here while I look for it.
4       So we'll take our break now and
5  come back and I'll pick up with this
6  document.
7       THE VIDEOGRAPHER:  Going off
8  the record at 4:56 p.m.
9       (Recess taken, 4:56 p.m. to
10      5:06 p.m.)
11      THE VIDEOGRAPHER:  We're back
12 on the record at 5:06 p.m.
13 BY MR. SOILEAU:
14   Q.    Okay.  Doctor, I think we've
15 reached our last session for this deposition.
16      Are you ready to proceed?
17   A.    Yes, I am.
18   Q.    What is fibrous talc?
19   A.    So I'm going to be speaking,
20 you know, without exact definitions in front
21 of me, but it is my general understanding
22 that fibrous talc is an elongated particle
23 that meets the World Health Organization or
24 OSHA definitions in regarding to fiber size.

Page 365

1    Q.    Is the question of fibrous talc
2  relevant to the issues that we discussed here
3  today?
4       MR. FROST:  Objection, vague.
5    A.    Generally speaking, you know,
6  in regards to assessing the causal
7  association between talcum powder and ovarian
8  cancer, the testing that we look at in the
9  scientific literature regarding talcum powder
10 insofar as it contains any materials, you
11 know, that would be included in those --
12 those studies.
13 BY MR. SOILEAU:
14   Q.    Do the talcum powder products
15 sold by Johnson & Johnson include, in part,
16 fibrous talc?
17      MR. FROST:  Objection, outside
18 of this witness' area of expertise.
19 BY MR. SOILEAU:
20   Q.    Is that true?
21   A.    Again, I do not -- I think I
22 have one section where I discuss fibrous talc
23 and it's not in relation to its content or
24 lack thereof in Johnson & Johnson baby powder

Kelly Tuttle, Ph.D.

Page 366

1    products.
2         As we discussed earlier, I'm
3    not a mineralogist. I'm not a geologist. I
4    do not offer any opinions in regards to that.
5    I believe others get into the mineralogy more
6    than I do.
7         Q.   Do you know whether fibrous
8    talc is carcinogenic?
9         A.   I am not aware that fibrous
10   talc has been classified as a carcinogen.
11        Q.   All right. Did you rely on any
12   of the testing documents that are part of
13   Appendix C, and specifically the asbestos
14   test in those documents?
15        A.   Again, in my report, I do not
16   get into specifically the testing. I don't
17   reference the asbestos testing in those
18   documents in my report. I look at the
19   scientific literature. I do believe I
20   reference the FDA testing of Johnson &
21   Johnson baby powder regarding asbestos.
22        In my report, I look at
23   Drs. Longo and Rigler, but I don't believe I
24   look at those Imerys and J&J documents as far

Page 367

1    as assessing asbestos content in the
2    Johnson & Johnson's baby powder.
3         Q.   Do you know whether any of the
4    tests were positive for asbestos, that is,
5    the test results included in Appendix C of
6    your report?
7         MR. FROST: Objection.
8         A.   As I said, I didn't go through
9    them, I didn't assess the methodology. I
10   know that there are others that look at that
11   specifically and look at the methodology and
12   the conclusions of those testings.
13   BY MR. SOILEAU:
14        Q.   Right. But you oversaw the
15   design and creation of Appendix C. You told
16   me that earlier, right?
17        A.   Yes, that's correct.
18        Q.   Does Appendix C include in
19   those charts any positive findings on
20   asbestos?
21        MR. FROST: Objection.
22   BY MR. SOILEAU:
23        Q.   You know, in the testing.
24        A.   As I said, there is asbestos

Page 368

1    testing in the appendix, and -- but I did not
2    summarize it in my report. I don't recall.
3    If they looked at the baby powder
4    specifically. I know that there was asbestos
5    testing done and I think that they did have
6    some detections.
7         But again, I did not assess the
8    methodology or the results to be able to
9    discuss those. As I understand, there are
10   others who have done that in more detail,
11   and, you know, they have more -- as I said,
12   I'm not a mineralogist and they discuss that
13   in more detail as regards to the methodology.
14        Q.   So are there any positive
15   findings, though, included in those many
16   pages of charts?
17        MR. FROST: Objection.
18        A.   Again, we can go through each
19   individual chart. I am not aware
20   specifically of any specific to Johnson &
21   Johnson baby powder. As I said, I know
22   there's asbestos testing throughout the
23   table, some of which were positive, but I did
24   not assess them or look at the methodology

Page 369

1    that was used in those, and I believe there
2    are others who do that and -- who do that.
3    BY MR. SOILEAU:
4         Q.   Okay, Doctor. Let's return now
5    to the IARC monograph that we had before our
6    last break, Tuttle Exhibit 34. Let's see if
7    I can do this this time without losing my
8    place.
9         So I've turned to page 294 of
10   Tuttle Exhibit 34, and I'm on Section 5,
11   Evaluation. And I'm looking at the second
12   sentence of that section, Evaluation. It
13   says, quote: "Asbestos causes mesothelioma
14   and cancer of the lung, larynx and ovary,"
15   closed quote.
16        Do you see that statement in
17   the IARC monograph?
18        A.   Yes, I see that statement.
19        Q.   Do you agree with that
20   statement?
21        A.   As I said previously, I'm aware
22   that IARC has found that exposure to high
23   occupational levels of asbestos was
24   associated with ovarian cancer.

93 (Pages 366 to 369)

Kelly Tuttle, Ph.D.

Page 370

1    Q.   Yes, Doctor, but I'm not asking
2    you if IARC said that or if you are aware
3    that IARC said that.  I'm asking you, as a
4    toxicologist, an expert witness put forward
5    in this case on behalf of Johnson & Johnson,
6    if you agree that asbestos causes
7    mesothelioma and cancer of the lung, larynx
8    and ovary?
9            MR. FROST:  Objection, form.
10           A.   Well, again, as I said
11   previously, I'm aware that IARC has stated
12   that high occupational exposures to asbestos
13   is associated with ovarian cancer.  In this
14   particular -- I was retained to look at the
15   body of evidence regarding talcum powder and
16   ovarian cancer.
17   BY MR. SOILEAU:
18           Q.   What level of -- well, let me
19   ask you this.
20           Can we agree that there's no
21   safe level of asbestos for talcum powder
22   products?
23           MR. FROST:  Objection.
24           ///

Page 371

1    BY MR. SOILEAU:
2            Q.   Do you agree with that
3    statement?  There is no safe level of
4    asbestos in the talcum powder products?
5            MR. FROST:  Objection.
6    BY MR. SOILEAU:
7            Q.   For Johnson & Johnson?
8            MR. FROST:  Still objection.
9            A.   Well, again, you know, we were
10   discussing earlier the Global Harmonization
11   Standard and the EPA guidelines that have
12   definitions regarding whether a material is
13   considered asbestos-containing or not, and
14   then we also briefly discussed fibrous talc,
15   you know, and we haven't discussed other
16   things.
17           I know there's been some
18   discussion regarding the methodology of, you
19   know, cleavage fragments in elongated
20   particles as opposed to asbestos.
21   BY MR. SOILEAU:
22           Q.   Wait.  You said cleavage.  We
23   didn't talk cleavage.
24           A.   You're right, we didn't discuss

Page 372

1    cleavage.
2            Q.   That was in Mr. Moore's
3    deposition.
4            MR. FROST:  Objection.
5    BY MR. SOILEAU:
6            Q.   Well, we haven't talked about
7    it today.
8            A.   No, you're correct, we haven't
9    discussed --
10           Q.   Have you done any work on that
11   for Johnson & Johnson?
12           MR. FROST:  Objection.
13           A.   No, I have not.
14   BY MR. SOILEAU:
15           Q.   Okay.  All right.  Go ahead,
16   I'm sorry.
17           A.   I'm just saying that in regards
18   to my report and the research I've done, I've
19   been looking at the scientific evidence
20   regarding talcum powder and the causal
21   association with ovarian cancer and whether
22   the scientific evidence supports it.
23           I'm aware that IARC has, as I
24   stated previously, found that high

Page 373

1    occupational exposure levels of asbestos is
2    associated with ovarian cancer, but I have
3    not, you know, gone into the data regarding
4    asbestos, especially occupational levels of
5    exposure.  I summarize it briefly in my
6    report.
7            Q.   Does asbestos cause ovarian
8    cancer, Doctor?
9            MR. FROST:  Objection, asked
10           and answered.
11           MR. SOILEAU:  If there was an
12           answer in all of that, I promise you,
13           I didn't hear it and I lost it.
14   BY MR. SOILEAU:
15           Q.   I mean, do you have an opinion?
16   You're a toxicologist.  You're here.  We're
17   talking about ovarian cancer.  You knew we
18   were going to talk about ovarian cancer, and
19   you knew asbestos is an issue.  You did the
20   Appendix C.  You've seen Longo and Rigler and
21   you talk about asbestos in your report.
22           Can asbestos cause ovarian
23   cancer, Doctor?
24           MR. FROST:  Objection, form.

94 (Pages 370 to 373)

Kelly Tuttle, Ph.D.

Page 374

1     A.    Well, and again, you know, IARC
2  has certainly stated that heavy occupational
3  exposures to asbestos are associated with
4  ovarian cancer.
5  BY MR. SOILEAU:
6     Q.   Do you believe that's true?
7     A.   I believe that is what IARC has
8  stated. For my -- but for my intents and
9  purposes, I'm looking at talcum powder in
10 ovarian cancer, and as you discussed, we were
11 talking about asbestos testing with talcum
12 powder.
13       But the scientific evidence
14 regarding talcum powder, if it does contain
15 asbestos, which as I stated previously, there
16 are others who get into that in more detail
17 than I do, all the epidemiological studies
18 and all the testing that's been done on the
19 talcum powder product would include any
20 materials that were included in the product,
21 including -- you know, if -- so if asbestos
22 was shown to be present, it would be included
23 in those studies.
24    Q.    I was asking if it caused -- if

Page 375

1  asbestos caused ovarian cancer, but I tell
2  you what, I give up. I don't think I can get
3  an answer.
4        Let me ask you this: If it
5  does, how does it get there?
6        MR. FROST: Objection.
7     A.    Again, I was looking -- I've
8  been looking at talcum powder and ovarian
9  cancer. I'm aware that IARC has classified
10 it. I have not done research into the
11 occupational levels of exposure in ovarian --
12 in asbestos and ovarian cancer.
13 BY MR. SOILEAU:
14    Q.    Doesn't that trouble you?
15       MR. FROST: Objection.
16 BY MR. SOILEAU:
17    Q.    Do you know how asbestos could
18 cause ovarian cancer?
19       MR. FROST: Objection.
20 BY MR. SOILEAU:
21    Q.    However -- if it's
22 occupational, if it's heavy, if it's asbestos
23 workers, if they're cutting asbestos
24 insulation, how does asbestos find its way to

Page 376

1  the ovary?
2        MR. FROST: Objection. Outside
3  of the opinions being rendered by this
4  witness.
5     A.    So again, I was not asked to
6  look at the causal association between
7  occupational exposures to asbestos and
8  ovarian cancer. I was asked to look at the
9  causal association between talcum powder
10 exposure and ovarian cancer and whether
11 there's scientific evidence to support it.
12 BY MR. SOILEAU:
13    Q.    Well, you knew that asbestos in
14 the talcum powder products is an issue, don't
15 you?
16       MR. FROST: Objection.
17    A.    Well, as I said, I am aware
18 that there's been testing. I'm aware the FDA
19 has tested Johnson & Johnson's talcum powder
20 and shown there was no asbestos, and I'm
21 aware that there is other -- there are other
22 experts in this litigation that look at that
23 in greater detail than I have.
24       ///

Page 377

1  BY MR. SOILEAU:
2     Q.    Then you must know it's an
3  issue in the case.
4        MR. FROST: Objection.
5  BY MR. SOILEAU:
6     Q.    Why would we be talking about
7  it if it's not an issue in the case?
8        MR. FROST: Objection.
9     A.    But again, regarding
10 establishing the scientific literature, if
11 you assume that the Johnson & Johnson talcum
12 powder products or that talcum powder
13 contains asbestos, then all the studies that
14 look at talcum powder in epidemiological
15 studies or in other scenarios, then they
16 would contain the hypothetical asbestos as
17 opposed to -- and would have it -- so,
18 therefore, it's included in that scientific
19 literature.
20 BY MR. SOILEAU:
21    Q.    I'm not sure if you're not
22 hearing my question or not answering it
23 despite hearing it, but I need to ask again.
24       If we assume that asbestos can

95 (Pages 374 to 377)

Golkow Litigation Services - 877.370.DEPS

Kelly Tuttle, Ph.D.

Page 378

1    cause ovarian cancer, how does it get there?
2        MR. FROST:  Same objections as
3    I lodged before.
4        A.    And again, I did not research
5    that in -- for this particular thing
6    regarding asbestos, so I -- I don't know.  I
7    can't speak to it.
8    BY MR. SOILEAU:
9        Q.    Does it?
10       MR. FROST:  Objection.
11       A.    Again, I didn't research it.  I
12   can't speak to it.
13   BY MR. SOILEAU:
14       Q.    The fact that asbestos is a
15   cause of ovarian cancer, doesn't that tell
16   you as a toxicologist that it's making its
17   way to the ovary?
18       MR. FROST:  Objection.
19       A.    Again, as I said before, I know
20   that IARC has found that heavy occupational
21   exposures are associated with ovarian cancer.
22   I was asked to evaluate the science regarding
23   perineal exposure to talcum powder and
24   ovarian cancer, not the body of science

Page 379

1    regarding occupational exposures to asbestos
2    and ovarian cancer.
3    BY MR. SOILEAU:
4        Q.    As a toxicologist, 255 hours of
5    looking at this issue, your background,
6    training and experience and the fact that
7    you've worked in asbestos litigation before,
8    doesn't it matter to you if there is asbestos
9    in the talcum powder products?
10       MR. FROST:  Objection.
11       Certainly outside the scope of this
12   witness' testimony she's giving here
13   today on behalf of Johnson & Johnson.
14       MR. SOILEAU:  I don't know why
15   because she offers an opinion about
16   causation.  She has asbestos in her
17   report.  She offers a causation
18   discussion in her report and she's got
19   an appendix, which is some 60-plus
20   pages, I think, of a chart that
21   includes asbestos testing.
22       But in any event, subject to
23   the objection.
24       THE WITNESS:  Okay.  Can you

Page 380

1    repeat the question for me, please?
2        MR. SOILEAU:  Sure.
3    BY MR. SOILEAU:
4        Q.    Does it matter to you if the
5    talcum powder products, including the baby
6    powder that you're using with your newborn
7    son, contains asbestos?
8        MR. FROST:  Objections.
9        MS. WOODS:  Objection.
10       THE WITNESS:  I'm sorry?
11   BY MR. SOILEAU:
12       Q.    Does it matter to you if this
13   product has asbestos in it?
14       MR. FROST:  Objection.
15       A.    Well, again, in looking at the
16   scientific evidence, if we assume that the
17   product has asbestos in it, which again,
18   there has been testing that's shown it does
19   not, and there are others involved that get
20   into the testing and the methodologies in
21   more detail.
22       But if we assume -- and I
23   even -- I think I state this in my report,
24   but even if we assume that the product is

Page 381

1    asbestos-containing, when we look at the
2    scientific literature regarding talcum powder
3    and ovarian cancer, that would include any
4    hypothetical components that were present in
5    the talcum powder.
6    BY MR. SOILEAU:
7        Q.    Does that mean it matters to
8    you or it doesn't matter to you?
9        MR. FROST:  Objection.
10       A.    It means that if the talcum
11   powder -- you know, again, if we assume that
12   it does contain asbestos, which again, there
13   has been testing to show consistently that it
14   does not, that all the studies that are
15   assessing the potential causal relationship
16   between perineal talcum powder exposure and
17   ovarian cancer would also include any
18   asbestos that was hypothetically present in
19   the talcum powder.
20   BY MR. SOILEAU:
21       Q.    So it does matter or it doesn't
22   matter --
23       MR. FROST:  Objection.
24       ///

96 (Pages 378 to 381)

Kelly Tuttle, Ph.D.

Page 382

1    BY MR. SOILEAU:
2        Q.    -- to your analysis and your
3    opinions in this case, Doctor?
4            MR. FROST:  Objection.
5        A.    Again, any -- any of the
6    studies that look at talcum powder -- excuse
7    me.
8            If we assume that the talcum
9    powder -- that Johnson & Johnson's baby
10   powder or Shower to Shower products contained
11   asbestos, even though there has been testing
12   that showed they do not, even if we assume it
13   is there, then the scientific data regarding
14   talcum powder would include any components
15   that were present in the talcum powder when
16   assessing the potential for a causal
17   association between talcum powder perineally
18   and ovarian cancer.
19   BY MR. SOILEAU:
20       Q.    Does inhalation of talcum
21   powder products offer a pathway to the
22   ovaries?
23           MR. FROST:  Objection.
24       A.    I don't know specifically.

Page 383

1    BY MR. SOILEAU:
2        Q.    Okay.  You discuss animal
3    models of talc exposure and toxicity at
4    pages 17 and 18 of your report, correct?
5        A.    Yes.
6        Q.    You have three paragraphs, just
7    three paragraphs there.
8        A.    Yes, that's correct.
9        Q.    Isn't animal study -- well,
10   first, isn't that an early area of focus for
11   you?
12           MR. FROST:  Objection.
13       A.    I did animal studies during my
14   Ph.D., yes.
15   BY MR. SOILEAU:
16       Q.    Did you ever study veterinary
17   science?
18       A.    My bachelor's is in veterinary
19   science, yes.
20       Q.    That's what I was referring to.
21           Your work now with CTEH, is it
22   generally emergency response?
23       A.    Yes, I think I stated earlier
24   that the majority of my work with CTEH is

Page 384

1    emergency response and nonlitigation
2    consulting.
3        Q.    Right.  Were you involved in
4    the BP project at all?
5        A.    No, I was not.
6        Q.    Are you aware of any
7    controversy involving CTEH's role in the BP
8    spill?
9            MR. FROST:  Objection.
10       A.    Very generally, I'm aware of a
11   news article that I believe CTEH drafted a
12   response to.  I don't know any, yeah, real
13   specifics.  I wasn't involved.  It was before
14   my time with the company.
15   BY MR. SOILEAU:
16       Q.    In the materials that you
17   presented with your report and your report, I
18   think, in speaking of qualifications, says
19   that CTEH is associated with the University
20   of Arkansas Medical Sciences BioVentures
21   program.
22           Do you recall that?
23       A.    Yes, I believe that that's
24   stated in my report.

Page 385

1        Q.    CTEH is not associated with the
2    University of Arkansas Medical Sciences
3    school, is it?
4        A.    So it's associated with their
5    BioVentures program, and again, this is
6    obviously before my time, so I can only speak
7    in generalities, but the -- it was originally
8    a start-off from professors at the University
9    of Arkansas.
10       Q.    Well, isn't it true that the
11   BioVentures program is a program that
12   generates spinoff companies that are in the
13   same area generally that CTEH is in?
14       A.    I couldn't speak to other
15   companies that went through the BioVentures
16   program.  I didn't go to the University of
17   Arkansas, and as I said, that was years
18   before I joined CTEH.
19       Q.    Have you heard the phrase
20   "spinoff companies"?
21       A.    I --
22       Q.    I'm sorry, I apologize.  Just
23   to be more clear, in connection with this
24   relationship of CTEH and the BioVentures

97 (Pages 382 to 385)

Kelly Tuttle, Ph.D.

Page 386

1  program?
2      A.   Again, I don't know that I have
3  specifically.
4      Q.   All right.  Take a look at that
5  document, tell me if you've seen that before.
6  That may be a website printout, by the way,
7  if it helps you.
8          THE REPORTER:  Is that marked?
9          THE WITNESS:  35.
10         MR. SOILEAU:  Yes, 35.
11         (Whereupon, Deposition Exhibit
12         Tuttle-35, Listing of BioVentures
13         Spinoff Companies, was marked for
14         identification.)
15  BY MR. SOILEAU:
16     Q.   Have you seen that before?
17     A.   No, I have not.
18     Q.   All right.  Let's go back to
19  the animal studies for a moment.  When you
20  wrote your report, you had Dr. Plunkett's
21  report, didn't you, Doctor?
22     A.   Yes, I did.
23     Q.   Do you know whether you
24  considered -- well, did you identify the

Page 387

1  animal studies that Dr. Plunkett cited and
2  discussed in her report?  In other words, did
3  you take her report and see what studies she
4  had looked at?
5      A.   I certainly looked at the
6  references cited in Dr. Plunkett's report.  I
7  don't recall how in depth I went regarding
8  animal studies as you -- we noted previously.
9  I just briefly touch on animal models of talc
10  exposure and toxicity in section 7.1.
11     Q.   Right.  That struck me.  Isn't
12  it true that animal studies are sort of the
13  foundation of toxicology?
14         MR. FROST:  Objection.
15     A.   There are a lot of different --
16  you know, the foundation of toxicology is the
17  dose makes the poison.  In vitro animal
18  studies and epidemiological or human studies
19  all are encompassed in the science of
20  toxicology and toxicological research.
21  BY MR. SOILEAU:
22     Q.   So it's your testimony that
23  toxicologists deal with in vitro, in vivo and
24  epidemiological studies equally?

Page 388

1          MR. FROST:  Objection.
2  BY MR. SOILEAU:
3      Q.   Is that what you're telling me?
4      A.   As I've said, the in vitro,
5  animal, in vivo or human studies all play a
6  role in toxicological research.
7      Q.   Equally?
8      A.   It would depend on the area of
9  toxicology that you're discussing as far as
10  which one would be used or encountered more
11  frequently.
12     Q.   Are you familiar with a study
13  called Shim, S-H-I-M, 2015, that is noted in
14  Dr. Plunkett's report, paragraph 63, page 43?
15     A.   I -- if you could -- you'd have
16  to provide me where she refers to it in
17  Dr. Plunkett's report.
18     Q.   Right.  Okay.  Well, I'm not
19  going to take the time to do that right now.
20  We've had some long answers and we're going
21  to run out of time shortly.
22          Can we agree that oxidative
23  stress produced by talc is evidence of
24  toxicity of talc?

Page 389

1          MR. FROST:  Objection.
2  BY MR. SOILEAU:
3      Q.   If we have a study that shows
4  oxidative stress produced by talc, is that
5  evidence of toxicity for talc?
6          MR. FROST:  Objection.
7      A.   It would -- it would depend on
8  the study.  As I mentioned earlier, the
9  inflammatory response and things like that
10  are normal processes in the body, and I would
11  need to see the study and what they were
12  looking at and what the conclusions were
13  to -- and what avenue you're discussing
14  regarding mechanism of toxicity.
15  BY MR. SOILEAU:
16     Q.   How about you look at your
17  reference materials and see if you discuss or
18  include in your reference materials a report
19  and animal study by Shim, S-H-I-M, from 2015.
20     A.   No, I do not.
21     Q.   What about Radic, R-A-D-I-C, a
22  1988 study cited by Dr. Plunkett at page 39
23  of her report, paragraph 59, for suppression
24  of immune system function?  Do you include

98 (Pages 386 to 389)

Kelly Tuttle, Ph.D.

Page 390

1   that in your reference materials?
2        A.   No, I do not.
3        Q.   Is suppression of the immune
4   system function evidence of toxicity?
5        A.   Again, it depends.  That's a
6   very general term.  There's not one universal
7   mechanism of toxicity.
8        Q.   Well, can we agree that if
9   Dr. Plunkett cited the Radic 1988 study in
10  her report, that you had notice of this
11  report, this study, and an opportunity to
12  look at both Shim and Radic before you
13  rendered your report?
14       MR. FROST:  Objection.
15       A.   Again, my report, my goal was
16  to assess the scientific literature regarding
17  the potential for perineal talc exposure and
18  causal association with ovarian cancer.  I
19  read Dr. Plunkett's report.  As I said, I
20  looked at the data Dr. Plunkett cites.  I
21  don't claim to have cited every reference
22  that Dr. Plunkett cites, and my specific
23  addresses to Dr. Plunkett are listed herein
24  and I only briefly touch on animal models or

Page 391

1   the animal studies regarding talc exposure.
2   BY MR. SOILEAU:
3        Q.   This is a point that we
4   discussed a bit earlier in your deposition.
5   You said just now you looked at the data
6   Dr. Plunkett cites.
7        Does that mean that if
8   Dr. Plunkett cited Shim and Radic, that you
9   would have looked at those studies?
10       MR. FROST:  Objection.
11       A.   I -- again, I don't claim -- I
12  think I just said that I don't claim to have
13  pulled every single reference that
14  Dr. Plunkett cites.  My address -- you know,
15  my references to Dr. Plunkett's report are in
16  my report and what I address specifically, I
17  did not get into the scientific literature
18  regarding an exhaustive search around animal
19  studies.  As I said, we only briefly -- I
20  only briefly touch on talc exposure in animal
21  studies.
22  BY MR. SOILEAU:
23       Q.   I understand that, but no, no,
24  no, no.  I'm not asking you about the

Page 392

1   thousands of studies that are out there.
2        I'm asking you specifically
3   about studies that Dr. Plunkett had in her
4   report that was provided to you as noted at
5   page 2 of your report, and you said to me,
6   quote, "As I said, I looked at the data
7   Dr. Plunkett cites," period.  "I don't claim
8   to have cited every reference that
9   Dr. Plunkett cites."  And you continue.  Your
10  testimony will speak for itself.
11       I'm just trying to find out if
12  you did, as you said a moment ago, look at
13  the data that Dr. Plunkett cites, including
14  Shim and Radic.
15       MR. FROST:  Objection.
16       A.   So again, you know, the
17  references that I cite in my report are the
18  references that I rely upon in my report.
19  BY MR. SOILEAU:
20       Q.   But not necessarily everything
21  you looked at.
22       A.   Well, you know, we discussed
23  that previously.
24       Q.   Right.

Page 393

1        A.   In looking at Dr. Plunkett's
2   report, my -- the things that I address in
3   her report are listed in my report.  I
4   don't -- and again, I don't get into a
5   detailed discussion of the in vivo studies
6   regarding talc exposure.
7        There's already a lot of
8   evidence in the epidemiological studies in
9   the human studies that I did not spend a
10  large amount of time in the scientific
11  research looking at the animal studies or the
12  in vitro studies, which are useful as we were
13  talking about earlier, but for causation
14  assessment analyses, you know, the human
15  studies are what primarily -- what I
16  emphasized in my report.
17       Q.   Why not?
18       MR. FROST:  Objection.
19  BY MR. SOILEAU:
20       Q.   So why not?
21       MR. FROST:  Why not what?  I
22  don't understand what the why not is
23  to.
24       MR. SOILEAU:  Well, I know,

Kelly Tuttle, Ph.D.

Page 394

1    it's buried in those long answers, but
2    she said "I don't get into a detailed
3    discussion of the in vivo studies
4    regarding talc exposure."
5    BY MR. SOILEAU:
6        Q.    And that's my question:  Why
7    not?
8            You also said, "I did not spend
9    a large amount of time in the scientific
10   research looking at the animal studies."
11           Why not?
12       A.    Because again, I was asked to
13   assess is the scientific literature about a
14   causal association, and while in vivo studies
15   and in vitro studies are useful for looking
16   at various aspects of toxicology, the
17   epidemiological studies and the studies that
18   I spend -- you know, those are the ones that
19   we use as far as epidemiological and
20   human-based, if they're available, for
21   establishing a causal association or seeing
22   if the data supports a causal association.
23       Q.    Let's do a couple more from
24   Dr. Plunkett's report.  Beck 1987, for the

Page 395

1    record, it's at page 39 of Dr. Plunkett's
2    report, paragraph 59.  It's cited for
3    macrophage phagocytosis inhibited and
4    elevated enzyme levels.
5        A.    And what was the question?
6        Q.    Did you look at the Beck '87
7    reference list?
8        A.    Again, I don't cite a Beck
9    article in my report.
10       Q.    Okay.  Can you agree that
11   elevated enzyme levels is evidence of
12   toxicity?
13           MR. FROST:  Objection.
14       A.    Again, it would depend, as we
15   discussed previously, there's not a universal
16   mechanism of toxicity.  I would need to see
17   the study and see what the parameters are,
18   what they're looking at.
19   BY MR. SOILEAU:
20       Q.    If, in a human body, the
21   macrophage phagocytosis is inhibited, is that
22   evidence of toxicity?
23           MR. FROST:  Objection.
24       A.    Again, it depends.

Page 396

1    BY MR. SOILEAU:
2        Q.    Are animal studies -- can we
3    take animal -- mammalian animal studies and
4    apply those to humans?  That is, if we see a
5    toxic effect in mammalian species, is it fair
6    to expect that we will see those in humans as
7    well?
8        A.    No, you need more information.
9    As I said before, animal studies are
10   certainly useful tools, but animal studies
11   are -- you know, animals do not share
12   identical mechanisms or physiological impacts
13   to humans.
14           And so you can't just say that
15   if it exerts a toxic effect in an animal that
16   it will assert a toxic effect in a human.
17   You would need more research and more
18   information.
19       Q.    What good are animal studies if
20   we can't apply them to humans?
21           MR. FROST:  Objection.
22       A.    Well, again, what I said was
23   that you need more information as far as
24   animal studies.  Animal studies are useful,

Page 397

1    they help us understand different things
2    depending on the questions asked, but you
3    cannot just take a single animal study and
4    directly apply it to human toxicity or
5    human -- human information.
6    BY MR. SOILEAU:
7        Q.    And you're saying animal.  I
8    just want to make sure it's clear that I'm
9    asking you specifically about mammalian
10   studies.  Is that understood?
11       A.    Yes.
12       Q.    Okay.  But your testimony is
13   the same, right?
14       A.    Well, again, as I said, you
15   know, animal studies are useful.  As far as
16   the application to human, you would need more
17   information there.  You know, as I stated
18   before, the anatomy and physiology of animals
19   is not identical to human anatomy and
20   physiology.
21       Q.    What animal model is the most
22   appropriate to study ovarian cancer?
23           MR. FROST:  Objection.
24           ///

Kelly Tuttle, Ph.D.

Page 398

```
1    BY MR. SOILEAU:
2       Q.   Do you know?
3       A.   I briefly discussed some of the
4    ovarian -- models, animal models of ovarian
5    cancer.  It would depend on what question you
6    were wanting to answer.
7       Q.   Well, I'm just -- if I -- if
8    the object is to study ovarian cancer, which
9    model is the most appropriate?
10         MR. FROST:  Objection.
11      A.   Again, it would depend on the
12   hypothesis that's being tested.
13   BY MR. SOILEAU:
14      Q.   Let me show you what I'm going
15   to mark as Tuttle Exhibit 36.
16         (Whereupon, Deposition Exhibit
17         Tuttle-36, NTP Study, Toxicology and
18         Carcinogenesis Studies of Talc, was
19         marked for identification.)
20   BY MR. SOILEAU:
21      Q.   Is this the NTP study, Doctor,
22   that you reference in your report?
23      A.   I'm just double-checking.  Yes,
24   I believe it is.
```

Page 399

```
1       Q.   Very well.
2            I know you have a number of
3    things to say about this report, but I want
4    to ask you:  Isn't it true -- well, first, do
5    you know what an interim evaluation is?
6       A.   I guess it would depend on the
7    context, but --
8       Q.   Well, in the context of an NTP
9    study like this one I just put in front of
10   you.
11      A.   Do they -- I mean an interim
12   evaluation, I guess I'd have to see it used
13   in the context.  Like I said, I know what
14   interim and evaluation mean, but as far as if
15   it's a preliminary study or if the results
16   are not finished yet or what they mean when
17   they say interim evaluation.
18      Q.   Well, what about if I say
19   interim sacrifice, does that help?
20      A.   No, that doesn't.
21      Q.   Okay.  Turn to page 54 of this
22   exhibit, which I have marked as Tuttle 36.
23         MR. ZELLERS:  I'm sorry, what
24         page, Counselor?
```

Page 400

```
1          MR. SOILEAU:  It's on page --
2          MR. FROST:  54.
3          MR. SOILEAU:  -- 54.  Thank
4    you.
5    BY MR. SOILEAU:
6       Q.   I'm interested in the language
7    here that begins within the paragraph to the
8    left below the chart.  It says:  The interim
9    evaluations in the NTP talc study clearly
10   demonstrate a progressive impairment of
11   homeostatic growth regulation in the areas of
12   chronic inflammation and fibrosis associated
13   with talc deposition in rats.
14         You're aware of this finding?
15      A.   As I said, I've read this
16   article or, I'm sorry, I've read this
17   research by the NTP.  I don't know
18   specifically that it's a finding.  Like you
19   say, it's a large document, and there have
20   been several documents that I've --
21      Q.   There have been several --
22      A.   -- read.
23      Q.   Several whats?  I didn't hear
24   you.
```

Page 401

```
1       A.   Oh, I said there have been a
2    lot of articles that I've been reading in
3    accordance with this.
4       Q.   Let's just focus on this
5    sentence then.  It's not to be a memory test
6    so much.  Do you know first what interim
7    evaluations mean here?
8            You said context before.  You
9    know what interim means, you know what
10   evaluation means, but do you know what is
11   meant by interim evaluations as used here at
12   page 54 of this NTP study?
13      A.   Judging from what it's saying
14   here, it sounds like it's -- you know, and
15   again, I'm not the author of this document,
16   so I'm merely having to base this on a single
17   sentence, again, not -- not the entire
18   context of the document.
19         But it looks like there --
20   maybe another word would be preliminary
21   evaluations or evaluations in the ongoing --
22   the ongoing study.
23      Q.   Okay.  And they say that the
24   interim evaluations in the NTP talc study
```

101 (Pages 398 to 401)

Golkow Litigation Services - 877.370.DEPS

Kelly Tuttle, Ph.D.

Page 402

1    clearly demonstrate a progressive impairment
2    of homeostatic growth regulation in the areas
3    of chronic inflammation and fibrosis
4    associated with talc deposition in rats.
5            What does that mean to you,
6    Doctor, as a toxicologist?
7       A.    Well, again, taking the one
8    statement, you know, out of this very
9    substantial document, and there's about five
10   pages of discussion and conclusions that
11   precede this particular paragraph, there
12   are -- so I don't know that I can speak to
13   what the authors are specifically saying
14   here.  There's...
15      Q.    What is homeostatic growth
16   regulation?
17      A.    Again, I don't feel
18   comfortable.  I don't think I can define that
19   scientifically without having a reference in
20   front of me.  I don't want to misspeak.
21      Q.    Okay.  I'm going to the next
22   sentence.  It says:  Hyperplasia --
23   hyperplasia of the alveolar epithelium.
24           Do you know what hyperplasia

Page 403

1    is?
2       A.    Again, yes.  As far as a
3    definition, I wouldn't want to misspeak and
4    misquote the scientific definition in the
5    media -- or sorry, not in the media -- in the
6    scientific literature.
7       Q.    How and why, if at all, is a
8    finding of hyperplasia in the epithelium
9    tissue that's evident at six months and that
10   became more extensive and severe with
11   duration of exposure significant to the
12   issues we discuss here today, Doctor?
13      A.    Well, again, it would depend.
14   In this particular study, it's talking about
15   the lung alveolar and inhalational exposures.
16   I would need to look at more information to
17   determine whether it is applied here.
18           As I said previously, I looked
19   at the perineal application of talcum powder
20   and the causal association with ovarian
21   cancer.
22      Q.    Does hyperplasia have any
23   relationship to carcinogenicity or the
24   development of cancer?

Page 404

1       A.    Well, I believe, if you look at
2    the, actually, next sentence, we do have a
3    definition as far as this NTP document
4    regarding hyperplasia, where they say there
5    was an increased number of cells.
6       Q.    What's that mean, Doctor?
7       A.    It would mean there's an
8    increased number of cells in the alveolar
9    regions that they were looking at in this
10   particular study.
11      Q.    What's going on here?  What's
12   NTP seeing?  Do you know?
13      A.    Hmm?
14      Q.    What is NTP seeing here in
15   these results?
16      A.    NTPC?
17      Q.    NTP.  What did I say?
18      A.    You said NTPC.
19      Q.    No.  I'm sorry.  I meant "see"
20   as with observational.
21      A.    Oh.
22      Q.    Can you help me understand
23   what's going on here in this section of this
24   report from the National Toxicology Program,

Page 405

1    a report that you cited?
2       A.    Again, without being able to
3    refamiliarize myself with the report, just
4    taking a couple of sentences in the
5    discussions and conclusions, I -- I am afraid
6    I can't help you as far as what is NTP, you
7    know, looking at.
8            As I said before, I've read the
9    report, but I don't have a photographic
10   memory, so I can't remember all the nuances
11   in it and all the context.
12      Q.    Very well, Doctor.
13           Let's go back to Exhibit 3.
14   That is the Reference Manual on Scientific
15   Evidence.  You recall we discussed that
16   earlier?  I'm looking at page 646.
17           Do you see the heading D,
18   Extrapolation from Animal and Cell Research
19   to Humans on page 646 of Tuttle Exhibit 3,
20   the Reference Manual on Scientific Evidence?
21      A.    Yes, I see it.
22      Q.    Do you see the second sentence
23   that says:  In qualitative extrapolation, one
24   can usually rely on the fact that a compound

102 (Pages 402 to 405)

Kelly Tuttle, Ph.D.

Page 406

1  causing an effect in one mammalian species
2  will cause it in another species, end of
3  quote.
4          Do you see that?
5      A.   I see that, where it states
6  that, but again, I'd have to look at the rest
7  of the paragraph and the rest of the section.
8      Q.   Sure.  Do you agree with that
9  statement, though?
10         MR. FROST:  Objection.
11     A.   Well, as I said before, and
12  this is dealing in qualitative
13  extrapolations --
14 BY MR. SOILEAU:
15     Q.   It is.
16     A.   As I said previously, we would
17  need more information in regards to an animal
18  study and the extrapolation to humans.
19         As I said previously, the
20  anatomy and physiology in animals is not
21  identical to that in humans, and there are --
22  in fact, it says some different things down
23  here about the mathematical depiction for
24  pharmacokinetics and toxicokinetics for

Page 407

1  extrapolating those kinds of studies to
2  humans.
3      Q.   Doctor, isn't it true that this
4  statement that I read stating:  In
5  qualitative extrapolation, one can usually
6  rely on the fact that a compound causing an
7  effect in one mammalian species will cause it
8  in another species, is a basic principle of
9  toxicology?
10         MR. FROST:  Objection.
11     A.   Well, again, as I've stated
12  before, it would depend -- and again, this
13  doesn't say an effect in one mammalian
14  species will cause an effect in humans.  It
15  just states another species.
16 BY MR. SOILEAU:
17     Q.   Well, that's certainly true.
18  It also says this is a basic principle of
19  toxicology, doesn't it?  Right there?
20     A.   In the next sentence, yes, it
21  states that.
22     Q.   Do you disagree with that?
23         MR. FROST:  Objection.
24     A.   Well, again, as I said, when

Page 408

1  you are -- you know, that animal and cell
2  research is extremely useful to
3  toxicologists, the extrapolation, you need
4  more information than just a general -- if an
5  adverse effect occurs in an animal study,
6  that it will also occur in humans.
7  BY MR. SOILEAU:
8      Q.   Do you know if -- if the
9  Casarett text on toxicology that we talked
10  about earlier in your deposition says two
11  main principles underlie all descriptive
12  animal toxicity testing; the first is that
13  the effects produced by a compound in
14  laboratory animals when properly qualified
15  are applicable to humans.  This premise
16  applies to all of experimental biology and
17  medicine.
18         Does that sound familiar to
19  you?  I don't have -- I didn't bring this as
20  an exhibit.  I didn't know this was going to
21  be an issue, but I have a copy of it here.
22         Do you recognize that language?
23  Two main principles underlie all descriptive
24  animal toxicity testing; the first is that

Page 409

1  effects produced by a compound in laboratory
2  animals when properly qualified are
3  applicable to humans.  This premise applies
4  to all of experimental biology and medicine.
5      A.   Well, again, I don't have the
6  textbook in front of me.  You have put it on
7  the overhead.
8      Q.   True, but --
9      A.   You do note that it says when
10  properly -- if you'd put it back up there,
11  please.
12     Q.   Sure.  You see, I'm just
13  showing it's Chapter 2, Principles of
14  Toxicology, and I just want to show you that
15  it's Chapter 2, Principles of Toxicology,
16  from Casarett, whether you recognize it or
17  not.  I'll put it back up there for you.
18  There you go.
19     A.   So as it says, when properly
20  qualified.  And as I say -- are applicable to
21  humans.  And as I said, when doing animal
22  research, it is very useful to toxicologists,
23  but to apply it to human studies, you -- to
24  apply it to humans, there are -- you can't

103 (Pages 406 to 409)

Kelly Tuttle, Ph.D.

Page 410

1    just -- I can't remember what the exact word
2    I used, but animal studies cannot just be
3    directly applied to humans.  There is more
4    information that's needed, and as it states
5    here, it needs to be properly qualified.
6        Q.    Isn't this statement in
7    Casarett that I am showing you consistent
8    with the statement from the reference manual
9    that we looked at a moment ago, page 646 of
10   Exhibit 3?
11           MR. FROST:  Objection.
12       A.    Well, again, as I said, the
13   extrapolation of animal and in vitro studies
14   to humans, you know, those studies are useful
15   for toxicologists, but there needs to be more
16   information when you're doing extrapolation
17   because the anatomy and physiology of animals
18   is not identical to that in humans.
19   BY MR. SOILEAU:
20       Q.    Are you familiar with the
21   anatomy of ovaries in rats?
22           MR. FROST:  Objection.
23       A.    I'm vaguely familiar with the
24   anatomy.  It's not something that I have done

Page 411

1    research on.
2    BY MR. SOILEAU:
3        Q.    You spend, I think, about 13
4    pages, which I'm calculating at about 20% of
5    the body of your expert report, dedicated to
6    epidemiology.
7           Does that surprise you or do
8    you realize that that much attention is paid
9    to epidemiology in your report?
10       A.    I would have to count the pages
11   to confirm whether your numbers are accurate,
12   but I certainly -- as I stated previously,
13   the available scientific literature does have
14   epidemiological studies and the actual
15   examination of the potential association
16   between talcum powder use and ovarian cancer
17   in humans, and so that would certainly be
18   where I would -- you know, I spent a lot of
19   time in my scientific research.
20       Q.    Is it true that the cohort
21   studies that you discuss in those pages of
22   your report do not include specific dose
23   information?
24       A.    We'd have to look at each

Page 412

1    individual cohort study that -- or each study
2    that I cite for me to be able to say
3    specifically.
4        Q.    You can't tell me whether the
5    cohort studies include dose information as we
6    sit here?
7           MR. FROST:  Objection.
8    BY MR. SOILEAU:
9        Q.    The cohort studies discussed in
10   your report, cohort studies on talcum powder
11   products.
12       A.    Well, as I said, we can look at
13   each individual study and my discussion on
14   them.  There are some that attempt to
15   establish some dose information and some that
16   do not, but I have to look at each individual
17   study.
18       Q.    By the way, this NTP study,
19   this discussion we were looking at, at
20   page 54, where it says:  Hyperplasia was
21   evident at six months and became more
22   extensive and severe with duration of
23   exposure.
24           Does that sound like

Page 413

1    dose-response to you?
2           MR. FROST:  Objection.
3        A.    Again, it mentions duration of
4    exposure, which is one component of dose.
5    BY MR. SOILEAU:
6        Q.    Well, it says more than
7    duration of exposure.  It says became more
8    extensive and severe with duration of
9    exposure.  Here, you can have my page for a
10   moment.
11           More severe, more extensive
12   with duration.  Isn't that dose-response?
13           MR. FROST:  Objection.
14       A.    Well, again, as I said,
15   duration is one component of dose, so --
16   BY MR. SOILEAU:
17       Q.    Right.
18       A.    -- that's certainly
19   preliminary, but again --
20       Q.    So doesn't that say --
21       A.    -- we need to look at that --
22   that is one sentence.  I'd need to look at
23   the data supporting it, but duration is
24   definitely a component of dose.

104 (Pages 410 to 413)

Kelly Tuttle, Ph.D.

Page 414

1    Q.    Right.  But when we have
2    increased dose and increased biological
3    effects, that is, when the effects, the
4    adverse biological effects increase when the
5    dose increases, isn't that the essence of
6    dose-response?
7         A.    That is the study of
8    dose-response, whether the symptom or
9    potential adverse health effect is associated
10   with the dose of a product.
11        Q.    Right.  And NTP in that
12   sentence is describing something that is
13   dose-responsive?
14             MR. FROST:  Objection.
15   BY MR. SOILEAU:
16        Q.    An adverse biological effect
17   that is dose-responsive?
18             MR. FROST:  Objection.
19        A.    Again, in that particular
20   sentence where they're looking at the
21   hyperplasias from inhalational exposure, they
22   certainly note that the hyperplasias were
23   associated with duration.
24             ///

Page 415

1    BY MR. SOILEAU:
2         Q.    Did the Schildkraut study that
3    you looked at in your report include a
4    dose-response relationship?
5         A.    I would need to --
6         Q.    You need it.  I'll give you a
7    copy marked as Tuttle Exhibit 37.
8             (Whereupon, Deposition Exhibit
9        Tuttle-37, 2016 Schildkraut et al
10       Publication, was marked for
11       identification.)
12   BY MR. SOILEAU:
13        Q.    This is a study that you
14   reference in your discussion of epidemiology,
15   isn't it?
16        A.    Yes, I believe so.  I'm
17   actually looking for the spot where I
18   reference it in my report.
19        Q.    Okay.  Do you want to look in
20   your reference list to confirm that you cite
21   it?
22        A.    Certainly.  Yes.
23        Q.    Look at page 25.
24        A.    Yes.

Page 416

1    Q.    Okay.  Didn't the authors in
2    the study marked now as Tuttle Exhibit 37
3    note a dose-response relationship with the
4    duration of use and number of lifetime
5    applications?
6         A.    Yes, I believe I state that in
7    my report, that the authors noted a
8    dose-response based on duration and number of
9    lifetime applications.
10            If I may, I'm sorry.
11        Q.    Go ahead.  Have at it.
12        A.    I was just looking at my report
13   on page 25, where I also note that the
14   significance disappeared when they were
15   interviewed prior or after 2014, and I'm
16   looking for the table in the actual report as
17   well.
18        Q.    Okay.  Was this study adjusted
19   for litigation-based bias?
20            MR. FROST:  Objection.
21        A.    Again --
22   BY MR. SOILEAU:
23        Q.    Is that what you're talking
24   about?

Page 417

1    A.    You know, they noted that there
2    was a difference between pre and post 2014,
3    and I believe that they state something about
4    the media, and I think I quoted heightened
5    awareness of the exposure as a result of two
6    recent class action lawsuits.
7         Q.    But my question, Doctor, is:
8    Did the authors of this study adjust for that
9    effect?
10        A.    As I said, they examined the
11   individuals that were interviewed by whether
12   they were interviewed prior to 2014 or after
13   2014.
14        Q.    Did you state that the
15   case-control studies were not consistent in
16   your report?
17        A.    I believe that I stated that
18   the scientific evidence -- and I actually can
19   refer to the summary in my report so I can
20   make sure I'm accurate regarding the
21   consistency.
22            I believe I say there is little
23   to no consistency among the scientific
24   literature between the studies as shown by

105 (Pages 414 to 417)

Kelly Tuttle, Ph.D.

Page 418

1    the variation between population and
2    hospital-based studies and between
3    case-control and cohort studies, mode of
4    genetic talc application and other places,
5    circumstances and times.
6        Q.    What was your conclusion about
7    the -- well, you reviewed the case-control
8    studies in your report, right?  You list them
9    and discuss them briefly?
10       A.    Yes, that's correct.
11       Q.    And what was the conclusion
12   that you reached?  I don't know that I saw
13   that you said based on these studies I
14   conclude that the case-control studies offer
15   some evidence, no evidence or otherwise
16   describe what evidence those offer.
17            Do you understand what I'm
18   saying?
19       A.    Yes, I think I do.  And if you
20   refer --
21       Q.    Did I miss it?
22       A.    If you refer to page --
23            MR. FROST:  Objection.
24            MR. SOILEAU:  Sorry.

Page 419

1        A.    If you refer to page 29 of my
2    report, after the summary of the various
3    scientific literature regarding, you know,
4    the epidemiological studies, there's a
5    section called Conclusion and Bradford Hill
6    Criteria.
7    BY MR. SOILEAU:
8        Q.    Let me show you something I've
9    marked as Tuttle Exhibit 38.
10            (Whereupon, Deposition Exhibit
11            Tuttle-38, Article, Retire Statistical
12            Significance, was marked for
13            identification.)
14   BY MR. SOILEAU:
15       Q.    Have you had a chance to see
16   this comment that was recently published in
17   Nature?  Do you recognize that journal,
18   Nature?
19       A.    Yes, I know the journal Nature.
20       Q.    Very good.
21            Do you receive it or does CTEH
22   receive it?
23       A.    I don't receive it.  I'm not
24   sure if CTEH receives it at the corporate

Page 420

1    office.  As I said previously, I'm based out
2    of my home right now.
3        Q.    Have you seen this article
4    before today?
5        A.    Yes, I believe I have.
6        Q.    And in what circumstances did
7    you come to see this article?
8        A.    I guess I'm trying to think
9    specifically.  I'm not entirely sure.  As I
10   said, I think have a passing familiarity.  I
11   think I remember seeing something about it
12   generally in the Nature journal.
13       Q.    Do you see the subheading on
14   the first page, Pervasive Problem?
15       A.    Yes, I do.
16       Q.    It says in that paragraph:
17   Let's be clear about what must stop:  We
18   should never conclude there is no difference
19   or no association just because a p value is
20   larger than a threshold such as 0.05 or,
21   equivalently, because a confidence interval
22   includes zero.  Neither should we conclude
23   that two studies conflict because one had a
24   statistically significant result and the

Page 421

1    other did not.  These errors waste research
2    efforts and misinform policy decisions.  We
3    agree, and call for the entire concept of
4    statistical significance to be abandoned.
5            That ends the quote.
6            Are you in a position to agree
7    or disagree with that statement?
8            MR. FROST:  Objection.
9        A.    I'm sorry, you jumped from that
10   paragraph to -- to the next -- when you were
11   reading that, so I don't know where you --
12   your last sentence came from.
13   BY MR. SOILEAU:
14       Q.    Oh, I went to the second page.
15   I'm sorry.  I turned the page.
16       A.    No, I mean, when you ended that
17   paragraph, the paragraph ends with "these
18   errors," and then the next paragraph says,
19   "For example," so I don't know where you went
20   to get the --
21            MR. FROST:  Yeah, the "we
22   agree" part.
23       A.    -- last sentence.
24            MR. FROST:  I don't know where

106 (Pages 418 to 421)

Kelly Tuttle, Ph.D.

Page 422

1     that's coming from.
2          MR. SOILEAU:  Oh, okay.  I'm
3     sorry.
4     BY MR. SOILEAU:
5          Q.    "These errors waste research
6     efforts and misinform policy decisions."  I
7     don't know, so I'm sorry.
8               Would you like me to read it
9     again?
10         A.    Please.
11         Q.    It says:  Let's be clear about
12    what must stop:  We should never conclude
13    there is no difference or no association just
14    because a p value is larger than a threshold
15    such as 0.05 or, equivalently, because a
16    confidence interval includes zero.  Neither
17    should we conclude that the two studies
18    conflict because one had a statistically
19    significant result and the other did not.
20    These efforts waste research efforts and
21    misinform policy decisions.
22             Are you in a position to agree
23    or disagree with that?
24         MR. FROST:  Objection.

Page 423

1          A.    Well, as we said previously on
2     other things, this is -- this is one
3     paragraph taken out of a three-page --
4     appears to be an opinion piece or a comment
5     piece as listed at the beginning of the
6     document, so I don't see any scientific data
7     or anything like that.
8               It appears to be an opinion, so
9     as such, I can't -- I mean, I can't agree or
10    disagree.
11    BY MR. SOILEAU:
12         Q.    Do you have any idea how many
13    epidemiologists or biostatisticians signed on
14    to this opinion piece?
15         A.    I see three authors, and then I
16    see something about 800 signatories.  But I
17    have no clue the qualifications or any of
18    that of who the signatories are.
19         Q.    Or the authors for that matter?
20         A.    That's correct.
21         Q.    I want to ask you a couple of
22    questions about heavy metals.  You talk about
23    heavy metals in your report.  In your
24    opinion, will any heavy metals included in

Page 424

1     the talcum powder products be transported
2     within the lattice of the talc?
3          A.    I think we're getting out of
4     the realm of what I assess in regards to
5     heavy metals in my report.  As I previously
6     said, any of the research around talcum
7     powder and talcum powder products, if we
8     assume heavy metals are present, then that
9     scientific evidence would include any
10    products that would be in the talcum powder.
11         Q.    But if the heavy metal is
12    present, it's present in the talcum powder,
13    right?
14         A.    That's what I said.  If we, you
15    know, assume that the heavy metals are
16    present in the talcum powder, then any
17    testing or any of the epidemiological studies
18    that look at talcum powder would include
19    heavy metals or other -- anything that was
20    present in the talcum powder.
21         Q.    Okay.  Because the effect, any
22    adverse biological effect presented by the
23    heavy metals would be combined with whatever
24    else is going on with the talcum powder

Page 425

1     products, fair?
2          A.    As I said, any study that would
3     look at the talcum powder products would
4     include anything that was present in the
5     talcum powder.
6          Q.    But does the talc have the
7     ability to transport within the lattice of
8     the talc heavy metals?
9          MR. FROST:  Objection.
10    BY MR. SOILEAU:
11         Q.    Do you know what I mean by
12    lattice?
13         A.    I -- I was about to just answer
14    that I don't know.
15         Q.    Okay.  Do you maintain that the
16    use of background limits for ambient air is
17    appropriate when we're concerned about
18    ovarian tissue?
19         MR. FROST:  Objection.
20         A.    Can you --
21         MR. FROST:  As to what?  Yeah.
22    BY MR. SOILEAU:
23         Q.    Well, in your report you talk
24    ambient air, correct?  Background levels of

Kelly Tuttle, Ph.D.

Page 426

1    exposure based on ambient air and standards
2    that apply to ambient air; is that right?
3        A.   I believe I discuss ambient air
4    in regards to background levels of exposure
5    to asbestos.
6        Q.   And you believe that's an
7    appropriate methodology, that is, that you
8    can use those ambient air standards in the
9    instance of ovarian cancer issues?
10       A.   Well, I'm not aware of ambient
11   air standards.  I refer to the fact that
12   everybody is exposed to background levels of
13   asbestos in a brief discussion regarding the
14   available information regarding airborne
15   exposures to asbestos as related to talcum
16   powder use, but for the -- again, for the
17   majority of my report, I'm referencing the
18   perineal application and --
19       Q.   Do you disagree or agree that
20   there is no safe level of asbestos to talcum
21   powder products?
22           MR. FROST:  Objection.
23       A.   I'm sorry, can you repeat that
24   one more time for me?

Page 427

1    BY MR. SOILEAU:
2        Q.   I only want you to answer if
3    you can tell me you agree or disagree,
4    because we -- we're out of time almost.
5            Is there any safe level or can
6    you agree there is no safe level of asbestos
7    when it comes to talcum powder products?
8            MR. FROST:  Objection.
9    BY MR. SOILEAU:
10       Q.   Are you able to agree or
11   disagree with that?
12       A.   I can't agree or disagree
13   without more discussion.
14       Q.   Okay.  I'm going to have to ask
15   you.  You said that you made an election to
16   use Johnson baby powder on your newborn.
17           Do you use it daily on him?
18           MR. FROST:  Objection, outside
19       of the scope of the expert opinions
20       being offered here.
21           MR. SOILEAU:  Well, I disagree.
22           MR. FROST:  You can answer.
23   BY MR. SOILEAU:
24       Q.   I mean, do you use it every

Page 428

1    day, each diapering?
2        A.   Not necessarily each diapering,
3    but I believe I use it every day.
4        Q.   Are you aware of the corn
5    starch alternative?
6            MR. FROST:  Objection.
7        A.   I'm aware that some powder
8    products use cornstarch as opposed to talc,
9    yes.
10   BY MR. SOILEAU:
11       Q.   Did you make a decision to use
12   the talc products instead of the cornstarch
13   products?
14       A.   I don't believe that I made a
15   conscious decision one way or the other.  I
16   bought Johnson & Johnson baby powder for use
17   on my child, and in the course of curiosity
18   as moving forward with this, I did check the
19   ingredients, and it is the talc-containing
20   one.
21       Q.   But you understand there's a
22   choice between talcum powder products in the
23   baby powder line and cornstarch products?
24           MR. FROST:  Objection.

Page 429

1        A.   I was not specifically aware of
2    that, no.
3    BY MR. SOILEAU:
4        Q.   Do you know which one you're
5    buying?
6            MR. FROST:  Objection, asked
7        and answered.
8        A.   As I just said, I ended up
9    looking at the bottle after purchasing it and
10   saw that it is the talc-containing one.
11   BY MR. SOILEAU:
12       Q.   Do you intend to continue to
13   use that product, the talcum powder product,
14   for your newborn?
15       A.   Yes, I do.
16       Q.   Have you read the warning on
17   the bottle?
18       A.   Goodness.
19           MR. FROST:  Objection.
20       A.   I'm trying to remember.  I'm
21   sure I probably saw it, but I can't remember
22   what it said off the top of my head.
23   BY MR. SOILEAU:
24       Q.   Do you know anything about the

108 (Pages 426 to 429)

Kelly Tuttle, Ph.D.

Page 430

1  proper use of Johnson's baby powder for an
2  infant?
3          MR. FROST:  Objection.
4      A.    I know how I use it.  I don't
5  know what you mean by proper use.
6  BY MR. SOILEAU:
7      Q.    Do you know if there's a
8  warning about inhalation hazards for
9  Johnson's -- Johnson & Johnson's talcum
10  powder baby powder?
11          MR. FROST:  Objection.
12      A.    Again, I remember there being
13  a -- I think there was a warning.  I don't
14  remember specifics about what it said.
15  BY MR. SOILEAU:
16      Q.    Are you aware of any talcum
17  powder products that carry a warning
18  regarding a risk of ovarian cancer?
19          MR. FROST:  Objection.
20      A.    No, I'm not aware of that.
21          MR. FROST:  How are we doing on
22  time?  We're done?
23          MR. SOILEAU:  Okay.  I'm going
24  to have to note just for the purposes

Page 431

1  of the record, we've had a lot of
2  long, nonresponsive answers, so I
3  think we will reserve our right to
4  consider a request for more time if
5  necessary just because of the
6  nonresponsiveness and length of some
7  of the answers.
8          MR. FROST:  Okay.  Obviously --
9          MR. SOILEAU:  I know that's
10  something we don't agree on.
11          MR. FROST:  I was going to say,
12  we disagree on that, but that's fine.
13  You can note it for the record.
14          MR. SOILEAU:  That's fine.  All
15  right.  I think that concludes the
16  deposition.
17          MR. FROST:  Yeah, I don't have
18  any questions.
19          THE VIDEOGRAPHER:  This marks
20  the end of the deposition.  We're
21  going off the record at 6:16 p.m.
22      (Proceedings recessed at
23  6:16 p.m.)
24              --o0o--

Page 432

1                  CERTIFICATE
2      I, SUSAN PERRY MILLER, Registered
3  Diplomate Reporter, Certified Realtime
   Reporter, Certified Court Reporter and Notary
   Public, do hereby certify that prior to the
4  commencement of the examination, KELLY
   TUTTLE, Ph.D., was duly sworn by me to
5  testify to the truth, the whole truth and
   nothing but the truth.
6
       I DO FURTHER CERTIFY that the
7  foregoing is a verbatim transcript of the
   testimony as taken stenographically by and
8  before me at the time, place and on the date
   hereinbefore set forth, to the best of my
9  ability.
10     I DO FURTHER CERTIFY that pursuant
   to FRCP Rule 30, signature of the witness was
11 not requested by the witness or other party
   before the conclusion of the deposition.
12
       I DO FURTHER CERTIFY that I am
13 neither a relative nor employee nor attorney
   nor counsel of any of the parties to this
14 action, and that I am neither a relative nor
   employee of such attorney or counsel, and
15 that I am not financially interested in the
   action.
16
17
   _____
18 SUSAN PERRY MILLER, RDR, CRR
   Fellow of the Academy of Professional Reporters
19 NCRA Registered Diplomate Reporter
   NCRA Certified Realtime Reporter
20 Certified Court Reporter
21 Notary Public in and for the
   State of Texas
22 My Commission Expires:  7/9/2020
23 Dated: April 12, 2019
24

Page 433

1          INSTRUCTIONS TO WITNESS
2
3          Please read your deposition over
4  carefully and make any necessary corrections.
5  You should state the reason in the
6  appropriate space on the errata sheet for any
7  corrections that are made.
8          After doing so, please sign the
9  errata sheet and date it.
10         You are signing same subject to
11 the changes you have noted on the errata
12 sheet, which will be attached to your
13 deposition.
14         It is imperative that you return
15 the original errata sheet to the deposing
16 attorney within thirty (30) days of receipt
17 of the deposition transcript by you.  If you
18 fail to do so, the deposition transcript may
19 be deemed to be accurate and may be used in
20 court.
21
22
23
24

Kelly Tuttle, Ph.D.

| | Page 434 |
|---|---|
| 1 | ERRATA |
| 2 | PAGE LINE CHANGE |
| 3 | ___ ___ ___ |
| 4 | REASON: _____ |
| 5 | ___ ___ ___ |
| 6 | REASON: _____ |
| 7 | ___ ___ ___ |
| 8 | REASON: _____ |
| 9 | ___ ___ ___ |
| 10 | REASON: _____ |
| 11 | ___ ___ ___ |
| 12 | REASON: _____ |
| 13 | ___ ___ ___ |
| 14 | REASON: _____ |
| 15 | ___ ___ ___ |
| 16 | REASON: _____ |
| 17 | ___ ___ ___ |
| 18 | REASON: _____ |
| 19 | ___ ___ ___ |
| 20 | REASON: _____ |
| 21 | ___ ___ ___ |
| 22 | REASON: _____ |
| 23 | ___ ___ ___ |
| 24 | REASON: _____ |

| | Page 436 |
|---|---|
| 1 | LAWYER'S NOTES |
| 2 | |
| 3 | PAGE  LINE |
| 4 | ___ ___ _____ |
| 5 | ___ ___ _____ |
| 6 | ___ ___ _____ |
| 7 | ___ ___ _____ |
| 8 | ___ ___ _____ |
| 9 | ___ ___ _____ |
| 10 | ___ ___ _____ |
| 11 | ___ ___ _____ |
| 12 | ___ ___ _____ |
| 13 | ___ ___ _____ |
| 14 | ___ ___ _____ |
| 15 | ___ ___ _____ |
| 16 | ___ ___ _____ |
| 17 | ___ ___ _____ |
| 18 | ___ ___ _____ |
| 19 | ___ ___ _____ |
| 20 | ___ ___ _____ |
| 21 | ___ ___ _____ |
| 22 | ___ ___ _____ |
| 23 | ___ ___ _____ |
| 24 | ___ ___ _____ |

Page 435

1       ACKNOWLEDGMENT OF DEPONENT
2
3
4      I, KELLY TUTTLE, Ph.D., do
   hereby certify that I have read the foregoing
5  pages and that the same is a correct
   transcription of the answers given by me to
6  the questions therein propounded, except for
   the corrections or changes in form or
7  substance, if any, noted in the attached
   Errata Sheet.
8
9
10
11
12  _____
   KELLY TUTTLE, Ph.D.     DATE
13
14
15  Subscribed and sworn to before me this
16  _____ day of _____, 20 _____.
17  My commission expires: _____
18
19  _____
20  Notary Public
21
22
23
24

Kelly Tuttle, Ph.D.

**A**

**a.m** 1:17 8:2,7
  86:9,10,11,13
  147:15,16
**A.O** 13:2
**A.P** 249:4
  250:18 251:2,9
  251:19 293:3
**abandoned**
  421:4
**ability** 49:24
  138:2,24 140:5
  191:8 333:23
  425:7 432:9
**able** 22:23 51:11
  60:7,18 74:18
  84:20 130:6
  131:24 156:3
  157:13 178:14
  178:21 180:16
  184:16 195:18
  196:9 218:24
  283:19 286:1
  313:15 324:20
  340:20 350:7
  368:8 405:2
  412:2 427:10
**absence** 244:22
  342:15
**absent** 154:8
**Absolutely**
  83:23 224:23
**abstract** 170:21
**Academy**
  262:11,15,18
  432:18
**accept** 75:23
  169:24
**accepted** 20:21
  59:21 80:21
  178:19
**access** 105:4
**accomplished**
  108:6
**account** 356:19
**accuracy** 78:4

**accurate** 115:7
  116:23 220:10
  411:11 417:20
  433:19
**accurately**
  157:14 322:24
  324:11 344:8
**acid** 289:22
**acknowledge**
  124:21 136:4
  359:10
**ACKNOWLE...**
  4:11 435:1
**acronym** 223:2
  262:1,6
**action** 417:6
  432:14,15
**activate** 323:23
**activated** 321:20
**actual** 16:18
  75:1 165:22
  287:1 289:5
  349:3 354:9
  411:14 416:16
**acute** 311:6
  313:6 317:19
**add** 163:1 165:9
**added** 202:7
  203:4 293:19
**addition** 19:16
  97:10,23
**additional** 17:22
  26:12 49:19
  51:9 96:20
  144:9 148:7
  159:16 174:12
  261:5 275:2,16
  291:4 318:16
**address** 52:20
  64:12 89:7
  123:11 127:11
  129:6 133:16
  140:11,17
  141:2 179:1
  185:23 236:19
  252:13 281:11
  292:2 315:16

315:20 391:14
  391:16 393:2
**addressed** 32:7
  132:18 143:16
  281:18 293:11
  320:8
**addresses** 207:7
  390:23
**addressing**
  11:14 62:12
  185:23 192:6
  231:10 232:23
  238:23 283:13
  283:14
**addressings**
  137:24
**adjust** 417:8
**adjusted** 416:18
**Administration**
  225:3,7,11,13
  226:4 354:19
**administrative**
  100:8,23
**admittedly** 36:5
**adopted** 229:23
**adverse** 17:10
  17:15 18:19
  19:3,8,18
  23:14,17 24:1
  24:6,15,18
  25:2,7 91:22
  92:7 130:8
  138:19 139:18
  210:12 241:1
  242:1 243:1
  305:18,19
  343:19,23
  408:5 414:4,9
  414:16 424:22
**advised** 223:23
**afraid** 311:12
  405:5
**afternoon**
  147:21 194:3
  303:5
**agencies** 58:13
  201:1 208:6

235:18 239:21
**agency** 141:21
  151:8 200:12
  200:20 201:7
  235:11 238:8
  238:16 239:24
  277:8
**agent** 13:15
  14:14 25:1
  159:13 218:15
  222:21 317:6
  344:4
**agents** 17:11
  18:20 19:19
  23:15 24:2
  343:20
**ago** 8:24 12:2
  37:15,16 42:20
  65:9 80:10
  135:9 329:16
  392:12 410:9
**agree** 17:9 18:23
  19:12 22:15,22
  22:23 23:5,9
  23:19 24:4,16
  51:5,13 52:2
  55:14,23 64:21
  83:15 84:14
  88:18 104:16
  107:23 122:20
  168:18,24
  178:24 180:2
  183:24 188:13
  229:11 230:21
  231:3,18
  232:11,16
  234:6 272:9,24
  273:22 274:12
  274:13,24
  275:14 276:19
  277:1 278:7,14
  305:21 306:7
  306:13 307:13
  309:19 310:17
  325:4 356:11
  361:11,16
  363:17 369:19

370:6,20 371:2
  388:22 390:8
  395:10 406:8
  421:3,6,22
  422:22 423:9
  426:19 427:3,6
  427:10,12
  431:10
**agree/disagree**
  84:22
**agreed** 343:18
  352:15 356:14
**agreement**
  181:5
**aha** 70:10
**ahead** 26:6 55:2
  79:21 84:24
  86:5 94:22
  103:20 114:19
  130:13 143:3
  158:2 197:24
  219:19 237:1
  238:17 258:18
  311:19 320:3
  349:14 351:9
  363:23 372:15
  416:11
**aimed** 34:22
**air** 425:16,24
  426:1,2,3,8,11
**airborne** 426:14
**airways** 312:16
  321:8
**al** 5:20,22 6:2,4
  6:5,7,20 7:10
  159:19 164:12
  166:15 170:13
  172:8 174:16
  190:6 202:24
  206:13 207:3
  320:17 415:9
**Alabama** 2:10
**Alexandria** 2:15
**Alfred** 262:10
  278:19 279:4
  293:15
**allegation** 14:18

Kelly Tuttle, Ph.D.

Page 438

**ALLEN** 2:8
**allow** 89:2,9,23
  165:24
**allows** 236:4
  277:1
**alphabetized**
  158:4
**alternative**
  213:5,11
  286:14 428:5
**alveolar** 321:9
  321:22,23
  322:9,10
  402:23 403:15
  404:8
**ambient** 425:16
  425:24 426:1,2
  426:3,8,10
**amelioration**
  23:17
**amount** 64:15
  393:10 394:9
**AMs** 321:15,17
  322:14
**analyses** 393:14
**analysis** 119:12
  137:9 216:16
  241:8 244:4
  246:12 285:13
  288:11,15
  295:17 297:22
  298:4,5 304:8
  382:2
**analyzed** 288:9
**analyzing**
  296:10
**anatomy** 130:3
  132:11 397:18
  397:19 406:20
  410:17,21,24
**ANDERTON**
  3:7
**Angeles** 2:21
**angle** 29:7
  209:20
**animal** 383:2,9
  383:13 386:19

387:1,8,9,12
387:17 388:5
389:19 390:24
391:1,18,20
393:11 394:10
396:2,3,3,9,10
396:15,19,24
396:24 397:3,7
397:15,21
398:4 405:18
406:17 408:1,5
408:12,24
409:21 410:2
410:13
**animals** 17:16
  19:20 130:9
  150:1 396:11
  397:18 406:20
  408:14 409:2
  410:17
**annoyed** 201:10
**answer** 19:12
  27:13 28:1,16
  52:12 60:18
  65:5 84:21,23
  107:6 118:11
  118:12 122:15
  125:4 236:24
  241:21 246:9
  257:20,22
  258:8,15 267:9
  268:23 311:20
  320:4 360:6
  373:12 375:3
  398:6 425:13
  427:2,22
**answered**
  360:18,22
  373:10 429:7
**answering** 10:8
  198:20 339:9
  377:22
**answers** 361:15
  388:20 394:1
  431:2,7 435:5
**anthophyllite**
  161:12

**anticipated**
  342:10
**anus** 199:14
**apologize** 58:16
  94:21 161:21
  201:13 262:7
  385:22
**apparent** 38:3
**apparently**
  173:22 219:7
  264:5
**appear** 44:8
  165:3 252:18
  353:21
**APPEARAN...**
  4:2
**appearing** 9:1
**appears** 11:7
  23:2 147:9
  161:9 163:3
  171:5,6 173:11
  198:11,23
  199:23 202:3
  218:19 219:11
  281:16 423:4,8
**appendices**
  10:14 11:1,8
  12:1 216:22
  217:7
**appendix** 6:18
  12:12 284:12
  284:15,20,24
  285:19 286:2,4
  286:19,22
  287:11 288:3
  289:13 366:13
  367:5,15,18
  368:1 373:20
  379:19
**apple** 239:13
**apples** 239:10
  239:12
**applicable** 64:17
  65:3 180:18
  214:22 351:22
  408:15 409:3
  409:20

**application**
  62:21 65:20
  68:8 88:15,19
  89:1,8,22 91:2
  91:5 107:15
  108:15 109:7
  110:10,14,19
  110:24 111:3,8
  111:16 112:7
  112:14 113:20
  114:8 115:11
  115:14 116:7
  119:9 120:10
  123:8 124:15
  126:8 127:19
  130:22 135:18
  136:12 150:16
  152:4,5 159:6
  165:15 166:23
  166:24 169:7
  169:16 171:12
  176:1 177:8
  178:9 179:1,3
  179:15,24
  180:19 184:12
  184:19 189:23
  192:7 194:10
  195:7,12,23
  206:16 208:19
  209:10,23
  211:13 212:23
  214:3,18 216:6
  229:16 230:10
  232:2,4 233:9
  233:20,22
  241:15 242:12
  242:17 245:13
  246:18 248:23
  250:11 260:16
  267:14 268:12
  269:1 303:16
  304:17,18
  305:4 332:13
  333:4,10,17
  345:3 397:16
  403:19 418:4
  426:18

**applications**
  416:5,9
**applied** 25:5
  27:1 45:18
  57:14 110:4
  116:8 136:24
  139:14 175:7
  175:23 176:21
  213:14,20
  215:11 244:18
  260:2 333:24
  340:22 348:16
  403:17 410:3
**applies** 408:16
  409:3
**apply** 28:13,15
  87:11 267:1
  268:4 272:3
  396:4,20 397:4
  400:23,24
  426:2
**applying** 123:1
  267:8 268:1
  270:19 271:10
**appreciate**
  117:1 124:7
  130:11 156:12
  341:11 356:1
**approach** 29:6
  77:14
**appropriate**
  15:24 51:2
  54:11 55:24
  56:18 59:7
  127:19 128:11
  129:19 299:19
  397:22 398:9
  425:17 426:7
  433:6
**appropriately**
  58:19 60:19
  122:15
**approximately**
  276:13
**April** 1:12 5:2
  8:2,6 218:3
  219:23 225:4

Kelly Tuttle, Ph.D.

432:23
**area** 34:3 48:18
49:12 89:3,10
89:23 108:6
111:9,17
112:16 113:21
114:9 116:8
138:5 167:10
186:1 199:13
250:12 252:19
260:2 295:20
296:12,13
297:7 315:12
329:20 339:7
339:23 365:18
383:10 385:13
388:8
**areas** 227:5
298:14 400:11
402:2
**argument**
127:23 137:22
**arguments**
128:5
**Arkansas** 18:9
384:20 385:2,9
385:17
**arose** 22:9
**arrive** 28:16
107:16 123:2
267:9
**art** 121:20
**Arthur** 203:8
**article** 7:12
65:14 70:23
72:19 74:14
75:1 85:4,6
113:15 159:3
163:3 165:12
169:2 170:10
171:17,22
172:24 173:22
176:6 178:18
180:10 184:17
193:19 200:4
219:12 220:22
221:3,5 234:14

239:20 252:18
254:12,16,16
254:19,21,22
255:5,8,15,19
256:19 258:21
277:15 320:13
320:22 321:1
325:21 326:1
328:20 329:1
329:12 342:23
384:11 395:9
400:16 419:11
420:3,7
**articles** 35:14
37:17 40:10
42:17 64:10
169:3 177:3,6
188:5,6 191:1
192:1 195:18
205:12 206:4
253:20,22
255:21 256:3
258:24 277:8
302:20 304:13
328:8 358:18
401:2
**asbestos** 7:6
13:16,21 14:4
14:20 161:12
162:21 312:5
353:20 355:5
355:12,13,15
355:19 356:3,4
356:23 362:13
363:4,15
366:13,17,21
367:1,4,20,24
368:4,22
369:13,23
370:6,12,21
371:4,20 373:1
373:4,7,19,21
373:22 374:3
374:11,15,21
375:1,12,17,22
375:23,24
376:7,13,20

377:13,16,24
378:6,14 379:1
379:7,8,16,21
380:7,13,17
381:12,18
382:11 426:5
426:13,15,20
427:6
**asbestos-cont...**
352:5 353:20
353:24 357:24
359:1,23 362:2
371:13 381:1
**ASHCRAFT**
2:13
**Ashton** 219:9
222:10 327:22
**aside** 191:13
194:11
**asked** 10:9
11:11,17 14:22
16:5 24:16
25:4 27:17
35:4 38:5
54:10 57:10
62:3,4,17
66:20 67:9
174:10 212:5
212:16 236:8
248:19 298:7
325:18 360:7
360:17,22
361:13 373:9
376:5,8 378:22
394:12 397:2
429:6
**asking** 23:1,3
47:3 48:1,21
52:23 53:1
55:3,6 60:11
60:13 103:12
108:22 160:18
171:21,22
198:20 209:13
209:15 210:20
210:21,22
215:17 229:22

234:21 241:8
241:20 242:9
242:10 243:24
264:8 273:21
274:3 299:16
310:3 311:16
329:11 331:18
335:20 343:2
345:8 348:11
356:2 358:22
358:24 359:3,9
359:16 360:13
370:1,3 374:24
391:24 392:2
397:9
**aspect** 126:4
**aspects** 49:16,17
72:3 394:16
**aspire** 64:23
**assembled** 123:6
**assert** 396:16
**assess** 27:18
29:9 30:7 49:3
56:7 57:10
62:17 112:10
148:22 149:9
208:19,23
213:9 241:14
287:15 292:5
297:22 298:15
367:9 368:7,24
390:16 394:13
424:4
**assessed** 16:21
31:23 113:11
113:17 119:19
212:21 233:8
245:5 265:18
266:3 271:1
290:12 343:11
**assessing** 24:24
27:10 28:6,21
80:1,2 90:5
91:19 114:5
119:18 156:22
242:11 246:17
246:23 267:7

270:19 275:20
303:3 356:20
365:6 367:1
381:15 382:16
**assessment** 6:10
7:3 16:12
40:20 43:16
57:17 58:2,14
58:20 59:8,13
59:16,19,24
60:3,14,16,22
60:23 63:1
91:1 104:24
105:9,16,22
129:8 193:15
201:18,24
211:5 214:21
215:20 222:6
283:2 301:1
314:23 324:18
330:12 335:2
344:24 345:13
346:12 347:4,7
347:15 348:2,6
348:14 349:4,8
349:17 356:20
393:14
**assessments**
16:11 52:13
58:6,9
**assimilate** 63:6
**assist** 54:10
**assistant** 341:19
**assisted** 100:2
287:1
**assisting** 98:9
**associated** 30:12
51:4,21 52:4
54:11 57:6
66:24 198:10
242:13 336:13
355:20,24
369:24 370:13
373:2 374:3
378:21 384:19
385:1,4 400:12
402:4 414:9,23

Kelly Tuttle, Ph.D.

**association**
11:20 27:20
29:12,19 57:13
62:20 72:20
73:6 75:16
76:6 78:12
80:6 91:14
149:5 155:20
162:20 206:15
212:17 223:20
226:20 227:6
227:12,13,20
232:8 233:14
233:17 236:2
236:10,14
237:12,22
238:22,23
241:4,8 244:8
244:11 251:3
263:7 264:12
264:19 265:7
265:23 266:13
267:3,18
268:18 272:12
272:12 274:9
275:23 276:10
278:12 279:8
279:14 282:11
282:14 300:13
337:13 343:14
345:17,23
346:3,7 365:7
372:21 376:6,9
382:17 390:18
394:14,21,22
403:20 411:15
420:19 422:13
**assume** 10:7
102:7,11
144:15,15
202:10 212:5
249:24 377:11
377:24 380:16
380:22,24
381:11 382:8
382:12 424:8
424:15

**assumed** 61:22
193:3
**assumption**
94:18 277:12
**assumptions**
277:14
**attach** 69:14
**attached** 205:5
219:7,12 220:2
252:10 433:12
435:7
**attaches** 218:23
221:5
**attachment**
26:12
**attempt** 64:11
65:2 322:15
412:14
**attempted**
195:10 292:13
**attention** 411:8
**attorney** 8:24
432:13,14
433:16
**attorneys** 11:12
11:17 27:15,17
28:2,17 34:11
61:11,14 71:1
92:21 104:2
106:16
**attract** 323:23
**Aurora** 13:4,6,7
13:8,10,15,19
**Austin** 73:10
78:23 82:23
114:22
**author** 159:24
172:13 174:21
320:15 401:15
**authored** 211:17
**authoritative**
20:21 21:4,9
21:15
**authority**
225:14,22
226:3 235:16
**authors** 80:17

85:11,16
156:21 279:19
302:21 320:15
321:1 402:13
416:1,7 417:8
423:15,19
**available** 11:13
14:23 56:9
63:24 64:2
71:10 103:24
113:8 115:23
117:21 118:2
118:23 120:17
121:7 138:11
177:22 178:17
194:19 221:20
286:5 304:23
394:20 411:13
426:14
**avenue** 3:8
389:13
**avenues** 327:13
**avoided** 173:6
**aware** 34:9 45:4
67:1 68:12
81:1 95:14
105:13 132:21
209:24 222:24
291:24 306:2
306:14 307:20
310:9,15
320:10 336:5
366:9 368:19
369:21 370:2
370:11 372:23
375:9 376:17
376:18,21
384:6,10
400:14 426:10
428:4,7 429:1
430:16,20
**awareness** 417:5

———————
**B**
**baby** 32:13 36:8
36:15,15 42:7
42:12 226:2

290:13 291:2
291:15 292:9
342:2 365:24
366:21 367:2
368:3,21 380:5
382:9 427:16
428:16,23
430:1,10
**bachelor's**
383:18
**back** 10:15
13:22 36:22
83:2 86:12
87:20 92:19
95:22 114:15
120:15 133:5
135:8 147:18
148:1 149:1
151:14 176:9
180:23 181:21
187:6,23 191:1
201:15 240:9
274:18 284:4
300:3 316:4
326:7,9 331:8
331:22 342:6
346:9 364:5,11
386:18 405:13
409:10,17
**background**
47:17 48:5,17
49:3 51:18
53:2 129:20
379:5 425:16
425:24 426:4
426:12
**bad** 146:21
282:8
**balance** 146:24
**ball** 247:5
**barrier** 253:8
259:15
**base** 333:14
401:16
**based** 42:23
43:11 48:4
57:1 84:5

110:7 112:1
113:9 168:17
183:3 184:16
189:8 194:3
209:15 210:16
210:22 270:10
270:17 291:6
299:3 304:24
333:16 416:8
418:13 420:1
426:1
**basic** 5:8 20:2
82:15 154:20
344:2 407:8,18
**basically** 35:6
**basing** 168:16
221:1
**basis** 22:4 39:20
41:13 85:6
114:13 135:4
154:17 168:23
191:7 218:22
222:3 229:5,11
230:7 231:5
238:12 255:11
289:24 290:5
291:19
**Bates** 217:10
**Bates-number...**
249:14
**bathroom** 35:20
37:1,10,12
**Battelle** 281:7
283:10,16,17
341:14
**Baukholt** 13:1
14:1
**bear** 51:1
**bearing** 171:1
304:12
**bears** 249:14
**BEASLEY** 2:8
**beat** 253:10
**Beck** 394:24
395:6,8
**began** 38:7
**beginning** 13:1

Kelly Tuttle, Ph.D.

78:15,20 83:19
135:16 149:2
181:9 187:24
188:15 262:22
297:1 343:17
423:5
**begins** 71:11
75:13 124:13
135:10 148:10
148:11 204:3
226:12 235:6
252:22 281:1
341:23 400:7
**behalf** 9:2 32:17
129:18 229:24
275:6 370:5
379:13
**believe** 20:13
23:23 24:8
33:24 37:23
38:13 44:10,11
51:19 58:10
70:18,19 75:5
75:20 76:6,13
81:5,12 83:10
83:24 87:7
88:7 99:10
100:6 101:14
102:3,9 103:17
104:2,6,13
105:2 106:5
110:17 114:4
129:5,12
137:10,23
138:13 142:24
143:14,16
148:3 154:4
155:4 158:3
172:17 174:22
176:12,14
202:5 203:5,11
208:11 210:14
213:7 216:2,11
216:19 234:2
255:20 263:16
285:21 286:24
289:15 294:19

302:3 314:9
316:1 319:18
321:20 326:24
334:4 337:16
338:17 341:1,7
348:10 353:16
354:3 355:17
355:18 358:15
362:2 363:3,10
366:5,19,23
369:1 374:6,7
384:11,23
398:24 404:1
415:16 416:6
417:3,17,22
420:5 426:3,6
428:3,14
**believed** 61:24
147:1 175:7
176:23 180:15
185:3
**believes** 66:17
**bell** 162:12
**best** 38:10 65:5
281:13 295:2
360:6 432:8
**better** 145:8
161:7 191:8
198:19 331:23
**beyond** 34:16,19
99:3 213:7
221:4 231:7
241:3,3 281:11
287:18 290:17
317:11
**bias** 416:19
**BIDDLE** 3:2
**Bill** 219:9 342:7
**billed** 96:1,6
100:5 101:17
102:2 275:6,9
**Billing** 5:14,15
93:9,12
**binder** 284:16
**biological** 23:15
203:17 204:4
204:11,15

206:8,14 207:5
207:8,13,14
212:20 214:1
224:10 234:7
236:18 237:23
238:24 244:16
245:8 250:23
252:6 255:19
279:15 295:7
295:11,21
296:1 305:9
333:13 414:2,4
414:16 424:22
**biologically**
232:13,15
234:22 235:2
**biology** 130:4,4
132:12 341:20
408:16 409:4
**biomedical**
342:1
**biophysics**
341:20
**biostatisticians**
423:13
**BioVentures** 7:7
384:20 385:5
385:11,15,24
386:12
**bit** 30:19 48:20
155:5 188:13
238:17 243:4
325:20 391:4
**black** 141:23
143:8,12
**bodies** 137:17
312:21 313:5
316:22 317:12
317:18
**bodily** 135:21
136:8 137:8,13
**body** 11:19,19
16:6,12,17,22
17:16 27:11,18
28:6,14,21
29:10 30:7
31:22,24 39:2

40:22,22 41:23
42:11 43:19,20
44:20,24 56:8
57:2,11,12
62:5,10,18
63:4,6,22,24
64:2,5 66:21
67:11 80:2
107:14 112:11
113:12,16
114:6 117:3,15
117:19,24
118:4,17,23
119:18,19,23
120:24 121:18
122:19,24
123:6 138:20
140:18,20
141:3 146:7
151:9,10
167:17 227:4
228:10 233:8
236:9,15
239:18,22
241:2 242:11
245:10 247:24
248:10 254:8
254:12,23
256:7,8,15
257:23 258:1
260:18 265:12
266:24 267:16
267:16 268:12
268:24 269:19
270:11 271:11
272:2,5 274:5
274:23 283:2
300:24 314:9
314:14 316:3,6
317:5,10,11
326:17 327:2,5
328:9 329:23
329:24 335:22
344:5 346:6
370:15 378:24
389:10 395:20
411:5

**body's** 314:16
319:6
**bones** 154:8
**bottle** 429:9,17
**bottom** 146:24
202:22 322:14
354:24
**bought** 428:16
**boundaries**
130:16 133:10
247:16,19
**BP** 384:4,7
**Bradd** 13:8
**Bradford** 27:1
28:15 73:10
75:19 76:12
77:15 78:23
82:24 114:23
203:8 419:5
**brain** 314:20
**brand-new**
20:16
**Brands** 30:21
**breach** 253:7
259:14
**break** 85:23
86:2,7,16 96:8
125:16 146:16
147:11,12
148:6 201:15
204:9 224:22
240:4 280:7
283:23 285:15
293:4 331:6
362:16 363:23
364:4 369:6
**break-wise**
85:21
**brief** 50:19 86:3
206:3 285:12
426:13
**briefly** 37:17
58:11 72:4
74:24 158:13
173:19 176:15
291:23 315:16
334:23 337:10

Kelly Tuttle, Ph.D.

Page 442

338:5 371:14
373:5 387:9
390:24 391:19
391:20 398:3
418:9
**bring** 51:18 74:9
76:21 77:5
78:9 269:3
290:3 300:2
408:19
**bringing** 319:6
**brings** 26:24
34:7 54:8
**broad** 2:4 36:1
52:9,15 56:4
120:21 129:24
226:23 296:4
310:22
**broader** 104:1
**bronchial** 321:9
**brought** 112:18
**browned** 271:18
**brush** 340:5
**brushed** 316:12
320:10 330:9
**bulleted** 68:22
**burden** 227:14
**buried** 394:1
**buying** 429:5

**C**

**C** 2:1,19 3:1
6:18 284:12,15
284:20,24
285:19 286:2,4
286:19,22
287:11 288:3
289:13 366:13
367:5,15,18
373:20
**C-U-B-A-N-S-...**
97:14
**C.F.R** 5:10 50:4
**calculating**
411:4
**calculation**
122:14

**California** 2:21
**call** 317:21
421:3
**called** 80:15
81:22 82:14
388:13 419:5
**calling** 181:3
**Campus** 3:3
**Canada** 6:10 7:2
104:24 105:9
105:10,16,21
106:2 201:17
201:24 202:9
202:17,18
204:15,21,24
206:7 207:15
208:2 346:9,20
347:3,15 348:1
348:13,23
349:3
**cancer** 6:8 9:5
11:16,22 27:21
29:14,20 30:13
42:22 45:9
57:14 62:22
65:21 66:24
68:9 88:1 91:3
91:14 130:4
141:21 149:6
153:18 197:6
197:17 198:5,8
198:10 199:7
199:12 200:8
207:2 212:19
218:15 222:21
226:16 227:22
228:1 233:15
236:11 242:14
244:9 245:4,13
246:19 247:1
248:24 252:24
257:3 264:21
265:24 268:19
275:24 293:21
306:19,24
307:11 308:6
308:16 310:14

330:13,18
331:15 333:10
334:18 335:1
335:11,22
336:21 337:7
337:14 343:15
345:17 355:16
355:20,24
356:5 365:8
369:14,24
370:7,13,16
372:21 373:2,8
373:17,18,23
374:4,10 375:1
375:9,12,18
376:8,10 378:1
378:15,21,24
379:2 381:3,17
382:18 390:18
397:22 398:5,8
403:21,24
411:16 426:9
430:18
**cancers** 228:13
326:20 336:6
356:5
**capital** 321:15
321:16
**captions** 12:21
**carbon** 141:23
143:8,12
158:21 159:4
159:12 182:16
183:5 189:21
**carcinogen**
355:12,14,15
356:3 366:10
**carcinogenesis**
7:9 218:13
226:13 231:1
232:10 336:12
338:4 398:18
**carcinogenic**
305:24 306:10
307:7,16
309:19 310:6
324:15 366:8

**carcinogenicity**
210:21 227:19
330:21 338:9
339:4 403:23
**carcinogens**
355:6 356:22
**carcinomatous**
163:12
**Care** 3:15
**career** 33:13
**carefully** 433:4
**carry** 430:17
**Casarett** 20:19
20:24 21:10
22:1,16 25:11
25:14 26:20
45:24 408:9
409:16 410:7
**cascade** 207:1
317:21,21
318:22 319:8
324:24 325:12
325:18,19
330:20
**cascades** 319:14
**case** 15:1,19,24
16:16 26:23
30:15 32:11
42:21 53:22
57:10 61:23
96:19 118:1
119:6 130:17
133:9 139:5
145:5 165:18
178:6,11,15
212:11 229:19
230:15 263:21
265:10 266:10
268:16 285:1
289:19 324:19
340:8 343:5
355:5 370:5
377:3,7 382:3
**case-control**
294:11 417:15
418:3,7,14
**cases** 1:8 13:15

13:23 158:20
**cast** 194:22
**causal** 11:20
27:2,19 29:12
29:18 57:13
62:20 76:5
78:12,21 82:14
84:4,12 91:13
119:12 122:4
155:20 212:17
226:21 232:8
233:14,17
236:2,10
237:12,22
238:22,23
241:4,8 244:11
246:24 264:19
265:1,7,14,23
266:13 267:3
267:17 268:17
275:22 300:13
300:23 301:1
337:13 343:14
345:17,23
346:2,7 365:6
372:20 376:6,9
381:15 382:16
390:18 394:14
394:21,22
403:20
**causality** 228:19
230:22 231:20
240:19 279:20
**causally** 30:12
66:23 242:13
**causation** 72:20
75:16 79:13
80:6 155:6,7
155:10,15,21
237:7 239:13
246:12,17
299:6 379:16
379:17 393:13
**causative** 73:7
218:15 222:21
**cause** 74:10
75:23 79:1

Kelly Tuttle, Ph.D.

Page 443

91:5 92:7
112:15 120:11
163:12 207:2
220:14 221:10
241:16 299:21
300:1 311:4
312:22 313:6
325:10 333:9
373:7,22
375:18 378:1
378:15 406:2
407:7,14
**caused** 106:6
162:11 305:19
356:4 374:24
375:1
**causes** 227:21
304:7 307:8
309:20 310:8
310:10 356:5
369:13 370:6
**causing** 206:10
406:1 407:6
**cavity** 165:4
168:9 228:6,9
229:1 281:10
326:16
**cell** 405:18
408:1
**cells** 306:4 314:1
314:6 316:21
323:24 330:4
344:4 404:5,8
**center** 319:6
**central** 313:10
313:19 314:4
321:16
**certain** 164:21
272:3 305:20
**certainly** 22:3
24:14 25:5
40:6 41:10,22
42:9,10 44:7
48:3 63:21
64:11 65:2,12
69:15 72:24
78:16 81:17

84:20 128:8
133:3,15 136:5
138:7 139:3
157:11 163:3
204:20 209:24
225:6 229:8
230:21 231:18
258:22 302:9
312:20 313:4
313:16 316:20
317:18 325:10
355:23 374:2
379:11 387:5
396:10 407:17
411:12,17
413:18 414:22
415:22
**CERTIFICA...**
4:9 432:1
**Certified** 1:18
1:20 432:2,3
432:19,20
**certify** 432:3,6
432:10,12
435:4
**cervical** 162:18
253:8 259:15
**cervix** 161:4
163:13 281:10
**challenge** 95:2,4
95:18 96:15
99:24 102:2
155:13
**chance** 158:11
173:10 176:18
177:3,12,12
178:2 179:10
183:1,4 200:2
277:23 304:14
419:15
**change** 246:4
266:24 434:2
**changed** 245:15
**changes** 163:12
433:11 435:6
**changing** 272:6
**chapter** 5:6

17:18,24 18:3
323:15 409:13
409:15
**Charles** 2:5 9:1
**chart** 98:21
285:18 368:19
379:20 400:8
**charts** 367:19
368:16
**check** 71:13
83:20 85:19
273:22 274:1
302:8 353:23
428:18
**checking** 98:5
**chemical** 18:19
19:18 23:14
92:4 139:16
164:20 165:2
210:11 312:5
318:10 323:22
**chemicals** 7:5
19:8 130:7
338:18 351:15
353:5 354:20
**chemistry** 130:4
**child** 36:12
428:17
**choice** 428:22
**chose** 103:22
**chronic** 400:12
402:3
**cigarette** 227:24
**ciliary** 253:10
**circumstances**
298:11 299:19
312:20 351:19
418:5 420:6
**citation** 142:24
235:16 352:12
352:13 359:7
**citations** 168:15
182:1 200:15
255:1
**cite** 20:13 22:1
28:10 32:2
72:20 73:4

85:3 105:11
118:1 135:4
137:10 144:5
145:4 150:19
158:10 162:8
183:17,23
184:2 188:5,21
189:13,15,15
190:17 191:2
192:10,14,20
196:9 200:20
200:24,24
206:4 208:9,11
208:12 215:19
220:22 234:20
237:10 240:2
251:18,24
252:9 253:19
255:9,12,20
256:12,14
258:21 277:9
286:11 290:15
291:12,22
302:5 327:11
350:18 352:4
354:13,13
357:21 358:11
358:14,17,20
392:17 395:8
412:2 415:20
**cited** 70:19 71:5
78:4 105:16
137:6 141:24
144:21 145:15
146:4 154:12
168:2,22
177:18 184:21
187:21 188:6,8
188:10,16,17
189:1,2 190:20
190:22 191:9
205:10,24
212:2,4 219:18
230:6 236:22
237:21 251:8
253:17 254:15
255:7 256:23

258:23 271:5
285:9 346:1,11
359:19 387:1,6
389:22 390:9
390:21 391:8
392:8 395:2
405:1
**cites** 22:4 85:3
176:8,11
180:11 189:2
390:20,22
391:6,14 392:7
392:9,13
**citing** 84:8
151:16 153:21
200:14 235:5,7
239:19 263:24
281:7 302:24
354:8
**citizen** 16:19
52:6 53:20
**claim** 189:1
390:21 391:11
391:12 392:7
**claims** 279:19
**clarified** 181:4
**clarify** 31:13
55:20 134:17
184:23
**clarity** 100:17
114:5
**class** 417:6
**classically** 24:8
24:22
**classification**
7:4 351:14
353:4 354:2,20
**classified** 355:13
355:22 366:10
375:9
**classifying**
218:14 222:20
**clear** 9:23,24
10:4,7 23:1
47:2 111:12
132:9 138:3,24
140:5 167:9

Kelly Tuttle, Ph.D.

171:20 195:2
208:15 247:2
252:5 269:15
290:10 338:24
360:9 363:14
385:23 397:8
420:17 422:11
**clearance**
152:17
**cleared** 325:2
**clearer** 132:8
**clearly** 91:11
268:21 324:7
339:11 400:9
402:1
**cleavage** 371:19
371:22,23
372:1
**clerical** 100:8,24
**Cleveland** 3:9
**clip** 284:16
**close** 89:14
146:15 162:20
280:6 281:9
359:6
**closed** 69:1
142:18 218:8,9
369:15
**clue** 423:17
**Code** 50:14,17
50:20
**Coherence**
207:16
**cohort** 411:20
412:1,5,9,10
418:3
**colleague** 99:13
**colleagues** 99:5
**collect** 287:11
**collection**
270:18
**column** 161:9
164:23 223:19
**Combine** 218:8
328:3
**combined**
424:23

**come** 42:21 44:2
83:2 89:13
92:19 95:22
104:19 122:14
130:5 196:3
262:2 267:20
323:6,7 336:17
364:5 420:7
**comes** 70:3 75:6
131:18 298:14
301:23 304:23
427:7
**comfortable**
130:14 133:8
133:12 194:4
296:13 339:9
402:18
**comfortably**
296:14
**coming** 37:17
201:12,13
256:20 422:1
**comma** 359:6
**commencement**
432:4
**commencing**
1:17
**comment** 84:20
100:13 229:22
262:23 329:10
329:11 331:1
419:16 423:4
**comments** 49:20
166:1 272:21
322:5
**Commerce** 2:9
**commission**
432:22 435:17
**Committee** 2:6
2:11,17
**common** 38:17
39:18 125:6
126:2
**commonly**
20:24 21:7,15
**communication**
168:8 218:20

219:13 221:3,6
221:15 222:5
342:22
**communicatio...**
264:5 294:5
**communiqué**
219:22 220:19
**companies** 7:7
53:19,19,24
54:14,20 55:7
385:12,15,20
386:13
**company** 34:13
34:23 35:8
48:6,23 49:1
52:3 53:4,15
54:8,10 66:7
95:9 98:21
99:2 342:2
384:14
**comparable**
289:21 290:4
**compare** 60:7
144:24 315:3,4
**compared**
286:10 327:14
329:23 342:13
**comparing**
98:20
**compelling**
218:6 221:22
**competently**
122:16
**competing**
120:19 121:8
121:11
**complete** 11:7
63:20 70:8
79:11 116:17
137:22 191:19
299:13
**complex** 316:13
323:22 330:3
**complexities**
320:12
**complicated**
327:19

**complications**
148:14
**component**
357:9 358:6
413:4,15,24
**components**
255:4 313:12
356:17 381:4
382:14
**composition**
310:19 311:18
312:15 321:8
**compound**
355:8 405:24
407:6 408:13
409:1
**compounds** 19:2
**comprehensive**
64:11
**computer** 124:4
**concentration**
355:2
**concept** 128:15
421:3
**Concepts** 82:15
**concern** 149:5
**concerned**
425:17
**conclude** 39:22
114:11 163:10
418:14 420:18
420:22 422:12
422:17
**concluded** 142:8
187:5 194:8
282:10
**concludes** 73:18
431:15
**conclusion** 40:3
40:16,21 41:16
41:20 172:22
189:6,8 227:21
237:12 257:14
267:21 290:1
418:6,11 419:5
432:11
**conclusions** 43:5

123:2 131:14
172:24 218:20
218:23 238:11
238:12 256:17
272:4 277:14
367:12 389:12
402:10 405:5
**conclusive**
228:18 235:24
236:2 257:15
**condemned** 84:5
**conditions**
158:21 162:18
313:4
**conduct** 38:7
39:15 44:15
58:19
**conducted** 38:21
113:7 148:12
148:21 149:9
287:24
**confidence**
296:20 420:21
422:16
**confidential**
54:23
**confidentiality**
55:3,11
**confirm** 182:11
411:11 415:20
**confirmed**
190:14
**conflict** 229:24
420:23 422:18
**conflicts** 230:14
**confound**
154:24 156:2,4
**confounded**
152:16,22
153:5 154:18
157:3,7
**confounding**
153:1,12,13,17
153:24 154:7
154:21 155:5,8
156:11,14,19
257:4

Kelly Tuttle, Ph.D.

**confronted**
  317:5
**confused** 95:20
  246:9
**conjunction**
  136:18
**connection** 29:5
  150:22 167:24
  225:14 251:4
  349:19 385:23
**conscious**
  428:15
**consecutively**
  217:12
**consequences**
  22:11 46:3,12
**Consequently**
  173:4
**consider** 16:1
  20:19 21:3,23
  56:17 59:7
  72:22 103:9
  129:17 145:14
  205:20 240:16
  240:19 241:11
  244:3 246:12
  254:1 345:19
  431:4
**consideration**
  160:6
**considerations**
  84:11
**considered** 5:17
  15:4 63:4
  102:21 103:5
  104:21 115:5
  158:7 164:9
  166:7 167:24
  170:24 174:24
  191:13,15,21
  192:12 193:10
  196:4 199:17
  204:14 254:13
  256:8 257:24
  345:4 349:2,4
  371:13 386:24
**considering**

55:17 248:11
**consistency**
  203:16 227:6
  227:12 417:21
  417:23
**consistent**
  182:20 242:5
  263:19 264:9
  410:7 417:15
**consistently**
  381:13
**constituent**
  14:19
**consulting** 384:2
**consumer** 263:7
  264:13 272:13
  274:9 276:11
  281:21 287:18
**consumers**
  16:19 52:6
  53:20
**contact** 33:2
  45:1 52:22
**contacted** 32:16
  32:19 39:24
**contain** 374:14
  377:16 381:12
**contained**
  382:10
**contains** 365:10
  377:13 380:7
**content** 216:16
  365:23 367:1
**contents** 201:2
**context** 51:10,12
  79:7 82:21
  113:17 115:9
  123:5 127:10
  135:16 136:11
  137:8 144:9
  145:21 156:3
  156:15 157:10
  157:13 177:2
  196:18 220:23
  227:4 230:5,20
  234:8 237:8,15
  245:9,10 247:9

247:12,23
  250:9,15
  256:22 257:10
  261:6,7 262:16
  265:20 272:22
  273:1 274:20
  275:3,16
  283:11 298:10
  298:23 299:2
  300:1,11,15,24
  318:22 325:13
  338:12 399:7,8
  399:13 401:8
  401:18 405:11
**continue** 39:14
  124:20 136:2,4
  152:13 392:9
  429:12
**continues**
  124:22 161:17
  181:9 279:21
  324:24
**contractibility**
  171:11
**contractility**
  170:22 171:15
  171:24
**contribute**
  305:24 306:9
  307:7,16
  309:18 310:6
  337:5
**controversy**
  384:7
**conveniently**
  158:4
**conversation**
  220:23
**conversations**
  61:9
**converse** 295:23
  298:8
**Cook** 285:9,19
  285:24 286:5
  286:10 287:13
  287:19
**copies** 340:17

351:5
**copy** 18:5 50:13
  71:1 81:10
  96:10 105:3
  106:15,17
  162:2 197:24
  273:16 293:17
  340:21 408:21
  415:7
**corn** 428:4
**cornstarch**
  428:8,12,23
**corporate** 18:8
  419:24
**correct** 11:1
  15:7 20:14
  26:21,22 29:23
  44:16 45:2,12
  45:13 48:19
  58:20 71:12
  73:21 76:22
  79:11 83:9
  87:8 102:14
  104:17 108:3
  108:16 109:11
  109:15 110:16
  114:24 115:6
  115:16 116:15
  116:16 117:6
  135:2 162:13
  172:17 174:8
  177:22 181:2
  181:20 183:16
  183:17,19
  184:2 185:12
  186:24 187:21
  187:22 188:16
  202:20 204:17
  207:5 215:6
  216:19 225:7
  248:2 253:19
  267:10,22
  270:21 275:13
  282:21 284:13
  285:17 288:21
  332:2,15
  345:20 347:12

367:17 372:8
  383:4,8 418:10
  423:20 425:24
  435:5
**corrections**
  433:4,7 435:6
**correctly** 18:21
  18:22 22:13,14
  76:1 88:5,7
  102:7,11
  107:18 114:3
  135:24 136:2
  148:16,17
  149:12 152:20
  152:21 173:7,9
  206:19 218:16
  218:18 231:9
  243:17 253:12
  253:14 263:9
  263:15 276:15
  321:18 322:11
**correlative** 73:6
**correspondence**
  281:17 283:6
  304:12 328:14
**cosmetic** 30:21
  31:5 51:1
  149:4 225:15
  225:21 250:24
  252:7 255:20
  257:16 291:2
**coughing** 323:3
**counsel** 2:6,11
  2:16,22 3:5,10
  3:15 8:12 12:1
  93:18 331:6
  432:13,14
**Counselor**
  399:24
**count** 411:10
**couple** 93:5
  228:21 394:23
  405:4 423:21
**course** 21:19
  47:2 81:14
  203:8 284:24
  288:14 289:9

Kelly Tuttle, Ph.D.

318:9 346:11
428:17
**court** 1:1,18
8:14 357:14
432:3,20
433:20
**courtroom** 70:9
336:18
**cover** 20:8 82:8
318:7 327:22
352:24 353:3
363:9
**covers** 21:10
138:18
**Covestro** 13:5
14:16
**Cramer** 176:12
**creation** 367:15
**criteria** 27:5,21
28:4,20 29:24
72:6 73:2,3,9
73:11 78:11
79:5,6,9,12,23
79:24 82:14
84:11 113:18
115:8,10 203:7
203:23 211:12
212:20 227:1,2
227:14,16
233:12 236:16
236:17 237:5,5
243:5 300:3,8
333:14 419:6
**critical** 185:16
185:18 187:10
303:20
**criticism** 60:21
347:14
**criticisms**
348:14 350:3
**criticize** 303:19
**criticizing**
186:23
**CRR** 432:18
**crude** 289:19
**cry** 75:16 80:6
**CTEH** 5:14,15

34:5 37:21
38:11 63:11
93:9,12 95:1,6
95:15,23 96:13
97:9 99:22
101:4,16,24
102:12 289:10
312:3 383:21
383:24 384:11
384:19 385:1
385:13,18,24
419:21,24
**CTEH's** 384:7
**CTFA** 261:23
263:2 272:18
273:2,5 282:22
283:13
**CTFA's** 281:13
**Cubanski** 97:12
287:1
**cuff** 324:8
339:10 344:9
**culminating**
285:11
**cup** 126:11,24
**curiosity** 41:4,7
428:17
**Curriculum** 5:9
26:9
**cursory** 11:6
38:24 39:4,5
169:5 177:24
292:20
**cut** 79:20 130:12
**cutoff** 355:6
356:22 359:20
359:21
**cutting** 375:23
**CV** 26:15
**cytokines** 314:1
330:4
**cytotoxic** 340:10
342:11,16
343:4,8 344:3
345:20
**cytotoxicity**
339:5,14 344:9

346:5

___

**D**

**D** 405:17
**D.C** 3:14
**daily** 427:17
**Dana** 97:11,23
287:1
**dash** 135:22
**data** 54:15 55:5
64:16 131:12
145:3 146:8
170:3 177:4
181:9 188:24
189:18 200:5
200:13 208:8
214:2 229:13
231:7,15 233:1
235:21,23
236:1,9 238:11
248:20 255:8
256:5,15,16
268:3 269:7,8
269:18 270:18
270:19 272:19
274:20 277:12
277:13,16,17
277:21 278:3
279:17 283:8
286:5,9 287:12
288:2 296:6,10
298:12,15,23
299:2 300:19
300:19 301:7
301:12,16
302:21 342:12
360:4 362:9
373:3 382:13
390:20 391:5
392:6,13
394:22 413:23
423:6
**databases** 66:3
**dataset** 248:20
**datasets** 254:18
259:3
**date** 1:17 8:6

220:2 225:4
262:24 432:8
433:9 435:12
**dated** 82:24
282:1,7 432:23
**Daubert** 95:2,3
95:18 96:14
99:23 102:1
155:12,13
**David** 3:21 8:4
**day** 20:17 96:7
198:18 224:11
428:1,3 435:16
**days** 433:16
**deal** 387:23
**dealing** 30:21
64:14 98:12
159:4,5 191:24
406:12
**Dear** 342:7
**DEBBIE** 3:18
**decide** 106:6
298:16 301:8
**deciding** 42:6
**deciphered**
276:14
**decision** 124:6
287:5,9 428:11
428:15
**decision-maki...**
84:8
**decisions** 421:2
422:6,21
**dedicated** 411:5
**deduce** 94:15
**deemed** 433:19
**deep** 161:2,16
**deeply** 162:19
**defend** 61:12
**Defendants** 2:22
3:5
**defense** 61:14
104:3 137:15
140:19,22
141:3 314:8,11
314:15,16,24
315:4,8,9,19

315:20 317:3
322:21 323:12
329:22 330:1
332:1,5,7
**defer** 134:4,5,22
**define** 311:13
324:7 339:11
344:8 359:23
402:18
**defined** 57:22
**defining** 150:13
**definitely**
138:20 300:7
413:24
**definition** 23:22
57:24 58:1
151:23 154:21
156:3,5,10
249:23 250:1
324:10 350:13
352:1,9 353:14
353:17 354:8,9
356:13 357:2
357:16,23
359:1,4,12
360:14 403:3,4
404:3
**definitions**
364:20,24
371:12
**degree** 97:21
**degreed** 97:17
**degrees** 314:11
**demonstrate**
263:6 264:12
272:11 278:11
278:16,17
279:7 282:14
400:10 402:1
**demonstrated**
279:20 281:8
**demonstrates**
274:8 276:4,10
**Department**
225:5
**depend** 24:19
56:10,13 58:12

Kelly Tuttle, Ph.D.

59:10 157:9
214:12,19
297:19 298:10
299:24 318:10
324:17,19
343:9 388:8
389:7 395:14
398:5,11 399:6
403:13 407:12
**depending** 25:3
156:20 288:6
311:4 317:16
318:10 397:2
**depends** 24:7,19
51:24 52:10
92:12 117:23
224:10 296:5
298:11 299:8
299:11 311:22
312:18,18,19
313:1 342:19
390:5 395:24
**depiction**
406:23
**deponent** 4:11
8:11 435:1
**deposed** 9:19
**deposing** 433:15
**deposit** 310:19
311:18 312:15
312:21 313:5
321:8
**deposited** 165:3
165:13 182:17
183:6
**deposition** 1:14
5:1 6:1 7:1 8:8
9:6 12:3 17:17
20:1 26:8 34:1
34:2 50:3
72:10 82:1
93:8,11 102:19
104:14 107:3
141:8 157:19
159:18 164:11
166:14 170:12
172:7 174:15

189:22 197:5
201:16 217:14
218:10 224:17
249:10 261:12
273:11 276:18
280:2 284:19
293:6 313:20
320:16 322:15
328:4 340:14
347:24 351:12
362:12 364:15
372:3 386:11
391:4 398:16
400:13 402:4
408:10 415:8
419:10 431:16
431:20 432:11
433:3,13,17,18
**depositions**
104:7 105:3
202:10,14
**deps@golkow...**
1:24
**depth** 58:11
128:24 177:4
205:19 291:16
304:15 319:17
337:15,21
387:7
**describe** 142:6
157:14 295:2
295:19 328:22
418:16
**described** 23:22
27:14 163:14
200:2 240:20
268:8
**describing**
414:12
**DESCRIPTI...**
5:3
**descriptive**
408:11,23
**design** 367:15
**despite** 377:23
**destroy** 322:16
**detail** 22:21

84:13 88:9
106:14,19
127:13 129:15
131:10 133:1
137:12,20
169:4 176:19
178:3 200:3
207:20 211:7
211:10 216:3
245:9 261:1
290:17 292:4
298:1 337:18
338:17 342:12
347:19 354:23
368:10,13
374:16 376:23
380:21
**detailed** 306:17
314:23 315:7
315:17 316:12
334:20 335:2
393:5 394:2
**details** 273:6
**detections**
289:20 368:6
**determination**
76:5 78:12
122:4 263:5,18
279:6
**determinations**
238:21 272:20
**determine** 11:19
29:17 30:9
43:10 55:15
79:1 214:21
255:11 349:20
403:17
**determined**
103:7,15 356:4
**determines**
271:17
**determining**
55:24
**developed**
300:16 334:11
**development**
9:5 163:4,9

169:10,12
335:11 336:20
337:6 403:24
**developments**
178:13
**develops** 335:22
**diameter** 126:13
**diapering** 428:1
428:2
**difference**
271:19 292:3
417:2 420:18
422:13
**differences** 59:1
**different** 75:8
75:13 76:3
80:4 92:16
94:6 121:14,15
122:7,17 125:9
126:15 127:23
127:23 128:21
130:2,5 137:24
149:20 153:23
156:20 165:14
176:8 185:23
209:13,20
214:17 246:8
253:20 288:6
288:12 290:11
290:19 302:11
313:12 314:1
314:10,10,11
314:15,18,23
325:20 330:4
331:18 387:15
397:1 406:22
**difficult** 253:5
259:13
**ding** 201:11
**dioxide** 141:23
143:9,12
**diploma** 262:17
**Diplomate** 1:19
262:10,15
432:2,19
**direct** 148:7
158:15,16

161:23 168:7
226:10,12
230:24
**direct-to-cons...**
54:4
**directed** 146:2
170:22 171:14
171:23
**directly** 47:20
49:7 53:18
77:11 78:3
397:4 410:3
**director** 219:8
**dis-** 79:5
**disagree** 22:22
22:24 23:9,19
51:13 84:14
168:18,24
180:2 229:8,11
234:6 272:24
273:22 274:12
274:14 275:1
275:11,14
276:19 277:1
278:7 360:12
360:23 407:22
421:7 422:23
423:10 426:19
427:3,11,12,21
431:12
**disappeared**
416:14
**discovered**
40:11
**discuss** 21:21
27:23 30:1
72:2,4 88:7,8
88:23 89:20
116:4 117:12
125:10 126:5
129:14 132:2
133:16,17
151:12 153:10
153:22 169:4
173:19 178:22
179:16 191:8
211:7 297:13

Kelly Tuttle, Ph.D.

| | | | | |
|---|---|---|---|---|
| 319:1 327:7 | 152:11 165:16 | **distracted** 124:5 | **document** 1:7 | 285:18,23,24 |
| 330:5 338:5 | 179:14 195:20 | **DISTRICT** 1:1 | 12:8 50:7,9,12 | 286:6,11,13,17 |
| 347:18,19 | 230:16 235:10 | 1:1 | 50:13,23 72:8 | 287:17 288:20 |
| 348:22 350:7 | 242:16 243:19 | **dive** 38:24 39:4 | 82:18 102:24 | 290:10 292:8 |
| 354:22 365:22 | 243:23 252:20 | 39:5 | 103:1 143:15 | 293:3,13 |
| 368:9,12 | 255:2 274:18 | **diverse** 327:18 | 144:8 146:6 | 344:17 347:9 |
| 371:24 383:2 | 274:22 294:7 | **doctor** 10:21 | 162:4 164:4 | 347:18 366:12 |
| 389:17 403:12 | 308:4 311:10 | 11:11 14:15 | 180:17 187:15 | 366:14,18,24 |
| 411:21 418:9 | 319:14 322:22 | 19:11 21:18 | 198:12 204:21 | 400:20 |
| 426:3 | 325:24 326:2 | 27:24 35:18 | 204:24 208:19 | **doing** 39:17 40:6 |
| **discussed** 24:9 | 327:15 330:7 | 38:21 47:24 | 217:9,13,19 | 43:4 46:10 |
| 32:7 37:20 | 338:17 342:21 | 49:23 50:12 | 221:10,16 | 85:20 119:23 |
| 104:23 105:1 | 342:23 371:10 | 59:5 67:19 | 228:22 230:4 | 122:13 124:8 |
| 106:13,19 | 388:9 389:13 | 68:19 77:14 | 230:19 231:10 | 156:21 193:15 |
| 111:24 113:12 | **discussion** 85:8 | 86:15 88:12 | 233:24 234:4 | 198:19 221:17 |
| 114:21 118:20 | 115:18 127:6 | 94:21 103:2 | 257:11 273:5 | 222:6 231:11 |
| 139:12,15 | 127:17 128:12 | 112:5 120:3 | 276:6 277:16 | 236:21 242:10 |
| 148:6 152:24 | 145:21 158:18 | 121:6 127:15 | 277:21 280:22 | 295:16,17 |
| 153:11 169:3 | 161:8 175:5,15 | 137:7 141:13 | 285:3 286:23 | 296:8 318:15 |
| 176:13 178:8 | 180:5,10,10 | 147:21 150:3 | 287:12 288:7 | 338:20 342:14 |
| 203:9 207:20 | 181:8 186:15 | 156:12 170:18 | 293:10 328:1 | 350:24 409:21 |
| 210:8 219:3,5 | 188:2 202:9 | 175:2 180:6 | 341:18 344:10 | 410:16 430:21 |
| 233:3 234:9 | 204:8 214:7 | 184:22 196:16 | 344:16 347:22 | 433:8 |
| 240:22 252:3 | 252:22 257:7 | 198:4 201:23 | 349:20 350:18 | **dominant** 171:2 |
| 265:21 272:1 | 285:12 339:14 | 205:6 208:24 | 350:22 352:21 | **dose** 17:13 24:11 |
| 290:2 304:7 | 343:18 371:18 | 209:12 213:13 | 353:1,7,11,14 | 24:12,23,24 |
| 319:5 326:9 | 379:18 393:5 | 218:17 221:9 | 353:21 354:1 | 92:15 305:20 |
| 329:21 332:22 | 394:3 402:10 | 229:18 234:18 | 354:10 356:12 | 312:19 313:2 |
| 336:11 337:15 | 412:13,19 | 236:3 239:2 | 359:11 360:13 | 317:17,23 |
| 338:23 339:3 | 415:14 426:13 | 240:12 245:14 | 360:20 362:3 | 318:3 325:10 |
| 346:5,10 | 427:13 | 257:21 263:10 | 362:23 364:6 | 343:24 387:17 |
| 355:17 365:2 | **discussions** | 268:7 277:19 | 386:5 400:19 | 411:22 412:5 |
| 366:2 371:14 | 61:10 405:5 | 284:7 289:1 | 401:15,18 | 412:15 413:4 |
| 371:15 372:9 | **Disease** 72:19 | 302:17 306:21 | 402:9 404:3 | 413:15,24 |
| 374:10 387:2 | **diseased** 252:14 | 307:12 308:10 | 423:6 | 414:2,5,10 |
| 391:4 392:22 | 253:4 260:5 | 318:22 330:15 | **documented** | **dose-response** |
| 395:15 398:3 | **diseases** 148:14 | 331:10 333:7 | 96:2 206:12 | 413:1,12 414:6 |
| 405:15 412:9 | 164:21 | 351:21 353:6 | **documents** | 414:8 415:4 |
| **discusses** 65:4 | **dismiss** 223:22 | 353:12 357:4 | 50:21 68:6 | 416:3,8 |
| 142:5 143:18 | **disprove** 79:13 | 357:14 360:13 | 69:1,5,21 | **dose-responsive** |
| 224:8 256:24 | 118:16 | 361:20 364:14 | 70:11,12 93:16 | 414:13,17 |
| 257:4 291:13 | **disregarded** | 369:4 370:1 | 103:24 145:2,5 | **dots** 172:15 |
| 336:9 | 163:24 | 373:8,23 382:3 | 151:8 188:23 | **double** 172:15 |
| **discussing** 16:3 | **distinction** | 386:21 398:21 | 188:24 208:7 | **double-check** |
| 46:7 59:1 60:4 | 245:22 246:6 | 402:6 403:12 | 216:9,10,12,24 | 76:23 |
| 89:19 118:3 | **distinctly** | 404:6 405:12 | 217:6 235:19 | **double-checki...** |
| 130:15 149:18 | 305:11 | 407:3 417:7 | 238:9 285:8,11 | 98:5 398:23 |

Case 3:16-md-02738-MAS-RLS   Document 9739-11   Filed 05/07/19   Page 124 of 205 PageID: 42132
Kelly Tuttle, Ph.D.

Page 449

doubt 227:20
Doull 20:20
Doull's 20:24
  21:10 22:1
downward
  135:20 136:8
  136:10 137:8
  137:13
Dr 8:21 9:22
  26:24 33:18,20
  97:23 99:1,8
  99:14,18,21
  101:3,19
  107:12 108:2,4
  108:12,22
  109:4,12,14
  110:2,3 124:14
  135:11,17
  136:16 142:5
  158:6 183:21
  185:16,19,20
  186:5,14,18,23
  187:11,14
  223:23 254:20
  259:9 261:10
  261:15,16
  285:9,9 287:13
  287:13,19,20
  301:23 302:14
  303:19,20
  343:3 386:20
  387:1,6 388:14
  388:17 389:22
  390:9,19,20,22
  390:23 391:6,8
  391:14,15
  392:3,7,9,13
  393:1 394:24
  395:1
draft 6:10
  104:24 105:9
  105:16,21
  201:17,23
  346:12 347:4
  347:15 348:14
  349:4,7,16
drafted 9:15

322:24 384:11
drafting 96:19
drew 185:6
drill 290:24
DRINKER 3:2
Drive 3:3
DRONETT 3:18
Drs 183:21
  285:19,24
  286:10 303:7
  366:23
Drug 225:3,6,11
  225:13 226:3
due 152:18
  171:1
duly 8:18 432:4
duration 403:11
  412:22 413:3,7
  413:8,12,15,23
  414:23 416:4,8
dust 322:15
dusted 199:13
dysfunction
  152:17

_____ E _____

E 1:18 2:1,1 3:1
  3:1 12:12
E-G-L-I 158:6
e-mail 33:5,6,8
e.g 301:22
earlier 22:18
  23:24 24:10
  27:14 28:14
  31:1 71:5 76:8
  100:15 102:16
  111:24 113:12
  114:22 139:12
  139:16 142:3
  182:8 210:9
  214:15 219:3,5
  220:18 226:15
  235:10 240:20
  240:23 270:24
  272:1 293:14
  298:7 300:5
  314:8 315:8

321:19 325:19
  326:9,11 330:9
  344:7,17 366:2
  367:16 371:10
  383:23 389:8
  391:4 393:13
  405:16 408:10
early 383:10
easier 220:6
easily 192:5
EASTERN 1:1
ecosystem 23:16
edition 5:13
  20:12,13,15
  22:18 23:2,4,8
  25:14 81:23
  82:3
educated 144:17
education 21:2
  48:5,16 129:19
  138:14 270:17
  292:18,21
educational
  81:16
effect 25:2 74:10
  75:24 79:1
  91:22 92:7
  130:8 138:19
  139:19 210:12
  241:1 242:1
  243:1 305:18
  305:19 316:2
  342:11,16
  396:5,15,16
  406:1 407:7,13
  407:14 408:5
  414:9,16 417:9
  424:21,22
effects 17:10,15
  18:19 19:3,8
  19:18 23:14,18
  24:1,6,15,18
  25:7 138:20
  250:24 252:7
  255:19 342:9
  343:20,23
  408:13 409:1

414:3,3,4
efforts 421:2
  422:6,20,20
Egli 5:19 157:20
  158:6,6,19
  160:1,13 182:5
  182:8,13,15,21
  183:2,10,16,21
  183:21 184:5,9
  187:24 188:15
  189:20
eight 136:15
eighth 20:13
Eighty-Eight
  13:3
either 17:13
  32:20 79:5,10
  79:12 104:14
  107:14 163:13
  169:8,9 190:15
  202:14 208:8
election 427:15
element 298:15
elevated 395:4
  395:11
elicit 228:10
  326:17
eliminated
  223:7,24
ELLIS 2:18 3:7
ELMO 18:15
  22:8
elongated
  364:22 371:19
elucidated
  321:19
embedded 161:3
  162:19 211:1
Embryology
  218:6
emergency
  12:19 383:22
  384:1
emphasis 84:5
emphasized
  76:11,16 84:4
  393:16

employ 48:7
  59:7 145:20
employed 203:7
employee 96:8
  432:13,14
employs 46:22
  47:1,11,20
encompassed
  387:19
encompasses
  130:1
encountered
  388:10
endeavors 81:16
ended 228:15
  421:16 429:8
endometrial
  228:9 326:15
endpoint 40:7
ends 325:17
  421:5,17
engineering
  122:7,13
engineers
  122:13
enter 213:21
  214:4 215:12
entering 199:15
entire 10:21
  51:8,11 63:24
  64:2,5 75:2
  180:17 181:2
  207:4,6 218:1
  228:21 230:4
  237:8 257:10
  300:24 401:17
  421:3
entirely 420:9
entirety 10:23
  163:20 176:7
  207:22 230:20
  309:5 353:2
entitled 72:19
  235:11 250:23
  301:9 306:23
entity 25:24
  26:19 198:5

Kelly Tuttle, Ph.D.

Page 450

225:9
**environment**
17:15 19:4,10
19:21 24:3
72:19 130:9
168:9 344:1
**enzyme** 395:4
395:11
**EPA** 357:22
358:11 359:22
371:11
**epidemiological**
208:22 255:3
257:1 345:24
374:17 377:14
387:18,24
393:8 394:17
394:19 411:14
419:4 424:17
**epidemiologic...**
17:5
**epidemiologist**
301:21
**epidemiologists**
297:10 423:13
**epidemiology**
80:15,23 81:11
81:15,18,20,23
82:13,16 84:3
130:3 243:5
411:6,9 415:14
**epithelial**
228:13 293:21
326:20
**epithelium**
218:11,11,12
253:10 328:5,5
402:23 403:8
**equally** 387:24
388:7
**equivalently**
420:21 422:15
**errata** 4:10
433:6,9,11,15
434:1 435:7
**errors** 421:1,18
422:5

**Es** 158:5
**Escalator**
322:19
**especially** 155:6
373:4
**ESQUIRE** 2:2,3
2:8,13,19 3:2,7
3:12
**essence** 17:9
414:5
**essentially** 26:15
268:2
**establish** 91:13
110:14 155:19
264:19 265:7
412:15
**established** 66:3
73:5 89:1
186:10 226:22
271:9 295:3
359:22
**establishes**
110:9
**establishing**
73:5 78:21
300:12 377:10
394:21
**establishment**
237:7
**estimate** 38:10
92:24
**estimating**
146:22
**et** 5:20,22 6:2,4
6:5,7,20 7:10
159:19 164:12
166:15 170:13
172:8 174:16
190:6 202:24
206:13 207:3
320:17 415:9
**etiological**
164:20
**euphemistically**
282:18
**European** 218:5
**evaluate** 378:22

**evaluated**
301:21
**evaluation**
114:10 240:19
268:11,24
369:11,12
399:5,12,14,17
401:10
**evaluations**
342:1 400:9
401:7,11,21,21
401:24
**event** 12:14
379:22
**events** 38:14
207:1 330:20
**eventually**
175:10 176:3
**everybody**
85:20 426:12
**evidence** 27:19
28:23 29:10,11
29:18 30:8,10
31:24 40:15
41:23 43:7
46:17 57:2,12
62:6,11,19,19
63:4,7,19 65:4
65:19 66:22
67:13,17,20
73:21 74:2,9
75:22 76:9,15
76:21 77:6,10
77:16 78:2,10
88:24 89:21
92:13 110:5,8
110:9,13,18,23
111:2,7 112:12
112:13 113:4,4
113:8,24
114:11 115:21
115:24 116:5,6
117:16,21
118:24 119:1,7
119:13,17
120:6,9,15
121:8,15,22

122:17,19
123:6,17 125:4
127:24 128:3
129:6 130:22
131:4 133:24
136:23 137:3,6
139:4,11,13,22
139:23 142:9
142:16 144:2
147:1 149:24
150:1,15
151:11 155:19
155:24 160:7
161:10 164:9
167:23 170:3
185:3 189:19
191:21,23
192:8 195:22
199:19 206:13
209:16,20,22
210:17,23
212:22,24
214:6 215:4,9
215:10 216:6
218:7,9 221:22
227:7,11
228:19 229:15
230:9,22
231:16,19,24
232:1,7 233:13
233:16,18
235:24 236:2
236:12,16
237:22 238:1
239:4,8,19
240:16,18
241:10,17,22
241:23 243:5
244:10,13,20
246:10,11,23
247:3,11,13,17
247:21,24
248:5,9,11,15
248:15,16
254:2,9,12,13
255:3 256:8,9
256:20 257:1

257:15,24
258:1 260:4,17
260:22 263:6
264:11,18,24
265:5,6,13,19
265:22 266:4
267:8 268:14
268:15,17
269:11 270:6,7
270:9,11 271:2
271:13 272:11
274:8 276:4,10
277:6 278:11
279:7 283:3
295:11 299:5
299:20 303:6
303:15,22
304:23 305:2
328:3 332:11
332:14,16,18
333:2,3,8,14
333:17,23
337:12 343:13
345:15,16
346:6 348:17
370:15 372:19
372:22 374:13
376:11 380:16
388:23 389:5
390:4 393:8
395:11,22
405:15,20
417:18 418:15
418:15,16
424:9
**evident** 403:9
412:21
**exact** 92:23
97:20 114:16
122:14 226:16
227:18 275:8
364:20 410:1
**exactly** 32:21
38:4,6,8 71:7
93:22 118:14
227:9
**examination** 4:6

40:9 173:3,12
255:11 411:15
432:4
**examine** 62:5
84:13 162:17
237:6 274:22
**examined** 17:3
73:24 123:7
195:12,22
199:19 210:16
229:21 417:10
**examines** 171:7
**examining**
89:20 127:24
260:14
**example** 27:9
54:7 97:17
101:8,19
189:19 221:12
227:17,22
314:18 353:9
421:19
**examples** 16:24
**excellent** 65:17
**exception** 11:8
104:15
**excerpt** 5:8,12
5:18 20:2,7
26:20 81:22
82:2,12 141:9
180:24
**exclamation**
281:9
**excuse** 45:18
72:5 180:13
232:1 235:24
382:6
**exert** 91:22
**exerts** 396:15
**exhausted**
172:16
**exhaustive**
391:18
**exhibit** 9:6,11
9:12 10:16,23
12:3,9,12,22
13:20 14:2,13

17:17,23,23
19:14,23 20:1
20:6 22:7 26:7
26:8,21 45:24
49:19 50:1,3,8
69:15 72:9,10
72:15,17 81:24
82:1,8 83:8,17
93:7,7,8,11
94:8,10,11,12
101:7,7,13
102:18,19
104:11 106:24
141:6,7,8,14
142:23 157:17
157:18,19
158:19 159:17
159:18,23
160:2,2 162:2
164:5,11 165:7
166:13,14
167:21 168:6
170:11,12
172:6,7,20,23
174:14,15
175:15 179:21
180:23 181:10
182:9,22
183:11 190:10
190:11 194:8
194:21 196:19
197:4,5 201:10
201:16,21,22
217:10,14
219:6,6 220:5
220:8,14
223:13,16
224:16,17
225:2 235:8
249:9,10
250:19 252:8
256:7 261:9,12
261:20 272:10
273:10,11
274:6 276:3,20
278:10,14,23
280:1,2,9,22

282:6 284:15
284:19 293:5,6
301:19 320:16
320:22 326:8
327:7,21
328:21 329:2,7
329:12 340:13
340:13,14
346:14,17,22
347:23,23,24
348:21 351:11
351:12,22,23
351:23 352:19
353:13,13
356:12 357:3
357:15 359:12
362:11,12,24
369:6,10
386:11 398:15
398:16 399:22
405:13,19
408:20 410:10
415:7,8 416:2
419:9,10
**exhibits** 5:1 6:1
7:1 93:6
341:11
**exist** 282:12
**existence** 330:17
331:13 332:19
336:19
**exists** 55:16
168:9 226:12
**expect** 47:14
48:22 62:9
65:16 336:17
396:6
**expectation** 48:1
48:6
**expel** 323:6
**experience**
47:22 48:5,17
51:18 53:7
129:20 222:11
270:17 296:21
340:2 379:6
**experiment**

127:1
**experimental**
408:16 409:4
**experiments**
254:20 255:10
256:4 259:3
295:4 342:15
**expert** 5:4 6:18
9:7 14:24
21:21 104:3,14
109:3 120:5
229:19 250:3
264:24 284:20
285:1 297:14
336:9 370:4
411:5 427:19
**expertise** 34:3
45:19 49:12,14
52:19 81:19
130:16,17
131:6 132:11
133:11 138:14
138:15 212:14
267:24 270:4
270:24 295:16
296:14,15
297:21 315:13
339:24 340:3
365:18
**experts** 129:11
129:13,18
134:5,21,22
376:22
**expires** 432:22
435:17
**explain** 164:20
195:5
**explanation**
112:24 212:7
**exposed** 13:21
22:12 228:12
325:8 326:19
426:12
**exposure** 11:21
29:13,20 30:11
30:16,20 32:1
66:23 87:24

149:4 152:10
206:17 212:18
232:9 233:15
264:20 265:24
268:18 293:20
305:12 311:5
318:11 343:12
343:15,24
355:20 369:22
373:1,5 375:11
376:10 378:23
381:16 383:3
387:10 390:17
391:1,20 393:6
394:4 403:11
412:23 413:4,7
413:9 414:21
417:5 426:1,4
**exposures** 14:10
24:13 92:15
213:11 355:24
370:12 374:3
376:7 378:21
379:1 403:15
426:15
**extended** 280:7
**extensive** 292:21
334:15 403:10
412:22 413:8
413:11
**extent** 54:23
205:21
**exterior** 166:24
**external** 89:22
91:4 126:8
150:16 152:5
167:6,11,17
168:8 169:15
171:13 173:14
176:21 177:8
178:9 180:19
189:23 192:6
195:7,12,23
208:19 209:10
209:23 212:22
213:2,8 214:3
216:6 229:16

Kelly Tuttle, Ph.D.

Page 452

230:10 232:2,3
233:9,20,22
241:15 242:17
242:18 303:16
304:16,18
305:4 332:12
333:3
**externally**
215:11 244:18
260:18
**extraction-rep...**
162:16
**extrapolating**
407:1
**extrapolation**
405:18,23
406:18 407:5
408:3 410:13
410:16
**extrapolations**
406:13
**extremely** 408:2

———————
**F**
**F** 3:13
**facility** 14:11
**fact** 85:12 117:7
117:14 123:16
237:19 277:7
308:9 320:24
352:21 378:14
379:6 405:24
406:22 407:6
426:11
**factor** 337:6
**factors** 84:8
155:8 163:23
313:3
**factually** 279:9
**fail** 115:24
433:18
**fails** 114:12
**fair** 9:23 10:1,4
10:9 27:16
35:1,11,22
38:9 43:24
44:8 61:6 64:1

65:11 67:5,10
69:8 70:8
71:21 77:14
78:17 85:13
89:6 90:14
95:11,18
100:24 101:1
102:13 105:14
105:20 116:22
120:2,18 121:9
125:18 129:3
149:2 154:9
171:21 175:21
185:16 187:17
188:2 196:6
198:1 204:12
205:17,22
207:9 213:16
217:7 219:9
227:22 243:21
248:12 278:17
278:18 299:13
301:9 308:19
310:14 313:17
319:8 330:16
331:10 338:11
350:4 396:5
425:1
**fairly** 243:17
**fairness** 85:9
**fall** 226:3
**fallopian** 175:9
176:3 182:18
183:7 184:14
190:1 228:9
253:10 326:16
**falls** 138:13,13
289:6
**familiar** 23:7
28:10 33:20
50:10,16,20
58:8 59:18
80:14 81:9
85:1,4,10,15
85:16 119:16
119:17 158:11
159:3,11 162:7

165:11 174:2
196:10 198:7
204:21 217:18
219:21 225:10
250:20 261:24
262:5,19
272:18 282:22
283:19 288:8
296:18,19
297:3 301:22
346:19 347:2,5
353:7 388:12
408:18 410:20
410:23
**familiarity**
34:12 35:5,8
35:10 420:10
**familiarize**
160:14
**families** 9:2
**far** 21:8 65:24
66:1 87:12
92:22 100:22
103:17 119:19
119:20 121:11
126:5 128:2
131:5 133:23
139:21 149:13
153:7,17
155:23 156:21
162:11 169:19
180:14 204:24
211:12 227:15
231:15 237:15
246:22 259:1
271:3 295:5
300:21 303:3
314:13 318:11
325:12 332:23
337:21 346:4
354:2 366:24
388:9 394:19
396:23 397:15
399:14 403:2
404:3 405:6
**fast** 161:22
**fault** 205:2

**fax** 1:23 6:11
217:15
**faxed** 262:23
**FDA** 6:13 17:1
224:18 225:11
225:20 230:1
232:12,15
234:5,7,20
235:6 236:6
237:20,21
238:4,14
239:20 326:8
327:4 328:13
329:6 366:20
376:18
**February** 342:6
**Federal** 50:14
50:17,20
**feel** 79:19
130:14 134:13
297:13 304:19
402:17
**feels** 134:3
**Fellow** 432:18
**felt** 342:11
**female** 89:24
91:6 108:14
109:6 110:11
111:9,23 116:9
120:12 135:21
137:14 152:17
167:17 168:10
195:24 213:22
215:13 232:4
260:19 303:17
327:13
**fence** 247:17
248:10 258:10
258:11,12,20
**fertility** 171:2
**fiber** 364:24
**fibers** 14:20
327:16
**fibrosis** 400:12
402:3
**fibrous** 364:18
364:22 365:1

365:16,22
366:7,9 371:14
**field** 20:22 97:20
129:24
**fields** 130:2,5
**fifth** 13:4
**figure** 131:17,18
131:21 260:7
334:7 337:2
**file** 95:6 100:3
**final** 83:3,16
289:21 290:4
290:20
**financially**
432:15
**find** 61:16 65:9
66:4 107:19
108:21 113:23
147:5 175:12
187:24 221:12
236:1 251:24
306:21 346:21
350:11 351:17
354:5 375:24
392:11
**finding** 234:7
256:3 400:14
400:18 403:8
**findings** 152:15
153:4 281:12
367:19 368:15
**finds** 221:21
235:23
**fine** 11:5 125:18
143:19 188:12
205:2 299:15
431:12,14
**finish** 236:23
323:19
**finished** 237:2
399:16
**first** 13:1 14:2
14:13 20:8
22:7 32:16,19
34:10 36:12
50:10 61:8
74:22 77:3

Kelly Tuttle, Ph.D.

Page 453

82:7 96:5
109:2 122:2
124:14 125:20
125:21 135:11
135:17 136:7
152:7 162:23
164:6,18,22
168:6,12
170:20 182:4
187:9 188:14
217:22 252:4
282:4 293:16
294:15 307:3
307:19 308:3
308:13,21
309:10 351:21
383:10 399:4
401:6 408:12
408:24 420:14
**Fiume** 291:22
**five** 402:9
**fix** 205:3
**fixing** 131:19
**flag** 283:1
**flawed** 107:17
108:3,8 109:15
109:23 186:6
186:11,14,16
186:17 303:8
**flip** 252:20
**flipping** 203:10
**Floor** 2:20
**Florham** 3:4
**flow** 11:3 135:20
136:8,10 137:8
137:13
**Flower** 2:20
**fluids** 135:21
136:9,11 137:8
137:13,14
**FLW** 1:5
**foam** 14:17,19
15:4
**focus** 31:8,17
85:18 86:19
132:23 136:7
383:10 401:4

**focused** 16:17
155:10 161:19
**focusing** 18:16
**folder** 284:17
**folks** 61:17,23
96:13 273:5
**follicle** 171:2
**follow** 134:14
151:17 154:3
253:2
**followed** 312:24
313:21 321:13
321:14 325:10
**following** 27:16
127:18 136:12
164:10 179:3
179:23 333:10
**follows** 8:19
**food** 169:22
225:3,6,11,13
226:3
**footnote** 350:13
**foregoing** 432:7
435:4
**foreign** 107:16
137:17 138:3
140:5 163:5
228:10 310:18
311:17 312:15
312:19,21
313:5,20 316:4
316:6,22 317:1
317:6,12,15,18
318:3 319:7
321:7 323:6,16
325:9,15 326:4
326:17 327:2,5
328:9 330:19
**form** 16:9 51:6
145:16 146:9
199:21 215:4
290:20 370:9
373:24 435:6
**formal** 40:19
**formally** 40:7
98:7
**formatting**

98:10 100:18
**formed** 112:5
113:9 193:22
264:23
**formidable**
253:8 259:15
**forming** 133:5
135:5 175:1
254:14 255:6
266:5
**formula** 218:14
222:20
**fornix** 158:22
159:8
**Fort** 1:15,16 8:9
18:12
**forth** 42:2 56:6
56:23 59:11
64:12 78:8
101:15 146:1
184:13 203:23
247:23 354:19
432:8
**forward** 139:11
200:16 227:11
229:12,19
267:2,15 268:5
270:13 370:4
428:18
**found** 50:2
64:17 65:13
70:23 113:18
114:6 117:4,16
131:3 158:23
161:2,3,15
162:19 182:16
183:16 184:21
187:16 193:5
194:6,20,21
209:1,17
210:15 211:1
215:5 231:24
261:7 332:14
342:10 355:18
369:22 372:24
378:20
**foundation**

331:12 334:11
387:13,16
**four** 5:5 12:4
13:9,15 125:9
137:23 185:22
251:14,19,22
252:9
**fourth** 13:8
125:20 350:12
**fragments**
371:19
**fragrances**
216:18
**fragrant** 338:18
**frame** 254:10
**framework** 7:3
348:2,6 349:10
**FRCP** 432:10
**frequency** 92:15
**frequently**
388:11
**front** 61:2 156:9
177:15 178:18
191:2 208:16
214:14 244:6
324:10 360:14
364:20 399:9
402:20 409:6
**Frost** 3:2 10:11
10:19 11:2
15:13 16:4,20
19:15 21:6
24:20 25:12
28:18 29:8,21
30:6 31:12,21
32:20 40:18
41:18 42:8
43:2,13 44:17
45:17 46:14
47:9,18 48:11
49:5 51:6,23
52:8 53:5,23
54:22 57:8
58:21 60:1,24
61:19 62:2,14
64:4 65:1,22
66:9,19 67:23

68:10 74:5
77:20,24 78:18
79:2,14 80:24
84:16 88:22
89:15 90:16
91:18 92:2,11
93:19 94:7,12
94:17 103:10
104:22 107:5
108:17 109:1
112:9 113:1
114:14 117:9
118:13 119:15
120:7 121:24
122:8,21 123:9
123:21,24
126:16,22
127:21 128:13
129:22 130:18
132:3 133:14
134:7,11,16,24
138:16 139:9
140:6,15,24
145:23 153:15
155:1 156:16
166:10 167:12
168:20 169:21
171:16 172:1
173:8 174:7
175:18 177:23
179:5,9 180:7
182:23 185:17
186:7 187:1
188:20 189:9
190:16 191:16
192:18 193:11
193:24 194:13
195:1 196:22
199:9,21
200:10 204:18
205:9 208:3
209:3,18
210:18 211:2
211:23 212:9
214:11 215:1,7
219:10 220:11
220:17 221:13

Kelly Tuttle, Ph.D.

221:24 222:22
224:6 225:16
226:5,18 229:3
230:2,17
232:18 233:6
234:11,23
236:7,23 238:6
239:16 240:21
242:3,7 243:12
245:17 246:14
247:6 248:3,13
250:13 251:5
254:4 255:17
256:10 258:3
258:13,19
259:8,21 260:9
263:11,22
264:16 265:3
265:16 266:7
266:11,18
267:11 268:10
269:4,14,23
270:22 271:20
271:23 272:15
273:18 274:16
275:19 276:5
276:21 277:4
278:2,21
280:13 283:4
286:7 288:4
290:8 291:7,21
296:3,17
297:15,18
298:18 299:7
299:22 301:10
303:10 306:1
306:11 307:17
308:2,11,20
310:21 311:9
313:23 315:14
316:7 317:8
318:1,5 319:9
323:9 324:16
325:6 327:9
328:11 329:3
329:13 330:22
331:2,16 332:3

332:21 333:11
334:5,13 335:7
335:12,15,23
336:4,22 337:8
338:2 339:8,16
340:1 341:1,5
341:7 342:18
343:6 344:6
345:6,10,21
347:16 348:18
349:6,22 350:5
351:8 354:11
356:6,15 357:5
357:17 358:13
359:14 360:8
360:17,23
361:3,8,12,21
363:6,13,20
365:4,17 367:7
367:21 368:17
370:9,23 371:5
371:8 372:4,12
373:9,24 375:6
375:15,19
376:2,16 377:4
377:8 378:2,10
378:18 379:10
380:8,14 381:9
381:23 382:4
382:23 383:12
384:9 387:14
388:1 389:1,6
390:14 391:10
392:15 393:18
393:21 395:13
395:23 396:21
397:23 398:10
400:2 406:10
407:10,23
410:11,22
412:7 413:2,13
414:14,18
416:20 418:23
421:8,21,24
422:24 425:9
425:19,21
426:22 427:8

427:18,22
428:6,24 429:6
429:19 430:3
430:11,19,21
431:8,11,17
**full** 18:16
  223:18 226:11
  243:19 263:4
**fully** 136:6
**function** 170:23
  389:24 390:4
**fundamental**
  56:14
**funny** 28:8
**further** 124:5
  163:15 164:1
  432:6,10,12
**future** 362:17

---

### G

**G.E** 158:6
**gather** 64:23
  65:2 118:22
  120:17 121:6
  285:23
**gathered** 67:21
  191:21 265:11
  265:13 312:8
**gathering** 63:19
  64:21 121:21
  164:10 267:7
**general** 21:9
  38:23 40:8,21
  41:8 42:2 43:5
  43:18 44:6
  50:21 53:11
  117:20 119:21
  121:5 154:10
  154:11,23
  155:10,15,21
  156:15 199:23
  225:24 244:23
  300:18 314:12
  325:22 330:6
  338:6 343:3
  346:16 364:21
  390:6 408:4

**generalities**
  119:4 121:13
  122:23 156:18
  385:7
**generally** 13:11
  13:13 20:21
  31:4 59:14,21
  101:13 118:6
  127:9 137:21
  140:16 144:24
  153:1 158:12
  159:12,14
  166:23 171:23
  181:24 195:21
  249:17 257:3
  285:7 294:9
  296:7 298:23
  304:15 305:11
  316:9,21
  319:24 320:1
  326:3 329:18
  336:5 337:20
  343:21 365:5
  383:22 384:10
  385:13 420:12
**generate** 63:6
  131:14 285:10
  286:1 288:1
  324:1
**generated**
  137:15
**generates**
  385:12
**generating**
  291:15
**generation**
  54:15 120:4
  287:2 324:1
**generic** 70:14
**genetic** 306:17
  307:22 320:11
  334:15 335:3
  346:4 418:4
**genital** 89:3,10
  89:23 108:5
  111:9,17
  112:16 113:21

114:9 116:8
168:10 175:8
176:2 186:1
250:12 260:2
345:3
**genitalia** 167:1
  167:17 171:13
  173:15 176:22
**genitals** 242:19
**genre** 328:6
**geologist** 292:22
  366:3
**geology** 292:19
  292:21
**GEREL** 2:13
**German** 281:1
**getting** 21:13
  146:15 260:8
  280:6 297:24
  318:6,24
  339:17,23
  424:3
**give** 92:23 96:23
  160:14 200:7
  208:1 217:23
  258:8 284:17
  351:5 375:2
  415:6
**given** 65:15
  121:14 176:5
  177:15 184:9
  227:19 330:15
  361:14 362:24
  435:5
**giving** 193:12
  379:12
**glad** 74:20
  223:15 346:16
**glance** 11:6
  169:5
**Global** 7:4 54:16
  54:18 56:5,23
  351:13 354:14
  358:1,3 359:24
  362:7 371:10
**Globally** 353:3
**gloves** 173:3

Kelly Tuttle, Ph.D.

Page 455

**go** 13:22 26:6
35:19 36:22
49:23 55:2
59:10 74:8
79:20 82:21
84:24 86:4,7
87:20 94:22
103:20 114:19
118:14 130:13
133:4 135:3,15
143:3 146:8,16
148:1 149:1
151:8,14
152:14 154:13
158:1,5 163:15
176:9 178:4
180:23 181:21
182:2 187:23
189:12 190:24
197:24 202:21
206:23 219:19
237:1 251:11
257:13 258:18
280:18 290:17
301:3 311:19
316:4 320:3
321:24 326:7
326:12 331:8
338:3 347:8
349:8,13 351:9
354:14 359:21
363:23 367:8
368:18 372:15
385:16 386:18
405:13 409:18
416:11
**goal** 41:20 43:15
43:15 390:15
**goes** 75:19
149:21,21
180:11 203:6
228:17 255:2
274:17 279:12
281:6 291:14
322:12 342:5
**going** 10:7 13:4
13:5 18:15

22:21 26:4
85:19,24 86:8
86:20 93:19
94:17,23
131:18,19
146:16,18
147:14 157:16
158:1,16
160:17,17
162:1 163:1
191:23 201:22
206:22 218:24
226:10 228:3
240:5 243:16
273:19 280:16
283:24 284:17
290:9,21 293:4
297:8 298:10
301:4 309:13
309:13,15
311:22 320:5
326:9,12
346:18 351:1,5
354:6 362:16
362:18 364:7
364:19 373:18
388:19,20
398:14 402:21
404:11,23
408:20 424:24
427:14 430:23
431:11,21
**Golkow** 1:23
3:21 8:5
**good** 8:21,22
9:16 10:5
11:10,23 32:23
34:21 52:2
53:3,10,14
77:22 87:20
94:14,20 124:6
147:21,24
161:10 195:4
224:4 361:10
396:19 419:20
**Goodman** 84:9
**Goodness** 42:19

339:6 429:18
**Google** 39:1,8
64:7 252:1
**government**
151:7 201:1
208:5 238:15
**governmental**
200:20 201:6
235:11,18
238:8,16
239:21,24
**grade** 291:1
**grades** 290:19
**Gradient** 203:17
**gravity** 117:6,7
117:12,13
123:5,12
124:17,20,23
125:3,21,22,24
126:3,20 127:5
127:6,17 128:1
128:5,11,14,18
129:2,4 135:14
135:20 136:14
136:19
**great** 137:12
290:17 337:18
338:16
**greater** 88:8
103:23 227:15
298:8 376:23
**Greenland** 81:4
85:11
**group** 100:21
147:1 162:21
185:3 283:7
355:22
**growth** 400:11
402:2,15
**guarantee** 64:16
**guess** 15:3
111:11 122:12
144:17,17,18
269:16 286:8
288:24 297:19
302:18 356:11
399:6,12 420:8

**guidance** 224:5
**guide** 5:7 17:18
280:24
**guidelines** 53:8
56:7,23 57:23
58:12,24 60:8
354:17 356:17
356:21 357:7,9
357:22 358:4
360:2 362:4
371:11
**gumbo** 271:15
**guys** 340:23
**gynecological**
148:13 164:21
173:2,12
**gynecologist**
131:8

___

## H

**H-E-L-L-E-R**
206:13
**H-U-N-C-H-A...**
301:23
**half** 307:19
308:3,13,21
309:10
**halfway** 107:21
**hand** 301:6
**handed** 189:11
**handful** 188:7
189:11
**handing** 9:10
**handwritten**
6:16 273:12,20
277:16,21
278:5
**happen** 82:9
97:6
**happens** 334:4
**happy** 133:17
138:7 178:5
179:15
**hard** 65:9,13
295:19
**hard-and-fast**
75:22 76:15

**harmful** 22:11
25:1 46:3,12
173:5
**Harmonization**
54:16,18 56:6
56:24 354:15
358:1,3 359:24
362:7 371:10
**Harmonized** 7:4
351:13 353:4
**hazard** 49:4
51:3 55:16
56:3,24 57:17
58:2,5,9,14,20
59:7,13,16,24
60:23 257:18
355:3,3,9
356:20 357:10
360:4
**hazards** 48:9
51:21 52:4
56:5,16 57:6
430:8
**head** 73:12
80:12 97:7
144:14 250:21
260:7 341:22
429:22
**header** 262:10
**heading** 108:1
187:10 197:19
252:23 405:17
**health** 6:10 7:2
19:3,8 51:3
97:11,16
104:24 105:9
105:10,16,21
106:2 138:20
139:18 201:17
201:24 202:9
202:17,18
204:15,21,24
206:7 207:15
208:2 210:12
225:5 241:1
242:1 243:1
257:18 305:18

Kelly Tuttle, Ph.D.

305:19 343:23
346:9,20 347:3
347:15 348:1
348:13,23
349:3 354:18
364:23 414:9
**healthy** 317:10
**hear** 19:11 70:9
247:20 257:21
266:3 273:4
299:11 333:20
373:13 400:23
**heard** 42:16
43:23 81:3,6
130:11 241:19
268:21 385:19
**hearing** 201:11
377:22,23
**heavy** 285:13
287:22 289:20
292:11 355:19
355:23 374:2
375:22 378:20
423:22,23,24
424:5,8,11,15
424:19,23
425:8
**heightened**
417:4
**held** 1:15
**Heller** 206:12
208:11,15
210:1 211:21
212:2
**help** 30:4 38:15
93:24 98:11
108:21 123:21
124:7 147:5
195:4 212:8
279:1 397:1
399:19 404:22
405:6
**helped** 328:20
328:24
**helpful** 192:17
**helps** 63:11
220:5 386:7

**Henderson** 5:20
6:2 159:19,24
160:3 162:15
166:15 167:21
168:5 176:14
190:6,9,12
191:12 193:5
193:13,16
194:5,7,19,20
195:19 196:4,8
196:18,19
**hereinbefore**
432:8
**high** 369:22
370:12 372:24
**highest** 289:20
**highlighted**
147:4 160:24
162:2 175:13
217:22 341:8
**highlighting**
340:19,21,22
341:2
**HIGHTOWER**
2:3
**Hill** 5:11 27:1,5
27:13,21 28:1
28:4,15,20
29:16,24 72:2
72:5,5,11,18
73:3,9,10,17
73:18,22 74:16
75:19 76:12
77:15 78:9,24
79:5 80:3
82:19,24 83:12
84:3,15 85:3
86:22 87:6
113:18 114:23
115:12 116:1
203:7,7,8,20
203:23 204:11
207:12 211:12
212:20 223:5
227:1 233:12
236:16 237:4
243:4 259:12

259:18 300:3,7
305:7,10
333:14 419:5
**Hill's** 85:3
112:20
**Hilton** 1:15
**hires** 47:20 49:7
**historical**
290:24
**history** 178:18
**Hmm** 404:13
**Holmes** 223:6
223:23
**Holmes/Watson**
259:18
**home** 18:6,11
131:15 420:2
**homeostatic**
400:11 402:2
402:15
**Hopkins** 261:10
261:11,15,17
**hospital-based**
418:2
**hour** 101:16
102:2,6 351:2
**hourly** 101:15
276:15
**hours** 92:21
93:1 96:6
101:8 275:5,10
275:17 276:14
379:4
**Howe** 13:7
**Hudson** 13:5
14:12,14,16
**Hugh** 86:20,21
**Huh-uh** 249:7
**human** 17:16
140:18 141:3
174:1 218:4,5
225:5 317:11
355:14 387:18
388:5 393:9,14
395:20 396:16
397:4,5,5,16
397:19 409:23

**human-based**
394:20
**humans** 173:2
396:4,6,13,20
405:19 406:18
406:21 407:2
407:14 408:6
408:15 409:3
409:21,24
410:3,14,18
411:17
**Huncharek**
301:23 302:6
302:14
**hundreds**
275:17
**hung** 309:14
**hygiene** 14:9
250:9
**hygienic** 249:18
249:21 250:6,6
252:23 257:1
**hyperplasia**
402:22,23,24
403:8,22 404:4
412:20
**hyperplasias**
414:21,22
**hypotheses**
256:21 303:22
**hypothesis**
74:11 88:15
89:8,21 111:21
112:13 113:19
118:17 120:9
126:7 128:4
137:4 213:18
214:2 216:7
218:8 221:23
233:19 236:13
241:14,18
244:17,20
303:15 398:12
**hypothesized**
118:12 206:9
**hypothetic**
261:2

**hypothetical**
177:10 377:16
381:4
**hypothetically**
381:18

### I

**IARC** 5:18 7:6
141:9 142:8,21
143:1,7,11
144:8,12,21
145:10,13,15
145:20,21
146:2,6 150:4
150:23 151:6
153:8,21
180:24 181:14
182:4 184:13
186:23 187:5,8
187:15 188:1,9
188:16,17,23
189:2,5 190:6
195:10 200:24
355:13,18
362:13 363:3
369:5,17,22
370:2,3,11
372:23 374:1,7
375:9 378:20
**idea** 89:6 111:3
119:13 125:3
423:12
**identical** 83:17
396:12 397:19
406:21 410:18
**identification**
9:8 12:6 17:20
20:4 26:10
50:5 72:12
82:4 93:10,13
102:22 141:11
157:22 159:21
164:14 166:17
170:15 172:10
174:18 197:8
201:19 217:17
224:19 249:12

Kelly Tuttle, Ph.D.

261:14 273:13
280:4 284:22
293:8 320:19
340:16 348:3
351:16 355:9
357:11 362:14
386:14 398:19
415:11 419:13
**identifications**
355:4
**identified** 69:5
69:17,23 70:12
193:10 207:3
210:4 212:6
351:11
**identify** 9:12
51:20 52:4
56:1 57:6
71:16 93:16
292:8,13
386:24
**ignore** 236:5
**ignored** 237:23
239:13
**II** 201:3
**images** 161:6
**imagine** 253:6
259:13
**Imerys** 216:10
216:11,24
217:6 285:8
290:10 366:24
**immediately**
71:10
**immune** 389:24
390:3
**impact** 169:19
295:11
**impacts** 295:7
396:12
**impairment**
400:10 402:1
**imperative**
433:14
**implications**
133:22
**implies** 176:20

**importance** 84:7
**important** 91:16
132:13 139:8
220:9 235:20
240:17 254:1
299:4 354:22
**impossible**
113:13 163:11
223:7 224:1
259:19
**impression** 43:6
**improbable**
223:8 224:2
259:19
**in-depth** 206:3
**inaccessible**
105:17
**inaccurate**
79:16 282:17
344:14
**inanimate** 253:6
259:13
**inappropriate**
98:14
**include** 28:5
36:4 52:3
101:2 115:12
167:4 191:14
193:8 216:23
235:16 269:2
286:4 356:12
359:12 365:15
367:18 374:19
381:3,17
382:14 389:18
389:24 411:22
412:5 415:3
424:9,18 425:4
**included** 10:20
14:19 18:1
48:9 69:14
83:4,18 106:10
106:12 117:1
128:20 129:4
133:18 154:14
161:7 164:7
167:22 168:14

170:17 172:18
174:5,23
181:15 200:5
202:18 205:21
254:18 286:15
287:4,4,7,8
309:20 310:7
356:3 357:8
360:3 365:11
367:5 368:15
374:20,22
377:18 423:24
**includes** 19:20
22:5 24:5,17
26:17 76:20
93:2 115:17
141:22 167:6
167:10 270:16
301:19 305:7,8
343:19 353:14
357:15 360:14
379:21 420:22
422:16
**including** 19:10
23:16 47:8,16
48:8 49:2,15
130:2 167:18
167:19 307:8
344:1 355:7
374:21 380:5
392:13
**inclusion** 127:17
128:11 129:2
**inconclusive**
279:18
**inconsistent**
257:4 279:18
**incorrect** 279:9
**increase** 199:12
414:4
**increased** 257:2
404:5,8 414:2
414:2
**increases** 414:5
**incriminate**
163:11
**incubation**

342:14
**independent**
25:17 145:16
264:24 266:9
**independently**
144:19 145:14
189:6 281:4
**INDEX** 4:1
**indicate** 210:10
210:11 238:24
257:16
**indicates** 158:20
**indisputable**
73:21 74:2,9
76:9,21 77:6
77:10,15 78:2
78:10 228:6
229:1 253:5
260:4
**indistinguisha...**
161:11
**individual** 13:23
52:13 119:21
150:11,17
153:2,9,22
154:5 209:8
239:24 272:6
314:6 368:19
412:1,13,16
**individuals** 95:9
153:3 417:11
**induce** 317:19
**industrial** 14:9
**industry** 54:9
**inert** 158:21
159:4 182:16
183:5 189:21
**infant** 430:2
**inference** 84:12
**inferences** 84:4
**inflammation**
206:11 218:12
306:23 307:9,9
308:5,15
309:20 310:8
310:11,12
311:4,6,11,14

312:24 313:6
313:22 315:16
315:18 317:9
317:19 319:4,8
319:20 320:6
320:10 321:13
321:15 325:11
328:5,10 329:8
330:11,19
334:16,17,24
335:10,21
336:12 337:11
337:17 338:1,5
338:16,20,22
339:2,3 340:3
340:4 346:5
400:12 402:3
**inflammatory**
228:11 313:6,9
313:13 314:2,5
316:13 317:2
318:9,12
319:15 323:24
324:3 325:17
325:22 326:18
327:3,6,18
328:21 329:19
330:2 334:20
335:2 340:6
389:9
**information** 6:9
11:13 14:23
54:1 56:9
62:12 63:10,14
64:24 97:3
139:20 177:5
184:8 197:7
199:1,24
231:13 235:20
237:16 246:16
246:22 247:8
248:5,9 260:12
260:13 264:7
265:11,12
274:21 275:2
275:16 287:3
289:3,4 324:20

Kelly Tuttle, Ph.D.

328:15 335:16
342:20 343:9
354:3 355:1
396:8,18,23
397:5,17
403:16 406:17
408:4 410:4,16
411:23 412:5
412:15 426:14
**ingredient**
356:18 357:8
358:5 360:3
362:8
**ingredients**
36:24 37:9,11
271:16,22
428:19
**inhalation**
107:15 109:8
311:24 312:2,8
312:10,10
382:20 430:8
**inhalational**
403:15 414:21
**inherent** 294:11
**inhibited** 395:3
395:21
**initial** 55:15,23
310:19 311:7
311:19 312:16
321:10,12
335:21
**initiate** 305:23
306:9 307:7,15
309:18 310:5
**initiates** 218:11
328:5
**initiation** 307:10
310:13 334:18
335:18 336:7,8
336:14
**injecting** 267:21
270:20
**input** 55:7
**inserted** 352:15
**insertion** 195:16
214:16

**inside** 126:14
248:10 258:11
**insofar** 365:10
**instance** 27:12
70:22 426:9
**instances** 12:11
317:18
**Institute** 197:17
198:6,8,11
199:8 200:9
**INSTRUCTI...**
433:1
**insufficient**
91:13 282:13
**insulation** 14:17
15:4 375:24
**intact** 170:23,24
**intend** 9:22
429:12
**intended** 64:1
257:17 344:18
344:21 345:4
**intent** 63:21
277:20
**intention** 63:18
64:23
**intentional**
245:19 246:3
**intents** 287:20
374:8
**interest** 39:18
40:4 41:3,9
43:4,18 44:10
44:20 45:6
162:22 281:13
**interested** 41:5
160:18 400:6
432:15
**interim** 399:5,11
399:14,17,19
400:8 401:6,9
401:11,24
**interlibrary**
63:12
**internal** 221:14
**International**
141:20

**interpret** 52:24
**interpretation**
156:7
**interrupt** 11:3
35:22,24
**interrupting**
94:22
**interval** 420:21
422:16
**intervals** 296:20
**interviewed**
416:15 417:11
417:12
**intricate** 319:14
320:11
**introduction**
137:16 168:7
168:14,22
169:13
**investigation**
214:8 221:11
304:13
**investigations**
163:16 164:2
**investigators**
281:4 305:22
306:7 307:5,14
309:16 310:4
310:16
**invoice** 94:6,9
96:21 101:18
155:13
**invoices** 94:24
96:2
**involve** 12:22
13:10 14:3
183:5 312:8
316:2
**involved** 13:15
13:16 14:8,16
16:10 24:14
25:6 31:4
32:14 54:3
127:12 129:13
131:9 132:22
137:19 153:8
153:20,24

211:9 215:16
271:1 292:1
300:23 313:12
313:15,16
314:2,6 318:12
325:19 330:5
336:7 380:19
384:3,13
**involves** 49:14
167:16 316:20
330:19
**involving** 14:24
166:21 316:23
332:19 334:3
384:7
**irration** 311:19
**irritant** 325:1
**irritation**
206:10 310:20
311:8,11,13
312:17,22,24
313:21 317:2
321:10,13
325:10 338:19
**issue** 13:11
14:14 27:2
32:11 33:15
37:19 53:22
54:21 55:3
65:10 89:5
92:19 107:10
112:18 116:12
120:6,17 123:7
131:23 132:2
133:9 134:22
144:20 149:17
196:5 243:10
246:8 275:18
276:16 299:5
301:22 304:9
304:21 305:6
312:10 318:11
373:19 376:14
377:3,7 379:5
408:21
**issues** 52:19
98:10 100:17

118:3 121:8
153:7 154:19
216:22 244:4
304:2 312:1
319:5 334:2
365:2 403:12
426:9
**italicized** 25:10
76:17
**italics** 23:13
**item** 54:8 55:17
104:15 197:11
199:6
**itemized** 96:21
102:5
**items** 49:24
68:22 104:10
205:21
**iteration** 23:23

---

**J**

**J** 219:8
**J&J** 27:15 28:2
28:17 92:21
229:24 281:21
285:8 290:10
366:24
**JACK** 3:2
**jack.frost@db...**
3:3
**Jersey** 1:1 3:4
**Jessica** 32:21
**JNJ** 249:14
**JNJ_000704**
217:11
**job** 96:24
**John** 261:10,10
261:15,16
**Johnson** 1:3,3
2:22,22 3:5,5
9:3,4 11:12,12
11:14,15 15:12
15:12,21,21
16:1,1,18,18
17:1,2 31:2,3
31:11,11,18,19
31:20,20 32:6

Kelly Tuttle, Ph.D.

32:7,13,13,18
32:18 33:1,1
33:12,12,17,17
34:6,6,11,11
34:13,13,14,15
34:23,23 35:13
35:13,15,15,17
35:17 36:1,1,6
36:6,14,21,21
42:6,12,12
46:22,22,24
47:1,11,11,14
47:15,20,20
48:7,7,23,23
49:7,7 53:4,4
53:19,19 61:11
61:11,12,12,13
61:13,17,17,23
61:24 62:4,4
62:10,10,24,24
65:17,17,23,24
66:6,7,13,13
66:17,17 67:2
67:2,6,7,7,13
67:13,20,20
68:2,2,6,6,12
68:12 95:1,2,3
95:3,6,7,15,15
95:17,18 96:14
96:14 99:23,23
102:1,1 129:18
129:19 134:21
134:21 216:8,9
250:4,4 251:3
251:3,4,4
275:7,7 292:15
292:15 342:2,2
365:15,15,24
365:24 366:20
366:21 367:2
368:20,21
370:5,5 371:7
371:7 372:11
372:11 376:19
377:11,11
379:13,13
382:9 427:16

428:16,16
430:9
**Johnson's** 36:14
42:7 67:6
226:2 367:2
376:19 382:9
430:1,9,9
**joined** 385:18
**journal** 173:21
218:3,4 221:4
419:17,19
420:12
**journals** 303:1,3
**JR** 2:2 3:2
**judging** 178:17
262:16 401:13
**jump** 98:16
**jumped** 311:11
421:9
**jumping** 238:17
283:11
**jurisdiction**
225:14

---

**K**

**K-I-S-S-L-E-R**
170:11
**keep** 85:24
126:21 141:15
181:3 189:19
206:22 309:13
309:14 341:12
**Kelly** 1:14 4:6
5:1 8:11,17
432:4 435:4,12
**Kenneth** 81:6
**key** 24:22,24
300:8
**khightower@l...**
2:4
**kick** 192:11
**kidneys** 314:19
**kind** 37:19
53:11 66:2
75:1 98:16
120:23 134:15
156:7 169:14

210:8 225:24
259:11 260:6
285:10 295:1,2
295:13,18,20
296:8 311:12
315:2
**kinds** 407:1
**Kissler** 6:4
170:11,13
**knew** 42:13
259:6 373:17
373:19 376:13
**know** 24:7,21
28:12 30:3
31:16 32:10
33:18,21,22
34:5,14,16
35:12 37:10
38:3,6,17
39:16,19,20
40:2,5 41:19
41:21 42:1,10
45:20 46:21,24
47:10,19 48:2
49:6 50:9
52:14,21 53:9
53:11 55:9,10
56:16 57:21,23
64:6,16 65:3,3
65:23 66:6,13
66:17 67:1,14
67:19 68:2
70:23 73:9,13
80:8,11,17,20
81:13 83:12
85:5,23 95:9
95:23 96:3,12
96:24 97:6
98:3,4,4 100:3
100:15,16
101:7,23 112:1
117:12,13,23
118:1,4 119:18
121:12,13,15
125:7 126:1,18
126:19,20
127:12,24

131:6 132:5,11
132:23 133:21
135:12 136:22
137:11,22
138:4,18
140:13 144:11
144:17 145:1
146:8 147:6
149:23 150:11
150:11 151:1,7
151:13,18
152:23 153:6,7
153:13,23
155:3 156:6,8
157:10 159:7
159:10 160:12
165:12 168:15
168:16,23
169:1,3,12
170:4,4 171:15
171:18,24
172:2 176:22
179:18 180:17
182:13 183:2,3
184:9,15
185:21 186:19
188:14 189:17
191:5,18
193:16,16,18
194:4 195:17
196:10,17,20
197:10,14
198:14,22
199:3 200:23
201:12,12
204:22,22
205:13 209:8
213:5 214:13
214:15,16
216:1 218:21
218:21 220:20
220:21,23,24
220:24 221:16
222:8,11,12,13
222:15,16,23
223:2 224:9,12
225:18,18,19

225:19 226:1,6
227:13,18
230:19 231:7
231:14,14
234:15,24
236:19 237:11
238:9 239:23
240:1 241:11
242:22 244:23
245:7 248:20
249:20,23
250:17 251:2,6
251:8,21,23
252:2,15 255:2
256:2,3,23
258:9,10 259:9
260:13,23
261:10,15,16
261:23 262:6
262:14 263:13
263:23 268:4
269:5 272:1,17
272:18,23
274:15,22,24
275:5,8,22
276:24 277:6
277:10,15,22
278:6 282:20
282:24 283:12
287:16 292:1,3
293:23 294:6
294:18 295:18
296:5,6,19
297:6,24
298:11,22
300:6,15,22
301:12 302:13
302:16,18
304:23 311:3
314:17,21
315:15,23
317:6 318:11
321:17 324:6,8
324:9,13
325:14 327:10
327:19 328:23
329:9,11,16,17

332:6 334:19
336:2 337:9
339:2 340:11
340:23 342:3
342:21 343:7,8
345:11 346:1,2
348:9 353:2,19
353:22 354:1
360:16 364:20
365:5,11 366:7
367:3,10,23
368:4,11,21
371:9,15,17,19
373:3 374:1,21
375:17 377:2
378:6,19
379:14 381:11
382:24 384:12
386:2,23
387:16 391:14
392:16,22
393:14,24
394:18 396:11
397:15,17
398:2 399:2,5
399:13 400:17
401:6,9,9,10
401:14 402:8
402:12,24
404:12 405:7
408:1,8,20
410:14 411:18
417:1 418:12
419:3,19
421:11,19,24
422:7 424:15
425:11,14
429:4,24 430:4
430:5,7 431:9
**knowing** 51:11
222:2 264:6
**knowledge**
34:12,17 42:11
95:5,8,10,14
103:8 172:16
224:10 314:4
316:12

**known** 73:2,8
198:5 226:17
355:14,15
**knows** 341:10
**Krekeler** 285:9
285:20 286:1,6
286:10 287:13
287:20
**KRISTIE** 2:3
_____
**L**
**lab** 289:10
**label** 50:24
354:16 355:9
355:10 360:4,5
362:9
**labeled** 82:14
108:22 109:12
**labeling** 7:4 56:5
351:14 353:5
354:2,20 355:7
356:20 357:10
358:6
**labels** 54:17
57:1 355:3
**laboratory**
408:14 409:1
**lack** 365:24
**Lake** 2:5 9:1
**Lane** 3:21 8:4
**language** 25:21
70:14 74:16
77:17 148:8
158:17 161:1,9
172:16 181:15
199:18 297:9
326:10,21
400:6 408:22
**large** 16:22
42:21 130:1
143:15 205:12
252:13 253:3
253:21 260:4
286:16 310:18
311:17 312:14
313:11,24
321:6 353:1

393:10 394:9
400:19
**larger** 420:20
422:14
**larynx** 369:14
370:7
**Lash** 85:11
**Latin** 80:8,9,10
**lattice** 424:2
425:7,12
**launched** 204:7
**law** 128:18
**lawsuits** 417:6
**LAWYER'S**
4:12 436:1
**Lawyers** 28:8
146:21
**lay** 75:21 76:14
331:23
**layman** 344:13
**layman's** 323:3
**lead** 159:23
172:12 174:20
286:21
**leading** 80:22
**leads** 218:12
**leak** 131:17
**leaking** 131:19
**led** 9:4 285:18
**left** 75:5,10
100:1 163:17
277:3 291:9
400:8
**LEIGH** 2:8
**leigh.odell@b...**
2:9
**length** 431:6
**lenient** 358:1
**lens** 211:11
**let's** 12:17 22:6
29:6 61:7 69:7
71:23 75:3
82:11 85:18
86:6,6,19,22
87:20 107:10
107:22 135:8
144:18 146:11

146:17,23
148:1 149:1
152:13 157:16
167:20 180:22
180:23 183:9
202:21 204:1
206:6 217:21
224:15 226:9
240:3 252:4,21
261:9 262:21
279:23 285:15
300:19 309:14
311:23 324:23
326:7 331:22
352:6 362:10
369:4,6 386:18
394:23 401:4
405:13 420:17
422:11
**letter** 6:13,15,17
6:19,21 224:18
225:3 231:8
232:20 234:9
234:13,18,19
234:19,21
235:7,13,15
236:4,6 237:10
237:20,21
238:4 239:9,11
261:13,20
262:22,24
263:14 279:22
280:3 281:20
281:24 293:7
293:11 294:1
294:15,17
297:8,9 302:17
327:11 328:13
329:7 340:15
**letters** 283:13
**level** 56:15
126:14 295:3
344:2 370:18
370:21 371:3
426:20 427:5,6
**levels** 126:21
152:16 314:10

355:19 369:23
373:1,4 375:11
395:4,11
425:24 426:4
426:12
**LHG** 1:5
**LIABILITY** 1:5
**library** 103:24
104:1
**lifetime** 416:4,9
**lightheartedly**
223:22
**limited** 116:22
184:8 188:13
312:9
**limits** 133:11
355:2 425:16
**line** 222:9
247:17 258:10
288:23 428:23
434:2 436:3
**lines** 49:1
257:21
**linking** 257:1
**list** 52:24 69:9
69:13,17 70:3
71:11,17,18,19
72:2,4 87:13
117:7 143:2
164:8 193:2
194:12,24
205:5,8 255:15
395:7 415:20
418:8
**listed** 12:11,22
13:19 14:2
68:13 83:6,16
87:19 101:16
104:11 106:24
117:4 151:2
196:6 216:14
265:21 356:18
356:19 358:5
362:8 390:23
393:3 423:5
**listening** 201:14
**listing** 7:7

Kelly Tuttle, Ph.D.

191:19 386:12
**literally** 64:17
**literature** 11:18
16:7,8 17:7
27:11 28:7,22
30:23 37:19
38:24 39:19
40:5 41:22
42:13 43:17
44:8,12,14
45:7,11,12,15
45:16,20 46:10
46:16 56:8,21
62:18 63:2,3,7
63:8,9,19
64:13,18,22
65:18 66:1,4
67:20 68:1
70:20 71:9
73:4 90:6 91:1
92:14 105:5,18
106:11,16
108:7 112:2
113:14,16
115:23 116:14
116:21 117:20
118:2,8,11,15
118:23 120:18
120:19,24
121:7 125:3
126:6 130:20
131:14,23
132:16 136:22
137:6 138:1,11
144:20 145:15
145:17 160:7
167:24 186:10
191:20 194:19
195:9,11
209:16 213:1
215:4 221:18
234:20 237:14
237:14 241:3
242:11 243:3
244:24 245:5
246:6 252:2
256:2 257:16

259:2,5 261:2
265:18 266:4
267:2,15 268:1
268:6 270:14
271:9,10
275:21 337:20
339:22 343:11
345:1,13 365:9
366:19 377:10
377:19 381:2
390:16 391:17
394:13 403:6
411:13 417:24
419:3
**litigation** 1:5,23
3:21 8:5,10
9:15 12:20,23
13:17 14:3,5
15:2 32:15,17
33:23 104:4
127:13 132:22
137:19 138:9
139:2 211:10
211:17 215:16
229:24 264:10
292:2 302:2
376:22 379:7
**litigation-based**
416:19
**litigations** 13:19
**little** 18:9 30:18
31:14 48:20
56:4 95:20
132:8 135:15
155:5 161:22
183:4 201:11
238:17 243:3
318:6,24
321:16 325:20
339:17 356:10
417:22
**living** 18:20 19:3
19:9,20 23:15
24:3 343:24
**LLC** 3:10,10
**LLP** 2:2,13,18
3:2,7,12

**loan** 162:1
**loans** 63:12
**localized** 161:16
**locate** 197:23
**located** 92:8
**locomotion**
253:7 259:14
**lodged** 378:3
**long** 39:14,16,20
48:14 66:6
204:8 246:9
258:8 295:9
324:24 325:15
350:24 388:20
394:1 431:2
**longer** 194:4
**Longo** 366:23
373:20
**loogie** 323:3
**look** 11:18 13:23
22:6 27:18
36:23 37:8
39:7 40:21
43:19 45:21
48:8 50:18
52:10 53:16
56:21 58:22,23
59:10 60:3
61:2 62:3
63:22 64:2
66:21 67:10
68:17 69:10
71:23 73:14
74:22 75:3
79:6 82:17
83:11 86:22
87:14 92:13,14
92:15 93:15
94:8,9 101:6
102:5,5 103:16
115:8 117:23
118:7,11,17
120:16,23
121:10,18,19
122:18 123:23
131:13 136:16
136:22 139:3

143:3 144:23
145:2 146:11
146:23 150:17
151:9,14,15
153:2,9 160:4
160:20 165:21
169:6 170:2,20
172:22 175:4
176:9,20 177:4
177:16 178:2
178:14 179:14
179:16 180:16
183:4 184:5,10
184:13 188:18
188:24 189:13
189:18,18
190:15,21
191:1,6,6
195:10,15,17
196:8 197:18
197:24 199:6
200:2,12,22
201:2 203:12
204:20 206:6
208:7 209:7,19
211:21 212:17
213:10 214:1
215:19 217:21
224:15 226:7,9
227:3 229:12
230:6 231:7
235:4,19,21
237:7 238:10
238:11 241:2
242:2,22 243:2
244:14,17
247:8,9,11
248:18,18
250:18 251:12
251:13 252:4
252:21 257:9
257:13 261:9
262:21 268:4
270:5 272:2
274:21 279:23
280:9 282:3
286:9 289:14

292:10 299:24
300:10,11,15
300:17,17,18
300:23 301:7,7
301:11,15,18
302:10,19,21
302:22 303:1
305:11 306:20
324:23 332:18
334:23,24
337:19 344:23
345:12 347:6
348:13,24
350:6 362:10
362:19 364:3
365:8 366:18
366:22,24
367:10,11
368:24 370:14
376:6,8,22
377:14 381:1
382:6 386:4
389:16 390:12
392:12 395:6
403:16 404:1
406:6 411:24
412:12,16
413:21,22
415:19,23
424:18 425:3
**looked** 35:9
36:23 37:19
40:4 42:10
44:20,23 45:14
45:15 46:1
67:10,11,12
86:21 105:8
113:16 115:22
115:22 117:15
131:22 139:1
148:2 150:22
177:8 178:9,10
180:13 183:2
185:10 188:7
190:21 191:12
192:2,5 194:5
194:8,22

Kelly Tuttle, Ph.D.

Page 462

196:20 202:17
205:8 209:6
211:11 213:14
213:17 214:24
215:3,8 216:5
226:14 232:24
233:9 239:17
265:18 266:4
277:6 293:2,14
304:16 310:10
326:10 332:1,9
332:10 333:1
334:2 344:17
345:14 348:17
350:4 368:3
387:4,5 390:20
391:5,9 392:6
392:21 403:18
410:9 415:3
**looking** 39:2
46:10,15 53:13
55:17 56:11
64:8 67:16,16
75:4 83:21
90:7 92:5 96:4
98:3,9 101:13
110:2,4,5
112:2 117:3
118:15 121:22
122:16,24
128:2 137:24
139:21 144:12
145:2 149:21
150:12 151:6,7
151:10 153:21
154:5 155:7,15
155:18 156:18
158:14 160:23
164:17 169:10
169:11,13
173:16 178:7
181:12 183:6
184:8 187:19
188:22,23
189:21,22
193:17 195:6,8
195:10 209:9

209:22 210:2,6
224:13 227:15
230:5,18
236:15,16,17
237:10 238:8
238:18 244:7
244:24 245:3
245:11 246:18
248:21 256:2
256:13,15,21
257:10 258:10
260:15 266:24
276:16 281:16
283:6 292:7
295:3,7,20
300:10 307:22
325:13,21
329:22 333:13
345:22,24
346:2,6 350:11
369:11 372:19
374:9 375:7,8
379:5 380:15
389:12 393:1
393:11 394:10
394:15 395:18
404:9 405:7,16
412:19 414:20
415:17 416:12
416:16 429:9
**looks** 50:19
87:12 112:3
125:8 208:17
257:14 329:17
401:19
**loose** 284:18
**Los** 2:21
**lose** 49:24
**losing** 369:7
**lost** 50:1 356:10
373:13
**lot** 16:8 24:11
53:12 169:12
253:19 276:16
311:24 312:3,8
312:11 330:3
387:15 393:7

401:2 411:18
431:1
**lots** 36:2
**Louisiana** 2:5
9:1
**LUNDY** 2:2,2
**lung** 227:22
228:1 312:21
313:4,5 321:9
323:18 325:3,8
327:14 329:19
369:14 370:7
403:15
**lungs** 311:23
313:18 314:19
315:5 316:5

---

## M

**M** 2:3 321:16
**M-A-L-M** 97:24
**ma'am** 120:22
**macrophage**
395:3,21
**macrophages**
313:9,16,18
314:3 316:3,19
317:3 321:20
322:9
**macrophages'**
316:5
**magnetic** 289:22
**main** 1:16 3:8
408:11,23
**maintain** 9:3
303:4 353:12
425:15
**maintained** 68:3
**maintains** 65:24
66:13
**majority** 383:24
426:17
**makeup** 216:17
**making** 41:20
44:5 98:10,13
98:13 378:16
**Malm** 97:24
99:1,14,21

101:3,19
**mammalian**
396:3,5 397:9
406:1 407:7,13
**man-made**
17:14 19:9,19
24:2
**manager** 281:20
341:19 342:1
**manner** 246:4
348:15
**manual** 17:24
18:6 19:14
20:14 24:9
405:14,20
410:8
**manufactured**
14:24 15:5,11
27:3,9 35:17
36:6 56:11
**manufacturer**
16:1 32:3
51:20
**manufacturers**
30:22
**manufactures**
36:2
**manufacturing**
49:8 291:12
**March** 178:19
262:24 263:1,3
**mark** 20:6 26:7
50:8 72:8
81:23 93:6
141:6 157:17
159:16 164:5
165:7 172:6
174:13 224:16
249:8 284:12
284:14 340:13
398:15
**marked** 9:8,11
10:15 12:5,8
17:19,23 20:3
26:10 50:4
72:12 82:3
93:10,13 94:1

102:17,22
141:10 157:21
159:20 164:13
166:12,16
168:5 170:10
170:14 172:9
172:20 174:17
183:11 190:9
197:3,7 201:18
201:21 217:10
217:16 224:19
235:8 249:12
250:19 252:8
261:14,20
273:9,13
279:24 280:4
280:22 284:21
293:5,8 320:18
320:21 340:16
347:23 348:2
351:15 352:20
362:11,14
386:8,13
398:19 399:22
415:7,10 416:2
419:9,12
**marketing** 1:4
66:7
**marks** 142:15
431:19
**married** 37:24
38:12
**master's** 97:19
**material** 21:23
54:15 91:21
92:6,7 316:20
355:8 360:3
362:6,9 371:12
**materials** 5:16
18:2 68:13,14
71:20 100:3
102:21 103:5,8
103:16,18
104:20 106:21
106:24 130:7
138:24 140:19
158:7 160:5

Kelly Tuttle, Ph.D.

Page 463

| | | | | |
|---|---|---|---|---|
| 164:8 167:23 | 139:18 152:22 | 227:7,18 | **medicine** 75:6 | 178:12 268:4 |
| 170:18 172:19 | 154:24 156:19 | 242:22 261:3 | 223:21 408:17 | **methodologies** |
| 174:5,24 | 157:8 166:19 | 305:8,12,14 | 409:4 | 27:22 28:5,20 |
| 183:12,24 | 177:11 190:21 | 315:8 318:13 | **meets** 364:23 | 29:3 30:1 |
| 191:14 192:12 | 194:16 204:7 | 326:1,3 327:8 | **member** 26:2 | 58:23,24 59:12 |
| 193:9 202:3,8 | 205:6 207:9 | 328:7,22 329:1 | **membership** | 59:23 60:4,6 |
| 202:19 203:4 | 216:21 220:13 | 330:18 331:14 | 26:18 | 60:12,15 |
| 205:22 216:12 | 235:4 240:24 | 333:9 334:9 | **memory** 253:23 | 133:22 187:11 |
| 216:15 251:10 | 242:1,24,24 | 335:3 336:20 | 313:14 401:5 | 265:20 266:5 |
| 251:20 252:10 | 249:21 250:3 | 337:5,14 | 405:10 | 267:1,14 |
| 287:15 288:18 | 250:11 259:24 | 389:14 390:7 | **mention** 117:12 | 270:12 288:22 |
| 290:13,18,22 | 276:15 279:2 | 395:16 | 123:15 153:19 | 303:21 380:20 |
| 312:7 360:2 | 283:9 295:9,22 | **mechanism(s)** | 190:2 207:10 | **methodology** |
| 365:10 374:20 | 297:11 303:24 | 207:1 | 338:22 | 27:1,2,13 28:1 |
| 384:16 389:17 | 305:17 309:2 | **mechanisms** | **mentioned** 31:1 | 28:10,15 29:17 |
| 389:18 390:1 | 318:20 319:23 | 137:16 140:19 | 105:1 153:16 | 58:7,18 59:6 |
| **mathematical** | 319:24 322:20 | 140:22 141:3 | 173:16 199:22 | 59:19 60:14,18 |
| 406:23 | 344:3 358:18 | 227:24 305:23 | 247:23 253:20 | 60:22 61:2 |
| **matter** 8:9 14:1 | 373:15 381:7 | 306:8 307:6,15 | 289:11 389:8 | 73:5 110:4 |
| 14:15 29:6 | 391:7 399:11 | 307:22 309:17 | **mentions** 413:3 | 115:12,14 |
| 39:17 40:23 | 399:14,16 | 310:5 314:15 | **mere** 92:3,5 | 117:22 119:11 |
| 158:8 160:8 | 401:7 402:5 | 314:17,24 | 242:23 243:6 | 123:1 185:19 |
| 168:1 267:7 | 404:6,7 421:16 | 315:4,10,17,19 | **merely** 73:6 | 185:20 187:14 |
| 379:8 380:4,12 | 423:9 425:11 | 315:21 317:4 | 152:5 169:7 | 236:3 239:14 |
| 381:8,21,22 | 427:24 430:5 | 319:15,19 | 185:19 187:11 | 242:6 254:19 |
| 423:19 | **meaning** 171:21 | 321:4 322:13 | 211:11 259:4 | 267:8 268:2,5 |
| **matters** 13:9 | 191:3 | 322:22 323:13 | 303:20 345:14 | 268:13 269:2 |
| 41:9 52:22 | **means** 45:21 | 329:22 330:1,6 | 401:16 | 270:20 272:3 |
| 381:7 | 80:11 106:16 | 330:10 332:1,5 | **mesothelioma** | 298:4 346:20 |
| **maximize** 171:2 | 108:14 109:5 | 332:7 334:16 | 369:13 370:7 | 347:3,6,9,14 |
| **mays** 220:20 | 151:19 156:2 | 337:21 338:16 | **Messel** 13:6 | 347:19 348:15 |
| **McDonald** 6:7 | 166:20 191:3 | 340:5,7 346:4 | **messengers** | 348:16,20,23 |
| 174:16,21 | 198:22 262:20 | 396:12 | 323:23 | 348:24 349:3,9 |
| 178:16,24 | 299:11,13,18 | **mechanistic** | **met** 8:23 33:4 | 349:16,21,24 |
| 179:20 | 315:24 328:23 | 181:8 306:3,18 | **meta-analysis** | 367:9,11 368:8 |
| **MDL** 1:4 8:10 | 381:10 401:9 | 330:10 334:2 | 202:24 208:15 | 368:13,24 |
| 104:4 | 401:10 | **mechanistics** | 208:21 | 371:18 426:7 |
| **mean** 11:2 35:2 | **meant** 36:4 | 337:17 | **metal** 285:13 | **methods** 196:11 |
| 37:6 42:13 | 70:13 92:20 | **media** 41:11 | 424:11 | 210:3 269:6 |
| 46:9 56:14,15 | 157:14 207:11 | 42:3 43:8,17 | **metals** 287:22 | 271:5,8,8 |
| 57:19 71:13 | 222:24 249:18 | 43:21,24 44:6 | 289:20,23 | 288:6,8,9,12 |
| 73:1 79:20 | 338:12 339:1 | 44:16,19 45:2 | 292:11 423:22 | 288:15 289:9 |
| 80:7 88:13 | 401:11 404:19 | 45:5 46:19 | 423:23,24 | **metrics** 343:24 |
| 90:22 91:22,24 | **meat** 154:7 | 403:5,5 417:4 | 424:5,8,15,19 | **Michael** 1:18 |
| 92:6 97:16 | **mechanism** | **mediators** 324:3 | 424:23 425:8 | 2:19 3:7 99:8 |
| 101:2 121:20 | 113:5 212:22 | **Medical** 384:20 | **method** 163:4,9 | **michael.ander...** |
| 131:15 134:4 | 226:16,16 | 385:2 | 169:9,12 | 3:8 |

Kelly Tuttle, Ph.D.

Page 464

michael.zeller...
2:19
MICHELLE
2:13
mid-sentence
124:19 206:21
middle 83:4
301:19 322:1
326:12
migrate 88:16
89:3,10,24
91:6 107:14
110:11,15,19
110:24 111:4,8
111:23 112:15
113:20 114:9
116:8 119:9
120:11 124:16
126:7 135:19
137:1 139:14
139:23 173:5
175:8 195:8
206:9 211:13
213:15 214:4,9
228:5,24
230:11 232:4
233:21,21
242:18 244:19
253:8 303:17
322:14 333:4
334:1
migrates 111:13
305:5
migrating
111:19
migration 88:3
89:6 90:14,20
91:4,20 107:11
107:13 108:2,5
108:14,23
109:5,13,14
110:3 111:17
112:6,19,24
113:9,24 116:6
116:13,22
117:1,5,8,14
117:17 119:8

120:6 123:7,18
124:15 125:5
125:12 127:7
127:11,18
128:4,6,23
129:14,21
130:15,20
131:23 132:1
132:17,23
133:9,13,16
134:6,23
135:11,18
136:11,17
137:9 142:7
145:22 149:17
150:8 164:19
164:19 169:11
169:20 171:13
173:1 176:2
177:10 179:2
179:23 180:20
184:18,19
185:24 186:5
186:15,20
192:7,9 193:7
193:7 194:10
195:6,13,24
196:5 204:16
208:20,23
209:10,14,22
210:6,20
211:12 212:23
213:2,9 216:7
218:7 220:16
221:23,23
229:16,20
230:10 232:3
232:13 233:10
239:4 241:16
242:16 243:10
243:10,19,23
243:23 245:8
260:18 293:18
303:7 304:2,9
304:17 305:3
332:9,12,16
333:1,15

337:15,16
Mike 8:15
Miller 1:18 8:15
32:21 432:2,18
millions 64:9
113:13 191:24
Mills 293:20
mind 40:8 70:4
74:19 93:20
122:12 124:7
145:9 160:11
228:2 301:24
mine 38:17
39:19 290:24
mined 290:19
292:3
mineralogist
292:24 293:1
366:3 368:12
mineralogy
366:5
minerals 162:21
289:23
mines 292:14
minute 179:15
275:12
minutes 85:18
158:23 182:19
280:16,18
351:3
misguided 84:10
misinform
421:2 422:6,21
misquote 156:10
403:4
missing 116:20
misspeak
344:14 402:20
403:3
misstates 194:14
276:6 303:11
303:11 329:14
357:18,18
misunderstood
193:1
mitigate 22:10
46:2

mode 418:3
model 397:21
398:9
models 383:3
387:9 390:24
398:4,4
Modern 5:12
80:15 81:11,15
81:22 82:2,13
82:16 84:2
molecular 130:4
132:12 207:1
341:20
moment 12:1
50:2 65:9
87:15 92:19
124:20 135:9
160:14 169:2
180:23 198:3
209:14 326:7
346:10 386:19
392:12 410:9
413:10
moments 8:24
37:14
monograph
5:18 7:6
141:10,21
142:22 143:9
143:10,11,18
144:13,22
145:5,10,13,15
145:20 146:2,6
148:2 180:24
181:3,3,6
182:5,11
184:24 187:16
188:10 189:3
190:6 362:13
363:4 369:5,17
monographs
363:16
Montgomery
2:10
month 33:5,7
months 403:9
412:21

Moore 33:19
Moore's 33:20
372:2
morning 8:21,22
218:3
mother 36:10
mouth 169:22
move 136:21
137:22 163:2
169:19 196:15
247:5 279:24
358:8
movement
148:22 149:10
149:16 150:5
150:13 151:13
151:19,24
152:12 156:23
moving 161:22
246:8 428:18
mparf@aol.co...
2:14
MSDS 355:9
356:18 357:8
Mucociliary
322:18
mucous 323:24
multiple 60:6
126:5 331:5
music 201:14

**N**

N 2:1 3:1,2
N.W 3:13
Nadia 33:18
name 8:4 33:21
33:22 34:14
35:12 63:17
81:3,6 97:13
99:9 219:1
249:3 250:21
283:18 293:13
302:1 327:24
341:14,21
names 47:4
96:13,23
101:12

Kelly Tuttle, Ph.D.

Page 465

narrow 35:23
126:12
Nation 63:17
97:1,2
National 197:17
198:5,8,10
199:7 200:8
222:16 404:24
Nations 350:19
352:10,21
353:14 354:17
359:6
natural 17:14
19:19 24:2
49:24
naturally 15:18
19:9
nature 63:13
67:3 100:19
213:12 214:20
214:20 277:11
419:17,18,19
420:12
NCI 197:14,15
197:16 198:21
199:18
NCRA 432:19
432:19
near 204:2
322:13 362:17
nearing 86:1
necessarily 40:3
44:18 50:11
91:20 139:18
240:24 241:24
303:2 316:22
392:20 428:2
necessary 10:3
51:2 56:18
84:12 170:24
288:1 290:3
431:5 433:4
need 21:22
50:18 53:15
56:15 60:3,7
60:17 73:14
74:24 83:10,20

84:21 85:5
86:2 108:21
114:15 117:10
123:10 139:19
143:3 144:7,23
146:16,17
151:14 157:12
160:20 173:18
178:13,21
190:23,24
191:6,18
193:15 195:17
196:7 204:19
208:16 231:6
237:7 238:3
241:21 242:2
242:22 246:15
246:21 248:4,8
248:14,17
251:11 252:16
258:8,9,10
260:6,12,13
268:22 276:24
280:7 286:9
298:22 300:15
300:16 304:20
324:19,20
335:16 338:3
342:19,20
344:15 347:7
350:6 356:17
356:19 362:16
377:23 389:11
395:16 396:8
396:17,23
397:16 403:16
406:17 408:3
413:21,22
415:5,6
needed 410:4
needs 85:23
410:5,15
negative 79:17
neither 109:8
180:12 420:22
422:16 432:13
432:14

never 70:12
205:8 228:2
420:18 422:12
new 1:1 3:4
22:18 23:8
25:14 201:9
223:21 253:18
259:3 304:23
newborn 36:10
36:15 42:7,13
380:6 427:16
429:14
news 34:19
35:14 37:17
42:16 384:11
Newton 5:19
128:19 157:20
182:5,9,16
183:21,22
184:5,10 188:1
188:15 189:20
nine 72:2,5,5
73:19,23 74:8
75:13 76:3,20
77:5 78:13
79:6,7 80:1,1,4
83:3,15,18
87:10 114:22
115:5,8 203:22
227:3,15
233:11 300:3
ninth 20:12,15
23:2,4
non 74:12 77:19
80:7
nonasbestos-c...
350:15 352:2
352:10 353:15
353:18 354:9
356:14 357:3
357:16 359:5
359:13 360:15
nonexistence
330:17 331:13
nonlitigation
384:1
nonresponsive

358:9 431:2
nonresponsive...
431:6
Nony 6:20
320:17
normal 106:15
142:10,18
144:3,4,10
147:3 149:24
185:5 252:14
253:4 260:5
344:18,21
345:4 389:10
normally 182:10
Notary 1:20
432:3,21
435:20
note 10:14 116:3
159:3 162:14
163:6 205:20
218:1 219:7
222:10 409:9
414:22 416:3
416:13 430:24
431:13
noted 8:12 18:1
26:18 169:23
288:6 327:4
387:8 388:13
392:4 416:7
417:1 433:11
435:7
notes 4:12 39:10
39:11 436:1
notice 165:13
176:7 390:10
noting 73:20
244:13
November
32:20 33:2
40:1 282:8
NRC 59:19
60:13,22
NTP 7:8 218:14
222:8,12,16,20
222:24 398:17
398:21 399:8

400:9,17
401:12,24
404:3,12,14,17
405:6 412:18
414:11
NTPC 404:16
404:18
nu- 136:14
nuances 42:2
128:23 129:15
405:10
Nucor 55:12
number 5:3 14:8
15:18 16:22
68:21 87:8,11
87:12,18,19
92:24 94:9
130:1,5 161:6
176:11,13
190:12 205:12
223:13 253:22
254:8 275:8
286:16 288:22
311:17 313:2
313:11 314:1
314:14 317:10
336:6 346:14
346:17 351:10
399:2 404:5,8
416:4,8
numbered
217:11 306:22
numbers 75:8
94:7 101:9,11
252:13 253:3
260:4 310:18
312:14 321:7
411:11
numerous
157:11
nurse 146:16

O

O 172:15
O'DELL 2:8
o0o-- 431:24
oath 9:17

Kelly Tuttle, Ph.D.

| | | | | |
|---|---|---|---|---|
| **obeyed** 75:23 | 172:1 173:8 | 290:8 291:7,21 | 384:9 387:14 | 375:11,22 |
| 76:16 | 174:7 175:18 | 296:3,17 | 388:1 389:1,6 | 376:7 378:20 |
| **object** 273:19 | 177:23 179:5,9 | 297:15,18 | 390:14 391:10 | 379:1 |
| 398:8 | 180:7 182:23 | 298:18 299:7 | 392:15 393:18 | **occupationally** |
| **objection** 15:13 | 185:17 186:7 | 299:22 301:10 | 395:13,23 | 13:21 |
| 16:4,20 19:15 | 187:1 188:20 | 303:10 306:1 | 396:21 397:23 | **occur** 139:19 |
| 21:6 24:20 | 189:9 190:16 | 306:11 307:17 | 398:10 406:10 | 210:12 241:1 |
| 25:12 28:18 | 191:16 192:18 | 308:2,11,20 | 407:10,23 | 242:2 243:1 |
| 29:8,21 30:6 | 193:11,24 | 310:21 311:9 | 410:11,22 | 311:6 317:9 |
| 31:12,21 40:18 | 194:13 195:1 | 313:23 315:14 | 412:7 413:2,13 | 408:6 |
| 41:18 42:8 | 196:22 199:9 | 316:7 317:8 | 414:14,18 | **occurring** 15:18 |
| 43:2,13 44:17 | 199:21 200:10 | 318:1,5 319:9 | 416:20 418:23 | 19:9 |
| 45:17 46:14 | 204:18 205:9 | 323:9 324:16 | 421:8 422:24 | **occurs** 260:18 |
| 47:9,18 48:11 | 208:3 209:3,18 | 325:6 327:9 | 425:9,19 | 362:3 408:5 |
| 49:5 51:6,23 | 210:18 211:2 | 328:11 329:4 | 426:22 427:8 | **October** 33:7 |
| 52:8 53:5,23 | 211:23 212:9 | 329:13 330:22 | 427:18 428:6 | 39:24 294:1 |
| 54:22 57:8 | 214:11 215:1,7 | 331:2,16 332:3 | 428:24 429:6 | **odd** 223:23 |
| 58:21 60:1,24 | 219:10 220:11 | 332:21 333:11 | 429:19 430:3 | **odds** 294:19,22 |
| 61:19 62:2,14 | 220:17 221:13 | 334:5,13 335:7 | 430:11,19 | 294:24 295:6 |
| 64:4 65:1,22 | 221:24 222:22 | 335:12,15,23 | **objections** 378:2 | 295:18,23 |
| 66:9,19 67:23 | 224:6 225:16 | 336:4,22,23 | 380:8 | 296:7,16,18,19 |
| 68:10 74:5 | 226:5,18 229:3 | 337:8 338:2 | **objective** 210:6 | 297:7,17,21 |
| 77:20,24 78:18 | 230:2,17 | 339:8,16 340:1 | 236:18 | 298:1,8,24 |
| 79:2,14 80:24 | 232:18 233:6 | 342:18 343:6 | **objectives** | 299:4,20 300:6 |
| 84:16 88:22 | 234:11,23 | 344:6 345:6,10 | 165:22 177:5 | 300:14,16,18 |
| 89:15 90:16 | 236:7 238:6 | 345:21 347:16 | 196:11 211:19 | 300:22 301:12 |
| 91:18 92:2,11 | 239:16 240:21 | 348:18 349:6 | **obligation** 51:20 | 301:13 |
| 103:10 104:22 | 242:3,7 243:12 | 349:22 350:5 | 52:3 | **offer** 11:13 |
| 107:5 108:17 | 245:17 246:14 | 354:11 356:6 | **observational** | 14:23 84:20 |
| 109:1 112:9 | 247:6 248:3,13 | 356:15 357:5 | 404:20 | 129:20 154:20 |
| 113:1 114:14 | 250:13 251:5 | 357:17 358:13 | **observations** | 156:3,6 165:24 |
| 117:9 118:13 | 254:4 255:17 | 359:14 360:8 | 163:14 | 166:8 175:1 |
| 119:15 120:7 | 256:10 258:3 | 360:17,24 | **observe** 223:20 | 212:8 278:1 |
| 121:24 122:8 | 258:13,19 | 361:21 365:4 | **obstacle** 71:8 | 299:20 330:16 |
| 122:21 123:9 | 259:8,21 260:9 | 365:17 367:7 | **obtain** 285:22 | 331:12 336:18 |
| 126:16,22 | 263:11,22 | 367:21 368:17 | 342:12 | 357:22 359:8 |
| 127:21 128:13 | 264:16 265:3 | 370:9,23 371:5 | **obviously** 73:2 | 360:7 366:4 |
| 129:22 130:18 | 265:16 266:7 | 371:8 372:4,12 | 163:16 164:2 | 382:21 418:14 |
| 132:3 133:14 | 266:11,18 | 373:9,24 375:6 | 302:24 350:3 | 418:16 |
| 134:7,11,16,24 | 267:11 268:10 | 375:15,19 | 385:6 431:8 | **offered** 77:16 |
| 138:16 139:9 | 269:4,14,23 | 376:2,16 377:4 | **occasions** | 212:11 230:15 |
| 140:6,15,24 | 270:22 271:20 | 377:8 378:10 | 157:12 | 427:20 |
| 145:23 153:15 | 271:23 272:15 | 378:18 379:10 | **occupational** | **offering** 100:13 |
| 155:1 156:16 | 274:16 275:19 | 379:23 380:9 | 75:6 354:18 | 166:7 |
| 166:10 167:12 | 276:5,21 277:4 | 380:14 381:9 | 355:19,23 | **offers** 46:1 |
| 168:20 169:21 | 278:2,21 283:4 | 381:23 382:4 | 369:23 370:12 | 218:6 379:15 |
| 169:22 171:16 | 286:7 288:4 | 382:23 383:12 | 373:1,4 374:2 | 379:17 |

Kelly Tuttle, Ph.D.

**offhand** 355:21
**office** 18:7,8,10
  18:11 420:1
**official** 218:4
**oh** 35:19 123:14
  161:24 164:24
  177:17 198:17
  401:1 404:21
  421:14 422:2
**Ohio** 3:9
**oil** 13:3 14:7,10
**okay** 10:4,19
  14:1,22 33:18
  35:16 36:20
  38:2 39:10
  44:7 45:4,10
  46:21 47:6
  49:18 51:15
  52:17 59:4,15
  59:18 60:20
  66:12 67:5
  68:5 69:19
  71:3,23 72:7
  75:3 79:19
  81:10 83:7,14
  84:1 85:9,17
  85:21 86:15,23
  87:5 89:5
  90:10 92:18
  93:2 94:21
  97:8 100:7
  102:15 103:23
  104:10 105:7
  105:12,19
  106:3 107:7,10
  109:11 115:17
  116:11,24
  117:19 119:10
  120:14 122:12
  123:4 127:3
  129:1 133:2,20
  137:5 141:5
  143:6,19,21
  144:1 146:11
  146:17,19,20
  147:10 149:1
  150:3 152:2,13

153:11 154:3
159:7,11,15
160:21 161:21
162:10 164:17
164:24 165:6
165:17 167:8
167:20 168:18
169:18 171:14
171:20 174:1
176:24 180:22
181:21 184:22
186:21 197:2
198:21 199:2
201:9 202:16
202:21 203:12
204:14 205:17
206:6 216:15
217:21 225:12
226:1,9 235:4
240:12 241:22
245:21 246:2,5
250:17,22
252:12 261:19
262:2,8,21
278:9 280:17
280:19 281:18
283:16,21
285:15 293:2
294:21 295:22
298:21 305:14
305:21 309:8
312:14 313:8
315:11 317:20
321:21 323:1,4
324:13 338:24
339:21 340:12
342:5 343:2
344:12 350:2,9
352:18 356:8
362:21 363:13
364:14 369:4
372:15 379:24
383:2 388:18
395:10 397:12
399:21 401:23
402:21 415:19
416:1,18 422:2

424:21 425:15
427:14 430:23
431:8
**old** 281:1
**older** 363:21
**omit** 77:17
  163:21
**once** 125:15
  309:12 341:8
**one-page** 20:7
  102:24
**one-paragraph**
  306:22
**ones** 44:9 103:18
  103:21 104:8
  188:10,11
  189:15,15
  363:21 394:18
**ongoing** 131:7
  401:21,22
**Oops** 322:4
**open** 124:4
  175:9 218:8
  281:9 359:5
**opened** 95:6
**opening** 167:4,7
  167:11
**opine** 236:8
**opines** 109:4
**opinion** 11:13
  14:24 42:23
  78:21 108:3,12
  108:23 109:8
  109:12 112:6
  112:23 113:9
  145:16 169:20
  193:23 208:24
  213:2 215:5
  264:18,24
  265:5 266:6,10
  266:17 267:6
  267:13,22
  268:9 269:3,22
  270:20 271:16
  271:17 277:22
  277:23,24
  295:10 298:14

303:12 331:13
333:7 334:8
336:18 337:3
373:15 379:15
423:4,8,14,24
**opinions** 67:2
  100:12 113:3
  122:18 129:21
  133:6 134:10
  135:5 146:9
  166:7 175:1
  199:20 212:10
  212:15 218:21
  222:3,4 230:14
  254:14 255:6
  256:20 263:20
  264:10 269:10
  269:17,18
  270:16 278:3
  303:9,14,18
  304:8 319:1
  330:17 337:9
  343:5,7 366:4
  376:3 382:3
  427:19
**opportunity**
  70:7 165:24
  170:2 171:6
  176:6 177:16
  193:13,18
  336:16 348:13
  390:11
**opposed** 43:5
  90:3 100:8
  155:15 159:6
  173:14 189:23
  243:6 245:2
  335:18 371:20
  377:17 428:8
**opposite** 278:13
**opposition**
  117:5,8,14
  125:5
**options** 15:19
  274:11
**order** 40:15
  141:16 151:12

248:9 286:1
**ore** 289:19
  290:13
**organ** 91:21
  92:8 139:17
  210:11 314:20
  314:21
**organisms** 17:11
  18:20 19:3,10
  19:20 23:16
  24:3 343:20
  344:1
**organization**
  222:13 364:23
**organizations**
  223:1
**organizing**
  100:2
**organs** 148:15
  314:10,18
  315:3 329:24
**organs'** 314:24
**original** 76:12
  105:8 144:9
  202:19 433:15
**originally** 385:7
**ORs** 294:13
**OSHA** 354:17
  364:24
**outlined** 65:9
  158:21 279:17
**outside** 18:12
  126:14 138:5
  212:9,14
  258:11 365:17
  376:2 379:11
  427:18
**ovarian** 6:8 9:5
  11:15,22 27:20
  29:13,20 30:12
  42:22 45:9
  57:14 62:22
  65:21 66:24
  68:9 88:1 91:3
  91:14 149:6
  153:18 161:12
  162:17 197:6

Kelly Tuttle, Ph.D.

| | | | | |
|---|---|---|---|---|
| 199:12 206:10 | 426:9 430:18 | 327:12 332:13 | 87:5,15,21 | 410:9 412:20 |
| 206:16 207:2 | **ovaries** 88:2,3 | 333:5,16 334:1 | 96:5 101:14,15 | 413:9 415:23 |
| 209:1,7 210:16 | 88:13,17,21 | 334:3 336:21 | 107:11,20 | 416:13 418:22 |
| 211:1,6 212:7 | 89:3,10,14 | 382:22 410:21 | 108:10 114:17 | 419:1 420:14 |
| 212:19 218:10 | 90:1,7,19 91:7 | **ovary** 108:6 | 123:23 124:10 | 421:14,15 |
| 218:15 222:21 | 91:9,12,16 | 163:13 233:21 | 124:13 125:9 | 434:2 436:3 |
| 226:13 230:24 | 107:17 108:13 | 245:16,23 | 125:20 135:8 | **pages** 71:23 72:1 |
| 232:9 233:15 | 109:5 110:12 | 315:20,21 | 136:15 142:2,3 | 83:19 96:7 |
| 236:11 242:13 | 110:15,21 | 332:2,5,7 | 143:20,23 | 102:5 180:11 |
| 244:1,2,9 | 111:5,10,19 | 369:14 370:8 | 147:5 148:1,3 | 202:21 358:19 |
| 245:4,13,16,22 | 112:7,16 | 376:1 378:17 | 148:6 158:3,17 | 358:19 359:11 |
| 246:11,19 | 113:21 114:9 | **overall** 116:14 | 158:18 160:10 | 368:16 379:20 |
| 247:1,4,21 | 116:10 119:9 | 127:10 132:14 | 160:23 161:8 | 383:4 402:10 |
| 248:23 252:14 | 120:12 126:9 | 163:8 | 161:24 162:23 | 411:4,10,21 |
| 252:24 253:4 | 130:23 137:1 | **overarchal** | 163:7 164:18 | 435:5 |
| 257:2 260:5 | 138:2,23 | 237:11 | 164:23 168:6 | **paid** 411:8 |
| 263:8 264:13 | 139:15 140:23 | **overarching** | 170:20 172:23 | **paper** 72:23 |
| 264:21 265:24 | 142:10,17 | 225:24 236:9 | 175:5,14 | 73:11 74:16,22 |
| 268:19 272:13 | 144:3 147:3 | **overhead** 409:7 | 178:18 181:10 | 76:12,22 83:8 |
| 274:10 275:24 | 148:24 149:11 | **overly** 52:14 | 181:11,19,22 | 104:19 105:14 |
| 276:11 281:5 | 149:22 150:2 | **oversaw** 367:14 | 182:3 185:1,11 | 105:24 106:4,7 |
| 293:21 306:4 | 152:1,6 173:15 | **oversee** 99:1 | 185:13,22 | 114:23 115:17 |
| 306:19,24 | 175:10 176:4 | **overseeing** | 187:3 190:5 | 158:19 159:16 |
| 307:10 308:5 | 179:4,23 | 98:22 | 199:6 203:15 | 160:1,21 161:7 |
| 308:15 310:14 | 184:14,20 | **oxidative** 388:22 | 204:1,3,10 | 161:20 162:6 |
| 328:4 330:13 | 185:4 186:1 | 389:4 | 206:7 207:16 | 162:15 163:1 |
| 330:18 331:15 | 190:2 192:8 | **oxygen** 324:2,4 | 207:19 212:3 | 164:6 165:7 |
| 332:20,24 | 195:8,13 196:1 | 324:9,14 | 217:22 223:19 | 167:21 168:4 |
| 333:9 335:1 | 199:15 206:12 | | 226:9 235:4 | 172:12 174:20 |
| 336:20 337:7 | 208:18 209:17 | **P** | 252:22 257:13 | 174:23 179:1 |
| 337:13 343:15 | 210:5,8,10,15 | **p** 2:1,1,8 3:1,1 | 274:6 282:3 | 179:20 180:3 |
| 345:17 355:16 | 211:14 212:23 | 262:10 278:19 | 289:13,18 | 182:7,21 183:2 |
| 355:20,24 | 213:6,16,23 | 279:4 293:15 | 290:7 294:15 | 183:10,16 |
| 356:5 365:7 | 214:5,7,10 | 420:19 422:14 | 301:18 302:10 | 184:5 190:9,15 |
| 369:24 370:13 | 215:6,14 228:9 | **p.m** 147:17,19 | 306:21 321:3 | 191:12 194:7 |
| 370:16 372:21 | 230:11 232:5 | 240:6,7,8,10 | 322:14 326:9 | 202:7 203:3,9 |
| 373:2,7,17,18 | 232:15 233:11 | 284:1,2,3,5 | 334:23 338:13 | 203:20 204:11 |
| 373:22 374:4 | 240:17,24 | 364:8,9,10,12 | 341:17 350:10 | 207:11 212:2 |
| 374:10 375:1,8 | 241:7,16,23 | 431:21,23 | 351:24 352:22 | 218:2 219:4,15 |
| 375:11,12,18 | 242:19,21 | **page** 5:3 13:6 | 352:24 353:3 | 219:24 220:5 |
| 376:8,10 378:1 | 244:13,14,19 | 14:13 18:14,17 | 355:1 357:14 | 221:21 223:5 |
| 378:15,21,24 | 244:22 248:17 | 20:9 22:6 | 363:24 369:9 | 249:16 250:23 |
| 379:2 381:3,17 | 249:1 253:11 | 25:20 68:17,19 | 388:14 389:22 | 252:6,8,15,23 |
| 382:18 390:18 | 260:20 303:18 | 70:10 71:12,14 | 392:5 395:1 | 253:16,17 |
| 397:22 398:4,4 | 304:18 305:5 | 73:17 74:19 | 399:21,24 | 256:6 257:23 |
| 398:8 403:20 | 314:19 315:5 | 75:4,8,9 82:7 | 400:1 401:12 | 274:20 275:2 |
| 411:16 425:18 | 315:10 326:16 | 82:12 86:24 | 405:16,19 | 275:15 278:7 |

Kelly Tuttle, Ph.D.

293:18,19,24
294:2 327:4
354:8
**papers** 116:19
169:18 183:21
192:23 193:4
220:2 251:9
252:9
**paragraph**
18:16 22:7
25:10,20 50:19
75:12,18 78:15
82:18,22 83:3
83:5,17 84:2
109:2 124:12
135:10 146:12
148:8,11 149:2
151:2,20 152:8
152:9,14
154:13 168:7
175:6,14 180:9
181:13 182:3
187:3,9 188:3
188:15 190:5
203:13 204:2
206:19,23
207:7,23
208:10 223:18
226:11,11
228:4,16,21
230:4,14,23
232:12,20
235:1,1,6
253:15 255:2
256:24 263:4
281:2,3 282:4
282:9 289:12
289:17 290:2
293:17 294:9
301:19 307:3
308:4,14,23
309:11 322:1
323:20 326:13
326:24 328:2
330:7 334:22
338:1,13
350:12 352:4

388:14 389:23
395:2 400:7
402:11 406:7
420:16 421:10
421:17,17,18
423:3
**paragraphs**
125:19 188:4
383:6,7
**Paralegal** 3:18
**parallel** 98:23
**parameters**
92:16 395:17
**paren** 281:9,9
359:6,7
**parenthetical**
161:15 352:14
**PARFITT** 2:13
**Park** 3:4
**part** 24:18 27:13
31:8 47:15
51:8 53:6
56:13 77:4
81:18 87:1,23
102:17 115:13
117:21 118:3
119:11 122:2
123:5 126:1,4
127:9,22 128:1
128:15 129:5,7
131:7 132:10
132:14 137:2
145:1 203:6
216:24 238:4
239:14 241:9
243:9 244:15
254:12 257:23
257:24 263:15
267:6,22 268:8
269:21 270:15
294:8,14,16
296:21 328:3
352:13 365:15
366:12 421:22
**particle** 92:4
108:5 136:17
139:17 142:7

171:12 185:24
186:5,15,20
312:19 318:4
364:22
**particles** 88:2,12
88:20 89:2,9
89:11,13,23
90:2,7,9,19
91:6,9,12,16
107:13 112:1,3
136:24 138:3
140:5 148:23
149:10 150:6,8
151:19,24
156:23 158:21
159:5,12 161:1
161:3,15
162:19 163:5
169:7,8 178:10
182:17 183:5
184:11 189:21
206:8 210:24
212:6 228:4
247:3,21 249:1
252:14 253:3,6
259:13 260:5
260:12 281:5
310:18 311:5
311:17 312:15
313:20 316:4,6
317:1,15 319:7
321:7 322:16
323:16 325:1,2
325:9,15,16
326:4 330:19
331:14 371:20
**particular** 15:19
31:18 35:10
40:7 46:13
47:4 55:16
57:10 59:6
65:10 73:15
96:7 101:17
118:1,16
137:11 150:19
151:1 153:19
154:12,22

155:16 165:18
184:12 185:22
188:3 207:19
207:21 208:10
211:3,15 227:2
229:14 237:9
238:13,22
239:19 240:1
254:24 255:1
292:14 300:22
323:15 325:13
329:20 355:5
359:19 370:14
378:5 402:11
403:14 404:10
414:19
**particularly**
38:18 108:1
205:18
**particulate**
228:8 326:15
**particulates**
228:24
**parties** 432:13
**parts** 331:5
354:23
**party** 432:11
**pass** 213:21
**passing** 175:8
420:10
**pathologies**
152:19
**Pathology**
174:22
**pathway** 382:21
**pathways**
319:19
**patience** 117:2
**patient** 6:9
197:7 198:24
199:23
**patients** 162:17
182:18 189:24
**pause** 220:15
221:11 304:7
**PC** 2:8
**PDQ** 198:9,12

198:22 199:3
**PDR** 6:9 197:7
**peer** 98:6,8
**peer-reviewed**
68:1 105:5,18
237:14
**pelvis** 206:9
**people** 100:21
130:8 271:16
**perform** 58:4
60:16 126:24
**performance**
58:9 289:5
**performed** 58:5
59:15 118:5
254:20 255:10
**performing**
295:4 342:24
**perineal** 11:21
15:20 30:11,20
32:1 62:21
65:20 66:23
68:7 88:15,18
89:1,8 91:2,4
107:15 108:15
109:7 110:10
110:14,18,23
111:3,7,15
112:7,14
113:19 114:7
116:7 119:8
120:10 123:8
124:15 126:8
127:19 130:22
135:18 136:12
149:3 150:16
152:4,9 159:6
165:15 166:19
166:20,20,22
169:6 171:11
176:1 177:8
178:9 179:3,14
179:24 180:19
184:11,18
189:23 192:6
194:9 195:23
206:16 209:10

Kelly Tuttle, Ph.D.

211:13 212:18
214:18 228:7
232:9 233:10
233:14 241:15
242:12 245:12
246:18 248:22
260:16 265:23
275:23 293:20
304:16 326:14
332:13 333:10
333:16 343:14
345:15 378:23
381:16 390:17
403:19 426:18
**perineally** 29:13
57:14 136:24
139:14 244:9
245:4 264:20
268:19 343:13
382:17
**perineum** 88:16
166:20,21
167:2,15 175:7
175:24 176:21
179:2 199:13
213:15,21
215:12 228:5
228:24 244:18
333:24
**period** 99:3
149:6 169:11
265:15 352:15
359:7 392:7
**peritoneal** 165:4
168:9 228:6
229:1
**peritoneum**
228:10 326:17
**PERRY** 432:2
432:18
**persist** 325:1
**person** 101:24
**personal** 3:15
34:17 37:7,13
38:7,21 39:15
39:18,22 40:12
41:3 42:5,17

42:24 43:4,12
44:15 57:22
218:19,20
220:19 221:2
222:5 250:9
269:17 270:16
281:16 283:6
294:5 304:11
328:14 342:22
**personally**
33:21 34:15
57:24 261:16
**persons** 101:4
**perspective**
13:11 15:23
16:15 49:11
56:2 59:22
91:17 132:6
315:12
**pertained** 33:14
**Pervasive**
420:14
**petition** 231:9
231:10 234:13
**petitions** 232:23
**ph** 1:23
**Ph.D** 1:15 4:6
5:1 8:11,17
98:18 99:16
289:9 295:15
296:9 320:7
341:19 342:1
383:14 432:4
435:4,12
**Phagocy** 316:13
**phagocytes**
323:21
**phagocytize**
315:24 316:14
316:17 317:3
322:15
**phagocytosis**
395:3,21
**pharmacokin...**
406:24
**Phillips** 84:8
**photographic**

253:23 405:9
**photographs**
161:6
**phrase** 282:17
344:20,24
345:12 385:19
**physical** 18:20
19:18 23:15
**physiological**
396:12
**physiology**
130:3 132:12
397:18,20
406:20 410:17
**pick** 315:3 364:5
**piece** 275:2,15
423:4,5,14
**pin** 38:15
**piqued** 43:18
44:9,19 45:5
**place** 8:8 136:10
281:1 338:22
369:8 432:8
**placed** 158:22
192:3 214:14
**places** 32:5
418:4
**placing** 191:2
**plaintiffs** 13:18
**Plaintiffs'** 2:6,11
2:16
**platforms** 98:24
**plausibility**
86:23 87:1,7
87:16,22,23
90:11,12
112:20 114:12
114:17 115:18
115:19 116:1
119:6 204:4,9
204:11,16
206:8,15 207:5
207:8,10,13,14
207:22 212:20
214:1 224:9,13
234:8 236:6,18
237:24 238:24

239:14 243:4
244:16 245:8
305:6,7,10
333:13
**plausible** 112:8
112:24 228:7
232:13,15
234:10,22
235:2 238:1
326:14 330:18
331:14 336:19
337:4,14
**play** 63:1 98:1
132:13 298:14
313:10,19
314:3 321:16
388:5
**plays** 24:24
**please** 31:14
55:21 74:14
134:17 217:4
223:14 306:21
307:4 347:1
380:1 409:11
422:10 433:3,8
**pledge** 124:3
**plumber** 131:20
131:24 297:4
**plumbing**
131:16 297:2,3
297:3
**Plunkett** 110:2
142:5 185:16
185:19 186:14
186:18,23
187:11 303:7
303:19 387:1
389:22 390:9
390:20,22,23
391:6,8,14
392:3,7,9,13
**Plunkett's**
107:12 108:2,4
109:14 124:14
135:11,17
136:16 185:20
186:5 386:20

387:6 388:14
388:17 390:19
391:15 393:1
394:24 395:1
**pocket** 201:13
**point** 39:23
40:14 44:4
66:14 115:4
118:24 120:5
123:19 165:19
175:17 180:4
184:16,
184:23,23
186:22 262:3
267:20 274:2
290:4 295:21
297:12 359:20
391:3
**pointed** 173:1
**points** 125:10
127:10 128:9
256:5 269:8
**poison** 24:23
387:17
**poisons** 5:8 20:3
24:11
**policy** 421:2
422:6,21
**popular** 84:10
**population**
418:1
**portion** 125:8
126:1 135:23
136:1,21
203:22 206:18
236:19 287:22
338:4
**posed** 27:16
28:16
**position** 67:6
84:23 99:11
229:23 236:5
264:9 276:24
281:20 330:24
331:11 421:6
422:22
**positions** 96:24

Kelly Tuttle, Ph.D.

positive 367:4
367:19 368:14
368:23
possessing
129:19
possession 67:22
possibility
116:19 145:12
163:22 345:20
possible 149:5
191:11 194:12
194:18,24
205:7 217:5
299:17,18,18
299:18 312:23
post 417:2
posterior 158:22
159:8
postscript 264:4
272:20 279:13
postscriptum
262:23
potential 14:9
17:14 19:2,7
24:1 25:1
30:11 56:2
130:8 138:19
148:22 149:9
152:12 156:22
177:9 195:13
212:17 213:11
218:13 220:21
222:20 228:4
228:23 233:10
248:24 295:7
295:12 333:9
334:9 343:23
381:15 382:16
390:17 411:15
414:9
potentially
22:11 46:3,11
46:12 173:4
338:19
powder 1:4 8:10
9:4 11:15,21
15:10,17,20,22

16:2,10,24
17:6 27:4,20
29:13,20 30:11
30:16,20 31:6
31:10,19 32:1
32:13 33:14
34:18,24,24
35:11 36:5,8,9
36:15,18,21
37:6,7 38:22
40:17 41:6
42:7,12,22
43:1,11 45:1,9
46:13 48:24
53:21 57:7,13
61:18,24 62:12
62:16,21 65:20
66:8,18 67:8
68:8 88:16,19
88:20 89:2,9
89:22 90:3
91:3,5 95:16
108:13 109:4
110:10,15,19
110:24 111:4,8
111:13,16,22
112:6,14,15
113:20 114:8
116:7 120:10
120:11 122:6
123:8 126:7
127:18 130:23
136:12 139:13
153:18 166:24
171:12 173:4
173:17 177:9
178:10,11
180:20 184:19
192:7 199:13
212:18 213:8
213:14,20
214:4,8 215:11
216:17 226:2
229:17 232:9
232:14 233:15
233:20 236:11
241:16 242:13

242:18 244:8
244:22 245:3
246:19,24
248:23 250:4
260:2,17
264:20 265:24
268:18 275:23
285:14 287:16
287:19 291:2
291:15 292:9
292:16 303:16
305:4 306:3,18
330:12 333:24
343:12,15
344:18,22
345:3,16 365:7
365:9,14,24
366:21 367:2
368:3,21
370:15,21
371:4 372:20
374:9,12,14,19
375:8 376:9,14
376:19 377:12
377:12,14
378:23 379:9
380:5,6 381:2
381:5,11,16,19
382:6,9,10,14
382:15,17,21
403:19 411:16
412:10 424:1,7
424:7,10,12,16
424:18,20,24
425:3,5 426:16
426:21 427:7
427:16 428:7
428:16,22,23
429:13 430:1
430:10,10,17
powdered 173:3
powders 290:13
practice 38:17
39:18 77:23
295:15 316:16
practices 1:5
52:3 53:3,10

53:14
pre 417:2
precede 402:11
Precisely 307:24
preclinical
281:21
predisposing
163:23
prefer 144:15
324:9
preliminary
163:14 399:15
401:20 413:19
premise 163:8
165:12 408:15
409:3
preparation
107:2 286:21
prepared
276:17 285:3,6
286:20
preparing 54:10
105:7 347:4
presence 91:9
91:11,15,20
92:4,6 139:16
161:10 206:11
208:18 210:7,9
211:5 213:6
240:23 241:6
242:21,23,24
243:7,24 244:2
244:12,21
248:24 252:13
253:3 260:11
261:5,6 332:23
present 3:17
49:4 53:20
56:3 117:13
246:21 248:17
290:20 328:9
349:10 355:8
374:22 381:4
381:18 382:15
424:8,12,12,16
424:20 425:4
presentation

98:4,10 100:17
presented 56:16
141:14 182:8
188:7 190:8,12
235:23 236:1
305:1 308:9
352:20 384:17
424:22
presents 52:5
257:17
pretty 220:9
prevent 22:10
25:7 46:2,11
51:3
prevention 6:8
23:17 24:5,15
24:17 25:6
197:6
previous 5:5
12:4 35:15
264:5 272:21
294:10
previously 9:20
30:19 33:17
34:18 36:20
55:13 151:6
178:7,8 188:22
197:11 200:11
206:2 226:24
233:7 234:4
237:3,4 245:6
252:3 260:24
264:17 265:21
283:10 294:3
300:9 307:20
314:14 315:18
325:9 327:1,10
328:13 329:21
331:19 332:23
340:4 343:10
360:1 369:21
370:11 372:24
374:15 387:8
392:23 395:15
403:18 406:16
406:19 411:12
420:1 423:1

Kelly Tuttle, Ph.D.

| | | | |
|---|---|---|---|
| 424:5 | 307:8,16 | 35:11,11,13,16 | 33:9 34:7 |
| **primarily** | 309:19 310:6 | 35:20 36:2,6 | 51:19 57:4 |
| 393:15 | 313:13 316:3 | 36:21,24 37:9 | 92:22 95:16,24 |
| **primary** 21:20 | 316:13,24 | 38:22 40:17 | 96:15 97:9 |
| 163:12 287:11 | 317:4 324:15 | 41:6 43:1,11 | 99:24 102:2 |
| **principle** 154:23 | 328:21 329:19 | 45:1 48:10,24 | 120:4 196:19 |
| 156:14,15 | 334:21 335:3 | 49:4 51:22 | 241:12 262:3 |
| 407:8,18 | 336:8 340:6 | 52:5,13 53:21 | 275:7 344:21 |
| **principles** 21:8 | **processed** | 53:21 54:2,4 | 384:4 |
| 21:12,16 22:2 | 289:22 | 57:7 61:18 | **projects** 312:11 |
| 408:11,23 | **processes** 49:9 | 62:1,13,16 | **promise** 373:12 |
| 409:13,15 | 389:10 | 65:21 66:8,18 | **promised** |
| **print** 40:10 | **processing** | 67:8 68:8 | 147:13 |
| 197:17 220:7 | 291:14 | 127:18 216:17 | **promotion** |
| **printout** 386:6 | **produce** 259:3 | 225:15,21 | 335:17 336:13 |
| **prior** 32:24 33:5 | 337:5 | 250:5 263:8 | **pronounce** |
| 39:23 148:20 | **produced** 69:13 | 264:13 272:13 | 218:24 |
| 165:1 177:22 | 388:23 389:4 | 274:10 276:11 | **pronunciation** |
| 416:15 417:12 | 408:13 409:1 | 281:22 287:17 | 172:14,17 |
| 432:3 | **product** 15:1,5,9 | 290:12 292:16 | **proof** 226:13 |
| **probably** 92:24 | 27:4,10 31:3 | 316:23 342:2 | 230:24 |
| 96:16 119:22 | 32:4 37:6,7 | 344:19,22 | **proper** 227:21 |
| 124:6 175:21 | 46:13 48:24 | 345:4 350:14 | 430:1,5 |
| 215:18 249:22 | 51:1,4 54:1,1,9 | 352:9 365:14 | **properly** 138:13 |
| 255:20 258:23 | 54:12 55:4,5 | 366:1 370:22 | 408:14 409:2 |
| 275:9 298:2 | 55:16 56:1,3 | 371:4 376:14 | 409:10,19 |
| 321:19 324:9 | 56:10,14,17 | 377:12 379:9 | 410:5 |
| 429:21 | 111:14 219:9 | 380:5 382:10 | **proposed** 82:23 |
| **problem** 194:2 | 287:18 289:21 | 382:21 412:11 | 88:3 90:13,20 |
| 281:11 420:14 | 290:5 291:5 | 424:1,7,10 | 91:4 305:3,12 |
| **proceed** 86:16 | 292:4 305:20 | 425:1,3 426:21 | 305:14,22 |
| 147:22 240:13 | 345:5 352:1 | 427:7 428:8,12 | 306:8 307:6,14 |
| 284:8 364:16 | 357:9 360:5 | 428:13,22,23 | 309:17 310:4 |
| **proceeding** | 362:8 374:19 | 430:17 | **propounded** |
| 155:12 | 374:20 380:13 | **professional** | 435:6 |
| **Proceedings** 4:3 | 380:17,24 | 33:13 48:22 | **prove** 79:5,10 |
| 8:1 431:22 | 414:10 429:13 | 432:18 | 79:10,13,17 |
| **process** 49:8 | 429:13 | **professors** 385:8 | **proved** 193:7 |
| 98:17 118:21 | **products** 1:4,5 | **program** 222:17 | **provide** 27:8 |
| 119:1,12 | 3:15 9:4 11:15 | 384:21 385:5 | 74:1 76:8 85:7 |
| 121:21 155:13 | 15:10,22 16:2 | 385:11,11,16 | 126:2 131:12 |
| 164:10 268:7 | 16:18 17:2,6 | 386:1 404:24 | 229:5 237:15 |
| 268:24 269:3 | 17:13 24:13 | **progress** 228:12 | 278:4 355:1,6 |
| 269:22 270:15 | 30:16,21 31:6 | 326:19 | 358:4 388:16 |
| 291:11,17,24 | 31:10,10,18,19 | **progressive** | **provided** 34:6 |
| 291:24 292:2 | 32:10,14 33:14 | 400:10 402:1 | 51:9 55:7 63:5 |
| 305:24 306:10 | 34:15 35:1,9 | **project** 31:9,17 | 63:9 68:5,13 |
| | | | 69:1,4,21 70:4 |
| | | | 70:11,19 94:24 |
| | | | 98:2 103:18 |
| | | | 104:3,9 106:17 |
| | | | 114:23 216:9 |
| | | | 216:13 256:5 |
| | | | 286:9 287:13 |
| | | | 304:14 312:7 |
| | | | 348:21 354:3 |
| | | | 392:4 |
| | | | **provides** 73:20 |
| | | | 353:16 354:16 |
| | | | 356:16 357:6 |
| | | | 360:1 |
| | | | **proximity** 88:1 |
| | | | 88:12,20 89:14 |
| | | | 90:19 |
| | | | **PTI** 3:10,10 |
| | | | **public** 1:21 66:8 |
| | | | 220:1 432:3,21 |
| | | | 435:20 |
| | | | **publication** 5:11 |
| | | | 5:19,21,22 6:3 |
| | | | 6:4,6,7,12,14 |
| | | | 6:20 7:11 |
| | | | 64:18 72:11 |
| | | | 157:21 159:20 |
| | | | 164:13 166:16 |
| | | | 170:14 172:9 |
| | | | 174:17 217:16 |
| | | | 220:2 249:11 |
| | | | 302:22 320:18 |
| | | | 415:10 |
| | | | **publications** |
| | | | 64:15 179:13 |
| | | | 256:4 320:8 |
| | | | **published** 65:14 |
| | | | 83:12 118:8 |
| | | | 173:22 174:21 |
| | | | 182:13 183:22 |
| | | | 218:3 219:22 |
| | | | 294:12 302:23 |
| | | | 303:2 419:16 |
| | | | **PubMed** 39:1,7 |
| | | | 40:11 63:12 |
| | | | 64:7 70:24 |
| | | | 178:17 252:1 |

**pull** 70:22 76:7
144:8,9 145:14
**pulled** 163:7
179:12 191:11
391:13
**Pump** 13:6,7,8
13:10,15,19
**Pumps** 13:4
**punctuation**
98:15 100:18
**purchasing**
429:9
**purporting**
248:6
**purpose** 11:4
21:20 29:4
41:2 170:5
287:11
**purposeful**
10:13,17
245:14
**purposes** 93:18
150:7 250:10
286:14 287:20
292:6 374:9
430:24
**pursuant** 432:10
**pursue** 342:12
**put** 18:15 22:8
28:2 42:2 51:9
59:11 64:12
71:18 78:4,8
88:19 101:15
126:11,23
139:11 146:1
154:7 177:15
184:13 192:15
194:23 200:16
203:22 211:20
216:12 229:12
229:18 231:5
238:4 267:2,15
268:5 270:13
290:23 311:23
323:2 351:10
354:19 360:5
370:4 399:9

409:6,10,17
**puts** 56:6 180:4

———— **Q** ————
**qua** 74:12 77:19
80:7
**qualifications**
289:7 384:18
423:17
**qualified** 289:1
408:14 409:2
409:20 410:5
**qualitative**
405:23 406:12
407:5
**question** 9:24
10:8,12 19:5
19:12 27:14,15
28:1,3,16
31:14 35:23
36:1 55:18
56:12 58:23
65:5,10,19
67:9 114:20
121:5,9 122:2
122:10 134:2
134:14 138:12
146:15 147:12
150:4,4 194:18
196:15,16
197:15 198:1
209:13 220:15
224:3 240:20
241:20,21
242:9,10
243:21 244:7
245:2,15
246:13,17
247:12 248:22
254:10 259:22
260:16 268:23
274:2 277:20
292:23 297:20
310:7 329:4
331:6,18 337:4
343:3 346:15
346:19 347:1

349:13,19
351:21,22
352:18 356:8
360:7 361:13
365:1 377:22
380:1 394:6
395:5 398:5
417:7
**questionable**
279:16
**questioning**
205:3
**questions** 9:23
10:3,7 25:4
52:11 117:2
146:19,22
160:19 198:20
215:17 248:18
285:16 397:2
423:22 431:18
435:6
**quick** 86:7 280:9
338:20
**quite** 56:19
185:15
**quotation** 147:7
151:21 187:17
272:17
**quotations** 78:4
145:24 263:24
**quote** 68:24
76:11,21,23
77:4,10,15
87:23 124:14
142:2,15,15
144:1,5,9
146:13 148:5
149:3 170:22
175:11 181:13
185:2 187:7,8
199:16 218:7,8
223:6,24 236:4
238:14 239:20
243:20 263:2
282:15 289:18
369:13,15
392:6 406:3

421:5
**quoted** 25:21
145:11 181:15
185:6,8 186:23
189:5 232:19
235:12 290:6
334:21 417:4
**quotes** 69:1
142:18 218:9,9
223:5 224:11
253:9 263:17
**quoting** 179:20
310:1

———— **R** ————
**R** 2:1,2 3:1
198:13,15
**R-A-D-I-C**
389:21
**R-E-I-L-L-Y**
99:10
**R.P** 341:19
**Radic** 389:21
390:9,12 391:8
392:14
**raise** 283:1
**range** 21:10,11
49:15 64:10
138:18
**rate** 97:6 101:15
101:20,22
102:6 276:15
**rates** 102:10
**ratio** 294:20,22
296:7 298:24
299:4,20
300:14,16,22
**ratios** 294:24
295:6,18,23
296:16,18,19
297:7,17,21
298:1,8 300:6
300:18 301:13
**rats** 400:13
402:4 410:21
**RDR** 432:18
**reach** 41:17

42:23 108:13
109:5 110:12
130:23 199:14
232:5 266:9
333:16
**reached** 199:20
364:15 418:12
**reaches** 228:8
326:15
**reaching** 175:10
176:4 334:3
**react** 85:12
**reaction** 228:11
326:18 327:3,6
328:10
**reactions** 317:22
**reactive** 324:2,4
324:8,13
**read** 18:21,22
19:13 22:9,13
22:14,19 23:4
23:12 25:10
39:19 43:24
46:18 51:11
74:17 76:1,11
84:1 88:4,6
103:19,22
104:5 107:18
135:14,23
136:1 148:16
148:17 149:12
152:20,21
163:19 168:19
169:2 170:2
171:17 173:7,9
176:6 177:3,13
178:22 179:11
182:15 192:15
193:13 196:8
197:23 205:11
205:14,19
206:1,4,18
207:4,6,14,22
218:1,16,18
220:6 228:20
234:24 253:12
253:13,21

254:15 258:22
263:9,14
273:16 274:5
304:15 307:2
309:3 320:14
326:22 352:8
390:19 400:15
400:16,22
405:8 407:4
422:8 429:16
433:3 435:4
**reading** 23:7
45:20 53:13
163:6 169:1
217:24 263:14
401:2 421:11
**reads** 77:4 282:9
**Readwin** 13:3
**ready** 86:16
147:22 240:12
284:7 364:16
**real** 258:17
263:7 264:12
272:12 278:12
279:8 282:14
384:12
**realize** 35:24
411:8
**really** 31:7
34:22 35:7
38:18 40:20
41:20 48:1
52:23 62:23
85:10 90:12
98:8 100:20
120:14 154:6
155:10,14
166:3 170:21
179:18 202:22
241:21 257:21
264:6 273:6
302:20 324:7
339:1,1 340:23
348:11 349:8
349:18 356:2,8
**realm** 113:15
138:21 213:8

318:24 424:4
**realtime** 1:20
145:7 432:2,19
**reason** 9:24
158:12 177:21
258:7 290:14
354:13,21
359:18 433:5
434:4,6,8,10
434:12,14,16
434:18,20,22
434:24
**reasons** 65:8
193:6 279:16
317:10
**REATH** 3:2
**REBECCA** 3:12
**recall** 13:24 15:3
15:8 45:3 46:5
46:7 55:9
81:19 106:20
123:15 181:12
190:11 196:23
202:15 207:19
259:17 283:19
287:14 313:15
316:18 368:2
384:22 387:7
405:15
**receipt** 433:16
**receive** 106:15
289:4 419:21
419:22,23
**received** 20:16
22:20 69:9
104:7,8
**receives** 419:24
**Recess** 86:10
147:16 240:7
284:2 364:9
**recessed** 431:22
**recognize** 12:9
18:3 20:10
25:9,16,24
26:13 57:16
72:14 74:15
103:1 119:10

141:13 150:6
173:21 197:16
198:4,9 201:23
203:19 225:6
225:12 245:21
249:3 283:17
293:12 302:1
318:21 320:22
341:21 362:23
408:22 409:16
419:17
**recognized**
60:13 74:21
84:7 148:4
297:10
**recollection**
82:9
**recommend**
301:20
**record** 8:4,13
49:21 86:7,9
86:13 102:17
147:11,15,19
240:6,10 284:1
284:5 307:4
322:6 340:18
359:10 361:8
363:7,14 364:8
364:12 395:1
431:1,13,21
**red** 283:1
**redacted** 96:10
101:9,12,12
**refamiliarize**
190:24 252:17
347:7 405:3
**refer** 22:3,3 58:1
60:5 74:13
90:4 117:10,11
123:11 127:14
131:11 133:3
134:3,9,19
135:1,2 143:1
144:7 151:3,10
166:22 182:10
211:6 215:18
215:24 216:4

221:17 223:11
231:15 235:19
238:10 240:1
252:19 255:14
298:2 303:13
305:10 324:10
346:13 417:19
418:20,22
419:1 426:11
**reference** 5:6
13:10 17:18,24
18:2,6 19:14
20:14 24:9
70:13 71:11,17
71:18 73:4
82:19,22
102:16 105:23
106:1 124:24
126:3 127:4,6
143:2,8 144:6
145:3 154:8,22
158:7 160:18
164:7,18
168:22 183:12
183:24 186:18
189:2 190:4
191:4 193:1,9
194:12,23
202:3,19 205:5
205:22 216:23
251:9,11,20
252:10 256:12
283:8 290:15
291:13 351:24
352:22 353:24
354:7 359:19
363:24 366:17
366:20 389:17
389:18 390:1
390:21 391:13
392:8 395:7
398:22 402:19
405:14,20
410:8 415:14
415:18,20
**referenced**
26:20 28:14

37:14 144:21
149:8 155:12
160:5 179:12
182:4 188:1
191:9 217:6
222:9 273:5,9
283:9 287:19
290:1 293:24
312:6
**references** 10:24
70:21 71:5
83:11 100:4
144:24 151:1,9
151:15 154:13
158:2,9 180:12
182:11 188:9
189:1,13,14
191:14,19
192:13,14,15
192:19 195:9
199:24 203:11
208:9 222:3
230:6 231:6,14
255:9,13,16,21
256:14,23
257:8 302:7,11
327:12 338:19
352:3 354:13
358:19 387:6
391:15 392:17
392:18
**referencing**
150:18 247:10
293:17 426:17
**referred** 12:1
60:6 127:8
128:2 205:24
256:12
**referring** 18:18
31:5 33:7
88:14 100:21
108:12 143:8
149:19 166:23
186:14 204:23
211:18 222:14
222:19 238:14
282:23 289:16

Kelly Tuttle, Ph.D.

323:16 327:5
328:16 335:17
344:10 355:5
383:20
**refers** 294:19
305:12 321:20
328:14 388:16
**reflected** 288:20
**refreshed**
313:14
**refresher** 318:8
**refreshing** 314:4
**refute** 281:12
**regarding** 9:15
22:2 27:19
29:11 30:10
32:1 35:15
42:22 44:21,24
45:8 49:17
51:12 52:13
53:14 54:2
55:11 56:7,21
56:24 57:11
59:12 60:2
62:19 66:22,24
67:3 76:5
78:12 85:2
91:2 95:1
114:16 127:10
130:20 132:16
137:13,20
163:4 211:5,8
213:4 216:16
224:12 225:21
227:7,24 231:8
236:10 237:12
238:21 245:3
248:22 261:1,2
261:3,6 275:21
278:5 285:13
287:16,22
292:11 298:1
306:3,17,18
308:14 319:20
324:11 334:15
334:20 338:9
343:11 352:4

354:19 355:1
356:17 357:10
362:5 364:24
365:9 366:21
370:15 371:12
371:18 372:20
373:3 374:14
377:9 378:6,22
379:1 381:2
382:13 387:7
389:14 390:16
391:1,18 393:6
394:4 404:4
417:20 419:3
426:13,14
430:18
**regardless** 33:13
183:20 202:16
234:6 272:23
298:24
**regards** 15:2
16:7 17:4
30:19 31:22
34:18 41:24
42:11 49:13
54:1 56:5
58:13 110:3
112:1 121:13
126:3 150:12
155:7 225:20
244:21 258:20
286:12 287:7
288:11 295:6
295:16 326:4
330:11 332:6
332:24 337:14
339:18 354:1
355:3,7 358:6
365:6 366:4
368:13 372:17
406:17 424:4
426:4
**region** 321:9
**regions** 404:9
**registered** 1:19
198:16,17,21
198:22 432:2

432:19
**regular** 39:20
**regularly** 27:10
**regulation** 50:13
400:11 402:2
402:16
**regulations**
49:17 50:14,17
50:20 51:12
52:12,24 53:13
53:14,16 54:2
57:23 59:11,12
60:8 225:22
**regulatory**
49:12,16 52:22
53:8,9 58:13
208:6
**Reilly** 99:8,18
**reiterate** 114:5
**related** 12:18
33:8 104:4
163:22 307:10
310:13 342:8
426:15
**RELATES** 1:7
**relating** 343:23
**relation** 90:24
125:12 365:23
**relationship**
11:14 27:3
29:19 33:1
65:19 68:7
87:2,24 90:13
119:13 122:5
194:9 226:21
226:21 245:12
246:24 265:2
265:14 295:12
299:21 381:15
385:24 403:23
415:4 416:3
**relationships**
295:8,17 300:2
**relative** 432:13
432:14
**release** 12:13,19
323:22 324:2

**releases** 312:6
**relevance** 137:7
339:13
**relevant** 64:24
65:18 181:8
196:5 214:7
240:18 299:4
343:5 365:2
**reliance** 21:23
**relied** 68:15
216:12 238:5
253:17 289:12
**relies** 88:1 90:11
90:13,22,22
**rely** 42:5 145:10
145:13 191:19
215:22 255:5
366:11 392:18
405:24 407:6
**relying** 71:20
**remains** 223:8
224:1 259:20
**remember**
32:21 42:20
44:4 97:18,20
143:17 181:19
231:9 253:24
280:14 320:7
321:18 355:21
405:10 410:1
420:11 429:20
429:21 430:12
430:14
**remind** 259:11
**remove** 289:23
325:14
**removed** 325:17
**removing**
140:19
**rendered** 376:3
390:13
**renders** 350:13
352:1,9
**repeat** 122:1
309:21 346:24
380:1 426:23
**repeatedly**

279:17
**rephrase** 194:17
311:20
**report** 5:4 6:18
9:7,14 10:12
10:24 11:7
18:1 20:24
22:2 26:13
27:22,23 28:6
28:11,21 29:3
29:5 30:2 32:5
32:8 58:11
68:14,18 69:15
69:22 71:6,12
71:24 72:2,21
73:1,17 76:18
76:22 77:8,9
77:12 78:3
83:19 87:1,15
87:21 88:9,24
89:7,19,20
90:5 96:19
98:3,5,12
100:12,16
104:15 105:1,8
105:11,13,20
106:2,4,8
107:12,19
108:10,11
109:3,18
112:19 116:4
117:4 120:5
124:14,21
129:3,7 132:18
132:19 133:16
133:17,18
136:5 137:6
140:11,18
141:16,24
142:6,13,16
144:6 145:11
146:1 147:8
148:5 151:21
153:17 155:6
156:9 158:3,5
162:9 165:21
168:3 177:19

Kelly Tuttle, Ph.D.

Page 476

| | | | | |
|---|---|---|---|---|
| 181:14,16 | 351:24 352:23 | 290:20 | 141:21 211:19 | 383:22 384:1 |
| 183:18 184:3 | 354:23 355:18 | **representatives** | 234:14 237:13 | 384:12 389:9 |
| 184:10,21 | 357:15,18 | 61:10,13 | 254:17 271:4,4 | **responses** 317:2 |
| 185:2,7,9,11 | 358:18,20 | **Reproduction** | 291:16 295:17 | 317:22 319:15 |
| 185:15,21 | 359:2 366:15 | 174:1 218:4,5 | 296:9 302:20 | **rest** 77:7 279:22 |
| 187:4 188:22 | 366:18,22 | **reproductive** | 306:14,17,18 | 308:23 406:6,7 |
| 189:3,14 | 367:6 368:2 | 89:24 91:7 | 315:7 318:16 | **restate** 95:19 |
| 190:18 191:3 | 372:18 373:6 | 108:15 109:6 | 319:17 324:21 | **restricted** |
| 191:10 192:10 | 373:21 379:17 | 110:11,20 | 332:4 340:5 | 198:13,16 |
| 192:14,16,20 | 379:18 380:23 | 111:5,10,18,23 | 342:23 372:18 | **result** 417:5 |
| 196:9 200:19 | 383:4 384:17 | 116:9 120:12 | 375:10 378:4 | 420:24 422:19 |
| 202:19 204:10 | 384:17,24 | 135:21 137:14 | 378:11 387:20 | **resulting** 14:10 |
| 204:20 205:6 | 386:20,21 | 148:14,23 | 388:6 393:11 | **results** 282:12 |
| 205:11,24 | 387:2,3,6 | 149:11 152:1,6 | 394:10 396:17 | 330:20 367:5 |
| 206:5 207:21 | 388:14,17 | 152:18 195:24 | 400:17 405:18 | 368:8 399:15 |
| 208:12 210:24 | 389:18,23 | 213:22 215:13 | 408:2 409:22 | 404:15 |
| 211:4,7,15,16 | 390:10,11,13 | 232:5 260:19 | 411:1,19 421:1 | **retail** 15:1,6 |
| 211:20 212:4 | 390:15,19 | 303:17 327:13 | 422:5,20 424:6 | 27:3 54:9 |
| 213:10 216:14 | 391:15,16 | **reputable** | **researched** | **retained** 34:10 |
| 217:7 219:18 | 392:4,5,17,18 | 301:01 | 38:19 138:6,9 | 61:12,14 |
| 233:9 235:5 | 393:2,3,3,16 | **request** 106:7 | 141:1 172:3 | 370:14 |
| 238:5,17 239:1 | 394:24 395:2,9 | 183:12 285:22 | 227:23 315:19 | **retention** 27:16 |
| 240:2 245:10 | 398:22 399:3 | 289:3 431:4 | 339:19 | 33:9 |
| 251:12 252:10 | 404:24 405:1,3 | **requested** 106:3 | **researching** | **Retire** 7:12 |
| 252:17 255:22 | 405:9 411:5,9 | 288:17 432:11 | 138:10 340:3 | 419:11 |
| 256:13,14 | 411:22 412:10 | **require** 124:16 | **reserve** 304:24 | **retrograde** |
| 258:22,24 | 415:3,18 416:7 | 135:19 267:6 | 431:3 | 142:9,17 144:2 |
| 265:22 271:6 | 416:12,16 | **required** 54:18 | **reset** 114:20 | 147:2 148:22 |
| 278:4 284:15 | 417:16,19 | 74:11 77:18 | **residences** 176:9 | 149:10,15 |
| 284:21 285:1 | 418:8 419:2 | 78:17,24 81:14 | **respiratory** | 150:2,5,13 |
| 285:12 287:23 | 423:23 424:5 | 148:15 163:16 | 140:2,4,7 | 151:13,18 |
| 289:12,18 | 425:23 426:17 | 164:2 342:14 | 313:19 323:5,7 | 152:12 156:22 |
| 290:7 302:7 | **reported** 152:15 | 357:7 358:5,8 | **response** 12:19 | 173:1 185:4 |
| 303:14,19 | 153:4 281:4 | 362:6 | 17:13 44:15,19 | 206:14 293:18 |
| 304:1,3,3,5,22 | **reporter** 1:19,19 | **requires** 299:1 | 228:11 234:13 | **retrospect** |
| 306:16,20 | 1:20 8:14 | **resay** 89:12 | 263:2 272:19 | 127:16 |
| 307:19 308:1 | 85:22 386:8 | 134:15 | 273:2 282:7 | **retrospective** |
| 309:3,5 310:1 | 432:2,3,3,19 | **research** 15:20 | 283:7 310:20 | 294:10 |
| 310:3 315:16 | 432:19,20 | 25:7 32:6 | 311:8,19 | **return** 114:15 |
| 315:21 318:7 | **Reporters** | 34:17 37:14 | 312:16 313:7,9 | 369:4 433:14 |
| 319:16,18,23 | 432:18 | 38:4,7,22 | 314:2,5 316:5 | **review** 11:12 |
| 330:12 333:12 | **reports** 44:16,19 | 39:15,23 40:12 | 317:11,15 | 14:23 16:5 |
| 336:11 337:10 | 45:2,5 104:3 | 40:16 41:10 | 318:9,12 319:7 | 34:1 51:9 98:6 |
| 337:18 338:5 | 135:3,5 202:15 | 42:6,18,24 | 321:10,12 | 98:8 100:15 |
| 339:18 340:8 | 251:19,22,24 | 43:12 44:15 | 325:14,17,22 | 103:9,22 |
| 346:1,11 | 277:9 286:24 | 130:6 138:8,22 | 326:8,18 327:3 | 106:11 113:8 |
| 350:10,10 | **represent** | 138:23 139:3 | 327:6,18 330:2 | 113:10 115:12 |

Golkow Litigation Services - 877.370.DEPS

Kelly Tuttle, Ph.D.

Page 477

116:21 117:19
131:6 144:19
145:14 161:19
162:4,11
165:21 171:6
173:11,19
176:19 178:22
183:1 184:17
189:7 193:19
201:6 206:3
209:15 210:17
210:22 221:17
231:15 246:5
252:18 254:16
254:22 255:18
255:21 256:2
256:18 258:21
258:23 277:10
334:15,20
349:15,19,23
**reviewed** 5:16
23:9 34:2
41:21 55:5
68:14 102:21
103:5,19 104:6
104:8,20
106:22 113:14
115:23 116:14
130:19 132:16
160:6 166:2
170:18 172:19
174:6,24
182:21 183:11
205:7,11
216:13 234:4
255:7 257:16
258:22 285:8
348:20 418:7
**reviewing** 70:2
98:3 100:11,16
138:11 146:6,9
162:6 194:18
208:6 254:23
256:19 259:4
267:24
**reviews** 63:9
**revisit** 220:15

304:8,21
**revisited** 327:1
**revisiting**
326:10
**revolves** 17:5
24:11
**revolving**
330:11
**Richard** 219:7
293:11
**right** 21:18
23:10 26:4
36:2 39:5
44:23 45:16
47:4 48:16,18
52:24 60:11
68:17 71:7
73:16 75:5
76:10,19 81:21
82:11 85:22
96:3,9,22
97:22 99:11
100:20,24
101:14 105:23
107:22 111:11
111:14 115:11
115:15 118:10
118:12,20
128:19 131:15
136:3 142:14
142:19 143:10
143:13 144:12
145:6,7 147:10
150:21 151:2,4
154:10,16
155:9,22 156:6
156:9 163:1
166:21 167:8
167:14 171:9
172:5 174:6
175:4 176:4
179:22 180:5
182:2 185:10
190:10,14,15
190:22 193:21
195:20 198:18
202:11 207:9

207:17 210:21
217:1 219:4,24
220:2,4 221:8
223:19 224:15
228:20 231:22
232:22 235:12
236:21 238:20
240:3 243:11
247:15 248:8
264:3 266:20
270:2,8 275:18
277:19 278:14
281:24 296:24
302:7 304:24
305:8 308:1,18
312:4 316:15
317:7,14 318:4
319:12 321:12
322:1,2 323:4
323:11 331:8
332:9 335:6
338:1,8,10
339:21 343:3
343:20 349:18
350:12,21
353:6 354:6
358:20 363:5
366:11 367:14
367:16 371:24
372:15 384:3
386:4,18
387:11 388:18
388:19 392:24
397:13 407:19
413:17 414:1
414:11 418:8
420:2 424:13
426:2 431:3,15
**Rigler** 366:23
373:20
**ring** 162:12
**risk** 7:2 59:19
59:24 60:2,14
60:22,23
199:12 257:2
293:21 348:1,6
430:18

**Road** 2:14
**Rock** 18:9
**role** 24:12,24
45:8 63:1 98:1
99:18 100:23
125:22 136:9
164:20 313:10
313:19 314:4
321:16 338:6
384:7 388:6
**roles** 320:11
**room** 266:17
341:10
**ROS** 324:2
**Rothman** 81:7
85:11
**Royston** 3:10
**Rudie** 2:2 8:23
10:11
**rudiesoileau...**
2:3
**rule** 259:19
301:5 432:10
**rules** 75:22
76:15 84:5
**run** 71:8 388:21
**rusty** 80:9
**rwoods@seyf...**
3:13

_____

**S**

**s** 2:1 3:1 321:16
**S-H-I-M** 388:13
389:19
**S-J-** 219:1
**S-J-O-S-T-E-N**
172:14 293:24
**sacrifice** 399:19
**safe** 43:1,12
61:18 62:1
66:18 370:21
371:3 426:20
427:5,6
**safety** 40:16
41:5 54:15
67:8 219:9
354:18 360:4

362:9
**sale** 52:5 53:20
**SALES** 1:4
**Samantha** 63:17
97:1,10
**sampled** 290:12
**samples** 285:14
288:9,11,14
290:2,23,24
291:1 292:8,10
**Sander** 81:3
**satisfy** 115:24
116:1
**save** 157:24
**Saves** 124:8
**saw** 40:3 105:15
106:1,13,18
113:17 196:18
202:8 327:24
418:12 429:10
429:21
**saying** 76:8 92:3
110:7 111:1
153:4 169:6
177:14 178:19
193:14 221:9
234:10 242:8
246:20 248:14
273:4 281:2
298:19,22
302:6 309:4,5
316:14 341:23
372:17 397:7
401:13 402:13
418:18
**says** 18:18 23:13
25:21 50:23,24
68:24 75:4
76:3 77:18
78:9 80:4 84:3
121:4 143:1,23
144:2 146:24
148:20 149:3
149:15,20,23
151:23,24
152:11 153:8
158:18 161:1

Kelly Tuttle, Ph.D.

| | | | | |
|---|---|---|---|---|
| 161:14 162:15 | 24:17 27:11,18 | 385:2 | 136:22,23 | 270:11,13 |
| 164:19 165:2 | 28:6,14,22 | **scientific** 11:18 | 137:5 138:1 | 271:2,9,10,12 |
| 170:22 176:22 | 29:10 30:8 | 16:6,8 17:7 | 139:4,12,22 | 272:10 274:8 |
| 180:15 182:15 | 31:23,24 39:3 | 27:11,19 28:7 | 145:16 150:15 | 275:21 276:3,9 |
| 189:24 202:23 | 40:22,23 41:14 | 28:22,23 29:10 | 151:11 155:19 | 277:6,13 |
| 219:22 223:6 | 41:23 42:11 | 29:11,18 30:8 | 155:24 156:10 | 278:11 279:7 |
| 223:18 224:9 | 43:19,20 44:21 | 30:9,10,22 | 160:7 161:20 | 283:2 296:10 |
| 228:3 230:1 | 44:24 56:8,22 | 31:24 37:18 | 164:9 167:23 | 299:5 301:16 |
| 234:18 259:12 | 57:2,11,12 | 38:24 40:5 | 170:3 186:10 | 302:19 303:6 |
| 262:22 268:14 | 62:5 63:22,24 | 41:12,22 42:10 | 186:19 189:19 | 303:14,21 |
| 273:15 276:9 | 64:2,6 66:21 | 43:7,16 44:8 | 191:20,20,23 | 304:13 305:2 |
| 278:10,16,16 | 67:12 80:2 | 44:11,14 45:6 | 195:9,11,22 | 332:10,15 |
| 279:8,13 281:3 | 97:19 112:11 | 45:11,15 46:10 | 199:19 200:4 | 333:2,14,17,23 |
| 282:7,16 | 113:12,17 | 46:16,17 56:8 | 209:16,20 | 337:12,19 |
| 293:19 294:8 | 114:6 117:16 | 56:21 57:2 | 210:17,23 | 339:22 343:11 |
| 297:9 302:17 | 117:24 118:18 | 62:6,11,11,18 | 211:19 212:21 | 343:13 345:1 |
| 321:12,14 | 119:18,20,23 | 63:2,3,7,19 | 213:1 215:4,9 | 345:13,14,16 |
| 328:2 342:7 | 121:3,11,14,17 | 64:9,13,18,22 | 215:10 216:5 | 365:9 366:19 |
| 348:6 352:24 | 121:17,18 | 64:24 65:4,18 | 221:3,4,15,18 | 372:19,22 |
| 353:3 361:9,9 | 122:24 129:14 | 65:24 66:22 | 222:6 229:15 | 374:13 376:11 |
| 369:13 384:18 | 132:14 133:5 | 67:12,16,19 | 230:9 231:5,15 | 377:10,18 |
| 400:8 402:22 | 135:4 145:3 | 68:1 70:20 | 231:16,24 | 380:16 381:2 |
| 405:23 406:22 | 146:7 151:9,11 | 77:13 88:24 | 232:1,7 233:1 | 382:13 390:16 |
| 407:18 408:10 | 193:15 200:13 | 89:21 90:6 | 233:13,16,18 | 391:17 393:10 |
| 409:9,19 | 223:21 233:8 | 91:1 92:13,14 | 235:21 236:9 | 394:9,13 403:4 |
| 412:20 413:6,7 | 236:10 239:18 | 105:18 106:11 | 236:12 237:13 | 403:6 405:14 |
| 420:16 421:18 | 239:22,22 | 106:16 108:7 | 238:11 239:4,8 | 405:20 411:13 |
| 422:11 | 241:2 242:11 | 110:5,8,9,13 | 239:18 241:3 | 411:19 417:18 |
| **scenario** 237:9 | 245:11 254:23 | 110:17,22 | 241:17 243:3 | 417:23 419:3 |
| 245:1 311:5 | 260:1 261:3 | 111:2,7 112:2 | 244:10,19,24 | 423:6 424:9 |
| 313:2 318:17 | 262:11,15 | 112:11,12 | 245:5 246:23 | **scientifically** |
| 325:20 | 266:13,16,16 | 113:3,4,8,14 | 247:10,12,17 | 79:16 108:16 |
| **scenarios** 25:3 | 266:23,23,23 | 113:15,24 | 248:5,11 252:2 | 108:23 109:9 |
| 145:9,19 169:9 | 267:1,16,17 | 114:6,11 | 254:2,8,13 | 109:13,17,22 |
| 214:17 319:2 | 268:3,12 269:1 | 115:21,24 | 256:3,9,15,16 | 127:20 269:6 |
| 323:17 377:15 | 269:7,19 | 116:5,5 117:16 | 256:19 258:1 | 270:12 271:8 |
| **Schildkraut** | 270:11 271:11 | 117:20 118:2,5 | 259:2,4 261:1 | 303:8 339:11 |
| 7:10 415:2,9 | 271:12 272:3,4 | 118:8,15,23 | 263:6 264:11 | 402:19 |
| **Schneider** 6:21 | 272:6 274:23 | 119:7,11 120:8 | 264:18 265:5,6 | **scientist** 97:11 |
| 340:15 341:19 | 296:5 298:12 | 120:17 121:21 | 265:11,12,13 | 97:17 260:6 |
| **Scholar** 39:1,8 | 299:2 300:24 | 123:17 125:2,4 | 265:18,19,22 | 266:2 |
| 64:7 252:1 | 301:12 302:21 | 126:6 127:5,24 | 266:3 267:2,7 | **scientists** 44:3 |
| **school** 385:3 | 343:22 378:22 | 128:3,15 129:6 | 267:14,15 | 47:8,16 48:7 |
| **science** 5:8 | 378:24 383:17 | 129:24 130:2 | 268:1,6,13,14 | 49:2,2 122:16 |
| 11:19,20 16:6 | 383:19 387:19 | 130:20,21 | 268:14,16 | 122:23 272:2,7 |
| 16:12,17,22 | **sciences** 138:19 | 131:3,13 | 269:1,6,8,11 | **scope** 52:18 |
| 20:3 22:4 24:4 | 262:18 384:20 | 132:16 133:23 | 269:18 270:6 | 212:10,14 |

Case 3:16-md-02738-MAS-RLS   Document 9739-11   Filed 05/07/19   Page 154 of 205 PageID: 42162
Kelly Tuttle, Ph.D.

Page 479

379:11 427:19
**Scott** 97:23
**scratch** 260:7
**screen** 175:13
217:23 322:2
**screening** 6:10
201:18 349:16
**search** 116:15
124:1 178:17
193:4 338:21
391:18
**searches** 39:1,2
63:12 66:4
70:24 252:2
**searching** 64:7,7
**second** 13:2,5,6
18:16,17 25:9
25:19 124:12
125:20 135:10
161:5,9 164:23
168:7 175:5,14
180:9 187:3,9
282:4,8 301:18
350:12 369:11
405:22 421:14
**second-to-last**
222:9
**secondarily** 91:8
139:15
**secretion** 324:1
**section** 50:15,17
50:24 68:18
69:22 70:10
82:14,15
107:12,24
108:11 116:3
124:13 142:4,5
150:23 155:6
181:6 185:14
186:4 187:4
200:1,17 207:5
207:14,21
238:13,23
240:2 251:12
306:22 319:3
365:22 369:10
369:12 387:10

404:23 406:7
419:5
**sections** 143:11
161:18 185:15
**see** 12:17 16:14
18:13 20:18
25:19 28:23
35:20 40:22
41:11,12,14,22
43:19 46:16
58:24 59:11
60:7,8,17
68:21 69:2,7
70:3 73:17
74:18 75:1,2,9
75:12,17,18
82:18,19,22
83:1,3,6 85:6
87:3,16 90:18
90:20 96:9
102:6 107:22
112:11 119:1
121:3 125:1
126:10 131:16
131:16 142:11
142:12 143:22
145:8 148:9
153:3 157:12
158:5 159:1,2
160:4 164:22
165:5,21 168:4
168:11,13
171:3,4 181:24
184:20 187:20
188:10 189:14
190:4 194:2
197:21 198:11
199:7,24 200:5
200:15 201:3,4
202:23 203:2
203:13,15
204:2 213:14
214:1 215:9
217:22 223:10
228:14 234:14
241:4 250:8,14
250:22 251:1

251:13,13
252:23 262:9
262:12,13
269:7 271:19
277:12 281:1
281:14,15,18
281:23 282:5
285:15 288:2
288:19 290:18
293:16,22
294:14,16,16
295:6 300:19
302:10,10,23
307:1 309:14
321:4 322:2
326:21 333:22
341:14 342:20
346:6 350:16
350:17 363:12
364:1 369:6,16
369:18 387:3
389:11,17
395:16,17
396:4,6 399:12
404:19 405:17
405:21,22
406:4,5 409:12
419:15 420:7
420:13 423:6
423:15,16
**seeing** 42:20
121:22 150:9
184:16 231:13
271:11 394:21
404:12,14
420:11
**seen** 34:19 35:14
37:16 40:15
43:17 46:18
105:19 124:24
160:13 180:3
197:10,12
209:8 217:12
220:1 233:24
246:6 261:19
273:2 280:21
282:19,21

294:3 305:1
341:1 344:20
348:5,8,22
373:20 386:5
386:16 420:3
**select** 103:24
**selected** 239:13
**sells** 15:22 16:18
48:23
**seminal** 72:23
**Seminary** 2:14
**sense** 47:7 55:18
64:20 70:1
125:6 126:2
217:23 222:18
**sentence** 18:17
22:8 75:2
76:19 77:4,8
88:4,6,8,11
107:21 127:9
136:2 137:11
148:3,4,9,10
148:18 149:7
150:20 152:10
152:23 153:19
157:15 165:1,2
170:21 171:3
173:13 177:2
179:12,19,19
180:1,4,9
186:4 187:17
202:23 228:16
239:8 253:12
253:13,14
254:24 255:1
256:22 263:4
282:9 307:3,19
308:4,14,22
309:11,13
324:24 326:24
350:12 352:8
352:14,16,22
357:21 358:12
358:15,23
359:2,8,21
369:12 401:5
401:17 402:22

404:2 405:22
407:20 413:22
414:12,20
421:12,23
**sentences** 98:15
200:17 334:22
405:4
**separate** 26:23
67:14 138:10
290:22
**separated**
292:10
**separately** 93:6
**separation**
289:22
**September**
282:1
**series** 323:22
**serum** 342:15
**serve** 281:13
**services** 1:23
3:21 8:6 34:6
225:5
**session** 364:15
**set** 56:23 84:5
191:13 194:10
231:14 432:8
**seven** 136:14
**severe** 403:10
412:22 413:8
413:11
**severely** 107:17
108:3,7 109:15
109:23 186:6
186:11,13,16
186:17
**SEYFARTH**
3:12
**share** 351:7
396:11
**SHAW** 3:12
**sheer** 64:15
**sheet** 274:19
278:7 360:4
362:9 433:6,9
433:12,15
435:7

Kelly Tuttle, Ph.D.

Page 480

sheets 54:16
Sherlock 223:23
Sherman 341:24
  341:24
Shim 388:13
  389:19 390:12
  391:8 392:14
short 86:15
  223:20 224:21
  362:16
short-term
  342:14
shorter 99:2
shortly 388:21
show 11:24
  17:22 19:23
  26:6 49:18
  50:7 72:7
  74:20 81:21
  93:5 102:15
  141:5 145:18
  157:17 159:15
  160:17 164:4
  165:6 166:9
  170:9 172:5
  174:12 181:17
  197:2,19 201:9
  217:9 223:4
  249:8 284:11
  293:4 320:3,13
  322:2 340:12
  344:15 347:22
  350:21 381:13
  398:14 409:14
  419:8
showed 183:10
  294:2 343:14
  382:12
Shower 32:14
  32:14 37:3,3
  226:2,2 382:10
  382:10
showing 41:23
  175:13 279:14
  409:13 410:7
shown 102:11
  169:19 176:18

304:11 329:7
343:10 374:22
376:20 380:18
417:24
shows 50:13
  56:22 67:13
  113:4 121:19
  268:3 269:11
  269:19 270:7,9
  271:13 272:5
  389:3
sic 281:9 336:7
side 171:1 192:3
sides 121:9
sifting 64:8
sign 433:8
signatories
  423:16,18
signature
  432:10
signed 105:12
  105:20 106:4,7
  211:17 293:14
  328:24 341:18
  423:13
significance
  7:12 84:6
  136:9 279:15
  294:22 295:21
  296:2 301:5
  416:14 419:12
  421:4
significant
  298:16 324:14
  337:6 342:17
  403:11 420:24
  422:19
signing 433:10
similar 47:17
  49:3 136:13
  282:5 288:15
  294:10
simple 41:4
  56:20 258:17
simplify 258:14
simply 23:2
  48:21 67:9

99:13 121:6
145:13 150:4
216:21 229:22
241:24 243:24
264:8 265:10
267:6 273:15
281:6 310:3
343:2
Simultaneously
  323:21
sine 74:11 77:18
  80:7
single 78:8,11
  113:15 285:10
  391:13 397:3
  401:16
sink 131:16
Sir 73:9,22
  75:19 76:12
  77:15 78:23
  80:3 82:23
  83:12 114:22
  203:8
sit 46:21 60:20
  66:16 67:18
  69:6,24 95:13
  128:10 140:13
  144:11 183:1
  196:14 276:17
  303:4 304:19
  347:13 348:12
  364:2 412:6
sites 322:14
situation 317:17
six 87:12 403:9
  412:21
sizable 353:1
size 98:13
  364:24
Sj?sten 6:5,12
  172:8,13,23
  217:16 219:2
  219:15 293:18
  293:24
slightly 156:20
sludge 290:24
small 125:8

126:1 136:14
136:20 143:15
189:11 197:18
212:19 220:7
smaller 351:18
Smith 13:2
smoking 227:17
  227:21,24
snippets 163:7
Society 25:22
  26:1,3,18
  218:5
Soileau 2:2,2 4:7
  8:20,23 9:9
  10:18,20,22
  11:5,9 12:7
  15:14 16:13
  17:8,21 19:22
  20:5 21:17
  25:8,15 26:11
  29:1,15,22
  30:14 31:15
  32:9 41:1 42:4
  42:15 43:9,22
  44:22 45:23
  46:20 47:13,23
  48:13 49:10,22
  50:6 51:14
  52:1,16 53:17
  54:5 55:1
  57:15 59:3
  60:10 61:5,21
  62:7,15 64:19
  65:7 66:5,11
  67:4 68:4,16
  72:13 74:6
  77:21 78:5,22
  79:8,18 81:2
  82:5 84:18
  85:20 86:4,14
  89:4,16 90:17
  91:23 92:9,17
  93:14,17,22,23
  94:5,14,19
  102:23 103:11
  105:6 107:7,9
  108:19 109:10

112:17 113:6
114:18 117:18
118:19 120:1
120:13 122:3
122:11 123:3
123:13,22
124:2,9 126:17
127:2 128:7,16
130:10 131:1
132:4 133:19
134:8,12,18
135:6 139:6
140:1,8,21
141:4,12
146:10 147:20
154:2 155:2
157:1,23
159:22 162:5
164:16 166:11
166:18 167:13
169:17,23
170:7,16
171:19 172:4
172:11 173:20
174:9,19
175:19 178:23
179:6,17
180:21 183:8
186:2,12 187:2
189:4 190:3,19
191:17 192:21
193:20 194:1
194:15 195:3
197:1,9 199:10
200:6,18
201:20 205:1
205:16 209:11
210:13,19
212:1,12
214:23 215:2
215:21 217:20
219:14 220:12
221:7,19 222:7
223:3 224:14
224:23 225:1
225:17 226:8
226:19 229:7

Kelly Tuttle, Ph.D.

| | | | | |
|---|---|---|---|---|
| 230:12 231:2 | 330:14,23 | 398:1,13,20 | 201:10 204:22 | **space** 433:6 |
| 232:21 233:23 | 331:7,20 332:8 | 400:1,3,5 | 209:4 217:2 | **speak** 30:24 |
| 234:16 235:3 | 333:6,19 334:6 | 406:14 407:16 | 219:20 223:11 | 47:21 53:10 |
| 236:20 237:1 | 335:5,9,13,19 | 408:7 410:19 | 224:3 231:3 | 59:13 68:6 |
| 237:17 238:19 | 336:1,15 337:1 | 411:2 412:8 | 243:15 245:18 | 131:24 136:5 |
| 240:3,11 241:5 | 337:23 338:7 | 413:5,16 | 254:5 269:16 | 178:3 180:18 |
| 242:4 243:8,14 | 339:12,20 | 414:15 415:1 | 278:24 284:12 | 193:13 195:19 |
| 245:20 247:14 | 340:9,17 341:3 | 415:12 416:22 | 297:8 309:21 | 228:22 264:6 |
| 248:7 249:2,13 | 341:9,13 343:1 | 418:24 419:7 | 316:14 318:19 | 298:23 318:14 |
| 250:16 251:7 | 343:16 344:11 | 419:14 421:13 | 320:4 327:23 | 322:24 328:16 |
| 254:6 255:23 | 345:7,18 346:8 | 422:2,4 423:11 | 329:2 331:4 | 334:12 338:21 |
| 257:19 258:5 | 347:21 348:4 | 425:10,22 | 335:8 336:24 | 378:7,12 385:6 |
| 258:16 259:10 | 349:1,12 350:1 | 427:1,9,21,23 | 341:24 349:13 | 385:14 392:10 |
| 259:23 260:21 | 350:8 351:4,9 | 428:10 429:3 | 363:11 372:16 | 402:12 |
| 261:18 263:12 | 351:17,20 | 429:11,23 | 380:10 385:22 | **speaking** 31:5 |
| 264:2,22 265:8 | 355:11 356:7,9 | 430:6,15,23 | 399:23 400:16 | 91:11 101:13 |
| 266:1,8,14,19 | 357:1,12 358:7 | 431:9,14 | 403:5 404:19 | 118:6 119:3 |
| 267:4,19 | 358:10,16 | **sold** 15:6,18 | 416:10 418:24 | 121:12 122:22 |
| 268:20 269:12 | 359:15 360:11 | 31:10,18,19 | 421:9,15 422:3 | 133:8 137:21 |
| 269:20 270:1 | 360:19,21 | 365:15 | 422:7 426:23 | 140:16 145:1 |
| 271:14,21 | 361:1,5,10,16 | **solely** 81:20 88:1 | **sort** 72:22 98:6 | 153:1 156:17 |
| 272:8 273:3,14 | 361:18,23 | 90:11,13,18,22 | 98:7,21,23 | 181:24 187:13 |
| 273:24 274:4 | 362:18,22 | 90:23 237:6 | 125:6 181:5 | 195:21 285:7 |
| 275:4 276:1,7 | 363:10,17,22 | **somebody** | 204:7 262:9 | 296:4,6 304:15 |
| 276:22 277:18 | 364:13 365:13 | 249:22 336:9 | 273:20 278:12 | 310:22 316:21 |
| 278:8,22 280:8 | 365:19 367:13 | **something's** | 280:24 297:2 | 324:11 328:17 |
| 280:19,20 | 367:22 369:3 | 273:23 | 298:13 310:2 | 329:18 343:21 |
| 283:15,21 | 370:17 371:1,6 | **somewhat** | 316:24 327:5 | 364:19 365:5 |
| 284:6,23 | 371:21 372:5 | 160:15 | 351:7 387:12 | 384:18 |
| 286:18 288:16 | 372:14 373:11 | **son** 36:9 42:14 | **SOT** 26:19 | **speaks** 124:21 |
| 291:8,18 | 373:14 374:5 | 380:7 | **sound** 108:16,24 | 348:7 |
| 292:12 293:9 | 375:13,16,20 | **soon** 362:19 | 109:9,13 | **specialist** 63:11 |
| 296:11,23 | 376:12 377:1,5 | **sorry** 25:13 | 201:15 408:18 | 63:14 97:4 |
| 297:16 298:6 | 377:20 378:8 | 31:13 35:2 | 412:24 | **species** 291:1 |
| 298:20 299:9 | 378:13 379:3 | 48:12 49:22 | **sounded** 297:2 | 324:2,5,9,14 |
| 301:2,17 | 379:14 380:2,3 | 58:16 74:13 | **sounds** 10:5 | 396:5 406:1,2 |
| 303:23 306:5 | 380:11 381:6 | 75:15 79:19 | 144:16 266:5 | 407:7,8,14,15 |
| 306:12 307:23 | 381:20 382:1 | 84:19,24 91:10 | 266:15 283:18 | **specific** 27:8 |
| 308:7,17 309:1 | 382:19 383:1 | 94:3 95:19 | 401:14 | 31:2,9,17,19 |
| 311:1,15 314:7 | 383:15 384:15 | 101:10,11 | **source** 65:18 | 32:6 34:20 |
| 315:22 316:8 | 386:10,15 | 103:20 109:21 | 66:2 147:7 | 35:8 37:10 |
| 317:13 318:2 | 387:21 388:2 | 116:11 117:11 | 148:4 187:15 | 43:14,15 50:12 |
| 318:18 319:10 | 389:2,15 391:2 | 122:1,9 123:14 | 187:17 285:18 | 58:1 83:11 |
| 320:20 322:4,7 | 391:22 392:19 | 140:3 155:4 | **sources** 41:12 | 119:22 126:3 |
| 323:10 324:22 | 393:19,24 | 169:21 174:4 | 64:8 213:12 | 143:2 150:10 |
| 325:23 327:20 | 394:5 395:19 | 174:10 178:7 | 292:14 | 151:23 154:6,8 |
| 328:18 329:5 | 396:1 397:6 | 198:17 201:3 | **South** 2:2,20 | 155:7 175:21 |

Kelly Tuttle, Ph.D.

Page 482

| | | | | |
|---|---|---|---|---|
| 206:24 207:8 | 362:3 366:13 | 358:2,4 360:1 | 411:12 417:17 | 43:8,17,20,23 |
| 210:5 225:22 | 366:16 367:11 | 362:7 371:11 | **statement** 6:16 | 43:24 44:5 |
| 225:23 245:2 | 368:4,20 | **standards** 53:9 | 18:24 19:13 | 57:1 110:6 |
| 248:22 252:19 | 382:24 386:3 | 426:1,8,11 | 22:16,24 23:3 | 200:12 208:9 |
| 283:20 286:12 | 391:16 392:2 | **standing** 247:4 | 23:5,11,12,12 | 218:22 220:20 |
| 292:9 297:20 | 397:9 400:18 | **stands** 117:7 | 23:20 25:10 | 221:1 222:2 |
| 316:19 318:16 | 402:13 412:3 | 121:19 199:3 | 51:2 52:10 | 233:1 257:7 |
| 324:18 352:7 | 420:9 429:1 | 262:7 | 84:15 85:2,7 | 273:20 283:7 |
| 352:16 356:13 | **Specificity** | **starch** 173:1,16 | 90:10 136:18 | **states** 1:1 78:14 |
| 357:23 368:20 | 203:16 | 428:5 | 145:11 147:7 | 78:19 80:22 |
| 390:22 411:22 | **specifics** 21:13 | **start** 12:24 | 154:11 168:11 | 173:13 175:6 |
| **specifical** | 52:11 332:6 | 118:10 135:16 | 168:13,19,24 | 208:17 229:4 |
| 225:21 | 384:13 430:14 | 280:12 295:3 | 175:16,20,22 | 263:3 272:24 |
| **specifically** 15:3 | **specified** 30:23 | 296:15 297:6 | 176:8,20 | 291:23 321:11 |
| 15:17 17:2 | **specify** 16:9,23 | **start-off** 385:8 | 180:14 184:13 | 354:16 406:5 |
| 21:12 25:18 | 32:3 38:18 | **started** 124:2 | 200:8 208:2 | 407:15,21 |
| 28:12 31:3 | 148:19 152:3,4 | **starting** 202:22 | 220:10,14 | 410:4 |
| 36:23 38:15,16 | 279:12 294:4 | 282:7 | 223:5 224:8,12 | **stating** 80:3 |
| 47:11 50:23 | **spell** 97:13 | **starts** 181:7 | 226:24 229:6 | 189:10 281:7 |
| 52:11 60:4 | **spelled** 172:14 | **state** 20:23 | 229:12,14 | 407:4 |
| 61:3 73:14,15 | **spend** 53:12 | 72:24 73:22 | 230:7,21 | **statistical** 7:12 |
| 77:9 90:5 | 393:9 394:8,18 | 88:7 108:4 | 231:19 236:5 | 84:6 297:22 |
| 97:19 101:23 | 411:3 | 111:24 123:17 | 237:19,20,23 | 298:3,5 419:11 |
| 104:5,6 106:20 | **spent** 39:16,21 | 139:10 142:12 | 248:16 254:11 | 421:4 |
| 112:19 115:4 | 92:21 93:1 | 145:4 153:24 | 255:12 257:9 | **statistically** |
| 117:11 120:4 | 275:17 342:9 | 154:18 156:22 | 259:12,17,18 | 420:24 422:18 |
| 120:24 123:11 | 411:18 | 186:9 194:16 | 263:3,17,18 | **statistician** |
| 125:21 132:24 | **sperm** 170:24 | 213:2 239:3 | 264:9 272:9,19 | 297:23 |
| 139:1 140:17 | 171:7 | 304:22 307:18 | 272:23 273:8 | **statisticians** |
| 141:2 143:17 | **spill** 12:13,18 | 333:12 357:20 | 273:12 274:6,7 | 297:10 |
| 153:10 159:9 | 384:8 | 380:23 416:6 | 274:14,19 | **stay** 126:13 |
| 173:24 174:3 | **spinoff** 7:7 | 417:3,14 | 275:1,15 | **staying** 133:9 |
| 178:4,14 185:1 | 385:12,20 | 432:21 433:5 | 276:19 277:10 | **Steel** 55:12 |
| 190:2 192:2 | 386:13 | **stated** 25:13 | 278:5,10 279:5 | **Steering** 2:6,11 |
| 193:14 195:18 | **spoke** 314:8 | 109:16,17 | 279:5,8 282:5 | 2:16 |
| 198:23 200:16 | **spot** 86:6 415:17 | 151:13 177:7 | 282:7,17,23 | **stenographic** |
| 200:22 202:15 | **spray** 14:17,19 | 200:23 208:4 | 290:6,14 297:1 | 8:13 49:20 |
| 204:16 207:7 | 15:4 | 209:5 238:7 | 301:20 306:7 | 322:5 |
| 209:15 226:6 | **squarely** 180:4 | 239:7 241:13 | 307:2,13,24 | **stenographica...** |
| 245:11 255:13 | **staff** 47:8,12 | 270:23 279:11 | 314:13 325:5 | 432:7 |
| 262:19 285:13 | 100:2 | 291:2 307:20 | 325:12 369:16 | **step** 55:15,24 |
| 287:21 292:5 | **stand** 129:1 | 308:12 325:8 | 369:18,20 | 103:13,14 |
| 294:7 299:15 | 181:5 303:24 | 327:11 337:10 | 371:3 402:8 | 120:15 169:15 |
| 315:9 318:15 | 304:4 322:8 | 370:11 372:24 | 406:9 407:4 | 241:9 273:7 |
| 320:7 336:10 | **standard** 54:17 | 374:2,8,15 | 410:6,8 421:7 | 285:5 318:20 |
| 339:1 344:23 | 54:19 56:6,24 | 383:23 384:24 | **statements** | 331:22 335:11 |
| 347:5 353:23 | 354:15,15 | 397:17 407:11 | 41:13 42:1 | 335:21 339:7 |

Kelly Tuttle, Ph.D.

Page 483

**step-by-step**
  291:11
**stepping** 317:1
**steps** 38:20 57:4
  61:16 63:5
  290:3 291:3,5
**stickers** 50:1
**stimulating**
  323:24
**stipulate** 361:5
  361:12
**stipulating**
  361:2
**stop** 86:5 146:18
  146:18,19
  147:11 283:22
  420:17 422:12
**stopped** 79:15
  135:15 145:7
  206:20 263:13
**stopping** 124:18
**stops** 228:21
**straightforward**
  359:17
**straw** 126:11,12
  126:14,15,23
**Street** 1:16 2:4,9
  2:20 3:13
**strength** 203:13
  227:5,13,19
  300:5
**stress** 388:23
  389:4
**stressed** 73:23
  115:2,3
**strike** 39:13
  62:8 358:8
**strokes** 310:23
**strong** 41:23
  227:7,8,10,11
  227:12,13
**struck** 387:11
**structure**
  243:20
**studied** 73:19
  76:4 78:13,14
  81:14,17

305:22 306:8
307:5,14
309:17 310:4
310:16 315:9
**studies** 7:9 16:8
  16:10,23 32:2
  32:2 65:10
  114:7 131:7
  148:21 149:8
  149:20 150:10
  150:22 151:15
  152:11,15
  153:5,8,10,20
  153:22 154:1,5
  154:11,18
  156:19 164:8
  166:4,5,5,6
  170:5 176:17
  181:17,22
  187:20,24
  189:7,12
  195:14 208:22
  209:6,8 210:2
  214:14 247:9
  248:18,19
  260:13 261:7
  279:14 282:11
  282:13 294:11
  294:13 300:17
  306:3,23
  307:21 308:5
  308:15 310:7,9
  334:24 342:13
  342:20,24
  343:9 345:24
  365:12 374:17
  374:23 377:13
  377:15 381:14
  382:6 383:13
  386:19 387:1,3
  387:8,12,18,18
  387:24 388:5
  391:1,9,19,21
  392:1,3 393:5
  393:8,9,11,12
  393:15 394:3
  394:10,14,15

394:17,17
396:2,3,9,10
396:19,24,24
397:10,15
398:18 407:1
409:23 410:2
410:13,14
411:14,21
412:5,9,10
417:15,24
418:2,3,8,13
418:14 419:4
420:23 422:17
424:17
**study** 7:3,8
  17:10,12 18:19
  19:2,7,17
  23:14 24:1,10
  75:15,15 78:20
  80:5 118:4,5
  130:1 138:21
  150:12,18
  153:3 154:9,23
  154:24 156:20
  158:19 160:13
  163:5,9 172:24
  174:13 176:12
  176:14 182:4
  188:1,14
  196:12 200:15
  208:11,16,20
  210:1 214:20
  281:7 283:10
  291:23 294:9
  300:16 301:5,8
  301:21 327:16
  343:19,22
  346:1,9 348:2
  383:9,16
  388:12 389:3,8
  389:11,19,22
  390:9,11
  395:17 397:3
  397:22 398:8
  398:17,21
  399:9,15 400:9
  401:12,22,24

403:14 404:10
406:18 408:5
412:1,1,13,17
412:18 414:7
415:2,13 416:2
416:18 417:8
425:2
**studying** 275:18
  342:9
**stuff** 129:15
  303:1 317:17
**subcategories**
  49:15
**subheading** 87:6
  87:22 420:13
**subject** 379:22
  433:10
**subjective** 268:9
  269:2 271:17
  298:15
**submitted**
  235:23 236:1
  288:13
**subpart** 50:23
  51:7 242:15
  243:18,22
  244:3
**Subscribed**
  435:15
**subsection**
  235:10
**subsequent** 96:7
**subset** 104:5
  143:15,18
  212:19
**subsiding** 325:1
**substance** 13:14
  14:14 122:5
  159:12 165:2
  173:5 344:4
  435:7
**substances**
  22:12 46:4
  164:21 355:2
**substantial**
  402:9
**substantive**

100:9,13
**successful**
  304:17
**sufficient** 91:12
  210:10 317:23
  325:9
**suggest** 102:7
  309:2 357:14
**suggested** 75:21
  282:11
**suggesting**
  312:9
**Suite** 2:15 3:8
**summaries**
  200:21 201:7
  208:7 235:11
  238:9,16
**summarize**
  231:12 368:2
  373:5
**summarized**
  28:3 132:19
  278:4 286:11
**summarizes**
  146:7
**summary** 5:14
  5:15 19:13
  84:15 90:14
  93:9,12 96:6
  162:14 224:8
  224:12 257:6
  279:13 285:10
  286:24 289:16
  348:6 417:19
  419:2
**summation**
  156:7
**super** 262:5
**superior** 98:22
**supplemental**
  5:16 69:9,13
  69:16 102:20
  103:4,8,16
  104:20 106:21
  106:23 202:8
  203:4
**supplemented**

Case 3:16-md-02738-MAS-RLS   Document 9739-11   Filed 05/07/19   Page 159 of 205 PageID: 42167
Kelly Tuttle, Ph.D.

Page 484

71:19
**support** 41:15
41:24 43:7
98:2 99:20
100:2 110:6
111:2,7 112:13
113:5,19,24
116:6 117:17
118:11,16
119:8 120:9
123:18 125:3
127:5 128:4
130:22 131:4
136:23 137:3
139:13,23
150:15 180:12
180:14 184:18
194:9 208:8
213:1 214:2
215:10 218:7
221:22 228:19
229:16 230:9
230:22 231:20
232:2,8 233:17
233:19 237:21
241:18 244:20
260:17 265:1
265:14,23
266:13 267:17
268:15,17
277:17 285:4
286:20 300:13
303:6,15,22
305:3 332:11
332:16 333:3,8
333:18,23
337:12 376:11
**supported** 29:12
29:18 43:20
62:20 96:18
109:17,22
114:7 193:7
236:13 345:16
**supporting**
126:6 413:23
**supportion**
128:6

**supportive**
46:17 233:13
**supports** 11:20
28:23 30:10
41:14 57:12
96:18 110:6,18
110:23 112:12
132:17 137:7
155:24 192:9
206:14 208:8
239:4 244:10
256:17 268:3
268:15 269:7
271:12 275:22
277:17 300:20
372:22 394:22
**suppose** 82:6
293:23
**supposed**
103:14
**supposedly**
107:14
**suppression**
389:23 390:3
**sure** 10:3,13,16
11:4 30:5
31:16 35:6
37:1 55:22
69:20 70:5,15
74:15 76:24
77:1 83:21
88:10 91:10
98:11,13,14
108:20 117:1
121:16 123:19
128:17 133:7
141:17 144:16
156:1 160:16
165:9 167:9
176:10 188:12
213:9 228:17
252:21 259:24
286:8,16 302:6
309:23 311:13
320:14 321:19
323:19 324:11
339:10 344:8

347:2 351:8
377:21 380:2
397:8 406:8
409:12 417:20
419:24 420:9
429:21
**surgery** 148:13
148:15
**surmised** 210:3
**surprise** 251:16
411:7
**surrounding**
298:4
**SUSAN** 432:2
432:18
**suspect** 340:23
**swear** 8:15
**sworn** 8:18
432:4 435:15
**symptom** 414:8
**synonymous**
109:19,24
149:16 150:7
**synthetic** 327:15
**system** 7:4 140:4
140:7 313:19
323:5,8 327:14
351:13 353:4
389:24 390:4
**systems** 314:9
314:11

---
## T

**T-A-H-E-R**
104:19
**table** 198:2
201:2 285:10
286:15 287:2,5
287:7 288:2,5
289:16 368:23
416:16
**tables** 287:21
**Taher** 104:18,19
105:14,24
106:4,7 202:7
202:7,9,17,24
203:3 207:3

208:14,20
**take** 28:13 61:16
63:5 78:8,10
79:4,6,9,12,23
79:24 86:5,6
93:15 115:10
143:20 146:11
147:12 160:20
179:15 224:21
227:2 237:5
240:4 251:13
280:7,9 283:22
289:14 297:8
362:19 363:23
364:4 386:4
387:3 388:19
396:3 397:3
**taken** 57:4 86:10
136:15 142:21
146:3 147:16
151:20 180:8
230:4 237:19
237:20 240:7
257:7,8 273:1
282:12 284:2
308:1 356:19
364:9 423:3
432:7
**takes** 169:15
247:18
**talc** 7:9 15:17
30:21 66:23
87:24 88:2,12
88:19 89:9,13
89:23 90:2,7,8
90:19 91:5,9
91:12,15
107:13 112:1,3
124:16 135:19
141:22 142:10
142:17 143:9
143:13,23
144:3 147:2
149:4,22 150:2
150:8 161:1,3
161:11,15
162:18,21

163:11,22
169:7,9,10
171:12 175:6
175:23,23
176:1,2,20
179:1,1,2,23
181:9 184:10
185:4 195:7,12
199:7,8,11,11
200:1 206:8,11
206:16 207:2
208:18 209:1,6
209:17 210:4,7
210:9,14,23,23
211:6 212:6
213:6,11,12
214:6 215:5
218:10,14
222:21 226:13
228:7 230:11
230:24 233:10
240:17,23
241:7,23
242:21 244:1,2
244:12,13,17
245:15,16,22
245:23 246:10
246:20 247:3,3
247:21 248:17
249:1,18,21
250:6,24 252:7
252:13,23
253:3 255:20
257:2,17 260:5
260:11 263:7
264:12 272:13
274:9 276:11
281:5,8 289:19
290:1,24 291:1
291:2,11 292:3
292:14 293:20
301:22 305:23
306:9,23 307:6
307:8,15 308:5
308:15 309:17
309:20 310:5,8
310:10 319:4

Kelly Tuttle, Ph.D.

Page 485

| | | | | |
|---|---|---|---|---|
| 331:14 332:13 | 89:11,22 90:3 | 378:23 379:9 | 373:17 374:11 | **tenet** 24:22 |
| 332:19,24 | 91:2,5 95:16 | 380:5 381:2,5 | 377:6 393:13 | **term** 53:11 90:8 |
| 333:4,9,15 | 108:13 109:4 | 381:10,16,19 | 403:14 416:23 | 119:17 153:5 |
| 334:3,24 | 110:10,14,19 | 382:6,8,14,15 | **tangled** 58:16 | 154:21 318:21 |
| 336:21 337:5 | 110:24 111:4,8 | 382:17,20 | **target** 314:23 | 353:15,19 |
| 337:13 338:12 | 111:13,16,22 | 403:19 411:16 | **taught** 295:14 | 390:6 |
| 339:2 340:10 | 112:6,14,15 | 412:10 424:1,6 | 296:9 | **terminology** |
| 342:9,16 343:4 | 113:20 114:8 | 424:7,10,12,16 | **teach** 78:24 | 354:10 |
| 345:20 349:5 | 116:7 120:10 | 424:18,20,24 | **teaches** 121:23 | **terms** 287:3 |
| 364:18,22 | 120:11 122:5 | 425:3,5 426:15 | **teaching** 21:1,8 | 296:5 323:3 |
| 365:1,16,22 | 123:8 126:7 | 426:20 427:7 | 21:16,19 | 344:14 |
| 366:8,10 | 127:18 130:23 | 428:22 429:13 | **team** 47:15 | **test** 289:5 |
| 371:14 383:3 | 136:11 139:13 | 430:9,16 | 95:16 96:17,18 | 366:14 367:5 |
| 387:9 388:23 | 153:17 166:24 | **talk** 30:15 52:18 | 285:4 286:20 | 401:5 |
| 388:24 389:4,5 | 171:12 173:17 | 70:7 111:15,17 | **technically** | **tested** 17:2 |
| 390:17 391:1 | 177:9 178:10 | 118:22 155:5 | 279:9 | 350:14 352:2,9 |
| 391:20 393:6 | 178:11 180:19 | 277:2,23 329:8 | **technique** | 376:19 398:12 |
| 394:4 398:18 | 184:19 192:7 | 336:16 339:4 | 162:16 | **testified** 8:19 |
| 400:9,13 | 199:12 212:18 | 371:23 373:18 | **telephone** 342:8 | 361:6 |
| 401:24 402:4 | 213:8,14,20 | 373:21 423:22 | **tell** 10:1,2 48:3 | **testify** 432:5 |
| 418:4 424:2 | 214:3,8 215:11 | 425:23 | 87:14 92:18 | **testifying** 361:3 |
| 425:6,8 428:8 | 216:17 229:17 | **talked** 30:18 | 94:9,23 96:17 | **testimony** 5:5 |
| 428:12 | 232:9,14 | 48:20 195:16 | 127:4 160:16 | 12:5 21:21 |
| **talc-containing** | 233:15,20 | 214:13 216:8 | 164:6 167:22 | 52:21 107:3 |
| 428:19 429:10 | 236:11 241:15 | 237:4 243:3 | 184:4 217:24 | 145:7 194:3,14 |
| **talcum** 1:4 8:10 | 242:12,18 | 254:7 282:5 | 234:3 237:24 | 194:17,17 |
| 9:4 11:15,21 | 244:8,22 245:3 | 300:9 301:14 | 258:6,7,12 | 196:2 258:2 |
| 15:10,16,20,22 | 246:19,24 | 328:8 334:21 | 268:22 276:23 | 263:20 303:11 |
| 16:2,10,23 | 248:23 250:4 | 344:17 372:6 | 287:10 321:24 | 329:14 357:13 |
| 17:6 27:4,20 | 260:2,16 | 408:9 | 346:16,18 | 357:19 379:12 |
| 29:12,19 30:11 | 264:20 265:24 | **talking** 15:9 | 354:4 375:1 | 387:22 392:10 |
| 30:16,20 31:5 | 268:18 275:23 | 30:17 83:7 | 378:15 386:5 | 397:12 432:7 |
| 31:10,19 32:1 | 285:14 287:16 | 129:10,10 | 412:4 427:3 | **testing** 31:2 49:8 |
| 33:14 34:18,24 | 287:18 292:4 | 133:12 134:20 | **telling** 90:15 | 84:6 231:11 |
| 34:24 35:11 | 292:15 303:16 | 150:10 167:10 | 92:1 93:20 | 286:12 287:15 |
| 36:5,8,17,21 | 305:4 306:3,18 | 175:22,23,24 | 113:23 154:4 | 288:1,17,19 |
| 37:5,6 38:22 | 330:12 333:24 | 179:7,21,22 | 194:6 196:3 | 289:2 292:11 |
| 40:16 41:6 | 343:12,15 | 181:22 204:6,9 | 216:23 231:17 | 365:8 366:12 |
| 42:22 43:1,11 | 344:18,22 | 211:16 212:15 | 232:12,16 | 366:16,17,20 |
| 44:24 45:8 | 345:3,15 365:7 | 214:15 226:24 | 247:20 263:19 | 367:23 368:1,5 |
| 46:13 48:24 | 365:9,14 | 244:6,15 | 264:14 265:9 | 368:22 374:11 |
| 53:21 57:6,13 | 370:15,21 | 246:16 259:7 | 266:15 319:11 | 374:18 376:18 |
| 61:18,24 62:12 | 371:4 372:20 | 260:11 261:4 | 329:6 333:20 | 379:21 380:18 |
| 62:16,21 65:20 | 374:9,11,14,19 | 296:15 297:6 | 388:3 | 380:20 381:13 |
| 66:8,18 67:8 | 375:8 376:9,14 | 300:1 313:3 | **tells** 119:2 | 382:11 408:12 |
| 68:8 88:16,19 | 376:19 377:11 | 316:10 327:12 | **Temporality** | 408:24 424:17 |
| 88:20 89:2,2,9 | 377:12,14 | 331:9 359:20 | 203:17 | **testings** 367:12 |

Kelly Tuttle, Ph.D.

**tests** 193:17
367:4
**Texas** 1:16 8:9
432:21
**text** 22:16 182:1
408:9
**textbook** 20:7,8
20:10,14,20,21
21:1,14 22:5
23:8,23 25:11
25:14,17 75:7
80:15,21,22
81:15,20,22
82:9,16 84:3
85:2,12,15
409:6
**thank** 79:22
110:22 123:20
160:22 162:3
207:24 223:17
240:4,15
251:15,18
280:19 284:10
322:10 346:23
363:19 400:3
**theory** 90:14
107:13 108:2,5
109:14 111:19
114:1 116:6
117:5,8,14,17
119:8 123:18
124:15 125:5
125:13 127:11
128:23 129:14
129:21 130:15
130:21 132:17
132:23 135:11
135:18 136:16
142:6 150:7
184:18 185:24
186:5,9,19
192:9 195:6,7
208:23 209:22
210:7 211:12
218:10 229:17
230:10 232:3
238:1 239:5

242:17 243:24
245:8 303:6
305:3 328:4,15
332:12,17
333:1,3,15
**thereof** 365:24
**thing** 66:2 90:21
111:12 179:21
207:15 238:3
328:7 378:5
**things** 16:9
41:11 52:14,17
63:13 69:16
98:17 100:4,18
109:19,21,24
116:13 117:4
118:15 119:21
126:5 127:23
128:21 132:13
135:3 137:17
153:20,23
178:13 195:15
211:8 213:12
220:21 224:11
225:20 233:2
247:22 271:5
297:4,24 314:2
323:5,6,7
330:4 356:21
371:16 389:9
393:2 397:1
399:3 406:22
423:2
**think** 20:23 24:8
33:2,4 35:5
38:1,3 40:13
54:3 70:21
71:1 77:14,22
78:1 95:11
100:1 104:7
107:24 111:12
122:9 123:16
124:5 127:16
128:10,22
134:2,2 137:18
139:7,11
148:20 151:17

152:24 153:12
154:3,14 158:1
160:1 172:13
177:21 181:4
182:12 185:10
186:8 193:6
197:12 198:2
198:15 202:6
211:9 212:13
215:15 220:6
222:24 224:4
231:12 232:6
235:20 240:22
249:21 257:20
259:6 270:23
271:24 275:9
280:5 289:13
295:1 298:9
302:5 320:2,6
323:2,17 330:1
330:8 332:22
335:4,17 336:8
338:4 341:9
343:18 346:10
346:21 347:8
347:11,11
349:9 354:22
358:7 363:22
364:14 365:21
368:5 375:2
379:20 380:23
383:23 384:18
391:12 402:18
411:3 417:4
418:19 420:8
420:10,11
424:3 430:13
431:3,15
**thinking** 362:20
**thinks** 67:7
**third** 5:13 13:3
13:7 22:7
81:23 82:3
125:20 148:9
148:10,18
165:1 226:11
282:9 294:9

341:17
**thirty** 433:16
**thorough** 63:20
113:7
**thoroughly**
64:13
**thought** 61:17
62:4,24 67:14
98:16 193:22
198:16 224:24
309:24 326:5
341:3
**thoughts** 67:2
122:17
**thousands** 64:9
116:19 191:24
192:23 193:4
392:1
**three** 109:24
117:4 122:12
143:11,16
182:18 184:12
189:24,24
251:19 302:11
321:1 383:6,7
423:15
**three-page**
341:18 423:3
**threshold**
420:20 422:14
**Thursday** 1:12
**time** 8:7 37:18
37:22 39:23
43:3,6 46:19
53:13 57:3
86:2 93:2 96:1
96:4,20 99:3
100:5 101:17
107:19 124:8
125:16 143:20
146:15 157:24
160:20 165:20
173:18 188:13
205:13,18
206:2 224:24
231:18 277:2
280:6,8,11

289:10 342:9
348:24 369:7
384:14 385:6
388:19,21
393:10 394:9
411:19 426:24
427:4 430:22
431:4 432:8
**time-wise** 85:21
**times** 101:12
120:18 121:7
254:8 277:7
288:18 330:2
333:21,22
361:14,15
418:5
**tissue** 91:21 92:8
161:2,13
162:17,20
206:10 209:1,7
210:16 211:1,6
212:7 244:1,2
245:16,23
246:11 247:4
247:22 252:15
253:4 260:6
281:5 310:19
311:18 317:22
328:9,10
332:20,24
403:9 425:18
**tissues** 107:16
161:16 163:6
**titanium** 141:22
143:9,12
**title** 50:14 85:5
183:3 186:4
198:12 201:8
**titled** 255:19
**titles** 96:24
**today** 8:11,14
9:1,17,23 16:3
21:19,20 26:24
31:4 34:8
35:24 46:22
52:18 60:20
66:16 67:18

Kelly Tuttle, Ph.D.

Page 487

69:6,10,24
118:21 128:10
133:8,13
140:14 166:8
175:1 177:22
180:3 196:14
230:16 233:5
234:1,5,9
254:7 258:2
263:20 264:15
276:18 293:14
294:2 304:7,20
331:1,11,22
333:22 336:16
339:15 343:18
347:13 348:12
352:20 361:4
365:3 372:7
379:13 403:12
420:4
**Today's** 8:6
**told** 35:5 52:21
116:12,18
156:1 174:4
187:19 193:6
202:6 229:20
286:19 298:9
331:21,24
334:10 367:15
**tools** 396:10
**top** 73:12 75:5,5
75:9 80:12
97:7 143:22
144:14 198:12
204:3 220:3
223:19 250:21
262:9 289:17
341:15,22
429:22
**topic** 64:12
65:15 112:20
121:1,14 127:7
180:4 186:3
203:13 234:8
**topics** 21:11
52:19 64:10
185:23 203:16

203:19
**tort** 12:20,22
**touch** 337:10
387:9 390:24
391:20
**touched** 58:10
176:15
**tough** 86:20
**tox-** 45:21
**toxic** 12:20,22
344:3,4 396:5
396:15,16
**toxicity** 305:13
305:15,16
317:24 318:13
321:4 322:13
325:19 326:1,3
327:8 328:22
329:1 330:6
383:3 387:10
388:24 389:5
389:14 390:4,7
395:12,16,22
397:4 408:12
408:24
**toxicokinetics**
406:24
**toxicological**
14:10 21:1,8
21:11,16 22:2
41:9,10 49:17
133:22 262:11
262:15,18
271:4 387:20
388:6
**toxicologist**
13:12 21:5,24
27:6 34:4 39:5
41:8 44:14
45:16,19,22
51:17 53:1
56:2 57:5,20
58:3 59:22,24
60:15 91:17
97:24 98:18
99:12,16 122:6
129:23 131:8

138:15 241:10
267:24 271:3
317:7 342:17
370:4 373:16
378:16 379:4
402:6
**toxicologists**
46:23 47:4,8
47:16 48:8
58:19 387:23
408:3 409:22
410:15
**toxicology** 5:7
5:13 7:8 17:10
17:12,19 18:18
19:1,7,17
20:20,22 21:2
22:9 23:13,22
23:24 24:5,10
24:17,23 25:5
25:22 26:1,3
26:19 46:1
48:18,21 49:14
49:16 53:8
81:19 82:3
92:5 129:24
132:11,14
138:18,21
222:17 270:5
271:1 281:21
296:22 312:2
330:10 343:19
343:22 387:13
387:16,20
388:9 394:16
398:17 404:24
407:9,19 408:9
409:14,15
**tract** 89:24 91:7
108:15 109:6
110:11,20
111:5,10,18,24
116:9 120:12
135:22 137:14
148:15,23
149:11 152:1,6
152:18 168:10

175:8,9 176:3
196:1 213:16
213:22 215:13
232:5 260:19
303:17
**trained** 58:3
**training** 45:19
47:17,21 48:17
49:13 51:17
53:2,7 81:18
129:20 131:5
132:10 138:14
267:23 270:4,5
270:17,24
294:24 295:15
296:1,20
297:21 299:3
379:6
**transcript** 432:7
433:17,18
**transcription**
435:5
**translate** 281:8
**transloading**
14:11
**translocate**
322:16
**transmission**
6:11 217:15
327:22
**transport** 142:9
142:17 144:2
147:2 149:22
150:2,16
170:23 171:1,7
185:4 206:14
215:12 425:7
**transported**
424:1
**traveled** 182:18
190:1
**treat** 22:10 46:3
**tree** 239:11,11
**trial** 341:8
**trick** 197:15
**tried** 285:9
290:22 292:8

**trigger** 82:9
317:20,23
331:15
**triggered** 40:4
42:17 313:21
336:21
**trouble** 125:15
375:14
**true** 56:15
120:19 125:11
182:3 226:15
314:9 335:14
338:10 358:21
363:18,20
365:20 374:6
385:10 387:12
399:4 407:3,17
409:8 411:20
**truth** 223:9
224:2 432:5,5
432:5
**try** 39:19 118:6
118:17 132:7
146:8,18 147:5
195:2 208:7
217:3 258:14
322:24
**trying** 54:24
65:5 70:21
71:16 91:10
98:11 131:21
141:15 155:4
166:3 192:24
195:5 269:15
274:1 295:1
297:5 299:12
334:7 337:2
341:12 360:9
392:11 420:8
429:20
**tubes** 158:24
175:9 176:3
182:19 183:7
184:14 190:1
228:9 326:16
**TUCKER** 2:18
3:7

Kelly Tuttle, Ph.D.

**tumor** 161:2,16
  162:20
**tumors** 161:4
  162:18 263:8
  264:13 272:14
  274:10 276:12
**turn** 18:14 82:11
  107:10 108:10
  132:1 135:8
  142:4 143:20
  158:2 160:10
  167:20 181:11
  204:1 321:3
  399:21
**turned** 44:13
  45:6,10,11
  201:15 369:9
  421:15
**turning** 350:10
**Tuttle** 1:14 4:6
  5:1,4,5,9,16
  6:18 8:11,17
  8:21 9:7,11,22
  12:4,9,12,22
  13:20 14:13
  19:14 22:6
  26:7,9,21,24
  50:8 72:8,14
  72:17 82:8
  83:8,17 93:7,7
  102:20 104:11
  106:24 141:6
  142:22 157:18
  158:18 159:16
  159:23 160:2
  162:2 164:5
  165:7 166:12
  168:6 170:10
  172:6,20,23
  174:13 175:15
  179:21 180:23
  182:9,22
  183:11 187:14
  190:10 194:7
  194:21 196:19
  197:3 201:22
  217:10 219:5,6

220:5,7,14
223:15 224:16
235:8 249:9
250:19 252:8
256:7 261:20
272:10 273:10
274:6 276:3,20
278:9,13,23
279:24 280:22
284:14,20
293:5 320:21
327:7 328:20
329:2 340:13
343:3 347:23
351:11,22
352:19 353:13
356:12 357:3
357:15 359:11
362:11,24
369:6,10
398:15 399:22
405:19 415:7
416:2 419:9
432:4 435:4,12
**Tuttle-1** 5:4 9:7
**Tuttle-10** 5:15
  93:12
**Tuttle-11** 5:16
  102:20
**Tuttle-12** 5:18
  141:9
**Tuttle-13** 5:19
  157:20
**Tuttle-14** 5:20
  159:19
**Tuttle-15** 5:22
  164:12
**Tuttle-16** 6:2
  166:15
**Tuttle-17** 6:4
  170:13
**Tuttle-18** 6:5
  172:8
**Tuttle-19** 6:7
  174:16
**Tuttle-2** 5:5
  12:4

**Tuttle-20** 6:8
  197:6
**Tuttle-21** 6:10
  201:17
**Tuttle-22** 6:11
  217:15
**Tuttle-23** 6:13
  224:18
**Tuttle-24** 6:14
  249:11
**Tuttle-25** 6:15
  261:13
**Tuttle-26** 6:16
  273:12
**Tuttle-27** 6:17
  280:3
**Tuttle-28** 6:18
  284:20
**Tuttle-29** 6:19
  293:7
**Tuttle-3** 5:6
  17:18
**Tuttle-30** 6:20
  320:17
**Tuttle-31** 6:21
  340:15
**Tuttle-32** 7:2
  348:1
**Tuttle-33** 7:4
  351:13
**Tuttle-34** 7:6
  362:13
**Tuttle-35** 7:7
  386:12
**Tuttle-36** 7:8
  398:17
**Tuttle-37** 7:10
  415:9
**Tuttle-38** 7:12
  419:11
**Tuttle-4** 5:8
  20:2
**Tuttle-5** 5:9
  26:9
**Tuttle-6** 5:10
  50:4
**Tuttle-7** 5:11

72:11
**Tuttle-8** 5:12
  82:2
**Tuttle-9** 5:14
  93:9
**two** 75:7 93:15
  98:20 145:9,19
  146:18 152:7
  158:20 161:18
  176:8 179:13
  180:11,12
  182:17 184:11
  189:22,24
  251:19 279:23
  315:3 331:22
  351:4 363:15
  408:10,23
  417:5 420:23
  422:17
**two-page** 50:8
  293:10
**type** 16:23 99:20
  215:20 228:11
  245:1 288:1,10
  288:19 326:17
  327:2,6
**types** 131:7
**typos** 98:4,13
_____
           **U**
**ultimately** 33:9
  131:13 133:4
  135:3 176:4
  271:7 285:11
  335:22
**Ultrastructural**
  174:22
**umbrella** 130:6
**unable** 70:22
**unclear** 134:13
**undergo** 148:12
**undergone**
  291:5
**undergrad**
  80:10
**underlie** 408:11
  408:23

**underlying**
  152:18
**understand** 9:16
  15:11 22:10
  28:9 31:7 46:2
  46:11 47:3,5
  47:24 52:18
  69:12 78:6
  90:21 111:20
  111:22 113:22
  116:18,20
  121:2 122:10
  125:17 128:8
  130:7 134:20
  145:8 155:9,11
  155:14 162:10
  165:23 166:1
  177:20 180:2
  191:7 192:22
  192:24 196:2
  204:23 208:21
  212:8 213:13
  219:19 221:8
  241:6 247:16
  249:17 291:14
  297:5 299:17
  319:3 358:23
  368:9 391:23
  393:22 397:1
  404:22 418:17
  428:21
**understanding**
  15:15,16,21
  24:12 32:12
  53:3 89:17
  100:22 102:4
  111:12 155:18
  156:13 167:15
  250:2,5,8
  290:16 291:6
  291:20 330:9
  345:2,9 364:21
**understood** 27:7
  35:7 69:18
  114:2 131:2
  326:6 397:10
**undertake** 38:20

Kelly Tuttle, Ph.D.

Page 489

undertaken 57:5 291:4
unfair 115:3
unfamiliar 264:1
unfold 317:4
unfortunately 253:22
unidentified 100:22
unintended 12:14
Union 3:10
United 1:1 80:22 350:19 352:10 352:21 353:13 354:17 359:6
universal 390:6 395:15
universally 80:21
University 384:19 385:2,8 385:16
unpublished 105:4,17,24 106:9
unsound 109:23 303:8
upper 175:8 176:2
upstream 253:9 253:9
uptake 316:20
upward 128:6
upwards 124:16 135:19
use 9:3 27:5,10 27:24 28:13,21 29:3,4 30:1 34:15 35:13 36:14,17 37:1 37:7 42:6,24 43:11 59:6 60:15,21 77:7 79:4 81:14 98:14 110:1

131:12 133:23
144:5 145:4
157:6 186:13
186:16 198:13
199:11 222:6
243:16 244:8
245:3 249:19
249:21 250:6,6
252:23 254:9
257:2 263:7
264:13 267:23
271:15,16
272:13 273:19
274:9 275:24
276:11 289:4
296:19 297:22
344:13,18,22
345:5,15
394:19 411:16
416:4 425:16
426:8,16
427:16,17,24
428:3,8,11,16
429:13 430:1,4
430:5
useful 256:1 301:13 393:12 394:15 396:10 396:24 397:15 408:2 409:22 410:14
usefully 75:21 76:14
uses 150:5 272:19 346:20
usually 405:24 407:5
uterine 170:22 171:10,14,23 281:10
uterotubal 170:23

**V**

v 13:1,2,3,5,6,7 13:8 14:6,16
vacuum 78:11

79:4,12,24
115:10 227:3 237:6
vagina 158:22 159:8 165:3,14 167:5,11,18,19 173:6,14 182:17 183:6 189:22 199:14 199:15 213:21 214:4,9 215:12 228:5 232:14
vaginal 159:5 169:13 195:16 213:15 214:16
vague 365:4
vaguely 59:20 80:16 81:8 410:23
validated 269:6 271:8
value 420:19 422:14
variables 257:5
variation 418:1
variations 169:8
variety 290:11
various 17:13 57:22 81:15 152:16 210:3 329:24 394:16 419:2
vary 314:20 315:2
Venter 5:22 164:6,12
verbatim 253:24 308:1 353:17 432:7
verify 166:4
versed 22:19 291:10,16 297:13
versus 206:3 245:23 311:13
veterinary 383:16,18

videographer 3:20 8:3,5 86:8 86:12 147:14 147:18 240:5,9 280:15 283:24 284:4 351:2 364:7,11 431:19
videotaped 1:14 107:4
view 57:22 84:10 130:16 130:17 133:10 149:16
viewpoint 74:1 76:7,9 112:20 114:12 115:18 207:16
viewpoints 73:19,20,23 74:9 75:14 76:4,20 77:5 77:17 78:8 80:4 82:23 83:4,16,18 86:23 87:6 114:22 115:5 115:13 116:2 121:15 203:22 204:12 207:12 227:3 233:12 300:4,7,8 305:8
Virginia 2:15
visited 327:1
Vitae 5:9 26:9
vitreous 327:15
vitro 306:4,15 307:21 387:17 387:23 388:4 393:12 394:15 410:13
vivo 306:4,15 307:21 387:23 388:5 393:5 394:3,14
Volume 184:24

**W**

W-E-H-N-E-R 251:17
W.J 159:24
wait 275:12 371:22
want 10:13,16 22:8 31:7 35:23 50:9 52:17 69:20 70:9 84:1 86:4 90:21 123:21 124:19 132:5 133:7 134:1,14 135:15 136:4,7 147:6 148:7 151:18 156:9 165:9,23 167:8 181:5,11 196:15 200:12 205:19 217:3 220:15 221:11 221:21 240:18 241:11 247:15 249:23,24 273:6 277:11 277:22 302:8 304:7 311:20 311:20 344:13 363:6 364:1,2 397:8 399:3 402:20 403:3 409:14 415:19 423:21 427:2
wanted 11:3 28:12 31:16 35:6 74:21 116:24 162:24 165:19 179:18 241:14 363:14
wanting 52:12 398:6
warning 51:1 54:6,7,11 55:4 55:24 429:16 430:8,13,17

Golkow Litigation Services - 877.370.DEPS

Kelly Tuttle, Ph.D.

Page 490

warnings 54:17
54:21 55:7
56:18
washing 289:23
Washington
3:14
wasn't 40:6,19
40:20 41:19
43:14,15
182:24 384:13
waste 421:1
422:5,20
Watch 284:17
water 126:12,13
126:24 131:16
Watson 223:6
223:23
way 22:9 46:2
61:3 71:11
96:12 101:6
181:1 206:23
226:14 254:10
294:6 295:2
334:8 337:3
342:6 351:18
375:24 378:17
386:6 412:18
428:15
we'll 69:13
85:24 86:7
92:19 147:12
169:23 206:22
363:23 364:4
we're 8:3 15:9
21:18,20 30:20
65:5 83:7
86:12 95:12
103:14 119:3
122:22 138:5
146:15 147:18
152:10 155:10
155:14,18
156:17 166:23
177:1 180:5
195:19 204:6
214:15 230:20
240:9 244:7

245:2,11
246:17,18
248:21 260:15
261:4 274:18
280:6 281:15
284:4 296:4
300:1 316:9
318:23 323:16
325:21 327:12
329:17 330:7
331:9 339:15
339:17 355:5
362:18 364:11
373:16 388:20
424:3 425:17
427:4 430:22
431:20
we've 48:20
168:5 169:3
172:15 176:12
178:1,8 180:13
185:21 187:14
187:16 188:6
195:15 203:9
207:4,6,12
228:20 232:19
233:3 234:9
242:15 243:3
243:18,22
260:1,1,3
265:20 280:15
304:6 327:1
328:7 340:19
364:14 388:20
431:1
weak 142:10,18
147:3 149:24
185:5 257:3
279:14 282:11
weaknesses
294:12
website 198:24
199:18,23
200:14 347:10
386:6
week 69:9 71:19
Wehner 6:14,15

6:17,19 249:4
249:11,15
250:18,23
251:2,9,19
252:12 254:11
254:20 256:6
259:6,9 260:3
261:13 262:10
278:20 279:4
280:3 282:6
293:3,7,15
294:1 344:16
344:17
weigh 40:14
117:21 119:1
120:6,15
weighing 119:13
119:20
weight 119:17
200:7 208:1
301:8
well-discussed
294:12
went 38:11 66:3
67:24 70:24
216:1 385:15
387:7 421:14
421:19
weren't 177:18
191:9,9
whats 400:23
wide 21:10,11
49:15 138:18
290:11
William 341:24
341:24
Wilson 13:2
14:6
witness 8:16
86:1 209:4
224:20 229:19
250:3 254:5
273:21 280:5
280:11,17
331:4 341:6
350:23 351:6
361:14 362:15

362:21 363:18
370:4 376:4
379:24 380:10
386:9 432:10
432:11 433:1
witness' 212:10
365:18 379:12
woman 155:16
women 9:2,2
142:10,18
144:3,4,10
147:3 148:12
148:21 149:4,9
149:24 185:5
209:17 210:15
215:6 228:12
240:17 326:19
wonder 221:10
wondering
246:7 289:1
WOODS 3:12
380:9
word 73:10,13
73:15 76:10,16
123:24 134:19
150:5 156:2
157:2,6,8
161:7 305:16
315:23 321:22
322:17 338:20
362:2 401:20
410:1
wording 83:22
114:16 146:1
words 28:9
57:16,19 77:10
110:1 135:10
136:8,15
142:16 152:7
163:21 185:1
186:13,16
204:3 243:16
243:20 244:6
249:18 254:9
258:1 275:12
289:3 290:5
291:4 308:8,9

308:19,19
309:4,6,7,8,9
318:20 353:20
354:5 359:5
387:2
work 15:24
16:16 21:4,24
27:6 29:5 31:8
32:17,24 33:11
33:16 38:11
53:8,18 55:12
57:5 61:22
85:3 95:1
99:21 100:7,12
120:3 131:7,11
133:4 168:1
215:19 216:4
241:12 262:3
265:10 275:6
276:16 288:14
288:18,23
289:10,10
296:21 302:2
304:4 311:24
312:4 320:6
344:21 372:10
383:21,24
worked 53:24
54:7,14,20
95:17,24 96:14
97:8 99:23
101:4 102:1
312:11 379:7
workers 13:20
375:23
working 37:21
53:7 95:10,15
147:1 185:3
283:7
workshop 263:5
263:18 279:6
282:10
World 364:23
Worth 1:15,16
8:9 18:12
wouldn't 62:9
62:23 63:1

Kelly Tuttle, Ph.D.

Page 491

65:16 139:7
214:6 222:18
249:24 334:10
403:3
**write** 304:4
309:6 328:20
328:24
**writing** 98:11
**writings** 157:3,7
**written** 253:24
273:23 274:7
274:12,19
275:1,15 276:2
278:6 308:13
308:22 319:22
**wrong** 94:11
193:10
**wrote** 278:13
309:7,10
329:16 386:20

**X**

**Y**

**Y'all** 99:5
**yeah** 55:2 95:22
262:5 280:17
314:22 320:5
323:14 356:7
384:12 421:21
425:21 431:17
**year** 32:20 40:1
83:13 178:20
182:14 294:4
**years** 5:5 12:4
35:15 37:16
42:19 322:23
329:16 385:17
**yesterday** 93:3

**Z**

**Z-A-R-E-N-S-...**
327:24
**Z-A-Z-E-N-S-...**
219:8 293:12
**Zaren-** 327:23
**Zazenski** 219:8

220:24 221:12
222:14 293:12
327:23
**Zelikoff** 108:12
109:4 110:3
303:7,20
**Zelikoff's**
108:22 109:12
**ZELLERS** 2:19
399:23
**zero** 420:22
422:16

**0**

**0.05** 420:20
422:15
**07932** 3:4

**1**

**1** 9:12 10:16,23
69:15 82:15
172:23 225:4
355:22
**1%** 355:6
356:22 359:20
359:21 362:6
**1.4** 301:4
**1.5** 301:4
**1.6** 299:4,20
301:4
**1:56** 240:6,7
**10** 93:7,21 94:11
94:16 101:7
223:19 263:3
351:3
**10/7/04** 6:19
293:7
**10:24** 86:9,10
**10:34** 86:11,13
**100C** 363:8,11
**102** 5:16
**11** 1:12 5:2 8:2
75:4,9 102:18
104:11,15,18
106:24 176:11
**11.5** 107:12,24
108:4 124:13

142:4 185:14
186:4 187:4,10
**11:34** 147:15,16
**1100** 3:8
**1181** 252:22
**1182** 257:13
**11th** 8:6
**12** 5:5 104:10,14
141:7 142:23
175:5,14
180:23 432:23
**12.2** 108:11
109:3
**12:22** 147:17
**12:24** 147:19
**13** 157:18
158:19 160:2
182:9,22
183:11 411:3
**14** 159:17,23
160:2 162:2
190:10 194:8
194:21 196:19
294:10
**141** 5:18
**14178** 249:15
**14189** 249:15
**15** 164:5
**153** 158:17,18
**157** 5:19
**159** 5:20
**16** 165:7 166:13
167:21 168:6
176:13
**16-2738** 1:5
**164** 5:22
**166** 6:2
**16th** 262:24
**17** 5:6 170:11
263:1 282:1,8
342:6 383:4
**170** 6:4
**172** 6:5
**174** 6:7
**18** 172:6,20,23
219:6,6 220:5
383:4

**19** 174:14
175:15 179:21
202:21,23
203:13
**1961** 160:1
182:5,9,16
183:10,16,22
184:6
**1965** 5:11 72:11
72:18 82:24
114:23 203:7
**197** 6:8
**1971** 5:20
159:19,24
160:3 190:6,9
190:12 191:12
193:5
**1977** 342:6
**1979** 5:22 164:6
164:12
**1986** 6:2 166:15
167:21 168:4
**1987** 394:24
**1988** 389:22
390:9
**1994** 6:14
249:11,15
250:23 252:7
282:8
**1996b** 206:13
**1997** 263:1
282:1
**1999** 316:15

**2**

**2** 4:2 12:9,12,22
13:20 14:2,13
22:6 68:17
70:10 282:3
321:3 392:5
409:13,15
**2.0** 294:13,23
295:1,5,6,10
295:13,18,24
296:8 298:8,17
299:1,1 301:14
301:14

**2/17/77** 6:21
340:15
**2:07** 240:8,10
**2:49** 284:1,2
**20** 5:8 93:1
197:4 202:21
203:15 435:16
**20%** 411:4
**20004-1454** 3:14
**2004** 6:4,5,11
84:9 170:13
172:8,12
173:23 217:15
218:3 219:16
219:23 294:1
**201** 6:10
**2010** 141:20
143:1,7
**2012** 363:8
**2014** 6:20 225:4
235:6 320:17
327:4 329:17
416:15 417:2
417:12,13
**2015** 388:13
389:19
**2016** 7:10 415:9
**2017** 350:19
352:11,21
359:6
**2018** 33:3,8
203:1 207:3
**2019** 1:12 5:2
6:7 8:2,7
174:16,20
432:23
**202** 3:14
**21** 5:10 50:4,14
201:22 202:22
204:1,3 206:7
207:16 212:3
346:22
**213** 2:21
**216** 3:9
**217** 6:11
**218** 2:9
**22** 217:10 220:8

Kelly Tuttle, Ph.D.

Page 492

220:14 327:21 329:7
**22311** 2:15
**224** 6:13
**23** 224:16 225:2 235:8 326:8
**24** 249:9 250:19 252:8 256:7
**249** 6:14
**25** 93:1 261:9,20 272:10 278:10 278:23 415:23 416:13
**250** 275:9
**255** 276:14 379:4
**26** 5:9 82:12 273:10 274:6 276:3,20 278:14
**261** 6:15
**268** 160:10,24 161:24 163:7
**269-2343** 2:10
**27** 280:1,9,22 306:21 334:23 338:13
**271** 161:8 163:8
**273** 6:16
**28** 158:23 235:4 284:15
**280** 6:17
**284** 6:18
**29** 293:5 301:19 419:1
**293** 6:19
**294** 369:9
**299** 75:5

---
**3**
---
**3** 17:23 19:14 101:14 160:23 199:6 405:13 405:19 410:10
**3.0** 68:18,21 69:22 70:10
**3/17/97** 6:15

261:13
**3:35** 284:3,5
**30** 86:24 87:5,21 114:17 116:3 182:19 257:20 320:22 327:7 328:21 329:2 329:12 432:10 433:16
**300** 275:10
**305** 101:16 102:2,6
**31** 340:13 341:5
**316304** 94:13
**32** 347:23,23 348:21
**320** 6:20
**33** 351:11,23 352:19 353:13 356:12 357:3 357:15 359:12
**334** 2:10
**337** 2:5
**34** 158:23 350:10 351:24 352:22 357:14 362:11,24 369:6,10
**340** 6:21
**348** 7:2
**35** 386:9,10
**351** 7:4
**36** 398:15 399:22
**36103-4160** 2:10
**362** 7:6
**37** 415:7 416:2 419:9
**38** 280:16,17 419:9
**386** 7:7
**39** 389:22 395:1
**391** 181:10
**392** 181:11,22 182:3 187:23 190:5
**398** 7:8

---
**4**
---
**4** 20:6 22:7 26:21 71:23 72:1 83:19 101:14,15 350:13
**4/1/14** 6:13 224:18
**4:56** 364:8,9
**411** 143:20 146:12,24 148:1,3 181:19 185:1 187:16 187:20
**415** 7:10
**419** 7:12
**42nd** 2:20
**43** 388:14
**430-3400** 2:21
**432** 4:9
**434** 4:10
**435** 4:11
**436** 4:12
**44113-7213** 3:9
**45** 289:13,18 290:7
**463-2400** 3:14
**4900** 2:14

---
**5**
---
**5** 26:7 71:24 72:1 73:17 83:19 87:15 204:10 226:9 326:9 369:10
**5:06** 364:10,12
**50** 5:10
**501** 2:4
**515** 2:20
**54** 399:21 400:2 400:3 401:12 412:20
**549-7000** 3:4
**57** 107:11 123:23 124:10 124:13 125:20 135:8 142:2

148:6 185:11 185:13 187:3
**59** 389:23 395:2

---
**6**
---
**6** 50:8 87:8,18 87:19
**6:16** 431:21,23
**60** 108:10
**60-plus** 379:19
**600** 3:3
**63** 388:14
**636** 18:14,17
**646** 405:16,19 410:9
**650** 2:15
**66** 291:1
**696-3675** 3:9

---
**7**
---
**7** 72:9,15,17 83:8 160:24 223:16 226:10 294:1 326:10
**7.1** 387:10
**7.3.3** 201:3 306:22 338:14
**7/9/2020** 432:22
**703** 2:16
**70801** 2:5
**709** 217:11
**71** 162:15 194:7 194:19,20 196:19
**72** 5:11 71:12 158:3
**740** 5:10 50:4,15 51:8
**740.1** 50:15,24
**77** 302:10

---
**8**
---
**8** 4:3,7 81:24 82:8 83:17
**800** 423:16
**802-4352** 2:5
**815** 1:16

**82** 5:12
**87** 395:6
**877.370.3377** 1:23
**88** 14:6

---
**9**
---
**9** 5:4 93:7,20 94:8,10,12 101:7,13
**9/17/97** 6:17 280:3
**9:08** 1:17 8:2,7
**90071** 2:21
**917.591.5672** 1:23
**93** 5:14,15,18 141:10 142:22 143:11 144:22 145:20 180:24 184:24 187:16 190:6
**931-5500** 2:16
**950** 3:3
**973** 3:4
**975** 3:13

---

Exhibit R

# *Casarett and Doull's*
# TOXICOLOGY
## The Basic Science of Poisons

Eighth Edition

editor

**Curtis D. Klaassen, PhD**
University Distinguished Professor
Division of Gastroenterology
Department of Internal Medicine
College of Medicine
University of Kansas
Kansas City, Kansas

 Medical

New York   Chicago   San Francisco   Lisbon   London   Madrid   Mexico City
Milan   New Delhi   San Juan   Seoul   Singapore   Sydney   Toronto



# chapter 2

# Principles of Toxicology

David L. Eaton and Steven G. Gilbert

Introduction to Toxicology
 Different Areas of Toxicology
 Toxicology and Society
 General Characteristics
  of the Toxic Response

Classification of Toxic Agents

Spectrum of Undesired Effects
 Allergic Reactions
 Idiosyncratic Reactions
 Immediate versus Delayed Toxicity
 Reversible versus Irreversible
  Toxic Effects
 Local versus Systemic Toxicity
 Interaction of Chemicals
 Tolerance

Characteristics of Exposure
 Route and Site of Exposure
 Duration and Frequency of Exposure

Dose–Response Relationship
 Individual, or Graded,
  Dose–Response Relationships

Quantal Dose–Response
 Relationships
Shape of the Dose–Response Curve
 Essential Nutrients
 Hormesis
 Threshold
 Nonmonotonic Dose–Response Curves
Assumptions in Deriving the
 Dose–Response Relationship
Evaluating the Dose–Response
 Relationship
 Comparison of Dose Responses
 Therapeutic Index
 Margins of Safety and Exposure
 Potency versus Efficacy

Variation in Toxic Responses
 Selective Toxicity
 Species Differences
 Individual Differences in Response

Descriptive Animal
 Toxicity Tests
 Acute Toxicity Testing
 Skin and Eye Irritations

Sensitization
Subacute (Repeated-Dose Study)
Subchronic
Chronic
Developmental and Reproductive
 Toxicity
Mutagenicity
Oncogenicity Bioassays
Neurotoxicity Assessment
Immunotoxicity Assessment
Other Descriptive Toxicity Tests

Toxicogenomics
 Genomics
 Epigenetics/Epigenomics
 Transcriptomics
 Proteomics
 Metabonomics/Metabolomics
 Bioinformatics
 Challenges in Using "Omics"
  Technologies for Predictive
  Toxicology and Risk
  Assessment

## INTRODUCTION TO TOXICOLOGY

*Toxicology* is the study of the adverse effects of chemical or physical agents on living organisms. A *toxicologist* is trained to examine and communicate the nature of those effects on human, animal, and environmental health. Toxicological research examines the cellular, biochemical, and molecular mechanisms of action as well as functional effects such as neurobehavioral and immunological, and assesses the probability of their occurrence. Fundamental to this process is characterizing the relation of exposure (or dose) to the response. *Risk assessment* is the quantitative estimate of the potential effects on human health and environmental significance of various types of chemical exposures (eg, pesticide residues in food, contaminants in drinking water). The variety of potential adverse effects and the diversity of chemicals in the environment make toxicology a broad science, which often demands specialization in one area of toxicology. Our society's dependence on chemicals and the need to assess potential hazards have made toxicologists an increasingly important part of the decision-making processes.

## Different Areas of Toxicology

The professional activities of toxicologists fall into 3 main categories: descriptive, mechanistic, and regulatory (Fig. 2-1). Although each has distinctive characteristics, each contributes to the other, and all are vitally important to chemical risk assessment (see Chap. 4).

A *mechanistic toxicologist* is concerned with identifying and understanding the cellular, biochemical, and molecular mechanisms by which chemicals exert toxic effects on living organisms (see Chap. 3 for a detailed discussion of mechanisms of toxicity). The results of mechanistic studies are very important in many areas of applied toxicology. In risk assessment, mechanistic data may be very useful in demonstrating that an adverse outcome (eg, cancer, birth defects) observed in laboratory animals is directly relevant to humans. For example, the relative toxic potential of organophosphorus (OP) insecticides in humans, rodents, and insects can be accurately predicted on the basis of an understanding of common mechanisms (inhibition of acetylcholinesterase) and differences in biotransformation for these insecticides among the different species. Similarly, mechanistic data may be very useful in identifying

14

UNIT 1

GENERAL PRINCIPLES OF TOXICOLOGY



Figure 2-2. Graphical representation of the interconnections between different areas of toxicology.

adverse responses in experimental animals that may not be relevant to humans. For example, the propensity of the widely used artificial sweetener saccharin to cause bladder cancer in rats may not be relevant to humans at normal dietary intake rates. This is because mechanistic studies have demonstrated that bladder cancer is induced only under conditions where saccharin is at such a high concentration in the urine that it forms a crystalline precipitate (Cohen, 1998). Dose–response studies suggest that such high concentrations would not be achieved in the human bladder even after extensive dietary consumption.

Mechanistic data are also useful in the design and production of safer alternative chemicals and in rational therapy for chemical poisoning and treatment of disease. For example, the drug thalidomide was originally marketed in Europe and Australia as a sedative agent for pregnant women. However, it was banned for clinical use in 1962 because of devastating birth defects that occurred if the drug was ingested during a critical period in pregnancy. But mechanistic studies over the past several decades have demonstrated that this drug may have a unique molecular mechanism of action that interferes with the expression of certain genes responsible for blood vessel formation (angiogenesis). With an understanding of this mechanism, thalidomide has been "rediscovered" as a valuable therapeutic agent that may be highly effective in the treatment of certain infectious diseases (eg, leprosy) and multiple myeloma. This provides an interesting example of how a highly toxic drug with selectivity toward a specific population (pregnant women) can be used relatively safely with proper precautions. Following its approval for therapeutic use in 1998, a program was established that required all clinicians, pharmacists, and patients who receive thalidomide to enroll in a specific program (System for Thalidomide Education and Prescribing Safety [STEPS]). The population at risk for the potential teratogenic effects of thalidomide (all women of childbearing age) was required to use 2 forms of birth control, and also have a negative pregnancy test within 24 hours of beginning therapy, and periodically thereafter. Among the patients registered with the STEPS program, 6000 were females of childbearing age. Remarkably, after 6 years of use, only 1 patient actually received thalidomide during her pregnancy. She initially tested negative at the beginning of therapy; on a subsequent test she was identified as positive, and the drug was stopped. The pregnancy ended up as a miscarriage (Uhl et al., 2006). Thus, a clear understanding of mechanism of action led to the development of strict prescribing guidelines and patient monitoring, thereby allowing a potentially dangerous drug to be used safely and effectively to treat disease in tens of thousands of patients who would otherwise not have benefited from the therapeutic actions of the drug (Lary et al., 1999).

In addition to aiding directly in the identification, treatment, and prevention of chemical toxicity, an understanding of the mechanisms of toxic action contributes to the knowledge of basic physiology, pharmacology, cell biology, and biochemistry. The advent of new technologies in molecular biology and genomics now provides mechanistic toxicologists with the tools to explore exactly how humans may differ from laboratory animals in their response to toxic substances. These same tools are also being utilized to identify individuals who are genetically susceptible to factors in the environment to respond differently to a chemical exposure. For example, a small percentage of the population genetically lacks the ability to detoxify the chemotherapeutic drug, 6-mercaptopurine, used in the treatment of some forms of leukemia. Young children with leukemia who are homozygous for this genetic trait (about 1 in 300) may experience serious toxic effects from a standard therapeutic dose of this drug (Weinshilboum et al., 1999). Numerous genetic tests for polymorphisms in drug-metabolizing enzymes and transporters are now available that can identify genetically susceptible individuals in advance of pharmacological treatment (Eichelbaum et al., 2006).

The development of new approaches to identifying associations between diseases or adverse outcomes and common genetic variants (polymorphisms) has changed from a focus on individual candidate genes to "genome-wide association studies" (GWAS). GWAS are based on a rapid scan of hundreds of thousands of specific genetic variants (markers called "tag SNP") across the genome of persons affected by a particular disorder or adverse-response phenotype and persons who are not affected, with robust statistical tests to identify associations between a specific genetic marker and the phenotype (eg, disease state or adverse drug response). These tools have resulted in the discovery of many "gene–environment interactions," including associations between adverse drug responses and particular genetic polymorphisms (Wang et al., 2011). Moving from the single, "candidate gene" approach to genome-wide studies has led to the development of the relatively new fields of pharmacogenomics and toxicogenomics. These areas provide an exciting opportunity for mechanistic toxicologists to identify and protect genetically susceptible individuals from harmful environmental exposures, and to customize drug therapies that enhance efficacy and minimize toxicity, based on an individual's genetic makeup.

A descriptive toxicologist is concerned directly with toxicity testing, which provides information for safety evaluation and regulatory requirements. The appropriate toxicity tests (as described later in this chapter and other chapters) in cell culture systems or experimental animals are designed to yield information to evaluate risks posed to humans and the environment from exposure to specific chemicals. The concern may be limited to effects on humans, as in the case of drugs and food additives. Toxicologists in the chemical industry, however, must be concerned not only with the risk posed by a company's chemicals (insecticides, herbicides, solvents, etc) to humans but also with potential effects on fish, birds, and plants, as well as other factors that might disturb the balance of the ecosystem. Descriptive toxicology is of course not divorced from mechanistic studies, as such studies provide important clues to a chemical's mechanism of action, and thus contribute to the development of mechanistic toxicology through hypothesis generation. Such studies are also a key component of risk assessments that are used by regulatory toxicologists. The development of so-called omics technologies (genomics, transcriptomics, proteomics, metabolomics/metabonomics, etc) forms the basis of the subdiscipline of toxicogenomics. The application of these technologies to toxicity testing is in many ways "descriptive" in nature, yet affords great mechanistic insights into how chemicals produce their toxic effects. This exciting area of toxicology is discussed in more detail later in the chapter.

A *regulatory toxicologist* has the responsibility for deciding, on the basis of data provided by descriptive and mechanistic toxicologists, whether a drug or other chemical poses a sufficiently low risk (or, in the case of drugs, a favorable risk/benefit profile) to be marketed for a stated purpose or subsequent human or environmental exposure resulting from its use. The Food and Drug Administration (FDA) is responsible for allowing drugs, cosmetics, and food additives to be sold in the market according to the Federal Food, Drug and Cosmetic Act (FFDCA). The US Environmental Protection Agency (EPA) is responsible for regulating most other chemicals according to a variety of different legislative acts, including the Federal Insecticide, Fungicide and Rodenticide Act (FIFRA), the Toxic Substances Control Act (TSCA), the Resource Conservation and Recovery Act (RCRA), the Safe Drinking Water Act, and the Clean Air Act. In 1996, the US Congress passed the Food Quality Protection Act (FQPA) that fundamentally changed the pesticide and food safety laws to consider stricter safety standards particularly for infants and children, who were recognized as more susceptible to health effects of pesticides. The EPA is also responsible for enforcing the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA, later revised as the Superfund Amendments Reauthorization Act [SARA]), more commonly called the Superfund Act. This regulation provides direction and financial support for the cleanup of waste sites that contain toxic chemicals that may present a risk to human health or the environment. The Occupational Safety and Health Administration (OSHA) of the Department of Labor was established to ensure that safe and healthful conditions exist in the workplace. The National Institute for Occupational Safety and Health (NIOSH) as part of the Centers for Disease Control and Prevention (CDC) in the Department of Health and Human Services (DHHS) is responsible for conducting research and making recommendations for the prevention of work-related injury and illness. The Consumer Product Safety Commission (CPSC) is responsible for protecting consumers from hazardous household substances, whereas the Department of Transportation (DOT) ensures that materials shipped in interstate commerce are labeled and packaged in a manner consistent with the degree of hazard they present. The Nuclear Regulatory Commission (NRC), established in 1974, regulates the civilian use of nuclear material to protect public health and safety, and the environment. Regulatory toxicologists are also involved in the establishment of standards for the amount of chemicals permitted in ambient air, industrial atmospheres, and drinking water, often integrating scientific information from basic descriptive and mechanistic toxicology studies with the principles and approaches used for risk assessment (see Chap. 4).

In addition to the above categories, there are other specialized areas of toxicology such as forensic, clinical, and environmental toxicology. *Forensic toxicology* is a hybrid of analytic chemistry and fundamental toxicological principles. It is concerned primarily with the medicolegal aspects of the harmful effects of chemicals on humans and animals. The expertise of forensic toxicologists is invoked primarily to aid in establishing the cause of death and determining its circumstances in a post-mortem investigation (see Chap. 31). *Clinical toxicology* designates an area of professional emphasis in the realm of medical science that is concerned with disease caused by or uniquely associated with toxic substances (see Chap. 32). Generally, clinical toxicologists are physicians who receive specialized training in emergency medicine and poison management. Efforts are directed at treating patients poisoned with drugs or other chemicals and at the development of new techniques to treat those intoxications. Public information about treatment and prevention is often provided through the national network of poison

control centers. *Environmental toxicology* focuses on the impacts of chemical pollutants in the environment on biological organisms. Although toxicologists concerned with the effects of environmental pollutants on human health fit into this definition, it is most commonly associated with studies on the impacts of chemicals on nonhuman organisms such as fish, birds, terrestrial animals, and plants. *Ecotoxicology* is a specialized area within environmental toxicology that focuses more specifically on the impacts of toxic substances on population dynamics in an ecosystem. The transport, fate, and interactions of chemicals in the environment constitute a critical component of both environmental toxicology and ecotoxicology.

## Toxicology and Society

Information from the toxicological sciences, gained by experience or research, has a growing influence on our personal lives as well as on human and environmental health across the globe. Knowledge about the toxicological effects of a compound affects consumer products, drugs, manufacturing processes, waste cleanup, regulatory action, civil disputes, and broad policy decisions. The expanding influence of toxicology on societal issues is accompanied by the responsibility to be increasingly sensitive to the ethical, legal, and social implications of toxicological research and testing.

The convergence of multiple elements has highlighted the evolving ethical dynamics of toxicology. First, experience and new discoveries in the biological sciences have emphasized our interconnectedness with nature and the need for well-articulated visions of human, animal, and environmental health. One vision is that we have "condition(s) that ensure that all living things have the best opportunity to reach and maintain their full genetic potential" (Gilbert, 2001a). Second, we have experience with the health consequences of exposure to such things as lead, asbestos, and tobacco, along with the detailed mechanistic research to understand the long-term risks to individuals and society. This has precipitated many regulatory and legal actions and public policy decisions, not to mention costly and time-consuming lawsuits. Third, we have an increasingly well-defined framework for discussing our social and ethical responsibilities. There is growing recognition that ethics play a crucial role in public health decision making that involves conflicts between individual, corporate, and social justice goals (Callahan and Jennings, 2002; Kass, 2001; Lee, 2002). Fourth is the appreciation that all research involving humans or animals must be conducted in a responsible and ethical manner. Fifth is managing both the uncertainty and biological variability inherent in the biological sciences. Decision making often includes making judgments with limited or uncertain information, which often includes an overlay of individual values and ethics. Finally, individuals involved in toxicological research must be aware of and accountable to their own individual biases and possible conflicts of interest and adhere to the highest ethical standards of the profession (Maurissen *et al.*, 2005; Coble *et al.*, 2009; Gilbert and Eaton, 2009).

Ethical reasoning and philosophy has a long and deep history, but more pragmatic bioethical reasoning can be traced to Leopold, who is arguably America's first bioethicist: "A thing is right when it tends to preserve the integrity, stability, and beauty of the biotic community. It is wrong when it tends otherwise" (Leopold, 1949). The essence of toxicology is to understand the effects of chemicals on the biotic community. This broader definition of an ethic became more focused with examples such as the mercury poisoning in Minamata Bay, Japan, thalidomide, and the effects of pesticides as brought to public awareness by Carson's *Silent Spring* (Carson, 1962). In the United States, these events supported the public and

political will to establish the EPA and strengthen the FDA and other regulations designed to protect human and environmental health. The knowledge that some segments of our society were deferentially at risk from chemical exposures evolved into an appreciation of environmental justice (Corburn, 2002; EPA, 2005; Lee, 2002; Morello-Frosch *et al*., 2002). The EPA defines environmental justice as "the fair treatment and meaningful involvement of all people regardless of race, color, national origin, or income with respect to the development, implementation, and enforcement of environmental laws, regulations, and policies…" (EPA, 2005). Environmental justice is now an important component of numerous community-based programs of interest, and is relevant to the field of toxicology (Nweke, 2011). There is growing recognition of the direct financial and indirect costs to individuals and society from environmental exposures that are not equally distributed across society (Landrigan *et al*., 2002).

On a parallel track, biomedical ethics developed out of the lessons of World War II and related abuses of human subjects. The 4 principle of biomedical ethics—respect for autonomy, beneficence (do good), nonmaleficence (do no harm), and justice (be fair)—became well established as a basis for decision making in health care settings (Beauchamp and Childress, 1994). These principles formed the basis of rules and regulations regarding the conduct of human research. The demands of ethics and science made it clear that the highest standards of care produced the best results in both human and animal research. Rules and regulations regarding the housing and conduct of animal studies evolved similarly. Professional toxicology societies now require their members to adhere to the highest ethical standards when conducting research with humans or animals. A further refinement and expansion of biomedical ethical principles is the development of community-based participatory research that takes into consideration community needs to ensure the best results and benefit to the community (Arcury *et al*., 2001; Gilbert, 2006; O'Fallon and Dearry, 2002).

A glance at the daily newspaper confirms the number of current, sometimes controversial issues that are relevant to the field of toxicology. Decisions and action are often demanded or required even when there is a certain level of uncertainty in the toxicological data. The classic example of this challenge is establishing causation of the health effects of tobacco products. In part to address issues related to the health effects of tobacco products, Hill, a distinguished epidemiologist, defined a set of guidelines for evaluating "causation"—for example, whether a causal connection between a particular "exposure" and a particular outcome, condition, or disease can be scientifically established (Hill, 1965). These criteria are briefly summarized as follows:

1. Strength of association (relationship between independent and dependent variables)
2. Consistency of findings (replication of results by different studies)
3. Biological gradient (strength of the dose–response relationship)
4. Temporal sequence ("cause" before effect)
5. Biological or theoretical plausibility (mechanism of action)
6. Coherence with established knowledge (no competing hypotheses)
7. Specificity of association (cause is tightly linked to an outcome)

Although the guidelines provided by Hill were originally designed for interpretation of epidemiological data, they are equally applicable to establishing causation in toxicology, which often relies on a mix of both epidemiological and toxicological data.

Quantitative risk assessment was developed in part to address issues of uncertainty related to potential harm. The risk assessment process summarizes data for risk managers and other decision makers, who must take into consideration to some degree the qualitative elements of ethical, social, and political issues. Whereas risk management clearly has an ethical and values-based aspect, risk assessment is not immune from the influence of one's values, bias, or perspective. Ultimately action is required and as Hill (1965) noted: "All scientific work is incomplete—whether it be observational or experimental. All scientific work is liable to be upset or modified by advancing knowledge. That does not confer upon us a freedom to ignore the knowledge we already have or postpone the action that it appears to demand at a given time." These so-called Bradford Hill criteria were developed largely as a "weight-of-evidence" approach for interpreting a body of epidemiology data, yet are relevant as well to toxicology. Guzelian *et al*. (2005) provided a more detailed, evidence-based approach for determining causation in toxicology, primarily for application in the legal arena.

Although the scientific data may be the same, there are substantial differences in how toxicological data are used in a regulatory framework to protect public health versus establishing individual causation in the courtroom (Eaton, 2003). The approach to regulatory decision making is in part directed by policy. For example, the experience with thalidomide and other drugs motivated the US Congress to give the FDA broad power to ensure the efficacy and safety of new medicines or medical procedures. In this situation the pharmaceutical company or proponents of an activity must invest in the appropriate animal and human studies to demonstrate safety of the product. In general, a relatively precautionary approach has historically been taken with regard to drugs and medical devices. The approach to industrial chemicals is defined by the Toxic Substance Control Act and does not stipulate such a rigorous approach when introducing a new chemical into commerce.

Building on the work of Hill and others particularly from Europe, the Precautionary Principle was defined at the Wingspread Conference, in 1998: "When an activity raises threats of harm to human health or the environment, precautionary measures should be taken even if some cause and effect relationships are not fully established scientifically" (Gilbert, 2005b; Myers and Raffensperger, 2006; Raffensperger and Tickner, 1999). The precautionary principle incorporates elements of science and ethical philosophy into a single statement, acknowledging that ethics and values are part of the decision-making process. Although the conceptual value of the precautionary principle to public health protection is obvious, its actual implementation in toxicological risk assessment is not straightforward, and remains a point of considerable debate (Marchant, 2003; Goldstein, 2006; Peterson, 2006). The challenge remains to develop a regulatory environment that is responsive to issues of public health and the stewardship of societal resources (Simon, 2011).

With the increased relevance of toxicological data and evaluation in issues fundamental to society, there has been increased awareness of the possibility of conflicts of interest influencing the decision-making process (Maurissen *et al*., 2005). The disclosure of conflicts of interest as well as the development of appropriate guidelines continues to be a challenge (NAS, 2003; Goozner, 2004; Krimsky and Rothenberg, 2001). These issues go to the core of one's individual values and integrity in the interpretation and communication of research results. Many professional societies, including the Society of Toxicology (http://www.toxicology.org/ai/asot/ethics.asp), have developed codes of ethics for their members. Conflict of interest has also been addressed by most publishers of toxicology journals (Krimsky and Sweet, 2009).

## Table 2-1

**Approximate Acute LD$_{50}$s of Some Representative Chemical Agents**

| AGENT | LD$_{50}$ (mg/kg)* |
|---|---|
| Ethyl alcohol | 10,000 |
| Sodium chloride | 4000 |
| Ferrous sulfate | 1500 |
| Morphine sulfate | 900 |
| Phenobarbital sodium | 150 |
| Picrotoxin | 5 |
| Strychnine sulfate | 2 |
| Nicotine | 1 |
| D-Tubocurarine | 0.5 |
| Hemicholinium-3 | 0.2 |
| Tetrodotoxin | 0.10 |
| Dioxin (TCDD) | 0.001 |
| Botulinum toxin | 0.00001 |

*$LD_{50}$ is the dosage (mg/kg body weight) causing death in 50% of exposed animals.

As the field of toxicology has matured and its influence on societal issues has increased, so has the need for the profession to make a commitment to examine the ethical, legal, and social implications of research and practice of toxicology.

## General Characteristics of the Toxic Response

One could define a poison as any agent capable of producing a deleterious response in a biological system, seriously injuring function or producing death. This is not, however, a useful working definition for the very simple reason that virtually every known chemical has the potential to produce injury or death if it is present in a sufficient amount. Paracelsus (1493–1541), a Swiss/German/Austrian physician, scientist, and philosopher, phrased this well when he noted, "What is there that is not poison? All things are poison and nothing [is] without poison. Solely the dose determines that a thing is not a poison."

Among chemicals there is a wide spectrum of doses needed to produce deleterious effects, serious injury, or death. This is demonstrated in Table 2-1, which shows the dosage of chemicals needed to produce death in 50% of treated animals (lethal dose 50 [LD$_{50}$]). Some chemicals produce death in microgram doses and are commonly thought of as being extremely poisonous. Other chemicals may be relatively harmless after doses in excess of several grams. It should be noted, however, that measures of acute lethality such as LD$_{50}$ do not accurately reflect the full spectrum of toxicity, or hazard, associated with exposure to a chemical. For example, some chemicals with low acute toxicity may have carcinogenic, teratogenic, or neurobehavioral effects at doses that produce no evidence of acute toxicity. In addition, there is growing recognition that genetic factors can account for individual susceptibility to a range of responses. Finally, it should be recognized that, for a given chemical, multiple different effects can occur in a given

organism, each with its own "dose–response relationship." In some circumstances, effects that occur at low doses may not be evident at higher doses because other adverse responses overwhelm or mask more subtle effects that may occur at low doses. Although some have argued that such low-dose effects, not seen at higher doses, make the classical interpretation of the "dose–response" relationship no longer relevant, such low-dose effects also follow their own "dose–response" relationship, but with a "saturation" of the effect occurring at higher doses that induces other molecular, biochemical, and cellular effects that tend to obscure the effects seen at lower doses. The effects of exogenous chemicals that bind to and activate or inhibit endogenous hormone receptors (so-called endocrine disruptors—see Chap. 21) may often have "low-dose" effects that are quite different from those seen at much higher doses.

## CLASSIFICATION OF TOXIC AGENTS

Toxic agents are classified in a variety of ways, depending on the interests and needs of the classifier. In this textbook, for example, toxic agents are discussed in terms of their target organs (liver, kidney, hematopoietic system, etc), use (pesticide, solvent, food additive, etc), source (animal and plant toxins), and effects (cancer, mutation, liver injury, etc). The term *toxin* generally refers to toxic substances that are produced by biological systems such as plants, animals, fungi, or bacteria. The term *toxicant* is used in speaking of toxic substances that are produced by or are a by-product of anthropogenic (human-made) activities. Thus, zearalenone, produced by a mold, is a toxin, whereas "dioxin" (2,3,7,8-tetrachlorodibenzo-*p*-dioxin [TCDD]), produced during the production and/or combustion of certain chlorinated organic chemicals, is a toxicant. Some toxicants can be produced by both natural and anthropogenic activities. For example, polyaromatic hydrocarbons are produced by the combustion of organic matter, which may occur both through natural processes (eg, forest fires) and through anthropogenic activities (eg, combustion of coal for energy production; cigarette smoking). Arsenic, a toxic metalloid, may occur as a natural contaminant of groundwater or may contaminate groundwater secondary to industrial activities. Generally, such toxic substances are referred to as toxicants, rather than toxins, because, although they are naturally produced, they are not produced by biological systems. Distinguishing a "toxin" from a "toxicant" is not always easy. For example, many pesticides, such as the pyrethroids, are synthetic analogs of natural products, such that one would call the pyrethrum found in the chrysanthemum flower a "toxin," but the synthetic (and slightly altered in structure) form produced for use in pesticide formulations would be a "toxicant." Thus, although technically incorrect, many physicians and others involved in the diagnosis and treatment of poisonings often use the term "toxin" to refer to any toxic substance, regardless of origin.

Toxic agents may also be classified in terms of their physical state (gas, dust, liquid, size, eg, nanotoxicology), their chemical stability or reactivity (explosive, flammable, oxidizer), general chemical structure (aromatic amine, halogenated hydrocarbon, etc), or poisoning potential (extremely toxic, very toxic, slightly toxic, etc). Classification of toxic agents on the basis of their biochemical mechanisms of action (eg, alkylating agent, cholinesterase inhibitor, endocrine disruptor) is usually more informative than classification by general terms such as irritants and corrosives. But more general classifications such as air pollutants, occupation-related agents, and acute and chronic poisons can provide a useful focus on a specific problem. It is evident from this discussion that no single classification is applicable to the entire spectrum of toxic agents and that a combination of classification systems or a classification based on

18

UNIT I

GENERAL PRINCIPLES OF TOXICOLOGY

other factors is generally needed to provide the best characterization of a toxic substance. Nevertheless, classification systems that take into consideration both the chemical and the biological properties of an agent and the exposure characteristics are most likely to be useful for regulatory or control purposes and for toxicology in general.

## SPECTRUM OF UNDESIRED EFFECTS

The spectrum of undesired effects of chemicals is often broad. Some effects are deleterious and others are not. In therapeutics, for example, each drug produces a number of effects, but usually only one effect is associated with the primary objective of the therapy; all the other effects are referred to as *undesirable* or *side effects* of that drug for that therapeutic indication. However, some of these side effects may be desired for another therapeutic indication. For example, the "first generation" antihistamine diphenhydramine (Benadryl) is effective in reducing histamine responses associated with allergies, but it readily enters the brain and causes mild central nervous system (CNS) depression (drowsiness; delayed reaction time). With the advent of selective histamine receptor antagonists that do not cross the blood–brain barrier and thus do not have this CNS-depressant side effect, diphenhydramine is used less commonly today as an antihistamine. However, it is widely used as an "over-the-counter" sleep remedy, often in combination with analgesics (eg, Tylenol PM, Excedrin PM), taking advantage of the CNS-depressant effects. Some side effects of drugs are never desirable and are always deleterious to the well-being of humans. These are referred to as the *adverse*, *deleterious*, or *toxic* effects of the drug.

### Allergic Reactions

*Chemical allergy* is an immunologically mediated adverse reaction to a chemical resulting from previous sensitization to that chemical or to a structurally similar one. The term *hypersensitivity* is most often used to describe this allergic state, but *allergic reaction* and *sensitization reaction* are also used to describe this situation when preexposure of the chemical is required to produce the toxic effect (see Chap. 12). Once sensitization has occurred, allergic reactions may result from exposure to relatively very low doses of chemicals; therefore, population-based dose–response curves for allergic reactions have seldom been obtained. Because of this omission, some people assumed that allergic reactions are not dose-related. Thus, they do not consider the allergic reaction to be a true toxic response. However, for a given allergic individual, allergic reactions are dose-related. For example, it is well known that the allergic response to pollen in sensitized individuals is related to the concentration of pollen in the air. In addition, because the allergic response is an undesirable, adverse, deleterious effect, it obviously is also a toxic response. Sensitization reactions are sometimes very severe and may be fatal.

Most chemicals and their metabolic products are not sufficiently large to be recognized by the immune system as a foreign substance and thus must first combine with an endogenous protein to form an antigen (or immunogen). A molecule that must combine with an endogenous protein to elicit an allergic reaction is called a *hapten*. The hapten–protein complex (antigen) is then capable of eliciting the formation of antibodies, and usually at least one or two weeks is required for the synthesis of significant amounts of antibodies. Subsequent exposure to the chemical results in an antigen–antibody interaction, which provokes the typical manifestations of allergy. The manifestations of allergy are numerous.

They may involve various organ systems and range in severity from minor skin disturbance to fatal anaphylactic shock. The pattern of allergic response differs in various species. In humans, involvement of the skin (eg, dermatitis, urticaria, and itching) and involvement of the eyes (eg, conjunctivitis) are most common, whereas in guinea pigs, bronchiolar constriction leading to asphyxia is the most common. However, chemically induced asthma (characterized by bronchiolar constriction) certainly does occur in some humans, and the incidence of allergic asthma has increased substantially in recent years. Hypersensitivity reactions are discussed in more detail in Chap. 12.

### Idiosyncratic Reactions

*Chemical idiosyncrasy* refers to a genetically determined abnormal reactivity to a chemical (Goldstein *et al.*, 1974; Levine 1978; Dieurecht, 2007). The response observed is usually qualitatively similar to that observed in all individuals but may take the form of extreme sensitivity to low doses or extreme insensitivity to high doses of the chemical. However, while some people use the term *idiosyncratic* as a catchall to refer to all reactions that occur with low frequency, it should not be used in that manner (Goldstein *et al.*, 1974). A classic example of an idiosyncratic reaction is provided by patients who exhibit prolonged muscular relaxation and apnea (inability to breathe) lasting several hours after a standard dose of succinylcholine. Succinylcholine usually produces skeletal muscle relaxation of only short duration because of its very rapid metabolic degradation by an enzyme that is present normally in the bloodstream called plasma butyrylcholinesterase (also referred to as pseudocholinesterase). Patients exhibiting this idiosyncratic reaction have a genetic polymorphism in the gene for the enzyme butyrylcholinesterase, which results in a protein that is less active in breaking down succinylcholine. Family pedigree and molecular genetic analyses have demonstrated that the presence of low plasma butyrylcholinesterase activity is due to the presence of one or more single-nucleotide polymorphisms (SNPs) in this gene (Bartels *et al.*, 1992). Similarly, there is a group of people who are abnormally sensitive to nitrites and certain other chemicals that have in common the ability to oxidize the iron in hemoglobin to produce *methemoglobin*, which is incapable of carrying oxygen to the tissues. The unusual phenotype is inherited as an autosomal recessive trait and is characterized by a deficiency in NADH-cytochrome $b_5$ reductase activity. The genetic basis for this idiosyncratic response has been identified as a single nucleotide change in codon 127, which results in replacement of serine with proline (Kobayashi *et al.*, 1990). The consequence of this genetic deficiency is that these individuals may suffer from a serious lack of oxygen delivery to tissues after exposure to doses of methemoglobin-producing chemicals that would be harmless to individuals with normal NADH-cytochrome $b_5$ reductase activity.

It is now recognized that many of the so-called idiosyncratic adverse drug reactions and many drug–drug interactions are due in specific genetic polymorphisms in drug-metabolizing enzymes, transporters, or receptors. As discussed previously, the growing field of pharmacogenomics and toxicogenomics has helped to identify the molecular basis for many previously described idiosyncratic responses to drugs and other toxic substances (Wang *et al.*, 2011). However, not all "idiosyncratic" responses to toxic substances are easily described by a single genetic polymorphism in a drug-metabolizing enzyme. It is generally thought that most, but not all, idiosyncratic drug responses are due to a combination of individual differences in the ability to: (1) form a reactive intermediate (usually through oxidation to an electrophilic intermediate), (2) detoxify

that reactive intermediate (usually through hydrolysis or conjugation), and/or (3) exhibit differences in immune response to adducted proteins (Uetrecht, 2007). The role of the immune system in mediating rare drug-induced toxic reactions in the liver, skin, and other organ systems is widely recognized, and specific genetic variants in certain parts of the genome that code for the major histocompatibility complexes (MHCs) give rise to specific immune responses to proteins that have been damaged by reactive intermediates of certain drugs. Thus, it is only the individuals who genetically form sufficient amounts of a reactive drug metabolite, *and* who then have an immune response to the modified protein, who have an adverse response to the drug (Uetrecht, 2007).

For example, troglitazone, introduced into the marketplace in 1997 as an effective treatment for type II diabetes, was subsequently withdrawn from the market because of a relatively rare (1 adverse response per 30,000 patients) but often fatal hepatotoxic response. Subsequent studies of tissues from patients who had developed hepatotoxic responses at the normal therapeutic doses revealed that individuals who lacked functional genes for 2 forms of glutathione *S*-transferase (GSTM1 and GSTT1) were more than 3 times as likely to develop troglitazone-induced hepatotoxicity than individuals with 1 or more functional GSTM1 or T1 genes (Ikeda, 2011). However, this does not explain the rarity of the adverse response, since there were many individuals who lacked GSTM1 and T1 genes who took troglitazone with no evident hepatotoxicity. Further studies have suggested that the idiosyncratic hepatotoxicity from troglitazone also has an immune system component, and genetic differences in specific human lymphocyte antigen (HLA) loci might contribute to idiosyncratic drug-induced hepatotoxicity (Ikeda, 2011).

## Immediate versus Delayed Toxicity

Immediate toxic effects can be defined as those that occur or develop rapidly after a single administration of a substance, whereas delayed toxic effects are those that occur after the lapse of some time. Carcinogenic effects of chemicals usually have a long latency period, often 20 to 30 years after the initial exposure, before tumors are observed in humans. For example, daughters of mothers who took diethylstilbestrol (DES) during pregnancy have a greatly increased risk of developing vaginal cancer, in young adulthood, approximately 20 to 30 years after their in utero exposure to DES (Hatch *et al.*, 1998). Also, delayed neurotoxicity is observed after exposure to some OP insecticides that act by covalent modification of an enzyme referred to as *neuropathy target esterase* (NTE), a neuronal protein with serine esterase activity (Glynn *et al.*, 1999). Binding of certain OP chemicals to this protein initiates degeneration of long axons in the peripheral and CNS. The most notorious of the compounds that produce this type of neurotoxic effect is triorthocresylphosphate (TOCP). The effect is not observed until at least several days after exposure to the toxic compound. In contrast, most substances produce immediate toxic effects but do not produce delayed effects.

## Reversible versus Irreversible Toxic Effects

Some toxic effects of chemicals are reversible, and others are irreversible. If a chemical produces pathological injury to a tissue, the ability of that tissue to regenerate largely determines whether the effect is reversible or irreversible. Thus, for a tissue such as liver, which has a high ability to regenerate, most injuries are reversible, whereas injury to the CNS is largely irreversible because differentiated cells of the CNS cannot divide and be replaced (although recovery from chemically induced damage to the CNS can occur,

primarily through the "plasticity" of the brain that allows developed neurons to learn new functions; see Chap. 16). Carcinogenic and teratogenic effects of chemicals, once they occur, are usually considered irreversible toxic effects.

## Local versus Systemic Toxicity

Another distinction between types of effects is made on the basis of the general site of action. Local effects are those that occur at the site of first contact between the biological system and the toxicant. Such effects are produced by the ingestion of caustic substances or the inhalation of irritant materials. For example, chlorine gas reacts with lung tissue at the site of contact, causing damage and swelling of the tissue, with possibly fatal consequences, even though very little of the chemical is absorbed into the bloodstream. The alternative to local effects is systemic effects. Systemic effects require absorption and distribution of a toxicant from its entry point to a distant site at which deleterious effects are produced. Most substances except highly reactive materials produce systemic effects. For some materials, both effects can be demonstrated. For example, tetraethyl lead produces effects on skin at the site of absorption and then is transported systemically to produce its typical effects on the CNS and other organs. If the local effect is marked, there may also be indirect systemic effects. For example, kidney damage after a severe acid burn is an indirect systemic effect because the toxicant does not reach the kidney.

Most chemicals that produce systemic toxicity do not cause a similar degree of toxicity in all organs; instead, they usually elicit their major toxicity in only 1 or 2 organs. These sites are referred to as the *target organs* of toxicity of a particular chemical. The target organ of toxicity is often not the site of the highest concentration of the chemical. For example, lead is concentrated in bone, but its toxicity is due to its effects in soft tissues, particularly the brain. DDT is concentrated in adipose tissue but produces no known toxic effects in that tissue.

The target organ of toxicity most frequently involved in systemic toxicity is the CNS (brain and spinal cord). Even with many compounds having a prominent effect elsewhere, damage to the CNS can be demonstrated by the use of appropriate and sensitive methods. Next in order of frequency of involvement in systemic toxicity are the circulatory system; the blood and hematopoietic system; visceral organs such as the liver, kidney, and lung; and the skin. Muscle and bone are least often the target tissues for systemic effects. With substances that have a predominantly local effect, the frequency with which tissues react depends largely on the portal of entry (skin, gastrointestinal tract, or respiratory tract).

## Interaction of Chemicals

Because of the large number of different chemicals an individual may come in contact with at any given time (workplace, drugs, diet, hobbies, etc), it is necessary, in assessing the spectrum of responses, to consider how different chemicals may interact with each other. Interactions can occur in a variety of ways. Chemical interactions are known to occur by a number of mechanisms, such as alterations in absorption, protein binding, and the biotransformation and excretion of 1 or both of the interacting toxicants. In addition to these modes of interaction, the response of the organism to combinations of toxicants may be increased or decreased because of toxicological responses at the site of action.

The effects of 2 chemicals given simultaneously produce a response that may simply be additive of their individual responses or may be greater or less than that expected by addition of their individual responses. The study of these interactions often leads to a

20

better understanding of the mechanism of toxicity of the chemicals involved. A number of terms have been used to describe pharmacological and toxicological interactions. An *additive* effect occurs when the combined effect of 2 chemicals is equal to the sum of the effects of each agent given alone (eg, 2 + 3 = 5). The effect most commonly observed when 2 chemicals are given together is an additive effect. For example, when 2 OP insecticides are given together, the cholinesterase inhibition is usually additive. A *synergistic* effect occurs when the combined effects of 2 chemicals are much greater than the sum of the effects of each agent given alone (eg, 2 + 2 = 20). For example, both carbon tetrachloride and ethanol are hepatotoxic compounds, but together they produce much more liver injury than the mathematical sum of their individual effects on liver at a given dose would suggest. *Potentiation* occurs when 1 substance does not have a toxic effect on a certain organ or system but when added to another chemical makes that chemical much more toxic (eg, 0 + 2 = 10). Isopropanol, for example, is not hepatotoxic, but when it is administered in addition to carbon tetrachloride, the hepatotoxicity of carbon tetrachloride is much greater than when it is given alone. *Antagonism* occurs when 2 chemicals administered together interfere with each other's actions or 1 interferes with the action of the other (eg, 4 + 6 = 8; 4 + (−4) = 0; 4 + 0 = 1). Antagonistic effects of chemicals are often very desirable in toxicology and are the basis of many antidotes. There are 4 major types of antagonism: functional, chemical, dispositional, and receptor. *Functional antagonism* occurs when 2 chemicals counterbalance each other by producing opposite effects on the same physiological function. For example, advantage is taken of this principle in that the blood pressure can markedly fall during severe barbiturate intoxication, which can be effectively antagonized by the intravenous administration of a vasopressor agent such as norepinephrine or metaraminol. Similarly, many chemicals, when given at toxic dose (TD) levels, produce convulsions, and the convulsions often can be controlled by giving anticonvulsants such as the benzodiazepines (eg, diazepam). *Chemical antagonism or inactivation* is simply a chemical reaction between 2 compounds that produces a less toxic product. For example, 2,3-dimercaptosuccinic acid (DMSA; Succimer) chelates with metal ions such as arsenic, mercury, and lead and decreases their toxicity. The use of antitoxins in the treatment of various animal toxins is also an example of chemical antagonism. The use of the strongly basic low-molecular-weight protein protamine sulfate to form a stable complex with heparin, which abolishes its anticoagulant activity, is another example. *Dispositional antagonism* occurs when the disposition—that is, the absorption, distribution, biotransformation, or excretion of a chemical—is altered so that the concentration and/or duration of the chemical at the target organ are diminished. Thus, the prevention of absorption of a toxicant by ipecac or charcoal and the increased excretion of a chemical by administration of an osmotic diuretic or alteration of the pH of the urine are examples of dispositional antagonism. If the parent compound is responsible for the toxicity of the chemical (such as the anticoagulant warfarin) and its metabolic breakdown products are less toxic than the parent compound, increasing the compound's biotransformation (metabolism) by administering a drug that increases the activity of the metabolizing enzymes (eg, a "microsomal enzyme inducer" such as phenobarbital) will decrease its toxicity. However, if the chemical's toxicity is largely due to a metabolic product (as in the case of the organophosphate insecticide parathion), inhibiting its biotransformation by an inhibitor of microsomal enzyme activity (SKF-525A or piperonyl butoxide) will decrease its toxicity. *Receptor antagonism* occurs when 2 chemicals that bind to the same receptor produce less of an effect when given together than the addition of their separate effects

(eg, 4 + 6 = 8) or when 1 chemical antagonizes the effect of the second chemical (eg, 0 + 4 = 1). Receptor antagonists are often termed *blockers*. This concept is used to advantage in the clinical treatment of poisoning. For example, the receptor antagonist naloxone is used to treat the respiratory depressive effects of morphine and other morphine-like narcotics by competitive binding to the same receptor. Another example of receptor antagonism is the use of the antiestrogen drug tamoxifen to lower breast cancer risk among women at high risk for this estrogen-related cancer. Tamoxifen competitively blocks estradiol from binding to its receptor. Treatment of organophosphate insecticide poisoning with atropine is an example not of the antidote competing with the poison for the receptor (cholinesterase) but of blocking the receptor (cholinergic receptor) for the excess acetylcholine that accumulates by poisoning of the cholinesterase by the organophosphate (see Chap. 22).

## Tolerance

Tolerance is a state of decreased responsiveness to a toxic effect of a chemical resulting from prior exposure to that chemical or to a structurally related chemical. Two major mechanisms are responsible for tolerance: 1 is due to a decreased amount of toxicant reaching the site where the toxic effect is produced (*dispositional tolerance*) and the other is due to a reduced responsiveness of a tissue to the chemical. Comparatively less is known about the cellular mechanisms responsible for altering the responsiveness of a tissue to a toxic chemical than is known about dispositional tolerance. Two chemicals known to produce dispositional tolerance are carbon tetrachloride and cadmium. The barbiturate, phenobarbital, produces tolerance to itself by increasing the expression of enzymes in the liver that are responsible for its biotransformation to pharmacologically inactive products, a process known as "biotransformation enzyme induction." The mechanism of cadmium tolerance is explained by induction of metallothionein, a metal-binding protein. Subsequent binding of cadmium to metallothionein rather than to critical cellular macromolecules decreases its toxicity.

## CHARACTERISTICS OF EXPOSURE

Toxic effects in a biological system are not produced by a chemical agent unless that agent or its metabolic breakdown (biotransformation) products reach appropriate sites in the body at a concentration and for a length of time sufficient to produce a toxic manifestation. Many chemicals are of relatively low toxicity in the "native" form but, when acted on by enzymes in the body, are converted to intermediate forms that interfere with normal cellular biochemistry and physiology. Thus, whether a toxic response occurs is dependent on the chemical and physical properties of the agent, the exposure situation, how the agent is metabolized by the system, the concentration of the active form at the particular target site(s), and the overall susceptibility of the biological system or subject. Thus, to characterize fully the potential hazard of a specific chemical agent, we need to know not only what type of effect it produces and the dose required to produce that effect but also information about the agent, the exposure, and its disposition by the subject. Two major factors that influence toxicity as it relates to the exposure situation for a specific chemical are the route of exposure and the duration and frequency of exposure.

## Route and Site of Exposure

The major routes (pathways) by which toxic agents gain access to the body are through the gastrointestinal tract (ingestion), the lungs (inhalation), or the skin (topical, percutaneous, or dermal). Toxic

UNIT I    GENERAL PRINCIPLES OF TOXICOLOGY

agents generally produce the greatest effect and the most rapid response when given directly into the bloodstream (the intravenous route). An approximate descending order of effectiveness for the other routes would be inhalation, intraperitoneal, subcutaneous, intramuscular, intradermal, oral, and dermal. The "vehicle" (the material in which the chemical is dissolved) and other formulation factors can markedly alter absorption after ingestion, inhalation, or topical exposure. In addition, the route of administration can influence the toxicity of agents. For example, an agent that acts on the CNS, but is efficiently detoxified in the liver, would be expected to be less toxic when given orally than when given via inhalation, because the oral route requires that nearly all of the dose pass through the liver before reaching the systemic circulation and then the CNS.

Occupational exposure to toxic agents most frequently results from breathing contaminated air (inhalation) and/or direct and prolonged contact of the skin with the substance (dermal exposure), whereas accidental and suicidal poisoning occurs most frequently by oral ingestion. Comparison of the toxic dose (TD) of a toxic substance by different routes of exposure often provides useful information about its extent of absorption. In instances when the TD after oral and dermal administration is similar to the TD after intravenous administration, the assumption is that the toxic agent is absorbed readily and rapidly. Conversely, in cases where the TD by the dermal route is several orders of magnitude higher than the oral TD, it is likely that the skin provides an effective barrier to absorption of the agent. Toxic effects by any route of exposure can also be influenced by the concentration of the agent in its vehicle, the total volume of the vehicle and the properties of the vehicle to which the biological system is exposed, and the rate at which exposure occurs. Studies in which the concentration of a chemical in the blood is determined at various times after exposure are often needed to clarify the role of these and other factors in the toxicity of a compound. For more details on the absorption of toxicants, see Chap. 5.

## Duration and Frequency of Exposure

Toxicologists usually divide the exposure of experimental animals to chemicals into 4 categories: acute, subacute, subchronic, and chronic. Acute exposure is defined as exposure to a chemical for less than 24 hours, and examples of exposure routes are intraperitoneal, intravenous, and subcutaneous injection; oral intubation; and dermal application. Whereas acute exposure usually refers to a single administration, repeated exposures may be given within a 24-hour period for some slightly toxic or practically nontoxic chemicals. Acute exposure by inhalation refers to continuous exposure for less than 24 hours, most frequently for 4 hours. Repeated exposure is divided into 3 categories: subacute, subchronic, and chronic. *Subacute exposure* refers to repeated exposure to a chemical for 1 month or less, *subchronic* for 1 to 3 months, and *chronic* for more than 3 months, although usually this refers to studies with at least 1 year of repeated dosing. These 3 categories of repeated exposure can be by any route, but most often they occur by the oral route, with the chemical added directly to the diet.

In human exposure situations, the frequency and duration of exposure are usually not as clearly defined as in controlled animal studies, but many of the same terms are used to describe general exposure situations. Thus, workplace or environmental exposures may be described as *acute* (occurring from a single incident or episode), *subchronic* (occurring repeatedly over several weeks or months), or *chronic* (occurring repeatedly for many months or years).



**Figure 2-2.** *Diagrammatic view of the relationship between dose and concentration at the target site under different conditions of dose frequency and elimination rate.* (Line A) A chemical with very slow elimination (eg, half-life of 1 year). (Line B) A chemical with a rate of elimination equal to frequency of dosing (eg, 1 day). (Line C) Rate of elimination faster than the dosing frequency (eg, 5 hours). Blue shaded area is representative of the concentration of chemical at the target site necessary to elicit a toxic response.

For many chemicals, the toxic effects that follow a single exposure are quite different from those produced by repeated exposure. For example, the primary acute toxic manifestation of benzene is CNS depression, but repeated exposures can result in bone marrow toxicity and an increased risk for leukemia. Acute exposure to chemicals that are rapidly absorbed is likely to produce immediate toxic effects but also can produce delayed toxicity that may or may not be similar to the toxic effects of chronic exposure. Conversely, chronic exposure to a toxic chemical may produce some immediate (acute) effects after each administration in addition to the long-term, low-level, or chronic effects of the toxic substance. In characterizing the toxicity of a specific chemical, it is evident that information is needed not only for the single-dose (acute) and long-term (chronic) effects but also for exposures of intermediate duration. The other time-related factor that is important in the temporal characterization of repeated exposures is the frequency of exposure. The relationship between elimination rate and frequency of exposure is shown in Fig. 2-2. A chemical that produces severe effects with a single dose may have no effect if the same total dose is given in several intervals. For the chemical depicted by line B in Fig. 2-2, in which the half-life for elimination (time necessary for 50% of the chemical to be removed from the bloodstream) is approximately equal to the dosing frequency, a theoretical toxic concentration (shown conceptually as 2 concentration units in Fig. 2-2) is not reached until the fourth dose, whereas that concentration is reached with only 2 doses for chemical A, which has an elimination rate much slower than the dosing interval (time between each repeated dose). Conversely, for chemical C, where the elimination rate is much shorter than the dosing interval, a toxic concentration at the site of toxic effect will never be reached regardless of how many doses are administered. Of course, it is possible that residual cell or tissue damage occurs with each dose even though the chemical itself is not accumulating. The important consideration, then, is whether the interval between doses is sufficient to allow for complete repair of tissue damage. It is evident that with any type of repeated exposure, the production of a toxic effect not only is influenced by the frequency of exposure but may also, in fact, be totally dependent on the frequency rather than the duration of exposure. Chronic toxic effects may occur, therefore, if the chemical accumulates in the biological system (rate

22

UNIT I

GENERAL PRINCIPLES OF TOXICOLOGY

of absorption exceeds the rate of biotransformation and/or excretion), if it produces irreversible toxic effects, or if there is insufficient time for the system to recover from the toxic damage within the exposure frequency interval. For additional discussion of these relationships, see Chaps. 5 and 7.

## DOSE–RESPONSE RELATIONSHIP

The characteristics of exposure and the spectrum of toxic effects come together in a correlative relationship customarily referred to as the *dose–response relationship*. Whatever response is selected for measurement, the relationship between the degree of response of the biological system and the amount of toxicant administered assumes a form that occurs so consistently as to be considered the most fundamental and pervasive concept in toxicology.

From a practical perspective, there are 2 types of dose–response relationships: (1) the individual dose–response relationship, which describes the response of an *individual* organism to varying doses of a chemical, often referred to as a "graded" response because the measured effect is continuous over a range of doses, and (2) a quantal dose–response relationship, which characterizes the distribution of individual responses to different doses in a *population* of individual organisms. It is also important to recognize that a given chemical may have multiple different molecular, biochemical, and cellular effects, each with its own "dose–response" relationship. Thus, the nature of a toxic response might very well be different at low doses than at higher doses. In the case of population-level "dose–response" characterization, the observed response is an integration of multiple individual "dose–response relationships" occurring in different cell types, and at different molecular sites within those cells. Subtle effects that occur at low doses may be masked or overwhelmed by more evident responses occurring at higher doses.

### Individual, or Graded, Dose–Response Relationships

Individual dose–response relationships are characterized by a dose-related increase in the severity of the response. The dose relatedness of the response often results from an alteration of a specific biochemical process. For example, Fig. 2-3 shows the dose–response relationship between different dietary doses of the organophosphate insecticide chlorpyrifos and the extent of inhibition of 2 different enzymes in the brain and liver: acetylcholinesterase and carboxylesterase. In the brain, the degree of inhibition of both enzymes is clearly dose-related and spans a wide range, although the amount of inhibition per unit dose is different for the 2 enzymes. From the shapes of these 2 dose–response curves it is evident that, in the brain, cholinesterase is more easily inhibited than carboxylesterase. The toxicological response that results is directly related to the degree of cholinesterase enzyme inhibition in the brain. Thus, clinical signs and symptoms for chlorpyrifos would follow a dose–response relationship similar to that for brain cholinesterase. However, as noted above, for many chemicals, more than 1 effect may result because of multiple different target sites in different tissues. Thus, the observed response to varying doses of a chemical in the whole organism is often complicated by the fact that most toxic substances have multiple sites or mechanisms of toxicity, each with its own "dose–response" relationship and subsequent adverse effect. Note that when these dose–response data are plotted using the base 10 log of the dose on the abscissa (Fig. 2.3B), a better "fit" of the data to a straight line usually occurs. This is typical of many graded as well as quantal dose–response relationships.



Figura 2-3. *Dose–response relationship between different doses of the organophosphate insecticide chlorpyrifos and esterase enzyme inhibition in the brain.* Open circles and blue lines represent acetylcholinesterase activity and closed circles represent carboxylesterase activity in the brains of pregnant female Long–Evans rats given 5 daily doses of chlorpyrifos. (**A**) Dose–response curve plotted on an arithmetic scale. (**B**) Same data plotted on a semi-log scale. (Data from Lassiter *et al.*, 1999, with permission.)

### Quantal Dose–Response Relationships

In contrast to the "graded" or continuous-scale dose–response relationship that occurs in individuals, the dose–response relationships in a *population* are by definition quantal—or "all or none"—in nature, that is, at any given dose, an individual in the population is classified as either a "responder" or a "nonresponder." Although these distinctions of "quantal population" and "graded individual" dose–response relationships are useful, the 2 types of responses are conceptually identical. The ordinate in both cases is simply labeled *the response*, which may be the degree of response in an individual or system or the fraction of a population responding, and the abscissa is the range in administered doses.

A widely used statistical approach for estimating the response of a population to a toxic exposure is the "effective dose" (ED). Generally, the midpoint, or 50%, response level is used, giving rise to the "$ED_{50}$" value. However, any response level, such as an $ED_{01}$, $ED_{10}$, or $ED_{30}$, could be chosen. A graphical representation of an approximate $ED_{50}$ is shown in Fig. 2-4. Note that these data are "quantal." Where death is the measured end point, the $ED_{50}$ would be referred to as the $LD_{50}$. Historically, determination of the $LD_{50}$ was often the first experiment performed with a new chemical. Today, it is widely recognized that the $LD_{50}$ is of marginal value as a measure of hazard, although it does provide a useful "ball park" indication of the relative hazard of a compound to cause serious, life-threatening poisoning from a single exposure. Although death is an obvious quantal end point to measure, it should be noted that any



Figure 2-4. Diagram of quantal dose-response relationship. The abscissa is a log dosage of the chemical. In the top panel the ordinate is response frequency, in the middle panel the ordinate is percent response, and in the bottom panel the response is in probit units (see text).

quantal response could be used. For example, the LD₅₀ of lead or DDT is not a relevant end point when characterizing hazards of the agents to children or wildlife, respectively. Even continuous variables can be converted to quantal responses if desired. For example, an antihypertensive drug that lowers blood pressure might be evaluated in a population by assigning a "responder" as an individual whose blood pressure was lowered by 10 mm Hg or more. Note that, in this example, an individual who responded to a change in blood pressure of 50 mm Hg would classified the same as an individual with a change in only 10 mm Hg, yet an individual with a change in 8 mm Hg would be classified as a "nonresponder." The top panel of Fig. 2-4 shows that quantal dose responses typically exhibit a normal or Gaussian distribution. The frequency histogram in this panel also shows the relationship between dose and effect. The bars represent the percentage of animals that responded at each dose minus the percentage that responded at the immediately lower dose. One can clearly see that only a few animals responded to the lowest dose and the highest dose. Larger numbers of animals responded to doses intermediate between these 2 extremes, and the maximum frequency of response occurred in the middle portion of the dose range. Thus, we have a bell-shaped curve known as a normal frequency distribution. The reason for this normal distribution is that there are

differences in susceptibility to chemicals among individuals; this is known as biological variation. Animals responding at the left end of the curve are referred to as hypersusceptible, and those at the right end of the curve are called resistant. If the numbers of individuals responding at each consecutive dose are added together, a cumulative, quantal dose-response relationship is obtained. When a sufficiently large number of doses is used with a large number of animals per dose, a sigmoid dose-response curve is observed, as depicted in the middle panel of Fig. 2-4. With the lowest dose (6 mg/kg), 1% of the animals respond. A normally distributed sigmoid curve such as this one approaches a response of 0% as the dose is decreased and approaches 100% as the dose is increased, but—theoretically—it never passes through 0% and 100%. However, the minimally ED of any chemical that evokes a stated all-or-none response is called the threshold dose even though it cannot be determined experimentally.

For a normally distributed population response, the sigmoid curve has a relatively linear portion between 16% and 84%. These values represent the limits of 1 standard deviation (SD) of the mean (and the median) in a population with truly normal or Gaussian distribution. However, it is usually not practical to describe the dose-response curve from this type of plot because one does not usually have large enough sample sizes to define the sigmoid curve adequately. In a normally distributed population, the mean ±1 SD represents 68.3% of the population, the mean ±2 SD represents 95.5% of the population, and the mean ±3 SD equals 99.7% of the population. Because quantal dose-response phenomena are usually normally distributed, one can convert the percent response to units of deviation from the mean or normal equivalent deviations (NEDs). Thus, the NED for a 50% response is 0; an NED of +1 is equated with an 84.1% response. Traditionally, units of NED are converted by the addition of 5 to the value to avoid negative numbers; these converted units are called probit units (Bliss, 1957). The probit (from the contraction of probability unit), then, is an NED plus 5. In this transformation, a 50% response becomes a probit of 5, a +1 deviation becomes a probit of 6, and a −1 deviation is a probit of 4.

The data given in the top 2 panels of Fig. 2-4 are replotted in the bottom panel with the response plotted in probit units. The data in the middle panel (which was in the form of a sigmoid curve) and the top panel (a bell-shaped curve) form a straight line when transformed into probit units. In essence, what is accomplished in a probit transformation is an adjustment of quantal data to an assumed normal population distribution, resulting in a straight line. The ED₅₀ is obtained by drawing a horizontal line from the probit unit 5, which is the 50% response point, to the dose-effect line. At the point of intersection, a vertical line is drawn, and this line intersects the abscissa at the ED₅₀ point. It is evident from the line that information with respect to the ED for 90% or for 10% of the population also may be derived by a similar procedure. Mathematically, it can be demonstrated that the range of values encompassed by the confidence limits is narrowest at the midpoint of the line (ED₅₀) and widest at both extremes (ED₁₀ and ED₉₀) of the dose-response curve (dotted lines in Fig. 2-5). In addition to the ED₅₀, the slope of the dose-response curve can also be obtained. Fig. 2-5 demonstrates the dose-response curves for the response of 2 compounds. Compound A exhibits a "flat" dose-response curve, showing that a large change in dosage is required before a significant change in response will be observed. However, compound B exhibits a "steep" dose-response curve, where a relatively small change in dosage will cause a large change in response. It is evident that the ED₅₀ for both compounds is the same (8 mg/kg). However, the slopes of the dose-response curves are quite different. At one half of ED₅₀ of the compounds (4 mg/kg), less than 1% of the animals exposed to compound B would respond but 20% of the animals given compound A would respond.



Figure 2-5. *Comparison of dose–response relationship for 2 different chemicals, plotted on a log dose–probit scale. Note that the slope of the dose–response is steeper for chemical B than for chemical A. Dotted lines represent the confidence limits for chemical A.*

In Figs. 2-4 and 2-5 the dosage has been given on a log basis. Although the use of the log of the dosage is empiric, log dosage plots for normally distributed quantal data provide a more nearly linear representation of the data. It must be remembered, however, that this is not universally the case. Some radiation effects, for example, give a better probit fit when the dose is expressed arithmetically rather than logarithmically. There are other situations in which other functions (eg, exponentials) of dosage provide a better fit to the data than does the log function. It is also conventional to express the dosage in milligrams per kilogram. It might be argued that expression of dosage on a mole-per-kilogram basis would be better, particularly for making comparisons among a series of compounds. Although such an argument has considerable merit, dosage is usually expressed in milligrams per kilogram.

One might also view dosage on the basis of body weight as being less appropriate than other bases, such as surface area. The term *allometry* refers to the field of study that examines the relationships between body weight and other biological and physical parameters such as rate of basal metabolism (caloric consumption), heart rate, blood flow, etc. Allometric studies revealed that the relationship between body weight and various other physiological parameters can be closely estimated by the following formula: $Y = aW^b$, where $Y$ is the biological parameter of interest and $a$ and $b$ are constants that relate $Y$ to body weight (Rodricks *et al.*, 2008). In general, organ sizes between species seem to scale best when $b$ is equal to 1, whereas metabolically derived parameters scale better when $b$ is 0.67 to 0.75. The relationship between body surface area and body weight across most mammalian species is closely described by the formula $SA = 10.5 \times (body\ weight\ [grams])^{0.67}$ (Harkness and Wagner, 1995). Empirical comparisons of toxicity data across species confirm that this relationship is appropriate for toxicological scaling. For example, Travis and White (1988) analyzed a number of toxicity testing data sets for 27 different chemotherapeutic drugs for which toxicity data were available in mouse, rat, hamster, dog, monkey, and human. They found that the exponent of body weight that gave the best correlation with toxicity was 0.73, with 95% confidence bounds of 0.69 to 0.77 (Rodricks *et al.*, 2008). Table 2-2 illustrates the differences in comparative doses when scaling is done by body weight (mg/kg) versus an allometric approach that uses an exponent of either 0.67 or 0.75. Thus, if a scaling factor of $(BW)^{2/3}$ is used, a mouse would need to receive a dose 13 times greater than that required for humans for an equivalent toxic response, whereas the dose would be 7 times greater if a scaling factor of $(BW)^{3/4}$ was used. However, not all toxic responses will necessarily scale across species in the same way. For example, acute lethality seemed to correlate better across species when body weight, rather than body surface area, was used (Rhomberg and Wolff, 1998). The selection of the most appropriate scaling factor should also take into account pharmacokinetic differences, including physiologically based pharmacokinetic modeling (PBPK). When toxicity is attributable to the formation of a toxic metabolite, or when xenobiotic biotransformation is saturated at high doses, a scaling factor of 1 may be more appropriate than 0.75 (Kirman *et al.*, 2003).

## Shape of the Dose–Response Curve

**Essential Nutrients** The shape of the dose–response relationship has many important implications in toxicity assessment. For example, for substances that are required for normal physiological

### Table 2-2

Allometric Scaling of Dose Across Different Species

| SPECIES | WEIGHT (kg) | SURFACE AREA (cm²)* | FOLD DIFFERENCE, RELATIVE TO HUMANS, NORMALIZED BY BODY WEIGHT | | |
|---|---|---|---|---|---|
| | | | mg/kg | $(BW)^{2/3}$ | $(BW)^{3/4}$ |
| Mouse | 0.30 | 103 | 1 | 13.0 | 7.0 |
| Rat | 0.2 | 365 | 1 | 6.9 | 4.3 |
| Guinea pig | 0.4 | 582 | 1 | 5.5 | 3.6 |
| Rabbit | 1.5 | 1410 | 1 | 3.5 | 2.6 |
| Cat | 2 | 1710 | 1 | 3.2 | 2.4 |
| Monkey | 4 | 2720 | 1 | 2.6 | 2.0 |
| Dog | 12 | 5680 | 1 | 1.8 | 1.5 |
| Human | 70 | 18,500 | 1 | 1.0 | 1.0 |

*Surface area of animals is closely approximated by the following formula: $SA = 10.5 \times (body\ weight\ [grams])^{2/3}$.



Figure 2-6. *Individual dose–response relationship for an essential substance such as a trace element.* It is generally recognized that, for most types of toxic responses, a threshold exists such that at doses below the threshold, no toxicity is evident. For essential substances, doses below the minimum daily requirement, as well as those above the threshold for safety, may be associated with toxic effects. The blue shaded region represents the "region of homeostasis"—the dose range that results in neither deficiency nor toxicity.

function and survival (eg, vitamins and essential trace elements such as chromium, cobalt, and selenium), the "graded" dose–response relationship in an individual over the entire dose range is actually U-shaped (Fig. 2-6). That is, at very low doses, there is a high level of adverse effect, which decreases with an increasing dose. This region of the dose–response relationship for essential nutrients is commonly referred to as a *deficiency*. As the dose is increased to a point where the deficiency no longer exists, no adverse response is detected and the organism is in a state of homeostasis. However, as the dose is increased to abnormally high levels, an adverse response (usually qualitatively different from that observed at deficient doses) appears and increases in magnitude with increasing dose, just as with other toxic substances. Thus, it is recognized that high doses of vitamin A can cause liver toxicity and birth defects, high doses of selenium can affect the brain, and high doses of estrogens may increase the risk of breast cancer, even though low doses of all these substances are essential for life.

**Hormesis** There is considerable evidence to suggest that some nonnutritional toxic substances may also impart beneficial or stimulatory effects at low doses but that, at higher doses, they produce adverse effects. This concept of "hormesis" was first described for radiation effects but may also pertain to most chemical responses (Calabrese and Blaine, 2005). Thus, in plotting dose versus response over a wide range of doses, the effects of hormesis may also result in a "U-shaped" dose–response curve. In its original development, the concept of hormesis pertained to the ability of substances to stimulate biological systems at low doses but to inhibit them at high doses. The application of the concept of hormesis to whole-animal toxicological dose–response relationships may also be relevant but requires that the "response" on the ordinate be variant with dose. For example, chronic alcohol consumption is well recognized to increase the risk of esophageal cancer, liver cancer, and cirrhosis of the liver at relatively high doses, and this response is dose-related (curve A, Fig. 2-7). However, there is also substantial clinical and epidemiological evidence that low to moderate consumption of alcohol reduces the incidence of coronary heart disease and stroke (curve B, Fig. 2-7) (Hanna *et al.*, 1997). Thus, when all responses are plotted on the ordinate, a "U-shaped" dose–response curve is obtained (curve C, Fig. 2-7). U-shaped dose–response relationships



Figure 2-7. *Hypothetical dose–response relationship depicting characteristics of hormesis.* Hormetic effects of a substance are hypothesized to occur when relatively low doses result in the stimulation of a beneficial or protective response (**B**), such as induction of enzymatic pathways that protect against oxidative stress. Although low doses provide a potential beneficial effect, a threshold is exceeded as the dose increases and the net effects will be detrimental (**A**), resulting in a typical dose-related increase in toxicity. The complete dose–response curve (**C**) is conceptually similar to the individual dose–response relationship for essential nutrients shown in Fig. 2-6.

have obvious implications for the process of low-dose extrapolation in risk assessment.

**Threshold** Another important aspect of the dose–response relationship at low doses is the concept of the threshold. It has long been recognized that acute toxicological responses are associated with thresholds, that is, there is some dose below which the probability of an individual responding is zero. Obviously, the identification of a threshold depends on the particular response that is measured, the sensitivity of the measurement, and the number of subjects studied. For the individual dose–response relationship, thresholds for most toxic effects certainly exist, although interindividual variability in response and qualitative changes in response pattern with dose make it difficult to establish a true "no effects" threshold for any chemical. The biological basis of thresholds for acute responses is well established and frequently can be demonstrated on the basis of mechanistic information (Aldridge, 1986). The traditional approaches to establishing acceptable levels of exposure to chemicals are inherently different for threshold versus nonthreshold responses. The existence of thresholds for chronic responses is less well defined, especially in the area of chemical carcinogenesis. It is, of course, impossible to scientifically prove the absence of a threshold, as one can never prove a negative.

UNIT I

GENERAL PRINCIPLES OF TOXICOLOGY

Nevertheless, for the identification of "safe" levels of exposure to a substance, the absence or presence of a threshold is important for practical reasons (see Chap. 4). A classic example of the difficulty of establishing thresholds experimentally is provided by the "$ED_{01}$" study, where over 24,000 mice and 81 different treatment groups were used to determine the shape of the dose–response relationship for the prototypical carcinogen 2-acetylaminofluorene (2-AAF). The study was designed to identify a statistically significant response of 1% (0.01 probability). The mice were exposed to 2-AAF at 1 of 7 different doses in the dose range of 30 to 150 ppm (plus 0 dose control) (Littlefield *et al.*, 1979). Eight "sacrifice intervals" were used to determine how quickly tumors developed. Both types of tumors demonstrated increasing incidence with increasing dose, but the shapes of the 2 curves are dramatically different. For liver tumors, no clear threshold was evident, whereas for bladder tumors, an apparent threshold was evident. However, the apparent threshold, or "no observable adverse effect level" (NOAEL), for bladder cancer was lower at 33 months (45 ppm) than at 24 months (75 ppm). Of course, the ability to detect a low incidence of tumors depends on the number of animals used in the study. Thus, although a threshold (a dose below which no response occurs) appears evident for bladder tumors, one cannot say for certain that tumors would not occur if more animals had been included in the lower-dose groups. A different animal model that relies on relatively brief exposure of rainbow trout embryos to carcinogens has allowed an even more statistically stringent analysis of the shape of the dose–response curve at low doses for mutagenic carcinogens. Using this model with 2 different genotoxic carcinogens, dibenzo[$d,e,f,p$] chrysene (DBC, also referred to as dibenzo[$a,l$]pyrene) and aflatoxin $B_1$ (AFB₁), estimates of the shape of the dose–response curve down to a response level of 1 additional tumor in 5000 animals could be obtained, because very large numbers of animals could be exposed. In both studies, over 40,000 trout were exposed to different doses ranging over a factor of 200 (AFB₁, lowest dose 0.5 ppb, highest dose 110 ppb) to 500 (DBC, lowest dose 0.45 ppm, highest dose 225 ppm), with over 8000 animals in the control and low-dose groups (Williams, 2012). Both of these chemicals are potent mutagens, so it was assumed that both the rate of DNA adduct formation and the tumor incidence would be linear throughout the dose range. However, for DBC, there was a clear deviation from linearity at the lower doses, such that the extrapolated dose–response curve crossed the *y*-axis at 1 cancer in a million exposed animals at a dose 500- to 1500-fold (depending on the statistical model) higher than would have been predicted from the linear extrapolation below the 10% response range ($ED_{10}$) (Bailey *et al.*, 2009) (Fig. 2-8). Remarkably, although the tumor response exhibited a clear "threshold," the formation of DBC–DNA adducts was quite linear through the lowest dose used. In contrast, in a similarly designed study using the potent carcinogen, AFB₁, both tumor response and AFB–DNA adduct formation appear approximately linear down through the lowest dose; the liver tumor response to AFB₁ remained linear to the lowest dose, although the slope was about 1.5 and the predicted dose resulting in 1 cancer in a million exposed animals was about 10-fold higher than that predicted from the extrapolated $LED_{10}$ line, although the lowest doses tested yielded tumor incidence that was close (within a factor of 2) to the background tumor rate (Fig. 2-9) (Williams *et al.*, 2009a; Williams, 2012).

(See Chap. 4 for more discussion on statistical issues related to extrapolation of dose–response curves and the determination of NOAELs.)

In evaluating the shape of the dose–response relationship in populations, it is realistic to consider inflections in the shape of the dose–response curve rather than absolute thresholds. That is, the





Figure 2-8. *Dose–response relationship for carcinogens—rodents and 2-AAF.*

slope of the dose–response relationship at high doses may be substantially different from the slope at low doses, usually because of dispositional differences in the chemical. Saturation of biotransformation pathways, protein-binding sites or receptors, and depletion of intracellular cofactors represent some reasons why sharp inflections in the dose–response relationship may occur. For example, the widely used analgesic acetaminophen has a very low rate of liver toxicity at normal therapeutic doses. Even though a toxic metabolite (*N*-acetyl-*p*-benzoquinone imine [NAPQI]) is produced in the liver



Figure 2-9. *Dose–response relationship for carcinogens—fish and aflatoxin B1.* (Reproduced with permission from Williams, 2012.)

at therapeutic doses, it is rapidly detoxified through conjugation with the intracellular antioxidant glutathione. However, at very high doses, the level of intracellular glutathione in the liver is depleted and NAPQI accumulates, causing serious and potentially fatal liver toxicity. This effect is analogous to the rapid change in pH of a buffered solution that occurs when the buffer capacity is exceeded. Some toxic responses, most notably the development of cancer after the administration of genotoxic carcinogens, are often considered to be linear at low doses and thus do not exhibit a threshold. In such circumstances, there is no dose with "zero" risk, although the risk decreases proportionally with a decrease in the dose. The existence or lack of existence of a threshold dose for carcinogens has many regulatory implications and is a point of considerable controversy and research in the field of quantitative risk assessment for chemical carcinogens (see Chap. 4).

**Nonmonotonic Dose–Response Curves** For chemicals that exert their primary toxic effects via modification of hormonal responses (endocrine disruptors), it is possible that effects occur at relatively low doses that are not seen at higher doses, thereby seemingly defying the traditional concept of "dose–response".

The characterization of so-called nonmonotonic dose–response (NMDR) curves is an important refinement in our understanding of dose–response relationships in toxicology (Fig. 2-10). Indeed, some chemicals, such as the plastics monomer bisphenol A (BPA), exhibit relatively little evident toxicity at high doses in traditional acute toxicity testing procedures, yet may have important biological effects when exposure occurs during sensitive periods of development, even at doses well below those shown to cause evident toxicity. For example, human pituitary cells cultured in the presence of BPA elicited significant responses at concentrations of 0.001 and



Figure 2-10. *Hypothetical dose–response curves for the (A) threshold responses, (B) nonthreshold linear dose response, and (C and D) nonmonotonic dose–response (NMDR). Curves A and B reflect traditional dose–response relationships. However, in the NMDR curve (C), an increase in dose does not necessarily correspond to an increase in response; such that, in this example, doses from $10^{-12}$ to $10^{-3}$ dose units result in an increase in response, and doses from $10^{-1}$ to $10^{6}$ dose units result in a decrease in response. Curve D represents the NMDR curves observed in mammary gland morphological parameters after administration of estradiol to ovariectomized females. The left y-axis is the number of terminal end buds (TEBs), and the right y-axis is total area of all TEBs; the TEB is an estrogen-dependent structure. (Based on Vandenberg et al., 2009.)*

27

CHAPTER 2   PRINCIPLES OF TOXICOLOGY

28

UNIT 1

GENERAL PRINCIPLES OF TOXICOLOGY

0.01 nM, but not at 1 and 10 nM, yet the response was seen at 100 nM (Vandenberg et al., 2009). Several other studies have found that BPA and other endocrine-active xenobiotics can elicit NMDR relationships for a variety of other specific receptors and/or cell signaling pathways (reviewed in Vandenberg et al., 2009).

Specific cellular/molecular mechanisms that might explain NMDR curves include: (1) upregulation of some receptors at low concentrations, with downregulation of the same receptors at higher levels, and/or (2) integration of 2 or more monotonic dose–response curves that occur through different molecular/cellular pathways with common end points but opposite effects (Vandenberg et al., 2009). Since endocrine-active xenobiotics may act as weak agonists for specific hormone receptors, it is reasonable that low doses could have different effects than high doses if, as partial agonists, they competitively inhibit endogenous ligands at higher concentrations, but have either no or positive agonist effects at low concentrations. Another explanation for NMDR curves is that we simply do not understand all the varied and interconnected molecular pathways that work in concert to produce an observable response at the organismal level. Indeed, BPA has been shown to have multiple different effects on a myriad of putative molecular pathways involved in hormone function, so it perhaps is not surprising to see NMDR functions over dose ranges of many orders of magnitude (Vandenberg et al., 2009).

## Assumptions in Deriving the Dose–Response Relationship

A number of assumptions must be considered before dose–response relationships can be used appropriately. The first is that the response is due to the chemical administered. To describe the relationship between a toxic material and an observed effect or response, one must know with reasonable certainty that the relationship is indeed a causal one. For some data, it is not always apparent that the response is a result of chemical exposure. For example, an epidemiological study might result in the discovery of an "association" between a response (eg, disease) and 1 or more variables. Frequently, the data are presented similarly to the presentation of "dose response" in pharmacology and toxicology. Use of the dose response in this context is suspect unless other convincing evidence supports a causal connection between the estimated dose and the measured end point (response). Unfortunately, in nearly all retrospective and case–control studies and even in many prospective studies, the dose, duration, frequency, and route of exposure are seldom quantified, and other potential etiologic factors are frequently present. In its most strict sense, then, the dose–response relationship is based on the knowledge that the effect is a result of a known toxic agent or agents.

A second assumption seems simple and obvious: the magnitude of the response is in fact related to the dose. Perhaps because of its apparent simplicity, this assumption is often a source of misunderstanding. It is really a composite of 3 other assumptions that recur frequently:

1. There is a molecular target site (or sites) with which the chemical interacts to initiate the response.
2. The production of a response and the degree of response are related to the concentration of the chemical at the target site.
3. The concentration at the site is, in turn, related to the dose administered.

The third assumption in using the dose–response relationship is that there exist both a quantifiable method of measuring and a precise means of expressing the toxicity. For any given dose–response

relationship, a great variety of criteria or end points of toxicity could be used. The ideal criterion would be one closely associated with the molecular events resulting from exposure to the toxicant. It follows from this that a given chemical may have a family of dose–response relationships, 1 for each toxic end point. For example, a chemical that produces cancer through genotoxic effects, liver damage through inhibition of a specific enzyme, and CNS effects via a different mechanism, may have 3 distinct dose–response relationships, 1 for each end point. Early in the assessment of toxicity, little mechanistic information is usually available; thus, establishing a dose–response relationship based on the molecular mechanism of action is usually impossible. Indeed, it might not be approachable even for well-known toxicants. In the absence of a mechanistic, molecular ideal criterion of toxicity, one looks to a measure of toxicity that is unequivocal and clearly relevant to the toxic effect. Such measures are often referred to as "effects-related biomarkers." For example, with a new compound chemically related to the class of organophosphate insecticides, one might approach the measurement of toxicity by measuring the inhibition of cholinesterase in blood. In this way, one would be measuring, in a readily accessible system and using a technique that is convenient and reasonably precise, a prominent effect of the chemical and one that is usually pertinent to the mechanism by which toxicity is produced.

The selection of a toxic end point for measurement is not always so straightforward. Even the example cited above may be misleading, as an organophosphate may produce a decrease in blood cholinesterase, but this change may not be directly related to its toxicity. As additional data are gathered to suggest a mechanism of toxicity for any substance, other measures of toxicity may be selected. Although many end points are quantitative and precise, they are often indirect measures of toxicity. Changes in enzyme levels in blood can be indicative of tissue damage. For example, alanine aminotransferase (ALT) and aspartate aminotransferase (AST) are used to detect liver damage. Use of these enzymes in serum is yet another example of an effects-related biomarker because the change in enzyme activity in the blood is directly related to damage to liver cells. Much of clinical diagnostic medicine relies on effects-related biomarkers, but to be useful the relationship between the biomarker and the disease must be carefully established. Patterns of isozymes and their alteration may provide insight into the organ or system that is the site of toxic effects. As discussed later in this chapter, the new tools of toxicogenomics provide an unprecedented opportunity to discover new "effects-related biomarkers" in toxicology.

Many direct measures of effects are also not necessarily related to the mechanism by which a substance produces harm to an organism but have the advantage of permitting a causal relation to be drawn between the chemical and its action. For example, measurement of the alteration of the tone of smooth or skeletal muscle for substances acting on muscles represents a fundamental approach to toxicological assessment. Similarly, measures of heart rate, blood pressure, and electrical activity of heart muscle, nerve, and brain are examples of the use of physiological functions as indices of toxicity. Measurement can also take the form of a still higher level of integration, such as the degree of motor activity or behavioral change.

The measurements used as examples in the preceding discussion all assume prior information about the toxicant, such as its target organ or site of action or a fundamental effect. However, such information is usually available only after toxicological screening and testing based on other measures of toxicity. With a new substance, the customary starting point is a single-dose acute toxicity test designed to provide preliminary identification of target organ

toxicity. Studies specifically designed with lethality as an end point are no longer recommended by the United States or international agencies. Data from acute studies provide essential information for choosing doses for repeated dosing studies as well as choosing specific toxicological end points for further study. Key elements of the study design must be a careful, disciplined, detailed observation of the intact animal extending from the time of administration of the toxicant to any clinical signs of distress, which may include detailed behavioral observations or physiological measures. It is recommended that these observations be taken over a 14-day period. From properly conducted observations, immensely informative data can be gathered by a trained toxicologist. Second, an acute toxicity study ordinarily is supported by histological examination of major tissues and organs for abnormalities. From these observations, one can usually obtain more specific information about the events leading to the various end points, the target organs involved, and often a suggestion about the possible mechanism of toxicity at a relatively fundamental level.

## Evaluating the Dose–Response Relationship

**Comparison of Dose Responses**  Fig. 2-11 illustrates a hypothetical quantal dose–response curve for a desirable effect of a chemical (effective dose, ED) such as anesthesia, a toxic effect (toxic dose, ED) such as liver injury, and the lethal dose (LD). As depicted in Fig. 2-11, a parallelism is apparent between the ED curve and the curve depicting mortality (LD). It is tempting to view the parallel dose–response curves as indicative of identity of mechanism—that is, to conclude that the lethality is a simple extension of the therapeutic effect. Whereas this conclusion may ultimately prove to be correct in any particular case, it is not warranted solely on the basis of the 2 parallel lines. The same admonition applies to any pair of parallel "effect" curves or any other pair of toxicity or lethality curves.

**Therapeutic Index**  The hypothetical curves in Fig. 2-11 illustrate 2 other interrelated points: the importance of the selection of the toxic criterion and the interpretation of comparative effect. The concept of the "therapeutic index" (TI), which was introduced by Paul Ehrlich in 1913, can be used to illustrate this relationship. Although the TI is directed toward a comparison of the therapeutically ED to the TD of a chemical, it is equally applicable to considerations of comparative toxicity. The TI in its broadest sense is defined as the ratio of the dose required to produce a toxic effect to

the dose needed to elicit the desired therapeutic response. Similarly, an index of comparative toxicity is obtained by the ratio of doses of 2 different materials to produce an identical response or the ratio of doses of the same material necessary to yield different toxic effects.

The most commonly used index of effect, whether beneficial or toxic, is the median effect dose ($ED_{50}$). The TI of a drug is an approximate statement about the relative safety of a drug expressed as the ratio of the adverse end point or TD (historically the LD) to the therapeutic dose:

$$TI = \frac{TD_{50}}{ED_{50}}.$$

From Fig. 2-11 one can approximate a TI by using these median doses. The larger the ratio, the greater is the relative safety. The $ED_{50}$ is approximately 20, and the $TD_{50}$ is about 60; thus, the TI is 3, a number indicating that reasonable care in exposure to the drug is necessary to avoid toxicity. However, the use of the median effective and median toxic doses is not without disadvantages, because median doses tell nothing about the slopes of the dose–response curves for therapeutic and toxic effects.

**Margins of Safety and Exposure**  One way to overcome this deficiency is to use the $ED_{99}$ for the desired effect and the $TD_1$ for the undesired effect. These parameters are used in the calculation of the margin of safety (MOS):

$$MOS = \frac{TD_1}{ED_{99}}.$$

The quantitative comparisons described above have been used mainly after a single administration of chemicals. However, for chemicals for which there is no beneficial or effective dose and exposures are likely to occur repeatedly, the ratio of $TD_1$ to $ED_{99}$ has little relevance. Thus, for nondrug chemicals, the term *MOS* has found use in risk assessment procedures as an indicator of the magnitude of the difference between an estimated "exposed dose" to a human population and the NOAEL or other benchmark dose determined in experimental animals.

A measure of the degree of accumulation of a chemical and/or its toxic effects can also be estimated from quantal toxicity data. The *chronicity index* of a chemical is a unitless value obtained by dividing its 1-dose $TD_{50}$ by its 90-dose (90-day) $TD_{50}$, with both expressed in milligrams per kilogram per day. Theoretically, if no cumulative effect occurs over the doses, the chronicity index will be 1. If a compound were absolutely cumulative, the chronicity index would be 90.

Historically, statistical procedures similar to those used to calculate the $LD_{50}$ can also be used to determine the lethal time 50 ($LT_{50}$), or the time required for half the animals to die (Litchfield, 1949). The $LT_{50}$ value for a chemical indicates the time course of the toxic effects but does not indicate whether 1 chemical is more toxic than another.

Frequently, dose–response curves from repeated-dose experimental animal studies (subacute, subchronic, or chronic) are used to estimate the NOAEL, or some other "benchmark" measure of minimal toxic response, such as the dose estimated to produce toxic effects in 10% of the population ($TD_{10}$) (see also Chap. 4). These estimates of minimal TD, derived from quantal dose–response curves, can be used in risk assessment to derive a "margin of exposure" (MOE) index. This index compares the estimated daily exposure, in milligrams per kilogram per day, that might occur under a given set of circumstances with some estimated value from the quantal dose–response relationship (eg, NOAEL or $TD_{10}$). Like the



**Figure 2-11.** *Comparison of effective dose (ED), toxic dose (TD), and lethal dose (LD).* The plot is of log dosage versus percentage of population responding in probit units.

UNIT I

GENERAL PRINCIPLES OF TOXICOLOGY



Figure 2-12. *Schematic representation of the difference in the dose–response curves for 4 chemicals (A-D), illustrating the difference between potency and efficacy (see text).*

MOS, the MOE is often expressed as a ratio of these 2 values. Thus, for example, if an estimate of human exposure to a pesticide residue yielded a value of 0.001 mg/kg per day, and a $TD_{10}$ of 1 mg/kg per day was determined for that same pesticide, the MOE would be 1000. This value indicates that the estimate of daily exposure under the described set of conditions is 1/1000 the estimated daily dose that would cause evident toxicity in 10% of exposed animals. (See Chap. 4 for a more complete discussion of benchmark doses, NOAELs, and MOE.)

**Potency versus Efficacy** To compare the toxic effects of 2 or more chemicals, the dose response to the toxic effects of each chemical must be established. One can then compare the potency and maximal efficacy of the 2 chemicals to produce a toxic effect. These 2 important terms can be explained by reference to Fig. 2-12, which depicts dose–response curves to 4 different chemicals for the frequency of a particular toxic effect, such as the production of tumors. Chemical A is said to be more potent than chemical B because of their relative positions along the dosage axis. Potency thus refers to the range of doses over which a chemical produces increasing responses. Thus, A is more potent than B and C is more potent than D. Maximal efficacy reflects the limit of the dose–response relationship on the response axis to a certain chemical. Chemicals A and B have equal maximal efficacy, whereas the maximal efficacy of C is less than that of D.

## VARIATION IN TOXIC RESPONSES

### Selective Toxicity

*Selective toxicity* means that a chemical produces injury to 1 kind of living matter without harming another form of life even though the 2 may exist in intimate contact (Albert, 1973). The living matter that is injured is termed the *uneconomic form* (or undesirable), and the matter protected is called the *economic form* (or desirable). They may be related to each other as parasite and host or may be 2 tissues in 1 organism. This biological diversity interferes with the ability of ecotoxicologists to predict the toxic effects of a chemical in 1 species (humans) from experiments performed in another species (laboratory animals). However, by taking advantage of the biological diversity, it is possible to develop chemicals that are lethal for an undesired species and harmless for other species. In agriculture, for example, there are fungi, insects, and even competitive plants that injure the crop, and thus selective pesticides are needed. Similarly, animal husbandry and human medicine require

chemicals, such as antibiotics, that are selectively toxic to the undesirable form but do not produce damage to the desirable form.

Drugs and other chemicals used for selective toxic purposes are selective for 1 of 2 reasons. Either (1) the chemical is equally toxic to both economic and uneconomic cells but is accumulated mainly by uneconomic cells or (2) it reacts fairly specifically with a cytological or a biochemical feature that is absent from or does not play an important role in the economic form (Albert, 1973). Selectivity resulting from differences in distribution usually is caused by differences in the absorption, biotransformation, or excretion of the toxicant. The selective toxicity of an insecticide spray may be partly due to a larger surface area per unit weight that causes the insect to absorb a proportionally larger dose than does the mammal being sprayed. The effectiveness of radioactive iodine in the treatment of hyperthyroidism (as well as its thyroid carcinogenicity) is due to the selective ability of the thyroid gland to accumulate iodine. A major reason why chemicals are toxic to one, but not to another, type of tissue is that there are differences in accumulation of the ultimate toxic compound in various tissues. This, in turn, may be due to differences in the ability of various tissues to transport or biotransform the chemical into the ultimate toxic product.

Selective toxicity caused by differences in comparative cytology is exemplified by a comparison of plant and animal cells. Plants differ from animals in many ways—for example, absence of a nervous system, an efficient circulatory system, and muscles as well as the presence of a photosynthetic mechanism and cell walls. The fact that bacteria contain cell walls and humans do not has been utilized in developing selective toxic chemotherapeutic agents, such as penicillin and cephalosporins, that kill bacteria but are relatively nontoxic to mammalian cells.

Selective toxicity can also be a result of a difference in biochemistry in the 2 types of cells. For example, bacteria do not absorb folic acid but synthesize it from *p*-aminobenzoic acid, glutamic acid, and pteridine, whereas mammals cannot synthesize folic acid but have to absorb it from the diet. Thus, sulfonamide drugs are selectively toxic to bacteria because the sulfonamides, which resemble *p*-aminobenzoic acid in both charge and dimensions, antagonize the incorporation of *p*-aminobenzoic acid into the folic acid molecule—a reaction that humans do not carry out.

### Species Differences

Although a basic tenet of toxicology is that "experimental results in animals, when properly qualified, are applicable to humans," it is important to recognize that both quantitative and qualitative

differences in response to toxic substances may occur among different species. As discussed above, there are many reasons for selective toxicity among different species. Even among phylogenetically similar species (eg, rats, mice, guinea pigs, and hamsters), large differences in response may occur. For example, the $LD_{50}$ for the highly toxic dioxin, TCDD, differs by more than 1000-fold between guinea pigs and hamsters. Not only the lethal dose for TCDD but also the particular target organs affected vary widely among species. Species differences in response to carcinogenic chemicals represent an important issue in regulatory risk assessment. As discussed in Chap. 4, extrapolation of laboratory animal data to infer human cancer risk is currently a key component of regulatory decision making. The validity of this approach of course depends on the relevance of the experimental animal model to humans. Large differences in carcinogenic response between experimental animal species are not unusual. For example, mice are highly resistant to the hepatocarcinogenic effects of the fungal toxin $AFB_1$. Dietary doses as high as 10,000 ppb failed to produce liver cancer in mice, whereas in rats dietary doses as low as 15 ppb produced a significant increase in liver tumors (Wogan et al., 1974). The mechanistic basis for this dramatic difference in response appears to be entirely related to species differences in the expression of a particular form of glutathione S-transferase (mGSTA3-3) that has unusually high catalytic activity toward the carcinogenic epoxide of aflatoxin (Eaton and Gallagher, 1994). Mice express this enzyme constitutively, whereas rats normally express a closely related form with much less detoxifying activity toward aflatoxin epoxide. Interestingly, rats do possess the gene for a form of glutathione S-transferase with high catalytic activity toward aflatoxin epoxide (rGSTA5-5) that is inducible by certain dietary antioxidants and drugs. Thus, dietary treatment can dramatically change the sensitivity of a species to a carcinogen.

Other examples in which large species differences in response to carcinogens have been observed include the development of renal tumors from 2,3,5-trimethylpentane and D-limonene in male rats (Lehman-McKeeman and Caudill, 1992), the production of liver tumors from "peroxisomal proliferators" such as the antilipidemic drug clofibrate and the common solvent trichloroethylene (Roberts, 1999), and the induction of nasal carcinomas in rats after inhalation exposure to formaldehyde (Monticello and Morgan, 1997).

Identifying the mechanistic basis for species differences in response to chemicals is an important part of toxicology because only through a thorough understanding of these differences can the relevance of animal data to human response be verified.

## Individual Differences in Response

Even within a species, large interindividual differences in response to a chemical can occur because of subtle genetic differences. Hereditary differences in a single gene that occur in more than 1% of the population are referred to as *genetic polymorphism* and may be responsible for idiosyncratic reactions to chemicals, as discussed earlier in this chapter. However, genetic polymorphism may have other important but less dramatic effects than those described for acute idiosyncratic responses (such as that occurring in pseudocholinesterase-deficient individuals after succinylcholine exposure). For example, it is recognized that approximately 50% of the Caucasian population has a gene deletion for the enzyme glutathione S-transferase M1. This enzyme has no apparent significant physiological function, and thus homozygotes for the gene deletion (eg, those who lack both copies of the normal gene) are functionally and physiologically normal. However, epidemiological studies have indicated that smokers who are homozygous for the null

allele may be at slightly increased risk of developing lung cancer compared with smokers who have 1 or both copies of the normal gene (Mohr et al., 2003). Chap. 6 provides additional examples of genetic differences in biotransformation enzymes that may be important determinants of variability in individual susceptibility to chemical exposures.

Genetic polymorphism in physiologically important genes may also be responsible for interindividual differences in toxic responses. For example, studies in transgenic mice have shown that mice possessing 1 copy of a mutated *p53* gene (a so-called tumor suppressor gene; see Chap. 8) are much more susceptible to some chemical carcinogens than are mice with 2 normal copies of the gene (Tennant et al., 1999). In humans, there is evidence that possessing 1 mutated copy of a tumor suppressor gene greatly increases the risk of developing certain cancers. For example, retinoblastoma is a largely inherited form of cancer that arises because of the presence of 2 copies of a defective tumor suppressor gene (the Rb gene) (Wiman, 1993). Individuals with 1 mutated copy of the Rb gene and 1 normal copy are not destined to acquire the disease (as are those with 2 copies of the mutated gene), although their chance of acquiring it is much greater than that of persons with 2 normal Rb genes. This is the case because both copies of the gene must be nonfunctional for the disease to develop. With 1 mutated copy present genetically, the probability of acquiring a mutation of the second gene (potentially from exposure to environmental mutagens) is much greater than the probability of acquiring independent mutations in both copies of the gene as would be necessary in people with 2 normal Rb alleles. (See Chap. 8 for additional discussion of tumor suppressor genes.)

As our understanding of the human genome increases, more "susceptibility" genes will be discovered, and it is likely that the etiology of many chronic diseases will be shown to be related to a combination of genetics and environment. Simple blood tests may ultimately be developed that allow an individual to learn whether he or she may be particularly susceptible to specific drugs or environmental pollutants. Although the public health significance of this type of information could be immense, the disclosure of such information raises many important ethical and legal issues that must be addressed before wide use of such tests.

The study of "gene–environment" interactions, or "ecogenetics" (Costa and Eaton, 2006), is a rapidly developing field of substantial relevance to toxicology. It is likely that the majority of chronic diseases develop as a result of the complex interplay between multiple genes and the myriad of environmental factors, including diet, lifestyle, and occupational and/or environmental exposures to toxic substances. The growing field of epigenetics, discussed in more detail later in this chapter, is likely to have an equally great impact on the science of toxicology, as it is likely that many xenobiotics will be found to exert many of their chronic adverse effects through subtle effects on gene expression.

## DESCRIPTIVE ANIMAL TOXICITY TESTS

Two main principles underlie all descriptive animal toxicity testing. The first is that the effects produced by a compound in laboratory animals, when properly qualified, are applicable to humans. This premise applies to all of experimental biology and medicine. Most, if not all, known chemical carcinogens in humans are carcinogenic in some species, but not necessarily in all species of laboratory animals. It has become increasingly evident that the converse—that all chemicals identified as carcinogenic in laboratory animals are also carcinogenic in humans—is not true (Dybing and Sanner, 1999; Grisham, 1997; Hengstler et al., 1999). However, for regulatory

31

CHAPTER 2   PRINCIPLES OF TOXICOLOGY

32

UNIT I

GENERAL PRINCIPLES OF TOXICOLOGY

and risk assessment purposes, positive carcinogenicity tests in animals are usually interpreted as indicative of potential human carcinogenicity. If a clear understanding of the mechanism of action of the carcinogen indicates that a positive response in animals is not relevant to humans, a positive animal bioassay may be considered irrelevant for human risk assessment (see Chap. 4). This species variation in carcinogenic response appears to be due in many instances to differences in biotransformation of the procarcinogen to the ultimate carcinogen (see Chap. 6).

The second principle is that exposure of experimental animals to chemicals in high doses is a necessary and valid method of discovering possible hazards in humans. This principle is based on the quantal dose–response concept that the incidence of an effect in a population is greater as the dose or exposure increases. Practical considerations in the design of experimental model systems require that the number of animals used in toxicology experiments always be small compared with the size of human populations at risk. Obtaining statistically valid results from such small groups of animals requires the use of relatively large doses so that the effect will occur frequently enough to be detected. However, the use of high doses can create problems in interpretation if the response(s) obtained at high doses does not occur at low doses. Thus, for example, it has been shown that bladder tumors observed in rats fed very high doses of saccharin will not occur at the much lower doses of saccharin encountered in the human diet. At the high concentrations fed to rats, saccharin forms an insoluble precipitate in the bladder that subsequently results in chronic irritation of bladder epithelium, enhanced cell proliferation, and ultimately bladder tumors (Cohen, 1998, 1999). In vitro studies have shown that precipitation of saccharin in human urine will not occur at the concentrations

that could be obtained from even extraordinary consumption of this artificial sweetener. As noted above and shown in Fig. 2-8, even for mutagenic chemicals that form DNA adducts, the response at high doses, as seen for DBC, may not be linear at low doses, although for another DNA-reactive carcinogen, $AFB_1$, the high-dose data were reflective of low-dose response in an approximately linear fashion. Examples such as these illustrate the importance of considering the molecular, biochemical, and cellular mechanisms responsible for toxicological responses when extrapolating from high to low dose and across species.

Toxicity tests are not designed to demonstrate that a chemical is safe but to characterize the toxic effects a chemical can produce. Although there are no set toxicology tests that have to be performed on every chemical intended for commerce, a tiered approach typical of many hazard assessment programs is illustrated in Fig. 2-13. Depending on the eventual use of the chemical, the toxic effects produced by structural analogs of the chemical, as well as the toxic effects produced by the chemical itself, contribute to the determination of the toxicology tests that should be performed. The FDA, EPA, and Organization for Economic Cooperation and Development (OECD) have written good laboratory practice (GLP) standards and other guidance that stipulate that procedure must be defined and accountability documented. These guidelines are expected to be followed when toxicity tests are conducted in support of the introduction of a chemical to the market.

The following sections provide an overview of basic toxicity testing procedures in use today. For a detailed description of these tests, the reader is referred to several authoritative texts on this subject (Barile, 2010; Hayes, 2008; Jacobson-Kram and Keller, 2006; Eaton and Gallagher, 2010).



Figure 2-13. *Typical tiered testing scheme for the toxicological evaluation of new chemicals.* (From Wilson *et al.* 2008. Fig. 19-1, p. 918.)

**Table 2-3**

International Conference on Harmonization (ICH) Codification of "Safety" Protocols

**Carcinogenicity studies**

| | |
|---|---|
| S1A | Need for Carcinogenicity Studies of Pharmaceuticals |
| S1B | Testing for Carcinogenicity of Pharmaceuticals |
| S1C(R1) | Dose Selection for Carcinogenicity Studies of Pharmaceuticals & Limit Dose |

**Genotoxicity studies**

| | |
|---|---|
| S2A | Guidance on Specific Aspects of Regulatory Genotoxicity Tests for Pharmaceuticals |
| S2B | Genotoxicity: A Standard Battery for Genotoxicity Testing of Pharmaceuticals |

**Toxicokinetics and pharmacokinetics**

| | |
|---|---|
| S3A | Note for Guidance on Toxicokinetics: The Assessment of Systemic Exposure in Toxicity Studies |
| S3B | Pharmacokinetics: Guidance for Repeated Dose Tissue Distribution Studies |

**Toxicity testing**

| | |
|---|---|
| | Single Dose Toxicity Tests |
| S4 | Duration of Chronic Toxicity Testing in Animals (Rodent and Non Rodent Toxicity Testing) |

**Reproductive toxicology**

| | |
|---|---|
| S5(R2) | Detection of Toxicity to Reproduction for Medicinal Products & Toxicity to Male Fertility |

**Biotechnological products**

| | |
|---|---|
| S6 | Preclinical Safety Evaluation of Biotechnology-Derived Pharmaceuticals |

**Pharmacology studies**

| | |
|---|---|
| S7A | Safety Pharmacology Studies for Human Pharmaceuticals |
| S7B | The Non-Clinical Evaluation of the Potential for Delayed Ventricular Repolarization (QT Interval Prolongation) by Human Pharmaceuticals |

**Immunotoxicology studies**

| | |
|---|---|
| S8 | Immunotoxicity Studies for Human Pharmaceuticals |

**Joint safety/efficacy (multidisciplinary) topic**

| | |
|---|---|
| M3(R1) | Non-Clinical Safety Studies for the Conduct of Human Clinical Trials for Pharmaceuticals |

*Titles and abbreviations adopted in November 2005. Data from http://www.ich.org/fileadmin/Public_Web_Site/ICH_Products/Guidelines/Guidelines_Index.pdf.*

Although different countries have often had different testing requirements for toxicity testing/product safety evaluation, efforts to "harmonize" such testing protocols have resulted in more standardized approaches. The International Conference on Harmonization (ICH) of Technical Requirements for Registration of Pharmaceuticals for Human Use includes regulatory authorities from Europe, Japan, and the United States (primarily the FDA), as well as experts from the pharmaceutical industry in the 3 regions, who worked together to develop internationally recognized scientific and technical approaches to pharmaceutical product registration. ICH has adopted guidelines for most areas of toxicity testing (Table 2-3). In addition to safety assessment (ICH guidelines designated with an "S"), ICH has also established guidelines on quality (Q), efficacy (E), and multidisciplinary (M) topics. (See http://www.ich.org/products/guidelines.html for a description of current ICH guidelines and reviews by Pugsley et al. (2008, 2011) for a detailed discussion of in vitro and in vivo approaches to safety pharmacology that has been informed by the ICH regulatory guidance document for preclinical safety testing of drugs.)

Typically, a tiered approach is used, with subsequent tests dependent on results of initial studies. A general framework for how new chemicals are evaluated for toxicity is shown in Fig 2-13. Early studies require careful chemical evaluation of the compound

or mixture to assess purity, stability, solubility, and other physicochemical factors that could impact the ability of the test compound to be delivered effectively to animals. Once this information is obtained, the chemical structure of the test compound is compared with similar chemicals for which toxicological information is already available. Structure–activity relationships may be derived from a review of existing toxicological literature, and can provide additional guidance on design of acute and repeated-dose experiments, and what specialized tests need to be completed. Once such basic information has been compiled and evaluated, the test compound is then administered to animals in acute and repeated-dose studies.

Because of increased societal pressure to reduce or eliminate the use of animals in toxicity testing, while also ensuring that new chemicals do not represent unreasonable risks to human health or the environment, regulatory agencies have been encouraging new approaches to descriptive toxicity tests that do not rely on laboratory animals. For example, the European Union (EU) promulgated an important regulatory initiative for the Registration, Evaluation, Authorisation and Restriction of Chemicals (REACH). The implementation of REACH "will have significant impact on applied toxicology and exposure assessment by stimulating innovation in sampling and analysis, toxicology testing, exposure modeling, alternative toxicity testing, and risk assessment practices"

(Williams *et al.*, 2009b). Alternative, in vitro approaches to toxicity assessment are likely to transform the way that product safety evaluation is done in the future, although the standard approaches to hazard evaluation described in this section are likely to continue as the mainstay of toxicity evaluation for the next decade, irrespective of the fact that some areas, such as acute toxicity testing and eye irritation, are likely to be largely replaced by in vitro tests in the next decade (Ukelis *et al.*, 2008).

The development of new "omics" technologies (discussed later in this section) may have profound implications for toxicity testing in the future (NAS/NRC, 2007). The recognition that many of the existing chemicals in commercial use today, as well as new chemicals being introduced into commerce, have little toxicological information about them has prompted calls for new "high-throughput" approaches to toxicity testing that will allow at least basic hazard characterization for the thousands of untested chemicals currently in the marketplace, as well as the many new chemicals that are introduced each year. A report from the National Academy of Sciences/National Research Council in 2007 called for a "paradigm shift" in how toxicity testing is done (NAS/NRC, 2007). A key component of this new vision on toxicity testing is the use of an extensive battery of in vitro tests to evaluate "pathways" of toxicity (NAS/NRC, 2010). The hope is that new technologies in genomics, transcriptomics, proteomics, metabolomics, and bioinformatics (discussed later in this chapter) can be combined with automated high-throughput technologies to create a tiered structure for toxicity testing. The approach to using biochemical and molecular pathway-based analyses, rather than apical end points (eg, target organ damage, mutagenesis, carcinogenesis, reproductive and developmental effects), to identify potentially problematic chemicals early in their development is particularly attractive from a time frame and economic perspective (NAS/NRC, 2010). However, it is also recognized that validation of such tests is critically important to the reliable use of such screening technologies, and that the traditional in vivo studies described in the following section will continue to serve an important role in hazard evaluations for years to come, especially as a means of validating new high-throughput screening approaches.

## Acute Toxicity Testing

Generally, the first toxicity test performed on a new chemical is acute toxicity, determined from the administration of a single exposure. The objectives of acute toxicity testing are to: (1) provide an estimate of the intrinsic toxicity of the substance, often times expressed as an approximate LD (eg, $LD_{50}$), (2) provide information on target organs and other clinical manifestations of toxicity, (3) identify species differences and susceptible species, (4) establish the reversibility of the toxic response, and (5) provide information that will assist in the design and dose selection for longer-term (subchronic, chronic) studies. It should be noted that the ICH recommended in 1991 (D'Arcy and Harron, 1992) the elimination of $LD_{50}$ determinations for pharmaceuticals, although other regulatory requirements, for example, pesticide registration, may still require determinations of $LD_{50}$s.

The $LD_{50}$ and other acute toxic effects are determined after 1 or more routes of administration (1 route being oral or the intended route of exposure) in 1 or more species. The species most often used are the mouse and rat. Studies are performed in both adult male and female animals. Food is often withheld the night before dosing. The number of animals that die in a 14-day period after a single dosage is tabulated. In addition to mortality and weight, daily examination of test animals should be conducted for signs

of intoxication, lethargy, behavioral modifications, morbidity, food consumption, and so on.

Determination of the $LD_{50}$ has become a public issue because of increasing concern for the welfare and protection of laboratory animals. The $LD_{50}$ is not a biological constant. Many factors influence toxicity and thus may alter the estimation of the $LD_{50}$ in any particular study. Factors such as animal strain, age, and weight, type of feed, caging, pretrial fasting time, method of administration, volume and type of suspension medium, and duration of observation have all been shown to influence adverse responses to toxic substances. These and other factors have been discussed in detail in earlier editions of this textbook (Doull, 1980). Because of this inherent variability in $LD_{50}$ estimates, it is now recognized that for most purposes it is only necessary to characterize the $LD_{50}$ within an order of magnitude range such as 5 to 50 mg/kg, 50 to 500 mg/kg, and so on.

There are several traditional approaches to determining the $LD_{50}$ and its 95% confidence limit as well as the slope of the probit line. The reader is referred to the classic works of Litchfield and Wilcoxon (1949), Bliss (1957), and Finney (1971) for a description of the mechanics of these procedures. Other statistical techniques that require fewer animals, such as the "moving averages" method of Thompson and Weill (Weil, 1952), are available but do not provide confidence limits for the $LD_{50}$ and the slope of the probit line. Finney (1985) has succinctly summarized the advantages and deficiencies of many of the traditional methods. For most circumstances, an adequate estimate of the $LD_{50}$ and an approximation of the 95% confidence intervals can be obtained with as few as 6 to 9 animals, using the "up-and-down" method as modified by Bruce (1985). When this method was compared with traditional methods that typically utilize 40 to 50 animals, excellent agreement was obtained for all 10 compounds tested (Bruce, 1987). In mice and rats the $LD_{50}$ is usually determined as described above, but in the larger species only an approximation of the $LD_{50}$ is obtained by increasing the dose in the same animal until serious toxic effects are evident.

Alternative in vitro approaches to estimating the $LD_{50}$ have been proposed. For example, the *Registry of Cytotoxicity* (RC), originally published in German in 1998 (Halle, 2003), was developed by linear regression analysis of the mean $IC_{50}$ values determined in mammalian cells in culture and the $LD_{50}$ values reported in the literature from various laboratory species. Using this approach, the authors predicted (within a reasonable dose range) the acute oral $LD_{50}$ for 252 of 347 xenobiotics, and the intravenous $LD_{50}$ for rats and/or mice for 117 of 150 xenobiotics (Halle, 2003). Of course, such in vitro approaches do not fully account for dispositional effects that could result in large species differences in acute toxicity, but do provide a rapid first approximation of acute toxicity without the use of experimental animals.

If there is a reasonable likelihood of substantial exposure to the material by dermal or inhalation exposure, acute dermal and acute inhalation studies are performed. When animals are exposed acutely to chemicals in the air they breathe or the water they (fish) live in, the dose the animals receive is usually not known. For these situations, the lethal concentration 50 ($LC_{50}$) is usually determined, that is, the concentration of chemical in the air or water that causes death to 50% of the animals. In reporting an $LC_{50}$, it is imperative that the time of exposure be indicated. The acute dermal toxicity test is usually performed in rabbits. The site of application is shaved. The test substance is kept in contact with the skin for 24 hours by wrapping the skin with an impervious plastic material. At the end of the exposure period, the wrapping is removed and the skin is wiped to remove any test substance still remaining. Animals are observed at various intervals for 14 days, and the $LD_{50}$ is calculated. If no

toxicity is evident at 2 g/kg, further acute dermal toxicity testing is usually not performed. Acute inhalation studies are performed that are similar to other acute toxicity studies except that the route of exposure is inhalation. Most often, the length of exposure is 4 hours.

By themselves $LD_{50}$ and $LC_{50}$ values are of limited significance given the growing sophistication of target organ toxicity end points and mechanistic analysis. The most meaningful scientific information derived from acute toxicity tests comes from clinical observations and post-mortem examination of animals rather than from the specific $LD_{50}$ value.

## Skin and Eye Irritations

The ability of a chemical to irritate the skin and eye after an acute exposure is usually determined in rabbits. For the dermal irritation test (Draize test), rabbits are prepared by removal of fur on a section of the back by electric clippers. The chemical is applied to the skin (0.5 mL of liquid or 0.5 g of solid) under 4 covered gauze patches (1 in square; 1 intact and 2 abraded skin sites on each animal) and usually kept in contact for 4 hours. The nature of the covering patches depends on whether occlusive, semiocclusive, or nonocclusive tests are desired. For occlusive testing, the test material is covered with an impervious plastic sheet; for semiocclusive tests, a gauze dressing may be used. Occasionally, studies may require that the material be applied to abraded skin. The degree of skin irritation is scored for erythema (redness), eschar (scab), and edema (swelling) formation, and corrosive action. These dermal irritation observations are repeated at various intervals after the covered patch has been removed. To determine the degree of ocular irritation, the chemical is instilled into 1 eye (0.1 mL of liquid or 100 mg of solid) of each test rabbit. The contralateral eye is used as the control. The eyes of the rabbits are then examined at various times after application.

Controversy over this test has led to the development of alternative in vitro models for evaluating cutaneous and ocular toxicity of substances. The various in vitro methods that have been evaluated for this purpose include epidermal keratinocyte and corneal epithelial cell culture models. Several commercially available "reconstructed human epidermis" models have been developed explicitly for the purposes of in vitro skin irritation and corrosion tests (Netzlaff et al., 2005).

## Sensitization

Information about the potential of a chemical to sensitize skin is needed in addition to irritation testing for all materials that may repeatedly come into contact with the skin. Numerous procedures have been developed to determine the potential of substances to induce a sensitization reaction in humans (delayed hypersensitivity reaction), including the Draize test, the open epicutaneous test, the Buehler test, Freund's complete adjuvant test, the optimization test, the split adjuvant test, and the guinea pig maximization test (Hayes et al., 2008; Rush et al., 1995). Although they differ in regard to route and frequency of duration, they all utilize the guinea pig as the preferred test species. In general, the test chemical is administered to the shaved skin topically, intradermally, or both and may include the use of adjuvant to enhance the sensitivity of the assay. Multiple administrations of the test substance are generally given over a period of 2 to 4 weeks. Depending on the specific protocol, the treated area may be occluded. Approximately 2 to 3 weeks after the last treatment, the animals are challenged with a nonirritating concentration of the test substance and the development of erythema is evaluated.

## Subacute (Repeated-Dose Study)

Subacute toxicity tests are performed to obtain information on the toxicity of a chemical after repeated administration and as an aid to establish doses for subchronic studies. A typical protocol is to give 3 to 4 different dosages of the chemicals to the animals by mixing it in their feed. For rats, 10 animals per sex per dose are often used; for dogs, 3 dosages and 3 to 4 animals per sex are used. Clinical chemistry and histopathology are performed after either 14 or 28 days of exposure, as described in the section "Subchronic."

## Subchronic

The toxicity of a chemical after subchronic exposure is then determined. Subchronic exposure can last for different periods of time, but 90 days is the most common test duration. The principal goals of the subchronic study are to establish a NOAEL and to further identify and characterize the specific organ or organs affected by the test compound after repeated administration. One may also obtain a "lowest observed adverse effect level" (LOAEL) as well as the NOAEL for the species tested. The numbers obtained for NOAEL and LOAEL will depend on how closely the dosages are spaced and the number of animals examined. Determinations of NOAELs and LOAELs have numerous regulatory implications. For example, the EPA utilizes the NOAEL to calculate the *reference dose* (RfD), which may be used to establish regulatory values for "acceptable" pollutant levels (Barnes and Dourson, 1988) (see Chap. 4). An alternative to the NOAEL approach referred to as the *benchmark dose* uses all the experimental data to fit 1 or more dose–response curves (Crump, 1984). These curves are then used to estimate a benchmark dose that is defined as "the statistical lower bound on a dose corresponding to a specified level of risk" (Allen et al., 1994a). Although subchronic studies are frequently the primary or sole source of experimental data to determine both the NOAEL and the benchmark dose, these concepts can be applied to other types of toxicity testing protocols, such as that for chronic toxicity or developmental toxicity (Allen et al., 1994a,b; Faustman et al., 1994) (see also Chap. 4 for a complete discussion of the derivation and use of NOAELs, RfDs, and benchmark doses). If chronic studies have been completed, these data are generally used for NOAEL and LOAEL estimates in preference to data from subchronic studies.

A subchronic study is usually conducted in 2 species (usually rat and dog for FDA, and mouse for EPA) by the route of intended exposure (usually oral). At least 3 doses are employed (a high dose that produces toxicity but does not cause more than 10% fatalities, a low dose that produces no apparent toxic effects, and an intermediate dose) with 10 to 20 rodents and 4 to 6 dogs of each sex per dose. Each animal should be uniquely identified with permanent markings such as ear tags, tattoos, or electronically coded microchip implants. Only healthy animals should be used, and each animal should be housed individually in an adequately controlled environment. When the test compound is administered in the diet over a prolonged period of time (subchronic and chronic studies), the concentration in the diet should be adjusted periodically (weekly for the first 12–14 weeks) to maintain a constant intake of material based on food consumption and rate of change in body weight (Wilson et al., 2008). Animals should be observed once or twice daily for signs of toxicity, including changes in body weight, diet consumption, changes in fur color or texture, respiratory or cardiovascular distress, motor and behavioral abnormalities, and palpable masses. All premature deaths should be recorded and necropsied as soon as possible. Severely moribund animals should be terminated immediately to preserve tissues and reduce unnecessary suffering.

At the end of the 90-day study, all the remaining animals should be terminated and blood and tissues should be collected for further analysis. The gross and microscopic condition of the organs and tissues (about 15–20) and the weight of the major organs (about 12) are recorded and evaluated. Hematology and blood chemistry measurements are usually done before, in the middle of, and at the termination of exposure. Hematology measurements usually include hemoglobin concentration, hematocrit, erythrocyte counts, total and differential leukocyte counts, platelet count, clotting time, and prothrombin time. Clinical chemistry determinations commonly made include glucose, calcium, potassium, urea nitrogen, ALT, serum AST, gamma-glutamyltranspeptidase (GGT), sorbitol dehydrogenase, lactic dehydrogenase, alkaline phosphatase, creatinine, bilirubin, triglycerides, cholesterol, albumin, globulin, and total protein. Urinalysis is usually performed in the middle of and at the termination of the testing period and often includes determination of specific gravity or osmolarity, pH, proteins, glucose, ketones, bilirubin, and urobilinogen as well as microscopic examination of formed elements. If humans are likely to have significant exposure to the chemical by dermal contact or inhalation, subchronic dermal and/or inhalation experiments may also be required. Subchronic toxicity studies not only characterize the dose–response relationship of a test substance after repeated administration but also provide data for a more reasonable prediction of appropriate doses for chronic exposure studies.

For chemicals that are to be registered as drugs, acute and subchronic studies (and potentially additional special tests if a chemical has unusual toxic effects or therapeutic purposes) must be completed before the company can file an Investigational New Drug (IND) application with the FDA. If the application is approved, clinical trials can commence. At the same time phase I, phase II, and phase III clinical trials are performed, chronic exposure of the animals to the test compound can be carried out in laboratory animals, along with additional specialized tests.

## Chronic

Long-term or chronic exposure studies are performed similarly to subchronic studies except that the period of exposure is longer than 3 months. In rodents, chronic exposures are usually for 6 months to 2 years. Chronic studies in nonrodent species are usually for 1 year but may be longer. The length of exposure is somewhat dependent on the intended period of exposure in humans. For example, for pharmaceuticals, the ICH S4 guidance calls for studies of 6 months in duration in rodents, and 9 months in nonrodents. However, if the chemical is a food additive with the potential for lifetime exposure in humans, a chronic study up to 2 years in duration is likely to be required.

Dose selection is critical in these studies to ensure that premature mortality from chronic toxicity does not limit the number of animals that survive to a normal life expectancy. Most regulatory guidelines require that the highest dose administered be the estimated maximum tolerable dose (MTD, also commonly referred to as the "minimally toxic dose"). This is generally derived from subchronic studies, but additional longer studies (eg, 6 months) may be necessary if delayed effects or extensive cumulative toxicity are indicated in the 90-day subchronic study. The MTD has had various definitions (Haseman, 1985). It has been defined by some regulatory agencies as the dose that suppresses body weight gain slightly (ie, 10%) in a 90-day subchronic study (Reno, 1997). However, regulatory agencies may also consider the use of parameters other than weight gain, such as physiological and pharmacokinetic considerations and urinary metabolite profiles, as indicators

of an appropriate MTD (Reno, 1997). Generally, 1 or 2 additional doses, usually fractions of the MTD (eg, one-half and one-quarter MTD), and a control group are tested.

Chronic toxicity tests may include a consideration of the carcinogenic potential of chemicals so that a separate lifetime feeding study that addresses carcinogenicity does not have to be performed. However, specific chronic studies designed to assess the carcinogenic potential of a substance may be required (see below).

## Developmental and Reproductive Toxicity

The effects of chemicals on reproduction and development also need to be determined. *Developmental toxicology* is the study of adverse effects on the developing organism occurring anytime during the life span of the organism that may result from exposure to chemical or physical agents before conception (either parent), during prenatal development, or postnatally until the time of puberty. *Teratology* is the study of defects induced during development between conception and birth (see Chap. 10). *Reproductive toxicology* is the study of the occurrence of adverse effects on the male or female reproductive system that may result from exposure to chemical or physical agents (see Chap. 20).

Several types of animal tests are utilized to examine the potential of an agent to alter development and reproduction. (For a detailed description of reproductive and developmental toxicity testing procedures, see Christian [2008].) General fertility and reproductive performance (segment I) tests are usually performed in rats with 2 or 3 doses (20 rats per sex per dose) of the test chemical (neither produces maternal toxicity). Males are given the chemical 60 days and females 14 days before mating. The animals are given the chemical throughout gestation and lactation. Typical observations made include the percentage of females that become pregnant, the number of stillborn and live offspring, and the weight, growth, survival, and general condition of the offspring during the first 3 weeks of life.

The potential of chemicals to disrupt normal embryonic and/or fetal development (teratogenic effects) is also determined in laboratory animals. Current guidelines for these segment II studies call for the use of 2 species, including 1 nonrodent species (usually rabbits). Teratogens are most effective when administered during the first trimester, the period of organogenesis. Thus, the animals (usually 12 rabbits and 24 rats or mice per group) are usually exposed to 1 of 3 dosages during organogenesis (days 7-17 in rodents and 7-19 in rabbits), and the fetuses are removed by cesarean section a day before the estimated time of delivery (gestational days 29 for rabbit, 20 for rat, and 18 for mouse). The uterus is excised and weighed and then examined for the number of live, dead, and resorbed fetuses. Live fetuses are weighed; half of each litter is examined for skeletal abnormalities and the remaining half for soft tissue anomalies.

The perinatal and postnatal toxicities of chemicals also are often examined (segment III). This test is performed by administering the test compound to rats from the 15th day of gestation throughout delivery and lactation and determining its effect on the birth weight, survival, and growth of the offspring during the first 3 weeks of life.

In some instances a multigenerational study may be chosen, often in place of segment III studies, to determine the effects of chemicals on the reproductive system. At least 3 dosage levels are given to groups of 25 female and 25 male rats shortly after weaning (30–40 days of age). These rats are referred to as the $F_0$ generation. Dosing continues throughout breeding (about 140 days of age), gestation, and lactation. The offspring ($F_1$ generation) have

thus been exposed to the chemical in utero, via lactation, and in the feed thereafter. When the $F_1$ generation is about 140 days old, about 25 females and 25 males are bred to produce the $F_2$ generation, and administration of the chemical is continued. The $F_2$ generation is thus also exposed to the chemical in utero and via lactation. The $F_1$ and $F_2$ litters are examined as soon as possible after delivery. The percentage of $F_0$ and $F_1$ females that get pregnant, the number of pregnancies that go to full term, the litter size, the number of still-born, and the number of live births are recorded. Viability counts and pup weights are recorded at birth and at 4, 7, 14, and 21 days of age. The fertility index (percentage of mating resulting in pregnancy), gestation index (percentage of pregnancies resulting in live litters), viability index (percentage of animals that survive 4 days or longer), and lactation index (percentage of animals alive at 4 days that survived the 21-day lactation period) are then calculated. Gross necropsy and histopathology are performed on some of the parents ($F_0$ and $F_1$), with the greatest attention being paid to the reproductive organs, and gross necropsy is performed on all weanlings.

The International Conference on Harmonization (ICH) guidelines provide for flexible guidelines that address 6 "ICH stages" of development: premating and conception (stage A), conception to implantation (stage B), implantation to closure of the hard palate (stage C), closure of the hard palate to end of pregnancy (stage D), birth and weaning (stage E), and weaning to sexual maturity (stage F). All of these stages are covered in the segment I to segment III studies described above (Christian, 2008).

Numerous short-term tests for teratogenicity have been developed (Faustman, 1988). These tests utilize whole-embryo culture, organ culture, and primary and established cell cultures to examine developmental processes and estimate the potential teratogenic risks of chemicals. Many of these in utero test systems are under evaluation for use in screening new chemicals for teratogenic effects. These systems vary in their ability to identify specific teratogenic events and alterations in cell growth and differentiation. In general, the available assays cannot identify functional or behavioral teratogens (Faustman, 1988).

## Mutagenicity

Mutagenesis is the ability of chemicals to cause changes in the genetic material in the nucleus of cells in ways that allow the changes to be transmitted during cell division. Mutations can occur in either of 2 cell types, with substantially different consequences. Germinal mutations damage DNA in sperm and ova, which can undergo meiotic division and therefore have the potential for transmission of the mutations to future generations. If mutations are present at the time of fertilization in either the egg or the sperm, the resulting combination of genetic material may not be viable, and the death may occur in the early stages of embryonic cell division. Alternatively, the mutation in the genetic material may not affect early embryogenesis but may result in the death of the fetus at a later developmental period, resulting in abortion. Congenital abnormalities may also result from mutations. Somatic mutations refer to mutations in all other cell types and are not heritable but may result in cell death or transmission of a genetic defect to other cells in the same tissue through mitotic division. Because the initiating event of chemical carcinogenesis is thought to be a mutagenic one, mutagenic tests are often used to screen for potential carcinogens.

Numerous in vivo and in vitro procedures have been devised to test chemicals for their ability to cause mutations. Some genetic alterations are visible with the light microscope. In this case, cytogenetic analysis of bone marrow smears is used after the animals have been exposed to the test agent. Because some mutations are

incompatible with normal development, the mutagenic potential of a chemical can also be evaluated by the dominant lethal test. This test is usually performed in rodents. The male is exposed to a single dose of the test compound and then is mated with 2 untreated females weekly for 8 weeks. The females are killed before term, and the number of live embryos and the number of corpora lutea are determined.

The test for mutagens that has received the widest attention is the Salmonella/microsome test developed by Ames et al. (1975). This test uses several mutant strains of Salmonella typhimurium that lack the enzyme phosphoribosyl ATP synthetase, which is required for histidine synthesis. These strains are unable to grow in a histidine-deficient medium unless a reverse or back mutation to the wild type has occurred. Other mutations in these bacteria have been introduced to enhance the sensitivity of the strains to mutagenesis. The 2 most significant additional mutations enhance penetration of substances into the bacteria and decrease the ability of the bacteria to repair DNA damage. Because many chemicals are not mutagenic or carcinogenic unless they are biotransformed to a toxic product by enzymes in the endoplasmic reticulum (microsomes), rat liver microsomes are usually added to the medium containing the mutant strain and the test chemical. The number of reverse mutations is then quantified by the number of bacterial colonies that grow in a histidine-deficient medium.

Strains of yeast have recently been developed that detect genetic alterations arising during cell division after exposure to nongenotoxic carcinogens as well as mutations that arise directly from genotoxic carcinogens. This test identifies deletions of genetic material that occur during recombination events in cell division that may result from oxidative damage to DNA, direct mutagenic effects, alterations in fidelity of DNA repair, and/or changes in cell cycle regulation (Galli and Schiestl, 1999). Mutagenicity is discussed in detail in Chap. 9.

With the advent of techniques that readily allow manipulation of the mouse genome, transgenic animals have been developed that allow for in vivo assessment of mutagenicity of compounds. For example, 2 commercially available mouse strains, the "MutaMouse" and "Big Blue," contain the lac operon of E. coli that has been inserted into genomic DNA using a lambda phage to DNA to produce a recoverable shuttle vector. Stable, homozygous strains of these transgenic animals (both mice and rats have been engineered) can be exposed to potential mutagenic agents. Following in vivo exposure, the target lac genes can be recovered from virtually any cell type or organ and analyzed for mutations (Brusick et al., 2008).

## Oncogenicity Bioassays

Oncogenicity studies are both time consuming and expensive, and are usually only done when there is reason to suspect that a chemical may be carcinogenic, or when there may be wide spread, long-term exposures to humans (eg, widely used food additives, drinking water contaminants, or pharmaceuticals that are likely to be administered repeatedly for long periods of time). Chemicals that test positive in several mutagenicity assays are likely to be carcinogenic, and thus are frequent candidates for oncogenicity bioassay assessment. In the United States, the National Toxicology Program (NTP) has the primary responsibility for evaluating non-drug chemicals for carcinogenic potential. For pharmaceuticals, the FDA may require the manufacturer to conduct oncogenicity studies as part of the preclinical assessment, depending on the intended use of the drug, and the results of mutagenicity assays and other toxicological data.

38



Figure 2-14. *Statistical limitations in the power of experimental animal studies to detect tumorigenic effects.*

Studies to evaluate the oncogenic (carcinogenic) potential of chemicals are usually performed in rats and mice and extend over the average lifetime of the species (18 months to 2 years for mice, 2–2.5 years for rats). To ensure that 30 rats per dose survive the 2-year study, 60 rats per group per sex are often started in the study. Both gross and microscopic pathological examinations are made not only on animals that survive the chronic exposure but also on those that die prematurely. The use of the MTD in carcinogenicity has been the subject of controversy. The premise that high doses are necessary for testing the carcinogenic potential of chemicals is derived from the statistical and experimental design limitations of chronic bioassays. Consider that a 0.5% increase in cancer incidence in the United States would result in over 1 million additional cancer deaths each year—clearly an unacceptably high risk. However, identifying with statistical confidence a 0.5% incidence of cancer in a group of experimental animals would require a minimum of 1000 test animals, and this assumes that no tumors were present in the absence of exposure (zero background incidence).

Fig. 2-14 shows the statistical relationship between minimum detectable tumor incidence and the number of test animals per group. This curve shows that in a chronic bioassay with 50 animals per test group, a tumor incidence of about 8% could exist even though no animals in the test group had tumors. This example assumes that there are no tumors in the control group. These statistical considerations illustrate why animals are tested at doses higher than those that occur in human exposure. Because it is impractical to use the large number of animals that would be required to test the potential carcinogenicity of a chemical at the doses usually encountered by people, the alternative is to assume that there is a relationship between the administered dose and the tumorigenic response and give animals doses of the chemical that are high enough to produce a measurable tumor response in a reasonable size test group, such as 40 to 50 animals per dose. The limitations of this approach are discussed in Chap. 4. For nonmutagenic pharmaceuticals agents, ICH S1C provides the following guidance on dose selection for oncogenicity studies: "The doses selected for rodent bioassays for nongenotoxic pharmaceuticals should provide an exposure to the agent that (1) allow an adequate margin of safety over the human therapeutic exposure, (2) are tolerated without significant chronic physiological dysfunction and are compatible with good survival, (3) are guided by a comprehensive set of animal and human data that focus broadly on the properties of the agent and the suitability of the animal (4) and permit data interpretation in the context of clinical use."

Another approach for establishing maximum doses for use in chronic animal toxicity testing of drugs is often used for substances for which basic human pharmacokinetic data are available (eg, new pharmaceutical agents that have completed phase I clinical trials). For chronic animal studies performed on drugs where single-dose human pharmacokinetic data are available, a daily dose that would provide an area under the curve (AUC) in laboratory animals equivalent to 25 times the AUC in humans given the highest (single) daily dose to be used therapeutically may be used, rather than the MTD. Based on a series of assumptions regarding allometric scaling between rodents and humans (Table 2-2), the ICH noted that it may not be necessary to exceed a dose of 1500 mg/kg per day where there is no evidence of genotoxicity, and where the maximum recommended human dose does not exceed 500 mg per day.

Most regulatory guidelines require that both benign and malignant tumors be reported in oncogenicity bioassays. Statistical increases above the control incidence of tumors (either all tumors or specific tumor types) in the treatment groups are considered indicative of carcinogenic potential of the chemical unless there are qualifying factors that suggest otherwise (lack of a dose response, unusually low incidence of tumors in the control group compared with "historic" controls, etc; Huff, 1999). Thus, the conclusion as to whether a given chronic bioassay is positive or negative for carcinogenic potential of the test substance requires careful consideration of background tumor incidence. Properly designed chronic oncogenicity studies require that a concurrent control group matched for variables such as age, diet, and housing conditions be used. For some tumor types, the "background" incidence of tumors is surprisingly high. Fig. 2-15 shows the background tumor incidence for



Figure 2-15. *Most frequently occurring tumors in untreated control rats from recent NTP 2-year rodent carcinogenicity studies. The values shown represent the mean ± SD of the percentage of animals developing the specified tumor type at the end of the 2-year study. The values were obtained from 27 different studies involving a combined total of between 1319 and 1353 animals per tumor type.*



**Male B6C3F1 mice**



**Female B6C3F1 mice**

Figure 2-16. *Most frequently occurring tumors in untreated control mice from recent NTP 2-year rodent carcinogenicity studies.* The values shown represent the mean ± SD of the percentage of animals developing the specified tumor type at the end of the 2-year study. The values were obtained from 30 different studies involving a total of between 1447 and 1474 animals per tumor type.

various tumors in male and female F344 rats used in 27 NTP 2-year rodent carcinogenicity studies. The data shown represent the percent of animals in control (nonexposed) groups that developed the specified tumor type by the end of the 2-year study. These studies involved more than 1300 rats of each sex. Fig. 2-16 shows similar data for control (nonexposed) male and female B6C3F1 mice from 30 recent NTP 2-year carcinogenicity studies and includes data from over 1400 mice of each sex. There are several key points that can be derived from these summary data:

1. Tumors, both benign and malignant, are not uncommon events in animals even in the absence of exposure to any known carcinogen.
2. There are numerous different tumor types that develop "spontaneously" in both sexes of both rats and mice, but at different rates.
3. Background tumors that are common in 1 species may be uncommon in another (eg, testicular interstitial cell adenomas are very common in male rats but rare in male mice; liver adenomas/carcinomas are about 10 times more prevalent in male mice than in male rats).
4. Even within the same species and strain, large gender differences in background tumor incidence are sometimes observed (eg, adrenal gland pheochromocytomas are about 7 times more prevalent in male F344 rats than in female F344 rats; lung and liver tumors are twice as prevalent in male B6C3F1 mice as in female B6C3F1 mice).
5. Even when the general protocols, diets, environment, strain and source of animals, and other variables are relatively constant, background tumor incidence can vary widely, as shown by the relatively large SDs for some tumor types in the NTP

bioassay program. For example, the range in liver adenoma/carcinoma incidence in 30 different groups of unexposed (control) male B6C3F1 mice went from a low of 10% to a high of 68%. Pituitary gland adenomas/carcinomas ranged from 12% to 60% and 30% to 76% in unexposed male and female F344 rats, respectively, and from 0% to 36% in unexposed female B6C3F1 mice.

Taken together, these data demonstrate the importance of including concurrent control animals in such studies. In addition, comparisons of the concurrent control results to "historic" controls accumulated over years of study may be important in identifying potentially spurious "false-positive" results. The relatively high variability in background tumor incidence among groups of healthy, highly inbred strains of animals maintained on nutritionally balanced and consistent diets in rather sterile environments highlights the dilemma in interpreting the significance of both positive and negative results in regard to the human population, which is genetically diverse, has tremendous variability in diet, nutritional status, and overall health, and lives in an environment full of potentially carcinogenic substances, both natural and human-made.

Finally, it should be noted that both inbred and outbred strains have distinct background tumor patterns and the NTP and most other testing programs select strains based on the particular needs of the agent under study. For example, the NTP used the Wistar rat for chemicals that may have the testis as a target organ, based on acute, subchronic, or other bioassay results. Similarly, the NTP used the Sprague–Dawley strain of rat in studies of estrogenic agents such as genistein because its mammary tumors are responsive to estrogenic stimulation, as are humans'.

## Neurotoxicity Assessment

Neurotoxicity or a neurotoxic effect is defined as an adverse change in the chemistry, structure, or function of the nervous system following exposure to a chemical or physical agent. The structure, function, and development of the nervous system and its vulnerability to chemicals are examined in Chap. 16. When considering the potential neurological effects of a compound, effects may be on the central or peripheral nervous system or related to exposure that occurred during development or as an adult. The developing nervous system is particularly sensitive to chemical exposures (see Chap. 10).

In vitro systems often using cell culture techniques are a rapidly developing area of neurotoxicity assessment. Specific cell lines are available to examine effects on neuron or glial cells such as proliferation, migration, apoptosis, synaptogenesis, and other end points. In vitro assays have a number of potential advantages including minimizing the use of animal, lower costs, and adaptable to high-throughput screening. It is also possible to use an in vitro model to examine the interaction of chemicals, such as food additives, on neuronal cells (Lau *et al.*, 2006). The principles and challenges of in vitro neurotoxicity testing are well described (Claudio, 1992; Tiffany-Castiglioni, 2004).

Procedures for the neurobehavioral evaluation of animals were initially developed as part of the scientific investigation of behavioral motivation. Some of these procedures were then used to evaluate the neuropharmacological properties of new drugs. Now animals are commonly used to evaluate the neurotoxic properties of chemicals. A wide range of adult and developmental animal tests are used to access neurobehavioral function. In addition, neuropathological assessment is an important part of the neurotoxicity evaluation and

best practices have been developed for developmental neurotoxicity (DNT) (Bolon *et al.*, 2006). Irwin developed a basic screen for behavioral function in mice (Irwin, 1968), which was subsequently refined to the functional observational battery (FOB) (Moser, 2000). The FOB can also be used in the evaluation of drug safety (Redfern *et al.*, 2005).

The US EPA established a protocol for the evaluation of DNT in laboratory animals (US EPA 870.6300 and OECD 426) (EPA, 1998; OECD, 2004). These protocols include tests of neurobehavioral function, such as auditory startle, learning and memory function, changes in motor activity, and neuropathological examination and morphometric analysis. Methods and procedures for DNT evaluation are well established (Claudio *et al.*, 2000; Cory-Slechta *et al.*, 2001; Dorman *et al.*, 2001; Garman *et al.*, 2001; Mileson and Ferenc, 2001). Recent studies examine the neurotoxicity of multiple chemical exposures in animals (Moser *et al.*, 2006). Methods are also available to examine cognitive measures on weanling rodents in DNT studies (Ehman and Moser, 2006). Nonhuman primates have been invaluable in evaluating the effects of neurotoxicants and the risk assessment process (Burbacher and Grant, 2000). Sophisticated assessment of operant behavior, and learning and memory assessment of rodents, has been used to evaluate the effects of lead (Cory-Slechta, 1995, 1996, 2003). Monkeys can also be used to evaluate the low-level effects of neurotoxicants such as mercury on vision, auditory function, and vibration sensitivity (Burbacher *et al.*, 2005; Rice and Gilbert, 1982, 1992, 1995). There is remarkable concordance between human and animal neurotoxicity assessment, for example, in lead, mercury, and PCBs (Rice, 1995).

Human testing for the neurological effects of occupational exposures to chemicals (Anger, 2003; Farahat *et al.*, 2003; Kamel *et al.*, 2003; McCauley *et al.*, 2006), and even the neurotoxic effects of war (Binder *et al.*, 1999, 2001), is advancing rapidly. These methods have also been applied to Hispanic workers (Rohlman *et al.*, 2001b) and populations with limited education or literacy (Rohlman *et al.*, 2003). The WHO has also recommended a test battery for humans (Anger *et al.*, 2000). There are also neurobehavioral test batteries for assessing children (Rohlman *et al.*, 2001a). Evaluation of the childhood neurological effects of lead (Lanphear *et al.*, 2005; Needleman and Bellinger, 1991) and mercury (Myers *et al.*, 2000) has added enormously to our understanding of the health effects of these chemicals and to the methodology of human neurobehavioral testing.

In summary, the neurotoxicological evaluation is an important aspect of developing risk assessments for environmental chemicals and drugs.

## Immunotoxicity Assessment

Under normal conditions, the immune system is responsible for host defense against pathogenic infections and certain cancers. However, environmental exposures can alter immune system development and/or function and lead to hypersensitivity, autoimmunity, or immunosuppression, the outcome of which may be expressed as a pathology in most any organ or tissue (see Chap. 12). Our understanding of the biological processes underlying immune system dysfunction remains incomplete. However, advances in molecular biology (including use of transgenic/knockout mice), analytic methods (including gene expression arrays and multiparameter flow cytometry), animal models (including adoptive transfers in immunocompromised mice and host resistance to viral, bacterial, or tumor cell challenge), and other methods are greatly advancing our knowledge.

From a toxicologist's perspective, evaluation of immune system toxicity represents special challenges. Development of hypersensitivity can take various forms, depending on the mechanism underlying the associated immune response, and standard assumptions regarding dose–response relationships may not necessarily apply. For example, a single or incidental exposure to beryllium has been associated with chronic beryllium disease in some individuals. We are only just beginning to understand the biological basis underlying such individual susceptibility. In the case of chronic beryllium disease, a genetic polymorphism in a gene involved in antigen recognition may be associated with increased susceptibility (see Bartell *et al.*, 2000). Although our ability to predict immunogenicity remains poor, research efforts are continuing to identify aspects of the chemical and the individual that confer immunogenicity and underlie hypersensitivity. For example, the increasing incidence of allergic asthma among preschool-age children in the United States since the 1980s may be associated with exposure to allergens (eg, dust mites, molds, and animal dander), genetic factors, and other factors in the in utero and postnatal environment (see Donovan and Finn, 1999; Armstrong *et al.*, 2005).

Immunosuppression is another form of immune system toxicity, which can result in a failure to respond to pathogenic infection, a prolonged infection period, or expression of a latent infection or cancer. Various chemicals have been associated with immunosuppression. Broad-spectrum and targeted immunosuppressive chemicals are designed and used therapeutically to reduce organ transplant rejection or suppress inflammation. However, a large number of chemicals have been associated with immunosuppression, including organochlorine pesticides, diethylstilbesterol, lead, and halogenated aromatic hydrocarbons (including TCDD), and exposures that occur during critical stages may present special risk to development (Holladay, 2005).

Autoimmunity is a specific immune system disorder in which components of the immune system attack normal (self) tissues. Cases of autoimmunity have been reported for a wide range of chemicals including therapeutic drugs, metals, pesticides, and solvents. As with other forms of immune system toxicity, autoimmunity can present in most any tissue.

Finally, new forms of immunotoxicity are appearing based on novel forms of clinical therapy and immunomodulation. These include the variously classified "tumor lysis syndromes" and "cytokine storms" that arise from massive cytokine dysregulation. A recent example involved 6 healthy volunteers who had enrolled in a phase 1 clinical trial in the United Kingdom who developed a severe cytokine response to an anti-CD28 monoclonal antibody leading to systemic organ failures (Bhogal and Combes, 2006). Such cases are stark reminders of the challenges we face in understanding how the immune system is regulated, developing reliable test systems for identifying such risks prior to human use, and developing safe means for testing these agents in humans.

As described in Chap. 12, current practice for evaluating potential toxic effects of xenobiotic exposures on the immune system involves a tiered approach to immunotoxicity screening (Luster *et al.*, 2003). This tiered approach is generally accepted worldwide in the registration of novel chemical and therapeutic products. Most recently, final guidance to the pharmaceutical industry was published in April 2006 by the ICH of Technical Requirements for Registration of Pharmaceuticals for Human Use (Table 2-3). This guidance, which applies to the nonclinical (animal) testing of human pharmaceuticals, is the accepted standard in the United States, EU, and Japan, and demonstrates the continued commitment by these regulatory bodies to understand the potential risks posed by novel therapeutics.

Tiered testing relies on the concept that standard toxicity studies can provide good evidence for immunotoxicity when considered with known biological properties of the chemical, including structural similarities to known immunomodulators, disposition, and other clinical information, such as increased occurrence of infections or tumors. Evaluation of hematological changes, including differential effects on white blood cells and immunoglobulin changes, and alterations in lymphoid organ weights or histology, can provide strong evidence of potential effects on the immune system. Should such evaluations indicate a potential effect on immune system function, more detailed evaluations may be considered, including the evaluation of functional effects (eg, T-cell-dependent antibody response or natural killer cell activity), flow cytometric immunophenotyping, or host resistance studies. Thus, as with other areas of toxicology, the evaluation of immune system toxicity requires the toxicologist to be vigilant in observing early indications from a variety of sources in developing a weight-of-evidence assessment regarding potential injury/dysfunction.

## Other Descriptive Toxicity Tests

Most of the tests described above will be included in a "standard" toxicity testing protocol because they are required by the various regulatory agencies. Additional tests may be required or included in the protocol to provide information relating a special route of exposure, such as inhalation. Inhalation toxicity tests in animals usually are carried out in a dynamic (flowing) chamber rather than in static chambers to avoid particulate settling and exhaled gas complications. Such studies usually require special dispersing and analytic methodologies, depending on whether the agent to be tested is a gas, vapor, or aerosol; additional information on methods, concepts, and problems associated with inhalation toxicology is provided in Chaps. 15 and 28. The duration of exposure for inhalation toxicity tests can be acute, subchronic, or chronic, but acute studies are more common with inhalation toxicology. Other special types of animal toxicity tests include toxicokinetics (absorption, distribution, biotransformation, and excretion), the development of appropriate antidotes and treatment regimens for poisoning, and the development of analytic techniques to detect residues of chemicals in tissues and other biological materials.

## TOXICOGENOMICS

In the past decade, numerous new genome-based technologies have become available that allow for the large-scale analysis of biological responses to external stimuli. Traditional scientific approaches to elucidate the biochemical and molecular effects of toxic substances focused largely on examining biochemical pathways that were logically connected to observed responses identified through gross pathology, histology, blood chemistry, or behavioral observations. Such "hypothesis-driven" research into understanding mechanism of action remains a mainstay of current scientific investigations in toxicology. However, technologies now available allow one to examine the entire "universe" of biological responses to a toxic substance (Fig. 2-17). These new "hypothesis-generating" technologies include genomics (characterization of much or all of the genome of an organism), transcriptomics (characterization of most or all of the messenger RNAs [mRNAs], or transcriptome, expressed in a given cell/tissue), proteomics (characterization of most or all of the proteins expressed in a given cell/tissue), and metabonomics (characterization of most or all of the small molecules in a cell or tissue, including substrates, products, and cofactors of enzyme reactions). Other "omics" approaches (eg, "lipidomics,"

"nutrigenomics") are being devised to look broadly at the biological response of an organism to change. The integration of all of these levels of molecular function (genomics, transcriptomics, proteomics, metabonomics, etc) to the understanding of how a living organism functions at the cellular level is sometimes referred to as "systems biology" (Weston and Hood, 2004). Because each level of analysis generates a very large quantity of data, the collection, organization, evaluation, and statistical analysis is in itself an enormous undertaking. The field of "bioinformatics" has been developed to address the many computational and statistical challenges of "omics" data. In the field of toxicology, the term "toxicogenomics" is used to define the area of research that "combines transcript, protein and metabolite profiling with conventional toxicology to investigate the interaction between genes and environmental stress in disease causation" (Waters and Fostel, 2004). A conceptual model for how the various new "omics" technologies can be incorporated into toxicological evaluation is shown in Fig. 2-17.

## Genomics

The genome of an organism represents the full complement of genes that are determined at fertilization by the combination of the parental DNA. Thus, each cell of an organism has the same genome, characterized by the nucleotide sequences inherited from its parents. The human genome consists of approximately 3 billion base pairs of deoxyribonucleotides. Within the human genome, there is, on average, about 0.1% variability in DNA sequence between any 2 individuals, and it is these differences that contribute to the uniqueness of each person. Most of this variability exists as "SNPs," although larger segments of DNA may be variable between individuals, including the duplication or loss of entire genes. The identification of particular genetic variants, such as the GSTM1 polymorphism, which might contribute to interindividual differences in susceptibility to chemicals or other environmental factors discussed previously, represents a relatively new and growing area of study that aims to understand the complex interactions between the human genome and the environment (Costa and Eaton, 2006).

Although the genome provides the blueprint for biological function, in order for the genomic information to be utilized in a cell, it must be expressed. Expression of the genome occurs when the coding sequence of DNA is converted to mRNA. For any given cell, transcription of the genomic information contained in that cell is only partial. It is the differential expression of genes in a given cell that is largely responsible for the diverse function of the thousands of different cells, tissues, and organs that constitute an individual organism. Thus, understanding which genes are expressed in a given tissue, at what level, and how toxicants perturb the "transcriptome" is of great relevance to toxicology. In addition to coding for mRNAs that provide the blueprint for protein synthesis, genomic DNA also generates small interfering RNAs (siRNA, microRNAs) that are biologically active and can participate in the regulation of gene expression.

## Epigenetics/Epigenomics

The expanding research into the relatively new field of epigenomics will have important implications for public health and toxicology. The concept of epigenetics, meaning something acting "above or in addition" to genes, was proposed many decades ago, although the application to the full genome (epigenomics) rather than to single or a few genes (epigenetics) is new. Conrad Hal Waddington first postulated in the 1930s that it was not just the genes that shaped development but also the environment that shapes the genes



Figure 2-17. *Conceptual approach for incorporating "omics" technologies and resulting large databases into toxicological evaluation.* Data from experiments that evaluate the effects of a chemical on global patterns of gene expression (transcriptomics), protein content (proteomics), and small molecules/metabolites (metabonomics/metabolomics), combined with genomic information from both the test species (eg, rats, mice) and the target species of interest (eg, humans), are analyzed by computational tools (bioinformatics) for unique or potentially predictive patterns of toxicity. Essential to the use of omics data for predictive toxicology/safety assessment is the ability to reliably tie observed omics patterns to traditional measures of toxicity, such as histopathology and clinical chemistry (phenotypic anchoring). (From Waters and Fostel, 2004, with permission.)

(Holliday, 2006). Understanding a possible mechanism had to wait for a far deeper understanding of DNA and its role in development. Epigenetics has been defined in various ways, with perhaps the strictest definition being "a mitotically or meiotically heritable change in gene expression that occurs independently of an alteration in DNA sequence" (Youngson and Whitelaw, 2008). Typically gene expression is silenced or suppressed, or in some instances activated, by DNA methylation or histone deacetylation—changes that do not alter the nucleotide sequence of the silenced genes (Fig. 2-18). Epigenetic changes can potentially be transgenerational, as suggested in some animal models, which has important implications for toxicological assessment (Rosenfeld, 2010; Skinner, 2011). Given the growing recognition of epigenetics as a means by which environmental factors can alter biological responses, genomic analyses in toxicology may also include techniques to identify toxicant-induced changes in DNA methylation patterns (Watson and Goodman, 2002; LeBaron et al., 2010).

Although classical approaches to toxicology have thoroughly documented the potential for a variety of environmental toxicants, such as thalidomide, alcohol, lead, mercury, and PCBs, to cause adverse effects on the developing organism, more subtle epigenetic changes, which are not associated with either cytotoxicity or mutations, can also result from environmental exposures and thus may have important toxicological implications. Epigenetic changes have been demonstrated to occur from exposure to a variety of environmental hazards, including tobacco smoke, metals, alcohol, phthalates, and BPA (Cheng et al., 2012; Perera and Herbstman, 2011; Bernal and Jirtle, 2010; Baccarelli and Bollati, 2009). Furthermore, epigenetic changes can occur through nutrition, methyl content of diet, intake of folic acid and vitamins, or even social and maternal behavior toward the offspring (Cummings et al., 2010). Epigenetic changes have been causally implicated in cancer, neurodevelopment disorders, autoimmune diseases, diabetes and metabolic disorders, asthma, behavioral disorders, and endocrine disorders (Godfrey et al., 2011; Nystrom and Mutanen, 2009; Zhang and Ho, 2011; Attig et al., 2010). There is also concern chemicals in the environment may induce epigenetic changes in wildlife that could be an important consideration in ecotoxicology (Vandegehuchte and Janssen, 2011; Head et al., 2012). Thus, epigenetic changes induced by xenobiotics, dietary factors, and maternal behavior have important implications for safety assessment and risk assessment for xenobiotics (LeBaron et al., 2010; Goodman et al., 2010; Szyf, 2007).

Thus, it is now evident that methylation of DNA is an important determinant of gene expression in cells and tissues, and exogenous chemicals can interfere with transcriptional function

43



Figure 2-18. *Process and consequence of epigenetic regulation of gene expression* (National Institute of Health).

via alternating DNA methylation (Watson and Goodman, 2002). Importantly, although such epigenetic changes do not result in the alteration of the genomic sequence, they theoretically can result in heritable phenotypic changes; although proof of multigenerational epigenetic changes from environmental exposures has yet to be demonstrated in humans (Baccarelli and Bollati, 2009), several animal models have demonstrated transgenerational epigenetic changes (Skinner, 2011). Thus, genomic analyses in toxicology may also include techniques to identify toxicant-induced changes in DNA methylation patterns to access epigenetic changes and the potential consequences (Watson and Goodman, 2002; Szyf, 2007).

## Transcriptomics

Among the first changes that a cell will exhibit following exposure to a toxic substance is a change in gene expression. The transcriptome (all of the mature mRNA species present in a cell at a given point in time) is dynamic, and represents the steady state between the rate of synthesis (transcription) and degradation of mRNAs in a cell. Toxicologists have utilized the so-called Northern blot analysis to assess the level of expression of individual genes in cells or tissues for decades. The "reverse transcriptase polymerase chain reaction" (RT-PCR) allows one to quantitatively measure the relative number of mRNA species in a sample for specific genes. Using general primers, it is also possible to amplify the entire transcriptome quantitatively to make many complete copies of the transcriptome in a test tube. Thus, large amounts of material for analysis can be obtained from a relatively small number of cells. Finally,

using microarray technologies, where tens of thousands of unique oligonucleotides (or cDNAs) are anchored on a solid matrix, toxicologists can now quantitatively assess the expression of thousands of unique mRNAs in a single sample, thus capturing an "expression profile" of the entire transcriptome in 1 analysis.

There is great promise that gene expression profiles may be used to provide signatures of specific types of toxic responses, such as a cellular response to DNA damage or oxidative stress. There is also hope that such signature changes in gene expression could be used to facilitate more accurate cross-species extrapolation, allowing comparison of, for example, toxicant-induced changes in gene expression in rat hepatocytes with that of human hepatocytes under identical experimental conditions. However, 1 of the major challenges in toxicogenomics is the recognition that transcriptional regulation is highly dynamic, and that gene expression profiles can change dramatically with both dose and time. Because microarray experiments are relatively expensive and highly data intensive, it becomes both costly and challenging to conduct and analyze experiments with extensive dose and time course data (although costs are declining). Although changes in gene expression often contribute to, or are reflective of, phenotypic changes that occur in response to a toxic substance, the transcriptome is still somewhat far removed from the ultimate biochemical functions that dictate the actual biological function of the cell. Because the functional expression of a gene generally requires the translation of the mRNA to a protein, there is also great interest in looking at the "proteome"—the entire complement of *proteins* that are present in a cell or tissue at a given point in time.

## Proteomics

Analysis of the proteome of a cell or tissue is much more difficult than analysis of the transcriptome, primarily because it is not yet possible to "amplify" the number of copies of proteins in a cell. Furthermore, unambiguous identification of specific proteins is much more difficult than that for individual mRNAs. Identification of specific proteins is generally done using a combination of separation techniques (eg, 2D gel electrophoresis, high-performance liquid chromatography), followed by tandem mass spectrometry for identification (Aebersold and Mann, 2003). Because of size limitations for accurate mass spectrometry, protein mixtures are usually digested to smaller peptide fragments. The mixture of peptide fragments is resolved into individual components, and the identity of the specific peptides is determined based on high-resolution mass analysis and sequential degradation (sequential loss of single amino acids) of the peptides by various means (Aebersold and Mann, 2003). The large and complex set of peptide mass fragments is then analyzed by computers and compared with a large database of mass fragments of known peptides/proteins. Because as few as 5 amino acid sequences may provide unique identification of a specific protein, the presence and relative abundance of specific proteins in a sample can then be reconstructed through bioinformatic analyses. As with transcriptomics, it is hoped that changes in protein expression can be used as specific biomarkers for particular types of toxic responses. Of course, such conceptual approaches have been used for years, for example, use of serum transaminase proteins as indicators of liver damage, or the presence of prostate-specific antigen (PSA) in serum as a potential biomarker of early stage prostate hyperplasia or cancer. The potential power of proteomics lies in the ability to identify unique patterns of protein expression, or identification of unique proteins or peptides, that are predictive of early toxic response or later development of disease.

## Metabonomics/Metabolomics

These 2 terms are often used interchangeably to describe the analysis of the "universe" of small molecules that serve as substrates, products, and cofactors of the milieu of enzymatic reactions and other metabolic processes that define living cells, and thus the organism. Metabonomics has been defined as "the comprehensive and simultaneous systematic profiling of metabolite levels and their systematic and temporal change through such effects on diet, lifestyle, environment, genetic and pharmaceuticals, both beneficial and adverse, in whole organisms" (Lindon et al., 2003, 2006). The term "metabolomics" has been used principally in studies in plants and in vitro or single-cell systems (Fiehn, 2002). Regardless of the specific term used (metabonomics will be used here), the concept of quantitatively analyzing toxicant-induced changes in the "metabolic profile" (the "metabonome") of a cell, tissue, or body fluid in some ways represents the "Holy Grail" of toxicogenomics, because the changes in these small molecules must represent a biologically relevant integration of all of the molecular, biochemical, and cellular perturbations that lead to the development of toxicity (Fig. 2-17). In other words, changes in the metabonome should reflect the biologically relevant changes in gene transcription, translation, protein function, and other cellular processes, including temporal and adaptive responses, while ignoring biologically irrelevant changes in these factors. Although conceptually superior to either transcriptomics or proteomics for predictive toxicology, metabonomics lags significantly in technological development of readily accessible tools for thorough analysis of the metabonome.

Two approaches for identifying and measuring hundreds, or even thousands, of small molecules in biological samples have emerged—nuclear magnetic resonance (NMR) and mass spectrometry (Lindon et al., 2003, 2006). Both have their advantages and limitations, and it is likely that the most successful approaches to applying metabonomics to toxicological problems will utilize both techniques (Pan and Raftery, 2007).

## Bioinformatics

One feature in common among all of the various "omics" technologies is the ability to generate very large volumes of data (literally millions of data points from a single experiment). Both the data management and statistical evaluation of toxicogenomics studies represent an enormous challenge. The emerging field of bioinformatics has developed to address these challenges. Numerous commercial platforms for conducting microarray analysis of the transcriptome are available, and sophisticated software is available for both data management and analysis. One of the major challenges in statistical analysis of large data sets is the large number of "false positives" that will result from multiple comparisons. In a typical gene array experiment, it is not uncommon for an investigator to make >20,000 different comparisons. At the typical "95%" statistical confidence limit, one would expect more than 1000 of the noted differences to occur just by chance alone. Thus, more rigorous statistical methods have been developed to reduce the so-called false discovery rate in such experiments (Storey et al., 2005; Gao, 2006).

## Challenges in Using "Omics" Technologies for Predictive Toxicology and Risk Assessment

A conceptual framework for incorporating these new technologies into toxicology, sometimes referred to as "systems toxicology," is shown in Fig. 2-18. Several key components of such an approach include: (1) large databases of treatment-specific information, such as results of transcriptomic, proteomic, and metabonomic analyses from target tissues and/or body fluids derived from toxicant-treated animals, (2) genomic databases that describe the DNA sequence information from the species of interest, (3) computational tools that extract information from these and other databases and the published literature to identify critical pathways and networks that are altered by the toxicant treatment, and (4) comparison with traditional toxicological end points to ensure that the observed "omics responses" are closely aligned with the toxicant-related pathophysiology in the animal (histopathology, clinical chemistry, etc)—a process called "phenotypic anchoring" (Waters and Fostel, 2004).

Toxicogenomics tools are becoming indispensable for research aimed at identifying the mechanisms and mode of action of toxic substances. However, the incorporation of such approaches into routine toxicity assessment presents numerous challenges. Numerous working group reports and publications have addressed the challenges of incorporating toxicogenomics data into predictive toxicology and risk assessment (Bammler et al., 2005; Maggioli et al., 2006; Boverhof and Zacharewski, 2006).

One of the major challenges to incorporating toxicogenomic data into risk assessment is related to the highly dynamic processes that preceded an observed toxic response. Traditional measure of toxicity, such as histopathological changes in a tissue, tends to be stable or even irreversible, whereas the myriad of molecular, biochemical, and cellular changes that give rise to the toxic response(s) are highly dynamic, frequently changing by the hour. Thus, the

profiles of mRNAs, proteins, and/or metabolites captured at a single point in time may be dramatically different, depending on the specific point in time the sample was collected. Many of the observed changes may be the result of direct effects of the toxicant on specific targets, whereas others will be compensatory or feedback mechanisms invoked in response to the initial damage. Nevertheless, patterns of change in transcript, protein, and/or metabolite profiles are likely to provide informative "signatures" of toxic response that will be of great value in predictive toxicology. Such approaches may be particularly useful in pharmaceutical development, where toxicogenomic profiles may help to accelerate preclinical evaluation of drug candidates by identifying "class prediction" profiles indicative of certain types of desirable (pharmacological efficacy) as well as adverse (eg, DNA damage, oxidative stress) responses.

Finally, it is likely that the introduction of omics technologies to toxicity testing will eventually contribute to the reduction, refinement, and replacement (the "3Rs") of animals in toxicity testing and product safety evaluations (Kroeger, 2006).

## REFERENCES

Aebersold R, Mann M. Mass spectrometry-based proteomics. *Nature.* 2003;422:198–207.

Albert A. *Selective Toxicity.* London: Chapman and Hall; 1973.

Aldridge WN. The biological basis and measurement of thresholds. *Annu Rev Pharmacol Toxicol.* 1986;26:39–58.

Allen BC, Kavlock RJ, Kimmel CA, et al. Dose–response assessment for developmental toxicity: II. Comparison of generic benchmark dose estimates with no observed adverse effect levels. *Fundam Appl Toxicol.* 1994a;23:487–495.

Allen BC, Kavlock RJ, Kimmel CA, et al. Dose–response assessment for developmental toxicity: III. Statistical models. *Fundam Appl Toxicol.* 1994b;23:496–509.

Ames BN, McCann J, Yamasaki E. Methods for detecting carcinogens and mutagens with the *Salmonella*/mammalian-microsome mutagenicity test. *Mutat Res.* 1975;31:347–364.

Anger WK. Neurobehavioural tests and systems to assess neurotoxic exposures in the workplace and community. *Occup Environ Med.* 2003;60:531–538, 474.

Anger WK, Liang YX, Nell V, et al. Lessons learned—15 years of the WHO-NCTB: a review. *Neurotoxicology.* 2000;21(5):837–846.

Arcury TA, Quandt SA, Dearry A. Farmworker pesticide exposure and community-based participatory research: rationale and practical applications. *Environ Health Perspect.* 2001;109(suppl 3):429–434.

Armstrong JM, Loer-Martin D, Leibnitz R. Developmental immunotoxicant exposure and exacerbated postnatal immune responses: asthma. In: Holladay SD, ed. *Developmental Immunotoxicology.* Boca Raton: CRC Press; 2005:229–281.

Attig L, Gabory A, Junien C. Nutritional developmental epigenomics: immediate and long-lasting effects. *Proc Nutr Soc.* 2010;69:221–231.

Baccarelli A, Bollati V. Epigenetics and environmental chemicals. *Curr Opin Pediatr.* 2009;21:243–251.

Bailey GS, Reddy AP, Pereira CB, et al. Non-linear cancer response at ultra-low dose: a 40,800-animal ED001 tumor and biomarker study. *Chem Res Toxicol.* 2009;22:1264–1276.

Bammler T, Beyer RP, Bhattacharya S, et al. Standardizing global gene expression analysis between laboratories and across platforms. *Nat Methods.* 2005;2:351–356.

Barile FA. Clinical Toxicology: Principles and Mechanisms, 2nd ed. New York, *Informa Healthcare.* 2010.

Barnes DG, Dourson M. Reference dose (RfD): description and use in health risk assessments. *Regul Toxicol Pharmacol.* 1988;8:471–486.

Bartell SM, Takaro TK, Ponce RA, et al. Risk assessment and screening strategies for beryllium exposure. *Technology.* 2000;7:241–249.

Bartels CF, James K, La Du BN. DNA mutations associated with the human butyrylcholinesterase J-variant. *Am J Hum Genet.* 1992;50:1104–1114.

Beauchamp TL, Childress JF. *Principles of Biomedical Ethics.* 4th ed. New York: Oxford University Press; 1994.

Bernal AJ, Jirtle RL. Epigenomic disruption: the effects of early developmental exposures. *Birth Defects Res A Clin Mol Teratol.* 2010;88(10):938–944.

Bhogal N, Combes R. TGN1412: time to change the paradigm for the testing of new pharmaceuticals. *Altern Lab Anim.* 2006;34:225–239.

Binder LM, Storzbach D, Anger WK, et al. Subjective cognitive complaints, affective distress, and objective cognitive performance in Persian Gulf War veterans. *Arch Clin Neuropsychol.* 1999;14:531–536.

Binder LM, Storzbach D, Campbell KA, et al. Neurobehavioral deficits associated with chronic fatigue syndrome in veterans with Gulf War unexplained illnesses. *J Int Neuropsychol Soc.* 2001;7:835–839.

Bliss CL. Some principles of bioassay. *Am Sci.* 1957;45:449–466.

Bolon B, Garman R, Jensen K, Krinke G, Stuart B. A "best practices" approach to neuropathologic assessment in developmental neurotoxicity testing—for today. *Toxicol Pathol.* 2006;34(3):296–313.

Boverhof DR, Zacharewski TR. Toxicogenomics in risk assessment: applications and needs. *Toxicol Sci.* 2006;89:352–360.

Bruce RD. An up-and-down procedure for acute toxicity testing. *Fundam Appl Toxicol.* 1985;5:151–157.

Bruce RD. A confirmatory study of the up-and-down method for acute oral toxicity testing. *Fundam Appl Toxicol.* 1987;8:97–100.

Brusick DJ, Fields WR, Myhr BC, Doolittle DJ. Genetic toxicology. In: Hayes AW, ed. *Principles and Methods of Toxicology.* 5th ed. New York: Informa Healthcare; 2008:1179–1222;chap 23.

Burbacher TM, Grant KS. Methods for studying nonhuman primates in neurobehavioral toxicology and teratology. *Neurotoxicol Teratol.* 2000;22:475–486.

Burbacher TM, Grant KS, Mayfield DB, et al. Prenatal methylmercury exposure affects spatial vision in adult monkeys. *Toxicol Appl Pharmacol.* 2005;208:21–28.

Calabrese EJ, Blain R. The occurrence of hormetic dose responses in the toxicological literature, the hormesis database: an overview. *Toxicol Appl Pharmacol.* 2005;202:289–301.

Callahan D, Jennings B. Ethics and public health: forging a strong relationship. *Am J Public Health.* 2002;92:169–176.

Carson R. *Silent Spring.* Boston: Houghton Mifflin; 2002, c 1962.

Cheng TF, Choudhuri S, Muldoon-Jacobs K. Epigenetic targets of some toxicologically relevant metals: a review of the literature. *J Appl Toxicol.* 2012;32(9):643–653.

Christian MS. Test methods for assessing female reproductive and developmental toxicology. In: Hayes AW, ed. *Principles and Methods of Toxicology.* 5th ed. New York: Informa Healthcare; 2008:1641–1712; chap 34.

Claudio L. An analysis of the U.S. Environmental Protection Agency neurotoxicity testing guidelines. *Regul Toxicol Pharmacol.* 1992;16(2):202–212.

Claudio L, Kwa WC, Russell AL, Wallinga D. Testing methods for developmental neurotoxicity of environmental chemicals. *Toxicol Appl Pharmacol.* 2000;164(1):1–14.

Coble Y, Coussens C, Quinn K. *Environmental Health Sciences Decision Making: Risk Management, Evidence, and Ethics: Workshop Summary.* Washington, DC: National Academies Press; 2009.

Cohen SM. Cell proliferation and carcinogenesis. *Drug Metab Rev.* 1998;30:339–357.

Cohen SM. Calcium phosphate–containing urinary precipitate in rat urinary bladder carcinogenesis. *IARC Sci Publ.* 1999;147:175–189.

Corburn J. Environmental justice, local knowledge, and risk: the discourse of a community-based cumulative exposure assessment. *Environ Manage.* 2002;29:451–466.

Cory-Slechta DA. Relationships between lead-induced learning impairments and changes in dopaminergic, cholinergic, and glutamatergic neurotransmitter system functions. *Annu Rev Pharmacol Toxicol.* 1995;35:391–415.

Cory-Slechta DA. Legacy of lead exposure: consequences for the central nervous system. *Otolaryngol Head Neck Surg.* 1996;114:224–226.

45

UNIT I

GENERAL PRINCIPLES OF TOXICOLOGY

Cory-Slechta DA. Lead-induced impairments in complex cognitive function: offerings from experimental studies. *Child Neuropsychol.* 2003;9:54–75.

Cory-Slechta DA, Cjorton KM, Foran IA, et al. Methods to identify and characterize developmental neurotoxicity for human health risk assessment. I: behavioral effects. *Environ Health Perspect.* 2001;109(suppl 1):79–91.

Costa LG, Eaton DL. *Gene-Environment Interactions: Fundamentals of Ecogenetics.* New York: Wiley Press; 2006:557 pp.

Crump KS. An improved procedure for low-dose carcinogenic risk assessment from animal data. *J Environ Pathol Toxicol Oncol.* 1984;5:339–348.

Cummings JA, Clemens LG, Nunez AA. Mother counts: how effects of environmental contaminants on maternal care could affect the offspring and future generations. *Front Neuroendocrinol.* 2010;31:440–451.

D'Arcy FF. Harron DWG, eds. *Proceedings of the First International Conference on Harmonisation.* Belfast: Queen's University of Belfast; 1992.

Donovan CE, Finn PW. Immune mechanisms of childhood asthma. *Thorax.* 1999;54:938–946.

Dorman DC, Allen SL, Byczkowski JZ, et al. Methods to identify and characterize developmental neurotoxicity for human health risk assessment. III: pharmacokinetic and pharmacodynamic considerations. *Environ Health Perspect.* 2001;109(suppl 1):101–111.

Doull J. Factors influencing toxicity. In: Doull J, Klaassen CD, Amdur MO, eds. *Casarett and Doull's Toxicology: The Basic Science of Poisons.* 2nd ed. New York: Macmillan; 1980:70–83.

Dybing E, Sanner T. Species differences in chemical carcinogenesis of the thyroid gland, kidney and urinary bladder. *IARC Sci Publ.* 1999;147:15–32.

Eaton DL. Scientific judgment and toxic torts: a primer in toxicology for judges and lawyers. *J Law Policy.* 2003;12:5–42.

Eaton DL, Gallacher EP. Introduction to principles of toxicology. In: McQueen C, ed. *Comprehensive Toxicology: Volume 1, General Principles.* 2nd ed. New York, Elsevier; 2010:1–46.

Ehman KD, Moser VC. Evaluation of cognitive function in weanling rats: a review of methods suitable for chemical screening. *Neurotoxicol Teratol.* 2006;28(1):144–161.

Eichelbaum M, Ingelman-Sundberg M, Evans WE. Pharmacogenomics and individualized drug therapy. *Annu Rev Med.* 2006;57:119–137.

EPA. *Health Effects Test Guidelines.* OPPTS 870.6300. Developmental Neurotoxicity Toxicity Study. Washington, DC: U.S. Environmental Protection Agency; 1998.

EPA. *Environmental Justice.* Washington, DC: Environmental Protection Agency, 2005. Available at: http://www.epa.gov/compliance/environmentaljustice/.

Farahat TM, Abdelrasoul GM, Amr MM, et al. Neurobehavioural effects among workers occupationally exposed to organophosphorous pesticides. *Occup Environ Med.* 2003;60:279–286.

Faustman EM. Short-term tests for teratogens. *Mutat Res.* 1988;205:355–384.

Faustman EM, Allen BC, Kavlock RJ, et al. Dose-response assessment for developmental toxicity. I. Characterization of database and determination of no observed adverse effect levels. *Fundam Appl Toxicol.* 1994;23:478–486.

Fiehn O. Metabolomics—the link between genotypes and phenotypes. *Plant Mol Biol.* 2002;48:155–171.

Finney DJ. *Probit Analysis.* Cambridge: Cambridge University Press; 1971.

Finney DJ. The median lethal dose and its estimation. *Arch Toxicol.* 1985;56:215–218.

Gaihi A, Schiestl RH. Cell division transforms mutagenic lesions into deletion-recombinagenic lesions in yeast cells. *Mutat Res.* 1999;429:13–26.

Gao X. Construction of null statistics in permutation-based multiple testing for multi-factorial microarray experiments. *Bioinformatics.* 2006;22:1486–1494.

Garman RH, Fix AS, Jortner BS, et al. Methods to identify and characterize developmental neurotoxicity for human health risk assessment. II: neuropathology. *Environ Health Perspect.* 2001;109(suppl 1):93–100.

Gilbert G. Ethical, legal, and social issues: our children's future. *Neurotoxicology.* 2005a;26:521–530.

Gilbert SG. Public health and the precautionary principle. *Northwest Public Health.* 2005b;(spring/summer):4.

Gilbert SG. Supplementing the traditional institutional review board with an environmental health and community review board. *Environ Health Perspect.* 2006;114:1626–1629.

Gilbert SG, Eaton DL. Ethical, legal, social, and professional issues in toxicology. In: Ballantyne B, Marrs TC, Syversen T, eds. *General and Applied Toxicology.* 3rd ed. West Sussex, UK: Wiley, 2009;chap 116.

Glynn P, Reid DJ, Lush MJ, et al. Molecular cloning of neuropathy target esterase (NTE). *Chem Biol Interact.* 1999;119(120):513–517.

Godfrey KM, Sheppard A, Gluckman PD, et al. Epigenetic gene promoter methylation at birth is associated with child's later adiposity. *Diabetes.* 2011;60:1528–1534.

Goldstein A, Aronow L, Kalman SM. *Principles of Drug Action.* New York: Wiley; 1974.

Goldstein BD. The precautionary principle: is it a threat to toxicological science? *Int J Toxicol.* 2006;25:3–7.

Goodman JI, Augustine KA, Cunningham ML, et al. What do we need to know prior to thinking about incorporating an epigenetic evaluation into safety assessments? *Toxicol Sci.* 2010;116:375–381.

Goozner M. *Unrevealed: Non-Disclosure of Conflicts of Interest in Four Leading Medical and Scientific Journals.* Washington, DC: Center for Science in the Public Interest; 2004.

Grisham JW. Interspecies comparison of liver carcinogenesis: implications for cancer risk assessment. *Carcinogenesis.* 1997;18:59–81.

Guzelian PS, Victoroff MS, Halmes NC, et al. Evidence-based toxicology: a comprehensive framework for causation. *Hum Exp Toxicol.* 2005;24:161–201.

Halle W. The Registry of Cytotoxicity: toxicity testing in cell cultures to predict acute toxicity (LD50) and to reduce testing in animals. *Altern Lab Anim.* 2003;31(2):89–198.

Hanna EZ, Chou SP, Grant BF. The relationship between drinking and heart disease morbidity in the United States: results from the National Health Interview Survey. *Alcohol Clin Exp Res.* 1997;21:111–118.

Harkness JE, Wagner JE. *The Biology and Medicine of Rabbits and Rodents.* 4th ed. New York: Williams and Wilkins; 1995.

Haseman JK. Issues in carcinogenicity testing: dose selection. *Fundam Appl Toxicol.* 1985;5:66–78.

Hatch EE, Palmer JR, Titus-Ernstoff L, et al. Cancer risk in women exposed to diethylstilbestrol in utero. *JAMA.* 1998;280:630–634.

Hayes AW, ed. *Principles and Methods of Toxicology.* 5th ed. New York: Informa Healthcare; 2008.

Hayes BB, Patrick E, Maibach HI, Dermatotoxicology. In: Hayes AW, ed. *Principles and Methods of Toxicology.* New York: Informa Healthcare; 2008:1359–1406;chap 27.

Head JA, Dolinoy DC, Basu N. Epigenetics for ecotoxicologists. *Environ Toxicol Chem.* 2012;31(2):221–227.

Hengstler JG, Van der Burg B, Steinberg P, et al. Interspecies differences in cancer susceptibility and toxicity. *Drug Metab Rev.* 1999;31:917–970.

Hill AB. The environment and disease: association or causation? *Proc R Soc Med.* 1965;58:295–300.

Holladay SD, ed. *Developmental Immunotoxicology.* Boca Raton: CRC Press; 2005:464

Holliday R. Epigenetics: a historical overview. *Epigenetics.* 2006;1:76–80.

Hulf JE. Value, validity, and historical development of carcinogenesis studies for predicting and confirming carcinogenic risk to humans. In: Kitchin KT, ed. *Carcinogenicity Testing: Predicting & Interpreting Chemical Effects.* New York: Marcel Dekker; 1999:21–123.

Ikeda T. Drug-induced idiosyncratic hepatotoxicity: prevention strategy developed after the troglitazone case. *Drug Metab Pharmacokinet.* 2011;26(1):60–70.

Irwin S. Comprehensive observational assessment Ia. A systematic, quantitative procedure for assessing the behavioral and physiologic state of the mouse. *Psychopharmacologia.* 1968;13(3):222–237.

Jacobson-Kram D, Keller KA. *Toxicology Testing Handbook: Principles, Applications and Data Interpretation.* 2nd ed. New York: Informa Healthcare; 2006.

Kamel F, Rowland AS, Park LP, et al. Neurobehavioral performance and work experience in Florida farmworkers. *Environ Health Perspect.* 2003;111:1765–1772.

Kass NE. An ethics framework for public health. Am J Public Health 2001;91:1776–1782.

Kliman CK, Sweeney LM, Meek ME, Gargas ML. Assessing the dose-dependency of allometric scaling performance using physiologically based pharmacokinetic modeling. Regul Toxicol Pharmacol. 2003; 38(3):345–367.

Kobayashi Y, Fukumaki Y, Yubisui T, et al. Serine–proline replacement at residue 127 of NADH-cytochrome b5 reductase causes hereditary methemoglobinemia, generalized type. Blood. 1990;75:1408–1413.

Krimsky S, Rothenberg LS. Conflict of interest policies in science and medical journals: editorial practices and author disclosures. Sci Eng Ethics. 2001;7:205–218.

Krimsky S, Sweet E. An analysis of toxicology and medical journal conflict-of-interest policies. Account Res. 2009;16:235–253.

Krueger M. How omics technologies can contribute to the '3R' principles by introducing new strategies in animal testing. Trends Biotechnol. 2006;24:343–346.

Landrigan PJ, Schechter CB, Lipton JM, et al. Environmental pollutants and disease in American children: estimates of morbidity, mortality, and costs for lead poisoning, asthma, cancer, and developmental disabilities. Environ Health Perspect. 2002;110:721–728.

Lanphear BP, Hornung R, Khoury J et al. Low-level environmental lead exposure and children's intellectual function: an international pooled analysis. Environ Health Perspect. 2005;113:894–899.

Lary JM, Daniel KL, Erickson JD, et al. The return of thalidomide: can birth defects be prevented? Drug Saf. 1999;21:161–169.

Lassiter TL, Barone S Jr, Moser VC, Padilla S. Gestational exposure to chlorpyrifos: dose–response profiles for cholinesterase and carboxylesterase activity. Toxicol Sci. 1999;52:93–100.

Lau K, McLean WG, Williams DP, Howard CV. Synergistic interactions between commonly used food additives in a developmental neurotoxicity test. Toxicol Sci. 2006;90:178–187.

LeBaron MJ, Rasoulpour RJ, Klapacz J, et al. Epigenetics and chemical safety assessment. Mutat Res. 2010;705(2):83–95.

Lee C. Environmental justice: building a unified vision of health and the environment. Environ Health Perspect. 2002;110(suppl 2):141–144.

Lehman-McKeeman LD, Caudill D. Biochemical basis for mouse resistance to hyaline droplet nephropathy: lack of relevance of the alpha 2u-globulin protein superfamily in this male rat-specific syndrome. Toxicol Appl Pharmacol. 1992;112:214–221.

Leopold A. A Sand County Almanac: With Essays on Conservation. Oxford: Oxford University Press; 1949 [reprinted, 2001].

Levine RR. Pharmacology: Drug Actions and Reactions. Boston: Little, Brown, and Company; 1978.

Lindon JC, Holmes E, Nicholson JK. Metabonomics techniques and applications to pharmaceutical research & development. Pharm Res. 2006;23:1075–1088.

Lindon JC, Nicholson JK, Holmes E, et al. Contemporary issues in toxicology the role of metabonomics in toxicology and its evaluation by the COMET project. Toxicol Appl Pharmacol. 2003;187:137–146.

Litchfield J, Wilcoxon F. Simplified method of evaluating dose-effect experiments. J Pharmacol Exp Ther. 1949;96:99–113.

Litchfield JT. A method for rapid graphic solution of time-percent effective curve. J Pharmacol Exp Ther. 1949;97:399–408.

Littlefield NA, Farmer JH, Gaylor DW, et al. Effects of dose and time in a long-term, low-dose carcinogenicity study. In: Staffa JA, Mehlman MA, eds. Innovations in Cancer Risk Assessment (ED01 Study). Park Forest South, IL: Pathotox Publishers; 1979.

Luster MI, Dean JH, Germolec DR. Consensus workshop on methods to evaluate developmental immunotoxicity. Environ Health Perspect. 2003;111:579–583.

Maggioli J, Hoover A, Weng L. Toxicogenomic analysis methods for predictive toxicology. J Pharmacol Toxicol Methods. 2006;53:31–37.

Marchant G. From general policy to legal rule: aspirations and limitations of the precautionary principle. Environ Health Perspect. 2003;111:1799–1803.

Maurissen JP, Gilbert SG, Sander M, et al. Workshop proceedings: managing conflict of interest in science. A little consensus and a lot of controversy. Toxicol Sci. 2005;87:11–14.

McCauley LA, Anger WK, Keifer M, et al. Studying health outcomes in farmworker populations exposed to pesticides. Environ Health Perspect. 2006; (14):953–960.

Mileson BE, Ferenc SA. Methods to identify and characterize developmental neurotoxicity for human health risk assessment: overview. Environ Health Perspect. 2001;109(suppl 1):77–78.

Mohr LC, Rodgers JK, Silvestri GA. Glutathione S-transferase M1 polymorphism and the risk of lung cancer. Anticancer Res. 2003;23:2111–2124.

Monticello TM, Morgan KT. Chemically-induced nasal carcinogenesis and epithelial cell proliferation: a brief review. Mutat Res. 1997;380:33–41.

Morello-Frosch R, Pastor M Jr, Porras C, Sadd J. Environmental justice and regional inequality in southern California: implications for future research. Environ Health Perspect. 2002;110(suppl 2):149–154.

Moser VC. The functional observational battery in adult and developing rats. Neurotoxicology. 2000;21(6):989–996.

Moser VC, Simmons JS, Gennings C. Neurotoxicological interactions of a five-pesticide mixture in preweanling rats. Toxicol Sci. 2006;92:235–245.

Myers GJ, Davidson PW, Cox C, et al. Twenty-seven years studying the human neurotoxicity of methylmercury exposure. Environ Res. 2000;83:275–285.

Myers N, Raffensperger C, eds. Precautionary Tools for Reshaping Environmental Policy. Cambridge: MIT Press; 2006.

NAS. Policy on Committee Composition and Balance and Conflicts of Interest for Committees Used in the Development of Reports. Washington, DC: National Academies Press; 2003.

NAS/NRC. Toxicity Testing in the 21st Century: A Vision and a Strategy. Washington, DC: National Academy Press; 2007.

NAS/NRC. Toxicity-Pathway-Based Risk Assessment: Preparing for Paradigm Change: A Symposium Summary. Washington, DC: National Academies Press; 2010.

Needleman HL, Bellinger D. The health effects of low level exposure to lead. Annu Rev Public Health. 1991;12:111–140.

Netzlaff F, Lehr CM, Werts PW, Schaefer UF. The human epidermis model-EpiSkin, SkinEthic and EpiDerm: an evaluation of morphology and their suitability for testing phototoxicity, irritancy, corrosivity, and substance transport. Eur J Pharm Biopharm. 2005;60(2):167–178.

Nweke OC. A framework for integrating environmental justice in regulatory analysis. Int J Environ Res Public Health. 2011;8(6):2366–2385.

Nyström M, Mattanen M. Diet and epigenetics in colon cancer. World J Gastroenterol. 2009;15:257–263.

OECD. Draft Guidance Document on Reproductive Toxicity Testing and Assessment, Series on Testing and Assessment No. 43. Paris, France: Environment Directorate, Organisation for Economic Cooperation and Development; 2004.

O'Fallon LR, Dearry A. Community-based participatory research as a tool to advance environmental health sciences. Environ Health Perspect. 2002;110(suppl 2):155–159.

Pan Z, Raftery D. Comparing and combining NMR spectroscopy and mass spectrometry in metabolomics. Anal Bioanal Chem. 2007;387(2): 525–527.

Perera F, Herbstman J. Prenatal environmental exposures, epigenetics, and disease. Reprod Toxicol. 2011;31:363–373.

Peterson M. The precautionary principle is incoherent. Risk Anal. 2006;26:595–601.

Pugsley MK, Authier S, Curtis MJ. Principles of safety pharmacology. Br J Pharmacol. 2008;154(7):1382–1399.

Pugsley MK, Towart R, Authier S, Gallacher DJ, Curtis MJ. Innovation in safety pharmacology testing. J Pharmacol Toxicol Methods. 2011; 64(1):1–6.

Raffensperger C, Tickner J, eds. Protecting Public Health & the Environment: Implementing the Precautionary Principle. Washington, DC: Island Press; 1999.

Redfern WS, Strang I, Storey S, et al. Spectrum of effects detected in the rat functional observational battery following oral administration of one CNS targeted compounds. J Pharmacol Toxicol Methods. 2005;52:77–82.

Reno FE. Carcinogenicity studies. In: Sipes IG, McQueen CA, Gandolfi AJ, eds. Comprehensive Toxicology. Williams PD, Hottendorf GH, eds. Toxicological Testing and Evaluation, Vol. 2. New York: Pergamon Press; 1997:123–131.

48



UNIT 1

GENERAL PRINCIPLES OF TOXICOLOGY

Rhomberg LR, Wolff SK. Empirical scaling of single oral lethal doses across mammalian species based on a large database. *Risk Anal.* 1998;18:741–753.

Rice DC. Neurotoxicity of lead, methylmercury, and PCBs in relation to the Great Lakes. *Environ Health Perspect.* 1995;103(suppl 9):71–87.

Rice DC, Gilbert SG. Early chronic low-level methylmercury poisoning in monkeys impairs spatial vision. *Science.* 1982;216(4547):759–761.

Rice DC, Gilbert SG. Exposure to methyl mercury from birth to adulthood impairs high-frequency hearing in monkeys. *Toxicol Appl Pharmacol.* 1992;115:6–10.

Rice DC, Gilbert SG. Effects of developmental methylmercury exposure or lifetime lead exposure on vibration sensitivity function in monkeys. *Toxicol Appl Pharmacol.* 1995;134:161–169.

Roberts RA. Peroxisome proliferators: mechanisms of adverse effects in rodents and molecular basis for species differences. *Arch Toxicol.* 1999;73:413–418.

Rodricks JV, Gaylor DW, Turnbull D. Quantitative extrapolations in toxicology. In: Hayes AW, ed. *Principles and Methods in Toxicology.* 5th ed. New York: Informa Healthcare; 2008:453–474:chap 9.

Rohlman DS, Anger WK, Tamulinas A, et al. Development of a neurobehavioral battery for children exposed to neurotoxic chemicals. *Neurotoxicology.* 2001a:22:657–665.

Rohlman DS, Bailey SR, Anger WK, McCauley L. Assessment of neurobehavioral function with computerized tests in a population of Hispanic adolescents working in agriculture. *Environ Res.* 2001b;85:14–24.

Rohlman DS, Gimenes LS, Eckerman DA, et al. Development of the Behavioral Assessment and Research System (BARS) to detect and characterize neurotoxicity in humans. *Neurotoxicology.* 2003;24:523–531.

Rosenfeld CS. Animal models to study environmental epigenetics. *Biol Reprod.* 2010;82:473–488.

Rush RE, Bonnette KL, Douds DA, et al. Dermal irritation and sensitization. In: Derelanko MJ, Hollinger MA, eds. *CRC Handbook of Toxicology.* New York: CRC Press; 1995:105–162.

Simon T. Just who is at risk? The ethics of environmental regulation. *Hum Exp Toxicol.* 2011;30:795–819.

Skinner MK. Role of epigenetics in developmental biology and transgenerational inheritance. *Birth Defects Res C Embryo Today.* 2011;93:51–55.

Storey JD, Xiao W, Leek JT, et al. Significance analysis of time course microarray experiments. *Proc Natl Acad Sci U S A.* 2005;102:12837–12842.

Szyf M. The dynamic epigenome and its implications in toxicology. *Toxicol Sci.* 2007;100(1):7–23.

Tennant RW, Stasiewicz S, Mennear J, et al. Genetically altered mouse models for identifying carcinogens. *IARC Sci Publ.* 1999;146:123–150.

Tiffany-Castiglioni E. ed. *In Vitro Neurotoxicology: Principles and Challenges (Methods in Pharmacology and Toxicology).* Totowa, NJ: Humana Press; 2004.

Travis CC, White RK. Interspecific scaling of toxicity data. *Risk Anal.* 1988;8:119–125.

Uetrecht J. Idiosyncratic drug reactions: current understanding. *Annu Rev Pharmacol Toxicol.* 2007;47:513–539.

Uhl K, Cox E, Rogan R, et al. Thalidomide use in the US: experience with pregnancy testing in the S.T.E.P.S. programme. *Drug Saf.* 2006;29:321–329.

Ukelis U, Kramer PJ, Olejniczak K, Mueller SO. Replacement of in vivo acute oral toxicity studies by in vitro cytotoxicity methods: opportunities, limits and regulatory status. *Regul Toxicol Pharmacol.* 2008;51(1):108–118.

Vandeghuchte MB, Janssen CR. Epigenetics and its implications for ecotoxicology. *Ecotoxicology.* 2011;20:607–624.

Vandenberg LN, Maffini MV, Sonnenschein C, Rubin BS, Soto AM. Bisphenol-A and the great divide: a review of controversies in the field of endocrine disruption. *Endocr Rev.* 2009;30(1):75–95.

Wang L, McLeod HL, Weinshilboum RM. Genomics and drug response. *N Engl J Med.* 2011;364(12):1144–1153.

Waters MD, Fostel JM. Toxicogenomics and systems toxicology: aims and prospects. *Nat Rev Genet.* 2004;5:936–948.

Watson RE, Goodman JI. Epigenetics and DNA methylation come of age in toxicology. *Toxicol Sci.* 2002;67:11–16.

Weil C. Tables for convenient calculation of median-effective dose (LD50 or ED50) and instruction in their use. *Biometrics.* 1952;8:249–263.

Weinshilboum RM, Otterness DM, Szumlanski CL. Methylation pharmacogenetics: catechol *O*-methyltransferase, thiopurine methyltransferase, and histamine *N*-methyltransferase. *Annu Rev Pharmacol Toxicol.* 1999;39:19–52.

Weston AD, Hood L. Systems biology, proteomics, and the future of health care: toward predictive, preventative, and personalized medicine. *J Proteome Res.* 2004;3:179–196.

Williams DE. The rainbow trout liver cancer model: response to environmental chemicals and studies on promotion and chemoprevention. *Comp Biochem Physiol C Toxicol Pharmacol.* 2012;155(1):121–127.

Williams DE, Orner G, Willard KD, et al. Rainbow trout (*Oncorhynchus mykiss*) and ultra-low dose cancer studies. *Comp Biochem Physiol C Toxicol Pharmacol.* 2009a;149(2):175–181.

Williams ES, Panko J, Paustenbach DJ. The European Union's REACH regulation: a review of its history and requirements. *Crit Rev Toxicol.* 2009b;39(7):553–575.

Wilson NH, Hardisty JF, Hayes JR. Short-term, subchronic and chronic toxicology studies. In: Hayes AW, ed. *Principles and Methods of Toxicology.* New York: Informa Healthcare; 2008:1223–1264:chap 24.

Wiman KG. The retinoblastoma gene: role in cell cycle control and cell differentiation. *FASEB J.* 1993;7:841–845.

Wogan GN, Paglialunga S, Newberne PM. Carcinogenic effects of low dietary levels of aflatoxin B1 in rats. *Food Cosmet Toxicol.* 1974;12:681–685.

Youngson NA, Whitelaw E. Transgenerational epigenetic effects. *Annu Rev Genomics Hum Genet.* 2008;9:233–257.

Zhang X, Ho SM. Epigenetics meets endocrinology. *J Mol Endocrinol.* 2011;46:R11–R32.