# EXHIBIT E1

**Jack Siemiatycki, Ph.D.**

```
     SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

                    CIVIL DIVISION




   ---------------------------
   LORI OULES,                )
                              )  Judge Brian Holeman
              Plaintiff,      )  Civil Action No.
                              )  2014 CA 088327 B
   vs.                        )
                              )
   JOHNSON & JOHNSON, et al., )
                              )
              Defendants.     )
   ---------------------------




   ---   This is the continued transcript of the

   deposition of JACK SIEMIATYCKI, Ph.D, taken at 850

   St. Denis Street, Montreal, Quebec, on the 16th

   day of December, 2016.



                        ------------



              REPORTED BY:   HELEN MARTINEAU

              CERTIFIED SHORTHAND REPORTER
```

**Page 286**

A P P E A R A N C E S:

FOR THE PLAINTIFF AND THE WITNESS:
ASHCRAFT & GEREL, LLP
PER: MICHELLE A. PARFITT, ESQ.
CHRISTOPHER V. TISI, ESQ.
4900 Seminary Road, Suite 650
Alexandria, Virginia 22311
mparfitt@ashcraftlaw.com
Cvtisi@aol.com
Tel: 1800.210.8503

FOR THE PLAINTIFF:
FERRER POIROT WANSBROUGH
PER: RUSS ABNEY, ESQ.
2603 Oak Lawn, Suite 300
Dallas, Texas 75219
rabney@lawyerworks.com
Tel: 1800.210.8503

**Page 287**

A P P E A R A N C E S:

FOR THE DEFENDANT: (Johnson & Johnson)
SHOOK, HARDY & BACON LLP
PER: MARK C. HEGARTY, ESQ.
2555 Grand Blvd.
Kansas City, Missouri, 64108-2613
mhegarty@shb.com
Tel: 816.474.6550

FOR THE DEFENDANT:(Imerys Talc America)
GORDON & REES LLP
PER: MICHAEL R. KLATT, ESQ.
816 Congress Avenue, Suite 1510
Austin, TX 78701
mklatt@gordonrees.com
Tel: 512.391.0197

**Page 288**

A P P E A R A N C E S:

FOR THE DEFENDANT:(PCPC-Personal Care Products Council)
SEYFARTH SHAW LLP
PER: THOMAS T. LOCKE, ESQ.
975 F Street N.W.
Washington, D.C. 20004-1454
tlocke@seyfarth.com
Tel: 202.463.2400

**Page 289**

INDEX OF EXHIBITS

| NO./ DESCRIPTION | PAGE |
|---|---|
| SIEMIATYCKI 22  Document titled "Association between Body Powder Use and Ovarian Cancer: The African American Cancer Epidemiology Study (AACES)" authored by Joellen M. Schildkraut et al. | 351 |
| SIEMIATYCKI 23  Document titled "Douching, Talc Use, and Risk of Ovarian Cancer" authored by Nicole L. Gonzales et al. | 353 |
| SIEMIATYCKI 24  Document titled "Factors Related to Inflammation of the Ovarian Epithelium and Risk of Ovarian Cancer" authored by Roberta B. Ness et al. | 367 |
| SIEMIATYCKI 25  Document titled "Expert Report of Jack Siemiatycki Msc, PhD on Talc Use and Ovarian Cancer" dated October 4, 2016. | 422 |
| SIEMIATYCKI 26  Notice of deposition for Jack Siemiatycki, Ph.D. in the case of Lori Oules v. Johnson & Johnson, et al. | 500 |
| SIEMIATYCKI 27  Series of 4 invoices from JS EpiTech Inc. to Michelle Parfitt. | 502 |
| SIEMIATYCKI 28  Document titled "Compendium of relative risk estimates abstracted from published studies on talc and ovarian cancer, as of March 2016". | 505 |
| SIEMIATYCKI 29  Curriculum Vitae of Jack Siemiatycki, Ph.D. | 507 |
| SIEMIATYCKI 30  Cross-notice of Deposition for Jack Siemiatycki, Ph.D, in the case of Valerie Swann, et al., v. Johnson & Johnson et al. | 508 |

