# EXHIBIT E2

Patricia Moorman, Ph.D., M.S.P.H.

Page 1

IN THE CIRCUIT COURT OF THE CITY OF ST. LOUIS
STATE OF MISSOURI


GAIL INGHAM, ET AL.,                    )
                                        )
              Plaintiffs,               )
                                        )
vs.                                     ) Case No.
                                        ) 1522-CC10417-01
JOHNSON & JOHNSON, ET AL.,              ) Division 10
                                        )
              Defendants.               )
_____/




DEPOSITION OF PATRICIA MOORMAN, Ph.D., M.S.P.H.

(Taken by Defendants)

Durham, North Carolina

Monday, March 12, 2018




Reported in Stenotype by
Amy A. Brauser, RPR, RMR, CRR
Transcript produced by computer-aided transcription

Patricia Moorman, Ph.D., M.S.P.H.

| Page 2 | Page 4 |
|---|---|

Page 2

```
 1        APPEARANCES
 2  ON BEHALF OF THE PLAINTIFFS:
 3      STEVE FARIES, ESQUIRE
        The Lanier Law Firm
 4      6810 Cypress Creek Parkway
        Houston, Texas 77069
 5      (713) 659-5200
        steve.faries@lanierlawfirm.com
 6
    ON BEHALF OF THE DEFENDANTS JOHNSON & JOHNSON AND
 7  JOHNSON & JOHNSON CONSUMER COMPANIES INC., NOW KNOWN
    AS JOHNSON & JOHNSON CONSUMER INC.:
 8
        MARK HEGARTY, ESQUIRE
 9      Shook, Hardy & Bacon, LLP
        2555 Grand Boulevard
10      Kansas City, Missouri 64108
        (816) 474-6550
11      mhegarty@shb.com
12  ON BEHALF OF THE DEFENDANT IMERYS TALC AMERICA, INC:
13      MICHAEL R. KLATT, ESQUIRE
        Gordon & Rees, LLP
14      816 Congress Avenue, Suite 1510
        Austin, Texas 78701
15      (512) 391-0197
        mklatt@grsm.com
16
    ON BEHALF OF THE WITNESS:
17
        JEFF GIBSON, ESQUIRE
18      Cohen & Malad, LLP
        One Indiana Square, Suite 1400
19      Indianapolis, Indiana 46032
        (317) 636-6481
20      jgibson@cohenandmalad.com
21
22
23  ALSO PRESENT:
24      Michelle A. Parfitt
25
```

Page 4

```
 1          INDEX OF EXAMINATIONS
 2  By Mr. Hegarty. . . . . . . . . . . Page 8, 344, 355
 3  By Mr. Klatt. . . . . . . . . . . . Page 290, 359
 4  By Mr. Faries. . . . . . . . . . . .Page 353
 5
 6
 7          INDEX OF EXHIBITS
 8  NUMBER      DESCRIPTION      MARKED/IDENTIFIED
 9  Exhibit 1   Plaintiff's Disclosure of        16
10              Expert Testimony
11  Exhibit 2   CV of Patricia Moorman,          19
12              Ph.D., M.S.P.H.,
13  Exhibit 3   Reliance Materials of Patricia   19
14              Moorman, Ph.D.
15  Exhibit 4   April 1, 2014, letter from FDA   86
16              to Samuel Epstein
17  Exhibit 5   NCI PDQ Screening and            94
18              Prevention Editorial Board
19  Exhibit 6   Ovarian, Fallopian Tube, and     96
20              Primary Peritoneal Cancer
21              Prevention (PDQ)- Health
22              Professional Version
23  Exhibit 7   IARC Monographs on the           105
24              Evaluation of Carcinogenic
25              Risks to Humans
```

| Page 3 | Page 5 |
|---|---|

Page 3

```
 1          DEPOSITION OF PATRICIA MOORMAN, Ph.D.,
 2  M.S.P.H., a witness called on behalf of Defendant,
 3  before Amy A. Brauser, Notary Public, in and for the
 4  State of North Carolina, at Cambria Hotel & Suites
 5  Durham, 2306 Elba Street, Durham, North Carolina, on
 6  Monday, the 12th day of March, 2018, commencing at
 7  9:01 a.m.
 8            * * * * * * * *
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1        INDEX OF EXHIBITS  (con't)
 2  Exhibit 8    Supplemental Selenium May       147
 3               Decrease Ovarian Cancer Risk in
 4               African-American Women
 5  Exhibit 9    Analgesic Medication Use and     149
 6               Risk of Epithelial Ovarian
 7               Cancer in African-American Women
 8  Exhibit 10   Dietary Quality and Ovarian      151
 9               Cancer Risk in African-American
10               Women
11  Exhibit 11   Socioeconomic Status in Relation 154
12               to the Risk of Ovarian Cancer in
13               African-American Women:  A
14               Population-Based Case-Control
15               Study
16  Exhibit 12   Ovarian Cancer Risk Factors      159
17               in African-American and White
18               Women
19  Exhibit 13   Primary Peritoneal and Ovarian   167
20               Cancers:  An Epidemiological
21               Comparative Analysis
22  Exhibit 14   Racial/Ethnic Differences in     174
23               the Epidemiology of Ovarian
24               Cancer:  A Pooled Analysis of
25               12 Case-Control Studies
```

2 (Pages 2 to 5)

Patricia Moorman, Ph.D., M.S.P.H.

Page 54

1      THE WITNESS:  I would say -- repeat the
2   question, please.
3   BY MR. HEGARTY:
4      Q.   Sure.  If I ask you the same series of
5   questions about talc without asbestos as it relates to
6   your primary opinion about talc increasing the risk of
7   ovarian cancer in users versus nonusers, but I asked
8   those same questions as to talc causing ovarian
9   cancer, you would give me the same answers; is that
10  correct?
11     MR. FARIES:  Objection to form.
12     THE WITNESS:  My answer would be that
13  talcum powder products on the basis of how women
14  reported them in these studies based on the
15  entire body of literature, yes, I would say that
16  talcum powder products, it can cause ovarian
17  cancer.
18  BY MR. HEGARTY:
19     Q.   If the evidence establishes that Johnson
20  baby powder and Shower to Shower have been asbestos
21  free over the years, is it correct that you would not
22  have the opinion that Johnson baby powder and Shower
23  to Shower cause ovarian cancer?
24     MR. FARIES:  Objection to form.  Objection
25  to the incomplete hypothetical.

Page 55

1   BY MR. HEGARTY:
2      Q.   You can answer.
3      A.   Okay.  My opinion is not based on --
4   exclusively on them containing asbestos.  My opinion
5   is based on the talcum powder products that the women
6   reported in our -- in the studies.
7      Q.   Is it your opinion that asbestos causes
8   ovarian cancer?
9      A.   Yes.
10     Q.   Have you done an in-depth analysis of the
11  literature looking at asbestos exposure in ovarian
12  cancer?
13     A.   I have looked at the literature related to
14  asbestos in ovarian cancer, yes.
15     Q.   How many studies have looked at the
16  potential link between asbestos and ovarian cancer?
17     MR. FARIES:  Objection to form.
18     THE WITNESS:  I cannot give you an exact
19  answer.
20  BY MR. HEGARTY:
21     Q.   Do you list all of the studies you
22  reviewed with regard to asbestos only in ovarian
23  cancer in your disclosure, Exhibit Number 3?
24     A.   I don't know.  I don't know.  There have
25  been quite a lot of those studies.

Page 56

1      Q.   When I talk about the studies looking at
2   asbestos and ovarian cancer, do you understand that
3   I'm separating those out of the talcum powder products
4   looking at ovarian cancer?  Do you understand that?
5      A.   Yes, I do understand that.
6      Q.   And do you know how many studies that have
7   looked at asbestos exposure in ovarian cancer that are
8   occupational exposures?
9      A.   I do not know the exact number.  I know
10  that there have been quite a few.
11     Q.   Do you know if there have been any
12  nonoccupational exposure studies looking at asbestos
13  exposure in ovarian cancer?
14     A.   Yes, there are studies characterized as
15  more environmental asbestos exposure.
16     Q.   Can you name for me any such studies?
17     A.   I cannot name the specific authors.  I
18  believe that there was a study that was done in
19  Australia where women were not directly occupationally
20  exposed, but it was thought that they had exposure
21  either through inhalation exposure or, perhaps,
22  through a family member involved in the industry.
23     Q.   Do you know how many total women have been
24  studied in the studies looking at asbestos exposure in
25  asbestos -- I mean, in ovarian cancer?

Page 57

1      A.   I do not know the exact number.
2      Q.   Are you aware of the difficulties that
3   have existed over time distinguishing between
4   peritoneal mesothelioma and ovarian cancer?
5      MR. FARIES:  Objection to form.
6      THE WITNESS:  I am aware that that has
7   been an issue that has been discussed in the
8   literature.
9   BY MR. HEGARTY:
10     Q.   What are the difficulties in
11  distinguishing between peritoneal mesothelioma and
12  ovarian cancer?
13     MR. FARIES:  Objection to form.
14     THE WITNESS:  Many times ovarian cancer is
15  rather advanced when it is diagnosed, and there
16  can be some involvement throughout the
17  peritoneum, and sometimes -- so some authors
18  have indicated that it can be a little bit
19  difficult or have raised the opinion that it
20  might be difficult to distinguish between an
21  ovarian and a peritoneal.
22  BY MR. HEGARTY:
23     Q.   That difficulty can lead to a
24  misclassification of cases in controls, correct?
25     A.   That has been an issue discussed in the

15 (Pages 54 to 57)

Patricia Moorman, Ph.D., M.S.P.H.

