# EXHIBIT E4

```
          SUPERIOR COURT OF THE STATE OF CALIFORNIA
       FOR THE COUNTY OF LOS ANGELES - CENTRAL CIVIL WEST

Coordinated Proceeding        )Coordinated Case
Special Title (Rule 3.550)    )No. JCCP4674
LAOSD ASBESTOS CASES          )
_____)LASC Case No. BC646315
                              )
TINA HERFORD and              )Coordination Trial
DOUGLAS HERFORD,              )Judge:
                              )Hon. Steven J.
          Plaintiffs,         )Kleifield, Dept. 324
                              )
     vs.                      )
                              )
AT&T CORP., a subsidiary      )
of AT&T INC., et al.,         )
                              )
          Defendants.         )
_____)

             SUPERIOR COURT OF NEW JERSEY
           LAW DIVISION, MIDDLESEX COUNTY
STEPHEN LANZO, III, and       )
KENDRA LANZO,                 )
                              )
          Plaintiffs,         )
                              )DOCKET NO.
     vs.                      )
                              )MID-L-7385-16AS
CYPRUS AMAX MINERALS          )
COMPANY, et al.,              )
                              )
          Defendants.         )
_____)

           DEPOSITION OF WILLIAM E. LONGO, PhD

                   August 23, 2017

         11555 Medlock Bridge Road, Suite 100
                Johns Creek, Georgia
       Debra R. Luther, RMR, CRR, CCR-B-881
                Atlanta Reporters, Inc.
          Georgia Certified Court Reporters
                   (866) 344-0459
               www.atlanta-reporter.com
```

## Page 2

```
 1            APPEARANCES OF COUNSEL
 2    On behalf of the Plaintiffs
        Tina Herford and Douglas Herford:
 3
         CHRIS PANATIER, Esq.
 4       Simon Greenstone Panatier Bartlett, PC
         3232 McKinney Avenue
 5       Suite 610
         Dallas, Texas 75204
 6       cpanatier@sgpblaw.com
 7
      On behalf of the Plaintiffs
 8      Stephen Lanzo, III, and Kendra Lanzo:
 9       JOSEPH D. SATTERLEY, Esq.
         Kazan, McClain, Satterley & Greenwood
10       55 Harrison Street
         Suite 400
11       Oakland, California 94607
         jsatterley@satterleylaw.com
12
13    On behalf of the Defendant
        Johnson & Johnson (Herford):
14
         ALEXANDER G. CALFO, Esq.
15       King & Spalding, LLP
         633 West Fifth Street
16       Suite 1700
         Los Angeles, California 90071
17       acalfo@kslaw.com
         (Appearance by telephone)
18
         ADAM REINKE, Esq.
19       King & Spalding, LLP
         1180 Peachtree Street, NE
20       Atlanta, Georgia 30309-3521
         areinke@kslaw.com
21
         JULIA ROMANO, Esq.
22       King & Spalding, LLP
         633 West Fifth Street
23       Suite 1700
         Los Angeles, California 90071
24       jromano@kslaw.com
         (Appearance by telephone)
25
```

## Page 3

```
 1         APPEARANCES OF COUNSEL (Continued)
 2    On behalf of the Defendant
        Imerys (Herford):
 3
         TODD B. BENOFF, Esq.
 4       Alston & Bird, LLP
         333 South Hope Street
 5       Sixteenth Floor
         Los Angeles, California 90071
 6       todd.benoff@alston.com
 7
      On behalf of the Defendant
 8      Shulton, Inc. (Herford):
 9       M. JAMES DEMPSEY, Esq.
         Cosmich, Simmons & Brown, PLLC
10       34 Millbranch Road
         Suite 70
11       Hattiesburg, Mississippi 39042
         jimmy@cs-law.com
12
13    On behalf of the Defendants
        Calaveras Asbestos, Ltd. (Herford):
14
         N. NIKKI HARIRCHI, Esq.
15       Foley & Mansfield, PLLP
         300 South Grand Avenue
16       Suite 2800
         Los Angeles, California 90071
17       nharirchi@foleymansfield.com
         (Appearance by telephone)
18
19    On behalf of the Defendant
        Revlon, Inc.; Yves San Laurent America,
20      Bristol-Myers Squibb Company; and
        Elizabeth Arden, Inc. (Herford):
21
         EDWARD R. ULLOA, Esq.
22       Hawkins, Parnell, Thackston & Young, LLP
         445 South Figueroa Street
23       Suite 3200
         Los Angeles, California 90071-1651
24       eulloa@hptylaw.com
         (Appearance by telephone)
25
```

