# EXHIBIT E6

**Page 1**

```
           SUPERIOR COURT OF NEW JERSEY
           LAW DIVISION: MIDDLESEX COUNTY

RICARDO RIMONDI and        )
PILAR RIMONDI,             )
                           )
          Plaintiffs,      )
                           )  DOCKET NO.
     vs.                   )  MID-L-2912-17
                           )
BASF CATALYSTS LLC, et al.,)
                           )
          Defendants.      )
_____)
JOANNA RUMAN and           )
JACENTY RUMAN,             )
                           )
          Plaintiffs,      )
                           )  DOCKET NO.
     vs.                   )  MID-L-2919-17
                           )
BASF CATALYSTS LLC, et al.,)
                           )
          Defendants.      )
_____)

                DEPOSITION OF

           WILLIAM E. LONGO, PhD

              January 7, 2019

                 10:30 a.m.

           11555 Medlock Bridge Road
                  Suite 100
             Johns Creek, Georgia


     Debra R. Luther, RMR, CRR, CCR-B-881
              Atlanta Reporters, Inc.
           Georgia Certified Court Reporters
                   (866) 344-0459
               www.atlanta-reporters.com
```

Atlanta Reporters, Inc.     866-344-0459     www.atlanta-reporter.com

**Page 2**

APPEARANCES OF COUNSEL

On behalf of the Plaintiffs:

    ETHAN A. HORN, Esq.
    The Lanier Law Firm
    21550 Oxnard Street
    Third Floor
    Woodland Hills, California  91367
    ethan.horn@lanierlawfirm.com

    JOSEPH N. COTILLETTA, Esq.
    The Lanier Law Firm
    Tower 56, Sixth Floor
    126 East 56th Street
    New York, New York  10022
    joseph.cotilletta@lanierlawfirm.com
    (Appearance by telephone)

On behalf of the Defendants
  Johnson & Johnson and
  Johnson & Johnson Consumer, Inc.:

    JOHN L. EWALD, Esq.
    Orrick, Herrington & Sutcliffe, LLP
    51 West 52nd Street
    New York, New York  10019-6142
    jewald@orrick.com

On behalf of the Defendants
  Imerys Talc America, Inc., and
  Cyprus Amax Minerals Company:

    SAMUEL A. GARSON, Esq.
    Rawle & Henderson, LLP
    401 Route 73 North, Suite 200
    40 Lake Center Executive Park
    Marlton, New Jersey  08053
    sgarson@rawle.com
    (Appearance by telephone)

- - -

Atlanta Reporters, Inc.     www.atlanta-reporters.com

**Page 3**

INDEX TO EXAMINATIONS

| Examination | Page |
|---|---|
| Examination by Mr. Ewald | 7 |
| Examination by Mr. Horn | 127 |

- - -

Atlanta Reporters, Inc.     www.atlanta-reporter.com

**Page 4**

INDEX TO EXHIBITS

Plaintiff's

| Exhibit | Description | Page |
|---|---|---|
| 1 | Letter from Cotilletta re: Leavitt case documents | 127 |

Atlanta Reporters, Inc.     www.atlanta-reporter.com

81

14:07:07  1   nonsensical definition to be asbestiform. So we know
14:07:10  2   the bundles are asbestiform, we have sources for
14:07:14  3   that.
14:07:15  4         Now we're dealing with the single fibers.
14:07:20  5   I don't believe it's reasonable to say 10 percent of
14:07:24  6   the single fibers from these mine sources are unknown
14:07:28  7   when you have all these other bundles. I don't think
14:07:33  8   it's reasonable to say that the average aspect ratio
14:07:36  9   from ground talc on tremolite that we find in these
14:07:40 10   samples are the same as what Blount found as well as
14:07:44 11   Campbell found as well as Langer found, saying these
14:07:49 12   are all asbestiform with that aspect ratio. So
14:07:54 13   that's my opinion, that these are asbestiform.
14:07:57 14      Q.   Okay. So if I asked you in 2016 what your
14:08:03 15   definition of asbestiform was, what would you have
14:08:05 16   said?
14:08:07 17         MR. HORN: Object to form. Vague and
14:08:11 18   ambiguous.
14:08:11 19         THE WITNESS: I don't know.
14:08:12 20      Q.   (By Mr. Ewald) If you have used the word
14:08:17 21   asbestiform in prior transcripts before talc
14:08:20 22   litigation -- I'll withdraw that.
14:08:24 23         The definition you gave today of
14:08:29 24   asbestiform, is that the definition that you have
14:08:32 25   used the entire time that you have been testifying in
Atlanta Reporters, Inc. 866-344-0459   www.atlanta-reporters.com

