# EXHIBIT E16

**FILED**

Superior Court of California
County of Los Angeles

**JUL 23 2018**

Sherri R. Ca~~~~~~~~~~ ~~~~~cer/Clerk

By _Alfredo Morales_ deputy
ALFREDO MORALES

# SUPERIOR COURT OF CALIFORNIA

# COUNTY OF LOS ANGELES

| | |
|---|---|
| Coordinated Proceeding<br>Special Title (Rule 3.550)<br><br>LAOSD ASBESTOS CASES | Case No.: JCCP 4674 |
| CAROLYN WEIRICK, et al.,<br><br>        Plaintiffs,<br><br>    vs.<br><br>BRENNTAG NORTH AMERICA, INC.,<br>et al.,<br><br>        Defendants. | Included Action Case No.: BC656425<br><br>**RULINGS ON MOTIONS<br>IN LIMINE** |

This case is an included action within the LAOSD Asbestos Cases, Judicial

Council Coordination Proceeding (JCCP) No. 4674.

1

1   This Court's rulings on certain motions in limine are set forth on the attached

2   pages. Exhibit A are the rulings on the Plaintiff's Motions in Limine. Exhibit B are

3   the rulings on the defense motions in limine.

4

5   The rulings are presented in three columns. Only the third column

6   constitutes the Court's ruling. The first two columns are summaries prepared by

7   the Court's research attorney. These are left in for the convenience of the parties

8   and the trial judge, who might otherwise need to review all the pleadings to get an

9   understanding of the contentions. Where appropriate, this Court has reviewed the

10  original of the motion papers, including the evidence and testimony submitted.

11

12  The parties may not bring additional motions in limine during trial except

13  with leave of the trial judge assigned.

14

15  With respect to any motions in limine that rely upon Evidence Code § 352,

16  the Court has weighed the probative value (if any) of the evidence against the

17  prejudicial effect of its admission, as well as the potential for such evidence to be

18  cumulative, confuse the jury, or cause undue consumption of time.

19

20  The concept of admissibility evolves with trial. As the trial evolves, it may be

21  that evidence originally thought inadmissible becomes admissible in light of the

22  admission of other evidence not anticipated at the beginning of trial. Also, by

23  placing new facts in issue, a party can make previously inadmissible evidence

24  admissible to prevent unfairness to the other side. A motion in limine should be a

25  shield against the incitement of passion and prejudice, not a sword that is used to

1  lead the jury to inferences of factual conclusions that are not true or otherwise

2  improper.

3

4       Unless an in limine ruling is revised by the Court, compliance is expected,

5  and counsel should advise the Court outside the presence of the jury before allowing

6  a witness to go outside the bounds of a motion in limine. Counsel are ordered to

7  familiarize themselves with, and comply with, LASC Local Rule 3.57 (e).

8

   DATED: July 23 2018

9

10

11

12                                              JOHN J. KRALIK

13                                              Acting Asbestos Coordination

14                                              Judge of the Superior Court

15

16

17

18

19

20

21

22

23

24

25

                                    3

# Exhibit B

**Defense MILs Re: BC656425 (Weirick)**

**Date:**        **6-25-18**
**Time:**        **9:00 am**

| No. | What to Exclude | Arguments | Ruling |
|---|---|---|---|
| 1 | "[E]vidence or making any reference during trial to diseases allegedly caused by or associated to asbestos-free talc, including ovarian cancer and talcosis." (Motion, p. 1.) | **Defendants contend:**<br><br>"Defendant Chanel, Inc. ("Chanel"), on behalf of itself and the remaining defendants, hereby moves this Court *in limine* for an order precluding Plaintiffs Carolyn Weirick and Elvira Graciela Escudero Lora ("Plaintiffs") from introducing evidence or making any reference during trial to diseases allegedly caused by or associated to asbestos-free talc, including ovarian cancer and talcosis. This is an asbestos action. Plaintiffs allege that Plaintiff Carolyn Weirick ("Weirick") was diagnosed with mesothelioma, a cancer in the lining of her lung, after having allegedly breathed asbestos fibers through her use and general presence around talcum powder products allegedly contaminated with asbestos. Plaintiffs' experts concede that talc alone – absent contamination of asbestos – does not cause mesothelioma. Accordingly, any reference to diseases potentially related to the perineal use of uncontaminated talc (ovarian cancer) and mining and milling of talc (talcosis) would be wholly irrelevant, misleading, and would severely prejudice Defendants by inflaming the jury. Chanel requests an order precluding any evidence or reference to diseases not at issue, including ovarian cancer and talcosis. Similarly, Chanel requests an order precluding reference to the IARC classification for perineal talc use." (Motion, p. 1.) | **Granted:**<br><br>The Court finds that the motion should be granted.  In light of the recent publicity and sizeable verdicts in the talc-only cases, the threat of prejudice is too great to allow Plaintiffs to present arguments and evidence regarding ovarian cancer, talcosis, and other non-asbestos injuries allegedly arising out of exposure to talc. The potential prejudice outweighs the probative value. (See, e.g., *Downing v. Barrett Mobile Home Transport* (1974) 38 Cal.App.3d 519 [injury from prior accident held irrelevant where plaintiff did not claim the subject incident caused the injury].) |

Case 3:16-md-02738-MAS-RLS Document 9742-22 Filed 05/07/19 Page 7 of 59 PageID: 47706

"Recently, lawsuits pertaining to ovarian cancer have been widely publicized and followed by national news. These lawsuits are often brought by individuals that believe that their perineal use of uncontaminated baby powder contributed to or caused such ovarian cancer. Specifically, the plaintiffs in these lawsuits believe that the talc in the baby powders contributed to their cancer. These lawsuits are unrelated to Chanel, and only relate to the use of baby powder products or other similar products intended to be used in the perineal region. By contrast, Chanel No. 5 was intended to be used as a fragrance, not for personal or feminine hygiene purposes. Critically, Plaintiffs do not allege that Weirick has been diagnosed with ovarian cancer from perineal use of talcum powders. In fact, Plaintiffs' experts do not even claim that talc itself caused Weirick's disease, but rather that trace levels of asbestos within the talc caused her mesothelioma. Indeed, Plaintiffs' occupational medicine expert Dr. Jacqueline Moline concedes that talc absent asbestos contamination has never been proven to cause mesothelioma. (*See* **Exhibit A** to the Declaration of Nicole A. Harrison at 72:7-17)." (Id. at pp. 1-2.)

"Similarly, talcosis has been studied epidemiologically as it relates to miners and millers of talc, that is, workers who have spent eight hours per day, five days per week in talc mines. In other words, there is a potential association between talcosis and prolonged exposure to talc. Here, Weirick's alleged use and general presence around talc-containing products, including Chanel No. 5, is a mere and miniscule fraction of the work talc miners and millers perform around talc. Most importantly, Plaintiffs do not allege that Weirick has been diagnosed with talcosis. Like ovarian cancer, talcosis is a very different disease than mesothelioma, both in cause and source. Indeed, uncontaminated talc is believed to be a cause of ovarian cancer and talcosis. By contrast, Plaintiffs claim that asbestos

within the talc in talcum powder products caused Weirick's mesothelioma, not the talc itself." (Id. at p. 2.)

"This is not an ovarian cancer case. The disease process of ovarian cancer is markedly different than that of mesothelioma. They involve two different parts of the body, have different causes, and the epidemiology and scientific literature regarding the two diseases do not overlap. The same applies to talcosis. Accordingly, introducing evidence or even referencing ovarian cancer, talcosis, and other such diseases would be irrelevant to the claims made by Plaintiffs, and would result in a waste of the Court's time and resources. The only admissible evidence at trial is relevant evidence. Cal. Evid. Code § 350. Plaintiffs should therefore be precluded from introducing any evidence or referencing during trial any diseases not at issue in the case, including ovarian cancer and talcosis." (Id. at p. 4.)

"[I] if Plaintiffs are allowed to reference diseases such as ovarian cancer and talcosis – two diseases that are thought to potentially be caused from exposure to talc – the jury may be misled to believe that talc causes mesothelioma, not asbestos. Moreover, lawsuits pertaining to ovarian cancer have been widely publicized and followed by the national news recently. These lawsuits are often brought by individuals that believe that their perineal use of baby powder contributed to or caused such ovarian cancer. Given the wide publicity such cases and their recent verdicts have received, as well as the personal nature of such lawsuits, it is very likely that reference to ovarian cancer will prejudice Defendants, including Chanel, by enflaming the jury. Specifically, such evidence could result in the jury believing that all products containing talc are dangerous, regardless of the evidence or expert testimony offered at trial. Accordingly, it is critical that Plaintiffs not be permitted to

reference diseases not at issue in the case, including ovarian cancer and talcosis."  (Id. at pp. 4-5.)

"For the same reasons stated above, any reference to or introduction of the IARC classification for perineal talc use should be precluded. Talc is not a carcinogen. The IARC monographs have differentiated the possible carcinogenicity of talc as it relates to perineal use, which is differentiated from talc not used for perineal purposes. Given that Plaintiffs' allegations are that asbestos contamination in talcum products caused her disease and not the talc itself, any reference to the IARC classification for perineal talc use should be precluded, as it is not only irrelevant, but highly prejudicial, misleading, and serves to do nothing more than inflame and confuse the jury."  (Id. at p. 5.)

**Plaintiffs contend:**

"Defendants move to exclude reference to the association between talc and ovarian cancer. As with any other product liability claim, the relationship between talc and ovarian cancer is probative of the defendant's knowledge of the hazards of talc; relevant to an analysis of the consumer expectations and risk/benefit tests for design defect; relevant to the analysis of allegations of a failure to warn; and material to establishing the element of malice in support of a prayer for punitive damages. In this case, such evidence is also particularly relevant to the issue of the presence of asbestos in Defendants' talc, an issue which Defendants themselves vehemently dispute and upon which they even sought summary judgment. Defendants have actually attempted to discredit studies linking talc with ovarian cancer by pointing to the presence of asbestos in the talc as a confounding factor in those studies. Thus, the ovarian cancer discussion is relevant to the center-most issue in the case: whether the talc has asbestos in it."  (Opposition, p. 2.)

"Consumer expectations" test:  "The fact that talc itself is a recognized carcinogen1 for ovarian cancer is directly relevant to the "consumer expectations" test for Plaintiff's strict liability design defect claims. A product is defective in design if it fails to perform as safely as the ordinary consumer would expect. (CACI 1203.) Evidence that talc puts its users at risk for *cancer* goes to the crux of the consumer expectations test; that Plaintiff developed another type of cancer due to the use of the product is inapposite. From the consumer or user's perspective, cancer was never the expected result of cosmetic or baby powder use."  (Id. at pp. 2-3.)

"Risk/benefit" test:  "CACI 1204 provides a product is defective if the benefits are outweighed by the risks, and/or the availability, cost, and feasibility of a safer alternative design rendered the harm from a product whose benefits outweigh its risks unnecessary and preventable under the circumstances. Defendants have repeatedly acknowledged that there is no actual health or medicinal benefit to the use of talcum powders. J&J has stated that the "Safety of cosmetic powders has been a concern, especially among health professionals. They have decided that powders provide no health benefit. Therefore, the potential for harm from respirables or accidental over exposure should be avoided. Mothers are now being advised not to use baby powder, especially talc baby powders." Thus, in light of baby talc's complete lack of "benefit," any risk of association with ovarian cancer is unjustified. Further, Defendants admitted that the use of cornstarch instead of talc was an available and feasible alternative design, and that it is not aware of any risks associated with the substitution of cornstarch."  (Id. at p. 3.)

Failure to warn:  "On the basis of ongoing ovarian cancer research, Defendants were aware that their product contained asbestos.

5

Furthermore, J&J was aware that asbestos in talc was reaching the ovaries in research studies. [¶]This knowledge is relevant to Plaintiff's failure to warn claim insofar as J&J was aware of an early link between talc and cancer, but nevertheless failed to warn of it. J&J's conduct pertaining to early indications that talc was a cause of ovarian cancer are relevant to J&J's failure to exercise reasonable care and disregard for the health and safety of its customers and users." (Id. at pp. 3-4.)

"The hazard posed by the product --- i.e., the risk of cancer created by the application or inhalation of talc --- is the hazard about which J&J was aware and should have warned. Whether the particular cancer which arises is the same from one talc user to the next is irrelevant for purposes of judging the defendant's knowledge of the hazard and its obligation to warn or find a safer design. So, whether Mrs. Weirick developed a cancer of the lining of her lungs versus of her ovaries doesn't alter the fact that the defendants were aware that talc could cause cancer and should have warned its consumers." (Id. at p. 4.)

