# EXHIBIT E18

Page 848

```
 1         SUPERIOR COURT OF THE STATE OF CALIFORNIA
 2                FOR THE COUNTY OF HUMBOLDT
 3
 4    CARLA ALLEN,
                           Plaintiff,
 5
      vs.                                   Case.  DR 180132
 6
      BRENNTAG NORTH AMERICA, INC.,
 7    (sued individually and as
      successor-in-interest to MINERAL
 8    PIGMENT SOLUTIONS, INC., and as
      successor-in-interest to WHITACKER
 9    CLARK & DANIELS, INC.,) et al.,
10                         Defendant.
      _____/
11
12
13
14         REPORTER'S TRANSCRIPT OF PROCEEDINGS
15         HAD BEFORE JUDGE TIMOTHY A. CANNING
16             Volume V - pages 848 to 983
17                  Eureka, California
18               Monday, October 1, 2018
19
20
21
22
23    Reported By:
24    LINDA VACCAREZZA, RPR, CLR, CRP, CSR. NO. 10201
25    JOB NO. 148406
```

Page 849

October 1, 2018
9:49 a.m.

REPORTER'S TRANSCRIPT OF PROCEEDINGS, held at Superior Court of California, County of Humboldt, 825 5th Street, Courtroom 1, Eureka, California, Before Judge Timothy A. Canning, reported by Linda Vaccarezza, a Certified Shorthand Reporter of the State of California.

Page 850

APPEARANCES:
KIRKLAND & ELLIS
Attorneys for the Defendants Johnson & Johnson and Johnson & Johnson Consumer, Inc.
  333 South Hope Street
  Los Angeles, California 90071
BY: KIMBERLY BRANSCOME, ESQ.
  F. CHADWICK MORRISS, ESQ.
  JAY BHIMANI, ESQ.
  BENJAMIN SADUN, ESQ.

SIMON GREENSTONE PANATIER
Attorneys for the Plaintiff
  1201 Elm Street
  Dallas, Texas 75270
BY: DAVID GREENSTONE, ESQ.
  CONOR NIDEFFER, ESQ.
  LEAH KAGAN, ESQ.

Page 851

APPEARANCES (CONT'D)
FOLEY & MANFIELD
Attorneys for Colgate-Palmolive Company
  300 South Grand Avenue
  Los Angeles, California 90071
BY: LOUIS KLEIN, ESQ.
  PETER MULARCZYK, ESQ.

BARNES & THORNBURG
Attorneys for CVS Pharmacy, Inc.
  2019 Century Park East
  Los Angeles, California 90067
BY: JAMES MURDICA, ESQ.
  SANDRA KO, ESQ.

Page 852

APPEARANCES: (CONT'D)
DENTONS
Attorneys for Imerys Talc America, Inc.
  Spear Street Tower
  One Market Plaza
  San Francisco, California 94105
BY: MORDECAI BOONE, ESQ.

Page 881

1  attorney, can claim where these samples came from and
2  whether or not they are original product.  That's an
3  overarching theme of the defense case.
4      And so what we were -- what was taken away
5  from us is not only the opportunity to test in a
6  similar fashion as Dr. Longo did, which by the way,
7  Your Honor, when he was deposed he said that he
8  wouldn't expect Dr. Sanchezs' laboratory to do any
9  different in terms of timing or do anything different
10 in terms of testing than what he did.
11     It's the fact that we had our investigation
12 taken away from us.  We lost two months of being able
13 to conduct any sort of the survey and discovery
14 request, conduct depositions in order to obtain
15 information about the providence of these samples.
16 And by the time that these samples were disclosed to
17 us, and when we got that letter, there was nothing
18 about these samples.  It simply said we have samples,
19 come and get them.
20     There was less than a week left before fact
21 discovery closed.  I mean, our hands were completely
22 tied.  There was nothing we could have done at that
23 point.  And when we met and conferred with Simon &
24 Greenstone and wrote them a letter two days after we
25 were made known about the existence of the samples and

