# EXHIBIT E22

Page 3487

1  SUPERIOR COURT OF THE STATE OF CALIFORNIA
2  FOR THE COUNTY OF HUMBOLDT
3  CARLA ALLEN,

   Plaintiff,
4
   vs.                                Case.  DR 180132
5
   BRENNTAG NORTH AMERICA, INC.,
6  (sued individually and as
   successor-in-interest to MINERAL
7  PIGMENT SOLUTIONS, INC., and as
   successor-in-interest to WHITTAKER
8  CLARK & DANIELS, INC.,) et al.,
9       Defendant.
   _____/
10
11
12
13      REPORTER'S TRANSCRIPT OF PROCEEDINGS
14        HAD BEFORE JUDGE TIMOTHY A. CANNING
15         Volume XVIII - Pages 3487 to 3705
16                Eureka, California
17             Friday, October 19, 2018
18
19
20
21
22
23  Reported By:
24  LINDA VACCAREZZA, RPR, CLR, CRP, CSR. NO. 10201
25  JOB NO. 148419

Page 3488

October 19, 2018
9:30 a.m.

REPORTER'S TRANSCRIPT OF PROCEEDINGS, held at Superior Court of California, County of Humboldt, 825 5th Street, Courtroom 1, Eureka, California, before Judge Timothy A. Canning, reported by Linda Vaccarezza, a Certified Shorthand Reporter of the State of California.

Page 3489

APPEARANCES:
  KIRKLAND & ELLIS
  Attorneys for the Defendants Johnson & Johnson and Johnson & Johnson Consumer, Inc.
    333 South Hope Street
    Los Angeles, California 90071
  BY: KIMBERLY BRANSCOME, ESQ.
      F. CHADWICK MORRISS, ESQ.
      JAY BHIMANI, ESQ.

  SIMON GREENSTONE PANATIER
  Attorneys for the Plaintiff
    1201 Elm Street
    Dallas, Texas 75270
  BY: DAVID GREENSTONE, ESQ.
      CONOR NIDEFFER, ESQ.

Page 3490

APPEARANCES (CONT'D)
  FOLEY & MANFIELD
  Attorneys for Colgate-Palmolive Company
    300 Lakeside Drive
    Oakland, California 94612
  BY: GARY SHARP, ESQ.
      PETER MULARCZYK, ESQ

  Co-counsel:
  QUINN, EMANUEL, URQUHART & SULLIVAN
    50 California Street
    San Francisco, California 94111
  BY: MORGAN TOVEY, ESQ.

Page 3491

1  THE COURT: Let's go on the record. And
2  we are in Allen versus Brenntag. I understand
3  there's an issue that we need to address before
4  bringing the jury?
5  MR. GREENSTONE: Yes, Your Honor.
6  Ms. Branscome indicated to me beforehand that she
7  wanted to ask Dr. Longo about a particle size
8  distribution. It's something that he talked about
9  as it relates to Johnson & Johnson. He hasn't
10 completed the work as it results -- as it relates
11 to Cashmere Bouquet.
12 I didn't talk about it on direct exam, but
13 he has done the work as it relates to Cashmere
14 Bouquet. It hasn't been -- it's not work that's
15 been turned over. It's not work that we discussed,
16 which is the reason that we did that.
17 She indicated that she wants to ask him,
18 "You haven't disclosed any other particle size
19 distributions," and make sure that he doesn't blurt
20 out that, "Oh, well, I did one for Cashmere
21 Bouquet."
22 And my position would be that he could
23 talk about if he was asked about it, but I was
24 instructed not to go into that, so I didn't. And
25 so she shouldn't then try to get a -- score a point

Page 3512

Q. And that would include the draft ASTM method for TEM for cosmetic talc, correct?

A. Oh, no. I will never give up my right to review the methods and give my scientific opinion why they should be either approved or voted negative. I still do that. That's a lot different than the person that has to get up in front of the subcommittee every six months and go, "Okay. We got all these negatives because people don't like it. We have to go through them and see if we can resolve it." That's a different -- whole different thing.

Q. Dr. Longo, in your chain of custody form that's found in Appendix B of your September report, it states that your lab prepared samples for testing on November 1st, 2018, doesn't it?

