# EXHIBIT E25

```
              SUPERIOR COURT OF THE STATE OF CALIFORNIA

                         COUNTY OF ALAMEDA

                BEFORE THE HONORABLE BRAD SELIGMAN

                           DEPARTMENT 23

                             ---oOo---

TERESA ELIZABETH LEAVITT
and DEAN J. MCELROY,

        Plaintiffs,
                                        No. RG17882401
vs.

JOHNSON & JOHNSON, et
al.,

        Defendants.
_____/

                  REPORTER'S TRANSCRIPT OF TRIAL

                    (WILLIAM E. LONGO, Ph.D.)

                   Thursday, February 7, 2019

                           Full Session




                 Taken before EARLY K. LANGLEY
                         RMR, RSA, B.A.
                          CSR No. 3537



                  Aiken Welch Court Reporters
                  One Kaiser Plaza, Suite 250
                   Oakland, California 94612
                  (510) 451-1580/(877) 451-1580
                      Fax:  (510) 451-3797
                       www.aikenwelch.com
```

Page 6

| | | | ID | EV |
|---|---|---|---|---|
| 1 | E0519.69 | Photo of Johnson's Baby Powder, Taiwan, 1/82 | 77 | 78 |
| 3 | E0519.235 | Photo of Actinolite/Tremolite with Talc Parallel Dispersion 1.605 R.I. @ 100X | 77 | 78 |
| 5 | E0519.241 | Photo of Actinolite/Tremolite Bundle Elongation @ 200X | 77 | 78 |
| 7 | E0519.243 | Photo of Actinolite/Tremolite Parallel Dispersion 1.605 R.I. @ 100X | 77 | 79 |
| 10 | E0519.252 | Photo of Tremolite (11.0 um x 0.9 um) 10/17/2018 | 77 | 79 |
| 11 | E0519.261 | Photo of Tremolite (6.3 um x 0.2 um) 10/18/2018 | 77 | 79 |
| 13 | E0514.169 | Photo: Figure 1. Sample M65228-001 Johnson's Baby Powder | 113 | 116 |
| 15 | E609 | Photo of close-up image of Johnson's baby powder | 113 | 115 |
| 16 | E0610 | Photo of the Back of Johnson's Baby Powder | 113 | 115 |
| 18 | E0611 | Photo of close-up image of Johnson & Johnson Consumer Products, Inc. Copyright | 113 | 115 |
| 20 | E0514.172 | Photo of Tremolite (4.5 um x 0.6 um) 2/24/2017 | 114 | 116 |
| 21 | E0615 | Photo of Richterite (6.8 um x 0.45 um) | 114 | 115 |
| 23 | E0520.14 | Alb Lung Tissue Sample: Mg Depleted Chrysotile Image and Alb Lung Tissue Sample: Mg Depleted Chrysotile EDXA | 132 | 135 |

Page 7

| | | | ID | EV |
|---|---|---|---|---|
| 1 | E0520.16 | Alb Lung Tissue Sample: Talc Fiber Image | 132 | 136 |
| 3 | E0520.22 | Alb Lung Tissue Sample: Tremolite Image | 132 | 137 |
| 4 | E0520.25 | Alb Lung Tissue Sample: Tremolite Bungle EDXA | 132 | 138 |
| 6 | E0520.32 | Bla Lung Tissue Sample | 132 | 138 |
| 7 | E0620 | Scanning Electron Micrographs, MAS Laboratory | 133 | 141 |
| 8 | E0621 | Scanning Electron Micrographs, MAS Laboratory | 133 | |
| 10 | E0622 | Scanning Electron Micrographs, MAS Laboratory | 133 | 141 |
| 11 | E0623 | Scanning Electron Micrographs, MAS Laboratory | 133 | 141 |

Page 8

INDEX - (Pages 1-215)

INDEX OF EXHIBITS

| DEFENDANT'S | | | ID | EV | WD |
|---|---|---|---|---|---|
| DX 12204 | June 1990 Advertisement, Asbestos Issues, Hands-On Solutions | | 175 | | |
| DX 11219 | MAS, TEM Asbestos Analysis of Libby Vermiculite-Containing Scotts' Turf Builder Products, Prepared by: William E. Longo, Ph.D. and Michael D. Mount, CIH, OHST, April 10, 2015 | | 182 | | |

Page 9

APPEARANCES OF COUNSEL ON THE RECORD:

For the Plaintiffs:
  JOSEPH SATTERLEY
  DENYSE CLANCY
  Kazan, McClain, Satterley & Greenwood
  55 Harrison Street, Suite 400
  Oakland, California 94607
  (510) 302-1000
  Jsatterley@kazanlaw.com
  Dclancy@kazanlaw.com

  MOSHE MAIMON
  Levy Konigsberg LLP
  800 Third Avenue, 11th Floor
  New York, NY 10022
  (212) 605-6200
  mmaimon@levyaw.com

For the Defendants Imerys Talc America, Inc.; Cyprus Mines Corporation; Imerys Talc Vermont, Inc.:
  SAMUEL JUBELIRER
  MORDECAI BOONE
  Dentons US LLP
  1999 Harrison Street, 13th Floor
  Oakland, California 94612
  (415) 882-5000
  Samuel.jubelirer@dentons.com
  Mordecai.boone@dentons.com

  BRADFORD DEJARDIN
  Dentons US LLP
  601 South Figueroa Street, Suite 2500
  Los Angeles, California 90017
  (213) 243-6116
  Brad.dejardin@dentons.com

