# EXHIBIT E26

```
 1          SUPERIOR COURT OF THE STATE OF CALIFORNIA

 2                       COUNTY OF ALAMEDA

 3             BEFORE THE HONORABLE BRAD SELIGMAN

 4                        DEPARTMENT 23

 5                          ---oOo---

 6   TERESA ELIZABETH LEAVITT
     and DEAN J. MCELROY,
 7
            Plaintiffs,
 8                                      No. RG17882401
     vs.
 9
     JOHNSON & JOHNSON, et
10   al.,

11          Defendants.
     _____/
12

13              REPORTER'S TRANSCRIPT OF TRIAL

14                 (WILLIAM E. LONGO, Ph.D.)

15               Thursday, February 14, 2019

16                       Full Session

17

18

19
                 Taken before EARLY K. LANGLEY
20                       RMR, RSA, B.A.
                         CSR No. 3537
21

22
                   Aiken Welch Court Reporters
23                 One Kaiser Plaza, Suite 250
                   Oakland, California 94612
24                (510) 451-1580/(877) 451-1580
                       Fax:  (510) 451-3797
25                     www.aikenwelch.com
```

Page 6

| | | | |
|---|---|---|---|
| 1 | E 52312 | Exhibit 17, Notebook - The Analysis of Johnson & Johnson's Historical Baby Powder and Shower to Shower Products, 1960s to early 1990s for amphibole asbestos, W. Longo deposition 11/27/18 Leavitt | 163 |
| 6 | E5236 | Ex. 6, November 1, 2018 report entitled "Analysis of Dr. J. Abraham's Lung Tissue Digests from Teresa Leavitt's Lung Tissue Using FE-SEM and EDXA, deposition of W. Longo | 167 |

Page 7

INDEX - (Pages 1-229)

INDEX OF EXHIBITS

| DEFENDANT'S | | | ID | EV | WD |
|---|---|---|---|---|---|
| DX | 9686 | Publication authored by Thomas Kremer of McCrone Associates and James Millette of Vander Wood associates in 1990 | 37 | | |
| DX | 9995 | Air Quality, Bulk Materials, Part 2: Quantitative determination of asbestos by gravimetric and microscopical methods; ISO 22262-22:2014 | 57 | | |
| DX | 9550 | 10/30/87 Interim TEM Analytical Methods to Determine Completion of Response Actions, 40 CFR, Part 763, Appendix A to Subpart E, US EPA AHERA Method 7-1-17 Edition | 61 | | |
| DX | 9064 | "Asbestos Standard" 30 CFR Ch. I (7-1-17 Edition) Section 71.702, Title 30, Vol. 1 | 68 | | |
| DX | 12181 | MSHA statements in Federal Register | 69 | | |
| DX | 9053 | Document entitled "Selected Silicate Minerals and Their Asbestiform Varieties" published by Bureau of Mines 1977 | 78 | | |
| DX | 9634 | Ewing, Hayes, Hatfield, Longo and Millette, "Zonolite Attic Insulation Exposure Studies" Int. J. Occupational Health, 2010 | 108 | | |

Page 8

| | | | |
|---|---|---|---|
| DX | 12136 | Summary report, Exposure to Asbestos-Containing Vermiculite from Libby, Montana, at 28 Processing Sites in the U.S., 10/29/2008. ATSDR | 109 |
| DX | 11227 | MAS Analysis Report Project #14-1683, Johnson's Baby Powder Sample Set 4/28/17 | 150 |
| DX | 12212 | Dr. Longo reports, March, August, November | 153 |
| DX | 12193 | TEM analysis, bulk analysis of Kaiser Gypsum joint compound by MAS | 178 |
| DX | 12151 | Publication, "Asbestos Fibers in Ambient Air of California, Jack C. Murchio, W. Clark Cooper, Arturo DeLeon, 3/1/73 | 212 |

Page 9

APPEARANCES OF COUNSEL ON THE RECORD:

For the Plaintiffs:
    JOSEPH SATTERLEY
    DENYSE CLANCY
    Kazan, McClain, Satterley & Greenwood
    55 Harrison Street, Suite 400
    Oakland, California 94607
    (510) 302-1000
    Jsatterley@kazanlaw.com
    Dclancy@kazanlaw.com

