# EXHIBIT E27

```
                    IN THE CIRCUIT COURT OF THE CITY OF ST. LOUIS
                                   STATE OF MISSOURI
                          The Honorable Rex M. Burlison, Judge



          GAIL LUCILLE INGHAM, ET AL.,  )
                                        )
                  Plaintiffs,           )
                                        )
                  vs.                   ) Cause No. 1522-CC10417-01
                                        )
          JOHNSON & JOHNSON, ET AL.,    )
                                        )
                  Defendants.           )




                                    TRIAL TRANSCRIPT
                                       Volume 7

                                     June 8, 2018




                              JENNIFER A. DUNN, RPR, CCR #485
                                  OFFICIAL COURT REPORTER
                                CITY OF ST. LOUIS CIRCUIT COURT
                               TWENTY-SECOND JUDICIAL CIRCUIT
                                   jdunncourts@yahoo.com
```

(Timestamp column on left: 00:00:59 repeated on each line)

```
00:00:59                    A P P E A R A N C E S
00:00:59
00:00:59        FOR THE PLAINTIFF GAIL INGHAM, et al.:
00:00:00
00:00:00        THE HOLLAND LAW FIRM
00:00:00        Mr. Eric Holland
00:00:00        Mr. Patrick Dowd
00:00:00        Mr. R. Seth Crompton
                300 N. Tucker Blvd.  #801
00:00:00        St. Louis, MO  63101
00:00:00
00:00:00        THE LANIER LAW FIRM, P.C.
00:00:00        Mr. W. Mark Lanier
00:00:00        Mr. Lee Cirsch
00:00:00        Ms. Rachel Lanier
00:00:00        Ms. Monica Cooper
00:00:00        THE LANIER LAW FIRM, P.C.
                6810 FM 1960 West
00:00:00        Houston, TX  77069
00:00:00
00:00:00        FOR THE DEFENDANT JOHNSON & JOHNSON and JOHNSON &
00:00:00        JOHNSON CONSUMER COMPANIES, INC.:

00:00:00        ORRICK, HERRINGTON & SUTCLIFFE LLP
00:00:00        Mr. Peter A. Bicks
00:00:00        Ms. Lisa T. Simpson
00:00:00        Mr. Morton Donald Dubin II
00:00:00        Ms. Nina Trovato
00:00:00        Ms. Alyssa Barnard
00:00:00        Ms. Anne Malik
00:00:00        Ms. Shasha Zou
00:00:00        Ms. Shaila Diwan
00:00:00        Mr. Matt Bush
                51 West 52nd Street
00:00:00        New York, NY  10019-6142
00:00:00
00:00:00        HEPLER BROOM LLC
00:00:00        Mr. Thomas J. Magee
00:00:00        Ms. Beth A. Bauer
                211 N. Broadway, Suite 2700
00:00:00        St. Louis, MO 63102
00:00:00
00:00:01        SHOOK HARDY & BACON
00:00:01        Mr. Mark Hegarty
                2555 Grand Boulevard
00:00:01        Kansas City, MO  64108
00:00:01
00:00:01
```

(Left margin timestamps: 00:00:00, 00:00:00, 00:00:00, 00:00:00, 00:00:01)

Page 1289

```
12:16:24   1    standard at some point in its process, you see where it's
12:16:28   2    talking about CTFA J4-1, TM7019, also separately had a
12:16:37   3    protocol to do TEM analysis on biweekly composites, right?
12:16:42   4        A    Yes, sir.
12:16:43   5        Q    So it would be completely unfair of Mr. Lanier to
12:16:47   6    suggest that somehow that Johnson & Johnson method for
12:16:51   7    testing its talc was to say yes -- I don't even know how to
12:16:58   8    write yes or no these days -- yes, no, XRD, and then decide,
12:17:02   9    well, let's stop there, because that wasn't the Johnson &
12:17:04  10    Johnson testing method?
12:17:06  11        A    Well, it's a little bit more complicated than
12:17:09  12    that.  There's a lot of XRD's stopped, didn't go on to PLM
12:17:14  13    or TEM.  Yes, you did TEM at some point, but a lot of the
12:17:18  14    industries were just using XRD and stopping at that.
12:17:22  15        Q    Right.  A lot of others in the industry, including
12:17:25  16    companies like Scotts that you were defending for.  They had
12:17:29  17    a protocol where you would stop at XRD, but Johnson &
12:17:32  18    Johnson did not?
12:17:34  19        A    That's not quite right.
12:17:36  20        Q    Okay.  We'll hear from somebody from the company
12:17:39  21    and we can talk about it then.
12:17:41  22        A    Okay.
12:17:41  23        Q    All right.  Next stop.  You were shown this
12:17:54  24    document.  It was a Johnson & Johnson memo, it's marked as
12:18:00  25    Plaintiffs' 08382.  And, in particular, you were -- your
```

