# EXHIBIT E28

**Page 1600**

```
SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK - CIVIL TERM - PART 7
------------------------------------------------x
DONNA A. OLSON and ROBERT M. OLSON,

                    Plaintiff,
                                        Index No.
        -against-                       190328/2017

BRENNTAG NORTH AMERICA, INC.;
BRENNTAG SPECIALTIES, INC.,
      Individually, and f/k/a Mineral Pigment
      Solutions, Inc., as successor-in-interest to
      Whittaker, Clark & Daniels, Inc.,
CYPRUS AMAX MINERALS COMPANY,
      Individually and as successor-in-interest to
      American Talc Company, Metropolitan Talc
      Company, Inc., Charles Mathieu, Inc., and
      Resource Processors, Inc.;
IMERYS TALC AMERICA, INC.,
JOHNSON & JOHNSON CONSUMER, INC.;
WHITTAKER, CLARK & DANIELS, INC.,
      Individually and as successor-in-interest
      To American Talc Company, Metropolitan Talc
      Company, Inc., Charles Mathieu, Inc., and
      Resource Processors, Inc.;

                    Defendants.
------------------------------------------------x
                              60 Centre Street
Jury Selection                New York, New York
                              February 26, 2019
B E F O R E:
        HONORABLE  GERALD LEBOVITZ,
                      JUSTICE
A P P E A R A N C E S:
          LEVY KONIGSBERG, LLP
          ATTORNEYS FOR THE PLAINTIFFS
                800 THIRD AVENUE
                NEW YORK, NEW YORK 10022
          BY:   JEROME H. BLOCK, ESQ.,

                                    CONTINUED:
```

**Page 1601**

```
            APPEARANCES CONTINUED:

          MAUNE RAICHLE HARTLEY FRENCH & MUDD, LLC
                150 WEST 30TH STREET
                NEW YORK, NEW YORK 10001
          BY:   SUZANNE M. RATCLIFFE, ESQ.,
                CHRISTIAN HARTLEY, ESQ.,


          PATTERSON BELKNAP WEBB & TYLER, LLP
          ATTORNEYS FOR JOHNSON & JOHNSON
                1133 AVENUE OF THE AMERICAS
                NEW YORK, NEW YORK 10036
          BY:   THOMAS P. KURLAND, ESQ.,
                LOUIS M. RUSSO, ESQ.,
                   -and-
          KIRKLAND & ELLIS, LLP
                300 NORTH LaSALLE STREET
                CHICAGO, IL 60654
          BY:   MIKE BROCK, ESQ.,
                STACEY GARBIS PAGONIS, ESQ.,
                BARRY E. FIELDS, ESQ.,
                ALLISON RAY, ESQ.,

                    Lori Sacco
                    Michael Ranita
                    Official Court Reporters
        *           *           *
```

**Page 1602** — Dr. Longo - Plaintiff - Direct (Mr. Block)

THE COURT: Good morning to everyone.

MR. BLOCK: Good morning.

MR. BROCK: Good morning.

THE WITNESS: Good morning, your Honor.

THE COURT: I understand that you would like to put the TV recording into evidence? You want to do that now or do you want to wait until a little bit later after the jury?

MR. BROCK: We'll wait until a little later. I think Tom is bringing it.

MR. BLOCK: It's our understanding they want it to be a Court Exhibit.

THE COURT: Yes.

MR. BROCK: Yes.

THE COURT: It was played to the court, so it should be an Exhibit, you know, if they want it in evidence.

MR. BROCK: That's our point.

THE COURT: You are entitled to it.

THE COURT OFFICER: Ready, Judge?

THE COURT: Yes.

THE COURT OFFICER: All rise. Jury entering.

(Whereupon, the jurors entered the courtroom and were properly seated in the jury box.)

THE COURT: Good morning to everyone, and please be seated. You will resume whenever you like.

DIRECT EXAMINATION

**Page 1603** — Dr. Longo - Plaintiff - Direct (Mr. Block)

BY MR. BLOCK:

Q  Good morning, Dr. Longo.

A  Good morning.

MR. BLOCK: Good morning, everybody.

