**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| IN RE: JOHNSON & JOHNSON TALCUM POWDER PRODUCTS MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | MDL No. 16-2738 (FLW-LHG) |
| *THIS DOCUMENT RELATES TO ALL CASES* | |

**THE PLAINTIFFS' STEERING COMMITTEE'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO EXCLUDE THE GEOLOGY OPINIONS OF DRS. MARY POULTON AND LAURA WEBB**

# TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................1

II.   FACTUAL BACKGROUND .........................................................2

   A.    The PSC's Experts: Drs. Robert Cook and Mark Krekeler .........................3

     1.    Summary of Opinions of Dr. Robert Cook, Ph.D. .....................................3

     2.    Summary of Opinions of Dr. Mark Krekeler, Ph.D. ..................................5

   B.    Defendants' Experts Drs. Mary Poulton and Dr. Laura Webb ....................7

     1.    Summary of Opinions of Dr. Mary Poulton, Ph.D. ...................................7

     2.    Summary of Opinions of Dr. Laura Webb, Ph.D. .....................................9

III.  LEGAL STANDARDS ...............................................................10

IV.   ARGUMENT .............................................................................10

   A.    Drs. Poulton and Webb Lack the Experience and Qualifications Necessary to Support Their Opinions Regarding the Presence of Asbestos at the Talc Mines Used to Source Defendants' Talcum Powder Products ....................................10

     1.    Dr. Poulton lacks the necessary qualifications to opine on the presence of asbestos at the talc mines used to source Defendants' talcum powder products 12

     2.    Dr. Webb Lacks the necessary qualifications to opine on the presence of asbestos at the talc mines used to source Defendants' talcum powder products 16

   B.    The Methodologies Employed by Drs. Poulton and Webb Render Their Opinions Unreliable ...............................................................................18

     1.    Dr. Poulton's opinions should be excluded because she failed to employ an appropriate methodology...........................................................................19

       a.  Dr. Poulton failed to employ the necessary scientific rigor and her opinions regarding Drs. Cook and Krekeler should be excluded.................19

       b.  The information relied upon by Dr. Poulton was cherry-picked and results in an uninformed and unreliable opinion ..........................................22

       c.  Dr. Poulton's *ipse dixit* opinions are based upon her unsupported, subjective beliefs .........................................................................25

d.  Dr. Poulton's *ipse dixit* opinions lack credibility due to an inadequate analysis and reliable synthesis of the documents and data presented and/or the lack of data reviewed ............................................................................28

e.  Dr. Poulton's opinions are unsound due to improper reliance on references that are unrelated to relevant aspects of her opinions .................34

2.    Dr. Webb's opinions should be excluded because they are based upon an incomplete record and she employs a methodology that Dr. Webb admits is not appropriate ........................................................................................................36

a.  Dr. Webb fails to adhere to her own "field-based" methodology to arrive at her opinions in this case ..........................................................................36

b.  Dr. Webb's methodology is flawed because she cherry-picked items upon which she relied and wholly ignored any maps, testing, samples, observations or other data related to the specific talc mines at issue ...........42

CONCLUSION ......................................................................................................46

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Aloe Coal Co. v. Clark Equip. Co.*,
    816 F.2d 110, 114 (3d Cir. 1987). .................................................................10

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
    303 F.3d 256, 268–69 (2d Cir. 2002) .........................................................38

*Brown v. Burlington N. Santa Fe Ry. Co.*,
    765 F.3d 765, 773, 776 (7th Cir. 2014) ......................................................38

*Buzzerd v. Flagship Carwash of Port St. Lucie, Inc.*,
    669 F. Supp. 2d 514, 522 (M.D. Pa. 2009)..................................................11

*D & D Assocs., Inc. v. Bd. of Educ. of N. Plainfield*,
    No. CIV.A. 03-1026 (MLC),
    2006 WL 755984, at *3 (D.N.J. Mar. 20, 2006) .........................................11

*Edison Wetlands Ass'n, Inc. v. Akzo Nobel Chems., Inc.*,
    2009 WL 5206280, at *2 (D.N.J. Dec. 22, 2009)........................................27

*Elcock v. Kmart Corp.*,
    233 F.3d 734, 743 (3d Cir. 2000). ...............................................................11

*Fireman's Fund Ins. Co. v. Videfreeze Corp.*,
    540 F.2d 1171, 1180 (3d Cir. 1976) ............................................................12

*Hamilton v. Emerson Elec. Co.*,
    133 F. Supp. 2d 360, 370 (M.D. Pa. 2001)............................................ 27, 37

*Holman Ent. v. Fidelity & Guaranty Ins. Co.*,
    563 F.Supp.2d 467, 470 (D.N.J. 2008).........................................................27

*In re Gabapentin Patent Litig.*, No. CIV.A. 00-2931,
    2011 WL 12516763, at *10 (D.N.J. Apr. 8, 2011)................................. 27, 37

*In re Neurontin Mktg. & Sales Practices Litig.*,
    04-cv-10739, 2011 WL 3852254, at *34 (D. Mass. Aug. 31, 2011),
    *aff'd*, 712 F.3d 21 (1st Cir. 2013) ................................................................18

*In re Seroquel Prods. Liab. Litig.*,
    06-md-1769, 2009 WL 3806434, at *5 (M.D. Fla. June 18, 2009). .............19

*In re TMI Litig.*,
    193 F.3d 613, 692 (3d Cir. 1999) .................................................................37

*In re Unisys Sav. Plan Litig.*,
    173 F.3d 145, 156-57 (3d Cir. 1999).............................................................11

*In re Zoloft (Setraline Hydrochloride) Prod. Liab. Litig.*,
    26 F. Supp. 3d 449 (E.D. Pa. 2014)..............................................................19

*Kumho Tire Co. v. Carmichael*,
    526 U.S. 137, 152, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999) ...................37

*Magistrini v. One Hour Martinizing Dry Cleaning*,

180 F. Supp. 2d 584, 595 (D.N.J. 2002) ...................................................... 27

*McMunn v. Babcock & Wilcox Power Generation Grp., Inc.*,
  10-cv-143, 2013 WL 3487560, at *22 (W.D. Pa. July 12, 2013) ................ 37

*Montgomery Cty. v. Microvote Corp.*,
  320 F.3d 440, 448 (3d Cir. 2003) ........................................................... 27, 37

*Oddi v. Ford Motor Co.*,
  234 F.3d 136 (3d Cir. 2000) ........................................................... 18, 27, 37

*Padillas v. Stark-Gamco, Inc.*,
  186 F.3d 412, 418 (3d Cir. 1999). .............................................................. 10

*Player v. Motiva Enterprises LLC*,
  No. CIV. 02-3216 (RBK), 2006 WL 166452, at *5 (D.N.J. Jan. 20, 2006) . 11

*Shepise v. Saturn Corp.,* 94-cv-385 (MLP),
  1997 WL 897676, at * (D.N.J. July 30, 1997) ........................................... 15

*Soldo v. Sandoz Pharm. Corp.*,
  244 F. Supp. 2d 434, 560 (W.D. Pa. 2003) ................................................. 37

*Truck Ins. Exch. v. MagneTek, Inc.*,
  360 F.3d 1206, 1213 (10th Cir. 2004) ........................................................ 38

*U.S. E.E.O.C. v. Rockwell Int'l Corp.*,
  60 F. Supp. 2d 791, 797 (N.D. Ill. 1999) .................................................... 38

*Zeller v. J.C. Penney Co.*,
  2008 WL 906350, at *7 n. 13 (D.N.J. Mar. 31, 2008) ................................ 27

**Rules**

Fed. R. Evid. 403 ...................................................................................... 1

Fed. R. Evid. 702 ...................................................................................... 1

Fed. R. Evid. 703 ...................................................................................... 1

Fed. R. Evid. 104 (a) ................................................................................ 1

## I.   <u>INTRODUCTION</u>

The Plaintiffs' Steering Committee ("PSC") respectfully submits this motion, pursuant to Fed. R. Evid. 104 (a), 702, 703 and 403, to exclude the opinions and testimony of Defendants' geology experts, Mary Poulton, Ph.D. and Laura Webb, Ph.D. *First,* Drs. Poulton and Webb are not qualified because they do not possess the requisite academic or practical experience to support their opinions regarding the presence of asbestos at the talc mines used to source talcum powder products for Defendants Johnson & Johnson and Johnson & Johnson Consumer Inc. (collectively "J&J"). *Second*, the opinions of Drs. Poulton and Webb are unreliable and do not abide by any discernible methodology.

Dr. Webb's opinions are unreliable because she inexplicably failed to adhere to her own "field-based" methodology which focuses on obtaining and analyzing rock samples.[1] Instead, her opinions rest solely on a small set of cherry-picked peer-reviewed literature, with no reference to any maps, tests, samples, observations, or other data related to the specific talc mines at issue in this litigation. Dr. Poulton's report and testimony fail to set forth any factual bases for her opinions.  Instead, as she acknowledges, the entirety of Dr. Poulton's opinion equates to a critique rather

---

[1] Dr. Webb also typically employs a radioactive dating process in her work that cannot be used on talc or asbestos.

than an expert evaluation.[2] Her opinions lack scientific rigor, are *ipse dixit* based upon unsupported subjective beliefs, are unreliable due to lack of data reviewed, are based on inadequate and incorrect analyses and synthesis of the data she did review. The opinions and methods offered by Drs. Poulton and Webb are in direct contradiction to the principles governing the admissibility of expert testimony and their testimony should be excluded in its entirety.

