# Exhibit A

Mary Poulton, Ph.D.

```
 1        IN THE UNITED STATES DISTRICT COURT
 2      FOR THE EASTERN DISTRICT OF NEW JERSEY
 3                    -  -  -
 4
      IN RE:  JOHNSON &         :
 5      JOHNSON TALCUM POWDER    :
        PRODUCTS MARKETING,      :
 6      SALES PRACTICES, AND     :  NO. 16-2738
        PRODUCTS LIABILITY       :  (FLW) (LHG)
 7      LITIGATION               :
                                 :
 8      THIS DOCUMENT RELATES    :
        TO ALL CASES             :
 9
                    -  -  -
10
                 March 18, 2019
11
                    -  -  -
12
13              Videotaped deposition of
      MARY POULTON, Ph.D., taken pursuant to
14    notice, was held at Skadden Arps, Four
      Times square, New York, New York,
15    beginning at 9:06 a.m., on the above
      date, before Michelle L. Gray, a
16    Registered Professional Reporter,
      Certified Shorthand Reporter, Certified
17    Realtime Reporter, and Notary Public.
18
                    -  -  -
19
20         GOLKOW LITIGATION SERVICES
         877.370.3377 ph| 917.591.5672
21            deps@golkow.com
22
23
24
```

## Page 2

```
 1  APPEARANCES:
 2
 3  BEASLEY ALLEN, P.C.
    BY:  P. LEIGH O'DELL, ESQ.
 4  BY:  JENNIFER K. EMMEL, ESQ.
    218 Commerce Street
 5  Montgomery, Alabama 36103
    (334) 269-2343
 6  leigh.odell@beasleyallen.com
    Jennifer.emmel@beasleyallen.com
 7
          - and -
 8
    MOTLEY RICE, LLC
 9  BY:  CARMEN S. SCOTT, ESQ.
    28 Bridgeside Boulevard
10  Mt. Pleasant, South Carolina 29464
    (843) 216-9160
11  cscott@motleyrice.com
    Representing the Plaintiffs
12
13  ORRICK, HERRINGTON & SUTCLIFFE, LLP
    BY:  ALEX V. CHACHKES, ESQ.
14  51 West 52nd street
    New York, New York 10019
15  (212) 506-3767
    achachkes@orrick.com
16
          - and -
17
    DRINKER BIDDLE & REATH LLP
18  BY:  JACK N. FROST, JR., ESQ.
    600 Campus Drive
19  Florham Park, New Jersey 07932
    (973)549.7106
20  Jack.frost@dbr.com
21        - and -
22
23
24
```

## Page 3

```
 1  APPEARANCES:  (Cont'd.)
 2
    DRINKER BIDDLE & REATH, LLP
 3  BY:  KATHERINE McBETH, ESQ.
    One Logan Square, Suite 2000
 4  Philadelphia, Pennsylvania 19103
    (215) 988-2706
 5  katherine.mcbeth@dbr.com
    Representing the Defendants, Johnson
 6  & Johnson entities
 7
    SEYFARTH SHAW, LLP
 8  BY:  THOMAS T. LOCKE, ESQ.
    975 F Street, NW
 9  Washington, D.C. 20004
    (202) 463-2400
10  tlocke@seyfarth.com
    Representing the Defendant, PCPC
11
12
13  ALSO PRESENT:
14
    VIDEOTAPE TECHNICIAN:
15    Henry Marte
16
17
18
19
20
21
22
23
24
```

## Page 4

```
 1            - - -
 2         I N D E X
 3            - - -
 4
    Testimony of:     MARY POULTON, Ph.D.
 5
 6    By Ms. O'Dell        13, 359
 7    By Mr. Chachkes         353
 8
 9
10            - - -
11        E X H I B I T S
12            - - -
13  NO.       DESCRIPTION        PAGE
14  Poulton-1   Notice of Deposition  15
15  Poulton-2   Expert Report of     18
                Mary Poulton, Ph.D.
16              2/25/19
17  Poulton-3   West Windsor Mill    49
                Sampling Calculations
18              And Notes
                (No Bates)
19
    Poulton-4   Faculty Senate       44
20              Minutes 3/3/08
21  Poulton-5   Amended Rule 26     103
                Report of Robert
22              B. Cook, Ph.D.
                1/22/19
23
24
```

## Page 5

```
 1            - - -
 2      E X H I B I T S  (Cont'd.)
 3
 4
 5  NO.       DESCRIPTION        PAGE
 6  Poulton-6   Rule 26 Expert      103
                Report of Mark
 7              Krekeler, Ph.D.
 8  Poulton-7   Department of       103
                Mineral Exploitation
 9              Report of Italian
                Mine Samples
10              J&J
                (Pooley)
11              FDP0000000495-618
12  Poulton-8   Department of       108
                Mineral Exploitation
13              Report of Italian
                Mine Samples
14              (Pooley)
                JNJ000322351-475
15
    Poulton-9   Progress Report     143
16              Battelle Memorial
                Institute
17              5/9/58
                JNJAZ550000000906
18
    Poulton-10  Progress Report     151
19              10/15/57
                Battelle
20              JNJ 000087868-01
21  Poulton-11  Stefano Memo        164
                4/30/73
22              JNJ 000270588
23
24
```

Page 6

E X H I B I T S (Cont'd.)

NO.        DESCRIPTION        PAGE
Poulton-12   An Update of a        167
             Mortality Study of
             Talc Miners and Millers
             In Italy
             (Coggiola)
Poulton-13   The Geology of        180
             Ore Deposits
             (Guilbert & Park)
Poulton-14   Letter from Ashton    184
             To Caneer
             8/6/71
             JNJAZ55_000006103-5

Poulton-15   Talc Geology, Mining  189
             And Processing for
             Cosmetic, Pharma and
             Food Applications
             (McCarthy February 2010
             IMERYS 081025-62
Poulton-16   6. Cosmetics         200
             Eastern Magnesia
             The Cosmetics
             Industry
             JNJH29W_00003708-712
Poulton-17   Binder. Poulton      211
             Reliance Materials
             Bibliography/Scientific
             Literature

Page 8

E X H I B I T S (Cont'd.)

NO.        DESCRIPTION        PAGE
Poulton-24   The Fundamental      258
             Relationship Between
             Sample Mass and Sampling
             Variance
             (Stanley)
Poulton-25   Geology and Ore      267
             Reserves of the
             Hammondsville Ore Body
             IMERYS 436972-97

Poulton-26   Colorado School of   268
             Mines
             Geology and Ore Reserves
             12/4/70
             JNJ 000245002-48

Poulton-27   Interoffice          279
             Correspondence
             5/21/92
             Subject, Hamm Mine
             Core Drilling
             IMERYS 238270-77
Poulton-28   2008 Annual Report   293
             For Mineral Resources
             And Ore Reserves Estimates
             Argonaut Vermont
             Ludlow, Vermont
             IMERYS-441340-17

Poulton-29   Rio Tinto Memo       325
             7/31/06
             RE, Vermont Market
             Plant 2006-2010
             IMERYS 132823

Page 7

E X H I B I T S (Cont'd.)

NO.        DESCRIPTION        PAGE
Poulton-18   Interoffice          216
             Correspondence
             3/25/92
             Cyprus Ore Reserves
             Arsenic & Tremolite
             (Munro)
             IMERYS 219720-22
Poulton-19   Memo, Rio Tinto      220
             8/17/06
             RE, North American
             Talc Market
             IMERYS-A_0005618-22
Poulton-20   Letter, 2/23/78      232
             From Lee to Miller
             IMERYS 139093-94
Poulton-21   Excerpts from        233
             Julie Pier's
             Deposition
             9/12/18

Poulton-22   Letter, 5/21/87      240
             From Stewart
             To Benninger
             Re, Windsor Minerals, Inc.
             JNJMX68_000015726

Poulton-23   Summary & Conclusions 247
             CSMRI
             4/14/71
             (Beers)
             IMERYS 238596-00

Page 9

E X H I B I T S (Cont'd.)

NO.        DESCRIPTION        PAGE
Poulton-30   Color Photograph     327
             Of a Rock
             (No Bates)
Poulton-31   Figure 137 Large     329
             Mass
             (No Bates)
Poulton-32   Binders              348
             Poulton Reliance
             Materials - J&J
             Defendants' Production
             Volume I
             Volume II
             &
             Poulton Reliance Materials
             Imerys' Productions
             Volume I
             Volume II
             Volume III

Poulton-33   Supplement List of   350
             Materials Reviewed
             And Considered by
             Mary Poulton, Ph.D.
Poulton-34   OneMine.org          367
             Document Search

Mary Poulton, Ph.D.

Page 10

```
 1              - - -
 2    P R E V I O U S L Y   M A R K E D
 3        E X H I B I T S
 4              - - -
 5
 6  NO.        DESCRIPTION        PAGE
 7  Hopkins-28   Demonstrative
                 From the Hopkins
 8               Examination
                 Spreadsheet
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 11

```
 1              - - -
 2      DEPOSITION SUPPORT INDEX
 3              - - -
 4
 5  Direction to Witness Not to Answer
 6  PAGE   LINE
    None.
 7
 8  Request for Production of Documents
 9  PAGE   LINE
    16    17
10
11  Stipulations
12  PAGE   LINE
    None.
13
    Questions Marked
14
    PAGE   LINE
15  None.
16
17
18
19
20
21
22
23
24
```

Page 12

```
 1              - - -
 2         THE VIDEOGRAPHER:  We are
 3  now on the record.  My name is
 4  Henry Marte.  I am a videographer
 5  with Golkow Litigation Services.
 6         Today's date is March 18,
 7  2019.  And the time is 9:06 a.m.
 8         This videotaped deposition
 9  is being held at Four Times
10  Square, New York, New York, in the
11  matter of Talcum Powder
12  Litigation.
13         The deponent today is Dr.
14  Mary Poulton.
15         All appearances are noted on
16  the stenographic record.
17         Will the court reporter
18  please administer the oath to the
19  witness.
20              - - -
21         ... MARY POULTON, Ph.D.,
22  having been first duly sworn, was
23  examined and testified as follows:
24              - - -
```

Page 13

