# Exhibit C

**DrinkerBiddle&Reath**
LLP

Susan M. Sharko
973-549-7350 Direct
973-360-9831 Fax
Susan.Sharko@dbr.com

Law Offices
600 Campus Drive
Florham Park, NJ
07932-1047

973-549-7000
973-360-9831 fax
www.drinkerbiddle.com

A Delaware Limited
Liability Partnership

CALIFORNIA
DELAWARE
ILLINOIS
LONDON
NEW JERSEY
NEW YORK
PENNSYLVANIA
TEXAS
WASHINGTON D.C.

January 25, 2019

**VIA ELECTRONIC MAIL**

Hon. Joel A. Pisano (Ret.)
Walsh Pizzi O'Reilly Falanga
1037 Raymond Boulevard, Suite 600
Newark, NJ  07102

      Re:    In re: Johnson & Johnson Talcum Powder Products Marketing, Sales Practices and Products Liability Litigation, MDL No. 2728

Dear Judge Pisano:

I am writing to seek Your Honor's further assistance in connection with our request for documents from plaintiffs' expert Dr. Ghassan M. Saed, another expert who published an article to support plaintiffs' theories in this litigation without disclosing that his research was funded by plaintiffs' counsel.

In direct contravention of Your Honor's express order, plaintiffs failed to produce complete lab notebooks relevant to Dr. Saed's report in advance of his deposition. Instead, they produced substantial materials for the first time at the start of his deposition, affording us no time to review the materials or consult our experts and substantially prejudicing our ability to conduct a complete and fair deposition. In addition, plaintiffs refused to allow us to retain some of these materials in any form after the deposition, further prejudicing our ability to develop expert evidence that fully responds to Dr. Saed, as well as our ability to prepare for a continued deposition of Dr. Saed should one be permitted.

But that was not all plaintiffs failed to produce. At the deposition, it was revealed that Dr. Saed had submitted his manuscript to a journal that rejected it, but none of the documents related to his submissions to that journal were produced. Nor did he produce documents related to the journal that ultimately accepted his manuscript, or documents related to his abstracts that summarized the same underlying experiments. Further, Dr. Saed admitted that he drafted but did not produce a budget for his manuscript and/or the underlying experiments on which it is based; nor did he provide receipts or invoices related to that work.

Dr. Saed also admitted at his deposition that, like plaintiffs' expert Dr. Alan Campion, he failed to disclose in his publication that the experiments were paid for by plaintiffs' counsel.

Andrew B. Joseph
Partner responsible for
Florham Park Office

Established 1849

96722657.1

DrinkerBiddle&Reath
LLP

Hon. Joel A. Pisano (Ret.)
January 25, 2019
Page 2

And plaintiffs' counsel refused to produce communications with Dr. Saed concerning the article under the purported auspices of privilege even though no privilege log relating to such communications has ever been produced.

These developments concern critical testimony and evidence in this litigation. Plaintiffs have consistently touted the supposed importance of Dr. Saed's experiments – and at his deposition, Dr. Saed effectively declared that his plaintiff-sponsored research has effected a major breakthrough in ovarian cancer research. Moreover, several of plaintiffs' experts rely on Dr. Saed's experiments in support of their opinions.

As a result, and as further explained in this letter, we are seeking additional time to depose Dr. Saed and other relief, including the production of additional documents.

**Background and Impact of Failures to Produce**

    **A.**    **Lab Books**

As Your Honor is aware, we first sought assistance on issues relating to the production of documents related to experiments performed by Dr. Saed in connection with his work as an expert for plaintiffs in December. We served a notice of deposition and duces tecum on the PSC setting forth requests for documents and "data underlying the experiments described on pages 13 to 21" of Dr. Saed's expert report. (*See* Notice of Deposition & Duces Tecum at 3.)[1]

The experiments to which we referred included all of Dr. Saed's talcum powder experiments, which, according to his own report, related not only to Johnson's Baby Powder but also to talcum powder manufactured by Fisher Scientific. As Dr. Saed expressly put it on page 14 of his report: "Talcum powder (Fisher Scientific, Catalog #T4-500, Lot#166820) or Johnson's Baby Powder (Johnson & Johnson, #30027477, Lot#13717RA) was" treated and studied. (*See* Saed Rep. at 14.)