## Page 330

1  your article --
2      MS. PARFITT: Is this a different
3  question?
4      BY MR. HEGARTY:
5      Q. This is a different question. The
6  Hartge paper that you list in your article did not
7  find a statistically significant increase in
8  relative risk between talc use and ovarian cancer,
9  correct?
10     A. At the .05 P-value level.
11     Q. Whittemore did not find a
12 statistically significant increase in relative
13 risk at the .05 level, correct?
14     A. Correct.
15     Q. Booth did not find a statistically
16 significant increase in risk, correct?
17     A. That's correct.
18     Q. Rosenblatt did not find a
19 statistically significant increase in risk,
20 correct?
21     A. Correct.
22     Q. Tzanou did not find a statistically
23 significant increase in risk?
24     A. That's correct.

## Page 331

1      Q. The Wong paper did not find a
2  statistically significant increase in risk?
3      A. That's correct.
4      Q. And when a meta-analysis was done of
5  those six studies it came to a relative risk of
6  1.12, that was not statistically significant at
7  the .05 confidence interval, correct?
8      A. That's correct.
9      Q. Then in that paper you compared
10 those groups of studies to the population-based,
11 case-control studies and you did a test for
12 heterogeneity, correct?
13     A. That's correct.
14     Q. And you found there was
15 heterogeneity between the population-based cased,
16 case-control studies and the hospital-based,
17 case-control studies, correct?
18     A. Correct. Just a small correction,
19 when you say, when did this or when you found
20 this, the "you" refers to the collective
21 authorship group and not to me personally because
22 I didn't carry out any of these analyses
23 personally. Is that understood?
24     Q. Did you disagree with the analyses?

## Page 332

1      A. You know, this is ten years old the
2  work on this; and I can't remember whether I
3  disagreed or expressed any disagreement with
4  particular tactics in the analysis strategy of
5  this thing.
6      Looking at it now I would not choose to
7  focus on the distinction between hospital-based
8  and population-based studies the way this article
9  presents it. Because, as I stated in my report, I
10 think the quality of a study depends on many
11 factors, of which whether it's hospital-based or
12 population-based is only one. And, furthermore,
13 the general opinion among epidemiologists, as one
14 would see in textbooks, is that generally
15 population-based studies are superior to
16 hospital-based studies, but I don't ascribe to
17 that as a strong motivating factor for judging
18 the quality of individual studies.
19     Q. In fact, nowhere in your paper --
20 I'm sorry, nowhere in your report do you say that
21 population-based, case-control studies are
22 superior to hospital-based, case-control studies,
23 correct?
24     A. That's correct.

## Page 333

1      Q. You've never said that in any
2  published article, correct?
3      A. Not that I recall.
4      Q. Now, in the Langseth paper the
5  authors chose to divide up the forest plot between
6  the population-based, case-control studies and the
7  hospital-based, case-control studies, correct?
8      A. Yes.
9      Q. Did you disagree with that division
10 of the forest plot back at the time that this
11 article was prepared?
12     A. I can't answer that question. I
13 just can't remember.
14     Q. Do you have any documents remaining
15 from your exchange of drafts with regard to
16 preparation of the Langseth paper back in 2006,
17 2007, 2008?
18     MS. PARFITT: Objection, form.
19     THE DEPONENT: I've no idea. I doubt
20 it.
21     BY MR. HEGARTY:
22     Q. The test for heterogeneity with
23 regard to hospital-based and the population-based,
24 case-control studies show that the two groups of