Page 58

1    literature.
2        Q.   And misclassification -- such
3    misclassification would also be called
4    misclassification bias, correct?
5        A.   It -- yes, it is a potential bias, yes.
6        Q.   And such a potential bias can affect the
7    results of any study looking at asbestos exposure in
8    ovarian cancer, correct?
9            MR. FARIES:  Objection to form.
10           THE WITNESS:  Yes, we examine biases,
11   potential biases because of our concern about
12   how they might affect the conclusions of the
13   study.
14   BY MR. HEGARTY:
15       Q.   And have the studies that have looked at
16   asbestos exposure in ovarian cancer considered
17   confounding as it relates to whether you're looking at
18   occupational versus nonoccupational -- strike that.
19   Let me start over again.
20           Have there been studies looking at or
21   trying to address confounding as an independent risk
22   factor?
23           MR. FARIES:  Objection to form.
24           THE WITNESS:  Off the top of my head, I
25   can't recall the extent to which they address

Page 59

1    confounding in those studies.
2    BY MR. HEGARTY:
3        Q.   For example, in the talc ovarian cancer
4    studies, a number of factors are adjusted for in those
5    studies to address confounding, correct?
6        A.   Yes, that is very common.
7        Q.   And have the studies that have looked at
8    asbestos exposure in ovarian cancer all accounted for
9    or adjusted for potential confounding factors such as
10   other risk factors for ovarian cancer?
11           MR. FARIES:  Objection to form.
12           THE WITNESS:  As I answered previously, I
13   cannot recall in those studies the degree to
14   which they controlled for confounding.
15   BY MR. HEGARTY:
16       Q.   If studies don't control for confounding,
17   again, that can lead to results that are potentially
18   inaccurate, correct?
19           MR. FARIES:  Objection to form.
20           THE WITNESS:  If you do not control for
21   confounding, it is a potential bias, yes.
22   BY MR. HEGARTY:
23       Q.   And a potential bias can distort the
24   results of the study, correct?
25       A.   It can lead to making an inaccurate

Page 60

1    conclusion either -- or either the overall conclusion
2    or the -- the strength of the association that you're
3    looking at.
4        Q.   Would you agree that exposure to asbestos
5    through perineal cosmetic talc use, assuming that talc
6    has asbestos in it, is different from an occupational
7    exposure to asbestos in a factory or in a plant?
8            MR. FARIES:  Objection to form.
9            THE WITNESS:  So you -- is exposure to
10   asbestos in an occupational exposure different
11   than exposure through use in talcum powder?
12   BY MR. HEGARTY:
13       Q.   Assuming for purpose of the question that
14   talcum powder has asbestos in it.
15       A.   Has asbestos in it.
16           MR. FARIES:  Objection to form.
17           THE WITNESS:  They are somewhat different
18   exposures.
19   BY MR. HEGARTY:
20       Q.   How are they different?
21       A.   In the -- probably in the level of
22   exposure.
23       Q.   Would you agree that studies that have
24   looked at, for example, women working in factories
25   where asbestos is part of the product have a different

Page 61

1    level of exposure than women who use talcum powder
2    products, assuming for the question that there is even
3    any talc -- any asbestos in talcum powder products?
4            MR. FARIES:  Objection to form.
5            THE WITNESS:  I think that it is
6    reasonable to assume that women who are working
7    in an occupation that makes asbestos-based
8    products, that they're going to have a different
9    level of exposure than women who have -- who use
10   talcum powder products.
11   BY MR. HEGARTY:
12       Q.   That different level of exposure would be
13   a higher level of exposure, correct?
14       A.   In -- most likely, yes.
15       Q.   Have you made any effort to quantify the
16   differences in exposures between the occupational
17   studies looking at asbestos and ovarian cancer and
18   studies looking at talcum powder products and ovarian
19   cancer?
20       A.   I have -- I have not done that.  However,
21   I think that it is important to bear in mind that
22   several authoritative bodies have designated that
23   there is no safe level of asbestos exposure.
24       Q.   Is it your opinion that there is no safe
25   level of asbestos exposure?

16 (Pages 58 to 61)

Patricia Moorman, Ph.D., M.S.P.H.

Page 62

1      A.   It is my opinion.
2      Q.   And what is that opinion based on?
3      A.   My opinion is based on, as I said, several
4  organizations:  The World Health Organization, and I
5  believe NIOSH has also indicate -- and The World Trade
6  Organization.  I believe that all of them have issued
7  documents indicating that there is no safe level of
8  asbestos exposure.
9      Q.   Any other authorities that you would cite
10 to for support for your opinion that there is no safe
11 level of asbestos exposure?
12     A.   Those are the ones that come to mind.
13     Q.   In the studies that have looked at
14 asbestos exposure in ovarian cancer, what types of
15 asbestos have they looked at?
16         MR. FARIES:  Objection to form.
17         THE WITNESS:  Once again, I -- I cannot
18     recall specifically what they had looked at.
19 BY MR. HEGARTY:
20     Q.   What is the most common type of asbestos?
21         MR. FARIES:  Objection to form.
22         THE WITNESS:  Once again, I want to point
23     out that I am not a mineral specialist.  My
24     understanding is that all forms of asbestos are
25     not good for you and all should be avoided, so

Page 63

1      I -- I really never considered that as I, you
2  know, evaluated or read that literature.
3  BY MR. HEGARTY:
4      Q.   Can you name the various types of
5  asbestos?
6      A.   Some of them.
7      Q.   Tell me the names that you know.
8      A.   Tremolite and chrysotile, and I know there
9  are others, but I can't recall them.
10     Q.   Does the effect of various types of
11 asbestos -- strike that.
12         Is the risk of ovarian cancer affected by
13 the type of asbestos to which a person is exposed to?
14 In other words, is the risk different by -- based on
15 subtype or subtype of asbestos?
16         MR. FARIES:  Objection to form.
17         THE WITNESS:  I don't know that any
18     literature has actually evaluated that.  I . . .
19 BY MR. HEGARTY:
20     Q.   How about as to subtype of ovarian cancer,
21 is there certain subtypes of ovarian cancer that are
22 believed more strongly linked to asbestos exposure
23 than others?
24     A.   I don't recall in the studies that have
25 looked at it in relation to asbestos, the extent to

Page 64

1  which subtypes were considered.
2      Q.   Generally what had been the range of
3  relative risks or odds ratios reported between
4  asbestos exposure and ovarian cancer?
5         MR. FARIES:  Objection to form.
6         THE WITNESS:  You know, there have been
7     many papers that have -- that I have looked at.
8     All of the papers have many numbers reported in
9     them, so it's rather hard to say precisely.  It
10    seems like most of them are in the range of
11    standard mortality ratios around 3ish.
12 BY MR. HEGARTY:
13     Q.   Well, do you have an opinion as to the
14 overall relative risk of ovarian cancer with talcum
15 powder product use?
16     A.   The range, the overall --
17     Q.   Let me ask it again.  Do you have a
18 particular relative risk or odds ratio that you
19 attribute to exposure to talcum powder products in
20 ovarian cancer?
21     A.   Okay.
22         MR. FARIES:  Objection to form.
23         THE WITNESS:  Based on multiple
24     meta-analyses, the summary relative risk, the
25     overall relative risk associated with talcum

Page 65

1      powder use has been approximately 1.25, 1.3.
2  BY MR. HEGARTY:
3      Q.   And have you determined such a overall
4  relative risk for asbestos exposure in ovarian cancer?
5      A.   There have been meta-analyses that have
6  looked at that.  Off the top of my head, I cannot
7  recall the exact value.
8         MR. FARIES:  I'm sorry, can we pause for a
9     second?  I'm going to see if I can get these
10    guys in the hallway outside just to quiet down
11    for a sec.
12         (DISCUSSION HELD OFF THE RECORD)
13 BY MR. HEGARTY:
14     Q.   The last question really went back to the
15 previous one where I had asked you whether you
16 formulated an opinion or came to an overall relative
17 risk or odds ratio for talcum powder use in ovarian
18 cancer that you then responded by saying as 1.25 to
19 1.3.  So my question was whether you've done the same
20 thing as to the literature looking at asbestos
21 exposure and to be more specifically, occupational
22 asbestos exposure and ovarian cancer?
23         MR. FARIES:  Objection to form.
24         THE WITNESS:  Okay.  Once again, I have
25     read that literature, and I have read hundreds

17 (Pages 62 to 65)

Patricia Moorman, Ph.D., M.S.P.H.

Page 118

1      THE WITNESS:  I can't recall any -- any
2  document that has that exact phrasing.
3  BY MR. HEGARTY:
4      Q.   Can you cite for me any author in any
5  publication who has ever stated that use of talcum
6  powder products increase the risk of ovarian cancer?
7      A.   I'm just having trouble recalling any
8  specific wording like that.
9      Q.   Can you identify for me any doctor who
10  treats ovarian cancer who has the same opinions you do
11  about cause?
12      MR. FARIES:  Objection to form.
13      THE WITNESS:  I actually have not
14  discussed that with -- that specific question
15  with any gynecologic oncologist.
16  BY MR. HEGARTY:
17      Q.   Have you discussed with any gynecologic
18  oncologist your opinion that talcum powder products
19  increase the risk of ovarian cancer?
20      A.   I have not had a specific discussion in
21  that regard, no.
22      Q.   You provided to us the primary opinion in
23  this case that women who use talcum powder products
24  are at a higher risk of ovarian cancer than women who
25  did not use them.  Do you recall making that

Page 119

1  statement?
2      A.   I do.
3      Q.   Did you have that opinion before being
4  contacted by Plaintiffs' counsel in this case?
5      A.   I had the opinion that women who use body
6  powder are at increased risk for ovarian cancer for,
7  yes, before I was contacted by the Plaintiffs'
8  attorneys.
9      Q.   You also provided the opinion that women
10  who use that -- strike that.
11      You also provided the opinion that talcum
12  powder products cause ovarian cancer.  Do you recall
13  making -- telling us that today?
14      A.   I do.
15      Q.   Did you have that opinion before being
16  contacted by Plaintiffs' counsel in this case?
17      A.   My opinion, I think that it became
18  stronger as I reviewed the body of literature in -- in
19  relation to this.  It was -- I held the opinion that
20  it was a risk factor.  It became stronger as I really
21  delved into it in greater detail.
22      Q.   And let me make sure I'm clear on
23  Plaintiffs' counsel.  Before being contacted by
24  Mr. Gibson or Ms. Parfitt is it your testimony that it
25  was your opinion that women who used talcum powder

Page 120

1  products are at a higher risk of ovarian cancer than
2  women who did not use them?
3      A.   That is correct.
4      Q.   And before you were contacted by
5  Mr. Gibson or Ms. Parfitt, I take it from your last
6  answer, that you had not come -- yet come to the
7  opinion that talcum powder products cause ovarian
8  cancer, correct?
9      MR. FARIES:  Objection to form.
10      THE WITNESS:  I -- epidemiologists by
11  nature tend to be very cautious.  And it was,
12  you know, reviewing all of the literature in
13  probably more detail than I had ever reviewed it
14  before led me to come to the conclusion that I
15  think that the evidence is strong enough to say
16  with a reasonable degree of scientific certainty
17  that talc use can cause ovarian cancer.
18  BY MR. HEGARTY:
19      Q.   Have you ever used, before being contacted
20  by Plaintiffs' counsel in this case, the phrase
21  "reasonable degree of scientific certainty"?
22      A.   I don't think that I have.
23      Q.   What does that phrase mean to you?
24      A.   I take it to mean that when considering
25  the bulk -- the overall evidence, that it is