## Page 4

```
 1            INDEX TO EXAMINATIONS
 2
 3    Examination                          Page
 4
 5    Examination by Mr. Calfo              14
 6    Examination by Mr. Benoff            125
 7    Examination by Ms. Harirchi          226
 8    Examination by Mr. Panatier          230
 9
10              - - -
11
...
19       (A disk(s) containing original Exhibits 1
20    through 18 will be attached to the original
21    transcript, the originals having been returned
22    to Dr. Longo.  Exhibits 3, 7, and 8 were not
23    produced to the court reporter by the time of
24    production and not attached.)
25
```

## Page 5

```
 1              INDEX TO EXHIBITS
 2
      Defendant's
 3    Exhibit      Description              Page
 4
       1    Curriculum vitae                 27
 5
       2    Testimony list                   27
 6
       3    (Not marked)                     28
 7
       4    Five high-resolution photographs 45
 8
       5    Talc Size Distribution of Johnson &  45
 9          Johnson and Valeant Shower to
            Shower Amphibole Positive Samples
10          (Longo and Rigler, 8/21/2017)
11     6    Project COC, chain of custody,   46
            purchase order, receipt,
12          photographs
13     7    (Not marked)                     51
14     8    (Not marked)                     61
15     9    Analysis of Johnson & Johnson Baby  62
            Powder and Valeant Shower to Shower
16          Talc Products for Amphibole
            (Tremolite) Asbestos (Longo and
17          Rigler, 8/2/2017)
18    10    CDs: Johnson & Johnson Testing   67
            Binders 1 - 3
19
20    11    FDA 1973 - 1977 retesting of Lewin  69
            samples
21
      12    5/17/1977 Minutes of the CTFA Task  69
22          Force on Round-Robin Testing of
            Consumer Talcum Products for
23          Asbestiform Amphibole Minerals
24    13    Report of Results MVA 11730,     69
            Investigation of Italian Talc
25          Samples for Asbestos (Compton,
            8/1/2017)
```

Page 30

1 where I actually do deposition or trial is on behalf
2 of plaintiffs.
3    Q.   Okay.  And just so we -- I'm sure you
4 testified to this in the past, but can you tell us
5 what percentage of your cases that you've testified
6 in through deposition or trial are on behalf of
7 plaintiffs?
8    A.   What I've testified in the past, I have
9 not added it up, but I would say approximately 90 to
10 95 percent of the time when I'm testifying either in
11 deposition or trials is on behalf of plaintiffs.  So
12 I don't have the exact number.
13   Q.   And then if we look at Exhibit 2, your
14 list, which of those cases involved allegations
15 related to talc?
16   A.   I don't know.
17   Q.   Are there any?
18   A.   I have testified in talc cases before, not
19 in cosmetic talc but primarily industrial talc,
20 typically involved in Vanderbilt.
21   Q.   I didn't hear the last part.
22   A.   Typically the Vanderbilt mines, or the
23 industrial talc mines.
24   Q.   Okay.
25   A.   But I don't know which ones those are.

Page 31

1    Q.   And you're a materials scientist?
2    A.   Yes, sir.
3    Q.   And as a materials scientist tell us what
4 your knowledge is in terms of the difference between
5 industrial talc and cosmetic talcum powder.
6    A.   Typically what I've seen in the past, what
7 others have testified to, is the industrial talc
8 typically has a larger particle size, usually more
9 fibrous, and the prevailing thought at the time was
10 that it would have higher concentrations of
11 amphiboles.
12        That's not consistent with some of the J&J
13 documents where they have looked at both industrial
14 versus cosmetic in some of the later reports.  But
15 that's usually what is the thought process, is that
16 you're not grinding it down to the size necessary for
17 the size distribution in industrial talc used in
18 things like joint compound, sometimes gaskets,
19 sometimes paint, et cetera, where the cosmetic talc
20 is specifically designed to be applied to the human
21 body.
22    Q.   And so just generally, let me just get
23 this generally.  Generally industrial talc has larger
24 particle size, it's more fibrous, and it has higher
25 concentrations of amphiboles; is that right,