82

14:08:37  1   cosmetic talc litigation?
14:08:40  2      A.   I think what I've stated in the past is
14:08:43  3   that for single fibers you can't tell if it's
14:08:48  4   asbestiform or not based on the definition. But
14:08:53  5   we're not looking just at a single fiber. We're
14:08:55  6   looking at multiple fibers and bundles.
14:08:58  7         So you have the geological definition of
14:09:02  8   asbestiform, and then you just have is it fibrous,
14:09:06  9   therefore it's asbestiform.
14:09:07 10      Q.   Under the if it's fibrous, therefore it's
14:09:12 11   asbestiform version, in your view you can determine
14:09:18 12   that a single fiber is asbestiform; is that your
14:09:21 13   view?
14:09:21 14      A.   A single fiber in one sample, yes, if it's
14:09:25 15   fibrous, it's asbestiform. It does not meet the
14:09:27 16   definition of a geological grab sample because the
14:09:31 17   definition of asbestiform provides you all these
14:09:34 18   different tests that are not applicable and don't
14:09:37 19   give you any measurement ability to measure high
14:09:42 20   tensile strength. Don't even tell you what high
14:09:45 21   tensile strength is. You can't measure flexibility.
14:09:47 22   You can't measure -- you can't measure any of that
14:09:53 23   with any of the protocols. And these are fibers that
14:09:59 24   are regulated asbestos fibers. My definition is
14:10:03 25   they're all asbestiform. Others can argue with that.
Atlanta Reporters, Inc. 866-344-0459   www.atlanta-reporters.com

83

14:10:12  1         MR. EWALD: Promise to not spend too much
14:10:14  2   time on 22262-1 today, but I have just a couple
14:10:18  3   of questions. So as Exhibit 9, we're going to
14:10:35  4   mark ISO 22262-1.
14:10:43  5         (Defendant's Exhibit 9 was marked for
14:10:55  6   identification.)
14:10:55  7      Q.   (By Mr. Ewald) Doctor, this ISO 22262-1
14:10:59  8   is one of the methods you used in connection with
14:11:02  9   your November 14th, 2018, report; is that correct?
14:11:08 10      A.   That is correct.
14:11:21 11      Q.   You've been asked for --
14:11:25 12      A.   2.8?
14:11:26 13      Q.   -- about 2.8. I'm not going to go back
14:11:29 14   there, at least immediately.
14:11:31 15         Am I correct that you referred to 2.8 on
14:11:36 16   page 2, definition of asbestiform as, quote, a
14:11:43 17   general definition; is that right?
14:11:44 18      A.   That's correct.
14:11:46 19      Q.   Okay. Let's go to page 23, and that is
14:11:53 20   carryover of 7.2.3.7.1, morphology. Let me know when
14:11:59 21   you get to 23.
14:12:03 22      A.   I have it.
14:12:04 23      Q.   Okay. Do you agree with me that ISO
14:12:18 24   22262-1 distinguishes in this section between
14:12:26 25   asbestiform amphibole fibers and nonasbestiform
Atlanta Reporters, Inc. 866-344-0459   www.atlanta-reporters.com