"Further, CACI 1203 and 1204 don't require that a Plaintiff prove a specific harm was contemplated by the defendant when it incorporated the hazardous design or failed to warn, just that it appreciated there was a risk of harm from the product or from whatever created the hazard. Indeed, CACI 1203 speaks only to the requirement that the product "didn't perform as safely" as a consumer would expect and the consumer "was harmed," and CACI 1204 requires only that plaintiff show the defendant made the product, that the plaintiff "was harmed," and that the product's design was a substantial factor in "causing harm." There is no additional requirement that the plaintiff show a particular harm, or the same harm, as any other victim of the product's defective design. A defective product may pose a danger in multiple different

6

|  |  | ways, and evidence that it caused different kinds of harm but from the same hazardous condition doesn't render such evidence irrelevant or inadmissible. For example, a defective airbag in a vehicle might cause facial lacerations, brain injury, even death. The fact that the outcomes might differ when a defective airbag deploys simply means the airbag posed a risk of harm to the driver about which the defendant should have warned[.]"  (Id. at pp. 4-5.)  Presence of asbestos during exposure period: "The presence or absence of asbestos in talc implicated to induce ovarian cancers is relevant not only to J&J's knowledge of the hazards of talc, but that talc is acknowledged to contain asbestos as a regular contaminant ("possible contamination of the talc with asbestos needed to be borne in mind"). [¶]  Defendants acknowledge that the risk of ovarian cancer from talc was known well back into the 1960s. Interestingly, they blame the ovarian cancer association on the presence of asbestos during that era. Thus, this evidence is probative for two reasons: 1. Defendants admit the presence of asbestos in talc during the relevant time period, and 2. Despite an awareness of a risk during that time, they failed to warn or recall the product. Presence of asbestos in the ovaries from the use of talc is well known to the talc industry."  (Id. at p. 6.) |  |

| No. | What to Exclude | Arguments | Ruling |
|-----|----------------|-----------|--------|
| 15 | "[E]vidence of, or having [Plaintiffs'] experts rely upon, three sets of test results: Dr. Seymour Lewin's 1972 preliminary report to the FDA; Dr. Lewin's | **Defendants contend:**  "Defendants Johnson & Johnson and Johnson & Johnson Consumer Inc. (hereinafter, "J&J Defendants") seek an in limine order precluding Plaintiffs from presenting evidence of or testimony related to or relying on certain documents from the 1970s that purportedly identified asbestos contamination in some cosmetic talcum powders. Such documents are hearsay and may | **Denied:**  The notice of motion identifies three test results.  The first is Dr. Lewin's 1972 preliminary report to the FDA.  Defendants claim Plaintiffs will try to introduce secondary sources – |

| | | | |
|---|---|---|---|
| 1973 final report to the FDA; and a 1976 article by Drs. Arthur Rohl and Arthur Langer, titled *Consumer Talcums and Powders: Mineral and Chemical Characterization*." (Notice of Motion, p. 1.) | only be invoked to the extent that an expert may reasonably rely on them. The documents at issue are misleading and consequently entirely unreliable—some have been disavowed by the authors of the cited studies, some have been deemed unreliable by the U.S. Food and Drug Administration ("FDA"), and some have nothing whatsoever to do with the J&J Defendants' products—Johnson's Baby Powder and Shower to Shower—on their face. As a result, the J&J Defendants respectfully request exclusion of all reference to these documents at trial." (Motion, p. 1,) | e.g., a *Wall Street Journal* article and Johnson & Johnson internal documents – that detail Dr. Lewin's preliminary findings. Defendants contend the secondary sources should be excluded because (1) the *WSJ* article misreports the preliminary findings, and (2) the preliminary findings contradict Dr. Lewin's final report. (See Motion, pp. 3-5.) | |
| | "First, the J&J Defendants seek to exclude what are acknowledged as preliminary results of testing conducted by Dr. Seymour Lewin, including second-hand accounts purporting to set forth such results. These preliminary results and accounts, alleging that tremolite and chrysotile were found in several cosmetic talcum powders, including the J&J Defendants' products, differ from Dr. Lewin's final, official report to the FDA, which did not identify quantifiable levels of tremolite or chrysotile in the J&J Defendants' products. The inaccuracy of some of these accounts was recognized by Dr. Lewin himself, who wrote a letter to the editor explaining that the Wall Street Journal, for example, had misreported his findings. Preliminary test results contradicted by the final reported results, let alone second-hand accounts of such repudiated test results, are not a reliable basis for an expert's opinion." (Id. at p. 1; see also id. at pp. 3-5.) | The Court believes that the Wall Street Journal article should not be admitted for the truth of matter asserted based on the present state of the record. But it may be referenced by experts for its historical significance in the debate. | |
| | "Second, the J&J Defendants seek to exclude tests performed in the 1970s by Dr. Arthur Rohl, Dr. Arthur Langer, and five co-authors (the "Rohl/Langer testing"). Drs. Rohl and Langer reported "asbestiform" particles in a subset of samples taken from several brands of cosmetic talc. But the article does not indicate whether any of these results purporting to show asbestos contamination | Otherwise, the Court denies the motion under LASC 3.57(a) and *Kelly v. New West Fed. Sav.* (1996) 49 Cal. App. 4th 659. First, it is unclear which, if any, secondary sources Plaintiffs intend to introduce. The Court will not issue an advisory opinion as to a category of | |

involve the J&J Defendants' products." (Id. at p. 1; see also id. at pp. 5-7.)

"Further, Drs. Rohl and Langer acknowledged that the testing methods they used were incapable of distinguishing asbestos from non-asbestiform amphiboles. As the Rohl/Langer testing does not, on its face, mention any of the J&J Defendants' products and does not distinguish between asbestos and non-asbestiform amphiboles, it is not the sort of reliable test result that Plaintiffs' experts are permitted to rely on to prove that the J&J Defendants' products contained asbestos. At least one other court has agreed and excluded such evidence for this reason." (Id. at pp. 1-2; see also id. at pp. 5-7.)

**Plaintiffs contend:**

"Defendants filed motion in limine to preclude Plaintiff and her experts from relying on what they call "unreliable" test results from the 1970s concerning its talc containing products and ore sources. Defendant claims that tests performed in the 1970s with a "positive" test result, i.e. showing that cosmetic talcum powders including Johnson & Johnson Baby Powder contained asbestos, are "unreliable." But there is no factual or legal support for Johnson & Johnson's arguments and its motion simply highlights the issues the jury must decide." (Opposition, p. 2.)

"There is nothing "unreliable" about testing done in the 1970s that shows asbestos in cosmetic talcum powders, including Johnson & Johnson Baby Powder. To the contrary, the testing confirmed what was already well-known to the talc industry—namely, that talc was contaminated with asbestos. Testing done in the 1970s confirmed the presence of asbestos in cosmetic talc, including Johnson & Johnson Baby Powder. And even if Johnson & Johnson was correct

potential documents. The admission of the documents may depend on when they are offered and on the examination of the witness at issue. Second, the fact that Dr. Lewin's final report contains different findings than the preliminary report does not necessarily justify exclusion and both reports are part of the history of the product. Defendants' evidence fails to establish unreliability, and they fail to identify another basis justifying exclusion. Cross-examination and targeted objections at trial are the proper ways to resolve this issue.

The second test result is Dr. Lewin's 1973 final report. Despite identifying it in the notice of motion, Defendants do not appear to actually seek exclusion. The moving brief does not argue that the final report is unreliable and inadmissible. This portion of the motion is moot.

that the amphiboles found in these cosmetic talc samples in the 1970s were "nonasbestiform" amphiboles, that fact would not make the studies unreliable or irrelevant. The underlying presence of nonasbestiform amphiboles in talc is significant for the presence of asbestos and, thus, relevant to this case." (Id.; see also id. at pp. 4-6.)

"The term asbestos is generally used as "[a] name applied to a group of naturally fibrous minerals." (A.N. Rohl, Langer et al., Consumer Talcums and Powders: Mineral and Chemical Characteristics, J. OF TOX. AND ENV. H. (1976) p. 277, attached as Exhibit A to Langhoff Declaration.) "Asbestiform" is a synonym of asbestos. Mrs. Weirick and her experts thus contend that a substantial amount of the amphiboles present in Johnson & Johnson Baby Powder were, in fact, asbestiform (i.e., fibrous) and thus capable of causing disease." (Id. at p. 2; see also id. at pp. 6-11.)

"NIOSH's current recommended exposure limit ("REL") states that particles are countable, and thus regulated as asbestos, if they include "any fiber or fragment of a mineral longer than 5 microns with a minimum aspect ratio of 3:1 . . . ." NIOSH further indicates that a "covered mineral" is any mineral having the crystal structure and elemental composition of one of the asbestos varieties…or one of their nonasbestiform analogs." The evidence in this case will be that substantial numbers of particles meeting NIOSH's definition of regulated asbestos (i.e., fibers more than 5 microns in length with a minimum aspect ratio of 3:1) were found in cosmetic talc, including Johnson & Johnson talcum powder products and source ores, in the 1970s." (Id. at pp. 2-3; see also id. at pp. 14-15.)

"The issues raised in this motion go to the weight of evidence, and thus fall squarely within the realm of cross-examination, and Johnson & Johnson's ability to present its own evidence. These are

The third test result is the 1976 report by Dr. Rohl and Dr. Langer. Defendants contend the result should be excluded because (1) the report fails to identify the products that contained asbestos – i.e., it fails to identify a Johnson & Johnson product, and (2) the FDA found the result unreliable. (See Motion, p. 5.)

The Court disagrees. Dr. Langer's 1976 report detected asbestos in cosmetic talc. In 2015, he testified that he stands behind the report and has never retracted. (See Langhoff Decl., Ex. E, pp. 62-64.) The FDA's contrary finding does not, itself, prove unreliability as a matter of law, but it can be weighed by the jury.

As noted elsewhere, the early work on this issue is part of the historical record of notice and the development of the science to be considered by the present-day experts or other competent witnesses.

| | |
|---|---|
| not issues of admissibility. Because they are liable for harm caused by asbestos-containing Johnson & Johnson talcum powder products, Defendants predictably take issue with the "positive" test results showing that cosmetic talc, and particularly Johnson & Johnson Baby Powder, contained asbestos. To the extent that Defendants take issue with the testing results, it may present its own evidence, as well as cross examine Plaintiff's expertsand challenge their theories. Defendants are well-protected by their ability to present their own evidence and experts, as well as cross-examine those retained by Plaintiff." (Id.a t p. 3; see also id. at pp. 16-18.)<br><br>"Under Kelly v. New West Federal Savings (1996) 49 Cal.App.4th 659, a motion in limine is not a mechanism for Defendants to strike unfavorable evidence. Simply because evidence is damaging to Johnson & Johnson and/or Imerys, does not mean it is inadmissible. Johnson & Johnson is confusing "unduly prejudicial" with damaging. They are not the same. (People v. Coddington (2000) 23 Cal.4th 529 ["Prejudicial" is not synonymous with "damaging"]; Vorse v. Sarasy (1997) 53 Cal.App.4th 998, 1008-09 [evidence is not prejudicial merely because it undermines the opponent's position].) Plaintiff therefore requests that Johnson & Johnson's motion in limine on this issue be denied in its entirety." (Id. at p. 3; see also id. at pp. 19-20.)<br><br>Moreover, hearsay exceptions apply to the test results. (See id. at p. 18.) | The Court does not opine on the ultimate issue of whether any particular document will be admitted in evidence, or for what purpose, but an in limine motion is inappropriate.<br><br>The Court shares Defendants' concern about prejudice since Dr. Langer's report fails to identify a Johnson & Johnson product. However, Plaintiffs identify some relevant, non-hearsay uses – e.g., notice of asbestos hazards in cosmetic talc and failure to warn. The Court does not assess at this point whether the document can be admitted for the truth of what it asserts. Defendants should make specific objections at trial so the trial judge can rule in context. The fact that no Johnson & Johnson product is referenced can be established through cross-examination. The motion is denied. |

| No. | What to Exclude | Arguments | Ruling |
|---|---|---|---|

| 16 | "[I]ntroducing, referencing, or having its experts rely upon the article authored by Ronald E. Gordon, Sean Fitzgerald, and James Millette, entitled *Asbestos in Commercial Cosmetic Talcum Powder as a Cause of Mesothelioma in Women* (the "Article") or its contents." (Notice of Motion, p. 1.) | **Defendants contend:**

"Defendants seek an order prohibiting any party, witness or attorney from making any direct or indirect reference to the article entitled Asbestos in Commercial Cosmetic Talcum Powder as a Cause of Mesothelioma in Women (the "Article"), or relying on same. Defendants anticipate that Plaintiffs and/or their experts will attempt to rely on the Article as evidence that Defendants' products, including Johnson's Baby Powder, Shower to Shower, and Chanel No. 5, were contaminated with asbestos, but it is undisputed that the article concerns products not at issue in this trial." (Motion, p. 1.)

"The Article was written by Plaintiff's purported expert Dr. Gordon and coauthors Mr. Sean Fitzgerald and Dr. James Millette, who also testify as expert witnesses for plaintiffs. (See August 9, 2016 Deposition of Sean Fitzgerald ("Fitzgerald Dep.") 175:21-23, Exhibit P to the Declaration of Jennifer T. Stewart ("Stewart Decl.").) The Article does not test, discuss, or mention any of Defendants' talcum powder products at issue in this case. Instead, the Article involves a product manufactured by Colgate (Cashmere Bouquet) that is not at issue in this case. As a result, the Article is, first and foremost, entirely irrelevant. It is also inadmissible hearsay."