Page 882

1  said, we know nothing about their condition, where
2  they came from, how they were collected and
3  transported, we got nothing in response.  And saying
4  we will -- we'll comply with the experts discovery
5  deadline and we'll give you what you need 48 hours
6  before Dr. Longo's deposition.  That wasn't the point.
7      The point was to find out how they got this
8  physical evidence, where it came from, and whether or
9  not we had an opportunity to conduct an investigation.
10 That's what was taken away from us.
11     Had they provided a list as the Court
12 suggested in July in response to discovery, not only
13 the inspection demand but the request for admission,
14 saying that there were no unsealed containers, we
15 could have started that process.  We would have
16 immediately started discovery request.  We would have
17 immediately met and conferred with them about where
18 they got the samples and deposing those individuals.
19 That's what was taken away from us.  That's the harm
20 here.
21     THE COURT:  I appreciate the argument.  I
22 think I've probably heard enough at this point.  And I
23 am concerned obviously about this giving Colgate
24 sufficient time to address the samples, at least the
25 existence of the samples.  And I certainly understand

Page 883

1  Colgate's argument regarding doing additional
2  discovery to try to figure out where the samples came
3  from and what the history of those samples are.
4      But at this point, what the Court will do is,
5  I'll leave my order in place for now, subject to
6  modification based on where things stands on the 15th.
7      Again, my intention is not to punish the
8  plaintiff for failing to turn over the -- to disclose
9  the existence of those samples, but I also want to
10 address the prejudice that's causing the defendant
11 because, as I mentioned, I thought it was an abuse of
12 the discovery process, so as not disclose the
13 existence of those samples.
14     So at this point the Court will leave the
15 order as previously stated, but I would, with the
16 permission to revisit those sanctions on the 15th.
17     And so I guess returning back to the question
18 of scheduling.  My intention, the Court's intention at
19 least, was that we would have a panel picked by the
20 end of this week and hopefully start with our openings
21 next week.  But I haven't gotten an update yet as far
22 as where things stand downstairs as far as jury
23 selection.
24     I do know that we lost a couple of jurors
25 over the weekend who essentially developed medical

Page 884

1  issues.  And so we are now down to, I think it's 57 or
2  58 in our pool.  And so it's one of the concerns that
3  the longer it takes to bring people up, we start
4  losing people.  So hopefully we can start bringing
5  people on tomorrow, depending on how things go today.
6      MR. MULARCZYK:  Your Honor, I did have a
7  question.  Once we have the number locked in, in terms
8  of group that's copping up, are we going to receive a
9  randomized list from the Court of who those jurors
10 will be, in terms of preparation?
11     THE COURT:  Yes.  And we'll generate a
12 randomized list and we'll identify who will be the
13 first 16 that we call as well -- or first eight.
14     MS. BRANSCOME:  Would it be possible, Your
15 Honor, to find out which jurors have dropped out
16 already? Just so that we don't spend time preparing
17 voir dire for jurors that we know are not returning?
18     THE COURT:  Thank you, yes.  And I can
19 certainly get that information for you over the lunch
20 hour.
21     MS. BRANSCOME:  Thank you.
22     MR. MULARCZYK:  Thank you, Your Honor.
23     MR. NIDEFFER:  Your Honor, regarding the ex
24 parte that we filed this morning, this is in regards
25 to what happened on Friday with the request for a