A. Actually, it says November 11th, 2018. Not -- it doesn't show it on anything where been analyzed. It's sort of off to the side, and I still haven't figured out what those numbers mean.

Q. Let's take a look at it. If I could have you direct your attention to Tab 15, and it is Appendix B at Page 6.

A. Appendix B. Are you just counting in the first page, second page? One, two, three, four,

Page 3513

five, six. I'm not seeing it where you're telling me it is.

MR. TOVEY: May I have a moment, Your Honor? We'll put it on the ELMO.

THE COURT: Certainly.

THE WITNESS: I found it. Thank you.

MR. TOVEY: May I have the ELMO, please?

Q. So what we are talking about here, Dr. Longo, is under the "prepped by," there's a date that says 11-13-18, and above that, it says 11-1-18. Right?

A. No. It's not 11-13.

Q. 4-13. I am sorry. 4-13-18?

A. That would make sense, since it's on the date line.

Q. And above that, it says November 1, 2018. That's what it says, right?

A. That's how I interpret that.

Q. Today's date is October 19th, 2018, right?

A. Yes, sir.

Q. It's not possible that your lab prepared any of the five Levy samples for testing on November 1, 2018, is it?

A. No, sir. But on the date for preparation, it has the appropriate date. I can't explain

Page 3514

November 1st, 2018. I think we have really smart scientists, but we haven't gone there yet.

Q. When I pointed this out to you on October 1st, 2018, I had asked you if you had a chance to discuss it with any of your scientists or employees. I take it you've not done that still?

A. On which date?

Q. The last time we spoke on October 1st, 2018?

A. No. I said, "Whose is that?"

Q. And this form doesn't appear just once in Appendix B, does it?

A. 11-1-18?

Q. Right.

A. I thought this was the only one, but even if it's on the other ones, I still can't explain it.

Q. So it wouldn't surprise you, though, would it, sir, to learn that this same chain of custody form appears five times in Appendix B, once for each of the five Levy samples, would it?

A. I still can't explain 11-1-18.

Q. Okay.

A. It's not the date they were prepped. It's the chain of custody samples that are analyzed,

Page 3515

it's not the date. Certainly, we agree that it would be impossible to go to November 1st, 2018, and prepare the samples and then bring them back.

Q. And we would agree that what is written on this chain of custody form, 11-1-18, is not correct, true?

A. If that, in fact, is supposed to be 11, November 11th -- excuse me, November 1st, 2018, that's obviously impossible.

Q. Sir, the FDA has never banned the sale of cosmetic talcum powder to consumers, has it?

A. Not that I'm aware of.

Q. In fact, no regulatory agency has ever banned the sale of cosmetic talcum powder to consumers, has it?

A. I believe that's correct.

Q. You understand the talcum powder is still being sold today without any asbestos containing warning label; true?

A. That's true.

Q. Sir, according to the chart that you displayed during your direct testimony, all 38 product containers labeled Cashmere Bouquet were manufactured beginning -- the first ones were manufactured beginning in the 1930s at one end of

Page 3516

1  the range, correct?
2      A.  That's what it states, yes, sir.
3      Q.  And according to the slide deck that you
4  presented during your direct testimony, the last
5  date of manufacture of any of the 38 product
6  containers you tested was 1975, correct?
7      A.  That's correct.
8      MR. TOVEY:  No further questions.  Thank
9  you, sir.
10      THE WITNESS:  Thank you.
11      THE COURT:  Thank you, Mr. Tovey.
12      Ms. Branscome?
13      MS. BRANSCOME:  Thank you, Your Honor.
14  May I take just a moment to set up a little bit?  I
15  don't need as much time so we can --
16      THE COURT:  Certainly.  Please, if you
17  would like to.
18      MS. BRANSCOME:  Your Honor's preference
19  has been expressed.  If we could take a brief break
20  and they can remove all their binders.  I know what
21  your preference is.  I know there's a lot of
22  materials in there.
23      THE COURT:  There are a lot of materials.
24  What I'd prefer doing, if you don't mind, if we
25  could -- we will just take a brief break, go off