**Page 10**

1  For the Defendants Johnson & Johnson; Johnson & Johnson Consumer, Inc.:
2
3      NATHAN DULLUM
       JERMAIN JONES
       Orrick, Herrington & Sutcliffe LLP
4      The Orrick Building
       405 Howard Street
5      San Francisco, California 94105
       (415) 773-5700
6      Ndullum@orrick.com
       Jjones@orrick.com
7
       MATTHEW ASHBY
8      GEOFFREY G. MOSS
       Orrick Herrington & Sutcliffe LLP
9      777 South Figueroa Street, Suite 3200
       Los Angeles, California 90071
10     (213) 612-2257
       Mashby@orrick.com
11     Gmoss@orrick.com
12     MICHAEL BROWN
       SCOTT RICHMAN
13     Nelson Mullins Riley & Scarborough LLP
       100 South Charles Street, Suite 1200
14     Baltimore, Maryland 21201
       (443) 392-9401
15     Mike.brown@nelsonmullins.com
       Scott.richman@nelsonmullins.com

**Page 11**

```
            --oOo--
        P R O C E E D I N G S
            --oOo--
     Thursday, February 7, 2019 - 8:49 a.m.
             (Morning Session)
     (Whereupon, the following proceedings were held
outside the presence of the jury:)
```

THE COURT: Good morning, everybody. So what do we have?

MR. MAIMON: Yes, Your Honor.

In anticipation of Dr. Longo's testimony this morning, I met and conferred with counsel for J&J and confirmed with him that I was not going to deal with talcs that are not at issue in this case that Dr. Longo may have tested, and specifically, some of the talcs that Dr. Longo tested deal with Chinese talc that Johnson & Johnson sourced for their post 2003 products pursuant to the Court's ruling pretrial we've avoided all of the Chinese talc. So we're not going to go into it.

I did note that in the cross-examination of Mr. Poye the other day, there was a report that he had issued to Dr. Longo that dealt with 79 samples. It wasn't identified as such, but some of those samples I happen to know because I've dealt -- defended

**Page 12**

Dr. Longo's depositions, dealt with his analysis of Johnson & Johnson products that had Chinese talc in them. And so I tried -- I met with counsel and asked -- told him that I was not going to go into Chinese talc, but I believe that would be improper for the defendants to elicit testimony with -- from Dr. Longo with regard to his testing of Johnson & Johnson products that were made from Chinese talc because it's irrelevant to his testimony in this case.

MR. ASHBY: Couple points, Your Honor. One is, one of the Chinese talc bottles that he uses for his control, so he has a -- he has a control bottle which is a bottle that he purchased off the shelf that's relevant to understanding the processes that he does with respect to analysis. You have to have a control blank. I don't see any way to separate the control blank from the rest of his analyses. So that's the first point.

The other point is that he has three other off-the-shelf bottles that were purchased in the 2000s that I would like to ask him about if he found asbestos in those, the reason being, one, we've heard testimony now from Mr. -- from Dr. Hopkins elicited by Mr. Maimon regarding China and the use of Chinese talc at some point during the use of Korean talc. There was a

**Page 13**

switchover, it sounded like, from the testimony of Dr. Hopkins that Mr. Maimon elicited. So they have heard about Chinese talc being used in lieu of Korean talc at some point.

And then, finally, there were -- there was much testimony from Dr. Hopkins with respect to what Johnson & Johnson was considering in the 2000s with respect to warnings. There were demonstrative -- there were exhibits that were entered from, I think like 2013 or 2014 where they were discussing warnings, there was a PowerPoint slide that was shown from Johnson & Johnson. So, to the extent there is an issue about whether Johnson & Johnson should have warned or not warned, it's relevant for the jury to know that there is testing that has been done in the 2000s, which is Chinese talc, at least after 2003, that suggests there is no need to warn because there is no asbestos in the Chinese talc.

MR. MAIMON: So taking that in order, Your Honor, I think that it is proper to question Dr. Longo about the control bottle that he used, the same way that they cross-examined Mr. Poye about that. And I don't have any objection to that.

With regard to the duty to warn, the duty to warn ends at the last exposure, which is 1998 in this

Page 146

1  Your Honor.  That's one.  We haven't heard from her.
2  So if she does end up coming, that alleviates some of
3  the issue.
4         That does not alleviate one continuing issue
5  that it sounds like Dr. Egilman -- excuse me -- that
6  Dr...
7         MR. SATTERLEY:  Longo.
8         MR. RICHMAN:  Thank you.
9         -- Dr. Longo was beginning to give and that
10 Dr. Egilman was starting to tread on.
11        What appears is there is this overall testimony
12 that, from the day of birth until 1968, she was exposed
13 to Korean talc and that there is absolutely no factual
14 foundation to support that opinion.
15        As Mr. Brown had to point out with Dr. Egilman,
16 the testimony of Ms. Susan Leavitt -- and this is --
17 I'm citing page 21 of her deposition.
18        "Question:"  This is line 15.  "Do you know
19 where the Johnson's Baby Powder that you purchased at
20 Sangley Point came from?
21        "Answer:  It came from the United States."
22        She says on page 19, "Now, where did you
23 purchase the baby powder that you used on Terry when
24 she was a baby in the Philippines.
25        "Answer:  When my husband was in the military