    MOSHE MAIMON
    Levy Konigsberg LLP
    800 Third Avenue, 11th Floor
    New York, NY 10022
    (212) 605-6200
    mmaimon@levylaw.com

For the Defendant Cyprus Mines Corporation:

    BRADFORD DEJARDIN
    Dentons US LLP
    601 South Figueroa Street, Suite 2500
    Los Angeles, California 90017
    (213) 243-6116
    Brad.dejardin@dentons.com

    SAMUEL JUBELIRER
    Dentons US LLP
    1999 Harrison Street, 13th Floor
    Oakland, California 94612
    (415) 882-5000
    Samuel.jubelirer@dentons.com

**10**

For the Defendants Johnson & Johnson; Johnson & Johnson Consumer, Inc.:

    NATHAN DULLUM
    JERMAIN JONES
    Orrick, Herrington & Sutcliffe LLP
    The Orrick Building
    405 Howard Street
    San Francisco, California 94105
    (415) 773-5700
    Ndullum@orrick.com
    Jjones@orrick.com

    SHASHA Y. ZOU
    Orrick, Herrington & Sutcliffe LLP
    51 West 52nd Street
    New York, New York 10019
    (212) 506-3676
    Szou@orrick.com

    MATTHEW ASHBY
    Orrick Herrington & Sutcliffe LLP
    777 South Figueroa Street, Suite 3200
    Los Angeles, California 90071
    (213) 612-2257
    Mashby@orrick.com
    Gmoss@orrick.com

    MICHAEL BROWN
    SCOTT RICHMAN
    Nelson Mullins Riley & Scarborough LLP
    100 South Charles Street, Suite 1200
    Baltimore, Maryland 21201
    (443) 392-9401
    Mike.brown@nelsonmullins.com

**11**

--oOo--

P R O C E E D I N G S

--oOo--

Thursday, February 14, 2019 - 8:47 a.m.

(**Morning Session**)

(Whereupon, the following proceedings were held outside the presence of the jury:)

THE COURT: Folks. Folks.

And, Dr. Longo, can I ask you to step outside, please.

THE WITNESS: Yes, sir.

THE COURT: All right. Let me first start with --

Is the door shut?

There was the Longo issue dealing with the chrysotile. And I need a little help here. I have just reviewed deposition testimony. To back up, the issue at trial is whether we can talk about any particular documents dealing with chrysotile; right?

MR. ASHBY: Right.

THE COURT: That's as to Johnson & Johnson. And I do see the deposition. There was his statement that he would go back and see if he could find any documents and if he was wrong about J&J internal documents, he'd withdraw it. And the agreement on

**12**

page 481 he was going to look for those documents. And I see that the deposition was reconvened later. It doesn't appear to me, unless I'm misreading it, that the documents produced at the reconvened deposition had to do with chrysotile.

MR. MAIMON: They did not. And the agreement at the end of the deposition of November 27th, Your Honor, did not deal with those documents. What happened is --

THE COURT: Let me make sure I know which -- November 27th. That's the -- that's the agreement.

MR. MAIMON: What happened is on page 370 and onward, which counsel for J&J according to the Court to --

THE COURT: Yes.

MR. MAIMON: There was discussion about chrysotile documents. At the conclusion or at the end of the deposition, an agreement was reached between counsel with regard to two specific documents, none having anything to do with chrysotile. They had to do with the -- as indicated on pages 480 and then 481, Mr. Ashby at the bottom: "Okay. All right then. Mr. Maimon and I talked about off the record the fact that will be produced in the coming days" -- "that what will be produced in the coming days is the Lee Poye

**13**

report related to the 75 samples that were analyzed under XRD and PLM." That's one document. As well as Dr. Longo was going to endeavor to find documents that were supporting his opinions about exposure data that we had discussed at the previous deposition. That was on the first day of the deposition. I indicated that we'll produce those, and to the extent there was a need felt by counsel for the defendants we would schedule a follow-up deposition.

That follow-up deposition was scheduled and did take place on December 5, 2018, and, as indicated on page 490, the indication was made that we had produced the documents that were agreed to.

And so, while we had a disagreement earlier in the deposition about the chrysotile documents and whether or not Johnson & Johnson had many opportunities to cross-examine Dr. Longo about them and we resolved -- I mean, we agreed to disagree at that point in the deposition.