Page 1290

```
12:18:08   1    attention was drawn to this statement.  Blow that up.
12:18:16   2             Note that talc or talc fragments cannot be part of
12:18:20   3    the above definitions and that massive forms of tremolite
12:18:23   4    and actinolite, which are in trace amounts in some
12:18:29   5    high-grade talcs, will also be out of the document.  And I
12:18:33   6    think Mr. Lanier's point was, isn't this exactly what you're
12:18:38   7    finding.  Is it what you're finding or not?
12:18:41   8        A    Exactly finding.
12:18:42   9        Q    Is that what you're finding?
12:18:44  10        A    We're finding actinolite and tremolite asbestos in
12:18:47  11    trace amount, yes.
12:18:48  12        Q    I'm sorry, you changed the words.  I asked are you
12:18:51  13    finding massive forms of tremolite and actinolite in trace
12:18:56  14    amounts, is that what you're finding?
12:18:59  15        A    We're finding asbestos fibers in bundles of
12:19:03  16    tremolite and actinolite in trace amounts.
12:19:05  17        Q    You mentioned nerd terms, so let me talk about
12:19:08  18    another nerd term, and you know that's why you're not
12:19:11  19    answering my question directly, right, sir?
12:19:14  20        A    No, that's not fair.  Massive forms mean -- can be
12:19:18  21    large bundles.  That's not fair.
12:19:20  22        Q    Yeah.  So the fact is this term "massive forms" is
12:19:27  23    a nerd term for the non-asbestos types of tremolite and
12:19:32  24    actinolite, right?
12:19:33  25        A    I don't agree, no.
```

Page 1291

```
12:19:34   1        Q    We'll talk to a geologist about what massive forms
12:19:38   2    of those amphiboles means.  Thank you.  You talked a little
12:19:46   3    bit about how in your view the document that somehow you
12:19:50   4    were proud of writing a bit ago now was a political
12:19:54   5    compromise document, this ASTM standard, but the same thing,
12:20:02   6    this same concept about what asbestos is, the difference
12:20:06   7    between mineral fragments and cleavage fragments and all of
12:20:10   8    that, that's also in IARC, right?
12:20:16   9        A    In one of the parts of that, yes.  And let's be
12:20:19  10    clear.  I'm very proud of that document.  It's just
12:20:22  11    political reality.  I worked hundreds of hours in getting
12:20:28  12    that through.  I'm still very proud of that.
12:20:31  13        Q    And we also looked -- we also looked at a bunch of
12:20:47  14    definitions, I'm not going to go back over them with you,
12:20:50  15    but you remember MSHA, OSHA, EPA, AHERA, and a number of
12:20:55  16    others that include this idea of asbestos being asbestiform,
12:20:58  17    correct?
12:20:58  18        A    It includes, yes, kind of.  Again, we can debate
12:21:02  19    it some more, but it's apples and oranges with what you're
12:21:06  20    suggesting.
12:21:07  21        Q    And we're going to talk about later what you found
12:21:10  22    fits these definitions or not.  But let me ask you about
12:21:12  23    this challenge that I made for you that Mr. Lanier said you
12:21:16  24    answered.  So let's look at what the actual thing I asked
12:21:22  25    you was.  I said, let's look ahead.  Can you point me to
```

Page 1292

```
12:21:36   1    anything, because I'll look it up overnight, in the
12:21:39   2    scientific and medical literature says that whenever you're
12:21:43   3    going to find non-asbestiform tremolite, you're also going
12:21:46   4    to find asbestos in that rock.  And you said I didn't know,
12:21:50   5    I'll look at it overnight with you, right?
12:21:52   6        A    Yes, sir.
12:21:53   7        Q    And you not only had your resources, but also the
12:21:56   8    Lanier Law Firm resources overnight, correct?
12:21:59   9        A    Correct.
12:22:00  10        Q    And your response today was to talk about some
12:22:09  11    e-mail from 2008, from a company, Imerys, between somebody
12:22:20  12    who's titled a regulatory affairs manager and a guy who says
12:22:28  13    I am not a mineralogist.  And that's what you brought today
12:22:33  14    in response to my request.  Correct?
12:22:36  15        A    That is correct.
12:22:37  16        Q    So when I asked you if there's anything in the
12:22:43  17    scientific and medical literature, now, I assume that you're
12:22:47  18    not telling me that this e-mail is published in the
12:22:50  19    scientific and medical literature, correct?
12:22:53  20        A    No, I actually think it's better.  Here's the
12:22:57  21    person that works at this mine.  He's the one saying it is
12:23:02  22    what it is.  To me it's like sandlot baseball when your own
12:23:06  23    side says you're out nobody argues.  This is somebody in the
12:23:09  24    mine, so I think it's very important.
12:23:12  25        Q    In the mine?
```