THE JURORS: Good morning.

MR. BLOCK: Your Honor, plaintiff moves Exhibit 64 into evidence at this time.

MR. BROCK: No objection.

(Whereupon, Plaintiff's Exhibit 64 was marked in evidence.)

Q  Dr. Longo, I want to pick up where we left off yesterday looking at this slide.

(Whereupon, a demonstrative aid was shown on the screen.)

Q  Dr. Longo, looking at the screen and at this slide, these terms have been used, analytical sensitivity, detection limit and I just want to make sure that we are all on the same page on these terms.

Now, did you have to change the title here to analytical sensitivity?

A  It's analytical sensitivity, which in this case --

THE COURT: A little louder, please.

A  Analytical sensitivity is the proper way to state this. It's also the detection limit. It's based on finding one asbestos fiber in one bundle.

Page 1640

Direct-Longo-Block

Q. deposition for purpose of gaining knowledge about her use of Johnson's Baby Powder and Shower to Shower products?
A. Yes.
Q. Did you investigate based upon her deposition testimony how often she used and how she used it?
A. Yes, sir, I did.
Q. And is it important to -- to look at how she used it so you can give an opinion about the approximate asbestos exposure she had from using that product?
A. Yes, sir.
Q. All right. And will you be basing your opinions on the historical Johnson & Johnson testing, articles from the peer-reviewed literature, including the Gordon Millette study you told us about and also your own testing that you did?
A. Yes.
Q. Okay. And what did you find out about in terms of Donna Olson's use of Johnson's Baby Powder and Shower to Shower that's significant in your opinions in this case?
A. When I calculated her overall numbers of application, it was approximately 22 -- 21,000 individual applications of either -- of Johnson Baby Powder up until about 1995. And then it was Shower to Shower after that. And that covers -- But that does not include the 1991 to

Page 1641

Direct-Longo-Block

1998 for her daughter after baths. So, this is a conservative estimate and does not account for what I would call bystander exposure, when she cleaned up her bathroom later as an adult after the applications of the powder. This is just strictly her either into -- applying to her hand, to her body or to the body directly or to her -- her daughter, where she applied to her hand and then to her daughter from the age of one day 'till approximately eight years old.
Q. All right. So, you focused on -- Let me ask you this. In terms of finding that she had about 21,000 applications of the product, what did you -- what did you see in terms of her use of the product herself over her lifetime?
A. Well, she remembered from the age of five. She was born in March 1953. She recalled at the age of five that her mother would powder her after her baths. And that her mother did this from the age of five to the age of eight or nine. I just used eight. And her mother would use approximately one or two shakes and then apply to her as a little girl. After the age of eight she started taking her own baths and showers. And she was fairly steady on her applications all the way up from --
THE COURT: Just a moment, doctor.
THE WITNESS: Oh, I'm sorry.

Page 1642

Direct-Longo-Block

JUROR: Sorry.
THE COURT: It's all good.
A. -- up until 2015. So -- And she was fairly routine about it. Also I did not calculate her mother -- She testified that during the summer months when she was younger, when it was very hot, her mother would apply baby powder before she went to bed so there would be, during the summer, two applications. But I did not include that into the calculation, because I didn't really have a timeframe, exactly start and stop. So this is a conservative estimate.
Q. Okay. And just to be clear, in estimating Donna Olson's exposure to asbestos when she applied Johnson's Baby Powder, Shower to Shower, did you also read about how she applied it?
A. Yes. She typically would apply by both by hand indirectly to the body, chest area and typically the groin area was the main portions she would apply to.
Q. All right. And based upon -- Have you also -- we have talked about the fact that you looked at Johnson & Johnson's own documents estimating exposures. Have you considered that in the opinion that I'm going to ask you to give?
A. Yes.
Q. Have you considered both Johnson & Johnson's

Page 1643

Direct-Longo-Block

own documents about their estimates of exposure and the amount typically applied?
A. Yes.
Q. Have you also considered historical documents showing asbestos in the Italian talc, in the source talc, the Italian talc?
A. Yes, sir.
Q. Have you considered Johnson & Johnson and Imerys' historical documents in the Vermont talc used in these products?
A. Yes, sir.
Q. And as you've said, have you also relied upon the published peer-reviewed literature, such as the Gordon, Millette paper which you find authoritative?
A. That is correct.
Q. All right. And based upon your review of Donna Olson's deposition and all of that material and information you relied upon, and based upon your own testing, do you have an opinion within a reasonable degree of scientific certainty as to the approximate amount of asbestos exposure that Donna Olson had when she applied Johnson's Baby Powder and Shower to Shower?
MR. BROCK: J & J renews its objection as previously stated.
THE COURT: Yes.