## II.   FACTUAL BACKGROUND

Geology is an area of science "which deals with the physical structures and substance of the earth, their history, and the processes which act on them."[3]  This includes the mineralogy of the rock and the process by which it was formed and changes over time.  The mineralogical composition of the deposits that were/are mined for Defendants' cosmetic talcum powder products (and specifically, the presence of talc (platy and fibrous), asbestos and heavy metals) are a relevant topic of importance in this litigation. So too are the standards, procedures and methodologies related to the mining process, which includes the fields of mining engineering and geology. Extraction of minerals through the mining process requires

---

[2] *See* March 18, 2019 Deposition of Mary Poulton, Ph.D. ("Poulton Dep.") at 22:20-23:13, attached hereto as **Exhibit A.**

[3] Oxford English Dictionary, https://en.oxforddictionaries.com/definition/ geology (last visited May 4, 2019).

2

a foundation in geology as well as mining engineering, including expertise in mineral exploration, excavation and processing.

## A.   The PSC's Experts: Drs. Robert Cook and Mark Krekeler

### 1.   Summary of Opinions of Dr. Robert Cook, Ph.D.

Dr. Cook received an EM degree in Mining Engineering from The Colorado School of Mines in 1966 and M.S. and Ph.D. degrees in Geology from the University of Georgia in 1968 and 1971, respectively.[4]  Dr. Cook is a registered geologist in Alabama, Georgia, and Florida, and has authored the state mineralogies for the states of Alabama and Georgia—these mineralogies describe every mineral that occurs within the states and describe mineral deposits containing talc, asbestos, and heavy metals.[5]  Dr. Cook has also authored approximately 100 research-based publications, and a similar number of published abstracts of papers presented before learned societies.[6]  As a part of his professional experience, he has explored the mineralogy and consulted with mining companies regarding the exploration for and mineralogy of talc deposits.[7]

---

[4] *See* January 22, 2019 Amended Rule 26 Expert Report of Robert B. Cook, PhD ("Cook Report") at 2, attached hereto as **Exhibit B**. Dr. Cook's report was amended following Defendants' late production of additional, relevant documents.

[5] *Id.* at 2.

[6] *Id.*

[7] *Id.*

Dr. Cook worked in the mineral exploration industry for several years before beginning an academic career at Auburn University where he was a full Professor, member of the Graduate Faculty, and the Department of Geology Graduate Program Officer and later Department Head for 22 years.[8] He has served as a consultant for the United Nations, NASA, the Department of Defense, and the U.S. Department of Justice.[9]

In this litigation, Dr. Cook reviewed the geology of the talc deposits that sourced Defendants' talcum powder products, evaluated the mining practices employed, and assessed Defendants' sampling and testing from a mining perspective.[10] Dr. Cook opines that talc deposits derived by the alteration of serpentinites contain chrysotile and amphibole species in fibrous asbestiform habits, and that fibrous talc occurs in serpentinite-derived talc deposits, possibly by pseudomorphism of early chrysotile or amphiboles.[11] Dr. Cook also opines that talc from the Vermont deposits have elevated nickel (Ni), chromium (Cr) and cobalt

---

[8] *Id.*

[9] *Id.*

[10] *Id.*

[11] *Id.* "Asbestos is the generic designation for a group of naturally occurring mineral silicate fibers of the serpentine and amphibole series. These include the serpentine mineral chrysotile and the five amphibole minerals – actinolite, amosite, anthophyllite, crocidolite, and tremolite (IARC, 1973; USGS, 2001; IARC 2012)." *Id.* at fn 3.

(Co).[12] It is Dr. Cook's expert opinion that mine development and selective mining are not effective at avoiding ore[13] and ore-related rock that contain amphiboles, chrysotile, and elevated amounts of heavy metals and arsenic.[14]

### 2.    Summary of Opinions of Dr. Mark Krekeler, Ph.D.

Dr. Krekeler obtained his Ph.D. in the field of Geotechnical Engineering and Earth Science in 2003 from the University of Illinois at Chicago.[15] He currently serves as a tenured associate professor in the Department of Geology and Environmental Earth Science at Miami University in Oxford, Ohio.[16] His work is primarily focused on mineral properties and mineral-based geotechnologies.[17] Dr. Krekeler has authored or co-authored several publications addressing issues related to mining.[18] He has also served as a consultant for various mining companies, advising them on their procedures and techniques for mineral sampling, as well as

---

[12] Cook Report at 3.

[13] Ore is defined as "a type of rock that contains minerals that can be extracted from the rock for sale." Cook Report at p.6.  Ore is the material removed or analyzed from the mine prior to beneficiation.

[14] Cook Report at 2.

[15] *See* November 16, 2018 Rule 26 Expert Report of Mark Krekeler, PhD ("Krekeler Report") at 1, attached hereto as **Exhibit C.**

[16] *Id.*

[17] *Id.*

[18] *Id.*

providing in-depth analyses of their ore minerals and waste materials.[19] He teaches a wide-variety of courses for both undergraduate and graduate students including courses focusing on mineralogy, geochemistry, ore geology, and analytical techniques.[20]

Based on his review of the documents, depositions, and materials available in the litigation, as well as his experience as an expert in the fields of mineralogy, geology, and environmental geoscience, Dr. Krekeler concludes to a reasonable degree of scientific certainty that Defendants did not act in accordance with industry standards or maintain adequate quality control in mining talc for use in talcum powder products.[21] He concludes that toxic constituents were, and are, known to occur in the mines used to source talcum powder products, including asbestos, heavy metals and fibrous talc (talc occurring in an asbestiform habit) and that there were longstanding analytical inadequacies implemented by Defendants that are inconsistent with common and reasonable industry practices for identifying and excluding harmful constituents in their mine products.[22]

---

[19] *Id.*

[20] *Id.*

[21] *Id.*

[22] *Id.*

Dr. Krekeler concludes that asbestos and fibrous talc were and are present in the mines from which Defendants obtain talc for use in cosmetic talcum powder products.[23] He concludes that Defendants' sampling of the talc ore at the mines was inadequate and, therefore, not representative.[24]  He concludes it was not possible for Defendants to mine "pure talc" with their methodology due to the irregularity of deposit formation and the presence of associated constituents, and that the space of the core drilling and necessary extrapolation by mapping tools resulted in inaccuracies in the data for mine planning.[25] Finally, he concludes that there is significant evidence of toxic metals in post-processed talcum powder used in Defendants' products.[26]

### B.    Defendants' Experts Drs. Mary Poulton and Dr. Laura Webb

#### 1.    Summary of Opinions of Dr. Mary Poulton, Ph.D.

Dr. Poulton is currently Co-Director of the Lowell Institute for Mineral Resources at the University of Arizona, and was formerly a Professor of Mining and Engineering at The University of Arizona.[27] She has a Ph.D. in Geological

---

[23] *Id.* at 45.

[24] *Id.*

[25] *Id.*

[26] *Id.*

[27] *See* February 25, 2019 Expert Report of Mary Poulton, Ph.D. for General Causation *Daubert* Hearing ("Poulton Report") at 2, attached hereto as **Exhibit D.**

Engineering which included some extra geology and civil engineering work.[28] Although she has taught mine planning and design, and mine operations in the context of an academic setting, Dr. Poulton has no experience outside of academia in mineral exploration, mine planning, and mine operations.[29] The primary focus of her career has been mine safety.[30]

Dr. Poulton's opinions consist of nothing more than a critique of the work undertaken by the PSC's experts, Drs. Cook and Krekeler. As outlined in her report, it is Dr. Poulton's opinion that Drs. Cook and Krekeler improperly conflate various things, including non-ore samples with ore samples, non-asbestiform with asbestiform minerals, and the mineralogy of non-cosmetic grade talc mines with cosmetic grade ore.[31] Dr. Poulton also criticizes Drs. Cook and Krekeler for relying upon test results, documents and information which, in her opinion, have no relevance to the talcum powder products at issue in this case.[32] Dr. Poulton's opinion is that the work performed by Drs. Cook and Krekeler in evaluating the mines from which Defendants' talcum powder was derived makes improper assumptions and is premised on misrepresentations.

---

[28] Poulton Dep. at 40:22-41:11.

[29] *Id.* at 71:11-74:7.

[30] *Id.* at 25:12-18.

[31] Poulton Report at 1.

[32] *Id.* at 1.

## 2.     Summary of Opinions of Dr. Laura Webb, Ph.D.

Dr. Laura Webb is a geology professor at the University of Vermont who specializes in: 1) petrology (the study of the origin and evolution of rocks based on mineralogical evidence); 2) structural geology (the interpretation of rock deformation); and 3) geochronology (radiometric dating).[33] She generally describes her area of expertise as the "histories of rocks and regions."[34]

Dr. Webb opines that the published scientific literature does not support the assertion that there is asbestos in the cosmetic grade talc deposits mined for use in J&J's talcum powder products, nor do geologic principles suggest that there should be asbestos in the talc deposits.[35] Dr. Webb opines that the conditions associated with the formation of the "high-purity" talc deposits used in J&J's talcum powder products were not amenable to asbestos formation, and that there is no well-founded, scientifically-sound evidence for the association of amphibole asbestos with those talc deposits.[36] She further opines that any amphibole that *has been* found in J&J talc and talcum powder products (from the Fontane, southern Vermont, and Guangxi

---

[33] *See* February 25, 2019 Expert Report of Laura Webb, PhD for General Causation *Daubert* Hearing ("Webb Report") at pp. 1-2, attached hereto as **Exhibit E.**

[34] *Id.* at 1.