```
 1         EXAMINATION
 2              - - -
 3  BY MS. O'DELL:
 4      Q.   Good morning, Dr. Poulton.
 5      A.   Good morning.
 6      Q.   My name is Leigh O'Dell.  I
 7  represent the plaintiffs in the
 8  multi-district litigation.  Would you
 9  please state your full name for the
10  record?
11      A.   Mary M. Poulton.
12      Q.   What's your current address?
13      A.   15521 North Howe Road, Mead,
14  Washington.
15      Q.   And what's your current
16  employment?
17      A.   University of Arizona,
18  co-director for the Lowell Institute For
19  Mineral Resources.
20      Q.   Okay.  University of Arizona
21  is not located in Mead, Oregon.
22      A.   No, it -- Washington.
23      Q.   Washington, excuse me.
24      A.   No, it's -- I go down about
```

Mary Poulton, Ph.D.

Page 14

1 a week a month and then work remotely the
2 rest of the time.  It's a part-time
3 position.  I retired from the university
4 in May 2017.
5     Q.   Okay.  Are you -- other than
6 your part-time work with the University
7 of Arizona and your work in this case, do
8 you have any other employment?
9     A.   Yes.  I am a contractor to
10 NIOSH through a company called AECOM.
11 And I am also a co-founder and help run
12 three start-up companies for my research
13 and do consulting.
14     Q.   Okay.  You mentioned a
15 company called AECOM?
16     A.   Yes.
17     Q.   Is that -- is that an
18 acronym?
19     A.   Yes.  A-E-C-O-M.
20     Q.   Let me ask you to take a
21 look at what I've marked as Exhibit
22 Number 1 which is the notice of
23 deposition for your deposition here
24 today.  Have you seen this before?

Page 15

1     A.   Yes.
2     Q.   And what documents have you
3 brought with you in response to the
4 notice?
5         (Document marked for
6         identification as Exhibit
7         Poulton-1.)
8         THE WITNESS:  I have my
9     report and my CV in this binder.
10 BY MS. O'DELL:
11     Q.   Okay.  May I see your
12 binder?
13     A.   Yes.
14     Q.   Thank you.  Have you brought
15 anything else with you?
16     A.   This is what -- this is what
17 I have.  I don't know what else might be
18 in binders here.
19         MR. CHACHKES:  We produced
20     something to you, I believe,
21     yesterday in response to this
22     subpoena.  So there's nothing
23     unique being brought to the
24     deposition.

Page 16

1         MS. O'DELL:  Okay.  I'm
2     going to ask questions about what
3     was produced yesterday --
4         MR. CHACHKES:  Okay.
5         MS. O'DELL:  -- at 8:30 last
6     night.
7 BY MS. O'DELL:
8     Q.   And I also want to ask, have
9 you brought with you today any invoices?
10     A.   No invoices today.
11     Q.   Have you submitted any
12 invoices in relation to your work on this
13 case?
14     A.   I have.
15     Q.   And how many?
16     A.   Two, December and January.
17         MS. O'DELL:  And I would
18     like to request those.  And Alex,
19     if you could get those to us
20     today, because we'd like to --
21         MR. FROST:  They were
22     produced per a notice -- were a
23     response to the notice on
24     Saturday.

Page 17

1         MS. O'DELL:  I got an
2     objection to the notice.  But I
3     didn't get any documents.  That's
4     all I got.
5         MR. FROST:  Okay.  It should
6     have been attached.  We'll -- we
7     can rectify it during a -- it
8     should have been attached to the
9     e-mail.  It's two invoices and the
10     retention letter that were served
11     with a response.
12         MS. O'DELL:  Okay.
13         MR. FROST:  We can sort that
14     out during a break, if that's all
15     right.  If you don't have it,
16     we'll get someone here to print it
17     and get it to you soon after.
18         MS. O'DELL:  That would be
19     fine.
20 BY MS. O'DELL:
21     Q.   Dr. Poulton, is the CV in
22 your binder different from the CV that
23 you produced with your report?
24     A.   In this binder?

Mary Poulton, Ph.D.

Page 18

1    Q.   Yes.
2    A.   Let me look and see.
3    Q.   Just for ease, I'm going to
4  hand you what I'm marking Exhibit 3,
5  which is --
6          MR. CHACHKES:  Exhibit 2.
7          Exhibit 2?
8          MS. O'DELL:  Yes.  Thank
9  you.
10         (Document marked for
11         identification as Exhibit
12         Poulton-2.)
13 BY MS. O'DELL:
14   Q.   Exhibit 2, which is a copy
15 of the report that we received -- your
16 report that we received from defendants.
17 It had a CV enclosed in the report.
18   A.   Okay.
19   Q.   And I'm just trying to ask,
20 simply, have there been any changes to
21 your CV since your report was served in
22 February?
23   A.   No.
24   Q.   Dr. Poulton, what were you

Page 19

1  asked to do in this case?
2    A.   I was asked to review the
3  expert reports by Drs. Cook and Krekeler
4  and render an expert opinion on mining
5  and beneficiation as it related to talc
6  mining for cosmetic products for Johnson
7  & Johnson.
8    Q.   When were you contacted by
9  Johnson & Johnson counsel?
10   A.   I believe in December 2018.
11   Q.   Who contacted you?
12   A.   I believe it was Alex
13 Chachkes and Jack Frost.
14   Q.   I'm glad to know somebody
15 else has difficulty pronouncing Alex's
16 name.
17         MR. CHACHKES:  You wouldn't
18         be alone.
19 BY MS. O'DELL:
20   Q.   What materials were you
21 provided by Johnson & Johnson counsel?
22   A.   The expert reports from
23 Drs. Cook and Krekeler, and the documents
24 they cited.

Page 20

1    Q.   Were you provided any other
2  documents produced in the litigation
3  other than those cited in Dr. Cook and
4  Dr. Krekeler's reports?
5    A.   I received their
6  depositions.  I can look at the list of
7  what I have here.
8          I requested documents as I
9  was reviewing Dr. Cook and Krekeler's
10 reports.
11   Q.   What materials did you
12 request?
13   A.   I requested information on
14 geologic models, mine plans, drilling
15 results.  Clarification on sample
16 numbers, I believe.
17   Q.   Were you provided any
18 documents other than the documents that
19 were actually cited in Dr. Cook and
20 Dr. Krekeler's reports?
21   A.   Documents that were in their
22 reports, documents I requested.
23   Q.   I'm trying to discern the
24 difference in the group of documents

Page 21

1  cited in Dr. Cook and Dr. Krekeler's
2  reports, and documents that you were
3  describing as ones you requested.  I'm
4  trying to determine if that's a different
5  group of documents.  And if so, I want to
6  know what you received that was not cited
7  in Dr. Cook or Dr. Krekeler's reports.
8    A.   Right.  So I had asked for
9  some documents.
10   Q.   Did you receive additional
11 documents?
12   A.   Yes, I did.
13   Q.   How -- how many?
14   A.   I don't remember offhand how
15 many it was.
16   Q.   Can you give me an
17 estimation?
18   A.   I would estimate somewhere
19 between six and a dozen perhaps.
20   Q.   Were you provided access to
21 a database of documents where you could
22 perform your own searches?
23   A.   No.
24   Q.   Can you identify the

Mary Poulton, Ph.D.

Page 22

1 specific six to 12 documents that were
2 provided to you at your request?
3        A.   I would have to go through
4 my report and try and tease those out.
5        Q.   If, as you go through -- as
6 you go through -- strike that and start
7 again.
8             In walking through your
9 report, is it your belief that you could
10 identify those documents based on the
11 references in your report?
12        A.   Not easily.
13        Q.   Could you do that?
14        A.   Could I do it?
15        Q.   Yes.
16        A.   Yes, I could.  It would --
17 it would take some time.
18        Q.   Hold that thought.  We may
19 do that.
20             So let me ask this question.
21 You were -- you were provided Dr. Cook
22 and Dr. Krekeler's reports.
23             What were you asked to do in
24 relation to those two documents?

Page 23

1        A.   To -- to their expert
2 reports?  I was asked to review them, see
3 if I agreed with what they did, what they
4 found, and then if not, why.  And what
5 information were they missing, what
6 analyses did I disagree with.
7             So, basically, looking at
8 mining and beneficiation practices and --
9 and those specific parts of their
10 reports.
11        Q.   In essence, you were asked
12 to critique their expert reports, true?
13        A.   Yes.
14        Q.   And what methodology did you
15 use in order to perform that critique?
16        A.   I started with the
17 assumption that they were correct in
18 their findings, and then corroborated
19 their statements with what I saw in
20 documents.  And if they said information
21 was missing, then I asked for that
22 information or looked for it within the
23 documents they had.
24             And then basically

Page 24

1 constructed the areas where I felt that
2 they were incorrect.
3        Q.   Is the methodology that you
4 employed in critiquing Dr. Cook and
5 Dr. Krekeler's reports methodology that's
6 been published in the scientific
7 literature?
8        A.   In terms of forming a
9 hypothesis and testing it, yes.
10        Q.   And can you name a reference
11 that would support that type of analysis?
12        A.   I believe nearly any
13 textbook on research methods would cite
14 how to form a hypothesis and -- and test
15 it.
16        Q.   What -- what was your
17 hypothesis in this particular -- in the
18 task that you were asked to perform?
19        A.   So my hypothesis was that
20 the conclusions reached by Drs. Cook and
21 Krekeler were correct.
22        Q.   And in terms of the process
23 that you undertook, could that process be
24 replicated by someone else?

Page 25

1        A.   Yes.
2        Q.   How?
3        A.   They -- if they have a
4 background in mining processes and -- and
5 beneficiation and geology, they could
6 look at the body of knowledge about how
7 you conduct mining, how you make mine
8 plans, how you process ore, and they
9 could compare that to the conclusions
10 that Drs. Cook and Krekeler reached from
11 the same documents that I looked at.
12        Q.   In regard to your -- your
13 background, is it fair to say that your
14 focus has been on mine safety and -- and
15 sort of the mine safety focus of
16 geological engineering?
17        A.   In my current stage of my
18 career, that's true.  I've had other
19 focus areas throughout the past 30-plus
20 years.
21        Q.   You are not an exploration
22 geologist, true?
23        A.   I've done quite a bit of
24 work in exploration geology, but I am an

Mary Poulton, Ph.D.

Page 26

1 engineer, not a geologist by degree.
2    Q.    You are not a certified
3 professional engineer, true?
4        A.    I have my EIT.
5        Q.    And what is an EIT?
6        A.    An EIT is the initial step
7 for professional certification.
8        Q.    So my question is, you are
9 not a certified professional engineer,
10 true?
11        A.    That's correct.
12        Q.    You are not a certified
13 professional geologist, true?
14        A.    True.
15        Q.    Turning your attention
16 toward what I've marked as Exhibit 2,
17 your expert report.  And about, I would
18 say, half the way into that document is
19 exhibit A which is a copy of your CV.
20        As I understand our
21 discussion a few minutes ago, that's an
22 up-to-date CV?
23        A.    It has not changed since I
24 submitted it.

Page 27

1        Q.    Okay.  And you have not
2 authored a peer-reviewed publication on
3 phyllosilicates, true?
4        A.    True.
5        Q.    You have not authored a
6 peer-reviewed publication regarding talc,
7 true?
8        A.    Let me look at my list.
9 I -- I covered talc in a software program
10 called Minerals Where and Why.  And I
11 just need to see if it's on the
12 peer-reviewed list or somewhere else.
13        So Publication 28 referee
14 book chapters could have included talc.
15 I don't remember.
16        Q.    My question related to
17 peer-reviewed publications and I took
18 that in your CV, referee journals to mean
19 peer-reviewed publications.
20        Is that fair?
21        A.    That's fair.  Referee book
22 chapters would also be peer reviewed.
23        Q.    And you have not authored
24 a -- a peer-reviewed publication

Page 28

1 regarding talc with a specific focus of
2 talc?
3        A.    That's correct.
4        Q.    And you have not authored a
5 peer-reviewed publication regarding the
6 geology of Vermont, correct?
7        A.    Correct.
8        Q.    You have not authored a
9 peer-reviewed publication regarding the
10 geology of Italy, correct?
11        A.    Correct.
12        Q.    And similarly, you have not
13 authored a peer-reviewed publication
14 regarding the geology of talc deposits in
15 China, correct?
16        A.    Correct.
17        Q.    Have you ever visited a talc
18 mine?
19        A.    Yes.
20        Q.    Where?
21        A.    In California.
22        Q.    And what mine?
23        A.    I don't remember.  It was in
24 the 1980s.

Page 29

1        Q.    What area?
2        A.    It -- that one would have
3 been in Southern California, Death Valley
4 kind of area.
5        Q.    That mine is not used to
6 source cosmetic talc, true?
7        A.    I believe that's true.
8        Q.    It is -- it contains high
9 levels of asbestos, true?
10        A.    What?
11        Q.    The mine that you visited in
12 Death Valley?
13        A.    I don't know that.
14        Q.    Is -- is that mine -- just
15 to make sure I'm thinking about the same
16 one you're thinking of -- and you don't
17 recall the name of the mine?
18        A.    I -- I don't.
19        Q.    Who was the owner?
20        A.    I don't know.
21        Q.    What was the purpose of your
22 visit?
23        A.    It was a class field trip.
24        Q.    You have not visited any of

Mary Poulton, Ph.D.

1  the talc mines in Vermont, correct?
2      A.   Correct.
3      Q.   And that would be true also
4  of any talc mines in Italy or China?
5      A.   Correct.
6      Q.   Have you done any research,
7  published or nonpublished, regarding
8  asbestos that's not related to the
9  litigation?
10     A.   Could you repeat that
11  question for me?
12     Q.   Sure.  Have you done any
13  research -- let me step back and say it
14  this way.  It will be easier, sorry.
15          Have you -- have you
16  authored any peer-reviewed publications
17  regarding asbestos?
18     A.   No, I have not published
19  peer-reviewed papers on asbestos.
20     Q.   Have you done any research
21  specifically regarding asbestos other
22  than what you've done in this litigation?
23     A.   We have had some projects in
24  our department regarding asbestos

1  associated with metal ores.  I wasn't the
2  lead person on it.  I was peripheral to
3  those studies.
4      Q.   It was not a focus of your
5  particular research?
6      A.   It was not my focus.
7      Q.   Is it fair to say that most
8  of your work in recent years has focused
9  on water preservation and health issues
10  as it relates to geology?
11     A.   In recent years that has
12  been one of my emphasis areas.
13     Q.   I notice on your CV there's
14  a company that you're involved with
15  called NOAH?
16     A.   NOAH.
17     Q.   What is NOAH?
18     A.   NOAH stands for neural
19  optimization applied hydrology.  We use
20  artificial neural networks coupled with
21  non-linear optimization to manage water
22  resources.
23     Q.   What is neural optimization?
24     A.   Neural networks are a form

1  of artificial intelligence.  They're the
2  basis of photo recognition on your smart
3  phones and Alexa and Siri and all of
4  those technologies that are AI now.
5      Q.   All the technologies that
6  are invading our life --
7      A.   Exactly.
8      Q.   -- and listening --
9      A.   Yes.
10     Q.   -- at various times.
11          Let me switch gears.  You
12  are not a physician?
13     A.   I am not a physician.
14     Q.   You're not an expert on the
15  health effects of talcum powder, true?
16     A.   Correct.
17     Q.   You're not an expert on
18  health effects of asbestos, correct?
19     A.   Correct.
20     Q.   You're not an expert on the
21  health effects of heavy metals?
22     A.   Correct.
23     Q.   You are not an
24  epidemiologist?

1      A.   Correct.
2      Q.   You're not a toxicologist?
3      A.   Correct.
4      Q.   You're not an industrial
5  hygienist?
6      A.   Correct.
7      Q.   Would it be fair to say that
8  you will defer to medical experts,
9  whether the genital use of talc can cause
10  cancer, true?
11     A.   Correct.
12     Q.   In regard to asbestos you
13  are not an expert in the identification
14  of asbestos in talc ore true?
15     A.   Could you clarify what you
16  mean by identification?
17     Q.   Have you examined cosmetic
18  talc for the presence of asbestos using
19  XRD?
20     A.   No.
21     Q.   Have you examined cosmetic
22  talc for the presence of asbestos using
23  polarized light microscopy?
24     A.   No.

Mary Poulton, Ph.D.

Page 34

1    Q.   Have you examined cosmetic
2  talc for the presence of asbestos using
3  TEM?
4    A.   No.
5    Q.   Have you ever tested
6  cosmetic talc in any way?
7    A.   No.
8    Q.   Do you have any expertise in
9  transmission electron microscopy?
10   A.   No.
11   Q.   Do you have any expertise in
12 using polarized light microscopy for
13 purposes of identifying contaminants in
14 an ore?
15   A.   Repeat the question for me.
16 I kind of lost my train of thought.
17   Q.   Do you use -- let me just
18 ask a different question.
19   A.   Okay.
20   Q.   Maybe that will address the
21 issue.
22        Do you use polarized light
23 microscopy as a routine part of your work
24 as a geological engineer?

Page 35

1    A.   No.
2    Q.   Do you plan to offer any
3  opinions in this case regarding the
4  appropriate technique for the use of
5  examining cosmetic talc for the presence
6  of asbestos?
7    A.   Maybe repeat the question
8  for me again.
9    Q.   Do you have any opinions
10 that you plan to provide in this case
11 that relate in any way to the appropriate
12 technique for use in analyzing cosmetic
13 talc for the presence of asbestos?
14   A.   Beyond the techniques that
15 are identified in things like ISO
16 standards.  I mean, just basically being
17 able to say that those are the identified
18 techniques.
19   Q.   But you have no expertise in
20 the techniques used to examine talc?
21   A.   In using those techniques,
22 correct.
23   Q.   Okay.  I didn't ask you this
24 before, Dr. Poulton.  But have you had

Page 36

1  your deposition taken before?
2    A.   No.
3    Q.   One of the things that will
4  help the court reporter and just all of
5  us, if you'll wait for me to finish --
6    A.   I'm sorry.
7    Q.   -- before you answer.  And
8  I'll endeavor to do the same with you.
9  And I'm from the south, as you probably
10 recognize, and sometimes I talk slow.  So
11 if you'll give me a minute to get my
12 question out, that would be great.
13       So have you ever been hired
14 as a consultant or otherwise employed by
15 a mine company to develop a drill core
16 program for purposes of evaluating an ore
17 deposit?
18   A.   Could you repeat that.
19   Q.   Outside the context of your
20 work as an academic, have you been hired
21 as a consultant or an employee of a
22 mining company to design a drill core
23 program?
24   A.   Pittsburgh and Midway Coal

Page 37

1  Mining Company.
2    Q.   And when was that?
3    A.   1984.
4    Q.   And what was your role with
5  Pittsburgh Coal and -- I'm sorry.  What's
6  the name of the company again?
7    A.   Pittsburgh and Midway.
8    Q.   Okay.
9    A.   So I was working on
10 long-range mine planning, 25-year mine
11 plan.  And we had to lay out the drilling
12 program, drill the holes, log the core,
13 assay the core, create the geologic
14 models, create the reserves, do the maps.
15   Q.   That was in 1984?
16   A.   Correct.
17   Q.   What was your position with
18 the company?
19   A.   Mining engineer.
20   Q.   How long did you have that
21 position?
22   A.   That was roughly May to
23 August.
24   Q.   And that was a summer job --

Mary Boulton, Ph.D.

Page 38

1    A.    Yes.
2    Q.    -- fair?
3          And that was a summer job
4    prior to your getting your master's
5    degree or your Ph.D.?
6    A.    My bachelor's degree.
7    Q.    Yeah.  So this was a summer
8    job while you were getting your
9    bachelor's degree?
10   A.    Yes.
11   Q.    And that would be the last
12   time that you had a job that involved
13   drill core, drilling program, logging
14   cores, et cetera?
15   A.    So we did those kind of
16   activities within the context of our
17   curriculum with graduate students.
18   Q.    I'm asking in regard to
19   consulting in a situation outside of
20   academic.
21   A.    No.
22   Q.    To make sure the question is
23   clear.  The last time that you were hired
24   in any capacity to develop a drill

Page 39

1    program, participate in a core drill
2    program or log cores was in 1984 when you
3    were a student?
4    A.    Outside of academia, yes.
5    Q.    Yes.
6    A.    Yes.
7    Q.    Have you been hired by a
8    mining company to perform minerologic
9    exploration for purposes of economic
10   exploitation?
11   A.    Outside of academia?
12   Q.    Yes.
13   A.    I don't believe so.
14   Q.    Have you ever designed a
15   mine plan for a talc mine?
16   A.    No.
17   Q.    Outside of academia, would
18   it be fair to say that you have not
19   designed a mine plan for any type of
20   mine?
21   A.    Outside of academia?
22   Q.    Yes.
23   A.    Correct.
24   Q.    Describe your work with the

Page 40

1    Lowell Institute For Mineral Resources at
2    the University of Arizona.
3          A.    So the Lowell Institute is a
4    large interdisciplinary research
5    institute within the University of
6    Arizona.  We bring together faculty from
7    many different disciplines to work on a
8    broad range of mineral resources, issues,
9    from grass roots, exploration and
10   fundamental geosciences through mining,
11   health and safety, reclamation,
12   geotechnical engineering, law.
13          And so we do research.  We
14   do outreach.  We do professional and
15   continuing education.  We do
16   interdisciplinary education.  We do
17   technology transfer.  Basically,
18   everything from the beginning of a
19   mineral resources project through
20   ultimate closure and community relations,
21   along with K-12 and public outreach.
22   Q.    Define geologic engineering.
23   A.    So geological engineering is
24   an accredited engineering degree.  It

Page 41

1    combines geologic knowledge with
2    engineering.  And depending on the
3    university, it's usually associated with
4    mining engineering or in some cases civil
5    engineering, or in some cases geology.
6          At the University of
7    Arizona, it was associated with mining
8    engineering.  So the geological
9    engineering was essentially mining
10   engineering with extra geology and some
11   extra civil engineering.
12   Q.    And you were department head
13   of mining and geological engineering at
14   the University of Arizona for some period
15   of time?
16   A.    Yes.
17   Q.    And that program was
18   accredited?
19   A.    Yes.
20   Q.    And is the accreditation
21   board for engineering and technology
22   the -- the organization that provides
23   accreditation for the University of
24   Arizona's department?

Mary Boulton, Ph.D.

Page 42

1    A.   ABET.  Yes.
2    Q.   ABET.
3         Did ABET audit your
4  department in 2004-2005?
5    A.   I would have to think about
6  what years, let's see.  2014 -- no, I'm
7  sorry.  2016.  2010.
8         Probably 2004 or
9  thereabouts.  I'd have to -- to search my
10  memory as to exact dates.
11    Q.   And ABET does a thorough
12  review of departments when investigating
13  them for purposes of accreditation, true?
14    A.   Thorough investigation, yes.
15    Q.   And -- and you were head of
16  the department in 2004-2005?
17    A.   Yes.
18    Q.   Did ABET find that you had
19  approved students for graduation that had
20  not completed the appropriate credits?
21    A.   There was some controversy
22  over how credits were counted for some
23  particular courses that was cleared up.
24    Q.   And, in fact, ABET

Page 43

1  threatened to not accredit the department
2  based on your approval of students for
3  graduation without them having completed
4  the appropriate courses, true?
5    A.   No, not -- not -- restate
6  the question.
7    Q.   And, in fact, ABET
8  threatened to not accredit the department
9  based on your approval of students for
10  graduation without them having completed
11  the appropriate credits, true?
12    A.   No.
13    Q.   That's not true?
14    A.   Mining engineering was --
15  was fine.  Geological engineering had
16  some questions that needed clarification.
17    Q.   Let me show you what -- let
18  me -- before I -- I show you this, let me
19  just ask.
20         Following that incident with
21  ABET in 2004 and 2005, was the condition
22  of your department maintaining its
23  accreditation that you no longer advise
24  geological engineering students, true?

Page 44

1    A.   I don't remember that
2  happening.
3    Q.   After 2004, you no longer
4  advised geological engineering students,
5  true?
6    A.   There were other situations
7  related to personnel in the department
8  for geological engineering.  So it's --
9  it's not a true statement that I was not
10  allowed to advise students.  There
11  were -- there were some personnel issues
12  surrounding geological engineering.
13    Q.   Following 2005, you no
14  longer advised geological students, true?
15    A.   I did not.
16    Q.   Let me show you what I'm
17  marking as Exhibit 4.
18         (Document marked for
19         identification as Exhibit
20         Poulton-4.)
21  BY MS. O'DELL:
22    Q.   I provided you as Exhibit 4
23  some minutes from a faculty senate
24  meeting in March 3, 2008.

Page 45

1         Do you see that?
2    A.   Where are we looking?  Okay.
3  So cover page, March 3, 2008.
4    Q.   Page -- do you see those?
5         Let me ask you to turn to
6  page -- I think it's five of the
7  document.
8    A.   Five is a Number 5 or?
9    Q.   No.  Actually just count the
10  pages because there are multiple
11  documents that were attached to the
12  minutes.
13         So if you look at Page 5 and
14  turn to the back of that page.  You'll
15  see a Paragraph Number 3.
16         Do you see that?
17    A.   No, I'm not sure where you
18  are.
19    Q.   Page 2 of the attachment, I
20  think to this document.  It's -- here you
21  go, ma'am, I'll turn you to the right
22  page if you'd like me to.
23         Right there.  This is Page 2
24  of a memorandum from Dr. Ben Sternberg to

Mary Boulton, Ph.D.

Page 46

1 the members of the faculty senate dated
2 March 1st, 2008.  Have you seen this
3 before?
4     A.   I would have to search my
5 memory.  I can tell you there was a
6 serious personnel issue with
7 Dr. Sternberg that I am not sure how much
8 I am allowed to say here.
9     Q.   Okay.
10     A.   But it is very germane to
11 the substance of this.
12     Q.   And looking at Page 2 under
13 Heading 3, Dr. Sternberg writes, "In the
14 2004-2005 accreditation cycle, the ABET
15 visitor for geological engineering found
16 that Dr. Poulton, department head of
17 mining and geological engineering, had
18 approved students for graduation without
19 their meeting the required number of
20 engineering credits.  Since this was
21 viewed as a fatal flaw, we were told that
22 we would lose accreditation.  After
23 extensive negotiations, the ABET
24 committee decided that they would allow

Page 47

1 this history to pass, if and only if
2 Dr. Poulton was no longer allowed to
3 advise geological engineering students.
4 Once this problem was overcome, the final
5 ABET report provided a strong
6 recommendation for our program."
7          Did I read that correctly?
8     A.   The -- you read that
9 correctly.
10     Q.   And it's fair to say that
11 the -- ABET agreed to accredit Arizona's
12 geological engineering program based on
13 the decision that you would be prohibited
14 from advising students, true?
15     A.   I strongly disagree with
16 this paragraph as being true.
17     Q.   You no longer advised
18 geological engineering students following
19 this time period, true?
20     A.   This was part of a personnel
21 action regarding Dr. Sternberg.
22     Q.   True?
23     A.   So --
24     Q.   Let me -- the question is --

Page 48

1          MR. CHACHKES:  Actually,
2     just let the witness finish the
3     answer, please.
4 BY MS. O'DELL:
5     Q.   And if you would just focus
6 on my question --
7          MR. CHACHKES:  Yeah, but
8     still, even if -- let the witness
9     finish her answer, please.
10 BY MS. O'DELL:
11     Q.   I'll let you certainly
12 explain your answer.  But if you'll just
13 listen to my question, Dr. Poulton.
14          You no longer advised
15 geological engineering students following
16 this 2004-2005 time period, true?
17     A.   That's not a true/false
18 question that I can answer.
19     Q.   Is that correct?
20     A.   It is correct I was not
21 advising students for that program.
22     Q.   Okay.
23     A.   But again, as part of a
24 personnel issue.

Page 49

1     Q.   As a part of the faculty
2 senate meeting in -- in March of -- of
3 2008, did you submit a memorandum or
4 letter disputing Dr. Sternberg's
5 statements in this memorandum?
6     A.   I don't remember.
7     Q.   You do not recall doing
8 that, correct?
9     A.   I -- I just don't remember.
10          (Document marked for
11     identification as Exhibit
12     Poulton-3.)
13 BY MS. O'DELL:
14     Q.   Let me ask you to take a
15 look at what I'm marking as -- previously
16 marking as Exhibit 3.
17          And ask you to --
18          MS. O'DELL:  Before I ask
19     you to identify it, I would just
20     note an objection on the record.
21     This was received last night, I
22     think, at 8:30 p.m.
23          We object to the late
24     production, to the lack of

Mary Boulton, Ph.D.

Page 50

1  opportunity to review this
2  analysis prior to the deposition.
3          And so, on the basis of --
4  of that late disclosure of the
5  supplemental report we'll move to
6  hold the deposition open until
7  we've had adequate opportunity to
8  analyze it.
9          MR. CHACHKES:  Okay.
10  Obviously we disagree and -- and I
11  think you have produced many
12  things with even less notice.
13          So it's an odd objection,
14  but noted.
15          MS. O'DELL:  I don't agree
16  with -- with that, but --
17          MR. CHACHKES:  Yeah, and by
18  the way, there's no supplemental
19  report.  You said supplemental
20  report.  This is not a
21  supplemental report.
22          MS. O'DELL:  This is a
23  supplemental analysis.  Well --
24          MR. CHACHKES:  It is not.

Page 51

1  Why don't you ask the question.
2          MS. O'DELL:  I'm about to
3  ask the question.
4          MR. CHACHKES:  Okay.
5  BY MS. O'DELL:
6      Q.  Dr. Poulton, would you
7  please describe what I've marked as
8  Exhibit 3?
9      A.  It's a simple spreadsheet
10  that I put together, back-of-the-envelope
11  kinds of calculations, looking at mining
12  throughputs and potential material that's
13  being sampled from the mine through the
14  mill.
15          A lot of assumptions.  I
16  pulled data from multiple mine plans to
17  get the variables.
18          But I was just basically
19  looking at rate of production and
20  throughput through the mill.
21      Q.  And an analysis of this type
22  was not included in your initial report?
23      A.  Correct.
24      Q.  Fair?

Page 52

1      A.  Correct.
2      Q.  And when you're talking
3  about the mill, what mill are you
4  referring to?
5      A.  West Windsor.
6      Q.  And what's the methodology
7  that you used to perform this analysis?
8      A.  I looked at the data that
9  was in their annual mine reports, their
10  mine plans.
11      Q.  For what year?
12      A.  It was a combination of data
13  from 1998 and 2002 reports.
14      Q.  What was the purpose of
15  doing this analysis?
16      A.  I wanted to just clarify in
17  my mind what the rates of production
18  were, and if I converted a continuous
19  process to a batch process, how many
20  blocks of ore were being processed in a
21  given amount of time and how did that
22  relate to how long it might take to fill
23  a silo with finished talc.
24      Q.  It's fair to say that this

Page 53

1  calculation was based on certain
2  assumptions that you made rather than a
3  specific analysis of what occurred during
4  the operation at West Windsor?
5      A.  So I took actual data, but I
6  had to make some assumptions.  For
7  instance, I didn't account for stripping
8  ratio of 2 to 1, which is used.  I didn't
9  account for bulking factor as the silo
10  was filled.
11          I had to convert a
12  continuous process to a batch process for
13  resonance time.
14      Q.  You were not able to account
15  for certain ways the mine manager may
16  have directed personnel to fill silos
17  that are not reflected in the documents,
18  true?
19      A.  These are based on reported
20  numbers.
21      Q.  And based on assumptions
22  that you've made and not necessarily what
23  may have happened that was not recorded
24  in a written document, true?

Mary Boulton, Ph.D.

Page 54

1    A.   Correct.  Correct.
2    Q.   Were you asked to perform
3  this analysis by counsel?
4    A.   No.
5    Q.   When did you perform this
6  analysis?
7    A.   Two Sundays ago.
8    Q.   When was it provided to
9  counsel?
10    A.   I believe Saturday or Sunday
11  morning.
12    Q.   How many times did you meet
13  with counsel in preparation for your
14  deposition?
15    A.   In preparation just for the
16  deposition?  Probably three times in
17  person and once by videoconference.
18    Q.   When did the in-person
19  meetings occur?
20    A.   One in Spokane.
21    Q.   When?
22    A.   I'm trying to remember.
23  Two -- two Thursday ago, March 7th or
24  thereabouts, whatever that Thursday date

Page 55

1  might be.  And then Friday and Sunday of
2  this most recent week.
3    Q.   When was the
4  videoconference?
5    A.   I don't remember without
6  looking at a calendar.
7    Q.   Was it prior to the
8  March 7th meeting in Spokane?
9    A.   Yes.
10    Q.   Other than the three
11  in-person meetings that you've mentioned
12  in preparation for your deposition and
13  the videoconference, did you meet with
14  counsel in person on any other occasion?
15    A.   No.
16    Q.   Prior to the March 7th
17  meeting in Spokane, had you ever met
18  counsel in person?
19    A.   I don't believe so.
20    Q.   And prior to that time, all
21  of your communication had been by
22  telephone?
23    A.   Yes.  Principally telephone,
24  some e-mail.

Page 56

1    Q.   Who contacted you about
2  serving as an expert?
3    A.   I was contacted by a
4  colleague at the University of Arizona.
5    Q.   Who?
6    A.   Robert Downs.
7    Q.   Who is Robert Downs?
8    A.   He is a geosciences
9  professor.
10    Q.   Who contacted Dr. Downs
11  about seeking an expert for this
12  litigation?
13    A.   I don't know who contacted
14  him.  He referred me to Alex and Jack.
15    Q.   When did you agree to serve
16  as an expert?
17    A.   In December before
18  Christmas.  I don't remember the date.
19    Q.   And was that -- did you
20  agree to become an expert at the time
21  that you were contacted by counsel for
22  J&J?
23    A.   There were multiple
24  conversations before I committed.

Page 57

1    Q.   Let me ask a couple of
2  general questions.
3         Would you agree that ore --
4  and you've referred to ore often in your
5  report, it is a term of art in geology of
6  course.  But for members of the jury and
7  maybe even others reading this
8  transcript, the definition of ore may not
9  be clear.
10         But can we agree that ore is
11  a type of rock that contains minerals
12  that can be extracted for sale?
13    A.   With the addition of
14  extracted at a profit, extracted and
15  processed at a profit.
16    Q.   So the ore in your mind, it
17  needs to be profitable?
18    A.   Profitable, yes.
19    Q.   And so if you happened to be
20  an unfortunate mining company, which can
21  happen, where you're mining rock and
22  you're selling it, but you're not making
23  money, is that not ore to you?
24    A.   We would still call that

Mary Boulton, Ph.D.

Page 58

1 ore. But for purposes of starting the
2 mine, we use an economic definition.
3     Q.   Okay. Because the hope is
4 you're going to make money?
5     A.   The hope is you're going to
6 make money.
7     Q.   Not always true?
8     A.   Not always true.
9     Q.   So -- but setting aside the
10 expectation of profit, et cetera, bottom
11 line is ore is what you extract from the
12 ground for purposes of sale?
13     A.   Yes.
14     Q.   Would you agree that
15 ofttimes, ore can have a primary mineral
16 and then also have accessory minerals?
17     A.   Yes.
18     Q.   Would you agree that
19 occurrences of certain minerals based on
20 their geology can have a high degree of
21 variability in terms of the prevalence of
22 accessory minerals?
23     A.   You might have to rephrase
24 that question for me.

Page 59

1     Q.   Okay. Would you agree that
2 certain minerals can, just because of
3 their very nature, how they are formed in
4 the earth, they can have a high
5 variability of accessory minerals, true?
6     A.   On what scale?
7     Q.   I'm not -- I'm not limiting
8 it to a particular scale. I'm just
9 saying they can have a high variability
10 of accessory minerals.
11     A.   I think I would want to
12 think of the more specific situation
13 before I answered.
14     Q.   Not willing to agree to that
15 pretty simple concept?
16     A.   No, it's actually not a
17 simple concept. I think I would want to
18 have a more specific example to answer.
19     Q.   How about with talc? Talc
20 is a mineral that can be used in
21 industrial and cosmetic settings, true?
22     A.   True.
23     Q.   And talc can be formed in a
24 number of different ways. For example,

Page 60

1 they can have an ultramafic deposit
2 that's formed through the -- which would
3 be true of Vermont, fair?
4     A.   True.
5     Q.   And that talc deposits can
6 have variability in terms of the
7 accessory minerals that are present,
8 true?
9     A.   What would you mean by
10 accessory minerals with regard to talc?
11     Q.   It could be chlorite. It
12 could be serpentine. Could be asbestos
13 minerals. Could be cobalt, chromium, et
14 cetera. Would you agree that certain
15 deposits have a greater amount of those
16 accessory minerals than others?
17     A.   So I think in this context
18 we would want to separate the actual talc
19 body from surrounding rock when we're
20 talking about accessory minerals.
21     Q.   And is it your opinion that
22 talc body, as you just used, an ore body,
23 would be a homogenous sort of formation
24 of solely talc?

Page 61

1     A.   No. It would not be solely
2 the chemical formula for talc. But what
3 accessory minerals might exist with it
4 would be very specific to how that
5 particular talc deposit formed and it
6 could be peripheral to the talc body.
7     Q.   And they also could vary in
8 amount across different talc deposits,
9 true?
10     A.   Again, could you clarify
11 what you mean by they could vary?
12     Q.   What's unclear about that?
13     A.   Well, I'm just -- I'm just
14 trying to get in my mind, are we talking
15 only about ultramafic bodies, what
16 accessory minerals are we talking about?
17 I just -- I just want to be clear in my
18 mind.
19     Q.   Well, take Vermont for
20 example, and ultra -- ultramafic talc
21 deposits, they can vary in terms of the
22 prevalence of certain accessory minerals,
23 true?
24     A.   The -- the talc body can

Mary Boulton, Ph.D.

1 certainly vary in terms of grade of talc,
2 brightness, other variables, but when we
3 are talking about accessory minerals, we
4 would want to clarify what's part of the
5 talc body versus what are the
6 peripheral -- peripheral rocks.
7     Q.   How do you define accessory
8 minerals?
9     A.   Accessory minerals, it would
10 depend on the type of ore body we are
11 talking about and whether we are talking
12 about the general geology of the ore
13 deposit.
14         Are we talking about what
15 might occur microscopically with a
16 particular mineral of interest?
17         So it just depends as -- as
18 to what specifically we are talking
19 about.
20     Q.   Is there a general
21 definition of accessory mineral that you
22 think is appropriate to use?
23     A.   I tend to think more of ore
24 versus gang as opposed to specific

1 accessory minerals, coming from a mining
2 background.  So geologists might talk
3 about specific accessory minerals in a
4 different context than -- than I might.
5     Q.   Well, since we're talking
6 about -- let me strike that and say this.
7         How do you understand
8 geologists to define accessory minerals?
9     A.   I'm not sure I could answer
10 generically how a geologist might define
11 that.
12     Q.   What is your definition
13 of -- general definition of accessory
14 minerals, as it's used in the geologic
15 literature?
16     A.   So if I'm talking
17 specifically about the commodity that's
18 being extracted, the accessory minerals
19 could be economic and separable, or they
20 can be gang material that is not
21 economic.  It really depends on the
22 situation.
23     Q.   Do you use the term "gang"
24 as -- interchangeably with waste

1 material?
2     A.   I do.
3     Q.   And in terms of the amount
4 of a material, in order for it to rise to
5 the level of an accessory mineral,
6 what -- what would that be in your mind?
7     A.   I don't know if I could
8 define a level that would make something
9 accessory.  If it could be separated and
10 is useful and could be sold, it would be
11 a byproduct or a co-product.  To a mining
12 person or a metal person, or a geologist,
13 that might still be considered an
14 accessory mineral.  If it is not of
15 sufficient quality or use to be sold,
16 then it would be gang or waste material.
17     Q.   You are not a geologist,
18 true?
19     A.   I am not a geologist.
20     Q.   Do you agree that selective
21 mining involves carefully outlining the
22 boundaries of a particular ore body
23 first?
24     A.   Outlining the?

1     Q.   The particular boundaries of
2 an ore body.
3     A.   Yes.
4     Q.   That's the first step --
5     A.   First step.
6     Q.   -- in selective mining.
7         The second step is to ensure
8 that the ore is segregated from the waste
9 material that also might be located
10 within that particular deposit, true?
11     A.   To the extent you can, yes.
12     Q.   It's not always possible.
13 True?
14     A.   It depends on the particular
15 situation.  So are we talking
16 specifically about --
17     Q.   I asked you just a general
18 question --
19         MR. CHACHKES:  If you would
20 let the witness finish, please.
21         MS. O'DELL:  I thought she
22 was finished.
23         MR. CHACHKES:  She was not.
24         Go ahead.

Mary Roulton, Ph.D.

Page 66

BY MS. O'DELL:

1 Q. I apologize. I thought you
2 were finished.
3 A. Again, I've -- I've lost my
4 train of thought.
5 So we were talking about
6 selective mining and whether you can --
7 how -- how narrowly you can define the
8 boundaries.
9 Q. No. We actually had moved
10 on.
11 A. Okay.
12 Q. We had talked about the
13 second step in selective mining is
14 essentially extracting material and then
15 delineating between ore versus waste
16 material. True?
17 A. I apologize.
18 Q. I'll restate it. If it's --
19 I'm going to do my best to ask you clear
20 questions. And so you can respond to
21 them and we can have an understanding
22 that you understood my question. But if
23 you don't, just ask me to restate it.

Page 67

1 I'm happy to do that.
2 A. Okay.
3 Q. The second step of selective
4 mining involves segregating ore and waste
5 during the extraction process, true?
6 A. Yes. You are basically
7 mining the ore and you don't want to
8 spend money moving any more waste than
9 you have to.
10 Q. Right. And sometimes,
11 despite best efforts, it's not always
12 possible to precisely segregate the ore
13 from other waste material that might be
14 included in that particular deposit,
15 fair?
16 A. So you can basically move
17 your -- your boundaries in from your
18 waste margins to prevent that from
19 happening.
20 Q. But in the delineation of
21 the particular ore body, if those
22 assumptions about the contours of the ore
23 body are not accurate, it's very possible
24 to extract waste believing that you're

Page 68

1 extracting ore, true?
2 A. Well, you can tell the
3 difference between ore and waste. So I'm
4 not quite sure, when you say contours,
5 what you mean.
6 Q. Is it always true that you
7 can tell the difference between ore and
8 waste within a mine setting?
9 A. And are we talking generic
10 mines or specific mines?
11 Q. Generic.
12 A. I think we would want to
13 talk specific mines to answer that
14 question.
15 Q. I'm asking you a general
16 question.
17 A. I don't think there's a
18 specific answer to that general question.
19 Q. You said in response to my
20 question that -- excuse me, let me go
21 back up to your answer.
22 You said you can tell the
23 difference between ore and waste. That
24 was your statement. Is that always true?

Page 69

1 A. Always true for every kind
2 of mineral deposit?
3 Q. Yes.
4 A. Again, I don't think we can
5 have a specific answer to a generic
6 question like that.
7 Q. It's not always true that
8 you can tell the difference between waste
9 and ore in certain mining contexts, true?
10 A. I think we would want to
11 talk about specifics.
12 Q. I'm asking you a general
13 question. If you can't answer that
14 question, then just say I can't answer
15 it.
16 A. Well, I -- I think it can be
17 answered with specifics, but I don't
18 think that it's --
19 Q. That's -- that's not a
20 general principle that you can agree to?
21 A. Well, you certainly
22 delineate ore and waste.
23 I just, I guess I'm still
24 confused on what -- what you're thinking

Mary Poulton, Ph.D.

| Page 70 |
| --- |

1  of in terms of can you discriminate
2  between them.
3      Q.   In an open pit setting where
4  you have -- when you're using a drill and
5  blasting situation, you'd agree with me
6  that it is not always possible to discern
7  between the boundary of ore and waste,
8  true?
9      A.   Again, I think we have to be
10  talking about specific situations.
11      Q.   And you can't answer that
12  question in a general way?
13      A.   I -- I think we have to talk
14  about specifics.
15      Q.   Is the answer -- you cannot
16  answer that question?
17      A.   As phrased about a generic
18  situation, I can't.
19      MR. CHACHKES:  Leigh, we've
20  been going about an hour and ten
21  minutes.  So wherever you think is
22  a good point for a break.
23      MS. O'DELL:  I'm fine.  If
24  you'd like a break, that's fine

| Page 71 |
| --- |

1  with me.
2      THE VIDEOGRAPHER:  Please
3  remove your microphones.  The time
4  is 10:14 a.m.  We are going off
5  the record.
6      (Short break.)
7      THE VIDEOGRAPHER:  Okay.  We
8  are back on the record.  The time
9  is 10:36 a.m.
10  BY MS. O'DELL:
11      Q.   Dr. Poulton, it's fair to
12  say that you have never designed an open
13  pit mine, true?
14      A.   No.
15      Q.   And it's fair to say that
16  you have never directed the operation of
17  an open pit mine, true?
18      A.   True.
19      Q.   Okay.  And you have never
20  designed an underground mine, true?
21      A.   From scratch?
22      Q.   Yes.
23      A.   Certainly within the context
24  of the coursework that we teach, we work

| Page 72 |
| --- |

1  with real data for companies.  That
2  includes surface and underground mine
3  data, mine planning, mine design.  So
4  working with the students, student
5  projects in the curriculum, we're working
6  with mining companies with real data.
7      So certainly I've been
8  involved in mine design and mine planning
9  with real data.
10      Q.   In the context of a
11  classroom?
12      A.   In the context of the
13  university.
14      Q.   And in a classroom, true?
15      A.   It doesn't necessarily have
16  to happen in a classroom.
17      Q.   But in a context of work as
18  a professor, true?
19      A.   Yes.
20      Q.   And in terms of consulting
21  with a mining company for purposes of
22  designing an underground mine, you've
23  never done that, true?
24      A.   I have not.

| Page 73 |
| --- |

1      Q.   And you have never consulted