The J&J defendants' document requests expressly sought, among other things: "Results from any and all analytical assays performed on talcum powder samples to determine composition, including samples from *Fisher Scientific and* Johnson & Johnson"; a "list of *all* experimental studies performed"; "[e]xperimental outlines for all experimental studies performed"; a "specific protocol for each experiment performed," including details related to the "number and type of cells seeded in each experiment," the "amount

---

[1]    Defendants are ready and willing to submit any of the documents cited in this letter brief at Your Honor's request. In order to avoid barraging the Court with materials (some of which are very large files), defendants have only attached the rough draft of Dr. Saed's deposition transcript. We will forward a final transcript as soon as it is available.

96722657.1

DrinkerBiddle&Reath
LLP

Hon. Joel A. Pisano (Ret.)
January 25, 2019
Page 3

of time elapsed from the treatment of cells with talc or other agent," and the "duration of treatment with talc or other agents"; and "[c]opies of all laboratory notebook pages corresponding to the research referred to in pages 13-21 of the report." (Notice of Deposition & Duces Tecum at 3-4 (emphases added).)

As we subsequently summarized in our letter seeking an order compelling production of these documents in advance of Dr. Saed's deposition, we needed advance access to these documents because "Dr. Saed does not provide information regarding the outlines and protocols developed for the experiment, or the existence of any other related experimental studies contemplated or performed but not reported." (Ltr. from S. Sharko to Hon. Joel A. Pisano at 2, Dec. 14, 2018.)

Your Honor overruled plaintiffs' objection to our requests for these materials and expressly ordered that the "PSC shall produce Dr. Saed's laboratory notebooks by January 2, 2019" and furthermore that "[a]ll Parties shall produce all laboratory notebooks and any other technical material for an expert who has done scientific testing at least three weeks prior to the scheduled deposition for that expert witness." (12/27/18 CMO ¶¶ 1, 3.)  As Your Honor explained in an accompanying letter opinion, the PSC had "agree[d] to produce Dr. Saed's laboratory notebooks" (plural) but had expressed a desire not to do so until the date of the deposition.  This solution was untenable, Your Honor explained, because "without advanced disclosure of the laboratory notebooks, the Johnson & Johnson Defendants will have no way to determine whether the notebooks actually contain the material sought in their demands." (Ltr. from Hon. Joel A. Pisano to All Counsel of Record at 2, Dec. 27, 2018.)

In a subsequent email, counsel for the PSC sought modification of Your Honor's order to the extent necessary to make clear that "the laboratory notebooks to be produced relate to the research referenced in the expert's report." (Ltr. from P. Leigh O'Dell to Hon. Joel A. Pisano at 1, Dec. 27, 2018.)  The stated need for this modification was not to exempt experiments related to Fisher talc or preliminary work related to Dr. Saed's experiments, but rather to clarify that Your Honor did not mean to reach "all research from an expert's lab regardless of when the research conducted and its relevance to talcum powder." (*Id.*) Your Honor emailed in response that plaintiffs' counsel was "correct" and that "the experts' materials that are subject to my order are those materials which relate to the report being considered." (Email from Hon. Joel A. Pisano to P. Leigh O'Dell, Dec. 27, 2018.)

Despite receiving the modification they requested, plaintiffs did not produce the notebooks on January 2 as contemplated by Your Honor's order – presumably at least in part because the notebooks had yet to be completely written, as Dr. Saed later revealed at

96722657.1

Drinker Biddle & Reath LLP

Hon. Joel A. Pisano (Ret.)
January 25, 2019
Page 4

his deposition. (*See* Saed Dep. 76:24-78:24 (attached as exhibit).)[2] Instead, on January 14, plaintiffs produced an electronic file named "Saed lab notebooks 000001-97.pdf," which appeared to be a black-and-white copy of Dr. Saed's notes. (Saed Lab Notebooks.) Of relevance here, the PDF file displayed Bates stamps page numbers in the lower right-hand corner, but – on the vast majority of pages in any event – *no indication of other pagination*.[3]

On January 21 – just two days before Dr. Saed's deposition commenced – plaintiffs produced a new electronic copy of the same document in color in response to defendants' request. (Saed Color Lab Notebooks.) This copy revealed for the first time that most of the pages had handwritten page numbers in the bottom corner – and that the page numbering started at 30, not 1. (*See generally id.*) On the same date, plaintiffs produced reviewer comments for Dr. Saed's manuscript – revealing for the first time that there were multiple drafts of the manuscript – and receipts supplying evidence for the first time that Dr. Saed's article, like Dr. Campion's, was bought and paid for by plaintiffs' counsel.