Page 334

1 studies were different, correct?
2    A. That the results were different,
3 that on average the ORs were different, yes.
4    Q. That means in -- I'll probably get
5 this wrong, but the confidence intervals as they
6 were overlapping were different, correct?
7    A. Well, you can see how the confidence
8 intervals overlap just by looking at it. So it's
9 not quite -- the overlap of the confidence
10 intervals isn't a perfect gauge of whether two
11 estimates are significantly -- statistically
12 significantly different from each other but they
13 are -- it is a good rough guide. And where it
14 says that the heterogeneity test between groups
15 was with a P .036 that would -- I have no reason
16 to doubt the validity of that estimate, even
17 though it wasn't me who derived it.
18        That would indicate that the difference
19 between those estimates, the 1.40 for a
20 population-based studies and 1.12, with their
21 respective confidence intervals, were
22 statistically significantly different at certain P
23 value.
24    Q. Correct. With regard to the studies

Page 335

1 that have looked at talc use and ovarian cancer we
2 have the three cohort studies, correct?
3    A. Right.
4    Q. We have six hospital-based,
5 case-control studies as reported in the Langseth
6 paper, correct?
7        MR. ABNEY: Object to form.
8        BY MR. HEGARTY:
9    Q. Let me say that differently. We
10 have hospital-based, case-control studies that
11 looked at talc and ovarian cancer, correct?
12    A. Correct.
13    Q. We also have population-based,
14 case-control studies that looked at talc and
15 ovarian cancer, correct?
16        MS. PARFITT: Not just in the Langseth
17 but overall, Mark?
18        BY MR. HEGARTY:
19    Q. Overall.
20    A. Can I make a comment again about
21 terminology? We're debating about
22 "hospital-based" and "population-based" studies.
23 There is some confusion about the terminology of
24 what those things mean. And I'm not trying to be

Page 336

1 coy about this but in the Langseth paper it was, I
2 think, a somewhat cavalier distinction was made;
3 but you can have population-based case series, you
4 can have hospital-based case series, you can have
5 population-based controls, and you can have
6 hospital-based controls, and you can have
7 combinations of. So it's possible for a study to
8 have one type of case series, population or
9 hospital-based, and one type of control series,
10 hospital or population-based, and different ones
11 of each; and how these are labelled as being a
12 population-based study or a hospital-based study
13 is unclear. There are no clear guidelines for how
14 those terms should be used.
15        I prefer myself now, as I come to
16 recognize this terminological problem, to refer to
17 hospital-based or population-base case series and
18 hospital-based or population-based control series.
19        I only say this to indicate that when
20 we're making -- when this report and other
21 publications are commenting on hospital-based
22 versus population-based studies it's not clear
23 exactly what is being compared and what is being
24 lumped together.

Page 337

1    Q. With regard to the epidemiologic
2 studies that have looked at talc and ovarian
3 cancer, we have the cohort studies and those
4 cohort studies uniformly showed nonstatistically
5 significant results, correct?
6        MS. PARFITT: Objection, form.
7        THE DEPONENT: The three that you
8 mention, yes.
9        MS. PARFITT: For all types.
10        BY MR. HEGARTY:
11    Q. And with regard to the
12 hospital-based, case-control studies --
13    A. Nurses' Health Study in the Gates'
14 2008 report did indicate -- sorry, a
15 nonstatistically significant result, yes.
16    Q. And we the hospital-based,
17 case-control studies that we just looked at in the
18 Langseth paper, and those showed uniformly
19 non-statistically significant results, correct?
20    A. Individually they showed
21 non-statistically significant results.
22    Q. And combined in a meta-analysis they
23 showed a non-statistically significant result?
24    A. That's correct.

Page 338

1  Q. With regard to population-based,
2  case-control studies when those combined they
3  showed an statistically significant increase in
4  relative risk, correct?
5  A. Correct.
6  Q. But within those particular studies
7  themselves they were mixed with regard to
8  individual studies being statistically significant
9  or not, correct?
10  MS. PARFITT: Objection, form.
11  THE DEPONENT: You mean some of the
12  individual studies were and some were not?
13  BY MR. HEGARTY:
14  Q. Correct.
15  A. Is that what you're saying? Yes.
16  Q. And with regard to Hill, do you have
17  the Hill paper handy? Under his section on
18  consistency that begins on page 8, that is Exhibit
19  20, and carries over to page 9, at the top of page
20  9.
21  A. Sorry.
22  Q. Sorry, page 297.
23  A. So 297.
24  Q. Yes, the very bottom paragraph.