Page 121

1  reasonable to make that statement.  I think that it
2  takes -- it takes into account that science evolves
3  and there may be additional data that could arise
4  and -- in which the opinion may evolve, but based on
5  the body of evidence now I do feel that there is
6  reasonable scientific certainty.
7      Q.   With regard to your prior testimony as to
8  looking at cause versus increased risk, you mentioned
9  that that opinion came after you had done an in-depth
10  review, correct?
11      A.   That is correct.
12      Q.   So it would be a fair statement to say
13  before you were contacted by either Mr. Gibson or
14  Ms. Parfitt that you had not done an in-depth review
15  of all of the literature concerning talcum powder
16  products and ovarian cancer, correct?
17      MR. FARIES:  Objection to form.
18      THE WITNESS:  I think that it is a matter
19  of degree.  I think that I was aware of the
20  epidemiologic studies that had addressed this.
21  And as I was -- after I was contacted about this
22  case, I tried to do a very critical, very
23  in-depth reviews.
24  BY MR. HEGARTY:
25      Q.   A review you had not yet done before being

31 (Pages 118 to 121)

Patricia Moorman, Ph.D., M.S.P.H.

## Page 122

1  contacted by Ms. Parfitt and/or Mr. Gibson, correct?
2      MR. FARIES:  Objection to form.
3      THE WITNESS:  As I said, I think that it
4  is not a matter of had I not or had I done it, I
5  think that it was, perhaps, the level of detail.
6  BY MR. HEGARTY:
7      Q.   You did a more detailed review and
8  analysis after being contacted by Ms. Parfitt and/or
9  Mr. Gibson than you had done before they had contacted
10  you, correct?
11      MR. FARIES:  Objection to form.
12      THE WITNESS: Correct.
13  BY MR. HEGARTY:
14      Q.   Have you ever provided the opinions you've
15  given us here today to any doctor who has ever treated
16  a patient for ovarian cancer?
17      A.   I have not.
18      Q.   That includes any doctor at Duke, correct?
19      A.   That is correct.
20      Q.   You've not told your opinions about talc
21  and ovarian cancer to any doctor in your own medical
22  school, correct?
23      MR. FARIES:  Objection to form, asked and
24  answered.
25      THE WITNESS: That is correct.

## Page 123

1  BY MR. HEGARTY:
2      Q.   Do you know any of the gynecologic
3  oncologists at Duke?
4      A.   Yes, I do.
5      Q.   Can you name for me the ones you know?
6      A.   I know Dr. Andrew Berchuck, Dr. Laura
7  Havrilesky.  I have met Angeles Alvarez Secord.  I
8  believe those are the ones that I know.
9      Q.   You've not spoken to them about your
10  opinions that you provided here today, correct?
11      A.   I have not had a direct conversation with
12  them.
13      Q.   Well, have you had any conversation with
14  them about your opinions in this case?
15      A.   No, I have not.
16      Q.   Have you told any of the authors that
17  you're on in the Schildkraut paper of your opinions in
18  this case?
19      MR. FARIES:  Objection to form.
20      THE WITNESS: No, I have not discussed my
21  involvement in this case with any of the
22  authors.
23  BY MR. HEGARTY:
24      Q.   How about any of the authors on any of the
25  papers you've been on?

## Page 124

1      MR. FARIES:  Objection to form.
2      THE WITNESS:  The only discussion that I
3  had about my involvement in this was with an
4  author.  It was a former student, and she had
5  been contacted by an attorney and asked me what
6  I thought about it and if I had had any
7  involvement.  And I had just mentioned to her
8  that I was working with the Plaintiffs'
9  attorney.  But I have not discussed otherwise.
10  BY MR. HEGARTY:
11      Q.   Who was that person?
12      A.   Who was the person?
13      Q.   Yes.
14      A.   Her name is Rachel Weber.
15      Q.   When did this discussion happen?
16      A.   I believe it was in the fall of last year.
17      Q.   Would it be a fair statement that with
18  regard to the opinions you've offered in this case,
19  that you've held those opinions for at least a year?
20      MR. FARIES:  Objection to form.
21      THE WITNESS: Yes, that is a fair
22  statement.
23  BY MR. HEGARTY:
24      Q.   Sitting here today you're not testifying
25  on behalf of Duke University, correct?

## Page 125

1      A.   No, I am not.
2      Q.   You're not coming here today testifying
3  that Duke University or the Duke Medical School has
4  the same opinions that you do, correct?
5      MR. FARIES:  Objection to form.
6      THE WITNESS: No, I am not.
7  BY MR. HEGARTY:
8      Q.   You're here on your own behalf, right?
9      A.   That is correct.
10      Q.   And the opinions you hold are your own
11  opinions, right?
12      A.   That is correct.
13      Q.   Can you identify for me any regulatory
14  body who has required a warning concerning genital
15  talc use and ovarian cancer?
16      MR. FARIES:  Objection to form.
17      THE WITNESS: No, I cannot.
18  BY MR. HEGARTY:
19      Q.   How about any regulatory body who has
20  concluded that genital talcum powder use is a risk
21  factor or a cause of ovarian cancer?
22      MR. FARIES:  Objection to form.
23      THE WITNESS: No, I cannot.
24  BY MR. HEGARTY:
25      Q.   Outside of your work with Plaintiffs'

32  (Pages 122 to 125)

Patricia Moorman, Ph.D., M.S.P.H.

| Page 126 | Page 128 |
|---|---|
| 1   counsel, has anyone before being contacted by | 1   specifically a cancer epidemiology course. |
| 2   Plaintiffs' counsel sought out your opinions regarding | 2       Q.   Have you ever provided to any of your |
| 3   talc and ovarian cancer? | 3   peers in any lecture format or otherwise the opinions |
| 4       A.   Before Plaintiffs' counsel -- | 4   you've offered here today? |
| 5       Q.   Yes. | 5       A.   No, I have not. |
| 6       A.   -- contacted me, has anybody else sought | 6       Q.   Do you consider yourself an expert in the |
| 7   out my opinion? | 7   possible association between asbestos -- strike that. |
| 8       Q.   Correct. | 8       Do you consider yourself to be an expert |
| 9       A.   No. | 9   in asbestos-causing ovarian cancer? |
| 10      Q.   Before being contacted by Plaintiffs' | 10      MR. FARIES:  Objection to form. |
| 11  counsel, has anybody sought out your opinion on | 11      THE WITNESS:  I consider myself to be an |
| 12  whether talcum powder products increase the risk of | 12  expert in the epidemiology of ovarian cancer.  I |
| 13  ovarian cancer? | 13  do not consider myself to be, specifically, an |
| 14      A.   No. | 14  expert about asbestos. |
| 15      Q.   Or about potential causes of ovarian | 15  BY MR. HEGARTY: |
| 16  cancer, generally?  Has anybody -- strike that. | 16      Q.   Have you conducted any original research |
| 17      Has anybody sought out your opinions, | 17  on asbestos in talcum powder products and ovarian |
| 18  generally, about the causes of ovarian cancer? | 18  cancer? |
| 19      A.   I'm not sure exactly how to interpret that | 19      MR. FARIES:  Objection to form. |
| 20  question.  I have -- you know, I have done things over | 20      THE WITNESS:  Please state that again. |
| 21  the course of my career such as reviewing grant | 21  BY MR. HEGARTY: |
| 22  applications, several years ago participated in a CDC | 22      Q.   Sure.  Have you conducted any original |
| 23  panel about ovarian cancer.  And so those I think that | 23  research looking at the potential for asbestos to be |
| 24  it would be fair to characterize them as people | 24  in talcum powder products? |
| 25  seeking my opinion about -- my -- my opinion, my | 25      A.   I think this goes back to the questions |

| Page 127 | Page 129 |
|---|---|
| 1   knowledge about ovarian cancer. | 1   that you've asked earlier.  As you clearly know, we |
| 2       Q.   I'd asked you previously about your | 2   did do a study that was evaluating talcum powder in |
| 3   opinions before being contacted by Plaintiffs' counsel | 3   relation to ovarian cancer, and so talcum powder with |
| 4   through the present date.  Have you provided the | 4   all its constituents.  We would not be able to |
| 5   opinions you've given us here today to any group, | 5   distinguish between asbestos-containing and |
| 6   person or entity outside of this litigation? | 6   nonasbestos-containing talcum powder. |
| 7       MR. FARIES:  Objection to form. | 7       Q.   My question is a little bit different. |
| 8       THE WITNESS:  No, I have not. | 8   You had commented earlier about reviewing studies or |
| 9   BY MR. HEGARTY: | 9   literature that has commented on the potential for |
| 10      Q.   Has NCI ever sought out your opinions with | 10  asbestos to be in talcum powder products.  Do you |
| 11  regard to talcum powder products and ovarian cancer? | 11  recall saying that earlier? |
| 12      A.   No, they have not. | 12      A.   That I looked at some of those studies. |
| 13      Q.   How about any scientific or medical body | 13      Q.   Have you ever been involved in any study |
| 14  or organization? | 14  looking at whether talcum powder products actually had |
| 15      A.   No, they have not. | 15  asbestos in them? |
| 16      Q.   Do you teach courses? | 16      MR. FARIES:  Objection to form. |
| 17      A.   Yes, I do. | 17      THE WITNESS:  Once again, that is outside |
| 18      Q.   Is that currently? | 18  of my realm of expertise.  I do not do any |
| 19      A.   Yes. | 19  mineral studies, testing, like that. |
| 20      Q.   Have you ever taught to any of your | 20  BY MR. HEGARTY: |
| 21  opinions -- have you ever taught to any of the | 21      Q.   Has there been any study looking at |
| 22  students in your classes the opinions you've provided | 22  actually asbestos in talcum powder products and that |
| 23  to us here today? | 23  link -- and such a link -- strike that.  Let me say it |
| 24      A.   No, I do not teach -- the course that I | 24  again. |
| 25  teach is called, Evidence-based Medicine.  It is not | 25      Have there been, actually, any studies |

33  (Pages 126 to 129)

Patricia Moorman, Ph.D., M.S.P.H.