Page 32

1 generally?
2    A.   That's what generally the thought process
3 is.  Certainly if you look at Gouverneur talc, Nytal
4 has significant amounts of tremolite, anthophyllite,
5 getting away from the argument of asbestiform and
6 nonasbestiform, those can be routinely in the higher
7 percentages.  But I guess it depends on the mine and
8 what's industrial versus what's not industrial.
9        And again, I may have to rethink that.
10 You have some industrial talc analysis for tremolite
11 and you have -- as compared to the cosmetic talc in
12 these documents, and the concentrations weren't that
13 much different for the tremolite and/or the
14 chrysotile found in at least the Vermont mines.
15        MR. CALFO:  I'm going to move to strike
16   everything after the word and again, but that's
17   okay.
18   Q.   (By Mr. Calfo)  If you look at your
19 Exhibit 2, can you tell me which of the cases on
20 Exhibit 2 that you've testified in involve cosmetic
21 talcum powder products?
22   A.   I think that we've already discussed that.
23 I don't recall ever testifying in a cosmetic talc
24 case other than a deposition I had when I was there
25 on behalf of a defendant, Scotts Turf Builder

Page 33

1 fertilizer, and I was just only produced for our
2 analysis of that.  And Moshe Maimon from Levy,
3 Phillips was there on behalf of the plaintiff, and
4 since he was crossing me and after he got my opinions
5 about Scotts Turf Builder, an individual -- and I
6 can't think of his name -- for Colgate, started
7 questioning me about cosmetic talc, even though I
8 wasn't there to testify about cosmetic talc.  And
9 that's the only time --
10   Q.   And what was the name of that case?
11   A.   I don't recall.
12   Q.   If you look at your list of Exhibit 2,
13 would that refresh your memory?
14        MR. PANATIER:  I bet you, Alex -- I kind
15   of know about this.  I'll look at the report.
16   If it was before 2013 or after -- if it was
17   before 2013, it's not on here.  I think it was
18   either Kenzig, Fishbain, or Diaz filed in either
19   New Jersey or New York.
20        MR. CALFO:  Okay.
21        MR. PANATIER:  And it was Morgan Tovey who
22   was doing the questioning.
23   Q.   (By Mr. Calfo)  So let me just ask you
24 this, sir.  How many cases have you testified in
25 where plaintiffs alleged they developed mesothelioma

Page 34

1 as a result of their exposure to cosmetic talc
2 powder?
3     A.   Where actually I was hired as an expert in
4 that case?
5     Q.   Yes.
6     A.   These would be the first two.  Well --
7 both -- yeah, these would be the first two.
8     Q.   And is Herford, the one we're here for
9 today, is that the first case you've ever testified
10 against Johnson & Johnson with respect to cosmetic
11 talc?
12          MR. SATTERLEY:  Object to the form of the
13     question.
14          THE WITNESS:  And just because I'm picky,
15     I don't testify for or against anybody.  I just
16     provide the opinions of what I find and based
17     on --
18     Q.   (By Mr. Calfo)  Let me rephrase it, then,
19 so you're comfortable with it.
20     A.   Hold on -- on my background, training, and
21 analysis.  And as far as I know, this would be the
22 first time that Johnson & Johnson is going to be
23 asking me questions about my work.
24     Q.   Okay.  Do you know who other defendants
25 are in the Herford case other than Johnson & Johnson?

Page 35

1     A.   I do not.
2     Q.   And let me just be clear.  Is this
3 August 2nd, 2017, report that you prepared, which I
4 received two days ago, was that the first time you
5 tested a cosmetic talcum powder product for what
6 might be a potential asbestos contamination?
7     A.   This would be the first time that we
8 looked for -- to determine trace amounts of amphibole
9 tremolite in a cosmetic talc versus the hundred times
10 that we have looked for trace amounts of amphibole in
11 other products, primarily the source being the
12 chrysotile in the products.
13          So this type of analysis is not new to us.
14 It's just a change or difference in the matrix
15 material that we're looking in.
16     Q.   I understand.  But the bottom line is this
17 was the first time you tested a cosmetic talcum
18 powder product for potential asbestos contamination;
19 right?
20     A.   You know, I can't say that without just
21 thinking we have looked at another type of cosmetic
22 talc, it's my understanding, that's not Johnson &
23 Johnson.  We've issued a report.  But I'm not here
24 for that deposition, and my client or clients on a
25 couple of those are not here for their interests, so