84

14:12:30  1   amphibole fibers?
14:12:43  2         MR. HORN: Can I have that question read
14:12:46  3   back? I was actually reading the protocol.
14:13:09  4         (Record was read by the court reporter.)
14:13:09  5         MR. HORN: Thank you.
14:13:09  6         THE WITNESS: Yes. This is intended as
14:13:11  7   guidance for analysts to discriminate -- from
14:13:15  8   the note on page 23 -- between nonasbestiform
14:13:23  9   and asbestiform amphibole populations. It is
14:13:27 10   not intended to override the definition of
14:13:29 11   asbestos as presented in 2.9 nor override any
14:13:33 12   national regulation.
14:13:35 13         So according to that, it is guidance to
14:13:38 14   the analyst.
14:13:41 15      Q.   (By Mr. Ewald) Okay. You can keep that
14:14:02 16   close by. We'll come back to it maybe.
14:14:05 17         I want to talk a little bit about
14:14:17 18   Mr. Poye.
14:14:17 19      A.   Sure.
14:14:25 20         MR. EWALD: Let's mark this as Exhibit 10.
         21         (Defendant's Exhibit 10 was marked for
14:14:43 22   identification.)
14:14:43 23      Q.   (By Mr. Ewald) Doctor, as Exhibit 10,
14:14:52 24   handing you what is -- it's got a couple pages at the
14:14:58 25   beginning. Can you describe what those first couple
Atlanta Reporters, Inc. 866-344-0459   www.atlanta-reporters.com

85

```
14:15:01   1    pages are?
14:15:01   2        A.   The chain of custodies for the samples we
14:15:07   3    sent him.  I think there's 50 -- 79.  These are the
14:15:22   4    chain of custodies for the 79 samples we sent him.
14:15:25   5    Also in the chain of custody is the key because we
14:15:28   6    sent them as blind, meaning we generated a number
14:15:32   7    68708, 1 through 79, and then the corresponding MDL
14:15:40   8    samples that we have.  And then on the back -- on
14:15:50   9    another page has his numbers, then the actual MDL
14:15:55  10    samples that were sent.
14:16:07  11        Q.   Am I correct after that you have
14:16:12  12    Mr. Poye's July 18th, 2018, report to you on the MAS
14:16:17  13    split of historic talc samples?
14:16:20  14        A.   Correct.
14:16:21  15        Q.   And have you seen this before?
14:16:23  16        A.   Of course.
14:16:26  17        Q.   Just making sure.
14:16:29  18             Now, when was the last time you spoke to
14:16:39  19    Mr. Poye about the testing reflected in his
14:16:46  20    July 18th, 2018, report?
14:16:48  21        A.   Some months.  I don't remember the last
14:16:50  22    time I talked to him about it.
14:16:52  23        Q.   Do you recall whether or not it was before
14:16:57  24    or after he sent you this work?
14:17:03  25        A.   No, I don't recall.
```

86

```
14:17:05   1        Q.   What do you recall about that
14:17:08   2    communication?
14:17:09   3        A.   I don't recall any of it.
14:17:11   4        Q.   Was it by phone?  In person?  Email?
14:17:14   5        A.   I'm sure it would have been by phone.  I
14:17:19   6    know I talked to him about sending the samples.  Have
14:17:22   7    I talked to him about the results or not, I don't
14:17:24   8    have any recollection of that.
14:17:26   9        Q.   Have you communicated with anyone other
14:17:32  10    than Mr. Poye at his lab, J3, about the testing that
14:17:39  11    is reflected in his July 18th report?
14:17:42  12        A.   Not that I recall.
14:17:45  13        Q.   There was some confusion, I believe,
14:17:54  14    during --
14:17:55  15        A.   Chain of custody of the spike samples?
14:18:01  16        Q.   Actually, that wasn't where I was going
14:18:06  17    but --
14:18:06  18        A.   Everybody seems to have confusion on that,
14:18:10  19    and I still have to get the chain of custody to
14:18:12  20    explain how the numbers work on the spike samples.
14:18:15  21    But I shouldn't cut you off and generate more
14:18:18  22    questions.
14:18:18  23        Q.   Exactly.  I was going there next.
14:18:23  24             Actually, it seemed to be unclear during
14:18:27  25    the Leavitt depositions about what method Lee Poye
```