"In addition, the Article is not the proper basis for expert reliance. First, the Article lacks value as expert reliance material because the testing underlying the Article is fundamentally flawed and has been excluded in a number of jurisdiction due to lack of authentication. Second, the Article is essentially a compilation of reports and testimony prepared by plaintiffs' experts in the context of litigation. Plaintiffs are not entitled to repackage expert reports and testimony from other cases and present it in entirely different litigation. Third, | **Granted:**

Expert testimony regarding tested samples may be excluded based on a "chain of custody" claim. (See *People v. Catlin* (2001) 26 Cal.4[th] 81, 134.) "In a chain of custody claim, '"[t]he burden on the party offering the evidence is to show to the satisfaction of the trial court that, taking all the circumstances into account including the ease or difficulty with which the particular evidence could have been altered, it is reasonably certain that there was no alteration.

The requirement of reasonable certainty is not met when some vital link in the chain of possession is not accounted for, because then it is as likely as not that the evidence analyzed was not the evidence originally received. Left to such speculation the court must exclude the evidence. [Citations.] Conversely, when it is the barest speculation that there was tampering, it is proper to admit the evidence |

the Article is akin to a case report, which is unreliable and irrelevant to the issue of causation and, if admitted directly or as a basis of expert opinion, would greatly prejudice Defendants, confuse the issues, and mislead the jurors.

"Finally, Defendants would be extremely prejudiced if Plaintiffs were permitted to mislead the jurors into believing that the Article relates to products at issue in this case when it does not."

**Plaintiffs contend:**

"Defendants' motion assert that the article is "irrelevant because it does not test, discuss, or mention any of the talcum powder products at issue in this case – Johnson's Baby Powder." (Mot., p. 1). What Defendants fail to note is that the talc used in the 50 containers of Cashmere Bouquet analyzed in the article is the same talc used in Johnson's Baby Powder. 1 The Italian talc used in Cashmere Bouquet was supplied by the same supplier of Italian talc to Johnson & Johnson: defendants Cyprus Amax Minerals and Imerys Talc America. This fact alone makes the article's findings of asbestos in Cashmere Bouquet's Italian talc directly relevant to the asbestos content of the same Italian talc used in Johnson's Baby Powder and supplied by defendant Imerys." (Opposition, p. 2.)

"Further, the article provides relevant and crucial data regarding the releasability of asbestos from cosmetic body talcum powder products that contain trace amounts of asbestos by weight. (Exhibit A at paragraph 48.) Plaintiff's experts rely on the article and the exposure data, and confirm that the data published by Gordon, et al. is consistent with historical publications and current testing of the Italian ore.2 Plaintiff's expert materials analyst and microscopist, Steven Compton, PhD, analyzed talc ore from defendant Imerys' Italian talc mines (the same talc at issue in the article) and

and let what doubt remains go to its weight." [Citations.]'" (Id.)

The Court has examined the article and its reliability in a previous proceeding in these consolidated cases, **Alfaro v. Imerys Talc, No. B277284.** The Article chronicles testing of vintage Cashmere Bouquet samples by Plaintiffs' expert, Dr. Gordon, and two other experts often employed by plaintiff firms – Mr. Fitzgerald and Dr. Millett. As such, it is more a part of the litigation science rather than the purely disinterested science. Mr. Fitzgerald and Dr. Millett are not designated in this case and their potential biases are not subject to cross-examination. Also, Cashmere Bouquet is not at issue in this case. In the Court's view, allowing the Article, or allowing Plaintiffs' experts to testify about the Article's results cause prejudice.

The motion is granted.

13

concluded that "the asbestos content of samples found to contain amphibole and chrysotile fibers range from approximately 1.7 to 660 million fibers per gram. After estimating the mass of the fibers, this corresponds to a quantity ranging from 0.00002% to 0.68% by weight." Relying on the data published by Gordon, et al., Dr. Compton opined that "Fiber release studies of consumer talc products within this range documented elevated concentrations of airborne asbestos fibers during use of those products. It is expected that aerosolization of these samples or any powder consumer product containing these samples as a constituent ingredient would likewise result in elevated concentrations of airborne asbestos fibers." This includes Johnson & Johnson Baby Powder. (Id. at p. 4.) Accordingly, the Gordon, et al. publication is relevant to the products at issue in this case and Mrs. Weirick's exposure to asbestos therefrom." (Id. at p. 3.)

"Defendants' motion is based on the false premise that the findings in the article are unreliable because it involves testing conducted while the authors were consulting in litigation. Defendants' essentially argue, without any evidence or legal authority, that the Plaintiffs and/or their counsel paid for the article or that its authors have some sort of interest or financial stake in the litigation and that somehow Plaintiffs and/or their counsel interfered with the peer-review process. There is no factual support for this; indeed, one of the authors, Mr. Fitzgerald, has previously testified that no law firm or attorneys representing plaintiffs paid for or otherwise influenced the authoring or publication of the article. (Excerpts from Fitzgerald Depo. dated Nov. 6, 2014, at 14:4-8, 67:10-68:22, 72:7-13, 72:18-25, 74:15-25, 82:9-14, attached as Exhibit C.)"

"Defendant cites to no legal authority to support this position either. It therefore requests this Court to announce, as a new rule of law, that where the author of an article is an expert in related

litigation in which the article is to be offered at trial, it should be assumed that the author has a financial stake in the litigation generally and his article cannot be referenced. Again, Defendant cites no authority for this novel position, and requests an illogical inference from the circumstances, particularly in the context of specialized asbestos-related scholarship, which often necessarily intersects with expert witnesses used in asbestos litigation. Indeed, Defendants' own experts purport to be authors of scientific scholarship and they will almost certainly attempt to refer to such work as support for their opinions.4

Defendants' criticisms of the article are not a proper basis for an evidentiary challenge, but are just accusations having no factual or legal support. It is the jury's role to determine the relative value of the experts' bases for their opinions, not a matter for this Court to decide at the in limine stage."

"It is well-established that an expert witness may testify about the reasons for his opinion and the matter upon which it is based. Specifically, Evidence Code section 802 provides: "A witness testifying in the form of an opinion may state on direct examination the reasons for his opinion and the matter . . . upon which it is based, unless he is precluded by law from using such reasons or matter as a basis for his opinion." An expert may rely on inadmissible evidence to form his or her opinion. Evidence Code section 801, subdivision (b), expressly permits an expert to rely upon inadmissible evidence (such as hearsay articles) if it is "of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates . . . ." (See Isaacs v. Huntington Memorial Hospital (1985) 38 Cal.3d 112, 133; 1 Jefferson, Cal. Evidence Benchbook (4th ed. 2010) § 30.40, p. 680.) It follows that expert witnesses may testify about an article or

| | | | |
|---|---|---|---|
| | | treatise upon which they reasonably base their opinion, even if that article or treatise is otherwise inadmissible." | |
| | | The article's findings are consistent with testing performed in 1976 at Mt. Sinai and testing by Colgate.  (See id. at pp. 6-9.) | |
| | | The article can be used for non-hearsay purposes.  (See id. at p. 9.) | |
| | | The article is not prejudicial.  (See id. at p. 10.) | |

| No. | What to Exclude | Arguments | Ruling |
|---|---|---|---|
| 22 | Opinons and testimony by Plaintiffs' expert Dr. David Fractor. | The binders the parties provided to the Court do not include this motion or the opposition.<br><br>The Court conducted a conference call with the parties on June 19th, and they admitted they had not filed briefs yet.  Defendants served the motion on Lexis File & serve on June 20th but did not submit a hard copy to the Court as required.  Plaintiffs submitted their opposition to the Court on June 21st.<br><br>**Defendants contend:**<br><br>"Dr. Fractor admitted that he did not consider the actual deposition testimony in this case in which both Plaintiffs testified regarding the *actual* household services performed by Plaintiff Carolyn Weirick ("Weirick"), nor did he consider the fact that Plaintiffs hired individuals to assist with certain services well before Weirick's diagnosis. Dr. Fractor admitted that he simply provides a "benchmark" of household services for the average adult, and that he expects the jury to adjust the benchmark based upon the actual evidence in this case. Allowing the jury to hear a calculation of | **Denied:**<br><br>The motion does appear to be untimely.  The Court held the final status conference on June 11th.  Under the Court's protocol, the parties were required to meet and confer at the hearing and then provide the remaining motions in limine to the Court. Defendants did not e-serve this motion until June 20[th], and never submitted a hard copy. The Court did not grant Defendants leave to file the motion late.<br><br>But the Court denies the motion for a separate reason. This Court has held in other |

household services that far exceed the actual evidence in this case will be prejudicial to Defendants."  (Motion ,pp. 1-2.)

"David Fractor, Ph.D. ("Fractor") was deposed on June 1, 2018. Prior to his deposition, Plaintiffs produced Fractor's Loss Summary Reports, which calculated $8,484 in past household services and $438,323 in future household services. (Declaration of Lindsay Weiss ("Weiss Decl."), Exhibit A.) In making his determination regarding household services, Fractor testified that he used the Dollar Value of a Day to come up with the annual replacement costs for services that Weirick can no longer perform. (Weiss Decl., Exhibit B at 40:15-3; 43:25-44:14.) However, Fractor conceded that his valuation did not take into consideration the deposition testimony offered by the Plaintiffs regarding the activities Weirick does and does not perform around the house. (*Id.* at 44:15-48:6.) Fractor testified that his valuation is solely a "benchmark" that the jury can use to either add or subtract to, based on their opinion of whether Weirick falls within the general Dollar Value of a Day mold his calculations were based on. (*Id.*) Fractor has no opinion one way or another as [to] whether Weirick falls above or b[e]llow the national average with regard to the activities that are listed on The Dollar Value of a Day tables which he used to calculate damages in this case. (Id. at 48:2-6)."  (Id. at p. 2.)

"In *In re Lockheed Litig. Cases* (2004) 115 Cal.App.4th 558, 563, the Court of Appeals construed Evidence Code section 801(b) to require that a trial court must determine that the matter relied on by an expert "provide[s] a reasonable basis for the particular opinion offered." The Court rejected the plaintiffs' argument that Evidence Code section 801(b) requires the trial court only to determine whether the type of matter on which an expert relied in forming his or her opinion is the type of matter on which an expert can reasonably rely in forming an opinion, without regard to whether actions in the coordinated *LAOSD Asbestos Cases* that "loss of household services" is recoverable by personal-injury asbestos plaintiffs.  Defendants contend Dr. Fractor's opinion is unusual because he created a generic value based on the Dollar Value of a Day tables instead of quantifying the actual value of the actual household services Ms. Weirick provides.  In *McKinney v. California Portland Cement*, however, the Court of Appeal affirmed a similar approach.  The expert there used the Cornell University study – which "analyzed  what people did around the home such as home repair and maintenance, automobile maintenance, yard work, cooking, cleaning, shopping and general home maintenance" – and "assumed that decedent was an average provider based on the study criteria." (*McKinney* (2002) 96 Cal.App.4th 1214, 1229.) The expert "presented an estimated value of an average provider's services in the

the matter on which the expert relied reasonably supports the particular opinion offered. (*In re Lockheed Litig. Case, supra*, 115 Cal.App.4th at p. 563.) The matter relied on must provide a reasonable basis for the particular opinion offered. (*Sargon Enterprises, Inc. v. University of Sothern California* (2012) 55 Cal.4th at p. 770, citing *In re Lockheed Litig. Cases, supra*, at p. 564.) It is therefore improper to use conjectural and speculative matters to support an expert's opinion on any subject because those types of matters render the opinion unreliable and irrelevant. (*Korsak v. Atlas Hotels, Inc.* (1992) 2 Cal.App.4th 1516, 1524; see also *Jennings v. Palomar Pomerado Health Sys., Inc.* (2003) 114 Cal.App.4th 1108, 1118—expert must offer "reasoned explanation illuminating why the facts have convinced the expert.")" (Id. at pp. 3-4.)

"In addition, Evidence Code section 802 provides that "[a] witness testifying in the form of an opinion may state...the reasons for his opinion and the matter...upon which it is based, unless he is precluded by law from using such reasons or matter as a basis for his opinion....[t]he court in its discretion may require that a witness before testifying in the form of an opinion be first examined concerning the matter upon which his opinion is based." Thus, under Evidence Code section 802, not only may the trial court inquire into the expert's reasons for an opinion, and examine experts concerning the matter on which they base their opinion before admitting their testimony, it may also inquire into whether that material actually supports the expert's reasoning. (*Sargon Enterprises, Inc. v. University of Southern California, supra,* 55 Cal.4th at p. 771.)" (Id. at p. 4.)

"Fractor calculates loss of household services beginning in February 2017 (the date of Weirick's diagnosis) through July 2, 2041. (Weiss Decl., Exhibit A). In calculating loss of household

home[.]" (Id.) The Court of Appeal held that the "estimate, **coupled with the evidence of [decedent's] actual work around the house**, was properly presented for the jury's consideration." (Id. [emphasis added].) Subject to specific objections to specific evidence at trial, Plaintiffs here probably should receive the same opportunity to combine estimate evidence and "actual work" evidence. If Dr. Fractor has not done so, he can be subject to cross-examination on that point.

services, Fractor uses the Dollar Value of a Day survey tables, which he concedes provides benchmark numbers for average adults performing household services. (Weiss Decl., Exhibit B at 43:25-44:14). Despite the fact that Fractor was provided Weirick's deposition testimony, in which she testified regarding the services she actually performs – and those she does not – Fractor claims that he could not rely upon the deposition testimony to provide him the accurate number of hours a person spends performing certain services. (*Id*. at 44:15-45:11). Fractor admitted that he did not try to "parse it out at all" and did not determine which services Weirick actually performed. (*Id.* at 45:21-46:11). Fractor did not take into consideration the fact that Weirick testified that she has employed a housekeeper, a gardener and a nanny for some time and prior to her diagnosis, and he did not consider the testimony where Weirick actually discussed the amount of cooking, grocery shopping, bill paying and handyman work that Weirick performed prior to her diagnosis. (*Id*. at 46:12-48:1). Fractor testified that he simply provides a benchmark and then lets "the testimony drive that number at trial." (*Id*. at 46:24-47:1)." (Id. at pp. 4-5.)