Page 885

1 leave to amend the complaint.
2     And we did reach an agreement over the
3 weekend, once we gave the ex parte notice on Friday,
4 for Tuesday, on a briefing schedule, shorter briefing
5 schedule.  So we have that.  The motion was filed and
6 served on all parties on Saturday before noon, was the
7 agreement.  The ex parte was served this morning.  So
8 what we're requesting, that the ex parte to be heard
9 tomorrow morning.
10     It's just the Court's agreement to our
11 shortened briefing schedule.  The opposition is going
12 to be filed by Tuesday morning at 9 a.m.  And then the
13 parties are willing to hear that tomorrow afternoon at
14 1:30, as long as the Court is willing to hear that.
15     THE COURT:  Is there any -- looks like this
16 is a stipulation but I just wanted to check in with
17 other counsel as far as any issues with the
18 scheduling.
19     MS. BRANSCOME:  That is the agreement with
20 respect to the shortened briefing schedule.  It was
21 our possession this was not an appropriate motion,
22 just ex parte, but we agreed to a shortened briefing
23 schedule.
24     THE COURT:  Thank you.  So that is certainly
25 acceptable to the Court.  So for the motion to amend

Page 886

1 the complaint, we'll have opposition papers to be
2 served tomorrow morning and then we'll have a hearing
3 at 1:30 tomorrow afternoon.
4     MR. NIDEFFER:  Thank you, Your Honor.
5     THE COURT:  Do you have a time estimate as
6 far as how long yours might take?
7     MR. NIDEFFER:  I think our argument would
8 probably be about 15 minutes, Your Honor.
9     THE COURT:  All right.  Does defense counsel
10 have an estimate?
11     MS. BRANSCOME:  Ours might be a touch longer,
12 Your Honor.  There's some complex legal doctrine, but
13 I would say 30 minutes or so.
14     THE COURT:  All right.  And just want to know
15 in case we do start bringing jurors up tomorrow.  And
16 then we'll take a little extra longer lunch break in
17 order to address the motion.
18     ==Then turning to the defendants Motions in==
19 ==Limine Number 1 -- I'm sorry, Number 5 and Number 4==
20 ==and Number 1.  As far as defense Motion in Limine==
21 ==Number 1, the Court is going to deny that request.==
22     ==It does appear to the Court that at least==
23 ==there's a sufficient basis for the experts to testify==
24 ==as to their testing of the samples themselves.  Though==
25 ==there's a conflict as to what the appropriate==

Page 887

1 ==definition of asbestos is, as well as the detection==
2 ==method for fibers as well as the methodology used for==
3 ==counting fibers.  There's also issues raised as to the==
4 ==genuineness and authenticity of the contents of the==
5 ==container.==
6     ==In the Court's view, those issues go to the==
7 ==weight of the results, not so much as to whether or==
8 ==not it's admissible or not.  And so, in the Court's==
9 ==view those are issues that are appropriate for the==
10 ==jury to resolve.==
11     ==And so the Court will permit the plaintiffs'==
12 ==expert to testify as to what they actually did, the==
13 ==description of the samples they tested, as well as why==
14 ==the procedures and methodology they employed==
15 ==adequately supports their conclusions about the==
16 ==samples.==
17     ==Defendants can cross-examine and argue to the==
18 ==jury that the experts testimony should be either==
19 ==disregarded or not given much weight because of==
20 ==questions regarding the source or content of the==
21 ==samples as well as the methodology employed by==
22 ==plaintiffs' experts.==
23     ==However the data they found supports their==
24 ==conclusions about those samples.  But under the==
25 ==standard of Sargon, the Court does believe that that's==

Page 888

1 ==a -- those are issues for the jury to decide not issue==
2 ==for the Court to decide.==
3     MR. MULARCZYK:  Your Honor, one point of
4 clarification.
5     THE COURT:  Certainly.
6     MR. MULARCZYK:  So as I understand it, the
7 ==plaintiffs will be limited in their ability to discuss==
8 ==samples that they actually personally tested.  So the==
9 ==samples we sought to exclude are over 50 of them, by==
10 ==other experts that have been tested, they will not be==
11 ==able to discuss those.==
12     ==THE COURT:  If they use those as far as to==
13 ==support their conclusions, they can offer testimony==
14 ==about other examples -- or other samples that were==
15 ==tested.  But as far as making the conclusions that==
16 ==those samples also contained asbestos, to the Court,==
17 ==that goes beyond what plaintiff's experts can testify==
18 ==to.==
19     ==They can certainly testify as to what other==
20 ==information they used to rely on, to reach their==
21 ==conclusions about these samples -- the samples that==
22 ==they actually tested.==
23     MR. MULARCZYK:  So they can't talk about the
24 results of the testing by the others?
25     THE COURT: They can talk about the