Page 3517

1  the record and leave the jury.
2      (Pause in proceedings.)
3      THE COURT:  And Ms. Branscome, whenever
4  you're ready.
5      MS. BRANSCOME:  Thank you, Your Honor.
6      REDIRECT EXAMINATION OF WILLIAM LONGO
7  BY MS. BRANSCOME:
8      Q.  Good morning, Dr. Longo.
9      A.  Good morning.
10      Q.  And you and I have had a chance to meet
11  before.  But again, Kimberly Branscome on behalf of
12  Johnson & Johnson.
13      Dr. Longo, as you discussed with the jury
14  on Wednesday, this is not the first time that
15  you've testified before, correct?
16      A.  No.  I've testified many times in the
17  past.
18      Q.  All right.  And I wanted to start off a
19  little bit about something that was raised during
20  your direct examination, and that was about an
21  advertisement that you took out.  This is in 1989,
22  correct, Dr. Longo?
23      A.  Yes, ma'am.
24      MS. BRANSCOME:  May I have the ELMO,
25  please.

Page 3518

1      Q.  So Dr. Longo, do you remember being asked
2  questions about this by Mr. Greenstone during your
3  direct examination?
4      A.  Yes, I do.
5      Q.  All right.  And just to confirm again,
6  that's you on the right in this picture, correct?
7      A.  That is definitely me.
8      Q.  Okay.  And I wasn't entirely clear on your
9  explanation for this advertising.  Were you
10  suggesting that this advertisement was taken out
11  with the intention of it going to school board
12  members or the heads of schools to encourage them
13  to do AHERA testing?
14      A.  No.  It was designed for, just like it
15  states on the bottom.  We were taking it out to go
16  to consultants, contractors who were doing final
17  air clearance.  We were trying to convince them
18  that we felt was the best lab in the country.
19      Q.  Okay.  So it was an advertisement for your
20  services, correct?
21      A.  Yes, ma'am.
22      Q.  And the advertisement involves you
23  standing -- that's a courtroom, correct, in the
24  state of Georgia?
25      A.  It is.

Page 3519

1      Q.  All right.  And you took out this ad in a
2  trade magazine for the National Asbestos Council,
3  correct?
4      A.  That is correct.
5      Q.  All right.  And since 1989, you have
6  testified roughly 2000 to 3000 times; is that
7  correct?
8      A.  Since approximately 1991 until today.
9  Yes.
10      Q.  All right.  Now, on average, you have
11  testified at least once a week, every week, for the
12  last five years, correct?
13      A.  That is correct.
14      Q.  Sounds exhausting.
15      A.  It is.
16      Q.  You have sometimes -- you have sometimes
17  as many as 100 depositions in a year; is that
18  correct?
19      A.  That is correct.
20      Q.  And I believe you told the jury this, but
21  90 to 95 percent of the time that you are
22  testifying in court or in a deposition is for
23  plaintiff's lawyers in asbestos litigation,
24  correct?
25      A.  As I stated, that's correct.

Page 3520

1    Q. All right. And in upcoming litigation,
2 you have been designated several thousand times as
3 an expert by plaintiff's lawyers in litigation,
4 correct?
5    A. I don't know how many times. But
6 unfortunately, a lot of attorneys list me without
7 ever talking to me. I wish I could break them of
8 that.
9    Q. Okay. And so what you're saying to this
10 jury, and you volunteered this before, is that you
11 think nearly every plaintiff's lawyer in the
12 country lists you as an expert in asbestos
13 litigation, and they do that without even talking
14 to you; is that right, Dr. Longo?
15    A. For the ones I won't work for, that's
16 correct. Typically, my clients will ask me if I
17 want to get involved in the case. The other ones
18 are, "Oh, I'm listed in that case? Got to stop
19 that."
20    Q. Your hourly rate, you told this jury, is
21 $550 an hour, correct?
22    A. Yes, ma'am.
23    Q. And you covered this a little bit on your
24 direct. But over the past five to ten years, your
25 company has billed about a million dollars per year