Page 147

1  we purchased it at the commissary or the PX."
2         And then she says:  "And where was the
3  commissary or PX.
4         "Answer:  It was in Sangley Point Naval
5  Station."
6         So the -- issue one is the undisputed testimony
7  from the witness is the products she purchased on base
8  was sourced from the United States.  There is nothing
9  to dispute that in the record.
10        More importantly, Your Honor, the other
11 undisputed testimony is that on -- sometime in
12 September of 1967, Terry Leavitt's mother, Susan, and
13 her husband -- I believe his name was David -- moved to
14 the United States.  They left behind Terry with Terry's
15 grandmother and a house helper.
16        So -- and they stayed there for another seven
17 months before Terry and the grandmother joined them
18 back in the United States.
19        I believe Terry's grandmother has passed and
20 also the housekeeper.  So there will be absolutely no
21 testimony about the products that were used on Terry
22 during the time she was still in the Philippines that
23 her parents had moved to the United States.
24        So it would be utter and complete speculation
25 as to what was used on her, the frequency it was used,

Page 148

1  how long it was used.  There would be -- there's no
2  evidence of that and it's total hearsay.
3         So -- and there's no way for us to unring the
4  bell with Dr. Longo when he's just going to say, oh,
5  that's what the testimony is, when there is no factual
6  foundation to support that, even if she does testify.
7  And that's the issue.
8         MR. SATTERLEY:  Your Honor, Mr. Richman and
9  Mr. Brown have been admitted here pro hac vice.  And I
10 would expect that they would follow the rules and the
11 law of California and be candid with the Court and not
12 make misrepresentations.
13        What Mr. Brown did yesterday, which is going to
14 come out later, is lie to the jury with Dr. Egilman.
15        And what Mr. Richman just did is not be candid
16 with Your Honor regarding the testimony, because on the
17 very -- a few pages later, Ms. Leavitt is directly
18 asked where they purchased the Johnson's Baby Powder,
19 and she said, at the local grocery stores where we go
20 shopping.
21        So, for the -- for counsel to tell Your Honor
22 that the only place that she purchased was at a local
23 PX --
24        MR. RICHMAN:  I never said that.
25        MR. SATTERLEY:  Wait a second now.

Page 149

1         MR. RICHMAN:  I object.  That's a
2  misrepresentation.
3         THE COURT:  One at a time.
4         MR. RICHMAN:  I never said that's the only
5  place, Your Honor.  The entire time period was the
6  representation of the witness.
7         THE COURT:  Let's -- plaintiff is speaking now.
8         MR. SATTERLEY:  So for counsel to suggest to
9  this jury and to Your Honor that -- number one, that
10 the Korean talc is not at issue because she purchased
11 it at a PX and that she knew the actual source of how
12 it came to when, in fact, on page 20 of her deposition,
13 when directly asked by counsel, she said, "We purchased
14 it at the grocery store where we go shopping."
15        So that -- number one, that's inaccurate
16 representation.
17        MR. RICHMAN:  Your Honor, I'm sorry.  I would
18 just ask counsel to read the question because it does
19 clarify.
20        MR. SATTERLEY:  "You mentioned that you -- that
21 you'd get the Johnson's Baby Powder at the
22 commissionary (sic) after he was discharged from the
23 military in late March 1967.  Where did you purchase
24 Johnson's Baby Powder?"
25        MR. RICHMAN:  After late March 1967.

Page 150

```
1         MR. SATTERLEY: Counsel.
2         THE COURT: Yeah, let's -- one at a time,
3  please.
4         MR. SATTERLEY: So my point is, Your Honor,
5  Ms. Leavitt's going to be here to -- Susan Leavitt's
6  going to be here to testify. She's going to testify
7  that she purchased sometime at the PX, the Post
8  Exchange, the military. Sometimes she purchased it at
9  a grocery store. She's going to testify when they did
10 and how they did it. All that's going to be -- she
11 testified about it in her deposition. This expert --
12 so there's no Sanchez issue at all. Sanchez related to
13 the gang activities and the underlying facts that were
14 never introduced and the testimony that was never
15 introduced. Here, that -- the Sanchez case doesn't
16 apply whatsoever. So she's going to testify about
17 that.
18        Everything he's raised is subject to
19 cross-examination and the weight the jury may give to
20 the testimony of -- of Ms. Leavitt's testimony.
21        The -- certainly we can -- Your Honor is going
22 to give an instruction that there's two ways to prove a
23 fact: direct evidence and indirect evidence.
24        And you -- I think Your Honor has already given
25 preliminary instructions to that.
```

Page 151

```
1         And Ms. Leavitt's going to testify that her --
2  I think it was her father and other family members did
3  this activity on Terry also, and that it's her
4  understanding and belief, because she instructed them
5  to do so, that that -- that the powder was done when
6  she wasn't there.
7         So -- and the jury, Your Honor, may sustain
8  objections when she comes, but to totally prevent an
9  expert from giving opinions regarding this testimony
10 is, I think, not well founded based upon the law in
11 California.
12        And Ms. Clancy says she's putting on
13 Ms. Leavitt.
14        I don't know.
15        Do you have anything to add to that argument?
16        MS. CLANCY: No. I agree with Mr. Satterley.
17        MR. RICHMAN: So just in response, Your Honor,
18 I have never stated there was not a small period of
19 time that she may have claimed she bought a powder at a
20 grocery store. What I stated to the Court was that,
21 from the date of her birth and through March of 1967,
22 the undisputed testimony was that she bought the
23 product on base which came from the United States.
24 There's no dispute about that fact.
25        Moreover, which is also in dispute and was not
```