At the end of the deposition on November 27th, Your Honor, there was an explicit agreement between counsel about -- about specific documents that would be produced and a follow-up deposition that would be held on it. And no time subsequent to that did Johnson & Johnson follow up and say, oh, what about the

Case 3:16-md-02738-MAS-RLS   Document 9742-32   Filed 05/07/19   Page 5 of 8 PageID: 47837
Page 146 to 149 of 229
38 of 58 sheets

**146**

```
 1  look at this, in only one of these grid openings, did
 2  all of the analysts agree on what they saw as being a
 3  fiber; true?
 4       A.  That's what it states, yes.
 5       MR. ASHBY:  Okay.  You don't have to do that,
 6  John.
 7  BY MR. ASHBY:
 8       Q.  So -- so out of these -- and there's one, two,
 9  three, four, five, six, seven, eight -- out of these
10  nine, where all of the analysts saw a structure, just
11  one out of nine times did they all say that that
12  structure was a fiber; right?  That's what the report
13  states?
14       A.  That's what the -- that's what your chart
15  states, yes.
16       MR. ASHBY:  All right.  You can take that down
17  now.
18  BY MR. ASHBY:
19       Q.  So Dr. Longo, you would agree with me that in
20  science, you often have to pay attention to details to
21  know what's true and what's not true; correct?
22       A.  It's always good to pay attention to details,
23  yes.
24       Q.  And you would agree with me that it's very
25  important to be accurate when you're accusing somebody
```

**147**

```
 1  of selling baby powder with asbestos in it?
 2       MR. MAIMON:  Objection, Your Honor.
 3       THE COURT:  Sustained.
 4  BY MR. ASHBY:
 5       Q.  All right.  Well, let's talk about your
 6  April 2017 preliminary report you gave to that lawyer.
 7  That's Tab B1.  And if we turn to page 29 --
 8       MR. ASHBY:  John, can you put up --
 9       We are going to put up the photo on page 29.
10  No objection?
11       MR. MAIMON:  No.
12  BY MR. ASHBY:
13       Q.  -- this -- this is your April 2017 preliminary
14  analysis; true?
15       A.  True.
16       Q.  And the caption down here has labeled this,
17  "TEM Image of a Tremolite Fiber in Sample M66352-002."
18  Right?
19       A.  That's the title on that header, yes.
20       Q.  Okay.  Well, it says "tremolite fiber"; does it
21  not?  Yes or no?
22       A.  It does say "tremolite fiber."  It's a bundle,
23  but it says "fiber."
24       MR. ASHBY:  Okay.  Move to strike, Your Honor.
25       THE COURT:  Strike the bundle.
```

**148**

```
 1       Just answer the question, please.
 2       THE WITNESS:  Yes, sir.
 3       THE COURT:  No volunteering additional.
 4  BY MR. ASHBY:
 5       Q.  All right.  And let's move to Tab B2,
 6  Plaintiffs' Exhibit E514 at page 492.
 7       MR. MAIMON:  492?
 8       MR. ASHBY:  Yeah.
 9       MR. MAIMON:  What tab?
10       MR. ASHBY:  Tab B2.  Do you have it?  I have it
11  in mine.
12  BY MR. ASHBY:
13       Q.  Do you have it in yours, Dr. Longo, page 492?
14       A.  No.
15       Q.  -- B2?
16       MR. MAIMON:  I don't feel short-changed.
17       MR. ASHBY:  There you go (handing).
18       THE WITNESS:  I don't know if I am looking at
19  the right thing.  I've got pages going up to
20  30-something.
21  BY MR. ASHBY:
22       Q.  So this is Tab B2, which is your August -- now
23  we're at the -- we are not looking at the April 2017
24  anymore.  We are looking at the August 2017.  And this
25  is B2.  I can give you my copy.
```