### Page 1293

```
12:23:14   1       A    Well --
12:23:15   2       Q    This mine talks about Death Valley, California.
12:23:20   3   Was Johnson & Johnson buying talc from Death Valley
12:23:22   4   California in 2008?
12:23:24   5       A    Not 2008.
12:23:28   6       Q    But the answer is overnight, no, you did not find
12:23:34   7   anything in the scientific and medical literature about this
12:23:36   8   point, correct?
12:23:39   9       A    For the reasons I stated, you're correct.
12:23:42  10       Q    All right.  Dr. Pooley, now, first of all,
12:23:57  11   historically when we're talking about concentration methods,
12:24:03  12   I want to put this in context because a lot of the
12:24:06  13   discussion historically about concentration methods was ways
12:24:10  14   to try to make these two methods work better, right, XRD and
12:24:17  15   PLM?
12:24:18  16       A    Yes.
12:24:19  17       Q    So, for example, Pooley is talking about a way to
12:24:22  18   try to make XRD better.  And Blount, and I think also
12:24:27  19   Colorado School of Mines, is talking about a way to make --
12:24:30  20   also talking about ways to make PLM better?
12:24:36  21       A    I believe so, yes.
12:24:37  22       Q    And part of the reason is that TEM is slower, more
12:24:41  23   expensive, harder to find people to do it, right, at the
12:24:44  24   time certainly?
12:24:46  25       A    Well, at certain times, yes, unless you have a lab
```

### Page 1294

```
12:24:49   1   that does it or you have your own.  But I think the
12:24:52   2   concentration method goes to more than that.  It makes it
12:24:56   3   more sensitive.  It's making it more sensitive for XRD,
12:25:00   4   making it for sensitive for PLM, and it makes it more
12:25:03   5   sensitive for TEM.  There's no reason you can use it for one
12:25:07   6   and not the other, in my opinion.
12:25:08   7       Q    I want to talk about the proposed specs for
12:25:11   8   analyzing talc for asbestos.  I really didn't think we had
12:25:15   9   much of a disagreement about this, that this is talking
12:25:21  10   about the results and use of XRD, x-ray diffraction, right,
12:25:28  11   XRD, XRD method, XRD method?
12:25:33  12       A    Yes.
12:25:33  13       Q    Okay.
12:25:35  14       A    For right there.
12:25:36  15       Q    And I didn't say that the word "asbestos" isn't in
12:25:40  16   the document.  Because XRD does have a role and has
12:25:45  17   historically had a role as a method for analyzing talc for
12:25:49  18   asbestos, right?
12:25:50  19       A    Correct.
12:25:50  20       Q    But that doesn't change the fact that XRD analysis
12:25:54  21   doesn't distinguish asbestiforms of tremolite from
12:25:58  22   non-asbestiforms, right?
12:26:00  23       A    I agree.
12:26:06  24       Q    Getting close.  You talked about Scotts.  The fact
12:26:18  25   that Scotts was vermiculite in a turf, doesn't change the
```

### Page 1295

```
12:26:25   1   fact that when you were working on this client engagement,
12:26:30   2   you said that the lab Johnson & Johnson used was literally
12:26:33   3   the best lab in the country, and you relied on both RJ Lee
12:26:36   4   and McCrone data as independent labs to support your
12:26:41   5   opinions, correct?
12:26:43   6       A    That is correct.  As I stated yesterday, and I
12:26:45   7   think -- have I been here three days, the day before?
12:26:48   8       Q    Okay.  And then I want to look back one more time
12:26:57   9   at this issue of your data.  And what data you had there and
12:27:04  10   what data was hidden.  And you're not going to disagree with
12:27:22  11   me that, first of all, in your Scotts Report, you're not
12:27:38  12   going to disagree with me in your Scotts Report you did
12:27:41  13   report your detection limit, it was important enough for you
12:27:44  14   to put your detection limit in your Scotts Report?
12:27:46  15       A    Based on one fiber, that's correct.
12:27:52  16       Q    Based on one fiber?
12:27:56  17       A    I believe.
12:27:56  18       Q    And it's very easy after somebody shows you
12:28:00  19   something like that to show this kind of data is not
12:28:02  20   important, it doesn't matter who cares that I didn't put it
12:28:08  21   in there.
12:28:09  22            But when I asked you about it before you knew that
12:28:14  23   was coming yesterday, I asked you when evaluating any
12:28:23  24   analytical method like this, it's important to know what
12:28:26  25   your analytical sensitivity is and you told me yes, sir.
```