Page 1644

Direct-Longo-Block

1  
2  A. That the range of exposure on average would  
3  be approximately .1 fibers per c.c. to one fiber per c.c.  
4  based on our testing results.  
5  Q. Is it your opinion that that would be her  
6  approximate exposure to asbestos each time that the  
7  Johnson's Baby Powder, Shower to Shower was applied on her  
8  body?  
9  MR. BROCK: Same objection.  
10  A. No, you can't say each time.  
11  THE COURT: There is an objection, sir.  
12  THE WITNESS: I'm sorry, your Honor.  
13  THE COURT: You need to pay attention for  
14  that. Everything happened all at once.  
15  Q. You said no, you can't say each time. So,  
16  what is your opinion as to this exposure level to asbestos  
17  and her 21,000 applications of Johnson's Baby Powder and  
18  Shower to Shower applied to her body?  
19  MR. BROCK: Same objection.  
20  A. My opinion would be more like --  
21  THE COURT: When there is an objection,  
22  doctor, you need to wait until the Court's ruling.  
23  Overruled. Now you may answer.  
24  A. It would be my opinion more likely than not  
25  based on our testing that when she used the product, that  
26  more likely greater than 50 percent would be -- would have  

Page 1645

Direct-Longo-Block

1  
2  enough tremolite in it.  
3  THE COURT: You need to speak up.  
4  A. Greater than 50 percent of the time she would  
5  have been exposed at this level is my opinion.  
6  Q. Okay. And is that based in part on your own  
7  testing?  
8  A. Yes, sir.  
9  Q. And is that based in part on your review of  
10  the peer-reviewed literature as to exposure of asbestos  
11  from cosmetic talcum powder including powders that used  
12  Italian talc?  
13  A. Yes, sir.  
14  Q. Is that also based upon your review of  
15  Johnson & Johnson's own documents estimating exposures  
16  from the use of these products?  
17  A. Yes, sir.  
18  Q. And is it also based upon your review of  
19  historical documents showing asbestos in the source talc  
20  that was used for these products?  
21  A. Yes, sir.  
22  Q. Thank you, Dr. Longo. I have no other  
23  questions at this time.  
24  A. Thank you.  
25  MR. BROCK: May it please the Court?  
26  THE COURT: Yes. You may inquire.  

Page 1646

Cross-Long-Brock

1  
2  MR. BROCK: Good morning, members of the  
3  jury.  
4  CROSS EXAMINATION  
5  BY MR. BROCK:  
6  Q. I want to talk about your company. I think  
7  you said yesterday that your company has tested somewhere  
8  around three to 400,000 bulk samples for asbestos over the  
9  last 30 years, correct?  
10  A. That is correct.  
11  Q. And in that entire period of time until 2017  
12  or thereabouts you had never tested cosmetic talc for  
13  asbestos, correct?  
14  A. That is correct.  
15  Q. In fact, in that entire period of time that  
16  you were doing that bulk sampling, you never tested J & J  
17  cosmetic talc for potential asbestos contamination,  
18  correct?  
19  A. That is correct.  
20  Q. The only time you have tested J & J talc for  
21  asbestos is in the context of being a litigation  
22  consultant and expert, true?  
23  A. That is true.  
24  Q. ==Now, when it comes to the talc litigation,==  
25  ==100 percent of your work is on behalf of plaintiffs,==  
26  ==correct?==  