[35] *Id.*

[36] *Id.*

mines) are likely incidental actinolite or tremolite cleavage fragments from non-asbestiform amphiboles from the margins (blackwall zones).[37]

## III.   <u>LEGAL STANDARDS</u>

The PSC incorporates as if set forth in entirety the legal standards set forth in *The Plaintiffs' Steering Committee's Omnibus Memorandum of Law Regarding Daubert Legal Standards and Scientific Principles for Assessing General Causation* ("Omnibus brief") as supplemented herein.

## IV.   <u>ARGUMENT</u>

### A.   **Drs. Poulton and Webb Lack the Experience and Qualifications Necessary to Support Their Opinions Regarding the Presence of Asbestos at the Talc Mines Used to Source Defendants' Talcum <u>Powder Products</u>**

As the parties offering Drs. Poulton and Webb, the burden is on Defendants to demonstrate that the experts are qualified and have used a reliable scientific method to reach their opinions.[38] It is well-settled that "[a]n expert witness must have such skill, knowledge, or experience in the field as to make it appear that his opinion will probably aid the trier of fact in his search for the truth."[39]

While courts have recognized a "liberal standard" for qualifying experts, the Third Circuit has made it clear that there is "a floor with respect to an expert

---

[37] *Id.* at 1.

[38] *See Padillas v. Stark-Gamco, Inc.*, 186 F.3d 412, 418 (3d Cir. 1999).

[39] *Aloe Coal Co. v. Clark Equip. Co.*, 816 F.2d 110, 114 (3d Cir. 1987).

witness's qualifications."[40]  This Circuit has "not pursued a policy of qualifying any proffered witness as an expert."[41]  A court still must focus on whether the qualifications that an expert does have provide a foundation for the witness to testify meaningfully on a given matter.[42]  A basic understanding of a general subject matter does not alone qualify a witness as an expert on that specific subject.[43]  Even when a witness is qualified as an expert in a particular field, the court cannot permit the witness to testify as to matters that are outside the area of his expertise.  This prohibition applies even when the subject matter of the testimony is related to the witness's area of expertise.[44]  Any testimony outside the expert's area of expertise

---

[40] *Elcock v. Kmart Corp.*, 233 F.3d 734, 743 (3d Cir. 2000).

[41] *Id.* (quoting *Waldorf v. Shuta*, 142 F.3d 601, 625 (3d Cir. 1998).

[42] *See Buzzerd v. Flagship Carwash of Port St. Lucie, Inc.*, 669 F. Supp. 2d 514, 522 (M.D. Pa. 2009) (citing *Rose v. Truck Centers, Inc.*, 611 F. Supp. 2d 745, 749 (N.D. Ohio 2009) ("The issue with regard to expert testimony is not the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question.").

[43] *See In re Unisys Sav. Plan Litig.*, 173 F.3d 145, 156-57 (3d Cir. 1999).

[44] *See D & D Assocs., Inc. v. Bd. of Educ. of N. Plainfield*, No. CIV.A. 03-1026 (MLC), 2006 WL 755984, at *3 (D.N.J. Mar. 20, 2006) ("If an expert's area of expertise is adjacent to, but not actually encompassing, the subject matter of his testimony, he may be deemed unqualified."); s*ee also Player v. Motiva Enterprises LLC*, No. CIV. 02-3216 (RBK), 2006 WL 166452, at *5 (D.N.J. Jan. 20, 2006) (finding that an expert who was experienced in appraising uncontaminated properties was unqualified to provide an opinion on the value of contaminated properties).

must be stricken.[45]

### 1. Dr. Poulton lacks the necessary qualifications to opine on the presence of asbestos at the talc mines used to <u>source Defendants' talcum powder products</u>

Dr. Poulton is not qualified to opine on the presence of asbestos at the talc mines used to source Defendants' talcum powder products.[46] Dr. Poulton does not possess a geology degree,[47, 48] and admits that she is unable to comment "on the genesis of rocks on the eastern seaboard from which, for decades, Defendants mined their talc."[49] She concedes that she is not an expert in the geology of Vermont talc deposits and she could not identify the Vermont counties where Defendants' mines were located.[50]  She is not a certified professional geologist, nor is she an exploration geologist.[51]

---

[45] *See Fireman's Fund Ins. Co. v. Videfreeze Corp.*, 540 F.2d 1171, 1180 (3d Cir. 1976) (excluding testimony as to whether a landslide was caused by an earthquake because, although expert was a geologist, he had no training in seismology).

[46] Dr. Poulton offers no opinions regarding fibrous talc. *See* Poulton Dep. at 267:10-16.

[47] *Id.* at 25:21-26:1.

[48] Unlike both of the PSC's experts, Drs. Cook and Krekeler, who hold Ph.D.'s in the areas of Geology and Geotechnical Engineering and Earth Science, respectively.

[49] Poulton Dep. at 177:10-15; 182:1-3.

[50] Poulton Dep. at 77:16-83:18; 183:4-9; 199:1-4.

[51] *Id.* at 25:23-26:1; 26:12-14.

In her report, Dr. Poulton criticizes Drs. Cook and Krekeler for improperly extrapolating general mineralogy from a region to the exact mineralogy of ore that went into J&J's talcum powder products.[52] Yet, Dr. Poulton admits she is not a geology expert[53] and was not focused on the geologic formation of any of the deposits used to source J&J's talcum powder products.[54]

Moreover, Dr. Poulton's paucity of expertise and experience with asbestos or the mining of ore deposits for which asbestos is a constituent renders her unqualified. Dr. Poulton has not published any peer-reviewed papers on asbestos.[55] She has no experience or expertise in microscopically detecting asbestos in talc, or in the testing of cosmetic talc in any way.[56] In fact, she has never published on *any* phyllosilicates (the group of minerals to which talc and asbestos belong) irrespective of the geographic region from which they are derived, and has never authored a peer-reviewed publication regarding the geology of any of the areas from which Defendants obtained their cosmetic talc.[57]

---

[52] Poulton Report at 2.

[53] *Id.* at 182:24-183:9.

[54] *Id.* at 9217-93:3.

[55] *Id.* at 30:15-31:6.

[56] *Id.* at 33:17-35:22.

[57] *Id.* at 27:1-4; 28:4-16.

Dr. Poulton is not a certified professional engineer, having only attained an EIT (engineer in training), which is the initial step for professional certification.[58] Dr. Poulton cannot supplant her lack of geological or engineering training with "hands-on" education. She has only visited a single talc mine – one that did not produce cosmetic talcum powder – in the 1980's on a "field trip," and has never visited the talc mines in Vermont, Italy, or China that produced Defendants' product.[59] Outside of the context of academia, Dr. Poulton has:

- Never designed, directed or been consulted regarding drilling programs for purposes of mineralogic exploration;[60]

- Never been hired to perform mineralogic exploration for purposes of economic development;

- Never designed, directed or been consulted regarding a mine plan;

- Never designed, directed or been consulted regarding the operation of an open-pit mine;

- Never designed, directed or been consulted regarding the operation of an underground mine; and,

- Never designed, directed or been consulted regarding a beneficiation or processing plant.[61]

---

[58] *Id.* at 26:2-11.

[59] *Id.* at 28:17-30:5.

[60] The only occasion during which Dr. Poulton participated in a drilling program was as a summer employee when she was a college student. *See Id.* at 37:4-38:10. As used here, mineralogic exploration would include drilling for purposes of identifying the contours and content of a mineral deposit.

[61] Poulton Dep. at 71:11-74:7; 229:7-230:8.

Dr. Poulton has no educational qualifications that qualify her to testify regarding the geologic formation of talc or asbestos, and admits she is not a geology expert. Likewise, she has no educational qualifications in mine development or mineral extraction and has no field experience in those areas. She fails to mention fibrous talc in her report and testified she had no opinions on it.[62] Metallogeny, defined by Dr. Poulton in her deposition as the distribution or formation of metals, is "outside [her] zone of expertise" so she could not offer comment on the subject matter.[63]

In sum, Dr. Poulton's mere involvement in a geological setting without the particularized training relevant to the issues in this matter does not enable her to form the conclusions set forth in her opinions. *See Shepise v. Saturn Corp.,* 94-cv-385 (MLP), 1997 WL 897676, at * (D.N.J. July 30, 1997) (excluding expert and holding that the mere review of numerous articles and studies did not qualify her to testify as to particularized issues related to the subject matter). Dr. Poulton's career in academia without any first-hand knowledge of this issue on which she offers opinions does not qualify her as an expert. Her opinions regarding the geology of the deposits and the presence of asbestos in the talc mines used to source Defendants' talcum powder products should be excluded.

---

[62] *Id.* at 267:10-16.

[63] *Id.* at 177:16-178:10.