2  with, or been employed by a mining
3  company in any way for purposes of
4  directing the operation of an underground
5  mine in the real world, so to speak,
6  true?
7      A.   You might have to repeat the
8  question for me.
9      Q.   I'm happy to.  You have
10  never been employed by a mining company
11  to direct the operation of an underground
12  mine, true?
13      A.   True.
14      Q.   You have never designed a
15  beneficiation process outside the context
16  of your work as a professor in an
17  academic setting, true?
18      A.   True.
19      Q.   Let's take that question
20  again to make sure we have it clear.
21      Outside the context of your
22  work as a professor, you have never
23  designed a beneficiation or processing
24  plant, true?

Mary Boulton, Ph.D.

Page 74

1    A.   For a mining company?
2    Q.   Yes.
3    A.   True.
4    Q.   And in relation to talc
5  specifically, you have never designed a
6  beneficiation process for talc, true?
7    A.   True.
8    Q.   And when we say
9  beneficiation in this context, would you
10 agree with me we're referring to the
11 processing plant that receives ore from
12 the mine, and it is taken through a
13 process to either purify it, remove
14 certain aspects of the ore, et cetera, in
15 order to get a final product?
16   A.   So beneficiation includes
17 comminution, which is reduction in
18 particle size and then concentration.
19   Q.   Turning to your report in
20 this case which we've marked previously
21 as Exhibit 2.  And I'll ask you to turn
22 to Page 4 of your report.  You cite an
23 article that was written by Miller and
24 published in 1984.  It's an article by

Page 75

1  Roger Miller.  Who is Roger Miller?
2    A.   Roger Miller worked at the
3  Hammondsville mine.  I think he might
4  have been mine manager at one point.
5    Q.   And he was employee of
6  Windsor Minerals, true?
7    A.   As far as I know, yes.
8    Q.   And Windsor Minerals was a
9  wholly owned subsidiary of Johnson &
10 Johnson, true?
11   A.   At one point, yes.
12   Q.   Mr. Miller wrote a
13 presentation that was given at a meeting
14 of the society of mining engineers.
15       And it was -- the
16 publication relates to continuous mining
17 machines.  Do you recall that?
18   A.   Yes.
19   Q.   And continuing mining
20 machines were utilized in underground
21 operations by Windsor Minerals, but they
22 were not used in open pit mining, true?
23   A.   No.
24   Q.   That's not true?

Page 76

1    A.   I believe they were used in
2  open pit mining at one point.
3    Q.   Which mines?
4    A.   I would have to go back and
5  look at documents to be sure.
6    Q.   What period of time?
7    A.   Again, I'd have to look at
8  the documents to -- to be sure.
9    Q.   Do you know how long?
10   A.   How --
11   Q.   How long they were used, if
12 they were used?
13   A.   They were used?  I don't
14 know without looking at the documents
15 again.
16   Q.   Do you have a memory whether
17 it was a short period of time or a long
18 period of time?
19   A.   What would you define as
20 short versus long?
21   Q.   Less than a year, more than
22 a year?
23   A.   That, I don't know.
24   Q.   What mines were in Vermont

Page 77

1  were used to source Johnson & Johnson
2  talcum powder products?
3    A.   I would want to refresh my
4  memory to make sure I have it exactly
5  right.  Hammondsville was used.  Argonaut
6  was used.  My memory is that at certain
7  points perhaps Hamm was used or qualified
8  for use and perhaps Rainbow was either
9  qualified or perhaps had been used, but I
10 would want to check the record to be
11 certain that that is the right list.
12   Q.   Any others?
13   A.   Not that come to mind again
14 without checking through some of the
15 documents.
16   Q.   What county is the
17 Hammondsville mine located in?
18   A.   What county?
19   Q.   Yes.
20   A.   I don't know.
21   Q.   What county is Argonaut
22 located in?
23   A.   I don't know.
24   Q.   Do you know what county the

Mary Boulton, Ph.D.

Page 78

1  Hamm mine is located in?
2       A.   I don't know.
3       Q.   Do you know what county
4  Ludlow is located in?
5       A.   I don't without looking at a
6  map.
7       Q.   You don't know that in the
8  context of your work in this case?  You
9  don't know what county those mines are
10  located, true?
11       A.   Off the top of my head in
12  this deposition, I don't.
13            I would have to consult a
14  map that was in some of the documents.
15       Q.   What mills were used by
16  Johnson & Johnson to process cosmetic
17  talc?
18       A.   West Windsor.
19       Q.   Any others?
20       A.   Not that I recall.
21       Q.   Ludlow, the Ludlow plant was
22  used to process industrial talc, true?
23       A.   That is my understanding.
24       Q.   And ore from -- ore --

Page 79

1  excuse me.
2            Ore for cosmetic talc was
3  crushed at Ludlow prior to being
4  transported to West Windsor for
5  processing, true?
6       A.   I would want to confirm that
7  in the documents.  That is my
8  recollection but I would want to confirm
9  that.
10       Q.   As I appreciate your answer,
11  is that's your recollection, that that
12  was the case, fair?
13       A.   Could you repeat the
14  question for my recollection?
15       Q.   Well, you just said it's my
16  recollection that it was true that ore
17  was crushed at Ludlow and then sent to
18  West Windsor for processing.  I
19  understood you to say that that is your
20  recollection.
21       A.   That is my recollection.
22       Q.   And then you keep saying
23  that you need to check documents.
24       A.   Yes.

Page 80

1       Q.   If you check documents and
2  you learn that that's not the case, would
3  you come back to me because I'm going to
4  rely on your answer that you've just
5  given.
6            MR. CHACHKES:  Counsel, I'm
7       just going to object there.  We
8       are not keeping the deposition
9       open.  If you want to investigate
10       documents, we can do it right
11       here.
12            MS. O'DELL:  Well, she's
13       saying I need to look at
14       documents.
15  BY MS. O'DELL:
16       Q.   If there's something that
17  you need to look at, I'm sure your lawyer
18  is going to provide it to you.  I don't
19  know exactly what document you are
20  referring to.  So you keep qualifying
21  your answer in that way.  And I'm just
22  trying to get a final answer so I'll know
23  what your opinion is.  Is that fair?
24       A.   Well, I don't want this to

Page 81

1  be a memory test.  I want it to be
2  accurate.  So I want to make sure that
3  what I'm answering is accurate.
4       Q.   I want -- I want to
5  understand your opinions.  That's why I'm
6  here today.  I want -- if there's
7  something that you have described in your
8  report, I'm here to ask you a question
9  about it.  If you've got another opinion
10  that's not in your report, I want to know
11  about it, because this is my opportunity.
12  Okay.
13            So it's your understanding
14  that cosmetic talc was crushed at Ludlow
15  and then sent to West Windsor for
16  processing, fair?
17       A.   That's my recollection.
18       Q.   Ore from Argonaut was mined
19  for both industrial purposes as well as
20  cosmetic purposes, true?
21       A.   True.
22       Q.   And that's also true for the
23  Hamm mine?
24       A.   I believe so.

Mary Poulton, Ph.D.

Page 82

1    Q.   That was also true for the
2  Hammondsville mine?
3    A.   That I would have to
4  confirm.
5    Q.   Hammondsville was used to
6  source cosmetic talc, true?
7    A.   True.
8    Q.   And Hammondsville was also
9  used to source industrial talc, true?
10    A.   I -- I would want to confirm
11  my memory on that.
12    Q.   But you believe that to be
13  the case?
14    A.   I believe sitting here right
15  now.  But again I don't necessarily want
16  to rely on memory right now.
17    Q.   Please describe the geology
18  of the talc deposits that were used to
19  source J&J talc, and I'm meaning the
20  Vermont deposit.
21    A.   Describe the geology?  Could
22  we look at the documents that -- that
23  describe the geology?
24    Q.   What's your understanding?

Page 83

1    A.   That they are talc bodies,
2  there is a sometimes serpentine or
3  serpentinite core that grades from that
4  core to a potentially talc carbonate
5  body, then a talc body, and then
6  ultimately to the boundary which is
7  called a black wall and then into country
8  rock.
9    Q.   What was the origin of
10  the -- the talc deposits in Vermont that
11  were used to source J&J talc?
12    A.   The geologic origin?
13    Q.   Yes.
14    A.   Again, I would want to go
15  back to geologic reports on that, because
16  my focus was primarily on the mining and
17  not the -- the genesis of ultramafic
18  bodies in Vermont.
19    Q.   You are not a mineralogist,
20  true?
21    A.   I am not a mineralogist, but
22  I do teach mineralogy and petrology for
23  engineers.
24    Q.   If the mineralogy of an ore

Page 84

1  body has been, you know, characterized,
2  data has been collected, whether through
3  core drilling or other mechanisms, and
4  that data has been collected and the
5  mineralogy of a particular deposit has
6  been described in the literature for
7  example, that data would be relevant for
8  all projects in the future that relate to
9  that particular ore body, true?
10    A.   So are we talking about a
11  general description of mineralogy
12  regionally?
13    Q.   It could be regionally.  It
14  could be a district that's being
15  described.
16        But for example, in this
17  particular case there are publications of
18  the mineralogy of Vermont and the talc
19  deposits found that were written in
20  1950s, 1960s, some earlier, that describe
21  the general mineralogy of those deposits.
22        Do you recall those?
23    A.   I think I've seen reference
24  to publications say by Chidester.  I

Page 85

1  think there was another one that is
2  commonly cited.  I don't remember the
3  author off the top of my head.
4    Q.   And in those publications,
5  though written in the 1950s, describe
6  the -- now, their -- let me strike that
7  and start again.
8        Those publications, though
9  they're written in 1950s for example,
10  characterize the mineralogy and continue
11  to have application for future projects
12  in that area, fair?
13    A.   And what do you mean by
14  projects?
15    Q.   Mining projects.
16    A.   Mining projects.  So it
17  really depends on the scale that you're
18  talking about.  And it also depends on
19  re-interpretation of geology since then
20  because we're much better at age dating
21  rocks.  We're much better at
22  understanding tectonic movements and --
23  and what was occurring when over millions
24  of years.  So maybe they are relevant on

Mary Boulton, Ph.D.

Page 86

1  a general level.  Maybe they are not.
2  And they may not be applicable when you
3  actually get down to the mining zone.
4      Q.    All right.  But the
5  fundamental geology doesn't change --
6  hasn't changed in the last hundred years,
7  fair?
8      A.    The rocks haven't changed --
9      Q.    Correct.
10      A.    -- perhaps in a million
11  years, but the -- the geologic science
12  has evolved.  And again it would come
13  down to revisions that can be made based
14  on new analytical techniques particularly
15  for aged dating.
16      Q.    But the fundamental
17  mineralogy would not vary over that
18  particular time period?
19      A.    The -- the minerals that are
20  in the rocks are -- are still there.  The
21  interpretation of the mineralogy could
22  potentially change.
23      Q.    May change, may not change?
24      A.    It depends on the level of

Page 87

1  detail of the analysis of the minerals.
2      Q.    If the geochemistry of a
3  particular ore body has been evaluated,
4  the data regarding that geochemistry
5  would be relevant for the entire period
6  of time that ore body is mined, true?
7      A.    So when you say
8  geochemistry, could you clarify for me --
9      Q.    The presence of heavy
10  metals, for example.
11      A.    The presence of heavy
12  metals.  And you're, again, asking
13  specifically what about the heavy metals?
14      Q.    I'm asking if the
15  fundamental geochemistry of a particular
16  ore body has been evaluated and described
17  in the literature, that would be relevant
18  for, you know, many years after that
19  publication was published, fair?
20      A.    Maybe not.  Again, it
21  depends on analytical techniques and
22  their resolution.  How samples were
23  taken.  So it -- it would really depend a
24  lot on when initial data were taken, what

Page 88

1  techniques, and what's available now.
2      Q.    If you assume the data is
3  correct, and if you assume -- assume the
4  methodology that was used is correct, and
5  there's been a description of the
6  geochemistry of a particular ore body,
7  that data would continue to be relevant
8  for decades after the publication of that
9  material, true?
10      A.    Again, it -- it really
11  depends on how those data were collected
12  and analyzed to start with.  And so I
13  can't say that something collected and
14  analyzed in the 1950s could be duplicated
15  with better techniques today.  I -- I
16  don't know the answer to that.
17      Q.    In terms of publications
18  like that, so we are talking about in
19  particular talc, in some of the -- the
20  publications that were written in the
21  '50s for example, the early '60s,
22  Chidester, do you have any basis to say
23  that those publications are no longer
24  relevant to the talc ore bodies in

Page 89

1  Vermont?
2      A.    So I have not read Chidester
3  and I couldn't answer specifically to
4  Chidester.
5      Q.    Have you had -- have you
6  read Seymour?
7      A.    I have not read Seymour.
8      Q.    Have you read Van Gosen on
9  talc deposits?
10      A.    I don't recall if I've read
11  all of Van Gosen.  I may have seen some
12  of Van Gosen.
13      Q.    Have you read the Ratté
14  publication on the mineralogy of Vermont?
15      A.    Which publication.
16      Q.    Ratté?
17      A.    Ratté.  And where is that in
18  my list?
19      Q.    I'm asking you, I'm not
20  looking at your list.
21      A.    Oh, okay.  I don't recognize
22  that name.  I guess I'd have to see the
23  citation.
24      Q.    Charles Ratté, Mineral

Mary Boulton, Ph.D.

Page 90

1 Resource Provinces of Vermont, Geological
2 Survey, 1982.
3     A.   I don't recall referencing
4 that in my report.
5     Q.   Have you read Robert Virta,
6 "The phase relationship of talc and
7 amphiboles in a fibrous talc sample,"
8 Bureau of Mines, 1985?
9     A.   I -- I may have seen that
10 paper.  I don't recall.  But it's --
11     Q.   If it's not on your list you
12 have not seen it, correct?
13     A.   Well, I may have seen it in
14 passing and decided that it wasn't
15 relevant to looking at the -- the mine
16 planning.
17     Q.   Do you have any opinions
18 regarding the mine planting -- not
19 planting -- planning and implementation
20 that was conducted in the Italian talc
21 mines?
22     A.   So do I have a opinion on
23 the mine planning that was done or the
24 mine operations?

Page 91

1     Q.   Yes.
2     A.   So there's very little
3 information other than what has been
4 described in trip reports for the mining
5 operation.  And I don't believe I saw a
6 published report on mine plans for the
7 Fontaine mine.
8     Q.   Do you have any opinions
9 regarding the mine planning for the
10 Italian mines that were used to source
11 Johnson & Johnson's Baby Powder or Shower
12 to Shower?
13     A.   So what I have seen from
14 described reports, describe the mining
15 methods, and describe the mining process.
16 And how the talc was sorted.  I don't
17 know that I have seen a published mine
18 plan.
19     Q.   So you don't have any
20 opinions regarding the mine planning or
21 mine plan of the mines in Italy that were
22 used to source J&J talcum powder
23 products, true?
24     A.   If you mean mine plan maps

Page 92

1 of the mine, I have not seen maps of the
2 Fontaine mine.
3     Q.   You've not seen planning
4 documents for the Italian talc mines that
5 were used to source Baby Powder and
6 Shower to Shower, true?
7     A.   So planning maps, did you
8 say?
9     Q.   I think I said mine plans,
10 or planning documents?
11     A.   Planning documents would
12 include mine maps.  Again, I have not
13 seen mine maps for Fontaine.
14     Q.   Or plans of any other type?
15     A.   Or plans.  I've seen
16 descriptions of the mining methods.
17     Q.   What's your understanding of
18 the geological formation of the talc
19 deposit in China that is used to source
20 J&J talcum powder products?
21     A.   So again, I'm not focused on
22 the geologic formation of these deposits.
23 I'm focused on the mining methods and the
24 beneficiation.  The descriptions that

Page 93

1 I've seen of the geology indicate that
2 it's carbonate based and is a pure talc
3 or a high grade talc I should say.
4     Q.   It's a deposit that is
5 characterized by high levels of dolomite,
6 true?
7     A.   I would have to look at some
8 documents to confirm dolomite.
9     Q.   How about chlorite?
10     A.   That I don't know without
11 looking at documents.
12     Q.   Have you seen any data --
13 strike that.  Let me ask one question
14 before I get there.
15        What's the name of the mine
16 or mines in China that are used to source
17 Johnson & Johnson's Baby Powder?
18     A.   The Chinese names I would
19 have to look in my report if that's okay.
20     Q.   Sure.
21     A.   Okay.  So I list a surface
22 mine in Guangxi Province, Longshen County
23 in China.  I would have to look at one of
24 the documents to get the exact name of

Mary Boulton, Ph.D.

Page 94

1  the mine, because I'll mispronounce it.
2  It's something on the order of Guping or
3  something, I think.  I want to go back
4  and look at that document.
5      Q.   Is the Zhizhuo -- and
6  forgive my pronunciation, but I think
7  that's close.  Alex can probably tell me.
8  Is the Zhizhuo mine one of the mines that
9  was used to source Johnson & Johnson
10 talcum powder products?
11     A.   I'd want to go back and look
12 at that document to make certain which
13 mines were which.
14     Q.   Have you seen any mine
15 planning documents related to the Chinese
16 mine, or mines used to source Johnson &
17 Johnson products?
18     A.   I have not seen mine plans
19 for the mine in China.
20     Q.   Have you seen drill core
21 logs or any similar data from the mines
22 in China used to source -- source J&J
23 talcum powder products?
24     A.   No.

Page 95

1      Q.   In your report on Page 5,
2  you mention that the Guangxi University
3  tests talc ore for quality.
4          Do you see that?
5      A.   Yes.
6      Q.   And in relation to that
7  testing, have you seen any test results
8  from the Guangxi University testing?
9      A.   I would have to go back and
10 look at some of the documents to see if
11 there were specific test results from
12 that university.
13     Q.   Do you recall any as you sit
14 here today?
15     A.   Possibly.  But I'm not sure.
16     Q.   Have you seen any
17 photomicrographs from that testing?
18     A.   I don't think I looked for
19 them.
20     Q.   So that's a no to my
21 question?
22     A.   If I have seen them, I would
23 agree I have not.
24     Q.   Have you seen any other data

Page 96

1  from testing from the tests that
2  ostensibly have been run by the Guangxi
3  University lab, whether that be, you
4  know, TEM data, SEM data, XRD data, et
5  cetera?
6      A.   I would have to look at some
7  of the documents for the Houston mill to
8  see if they had the university test
9  results in the documents when they
10 received shipment in Houston.
11     Q.   Do you -- I'm not asking for
12 any summary documents.  I'm asking for
13 underlying data from that testing.  Have
14 you seen any XRD, TEM, or SEM output or
15 data from that testing?
16     A.   And I would have to see if
17 those fundamental data were attached to
18 anything that was received in Houston.
19     Q.   Do you recall such data
20 being attached as you sit here today?
21     A.   I don't without going back
22 and looking at some of the documents.
23     Q.   So I'll represent to you
24 that I have -- I or my colleagues -- have

Page 97

1  looked through every document that's been
2  disclosed in this litigation regarding
3  geology testing, et cetera.  If I've
4  never seen any XRD output, SEM output,
5  you know, TEM underlying data, would you
6  agree with me that it's not been
7  provided?
8          MR. CHACHKES:  Objection.
9          THE WITNESS:  I might ask a
10     second opinion, but...
11 BY MS. O'DELL:
12     Q.   You have no reason to
13 disagree with me?
14     A.   I don't have a reason to
15 disagree.
16     Q.   What is JORC J-O-R-K?
17     A.   C.
18     Q.   C, excuse me.
19     A.   JORC is joint ore reserve
20 committee.
21     Q.   And that joint ore resource
22 committee is a -- or document, is
23 published by the Australasian -- I can't
24 say this.  Forgive me.  Australasian --

Mary Boulton, Ph.D.

Page 98

1 Pacific Rim is easier. Australasian code
2 for reporting of mineral resources and
3 ore reserves?
4     A.    Correct.
5     Q.    And the Pacific of JORC is
6 to institute some type of standard or
7 agreed upon reporting in order to
8 evaluate ore reserves, correct?
9     A.    And resources.
10     Q.    And essentially the purpose
11 of that document, JORC, if you will, is
12 to ensure that ore reserves are
13 calculated with some accuracy for
14 purposes of evaluating the economic value
15 of a particular ore body, true?
16     A.    So it is for public
17 reporting of resources in reserves to
18 protect investors from erroneous reports
19 of resources and reserves. So it sets a
20 professional standard for how those
21 resources and reserves should be
22 calculated and reported.
23     Q.    It is not a required
24 reporting mechanism for mines in the

Page 99

1 United States, true?
2     A.    So there is a harmonization
3 group for securities exchanges called
4 CRIRSCO. So all of the various security
5 exchanges that deal with mine resource
6 and reserve reporting participate through
7 professional organizations within
8 CRIRSCO, a worldwide organization. And
9 JORC has been a permanent standard in
10 that harmonization worldwide for
11 securities exchanges.
12         So the Securities & Exchange
13 Commission in the U.S., the SEC, used a
14 different standard called Guide 7 until
15 quite recently. And now they have agreed
16 to change Guide 7 and update it to be
17 more in alignment with JORC.
18     Q.    But the SEC does not, has
19 not in the past and currently does not
20 require adherence to JORC, true?
21     A.    It's a similar standard. It
22 leaves out certain categories of
23 resources.
24     Q.    The SEC does not require

Page 100

1 adherence to JORC, true?
2     A.    Adherence to JORC as
3 published on the JORC.org website, true.
4     Q.    As to the mines in China, do
5 you have any information to suggest that
6 the Chinese mining company is in
7 compliance with the JORC standards?
8     A.    I don't have information.
9     Q.    In terms of Vermont, would
10 it be fair to say that in relation to the
11 Vermont talc mines, that they were never
12 in compliance with JORC standards?
13     A.    I don't know that I can say
14 they were never in compliance. Rio
15 Tinto, I believe, followed JORC as
16 largely an Australian company. I don't
17 have complete records to know what was
18 reported for talc resources and reserves
19 through Rio Tinto.
20     Q.    During the -- during the
21 time period that Vermont was used to
22 source Johnson & Johnson's talcum powder
23 products, approximately 1960 to 2000 --
24 early 2003, do you have any information

Page 101

1 to suggest that either Windsor Minerals
2 or Cyprus Minerals or any of the
3 companies that owns -- Imerys, were in
4 compliance with JORC during the time they
5 operated the mines?
6     A.    Well, JORC didn't come into
7 existence until 1970s, I believe. I'd
8 have to look at the exact date for when
9 JORC came into compliance. I believe
10 Guide 7 for the SEC, late '70s, early
11 '80s, perhaps as well. So you can only
12 go back as far as those standards of
13 practice existed.
14     Q.    That's fair -- that's fair
15 enough.
16         Following the creation of
17 JORC, 1970s, whatever it might have been.
18 And obviously the talc mines were in
19 operation in Vermont, the ones that were
20 used to source Baby Powder. Do you have
21 any data to suggest that the operations
22 were in compliance with the mandates of
23 JORC?
24     A.    I have seen reference to

Mary Poulton, Ph.D.

Page 102

¹ JORC in some of the mine plans during the
² Rio Tinto ownership.
³     Q.   And, in fact, Rio Tinto
⁴ in -- in 2008 in a document states that
⁵ they were not in JORC compliance.
⁶     A.   Not at that stage of the
⁷ planning.
⁸     Q.   And do you have any data to
⁹ suggest that they were in compliance with
¹⁰ JORC prior to 2008?
¹¹     A.   I would have to go back and
¹² look at earlier mine documents.
¹³     Q.   If JORC was never mentioned
¹⁴ in a Rio Tinto or Imerys or Cyprus or
¹⁵ West Windsor Minerals document prior to
¹⁶ 2008, would you agree with me it's more
¹⁷ likely than not they were not in
¹⁸ compliance with JORC?
¹⁹     A.   Not necessarily.  It doesn't
²⁰ have to say this is in compliance with
²¹ JORC to be in compliance with JORC.
²²     Q.   Do you have any data to
²³ suggest they were in compliance prior to
²⁴ 2008?

Page 103

¹     A.   Were or were not in
² compliance?
³     Q.   Were in compliance.
⁴     A.   I -- I don't have
⁵ information that they were or were not.
⁶     Q.   You can't say one way or the
⁷ other?
⁸     A.   I don't have that
⁹ information.
¹⁰         (Document marked for
¹¹     identification as Exhibit
¹²     Poulton-5.)
¹³ BY MS. O'DELL:
¹⁴     Q.   Let me show you what I'm
¹⁵ going to mark as Exhibit 5.  It is a copy
¹⁶ of Dr. Cook's report that was served in
¹⁷ the litigation.  We'll be referring to
¹⁸ that some.
¹⁹         And then also hand you what
²⁰ I'm marking as Exhibit 6 which is a copy
²¹ of Dr. Krekeler's report.
²²         (Document marked for
²³     identification as Exhibit
²⁴     Poulton-6.)

Page 104

¹ BY MS. O'DELL:
²     Q.   And you reviewed both of
³ these reports in writing your report in
⁴ this case, fair?
⁵     A.   Correct.
⁶         MR. CHACHKES:  Just for the
⁷     record, Exhibit 5 is the amended
⁸     report, right?
⁹         MS. O'DELL:  Yes.  That's
¹⁰     correct.  Exhibit 5 is Dr. Cook's
¹¹     amended report.  Thanks for the
¹²     clarification.
¹³ BY MS. O'DELL:
¹⁴     Q.   If you'll turn to Page 6 of
¹⁵ your report, and we'll be toggling back
¹⁶ and forth a little bit between reports.
¹⁷         But, to start our
¹⁸ discussion, you criticize Dr. Cook and
¹⁹ Dr. Krekeler for, as you put it,
²⁰ improperly conflating non-ore samples and
²¹ ore samples.
²²         Fair?
²³     A.   Correct.
²⁴     Q.   And you base that in large

Page 105

¹ measure on statements in which Dr. Cook
² and Dr. Krekeler refer to a report of
³ Dr. Fred Pooley from -- regarding Italian
⁴ mines?
⁵     A.   Yes.
⁶     Q.   And fundamentally,
⁷ Dr. Poulton, is it your position that all
⁸ of the samples that Dr. Pooley analyzed
⁹ in that report regarding the Italian
¹⁰ mine, that those samples were not
¹¹ material that would be considered ore?
¹²     A.   My recollection is that he
¹³ was, in this case, specifically
¹⁴ collecting samples of non-ore and took a
¹⁵ few examples of ore but was predominately
¹⁶ looking at non-ore.
¹⁷     Q.   But he considered both ore
¹⁸ and non-ore in the report, fair?
¹⁹     A.   He had a couple of ore
²⁰ samples.
²¹     Q.   So he had ore samples and
²² what -- and what you would term as
²³ "non-ore" --
²⁴     A.   Non-ore.

Mary Roulton, Ph.D.

Page 106

1    Q.   -- true?
2    A.   I believe so.
3         (Document marked for
4    identification as Exhibit
5    Poulton-7.)
6    BY MS. O'DELL:
7    Q.   And I'm going to hand you
8    what I'm going to mark as Exhibit
9    Number 7 for your deposition.  And ask
10   you if that's the -- the Pooley report
11   that you're referring to in your report
12   at Page 6?
13   A.   I'd have to look at the one
14   I had, because I didn't have color
15   pictures in it.  So I'd have to find out
16   if this is the same one.
17        MR. CHACHKES:  Let's not
18   forget to write in Poulton on the
19   exhibit tags.  I see they are
20   blank right now with just numbers.
21        (Whereupon, a discussion was
22   held off the record.)
23   BY MS. O'DELL:
24   Q.   So taking a look at this,

Page 107

1    what I've marked as Exhibit 7, does this
2    appear to be the Pooley report that you
3    reviewed in reaching your opinions
4    expressed on Page 6 and thereafter?
5    A.   It seems to have different
6    numbers on it.  So I think I would have
7    to put mine side by side with this to
8    confirm.
9    Q.   Okay.  Did you bring yours
10   with you?
11   A.   I don't have it with.
12        MR. CHACHKES:  We -- we do
13   have every exhibit somewhere here
14   in the room.
15   BY MS. O'DELL:
16   Q.   Okay.  Well, I -- I believe
17   this to be the same report that you've
18   looked at, the -- the one I have marked
19   as -- as Exhibit 7.
20        But if you need to see your
21   own copy or your lawyer's copy to confirm
22   that, we can go off the record for a
23   moment and y'all can find the exhibit.
24   A.   Yeah, I'd like to because

Page 108

1    I -- I haven't seen color pictures in my
2    report.  So I would like to know that
3    it's exactly the same.
4         MS. O'DELL:  Let's go off.
5         THE VIDEOGRAPHER:  All
6    right.  The time is 11:23 a.m.
7    Off the record.
8         (Brief pause.)
9         THE VIDEOGRAPHER:  Okay.  We
10   are back on the record.  The time
11   is 11:44 a.m.
12   BY MS. O'DELL:
13   Q.   Dr. Poulton, I've put before
14   you your copy of Dr. Pooley's report
15   regarding Italian mine samples.  I've
16   marked it as Exhibit 8.  Do you have that
17   in front of you?
18   A.   I do.
19        (Document marked for
20   identification as Exhibit
21   Poulton-8.)
22   BY MS. O'DELL:
23   Q.   If you'll turn to Page 8 --
24   excuse me, not 8.  2 of his actual

Page 109

1    report, which has at the bottom, a number
2    JNJ 000322355.
3         Do you see that?
4    A.   Yes.
5    Q.   It's page --
6    A.   It also says JNJ 0050290.
7    Is that the same page?
8    Q.   It is.
9    A.   Okay.
10   Q.   So for our purposes today,
11   we'll go -- we'll go with the bottom
12   Bates number.
13   A.   Okay.
14   Q.   What you see right there on
15   the screen.
16   A.   Okay.
17   Q.   And if you'll look at the
18   top of the page, the second paragraph
19   beginning with the objective.
20        Do you see that?
21   A.   Yes.
22   Q.   It says, "The objective of
23   the examination has been mainly to
24   establish the major minerals which occur

Mary Boulton, Ph.D.

Page 110

1 in association with talc at the Italian
2 mine.  In particular, to look at the
3 association of these minerals with talc,
4 and especially those minerals which are
5 of the same family as the commercial
6 asbestos minerals, i.e., the amphiboles
7 and serpentine."
8        Did I read that correctly?
9        A.   I see that, yes.
10       Q.   And -- and so this is
11 Dr. Pooley's description of his objective
12 for this analysis, true?
13       A.   Yes, that he is looking at
14 the minerals that are associated with the
15 talc.  Not necessarily the talc ore.
16       Q.   Well, it can be associated
17 with talc in the same ore body.  Fair?
18       A.   Ore body being what's
19 extracted versus the surrounding rock
20 would be different.
21       Q.   Well, asbestos minerals can
22 occur within talc formations, fair?
23       A.   I would disagree to some
24 extent with that statement.  Because it

Page 111

1 very much depends on the origin of the
2 talc and whether you're talking about the
3 actual mining zone of commercial high
4 grade talc.
5        Q.   In regard to Dr. Pooley's
6 study in -- of Italian talc, he was
7 studying not only talc, but those
8 minerals associated with talc in the
9 Italian mine, true?
10       A.   That -- that would be the
11 minerals that are surrounding the talc
12 ore body.  Not necessarily the minerals
13 that are in the commercial talc.
14       Q.   Well you're speculating in
15 that sense.  I'm asking you what he set
16 out to do in this report.
17       MR. CHACHKES:  Objection.
18 BY MS. O'DELL:
19       Q.   His --
20       MS. O'DELL:  Let me finish.
21       MR. CHACHKES:  I thought you
22    were done.  Sorry.
23 BY MS. O'DELL:
24       Q.   His objective was to

Page 112

1 evaluate -- let me just read it.
2        His objective as stated was,
3 "The examination has been mainly to
4 establish the major minerals which occur
5 in association with talc at the Italian
6 mine," true?
7        A.   So that statement doesn't
8 mean that those minerals are associated
9 with the commercial minable talc.  It
10 means that they're associated surrounding
11 the talc body when you look at where he
12 took samples.
13       Q.   If you'll listen to my
14 question.  His -- I'm not asking you
15 about commercial Italian talc in a
16 general sense.  I'm asking you about the
17 objective of his study.  And he stated
18 his objective in his report, true?
19       A.   Well, I believe I answered
20 that question, that he is looking at
21 primarily samples surrounding the talc
22 ore body in the Italian mine.  So mine
23 would mean that they're mining commercial
24 talc.  And he's looking at the minerals

Page 113

1 that are surrounding that ore body to
2 understand whether they might contain
3 things that could be problematic for that
4 commercial talc.
5        Q.   He is examining samples to
6 identify minerals which occur in
7 association with talc at the Italian
8 mine, true?
9        A.   So.
10       Q.   That's what he states?
11       A.   Association with talc at the
12 Italian mine means that they are
13 surrounding the talc.
14       Q.   If you'll turn to the next
15 page, it lists the samples that
16 Dr. Pooley examined.  Sample I.5 was
17 general ore, meaning general talc ore,
18 fair?
19       A.   Yes.
20       Q.   He looked at I.7 which was
21 mica schist specimen?
22       A.   Which is not the talc ore.
23       Q.   I'm just asking if you
24 looked at that sample.

Mary Boulton, Ph.D.

| Page 114 |
|---|
| 1   A.   So I see that he lists I.7, |
| 2   mica schist specimen -- |
| 3   Q.   So the answer to my question |
| 4   was yes? |
| 5   A.   Could you repeat your |
| 6   question for me. |
| 7   Q.   My question was, he looked |
| 8   at a Sample I.7, and it was -- he |
| 9   identified it as mica schist specimen? |
| 10   A.   That's what it says. |
| 11   Q.   He looked -- examined sample |
| 12   I.19 which was tremolite, quartz and talc |
| 13   in one sample? |
| 14   A.   That's what it says. |
| 15   Q.   I.24 was also a talc sample. |
| 16   It says it's next to carbonate face 2? |
| 17   A.   That's what it says. |
| 18   Q.   So examined talc in that |
| 19   sample, true? |
| 20   A.   That's what it says. |
| 21   Q.   And if you'll turn to the |
| 22   next page, he looked at a sample that he |
| 23   identified as I.41 which was described as |
| 24   "face 2, good specimen." |

| Page 115 |
|---|
| 1   Do you see that? |
| 2   A.   I see what it says there. |
| 3   Q.   If you'll turn over to Page |
| 4   $6 of Exhibit 8.  He gives a summary in |
| 5   part of the method he used. |
| 6   And then he goes onto |
| 7   different a description of some of the |
| 8   constituents.  Begin in the first |
| 9   paragraph he says, "Thin and polished |
| 10   sections were prepared of the specimens |
| 11   of wallrock and, where possible, the talc |
| 12   ore." |
| 13   Do you see that? |
| 14   A.   I see where it says that. |
| 15   Q.   And it goes on to say, "The |
| 16   minerals which formed a major constituent |
| 17   in at least one of the sections were |
| 18   quartz, muscovite, talc, chlorite (var |
| 19   sheridanite), calcite, garnet and |
| 20   tremolite." |
| 21   Do you see that? |
| 22   A.   Yes. |
| 23   Q.   It goes on to say, "Phases |
| 24   which were always minor or accessory were |

| Page 116 |
|---|
| 1   microcline, plagioclase, biotite, pennine |
| 2   epidote, clinozoisite" -- do you know how |
| 3   to say that?  Clinozoisite? |
| 4   A.   You know, my copy is so |
| 5   smudged, I can't read it. |
| 6   Q.   Okay. |
| 7   -- "hornblende, and then |
| 8   actinolite." |
| 9   Do you see that? |
| 10   A.   I see those. |
| 11   Q.   Were what he referred to as |
| 12   minor or accessory minerals within the |
| 13   deposit, true? |
| 14   A.   Within the talc deposits, he |
| 15   is listing a range of specimens here |
| 16   which may or may not again be in the talc |
| 17   ore.  It could be in the surrounding |
| 18   rock. |
| 19   Q.   And it could also be in the |
| 20   talc ore, fair? |
| 21   A.   We would have to look at the |
| 22   specimens that came specifically from the |
| 23   talc ore. |
| 24   Q.   Is it agreed that within in |

| Page 117 |
|---|
| 1   the specimens that he examined and |
| 2   reported on in Exhibit 8, Dr. Pooley |
| 3   found tremolite?  True? |
| 4   A.   Could you repeat that |
| 5   question for me? |
| 6   Q.   Dr. Pooley found tremolite |
| 7   in the specimens that he examined and |
| 8   reported on in Exhibit 8? |
| 9   A.   So we would want to look at |
| 10   the specific specimens and see which ones |
| 11   listed tremolite. |
| 12   Q.   Are you disputing that he |
| 13   reported that he found tremolite within |
| 14   these samples? |
| 15   A.   I would want to look at each |
| 16   specific specimen to see what each one |
| 17   said. |
| 18   Q.   So you can't agree with |
| 19   that, just based on your knowledge of the |
| 20   document? |
| 21   A.   I would want -- because he |
| 22   has a number of specimens here, I would |
| 23   want to know what each one said. |
| 24   Q.   Just sitting here today, you |

Mary Boulton, Ph.D.

| Page 118 |
| --- |

1 can't tell us whether Dr. Pooley reported
2 that he found tremolite or actinolite
3 within the specimens that he examined and
4 reported on in Exhibit 8?
5      A.   Well, we can go through the
6 specimens one by one.
7      Q.   All right.  We can do that.
8      A.   We can do that.
9      Q.   And we're going to go
10 through a number of them.  But I'm just
11 asking as a general matter, do you know
12 that one way or the other?
13      A.   Well, I would again be very
14 clear about looking at each analysis.
15      Q.   Turn to Page 6 of his
16 report.  It's at the top.  It's Page 6.
17 The Bates number at the bottom ends 361.
18      A.   Are you sure it's 6 or 8?
19      Q.   That's a good question.  It
20 could be 8.  It's eight.  Sorry.  Looked
21 like -- as you mentioned, this is not the
22 best copy.
23          Are you there?
24      A.   And can you repeat the Bates

| Page 119 |
| --- |

1 number for me?
2      Q.   361.
3      A.   361 yes.
4      Q.   He is describing what he
5 found with specimen I.5, general ore.
6          Do you see that?
7      A.   I see that.
8      Q.   And he reports that, "A
9 coarse aggregate of curving foliaceous
10 and feathery crystals of talc displaying
11 evidence of shearing and translation
12 twinning.  As in Specimen I.3, dusty
13 inclusions of transparent mineral with a
14 general prismatic habit occurs dispersed
15 in the talc.  As before, but to a lesser
16 extent, the talc is cleansed of these
17 inclusions along zones associated with
18 deformation and translation twinning, and
19 it appears that the inclusions" -- he's
20 talking about these prismatic
21 inclusions -- have either been converted
22 to talc (as in conversion of tremolite to
23 talc by low temperature)."
24          Do you see that?

| Page 120 |
| --- |

1      A.   Yes, yes.
2      Q.   And you would agree that
3 there were inclusions in the specimen I.5
4 of general talc ore, which had what
5 appears to be some metamorphous of
6 tremolite, true?
7      A.   So he's saying that the
8 inclusion has been converted to talc.
9      Q.   "As in conversion of
10 tremolite to talc by low temperature CO2
11 metamorphism (sic)."
12          Do you see that?
13      A.   That's where -- I see that
14 sentence.
15      Q.   And those inclusions --
16          MR. CHACHKES:  I'm just
17      going to object.  I think you
18      misread.  I see "CO2,
19      metasomatism."
20          MS. O'DELL:  That's fair.
21      That's fair.  Not intentional.
22 BY MS. O'DELL:
23      Q.   So tremolite, according to
24 Dr. Pooley, had been present and it had

| Page 121 |
| --- |

1 converted at least to some degree, maybe
2 not completely, but to some degree, to
3 talc, fair?
4      A.   That seems to be his
5 conclusion here.
6      Q.   If you'll turn over to Page
7 11 of his report, Bates ending 364, he
8 reports on his finding in relation to
9 Specimen I.7.
10          Do you see that?
11      A.   I see I.7.
12      Q.   And it says, "This specimen
13 of wallrock is quartz-muscovite-garnet
14 schist" -- he identifies certain
15 figures -- "containing some accessory
16 actinolite, Brown hornblende, talc, and
17 rare biotite."
18          Did I read that correctly?
19      A.   I believe so.
20      Q.   And in I.7 Dr. Pooley
21 identified actinolite.  Fair?
22      A.   He says some accessory
23 actinolite.
24      Q.   And then if you'll turn over

Mary Boulton, Ph.D.

1  to Page 32 of his report.  Bates number
2  ending 385.  He's reporting on Specimen
3  I.24.  And he refers to it as talc next
4  to carbonate.
5      A.   Mm-hmm.
6      Q.   Do you see that?
7      A.   I do.
8      Q.   And he says, "This specimen
9  of talc ore consists dominantly of course
10 fiber" -- "fibrous talc with minor
11 chlorite."
12         Do you see that?
13     A.   I see that.
14     Q.   And so in that sample of
15 talc ore, he identifies fibrous material,
16 true?
17     A.   He identifies fibrous talc.
18     Q.   Okay.  He identifies fibrous
19 material, true?
20     A.   He identifies fibrous talc.
21     Q.   If you'll turn to -- we've
22 got to go back two pages.  Sorry, I
23 skipped one I intended to mention, and
24 that's on Page 28.  Specimen I.19.

1          Do you see that?
2      A.   Could you just confirm --
3  let's see.  Specimen, Page 28, the
4  specimen consists.  Okay.
5      Q.   He reports on Specimen I.19
6  and he states, "This specimen consists of
7  an aggregate of course grain anhedral
8  magnesite intergrown with solitary bladed
9  crystals and crystal aggregates of
10 tremolite associated with minor amounts
11 of fine fibrous talc and rare anhedral
12 grains of quartz."
13         Do you see that?
14     A.   I see that.
15     Q.   And then he goes -- he has a
16 photo microphotograph which shows
17 dissections under PPL showing course
18 bladed tremolite intergrown with very
19 course magnesite.
20         And so he confirms in
21 Specimen I.19 the presence of tremolite
22 and fibrous talc, fair?
23     A.   So he does identify crystal
24 aggregates of tremolite and minor amounts

1  of fibrous talc.
2      Q.   And if you'll go to Page 83
3  of the document.  Bates number ending
4  396.
5      A.   Oh, that might take me a
6  while to find.  396.
7      Q.   Page 83 of the document.
8  Bates number ending 396.
9      A.   I think that's actually
10 Page 43 maybe.
11     Q.   It could be.  396.  But
12 it's -- it's Specimen I.41.
13     A.   Okay.  I see that page.
14     Q.   Okay.  Are you there?
15     A.   I am there.
16     Q.   And this is a specimen of
17 talc ore, correct?
18     A.   That's what it says.
19     Q.   And it says, "This specimen
20 of talc ore consists of course aggregate
21 of feathery talc intimately intergrown
22 with minor chlorite" -- it says V-A-R
23 period -- "sheridanite, and enclosing
24 rare large porphyroblasts of subhedral

1  garnet which occasionally contain long
2  prismatic inclusions of tremolite."
3          Did I read that correctly?
4      A.   Yes.
5      Q.   And this would be an
6  instance where talc ore was found to
7  include tremolite, true?
8      A.   The tremolite was within the
9  garnet as I read this.
10     Q.   But it's within a talc ore
11 sample, true?
12     A.   So -- so the garnet is
13 within a talc ore.
14     Q.   And the garnet contains
15 tremolite, true?
16     A.   That's what it says.
17     Q.   In your report, you
18 criticize Dr. Cook and Dr. Krekeler in
19 their treatment of Dr. Pooley's report,
20 Exhibit 8.  And you say in part that
21 "Dr. Pooley makes clear there is no
22 asbestiform minerals."
23         In fact, Dr. Pooley's report
24 does find the presence of fibrous

Mary Boulton, Ph.D.

Page 126

1  material within the samples that -- that
2  he reported on Exhibit 8?
3      A.   So fibrous is not the same
4  as asbestiform.
5      Q.   How do you distinguish the
6  two?
7      A.   So asbestiform means that
8  the crystals are fibrils that have high
9  tensile strength and flexibility and no
10 lateral connection between fibrils.  So
11 that the fibrils can be separated from
12 each other.  That's not the same as
13 fibrous.
14     Q.   Fibrous -- let me strike
15 that and start again.
16         Dr. Pooley did report on
17 finding fibrous material within the
18 samples that he reported on in Exhibit 8,
19 true?
20     A.   He listed fibrous talc.
21     Q.   So the answer to my question
22 is yes, he did report fibrous material in
23 Exhibit 8?
24     A.   So he -- he did list fibrous

Page 127

1  talc.
2      Q.   And he also, you would
3  agree, reported the finding of -- finding
4  tremolite as well as actinolite within
5  these samples?
6      A.   He reported finding
7  tremolite and actinolite.
8      Q.   And are you aware that
9  tremolite has been found in other tests
10 of Italian talc?
11         MR. CHACHKES:  Objection.
12         THE WITNESS:  What other
13     Italian talc would we be talking
14     about?
15 BY MS. O'DELL:
16     Q.   Let me just ask a more
17 specific question.
18         Are you aware of historical
19 tests that report finding tremolite in
20 talc from mines in Italy that were used
21 to source Johnson & Johnson's Baby Powder
22 and Shower to Shower?
23     A.   So we could look at other
24 test reports for Italian samples if -- if

Page 128

1  you want to.
2      Q.   Are you aware that there
3  have been other tests in addition to
4  Dr. Pooley that have reported finding
5  tremolite in samples taken from the
6  Italian mine used to source J&J Baby
7  Powder?
8      A.   My recollection is Battelle
9  found tremolite, and we can look at those
10 specific test results.
11     Q.   And are you aware of test
12 results from the examination of Italian
13 talc that also reported the presence of
14 actinolite?
15     A.   So I -- I want to be careful
16 that I make a distinction between what is
17 called Italian talc for testing and what
18 is considered the ore zone that was used
19 for production and the fact that
20 actinolite and tremolite are not
21 asbestos.
22     Q.   They can be asbestos.
23     A.   There are asbestiform
24 varieties, but they are called tremolite

Page 129

1  asbestos and actinolite asbestos.
2      Q.   And historically, in reports
3  of asbestos testing, actinolite with the
4  word asbestos has not always been
5  included for purposes of reporting
6  asbestiform --
7          MR. CHACHKES:  Objection.
8  BY MS. O'DELL:
9      Q.   -- true?
10     A.   That I don't know.
11     Q.   In Dr. Pooley's report --
12 well, let me back up and say, you state
13 in your report that claims -- strike
14 that.  Start again.
15         You state in your report,
16 "Specimens collected in the hanging wall,
17 in the football of" -- "of the ore body,
18 are not concerning because essentially
19 the selected mining methods used would
20 ensure that actinolite or tremolite would
21 not contaminate the ore used in the
22 product," is that a -- long way of saying
23 it, but is that a fair summary of what
24 you -- what you said in your report?

Mary Boulton, Ph.D.

Page 130

1    A.   You may have lost me.  I was
2  looking at my report while you were
3  talking.  I apologize.
4    Q.   All right.
5    A.   So maybe we could just read
6  what my report says.
7    Q.   So where -- so what were you
8  looking at in your report?
9    A.   I was looking at the
10 paragraph on Page 6 that says, "and in
11 fact."
12       Is -- is that the section
13 you were referring to?
14   Q.   No, actually.  But you state
15 just below that, you state in the next
16 paragraph, you say, "The report," and
17 you're referring to Pooley's report,
18 Exhibit 8, "makes clear that no
19 asbestiform minerals were found."
20       And we've all -- you said