Further revelations emerged just minutes before Dr. Saed's deposition commenced on January 23, when the PSC produced physical copies of not one but two laboratory notebooks. The first of these contained the pages that had been copied and produced to defendants previously, but also additional pages from a preceding section – *some of which had been torn out and were missing* – and a table of contents.[4] The second was a lab notebook that Dr. Saed would later testify related to his testing of Fisher Laboratories talc (hereinafter the "Fisher lab book," as contrasted with the other notebook, which I will refer to as the "JBP lab book," although plaintiffs and Dr. Saed apparently dispute whether all of its contents relate to Johnson's Baby Powder). We were advised that the lab notebooks had to be retained by Dr. Saed pursuant to Wayne State University policy;

---

[2]     As noted above, only the rough draft of Dr. Saed's deposition transcript is available, and all citations to Dr. Saed's deposition are to the rough transcript.

[3]     One page revealed what is now understood by defendants to be a handwritten page number in the lower corner, but its placement next to a grid containing other typewritten numbers and its lack of correlation with the Bates number stamped on the same page, combined with the lack of any other visible handwritten page numbers on any of the other 96 pages, made its significance unclear at the time defendants received the document. (*See* Saed Lab Notebooks at SAED000015 (the first and only page on which any such writing occurs, revealing a number that is partially cut off by photocopying and next to a grid of other numbers, making it unclear whether it was a page number or some notation related to the grid).)

[4]     Even on the pages that were copied and provided to defendants in advance of the deposition, some materials were omitted. As Dr. Saed confirmed at his deposition, there were at least two charts that for reasons he could not explain were not included in defendants' copies, and there was also another chart that had been taped over writing in the original lab book, making it impossible to read that writing in defendants' copy. (Saed Dep. 95:16-96:3, 98:15-101:16.)

Drinker Biddle & Reath LLP

Hon. Joel A. Pisano (Ret.)
January 25, 2019
Page 5

we were provided with copies of the Fisher lab book at the same time, along with a copy of the table of contents of the JBP lab book, but we were not provided with a copy of the pages of the JBP lab book that preceded the page 30 on which our copy begins.[5]

We immediately objected to the untimely production, citing Your Honor's order. Counsel for the PSC took the position that they were under no obligation to produce the additional materials prior to the deposition, asserting that "Judge Pisano's order related to the specific . . . Notice of Deposition that requested documents regarding the underlying data and study that was reported in Dr. Saed's manuscript as well as his expert report," that there was a "second general notice that asked for other talc studies," and that "[t]he additional talc study that's noted in the [JBP lab book in the pages preceding page 30] was not part of Dr. Saed's manuscript." (Saed Dep. 4:16-5:2.) Counsel for the PSC took the same position as to the Fisher lab book. (*Id.* 5:16-24 (asserting that the Fisher lab book relates to "a separate and distinct set of data for a Fisher talc study, and we have provided that today, as it was published in an abstract").)

Upon examination of Dr. Saed, however, it became apparent that the supposedly distinct subject matter of the portions of the lab books that had not previously been produced was highly relevant and well within the scope of the requests on which Your Honor previously ruled, for several reasons. First, according to Dr. Saed, the preliminary pages in the JBP lab book outlined his lab's efforts to "tune-up" its technique for performing the very experiments documented in the copies of the pages we received. (Saed Dep. 41:10-43:18.) That makes those pages patently within the scope of our requests and this Court's order; indeed, as noted above, we expressly explained in our letter to the Court in December that we needed to understand the "protocols developed for the experiment, or the existence of any other related experimental studies contemplated or performed but not reported." (Ltr. from S. Sharko to Hon. Joel A. Pisano at 2, Dec. 14, 2018.)

Second, Dr. Saed testified that the matters addressed in the preliminary pages of the JBP lab book (and the entirety of the Fisher lab book) related to Fisher talc. (Saed Dep. 45:24-46:12; 167:13-168:5.) While plaintiffs' counsel emphasized this supposedly distinct work as a basis for withholding production (*see id.* 5:16-24), our request expressly called for "other related experimental studies" and even named Fisher talc specifically (since Fisher was noted by Dr. Saed in his report).

Third, and relatedly, it is obvious that Dr. Saed has no clear distinction in his mind between the work he did on Fisher talc and the work he did with respect to Johnson's Baby Powder. The most striking example of this involved a portion of Dr. Saed's JBP lab book in which a portion identifying the talc being tested has been whited out, with the

---

[5]   A copy of a check dated November 2, 2017, was also produced, reflecting payment of what was described by the PSC and Dr. Saed as a retainer payment of $15,000 for his services.