Page 339

1  A. Left-hand sides.
2  Q. Sorry, on page 296. This paragraph
3  read:
4  "We have, therefore, the somewhat
5  paradoxical position that the different
6  results of a different inquiry certainly
7  cannot be held to refute the original
8  evidence. Yet the same results from
9  precisely the same form of inquiry will
10  not invariably greatly strengthen the
11  original evidence. I would myself put a
12  great deal of weight upon similar
13  results reached in quite different ways.
14  For example, prospectively and
15  retrospectively."
16  Do you see where I'm reading?
17  A. Yes, I do.
18  Q. Now, with regard to the prospective
19  studies that looked at talc and ovarian cancer, as
20  we discussed those show a uniform,
21  non-statistically significant result, correct?
22  MS. PARFITT: Objection, form.
23  THE DEPONENT: What they show is a
24  series of odds ratio estimates and their

Page 340

1  confidence intervals. What the statistical
2  significance is interpretation. So there's what
3  the data shows and then there is interpretation of
4  what the data shows.
5  BY MR. HEGARTY:
6  Q. Well, the cohort studies
7  individually did not show an association between
8  talc use and ovarian cancer, correct?
9  MS. PARFITT: Objection, form.
10  THE DEPONENT: They showed odds ratios
11  with confidence intervals is what the data of
12  those studies showed.
13  BY MR. HEGARTY:
14  Q. Those studies did not show an
15  association between talc use and ovarian cancer,
16  correct?
17  MS. PARFITT: Objection, form.
18  THE DEPONENT: They showed, again, as an
19  example a result like -- if we go to the Langseth
20  forest plot --
21  BY MR. HEGARTY:
22  Q. Doctor, I'm talking about the cohort
23  studies.
24  MS. PARFITT: Let him finish.

Page 341

1  MR. HEGARTY: He's not answering my
2  question.
3  MS. PARFITT: Maybe he is. Do you
4  understand his question?
5  BY MR. HEGARTY:
6  Q. Do you understand my question?
7  A. The cohort studies only.
8  Q. The cohort study only. The cohort
9  studies individually did not show an association
10  between talc use and ovarian cancer?
11  MS. PARFITT: Objection, form.
12  THE DEPONENT: So the Gates' reports,
13  the Gates publications, the two of them, and the
14  Nurses' Health Study report -- if we look at all
15  tumors they --
16  BY MR. HEGARTY:
17  Q. Doctor, I'm not asking for the
18  relative risk.
19  MS. PARFITT: Excuse me, let him finish
20  please.
21  THE DEPONENT: But the relative risk is
22  what they show.
23  MS. PARFITT: Complete your answer.
24  THE DEPONENT: The statistical

Page 342

1  significance is an interpretation of what they
2  show based on a judgment of what level of
3  statistical proof you want to have before you
4  reject the null hypothesis.  That's opinion.
5       There's what the data shows and then you
6  layer opinion over that data.  What it shows is
7  the odds ratios, relative risks and the confidence
8  intervals.  That gets interpreted as statistical
9  significant by the person who is interpreting it
10 based on their -- the P values that they think are
11 relevant.
12       BY MR. HEGARTY:
13       Q.  Well, let me ask a different
14 question.  The prospective studies that looked at
15 talc and ovarian cancer came to different results
16 than the retrospective case studies?
17       MS. PARFITT:  Objection, form.
18       THE DEPONENT:  Different conclusions or
19 different results?
20       BY MR. HEGARTY:
21       Q.  Different results.
22       A.  Well, in the 2008 Gates' publication
23 the result, the relative result is exactly the
24 same as the result from the Terry pooled analysis