Page 130

1   that have identified products, talcum powder products,
2   that actually have asbestos in them and looking at
3   those products link to ovarian cancer?
4           MR. FARIES:  Objection to form.
5           THE WITNESS:  I think that it goes back to
6       the same thing that I've said before.  There is
7       no way to do studies of ovarian cancer and -- in
8       relation to talcum powder use to distinguish
9       between asbestos-containing or not.
10  BY MR. HEGARTY:
11      Q.   You are not a medical doctor, correct?
12      A.   That is correct.
13      Q.   And you have never been involved in the
14  care and treatment of a patient with ovarian cancer,
15  correct?
16      A.   No, I have not.
17      Q.   You are not authorized to treat patients,
18  correct?
19      A.   No, I am not.
20      Q.   And you have never analyzed a patient's
21  risk factors for ovarian cancer, true?
22      A.   No, I have not.
23      Q.   You have never attempted to look at a
24  patient's risk factors and determine which factor, if
25  any, had anything to do with their ovarian cancer,

Page 131

1   correct?
2       A.   No.
3       Q.   Are you aware of a method published in the
4   medical literature for reliably determining the cause
5   of an individual patient's ovarian cancer?
6           MR. FARIES:  Objection to form.
7           THE WITNESS:  I'm not aware of anything
8       like that.
9   BY MR. HEGARTY:
10      Q.   Do you know the names of the plaintiffs in
11  this case?
12          MR. FARIES:  Objection to form.
13          THE WITNESS:  No, I do not.
14  BY MR. HEGARTY:
15      Q.   Do you know how many plaintiffs are in
16  this case?
17      A.   No, I do not.
18      Q.   Do you know anything about them, where
19  they live, where they grew up, their asbestos -- their
20  asbestos exposures, their talcum powder product
21  exposure?  Do you know any of that information?
22      A.   No, I do not.
23      Q.   Do you have any personal knowledge of any
24  patient who has used talcum powder products and
25  developed ovarian cancer?

Page 132

1           MR. FARIES:  Objection to form.
2           THE WITNESS:  I know several women who
3       have ovarian cancer.  I have not spoken to them,
4       specifically, about their use of talcum powder.
5       But it is a quite ubiquitous exposure, so it is
6       very possible that they did have that exposure.
7   BY MR. HEGARTY:
8       Q.   Is it correct that you don't intend, in
9   this case, to offer the opinion that any particular
10  woman's use of talcum powder products caused their
11  ovarian cancer?
12      A.   I was asked to comment on the general
13  causation meaning it is pulling on my expertise as a
14  population scientist.  I will not be commenting on any
15  specific woman.
16      Q.   If we talk about statistical significance
17  and if we look at relative risk or odds ratios, in
18  that analysis one is considered the null value,
19  correct?
20      A.   That is correct.
21      Q.   And null value would indicate no
22  association between the exposure you're looking at and
23  the disease you're looking at, correct?
24      A.   Yes.
25      Q.   If a study is statistically significant,

Page 133

1   it means that the likelihood of the result is caused
2   by something other than random chance, correct?
3           MR. FARIES:  Objection to form.
4           THE WITNESS:  The statistical significance
5       is one tool that we use to evaluate the results
6       from a study.
7   BY MR. HEGARTY:
8       Q.   Let me ask it a different way.
9       A.   Okay.
10      Q.   If a study is not statistically
11  significant, it means the result could be due to
12  random chance, correct?
13          MR. FARIES:  Objection to form.
14          THE WITNESS:  Okay.  It is -- if it is not
15      statistically significant that -- and you
16      give -- a 95 percent confidence interval is
17      reported, that is indicating that if you had
18      taken another sample from the population, this
19      is a plausible range of values that would be
20      statistically possible if you were able to
21      repeat the study.
22  BY MR. HEGARTY:
23      Q.   And a confidence interval includes the
24  value of one to a 95 percent -- a 95 percent
25  confidence interval would mean that the result could

34 (Pages 130 to 133)

Patricia Moorman, Ph.D., M.S.P.H.

Page 142

1   likely to be concerned about the potential effect on
2   that finding by confounders or biases?
3           MR. FARIES:  Objection to form.
4           THE WITNESS:  You would be concerned about
5       confounding regardless of the strength of the
6       association.  If it is a relative risk that is
7       very large, it would have to be a factor that
8       was associated with both the exposure, in this
9       case the smoking, and the outcome to a similar
10      degree of strength.
11          MR. FARIES:  Okay.  Mark, can you find a
12      stopping point here --
13          MR. HEGARTY:  Yeah.
14          MR. FARIES:  -- shortly?
15          MR. HEGARTY:  Give me about -- just about
16      a few minutes --
17          MR. FARIES:  Okay.
18          MR. HEGARTY:  -- and then I'll be done.  A
19      few minutes here.
20  BY MR. HEGARTY:
21      Q.   Do you agree that the size of an odds
22  ratio or relative risk is an important consideration
23  in evaluating the plausibility of a causal
24  relationship between the exposure and the disease?
25          MR. FARIES:  Objection to form.

Page 143

1           THE WITNESS:  One considers the size of
2       the odds ratio, but one would also bear in mind,
3       and it is pointed out in numerous papers, that
4       some associations may be smaller in magnitude
5       but still plausible and real.
6   BY MR. HEGARTY:
7       Q.   When you say it's a consideration, what do
8   you mean?  The size of the relative risk or odds ratio
9   is a consideration in assessing a causal relationship
10  between the exposure and the disease?
11      A.   Okay.  You know, as I have stated earlier,
12  the Bradford Hill viewpoints, I don't want to use word
13  "criteria" because he doesn't use that, but the
14  strength of the association is one of the
15  considerations that is described there.  So it's -- it
16  is taken into account in the total picture.
17      Q.   Do you agree that in looking at
18  epidemiologic studies the presence of an association
19  does not establish a causal relationship?
20          MR. FARIES:  Objection to form.
21          THE WITNESS:  Okay.  That is what we
22      always -- one of the first things we teach
23      students, that correlation is not causation.
24  BY MR. HEGARTY:
25      Q.   And is correlation and association the

Page 144

1   same thing?
2       A.   In a general sense, yes.
3       Q.   Do you agree that epidemiologic --
4   epidemiology or epidemiologic evidence by itself is
5   insufficient to establish causality?
6           MR. FARIES:  Objection to form.
7           THE WITNESS:  When we -- again, in
8       epidemiology, we often rely on the Bradford Hill
9       criteria.  And it's not just the epidemiologic
10      evidence, but a very important consideration is
11      the consideration of a plausible biological
12      mechanism.
13  BY MR. HEGARTY:
14      Q.   And consideration of a plausible biologic
15  mechanism would take the analysis beyond just
16  epidemiologic studies, correct?
17      A.   It would consider data from beyond the
18  epidemiologic study, yes.
19      Q.   Do you agree that a risk factor is not
20  necessarily a causal factor?
21          MR. FARIES:  Objection to form.
22          THE WITNESS:  I -- I do agree that there
23      are examples of that, yes.
24  BY MR. HEGARTY:
25      Q.   Have you ever been on a panel for a CDC?

Page 145

1           MR. FARIES:  I'm sorry, is this not a good
2       breaking point now?
3           MR. HEGARTY:  Oh, yeah.  No, we can do a
4       breaking point.  We can do it now.
5           MR. FARIES:  Yeah, let's do it now.
6       (RECESS TAKEN FROM 12:28 P.M. TO 1:30 P.M.)
7   BY MR. HEGARTY:
8       Q.   Dr. Moorman, when you do a case-control
9   study, you adjust for confounders that are also risk
10  factors that you believe may have an effect on the
11  results of the study, correct?
12      A.   Yes, we consider confounders, yes.
13      Q.   Is a confounder the same thing as a risk
14  factor?
15          MR. FARIES:  Objection to form.
16          THE WITNESS:  A confounder is a factor
17      that is associated with the outcome and is also
18      associated with the exposure that you're
19      interested in.  So it should have some -- it
20      should be associated with the outcome.
21  BY MR. HEGARTY:
22      Q.   Your intent when you do studies is to
23  adjust for all risk factors that are -- could be
24  associated with the outcome, correct?
25          MR. FARIES:  Objection to form.

37 (Pages 142 to 145)

Patricia Moorman, Ph.D., M.S.P.H.

Page 146

```
 1        THE WITNESS:  I do want to make that a
 2   little bit more nuanced.  We -- our objective is
 3   to consider them.  Sometimes when you do the
 4   analysis you might do it in an iterative process
 5   and so you might consider a factor as a
 6   potential confounder.  If it does not change the
 7   overall association, you may not necessarily
 8   keep that in your final statistical model.
 9   BY MR. HEGARTY:
10        Q.   But you agree that in papers where you
11   have been an author and looking at -- at risk factors
12   for ovarian cancer that you have not included as a
13   confounder body powder use, correct?
14        MR. FARIES:  Objection to form.
15        THE WITNESS:  I don't believe that is an
16   absolute accurate statement.  I think that we
17   may have considered it.  As I said, it may not
18   have -- if we put it into a model and it made no
19   difference, then there would be no need to
20   adjust for it.
21   BY MR. HEGARTY:
22        Q.   Did the paper reflect whether you
23   considered it, that is body powder use as a risk
24   factor, and decided not to adjust for it?
25        A.   It -- I can't say that with absolute
```

Page 147

```
 1   certainty.  It is typical to describe the factors that
 2   you considered as risk factors.
 3        Q.   I'm going to hand you what I marked as
 4   Exhibit Number 8.
 5        A.   Okay.
 6        (EXHIBIT NUMBER 8 WAS MARKED FOR IDENTIFICATION)
 7        MR. FARIES:  Thank you.
 8   BY MR. HEGARTY:
 9        Q.   This is a paper in which you were a
10   coauthor on entitled, Supplemental Selenium May
11   Decrease Ovarian Cancer Risk in African-American
12   Women.  Is that correct?
13        A.   Yes.
14        Q.   This was published -- well, it says at the
15   bottom: (Reading)
16            Manuscript received
17        October 20, 2016; initial review
18        completed November 23rd, 2016;
19        revisions accepted January 17th, 2017.
20            Correct?
21        A.   That is correct.
22        Q.   Then it notes it was first published
23   online on February 15, 2017, correct?
24        A.   Correct.
25        Q.   If you turn over to page 2 under the
```