Page 36

1 I can't talk about them.
2          But this would be the first deposition
3 specifically involving a matrix of talc looking for
4 and determining if there's any trace levels of
5 amphiboles -- detectable trace levels of amphiboles
6 in the samples we looked at versus other types of
7 samples where we have looked at different matrices
8 where we are determining if there's trace amounts of
9 amphiboles present.
10     Q.   And I know you don't want to talk about
11 your other matter, but when did you test the talcum
12 powder for that other product unrelated to Johnson &
13 Johnson?
14     A.   I think there's been a couple, but it's
15 been within the last six months or seven months or
16 so.
17     Q.   Have you had your deposition taken in
18 either of those instances?
19     A.   No, sir.  If I did, I could talk about it.
20     Q.   Can you tell us who the plaintiff lawyers
21 were?
22     A.   I prefer not to because I'm not an
23 attorney and I don't know what opens the door or not
24 opens the door.  It's certainly nothing that I'm
25 relying on in this matter or that any results of

Page 37

1 those studies affects any of my opinions in this
2 matter.  And I prefer to keep it confidential since
3 they're not here, I don't know if they want their
4 names spoken or not about it, so I just can't talk
5 about it.  But I don't want you to think that this is
6 the only time within the last year that we have
7 analyzed talc samples.
8          MR. PANATIER:  And just for the record,
9     I'll just place an objection that the question
10     violates the attorney work product privilege
11     because as far as I know, any of that work that
12     has been done has been done on a consulting
13     expert basis.
14     Q.   (By Mr. Calfo)  Well, let me move on.  I
15 just want to -- let's keep moving, then.
16          Have you ever tested a cosmetic talcum
17 powder product for potential asbestos contamination
18 outside of litigation?
19     A.   I don't believe so.
20     Q.   Okay.  Your report for this case, it's
21 entitled Analysis of Johnson & Johnson Baby Powder
22 and Valeant Shower to Shower Talc Products for
23 Amphibole (Tremolite) Asbestos; is that right?
24     A.   That is correct.
25     Q.   And it's a 25-page report with

Page 38

1  attachments, which I received on Monday.  You have
2  attachments to your report; right?
3      A.  Yes, sir.
4      Q.  Okay.  And when I looked at your report on
5  Monday, I noted there were 679 pages in total, if you
6  include the attachments.  So you have a 25-page
7  report with attachments that total about 679 pages;
8  would that be fair, sir?
9      A.  That's fair.
10     Q.  Now, here's my confusion, because I
11 understand there are new documents that I don't have.
12 Other than the 25-page report and the 679 pages total
13 that we've received, what else do you have that you
14 brought with you today?
15     A.  I brought better quality photographs of
16 each of the specimen container samples that show top,
17 bottom -- six sides that are of higher quality than
18 the one page in the book.
19         And also I brought with me today a
20 particle size analysis that was run on our scanning
21 electron microscope to compare the size distributions
22 of the talc particles as well as any fibrous
23 particles in there as compared to what I would call a
24 control, which is essentially a current version of
25 Johnson's Baby Powder that was bought at a local

Page 39

1  store here so that I could see how the size particles
2  compare from sample to sample to sample to sample as
3  well as what Johnson & Johnson is selling today --
4  well, not today but within the last three or four
5  months.
6      MR. SATTERLEY:  And let me just -- the
7  Lanzo file and folders and binders and things
8  are here as well; he brought those as well.
9      MR. CALFO:  Okay.  Like I said, I just
10 don't know anything about Lanzo, so I'm sorry.
11 Thanks for putting it on the record.
12     MR. SATTERLEY:  It was produced to
13 Johnson & Johnson last week, so I'm sorry that
14 your client didn't share it with you.  But if
15 you got this information on Monday in the
16 California case, I assume Johnson & Johnson
17 lawyers in Lanzo didn't share it with you on
18 Friday.
19     MR. CALFO:  The only thing I got is -- is
20 this Mr. Satterley?
21     MR. SATTERLEY:  It is.
22     MR. CALFO:  All I received on Monday was a
23 25-page report with 679 pages.  That's all I
24 got.  And I haven't spoken with anyone because I
25 thought that was all we were doing.  So we can