87

```
14:18:36   1    used with respect to PLM, and I would like you to
14:18:41   2    turn to --
14:18:42   3        A.   Used the ISO method.
14:18:44   4        Q.   Okay.  It's your understanding that he
14:18:46   5    used the ISO 22262-1 method?
14:18:54   6        A.   Correct.  And the confusion came in where
14:18:59   7    the original XRD samples I sent him for those 30
14:18:59   8    samples, I believe that was the R-93 method.  I just
14:19:01   9    got them mixed up in my head.  I could have just
14:19:03  10    looked at the document and stated it correctly.
14:19:15  11        Q.   Do you have an understanding as to why J3
14:19:25  12    used ISO 22262-1 as opposed to R-93 for the PLM work?
14:19:31  13        A.   I'll have to let Lee Poye speak to that.
14:19:36  14    It looks like to me just standardizing the protocol
14:19:39  15    since there is both an ISO PLM for talc as well as an
14:19:43  16    ISO TEM for talc.
14:19:48  17        Q.   So I asked Lee Poye that.
14:19:50  18        A.   What did he say?
14:19:52  19        Q.   Mr. Poye said that his recollection is
14:19:54  20    that you told him to use ISO 22262-1.  Do you have
14:19:59  21    any recollection of that?
14:20:00  22        A.   It's possible.  I just don't recall that.
14:20:03  23        Q.   Do you see on -- it's the cover letter to
14:20:08  24    the report on top of page 2, at the top, first full
14:20:18  25    sentence, J3 was directed to analyze the talcum
```

88

```
14:20:21   1    powder samples for the presence and percentage of
14:20:24   2    regulated asbestos utilizing the following
14:20:27   3    appropriate methods, and one of the methods there
14:20:30   4    that's listed is ISO 22262-1; do you see that?
14:20:38   5        A.   I do see that.  Now, if that's Mr. Poye's
14:20:43   6    recollection, I have no reason to dispute that.
14:20:45   7        Q.   I take it, then, you have not reviewed
14:20:48   8    Mr. Poye's deposition in the Lovett case relating to
14:20:52   9    testing of the samples reflected in the July 18th
14:20:56  10    report?
14:20:56  11        A.   I have not.
14:21:13  12        Q.   Do you have any knowledge about J3's
14:21:20  13    testing of the MDL samples beyond what is reflected
14:21:28  14    in this July 18, 2018, report?
14:21:33  15        A.   I don't think so.
14:21:41  16        Q.   Let me toggle between a couple of reports
14:21:46  17    now.  I'll keep the Lee Poye one close by, but if
14:21:49  18    you'll look at your November report, on page 16
14:22:03  19    there's a reference to the comparing of -- well, let
14:22:11  20    me take a step back.
14:22:12  21             Can you please explain what you asked Lee
14:22:28  22    Poye's lab, J3, to do with respect to the 79 samples
14:22:37  23    that you sent them.
14:22:38  24        A.   **Well, it looks like I asked them to**
14:22:41  25    **analyze it by the ISO 22262-1 protocol for PLM and**
```

## Page 89

```
14:22:48   1   XRD.
14:22:52   2       Q.   And then, at least as of the time of this
14:22:55   3   report, this report being the November 14th report,
14:23:04   4   J3 and MAS had analyzed 22 of same samples by ISO PLM
14:23:27   5   that MAS had; is that correct?
14:23:28   6       A.   That's correct.
14:23:29   7       Q.   And the statement here at the bottom that
14:23:35   8   J3 did not find any asbestos detected in those 22
14:23:42   9   samples, while MAS found asbestos in eight of the 22
14:23:47  10   samples using the ISO PLM method, is that the correct
14:23:51  11   statement?
14:23:52  12       A.   That is a correct statement.
14:23:53  13       Q.   And then it goes on to state, These
14:23:56  14   different results between the two labs will require
14:23:59  15   further investigation to understand the reason for
14:24:01  16   these differences.
14:24:02  17            Did I read that correctly?
14:24:04  18       A.   You did.
14:24:04  19       Q.   As of day 3 of Leavitt, I think this was
14:24:09  20   asked -- maybe it was day two --
14:24:12  21       A.   Or day one --
14:24:14  22       Q.   There had not been any steps taken at that
14:24:17  23   point in time on this question of investigating the
14:24:19  24   different results.  Have there since been any efforts
14:24:24  25   by MAS or efforts you're aware of from J3 to
```