"Similarly, Fractor did not take into consideration any of the testimony that Weirick's spouse gave regarding the services Weirick's spouse actually performed for the family home. (*Id*. at 47:16-20). Fractor has no opinion as to whether or not Weirick falls above or below the national average concerning the various activities that are listed on the Dollar Value of a Day tables, which he used to prepare his calculations in this case. (*Id*. at 48:2-6)." (Id. at p. 5.)

"In addition, Dr. Fractor adopts the calculations performed by Plaintiffs' expert Karen Luckett with regard to damages associated with household services, and did not verify the accuracy of the information provided by Luckett nor did he perform his own

investigation or research as to Plaintiffs' household services. Defendants refer the Court to their Motion *in Limine* No. 23, which challenges the foundation for Luckett's opinions in this matter. Accordingly, for the reasons set forth in Motion *in Limine* No. 23, Defendants respectfully request that the Court issue an order precluding Dr. Fractor from adopting the opinions of Karen Luckett." (Id.)

**Plaintiffs contend:**

"Defendants improperly seek to preclude Plaintiffs' economist Dr. David Fractor from providing opinions regarding Plaintiff Carolyn Weirick's loss of household services. First, Defendants' motion should be denied because it is untimely. Dr. Fractor was deposed in this matter on June 1, 2018 and Defendants did not file the instant motion until 19 days later on June 19, 2018, eight days after all motions *in limine* were due to the Court." (Opposition, p. 2.)

"Second, even if this motion is considered by the Court, it should still be denied because Dr. Fractor's opinions regarding loss of household services are admissible under Evidence Code Section 801 and *McKinney v. California Portland Cement Co.* (2002) 96 Cal.App.4th 1214." (Id.)

"The plaintiff seeking recovery has the burden to prove the "reasonable value" of the household services he or she will no longer be able to provide in the future as a result of his injuries and death. That evidence must come from an expert economist. (Evid. Code, section 801(a).)2 Plaintiffs have therefore designated Dr. Fractor to offer opinions regarding, among other things, the value of Carolyn's future household services. Dr. Fractor used the "Dollar Value of a Day"3 to come up with a benchmark number for Carolyn's loss of household services, both past and future. It is a

20

number that the jury can use, and then based upon the evidence presented at trial regarding Carolyn's specific household duties and her inability to perform those duties, evaluate whether Carolyn's loss is more or less than the number provided by Dr. Fractor." (Id. at p. 3.)

"Dr. Fractor's valuation of future loss of household services also includes services that Carolyn would have provided to her children had she not developed mesothelioma. To prove the reasonable cost of outside services, plaintiffs asked Life Care Planner Karen Luckett to prepare a report. Based on Dr. Fractor's review of Luckett's report, and his conversation with her, Dr. Fractor has formed opinions regarding the economic value of that component." (Id.)

"Under California law, an economist may rely only on estimates derived from statistical data in forming an opinion about loss of household services. The Court in *McKinney v. California Portland Cement Co.* held that it was appropriate for Plaintiffs' economist Dr. Ben-Zion's rely on the Cornell Universe study that analyzed household services to calculate Plaintiffs' loss. *McKinney v. California Portland Cement Co.* (2002) 96 Cal.App.4th 1214, 1229. The Court stated that Dr. Ben-Zion's use of the study "presented an estimated value of an average provider's services in the home. This estimate, coupled with the evidence of Roland McKinney's actual work around the house, was properly presented for the jury's consideration. (*Id.*) Dr. Ben-Zion explained at trial that the jury then evaluates the evidence regarding the particular individual and household duties performed by that individual, and then decides whether that individual did more or less than the average and had more than average skills in determining the value of the services. (*Id.*)" (Id. at pp. 3-4.)

| | | |
|---|---|---|
| | | "Here, Dr. Fractor does exactly what California law allows him to do, relies on a study that provides statistical data regarding household services, comes up with a benchmark for the jury and allows the jury to decide whether Carolyn's services would fall above or below his benchmark number. Defendants fail to acknowledge the law and argue that Dr. Fractor's opinions are speculative and should not be admissible because he did not take into consideration Carolyn's testimony about her inability to perform certain household duties. Striking Dr. Fractor's opinions regarding future loss of household services or limiting the number is not for the judge to decide. It is for the fact finder determine after all of the evidence is presented." (Id. at p. 4.)<br><br>Dr. Fractor may rely on Karen Luckett's report no matter whether it is hearsay. (See id. at pp. 4-5.)<br><br>Dr. Fractor is qualified to testify about a Life Care Plan, and his opinions are relevant to the "household services" component of future economic damages. (See id. at pp. 5-7.) | |

| No. | What to Exclude | Arguments | Ruling |
|---|---|---|---|
| 23 | Opinons and testimony by Plaintiffs' expert Karen Luckett. | During the June 19th conference call, Plaintiffs informed the Court that they would be filing an opposition. They provided a hard copy to the Court on June 21st.<br><br>**Defendants contend:**<br><br>"The expert discovery cut-off in this action was May 14, 2018. On February 23, 2018, Plaintiffs designated Karen Luckett as an expert witness, and the parties agreed Ms. Luckett would be deposed on May 14, 2018. Just days before Ms. Luckett's scheduled deposition, however, Plaintiffs unilaterally removed the deposition | **Denied:**<br><br>Ms. Luckett's deposition occurred after the discovery cutoff, but the Court declines to exclude her on this ground. Her deposition finished last week, and Defendants were able to question her. Defendants did not suffer prejudice. |

from the case's calendar, providing no explanation at the time. Later, Plaintiffs would explain that Ms. Luckett suffered "toxic poisoning" that precluded her from testifying as scheduled. Once her deposition eventually convened, however, Ms. Luckett testified she had been ready and able to testify."  (Motion, p. 3.)

"This feels like game-playing that exceeds even the usual scenario of late-deposed experts. Even so, defendants would not complain for this reason alone. But there is more here than the flouting of deadlines. Defendants eventually deposed Ms. Luckett on May 22, 2018. After that deposition, she dramatically revised her report— and plaintiffs have now offered Ms. Luckett for yet another deposition. So, a late report has been supplanted by an even later one, and a late, still-untaken deposition is meant to supplement her prior, late testimony. Ms. Luckett gets to "fix" her report and her testimony, and defendants—and their reciprocal damages expert— are left to react at the last minute." (Id.)

"Ms. Luckett is not qualified to opine on life care plans for patients with mesothelioma. Her experience and expertise in life care planning is with plaintiffs who have been diagnosed with orthopedic injuries – not cancers, let alone mesothelioma. Accordingly, many of Ms. Luckett's opinions are speculative and lack foundation. As an example: Ms. Luckett included costs for future medical costs—such as alternative therapies, surgical interventions, and hospitalizations — based solely on her independent research on cancer from the American Cancer Society's website and not in relation to Ms. Weirick's current condition or recommendations from Ms. Weirick's treating physicians." (Id. at p. 4.)

"Ms. Luckett's opinion regarding the future value of Ms. Weirick's medical services is inadmissible. Ms. Luckett improperly calculated

The Court finds Ms. Luckett qualified to testify.  She is a practicing life-care planner. She has testified in 70 cases, including cases involving personal injuries and products liability, and has never been disqualified.  (See Blumenfeld-James Decl., Ex. A, pp. 8-9.) Markedly, she testified that she agreed with Defendants' standards and methodology (the International Academy of Life Care Planners Standards of Practice) and followed the steps. (See id. at Ex. A, pp. 220-224.)

Defendants' assertion – Ms. Luckett is unqualified because she hasn't worked on many mesothelioma cases – is unpersuasive.  "[T]here is no requirement that the expert have experience in the particular field of his or her testimony[.]"  (Wegner et al., Cal. Practice Guide:  Civil Trials and Evidence (The Rutter Group 2018) ¶ 8:737.) The expert can testify if he or she shows "a 'special'

Ms. Weirick's future medical damages based on the amounts that providers bill for medical services and equipment, rather than the lesser amounts accepted as full payment." (Id.)

"Ms. Luckett's life care plan includes damages for loss of future household services, which is not a proper element of economic loss pursuant to Civil Code Section 1431.2(b)(1). Compounding this error, Ms. Luckett's calculations are further flawed because she used an average value of all services performed by married homemakers, rather than basing her calculations on the specific, more limited services Ms. Weirick actually performed before her mesothelioma diagnosis. Similarly, Ms. Luckett's life care plan includes costs for Ms. Weirick's children that are simply not recoverable in a personal injury action—such as expenses for her three children to attend college and receive grief counseling and financial planning services. It is well established under California law that there is no right to recovery for loss of parental consortium in a personal injury action." (Id.)

**Plaintiffs contend:**

"Karen Luckett was offered for deposition on May 14, 2018, the last day of expert discovery. (Blumenfeld-James Dec. ¶ 2). However, on May 8, 2018 Ms. Luckett experienced an incident with her car that caused her to inhale toxic fumes that burned her lungs making it hard for her to breath and talk. This made it impossible for Ms. Luckett to finish her work on the case, and sit for deposition on May 14, 2018." (Opposition, p. 2.)

Defendants did not experience prejudice: "In their motion, Defendants make the factual statement that Ms. Luckett's deposition took place after the close of expert discovery. But what they do not state, is how this prejudiced them. The reason for this is

knowledge of the subject matter." (Id.) In accordance with the International Academy of Life Care Planners Standards of Practice (see Blumenfeld-James Decl., Ex. B, p. 7), Ms. Luckett said she "did research on it and I read the medical records and talked to the doctors for a recommendation." (Id. at Ex. A, pp. 220-224.)

The parties' dispute about the cost of future medical care is a trial issue. The various manners in which such damages are estimated are normally subject to dispute because of the unsettled nature of the medical marketplace. This matter should be addressed through cross-examination.

As to loss of future household services, which includes loss of services to children, the motion is denied without prejudice to specific objection at trial to particular items. It would appear that the Plaintiff can recover the value of

simple: It did not. Plaintiffs agreed to take Defendants' economist after Ms. Luckett was deposed. (Blumenfeld-James Dec. ¶ 4). Defendants' expert was on vacation from June 1 until June 18. (*Id.*) As a result, Ms. Dolan has not yet issued her report/opinions. As such, she has had ample time to review the materials and express her opinion. The fact that Ms. Luckett's deposition took place after May 14, 2018, has no prejudicial effects on Defendants." (Id. at p. 3.)

Ms. Luckett is qualified and has never been disqualified as an expert: "Karen Luckett is an experienced life care planner, who followed the normal process of life care planning in this case. Defendants allege that because she has not worked with many cases involving an individual diagnosed with mesothelioma, she is somehow unable to provide an opinion in this case. However, this is not accurate. Life Care Planners, often encounter new injuries or types of care, and are provided with a guideline of how to handle this situation. During her deposition, Ms. Luckett was shown the International Academy of Life Care Planners Standards of Practice by defense counsel. (Blumenfeld-James Dec. Exhibit B). This is the guideline that explains how a life care planner would handle a new situation. And as Ms. Luckett explained, she did exactly that in this case[.]" (Id. at p. 4; see also id. at pp. 5-6.)

Ms. Luckett's opinions regarding the costs of future medical care should be addressed by cross-examination, not exclusion. (See id. at p. 7.)

Plaintiffs are entitled to recover loss of future household services: "the annotated CACI explains that Plaintiffs are entitled to future loss of household services when the injury occurs, which is now. As the Court explained in *Overly v. Ingalls Shipyard, Inc.*, which is cited in CACI: [']Although the parties do not distinguish between

services that she would have provided to her son during her lifetime had there not been the injury alleged.

The Court does grant the motion in part to exclude the claimed damages for the loss of the ability to pay college tuition. Among other things, this represents a double recovery for loss of income. Damages for grief counseling are likewise excluded as they do not appear to be proximately caused by the event at issue. Rather, they are an ineluctable fact of life irrespective of the cause or timing of a parent's death.

the different types of lost years damages that were awarded, we note that lost household services damages, are different than other types of future earnings included in this category. Generally household services damages represent the detriment suffered when injury prevents a person form contributing some or all of his or her customary services to the family unit. The justification for awarding this type of damage as compensated for the value of the services he would have performed during the lost years which, because of the injury, will now have to be performed by someone else.[']" (Id.)

"Ms. Luckett's opinions regarding Ms. Weirick's children fall under "household services" component of the Ms. Weirick's future economic damages. Plaintiffs' household services include services she contributes to the family unit, and here the family unit includes a three minor children, one of whom is autistic. As stated above, "(g)enerally household services damages represent the detriment suffered when injury prevents a person *from contributing some or all of his or her customary services to the family unit*. (*Overly* at 174 (emphasis added).)" (Id. at p. 8.)