Page 889

1  methodology, and the testing and so forth. But as far
2  as using that information to reach a conclusion that
3  therefore their samples also had asbestos, that's
4  beyond the scope of the expert testimony.
5       MR. GREENSTONE: So, for instance, Your
6  Honor, and I apologize.
7       THE COURT: Certainly. I would rather have
8  it clarified at this point and work out any issues.
9       MR. GREENSTONE: Right. So, for instance,
10 Dr. Compton and Dr. Longo, setting aside the Cashmere
11 Bouquet for a moment, Dr. Longo and Dr. Compton can
12 testify about the testing that they have done on the
13 samples that they tested and they can tell the jury
14 about those things?
15      THE COURT: That's correct, yes.
16      MR. GREENSTONE: And then as it relates to --
17 so the Court's ruling is then relating to them, then
18 talking, for instance, Dr. Compton saying, here's what
19 some other expert tested and here's what they found,
20 that's what you've limited?
21      THE COURT: Correct. They can talk about
22 other testing but not as far as the conclusion that
23 the talcum powder had asbestos.
24      MR. GREENSTONE: Okay.
25      THE COURT: If they are using the same

Page 890

1  methodology to support what the testing methods were
2  that the plaintiff's experts used, they can testify,
3  for example, this is the same methodology used by
4  other experts.
5       As to the Motions in Limine Number 4 and
6  Number 5, the Court will deny those in part and grant
7  those in part.
8       In the Court's view, Dr. Longo Dr. Compton,
9  again, will be allowed to testify about the testing
10 that they did, the methodology that they used, the
11 data they collected from the samples that they tested.
12 They can also testify regarding their conclusions
13 about the samples that they tested.
14      However, the Court finds that there's not a
15 reasonable basis for Dr. Longo or Dr. Compton to opine
16 about asbestos in the entire product line throughout
17 the years that Ms. Allen used the products, or
18 specifically in the products that Ms. Allen actually
19 used.
20      The Court doesn't see that there's any
21 evidence that these two experts used any scientific
22 method or any mathematical method or any statistical
23 method in reaching their broad conclusions about the
24 products line or about the products that Ms. Allen
25 actually used.

Page 891

1       To the Court's view, those opinions are based
2  on a leap of logic or conjecture. And quoting from
3  the case Sargon, S-A-R-G-O-N, quote, the Court may
4  conclude that there is simply too great an analytical
5  gap between the data and the opinion proffer, end
6  quote.
7       That was from Sargon versus U.S.C. (2012) 55
8  Cal. 4th 747, pages 771-772.
9       Similarly, the Court also stated in that
10 opinion that expert opinion is not admissible if it
11 consists of inferences and conclusions which can be
12 drawn as easily and intelligently by the trier of fact
13 as by the witness.
14      So here, the Court's view is that Dr. Compton
15 and Dr. Longo's opinion, or the presence of asbestos
16 in the entire talc line is not based on research or
17 scientific methodology, but instead is based on
18 inferences and conclusions about their product line
19 from the research on samples.
20      But there's no testimony, or at least no
21 evidence here, that the doctors used any type of
22 scientific methodology or mathematical analysis to
23 extrapolate from what they found in the samples to
24 what was contained in the entire product line.
25      Also there was some testimony I guess from a