Page 3521

1 in connection with asbestos litigation, correct?
2    A. No. We billed approximately $2 million a
3 year involving asbestos litigation on behalf of
4 both plaintiffs and defendants, so about 900,000 to
5 a million for plaintiffs and about an equal amount
6 for defendants.
7    Q. Okay. So $2 million per year in asbestos
8 litigation?
9    A. Yes, ma'am.
10    Q. All right. And you told the jury that
11 your company has been paid roughly $30 million just
12 for testifying on behalf of plaintiff's attorneys,
13 correct?
14    A. No. Not quite correct. $30 million is
15 correct, I believe. But it has to do with both
16 testifying as well as all the analysis that we do
17 and all the work we have to do to get ready for the
18 cases.
19    Q. Okay. Well, that's a fair clarification,
20 Dr. Longo. But it is true that your company has
21 billed $30 million for work that you have done in
22 connection with litigation on behalf of plaintiffs,
23 correct?
24    A. I know I stated on behalf of plaintiffs.
25 You know, in 1991, I might have had one case. So I

Page 3522

1 think it's averaged out that for everybody. But I
2 know I stated plaintiffs, so I have to carry that
3 burden around.
4    Q. And now on Wednesday, you showed this jury
5 a slide with a lot of the different work that MAS
6 does outside of the litigation context, correct?
7    A. Yes, ma'am.
8    Q. And presumably, MAS gets paid for that
9 work, correct?
10    A. Yes, ma'am. I'm not embarrassed. We are
11 a for-profit company. We have to hire people and
12 pay bills.
13    Q. Certainly. But the amounts that you're
14 getting paid for your non-litigation work that's
15 coming into the company is in addition to the $30
16 million that you and your team has made in
17 connection with litigation, correct?
18    A. Yes, ma'am.
19    Q. All right. And now, Dr. Longo, when you
20 were asked about this $30 million on Wednesday, you
21 said, "Well, I don't make that personally."
22       Do you recall that testimony?
23    A. I do.
24    Q. But you do personally own 75 percent of
25 MAS, correct?

Page 3523

1    A. I do.
2    Q. Now, you have tested between 300,000 to
3 400,000 bulk samples of asbestos or for asbestos
4 over the last 30 years?
5    A. Somewhere around there, yes.
6    Q. And just as a reminder. You had here at
7 the bottom of the slide that you showed the jury on
8 direct that you had done 300 to 400,000 analyses in
9 asbestos product testing over 30 years; is that
10 correct?
11    A. That's correct.
12    Q. Dr. Longo, did you prepare this slide?
13    A. I approved it but I did not prepare it.
14    Q. Okay.
15    A. I didn't see product testing. Because
16 that's probably a more fair for all the testing we
17 do, not just bulk samples.
18    Q. But it's all testing for asbestos,
19 correct?
20    A. All testing for asbestos.
21    Q. All right. And in all that time, you had
22 never tested Johnson & Johnson cosmetic talcum
23 powder products for potential asbestos litigation
24 outside of litigation, correct?
25    A. I don't believe so.

Page 3704

1       I N D E X
2                        PAGE
3  WITNESS:  DR. WILLIAM LONGO
4       BY MR. TOVEY..............................3505
5       BY MS. BRANSCOME..........................3517
6       BY MR. GREENSTONE.........................3687
7            --O0O--

Page 3705

1  STATE OF CALIFORNIA   )
                         )    ss.
2  COUNTY OF HUMBOLDT    )
3
4       I, LINDA VACCAREZZA, CSR NO. 10201, do
5  hereby certify that I am a Freelance Certified
6  Shorthand Reporter in and for the State of California,
7  and that as such, I reported the proceedings had in
8  the above-entitled matter at the time and place set
9  forth herein;
10
11      I further certify that my stenotype notes

12  were thereafter transcribed by me, and that the

13  foregoing pages numbered 3487 to 3705, constitute a

14  full, true and correct transcription of my said

15  notes.

16      I declare under penalty of perjury under
17  the laws of the State of California that the foregoing
18  is true and correct.
19          DATED:  22nd day of October, 2018.
20
21          _____
22          LINDA VACCAREZZA, CSR, RPR, CLR, CRP
23          License No. 10201
24
25

TSG Reporting - Worldwide    877-702-9580

56