Page 152

```
1  addressed by Mr. Satterley, is that, as of June of '67,
2  Terry's mother and her husband moved to the
3  United States. Since I have familiarized myself with
4  the rules of California caselaw, a fact witness needs
5  personal knowledge of the testimony -- or of events to
6  give testimony about those. It is sheer and utter
7  speculation as to what the babysitter may have been
8  doing during the time that Terry is across the world
9  from where her parents are. There's not going to be
10 any evidence of -- from anyone with any personal
11 knowledge as to what happened after September of 1967.
12        The problem is, that Mr. Satterley seems to
13 keep missing, is that these expert witnesses keep
14 saying there's just this continuous use of the product
15 from Korea from the date of her birth through 1968.
16 And there's absolutely no factual basis to substantiate
17 that. And that is our issue.
18        THE COURT: I understand the arguments that
19 have been made here. I haven't yet heard actually what
20 he's going to say. And what he's going to say is
21 what -- and I will instruct the jury -- that his
22 statements about the depositions are not evidence and
23 the jury will have to decide whether, in fact, when
24 these people testify, it is. And there's an
25 instruction I give at the end of the case in which the
```

Page 153

```
1  jury considers whether something has been established
2  or not with regard -- that an expert relies on.
3         So all of that's sort of a -- a later problem.
4         The arguments that you raise right now are all
5  appropriate matters for cross-examination. I'm not
6  going to preclude him from expressing an opinion, and
7  you can go at him going forward.
8         I haven't heard actually what he's going to
9  say, and I want to hear that. If he says something
10 that you think he -- that there's no basis in the
11 record to do it, I'll consider that. ==But what I am==
12 ==hearing is is he's going to tell based on what he==
13 ==understands from her deposition and he's going to draw==
14 ==some conclusions about it.== And that may or may not be
15 borne out by the evidence.
16        So I'm not going to issue a ruling right now
17 that precludes him from going there.
18        MR. RICHMAN: And that's fine. I just -- to
19 clarify the last point, I think -- or ask the Court to
20 consider, because we're going to have to probably
21 revisit this with this witness. It's not that she
22 doesn't say it in her deposition, it's that she has no
23 basis for saying it, and that now this witness cannot
24 regurgitate something that she will not be able to say
25 under any Rule of Evidence.
```

Page 154

1  THE COURT: And that is -- that is why I am
2  going to instruct the jury that he's explaining what
3  the basis of his opinion is.  His summary of the
4  deposition is not admissible testimony at all.  The
5  jury is going to have to decide when that individual
6  testifies what is there and decide if that supports his
7  opinion.
8  MR. RICHMAN: Thank you, Your Honor.
9  THE COURT: Let's take a break while we can.
10 MR. ASHBY: I have one other issue.  I hadn't
11 made a Kennemur objection.  It had to do with documents
12 that Dr. Longo said he had reviewed for historical
13 testing regarding chrysotile.  I had asked him at his
14 deposition about that.  I had asked him to cite those
15 documents for me.  He could not do that at the
16 deposition.  He said he would withdraw his testimony if
17 he couldn't find those documents.  He offered to
18 collect those documents for me and give them to me,
19 which he never did.  That was the basis of my Kennemur
20 objection, is that I am now in a position where he's
21 testified about documents he's seen that show
22 historical testing of chrysotile, yet at his deposition
23 he was unable to disclose those documents to me,
24 offered, volunteered to collect those documents for me
25 to provide them but never did.  Now I'm hearing it at

Page 155

1  trial and I'm incapable of cross-examining him on the
2  documents.
3  MR. MAIMON: I think if you look at the
4  deposition transcript, what Dr. Longo said is I have
5  been deposed countless times for Johnson & Johnson,
6  I've identified the documents before in prior
7  depositions by Johnson & Johnson, and by Mr. Ashby's
8  firm, of him and that he relies on the list of
9  documents that he has produced and these documents are
10 on the list.  And he doesn't -- I don't believe he has
11 to sit there at a deposition and identify document by
12 document if it's been produced in anticipation of his
13 deposition, if it's -- if it's there, and if he's been
14 deposed upon it, countless times and gone through the
15 documents with Johnson & Johnson.
16 MR. SATTERLEY: I believe the disclosure of the
17 case incorporated by reference, his prior testimony
18 from the Lanzo case and from these other cases so that
19 we have more than adequate notice and these list of
20 reliance lists, he's been cross-examined ad nauseam.
21 MR. ASHBY: The problem, if anyone puts
22 themselves in my shoes, is when he's tells me he's seen
23 documents regarding chrysotile in products, and as I
24 explained at the deposition and Mr. Maimon and I got
25 into a disagreement about is, I need to see the

Page 156

1  document to know whether or not it's relevant at all to
2  this case and the exposures in this case, because as
3  you know, there are -- there's Chinese talc, there's
4  Italian talc, there's Vermont talc, and there's Korean
5  talc.  And for me to know whether or not these are
6  documents that are relevant to this case, that may have
7  been relevant to some other case certainly, or somebody
8  else may have asked him about it, it's only fair for me
9  to see those documents when he says to me that there
10 are documents that support this position.
11 And he cited -- he cited -- in his report he
12 cites there's 95 documents.  So I asked him, of those
13 95 documents you're citing, which ones are the
14 chrysotile documents that support your opinion?  And he
15 could not do it.  He said he would collect those for
16 me, and he did not do it.
17 So I'm put in this very difficult position now.
18 It's not unlike when Dr. Hopkins was on the stand and
19 the objections constantly were, what's the document
20 that supports it?
21 THE COURT: Let me see the deposition testimony
22 you're referring to before you ask him.
23 MR. SATTERLEY: And the disclosure here,
24 Your Honor, where I incorporated Lanzo, Anderson,
25 Ingham.