**149**

```
 1       A.  Oh, 492?
 2       Q.  Page 492.
 3       A.  Yeah, I've got it.
 4       Q.  All right.
 5       MR. ASHBY:  John, could you put that up.
 6  BY MR. ASHBY:
 7       Q.  So now we are looking at that same sample,
 8  M66352-002; right?
 9       A.  Yes.
10       Q.  And we're looking at Structure Number 1; right?
11       A.  That's correct.
12       Q.  I've highlighted Structure Number 1.  Structure
13  Number 1 is the same one that we saw in April of 2017
14  that was written down as a tremolite fiber; right?
15       A.  Yes, on -- but not on the count sheet from that
16  time frame.
17       Q.  Well, we -- you remember, in April 2017, there
18  was no -- there were no backup data that was provided
19  with that report; right?
20       A.  That's right.  It was a preliminary report.
21  But the backup data, what the analyst called that
22  originally never changed.
23       Q.  Well, I -- okay.  So you say.
24       But what we looked at here is, by April -- by
25  August of 2017, we see that, in fact, that structure
```

**150**

1  that was in the April 2017 report as a fiber is now a
2  bundle; right?
3      A. No.
4      MR. MAIMON: Objection.
5      THE WITNESS: Look at the top there on the
6  right. See the "Date of analysis, 4/25/2017"? The
7  original data on the count sheet that the analyst saw
8  has never changed. Was there a typo on the preliminary
9  draft report? Absolutely.
10     (Whereupon, Defendant's Exhibit DX11227 was
11     marked for identification.)
12 BY MR. ASHBY:
13     Q. Okay. Let's look at another one. Let's go
14 back to Tab B1, DX11227. This is page 28.
15     A. Hold on. Let me get there.
16     Q. So this is going to be another one of those
17 mistakes; right?
18     MR. MAIMON: Objection, Your Honor.
19     THE COURT: Overruled -- sustained.
20 BY MR. ASHBY:
21     Q. We see that TEM image of a tremolite fiber. It
22 states "fiber"; right?
23     A. It does state "fiber" on the typed-in stuff on
24 the report, that's correct.
25     Q. And this is the April 2017 report; right?

**151**

1      A. Correct.
2      Q. And you know if we go and look at the
3  August 2017 report, that that same fiber will be called
4  a bundle; right?
5      A. Correct. But if you, again, look at the count
6  sheet, top left-hand corner, 4/3/2017 to 4/6/2017 --
7  the microscopist who was analyzing this put down what
8  that structure is, a bundle. That has never changed.
9         And, again, the preliminary report was a draft,
10 and that's why it was fixed when we got done with the
11 draft report.
12     Q. All right. Now let's look at Tab B8. And this
13 is Plaintiffs' Exhibit E521. And if we turn to
14 page 182 --
15     MR. ASHBY: Actually, John, why don't you start
16 with page 219.
17     THE COURT: What page did you say?
18     MR. ASHBY: 219.
19     THE WITNESS: Oh, 219.
20     (Whereupon, Plaintiff's Exhibit E521 was marked
21     for identification.)
22 BY MR. ASHBY:
23     Q. All right. So what we are looking at here is
24 Structure 12 from Sample 65D; correct?
25     A. Correct.

**152**

1      Q. Is that a bundle or a fiber?
2      A. For me sitting here and looking at the
3  two-dimensional photograph, it would be hard for me to
4  say. But I wouldn't call one like this a fiber or a
5  bundle unless I were sitting at the microscope.
6      Q. Well, let's see what the analyst called it. If
7  we go to page 182, if we look at Structure 12, it
8  started as a fiber but was changed to a bundle; true?
9      A. That's true.
10     Q. All right. But we can do a comparison between
11 what was called bundles from these reports and what
12 were called bundles for these reports by comparing
13 pictures; can we not?
14     A. Comparing pictures?
15     Q. Yeah.
16     A. A lot of these -- yes. A lot of these bundles
17 are very obvious. It's -- the ones that are -- you
18 have to have and look at it at a higher magnification
19 and go through, you really need to be sitting at the
20 microscope. And we accept the -- the analyst who was
21 doing that at that particular time.
22     Q. All right. And -- now back in March and August
23 of 2017 and April of 2017 -- or March 2018 and these
24 2017 reports, you called 53 percent of the structures
25 that you saw bundles in the eBay and collector bottles;