### Page 1296

```
12:28:31   1   And I asked you, it's important to know what your detection
12:28:34   2   limit is, and you told me that's correct, right?
12:28:39   3       A    That's what I stated, I still stick by that.
12:28:42   4       Q    Okay.  If we look back at C2019, page 193.  And we
12:28:57   5   can click the box again.  Those two things I just -- you
12:29:03   6   just agreed with me were important, analytical sensitivity,
12:29:09   7   detection limit, those are the things that were whited out
12:29:14   8   routinely in your report with a white box over them before
12:29:18   9   they were sent to us?
12:29:20  10       A    Well --
12:29:21  11       Q    Correct?
12:29:21  12       A    Before they were sent to everybody, yes, it was --
12:29:24  13   there was an edit on it and the analytical sensitivity is
12:29:27  14   one fiber because of the spreadsheet, yes, that happened.
12:29:33  15       Q    And I believe Mr. Lanier suggested, well, you
12:29:37  16   could have asked him at his deposition.  Should my first
12:29:40  17   question to you in future depositions be are you hiding
12:29:43  18   anything that you haven't shown me yet?
12:29:46  19       A    Sure, if you want.
12:29:47  20       Q    Okay.  I'll remember that.  Finally, let's go back
12:29:52  21   to L39.  This ad.  Because I think you also made the
12:30:06  22   implication that unlike RJ Lee, you weren't tied to
12:30:11  23   industry, right, you said that?
12:30:12  24       A    Yes, sir.
12:30:13  25       Q    But you are tied to an industry, you're tied to
```

Page 1297

```
12:30:16   1   the litigation industry, that's why you've testified
12:30:20   2   thousands of times, that's why your company has billed over
12:30:24   3   $30 million to Plaintiffs' Counsel For testifying in cases.
12:30:29   4   You are a trial expert, correct?
12:30:37   5       A   No, no, no, I guess since I'm here, no. Tied to
12:30:43   6   industry is when you go and lobby for them. I'm not going
12:30:46   7   to Congress and lobbying for Plaintiffs' attorneys or
12:30:50   8   defense attorneys or firms. This is part of what we do. We
12:30:56   9   fund analyses, but we're willing, if we do these analyses,
12:31:02  10   to come and defend them, that's what we do and others in my
12:31:06  11   lab.
12:31:08  12           MR. DUBIN: All right. Thanks a lot.
12:31:09  13           THE COURT: Anything further?
12:31:11  14           MR. LANIER: Please, your Honor.
12:31:11  15              FURTHER REDIRECT EXAMINATION
12:31:11  16   BY MR. LANIER:
12:31:12  17       Q   You understand under the law that if I'm going to
12:31:14  18   represent somebody that's been hurt by asbestos, I have to
12:31:18  19   hire you or someone else who can testify in a courtroom?
12:31:20  20       A   I would recommend it. I don't know if you have
12:31:23  21   to.
12:31:24  22       Q   I can't win a case without putting it on the
12:31:26  23   record that there's asbestos in there, do you understand?
12:31:30  24       A   That I understand.
12:31:30  25       Q   So you fill a very important role. Are you
```

Page 1298

```
12:31:33   1   apologetic about that?
12:31:35   2       A   No, but a lit overwhelmed when I think about it.
12:31:38   3       Q   Do you change the science because of who hired
12:31:41   4   you?
12:31:42   5       A   No.
12:31:43   6       Q   Does the fact that I've hired you here, I've been
12:31:46   7   against you in other cases, does that change what is in a
12:31:53   8   bottle of Johnson & Johnson Baby Powder?
12:31:56   9       A   Not at all.
12:31:57  10       Q   Do all of a sudden asbestos fibers start finding
12:32:02  11   their way in this bottle because you've testified before?
12:32:06  12       A   That would be impossible, no.
12:32:10  13       Q   Does the things that are hidden on your report,
12:32:15  14   this is -- this is, let's make, because this gets typed up
12:32:20  15   and he's going to use this again. Let's make sure it's real
12:32:23  16   clear on the record.
12:32:24  17           Tell this jury what happened. Tell them how it
12:32:27  18   happened, and then I'm going to ask what difference does
12:32:30  19   it -- he finished right as I was writing this -- make.
12:32:39  20           What happened. How did it happen. Tell the
12:32:41  21   jury -- I don't even understand why we're fussing over this,
12:32:47  22   but tell the jury, please.
12:32:49  23       A   It's just an Excel spreadsheet for the analysis,
12:32:52  24   and part of these protocols, as Mr. Dubin pointed out in the
12:32:56  25   ASTM, it says here's your detection limit. So it's just
```