Page 1647

==Cross-Long-Brock==

1  
2  ==A. That is correct.==  
3  Q. And you were mentioning yesterday that you  
4  have performed some work for the government over time. Is  
5  it correct that none of your work for any of the  
6  government entities had anything to do with testing talcum  
7  powder?  
8  A. That is correct.  
9  MR. BROCK: Could I have the Elmo, please.  
10  Q. All right. So, yesterday you had a slide  
11  that you presented to the jury in terms of your consulting  
12  work. And one of the government entities that you  
13  referred to was CDC. Is it correct that your work for the  
14  CDC did not involve the testing of commercial talc?  
15  A. That is correct.  
16  Q. Nor did it involve the testing of cosmetic  
17  talc?  
18  A. That is correct.  
19  Q. Same is true for the National Institutes of  
20  Health, the consulting work that you did for the National  
21  Institutes of Health did not involve testing of cosmetic  
22  talc for asbestos, true?  
23  A. That is correct.  
24  Q. For the City and State of New York, your work  
25  did not involve the testing or evaluation of cosmetic talc  
26  for asbestos, true?

Case 3:16-md-02738-MAS-RLS   Document 9742-34   Filed 05/07/19   Page 5 of 7 PageID: 47852

Olson v.                                                                                    Longo
Brenntag, et al.                                                                  February 26, 2019

Page 1648

Cross-Long-Brock

A. That is correct.
Q. Obviously I don't think your work for NASA involved testing of cosmetic talc for asbestos, true?
A. That is correct. That is true.
Q. You mentioned something about DOW. And did you do work on behalf of DOW?
A. One of our labs did some analysis for DOW.
Q. Okay. That did not involve cosmetic talc, true?
A. That is correct. It did not.
Q. Then the other organization that you listed was the Air Force. That work did not involve the testing of cosmetic talc, correct?
A. That is correct.
Q. All right. Now, you also talk about your lab, and you've referenced that you know Dr. Webber, correct?
A. I do.
Q. You know that he used to work for the New York Department of Health, correct?
A. I do know that.
Q. All right. And the New York Department of Health an Environmental Labs has an accreditation program that certifies a lab for testing New York asbestos samples, true?

Page 1649

Cross-Long-Brock

A. That's true.
Q. In Georgia, the state of George, Georgia, is it right, that there are four labs that are certified by the New York State Department of Health and Environmental Labs?
A. That is true.
Q. And is it also correct that your lab is not accredited by the New York State Department of Health and Environmental Labs?
A. That is correct.
Q. It's true, is it not, Dr. Longo, that you have never visited a talc mine?
A. That is still true.
Q. You are not an expert in the techniques of mine talc?
A. No, sir, I'm not.
Q. And you've never published any papers relating to the possibility of asbestos contamination of talc, correct?
A. No, I haven't.
Q. You've talked about the technique that you've used for testing cosmetic talc. Your techniques for testing cosmetic talc have never been published in the peer-reviewed literature, have they?
A. I don't think that's quite correct.

Page 1650

Cross-Long-Brock

Q. Have you published your technique the way you do it in litigation in the peer-reviewed literature?
A. It's not my technique. The Blount PLM has been published and we used the protocols. It's not my method.
   MR. BROCK: Object and move to strike, your Honor. I think it was an easy yes or no answer to that question.
   THE COURT: He was able to answer that yes or no, at least as to that one.
Q. All right. Let's keep going. You know that there are components of the tests that you have conducted that are not consist with the Blount Method that is reported in the peer-reviewed literature, correct?
A. I don't believe that's correct.
Q. You spin (gesturing) the sample in a different rate, do you not?
A. Not for our Blount PLM we don't. We follow the method exactly.
Q. Do you use a different weight for the -- the material that you're using in the test?
A. No. When we did the Blount PLM Method for these analysis, we followed her protocol. We used the same heavy liquid density.
Q. For your test of 30 samples that you received