2. **Dr. Webb Lacks the necessary qualifications to opine on the presence of asbestos at the talc mines used to <u>source Defendants' talcum powder products</u>**

Dr. Webb lacks both academic qualifications and practical experience to support her opinions. At her deposition, Dr. Webb testified that one of her primary areas of focus is the radiometric dating of minerals—she takes rocks to her laboratory and determines the isotope ratios (based on the decay of potassium 40 to argon 40) in order to calculate the absolute age.[64] This methodology only works for rocks that contain potassium-bearing minerals.[65] Dr. Webb testified that talc, an ultramafic rock, *does not* contain potassium-bearing minerals and is therefore not a mineral that she typically encounters in the radioactive dating process: "…these talc ores of pure talc and magnesites, they would not be the ideal targets for that."[66] Accordingly, Dr. Webb only encounters talc when it happens to be present with other minerals in rocks, and she has never examined samples of talc for the purpose of identifying asbestos.[67]

---

[64] *See* March 29, 2019 Deposition of Laura Webb, Ph.D. ("Webb Dep.") at 89:20-90:19, attached hereto as **Exhibit F.**

[65] *Id.* at 90:18-21.

[66] *Id.* at 91:2-92:2.

[67] *Id.* at 116:5-16.

Dr. Webb has never performed any academic research or studies focused on talc or asbestos.[68] She has never published any peer-reviewed articles on asbestiform amphiboles in talc, nor any peer-reviewed articles on the methodological approaches for identifying asbestiform amphiboles in talc, and she has not presented on those topics.[69] She has not published any peer-reviewed articles pertaining to the talc deposits in Vermont, Italy, or China used to source J&J's Baby Powder and Shower to Shower.[70]

Dr. Webb has never reviewed articles or other materials on any issues relating to asbestos in talc for any peer-reviewed journals, nor has she worked with graduate students on that topic.[71] She has never participated in any conferences or forums pertaining to the topic of asbestos in talc,[72] and she has never been involved in research or work of any kind designed to investigate the presence of asbestos in geologic formations.[73]

Nor does Dr. Webb have any practical or hands-on experience to support her opinions in this case. She has:

---

[68] *Id.* at 92:6-23; 112:22-113:3.

[69] *Id.* at 114:4-17.

[70] *Id.* at 138:18-21.

[71] *Id.* at 114:18-115:10.

[72] *Id.* at 116:5-9.

[73] *Id.* at 117:21-25.

- Never set foot in or worked in a talc mine, including the mines in nearby southern Vermont that were used to source J&J's talcum powder products;[74]

- Never designed talc mine operations or consulted on talc mine operations;[75]

- Never designed drill core sampling protocols for talc mines, blast hole sampling protocols, open pit mining operations, or underground mining operations;[76] and,

- Never reviewed any talc mine planning maps or drill cores.[77]

Since Dr. Webb is not qualified to provide an opinion regarding the presence (or absence) of asbestos at the talc mines used to source J&J's talcum powder products, the Court should preclude her from doing so in this litigation.

## B. The Methodologies Employed by Drs. Poulton and Webb Render Their Opinions Unreliable

The decision to admit or exclude an expert's opinion depends upon "whether the 'particular opinion is based on valid reasoning and reliable methodology.'"[78] Focusing on extremely limited evidence or ignoring the totality of available relevant scientific proof renders an expert opinion unreliable and scientifically unsound.[79]

---

[74] *Id.* at 133:8-134:1.

[75] *Id.* at 132:12-20.

[76] *Id.* at 132:21-133:7.

[77] *Id.* at 133:4-15.

[78] *Oddi v. Ford Motor Co.*, 234 F.3d 136, 145-146 (3d Cir. 2000) (citation omitted).

[79] *In re Neurontin Mktg. & Sales Practices Litig.*, 04-cv-10739, 2011 WL 3852254, at *34 (D. Mass. Aug. 31, 2011), *aff'd*, 712 F.3d 21 (1st Cir. 2013) (excluding expert's testimony where it was found that the expert "reach[ed] his opinion by first

"An expert's opinion may be unreliable if he fails to account for contrary scientific literature and instead 'selectively chooses his support from the scientific landscape.'"[80] "The reliability of an expert's opinion should be seriously questioned when it is shown that the expert formed his or her opinion prior to reviewing scientific evidence, and, thereafter, merely cherry-picked evidence favorable to that opinion."[81]

### 1. Dr. Poulton's opinions should be excluded because she failed to employ an appropriate methodology

#### a. Dr. Poulton failed to employ the necessary scientific rigor and her opinions regarding Drs. Cook and Krekeler should be excluded

Dr. Poulton's report and testimony clearly establish that she failed to employ the scientific rigor demanded by *Daubert* in reaching her opinions.  The entirety of her opinions, as she admitted, amount to nothing more than a critique of the PSC's experts rather than an expert evaluation.[82] When asked what methodology she used

---

identifying his conclusion… and then cherry-picking observational studies that support his conclusion and rejecting or ignoring the great weight of evidence that contradicts his conclusion.").

[80] *In re Zoloft (Setraline Hydrochloride) Prod. Liab. Litig.*, 26 F. Supp. 3d 449 (E.D. Pa. 2014) (finding expert's opinion not reliable or scientifically unsound because the expert failed to account adequately for contrary evidence).

[81] *In re Seroquel Prods. Liab. Litig.*, 06-md-1769, 2009 WL 3806434, at *5 (M.D. Fla. June 18, 2009).

[82] Poulton Dep. at 23:1-13.

to perform that critique, Dr. Poulton responded that she "started with the assumption that [Drs. Cook and Krekeler] were correct in their findings, and then corroborated their statements with what [she] saw in documents. And if they said information was missing, then [she] asked for that information or looked for it within the documents they had.  And then basically constructed the areas where [she] felt that they were incorrect."[83]

While Dr. Poulton's report does not set forth a clear mandate or scope, in her deposition she stated, "I was asked to review the expert reports by Drs. Cook and Krekeler and render an expert opinion on mining and beneficiation as it related to talc mining for cosmetic products for Johnson & Johnson."[84] She admits that she was essentially asked to critique their reports.[85] The summary section of Dr. Poulton's report indicates her opinions, which consist of a list of critiques of Drs. Cook and Krekeler, to be "based on analysis of the reports of Drs. Cook and Krekeler, examination of documents presented, use of reference literature, and my engineering experience."[86] As part of her analysis Dr. Poulton assumes a hypothesis

---

[83] *Id.* at 23:14-24:2.

[84] *Id.* at 19:2-7.

[85] *Id.* at 23:1-13.

[86] Poulton Report at 1.

based on the accuracy of the PSC's experts' conclusions and subsequently criticizes those conclusions to disprove the hypothesis.

As a basis for her critique, Dr. Poulton reviewed materials *cited* by Plaintiff's experts but not all of the materials they *considered*, and then either asked for additional information "or looked for it within the documents [Drs. Cook and Krekeler] had."[87] Based on a comparison of the reliance lists, Dr. Krekeler considered an extensively larger body of literature than Dr. Poulton,[88] but the disparity is most shocking in the number of internal documents reviewed that were produced by defendants, with Dr. Cook having reviewed ~900 and Dr. Poulton having only reviewed ~370.[89] However, in considering only the material *cited*, Dr. Poulton ignored all of the additional information that went into forming the basis of Drs. Cook's and Krekeler's opinions – foundation that Dr. Poulton lacks, rendering her criticisms of Drs. Cook and Krekeler unreliable and her opinions should be excluded.

Dr. Poulton's conclusions about the PSC's experts' analyses are based upon only a mere fraction of the information that was actually relied upon by the PSC's

---

[87] Poulton Dep. at 23:14-23.

[88] Dr. Krekeler considered ~172 literature references (*see* Krekeler Report at 73), whereas Dr. Poulton only considered ~20 literature references (*see* Poulton Report at 36).

[89] *See* Cook Report at 3; Poulton Report at 39.

experts in reaching their conclusions. Both her report and her testimony establish that Dr. Poulton failed to employ the scientific rigor that *Daubert* requires in reaching expert opinions. Thus, her opinions would not be helpful, and may in fact mislead a jury.  It is for this reason that Dr. Poulton's opinions should be excluded.

> **b.   The information relied upon by Dr. Poulton was cherry-picked and results in an uninformed and <u>unreliable opinion</u>**

Dr. Poulton used a review of literature as the basis for her opinions, but she did not have sufficient literature for the geographic areas of mines used to source J&J talc or relevant corporate documents available to her. Dr. Poulton did not have independent access to Defendants' document database to perform her own document searches.[90]  Beyond the limited set of materials she was given, Dr. Poulton requested "geologic models, mine plans, drilling results . . . [and] [c]larification on sample numbers," but was provided only 6 to 12 documents selected by defense counsel.[91]

Dr. Poulton was provided only one page from the transcript of Dr. John Hopkins,[92] the J&J Defendants' corporate representative on composition, testing and talc mines; only a single page from the deposition transcript of Donald Hicks,[93]

---

[90] Poulton Dep. at 21:20-23.

[91] *Id.* at 20:13-21:19.

[92] *Id.* at 135:23-137:15.

[93] *Id.* at 345:6-8.

J&J's corporate representative on composition, specifications, testing, sampling and quality control; and only one page from the deposition transcript of Julie Pier,[94] an Imerys corporate representative who testified about composition, sampling and testing. Dr. Poulton's decision to consider only a finite set of documents and testimony is significant and renders her opinions unreliable.