21 there's no asbestiform minerals that may
22 or may not be described, but certainly
23 there were fibrous material within the --
24 the samples, we've agreed on that, right?

Page 131

1    A.   There was fibrous talc
2  described.
3    Q.   And -- and "any
4  non-asbestiform amphiboles identified
5  were not located in ore typical of
6  production."  That's what you write.
7       Yet we've identified today
8  some talc ore that did, in fact, have
9  tremolite, true?
10   A.   So we would want to look at
11 the location of those specimens to make
12 sure even though they said ore, that was
13 considered in a production area.
14   Q.   He called them talc ore?
15   A.   Well, that doesn't
16 necessarily mean that they would be in a
17 production area.
18   Q.   Dr. Pooley referred to them
19 as talc ore, true?
20   A.   He said ore, but that does
21 not necessarily equate to production
22 areas.
23   Q.   Maybe, maybe not.  To
24 suggest otherwise sitting here today

Page 132

1  without any further information on your
2  part would be speculation, fair?
3       MR. LOCKE:  Objection.
4       THE WITNESS:  So we could go
5  back and look at more
6  descriptions.
7  BY MS. O'DELL:
8    Q.   He described that as talc
9  ore, true?
10   A.   That's the phrase he used.
11 But again, ore doesn't necessarily mean
12 that it is actually in a production area.
13 You do --
14   Q.   Maybe, maybe not.
15   A.   You do waste some ore.
16   Q.   I understand.  Maybe, or
17 maybe not.  That's the most you can say?
18   A.   Well, I would, again, want
19 to go through the report and look
20 specifically at where he later summarized
21 those samples.
22   Q.   Okay.  If -- and an ore by
23 your definition is material for sale,
24 true?

Page 133

1    A.   Yes, generally.
2    Q.   You go on to say, "Some
3  specimens were collected in the hanging
4  wall, but the method of mining, which
5  consisted of hand-filling methods,
6  precluded any gross contamination of the
7  ore."
8       Is what you -- that's what
9  you state?
10   A.   That's a quote from the
11 report.
12   Q.   Right.  And it goes on to
13 say that, "By virtue of the fact that
14 they were in the hanging wall, they would
15 not be included in the material that
16 ultimately was bottled as Johnson &
17 Johnson's Baby Powder and Shower to
18 Shower.
19       That's your -- that's your
20 opinion?
21   A.   So the hanging wall is
22 outside the ore zone by definition.
23   Q.   Does it mean that material
24 from a hanging wall cannot be included in

Page 134

1  what's extracted from the mine, true?
2      A.   So you would mine within a
3  margin away from that.
4      Q.   But my question is, it
5  doesn't mean that the material from the
6  hanging wall was not included in what was
7  ultimately bottled for Johnson &
8  Johnson's Baby Powder, true?
9      A.   So the mining practices
10  would make every attempt to stay away
11  from that material, because it is too
12  hard to process.
13          So is it completely
14  theoretically hypothetically possible
15  some of that material could be commingled
16  with talc ore taken to a mill, maybe.
17      Q.   And you cannot say to a
18  reasonable degree of scientific certainty
19  that that did not occur, can you?
20      A.   I wasn't there.
21          MR. CHACHKES:  Tell me when
22      you reach a wrapping-up point,
23      because we're probably going to
24      have lunch at 12:15.

Page 135

1          MS. O'DELL:  Give me just a
2      few minutes.
3  BY MS. O'DELL:
4      Q.   Are you okay for another few
5  minutes, Doctor?
6      A.   A few.  Not 30.
7      Q.   Okay.  I'll be brief.  Let
8  me ask you to look at what's previously
9  been marked as Hopkins Exhibit 28.
10          Have you seen that before?
11      A.   I believe so.
12      Q.   And are you aware that --
13  that this exhibit, Hopkins-28 was a
14  product of the examination of Dr. John
15  Hopkins, who is a corporate
16  representative for Johnson & Johnson?
17          MR. CHACHKES:  Objection.
18          THE WITNESS:  I actually
19      don't know how it was produced.  I
20      just know that it was an exhibit I
21      received.
22  BY MS. O'DELL:
23      Q.   And it was an exhibit to
24  John Hopkins' deposition, true?

Page 136

1      A.   I assume that's true, since
2  it was marked as an exhibit.
3      Q.   Do you know who he is?
4      A.   I don't know who he is.
5      Q.   Do you have you read his
6  deposition?
7      A.   I only had one page of it.
8      Q.   What page of the deposition
9  did you have?
10      A.   I'd have to actually look at
11  my files to see which page I had.
12      Q.   So you did not see the whole
13  deposition?
14      A.   I did not see the whole
15  deposition.
16      Q.   And so if it lists the whole
17  deposition on your reliance materials,
18  that would be inaccurate; you only
19  received one page?
20      A.   I only saw one page that
21  came with the Cook and Krekeler
22  documents.  It's possible that it was
23  uploaded to my box, and I missed it.  But
24  I only saw, in my documents, the one

Page 137

1  page.
2      Q.   Did you examine all of the
3  exhibits that were identified as Hopkins
4  deposition exhibits?
5      A.   I looked at the ones that
6  were germane to my assignment, which was
7  mining and beneficiation.
8      Q.   Which was reviewing Dr. Cook
9  and Krekeler's reports.  And so if they
10  weren't referred to in Dr. Cook and
11  Dr. Krekeler's reports specifically, it
12  would be fair to say that you did not
13  review those?
14      A.   Correct, unless I requested
15  them for some reason.
16      Q.   Okay.  And if you'll look at
17  Hopkins Exhibit 28, he lists here a
18  10/15 -- or October 15, 1957, test by
19  Battelle.  And if you'll look to the
20  right, it says that that is of Italian
21  talc.  And the test revealed that,
22  "Italian talc averages about 10 percent
23  fibrous or acicular particles."
24          Did I read that correctly?

Mary Boulton, Ph.D.

Page 138

1    A.   That's what it says.
2    Q.   And is that consistent with
3  your understanding of the Battelle
4  testing document -- documents?
5    A.   I would want to go back and
6  look at that Battelle document, because
7  they tested a number of things.  And I
8  don't actually remember which Battelle
9  document was which.
10    Q.   If you'll look forward one
11  line to May 9th, 1958, Exhibit J&J-1,
12  also Battelle testing document, of talc
13  from the Val Chisone mine, and it was
14  processed Italian talc.
15       Do you see that?
16    A.   I see that.
17    Q.   Processed Italian talc would
18  be talc ore that has gone through
19  beneficiation and is essentially is ready
20  for bottling, true?
21    A.   I don't know how they define
22  processed talc.
23    Q.   It would be fair to say that
24  processed talc would be part of the talc

Page 139

1  ore, true?
2       MR. CHACHKES:  Objection.
3       THE WITNESS:  I believe --
4       MR. CHACHKES:  Sorry.  Go
5  ahead.  Objection.
6       THE WITNESS:  I believe so.
7  BY MS. O'DELL:
8    Q.   And it says the test
9  revealed tremolite.
10       Do you see that?
11    A.   I see that.
12    Q.   And that was consistent with
13  Dr. Pooley's results as reported in
14  Exhibit 8, true?  Where Dr. Pooley also
15  found tremolite in specimens taken from
16  the Italian mine, true?
17    A.   So we would basically want
18  to look at some more information as to
19  where samples were collected before
20  making a generalization that they were
21  from exactly the same area.
22    Q.   I didn't say that.  I said
23  it was from the Italian mine.  Dr. Pooley
24  took specimens from the Italian mine, and

Page 140

1  within those specimens as reported in
2  Exhibit 8, he found tremolite, true?
3  We've been through this.
4       MR. CHACHKES:  Objection.
5  BY MS. O'DELL:
6    Q.   Today.  So he reported
7  tremolite, fair?
8    A.   He -- he reported tremolite
9  in some of his studies, yes.
10    Q.   And in the test results from
11  Battelle dated May the 9th of processed
12  Italian talc, tremolite was also found,
13  true?
14    A.   That's what it says.
15    Q.   And if you'll look further
16  at May 23rd, 1958, was the date of the
17  test, also Battelle testing of processed
18  Italian talc from the Val Chisone mine,
19  tremolite was found, true?
20    A.   True.
21    Q.   And 6 to 10 percent fibrous
22  talc.
23       Did I read that correctly?
24    A.   That's what it says.

Page 141

1    Q.   And then in terms of
2  Dr. Pooley's testing and the results
3  where he found tremolite in the specimens
4  that he looked at, those results are
5  consistent with what Battelle found in
6  its examination of Italian talc, true?
7    A.   I may be comparing apples
8  and oranges, and to answer that again, I
9  would just want to be very careful as to
10  where Battelle samples came from relative
11  to where Pooley samples came from.  And
12  we would also want to know whether
13  processed talc meant that Battelle ground
14  it to some specification, or if somehow
15  it was processed by Johnson & Johnson.
16    Q.   And in your mind, that would
17  make a difference?
18    A.   It could.  There could be
19  beneficiation steps that were missing
20  between actual production versus a
21  laboratory test.
22    Q.   Is it your opinion to a
23  reasonable degree of scientific certainty
24  that asbestos found in talc can be

Mary Boulton, Ph.D.

1  removed through a beneficiation process?
2          MR. CHACHKES:  Objection.
3          THE WITNESS:  So the
4      question is could asbestos be
5      removed through beneficiation?
6  BY MS. O'DELL:
7      Q.   Yes.
8      A.   Okay.  There are several
9  steps where it can be removed.
10     Q.   Can it be completely
11 removed?
12     A.   I don't know, depending on
13 the concentration and the processing
14 steps used.  I would want to see data.
15     Q.   Have you examined -- well,
16 before I go there, we'll get there in a
17 bit.  I want to come back to that.
18         When you talk about
19 processed Italian talc and you say
20 there's some confusion about whether that
21 was the process from -- that might have
22 been undertaken by Battelle versus
23 Johnson & Johnson.  Let's focus on that.
24         The material that was tested

1  was processed Italian talc.  And is it
2  your belief that that does not mean talc
3  that has been through the beneficiation
4  process?
5      A.   I'd want to look at those
6  Battelle reports and see exactly what
7  they did.
8          MR. CHACHKES:  Leigh, how
9      much longer are you planning?
10         MS. O'DELL:  Give me just a
11     few minutes.  I was trying to
12     finish this section.
13         You know, I think this
14     exhibit -- I think the fact that
15     this is processed talc is pretty
16     clear.  But if -- if Dr. Poulton
17     doesn't remember then I'd like to
18     show her.
19 BY MS. O'DELL:
20     Q.   Let me show you what I'm
21 marking as Exhibit 9 to your deposition.
22         (Document marked for
23     identification as Exhibit
24     Poulton-9.)

1  BY MS. O'DELL:
2      Q.   This correlates with J&J-1,
3  which is the May 9, 1958, test that we
4  just discussed.
5      A.   Okay.
6      Q.   Do you see that?
7      A.   I do.
8      Q.   If you'll turn to Bates
9  number ending 911.
10     A.   Okay.
11     Q.   At the bottom, last
12 paragraph, "The measurements presented in
13 this report were made on the same samples
14 of EGT Extra 0000 talc obtained from
15 Cranford, New Jersey, plant which was
16 used in the work previously reported."
17         So this is beneficiated talc
18 that has been through the Johnson &
19 Johnson plant, correct?
20         MR. CHACHKES:  Just for the
21     record -- the record, you left out
22     "except where otherwise noted."
23         MS. O'DELL:  Okay.  Fair
24     enough.

1  BY MS. O'DELL:
2      Q.   So this is beneficiated or
3  processed talc that has been processed by
4  Johnson & Johnson that's being reported
5  in Exhibit 9, true?
6      A.   So this says EGT Extra
7  00000, and the table says, "Processed
8  talc Italian 1."
9          Are -- are those the same?
10     Q.   They are.  I think you will
11 find that Italian 1 is referred to on
12 Page 5 of this report, and it's the
13 identification of the specific sample.
14     A.   I see.
15     Q.   Do you see that?
16     A.   I see.
17     Q.   So are we in agreement now
18 that the samples reported as on May 9,
19 1958, and on May 23, 1958, are samples of
20 processed Johnson & Johnson talc?
21     A.   Could I read a little more
22 of this report?
23     Q.   I'm just asking a simple
24 question.

Mary Boulton, Ph.D.

Page 146

1    A.   Well, I just, I just want to
2  make sure.  I have seen that paragraph on
3  Page 2.  I want to read the lead-up to
4  the table we just referred to on Page 5.
5    Q.   Have you seen this report
6  before?
7    A.   I have, yeah.  I have seen a
8  lot of reports.
9    Q.   Sure, I'm just asking.
10   A.   Yeah, I have seen this.
11   Q.   I'm not suggesting anything
12  other than I'm just asking if you have
13  seen this.
14   A.   Yeah, I have seen this.
15   Q.   Okay.  All right.  Anything
16  about what you've read so far that --
17  that makes you doubt that this was
18  processed talc that was actually tested?
19   A.   Well, again I want to see
20  what they were doing inhouse versus what
21  they acquired, just, just to be sure in
22  my mind.
23   Q.   Do you think that they were
24  adding tremolite inhouse?

Page 147

1    A.   I don't know.  I -- I
2  just -- I want to read the report.
3    Q.   It could, could be.  It
4  could, could be, okay.
5    A.   I just want to --
6    Q.   Well, we'll take a break,
7  and if you -- you can read it over lunch,
8  and then we'll come back and I'll ask you
9  a few more questions about it.
10   A.   Okay.
11       THE VIDEOGRAPHER:  Off the
12  record, right?
13       MS. O'DELL:  Yeah.
14       THE VIDEOGRAPHER:  The --
15  time is 12:28 p.m.  Off the
16  record.
17          - - -
18       (Lunch break.)
19          - - -
20       THE VIDEOGRAPHER:  Okay.  We
21  are back on the record.  The time
22  is 1:29 p.m.
23          - - -
24     A F T E R N O O N   S E S S I O N

Page 148

1          - - -
2       EXAMINATION (Cont'd.)
3          - - -
4  BY MS. O'DELL:
5    Q.   Dr. Poulton, before lunch,
6  we were talking about testing that
7  Battelle had done of certain Italian talc
8  samples.  And we were discussing whether
9  they were processed Italian talc, in
10  other words, there -- the samples had
11  been processed -- was -- were -- whether
12  the samples were processed powder by J&J.
13       And we looked at page, I
14  think it's 2 of the report ending Bates
15  911.  It refers to the samples as being
16  EGT Extra 00000 talc from the mill at
17  Cranford, New Jersey.  And you wanted to
18  take a little closer look at that report.
19   A.   Yeah.
20   Q.   Have you had an opportunity
21  to do that?
22   A.   I did look at it.
23   Q.   And are we in agreement that
24  the samples that were tested were

Page 149

1  processed Johnson & Johnson talcum
2  powder?
3    A.   I could not confirm that
4  from the Cranford, New Jersey, plant.
5  And I -- and I couldn't accurately map
6  Talc 1 and Talc 2 to EGT Extra.  So I --
7  I am still confused as to whether that is
8  truly a Johnson & Johnson processed talc.
9    Q.   And in your mind, you don't
10  know -- strike that.
11       You don't know whether EGT
12  talc was actually the product name for
13  Italian talc?
14   A.   From -- from Cranford.
15   Q.   You do not know that?
16   A.   I do not know that EGT Extra
17  00000 talc from Cranford is Johnson &
18  Johnson talc.  I -- I don't have
19  confirmation of that.
20   Q.   Are -- are you -- have you
21  seen that referred to in documents as
22  Johnson & Johnson Italian talc?
23   A.   EGT Extra?
24   Q.   Yeah.

Mary Boulton, Ph.D.

| Page 150 |
|---|
| 1    A.   I'd have to go back and look |
| 2  for -- for that reference. |
| 3    Q.   And you are aware that |
| 4  the -- Battelle did a series of tests on |
| 5  Johnson & Johnson talcum powder from |
| 6  Italy.  Are you not? |
| 7    MR. CHACHKES:  Objection. |
| 8    THE WITNESS:  I -- I know |
| 9    that Battelle did a number of |
| 10    tests for Johnson & Johnson |
| 11    involving samples from Italy. |
| 12  BY MS. O'DELL: |
| 13    Q.   And, in fact, we looked at |
| 14  not only the May the 9th sample results |
| 15  that we just have reviewed the actual |
| 16  report which is Exhibit 9.  But in the |
| 17  Hopkins Exhibit 28 chart, we also looked |
| 18  at the test results for a May 23, 1958, |
| 19  sample. |
| 20    Do you recall that? |
| 21    A.   We have that in the table. |
| 22  I don't think that we've looked at J&J-2, |
| 23  the Battelle report for that. |
| 24    Q.   Well -- fair -- fair enough. |

| Page 151 |
|---|
| 1    But the Hopkins charts |
| 2  refers to it as processed talc as well, |
| 3  correct? |
| 4    A.   It -- it does.  I would have |
| 5  the same questions as to what the actual |
| 6  origination of the sample is. |
| 7    Q.   And you doubt that |
| 8  originated from Johnson & Johnson, is |
| 9  that your testimony? |
| 10    A.   I have a question about |
| 11  that. |
| 12    (Document marked for |
| 13    identification as Exhibit |
| 14    Poulton-10.) |
| 15  BY MS. O'DELL: |
| 16    Q.   Let me show you what I'm |
| 17  marking as Exhibit 10, which is a |
| 18  Battelle report dated October 15th, 1957. |
| 19  Do you see that? |
| 20    A.   Let's see.  Yes.  Okay. |
| 21    Q.   And if you look at Page 1 of |
| 22  the actual report which ends in Bates |
| 23  number ending 874. |
| 24    Do you see that? |

| Page 152 |
|---|
| 1    A.   I do. |
| 2    Q.   And if you'll look, the |
| 3  samples measured in this or analyzed in |
| 4  this report at the bottom are also |
| 5  referred to as EGT Extra 0000. |
| 6    Do you see that? |
| 7    A.   I see that. |
| 8    Q.   And they're taken weekly -- |
| 9  at weekly intervals from the conveyor at |
| 10  the Cranford, New Jersey plant.  Which is |
| 11  a J&J processing plant, correct? |
| 12    A.   So I don't know that.  I |
| 13  would want to see some documentation that |
| 14  that was exclusively Johnson & Johnson |
| 15  sourcing. |
| 16    Q.   What do you know about the |
| 17  beneficiation process of Italian talc |
| 18  that J&J employed? |
| 19    A.   So I believe that there was |
| 20  hand sorting in Italy to select the |
| 21  purest grades of talc.  And it was |
| 22  shipped to the United States.  At that |
| 23  point I actually don't know where the |
| 24  Italian talc was processed. |

| Page 153 |
|---|
| 1    Q.   Okay.  Let's assume for |
| 2  purposes of my question that the |
| 3  Cranford, New Jersey facility is a |
| 4  Johnson & Johnson facility, which I will |
| 5  represent to you it is, that based on |
| 6  this document, taken in the context of |
| 7  not only Exhibit 10, but also Exhibit 9, |
| 8  which analyzed EGT Extra 000 talc.  Does |
| 9  it appear that that is talc that was |
| 10  taken from the conveyor of the processing |
| 11  plant there in New Jersey? |
| 12    A.   It does say it's taken from |
| 13  the conveyor at that processing plant. |
| 14    Q.   So in other words, it was |
| 15  processed talc? |
| 16    A.   It looks like it. |
| 17    Q.   In both of those samples, |
| 18  excuse me.  In both of those samples |
| 19  tremolite was identified? |
| 20    A.   So per this table, tremolite |
| 21  is identified from this report.  I think |
| 22  I would look through here and see exactly |
| 23  what that was. |
| 24    Q.   Let me ask you -- let me ask |

Mary Boulton, Ph.D.

Page 154

1 you this question.  You gave us earlier,
2 and I marked it as Exhibit 3, this table.
3      A.   Yes.
4      Q.   And this was the, what you
5 called the "back of the envelope many
6 assumptions" analysis that you conducted
7 over the last couple of weeks?
8      A.   Yes.
9      Q.   And what was the purpose of
10 you performing this analysis?
11      A.   I just had questions in my
12 mind as to what the actual mining rates
13 might have been and I wanted to do some
14 calculations to see what they looked like
15 and how that material flowed through the
16 mill, how long it might take.  It was
17 actually not something that I relied on.
18 It was just a question I had as I was
19 reviewing documents.
20      Q.   So this is not a calculation
21 or analysis that you relied on in
22 reaching your opinions?
23      A.   That's correct.
24      Q.   And what was -- what were

Page 155

1 your conclusions or what were, you know,
2 your takeaways from your analysis?
3      A.   That it was very slow
4 production.  It was not -- it confirmed
5 that this is truly a small mine with slow
6 production.
7      Q.   When you say small mine,
8 what are you referring to?
9      A.   Well, I often deal with very
10 large metal mines that produce in one
11 truckload what Argonaut produces in a
12 day.
13      Q.   And the data that you
14 considered in doing this calculation was
15 data from Argonaut?
16      A.   Yes.
17      Q.   So you criticize Dr. Cook
18 and Dr. Krekeler for conflating
19 non-asbestiform minerals with asbestiform
20 minerals?
21      A.   Correct.
22      Q.   If you'll turn to Dr. Cook's
23 report, which we previously marked, I
24 believe -- do you have it in front of you

Page 156

1 there?
2      A.   Hang on a minute.
3 Exhibit 5.
4      Q.   Yes.
5      A.   Okay.
6      Q.   And if you will turn to Page
7 13 of Dr. Cook's report, the second full
8 paragraph right before the table.
9           Do you see that?
10      A.   The paragraph that starts,
11 "The testing results --
12      Q.   That's right?
13      A.   -- "appearing in Table 17"?
14      Q.   Yes.  And in that sentence
15 it says, "The testing results appearing
16 in table" -- "in the table below are some
17 of the reported instances within
18 defendant's internal documents where
19 serpentine asbestos, chrysotile,
20 amphibole asbestos or potentially
21 asbestiform amphiboles have been found in
22 samples of talc used to source J&J talcum
23 powder products."
24           Did I read that correctly?

Page 157

1      A.   That's what it says.
2      Q.   The sentence makes clear
3 that Dr. Cook and, I believe there's a
4 similar sentence in Dr. Krekeler's
5 reports, are not conflating asbestiform
6 asbestos with non-asbestiform asbestos,
7 true?
8      A.   No.  That was not my reading
9 of their expert reports in conjunction
10 with the full documents that I looked at
11 for these samples.
12           Where they're saying things
13 are amphibole asbestos, I was not seeing
14 reference to asbestos in test samples
15 that were specifically labeled as ore.
16      Q.   The table is presented in
17 terms of serpentine asbestos, amphibole
18 asbestos, or potentially asbestiform
19 amphiboles.
20           Do you see that?
21      A.   Could you show me where
22 you're looking?
23      Q.   Where I just read.
24      A.   Okay.  And this table is

Mary Boulton, Ph.D.

Page 158

1   essentially Hopkins' table?
2       Q.   It has similarities.  But it
3   is not the same.
4       A.   It is not the same.  And the
5   difference is?
6       Q.   My question to you is not a
7   comparison of the table to the
8   Hopkins-28.  My question is in presenting
9   this table of results, Dr. Cook
10  acknowledges that there are internal
11  documents that state there's serpentine
12  asbestos or chrysotile, amphibole
13  asbestos, or potentially asbestiform
14  amphiboles.  He is clearly not conflating
15  the two, correctly -- correct?
16          MR. CHACHKES:  Objection.
17          THE WITNESS:  I disagree
18      with that interpretation when I
19      looked at these documents and how
20      Drs. Cook and Krekeler were
21      associating test results with
22      their conclusion, that these were
23      asbestiform minerals in the ore
24      samples.

Page 159

1   BY MS. O'DELL:
2       Q.   Did -- are there -- are your
3   criticisms of the table reporting the
4   results of asbestos testing fully set out
5   in your report?
6       A.   I identified a few examples.
7       Q.   Are they fully set out in
8   your report?
9       A.   When you say fully set out,
10  what do you mean?
11      Q.   I'm saying if you have a
12  criticism of the report of Dr. Cook's --
13  strike that.  Start again.
14          Are all your criticisms of
15  the table reporting the test results for
16  asbestos testing contained in your
17  report?
18      A.   I think I'm still
19  unfortunately having trouble following
20  your question.
21      Q.   Are all your criticisms of
22  the table containing asbestos test
23  results in Dr. Cook and Dr. Krekeler's
24  reports outlined in your report?

Page 160

1       A.   So I looked at some of the
2   examples that they listed as being
3   asbestos-containing samples.  I looked at
4   the cited documents and concluded that
5   they had not correctly identified samples
6   as containing asbestos when the
7   reports said those were not ore samples
8   or they did not identify things as
9   asbestos.
10      Q.   And your criticisms are
11  outlined in your expert report, true?
12      A.   Yes.
13      Q.   If you'll turn to Page 7 of
14  your report.  And specifically you cite
15  J&J 000087868, which we just marked a few
16  moments ago as Exhibit 10.
17          And you criticize Dr. Cook
18  by saying that, "When tremolite was
19  identified, the tremolite was not
20  identified as asbestiform."
21          Do you see that sentence in
22  your report?
23      A.   Yes, I do.
24      Q.   And if you'll turn to Page

Page 161

1   21 of the report that we've marked as
2   Exhibit 10 -- do you see that, Page 21?
3       A.   Labeled "conclusions"?
4       Q.   Yes.
5       A.   Okay.
6       Q.   Under Number 2.  Battelle et
7   al. concludes that 10 percent of the
8   material that was examined was fibrous,
9   correct?
10      A.   That's what it says.
11  Fibrous is not the same as asbestos.
12      Q.   Can be asbestiform, true?
13      A.   Fibrous?
14      Q.   Yes.
15      A.   Is a broader term.
16  Asbestiform is quite specific.
17      Q.   And asbestiform -- fibrous
18  material includes asbestiform material,
19  correct?
20      A.   I would not put the two in
21  the same category.
22      Q.   But if -- if your -- in your
23  view as fibrous is a broader category
24  than asbestiform, asbestiform certainly

Mary Boulton, Ph.D.

Page 162

1 would be encompassed by the term
2 "fibrous"?
3 A. I wouldn't make that
4 equation because I think it confuses the
5 definition of asbestiform. I -- I would
6 say that if it's truly asbestiform, it is
7 asbestiform. And fibrous is distinct
8 from that.
9 Q. But asbestiform is fibrous
10 material. We can -- we can debate the
11 definition, we can debate some of the
12 characteristics, but asbestiform asbestos
13 is fibrous in nature, true?
14 MR. LOCKE: Objection.
15 THE WITNESS: Again, I -- I
16 would stay with a very specific
17 definition. I would not agree to
18 equate fibrous with asbestiform.
19 BY MS. O'DELL:
20 Q. I didn't -- I didn't say
21 equate. I said asbestiform is -- would
22 be encompassed in the term "fibrous."
23 A. I would not put it in that
24 set.

Page 163

1 Q. Okay. So it's --
2 A. I would keep asbestiform
3 separate.
4 Q. It's not fibrous material?
5 A. I would keep it as a
6 separate distinction from fibrous.
7 Q. My question is, is
8 asbestiform asbestos fibrous in nature?
9 A. Again, I would stay with the
10 definition of asbestiform having very
11 specific characteristics which may not be
12 characteristic of something in a fibrous
13 set. So I would keep them separate.
14 Q. I get -- I understand what
15 you're saying, but the truth is that in
16 the context of a 1958 or '7 report,
17 fibrous -- 10 percent fibrous material
18 would include potentially asbestiform
19 material, true?
20 MR. LOCKE: Objection.
21 THE WITNESS: I don't agree
22 with that.
23 BY MS. O'DELL:
24 Q. You also go on to cite a

Page 164

1 document, it's a memo from Dr. Umberto
2 Stefano. It's a 1973 memo. Do you
3 recall that?
4 A. Yes.
5 Q. And you cite it for purposes
6 of -- of stating that there are no
7 asbestiform fibers in talc from the Val
8 Chisone region, true?
9 A. Can we look at his memo?
10 Q. I'm asking you a question
11 about what you cite it for.
12 A. Well, I'm -- I'd like to see
13 what his memo says to refresh my memory.
14 Q. Who -- who is he?
15 A. I don't know if he was a
16 medical doctor for a company or a medical
17 doctor in the region.
18 (Document marked for
19 identification as Exhibit
20 Poulton-11.)
21 BY MS. O'DELL:
22 Q. Here is Exhibit 11, which
23 is -- is that the memo you're referring
24 to in your report?

Page 165

1 A. I believe so.
2 Q. And according to your
3 report, Dr. Stefano references a study
4 and -- of whether talc mining in the Val
5 Chisone region caused lung -- lung
6 diseases in mine and mill workers due to
7 the presence of asbestiform minerals and
8 silica. That's what you state in your
9 report, correct?
10 A. Let me just read.
11 Q. Is that the document you
12 cited, Dr. Poulton?
13 A. It is.
14 Q. And Dr. Stefano reports
15 information from conversations that he's
16 had with physicians in the Val Chisone
17 area, true?
18 A. He contacted physicians and
19 health officers in the area.
20 Q. And he -- this is not a
21 scientific study published in the
22 peer-reviewed literature, true?
23 A. As far as -- I -- I don't
24 know whether this was published or not.

Mary Boulton, Ph.D.

Page 166

1 I just have this memo.
2    Q.   And this, this memo was not
3 published in a peer-reviewed literature,
4 true?
5    A.   This exact memo, I don't
6 know.
7    Q.   What you're holding in your
8 hand is not a peer-reviewed publication,
9 true?
10    A.   That's correct.
11    Q.   And there's no protocol
12 outlined in this memo, true?
13    A.   True.
14    Q.   There's no identification of
15 patients that were followed as a part of
16 this examination, true?
17    A.   True.
18    Q.   That -- you know,
19 interviewing medical doctors is not an
20 appropriate study method for determining
21 if individuals have developed lung --
22 lung disease or silicosis as opposed to
23 exposure to an environmental material,
24 true?

Page 167

1       MR. CHACHKES:  Objection.
2       THE WITNESS:  So I am not
3    commenting on whether this is a
4    scientific study.  I'm simply
5    citing that this memo exists and
6    what his conclusions were.
7 BY MS. O'DELL:
8    Q.   And this memo states that
9 tremolite is the only asbestos mineral
10 found in a very small amount in this
11 talc?
12    A.   That's his sentence.
13    Q.   You go on to talk about
14 Coggiola.  Coggiola.  I'm not sure how
15 you say that.  And you cite Coggiola for
16 the purpose of stating that there are no
17 asbestiform fibers in the -- in the Val
18 Chisone reason -- region.
19       Do you see that in your
20 report?
21    A.   I see that statement.
22       (Document marked for
23    identification as Exhibit
24    Poulton-12.)

Page 168

1 BY MS. O'DELL:
2    Q.   Let me show you what I've
3 marked as Exhibit 12.  Is that the
4 article that you're referencing?
5    A.   I believe so.
6    Q.   And this is a -- a study
7 of -- of talc miners and millers in Italy
8 to determine if they have significant
9 excess mortality from exposure to
10 asbestiform fibers, fair?
11    A.   In Val Chisone, yes.
12    Q.   And -- and it -- it states
13 in the background that, top of the page,
14 talc found here is free from asbestiform
15 fibers.
16       Do you see that?
17    A.   Yes.
18    Q.   Is there any citation to
19 support that statement?
20    A.   I would need to read through
21 the paper to see.
22    Q.   Is there any citation at
23 that location to support the statement
24 that talc from Italy is free from

Page 169

1 asbestiform fibers?
2    A.   I'd -- I'd want to go
3 through the paper and -- and look for his
4 references.
5    Q.   Okay.
6       MS. O'DELL:  Let's go off
7    the record.
8       THE VIDEOGRAPHER:  Okay.
9    The time is 1:56 p.m.  Off the
10    record.
11       (Short break.)
12       THE VIDEOGRAPHER:  We are
13    back on the record.  The time is
14    1:59 p.m.
15 BY MS. O'DELL:
16    Q.   So, Doctor, before we went
17 off the record, I pointed you to the
18 statement in Coggiola that states, "Talc
19 found here is free from asbestiform
20 fibers."  And I asked you the question,
21 is there a reference to support that
22 statement.  There's certainly no footnote
23 there.
24    A.   So the references are on

Mary Boulton, Ph.D.

1  Page 64.
2      Q.   Okay.
3      A.   Left-hand column, first full
4  paragraph that starts, "To provide
5  further evaluation on the issue, we
6  updated the analysis of the Italian
7  cohort of talc miners and millers in Val
8  Chisone/Turin, reference Rubino et al.
9  1976, 1979, in which the talc was free
10 from asbestiform fibers, reference Verdel
11 et al. 1983; Parks 1994.
12     Q.   And that's what you're
13 relying on to say that talc from Italy
14 has no asbestiform fibers?
15         MR. CHACHKES:  Objection.
16         THE WITNESS:  That's what
17     I'm relying on in this paper that
18     the miners and millers in their
19     study from the Val Chisone region
20     were not exposed to talc that had
21     asbestiform.
22 BY MS. O'DELL:
23     Q.   Okay.  And you've seen tests
24 from the Val Chisone reason -- region

1  that has -- of talc with asbestiform
2  fibers, true?
3      A.   I don't recall seeing
4  asbestos in the talc ore that was being
5  milled.
6      Q.   Okay.  And so it's your view
7  that Battelle and -- Pooley's
8  analysis that show asbestiform fibers
9  are -- are not applicable to Johnson &
10 Johnson commercial talc?
11         MR. CHACHKES:  Objection.
12         THE WITNESS:  I did not see
13     reference to asbestos minerals,
14     asbestiform minerals in the
15     samples that were marked as ore
16     for Johnson & Johnson.
17 BY MS. O'DELL:
18     Q.   We went through a sample, if
19 you'll recall, in Dr. Pooley's report, of
20 talc ore that contained tremolite?
21     A.   And I think that, again,
22 just because it says it's ore doesn't
23 mean that it's coming from an area that's
24 actually mined.  So you can mark things

1  as ore and waste them so you don't
2  produce them.  And you may call it part
3  of the ore body, but it's not the ore
4  that you're mining.  You're wasting it.
5      Q.   And what's your methodology
6  for concluding that the reference to talc
7  ore in the Pooley report is -- is
8  incorrect?
9          MR. CHACHKES:  Objection.
10         THE WITNESS:  I believe he
11     had a statement in his report that
12     I referenced.
13         He mentions that, "Materials
14     being tested do not represent an
15     average collection of specimens of
16     material being produced at the
17     mine.  The specimens were
18     collected with the intention of
19     sampling those areas with obvious
20     non-talc mineral inclusions.
21 BY MS. O'DELL:
22     Q.   And that's your -- that's
23 your methodology?
24     A.   That's his quote from his

1  report stating what he was sampling and
2  why.
3      Q.   And yet, he goes on to
4  say -- and we went through this
5  earlier -- that he also sampled talc ore
6  and we went through those results, I
7  think the record will reflect that?
8      A.   And I outline in my
9  paragraph which samples were from pure
10 talc faces, a sample I.39 was from the
11 crusher, had no asbestiform minerals.
12 The sample I.41 that we talked about
13 labeled "good specimen from face 2" had
14 tremolite only as an inclusion in a
15 garnet grain.
16     Q.   Let me just stop you there.
17 It had tremolite in this one.
18         MR. CHACHKES:  We should let
19     the witness finish.  Please don't
20     interrupt her.
21         MS. O'DELL:  Excuse me.
22         MR. CHACHKES:  Move to
23     strike the question.
24         MS. O'DELL:  So be it.

Mary Boulton, Ph.D.

Page 174

1   That's fine.
2  BY MS. O'DELL:
3      Q.   So let me ask you this.
4  Rubino is -- was the initial mortality
5  study of talc miners and millers in
6  Italy, true?
7      A.   I do not look up that
8  reference.
9      Q.   I'll represent to you that
10 that's the case.  And Coggiola is a
11 follow-up study to that particular study.
12     That is -- neither Rubino or
13 Coggiola involved the testing of talc
14 samples, true?
15     MR. CHACHKES:  Objection.
16     THE WITNESS:  I don't know.
17 BY MS. O'DELL:
18     Q.   Coggiola does not involve
19 the testing of talc samples, true, for
20 the presence of asbestos?
21     A.   I believe he is relying on
22 others for that information.
23     Q.   Does not involve the testing
24 of talc samples for asbestos, true?

Page 175

1      MR. CHACHKES:  Objection.
2      THE WITNESS:  I believe he
3   is not testing --
4  BY MS. O'DELL:
5      Q.   So the answer to my question
6  is, that is correct?
7      MR. CHACHKES:  Objection.
8   Asked and answered.
9  BY MS. O'DELL:
10     Q.   You may answer.
11     A.   I may answer that, okay?
12 Can you just rephrase your question one
13 more time for me.
14     Q.   What I'm asking you, a
15 simple question, yes or no, is, Coggiola
16 does not involve the testing of talc
17 samples for the presence of asbestos,
18 true?
19     A.   That's my understanding.
20     Q.   And do you have a copy of
21 Verdel with you?
22     A.   I do not.
23     Q.   Let me ask you if you agree
24 with this statement.  The term "zoning"

Page 176

1  in terms -- zoning, Z-O-N-I-N-G -- is --
2  let me just ask you before I ask and see
3  if you agree with this statement.
4      Do you -- do you understand
5  the term "zoning" in the context of
6  geologic exploration?
7      A.   I understand zoning in the
8  context of alteration zones.
9      Q.   Do you agree that when you
10 conduct zoning in ore deposits, what
11 you're really doing is identifying a
12 regular pattern or distribution of
13 minerals or elements over a particular
14 geographic area?  Do you agree with that?
15     A.   I don't think that's
16 phrasing I understand for zoning.
17     Q.   Have you heard the term
18 "regional zoning"?
19     A.   Regional zoning?  In the
20 context of what exactly?
21     Q.   Of geologic exploration or
22 evaluation.
23     A.   Can you give me an example?
24     Q.   Well, for example, the --

Page 177

1  when you look at the Southern Piedmont
2  marked region, for example, there are
3  areas of sedimentary deposits that
4  encompass a large part of that region.
5  Are you familiar with that?
6      A.   So you're talking about east
7  coast geology, and that regional scale
8  geology is really not the core focus of
9  my report.
10     Q.   So that -- you wouldn't be
11 qualified to comment on the geology of
12 basically the eastern seaboard, fair?
13     A.   I would not be able to
14 comment on the genesis of rocks on the
15 eastern seaboard.
16     Q.   Are you familiar with the
17 term metallogeny?
18     A.   Metallogeny.
19     Q.   Thank you.  Metallogeny.
20     A.   Yes, I've heard it.
21     Q.   How would you define it?
22     A.   I would define it as
23 distribution of formation of metals.
24     Q.   And regional -- metallogeny,

Mary Boulton, Ph.D.

Page 178

¹ say it again one more time for me, if you
² don't mind?
³      A.   Metallogeny.
⁴      Q.   Metallogeny.  I'm going to
⁵ get it.  Metallogeny is a form of
⁶ regional zoning, true?
⁷      A.   I don't know that I would
⁸ necessarily say that.  But again, you're
⁹ straying outside my zone of expertise
¹⁰ here, so I couldn't comment.
¹¹      Q.   Would you agree that there
¹² can be broad consistency in ore deposits
¹³ over a geographic region?
¹⁴      A.   No.  And I think we would
¹⁵ again have to take this on a case-by-case
¹⁶ basis, not a general hypothetical.
¹⁷      Q.   I'm entitled to ask you
¹⁸ hypotheticals.  And so my question is,
¹⁹ would you agree that similarities in
²⁰ particular types of ore deposits can
²¹ occur over regions?
²²      A.   So we would want to be
²³ careful with the word "similarity" to
²⁴ answer that question honestly.

Page 179

¹      Q.   How about consistency?
²      A.   Even consistency we would
³ want to define.
⁴      Q.   Okay.  Would you agree with
⁵ me that economic geologists often look to
⁶ a particular region and the consistencies
⁷ in the deposits of certain types of
⁸ minerals in order to evaluate that area
⁹ for, you know, economic exploitation?
¹⁰      A.   So we have models of mineral
¹¹ deposits that may be based on, say,
¹² tectonic locations.  They may be based on
¹³ formation in a particular kind of basin
¹⁴ or in a particular time frame in the
¹⁵ Earth's evolution.
¹⁶         So that may put you in a
¹⁷ particular part of the world that is
¹⁸ relevant for that type of deposit.  But
¹⁹ if it were so easy to say I have to be in
²⁰ South America to find copper, we wouldn't
²¹ be exploring for copper.  We would know
²² where it all is.  So it only gets you so
²³ close, and then the details become very
²⁴ important.

Page 180

¹      Q.   In terms of zoning however,
² that's an important first step to
³ understand the details of a specific
⁴ deposit, true?
⁵      A.   I think we're using zoning
⁶ differently from my body of knowledge of
⁷ how the word "zoning" would be used.  So
⁸ I think I'm not on the same page where
⁹ you are with this question.
¹⁰      Q.   Okay.  Let me ask you to
¹¹ look at what I'm marking as Exhibit 13.
¹²         (Document marked for
¹³         identification as Exhibit
¹⁴         Poulton-13.)
¹⁵ BY MS. O'DELL:
¹⁶      Q.   It's an expert from Guilbert
¹⁷ and Park which you cite.  I don't have
¹⁸ another copy.  I'm sorry.  You are
¹⁹ familiar with Guilbert and Park?
²⁰      A.   I am.
²¹      Q.   You cite that in your
²² report?
²³      A.   I do.
²⁴      Q.   It's authoritative?

Page 181

¹      A.   Yes.
²      Q.   And Guilbert and Park have a
³ section on regional zoning.
⁴         Do you see this?
⁵      A.   Yes.
⁶      Q.   And they write, "Economic
⁷ geologists have been aware that many
⁸ types of ore deposits seem to have broad
⁹ scale pattern consistencies," and they
¹⁰ talked about the defied explanation until
¹¹ the 1970s.  And then they give examples
¹² of different types of deposits and the
¹³ bands of deposits that can occur over
¹⁴ broad geographical areas.
¹⁵         Do you see that?
¹⁶      A.   Yes.
¹⁷      Q.   And would you agree with me
¹⁸ that the ultramafic deposits, talc
¹⁹ deposits that are located in Vermont are
²⁰ part of a consistent pattern of
²¹ ultramafic deposits that start in Canada
²² and move down the eastern seaboard
²³ through western North Carolina, north
²⁴ Georgia, Alabama, et cetera?

Mary Poulton, Ph.D.

Page 182

1    A.   I wouldn't be an
2  authoritative expert on Eastern Seaboard
3  ultramafic rocks.
4      Q.   Would you agree with me that
5  regional zoning, such as described in
6  Guilbert and Park is a generally accepted
7  principle in geologic exploration?
8      A.   So I think that as Guilbert
9  and Park are using zoning, and -- and
10 you're referring to them, it's very
11 similar to what I said where you look at
12 tectonic locations, history.  That puts
13 you in the ballpark.
14      So to the extent that that's
15 a zone, that it puts you in the ballpark,
16 then yes, it helps you narrow into an
17 area.  But as you get closer and closer,
18 smaller scales, then those differences
19 become very important.
20      So zoning gets you in the
21 ballpark.  Then it's important to figure
22 out which seat you are in if we use a
23 ballpark analogy.
24      Q.   And you've not done that

Page 183

1  examination for the eastern part of the
2  United States that contains ultramafic
3  derived talc deposits, true?
4      A.   I'm not the geologic expert
5  for Eastern Seaboard ultramafic rocks.
6      Q.   Including the talc deposits
7  in -- in Vermont, true?
8      A.   The region of the talc
9  deposits in Vermont.
10      Q.   You cite Guilbert and Park
11 as an authoritative source.  But Guilbert
12 and Park does not describe ultramafic
13 talc occurrences, true?
14      A.   I was not citing them in the
15 context of ultramafic talc.
16      Q.   And Guilbert and Park does
17 not address talc occurrences specifically
18 in Vermont, true?
19      A.   I believe that's correct.
20      Q.   On Page 8 of your report you
21 criticize Dr. Cook in relation to a
22 letter that he relied on.  Do you see
23 that, on the top of Page 8?
24      A.   The paragraph that starts,

Page 184

1  "Cook states chrysotile is also
2  reported"?
3      Q.   Correct.
4      A.   Correct.  Yes.
5      Q.   And what he says is, in this
6  report is, "Chrysotile is also reported
7  in the Val Chisone mineral suite in 1971
8  by Ashton."
9      That's the quote you
10 criticize, correct?
11      A.   That's the quote I
12 criticize.
13      Q.   Let me ask you to look at
14 what I'm marking as Exhibit 14.
15      (Document marked for
16 identification as Exhibit
17 Poulton-14.)
18 BY MS. O'DELL:
19      Q.   Exhibit 14 is a letter from
20 Bill Ashton, an employee of Johnson &
21 Johnson, to a Mr. Caneer at the Colorado
22 School of Mines.
23      It's dated 1971, correct?
24      A.   Correct.

Page 185

1      Q.   And do you know who Bill
2  Ashton is?
3      A.   I do not.
4      Q.   Do you know what his role
5  was at Johnson & Johnson?
6      A.   I do not.
7      Q.   In the third paragraph from
8  the bottom, and -- well, maybe I should
9  start at the top.  He says, "Dear
10 Mr. Caneer," he said, "I've shipped to
11 Bob Beers' attention one drum of Italian
12 rock from the Crosetto mine in the
13 Chisone valley of the Italian Alps."
14      Do you see that?
15      A.   Yes.
16      Q.   He says this is -- "That is
17 the" -- "the working from which the high
18 grade Italian talc originates," referring
19 to talc for Baby Powder.
20      Do you see that?
21      A.   I don't know that it says
22 Baby Powder.  It just says high grade
23 Italian talc.
24      Q.   And he calls it the high

Mary Beulton, Ph.D.

1   grade Italian talc originates, that's
2   what he says, right?
3        A.   The high -- the high grade
4   Italian talc originates.
5        Q.   And he says at the bottom,
6   "I have also checked into the
7   mineralization of that part of the
8   territory, and the minerals which show in
9   the valley are talc, pyrite, magnetite,
10  dolomite, apatite, clinochlore,
11  chrysotile, tourmaline, tremolite,
12  actinolite," and then he goes on.
13        So, in fact, Dr. Cook's
14  citation of this letter is accurate.
15        A.   I don't read that the same
16  way.  This paragraph says he's -- he's
17  checked into mineralization of that part
18  of the territory in the valley and it
19  doesn't -- it doesn't relate that suite
20  of minerals specifically back to the
21  mine.  It's simply talking about some
22  unknown size region.
23        Q.   And -- and that's your
24  criticism of -- of Dr. Cook's, that

1   citation in Dr. Cook's report?
2        A.   Yes.  It does not state
3   that -- that chrysotile is in the
4   Crosetto mine.
5        Q.   What he actually stated was,
6   is that chrysotile is reported in the Val
7   Chisone mineral suite, and that's -- he's
8   referring to the valley, Val Chisone
9   valley, correct?
10        MR. CHACHKES:  Objection.
11        THE WITNESS:  Dr. Cook is
12   reporting to Val Chisone.
13        This paragraph says
14   "territory in the valley."  And it
15   doesn't -- I -- I can't infer from
16   that that valley and territory are
17   as specific as Val Chisone.
18  BY MS. O'DELL:
19        Q.   He says the valley in the
20  paragraph that Dr. Cook references.  He
21  says, "I've also checked in the
22  minimization of that part of the
23  territory."  He doesn't stop there.  And
24  he says, "The minerals which show in the

1   valley."
2        And he's referring to the
3   Val Chisone valley in this letter,
4   correct?
5        A.   I don't know that.  He's
6   referring to Val Chisone in the first
7   paragraph where the talc samples that
8   he -- he has shipped have come from.
9        This is too nonspecific for
10  me to say that -- that he's referencing
11  territory and valley as specifically Val
12  Chisone.
13        Q.   And it's your -- you're
14  testifying here under oath that valley in
15  this letter does not refer to the Chisone
16  Valley?
17        A.   I can't say that it does.
18  It's -- it's too general in that
19  paragraph.
20        Q.   And in certainly the whole
21  context of the letter is the Val Chisone
22  Valley, correct?
23        A.   The first paragraph that the
24  sourcing of the material has come from

1   the Chisone Valley.  Again, I can't say
2   in a broad paragraph that says territory
3   and valley, what he is specifically
4   referring to.
5        Q.   And you're -- you're opining
6   that valley in the latter paragraph is
7   not the Chisone Valley, correct?
8        A.   I cannot conclusively say