Drinker Biddle & Reath LLP

Hon. Joel A. Pisano (Ret.)
January 25, 2019
Page 6

words "Johnson & Johnson, # 30027477, Lot# 13717RA" written over it. (Saed Lab Notebooks at SAED00025.) When asked about this alteration at his deposition, Dr. Saed agreed that it was entirely possible that it originally said "Fisher talc" under the white out. (Saed Dep. 92:6-25.)[6] At a minimum, that possibility suggests that Dr. Saed was not treating his experiments with different talcum powders as conceptually different; and it raises significant questions about whether he even correctly kept track of which powder he was testing in which lab book. In short, for a host of reasons, all of both lab books should have been produced in advance of Dr. Saed's deposition.

The fact that they were not produced substantially prejudiced defendants' ability to conduct Dr. Saed's deposition. As a threshold matter, a significant amount of time had to be expended simply understanding the distinctions between the lab books and the reasons why the initial portions of the JBP lab book were withheld, effectively prejudicing the entire deposition by using up time that defendants had intended to allocate to other issues. Defendants were further prejudiced by the obvious inability to consult with their own experts on the contents of the withheld materials, which are extremely dense and generally beyond the scope of lay or attorney understanding. It is also clear that the materials are highly relevant to Dr. Saed's methods and the topics addressed at the deposition. Although defendants were not supplied with copies of the preliminary portion of the JBP lab book, for example, our recollection is that its contents go well beyond setting forth a colorless "tune-up" of Dr. Saed's method (though even that would be relevant and within the scope of our initial document requests). Instead, portions of it addressed refinements concerning problems Dr. Saed was encountering with using too much talc and thereby killing the cells; other portions relate to time of treatment. Both of these topics were discussed at some length in Dr. Saed's deposition – and of particular note, his publications in multiple instances used the wrong numbers both for the amount of talc used and the treatment time. (Saed Dep. 301:2-302:10.) But defendants were not prepared to explore these issues to the extent the lab books bore on them further because they were denied an opportunity to review them in advance of the deposition.

---

[6]  Several portions of Dr. Saed's JBP lab book contain white-out and, as noted above, several pages have been removed from the portion of the book that was not copied when produced to defendants. Dr. Saed repeatedly resisted conceding the obvious point that whiting out lab books is not proper lab practice – in fact, it is considered unethical, see Philip Ryan, Ph.D., Office of Intramural Training & Education, National Institutes of Health, *Keeping a Lab Notebook: Basic Principles and Best Practices* at 11 (stating under "Ethics" heading that "[n]o pages come out of the notebook" and that authors should "[c]orrect mistakes, [] not remove them," specifically by "cross[ing] out mistakes with a single line"), https://www.training.nih.gov/assets/Lab_Notebook_508_%28new%29.pdf – but he ultimately agreed that it was not his preference that errors in lab books be corrected with white out (while taking no responsibility for its use here, instead blaming his lab assistant). (*See* Saed Dep. 87:5-98:13; 102:5-104:19.)

96722657.1

DrinkerBiddle&Reath
LLP

Hon. Joel A. Pisano (Ret.)
January 25, 2019
Page 7

### B. Other Materials That Have Not Been Produced

As noted at the beginning of the letter, several facts emerged at Dr. Saed's deposition concerning the publication of his manuscript and its funding. In particular, it is now clear that plaintiffs' counsel paid tens of thousands of dollars to Dr. Saed for the development of his manuscript before he undertook to write his report in this litigation – and despite this fact, the only disclosure of funding in his manuscript is that he received consulting fees (without naming the source or disclosing the fact that it was for litigation on the same topic as the article). But when defendants attempted to probe plaintiffs' counsel's arrangement with Dr. Saed – including asking him if they corresponded by email or spoke in meetings about the manuscript – plaintiffs' counsel objected and instructed him not to answer, citing privilege grounds. (*See* Saed Dep. 53:21-55:9, 59:23-60:12.) For the reasons defendants just set forth to the Court concerning Dr. Campion, such communications are not privileged, especially where, as here, the expert insists that the work was all his own, uninfluenced by his financiers, and was undertaken before he began work on his for-litigation expert report. (*See* Saed Dep. 27:13-16; 28:3-14; 35:17-21, 36:19-25; 123:3-10.) Moreover, as with Dr. Campion, plaintiffs' counsel have not produced a privilege log with respect to documents recording their communications with Dr. Saed.