Page 343

1  of ten case-control studies, although the
2  confidence interval is wider.  Why is it wider?
3  Because the number of subjects is so small that
4  the confidence interval is wider.
5       The estimate of risk -- the best
6  estimate of risk is still the point estimate, the
7  1.24, and that's exactly the same as Terry found.
8       So there are differences and there are
9  similarities between those results.
10      Q.  Is it your testimony that the
11 conclusions reached in the prospective
12 case-control studies are exactly the same as the
13 conclusions reached in the case-control studies,
14 the retrospective case-control studies?
15      MS. PARFITT:  Objection, form.
16      THE DEPONENT:  I was referring to one
17 particular result from the Nurses' Health Study.
18 The other result from the Nurses' Health Study, in
19 the Gates 2010 paper and, as I've said before, I
20 can't tell from the publications which of the two
21 is a more valuable, informative result to rely on.
22 Then that one is different from the consensus of
23 the case-control studies.
24

Page 344

1       BY MR. HEGARTY:
2       Q.  Which one?
3       A.  Sorry, the Gates 2010 estimate of
4  1.06 with confidence interval from .89 to 1.28
5  that looks different to me than the, for example,
6  the pooled results in the Terry analysis and all
7  the other combined analyses, and various
8  meta-analyses that have been carried out since the
9  first one I guess in 1995 or '96.  And I think
10 Huncharek's the last one.
11      Q.  The Houghton 2014 results also look
12 different?
13      A.  Yes.
14      Q.  As well as the Gonzales 2016
15 results, correct?
16      A.  Yes.
17      Q.  Now, with regard to looking at dose
18 response in the case control and the cohort
19 studies, it is your opinion that you should
20 exclude nonusers in that evaluation, correct?
21      A.  It's not a simple thing.  Many
22 epidemiologist, in fact I would venture to say
23 that most published, dose response relationship
24 estimates in the literature include the nonexposed

Page 345

1  as part of the testing of statistical significance
2  of the trend.  There are reasons in favor and
3  there are reasons against doing that.  I tend to
4  favor excluding the nonusers when that result --
5  when the trend result is juxtaposed with the ever
6  never result from a study.
7       So what we have from a given study is
8  the ever never result and the dose response
9  pattern among the exposed, and those form a
10 package of information that should be interpreted.
11      If -- failing that the unexposed group
12 should be included in the analysis.  If you don't
13 take the ever never result into account when
14 you're looking at the dose response then you
15 should include the unexposed in the test for
16 trend.
17      Q.  The Terry paper on which you rely in
18 your report does not include nonusers in the dose
19 response analysis, correct?
20      A.  Does not include nonusers?
21      Q.  Correct.
22      A.  I think it does.  I think it
23 presents results both using -- including nonusers
24 and not including nonusers.  That's my