Page 148

```
 1   results section.  Do you see that?
 2        A.   Yes.
 3        Q.   The first line there says:  (Reading)
 4            As expected, established
 5        ovarian cancer risk factors differ
 6        between cases and controls.
 7            You cite the Table 1, correct?
 8        A.   Yes.
 9        Q.   You did not include in Table 1 body powder
10   exposure as an established ovarian cancer risk factor,
11   correct?
12        A.   No, Dr. Terry did not include that in this
13   table.
14        Q.   You did not recommend that she include
15   that in this table either, did you?
16        MR. FARIES:  Objection to form.
17        THE WITNESS:  No, I did not make that
18   recommendation.
19   BY MR. HEGARTY:
20        Q.   That's all I have as to that study.
21        MR. KLATT:  I'm sorry, what was that
22   exhibit?
23        MR. HEGARTY:  8.
24        MS. PARFITT:  8.
25        MR. FARIES:  You write that on there?
```

Page 149

```
 1        MR. KLATT:  Do you want me to?  On the
 2   article?
 3        MR. HEGARTY:  Yeah, on the article itself.
 4        (EXHIBIT NUMBER 9 WAS MARKED FOR IDENTIFICATION)
 5   BY MR. HEGARTY:
 6        Q.   I'm going to show you what I've marked as
 7   Exhibit 9.  This is another paper in which you were an
 8   author on, correct?
 9        A.   Yes.
10        Q.   That paper is entitled, Analgesic
11   Medication Use and Risk of Epithelial Ovarian Cancer
12   in African-American Women.  Correct?
13        A.   Yes.
14        Q.   If you look over on page 823, Tables 2
15   and 3 and even Table 1 did not include body powder or
16   talcum powder use as a confounder that was adjusted
17   for, correct?
18            (WITNESS REVIEWS DOCUMENT)
19        A.   That is correct.
20        Q.   Did you recommend to the author, Lauren
21   Peres, that they include talcum powder use or body
22   powder use as a potential confounder to consider in
23   this -- this analysis?
24        A.   I do not recall that I did that, no.
25        Q.   And why would you not have made that
```

Patricia Moorman, Ph.D., M.S.P.H.

Page 150

1  recommendation?
2      A.   I don't know exactly what my thought
3  process would have been.  In this paper, Dr. Peres is
4  a post-doc under the direction of Dr. Schildkraut and
5  many times in this situation, the coauthors are not
6  involved in every decision along the way and so I
7  don't know the entire thought process that they went
8  through when they decided which factors they were
9  going to use including their statistical model.
10     Q.   Well, when you say "they," you're one of
11 the listed authors, right?
12     A.   I am one of the listed authors, yes.
13     Q.   You read that paper and signed off on it
14 before it was published, correct?
15     A.   Yes.
16     Q.   You had the ability in that paper and in
17 the paper we just looked at, Exhibit Number 8, to
18 recommend adjustment for other risk factors, correct?
19         MR. FARIES:  Objection to form.
20         THE WITNESS:  That is correct.
21 BY MR. HEGARTY:
22     Q.   You did not do so as it relates to body
23 powder or talcum powder use, correct?
24     A.   No, I did not.
25     Q.   This -- these papers use the same study

Page 151

1  population that you have been working from, the North
2  Carolina and/or the African-American study, in which
3  you do have information as far as body powder use,
4  correct, right?
5          MR. FARIES:  Objection to form.
6          THE WITNESS:  Yes.
7  BY MR. HEGARTY:
8      Q.   And you stand behind every word that's
9  published in these papers, correct, as an author?
10         MR. FARIES:  Objection to form.
11         THE WITNESS:  I stand behind these papers
12 in the -- in the way that authors stand behind
13 them.  It's -- I did not write every word.  In
14 fact, I did not write these papers, and I felt
15 like overall they were appropriate.  The data
16 was -- I didn't have objections to how the --
17 the data were presented.
18 BY MR. HEGARTY:
19     Q.   And all the authors, the lead authors, are
20 certainly competent and respectable scientists,
21 correct?
22     A.   Yes.
23     Q.   I'm going to show you what I next marked
24 as Exhibit Number 10.
25     (EXHIBIT NUMBER 10 WAS MARKED FOR IDENTIFICATION)

Page 152

1          MR. FARIES:  Thank you.
2  BY MR. HEGARTY:
3      Q.   This is another paper in which you are an
4  author, correct?
5      A.   That is correct.
6      Q.   This is a paper whose lead author is
7  Bo Qin; is that correct?
8      A.   Yes.
9          MR. KLATT:  Mark, do you mind reading the
10 title?
11         MR. HEGARTY:  Yeah, just a second.
12 BY MR. HEGARTY:
13     Q.   The title of that paper is, Dietary
14 Quality and Ovarian Cancer Risk in African-American
15 Women, correct?
16     A.   That is correct.
17     Q.   If you turn over to -- first of all, if
18 you look at this paper, first page it said it was
19 accepted for publication on June 8th, 2016, correct?
20     A.   Yes.
21     Q.   If you turn over to page 1282 under the
22 section, Statistical Analysis.  Do you see that
23 section?
24     A.   Yes, I do.
25     Q.   Towards the bottom of the second full

Page 153

1  paragraph it notes that:  (Reading)
2          The multi-variant adjusted
3      model further considered a priority
4      the potential confounders or risk
5      factors for ovarian cancer of . . .
6          And then it lists a number of risk
7  factors, correct?
8      A.   Correct.
9      Q.   And body powder use is not listed,
10 correct?
11     A.   Correct.
12     Q.   This paper also did not adjust for body
13 powder/talcum powder use, correct?
14     A.   Correct.
15     Q.   You, likewise, had the opportunity to make
16 that recommendation if you thought that was
17 appropriate to do so, right?
18     A.   Yes.
19     Q.   And you felt that the paper as presented
20 was appropriate, correct?
21         MR. FARIES:  Objection to form.
22         THE WITNESS:  Yes.
23 BY MR. HEGARTY:
24     Q.   Next paper I'm going to show you is one I
25 marked as Exhibit Number 11.

39 (Pages 150 to 153)

Patricia Moorman, Ph.D., M.S.P.H.

---

Page 154

```
1     (EXHIBIT NUMBER 11 WAS MARKED FOR IDENTIFICATION)
2   BY MR. HEGARTY:
3       Q.   This is a paper entitled, Socioeconomic
4   Status in Relation to the Risk of Ovarian Cancer in
5   African-American Women:  A Population-Based
6   Case-Control Study.  Correct?
7       A.   Correct.
8       Q.   You're also an author on this study; is
9   that right?
10      A.   Correct.
11      Q.   If you look in the abstract, about middle
12  of the abstract paragraph, it says:  (Reading)
13            After adjustment for a
14      established ovarian cancer risk
15      factors.
16          Do you see that?
17      A.   I do.
18      Q.   What that means is that this paper
19  adjusted for established ovarian cancer risk factors,
20  correct?
21          MR. FARIES:  Objection to form.
22          THE WITNESS:  That's what they state.
23  BY MR. HEGARTY:
24      Q.   In fact, that's what you state?
25      A.   Yes.
```

---

Page 155

```
1       Q.   Nowhere in this paper did you as an author
2   or the other authors adjust for body powder or talcum
3   powder exposure, correct?
4       A.   That is correct.
5       Q.   So you would have to agree that as of the
6   date this paper was published you did not believe that
7   body powder exposure or talcum powder exposure was an
8   established ovarian cancer risk factor?
9           MR. FARIES:  Objection to form.
10          THE WITNESS:  As I have stated before, I'm
11      not sure.  It's very hard to pinpoint at a
12      particular date what my opinion -- what my
13      opinion was.
14  BY MR. HEGARTY:
15      Q.   Well, wouldn't it be a fair statement that
16  as of the date of all these four papers we just looked
17  at, if you had believed that ovarian -- that body
18  powder or talcum powder use was an established ovarian
19  cancer risk factor, you would have recommended that
20  the -- you and the other authors adjust for it in the
21  study findings, correct?
22          MR. FARIES:  Objection to form.
23          THE WITNESS:  I -- I did not make that
24      recommendation.
25
```

---

Page 156

```
1   BY MR. HEGARTY:
2       Q.   Well, my question is a little bit
3   different.
4       A.   Yes, sir.
5       Q.   Isn't it correct, though, that if you had
6   believed at the time these papers were published that
7   body powder or talcum powder exposure was an
8   established risk factor for ovarian cancer that you
9   would have recommended to your fellow authors that
10  they adjust for it in the papers?
11          MR. FARIES:  Objection to form.
12          THE WITNESS:  I think it would be fair to
13      say that it should be considered, yes.
14  BY MR. HEGARTY:
15      Q.   Well, is it fair to say, though, in answer
16  to my question, that if you believed it would have
17  been -- it was an established risk factor at the time
18  these papers were published that you would have made
19  such a recommendation to your coauthors?
20          MR. FARIES:  Objection to form.
21          THE WITNESS:  I'm -- I'm not really -- I'm
22      not really sure.  It's -- as I said many times,
23      when we are working in these large groups,
24      you -- you may provide input.  It -- I might
25      have been operating on the assumption that they
```

---

Page 157

```
1   had looked at it and perhaps it was not a risk
2   factor, but I just don't know exactly what my
3   frame of mind was at that point.
4   BY MR. HEGARTY:
5       Q.   Well, you know better than anyone yourself
6   and how you would approach being an author on a paper,
7   correct?
8       A.   Correct.
9       Q.   Is it your testimony that if you had
10  believed that ovarian -- that body powder or talcum
11  powder use was an established risk factor that you
12  would not have passed that information along to your
13  coauthors?
14          MR. FARIES:  Objection to form and
15      mischaracterizes the witness' prior testimony.
16  BY MR. HEGARTY:
17      Q.   You can answer.
18      A.   I'm -- I -- I think that I was probably
19  relying on my coauthors and I did not make that
20  recommendation.  That's all I can say.
21      Q.   Well, are you testifying here today that
22  at the time these papers were published you did
23  believe that body powder or talcum powder use was an
24  established ovarian cancer risk factor?
25          MR. FARIES:  Objection to form.
```

Patricia Moorman, Ph.D., M.S.P.H.