Page 40

1  talk about this off the record.
2      MR. PANATIER:  Alex, this is Chris.  To be
3  clear, in Herford we also uploaded for you all
4  of the Johnson & Johnson documents that we gave
5  to Dr. Longo.  So you have that too.
6      MR. CALFO:  Fair enough.  Fair enough.
7  And I've always had those; right?
8      MR. PANATIER:  Right, of course.
9      Q.  (By Mr. Calfo)  Okay.  So I don't have the
10 quality photos that you have brought with you today,
11 sir, but just tell me generally what are they and how
12 do they bear on your opinions that you're going to
13 render in the Herford case?
14     A.  They're a documentation of the containers
15 of talcum powder that we analyzed that shows top,
16 bottom, and all four sides for each of the 30
17 samples.  And other than saying this is what we
18 analyzed and this is the container as received, it
19 doesn't really have any other impact on my testimony.
20     MR. PANATIER:  And just to be clear,
21 because I think he asked for all the photos,
22 there's some of the fiber photos as well that
23 are high-res photos.
24     THE WITNESS:  Oh, correct.  A couple of
25 the samples we took -- because there was visible

Page 41

1  amphiboles in the SEM, we took some high
2  resolution just to show the structure of
3  actually at the high resolution because of this
4  instrument, they're bundles versus just a fiber,
5  which that's what it would look like mostly on
6  TEM, just some representative fibers from a
7  couple of the positive samples.
8      Q.  (By Mr. Calfo)  All right.  So bottom
9  line, what did the photos show in supporting your
10 opinions in this case?
11     A.  Well, the few fibers --
12     Q.  Because I haven't seen them.
13     A.  The few amphibole fibers that we
14 documented are consistent with what we found in the
15 transmission electron microscope as well as shows
16 more of the surface features of these fibers where
17 you can -- what look as a fiber showing bundles, and
18 bundles by definition are asbestiform, because you
19 cannot fracture a blocky material and get numerous
20 fibers stacked on top of each other, and it just
21 shows some of the asbestiform tremolite fibers that
22 were found in a couple of those samples.
23     Q.  How many photos do you have, sir, that you
24 brought with you today?
25     A.  I have five.

Page 106

1    A.  No, sir.  It was a different manufacturer.
2  However, the results are consistent with our results
3  and with others.  I wouldn't expect the J&J to behave
4  any differently with a similar cosmetic type talc
5  with contamination or trace levels of amphiboles as
6  was found in the samples they tested.
7    Q.  Can you cite for me any peer-reviewed
8  epidemiology study that concludes that exposure to
9  nonasbestiform amphibole minerals increases a
10 person's risk of developing cancer?
11   A.  I'm not aware of any epi studies in which
12 they exposed humans just to nonasbestiform, because
13 you typically will get some asbestiform along with
14 the nonasbestiform.  I don't know how much was
15 published of miners.  And I'm not an epidemiologist,
16 so that's not an area I testify about.
17       And I don't testify about the hazards of
18 asbestos exposure, so I'm not here to say that any of
19 these results one way or the other are hazardous or
20 nonhazardous.
21       I'm just saying if you look at the data,
22 you look at all the testing, you look at our testing,
23 you look at others' testing, that there is an
24 exposure level for the use of these cosmetic talcs
25 that have amphibole contamination.  Is that exposure

Page 107

1  level harmful and causes cancer or not?  That's not
2  my area.  Others can argue about that.
3    Q.  All right.  Because you mentioned
4  significant exposure.  I didn't know what you meant
5  by that.  But that's not what you're going to be
6  talking about; right?
7    A.  Well, when I say significant exposure,
8  it's over background.  And background levels for
9  tremolite anthophyllite are zero.  So any detection
10 of airborne -- in my opinion, any detection of any
11 concentration of airborne tremolite anthophyllite,
12 unless you're living in Libby, Montana, when they're
13 working that mine, is going to be above background,
14 and that would be significant in my definition.
15   Q.  What in layman's term is tremolite?
16   A.  In layman's term?
17   Q.  Yes.
18   A.  It is an asbestos -- a regulated asbestos
19 fiber so that the exposure to tremolite-actinolite,
20 the tremolite series, is one of the types of
21 regulated asbestos fibers that OSHA, EPA, are
22 concerned about.
23       I don't know what a layman's term really
24 means.  It's an asbestos -- regulated asbestos
25 mineral.