## Page 90

```
14:24:28   1   investigate the different results reached on those 22
14:24:32   2   PLM samples?
14:24:32   3       A.   We haven't done anything further.  May
14:24:36   4   develop some standards at the lower detection limit
14:24:39   5   and have a blind round-robin between the two analysts
14:24:43   6   to see how consistent they are.
14:24:45   7            But other than that, I don't have any
14:24:48   8   other information that I can share for the reason for
14:24:52   9   the eight positives versus the eight negatives by J3.
14:24:57  10       Q.   So as you sit here today, do you have any
14:25:01  11   basis to understand why two labs using the same
14:25:09  12   method and the same samples reached different results
14:25:12  13   in eight cases?
14:25:14  14       A.   For eight samples?  No.
14:25:21  15       Q.   Do you know who did the PLM work at J3?
14:25:27  16       A.   Other than it's their PLM analyst, I can't
14:25:38  17   remember that individual's name right at the moment.
14:25:41  18       Q.   Without remembering his or her name, do
14:25:48  19   you know if you met that person before?
14:25:49  20       A.   I've been to their lab.  I don't know if I
14:25:56  21   met him or not.
14:25:57  22       Q.   It's your recollection it's a he, not a
14:26:00  23   she?
14:26:01  24       A.   To my recollection it's a he.
14:26:05  25       Q.   I think we're done with Poye, at least for
```

## Page 91

```
14:26:27   1   now, and can set that aside.
14:26:34   2            Going back to your November report, what
14:26:40   3   role did Dr. Rigler play in this report?
14:26:44   4       A.   He helped edit and review the data so that
14:26:48   5   he was one of the QC people.
14:27:18   6       Q.   Why did you ask J3 to perform the ISO PLM
14:27:25   7   on the same samples that MAS was testing with ISO
14:27:30   8   PLM?
14:27:30   9            MR. HORN:  Object to form.
14:27:33  10            THE WITNESS:  They had initially done a
14:27:37  11       number of the ISO PLM.  We had sent off the
14:27:41  12       samples for the original 30 and, just to be
14:27:43  13       consistent, wanted to see the difference between
14:27:47  14       the two labs that used that method.  And of
14:27:54  15       course the XRD, we don't have an XRD.  So it
14:28:00  16       just was interesting to me.
14:28:01  17       Q.   (By Mr. Ewald)  Trying to get a sense of,
14:28:36  18   essentially, the workflow for the November 14th
14:28:39  19   testing -- with respect to the testing reflected in
14:28:45  20   the November 14th report at MAS, and there are a
14:28:50  21   number of different test methods that are described
14:28:52  22   there that MAS conducted.  Do you have a sense of how
14:28:56  23   that played out, whether it was all done in the same
14:28:59  24   order with respect to a particular sample?  Can you
14:29:03  25   give some explanation of that?
```

## Page 92

```
14:29:05   1       A.   When you say a particular order --
14:29:07   2       Q.   So, for example, you have one of the 56
14:29:15   3   samples there that MAS tested by ISO PLM, Blount PLM,
14:29:23   4   and TEM; right?
14:29:26   5       A.   Correct.
14:29:27   6       Q.   For each sample was the analysis done in a
14:29:32   7   particular order with respect to the type of testing,
14:29:38   8   or was it just done in whatever order it happened?
14:29:43   9       A.   Well, there's two different groups that
14:29:45  10   are doing the testing, so you have the PLM group and
14:29:50  11   then the TEM group.  Typically we don't -- we're not
14:29:57  12   trying to do one before the other because they're two
14:30:00  13   separate groups.  And irrespective of the ISO
14:30:05  14   22262-1, which says you should do the PLM first,
14:30:09  15   somebody's already asked that because some of the
14:30:11  16   PLMs -- was it you?
14:30:13  17       Q.   Yeah, that would be me.
14:30:15  18       A.   It was a good question.  A good question
14:30:17  19   in that I believe the reason for that is instead of
14:30:20  20   fully characterizing these cosmetic talcs like we're
14:30:25  21   doing, if you find it by PLM and it meets the
14:30:29  22   definition, probably what I believe -- I should email
14:30:35  23   Dr. Chatfield -- Eric -- one of these days -- is that
14:30:40  24   there's really no need to go any further if you're
14:30:45  25   just trying to determine if there's asbestos or not
```