"While the value of household services can be calculated using statistical data regarding the contributions of an "average" provider, California also recognizes that the economic value of a particular individual's contribution may, on a case-by-case basis, be may be more or less than the average. An expert may rely not just on estimates derived from statistical data but actual, case-specific evidence. (*McKinney v. California Portland Cement Co.* (2002) 96 Cal.App.4th 1214, 1229.) The specifics of this particular case demonstrate that Carolyn Weirick's contribution to her household was substantially greater than the average, and the life care plan supports plaintiffs' ability, through their experts, to meet their burden of proving the reasonable value of all potential loss." (Id.)

| | | |
|---|---|---|
| | | "But for Ms. Weirick's diagnosis with mesothelioma, she would have continued to work to support both her wife and her sons. Her future inability to provide income and other support for the additional costs and expenses associated with her sons was caused by the disease which resulted from defendants' negligence and strict liability. Defendant should not be able to sidestep the peculiarities of this family's situation. Stated otherwise, Carolyn Weirick's family situation is an "eggshell" situation, whereby defendant must take him as they find him and, in this case, they must take the financial burden occasioned by her disease and eventual death."  (Id. at pp. 8-9.) | |

| No. | What to Exclude | Arguments | Ruling |
|---|---|---|---|
| 25 | Opinions and testimony by Plaintiffs' expert William Longo. | **Defendants contend:**<br><br>"Over the last year, Dr. Longo has received 35 containers of purported J&J talcum powder products from various sources, including three different plaintiff law firms. Those law firms obtained these containers from a hodgepodge of sources: some came from unrelated plaintiffs, others came from unidentified "collectors," and still others were purchased on sites like eBay. Most had been opened and used before Dr. Longo received them for testing. Dr. Longo purports to have found trace levels of "asbestos" in 20 out of 35 samples that he tested."  (Motion, p. 1.)<br><br>"Dr. Longo's testing of the samples was unreliable at every step and must be excluded. First, Plaintiffs have failed to establish that the samples Dr. Longo analyzed contained the J&J Defendants' talcum powder in its original, unaltered condition. Most of the samples are more than a half-century old, and there is no information about how they were handled or stored before Dr. | **Denied in part; Granted in part:**<br><br>The first issue regards chain of custody. Dr. Longo ultimately tested 35 Johnson & Johnson containers – 32 Baby Powder and three Shower-to-Shower. (See Opposition, p. 7.) Confusingly, portions of the parties' briefs discuss 30 containers while other portions discuss 35.<br><br>Expert testimony about tested samples may be excluded based on a "chain of custody" claim. (See *People v. Catlin* |

Longo received them—other than that most had been opened. There is a real risk that the samples Dr. Longo tested were contaminated after they were manufactured and sold. This is a particularly troubling possibility because Dr. Longo identified richterite—a mineral not known to be present in the talc mines at issue but present in insulation in the 1970s—in some of the samples and did not identify amphiboles in any brand new, "off-the-shelf," sealed samples that he tested. Similarly, because it is possible for people to refill talcum powder containers, there is a real risk that the products Dr. Longo tested were not manufactured by the J&J Defendants at all." (Id.; see also id. at pp. 4-11.)

"In sum, serious chain of custody issues make it impossible to know whether Dr. Longo was in fact testing the J&J Defendants' talcum powder in its original, unaltered condition. As a result, his testing must be excluded, as two other California courts and additional courts in other jurisdictions have concluded with respect to similar testing conducted under similar circumstances." (Id. at pp. 1-2; see also id. at pp. 4-11.)

"Second, Dr. Longo did not adhere to a generally accepted methodology for identifying asbestos. Dr. Longo performed an analysis that he admits is incapable of distinguishing between asbestiform and non-asbestiform fibers—in other words, between minerals that are asbestos and minerals that are not. Instead, Longo assumes that the amphibole particles he detected were asbestos even though the asbestiform varieties of these minerals are exceedingly rare, and has repeatedly been unable to point to any support for this assumption. He further assumes, without foundation and indeed contrary to his findings, that the purported contamination he identifies is homogeneous throughout the tested samples." (Id. at p. 2; see also id. at pp. 11-16.)

(2001) 26 Cal.4th 81, 134.) "In a chain of custody claim, '"[t]he burden on the party offering the evidence is to show to the satisfaction of the trial court that, taking all the circumstances into account including the ease or difficulty with which the particular evidence could have been altered, it is reasonably certain that there was no alteration. [¶] The requirement of reasonable certainty is not met when some vital link in the chain of possession is not accounted for, because then it is as likely as not that the evidence analyzed was not the evidence originally received. Left to such speculation the court must exclude the evidence. [Citations.] Conversely, when it is the barest speculation that there was tampering, it is proper to admit the evidence and let what doubt remains go to its weight." [Citations.]'" (Id.)

In this case, the contamination alleged is a very low level, so low that it is detectable only by

"Third, Dr. Longo cannot extrapolate the results of his analysis of the samples to conclude that the talcum powder Ms. Weirick actually used would have been contaminated with asbestos. He conducts no analysis, statistical or otherwise, to reach this conclusion. Dr. Longo is not entitled to simply guess that his test results are applicable to the Johnson's Baby Powder or Shower to Shower actually used by Ms. Weirick. " (Id. at p. 2; see also id. at pp. 16-19.)

"Finally, Dr. Longo has issued multiple reports and supplemental reports in this case, all of which set forth the results of one test method for identifying amphibole particles: TEM analysis. Because Dr. Longo has never referred to any other testing in his reports and deposition, he should be precluded about doing so at trial." (Id. at p. 2; see also id. at pp. 19-20.)

**Chanel contends:**

Chanel filed a separate motion in limine concerning Dr. Longo. It is Chanel's motion in limine no. 29. Chanel contends Dr. Longo should be excluded because (1) he admitted that he never tested a Chanel product, (2) he did not review tests from other labs that detected asbestos in Chanel products, (3) he "had no information about the source of any talc incorporated into Chanel No. 5, including whether Chanel ever sourced its talc from the Vermont mine that many of the samples Dr. Longo tested contained[,]" and (4) "he conceded that asbestos contamination within talc mines is inconsistent and varied." (Chanel MIL No. 29, p. 1.)

**Plaintiffs contend:**

"At least four courts, two in Los Angeles County, California, one in Middlesex County, New Jersey, and one in Darlington County,

the Plaintiffs' experts using electronic microscopes. As such it is necessary that there be some assurance that the sample was free from the possibility of contamination from any number of sources.

Here, the samples came from multiple sources (clients, collectors, and off-the-shelf purchases by the plaintiff firms) and multiple eras (unknown, 1950s, 1960s, 1970s, 1990s, 2000s, and 2010s). Plaintiffs claim "Dr. Longo has chain of custody documentation for each of the 30 [now 35] samples he tested." (Opposition, p. 15.) They cite Dr. Longo's expert report, sections 2, 3, and 4. (See id. at p. 15 n. 66.) These sections contain transport slips that merely identify the person who sent the sample, by UPS or FedEx, and the person who received the delivery. (See Stewart Decl., Ex. A.) The testing charts, similarly, say nothing about chain of custody. (See id. at Ex. 9, pp. 3-4, 9-22.) None of this

29

South Carolina, have considered and denied Johnson & Johnson's challenges to Dr. Longo's opinions. In the first mesothelioma trial against Johnson & Johnson, Judge Simpson ruled that based on the extensive documentation before him, a 402 hearing was unnecessary and Dr. Longo would be allowed to testify as to his testing of the historical samples. Similarly, Judge Ana Viscomi, in the state court of New Jersey, after hearing Dr. Longo's testimony during a full contested hearing, ordered that 'What the Court found compelling was the testimony of Dr. Longo insofar as he found that by doing the testing, the consistency of the product throughout and some of the tests that he conducted revealed the presence of asbestos. Some did not and so based upon his argument as to the consistency, which the Court found compelling, as to it being an indicia of reliability, the Court finds that it would be appropriate to deny the motion to exclude, allow the testimony, but certainly there are issues that would go to the weight of the evidence.'" (Opposition, p. 1.)

"In South Carolina, Dr. Longo was permitted to testify regarding his analyses of Johnson & Johnson baby powder that included talc from the Vermont mine. The samples about which he was permitted to testify were limited to the Vermont talc due to the plaintiff's exposure occurring only during years in which that talc was incorporated into Johnson's Baby Powder." (Id. at pp. 1-2.) In West Covina, Judge Gloria White-Brown overruled all of Johnson & Johnson's objections to Dr. Longo's testimony in the Anderson trial. Notably, Johnson & Johnson has requested in the alternative a 402 hearing regarding Dr. Longo; in the Anderson case, with Dr. Longo literally waiting in the hall, counsel for Johnson & Johnson waived this request. In the ongoing Brick v. Johnson & Johnson matter, Johnson & Johnson and Plaintiffs' counsel reached an agreement permitting Dr. Longo regarding the exact same testing at issue in the instant Motion." (Id. at pp. 1-2.)

evidence clears up the gap between the manufacture dates and the testing dates. Plaintiffs' showing fails to explain how the samples were stored, repackaged, delivered, etc. (See Opposition, pp. 9-10.)

On this record, under California law, this Court finds Plaintiffs' "chain of custody" showing inadequate. The motion is granted as to the test results for these samples and Dr. Longo's related testimony and opinions. Given the low levels of asbestos to which the Plaintiffs' experts are referring, the samples must have a chain of custody that prevents contamination.

As for Defendants' other arguments, the gatekeeper role of a court "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant

"The substance of Johnson & Johnson's challenge to Dr. Longo in this case is the same as that which has been repeatedly – and unanimously – rejected by every judge who has considered the issue. In fact, the development of additional evidence since the last hearings on this subject have only continued to support and buttress Dr. Longo's work." (Id. at p. 2.)

Dr. Longo's methodology (the Blount method) is recognized and approved. Defendants' experts endorse and use it. (See id. at pp. 3-11.)

The FDA method is inadequate: "Not even the FDA follows the "FDA Method,"58 and neither do Defendants' experts. Firstly, it is misleading to suggest there is an "FDA Method." What Defendants reference here is the test for Absence from Asbestos published by the United States Pharmacopeia (USP), a private standards organization. The current USP test method for asbestos in talc doesn't even require TEM analysis, carries a significant risk of false negatives and the USP panel brought together to modernize the standard says as much.59 Dr. Longo stated that, "the USP...uses IR and...of course infrared analysis is a method that has been discredited many years ago for determining the amount of asbestos in anything, and it's not recognized by anybody, and XRD, of course, has its problems and optical has its problems...But the technique...is not really designed to see the concentrations of trace [asbestos] in the characterizations such as we can do with TEM. Hopefully the USP will be a TEM method because that is the most precise method."" (Id. at p. 11.)

Asbestiform v. non-asbestiform: Defendants accurately point out that Dr. Longo did not attempt to distinguish asbestiform vs. non-asbestiform, referring to the growth habit of the particles he

field." (*Sargon* (2012) 55 Cal.4[th] 747, 772.) The court should "exclude expert opinion testimony that is (1) based on matter of a type on which an expert may not reasonably rely, (2) based on reasons unsupported by the material on which the expert relies, or (3) speculative." (Id. at 771-72.)

"But courts must also be cautious in excluding expert testimony. The trial court's gatekeeping role does not involve choosing between competing expert opinions. The high court warned that the gatekeeper's focus 'must be solely on principles and methodology, not on the conclusions that they generate.'" (Id. at 772.)

"The court must not weigh an opinion's probative value or substitute its own opinion for the expert's opinion. Rather, the court must simply determine whether the matter relied on can provide a reasonable basis for the opinion or whether that

identified. He complied with the EPA/AHERA counting protocol for regulated asbestos fibers.61 As discussed and established in connection with Plaintiff's Motion in Limine #14, no asbestos counting methods require a prerequisite geological finding that a regulated particle is "asbestiform" or not, including AHERA. "Asbestiform" is a commercial geological distinction designed to designate certain asbestos deposits as commercially desirable or not. It has zero relevance to the health hazard of the material." (Id. at p. 12.)

Dr. Longo may rely on "off the shelf" and historical samples: "There are five reasons why Dr. Longo may rely upon the samples he tested. First, as an expert material scientist, Dr. Longo and countless other researchers routinely rely upon historical samples to determine their contents. Second, the samples are what they purport to be: Johnson & Johnson talc with no signs or allegations that they are contaminated or have ever been tampered with. Third, ten samples for which there can be no "authenticity" challenge (off the shelf and client-owned samples) are consistent in every way with the other twenty samples. Another sample was obtained directly from Johnson & Johnson. Fourth, Dr. Longo took an extra step to confirm the uniformity of the samples by running a particle size distribution analysis. Fifth, the results are precisely in line with dozens of Johnson & Johnson's internal tests, third party testing, and admissions." (Id. at p. 15; see also id. at pp. 16-22.)

Experts reasonably rely on "off the shelf" and historical samples. (See id. at pp. 22-24.)

Authentication is unnecessary since Plaintiffs do not seek to introduce the talc ore or historical containers. (See id. at pp. 24-27.)

opinion is based on a leap of logic or conjecture. The court does not resolve scientific controversies. Rather, it conducts a 'circumscribed inquiry' to 'determine whether, as a matter of logic, the studies and information cited by experts adequately support the conclusion that the expert's general theory or technique is valid.'" (Id.)