Page 892

1  -- that showed up in a report on samples from the
2  mines and the idea that the mines actually had
3  homogeneous population, or that the mines were
4  geologically homogeneous, but that doesn't translate
5  in this matter to being able to use the samples to
6  reach a conclusion about the entire mine. And
7  primarily because the samples themselves showed
8  variations as far as the number of asbestos fibers
9  that were in the mine samples.
10      Also, there's nothing in the expert's training
11 or background that suggest any expertise or
12 specialized knowledge or training in extrapolating
13 data from the samples to describe an entire
14 population.
15      And so the Court is going to grant the
16 Defendants Motion in Limine Number 4 in part, to
17 exclude Dr. Compton's testimony as to the following
18 opinions. This is excluding these opinions that the
19 talc plaintiff used contained asbestos, that all or
20 most of the talc from the argonaut mine contained
21 asbestos, that all or most of the talc from the
22 Italian mine contained asbestos, and all or most of
23 the talcum powder sold in the United States contained
24 asbestos.
25      So as to Number 5, the Court will exclude any

Page 893

1  testimony from Dr. Longo regarding follow-up opinions.
2  The talc plaintiffs used contained asbestos.  All or
3  most of the talcum powder sold in the United States
4  contained asbestos as well as other opinions that
5  reach beyond the samples that Dr. Longo has tested.
6      And so as far as this is concerned, are there
7  any requests for clarification?
8      MR. MULARCZYK:  Not from Colgate, Your Honor.
9  Thank you.
10      MS. BRANSCOME:  Not from J & J.  Thank you,
11  Your Honor.
12      THE COURT:  Sure.
13      MR. GREENSTONE:  But as it relates -- I do
14  want to clarify just one issue.  As it relates to the
15  motion in limine relating to their -- the testing that
16  was done by Dr. Compton and Dr. Longo, the Court has
17  denied the motion in limine and allowed Dr. Compton
18  and Dr. Longo to come and testify about the
19  methodology and their own testing and the results?  Am
20  I understanding that correctly?
21      THE COURT:  That's correct, but not the next
22  step of saying that because of our results we believe
23  that all talc contained asbestos.
24      MR. GREENSTONE:  I understand, Your Honor.
25  Thank you.

Page 894

1      THE COURT:  Thank you.
2      And next then, we can move to the trial
3  preservation testimony by Dr. Cameron.
4      MR. MORRIS:  Your Honor, with your
5  permission?
6      THE COURT:  I believe we're ready to proceed,
7  yes.
8      MR. MORRIS:  Chad Morris, on behalf of
9  Johnson & Johnson.
10      Your Honor, as you had stated, this hearing
11  is about line and page designations from Dr. Cameron's
12  deposition.  And I think you've been provided with a
13  notebook that has the designated testimony.  I did
14  want to point out one thing.  I guess we tried to make
15  this probably as confusing for the Court as we
16  possibly could.
17      On every page where there is a designation
18  that may run ten or twelve pages, there will be an
19  objection on the top of each page.  But not every
20  question and answer has been objected to.  So you
21  really have to follow the chart that has the
22  designation by page and line number, and then the
23  objection besides it.  And then there will be a place
24  for the Court's ruling.
25      I just didn't want to -- I was a little

Page 895

1  nervous the Court would be overwhelmed by the number
2  of stamped objections on every page and it's not as
3  voluminous as it would appear.  And I think you will
4  have to follow that page and line number from the
5  objections.
6      THE COURT:  Thank you.
7      MR. MORRIS:  Just to set the stage, the Court
8  entered a ruling last week that portions of
9  Dr. Cameron's deposition exceeded the scope of
10  treatment and went into areas that would be beyond
11  what a treating physician would be able to testify
12  about.
13      Instead of trying to take on individual
14  questions and answers, for me it's -- I put it in
15  three buckets.  And the objection would apply
16  basically similarly to every Q and A that's in that
17  bucket.  The first one deals with Dr. Cameron's
18  testimony about pleural plaques.  And that's found at
19  Pages 138 through Page 145.
20      And so to set the stage for that, we again go
21  to the discovery deposition where Dr. Cameron is asked
22  whether there are any radiographs, pathology, or other
23  testing that confirms the existing of pleural plaques.
24  And his answer is uh, no.
25      Dr. Cameron did not say he needed to look at