Page 157

1  THE COURT: Before you go there, I want to hear
2  first what the testimony is.
3  Mr. Ashby.
4  You know what we're going to do?  Go look for
5  it now.  I want to take a break right now.  Before we
6  call the jury back in, I'll look at this issue.
7  Let's go off the record.
8       (Recess taken.)
9         (Afternoon Session)
10 (Whereupon, the jury having entered the
11 courtroom, the following proceedings were held:)
12 THE COURT: Before we were on the break, there
13 was an objection to Dr. Longo who was referring to some
14 testimony of plaintiff's mother, who will be a witness
15 in this case.
16 I'm overruling the objection at this point, but
17 I want to instruct you that the expert is permitted to
18 tell you what assumptions he's making in reaching his
19 conclusions.
20 You will be asked at the end of the case to
21 decide whether those assumptions are supported by the
22 actual evidence.  So his statement summarizing the
23 depositions are not evidence in this case.  You hear
24 the actual testimony and decide if it supports the
25 opinion.

Page 166

1   A.  Yes.
2   Q.  And, to the extent that that talc was
3   anthophyllite you explained the inability of the SEM to
4   distinguish, is that also consistent with your testing
5   of the Johnson & Johnson products?
6   A.  It would be.
7   Q.  And you found chrysotile in the tissue as well;
8   correct?
9   A.  Yes, sir.
10  Q.  And is that consistent with your review of the
11  documents?
12  A.  Yes, it is.
13      MR. ASHBY:  Object.  Move no strike,
14  Your Honor, based on what we talked about.
15      THE COURT:  There is a motion to strike on the
16  documents.  I'm going to reserve ruling on that subject
17  to our discussions.
18  BY MR. MAIMON:
19  Q.  And is it also consistent with your review of
20  the Cyprus or Imerys documents, Dr. Longo?
21  A.  It is.
22  Q.  Now, based upon your review of the materials in
23  this case, is there any other documented or confirmed
24  significant asbestos exposure that Terry Leavitt has
25  had aside from her use of Johnson's Baby Powder for the

Page 167

1   use on her?
2       MR. DEJARDIN:  Objection.  Foundation.  First
3   part.  Or "after the side" -- or "aside."
4       THE COURT:  Let me -- let me figure out.  I'm
5   going to sustain the objections.  First of all, I don't
6   know what foundation or what basis of where we're going
7   on this.
8       MR. MAIMON:  Sure.
9   BY MR. MAIMON:
10  Q.  You told us that you reviewed Ms. Leavitt's
11  deposition?
12  A.  Yes.
13  Q.  You reviewed her mother's deposition; correct?
14  A.  Yes, sir.
15  Q.  You reviewed answers to interrogatories talking
16  about where she lived and where she went to school?
17  A.  Yes, sir.
18  Q.  And based -- and did -- and based upon that,
19  have you been able to identify, based on your review of
20  the materials in this case, any other asbestos --
21  confirmed or documented significant asbestos exposure
22  aside from the Johnson's Baby Powder that you already
23  told us about?
24  A.  No.  I could not find any evidence of any
25  outside exposure other than the Johnson's Baby Powder.

Page 168

1   Q.  Now, I have one final question for you,
2   Dr. Longo.  And first of all --
3       Two questions.
4   A.  It's a lie.
5       THE COURT:  Never a trust a lawyer who says he
6   has one final question.
7       MR. SATTERLEY:  On both sides.
8       THE COURT:  You can pick a side.
9   BY MR. MAIMON:
10  Q.  Is your methodology, when you talked about with
11  the sensitivity, is it capable of identifying
12  14 asbestos fibers per gram of talc?
13  A.  No, sir.  That's impossible, as we sit here
14  today.
15  Q.  And is any methodology that you're familiar
16  with capable of identifying asbestos in talc at the
17  level of 14 fibers per gram?
18  A.  No.  We have probably the lowest sensitivity of
19  any of the labs that I know.  We're right -- hovering
20  around 2500.  We're talking almost two orders of
21  magnitude lower than that.  I'm not aware of anything
22  that can do that.
23  Q.  Of all the opinions that you've given us been
24  to a reasonable degree of scientific certainty?
25  A.  Yes, sir.

Page 169

1       MR. MAIMON:  Thank you.
2       Those are all the questions I have, Your Honor.
3       THE COURT:  Cross-examination?
4       MR. ASHBY:  Thank you, Your Honor.
5       Can I have a second to clear this out,
6   Your Honor?
7   CROSS-EXAMINATION BY MR. ASHBY:
8   Q.  Good afternoon, Dr. Longo.
9   A.  Good afternoon, sir.
10  Q.  I have not seen you since your deposition.  I
11  hope you've been well.
12  A.  I'm trying to.
13  Q.  You talked a little bit about industrial
14  hygiene earlier, and I think you said you attended some
15  seminars maybe on it and maybe you spoke at some of
16  them; is that what you said?
17  A.  I've taught at industrial hygiene conferences
18  to certified industrial hygienists.  I've published in
19  industrial hygiene journals.  I have been -- I have
20  been asked to give talks on our research on industrial
21  hygiene, yes, sir.
22  Q.  What you did say, though, is you're not a
23  certified industrial hygienist; correct?
24  A.  No, sir, I'm still not.
25  Q.  You've never taken the test to be a certified

Page 170

```
1  industrial hygienist?
2      A.  No, sir, I haven't.
3      Q.  You -- you're not a geologist, either; correct?
4      A.  No.  I don't have a degree in geology.
5      Q.  You're not a mineralogist as well?
6      A.  I don't have a degree in mineralogy.  We have
7  to -- I have to do a lot of that in the arena of
8  asbestos, but I don't have a degree in it.
9      Q.  I -- what my question was is are you a
10 mineralogist?  Is that "yes" or "no"?
11     A.  Well, it's a little difficult to answer
12 questions like that "yes" or "no," so I would have to
13 say "yes and no."
14     Q.  Do you have a Ph.D. in mineralogy?
15     A.  That I do not have.
16     Q.  The first time that you personally ever
17 analyzed what you know to be a Johnson & Johnson talcum
18 powder product was in 2017?
19     A.  January of 2017, yes, sir.
20     Q.  And you're aware, however, that the testing of
21 cosmetic talc for the presence of asbestos has gone on
22 for decades; right?
23     A.  Yes, sir.
24     Q.  You, on the other hand, first started testing
25 cosmetic talc only after being contacted by law firms
```