**153**

1  is that true?
2      A. That I don't know.
3      Q. Maybe I can quickly refresh your recollection
4  with your own testimony. If you turn to Tab 25?
5      A. I'm at Tab 25.
6      Q. So page 3,673?
7      A. 3,673. Line 4 to line 10.
8      Q. Tab 25; right?
9      A. You're right. I'm sorry. I thought it was a
10 little lower.
11     ==Q. Okay. All right. So we can agree now that==
12 ==53 percent of what you saw back here for the March 2018==
13 ==and before data it was 53 percent bundles; right?==
14     ==A. Yes, sir.==
15     Q. By November 2018, this data, you had 93 percent
16 bundles?
17     A. That's correct.
18     Q. So it's an increase of 40 percent; true?
19     A. That's true.
20     Q. All right. I'm going to hand you --
21     MR. ASHBY: Do we have an exhibit number? I'll
22 mark these as Exhibit DX12212.
23     (Whereupon, Defendant's Exhibit DX12212 was
24     marked for identification.)
25 BY MR. ASHBY:

Case 3:16-md-02738-MAS-RLS   Document 9742-32   Filed 05/07/19   Page 7 of 8 PageID: 47839
Page 154 to 157 of 229
40 of 58 sheets

**154**

1  Q. Can you take a look at those and tell me if
2  that looks like data from your August reports and your
3  November reports?
4  A. I'm sorry, for what reports?
12:37:07 5  Q. The one on the left would be the March report.
6  You can tell by the date of the picture. And the one
7  on the right would be the November report, because you
8  can tell by the date of the picture.
9  A. That's correct.
12:37:24 10  Q. Okay.
11  MR. ASHBY: Permission to publish?
12  MR. MAIMON: No objection.
13  THE COURT: You may.
14  BY MR. ASHBY:
12:37:35 15  Q. So here on the left we see a structure that was
16  called a fiber; right? We're looking at Structure 4
17  from this sample. M65205-001 is the sample.
18  Structure 4, which is this one down here; right?
19  A. That's correct.
12:37:55 20  Q. So that was a fiber. This structure here is
21  from November 2018. It's Structure 52D, Structure 4.
22  And that one was called a bundle; right?
23  A. Yes, sir.
24  Q. Here again -- this is in 2017. This structure
12:38:26 25  here is M65205-001, Structure 7.

**155**

1  That was labeled a fiber in 2017; right?
2  A. Yes, sir, it is.
3  Q. And then this structure here in 2018 is
4  M69248-003-004.
12:38:53 5  And that's a bundle; right?
6  A. Yes, sir, it is. At two completely different
7  magnifications.
8  Q. Okay. That's a fiber, that's a bundle; right?
9  A. Yes, sir. I agree with that.
12:39:07 10  Q. All right.
11  MR. ASHBY: The next one, John.
12  BY MR. ASHBY:
13  Q. Again, you'll agree with me that this is a
14  photo from 2017 taken at the MAS Lab, on the left?
12:39:22 15  A. Correct.
16  Q. That's labeled a fiber in 2017; right?
17  A. That's what it is.
18  Q. 2018, you would agree with me the one on the
19  right is a 2018 photo taken at the MAS Lab?
12:39:35 20  A. It is.
21  Q. And that was labeled a bundle; correct?
22  A. Yes, sir.
23  Q. You had shown some pictures, PLM pictures.
24  Those are the colored ones with the pink on them and it
12:39:54 25  had the -- what you called the bundles in them.

**156**

1  Do you remember that?
2  A. There's the pink, there's the dark field,
3  there's regular cross polar, so there's a number of
4  them there.
12:40:06 5  Q. It's just -- I think it's easier for everybody
6  to remember seeing the pink ones. That's why I said
7  that those were the PLM.
8  But, in any event, the PLM ones are the pink
9  ones; right?
12:40:17 10  A. Yes, sir. That's correct.
11  Q. You talked about seeing some pretty large
12  bundles by PLM, did you not?
13  A. I did.
14  Q. What you didn't tell us was that Lee Poye
12:40:28 15  looked at some of those same samples by PLM and didn't
16  find any asbestos in them; right?
17  A. That's correct. But you can't compare the two.
18  MR. ASHBY: Your Honor, I'll move to strike the
19  last part.
12:40:47 20  MR. MAIMON: I object, Your Honor.
21  THE COURT: Overruled.
22  BY MR. ASHBY:
23  Q. So what you told us was those were some big,
24  obvious-looking bundles that you saw by PLM; right?
12:41:08 25  So you said -- I can't remember. You said they