Page 1299

```
12:33:01   1   automatically in there. It's different here because we're
12:33:04   2   dealing with not a commercial asbestos product. We're
12:33:09   3   dealing with something that's very rare to find. So your
12:33:12   4   detection limit and your analytical sensitivity is, in my
12:33:16   5   opinion, the same. Finding one fiber.
12:33:18   6           So it just automatically put it in. So I said to
12:33:22   7   remove it because it doesn't portray what I'm testifying
12:33:27   8   about. But it's simple to do, you just say, okay, three
12:33:31   9   fibers.
12:33:32  10       Q   If I reissue the report to them over the weekend
12:33:35  11   and we take that white box off and they get the entire, does
12:33:39  12   it change anything you have said at all?
12:33:41  13       A   Nothing.
12:33:42  14       Q   Does it change the asbestos that's in their
12:33:44  15   bottle?
12:33:44  16       A   No, sir.
12:33:45  17       Q   Does it change the fact you've got to test it
12:33:48  18   right to find it?
12:33:50  19       A   No, sir.
12:33:53  20       Q   And I'm sure -- does this mean that -- well, I'll
12:34:01  21   cross their experts on that one, please.
12:34:07  22           Next subject. Testing the mines. He said, well,
12:34:13  23   you can just test the mines?
12:34:17  24       A   We did test the mines.
12:34:18  25       Q   Tell the jury about that.
```

Page 1300

```
12:34:19   1       A   We didn't go to the mine.
12:34:21   2       Q   Why not?
12:34:25   3       A   Nobody said you could go to somebody else's mine
12:34:28   4   in this type of environment.
12:34:31   5       Q   Did you know we actually requested it and we're
12:34:33   6   not allowed to?
12:34:34   7       A   I'm not surprised. So if you think about how do
12:34:38   8   we test the mines. We're testing the samples that came from
12:34:41   9   the mine. When we look at these ones before World War II
12:34:47  10   where they went off to California, and we test something
12:34:50  11   from 1933 that came from the Italian mine, just as Mr. Dubin
12:34:55  12   says, nothing changes. That covers what happened when
12:34:58  13   you're using the same mine for your 1955 bottles. So the
12:35:02  14   same mine for your 1966, excuse me, '66 bottles.
12:35:07  15           Just going there today you can figure out what's
12:35:11  16   in the mine works the same way. You can't have it both
12:35:13  17   ways. You can't say, well, you're analyzing it today for
12:35:17  18   everything you couldn't find in the past. While I'm
12:35:21  19   analyzing what's happened in the past for times outside of
12:35:24  20   the bottles I have. Same mine, same concept.
12:35:27  21           Vermont mine. I haven't tested all the bottles
12:35:31  22   from all the times in Vermont, but if I test bottles that
12:35:35  23   have asbestos in it from Vermont, that's an indication of
12:35:38  24   what's in that Vermont mine. So we are actually testing the
12:35:41  25   mine, but we're testing the final product from the mine.
```

32 (Pages 1297 to 1300)

```
                                                              Page 1317
12:57:23    1                    CERTIFICATE
12:57:23    2            I, Jennifer A. Dunn, Registered Professional
12:57:23    3    Reporter and Certified Court Reporter, do hereby certify
12:57:23    4    that I am an official court reporter for the Circuit Court
12:57:23    5    of the City of St. Louis; that on June 8, 2018, I was
12:57:23    6    present and reported all the proceedings had in the case of
12:57:23    7    GAIL INGHAM, ET AL., Plaintiffs, vs. JOHNSON & JOHNSON,
12:57:23    8    Defendant, Cause No. 1522-CC10417-01.
12:57:23    9            I further certify that the foregoing pages
12:57:23   10    contain a true and accurate reproduction of the proceedings.
12:57:23   11
12:57:23   12
12:57:23   13
12:57:23   14
12:57:23   15
12:57:23   16              "/s/JENNIFER A. DUNN, RPR, CCR #485"
           17
           18
           19
           20
           21
           22
           23
           24
           25
```