Page 1651

Cross-Long-Brock

from eBay and collectors and from plaintiffs' lawyers who had clients, when you did that test, you did the test with TEM, did you not?
A. Yes, sir.
Q. And Blount did her test with PLM, correct?
A. That is correct.
Q. Have you published your technique of using TEM with the concentration method in the peer-reviewed literature?
A. We have not published on cosmetic talcs yet.
Q. You haven't published at all, correct?
A. Not yet; no, sir.
Q. It's correct that you have not published the technique of using TEM with the Concentration Method, that's true, isn't it?
A. It's already been published.
Q. No. I'm asking, sir --
   THE COURT: You have to answer the question, sir, yes, no or I don't know. Those are your only options. Have you published it?
   THE WITNESS: I have not published it.
   THE COURT: Thank you.
   THE WITNESS: Thank you, your Honor.
Q. Thank you. Now, you mentioned yesterday that you have been working as a testifying expert in litigation

Page 1652

Cross-Long-Brock

1  for many years, correct?
2  A. That is correct.
3  Q. In fact, you've been testifying as an expert since around 1990, correct?
4  A. '90, '91, yes, sir.
5  Q. Okay. Your business, the one that you run today MAS, was opened in 1988, correct?
6  A. Yes, sir.
7  Q. And soon after opening your business, you started advertising your services to be involved in litigation, correct?
8  A. That's not correct.
9  MR. BROCK: Let's look at DD I think it's dash one or dash two. Thirty-four, yes.
10  Q. This was an advertisement for your services that you put up in -- put out in 1989, correct?
11  A. That's correct.
12  Q. Shortly after starting your business MAS, correct?
13  A. A year later, yes, sir.
14  Q. And that's you, a younger version of you standing in a courtroom, isn't it?
15  A. Yes, sir that's a much younger version of me.
16  Q. And this is one of your colleagues. Is this Dr. Yamete --

Page 1653

Cross-Long-Brock

1  A. Dr. Yamete, yes.
2  Q. -- standing there with you, correct?
3  A. Yes.
4  Q. And you're standing in a courtroom, correct?
5  A. That's correct.
6  Q. You showed the jury yesterday your nice microscopes and the equipment that you have. You didn't take a picture of yourself in a white coat standing at the TEM, did you?
7  A. No, sir.
8  Q. And this picture, did you put in one of the magazines, you're standing in a courtroom with your colleague there, Dr. Yamete, at the time, correct?
9  A. That is correct.
10  Q. And you took out this ad in a trade magazine for a group called The National Asbestos Council, correct?
11  A. Yes, sir.
12  **Q. And since this time, working as a consultant and an expert in asbestos litigation, has been very lucrative for you, hasn't it?**
13  **A. It has allowed our lab to survive, yes, sir.**
14  Q. Well, you've survived to the tune, I think you've described it, as a million dollars a year for 30 years, correct?
15  A. That's what we billed plaintiff's attorneys,

Page 1654

Cross-Long-Brock

1  yes, sir.
2  Q. And that's what you call surviving?
3  A. Yes, sir.
4  Q. Okay. Now, this period of time during which you've been serving as a litigation expert and consultant in lawsuits, I think you just said this $30 million that we're talking about is what you have billed to lawyers who are representing folks that are filing lawsuits, correct?
5  A. Yes, sir.
6  Q. So, $30 million on behalf of plaintiffs?
7  A. That's correct.
8  Q. And let's talk about sort of what you do in those cases. Since that ad ran back in 1989, you have said that you have testified under oath somewhere around 2,500 to 3,000 times, correct?
9  A. Yes, sir. That would be correct.
10  Q. And that means that you're giving somewhere around a hundred depositions or making trial appearances a year, is that correct?
11  A. Between 50 and a hundred, yes, sir.
12  Q. Well, if it's 3,000 and you've been doing it for 30 years, what does that come to?
13  A. Well, I will tell you.
14  Q. All right.
15  THE COURT: The record should reflect the

Page 1655

Cross-Long-Brock

1  witness is looking at his cell phone, probably using a calculator.
2  A. Somewhere between one and two.
3  Q. Between one and 200?
4  A. One or two depositions a week.
5  Q. Okay. I was asking a different question, but thank you for that.
6  A. I'm sorry.
7  Q. If you have given 3,000 depositions and court appearances where you've testified under oath over a period of 30 years, that would be about a hundred a year, correct?
8  A. Yes, sir.
9  Q. All right. And if we think about this as working around 300 days a year, you would be giving testimony under oath every third business day, correct?
10  A. If it's that amount, yes.
11  Q. Okay. And that works out to about what you described. You give testimony under oath one to two times a week?
12  A. Yes, sir.
13  Q. Now, you've also described that you've been designated as an expert several thousand times by plaintiffs' lawyers suing in litigation, correct?
14  A. That is correct.