For example, although she offered testimony regarding the quality of Vermont talc mined for Defendants' talcum powder products, she was unfamiliar with one of the mines sourced by Defendants (the Johnson mine).[95] Dr. Poulton acknowledged that there are thousands and thousands of documents that have been produced, and that other documents could corroborate findings that contradict her positions,[96] but she did not seek the documents out. Dr. Poulton did not consider or rely on publications from the 1950s and 1960s that are directly applicable to Vermont geology.[97] Yet she acknowledged in her testimony that "the minerals that are in the

---

[94] *Id.* at 238:4-21.

[95] *Id.* at 199:1-205:24.

[96] *Id.* at 206:14-207:1.

[97] *Id.* at 88:17-90:10 (testifying that she did not consider Chidester, A.H.M.P. Billings, and W.M. Cady, 1951, Talc Investigations in Vermont-Preliminary Report. U.S. Geological Survey Circular 95; Chidester, A.H., 1968, Evolution of the Ultramafix Complexes of Northeastern New England: Studies of the Appalachian Geology, Chapter 26, John Wiley Interscience Publishers, New York, P. 351; Ratte', Charles A. "Mineral Resource Provinces of Vermont" Vermont Geological Survey, DEC (February 1982); Van Gosen, Bradley S., Lowers, Heather A., Sutley, Stephen J., Grant, Carol A. "Using the Geologic Setting of Talc Deposits as an Indicator of Amphibole Asbestos Content: U.S. Geological Survey (2004) 45:920-939; Virta,

rocks are – are still there."[98]  Defendants' talcum powder has been mined exclusively in China for nearly two decades, yet Dr. Poulton testified that she was "not focused on the geologic information of these deposits."[99]  She also acknowledged that it is necessary to see documents and information in context,[100] but still chose to rely upon single pages of deposition testimony that in no way could be considered in context.

By way of another example, Dr. Poulton asserts in her report that the PSC's expert Dr. Cook incorrectly relied on an internal J&J report to conclude findings of fibrous tremolite and actinolite in talc ore.[101, 102] Her assertion is based upon an assumption that the samples referred to in the Pooley Report were taken from "non-ore" samples and were not fibrous.[103] The Pooley Report specifically stated that "sections were prepared of the specimens of wallrock and, where possible, _the talc ore_" and goes on to list the minerals which formed a major constituent in at least one of the sections, including tremolite. The Pooley Report went on to include actinolite

---

Robert L. "The Phase Relationship of Talc and Amphiboles in a Fibrous Talc Sample: Bureau of Mines Report of Investigations (1985)).

[98] _Id._ at 86:4-87:1.

[99] _Id._ at 92:17-24.

[100] _Id._ at 207:8-19.

[101] Poulton Report at 6.

[102] The report relied upon by Plaintiffs' expert Dr. Cook and challenged by Dr. Poulton is referred to herein as the "Pooley Report," and is attached hereto as **Exhibit G.**

[103] Poulton Report at 6.

as a minor accessory,[104] identified *fibrous talc in talc ore*,[105] and additional samples that contained tremolite.[106] Ultimately, Dr. Poulton acknowledged the findings counter to her opinions after being shown additional documents reflecting samples containing fibrous talc, tremolite, and actinolite.[107]

Dr. Poulton based her opinions on a narrow subset of material cited by the PSC's experts (*see* Section B(1)(a) above), and 6-12 documents selected by Defendants' counsel.[108] Some materials provided to her were incomplete, consisting of one page out of hundreds. The selection of materials by a third party, where that selection is severely limited relative to the materials available on the topic, is an unreliable methodology. Dr. Poulton's opinions are based only on cherry-picked scientific evidence favorable to the opinion of Defendants' counsel, resulting in a biased and unreliable review process.  Her opinions, therefore, should be excluded.

        c.    **Dr. Poulton's *ipse dixit* opinions are based upon her unsupported, subjective beliefs**

---

[104] Poulton Dep. at 115:23-116:10.

[105] *Id.* at 122:8-20.

[106] *Id.* at 123:5-125:16.

[107] *Id.* at 126:21-127:7.

[108] *Id.* at 20:17-21:19.

Dr. Poulton states in her report that the hanging wall[109] - the block of the mine positioned over the fault line where harmful constituent minerals may be found - would not be included in the material that was bottled for Defendants' Baby Powder.[110] However, when asked whether she could exclude this possibility to a reasonable degree of scientific certainty, Dr. Poulton acknowledged that she could not do so.[111]

Dr. Poulton advocates the concept that selective mining is successfully done in talc mines. Selective mining involves an excavator operator scooping minerals for transport with a bucket loader. Dr. Poulton characterized the excavator operator as "probably the person that looks most at the rocks" and "execute[s] decisions" from the excavator.[112] Despite her stated opinion that the excavator operator is the one who looks most at the rocks and executes decisions, doing so from his position atop the excavator, Dr. Poulton acknowledged that you cannot identify and differentiate between minerals if you "can't rotate it…can't use a hand lens to look at it in detail,"

---

[109] "Hanging wall" is defined as "the upper or overhanging wall of an inclined vein, fault, or other geologic structure." https://www.merriam-webster.com/dictionary/hanging%20wall?src=search-dict-box.

[110] Poulton Report at 6; Poulton Dep. at 133:12-22.

[111] Poulton Dep. at 134:9-16 ("it is completely theoretically hypothetically possible some of that material could be commingled with talc ore taken to a mill, maybe."). *See also id.* at 134:17-20 ("Q. And you cannot say to a reasonable degree of scientific certainty that that did not occur, can you? A. I wasn't there.").

[112] *Id.* at 324:14-325:4.

and "can't touch it…take measurements of it."[113] In her report on page 25, Dr. Poulton inserted a caption below a picture instructing the reader to "notice the boundaries are sharp and it is easy to segregate this material during selective mining." Yet, when asked, she herself could not identify the ore in the photograph.[114]

Dr. Poulton's *ipse dixit* opinions[115] should be excluded in their entirety because they are based upon her unsupported, subjective beliefs and will not assist the trier of fact.

---

[113] *Id.* at 328:11-24; 331:13-332:7.

[114] Poulton Report at 25; Poulton Dep. at 334:21-336:3.

[115] *Oddi v. Ford Motor Co.,* 234 F.3d 136, 158 (3d Cir. 2000) (holding that an expert's *ipse dixit* does not withstand *Daubert's* scrutiny); *Magistrini v. One Hour Martinizing Dry Cleaning*, 180 F. Supp. 2d 584, 595 (D.N.J. 2002) (citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S. Ct. 512, 139 L. Ed. 2d 508 (1997) ("nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.")); *Montgomery Cty. v. Microvote Corp.*, 320 F.3d 440, 448 (3d Cir. 2003) (citing *Joiner,* 522 U.S. at 146); *In re Gabapentin Patent Litig.*, No. CIV.A. 00-2931, 2011 WL 12516763, at *10 (D.N.J. Apr. 8, 2011); *Hamilton v. Emerson Electric Co.*, 133 F. Supp.2d 360, 370 (M.D. Pa. 2001) ("*ipse dixit* is defined in Black's Law Dictionary as 'a bare assertion resting on the authority of an individual.' Black's Law Dictionary 828 (6th Ed. 1990)."); *Holman Ent. v. Fidelity & Guaranty Ins. Co.*, 563 F.Supp.2d 467, 470 (D.N.J. 2008); *see Zeller v. J.C. Penney Co.*, 2008 WL 906350, at *7 n. 13 (D.N.J. Mar. 31, 2008) (noting that "an expert's bare conclusions are not admissible."); *see also Edison Wetlands Ass'n, Inc. v. Akzo Nobel Chems., Inc*., 2009 WL 5206280, at *2 (D.N.J. Dec. 22, 2009) (holding that "the expert must have good grounds for his or her belief" and that courts "need not admit bare conclusions or mere assumptions proffered under the guise of expert opinions").

> **d.** **Dr. Poulton's *ipse dixit* opinions lack credibility due to an inadequate analysis and reliable synthesis of the documents and data presented <u>and/or the lack of data reviewed</u>**

Dr. Poulton criticizes Drs. Cook and Krekeler for improperly conflating non-asbestiform minerals with asbestiform minerals.[116] She further criticizes Dr. Cook for relying on documents that state chrysotile is reported.[117] Yet, Dr. Poulton is unable to deny that the documents referenced by Dr. Cook clearly refer to chrysotile.[118] Dr. Poulton criticizes Drs. Cook and Krekeler for conflating non-asbestiform with asbestiform minerals.[119] However, Dr. Cook's report specifically refers to testing results in a table where "…amphibole asbestos or potentially asbestiform amphiboles have been found…"[120] Similar statements differentiating amphibole or fibrous amphibole are found in Dr. Krekeler's report, an acknowledgment of the distinction between asbestiform and non-asbestiform minerals. In fact, Dr. Krekeler specifically notes findings of fibrous, *asbestiform* mineral.[121] Dr. Poulton goes on to specifically criticize Drs. Cook and Krekeler for

---

[116] Poulton Report at 7-8.

[117] *Id.* at *8.*

[118] *See* Poulton Deposition Exhibit 14, attached hereto as **Exhibit H.** *See also* Poulton Dep. at 183:20-189:12 ("the minerals which show in the valley are… chrysotile… tremolite, actinolite…").

[119] Poulton Report at 7.

[120] Cook Report at 13. *See also* Poulton Dep. at 155:19-157:1.