9   it's Val Chisone Valley.
10        Q.   And that's your criticism of
11  Dr. Cook's report --
12        A.   Yes, yes.
13        Q.   I think reasonable sort of
14  minds could differ on that point.
15        Let me ask you to look at
16  Imerys 081025.
17        And you state in your
18  report, "Cook misrepresents general
19  information on minerals associated with
20  talc in Italy."  And you cite that
21  document.
22        Do you see that?
23   A.   Yes.
24   Q.   Let me ask you to look at

Mary Poulton, Ph.D.

Page 190

1  Exhibit 15.
2          (Document marked for
3      identification as Exhibit
4      Poulton-15.)
5  BY MS. O'DELL:
6      Q.   And it's Bates Number
7  081025.  That's the document you referred
8  to, correct?
9      A.   Yes.
10      Q.   And your criticism of
11  Dr. Cook is that he misrepresents general
12  information regarding Italy in citation
13  of this document?
14      A.   That is my criticism.
15      Q.   Isn't it true that you're in
16  error, Dr. Poulton, by referring to this
17  document in relation to Italy?
18      A.   Could you explain me -- what
19  you think my error is?
20      Q.   First, Dr. Cook does not
21  cite this document in his description of
22  Italian talc mines.
23      A.   Oh, he does not?
24      Q.   He does not.  In fact, I'll

Page 191

1  direct your attention to Page 10 of
2  Dr. Cook's report where he describes the
3  geology of Italian talc mines.  And this
4  document is not included, correct?
5      A.   We would want to check that
6  there isn't another number for my
7  citation.
8      Q.   I mean you're the -- you --
9  you're the one who included that number.
10      A.   I did include that number.
11  And it's quite possible that if I opened
12  one of his documents that was the same
13  file, I numbered it as Imerys in my
14  document, so I would want to actually
15  confirm that there isn't some other
16  number for the Imerys document that I
17  have cited here.  I don't believe I
18  pulled it out of thin air.
19      Q.   I'll represent to you that
20  Imerys documents typically don't have
21  more than one number.  So unlike J&J
22  documents which have been involved in
23  litigation for quite a period of time.
24          So I put before you Imerys

Page 192

1  081025.  And that's Exhibit 15.  You have
2  that in front of you?
3      A.   I do.
4      Q.   That's what you cite?
5      A.   That's what I cite.
6      Q.   There's no reference in --
7  excuse me.
8          There's no reference in that
9  document to Italy, correct?
10      A.   In this document?
11      Q.   Correct.  Exhibit 15.
12      A.   I stand corrected.  There is
13  not Italy in this particular document.
14  So I've either mis-cited the document or
15  I've put it in the wrong place.
16      Q.   Or you were incorrect in
17  making the statement?
18          MR. LOCKE:  Objection.
19          THE WITNESS:  I may be
20      incorrect in referencing this
21      document.
22  BY MS. O'DELL:
23      Q.   So as stated in your report
24  on Page 8, the second paragraph from the

Page 193

1  top of the page is incorrect?
2      A.   This document does not cite
3  Italy, so I am incorrect in that citation
4  of the document.
5      Q.   Earlier today you said that
6  asbestos could be removed from talc in
7  the beneficiation process.
8          Do you recall that?
9      A.   I would have to see exactly
10  what I said, but there is the ability to
11  separate asbestos.  I would have to see
12  exactly what I said this morning.
13      Q.   That's all you said.
14      A.   Okay.
15      Q.   I'm just asking you the
16  question, is what is -- what are you
17  relying on to make the statement that as
18  asbestos can be fully removed from talc?
19      A.   I don't think I said the
20  word "fully," did I?
21      Q.   If you -- what process --
22  let me just back up.
23          Can asbestos in the --
24  present in talcum powder be completely

Mary Boulton, Ph.D.

Page 194

1 removed in the beneficiation process?
2     A.   So when you say talcum
3 powder, do you mean talc ore?
4     Q.   You can assume it means talc
5 ore that's being processed for purposes
6 of bottling.
7     A.   Okay.  Okay.  So as long as
8 there are physical properties differences
9 between minerals, you have the ability to
10 separate them based on particle size in
11 an air classification separator.
12          You have the possibility of
13 different surface chemistry processes or
14 surface chemistry properties that would
15 allow separation and flotation with the
16 correct reagents.
17          You may have the
18 possibility, even in the crushing and
19 grinding, because amphiboles are harder
20 than talc ore is.  And the grinding mills
21 are set up for particular hardness of
22 minerals.
23          So there are several stages
24 that you can separate minerals based on

Page 195

1 their physical properties.  And
2 asbestiform minerals would have different
3 physical properties than talc.
4     Q.   Okay.  Have you ever
5 designed a process for purposes of
6 removing asbestiform minerals from talc?
7     A.   No.
8     Q.   Have you ever supervised a
9 process that the purpose of which was to
10 remove asbestos from talc?
11     A.   No.
12     Q.   What reported process are
13 you -- let me strike that and start
14 again.
15          What peer-reviewed
16 publication are you relying on to
17 conclude that asbestos in talcum powder
18 can be removed during the beneficiation
19 process?
20     A.   So I'm relying on background
21 knowledge of separating asbestos from
22 other minerals.  And I have looked at
23 West Windsor document where they looked
24 at changes of flotation reagents and its

Page 196

1 impact on asbestos.
2          But I'm largely looking at
3 when we have asbestos mixed in with other
4 kinds of minerals.
5     Q.   Can you remove or separate
6 asbestos from talc based on the specific
7 physical properties of asbestos?
8     A.   There are differences in the
9 physical properties with talc.  So based
10 on the separation and the beneficiation
11 processes that you're using, I would say
12 it is possible.
13     Q.   Possible, but you've not
14 ever studied that process or been
15 involved in that process, fair?
16     A.   I have not had personal
17 experience.
18     Q.   You've not written on that,
19 separation of asbestos from talc or other
20 minerals, true?
21     A.   I have not published on
22 that.
23     Q.   Let me ask you in Exhibit 15
24 to turn to -- first let me, before you

Page 197

1 turn to the page, this PowerPoint is
2 entitled "Talc Geology Mining and
3 Processing For Cosmetic, Pharma, and Food
4 Applications" by E.F. McCarthy dated
5 February 2010.
6          You've seen this document
7 before?
8     A.   I have.
9     Q.   And you're aware that
10 Mr. McCarthy was a toxicologist and
11 safety director that worked for Imerys
12 Talc America?
13     A.   I knew he was an Imerys
14 employee.  I didn't know what his actual
15 role was.
16     Q.   If you'll turn to page Bates
17 number ending in 043.  Mr. McCarthy has
18 created a slide called "Talc
19 Beneficiation," correct?
20     A.   Yes.
21     Q.   And he's -- in the second
22 bullet, he's talking about rejection of
23 fibrous minerals.
24          Do you see that?

Mary Poulton, Ph.D.

Page 198

1    A.   Yes.
2    Q.   And he says, and he's
3 referring to fibrous minerals, "Can be
4 selectively rejected and levels reduced
5 by flotation and manual sorting, but they
6 cannot be eliminated to meet cosmetic
7 standards."
8         Did I read that correctly?
9    A.   That's what his bullet says.
10   Q.   If you'll look at Dr. Cook's
11 report, Page 11.  He's talking about --
12 I'll give you a moment to get there, Page
13 11 of Dr. Cook's report.  In the second
14 paragraph, he does a literature review
15 for Vermont talc occurrences.
16        Do you see that?
17   A.   Yes.
18   Q.   And he is describing the
19 geology of the counties that surround the
20 mines that were used to source Johnson &
21 Johnson's Baby Powder, true?
22   A.   I don't actually know where
23 these mines are located geographically
24 relative to the Johnson & Johnson mines.

Page 199

1    Q.   Okay.  And you don't know
2 the counties where the Johnson & Johnson
3 source mines were located, true?
4    A.   That's correct.
5    Q.   And you state in your report
6 that the Johnson mine was never used to
7 source Baby Powder in your report?
8    A.   That's my understanding.
9    Q.   How did you get that
10 understanding?
11   A.   I believe I looked at the
12 reports where the mines were cited that
13 were producing Johnson & Johnson Baby
14 Powder.  I don't recall seeing Johnson
15 mine on that list.
16   Q.   What reports were you
17 referring to?
18   A.   Many reports.
19   Q.   Are you referring to an
20 expert report, or some other type of
21 report?
22   A.   No, I'm referring to
23 documents that were produced.
24   Q.   You are aware that the

Page 200

1 Johnson mine was owned by Johnson &
2 Johnson -- a Johnson & Johnson
3 subsidiaries, are you not?
4        MR. CHACHKES:  Objection.
5        THE WITNESS:  I would have
6        to look back at the documents of
7        who owned what and when.
8 BY MS. O'DELL:
9    Q.   Do you know that as you're
10 sitting here?
11   A.   I don't know that off the
12 top of my head.
13        (Document marked for
14        identification as Exhibit
15        Poulton-16.)
16 BY MS. O'DELL:
17   Q.   Let me show you what I'm
18 going to mark as Exhibit 16.  Have you
19 seen this document before?
20   A.   This does not look familiar.
21 I would have to check my list to see if
22 it's one that I had.
23   Q.   If you'll turn to the second
24 page of the document.  I think you're

Page 201

1 already there.
2        Do you see at the top, this
3 is Eastern Magnesia Talc Inc., a Johnson
4 & Johnson company?
5        Do you see that?
6    A.   I see that.
7    Q.   And it's a memo entitled
8 "The Cosmetics Industry."
9        Do you see that?
10   A.   Yes.
11   Q.   And it goes through today's
12 market.  And then talks about, in
13 Subsection B, perfumed Baby Powder.
14        Do you see that?
15   A.   I'm struggling to find where
16 you see perfumed Baby Powder here.  Oh,
17 B?
18   Q.   Yes.
19   A.   Okay.
20   Q.   And if you look down to D it
21 talks about EMTals for cosmetic.
22        Do you see that?
23   A.   I do.
24   Q.   He's talking about cosmetic

Mary Poulton, Ph.D.

Page 202

1    talc powder.
2         Do you see that?  EMTals for
3    cosmetics?
4         A.    And what is an EMTal?
5         Q.    It is a reference to
6    cosmetic powder produced by Eastern
7    Magnesia Talc Company.
8         Do you see that?
9         A.    I see.  So we're looking at
10   the column under D, EMTals?
11        Q.    Actually, I'm looking at the
12   title.  Says "EMTals For Cosmetics."
13        A.    Cosmetics.
14        Q.    Do you see that?
15        A.    I see that.
16        Q.    I'll represent to you that
17   is a reference to cosmetic talc?
18             MR. LOCKE:  Objection.
19             MR. CHACHKES:  Objection.
20             THE WITNESS:  So I -- I see
21        Grade 66 which is what I recognize
22        as Johnson & Johnson's talc grade
23        from Vermont.  And that's
24        referenced for West Windsor.

Page 203

1    BY MS. O'DELL:
2         Q.    Right.
3         A.    I do not see that same grade
4    referenced for Johnson.
5         Q.    And at different mines, in
6    other words, Italy had a different
7    product reference for the talc that was
8    used for Johnson's Baby Powder than --
9    with reference for mine talc, correct?
10             MR. CHACHKES:  Objection.
11             THE WITNESS:  So Italy had
12        its own number?
13   BY MS. O'DELL:
14        Q.    Product code.
15        A.    Product code.
16        Q.    And it was a different
17   product code in the West Windsor group of
18   mines, correct?
19        A.    So I've only seen 66
20   referenced for approved Johnson & Johnson
21   talc.
22        Q.    Right.
23        A.    I've never seen another
24   number in any document associated with

Page 204

1    Johnson & Johnson cosmetic talc products.
2         Q.    Well, you are aware that
3    Italy had a different product number for
4    talc used in Johnson's Baby Powder and
5    Shower to Shower, true?
6         A.    Yes.
7         Q.    And you're -- are you aware
8    that China had a different product code
9    for the talcum powder that was used in --
10   is still being used for Johnson's Baby
11   Powder?
12        A.    Yes.
13        Q.    Okay.  And so turn to Page 3
14   of this document.  Do you see at the
15   bottom, Dr. Poulton, EMTCO which is
16   Eastern Magnesia Talc Company.
17             Do you see that?  "Working
18   to replace Johnson EMTals," which we've
19   established was cosmetic talc?
20        A.    Okay.
21             MR. LOCKE:  Objection.
22             MR. CHACHKES:  Objection.
23   BY MS. O'DELL:
24        Q.    "With West Windsor EMTals

Page 205

1    when and if Johnson cosmetic grades are
2    eliminated due to arsenic content."
3             Do you see that?
4         A.    I'm sorry, I'm just catching
5    up with where you are now.
6             You are on page?
7         Q.    I'm on Page 3, at the
8    bottom.
9         A.    Okay.
10        Q.    Number 5, under 3, do you
11   see that?
12             Are you with me?
13        A.    Yes, I see that statement.
14        Q.    "EMTCO," which is Eastern
15   Magnesia Talc Company, "working to
16   replace Johnson EMTals," which we've just
17   reviewed, "or cosmetic talc" --
18             MR. LOCKE:  Objection.
19   BY MS. O'DELL:
20        Q.    -- "with West Windsor EMTals
21   when and if Johnson cosmetic grades are
22   eliminated due to arsenic content."
23             Do you see that?
24             MR. CHACHKES:  Objection.

Mary Boulton, Ph.D.

Page 206

1    THE WITNESS: I see that
2  statement. I still stand by my
3  statement that I've never seen
4  anything but Grade 66 referenced
5  for Johnson & Johnson cosmetic
6  talc.
7  BY MS. O'DELL:
8    Q.   And you've only seen in
9  review of -- for your report, the
10 references cited by Dr. Cook and
11 Dr. Krekeler, plus six to 12 other
12 documents, true?
13   A.   That I asked for, yes.
14   Q.   And are you aware that there
15 are thousands and thousands of other
16 documents that have been produced in this
17 litigation, including the one that's been
18 marked as Exhibit 16?
19   A.   I have heard from other
20 depositions that there are many
21 documents.
22   Q.   What depositions are you
23 referring to?
24   A.   Dr. Cook's and

Page 207

1  Dr. Krekeler's.
2    Q.   And in regard to Exhibit 16,
3  the clear import is that Johnson EMTals
4  are being used, or Johnson's cosmetic
5  talc is being used for cosmetic purposes
6  according to this memo?
7    MR. CHACHKES: Objection.
8    THE WITNESS: So I would
9  imagine there are other documents
10 that could corroborate that. But
11 again, I stand by the only thing I
12 have seen is Grade 66 associated
13 with Johnson & Johnson cosmetic
14 grade talc.
15    So seeing this document out
16 of context, I can't agree that the
17 Johnson mine was used as a
18 commercial source for Johnson &
19 Johnson cosmetic products.
20 BY MS. O'DELL:
21   Q.   But it's clearly what this
22 memo states.
23    MR. CHACHKES: Objection.
24    THE WITNESS: I don't know

Page 208

1  that that's what this memo states
2  without looking at larger context.
3  BY MS. O'DELL:
4    Q.   The words of this memo says,
5  "We're working to replace Johnson EMTals
6  with West Windsor EMTals when and if
7  Johnson cosmetic grades are eliminated
8  due to arsenic content."
9    That's what the document
10 says.
11   A.   That's what this says. But
12 again, I believe there's probably a
13 larger context.
14    MS. O'DELL: Move to strike.
15 You're speculating.
16 BY MS. O'DELL:
17   Q.   You don't know that, do you?
18    MR. CHACHKES: Objection.
19    THE WITNESS: Based on the
20 documents I've seen, I would stand
21 by that statement.
22 BY MS. O'DELL:
23   Q.   And it's your statement that
24 only Grade 66 was -- has ever been used

Page 209

1  to make Johnson's Baby Powder?
2    MR. CHACHKES: Objection.
3    THE WITNESS: That's the
4  only reference I have seen.
5  BY MS. O'DELL:
6    Q.   Okay.
7    You cited on Page 8 of your
8  report Guilbert and Park, Page 66 and 67.
9  And you say, "Guilbert and Park note the
10 role of stress in changing the
11 distribution of mineralization in mineral
12 deposits and how the permeability and
13 porosity created by fractures and joints
14 at the large scale and crystal boundaries
15 and cleavage planes at the small scale
16 contribute to both the final
17 configuration of ore deposit components."
18 Citing Page 66 and 67.
19   A.   Correct.
20   Q.   Page 66 and 67 of Guilbert
21 and Park deal with migration of
22 hydrothermal fluids at shallow depth,
23 true?
24   A.   I would need to see the

Mary Boulton, Ph.D.

Page 210

¹ reference again to ensure that.
²          MR. CHACHKES:  Do you have
³ another copy?
⁴          MS. O'DELL:  Sure.
⁵ It's your copy.
⁶          MR. FROST:  It's -- it's one
⁷ of the books.  We can get another
⁸ one if you want it.
⁹          MR. CHACHKES:  That's fine.
¹⁰          THE WITNESS:  Yes.
¹¹ BY MS. O'DELL:
¹²     Q.    And that does not relate to
¹³ talc deposits in Vermont, correct?
¹⁴     A.    It could.
¹⁵     Q.    Does it reference -- excuse
¹⁶ me.  It doesn't reference talc
¹⁷ occurrences in Vermont, true?
¹⁸     A.    That's a more general
¹⁹ quotation from a more general section of
²⁰ that book, not specifically referenced in
²¹ my report or the book for Vermont talc.
²²     Q.    Or talc in general?
²³     A.    Or talc in general.
²⁴          MS. O'DELL:  I'm just going

Page 211

¹     to go ahead and mark the binder
²     that's been provided as
³     Exhibit 17.
⁴          MR. CHACHKES:  Okay.  We've
⁵     been going an hour and 20 minutes.
⁶     Maybe take a break at some point?
⁷          MS. O'DELL:  Yeah, that's
⁸     fine.
⁹ BY MS. O'DELL:
¹⁰     Q.    Let me just identify this
¹¹ for the record and we can take a break.
¹²          (Document marked for
¹³          identification as Exhibit
¹⁴          Poulton-17.)
¹⁵ BY MS. O'DELL:
¹⁶     Q.    So Exhibit 17 are the
¹⁷ excerpts of the -- let me just strike
¹⁸ that.
¹⁹          What is Exhibit 17?
²⁰     A.    Exhibit 17 is additional
²¹ references that I cited.
²²     Q.    And those are excerpts from
²³ certain books that you have listed on
²⁴ your reference list, correct?

Page 212

¹     A.    Some are books.  Some are
² papers.
³     Q.    And -- fair enough.
⁴          MS. O'DELL:  We can take a
⁵     break.
⁶          THE VIDEOGRAPHER:  Remove
⁷     your microphones.  The time is
⁸     2:51 p.m.  Off the record.
⁹          (Short break.)
¹⁰          THE VIDEOGRAPHER:  Okay.  We
¹¹     are back on the record.  The time
¹²     is 4:16 p.m. -- I mean 3:16 p.m.
¹³     Sorry.
¹⁴ BY MS. O'DELL:
¹⁵     Q.    Dr. Poulton, let me ask you
¹⁶ to look at Page 11 of your report.
¹⁷     A.    Page 11 of my report.  Okay.
¹⁸     Q.    And you state that Dr. Cook
¹⁹ misrepresents the arsenic content of talc
²⁰ ore for cosmetic applications.
²¹          And your criticism, at least
²² in part, is that he cites a 2006 test
²³ report.
²⁴          Do you see that?

Page 213

¹     A.    Yes.
²     Q.    Is it -- is it your opinion
³ that the talc mines in Vermont did not
⁴ have high levels of arsenic?
⁵     A.    The test results I've seen
⁶ indicated that there is arsenic.  It was
⁷ something that they were managing.  Some
⁸ zones of the mine had fractures that were
⁹ coated with arsenic-bearing minerals that
¹⁰ they identified.  Other areas of the mine
¹¹ did not have those zones of arsenic.
¹² That's my understanding.
¹³     Q.    And the documents also say
¹⁴ that material that was in silos and
¹⁵ weathered could also have higher levels
¹⁶ of arsenic.  I'm sure you saw those
¹⁷ documents?
¹⁸     A.    I didn't see any reference
¹⁹ to material that was processed into
²⁰ silos.  I saw that if it was blasted on
²¹ benches, that they suspected arsenic had
²² weathered and they were watching their
²³ stock piles.  That's the information I
²⁴ remember.

Mary Boulton, Ph.D.

Page 214

1    Q.   So would the limit of your
2  criticism be that Dr. Cook cited in part
3  for his opinion that some of the talc ore
4  had high levels of arsenic, that he cited
5  a 2006 report?
6          MR. CHACHKES:  Objection.
7          THE WITNESS:  That is one of
8      the criticisms that I make here.
9  BY MS. O'DELL:
10   Q.   But you're not stating that
11 the ore in the
12 Argonaut/Hamm/Hammondsville mine did not
13 have a high level of arsenic in parts?
14 That's not your criticism?
15   A.   So I agree that there are
16 zones where they've identified higher
17 arsenic that they were managing.
18   Q.   The arsenic problem in the
19 Vermont mines was an ongoing problem
20 throughout the time that talc was being
21 mined for purposes of cosmetic powders,
22 true?
23   A.   So you say it was an ongoing
24 problem?

Page 215

1    Q.   Correct.
2    A.   Throughout the history of
3  using Vermont talc?
4    Q.   Correct.
5    A.   I think I would want to look
6  very specifically at arsenic test results
7  at different time periods.
8    Q.   Certainly in '92 it was
9  reported as a problem in talc deposits in
10 Vermont, true?
11   A.   Oh, I would need to see a
12 reference.
13   Q.   Do you recall that?
14   A.   I don't recall the specific
15 documents or date.
16   Q.   And -- and I guess the
17 question I have is in relation to
18 Dr. Cook's report, and what he
19 specifically opines on, he states that in
20 certain areas of the Vermont talc mines,
21 there was a high level of arsenic.
22 That's sort of the summary of his
23 opinion.
24          Do you disagree with that?

Page 216

1    A.   Could we look at his report
2  specifically in that section?
3    Q.   Do you disagree with that
4  statement?
5    A.   I would want to see the
6  statement.
7    Q.   Let me ask you, do you
8  disagree with the statement that in
9  certain areas of the Vermont talc mines
10 there were high levels of arsenic?
11   A.   So I think we would want to
12 talk about specific mines sourced for
13 Johnson & Johnson talc and what the
14 specific levels of arsenic are instead of
15 saying simply high levels in all Vermont
16 mines.
17   Q.   Okay.  Let me show you what
18 I'm going to mark as Exhibit Number 18
19 for this deposition.
20          (Document marked for
21      identification as Exhibit
22      Poulton-18.)
23 BY MS. O'DELL:
24   Q.   Have you seen this document

Page 217

1  before?
2    A.   I believe I have.
3          MR. CHACHKES:  Just for the
4      record, it's also Downey-12,
5      right?
6          MS. O'DELL:  I covered that
7      up on her copy.
8          MR. CHACHKES:  Right.  I'm
9      just making a record.
10         MS. O'DELL:  It won't matter
11     because it's covered up.  But it
12     was Downey-12.
13         MR. CHACHKES:  Just to
14     cross-reference once we get the
15     transcript in.
16         MS. O'DELL:  I see.  Fair
17     enough.
18 BY MS. O'DELL:
19   Q.   And Exhibit 18, have you
20 seen this before?
21   A.   I believe I have.
22   Q.   In this 1992 memo from R.C.
23 Munro discusses arsenic that is present
24 in Cyprus talc deposits that are used to

Mary Boulton, Ph.D.

Page 218

1  source J&J talc, true?
2      A.   I see reference to Rainbow.
3  So I would first want to know if Rainbow
4  was a source for Johnson & Johnson talc
5  at this particular date.
6      Q.   West Windsor was the
7  processing plant for cosmetic talcs,
8  true?
9      A.   True.
10     Q.   And if you look down in the
11 page -- first page, third paragraph, it
12 says, "High, e.g., six parts per million
13 arsenic" -- "soluble arsenic contents of
14 mill feed through the West Windsor mill
15 contribute to reduced recoveries and
16 milling rates."
17         Do you see that?
18     A.   I see that sentence.
19     Q.   At West Windsor part of the
20 mill recovery problem, at least as been
21 ascribed to a high fines content in the
22 feed and to low pH both of which
23 contribute to increased soluble arsenic?
24     A.   Yes.

Page 219

1      Q.   And so Munro is reporting
2  high levels of arsenic at the West
3  Windsor feed, correct?
4      A.   At West Windsor.  West
5  Windsor also produced industrial talc, is
6  my understanding.
7      Q.   What's the basis for that
8  understanding?
9      A.   I have seen some reports
10 that indicated material that wasn't
11 within spec for Johnson & Johnson Grade
12 66 was sold to industrial buyers for
13 other applications.  And if memory serves
14 me, the number of silos at West Windsor,
15 the ones for Grade 66 are specifically
16 marked for Grade 66.  And there are
17 others that are not marked for Grade 66,
18 presumably because they don't hold Grade
19 66 talc.
20     Q.   Are you testifying that ore
21 used in Baby Powder did not test high for
22 arsenic?
23     A.   I think we again would have
24 to look at individual test samples and

Page 220

1  then see if the certificates of
2  acceptance were created for those samples
3  or if they were rejected.
4      Q.   Have you seen arsenic test
5  results of product or processed talc?
6      A.   I would have to go back and
7  look at data to refresh my memory
8  specifically on arsenic.
9      Q.   But you -- as you're sitting
10 here today, you cannot identify --
11     A.   I cannot name specific
12 samples.
13     Q.   And you don't recall at this
14 point seeing test results for specific
15 samples, fair?
16     A.   I would have to refresh my
17 memory if I saw them in a table or
18 document.
19     Q.   But you don't recall as you
20 sit here today?
21     A.   As I sit here right now
22 without the documents in front of me, I
23 don't recall.
24     Q.   Let me show you what I've

Page 221

1  marked as Exhibit 19.
2          (Document marked for
3          identification as Exhibit
4          Poulton-19.)
5  BY MS. O'DELL:
6      Q.   Have you seen this before?
7      A.   I believe so.
8      Q.   And this is a memo from
9  Mr. McCarthy, Ed McCarthy dated 2006.
10 If you'll turn to Page 4 of
11 the document there's a section entitled
12 "Vermont."
13         Do you see that?
14     A.   Yes.
15     Q.   It says, "The Vermont
16 operation consists of the Argonaut mine."
17         Do you see that?
18     A.   Yes.
19     Q.   And if you'll look down two
20 more paragraphs, the paragraph beginning
21 "The mine."
22         Do you see that?
23     A.   Yes.
24     Q.   Argonaut was one of the

Mary Boulton, Ph.D.

**Page 222**

1 mines that sourced Johnson's Baby Powder,
2 true?
3      A.   True.
4      Q.   It says, "The mine has a
5 poor" -- "a history of poor operation,
6 primarily due to management shortcomings,
7 inadequate stripping, poor productivity,
8 ore variability, arsenic and serpentine
9 contamination, and water management have
10 all been issues in recent years."
11           Do you see that?
12      A.   I see that.
13      Q.   "And because of this, it has
14 been difficult to upgrade the product
15 line."
16           Do you see that?
17      A.   Yes.
18      Q.   According to Mr. McCarthy,
19 arsenic contamination had been an issue
20 for some period of years, correct?
21      A.   I don't know what his time
22 frame is for history.
23      Q.   But he says in recent years.
24      A.   Let's see.  Where -- could

**Page 223**

1 you refresh my memory on where it says
2 recent years?
3      Q.   The paragraph we were just
4 reading from:  "The mine has a history."
5           Do you see that?
6      A.   Has a history...
7           Oh I see.  Okay.
8      Q.   So arsenic contamination had
9 been a problem for some years, true?
10      A.   So --
11      Q.   That's what the document
12 says, correct?
13      A.   In recent years --
14      Q.   That's what the document
15 says, correct?
16      A.   It says recent years.
17      Q.   All right.  Let me ask you
18 to turn in your report to Page 12.  And
19 you're referring to a trip that
20 exploration -- exploratory trip that was
21 undertaken by David Crouse and others to
22 explore potential new mines to source
23 Baby Powder.
24           Do you see that?

**Page 224**

1      A.   I see that paragraph.
2      Q.   And you assert that the --
3 Dr. Krekeler's criticism of the sampling
4 that was done on that trip, if you
5 recall, their -- they visited four mines
6 and they took eight samples.
7           Do you recall that?
8      A.   Yes.
9      Q.   And -- and Dr. Krekeler
10 criticized that sampling process as being
11 inadequate to evaluate the mines for
12 purposes of determining if they were
13 appropriate sources of -- for Baby Powder
14 or cosmetic powder?
15      A.   I believe that was his
16 conclusion.
17      Q.   And it's your opinion that
18 eight samples is a sufficient number in
19 order to adequately evaluate four
20 cosmetic mines, is that your opinion?
21      A.   So we need to be very
22 careful about the word evaluate.
23      Q.   How do you use evaluate?
24      A.   So you can use evaluate to

**Page 225**

1 look at business opportunities, and that
2 is, I believe, what Mr. Crouse stated was
3 the purpose.
4           He was looking specifically
5 for potential prospect areas.  The report
6 is a summary of that trip with
7 recommendations and opportunities
8 identified.  And in that report he talked
9 about potential joint ventures with
10 Chinese state-owned companies.  So he was
11 there looking at business opportunities
12 and not conducting an exploration
13 program.
14      Q.   And Dr. Crouse is -- is a
15 geologist, true, or Mr. Crouse is a
16 geologist, true?
17      A.   I don't know what his -- his
18 background is.
19      Q.   Do you know his role at
20 Imerys?
21      A.   I do not.
22      Q.   Do you know whether any
23 further sampling was done to evaluate the
24 geology of those mines?

Mary Boulton, Ph.D.

Page 226

1      A.   I do not know what was
2  conducted after his field trip.
3      Q.   It'd be fair to say that
4  eight samples of four mines is not a
5  representative number of samples to
6  evaluate the geology of those mines,
7  true?
8      A.   He was not there to sample
9  the geology.  He was there to look at
10 potential business opportunities, is my
11 understanding of his field trip report.
12     Q.   Certainly evaluating a
13 potential mine to source a product would
14 involve evaluating the geology of the
15 particular deposit, true?
16     A.   Not necessarily at this
17 stage.
18     Q.   Okay.  So you think he was
19 sightseeing in China at various mines and
20 didn't care what was -- what the geology
21 was?
22          MR. CHACHKES:  Objection.
23          MR. LOCKE:  Objection.
24          THE WITNESS:  I -- I --

Page 227

1  BY MS. O'DELL:
2      Q.   Is that your opinion?
3      A.   I can't say that he was
4  there to sightsee.  I can say that when
5  you go evaluate potential business
6  opportunities, you may collect a sample
7  just to show, say, what a typical piece
8  of high grade ore would look like or some
9  other interesting sample.  But you're not
10 there to conduct an exploration program.
11          You're there to -- to get a
12 sense of what the business environment
13 looks like and what the -- what the state
14 of the businesses are and what the
15 potential resources might be that you
16 would investigate later.
17     Q.   Imerys was already
18 purchasing talc from China at this time
19 that this trip was undertaken, true?
20     A.   I would need to again look
21 at what date he did this trip to refresh
22 my memory.
23     Q.   When did Imerys start
24 selling talc from China to source Baby

Page 228

1  Powder?
2      A.   So I believe Rio Tinto was
3  doing that before Imerys bought those
4  operations.  So we'd need to look at when
5  Rio Tinto was doing work and -- and when
6  it was Imerys.
7      Q.   For purposes of our
8  discussion, there were predecessor
9  companies to Imerys.  I'm going to refer
10 to them globally as Imerys.
11     A.   Okay.
12     Q.   Do you know when Imerys
13 began to source cosmetic talc for Baby
14 Powder?
15     A.   I believe it was around
16 2003.
17     Q.   And the trip that you refer
18 to that Mr. Crouse took was in 2004,
19 correct?
20     A.   I would want to look at that
21 document just to confirm the date.
22     Q.   Let me ask you, have you
23 been hired or consulted with any mining
24 companies for purposes of leading a trip

Page 229

1  to explore potential mines --
2          MS. O'DELL:  Just leave it
3  right there.
4  BY MS. O'DELL:
5      Q.   -- of any type in any
6  region?
7          Have you ever been hired by
8  a company to lead an exploratory trip to
9  evaluate potential mines?
10     A.   Hired by a company to lead a
11 trip to evaluate exploration prospects?
12 Not hired by a company.
13     Q.   And -- and you have not
14 consulted or been hired by a company to
15 participate in an evaluation trip like
16 the one we are talking about involving
17 Dr. Crouse, true?
18     A.   Could you restate your
19 question for me again?
20     Q.   Have you ever been hired to
21 consult for -- by a mining company for
22 purposes of exploring potential
23 sources of -- potential sources for a
24 mineral?

Mary Boulton, Ph.D.

Page 230

1 A. So those projects were
2 funded through the university to do the
3 projects for the companies?
4 Q. I'm asking if you've been
5 hired by a company, not what you've done
6 in relation to the university.
7 A. Outside of the university,
8 no.
9 Q. Let me ask you to turn --
10 look at the bottom of Page 12 of your
11 report. And then onto Page 13, you state
12 that "Imerys 139093 states that the
13 applicable testing protocols surpasses
14 industry standards."
15 Do you see that?
16 A. Help me find that.
17 Q. Page 13 of your report.
18 A. Okay. I see the statement.
19 Q. And you say that Imerys
20 conducted biweekly testing of the talc
21 using Test Method 7024.
22 Do you see that?
23 A. Yes.
24 Q. And that they test weekly

Page 231

1 composites of CT -- using the CTFA J4-1
2 method.
3 Do you see that?
4 A. Yes.
5 Q. So biweekly -- is it your
6 position that Imerys and J&J conducted
7 testing -- testing for purposes of
8 identifying asbestos either weekly or
9 biweekly?
10 A. I would have to look at
11 which samples were specifically for
12 asbestos because not all of the tests
13 were specifically for asbestos as I
14 understand it.
15 Q. What -- what is Test
16 Method 7024?
17 A. I believe the TM is -- is
18 transition microscopy. But again I'd
19 want to confirm that.
20 Q. Do -- do you -- do you know
21 what TM 7024 was designed to identify?
22 A. No. The -- the microscopy
23 testing is -- is not my area of
24 expertise.

Page 232

1 Q. And is it -- is your opinion
2 or criticism of Dr. Cook and Krekeler
3 based on your understanding that testing
4 was -- for asbestos was conducted
5 biweekly or weekly?
6 MR. CHACHKES: Objection.
7 THE WITNESS: Again, I would
8 want to go back and just confirm
9 with my memory when the asbestos
10 testing was done on what
11 composites that were collected at
12 which times.
13 BY MS. O'DELL:
14 Q. Is -- was it done biweekly?
15 A. Again, I'd want to go back
16 and look at that document with their
17 sampling protocols.
18 Q. But, you don't know as
19 you're sitting here today?
20 A. I would need to refresh my
21 memory.
22 (Document marked for
23 identification as Exhibit
24 Poulton-20.)

Page 233

1 BY MS. O'DELL:
2 Q. Let me show you what I'm
3 marking as Exhibit 20. Have you seen
4 that document before?
5 A. It looks familiar.
6 Q. But you don't recall having
7 seen that as you sit here today?
8 A. It's not foremost in my
9 brain.
10 Q. Okay. And it's your
11 understanding that testing for asbestos
12 was done on a weekly or biweekly basis?
13 A. I don't know that the
14 testing with the TEM was done on that
15 basis, but samples were collected on some
16 fixed schedule that were composited and
17 used for the asbestos testing.
18 Q. And in fact, talc for use in
19 Baby Powder was not tested on a weekly or
20 biweekly basis for asbestos, true?
21 MR. CHACHKES: Objection.
22 THE WITNESS: Again, I would
23 want to go back and look at that
24 testing schedule.

Mary Boulton, Ph.D.

Page 234

1    (Document marked for
2    identification as Exhibit
3    Poulton-21.)
4  BY MS. O'DELL:
5    Q.  Let me show you what I'm
6  marking as Exhibit 21.  You'll see this
7  is the deposition of -- the front page of
8  the deposition of Julie Pier.
9    Do you see that?
10   A.  Yes.
11   Q.  And I'll represent to you
12  that Ms. Pier was the head of testing for
13  Imerys, and she testified as a corporate
14  representative for testing from 1989 to
15  the present.  I'll represent that to you.
16  If I'm incorrect about that, I'm sure
17  your counsel will weigh in.
18    But she was a corporate
19  representative, and she testified to bind
20  the company on the testing that was
21  performed on Johnson & Johnson talc.
22   A.  I'm sorry.  Your voice
23  dropped off for a minute.  You said she
24  was -- and part of your sentence dropped

Page 235

1  off.
2    Q.  Her testimony binds the
3  company as to how they were testing
4  Johnson & Johnson talc for asbestos.
5    A.  Okay.  Thank you.
6    Q.  Now, she was asked a series
7  of questions regarding the testing for
8  asbestos.
9    If you turn to Page 219.
10  Let me just go back.  She's
11  asked about testing for various things.
12  And she gets to TEM, which you understand
13  to be transmission electron microscopy.
14   A.  Correct.
15   Q.  And she said, "The TEM
16  quarterly sample is constructed from two
17  silos' composites in Vermont.  So as a
18  silo is being filled a periodic sampling
19  is done of the entire product to
20  represent what's in the silos.  And then
21  that is composited, sent to Denver for
22  x-ray defraction, basically the J-4-1
23  method.  For those samples, a quarterly
24  deposit is being made and sent to" -- I

Page 236

1  think she means composite, not deposit --
2  "is made and sent to an external lab for
3  TEM."
4    Do you see that?
5    A.  Yes.
6    Q.  So only quarterly testing
7  was done for purposes of asbestos?
8    MR. CHACHKES:  I'm just
9    going to object to providing an
10   incomplete part of her depo.
11  BY MS. O'DELL:
12   Q.  Okay.  That was what was --
13  her testimony was.
14   A.  So I haven't seen the whole
15  deposition.  I know that the silos were
16  sampled at regular intervals as they were
17  being filled.  So there was sampling
18  being done.  How often the TEM actual
19  measurements were done, this indicates
20  quarterly, but on a composited sample
21  that was taking frequently during
22  filling.
23   Q.  Quarterly, a quarterly
24  testing was performed.

Page 237

1    A.  Quarterly testing on a
2  sample that was taken at regular
3  intervals during filling.
4    Q.  So according to Ms. Pier
5  neither weekly or biweekly testing for
6  asbestos was conducted, at least for the
7  period of 1989 forward?
8    MR. CHACHKES:  Objection.
9  BY MS. O'DELL:
10   Q.  True?  Her testimony, it was
11  quarterly.
12   A.  So she says TEM quarterly.
13   Q.  Correct.
14   A.  Does that imply as well that
15  the XRD was only done quarterly or PLM
16  was only done quarterly?
17   Q.  Testing for asbestos was
18  only done quarterly, is what her
19  testimony was.
20    MR. CHACHKES:  Objection.
21    MR. LOCKE:  Objection.
22    THE WITNESS:  Well, it says
23  TEM was done quarterly.  There are
24  other tests for asbestos.  So I

Mary Poulton, Ph.D.

Page 238

1  would want to see, again, what was
2  the schedule for PLM and XRD.
3  BY MS. O'DELL:
4  Q.   Were you provided Ms. Pier's
5  deposition?
6  A.   I only had one page.
7  Q.   Of her deposition?
8  A.   Yes.
9  Q.   So you had one page of
10  Ms. Pier's deposition and one page of
11  John Hopkins' deposition?
12  A.   Yes.
13  Q.   What pages were you
14  provided?
15  A.   I would have to look in my
16  notes and see which page I got.  But it
17  was one that was cited by Cook and
18  Krekeler.
19  Q.   And that was the only --
20  A.   That was the only page I
21  got.
22  Q.   In your report on Page 13,
23  you cite a letter from McCrone.  And the
24  Bates number is JNX -- JNJMX-68.

Page 239

1  Do you see that?
2  A.   Yes.
3  Q.   How did you obtain this
4  document?
5  A.   That was, if not part of the
6  materials that I received Cook and
7  Krekeler, it was related to requests I
8  made about more information on sampling
9  graphs.
10  Q.   It was not cited by Cook or
11  Krekeler.  So this was a document that
12  was selected by counsel and provided to
13  you.
14  MR. FROST:  Objection.
15  THE WITNESS:  I don't know
16  that it was provided at their
17  insistence or whether I had
18  requested information.
19  BY MS. O'DELL:
20  Q.   And if you requested
21  information, then they would have
22  selected the document that was provided
23  to you, correct?
24  MR. FROST:  Objection.

Page 240

1  THE WITNESS:  I would assume
2  so.
3  BY MS. O'DELL:
4  Q.   If Ms. Pier testified in her
5  deposition that all testing for asbestos
6  took place on a quarterly basis, would
7  that be important for your opinion in
8  this case?
9  MR. CHACHKES:  Objection.
10  THE WITNESS:  I think I
11  would want to see the full context
12  of what she was talking about.
13  BY MS. O'DELL:
14  Q.   You would have wanted to see
15  that?
16  A.   Yes.
17  Q.   And that was not provided to
18  you, was it?
19  A.   As far as I know it was not.
20  Perhaps I missed it in the box folder.
21  Q.   You were provided, according
22  your testimony a few minutes ago, one
23  page of the Pier deposition, true?
24  A.   That's what I saw in my

Page 241

1  collection.
2  (Document marked for
3  identification as Exhibit
4  Poulton-22.)
5  BY MS. O'DELL:
6  Q.   Let me show you what I'm
7  marking Exhibit 22, which is the letter
8  to Armstrong World Industries from
9  McCrone.
10  Do you recall this?
11  A.   I think I recall seeing
12  this.
13  Q.   And you cite it in your
14  report, correct?
15  A.   If you say so.
16  Q.   It's your report.  Did you
17  cite it in your report?
18  MR. CHACHKES:  Objection.
19  THE WITNESS:  There are so
20  many documents cited I would have
21  to look at this number --
22  BY MS. O'DELL:
23  Q.   Well, to be --
24  A.   -- and look at my list

Mary Boulton, Ph.D.

Page 242

1 honestly.
2      Q.   Yeah.  Well, to be fair,
3 Dr. Poulton, I had already directed your
4 attention to it on Page 13, fair?
5      A.   Fair.
6      Q.   I'd already done that.  So
7 I'm not trying to be tricky.  I'm just
8 asking you if this is what you cited.
9 And I understand -- is that a yes?  Is
10 this the document that you were referring
11 to?
12      A.   Is this the JNJMX68
13 document?
14      Q.   Yes.
15      A.   Okay.
16      Q.   You rely on it for purposes
17 of this statement.  It's in the last full
18 paragraph at the bottom.  Windsor -- and
19 it says, "Suffice it to say that amidst
20 mutterings of 'that inspector is no
21 longer with us,' the Illinois EPA
22 wrote" -- "wrote to Windsor Minerals to
23 the effect that they were satisfied that
24 Windsor product is free of asbestos."

Page 243

1      That's what the document
2 says, right?
3      A.   That's what that quote says.
4      Q.   And you cited for purposes
5 of saying that McCrone has been of the
6 opinion that Windsor product is free of
7 asbestos for over 15 years, correct?
8      A.   That's what this document
9 says.
10      Q.   And Mr. Stewart from McCrone
11 goes on to say, "That has always been our
12 opinion and continues to be our opinion
13 based on 15 years of closely examining
14 this product."
15      And that's what you refer
16 to, correct?
17      A.   This product, and I think
18 there are, in reference to the Illinois
19 EPA, there was a document that indicated
20 what the Illinois EPA was looking at was
21 potentially industrial talc and not
22 cosmetic grade talc, if my memory is
23 correct.
24      Q.   You have seen test results

Page 244

1 from testing that are dated after 1987
2 where cosmetic talc has tested positive
3 for asbestos, true?
4      A.   I don't recall.  We'd have
5 to look at specific examples.
6      Q.   Let me ask you to turn to --
7 I'll find it, to Page 19 of Dr. Cook's
8 report.
9      A.   On what page?
10      Q.   Page 19.  If you'll look
11 about three-fourths of the way down,
12 there's a sample dated February the 25th,
13 1992.
14      Do you see that?
15      A.   J&J-202.
16      Q.   That's correct.
17      A.   Yes.
18      Q.   The testing entity was
19 Cyprus.  The mine was Argonaut, you know,
20 Hammondsville.
21      They tested ore, and then
22 the results revealed fibrous tremolite
23 was identified in exposures in cores at
24 East Argonaut 7 and Black Bear mines.

Page 245

1      Do you see that?
2      A.   I see that column.
3      Q.   And did you review the test
4 results that are compiled in the asbestos
5 chart that Dr. Cook and Dr. Krekeler have
6 in their reports?
7      A.   I looked at some.
8      Q.   But you did not look at all?
9      A.   I did not look at all of
10 them.  I tried to focus on those related
11 to the mine.
12      Q.   And you are aware of tests
13 that postdate -- that predate 1987 where
14 talc used in Johnson's talcum powder
15 products tested positive for asbestos?
16      MR. CHACHKES:  Objection.
17 BY MS. O'DELL:
18      Q.   True?
19      A.   I -- I don't recall that, so
20 we'd have to look at some specific
21 examples, those specific tests.
22      Q.   And I'm -- I'm -- as you're
23 sitting here today, now we've been
24 through some of them that were from

Mary Boulton, Ph.D.

Page 246

1  Italian talc.
2         But as you're sitting here
3  today, your testimony is that you're
4  not -- you have not reviewed test results
5  from tests prior to May 21, 1987, that --
6         MR. CHACHKES:  Objection.
7         THE WITNESS:  No, that's not
8  what I said.
9  BY MS. O'DELL:
10     Q.   I wasn't finished.
11     A.   Oh, sorry.
12     Q.   But -- so you -- so my
13 question is, are you aware of test
14 results prior to 1987 reporting the
15 presence of asbestos in talc used in
16 Johnson's Baby Powder?
17     A.   I don't recall those tests.
18 But if we look at specific examples
19 you're thinking of, we can see where
20 they're from.
21     Q.   And certainly you would
22 agree with me that there were numerous
23 tests listed in the table compiling
24 asbestos test results that were dated

Page 247

1  prior to 1987?
2      A.   Yes.  There are tests before
3  1987.
4      Q.   And in some you -- you
5  looked at, and some you did not look at,
6  fair?
7      A.   Fair.
8      Q.   And I'll direct your -- your
9  attention to Exhibit 23.
10         (Document marked for
11         identification as Exhibit
12         Poulton-23.)
13 BY MS. O'DELL:
14     Q.   And this is a test result
15 from April 14, 1971.
16         Do you see that?
17     A.   I see the date.
18     Q.   From the Colorado School of
19 Mines, correct?
20     A.   Yes.
21     Q.   The results are being
22 reported to Robert Russell at Johnson &
23 Johnson, correct?
24     A.   Yes.

Page 248

1         Q.   And there are two samples
2  being tested, Sample A and Sample B.
3         Do you see that?
4      A.   Yes.
5      Q.   And going down the page, the
6  summary and conclusions, it says, "X-ray
7  defraction studies indicated a trace of
8  tremolite and actinolite in CSM RI Sample
9  Number 16."
10         Do you see that?
11     A.   I see that.
12     Q.   And Colorado School of Mines
13 is a respected institution in the world
14 of geology, fair?
15     A.   I have to say under oath
16 that a rival school is respected, yes.
17     Q.   And if you turn over to
18 Page 2 of the results.  We're talking
19 about microscopic analyses of the -- of
20 the as-received samples.
21         Do you see that?
22     A.   I see that sentence.
23     Q.   And they note tremolite and
24 actinolite in Sample Number 16.

Page 249

1         Do you see that?
2      A.   Yes.
3      Q.   And so this would be an
4  example of a positive test result for
5  talc used in Johnson's Baby Powder prior
6  to 1987, true?
7      A.   I don't see any reference to
8  what the samples are.  It says, "Two
9  Vermont final product samples."  It
10 doesn't say that this is cosmetic grade.
11 So I don't know if this is industrial
12 talc or if this is cosmetic talc.
13     Q.   In terms of -- of Johnson &
14 Johnson, they sell cosmetic talc, true?
15     A.   They sell cosmetic talc.
16     Q.   And in this report, you
17 can't say to -- to -- with certainty that
18 that was not cosmetic talc, can you?
19     A.   Conversely you would want to
20 say with certainty, and this memo does
21 not say in certainty what the -- what the
22 samples are.
23         So there -- there needs to
24 be something that identifies these

Mary Boulton, Ph.D.

Page 250