It is also now clear that Dr. Saed's manuscript was rejected by his first choice of journal – *OB-GYN Oncology* – even though, according to Dr. Saed, the comments he received from the peer-review process with that journal were nothing short of glowing. (Saed Dep. 35:5-14, 35:22-36:18, 37:18-38:9.) But no correspondence between Dr. Saed and this journal or its reviewers has been produced. Similarly, it was revealed that Dr. Saed has written multiple drafts of his manuscript, and might have written cover letters or other communications associated with submission of the drafts to the journals (*id.* 31:19-35:24, 38:10-39:6, 143:7-15, 148:15-149:18) – but none of these documents have been produced; nor are we able to discern what role plaintiffs' counsel played in this process. And although Dr. Saed published abstracts based on the same experiments that he described in his manuscript, no correspondence with the publishers or drafts of the abstracts have been produced, either. (*See id.* 127:8-128:17.)

Finally, Dr. Saed testified that he drafted a budget for his manuscript and/or the underlying experiments on which it is based, and his office has invoices and receipts related to that work, but these items, too, have not been produced, despite Your Honor's express instruction that plaintiffs' counsel produce evidence relating to the funding of Dr. Saed's work, and the direct representation to Your Honor by Ms. O'Dell that all funding documents had been produced. Relatedly, it appears that Wayne State University paid to support Dr. Saed's research, and it is not clear whether he disclosed the litigation purpose of the research to the university. Nor is it clear how costs were allocated between the university and the lawyers.

Because these items have never been made available – either at the deposition or before it – defendants have been deprived of documents touching on important issues that they sought to explore at Dr. Saed's deposition. That examination is incomplete to the extent that these other documents shed further light on Dr. Saed's methods and relationship with plaintiffs' counsel, as they surely would.

Defendants made an express request for related materials at the conclusion of Dr. Saed's deposition. (Saed Dep. 325:8-326:7.) Plaintiffs' counsel agreed to meet and confer, and defendants are pursuing that course now but are raising the issue in this letter to ensure that the matter is resolved expeditiously given the rapidly approaching deadline for defendants' own expert reports.

**Requested Relief**

In light of the foregoing, defendants request the following relief:

1.      That Your Honor grant defendants leave to continue Dr. Saed's deposition for an additional 2.5 hours, to be taken by February 7.

2.      That Your Honor compel production of the additional materials noted above by January 29, including, but not limited to, the following:

> a. Copies of prior drafts of Dr. Saed's manuscript, *Molecular basis supporting the association of talcum powder use with increased risk of ovarian cancer*, including, but not limited to, all initial, revised, and final versions of drafts submitted to *Reproductive Sciences* and *OB-GYN Oncology* or any other journal or other correspondent.
>
> b. Copies of any correspondence or other communication with *OB-GYN Oncology*, and its reviewers or anyone else associated with any journal, in any way in connection with the consideration of Dr. Saed's manuscript for possible publication.
>
> c. Copies of any cover letters or other submission-related correspondence, regardless of form, but including any letters or any statements entered into online submission forms, and wherever maintained, either in the possession of Dr. Saed or his lab or maintained in online accounts associated with the journals to which Dr. Saed has access, that accompanied, preceded, or followed the submission or re-submission of the manuscript to any journal.

DrinkerBiddle&Reath LLP

Hon. Joel A. Pisano (Ret.)
January 25, 2019
Page 9

    d. All communications between Dr. Saed and any lawyer for any plaintiff that pertains in any way to his manuscript. To the extent any responsive document is withheld on purported privilege grounds, supporting objections should be set forth in a privilege log.

    e. All budgets Dr. Saed prepared concerning his manuscript and/or the underlying experiments and all related lab work, whether in connection with Johnson's Baby Powder, Fisher talc, or any other talc product.

    f. All accounting documents, invoices or other original documents that memorialize the expenses, costs, payments, reimbursements, and any similar compensation, whether in monetary or other form, for work on the manuscript, including all documents maintained and/or referenced by Sharon Pepe in calculating the cost figures contained in Exhibit No. 5 to Dr. Saed's deposition.

    g. All communications with Wayne State University regarding Dr. Saed's talc-related experiments.

    h. Copies of any correspondence or other communication with any organization, including SGO, SRI or any other group or journal, and its reviewers or anyone else associated with any such group or journal in any way, in connection with the consideration of Dr. Saed's abstracts concerning his experiments with talc.

Respectfully submitted,

DRINKER BIDDLE

/s/*Susan M. Sharko*

Susan M. Sharko


Cc by electronic mail:

Leigh O'Dell, Esq.
Michelle Parfit, Esq.
Thomas Locke, Esq.
Mark Silver, Esq.

96722657.1