| Page 346 | Page 348 |
|---|---|
| 1  recollection but let me check that.<br>2      Q.  In the abstract they report<br>3  observing no significant trend in risk with<br>4  increasing number of lifetime applications.<br>5  That's based on excluding nonusers from the<br>6  analysis, correct?<br>7      A.  Can I answer your previous question<br>8  first as to whether -- as to what they did?<br>9      Q.  I think I changed my question.<br>10     A.  Is it only the abstract that<br>11 counts --<br>12     MS. PARFITT:  No.<br>13     THE DEPONENT:  -- for you?<br>14     BY MR. HEGARTY:<br>15     Q.  My question -- let me restate the<br>16 question.  Let me withdraw that question and state<br>17 another question.<br>18     In the abstract the authors say, "Among<br>19 genital powder users we observed no significant<br>20 trend P .17 in risk with increasing number of<br>21 lifetime applications assessed in quartiles."<br>22 That's what they said, correct?<br>23     MS. PARFITT:  The question is whether<br>24 they said that in the abstract only. | 1  test independent of the test for overall<br>2  relative risk."<br>3  That's what you said, right?<br>4      A.  Correct.  I would probably make a<br>5  small amendment to make it clear that that assumes<br>6  that the reader, or that the investigator is<br>7  considering as a package the ever never result<br>8  along with the trend test.  It's together as a<br>9  package that -- when they're used together as a<br>10 package that I would argue that the trend test<br>11 should be kept separate from the ever never<br>12 result.<br>13     When somebody wants to disembody the<br>14 trend test from considering the overall ever never<br>15 result then the unexposed should be included in<br>16 the trend test.<br>17     Q.  Now, with regard to dose response<br>18 you reported, with regard to looking at duration<br>19 of use, no dose response across the studies that<br>20 used that measurement?<br>21     MS. PARFITT:  Objection, form.<br>22     THE DEPONENT:  May I look at the table<br>23 just to refresh my memory?<br>24     MS. PARFITT:  Yes. |
| **Page 347** | **Page 349** |
| 1      BY MR. HEGARTY:<br>2      Q.  Correct.<br>3      A.  Yes, they said that in the abstract.<br>4      Q.  That reference P .17 is excluding<br>5  nonusers, correct?<br>6      A.  Yes.<br>7      Q.  And they don't report in the<br>8  abstract any calculation that includes users,<br>9  correct?<br>10     MS. PARFITT:  In the abstract only.<br>11     THE DEPONENT:  In the abstract.<br>12     BY MR. HEGARTY:<br>13     Q.  Correct.<br>14     A.  An abstract is a very, very concise<br>15 extraction of information from an article.  And it<br>16 doesn't convey all the useful information in an<br>17 article.<br>18     Q.  In your report at page 36 you say:<br>19     "It is my view that the appropriate<br>20 statistical test for trend is one that<br>21 excludes the baseline, unexposed<br>22 category.  Since the baseline category<br>23 is used for the overall binary relative<br>24 risk it is preferable to keep the trend | 1      BY MR. HEGARTY:<br>2      Q.  With regard to the studies that use<br>3  frequency as the measurement you also found no<br>4  dose response, correct?<br>5      A.  That's correct.<br>6      Q.  With the studies that looked at<br>7  frequency times duration, or cumulative number of<br>8  applications you likewise found no dose response?<br>9      A.  I'm sorry.<br>10     Q.  You likewise found no dose response.<br>11     A.  For which?<br>12     Q.  For the cumulative exposure group of<br>13 case-control studies.<br>14     MS. PARFITT:  Objection, form.<br>15     THE DEPONENT:  No, I disagree with that.<br>16 I did find evidence of dose response.<br>17     BY MR. HEGARTY:<br>18     Q.  Well, I'm not talking about evidence<br>19 -- finding evidence of dose response.  Did the<br>20 data itself establish a dose response?<br>21     MR. ABNEY:  Object to form.<br>22     THE DEPONENT:  The data indicated that<br>23 there was dose response and that the evidence for<br>24 that was not statistically significant at the .05 |

Jack Siemiatycki, Ph.D.

Page 350

1  level, in conjunction with the fact that the
2  overall ever never result was highly statistically
3  significant.
4       BY MR. HEGARTY:
5       Q.  When you say in your report that,
6  "The Terry results are compatible with the
7  presence of an underlying dose response", what
8  does that mean?
9       A.  It means that if there were a true
10 dose response pattern the Terry results would fit,
11 would be compatible with that hypothesis.
12      Q.  If the number that Terry had
13 calculated was statistically significant what
14 would that interpretation be?
15      A.  The interpretation there would be
16 that if there truly was no dose response
17 relationship the data that -- the data, as
18 observed, would reject the hypothesis of no dose
19 response.
20      Q.  So the data as it is reported by --
21 strike that.
22      How would you phrase that same thing in
23 the -- in the manner in which the data was
24 reported by Terry?