## Page 158

1    THE WITNESS:  My testimony is that I have
2  believed for quite some time that talcum powder
3  use is a risk factor for ovarian cancer.
4  BY MR. HEGARTY:
5    Q.   Understood, but I'm talking about at the
6  date these papers were published.  Is your
7  testimony that at the date these papers were published
8  that you believed that body powder or talcum powder
9  use was an established risk factor for ovarian cancer?
10    MR. FARIES:  Objection to form.
11    THE WITNESS:  I would say yes, I did
12  believe it at that point.
13  BY MR. HEGARTY:
14    Q.   And that goes back to even the paper that
15  was published in 2015?
16    A.   As I have stated before, I have held this
17  position for a while.  I don't know exactly at what --
18  what point I would have said I held it or did not hold
19  it.
20    Q.   And it's your testimony that you --
21  despite you holding that belief, you didn't pass that
22  belief on to your coauthors; is that correct?
23    MR. FARIES:  Objection.  Sorry.  Objection
24  to form, asked and answered multiple times.
25

## Page 159

1  BY MR. HEGARTY:
2    Q.   You can answer.
3    A.   Okay.
4    MR. FARIES:  And let this be the last time
5  that you ask this question, please.
6    THE WITNESS:  Okay.  No, I did not pass
7  that information along to the coauthors.
8  BY MR. HEGARTY:
9    Q.   Okay.  Now, you -- in none of the papers
10  that we just looked at was there a reporting of a
11  relative risk or an odds ratio for talcum or body
12  powder use in ovarian cancer, correct?
13    A.   That is correct.
14    Q.   But you have been an author on several
15  papers that have reported an odds ratio or relative
16  risk for use of talcum powder or body powder --
17  powders and ovarian cancer, correct?
18    A.   That is correct.
19    (EXHIBIT NUMBER 12 WAS MARKED FOR IDENTIFICATION)
20  BY MR. HEGARTY:
21    Q.   The first paper, from what I can tell, of
22  your publications that reported an odds ratio or
23  relative risk is what I've marked as Exhibit Number 12
24  which is titled, Ovarian Cancer Risk Factors in
25  African-American and White Women.  Correct?

## Page 160

1    A.   That is correct.
2    Q.   Is it correct that this first -- this --
3  this paper, Exhibit 12, is the first time you ever
4  reported in the study in which you were on a relative
5  risk or odds ratio for body powder or talcum powder
6  use in ovarian cancer?
7    A.   To the best of my knowledge yes.
8    Q.   This is a paper in which you are the lead
9  author, correct?
10    A.   That is correct.
11    Q.   That means you are responsible for
12  everything in this paper, right?
13    MR. FARIES:  Objection to form.
14    THE WITNESS:  I wrote this paper, yes.
15  BY MR. HEGARTY:
16    Q.   And you stand behind the results of this
17  paper, correct?
18    A.   I do.
19    Q.   And in this paper you found no association
20  between talcum powder use and ovarian cancer in either
21  of African-American or white women, correct?
22    MR. FARIES:  Objection to form.
23    THE WITNESS:  In this paper there was not
24  a statistically significant association, that is
25  true.

## Page 161

1  BY MR. HEGARTY:
2    Q.   Well, with regard to white women, the odds
3  ratio you reported is 1.04, correct?
4    A.   That is correct.
5    Q.   That is essentially null value, right?
6    MR. FARIES:  Sorry, hang on, slow down.
7  Objection to form.
8    MR. HEGARTY:  Okay.
9    MR. FARIES:  Now you can proceed.
10    THE WITNESS:  Okay.  Among the white
11  women, that is correct, the odds ratio is 1.04,
12  which is very close to the null value.
13  BY MR. HEGARTY:
14    Q.   You also compared the results in whites
15  and African-American women and found no difference
16  between the two, correct?  You did not find
17  heterogeneity, right?
18    A.   If you let me just look for a moment to --
19    Q.   Sure.
20    A.   -- just recall.
21    MR. FARIES:  If you don't feel
22  comfortable, always review your paper.
23    (WITNESS REVIEWS DOCUMENT)
24    THE WITNESS:  Uh-huh.  That is correct, we
25  did not find a statistically significant

41 (Pages 158 to 161)

Patricia Moorman, Ph.D., M.S.P.H.

Page 174

1    Q.   Do you rely on what I've marked as Exhibit
2    Number 13 as part of your reliance materials for your
3    opinions in this case?
4        A.   I consider -- you know, as I said, I
5    considered the full body of literature and so, yes.
6        Q.   Within the dataset of the North Carolina
7    Ovarian Cancer Study, are there -- is that a racially
8    diverse population; in other words, does it include
9    white women, African-American women, Hispanic women?
10       A.   It was -- is a racially diverse.  There
11   were no exclusions by race/ethnicity, but it was
12   reflecting the population and the incidence of ovarian
13   cancer, so the vast majority of the -- or a large
14   majority of the women in the study were white women.
15       Q.   Do you know what percentage?
16       A.   Off the top of my head, I don't know.  I
17   would say probably definitely greater than 80 percent.
18       (EXHIBIT NUMBER 14 WAS MARKED FOR IDENTIFICATION)
19   BY MR. HEGARTY:
20       Q.   Next study I'm going to hand you I've
21   marked as Exhibit Number 14.  This is a study
22   entitled, Racial, slash, Ethnic Differences in the
23   Epidemiology of Ovarian Cancer:  A Pooled Analysis of
24   12 Case-Control Studies.
25       A.   Yes.

Page 175

1        Q.   Is that correct?
2        A.   That is correct.
3        Q.   You are an author on this paper; is that
4    correct?
5        A.   That is correct.
6        Q.   This paper shows in the upper right-hand
7    corner that it was published on December 2nd, 2017; E
8    published ahead of print; is that correct?
9        A.   I'm sorry, where are you?
10       Q.   Upper right-hand corner.
11       A.   I am not seeing that on the document.
12       Q.   I'm sorry, you may have different copy
13   than I have.  This is the copy I have.  I guess they
14   gave me a different copy.  The copy I have shows it
15   was published in December 2nd -- on December 2nd; E
16   published ahead of print.  Do you know if that's
17   accurate, of whether it was published in December of
18   2017?
19       A.   I don't recall the exact date.  I know
20   that it is a paper that came out fairly recently.
21       Q.   Do you agree it came out in the last three
22   months, four months?
23       A.   That sounds about right.
24       Q.   If you turn over to page 8 of this
25   study --

Page 176

1        MS. PARFITT:  Page 8?
2        MR. HEGARTY:  Page 8.
3    BY MR. HEGARTY:
4        Q.   -- and you look at the section, Body
5    Powder Use.  Do you see that section?
6        A.   Yes, I do.
7        Q.   First of all, body powder use includes use
8    of cornstarch products, correct?
9        A.   It may.
10       Q.   It can include deodorizing body powders,
11   correct?
12       A.   It -- it may, yes.
13       Q.   Body powder use is not exclusive to
14   powders containing talcum powder for purposes of the
15   African-American study, correct?
16       MR. FARIES:  Objection to form.
17       THE WITNESS:  That is correct.
18   BY MR. HEGARTY:
19       Q.   In fact, some of the women in the
20   African-American study used only cornstarch products,
21   correct?
22       MR. FARIES:  Objection to form.
23       THE WITNESS:  We do not know that.  We
24   asked about body powder use, so we did not ask
25   them to distinguish.

Page 177

1    BY MR. HEGARTY:
2        Q.   But you did not limit it to body powder
3    use containing talcum, correct?
4        A.   That is correct.
5        Q.   If you look at the column for body powder
6    use, you found that -- you found no increase in the
7    risk of ovarian cancer from any genital use in
8    Hispanic women, correct?
9        MR. FARIES:  Objection to form.  When
10   you're referring to "you," do you mean the
11   witness literally or the authors of the study?
12       MR. HEGARTY:  Fair point.
13   BY MR. HEGARTY:
14       Q.   Yeah, the -- when I talk about "you," I'm
15   referring to the paper or the authors.  Is that -- do
16   you understand that?
17       A.   Right.  Once again, I want to say the --
18   found an odds ratio of 1.41.  The confidence interval
19   included 1 so, therefore, it was not a statistically
20   significant increased risk.
21       Q.   You also not find a statistically
22   significant increased risk in Asian/Pacific Islander
23   women, correct?
24       A.   That is correct.
25       Q.   Is it your opinion that the increased risk

Patricia Moorman, Ph.D., M.S.P.H.

Page 178

1    of body powder -- of ovarian cancer with body powder
2    use does not vary across racial and ethnicity
3    features?
4           MR. FARIES:  Objection to form.
5    BY MR. HEGARTY:
6        Q.   Let me ask it a different way.
7        A.   Yeah, there were a couple of double.
8        Q.   Do you believe -- you've offered the
9    opinions in this case about body powder use in ovarian
10   cancer.  Do you -- is it your opinion that those apply
11   regardless of racial or ethnicity characteristics?
12          MR. FARIES:  Objection to form.
13          THE WITNESS:  Okay.  I based my opinion on
14      the overall body of literature, and as all of us
15      are well aware, the body of literature is
16      predominantly white populations.  And as we can
17      see here, the number of Hispanic women is a
18      small fraction of the number of non-Hispanic
19      whites and the same is true but to a lesser
20      extent for black women and Asian and Pacific
21      Islanders.  And again, my opinion was based on
22      the overall body of literature.  This one
23      publication suggests that the strength of the
24      association may vary somewhat across race/ethnic
25      groups, but again, that is for race/ethnic

Page 179

1        groups other than non-Hispanic whites.  We are
2    somewhat more limited in the numbers.
3    BY MR. HEGARTY:
4        Q.   You found in -- you or the paper or the
5    studies found in this analysis that there was no
6    statistically significant association between
7    nongenital use of body powder and ovarian cancer in
8    any racial group, correct?
9        A.   As reported here, so in non-Hispanic
10   white, the odds ratio 1, that is an accurate
11   statement.  For the Hispanic woman, it is -- 1.55 is
12   the odds ratio.  The lower bound of the confidence
13   interval is right at 1 so that would typically
14   translate to a p-value of right at .05, and so at
15   least in that group there is some indication of
16   increased risk.
17       Q.   But that group, the real odds ratio
18   could be 1.00, correct?
19          MR. FARIES:  Objection to form.
20          THE WITNESS:  We've talked about the
21      interpretation of the odds ratio repeatedly.
22      This is the range of values with which it is
23      statistically compatible.  The lower bound of
24      the confidence interval is a possible but less
25      likely value.