Page 108

1    Q.  Do you agree that tremolite can exist as
2  nonasbestos?
3    A.  I would agree that the tremolite can be
4  nonasbestiform so --
5    Q.  In other words there's --
6       MR. SATTERLEY:  He's not --
7       MR. PANATIER:  Hold on.
8       THE WITNESS:  So I can't agree that any
9  mine or any area that has, quote,
10 nonasbestiform, depending on who defines it,
11 there's not going to be asbestiform, according
12 to who defines it.
13      You can look at some individuals'
14 definition of asbestiform which essentially
15 would eliminate all the exposures from Libby,
16 Montana.  Now, I'm not a medical doctor, but I
17 don't think there's much disagreement that those
18 tremolite, richterite, winchite exposures have
19 been killing people in Libby, Montana, for a lot
20 of years.  But they may not meet the definition
21 of some folks's description of what asbestiform
22 is and nonasbestiform.
23      MR. CALFO:  I'm going to move to strike to
24 the extent it's nonresponsive.
25   Q.  (By Mr. Calfo)  Let me ask you this.  Do

Page 109

1  you agree there's both asbestiform tremolite and also
2  nonasbestiform tremolite?
3    A.  I will agree.
4    Q.  And do you agree that nonasbestiform
5  tremolite is common?
6    A.  Again, what do you mean by common?
7    Q.  How about the word ubiquitous.  Wouldn't
8  you agree that nonasbestiform tremolite is
9  ubiquitous?
10      MR. PANATIER:  I'll object to form.
11      THE WITNESS:  Well, that tells me that you
12 can go out anywhere and find nonasbestiform
13 tremolite in any sample.  I don't know if you
14 can do that.
15      I will agree with you that tremolite
16 contamination, you can find both asbestiform and
17 nonasbestiform, cleavage fragments, true
18 cleavage fragments, and typically -- that don't
19 meet the definition of a regulated fiber.
20 Certainly would agree with that.
21   Q.  (By Mr. Calfo)  So let me ask it very
22 easily.  True or false:  nonasbestiform tremolite is
23 ubiquitous?
24      MR. PANATIER:  Same objection.
25      THE WITNESS:  I don't know how you

Page 110

1    define --
2    Q.   (By Mr. Calfo)  True or false?
3    A.   It is true if it is in an area that has
4    tremolite contamination.  That is false if you're
5    looking at ubiquitous as that's everywhere.
6    Q.   True or false: nonasbestiform tremolite in
7    the world, there's more of it than asbestiform
8    tremolite?
9         MR. PANATIER:  Same objection.
10        THE WITNESS:  That, I can't answer true or
11   false because I don't have that information to
12   validate that.
13   Q.   (By Mr. Calfo)  In your report you mention
14   tremolite.  What did you do to confirm that what you
15   were seeing in your analysis was tremolite?
16   A.   It had at least a 5:1 aspect ratio, it had
17   the chemistry by energy dispersive EDXA, and it also
18   had the typical amphibole diffraction for the
19   intercrystalline spacing of somewhere in the 5.2 to
20   5.3, had the amphibole diffraction pattern, and
21   therefore it was called either tremolite, either
22   winchite, either richterite, I think we found
23   actinolite in one sample.
24        So we confirmed that as specified by the
25   Environmental Protection Agency in their TEM

Page 111

1    analysis, as specified in OSHA 7402 analysis, as
2    specified in some of the ISO protocols, so we
3    confirmed it as specified by government regulations
4    on what to call tremolite asbestos versus something
5    else.
6    Q.   Okay.  So is there anything else that you
7    did to rule out that what you're seeing is tremolite
8    as opposed to another mineral?
9    A.   Well, other than that it was fibrous, it
10   had the appropriate diffraction pattern, it had the
11   spot-on microchemistry of a fiber, no.
12   Q.   What did you do to determine whether the
13   tremolite you claim you have seen is asbestiform
14   versus nonasbestiform?
15   A.   Well, that's a good question.  At the
16   level of TEM, if you have that it meets the
17   definition, at least by EPA, that it has a 5:1 aspect
18   ratio with parallel sides and it's a single fiber,
19   you cannot determine if it's asbestiform or
20   nonasbestiform.
21        What you can say is that it meets the
22   federal regulation or definition by the Environmental
23   Protection Agency or it is a single fiber that's
24   greater than 5 micrometers and the width of it is
25   greater than .2, it meets the definition of what OSHA

Page 112

1    and the EPA believes is appropriate to count for
2    asbestos.
3         At the high magnifications, if it's a
4    single fiber, at least somebody who is knowledgeable,
5    that you cannot tell exactly if it's asbestiform or
6    nonasbestiform.
7         However, where you have a bundle of
8    tremolite, where you have more than two or more
9    parallel fibers that are touching, typically it's
10   more than that, that is an asbestiform material,
11   because you cannot have cleavage fragments that are
12   breaking from rock and then stack up precisely in
13   long fibers on top of each other.  That doesn't
14   happen.
15   Q.   Is there anything else you can tell us
16   about what you did to determine whether the tremolite
17   you were seeing is asbestiform versus nonasbestiform?
18   A.   I didn't call anything asbestiform or
19   nonasbestiform, but I've just given you, if asked,
20   that would be what I would state, by looking at the
21   photographs and looking is it single fiber versus a
22   bundle.
23        I would be hesitant to call it asbestiform
24   or nonasbestiform if it meets the definition of both
25   the Environmental Protection Agency and/or OSHA as