93

14:30:47  1  present.
14:30:47  2  There's four TEM analysts. Whatever they
14:30:50  3  seem to be working on, some will take samples -- say
14:30:54  4  we have 22 samples. Some may be working from 22 on
14:30:59  5  down, some may be grabbing in the middle. It's just
14:31:02  6  whoever's free and what's available, what's been
14:31:05  7  prepared. At the end of the day then we're just
14:31:10  8  trying to put them all together. However, I'll give
14:31:15  9  you credit now trying to get the PLM analysts to get
14:31:19 10  ahead of the TEM guys.
14:31:22 11       Q.   Have you communicated with Dr. Chatfield
14:31:25 12  in any way about his -- not his -- about ISO 22262-1?
14:31:33 13       A.   Well, to give Dr. -- Eric credit, it's
14:31:37 14  basically his.
14:31:38 15       Q.   The answer to my question is yes or no?
14:31:40 16       A.   No, I have not talked to Eric. I haven't
14:31:43 17  seen him in a while. He is a world of knowledge.
14:31:51 18       Q.   Do you agree that it's common for
14:31:57 19  independent labs to design standard operating
14:32:00 20  procedures for companies analyzing asbestos in their
14:32:03 21  products?
14:32:05 22       A.   Is it standard operating procedure --
14:32:10 23            MR. HORN:  Let me just object to form.
14:32:12 24  It's vague and ambiguous.
14:32:13 25            THE WITNESS:  And I'm just trying to

Atlanta Reporters, Inc.  866-344-0459  www.atlanta-reporters.com

94

14:32:15  1  clarify, so that if a company comes and says
14:32:17  2  develop a protocol for me, I mean, we've done
14:32:20  3  that once. We did it for Federal-Mogul for when
14:32:24  4  they came into an accessory mineral tremolite
14:32:27  5  issue with their brake shoes.
14:32:35  6            So I can't speak for other labs. What I
14:32:38  7  know is that we had developed a protocol for
14:32:41  8  them, and I guess they -- if you go on Google,
14:32:46  9  you can get it.
14:32:46 10       Q.   (By Mr. Ewald) And did that relate to
14:32:51 11  analyzing raw wollastonite?
14:32:56 12       A.   It did.
14:32:57 13       Q.   And that was with PLM?
14:32:59 14       A.   It was a combination, but primarily PLM
14:33:04 15  after we went through a concentration method.
14:33:07 16  Because of the concentration that was being found in
14:33:09 17  there, you only needed PLM.
14:33:14 18       Q.   And that one, the SOP used R-93?
14:33:20 19       A.   Yes, I believe so. I haven't seen that
14:33:24 20  SOP in a while, and you're probably looking at it.
14:33:33 21       Q.   So you don't have a sense one way or the
14:33:53 22  other, apart from your own lab, about how often that
14:33:56 23  happens in the industry with respect to other labs?
14:33:59 24       A.   No. Obviously, I'm aware that the McCrone
14:34:04 25  TEM method is identical to Johnson & Johnson's 7024.

Atlanta Reporters, Inc.  866-344-0459  www.atlanta-reporters.com

95

14:34:12  1  I'm assuming McCrone is the ones that developed a
14:34:15  2  method that was adopted by Johnson & Johnson.
14:34:23  3            Outside of that, I really don't have a
14:34:25  4  sense on what other commercial laboratories have done
14:34:27  5  for clients.
14:34:28  6       Q.   And you don't hold the opinion that the
14:34:31  7  McCrone and Millette method was designed as a rigged
14:34:37  8  test, do you?
14:34:37  9       A.   As a what?
14:34:38 10       Q.   As a rigged test.
14:34:39 11       A.   I don't know what rigged means. I don't
14:35:12 12  know what McCrone was thinking.
14:35:17 13            Only issue I have with all those methods
14:35:19 14  is that there seems to be a lack of understanding on
14:35:22 15  just how much asbestos -- regulated asbestos meeting
14:35:29 16  definitions has to be in the sample before you call
14:35:32 17  it a positive sample.
14:35:35 18            And as I've progressed through this work,
14:35:37 19  the weight percents -- and that's the other problem I
14:35:41 20  have, is the theoretical weight percent detection
14:35:47 21  limits.
14:35:48 22            Where the disconnect on that is our
14:35:52 23  detection limit is based on one small fiber, and it's
14:35:58 24  like looking at the FDA 2010 data from AMA, and I
14:36:04 25  think they gave a detection limit of 2.0 times 10 to