"If the opinion is based on materials on which the expert may reasonably rely and is grounded in logic flowing from those materials, the opinion should be allowed even when the court or other experts disagree with its conclusion or the methods and materials used to arrive at it." (Wegner et al., Cal. Practice Guide: Civil Trials and Evidence (The Rutter Group 2018) ¶ 11:77.)

Defendants contend Dr. Longo failed to "adhere to a generally accepted methodology for identifying asbestos." (Motion, p. 2.)

| | |
|---|---|
| California law permits experts to rely on historical samples; and Dr. Longo has adequate foundation to testify about Ms. Weirick's exposures.  (See id. at pp. 27-28.)<br><br>Plaintiffs properly disclosed Dr. Longo's SEM analysis.  (See id. at p. 29.)<br><br>As to Chanel, Dr. Longo will not testify directly that talc used in Chanel products contained asbestos, but he may answer hypothetical questions that ask him to assume Chanel used Italian talc in Chanel No. 5.  He will be able to lay foundation to answer the hypotheticals.  (See id. at p. 30.) | Under *Sargon*, the Court is not supposed to pick one scientific method over another; the Court's role, simply, is to determine whether the expert used a recognized, viable method.  There is at least some evidence that defendants' experts and consultants have used these methods.  (See Opposition, p. 7; see also, e.g., Blumenfeld-James Decl., Ex. 6.)  A defense geology expert, Mickey Gunter, said he had no criticism of the "Blount Method."  (See id. at Ex. 17, pp. 165-166.)<br><br>Dr. Longo also utilizes scanning electron microscopy ("SEM").  Defendants suggest his SEM findings should be excluded because Plaintiffs failed to disclose his SEM analysis.  The Court declines to adopt the argument because Dr. Longo testified about his SEM findings at his deposition, and Defendants cross-examined him.  (See Opposition, p. 29; see also |

33

|  |  |  | Blumenfeld-James Decl., Ex. 40.) |
|--|--|--|--|
|  |  |  | Dr. Longo's counting methodology also appears to be a matter of legitimate scientific debate, at least on this record. |
|  |  |  | Accordingly, the motion is denied as to Dr. Longo's methodology, his use of TEM and SEM, and his counting methodology. This is a scientific debate that the Court cannot resolve as a matter of law. |
|  |  |  | Dr. Longo's ability to extrapolate requires different analysis. Dr. Longo's expert report states: "Based on the results of our analysis, it can be stated, that individuals who used Johnson & Johnson's Baby Powder or Valiant Shower to Shower talc products would have, more likely than not, been exposed to fibrous amphibole asbestos. (See Stewart Decl., Ex. A, p. 25.) He reached this opinion by detecting asbestos in 17 of |

|  |  |  | 30 containers.  (See id. at Ex. A, pp. 2, 23.)  Plaintiffs fail to show how these results provide a reliable means to extrapolate a likelihood of asbestos contamination and exposures above background levels.  A 57% positive rate among containers lacking "chain of custody" evidence is a dubious foundation.  The opposition papers fail to cure this deficiency.  Dr. Longo's extrapolation of general conclusions about the product from these samples is excluded.<br><br>Plaintiffs did address Chanel's separate argument, and quoted the foundation for Dr. Longo's opinion that the product contains asbestos.  This foundation is inadequate to support the opinion given, and that opinion is excluded. |

| No. | What to Exclude | Arguments | Ruling |
|---|---|---|---|
| 27 | Opinions and testimony by | **Defendants contend:** | **Denied in part; Granted in part:** |

| Plaintiffs' expert Dr. Steven Compton. | Dr. Steven Compton did not test any sample actually used by Ms. Weirick.  He tested 13 samples obtained by Alan Seagrave from the Italian mines and 15 samples from the Argonaut mine in Vermont.  He intends to testify that the samples contained asbestos.  He also intends to testify that (1) all or most talc from the mines contained asbestos, and (2) because of the extensive contamination, the bottles used by Ms. Weirick must have contained asbestos. | Defendants do not assert a "chain of custody" claim.  It's undisputed that Dr. Compton received the talc samples from Defendants' experts. |
|---|---|---|
| | His testimony should be excluded because (1) he used an improper methodology that failed to determine whether the fibers he observed constituted asbestiform, and (2) his opinion that all or most talc from the mines contained asbestos is based on speculation and conjecture.  His testing of a few samples is insufficient to support this leap.  (See Motion, pp. 1-2; see also id. at pp. 4-8.) | Defendants contend Dr. Compton employed an unscientific methodology.  They claim he admitted that his methodology "does not distinguish between the asbestos and non-asbestos varieties of the amphibole minerals he identified." |
| | The Court should prohibit Dr. Compton from testifying about Chinese mines and the Hamm and Rainbow Vermont mines because he did not test samples from these sources.  (See id. at pp. 8-9.) | (Motion, p. 2.)  Defendants say this is a problem "because the EPA and ISO [International Organization for Standardization] methods that Dr. Compton claims to be following make that distinction – they define 'asbestos' as the *asbestiform* version of the mineral."  (Motion, p. 2.) |
| | **Chanel contends:** | |
| | Chanel filed a separate motion in limine – Chanel motion in limine no. 30.  Chanel contends "[t]here are many issues with Dr. Compton's opinions and anticipated testimony. First, Dr. Compton's methodology was improper, is not generally accepted by the scientific community, and is therefore unreliable. Dr. Compton is also not a geologist with the requisite educational background to opine on the morphology and geological components of the minerals he tested. On those bases alone, Dr. Compton's opinions and testimony attendant to his testing of Italian talc should be excluded from trial. Moreover, specifically as to Chanel, Dr. Compton has no basis to offer any opinions that Chanel | Again, the Court's role under *Sargon* 2012) 55 Cal.4th 747 is to determine whether the expert used a recognized, viable scientific method, not to choose one method over another. |

36

No. 5 was contaminated with asbestos. Dr. Compton has only tested Italian talc. He has not tested a Chanel product for this case, despite having one in his very possession. Dr. Compton further testified during his deposition that he does not know the origin of the talc incorporated into any Chanel No. 5, and has not formed the opinion that any Chanel product has ever contained asbestos. Accordingly, even assuming Dr. Compton's findings of asbestos in some of the Italian talc tested are accurate and reliable – which, as will be explained in greater detail below, they are not – there is absolutely no foundation for Plaintiffs to assert that Dr. Compton's testing of Italian talc therefore establishes that the talc incorporated into Chanel No. 5 was necessarily contaminated with asbestos. Just because Dr. Compton allegedly found asbestos in *some* (not all) of the Italian talc samples he tested using unreliable methodologies, does not therefore mean that *all* Italian talc incorporated into talcum powder products were contaminated." (Chanel's Motion, pp. 1-2.)

**Plaintiffs contend:**

"[N]ear the end of 2015, Imerys' lawyers hired two expert geologists/mineralogists (Alan Segrave and Defendants' expert Matthew Sanchez, Ph.D.), provided them a paid trip to Italy, and gave them a tour of the talc mines in Val Chisone/Val Germanasca. Segrave and Sanchez collected samples of talc and associated minerals they considered representative of the Italian-mined talc historically sold by Imerys and its predecessors to Johnson & Johnson and many other talc product manufacturers. Segrave and Sanchez analyzed the samples and submitted reports to Imerys's lawyers, concluding that talc produced from the Italian mines did not now and had never contained asbestos.1 Segrave produced his samples to Plaintiffs' expert Dr. Compton for analysis. Dr.

At this point, this court cannot say that Dr. Compton's methods are so unreliable that the jury should not be able to consider them. This is a matter best demonstrated through oppositional evidence or cross-examination as both parties' experts will be examining essentially the same samples.

Likewise, on this record, the Court cannot determine that Dr. Compton's counting rules are so unreliable that they must be excluded. The appropriateness appears to be the subject of a debate between the parties' witnesses, and an issue for the trier of fact.

At this point, the testing methodology employed by Dr. Compton seems reasonably subject to scientific dispute, and the Court declines to exclude it under *Sargon*.

In summary, the Court denies the motion as to Dr. Compton's methodology and counting methodology.

Compton found that 11 of 13 samples did, in fact, contain asbestos." (Opposition, p. 2.)

"Dr. Compton also recently tested 15 samples he received from Dr. Sanchez, initially collected by Johnson & Johnson expert Mickey Gunter from the Argonaut mine in Vermont.3 Dr. Compton detected amphibole fibers in ten of the fifteen samples, including 6 of the 7 talc samples provided. . . . As a preliminary matter, it must be noted that very similar motions against Dr. Compton have been filed in multiple talc trials, and either rejected by the court or waived by the Defendants each time." (Id. at pp. 2-3.)

"In the Herford case tried in October of 2017 in Pasadena in front of Judge C. Edward Simpson, the Court allowed Dr. Compton to testify about his testing of Mr. Segrave's Italian samples: "I think [Dr. Compton] can testify about his tests, what he tested, and I think he might also be able to testify that based upon his tests the mine from which the product was taken contained asbestos." In the recent Anderson trial, Defendant J&J filed a similar motion in limine, but chose not to argue the MIL. Dr. Compton testified regarding his analysis of both the Italian source ore and the Vermont source ore, and was subject to cross-examination regarding these tests. In the Brick matter, currently in trial in Los Angeles County before Judge Stephen Moloney, Defendants J&J and Imerys filed a similar MIL, but an agreement was reached pursuant to which Dr. Compton was permitted to testify regarding his analysis of both Italian and Vermont mine samples. Finally, in the Lyons matter, recently in trial in San Francisco, Defendant Colgate's challenge to Dr. Compton's analysis of the Italian samples (again, the Vermont samples were not at issue) was summarily denied." (Id. at p. 3.)

As to the extrapolation opinions of Dr. Compton, the Court grants the motion based upon the same analysis as contained in Motion in Limine 25. The analysis appears to be a logical leap that cannot be supported by quantitative analysis. Plaintiffs do not appear to oppose this aspect of the motion.

The Court excludes opinions about the content of the actual containers of talc used by Ms. Weirick. Plaintiffs do not appear to oppose this aspect of the motion.

The Court excludes opinions about the Guagxi region of China or the Hamm or Rainbow mines in Vermont. Plaintiffs do not seem to oppose this aspect of the motion.

As with motion 25, there is insufficient foundation for Dr. Compton to testify regarding Chanel's product, and his

| | | Dr. Compton utilized accepted scientific testing methods: "J&J has seized upon one sentence taken out of context in the method that Dr. Compton uses from his tests, ISO 10312. They claim that the method cannot distinguish between asbestos and non-asbestos, and therefore is an unreliable method. Their critiques are clearly taken out of context. ISO stands for the International Organization for Standardization, and is one of the primary international organizations that promulgates testing methodology. The title of the particular method that Dr. Compton uses is: "Ambient air - Determination of asbestos fibers- Direct transfer transmission electron microscopy method."16 (Emphasis added) So the method that Defendants vehemently claim cannot ever determine the presence of asbestos fibers was actually created for the explicit purpose of doing just that." (Id. at p. 5.) | opinions regarding the Chanel product, if any, are excluded. |
| | | "In addition, the ISO includes this language in the introduction to the method that Dr. Compton utilizes: 'This international Standard is based on transmission electron microscopy, which has adequate resolution to allow detection of small fibers, and is currently the only technique capable of unequivocal identification of the majority of individual fibers of asbestos.'" (Id.) | |
| | | Dr. Compton utilized ISO 10312 to analyze the talc samples received from Alan Segrave for the presence of asbestos. While the Defendants lawyers spend several pages of their motion complaining that Dr. Compton "did not apply a scientific methodology to identify asbestos,"19 their retained experts do not share that view. Mickey Gunter, an expert who has been retained in other cosmetic talc cases by J&J, was particularly clear on this point when testifying about Dr. Compton's methodology in analyzing the Italian talc samples: Q. With regard to Dr. Compton's analysis of the samples that he obtained, do you have any criticism of the methodology that he used in doing so? A. Maybe not the | |

methodology, but the results." (Id. at pp. 5-6.) "Dr. Compton employed the same methodology in analyzing the Vermont samples, collected by the same Mickey Gunter who endorsed that method with respect to the Italian samples." (Id. at p. 6.)

Dr. Compton's analysis of samples from the Italian mines is a reliable basis for his exposure and causation opinions: "Although Defendants' Motion combines the representativeness of the Italian talc samples and the Vermont talc samples into one issue, in fact these are very distinct. Dr. Compton, relying on the type of materials on which experts in his field typically relies, has an adequate foundation to opine that the Italian talc samples he analyzed are representative of the current and past mining output of the Italian talc mines that provided talc that was incorporated into Johnson and Johnson talc products, Chanel talc products, and numerous other brands of talc products. Because he has not reviewed similar evidence of the representativeness of the Vermont talc samples, he will not offer any opinions on that issue." (Id. at p. 9.)

"As described above, the Italian talc samples Dr. Compton tested that form the basis of his report26 were obtained from Italy by Alan Segrave, a geologist hired by Imerys27 and also retained by Chanel in this case. Defendants' attorneys criticize Dr. Compton for extrapolating from the findings based on these samples to the mine as a whole, both in terms of its presentday and historical composition. Yet that is exactly what Mr. Segrave, in his report to Imerys' attorneys, concluded. Segrave described the 'current mining activity of the Fontane deposit as a homogenous talc horizon' and, moreover, concluded that 'the talc deposit is homogenous throughout for past-mined horizons having similar carbonate purity.'" (Id.)