Page 896

1  other medical records.  He did not say that he had
2  some vague recollection that there might have been
3  something he has seen in the past.  So when we left
4  the discovery deposition, it was our understanding
5  that Dr. Cameron had no opinions that there was a
6  pleural plaque.  That was consistent with what the
7  plaintiffs' expert Dr. Kradin had said 24 hours
8  earlier.  And we certainly had no reason to think that
9  pleural plaques would be an issue when he came to
10  trial to testify.
11      So then we moved to the trial preservation
12  deposition and that's as if he would come in on
13  Wednesday of next week to testify in front of Your
14  Honor and the jury, and we had received no notice from
15  the plaintiff that Dr. Cameron had new opinions or
16  different opinions.
17      We had no notice whatsoever that he would
18  offer an opinion about pleural plaques until close to
19  the end of the deposition, plaintiff's counsel pulls
20  out a recorded that is not in Dr. Cameron's record
21  set.  It's not a record that's part of the U.C.L.A.
22  file.
23      And they begin to lead him down a series of
24  questions:
25      Do you recall being asked about pleural

Page 897

1  plaques last week in your discovery deposition? He
2  says yes.
3       Do you recall what you said?
4       He says yes.
5       What did you say?
6       And he then responded that he says he wanted
7  to look at the records.
8       But that's not what he said in the discovery
9  deposition.
10      He then says that he remembered that he
11 thought he saw a pathology or something like that
12 about a pleural plaque. He didn't say anything about
13 that in the discovery deposition. So what you have is
14 a physician who is a treating physician, being shown a
15 document that's not part of his file by the plaintiffs
16 lawyer, a complete surprise to the defendants. It's
17 not a U.C.L.A. record. It's a biopsy that's not a
18 procedure that Dr. Cameron performed. It's not a
19 procedure that anyone within his department or at
20 U.C.L.A. did.
21      And for the first time, he not only says
22 there is a pleural plaque, he then goes the next step
23 to say he has an opinion about that, and that it was
24 caused by exposure to asbestos. And our view, Your
25 Honor, is that this one goes well beyond the scope of

Page 898

1  treatment of a physician, Number 1. Both in the use
2  of a record brought to the deposition by the
3  plaintiffs lawyer.
4       And then, two, rendering an opinion about
5  that beyond his treatment of the plaintiff. And in
6  the briefing, Your Honor, for the original motion, we
7  cite to a case called Dozier versus Shapiro. And I
8  have an extra copy of that if Your Honor would like to
9  have a copy.
10      THE COURT: No thanks. I actually have easy
11 access to it.
12      MR. MORRIS: And so this is 199 Cal. App. 4th
13 1509. It's Dozier vs Shapiro. It's a medical
14 malpractice case, and a treating physician who was a
15 non-retained expert was deposed by the defendant.
16      Defendants counsel asked, do you have any
17 opinions about the standard of care that was given to
18 the plaintiff?
19      The treating physician responded that he
20 didn't have an opinion because he didn't have enough
21 information to formulate a view at that point. The
22 treating physician, again, a non-retained expert shows
23 up at trial and attempts to offer testimony that some
24 of the treatment performed by the defendant physician
25 had in fact breached the standard of care.

Page 899

1       And the Court ruled that there is a time and
2  place where a physician sort of steps out of that
3  treating physician role and is treated like a retained
4  expert. And I think sort of a quote out of this case
5  from the Court is very, sort of illustrative of what
6  happened to us in this case.
7       The Court said that after a witness has
8  denied at his or her deposition having reached
9  opinions on a particular subject, the defendant is
10 entitled to rely on that disclaimer until such time as
11 appellate disclosed that the expert had conducted
12 further investigation, had reached additional opinions
13 in a new area of inquiry.
14      When counsel is not notified when the
15 opposing parties' expert witness formulate post
16 deposition opinions to be offered at trial, the
17 witness is in effect not made available for deposition
18 as to the further opinions. The very purpose of the
19 expert witness discovery statute is to give fair
20 notice of what an expert will say at trial. When an
21 expert is permitted to testify at trial on a wholly
22 undisclosed subject area, opposing parties lack a fair
23 opportunity to prepare for cross-examination or
24 rebuttal.
25      And that, Your Honor, is exactly what