Page 171

```
1  for the plaintiffs in asbestos litigation; right?
2      A.  That is true.
3      Q.  You never -- you've never tested cosmetic talc
4  when you weren't being paid to do it by lawyers for the
5  plaintiffs?
6      A.  That is true.
7      Q.  The only time you've tested talcum powder is
8  for plaintiffs lawyers suing for money in litigation;
9  right?
10     A.  I guess eventually that's what happens, yes,
11 sir.
12     Q.  You mentioned some work for some government
13 agencies.  I think you talked -- did you talk about --
14 did you mention NASA today?
15     A.  I did not.
16     Q.  No, you did not.  Okay.
17     A.  Did you want me to?
18     Q.  No.  You don't have to.  You usually say that
19 you can't talk about it; right?
20         MR. MAIMON:  Objection, Your Honor.
21         "Can't talk about."
22         THE WITNESS:  No, I talk about NASA.  That's
23 the work we did on their space x-ray telescope where we
24 were doing microsurgery, actually drilling holes to
25 help connect chips because of -- et cetera, et cetera.
```

Page 172

```
1  I can't talk about the Department of Defense stuff;
2  otherwise, I'm going to have to kill you.
3          MR. ASHBY:  I didn't catch that.  What did he
4  say?
5          MR. SATTERLEY:  Don't repeat it.  Don't repeat
6  it.
7          THE WITNESS:  Only since it's on the record.
8          THE COURT:  The Court will note everyone is
9  laughing and we hope it was a joke.
10         THE WITNESS:  It was a joke.
11         I think I'd get killed if I said that.
12 BY MR. ASHBY:
13     Q.  None of that work, though, had anything to do
14 with talcum powder; right?
15     A.  No.  It wasn't talcum powder, but all this
16 research we've done over the years helps us understand
17 how to really analyze for microparticles and
18 microfibers.  So we're not just a -- we're just not a
19 testing lab.  We have all these scientists that we can
20 make progress on this.  So we use things that we have
21 used for talcum powder.  But, no.  No government agency
22 has come to us and said, please test this talcum
23 powder.
24     Q.  Dr. Longo, you've done this a few times.  You
25 know how this works.  We're going to try and get you
```

Page 173

```
1  out of here as fast as you can.
2          I would appreciate it if you answer my
3  questions.
4          MR. ASHBY:  I'll ask the Court to either
5  admonish the witness or move to strike the testimony to
6  the extent it was more than a "yes" or "no."
7          THE COURT:  I'm not going to strike that
8  answer, but I will -- let's try to keep your answers
9  succinct, sir.
10         THE WITNESS:  Sorry, Your Honor.
11         THE COURT:  Go ahead.
12 BY MR. ASHBY:
13     Q.  You never published any papers relating to
14 talc; true?
15     A.  That's true.
16     Q.  None of the work you've talked about with the
17 jury in this case has ever been submitted for peer
18 review; true?
19     A.  That is correct.
20     Q.  You're being compensated for your time here
21 today; true?
22     A.  That is correct.
23     Q.  And you've told me at your deposition in
24 November that you've only ever talked about your data
25 with respect to cosmetic talc when MAS has been
```

Page 174

1 compensated for it; right?
2   A. We've only ever talked about it?
3   Q. You've only ever talked about it when MAS is
4 being compensated for it.
5   A. I've only testified at trial when -- when -- so
6 my company can send a bill, yes, sir.
7   Q. And you're the president of your lab, and it's
8 called MAS; right?
9   A. Yes, sir.
10  Q. You own 75 percent of MAS; true?
11  A. That is correct.
12  Q. You opened MAS in February of 1988?
13  A. Opened the doors, yes, sir.
14  Q. And you had some discussions with Mr. Maimon
15 about the $30 million number.
16     Do you recall that?
17  A. I do.
18  Q. And you said you hadn't -- that wasn't personal
19 to you, you didn't make that 30 million personally is
20 what you said; right?
21  A. That is correct.
22  Q. But what you've testified to in the past is
23 that over the past 30 years MAS has billed over
24 30 million for legal consultation, depositions, work
25 evaluation, and trial testimony on behalf of

Page 175

1 plaintiffs. Right?
2   A. That is correct.
3   Q. Not long after opening the doors at MAS, you
4 were running an ad in which you were soliciting
5 business; correct? Are you familiar with this ad?
6   A. I've been shown it many times in the last
7 30 years.
8   Q. It's in the National Asbestos Council; right?
9 In that magazine?
10  A. Yes, sir. 1989. It's a classic.
11     MR. ASHBY: May I approach, Your Honor?
12     THE COURT: You may.
13 BY MR. ASHBY:
14  Q. I've handed you DX12204.
15     Do you recognize that document?
16  A. I do.
17  Q. And is this the ad that you had published in
18 the trade magazine for the National Asbestos Council?
19  A. Yes, sir, it is.
20  Q. All right.
21     MR. ASHBY: Your Honor, can I publish?
22     MR. MAIMON: No objection.
23     THE COURT: You may publish.
24     (Whereupon, Defendant's Exhibit DX12204 was
25     marked for identification.)