**157**

1  were like 300 to 1 aspect ratio, something like that;
2  right?
3  A. Not the bundles themselves. The individual
4  fibers in the bundles following the counting rules all
12:41:24 5  averaged 20 or 1 greater and some of them -- there were
6  so many individual fibers, we had one that got as high
7  as 300 to 1.
8  Q. Right. Okay. In any event, they were big,
9  though? There were some big microns like a hundred --
12:41:31 10  some of them are like a hundred microns or something;
11  right?
12  A. Hundred microns long. We had 70. Had some
13  higher than that, about 5 to 10 microns wide. But they
14  all were fibers.
12:41:44 15  Q. In any event, Lee Poye looked at some of the
16  same exact samples you did and didn't see any of those
17  big, obvious bundles, did he? He didn't report any
18  asbestos in the stuff he looked at; right?
19  A. No, he wouldn't because of the method he was
12:41:57 20  using compared to what we used.
21  Q. Well, he -- you used the ISO PLM method; right?
22  A. That's correct.
23  Q. Lee Poye also used the ISO PLM method; correct?
24  A. Correct. But it's still different on the
12:42:11 25  analysis we do. It has no resemblance to the average

## 226

14:07:46

And then even further, Your Honor, the undisputed testimony, even putting that aside, was that by the time Terry Leavitt came to the United States at 20 months old, she was no longer in diapers.

So there is no testimony to support the basis of Dr. Longo's opinions with respect to the number of times that the diapering occurred. So, given that, I'm renewing my original objection and moving to strike his opinions regarding the number of diaperings.

14:08:05

MS. CLANCY: She did say that she diapered her seven or more times per day. She did say that it was standard operating procedure. She said that it was a procedure her mother had taught her how to do, that she expected that her mother did it while she was gone, while she wasn't there in the Philippines with her.

14:08:22

And so circumstantial evidence would be that this is a procedure her mom taught her how to do. It was standard operating procedure. She had every expectation that her mother continued to do it. There was no contrary evidence that her mother did not do it while she was in the Philippines.

14:08:37

So we have both actual eyewitness evidence that she diapered her seven or more times a day prior to her leaving in September of 1967 and we have circumstantial evidence that this occurred through, I think, I want to

14:08:49

## 227

say April or May of '68. And then she said she was just getting out of diapers in May of '68.

So, if anything -- and Dr. Longo explained his math and said, what I was doing exactly was I was taking the number of times per day, multiplying it by the number of times in a year. So if it means, therefore, then, that you take two months out of it, that doesn't mean that you strike the whole testimony. That would just mean that the jury is entitled to do its own math and to say -- and they are entitled to argue you got the math wrong because it was only 22 months that she was in diapers, and, therefore, he said she should have said 24 months. But he explained his whole math. He explained exactly what he was doing. That doesn't warrant striking testimony over that.

14:09:06

14:09:23

14:09:40

MR. SATTERLEY: Your Honor, there's a CACI instruction that Your Honor gives on expert testimony that directly would apply to this.

14:09:50

THE COURT: I think this goes to argument. He laid out his basis for doing it. I don't think that the -- I don't think his basis calls for a striking of his testimony. It all goes to the weight and the argument on it. I think he laid out what he did. I think there is -- arguably, the jury could find from a

14:10:07

## 228

factual basis provided by Ms. Leavitt that the numbers are consistent with the kind of analysis that Dr. Longo did and the jury is perfectly capable of modifying.

So the motion to strike is denied.

14:10:22

MR. RICHMAN: Thank you, Your Honor.

MS. CLANCY: They're probably more capable than any of us. The jury is so smart.

THE COURT: We are taking a break here. So we're done. Have a good time, everybody.

(Whereupon, the proceedings were concluded at 2:10 p.m.)

## 229

1  STATE OF CALIFORNIA    )
2                        ) ss.
3  COUNTY OF ALAMEDA      )

I, EARLY K. LANGLEY, do hereby certify:

That foregoing proceedings were held in the above-entitled action at the time and place therein specified;

That said proceedings were taken before me at said time and place, and was taken down in shorthand by me, a Certified Shorthand Reporter of the State of California, and was thereafter transcribed into typewriting, and that the foregoing transcript constitutes a full, true and correct report of said proceedings that took place;

IN WITNESS WHEREOF, I have hereunder subscribed my hand on February 14, 2019.

EARLY K. LANGLEY, CSR No. 3537
State of California