Page 1656

Cross-Long-Brock

Q. And that you think that every plaintiffs' lawyer in the country lists you as an expert in asbestos litigation?
A. I think they do without asking me.
Q. And, in fact, you think you've been listed in thousands of cases where you haven't even been contacted yet, true?
A. I think so. Or never contacted.
Q. But you know that you're being listed in cases as an expert where you've not even had a contact with the lawyer yet, correct?
A. No, sir. I only find out after the fact that the case is over or something happens, and they go, do you know you're listed here. And it's a problem because defendants will list me, and I have no idea that the plaintiffs have listed me. Then we have that issue.
Q. I think we're saying the same thing. Let me make sure we have got a clear record on this. You know that plaintiffs' lawyers are listing you in upcoming cases before they ever talk to you?
A. No. I don't know that for a fact. I only find out afterwards if there is a conflict. That's not true.
Q. You have found out that you have been listed in cases where you were not contacted, correct?

Page 1657

Cross-Long-Brock

A. Now that's a true statement.
Q. And, in fact, you've been designated several times, several thousand times in upcoming cases, correct?
A. Yes, sir. I'm typically designated in an upcoming case if I agree to work on a case.
Q. The answer is yes, you have been designated several thousand times, correct?
A. I don't know about several thousand times. That's not usually how it works.
Q. Now, before the talc litigation came along a couple of years ago, your firm was engaged in work in the asbestos litigation market, and that work was accounting for about 35 to 40 percent of your business, correct?
A. That is correct.
Q. Stated another way, before you got heavy into consulting and cosmetic talc litigation, about 35 to 40 percent of your business came from consulting for plaintiffs in litigation, correct?
A. Plaintiffs and defendants, that's correct.
Q. But in the last year the percentage of your business, the percentage of your business that is accounted for by your work in the talc litigation is now about 70 percent, correct?
A. That is correct.
Q. In other words, 70 percent of your entire

Page 1658

Cross-Long-Brock

business is devoted to working on behalf of plaintiffs in this litigation, the talc litigation?
A. No, not 70 percent of the business. That's not correct.
Q. Would it be --
A. Thirty-five to 40 percent of our business where both plaintiffs and defendants. So, 30 percent is the increase because of the talc litigation.
Q. So, thank you for that clarification. Before you were engaged to do work on behalf of plaintiffs in the talc litigation, about 30 to 35 percent of your overall business would have been involved in litigation, correct?
A. Yes, sir.
Q. And when the talc litigation came along and you became involved in that, then your work in litigation increased from about 30 to 35 percent to 70 percent, true?
A. Almost.
Q. Almost to 70 percent or almost true?
A. No. It was 35 to 40 to 70 percent to keep it accurate, not 30 to 35.
Q. That's fine. Your business, in terms of testifying and consulting in litigation, went from 35 percent of your business to 70 percent of your business when you got involved testifying on behalf of plaintiffs in the talc litigation?

Page 1659

Cross-Long-Brock

A. Yes, sir.
Q. We have it now?
A. It's either 35 or 40 to 70. And that additional 30 percent is involved in all the talc testing and testifying, yes, sir.
Q. Now, your ownership of MAS is about 75 percent of the company, correct?
A. That is correct.
Q. We talked about the fact that you're not a geologist, correct?
A. I'm not a geologist.
Q. You're also not a mineralogist, correct?
A. Well, that's sort of a yes and no.
Q. Let me ask the question a different way. Do you have a degree in mineralogy?
A. I do not.
Q. Do you have formal education and training in mineralogy in terms of any of your undergraduate or graduate studies?
A. Sort of.
Q. Do you consider yourself a mineralogist?
A. I don't have a degree in mineralogy, but dealing with asbestos, that's a mineral, yes. I understand that.
Q. Okay. But you don't have a degree in