[121] Krekeler Report at 4; 14; and 29-31.

a finding of tremolite, asserting the document they cited did not identify it as asbestiform.[122]   However, Dr. Poulton is unable to reconcile her opinion with the fact that the document states that Battelle concluded "10 percent of the material that was examined was fibrous."[123]

Dr. Poulton criticizes Dr. Krekeler's assessment that field trip samples obtained in China were inadequate to review geology and evaluate prospect areas.[124] She testified that the Imerys geologist was not in China to sample the geology but to look at potential business opportunities.[125] However, Dr. Poulton's self-serving interpretation lacks credibility because in 2004 when the field trip occurred, Imerys was already sourcing from China.[126] In the end, Dr. Poulton's position in regard to the field trip samples is unsupported speculation.

Dr. Poulton opines that weekly composites of talc were tested by Defendants using TM 7024 (TEM test method).[127]   However, during her deposition Dr. Poulton admitted that she was actually uncertain what Defendants' schedule for TEM testing

---

[122] Poulton Report at 7.

[123] *See* JNJ000087868 at 894, attached hereto as **Exhibit I.**

[124] *Id.* at 11.

[125] Poulton Dep. at 226:8-227:16.

[126] *Id.* at 227:17-228:21.

[127] Poulton Report at 13.

for the presence asbestos was.[128] Further, after reviewing testimony by Julie Pier (Imerys's corporate representative), Dr. Poulton conceded that Defendants conducted TEM testing for asbestos on only a quarterly basis.[129] Although Dr. Poulton stated that she "would have wanted to see" information related to the frequency of TEM testing for asbestos, that information was not provided to her.[130] Ironically, despite also testifying that she would have liked to consider the testimony of Julie Pier in context, Dr. Poulton was only provided a single page of Julie Pier's testimony and Dr. Poulton never requested the entire transcript.[131]

Dr. Poulton's selective mining analysis is based in part on her review of core drilling[132] wherein she discusses the amount of core that was drilled in 1998.[133] Dr. Poulton testified that data from the drill cores are used along with samples from blast hole drills and in-fill drilling to extrapolate the material between the holes and create a statistical model of mineralogy between drill core holes.[134] However, a 2008 Argonaut mine document, states that "over 300 drill hole datasets were found

---

[128] Poulton Dep. at 223:10-24.

[129] *Id.* at 237:4-12.

[130] *Id.* at 240:4-241:1

[131] *Id.*

[132] Poulton Dep. at 285:4-9; 290:3-14.

[133] Poulton Report at 20.

[134] Poulton Dep. at 292:1-22.

without complete geology logs, no collar data, survey data or inconsistent and unrealistic data.  All of these 300 drill holes were drilled during the 1990s with very poor data collection and retention. None of these drill holes were used in the construction and estimation of either the 2002 or the 2007 model."[135] To bolster her tenuous position Dr. Poulton testified that they relied on blast hole data that were used for ore control at the time.[136] However, the document also states that "only limited blast hole data was utilized in the construction of the geologic polygons primarily due to the lack of quality control on the blast hole database" and "could not be confirmed reliable…was used sparingly."  Dr. Poulton agreed it was possible that Imerys determined that the data they had was not reliable for purposes of the computer model for Argonaut.[137]

Dr. Poulton cites to a 1987 letter from McCrone Associates, Inc., a testing lab, that states McCrone has continuously monitored samples for Windsor using TEM and the product has been free of asbestos for over 15 years.[138] Dr. Poulton states that Dr. Cook did not see all the testing results and was incorrect in his assertion that

---

[135] *Id.* at 299:12-300:4. *See also* Poulton Dep. Exhibit 28, attached hereto as **Exhibit J.**  The document also states the assay and logs at geologic intervals did not coincide and the logged rock height was not consistent with assay data.

[136] *Id.* at 301:3-16.

[137] *Id.* at 336:14-337:13.

[138] Poulton Report at 13. *See also* Poulton Deposition Exhibit 22, attached hereto as **Exhibit K.**

testing protocols were not followed.[139] However, rather than developing her own opinion regarding the sampling processes by reviewing the testing and sampling documents that were available, Dr. Poulton merely cherry-picked a small number of documents like the McCrone letter to form her opinion. Dr. Poulton's process lacks credibility and, as a result, her opinions are flawed.

Likewise, Dr. Poulton criticized Dr. Cook's statements regarding Defendants' faulty sample monitoring system because Dr. Cook did not see *all* of the testing results.[140] Yet, in reaching the opposite opinion, Dr. Poulton reviewed only a portion of the test results compiled by Drs. Cook and Krekeler in their asbestos charts reports.[141] Dr. Poulton's credibility is further undermined by her lack of consideration of pre-1987 testing results that reported the presence of asbestos despite those positive test results being listed in the reports of the PSC's experts.[142]

In her report, Dr. Poulton cites to an article by Stanley[143] to opine that the PSC's expert, Dr. Krekeler, was incorrect in stating composite sampling was

---

[139] Poulton Report at 12-13.

[140] *Id.* at 13.

[141] Poulton Dep. at 245:3-11.

[142] *Id.* at 246:12-247:7. *See also* Poulton Dep. at 247:14-250:12 and Poulton Dep. Exhibit 23 (1971 test result reporting tremolite and actinolite in a sample, attached hereto as **Exhibit L**); Poulton Dep. at 250:17-252:19 (discussing chart showing tests results positive for tremolite and actinolite from 1971 and 1972).

[143] Stanley, C.  The fundamental relationship between sample mass and sampling variance in real geological samples and corresponding statistical models.

improper.[144] However, Stanley relied on homogenous distribution of geological material, a characteristic that talc ore does not have.[145] In her report, Dr. Poulton asserts that Defendants' drilling methods were adequate because they followed international reporting standards dictated by the Joint Ore Reserve Committee (JORC).[146] However, this is an incorrect standard to apply. JORC is the Australasian publishing conduit for standards related to evaluating and reporting ore reserves and resources.[147] The United States Securities and Exchange Commission does not require adherence to JORC and, actually, uses a different standard.[148] Further, Dr. Poulton could not cite to any evidence that the JORC standards were used in any of Defendants' U.S.-based mines. Even if Defendants' U.S. mines were subject to JORC standards, in 2008 the Vermont operations were not in compliance with JORC,[149] and Dr. Poulton could provide no information that Vermont was in compliance prior to 2008.[150] Finally, she did not have information about whether

---

Exploration and Mining Geology.   2007; 16(1-2):109-123, attached hereto as **Exhibit M.**

[144] Poulton Report at 13-14.

[145] Poulton Dep. at 258:18-260:16.

[146] Poulton Report at 21.

[147] Poulton Dep. at 97:16-99:17. *See also* JORC.org.

[148] *Id.* at 99:24-100:3.

[149] *Id.* at 102:3-7.

[150] *Id.* at 102:22-103:5.

Defendants' Chinese mine – arguably subject to JORC standards – was ever in compliance with JORC.[151]

Dr. Poulton relies upon a diagram using the triangulation method for the Hammondsville mine as an illustration of how ore grades are assigned to volumes of rock,[152] but admits that there was probably a lack of sufficient drill core data to fully complete the model for mine planning.[153]

As exemplified above, the opinions of Dr. Poulton lack credibility because they are based upon a limited set of documents, some of which are misinterpreted by Dr. Poulton, ignore a host of relevant documents, and are premised on unsupported speculation.

> **e.    Dr. Poulton's opinions are unsound due to improper reliance on references that are <u>unrelated to relevant aspects of her opinions</u>**

Dr. Poulton further criticizes Dr. Cook for "misrepresent[ing] general information on minerals associated with talc in Italy."[154]  Her criticism is based upon Dr. Cook's reliance on a February 2010 Luzenac document entitled "Talc Geology, Mining and Processing for Cosmetic, Pharma and Food Applications."[155]  However,

---

[151] *Id.* at 100:4-8.

[152] Poulton Report at 18.

[153] Poulton Dep. at 278:18-279:2.

[154] Poulton Report at 8.

[155] *See* IMERYS 081025, attached hereto as **Exhibit N.**

34

Dr. Cook did not cite this document to describe Italian talc or talc mines, nor does the document itself make any reference to Italy.[156] Dr. Poulton acknowledged that she "[was] incorrect in that citation of the document" and the statements should be excluded.[157]  Dr. Poulton also references an article by Coggiola[158] to support the assertion that the 2003 study of miners and millers in Val Chisone showed "no asbestiform fibers in talc from the Val Chisone region."[159]  However, Dr. Poulton admitted Coggiola does not involve talc testing for asbestos.[160] She cites Guilbert and Park in regard to the characterization of the properties of an ore body in relation to the surrounding rocks.[161] However, Guilbert and Park does not address either ultramafic talc occurrences, or talc occurrences in Vermont.[162]

Dr. Poulton's relies on Noakes 2005[163] to support the assertion that hand sorting of high-grade talc is used in production outside of China. However, the

---

[156] Poulton Dep. at 190:20-192:13.

[157] *Id.* at 193:2-4.

[158] Coggiola, M., Bosio, D., Pira, E., Piolato, P., La Vecchia, C., Negri, E., Michelazzi, M., and Bacaloni, A.  An update of a mortality study of talc miners and millers in Italy.  Am J Industrial Med.  2003; 44:63-69.

[159] Poulton Report at 7.

[160] Poulton Dep. at 175:14-19.

[161] Poulton Report at 7.

[162] Poulton Dep. at 183:10-19.

[163] Noakes, F.  The customer's king at Three Springs.  Australian Mining.  (April) 2005: 32-34.