```
1   samples.
2       Q.   And if -- just -- you know,
3   the document states that these are two
4   Vermont final product samples, talking
5   about final talcum powder product
6   samples.
7           Do you see that on Page 1?
8           MR. FROST:  Objection.
9           THE WITNESS:  It doesn't
10  follow necessarily, because it
11  says product that it's going to be
12  cosmetic grade.
13  BY MS. O'DELL:
14      Q.   And -- and it's your belief
15  that -- is it your belief that industrial
16  grade talc is -- well, strike that.
17          Let me ask you to turn,
18  Dr. Poulton, to Exhibit 28, Hopkins 28.
19          And if you'll look on Page 1
20  you'll see a July 7th -- can you not find
21  it, ma'am?
22      A.   It's a deep excavation.
23      Q.   Page 1.
24      A.   Okay.
```

Page 251

```
1       Q.   You'll see July 7, 1971.
2   It's at J&J-15.  Do you see that about
3   midway down the page?
4       A.   Yes.
5       Q.   That's Vermont talc.
6   Do you see that?
7       A.   Yes.
8       Q.   It's processed talc.
9   Do you see that?
10      A.   Sample 344-L?
11      Q.   Yes.  And it tested positive
12  for tremolite and actinolite.
13          Do you see that?
14      A.   I see that.
15      Q.   If you go down further,
16  October 12, 1971, do you see that,
17  J&J-23?
18      A.   Yes.
19      Q.   McCrone tested Shower to
20  Shower.
21          Do you see that?
22      A.   Yes.
23      Q.   It had traces of tremolite.
24          Do you see that?
```

Page 252