Page 351

1       A.  I would say that the data are
2  compatible with the presence of an underlying dose
3  response but they -- the hypothesis of no trend
4  cannot be rejected.
5       Q.  Got you, thanks.
6       You had made comments in -- or you made
7  comments in your report with regard to the
8  Schildkraut paper?
9       EXHIBIT NO. SIEMIATYCKI 22:  Document
10      titled "Association between Body Powder
11      Use and Ovarian Cancer: The African
12      American Cancer Epidemiology Study
13      (AACES)" authored by Joellen M.
14      Schildkraut et al.
15      MS. PARFITT:  Is there a good time for a
16 bio break?
17      MR. HEGARTY:  Sure.
18      ---  Break taken at 10:41 a.m.
19      ---  Upon resuming at 10:58 a.m.
20      BY MR. HEGARTY:
21      Q.  Doctor, when we broke we were
22 getting ready to look at the Schildkraut paper,
23 Exhibit 22, and you had made comments earlier in
24 the deposition about Schildkraut.  What criticism

Page 352

1  do you have of that paper?  Do you have to read it
2  again, Doctor?
3       A.  It's been a few months since I read
4  it so I just need to scan it at least to refresh
5  my memory.  I can't remember if in my report I
6  explicitly addressed issues around it.  If I did
7  can you point me to it?
8       Q.  Well, you made a comment a few
9  minutes ago about Schildkraut being a poor study.
10      A.  Did I?
11      Q.  You must have some basis for making
12 that comment.
13      A.  Can someone read back to me what I
14 said?  Because I don't
15      MR. HEGARTY:  Can you search?
16      THE COURT REPORTER:  I don't have
17 anything for that.
18      BY MR. HEGARTY:
19      Q.  Let me ask you, do you think
20 Schildkraut is a poor study?
21      A.  Let me quickly refresh my memory.
22      Q.  I'm sorry, let me restate that.  You
23 had said Gonzales was a poor study.  Let's talk
24 about Schildkraut, let me start over.

Page 353

1       A.  I don't remember using that word
2  "Schildkraut".
3       Q.  Let me shift back gears.  You had
4  talked about Gonzales.  What criticisms do you
5  have of the Gonzales paper?  I have a copy I'll
6  mark it as Exhibit 23.
7       EXHIBIT NO. SIEMIATYCKI 23:  Document
8       titled "Douching, Talc Use, and Risk of
9       Ovarian Cancer" authored by Nicole L.
10      Gonzales et al.
11      BY MR. HEGARTY:
12      Q.  It was Gonzales that you said was a
13 poor study.
14      A.  Did I use that term?
15      Q.  I believe you did use that term.
16      A.  Can you read back the sentence
17 because I don't remember saying those words.
18      THE COURT REPORTER:
19      "ANSWER:  The Gonzales 2016 paper by
20      itself similarly, with the caveat that
21      it's a particularly weak study because
22      of very small numbers and some
23      questionable data collection that's
24      based on very fragile numbers."

Jack Siemiatycki, Ph.D.

**Page 610**

REPORTER'S CERTIFICATE

I, HELEN MARTINEAU, CSR, Certified Shorthand Reporter, certify;

That the foregoing proceedings were taken before me at the time and place therein set forth at which time the witness was put under oath by me;

That the testimony of the witness and all objections made at the time of the examination were recorded stenographically by me and were thereafter transcribed;

That all notes were inserted as read;

That the foregoing is a true and accurate transcript of my shorthand notes so taken. Dated this 2nd day of January, 2017.

_____
PER: HELEN MARTINEAU
CERTIFIED SHORTHAND REPORTER

**Page 611**

- - - - - -
E R R A T A
- - - - - -

PAGE  LINE  CHANGE

____ ____ _____
REASON: _____
____ ____ _____
REASON: _____
____ ____ _____
REASON: _____
____ ____ _____
REASON: _____
____ ____ _____
REASON: _____
____ ____ _____
REASON: _____
____ ____ _____
REASON: _____
____ ____ _____
REASON: _____
____ ____ _____
REASON: _____
____ ____ _____
REASON: _____

**Page 612**

ACKNOWLEDGMENT OF DEPONENT

I,_____, do hereby certify that I have read the foregoing pages, and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

_____
Jack Siemiatycki, Ph.D.      DATE

Subscribed and sworn to before me this _____ day of _____, 20____.
My commission expires:_____

_____
Notary Public