Page 180

1    BY MR. HEGARTY:
2        Q.   You also found in this study:  (Reading)
3              As reported below, no
4        statistically significant association
5        between aspirin, acetaminophen, or
6        NSAID use and ovarian cancer.
7        Correct?
8        A.   Again, all of those associations were not
9    statistically significant.
10       Q.   If turn over to page 9, top of the second
11   column you say:  (Reading)
12             Study heterogeneity was
13        present for several characteristics
14        which include body powder exposure.
15        Correct?
16       A.   Let me just -- yes, that is what it
17   states.
18       Q.   That means that you found differences in
19   the odds ratios across the various racial groups,
20   correct?
21       A.   Yes, that is -- would be -- yes.
22       Q.   And if you look down at the bottom of that
23   column, the last paragraph says:  (Reading)
24             For a model of established EOC
25        epithelial ovarian cancer risk

Page 181

1        factors.
2             Then you list several of those risk
3    factors in the -- then you list the risk factors in
4    the parenthetical.  Then you state:  (Reading)
5             The average ORs among the
6        controls was estimated by race
7        ethnicity.
8        Correct?
9        A.   That's what is stated, yes.
10       Q.   In this paper you did not include as an
11   established epithelial ovarian cancer risk factor body
12   powder use, correct?
13          MR. FARIES:  Objection to form.  And just,
14      once again, the "you" is the authors, the
15      collective publication.
16          MR. HEGARTY:  That includes her.
17          MR. FARIES:  Yes, she's one of authors.
18          THE WITNESS:  Okay.  Yes, the -- talc was
19      not included in this model.
20   BY MR. HEGARTY:
21       Q.   Did you recommend to your fellow authors
22   that talcum powder -- or I'm sorry, that body powder
23   use should be included in the list of established
24   epithelial ovarian cancer risk factors?
25       A.   I did not.

46  (Pages 178 to 181)

Patricia Moorman, Ph.D., M.S.P.H.

Page 182

1     Q.   And that's what this line says
2  when -- strike that.
3          When you put the parenthetical -- when the
4  authors put the parenthetical after established
5  epithelial ovarian cancer risk factors, you intended
6  to identify in that parenthetical those the authors
7  concluded were established risk factors, correct?
8          MR. FARIES:  Objection to form.
9          THE WITNESS:  That is a list of them --
10     the factors that they did include in the model,
11     yes.
12  BY MR. HEGARTY:
13     Q.   Well, that they included --
14     A.   And they --
15     Q.   I'm sorry.
16     A.   That they -- the investigators that did
17  this statistical analysis, that is what they included
18  in that model as -- and they considered the
19  established risk factors.
20     Q.   And the investigators included you?
21     A.   Yes.
22     Q.   And then if you turn over to the next
23  page, page 10, the very bottom to the right-hand
24  column, the authors write:  (Reading)
25          A concern with self-reported

Page 183

1     data is recall bias especially for
2     characteristics that are difficult to
3     report with accuracy.  Required
4     subjective summarization or can be
5     influenced by the investigator, media,
6     or similar factors.  Such problematic
7     characteristics may include body
8     powder exposure, analgesic medication
9     use, breastfeeding, and possibly
10     family history.
11          Did I read that correctly?
12     A.   You did read that correctly.
13     Q.   What the authors are stating there is that
14  the results reported could be inaccurate because of
15  subjective summarization or the influence by the
16  investigator, media, or similar factors, correct, as
17  it relates to body powder use, correct?
18          MR. FARIES:  Objection to form.
19          THE WITNESS:  Please state --
20  BY MR. HEGARTY:
21     Q.   Sure.  What that --
22     A.   -- the question.
23     Q.   -- those two sentences state is that
24  recall bias could influence the results as it relates
25  to body powder use, correct?

Page 184

1          MR. FARIES:  Objection to form.
2          THE WITNESS:  These two sentences are
3  definitely raising that as a concern about
4  factors like this.  They outline some of the
5  concerns about how difficult it is to accurately
6  report this -- these exposures.
7  BY MR. HEGARTY:
8     Q.   And you stand behind the results of this
9  study too, correct?
10     A.   Yes, I do.
11     Q.   Now, at the time this study was published,
12  you had been retained as an expert for Plaintiffs in
13  this litigation, correct?
14     A.   Let's see, I'm trying to -- this -- yes,
15  I -- I think that I must have been.
16     Q.   Did you have to fill out a conflict of
17  interest disclosure as part of this paper?
18     A.   I don't recall specifically for this
19  paper.
20     Q.   Well, as a matter of course, you have to
21  fill out one, correct?
22     A.   Most journals do.
23     Q.   Are you ever published in -- in any
24  journal that has not required the authors in the last
25  few years to provide a conflict of interest

Page 185

1  disclosure?
2     A.   I can't think of one right offhand.  I
3  just . . .
4     Q.   This was published in the International
5  Journal of Epidemiology, correct?
6     A.   Yes.
7     Q.   That journal requires the authors to
8  identify any potential conflicts of interest, correct?
9          MR. FARIES:  Objection to form.
10          THE WITNESS:  Once again, I publish in --
11     we publish in many journals and I -- I just
12     don't specifically recall the conflict of
13     interest form for this one.
14  BY MR. HEGARTY:
15     Q.   Did you disclose to the Journal at the
16  time this was published that you were a paid
17  Plaintiffs' expert in litigation involving talcum
18  powder or body powder use in ovarian cancer?
19     A.   I did not.
20     Q.   Don't you believe that an author reading
21  this paper with your name on it should know whether
22  you're a paid Plaintiffs' expert who's going to
23  testify in litigation that body powder use or talcum
24  powder use causes ovarian cancer?
25          MR. FARIES:  Objection to form.

47 (Pages 182 to 185)

Patricia Moorman, Ph.D., M.S.P.H.

Page 202

1    agree that it would be impossible to do a case control
2    study that would report accurate results?
3            MR. FARIES: Objection to form.
4            THE WITNESS: I could not state what
5        level, what degree, what that would be to say
6        that we could not do a case-control study.
7    BY MR. HEGARTY:
8        Q.   You do agree it would be a significant
9    concern in such an environment?
10           MR. FARIES: Objection to form.
11           THE WITNESS: Anytime we do a case-control
12       study we consider recall bias as a concern.
13   BY MR. HEGARTY:
14       Q.   But you would consider a concern publicity
15   or awareness of your study group between an exposure
16   and a disease you're looking at, correct?
17       A.   Yes, we would, which would play into
18   recall bias, why might women recall differently.
19       Q.   As you said, recall bias could explain the
20   difference between the number of cases who reported
21   body powder use before 2014 and the number that
22   reported afterwards, after 2014?
23           MR. FARIES: Objection to form.
24           THE WITNESS: I said that that was one
25       possible explanation.

Page 203

1    BY MR. HEGARTY:
2        Q.   Now, you looked at dose response in this
3    study, correct?
4        A.   Yes, we considered that.
5        Q.   You -- you reported on a dose
6    response for only any powder use, correct?
7            MR. FARIES: What table are we looking at?
8            MR. HEGARTY: I'm sorry, for -- let me
9        back -- let me break that up. I'm still
10       Table 2.
11           MR. FARIES: All right.
12           THE WITNESS: Okay.
13   BY MR. HEGARTY:
14       Q.   For duration you found no dose response in
15   any group, correct?
16       A.   Okay. We are looking at Table 2 --
17       Q.   Duration of use.
18       A.   -- in duration of use. So the women who
19   reported it for less than 20 years, 1.33, for greater
20   than 20 years the odds ratio was 1.52 with a
21   significant p-value for trend. So that does indicate
22   a significant trend with duration of use for any
23   genital use.
24       Q.   You did not find one for -- you're not
25   finding dose response for only nongenital use,

Page 204

1    correct? Under duration of use?
2            MR. FARIES: I'm sorry, objection to the
3        form of the question.
4            THE WITNESS: And the test for trend for
5        duration of use was not statistically
6        significant for the nongenital use. Yes, that
7        is correct.
8    BY MR. HEGARTY:
9        Q.   With regard to the -- any genital use by
10   number of applications, you use the levels of less
11   than 3600 and greater than 3600. How did those -- how
12   were those levels chosen?
13       A.   That was the median number of
14   applications. That was the cut point used.
15       Q.   Is it correct that you did not -- or
16   strike that.
17           Did you find any dose response for only
18   nongenital use in ovarian cancer?
19       A.   We did not find a significant trend with
20   either duration of use nor with number of applications
21   for nongenital use.
22       Q.   You also found no increase in risk of
23   ovarian cancer -- I'm sorry, strike that.
24           For occupational exposures you found no
25   increase in risk of ovarian cancer, correct?

Page 205

1        A.   I'm trying to remember where we reported
2    that in the paper. Right. In the paragraph below
3    that we report an odds ratio of 1.31. And the
4    confidence interval does include one, so it was not
5    statistically significant. And as I recall, that was
6    a pretty small number of women who reported
7    occupational use.
8        Q.   Did you also report in this study that you
9    found that most studies show no association to
10   nongenital use?
11       A.   I think that we did make that statement in
12   here.
13       Q.   Did you make a statement anywhere in this
14   paper that body powder use causes ovarian cancer?
15       A.   No, I did not make -- no, that statement
16   was not made in this paper.
17       Q.   Can you cite for me any epidemiologic
18   study where the authors determined a statistically
19   significant increase in risk of talcum powder use in
20   ovarian cancer that exceeded 2.0?
21           MR. FARIES: Objection to the form.
22           THE WITNESS: I -- I'm sorry, tell me
23       again.
24   BY MR. HEGARTY:
25       Q.   Sure. Can you cite for me any

52 (Pages 202 to 205)

Patricia Moorman, Ph.D., M.S.P.H.