Page 113

1    what's defined as a fiber that they regulate.
2    Q.   Okay.  So let me -- I'm just trying to
3    figure out where I'm at with this.
4         So you went to the level of the TEM and
5    you looked at photos and you determined that there's
6    a single fiber versus bundle.  Is there anything
7    else -- and it's not what you know.  I just want to
8    know what else you did.
9         MR. PANATIER:  I'll just object to asked
10   and answered.
11        THE WITNESS:  I mean, we've already gone
12   over how we identify tremolite versus actinolite
13   versus talc fibers.  But for me to sit here and
14   say this is an asbestiform and this is
15   nonasbestiform, using a TEM, you can't say a
16   single fiber one way or the other, but you can
17   on bundles.
18   Q.   (By Mr. Calfo)  Do you agree that
19   nonasbestiform amphiboles have properties that are
20   very similar to their asbestos counterparts?
21   A.   They all have the same chemistry; they all
22   have the same diffraction patterns.  The
23   nonasbestiforms will be shards with nonparallel
24   sides, typically.  But the properties --
25   analytically, they would look the same.

Page 114

1  Q. Well, you're familiar with the Yamate
2  method; right?
3  A. I am.
4  Q. And you agree the Yamate method is
5  reliable and authoritative, don't you?
6  A. For the time, absolutely.
7  Q. And do you know the three levels of
8  analysis under the Yamate method?
9  A. I do. George Yamate used to work for me.
10  Q. Okay. And did you use the Yamate method
11  when you did your analysis?
12  A. We used the AHERA sizing method and what
13  AHERA states to confirm. If you want to look at the
14  Yamate method on what is the appropriate method for
15  this analysis, it would be a Level II. Of course,
16  what you're getting at is the zone axis requirement
17  for amphiboles in Level III.
18      Because I have had George Yamate work for
19  me, George and I had discussions about the zone axis.
20  And at the time that the Level III was put out, the
21  EDXA or how we used to call the EDS detectors weren't
22  nearly as sensitive, there nearly wasn't enough
23  round-robins, they didn't have the controls and
24  standards, that's why he stated that.
25      But if George Yamate was alive today, he

Page 115

1  could testify that with the equipment we have today,
2  we don't need zone axis diffraction to identify
3  tremolite, anthophyllite, actinolite, richterite,
4  winchite. And that's why it's not required for any
5  of the current methods both by EPA as well -- people
6  are more than welcome to do it, but it's not needed.
7  Q. That's great. Let me just ask you this,
8  very simple question.
9      Is it fair to say that your analysis did
10  not strictly follow the Yamate method? True or
11  false?
12      MR. PANATIER: I'm going to object to
13  form.
14      THE WITNESS: That's too broad for me to
15  say true or false. It certainly followed the
16  Level II. And, no, we did not do zone axis
17  diffraction patterns because of the reasons I've
18  already stated.
19  Q. (By Mr. Calfo) Okay. So let me just get
20  this. You did not specifically follow the Yamate
21  method, and you did not conduct a detailed zone axis
22  SAED analysis; right?
23      MR. PANATIER: I'm just going to object
24  that that assumes that he set out to follow
25  Yamate in the first place.

Page 116

1      Go ahead.
2  Q. (By Mr. Calfo) Okay. Well, let me ask
3  you. Did you set out to follow the Yamate method?
4  A. We set out to follow the AHERA counting
5  rules, the identification as specified in AHERA, and
6  that coincides with the Yamate -- or the EPA
7  Level II.
8      We did not set out to use the zone axis
9  diffraction requirement in the Level III for the
10  reasons I've already stated.
11      So when you say you did not follow the
12  Yamate method, the Yamate method and the AHERA method
13  are literally -- the Yamate method Level II is
14  literally identical to the AHERA method.
15      So we reference the AHERA method in the
16  report. We did not reference the Yamate Level II, I
17  don't believe, but they're literally the same.
18  Q. Can we agree that you did not, either way,
19  conduct a detailed zone axis SAED analysis?
20  A. That's correct; we did not.
21  Q. All right. Now, let me ask you a few
22  questions about your report.
23      At page 3 of 25, you state 17 samples were
24  found to contain detectable amounts of amphibole
25  asbestos --