Atlanta Reporters, Inc.  866-344-0459  www.atlanta-reporters.com

96

14:36:09  1  the minus 6 weight percent because they're detecting
14:36:13  2  one fiber. Well, you have to understand in order to
14:36:16  3  detect that one fiber for the TEM method that AMA was
14:36:20  4  looking at, you have to have something like 12
14:36:23  5  million fibers before, statistically, you may run
14:36:26  6  across one fiber.
14:36:28  7            So the method is the method. I'll let
14:36:31  8  others decide if it's, quote, rigged or not. But you
14:36:36  9  can't use that method and say there's nothing in the
14:36:45 10  talc. That's my only issue with it.
14:36:47 11       Q.   Have you reviewed any reports from
14:36:49 12  Dr. Sanchez that he recently released relating to the
14:36:53 13  MDL samples?
14:36:54 14       A.   Yes, I have.
14:36:55 15       Q.   Do you recall which reports you reviewed?
14:36:59 16       A.   I understand he has them all, but I think
14:37:02 17  the first ten or so, which were the ten samples from
14:37:06 18  Vermont where he says all the anthophyllite that --
14:37:15 19  well, the anthophyllite series that we identified is
14:37:19 20  all nonasbestos -- is all cleavage fragment
14:37:26 21  cummingtonite.
14:37:27 22       Q.   What's your response to that?
14:37:29 23       A.   Well, my comments are, one, it's unclear
14:38:08 24  to me why he used electron backscatter detection for
14:38:20 25  determining the crystalline structure. What he did

Atlanta Reporters, Inc.  866-344-0459  www.atlanta-reporters.com

## Page 129

asbestos, and that would be more accurate for the detection limit for weight percent.

I don't mean to be thinking out loud, but I think in the supplement report that's something we can do. That way you're not picking something. You say, okay, for this I measured 60 or 70 asbestos structures and it came from the Vermont mine and here's the average length and width, so I'm going to use that for the analytical sensitivity.

I don't mean to come up with an idea sitting here.

MR. HORN: Just created more work.

THE WITNESS: It's the nerd in me, I guess.

Q. (By Mr. Horn) And just so it's clear for the record, the analytical sensitivity, when you use it with a weight percentage, is that just dictated by the protocol that you're using? Or when would you use that versus something else?

A. Well, most of these protocols call for a weight percent. But in order to have a weight percent, you have to count all the number of fibers and structures that are in there. So it's literally how you report it.

Nothing changes how you collect the data.

## Page 130

So any of these TEM count sheets, you would take the average length and width of everything in there for these weight percents that we have reported.

For example, Table 4, we found a concentration of 53,000 asbestos structures per gram. That number of fibers that made that 53,000 is the same number of fibers that you would do the exact same calculations. Instead of fibers per gram, it's going through and measuring every length, every width, and typically they end up in picograms of some amount, and that's added all up, and then you go through the exact same calculations that you go through to determine how many fibers or bundles per gram. It's just the way they express the data.

In my opinion, it is better to have fibers and bundles per gram, because if you measure an exposure, it's always fibers per cubic centimeter of air. It's not weight percent of a cubic centimeter of air. That's been shown to be completely inaccurate, and it doesn't tell you anything about your potential exposure.

That's why I believe the fibers per gram or fiber bundles per gram is important, because it gives you some idea of the potential for exposure when measuring fibers per cc.

## Page 131

MR. HORN: That's all I have.

MR. EWALD: I'm just going to put on the record, Ethan, I just haven't seen the letter or the back and forth you referenced about Leavitt. I don't need to reserve any rights, but I'm not familiar with it so I just wanted to make note of it in case people take issue with it.

MR. HORN: We sent a link out that contained a lot of materials, and it's tucked in there.

MR. EWALD: All right.

MR. HORN: Before we go, let me just email it to both of you.

(Deposition concluded at 4:00 p.m.)

(Pursuant to Rule 30(e) of the Federal Rules of Civil Procedure and/or OCGA 9-11-30(e), signature of the witness has been reserved.)

(Original transcript sent to McCarter & English, LLP.)

## Page 132

C E R T I F I C A T E

STATE OF GEORGIA:
COUNTY OF GWINNETT:

I hereby certify that the foregoing transcript was taken down, as stated in the caption, and the questions and answers thereto were reduced to typewriting under my direction; that the foregoing pages 1 through 131 represent a true, complete, and correct transcript of the evidence given upon said hearing, and I further certify that I am not of kin or counsel to the parties in the case; am not in the regular employ of counsel for any of said parties; nor am I in anywise interested in the result of said case.