"Mr. Segrave's testimony in a recent deposition makes perfectly clear that the samples he collected (in which Dr. Compton found asbestos, and Mr. Segrave reported none) are representative of all Italian talc ever produced from that mine[.]" (Id. at p. 10.) "Accordingly, Dr. Compton's opinion regarding the asbestos content of the Italian talc mines are based on his own analysis of samples from that mine that, in the stated opinion of Imerys' and Chanel's own retained expert Alan Segarve, are representative of current and historical talc mining. Dr. Compton does not profess to have undertaken any geological analysis of the mine to determine the representativeness of the samples. To the extent that Defendants' attorneys want to impeach the opinion of their own retained witness Alan Segrave, they certainly are free to do so. But under Evidence Code Sec. 801, the stated opinion of Mr. Segrave is "of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates," and Dr. Compton is certainly justified in relying on aspects of the study commissioned and paid for by Imerys. Dr. Compton's testimony should be allowed." (Id. at pp. 10-11.)

Chanel: "In addition to similar methodological criticisms raised by Defendants Imerys and Johnson and Johnson, Chanel also urges exclusion of Dr. Compton's Italian talc opinions because he testified in deposition that "1) he had not conducted any testing on a Chanel product attendant to this case; 2) he did not know the source of talc incorporated into Chanel No. 5; and 3) he had no opinion as to whether Chanel No. 5 has ever been contaminated with asbestos."30 Plaintiffs will not elicit any opinions from Dr. Compton that contradict his deposition testimony, but will ask Dr. Compton hypothetical questions based on the evidence in this case. Specifically, after Dr. Compton was deposed, Chanel's corporate representative Amy Wyatt confirmed in her deposition that Chanel No. 5 body powder used Italian talc until 2010." (Id. at p. 11.)

| No. | What to Exclude | Arguments | Ruling |
|---|---|---|---|
| | | | |
| 28 | Opinions and testimony by Plaintiffs' expert Dr. James Webber. | **Defendants contend:** The Court should exclude Dr. James Webber and his report because he appeared for one day of deposition, the deposition did not finish, and Plaintiffs failed to offer him for another day of deposition before the expert discovery closed. (See Motion, p. 1; see also id. at pp. 2-4.) Dr. Webber intends to testify that, in the 1970s, the cosmetics industry "confounded" the FDA's attempt to "develop a sensitive and reliable method for detecting asbestos in talc[.]" (Id.) His opinion and testimony "about the actions and motivations of the cosmetics industry . . . are not a proper subject for expert testimony." (Id. at p. 1; see also id. at pp. 4-6.) The Court also should exclude Dr. Webber because he is unqualified to testify about the FDA's interactions with the cosmetics industry in the 1970s. (See id. at pp. 2, 7-8.) **Plaintiffs contend:** "Imerys has argued, and intends to argue to the jury, that the FDA has given its talc some seal of approval based on testing of their products and lack of required warnings. However, what Imerys failed to disclose is the genesis of the method used and the cosmetic talc industry's efforts in thwarting development of a sensitive and reliable method. Dr. James Webber – an environmental health scientist, regulator, and microscopist with decades of experience developing methods for the detection of asbestos in materials - is qualified as an expert to provide the jury | **Denied:** Defendants' argument – Dr. Webber should be excluded because he failed to finish his deposition – should be resolved by the time of trial. In his expert report, Dr. Webber opines that the talc industry "obstruct[ed]" the FDA's efforts to develop an asbestos-detection method for talc. (Id. at Ex. B, p. 13.) Defendants argue this is an "[im]proper subject for expert testimony[,]" citing federal district court rulings from New York, Florida, Minnesota, and Pennsylvania. (Motion, p. 1.) "Expert opinion testimony is 'helpful' (and, therefore, 'permissible') where the subject matter is sufficiently beyond the scope of common experience to be of assistance to the trier of fact." (Wegner et al., Cal. Practice Guide: Civil Trials and Evidence (The Rutter Group 2018) ¶ 8:701.) |

an opinion regarding the development of the methods used for detection of asbestos in talc and the cosmetic talc industry's role in confounded regulatory agency efforts as such information is well beyond the common experience of the jury." (Opposition, p. 2.)

All parties had the opportunity to depose Dr. Webber: "Dr. Webber has already given two depositions in this case, with a third day of deposition scheduled for June 11. The first day of his deposition took place on April 6, 2018, with questioning by counsel for Johnson & Johnson. His second day of deposition occurred on May 25, 2018, when he was further questioned by Johnson & Johnson and also by counsel for Imerys. Between these two depositions, Dr. Webber underwent surgery for a complete knee replacement and was medically unavailable to testify.1 Notably, Johnson & Johnson and Imerys both stipulated that their questioning of Dr. Webber was complete as of May 25, 2018, barring any need for follow-up based on testimony elicited by counsel for Chanel in the final session of his deposition.2 Accordingly, as all parties will have had the opportunity to depose Dr. Webber regarding his opinions in this matter and in light of Dr. Webber's medical treatment between deposition sessions, Dr. Webber should not be precluded from testifying based on the incompleteness of his deposition." (Id. at pp. 2-3.)

Dr. Webber is qualified: "Plaintiffs' expert, Dr. James Webber is an environmental health scientist specializing in the measurement and analysis of materials, determining the constituent ingredients in materials, and characterizing those materials and ingredients from a laboratory and public health perspective.3 Dr. Webber's expertise spans over 40 years and includes asbestos research, asbestos analysis, certification of laboratories for asbestos testing and analysis, environmental chemistry, standards and regulation development, aerosol research, and trace metal analysis. (See

"The jury need not be wholly ignorant of the subject matter of the opinion … if that were the test, little expert opinion testimony would ever be heard. Instead, the statute declares that *even if the jury has some knowledge* of the matter, expert opinion may be admitted whenever it would 'assist' the jury." (Id. [emphasis in original].) This is a liberal standard. "Expert opinion testimony is excluded 'only when it would add *nothing at all* to the jury's common fund of information." (Id. at ¶ 8:728 [emphasis in original].)

As to this specific opinion, the Court grants the motion. It is an argumentative viewpoint of an advocate based upon historical events. Dr. Webber may be a helpful witness in authenticating certain historical events. He may even be a witness to some of them. The argument regarding the import of the events is better left to the lawyers.

43

Exhibit A at 1-4.) Dr. Webber has expertise in the analysis of various substances, including asbestos and talc, through the use of various analytical methodologies and equipment including x-ray diffraction (XRD), polarized light microscopy (PLM) phase contrast microscopy (PCM) and transmission electron microscopy (TEM) with selected area electron diffraction (SAED) and Electron Dispersive Spectroscopy (EDS). (Id.) He has conducted analysis for asbestos (measurement, identification, quantification) in thousands of samples of various products and materials in the public and private sector, and trained other technicians to do so as well. (Id.) Dr. Webber received his Ph.D. from the School of Public Health at the State University of New York at Albany in 1999 based on his dissertation A Paleolimnolical Reconstruction of Airborne Asbestos Concentrations in the Fibrous-Talc Region of St. Lawrence County, New York, from 1872 to 1998, relating to asbestos in talc and exposure in the environment as a result.4" (Id. at pp. 3-4.)

"Johnson and Johnson asserts that Dr. Webber is not qualified to offer an opinion regarding the development of "a sensitive and reliable method for detection of asbestos in talc" by the Food & Drug Administration (FDA) (Motion at 4.) What Defendants' fails to note is that Dr. Webber has spent vast majority of his career - 33 years - in the regulatory sphere developing methods for the detection of asbestos in products and materials, water, soil, and air. At the New York State Department of Health, Dr. Webber worked directly with federal regulatory agencies, including the Environmental Protection Agency, in developing methods for detection of asbestos[.]" (Id. at p. 4.) "Indeed, as part of the methods development work Dr. Webber did as a regulator, he specifically developed programs to test the efficacy of these methods, the very same methods being considered by the FDA in

the 1970's6 , upon which he offers an opinion in this case[.]"  (Id. at p. 5.)

"Dr. Webber has been qualified as an expert regarding asbestos in talc, methods for detection of asbestos in talc, and industry's role in shaping and confounding those methods in our California courts as well as in New Jersey8 and New York9 . This case is no different and Defendants' has failed to show otherwise. Last year, Dr. Webber offered the same opinion Defendants' now seek to preclude in the Polakow matter before the Honorable H. Chester Horn,10 the Depoian matter before the Honorable Charles F. Palmer11, and the Blount matter before the Honorable Randolph Rhoades12."  (Id. at p. 7.)

Dr. Webber's opinions concerning the cosmetic industry's efforts to "confound" the FDA are a proper subject of expert testimony: "[E]ven if, as Defendants' argues, the jurors are able to read the same industry documents and published methods as Dr. Webber, certainly the intricate details and implications of each analytical method, their development, significance of the cosmetic talc industry's involvement in their development, and the consequences are well beyond "the common knowledge that men of ordinary education could reach a conclusion as intelligently" as Dr. Webber. The Polakow, Depoian, and Blount courts agreed that Dr. Webber's specific opinion Defendants'seek to exclude is "sufficiently beyond common experience" and "would assist the trier of fact" (See Exhibits D, I, J & K). Johnson and Johnson offers only nonbinding opinions from out-of-state courts to support its assertion that our courts require something other than exclusion only when an expert's opinion "would add mothing at all to the jury's common fund of information." (McDonald (1984) 37 Cal.3d at 367)."  (Id. at p. 10; see also id. at pp. 11-14.)

| No. | What to Exclude | Arguments | Ruling |
|-----|-----------------|-----------|--------|
| 29 | Opinions and testimony by Plaintiffs' expert Dr. John Maddox. | **Defendants contend:**<br><br>Dr. John Maddox intends to testify that the Johnson & Johnson and Chanel products used by Ms. Weirick caused her injuries.  (See Motion, p. 1.)  Dr. Maddox's opinions should be excluded because he relied on Dr. Longo's and Dr. Compton's flawed testing results.  Particularly, Dr. Maddox relied on Dr. Longo's and Dr. Compton's unsupported conclusions that all or most talc from the source mines, as well as the finished products Ms. Weirick used, contained asbestos.  (See Motion, pp. 1, 4-10.)<br><br>Additionally, Dr. Maddox's opinions ignore the universe of other testing results conducted by universities, government agencies, Defendants, and independent labs.  (See id. at p. 10.)<br><br>**Plaintiffs contend:**<br><br>"Defendants falsely assert that Dr. Maddox only relied on the works of Dr. Longo and Dr. Compton for his opinion. This is simply not the case. In his deposition, Dr. Maddox clearly details some of the materials he relies on for his opinion that consumer talcum powders, such as those manufactured by Johnson and Johnson and Chanel, are routinely contaminated with asbestos."  (Opposition, p. 3.)  "At the start, Dr. Maddox provided a list of reliance articles that support his various opinions."  (Id.)  "The list is 55 pages, and contains approximately 30 articles are listed in the "Talc" section. Defendants' assertion that Dr. Maddox solely relies on the works of Dr. Longo and Dr. Compton is disingenuous and without support. Dr. Maddox outlines in his reference list all of the articles on which he relies."  (Id. at p. 4.)  "Furthermore, when asked about specific foundation for Dr. Maddox's opinions | **Denied without prejudice:**<br><br>Dr. Maddox is a pathologist. Defendants seek to exclude him because he relied on Dr. Longo's and Dr. Compton's "flawed testing" and the "inappropriate extrapolations made by Plaintiffs' counsel from the binomial table created by Plaintiffs' statistician, Dr. Lynne Stokes."  (Motion, p. 1.)<br><br>Defendants concede Dr. Maddox is qualified to "tell the jury that [] Ms. Weirick has developed mesothelioma."  (Id.)  But they claim he is unqualified to say whether the relevant Johnson & Johnson and Chanel products contained asbestos. They contend Dr. Longo's and Dr. Compton's reports fail to provide Dr. Maddox sufficient foundation to discuss the "frequency with which [Ms. Weirick's] containers were contaminated, the level of contamination, or that her exposures to these products was a substantial |

regarding asbestos content of Johnson and Johnson products and Chanel products, Dr. Maddox cites not just to the work of Dr. Longo and Dr. Compton, but also testing found in defendants' own records, performed by their own consultants, the RJ Lee group[.]" (Id.) "Furthermore, later in his deposition, Dr. Maddox recalled an additional basis for his opinion that Johnson's baby powder had asbestos, the articles by Dr. Blount, an employee of Johnson and Johnson, who published an article regarding asbestos content of Johnson and Johnson products[.]" (Id. at p. 5.) "Finally, Dr. Maddox specifically cites to the paper by Millette, Fitzerald and Gordon paper of 2014[.]" (Id. at p. 6.) "Thus, Dr. Maddox relies on a wide variety of materials as foundation for his opinions in this case, including published scientific and medical literature, corporate documents, testing of source ore, and testing of finished products at issue, all of which are the type of documents upon which an occupational medicine physician may reasonably rely. Dr. Maddox's opinions flow in a reasoned chain of logic from these materials, using appropriate, published methodology." (Id.)