Page 900

1  happened in this case. To our surprise, for the first
2  time we are now talking about a pleural plaque and it
3  was caused by asbestos. And the defense lawyers were
4  completely denied an opportunity to prepare for a
5  trial cross-examination at this deposition.
6       And based on that, Your Honor, we will ask
7  that the Court exclude the questions and answers
8  relating to the pleural plaque.
9       The second bucket --
10      MR. GREENSTONE: I'm sorry, Your Honor, I
11 just thought perhaps that while we were talking
12 buckets, that I could respond to that before they
13 moved on to the next one, while the argument is still
14 fresh.
15      MR. MORRIS: Whatever the Court prefers is
16 fine with me.
17      THE COURT: If you don't mind, let's go ahead
18 and have a plaintiff's response to that.
19      MR. SHARP: Your Honor, I know I've been very
20 quiet. And I know you've been dying to hear from me.
21 Your Honor, Gary Sharp, on behalf of Colgate. The
22 only thing I would add to that is that it should be
23 excluded under Cameron.
24      And Number 2, the description in the biopsy
25 was a fibrous sclerotic plaque. That is a nonspecific

Page 981

1  THE COURT: Unless there's some reason to be
2  present. We certainly have the time, so if there's
3  something that we can address prior to the start of
4  voir dire?
5  MS. KO: Your honor, just to keep on the
6  radar that there is still a CVS motion in limine on
7  five newspaper articles but that hasn't been fully
8  briefed yet. We're still -- the plaintiffs are
9  intending, I understand, to file a written opposition
10 and we haven't seen that yet so it's not fully
11 briefed.
12  I don't think we need to wait on voir dire --
13 on that motion to start voir dire; I just wanted that
14 on the Court's radar.
15  And that was Number 30, I think?
16  MS. KO: Number 30, yes.
17  MS. BRANSCOME: And I would just say, Your
18 Honor, according to the agreed upon briefing schedule
19 we will be filing our opposition to the plaintiff's
20 motion for leave to amend the complaint by 9:00 a.m.
21 tomorrow so that will be something that will be coming
22 in before the 1:30 hearing, but I don't think there's
23 any other outstanding issues at least from J&J's
24 standpoint.
25  MR. MULARCZYK: Not unless the Court wants to

Page 982

1  talk about the rulings on the trial preservation for
2  Dr. Cameron, I don't think so.
3  THE COURT: That's true. If you don't mind,
4  perhaps we can do that at 1:30 as well, or sometime
5  during the afternoon session.
6  MR. MULARCZYK: That's fine, that's fine.
7  THE COURT: So that's what we'll do then.
8  We'll set Wednesday for the start of voir dire and
9  tomorrow morning we won't have any session and then
10 we'll resume at 1:30 tomorrow afternoon.
11  (Time noted 2:34 p.m.)

Page 983

1  STATE OF CALIFORNIA  )
                       )    ss.
2  COUNTY OF HUMBOLDT  )
3
4  I, LINDA VACCAREZZA, CSR NO. 10201, do
5  hereby certify that I am a Freelance Certified
6  Shorthand Reporter in and for the State of California,
7  and that as such, I reported the proceedings had in
8  the above-entitled matter at the time and place set
9  forth herein;
10
11  I further certify that my stenotype notes
12 were thereafter transcribed by me, and that the
13 foregoing pages numbered 848 to 983, constitute a
14 full, true and correct transcription of my said
15 notes.
16  I declare under penalty of perjury under
17 the laws of the State of California that the foregoing
18 is true and correct.
19
20  DATED: 2nd day of October, 2018.
21
22  _____
23  LINDA VACCAREZZA, CSR, RPR, CLR, CRP
    License No. 10201
24
25