Page 176

1 BY MR. ASHBY:
2   Q. That's you on the right there; right?
3   A. How did you guess?
4   Q. George Yamate on the left there?
5   A. Yes, sir.
6   Q. You told us -- or you told me at your
7 deposition in the past one of the ways you've explained
8 this is that there was a price competition in the TEM
9 community and you wanted to show that you had the best
10 TEM lab at the time; is that right?
11  A. That's correct.
12  Q. But what you didn't do for showing that you're
13 the best TEM lab in the country is you didn't -- you
14 were not wearing a lab coat there; right?
15  A. No. That would be a suit.
16  Q. Are you wearing a lab coat?
17     That's not a lab coat.
18  A. That's not a lab coat.
19  Q. Are you in a lab?
20  A. No, sir, I'm not.
21  Q. You're in a courtroom; right?
22  A. Yes.
23  Q. Another way you've explained it in the past is
24 that you were trying to get the message across that MAS
25 was a great lab for clearance samples and if there was

Page 177

1 ever a dispute, you'd be willing to stand up and defend
2 your data in court; right? That's the other way you
3 explained it; is that true?
4   A. I think both those explanations go together.
5   Q. I'm not suggesting they're not. I'm just
6 asking if those are the two explanations.
7     MR. MAIMON: Objection.
8 BY MR. ASHBY:
9   Q. So let me back up. The other way for -- or
10 maybe the similar way you've explained this is that you
11 were trying to get the message across that MAS was a
12 great lab for clearance samples and if there was ever a
13 dispute you'd be willing to stand up and defend your
14 data in court; right?
15  A. That's all part of the same reason why we did
16 that.
17  Q. Okay. But you've never actually testified in
18 court to defend your clearance data; right?
19  A. I have not. That's because we're so good.
20  Q. Before you got heavy into consulting in
21 cosmetic talc litigation, about 35 to 40 percent of
22 MAS's business came from consulting?
23  A. Yes, sir.
24  Q. But in the past year, it has increased to about
25 70 percent of your business; right?

Page 178

1  A. That is correct.
2  Q. And that jump from 40 to 70 percent is due
3  exclusively to the more work you have in talc
4  litigation; right?
5  A. That is correct.
6  Q. You've testified as an expert in asbestos
7  litigation since the 1980s; right?
8  A. I think the first case was 1989 or 1990.
9  Q. Since you ran that ad that we still have up,
10  30 years ago you've given about 2500 to 3,000
11  depositions; true?
12  A. Since about 1989, 1990, when it started in
13  about 1991 and '92, that's true.
14  Q. On average, now, you have testified at least
15  once a week, every week for the last five years?
16  A. Yes. That is correct.
17  Q. Even more recently, you're having one to two
18  depositions per week; right?
19  A. Yes, sir.
20  Q. And 95 percent of the time that you're in
21  court, it's for plaintiffs attorneys in asbestos
22  litigation; true?
23  A. That is true.
24  Q. In fact, you've been designated as an expert
25  several thousand times by plaintiffs lawyers suing in

Page 179

1  litigation?
2  A. With 3500 depositions, that math works.
3  Q. You said recently that you think every
4  plaintiff's attorney in the country lists you in any
5  type of asbestos litigation?
6  A. Sadly, that's true. They don't even call me.
7  They just list my name.
8  Q. Okay. I'm going to -- you switched subjects
9  now. You talked a little bit about -- or you talked
10  with Mr. Maimon a little bit about the concentration
11  method and TEM, so we can talk about microscopes. You
12  can put that aside, the ads.
13  Would you agree with me that in the 1970s, TEM
14  analysis was expensive, the TEM microscope itself?
15  A. In 1970 dollars, I would agree.
16  Q. And you've stated there were very few, if any,
17  TEMs in commercial laboratories that had the
18  appropriate technology to perform accurate trace
19  amphibole contaminant analysis; right?
20  A. That's correct.
21  Q. You've actually -- some of the work you've done
22  when you have worked for defendants you did some work
23  for a company called Scotts; right?
24  A. Yes, sir.
25  Q. And Scotts was a company that took vermiculite,

Page 180

1  and they did something called "exfoliation" to it.
2  Can you explain what "exfoliation" is?
3  A. Sure. Vermiculite comes in plates, sort of
4  stacked up, thin mineral plates and has some water in
5  there. And if you take it through a furnace at about
6  1250 degrees Farenheit and rotate it through, it'll
7  expand that water and make it pop like popcorn so it's
8  exfoliated.
9  That gives it its insulation capabilities
10  because it lets air get into the structure between the
11  leaves. So you can go from what looks like a pound of
12  the rock and exfoliate that and it would be this big
13  (indicating).
14  Q. And Scotts, because it had vermiculite in it,
15  their product had some trace asbestos contamination;
16  right?
17  A. That's correct.
18  Q. And they hired you to defend them in court to
19  say that the trace contamination in their product was
20  extremely low and couldn't cause harm to a consumer;
21  right?
22  A. Yes and no. I never say any -- that any of
23  this causes harm to anybody. I'm just a measurement
24  guy.
25  And, yes, based on the application of that

Page 181

1  fertilizer, encapsulated, spread with a spreader in the
2  trace amounts, I don't -- it was my opinion that there
3  was no significant exposure, which is different than
4  taking a powder that's loose and pouring it on your
5  body every day. So there's -- you can't -- it's apples
6  and oranges, those two types of scenarios.
7  Q. So if you -- I gave you some binders there.
8  You took a look at them earlier when you first got in.
9  A. Which one do you want me to get?
10  Q. It's Volume II.
11  MR. ASHBY: Can you see if Mr. Maimon has a
12  copy?
13  THE WITNESS: I don't see volumes.
14  MR. MAIMON: How about the tab number?
15  MR. ASHBY: Why don't I take a look?
16  THE WITNESS: This one's much fatter than
17  yours.
18  MR. ASHBY: We're starting skinny.
19  THE WITNESS: There's more down here. Oh, 202.
20  BY MR. ASHBY:
21  Q. Right. There you go.
22  So if you could turn to just that first tab.
23  It says "April 10, 2015 report"?
24  Is that the report that you prepared for the
25  Scotts Company?