Noakes article pertains to Three Springs talc mine in Australia, an industrial talc mine never sourced for cosmetic talc.[164] She cites to Birkhimer in her report, stating that hydraulic excavators can selectively mine layers or pockets of material.[165] However, the relevance of this reference is uncertain because the machinery is only identified in the reference by broad category of machinery, no specific bucket or machinery sizes are listed.[166]

Dr. Poulton's opinions are based on limited evidence and in numerous instances, on a flawed or incorrect understanding of the import of the documents she did review. She ignored the totality of the evidence, choosing to cherry-pick supportive evidence to the exclusion of evidence that would undermine her opinions. As such, her opinions are unreliable, scientifically unsound, and should be excluded.

2. **Dr. Webb's opinions should be excluded because they are based upon an incomplete record and she employs a methodology that Dr. Webb admits is not appropriate**

a. **Dr. Webb fails to adhere to her own "field-based" methodology to arrive at her opinions in this case**

An expert must be able to demonstrate that he or she employed a scientifically valid and reliable methodology to form the basis of his or her opinion. Merely stating

---

[164] Poulton Dep. at 340:2-15.

[165] Poulton Report at 30.

[166] Poulton Dep. at 340:16-343:23.

so is not sufficient.[167] An expert must "[employ] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."[168]

The Third Circuit has held that where an expert acknowledges that a particular method is the "preferable methodology" to use for an analysis, but the expert does not use that methodology, his testimony should be excluded.[169] In analyzing the reliability of an expert's opinion, "it is appropriate for the Court to consider whether the testimony [the expert] intends to give faithfully complies with *their own views* of what standards constitute the scientific method."[170] Courts have routinely excluded expert testimony where the expert has failed to use the very methodology that he or she normally uses outside of the courtroom.[171]

---

[167] *See Oddi*, 234 F.3d at158 (holding that an expert's *ipse dixit* does not withstand *Daubert's* scrutiny); *see also Montgomery Cty. v. Microvote Corp.*, 320 F.3d 440, 448 (3d Cir. 2003) (citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S. Ct. 512, 139 L. Ed. 2d 508 (1997)); *In re Gabapentin Patent Litig.*, 00-cv-2931, 2011 WL 12516763, at *10 (D.N.J. Apr. 8, 2011); *Hamilton v. Emerson Elec. Co.*, 133 F. Supp. 2d 360, 370 (M.D. Pa. 2001) ("*ipse dixit* is defined in Black's Law Dictionary as 'a bare assertion resting on the authority of an individual.' Black's Law Dictionary 828 (6th Ed. 1990).").

[168] *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999).

[169] *In re TMI Litig.*, 193 F.3d 613, 692 (3d Cir. 1999).

[170] *Soldo v. Sandoz Pharm. Corp.*, 244 F. Supp. 2d 434, 560 (W.D. Pa. 2003) (emphasis added).

[171] *See McMunn v. Babcock & Wilcox Power Generation Grp., Inc.*, 10-cv-143, 2013 WL 3487560, at *22 (W.D. Pa. July 12, 2013) (expert's failure to apply the Bradford Hill criteria, which he has called the "gold standard" in this field, when he ordinarily does so is significant (citing *Rimbert v. Eli Lilly & Co.*, 06-cv-0874 JCH/LFG, 2009

The Court should exclude Dr. Webb's opinions in their entirety because they are unreliable. She has inexplicably failed to use the very observation-based methodology that she normally uses in the field and outside of the courtroom, and the radioactive dating methodology she typically employs in the laboratory is irrelevant to this litigation because talc and asbestos cannot be dated in that manner.[172]

Dr. Webb describes herself as a field-based geologist, one who is "out in the field making structural measurements, collecting oriented samples."[173] She characterizes her particular field-based skill set as "the ability to recognize and document structures, to make the appropriate measurements" in the field.[174] Indeed, her typical process is *observation-focused* in the field; she is "looking to make

---

WL 2208570, at *14 (D.N.M. July 21, 2009) ("That Dr. Jackson chose not to apply the methodology that she personally considers to be the standard in her field to assess causation [Bradford Hill criteria] undermines the reliability of her testimony."); *see also Brown v. Burlington N. Santa Fe Ry. Co.*, 765 F.3d 765, 773, 776 (7th Cir. 2014) (affirming exclusion of expert testimony where expert failed to follow his own description of proper methodology); *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 268–69 (2d Cir. 2002) (affirming exclusion of expert where expert failed to reliably apply his own methodology); *Truck Ins. Exch. v. MagneTek, Inc.*, 360 F.3d 1206, 1213 (10th Cir. 2004) ("The district court noted that [the expert]'s opinion did not meet the standards of fire investigation [the expert] himself professed he adhered to."); *U.S. E.E.O.C. v. Rockwell Int'l Corp.*, 60 F. Supp. 2d 791, 797 (N.D. Ill. 1999) (same).

[172] Webb Dep. at 90:14-92:2.

[173] *Id.* at 109:10-19.

[174] *Id.* at 109:20-24.

observations and document structural orientations, again about the planar or linear elements that might be present in a rock as a function of its deformation history," and to make observations about the "rock types" and "the mineralogy in detail," which includes the use of radioactive dating.[175]

Dr. Webb described her standard step-by-step process in detail. Building on what was known and documented for the region, she first observes and obtains rock samples in the "field," which may include road cut-outs, quarries, rivers, and mines.[176] After she obtains rock samples from these varied locations, she takes the samples back to the "rock-cutting" facility at her department at the University of Vermont and has petrographic thin sections made for testing.[177] Once she has petrographic thin sections, she looks at them under a petrographic microscope and/or a polarized light microscope to make mineral identifications and to observe the textural relationships between the minerals.[178] In many cases, she uses radioactive dating to calculate the absolute age of the rock.[179] Finally, she makes a record of the mineralogy and the structures that she observes.[180]

---

[175] *Id.* at 119:3-13.

[176] *Id.* at 121:16-25.

[177] *Id.* at 122:1-9.

[178] *Id.* at 122:10-15.

[179] *Id.* at 90:14-92:2.

[180] *Id.* at 123:13-23.

Remarkably, Dr. Webb did not employ her usual "field-based" process to arrive at her opinions in this case. She did not build on what was known and documented by reviewing the specific geologic maps, mine planning documents, and geological analyses of the mines used to source J&J's talcum powder products. She did not sample rocks from any of the talc mines used to source J&J talcum powder products, despite the fact that the Hamm, Hammondsville and Argonaut mines are only an approximately 2.5-hour drive from where she works in Burlington, Vermont.[181] Dr. Webb never asked to visit any of the Vermont mines (Argonaut, Hamm, or Hammondsville) to collect samples, and she was never told that she could not go if she wished.[182]  In her own words, "But, yeah, no, I didn't ask to go. I wasn't told that I should go or couldn't go. I was left to use my professional opinion about how that played out."[183]

The list of activities that Dr. Webb *did not* undertake in forming her opinions about the talc mines used to source J&J talcum powder products is extensive and was covered in detail at her deposition.[184] She admitted that she has both a *general* lack of knowledge regarding talc mines and she made no effort to gather information

---

[181] *Id.* at 127:18-21; 130:3-8.

[182] *Id.* at 130:23-131:15.

[183] *Id.* at 131:12-15.

[184] *See* Webb Deposition Exhibit 18, attached hereto as **Exhibit O.**

about the *specific* talc mines at issue in Vermont, China, and Italy. Dr. Webb never requested or inspected core logs from any talc mines used to source J&J talcum powder products.[185] She did not test (or ask to test) any samples of the J&J talcum powder products, nor analyze samples or thin sections of rock specimens taken from J&J mines.[186] She never conducted XRD, PLM, scanning electron microscopy, or transmission electron microscopy on any J&J product samples.[187] Further, she conceded that she was not aware of anyone else performing such testing (outside this litigation) that she could otherwise rely on.[188] She never saw or reviewed the results of testing of samples taken from the J&J mines conducted by J&J, third party labs, or Imerys, including, but not limited to tests for asbestos or other constituents in the talc (such as fibrous talc[189] and heavy metals).[190]

Dr. Webb's utter lack of interest in testing samples from any of the talc mines at issue—particularly the nearby Vermont mines—is puzzling given the fact that she is familiar with and has used a scanning electron microscope, laser ablation inductively coupled mass spectrometry, and cathodoluminescence imaging to

---

[185] Webb Dep. at 136:9-11.

[186] *Id.* at 136:12-23.

[187] *Id.* at 136:24-138:8.

[188] *Id.* at 137:2-15.

[189] Dr. Webb concedes that fibrous talc could be present in the talc deposits in Vermont. *Id.* at 164:14-165:9.

[190] *Id.* at 138:9-14.

identify minerals.[191] Dr. Webb testified that the University of Vermont medical school has both a transmission electron microscope and a scanning microscope that she could have used to test samples if she wished to do so.[192]

In sum, although Dr. Webb's expertise is "field-based" observation and actual laboratory analysis of rocks and minerals, she did not employ her expertise in forming her current opinions.