```
1       A.   Wait, which date are we
2   looking at?
3       Q.   October 12, 1971.
4       A.   And that's J&J-23?
5       Q.   Yes.
6       A.   And it's Shower to Shower?
7       Q.   Yes.  Do you see that it has
8   traces of -- of chrysotile?
9           Do you see that?
10      A.   Yeah.  I'm reading the
11  description below it.  Is that unrelated?
12      Q.   That is unrelated to that.
13  It had chrysotile, correct?
14          MR. CHACHKES:  Objection.
15          THE WITNESS:  In the JNJ23?
16  BY MS. O'DELL:
17      Q.   Yes.
18      A.   That's what it says.  We
19  would want to pull that full report.
20      Q.   But if -- if you'll go
21  further, Page 2, you'll see on Line 3,
22  August 24, 1972, there is a sample of
23  Shower to Shower.
24          Do you see that?
```

Page 253

```
1       A.   August 24, 1972, JNJ29.
2   Sperry Rand?
3       Q.   Yes.  "Shower to Shower was
4   tested, and the test found asbestos
5   fibers could be detected in the sample."
6           Do you see that?
7       A.   I see that there was
8   discussion of whether that was a true
9   finding.
10      Q.   Where do you see that?
11      A.   I remember that report.
12      Q.   From what?
13      A.   I remember a discussion
14  about Sperry Rand doing testing and
15  whether or not their methodology was able
16  to detect asbestos.
17      Q.   What methodology are you
18  referring to?
19      A.   I seem to recall and we can
20  pull up that document.  That perhaps they
21  used SEM.
22      Q.   Okay.  Let me just take you
23  to the bottom of the page, 1221 1973.
24          Do you see that?
```

Mary Boulton, Ph.D.

Page 254

1    A.    JNJ263?
2    Q.    Correct.  Colorado School of
3 Mines.
4    A.    Yes.
5    Q.    Okay.  They understand how
6 to test talcum powder for asbestos, don't
7 they, Dr. Poulton?
8        MR. FROST:  Objection.
9        THE WITNESS:  I don't know
10    what they understand.
11 BY MS. O'DELL:
12    Q.    Do you have any reason to
13 believe that they are not experts in
14 testing talc for asbestos?
15    A.    In 1973, I think a lot of
16 people were wondering how to do it.
17    Q.    Okay.  You are not an expert
18 in it?
19    A.    I am not an expert in it.
20    Q.    And the finding from the
21 Colorado School of Mines, using TEM on a
22 Vermont talc sample was they identified
23 chrysotile, correct?
24        MR. CHACHKES:  Objection.

Page 255

1        THE WITNESS:  And again, we
2    would want to look at that
3    document and the testing that they
4    did.
5 BY MS. O'DELL:
6    Q.    Do you have any reason to
7 believe that that is not an accurate
8 summary of that test result?
9    A.    The details are important in
10 looking at the results and so we want to
11 look at what the samples are and how the
12 testing was done, make sure there was no
13 contamination.  Make sure proper
14 methodologies were done.
15    Q.    You're not an expert on the
16 proper methodologies, correct?
17    A.    I am not.
18    Q.    And let me ask you to look
19 further on the next page in 19 -- midway
20 down the page, May 8, 1974.  You'll see
21 JNJ66.
22    A.    Next to McCrone?
23    Q.    Yes.
24    A.    Yes.

Page 256

1    Q.    And Windsor 66 ore and
2 product was tested and tremolite and
3 chrysotile was found using TEM, correct?
4    A.    And the next column says
5 possible contamination.  So we'd want to
6 look at the details on that.
7    Q.    Multiple test results
8 showing asbestos from tests dated prior
9 to 1987 were provided to you,
10 Dr. Poulton, true?
11        MR. FROST:  Objection.
12        THE WITNESS:  Yes.  We've
13    looked at a number of samples in
14    this chart.
15 BY MS. O'DELL:
16    Q.    And the statement in the
17 McCrone letter that Windsor's product is
18 free of asbestos for over 15 years is
19 incorrect based on the testing data that
20 we reviewed, correct?
21        MR. CHACHKES:  Objection.
22        THE WITNESS:  I disagree
23    with that statement.
24 BY MS. O'DELL:

Page 257

1    Q.    On Page 14 of your report,
2 you assert that Dr. Krekeler's theory
3 that composite sampling should not be
4 used for cosmetic products -- in other
5 words, Dr. Krekeler asserts that
6 composite samples is an inappropriate
7 method for cosmetics where there may be
8 trace amounts of carcinogens.
9        Do you recall that from his
10 report?
11    A.    I recall him saying that.
12    Q.    And it's your opinion that
13 that is incorrect?
14    A.    I disagree with him that you
15 can't use composite sampling.
16    Q.    And you cite Stanley as a
17 basis for your disagreement with
18 Dr. Krekeler, correct?
19    A.    Stanley is an example of
20 sampling theory.
21    Q.    And you rely on Stanley in
22 your critique of Dr. Krekeler, true?
23    A.    I cite Stanley as an -- as
24 an example of sampling theory.

Mary Boulton, Ph.D.

1    Q.   And in fact, Stanley is an
2  article that deals with sampling
3  involving gold, correct?
4    A.   No.
5    Q.   That's not correct?
6    A.   So Stanley's model was
7  generalizable as he states in his paper
8  and we can -- and we can look at the
9  quote, I believe to all geologic
10  materials was his statement.
11    Q.   Okay.  Let's look at
12  Stanley.
13      Exhibit 24.
14      (Document marked for
15      identification as Exhibit
16      Poulton-24.)
17  BY MS. O'DELL:
18    Q.   Exhibit 24.  This is the
19  paper that you're relying on?
20    A.   Yes.
21    Q.   One of the assumptions that
22  Stanley makes is that the geological
23  material exhibits homogenous distribution
24  of the element of interest, true?

1    A.   We would have to go through
2  this paper, because I believe that he was
3  disputing that you would use the equant
4  grain model.
5    Q.   In fact, if you look at Page
6  110 on the right-hand side of the page
7  down at the bottom, do you see that
8  under, sample size and -- size and sample
9  variance.
10      Do you see that?
11    A.   Yes.
12    Q.   He states, "Assume that this
13  geological material exhibits a homogenous
14  distribution of the element of interest
15  at least at and above the scale of the
16  sample."
17      Did I read that correctly?
18    A.   You did.  However he's
19  starting his derivation.
20    Q.   You would agree in terms of
21  asbestos in talc, that would not be a
22  substance that is homogenous in its
23  distribution across talc ore, true?
24      MR. CHACHKES:  Objection.

1      THE WITNESS:  Correct.
2  BY MS. O'DELL:
3    Q.   And in terms of -- of
4  sampling talc, it would be fair to say
5  that the minerals of interest, asbestos,
6  fibrous talc, chromium, cobalt and
7  nickel, they would not be homogenous
8  across the ore body, true?
9      MR. CHACHKES:  Objection.
10      THE WITNESS:  Asbestos
11      should not be homogenous across
12      the ore body.  I believe I would
13      need to look specifically at metal
14      distribution.  Because we've
15      talked about arsenic being a
16      function of particular fractures.
17  BY MS. O'DELL:
18    Q.   When you use composite
19  sampling like what was used in Vermont,
20  isn't it fair to say that the sampling in
21  terms of isolating a particular element
22  that you are diluting your ability to
23  find a particular element because many,
24  many samples are composited and then only

1  a small amount of that composited sample
2  is tested?
3    A.   So there are two ways that
4  we use composite that are different.  So
5  could you clarify for me which way you
6  use composite?
7    Q.   Well, I'm talking about the
8  way they use composite sampling in
9  Vermont.  For example, they took daily
10  sample from certain silos, put it in a
11  bucket.  That became their composite
12  sample location.
13      Are you in agreement with me
14  there?
15    A.   Yes.
16    Q.   And then they took that
17  composite, in some instances on a monthly
18  basis, and they took a small portion and
19  that's what they tested, fair?
20    A.   So the -- when you do that
21  kind of sampling and they talk about
22  this, they blend the material, and then
23  there are specific ways that you split
24  that sample to get something that is

Mary Roulton, Ph.D.

Page 262

1  statistically representative of that
2  population of your sample.
3       So I think in many ways you
4  could argue that this method is more
5  representative of the bulk, but certainly
6  what's important is that you're relating
7  all of your sampling to the material
8  that's coming through.
9       Q.   What -- what are you relying
10 on for your understanding that there was
11 a particular blending process that took
12 place in creating composite samples?
13      A.   I believe I saw a document
14 that talked about once they took the
15 samples that they collected as they were
16 filling the silo, I -- I believe I saw
17 somewhere that they talked about how they
18 broke that down to -- to collect a sample
19 to do the microscopy.
20      Q.   Did you cite that document
21 in your report?
22      A.   I don't remember if I did.
23      MS. O'DELL:  Why don't we go
24      off the record.

Page 263

1       MR. CHACHKES:  Take a break,
2  it's been about an hour?
3       MR. FROST:  Yeah, I'd say
4  it's been about an hour and 5
5  minutes.
6       THE VIDEOGRAPHER:  The time
7  is 4:19 p.m.  Off the record.
8       (Short break.)
9       THE VIDEOGRAPHER:  We are
10 back on the record.  The time is
11 4:49 p.m.
12 BY MS. O'DELL:
13      Q.   Dr. Poulton, prior to the
14 break, you testified that you have seen a
15 document that describes the manner in
16 which composite samples are, you know,
17 mixed and prepared for testing.  Do you
18 recall that?
19      A.   Correct.
20      Q.   And you were going to look
21 for that document during the break.  Did
22 you do that?
23      A.   Yes.
24      Q.   And what document are you

Page 264

1  relying on for your opinion in that
2  regard?
3       A.   So the two are J&J 0043746.
4       Q.   Why don't you give that to
5  me one more time, please.
6       A.   Okay.  J&J 0043746 and
7  Downey Exhibit 51.
8       Q.   And do you cite those in
9  your report?
10      A.   I don't remember if I do or
11 not.
12      Q.   And you said J&J 007437 --
13      A.   No.  004374746.
14      Q.   Okay.  And that's not
15 included on your reliance list,
16 Dr. Poulton.
17      A.   Is it not?
18      Q.   No.
19      A.   Okay.
20      Q.   Dr. Poulton, you realize
21 today that this is my opportunity to
22 understand what you've seen and you
23 relied on and what your opinions are in
24 this case?

Page 265

1       A.   Yes.
2       Q.   And -- and so these
3  documents -- and you said Downey 51?
4       A.   Yes.
5       Q.   And Downey 51 is not on your
6  reliance list.
7       MR. CHACHKES:  I'm just
8  going to object.  They have
9  alternate stampings and numbers.
10 So that's not quite clear yet.
11      MS. O'DELL:  We'll -- we'll
12 check that.
13      MR. CHACHKES:  Yeah.
14      MS. O'DELL:  But neither the
15 Bates number that you provided to
16 me today for the J&J document or
17 Downey 51 are on your reliance
18 list.
19 BY MS. O'DELL:
20      Q.   So, were those provided to
21 you by counsel during the break?
22      A.   I asked them to search for
23 certain keywords.
24      Q.   Have you expressed all of

Mary Roulton, Ph.D.

Page 266

¹ your criticisms of -- if you have any, of
² Dr. Cook and Dr. Krekeler regarding
³ fibrous talc in your report?
⁴     A.   Could you --
⁵     Q.   Are all your opinions or
⁶ criticisms of Dr. Cook and Krekeler in
⁷ relation to fibrous talc contained in
⁸ your report?
⁹     A.   I am not sure that I talk
¹⁰ specifically about fibrous talc. I
¹¹ believe I focused on asbestos minerals.
¹²     Q.   So if you have any
¹³ criticisms of Dr. Cook and Dr. Krekeler
¹⁴ regarding fibrous talc, they would be in
¹⁵ your report, fair?
¹⁶     A.   I would have to take a quick
¹⁷ look and see if I ever mentioned fibrous
¹⁸ talc.
¹⁹     Q.   I will -- I will say that
²⁰ I've looked and you don't mention fibrous
²¹ talc.
²²     A.   Okay.
²³     Q.   And I'm trying to make sure
²⁴ I understand, because this is my chance

Page 267

¹ with you today, that if you don't have
² any opinions in your report regarding
³ fibrous talc, that means you're not going
⁴ to have any if we get to the point of
⁵ trial, fair?
⁶     A.   I'm -- I'm not quite sure
⁷ I'm understanding.  So if I don't mention
⁸ fibrous talc in the context of Drs. Cook
⁹ and Krekeler --
¹⁰     Q.   You don't mention fibrous
¹¹ talc in your report at all, correct.
¹²     A.   Okay.
¹³     Q.   And so I'm assuming based on
¹⁴ that, you don't have any opinions on
¹⁵ fibrous talc, fair?
¹⁶     A.   I believe that's fair.
¹⁷     Q.   Based on that answer, I'm
¹⁸ not going to have to take you through
¹⁹ that big slog of a document.
²⁰         Okay.  Let me show you what
²¹ I'm going to -- in terms of -- of your
²² opinions regarding selective mining, let
²³ me just turn you to the right page in
²⁴ your report.  Page 16.

Page 268

¹         Do you see that?
²     A.   I do.
³     Q.   Let me ask you to look at
⁴ what was previously marked as Downey
⁵ Exhibit 15.  And I'll mark it for
⁶ purposes of your deposition as
⁷ Exhibit 25.
⁸         (Document marked for
⁹     identification as Exhibit
¹⁰     Poulton-25.)
¹¹ BY MS. O'DELL:
¹²     Q.   Did you review this document
¹³ in -- in reaching your opinions in this
¹⁴ case?
¹⁵     A.   I did.
¹⁶     Q.   And let me ask you -- well,
¹⁷ I tried hard not to mark this, but I've
¹⁸ just got to.  So there you go.
¹⁹         Let me also mark what was
²⁰ previously identified as Downey 14.  And
²¹ I'm going to mark it Exhibit 26 to your
²² deposition.
²³         (Document marked for
²⁴     identification as Exhibit

Page 269

¹     Poulton-26.)
² BY MS. O'DELL:
³     Q.   And these documents relate
⁴ to the -- a drill -- a core drill program
⁵ that was undertaken at the Hammondsville
⁶ mine, you know, in -- first reported in
⁷ 1970, and then there were other drill
⁸ cores taken and they were reported, I
⁹ believe, in 1978.
¹⁰         Do you recall that?
¹¹     A.   Yes.
¹²     Q.   In relation to the drilling
¹³ that was conducted at Hammondsville,
¹⁴ and -- and I'm going to be toggling back
¹⁵ and forth because both of these documents
¹⁶ deal with the drilling program at -- in
¹⁷ Hammondsville.
¹⁸         But Downey Exhibit 15, and
¹⁹ Bates Number 4369 -- let me get to the
²⁰ right page, 979.
²¹     A.   Is that marked Page 4,
²² careful attention?
²³     Q.   Yes.
²⁴         And if you'll look, one of

Mary Boulton, Ph.D.

Page 270

1 the criticisms of the drilling program at
2 Hammondsville was the distance between
3 the particular drill holes, true?
4     A.   Yes.  Mining engineers and
5 geologists always want more data.
6     Q.   Right.  And, in fact, for
7 the Hammondsville exploration, these
8 drill holes, some of them were nearly
9 500 feet apart, correct?
10     A.   So they say some holes are
11 nearly 500 feet from near shaft drill
12 holes.  But again, it's the context of
13 what part of the ore body they are
14 sampling.
15     Q.   And in terms of the
16 precision of the data that can be gleaned
17 from core drilling, the closer the holes
18 are together, the more data that can be
19 learned about the underlying ore body,
20 fair?
21     A.   Not necessarily.  So you
22 could have --
23     Q.   Is that a general principle?
24     A.   No, I wouldn't -- I wouldn't

Page 271

1 necessarily generalize, because it very
2 much depends on what you're trying to
3 sample.
4     Q.   Okay.  For purposes of
5 evaluating the structure of an ore body
6 like talc, particularly because they are
7 smaller in scope, you mentioned that
8 earlier today, the mines at Vermont were
9 quite small, fair?
10     A.   Yes.
11     Q.   And -- and the ore bodies
12 within the mines, the talc ore bodies,
13 were variable, in other words, they
14 were -- there were dikes that were
15 present within the ore body, true?
16     A.   I would have to look at
17 whether we would say present in the ore
18 body or present on the fringes.
19     Q.   Or within the actual ore
20 body, correct?
21     A.   We'd have to look at that
22 specific language.
23     Q.   In -- in fact, there are
24 drill cores that discuss the presence

Page 272

1 of -- of dikes within the actual talc
2 ore, true?
3     A.   We'd have to look at that
4 specific situation.
5     Q.   Do you recall that, having
6 reviewed the documents?
7     A.   I've reviewed documents and
8 I've seen reference to small stringers
9 that ultimately were not in the ore body.
10     Q.   And -- but they occurred
11 within the talc deposit, correct?
12     A.   Well, if you think of talc
13 deposit including the surrounding
14 non-talc rock.
15     Q.   I'm thinking of within the
16 actual deposit where the talc is located,
17 true?
18     A.   So we would want to look at
19 those specific examples.
20     Q.   Do you recall having
21 reviewed documents, both from
22 Hammondsville and Argonaut that describe
23 in detail the presence of dikes within
24 the talc ore body?

Page 273

1     A.   I remember seeing the
2 presence of dikes.  I would have to
3 confirm whether or not they were
4 considered to be in the ore body, as in
5 the minable ore.
6     Q.   If you'll turn to Exhibit 15
7 (sic), Downey-15, to Bates 437034?
8         MR. CHACHKES:  Exhibit 25.
9         THE WITNESS:  What was the
10 page number?
11 BY MS. O'DELL:
12     Q.   437034.  Do you see that?
13     A.   Your voice dropped off
14 again.
15     Q.   437034.
16     A.   034.
17     Q.   Do you see that?
18     A.   I see image 14.
19     Q.   Figure 14 has a subtitle
20 surface geologic map of the Argonaut ore
21 body showing a general relationship of
22 various rocks.
23         And the -- this is Figure
24 14.  And this is a description of the ore

Mary Boulton, Ph.D.

Page 274

1 body at Argonaut, true?
2     A.   That's what the caption
3 says.
4     Q.   Yes.  And within the center
5 of this is actually serpentine, correct?
6     A.   That's how it's mapped.
7 Serpentinite.
8     Q.   And within the -- outside
9 the serpentinite there is a -- there are
10 small veins of talc carbonate schist?
11     A.   You're looking specifically
12 at the vertical dashes?  Yes.
13     Q.   Right here in the -- what in
14 the nomenclature is the -- is the little
15 circles.
16         Do you see that?
17     A.   So the circles are carbonate
18 talc rock.  You had mentioned talc
19 carbonate schist.
20     Q.   All right.  Let's be fair
21 then.  This with the circles is carbonate
22 talc rock, meaning there's more carbonate
23 than talc, correct?
24     A.   I believe so.  I'd have to

Page 275

1 look at their definition.
2     Q.   And then there's talc
3 carbonate schist here, which is a greater
4 amount of talc, correct?
5     A.   I believe that's their
6 definition.
7     Q.   And so looking at this,
8 there is variability within the ore body
9 in terms of width and length of talc,
10 correct?
11     A.   Yes.
12     Q.   If you'll turn over to the
13 next page, also seeing -- there's biotite
14 chlorite schist within the actual ore
15 body, correct?  I'm pointing to that
16 right there.
17     A.   Yes.
18     Q.   So dikes that occur actually
19 within the talc ore body, correct?
20     A.   Yes.  It's just a question
21 of whether you mine that section of the
22 ore body is the point that I've been
23 making.
24     Q.   But it is present within the

Page 276

1 talc ore?
2     A.   It's present within the
3 talc.
4     Q.   And in terms of delineating
5 distinctions in the talc deposit, the
6 greater number of drill cores that you
7 have to gather data, the greater
8 precision by which you're going to
9 understand the contours of the particular
10 talc deposit, true?
11     A.   So I would say that first
12 and foremost, you place your drill holes
13 according to the geology that you're
14 seeking to confirm.  They could be angled
15 and actually cover more of the deposit
16 than vertical closely spaced holes would.
17 So context is important for the
18 information that you're trying to derive.
19     Q.   Isn't it -- wouldn't you
20 agree with me that when there is
21 variations in the drill hole spacing, the
22 thickness of the ore body, or grade, that
23 will distort the results obtained through
24 the triangulation method of drilling?

Page 277

1     A.   Could you repeat that for
2 me?
3     Q.   Happy to.  If you'll look
4 at --
5         MS. O'DELL:  I'm done with
6     that, Henry.  Thank you.
7 BY MS. O'DELL:
8     Q.   Are you familiar with a
9 triangular method that's used in planning
10 core drilling?
11     A.   It's what we did before we
12 had computers.
13     Q.   And that's what was used in
14 Hammondsville and Hamm and Argonaut in
15 the '70s and early '80s, fair?
16     A.   That would be my
17 understanding.
18     Q.   Okay.  And that's what is
19 depicted on -- in your report at Page 18,
20 is a diagram using a triangulation
21 method -- triangulation method.  That's
22 what you include in the body of your
23 report?
24     A.   Yes.

Mary Boulton, Ph.D.

Page 278

1    Q.   Correct?  And you include it
2  in your report as Figure 1-B, correct?
3    A.   Yes.
4    Q.   And this is a model that is
5  used to evaluate ore reserves, correct?
6    A.   Yes.  It can be.
7    Q.   And that's typically the use
8  of a model like this, to evaluate the
9  grade and the volume of a particular type
10 of ore, true?
11   A.   So that's part of what you
12 use it for.
13   Q.   It's often and most often
14 used as an economic model in order to
15 understand how much product there is to
16 sell, true?
17   A.   It's one of the uses.
18   Q.   And in terms of the data
19 within this model for Hammondsville,
20 there was, in some areas insufficient
21 drill core in order to fully complete
22 this model, correct?
23   A.   Probably for the areas that
24 they were contemplating extending the

Page 279

1  mine into, was the way the reports were
2  written.
3    Q.   In addition to these drill
4  core programs 1970 and 1978 at Hamm -- at
5  Hammondsville, there was also drilling
6  that was done at Hamm mine.  Do you
7  recall that?
8    A.   I recall drilling at Hamm.
9  I need to look at the dates.
10   Q.   And I'm not asking for
11 specific dates.  I'll represent it's
12 after the Hammondsville exploration.
13       Do you recall that?
14   A.   I recall drilling at Hamm.
15   Q.   Okay.  And did you look at
16 those drill cores?
17   A.   I believe I did.
18   Q.   Let me show you what I'm
19 marking as Exhibit Number 27.
20       (Document marked for
21       identification as Exhibit
22       Poulton-27.)
23 BY MS. O'DELL:
24   Q.   I've handed you a memorandum

Page 280

1  dated May 21, 1992 that discusses the
2  Hamm mine core drilling, correct?
3    A.   Yes.
4    Q.   It was prepared as an
5  overview of drilling that had occurred in
6  1992, correct?
7    A.   I believe so.
8    Q.   And there were four drill
9  holes that were drilled.
10       Do you see that, on page --
11 I believe it's 5 of the memo.
12   A.   Yes.
13   Q.   And this is a summary on
14 Page 5 of what was logged from the cores.
15       Do you see that?
16   A.   Yes.
17   Q.   And so Hole 91 -- 92-1 has
18 intervals of talc carbonate and then
19 serpentinite and then it goes again to
20 talc carbonate and serpentinite.  And you
21 see a chloritic dike that's at 235 feet.
22       Do you see that?
23   A.   I see that.
24   Q.   So there are in this

Page 281

1  instance two.  There was not only
2  Argonaut, but in the Hamm mine there was
3  chloritic dikes that occurred within the
4  talc deposit, correct?
5    A.   Within the deposit.  You
6  have to put these into the context of the
7  edges of the deposit and what was going
8  to be minable ore versus waste.
9    Q.   They can also occur within
10 the talc deposit, true, within the talc
11 as we saw for Argonaut?
12   A.   Well, it can be within the
13 talc and still not be in a minable zone
14 within the talc.
15   Q.   Then you look at 92-2 and
16 then Hole 92-3 and you also see chloritic
17 dikes that occur within those drill
18 cores, correct?
19   A.   Yes.  And they are actually
20 coded separately from the ore.
21   Q.   They are identified as
22 chloritic dikes, true?
23   A.   They are identified as
24 chloritic dikes, and the ore code for

Mary Poulton, Ph.D.

Page 282

1  them is different than the -- the -- the
2  rock code is different than the minable
3  ore.
4      Q.   Okay.  And then if you'll
5  turn over to Page 6 of the memo, you'll
6  see that core samples were taken to the
7  Columbia mill and -- and tested.
8          Do you see that?
9      A.   First paragraph?
10     Q.   Yes.
11     A.   Yes.
12     Q.   And the sample that you'll
13 see at the end of that paragraph was then
14 pulverized to pass 325 mesh and tested
15 for talc content, brightness, and the
16 presence of arsenic and amphibole.
17         Do you see that?
18     A.   Yes.
19     Q.   If you'll look down further
20 to the fourth paragraph, it says, middle
21 of the paragraph, "In the pit, arsenic
22 was observed as oxidized coatings on
23 fractured surfaces."
24         Do you see that?

Page 283

1      A.   Not yet.
2      Q.   Fourth paragraph.  Midway
3  down.
4      A.   Okay.
5      Q.   "In the pit, arsenic was
6  observed"?
7      A.   Yes, I see it.
8      Q.   And then -- then you go on
9  down to the next paragraph and it talks
10 about "XRD scanning did not reveal the
11 presence of amphibole in the drill core."
12         Do you see that?
13     A.   I see that sentence.
14     Q.   And, in fact, the portions
15 of the core that contained amphibole were
16 not sampled, true?
17     A.   There is a companion
18 document for this that says that anything
19 that contains amphibole is going to be
20 wasted.
21     Q.   They were not -- the
22 material containing amphiboles was not
23 sampled for purposes of testing, true?
24     A.   It was not sampled as part

Page 284

1  of this campaign.
2      Q.   If you'll turn back to the
3  first page, Dr. Poulton, second
4  paragraph, this document states that
5  "fibrous amphiboles, actinolite, were
6  observed only within the chloritized
7  mafic dikes extending into places a
8  couple of inches into the contacting talc
9  ore."
10         Do you see that?
11     A.   I see that sentence.
12     Q.   So the chloritic dikes
13 were -- did occur in the talc ore and,
14 according to this document, they
15 contained fibrous actinolite, true?
16     A.   So it says they extended a
17 couple of inches into the contacting talc
18 ore which doesn't mean that they're
19 necessarily going to be in a minable
20 block.
21     Q.   But they are in the talc ore
22 nonetheless, correct?
23     A.   They -- they are at the edge
24 of the talc ore.

Page 285

1      Q.   In fact, it says they extend
2  into that talc ore in places?
3      A.   A couple of inches.
4      Q.   Your analysis of the
5  selective mining that took place within
6  Vermont is based on your review of the
7  core drilling that was done, correct?
8      A.   Core drilling was part of
9  that.
10     Q.   And what years of core
11 drilling support -- or are you relying on
12 to support your opinions?
13     A.   I have a -- we're talking
14 about Argonaut now?
15     Q.   Any of the mines.
16     A.   So we can -- we can talk
17 about Argonaut.  I referenced a document
18 that had actually several thousand
19 samples from drilling in it.  And I also
20 looked at the mine -- block models that
21 were described in reports.
22     Q.   Of those periods of -- of
23 drilling, what would you say were the
24 most comprehensive, you know, drilling

Mary Boulton, Ph.D.

Page 286

¹ efforts in terms of the different years?
²      A.   I would have to look at the
³ documents.  Off the top of my head I
⁴ don't remember all the years and how many
⁵ holes.
⁶      Q.   Would you agree with me that
⁷ the 1998 drilling campaign was the -- was
⁸ the most comprehensive that was
⁹ undertaken in?
¹⁰      A.   I'd -- I'd want to confirm
¹¹ that.
¹²      Q.   You don't remember as you're
¹³ sitting here today?
¹⁴      A.   As I'm sitting here without
¹⁵ looking at the document, I don't.
¹⁶      Q.   In terms of the most
¹⁷ reliable and comprehensive drilling that
¹⁸ was done at any of the talc mines, not
¹⁹ limiting it to Argonaut.  It could be
²⁰ Hamm, Hammondsville, or Argonaut, what
²¹ was the most comprehensive and reliable
²² core drilling campaign that was done?
²³ Can you say that?
²⁴      A.   What -- what do you mean by

Page 287

¹ comprehensive and reliable?
²      Q.   Well, planned sufficiently
³ so that the drill core holes were not too
⁴ far apart, that it was adequate -- the
⁵ cores were adequately sampled.
⁶         Do you find that there was
⁷ any drilling that was more comprehensive
⁸ than another?
⁹      A.   So these are not -- the --
¹⁰ the mine is like a living engineering
¹¹ project.  So there's not a static, we
¹² will define all of this and it's -- it's
¹³ done.  You constantly add information to
¹⁴ the mine model.  I can't say that there
¹⁵ is one year where the drilling was
¹⁶ somehow perfect, in other years it was
¹⁷ imperfect, without looking at each of the
¹⁸ drilling campaigns and what specifically
¹⁹ they were trying to accomplish and what
²⁰ information they were adding to their
²¹ knowledge base.
²²      Q.   How many campaigns were
²³ undertaken at Vermont?
²⁴      A.   At all of Vermont or --

Page 288

¹      Q.   Let's stick with Argonaut.
²      A.   At Argonaut?  Again, I would
³ have to go back and look at how many
⁴ different drilling campaigns and how many
⁵ holes.
⁶      Q.   In terms of your report, is
⁷ there one drilling campaign that you
⁸ relied on more than others?
⁹      A.   I don't know that I can say
¹⁰ there was one campaign more than another,
¹¹ again without having the data all in
¹² front of me.
¹³      Q.   You say on Page 20 that
¹⁴ there were -- of your report, that
¹⁵ approximately 2500 feet of core was
¹⁶ drilled in 1998.
¹⁷         Do you see that?
¹⁸      A.   I see that.
¹⁹      Q.   And -- and you talk in terms
²⁰ of which holes were drilled and the --
²¹ how far apart and -- and so forth.
²²         Do you see that?
²³      A.   I -- I -- yes, I see that
²⁴ I'm referencing the Figure 3 I believe.

Page 289

¹      Q.   Okay.  And Figure 3 is on
² Page 22 of your report, correct?
³      A.   Yes.
⁴      Q.   And if you look at Figure 22
⁵ in your report, this is a depiction, a
⁶ drawing of the drill holes that were
⁷ drilled in Argonaut, correct?
⁸         MR. CHACHKES:  Figure 22?
⁹         THE WITNESS:  You said
¹⁰ Figure 22?
¹¹         MS. O'DELL:  I said -- I was
¹² trying to say Figure 3.
¹³         THE WITNESS:  Okay.
¹⁴         MS. O'DELL:  That's what I
¹⁵ meant.
¹⁶ BY MS. O'DELL:
¹⁷      Q.   That's what you referred to,
¹⁸ correct?
¹⁹      A.   Yes.
²⁰      Q.   And so -- I'm on Page 22.
²¹ That's what I was -- Page 22, Figure 3.
²²      A.   That's...
²³      Q.   That's what I was trying to
²⁴ say, but if I didn't say that correctly.

Mary Poulton, Ph.D.

Page 290

1    Do you see that?
2    A.   I see the figure.
3    Q.   And that's the -- the
4  drilling program that you relied on in
5  large measure to discuss selective
6  mining, correct?
7    A.   I can't say that I relied on
8  this in large measure.  It was one of the
9  pieces of information I used.
10    Q.   You relied on it in reaching
11  your opinions regarding selective mining,
12  true?
13    A.   It -- it was part of my
14  information.
15    Q.   The -- looking at Figure 3,
16  the parallel lines across the figure, let
17  me just -- if you'll --
18      MS. O'DELL:  If I can have
19    the Elmo.
20  BY MS. O'DELL:
21    Q.   These parallel lines, these
22  blocks if you will, they are in blocks of
23  100 feet, correct?
24    A.   This may be a local mine

Page 291

1  coordinate system.  And I don't know what
2  the scale is, once this has been
3  reproduced.
4    Q.   Okay.  So you don't know the
5  scale for this particular figure?
6    A.   I'm -- I'm estimating it.
7    Q.   What is your estimate?
8    A.   I can't -- I can't read the
9  numbers on this particular one.  I think
10  I estimated that these holes were roughly
11  100 feet apart perhaps.
12    Q.   And when you mean -- you're
13  referring to the holes, you are talking
14  about these lines actually depict drill
15  cores, correct?
16    A.   They represent the drill
17  holes --
18    Q.   Correct.
19    A.   -- projected to a horizontal
20  plane.
21    Q.   Yes.  And in many instances,
22  those holes are anywhere from 100 to as
23  many as 150 feet apart, correct?
24    A.   Could be.

Page 292

1    Q.   And so it would be fair to
2  say that the data from each hole is used
3  to extrapolate the material between the
4  holes, true?
5    A.   Not solely, because you also
6  have blast hole drills and you have
7  in-fill drilling.
8    Q.   That would be one of the
9  primary mechanisms by which you estimate
10  or extrapolate what is actually present
11  between the drill core holes?
12    A.   So you create a drill
13  statistical model based on all your
14  drilling and geological data.  And from
15  that, you can map the support of one set
16  of data to another set of data.  That's
17  the basics -- basics of geostatistics.
18    Q.   And it's a model.  It's not
19  necessarily actual data on what's there.
20  It's a model of what's estimated to be
21  there, correct?
22    A.   It is a model.
23    Q.   In a geostatistical analysis
24  like this, is 500 feet a appropriate

Page 293

1  distance in order to accurately estimate
2  what material is there?
3    A.   It depends on what you're
4  actually trying to estimate.  You may
5  just be looking for an edge of something.
6  You may be looking for a particular
7  structure.
8    Q.   Let me ask you.  I think we
9  previously marked this, 2008 annual
10  report for mineral resource and ore
11  reserve estimates of the Argonaut mine.
12      Do you see that?
13      MR. CHACHKES:  You said 25
14    or 26?
15      MS. O'DELL:  No. It looks
16    like this.
17      MR. CHACHKES:  I don't think
18    we have it.
19      MS. O'DELL:  I'll mark it
20    Exhibit 28.
21      (Document marked for
22    identification as Exhibit
23    Poulton-28.)
24  BY MS. O'DELL:

Mary Boulton, Ph.D.

Page 294

1    Q.   Have you seen that document
2  before?
3    A.   Yes.
4    Q.   And on Page 26 of your
5  report, you reference this document,
6  true?
7    A.   Could you give me paragraph?
8    Q.   The second paragraph from
9  the bottom.
10    A.   Krekeler improperly assumes?
11    Q.   Yes.  And you say he
12  properly assumes that only drilling at a
13  core density of 50 to 100 feet on a
14  square grid pattern covering the entire
15  ore body would allow for a selective --
16  effective selective mining.
17         MR. CHACHKES:  You said
18      properly, when you meant to say
19      improperly.
20         MS. O'DELL:  I think I said
21      improperly.  But I may not have
22      been clear.
23  BY MS. O'DELL:
24    Q.   You write he improperly

Page 295

1  assumes that drilling at core density of
2  50 to 100 feet on a square grid pattern
3  covering the entire ore body would allow
4  effective selective mining.
5    A.   Yes.  That's what I wrote.
6    Q.   And that's your opinion,
7  right?
8    A.   That's my opinion.
9    Q.   And you rely on Exhibit --
10  what we have marked as Exhibit 28, and
11  it's Bates number 441340, correct?
12    A.   That is one of the pieces of
13  information that I used as an example.
14    Q.   And this was written in
15  2008, correct?
16    A.   Yes.
17    Q.   And that's an appropriate --
18  that would be an appropriate reference to
19  evaluate the talc deposits at Argonaut,
20  true?
21    A.   So -- so 2008 they were no
22  longer producing talc for Johnson &
23  Johnson.  I referenced this report as an
24  example of a mine model.

Page 296

1    Q.   And this is an evaluation of
2  the ore deposit at Argonaut?
3    A.   At Argonaut.
4    Q.   And it contains not only
5  data collected in 2008, but it analyzes
6  data that had been collected in prior
7  drill core programs, correct?
8    A.   Yes.
9    Q.   And so there is data from
10  the time period during which talc was
11  being sourced to Johnson & Johnson within
12  this document, correct?
13    A.   I would have to confirm
14  that.  But I believe that to be true.
15    Q.   And that data is relevant to
16  the talc that was being mined and
17  supplied to J&J, true?
18    A.   I would have to confirm
19  that.
20    Q.   And provided the data was
21  before 2003, in your mind, that would be
22  relevant data, correct?
23    A.   If it was before 2003.
24    Q.   And in fact, to a degree,

Page 297

1  the data was collected after 2003 but
2  dealt with the same ore bodies, it would
3  also have relevance, true?
4    A.   You might have to explain
5  your question to me.
6    Q.   I think it's clear.  That if
7  data that was collected after 2003, but
8  relates to the same ore body that was
9  used to source Johnson & Johnson talc,
10  it's also relevant data?
11    A.   And so what data would that
12  be that you would be referring to?
13    Q.   It could be certain core
14  drill information.  It could be other
15  sampling information, correct?
16    A.   So you could certainly
17  refine your model.  I guess I am confused
18  about the timing of certificates of
19  analysis that are sent to J&J.
20    Q.   I didn't mention
21  certificates of analysis to J&J.  I said
22  there's data in this document regarding
23  2002 drilling, for example, that would be
24  very relevant to the talc that was sold

Mary Boulton, Ph.D.

| Page 298 | Page 300 |
|---|---|

Page 298

1 to J&J during that time period, correct?
2     A.   I guess my answer would be
3 it just depends on what we're talking
4 about.
5     Q.   The drilling that was done
6 in 2002 at Argonaut provides data
7 regarding the deposit that is relevant
8 for the material and constituents
9 contained in Argonaut's deposit true?
10     A.   So you're asking if holes
11 drilled in 2002 relate to --
12     Q.   They're relevant?
13     A.   Are relevant to --
14     Q.   The issues that we're
15 dealing with in this case.
16     A.   So because you drill and
17 produce your model in advance of mining,
18 holes that you drill in 2002 might not
19 actually be relevant until much, much
20 later.
21     Q.   Let me ask you this
22 question.  Did this report evaluate
23 previous core drilling that had been done
24 at the Argonaut mine?

Page 300

1 the construction and estimate of either
2 the 2002 or the 2007 model.
3         Did I read that correctly?
4     A.   You read that correctly.
5     Q.   So the 1998 data that you
6 rely on in your report was deemed
7 essentially unreliable and unusable by
8 Rio Tinto in 2008, correct?
9         MR. CHACHKES:  Objection.
10         THE WITNESS:  No.  That's I
11     believe misstating what these
12     drill holes may actually
13     represent.
14 BY MS. O'DELL:
15     Q.   It goes on to say, the
16 historic drill data was checked for
17 accuracy, frequently the assay and logs
18 at geologic intervals did not coincide.
19 Do you see that?
20     A.   Yes.
21     Q.   In some cases, the logged
22 rock height was not consistent with assay
23 data.
24     Do you see that?  First

Page 299

1     A.   I'd have to go back and look
2 at it.
3     Q.   Do you remember as you're
4 sitting here?
5     A.   As I'm sitting here I could
6 not confirm what years this includes.
7     Q.   If you'll turn to Page 14 of
8 the document.  Do you see at the bottom
9 of the Page 3.3 data validation in QA and
10 QC?
11     A.   Yes.
12     Q.   It's talking about drilling
13 performed at the Argonaut mine in
14 previous years.
15     Do you see that?
16     A.   I see where it says over 300
17 drill hole datasets were found.
18     Q.   It goes on to say, "Found
19 without complete geology logs, no collar
20 data, survey data or inconsistent and
21 unrealistic data.  All of these 300 drill
22 holes were drilled during the 1990s with
23 very poor data collection and retention.
24 None of these drill holes were used in

Page 301

1 sentence of the next paragraph.
2     A.   Yes.
3     Q.   And so the evaluation of the
4 drilling that was done at Argonaut in the
5 1990s, was essentially determined to be
6 of poor quality and not relied on in this
7 model, correct?
8     A.   So it's relevant to what --
9 the context is, can you take those drill
10 hole data that were based on the numbers
11 of them, most likely blast hole data that
12 were used for ore control at the time,
13 and are they relevant to put into a new
14 computer model.  That's my interpretation
15 of this document.
16     Q.   But yet -- and for this
17 model, they rejected that data and did
18 not rely on it, the 1990s drill core
19 data, correct?
20     A.   At least at the time this
21 document is drafted.
22     Q.   That's what it states?
23     A.   That's what it's stating at
24 the time of this draft.

Mary Boulton, Ph.D.

Page 302

1    Q.   You mentioned blast hole
2  samples?
3    A.   Yes, I did.
4    Q.   Have you seen any documents
5  or data that document testing of blast
6  hole samples?
7    A.   I would have to look and see
8  if there were any mentions.
9    Q.   I'm talking about specific
10 test results from blast holes.
11   A.   Yeah, and I -- and I would
12 have to look and see if I saw any data.
13   Q.   Do you recall as you're
14 sitting here today, that data?
15   A.   I don't recall with the
16 amount of data I've looked at.
17   Q.   You talk a lot in your
18 report about the -- the block models and
19 creating block models for deposits that
20 identify particular segments of talc
21 versus other material.
22   A.   Yes.
23   Q.   And let me ask you if you
24 wouldn't mind.  We marked the literature

Page 303

1  and excerpts of books that you relied on.
2  If you wouldn't mind, Dr. Poulton, if I
3  could have that, because I don't have a
4  copy of one of the articles.
5  Specifically the Noble article.
6       Do you recall that?
7    A.   I believe so.
8    Q.   And in Noble you describe
9  certain theories or methodology regarding
10 block models, true?
11   A.   We can look at Noble.
12   Q.   And the Noble reference that
13 we're referring to is a chapter in a
14 mining engineering book entitled "Mineral
15 Resource Estimation."
16       Fair?
17   A.   I believe so.
18   Q.   And because we only have one
19 copy, I'll put it up on the Elmo so we
20 can look together.
21       So this is the reference
22 that you relied on, correct?
23   A.   Yes.
24   Q.   And Noble goes through

Page 304

1  different methodologies for estimating
2  the amount of ore in a particular
3  deposit, true?
4    A.   Yes.
5    Q.   And it describes data
6  collection, geologic interpretation, it
7  goes through some statistics, et cetera,
8  correct?
9    A.   Yes.
10   Q.   And on Page 212 of Noble,
11 it -- right here, I don't know if you can
12 see -- describes certain common problems
13 that are associated with block models
14 such as this, correct?
15   A.   Some.
16   Q.   It says, "The most common
17 problem with geometric methods is that
18 they may imply more selective mining that
19 may be achieved by the mining method."
20       In other words, the model
21 may not match what's going on in the
22 actual real world mine, true?
23   A.   So I would actually need to
24 see the article and the context of what

Page 305

1  came before this.
2    Q.   It goes on to say, "The
3  results from estimating the resource from
4  samples, the size of the drill hole,
5  but" -- sorry, let me read that again.
6       "This results from
7  estimating the resource from samples the
8  size of a drill hole but mining larger,
9  less selective volumes."
10      Did I read that correctly?
11   A.   You read it correctly.
12   Q.   "High grade blocks usually
13 include lower grade material when they
14 are mined and low grade blocks usually
15 include some higher grade material."
16      Did I read that correctly?
17   A.   Yes.
18   Q.   "The resulting mined grades
19 are different from the predicted
20 distribution for cutoff grades below the
21 average grade of the deposit, the mined
22 grade will be lower and the tonnage will
23 be higher."
24      Did I read that correctly?

Mary Boulton, Ph.D.

Page 306

1    A.   Yes.
2    Q.   "If the cutoff grade is
3  significantly higher than the average
4  grade of the deposit however, both the
5  mined grade and the tonnage can be lower,
6  resulting in severe overestimation of
7  contained metal."
8       Do you see that?
9    A.   Yes, I saw that.
10    Q.   And -- so in other words,
11  the model and what's predicted to be in
12  the mine and what's predicted to be
13  actually extracted may -- may not act --
14       MS. O'DELL:  Excuse me.
15  Thank you.  You see all my notes.
16       THE WITNESS:  Oh great.
17       MR. CHACHKES:  It's over for
18  you.
19       MS. O'DELL:  Well, there you
20  go.  I made it a long time, so
21  hopefully I skip.
22  BY MS. O'DELL:
23    Q.   But the model and what's
24  predicted to be mined from the deposit

Page 307

1  may not match what actually is removed by
2  the people on the ground in the equipment
3  removing the material, true?
4    A.   So we have to be careful,
5  because the section that you just quoted
6  in that article was potentially leading
7  up to more sophisticated methods that
8  lead to a more accurate mine model.
9       So I think that we can't
10  just take one paragraph out of context
11  and then draw the conclusion that the
12  model is inaccurate.
13    Q.   Well, let me -- let me just
14  ask in a general way.  You can have a
15  model of what's in the deposit, the ore
16  that -- that is designated to be removed.
17  And the truth of the matter is, that
18  model may or may not match what's
19  actually going on in the mine itself,
20  true?
21    A.   That's why you constantly
22  reconcile the two, so it's a -- it's a
23  learning process.
24       You start.  You see what's

Page 308

1  there.  You correct.  You mine more.  You
2  correct so your model becomes more and
3  more sophisticated over time.
4    Q.   So the answer to my
5  question, what's -- what's in the model
6  and what's happening in the mine may not
7  match.  The answer to my question is yes,
8  that is true?
9    A.   I think we're talking about
10  different time scales and different uses
11  of the model.
12       So keep in mind the model is
13  not -- I've -- I've built this rigid
14  thing that can never change.  It
15  constantly improves as we gather more
16  information and --
17    Q.   What's the first mine model
18  that you saw related to any of the
19  Vermont talc mines, what's the date on
20  that?
21    A.   2002 would come to mind.
22  There might have been something sooner
23  than that.  But I believe I saw 2002.
24    Q.   No mine models for those

Page 309

1  mines in the 1970s, 1980s, or up until,
2  let's say, 1999.  True?
3    A.   No, I wouldn't say that
4  there's no models.  It depends on whether
5  we are talking about paper based, even
6  physical 3D models versus computer
7  models.
8    Q.   No, there were no computer
9  models in the '90s for Argonaut, true?
10    A.   I don't know that that's
11  true.
12    Q.   The -- in terms of -- of the
13  mining process itself, and I'm not
14  talking about a computer model, I'm
15  talking about what happens within the --
16  the open pit itself.  The selective
17  mining process is dependent on, in large
18  measure, on the visual inspection of an
19  equipment operator, true?
20    A.   I would say that there are
21  many inputs to selecting what you're
22  mining for delivery to a particular
23  stockpile for a particular use or -- or
24  wasting it.

Mary Boulton, Ph.D.

Page 310

1   Q.   And that decision on an
2  hourly by hourly basis is made by the
3  person who is running the excavator
4  that's removing the material, true?
5   A.   Not necessarily.  You have
6  other input to what that operator is
7  doing.
8   Q.   But it can be, correct?
9   A.   That would be a
10 hypothetical.
11  Q.   No, that's real world, in
12 fact.
13      For an excavator operator
14 who is loading trucks and making a
15 decision of whether material is going to
16 go to West Windsor for cosmetic talc
17 versus Ludlow for industrial talc, that's
18 going to be made when that operator is
19 extracting the material with an excavator
20 and placing it in a truck, true?
21  A.   So the equipment operator is
22 excavating the material and placing it in
23 a truck.
24      That material may have been

Page 311

1  already marked by the geologist, the
2  mining engineer, as to what material that
3  is and where that truck is routed to.
4   Q.   May or may not have been
5  premarked, correct?
6   A.   So premarked as opposed to
7  other ways of delineating it.
8   Q.   And in terms of -- of that
9  process, the determination of what's
10 going to be in a talc mine, cosmetic talc
11 versus industrial talc, is going to be
12 decided at the site of extraction?
13  A.   I would say not solely.
14  Q.   But in large measure?
15  A.   I can't define what in large
16 measure would be.
17  Q.   It -- that's part of the
18 decisionmaking process, true?
19  A.   It's one of the inputs.
20  Q.   The excavator operator is
21 going to be determining what material is
22 going to be beneficiated versus what's
23 going to be wasted.  You might have
24 gotten input from -- of a geology

Page 312

1  engineer or a mine manager, but for that
2  bucket-by-bucket decision, that's going
3  to be the excavator operator, true?
4   A.   So your question is, is the
5  excavator operator the sole person making
6  that decisions?
7   Q.   That's not what I said.
8   A.   Okay.  Because you --
9   Q.   He's going to be one of the
10 people who is making the decision about
11 whether material is going to be
12 beneficiated or wasted?
13  A.   So there's a distinction
14 between making the decision as opposed to
15 executing the decision.
16  Q.   In terms of -- of actually
17 loading a particular truck that's going
18 to go to a particular mill --
19  A.   Yes.
20  Q.   -- that's going to be the
21 excavator operator, correct?
22  A.   No, not necessarily.  So,
23 so, basically, based on what you know
24 you're mining and where it's going to go,

Page 313

1  the -- the truck driver who is ultimately
2  taking that material to its destination
3  is told where that truck should go.  That
4  could be based on a dispatching system.
5  It could be based on today everything is
6  going to Stockpile 54.  But there's a
7  difference between making a decision
8  versus executing the decision.
9   Q.   Well, that may be true.  I
10 wouldn't -- won't dispute that.  But
11 executing the -- the decision is sort of
12 where the proof is in the pudding,
13 correct?
14      I mean, in terms of that
15 excavator operator delineating the ore
16 that should go for cosmetic talc, that
17 person is going to be looking at
18 potentially boundaries that are drawn by
19 a geologist, correct?
20  A.   Yes.
21  Q.   Or a mine manager, not
22 necessarily a geologist?
23  A.   Yes.  Yes.
24  Q.   Those boundaries, as

Mary Boulton, Ph.D.

Page 314

1 material is removed, can be disrupted, so
2 it's more difficult to tell where those
3 boundaries occur, true?
4     A.   Mm-hmm, could be.
5     Q.   And you got, in a pit
6 situation you're going to have dust,
7 true, that may impinge on the
8 identification of a particular material?
9     A.   I would not think that dust
10 in this situation is going to obstruct
11 your visibility.
12     Q.   You've got snow in certain
13 parts of -- certain time periods of the
14 year, correct?
15     A.   You do have snow.
16     Q.   You could have rain and
17 other weather elements that impact the
18 person who is trying to remove certain
19 ore?
20     A.   Usually wet makes things
21 easier to identify.
22     Q.   Maybe, maybe not.  Depends
23 on the mud, true?
24     A.   I wouldn't say the mud,

Page 315

1 but -- but certainly if you take a rock
2 sample and you make it wet, a lot of
3 times the identification is much easier.
4     Q.   But we're not talking about
5 rock samples.  We're talking about
6 somebody in a piece of equipment.
7     A.   No, I'm -- I'm still saying
8 the rock face when wet can be far more
9 distinctive than when dry.
10     Q.   But not the floor of the pit
11 in -- not the floor of the pit in many
12 instances --
13     A.   Well, the floor of the pit
14 we're generally driving on.
15     Q.   Not necessarily.  It depends
16 on if you've got -- you've blasted and
17 you've got material that's been blasted
18 and it's being prepared to be excavated
19 and -- and trucked to the mill.
20     A.   So you're talking about a
21 muck pile on a bench?
22     Q.   Maybe, maybe not.  Could be.
23         But let me just ask this
24 question.  An excavator operator is

Page 316

1 approximately how far from the end of the
2 bucket on the excavator?
3     A.   It very much depends on the
4 excavator.
5     Q.   And -- and you have
6 described an excavator that is
7 appropriate for selective mining in the
8 context of -- of Vermont talc as having a
9 4.7-yard bucket, correct?
10     A.   That's the bucket that they
11 have described having.
12     Q.   And that's the bucket they
13 were using?
14     A.   Yes.
15     Q.   And the location of the
16 operator in front of the controls in the
17 seat of the machine to the end of the
18 bucket would be anywhere from 25 to
19 35 feet, correct?
20     A.   It very much depends on
21 where the machine is relative to the
22 excavator arm.  It could be closer.
23     Q.   And it -- it could be
24 farther?

Page 317

1     A.   Depends on the reach of the
2 boom.
3     Q.   Yes.
4     A.   You generally don't want to
5 lift a lot of things from a great
6 distance because of the stress on the
7 boom.
8     Q.   Correct.  But the -- a good
9 estimate of the distance would be
10 somewhere between 25 and 35 feet,
11 correct?
12     A.   I don't know that I could
13 say that that's an estimate of the
14 distance between the operator and what
15 that person is digging.
16     Q.   How many pounds of material
17 would a 4.7-cubic-yard bucket hold?
18     A.   So we would have to do some
19 math late in the day here.  I believe a
20 ten-foot by ten-foot by ten-foot block of
21 rock was roughly 75 tons.  I'd have to go
22 through and calculate bank cubic yards
23 and figure out what would actually fit in
24 an excavator of that size and then figure

Mary Boulton, Ph.D.

Page 318

1  out what that weight would be.  I don't
2  think I'm prepared to do that math right
3  now.
4       Q.   And you don't know that from
5  your information in -- in the mining
6  field?
7       MR. CHACHKES:  Objection.
8       THE WITNESS:  I don't know
9     that from my information in the
10    mining field?  No, I just can't
11    calculate it right now.
12 BY MS. O'DELL:
13      Q.   Would it be fair to say that
14 3,000 pounds per yard is a reasonable
15 estimate of the amount of material
16 that -- that would be in one yard of a
17 bucket?
18      A.   3,000 pounds per yard of
19 talc?
20      Q.   Yes.
21      A.   I'd have to do some
22 calculations.
23      Q.   So assume for me, for
24 purposes of this discussion, that a yard

Page 319

1  would hold approximately 3,000 pounds and
2  a 4.7 -- 4.7-cubic-yard bucket would hold
3  approximately 15,000 pounds of ore,
4  assume that with me.
5       If there are trace minerals
6  or accessory -- accessory minerals within
7  that talc, it would be impossible to
8  selectively mine that material with any
9  precision, true?
10      MR. CHACHKES:  Objection.
11      MR. LOCKE:  Objection to
12    form.
13      THE WITNESS:  So these
14    impurities don't jump out of the
15    rock face into the muck pile.
16      Again, we've built these
17    models so that we're, for cosmetic
18    grade talc, mining the very best
19    blocks.  And I -- I object to the
20    conclusion that there would
21    suddenly be unknown contaminants
22    appearing in the muck pile.
23      MS. O'DELL:  Move to strike
24    as nonresponsive.

Page 320

1  BY MS. O'DELL:
2       Q.   Let me ask you this.  That
3  15,000 pounds of -- a bucket that can
4  hold 15,000 pounds is hardly a precise
5  instrument from which to identify certain
6  ore and remove only that ore for purposes
7  of cosmetic talc, true?
8       MR. CHACHKES:  Objection.
9       THE WITNESS:  That would
10    assume that you're always
11    completely filling the entire
12    bucket, which you may not do.
13 BY MS. O'DELL:
14      Q.   Let's say it's half,
15 7500 pounds, that's not a terribly
16 precise process by which to selectively
17 mine material, true?
18      MR. CHACHKES:  Objection.
19      MR. LOCKE:  Objection.
20      THE WITNESS:  You could fill
21    it with even less than that.
22 BY MS. O'DELL:
23      Q.   For purposes of selective
24 mining, impurities within talc ore may

Page 321

1  not be apparent to the operator who is
2  removing the material, true?
3       MR. FROST:  Objection.
4       THE WITNESS:  When you say
5     may not be apparent to the
6     operator?
7  BY MS. O'DELL:
8       Q.   Through visual inspection --
9       A.   And this --
10      Q.   -- of the material from the
11 seat of their particular machine.
12      MR. FROST:  Objection.
13      THE WITNESS:  And this would
14    assume that the operator is
15    incapable of asking for help in
16    identifying what's in the
17    material?
18 BY MS. O'DELL:
19      Q.   That's assuming that he or
20 she is not able to identify microscopic
21 amounts of impurities within talc rocks.
22      MR. FROST:  Objection.
23      THE WITNESS:  So by the
24    definition of microscopic

Mary Poulton, Ph.D.

Page 322

1    impurities, you're basically
2    saying nobody can identify this.
3  BY MS. O'DELL:
4      Q.   If there is tremolite within
5  a talc rock and -- and it's within that
6  rock, and it's 25 to 35 feet away from a
7  machine operator, more likely than not,
8  that is not going to be visible with the
9  naked eye, true?
10     MR. CHACHKES:  Objection.
11     THE WITNESS:  So I -- I am
12     struggling with sort of the -- the
13     logic of a single tremolite
14     crystal in a pile of rock.
15  BY MS. O'DELL:
16     Q.   I didn't say either of those
17  things.  I said within a rock that
18  microscopic amounts of tremolite are not
19  going to be visual -- visible to the
20  naked eye.
21        True?
22     A.   They may not be visible to
23  the naked eye, but surely they would have
24  been detected in the analysis of the rock

Page 323

1  in that vicinity.
2      Q.   Right.  Within -- within the
3  context of core holes driven -- drilled
4  anywhere from 100 to 500 feet apart,
5  fair?
6      A.   Well, the geologists are
7  also capable of taking samples from the
8  bench face.  So it's not solely drill
9  core.
10     Q.   Did you see data for samples
11  taken from the bench face?
12     A.   I saw reference to taking
13  grab samples from the bench face.
14     Q.   Did you see data?
15     A.   I don't know that I saw
16  assay data.
17     MS. O'DELL:  Let's take a
18     short break.
19     THE VIDEOGRAPHER:  All
20     right.  Stand by, please.  Remove
21     your microphones.  The time is
22     6:04 p.m.  Off the record.
23     (Short break.)
24     THE VIDEOGRAPHER:  We are

Page 324

1    back on the record.  The time is
2    6:37 p.m.
3  BY MS. O'DELL:
4      Q.   Dr. Poulton, following up on
5  the, sort of our discussion that we were
6  having before the break about selective
7  mining.
8          Would you agree with me that
9  excavator operators have an influence
10  over the material that is extracted and
11  mined as ore versus waste?
12     A.   When you say influence, what
13  do you mean?
14     Q.   They have an impact on the
15  decision of what is determined to be ore
16  versus waste.
17     A.   I would say that based on
18  the mine model, the geologic input, the
19  ore versus waste has multiple inputs.  I
20  would not say that the excavator operator
21  has necessarily a major influence.
22          But again the excavator
23  operator is probably the person that
24  looks most at the rocks.  So again, they

Page 325

1  execute decisions.  How much latitude
2  they have to make decisions, I think we
3  would have to know from mine managers
4  there.
5      Q.   And they would have an
6  influence on those decisions, true?
7      A.   Influence versus input
8  versus executing a decision, I don't
9  think that's something that I can say
10  from not knowing how they did their
11  day-to-day operations.
12     Q.   And so you cannot agree to
13  the word influence?
14     A.   I would not agree to the
15  word influence.
16     Q.   You cannot agree to the
17  statement that excavator operators have
18  influence on the degree of ore loss or
19  dilution?
20     A.   Influence over ore loss or
21  dilution.  To the extent that the
22  excavator operator is putting material in
23  trucks to go certain places.  Again, I
24  think I need to see some context for all

Mary Poulton, Ph.D.

Page 326

1   of this just to know what I'm answering.
2      Q.   Let me ask you to look at
3   what I'm going to mark as Exhibit 29.
4   This is a July 31, 2006 memo from Ed
5   McCarthy regarding Vermont market.
6      Do you see that?
7      A.   Yes.
8      (Document marked for
9      identification as Exhibit
10     Poulton-29.)
11  BY MS. O'DELL:
12     Q.   If you'll turn, please, to
13  Page 3 of this document.  You see a
14  caption reading "Present Situation."
15     Do you see that?
16     A.   I do.
17     Q.   And if you'll look at the
18  second sentence, it reads, "It's very
19  critical that care be exercised near the
20  limits of the talc zones as serpentine
21  and arsenic are commonly found there.  In
22  theory that ore is segregated by talc
23  content, color, and arsenic content at
24  the mine face, but in actuality, mine ore

Page 327

1   control is rudimentary and is generally
2   based on post-mill rather than drill hole
3   analysis."
4      Did I read that correctly?
5      A.   Yes.
6      MR. LOCKE:  Can I ask, is
7   this different from the exhibit
8   you previously --
9      MS. O'DELL:  Yes.
10     MR. LOCKE:  One is a
11  handwritten Bates?
12     MS. O'DELL:  It's a
13  different document, Tom.
14     MR. LOCKE:  I've got two
15  here that are on 730106.
16     MS. O'DELL:  I think -- I
17  think that they are different.
18  There is another memo that looks
19  very similar to this.  But it's --
20  it's different.
21  BY MS. O'DELL:
22     Q.   Let me ask you to look at
23  what I'm marking as Exhibit 30.
24     (Document marked for

Page 328

1   identification as Exhibit
2   Poulton-30.)
3      MS. O'DELL:  I'm one short
4   on this.  I'm sorry.
5      MR. CHACHKES:  That's fine.
6   Two is fine.
7   BY MS. O'DELL:
8      Q.   Do you see this,
9   Dr. Poulton?
10     A.   I see this image.
11     Q.   Can you identify the -- the
12  minerals in this image?
13     MR. FROST:  Objection.
14     THE WITNESS:  With no
15  context, no.
16  BY MS. O'DELL:
17     Q.   You cannot?
18     A.   I -- I don't have any
19  information on size.  I don't have any
20  information on hardness, specific
21  gravity.  I can't rotate it.  I can't use
22  a hand lens to look at it in detail.
23  I'm -- I'm basically just looking at a
24  color image.

Page 329

1      Q.   If I represent to you that
2   this is a photo of actinolite within
3   talc, would you disagree with that?
4      A.   I don't have any information
5   to agree or disagree with that.  I don't
6   know what this image is.
7      Q.   Cannot identify it?
8      MR. FROST:  Objection.
9      THE WITNESS:  I can't
10  identify from a picture when I
11  have no information.
12     (Document marked for
13     identification as Exhibit
14     Poulton-31.)
15  BY MS. O'DELL:
16     Q.   Let me show you what I'm
17  marking as Exhibit 31.  See the caption
18  on this figure, "Large mass,
19  approximately 15 centimeters across of
20  actinolite in talc from the Argonaut
21  quarry.  Ludlow, Vermont."
22     Do you see that?
23     A.   I see the caption.
24     Q.   Do you -- do you have any

Mary Boulton, Ph.D.

Page 330

1 basis for disagreeing with that
2 identification?
3          MR. FROST:  Objection.
4          THE WITNESS:  I don't know
5     what this figure is from.  I don't
6     know who has identified it.  So
7     again, I -- it's not something I
8     can touch and see.
9 BY MS. O'DELL:
10     Q.   Have you any basis to
11 disagree with that caption?
12     A.   Again, I don't know where
13 it's from.  I don't have any information.
14     Q.   The -- well, you do have
15 information on page -- or on Exhibit 31,
16 don't you?
17          MR. FROST: Objection.
18          THE WITNESS:  Well, I -- I
19     see a figure caption here.  Again,
20     I don't know who has identified
21     it.  I don't know where this has
22     come from.  So I --
23 BY MS. O'DELL:
24     Q.   You just --

Page 331

1     A.   I don't know how I can
2 identify something with no information.
3     Q.   But you have information
4 that's provided in caption -- on -- the
5 caption on Exhibit 31, true?
6          MR. FROST: Objection.
7          THE WITNESS:  Again, I don't
8     know where this caption has come
9     from.  I don't know where the
10    picture has come from.  I don't
11    know what the document is.
12 BY MS. O'DELL:
13     Q.   And with the information
14 provided on Exhibit 35 -- 31, you are
15 unable to identify that -- what that rock
16 is or state the reasons why it's not
17 actinolite in talc?
18          MR. CHACHKES: Objection.
19          MR. FROST:  Objection.
20 BY MS. O'DELL:
21     Q.   True?
22     A.   I've already stated that I
23 can't touch it.  I can't take
24 measurements on it.  I can't confirm the

Page 332

1 identification.
2     Q.   And you would need to touch
3 it in order to identify the mineral?
4          MR. LOCKE:  Objection.
5          THE WITNESS:  I -- I would
6     need to be to make measurements on
7     it.
8 BY MS. O'DELL:
9     Q.   Let me ask you to turn to
10 Page 25 your report.  And you have it in
11 front of you?
12     A.   Yes.
13     Q.   And are you looking at
14 the -- you're -- you're looking at your
15 copy, not the marked copy of the report,
16 correct?
17     A.   It's the copy in this
18 binder.
19     Q.   Okay.  I'm going to ask you
20 to pull out from your stack the copy of
21 the report that I marked because I want
22 you to draw on it.  It should be --
23          MR. CHACHKES:  I think
24     Number 1 or 2.

Page 333

1 BY MS. O'DELL:
2     Q.   I think it's Number 2.  It
3 should be on the bottom.
4     A.   My report?
5     Q.   Correct.
6     A.   This one?
7     Q.   Yes.  All right.  If you'll
8 turn to Page 25.  Are you -- are you
9 there?
10    A.   I am.
11    Q.   You write, "Notice the color
12 change to distinguish the ore from waste
13 is easily discernable."
14          Do you see that?
15    A.   And we are on Page 25?
16    Q.   Correct.
17    A.   I say, "Close-up of the
18 lamprophyre dikes.  Notice the boundaries
19 are sharp and it is easy to segregate
20 this material during selective mining."
21    Q.   I think if you'll look on
22 Figure 6 that you write, "Notice the
23 color change to distinguish the ore from
24 waste is easily discernable."

Mary Boulton, Ph.D.

Page 334

1    Do you see that?
2    A.   Yes.
3    Q.   Where is -- I'd like for you
4  to identify the area of ore in this
5  photo.
6    A.   So I'm denoting that there
7  is a color change, and based on the
8  document that I -- I took this from, have
9  denoted that -- that the light material
10 is different than the dark material.
11   Q.   I would like for you to
12 draw.  If you don't -- you're welcome to
13 use my pen or somebody else's pen, what
14 you identify as ore versus waste.
15   A.   Well, I can -- I can mark
16 where we have the fault in that material
17 as waste.
18       To -- to go beyond that with
19 a photograph, I think is -- is difficult
20 to do without more context.
21   Q.   Can you identify the ore in
22 that photograph, yes or no?
23   A.   I would say that it would be
24 difficult again without having more

Page 335

1  information.
2    Q.   So you cannot, as you're
3  sitting here today, identify the ore
4  that's present in that photograph, true?
5    MR. CHACHKES:  Objection.
6    THE WITNESS:  I would say
7  again, I would want to have more
8  information before I marked on it.
9  BY MS. O'DELL:
10   Q.   So based on the information
11 you have today, and based on the
12 materials you reviewed, you're unable to
13 identify the ore that's depicted in that
14 photograph, true?
15   MR. CHACHKES:  Objection.
16   THE WITNESS:  I wouldn't say
17 that I'm unable.  I would say that
18 I would want to make sure that I
19 did it carefully with more
20 information.
21 BY MS. O'DELL:
22   Q.   And you're not able to do
23 that as we sit here in the deposition
24 today, correct?

Page 336

1    MR. CHACHKES:  Objection.
2    THE WITNESS:  At this moment
3  in time.
4  BY MS. O'DELL:
5    Q.   If you'll look in your
6  stack, please, Dr. Poulton, for
7  Exhibit 28, which is the 2008 annual
8  report for mineral resources and ore
9  reserves.  Do you have that in front of
10 you?
11   A.   28?
12   Q.   Yes.
13   A.   Yes.
14   Q.   Great.  If you'll turn to
15 Page 16 of the document.  Are you there?
16   A.   I am on Page 16.
17   Q.   Okay.  Top of the page,
18 Doctor, it reads, "Only limited blast
19 hole data was utilized in the
20 construction of the geologic polygons
21 primarily due to the lack of quality
22 control on the blast hole database."
23       Do you see that?
24   A.   I see that paragraph.

Page 337

1    Q.   It says, "The blast hole
2  data could not be confirmed reliable,
3  therefore, was used sparing" --
4  "sparingly."
5    Do you see that?
6    A.   I see that sentence.
7    Q.   And to the degree that blast
8  hole data is something that is typically
9  relied on, Imerys determined that the
10 data they had was not reliable for
11 purposes of the computer model that was
12 being created for Argonaut, fair?
13   A.   Possibly.
14   Q.   It's what the document says?
15   A.   Well, again the -- the blast
16 hole data can be used to inform the
17 mining that you're doing and that
18 information can also go into the geologic
19 and computer model.  So it's not just
20 drill hole data that informs these
21 computer models.  There's other geologic
22 information that informs these models.
23   Q.   So blast hole data, however,
24 was determined to be unreliable by the

Mary Roulton, Ph.D.

Page 338

1 individuals who wrote this annual report,
2 correct?
3         MR. CHACHKES:  Objection.
4         THE WITNESS:  So again we
5    have to look at the context of
6    where this paragraph comes from
7    and what they are attempting to do
8    with that particular blast hole
9    data.
10 BY MS. O'DELL:
11    Q.   Certainly what they --
12 certainly what they stated, correct?
13    A.   Not necessarily.  Again, we
14 have to look at the full context of
15 what's being stated, not just a paragraph
16 without any context.
17    Q.   That's what that paragraph
18 stated, correct?
19    A.   Again, I would say context
20 is very important to understand what's
21 being said.
22    Q.   Yes or no?
23    A.   I don't think I can say yes
24 or no to a question that requires

Page 339

1 context.
2    Q.   And I don't think this
3 requires context.  That's what that
4 paragraph stated, correct?
5         MR. FROST:  Objection.
6         THE WITNESS:  No.  I would
7    say based on my background, you do
8    need context.
9 BY MS. O'DELL:
10    Q.   I'm not asking you about
11 your background to be, you know,
12 respectful, Doctor.
13         I'm just asking if the
14 statement in the report was that they
15 could not confirm the reliability of the
16 blast hole data, that's what it says.
17    A.   That's what it says, but
18 it's what it says in the context of other
19 things that matters.
20    Q.   You were asked -- strike
21 that.  Let me start this way.
22         You cite in your report, I
23 believe it's the -- the Noakes 2005.  Let
24 me turn to it on Page 5 of your report.

Page 340

1 It's one of your references.
2         So Page 5 of your report.
3 Let's see.  Noakes 2005.
4         Do you see that?
5    A.   Yes.
6    Q.   And you give an example
7 regarding the Three Springs talc mine in
8 Australia?
9    A.   Yes.
10    Q.   Three Springs is not a
11 cosmetic talc mine, true?
12    A.   That's my understanding.
13    Q.   It's a mine for industrial
14 talc, correct?
15    A.   That's my understanding.
16    Q.   You cite Birkhimer on
17 Page 30 of your report, and you cite
18 Birkhimer in the last paragraph, and you
19 are talking about hydraulic excavators.
20         And you say, "Birkhimer
21 notes that hydraulic excavators can
22 selectively mine layers or pockets of
23 material."
24         Do you see that?

Page 341

1    A.   Yes.
2    Q.   Birkhimer, first, is there,
3 you know, any designation to the size of
4 the equipment in relation to what was
5 used at the Argonaut mine?
6         Let me strike that.  Start
7 again.
8         Is there any designation of
9 the size of equipment that is being
10 referred to in Birkhimer as compared to
11 the equipment that was used at Argonaut?
12    A.   Could I look at Birkhimer
13 again?
14    Q.   Sure.  In fact, let me just
15 ask you to look on the screen here so we
16 can both look.
17         This is Birkhimer.  Do you
18 see that?  Do you recognize that?
19    A.   I believe so.
20         MR. CHACHKES:  Objection.
21         This is a page from Birkhimer.
22 BY MS. O'DELL:
23    Q.   Did you rely on anything
24 else in reaching your opinions in the

Mary Boulton, Ph.D.

Page 342

1  Birkhimer article?
2      A.   I was focused on hydraulic
3  excavators as opposed to other kinds of
4  equipment.
5      Q.   And -- and this is the page
6  that you relied on, fair?
7      A.   Yes.
8      Q.   Is -- does this refer in any
9  way to talc mining?
10     A.   It does not refer to any
11 particular kind of mining if memory
12 serves me.
13     Q.   Is there any designation of
14 the size of the equipment that's being
15 used and the precision of its ability to
16 selectively mine?
17     A.   In this table it's just
18 comparing three different kinds of
19 loading tools.
20     Q.   Do you have any information
21 that would allow you to apply the data
22 contained in this table to the equipment
23 that was used at Argonaut?
24     A.   The fact that it's a

Page 343

1  hydraulic excavator and not an electric
2  cable shovel would be an example.
3      Q.   And that's the only thing,
4  in terms of size of bucket, size of
5  machinery, you don't have any of that
6  data?
7      A.   It is the type of equipment
8  that Birkhimer is referring to.
9      Q.   And when you say, talking
10 about hydraulic excavators, you are
11 talking about excavators that are
12 typically used in an open pit situation
13 as opposed to a underground mine
14 situation?
15     A.   I'm sorry?
16     Q.   As opposed to an underground
17 mine situation?
18     A.   So you're asking --
19     Q.   You're talk -- when you say
20 a hydraulic excavator, you are talking
21 about something that's typically used in
22 an open pit?
23     A.   Correct.
24     Q.   And, in fact, those types of

Page 344

1  excavators are depicted in some of the
2  photos in your report, hydraulic
3  excavators?
4      A.   Yes.
5      Q.   You were -- I asked you
6  earlier about -- we had a discussion
7  earlier about some depositions that are
8  on your reliance list.
9          You also list in addition to
10 Dr. Hopkins' deposition, Alice Blount's
11 deposition.
12     A.   Yes.
13     Q.   Did -- were you provided the
14 entire deposition of Dr. Blount?
15     A.   I believe I have the entire
16 deposition.
17     Q.   Did you read that
18 deposition?
19     A.   I skimmed it.
20     Q.   Did you rely on it in
21 reaching your opinions in this case?
22     A.   No.
23     Q.   Were you provided the
24 deposition of Pat Downey?

Page 345

1      A.   Yes.
2      Q.   How much of that deposition
3  were you provided?
4      A.   I believe I have the entire
5  deposition.
6      Q.   Were you provided the
7  deposition of -- of Donald Hicks?
8      A.   I believe I have one page.
9      Q.   And were you provided the
10 depositions of Dr. Krekeler and Dr. Cook?
11     A.   Yes.
12     Q.   Were you provided those
13 depositions in their entirety?
14     A.   I believe so.
15     Q.   You cited the -- the Miller
16 article.  We talked about that earlier.
17 The -- the reference that was authored by
18 Roger Miller.  Do you recall that?
19     A.   Is that -- can you give me
20 the reference again?
21     Q.   It's Miller.
22     A.   Okay.  In?
23     Q.   Do you recall us looking at
24 that earlier?

Mary Poulton, Ph.D.

Page 346

1    A.   Perhaps.
2    Q.   If you'll recall, and I'll
3  just put it under -- we marked as an
4  exhibit, this was entitled "Talc mining
5  in Vermont:  The application of
6  continuous machines."  Roger Miller?
7    A.   Yes.
8    Q.   It is a presentation at a
9  fall meeting in October of 1984, correct?
10   A.   So it was presented at the
11 fall meeting.  I believe there's -- he
12 submitted a preprint for this meeting.
13   Q.   And this is not a
14 peer-reviewed publication, correct?
15   A.   I believe SME preprints
16 quite often are peer reviewed.  I would
17 have to confirm that for that particular
18 time period.
19   Q.   Do -- you don't have -- as
20 you're sitting here today, you don't know
21 if a presentation in 1984 was peer
22 reviewed, correct?
23   A.   Well, it's written as a
24 paper.  The presentation would be slides.

Page 347

1  So he's -- he's written the paper, he
2  gives a presentation based on the paper.
3  So I wouldn't characterize his paper as a
4  presentation.  It was a paper that was
5  presented.
6    Q.   That's what the document
7  says, it was a presentation, correct?
8    A.   Well, that means he
9  presented the content of the paper at the
10 meeting.
11   Q.   And -- and it's your
12 testimony under oath that he would have
13 had slides in 1984 for a presentation to
14 the Society of Mining Engineers in
15 Colorado?
16   A.   Well, in 1984 I was using
17 slides to give presentations,
18 35-millimeter slides.
19   Q.   Yeah.  Not -- well,
20 35-millimeter maybe, but not PowerPoint
21 slides?
22   A.   Oh heavens no.  No, but
23 we -- we took --
24   Q.   Correct.  So let's be clear.

Page 348

1    A.   We -- we took 35-millimeter
2  photographs and used slide carousels.
3    Q.   Do you have any -- any
4  information as you are sitting here today
5  that that was a peer-reviewed
6  publication?
7    A.   I don't for that particular
8  time with SME.
9        MS. O'DELL:  Let's go off
10 the record.
11       THE VIDEOGRAPHER:  Sure.
12 The time is 7:03 p.m.  Off the
13 record.
14       (Short break.)
15       THE VIDEOGRAPHER:  We are
16 back on the record.  The time is
17 7:23 p.m.
18 BY MS. O'DELL:
19   Q.   For the record, I've marked
20 as Exhibit 32 a group of binders, I think
21 it's six -- five binders brought to the
22 deposition which I understand are
23 Dr. Poulton's reliance materials in terms
24 of the Bates documents that she was

Page 349

1  provided.  That's Exhibit 32.
2        (Document marked for
3  identification as Exhibit
4  Poulton-32.)
5        MS. O'DELL:  Exhibit 33 --
6        MR. CHACHKES:  Exhibit 32,
7  I'll have to double-check exactly
8  what they are.  So if they were
9  sent to me I haven't reviewed
10 them.  I think that's what they
11 are, so --
12       MS. O'DELL:  Well, I'll
13 identify, just they are Imerys
14 Volumes 1 through 3 and J&J
15 Reliance Materials 1 and 2.
16       MR. CHACHKES:  Right.
17 That's what the legal assistant
18 put on the spine.
19       MR. FROST:  I was going to
20 say.  Leigh, the other thing I
21 want to put on the record, it
22 might not be a complete collection
23 of all the reliance materials.
24 But it is certainly what we

Mary Poulton, Ph.D.

Page 350