Page 206

1  epidemiologic study where the authors determined a
2  statistically significant increase in risk greater
3  than two between perineal talc use and ovarian cancer?
4        MR. FARIES:  Objection to form.
5        THE WITNESS:  Okay.  We have already
6     talked about one instance of that.  In the
7     Cramer paper it was greater than two for the
8     sample of African-American women.  But, again,
9     we have talked about the imprecision of that
10    estimate based on the small sample size.
11       And I -- I know that there have -- other
12    studies have reported a relative risk greater
13    than two.  I do not recall on the individual
14    studies if it was statistically significant
15    right off the top of my head.
16 BY MR. HEGARTY:
17    Q.   Are you aware of any paper where the
18 authors reported an overall increase in risk that's
19 statistically significant in excess of two between
20 perineal talc use and ovarian cancer?
21    A.   So my answer is the same as for the last
22 question that there have been some papers that have
23 reported an odds ratio greater than two but off the
24 top of my head, I don't recall whether or not they
25 were statistically significant.

Page 207

1     Q.   Dr. Moorman, have you ever -- strike that.
2     Dr. Moorman, before being contacted by
3  Plaintiffs' lawyers in this case, had you ever done
4  any type of analysis, review and come to opinions as
5  you have done here in any situation involving any
6  exposure or any disease?
7        MR. FARIES:  Objection to form.
8        THE WITNESS:  I think that every time we
9     write a paper, we are considering all of the
10    data and coming to an opinion, so I would argue
11    that I have done that many times.
12 BY MR. HEGARTY:
13    Q.   Have you ever done the same analysis
14 here -- strike that.
15       Have you ever done analysis like you did
16 here and came to the conclusion that any other
17 exposure caused or causes any other disease?
18    A.   I have never used the phrasing "cause."  I
19 have certainly used the phrasing "increased risk."
20    Q.   Have you ever done an analysis looking at
21 either an increased risk -- looking at either
22 increased risk or cause where you've received
23 materials from a plaintiff's lawyer?
24    A.   Other than this case?
25    Q.   Yes.

Page 208

1     A.   No, I have not.
2     Q.   Have you ever done the kind of analysis
3  you've done here with regard to talcum powder product
4  use in ovarian cancer where you've been paid by
5  plaintiffs' lawyers?
6     A.   No, I have never done anything like that.
7     Q.   Have you ever done any kind of analysis
8  like you've done here where you've reviewed deposition
9  testimony and other materials generated in litigation?
10    A.   No, I have not.
11    Q.   Have you ever done any type of analysis
12 like you've done here for any cosmetic other than
13 talcum powder products?
14    A.   No, I have not.
15    Q.   How about with regard to any other mineral
16 besides talcum powder?
17    A.   No, I have not.
18    Q.   In terms of the process you've talked
19 about in reaching your opinions in this case, have you
20 ever published in any peer-reviewed publication the
21 steps that you took here to come to your opinions?
22       MR. FARIES:  Objection to form.
23       THE WITNESS:  Have I ever described the
24    steps I took to evaluate talc and ovarian
25    cancer?

Page 209

1  BY MR. HEGARTY:
2     Q.   Yes.  In any published, peer-reviewed
3  piece of literature?
4     A.   I have not.
5        MR. FARIES:  Objection to form.
6  BY MR. HEGARTY:
7     Q.   I'm sorry, what was the answer?
8     A.   I said I have not.
9     Q.   Other than -- strike that.
10       In terms of -- Dr. Moorman, do you agree
11 that all women are at risk for developing ovarian
12 cancer?
13       MR. FARIES:  Objection to form.
14       THE WITNESS:  I would say that all women
15    who have ovaries are at risk for developing
16    ovarian cancer.
17 BY MR. HEGARTY:
18    Q.   With regard to women who have ovaries,
19 what is their lifetime risk of developing ovarian
20 cancer?
21    A.   That is typically reported as about a 1.3
22 to 1.4 lifetime probability.
23    Q.   Ovarian cancer existed before any talcum
24 powder product was ever used by women, correct?
25    A.   Yes.

53 (Pages 206 to 209)

Patricia Moorman, Ph.D., M.S.P.H.

Page 210

1    Q.   Ovarian cancer would still exist if women
2  stopped using talcum powder products, correct?
3    A.   Yes.
4    Q.   Ovarian cancer occurs in women who have
5  never been exposed to any talcum powder product,
6  correct?
7    A.   Yes.
8    Q.   And any woman who used a talcum powder
9  product was still at risk for ovarian cancer without
10 regard to the use of the talcum powder products,
11 correct?
12   A.   Yes.
13   Q.   And there are women who develop ovarian
14 cancer who have no known risk factors, correct?
15         MR. FARIES:  Objection to form.
16         THE WITNESS:  Yes.
17 BY MR. HEGARTY:
18   Q.   And as to all of the women in this case,
19 if you had been able to talk to them at a young age,
20 you could not have assured them that they would not
21 get ovarian cancer if they never used a talcum powder
22 product, correct?
23         MR. FARIES:  Objection to form.
24         THE WITNESS:  You could not assure them of
25   that because ovarian cancer is not caused by one

Page 211

1    single risk factor.
2  BY MR. HEGARTY:
3    Q.   So no single risk factor can be the cause
4  of an ovarian cancer; is that what -- that that you're
5  saying?
6    A.   No, I am -- I am not saying that.  I am
7  saying that there is no single risk factor that
8  accounts for all ovarian cancers.
9    Q.   Ovarian cancer occurs even in the absence
10 of risk factors, correct?
11         MR. FARIES:  Objection to form.
12         THE WITNESS:  Ovarian cancer, something
13   has to cause it, okay?  And so it is accurate to
14   say that sometimes it occurs in the absence of
15   known risk factors.
16 BY MR. HEGARTY:
17   Q.   That cause can be what's considered to be
18 sporadic, correct?
19         MR. FARIES:  Objection to form.
20 BY MR. HEGARTY:
21   Q.   Do you know what the phrase "sporadic
22 cause" means?
23   A.   In the epidemiology world, most often when
24 the term "sporadic" is used, it is used to contrast it
25 with, like, a genetic cause or, like, for example, a

Page 212

1  defined mutation in, like, BRCA1 or BRCA2.  And so
2  it's contrasting those -- the genetic -- the strong
3  genetic association versus the ones without that.
4    Q.   If a woman's lifetime risk generally is
5  1.3 to 1.4, what is the lifetime risk of a woman who
6  uses talcum powder products?
7          MR. FARIES:  Objection to form.
8          THE WITNESS:  We are talking about the
9    relative risk.  Most of the meta-analyses
10   conclude that there is a relative risk of about
11   1.25, so multiplying 1.4 by 1.25 gives you a
12   lifetime risk of approximately 1.7 percent,
13   something like that.  When -- and, of course,
14   when you apply it to millions of women, that
15   small difference becomes more important.
16 BY MR. HEGARTY:
17   Q.   What is the latency period by which use of
18 talcum powder products can cause ovarian cancer?
19         MR. FARIES:  Objection to form.
20         THE WITNESS:  It is usually very difficult
21   to establish with precision what the latency
22   period is for any given exposure.  Many times it
23   is thought that the latency period can be many
24   decades.
25

Page 213

1  BY MR. HEGARTY:
2    Q.   Well, do you have an opinion as to how
3  long a woman must use a talcum powder product for it
4  to be a -- for it to cause ovarian cancer?
5          MR. FARIES:  Objection to form.
6          THE WITNESS:  For an individual woman, I
7    would not have an opinion, and I also do not
8    think that we have the data that we could say --
9    we could say that how many applications, how
10   long is too much.  I don't think we can identify
11   any safe period of use.
12 BY MR. HEGARTY:
13   Q.   All right.  Do you have the data to have
14 an opinion as to how long talcum powder products must
15 be used or how frequent they must be used in order to
16 actually increase the risk of ovarian cancer in a
17 woman?
18         MR. FARIES:  Objection to form.
19         THE WITNESS:  I think my answer is just
20   like for the previous question, that we don't
21   have that data.
22 BY MR. HEGARTY:
23   Q.   What is the volume of talcum powder
24 exposure necessary to either cause or increase the
25 risk of ovarian cancer?

54 (Pages 210 to 213)

Patricia Moorman, Ph.D., M.S.P.H.

Page 362

```
 1        - - - - - -
          E R R A T A
 2        - - - - - -
 3   PAGE LINE CHANGE
 4   ____ ____ _____
 5     REASON: _____
 6   ____ ____ _____
 7     REASON: _____
 8   ____ ____ _____
 9     REASON: _____
10   ____ ____ _____
11     REASON: _____
12   ____ ____ _____
13     REASON: _____
14   ____ ____ _____
15     REASON: _____
16   ____ ____ _____
17     REASON: _____
18   ____ ____ _____
19     REASON: _____
20   ____ ____ _____
21     REASON: _____
22   ____ ____ _____
23     REASON: _____
24   ____ ____ _____
25     REASON: _____
```

```
 1   STATE OF NORTH CAROLINA
 2   COUNTY OF DAVIDSON
 3          C E R T I F I C A T E
 4       I, Amy A. Brauser, RPR, RMR, CRR, Registered
 5   Merit Reporter/Certified Realtime Reporter, the
 6   officer before whom the foregoing deposition was
 7   taken, do hereby certify that the witness was duly
 8   sworn by me prior to the taking of the foregoing
 9   deposition; that the testimony of said witness was
10   taken by me to the best of my ability and thereafter
11   reduced to typewriting under my direction; that I am
12   neither counsel for, related to, nor employed by any
13   of the parties to the action in which this deposition
14   was taken, and further that I am not a relative or
15   employee of any attorney or counsel employed by the
16   parties thereto, nor financially or otherwise interest
17   in the outcome of the action.
18
19       This is on the 13th day of March, 2018.
20
     _____
21       Amy A. Brauser, RPR RMR CRR
         Notary Public # 20023030055
22
23
24
25
```

```
 1        ACKNOWLEDGMENT OF DEPONENT
 2           I,_____, do
 3   hereby certify that I have read the
     foregoing pages, and that the same
 4   is a correct transcription of the answers
     given by me to the questions therein
 5   propounded, except for the corrections or
     changes in form or substance, if any,
 6   noted in the attached Errata Sheet.
 7
     _____
 8   PATRICIA MOORMAN, Ph.D., M.S.P.H.  DATE
 9
10
11
12
13
14
     Subscribed and sworn
15   to before me this
     _____ day of _____, 20____.
16
     My commission expires:_____
17
18   _____
     Notary Public
19
20
21
22
23
24
25
```