Page 117

1  A. Correct.
2  Q. -- tremolite series and
3  ferro-anthophyllite.
4      Do you see that?
5  A. Yes.
6  Q. How do you define amphibole asbestos?
7  A. That it's any of the regulated amphiboles
8  that are asbestos as well as some of the
9  potassium-rich and sodium-rich tremolite fibers that
10  EPA is now calling winchite and richterite.
11      I know technically that's not a regulated
12  asbestos fiber from the winchite -- tremolite to
13  winchite and richterite, but I don't believe there's
14  any argument that that is problematic and of course
15  is of great concern to EPA and its Superfund site.
16  So I'm calling them amphibole asbestos, and these are
17  the amphiboles that I found.
18  Q. All right. And just in a nutshell, what
19  is it that you rely on for your definition of
20  amphibole asbestos?
21  A. Definition is that they're regulated and
22  they're called asbestos and that these would all have
23  been called asbestos by any of the protocols that we
24  use when we're dealing with what is asbestos and what
25  is not asbestos when we do analysis.

### Page 238

1    (Deposition concluded at 4:41 p.m.)
2    (Pursuant to Rule 30(e) of the Federal
3    Rules of Civil Procedure and/or OCGA 9-11-30(e),
4    signature of the witness has been reserved.)
5    (Original transcript sent to Mr. Calfo.)

### Page 239

         C E R T I F I C A T E

STATE OF GEORGIA:
COUNTY OF GWINNETT:

    I hereby certify that the foregoing
transcript was taken down, as stated in the
caption, and the questions and answers thereto
were reduced to typewriting under my direction;
that the foregoing pages 1 through 238 represent
a true, complete, and correct transcript of the
evidence given upon said hearing, and I further
certify that I am not of kin or counsel to the
parties in the case; am not in the regular
employ of counsel for any of said parties; nor
am I in anywise interested in the result of said
case.
    This, the 29th day of August 2017.

    _____
    DEBRA R. LUTHER, B-881
    Georgia Certified Court Reporter

### Page 240

COURT REPORTER DISCLOSURE

    Pursuant to Article 10.B. of the Rules and Regulations of the Board of Court Reporting of the Judicial Council of Georgia which states: "Each court reporter shall tender a disclosure form at the time of the taking of the deposition stating the arrangements made for the reporting services of the certified court reporter, by the certified court reporter, the court reporter's employer, or the referral source for the deposition, with any party to the litigation, counsel to the parties or other entity. Such form shall be attached to the deposition transcript," I make the following disclosure:

    I am a Georgia Certified Court Reporter. I am here as a representative of Atlanta Reporters, Inc. Atlanta Reporters was contacted by King & Spalding, LLP, to provide court reporting services for the deposition. Atlanta Reporters will not be taking this deposition under any contract that is prohibited by OCGA 15-14-37(a) and (b).

    Atlanta Reporters has no contract/agreement to provide reporting services with any party to the case, any counsel in the case, or any reporter or reporting agency from whom a referral might have been made to cover this deposition. Atlanta Reporters will charge its usual and customary rates to all parties in the case, and a financial discount will not be given to any party to this litigation.

    _____
    DEBRA R. LUTHER, B-881
    Georgia Certified Court Reporter

### Page 241

DEPOSITION OF WILLIAM E. LONGO, PhD /DRL
    I do hereby certify that I have read all questions propounded to me and all answers given by me on the 23rd day of August 2017, taken before Debra R. Luther, and that:

_____ 1) There are no changes noted.
_____ 2) The following changes are noted:
    Pursuant to Rule 30(e) of the Federal Rules of Civil Procedure and/or the Official Code of Georgia Annotated 9-11-30(e), both of which read in part: Any changes in form or substance which you desire to make shall be entered upon the deposition...with a statement of the reasons given...for making them. Accordingly, to assist you in effecting corrections, please use the form below:

Page No. _____ Line No. _____ should read: _____
_____
Page No. _____ Line No. _____ should read: _____
_____
Page No. _____ Line No. _____ should read: _____
_____
Page No. _____ Line No. _____ should read: _____
_____
Page No. _____ Line No. _____ should read: _____
_____
Page No. _____ Line No. _____ should read: _____
_____
Page No. _____ Line No. _____ should read: _____
_____
Page No. _____ Line No. _____ should read: _____
_____