This, the 10th day of January 2019.

_____
DEBRA R. LUTHER, B-881
Georgia Certified Court Reporter

## 133

COURT REPORTER DISCLOSURE

    Pursuant to Article 10.B. of the Rules and Regulations of the Board of Court Reporting of the Judicial Council of Georgia which states: "Each court reporter shall tender a disclosure form at the time of the taking of the deposition stating the arrangements made for the reporting services of the certified court reporter, by the certified court reporter, the court reporter's employer, or the referral source for the deposition, with any party to the litigation, counsel to the parties or other entity.  Such form shall be attached to the deposition transcript," I make the following disclosure:

    I am a Georgia Certified Court Reporter.  I am here as a representative of Atlanta Reporters, Inc. Atlanta Reporters was contacted by McCarter & English to provide court reporting services for the deposition.  Atlanta Reporters will not be taking this deposition under any contract that is prohibited by OCGA 15-14-37(a) and (b).

    Atlanta Reporters has no contract/agreement to provide reporting services with any party to the case, any counsel in the case, or any reporter or reporting agency from whom a referral might have been made to cover this deposition.  Atlanta Reporters will charge its usual and customary rates to all parties in the case, and a financial discount will not be given to any party to this litigation.

    _____
    DEBRA R. LUTHER, B-881
    Georgia Certified Court Reporter

Atlanta Reporters, Inc.    866-344-0459    www.atlanta-reporters.com

## 134

DEPOSITION OF WILLIAM E. LONGO, PhD /DRL

    I do hereby certify that I have read all questions propounded to me and all answers given by me on the 7th day of January 2019, taken before Debra R. Luther, and that:

\_\_\_\_\_ 1)  There are no changes noted.

\_\_\_\_\_ 2)  The following changes are noted:

    Pursuant to Rule 30(e) of the Federal Rules of Civil Procedure and/or the Official Code of Georgia Annotated 9-11-30(e), both of which read in part: Any changes in form or substance which you desire to make shall be entered upon the deposition...with a statement of the reasons given...for making them. Accordingly, to assist you in effecting corrections, please use the form below:

Page No. \_\_\_\_\_ Line No. \_\_\_\_\_ should read: _____
_____

Page No. \_\_\_\_\_ Line No. \_\_\_\_\_ should read: _____
_____

Page No. \_\_\_\_\_ Line No. \_\_\_\_\_ should read: _____
_____

Page No. \_\_\_\_\_ Line No. \_\_\_\_\_ should read: _____
_____

Page No. \_\_\_\_\_ Line No. \_\_\_\_\_ should read: _____
_____

Page No. \_\_\_\_\_ Line No. \_\_\_\_\_ should read: _____
_____

Page No. \_\_\_\_\_ Line No. \_\_\_\_\_ should read: _____
_____

Page No. \_\_\_\_\_ Line No. \_\_\_\_\_ should read: _____
_____

Atlanta Reporters, Inc.    866-344-0459    www.atlanta-reporters.com

## 135

DEPOSITION OF WILLIAM E. LONGO, PhD /DRL

Page No. \_\_\_\_\_ Line No. \_\_\_\_\_ should read: _____
_____

Page No. \_\_\_\_\_ Line No. \_\_\_\_\_ should read: _____
_____

Page No. \_\_\_\_\_ Line No. \_\_\_\_\_ should read: _____
_____

Page No. \_\_\_\_\_ Line No. \_\_\_\_\_ should read: _____
_____

Page No. \_\_\_\_\_ Line No. \_\_\_\_\_ should read: _____
_____

Page No. \_\_\_\_\_ Line No. \_\_\_\_\_ should read: _____
_____

Page No. \_\_\_\_\_ Line No. \_\_\_\_\_ should read: _____
_____

If supplemental or additional pages are necessary, please furnish same in typewriting annexed to this deposition.

    _____
    WILLIAM E. LONGO, PhD

Sworn to and subscribed before me,

This, the \_\_\_\_\_ day of _____ 20\_\_\_\_.

_____
Notary Public
My commission expires: _____

Atlanta Reporters, Inc.    866-344-0459    www.atlanta-reporters.com