"The issues raised by Defendants in their Motion fall squarely within the realm of vigorous cross-examination, not a 402 hearing. They go to the weight and credibility of evidence (matters for the jury's consideration), rather than admissibility or sufficiency." (Id. at p. 7.) "Specifically, the argument that Dr. Maddox's reliance on the works of Dr. Compton and Dr. Longo cannot be excluded simply because Defendant's have criticisms of certain aspects of them. There is no justification or legal basis to exclude Dr. Maddox's reliance of these studies. Medical experts routinely rely on their testing and the scientific work of others as evidence of what does and does not contain asbestos. Dr. Maddox certainly does not have expertise himself to conduct such testing. As such, it is not at all unusual or out of the norm for a Medical expert to rely on testing of others who have the expertise to undertake such

factor in causing her disease." (Id.)

The Court's rulings exclude some, but not all, of the evidence upon which Dr. Maddox relies. If Dr. Maddox continues to hold the same opinion based on evidence that has not been excluded, then The Trial Court, in its discretion, can decide whether a 402 hearing is necessary regarding whether Dr. Maddox has sufficient independent foundation for his opinion.

testing, to help inform their opinions in the present case." (Id.) "As manufacturers of asbestos-containing talcum powders, Defendants predictably take issue with expert testimony and opinions regarding the contamination of their talc with asbestos. Defendants' challenge to Dr. Maddox's opinions is the proper subject of vigorous cross-examination, governed by Evidence Code sections 761, 767, 773 and 780, and not an evidentiary hearing under Evidence Code section 402." (Id.)

| No. | What to Exclude | Arguments | Ruling |
|-----|-----------------|-----------|--------|
| 30 | Opinions and testimony by Plaintiffs' expert Dr. Jacqueline Moline. | **Defendants contend:**<br><br>"Dr. Moline intends to tell the jury that plaintiff Carolyn Weirick ("Ms. Weirick") was exposed to asbestos through her use of Johnson's Baby Powder and Shower to Shower talcum powder ("Johnson's talcum powder products"), and that this exposure was a substantial factor in causing her mesothelioma. However, Dr. Moline admitted that she does not know how much asbestos, if any, Ms. Weirick was allegedly exposed to from her use of Johnson's Baby Powder or Shower to Shower. Thus, Dr. Moline's causation opinion is wholly without basis and should be excluded." (Motion, p. 1.)<br><br>"Defendants anticipate that Dr. Moline may also attempt to tell the jury about the ~50 other plaintiffs in other asbestos litigation who she has concluded developed mesothelioma from exposure to cosmetic talc. Defendants have no information regarding these other plaintiffs, their medical and exposure histories, or their lawsuits (including their allegations of asbestos exposure). Such testimony is not only irrelevant but is highly prejudicial to Defendants and will only result in undue consumption of time and juror confusion." (Id.; see also id. at pp. 3-4.) | **Granted in part. Otherwise denied without prejudice:**<br><br>Defendants contend Dr. Moline should be excluded because she failed to quantify the dose Ms. Weirick inhaled.<br><br>Plaintiff cites to *Davis v. Honeywell* (2012) 245 Cal. App.4th 477, which holds that the "every exposure" theory is a jury question. Such testimony may be admissible, but Dr. Moline cannot go further in arguing that Plaintiff was exposed to a specific quantifiable dose unless she has a basis for doing so. Apparently she does not.<br><br>As with Motion in Limine 29 |

Dr. Moline's opinions lack foundation: "Dr. Moline agrees that asbestos-related mesothelioma is a dose-response disease. (Deposition of Dr. Moline ("Moline Dep."), attached as Exhibit A to Stewart Decl., at 39:15-22.) According to Dr. Moline, only "nontrivial exposures to asbestos" should be considered a substantial factor in the development of mesothelioma. (Id. at 39:23-40:11, 44:22-45:11,) Dr. Moline explained that a "nontrivial exposure" is an exposure "orders of magnitude above background that are associated with increased risk of developing disease." (Id. at 40:12-18.)" (Id. at pp. 1-2.)

"Accordingly, by Dr. Moline's own standard, Ms. Weirick would have to be exposed to a "nontrivial" level of asbestos "orders of magnitude above background" from her use of Johnson's talcum powder products in order for Dr. Moline to consider the Johnson's talcum powder products a substantial factor in the development of her mesothelioma. Yet, Dr. Moline admitted at deposition: [1] She has not done a dose calculation to determine how much asbestos Ms. Weirick may have been exposed to through her use of Johnson's talcum powder products (id. at 224:21-225:5; 229:11-25.); [2] She has not calculated a cumulative asbestos fiber dose for Ms. Weirick from her use of Johnson's talcum powder products (id. at 230:7-10); and [3] She has not done a quantitative analysis with respect to the amount of asbestos she believes Ms. Weirick may have been exposed to through her use of Johnson's talcum powder products (id. at 227:23-228:4; 229:11-25.)" (Id. at pp. 1-2.)

"Dr. Moline clearly has no idea how much asbestos, if any, Ms. Weirick was exposed to from her use of Johnson's talcum powder products Thus, Dr. Moline has absolutely no basis— let alone a reasonable one— on which to opine that Ms. Weirick was exposed to a "nontrivial" amount of asbestos "orders of magnitude above

Plaintiffs and Dr. Moline must verify that she is able to testify to a reasonable degree of scientific certainty without reliance upon the evidence excluded by this Court. Plaintiffs state that there is enough evidence to establish exposure to asbestos through use of the product. The trial court can decide whether that is so.

Dr. Molina's testimony about asbestos fibers appears to be the subject of the same debate that is occurring between other expert witnesses. The Court is not prepared to take sides by excluding Plaintiffs' evidence at this point.

Dr. Molina's testimony about the specifics of other asbestos cases is excluded.

background" from her use of Johnson's talcum powder products. Dr. Moline likewise has zero basis on which to opine Ms. Weirick's use of Johnson's talcum powder products was a substantial factor in the development of her mesothelioma. Dr. Moline's causation opinion is entirely lacking in foundation and purely speculative. Dr. Moline's causation opinion is guesswork— not science. Accordingly, Dr. Moline's causation opinion must be excluded pursuant to the standards set forth in Sargon." (Id. at p. 2.)

"In addition, Dr. Moline should not be allowed to rely on the binomial spreadsheet prepared by Plaintiffs' statistical expert, Dr. Stokes, to opine about the probability of Ms. Weirick's exposure. (Exh. A to Stewart Decl. (Moline Dep.), at 227:23-230:25.) Dr. Moline is not an expert in statistics. (Id. at 141:11-13.) All she did was review an affidavit of Dr. Stokes' opinions. She never spoke to Dr. Stokes nor did she ever review Dr. Stokes' deposition testimony. (Id. at 198:16-199:23.) She is also unqualified to conduct her own statistical probability analyses. (Id. at 141:11-13.) She should, therefore, be precluded from offering any opinion about the probability of Ms. Weirick being exposed to asbestos-contaminated talcum powder or the statistics underlying such an analysis." (Id. at pp. 2-3.)

**Chanel contends:**

"Plaintiffs allege that Plaintiff Carolyn Weirick ("Weirick") was diagnosed with mesothelioma, a cancer in the lining of her lung, after having allegedly breathed asbestos fibers through her use and general presence around talcum powder products allegedly contaminated with asbestos. As against Chanel, Plaintiffs allege that Chanel No. 5 After Bath Powder ("Chanel No. 5) has, at some point, been contaminated with asbestos, and that Weirick's mother

occasionally applied Chanel No. 5 in Weirick's presence, thereby potentially exposing Weirick to asbestos fibers." (Chanel Motion, p. 1.)

"Dr. Moline is an Occupational Medicine Specialist, retained by Plaintiffs to offer opinions in this matter. It is anticipated the Dr. Moline will be offered at trial to opine that 1) Weirick's presence around her mother while she applied Chanel No. 5 resulted in exposure to asbestos, such that it was a substantial factor in causing Weirick's mesothelioma; 2) asbestos fibers shorter than 5 microns in length can be carcinogenic; and 3) nonasbestiform fibers can cause mesothelioma. However, Dr. Moline's opinions on these subjects are lacking in foundation and should be excluded:

- "Dr. Moline is not aware of any testing conducting on Chanel talcum powderproducts, does not know who supplied talc to Chanel, or which mines the talc in Chanel No. 5 was sourced from (other than through a representation made by Plaintiffs' counsel that Chanel used Italian talc).

- "Dr. Moline's belief that asbestos fibers shorter than 5 microns in length can be carcinogenic is not a generally accepted opinion in the medical or scientific community and is based on a study merely identifying asbestos fibers in the pleura; importantly, the presence of asbestos fibers only identify exposure to asbestos – which everyone experiences through background levels of asbestos – not causation.

- "The basis for Dr. Moline's opinion as to nonasbestiform fibers potentially causing mesothelioma is irrelevant, unsubstantiated, and unreliable." (Id. at pp. 1-2.)

**Plaintiffs contend:**

51

"Defendant's move to preclude Dr. Moline from opining that Mrs. Weirick's exposure to Johnson's Baby Powder, Shower to Shower and Chanel No. 5 After Bath Powder caused or contributed to her disease. At the outset it must be brought to the Court's attention that Dr. Moline's opinions regarding these issues have never been excluded or limited by any Court to Plaintiffs' knowledge. She has testified for many years, across the country, and despite having motions such as the ones filed here, filed in many cases, they have not, to plaintiffs' knowledge been granted. If Dr. Moline's opinions had been excluded in the past Defendants would have attached said orders to their motions. Notably Dr. Moline testified in several recent cases involving Johnson's Baby Powder exposure including the Stephen Lanzo case in New Jersey, the Joanne Anderson case here in Los Angeles, and in the Ilene Brick case here in Los Angeles. Dr. Moline's opinions in this case are not new or novel, or unusual in any way, but are consistent is testimony that has been admitted all over the country for many years." (Opposition, p. 2.)

"Specifically addressing Defendants' motions, talc-containing Johnson's Baby Powder and Shower to Shower powder contains asbestos and has for decades. Chanel has also sold asbestos-containing Chanel No. 5 After Bath Powder for decades. The evidence to be presented at this trial, in the form of expert testimony, historical testing results, internal Johnson & Johnson documents, testing of ore sources, and corporate representative testimony, will overwhelmingly establish the fact that Johnson's Baby Powder, Shower to Shower, and Chanel No. 5 After Bath Powder contained asbestos for decades." (Id.)

"In light of the clear evidence of asbestos content in Defendants' products, Dr. Moline holds the opinion that Mrs. Weirick's decades-long use of Johnson & Johnson baby powder and Shower

52

to Shower exposed her to significant amounts of asbestos and substantially contributed to cause her mesothelioma. Dr. Moline also holds the opinion that Mrs. Weirick's mother's use of Chanel No. 5 After Bath Powder, also caused Mrs. Weirick be exposed to significant amounts of asbestos and substantially contributed to cause her mesothelioma." (Id.)

Dr. Moline relied on reliable materials – Dr. Longo's report, Dr. Compton's report, Dr. Stokes's statistical analysis, Dr. Alice Blount's work, corporate documents, historical tests, etc. (See id. at pp. 4-10.)

Dr. Molines is not required to identify a numerical dose of exposure: "Defendants seem to be arguing that Dr. Moline has testified that in order to reach a causation opinion she must first (a) perform a dose calculation to determine how much asbestos Ms. Weirick may have been exposed to (b) calculate a cumulative asbestos fiber dose for Mrs. Weirick for her use of Johnson's talcum products, and finally (c) a quantitative analysis with respect to the amount of asbestos she believes Mrs. Weirick may have been exposed to through her use of Johnson's talcum powder products. No case, and no testimony by Dr. Moline, supports this conclusion. In fact, the court in Davis v. Honeywell, 245 Cal. App. 4th 477 (2012), held that California law does not require any quantification of dose in order to establish causation in a mesothelioma case." (Id. at p. 10.)

Dr. Moline should be allowed to testify about other mesothelioma plaintiffs: "The issues raised by Defendants in their Motion fall squarely within the realm of vigorous cross-examination, not a 402 hearing. They go to the weight and credibility of evidence (matters for the jury's consideration), rather than admissibility or sufficiency." (Id. at p. 13.) "Specifically, the argument that Dr.

53

| | | Moline's examination of ~50 other people diagnosed with mesothelioma for which talcum powder was a cause cannot be excluded simply because those individuals had legal cases. There is no justification for such a position; no legal basis to exclude this information that Dr. Moline properly relies upon to help inform her opinion in this case. Medical experts routinely rely on their experience and training when giving testimony in front of a jury. It is not at all unusual or out of the norm for a Medical expert to rely on other patients or cases they have seen and evaluated (whether in litigation or not) to help inform their opinions in the present case. As a manufacturer asbestos-containing talcum powder, the Defendants predictably take issue with expert testimony and opinions regarding the contamination of their talc with asbestos. Defendants' challenge to Dr. Moline's opinions is the proper subject of vigorous cross-examination, governed by Evidence Code sections 761, 767, 773 and 780, and not an evidentiary hearing under Evidence Code section 402." (Id.)<br><br>Dr. Moline has foundation to opine concerning the asbestos content of Chanel No. 5 After Bath Powder. (See id. at pp. 13-16.)<br><br>Dr. Moline should be allowed to testify regarding asbestos fibers shorter than five microns and the distinction between asbestiform and non-asbestiform. (See id. at pp. 16-19.) | |