Page 182

1  THE COURT: Are you looking at the exhibit book
2  or the transcript book?
3  MR. ASHBY: It's called -- it says "Longo Cross
4  Outline Exhibits, Volume II."
5  THE COURT: Okay. Which tab again?
6  MR. ASHBY: The first one.
7  THE COURT: All right. That's easy.
8  **THE WITNESS: Yes, sir. This is one of them.**
9  BY MR. ASHBY:
10  Q. Right. This is one of the -- this is a report
11  that you issued to the Court in some case that Scotts
12  was in?
13  **A. I believe so.**
14  Q. If you could turn to the -- page 6. Actually,
15  turn -- it's going to be marked -- it says "005" at the
16  bottom.
17  Do you see that?
18  **A. I have 005.**
19  MR. ASHBY: So it says DX11219.0005 for
20  everybody following along.
21  Your Honor, can I publish his report?
22  THE COURT: Any objection?
23  MR. MAIMON: No objection.
24  THE COURT: All right. You may publish.
25  (Whereupon, Defendant's Exhibit DX11219 was

Page 183

1  marked for identification.)
2  MR. ASHBY: John, can you pull up page -- on my
3  copy, 0005.
4  BY MR. ASHBY:
5  Q. So it says -- you start -- you wrote this;
6  right?
7  **A. Yes, sir.**
8  Q. And what you wrote was, "One of the criticisms
9  leveled at Scotts of this early testing for both bulk
10  and air sample analysis was the use of PLM, XRD, and
11  PCM for the quantification of possible amphibole
12  contamination and exposure in light of these
13  instruments' detection limits and specificity for
14  amphibole asbestos."
15  Do you see that?
16  **A. I do.**
17  Q. And you said, "This would be a valid criticism
18  if these analyses were performed today because of the
19  validation and routine use of analytical transmission
20  electron microscopes for this type of vermiculite
21  amphibole contaminant analysis."
22  Do you see that?
23  **A. Yes, sir.**
24  Q. You still agree with that; right?
25  **A. Yes, I do.**

Page 184

1  Q. However, in the 1970s, there were no ATEM bulk
2  sample vermiculite/amphibole accepted and validated
3  protocols for this type of analysis."
4  Do you see that?
5  **A. I do.**
6  Q. And then -- then you say, "Another problem in
7  the 1970s was that there were very few, if any, ATEMs
8  in commercial laboratories that had the appropriate
9  technology to perform accurate trace amphibole
10  contaminant analysis."
11  That's what you said when you were working on
12  behalf of Scotts; right?
13  **A. Yes, sir. I still stand by that statement.**
14  Q. I'm not suggesting you don't.
15  So you -- you talked a little bit about -- you
16  can take that down now, John.
17  And you're familiar with the J4-1 Method. You
18  talked about that a little bit, too; right?
19  **A. Yes.**
20  Q. And you know that if you reviewed the J4-1
21  Method that the J4-1 Method on its face says one of the
22  reasons that TEM wasn't being used for J4-1 was that
23  there was -- it had to do with the expense of the
24  equipment eliminated -- eliminated it as a routine
25  method; right?

Page 185

1  **A. That's what it states.**
2  Q. It's one of the reasons. There were a couple,
3  but that's one of the reasons.
4  **A. That's what it states.**
5  Q. And you know that J4-1 was the industry
6  standard in the United States in the 1970s, right, for
7  the analysis of cosmetic talc for the presence or
8  absence of asbestos; right?
9  **A. Yes. I think it was a trade organization**
10  **standard.**
11  Q. And you know that the UK Cosmetic Trade
12  Association, so the United Kingdom's Cosmetic Trade
13  Association, in the 1970s was called the British
14  Toiletry Preparation Federation; right?
15  **A. That is correct.**
16  Q. And the British Toiletry Prep -- Toiletry
17  Preparation Federation developed its own industry
18  standard for testing of talc; right?
19  **A. I believe so.**
20  Q. And the British -- and I'm going to call it
21  "TPF." The British TPF method was XRD; right?
22  **A. I think so. I'd have to look at it to verify**
23  **that.**
24  Q. Why don't you look at the binder there that I
25  have. It's Volume I. If you'd go to Tab K.

```
                                            Page 214
 1   STATE OF CALIFORNIA    )
 2                          )   ss.
 3   COUNTY OF ALAMEDA      )
 4
 5       I, EARLY K. LANGLEY, do hereby certify:
 6     That foregoing proceedings were held in the
 7   above-entitled action at the time and place therein
 8   specified;
 9     That said proceedings were taken before me at said
10   time and place, and was taken down in shorthand by me,
11   a Certified Shorthand Reporter of the State of
12   California, and was thereafter transcribed into
13   typewriting, and that the foregoing transcript
14   constitutes a full, true and correct report of said
15   proceedings that took place;
16     IN WITNESS WHEREOF, I have hereunder subscribed my
17   hand on February 7, 2019.
18
19
20
21
22   _____
         EARLY K. LANGLEY, CSR No. 3537
23            State of California
24
25
```