> **b.    Dr. Webb's methodology is flawed because she cherry-picked items upon which she relied and wholly ignored any maps, testing, samples, observations or other data related to the specific talc mines at issue**

Dr. Webb chose to forego her usual field-based approach (obtaining and testing actual samples), and instead relied solely on a limited selection of cherry-picked literature to conclude that one would "not expect" asbestos to be present in the talc mines at issue.  She made clear that her opinions are based solely on the small set of materials she reviewed and identified as reliance materials in her report.[193]  Dr. Webb reviewed a mere 17 company documents.  She did not review or reference any observations, tests, samples, or other data from the actual talc mines used to source the J&J talcum powder products. While Dr. Webb testified that she had access to the entirety of the expert reports prepared by the PSC's experts Dr.

---

[191] *Id.* at 105:3-13; 106:1-13.

[192] *Id.* at 117:7-16.

[193] *Id.* at 37:7-13.

Robert Cook and Dr. Mark Krekeler, she did not review all of their reliance materials (which numbered in the 100s of documents).[194] She also had access to the reports prepared by defense experts Dr. Ann G. Wylie, Dr. Mary Poulton, and Dr. Melinda Darby Dyar, but did not review any of the materials that those experts reviewed and/or relied upon in forming their opinions.[195]

Dr. Webb never reviewed geologic maps from any mines used to source J&J talcum powder products, and more importantly, never even asked if any were available.[196] She testified that she never actually reviewed a map specific to the Argonaut mine in Vermont as part of her methodology in determining whether there was asbestos present. When asked "if there was a geologic map of the Argonaut mine available, would you want to see that?," she responded "I guess, yeah, if there was good data and—and context there."[197]  When asked whether "more information is better than less information" in forming opinions, Dr. Webb conceded, "I guess, yeah, we—yeah, information is good if there's—if you're able to evaluate the—the real data and the—the methodology."[198]

---

[194] *Id.* at 235:15-236:1.

[195] *Id.* at 21:17-22:25.

[196] *Id.* at 134:24-135:3.

[197] *Id.* at 31:22-32:24.

[198] *Id.* at 33:4-16.

Dr. Webb acknowledges that there is asbestos in Vermont, but opines that there is "no evidence" of asbestos in the particular Vermont mines used to source J&J talcum powder products.[199] Dr. Webb's extremely narrow review of relevant materials is important because she *does not* explicitly opine that there is no asbestos in the mines—rather, her opinion is that "no evidence has been demonstrated to [her] *in the literature or the reports [she has] reviewed*."[200] When asked directly whether it is her opinion that there is no asbestos in the talc mines used to source J&J talcum powder products, Dr. Webb testified, "*I see no evidence* to support the claim that there is asbestos in these mines."[201] Indeed, she did not find any such evidence because, "*the vast majority of what [she] looked at was [her] own research*," not the actual tests, data, or observations of others relating to the mines used to source J&J talcum powder products.[202]

While the limited literature Dr. Webb reviewed indicates, in her opinion, that it is "extremely unlikely" that asbestos exists in the talc mines, she concedes that it

---

[199] *Id.* at 193:25-196:17.

[200] *Id.* at 162:6-17 (emphasis added).

[201] *Id.* at 36:9-17 (emphasis added).

[202] *Id.* at 199:1-200:3 (emphasis added); *see also* Dr. John Hopkins Deposition, Exhibit 28, attached hereto at Exhibit P.

is not impossible.[203] She further concedes that she has "seen evidence of fibrous talc" in the J&J Vermont talc mines and that it "could be present" there.[204]

Similarly, Dr. Webb opines that one would "not expect" actinolite to be present in the main body of the talc ore, because "the bulk composition isn't really appropriate for that," nor would you expect to find "great volumes" of tremolite because of the relatively low levels of calcium.[205]  And because she "can't come up with a petrologic argument to say those should be present in any abundance" in the J&J talc mines, she speculates that the actinolite and tremolite is "most likely coming from the margins."[206] However, when presented with documents produced in this litigation that reference the presence of actinolite and tremolite in the Vermont mines—documents she had never seen before—Dr. Webb acknowledged that she could not rule out that the documents refer to the asbestiform versions of actinolite and tremolite but would *need to see more information* to make that determination.[207,]

---

[203] *Id.* at 162:21-163:6.

[204] *Id.* at 163:20-164:18.

[205] *Id.* at 184:19-185:17.

[206] *Id.* at 185:20-25.

[207] *Id.* at 201:10-206:17 (discussion of IMERYS 219720-22, titled Cyprus Ore Reserves – Arsenic and Tremolite, attached hereto as **Exhibit Q**); *see also id.* at 210:14-25 (discussion of IMERYS238270-77, titled Interoffice Correspondence, Hamm Mine Core Drilling, attached hereto as **Exhibit R**).

In Dr. Webb's own words, "I mean, I don't want to rub actinolite on my face, asbestiform or non-asbestiform."[208]

## <u>CONCLUSION</u>

For this and the other foregoing reasons, the Court should grant the PSC's *Daubert* motion to exclude the opinions of Mary Poulton, PhD and Laura Webb, Ph.D. in their entirety.  Neither are qualified to render the opinions they offer in this case, and the methodologies they employed to reach their opinions are flawed and unreliable.

<div style="margin-left: 40%;">

Respectfully submitted,

/s/ *Michelle A. Parfitt*
Michelle A. Parfitt
ASHCRAFT & GEREL, LLP
1825 K Street, NW, Suite 700
Washington, DC 20006
Tel: 202-783-6400
Fax: 202-416-6392
mparfitt@ashcraftlaw.com

/s/ *P. Leigh O'Dell*
P. Leigh O'Dell
BEASLEY, ALLEN, CROW, METHVIN, PORTIS & MILES, P.C.
218 Commerce Street
Montgomery, AL 36104
Tel: 334-269-2343
Fax: 334-954-7555
Leigh.odell@beasleyallen.com

***Plaintiffs' Co-Lead Counsel***

</div>

---

[208] *Id.* at 216:11-16.

/s/ *Christopher M. Placitella*
Christopher M. Placitella
COHEN, PLACITELLA & ROTH, P.C.
127 Maple Avenue
Red Bank, NJ 07701
Tel: 732-747-9003
Fax: 732-747-9004
cplacitella@cprlaw.com

*Plaintiffs' Liaison Counsel*

## PLAINTIFFS' EXECUTIVE COMMITTEE:

Warren T. Burns
BURNS CHAREST LLP
500 North Akard Street, Suite 2810
Dallas, TX 75201
Tel: 469-904-4551
Fax: 469-444-5002
wburns@burnscharest.com

Richard Golomb
GOLOMB & HONIK, P.C.
1515 Market Street, Suite 1100
Philadelphia, PA 19102
Tel: 215-985-9177
rgolomb@golombhonik.com

Richard H. Meadow
THE LANIER LAW FIRM PC
6810 FM 1960 West
Houston, TX 77069
Tel: 713-659-5200
Fax: 713-659-2204
richard.meadow@lanierlawfirm.com

Hunter J. Shkolnik
NAPOLI SHKOLNIK PLLC
360 Lexington Avenue, 11thFloor
New York, NY 10017
Tel: 212-397-1000
hunter@napolilaw.com

## PLAINTIFFS' STEERING COMMITTEE:

Laurence S. Berman
LEVIN, SEDRAN & BERMAN LLP
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Tel: 215-592-1500
Fax: 215-592-4663
lberman@lfsblaw.com

Timothy G. Blood
BLOOD, HURST & O'REARDON, LLP
701 B Street, Suite 1700
San Diego, CA 92101
Tel: 619-338-1100
Fax: 619-338-1101
tblood@bholaw.com

Sindhu S. Daniel
BARON & BUDD, P.C.
3102 Oak Lawn Avenue, #1100
Dallas, TX 75219
Tel: 214-521-3605
Fax: 214-520-1181
sdaniel@baronbudd.com

Kristie M. Hightower
LUNDY, LUNDY, SOILEAU & SOUTH, LLP
501 Broad Street
Lake Charles, LA 70601
Tel: 337-439-0707
Fax: 337-439-1029
khightower@lundylawllp.com

Victoria Maniatis
SANDERS PHILLIPS GROSSMAN, LLC
100 Garden City Plaza, Suite 500
Garden City, NJ 11530
Tel: 516-640-3913
Fax: 516-741-0128
vmaniatis@thesandersfirm.com

Eric H. Weinberg
THE WEINBERG LAW FIRM
149 Livingston Avenue
New Brunswick, NJ 08901
Tel: 732-246-7080
Fax: 732-246-1981
ehw@erichweinberg.com

Christopher V. Tisi
LEVIN PAPANTONIO
316 South Baylen St.
Pensacola, FL 32502
(850) 435-7000
ctisi@levinlaw.com

Jeff S. Gibson
WAGNER REESE, LLP
11939 N. Meridian St.
Carmel, IN 46032
Tel: (317) 569-0000
Fax: (317) 569-8088
jgibson@wagnerreese.com

Daniel R. Lapinski
MOTLEY RICE LLC
210 Lake Drive East, Suite 101
Cherry Hill, NJ 08002
Tel: 856-667-0500
Fax: 856-667-5133
dlapinski@motleyrice.com

Carmen S. Scott
MOTLEY RICE LLC
28 Bridgeside Boulevard
Mount Pleasant, SC 29464
Tel: 843-216-9162
Fax: 843-216-9450
cscott@motleyrice.com

Richard L. Root
MORRIS BART, LLC
Pan America Life Center
601 Poydras St., 24th Fl.
New Orleans, LA 70130
Tel. 504-525-8000
Fax: 504-599-3392
rroot@morrisbart.com