```
1    brought with us today to the
2    deposition.
3         MS. O'DELL:  To -- in terms
4    of the reliance list that was
5    provided to us listing Bates
6    numbers, is it -- is it -- are
7    y'all representing that that's a
8    different group of documents than
9    what's being disclosed?
10        MR. CHACHKES:  No, what I'm
11   saying is I don't know.  And we
12   can -- we can talk later about
13   exactly what it is.  It's just
14   what my paralegal gave me and
15   that's all I can tell you right
16   now.
17        MR. FROST:  I will say it
18   shouldn't be.
19        MS. O'DELL:  I understand
20   that's what you're saying, and
21   that doesn't comfort me a whole
22   lot.  But I understand.
23        (Document marked for
24   identification as Exhibit
```

Page 351

```
1    Poulton-33.)
2    BY MS. O'DELL:
3         Q.   Okay.  Let me show you what
4    I'm marking as Exhibit Number 33 which is
5    a supplemental reliance list.  And it
6    lists the reports of Wiley, Webb and
7    Dyar.
8         Have you reviewed those?
9         A.   Yes.
10        Q.   In addition, there are some
11   invoices that follow the supplemental
12   reliance list.  And are those all the
13   invoices that you have produced in this
14   case?
15        A.   So far.  I still have other
16   invoices to produce.
17        Q.   In addition to the hours
18   depicted in these two invoices, how many
19   hours have you spent working on this
20   case?
21        A.   I have not added up February
22   and March to date.
23        Q.   Can you give me an
24   approximation?
```

Page 352

```
1         A.   I don't know that I can
2    ballpark it very accurately.
3         Q.   Is it more than 50 hours or
4    less than 50 hours?
5         A.   I would estimate more than
6    50.
7         Q.   More than 100 hours or less
8    than 100 hours?
9         A.   That I don't know.
10        Q.   Is it between 50 and
11   100 hours to the best of your knowledge?
12        MR. CHACHKES:  Objection.
13        THE WITNESS:  Possibly.  I
14   don't know.
15   BY MS. O'DELL:
16        Q.   And your retention with
17   counsel for J&J was December the 19th,
18   2018, correct?
19        A.   That is the date, yes.
20        Q.   And that's the date you
21   agreed to serve as an expert?
22        A.   Yes.
23        MS. O'DELL:  I have nothing
24   further.
```

Page 353

```
1         MR. CHACHKES:  Let's go off
2    the record.  And then we might
3    have a little bit of redirect.
4    Maybe not.  Okay.  Give us a few
5    minutes.
6         THE VIDEOGRAPHER:  The time
7    is 7:26 p.m.  Off the record.
8         (Short break.)
9         THE VIDEOGRAPHER:  We are
10   back on the record.  The time is
11   7:40 p.m.
12        - - -
13        EXAMINATION
14        - - -
15   BY MR. CHACHKES:
16        Q.   Professor Poulton, you were
17   asked --
18        THE VIDEOGRAPHER:
19   Counselor, your microphone is not
20   on.
21   BY MR. CHACHKES:
22        Q.   Professor Poulton, you were
23   asked questions about working with
24   industry for mineral exploration mine
```

Mary Boulton, Ph.D.

Page 354

1 design, through that process.  Do you
2 remember that?
3     A.   I do.
4     Q.    What about otherwise, you
5 were asked very specifically about
6 directly with industry, I think
7 consulting directly for them.
8         What about otherwise?
9     A.   So rather than going outside
10 the university and doing consulting, we
11 actually brought the consulting projects
12 into our classes, and into our student
13 projects.  So that way the students would
14 learn and the students would benefit and
15 it gave the faculty the opportunity to
16 work together on a wide range of
17 different kinds of projects.
18         So as one example, we have a
19 field methods in geophysical exploration
20 and we would have a company basically be
21 the client for that class and we would
22 design geophysical surveys with the
23 class.  We would go out and collect the
24 data.  Process the data, produce the

Page 355

1 reports, work with the company,
2 geologists, and geophysicists on overall
3 interpretation, and choose bore hole
4 selections where appropriate.  That is
5 one example.
6         Another example is we would
7 do rock mechanics testing for mines.  And
8 we would have those samples in our
9 geomechanics laboratory.  So the students
10 had the opportunity to work with real
11 samples and collect the data, write the
12 reports, and work alongside the company
13 on what those test results meant and were
14 being used for.  Those are two examples.
15     Q.   You talked a little bit
16 about the possibility that material from
17 outside the talc body might be mined.  Do
18 you recall that?
19         MS. O'DELL:  Object to the
20     form.
21         THE WITNESS:  I do.
22 BY MR. CHACHKES:
23     Q.   Okay.  Based on your review
24 of the documents in this case and your

Page 356

1 experience, what's your opinion on what
2 happened in practice for the mines that
3 J&J sourced its cosmetic talc from?
4         MS. O'DELL:  Object to the
5     form.
6         THE WITNESS:  So there --
7     there are two things you do.  One
8     is you leave a buffer zone when
9     you have to be careful about
10     inclusion of undesirable rocks in
11     your process stream.
12         The other thing with
13     underground mining is you need to
14     leave some supporting rocks
15     because you're -- you're mining
16     out holes and you don't have
17     support for the rock over your
18     head.
19         So quite frequently you will
20     leave the undesirable rock behind
21     as your support.
22 BY MR. CHACHKES:
23     Q.   Okay.  You recall the charts
24 in the Cook and Krekeler reports that

Page 357

1 they list documents to support their
2 opinions about testing results?
3     A.   Yes.
4         MS. O'DELL:  Object to the
5     form.
6 BY MR. CHACHKES:
7     Q.   If you in your rebuttal did
8 not mention a document in one of those
9 charts, to what degree does that mean you
10 agreed with their take on the document?
11         MS. O'DELL:  Object to the
12     form.
13         THE WITNESS:  It does not
14     mean that I agreed with their
15     conclusions.  It -- it simply
16     means that that wasn't one of the
17     documents I selected to examine.
18 BY MR. CHACHKES:
19     Q.   And you were asked a lot of
20 questions about general principles in
21 mining.  To what degree are there any --
22 are any of those general principles
23 applicable to a specific mine?
24         MS. O'DELL:  Object to the

Mary Boulton, Ph.D.

Page 358

1  form.
2      THE WITNESS: So you -- you
3  take those general principles and
4  then you look at the context of
5  your specific mining situation and
6  determine how you modify those
7  general principles. So every mine
8  has potentially unique situations
9  that you have to take into
10  account.
11  BY MR. CHACHKES:
12      Q.  What is your understanding
13  of the conclusion of Pooley's testing in
14  Italy?
15      A.  So my understanding of
16  Pooley's testimony, and it's a direct
17  quote from his report, "No amphibole or
18  chrysotile material was detected in any
19  of the numerous powders examined."
20      MS. O'DELL: Where -- excuse
21  me. Doctor, if you don't mind, if
22  you're quoting that, would you
23  just tell me what page you are on?
24      THE WITNESS: 7 of my

Page 359

1  report.
2      MS. O'DELL: What's the page
3  on the Pooley document?
4      THE WITNESS: I have the
5  quote in the J&J number, I don't
6  have the specific page number.
7      MR. CHACHKES: Okay. So no
8  further questions.
9      MS. O'DELL: Okay. I have a
10  few questions.
11          - - -
12      EXAMINATION
13          - - -
14  BY MS. O'DELL:
15      Q.  You mentioned the Pooley
16  report. What page were you referring to?
17      A.  We could open up the Pooley
18  report and find the exact page number.
19      Q.  No. You're -- you
20  mentioned -- you quoted from your report,
21  correct?
22      A.  Yes.
23      Q.  And what -- what was the
24  specific quote you were reading?

Page 360

1      A.  So I was reading a quote
2  from Pooley's report.
3      Q.  What page of your report?
4      A.  Of my report is Page 7.
5      Q.  Page 7. And just so I
6  can -- can follow. Did you read a
7  portion of the quote that appears at the
8  top of Page 7?
9      A.  Yes.
10      Q.  If you'll go to Exhibit 8,
11  which is the Pooley report. Exhibit 8.
12      Are you there?
13      A.  I have Exhibit 8.
14      Q.  And if you'll turn to the
15  last page of the exhibit. When you --
16  the quote in your report actually leaves
17  out some sentences on this page.
18      You -- you state in your
19  report, "Particles formed from the
20  amphibole mineral found at the mine were
21  hardly fibers of character, and the
22  majority of the tremolite breaking to
23  give compact particles."
24      And then you don't quote the

Page 361

1  next sentence: "Those" -- "those fibers
2  formed were short and had a very large
3  diameter with" -- "when compared to
4  commercial varieties of asbestos."
5      Did I read that directly?
6      MR. FROST: Objection.
7      THE WITNESS: I haven't
8  found where you are exactly.
9  BY MS. O'DELL:
10      Q.  The last page of the report.
11  Are you there?
12      A.  I see the last page.
13      Q.  And it's Bates Number 475?
14      A.  475.
15      Q.  And you quoted in your
16  report from the second paragraph at the
17  end, correct?
18      A.  Yes.
19      Q.  And Dr. Pooley noted that
20  there were fibers within the talc,
21  correct?
22      MR. LOCKE: Objection to
23  form.
24      THE WITNESS: So those

Mary Boulton, Ph.D.

Page 362

1  fibers are not asbestos.  They are
2  not identified as asbestos.
3  BY MS. O'DELL:
4      Q.    Then he goes on to say, "The
5  Italian talc" -- this is the next
6  paragraph.
7          "The Italian talc contains
8  observable quantities of chlorite and
9  carbonate minerals and could contain any
10  one of the following minerals in minor
11  amounts," and he includes in that
12  tremolite, correct?
13      A.    And tremolite is not
14  asbestos.
15      Q.    It can be asbestos, correct?
16      MR. FROST:  Objection to
17  form.
18      MR. CHACHKES:  Objection.
19      THE WITNESS:  That's not
20  what's stated here.
21  BY MS. O'DELL:
22      Q.    Tremolite can be asbestiform
23  or non-asbestiform, correct?
24          Is that a true statement?

Page 363

1      A.    Tremolite asbestos is the
2  asbestos mineral.
3      Q.    That's not what I asked you.
4  I asked you if tremolite can occur in
5  non-asbestiform and an asbestiform habit,
6  true?
7      A.    So -- so --
8      Q.    Is that true?
9      A.    -- tremolite --
10      Q.    Is that true, ma'am?
11      A.    -- can be --
12      MR. CHACHKES:  Please don't
13  badger the witness.  Let her
14  answer.
15      MS. O'DELL:  She needs to
16  answer my question.  I just asked
17  her a simple question that's
18  noncontroversial --
19      MR. CHACHKES:  So let her --
20  let her answer, please.
21      MR. LOCKE:  Just for the
22  record, we're over the time --
23      MR. CHACHKES:  Yeah.
24      MR. LOCKE:  -- that was

Page 364

1  spent for --
2      MS. O'DELL:  I had
3  14 minutes left, Tom.
4      MR. LOCKE:  Yeah, I think
5  based on the way you did timing
6  for the prior depositions, I think
7  we're already over.
8      MS. O'DELL:  No, I don't --
9  I -- I disagree with that.
10  BY MS. O'DELL:
11      Q.    Ma'am, do you remember my
12  question?
13      A.    So tremolite asbestos is not
14  the same as tremolite.
15      Q.    Tremolite can occur as a
16  non-asbestiform mineral and also an
17  asbestiform mineral, true?
18      A.    So tremolite asbestos is not
19  tremolite.
20      MR. CHACHKES:  Okay.  So by
21  the way, this -- let's go off the
22  record just for a moment.  Because
23  it's my understanding that you --
24  y'all in your depositions limited

Page 365

1  our redirect -- our recross to the
2  time of redirect without regard to
3  the amount of time that was
4  leftover from the --
5      MS. O'DELL:  That -- that's
6  not --
7      MR. LOCKE:  True.
8      MR. CHACHKES:  That is true.
9      MS. O'DELL:  Jack, you know
10  that's not true.  That is
11  absolutely not true.  That we
12  allowed the time that remained was
13  added to your redirect, any
14  additional --
15      MR. CHACHKES:  That's why I
16  wanted to go off the record.  Let
17  me just clarify --
18      THE VIDEOGRAPHER:  Yeah,
19  we're still on the record, so --
20      MR. CHACHKES:  Yeah.
21      THE VIDEOGRAPHER:  You want
22  to go off?
23      MR. CHACHKES:  Yeah, let's
24  go off.  Just to make sure because

Mary Boulton, Ph.D.

Page 366

1  this is an important point, right?
2       MS. O'DELL: We're off the
3  record?
4       THE VIDEOGRAPHER: The time
5  is 7:50 p.m. We're off the
6  record.
7       (Brief pause.)
8       THE VIDEOGRAPHER: We are
9  back on the record. The time is
10 7:53 p.m.
11 BY MS. O'DELL:
12      Q.   You talked about with
13 counsel for J&J classes. I think you
14 mentioned field methods was one class
15 where there was some engagement with
16 industry and students worked on projects
17 that involved geophysical exploration,
18 surveys, et cetera.
19      Do you call -- recall that?
20      A.   That was one example.
21      Q.   And did any of those
22 projects involve talc mines?
23      A.   No.
24      Q.   You also mentioned a class

Page 367

1  involving rock mechanic testing in a lab.
2       A.   Yes.
3       Q.   Did that type of testing
4  that was done in that lab involve TEM?
5       A.   TEM is not a rock mechanics
6  instrument.
7       Q.   I would -- what is rock
8  mechanics, just to make sure I
9  understand?
10      A.   Rock mechanics is the
11 engineering strength of rocks.
12      Q.   So tensile strength?
13      A.   Compressive strength,
14 tensile strength.
15      Q.   Any evaluation by
16 microscopy?
17      A.   I don't believe so for
18 undergraduate testing.
19      (Document marked for
20 identification as Exhibit
21 Poulton-34.)
22 BY MS. O'DELL:
23      Q.   Let me show you what I've
24 marked as Exhibit 34. It's something

Page 368

1  that was in the binders that were
2  prepared for you. It's a printout from a
3  website that you referenced in your
4  reliance materials. I think it's called
5  OneMine.org?
6       A.   Yes.
7       Q.   And is that the web page
8  which you relied on in reaching your
9  opinions in this case?
10      MR. CHACHKES: Objection.
11      THE WITNESS: I used this
12      website to search for documents.
13 BY MS. O'DELL:
14      Q.   Is that the page that --
15 that -- does that page reflect data that
16 you reviewed and relied on in reaching
17 your opinions?
18      MR. CHACHKES: Objection.
19      THE WITNESS: This page is a
20      search box.
21 BY MS. O'DELL:
22      Q.   What searches did you
23 perform using OneMine.org?
24      A.   So I searched for talc. I

Page 369

1  searched for sampling. I believe I
2  searched for asbestos.
3       Q.   Any other searches?
4       A.   Possibly. I don't remember.
5       Q.   You also testified
6  regarding -- I think you used the -- the
7  term "buffer."
8       You were asked the question:
9  "Based on your review of the documents in
10 this case and your experience, what's
11 your opinion on what happened in practice
12 for the mines that sourced -- that J&J
13 sourced its cosmetic talc from?"
14      Do you remember that
15 question?
16      A.   Is that a question that Alex
17 asked?
18      Q.   Correct.
19      A.   Okay.
20      Q.   And -- and you testified
21 that -- about a buffer zone that was left
22 in the mining process used to source J&J
23 talc.
24      What data are you relying on

Mary Poulton, Ph.D.

Page 370

1  regarding the use of a buffer zone?

2      A.   So can you read the exact

3  question?

4      Q.   "Based on your review of the

5  documents in this case and your

6  experience, what's your opinion on what

7  happened in practice for the mines that

8  J&J sourced its cosmetic talc from?"

9          And I want to know -- you

10  testified to a buffer zone, and I want to

11  know what you're relying on to state that

12  there was a buffer zone used.

13     A.   So I believe in reading

14  through the documents, they talked about

15  staying away from the black wall and

16  using that as the boundary.  And they

17  also talked about leaving rock behind for

18  support.

19     Q.   And that was in underground

20  mines?

21     A.   Underground.

22         MS. O'DELL:  Okay.  I have

23  nothing further.  Thank you.

24         THE VIDEOGRAPHER:  This

Page 371

1  marks the end of today's

2  deposition.  The time is 7:58 p.m.

3      (Excused.)

4      (Deposition concluded at

5  approximately 7:58 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Page 372

1

2          CERTIFICATE

3

4

5      I HEREBY CERTIFY that the
   witness was duly sworn by me and that the
6  deposition is a true record of the
   testimony given by the witness.

7

       It was requested before
8  completion of the deposition that the
   witness, MARY POULTON, Ph.D., have the
9  opportunity to read and sign the
   deposition transcript.

10

11

12

       _____
       MICHELLE L. GRAY,
13     A Registered Professional
       Reporter, Certified Shorthand
14     Reporter, Certified Realtime
       Reporter and Notary Public
15     Dated:  March 19, 2019

16

17

18     (The foregoing certification
19  of this transcript does not apply to any
20  reproduction of the same by any means,
21  unless under the direct control and/or
22  supervision of the certifying reporter.)

23

24

Page 373

1      INSTRUCTIONS TO WITNESS

2

3      Please read your deposition

4  over carefully and make any necessary

5  corrections.  You should state the reason

6  in the appropriate space on the errata

7  sheet for any corrections that are made.

8      After doing so, please sign

9  the errata sheet and date it.

10     You are signing same subject

11  to the changes you have noted on the

12  errata sheet, which will be attached to

13  your deposition.

14     It is imperative that you

15  return the original errata sheet to the

16  deposing attorney within thirty (30) days

17  of receipt of the deposition transcript

18  by you.  If you fail to do so, the

19  deposition transcript may be deemed to be

20  accurate and may be used in court.

21

22

23

24

Mary Poulton, Ph.D.

Page 374

```
 1          - - - - - -
             E R R A T A
 2          - - - - - -

 3

 4  PAGE  LINE  CHANGE
 5  _____  _____
 6     REASON:  _____
 7  _____  _____
 8     REASON:  _____
 9  _____  _____
10     REASON:  _____
11  _____  _____
12     REASON:  _____
13  _____  _____
14     REASON:  _____
15  _____  _____
16     REASON:  _____
17  _____  _____
18     REASON:  _____
19  _____  _____
20     REASON:  _____
21  _____  _____
22     REASON:  _____
23  _____  _____
24     REASON:  _____
```

Page 376

```
 1          LAWYER'S NOTES
 2  PAGE  LINE
 3  _____  _____  _____
 4  _____  _____  _____
 5  _____  _____  _____
 6  _____  _____  _____
 7  _____  _____  _____
 8  _____  _____  _____
 9  _____  _____  _____
10  _____  _____  _____
11  _____  _____  _____
12  _____  _____  _____
13  _____  _____  _____
14  _____  _____  _____
15  _____  _____  _____
16  _____  _____  _____
17  _____  _____  _____
18  _____  _____  _____
19  _____  _____  _____
20  _____  _____  _____
21  _____  _____  _____
22  _____  _____  _____
23  _____  _____  _____
24  _____  _____  _____
```

Page 375

```
 1
 2      ACKNOWLEDGMENT OF DEPONENT
 3
 4       I,_____, do
 5  hereby certify that I have read the
 6  foregoing pages, 1 - 376, and that the
 7  same is a correct transcription of the
 8  answers given by me to the questions
 9  therein propounded, except for the
10  corrections or changes in form or
11  substance, if any, noted in the attached
12  Errata Sheet.
13
14
15  _____
16  MARY POULTON, Ph.D.        DATE
17
18
19  Subscribed and sworn
    to before me this
20  _____ day of _____, 20____.
21  My commission expires:_____
22

    _____
23  Notary Public
24
```