# Exhibit E

Ghassan Saed, Ph.D.

1                    IN THE UNITED STATES DISTRICT COURT

2                        FOR THE DISTRICT OF NEW JERSEY

3

4     IN RE:  JOHNSON & JOHNSON TALCUM

5     POWDER PRODUCTS MARKETING, SALES

6     PRACTICES, AND PRODUCTS

7     LIABILITY LITIGATION            MDL NO: 16-2738(FLW)(LHG)

8

9     _____/

10    THIS DOCUMENT RELATES TO

11    ALL CASES

12    _____/

13    PAGE 1 TO 343

14

15        The Videotaped Deposition of GHASSAN SAED, PH.D.,

16        Taken at 1 Park Avenue,

17        Detroit, Michigan,

18        Commencing at 9:15 a.m.,

19        Wednesday, January 23, 2019,

20        Before Laurel A. Frogner, RMR, CRR, CSR-2495.

21

22

23

24

25

Ghassan Saed, Ph.D.

```
 1   APPEARANCES:

 2

 3   BEASLEY ALLEN LAW FIRM

 4   BY:  P. LEIGH O'DELL, ESQ. and

 5        MARGARET M. THOMPSON, MD, JD

 6   218 Commerce Street

 7   P.O. Box 4160

 8   Montgomery, Alabama 36103

 9   334-269-2343

10   leigh.odell@beasleyallen.com

11   Margaret.Thompson@BeasleyAllen.com

12        Appearing on behalf of the Plaintiffs

13

14

15   ASHCRAFT & GEREL, LLP

16   BY:  MICHELLE A. PARFITT, ESQ.

17   4900 Seminary Road

18   Alexandria, Virginia 22311

19   703-931-5500

20   mparfitt@ashcraftlaw.com

21        Appearing on behalf of the Plaintiffs

22

23

24

25
```

Ghassan Saed, Ph.D.

```
 1   APPEARANCES (Continued):

 2

 3   NAPOLI SHKOLNIK PLLC

 4   BY:  ALASTAIR J.M. FINDEIS, ESQ.

 5   400 Broadhollow Road, Suite 305

 6   Melville, New York 11747

 7   631-224-113

 8   afindeis@napolilaw.com

 9        Appearing on behalf of the Plaintiffs

10

11

12   WILENTZ, GOLDMAN & SPITZER, P.A.

13   BY:  DANIEL R. LAPINSKI, ESQ.

14   90 Woodbridge Center Drive

15   Suite 900, Box 10

16   Woodbridge, New Jersey 07095

17   732-855-6066

18   dlapinski@wilentz.com

19        Appearing on behalf of the Plaintiffs

20

21

22

23

24

25
```

Ghassan Saed, Ph.D.

```
 1   APPEARANCES (Continued):

 2

 3   RESTAINO LAW LLC

 4   BY:  JOHN M. RESTAINO, JR., ESQ.

 5   130 Forest Street

 6   Denver, Colorado 80220

 7   303-839-8000

 8   JRestaino@RestainoLLC.com

 9       Appearing on behalf of the Plaintiffs

10

11

12   SHOOK, HARDY & BACON, LLP

13   BY:  MARK C. HEGARTY, ESQ.

14   2555 Grand Boulevard

15   Kansas City, Missouri 64108

16   816-474-6550

17   mhegarty@shb.com

18       Appearing on behalf of the Defendant Johnson & Johnson

19

20

21

22

23

24

25
```

Ghassan Saed, Ph.D.

```
 1   APPEARANCES (Continued):

 2

 3   SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

 4   BY:  GEOFFREY M. WYATT, ESQ.

 5   1440 New York Avenue N.W.

 6   Washington, D.C. 20005

 7   202-371-7008

 8   geoffrey.wyatt@skadden.com

 9       Appearing on behalf of the Defendant Johnson & Johnson

10

11

12   GORDON & REES SCULLY MANSUKHANI, LLP

13   BY:  MICHAEL R. KLATT, ESQ.

14   816 Congress Avenue, Suite 1510

15   Austin, Texas 78701

16   512-391-0197

17       Appearing on behalf of the Defendant Imerys Talc America

18

19

20

21

22

23

24

25
```

Ghassan Saed, Ph.D.

```
 1   APPEARANCES (Continued):

 2

 3   COUGHLIN DUFFY LLP

 4   BY:   JONATHAN F. DONATH, ESQ.

 5   350 Mount Kemble Avenue

 6   P.O. Box 1917

 7   Morristown, New Jersey 07962

 8   973-267-0058

 9   jdonath@coughlinduffy.com

10       Appearing on behalf of the Defendant Imerys Talc America

11

12

13   TUCKER ELLIS

14   BY:   JAMES W. MIZGALA, ESQ.

15   233 South Wacker Drive

16   Chicago, Illinois 60606

17   312-624-6300

18   James.mizgala@tuckerellis.com

19       Appearing on behalf of the Defendant PTI

20

21

22

23

24

25
```

Ghassan Saed, Ph.D.

```
 1   APPEARANCES (Continued):

 2

 3   SEYFARTH SHAW LLP

 4   BY:  THOMAS T. LOCKE, ESQ.

 5   975 F Street, N.W.

 6   Washington, D.C. 20004

 7   202-463-2400

 8   tlocke@seyfarth.com

 9       Appearing on behalf of the Defendant PCPC

10

11   ALSO PRESENT:  Marc Myers, Videographer

12

13

14

15

16

17                        *  *  *  *  *  *  *

18

19

20

21

22

23

24

25
```

Ghassan Saed, Ph.D.

```
 1                   TABLE OF CONTENTS

 2   Witness                                    Page

 3   EXAMINATION BY MR. HEGARTY                   17

 4   EXAMINATION BY MR. KLATT                    283

 5   RE-EXAMINATION BY MR. HEGARTY               316

 6   EXAMINATION BY MS. O'DELL                   319

 7   RE-EXAMINATION BY MR. HEGARTY               328

 8   RE-EXAMINATION BY MR. KLATT                 337

 9   EXAMINATION BY MR. LOCKE                    339

10

11

12                   INDEX TO EXHIBITS

13           (Exhibits attached to transcript)

14

15   Exhibit                                    Page

16   SAED DEPOSITION EXHIBIT NUMBER 1, COPY OF NOTEBOOK    13

17   BATES SAED000001 - SAED000097, WAS MARKED BY THE

18   REPORTER FOR IDENTIFICATION

19

20   SAED DEPOSITION EXHIBIT NUMBER 2, LAB NOTEBOOK,       13

21   (Retained by Witness) WAS MARKED BY THE REPORTER

22   FOR IDENTIFICATION

23

24

25
```

Ghassan Saed, Ph.D.

```
 1    SAED DEPOSITION EXHIBIT NUMBER 3, LAB NOTEBOOK,          14

 2    (Retained by Witness) WAS MARKED BY THE REPORTER

 3    FOR IDENTIFICATION

 4

 5    SAED DEPOSITION EXHIBIT NUMBER 4, INVOICES, WAS          22

 6    MARKED BY THE REPORTER FOR IDENTIFICATION

 7

 8    SAED DEPOSITION EXHIBIT NUMBER 5, DECEMBER 18,           35

 9    2018 DOCUMENT, WAS MARKED BY THE REPORTER FOR

10    IDENTIFICATION

11

12    SAED DEPOSITION EXHIBIT NUMBER 6, COPY OF CHECK          40

13    DATED 11/2/2017 FOR $15,000, WAS MARKED BY THE

14    REPORTER FOR IDENTIFICATION

15

16    SAED DEPOSITION EXHIBIT NUMBER 7, MOLECULAR BASIS        42

17    SUPPORTING THE ASSOCIATION OF   TALCUM POWDER USE

18    WITH INCREASED RISK OF OVARIAN CANCER, WAS MARKED

19    BY THE REPORTER FOR IDENTIFICATION

20

21    SAED DEPOSITION EXHIBIT NUMBER 8, MOLECULAR BASIS        45

22    SUPPORTING THE ASSOCIATION OF TALCUM POWDER USE

23    WITH INCREASED RISK OF OVARIAN CANCER, WAS MARKED

24    BY THE REPORTER FOR IDENTIFICATION

25
```

Ghassan Saed, Ph.D.

```
 1   SAED DEPOSITION EXHIBIT NUMBER 10, INDEX FOR LAB        78

 2   NOTEBOOK, WAS MARKED BY THE REPORTER FOR

 3   IDENTIFICATION

 4

 5   SAED DEPOSITION EXHIBIT NUMBER 9, PILOT STUDY,          84

 6   WAS MARKED BY THE REPORTER FOR IDENTIFICATION

 7

 8   SAED DEPOSITION EXHIBIT NUMBER 11, NOTEBOOKS,          132

 9   WAS MARKED BY THE REPORTER FOR IDENTIFICATION

10

11   SAED DEPOSITION EXHIBIT NUMBER 12,                     151

12   SAGE PUBLISHING DOCUMENT,

13   WAS MARKED BY THE REPORTER FOR IDENTIFICATION

14

15   SAED DEPOSITION EXHIBIT NUMBER 13,                     157

16   SAGE PUBLISHING DOCUMENT,

17   WAS MARKED BY THE REPORTER FOR IDENTIFICATION

18

19   SAED DEPOSITION EXHIBIT NUMBER 14,                     161

20   COPY OF LETTER FROM REPRODUCTIVE SCIENCES,

21   WAS MARKED BY THE REPORTER FOR IDENTIFICATION

22

23   SAED DEPOSITION EXHIBIT NUMBER 15, JANUARY 14,         173

24   2019 E-MAIL, WAS MARKED BY THE REPORTER FOR

25   IDENTIFICATION
```

Ghassan Saed, Ph.D.

```
 1   SAED DEPOSITION EXHIBIT NUMBER 16, EXPERT REPORT,      175

 2   WAS MARKED BY THE REPORTER FOR IDENTIFICATION

 3

 4   SAED DEPOSITION EXHIBIT NUMBER 17, RESEARCH            214

 5   ARTICLE, WAS MARKED BY THE REPORTER FOR

 6   IDENTIFICATION

 7

 8   SAED DEPOSITION EXHIBIT NUMBER 18, CURRICULUM          278

 9   VITAE, WAS MARKED BY THE REPORTER FOR

10   IDENTIFICATION

11

12   SAED DEPOSITION EXHIBIT NUMBER 19, ABSTRACT            315

13   SUBMITTED TO SGO, WAS MARKED BY THE REPORTER FOR

14   IDENTIFICATION

15

16   SAED DEPOSITION EXHIBIT NUMBER 20, ABSTRACT,           316

17   WAS MARKED BY THE REPORTER FOR IDENTIFICATION

18

19   SAED DEPOSITION EXHIBIT NUMBER 21, ABSTRACT            317

20   FROM SRI, WAS MARKED BY THE REPORTER FOR

21   IDENTIFICATION

22

23

24

25
```

Ghassan Saed, Ph.D.

```
1                    Detroit, Michigan

2                    Wednesday, January 23, 2019

3                    About 9:15 a.m.

4           THE VIDEOGRAPHER:  We are now on the record.

5    My name is Marc Myers.  I'm the videographer for Golkow

6    Litigation Services.  Today's date is January 23rd,

7    2019.  The time is now 9:15 a.m.  This video deposition

8    is being held in Detroit, Michigan in regards to the

9    Johnson & Johnson Talcum Powder Products Marketing,

10   Sales Practices, and Products Liability Litigation,

11   pending in the United States District Court for the

12   District of New Jersey.

13           The deponent is Dr. Ghassan Saed.  And

14   counsel will be noted on the stenographic record.  And

15   will the court reporter please swear in the witness.

16                    DR. GHASSAN SAED,

17   having first been duly sworn, was examined and

18   testified on his oath as follows:

19           MR. HEGARTY:  Before we begin with

20   questioning Dr. Saed, I want to make a note on the

21   record with regard to materials that were produced to

22   us this morning by counsel for Plaintiffs.  Those

23   materials included the original lab notebook for

24   presumably the study that Dr. Saed did that's reported

25   in a manuscript that we were provided as well in
```

Ghassan Saed, Ph.D.

```
 1          advance, and it's our understanding that we were to

 2          have copies of the notebook provided to us in advance

 3          of the deposition.  We were provided with what we

 4          believe to be that notebook that I'm marking as Exhibit

 5          Number 1.

 6                  SAED DEPOSITION EXHIBIT NUMBER 1,

 7                  COPY OF NOTEBOOK BATES SAED000001 - SAED000097,

 8                  WAS MARKED BY THE REPORTER

 9                  FOR IDENTIFICATION

10                  MR. HEGARTY:  That notebook -- those notebook

11          pages begin on Page 30 and go through Page 124 as noted

12          in handwriting on the pages.  They are Bates Numbered 1

13          through 97.

14                  SAED DEPOSITION EXHIBIT NUMBER 2,

15                  LAB NOTEBOOK, (Retained by Witness)

16                  WAS MARKED BY THE REPORTER

17                  FOR IDENTIFICATION

18                  MR. HEGARTY:  The lab notebook we've been

19          provided this morning, which I will designate for

20          purposes of the record as Exhibit Number 2, because we

21          were told that we were not to mark on it and that Dr.

22          Saed would retain it, but the lab notebook provided is

23          Exhibit Number 2, includes Pages 1 through 29 which we

24          were not provided in advance of the deposition.  We

25          believe those pages should have been provided along
```

Ghassan Saed, Ph.D.

```
 1           with the other pages pursuant to Judge Pisano's order

 2           and pursuant to our Notice of Deposition.  Not having

 3           those pages in advance prejudices our right to have a

 4           full and complete opportunity to discuss the lab

 5           notebook with Dr. Saed during his deposition, and we

 6           object to its production here this morning and

 7           certainly reserve our right to seek additional time

 8           with Dr. Saed as well as any other remedies that we

 9           might be entitled to for what we believe to be an

10           untimely production.

11                   Also, I will note for purposes of the record

12           that we received this morning as well another lab

13           notebook that is purported to be a notebook covering an

14           additional set of tests that Dr. Saed did with Fisher

15           Scientific Talc, and make note that there's a reference

16           in the manuscript that we were provided testing done on

17           Fisher Scientific talc.  We'll designate for purposes

18           of the record this notebook is Exhibit Number 3.

19           SAED DEPOSITION EXHIBIT NUMBER 3,

20           LAB NOTEBOOK, (Retained by Witness)

21           WAS MARKED BY THE REPORTER

22           FOR IDENTIFICATION

23                   MR. HEGARTY:  This notebook was not provided

24           nor -- in advance of the deposition nor were any pages

25           of this notebook provided in advance of the deposition.
```

Ghassan Saed, Ph.D.

```
 1            We have not had an opportunity to review it to know
 2            whether this is pertinent to the manuscript that we'll
 3            talk about here today, but also believe that this is
 4            likely to also fall within the scope of Judge Pisano's
 5            order and certainly within the scope of the Notice of
 6            Deposition that we had made.  So we also object to
 7            its -- the timeliness of the production of this
 8            notebook and, again, we reserve all rights for whatever
 9            remedies are appropriate due to this late production.
10                 MR. KLATT:  Imerys Talc America joins in what
11            Mr. Hegarty said.  And can we have the agreement we've
12            had that one objection is good for all?
13                 MS. O'DELL:  Yes.
14                 MR. KLATT:  All defendants join.
15                 MS. O'DELL:  So on behalf of the steering
16            committee, let me state that Judge Pisano's order
17            related to the specific -- a specific Notice of
18            Deposition that requested documents regarding the
19            underlying data and study that was reported in Dr.
20            Saed's manuscript as well as his expert report.  That
21            was the subject of the order.  Those materials were
22            provided in compliance with Judge Pisano's order.
23            There was a second general notice that asked for other
24            talc studies.  The additional talc study that's noted
25            in the lab book Exhibit 2 was not a part of Judge --
```

Ghassan Saed, Ph.D.

```
1              excuse me, was not a part of Dr. Saed's manuscript.
2                         MR. HEGARTY:  I marked it as Exhibit 3, the
3              other lab notebook.
4                         MS. O'DELL:  I'm referring to Exhibit 2, the
5              initial lab --
6                         MR. HEGARTY:  Okay, I'm sorry, I thought you
7              were referring to the second one.
8                         MS. O'DELL:  I was not.
9                         MR. HEGARTY:  I'm sorry to interrupt.
10                        MS. O'DELL:  I'm pretty sure you are not
11             sorry you interrupted me, but Exhibit 2 is the lab
12             notebook I'm referring to, and the study that is the
13             basis of the objection was not a part of the manuscript
14             or the report.
15                        Secondly, Exhibit 3 includes a separate and
16             distinct set of data for a Fisher talc study, and we
17             have provided that today, it was published in an
18             abstract and we provided that today in compliance with
19             the second notice of deposition.  So the plaintiff's
20             position is we have provided everything the Judge
21             ordered, everything that's required as part of the
22             notice, and we'll oppose any motion to extend the
23             deposition and keep it open.
24                        MR. HEGARTY:  I do have a question.  You're
25             saying that the lab notebook we designated as Exhibit
```

Ghassan Saed, Ph.D.

```
 1         Number 2 for which you provided copies is not related

 2         to the manuscript that's titled Molecular Basis

 3         Supporting the Association of Talcum Powder Use With

 4         Increased Risk of Ovarian Cancer?

 5               MS. O'DELL:  That's not what I said.  What I

 6         said is the portion of the lab notebook Exhibit 2,

 7         which you referred to as Pages 1 through 29, are not

 8         reported in the manuscript or the report, the expert

 9         report in this matter, and, therefore, they were not

10         subject Judge Pisano's previous ruling, so that's the

11         distinction that I'm making.  These are materials that

12         were made available to you today and you have full

13         opportunity TO ask Dr. Saed questions about it.

14               MR. HEGARTY:  I understand.

15    EXAMINATION BY MR. HEGARTY:

16    Q.   Good morning, Dr. Saed.

17    A.   Good morning.

18    Q.   Would you -- strike that.  My name is Mark Hegarty.  I

19         represent the Johnson & Johnson defendants in this

20         matter.  Would you please state your full name for the

21         record, please.

22    A.   Ghassan Saed.

23    Q.   Who is your current employer, Dr. Saed?

24    A.   Wayne State University Medical School.

25    Q.   What is your title?
```

Ghassan Saed, Ph.D.

```
 1    A.    Wayne State University Medical School.

 2    Q.    What is your title there?

 3    A.    Associate professor.

 4    Q.    How long have you held that position?

 5    A.    Eight years about, I'm not --

 6    Q.    Do you also have a separate personal consulting

 7          business for purposes of litigation?

 8    A.    DS Biotech, it's a consulting company.

 9    Q.    Are there any other employees or owners or other

10          individuals involved in DS Biotech besides you?

11    A.    No.

12    Q.    Is your son in any way involved in that business?

13    A.    Just doing some paperwork.

14    Q.    Do you do any business through DS Biotech besides

15          expert witness consulting for litigation?

16    A.    We do consulting for scientific testing for

17          universities, for investigators, we design experiments,

18          we help them write manuscripts.

19    Q.    You said for other investigators or universities.  Do

20          you do any business with any companies?

21    A.    I do, yes.

22    Q.    Can you name a company with whom you do business?

23    A.    Temple Pharmaceuticals.

24    Q.    How long has DS Biotech been in business?

25    A.    2006.
```

Ghassan Saed, Ph.D.

```
 1   Q.   Are you currently named as an expert witness in any
 2        other litigation besides this one?
 3   A.   No.
 4   Q.   Have the fees that you have generated in connection
 5        with your work on this case been directed to DS
 6        Biotech?
 7   A.   Been directed?
 8   Q.   Well, have the fees that you have generated for your
 9        work on this case been paid to DS Biotech?
10   A.   Yes.
11   Q.   Do you receive all of the income from those fees?
12   A.   Through DS Biotech?
13   Q.   Yes.
14   A.   Yes, after I submit taxes and all that.
15   Q.   But you essentially receive the fees even though they
16        were directed to DS Biotech, correct?
17   A.   Correct, the company received it, yes.
18   Q.   Then you have been -- you were paid by the company,
19        correct?
20   A.   Yes.
21   Q.   Were you -- have you been paid by the company the same
22        amount to which the fees generated?
23             MS. O'DELL:  Object to the form.
24             THE WITNESS:  Yeah, I am -- the answer is no.
25
```

Ghassan Saed, Ph.D.

```
 1    BY MR. HEGARTY:

 2    Q.   What portion of the fees have you not been paid --

 3    A.   So we --

 4    Q.   -- through DS Biotech?

 5    A.   So we have to deduct expenses and everything.

 6    Q.   Can you approximate the expenses you have had to deduct

 7         from the fees you've --

 8    A.   I haven't done it for this year yet.

 9    Q.   Do you have any other sources of income besides your

10         work at Wayne State and through DS Biotech?

11    A.   No.

12    Q.   What are you charging Plaintiff's Counsel in this

13         litigation for your work?

14    A.   $600 an hour.

15    Q.   Do you have different rates for deposition or trial

16         testimony?

17    A.   Do I have different rate?

18    Q.   Sure.  The rate you just quoted me was per hour, $600

19         per hour.  Do you have a different per-hour rate if

20         you're being deposed or if you're going to trial?

21    A.   Oh, no.

22    Q.   You have obligations at Wayne State University to

23         disclose financial arrangements --

24    A.   Yes.

25    Q.   -- is that correct?  Have you disclosed your financial
```

Ghassan Saed, Ph.D.

```
 1        arrangement --

 2   A.   Yes.

 3   Q.   -- to Wayne State with regard to your work with

 4        Plaintiff's Counsel in this case?

 5   A.   Yes.

 6   Q.   When did you make that disclosure?

 7   A.   Every year they -- there's a deadline to receive -- to

 8        submit a form which shows consultation efforts, and for

 9        2018 that was submitted 10 days ago.

10   Q.   Who did you identify to whom you were consulting with

11        with regard to that disclosure for purposes of this

12        litigation?

13   A.   DS Biotech and Beasley Allen.

14   Q.   You prepared a report in this case, correct?

15   A.   (Nods head.)

16   Q.   Yes?

17   A.   Did I prepare a report?  Yes.

18   Q.   Did anyone outside of the lawyers for the plaintiffs in

19        this case assist you in any way with that report?

20   A.   No.

21   Q.   Do you know how much you have been paid through the

22        present date for your work in this litigation?

23   A.   Yes.

24   Q.   How much?

25   A.   Approximately 260, something like that.
```

Ghassan Saed, Ph.D.

```
 1    Q.    260,000?

 2    A.    Yes, about that, maybe a little bit less, I don't know,

 3          I can't remember the exact number.

 4                SAED DEPOSITION EXHIBIT NUMBER 4,

 5                INVOICES,

 6                WAS MARKED BY THE REPORTER

 7                FOR IDENTIFICATION

 8    BY MR. HEGARTY:

 9    Q.    I'm marking as Exhibit Number 4, Dr. Saed, copies of

10          invoices that we were provided in advance of the

11          deposition.  Would you look at Exhibit Number 4, and

12          tell me whether those are copies of all the invoices

13          you have generated for purposes of your work in this

14          case?

15    A.    Yeah, they look fine to me.

16    Q.    The last invoice we were provided is dated November 16,

17          2018, that's the issue date.  Have you prepared any

18          additional invoices since that date?

19    A.    No.

20    Q.    Have you spent additional time on this case for which

21          you intend to prepare an invoice --

22    A.    Yes.

23    Q.    -- since that date?

24    A.    Yes.

25    Q.    How much additional time have you spent that you have
```

Ghassan Saed, Ph.D.

```
 1        not yet invoiced?

 2   A.   Approximately 100, 110 hours.

 3   Q.   The invoices show that they were issued by DS Biotech,

 4        that's the company we talked about earlier, is that

 5        correct?

 6   A.   Yes.

 7   Q.   There are no other employees of DS Biotech besides

 8        yourself, is that correct?

 9   A.   And help from my son, paperwork part-time.

10   Q.   Is he a paid employee?

11   A.   No.

12   Q.   The first page of Exhibit Number 4 with an issue date

13        of the invoice 10-30-2017 includes just a single word

14        in the description Consulting with no corresponding

15        date.  What is the date of the first consulting entry

16        that you have listed on the first page of Exhibit

17        Number 4?

18   A.   10-30, so what's the -- I'm sorry.

19   Q.   Let me ask, Exhibit Number 4, the first page refers to

20        an invoice of $20,400 at a unit price of $600, so there

21        would be several hours, you spent several hours doing

22        something that generated that invoice, correct?

23   A.   Yes.

24   Q.   When did that something start?  When is the first time

25        that you spent anytime on this matter on behalf of
```

Ghassan Saed, Ph.D.

```
 1         Beasley Allen?

 2    A.   So I started October, maybe 1st of October, maybe

 3         before that, I can't remember the exact date.

 4    Q.   What is your best estimate?

 5    A.   I would say end of September.

 6    Q.   So the first invoice -- I'm sorry, go ahead.

 7    A.   Go ahead.

 8    Q.   So the first invoice on Exhibit Number 4 would reflect

 9         the time you spent from approximately the end of

10         September through October 30th, 2017, correct?

11    A.   Correct.

12    Q.   Can you describe for me with regard to the first

13         invoice the type of work that you did between the

14         first -- between the end of September and the date of

15         this first invoice?

16    A.   Sure.  So this was time for meetings, meeting with them

17         and reviewing literature basically.

18    Q.   You said meeting with them.  Who is "them"?

19    A.   With Beasley Allen.

20    Q.   Which attorneys from Beasley Allen did you meet with?

21    A.   Dr. Thompson, Mrs. --

22              MS. O'DELL:  O'Dell.

23              THE WITNESS:  -- O'Dell and Jennifer --

24         what's her last name?

25
```

Ghassan Saed, Ph.D.

```
 1    BY MR. HEGARTY:

 2    Q.   Do you recall the date of your first contact by Beasley

 3         Allen?

 4    A.   Around middle of August.

 5    Q.   How was that contact made?

 6    A.   A phone call.

 7    Q.   A phone call to you?

 8    A.   Yes.

 9    Q.   Who called you?

10    A.   Dr. Thompson.

11    Q.   Did you know Dr. Thompson before the call?

12    A.   No.

13    Q.   Apart from -- or strike that.  What did she tell you

14         when she first called you?

15    A.   She told me that they would like to meet with me to

16         discuss the possibility of acting as a witness expert

17         in ovarian cancer inflammation and oxidative stress.

18    Q.   Did you agree to serve as a retained expert on behalf

19         of Beasley Allen at that first call?

20    A.   No.

21    Q.   What else were you told by Miss Thompson during that

22         phone call?

23    A.   We just basically talked about setting a meeting and we

24         did.

25    Q.   You said that she told you that they would like to meet
```

Ghassan Saed, Ph.D.

```
 1          with you to discuss the possibility of acting as a

 2          witness, expert witness on cancer inflammation and

 3          oxidative stress.  Was there a reference during that

 4          call to talc exposure?

 5     A.   No.

 6     Q.   So talc was not brought up --

 7     A.   In the conversation, no.

 8     Q.   -- in the first call.  Was the fact that they were

 9          representing clients or that they were wanting to talk

10          to you in connection with a litigation, was that

11          discussed?

12     A.   In the phone call, no.

13     Q.   Did she identify herself as a lawyer?

14     A.   Yes, and the firm.

15     Q.   What was your understanding as far as why a lawyer from

16          Beasley Allen would want to talk to you about

17          inflammation and oxidative stress?

18     A.   Because -- so, oh, so you're telling me if she told me

19          she is the lawyer on behalf of the defendants, I mean

20          the plaintiffs in ovarian cancer cases and talc?

21     Q.   Yes.

22     A.   She, yes, she identified herself as such.

23     Q.   So you understood that the --

24     A.   Yes.

25     Q.   -- consulting that you would be doing would be with
```

Ghassan Saed, Ph.D.

```
 1          regard to in some way to talc, correct?

 2                    MS. O'DELL:  Object to the form.

 3                    THE WITNESS:  No.  I was asked to serve as a

 4          witness expert in my specialty, which is what we did

 5          and what I do for the last 30 years, ovarian cancer,

 6          oxidative stress, and inflammation.

 7     BY MR. HEGARTY:

 8     Q.   As of the time of that phone call, your specialty was

 9          not talc, correct?

10     A.   My specialty is anything that induces inflammation and

11          oxidative stress that is linked to ovarian cancer.

12     Q.   But at the time of that first call you had done no

13          studies involving talc, correct?

14     A.   No, no studies, but I was really interested in it

15          because of the media reports that's going at the time.

16     Q.   And at the time of that first call you had done no

17          analysis of the medical literature with regard to talc

18          and ovarian cancer, correct?

19                    MS. O'DELL:  Objection.

20                    THE WITNESS:  Not correct.

21     BY MR. HEGARTY:

22     Q.   What analysis of the medical literature had you done

23          with regard to talc and ovarian cancer prior to the

24          call from Miss Thompson?

25                    MS. O'DELL:  Doctor, if you'll give me just a
```

Ghassan Saed, Ph.D.

```
 1          moment after Mark's question so I can object if I need

 2          to.

 3                    THE WITNESS:  Oh, I'm sorry.

 4                    MS. O'DELL:  Thank you.

 5                    THE WITNESS:  Where are we now?

 6   BY MR. HEGARTY:

 7   Q.    Yes, I said -- my question was what analysis of the

 8          medical literature had you done with regard to talc and

 9          ovarian cancer prior to the call from Miss Thompson?

10   A.    Reading the literature.

11   Q.    What literature had you read?

12   A.    I read the epidemiology studies, I read some of the

13          molecular studies, I read what's in the news, I read

14          everything, I listened to the news, that's my interest,

15          it's ovarian cancer and inflammation.

16   Q.    What epidemiologic studies had you read prior to the

17          call from Miss Thompson?

18   A.    I read -- the exact one?

19   Q.    Yes.

20   A.    I can't remember exact one, but I read several studies.

21   Q.    Can you identify the names of any studies, whether by

22          author or study name, that you had read prior to the

23          call from Miss Thompson?

24                    MS. O'DELL:  Object and asked and answered.

25                    THE WITNESS:  Yeah.  I mean I can look it up
```

Ghassan Saed, Ph.D.

```
 1          for you, but the cohort study is what I read, and I

 2          read some other studies.  I can't remember exactly.

 3   BY MR. HEGARTY:

 4   Q.    When in relation to the call from Miss Thompson had you

 5          read the medical literature you just described?

 6   A.    Sorry, I missed that.

 7   Q.    When in relation to the call from Miss Thompson in

 8          August of 2017 had you read the literature you just

 9          talked about, the epi studies, the molecular studies?

10   A.    Yeah, it's over the past year prior.

11   Q.    What was it that prompted you to review those materials

12          in the first place?

13   A.    The media reports.

14   Q.    What media reports?

15   A.    People talking about the risk of ovarian cancer and

16          talc powder use, it was all over the place.

17   Q.    As of the time that Miss Thompson called, you had done

18          no studies yourself involving talc, correct?

19   A.    Lab studies?

20   Q.    Lab studies.

21   A.    No.

22   Q.    You had done no other study besides reading the

23          literature, correct?

24               MS. O'DELL:  Objection to form.

25               THE WITNESS:  Other studies related to talc?
```

Ghassan Saed, Ph.D.

```
 1   BY MR. HEGARTY:

 2   Q.   Correct.

 3   A.   I didn't do any studies related to -- lab studies

 4        related to talc before that, yes.

 5   Q.   And as of the time that Miss Thompson called you, had

 6        you formed any opinions with regard to talc and ovarian

 7        cancer?

 8   A.   Formed an opinion?

 9   Q.   Yes, as to whether there's a causal link between talc

10        and ovarian cancer?

11   A.   It's always my opinion that anything that causes

12        inflammation, redox imbalance, is linked to increased

13        risk of ovarian cancer.  This is the core of my work.

14   Q.   So it's always been your opinion that anything that

15        causes inflammation will cause ovarian cancer?

16             MS. O'DELL:  Object to the form.

17             You may answer.

18             THE WITNESS:  No.  I said that anything that

19        induces inflammation, alter the redox balance is

20        potential for increasing risk of ovarian cancer, yes.

21   BY MR. HEGARTY:

22   Q.   As of the time that Miss Thompson called you, what

23        medical studies reported that talc altered the redox

24        balance leading to inflammation?

25   A.   There was one study of Shukla, I think, and they
```

Ghassan Saed, Ph.D.

```
 1          measured the effect of -- they measured the reactive

 2          oxygen species especially dihydrogen peroxide H2O2, and

 3          they found a dose response effect when exposure to

 4          talc.

 5     Q.   From that one study you came to the opinion that --

 6     A.   No.

 7     Q.   -- talc use causes redox imbalance that leads to

 8          inflammation that leads to ovarian cancer?

 9               MS. O'DELL:  Object to the form.

10               THE WITNESS:  No.  What I said that my

11          interest is inflammation and redox balance and

12          imbalance and reactive oxygen species, so anything that

13          able at the cellular level to alter this, manipulate

14          this, is a candidate, is a potential risk to ovarian

15          cancer.

16     BY MR. HEGARTY:

17     Q.   As of the time that Miss Thompson called you, had you

18          come to the opinion that talc used by women did alter

19          the redox balance?

20               MS. O'DELL:  Objection, asked and answered.

21               You may answer.

22               THE WITNESS:  Repeat the question, please.

23     BY MR. HEGARTY:

24     Q.   Sure.  As of the time that you received the call from

25          Miss Thompson, what opinion did you have with regard to
```

Ghassan Saed, Ph.D.

```
 1        talc and ovarian cancer?

 2   A.   That talc is a potential inducer of inflammation, and

 3        it induces and increases risk of ovarian cancer.

 4   Q.   Those opinions came from your review -- from the media

 5        reports and your review of the literature you

 6        described?

 7   A.   Uh-huh.

 8   Q.   Is that correct?

 9   A.   Correct.

10   Q.   With regard to the invoices we marked as Exhibit

11        Number 4, do these reflect only your time spent in this

12        case?

13   A.   Correct.

14   Q.   Are you able to break down from these invoices the

15        amount of hours you spent reviewing literature?

16   A.   From the first one?

17   Q.   From the first one through the end.

18   A.   The answer is no, because I always review literature,

19        this is my job, that's what I do for a living, I review

20        literature every single day.

21   Q.   After being contacted by Miss Thompson, did you review

22        literature with regard to this subject area, talc and

23        ovarian cancer, that you had not reviewed before?

24   A.   Yes.

25   Q.   Are you able to break down from these invoices the
```

Ghassan Saed, Ph.D.

```
 1        amount of time you spent writing your expert report?

 2   A.   There is actually one that actually state -- no, no,

 3        where is it?  I thought there was one saying expert

 4        report.  I can identify it, yes.

 5   Q.   You can't identify it?

 6   A.   I can, just give me one second.  Yes, it's this one.

 7   Q.   The very last one?

 8   A.   Yes.

 9   Q.   Does the very last one represent the amount of time you

10        spent writing your report?

11   A.   Correct.

12   Q.   Are you able to break down from the invoices the amount

13        of time you spent talking with lawyers for Beasley

14        Allen?

15   A.   No.

16   Q.   You prepared a manuscript which we'll talk about today

17        that has been submitted to the Journal for Reproductive

18        Sciences entitled Molecular Basis Supporting the

19        Association of Talcum Powder Use With Increased Risk of

20        Ovarian Cancer.  Are you familiar with that?

21   A.   Yes.

22   Q.   Did you bill the time you spent preparing that

23        manuscript to lawyers for Beasley Allen?

24   A.   For this one?  Yes.

25   Q.   Is that reflected in these invoices?
```

Ghassan Saed, Ph.D.

```
 1   A.   Yes.

 2   Q.   Are you able to tell me how much time you spent

 3        preparing that manuscript that's reflected in the

 4        invoices we marked as Exhibit Number 4?

 5   A.   Exactly, no.

 6   Q.   Can you approximate it in any way?

 7   A.   Yes.

 8   Q.   What's your approximation?

 9   A.   I would say about 60 to 70 hours.

10   Q.   There are other authors on that paper, correct?

11   A.   Correct.

12   Q.   Did you bill their time to Beasley Allen for their work

13        on the manuscript?

14   A.   No.

15   Q.   How was their time paid for?

16   A.   So some of them are, if you look at the names, some of

17        them are the department chair, Dr. Morris, and this is

18        an academic institution, we don't bill for the time of

19        consultants or coworkers or co-authors.  The research

20        technicians was paid from my lab, and Amy Harper is a

21        fellow, OB-GYN oncology fellow, and they're paid for

22        fellowships through the department, so we don't bill

23        for their time.

24   Q.   I'm marking as Exhibit Number 5 -- I'm sorry, go ahead.

25   A.   Go ahead.
```

Ghassan Saed, Ph.D.

```
 1    Q.   You were saying something.

 2    A.   I said the only time billed to this from the manuscript

 3         is my time.

 4    Q.   I'm marking this as Exhibit Number 5, a copy of another

 5         document we were provided in advance of the deposition.

 6              SAED DEPOSITION EXHIBIT NUMBER 5,

 7              DECEMBER 18, 2018 DOCUMENT,

 8              WAS MARKED BY THE REPORTER

 9              FOR IDENTIFICATION

10    BY MR. HEGARTY:

11    Q.   Can you tell me what Exhibit Number 5 is?

12    A.   So this is the cost of this project since the beginning

13         till now from my lab from my side.

14    Q.   This listing of costs was sent to you by a Sharon Pepe?

15    A.   The contract -- the grants and contract manager, yes.

16    Q.   Who is that?

17    A.   The financial manager of our department, grants and

18         contract.

19    Q.   How did she come to send you this document on

20         December 18, 2018?

21    A.   How come?

22    Q.   Yes.

23    A.   I asked her.  Every year they give us a budget balance

24         of each account that we have.

25    Q.   Why did you ask her to send you the accounting of the
```

Ghassan Saed, Ph.D.

```
 1          costs for your talc project that she did on

 2          December 18, 2018?

 3     A.   I always ask for all my projects accounts.

 4     Q.   Where is the documentation or accounting of the time

 5          you spent, the lab supplies, the equipment, services,

 6          isn't there a separate list that breaks down the hours

 7          or the costs for personnel time and lab supplies,

 8          equipment, services?

 9               MS. O'DELL:  Objection.

10               THE WITNESS:  Yeah, so the question is these

11          numbers came from breakdown of expenses, receipts.  We

12          do have receipts for all the expenses from the lab.

13     BY MR. HEGARTY:

14     Q.   Do you have receipts for, that document all the time

15          that is under the heading personnel?

16     A.   So the only personnel that's paid was Dr. Fletcher and

17          part-time my research assistant, medical student Ira,

18          she was paid part-time, but full-time salary was paid

19          for Nicole from this budget.

20     Q.   Who paid --

21     A.   That's included in what they call indirect.

22     Q.   Let me finish, Doctor, who paid for Ira and Nicole's

23          time?

24     A.   My lab.

25     Q.   When you say your lab, you're talking about your lab at
```

Ghassan Saed, Ph.D.

```
 1          Wayne State?

 2     A.   Yes.

 3     Q.   And where did the funds come from that your lab could

 4          use to pay Ira and Nicole?

 5     A.   I have discretion funding for my lab.

 6     Q.   I'm sorry?

 7     A.   I have funds available for me to my lab.

 8     Q.   Who provides those funds?

 9     A.   The department.

10     Q.   So the department paid for Ira's and Nicole's time to

11          work on this talc project?

12     A.   Correct.

13     Q.   The total listed there is $94,957.  How much of that

14          went to Ira and Nicole?

15     A.   Most of that went to Nicole, I can't remember exact,

16          but most of that went to Nicole because she was a

17          full-time post doc at the time.

18     Q.   Do you know where the department received the funds

19          that were used to pay Ira and Nicole?

20               MS. O'DELL:  Object to the form.

21               THE WITNESS:  I missed that.

22     BY MR. HEGARTY:

23     Q.   Sure.  I think you said the department paid for Ira's

24          and Nicole's time.  From where did the department get

25          the funds they used to pay for Ira and Nicole's time?
```

Ghassan Saed, Ph.D.

```
 1    A.   Let me explain that.  So I get fund from the department

 2         in the form of an account, and the personnel is billed

 3         into this account.

 4    Q.   So where did the funds come from that you get access

 5         to?

 6    A.   From the department.

 7    Q.   And where does the department get them from?

 8    A.   Ask them, I don't know.  They have fund for scientists

 9         to do, develop.

10    Q.   Who would have the receipts of all the expenses and the

11         costs associated with this project?

12    A.   Sharon.

13    Q.   She notes that the costs listed are for your talc

14         project from October 1, 2017.  Is that the date on

15         which the talc project started incurring expenses?

16    A.   I think so, yes.

17    Q.   The document notes that this does not include your

18         effort costs.  What does that mean?

19    A.   My salary.

20    Q.   Your salary at Wayne State?

21    A.   Yes.

22    Q.   So you were paid a salary at Wayne State but you were

23         also paid by Beasley Allen to do this talc project,

24         correct?

25              MS. O'DELL:  Object to the form.
```

Ghassan Saed, Ph.D.

```
 1                    THE WITNESS:  I was paid as a consultant for
 2         my time.
 3    BY MR. HEGARTY:
 4    Q.   Now, all the work that you did on the talc project was
 5         paid for in an hourly way by Beasley Allen, correct?
 6    A.   No.
 7    Q.   What time that you spent on the talc project was not
 8         paid for by Beasley Allen?
 9    A.   It's the time I spent in the lab doing my duties.
10    Q.   The time you spent in the lab doing your duties on this
11         project?
12    A.   On this project, on other projects, too.
13    Q.   So there was time you spent on the talc project that
14         you did not bill to Beasley Allen?
15    A.   Correct.
16    Q.   How did you divide that, the time that you did bill
17         Beasley Allen for on the talc project and the time you
18         didn't?
19    A.   So the time I work for extra, additional work, I billed
20         them, like overtime, I worked Saturdays, I worked
21         weekends, I write, I read.
22    Q.   Can you estimate the amount of time that you spent on
23         the talc project that you did not bill Beasley Allen?
24    A.   Hour, hours you're talking?
25    Q.   By hours.
```

Ghassan Saed, Ph.D.

```
 1    A.   I can't.  I didn't -- I never thought about it like

 2         that.

 3    Q.   Does Exhibit Number 5 capture all of the personnel, lab

 4         supplies, equipment, services, costs for this project?

 5    A.   From my lab, yes.

 6    Q.   Have there been any such costs incurred since

 7         December 18, 2018?

 8    A.   What's the last date here?  Since what's the --

 9    Q.   Since the date of this document, have there been

10         additional costs incurred for the talc project?

11    A.   No.

12    Q.   Dr. Saed, we were also provided today with what I'm

13         marking as Exhibit Number 6.

14              SAED DEPOSITION EXHIBIT NUMBER 6,

15              COPY OF CHECK DATED 11/2/2017 FOR $15,000,

16              WAS MARKED BY THE REPORTER

17              FOR IDENTIFICATION

18    BY MR. HEGARTY:

19    Q.   Would you please identify for me what Exhibit Number 6

20         is.

21    A.   This is a retainer check for my consulting work.

22    Q.   Did you ask for a retainer in connection with your

23         consulting work or did they offer to provide that to

24         you?

25    A.   I can't remember.
```

Ghassan Saed, Ph.D.

```
 1    Q.    With regard to the invoices and the retainer, have you

 2          been paid for all the invoices?

 3    A.    I have been paid for these invoices, yes.

 4    Q.    So with regard to the amount of the check, that was

 5          $15,000, correct?

 6    A.    The retainer check?  Yes.

 7    Q.    Yes, and the date of the invoice is October 19, 2017?

 8    A.    Which invoice?

 9                MS. O'DELL:  Object to the form.

10                THE WITNESS:  Which invoice?

11    BY MR. HEGARTY:

12    Q.    Well, there's an invoice date listed at the bottom of

13          the check of October 19, 2017.  Do you see that?

14                MS. O'DELL:  I would just state for the

15          record that there are no additional invoices, that that

16          is my belief that data was put in by our Accounting

17          Department when the request was made, so there's no

18          invoice that has not been disclosed if that's --

19                MR. HEGARTY:  That was going to be my next

20          question.

21                The date of the check is November 2nd, 2017,

22          correct?

23                THE WITNESS:  Correct.

24    BY MR. HEGARTY:

25    Q.    And all these funds went to you, correct?
```

Ghassan Saed, Ph.D.

```
 1    A.    The 15,000?

 2    Q.    Yes.

 3    A.    Yes.

 4                SAED DEPOSITION EXHIBIT NUMBER 7,

 5                MOLECULAR BASIS SUPPORTING THE ASSOCIATION OF

 6                TALCUM POWDER USE WITH INCREASED RISK OF OVARIAN

 7                CANCER, WAS MARKED BY THE REPORTER

 8                FOR IDENTIFICATION

 9    BY MR. HEGARTY:

10    Q.    I'm going to mark next as Exhibit Number 7 a copy of a

11          manuscript we've been provided, which I referenced

12          earlier, the manuscript that I marked as Exhibit

13          Number 7 is entitled Molecular Basis Supporting the

14          Association of Talcum Powder Use With Increased Risk of

15          Ovarian Cancer.  Do you see what I'm referring to,

16          Doctor?

17    A.    Yes.

18    Q.    First of all, is this the current version of the paper

19          you submitted to Reproductive Sciences?

20    A.    Yes.

21    Q.    Do you have prior drafts of this paper in your office

22          or in your possession?

23    A.    Do I have drafts?

24    Q.    Correct.

25    A.    Like --
```

Ghassan Saed, Ph.D.

```
 1    Q.    Well, let me explain.  Go to the very last page of

 2          Exhibit Number 7.

 3    A.    Okay.

 4    Q.    Very last page.

 5    A.    Okay.

 6    Q.    There's an e-mail there.

 7    A.    Oh.

 8    Q.    Of December 26, 2018, which would indicate that you

 9          submitted the paper in advance of that date, yet on the

10          first page of Exhibit Number 7 it reports the date

11          submitted by the author of January 3rd, 2019.  So there

12          must have been a prior manuscript submitted to

13          Reproductive Sciences before Exhibit Number 7, correct?

14    A.    Hold on.  I need to digest this.  Can you repeat that,

15          please?

16    Q.    Sure.

17    A.    What are we talking about?

18    Q.    The e-mail that you're looking at is dated December 26,

19          2018, correct?

20    A.    Yes.

21    Q.    That e-mail refers to a manuscript you had submitted,

22          which would have been submitted before that date,

23          correct?

24    A.    Yes.

25    Q.    The first page of Exhibit Number 7 in the date
```

Ghassan Saed, Ph.D.

```
 1            submitted by the author section says January 3rd, 2019,

 2            which is after December 26, 2018.  So my question is

 3            where is the manuscript that was submitted before

 4            December 26, 2018?

 5    A.      Okay.  So when you submit a manuscript, they return

 6            they usually give you some corrections or editing to

 7            do, and then you do the editing, and then you resubmit

 8            the manuscript, so I have both copies.  Are you

 9            interested to see the one that went to revision versus

10            the one after revision?

11    Q.      You have the copy that you initially sent to

12            Reproductive Sciences which is the one referred to in

13            the e-mail of December 26, 2018?

14    A.      Sure.

15    Q.      Are there only two drafts of the manuscript, the one

16            you submitted prior to December 26, 2018 and the one we

17            marked as Exhibit Number 7?

18    A.      For Reproductive Science, yes.

19    Q.      Have you made any revisions to the document that we

20            have marked as Exhibit Number 7?

21    A.      Let's see if I remember, so this is the first -- which

22            one is this, okay, because there is one original that

23            we submitted.

24    Q.      Correct.

25    A.      Went to review, the reviewer asked for some
```

Ghassan Saed, Ph.D.

```
 1          modification, I did it and resubmit it.

 2     Q.   Is Exhibit Number -- I'm sorry, go ahead.

 3     A.   So this, I can't remember is this the most recent one

 4          or not.

 5     Q.   Did you bring a copy today?

 6     A.   I have a copy.

 7     Q.   You brought a copy from your office?

 8     A.   Yeah, this is a copy from my office.

 9     Q.   May I see it, please?

10     A.   Yes.

11               SAED DEPOSITION EXHIBIT NUMBER 8,

12               MOLECULAR BASIS SUPPORTING THE ASSOCIATION OF

13               TALCUM POWDER USE WITH INCREASED RISK OF OVARIAN

14               CANCER,

15               WAS MARKED BY THE REPORTER

16               FOR IDENTIFICATION

17     BY MR. HEGARTY:

18     Q.   I'm going to mark as Exhibit Number 8 a copy of the

19          article or manuscript that Dr. Saed just provided to

20          me.  At least the cover page contains the same date

21          submitted by the author date.  Would you look at the

22          two Exhibit Number 7 and Exhibit Number 8, and tell me

23          whether they are the same?

24     A.   Yeah, it looks the same to me.

25     Q.   So have there been any additional revisions to the
```

Ghassan Saed, Ph.D.

```
 1          manuscript that we've marked as 7 and 8?

 2    A.    No.  We revised it according to the reviewer's comment

 3          and resubmitted it, and then it was officially

 4          accepted.

 5    Q.    Did you submit the manuscript to any other journals?

 6    A.    Prior to this?

 7    Q.    Prior to this.

 8    A.    Yes.

 9    Q.    What journals did you submit to?

10    A.    OB-GYN Oncology.

11    Q.    When did you submit the manuscript to OB-GYN Oncology?

12    A.    I'm not good on dates.

13    Q.    You submitted it before --

14    A.    Prior.

15    Q.    Prior to submitting it to Reproductive Sciences?

16    A.    Correct.

17    Q.    Are you able to estimate when you completed the

18          manuscript such that it could be submitted to a

19          journal?

20    A.    I would say -- what's the date now -- September,

21          October, September maybe around.

22    Q.    Did you get a response from OB-GYN Oncology to your

23          submission?

24    A.    I did.

25    Q.    What was their response?
```

Ghassan Saed, Ph.D.

```
 1   A.   That I needed to do in vivo, additional in vivo animal
 2        experiments.
 3   Q.   That you needed to do additional in vivo animal
 4        experiments before they would agree to publish your
 5        paper; is that correct?
 6   A.   No, they -- usually the basis of their rejection, this
 7        is a review of comment, not the editor request, so
 8        comments you can do, you can agree with or you can
 9        disagree with.  So I always publish papers and I'm very
10        familiar with this process.  So there's a distinction
11        between editor's opinion and reviewer's comment.  So
12        reviewer comments, they're not bound -- I'm not bound
13        to their comments.  I may agree with them and I may
14        disagree with them.  So the reviewer -- the editor,
15        they usually, their policy, they use it based on
16        reviewer's comment, that's part of the concentration,
17        the other part will be the how many -- the volume, how
18        many they receive and priority for the articles to be
19        published.
20   Q.   So as to the chronology, you completed a draft of your
21        manuscript that we marked as Exhibit Number 7 and 8,
22        you submitted that manuscript initially to OB-GYN
23        Oncology --
24   A.   Correct.
25   Q.   -- in the September 2018 time frame?
```

Ghassan Saed, Ph.D.

```
 1    A.   Correct.

 2    Q.   They, based on correspondence with you, sent that paper

 3         to peer reviewers, correct?

 4    A.   Correct.

 5    Q.   How many peer reviewers did they send it to?

 6    A.   I don't know.

 7    Q.   How many comments back from peer reviewers did you

 8         receive, just by peer reviewer number?

 9    A.   I know, but I'm trying to remember, maybe one or two, I

10         can't remember, I think two.

11    Q.   You mentioned one of the comments was --

12    A.   But two that they commented.  So usually they send it

13         to more.  If they have no comments, they don't include

14         them.

15    Q.   One of the reviewers commented that you needed to do

16         additional in vivo animal studies to show the same

17         effect that you reported in cell cultures that you did,

18         correct?

19              MS. O'DELL:  Object to form.

20              THE WITNESS:  No.

21    BY MR. HEGARTY:

22    Q.   What did he say or she say?

23    A.   It was said that this is very exciting work,

24         interesting work, has a biological relevance, it would

25         be interesting to see if this can be shown in vivo.
```

Ghassan Saed, Ph.D.

```
 1    Q.    Do you remember anything else that was said in those

 2          comments besides what you provided to us this morning?

 3    A.    Yeah, they like it, they love my work.

 4    Q.    Anything else you can recall from the comments?

 5    A.    No, this is positive and it's good data that they need

 6          to -- complimented with.

 7    Q.    So with regard to the comments, then what -- strike

 8          that.  OB-GYN Oncology rejected your paper, correct?

 9    A.    They said that -- yeah, they said that we don't want --

10          priority at this time.

11    Q.    Did they say why they rejected your paper?

12    A.    They say we have lot of papers received by the journal

13          and it's not a priority right now.

14    Q.    Do you have all the documents of your submission to

15          OB-GYN Oncology and their -- the comments and other

16          documents that you received back in connection with

17          that submission?

18                MS. O'DELL:  Object to the form.

19    BY MR. HEGARTY:

20    Q.    Yes?

21    A.    I want to see -- what's the question?  Sorry.

22    Q.    Sure.  Do you have the documentation, all the documents

23          of your submission to OB-GYN Oncology and their

24          response back?

25    A.    You mean the manuscript?
```

Ghassan Saed, Ph.D.

```
 1    Q.   The manuscript, your cover letter, the letter back, the
 2         comments, the comments you received back, do you have
 3         all that material?
 4    A.   Yes.
 5    Q.   Is that back in your office?
 6    A.   It's in my office, yes.  You talking about manuscript,
 7         right?
 8    Q.   Well, the manuscript and the reviewer comments.
 9    A.   And the reviewer comments, yes.
10    Q.   You chose not to do or try to replicate your results in
11         an in vivo animal model, correct?
12    A.   No, it's not correct, I didn't choose, I just don't
13         have the time to do it and the money.
14    Q.   Did you submit your manuscript to any other journals
15         besides OB-GYN Oncology and Reproductive Sciences?
16    A.   No.
17    Q.   How did you choose to submit your journal first to
18         OB-GYN Oncology?  Why did you choose that journal?
19    A.   Those, the OB-GYN Oncology and Reproductive Sciences
20         are the major societies for our specialty, and most
21         readers -- OB-GYN readers read those two manuscripts, I
22         mean journals.
23    Q.   Of your specialty, which specialty is that?
24    A.   Like our -- like in the field of OB-GYN research.
25    Q.   And what resource do you have that Reproductive
```

Ghassan Saed, Ph.D.

```
 1          Sciences is a journal that most in your specialty

 2          review or read?

 3                    MS. O'DELL:  Object to the form.

 4                    THE WITNESS:  I mean do I have a number?  Or

 5          you mean the source where I got that from?

 6     BY MR. HEGARTY:

 7     Q.   Yeah, where did you get that from?

 8     A.   From my experience with them for the last 25 years.

 9     Q.   Have you published in that journal before?

10     A.   Yes.

11     Q.   Have you published in OB-GYN Oncology before?

12     A.   Yes.

13     Q.   Is there such a thing as something called an impact

14          factor of a journal?

15     A.   Correct.

16     Q.   Do you know what the impact factor is of Reproductive

17          Sciences?

18     A.   About 3, 2.8 something.

19     Q.   How about OB-GYN Oncology?

20     A.   4, the upper 5, the upper 4, 5, 4.6, 5 maybe.

21     Q.   We were also, as we talked earlier, provided with the

22          original lab notebook that -- in connection with the

23          article that you have submitted to Reproductive

24          Sciences and that you submitted to OB-GYN Oncology.  Is

25          what we've designated as Exhibit Number 2 all of the --
```

Ghassan Saed, Ph.D.

```
 1          does it represent all the work that you did that went

 2          into the paper we marked as Exhibit Number 7?

 3                    MS. O'DELL:  Object to the form.

 4                    THE WITNESS:  So, yeah, so this part starting

 5          here, from here all the way to the end, that represents

 6          everything in the manuscript.

 7     BY MR. HEGARTY:

 8     Q.   You're pointing to 30?

 9     A.   From here, yes.

10                    MS. O'DELL:  To the end.

11                    THE WITNESS:  To the end.

12     BY MR. HEGARTY:

13     Q.   What is contained in Pages 1 through 29?

14     A.   This is like preliminary trials that we were running,

15          testing, so forth, the talc.

16     Q.   Do Pages 1 through 29 represent activities as part of

17          the work that generated the results contained on

18          Pages 30 thereafter?

19     A.   No.

20     Q.   What does it represent, then?

21     A.   It's a trial, it's a pilot experiment to tune-up the

22          technique.

23     Q.   When did this -- this pilot experiment goes back, at

24          least based on the date of the notebook, to 10-15-17?

25     A.   Correct.
```

Ghassan Saed, Ph.D.

```
 1    Q.    Is it -- do you always do pilot experiments before you

 2          do an experiment like this?

 3    A.    Sure.

 4    Q.    Why do you always do a pilot experiment?

 5    A.    You need to figure out the right conditions, right

 6          concentration, the right incubation time.

 7    Q.    And how does a pilot study provide that information?

 8    A.    I don't understand what you mean.

 9    Q.    How does a pilot study provide you with information to

10          know you're using the right conditions, the right

11          concentration?

12    A.    So when you use a concentration of 1,000 microgram per

13          ml and it kills your cells, you know it's toxic, you

14          should go lower.

15    Q.    Is that what you did here?

16    A.    Yes.

17    Q.    Do you do any other testing like that to determine the

18          parameters of your later tests?

19    A.    Sorry, I don't understand.

20    Q.    Well the test you just described is sort of that it, it

21          sort of set an upper limit of where you could go before

22          you kill the cells, right?

23                MS. O'DELL:  Object.

24                THE WITNESS:  Just an example, I'm giving you

25          an example.
```

Ghassan Saed, Ph.D.

```
 1    BY MR. HEGARTY:

 2    Q.    An example.  Do you recall anything specific that you

 3          did in the pilot study that helped you define the

 4          parameters of the later study that you did?

 5    A.    Other than the dose, most of the technology and the

 6          methods that we used, it's really standard in our

 7          laboratory, we have published them, we -- and not just

 8          us, it's standard accepted technology everywhere in

 9          this field.

10    Q.    And how did the pilot study that's reflected in Exhibit

11          Number 2 inform you as to the studies -- study that you

12          did that are reflected in the rest of the pages?

13    A.    Yes, so basically we looked at the dose here and this

14          pilot study showing that the initial dose was high and

15          it was like 500 microgram per ml to a thousand, that's

16          how we started, and we figured out that this dose

17          killed the cells and induced some toxicity, so this is

18          why we learned from this, and then we turned up the

19          CA-125 assay, this is turning up the assay to see how

20          much you need to use.  Is it from the media?  Is it

21          from the cell?  You need to set up all this, and this

22          is done in here, and it's described, it's not hidden,

23          it's all over, it's all here.  But we determined

24          basically the dose, and we figured out what is toxic to

25          the cells.
```

Ghassan Saed, Ph.D.

```
 1    Q.    How did you come to start with the 500 milligram per

 2          milliliter dose?

 3    A.    So we read in the literature prior experiments people

 4          did from 5 all the way to 1,000, and I found the paper

 5          after we did -- we thought first initial experiment we

 6          will hit the cells with high concentration, see what

 7          happened, and then titrate it down, but then we found

 8          it's toxic effect on the cells so -- and then I came

 9          across a paper where they used these small doses that

10          they found biological effect with, and they used 5, 20

11          and 100 and up to 500, so I chose the lower range,

12          which is 5, 20, and 100 for my study.

13    Q.    What paper was that?

14    A.    That was -- do you have that paper -- --

15    Q.    Is that the Buz'Zard paper?

16    A.    Let me see, do you have the Buz'Zard --

17                MS. O'DELL:  It's right in your notebook

18          there, Doctor.

19                THE WITNESS:  Where do I find it now here?

20                MS. O'DELL:  You might look in your

21          references of your report.

22                THE WITNESS:  Right.

23                MS. O'DELL:  And then we can go from there.

24                THE WITNESS:  I think it's Buz'Zard or

25          Shukla, one or the other, I can't remember.
```

Ghassan Saed, Ph.D.

```
 1    BY MR. HEGARTY:

 2    Q.   Are you confident that it was one or the other?

 3    A.   Yes.

 4    Q.   The lab notebook that we've been provided marked as

 5         Exhibit Number 2 has a first date of 10-15-17.  Is that

 6         the first date that there was any lab work done either

 7         in the pilot study or the later study?

 8    A.   No.

 9    Q.   What is the earliest date of work?

10    A.   May I have this?

11    Q.   Yeah, I'm handing you Exhibit Number 3.

12    A.   So the first work that we did with talc, 9-26.

13    Q.   Dr. Saed referred to Exhibit Number 3 and pointed me to

14         a page that's dated 9-26.  First of all, what is

15         represented or contained in Exhibit Number 3, this lab

16         notebook?

17    A.   So this part, okay, so I have to indicate something, we

18         share lab notebook, we use them for -- so not

19         necessarily one lab notebook for one project.  So, for

20         example, the first part of this lab notebook --

21              MS. O'DELL:  Which is Exhibit 3.

22              THE WITNESS:  -- which is Exhibit 3, looking

23         at the effect of a dipeptide on adhesion markers, and

24         then we continued with talc, so sometimes we mix up,

25         like we don't necessarily use one project for one lab
```

Ghassan Saed, Ph.D.

```
 1          notebook, okay.  So this part of the notebook --

 2   BY MR. HEGARTY:

 3   Q.   The first part?

 4   A.   The first part is for the different study.  This part

 5        where we started the actual work with talc.

 6   Q.   When you -- you started referencing the pages, this

 7        part, then what does this part represent being done?

 8   A.   This part was an experiment that we did exposing cells,

 9        ovarian cancer cells, to talc, Fisher, and look at

10        oxidative stress markers.  We used three ovarian cancer

11        cell lines, and we used macrophages of normal

12        epithelial cells.  And the result of this work was

13        submitted to Society of Reproductive Investigation

14        meeting that was held last year March, yes, last year

15        in San Diego, and you can see all the way down, this is

16        the poster that resulted from this work.

17   Q.   The poster you pointed to is on Page 63?

18   A.   Yes.

19   Q.   Was there a pilot study done before doing this

20        experiment?

21   A.   So this is a pilot study.

22   Q.   So the study that we are looking at dated -- with the

23        start date of 9-26-2017 --

24   A.   Right.

25   Q.   -- you consider that to be a pilot study?
```

Ghassan Saed, Ph.D.

```
 1   A.   This is a -- we have many pilot studies.  It depends on

 2        what marker you're doing the pilot study for.  So

 3        there's a pilot study for CA-125.  There is a pilot

 4        study for the dose.  There is a pilot study for cells.

 5        So this is a pilot study.

 6   Q.   In the other notebook you went from a pilot study to

 7        doing a subsequent study.

 8   A.   Correct.

 9   Q.   Did you do that with this pilot study?

10   A.   No, this is only done with -- this is a preliminary

11        study that we did, and we only tested mRNA levels of

12        some oxidative stress markers.  The other study that

13        you're referring to with the manuscript, this is a

14        comprehensive study that looked at every fold of gene

15        expression from mRNA to DNA to ELISA to activity of

16        proteins, everything.  This is just simply a pilot

17        experiment looking at, yes, there is an effect, no,

18        there is not an effect, and, yes, there is an effect,

19        so we published it.

20   Q.   The first date of any study that you did with talc is

21        September 26, 2017?

22   A.   Correct.

23   Q.   Who is involved in the study that we looked at in

24        Exhibit Number 3 whose begin date was September 26,

25        2017?
```

Ghassan Saed, Ph.D.

```
 1    A.   That's Nicole King and Ira, and myself.

 2    Q.   What prompted you to do this initial study?

 3    A.   My lab interest is ovarian cancer and oxidative stress,

 4         we talked about that, I answered that, the media and,

 5         you know, what's going on, and this is the core of my

 6         lab specialty is looking at oxidative stress markers,

 7         inflammation, and ovarian cancer.

 8    Q.   Is it your testimony that this study with the start

 9         date of 9-26-2017 was not prompted by your call with

10         Miss Thompson?

11              MS. O'DELL:  Object to the call.

12              THE WITNESS:  Was not prompted?

13    BY MR. HEGARTY:

14    Q.   Yes.

15              MS. O'DELL:  Object to the form.

16    BY MR. HEGARTY:

17    Q.   In other words, you would not have done this study or

18         the study for which you have submitted a manuscript to

19         Reproductive Sciences if Miss Thompson had not called

20         you, correct?

21              MS. O'DELL:  Object to the form.

22              THE WITNESS:  No, I was always interested in

23         doing this.

24    BY MR. HEGARTY:

25    Q.   So it's your testimony that if you had not gotten a
```

Ghassan Saed, Ph.D.

```
 1        call from Miss Thompson, you would have still done

 2        these studies?

 3   A.   Correct.

 4   Q.   Were the studies in the works at the time that Miss

 5        Thompson called you?

 6   A.   I was reviewing literature only.

 7   Q.   You had not thought about doing actual laboratory

 8        studies before Miss Thompson had called you involving

 9        talc?

10   A.   I planned it before she called me.

11   Q.   You had actually planned to do laboratory studies?

12   A.   Correct.

13   Q.   Do you have any documentation of that plan?

14   A.   No.

15   Q.   Did you talk with anyone and tell them that your plan

16        was to do studies involving talc before you were called

17        by Miss Thompson?

18   A.   We always discussed talking about looking at any

19        substance that induces inflammation and oxidative

20        stress.  So we always talk in the lab and with

21        colleagues about any substance.  Talc was brought up,

22        yes.

23   Q.   To whom did you speak with about talc and doing an

24        experiment about talc before you received a call from

25        Miss Thompson?
```

Ghassan Saed, Ph.D.

```
 1    A.    I discussed with Nicole.

 2    Q.    When was that discussion?

 3    A.    I can't remember dates, but we always discussed markers

 4          of oxidative stress.

 5    Q.    Well, you said that you always talk in the lab and with

 6          colleagues about any substance.  Talc was brought up.

 7    A.    Correct.

 8    Q.    What substances had you tested in your lab with regard

 9          to oxidative stress before your study about talc?

10    A.    We go backwards, we go looking at reducing oxidative

11          stress and looking at mechanisms, or manipulating

12          alteration of oxidative stress, like, for example, we

13          did the work where we added a scavenger of Superoxide

14          dismutase, which is a very powerful oxidant, and we

15          looked at inducing apoptosis in ovarian cancer cells.

16          We're looking at intervention, changing the cell redox

17          balance, alteration of that balance, it is given, it's

18          accepted in the literature and in our world that cancer

19          cells and ovarian cancer cells included, they all have

20          characterized by a pro-oxidant state that is given,

21          it's known.  So we don't need to show a substance that

22          induces further that oxidative stress.  We are looking

23          for attenuating and modulating that oxidative stress

24          and see the effect, the downstream effect.  We have

25          done that, we have published that with looking at SRNA
```

Ghassan Saed, Ph.D.

```
 1          to shut down proteins, knock down proteins, we did it
 2          for myeloperoxidase, we did it for ionase, we did it
 3          for SOD so.
 4   Q.     But prior to the call you received from Miss Thompson,
 5          you had never tested any particulate or exposed cells
 6          to any particulate and looked for oxidative stress,
 7          correct?
 8   A.     No, not correct.  I used hypoxia, induced hypoxia and
 9          look at normal cells.
10   Q.     What particles did you apply to cells in that study?
11   A.     Hypoxia.
12   Q.     What's hypoxia?
13   A.     It is the creation of a hypoxic micro environment into
14          the cells.  This can be in vivo induced by infection,
15          by wound, by many other factors that do that.
16   Q.     Let me clarify my question, then.  My question is what
17          environmental particles that are not generated in vivo
18          had you ever applied to cells and culture prior to the
19          call from Miss Thompson?
20   A.     That we published?  I don't -- like a given particle
21          you're talking about?
22   Q.     Correct.
23   A.     No, I don't have any, I never done anything like that.
24   Q.     What studies had you actually planned on doing with
25          talc before your call -- before the call came from Miss
```

Ghassan Saed, Ph.D.

```
 1          Thompson?  Had you actually formed the framework of a

 2          study?

 3   A.     No, I was just thinking about the overall, it would be

 4          interesting to see if this is -- this will induce

 5          inflammation in our cells, and if it does, then it

 6          should be linked to the risk of ovarian cancer, so

 7          thinking, just talking about it.

 8   Q.     With regard to the manuscript that -- strike that.

 9          With regard to the tests that were part of the

10          manuscript, those tests were done in connection with

11          your communications with Beasley Allen, correct?

12   A.     Those tests?

13   Q.     Yes.

14   A.     What do you mean by communication?

15                 MS. O'DELL:  Object to form.

16   BY MR. HEGARTY:

17   Q.     Well, you talked with Beasley Allen about doing those

18          tests, correct, before you did them?

19                 MS. O'DELL:  Object to the form.

20                 THE WITNESS:  No, I was planning to do them,

21          anyways.

22   BY MR. HEGARTY:

23   Q.     You just said, though, before the call you had not done

24          anything formal or even --

25   A.     Yeah, I said --
```

Ghassan Saed, Ph.D.

```
 1   Q.   -- informal about putting a test together, correct?

 2   A.   I said I was planning to do this.

 3   Q.   Okay.

 4   A.   I had a plan to do this.

 5   Q.   Okay.  What was your plan?

 6   A.   This is the plan -- the plan -- okay, this is important

 7        to know, that I have this set up ready in my lab, ready

 8        to go.  We have all the technology for all these

 9        markers.  So it is not hard just to add -- so when I

10        plan, it means I -- we had used the setup that I

11        already have in my laboratory, that's what I -- in my

12        plan.

13   Q.   But you had not done anything to further that plan?

14   A.   Physically, no.

15   Q.   Let me finish, you had not done anything to further

16        that plan until after the call came from Miss Thompson,

17        correct?

18   A.   Correct.

19   Q.   Did you discuss at all the makeup of the study or what

20        you were going to do with the study or the methods of

21        the study with Beasley Allen before you did them?

22   A.   No.

23   Q.   Did you have any discussions at all with attorneys for

24        Beasley Allen about the concept of the study, the

25        methods of the study, the protocol of the study, how
```

```
 1          the study was going to be done, anything like that?
 2                    MS. O'DELL:  Let me just stop you right
 3          there.  I think when you're talking about conversations
 4          you -- you're talking about after the time that he's
 5          been engaged by Beasley Allen and those discussions
 6          would be protected by the privilege.  I'm going to
 7          instruct the witness not to answer.
 8                    MR. HEGARTY:  Well, my questions are related
 9          solely to the manuscript, the testing in the manuscript
10          that has been submitted to Reproductive Sciences.  So
11          is it your position that all the communications you had
12          with regard to the tests done for purposes of the
13          publication Reproductive Sciences and the writing of
14          the article, submission of the article, are protected
15          by the consulting privilege?
16                    MS. O'DELL:  Well, and as you know, the
17          substance of the manuscript largely is Dr. Saed's
18          expert report, and the work that he did in terms of
19          consulting was paid for by Beasley Allen and he was
20          doing that as a part of the consulting arrangement.
21          So, yes, to the degree he had conversations with the
22          lawyers, we're going to -- I'm going to instruct him
23          not to answer.
24                    MR. HEGARTY:  I'm not going to argue with
25          you.  I just want to make sure I'm interesting that
```

Ghassan Saed, Ph.D.

```
 1          that's -- that your objection extends to any question

 2          that I would ask with regard to communications with

 3          Beasley Allen or attorneys for the plaintiffs with

 4          regard to the creation of the study, the setup of the

 5          study, the protocol of the study, doing the study,

 6          writing the manuscript.

 7                    MS. O'DELL:  That was not, your question's a

 8          little bit different than what you just described.  You

 9          can ask your questions, there may be some that are

10          appropriate and some not, but as regard the question

11          that's on the table, I think that's inappropriate and

12          I've instructed him not to answer.

13     BY MR. HEGARTY:

14     Q.   Dr. Saed, did you have any discussions with any

15          attorneys for Beasley Allen regarding the pilot study

16          that we talked about in Exhibit Number 3?

17     A.   What's Exhibit Number 3?

18     Q.   The one -- the study that's dated 9-26-2007.

19                    MS. O'DELL:  Objection, vague.

20                    THE WITNESS:  Again, okay, here is my answer.

21          No one has interfered with the design of the study, how

22          the study should be done, what assay should be applied,

23          what method of analysis should be performed, the

24          writing of the results, the analysis of the results,

25          this is my world, this is my specialty.  No one
```

Ghassan Saed, Ph.D.

```
 1            interfered with that.

 2    BY MR. HEGARTY:

 3    Q.    I appreciate that.  That was not my question.  My

 4          question was simply did you have any discussions with

 5          attorneys for Beasley Allen or attorneys for plaintiffs

 6          in this case with regard to conducting the pilot study

 7          that's in Exhibit Number 3 with the start date of

 8          9-26-2017?

 9    A.    They know that I'm doing this.

10    Q.    Did they know that you were doing it at the time that

11          you were doing it?

12    A.    At this time?

13    Q.    Yes.

14    A.    Yes.

15    Q.    Did you have discussions in advance of doing that study

16          with them?

17    A.    I actually designed this whole thing.  So when they

18          approached me and I got -- you know, I told them this

19          is what I'm going to do, this is what I have in mind,

20          we have all this setup in my lab and I want to do it,

21          and I did it.

22    Q.    Did they provide to you any suggestions on how to do

23          this study?

24    A.    They don't know nothing about this.

25    Q.    Who paid for the pilot study that's reported in Exhibit
```

Ghassan Saed, Ph.D.

```
 1          Number --

 2     A.   My lab.

 3     Q.   Sorry let me finish.

 4     A.   We already talked.

 5     Q.   Who paid for the pilot study that's reported in Exhibit

 6          Number 3?

 7               MS. O'DELL:  Object to the form, to the

 8          degree it's vague.

 9               MR. HEGARTY:  You can answer.

10               THE WITNESS:  We discussed this, right?

11     BY MR. HEGARTY:

12     Q.   Now, the before questions, at least I thought, were

13          limited to the lab costs for -- and personnel costs for

14          the study in exhibit -- in the first notebook, Number

15          2.  Did those lab costs reflected in that exhibit,

16          which is Exhibit Number 5, also cover the pilot study

17          that's in notebook that we marked as Exhibit Number 3?

18     A.   The answer, my lab is paid for -- paid for all the

19          studies that we did.

20     Q.   The --

21     A.   Yeah, you can go back five days later.

22     Q.   Exhibit Number 5 reports the costs of the talc project

23          dated from October 1st, 2017.  This pilot study began

24          on September 26, 2017 correct?

25     A.   Correct.
```

Ghassan Saed, Ph.D.

```
 1   Q.   Is it your testimony that the costs of the pilot study

 2        are included in what's listed in Exhibit Number 5?

 3             MS. O'DELL:  Object to the form.

 4             THE WITNESS:  We started the -- culturing the

 5        cells, so the idea -- are you talking about the actual

 6        money?  We started -- yes, it is included there.

 7   BY MR. HEGARTY:

 8   Q.   You shook your head.  I want to make sure I got it on

 9        the record.

10   A.   Yes.

11   Q.   So the costs for the pilot study in Exhibit Number 3

12        that began on September 26, 2017, are contained in

13        Exhibit Number 5?

14   A.   Correct.  It takes three weeks to get the cells up and

15        going.

16             MR. HEGARTY:  Want to take a break?  We've

17        been going for about an hour and 20 minutes.  Take a

18        break.

19             THE VIDEOGRAPHER:  Going off the record at

20        10:32 a.m.

21             (A short recess was taken.)

22             THE VIDEOGRAPHER:  We're back on the record

23        at 10:51 a.m.

24   BY MR. HEGARTY:

25   Q.   Dr. Saed, when we left off, we were talking about any
```

Ghassan Saed, Ph.D.

```
 1          communication you had with Beasley Allen or other

 2          attorneys for the plaintiffs with regard to the

 3          experiments that you did or the preparation of the

 4          manuscript that you've submitted to Reproductive

 5          Sciences.  Over the course of the time that you did the

 6          experiments, that you did the writing, that you

 7          submitted to Reproductive Sciences, OB-GYN Oncology,

 8          did you exchange any e-mails or letters with attorneys

 9          for Beasley Allen or the plaintiffs with regard to the

10          testing, the writing, the submission of the manuscript?

11                  MS. O'DELL:  Objection to form.

12                  THE WITNESS:  Can you please repeat the

13          question, clarify what you --

14     BY MR. HEGARTY:

15     Q.   Sure.  Well, during the time that you were doing the

16          testing that we've been talking about?

17     A.   Experiments.

18     Q.   -- that's reflected in the lab notebooks, you call them

19          experiments, in the time that you wrote the paper that

20          you first submitted to OB-GYN Oncology and then later

21          to Reproductive Sciences.  Did you have communications

22          with attorneys for Beasley Allen or any plaintiff in

23          this litigation regarding the experiments or regarding

24          the writing of the article or regarding the submission

25          of the article to journals?
```

Ghassan Saed, Ph.D.

```
 1   A.   No.

 2   Q.   Did you have any telephone calls or meetings during

 3        the -- about the experiments or the writing of the

 4        manuscript for the journals or the submission of the

 5        journals with attorneys for Beasley Allen or any

 6        plaintiff in this litigation?

 7             MS. O'DELL:  Objection to the form.

 8             THE WITNESS:  No.

 9             MS. O'DELL:  I was just going to instruct you

10        to the degree that you're asking him about subjects

11        that were discussed in meetings with attorneys for the

12        plaintiff, don't discuss those, the subject matter

13        because those, they're not entitled to know those

14        discussions, so to the degree you can answer your

15        questions outside those parameters, you may.

16             THE WITNESS:  My answer was no for any

17        discussion related to the design of the experiments,

18        the results of the work, the submission to the journal,

19        which journal to submit to, writing the manuscript, all

20        that work I know the answer was no to that work.

21   BY MR. HEGARTY:

22   Q.   So as to everything you just described, you had no

23        discussions with the attorneys for Beasley Allen or any

24        plaintiffs in this case about anything dealing with

25        experiments, the design, the protocol the writing of
```

Ghassan Saed, Ph.D.

```
 1          the manuscript, the submission of the manuscript; is

 2          that correct?

 3                    MS. O'DELL:  Object to the form.

 4    BY MR. HEGARTY:

 5    Q.    You can answer.

 6    A.    I said -- I answered you.  I said I did not discuss the

 7          design of the experiments, the results of the

 8          experiments, where to submit it, how to analyze the

 9          data, all this work I did myself.

10    Q.    Understood.  I'm not asking if they provided input on

11          how to do it or how to write it or where to send it.

12          I'm asking if you had discussions with any attorney for

13          Beasley Allen or any other attorney for Plaintiff over

14          the course of doing all this work about what you were

15          doing?

16    A.    I still don't understand discussion, what does the

17          discussion mean?

18    Q.    Well, discussion means a phone call, an in-person

19          meeting, an e-.mail?

20    A.    Oh.

21    Q.    Any communication that talks about what you're doing.

22                    MS. O'DELL:  Excuse me, you may answer the

23          question whether calls or meetings occurred, you may

24          answer that yes or no, but you cannot divulge the

25          discussions or the topics that were included in those
```

Ghassan Saed, Ph.D.

```
 1         discussions.
 2               THE WITNESS:  Yes, so calls, we did calls.
 3    BY MR. HEGARTY:
 4    Q.   And what were the -- what did you discuss with the
 5         attorneys for Beasley Allen or the plaintiffs during
 6         those calls with regard to the experiments you were
 7         doing or the writing of the manuscript or the
 8         submission of the journal?
 9               MS. O'DELL:  I'm going to instruct you not to
10         answer that question.
11               MR. HEGARTY:  We object to that instruction
12         and believe that that is an inappropriate objection and
13         instruction that's not covered by the consultant
14         privilege, but we're not going to decide it here,
15         understand that, but I just want to make it clear on
16         the record that we don't agree that your objection
17         covers the kind of communications that I asked the
18         doctor.
19               MS. O'DELL:  Well, the privilege covers
20         communications, whether written or verbal, in person or
21         on the telephone, during Dr. Saed's consulting
22         relationship with the plaintiffs and that's what you've
23         asked him and that's what I'm objecting to.
24               MR. HEGARTY:  I understand the objection.  We
25         don't agree with the objection.
```

Ghassan Saed, Ph.D.

```
 1                    MS. O'DELL:  I want to make sure the record
 2          is clear.
 3                    MR. HEGARTY:  And I'm making for the record
 4          that we don't agree with the objection and dispute the
 5          propriety of it and object to you instructing the
 6          doctor not to respond.  With regard to this -- the work
 7          we've been talking about, the pilot study with talc,
 8          that's reflected in the -- and the other studies with
 9          talc that's reflected in the two notebooks, have you
10          prepared any other manuscripts related to those
11          experiments that you intend to submit to any journal?
12                    THE WITNESS:  Other than submitted abstracts
13          to different meetings, no.
14     BY MR. HEGARTY:
15     Q.   Have you prepared abstracts or do you intend to prepare
16          abstracts or have you submitted abstracts regarding the
17          work reflected in the two notebooks that have not yet
18          been disseminated?
19     A.   Disseminated means --
20                    MS. O'DELL:  Object to form.
21     BY MR. HEGARTY:
22     Q.   Well, as we're going to look at here today, there are
23          some abstracts where you describe the work that you're
24          doing, the experiments that you did.  Do you currently
25          have in the works any abstracts that have not yet been
```

Ghassan Saed, Ph.D.

```
 1        published or provided to anyone?

 2                 MS. O'DELL:  Object to the form.

 3    BY MR. HEGARTY:

 4    Q.   Do you understand the question?

 5    A.   Not really.

 6    Q.   Well, do you currently have any abstracts that you're

 7         working on that you intend to submit?

 8    A.   Now I understood.  In relation to --

 9    Q.   The experiments --

10    A.   In relation to the talc project?

11    Q.   Correct.

12    A.   The answer is no.

13    Q.   Do you have any other written work in process relating

14         to the talc experiments that you intend to either turn

15         into an abstract or turn into a journal article?

16    A.   I was asked to write an editorial to one of the

17         journals and I am planning to do that.

18    Q.   Who asked you to write an editorial to a journal?

19    A.   The journal.

20    Q.   What journal?

21    A.   OB-GYN, let me see, I can find the exact name for you,

22         which I'm planning to do.  It's an open access journal

23         obstetrics and gynecology it's in my CV somewhere --

24         trying to find it for you -- where is it -- this is my

25         updated CV?
```

Ghassan Saed, Ph.D.

```
 1                    MS. O'DELL:  This is not your updated CV
 2         actually, this is the one --
 3                    THE WITNESS:  I can find it for you.  It's an
 4         obstetrics and gynecology online, open access online.
 5    BY MR. HEGARTY:
 6    Q.   Who within -- for that publication asked you to write
 7         an editorial?
 8    A.   The editorial office.
 9    Q.   And when did that request come in?
10    A.   I think two weeks ago.
11    Q.   And editorial on what?
12    A.   On talc and oxidative stress.
13    Q.   Have you started writing it?
14    A.   Not yet.
15    Q.   Do you intend to do so?
16    A.   Yes.
17    Q.   Did they give you a date --
18    A.   No.
19    Q.   -- for submission?
20                    MS. O'DELL:  Let him finish his question,
21         please, Doctor.
22    BY MR. HEGARTY:
23    Q.   Did they give you a date for providing -- did they give
24         you a date for providing the editorial?
25    A.   No.
```

Ghassan Saed, Ph.D.

```
 1    Q.    Is the editorial going to be in response to a journal

 2          article or another publication?

 3    A.    It is in response to the published abstracts that I did

 4          online.

 5    Q.    And with regard to the open access publication, is that

 6          a publication that's only available on the internet?

 7    A.    Open access, yes.

 8    Q.    Is that a publication which you have to pay to have

 9          your materials published on the internet?

10    A.    All open access journals you have to pay, yes.

11    Q.    You will have to pay to have your editorial published?

12    A.    Yes.

13    Q.    How much does that cost?

14    A.    Not too much like, 3, $400.

15                MR. LOCKE:  Could we ask the witness to speak

16          up.

17                MS. O'DELL:  They don't have access to a

18          speaker, so they're just listening to you over there,

19          so if you could raise your voice.

20                THE WITNESS:  4, $500, 400 to 500 -- where is

21          that --

22                MS. O'DELL:  That's okay.

23                MR. HEGARTY:  We're past that question,

24          Doctor.

25                THE WITNESS:  Thank you.
```

Ghassan Saed, Ph.D.

```
 1    BY MR. HEGARTY:

 2    Q.   We were provided some additional materials this morning

 3         that I wanted to make sure I mark for the record and

 4         follow up on a few things in those materials.  I'm

 5         going to mark as Exhibit Number 10 what was represented

 6         to us today to be the index for the lab notebook that

 7         we marked as Exhibit Number 2, that's the notebook that

 8         has the experiments in it that went into your

 9         manuscript.

10              SAED DEPOSITION EXHIBIT NUMBER 10,

11              INDEX FOR LAB NOTEBOOK,

12              WAS MARKED BY THE REPORTER

13              FOR IDENTIFICATION

14    BY MR. HEGARTY:

15    Q.   And I'll show you -- make sure we have the right lab

16         note --

17                   MR. LAPINSKI:  Counsel, is there an Exhibit 9

18         marked?

19                   MR. HEGARTY:  Oh, I skipped over Exhibit 9.

20         I'll go back to it.

21                   THE WITNESS:  So this and this.

22    BY MR. HEGARTY:

23    Q.   Yes, you looked at Exhibit 2 compared to Exhibit 10.

24         Is that the index to Exhibit 2?

25    A.   Yes.
```

Ghassan Saed, Ph.D.

```
 1   Q.   With regard to the index there, on the index, Doctor,

 2        Exhibit 10, the pages after 21 you jump to 31.  What

 3        happened to Pages 22 to 29 -- I'm sorry, 22 to 30?

 4             MS. O'DELL:  I'm sorry, are you referring to

 5        Exhibit 10 or --

 6             MR. HEGARTY:  Yes, Exhibit 10, the pages go

 7        20-21, then jump to 31-32, and my question is where are

 8        Pages 22 to 30?

 9             THE WITNESS:  22, you said?

10   BY MR. HEGARTY:

11   Q.   Yes.

12   A.   22, 23, 24, 29.  Oh, so there's -- yeah, you talking

13        about the tore apart?

14   Q.   We'll get to that part in a second.  First of all, why

15        aren't Pages 22 to 29 listed in the index or at least a

16        portion of those?

17             MS. O'DELL:  Object to the form.

18             THE WITNESS:  31 -- 21 -- 21, 31, what

19        happened, 21, yeah, there is nothing after that, right?

20   BY MR. HEGARTY:

21   Q.   Well, on Exhibit Number 10 it jumps from 21 to 31, and

22        where are the nine or ten pages in between those?

23   A.   Yeah, that's what I'm talking about, those are -- you

24        want me to answer for the missing pages?

25   Q.   Well, I'll get to that first but --
```

Ghassan Saed, Ph.D.

```
 1   A.   That's the answer.

 2   Q.   Let me look at the notebook.  There are pages --

 3        there's 21 and then there is a 22, 23, and a 24 that's

 4        not referenced in the index.  Why is that?

 5   A.   Because those are figures.  They could be referenced.

 6   Q.   But they have page numbers on them.

 7   A.   Sure.

 8   Q.   And you otherwise list page numbers here that are also

 9        just pages that contained figures, correct?

10   A.   Correct.

11   Q.   Why are these pages not referenced in the index?

12   A.   I don't know.

13   Q.   There are also --

14   A.   Maybe --

15   Q.   I'm sorry.

16   A.   Maybe -- we have it, we labeled it.

17   Q.   But they're not included in the index.

18   A.   Maybe just missed here.

19   Q.   There are also a number of pages that have been cut out

20        of Exhibit Number 2 that -- where the pages go from 24

21        to 29, and there are clearly pages in between that

22        appear to have either been cut out by a razor or by

23        some other cutting instrument.  First of all, what was

24        on those pages?

25   A.   Okay, so as I mentioned earlier, we do not specify one
```

Ghassan Saed, Ph.D.

```
 1          lab notebook to a specific study.  So my research

 2          technician by a mistake added a different project here,

 3          and because this is talc, there is a litigation and

 4          lawyers and all that, we had to remove it and we have

 5          to specialize in that lab notebook just for this work.

 6     Q.   What other project was represented or documented in

 7          those pages that were removed from this lab notebook?

 8     A.   It's a different project than talc.

 9     Q.   What was the project or what is the project?

10               MS. O'DELL:  You mean the subject matter?

11     BY MR. HEGARTY:

12     Q.   The subject matter.

13     A.   The same, reactive oxygen species, inflammation in

14          ovarian cancer.

15     Q.   What are you looking at in that other project?

16     A.   I can't remember, but I can find out.

17     Q.   Does it involve exposure to any environmental

18          particulate?

19     A.   No.

20     Q.   Do you know when the pages that we've been talking

21          about were removed from this lab notebook?

22     A.   I don't remember.

23     Q.   Were you aware that they had been removed?

24     A.   Yes.

25     Q.   Have you ever in your experiences in conducting a lab
```

Ghassan Saed, Ph.D.

```
1          cut out pages of a lab notebook?

2     A.   Have I ever done that?  No.

3     Q.   That's not good laboratory practice, is it?

4               MS. O'DELL:  Objection to form.

5               THE WITNESS:  Yes, I -- the reason I told

6          you, I just told you the reason why we did that.

7     BY MR. HEGARTY:

8     Q.   But my question is that's not proper laboratory

9          practice to cut out pages of a lab book, is it?

10              MS. O'DELL:  Object to the form.

11              THE WITNESS:  We didn't cut the notes from

12         them, we just wanted to keep the talc study separate.

13    BY MR. HEGARTY:

14    Q.   Understood, but I'm talking about good laboratory

15         practices, and good laboratory practices don't sanction

16         or allow for you to cut out pages of a laboratory

17         notebook, do they?

18              MS. O'DELL:  Object to the form.

19              THE WITNESS:  We, as you can see, we're not

20         hiding it.

21    BY MR. HEGARTY:

22    Q.   I'm not asking if you're hiding it.  I'm asking you, do

23         you -- is it your testimony that cutting lab -- cutting

24         pages out of a lab notebook is consistent with good

25         laboratory practice?
```

Ghassan Saed, Ph.D.

```
 1                    MS. O'DELL:  Object to the form.

 2                    THE WITNESS:  I didn't say that.

 3    BY MR. HEGARTY:

 4    Q.   You agree it's not consistent with good laboratory

 5         practice, don't you?

 6                    MS. O'DELL:  Object to the form.

 7                    THE WITNESS:  I don't agree.

 8    BY MR. HEGARTY:

 9    Q.   You don't agree with what?

10    A.   Okay, I told you the reason why we removed those pages.

11    Q.   Did you instruct someone to cut those pages out of this

12         notebook?

13    A.   My lab research assistant was doing different project.

14         She was writing it here in the middle of this lab

15         notebook.  I asked her let's remove it, continue so we

16         can keep this lab notebook independent.

17    Q.   But the other lab notebook you prepared you left in the

18         pages of the other project, you didn't cut those out,

19         correct?

20    A.   No, because this was a preliminary results and that was

21         continued, not in the middle, it was continued, so we

22         only used like few pages from the book.

23    Q.   The lab notebooks contain on the outside, at least one

24         of them, Nicole King Talc Study, do you see that?

25    A.   I do.
```

Ghassan Saed, Ph.D.

1    Q.    And Nicole King again is who?

2    A.    My research post doc.

3    Q.    Then on the other lab notebook that contained -- that

4          was on Exhibit 2.  Exhibit 3 on the outside is

5          something called Temple 1.  What does that mean?

6    A.    That's a project that we did for Temple Pharmaceutical

7          in our lab.

8    Q.    That's a project that's -- that's the project that's in

9          the first part of the lab notebook?

10   A.    Correct.

11              SAED DEPOSITION EXHIBIT NUMBER 9,

12              PILOT STUDY,

13              WAS MARKED BY THE REPORTER

14              FOR IDENTIFICATION

15   BY MR. HEGARTY:

16   Q.    Also provided today, which I'll mark as Exhibit

17         Number 9, are copies of what I believe to be the pilot

18         study that's contained in Exhibit Number 3.  Would you

19         look at Exhibit Number 9 and compare to Exhibit

20         Number 3, and tell me whether Exhibit Number 9 are the

21         pages copied from Exhibit Number 3, the pilot project

22         we talked about earlier along with the index?

23   A.    Yes.

24   Q.    On the first page of -- or strike that.  On Page 1 of

25         Exhibit Number 2 there's a statement at the very

Ghassan Saed, Ph.D.

1        beginning that says tried to dissolve talc Fisher 74 --

2        or Fisher T4-500 lot numbers 166820 in Johnson &

3        Johnson Baby Powder.  Do you see that reference?  Do

4        you see where I'm reading?

5    A.  You're reading wrong.  What is in?

6    Q.  In.

7    A.  That's not in.

8    Q.  What is that word?

9    A.  That's or.

10   Q.  Or Johnson's Baby Powder, okay, and it says it won't

11       completely dissolve.  What does that mean?

12   A.  It won't completely dissolve.

13   Q.  What was the extent of its -- that it dissolved?

14   A.  Partial.

15           MS. O'DELL:  Object to form.

16           THE WITNESS:  Yeah, so, okay, so you need to

17       know the percentage of how much it's dissolved?

18   BY MR. HEGARTY:

19   Q.  How much is dissolved as reflected in Page 1.

20   A.  Nothing dissolved.

21   Q.  Whose handwriting is on Page 1?

22   A.  This is Nicole I think, I think.

23   Q.  Whose handwriting is throughout Exhibit Number 2?

24   A.  This?

25   Q.  Throughout the exhibit.

Ghassan Saed, Ph.D.

```
 1    A.   Some Nicole, some others, my research assistant.

 2    Q.   Who else's handwriting besides Nicole's are in Exhibit

 3         Number 2?

 4    A.   My research assistant.

 5    Q.   Who is that?

 6    A.   Flory, her name is Flory, Flory Rong, I think she's

 7         part of the authors, yes, her name is, okay, this is

 8         the right -- correction, Fan Rong.

 9              MS. O'DELL:  How do you spell that?

10              THE WITNESS:  It's here, F-a-n and then

11         R-o-n-g.

12    BY MR. HEGARTY:

13    Q.   Isn't it Rong Fan, Doctor?

14    A.   Rong Fan?  The first name is --

15    Q.   First name is Rong, right?

16    A.   I think it's the other way around, I'm not expert on

17         names.

18    Q.   Who is Mr. Rong?

19    A.   Mrs.

20    Q.   Mrs. Rong who is that?

21    A.   She is my research assistant.

22    Q.   How long has she been your research assistant?

23    A.   From I believe the beginning of '18.

24    Q.   But you don't know her name?

25    A.   I know her name, Flory, we call her Flory.
```

Ghassan Saed, Ph.D.

```
 1   Q.   What's her full name?

 2   A.   This is her full name, how she officially write, it's

 3        on the paper.

 4   Q.   And is it -- according to you, is her name Fan Rong?

 5   A.   I call her Flory.

 6   Q.   Do you know her name?

 7   A.   That's her name.

 8   Q.   And how do you pronounce it?

 9   A.   Rong Fan, I never called her with this name.

10   Q.   Who else's handwriting is contained in Exhibit

11        Number 2?

12   A.   Some would be mine.

13   Q.   Who else?

14   A.   That's it.

15   Q.   Were all the entries in Exhibit Number 2 prepared at

16        the time that the work was done?

17   A.   No.

18   Q.   When you say no, does that mean that there was work

19        done and then the -- later on entries were made in the

20        lab notebook?

21   A.   Correct.

22   Q.   How much later -- strike that.  If the entries have a

23        certain date on them, does that mean that they were

24        entered on that date or the work was done on that date?

25   A.   Work was done on that date.
```

Ghassan Saed, Ph.D.

```
 1    Q.   Does that mean there could be instances where work was

 2         done on that date but then entered later in the lab

 3         notebook?

 4    A.   Okay, so let me explain how we do this.  So we run our

 5         experiments and we have everything, as you see here,

 6         electronically, and we -- it's a matter of -- practice

 7         of cutting and pasting it in the lab notebook, but

 8         everything is done in electronically.

 9    Q.   When was this lab notebook, Exhibit Number 2, prepared?

10    A.   I don't know, exact dates?

11    Q.   Correct.

12    A.   I don't know, I can't remember.

13    Q.   Well, the date -- the dates run from 10-15-17 to --

14    A.   All the way to --

15    Q.   All the way to --

16    A.   -- October.

17    Q.   -- October or so of 2018.  So was this notebook

18         prepared over that entire period of time?

19    A.   Yes.

20    Q.   It wasn't prepared, put together in its entirety four

21         weeks ago?

22    A.   Some of it was, yes.

23    Q.   What portions were put together four weeks ago?

24    A.   I think the one related to the last portion.

25    Q.   Can you point to me the pages that were put together in
```

Ghassan Saed, Ph.D.

```
 1          the last month or so?

 2   A.   I can't really exactly remember, but the last, I would

 3          say, the statistical part for sure.

 4   Q.   Starting on what page?

 5   A.   I'm trying to find it.  So starting on Page 114, this

 6          is the statistics of the study, all the way to 19 --

 7          122, 124, so all the way to the end, which is 124.

 8          This part, it's created by or done by a

 9          biostatistician, and this is all you can see

10          electronics, so we just cut and pasted there.

11   Q.   So if you go to Page 114, that has a date of October 6,

12          2018.  Is it your testimony that this was not prepared

13          on that date but was prepared later and then back dated

14          to say October 6, 2018?

15                  MS. O'DELL:  Object to the form, misstates

16          his testimony.

17   BY MR. HEGARTY:

18   Q.   You can answer.

19                  MS. O'DELL:  If you understand the question.

20                  THE WITNESS:  What's the question?

21   BY MR. HEGARTY:

22   Q.   Sure.  You see the date at the top of that page of

23          October 6, 2018, correct?

24   A.   Correct.

25   Q.   Was this page prepared on that date or was it prepared
```

Ghassan Saed, Ph.D.

```
 1          at a time later than that but dated October 6, 2018?

 2                    MS. O'DELL:  Object to the form.

 3                    THE WITNESS:  Okay, so this -- I can't

 4          remember when we did the statistics, but this date

 5          reflects when the statistics was actually done.

 6   BY MR. HEGARTY:

 7   Q.    So in this instance, the statistics were done on

 8          October 6, 2018, but was the page prepared later than

 9          that after October 6, 2018?

10   A.    The pages, yes.

11   Q.    With regard to other entries in the notebook that have

12          dates, can you tell whether those pages were created on

13          the date listed on the page or were they created later

14          but backdated to the date the work occurred?

15                    MS. O'DELL:  Objection to form.

16                    THE WITNESS:  Yeah, so, again, we do the

17          experiment, sometimes it takes a week or two to write

18          it in the notebook because we have the data

19          electronically, so I cannot tell you the exact date

20          when they were put in.

21   BY MR. HEGARTY:

22   Q.    All the data that is reflected in Exhibit Number 2 is

23          kept in electronic format?

24   A.    Yes.

25   Q.    Does that electronic format still exist?
```

Ghassan Saed, Ph.D.

```
 1   A.   Yes.

 2   Q.   Is the data in that electronic format all dated and is

 3        the date the date the data was generated?

 4             MS. O'DELL:   Objection to form.

 5   BY MR. HEGARTY:

 6   Q.   You're pointing to an example.

 7   A.   An example.

 8   Q.   What page is that on?

 9   A.   June 19.

10   Q.   What page is that on, Doctor?

11   A.   This is Page -- oh, no, that's -- which page was

12        this --

13   Q.   It's in the lower right-hand corner.

14   A.   I just noticed -- no, it's this one.  Like, for

15        example, if you find the dates that are here, these

16        dates reflect the time we did the experiment.

17   Q.   Can you stop at a page and give me an example?

18   A.   I'm trying to find one.  So this is February --

19        Page 73, if you look here, it says February -- so

20        small, February 20th, is that --

21   Q.   Yes, 2018.

22   A.   Right.  So that's the date, and that's the date that is

23        this experiment performed.

24   Q.   With regard to the experiments that you did for your

25        manuscript, did those experiments begin in
```

Ghassan Saed, Ph.D.

```
1        January 2018, and I'll direct you to Page --

2    A.  51.

3    Q.  Page 53.

4    A.  Of this notebook?

5    Q.  Of the notebook.

6    A.  So one more time, the question.

7    Q.  Turn to Page 53 of Exhibit Number 2.

8    A.  53?

9    Q.  Yes.

10   A.  Okay.

11   Q.  There's a couple dates at the top of January 3rd, 2018

12       and, also, do you see January 7, 2018 at the top?

13            MS. O'DELL:  Excuse me, Mark, what Bates

14       Number?

15            MR. HEGARTY:  I'm looking at -- I'm using the

16       page numbers in the lower right-hand corner.

17            THE WITNESS:  53?

18   BY MR. HEGARTY:

19   Q.  53.

20   A.  On this date?

21   Q.  Yes, 1-7-18.  What I'm trying to find out is when was

22       the first date that you did --

23            MS. O'DELL:  What's the Bates Number on the

24       document?

25            MR. HEGARTY:  The Bates Number is 25.
```

Ghassan Saed, Ph.D.

```
 1                    MS. O'DELL:  Okay.

 2    BY MR. HEGARTY:

 3    Q.    When is the first date that you started the -- when did

 4          you start the experiments that you then report in your

 5          manuscript?

 6    A.    It says right there, January 3rd we seeded the cells,

 7          started the experiment.

 8    Q.    If you go to Page 2 using the Bates -- let me switch

 9          you over to the Bates Numbers because that's what I had

10          to work from.

11    A.    Okay.

12    Q.    Let me show you Exhibit Number 1, that's a copy of the

13          notebook that we've been looking at, Exhibit Number 2.

14    A.    Okay.  Page 2?

15    Q.    Look at Page 2 of Bates Number --

16                    MS. O'DELL:  When he says Bates Number, he's

17          referring to the very small number to the right-hand

18          side that's been -- yes --

19                    THE WITNESS:  Where does it say Page 2?  Oh,

20          sorry, okay.  Page 2?

21    BY MR. HEGARTY:

22    Q.    Yes, and that has a date of January 24, 2018?

23    A.    Yes.

24    Q.    Do you see that?

25    A.    Yes.
```

Ghassan Saed, Ph.D.

```
 1   Q.   Then if you go through the next several pages through

 2        to Page 23 by Bates Number --

 3   A.   Yes.

 4   Q.   -- that's dated March 2nd, 2018.  Do you see that?

 5   A.   Yes.

 6   Q.   Then if you go to Page 25, I'm sorry, if you go to

 7        Page 53 --

 8   A.   It's January 7.

 9   Q.   Well, then you go Page 25 you see January 7, which is

10        not in the same order.  So the book doesn't appear to

11        be in chronologic order, is that correct?

12   A.   Okay, let me answer this.  Here is the answer.  So we

13        have sections, this is a PCR section, we left some

14        pages blank, next section is ELISA section, because

15        we're doing the experiments simultaneously, so we

16        wanted to separate each section, so the PCR section we

17        created, we designated certain pages, and then we have

18        ELISA section, and then we have other sections.  So

19        every time we do the experiment, we add to the section.

20        That's why the dates are not in chronological order.

21   Q.   Okay.  If you look at Bates Number 78, Doctor, that

22        page is dated June 29, 2018?

23   A.   This one?

24   Q.   Yes.

25   A.   Yes.
```

Ghassan Saed, Ph.D.

| | | |
|---|---|---|
| 1 | Q. | See that date? |
| 2 | A. | I imagine it better if I see the notebook. |
| 3 | Q. | Then if you turn over to Bates 86. |
| 4 | A. | 86.  86 that's a different section. |
| 5 | Q. | Okay.  There's a date on there of September 4, 2018, |
| 6 | | looked like there was a break between June 29th and |
| 7 | | September 4. |
| 8 | A. | Look at the original here, see that's a section, it's a |
| 9 | | different section. |
| 10 | Q. | To the extent that there are periods of time where |
| 11 | | there is no activity going on, that there might be a |
| 12 | | month between data entries, does that mean that there's |
| 13 | | no work going on at that time? |
| 14 | A. | No, no, no, we do simultaneously different, like we do |
| 15 | | PCR, we do ELISA, we do proliferation, all that |
| 16 | | studies, and we divided this notebook into sections, |
| 17 | | and as we go, we added to the corresponding section, so |
| 18 | | you can -- yeah. |
| 19 | Q. | And were all the graphs in the notebook provided at a |
| 20 | | later time or were they provided at the time they were |
| 21 | | created? |
| 22 | | MS. O'DELL:  Objection to form. |
| 23 | | THE WITNESS:  Yeah, I don't really understand |
| 24 | | the question. |
| 25 | | |

Ghassan Saed, Ph.D.

```
 1    BY MR. HEGARTY:

 2    Q.   Sure.  As we just looked at, the graphs are all -- and

 3         tables and charts are all dated, correct?

 4    A.   Correct.

 5    Q.   Were they added to the notebook at the time they were

 6         created or were they added later?

 7    A.   Which graph you referring to?

 8    Q.   Any of the tables where the -- that have been pasted

 9         in, were they pasted in at the time they were created

10         or later?

11              MS. O'DELL:  Object to the form, asked and

12         answered.

13              THE WITNESS:  So you are saying if this graph

14         was created the same time that --

15    BY MR. HEGARTY:

16    Q.   We're looking at Page 87, and you're pointing to a

17         graph, and my question is with regard to the graph, was

18         it pasted in the notebook on the day it was generated?

19              MS. O'DELL:  Objection, asked and answered.

20              THE WITNESS:  I really can't remember, but we

21         have this electronically.

22    BY MR. HEGARTY:

23    Q.   Doctor, if you go to Page 4, Bates Number 4, which

24         corresponds to Page 33 of the notebook --

25    A.   This?
```

Ghassan Saed, Ph.D.

```
 1    Q.    -- there appears to be a reference on Page 33 that

 2          says go to Page 35.  Do you see that?

 3    A.    Okay.

 4    Q.    How can you know to go to Page 35 when you're on

 5          Page 33 and 35 is not yet created?

 6    A.    Oh, okay, good question.  So this is established

 7          protocol, we do this -- this is not like the first time

 8          we're doing this, this is done repeatedly over years

 9          and years and years  with different publication.  This

10          is the setup how we write it, so this is like something

11          we predicting to happen, this we already know, that's

12          the protocol, we just sticking it here.

13    Q.    You're anticipating that when you prepare -- strike

14          that.  When you prepared Page 33, you're anticipating

15          that you were going to --

16    A.    Discuss it.

17    Q.    -- discuss it in Page 35?

18    A.    Yes.

19    Q.    Are the page numbers that you've added at the bottom in

20          handwriting, are those made in the beginning of the

21          work or are they added as you go?  In other words, do

22          you start with a notebook that's blank and then just

23          simply number the pages before you start the work or

24          you do it after the fact?

25    A.    We do it both ways, I don't remember.
```

Ghassan Saed, Ph.D.

```
 1    Q.   There's -- the writing I pointed to is in blue ink

 2         versus the other writing, which is in black ink.  Was

 3         that blue ink added at the time that 33 was created or

 4         was it added later?

 5    A.   I don't remember.

 6    Q.   Do you know whose handwriting --

 7    A.   Yeah, this is Rong -- what's her name, Mrs. Rong.

 8    Q.   Okay.  If you look again back at Page 4 of the Bates

 9         Stamped copy.

10    A.   Page 4.

11    Q.   That's Exhibit Number 1.

12    A.   Same page, 4?  That's 4.

13    Q.   Same Page 4, which is Page 33 of the lab notebook,

14         okay?

15    A.   Same page.

16    Q.   There is a portion of that notebook page that is whited

17         out, correct, and written over?

18    A.   Yeah, I see that.

19    Q.   What was whited out?

20    A.   (Shrugs shoulders.)

21    Q.   Do you know?

22    A.   I don't know.  Again, this is an established procedure

23         that had been published with several, 100 papers over.

24    Q.   Well, what established procedure can you cite me to

25         that says that it's proper laboratory practice to white
```

Ghassan Saed, Ph.D.

1        out information and then write over it?

2                MS. O'DELL:  Object to the form.

3                THE WITNESS:  If you like write something

4        like a mistake or a typo and you write it over.

5    BY MR. HEGARTY:

6    Q.   Can you cite for me any --

7    A.   Cite?

8    Q.   -- published guidelines or laboratory methods that say

9         that that's a proper approach to preparing a lab

10        notebook?

11               MS. O'DELL:  Objection to form.

12               THE WITNESS:  Yeah, umm, what we did here I

13        think -- this is her handwriting and --

14               MS. O'DELL:  When you say "her," who are you

15        referring to?

16               THE WITNESS:  Rong, Mrs. Rong, so nothing

17        really that alarmed me or directed my attention to

18        anything.  She wrote what she supposed to write.  Maybe

19        she did a mistake.

20   BY MR. HEGARTY:

21   Q.   Doctor, would you ever in preparing a lab notebook

22        white out information that's been written in a lab

23        notebook and then write over it?

24               MS. O'DELL:  Object to the form.

25               THE WITNESS:  Typically I don't do that, no.

Ghassan Saed, Ph.D.

```
 1    BY MR. HEGARTY:

 2    Q.   That's not proper laboratory practice, is it?

 3    A.   No.  What I said is really simple.  She probably did a

 4         mistake and then she whited out and wrote over it.

 5    Q.   Proper laboratory practice is to line through it so the

 6         information that was there is still visible, and then

 7         include the data somewhere else so everything is

 8         transparent, correct?

 9              MS. O'DELL:  Object to the form.

10              THE WITNESS:  The information that she whited

11         out has nothing to do with the results or anything.

12         This is just describing an established methodology that

13         is published in all of our papers.

14              MR. KLATT:  Objection, form, unresponsive.

15              MR. HEGARTY:  Understood, but the proper

16         laboratory practice would be to line through it so it

17         could still be visible, and then add the corrected or

18         additional information, correct?

19              MS. O'DELL:  Object to the form.

20              THE WITNESS:  My response, as I told you,

21         this is something that she probably misspelled or

22         mistake she did, she thought she was doing something,

23         writing something, she wrote different, you know, we're

24         doing different experiment different time, same times.

25              MR. KLATT:  Objection, form, nonresponsive.
```

Ghassan Saed, Ph.D.

```
 1    BY MR. HEGARTY:

 2    Q.   Doctor, listen to my question.  The proper laboratory

 3         practice would be to line through what she whited over

 4         so that it would still be visible, and then add

 5         whatever other information she wanted to add to this

 6         page, correct?

 7    A.   If it's related to data.

 8    Q.   So this is not proper, this whiting out is not proper

 9         laboratory practice, correct?

10              MS. O'DELL:  Let him finish his question, and

11         give me a moment to object.  Object to the form.

12              You may answer if you remember his question.

13              THE WITNESS:  What I am trying to tell you,

14         if it's something to do with data it is not proper to

15         do, but this is -- this even shouldn't be in the

16         notebook, we can reference that, it is something that

17         we do in our laboratory so we can be detailed, it's

18         about the procedure, the method, which is already

19         published.

20    BY MR. HEGARTY:

21    Q.   But good laboratory practice --

22    A.   It has nothing to do --

23    Q.   Let me finish, Doctor -- good laboratory practice,

24         whether it's data or otherwise, dictates that you not

25         white out any information that's put in a lab notebook;
```

Ghassan Saed, Ph.D.

```
 1          rather, you're to line through it so it's still

 2          visible, correct?

 3                    MS. O'DELL:  Object to the form.

 4                    THE WITNESS:  I just told you what I feel.

 5          This is an established method, it's nothing to do with

 6          the data, this is just describing standard methodology,

 7          with it or without it, doesn't change anything.

 8     BY MR. HEGARTY:

 9     Q.   So are you okay or fine with the whiting out of

10          information in this lab notebook as was done here?

11                    MS. O'DELL:  Objection to form.

12                    THE WITNESS:  What I'm -- am I fine with

13          that?

14     BY MR. HEGARTY:

15     Q.   Yes.

16     A.   I prefer that does not happen, but it happened and she

17          did it, but that doesn't change anything.

18     Q.   Above that whited out area there's an arrow pointing to

19          100 milligrams talc, after the arrow it says Johnson

20          Baby Powder.  Do you see where I'm referring to,

21          Doctor?

22     A.   Yes.

23     Q.   Whose handwriting is that?

24     A.   I think it's Flory.

25     Q.   Was that information added later than the time this
```

Ghassan Saed, Ph.D.

```
 1       page was prepared?

 2   A.  No.

 3   Q.  Can you tell when that information was added to Page 33

 4       or Bates Number Page 4?

 5              MS. O'DELL:  Objection to the form.

 6              THE WITNESS:  When we prepared the page.

 7   BY MR. HEGARTY:

 8   Q.  Why was it added in a way that put it out of order and

 9       had to have a line directing it to another part of the

10       page?

11   A.  That's what we did.

12   Q.  Why was it not included there in the first place?

13              MS. O'DELL:  Objection, asked and answered.

14   BY MR. HEGARTY:

15   Q.  You don't know?

16   A.  I don't know.

17   Q.  If you look next at Bates Stamp Page 25, which is

18       Page 53 of the lab notebook, there is another portion

19       that has been whited out and written over.  Do you see

20       that?

21   A.  Yes, I see it.

22   Q.  What was whited out?

23   A.  I don't know.

24   Q.  Something was whited out and the name Johnson & Johnson

25       number 30027477 lot number 13717RA was written over
```

Ghassan Saed, Ph.D.

```
 1        that.  Do you see that?

 2   A.   I do.

 3   Q.   Whose handwriting is reflected by the addition of

 4        Johnson & Johnson, et cetera?

 5   A.   I think it's Flory, Rong.

 6   Q.   What was under -- what did she write over?

 7   A.   I don't know, I wasn't there when she wrote this, but

 8        when I looked at it I confirmed that this is what we

 9        did.

10   Q.   Well, did she write over Fisher Scientific talc?

11   A.   Could be.

12   Q.   But did you actually test Fisher Scientific talc

13        instead of Johnson & Johnson and then alter the lab

14        notebook?

15             MS. O'DELL:  Objection, form.

16             THE WITNESS:  We actually did both.

17   BY MR. HEGARTY:

18   Q.   You agree it's not proper practice, as reflected here,

19        to white out information in a lab notebook where it

20        can't be read and then write over it, correct?

21             MS. O'DELL:  Objection to form.

22             THE WITNESS:  You keep asking me the same

23        question.  I'm answering you the same way.  She did the

24        mistakes, to the best of her ability that's what she

25        thought she will do, and I left it because I don't want
```

Ghassan Saed, Ph.D.

```
 1        to change it.

 2   BY MR. HEGARTY:

 3   Q.   Did you talk to her about the propriety of whiting out

 4        data?

 5   A.   Yes, I did.

 6   Q.   What did you tell her?

 7   A.   I said we should not white out just write underneath

 8        it.

 9   Q.   When did you have that discussion with her?

10   A.   After I saw this.

11   Q.   When did you see it?

12   A.   I think -- I don't remember.

13   Q.   Did you see it in the last two weeks?

14   A.   No, no, no, way before.

15   Q.   Is it proper methodology for creating -- for doing

16        experiments and creating a lab book to white -- start

17        over.  Is it proper methodology in doing experiments

18        like this in creating the lab book that corresponds

19        with those experiments to white out information and

20        then write over it?

21             MS. O'DELL:  Objection to form.

22   BY MR. HEGARTY:

23   Q.   In your opinion?

24             MS. O'DELL:  Objection to form.

25             THE WITNESS:  So I just told you we did
```

Ghassan Saed, Ph.D.

```
1          not -- with the information that is here is accurate,

2          we voluntarily did that.

3     BY MR. HEGARTY:

4     Q.   I'm not asking you if the information is accurate with

5          my question.  My question is, is it proper methodology

6          in doing experiments like this and in creating the lab

7          notebook that corresponds to those experiments to white

8          out information and write over it, in your opinion?

9                    MS. O'DELL:  Object to the form.

10                   THE WITNESS:  I mean it's -- in my personal

11         opinion?

12    BY MR. HEGARTY:

13    Q.   Correct.

14    A.   I think if you report that this is what actually

15         happened and a mistake happened and this is, to her

16         knowledge, this is the best way to handle it, she

17         handled it.

18    Q.   So you consider the --

19    A.   And I talked to her about it and --

20    Q.   Do you consider the way she handled it to be proper

21         laboratory methodology?

22    A.   That's why I told you, I talked to her about it so I

23         don't.

24    Q.   May I see the notebook?

25    A.   Sure.
```

Ghassan Saed, Ph.D.

```
 1    Q.   Doctor, I'm looking at Page 102 of the notebook,

 2         Exhibit Number 2, which is Bates 78.  If you want to

 3         look at it --

 4    A.   Okay, yes, I see it.

 5    Q.   -- either in Exhibit 1 or Exhibit 2.  There appears to

 6         be something that has been covered over by the table

 7         that's been pasted there because I see some handwriting

 8         on the far right-hand column, and I don't want to pull

 9         that up, but what is under that table or that chart?

10    A.   The answer is I don't know.  But I'll find out.  It's a

11         description of the method.

12    Q.   I just want to note for the record that the doctor is

13         pulling the table up and --

14    A.   Yeah.

15    Q.   Okay.

16    A.   Do you want to see what's written under?

17    Q.   Yes.

18    A.   Okay.  I want to see, also.  Okay.  So this is just the

19         oligonucleotide primers and the cyclin for the PCR,

20         this is very standard protocol that you don't need to

21         even show, it's a methodology, so it doesn't really

22         need to even show that.

23    Q.   So, in your opinion, is it proper laboratory practice

24         in creating a lab book to cover up information that's

25         included in a lab book by a table or a chart?
```

Ghassan Saed, Ph.D.

```
 1                    MS. O'DELL:  Object to form.

 2                    THE WITNESS:  I didn't cover it, I just

 3          showed it to you.

 4     BY MR. HEGARTY:

 5     Q.   I'm talking about in the creation of a lab book,

 6          though, is it considered proper methodology to take a

 7          printout from a test and paste over text in the lab

 8          notebook?

 9                    MS. O'DELL:  Object to the form.

10                    THE WITNESS:  I just told you.  So my answer

11          is the information that she decided to hide this that

12          you're talking about is an established methodology in

13          my lab that doesn't even need to be here.  She chose

14          to just -- over it for a space limitation, that's all,

15          but it's not hidden, you can see it.

16     BY MR. HEGARTY:

17     Q.   Thank you.

18     A.   If we hide it, we can -- we don't have to have it

19          there.

20     Q.   That information, though, was not photocopied and

21          provided to us in advance of the deposition, correct?

22     A.   What information?

23     Q.   The information that was covered by that chart.

24                    MS. O'DELL:  Object to the form.

25                    THE WITNESS:  I know, I see, there is no
```

Ghassan Saed, Ph.D.

```
 1          information covered by that chart, that is not needed

 2          to be there.

 3     BY MR. HEGARTY:

 4     Q.   But there is information that's been covered, correct?

 5               MS. O'DELL:  Object to the form.

 6               THE WITNESS:  I answered, I said there is not

 7          relevant information that is covered, intentionally

 8          covered.

 9     BY MR. HEGARTY:

10     Q.   Over on Page 103 of Exhibit Number 2, Bates Number 79,

11          there is another or other words that have been whited

12          out.  What are those other words?

13               MS. O'DELL:  Object to the form.

14               THE WITNESS:  I mean I can read the word.

15     BY MR. HEGARTY:

16     Q.   What is the word?

17     A.   It says sample something.

18     Q.   Why was that whited out?

19     A.   Maybe it doesn't belong here.

20     Q.   Do you know why it was whited out?

21     A.   I think it doesn't belong here.

22     Q.   Who whited it out?

23     A.   Flory.

24     Q.   Is that whiteout okay to you in terms of doing a

25          proper -- having a proper methodology for preparing a
```

Ghassan Saed, Ph.D.

```
 1        lab notebook?

 2                     MS. O'DELL:  Objection to the form.

 3                     THE WITNESS:  I prefer without it but it's

 4        what it is.

 5   BY MR. HEGARTY:

 6   Q.   Doctor, would you look at Exhibit Number 1 at Bates

 7        Stamp 57, please.

 8   A.   Exhibit Number -- this is --

 9   Q.   Yes, what you have in front of you.

10   A.   57?

11   Q.   Correct.  That corresponds to Page 84 of the lab

12        notebook.  There is now in the lab notebook a table

13        that is pasted there that appears to have been removed

14        from the page that we received that was photocopied and

15        is part of Exhibit Number 1.  Can you explain why our

16        copy does not include that table?

17                     MS. O'DELL:  Object to the form.

18                     THE WITNESS:  No idea.

19   BY MR. HEGARTY:

20   Q.   Okay.

21   A.   But it's here.

22   Q.   Well, do you know what else --

23   A.   This is this.

24   Q.   Do you know what other charts were removed from the

25        copy that we received?
```

Ghassan Saed, Ph.D.

```
 1   A.   No one removed anything.

 2             MS. O'DELL:  Excuse me, when you say this is

 3        this, I don't know that that's clear on the record

 4        because you're pointing to the notebook.

 5             THE WITNESS:  This is the results and this is

 6        the graph from the results.

 7   BY MR. HEGARTY:

 8   Q.   Well, can you explain to us if this page was copied and

 9        included in Exhibit Number 1, why this chart is not in

10        Exhibit Number 1?

11   A.   No idea.

12   Q.   You agree that --

13   A.   When we scanned it probably didn't show up, I don't

14        know.

15   Q.   Well, you would agree that it would had to have been

16        removed, correct; otherwise it would appear on the

17        paper?

18   A.   I don't agree.

19   Q.   Well, you can tell on the copy that there are places

20        there that look like where tape had appeared, correct?

21             MS. O'DELL:  Object to the form.

22             THE WITNESS:  So same thing here, tape

23        appeared and it's there.

24   BY MR. HEGARTY:

25   Q.   Did you instruct -- strike that.  Did you instruct
```

Ghassan Saed, Ph.D.

```
 1          someone to copy this notebook?

 2     A.   To scan the notebook.

 3     Q.   Who did you instruct to do that?

 4     A.   Flory, my research assistant.

 5     Q.   And did you instruct her to remove this table on

 6          Page 84?

 7     A.   Absolutely not.

 8     Q.   Do you know why it's not there?

 9     A.   No idea, but the marks of this one are showing, and the

10          graph is showing, so this should show up, I don't know

11          why it's not showing up.

12     Q.   I'm going to direct you to Bates Stamp Page 62.

13     A.   Same thing.

14     Q.   Which is -- which corresponds to handwritten Page

15          Number 87, there again is a chart --

16     A.   You referring to this one or this one?

17     Q.   I'm referring to 87, there again in the copy portion at

18          the upper part of the page there is a table or a chart

19          that is not included in the copy we've been given.  Do

20          you know why that is the case?

21               MS. O'DELL:  Objection to the form.

22               THE WITNESS:  So I think this is probably

23          technical through scanning, I have no idea the answer

24          is.

25
```

Ghassan Saed, Ph.D.

```
 1    BY MR. HEGARTY:

 2    Q.   Then under --

 3    A.   But we do have all the data.

 4    Q.   Under that table there appears to be some very vague

 5         what appears to be handwriting.  Can you explain what

 6         that is?  That again is on Bates Stamp 62, Page 87 of

 7         the original lab notebook.

 8    A.   I don't know what that is.

 9    Q.   Doctor, is this lab notebook typical of the lab

10         notebooks you generate for all the experiments you've

11         conducted?

12              MS. O'DELL:  Object to the form.

13              THE WITNESS:  What do you mean by typical?

14    BY MR. HEGARTY:

15    Q.   Well, is this -- the things we've talked about here

16         this morning, would those same things appear in all the

17         lab notebooks that you prepare as part of your

18         experiments?

19              MS. O'DELL:  Object to the form.

20              THE WITNESS:  So for -- most of our

21         experiments are documented in a lab notebook like this.

22    BY MR. HEGARTY:

23    Q.   Do most of your experiments -- strike that -- do most

24         of the notebooks of your experiments have whiteout in

25         them?
```

Ghassan Saed, Ph.D.

```
 1    A.    Oh, that's what you're saying?

 2    Q.    Yes.

 3    A.    No.

 4    Q.    Have you ever seen one of your other notebooks for your

 5          lab experiments have whiteout in them and handwriting

 6          over that whiteout?

 7    A.    It's not a general practice.  The answer is I don't

 8          remember.

 9    Q.    Does your lab have standard operating procedures for

10          how a lab notebook is to be prepared?

11                  MS. O'DELL:  Objection to the form.

12                  THE WITNESS:  So from who?  From our own lab?

13    BY MR. HEGARTY:

14    Q.    Correct.

15    A.    So this is the procedure that we follow for our lab.

16    Q.    Do you have any written standards on how you are to

17          prepare a lab notebook?

18    A.    No.

19    Q.    Do you instruct those within your lab on how to prepare

20          a lab notebook based on any published methods for

21          preparing a lab notebook?

22    A.    So most of our work nowadays -- in the past we used to

23          do a lot of lab notebooks, but most of the work that we

24          do right now, most of it is electronically, and just to

25          keep a record in case something happened to electronic
```

Ghassan Saed, Ph.D.

```
 1          version, we print it and paste it in the lab notebook.

 2          So in the past we used to take more precautions for lab

 3          notebooks, but these days because of this electronic

 4          facilities and help, we just print it and paste it

 5          there.

 6    Q.    Did you instruct those who prepared the lab notebooks

 7          that we've been looking at here today on how to prepare

 8          laboratory notebooks?  Did that instruction come from

 9          you?

10    A.    Yes.

11    Q.    Was that instruction based on any published standards

12          in the literature for how to prepare a lab notebook?

13    A.    That was based on what I've been told since 1983.

14    Q.    Where were you taught that in 1983?

15    A.    I did my Ph.D. in molecular biology.

16    Q.    Where was that?

17    A.    Where?

18    Q.    Yes.

19    A.    England.

20    Q.    What school in England?

21    A.    University of Essex.

22    Q.    You learned at the University of Essex on how to

23          prepare a laboratory notebook?

24    A.    Sure.

25    Q.    You used that training to instruct those who prepared
```

Ghassan Saed, Ph.D.

```
 1           the laboratory notebooks we've been looking at today on

 2           how to prepare lab notebooks, correct?

 3      A.   I instruct the lady who did this, yes, how to prepare

 4           lab notebook.

 5      Q.   Did you ever instruct her about what to do in the case

 6           of needing to correct information that has been written

 7           in the lab notebook?

 8      A.   Yes, she actually knows that because on, I already

 9           instruct her not to do the whiteout, she did it

10           anyways, but her defense was, oh, I am only doing it on

11           words that we already -- on procedures that is not even

12           supposed to be there, it's like a normal practice

13           procedure that we have done many times.

14      Q.   Doctor, if you would turn over to Bates Stamp 25 in

15           Exhibit Number 1, which is Page 53 in the notebook.

16      A.   ELISA.

17      Q.   Under the -- in the section on the upper part of the

18           page there appears to be documentation of adding talc

19           to the cells; is that correct?

20      A.   Where do you see that?  Cells were seeded, density --

21      Q.   Can I look at it, Doctor?

22      A.   Treat with --

23      Q.   This part of the notebook, what is described where

24           you're talking about X1 X2 X3?

25      A.   Okay.  These are the dilution of talc that we used, 5
```

Ghassan Saed, Ph.D.

```
 1            micrograms, 20 micrograms, and 100 micrograms.  These

 2            are the three doses that we used, and this is how we

 3            got them.

 4    Q.    With these doses are you adding DMSO?

 5    A.    The talc was dissolved in DMSO.

 6    Q.    Does the lab notebook show how much DMSO was used for

 7            each sample?

 8    A.    How much DMSO?  Yeah.

 9    Q.    Yes.  Where is that?

10    A.    Let me see.  So you -- where is it -- it's

11            50 milligrams per ml, so one ml, that's the initial

12            concentration, 50 milligrams of the talc with one ml of

13            the DMSO.

14    Q.    Did the amount of DMSO increase with the increasing

15            doses of talc?

16    A.    No, no, no, no, okay, let me explain this.

17                    MS. O'DELL:  What page were you referring to,

18            Doctor?

19    BY MR. HEGARTY:

20    Q.    Thank you.

21    A.    The first page.

22    Q.    What's that page number?

23    A.    1.

24    Q.    Page 1, okay.

25    A.    So let me explain this.  So we prepare a stock solution
```

Ghassan Saed, Ph.D.

```
1          of the talc powder plus DMSO, the solvent, which is

2          50 milligrams per ml, you can upscale it, downscale it,

3          from there we dilute, as you can see here, it says the

4          exact delusions, and it says X1 times 10 to the 4th

5          microgram per ml, that's what you want to get, and

6          that's 15 ml times 5 micrograms per ml, that's the

7          concentration desired, and then you take -- this will

8          tell you how much volume you add to the cells.  So we

9          added 2.35 microliters that correspond to 5 micrograms

10         per ml, 10 microliters corresponded to 20, and so on,

11         50 corresponded to that, and then the untreated cells

12         got that DMSO alone.

13                    MS. O'DELL:  What page --

14   BY MR. HEGARTY:

15   Q.   The DMSO at 2.5, 10, and 50?

16   A.   DMSO.

17   Q.   DMSO at 2.5, 10, and 50?

18                    MS. O'DELL:  Excuse me, what page are you

19         referring to?

20                    THE WITNESS:  This Page 53 right here.

21                    No, so the DMSO has no concentration.  The

22         DMSO is the solvent where you dilute, dissolve the

23         talc.

24   BY MR. HEGARTY:

25   Q.   My question is -- was, though, with regard to the
```

Ghassan Saed, Ph.D.

```
 1        controls --

 2   A.   Volumes, you use volumes.

 3   Q.   -- did you, for each level of talc applied to the

 4        cells, for the corresponding controls did you also

 5        apply DMSO?

 6   A.   Yes.

 7   Q.   At what volume?

 8   A.   It's 2.5, 10, and 50.

 9   Q.   Of DMSO alone?

10   A.   Correct.

11   Q.   If you turn over to Page 55, I'm sorry, 53 in the lab

12        notebook, which is Bates Stamped 27 in the copy

13        version, Page 53.

14   A.   This one?  Same page?

15   Q.   55, Page 55 of the lab notebook, which is Bates Stamped

16        27.

17   A.   Okay.

18   Q.   Is this -- does this page describe the BCA protein

19        detection assay?

20   A.   Correct.

21   Q.   And does the assay work by measuring the amount of

22        color change, that is, the more color change you

23        detect, the greater the response it indicates?

24   A.   Are you saying it's a colorimetric assay?

25   Q.   Well, I'm not sure.  I can ask it in a different way.
```

Ghassan Saed, Ph.D.

```
1          Does the assay work by you measuring the amount of

2          color change?

3                  MS. O'DELL:  Object to the form.

4                  THE WITNESS:  The answer -- I just answered

5          you.

6   BY MR. HEGARTY:

7   Q.    Which is?

8   A.    Are you referring to --

9   Q.    Well, explain how it works with regard to color.

10  A.    Okay, oh, I would love to, I'll be very happy to do

11         that.  Okay, so this is measuring the optical density

12         of the concentration of the protein that is correlated

13         to the -- how much protein is there.  You measure the

14         optical density absorbance at 5, 62 nanometer, and you

15         construct a standard curve from BSA, and the standard

16         curve is known concentration, and it tells you when

17         it -- where is the absorption and what's the slope of

18         the line, and that helps you extrapolate the unknown

19         samples from your standard curve.

20  Q.    So is --

21  A.    It is a colorimetric assay.

22  Q.    It's measuring a color change, correct?

23  A.    No.

24  Q.    When you say colorimetric assay, what do you mean?

25  A.    It's extension coefficient, it measures BSA at specific
```

Ghassan Saed, Ph.D.

```
 1            wavelength.

 2    Q.   And what did you do to validate that the assay would

 3            work with the presence of talc?

 4    A.   What assay?

 5    Q.   This assay.

 6    A.   This assay is not for talc, this assay is a standard

 7            curve to measure -- to use a standard for -- so we can

 8            apply the same amount of protein for each sample.

 9    Q.   But you are using -- you are measuring the samples

10            after they've been -- after talc has been applied,

11            correct?

12    A.   We are measuring each like, for example, okay --

13                   MS. O'DELL:  Refer to a specific page.

14                   THE WITNESS:  Let's say, for example,

15            catalase, so we are measuring catalase, but to measure

16            catalase, you need to compare between samples, right?

17            You need to compare between treated versus untreated.

18            How are you -- how can you determine that you have the

19            same amount of protein?  What if you have more protein

20            here than here?  The results is not accurate.  So we

21            use BSA as a standard to measure and standardize all

22            the samples to the same amount of protein, so the

23            comparison would be -- the comparison would be

24            accurate.

25
```

Ghassan Saed, Ph.D.

```
 1    BY MR. HEGARTY:

 2    Q.   How did you rule out the possibility that the color

 3         change or the wavelength change was due to the talc

 4         particles themselves as opposed to any effect they were

 5         having?

 6              MS. O'DELL:  Object to the form.

 7              THE WITNESS:  Yeah, so we use the same cell

 8         line, we split the cells, we grow the cells, some cells

 9         get the talcum powder, the same cells, the other

10         aliquot get no talcum powder, we extract proteins, we

11         correct for the differences in the extraction of

12         proteins, and then we run catalase, for example.

13    BY MR. HEGARTY:

14    Q.   Within the proteins extracted, would there still be

15         talc particles?

16    A.   No, no.

17    Q.   How do you know there are not talc particles?

18    A.   Because these are total proteins.  You extract

19         proteins.  There is a process of extraction of

20         proteins.  You wash off all the media, you precipitate

21         the cells, you lyse the cells, you extract proteins.

22    Q.   How many times did you repeat the experiment you just

23         described for catalase?

24    A.   So all this work from January 24th till the end of this

25         work, it's done in triplicate.
```

Ghassan Saed, Ph.D.

```
1    Q.   What does being done in triplicate mean?

2    A.   Every experiment is done in triplicate.

3    Q.   Explain that to me.

4    A.   Okay.  So, for example, if you look at, see how --

5    Q.   What are you looking at?

6    A.   For example, 56, if you look at 56, look at the table.

7              MS. O'DELL:  Give us just a minute to get

8         there.

9    Q.   Okay, go ahead.

10   A.   You have the table?

11   Q.   Yes.

12   A.   Okay.  If you look at the table it says -- this

13        particular ovarian cancer cell line, TOV-112-C, you

14        have C, you have 5 microgram, you have 20 micrograms,

15        and you have 100 microgram, you see them?  And you can

16        see OD1, OD2, OD3, blank, blank, blank, so triplicate,

17        three times.  The blank three times, the experiment

18        three times, and subtract from the blank and do the

19        calculation.

20   Q.   You're measuring the same protein extracted three

21        times?

22              MS. O'DELL:  Object to the form.

23   BY MR. HEGARTY:

24   Q.   Is that correct?

25
```

Ghassan Saed, Ph.D.

```
 1    A.   I am not measuring the protein, I'm measuring catalase.

 2    Q.   You're measuring the catalase.

 3    A.   Catalase and control cells versus treated cells, okay,

 4         in triplicates.

 5    Q.   So you measure it once using the same sample, you

 6         measure the same sample two more times?

 7    A.   Okay, oh, now I understand your question, okay.  So

 8         this triplicate is for the assay, so we did one, two,

 9         three, four, five, six cell lines in triplicate each

10         time point.

11    Q.   When you say in triplicate, does that mean you have

12         three sets of petri dishes or are you doing one set of

13         petri dishes and you're doing the test three times?

14              MS. O'DELL:  Objection.

15              THE WITNESS:  So it is -- this one here is

16         one set of petri dish, and it's done in triplicate for

17         each time point.

18    BY MR. HEGARTY:

19    Q.   So you didn't -- for each cell line you didn't have

20         three --

21    A.   Independent.

22    Q.   -- independent cultures and then test each independent

23         culture against the others.  You had one independent

24         culture you tested three times?

25              MS. O'DELL:  Object to the form.
```

Ghassan Saed, Ph.D.

```
 1   BY MR. HEGARTY:

 2   Q.   Is that correct?

 3              MS. O'DELL:   If you need to read his

 4        question, it was confusing.

 5              THE WITNESS:   Independent cultures, what does

 6        that mean?

 7   BY MR. HEGARTY:

 8   Q.   Well, I tried to use your word.

 9   A.   I know.

10   Q.   Did you have for each cell line three separate petri

11        dishes, three petri dishes, so you ran the experiment

12        essentially three times for each cell line or did you

13        have one petri dish with a cell line in it, extract the

14        catalase, and run that extraction three times?

15   A.   No, no, no.  How can you -- okay, I'm confused now.

16        Okay, so how can you have one petri dish and you

17        extract three time points of treatment?

18   Q.   I'm not asking you --

19   A.   So we have three, we have three, we have actually four,

20        one, two, three, four, four independent culture dishes

21        for each treatment.

22   Q.   Correct.

23   A.   That is done in triplicate.

24   Q.   And what you say in triplicate, that means you're

25        taking the extraction and you're testing it three
```

Ghassan Saed, Ph.D.

```
 1        times, the same extraction.

 2   A.   For each time point.

 3   Q.   For each time point.

 4   A.   Yes.

 5   Q.   You don't have petri dishes that have the same cells in

 6        it for three separate petri dishes, then doing the

 7        extractions for each of those three petri dishes, do

 8        you follow my question?

 9   A.   Yeah, I follow the question.

10             MS. O'DELL:  Objection.

11             THE WITNESS:  You cannot do that because then

12        you have to do triplicate of triplicate.

13   BY MR. HEGARTY:

14   Q.   Exactly.

15   A.   Have I done that?

16   Q.   Yes.

17   A.   No.

18   Q.   Okay.  That was my question.

19   A.   Not for this assay.

20   Q.   Have you ever done assays like that where you've had --

21   A.   Yes.

22   Q.   -- multiple?

23             MS. O'DELL:  Let him finish.

24   BY MR. HEGARTY:

25   Q.   Have you done assays like that where you've used the
```

Ghassan Saed, Ph.D.

```
 1          same cell line in three different dishes and done the

 2          triplicate, triplicate, triplicate off of each dish?

 3                    MS. O'DELL:  Object to the form.

 4                    THE WITNESS:  Okay, so in the past I have

 5          done -- this is a very important question, it is always

 6          raised when we submit our data to be considered for

 7          publication, they will say did you do a real triplicate

 8          or a triplicate of the assay.  So the answer is we have

 9          done that in the past, and in our system here there is

10          no difference between -- because catalase have been

11          done in our lab, we published with it, it is a standard

12          protocol in our lab, and we never have -- we test it

13          for intra-assay variation triplicates, and that was not

14          the case.  Did we test that?  Yes, we did, but not for

15          talc treatment per se, because these are established

16          protocols in our lab, we already know and we learn from

17          them, so you don't really need to do a triplicate of a

18          triplicate of a triplicate.

19   BY MR. HEGARTY:

20   Q.    Thank you.  On Page 26 of the Bates Stamp document

21          Number 1, which is after --

22                    MS. O'DELL:  54 of the lab.

23                    MR. HEGARTY:  Is it 54 of the lab notebook?

24          Because I can't -- my page doesn't have a handwritten

25          number.
```

Ghassan Saed, Ph.D.

```
 1                    MS. O'DELL:  So you wanted 26 of the Bates,

 2          and that's at the bottom left corner 54.

 3                    THE WITNESS:  This?

 4     BY MR. HEGARTY:

 5     Q.   Yes.  Your sample ID for -- your sample IDs run from

 6          356 to 386, is that right?

 7     A.   So let me understand your question.  Are these numbers

 8          in serial number?

 9     Q.   Are these the sample ID numbers of your tests?

10     A.   Okay, so the sample ID correspond to each specimen,

11          yes, each cells.

12     Q.   And those sample IDs run in chronologic order from 356

13          to 386?

14     A.   No, they're missing.  For example, there is 60 -- where

15          is it -- actually, 84, 85, yes, they are.

16     Q.   So you're right, they jump from 371 to 379, do you see

17          that?

18     A.   Yeah.

19     Q.   Why is that?

20     A.   Because, you see, these are already, these cells were

21          treated in different times, so that's why they get

22          different IDs.

23     Q.   Okay.

24     A.   This is a lot of work.  You can't do it in one time.

25     Q.   What type of test is -- or strike that.  Then if you
```

Ghassan Saed, Ph.D.

```
 1        turn over to Page 69 of Exhibit Number 1, which, again,

 2        my copy doesn't have a handwritten page number on it.

 3                MR. LAPINSKI:  Counsel, just to confirm, when

 4        you refer to page numbers, you're referring to the

 5        Bates Numbers, correct?

 6                MR. HEGARTY:  In this case I'm referring to

 7        Page 69 in Exhibit Number 1, which is the Bates Number.

 8                MS. O'DELL:  Well, and to be -- I think in

 9        the lower right-hand corner of your page that's 94, and

10        that's what was produced so --

11                MR. HEGARTY:  If you go to Page 94, then,

12        Doctor.

13    BY MR. HEGARTY:

14    Q.  It should be this.

15    A.  Yes.

16    Q.  Are those the same sample numbers that we looked at in

17        the prior -- on the prior page?

18    A.  What page was it?  Sorry.

19    Q.  That was Page 54.

20    A.  Yes.

21    Q.  Do those refer to the same samples?

22    A.  Yes.

23    Q.  If you turn next, then, to page Bates Number 76 Exhibit

24        Number 1, Page 100 in the laboratory notebook, there

25        are -- do you see what I'm referring you to, Doctor,
```

Ghassan Saed, Ph.D.

```
 1         Page 100?

 2    A.   Yes.

 3    Q.   There are again sample numbers listed there.  Are those

 4         for a different test?

 5    A.   This is for different test, this is Caspase-3 activity.

 6    Q.   Are you using the same sample numbers as in the

 7         previous test?

 8    A.   It should indicate here, so 368, 369, 370, so the

 9         answer is yes, some of them, the numbers that

10         correspond they are -- let me see, hold on, let me just

11         make sure.  So this is for ELISA, we did the normal --

12         so the answer is yes.

13    Q.   If you're using the same numbers for different tests,

14         how are you able to keep those straight?

15              MS. O'DELL:  Objection, form.

16              THE WITNESS:  Okay.  So let me explain this.

17         So here, this is the sample ID, the treated cells.

18    BY MR. HEGARTY:

19    Q.   That's on Page --

20    A.   54.

21    Q.   Okay.

22    A.   So this is the sample ID, and this is what are they,

23         what each cell line definition.  Now, this was

24         subjected to isolation of protein, okay, and we use

25         BSA, as we discussed, as a standard, then you isolate
```

Ghassan Saed, Ph.D.

```
 1          the total protein from it, now you can do what we did,

 2          we can do catalase, we can do SOD, we can do different

 3          markers from total proteins.  Caspase-3 is included.

 4     Q.   Got you, okay thank you.  I'm probably going into a

 5          different section that's going to take a while if you

 6          want to take a break now or keep going.

 7                    MS. O'DELL:  It's 12:15, Doctor, would you

 8          like a short break for lunch or what's your preference?

 9                    THE WITNESS:  Yes.

10                    MR. HEGARTY:  Let's go off the record.

11                    THE VIDEOGRAPHER:  Going off the record at

12          12:16 p.m.

13                    (A recess was taken.)

14                    THE VIDEOGRAPHER:  We are back on the record

15          at 1:26 p.m.

16     BY MR. HEGARTY:

17     Q.   Doctor, you brought with you a notebook that appears to

18          contain articles and perhaps a number of other

19          documents.  What is in the notebook that you have in

20          front of you?

21     A.   So I have my report that I submitted, my CV, and my

22          references.

23     Q.   I'll mark that notebook as Exhibit Number 11.

24

25
```

Ghassan Saed, Ph.D.

```
1                SAED DEPOSITION EXHIBIT NUMBER 11,

2                NOTEBOOKS,

3                WAS MARKED BY THE REPORTER

4                FOR IDENTIFICATION

5     BY MR. HEGARTY:

6     Q.   So Exhibit Number 11 is the notebook you brought with

7          you to the deposition here today?

8     A.   This, yes.

9                MS. O'DELL:  There are actually two parts.

10    BY MR. HEGARTY:

11    Q.   There are two parts.  Where is the other part?

12               MS. O'DELL:  It's right here.

13    BY MR. HEGARTY:

14    Q.   Both parts of the notebook contain what?

15    A.   So references 86 continued 89.

16    Q.   Did you compile Exhibit Number 11?  Did you put that

17         together?

18    A.   Number 11 we're talking about?  Sorry.

19    Q.   Number 11 are both notebooks.

20    A.   Yes.

21    Q.   Did you choose the articles to put in Exhibit

22         Number 11?

23    A.   My references from the articles, yes.

24               MS. O'DELL:  Just I think there's some lack

25         of clarity.  You chose the articles.  Did you copy the
```

Ghassan Saed, Ph.D.

```
 1        pages?

 2                    THE WITNESS:  No.

 3   BY MR. HEGARTY:

 4   Q.   Did you put the notebooks together yourself?

 5   A.   No.

 6   Q.   Do you know who put the notebooks together?

 7                    MS. O'DELL:  Objection, it's a little vague.

 8                    THE WITNESS:  You guys did it.

 9   BY MR. HEGARTY:

10   Q.   Counsel for Plaintiffs put the notebooks together?

11   A.   What do you call them, sorry?

12   Q.   Counsel for Plaintiffs put the notebooks --

13   A.   Yes, sorry, I'm just having -- I thought that I put the

14        references together, yes.

15   Q.   I want to talk in more detail about Exhibit Number 7.

16        That's your manuscript.

17   A.   Okay.

18   Q.   When did the writing process begin for Exhibit 7?  And

19        this goes back to the original version that you

20        submitted to --

21   A.   Yes.

22   Q.   -- OB-GYN Oncology.

23   A.   September I think.

24   Q.   Do you know approximately when in September?

25   A.   I can't remember.
```

Ghassan Saed, Ph.D.

```
 1    Q.   Dr. Fletcher is identified as the lead author.  How did

 2         that come about?

 3    A.   She is not the lead author.

 4    Q.   Who is the lead author?

 5    A.   I am.

 6    Q.   The reason I thought she was lead author is on the

 7         second page of Exhibit Number 7 after the title she's

 8         the first author listed.

 9    A.   That's -- lead author is the corresponding author,

10         that's me.

11    Q.   What was the involvement of -- strike that.  What was

12         Dr. Fletcher's involvement in the preparation of this

13         article?

14    A.   So for the articles, she helped in doing the -- on this

15         article or experiments, the whole thing, or just this

16         article?

17    Q.   Just on the article.

18    A.   Okay, so her role was basically reading after me make

19         sure that the methods are what we really used, typos

20         and like help read proofing.

21    Q.   What was Dr. Harper's involvement in preparation of the

22         manuscript?

23    A.   Analysis of data, interpretation of data, she's a

24         clinical OB-GYN oncologist.

25    Q.   What was Dr. -- or, I'm sorry, what was Ira Memaj?
```

Ghassan Saed, Ph.D.

```
 1    A.    Ira Memaj was a medical student that helped also in

 2          looking for the grammar and proofreading mostly.

 3    Q.    What was Rong Fan's involvement?

 4    A.    Same thing.  Now, the authors that are here, not

 5          necessarily because they participated in writing the

 6          manuscript, but they own the authorship because they

 7          participated in the work that created the manuscript.

 8    Q.    What was Robert Morris's -- Dr. Robert Morris's --

 9    A.    Dr. Morris is the OB-GYN Oncology chief, and he helped

10          in also editing the manuscript and help interpretation

11          of data clinically.

12    Q.    Who prepared the original manuscript?  Who was the

13          author?

14    A.    I did.

15    Q.    Did anyone help you write the original manuscript?

16    A.    No.

17    Q.    Did anyone in any way contribute to the manuscript

18          besides those individuals listed in Exhibit Number 7?

19    A.    No.

20    Q.    Over on Page 12 in the Acknowledgments section there's

21          a notation thanking Imaan Singh.

22    A.    Yes, she was a medical student.

23    Q.    What did Imaan Singh do?

24    A.    She helped in running some experiments for us.

25    Q.    Anyone else assist in any way in the preparation of the
```

Ghassan Saed, Ph.D.

```
 1         article besides those we talked about?
 2   A.    No, so she -- that's why she's in the acknowledgment,
 3         not in the authorship, because she was repeating
 4         experiments.
 5   Q.    In connection with the experiments that you conducted
 6         that went into preparing or that led to preparing of
 7         this manuscript, did you prepare a proposal to request
 8         funding of the experiments in the article?
 9              MS. O'DELL:  Object to the form.
10              THE WITNESS:  I created a budget so to see
11         how much this will cost me.
12   BY MR. HEGARTY:
13   Q.    When you seek funding from NIH, for example, or another
14         organization, you have to prepare a formal grant
15         request where you set out and provide certain
16         information describing what you intend to do and how
17         much it's going to cost, correct?
18   A.    For NIH?
19   Q.    Yes.
20   A.    Yes.
21   Q.    Did you prepare any kind of grant request in connection
22         with the experiments that went into preparing this
23         manuscript?
24              MS. O'DELL:  Object to the form, other than
25         he's testified to.
```

Ghassan Saed, Ph.D.

```
 1                      THE WITNESS:  The answer is no.

 2   BY MR. HEGARTY:

 3   Q.   Did you submit the budget you created to anybody?

 4   A.   Official funding agencies, no.

 5   Q.   Did you provide the budget to Counsel for Plaintiffs,

 6        Beasley Allen?

 7   A.   I can't remember.

 8   Q.   Do you still have a copy of the budget?

 9   A.   I do.

10   Q.   Did you prepare any type of protocol or outline in

11        advance of the experiments describing the methods or

12        goals of the experiments?

13   A.   In writing?

14   Q.   In writing.

15   A.   I don't remember.

16   Q.   Is that something that's commonly done -- or strike

17        that.  Is that something you commonly do in your work

18        in connection with doing studies that then go into a

19        journal article?

20                      MS. O'DELL:  Object to the form.

21                      THE WITNESS:  So the way I do this, this

22        is -- again, this is routinely done in our lab, and we

23        ran a pilot experiment using PCR, using single dose,

24        and when we saw the data and we saw that there's a

25        biological effect, then we had a plan of what to do,
```

Ghassan Saed, Ph.D.

```
 1            and which is the whole study.

 2     BY MR. HEGARTY:

 3     Q.    Do you prepare that plan in writing?

 4     A.    In writing?

 5     Q.    Yes.

 6     A.    I really don't need to because it's the technology

 7            again, it is all applied in our laboratory, and we are

 8            testing the markers that we been extensively publishing

 9            on and testing through our lab.

10     Q.    For any articles that you have published in scientific

11            journals, have you ever prepared an outline or protocol

12            describing what you're going to do before you actually

13            do the experiments?

14                  MS. O'DELL:  Object to the form.

15                  THE WITNESS:  Yeah, so, again, I'm just

16            trying to explain to you that the methodology is in

17            place, it's in the lab, it's been published, it's been

18            referenced, and we test the same markers over and over,

19            so there is no need to every time write this down.

20     BY MR. HEGARTY:

21     Q.    But have you ever prepared in connection with a journal

22            article you're going to hopefully write after doing

23            experiments an outline or an overview or a summary of

24            what you're going to do before you then go on and do

25            it?
```

Ghassan Saed, Ph.D.

```
 1    A.   We write the methodology.

 2    Q.   So you have written methodologies for what you're going

 3         to do before you actually start the experiments?

 4              MS. O'DELL:  Object to the form, that's not

 5         what he said.

 6              THE WITNESS:  Not this experiment.

 7    BY MR. HEGARTY:

 8    Q.   On other occasions you have done that?

 9    A.   Yes.

10    Q.   On other occasions when you have published articles in

11         scientific and medical journals?

12    A.   Not all the times, no.

13    Q.   When is it that you do prepare an outline or protocol?

14    A.   When it is something that is not routinely daily test

15         that is performed in our laboratory, something

16         different.

17    Q.   Did you discuss the results of the testing or the

18         experiments with anyone outside of the authors on the

19         manuscript?

20              MS. O'DELL:  Objection to form.

21              THE WITNESS:  Yes, so the answer -- I'm

22         sorry, that wasn't the answer.  This part of this work

23         was accepted and presented at national meetings, was

24         presented at SRI, presented at ASRM, and it was open

25         for everybody to discuss.
```

Ghassan Saed, Ph.D.

```
 1   BY MR. HEGARTY:

 2   Q.   So tell me again what meetings this --

 3   A.   SRI.

 4   Q.   -- testing was presented.

 5   A.   SRI March 2018, and then if I recall correctly, ASRM

 6        October --

 7              MS. O'DELL:  ASRM, is that what you're

 8        saying?

 9              THE WITNESS:  No, it wasn't ASRM.  I forgot

10        which the other one -- SGO, SGO, I forgot where I

11        submitted, sorry, but I did submit two abstracts and I

12        presented them in national meetings, SRI for sure was

13        March -- I believe it was SGO.

14              MS. O'DELL:  For the record, Doctor, what

15        does SGO stand for?

16              THE WITNESS:  Society of Gynecology and

17        Oncology.

18   BY MR. HEGARTY:

19   Q.   In March of 2018?

20   A.   The SRI meeting, yes, that was the preliminary study.

21   Q.   The lab notebook you provided includes entries for work

22        that occurred after March 2018, correct?

23   A.   Correct.

24   Q.   What did you then present in March of 2018?

25   A.   We presented the work that we did preliminary just to
```

Ghassan Saed, Ph.D.

```
 1           show the effect on using just PCR.
 2    Q.   Did you discuss the contents of the manuscript, Exhibit
 3           Number 7, with anyone besides the authors during the
 4           time it was being written?
 5    A.   No.
 6    Q.   Did you discuss the contents of the manuscript during
 7           the time it was being written with attorneys for
 8           Beasley Allen or any other Plaintiff's Counsel in this
 9           case?
10           MS. O'DELL:  Don't discuss -- I'm going to
11           instruct you not to answer that question.
12    BY MR. HEGARTY:
13    Q.   Doctor, if you would turn to --
14           UNIDENTIFIED ATTORNEY:  Excuse me, was that a
15           yes or no question?  You're instructing him not to
16           answer whether he discussed the contents?
17           MS. O'DELL:  Well, the question presupposes
18           the subject matter of the discussion and that's the --
19           so I'm going to instruct him not to answer the
20           question.
21    BY MR. HEGARTY:
22    Q.   Doctor, would you turn to Page 12 of Exhibit 7, please.
23           Did you prepare the Conflict of Interest section on
24           Page 12?
25    A.   Yes.
```

Ghassan Saed, Ph.D.

```
 1    Q.   For whom did you act as a consultant for a fee?

 2    A.   Beasley Allen.

 3    Q.   Why didn't you disclose Beasley Allen in this Conflict

 4         of Interest disclosure?

 5    A.   The name you mean?

 6    Q.   Yes.

 7    A.   Just add the name?  I didn't do it.

 8    Q.   At the time you prepared this manuscript, you were

 9         acting as a consultant for Beasley Allen in litigation

10         involving the topic of this paper, correct?

11    A.   Correct.

12    Q.   But you didn't identify that in the Conflict of

13         Interest disclosure that you were acting as a

14         consultant in litigation involving this topic for a

15         fee, correct?

16              MS. O'DELL:  Objection to form.

17              THE WITNESS:  The journal, this is sufficient

18         language for the journal.

19    BY MR. HEGARTY:

20    Q.   But you did not disclose that you were acting as a

21         consultant in litigation involving this topic, correct?

22              MS. O'DELL:  Objection to form.

23              THE WITNESS:  This is what I disclosed.

24    BY MR. HEGARTY:

25    Q.   At the time you prepared this disclosure, you were
```

Ghassan Saed, Ph.D.

```
 1          acting as a consultant -- strike that.  At the time

 2          that you prepared this conflict of interest, you were

 3          acting as a named testifying expert in the

 4          litigation -- in the talc litigation for plaintiffs

 5          lawyers, correct?

 6    A.    Is that the same question?  Yes.

 7    Q.    So at the time that you prepared this disclosure, you

 8          were not just a consultant, you were a testifying

 9          expert witness in litigation, correct?

10                    MS. O'DELL:  Objection to form.

11                    THE WITNESS:  As far as I know, I'm a

12          consultant, witness expert to consult in this matter,

13          yes.

14    BY MR. HEGARTY:

15    Q.    You did not disclose this relationship in the

16          acknowledgment, that is, this relationship that you

17          were a designated testifying expert in litigation

18          involving talc and ovarian cancer, correct?

19    A.    The language that I wrote here was sufficient by the

20          journal.

21                    MR. KLATT:  Objection, nonresponsive.

22    BY MR. HEGARTY:

23    Q.    Why didn't you disclose in this acknowledgment that you

24          were a designated expert on behalf of plaintiffs in

25          litigation involving talc and ovarian cancer?
```

Ghassan Saed, Ph.D.

```
 1    A.    No reason, I could add this --

 2    Q.    You say in the disclosure that you acted as a

 3          consultant regarding this topic for a fee.  What was

 4          the fee?

 5    A.    What was the fee?

 6    Q.    Yes.

 7    A.    I think $600 an hour.

 8    Q.    Was the fee the total amount you gave us for your

 9          invoices at the beginning of the deposition?

10    A.    Yes.  No?

11                MS. O'DELL:  Sorry, I was going to object, it

12          was a little unclear, but I think you understood his

13          question.

14    BY MR. HEGARTY:

15    Q.    Doctor, don't you agree that anyone reading this

16          article should know that you are a paid expert for

17          lawyers who have a financial interest in this subject

18          area?

19                MS. O'DELL:  Object to the form.

20                THE WITNESS:  Again, my response would be I

21          put the conflict of interest that I'm acting as a

22          consultant on this topic.

23    BY MR. HEGARTY:

24    Q.    Don't you think the --

25
```

Ghassan Saed, Ph.D.

```
1    A.    -- for a fee.

2    Q.    Don't you think the potential readers of this article

3          are entitled to know that you are using this article to

4          profit on this topic?

5                MS. O'DELL:  Objection to form.

6                THE WITNESS:  This is the language that is

7          requested by the journal.

8    BY MR. HEGARTY:

9    Q.    Don't you think that anyone reading this article would

10         want to know that you have a financial interest in this

11         topic?

12   A.    It says clearly fee, for a fee.

13   Q.    You don't identify, though, the area of this topic in

14         which you're consulting, correct?

15               MS. O'DELL:  Objection to form.

16               THE WITNESS:  So for the reader of this, our

17         readers, it's enough to say I'm a consultant for a fee

18         on this topic.

19   BY MR. HEGARTY:

20   Q.    You are getting paid in this litigation to testify on

21         behalf of plaintiffs, correct?

22   A.    Yes.

23   Q.    Your testimony is supported by the manuscript, by

24         Exhibit Number 7, correct?

25               MS. O'DELL:  Objection to form.
```

Ghassan Saed, Ph.D.

```
 1                    THE WITNESS:  It's -- part of it is in the
 2          manuscript and part of it is not.
 3    BY MR. HEGARTY:
 4    Q.   You stand to benefit financially to the extent
 5          Plaintiff's Counsel use your article successfully in
 6          this litigation, correct?
 7                    MS. O'DELL:  Object to the form.
 8                    THE WITNESS:  I didn't understand the
 9          question.
10    BY MR. HEGARTY:
11    Q.   You stand to benefit financially to the extent that
12          Plaintiff's Counsel use your article in this
13          litigation, correct?
14                    MS. O'DELL:  Object to the form.
15                    THE WITNESS:  Can you -- I know but I don't
16          understand what you really want to say.
17    BY MR. HEGARTY:
18    Q.   You stand to benefit financially, make more money by
19          Plaintiff's Counsel using your article in this
20          litigation, correct?
21                    MS. O'DELL:  Object to the form.
22                    THE WITNESS:  No, I'm not aware, how they
23          going to make more money by using this?
24    BY MR. HEGARTY:
25    Q.   Well, they will continue to use you as an expert
```

Ghassan Saed, Ph.D.

```
1        witness in all the cases to the extent they are

2        successful in using your article, correct?

3                MS. O'DELL:  Object to the form.

4                THE WITNESS:  So they can use whatever they

5        want.  This is my research and my lab.  These are the

6        results that I stand for.

7   BY MR. HEGARTY:

8   Q.   Do you think they would pay you to testify in this

9        litigation if your results were different in your

10       article?

11               MS. O'DELL:  Object to the form.

12               THE WITNESS:  This work, negative results or

13       positive results, both are results, so they're paying

14       for my time to consult.  Whether it's positive or

15       negative to them doesn't matter.

16   BY MR. HEGARTY:

17   Q.   Well, when you said you're acting as a consultant

18        regarding this topic, what is this topic?  Is it

19        inflammation and cancer?  Is it antioxidants?  Is it

20        talc?  How is the reader supposed to know?

21               MS. O'DELL:  Object to the form.

22               THE WITNESS:  If you read -- the reader will

23        read the title, which says Molecular Basis Supporting

24        the Association of Talcum Powder Use With Increased

25        Risk of Ovarian Cancer; very clear topic.
```

Ghassan Saed, Ph.D.

```
 1     BY MR. HEGARTY:

 2     Q.   The rest of the conflict of interest disclosure says

 3          that no other -- the authors declare -- the other

 4          authors declare there are no conflicts of interest; do

 5          you see that?

 6     A.   I do.

 7     Q.   So did any of the other authors consult on this topic

 8          for a fee, to your knowledge?

 9     A.   To my knowledge, no.

10     Q.   Were the other authors on this manuscript aware of your

11          relationship with the attorneys for Beasley Allen in

12          this litigation?

13     A.   Yes, they are.

14     Q.   How were they made aware of it?

15     A.   I made them aware of it.

16     Q.   When did you make them aware of it?

17     A.   When we started this whole thing.

18     Q.   What did you tell them?

19     A.   I tell them I'm acting as a -- what do you call it -- a

20          witness expert in this litigation.

21     Q.   Did you -- have you told them that you've been

22          designated to testify as an expert witness in this

23          litigation?

24               MS. O'DELL:  Objection, asked and answered.

25               THE WITNESS:  I just said -- shared with them
```

Ghassan Saed, Ph.D.

```
 1          that I was selected to be an expert witness in this

 2          topic.

 3     BY MR. HEGARTY:

 4     Q.   And you told them that before you started the

 5          experiments?

 6     A.   About, yeah.

 7     Q.   You are the senior author on this paper, correct?

 8     A.   Correct.

 9     Q.   Do you in any way supervise or do you in any way

10          supervise any of the work of the other authors?

11     A.   All the work that is in this manuscript is done under

12          my hundred percent supervision.

13     Q.   How about generally, do you supervise any of the other

14          authors?

15     A.   I do.

16     Q.   Do they report to you?

17     A.   Yes.

18     Q.   Which ones report directly to you?

19     A.   So Nicole King, Ira, Amy, and that's about all the

20          authors here.

21     Q.   Are you a resource for grant funding for things that

22          they work on?

23               MS. O'DELL:  Object to the form.

24               THE WITNESS:  Am I a resource?

25
```

Ghassan Saed, Ph.D.

```
 1   BY MR. HEGARTY:

 2   Q.   Yes.  Do they work on studies that you have received

 3        funding for?

 4   A.   No.

 5   Q.   Do they otherwise work for you -- let me strike that.

 6        Do they work for you -- have they done work for you

 7        outside of the work on this manuscript?

 8   A.   Some of them --

 9                MS. O'DELL:  Object to form.

10                THE WITNESS:  Some of them did.

11   BY MR. HEGARTY:

12   Q.   Do some of them still work for you?

13   A.   Yes.

14   Q.   Which of the authors still work for you?

15                MS. O'DELL:  Object to the form.

16                THE WITNESS:  Work for me or work with me?

17   BY MR. HEGARTY:

18   Q.   Work for you.

19   A.   Work for me?

20                MS. O'DELL:  Object to the form.

21                THE WITNESS:  So what's work for me means?

22        I'm their supervisor?

23   BY MR. HEGARTY:

24   Q.   Yes.

25   A.   I'm paying their salary?
```

Ghassan Saed, Ph.D.

```
 1   Q.   You're their supervisor.  Are you their supervisor?

 2   A.   Yes, I'm supervisor of Rong Fan, she is my research

 3        technician or assistant.  I am the Fellow Director for

 4        the fellowship of Amy Harper.  And let's see who's

 5        here, Ira's no longer with us, she went to medical

 6        school in New York.

 7   Q.   Do you prepare evaluations for -- have you prepared

 8        evaluations for any of the authors on this paper?

 9   A.   Previously?

10   Q.   Previously.

11   A.   Nicole Fletcher.

12   Q.   Any others?

13   A.   Yearly evaluation because she was a post doc in my lab,

14        and this year I will prepare one for Rong.

15   Q.   Reproductive Sciences is -- Reproductive Sciences is

16        published by SAGE Publications, correct?

17   A.   I don't know, they keep, they switch different

18        publishers.

19             SAED DEPOSITION EXHIBIT NUMBER 12,

20             SAGE PUBLISHING DOCUMENT,

21             WAS MARKED BY THE REPORTER

22             FOR IDENTIFICATION

23   BY MR. HEGARTY:

24   Q.   I'm going to mark as Exhibit Number 12 a printout from

25        the SAGE Publications website, it's printed out on
```

Ghassan Saed, Ph.D.

```
 1              January 16, 2019.  Do you see where it lists SAGE

 2              Publications, underneath that Reproductive Sciences?

 3    A.   This here?

 4    Q.   Yes, at the top.  SAGE and Reproductive Sciences.

 5    A.   Yes.

 6    Q.   Reproductive Sciences is a journal that has accepted

 7              your article for publication, correct?

 8    A.   Yes.

 9    Q.   This exhibit identifies the editorial policies, peer

10              review policies, and other policies of this

11              publication.  Are you familiar with all of these

12              policies?

13                   MS. O'DELL:  Object to the form.

14                   THE WITNESS:  Some.

15    BY MR. HEGARTY:

16    Q.   Would you turn over to Page 5, sorry, Page 3 of 10.

17              Under the section Funding, it states that to comply

18              with the guidance for research funders, authors, and

19              publishers issued by the Research Information Network,

20              RS additionally requires all authors to acknowledge

21              their funding in a consistent fashion under a separate

22              heading.  Do you see that?

23    A.   Yes.

24    Q.   Where in your acknowledgment do you acknowledge the

25              source of your funding?
```

Ghassan Saed, Ph.D.

```
 1   A.   Okay, so this is -- this only applies to agencies that
 2        require this.  So, for example, I got NIH grant, I got
 3        funding from NIH, I have to disclose funding from NIH.
 4        If there is no funding, if it's internal funding, you
 5        don't have to do that.
 6   Q.   Where does that standard -- where is that standard in
 7        this document?
 8   A.   This is -- I have published in this journal for the
 9        last 20 years.  This is the protocol that we use.
10   Q.   Can you cite for me any anything that came from SAGE
11        Publications saying that that's an appropriate reading
12        of the funding requirements?
13             MS. O'DELL:  Object to the form.
14             THE WITNESS:  I already told you we published
15        with SRI for several years, and my understanding that
16        if the agency, the funding agency requests that you
17        should add their name to the funding part of it, then
18        you should do that.  If it's no funding -- departmental
19        is not considered funding, that's a burden actually,
20        it's not funding.
21   BY MR. HEGARTY:
22   Q.   If you look under the section Declaration of
23        Conflicting Interests, you see the last paragraph of
24        that section before For More Information, it reads any
25        commercial or financial involvements that might
```

Ghassan Saed, Ph.D.

```
1              represent an appearance of a conflict of interest need

2              to be additionally disclosed in the covering letter

3              accompanying your article to assist the editor in

4              evaluating whether sufficient disclosure has been made

5              within the Declaration of Conflicting Interests

6              provided in the article.  Do you see where I'm reading?

7     A.       Yes.

8     Q.       Did you provide such a cover letter to the editor of

9              Reproductive Sciences identifying your consulting

10             relationship with Beasley Allen?

11    A.       Okay, so when you go to the website Reproductive

12             Sciences and you try to upload your manuscript to be

13             considered for review on publication, there are forms

14             that -- pages that you go through, and each page you

15             have to answer the question before it allows you to

16             proceed.  So one of the pages was conflict of interest,

17             and they, at that level they just want to know if you

18             have a conflict of interest, you say "yes" or "no."

19             And then later on in the manuscript you identify the

20             conflict of interest if there is any.

21    Q.       When you were asked if you had a conflict of interest

22             how did you respond?

23    A.       Yes.

24    Q.       Then you went to the next page that that would lead you

25             to, and that's where you prepared --
```

Ghassan Saed, Ph.D.

```
 1   A.   Your manuscript.

 2   Q.   -- the Acknowledgment Section, correct?

 3   A.   No.

 4   Q.   Sorry, the Conflict of Interest Section.

 5   A.   No, no.  Okay, so you write -- this is part of the

 6        format of the manuscript, the acknowledgment, the

 7        conflict of interest, that's the setup.  Like how it

 8        says abstract, key words, introduction, methods, all

 9        that, this is part of the format, so this has to be in

10        the manuscript, we upload to them.

11   Q.   What did you type in on that online form when you said

12        yes to having a conflict of interest and then it

13        directed you to another --

14   A.   There is no other form, they direct you to upload your

15        manuscript.  They accepted your yes answer, and then

16        they allow you to proceed.  If you don't answer, you

17        are not allowed to proceed.

18   Q.   Exhibit Number 12 also says in the paragraph that I

19        read to you that in addition to what you just

20        described, that you need to include such a disclosure

21        in the cover letter accompanying your article.  First

22        of all, did you send a cover letter with your article?

23   A.   I can't remember if it was required.

24   Q.   If you sent a cover letter, do you still have a copy of

25        that cover letter?
```

Ghassan Saed, Ph.D.

```
 1   A.   If I did, yes.

 2   Q.   If you sent a cover letter, do you recall if you

 3        provided information about the conflict of interest you

 4        disclosed in your paper or manuscript?

 5             MS. O'DELL:  Object to the form.

 6             THE WITNESS:  Yeah, if I provided the cover

 7        letter, will there be a conflict of interest in the

 8        cover letter?

 9   BY MR. HEGARTY:

10   Q.   Yes.  Do you recall if you described the conflict of

11        interest in your cover letter as required under the

12        SAGE Publishing guidelines, Exhibit Number 12?

13             MS. O'DELL:  Objection to form.

14             THE WITNESS:  Yes, so in our practice I have

15        been publishing with this particular journal and other

16        journals, I never seen a cover letter saying that we

17        have a conflict of interest.  It's not a practice of

18        talking to the editor and tell them that this is

19        what --

20   BY MR. HEGARTY:

21   Q.   In any of your prior publications have you ever

22        disclosed a conflict of interest?

23   A.   Yes.

24   Q.   And do you recall an example of when you disclosed a

25        conflict of interest?
```

Ghassan Saed, Ph.D.

```
 1    A.   When?

 2    Q.   Yes.  Do you recall an example of when you disclosed a

 3         conflict of interest?

 4    A.   Every manuscript you submit you have to disclose a

 5         conflict of interest, whether it's yes or no, you have

 6         to.

 7    Q.   Well, let me ask it a different way.  Have you ever

 8         included a conflict of interest statement like the one

 9         in your manuscript in any prior publication of yours?

10    A.   Very rare, because I never consult -- I don't consult

11         usually in this caliber, but colleagues, co-authors

12         have done that, and there are co-authors in my

13         publications.  Everybody has to disclose.

14              SAED DEPOSITION EXHIBIT NUMBER 13,

15              SAGE PUBLISHING DOCUMENT,

16              WAS MARKED BY THE REPORTER

17              FOR IDENTIFICATION

18    BY MR. HEGARTY:

19    Q.   We'll mark as Exhibit 13 another printout from the SAGE

20         Publications website on the ethics and responsibility

21         of authors.  Would you look at Exhibit 13, Doctor.

22    A.   Yes.

23    Q.   Under the section Authors, it says authors should

24         ensure that, and go down several bullet points where it

25         reads any real or apparent conflicting or competing
```

Ghassan Saed, Ph.D.

```
 1         interest is clearly stated on submission of their

 2         paper.  (This would include funding assistance).  Do

 3         you see that?

 4    A.   Where do you -- where is this --

 5    Q.   It's the bullet point, second to last bullet point at

 6         the very bottom of the page.

 7    A.   Yes.

 8    Q.   So this is saying that any -- an author should ensure

 9         that any real or apparent conflicting or competing

10         interest is clearly stated on submission of their

11         paper.  (This would include funding assistance).  Do

12         you see where I'm reading?

13    A.   Yes.

14    Q.   And is it your contention that you did that in this

15         manuscript?

16    A.   I did.

17    Q.   You did not disclose in this manuscript that you

18         received funding for this paper by attorneys in

19         litigation, did you?

20    A.   I did, yes, I said consulting for a fee.

21    Q.   Where do you make reference to consulting for a fee in

22         litigation?

23    A.   That's my --

24              MS. O'DELL:  Objection to form.

25              THE WITNESS:  That's my understanding.
```

Ghassan Saed, Ph.D.

```
 1   BY MR. HEGARTY:

 2   Q.   You chose to use the words you set out in the Conflict

 3        of Interest Section, correct?

 4   A.   Yes.

 5   Q.   You agree that your relationship as a consultant does

 6        present a conflict of interest?

 7             MS. O'DELL:  Object to the form.

 8             THE WITNESS:  My relationship?

 9   BY MR. HEGARTY:

10   Q.   Yes, as a consultant does present a conflict of

11        interest, which is why you included a Conflict of

12        Interest Statement, correct?

13             MS. O'DELL:  Object to the form.

14             THE WITNESS:  We keep going back the same

15        circles.  What's the question?

16   BY MR. HEGARTY:

17   Q.   You agree that your relationship with attorneys for

18        Beasley Allen presents a conflict of interest that you

19        needed to disclose?

20   A.   I disclosed that, yes.

21   Q.   If you would look at the letter on the very back page

22        again of Exhibit Number 7.

23             MS. O'DELL:  Is the intent of the exhibit to

24        include all of the communications or just this one?

25             MR. HEGARTY:  Start with this one.
```

Ghassan Saed, Ph.D.

```
1                    The first paragraph of the letter makes

2          reference to comments of the reviewers being included

3          at the bottom of this letter, and we'll get to those

4          comments, but you did receive comments back from

5          reviewers of this article, correct?

6                    THE WITNESS:  This is the only thing I

7          received.

8    BY MR. HEGARTY:

9    Q.   Did you eventually receive comments back from reviewers

10         of the article?

11   A.   This is the only letter I received.

12   Q.   In addition to the letter, you did receive comments

13         from authors of the -- I'm sorry -- from reviewers of

14         the manuscript, correct?

15                   MS. O'DELL:  Objection, asked and answered.

16                   THE WITNESS:  Is this the whole --

17   BY MR. HEGARTY:

18   Q.   Let me mark as Exhibit 14 --

19   A.   Is this the whole letter?

20                   MS. O'DELL:  I think it's two pages.

21                   THE WITNESS:  It's two pages?  This is the

22         whole e-mail?

23

24

25
```

Ghassan Saed, Ph.D.

```
 1                SAED DEPOSITION EXHIBIT NUMBER 14,

 2                COPY OF LETTER FROM REPRODUCTIVE SCIENCES,

 3                WAS MARKED BY THE REPORTER

 4                FOR IDENTIFICATION

 5     BY MR. HEGARTY:

 6     Q.   I'm going to mark as Exhibit 14 in addition to what we

 7          had received in connection with that manuscript, but

 8          this is the letter with the reviewer comments included.

 9     A.   Yeah, this is all I received.

10     Q.   Is Exhibit Number 14 a copy of the letter with the

11          reviewer comments at the end?

12     A.   Okay, this is all I received.

13     Q.   When you say this, you're talking about --

14     A.   The letter.

15     Q.   -- number 14?

16     A.   Yeah, the e-mail.

17     Q.   The next paragraph in that e-mail, the second paragraph

18          says that the reviewers have recommended publication

19          but also suggest some minor revisions to your

20          manuscript.  Therefore, I invite you to respond to the

21          viewer's comments and revise your manuscript.  Do you

22          see where I'm reading?

23     A.   Yes.

24     Q.   Did you respond to the reviewer's comments?

25     A.   Yes.
```

Ghassan Saed, Ph.D.

```
 1   Q.   Did you respond to reviewer's comments via e-mail?

 2   A.   No, you can't do that.

 3   Q.   How did you respond to viewer's comments?

 4   A.   So you have to log in to Manuscript Central, you have

 5        to go to Revised Manuscript, and you have to include

 6        highlighted changes in the revised manuscript, and then

 7        you have to submit that to the reviewer one more time.

 8   Q.   And did you do that in this case?

 9   A.   Yes.

10   Q.   Do you still have a copy of the highlighted copy of the

11        revisions that you submitted to the reviewers?

12   A.   Yes, and, also, it's in the website for the journal.

13   Q.   If you look down at Paragraph 6 of Exhibit 14, it reads

14        when submitting your revised manuscript, you will be

15        able to respond to the comments made by the reviewers

16        in the space provided.  So is there actually a space

17        provided where you can actually communicate with the

18        reviewers?

19   A.   (Witness shakes head from side to side.) You can't

20        communicate with the reviewers.

21   Q.   Is there any way to respond?

22   A.   I don't know who they are, yes, you have to write your

23        response but to the editor, not to the reviewer.  I

24        don't know who is the reviewer.

25   Q.   So did you write a response to the comments to the
```

Ghassan Saed, Ph.D.

```
 1         editor?

 2    A.   Correct.

 3    Q.   And do you still have a copy of that response?

 4    A.   It's uploaded in the manuscript center, and I do have a

 5         copy, yes.

 6    Q.   With regard to the reviewer comments, if you look at

 7         the second page of Exhibit 14, the first sentence under

 8         Comments and Suggestions, it reads what is the

 9         mechanism by which the ovary and not the vagina, the

10         cervix, or the endometrium are susceptible to talc

11         effects?  Do you see where I'm reading?

12    A.   Yes, sorry.

13    Q.   Did you include any explanation in your revised

14         manuscript to explain the mechanism by which the ovary

15         and not the vagina and the cervix and the endometrium

16         are susceptible talc effects?

17    A.   It was in the letter and response to the reviewer, to

18         the editor, yes, it was in the form that you submit.

19    Q.   Did you revise your manuscript to include such a

20         discussion about the mechanism by which the ovary and

21         not the vagina, the cervix, or the endometrium are

22         susceptible to talc effects?

23    A.   I believe I did, I added three sentences to clarify

24         that.

25    Q.   Where in your manuscript are those three sentences?
```

Ghassan Saed, Ph.D.

```
 1    A.    I don't know, I don't know because they -- you write

 2          them, you write them in a space online, and they

 3          incorporate them into the manuscript if they agree with

 4          it, maybe disagree.  So they send it to the reviewer,

 5          and the reviewer will decide, okay, I like this

 6          explanation, add it to the manuscript, or this

 7          explanation is already in the manuscript, which I

 8          recall I said to the reviewer, to the editor.

 9    Q.    You recall saying to the editor that this -- as to this

10          comment, it was already in the manuscript?

11    A.    Yes, I said this has been addressed in this section of

12          manuscript; however, this is what we believe the

13          molecular mechanism is all about.  And he sent it to

14          the reviewer, and the reviewer will say I agree, go

15          ahead, accept, or I disagree, I think they should edit,

16          or we don't like the whole comment.

17    Q.    Do you still have a copy of your response to this

18          reviewer's comment?

19    A.    Again, this is done on the website.

20    Q.    Is that comment still on the website, to your

21          knowledge?

22    A.    I don't know, but I can find it.

23    Q.    Well, what is the mechanism by which the ovary, and not

24          the vagina, the cervix, or the endometrium are

25          susceptible to talc effects, in your opinion?
```

Ghassan Saed, Ph.D.

```
 1    A.    So, in my opinion, that talcum powder, talcum particles

 2          go -- transfer, it's an open access for genital use.

 3          When  they use it for genital use, it goes into the

 4          ovaries and incorporate into the tissues, and this

 5          continuously induce chronic inflammation that is linked

 6          strongly and actually the cause of ovarian cancer.  Why

 7          other tissues don't get it, there are more than one

 8          explanation to that if you'd like to hear it.

 9    Q.    Well, yeah, because I want to know what you believe to

10          be the difference in the ovary versus the other organs.

11    A.    Yes.  First, cancer is a tissue specific like cervical

12          cancer, HPV so -- Second is the area in the uterus is

13          full of secretion, and there is a dilution factor that

14          kick everything out, whereas if it make it -- if the

15          particles makes it to the ovaries, they sit there

16          indefinitely.

17    Q.    Anything else?

18    A.    For now.

19    Q.    What about the -- you mentioned, though, the uterus.

20          What about the vagina and cervix?

21    A.    What about --

22    Q.    Why is the ovary affected and not the vagina and

23          cervix?

24    A.    Shall I repeat that, my answer?

25    Q.    Is it the same reason in your opinion?
```

Ghassan Saed, Ph.D.

```
 1   A.   It's the wash, it's the dilution factor, it's the

 2        excretion, it's always excretions, but ovaries are not.

 3   Q.   And is that opinion somewhere in Exhibit Number 7?  You

 4        said it already is in the section.  In what section is

 5        that concept?

 6   A.   So the peristaltic travel of the talcum particles into

 7        the ovary has been actually discussed somewhere.

 8   Q.   That's over at the bottom of Page 8.  Is that the

 9        portion of the paper that you say already addresses

10        this comment?

11   A.   Yes, part of it.

12   Q.   Where else in the manuscript do you address this

13        comment by one of the reviewers?

14   A.   I think this is sufficient, in my opinion, to show

15        evidence that there is a transfer of the particles from

16        the vagina and uterus area and fallopian tube into the

17        ovaries, that's substantial.

18   Q.   The next comment reads what do the authors believe is

19        the determining factor for the increased sensitivity of

20        the epithelial ovarian cells to talc?  You see where

21        I'm reading?

22   A.   Where is that?  Where is it?

23   Q.   In the second comment that begins --

24   A.   Oh, the determining factor.

25   Q.   What is -- the second comment is what do the authors
```

Ghassan Saed, Ph.D.

```
 1        believe is the determining factor for the increased

 2        sensitivity of the epithelial ovarian cells to talc?

 3        How did you respond to that comment?

 4   A.   This is the core of the actual, the whole manuscript,

 5        is about chronic inflammation and its link to ovarian

 6        cancer.

 7   Q.   Did you revise your manuscript in response to this

 8        reviewer comment?

 9   A.   Yes.

10   Q.   How did you revise the transcript -- I'm sorry -- the

11        manuscript in response to this reviewer comment?

12   A.   So we took the last part, we cut some words out, it

13        says wordy --

14   Q.   I'm not talking about that comment yet.

15   A.   Which comment?

16   Q.   The determining factor comment.

17   A.   I told you, you don't need necessarily to agree with

18        the reviewer comment, you just put it in the -- there's

19        a box when you go online, and you just say we believe

20        that the manuscript is all about why ovarian cancer are

21        sensitive to inflammation.

22   Q.   Is that how you responded to this reviewer comment?

23   A.   Yes.

24   Q.   So what is your opinion as to what you believe the

25        determining factor is for the increased sensitivity of
```

Ghassan Saed, Ph.D.

```
 1          the epithelial ovarian cells to talc?

 2    A.    Chronic inflammation.

 3    Q.    And how is chronic inflammation -- or strike that --

 4          how are epithelial ovarian cells, how do they have

 5          increased sensitivity to chronic inflammation?

 6    A.    So this is what actually made them in the first place.

 7          It's the fact that they are exposed to continuously

 8          over time with talcum particles, and that created a

 9          chronic inflammation that actually transformed those

10          cells and caused the cells to go, the epithelial

11          ovarian cells to go cancerous with time.

12    Q.    So, in your opinion, for purposes of your biologic

13          mechanism for talc causing ovarian cancer, talc must

14          reach the ovary, correct?

15                MS. O'DELL:  Object to the form.

16                THE WITNESS:  Not necessarily.

17    BY MR. HEGARTY:

18    Q.    Well, the processes you just described all involve talc

19          reaching the ovary, correct?

20    A.    No.  I said any environment that create chronic

21          inflammation to the ovaries, epithelial ovarian cells,

22          normal ones, can or are known to develop this signature

23          of pro-oxidant state.  We have published that in

24          several manuscripts.

25    Q.    So, in your opinion, where must talc go to cause the
```

Ghassan Saed, Ph.D.

```
 1           inflammation that you say can cause ovarian cancer?

 2                    MS. O'DELL:  Objection to form.

 3                    THE WITNESS:  Yeah, so I don't know, but what

 4           I'm saying is the genital use of talcum powder expose

 5           the genital tract, the reproductive tract to chronic

 6           inflammation that, according to our 30 years of

 7           studies, is linked and the cause of ovarian cancer.

 8    BY MR. HEGARTY:

 9    Q.    Well, where in the genital tract must the chronic

10           inflammation occur to cause ovarian cancer?

11    A.    If the environment is chronic and it has chronic

12           inflammation -- so preferred will be -- the first thing

13           will be actual contact, which would be in the ovaries,

14           second would be fallopian tube, and there are many

15           studies now indicating that the source of epithelial

16           ovarian cancer come from fallopian tube, and fallopian

17           tube is very close to the uterus and that close to the

18           cervix and vagina, so that's an open access in the

19           body.

20    Q.    So you mentioned -- as far as where the chronic

21           inflammation must consider, you mentioned the ovary and

22           the fallopian tube.  Is there any other organ in the

23           reproductive tract that you believe if it becomes

24           inflamed due to talc can lead to ovarian cancer?

25                    MS. O'DELL:  Object to the form.
```

Ghassan Saed, Ph.D.

```
 1                    THE WITNESS:  Yeah, I -- no, I understood

 2           your question, but I disagree, that's not what I said.

 3    BY MR. HEGARTY:

 4    Q.    What did you say?

 5    A.    No.  So what I said is the use of talcum powder allows

 6           talcum particles, according to our research, we added

 7           the particles to the cells, the cells showed

 8           inflammatory response.  So we expect if the talcum

 9           powder enter the genital area, go to -- and I said I,

10           you know, organized them for you, so the most effect

11           will be if they are in the ovary, and we already have

12           evidence, and not just us, every -- all the world know

13           now, that acute inflammation does not cause cancer, is

14           not linked to cancer, it may initiate cancer, but

15           chronic inflammation is the real trigger for cancer in

16           general and ovarian cancer.  And we have shown that all

17           these redox balance is altered in ovarian cancer cells.

18           So the first impact, the highest impact will be if the

19           particle is in the ovary, and this has been reported by

20           some people, and the second or less degree, less impact

21           or longer time, maybe it's the same impact but it's a

22           longer time probably, all this need to be further

23           studied, is in the fallopian tube, and then who knows

24           what it does to uterus and cervical area.

25    Q.    Well, I thought you said when you responded to the
```

Ghassan Saed, Ph.D.

```
 1          question, the comment that said the mechanism which the

 2          ovary and not the vagina, the cervix, or the

 3          endometrium are susceptible, that this washing keeps

 4          those organs from being susceptible.  So the

 5          endometrium is in the uterus, correct?

 6                  MS. O'DELL:  Object to the form.

 7                  THE WITNESS:  Okay.  So the question here

 8          they are asking about mechanisms in the ovaries, so

 9          that's what I responded to.

10     BY MR. HEGARTY:

11     Q.   Well, do you consider the endometrium to be a

12          susceptible organ to talc in the sense that it can

13          cause inflammation that can lead to ovarian cancer?

14     A.   Probably.

15     Q.   Can you cite for me any published scientific or medical

16          article reporting inflammation of the ovaries or

17          inflammation of the fallopian tubes or the endometrium

18          in women using talc?

19                  MS. O'DELL:  Object to the form.

20                  THE WITNESS:  So can I report articles for

21          you?

22     BY MR. HEGARTY:

23     Q.   Yes.

24     A.   There are -- are you talking about gynecological

25          studies that link the use of -- in women to ovarian
```

Ghassan Saed, Ph.D.

```
1        cancer risk?

2   Q.   Question is very specific.  Can you cite for me any

3        published literature reporting finding chronic

4        inflammation in the presence of talc in the fallopian

5        tubes or ovaries or the endometrium in women using

6        talc?

7               MS. O'DELL:  Objection to the form.

8        Epidemiological studies is what the doctor asked you to

9        clarify.  Is that what you meant?

10              THE WITNESS:  Do you --

11  BY MR. HEGARTY:

12  Q.   I don't think -- I'm not talking about epidemiologic

13       studies.  I'm talking about can you cite for me any

14       studies that report finding inflamed tissue in the

15       presence of talc in women using talc on the perineum?

16              MS. O'DELL:  Object to the form.

17              THE WITNESS:  So your question is any

18       manuscript, any papers, any papers that cite or discuss

19       the presence of inflamed tissues in response to woman

20       using talcum powder.

21  BY MR. HEGARTY:

22  Q.   Correct.

23  A.   And my answer to you is I don't know any references.

24       What I do know, that there are lots of epidemiological

25       studies that link woman who uses talcum powder are at
```

Ghassan Saed, Ph.D.

```
 1         increased risk of developing ovarian cancer.  That is

 2         in the literature everywhere.  There are some few

 3         molecular work also indicating that this also can cause

 4         inflammation, oxidative stress, it's out in there.

 5         There are some other molecular works that also shows

 6         that there is actually gene expression differential,

 7         gene expression in exposure to talc, and this is

 8         really -- I mean this powder, this particle cause

 9         biological changes to the cell, so I am not surprised

10         if it does the same inside the genital tract.

11    Q.   The next comment in Exhibit Number 14 says the

12         manuscript is wordy and would benefit from an attentive

13         reduction, do you see that?

14    A.   I did.

15    Q.   How did you respond to that comment?

16    A.   I agreed, and I shaped some words unnecessary

17         references that we have established methodology that we

18         don't need to do, to have.

19              SAED DEPOSITION EXHIBIT NUMBER 15,

20              JANUARY 14, 2019 E-MAIL,

21              WAS MARKED BY THE REPORTER

22              FOR IDENTIFICATION

23    BY MR. HEGARTY:

24    Q.   I want to next mark as Exhibit 15 another reviewer

25         comment that we were provided.  Do you recognize
```

Ghassan Saed, Ph.D.

```
 1          Exhibit 15?

 2    A.    This is an e-mail from the editor.

 3    Q.    Yes.

 4    A.    Yes, saying that they accepted the manuscript.

 5    Q.    This is dated January 14, 2019, correct?

 6    A.    Okay.

 7    Q.    Is that right?

 8    A.    Yes, it says so.

 9    Q.    Then again it -- strike that.  Below it says Reviewer:

10          1, correct?

11    A.    Yes.

12    Q.    Comments to the author.  Well done.

13    A.    Yes.

14    Q.    Was there only one reviewer for purposes of your paper?

15    A.    Yes, Reviewer:  1.

16    Q.    In what I marked as Exhibit Number 15 is Reviewer 1's

17          comment after you made changes to your paper?

18    A.    Correct.

19    Q.    So the peer review for this article had one reviewer,

20          correct?

21    A.    No, I don't know.

22    Q.    Did you get comments back from any other reviewer?

23    A.    I review comments, I review manuscripts for many

24          journals.  If you have no comments or if you have good

25          comments, I don't need to show them.
```

Ghassan Saed, Ph.D.

1    Q.   Do you know how many reviewers --

2    A.   No knowledge.

3    Q.   Let me finish -- do you know how many reviewers

4         Reproductive Sciences had for your manuscript?

5    A.   No.

6              MR. HEGARTY:  Let's go off the record real

7         quick.  I need to take just a quick break and we'll be

8         right back.

9              THE VIDEOGRAPHER:  Going off the record at

10        2:23 p.m.

11             (A short recess was taken.)

12             THE VIDEOGRAPHER:  We're back on the record

13        at 2:28 p.m.

14   BY MR. HEGARTY:

15   Q.   Dr. Saed, are there any other communications between

16        you and the editors of Reproductive Sciences that we've

17        not talked about today?

18   A.   Not that I'm aware of.

19   Q.   Do you know when your article is supposed to be

20        published?

21   A.   I don't know.

22             SAED DEPOSITION EXHIBIT NUMBER 16,

23             EXPERT REPORT,

24             WAS MARKED BY THE REPORTER

25             FOR IDENTIFICATION

Ghassan Saed, Ph.D.

```
 1   BY MR. HEGARTY:

 2   Q.   I'm going to mark as Exhibit Number 16 a copy of the

 3        expert report for you we were provided in this case.

 4        Is Exhibit Number 16 your expert report in this case?

 5   A.   Yes.

 6   Q.   There are large portions of the manuscript that are

 7        identical to your report, correct?

 8   A.   I don't know about large, but based on it, yes.

 9   Q.   Which was prepared first, the manuscript or the report?

10   A.   This is November, and the manuscript was September, so

11        the manuscript was first.

12   Q.   Did you conduct the experiments that are described in

13        the manuscript for Beasley Allen?

14   A.   Say that again, please.

15   Q.   Did you conduct the experiments that are in the

16        manuscript for Beasley Allen?

17             MS. O'DELL:  Object to the form.

18             THE WITNESS:  The experiment I did, I did it

19        in my lab for me.

20   BY MR. HEGARTY:

21   Q.   Was the work that you did on -- in conducting the

22        experiments and doing the manuscript independent of

23        Beasley Allen or any counsel for Plaintiffs?

24             MS. O'DELL:  Object to the form.

25             THE WITNESS:  The work that I did in the lab,
```

Ghassan Saed, Ph.D.

```
 1          no one has any interference in how it's designed, what

 2          the method should be used, how to analyze the data, how

 3          to write the manuscript, all that is all mine.

 4                    UNIDENTIFIED ATTORNEY:  Objection,

 5          nonresponsive.

 6     BY MR. HEGARTY:

 7     Q.   Going back to my question, was the experiment you

 8          conducted and the manuscript that you wrote independent

 9          of your work with Beasley Allen in this litigation?

10                    MS. O'DELL:  Objection to the form.

11                    THE WITNESS:  So I was paid for my time as a

12          consultant, but this work was funded by my lab.

13     BY MR. HEGARTY:

14     Q.   But going back to the experiments that you did and the

15          manuscript that you wrote, were those separate -- was

16          that a separate piece of work than what you're doing

17          with Beasley Allen?

18                    MS. O'DELL:  Object to the form, asked and

19          answered.

20                    THE WITNESS:  Separate means -- what do you

21          mean by separate?

22     BY MR. HEGARTY:

23     Q.   Separate means unrelated.

24                    MS. O'DELL:  Object to the form.

25                    THE WITNESS:  Yeah, we're -- I'm hired as a
```

Ghassan Saed, Ph.D.

```
 1          witness expert in talc, ovarian cancer and oxidative

 2          stress, and I am doing work in my lab related to the

 3          consulting that what I'm doing with Beasley Allen.

 4     BY MR. HEGARTY:

 5     Q.   So was the work that you did in doing the tests and

 6          preparing the manuscript independent of your

 7          relationship with Beasley Allen?

 8               MS. O'DELL:  Objection, asked and answered.

 9               THE WITNESS:  I still don't understand the

10          independent type.

11     BY MR. HEGARTY:

12     Q.   Well, was it done --

13     A.   Can you reformat the question, please.

14     Q.   Well, was that work separate and unrelated to your work

15          with Beasley Allen?

16               MS. O'DELL:  Object to the form.

17               THE WITNESS:  It was separate, not -- it is

18          related, so I don't know about what separate means, but

19          it is related, yes, but in what caliber it's related,

20          that's what I want to emphasize.  They have no saying

21          in any of the work that has been done here.

22     BY MR. HEGARTY:

23     Q.   Would you have done this same work if you were not a

24          consultant for Beasley Allen?

25               MS. O'DELL:  Object to the form.
```

Ghassan Saed, Ph.D.

```
 1                    THE WITNESS:  I would have done the same type

 2          of rigorous testing because this is my primary focus of

 3          my laboratory, and anything that is related to

 4          inflammation, oxidative stress, and ovarian cancer, it

 5          is what we like to do in our lab.

 6   BY MR. HEGARTY:

 7   Q.   Your experiments involved Johnson's Baby Powder,

 8          correct?

 9   A.   Correct.

10   Q.   Where did you purchase the Johnson's Baby Powder that

11          you used?

12   A.   Walgreen across the street.

13   Q.   Why did you choose to use Johnson's Baby Powder in your

14          experiment?

15   A.   Because I want to see if the use of baby powder, talcum

16          powder, has any biological effect on ovarian cancer

17          cells.

18   Q.   Why did you choose the Johnson's Baby Powder brand?

19   A.   I chose Johnson & Johnson baby powder and I chose

20          Fisher.

21   Q.   Why did you choose the Johnson Baby Powder brand versus

22          another brand of talcum powder product?

23   A.   I chose Fisher.

24   Q.   Why did you choose Johnson's Baby Powder over another

25          commercially available baby powder?
```

Ghassan Saed, Ph.D.

```
 1   A.   Because the whole news and the whole media is all about

 2        Johnson & Johnson product.

 3   Q.   Did you choose Johnson's Baby Powder because that

 4        product is in this litigation?

 5   A.   Not in this litigation, but for me, because of the

 6        media and all these reports that I've been reading and

 7        the association of woman using Johnson & Johnson Baby

 8        Powder with increased risk of ovarian cancer.

 9   Q.   Within your lab notebooks, where are the tests that you

10        conducted with Fisher Scientific talcum powder?

11   A.   I can show it to you.

12   Q.   Okay.  You're looking at Exhibit Number 2, the lab

13        notebook for the experiments reflected in your --

14             MS. O'DELL:  I think it's Exhibit 3.

15             THE WITNESS:  That's Fisher.

16   BY MR. HEGARTY:

17   Q.   I'm sorry.  So Exhibit Number 3, which is the lab

18        notebook for the pilot study involved Fisher --

19   A.   Correct.

20   Q.   -- talc?

21   A.   Talc.

22   Q.   The only talc tested as reflected in Exhibit Number 2

23        is Johnson & Johnson, Johnson's Baby Powder?

24   A.   This one here, initially we used both, and then we

25        stopped using Fisher and we continued using Johnson &
```

Ghassan Saed, Ph.D.

```
 1          Johnson.

 2     Q.   Is there any reference in -- to testing Fisher talcum

 3          powder in Exhibit Number 2?

 4     A.   I can't remember.

 5     Q.   Well, the first page of your -- strike that.

 6               MS. O'DELL:  Just for the record, can we note

 7          the page it's turned to in Exhibit 3, what page is

 8          that, in the lab notebook?

 9               THE WITNESS:  Okay.

10               MS. O'DELL:  What page is it turned to?

11               MR. HEGARTY:  It's now on Pages 38 and 39.

12               MS. O'DELL:  Okay.

13     BY MR. HEGARTY:

14     Q.   If you look at Page 5 of your manuscript.

15     A.   Methodology?

16     Q.   Not of your report, your manuscript, that's Exhibit 7.

17     A.   Page 5.

18     Q.   Page 5.

19     A.   Okay.

20     Q.   At the top you say Treatment of cells.  Talcum powder

21          (Fisher Scientific, Catalog #T4-500, Lot#166820) or

22          baby powder, then referencing Johnson & Johnson, was

23          dissolved in DMSO, et cetera.  Do you see where I'm

24          reading?

25     A.   Yes.
```

Ghassan Saed, Ph.D.

```
 1    Q.   Where in your manuscript do you report the results from

 2         your tests done on Fisher Scientific talcum powder?

 3    A.   We didn't.  This is for the previous abstracts that we

 4         used which is this.

 5    Q.   So none of the data reported in your manuscript was

 6         data from experiments involving Fisher Scientific

 7         talcum powder?

 8    A.   In this manuscript, all the data here, as far as I

 9         remember, they're all done with Johnson & Johnson.

10    Q.   Did you run the exact same tests that you report in

11         your manuscript with Fisher Scientific talcum powder?

12    A.   No, we only did this with Fisher, which is PCR.

13              MS. O'DELL:  And what are you pointing to,

14         Doctor, just so the record --

15              THE WITNESS:  Which is the preliminary

16         studies that we used to publish for our SRI abstract

17         which was presented March of 2018.  There was only one

18         component, which is PCR, and some few fact -- and some

19         few markers.  This is -- this was not an extensive and

20         comprehensive study as the one described here.  This is

21         just preliminary to show there is an effect or there is

22         no effect.

23    BY MR. HEGARTY:

24    Q.   What prooxidant or anti-oxidant --

25              MS. O'DELL:  It's confusing because you're
```

Ghassan Saed, Ph.D.

```
 1          saying this, but you're referring to Exhibit 3, the

 2          study in Exhibit 3.

 3                    THE WITNESS:  This is Exhibit 3?

 4                    MS. O'DELL:  Yes.

 5                    MR. FINDEIS:  Which page of the exhibit?

 6                    THE WITNESS:  3 is --

 7                    MR. FINDEIS:  It's open to which page --

 8                    THE WITNESS:  So this is Exhibit 3, Page 38

 9          onward.

10   BY MR. HEGARTY:

11   Q.   Which pro-oxidant and anti-oxidant enzyme did you look

12          at involving Fisher Scientific talcum powder?

13   A.   So they are all listed here.  I'll tell you in one

14          second.  Catalase.

15                    MS. O'DELL:  What page?

16                    THE WITNESS:  Page 47, catalase GSR, GPX,

17          GST, MPO, nitric oxide, SOD3.

18   BY MR. HEGARTY:

19   Q.   And you say you only ran --

20   A.   PCR.

21   Q.   And what test did you do beyond PCR with Johnson's Baby

22          Powder?

23   A.   Sorry, I just want to make sure that they're all here,

24          okay.  So, sorry, what's the question?

25   Q.   What tests did you do besides PCR with Johnson's Baby
```

Ghassan Saed, Ph.D.

```
 1        Powder?

 2   A.   Okay.  So I'm now referring to this, what's this --

 3   Q.   Exhibit 2.

 4   A.   Exhibit 2 and I did --

 5                MS. O'DELL:  Page --

 6                THE WITNESS:  Here sections PCR, I did ELISA.

 7                MS. O'DELL:  What page does ELISA begin on?

 8                THE WITNESS:  53.

 9                MS. O'DELL:  Okay.

10                THE WITNESS:  I did -- all labeled here what

11        we did.  SNP analysis --

12                MS. O'DELL:  What page?  Starts --

13                THE WITNESS:  102.

14                MS. O'DELL:  Okay.

15                THE WITNESS:  I did MTT.

16                MS. O'DELL:  What page?

17                THE WITNESS:  106.  And statistics final.  So

18        that's all done with J & J Baby Powder.

19   BY MR. HEGARTY:

20   Q.   Does Exhibit Number 3 contain all the data of your PCR

21        tests for Fisher Scientific talcum powder?

22   A.   Sorry, one more time, please.

23   Q.   Does Exhibit Number 3 contain all of the data of your

24        PCR tests for Fisher Scientific talcum powder?

25   A.   That we reported this abstract at SRI, yes.
```

Ghassan Saed, Ph.D.

```
 1   Q.   In your manuscript you report the enzyme data after 72
 2        hours.
 3   A.   Enzyme?
 4   Q.   I'm sorry, the protein data after 72 hours.
 5   A.   No, I didn't.
 6   Q.   What did you report after 72 hours?
 7   A.   The effect of treatment after 72 hours.  That's totally
 8        different.
 9   Q.   Why did you choose 72 hours?
10   A.   It was from a previous paper, one of those two, 72
11        hours, they did 48 hours, 72 hours, and I picked 72
12        because there is data showing very similar, I can't
13        remember the reference of it.
14   Q.   In your report you describe the results of your tests
15        only up to 48 hours, correct?
16   A.   Where is it, my report --
17   Q.   Over on Page 14.
18   A.   Page 14.
19   Q.   In the section Treatment of Cells.
20   A.   Where does it say that?  Here?  Treatment of cells.
21        Yeah, this is not accurate, 72 hours, this is a typo.
22   Q.   So you're saying that the reference to 48 hours in
23        Exhibit Number -- what is that marked as, your report?
24             MS. O'DELL:  16.
25   BY MR. HEGARTY:
```

Ghassan Saed, Ph.D.

```
1    Q.   16, so you're saying that the reference to 48 hours in

2         Exhibit Number 16 is incorrect and it should be 72

3         hours?

4    A.   Correct, because we did all the work with 72 hours.

5    Q.   Did you try other durations that are not reported in

6         your report or manuscript?

7    A.   No.

8    Q.   At the bottom of Page 8 of your manuscript, Exhibit 7.

9    A.   Exhibit 7, that's Exhibit 8, oh, I have two, two

10        manuscripts.

11   Q.   7 and 8 are identical.

12   A.   Okay.

13   Q.   Bottom of Page 7.

14   A.   Page 7.

15   Q.   You made reference to this before to citing to

16        something called the peristaltic pump; do you see that?

17   A.   Page 7.

18   Q.   Page 8.

19   A.   Oh, sorry, Page 8, I heard 7, sorry.  The last

20        sentence.

21   Q.   Yes, second to the last line.

22   A.   Feature of uterus, yes.

23   Q.   That reference is not in your expert report.

24   A.   This is my paper, okay.  So let's see.

25   Q.   Right, but my question is that the reference to the
```

Ghassan Saed, Ph.D.

```
 1        peristaltic pump is nowhere in Exhibit Number 16, your

 2        expert report.  Why did you not include that in your

 3        expert report?

 4   A.   Is it not included?  I don't know, I trust you.

 5             MS. O'DELL:  Take a look.

 6             THE WITNESS:  Let me take a look.  So Number

 7        8 is -- this is the manuscript, where are the

 8        references?  So do I have the references here?

 9   BY MR. HEGARTY:

10   Q.   I'll represent, Doctor, that it's not in there.  Do you

11        recall when you came across a reference to this phrase

12        the peristaltic pump?

13             MS. O'DELL:  Objection to the form.

14             THE WITNESS:  Okay, sorry.

15   BY MR. HEGARTY:

16   Q.   Yes, you do you recall when in the writing process for

17        your manuscript you came across a reference to this

18        thing called a peristaltic pump?

19             MS. O'DELL:  Objection to form.

20             THE WITNESS:  If I recall where I read this

21        manuscript, this reference?

22   BY MR. HEGARTY:

23   Q.   Yes, and when.

24   A.   No, I don't remember.

25   Q.   Were you -- strike that.  You made references at that
```

Ghassan Saed, Ph.D.

```
 1          part of your manuscript to 8 through 10.  Did counsel

 2          for Beasley Allen provide those references to you?

 3    A.    Absolutely not.

 4    Q.    So is it your testimony that you came up with -- that

 5          you decided on your own to make reference to the

 6          peristaltic pump in your manuscript?

 7    A.    This is not I decide on my own.  This is like a

 8          collective reading of my reading throughout the whole

 9          literature.  It's not just -- so the hypothesis that we

10          have been trying to address for the last 30 years of my

11          lab is how -- what's the trigger, what's the initiator

12          for ovarian cancer, and there are many hypotheses out

13          there, and one of the hypotheses is that something come

14          through the genital tract.

15    Q.    If you turn to Page 9 in your manuscript, you in the

16          first sentence of the second paragraph, you say in this

17          study, we have shown beyond doubt that talc alters key

18          redox and inflammatory markers, et cetera.  Do you see

19          what I'm reading?

20    A.    Yes.

21    Q.    Have you ever used the phrase "beyond doubt" before in

22          any published article of yours?

23    A.    I believe I did.

24    Q.    Can you cite for me one where you use that phrase?

25    A.    Not now.
```

Ghassan Saed, Ph.D.

```
 1    Q.    It's true, though, that whatever you found and reported

 2          in your article was under the conditions of your

 3          experiment, correct?

 4                    MS. O'DELL:  Object to the form.

 5                    THE WITNESS:  Can you --

 6    BY MR. HEGARTY:

 7    Q.    Everything you describe in this manuscript occurred

 8          under the conditions of your experiments, correct?

 9                    MS. O'DELL:  Object to the form.

10                    THE WITNESS:  So occurred means -- okay, so

11          my response to this, all the experiments that has been

12          performed here, they were performed according to the

13          standard protocols that we have extensively published

14          with.

15    BY MR. HEGARTY:

16    Q.    The statement that you make there is based on the

17          results of your cell studies, correct?

18    A.    My cell studies, yes.

19    Q.    It's not based on any data from in vivo studies,

20          correct?

21                    MS. O'DELL:  Objection, form.

22                    THE WITNESS:  There is no need.

23    BY MR. HEGARTY:

24    Q.    That's not my question.  My question is those

25          statements are not based on any in vivo data, correct?
```

Ghassan Saed, Ph.D.

```
 1                    MS. O'DELL:  Object to the form.
 2                    THE WITNESS:  So those, again, those results,
 3           the result, no, this is -- this is what we have shown
 4           in this manuscript, that's not my opinion of the whole
 5           situation.  So this -- the basis of the sentence is --
 6           came from the results, the experiments that we did that
 7           we described here.
 8      BY MR. HEGARTY:
 9      Q.   Those results have not been shown in any in vivo
10           situation, whether it's human or animal, correct?
11                    MS. O'DELL:  Object to the form.
12                    THE WITNESS:  Similar outcome have been shown
13           in -- before, yes.
14      BY MR. HEGARTY:
15      Q.   Well, cite for me the published articles reporting the
16           same results that you got in an in vivo model.
17                    MS. O'DELL:  Objection, form.
18                    THE WITNESS:  There was no any in vivo
19           studies done at the molecular level.  This is -- my
20           study was the first comprehensive study that actually
21           does that.
22      BY MR. HEGARTY:
23      Q.   What you found was in cell cultures.
24      A.   These are ovarian cancer cells from patients.
25      Q.   These are not ovarian cancer cells -- these are not
```

Ghassan Saed, Ph.D.

```
 1          normal ovarian cancer cells, correct?

 2    A.    Some are, yes.

 3    Q.    Well, they've been immortalized, correct?

 4    A.    The normal variance they have been immortalized.

 5          They're sold as such.

 6    Q.    The data that you report in your manuscript has never

 7          been reported in an in vivo situation, correct?

 8                MS. O'DELL:  Object to the form.

 9                THE WITNESS:  So, again, using -- I have seen

10          reports in vivo in animals that have shown the

11          association of the talc with inflammation, yes.

12    BY MR. HEGARTY:

13    Q.    I'm talking about the very results that you report in

14          your study --

15    A.    I don't think anybody did them.

16                MS. O'DELL:  Let him finish.

17                MR. HEGARTY:  Let me finish the question.

18                MS. O'DELL:  Let me object.

19    BY MR. HEGARTY:

20    Q.    You cannot cite to any published literature showing the

21          same results that you found in your cell studies in any

22          in vivo model, animal or human, correct?

23                MS. O'DELL:  Object to the form.

24                THE WITNESS:  I have seen in animals, yes.

25
```

Ghassan Saed, Ph.D.

```
 1    BY MR. HEGARTY:

 2    Q.   What published literature reports finding the same

 3         things you report in this study in an animal model?

 4    A.   Not the same things, similar things.

 5    Q.   I'm asking --

 6    A.   Same exact?

 7    Q.   I'm asking can you cite for me any published literature

 8         reporting the same findings that you report in this

 9         article in an in vivo model?

10              MS. O'DELL:  Object to the form.

11              THE WITNESS:  Again, I repeat the same thing,

12         I say I have seen work that has been done in vivo using

13         animals, different type of animals, that show an

14         association of talcum powder to increased risk of

15         ovarian cancer.  My work that has been done here in

16         cell lines is not many laboratory have done this in

17         ovarian cancer because this is our specialty, this is

18         what we do.  So we don't have -- part of it is done

19         probably like oxidative stress as collective like, for

20         example, some manuscripts, they measure hydrogen

21         peroxide as a marker of oxidative stress, so for

22         experts in oxidative stress, you need to do more than

23         just that.  So I have seen in animals where there are

24         some biological effects in vivo.

25
```

Ghassan Saed, Ph.D.

```
 1   BY MR. HEGARTY:

 2   Q.   I'm talking about the biological effects you report in

 3        your manuscript.

 4   A.   Which include some of this.

 5   Q.   What literature can you cite for me that has shown

 6        these same biological effects in an in vivo model?

 7                 MS. O'DELL:  Object to the form.

 8   BY MR. HEGARTY:

 9   Q.   The same biological effects you report in your

10        manuscript.

11                 MS. O'DELL:  Object to the form, asked and

12        answered.

13                 THE WITNESS:  I guess I'm not understanding

14        the question because, again, these are cell lines from

15        ovarian cancer patients, and doing work with cell lines

16        is the closest you can get to in vivo.  If there is

17        work that has been done to depict all the work I have

18        done here, this is none, to my knowledge, but there are

19        reports that clearly indicates an in vivo effect.

20   BY MR. HEGARTY:

21   Q.   What reports are you referring to?

22   A.   Animal studies.

23   Q.   Cite for me the author or name of the animal studies

24        you're referring to.

25                 MR. DONATH:  Move to strike, nonresponsive.
```

Ghassan Saed, Ph.D.

```
 1                THE WITNESS:  So, yeah, I think I referenced
 2        some animal studies work here.  Let's see.  This is the
 3        manuscript?  I'm trying to find references.  Yes.
 4        Where is that paper?  I can't remember this.  I know
 5        it's in the report.  Yeah, it's right here, sorry.  I
 6        know I referenced it here.
 7   BY MR. HEGARTY:
 8   Q.   How much more time do you need, Doctor?
 9   A.   It's been a while, so I need to find out exactly where
10        this is, but I know it's here.  So it is some cited in
11        reference 50, but that's not the author -- that's not
12        the original reference, this is a cross-reference.
13   Q.   You said cited in 50?
14   A.   Number 50, but that's a cross-reference, if I recall
15        correctly.
16   Q.   You need more time?
17   A.   I do.  I'm trying to look for it.
18   Q.   Let's go off the record.
19                THE VIDEOGRAPHER:  Going off the record at
20        2:57 p.m.
21                (An off-the-record discussion was held.)
22                THE VIDEOGRAPHER:  Back on the record at 2:59
23        p.m.
24   BY MR. HEGARTY:
25   Q.   Doctor, when we went off the record momentarily you
```

Ghassan Saed, Ph.D.

```
 1        were going through your references in your report to

 2        identify any in vivo animal models that you claim show

 3        the same results that you report in your manuscript.

 4        Can you cite for us the publications that you contend

 5        show the same results as your manuscript in an animal

 6        model?

 7              MS. O'DELL:  Object to the form.

 8              You may answer.

 9              THE WITNESS:  So I am responding that I read

10        in some references and reviews that there was an in

11        vivo animal studies that showed association of talcum

12        powder use with increased risk of ovarian cancer in

13        animal models, and the reference for that is in the NTP

14        studies.

15   BY MR. HEGARTY:

16   Q.   That study did not measure the pro-oxidant and

17        anti-oxidant markers that you measure in your study,

18        correct?

19   A.   They talk about oxidative stress in general,

20        inflammation in general.

21   Q.   But they don't -- that study doesn't measure the

22        pro-oxidant or anti-oxidant markers that you report in

23        your study, correct?

24   A.   That study, no.

25   Q.   The NTP study concerned findings in the lungs of the
```

Ghassan Saed, Ph.D.

```
 1         rats and mice, not the ovaries, correct?

 2    A.   No, it was summarize a review of everything, the actual

 3         study, yes.

 4    Q.   The NTP didn't look at ovarian cancer, correct?

 5    A.   I'm not sure.  I read from that study that they have

 6         summary, summary, and somewhere there I read that there

 7         was in vivo association of the talcum powder use with

 8         ovarian cancer.  So that's called reference reference.

 9    Q.   Your report --

10    A.   May I add something?  I also read it somewhere else, I

11         cannot remember right now.

12    Q.   Your report in your manuscript say that you in your

13         experiments found genotype switches at 72 hours; is

14         that correct?

15    A.   Genotype switches, what are you referring to?

16              MS. O'DELL:  What page?

17    BY MR. HEGARTY:

18    Q.   You report in your manuscript.

19    A.   Which particular --

20    Q.   Well, let me ask you about your manuscript.  Did your

21         manuscript report genotype switches at 72 hours?

22    A.   The effect of talcum 72 hours induced SNP in genetic

23         mutations.

24    Q.   And do you claim that those genetic mutations occurred

25         in all cells treated with talc, in your experiments?
```

Ghassan Saed, Ph.D.

```
 1    A.    There is a table actually that summarize the results,

 2          and it doesn't show it with all markers, so we can

 3          refer to it, so if you look, for example --

 4                MS. O'DELL:  What figure?

 5                THE WITNESS:  The figure Table 2, if you look

 6          at GSR, GSR no effect, SOD3 no effect, catalase there

 7          is an effect in some cells, not others, you can see

 8          that A2780 has no effect, the talc treatment.

 9    BY MR. HEGARTY:

10    Q.    But with regard to the cells that it did have an

11          effect, SKOV-3, for example, with regard to --

12    A.    SKOV with regard to catalase, for example, has no

13          effect.

14    Q.    With regard to --

15    A.    TOV112 with catalase there is an effect.

16    Q.    And was that effect in all the cells tested with talc?

17                MS. O'DELL:  Object to the form.

18                THE WITNESS:  I don't understand your

19          question.

20    BY MR. HEGARTY:

21    Q.    Well, don't you -- do you contend that those genotype

22          changes occurred in all cells treated with talc?

23    A.    I didn't say that.

24    Q.    Did that happen?

25    A.    No.  What I'm saying is if you treat the cell line,
```

Ghassan Saed, Ph.D.

```
 1          okay, TOV112, with talc for 72 hours, there will be an

 2          increase, an acquisition of this mutation.  Now, you're

 3          asking if I determined whether all cells in that

 4          population got this mutation.

 5    Q.    Correct.

 6    A.    The answer is I don't know.

 7    Q.    Are you able to determine the quantity of cells -- let

 8          me back up.  How many cells are in the culture?

 9    A.    Yeah, so this is DNA extracted from 1 million cells

10          treated with 100 microgram per ml of talcum powder.

11          Now, there is another way you can quantitate if we need

12          to proceed further with this.

13    Q.    Are you able to estimate the volume of cells that this

14          genotype switch occurred in?

15                  MS. O'DELL:  Object to the form.

16                  THE WITNESS:  The volume?

17    BY MR. HEGARTY:

18    Q.    Yes, the number.

19                  MS. O'DELL:  Object to form.

20                  THE WITNESS:  I just said, no, we can't.

21          This technique will tell you yes or no, doesn't tell

22          you how much -- how many, sorry.

23    BY MR. HEGARTY:

24    Q.    So would it tell you, yes, if it -- (coughing in

25          room) -- only one of the 1 ml cells?
```

Ghassan Saed, Ph.D.

```
 1                MS. O'DELL:  Object to the form.

 2                THE WITNESS:  Again, this is not

 3       quantitative.  This will tell you if there is a

 4       mutation or there is no mutation.

 5  BY MR. HEGARTY:

 6  Q.   Without regard to the number of cells the mutation

 7       occurred in?

 8                MS. O'DELL:  Objection to the form.

 9                THE WITNESS:  Okay.  I will repeat myself

10       again.  This is -- this technique will tell you if

11       there are population of cells that acquired this

12       genotype.

13  BY MR. HEGARTY:

14  Q.   Does it tell you the number of such a population?

15  A.   I just said no.

16  Q.   If you look at Page 2 of your abstract, I'm sorry, your

17       manuscript, the abstract, looking at the Abstract

18       Section, second line towards the end, you say here

19       we've demonstrated that talc induces significant

20       changes in key redox enzymes and enhances the

21       pro-oxidant state in normal and EOC cells.

22  A.   Where are you reading?  Sorry.

23  Q.   The second line, towards the end of the second line.

24  A.   Towards the end of the second line -- here, yes, I see

25       it I see it.
```

Ghassan Saed, Ph.D.

```
 1   Q.   What do you mean when you say induces significant
 2        changes?  What does that mean, what does the word
 3        significant there mean?
 4   A.   Got you.  So this means marginal change, it's not --
 5        here the words does not imply statistically significant
 6        is that you're referring to, although the results were
 7        statistically significant, this is referring to the
 8        magnitude.
 9   Q.   And how do you define -- how did you define the
10        magnitude as significant?
11   A.   You don't, many readers assume significant is
12        statistically significant.
13   Q.   Was the choice of the word significant a subjective
14        word choice by you?
15   A.   I chose this word because it applies that there is a
16        significant effect which I know it is.
17   Q.   And when you say significant effect, what do you mean?
18   A.   I mean both marginal and statistically significant.
19   Q.   What does it mean to have a marginal effect?
20   A.   Marked like, for example, it is not like 1 versus 1.35,
21        it is 1 versus 3, that's mean marginal.
22   Q.   You say about the middle of that paragraph that in all
23        talc treated cells, do you see where I'm reading?
24   A.   Yes.
25   Q.   There was a significant dose-dependent increase in
```

Ghassan Saed, Ph.D.

```
 1         pro-oxidants iNOS, nitrate/nitrite, and MPO with a

 2         concomitant decrease in anti-oxidants CAT, SOD, GSR,

 3         and GPX.  Do you see where I'm reading?

 4    A.   Yes.

 5    Q.   What do you mean when you use the phrase significant

 6         there?

 7    A.   It is indicated by the P value, so once you have the P

 8         value, that's -- indicates statistically significant.

 9    Q.   And when you say an increase and a decrease as compared

10         to what?

11    A.   To untreated.  It says all talc treated cells.

12    Q.   There is no data that correlates your findings and your

13         experiments to ovarian cancer risk in humans, correct?

14              MS. O'DELL:  Objection, form.

15              THE WITNESS:  One more time, please.

16    BY MR. HEGARTY:

17    Q.   Sure.  There is no data that correlates your findings

18         in this manuscript to ovarian cancer risk in women,

19         correct?

20              MS. O'DELL:  Objection to form.

21              THE WITNESS:  So my data explain, explain and

22         actually classify and characterize epithelial ovarian

23         cancer cells to have a pro-oxidant state, and we were

24         the first lab to actually demonstrate that epithelial

25         ovarian cancer cells manifest a pro-oxidant state by
```

Ghassan Saed, Ph.D.

```
 1          increasing in these pro-oxidants that we have here and

 2          decreasing the anti-oxidant that we studied.  So this

 3          is a -- I have written a review article about this, I

 4          have written a book chapter about this, this is the

 5          major focus of my lab is to characterize the ovarian

 6          cancer cells as a pro-oxidant, that they manifest a

 7          pro-oxidant state and we characterize it.

 8     BY MR. HEGARTY:

 9     Q.   There is no data showing that these increases or

10          decreases increase the risk of ovarian cancer in women,

11          correct?

12               MS. O'DELL:  Objection to form.

13               THE WITNESS:  Okay, so there are data that --

14          recent data that showing, for example, I'll give you an

15          example, myeloperoxidase is a marker of inflammation.

16          My lab was the first lab in the entire world to report

17          that myeloperoxidase is expressed by epithelial ovarian

18          cancer cells, although this marker is only supposed to

19          be a myeloid marker, which is a blood marker, a blood

20          cells marker, not a nonmyeloid.  Several reports later

21          they confirm my finding, and not only that, other labs

22          have just -- they reported that the SNP that we use

23          here, it is correlated with increased risk of ovarian

24          cancer, that's reported.  That's number one.

25               Another example, SOD, catalase, those two
```

Ghassan Saed, Ph.D.

```
1        enzymes and one more -- okay, but for those two, I know
2        for a fact that their SNPs has also been reported to be
3        associated with increased risk of ovarian cancer in
4        human, so that's for the genotype.
5               For the markers, there are several studies in
6        the literature that talk about alteration of oxidative
7        stress and inflammation in ovarian cancer.  Our lab,
8        other labs have published, repeatedly published this,
9        so this is, as far as I'm concerned, this is a fact for
10       me, we have documented this, others documented this,
11       and to confirm my work with a report from a different
12       lab saying there is this myeloperoxidase SNP minus
13       463AA correlates with increased risk of ovarian cancer,
14       and we have this to be the genotype that changes in
15       talc powder, that's incredible to me.
16  BY MR. HEGARTY:
17  Q.   Identify the SNPs that you report in your manuscript
18       that have been shown to have reached genome wide
19       significance of association with ovarian cancer.
20  A.   Risk.
21               MS. O'DELL:  Object to form.
22               THE WITNESS:  Risk, so the minus, the same
23       SNP that we use here, minus 63, 463, which is the MPO
24       SNP, this SNP is recognized to be associated with
25       increased risk of ovarian cancer in a human.
```

Ghassan Saed, Ph.D.

```
 1    BY MR. HEGARTY:

 2    Q.   And that's been recognized to be associated in a genome

 3         wide significantly way?

 4                   MS. O'DELL:  Object to the form.

 5                   THE WITNESS:  I don't know what you mean by

 6         genome wide.

 7    BY MR. HEGARTY:

 8    Q.   Well, you're familiar with what the --

 9    A.   SNP is --

10    Q.   -- GWAS --

11    A.   Yes.

12    Q.   -- the GWAS study is, correct?  Are you familiar with

13         that?

14                   MS. O'DELL:  Would you repeat the question?

15         I couldn't hear it.

16    BY MR. HEGARTY:

17    Q.   I asked him if he's familiar with what GWAS is.

18    A.   Yes.

19    Q.   What is it?

20    A.   It's the genome wide association where they list all

21         the SNPs and their frequency of occurrence and their

22         what they call it -- frequency of occurrence in general

23         population.

24    Q.   And what SNPs in your manuscript have been associated

25         by the GWAS studies with ovarian cancer?
```

Ghassan Saed, Ph.D.

```
 1   A.   So this, okay, we're mixing up two things.  I need to

 2        clarify this.  So the GWAS, they identify the SNP.

 3        Then investigators after the SNP has been identified by

 4        the GWAS, they pick that SNP and they say, hmm, there's

 5        a lab that published that myeloperoxidase in ovarian --

 6        in epithelial ovarian cancer where it's not supposed to

 7        be there, well, let's do this study where we see if

 8        this SNP is indeed associated with increased risk of

 9        ovarian cancer.  So that's not part of the GWAS study.

10        They use the GWAS study information like I did it.

11   Q.   That's not my question, Doctor.  My question is which

12        of the SNPs that you report in your manuscript have

13        been shown to be associated with ovarian cancer by the

14        GWAS studies?

15             MS. O'DELL:  Objection to form.

16             THE WITNESS:  I just said what I have to say.

17   BY MR. HEGARTY:

18   Q.   Well, none of the SNPs that you referred to in your

19        manuscript have been identified by the GWAS studies as

20        being associated with ovarian cancer risk, correct?

21             MS. O'DELL:  Object to the form.

22             THE WITNESS:  No, it's not correct because I

23        repeat again, the GWAS have no responsibility to tell

24        you, they don't do studies looking at association.

25        They just list SNP and prevalence in general
```

Ghassan Saed, Ph.D.

```
1        population, very clear.

2   BY MR. HEGARTY:

3   Q.   So it's your contention that the GWAS, the genome wide

4        significance of association doesn't list SNPs that are

5        associated with ovarian cancer?

6             MS. O'DELL:  Object to the form.

7             THE WITNESS:  What I'm saying is, to my

8        understanding, GWAS is an information bank where you go

9        and you say, okay, there is -- there exists a catalase

10       SNP, which is this SNP, this specific sequence that is

11       present in .01 percent of general population.  Above

12       that will be characterized as risk factor.  So now in

13       the GWAS they identified the MPO SNP, the catalase SNP,

14       the SOD SNP, all SNPs that it's like an information

15       bank where you go to to find your information and then

16       you go and study them.  I study them, others study

17       them, different labs can study them, but they do it for

18       us.  It's like the gene sequencing bank, it's the same

19       thing, same concept, protein sequence bank.  I don't

20       need necessarily to go and sequence the whole thing to

21       understand, it's already sequenced for me.

22   BY MR. HEGARTY:

23   Q.   What does it mean for a SNP to reach genome wide

24        significance?

25   A.   So there is a cutoff that they have in their website to
```

Ghassan Saed, Ph.D.

```
 1           each based on epidemiological studies that there is

 2           association, if it increased over this level, it could

 3           be associated with diseases.

 4    Q.     Which of the SNPs that you reference in your manuscript

 5           have been associated with ovarian cancer, in other

 6           words, which have reached genome wide significance?

 7                   MS. O'DELL:  Object to the form.

 8                   THE WITNESS:  I can answer this.  I know for

 9           a fact it's catalase, not only ovarian but also in

10           breast cancer, and they are twins.

11    BY MR. HEGARTY:

12    Q.     Any others?

13    A.     I'm not -- I can't remember the actual -- for me, the

14           GWAS was an information bank where I get my -- the

15           information I need to perform the studies, like me and

16           others in the same situation.

17    Q.     Cite for me any published literature that is

18           associated -- that has shown a clinical significant

19           association between the SNPs that you reference in your

20           paper and ovarian cancer.

21    A.     I'm sorry, one more time.

22                   MS. O'DELL:  Object to the form.

23    BY MR. HEGARTY:

24    Q.     Identify for me any published literature that shows a

25           statistically significant association between the SNPs
```

Ghassan Saed, Ph.D.

```
 1          you reference in your manuscript and ovarian cancer.

 2                    MS. O'DELL:  Object to the form.

 3                    THE WITNESS:  So I'm not -- I am objecting to

 4          the word statistically significant, but I can identify

 5          several studies that, for example, looking at catalase

 6          SNP and its association with increased risk of ovarian

 7          cancer, myeloperoxidase SNP and its association with

 8          increased risk of ovarian cancer, there was one more

 9          I'm skipping, and so those two were definitely there.

10   BY MR. HEGARTY:

11   Q.   Why do you object to my use of the phrase statistical

12        significance?

13   A.   Because I am not sure if they did -- they did molecular

14        study or they did a different type of study, so I'm

15        just, you know, not familiar with the epidemiological

16        studies that they performed.

17   Q.   Well, cite for me any studies that show, as you say, an

18        association between MPO or CAT and ovarian cancer.

19                    MS. O'DELL:  Object to the form.

20                    THE WITNESS:  MPO?

21   BY MR. HEGARTY:

22   Q.   Yes.

23   A.   The MPO SNP?

24   Q.   Yes.

25   A.   That's what we're talking about?
```

Ghassan Saed, Ph.D.

```
 1    Q.   Yes.

 2    A.   Yes, I can cite.

 3    Q.   Cite for me a study.

 4    A.   I don't remember it now, but there is study.

 5    Q.   Did you cite it in your manuscript?

 6    A.   I believe so.  Let's talk -- let's see about where we

 7         talk about SNP.  Okay, were the first to do this --

 8         sorry -- I would be very happy to provide you with

 9         these references that I mentioned, MPO and catalase and

10         the SNP in ovarian cancer.

11    Q.   Can you cite for me here today any studies associating

12         catalase or MPO with ovarian cancer?

13                   MS. O'DELL:  Object to the form.  You mean

14         the SNP?

15                   THE WITNESS:  I can't remember where I put

16         it.

17    BY MR. HEGARTY:

18    Q.   How much time do you need to look, Doctor?

19    A.   See, I write this every day so I get so overwhelmed.

20    Q.   Let's go off the record.

21    A.   So we're looking for catalase SNP for --

22                   MS. O'DELL:  Stay on, if you're -- do you

23         need more time, Doctor, or are you --

24                   THE WITNESS:  I'm trying to find it in my --

25                   MR. HEGARTY:  Let's go off the record.
```

Ghassan Saed, Ph.D.

```
 1                    THE WITNESS:  I mean I may not even reference

 2          it here so I don't know.

 3                    THE VIDEOGRAPHER:  Going off the record at

 4          3:23 p.m.

 5                    (An off-the-record discussion was held.)

 6                    THE VIDEOGRAPHER:  We're back on the record

 7          at 3:26 p.m.

 8   BY MR. HEGARTY:

 9   Q.    Doctor, when we went off the record I asked you for any

10          studies associating catalase or MPO with ovarian

11          cancer.  You've had a chance to look for such studies,

12          and what is your response?

13   A.    So there's one study by Olson, et al., that was

14          published in Gynecology Oncology 2004.

15   Q.    How do you spell his first name?

16   A.    O-l-s-o-n, and it's looking at SOD and MPO SNP.  There

17          is an increased risk of ovarian cancer.  I couldn't

18          find the catalase one, but it is there, I can search

19          for it, it is hundred percent there.  There is another

20          one looking at Superoxide dismutase published in JBC

21          Journal by Yumin, et al.

22   Q.    How do you spell that?

23   A.    Y-u-m-i-m, Hu, H-u.  And there is one more which is

24          about catalase if you -- SNP.

25   Q.    What is the date of the Yumin article?
```

Ghassan Saed, Ph.D.

```
 1    A.    What's the data?

 2    Q.    What's the date?

 3    A.    Oh, the date, I'm sorry.  Can I look?

 4    Q.    Yes.

 5    A.    So the date was 2005.

 6    Q.    And then you believe there's an article that associates

 7          catalase to ovarian cancer?

 8    A.    Yes.

 9    Q.    You can't recall that article sitting here today?

10    A.    I have it here, it's Catalase Nucleotide SNP Strongly

11          Associated With Ovarian Cancer, this is by -- from our

12          lab and from another lab, also.

13    Q.    What is the -- who is the first author?

14    A.    From my lab?

15    Q.    Well, you said --

16    A.    This second one, the second one is by -- so this is our

17          paper, and there's one here.

18    Q.    When you say our paper, who's the lead author?

19    A.    Okay.  Can I just tell you the paper?  So this is

20          published in -- it says The Effect of Catalase SNP and

21          Susceptibility to Ovarian Cancer, and this is by --

22          published in -- doesn't -- it's in 2017, and it doesn't

23          tell me the journal, Journal of Obstetrics and

24          Gynecology, Volume 38, 2018, Issue 4.

25                And going back to your previous question, I
```

Ghassan Saed, Ph.D.

```
1         am -- if you define lead author as corresponding author

2         or first author?

3    Q.   First author.

4    A.   Is Dr. Belotte, he was an M.D., Ph.D. trained in my

5         laboratory.  I was his Ph.D. advisor.

6    Q.   What year?  What is the year of the article?

7    A.   Oh, sorry, 2015.

8    Q.   What is the name of the article?

9    A.   Single Nucleotide Polymorphism in Catalase is Strongly

10        Associated With Ovarian Cancer Survival.

11   Q.   So that article doesn't have anything to do with

12        ovarian cancer initiation, correct?

13             MS. O'DELL:  Object to the form.

14             THE WITNESS:  Is that another question?

15   BY MR. HEGARTY:

16   Q.   Yes.

17   A.   Saying --

18   Q.   In that article, it associated catalase with ovarian

19        cancer survival, correct?

20   A.   Uh-huh.

21   Q.   It didn't associate catalase with causing ovarian

22        cancer, correct?

23             MS. O'DELL:  Object to the form.

24             THE WITNESS:  So in this article what we did,

25        we actually, this is -- we identified the SNP and
```

Ghassan Saed, Ph.D.

```
 1          catalase that others also identified, and we looked at

 2          the presence of the SNP in chemoresistance versus

 3          sensitive looking at different parameters, and we

 4          actually reversed the SNP using the CRISPR editing,

 5          gene editing, and we induced apoptosis, so there was

 6          like a survival mechanism.

 7     BY MR. HEGARTY:

 8     Q.   Doctor, the article you actually cite and which you

 9          included as an author found that with regard to the

10          seven selected SNP study, no association -- you found

11          no association with ovarian cancer risk, correct?

12               MS. O'DELL:  Object to the form.

13               THE WITNESS:  Which article you talking

14          about?

15     BY MR. HEGARTY:

16     Q.   The article with the lead author Belotte, Belotte.

17     A.   Jimmy Belotte, okay, what about it?

18     Q.   Your article looked at CAT, CYBA, GPX1, GSR, MnSOD,

19          MPO, and NOS2, correct?

20     A.   Yes.

21     Q.   You found doing the same kind of testing you did here

22          that none of those SNPs was associated with ovarian

23          cancer risk, correct?

24               MS. O'DELL:  Object to the form.

25               THE WITNESS:  No.
```

Ghassan Saed, Ph.D.

```
 1                 MS. O'DELL:  Excuse me.  Object to the form.

 2          If you need to see the paper --

 3                 THE WITNESS:  Yeah, it's been a while but --

 4                 MS. O'DELL:  If you need to see the paper.

 5          SAED DEPOSITION EXHIBIT NUMBER 17,

 6          RESEARCH ARTICLE,

 7          WAS MARKED BY THE REPORTER

 8          FOR IDENTIFICATION

 9  BY MR. HEGARTY:

10  Q.   I marked as Exhibit 17 the paper.

11  A.   Very good.

12  Q.   Show me in that paper where you found an association

13       with the listed SNPs and ovarian cancer risk.

14  A.   Okay.  So there is no -- this study we looked at, this

15       particular SNP and catalase that we found, the other we

16       found that they are not associated with survival, so

17       this study was basically looking at survival of ovarian

18       cancer.  So this is not a study meant to study risk.

19                 MR. KLATT:  Objection, nonresponsive.

20  BY MR. HEGARTY:

21  Q.   If you look over at Page 11 of your manuscript.

22                 MS. O'DELL:  Which page --

23                 MR. HEGARTY:  It's Exhibit 7.

24                 MS. O'DELL:  Well, he just has one manuscript

25       in his hand.  Do you know where we are, Doctor?
```

Ghassan Saed, Ph.D.

```
 1                    THE WITNESS:  Page 11 --

 2    BY MR. HEGARTY:

 3    Q.   Yes, Page 11.  The first sentence of the third

 4         paragraph beginning To Elucidate the Mechanism, do you

 5         see that?

 6    A.   Yes.

 7    Q.   You state later in that sentence, we have examined

 8         selected known gene mutations corresponding to SNPs

 9         known to be associated with altered enzymatic activity

10         and increased cancer risk.  Do you see where I'm

11         reading?

12    A.   To elucidate the mechanism, that paragraph?

13    Q.   Yes.

14    A.   Okay.

15    Q.   And at the end of that sentence you cite Reference 28.

16    A.   Okay.

17    Q.   And Reference 28 is that Belotte article, correct?

18    A.   28 is Belotte, yes.

19    Q.   Can you hand me the Belotte article back, please.

20    A.   (Witness complied.)

21    Q.   In the Belotte article you say of the seven selected

22         SNPs studied, no association with ovarian cancer risk

23         was found.  That's what you found, correct, Doctor?

24                    MS. O'DELL:  Objection to form.  If you need

25         to see Belotte -- do you have another copy, Mike, or is
```

Ghassan Saed, Ph.D.

```
 1        that it?  And it's also in your notebook at 34 if you

 2        both need it so.

 3                  THE WITNESS:  Can I look at it?

 4   BY MR. HEGARTY:

 5   Q.   Yes, go ahead and look at 34.

 6   A.   I can't remember if we did the same SNP in both

 7        studies, so I just want to make sure that we did that,

 8        because there are several SNPs for the same enzyme

 9        reported in the GWAS.

10   Q.   How long will it take you to look at -- you did the

11        same SNPs in the Belotte article as you did here?

12   A.   I have to look at the accession numbers and compare

13        them.

14   Q.   Well, we'll maybe get to that, but my question goes

15        back to your reference on Page --

16                  MS. O'DELL:  34.

17                  MR. HEGARTY:  Your reference to that article

18        on Page 11 of your manuscript, you quote that article

19        as saying that you examined several selected known gene

20        mutations corresponding to SNPs known to be associated

21        with altered enzyme activity and increased cancer risk.

22        What part of that Belotte article shows that the SNPs

23        that you examined are associated with increased cancer

24        risk?

25                  THE WITNESS:  So if you look at the table,
```

Ghassan Saed, Ph.D.

```
 1          Page 3, Dr. Belotte's article, there is a table here
 2          that lists what is the SNP, what is the mean allele
 3          frequency occurrence, the chromosomal equation, and if
 4          it is known nucleotide switch, and the effect of
 5          activity.  So there are SNPs that affect activity of
 6          the enzymes, and if they do, they are, according to our
 7          findings, they are associated with anything that alters
 8          oxidative stress to the pro-oxidant state can
 9          contribute to increased risk.
10    BY MR. HEGARTY:
11    Q.   But you in your paper, Exhibit 17, say that the SNPs
12         you studied showed no association with ovarian cancer
13         risk, correct?
14    A.   Which one?
15    Q.   The Belotte paper.
16    A.   Oh, keep saying what paper.
17    Q.   You look at the abstract.
18    A.   So, again, we're looking at specific SNPs.
19    Q.   Correct.
20    A.   Right, so --
21    Q.   And in the specific --
22    A.   Some of the SNPs that we looked at when we did this
23         study, they were associated with survival of ovarian
24         cancer, that's what we tested.
25    Q.   None of the SNPs --
```

Ghassan Saed, Ph.D.

```
 1                    MR. KLATT:  Nonresponsive.

 2   BY MR. HEGARTY:

 3   Q.   Doctor, you also examined whether the SNPs reported in

 4        this study were associated with ovarian cancer risk,

 5        correct, not just survival?

 6                    MS. O'DELL:  Objection, form.

 7                    THE WITNESS:  Give me a moment to see, to

 8        refresh my memory.  This is 2015, so I need to remember

 9        what we did.  I have done many work.

10   BY MR. HEGARTY:

11   Q.   How much time do you need to study that article?

12   A.   Just -- okay, so in this study we only did survival,

13        the Jimmy Belotte study, this is my -- yeah, so this

14        here we only did analysis of survival.

15   Q.   Doctor, if you turn over to Page 6 of that article at

16        the very bottom, third from -- third line from the

17        bottom, you write that currently we demonstrated that

18        there is no association between the selected SNPs and

19        risk of developing ovarian cancer, citing Table 2,

20        those are your words, correct?

21   A.   Yeah, Table 2 is, let's see --

22                    MS. O'DELL:  What were you reading?

23                    MR. HEGARTY:  The bottom of Page 6 of 12.

24                    THE WITNESS:  Yeah, I see that.

25
```

Ghassan Saed, Ph.D.

```
1    BY MR. HEGARTY:

2    Q.   Doctor, is it your testimony that in this study you did

3         not investigate whether the SNPs listed in Table 2 were

4         associated with ovarian cancer risk?

5                   MS. O'DELL:  Object to the form.

6                   THE WITNESS:  Let me just look at this,

7         sorry.

8                   MR. HEGARTY:  Let's go off the record.

9                   MS. O'DELL:  He's just looking at the table.

10        Ask him a question, he's entitled --

11                  MR. HEGARTY:  Let's go off the record.

12                  MS. O'DELL:  No, we're not.

13                  MR. HEGARTY:  We're going off the record.

14                  MS. O'DELL:  No, we're not.

15                  MR. KLATT:  We're going to call Judge Pisano.

16                  MS. O'DELL:  Wait a minute.  Let me speak.

17        If you ask the doctor about his manuscript, he is not

18        required to have put to memory every word and table in

19        the manuscript.  If you ask him about something, he is

20        entitled to look at it and reply completely.  And to

21        somehow suggest if he takes more than 15 seconds we're

22        going off the record, that's ridiculous.

23                  MR. KLATT:  It's every single time he's asked

24        a question, he wants to look something up.  This is

25        slow walking the deposition, we're not going to put up
```

Ghassan Saed, Ph.D.

```
 1        with it.
 2                MS. O'DELL:  It is not.
 3                MR. KLATT:  He's perfectly entitled to look
 4        things up to answer them, but it doesn't count against
 5        our time.
 6                MS. O'DELL:  He's not looking things up.
 7        He's looking at the exhibit that had been placed before
 8        him.
 9                THE COURT REPORTER:  Excuse me --
10                (Simultaneous crosstalk.)
11                MS. O'DELL:  We are on the record.
12                And, Doctor, if you are prepared to respond
13        to the question, you may do so.  If you need a minute,
14        let us know that.
15    BY MR. HEGARTY:
16    Q.   How much time do you need to review the article,
17         Doctor?
18    A.   I'm just asking you, please, where do you see in Table
19         2.
20    Q.   I'm referring to your words at the bottom of Page 6
21         that's referring over to Table 2, and I'm asking you is
22         it your testimony that you did not investigate the
23         association in this paper between these SNPs and
24         ovarian cancer risk, is that your testimony?
25                MS. O'DELL:  Are you quoting a sentence?
```

Ghassan Saed, Ph.D.

```
 1           What sentence are you referring to?
 2                   MR. HEGARTY:  I'm not -- you're not taking
 3           this deposition of me.  I'll let my question stand.
 4                   MS. O'DELL:  Object to the form of the
 5           question, it's unclear.  If there's a specific sentence
 6           you're referring to in the manuscript, you said bottom
 7           of Page 6, so if there's something you're referring to,
 8           I'd ask you direct the witness to it.
 9      BY MR. HEGARTY:
10      Q.   Can you answer my question, Doctor?
11                   MS. O'DELL:  Object to the form.
12                   THE WITNESS:  Where is the -- can you
13           please --
14      BY MR. HEGARTY:
15      Q.   Bottom of Page 6 for the second time.
16      A.   Yes.
17      Q.   I'm reading this to you, it says currently we
18           demonstrated that there is no association between the
19           selected SNPs and risk of developing ovarian cancer,
20           Table 2.  Do you see that?
21      A.   Yes.
22      Q.   Is it your testimony that this article did not
23           investigate an association between the selected SNPs
24           and ovarian cancer risk?
25      A.   In this study that we did with this number of people
```

Ghassan Saed, Ph.D.

```
 1          that we looked at, we found, okay, that the only

 2          catalase SNP is associated with ovarian cancer

 3          survival, none of the other SNPs were associated from

 4          these patients to increased risk of ovarian cancer.

 5     Q.   Right.

 6     A.   We only did 143, I believe, 94.

 7     Q.   So the sentence that I read to you on Page 11 of your

 8          manuscript it's citation 28 is wrong, correct?

 9                    MS. O'DELL:  Objection to form.

10                    THE WITNESS:  What's the citation?

11   BY MR. HEGARTY:

12     Q.   Well, you support the sentence that says we have

13          examined selected known gene mutations corresponding to

14          SNPs known to be associated with altered enzymatic

15          activity and increased ovarian cancer risk citing 28.

16          28 doesn't support a finding that the SNPs you tested

17          show increased ovarian cancer risk, correct?

18                    MS. O'DELL:  Object to the form.

19                    THE WITNESS:  What we -- again, this --

20          what -- the SNPs that we are used here in this study,

21          they were used in response to test the effect of talc

22          treatment, talcum powder treatment to the genetic -- to

23          the specific genetic mutations.  Now, we link survival

24          to risk, so, for example, if you look, most of our

25          hypothesis --
```

Ghassan Saed, Ph.D.

```
 1    BY MR. HEGARTY:

 2    Q.    I object to it's nonresponsive.  Doctor, you're not

 3          answering my question.  I'm going to withdraw the

 4          question.

 5                MS. O'DELL:  Don't cut him off if he's

 6          finishing --

 7                MR. HEGARTY:  He's not finishing, he's

 8          answering something else.

 9                MS. O'DELL:  He's trying to answer your

10          question.

11                MR. HEGARTY:  I withdrew the question.

12                Listen to my question, Doctor.  Does the

13          Belotte paper show that the SNPs you looked at are

14          associated with increased cancer risk?

15                THE WITNESS:  Ovarian cancer risk.

16    BY MR. HEGARTY:

17    Q.    Ovarian cancer risk.

18    A.    So what I'm trying to tell you, according to this

19          paper, we only tested limited number of patients.

20    Q.    Listen to my question.

21    A.    And I'm not sure, I'm answering, trying to answer.

22    Q.    You're not answering the question.  I'm going to

23          withdraw the question.

24    A.    Can I finish?

25    Q.    I'm going to withdraw the question.  I'm going to
```

Ghassan Saed, Ph.D.

```
1        answer it again.

2              MS. O'DELL:  You can go ahead and finish.

3              Stop interrupting.

4              THE COURT REPORTER:  I cannot take

5        everybody --

6              MS. O'DELL:  Here's my objection.  The

7        witness is being interrupted while he's trying to

8        respond to the question, and so if there's a question

9        pending the doctor is trying to answer, you cannot

10       interrupt him.

11             MR. HEGARTY:  Well, the record's going to

12       speak for itself as far as his nonresponsiveness to my

13       question.

14             MS. O'DELL:  Were you finished with your

15       answer?

16             MR. HEGARTY:  I withdrew the question.

17             MS. O'DELL:  Were you finished with your

18       answer?

19             THE WITNESS:  So what I'm trying to tell you,

20       I cannot remember that we did the same exact SNP in

21       Jimmy Belotte study and this study.

22  BY MR. HEGARTY:

23  Q.   That was not my question.  My question is specific to

24       this study.

25  A.   To the Jimmy Belotte study.
```

Ghassan Saed, Ph.D.

 1    Q.    Correct.

 2    A.    Yes.

 3    Q.    And reading from your study in the abstract, starting

 4          on the third line it says we sought to evaluate the

 5          association of SNPs in key oxidant and anti-oxidant

 6          enzymes with increased risk in survival in epithelial

 7          ovarian cancer.  So you agree in this study that you

 8          looked at certain specific SNPs with regard to

 9          increased risk of ovarian cancer, correct?

10    A.    Those SNPs, yes.

11    Q.    You found from your study that those SNPs were not

12          associated with increased ovarian cancer risk, correct?

13    A.    Correct.

14                MS. O'DELL:  Object to the form.

15                THE WITNESS:  Correct.

16    BY MR. HEGARTY:

17    Q.    Can you cite for me any study that has shown the SNPs

18          you report, you discuss in your manuscript to occur in

19          women using talc?

20                MS. O'DELL:  Object to the form.

21                THE WITNESS:  That the SNP that we used in

22          this study --

23    BY MR. HEGARTY:

24    Q.    In the manuscript.

25    A.    In the manuscript, any of these SNPs has been

Ghassan Saed, Ph.D.

```
 1        associated with woman using talc?

 2   Q.   Correct.

 3   A.   I don't know.

 4   Q.   Can you report -- can you cite for me any studies

 5        showing the enzyme activity that you report to have

 6        occurred with application of talc use to be in women

 7        using talc?

 8             MS. O'DELL:  Object to the form.

 9             THE WITNESS:  So if other people have done

10        the same work that I did with samples from woman who

11        got ovarian cancer and they used talc?

12   BY MR. HEGARTY:

13   Q.   Can you cite for me any study showing your findings as

14        to decrease in the expression of anti-oxidant enzymes

15        and the increased expression in pro-oxidant enzymes in

16        women using talc?

17             MS. O'DELL:  Object to the form.

18             THE WITNESS:  I can cite to you several

19        studies that have indicated the pro-oxidant state and

20        the anti-oxidant state in several human, animal, in

21        vitro studies of cells with ovarian cancer.

22   BY MR. HEGARTY:

23   Q.   That's not my question.  My question, Doctor, is can

24        you cite for me any studies showing your findings as to

25        decrease in the expression of anti-oxidants and the
```

Ghassan Saed, Ph.D.

```
 1          increase expression of pro-oxidants in women using talc

 2          on their bodies?

 3                    MS. O'DELL:  Object to the form.

 4                    THE WITNESS:  I don't know.

 5     BY MR. HEGARTY:

 6     Q.   Can you cite for me any study showing the results --

 7          showing any of the results in your manuscript to

 8          occur -- to have occurred in women applying talc to

 9          their bodies?

10                    MS. O'DELL:  Object to the form.

11                    THE WITNESS:  So let's go back.  I have --

12          this is important.  Good question.  My answer is

13          simple.  The fact that you -- that talc has been shown

14          to elicit a molecular response, that is same response

15          that you get in the pro-oxidant state that has been

16          published by many people in ovarian cancer, that is, to

17          my understanding, link talcum powder to increased risk

18          of ovarian cancer.

19     BY MR. HEGARTY:

20     Q.   Object as nonresponsive.  Listen to my question,

21          Doctor.  My question is can you cite for me any studies

22          showing the findings you report in your manuscript or

23          in your expert report in this case to have occurred or

24          been reported in women using talc on their bodies?

25                    MS. O'DELL:  Object to the form.
```

Ghassan Saed, Ph.D.

```
 1                    THE WITNESS:  So other than the similarities

 2          in the mechanism, direct link with woman who use

 3          specific talc on that day, I don't know.

 4     BY MR. HEGARTY:

 5     Q.   Let's take a break.

 6                    THE VIDEOGRAPHER:  We're going off the record

 7          at 3:49 p.m.

 8                    (A short recess was taken.)

 9                    THE VIDEOGRAPHER:  We're back on the record

10          at 4:05 p.m.

11     BY MR. HEGARTY:

12     Q.   Doctor, in looking at your manuscript again Page 13,

13          I'm sorry, in looking at your report, sorry, Page 13,

14          you describe the cell lines that you use for purposes

15          of your experiments, is that correct?

16     A.   In the cell lines section?

17     Q.   Yes.

18     A.   Yes.

19     Q.   Which of those cell lines -- strike that.  What sub

20          type of ovarian cancer are these cells?

21     A.   Sorry.  Unknown.

22     Q.   You don't know whether they're high grade, serous,

23          endometrioid, mucinous, clear cell?

24                    MS. O'DELL:  Object to the form.

25                    THE WITNESS:  When we purchased these cell
```

Ghassan Saed, Ph.D.

```
 1              lines from ATCC, they have described them where they

 2              isolated from and what's the patient and all that, but

 3              I can't remember exactly which one is which.

 4    BY MR. HEGARTY:

 5    Q.   So are any of these cell lines or have any of these

 6         cell lines been qualified as high grade serous ovarian

 7         cancer cell lines?

 8              MS. O'DELL:  Object to the form.

 9              THE WITNESS:  I can't remember.

10    BY MR. HEGARTY:

11    Q.   You say that your experiments used what you call --

12         well, you say immortalized human fallopian tube

13         epithelial cells FT33, is that right?

14    A.   FT33, yes.

15    Q.   Those, as you note in your paper, are immortalized cell

16         lines, correct?

17    A.   Correct.

18    Q.   And such cell lines are considered abnormal or

19         precancerous, isn't that correct?

20    A.   Not necessarily.

21    Q.   Well, they were modified to essentially live forever,

22         correct?

23    A.   No, it's not correct.

24    Q.   Well --

25    A.   They're modified so they can be consistent.
```

Q. But normal cells are not immortalized cells, correct?
A. Correct.
Q. And to immortalize a cell, you have to fundamentally change the cell, correct?
A. Not correct.
Q. Well, you typically have to induce something like the SV40 DNA tumor virus, correct?
A. Correct.
Q. And that alters the makeup of the cells, correct?
A. Not necessarily.
Q. Well, it essentially shuts off, for example, the P53 cell, P53 marker, correct?
A. Oncogene.
Q. Oncogene, correct? And these cells carry essentially a functional equivalent of four critical oncogenes, oncogenic mutations in tumor suppression pathways that have been implicated in ovarian carcinogenesis, correct?
A. Let me explain to you, I have been conducting research all my career using primary cultures of cells established from -- fresh from patient tissues as well as immortalized cell lines. The problem with using primary cultures, the results cannot be reproduced, because if you passage the cells, they change their phenotype with passages, so researcher agreed upon this

Ghassan Saed, Ph.D.

```
1            is the best utility that you have in vitro, that you

2            can use immortalized cell lines, at least they are

3            all -- their machinery of gene expression is controlled

4            and it's consistent and reproducible with passages.

5       Q.   Did you do anything to correlate the cell lines you

6            used to, for example, serous ovarian cancer cells in

7            vivo?

8                      MS. O'DELL:  Object to the form.

9                      THE WITNESS:  Yeah, so from patients, this is

10           our -- my next interest to do, to go -- I have

11           extensive experience and expertise in isolating primary

12           cultures at zero passages from patients' tissues,

13           blood, and the fluid, and it is in my mind to do

14           further testing of talcum powder and see if we can

15           reproduce the effect on those cells.

16  BY MR. HEGARTY:

17      Q.   When you say those cells, what do you mean?

18      A.   The primary freshly established cells from different

19           histotypes of ovarian cancer.

20      Q.   Did you do anything --

21      A.   Because this is not available commercially.

22      Q.   Did you do anything to establish that the cell lines

23           you were looking at are, for example, high grade

24           serious ovarian cancer cell lines?

25                     MS. O'DELL:  Object to the form.
```

Ghassan Saed, Ph.D.

```
 1                    THE WITNESS:  So, again, I said one of the
 2          cell lines, I can't remember which, is from high grade,
 3          high serous grade.  The others are not clearly
 4          identified by the ATCC information provided.  But that
 5          was not my point of my research.  My point of my
 6          research is to see does talcum powder induces or alter
 7          oxidative stress markers that we know and we have
 8          published in several documents that is associated with
 9          ovarian cancer.
10     BY MR. HEGARTY:
11     Q.   Can you cite for me any data showing that the
12          concentrations of exposure that you used in your
13          experiments are similar or the same as would be
14          occurring in women using talc on the perineum?
15     A.   I can't tell you that.
16     Q.   Can you cite for me any data that shows that the level
17          of concentration of talc that you used in your cell
18          studies has ever occurred in women applying talc to
19          their bodies?
20                    MS. O'DELL:  Object to the form.
21                    THE WITNESS:  My response to this is I
22          consider, according to my studies, I consider talc
23          powder to be carcinogenic, and in my understanding of
24          biology of cancer, there is no minimum threshold beyond
25          which you are protected from developing cancer.  Every
```

Ghassan Saed, Ph.D.

```
 1          time you're exposed to the insult.  It's like

 2          radiation, it is a accumulative, it is registered in

 3          your body; that's my opinion.

 4    BY MR. HEGARTY:

 5    Q.   So your opinion is that one particle of talc is enough

 6          to cause inflammation to lead to ovarian cancer?

 7    A.   I did not say that.

 8    Q.   Well, how much talc must there be introduced in vivo to

 9          cause ovarian cancer?

10    A.   I don't know.

11    Q.   At what -- strike that.  What data shows that a woman

12          using talc will have the same level of talc exposure to

13          her ovarian cells or fallopian tube cells as you used

14          in your experiments?

15               MS. O'DELL:  Object to the form.

16               THE WITNESS:  So when you want to test the

17          effect of any substance in the biology of the body, you

18          always start with cell cultures, cell lines, so this is

19          pretty accepted standard.  Now, the amount of exposure

20          in cell lines, because it's direct and it is an

21          isolated environment, it is definitely not -- does not

22          correlate with the in vivo and how much you will get

23          with that exposure.  The answer is I don't know how

24          much a woman need to be exposed and for how long to

25          develop ovarian cancer in response to talcum powder
```

Ghassan Saed, Ph.D.

```
 1          use.  But what I do know, talcum powder induces -- is a

 2          carcinogenic and induces similar response to the

 3          profile that we see in pro-oxidant state that we

 4          extensively characterize in studies in ovarian cancer

 5          in our laboratory and others.

 6     BY MR. HEGARTY:

 7     Q.   It induces -- talc induces a similar response to the

 8          profile that you see in pro-oxidant state in the cell

 9          cultures that you experimented, correct, experimented

10          with, correct?

11               MS. O'DELL:  Object to the form.

12               THE WITNESS:  We and others have reported,

13          for example, there was a report showing that patients

14          with ovarian cancer, their blood is contain high levels

15          of pro-oxidants, so that's an indication that ovarian

16          cancer -- as a result of getting ovarian cancer your

17          blood is -- have high levels of oxidants that we

18          characterized.  And there are many other studies that

19          have shown that -- in vivo that there is an association

20          between oxidative stress and the risk of developing

21          ovarian cancer.

22     BY MR. HEGARTY:

23     Q.   But none of those studies have shown those effects in

24          women using talc, correct?

25     A.   I don't know.
```

Ghassan Saed, Ph.D.

```
 1    Q.   You don't know of any such studies?

 2    A.   I don't know if those studies included in their

 3         population women that who have used talc or not.

 4    Q.   You can't site for me any studies that have shown the

 5         levels of pro-oxidant or anti-oxidant states that you

 6         report in your papers in women using talc, correct?

 7              MS. O'DELL:  Object to the form.

 8              THE WITNESS:  I just answered you.

 9    BY MR. HEGARTY:

10    Q.   And the answer is no?

11    A.   No, no, I just -- my previous answer is the same.

12    Q.   Which is what?

13    A.   Which I said oxidative -- there have been shown that in

14         the blood of a woman with ovarian cancer, there is an

15         elevated levels of oxidants, and we're saying that if

16         talcum powder induces oxidative stress, alter oxidative

17         levels and redox balance by increasing oxidants and

18         decreasing anti-oxidants, according to our data, that

19         is an indication that it is doing -- manifesting the

20         pathogenesis of ovarian cancer.

21    Q.   The studies you're referring to --

22              MR. KLATT:  Objection, nonresponsive.

23    BY MR. HEGARTY:

24    Q.   The studies you're referring to have been reported to

25         have occurred in women with ovarian cancer, correct?
```

Ghassan Saed, Ph.D.

```
1    A.   The blood of woman with ovarian cancer.

2    Q.   No studies have reported those same results in the

3         blood of women who do not have ovarian cancer but are

4         using talc on their bodies, correct?

5    A.   One more time.

6              MS. O'DELL:  Object to the form.

7    BY MR. HEGARTY:

8    Q.   No studies have reported those same results in the

9         blood of women who do not have ovarian cancer that are

10        using talc on their bodies, correct?

11   A.   I don't know.

12   Q.   When you say you don't know, what do you mean?

13   A.   I don't know if there are studies.  So you talking --

14        are you referring to the study -- I'm only referring to

15        patients with ovarian cancer, blood, their blood have

16        high oxidants.  Now, if normal, talk about normal

17        people with normal woman with no ovarian cancer, they

18        have -- I don't know, if they use talc they will have

19        higher level of oxidants, maybe that's something we

20        need to do.

21   Q.   You don't know -- you're not aware of any data showing

22        high oxidant levels in women using talc who do not have

23        ovarian cancer?

24   A.   I would be very much interested to do it.

25   Q.   You're not aware of any such studies?
```

Ghassan Saed, Ph.D.

```
 1    A.   No.

 2    Q.   Can you can cite for me anyone in the scientific

 3         community who has accepted that talcum powder causes

 4         ovarian cancer by the mechanism that you refer to in

 5         your report?

 6    A.   Give names?

 7    Q.   Yes.

 8    A.   The co-authors of my manuscript.

 9    Q.   Anyone else?

10    A.   I'm not aware, this is a very recent study.

11    Q.   Is it your testimony that the scientific community has

12         accepted your opinion as establishing the causal

13         mechanism between talc and ovarian cancer?

14              MS. O'DELL:  Object to the form.

15              THE WITNESS:  My opinion is not out there

16         yet, it's -- this is -- the manuscript is still under

17         press, it's in press so it's not really out for the

18         readers.

19    BY MR. HEGARTY:

20    Q.   You agree that the medical community has not generally

21         accepted that talc use causes ovarian cancer?

22              MS. O'DELL:  Object to the form.

23              THE WITNESS:  That they accept --

24    BY MR. HEGARTY:

25    Q.   Yes.
```

Ghassan Saed, Ph.D.

```
 1   A.   Which community you talking about?

 2   Q.   Well, I'm talking about the medical community.

 3   A.   The doctors?

 4   Q.   Doctors.

 5   A.   Researchers?

 6   Q.   Researchers.

 7             MS. O'DELL:  Object to the form.

 8   BY MR. HEGARTY:

 9   Q.   You agree that the medical community, doctors and

10        researchers, have not generally accepted that talc use

11        causes ovarian cancer?

12             MS. O'DELL:  Object to the form.

13             THE WITNESS:  I don't know, I really don't

14        know if they do or not.

15   BY MR. HEGARTY:

16   Q.   You include in your report, in particular in the

17        summary of your report over on Page 20, in Paragraphs 5

18        and 6 that use of Johnson's Baby Powder can cause

19        ovarian cancer, and in Paragraph 6 can worsen the

20        prognosis of patients with ovarian cancer, correct?

21   A.   Correct.

22   Q.   By what methodology did you use to come to those

23        opinions?

24   A.   Okay.  So I have to distinguish between opinions versus

25        conclusion from results.  So here I cite my personal
```

Ghassan Saed, Ph.D.

```
 1        opinion.  Now, my personal opinion is based on my data
 2        that I got here.  The data that I tested, my
 3        methodology that I used, and the results of this study
 4        strongly divert -- pushed my opinion towards this.
 5   Q.   My question is a little bit different, Doctor.  By what
 6        published methodology did you use to reach your
 7        causation opinions in this case?
 8             MS. O'DELL:  Objection, asked and answered.
 9   BY MR. HEGARTY:
10   Q.   For example, are you familiar with the Bradford Hill
11        factors or criteria?
12   A.   Okay, so are you referring to epidemiological studies?
13   Q.   No, let me back up.  Have you ever heard of the
14        Bradford Hill factors?
15   A.   No.
16   Q.   Is there -- can you cite for me any published
17        methodology that you used to look at the data, look at
18        your experiments, and come to the opinions that you set
19        out in the summary of your report?
20   A.   Yes.  I just said to you that based on my results and
21        my previous finding, previous publications with other
22        publications from other laboratories, that all agreed
23        that a factor that causes inflammation and alter these
24        signature factors, the signature for reactive oxygen
25        species the way it does it for -- that simulates
```

Ghassan Saed, Ph.D.

```
 1            ovarian cancer is in a hypothesis is a cause and
 2            effect.  My opinion is based on that.
 3      Q.    Are the methods that you used to reach those opinions
 4            published anywhere?
 5      A.    The method that we used to do -- to test the effect of
 6            talcum powder on reactive oxygen species, oxidative
 7            stress, and inflammation is very basic methodology --
 8            let me finish, please -- basic methodology that is
 9            known since early 70s or even mid 70s, some of it,
10            ELISA is a very well method, very standard method, we
11            and others use this all the time.  PCR is another well
12            established method.  Every single study now you see PCR
13            all over the places.  So what the methodology that we
14            employed here is really standard methodology, and I'm
15            really surprised that this work that has not been done
16            till now.
17      Q.    Are your opinions based solely on the experiments that
18            you did that are set out in your manuscript?
19                   MS. O'DELL:  Object to the form.
20                   THE WITNESS:  My opinion is based on the data
21            from this manuscript and this work that I did and,
22            also, in published literature that identify the
23            pattern, the signature of pro-oxidants in ovarian
24            cancer.
25
```

Ghassan Saed, Ph.D.

```
 1    BY MR. HEGARTY:

 2    Q.   The opinions that you set out in Paragraphs 5 and 6

 3         have never been published in the peer-reviewed

 4         literature, correct?

 5    A.   My opinion?

 6                   MS. O'DELL:  Object to the form.

 7    BY MR. HEGARTY:

 8    Q.   Yes.  The opinions in Paragraphs 5 and 6 have never

 9         been published in the peer-reviewed literature,

10         correct?

11                   MS. O'DELL:  Object to the form.

12                   THE WITNESS:  I don't understand published

13         means.

14    BY MR. HEGARTY:

15    Q.   Well, published in peer-reviewed literature.

16    A.   As what, as a manuscript?

17    Q.   In any format.  You have never set out the opinions in

18         Paragraphs 5 and 6 in any public --

19    A.   So I read this somewhere else?

20    Q.   Somewhere else.

21    A.   I never read this somewhere else.

22    Q.   So you have never provided your opinions to any of your

23         peers in any published article, correct?

24                   MS. O'DELL:  Object to the form.

25                   THE WITNESS:  That's very general.  What do
```

Ghassan Saed, Ph.D.

1        you mean?

2    BY MR. HEGARTY:

3    Q.   Well, my question is the opinions you said in

4         Paragraphs 5 and 6 have never been published anywhere,

5         correct?

6              MS. O'DELL:  Object to the form.

7              THE WITNESS:  No.  What I'm saying is these

8         are my own, my own opinion, my own writing, writing.

9         If someone stole this and published it, I'm not aware

10        of that, but this is my language, my words, my opinion,

11        and this is based, as I told you and as I mentioned, on

12        my data and the results of this study as well as what

13        is known for the strong link of ovarian cancer and

14        oxidative stress.

15   BY MR. HEGARTY:

16   Q.   Listen to my question.  You have never published the

17        opinions of yours set out in Paragraphs 5 and 6 of your

18        report, correct?

19             MS. O'DELL:  Object to the form.

20             THE WITNESS:  I have published that ovarian

21        cancer is characterized and ovarian cancer cells

22        manifest a pro-oxidant state, I have published that --

23   BY MR. HEGARTY:

24   Q.   Nowhere have you --

25   A.   -- that can lead to a mechanism to identify --

Ghassan Saed, Ph.D.

```
 1          actually, we did identify a pathogenesis, a mechanism

 2          that involves these specific pro-oxidants to be unique

 3          mechanism of survival in ovarian cancer.

 4     Q.   Nowhere have you published in any literature that talc

 5          use can cause ovarian cancer, correct?

 6     A.   Previous to this study?

 7     Q.   This study -- your report has not been published,

 8          correct?

 9     A.   No.

10     Q.   It's not been peer reviewed, correct?

11     A.   No, my report?  No.

12     Q.   What you say in your report that Johnson's Baby Powder

13          exposure can cause ovarian cancer has never been

14          published in the medical literature, correct?

15               MS. O'DELL:  Object to the form.

16               THE WITNESS:  My report has not published

17          yet.

18     BY MR. HEGARTY:

19     Q.   The opinions in your report that talcum powder exposure

20          can cause ovarian cancer have never been published,

21          correct?

22               MS. O'DELL:  Object to the form, by him or

23          others?

24               THE WITNESS:  Okay.  By me?

25
```

Ghassan Saed, Ph.D.

```
 1    BY MR. HEGARTY:

 2    Q.   By you.

 3    A.   My opinion?

 4    Q.   Yes.

 5    A.   Has never been -- I never said this before, this

 6         study --

 7    Q.   Correct.

 8    A.   -- is that what you're saying?

 9    Q.   Before your report.

10    A.   About specifically talc and ovarian cancer?

11    Q.   Yes.

12    A.   Yes.

13    Q.   And you never said in any other writing that use of

14         baby powder worsens the prognosis for patients with

15         ovarian cancer?

16    A.   I didn't write about this subject prior to starting

17         these experiments.

18    Q.   Even in your manuscript, you don't include the opinion

19         that talcum powder use causes ovarian cancer, correct?

20    A.   You cannot include opinions in manuscripts.

21    Q.   That's not my question.  My question is that your

22         manuscript does not include your opinion that talcum

23         powder use causes ovarian cancer, correct?

24    A.   I answered you.

25              MS. O'DELL:  Object to the form.
```

Ghassan Saed, Ph.D.

```
 1    BY MR. HEGARTY:

 2    Q.   Am I correct?

 3                 MS. O'DELL:  Object to the form.

 4                 THE WITNESS:  Excuse me, one more time.  I

 5         said in manuscripts you are not allowed to publish to

 6         draw opinions, in manuscripts you're allowed to draw

 7         conclusions, so conclusions are different than

 8         opinions.  Conclusions are based solely on the results.

 9         Opinions, you can say it, if you say it, then if they

10         accept it, it's fine, but opinions are based on not

11         just the study but your opinion in it, too, based on

12         your expertise.

13    BY MR. HEGARTY:

14    Q.   Move to strike as nonresponsive.  Doctor, listen to my

15         question.

16    A.   I'm trying.

17    Q.   Your manuscript does not include your opinion that baby

18         powder exposure can cause ovarian cancer, you don't say

19         that in your manuscript, correct?

20                 MS. O'DELL:  Object to the form.

21                 THE WITNESS:  I have to look in my

22         manuscript.

23    BY MR. HEGARTY:

24    Q.   Doctor, you can't tell me sitting here today --

25    A.   I'm sorry, I can't remember everything I wrote.
```

Ghassan Saed, Ph.D.

```
 1   Q.   Listen to my question.

 2   A.   Okay.

 3   Q.   Does your manuscript say that Johnson's Baby Powder

 4        exposure can cause ovarian cancer?

 5   A.   In this specific language?

 6   Q.   Yes.

 7   A.   I have to look.

 8   Q.   Okay.  How about do you have to look --

 9   A.   Because you're asking me -- it's not fair, you're

10        asking me for a specific language, and I am saying, I'm

11        answering back saying that my opinion, it does.  Based

12        on the results in my manuscript, I concluded that it

13        will -- it has increased risk of ovarian cancer, yes,

14        somewhere.  I have to read.  That's what I'm saying.  I

15        don't remember where I did that.

16   Q.   Okay.

17   A.   I have to go and refer to the manuscript.  Is that

18        fair?

19   Q.   In Paragraph 6, what do you mean when you say Johnson's

20        Baby Powder exposure worsens the prognosis for patients

21        with ovarian cancer?

22   A.   Oh, we're still here?  I'm sorry, where --

23   Q.   Paragraph 6 in your report.

24   A.   Oh, my report now?

25   Q.   On Page 21.
```

Ghassan Saed, Ph.D.

```
 1    A.   21?

 2    Q.   Yes.

 3    A.   Okay, yes, so same, same discussion.

 4    Q.   Listen to my question.  My question is what do you mean

 5         that Johnson's Baby Powder exposure worsens the

 6         prognosis for patients with ovarian cancer?

 7    A.   Can I answer?

 8    Q.   Yes.

 9    A.   Okay.  So based on our results here, we have shown that

10         there is a dose response effect of talcum powder on

11         these key markers of oxidative stress.  That's my

12         answer.

13    Q.   And how do those key -- strike that.

14    A.   Dose response.

15    Q.   What is the measure that you apply for worsening the

16         prognosis of ovarian cancer?

17    A.   Is increasing redox balance -- reactive oxygen species,

18         tilting the balance, adding more inflammatory markers

19         with time with exposure.

20    Q.   You make reference in your paper to CA-125, when I say

21         your paper I'm talking about your report and in your

22         manuscript, correct?

23    A.   Correct.

24    Q.   No studies have correlated CA-125 levels with ovarian

25         cancer risk, correct?
```

Ghassan Saed, Ph.D.

```
1    A.    What I know is CA-125 is accepted, it's the only

2          accepted marker because that's the only one available,

3          although not specific to ovarian cancer, but we use it

4          for preliminary following up treatment and diagnosis.

5          You can, you know, I can defer to a clinician to answer

6          more about that, but what I know is that it is not

7          specific to ovarian cancer, endometriosis can increase

8          levels of CA-125, some other inflammatory can do that.

9    Q.    Doctor, listen to my question.  My question was that no

10         studies have correlated CA-125 levels with ovarian

11         cancer risk, correct?

12                   MS. O'DELL:  Object to the form.

13                   THE WITNESS:  Again, I told you, I'm not an

14         expert in CA-125 and its clinical utility.  What I'm

15         trying to tell you is that CA-125 is a marker that

16         clinician, OB-GYN oncologist, use to help them diagnose

17         and follow up the effect of -- the efficacy of

18         treatment.  Now, this molecule is a marker of

19         inflammation, and we and our results shows clearly that

20         talcum powder can induce this inflammatory marker that

21         has been clinically used by clinicians to help them

22         diagnose and, more importantly, follow up the efficacy

23         of treatment.

24   BY MR. HEGARTY:

25   Q.    Dr. Listen, to my question.  I'll ask a different
```

Ghassan Saed, Ph.D.

```
 1        question.  CA-125 is used only in monitoring disease

 2        progress in women who have ovarian cancer, correct?

 3   A.   I don't know if that's the only use of it.

 4   Q.   It's not used to diagnose ovarian cancer, correct?

 5   A.   I don't know.  I'm not a clinician.  I really don't

 6        know.

 7   Q.   It's not used to determine the cause of ovarian cancer,

 8        is it?

 9   A.   I don't know, you can ask.  I defer these questions to

10        a physician, OB-GYN oncologist who can answer you.  I

11        am a biological chemist, I'm molecular biologist.  I

12        will answer you within my expertise.

13   Q.   CA-125 is not used to determine whether women have an

14        inflammatory process going on in their bodies, correct?

15             MS. O'DELL:  Object to the form.

16             THE WITNESS:  If the levels of CA-125 is

17        increased in a woman, my understanding, this is a

18        strong indication to an inflammatory process going on,

19        yes.

20   BY MR. HEGARTY:

21   Q.   You're talking about in women who have ovarian cancer?

22   A.   It is also increased in women with, yes, with ovarian

23        cancer.

24   Q.   CA-125 is not used to diagnose whether inflammation is

25        going on in women who do not have ovarian cancer?
```

Ghassan Saed, Ph.D.

```
 1                 MS. O'DELL:  Object to the form.

 2                 THE WITNESS:  Ask the OB-GYN oncologist.

 3    BY MR. HEGARTY:

 4    Q.   If you look at your manuscript over at Table 2.

 5    A.   Okay.

 6    Q.   What is the mechanism by which talc causes the SNP

 7         changes or switches you report in this table?

 8    A.   Do I know the mechanism that does that?

 9    Q.   Yes.

10    A.   Precisely, no, but we have previously published a

11         report showing that development of chemoresistance,

12         which is an ovarian cancer -- ovarian cancer disease

13         that is characterized by even further enhancement of

14         oxidative stress, we have published that is associated

15         with these SNPs.  So the precise mechanism I'm

16         proposing that according to my understanding is that

17         the higher the oxidative stress level, the more chances

18         that you induce these switches, these mutations.

19    Q.   Can you cite for me any published data showing these

20         same or similar type of switches in cells that have

21         been exposed to any other substance, whether it's a

22         carcinogen or otherwise?

23    A.   If there is any other substance that induces mutations?

24    Q.   That induces the kinds of mutations that you report

25         here.
```

Ghassan Saed, Ph.D.

```
 1   A.   In the literature, there are several, many substance
 2        that have been associated with certain mutations in the
 3        DNA, yes.
 4   Q.   Well, let me ask it a different way.  Can you cite for
 5        me any substance that has been shown to cause -- or
 6        strike that, let me back up.  Is it your testimony that
 7        what you're reporting here -- that you're reporting
 8        here that talc causes mutations in DNA in 72 hours?
 9             MS. O'DELL:  Object to form.
10             THE WITNESS:  My results indicates that if
11        you treat cells with talcum powder for 72 hours and
12        look for whatever showed positive here, some showed
13        negative, that there is an induction of this specific
14        mutation in response to the treatment of talc.
15   BY MR. HEGARTY:
16   Q.   Can you cite for me any other substance that's ever
17        been reported to cause these kinds of mutations after
18        72 hours of treatment in cell cultures?
19   A.   I cannot recall now.  I'm sure I can find them.  There
20        are many in the literature, by the way, but I am citing
21        you specifically my work that I have done in my
22        laboratory that was shown that when oxidative stresses
23        further -- increased and enhanced, we develop some of
24        these mutations, cell would acquire these mutations in
25        certain key pro-oxidants and anti-oxidant enzymes that
```

Ghassan Saed, Ph.D.

```
 1          results in further inhibition of apoptosis and increase

 2          of survival -- apoptosis, cell death, cell death.

 3    Q.    Doctor, listen to my question.  Can you cite for me any

 4          other substances that have ever been reported to cause

 5          these kinds of mutations after 72 hours of treatment in

 6          cell cultures?

 7    A.    I cannot recall now.

 8    Q.    The cell cultures you used are at high oxygen levels,

 9          are at high oxygen levels than in vivo, correct?

10    A.    I don't understand the question.

11    Q.    Well, the cell cultures that you use for purpose of

12          your experiments are at higher oxygen levels than these

13          cells would experience in vivo, correct?

14    A.    You mean the whole world of researcher used?

15    Q.    No, that the cell lines that you used --

16    A.    The whole world of researcher used, same 20 percent

17          oxygen in CO2, okay, it's the same exact standard

18          protocol all over the research field.  I never heard

19          that there's anyone culturing cancer cells in a

20          different environment than -- we have done many work

21          looking at the effect of hypoxia and hyperoxia on the

22          expression of these markers in normal cells.  We have

23          done several, I have published several publications.

24          Let me help you with this information.

25    Q.    Let me withdraw the question, Doctor.  You're going on
```

Ghassan Saed, Ph.D.

```
 1          not answering my question.

 2     A.   I'm trying.

 3     Q.   No, you're not answering my question.

 4     A.   I'm answering what I understood.

 5     Q.   The tests you conducted, the experiments you conducted

 6          are higher oxygen levels than cells are exposed to in

 7          vivo, correct?

 8     A.   I'm trying to -- no, it's not, I'm trying to explain it

 9          to you.

10     Q.   They're not higher levels?

11     A.   What do you mean by in vivo?  In blood?

12     Q.   Cells inside the body.

13     A.   It's PO20, it's the same.

14     Q.   So the oxygen levels of the cells in the body are at

15          the same level as the oxygen levels of the cells in

16          your cell --

17               MS. O'DELL:  Objection.

18               THE WITNESS:  No, I said the oxygen levels in

19          the circulation in vivo is the same as the oxygen level

20          in the media where we culture cells.  This is where we

21          get it from, not from a dream, we got it from there.

22          Now, if you're referring to the oxygen levels that

23          cells are exposed to in tissues --

24     BY MR. HEGARTY:

25     Q.   Yes.
```

Ghassan Saed, Ph.D.

```
 1    A.   Nobody knows that.  There's only one single report that

 2         says in a physiology book where I was a student at that

 3         time, they're saying 6 percent, 5 to 6 percent.  But

 4         that is inside the tissues without the circulation.

 5         Now, you have to remember all cells get food from

 6         circulation, so you will have eventually enough oxygen

 7         that you're getting for.  So this is within my

 8         expertise, I've done many, many work on this.

 9    Q.   The glucose levels in your cell cultures are also

10         higher than what the cells would experience in the

11         body, correct?

12    A.   The glucose level that we use in the media, again, is

13         standard with all of any researcher on the face of this

14         earth use.  It is standard accepted levels.  So if you

15         are trying to make that what we use is different than

16         in vivo, it could be, but this is what agreed upon in

17         the research community.

18    Q.   Move to strike as nonresponsive.  Listen to my

19         question, Doctor.  Are the glucose levels in cell

20         cultures that you performed for purposes of your

21         experiments higher than the glucose levels of the cells

22         inside the body?

23              MS. O'DELL:  Objection, form, asked and

24         answered.

25              THE WITNESS:  I don't know.
```

Ghassan Saed, Ph.D.

```
 1    BY MR. HEGARTY:
 2    Q.   Aren't the cells that you experiment with in a
 3         hyperglycemic state?
 4    A.   I just told I don't know.
 5    Q.   Can high glucose levels cause an increase in reactive
 6         oxygen species?
 7    A.   Okay, so --
 8    Q.   Can they or can't they?
 9              MS. O'DELL:  He gets to -- you asked the
10         question, he --
11              THE WITNESS:  There is no yes or no answer.
12    BY MR. HEGARTY:
13    Q.   Okay.  I withdraw the question.
14    A.   If you are trying to take me to say "yes" or "no" to
15         something that I have explanation for, I think you
16         should just listen to my explanation.  I am actually --
17         this field, this field is my field, and I will tell
18         you, okay, I'll tell you that the cancer cells are --
19         their metabolism is different than normal cells because
20         their uptake, their uptake of glucose, they don't go in
21         aerobic metabolism, they go anaerobic metabolism, so it
22         doesn't matter how much glucose you give them, it
23         doesn't really.
24    Q.   If you look over on Page -- Figure 6 of your
25         manuscript, why do your normal cell lines -- strike
```

Ghassan Saed, Ph.D.

```
 1          that -- why do your control cell lines have such high

 2          levels of Caspase?

 3     A.   So it is known, as we have previously published and all

 4          other researcher who was interested in this, that

 5          cancer cells have almost shut down their apoptosis,

 6          because they have to increase their survival.  So when

 7          you compare apoptosis of any cancer cell from any type,

 8          okay, you will find their apoptosis is way, way lower

 9          than normal cells.  Normal cells, they have -- they

10          divide, they die, they reproduce, all the times.

11          Cancer cells don't like to die, they love to survive,

12          so their apoptotic pathways are not normal.

13     Q.   So then what you're reporting here are as to control

14          cells, controls in ovarian cancer cells?

15     A.   No, no.  The controls here are macrophages, it's normal

16          ovarian epithelial, and fallopian tube epithelial.

17     Q.   Why are your -- the Caspase levels higher in your

18          controls than in your talc treated cells?

19     A.   Maybe I missed the question.  I just answered that,

20          right?

21     Q.   Well, I don't think you answered my question.

22     A.   Well, let me try to understand what you want.

23     Q.   Well, the Figure 6 shows that the controls have higher

24          levels of Caspase-3 than the talc treated cells,

25          correct?
```

Ghassan Saed, Ph.D.

```
 1                    MS. O'DELL:  Object to the form.  Do you need
 2          to see that in color, Doctor?  Would that help?
 3                    THE WITNESS:  Yes, please.
 4                    MS. O'DELL:  (Handing.)
 5                    THE WITNESS:  So here, the control cells, so
 6          let's look at the normal cells -- okay, the normal
 7          cells -- well, that's the whole idea, the whole
 8          objective of this research, the whole point, that if
 9          you treat with talcum powder, talcum powder induces --
10          enhances oxidative stress that stimulate apoptosis
11          pathways and shut them down, inhibit them.  So in the
12          treated -- in the treated, they should be lower than
13          the untreated.
14     BY MR. HEGARTY:
15     Q.   What are the normal Caspase levels in a normal cell?
16     A.   It's different for different cell types, but normal
17          cell types, normal cells always have way higher
18          apoptosis than cancer cells.  This is well known
19          phenomenon.
20     Q.   At the levels you report in Figure 6?
21     A.   It depends on the cells, again, I said, it depends on
22          the cell type.  So maybe other people in their work,
23          they have different response.  But it is accepted that
24          is cancer cells, all cancer cells, no exception, have
25          lower, way lower apoptosis than normal cells.  I
```

Ghassan Saed, Ph.D.

```
 1         published previously that lower apoptosis in cancer

 2         cells is due to overexpression of nitric oxide

 3         synthase, which is a pro-oxidant, and myeloperoxidase,

 4         which is another pro-oxidant, and they work together to

 5         nitrisolate Caspase-3, that's what we're measuring

 6         here, and shutting down its activity and its apoptosis.

 7    Q.   The type of SNP changes that you report in your

 8         manuscript can be detected by Sanger sequencing,

 9         correct?

10    A.   Now, that's -- we're moving from this?

11    Q.   Yes.

12    A.   Okay, sorry, I thought we were still here.

13    Q.   Different question.

14    A.   Okay.  Give me a --

15    Q.   Can you answer my question?

16    A.   What's the question?

17    Q.   The type of SNP changes that you report in your

18         manuscript can be detected by Sanger sequencing,

19         correct?

20    A.   Yes.

21    Q.   Did you use this method?

22    A.   No.

23    Q.   Have you ever used Sanger sequencing to detect changes

24         in SNPs or to analyze SNPs?

25    A.   You mean gene mutations?
```

Ghassan Saed, Ph.D.

```
 1    Q.    Gene mutations, yes.

 2    A.    So the answer is nowadays no one does this from the

 3          research community.  There are core facilities, labs

 4          that you send to.  You don't need -- I don't believe

 5          people will in their laboratories that sit down and do

 6          experiments that takes forever.  They just rather send

 7          it to this lab, we have -- every university have this,

 8          we have a core facility that you can send to, and then

 9          they will do it for you and they will give you the

10          results, so you don't need to do it yourself.

11    Q.    Is Sanger sequencing considered more accurate than

12          TaqMan?

13    A.    Pretty much I think they are the same level.

14    Q.    And you said you have used Sanger sequencing before?

15    A.    No, personally no.

16    Q.    What is the mechanism by which the SNP change, as you

17          say, talc induces cause the redox changes that you

18          report in your study?

19    A.    So talcum powder treatment increase, induces the

20          specific mutations that are associated with altering

21          the activity of the redox, the key oxidant enzymes that

22          the results will be altering the oxidated balance.

23    Q.    And what studies show that?

24    A.    This study.

25    Q.    What studies besides your study, your manuscript?
```

Ghassan Saed, Ph.D.

```
 1   A.   I believe we have published a different study with the

 2        same subject.  You want me to look for it?

 3   Q.   Not right now.

 4   A.   Okay, but we did publish that before.

 5   Q.   Did you measure changes in peroxide levels as part of

 6        your experiment?

 7   A.   Excuse me, one more time.

 8   Q.   Did you measure changes in peroxide levels as part of

 9        your experiments?

10   A.   What is peroxide level?

11   Q.   Hydrogen peroxide level.

12   A.   Oh, H2O2?

13   Q.   Yes.

14   A.   Indirectly, yes.

15   Q.   When you sat indirectly, what do you mean?

16   A.   Because it's the substrate for an enzyme, so it's an

17        enzymatic reaction.

18   Q.   Did you find any changes in hydrogen peroxide levels in

19        the talc treated cells?

20   A.   We didn't measure the actual H2O2 levels in these

21        cells.  We did measure the catalase activity that turns

22        H2O2 to H2O, which is the turnover.

23   Q.   Have you ever measured hydrogen peroxide levels in

24        these types of studies?

25   A.   Have I measured -- H2O2, I don't think so, directly,
```

Ghassan Saed, Ph.D.

```
 1        directly H2O2 levels, no.

 2   Q.   You've referred earlier to the fact that you have

 3        published abstracts that have talked about the results

 4        of the experiments we've marked as -- let me start

 5        again.  You mentioned earlier that you published the

 6        results of the experiments documented in lab notebooks

 7        marked as Exhibits 2 and 3 in the past, correct?

 8             MS. O'DELL:  Object to the form.

 9   BY MR. HEGARTY:

10   Q.   You didn't get that question?

11   A.   No.

12   Q.   You mentioned you had published the results of your

13        experiments that we've been talking about here today in

14        abstracts, correct?

15   A.   There was an SRI abstract that I presented at the SRI

16        meeting March of '18, last year, that was reflected or

17        involved this initial work that we did with Fisher with

18        PCR.

19   Q.   And you also presented at an SGO meeting, correct?

20   A.   I believe I did.

21   Q.   In either case did you disclose that you were a

22        consultant for plaintiffs counsel in litigation,

23        correct?

24   A.   When you submit the abstract, they will not let you

25        proceed until you -- yes, the answer is yes.
```

Ghassan Saed, Ph.D.

1   Q.   The answer is that you did disclose?

2   A.   I did disclose, yes.

3   Q.   It's not included -- the disclosure's not included in

4        the abstracts, correct.

5   A.   They don't have it like that, no.

6   Q.   When you presented the abstracts, did this involve

7        standing there in front of a poster?

8   A.   Yes.

9   Q.   And did people come up and talk to you about your

10       posters?

11  A.   Yes.

12  Q.   Did you identify yourself as an expert in litigation

13       involving talc and ovarian cancer?

14            MS. O'DELL:  Object to the form.

15            THE WITNESS:  No one asked me.

16  BY MR. HEGARTY:

17  Q.   Did you tell them that you were?

18  A.   I didn't volunteer anything.

19  Q.   Have you provided your opinions in this case to anyone

20       outside of plaintiff's counsel or your colleagues on

21       the manuscript?

22            MS. O'DELL:  Object to the form.

23            THE WITNESS:  So you just asked me if I

24       discussed this with people that I presented to in the

25       whole meeting.

Ghassan Saed, Ph.D.

```
 1   BY MR. HEGARTY:

 2   Q.   Well, let me ask it a different way because I can see

 3        where you're confused.  We talked about your opinions

 4        that talc can cause ovarian cancer.

 5   A.   Oh, so we're going back here now?

 6   Q.   Yes, we're going back to your opinions.

 7   A.   Okay.

 8   Q.   Have you ever told anyone at the medical school, at

 9        Wayne State Medical School that talc use can cause

10        ovarian cancer?

11   A.   I don't recall.

12   Q.   Have you ever told anyone at Wayne State School of

13        Medicine that talc use can worsen the prognosis of

14        ovarian cancer?

15   A.   Again, I don't recall.  I don't remember.

16   Q.   Can you tell for me, when you say you can't recall

17        having had a discussion with anyone --

18   A.   I can't remember that I said that.

19   Q.   Can you cite for me anyone that you've spoken with at

20        the Wayne State School of Medicine where you've told

21        them your opinions that talc use can cause ovarian

22        cancer or can worsen ovarian cancer?

23   A.   Other than the co-authors of this study?

24   Q.   Yes.

25   A.   I haven't talked to anyone, in my school, to be
```

Ghassan Saed, Ph.D.

```
 1       specific.

 2   Q.  Are your opinions in this case premised on talc

 3       containing asbestos?

 4   A.  (Witness shakes head from side to side.) I don't know,

 5       no, my opinion has nothing to do with that.

 6   Q.  Are your opinions in any way based on talc having heavy

 7       metals in them?

 8   A.  No.

 9   Q.  Is it your opinion that talc without asbestos or

10       without any other constituents can cause ovarian

11       cancer?

12   A.  The one that I got in this bottle from J & J, yes.

13   Q.  Is it your opinion, Doctor, that your studies or your

14       experiments show that talc increases cellular

15       proliferation and decreases apoptosis?

16   A.  I'm sorry, one more time, one more time.

17   Q.  Sure.  Is it your opinions or is it your opinion that

18       talc use increases cellular proliferation and decreases

19       apoptosis in normal ovarian cells?

20   A.  My finding clearly indicates that if you treat cells

21       with talcum powder, the results of this treatment is a

22       dose response increase in proliferation and decrease in

23       apoptosis, yes.

24   Q.  In normal ovarian cells?

25   A.  In normal and in cancer cells.
```

Ghassan Saed, Ph.D.

```
 1    Q.    Cell proliferation does not mean cancer, correct?

 2    A.    Cell -- increase in cell proliferation beyond normal is

 3          a highlight of cancer cells.

 4    Q.    There is cell proliferation in normal cells in the

 5          absence of cancer, correct?

 6    A.    So good question.  So cell -- normal cells in response

 7          to agents can be temporally transit induces their

 8          proliferation, but they come back.  Cancer cells don't

 9          come back.  They will proliferate forever.

10    Q.    But you agree that cell proliferation does not equate

11          to cancer?

12    A.    Okay, I am answering you.  According to my knowledge,

13          transit, transit or let's say temporary or initial

14          induction of proliferation, it is a normal response of

15          all normal cells to agents.  If this response

16          continues, now, this is a hallmark of cancer.  It is

17          indication that this cell is going that route.

18    Q.    In the tests you conducted, the results would be

19          considered an acute response to talc, correct?

20               MS. O'DELL:  Object to the form.

21               THE WITNESS:  Yes, I understand.  In cell

22          culture you cannot distinguish between acute response

23          versus chronic response.  In cell culture you cannot do

24          that.  So in cell culture it is a response.

25    Q.    That you cannot say would occur in a chronic way?
```

Ghassan Saed, Ph.D.

```
 1                MS. O'DELL:  Objection.

 2                THE WITNESS:  I don't know if this -- okay,

 3        here's the question, so the answer is you expose cells,

 4        talcum powder, cells go crazy and they increase their

 5        proliferation.  If they don't come back, so that's the

 6        response to the acute, if they don't come back and

 7        there is talcum powder particles in there, and they

 8        keep provoking the inflammation, that transit goes into

 9        chronic inflammation.  I'm trying to think of

10        simulation to in vivo, but in cell culture you cannot

11        tell.

12   BY MR. HEGARTY:

13   Q.   Can you cite for me any studies showing increase in

14        cell proliferation in the presence of talc in vivo?

15                MS. O'DELL:  Objection, form.

16                THE WITNESS:  Very complicated question,

17        break it down for me, please.

18   BY MR. HEGARTY:

19   Q.   I don't know if I can break it down.  Can you cite for

20        me any study showing an increase in cell proliferation

21        in the presence of talc in women using talc?

22   A.   How would you measure --

23                MS. O'DELL:  Objection.

24                THE WITNESS:  How would you measure cell

25        proliferation in woman?
```

Ghassan Saed, Ph.D.

```
 1   BY MR. HEGARTY:

 2   Q.   Well, I'm asking you if you're aware of any such

 3        studies?

 4   A.   I'm answering.  I said how would you measure that?  I'm

 5        not aware, I don't know.

 6   Q.   Are you aware of any studies showing a decrease in

 7        apoptosis in the cells of women using talc?

 8   A.   Again, these studies only done in cell culture.  You

 9        cannot do this in vivo.  This has to be isolated from

10        the woman of ovarian cancer who use talc, who didn't

11        use talc, and then you look at their cells in culture

12        to determine those parameters.  You cannot determine

13        those in vivo.  Although there are pathology they can

14        do, they can do proliferation markers like KI67, it's

15        been done, it's all over, there are indications, but

16        they cannot do this in vivo.  This has been done in

17        tissues.  With woman, yes, you can do it, but to do

18        that you have to isolate the cells and then look at the

19        cell response.

20   Q.   Are there any studies showing that an increase in cell

21        proliferation, as you showed in your experiments, is

22        associated with an increase in ovarian cancer risk?

23             MS. O'DELL:  Object to the form.

24             THE WITNESS:  There are several studies that

25        shows that enhanced proliferation and reduce with
```

Ghassan Saed, Ph.D.

```
 1          contaminant decrease in apoptosis is a hallmark of

 2          ovarian cancer.

 3     BY MR. HEGARTY:

 4     Q.   Not my question, Doctor.  My question was are there any

 5          studies showing that an increase in cell proliferation,

 6          as you showed in your experiments, is associated with

 7          an increase in ovarian cancer risk?

 8                    MS. O'DELL:  Object to the form, asked and

 9          answered.

10                    THE WITNESS:  Okay, so you're asking if there

11          are reports showing that there is the increased

12          proliferation is associated with increased cancer risk?

13     BY MR. HEGARTY:

14     Q.   Correct.

15     A.   Okay, again, I'm answering, the answer is I don't know

16          because I believe that you cannot measure proliferation

17          in vivo.

18     Q.   Are there any studies showing that a decrease in

19          apoptosis, as you showed in your experiments, is

20          associated with an increase in ovarian cancer risk?

21     A.   So I would respond the same way.  I would say, again,

22          these -- to determine apoptosis, you have to isolate

23          the cells from the patient outside and do cell culture

24          and look into that, so I'm not aware.

25     Q.   Are there any studies showing either an increase in
```

Ghassan Saed, Ph.D.

```
 1          cell proliferation or a decrease in apoptosis as you

 2          have shown in your report in women using talc?

 3                    MS. O'DELL:  Object to the form.

 4                    THE WITNESS:  I'm not aware of that.

 5                    MR. HEGARTY:  Why don't we take a break, go

 6          off the record.  I need to converse with counsel for

 7          Imerys about how much time that he needs for his

 8          questioning.

 9                    MS. O'DELL:  Okay.

10                    THE VIDEOGRAPHER:  Going off the record at

11          5:04 p.m.

12                    (A short recess was taken.)

13                    THE VIDEOGRAPHER: We're back on the record at

14          5:26 p.m.

15     BY MR. HEGARTY:

16     Q.   Doctor, in your cell experiments, how did you control

17          for cross-contamination?

18                    MS. O'DELL:  I'm sorry, I didn't hear, for

19          cross-contamination?

20                    MR. HEGARTY:  Yes.

21                    THE WITNESS:  Cross-contamination, so cross-

22          contamination from each -- from the cells that I used?

23     BY MR. HEGARTY:

24     Q.   How did you control to keep from mixing up of samples?

25                    MS. O'DELL:  Object to the form.
```

Ghassan Saed, Ph.D.

```
 1                    THE WITNESS:  I'm not sure that I understood

 2          your question.  Are you referring to mixing the two

 3          cell lines, for example?

 4     BY MR. HEGARTY:

 5     Q.   Yes.

 6     A.   With each other?

 7     Q.   Correct.

 8     A.   That's not possible.

 9     Q.   Why is that not possible?

10     A.   Because each cell line is done in one experiment

11          treatment with all the doses on its own.

12     Q.   What about mixing normal cells with the -- I'm sorry,

13          how about mixing control cells with the treated cells,

14          is that possible?

15     A.   What do you mean by control cells, not treated?

16     Q.   Not treated?

17     A.   So, also, that's not possible because you -- we divide,

18          we grow the cells, one lot, one lot of cells, and then

19          we aliquot, we put 1 million cells here, 1 ml cells

20          here, and then we separate them and give the different

21          doses for each cell lines.  And the -- this thing, the

22          treatment was repeated for PCR for RNA, for protein for

23          ELISA, for proliferation assays, so it's not possible

24          that there is a mix between treated and untreated.

25     Q.   Do you know what positive and negative controls are in
```

Ghassan Saed, Ph.D.

```
 1        cell studies?

 2   A.   I do.

 3   Q.   You did not use positive and negative controls in your

 4        cell studies, correct?

 5   A.   Not correct.

 6   Q.   Well, I'm going to define positive controls as applying

 7        a known cancer causing substance to the cells.  Is that

 8        your understanding of positive control?

 9   A.   Not in these studies.

10   Q.   I'm talking about generally.

11   A.   Generally a positive control that something that you

12        know it's there and you're looking for it.

13   Q.   What is in general terms a negative control?

14   A.   A negative control, something you're not looking for,

15        it is not there.

16   Q.   Well --

17   A.   So there is negative negative and there is positive

18        positive.

19   Q.   Did you do any of your tests -- I'm sorry, did you do

20        any of your experiments using any substances known to

21        be a carcinogen?

22   A.   One more time.  I will answer you.  The answer is no,

23        okay, but you're referring to -- so there are two

24        different controls, negative and positive for the

25        target, and negative and positive for the treatment.
```

Ghassan Saed, Ph.D.

```
 1          There's two different controls, okay.  We did negative

 2          and positive for the treatment, so this is with talc,

 3          this is with no talc.  For the markers, for the

 4          markers, we have standards that with serial dilution

 5          tells you exactly how much you expect to get in there.

 6   Q.     Did you use a negative control in your cell studies

 7          with a known inert substance?

 8                  MS. O'DELL:  Object to the form.

 9                  THE WITNESS:  That's not a negative control

10          to me, it does not apply to my study.  The only

11          negative control that applies to my study is talc with

12          no talc.

13   BY MR. HEGARTY:

14   Q.     How can you rule out in your studies that any

15          particulate you added to the cell cultures would cause

16          the same thing?

17   A.     Again, we tested several fold.  So our study does not

18          qualify for a positive positive control that you're

19          referring to or a negative negative control.

20   Q.     How are you able to rule out that glass beads wouldn't

21          cause the same --

22   A.     Glass beads?

23   Q.     -- effect?  How are you able to rule out that some

24          inert part, other part -- strike that.  How would you

25          rule out that any particle wouldn't cause the same
```

Ghassan Saed, Ph.D.

1       effect that you saw in your studies?

2   A.  Very simple, the untreated didn't show that.

3   Q.  Well, how do you rule out that the treated cells would

4       react the same way regardless of what you put on them?

5       In other words, if you put -- how did you rule out that

6       any particle would not cause the same thing if you

7       mixed it with DMSO and applied it to talc?

8   A.  Yeah, so we did DMSO control.

9               MS. O'DELL:  Object to the form.

10              THE WITNESS:  So we did -- took the talc,

11      mixed it with DMSO, took the DMSO, treat the cells with

12      DMSO alone and with DMSO and talc.  So if the effect

13      was due to DMSO, you would see the response in the

14      untreated cells.

15  BY MR. HEGARTY:

16  Q.  Would cornstarch cause the same result?

17  A.  I did not test it.

18  Q.  How can you rule out that cornstarch wouldn't do the

19      same thing if applied to cells?

20              MS. O'DELL:  Object to the form.

21              THE WITNESS:  I didn't rule anything, I did

22      not test it.

23  BY MR. HEGARTY:

24  Q.  Does cornstarch cause cancer?

25  A.  I did not test it.

Ghassan Saed, Ph.D.

```
 1    Q.   Well, in your opinion, does --

 2    A.   In my opinion?

 3    Q.   Yes.

 4    A.   From my information?  I don't think so.

 5    Q.   Could you have tested cornstarch in the same way you

 6         tested talc?

 7    A.   Could I have?

 8    Q.   Yes.

 9    A.   I can use my methodology to test that, yes, of course.

10    Q.   And are you able to say that no other particle exposed

11         in the same way that you would expose cells with talc

12         would not have caused the same result?

13              MS. O'DELL:  Object to the form.

14              THE WITNESS:  I already answered.

15    BY MR. HEGARTY:

16    Q.   What's your answer?

17    A.   Okay, I'm saying that in this study, the way this

18         study's designed to look at the effect with talc,

19         without talc, if you are looking at one marker only,

20         then maybe we should consider more, but we're looking

21         at several markers at several levels.  So we're looking

22         at mRNA DNA mRNA protein activity, several levels here.

23    Q.   But you cannot say that cornstarch wouldn't do the same

24         thing as talc did in your experiments?

25    A.   I did not study cornstarch, so I cannot tell you.
```

Ghassan Saed, Ph.D.

```
 1   Q.   We talked earlier at the beginning of the deposition
 2        about you receiving a call from Miss Thompson, correct?
 3   A.   Yes.
 4   Q.   Do you know how she came to call you in the first
 5        place?
 6   A.   From according to her?
 7   Q.   Yes.
 8   A.   Or according to me?
 9   Q.   Well, what is your understanding as to why she
10        initiated that initial call, how she came to get your
11        name?
12   A.   She found me on what do you call it -- Med Web, because
13        I had published this review article in this very
14        prestigious journal called OB-GYN Oncology.  Want to
15        let me finish?
16             MS. O'DELL:  Yes, you may finish.
17   BY MR. HEGARTY:
18   Q.   Are you finished?
19   A.   No.
20   Q.   How much more is there?
21   A.   Okay --
22             MS. O'DELL:  You may finish, Doctor.
23   BY MR. HEGARTY:
24   Q.   You mentioned that you did not agree to serve as a
25        consultant at the time of the first call, correct?
```

Ghassan Saed, Ph.D.

```
 1   A.   I didn't say I did not agree.  I said I am not -- I

 2        don't have any molecular data in my laboratory to

 3        support the direct effect of talcum powder on my

 4        markers that I studied in my lab, and I would like to

 5        do that.

 6   Q.   When in relation to the first call that you had with

 7        Miss Thompson did you agree to serve as a consultant

 8        for Beasley Allen?

 9   A.   I think it was like October sometime.

10   Q.   And in between the time of the first call and October,

11        did you have any additional calls with anyone from --

12   A.   We had the meeting September 7, if I remember.

13   Q.   At the time of that meeting, had you agreed to serve as

14        a consultant for Beasley Allen?

15   A.   I agreed in principle to serve as a consultant for what

16        I am an expert in, which is oxidative stress and

17        ovarian cancer, and I promised to run data, do some

18        work, because I wanted to find out if there is

19        molecular evidence to support the effect of talcum

20        powder on the markers that I study, which are the

21        markers of risk of ovarian cancer.

22   Q.   And you agreed to serve as a consultant, at least as to

23        oxidative stress and ovarian cancer, as of the time of

24        the meeting in September?

25             MS. O'DELL:  Object as to form.
```

Ghassan Saed, Ph.D.

```
 1                    THE WITNESS:  I agreed to serve as a
 2          consultant for oxidative stress and ovarian cancer in
 3          actually the first phone call.
 4     BY MR. HEGARTY:
 5     Q.   With regard to your work in this litigation, have you
 6          reviewed any of the expert reports of any other experts
 7          designated by plaintiffs?
 8     A.   Barely I remember one or two, just briefly.  I don't
 9          even remember names.
10     Q.   Have you reviewed, for purposes of your opinions in
11          this case, anything that you did not bring with you
12          here today?
13     A.   Good question, no.
14     Q.   Are there any necessary changes to your expert report?
15     A.   As --
16     Q.   As you sit here today.
17     A.   As of now today, no.
18     Q.   Have you ever had your deposition taken before?
19     A.   No.
20     Q.   Have you ever been designated to serve as an expert
21          witness in any lawsuit?
22     A.   No.
23     Q.   You are not a medical doctor, correct?
24     A.   No.
25     Q.   You brought with you a copy of your updated CV; is that
```

Ghassan Saed, Ph.D.

```
 1       correct?

 2   A.  Correct.

 3   Q.  Yes.  I'm going to mark this Exhibit Number 18.

 4           SAED DEPOSITION EXHIBIT NUMBER 18,

 5           CURRICULUM VITAE,

 6           WAS MARKED BY THE REPORTER

 7           FOR IDENTIFICATION

 8   BY MR. HEGARTY:

 9   Q.  The CV you brought with you today, is that your current

10       curriculum vitae?

11   A.  Yes.

12   Q.  Okay.  Thank you.  You don't treat ovarian cancer

13       patients, correct?

14   A.  I am not an M.D., I'm not a medical doctor.

15   Q.  Do you teach any courses?

16   A.  In the university, yes.

17   Q.  What courses do you teach?

18   A.  They are listed here in my CV.

19   Q.  Listed in your CV?

20   A.  Yes.

21   Q.  Do you teach medical students?

22   A.  I do.

23   Q.  Those would be listed in your CV?

24   A.  Everything I teach is listed here.

25   Q.  What percentage of your time is spent teaching?
```

Ghassan Saed, Ph.D.

```
 1    A.    Okay, so we have two types of teaching in our

 2          institution they consider teaching.  We have formal

 3          courses and then we have hands-on teaching, which is

 4          required for our residency program and fellowship

 5          program.  I do more of the hands-on for the medical

 6          doctors for our residents and fellows in the

 7          department, then I help them write their thesis, design

 8          their experiments, do the work, so that's my primary --

 9          I spend almost significant time.  I can't tell you

10          exactly what I spend on that part, but I do.

11    Q.    Have you applied to be a full professor at Wayne State

12          University?

13    A.    No.

14    Q.    Why not?

15    A.    Applying for a full professor at our institution

16          requires current NIH NCI only funding, which is very

17          hard to get these days.

18    Q.    Is it your opinion that talc induces chemoresistance?

19    A.    Talc induces chemoresistance -- so we -- I have not

20          tested that, so this needs to be tested.

21    Q.    In connection with developing and setting out your

22          opinions in this case, did you review all of the animal

23          literature looking at talc and ovarian cancer?

24    A.    All of the literature, no.

25    Q.    Did you review all of the cell studies looking at talc
```

Ghassan Saed, Ph.D.

```
 1        and ovarian cancer for purposes of developing your

 2        opinions in this case?

 3    A.  To my best knowledge, yes, only like three papers out

 4        there.

 5    Q.  I'm sorry?

 6    A.  There are only like three papers out there that I can

 7        remember.

 8    Q.  Did you do a search yourself for literature concerning

 9        talc and ovarian cancer?

10    A.  Yes.

11    Q.  What search engines or tools did you use?

12    A.  I used what I always use, the PopMed.

13    Q.  You say in your report that an enhanced redox state has

14        been described with epithelial ovarian cancer.

15    A.  I'm sorry, one more time.

16    Q.  Is it your opinion that an enhanced redox state has

17        been described in patients with epithelial ovarian

18        cancer?

19    A.  With ovarian cancer patients, yes.

20    Q.  And enhanced redox state has been described with other

21        types of cancer, too, correct?  It's not unique to

22        ovarian cancer?

23    A.  Okay, I don't know about other cancer, that's not my --

24        what I do.  What I do, what I talk about, what I work

25        with is ovarian cancer.  So we did work in my lab only
```

Ghassan Saed, Ph.D.

```
 1        with ovarian cancer and these markers.

 2   Q.   Has an enhanced redox state been described with other

 3        diseases besides cancer?

 4   A.   One more time, please.

 5             MS. O'DELL:  Object to form.

 6   BY MR. HEGARTY:

 7   Q.   Has an enhanced redox state been described with

 8        diseases other than cancer?

 9   A.   I don't know.

10   Q.   You have done research looking at that pathogenesis of

11        tissue fibrosis, correct?

12   A.   Correct.

13   Q.   Tissue fibrosis does not increase the risk of

14        developing cancer, correct?

15   A.   Not correct.

16   Q.   So it's your opinion that having -- that fibrosis

17        increases the risk of cancer?

18   A.   Not correct, that's not my opinion.

19   Q.   What is your opinion with regard to the relationship

20        between fibrosis and cancer?

21   A.   Good, I like that question.  So initially when I

22        started all this work, I was interested in tissue

23        fibrosis and, in particular, keloids, hypertrophic

24        scars, postoperative adhesions development, and

25        fibroids, endometriosis, trying to answer one question
```

Ghassan Saed, Ph.D.

```
1        in my mind, which is -- which started this whole focus
2        of work, why, how come we have an overgrowth that is --
3        has similar pathogenesis, yet it's not malignant, for
4        example, fibroids, they're benign tumors, they're
5        tumors, they're benign, what is the difference between
6        what makes this tumor benign versus malignant?  So this
7        is my focus and my long-term interest in my life is to
8        figure out why is this overgrowth that has oxidative
9        stress, high this, high this, high this, but it's not
10       malignant, fibroids, possibility of adhesions, keloids,
11       although some keloids develop -- some fibrosis
12       development of cancer, and endometriosis, for example.
13       So that's the question that I'm really interested in.
14       So that's why we look everything in comparison.  I have
15       published in here and I have published in here
16       extensively.
17   Q.  You have published that fibrosis causes cancer?
18   A.  No, I have published that the process of fibrosis is
19       very similar to the process of oncogenesis.
20   Q.  Does fibrosis cause cancer?
21            MS. O'DELL:  Object to form.
22            THE WITNESS:  In some cases it may.
23   BY MR. HEGARTY:
24   Q.  Give me an example of a type of fibrosis that can cause
25       cancer.
```

Ghassan Saed, Ph.D.

```
 1   A.   Keloids, fibroblastoma can develop, endometriosis can

 2        induce maybe ovarian cancer, there's a link between the

 3        two.

 4   Q.   Do postoperative adhesions cause cancer?

 5   A.   We don't know.

 6   Q.   Doctor, I'm going to rest for a moment and let my

 7        colleague representing Imerys ask you some questions as

 8        well.

 9   EXAMINATION BY MR. KLATT:

10   Q.   Hello, Dr. Saed.  My name is Mike Klatt and I represent

11        Imerys Talc America in this case.  Have you ever heard

12        of Imerys Talc America before today?

13   A.   Heard on the news, yes.

14   Q.   I'm sorry?

15   A.   Heard about it, yes.

16   Q.   What do you know about Imerys?

17   A.   I know that very small thing, mining company.

18   Q.   How did you learn that?

19   A.   From the news.

20   Q.   You said just a minute ago that we don't know whether

21        postoperative intra-abdominal adhesions cause cancer;

22        is that true?

23   A.   I am not aware --

24             MS. O'DELL:  Object to the form.

25             THE WITNESS:  -- that incidence of
```

Ghassan Saed, Ph.D.

```
 1          postoperative adhesions development may develop into

 2          cancer.  I'm not aware of that.

 3    BY MR. KLATT:

 4    Q.    You're not aware of any evidence of that, is that what

 5          you're saying?

 6    A.    I'm not aware of a certain -- a specific situation

 7          where a patient developed postoperative adhesions, that

 8          postoperative adhesions causes some type of cancer

 9          somewhere.

10    Q.    I'm going to skip around just to follow up on some

11          stuff that Mr. Hegarty brought up during the day.  You

12          mentioned your company DS Biotech this morning.  What

13          does DS stand for?

14    A.    A name I chose.

15    Q.    The D and the S don't stand for anything in particular?

16    A.    Oh, sorry, I missed the question.  So D is Diamond Saed

17          Biotech, that's my partner, used to be long time ago.

18    Q.    You had a partner named Diamond?

19    A.    Michael Diamond.  When we first initiated this, we

20          started it, but then he moved from my institution to

21          his institution, and then I acquired the whole company.

22    Q.    So Dr. Diamond -- is it a Dr. Diamond?

23    A.    Dr. Diamond, yes.

24    Q.    He has no affiliation with DS Biotech any longer, is

25          that true?
```

Ghassan Saed, Ph.D.

```
 1    A.   No, for the last even seven, eight years.

 2    Q.   When's the last time you had an NIH NCI grant?

 3    A.   It should be in my CV, really bad memory, although I

 4         should remember such a great thing.  You want me to

 5         look for it?

 6    Q.   How long's it going to take you?

 7    A.   I don't know, I have to look in my list of grants --

 8         when was it, when was it -- do you want me to

 9         approximate?

10    Q.   Sure.

11    A.   NIH -- I think it's 2005 -- pending, submitted --

12         previously funded, okay, here we go.  So I was part of

13         the -- I was co-principal investigator in the Wayne

14         State University partnership to promote diversity for

15         reproductive sciences, that was 3,020,000 something.  I

16         was a co-investigator with Dr. Michael Diamond as a

17         principal investigator to this Wayne State Clinical

18         Translational Science Award.

19    Q.   What year is the question?

20    A.   So there are many, 2015, 2012, 2012, 2012, this was the

21         major one where I was the principal investigator

22         looking for adhesions and the role of hypoxia, and that

23         was 2012.

24    Q.   What level NIH grant was that?

25    A.   That's an RO1.
```

Ghassan Saed, Ph.D.

```
 1    Q.   Can ovulation cause the DNA damage that results in

 2         ovarian cancer?

 3    A.   You are asking my opinion?

 4    Q.   Yes.

 5    A.   Or my -- based on science?

 6    Q.   Well, I hope your opinion's based on science, but what

 7         is your opinion?

 8    A.   Okay.  So ovulation theory has been there for a long

 9         time, and I don't know if there is a link between

10         ovulation and damage to DNA particular to that.

11    Q.   Is ovulation an inflammatory event?

12    A.   It is.

13    Q.   And in a woman that has a normal reproductive life,

14         that can occur 2, 400 times in her lifetime, correct?

15    A.   I am not a reproductive scientist.

16    Q.   You don't know?

17    A.   I don't know.

18    Q.   Woman that has a 40-year reproductive life times 12?

19    A.   I do know that.

20    Q.   That's 480 ovulatory cycles, correct?

21    A.   If you say so, I don't know.

22    Q.   You don't know about this?

23    A.   I do know --

24              MS. O'DELL:  Object to the form.

25              THE WITNESS:  Excuse me, okay, I am not --
```

Ghassan Saed, Ph.D.

```
 1          again, I am not a reproductive scientist, so I know as

 2          much as anybody know, like ovulation, yes, I do know

 3          about it, I know about the ovulation theory, I know

 4          that ovulation is cause of inflammation, I do know all

 5          that.

 6    BY MR. HEGARTY:

 7    Q.    And is it your opinion, as a scientist who studied in

 8          the field you studied, that ovulation can cause ovarian

 9          cancer?

10    A.    I don't know, it needs to be tested.

11    Q.    Even though it's an inflammatory event that occurs

12          every month, correct?

13    A.    Maybe that's a natural inflammatory response.

14    Q.    But you don't know, one way or the other, correct?

15    A.    Yeah, there's a big difference between a naturally-

16          induced inflammatory response versus an external

17          exogenous induced inflammation.

18    Q.    Certainly you're aware it's the opinion of many in the

19          field that incessant ovulation does cause ovarian

20          cancer, correct.

21    A.    That was just a theory.

22    Q.    I'm sorry?

23    A.    A theory.

24    Q.    And certainly ovarian cancer risk is directly related

25          to number of lifetime ovulations, correct?
```

Ghassan Saed, Ph.D.

```
 1    A.    Not correct.

 2    Q.    You don't know that?

 3                MS. O'DELL:  Object to the form.

 4                THE WITNESS:  It's a theory; I just answered

 5          you.

 6    BY MR. KLATT:

 7    Q.    Are you aware of the data that lifetime ovulations is

 8          directly related to ovarian cancer risk?

 9                MS. O'DELL:  Object to the form.

10                THE WITNESS:  So do you mean that there are

11          data out there that is showing a direct link to normal

12          ovulation process and the development -- increased risk

13          of getting ovarian cancer?

14    BY MR. KLATT:

15    Q.    Thank you.

16                MR. LAPINSKI:  Doctor, was that an answer or

17          a question?

18                THE WITNESS:  That was a question to you.

19    BY MR. KLATT:

20    Q.    Well, I'm asking the questions, you're giving me the

21          answers.  Are you aware of data that increased number

22          of lifetime ovulations increases ovarian cancer risk?

23                MS. O'DELL:  Object to the form.

24                THE WITNESS:  And then I answered you, I

25          answered you, if you mean that you're looking for
```

Ghassan Saed, Ph.D.

```
 1          specific data that linking normal ovulation to

 2          inflammation that causes or increases the risk of

 3          ovarian cancer, is that what you mean?

 4     BY MR. KLATT:

 5     Q.   I'm simply asking you if you're aware of data that

 6          number of lifetime or of ovulations correlates with

 7          increased ovarian cancer risk; that's all I'm asking.

 8     A.   My answer again, I'm aware that this is a theory, and I

 9          don't know if it's based on data.

10     Q.   Is the mechanism that causes post-surgical adhesions

11          the same mechanism that you think can result in ovarian

12          cancer?

13     A.   No, they have similarities but not the same.

14     Q.   Can oxidative stress be induced by low vitamin E?

15     A.   I don't know.

16     Q.   Can oxidative stress be induced by low vitamin C?

17     A.   I don't know.

18     Q.   Can oxidative stress be induced by low uric acid?

19     A.   We never tested that.

20     Q.   Can oxidative stress be induced by albumin levels?

21     A.   We never tested that.

22     Q.   You said you'd never given a deposition before,

23          correct?

24     A.   Correct.

25     Q.   And you've also never testified in a court before, is
```

Ghassan Saed, Ph.D.

```
 1          that right?

 2     A.   Correct.

 3     Q.   Early this morning you said that high, very high doses

 4          of talc were toxic to cells.  What did you mean by

 5          that?

 6     A.   We tried 1,000 micrograms per ml, 1,000 micrograms per

 7          ml, induced toxicity, so decreased viability, yes.

 8     Q.   How are you defining toxicity at this time?

 9     A.   Decreases cell viability.

10     Q.   Does that mean decrease in cell number?

11     A.   No, I said cell viability.

12     Q.   What does that mean?

13     A.   Death.

14     Q.   Okay.

15     A.   Okay.

16     Q.   Do you agree with me that CA-125 levels can be

17          increased or elevated by pregnancy?

18     A.   I don't know this information.

19     Q.   Can CA-125 levels be increased during the menstrual

20          period?

21     A.   I am not an OB-GYN oncologist, I am not an expert in

22          this.  I defer this to a clinician.

23     Q.   Can CA-125 levels be increased by women who have

24          uterine fibroids?

25     A.   Again, I gave you my answer.
```

Ghassan Saed, Ph.D.

```
 1    Q.   Can CA-125 be increased by coronary heart disease?

 2    A.   I don't know.

 3    Q.   Can you look at Exhibit Number 1, please, which I

 4         believe is the copy of your lab book.

 5    A.   Lab report, okay.

 6    Q.   And I'm going to -- does your copy have the Bates

 7         Numbers down on the right-hand corner?

 8              MS. O'DELL:  He's looking at the actual lab

 9         notebook.

10              MR. KLATT:  Is it Bates Numbered?

11              MS. O'DELL:  Not the lab notebook, no.  We

12         have not made markings on this.

13              MR. KLATT:  Do you have a copy of Exhibit 1?

14         Let's make sure we're referring --

15              MS. O'DELL:  I think that may be yours, and,

16         Mike, if you wouldn't mind directing us to the page

17         number that's written on the actual book itself.

18              MR. KLATT:  Yeah, I'll give both the Bates

19         number and the page number.

20              MS. O'DELL:  That would be good.

21    BY MR. KLATT:

22    Q.   Are you looking now at Exhibit 1, Doctor?

23    A.   Yes.

24    Q.   And it's a copy of the lab notebook, correct?

25    A.   Yes.
```

Ghassan Saed, Ph.D.

```
 1    Q.    And in the lower right-hand corner there's two page

 2          numbers.  One's a stamped page number that we call a

 3          Bates Number, and the other is a handwritten page

 4          number, correct?

 5    A.    This and this?  Yes.

 6                MS. O'DELL:  Yes.

 7    BY MR. KLATT:

 8    Q.    When were those handwritten page numbers added to the

 9          lab book?

10    A.    I don't know.

11    Q.    Because we had gotten a black and white copy of the lab

12          book, and there were no page numbers on it, so were

13          they added recently?

14    A.    No, definitely not.  They should have them, you should

15          have them in your black, white and black.

16    Q.    Would you look at Exhibit 1 handwritten Page 31 Bates

17          Number, and I'll just say the last two Bates Numbers

18          02.

19    A.    Page 2, you said?

20    Q.    Yes, Page 02 is the stamp number and Page 31 --

21    A.    Yes.

22    Q.    -- is the handwritten number.

23    A.    I'm looking at it.

24    Q.    Down at the bottom it says cells doubled in one day.

25          What's that referring to?
```

Ghassan Saed, Ph.D.

```
 1   A.   Okay, so when you culture the cells, you want to get --

 2        cells divide and they double, so you want to have them

 3        in the stage -- that's just a notation that the cell

 4        doubled so we can start the experiment.

 5   Q.   And so were these cells doubling each day?

 6   A.   No, no, not necessarily.  This is just to follow up the

 7        progress of cell growth.  And then we take from that 1

 8        million cells, and then we start, because the space for

 9        the cell is very important, so if they don't double in

10        one day, it means that the space is not good and they

11        are overcrowded, so now we split them.  So this is an

12        indication that they're ready for us so we can use.

13   Q.   Did you try to measure cell proliferation in the

14        presence of talc by BRDU incorporation?

15   A.   What is PRDU?

16   Q.   BRDU incorporation, are you familiar with that method?

17   A.   BRDU?  I've never heard of that.

18   Q.   What about Ki-67, did you use that method --

19   A.   No.

20   Q.   -- in your experiments to measure cell proliferation?

21   A.   As I stated earlier, Ki-67 is used by pathologists

22        mainly or researchers in tissue sections.

23   Q.   My question is did you use it in this --

24   A.   No.

25   Q.   -- experiment?  Did you try to count cells to measure
```

Ghassan Saed, Ph.D.

```
 1        proliferation using a hemocytometer?

 2   A.   Okay, for cell proliferation we use MTT assay, that's

 3        even more accurate than what you're referring to, but

 4        we always count cells with hemocytometer to start with

 5        1 million cells, this is how we start.

 6   Q.   But did you try to measure cell proliferation in your

 7        experiments by using a hemocytometer in cell counting?

 8   A.   Cell proliferation cannot be measured by cell count.

 9   Q.   Would you agree with me that MTT is not the optimal

10        method to measure cell proliferation?

11   A.   It is one of the best methods we have tested.

12   Q.   It simply measures cell metabolism, doesn't it?

13   A.   It measures the -- it differentiates between cells,

14        cells that incorporate the dye versus cells that it

15        doesn't incorporate the dye, which means it

16        differentiates between viable cells and proliferative

17        cells.

18   Q.   And if you increase the metabolism of a certain number

19        of cells, that will increase the dye level even if you

20        don't have a greater number of cells?

21   A.   I don't know about metabolism that you're throwing in

22        here.

23   Q.   You don't know about that?

24   A.   No.

25   Q.   Can you look again, referring to Exhibit 1, and I'm
```

Ghassan Saed, Ph.D.

```
 1           referring to the Bates Stamped page that ends in -- the

 2           stamp number is 03 and the handwritten Page 32.

 3    A.     Yes.

 4    Q.     And there's a list there of sample IDs, is that

 5           correct?

 6    A.     Correct.

 7    Q.     And are those the cell lines that you tested in your

 8           experiments?

 9    A.     Yes, in this experiment.

10    Q.     And I want to make sure I understand, for each sample

11           ID, let's just take the first one Sample ID 356, the

12           EL1 untreated, so would that sample represent one plate

13           of those cells?

14    A.     The 356?

15    Q.     Right?

16    A.     It represents an aliquot of normal macrophages with no

17           treatment with talc.

18    Q.     And is it one plate of cells?

19    A.     It could be one if we need or two or three or four,

20           depends on --

21    Q.     What was it in this case?

22    A.     Any sample that carry this number is a normal

23           macrophages, you can have it in one plate, two plates,

24           five plates, 10 plates.

25    Q.     And what did you have it in your experiment?
```

Ghassan Saed, Ph.D.

```
 1    A.    Oh, that's a different question.  I thought you were

 2          talking about the sample ID refers to what.  That's my

 3          answer.

 4    Q.    I'm talking about in your experiment.

 5    A.    In my experiment, we took like, for example, normal

 6          macrophages from one plate, and we divided that into

 7          two.  One plate got treatment, the other plate no

 8          treatment.  And then we continue, we isolated RNA.

 9    Q.    So for, for example, let's take Sample ID 357, EL1 5

10          micrograms of talc?

11    A.    Yes.

12    Q.    That was on one plate?

13    A.    Okay, let me explain this one more time.  So you

14          take -- this is the stock samples, we call it 356,

15          okay.  We split that into -- we take -- we can --

16          that's why when you said one plate, it's not true,

17          because we take one, two, three, four plates, okay, so

18          each plate will get the treatment like 5 micrograms, 20

19          micrograms, 100 micrograms.

20    Q.    I understand that.  I'm just talking about Sample 357?

21    A.    357 is 1 million cells of macrophages treated with 5

22          microgram per ml of talc.

23    Q.    And it was one plate?

24    A.    1 million cells, one plate.

25    Q.    And then from that you took mRNA, correct?
```

Ghassan Saed, Ph.D.

```
 1    A.   Correct.

 2    Q.   And then from the mRNA from that one plate of cells,

 3         you took -- or created CDNA, correct?

 4    A.   Correct.

 5    Q.   And then at the end of the day, you measured that CDNA

 6         three separate times, correct?

 7    A.   Correct.

 8    Q.   And from the process I just described, that all

 9         originated for 357 from that one plate that was treated

10         with 5 micrograms of talc, correct?

11    A.   One plate, yes.

12    Q.   And did you do that for each of the cell lines listed

13         Samples 356 through 386?

14    A.   Yes, let me explain something here.  So we --

15    Q.   That's all I needed.

16    A.   Okay.  Can I explain something?

17    Q.   Sure.

18    A.   So I know what you're referring to that this is called

19         N = 1, but we have even better and more precise way of

20         measuring this very old method of doing it.  We chose

21         to do instead of repeat the same one three times, so

22         N = 3, we actually chose three different normal cells

23         and three different ovarian cancer cells, and that is

24         more powerful than using the same one three times.

25    Q.   Okay.
```

Ghassan Saed, Ph.D.

```
 1                    MR. LOCKE:  Can I just make an objection.
 2           Those are the kind of answers that your counsel can ask
 3           you the question so you can give an explanation.  All
 4           of the defendants don't have time to question you, so
 5           "yes" or "no" would be helpful, particularly at this
 6           point where we're really running out of time.
 7                    MS. O'DELL:  Well, he's been asking specific
 8           questions about plates, and for it not to be clear, and
 9           he needs to -- he needs to give a responsive answer.
10                    MR. LOCKE:  We're wasting time.
11    BY MR. KLATT:
12    Q.   What I want to know is for 357 and all the sample IDs
13           listed here, there was one individual plate for each
14           sample ID treated with a certain level of talc,
15           correct?
16    A.   Correct.
17    Q.   Easy, Doctor.
18    A.   Thank you.
19    Q.   Gene expression, measuring gene expression is not the
20           same thing as measuring gene mutations, correct?
21    A.   Gene expression refers to mRNA levels that is reflected
22           in protein levels.
23    Q.   Gene expression is something that occurs all the time
24           in our bodies every day, correct?
25    A.   Correct.
```

Ghassan Saed, Ph.D.

```
 1   Q.   It's how we live as people, right?

 2   A.   Yes.

 3   Q.   If we didn't have gene expression, we'd be dead?

 4   A.   I don't know why you're saying that.

 5   Q.   Is it true?

 6   A.   Of course.

 7   Q.   You would agree with me that a reactive oxygen species,

 8        and can we call that ROS for short, Doctor?

 9   A.   Yes, I'm thinking, reactive oxygen and reactive

10        nitrogen species, let's call them oxidants.

11   Q.   I'm sorry?

12   A.   Oxidants.

13   Q.   Oxidants?  Well, what if I'm specifically asking about

14        ROS, reactive oxygen --

15   A.   You can, it depends on which one you would specify I

16        would answer, yes.

17   Q.   Okay.  So if I say ROS, can we agree I'm talking about

18        reactive oxygen species?

19   A.   Yes.  Which one, though?  You have to tell me.

20   Q.   As a category.

21   A.   Okay, keep going.

22   Q.   ROS aren't the same thing as inflammation, correct?

23   A.   Not correct.

24   Q.   ROS are a part of normal cell physiology, correct?

25   A.   Normal levels of ROS found in cells, yes.
```

Ghassan Saed, Ph.D.

```
 1    Q.   The major source of ROS comes from inside the cells

 2         from mitochondria, correct?

 3    A.   Not accurate answer, no.

 4    Q.   Can you distinguish between ROS produced inside the

 5         mitochondria of the cell from ROS produced outside the

 6         cell?

 7    A.   There are some enzymes that are produced from the

 8         mitochondria like SOD in different forms, and there are

 9         SODs that are produced from the membrane of the cell

10         and the cytoplasm, so it depends.

11    Q.   Do you agree that the persistent generation of cellular

12         ROS is a consequence of aging?

13    A.   I didn't study aging.

14    Q.   You haven't said that before?

15    A.   That --

16    Q.   The persistent generation of cellular ROS is a

17         consequence of aging.

18    A.   I don't remember.  Aging of the cells or aging of

19         people?

20    Q.   Aging of people.

21    A.   I don't remember I said that.

22    Q.   You didn't sequence the DNA in your studies to

23         determine mutations, correct?  You only used the SNP

24         gene assay?

25    A.   I used the SNP gene assay, yes.
```

Ghassan Saed, Ph.D.

```
 1   Q.   You realize the same company that made the SNP gene
 2        assay that you used also makes a gene mutation assay?
 3   A.   No, I'm not aware of that.
 4   Q.   You're not aware of that?
 5   A.   No.
 6   Q.   But so, therefore, you did not use that company's gene
 7        mutation assay in your experiments, correct?
 8             MS. O'DELL:  Object to the form.
 9             THE WITNESS:  I used the core facility at our
10        institutions, and this is what they ran and this is
11        what I have.
12   BY MR. KLATT:
13   Q.   So you did not use the gene mutation assay made by the
14        same company that makes the SNP assay that you used in
15        your studies, correct?
16             MS. O'DELL:  Object to the form.
17             THE WITNESS:  The core facility ordered the
18        kits, and they are the one who choose which company to
19        buy it from.  I have no influence in that.
20   BY MR. KLATT:
21   Q.   So was the core facility the one that decided to use
22        the SNP assay rather than the gene mutation assay or
23        was that your decision?
24   A.   That was what is available in the core facility, and I
25        said I want to use it.
```

Ghassan Saed, Ph.D.

```
1   Q.   But you were unaware that the same company that makes

2        the SNP assay also makes a gene mutation assay; is that

3        true?

4                 MS. O'DELL:  Object to the form.

5                 THE WITNESS:  I don't even know what company

6        you're talking about.

7   BY MR. KLATT:

8   Q.   Do you know what company made the SNP assay?

9   A.   The core facility ordered the SNP kit, they just give

10       you -- I'm interested in doing the SNP mutation and

11       this is what we run, so please run these samples for

12       me.

13  Q.   Did you ask them not to use a gene mutation assay?

14  A.   Not to use?  I didn't ask them, no.

15  Q.   Would you agree with me that the determination of the

16       redox state of a cell is determined by far more enzymes

17       and proteins and substances than just the ones you

18       looked at in your talc studies?

19                MS. O'DELL:  Object to the form.

20                THE WITNESS:  We -- in my studies we looked

21       at there are many enzymes, but we're looking at key

22       enzymes that control the redox balance.

23  BY MR. KLATT:

24  Q.   Object, nonresponsive.  Do you agree with me that redox

25       balance in cells is controlled by far more enzymes,
```

Ghassan Saed, Ph.D.

```
1        proteins, and substances than you looked at in your

2        talc studies?

3               MS. O'DELL:  Object to the form.

4               THE WITNESS:  And I answered.  I said

5        these -- the one we looked at are the main, there are

6        others, but they're not major players.  Those are, the

7        one we studied are the major contributor to the overall

8        pro-oxidant state of the cell.

9   BY MR. KLATT:

10   Q.   And some of those enzymes in some cancers are pro-

11        tumorigenic and some of those same enzymes in other

12        cancers are anti-tumorigenic, correct?

13   A.   I'm not aware of that.

14   Q.   You haven't said that before?

15   A.   Said that exact word?  No.

16   Q.   Do you recall ever saying this:  Decreasing oxidative

17        stress and increased SOD promotes apoptosis in the

18        cancer cell lines studied, but multiple other studies

19        performed using other cell lines have shown the

20        opposite, that decreased SOD can promote apoptosis?

21               MS. O'DELL:  Object to the form.

22               THE WITNESS:  So this -- I said that?  Or you

23        took this from my --

24   BY MR. KLATT:

25   Q.   I'm asking if you recall saying that?
```

Ghassan Saed, Ph.D.

```
 1   A.   Saying it, I don't recall saying it.

 2   Q.   Do you recall writing it?

 3   A.   Maybe, but that does not agree with what you just said,

 4        what you read.

 5   Q.   Can oxidative stress both promote apoptosis and promote

 6        cell survival?

 7   A.   Oxidative stress is a balance, so it's not just simple

 8        process.  So the outcome of this balance promote

 9        proliferation, promote survival, and decrease

10        apoptosis.

11   Q.   Can oxidative stress be both pro-tumorigenic and

12        anti-tumorigenic?

13   A.   You mean marker, some certain markers of oxidative

14        stress?  Is that what you're referring to?

15   Q.   Sure.

16   A.   Certain markers of oxidative stress can have -- can

17        induce tumors and can inhibit tumor, I'm not really

18        aware of that.

19   Q.   Are you aware of any study case report or case series

20        that says that women that use talc in the external

21        genital area have increased fibrosis or adhesions

22        anywhere in their reproductive tract?

23             MS. O'DELL:  Object to the form.

24             THE WITNESS:  Have I -- am I aware of people

25        use talcum powder is linked to development of
```

Ghassan Saed, Ph.D.

```
 1        possibility of adhesions?

 2   BY MR. KLATT:

 3   Q.   I'm asking you a very specific question.  Are you aware

 4        of any articles in the medical or scientific

 5        literature, any case studies, any case reports of women

 6        who used external talc having increased adhesions,

 7        fibrosis, granulomas anywhere in their reproductive

 8        tract?

 9             MS. O'DELL:  Object to the form.

10             THE WITNESS:  What do you mean by external?

11   BY MR. KLATT:

12   Q.   What does external mean to you?

13   A.   I'm asking you.

14   Q.   I'm asking the questions, Doctor.

15   A.   Okay, I understand, I just want to clarify.

16   Q.   Do you understand what external talc application means?

17             MS. O'DELL:  You didn't say that, you just

18        said external, so, anyway.

19             If you understand his question, answer the

20        question or define what you mean.

21   BY MR. KLATT:

22   Q.   Let me ask the question again.  Are you aware of any

23        study in the medical or scientific literature, case

24        report, that shows that external genital application of

25        talc results in increased fibrosis, granulomas, or
```

Ghassan Saed, Ph.D.

```
 1          adhesions anywhere inside the female reproductive

 2          tract?

 3                    MS. O'DELL:  Object to the form.

 4                    THE WITNESS:  I'm not aware.

 5     BY MR. KLATT:

 6     Q.   Are you aware that according to studies, anywhere from

 7          30 to 50 percent of U.S. women have used talc in the

 8          external genital area?

 9     A.   I'm sorry, say that again, sorry.

10     Q.   Are you aware from studies that anywhere from 30 to 50

11          percent of U.S. women have used talcum powder in the

12          external genital area?

13     A.   I'm not sure about the number.

14     Q.   Are you aware of any epidemic of granulomas, fibrosis,

15          or adhesions in women who use externally applied

16          genital talc?

17                    MS. O'DELL:  Object to the form.

18                    THE WITNESS:  I don't know if -- I don't know

19          if any relation between talc powder use and adhesions.

20     BY MR. KLATT:

21     Q.   Is there a way to measure the redox state directly

22          inside of cells?

23     A.   Very difficult.

24     Q.   Can it be done?

25     A.   The data will not be very reliable.
```

Ghassan Saed, Ph.D.

```
1    Q.    Is there a method to do that?

2    A.    You can measure H2O2, you can measure nitrosylation,

3          degree of nitrosylation of protein, we have done that

4          with Caspase-3 and S-nitrosylation of Caspase-3 as a

5          measure of how the level of antioxidants.  The accurate

6          way to measure it is to measure the key players

7          together to have the complete picture.

8    Q.    Those two methods that you just named, did you use

9          those in any of your talc studies?

10   A.    What methods?

11   Q.    The methods you just listed for me which were a way to

12         directly measure the redox state of cells.

13   A.    Measuring all markers?  Oh, the other method, yes, they

14         are listed here.

15   Q.    Did you use those?

16   A.    I'm sorry, I'm missing you.  Am I use ever in my lab or

17         in this study?

18   Q.    In the talc studies.

19   A.    The S-nitrosylation of Caspase-3, we did not use in

20         this study.

21   Q.    And there was one other method that you mentioned.

22   A.    The H2O2.

23   Q.    Did you use that method in your talc --

24   A.    No, we used it for catalase activity indirectly.

25   Q.    Can we go off the record for a second.  I just need to
```

Ghassan Saed, Ph.D.

```
 1          look and see if I have any other notes.

 2                    THE VIDEOGRAPHER:  Going off the record at

 3          6:18 p.m.

 4                    (An off-the-record discussion was held.)

 5                    THE VIDEOGRAPHER:  Back on the record at 6:19

 6          p.m.

 7     BY MR. KLATT:

 8     Q.   Doctor, in your PCR studies, did you normalize for

 9          actin?

10     A.   Yes.

11     Q.   And how did you do that?

12     A.   So we did PCR for beta-actin.

13     Q.   And where is that indicated in your lab --

14     A.   It is page -- every experiment we did with PCR we ran

15          beta-actin, and if you go to Page -- what's this page

16          here --

17                    MS. O'DELL:  What's the ending Bates Number

18          on there?

19     BY MR. KLATT:

20     Q.   There may be a Bates Number in the lower right hand

21          corner.

22     A.   10.

23     Q.   Okay.  I'm with you.

24     A.   Are you there?

25     Q.   Yes.
```

Ghassan Saed, Ph.D.

```
 1    A.   It's even cut off from here, I don't know why.  But you

 2         see the standard curve?

 3    Q.   Yes.

 4    A.   Okay, so what we do here, we do a realtime RT-PCR where

 5         we design a small oligo that is flanked by the primers,

 6         and we order that to be synthesized, and we know the

 7         concentration, we dilute it down, and we create a

 8         standard curve, and we use this standard curve to

 9         extrapolate the results and normalize for our level of

10         mRNA with the treatment.

11    Q.   Can I ask you a question.  On Page 10, that indicates

12         raw data, correct?

13    A.   Page 10?

14    Q.   The page you were just looking at.

15    A.   I just want to see, it's not clear here.  I just want

16         to see what page is this here.  I'm with you.

17              MS. O'DELL:  What's the question, Mike?

18    BY MR. KLATT:

19    Q.   Looking at Page 10 on Exhibit 1, and I'm not talking

20         about the lab page number, I'm talking about the Bates

21         Number, if you look for Sample 356, you see to the

22         right there's numbers 285995.18, 273439.209?

23    A.   Uh-huh.

24    Q.   And 409589.891?

25    A.   Correct.
```

Ghassan Saed, Ph.D.

```
 1   Q.   If you turn to the next page, those numbers are

 2        replicated for Sample 356.

 3   A.   What next page?

 4   Q.   The very next page in the --

 5   A.   Here?

 6   Q.   Yeah.

 7   A.   Okay.  Where are they?  356, this is copies per

 8        micrograms of CDNA.

 9   Q.   And that corresponds to those numbers, those same three

10        numbers on the previous page, correct?

11   A.   So this is the copy number, 28274095, yeah, I see

12        they're the same.

13   Q.   But for the 357 sample, the numbers don't correspond

14        between those two pages, correct?

15   A.   Correct.

16   Q.   And can you explain why?

17   A.   So that's why we normalize, because you will have

18        different copy numbers all the time, so we normalize

19        it.

20   Q.   Can you go to the next page, which would be notebook

21        page -- handwritten Page 39 and Bates Number 11.

22   A.   39?  I'm still on the same page, right?

23             MS. O'DELL:  That's where we were I thought,

24        unless I was confused about your question.

25   BY MR. KLATT:
```

Ghassan Saed, Ph.D.

```
 1    Q.   Well, Bates Number -- my Bates Number's cut off, excuse

 2         me, my handwritten number's cut off so I'm going to the

 3         Bates Number, which is 11.

 4              MS. O'DELL:  Okay, it's Page --

 5              THE WITNESS:  The next page.

 6    BY MR. KLATT:

 7    Q.   Okay.  And do you see the column toward the right

 8         called picograms per microgram of RNA?

 9    A.   Where is that?

10    Q.   The third column from the right-hand side.

11    A.   On Page -- in this page, right?

12    Q.   Page 11, Bates Stamped Page 11.

13    A.   This is the page, okay, this is the page.  So you're

14         looking at microgram?

15    Q.   Picograms per microgram per RNA, do you see that

16         column?

17    A.   I see copies per microgram for RNA, I see copies per

18         microgram for RNA, thintogram (sic) per microgram for

19         RNA. Is what you're looking at?

20    Q.   I'm looking right here, picograms per micrograms RNA

21         the third column from the right.

22    A.   1, 2, 3, that's called thintogram (sic).

23    Q.   And what's the first number in that column?

24    A.   125.  Is that what you're looking at?

25    Q.   I think we're not looking in the same place.
```

Ghassan Saed, Ph.D.

```
 1    A.    Yeah.  Is it Page 41?

 2                    MS. O'DELL:  You're on Page 11?

 3                    MR. KLATT:  Correct.

 4                    MS. O'DELL:  So I think it's this page.

 5                    THE WITNESS:  Oh.  Isn't it this page?

 6                    MS. O'DELL:  No, I think it's back, if I'm

 7          not mistaken.

 8                    THE WITNESS:  Oh, here.  We were on this

 9          page, right?

10    BY MR. KLATT:

11    Q.    I'm confused because you're looking at the real lab

12          notebook and I'm looking at --

13    A.    No, no, no, we were on the same page.  I thought you

14          asked me to go to a different page.  I see that column.

15    Q.    Just so we're on the same wavelength --

16    A.    I see it.

17    Q.    -- I'm referring to Page 11 Bates Number, correct?

18    A.    Picogram per microgram for RNA.

19    Q.    Right.

20    A.    4.58, the first number.

21    Q.    4.58?

22    A.    Uh-huh.

23    Q.    Right, and if you go -- that whole column's full of

24          numbers, correct?

25    A.    This column, yes.
```

Ghassan Saed, Ph.D.

```
 1    Q.   And then to the right of that you have an average,

 2         correct?

 3    A.   Yes.

 4    Q.   Sometimes you average two of the three numbers,

 5         sometimes you average all three numbers.

 6    A.   Correct.

 7    Q.   Why do you only average two of the three numbers

 8         sometimes?

 9    A.   If we have outlier, really high, different.

10    Q.   And what's your criteria for throwing out an outlier?

11    A.   So if you have 4.5, 4.3, and 6.5, that's an outlier.

12    Q.   What's your threshold for classifying something as an

13         outlier to not include it in your calculations?

14    A.   So if the two numbers match, the closer they match and

15         the higher the outlier is is what we determine.

16    Q.   So do you always throw out the outlier of the three

17         values?

18    A.   Not always, not necessarily.

19    Q.   So I'm just trying to figure what's your criteria

20         for --

21    A.   So if they are like, for example, close like, for

22         example, here, if we don't know that it is an outlier,

23         like, for example, here, 3.6, 4.3, 3.2, it's very hard

24         to determine an outlier, but if you have 6 and 6 and 7,

25         it is not hard.
```

Ghassan Saed, Ph.D.

```
1    Q.   Do you have a certain numerical criteria that you use

2         to classify something as an outlier that you're going

3         to exclude from your calculations?

4    A.   I just told you.

5    Q.   What's the numerical value?

6    A.   I don't have a numerical value.

7    Q.   You just eyeball it?

8              MS. O'DELL:  Object to the form.

9              THE WITNESS:  No, no, no, no, please, so I

10        just said that if the two numbers, okay, agrees very

11        close, the closer the two numbers together and the more

12        further is the other number, that is considered an

13        outlier to me.

14   BY MR. KLATT:

15   Q.   But, again, you don't have any numerical formula that

16        you follow to make that determination, correct?

17             MS. O'DELL:  Object to the form.

18             THE WITNESS:  I told you what I follow.

19   BY MR. KLATT:

20   Q.   When it's close together, you exclude the third one.

21        When it's further apart, you --

22   A.   I did not say that.

23             MS. O'DELL:  Object to the form.

24   BY MR. KLATT:

25   Q.   Then please explain numerically how you make the
```

Ghassan Saed, Ph.D.

```
 1        decision to exclude one of the three values --

 2   A.   Okay.

 3   Q.   -- or include it.

 4   A.   One more time.  So if the two number -- we have three

 5        numbers, right, three values.  If two of the three

 6        values are very close, the closer they are together,

 7        and they are more further from the third one, that

 8        third one qualifies for outlier.

 9   Q.   How close do the two have to be to exclude the third?

10   A.   Very close, have to be very close.

11   Q.   Numerically how --

12   A.   I don't know, I don't have a numerical value.

13   Q.   That's all the questions I have, Doctor.

14                MR. HEGARTY:  How much time do we have left?

15                THE VIDEOGRAPHER:  Two minutes left.

16                MS. O'DELL:  Do you have questions?

17                MR. LOCKE:  I do have a few.

18                MS. O'DELL:  You've got two minutes.

19                MR. LOCKE:  I know you've got some, too.

20                MR. HEGARTY:  I do.

21                MR. LOCKE:  Go ahead, Mark.

22        SAED DEPOSITION EXHIBIT NUMBER 19,

23        ABSTRACT SUBMITTED TO SGO,

24        WAS MARKED BY THE REPORTER

25        FOR IDENTIFICATION
```

Ghassan Saed, Ph.D.

```
 1

 2          RE-EXAMINATION BY MR. HEGARTY:

 3    Q.    Doctor, I'm showing you what I'm marking as Exhibit 19.

 4          Do you recognize Exhibit 19?

 5    A.    It looks like the abstract we submitted to SGO.

 6    Q.    This abstract in the middle refers to testing done at

 7          48 hours; is that correct?

 8    A.    48 hours is a typo everywhere you see it, I acknowledge

 9          that.

10    Q.    So you reported 48 hours in this abstract to SGO?

11    A.    Correct.  It is wrong.  All the work that I did it's 72

12          hours.

13              SAED DEPOSITION EXHIBIT NUMBER 20,

14              ABSTRACT,

15              WAS MARKED BY THE REPORTER

16              FOR IDENTIFICATION

17    BY MR. HEGARTY:

18    Q.    I'm going to mark as Exhibit Number 20 another abstract

19          of yours; is that correct?

20    A.    Where is it -- talcum powder -- where was this?

21    Q.    Do you recognize this abstract?

22    A.    March 2018, okay.

23    Q.    In the middle you report treating cells at 0, 200, and

24          500 micrograms per milliliter; is that correct?

25    A.    Yes, that was the initial study that we did.
```

Ghassan Saed, Ph.D.

```
 1   Q.   And that data is reflected in the notebooks we looked

 2        at?

 3   A.   It's here, yes.

 4              MR. KLATT:  Which notebook?

 5              MS. O'DELL:  Exhibit 3.

 6          SAED DEPOSITION EXHIBIT NUMBER 21,

 7          ABSTRACT FROM SRI,

 8          WAS MARKED BY THE REPORTER

 9          FOR IDENTIFICATION

10   BY MR. HEGARTY:

11   Q.   I'm going to mark next as Exhibit Number 21 another

12        abstract of yours from SRI; is that correct?

13   A.   SRI, March 16, this one is -- what is the title --

14        yeah, talcum powder -- yes.

15   Q.   In the method section you report treating cells with

16        1,000 micrograms per milliliter of talc; is that

17        correct?

18   A.   That's a typo that's 100.

19   Q.   That's another mistake?

20   A.   Yes, it's 100.

21              MS. O'DELL:  I think your time's gone.

22              MR. HEGARTY:  Okay.  Well, we --

23              THE WITNESS:  And all those are the

24        preliminary that we did.

25              MR. HEGARTY:  We have request for several
```

Ghassan Saed, Ph.D.

1          documents to be produced, so we can go on the record

2          before we finish the deposition.  And then, also, we

3          reserve the right, as we indicated at the beginning of

4          the deposition, to seek additional time because of the

5          late productions and, also, because of the

6          nonresponsive nature Dr. Saed has been throughout the

7          deposition.

8                    MS. O'DELL:  I think the objection for one

9          was objection for all, I think you made that rule,

10         Mike, but I'm glad you put -- we're going to go off the

11         record, and I may have a few questions for Dr. Saed.

12         Before I do, I will say I think to state that Dr. Saed

13         has not been responsive in his answers today is a

14         misstate.  The record and his testimony will be

15         reflective that he was attempting to respond to the

16         questions, very difficult technical questions, and so

17         he's attempted to do his best, and as we said before,

18         we've complied with all the orders of the Court and the

19         Notice of Deposition, and we'll oppose efforts at this

20         point for any additional time with him.  So let's go

21         off the record.

22                    MR. HEGARTY:  And to the extent that you

23         don't have any additional questions, I just want to go

24         back on the record and make a note of the additional

25         documents we want from Dr. Saed.  We can do it now or

Ghassan Saed, Ph.D.

```
 1        we can do it at the end.

 2                  MS. O'DELL:  Why don't we wait until the end.

 3                  MR. HEGARTY:  Okay.

 4                  THE VIDEOGRAPHER:  Going off the record at

 5        6:32 p.m.

 6                  (A short recess was taken.)

 7                  THE VIDEOGRAPHER:  We're back on the record

 8        at 6:56 p.m.

 9   EXAMINATION BY MS. O'DELL:

10   Q.   Doctor, I wanted to follow up on a few questions.

11        First, when you were acting as a consultant, you

12        referred to yourself as a consultant a number of times

13        today, was it your understanding as a consultant you

14        were also an expert witness?

15   A.   Yes.

16   Q.   And so during all the time that you were conducting the

17        studies that you testified to today, that you were

18        preparing certain publications, you were working as an

19        expert witness?

20                  MR. KLATT:  Objection, leading.

21   BY MS. O'DELL:

22   Q.   Were you working during that time period as an expert

23        witness?

24   A.   Yes.

25   Q.   Okay.  Let me see if I can direct you back to --
```

Ghassan Saed, Ph.D.

```
 1        actually, maybe I should do it this way, I apologize.

 2        If you would, let me hand to you what was marked as the

 3        lab notebook for your -- the experiments that were done

 4        to and reported on in your manuscript and your report,

 5        Exhibit 1.  Do you see those?

 6   A.   Yes.

 7   Q.   And if you turn to I think it was Page 57, Bates Number

 8        57 -- make sure I'm at the right page.  Let me know

 9        when you get there, Doctor.

10   A.   57?

11   Q.   Uh-huh.

12   A.   This page?

13   Q.   Maybe I wrote the page down -- oh, yeah, it's actually

14        84 in -- it's 57 in there and it's 84 in your main lab

15        notebook.  You recall a number of questions about or

16        two questions at least that I recall, and it refers to

17        Page 84 in Exhibit 2 that corresponds to Bates Number

18        57 of Exhibit 1, do you recall that, and there was --

19        you were asked about a missing data table --

20   A.   Correct.

21   Q.   -- that did not make it into the scanned version.

22   A.   Correct.

23   Q.   Is the data contained in the table on Page 57 of the

24        scanned -- excuse me -- 84 of the lab notebook

25        contained in the figure below?
```

Ghassan Saed, Ph.D.

```
 1    A.    Yes.

 2    Q.    And was that figure included in the version that was

 3          provided to defense counsel?

 4    A.    Yes.

 5    Q.    Okay.  I've got one more situation like this.  If

 6          you'll turn to page -- let me get it -- it's 62 at the

 7          Bates Stamp Number version, Exhibit 1, and for the lab

 8          notebook it's Page 87.

 9    A.    Yes.

10    Q.    And I think in this instance there was a table on

11          Page 87 of the lab notebook that was not scanned in the

12          electronic version.  Is the data that's contained in

13          the table on Page 87 also in the figure that was

14          produced to Defendants?

15                  MR. HEGARTY:  Objection, form.  You can

16          answer.

17                  THE WITNESS:  Yes.

18    BY MS. O'DELL:

19    Q.    You were also asked a series of questions about your

20          manuscript and the use of the word marginal.  Do you

21          recall that discussion?

22    A.    Yes.

23    Q.    What did you intend by the use of the word marginal?

24    A.    I meant marked increase, marked difference.

25    Q.    Okay.  Let me change directions with you.  We got your
```

Ghassan Saed, Ph.D.

```
 1          notebook that's been marked or two notebooks that have

 2          been marked Exhibit 11, and does that contain your

 3          expert report in this case as well as the references

 4          noted in your expert report?

 5     A.   Correct.

 6     Q.   And do you have any changes that you would like to make

 7          in your expert report?

 8     A.   Yes, I do.

 9     Q.   Okay.

10     A.   So I think during that note there were some references

11          that were mislabeled, so I would like to --

12     Q.   Tell us what page you're on.

13     A.   Page 10, I'd like to add -- where it says 49, I would

14          like to add 51 there.

15     Q.   And when you say 51, do go --

16     A.   Reference number 51.

17     Q.   Okay.

18     A.   Okay.  And next page, Page 11, where it says 50 on the

19          top of the page, first line, I'd like to add the NTP

20          study 1993.

21     Q.   Okay.

22     A.   And on Page 12, I'd like to remove 4575.

23     Q.   Okay.  And where is that on Page 12?

24     A.   On the middle paragraph.

25     Q.   All right.
```

Ghassan Saed, Ph.D.

```
 1                 MR. HEGARTY:  I'm sorry, we're not getting

 2        realtime.

 3                 MS. O'DELL:  Let's go off the record.  Do you

 4        need that or can we move on?

 5                 MR. HEGARTY:  No, I need it.  I just wanted

 6        to see what he just said, and I can't, I obviously

 7        can't see it so --

 8                 MS. O'DELL:  Off the record.

 9                 THE VIDEOGRAPHER:  Going off the record at

10        7:03 p.m.

11                 (An off-the-record discussion was held.)

12                 THE VIDEOGRAPHER:  We're back on the record

13        at 7:05 p.m.

14      BY MS. O'DELL:

15      Q.   You may continue, Doctor?

16      A.   Yes.  So the Page 12, the middle paragraph, I would

17           like to delete references 4575 from the whole

18           paragraph, they don't belong there.

19      Q.   Okay.

20      A.   That's it.

21      Q.   Anything else?  Okay.  Doctor, do in vitro models

22           reliably predict the pathogenicity of potentially

23           harmful particulates or other carcinogens in humans?

24                 MR. HEGARTY:  Objection, form.

25                 THE WITNESS:  Yes.
```

Ghassan Saed, Ph.D.

```
 1    BY MS. O'DELL:

 2    Q.   You were asked a number of questions about your

 3         manuscript today.  In your manuscript you state that

 4         your findings provide a molecular mechanism for linking

 5         genital talcum powder use to increased ovarian cancer

 6         risk?

 7    A.   Yes.

 8    Q.   And does that statement relate to the pathogenesis of

 9         ovarian cancer?

10    A.   Yes.

11    Q.   Does pathogenesis refer to the molecular mechanism that

12         results in the development of a disease?

13    A.   Yes.

14    Q.   Also, in relation to your manuscript, has your

15         manuscript been peer reviewed and accepted for

16         publication?

17    A.   Yes.

18    Q.   Is the use of immortalized cells in laboratory research

19         generally accepted in your field?

20    A.   Yes.

21              MR. HEGARTY:  Objection, form.

22    BY MS. O'DELL:

23    Q.   Is it widely accepted?

24              MR. HEGARTY:  Objection, form.

25              THE WITNESS:  Yes.
```

Ghassan Saed, Ph.D.

```
 1    BY MS. O'DELL:

 2    Q.   Is it a generally accepted practice for researchers in

 3         your field to correlate findings from immortalized

 4         cells to in vivo application in humans?

 5    A.   Yes.

 6    Q.   In terms of the studies that you have conducted on

 7         talc, you mentioned that you use multiple types --

 8         multiple lines of each type of cell; do you recall

 9         that?

10    A.   Yes.

11    Q.   How many lines of or types of ovarian cells did you

12         use?

13    A.   Three different ovarian cancer cell lines and three

14         different normal cell lines.

15    Q.   And what's the reason for doing that?

16    A.   The reason is to get a rebox finding to show that it is

17         not repeated three times but the finding is reproduced

18         from three different normal or three different ovarian.

19    Q.   And could another scientist with your expertise in and

20         background in research, could they replicate the

21         studies that you've conducted?

22    A.   Yes.

23    Q.   In terms of the outcomes for oxidative stress and

24         inflammation that you saw demonstrated in your studies,

25         are there any alternative explanations for those
```

Ghassan Saed, Ph.D.

```
 1        results?

 2                  MR. HEGARTY:  Objection, form.

 3                  THE WITNESS:  That talcum powder induces

 4        inflammation that leads to increased risk of ovarian

 5        cancer.

 6   BY MS. O'DELL:

 7   Q.   Are there any other alternative explanations other than

 8        the presence of talc treating a cell?

 9   A.   This is a direct experiment showing isolated effect.

10   Q.   Based on your academic training and years of experience

11        studying ovarian cancer, does the cause and effect

12        observed in your studies make sense?

13                  MR. HEGARTY:  Objection, form.

14                  THE WITNESS:  It does.

15   BY MS. O'DELL:

16   Q.   In terms of the particular data that you evaluated, I

17        want to ask you to take a look at I think it was Bates

18        Number Page 11 of Exhibit 1, and you were asked some

19        questions about occasions when you averaged two

20        findings?

21   A.   Outliers.

22   Q.   Yes.  So address the outliers --

23   A.   Yeah, so what I forgot to say that when I was asked

24        by -- this whole statistics, I did not touch.  This was

25        done by a professional, by a statistician, and the
```

Ghassan Saed, Ph.D.

```
 1         results, his finding is in the section in the notebook.

 2         He determined everything.

 3   Q.    Would you have published your results even if they had

 4         shown there was no biological effect?

 5                MR. HEGARTY:  Objection, form.

 6                THE WITNESS:  Of course.

 7   BY MS. O'DELL:

 8   Q.    Is it a standard cell culture technique generally

 9         accepted in your field to split the cell culture right

10         after the cells have -- (coughing in room) -- in a

11         24-hour period?

12   A.    It is.

13   Q.    Is it a standard cell culture technique that's

14         generally accepted in your field to start experiments

15         right after splitting the cells?

16   A.    Cells have to reach confluency and then you split them,

17         yes.

18   Q.    And it's generally accepted to begin your experiments

19         right after that point?

20   A.    Correct.

21                MS. O'DELL:  Nothing further.

22                How long was that?

23                THE VIDEOGRAPHER:  14 minutes.

24                MR. HEGARTY:  Give me a second.

25
```

Ghassan Saed, Ph.D.

```
 1    RE-EXAMINATION BY MR. HEGARTY:

 2    Q.   Doctor, in connection with your work in this

 3         litigation, did the lawyers for Plaintiff provide you

 4         with any medical or scientific literature?

 5    A.   No.

 6    Q.   So none of the materials we marked as Exhibit Number 11

 7         were provided by Counsel for Plaintiffs?

 8              MS. O'DELL:  Object to the form.

 9              THE WITNESS:  Yeah, this was copied and

10         provided by them, the references I made.

11    BY MR. HEGARTY:

12    Q.   In connection with you -- strike that.  In connection

13         with any other testing you have done involving cell

14         cultures, have you ever served as an expert witness or

15         a consultant in litigation involving the same topic of

16         those experiments?

17              MS. O'DELL:  Object to the form.

18              THE WITNESS:  I never served, as I stated, as

19         an expert witness in any litigation.

20    BY MR. HEGARTY:

21    Q.   In connection with any experimental testing you've done

22         involving cell cultures, have you ever served as a paid

23         expert for plaintiffs lawyers on the same topic for

24         which you were doing those experiments?

25              MS. O'DELL:  Object to the form.
```

Ghassan Saed, Ph.D.

```
 1                    THE WITNESS:  Have I been hired by and paid

 2         for by another?  I'm sorry --

 3    BY MR. HEGARTY:

 4    Q.   Other lawyers at the same time you were doing cell

 5         culture tests involving the same topic that you were

 6         consulting with them on.

 7                    MS. O'DELL:  Object to the form.

 8                    THE WITNESS:  No.

 9    BY MR. HEGARTY:

10    Q.   You said in response to counsel's question that when

11         you used the word marginal, you meant marked.  What

12         is -- where is a written definition for marked?

13    A.   Marked.

14    Q.   I think I said that, but where is a published standard

15         for what marked means?

16    A.   This is marked is to me, but we can go the

17         statistically significance.  To me, when you have an

18         increase of 1 versus 6 fold, that's a marked increase.

19    Q.   Is there a written standard for what constitutes a

20         marked increase?

21    A.   No.

22                    MS. O'DELL:  Object to the form.

23    BY MR. HEGARTY:

24    Q.   When I asked you not long ago if you had any revisions

25         to your expert report, you answered no.  Do you recall
```

Ghassan Saed, Ph.D.

```
 1              telling me that?

 2                   MS. O'DELL:  I don't recall the question

 3         being asked.

 4    BY MR. HEGARTY:

 5    Q.   I did ask.  I asked you, Doctor, didn't I, if you had

 6         any -- if you needed to revise in any way your report.

 7         Do you recall me asking that?

 8                   MS. O'DELL:  Object to the form.

 9                   THE WITNESS:  Probably I forgot that those

10         references need to be done.

11    BY MR. HEGARTY:

12    Q.   When did this revelation come to you?

13    A.   I mean I don't --

14                   MS. O'DELL:  Object to the form.

15                   THE WITNESS:  I'm not sure, we've been

16         through many, many, many questions, so I don't really

17         remember be accurately.

18    BY MR. HEGARTY:

19    Q.   Well, I asked that you question about --

20    A.   Make you did, I'm not denying, maybe you did, but I'm

21         saying there are too many things that we're covering

22         today in very small time.

23    Q.   Well, did you discover the need to make those revisions

24         before today?

25    A.   Yes, they actually they were marked in my -- with my
```

Ghassan Saed, Ph.D.

```
 1          handwriting, this is my handwriting, they were marked

 2          with my handwriting.

 3     Q.   When did you make those handwritten marks?

 4     A.   Last night, I was reviewing this, and I -- what I

 5          understood maybe your question as if I want to make

 6          something to the text, but this is like probably the

 7          end notes without the references.

 8     Q.   Did you meet with counsel for Plaintiffs yesterday?

 9     A.   Did I meet with -- yes, I did.

10     Q.   For how long?

11     A.   I can't remember, three, four hours, five hours, I

12          don't know.

13     Q.   From when to when?

14     A.   When was it, 10 maybe to 2, 3.

15     Q.   Who did you meet with?

16     A.   The three -- Leigh, Margaret, John, right, and who

17          else -- I think that's it right, I don't remember,

18          Leigh, Margaret, John, and Dan.

19     Q.   At any point in time during your consultation with

20          Plaintiff's Counsel, have you met with any other

21          lawyers that you've not identified here today?

22     A.   Have I met at any point?

23     Q.   At any point.

24     A.   I met Allison, right?

25     Q.   Any others who we haven't talked about?
```

Ghassan Saed, Ph.D.

```
 1    A.    What's the name of the lady I met today --

 2                MS. O'DELL:  Michelle.

 3                THE WITNESS:  Michelle, I just met her today.

 4          Sorry, I'm not good at names.

 5                MS. O'DELL:  Alastair.

 6                THE WITNESS:  And Alastair, we met today.

 7    BY MR. HEGARTY:

 8    Q.    You testified a moment ago that an in vitro model

 9          reliably predicts that, I think, pathogenesis of

10          potentially harmful particles and other carcinogens --

11          let me back up and find that testimony -- you said

12          do -- you agreed with the question that in vitro models

13          reliably predict the pathogenesis of potentially

14          harmful particulates or other carcinogens in humans.

15          Do you recall agreeing with that statement?

16    A.    Yes.

17    Q.    What data does it take for an in vitro model to

18          reliably predict the carcinogenicity of a particle?

19    A.    What data?

20    Q.    Is it your testimony that in vitro models by themselves

21          reliably predict the carcinogenicity of a particle to a

22          human?

23    A.    Yes.

24                MS. O'DELL:  Object to the form.

25                THE WITNESS:  They do.
```

Ghassan Saed, Ph.D.

```
 1    BY MR. HEGARTY:

 2    Q.   Cite for me an instance when a carcinogen has been

 3         identified in humans based solely on an in vitro model.

 4    A.   I can't remember.

 5    Q.   When have you ever classified a substance as a

 6         carcinogen based on the result in an in vitro model?

 7    A.   In vitro model is a good predictor to determine whether

 8         a substance is carcinogenic or not, if the same effect

 9         is replicated in vivo.

10    Q.   You did not replicate your results in an in vivo model,

11         correct?

12    A.   Not yet.

13    Q.   You were asked with regard to your experimental results

14         whether there was any other alternative explanation for

15         the results.  What did you do to rule out alternative

16         explanations for the results that you found in your

17         testing?

18    A.   Because treatment without talc did not induce it, we're

19         doing a comparison, very simple comparison with and

20         without, and with did this, without, this didn't do.

21    Q.   You claim that your test results show that talc

22         increases the risk of ovarian cancer.  How did you show

23         by your test results that talc increases the risk --

24         I'm sorry -- yeah, increases the risk of ovarian

25         cancer?
```

Ghassan Saed, Ph.D.

```
 1    A.    One more time, please.

 2    Q.    How do you remember test results show that talc

 3          increases the risk of ovarian cancer?

 4    A.    By showing that the treatment with talcum powder

 5          induces the same oxidative oxidant and anti-oxidant

 6          profile that we observe in epithelial ovarian cancer

 7          cells.

 8    Q.    But no study has shown those results in women using

 9          cosmetic talc, correct?

10              MS. O'DELL:  Object to the form.

11              THE WITNESS:  So you're saying there's no

12          studies out there showing woman using the talc powder

13          have increased any of these markers?

14    BY MR. HEGARTY:

15    Q.    Correct.

16    A.    I think you asked me the same question before.

17    Q.    Let me ask it a different way, if you -- I already

18          asked you the same question.  How do you go from your

19          test results to concluding there's an increased risk of

20          cancer with applying talc to the body?

21              MS. O'DELL:  Object to the form.

22              THE WITNESS:  Again, as I stated, the

23          treatment of ovarian cancer cells, three different

24          ovarian cancer cell lines and three different normal

25          cells with talcum powder induces a profile of oxidative
```

Ghassan Saed, Ph.D.

```
 1         stress that we in our lab have extensively published

 2         and characterized for ovarian cancer cells.

 3    BY MR. HEGARTY:

 4    Q.   You characterized that state in ovarian cancer cells,

 5         correct?

 6              MS. O'DELL:  I'm sorry --

 7              THE WITNESS:  State?

 8    BY MR. HEGARTY:

 9    Q.   Well, the pro-oxidant and anti-oxidant state, you've

10         characterized that to exist in ovarian cancer cells,

11         correct?

12    A.   We characterized that there is an enhanced pro-oxidant

13         state in -- that manifest in ovarian cancer cells, yes.

14    Q.   You've not done any studies showing a pro-oxidant or

15         decreased anti-oxidant state in normal ovarian cancer

16         cells, correct?

17              MS. O'DELL:  Object to the form.

18              THE WITNESS:  Normal ovarian cancer?

19    BY MR. HEGARTY:

20    Q.   Yes.  I'm sorry -- you have not shown a pro-oxidative

21         or anti-oxidative state in normal ovarian cells?

22    A.   In response to what?

23    Q.   In response to anything.

24              MS. O'DELL:  Object to the form.

25              THE WITNESS:  That's a very vague question.
```

Ghassan Saed, Ph.D.

```
 1          I don't understand what you're trying to do, seriously.

 2   BY MR. HEGARTY:

 3   Q.   Well, have you ever reported finding a pro-oxidative or

 4        an anti-oxidative state in normal ovarian cells?

 5             MS. O'DELL:  Object to the form.

 6             THE WITNESS:  As compared to what?

 7   BY MR. HEGARTY:

 8   Q.   As compared to nothing.

 9   A.   How you not compare to nothing?

10   Q.   Right.

11   A.   So we comparing ovarian cancer to normal cells.

12   Q.   My question is simply in normal cells, have you ever

13        found pro-oxidative or anti-oxidative state?

14   A.   We found -- okay, maybe I know what you want me to say.

15        So there are the players, the key oxidants and key

16        anti-oxidants, they are expressed in all cells

17        including normal.  Now, the amount of -- the degree of

18        expression, that what gets screwed up and altered when

19        you develop -- you start -- cells start developing that

20        oncogenesis phenotype.

21   Q.   I need to leave Mr. Klatt a minute or two.  You

22        mentioned that you would still have published your

23        article if you found no biologic effect.  Do you recall

24        answering that question?

25   A.   Correct.
```

Ghassan Saed, Ph.D.

```
 1    Q.    Is it your belief that anyone would publish your paper

 2          if you showed no biologic effect?

 3                    MS. O'DELL:  Object to the form.

 4                    THE WITNESS:  Anyone not me, you talking

 5          about me?

 6    BY MR. HEGARTY:

 7    Q.    Yes, any publisher.

 8    A.    That it would be published, yes, I would consider this

 9          a very positive and very negative, same thing.

10    Q.    But do you think a journal would publish --

11    A.    Absolutely, it's a finding.

12    Q.    What is that based on?

13    A.    It's a finding.

14    Q.    Have you ever approached a journal and had them publish

15          an article on a negative finding?

16    A.    I don't know what you call negative.

17    Q.    Well, showing no biologic --

18    A.    That's not negative, that's a huge finding.

19    Q.    Okay.  All right.

20                    You have questions, Mike?  Go ahead.

21          RE-EXAMINATION BY MR. KLATT:

22    Q.    Dr. Saed, are you aware that a plaintiff's expert named

23          John Godlesky has tested dozens of women's ovarian,

24          reproductive, and peritoneal tissue, and found many,

25          many nontalc particles, foreign particles in that
```

Ghassan Saed, Ph.D.

```
1          tissue; are you aware of that?

2     A.   No.

3     Q.   If you tested those other foreign particles that aren't

4          talc in the same test that you tested talc, could you

5          get the same results?

6               MS. O'DELL:  Object to the form.

7               THE WITNESS:  I didn't test them.

8     BY MR. KLATT:

9     Q.   But is it possible that if you tested them, you could

10         get the same results?

11    A.   If I didn't test them, I will not give you an answer.

12    Q.   I'm sorry?

13    A.   I did not test them.

14    Q.   So you have no idea whether any other foreign particle

15         other than talc would result in the same findings you

16         found for talc, correct?

17              MS. O'DELL:  Object to the form.

18    BY MR. KLATT:

19    Q.   Because you haven't done the test.

20    A.   When I test, I will tell you.

21    Q.   So you can't give us any information on what any other

22         particles other than talc would do under the tests that

23         you -- let me finish -- the tests that you submitted

24         talc to, correct?

25              MS. O'DELL:  Object to the form.
```

Ghassan Saed, Ph.D.

```
 1                    THE WITNESS:  I only can give you information
 2         to the experiments that I did and --
 3    BY MR. KLATT:
 4    Q.   And you didn't do any tests on any foreign particles
 5         other than talc, correct?
 6    A.   Correct.
 7    Q.   And has all your testing on talc been paid for by the
 8         Beasley Allen firm?
 9                    MS. O'DELL:  Object to the form.
10                    THE WITNESS:  My time?
11    BY MR. KLATT:
12    Q.   Well, the testing, yeah, the time that you spent
13         testing talc.
14                    MS. O'DELL:  Object to the form.
15                    THE WITNESS:  No, testing is not -- what are
16         you trying to -- we already discussed this.  Time, they
17         paid for my time for consultation, I paid for the
18         expenses from the lab.  We already talked about that.
19                    MR. KLATT:  Okay.  Anybody else?
20                    MR. LOCKE:  Yeah.  Are you finished?
21                    MR. KLATT:  Yes.
22         EXAMINATION BY MR. LOCKE:
23    Q.   I just want to clarify for you, Doctor --
24                    MS. O'DELL:  You've got 20 seconds.
25                    MR. LOCKE:  Okay, well, I'm going to ask as
```

Ghassan Saed, Ph.D.

```
 1          many questions as I can in 20 seconds.  You're the

 2          first expert to reach the conclusions that you have in

 3          your report, is that correct?

 4                    MS. O'DELL:  Object to the form.

 5                    THE WITNESS:  That were looking at the

 6          molecular mechanism and molecular effect of talcum

 7          powder?

 8     BY MR. LOCKE:

 9     Q.   Right.

10     A.   I wasn't the first one.

11     Q.   Who did it before?

12     A.   Was Shukla and there was the -- what was the other guy

13          name, I can't remember names, but there were two or

14          three papers that look at molecular mechanisms,

15          molecular effects.

16     Q.   Okay.

17                    MS. O'DELL:  I'm sorry, time's up.

18                    MR. LOCKE:  I'm going to still object to not

19          being able to ask a couple quick questions here.

20                    MS. O'DELL:  Tom, I'm sorry, I mean this

21          is between --

22                    MR. LOCKE:  You're cutting me off.

23                    MS. O'DELL:  I've tried to be very

24          accommodating, but this is between you and your

25          co-counsel.
```

Ghassan Saed, Ph.D.

```
 1                    MR. LOCKE:  No, it's really not.

 2                    MS. O'DELL:  Yes, it is, it is.

 3                    MR. LOCKE:  Okay.  We'll be back with this

 4        witness.

 5                    MR. HEGARTY:  Do you have anything further?

 6                    MS. O'DELL:  I have nothing further.

 7                    MR. HEGARTY:  I just want to put on the

 8        record several document requests, and I certainly don't

 9        expect you to agree to them right now.

10                    We would like copies of Dr. Saed's prior

11        drafts of his manuscript; copies of any correspondence

12        with OB-GYN Oncology and its reviewers, whether it's in

13        his possession or maintained on a website; any cover

14        letters accompanying submissions of the manuscript to

15        either OB-GYN Oncology or Reproductive Sciences; all

16        communications with Dr. Saed, between Dr. Saed and

17        Beasley Allen and other plaintiffs lawyers with regard

18        to his manuscript; and the budget that Dr. Saed

19        prepared for his manuscript; as well as all accounting

20        documents, invoices, or other original documents that

21        memorialize the expenses, costs, et cetera, hours

22        worked on the manuscript that we -- that are reported

23        in Exhibit Number 5.

24                    MS. O'DELL:  You're referring to the budget

25        officer at Wayne State?
```

Ghassan Saed, Ph.D.

```
 1                    MR. HEGARTY:  Correct, and the documents that
 2         Sharon Pepe used to put together the numbers that are
 3         reported in that exhibit.  And those are at least the
 4         document requests that I can think of right now, but we
 5         reserve the right to go back and look at the transcript
 6         to see if there are any additional requests, and we
 7         will make them in a timely manner.
 8                    MS. O'DELL:  We will be happy to meet and
 9         confer on all of those items, some of which we might
10         work an agreement out, some of which we might need some
11         assistance by the Court.
12                    THE VIDEOGRAPHER:  This concludes the
13         deposition.  We're going off the record at 7:29 p.m.
14                    (The deposition was concluded at 7:29 p.m.)
15
16
17
18
19
20
21
22
23
24
25
```

Ghassan Saed, Ph.D.

```
 1                    CERTIFICATE OF NOTARY

 2

 3       STATE OF MICHIGAN          )

 4                                  ) SS

 5       COUNTY OF OAKLAND          )

 6            I, Laurel A. Frogner, Certified Shorthand

 7       Reporter, a Notary Public in and for the above county

 8       and state, do hereby certify that the above deposition

 9       was taken before me at the time and place hereinbefore

10       set forth; that the witness was by me first duly sworn

11       to testify to the truth, and nothing but the truth,

12       that the foregoing questions asked and answers made by

13       the witness were duly recorded by me stenographically

14       and reduced to computer transcription; that this is a

15       true, full and correct transcript of my stenographic

16       notes so taken; and that I am not related to, nor of

17       counsel to any party, nor interested in the event of

18       this cause.

19

20

21                        Laurel A. Frogner, CSR-2495, RMR, CRR

22                        Notary Public,

23                        Oakland County, Michigan

24                        My Commission expires:  4-22-2022

25
```

Ghassan Saed, Ph.D.

```
 1                - - - - - -

               E R R A T A

 2                - - - - - -

 3   PAGE  LINE  CHANGE

 4   ____  ____  _____

 5      REASON: _____

 6   ____  ____  _____

 7      REASON: _____

 8   ____  ____  _____

 9      REASON: _____

10   ____  ____  _____

11      REASON: _____

12   ____  ____  _____

13      REASON: _____

14   ____  ____  _____

15      REASON: _____

16   ____  ____  _____

17      REASON: _____

18   ____  ____  _____

19      REASON: _____

20   ____  ____  _____

21      REASON: _____

22   ____  ____  _____

23      REASON: _____

24   ____  ____  _____

25      REASON: _____
```

Ghassan Saed, Ph.D.

```
1              ACKNOWLEDGMENT OF DEPONENT

2

               I,_____, do

3    hereby certify that I have read the

     foregoing pages, and that the same

4    is a correct transcription of the answers

     given by me to the questions therein

5    propounded, except for the corrections or

     changes in form or substance, if any,

6    noted in the attached Errata Sheet.

7

     _____

8    Ghassan Saed, Ph.D.      DATE

9

10

11

12

13

14

     Subscribed and sworn

15   to before me this

     _____ day of _____, 20____.

16

     My commission expires:_____

17

18   _____

     Notary Public

19

20

21

22

23

24

25
```

Ghassan Saed, Ph.D.

```
 1                  IN THE UNITED STATES DISTRICT COURT

 2                    FOR THE DISTRICT OF NEW JERSEY

 3

 4    IN RE:  JOHNSON & JOHNSON TALCUM

 5    POWDER PRODUCTS MARKETING, SALES

 6    PRACTICES, AND PRODUCTS

 7    LIABILITY LITIGATION            MDL NO: 16-2738(FLW)(LHG)

 8

 9    _____/

10    THIS DOCUMENT RELATES TO

11    ALL CASES

12    _____/

13    PAGE 1 TO 343

14

15         The Videotaped Deposition of GHASSAN SAED, PH.D.,

16         Taken at 1 Park Avenue,

17         Detroit, Michigan,

18         Commencing at 9:15 a.m.,

19         Wednesday, January 23, 2019,

20         Before Laurel A. Frogner, RMR, CRR, CSR-2495.

21

22

23

24

25
```

Ghassan Saed, Ph.D.

```
 1    APPEARANCES:

 2

 3    BEASLEY ALLEN LAW FIRM

 4    BY:  P. LEIGH O'DELL, ESQ. and

 5         MARGARET M. THOMPSON, MD, JD

 6    218 Commerce Street

 7    P.O. Box 4160

 8    Montgomery, Alabama 36103

 9    334-269-2343

10    leigh.odell@beasleyallen.com

11    Margaret.Thompson@BeasleyAllen.com

12         Appearing on behalf of the Plaintiffs

13

14

15    ASHCRAFT & GEREL, LLP

16    BY:  MICHELLE A. PARFITT, ESQ.

17    4900 Seminary Road

18    Alexandria, Virginia 22311

19    703-931-5500

20    mparfitt@ashcraftlaw.com

21         Appearing on behalf of the Plaintiffs

22

23

24

25
```

Ghassan Saed, Ph.D.

```
 1   APPEARANCES (Continued):

 2

 3   NAPOLI SHKOLNIK PLLC

 4   BY:  ALASTAIR J.M. FINDEIS, ESQ.

 5   400 Broadhollow Road, Suite 305

 6   Melville, New York 11747

 7   631-224-113

 8   afindeis@napolilaw.com

 9        Appearing on behalf of the Plaintiffs

10

11

12   WILENTZ, GOLDMAN & SPITZER, P.A.

13   BY:  DANIEL R. LAPINSKI, ESQ.

14   90 Woodbridge Center Drive

15   Suite 900, Box 10

16   Woodbridge, New Jersey 07095

17   732-855-6066

18   dlapinski@wilentz.com

19        Appearing on behalf of the Plaintiffs

20

21

22

23

24

25
```

Ghassan Saed, Ph.D.

```
 1   APPEARANCES (Continued):

 2

 3   RESTAINO LAW LLC

 4   BY:  JOHN M. RESTAINO, JR., ESQ.

 5   130 Forest Street

 6   Denver, Colorado 80220

 7   303-839-8000

 8   JRestaino@RestainoLLC.com

 9       Appearing on behalf of the Plaintiffs

10

11

12   SHOOK, HARDY & BACON, LLP

13   BY:  MARK C. HEGARTY, ESQ.

14   2555 Grand Boulevard

15   Kansas City, Missouri 64108

16   816-474-6550

17   mhegarty@shb.com

18       Appearing on behalf of the Defendant Johnson & Johnson

19

20

21

22

23

24

25
```

Ghassan Saed, Ph.D.

```
 1    APPEARANCES (Continued):

 2

 3    SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

 4    BY:  GEOFFREY M. WYATT, ESQ.

 5    1440 New York Avenue N.W.

 6    Washington, D.C. 20005

 7    202-371-7008

 8    geoffrey.wyatt@skadden.com

 9        Appearing on behalf of the Defendant Johnson & Johnson

10

11

12    GORDON & REES SCULLY MANSUKHANI, LLP

13    BY:  MICHAEL R. KLATT, ESQ.

14    816 Congress Avenue, Suite 1510

15    Austin, Texas 78701

16    512-391-0197

17        Appearing on behalf of the Defendant Imerys Talc America

18

19

20

21

22

23

24

25
```

Ghassan Saed, Ph.D.

```
 1   APPEARANCES (Continued):

 2

 3   COUGHLIN DUFFY LLP

 4   BY:  JONATHAN F. DONATH, ESQ.

 5   350 Mount Kemble Avenue

 6   P.O. Box 1917

 7   Morristown, New Jersey 07962

 8   973-267-0058

 9   jdonath@coughlinduffy.com

10       Appearing on behalf of the Defendant Imerys Talc America

11

12

13   TUCKER ELLIS

14   BY:  JAMES W. MIZGALA, ESQ.

15   233 South Wacker Drive

16   Chicago, Illinois 60606

17   312-624-6300

18   James.mizgala@tuckerellis.com

19       Appearing on behalf of the Defendant PTI

20

21

22

23

24

25
```

Ghassan Saed, Ph.D.

```
1    APPEARANCES (Continued):

2

3    SEYFARTH SHAW LLP

4    BY:  THOMAS T. LOCKE, ESQ.

5    975 F Street, N.W.

6    Washington, D.C. 20004

7    202-463-2400

8    tlocke@seyfarth.com

9        Appearing on behalf of the Defendant PCPC

10

11   ALSO PRESENT:  Marc Myers, Videographer

12

13

14

15

16

17                      *   *   *   *   *   *   *

18

19

20

21

22

23

24

25
```

Ghassan Saed, Ph.D.

```
 1                    TABLE OF CONTENTS

 2   Witness                                          Page

 3   EXAMINATION BY MR. HEGARTY                         17

 4   EXAMINATION BY MR. KLATT                          283

 5   RE-EXAMINATION BY MR. HEGARTY                     316

 6   EXAMINATION BY MS. O'DELL                         319

 7   RE-EXAMINATION BY MR. HEGARTY                     328

 8   RE-EXAMINATION BY MR. KLATT                       337

 9   EXAMINATION BY MR. LOCKE                          339

10

11

12                    INDEX TO EXHIBITS

13            (Exhibits attached to transcript)

14

15   Exhibit                                          Page

16   SAED DEPOSITION EXHIBIT NUMBER 1, COPY OF NOTEBOOK    13

17   BATES SAED000001 - SAED000097, WAS MARKED BY THE

18   REPORTER FOR IDENTIFICATION

19

20   SAED DEPOSITION EXHIBIT NUMBER 2, LAB NOTEBOOK,      13

21   (Retained by Witness) WAS MARKED BY THE REPORTER

22   FOR IDENTIFICATION

23

24

25
```

Ghassan Saed, Ph.D.

```
 1    SAED DEPOSITION EXHIBIT NUMBER 3, LAB NOTEBOOK,        14

 2    (Retained by Witness) WAS MARKED BY THE REPORTER

 3    FOR IDENTIFICATION

 4

 5    SAED DEPOSITION EXHIBIT NUMBER 4, INVOICES, WAS        22

 6    MARKED BY THE REPORTER FOR IDENTIFICATION

 7

 8    SAED DEPOSITION EXHIBIT NUMBER 5, DECEMBER 18,         35

 9    2018 DOCUMENT, WAS MARKED BY THE REPORTER FOR

10    IDENTIFICATION

11

12    SAED DEPOSITION EXHIBIT NUMBER 6, COPY OF CHECK        40

13    DATED 11/2/2017 FOR $15,000, WAS MARKED BY THE

14    REPORTER FOR IDENTIFICATION

15

16    SAED DEPOSITION EXHIBIT NUMBER 7, MOLECULAR BASIS      42

17    SUPPORTING THE ASSOCIATION OF   TALCUM POWDER USE

18    WITH INCREASED RISK OF OVARIAN CANCER, WAS MARKED

19    BY THE REPORTER FOR IDENTIFICATION

20

21    SAED DEPOSITION EXHIBIT NUMBER 8, MOLECULAR BASIS      45

22    SUPPORTING THE ASSOCIATION OF TALCUM POWDER USE

23    WITH INCREASED RISK OF OVARIAN CANCER, WAS MARKED

24    BY THE REPORTER FOR IDENTIFICATION

25
```

Ghassan Saed, Ph.D.

```
 1   SAED DEPOSITION EXHIBIT NUMBER 10, INDEX FOR LAB        78

 2   NOTEBOOK, WAS MARKED BY THE REPORTER FOR

 3   IDENTIFICATION

 4

 5   SAED DEPOSITION EXHIBIT NUMBER 9, PILOT STUDY,          84

 6   WAS MARKED BY THE REPORTER FOR IDENTIFICATION

 7

 8   SAED DEPOSITION EXHIBIT NUMBER 11, NOTEBOOKS,          132

 9   WAS MARKED BY THE REPORTER FOR IDENTIFICATION

10

11   SAED DEPOSITION EXHIBIT NUMBER 12,                     151

12   SAGE PUBLISHING DOCUMENT,

13   WAS MARKED BY THE REPORTER FOR IDENTIFICATION

14

15   SAED DEPOSITION EXHIBIT NUMBER 13,                     157

16   SAGE PUBLISHING DOCUMENT,

17   WAS MARKED BY THE REPORTER FOR IDENTIFICATION

18

19   SAED DEPOSITION EXHIBIT NUMBER 14,                     161

20   COPY OF LETTER FROM REPRODUCTIVE SCIENCES,

21   WAS MARKED BY THE REPORTER FOR IDENTIFICATION

22

23   SAED DEPOSITION EXHIBIT NUMBER 15, JANUARY 14,         173

24   2019 E-MAIL, WAS MARKED BY THE REPORTER FOR

25   IDENTIFICATION
```

Ghassan Saed, Ph.D.

```
 1   SAED DEPOSITION EXHIBIT NUMBER 16, EXPERT REPORT,        175

 2   WAS MARKED BY THE REPORTER FOR IDENTIFICATION

 3

 4   SAED DEPOSITION EXHIBIT NUMBER 17, RESEARCH             214

 5   ARTICLE, WAS MARKED BY THE REPORTER FOR

 6   IDENTIFICATION

 7

 8   SAED DEPOSITION EXHIBIT NUMBER 18, CURRICULUM           278

 9   VITAE, WAS MARKED BY THE REPORTER FOR

10   IDENTIFICATION

11

12   SAED DEPOSITION EXHIBIT NUMBER 19, ABSTRACT             315

13   SUBMITTED TO SGO, WAS MARKED BY THE REPORTER FOR

14   IDENTIFICATION

15

16   SAED DEPOSITION EXHIBIT NUMBER 20, ABSTRACT,            316

17   WAS MARKED BY THE REPORTER FOR IDENTIFICATION

18

19   SAED DEPOSITION EXHIBIT NUMBER 21, ABSTRACT             317

20   FROM SRI, WAS MARKED BY THE REPORTER FOR

21   IDENTIFICATION

22

23

24

25
```

Ghassan Saed, Ph.D.

```
 1                    Detroit, Michigan

 2                    Wednesday, January 23, 2019

 3                    About 9:15 a.m.

 4              THE VIDEOGRAPHER:  We are now on the record.

 5     My name is Marc Myers.  I'm the videographer for Golkow

 6     Litigation Services.  Today's date is January 23rd,

 7     2019.  The time is now 9:15 a.m.  This video deposition

 8     is being held in Detroit, Michigan in regards to the

 9     Johnson & Johnson Talcum Powder Products Marketing,

10     Sales Practices, and Products Liability Litigation,

11     pending in the United States District Court for the

12     District of New Jersey.

13              The deponent is Dr. Ghassan Saed.  And

14     counsel will be noted on the stenographic record.  And

15     will the court reporter please swear in the witness.

16                    DR. GHASSAN SAED,

17     having first been duly sworn, was examined and

18     testified on his oath as follows:

19              MR. HEGARTY:  Before we begin with

20     questioning Dr. Saed, I want to make a note on the

21     record with regard to materials that were produced to

22     us this morning by counsel for Plaintiffs.  Those

23     materials included the original lab notebook for

24     presumably the study that Dr. Saed did that's reported

25     in a manuscript that we were provided as well in
```

Ghassan Saed, Ph.D.

```
 1          advance, and it's our understanding that we were to

 2          have copies of the notebook provided to us in advance

 3          of the deposition.  We were provided with what we

 4          believe to be that notebook that I'm marking as Exhibit

 5          Number 1.

 6                 SAED DEPOSITION EXHIBIT NUMBER 1,

 7                 COPY OF NOTEBOOK BATES SAED000001 - SAED000097,

 8                 WAS MARKED BY THE REPORTER

 9                 FOR IDENTIFICATION

10                 MR. HEGARTY:  That notebook -- those notebook

11          pages begin on Page 30 and go through Page 124 as noted

12          in handwriting on the pages.  They are Bates Numbered 1

13          through 97.

14                 SAED DEPOSITION EXHIBIT NUMBER 2,

15                 LAB NOTEBOOK, (Retained by Witness)

16                 WAS MARKED BY THE REPORTER

17                 FOR IDENTIFICATION

18                 MR. HEGARTY:  The lab notebook we've been

19          provided this morning, which I will designate for

20          purposes of the record as Exhibit Number 2, because we

21          were told that we were not to mark on it and that Dr.

22          Saed would retain it, but the lab notebook provided is

23          Exhibit Number 2, includes Pages 1 through 29 which we

24          were not provided in advance of the deposition.  We

25          believe those pages should have been provided along
```

Ghassan Saed, Ph.D.

```
 1          with the other pages pursuant to Judge Pisano's order

 2          and pursuant to our Notice of Deposition.  Not having

 3          those pages in advance prejudices our right to have a

 4          full and complete opportunity to discuss the lab

 5          notebook with Dr. Saed during his deposition, and we

 6          object to its production here this morning and

 7          certainly reserve our right to seek additional time

 8          with Dr. Saed as well as any other remedies that we

 9          might be entitled to for what we believe to be an

10          untimely production.

11                  Also, I will note for purposes of the record

12          that we received this morning as well another lab

13          notebook that is purported to be a notebook covering an

14          additional set of tests that Dr. Saed did with Fisher

15          Scientific Talc, and make note that there's a reference

16          in the manuscript that we were provided testing done on

17          Fisher Scientific talc.  We'll designate for purposes

18          of the record this notebook is Exhibit Number 3.

19              SAED DEPOSITION EXHIBIT NUMBER 3,

20              LAB NOTEBOOK, (Retained by Witness)

21              WAS MARKED BY THE REPORTER

22              FOR IDENTIFICATION

23                  MR. HEGARTY:  This notebook was not provided

24          nor -- in advance of the deposition nor were any pages

25          of this notebook provided in advance of the deposition.
```

Ghassan Saed, Ph.D.

```
1        We have not had an opportunity to review it to know

2        whether this is pertinent to the manuscript that we'll

3        talk about here today, but also believe that this is

4        likely to also fall within the scope of Judge Pisano's

5        order and certainly within the scope of the Notice of

6        Deposition that we had made.  So we also object to

7        its -- the timeliness of the production of this

8        notebook and, again, we reserve all rights for whatever

9        remedies are appropriate due to this late production.

10             MR. KLATT:  Imerys Talc America joins in what

11        Mr. Hegarty said.  And can we have the agreement we've

12        had that one objection is good for all?

13             MS. O'DELL:  Yes.

14             MR. KLATT:  All defendants join.

15             MS. O'DELL:  So on behalf of the steering

16        committee, let me state that Judge Pisano's order

17        related to the specific -- a specific Notice of

18        Deposition that requested documents regarding the

19        underlying data and study that was reported in Dr.

20        Saed's manuscript as well as his expert report.  That

21        was the subject of the order.  Those materials were

22        provided in compliance with Judge Pisano's order.

23        There was a second general notice that asked for other

24        talc studies.  The additional talc study that's noted

25        in the lab book Exhibit 2 was not a part of Judge --
```

Ghassan Saed, Ph.D.

```
 1          excuse me, was not a part of Dr. Saed's manuscript.
 2                  MR. HEGARTY:  I marked it as Exhibit 3, the
 3          other lab notebook.
 4                  MS. O'DELL:  I'm referring to Exhibit 2, the
 5          initial lab --
 6                  MR. HEGARTY:  Okay, I'm sorry, I thought you
 7          were referring to the second one.
 8                  MS. O'DELL:  I was not.
 9                  MR. HEGARTY:  I'm sorry to interrupt.
10                  MS. O'DELL:  I'm pretty sure you are not
11          sorry you interrupted me, but Exhibit 2 is the lab
12          notebook I'm referring to, and the study that is the
13          basis of the objection was not a part of the manuscript
14          or the report.
15                  Secondly, Exhibit 3 includes a separate and
16          distinct set of data for a Fisher talc study, and we
17          have provided that today, it was published in an
18          abstract and we provided that today in compliance with
19          the second notice of deposition.  So the plaintiff's
20          position is we have provided everything the Judge
21          ordered, everything that's required as part of the
22          notice, and we'll oppose any motion to extend the
23          deposition and keep it open.
24                  MR. HEGARTY:  I do have a question.  You're
25          saying that the lab notebook we designated as Exhibit
```

Ghassan Saed, Ph.D.

```
 1          Number 2 for which you provided copies is not related

 2          to the manuscript that's titled Molecular Basis

 3          Supporting the Association of Talcum Powder Use With

 4          Increased Risk of Ovarian Cancer?

 5                  MS. O'DELL:  That's not what I said.  What I

 6          said is the portion of the lab notebook Exhibit 2,

 7          which you referred to as Pages 1 through 29, are not

 8          reported in the manuscript or the report, the expert

 9          report in this matter, and, therefore, they were not

10          subject Judge Pisano's previous ruling, so that's the

11          distinction that I'm making.  These are materials that

12          were made available to you today and you have full

13          opportunity TO ask Dr. Saed questions about it.

14                  MR. HEGARTY:  I understand.

15     EXAMINATION BY MR. HEGARTY:

16     Q.   Good morning, Dr. Saed.

17     A.   Good morning.

18     Q.   Would you -- strike that.  My name is Mark Hegarty.  I

19          represent the Johnson & Johnson defendants in this

20          matter.  Would you please state your full name for the

21          record, please.

22     A.   Ghassan Saed.

23     Q.   Who is your current employer, Dr. Saed?

24     A.   Wayne State University Medical School.

25     Q.   What is your title?
```

Ghassan Saed, Ph.D.

```
 1    A.   Wayne State University Medical School.

 2    Q.   What is your title there?

 3    A.   Associate professor.

 4    Q.   How long have you held that position?

 5    A.   Eight years about, I'm not --

 6    Q.   Do you also have a separate personal consulting

 7         business for purposes of litigation?

 8    A.   DS Biotech, it's a consulting company.

 9    Q.   Are there any other employees or owners or other

10         individuals involved in DS Biotech besides you?

11    A.   No.

12    Q.   Is your son in any way involved in that business?

13    A.   Just doing some paperwork.

14    Q.   Do you do any business through DS Biotech besides

15         expert witness consulting for litigation?

16    A.   We do consulting for scientific testing for

17         universities, for investigators, we design experiments,

18         we help them write manuscripts.

19    Q.   You said for other investigators or universities.  Do

20         you do any business with any companies?

21    A.   I do, yes.

22    Q.   Can you name a company with whom you do business?

23    A.   Temple Pharmaceuticals.

24    Q.   How long has DS Biotech been in business?

25    A.   2006.
```

Ghassan Saed, Ph.D.

```
 1    Q.    Are you currently named as an expert witness in any
 2          other litigation besides this one?
 3    A.    No.
 4    Q.    Have the fees that you have generated in connection
 5          with your work on this case been directed to DS
 6          Biotech?
 7    A.    Been directed?
 8    Q.    Well, have the fees that you have generated for your
 9          work on this case been paid to DS Biotech?
10    A.    Yes.
11    Q.    Do you receive all of the income from those fees?
12    A.    Through DS Biotech?
13    Q.    Yes.
14    A.    Yes, after I submit taxes and all that.
15    Q.    But you essentially receive the fees even though they
16          were directed to DS Biotech, correct?
17    A.    Correct, the company received it, yes.
18    Q.    Then you have been -- you were paid by the company,
19          correct?
20    A.    Yes.
21    Q.    Were you -- have you been paid by the company the same
22          amount to which the fees generated?
23                MS. O'DELL:  Object to the form.
24                THE WITNESS:  Yeah, I am -- the answer is no.
25
```

Ghassan Saed, Ph.D.

```
 1    BY MR. HEGARTY:

 2    Q.   What portion of the fees have you not been paid --

 3    A.   So we --

 4    Q.   -- through DS Biotech?

 5    A.   So we have to deduct expenses and everything.

 6    Q.   Can you approximate the expenses you have had to deduct

 7         from the fees you've --

 8    A.   I haven't done it for this year yet.

 9    Q.   Do you have any other sources of income besides your

10         work at Wayne State and through DS Biotech?

11    A.   No.

12    Q.   What are you charging Plaintiff's Counsel in this

13         litigation for your work?

14    A.   $600 an hour.

15    Q.   Do you have different rates for deposition or trial

16         testimony?

17    A.   Do I have different rate?

18    Q.   Sure.  The rate you just quoted me was per hour, $600

19         per hour.  Do you have a different per-hour rate if

20         you're being deposed or if you're going to trial?

21    A.   Oh, no.

22    Q.   You have obligations at Wayne State University to

23         disclose financial arrangements --

24    A.   Yes.

25    Q.   -- is that correct?  Have you disclosed your financial
```

Ghassan Saed, Ph.D.

```
 1          arrangement --

 2   A.     Yes.

 3   Q.     -- to Wayne State with regard to your work with

 4          Plaintiff's Counsel in this case?

 5   A.     Yes.

 6   Q.     When did you make that disclosure?

 7   A.     Every year they -- there's a deadline to receive -- to

 8          submit a form which shows consultation efforts, and for

 9          2018 that was submitted 10 days ago.

10   Q.     Who did you identify to whom you were consulting with

11          with regard to that disclosure for purposes of this

12          litigation?

13   A.     DS Biotech and Beasley Allen.

14   Q.     You prepared a report in this case, correct?

15   A.     (Nods head.)

16   Q.     Yes?

17   A.     Did I prepare a report?  Yes.

18   Q.     Did anyone outside of the lawyers for the plaintiffs in

19          this case assist you in any way with that report?

20   A.     No.

21   Q.     Do you know how much you have been paid through the

22          present date for your work in this litigation?

23   A.     Yes.

24   Q.     How much?

25   A.     Approximately 260, something like that.
```

Ghassan Saed, Ph.D.

```
 1   Q.   260,000?

 2   A.   Yes, about that, maybe a little bit less, I don't know,

 3        I can't remember the exact number.

 4             SAED DEPOSITION EXHIBIT NUMBER 4,

 5             INVOICES,

 6             WAS MARKED BY THE REPORTER

 7             FOR IDENTIFICATION

 8   BY MR. HEGARTY:

 9   Q.   I'm marking as Exhibit Number 4, Dr. Saed, copies of

10        invoices that we were provided in advance of the

11        deposition.  Would you look at Exhibit Number 4, and

12        tell me whether those are copies of all the invoices

13        you have generated for purposes of your work in this

14        case?

15   A.   Yeah, they look fine to me.

16   Q.   The last invoice we were provided is dated November 16,

17        2018, that's the issue date.  Have you prepared any

18        additional invoices since that date?

19   A.   No.

20   Q.   Have you spent additional time on this case for which

21        you intend to prepare an invoice --

22   A.   Yes.

23   Q.   -- since that date?

24   A.   Yes.

25   Q.   How much additional time have you spent that you have
```

Ghassan Saed, Ph.D.

```
 1         not yet invoiced?

 2    A.   Approximately 100, 110 hours.

 3    Q.   The invoices show that they were issued by DS Biotech,

 4         that's the company we talked about earlier, is that

 5         correct?

 6    A.   Yes.

 7    Q.   There are no other employees of DS Biotech besides

 8         yourself, is that correct?

 9    A.   And help from my son, paperwork part-time.

10    Q.   Is he a paid employee?

11    A.   No.

12    Q.   The first page of Exhibit Number 4 with an issue date

13         of the invoice 10-30-2017 includes just a single word

14         in the description Consulting with no corresponding

15         date.  What is the date of the first consulting entry

16         that you have listed on the first page of Exhibit

17         Number 4?

18    A.   10-30, so what's the -- I'm sorry.

19    Q.   Let me ask, Exhibit Number 4, the first page refers to

20         an invoice of $20,400 at a unit price of $600, so there

21         would be several hours, you spent several hours doing

22         something that generated that invoice, correct?

23    A.   Yes.

24    Q.   When did that something start?  When is the first time

25         that you spent anytime on this matter on behalf of
```

Ghassan Saed, Ph.D.

```
 1            Beasley Allen?

 2    A.   So I started October, maybe 1st of October, maybe

 3         before that, I can't remember the exact date.

 4    Q.   What is your best estimate?

 5    A.   I would say end of September.

 6    Q.   So the first invoice -- I'm sorry, go ahead.

 7    A.   Go ahead.

 8    Q.   So the first invoice on Exhibit Number 4 would reflect

 9         the time you spent from approximately the end of

10         September through October 30th, 2017, correct?

11    A.   Correct.

12    Q.   Can you describe for me with regard to the first

13         invoice the type of work that you did between the

14         first -- between the end of September and the date of

15         this first invoice?

16    A.   Sure.  So this was time for meetings, meeting with them

17         and reviewing literature basically.

18    Q.   You said meeting with them.  Who is "them"?

19    A.   With Beasley Allen.

20    Q.   Which attorneys from Beasley Allen did you meet with?

21    A.   Dr. Thompson, Mrs. --

22              MS. O'DELL:  O'Dell.

23              THE WITNESS:  -- O'Dell and Jennifer --

24         what's her last name?

25
```

Ghassan Saed, Ph.D.

```
 1    BY MR. HEGARTY:

 2    Q.   Do you recall the date of your first contact by Beasley

 3         Allen?

 4    A.   Around middle of August.

 5    Q.   How was that contact made?

 6    A.   A phone call.

 7    Q.   A phone call to you?

 8    A.   Yes.

 9    Q.   Who called you?

10    A.   Dr. Thompson.

11    Q.   Did you know Dr. Thompson before the call?

12    A.   No.

13    Q.   Apart from -- or strike that.  What did she tell you

14         when she first called you?

15    A.   She told me that they would like to meet with me to

16         discuss the possibility of acting as a witness expert

17         in ovarian cancer inflammation and oxidative stress.

18    Q.   Did you agree to serve as a retained expert on behalf

19         of Beasley Allen at that first call?

20    A.   No.

21    Q.   What else were you told by Miss Thompson during that

22         phone call?

23    A.   We just basically talked about setting a meeting and we

24         did.

25    Q.   You said that she told you that they would like to meet
```

Ghassan Saed, Ph.D.

```
 1          with you to discuss the possibility of acting as a
 2          witness, expert witness on cancer inflammation and
 3          oxidative stress.  Was there a reference during that
 4          call to talc exposure?
 5     A.   No.
 6     Q.   So talc was not brought up --
 7     A.   In the conversation, no.
 8     Q.   -- in the first call.  Was the fact that they were
 9          representing clients or that they were wanting to talk
10          to you in connection with a litigation, was that
11          discussed?
12     A.   In the phone call, no.
13     Q.   Did she identify herself as a lawyer?
14     A.   Yes, and the firm.
15     Q.   What was your understanding as far as why a lawyer from
16          Beasley Allen would want to talk to you about
17          inflammation and oxidative stress?
18     A.   Because -- so, oh, so you're telling me if she told me
19          she is the lawyer on behalf of the defendants, I mean
20          the plaintiffs in ovarian cancer cases and talc?
21     Q.   Yes.
22     A.   She, yes, she identified herself as such.
23     Q.   So you understood that the --
24     A.   Yes.
25     Q.   -- consulting that you would be doing would be with
```

Ghassan Saed, Ph.D.

```
 1          regard to in some way to talc, correct?

 2                  MS. O'DELL:  Object to the form.

 3                  THE WITNESS:  No.  I was asked to serve as a

 4          witness expert in my specialty, which is what we did

 5          and what I do for the last 30 years, ovarian cancer,

 6          oxidative stress, and inflammation.

 7      BY MR. HEGARTY:

 8      Q.  As of the time of that phone call, your specialty was

 9          not talc, correct?

10      A.  My specialty is anything that induces inflammation and

11          oxidative stress that is linked to ovarian cancer.

12      Q.  But at the time of that first call you had done no

13          studies involving talc, correct?

14      A.  No, no studies, but I was really interested in it

15          because of the media reports that's going at the time.

16      Q.  And at the time of that first call you had done no

17          analysis of the medical literature with regard to talc

18          and ovarian cancer, correct?

19                  MS. O'DELL:  Objection.

20                  THE WITNESS:  Not correct.

21      BY MR. HEGARTY:

22      Q.  What analysis of the medical literature had you done

23          with regard to talc and ovarian cancer prior to the

24          call from Miss Thompson?

25                  MS. O'DELL:  Doctor, if you'll give me just a
```

Ghassan Saed, Ph.D.

```
 1          moment after Mark's question so I can object if I need

 2          to.

 3                    THE WITNESS:  Oh, I'm sorry.

 4                    MS. O'DELL:  Thank you.

 5                    THE WITNESS:  Where are we now?

 6     BY MR. HEGARTY:

 7     Q.   Yes, I said -- my question was what analysis of the

 8          medical literature had you done with regard to talc and

 9          ovarian cancer prior to the call from Miss Thompson?

10     A.   Reading the literature.

11     Q.   What literature had you read?

12     A.   I read the epidemiology studies, I read some of the

13          molecular studies, I read what's in the news, I read

14          everything, I listened to the news, that's my interest,

15          it's ovarian cancer and inflammation.

16     Q.   What epidemiologic studies had you read prior to the

17          call from Miss Thompson?

18     A.   I read -- the exact one?

19     Q.   Yes.

20     A.   I can't remember exact one, but I read several studies.

21     Q.   Can you identify the names of any studies, whether by

22          author or study name, that you had read prior to the

23          call from Miss Thompson?

24                    MS. O'DELL:  Object and asked and answered.

25                    THE WITNESS:  Yeah.  I mean I can look it up
```

Ghassan Saed, Ph.D.

```
 1          for you, but the cohort study is what I read, and I
 2          read some other studies.  I can't remember exactly.
 3    BY MR. HEGARTY:
 4    Q.    When in relation to the call from Miss Thompson had you
 5          read the medical literature you just described?
 6    A.    Sorry, I missed that.
 7    Q.    When in relation to the call from Miss Thompson in
 8          August of 2017 had you read the literature you just
 9          talked about, the epi studies, the molecular studies?
10    A.    Yeah, it's over the past year prior.
11    Q.    What was it that prompted you to review those materials
12          in the first place?
13    A.    The media reports.
14    Q.    What media reports?
15    A.    People talking about the risk of ovarian cancer and
16          talc powder use, it was all over the place.
17    Q.    As of the time that Miss Thompson called, you had done
18          no studies yourself involving talc, correct?
19    A.    Lab studies?
20    Q.    Lab studies.
21    A.    No.
22    Q.    You had done no other study besides reading the
23          literature, correct?
24                  MS. O'DELL:  Objection to form.
25                  THE WITNESS:  Other studies related to talc?
```

Ghassan Saed, Ph.D.

```
 1   BY MR. HEGARTY:

 2   Q.   Correct.

 3   A.   I didn't do any studies related to -- lab studies

 4        related to talc before that, yes.

 5   Q.   And as of the time that Miss Thompson called you, had

 6        you formed any opinions with regard to talc and ovarian

 7        cancer?

 8   A.   Formed an opinion?

 9   Q.   Yes, as to whether there's a causal link between talc

10        and ovarian cancer?

11   A.   It's always my opinion that anything that causes

12        inflammation, redox imbalance, is linked to increased

13        risk of ovarian cancer.  This is the core of my work.

14   Q.   So it's always been your opinion that anything that

15        causes inflammation will cause ovarian cancer?

16             MS. O'DELL:  Object to the form.

17             You may answer.

18             THE WITNESS:  No.  I said that anything that

19        induces inflammation, alter the redox balance is

20        potential for increasing risk of ovarian cancer, yes.

21   BY MR. HEGARTY:

22   Q.   As of the time that Miss Thompson called you, what

23        medical studies reported that talc altered the redox

24        balance leading to inflammation?

25   A.   There was one study of Shukla, I think, and they
```

Ghassan Saed, Ph.D.

```
 1        measured the effect of -- they measured the reactive

 2        oxygen species especially dihydrogen peroxide H2O2, and

 3        they found a dose response effect when exposure to

 4        talc.

 5   Q.   From that one study you came to the opinion that --

 6   A.   No.

 7   Q.   -- talc use causes redox imbalance that leads to

 8        inflammation that leads to ovarian cancer?

 9             MS. O'DELL:  Object to the form.

10             THE WITNESS:  No.  What I said that my

11        interest is inflammation and redox balance and

12        imbalance and reactive oxygen species, so anything that

13        able at the cellular level to alter this, manipulate

14        this, is a candidate, is a potential risk to ovarian

15        cancer.

16   BY MR. HEGARTY:

17   Q.   As of the time that Miss Thompson called you, had you

18        come to the opinion that talc used by women did alter

19        the redox balance?

20             MS. O'DELL:  Objection, asked and answered.

21             You may answer.

22             THE WITNESS:  Repeat the question, please.

23   BY MR. HEGARTY:

24   Q.   Sure.  As of the time that you received the call from

25        Miss Thompson, what opinion did you have with regard to
```

Ghassan Saed, Ph.D.

```
 1        talc and ovarian cancer?

 2   A.   That talc is a potential inducer of inflammation, and

 3        it induces and increases risk of ovarian cancer.

 4   Q.   Those opinions came from your review -- from the media

 5        reports and your review of the literature you

 6        described?

 7   A.   Uh-huh.

 8   Q.   Is that correct?

 9   A.   Correct.

10   Q.   With regard to the invoices we marked as Exhibit

11        Number 4, do these reflect only your time spent in this

12        case?

13   A.   Correct.

14   Q.   Are you able to break down from these invoices the

15        amount of hours you spent reviewing literature?

16   A.   From the first one?

17   Q.   From the first one through the end.

18   A.   The answer is no, because I always review literature,

19        this is my job, that's what I do for a living, I review

20        literature every single day.

21   Q.   After being contacted by Miss Thompson, did you review

22        literature with regard to this subject area, talc and

23        ovarian cancer, that you had not reviewed before?

24   A.   Yes.

25   Q.   Are you able to break down from these invoices the
```

Ghassan Saed, Ph.D.

```
 1          amount of time you spent writing your expert report?
 2    A.    There is actually one that actually state -- no, no,
 3          where is it?  I thought there was one saying expert
 4          report.  I can identify it, yes.
 5    Q.    You can't identify it?
 6    A.    I can, just give me one second.  Yes, it's this one.
 7    Q.    The very last one?
 8    A.    Yes.
 9    Q.    Does the very last one represent the amount of time you
10          spent writing your report?
11    A.    Correct.
12    Q.    Are you able to break down from the invoices the amount
13          of time you spent talking with lawyers for Beasley
14          Allen?
15    A.    No.
16    Q.    You prepared a manuscript which we'll talk about today
17          that has been submitted to the Journal for Reproductive
18          Sciences entitled Molecular Basis Supporting the
19          Association of Talcum Powder Use With Increased Risk of
20          Ovarian Cancer.  Are you familiar with that?
21    A.    Yes.
22    Q.    Did you bill the time you spent preparing that
23          manuscript to lawyers for Beasley Allen?
24    A.    For this one?  Yes.
25    Q.    Is that reflected in these invoices?
```

Ghassan Saed, Ph.D.

```
 1    A.   Yes.

 2    Q.   Are you able to tell me how much time you spent

 3         preparing that manuscript that's reflected in the

 4         invoices we marked as Exhibit Number 4?

 5    A.   Exactly, no.

 6    Q.   Can you approximate it in any way?

 7    A.   Yes.

 8    Q.   What's your approximation?

 9    A.   I would say about 60 to 70 hours.

10    Q.   There are other authors on that paper, correct?

11    A.   Correct.

12    Q.   Did you bill their time to Beasley Allen for their work

13         on the manuscript?

14    A.   No.

15    Q.   How was their time paid for?

16    A.   So some of them are, if you look at the names, some of

17         them are the department chair, Dr. Morris, and this is

18         an academic institution, we don't bill for the time of

19         consultants or coworkers or co-authors.  The research

20         technicians was paid from my lab, and Amy Harper is a

21         fellow, OB-GYN oncology fellow, and they're paid for

22         fellowships through the department, so we don't bill

23         for their time.

24    Q.   I'm marking as Exhibit Number 5 -- I'm sorry, go ahead.

25    A.   Go ahead.
```

Ghassan Saed, Ph.D.

```
 1    Q.    You were saying something.

 2    A.    I said the only time billed to this from the manuscript

 3          is my time.

 4    Q.    I'm marking this as Exhibit Number 5, a copy of another

 5          document we were provided in advance of the deposition.

 6                SAED DEPOSITION EXHIBIT NUMBER 5,

 7                DECEMBER 18, 2018 DOCUMENT,

 8                WAS MARKED BY THE REPORTER

 9                FOR IDENTIFICATION

10    BY MR. HEGARTY:

11    Q.    Can you tell me what Exhibit Number 5 is?

12    A.    So this is the cost of this project since the beginning

13          till now from my lab from my side.

14    Q.    This listing of costs was sent to you by a Sharon Pepe?

15    A.    The contract -- the grants and contract manager, yes.

16    Q.    Who is that?

17    A.    The financial manager of our department, grants and

18          contract.

19    Q.    How did she come to send you this document on

20          December 18, 2018?

21    A.    How come?

22    Q.    Yes.

23    A.    I asked her.  Every year they give us a budget balance

24          of each account that we have.

25    Q.    Why did you ask her to send you the accounting of the
```

Ghassan Saed, Ph.D.

```
 1          costs for your talc project that she did on

 2          December 18, 2018?

 3    A.    I always ask for all my projects accounts.

 4    Q.    Where is the documentation or accounting of the time

 5          you spent, the lab supplies, the equipment, services,

 6          isn't there a separate list that breaks down the hours

 7          or the costs for personnel time and lab supplies,

 8          equipment, services?

 9              MS. O'DELL:  Objection.

10              THE WITNESS:  Yeah, so the question is these

11          numbers came from breakdown of expenses, receipts.  We

12          do have receipts for all the expenses from the lab.

13    BY MR. HEGARTY:

14    Q.    Do you have receipts for, that document all the time

15          that is under the heading personnel?

16    A.    So the only personnel that's paid was Dr. Fletcher and

17          part-time my research assistant, medical student Ira,

18          she was paid part-time, but full-time salary was paid

19          for Nicole from this budget.

20    Q.    Who paid --

21    A.    That's included in what they call indirect.

22    Q.    Let me finish, Doctor, who paid for Ira and Nicole's

23          time?

24    A.    My lab.

25    Q.    When you say your lab, you're talking about your lab at
```

Ghassan Saed, Ph.D.

```
 1          Wayne State?

 2    A.    Yes.

 3    Q.    And where did the funds come from that your lab could

 4          use to pay Ira and Nicole?

 5    A.    I have discretion funding for my lab.

 6    Q.    I'm sorry?

 7    A.    I have funds available for me to my lab.

 8    Q.    Who provides those funds?

 9    A.    The department.

10    Q.    So the department paid for Ira's and Nicole's time to

11          work on this talc project?

12    A.    Correct.

13    Q.    The total listed there is $94,957.  How much of that

14          went to Ira and Nicole?

15    A.    Most of that went to Nicole, I can't remember exact,

16          but most of that went to Nicole because she was a

17          full-time post doc at the time.

18    Q.    Do you know where the department received the funds

19          that were used to pay Ira and Nicole?

20                MS. O'DELL:  Object to the form.

21                THE WITNESS:  I missed that.

22    BY MR. HEGARTY:

23    Q.    Sure.  I think you said the department paid for Ira's

24          and Nicole's time.  From where did the department get

25          the funds they used to pay for Ira and Nicole's time?
```

Ghassan Saed, Ph.D.

```
 1   A.   Let me explain that.  So I get fund from the department
 2        in the form of an account, and the personnel is billed
 3        into this account.
 4   Q.   So where did the funds come from that you get access
 5        to?
 6   A.   From the department.
 7   Q.   And where does the department get them from?
 8   A.   Ask them, I don't know.  They have fund for scientists
 9        to do, develop.
10   Q.   Who would have the receipts of all the expenses and the
11        costs associated with this project?
12   A.   Sharon.
13   Q.   She notes that the costs listed are for your talc
14        project from October 1, 2017.  Is that the date on
15        which the talc project started incurring expenses?
16   A.   I think so, yes.
17   Q.   The document notes that this does not include your
18        effort costs.  What does that mean?
19   A.   My salary.
20   Q.   Your salary at Wayne State?
21   A.   Yes.
22   Q.   So you were paid a salary at Wayne State but you were
23        also paid by Beasley Allen to do this talc project,
24        correct?
25             MS. O'DELL:  Object to the form.
```

Ghassan Saed, Ph.D.

```
 1                  THE WITNESS:  I was paid as a consultant for
 2        my time.
 3   BY MR. HEGARTY:
 4   Q.   Now, all the work that you did on the talc project was
 5        paid for in an hourly way by Beasley Allen, correct?
 6   A.   No.
 7   Q.   What time that you spent on the talc project was not
 8        paid for by Beasley Allen?
 9   A.   It's the time I spent in the lab doing my duties.
10   Q.   The time you spent in the lab doing your duties on this
11        project?
12   A.   On this project, on other projects, too.
13   Q.   So there was time you spent on the talc project that
14        you did not bill to Beasley Allen?
15   A.   Correct.
16   Q.   How did you divide that, the time that you did bill
17        Beasley Allen for on the talc project and the time you
18        didn't?
19   A.   So the time I work for extra, additional work, I billed
20        them, like overtime, I worked Saturdays, I worked
21        weekends, I write, I read.
22   Q.   Can you estimate the amount of time that you spent on
23        the talc project that you did not bill Beasley Allen?
24   A.   Hour, hours you're talking?
25   Q.   By hours.
```

Ghassan Saed, Ph.D.

```
 1   A.   I can't.  I didn't -- I never thought about it like

 2        that.

 3   Q.   Does Exhibit Number 5 capture all of the personnel, lab

 4        supplies, equipment, services, costs for this project?

 5   A.   From my lab, yes.

 6   Q.   Have there been any such costs incurred since

 7        December 18, 2018?

 8   A.   What's the last date here?  Since what's the --

 9   Q.   Since the date of this document, have there been

10        additional costs incurred for the talc project?

11   A.   No.

12   Q.   Dr. Saed, we were also provided today with what I'm

13        marking as Exhibit Number 6.

14             SAED DEPOSITION EXHIBIT NUMBER 6,

15             COPY OF CHECK DATED 11/2/2017 FOR $15,000,

16             WAS MARKED BY THE REPORTER

17             FOR IDENTIFICATION

18   BY MR. HEGARTY:

19   Q.   Would you please identify for me what Exhibit Number 6

20        is.

21   A.   This is a retainer check for my consulting work.

22   Q.   Did you ask for a retainer in connection with your

23        consulting work or did they offer to provide that to

24        you?

25   A.   I can't remember.
```

Ghassan Saed, Ph.D.

```
 1    Q.   With regard to the invoices and the retainer, have you

 2         been paid for all the invoices?

 3    A.   I have been paid for these invoices, yes.

 4    Q.   So with regard to the amount of the check, that was

 5         $15,000, correct?

 6    A.   The retainer check?  Yes.

 7    Q.   Yes, and the date of the invoice is October 19, 2017?

 8    A.   Which invoice?

 9              MS. O'DELL:  Object to the form.

10              THE WITNESS:  Which invoice?

11    BY MR. HEGARTY:

12    Q.   Well, there's an invoice date listed at the bottom of

13         the check of October 19, 2017.  Do you see that?

14              MS. O'DELL:  I would just state for the

15         record that there are no additional invoices, that that

16         is my belief that data was put in by our Accounting

17         Department when the request was made, so there's no

18         invoice that has not been disclosed if that's --

19              MR. HEGARTY:  That was going to be my next

20         question.

21              The date of the check is November 2nd, 2017,

22         correct?

23              THE WITNESS:  Correct.

24    BY MR. HEGARTY:

25    Q.   And all these funds went to you, correct?
```

Ghassan Saed, Ph.D.

```
 1    A.    The 15,000?

 2    Q.    Yes.

 3    A.    Yes.

 4                SAED DEPOSITION EXHIBIT NUMBER 7,

 5                MOLECULAR BASIS SUPPORTING THE ASSOCIATION OF

 6                TALCUM POWDER USE WITH INCREASED RISK OF OVARIAN

 7                CANCER, WAS MARKED BY THE REPORTER

 8                FOR IDENTIFICATION

 9    BY MR. HEGARTY:

10    Q.    I'm going to mark next as Exhibit Number 7 a copy of a

11          manuscript we've been provided, which I referenced

12          earlier, the manuscript that I marked as Exhibit

13          Number 7 is entitled Molecular Basis Supporting the

14          Association of Talcum Powder Use With Increased Risk of

15          Ovarian Cancer.  Do you see what I'm referring to,

16          Doctor?

17    A.    Yes.

18    Q.    First of all, is this the current version of the paper

19          you submitted to Reproductive Sciences?

20    A.    Yes.

21    Q.    Do you have prior drafts of this paper in your office

22          or in your possession?

23    A.    Do I have drafts?

24    Q.    Correct.

25    A.    Like --
```

Ghassan Saed, Ph.D.

```
 1    Q.   Well, let me explain.  Go to the very last page of

 2         Exhibit Number 7.

 3    A.   Okay.

 4    Q.   Very last page.

 5    A.   Okay.

 6    Q.   There's an e-mail there.

 7    A.   Oh.

 8    Q.   Of December 26, 2018, which would indicate that you

 9         submitted the paper in advance of that date, yet on the

10         first page of Exhibit Number 7 it reports the date

11         submitted by the author of January 3rd, 2019.  So there

12         must have been a prior manuscript submitted to

13         Reproductive Sciences before Exhibit Number 7, correct?

14    A.   Hold on.  I need to digest this.  Can you repeat that,

15         please?

16    Q.   Sure.

17    A.   What are we talking about?

18    Q.   The e-mail that you're looking at is dated December 26,

19         2018, correct?

20    A.   Yes.

21    Q.   That e-mail refers to a manuscript you had submitted,

22         which would have been submitted before that date,

23         correct?

24    A.   Yes.

25    Q.   The first page of Exhibit Number 7 in the date
```

Ghassan Saed, Ph.D.

```
 1          submitted by the author section says January 3rd, 2019,
 2          which is after December 26, 2018.  So my question is
 3          where is the manuscript that was submitted before
 4          December 26, 2018?
 5   A.     Okay.  So when you submit a manuscript, they return
 6          they usually give you some corrections or editing to
 7          do, and then you do the editing, and then you resubmit
 8          the manuscript, so I have both copies.  Are you
 9          interested to see the one that went to revision versus
10          the one after revision?
11   Q.     You have the copy that you initially sent to
12          Reproductive Sciences which is the one referred to in
13          the e-mail of December 26, 2018?
14   A.     Sure.
15   Q.     Are there only two drafts of the manuscript, the one
16          you submitted prior to December 26, 2018 and the one we
17          marked as Exhibit Number 7?
18   A.     For Reproductive Science, yes.
19   Q.     Have you made any revisions to the document that we
20          have marked as Exhibit Number 7?
21   A.     Let's see if I remember, so this is the first -- which
22          one is this, okay, because there is one original that
23          we submitted.
24   Q.     Correct.
25   A.     Went to review, the reviewer asked for some
```

Ghassan Saed, Ph.D.

```
 1          modification, I did it and resubmit it.

 2    Q.   Is Exhibit Number -- I'm sorry, go ahead.

 3    A.   So this, I can't remember is this the most recent one

 4         or not.

 5    Q.   Did you bring a copy today?

 6    A.   I have a copy.

 7    Q.   You brought a copy from your office?

 8    A.   Yeah, this is a copy from my office.

 9    Q.   May I see it, please?

10    A.   Yes.

11              SAED DEPOSITION EXHIBIT NUMBER 8,

12              MOLECULAR BASIS SUPPORTING THE ASSOCIATION OF

13              TALCUM POWDER USE WITH INCREASED RISK OF OVARIAN

14              CANCER,

15              WAS MARKED BY THE REPORTER

16              FOR IDENTIFICATION

17    BY MR. HEGARTY:

18    Q.   I'm going to mark as Exhibit Number 8 a copy of the

19         article or manuscript that Dr. Saed just provided to

20         me.  At least the cover page contains the same date

21         submitted by the author date.  Would you look at the

22         two Exhibit Number 7 and Exhibit Number 8, and tell me

23         whether they are the same?

24    A.   Yeah, it looks the same to me.

25    Q.   So have there been any additional revisions to the
```

Ghassan Saed, Ph.D.

```
 1          manuscript that we've marked as 7 and 8?

 2     A.   No.  We revised it according to the reviewer's comment

 3          and resubmitted it, and then it was officially

 4          accepted.

 5     Q.   Did you submit the manuscript to any other journals?

 6     A.   Prior to this?

 7     Q.   Prior to this.

 8     A.   Yes.

 9     Q.   What journals did you submit to?

10     A.   OB-GYN Oncology.

11     Q.   When did you submit the manuscript to OB-GYN Oncology?

12     A.   I'm not good on dates.

13     Q.   You submitted it before --

14     A.   Prior.

15     Q.   Prior to submitting it to Reproductive Sciences?

16     A.   Correct.

17     Q.   Are you able to estimate when you completed the

18          manuscript such that it could be submitted to a

19          journal?

20     A.   I would say -- what's the date now -- September,

21          October, September maybe around.

22     Q.   Did you get a response from OB-GYN Oncology to your

23          submission?

24     A.   I did.

25     Q.   What was their response?
```

Ghassan Saed, Ph.D.

```
 1   A.   That I needed to do in vivo, additional in vivo animal

 2        experiments.

 3   Q.   That you needed to do additional in vivo animal

 4        experiments before they would agree to publish your

 5        paper; is that correct?

 6   A.   No, they -- usually the basis of their rejection, this

 7        is a review of comment, not the editor request, so

 8        comments you can do, you can agree with or you can

 9        disagree with.  So I always publish papers and I'm very

10        familiar with this process.  So there's a distinction

11        between editor's opinion and reviewer's comment.  So

12        reviewer comments, they're not bound -- I'm not bound

13        to their comments.  I may agree with them and I may

14        disagree with them.  So the reviewer -- the editor,

15        they usually, their policy, they use it based on

16        reviewer's comment, that's part of the concentration,

17        the other part will be the how many -- the volume, how

18        many they receive and priority for the articles to be

19        published.

20   Q.   So as to the chronology, you completed a draft of your

21        manuscript that we marked as Exhibit Number 7 and 8,

22        you submitted that manuscript initially to OB-GYN

23        Oncology --

24   A.   Correct.

25   Q.   -- in the September 2018 time frame?
```

Ghassan Saed, Ph.D.

```
 1    A.   Correct.

 2    Q.   They, based on correspondence with you, sent that paper

 3         to peer reviewers, correct?

 4    A.   Correct.

 5    Q.   How many peer reviewers did they send it to?

 6    A.   I don't know.

 7    Q.   How many comments back from peer reviewers did you

 8         receive, just by peer reviewer number?

 9    A.   I know, but I'm trying to remember, maybe one or two, I

10         can't remember, I think two.

11    Q.   You mentioned one of the comments was --

12    A.   But two that they commented.  So usually they send it

13         to more.  If they have no comments, they don't include

14         them.

15    Q.   One of the reviewers commented that you needed to do

16         additional in vivo animal studies to show the same

17         effect that you reported in cell cultures that you did,

18         correct?

19              MS. O'DELL:  Object to form.

20              THE WITNESS:  No.

21    BY MR. HEGARTY:

22    Q.   What did he say or she say?

23    A.   It was said that this is very exciting work,

24         interesting work, has a biological relevance, it would

25         be interesting to see if this can be shown in vivo.
```

Ghassan Saed, Ph.D.

```
 1   Q.   Do you remember anything else that was said in those
 2        comments besides what you provided to us this morning?
 3   A.   Yeah, they like it, they love my work.
 4   Q.   Anything else you can recall from the comments?
 5   A.   No, this is positive and it's good data that they need
 6        to -- complimented with.
 7   Q.   So with regard to the comments, then what -- strike
 8        that.  OB-GYN Oncology rejected your paper, correct?
 9   A.   They said that -- yeah, they said that we don't want --
10        priority at this time.
11   Q.   Did they say why they rejected your paper?
12   A.   They say we have lot of papers received by the journal
13        and it's not a priority right now.
14   Q.   Do you have all the documents of your submission to
15        OB-GYN Oncology and their -- the comments and other
16        documents that you received back in connection with
17        that submission?
18             MS. O'DELL:  Object to the form.
19   BY MR. HEGARTY:
20   Q.   Yes?
21   A.   I want to see -- what's the question?  Sorry.
22   Q.   Sure.  Do you have the documentation, all the documents
23        of your submission to OB-GYN Oncology and their
24        response back?
25   A.   You mean the manuscript?
```

Ghassan Saed, Ph.D.

```
 1   Q.   The manuscript, your cover letter, the letter back, the

 2        comments, the comments you received back, do you have

 3        all that material?

 4   A.   Yes.

 5   Q.   Is that back in your office?

 6   A.   It's in my office, yes.  You talking about manuscript,

 7        right?

 8   Q.   Well, the manuscript and the reviewer comments.

 9   A.   And the reviewer comments, yes.

10   Q.   You chose not to do or try to replicate your results in

11        an in vivo animal model, correct?

12   A.   No, it's not correct, I didn't choose, I just don't

13        have the time to do it and the money.

14   Q.   Did you submit your manuscript to any other journals

15        besides OB-GYN Oncology and Reproductive Sciences?

16   A.   No.

17   Q.   How did you choose to submit your journal first to

18        OB-GYN Oncology?  Why did you choose that journal?

19   A.   Those, the OB-GYN Oncology and Reproductive Sciences

20        are the major societies for our specialty, and most

21        readers -- OB-GYN readers read those two manuscripts, I

22        mean journals.

23   Q.   Of your specialty, which specialty is that?

24   A.   Like our -- like in the field of OB-GYN research.

25   Q.   And what resource do you have that Reproductive
```

Ghassan Saed, Ph.D.

1        Sciences is a journal that most in your specialty

2        review or read?

3               MS. O'DELL:  Object to the form.

4               THE WITNESS:  I mean do I have a number?  Or

5        you mean the source where I got that from?

6    BY MR. HEGARTY:

7    Q.   Yeah, where did you get that from?

8    A.   From my experience with them for the last 25 years.

9    Q.   Have you published in that journal before?

10   A.   Yes.

11   Q.   Have you published in OB-GYN Oncology before?

12   A.   Yes.

13   Q.   Is there such a thing as something called an impact

14       factor of a journal?

15   A.   Correct.

16   Q.   Do you know what the impact factor is of Reproductive

17       Sciences?

18   A.   About 3, 2.8 something.

19   Q.   How about OB-GYN Oncology?

20   A.   4, the upper 5, the upper 4, 5, 4.6, 5 maybe.

21   Q.   We were also, as we talked earlier, provided with the

22       original lab notebook that -- in connection with the

23       article that you have submitted to Reproductive

24       Sciences and that you submitted to OB-GYN Oncology.  Is

25       what we've designated as Exhibit Number 2 all of the --

Ghassan Saed, Ph.D.

```
1          does it represent all the work that you did that went

2          into the paper we marked as Exhibit Number 7?

3                    MS. O'DELL:  Object to the form.

4                    THE WITNESS:  So, yeah, so this part starting

5          here, from here all the way to the end, that represents

6          everything in the manuscript.

7     BY MR. HEGARTY:

8     Q.   You're pointing to 30?

9     A.   From here, yes.

10                   MS. O'DELL:  To the end.

11                   THE WITNESS:  To the end.

12    BY MR. HEGARTY:

13    Q.   What is contained in Pages 1 through 29?

14    A.   This is like preliminary trials that we were running,

15         testing, so forth, the talc.

16    Q.   Do Pages 1 through 29 represent activities as part of

17         the work that generated the results contained on

18         Pages 30 thereafter?

19    A.   No.

20    Q.   What does it represent, then?

21    A.   It's a trial, it's a pilot experiment to tune-up the

22         technique.

23    Q.   When did this -- this pilot experiment goes back, at

24         least based on the date of the notebook, to 10-15-17?

25    A.   Correct.
```

Ghassan Saed, Ph.D.

```
 1   Q.   Is it -- do you always do pilot experiments before you
 2        do an experiment like this?
 3   A.   Sure.
 4   Q.   Why do you always do a pilot experiment?
 5   A.   You need to figure out the right conditions, right
 6        concentration, the right incubation time.
 7   Q.   And how does a pilot study provide that information?
 8   A.   I don't understand what you mean.
 9   Q.   How does a pilot study provide you with information to
10        know you're using the right conditions, the right
11        concentration?
12   A.   So when you use a concentration of 1,000 microgram per
13        ml and it kills your cells, you know it's toxic, you
14        should go lower.
15   Q.   Is that what you did here?
16   A.   Yes.
17   Q.   Do you do any other testing like that to determine the
18        parameters of your later tests?
19   A.   Sorry, I don't understand.
20   Q.   Well the test you just described is sort of that it, it
21        sort of set an upper limit of where you could go before
22        you kill the cells, right?
23             MS. O'DELL:  Object.
24             THE WITNESS:  Just an example, I'm giving you
25        an example.
```

Ghassan Saed, Ph.D.

```
 1    BY MR. HEGARTY:

 2    Q.   An example.  Do you recall anything specific that you

 3         did in the pilot study that helped you define the

 4         parameters of the later study that you did?

 5    A.   Other than the dose, most of the technology and the

 6         methods that we used, it's really standard in our

 7         laboratory, we have published them, we -- and not just

 8         us, it's standard accepted technology everywhere in

 9         this field.

10    Q.   And how did the pilot study that's reflected in Exhibit

11         Number 2 inform you as to the studies -- study that you

12         did that are reflected in the rest of the pages?

13    A.   Yes, so basically we looked at the dose here and this

14         pilot study showing that the initial dose was high and

15         it was like 500 microgram per ml to a thousand, that's

16         how we started, and we figured out that this dose

17         killed the cells and induced some toxicity, so this is

18         why we learned from this, and then we turned up the

19         CA-125 assay, this is turning up the assay to see how

20         much you need to use.  Is it from the media?  Is it

21         from the cell?  You need to set up all this, and this

22         is done in here, and it's described, it's not hidden,

23         it's all over, it's all here.  But we determined

24         basically the dose, and we figured out what is toxic to

25         the cells.
```

Ghassan Saed, Ph.D.

```
 1   Q.   How did you come to start with the 500 milligram per
 2        milliliter dose?
 3   A.   So we read in the literature prior experiments people
 4        did from 5 all the way to 1,000, and I found the paper
 5        after we did -- we thought first initial experiment we
 6        will hit the cells with high concentration, see what
 7        happened, and then titrate it down, but then we found
 8        it's toxic effect on the cells so -- and then I came
 9        across a paper where they used these small doses that
10        they found biological effect with, and they used 5, 20
11        and 100 and up to 500, so I chose the lower range,
12        which is 5, 20, and 100 for my study.
13   Q.   What paper was that?
14   A.   That was -- do you have that paper -- --
15   Q.   Is that the Buz'Zard paper?
16   A.   Let me see, do you have the Buz'Zard --
17             MS. O'DELL:  It's right in your notebook
18        there, Doctor.
19             THE WITNESS:  Where do I find it now here?
20             MS. O'DELL:  You might look in your
21        references of your report.
22             THE WITNESS:  Right.
23             MS. O'DELL:  And then we can go from there.
24             THE WITNESS:  I think it's Buz'Zard or
25        Shukla, one or the other, I can't remember.
```

Ghassan Saed, Ph.D.

```
 1    BY MR. HEGARTY:

 2    Q.   Are you confident that it was one or the other?

 3    A.   Yes.

 4    Q.   The lab notebook that we've been provided marked as

 5         Exhibit Number 2 has a first date of 10-15-17.  Is that

 6         the first date that there was any lab work done either

 7         in the pilot study or the later study?

 8    A.   No.

 9    Q.   What is the earliest date of work?

10    A.   May I have this?

11    Q.   Yeah, I'm handing you Exhibit Number 3.

12    A.   So the first work that we did with talc, 9-26.

13    Q.   Dr. Saed referred to Exhibit Number 3 and pointed me to

14         a page that's dated 9-26.  First of all, what is

15         represented or contained in Exhibit Number 3, this lab

16         notebook?

17    A.   So this part, okay, so I have to indicate something, we

18         share lab notebook, we use them for -- so not

19         necessarily one lab notebook for one project.  So, for

20         example, the first part of this lab notebook --

21              MS. O'DELL:  Which is Exhibit 3.

22              THE WITNESS:  -- which is Exhibit 3, looking

23         at the effect of a dipeptide on adhesion markers, and

24         then we continued with talc, so sometimes we mix up,

25         like we don't necessarily use one project for one lab
```

Ghassan Saed, Ph.D.

```
 1        notebook, okay.  So this part of the notebook --

 2   BY MR. HEGARTY:

 3   Q.   The first part?

 4   A.   The first part is for the different study.  This part

 5        where we started the actual work with talc.

 6   Q.   When you -- you started referencing the pages, this

 7        part, then what does this part represent being done?

 8   A.   This part was an experiment that we did exposing cells,

 9        ovarian cancer cells, to talc, Fisher, and look at

10        oxidative stress markers.  We used three ovarian cancer

11        cell lines, and we used macrophages of normal

12        epithelial cells.  And the result of this work was

13        submitted to Society of Reproductive Investigation

14        meeting that was held last year March, yes, last year

15        in San Diego, and you can see all the way down, this is

16        the poster that resulted from this work.

17   Q.   The poster you pointed to is on Page 63?

18   A.   Yes.

19   Q.   Was there a pilot study done before doing this

20        experiment?

21   A.   So this is a pilot study.

22   Q.   So the study that we are looking at dated -- with the

23        start date of 9-26-2017 --

24   A.   Right.

25   Q.   -- you consider that to be a pilot study?
```

Ghassan Saed, Ph.D.

```
 1   A.   This is a -- we have many pilot studies.  It depends on

 2        what marker you're doing the pilot study for.  So

 3        there's a pilot study for CA-125.  There is a pilot

 4        study for the dose.  There is a pilot study for cells.

 5        So this is a pilot study.

 6   Q.   In the other notebook you went from a pilot study to

 7        doing a subsequent study.

 8   A.   Correct.

 9   Q.   Did you do that with this pilot study?

10   A.   No, this is only done with -- this is a preliminary

11        study that we did, and we only tested mRNA levels of

12        some oxidative stress markers.  The other study that

13        you're referring to with the manuscript, this is a

14        comprehensive study that looked at every fold of gene

15        expression from mRNA to DNA to ELISA to activity of

16        proteins, everything.  This is just simply a pilot

17        experiment looking at, yes, there is an effect, no,

18        there is not an effect, and, yes, there is an effect,

19        so we published it.

20   Q.   The first date of any study that you did with talc is

21        September 26, 2017?

22   A.   Correct.

23   Q.   Who is involved in the study that we looked at in

24        Exhibit Number 3 whose begin date was September 26,

25        2017?
```

Ghassan Saed, Ph.D.

```
 1    A.    That's Nicole King and Ira, and myself.

 2    Q.    What prompted you to do this initial study?

 3    A.    My lab interest is ovarian cancer and oxidative stress,

 4          we talked about that, I answered that, the media and,

 5          you know, what's going on, and this is the core of my

 6          lab specialty is looking at oxidative stress markers,

 7          inflammation, and ovarian cancer.

 8    Q.    Is it your testimony that this study with the start

 9          date of 9-26-2017 was not prompted by your call with

10          Miss Thompson?

11                MS. O'DELL:  Object to the call.

12                THE WITNESS:  Was not prompted?

13    BY MR. HEGARTY:

14    Q.    Yes.

15                MS. O'DELL:  Object to the form.

16    BY MR. HEGARTY:

17    Q.    In other words, you would not have done this study or

18          the study for which you have submitted a manuscript to

19          Reproductive Sciences if Miss Thompson had not called

20          you, correct?

21                MS. O'DELL:  Object to the form.

22                THE WITNESS:  No, I was always interested in

23          doing this.

24    BY MR. HEGARTY:

25    Q.    So it's your testimony that if you had not gotten a
```

Ghassan Saed, Ph.D.

```
 1          call from Miss Thompson, you would have still done

 2          these studies?

 3     A.   Correct.

 4     Q.   Were the studies in the works at the time that Miss

 5          Thompson called you?

 6     A.   I was reviewing literature only.

 7     Q.   You had not thought about doing actual laboratory

 8          studies before Miss Thompson had called you involving

 9          talc?

10     A.   I planned it before she called me.

11     Q.   You had actually planned to do laboratory studies?

12     A.   Correct.

13     Q.   Do you have any documentation of that plan?

14     A.   No.

15     Q.   Did you talk with anyone and tell them that your plan

16          was to do studies involving talc before you were called

17          by Miss Thompson?

18     A.   We always discussed talking about looking at any

19          substance that induces inflammation and oxidative

20          stress.  So we always talk in the lab and with

21          colleagues about any substance.  Talc was brought up,

22          yes.

23     Q.   To whom did you speak with about talc and doing an

24          experiment about talc before you received a call from

25          Miss Thompson?
```

Ghassan Saed, Ph.D.

```
 1    A.    I discussed with Nicole.

 2    Q.    When was that discussion?

 3    A.    I can't remember dates, but we always discussed markers

 4          of oxidative stress.

 5    Q.    Well, you said that you always talk in the lab and with

 6          colleagues about any substance.  Talc was brought up.

 7    A.    Correct.

 8    Q.    What substances had you tested in your lab with regard

 9          to oxidative stress before your study about talc?

10    A.    We go backwards, we go looking at reducing oxidative

11          stress and looking at mechanisms, or manipulating

12          alteration of oxidative stress, like, for example, we

13          did the work where we added a scavenger of Superoxide

14          dismutase, which is a very powerful oxidant, and we

15          looked at inducing apoptosis in ovarian cancer cells.

16          We're looking at intervention, changing the cell redox

17          balance, alteration of that balance, it is given, it's

18          accepted in the literature and in our world that cancer

19          cells and ovarian cancer cells included, they all have

20          characterized by a pro-oxidant state that is given,

21          it's known.  So we don't need to show a substance that

22          induces further that oxidative stress.  We are looking

23          for attenuating and modulating that oxidative stress

24          and see the effect, the downstream effect.  We have

25          done that, we have published that with looking at SRNA
```

Ghassan Saed, Ph.D.

```
 1          to shut down proteins, knock down proteins, we did it
 2          for myeloperoxidase, we did it for ionase, we did it
 3          for SOD so.
 4    Q.    But prior to the call you received from Miss Thompson,
 5          you had never tested any particulate or exposed cells
 6          to any particulate and looked for oxidative stress,
 7          correct?
 8    A.    No, not correct.  I used hypoxia, induced hypoxia and
 9          look at normal cells.
10    Q.    What particles did you apply to cells in that study?
11    A.    Hypoxia.
12    Q.    What's hypoxia?
13    A.    It is the creation of a hypoxic micro environment into
14          the cells.  This can be in vivo induced by infection,
15          by wound, by many other factors that do that.
16    Q.    Let me clarify my question, then.  My question is what
17          environmental particles that are not generated in vivo
18          had you ever applied to cells and culture prior to the
19          call from Miss Thompson?
20    A.    That we published?  I don't -- like a given particle
21          you're talking about?
22    Q.    Correct.
23    A.    No, I don't have any, I never done anything like that.
24    Q.    What studies had you actually planned on doing with
25          talc before your call -- before the call came from Miss
```

Ghassan Saed, Ph.D.

```
 1          Thompson?  Had you actually formed the framework of a

 2          study?

 3    A.    No, I was just thinking about the overall, it would be

 4          interesting to see if this is -- this will induce

 5          inflammation in our cells, and if it does, then it

 6          should be linked to the risk of ovarian cancer, so

 7          thinking, just talking about it.

 8    Q.    With regard to the manuscript that -- strike that.

 9          With regard to the tests that were part of the

10          manuscript, those tests were done in connection with

11          your communications with Beasley Allen, correct?

12    A.    Those tests?

13    Q.    Yes.

14    A.    What do you mean by communication?

15               MS. O'DELL:  Object to form.

16    BY MR. HEGARTY:

17    Q.    Well, you talked with Beasley Allen about doing those

18          tests, correct, before you did them?

19               MS. O'DELL:  Object to the form.

20               THE WITNESS:  No, I was planning to do them,

21          anyways.

22    BY MR. HEGARTY:

23    Q.    You just said, though, before the call you had not done

24          anything formal or even --

25    A.    Yeah, I said --
```

Ghassan Saed, Ph.D.

```
 1    Q.    -- informal about putting a test together, correct?

 2    A.    I said I was planning to do this.

 3    Q.    Okay.

 4    A.    I had a plan to do this.

 5    Q.    Okay.  What was your plan?

 6    A.    This is the plan -- the plan -- okay, this is important

 7          to know, that I have this set up ready in my lab, ready

 8          to go.  We have all the technology for all these

 9          markers.  So it is not hard just to add -- so when I

10          plan, it means I -- we had used the setup that I

11          already have in my laboratory, that's what I -- in my

12          plan.

13    Q.    But you had not done anything to further that plan?

14    A.    Physically, no.

15    Q.    Let me finish, you had not done anything to further

16          that plan until after the call came from Miss Thompson,

17          correct?

18    A.    Correct.

19    Q.    Did you discuss at all the makeup of the study or what

20          you were going to do with the study or the methods of

21          the study with Beasley Allen before you did them?

22    A.    No.

23    Q.    Did you have any discussions at all with attorneys for

24          Beasley Allen about the concept of the study, the

25          methods of the study, the protocol of the study, how
```

Ghassan Saed, Ph.D.

```
1        the study was going to be done, anything like that?

2                MS. O'DELL:  Let me just stop you right

3        there.  I think when you're talking about conversations

4        you -- you're talking about after the time that he's

5        been engaged by Beasley Allen and those discussions

6        would be protected by the privilege.  I'm going to

7        instruct the witness not to answer.

8                MR. HEGARTY:  Well, my questions are related

9        solely to the manuscript, the testing in the manuscript

10       that has been submitted to Reproductive Sciences.  So

11       is it your position that all the communications you had

12       with regard to the tests done for purposes of the

13       publication Reproductive Sciences and the writing of

14       the article, submission of the article, are protected

15       by the consulting privilege?

16               MS. O'DELL:  Well, and as you know, the

17       substance of the manuscript largely is Dr. Saed's

18       expert report, and the work that he did in terms of

19       consulting was paid for by Beasley Allen and he was

20       doing that as a part of the consulting arrangement.

21       So, yes, to the degree he had conversations with the

22       lawyers, we're going to -- I'm going to instruct him

23       not to answer.

24               MR. HEGARTY:  I'm not going to argue with

25       you.  I just want to make sure I'm interesting that
```

Ghassan Saed, Ph.D.

```
 1        that's -- that your objection extends to any question

 2        that I would ask with regard to communications with

 3        Beasley Allen or attorneys for the plaintiffs with

 4        regard to the creation of the study, the setup of the

 5        study, the protocol of the study, doing the study,

 6        writing the manuscript.

 7                 MS. O'DELL:  That was not, your question's a

 8        little bit different than what you just described.  You

 9        can ask your questions, there may be some that are

10        appropriate and some not, but as regard the question

11        that's on the table, I think that's inappropriate and

12        I've instructed him not to answer.

13   BY MR. HEGARTY:

14   Q.   Dr. Saed, did you have any discussions with any

15        attorneys for Beasley Allen regarding the pilot study

16        that we talked about in Exhibit Number 3?

17   A.   What's Exhibit Number 3?

18   Q.   The one -- the study that's dated 9-26-2007.

19                 MS. O'DELL:  Objection, vague.

20                 THE WITNESS:  Again, okay, here is my answer.

21        No one has interfered with the design of the study, how

22        the study should be done, what assay should be applied,

23        what method of analysis should be performed, the

24        writing of the results, the analysis of the results,

25        this is my world, this is my specialty.  No one
```

Ghassan Saed, Ph.D.

```
 1            interfered with that.

 2   BY MR. HEGARTY:

 3   Q.   I appreciate that.  That was not my question.  My

 4        question was simply did you have any discussions with

 5        attorneys for Beasley Allen or attorneys for plaintiffs

 6        in this case with regard to conducting the pilot study

 7        that's in Exhibit Number 3 with the start date of

 8        9-26-2017?

 9   A.   They know that I'm doing this.

10   Q.   Did they know that you were doing it at the time that

11        you were doing it?

12   A.   At this time?

13   Q.   Yes.

14   A.   Yes.

15   Q.   Did you have discussions in advance of doing that study

16        with them?

17   A.   I actually designed this whole thing.  So when they

18        approached me and I got -- you know, I told them this

19        is what I'm going to do, this is what I have in mind,

20        we have all this setup in my lab and I want to do it,

21        and I did it.

22   Q.   Did they provide to you any suggestions on how to do

23        this study?

24   A.   They don't know nothing about this.

25   Q.   Who paid for the pilot study that's reported in Exhibit
```

Ghassan Saed, Ph.D.

1           Number --

2      A.   My lab.

3      Q.   Sorry let me finish.

4      A.   We already talked.

5      Q.   Who paid for the pilot study that's reported in Exhibit

6           Number 3?

7                MS. O'DELL:  Object to the form, to the

8           degree it's vague.

9                MR. HEGARTY:  You can answer.

10               THE WITNESS:  We discussed this, right?

11     BY MR. HEGARTY:

12     Q.   Now, the before questions, at least I thought, were

13          limited to the lab costs for -- and personnel costs for

14          the study in exhibit -- in the first notebook, Number

15          2.  Did those lab costs reflected in that exhibit,

16          which is Exhibit Number 5, also cover the pilot study

17          that's in notebook that we marked as Exhibit Number 3?

18     A.   The answer, my lab is paid for -- paid for all the

19          studies that we did.

20     Q.   The --

21     A.   Yeah, you can go back five days later.

22     Q.   Exhibit Number 5 reports the costs of the talc project

23          dated from October 1st, 2017.  This pilot study began

24          on September 26, 2017 correct?

25     A.   Correct.

Ghassan Saed, Ph.D.

```
 1   Q.    Is it your testimony that the costs of the pilot study

 2         are included in what's listed in Exhibit Number 5?

 3               MS. O'DELL:  Object to the form.

 4               THE WITNESS:  We started the -- culturing the

 5         cells, so the idea -- are you talking about the actual

 6         money?  We started -- yes, it is included there.

 7   BY MR. HEGARTY:

 8   Q.    You shook your head.  I want to make sure I got it on

 9         the record.

10   A.    Yes.

11   Q.    So the costs for the pilot study in Exhibit Number 3

12         that began on September 26, 2017, are contained in

13         Exhibit Number 5?

14   A.    Correct.  It takes three weeks to get the cells up and

15         going.

16               MR. HEGARTY:  Want to take a break?  We've

17         been going for about an hour and 20 minutes.  Take a

18         break.

19               THE VIDEOGRAPHER:  Going off the record at

20         10:32 a.m.

21               (A short recess was taken.)

22               THE VIDEOGRAPHER:  We're back on the record

23         at 10:51 a.m.

24   BY MR. HEGARTY:

25   Q.    Dr. Saed, when we left off, we were talking about any
```

Ghassan Saed, Ph.D.

```
 1          communication you had with Beasley Allen or other

 2          attorneys for the plaintiffs with regard to the

 3          experiments that you did or the preparation of the

 4          manuscript that you've submitted to Reproductive

 5          Sciences.  Over the course of the time that you did the

 6          experiments, that you did the writing, that you

 7          submitted to Reproductive Sciences, OB-GYN Oncology,

 8          did you exchange any e-mails or letters with attorneys

 9          for Beasley Allen or the plaintiffs with regard to the

10          testing, the writing, the submission of the manuscript?

11                  MS. O'DELL:  Objection to form.

12                  THE WITNESS:  Can you please repeat the

13          question, clarify what you --

14     BY MR. HEGARTY:

15     Q.   Sure.  Well, during the time that you were doing the

16          testing that we've been talking about?

17     A.   Experiments.

18     Q.   -- that's reflected in the lab notebooks, you call them

19          experiments, in the time that you wrote the paper that

20          you first submitted to OB-GYN Oncology and then later

21          to Reproductive Sciences.  Did you have communications

22          with attorneys for Beasley Allen or any plaintiff in

23          this litigation regarding the experiments or regarding

24          the writing of the article or regarding the submission

25          of the article to journals?
```

Ghassan Saed, Ph.D.

```
 1   A.   No.

 2   Q.   Did you have any telephone calls or meetings during

 3        the -- about the experiments or the writing of the

 4        manuscript for the journals or the submission of the

 5        journals with attorneys for Beasley Allen or any

 6        plaintiff in this litigation?

 7                 MS. O'DELL:  Objection to the form.

 8                 THE WITNESS:  No.

 9                 MS. O'DELL:  I was just going to instruct you

10        to the degree that you're asking him about subjects

11        that were discussed in meetings with attorneys for the

12        plaintiff, don't discuss those, the subject matter

13        because those, they're not entitled to know those

14        discussions, so to the degree you can answer your

15        questions outside those parameters, you may.

16                 THE WITNESS:  My answer was no for any

17        discussion related to the design of the experiments,

18        the results of the work, the submission to the journal,

19        which journal to submit to, writing the manuscript, all

20        that work I know the answer was no to that work.

21   BY MR. HEGARTY:

22   Q.   So as to everything you just described, you had no

23        discussions with the attorneys for Beasley Allen or any

24        plaintiffs in this case about anything dealing with

25        experiments, the design, the protocol the writing of
```

Ghassan Saed, Ph.D.

```
 1          the manuscript, the submission of the manuscript; is

 2          that correct?

 3                  MS. O'DELL:  Object to the form.

 4     BY MR. HEGARTY:

 5     Q.   You can answer.

 6     A.   I said -- I answered you.  I said I did not discuss the

 7          design of the experiments, the results of the

 8          experiments, where to submit it, how to analyze the

 9          data, all this work I did myself.

10     Q.   Understood.  I'm not asking if they provided input on

11          how to do it or how to write it or where to send it.

12          I'm asking if you had discussions with any attorney for

13          Beasley Allen or any other attorney for Plaintiff over

14          the course of doing all this work about what you were

15          doing?

16     A.   I still don't understand discussion, what does the

17          discussion mean?

18     Q.   Well, discussion means a phone call, an in-person

19          meeting, an e-.mail?

20     A.   Oh.

21     Q.   Any communication that talks about what you're doing.

22                  MS. O'DELL:  Excuse me, you may answer the

23          question whether calls or meetings occurred, you may

24          answer that yes or no, but you cannot divulge the

25          discussions or the topics that were included in those
```

Ghassan Saed, Ph.D.

```
 1        discussions.

 2               THE WITNESS:  Yes, so calls, we did calls.

 3   BY MR. HEGARTY:

 4   Q.   And what were the -- what did you discuss with the

 5        attorneys for Beasley Allen or the plaintiffs during

 6        those calls with regard to the experiments you were

 7        doing or the writing of the manuscript or the

 8        submission of the journal?

 9               MS. O'DELL:  I'm going to instruct you not to

10        answer that question.

11               MR. HEGARTY:  We object to that instruction

12        and believe that that is an inappropriate objection and

13        instruction that's not covered by the consultant

14        privilege, but we're not going to decide it here,

15        understand that, but I just want to make it clear on

16        the record that we don't agree that your objection

17        covers the kind of communications that I asked the

18        doctor.

19               MS. O'DELL:  Well, the privilege covers

20        communications, whether written or verbal, in person or

21        on the telephone, during Dr. Saed's consulting

22        relationship with the plaintiffs and that's what you've

23        asked him and that's what I'm objecting to.

24               MR. HEGARTY:  I understand the objection.  We

25        don't agree with the objection.
```

Ghassan Saed, Ph.D.

 1            MS. O'DELL:  I want to make sure the record

 2       is clear.

 3            MR. HEGARTY:  And I'm making for the record

 4       that we don't agree with the objection and dispute the

 5       propriety of it and object to you instructing the

 6       doctor not to respond.  With regard to this -- the work

 7       we've been talking about, the pilot study with talc,

 8       that's reflected in the -- and the other studies with

 9       talc that's reflected in the two notebooks, have you

10       prepared any other manuscripts related to those

11       experiments that you intend to submit to any journal?

12            THE WITNESS:  Other than submitted abstracts

13       to different meetings, no.

14  BY MR. HEGARTY:

15  Q.   Have you prepared abstracts or do you intend to prepare

16       abstracts or have you submitted abstracts regarding the

17       work reflected in the two notebooks that have not yet

18       been disseminated?

19  A.   Disseminated means --

20            MS. O'DELL:  Object to form.

21  BY MR. HEGARTY:

22  Q.   Well, as we're going to look at here today, there are

23       some abstracts where you describe the work that you're

24       doing, the experiments that you did.  Do you currently

25       have in the works any abstracts that have not yet been

Ghassan Saed, Ph.D.

```
 1        published or provided to anyone?

 2               MS. O'DELL:  Object to the form.

 3   BY MR. HEGARTY:

 4   Q.   Do you understand the question?

 5   A.   Not really.

 6   Q.   Well, do you currently have any abstracts that you're

 7        working on that you intend to submit?

 8   A.   Now I understood.  In relation to --

 9   Q.   The experiments --

10   A.   In relation to the talc project?

11   Q.   Correct.

12   A.   The answer is no.

13   Q.   Do you have any other written work in process relating

14        to the talc experiments that you intend to either turn

15        into an abstract or turn into a journal article?

16   A.   I was asked to write an editorial to one of the

17        journals and I am planning to do that.

18   Q.   Who asked you to write an editorial to a journal?

19   A.   The journal.

20   Q.   What journal?

21   A.   OB-GYN, let me see, I can find the exact name for you,

22        which I'm planning to do.  It's an open access journal

23        obstetrics and gynecology it's in my CV somewhere --

24        trying to find it for you -- where is it -- this is my

25        updated CV?
```

Ghassan Saed, Ph.D.

```
 1                    MS. O'DELL:  This is not your updated CV

 2         actually, this is the one --

 3                    THE WITNESS:  I can find it for you.  It's an

 4         obstetrics and gynecology online, open access online.

 5    BY MR. HEGARTY:

 6    Q.   Who within -- for that publication asked you to write

 7         an editorial?

 8    A.   The editorial office.

 9    Q.   And when did that request come in?

10    A.   I think two weeks ago.

11    Q.   And editorial on what?

12    A.   On talc and oxidative stress.

13    Q.   Have you started writing it?

14    A.   Not yet.

15    Q.   Do you intend to do so?

16    A.   Yes.

17    Q.   Did they give you a date --

18    A.   No.

19    Q.   -- for submission?

20                    MS. O'DELL:  Let him finish his question,

21         please, Doctor.

22    BY MR. HEGARTY:

23    Q.   Did they give you a date for providing -- did they give

24         you a date for providing the editorial?

25    A.   No.
```

Ghassan Saed, Ph.D.

```
 1   Q.   Is the editorial going to be in response to a journal

 2        article or another publication?

 3   A.   It is in response to the published abstracts that I did

 4        online.

 5   Q.   And with regard to the open access publication, is that

 6        a publication that's only available on the internet?

 7   A.   Open access, yes.

 8   Q.   Is that a publication which you have to pay to have

 9        your materials published on the internet?

10   A.   All open access journals you have to pay, yes.

11   Q.   You will have to pay to have your editorial published?

12   A.   Yes.

13   Q.   How much does that cost?

14   A.   Not too much like, 3, $400.

15              MR. LOCKE:  Could we ask the witness to speak

16        up.

17              MS. O'DELL:  They don't have access to a

18        speaker, so they're just listening to you over there,

19        so if you could raise your voice.

20              THE WITNESS:  4, $500, 400 to 500 -- where is

21        that --

22              MS. O'DELL:  That's okay.

23              MR. HEGARTY:  We're past that question,

24        Doctor.

25              THE WITNESS:  Thank you.
```

Ghassan Saed, Ph.D.

```
 1    BY MR. HEGARTY:

 2    Q.   We were provided some additional materials this morning

 3         that I wanted to make sure I mark for the record and

 4         follow up on a few things in those materials.  I'm

 5         going to mark as Exhibit Number 10 what was represented

 6         to us today to be the index for the lab notebook that

 7         we marked as Exhibit Number 2, that's the notebook that

 8         has the experiments in it that went into your

 9         manuscript.

10              SAED DEPOSITION EXHIBIT NUMBER 10,

11              INDEX FOR LAB NOTEBOOK,

12              WAS MARKED BY THE REPORTER

13              FOR IDENTIFICATION

14    BY MR. HEGARTY:

15    Q.   And I'll show you -- make sure we have the right lab

16         note --

17              MR. LAPINSKI:  Counsel, is there an Exhibit 9

18         marked?

19              MR. HEGARTY:  Oh, I skipped over Exhibit 9.

20         I'll go back to it.

21              THE WITNESS:  So this and this.

22    BY MR. HEGARTY:

23    Q.   Yes, you looked at Exhibit 2 compared to Exhibit 10.

24         Is that the index to Exhibit 2?

25    A.   Yes.
```

Ghassan Saed, Ph.D.

```
 1   Q.   With regard to the index there, on the index, Doctor,

 2        Exhibit 10, the pages after 21 you jump to 31.  What

 3        happened to Pages 22 to 29 -- I'm sorry, 22 to 30?

 4             MS. O'DELL:  I'm sorry, are you referring to

 5        Exhibit 10 or --

 6             MR. HEGARTY:  Yes, Exhibit 10, the pages go

 7        20-21, then jump to 31-32, and my question is where are

 8        Pages 22 to 30?

 9             THE WITNESS:  22, you said?

10   BY MR. HEGARTY:

11   Q.   Yes.

12   A.   22, 23, 24, 29.  Oh, so there's -- yeah, you talking

13        about the tore apart?

14   Q.   We'll get to that part in a second.  First of all, why

15        aren't Pages 22 to 29 listed in the index or at least a

16        portion of those?

17             MS. O'DELL:  Object to the form.

18             THE WITNESS:  31 -- 21 -- 21, 31, what

19        happened, 21, yeah, there is nothing after that, right?

20   BY MR. HEGARTY:

21   Q.   Well, on Exhibit Number 10 it jumps from 21 to 31, and

22        where are the nine or ten pages in between those?

23   A.   Yeah, that's what I'm talking about, those are -- you

24        want me to answer for the missing pages?

25   Q.   Well, I'll get to that first but --
```

Ghassan Saed, Ph.D.

```
 1   A.   That's the answer.

 2   Q.   Let me look at the notebook.  There are pages --

 3        there's 21 and then there is a 22, 23, and a 24 that's

 4        not referenced in the index.  Why is that?

 5   A.   Because those are figures.  They could be referenced.

 6   Q.   But they have page numbers on them.

 7   A.   Sure.

 8   Q.   And you otherwise list page numbers here that are also

 9        just pages that contained figures, correct?

10   A.   Correct.

11   Q.   Why are these pages not referenced in the index?

12   A.   I don't know.

13   Q.   There are also --

14   A.   Maybe --

15   Q.   I'm sorry.

16   A.   Maybe -- we have it, we labeled it.

17   Q.   But they're not included in the index.

18   A.   Maybe just missed here.

19   Q.   There are also a number of pages that have been cut out

20        of Exhibit Number 2 that -- where the pages go from 24

21        to 29, and there are clearly pages in between that

22        appear to have either been cut out by a razor or by

23        some other cutting instrument.  First of all, what was

24        on those pages?

25   A.   Okay, so as I mentioned earlier, we do not specify one
```

Ghassan Saed, Ph.D.

```
 1          lab notebook to a specific study.  So my research

 2          technician by a mistake added a different project here,

 3          and because this is talc, there is a litigation and

 4          lawyers and all that, we had to remove it and we have

 5          to specialize in that lab notebook just for this work.

 6   Q.     What other project was represented or documented in

 7          those pages that were removed from this lab notebook?

 8   A.     It's a different project than talc.

 9   Q.     What was the project or what is the project?

10                MS. O'DELL:  You mean the subject matter?

11   BY MR. HEGARTY:

12   Q.     The subject matter.

13   A.     The same, reactive oxygen species, inflammation in

14          ovarian cancer.

15   Q.     What are you looking at in that other project?

16   A.     I can't remember, but I can find out.

17   Q.     Does it involve exposure to any environmental

18          particulate?

19   A.     No.

20   Q.     Do you know when the pages that we've been talking

21          about were removed from this lab notebook?

22   A.     I don't remember.

23   Q.     Were you aware that they had been removed?

24   A.     Yes.

25   Q.     Have you ever in your experiences in conducting a lab
```

Ghassan Saed, Ph.D.

```
 1        cut out pages of a lab notebook?

 2   A.   Have I ever done that?  No.

 3   Q.   That's not good laboratory practice, is it?

 4             MS. O'DELL:  Objection to form.

 5             THE WITNESS:  Yes, I -- the reason I told

 6        you, I just told you the reason why we did that.

 7   BY MR. HEGARTY:

 8   Q.   But my question is that's not proper laboratory

 9        practice to cut out pages of a lab book, is it?

10             MS. O'DELL:  Object to the form.

11             THE WITNESS:  We didn't cut the notes from

12        them, we just wanted to keep the talc study separate.

13   BY MR. HEGARTY:

14   Q.   Understood, but I'm talking about good laboratory

15        practices, and good laboratory practices don't sanction

16        or allow for you to cut out pages of a laboratory

17        notebook, do they?

18             MS. O'DELL:  Object to the form.

19             THE WITNESS:  We, as you can see, we're not

20        hiding it.

21   BY MR. HEGARTY:

22   Q.   I'm not asking if you're hiding it.  I'm asking you, do

23        you -- is it your testimony that cutting lab -- cutting

24        pages out of a lab notebook is consistent with good

25        laboratory practice?
```

Ghassan Saed, Ph.D.

```
 1                    MS. O'DELL:  Object to the form.

 2                    THE WITNESS:  I didn't say that.

 3   BY MR. HEGARTY:

 4   Q.   You agree it's not consistent with good laboratory

 5        practice, don't you?

 6                    MS. O'DELL:  Object to the form.

 7                    THE WITNESS:  I don't agree.

 8   BY MR. HEGARTY:

 9   Q.   You don't agree with what?

10   A.   Okay, I told you the reason why we removed those pages.

11   Q.   Did you instruct someone to cut those pages out of this

12        notebook?

13   A.   My lab research assistant was doing different project.

14        She was writing it here in the middle of this lab

15        notebook.  I asked her let's remove it, continue so we

16        can keep this lab notebook independent.

17   Q.   But the other lab notebook you prepared you left in the

18        pages of the other project, you didn't cut those out,

19        correct?

20   A.   No, because this was a preliminary results and that was

21        continued, not in the middle, it was continued, so we

22        only used like few pages from the book.

23   Q.   The lab notebooks contain on the outside, at least one

24        of them, Nicole King Talc Study, do you see that?

25   A.   I do.
```

Ghassan Saed, Ph.D.

```
 1    Q.   And Nicole King again is who?

 2    A.   My research post doc.

 3    Q.   Then on the other lab notebook that contained -- that

 4         was on Exhibit 2.  Exhibit 3 on the outside is

 5         something called Temple 1.  What does that mean?

 6    A.   That's a project that we did for Temple Pharmaceutical

 7         in our lab.

 8    Q.   That's a project that's -- that's the project that's in

 9         the first part of the lab notebook?

10    A.   Correct.

11              SAED DEPOSITION EXHIBIT NUMBER 9,

12              PILOT STUDY,

13              WAS MARKED BY THE REPORTER

14              FOR IDENTIFICATION

15    BY MR. HEGARTY:

16    Q.   Also provided today, which I'll mark as Exhibit

17         Number 9, are copies of what I believe to be the pilot

18         study that's contained in Exhibit Number 3.  Would you

19         look at Exhibit Number 9 and compare to Exhibit

20         Number 3, and tell me whether Exhibit Number 9 are the

21         pages copied from Exhibit Number 3, the pilot project

22         we talked about earlier along with the index?

23    A.   Yes.

24    Q.   On the first page of -- or strike that.  On Page 1 of

25         Exhibit Number 2 there's a statement at the very
```

Ghassan Saed, Ph.D.

```
 1          beginning that says tried to dissolve talc Fisher 74 --

 2          or Fisher T4-500 lot numbers 166820 in Johnson &

 3          Johnson Baby Powder.  Do you see that reference?  Do

 4          you see where I'm reading?

 5     A.   You're reading wrong.  What is in?

 6     Q.   In.

 7     A.   That's not in.

 8     Q.   What is that word?

 9     A.   That's or.

10     Q.   Or Johnson's Baby Powder, okay, and it says it won't

11          completely dissolve.  What does that mean?

12     A.   It won't completely dissolve.

13     Q.   What was the extent of its -- that it dissolved?

14     A.   Partial.

15               MS. O'DELL:  Object to form.

16               THE WITNESS:  Yeah, so, okay, so you need to

17          know the percentage of how much it's dissolved?

18     BY MR. HEGARTY:

19     Q.   How much is dissolved as reflected in Page 1.

20     A.   Nothing dissolved.

21     Q.   Whose handwriting is on Page 1?

22     A.   This is Nicole I think, I think.

23     Q.   Whose handwriting is throughout Exhibit Number 2?

24     A.   This?

25     Q.   Throughout the exhibit.
```

Ghassan Saed, Ph.D.

```
 1    A.    Some Nicole, some others, my research assistant.

 2    Q.    Who else's handwriting besides Nicole's are in Exhibit

 3          Number 2?

 4    A.    My research assistant.

 5    Q.    Who is that?

 6    A.    Flory, her name is Flory, Flory Rong, I think she's

 7          part of the authors, yes, her name is, okay, this is

 8          the right -- correction, Fan Rong.

 9                MS. O'DELL:  How do you spell that?

10                THE WITNESS:  It's here, F-a-n and then

11          R-o-n-g.

12    BY MR. HEGARTY:

13    Q.    Isn't it Rong Fan, Doctor?

14    A.    Rong Fan?  The first name is --

15    Q.    First name is Rong, right?

16    A.    I think it's the other way around, I'm not expert on

17          names.

18    Q.    Who is Mr. Rong?

19    A.    Mrs.

20    Q.    Mrs. Rong who is that?

21    A.    She is my research assistant.

22    Q.    How long has she been your research assistant?

23    A.    From I believe the beginning of '18.

24    Q.    But you don't know her name?

25    A.    I know her name, Flory, we call her Flory.
```

Ghassan Saed, Ph.D.

```
 1   Q.   What's her full name?

 2   A.   This is her full name, how she officially write, it's

 3        on the paper.

 4   Q.   And is it -- according to you, is her name Fan Rong?

 5   A.   I call her Flory.

 6   Q.   Do you know her name?

 7   A.   That's her name.

 8   Q.   And how do you pronounce it?

 9   A.   Rong Fan, I never called her with this name.

10   Q.   Who else's handwriting is contained in Exhibit

11        Number 2?

12   A.   Some would be mine.

13   Q.   Who else?

14   A.   That's it.

15   Q.   Were all the entries in Exhibit Number 2 prepared at

16        the time that the work was done?

17   A.   No.

18   Q.   When you say no, does that mean that there was work

19        done and then the -- later on entries were made in the

20        lab notebook?

21   A.   Correct.

22   Q.   How much later -- strike that.  If the entries have a

23        certain date on them, does that mean that they were

24        entered on that date or the work was done on that date?

25   A.   Work was done on that date.
```

Ghassan Saed, Ph.D.

```
 1    Q.   Does that mean there could be instances where work was

 2         done on that date but then entered later in the lab

 3         notebook?

 4    A.   Okay, so let me explain how we do this.  So we run our

 5         experiments and we have everything, as you see here,

 6         electronically, and we -- it's a matter of -- practice

 7         of cutting and pasting it in the lab notebook, but

 8         everything is done in electronically.

 9    Q.   When was this lab notebook, Exhibit Number 2, prepared?

10    A.   I don't know, exact dates?

11    Q.   Correct.

12    A.   I don't know, I can't remember.

13    Q.   Well, the date -- the dates run from 10-15-17 to --

14    A.   All the way to --

15    Q.   All the way to --

16    A.   -- October.

17    Q.   -- October or so of 2018.  So was this notebook

18         prepared over that entire period of time?

19    A.   Yes.

20    Q.   It wasn't prepared, put together in its entirety four

21         weeks ago?

22    A.   Some of it was, yes.

23    Q.   What portions were put together four weeks ago?

24    A.   I think the one related to the last portion.

25    Q.   Can you point to me the pages that were put together in
```

Ghassan Saed, Ph.D.

```
 1        the last month or so?

 2   A.   I can't really exactly remember, but the last, I would

 3        say, the statistical part for sure.

 4   Q.   Starting on what page?

 5   A.   I'm trying to find it.  So starting on Page 114, this

 6        is the statistics of the study, all the way to 19 --

 7        122, 124, so all the way to the end, which is 124.

 8        This part, it's created by or done by a

 9        biostatistician, and this is all you can see

10        electronics, so we just cut and pasted there.

11   Q.   So if you go to Page 114, that has a date of October 6,

12        2018.  Is it your testimony that this was not prepared

13        on that date but was prepared later and then back dated

14        to say October 6, 2018?

15             MS. O'DELL:  Object to the form, misstates

16        his testimony.

17   BY MR. HEGARTY:

18   Q.   You can answer.

19             MS. O'DELL:  If you understand the question.

20             THE WITNESS:  What's the question?

21   BY MR. HEGARTY:

22   Q.   Sure.  You see the date at the top of that page of

23        October 6, 2018, correct?

24   A.   Correct.

25   Q.   Was this page prepared on that date or was it prepared
```

Ghassan Saed, Ph.D.

```
 1          at a time later than that but dated October 6, 2018?

 2                    MS. O'DELL:  Object to the form.

 3                    THE WITNESS:  Okay, so this -- I can't

 4          remember when we did the statistics, but this date

 5          reflects when the statistics was actually done.

 6   BY MR. HEGARTY:

 7   Q.    So in this instance, the statistics were done on

 8          October 6, 2018, but was the page prepared later than

 9          that after October 6, 2018?

10   A.    The pages, yes.

11   Q.    With regard to other entries in the notebook that have

12          dates, can you tell whether those pages were created on

13          the date listed on the page or were they created later

14          but backdated to the date the work occurred?

15                    MS. O'DELL:  Objection to form.

16                    THE WITNESS:  Yeah, so, again, we do the

17          experiment, sometimes it takes a week or two to write

18          it in the notebook because we have the data

19          electronically, so I cannot tell you the exact date

20          when they were put in.

21   BY MR. HEGARTY:

22   Q.    All the data that is reflected in Exhibit Number 2 is

23          kept in electronic format?

24   A.    Yes.

25   Q.    Does that electronic format still exist?
```

Ghassan Saed, Ph.D.

```
 1    A.   Yes.

 2    Q.   Is the data in that electronic format all dated and is

 3         the date the date the data was generated?

 4              MS. O'DELL:  Objection to form.

 5    BY MR. HEGARTY:

 6    Q.   You're pointing to an example.

 7    A.   An example.

 8    Q.   What page is that on?

 9    A.   June 19.

10    Q.   What page is that on, Doctor?

11    A.   This is Page -- oh, no, that's -- which page was

12         this --

13    Q.   It's in the lower right-hand corner.

14    A.   I just noticed -- no, it's this one.  Like, for

15         example, if you find the dates that are here, these

16         dates reflect the time we did the experiment.

17    Q.   Can you stop at a page and give me an example?

18    A.   I'm trying to find one.  So this is February --

19         Page 73, if you look here, it says February -- so

20         small, February 20th, is that --

21    Q.   Yes, 2018.

22    A.   Right.  So that's the date, and that's the date that is

23         this experiment performed.

24    Q.   With regard to the experiments that you did for your

25         manuscript, did those experiments begin in
```

Ghassan Saed, Ph.D.

```
 1          January 2018, and I'll direct you to Page --

 2    A.    51.

 3    Q.    Page 53.

 4    A.    Of this notebook?

 5    Q.    Of the notebook.

 6    A.    So one more time, the question.

 7    Q.    Turn to Page 53 of Exhibit Number 2.

 8    A.    53?

 9    Q.    Yes.

10    A.    Okay.

11    Q.    There's a couple dates at the top of January 3rd, 2018

12          and, also, do you see January 7, 2018 at the top?

13                MS. O'DELL:  Excuse me, Mark, what Bates

14          Number?

15                MR. HEGARTY:  I'm looking at -- I'm using the

16          page numbers in the lower right-hand corner.

17                THE WITNESS:  53?

18    BY MR. HEGARTY:

19    Q.    53.

20    A.    On this date?

21    Q.    Yes, 1-7-18.  What I'm trying to find out is when was

22          the first date that you did --

23                MS. O'DELL:  What's the Bates Number on the

24          document?

25                MR. HEGARTY:  The Bates Number is 25.
```

Ghassan Saed, Ph.D.

```
 1                   MS. O'DELL:  Okay.

 2    BY MR. HEGARTY:

 3    Q.   When is the first date that you started the -- when did

 4         you start the experiments that you then report in your

 5         manuscript?

 6    A.   It says right there, January 3rd we seeded the cells,

 7         started the experiment.

 8    Q.   If you go to Page 2 using the Bates -- let me switch

 9         you over to the Bates Numbers because that's what I had

10         to work from.

11    A.   Okay.

12    Q.   Let me show you Exhibit Number 1, that's a copy of the

13         notebook that we've been looking at, Exhibit Number 2.

14    A.   Okay.  Page 2?

15    Q.   Look at Page 2 of Bates Number --

16                   MS. O'DELL:  When he says Bates Number, he's

17         referring to the very small number to the right-hand

18         side that's been -- yes --

19                   THE WITNESS:  Where does it say Page 2?  Oh,

20         sorry, okay.  Page 2?

21    BY MR. HEGARTY:

22    Q.   Yes, and that has a date of January 24, 2018?

23    A.   Yes.

24    Q.   Do you see that?

25    A.   Yes.
```

Ghassan Saed, Ph.D.

```
 1    Q.   Then if you go through the next several pages through

 2         to Page 23 by Bates Number --

 3    A.   Yes.

 4    Q.   -- that's dated March 2nd, 2018.  Do you see that?

 5    A.   Yes.

 6    Q.   Then if you go to Page 25, I'm sorry, if you go to

 7         Page 53 --

 8    A.   It's January 7.

 9    Q.   Well, then you go Page 25 you see January 7, which is

10         not in the same order.  So the book doesn't appear to

11         be in chronologic order, is that correct?

12    A.   Okay, let me answer this.  Here is the answer.  So we

13         have sections, this is a PCR section, we left some

14         pages blank, next section is ELISA section, because

15         we're doing the experiments simultaneously, so we

16         wanted to separate each section, so the PCR section we

17         created, we designated certain pages, and then we have

18         ELISA section, and then we have other sections.  So

19         every time we do the experiment, we add to the section.

20         That's why the dates are not in chronological order.

21    Q.   Okay.  If you look at Bates Number 78, Doctor, that

22         page is dated June 29, 2018?

23    A.   This one?

24    Q.   Yes.

25    A.   Yes.
```

Ghassan Saed, Ph.D.

```
 1   Q.   See that date?

 2   A.   I imagine it better if I see the notebook.

 3   Q.   Then if you turn over to Bates 86.

 4   A.   86.  86 that's a different section.

 5   Q.   Okay.  There's a date on there of September 4, 2018,

 6        looked like there was a break between June 29th and

 7        September 4.

 8   A.   Look at the original here, see that's a section, it's a

 9        different section.

10   Q.   To the extent that there are periods of time where

11        there is no activity going on, that there might be a

12        month between data entries, does that mean that there's

13        no work going on at that time?

14   A.   No, no, no, we do simultaneously different, like we do

15        PCR, we do ELISA, we do proliferation, all that

16        studies, and we divided this notebook into sections,

17        and as we go, we added to the corresponding section, so

18        you can -- yeah.

19   Q.   And were all the graphs in the notebook provided at a

20        later time or were they provided at the time they were

21        created?

22             MS. O'DELL:  Objection to form.

23             THE WITNESS:  Yeah, I don't really understand

24        the question.

25
```

Ghassan Saed, Ph.D.

```
 1   BY MR. HEGARTY:

 2   Q.   Sure.  As we just looked at, the graphs are all -- and

 3        tables and charts are all dated, correct?

 4   A.   Correct.

 5   Q.   Were they added to the notebook at the time they were

 6        created or were they added later?

 7   A.   Which graph you referring to?

 8   Q.   Any of the tables where the -- that have been pasted

 9        in, were they pasted in at the time they were created

10        or later?

11             MS. O'DELL:  Object to the form, asked and

12        answered.

13             THE WITNESS:  So you are saying if this graph

14        was created the same time that --

15   BY MR. HEGARTY:

16   Q.   We're looking at Page 87, and you're pointing to a

17        graph, and my question is with regard to the graph, was

18        it pasted in the notebook on the day it was generated?

19             MS. O'DELL:  Objection, asked and answered.

20             THE WITNESS:  I really can't remember, but we

21        have this electronically.

22   BY MR. HEGARTY:

23   Q.   Doctor, if you go to Page 4, Bates Number 4, which

24        corresponds to Page 33 of the notebook --

25   A.   This?
```

Ghassan Saed, Ph.D.

```
 1    Q.    -- there appears to be a reference on Page 33 that

 2          says go to Page 35.  Do you see that?

 3    A.    Okay.

 4    Q.    How can you know to go to Page 35 when you're on

 5          Page 33 and 35 is not yet created?

 6    A.    Oh, okay, good question.  So this is established

 7          protocol, we do this -- this is not like the first time

 8          we're doing this, this is done repeatedly over years

 9          and years and years  with different publication.  This

10          is the setup how we write it, so this is like something

11          we predicting to happen, this we already know, that's

12          the protocol, we just sticking it here.

13    Q.    You're anticipating that when you prepare -- strike

14          that.  When you prepared Page 33, you're anticipating

15          that you were going to --

16    A.    Discuss it.

17    Q.    -- discuss it in Page 35?

18    A.    Yes.

19    Q.    Are the page numbers that you've added at the bottom in

20          handwriting, are those made in the beginning of the

21          work or are they added as you go?  In other words, do

22          you start with a notebook that's blank and then just

23          simply number the pages before you start the work or

24          you do it after the fact?

25    A.    We do it both ways, I don't remember.
```

Ghassan Saed, Ph.D.

```
 1   Q.   There's -- the writing I pointed to is in blue ink

 2        versus the other writing, which is in black ink.  Was

 3        that blue ink added at the time that 33 was created or

 4        was it added later?

 5   A.   I don't remember.

 6   Q.   Do you know whose handwriting --

 7   A.   Yeah, this is Rong -- what's her name, Mrs. Rong.

 8   Q.   Okay.  If you look again back at Page 4 of the Bates

 9        Stamped copy.

10   A.   Page 4.

11   Q.   That's Exhibit Number 1.

12   A.   Same page, 4?  That's 4.

13   Q.   Same Page 4, which is Page 33 of the lab notebook,

14        okay?

15   A.   Same page.

16   Q.   There is a portion of that notebook page that is whited

17        out, correct, and written over?

18   A.   Yeah, I see that.

19   Q.   What was whited out?

20   A.   (Shrugs shoulders.)

21   Q.   Do you know?

22   A.   I don't know.  Again, this is an established procedure

23        that had been published with several, 100 papers over.

24   Q.   Well, what established procedure can you cite me to

25        that says that it's proper laboratory practice to white
```

Ghassan Saed, Ph.D.

```
 1          out information and then write over it?

 2                    MS. O'DELL:  Object to the form.

 3                    THE WITNESS:  If you like write something

 4          like a mistake or a typo and you write it over.

 5     BY MR. HEGARTY:

 6     Q.   Can you cite for me any --

 7     A.   Cite?

 8     Q.   -- published guidelines or laboratory methods that say

 9          that that's a proper approach to preparing a lab

10          notebook?

11                    MS. O'DELL:  Objection to form.

12                    THE WITNESS:  Yeah, umm, what we did here I

13          think -- this is her handwriting and --

14                    MS. O'DELL:  When you say "her," who are you

15          referring to?

16                    THE WITNESS:  Rong, Mrs. Rong, so nothing

17          really that alarmed me or directed my attention to

18          anything.  She wrote what she supposed to write.  Maybe

19          she did a mistake.

20     BY MR. HEGARTY:

21     Q.   Doctor, would you ever in preparing a lab notebook

22          white out information that's been written in a lab

23          notebook and then write over it?

24                    MS. O'DELL:  Object to the form.

25                    THE WITNESS:  Typically I don't do that, no.
```

Ghassan Saed, Ph.D.

```
 1   BY MR. HEGARTY:

 2   Q.   That's not proper laboratory practice, is it?

 3   A.   No.  What I said is really simple.  She probably did a

 4        mistake and then she whited out and wrote over it.

 5   Q.   Proper laboratory practice is to line through it so the

 6        information that was there is still visible, and then

 7        include the data somewhere else so everything is

 8        transparent, correct?

 9             MS. O'DELL:  Object to the form.

10             THE WITNESS:  The information that she whited

11        out has nothing to do with the results or anything.

12        This is just describing an established methodology that

13        is published in all of our papers.

14             MR. KLATT:  Objection, form, unresponsive.

15             MR. HEGARTY:  Understood, but the proper

16        laboratory practice would be to line through it so it

17        could still be visible, and then add the corrected or

18        additional information, correct?

19             MS. O'DELL:  Object to the form.

20             THE WITNESS:  My response, as I told you,

21        this is something that she probably misspelled or

22        mistake she did, she thought she was doing something,

23        writing something, she wrote different, you know, we're

24        doing different experiment different time, same times.

25             MR. KLATT:  Objection, form, nonresponsive.
```

Ghassan Saed, Ph.D.

```
 1   BY MR. HEGARTY:

 2   Q.   Doctor, listen to my question.  The proper laboratory

 3        practice would be to line through what she whited over

 4        so that it would still be visible, and then add

 5        whatever other information she wanted to add to this

 6        page, correct?

 7   A.   If it's related to data.

 8   Q.   So this is not proper, this whiting out is not proper

 9        laboratory practice, correct?

10             MS. O'DELL:  Let him finish his question, and

11        give me a moment to object.  Object to the form.

12             You may answer if you remember his question.

13             THE WITNESS:  What I am trying to tell you,

14        if it's something to do with data it is not proper to

15        do, but this is -- this even shouldn't be in the

16        notebook, we can reference that, it is something that

17        we do in our laboratory so we can be detailed, it's

18        about the procedure, the method, which is already

19        published.

20   BY MR. HEGARTY:

21   Q.   But good laboratory practice --

22   A.   It has nothing to do --

23   Q.   Let me finish, Doctor -- good laboratory practice,

24        whether it's data or otherwise, dictates that you not

25        white out any information that's put in a lab notebook;
```

Ghassan Saed, Ph.D.

```
1          rather, you're to line through it so it's still

2          visible, correct?

3                    MS. O'DELL:  Object to the form.

4                    THE WITNESS:  I just told you what I feel.

5          This is an established method, it's nothing to do with

6          the data, this is just describing standard methodology,

7          with it or without it, doesn't change anything.

8     BY MR. HEGARTY:

9     Q.   So are you okay or fine with the whiting out of

10         information in this lab notebook as was done here?

11                   MS. O'DELL:  Objection to form.

12                   THE WITNESS:  What I'm -- am I fine with

13         that?

14    BY MR. HEGARTY:

15    Q.   Yes.

16    A.   I prefer that does not happen, but it happened and she

17         did it, but that doesn't change anything.

18    Q.   Above that whited out area there's an arrow pointing to

19         100 milligrams talc, after the arrow it says Johnson

20         Baby Powder.  Do you see where I'm referring to,

21         Doctor?

22    A.   Yes.

23    Q.   Whose handwriting is that?

24    A.   I think it's Flory.

25    Q.   Was that information added later than the time this
```

Ghassan Saed, Ph.D.

```
 1        page was prepared?

 2   A.   No.

 3   Q.   Can you tell when that information was added to Page 33

 4        or Bates Number Page 4?

 5             MS. O'DELL:  Objection to the form.

 6             THE WITNESS:  When we prepared the page.

 7   BY MR. HEGARTY:

 8   Q.   Why was it added in a way that put it out of order and

 9        had to have a line directing it to another part of the

10        page?

11   A.   That's what we did.

12   Q.   Why was it not included there in the first place?

13             MS. O'DELL:  Objection, asked and answered.

14   BY MR. HEGARTY:

15   Q.   You don't know?

16   A.   I don't know.

17   Q.   If you look next at Bates Stamp Page 25, which is

18        Page 53 of the lab notebook, there is another portion

19        that has been whited out and written over.  Do you see

20        that?

21   A.   Yes, I see it.

22   Q.   What was whited out?

23   A.   I don't know.

24   Q.   Something was whited out and the name Johnson & Johnson

25        number 30027477 lot number 13717RA was written over
```

Ghassan Saed, Ph.D.

```
 1        that.  Do you see that?

 2   A.   I do.

 3   Q.   Whose handwriting is reflected by the addition of

 4        Johnson & Johnson, et cetera?

 5   A.   I think it's Flory, Rong.

 6   Q.   What was under -- what did she write over?

 7   A.   I don't know, I wasn't there when she wrote this, but

 8        when I looked at it I confirmed that this is what we

 9        did.

10   Q.   Well, did she write over Fisher Scientific talc?

11   A.   Could be.

12   Q.   But did you actually test Fisher Scientific talc

13        instead of Johnson & Johnson and then alter the lab

14        notebook?

15             MS. O'DELL:  Objection, form.

16             THE WITNESS:  We actually did both.

17   BY MR. HEGARTY:

18   Q.   You agree it's not proper practice, as reflected here,

19        to white out information in a lab notebook where it

20        can't be read and then write over it, correct?

21             MS. O'DELL:  Objection to form.

22             THE WITNESS:  You keep asking me the same

23        question.  I'm answering you the same way.  She did the

24        mistakes, to the best of her ability that's what she

25        thought she will do, and I left it because I don't want
```

Ghassan Saed, Ph.D.

```
 1       to change it.

 2   BY MR. HEGARTY:

 3   Q.   Did you talk to her about the propriety of whiting out

 4        data?

 5   A.   Yes, I did.

 6   Q.   What did you tell her?

 7   A.   I said we should not white out just write underneath

 8        it.

 9   Q.   When did you have that discussion with her?

10   A.   After I saw this.

11   Q.   When did you see it?

12   A.   I think -- I don't remember.

13   Q.   Did you see it in the last two weeks?

14   A.   No, no, no, way before.

15   Q.   Is it proper methodology for creating -- for doing

16        experiments and creating a lab book to white -- start

17        over.  Is it proper methodology in doing experiments

18        like this in creating the lab book that corresponds

19        with those experiments to white out information and

20        then write over it?

21             MS. O'DELL:  Objection to form.

22   BY MR. HEGARTY:

23   Q.   In your opinion?

24             MS. O'DELL:  Objection to form.

25             THE WITNESS:  So I just told you we did
```

Ghassan Saed, Ph.D.

```
 1        not -- with the information that is here is accurate,

 2        we voluntarily did that.

 3   BY MR. HEGARTY:

 4   Q.   I'm not asking you if the information is accurate with

 5        my question.  My question is, is it proper methodology

 6        in doing experiments like this and in creating the lab

 7        notebook that corresponds to those experiments to white

 8        out information and write over it, in your opinion?

 9             MS. O'DELL:  Object to the form.

10             THE WITNESS:  I mean it's -- in my personal

11        opinion?

12   BY MR. HEGARTY:

13   Q.   Correct.

14   A.   I think if you report that this is what actually

15        happened and a mistake happened and this is, to her

16        knowledge, this is the best way to handle it, she

17        handled it.

18   Q.   So you consider the --

19   A.   And I talked to her about it and --

20   Q.   Do you consider the way she handled it to be proper

21        laboratory methodology?

22   A.   That's why I told you, I talked to her about it so I

23        don't.

24   Q.   May I see the notebook?

25   A.   Sure.
```

Ghassan Saed, Ph.D.

```
1    Q.   Doctor, I'm looking at Page 102 of the notebook,

2         Exhibit Number 2, which is Bates 78.  If you want to

3         look at it --

4    A.   Okay, yes, I see it.

5    Q.   -- either in Exhibit 1 or Exhibit 2.  There appears to

6         be something that has been covered over by the table

7         that's been pasted there because I see some handwriting

8         on the far right-hand column, and I don't want to pull

9         that up, but what is under that table or that chart?

10   A.   The answer is I don't know.  But I'll find out.  It's a

11        description of the method.

12   Q.   I just want to note for the record that the doctor is

13        pulling the table up and --

14   A.   Yeah.

15   Q.   Okay.

16   A.   Do you want to see what's written under?

17   Q.   Yes.

18   A.   Okay.  I want to see, also.  Okay.  So this is just the

19        oligonucleotide primers and the cyclin for the PCR,

20        this is very standard protocol that you don't need to

21        even show, it's a methodology, so it doesn't really

22        need to even show that.

23   Q.   So, in your opinion, is it proper laboratory practice

24        in creating a lab book to cover up information that's

25        included in a lab book by a table or a chart?
```

Ghassan Saed, Ph.D.

```
 1                    MS. O'DELL:  Object to form.

 2                    THE WITNESS:  I didn't cover it, I just

 3          showed it to you.

 4     BY MR. HEGARTY:

 5     Q.   I'm talking about in the creation of a lab book,

 6          though, is it considered proper methodology to take a

 7          printout from a test and paste over text in the lab

 8          notebook?

 9                    MS. O'DELL:  Object to the form.

10                    THE WITNESS:  I just told you.  So my answer

11          is the information that she decided to hide this that

12          you're talking about is an established methodology in

13          my lab that doesn't even need to be here.  She chose

14          to just -- over it for a space limitation, that's all,

15          but it's not hidden, you can see it.

16     BY MR. HEGARTY:

17     Q.   Thank you.

18     A.   If we hide it, we can -- we don't have to have it

19          there.

20     Q.   That information, though, was not photocopied and

21          provided to us in advance of the deposition, correct?

22     A.   What information?

23     Q.   The information that was covered by that chart.

24                    MS. O'DELL:  Object to the form.

25                    THE WITNESS:  I know, I see, there is no
```

Ghassan Saed, Ph.D.

```
 1          information covered by that chart, that is not needed

 2          to be there.

 3     BY MR. HEGARTY:

 4     Q.   But there is information that's been covered, correct?

 5               MS. O'DELL:  Object to the form.

 6               THE WITNESS:  I answered, I said there is not

 7          relevant information that is covered, intentionally

 8          covered.

 9     BY MR. HEGARTY:

10     Q.   Over on Page 103 of Exhibit Number 2, Bates Number 79,

11          there is another or other words that have been whited

12          out.  What are those other words?

13               MS. O'DELL:  Object to the form.

14               THE WITNESS:  I mean I can read the word.

15     BY MR. HEGARTY:

16     Q.   What is the word?

17     A.   It says sample something.

18     Q.   Why was that whited out?

19     A.   Maybe it doesn't belong here.

20     Q.   Do you know why it was whited out?

21     A.   I think it doesn't belong here.

22     Q.   Who whited it out?

23     A.   Flory.

24     Q.   Is that whiteout okay to you in terms of doing a

25          proper -- having a proper methodology for preparing a
```

Ghassan Saed, Ph.D.

```
1        lab notebook?

2                     MS. O'DELL:  Objection to the form.

3                     THE WITNESS:  I prefer without it but it's

4        what it is.

5    BY MR. HEGARTY:

6    Q.   Doctor, would you look at Exhibit Number 1 at Bates

7         Stamp 57, please.

8    A.   Exhibit Number -- this is --

9    Q.   Yes, what you have in front of you.

10   A.   57?

11   Q.   Correct.  That corresponds to Page 84 of the lab

12        notebook.  There is now in the lab notebook a table

13        that is pasted there that appears to have been removed

14        from the page that we received that was photocopied and

15        is part of Exhibit Number 1.  Can you explain why our

16        copy does not include that table?

17                    MS. O'DELL:  Object to the form.

18                    THE WITNESS:  No idea.

19   BY MR. HEGARTY:

20   Q.   Okay.

21   A.   But it's here.

22   Q.   Well, do you know what else --

23   A.   This is this.

24   Q.   Do you know what other charts were removed from the

25        copy that we received?
```

Ghassan Saed, Ph.D.

```
 1    A.    No one removed anything.

 2               MS. O'DELL:  Excuse me, when you say this is

 3          this, I don't know that that's clear on the record

 4          because you're pointing to the notebook.

 5               THE WITNESS:  This is the results and this is

 6          the graph from the results.

 7    BY MR. HEGARTY:

 8    Q.    Well, can you explain to us if this page was copied and

 9          included in Exhibit Number 1, why this chart is not in

10          Exhibit Number 1?

11    A.    No idea.

12    Q.    You agree that --

13    A.    When we scanned it probably didn't show up, I don't

14          know.

15    Q.    Well, you would agree that it would had to have been

16          removed, correct; otherwise it would appear on the

17          paper?

18    A.    I don't agree.

19    Q.    Well, you can tell on the copy that there are places

20          there that look like where tape had appeared, correct?

21               MS. O'DELL:  Object to the form.

22               THE WITNESS:  So same thing here, tape

23          appeared and it's there.

24    BY MR. HEGARTY:

25    Q.    Did you instruct -- strike that.  Did you instruct
```

Ghassan Saed, Ph.D.

```
 1          someone to copy this notebook?

 2    A.    To scan the notebook.

 3    Q.    Who did you instruct to do that?

 4    A.    Flory, my research assistant.

 5    Q.    And did you instruct her to remove this table on

 6          Page 84?

 7    A.    Absolutely not.

 8    Q.    Do you know why it's not there?

 9    A.    No idea, but the marks of this one are showing, and the

10          graph is showing, so this should show up, I don't know

11          why it's not showing up.

12    Q.    I'm going to direct you to Bates Stamp Page 62.

13    A.    Same thing.

14    Q.    Which is -- which corresponds to handwritten Page

15          Number 87, there again is a chart --

16    A.    You referring to this one or this one?

17    Q.    I'm referring to 87, there again in the copy portion at

18          the upper part of the page there is a table or a chart

19          that is not included in the copy we've been given.  Do

20          you know why that is the case?

21               MS. O'DELL:  Objection to the form.

22               THE WITNESS:  So I think this is probably

23          technical through scanning, I have no idea the answer

24          is.

25
```

Ghassan Saed, Ph.D.

```
 1   BY MR. HEGARTY:

 2   Q.   Then under --

 3   A.   But we do have all the data.

 4   Q.   Under that table there appears to be some very vague

 5        what appears to be handwriting.  Can you explain what

 6        that is?  That again is on Bates Stamp 62, Page 87 of

 7        the original lab notebook.

 8   A.   I don't know what that is.

 9   Q.   Doctor, is this lab notebook typical of the lab

10        notebooks you generate for all the experiments you've

11        conducted?

12             MS. O'DELL:  Object to the form.

13             THE WITNESS:  What do you mean by typical?

14   BY MR. HEGARTY:

15   Q.   Well, is this -- the things we've talked about here

16        this morning, would those same things appear in all the

17        lab notebooks that you prepare as part of your

18        experiments?

19             MS. O'DELL:  Object to the form.

20             THE WITNESS:  So for -- most of our

21        experiments are documented in a lab notebook like this.

22   BY MR. HEGARTY:

23   Q.   Do most of your experiments -- strike that -- do most

24        of the notebooks of your experiments have whiteout in

25        them?
```

Ghassan Saed, Ph.D.

```
 1    A.    Oh, that's what you're saying?

 2    Q.    Yes.

 3    A.    No.

 4    Q.    Have you ever seen one of your other notebooks for your

 5          lab experiments have whiteout in them and handwriting

 6          over that whiteout?

 7    A.    It's not a general practice.  The answer is I don't

 8          remember.

 9    Q.    Does your lab have standard operating procedures for

10          how a lab notebook is to be prepared?

11                MS. O'DELL:  Objection to the form.

12                THE WITNESS:  So from who?  From our own lab?

13    BY MR. HEGARTY:

14    Q.    Correct.

15    A.    So this is the procedure that we follow for our lab.

16    Q.    Do you have any written standards on how you are to

17          prepare a lab notebook?

18    A.    No.

19    Q.    Do you instruct those within your lab on how to prepare

20          a lab notebook based on any published methods for

21          preparing a lab notebook?

22    A.    So most of our work nowadays -- in the past we used to

23          do a lot of lab notebooks, but most of the work that we

24          do right now, most of it is electronically, and just to

25          keep a record in case something happened to electronic
```

Ghassan Saed, Ph.D.

```
 1          version, we print it and paste it in the lab notebook.

 2          So in the past we used to take more precautions for lab

 3          notebooks, but these days because of this electronic

 4          facilities and help, we just print it and paste it

 5          there.

 6     Q.   Did you instruct those who prepared the lab notebooks

 7          that we've been looking at here today on how to prepare

 8          laboratory notebooks?  Did that instruction come from

 9          you?

10     A.   Yes.

11     Q.   Was that instruction based on any published standards

12          in the literature for how to prepare a lab notebook?

13     A.   That was based on what I've been told since 1983.

14     Q.   Where were you taught that in 1983?

15     A.   I did my Ph.D. in molecular biology.

16     Q.   Where was that?

17     A.   Where?

18     Q.   Yes.

19     A.   England.

20     Q.   What school in England?

21     A.   University of Essex.

22     Q.   You learned at the University of Essex on how to

23          prepare a laboratory notebook?

24     A.   Sure.

25     Q.   You used that training to instruct those who prepared
```

Ghassan Saed, Ph.D.

```
1          the laboratory notebooks we've been looking at today on

2          how to prepare lab notebooks, correct?

3     A.   I instruct the lady who did this, yes, how to prepare

4          lab notebook.

5     Q.   Did you ever instruct her about what to do in the case

6          of needing to correct information that has been written

7          in the lab notebook?

8     A.   Yes, she actually knows that because on, I already

9          instruct her not to do the whiteout, she did it

10         anyways, but her defense was, oh, I am only doing it on

11         words that we already -- on procedures that is not even

12         supposed to be there, it's like a normal practice

13         procedure that we have done many times.

14    Q.   Doctor, if you would turn over to Bates Stamp 25 in

15         Exhibit Number 1, which is Page 53 in the notebook.

16    A.   ELISA.

17    Q.   Under the -- in the section on the upper part of the

18         page there appears to be documentation of adding talc

19         to the cells; is that correct?

20    A.   Where do you see that?  Cells were seeded, density --

21    Q.   Can I look at it, Doctor?

22    A.   Treat with --

23    Q.   This part of the notebook, what is described where

24         you're talking about X1 X2 X3?

25    A.   Okay.  These are the dilution of talc that we used, 5
```

Ghassan Saed, Ph.D.

```
 1          micrograms, 20 micrograms, and 100 micrograms.  These

 2          are the three doses that we used, and this is how we

 3          got them.

 4     Q.   With these doses are you adding DMSO?

 5     A.   The talc was dissolved in DMSO.

 6     Q.   Does the lab notebook show how much DMSO was used for

 7          each sample?

 8     A.   How much DMSO?  Yeah.

 9     Q.   Yes.  Where is that?

10     A.   Let me see.  So you -- where is it -- it's

11          50 milligrams per ml, so one ml, that's the initial

12          concentration, 50 milligrams of the talc with one ml of

13          the DMSO.

14     Q.   Did the amount of DMSO increase with the increasing

15          doses of talc?

16     A.   No, no, no, no, okay, let me explain this.

17               MS. O'DELL:  What page were you referring to,

18          Doctor?

19     BY MR. HEGARTY:

20     Q.   Thank you.

21     A.   The first page.

22     Q.   What's that page number?

23     A.   1.

24     Q.   Page 1, okay.

25     A.   So let me explain this.  So we prepare a stock solution
```

Ghassan Saed, Ph.D.

```
 1          of the talc powder plus DMSO, the solvent, which is

 2          50 milligrams per ml, you can upscale it, downscale it,

 3          from there we dilute, as you can see here, it says the

 4          exact delusions, and it says X1 times 10 to the 4th

 5          microgram per ml, that's what you want to get, and

 6          that's 15 ml times 5 micrograms per ml, that's the

 7          concentration desired, and then you take -- this will

 8          tell you how much volume you add to the cells.  So we

 9          added 2.35 microliters that correspond to 5 micrograms

10          per ml, 10 microliters corresponded to 20, and so on,

11          50 corresponded to that, and then the untreated cells

12          got that DMSO alone.

13                    MS. O'DELL:  What page --

14     BY MR. HEGARTY:

15     Q.   The DMSO at 2.5, 10, and 50?

16     A.   DMSO.

17     Q.   DMSO at 2.5, 10, and 50?

18                    MS. O'DELL:  Excuse me, what page are you

19          referring to?

20                    THE WITNESS:  This Page 53 right here.

21                    No, so the DMSO has no concentration.  The

22          DMSO is the solvent where you dilute, dissolve the

23          talc.

24     BY MR. HEGARTY:

25     Q.   My question is -- was, though, with regard to the
```

Ghassan Saed, Ph.D.

```
 1        controls --

 2   A.   Volumes, you use volumes.

 3   Q.   -- did you, for each level of talc applied to the

 4        cells, for the corresponding controls did you also

 5        apply DMSO?

 6   A.   Yes.

 7   Q.   At what volume?

 8   A.   It's 2.5, 10, and 50.

 9   Q.   Of DMSO alone?

10   A.   Correct.

11   Q.   If you turn over to Page 55, I'm sorry, 53 in the lab

12        notebook, which is Bates Stamped 27 in the copy

13        version, Page 53.

14   A.   This one?  Same page?

15   Q.   55, Page 55 of the lab notebook, which is Bates Stamped

16        27.

17   A.   Okay.

18   Q.   Is this -- does this page describe the BCA protein

19        detection assay?

20   A.   Correct.

21   Q.   And does the assay work by measuring the amount of

22        color change, that is, the more color change you

23        detect, the greater the response it indicates?

24   A.   Are you saying it's a colorimetric assay?

25   Q.   Well, I'm not sure.  I can ask it in a different way.
```

Ghassan Saed, Ph.D.

```
 1          Does the assay work by you measuring the amount of

 2          color change?

 3                    MS. O'DELL:  Object to the form.

 4                    THE WITNESS:  The answer -- I just answered

 5          you.

 6     BY MR. HEGARTY:

 7     Q.   Which is?

 8     A.   Are you referring to --

 9     Q.   Well, explain how it works with regard to color.

10     A.   Okay, oh, I would love to, I'll be very happy to do

11          that.  Okay, so this is measuring the optical density

12          of the concentration of the protein that is correlated

13          to the -- how much protein is there.  You measure the

14          optical density absorbance at 5, 62 nanometer, and you

15          construct a standard curve from BSA, and the standard

16          curve is known concentration, and it tells you when

17          it -- where is the absorption and what's the slope of

18          the line, and that helps you extrapolate the unknown

19          samples from your standard curve.

20     Q.   So is --

21     A.   It is a colorimetric assay.

22     Q.   It's measuring a color change, correct?

23     A.   No.

24     Q.   When you say colorimetric assay, what do you mean?

25     A.   It's extension coefficient, it measures BSA at specific
```

Ghassan Saed, Ph.D.

```
 1          wavelength.

 2    Q.    And what did you do to validate that the assay would

 3          work with the presence of talc?

 4    A.    What assay?

 5    Q.    This assay.

 6    A.    This assay is not for talc, this assay is a standard

 7          curve to measure -- to use a standard for -- so we can

 8          apply the same amount of protein for each sample.

 9    Q.    But you are using -- you are measuring the samples

10          after they've been -- after talc has been applied,

11          correct?

12    A.    We are measuring each like, for example, okay --

13                MS. O'DELL:  Refer to a specific page.

14                THE WITNESS:  Let's say, for example,

15          catalase, so we are measuring catalase, but to measure

16          catalase, you need to compare between samples, right?

17          You need to compare between treated versus untreated.

18          How are you -- how can you determine that you have the

19          same amount of protein?  What if you have more protein

20          here than here?  The results is not accurate.  So we

21          use BSA as a standard to measure and standardize all

22          the samples to the same amount of protein, so the

23          comparison would be -- the comparison would be

24          accurate.

25
```

Ghassab Saed, Ph.D.

```
 1   BY MR. HEGARTY:

 2   Q.   How did you rule out the possibility that the color

 3        change or the wavelength change was due to the talc

 4        particles themselves as opposed to any effect they were

 5        having?

 6             MS. O'DELL:  Object to the form.

 7             THE WITNESS:  Yeah, so we use the same cell

 8        line, we split the cells, we grow the cells, some cells

 9        get the talcum powder, the same cells, the other

10        aliquot get no talcum powder, we extract proteins, we

11        correct for the differences in the extraction of

12        proteins, and then we run catalase, for example.

13   BY MR. HEGARTY:

14   Q.   Within the proteins extracted, would there still be

15        talc particles?

16   A.   No, no.

17   Q.   How do you know there are not talc particles?

18   A.   Because these are total proteins.  You extract

19        proteins.  There is a process of extraction of

20        proteins.  You wash off all the media, you precipitate

21        the cells, you lyse the cells, you extract proteins.

22   Q.   How many times did you repeat the experiment you just

23        described for catalase?

24   A.   So all this work from January 24th till the end of this

25        work, it's done in triplicate.
```

Ghassan Saed, Ph.D.

1    Q.    What does being done in triplicate mean?

2    A.    Every experiment is done in triplicate.

3    Q.    Explain that to me.

4    A.    Okay.  So, for example, if you look at, see how --

5    Q.    What are you looking at?

6    A.    For example, 56, if you look at 56, look at the table.

7              MS. O'DELL:  Give us just a minute to get

8          there.

9    Q.    Okay, go ahead.

10   A.    You have the table?

11   Q.    Yes.

12   A.    Okay.  If you look at the table it says -- this

13         particular ovarian cancer cell line, TOV-112-C, you

14         have C, you have 5 microgram, you have 20 micrograms,

15         and you have 100 microgram, you see them?  And you can

16         see OD1, OD2, OD3, blank, blank, blank, so triplicate,

17         three times.  The blank three times, the experiment

18         three times, and subtract from the blank and do the

19         calculation.

20   Q.    You're measuring the same protein extracted three

21         times?

22              MS. O'DELL:  Object to the form.

23   BY MR. HEGARTY:

24   Q.    Is that correct?

25

Ghassan Saed, Ph.D.

```
 1    A.   I am not measuring the protein, I'm measuring catalase.

 2    Q.   You're measuring the catalase.

 3    A.   Catalase and control cells versus treated cells, okay,

 4         in triplicates.

 5    Q.   So you measure it once using the same sample, you

 6         measure the same sample two more times?

 7    A.   Okay, oh, now I understand your question, okay.  So

 8         this triplicate is for the assay, so we did one, two,

 9         three, four, five, six cell lines in triplicate each

10         time point.

11    Q.   When you say in triplicate, does that mean you have

12         three sets of petri dishes or are you doing one set of

13         petri dishes and you're doing the test three times?

14              MS. O'DELL:  Objection.

15              THE WITNESS:  So it is -- this one here is

16         one set of petri dish, and it's done in triplicate for

17         each time point.

18    BY MR. HEGARTY:

19    Q.   So you didn't -- for each cell line you didn't have

20         three --

21    A.   Independent.

22    Q.   -- independent cultures and then test each independent

23         culture against the others.  You had one independent

24         culture you tested three times?

25              MS. O'DELL:  Object to the form.
```

Ghassan Saed, Ph.D.

```
 1   BY MR. HEGARTY:

 2   Q.   Is that correct?

 3               MS. O'DELL:   If you need to read his

 4        question, it was confusing.

 5               THE WITNESS:   Independent cultures, what does

 6        that mean?

 7   BY MR. HEGARTY:

 8   Q.   Well, I tried to use your word.

 9   A.   I know.

10   Q.   Did you have for each cell line three separate petri

11        dishes, three petri dishes, so you ran the experiment

12        essentially three times for each cell line or did you

13        have one petri dish with a cell line in it, extract the

14        catalase, and run that extraction three times?

15   A.   No, no, no.  How can you -- okay, I'm confused now.

16        Okay, so how can you have one petri dish and you

17        extract three time points of treatment?

18   Q.   I'm not asking you --

19   A.   So we have three, we have three, we have actually four,

20        one, two, three, four, four independent culture dishes

21        for each treatment.

22   Q.   Correct.

23   A.   That is done in triplicate.

24   Q.   And what you say in triplicate, that means you're

25        taking the extraction and you're testing it three
```

Ghassan Saed, Ph.D.

```
1          times, the same extraction.

2    A.    For each time point.

3    Q.    For each time point.

4    A.    Yes.

5    Q.    You don't have petri dishes that have the same cells in

6          it for three separate petri dishes, then doing the

7          extractions for each of those three petri dishes, do

8          you follow my question?

9    A.    Yeah, I follow the question.

10              MS. O'DELL:  Objection.

11              THE WITNESS:  You cannot do that because then

12          you have to do triplicate of triplicate.

13   BY MR. HEGARTY:

14   Q.    Exactly.

15   A.    Have I done that?

16   Q.    Yes.

17   A.    No.

18   Q.    Okay.  That was my question.

19   A.    Not for this assay.

20   Q.    Have you ever done assays like that where you've had --

21   A.    Yes.

22   Q.    -- multiple?

23              MS. O'DELL:  Let him finish.

24   BY MR. HEGARTY:

25   Q.    Have you done assays like that where you've used the
```

Ghassan Saed, Ph.D.

```
1        same cell line in three different dishes and done the

2        triplicate, triplicate, triplicate off of each dish?

3                MS. O'DELL:  Object to the form.

4                THE WITNESS:  Okay, so in the past I have

5        done -- this is a very important question, it is always

6        raised when we submit our data to be considered for

7        publication, they will say did you do a real triplicate

8        or a triplicate of the assay.  So the answer is we have

9        done that in the past, and in our system here there is

10       no difference between -- because catalase have been

11       done in our lab, we published with it, it is a standard

12       protocol in our lab, and we never have -- we test it

13       for intra-assay variation triplicates, and that was not

14       the case.  Did we test that?  Yes, we did, but not for

15       talc treatment per se, because these are established

16       protocols in our lab, we already know and we learn from

17       them, so you don't really need to do a triplicate of a

18       triplicate of a triplicate.

19   BY MR. HEGARTY:

20   Q.  Thank you.  On Page 26 of the Bates Stamp document

21       Number 1, which is after --

22               MS. O'DELL:  54 of the lab.

23               MR. HEGARTY:  Is it 54 of the lab notebook?

24       Because I can't -- my page doesn't have a handwritten

25       number.
```

Ghassan Saed, Ph.D.

```
 1                    MS. O'DELL:  So you wanted 26 of the Bates,

 2          and that's at the bottom left corner 54.

 3                    THE WITNESS:  This?

 4     BY MR. HEGARTY:

 5     Q.   Yes.  Your sample ID for -- your sample IDs run from

 6          356 to 386, is that right?

 7     A.   So let me understand your question.  Are these numbers

 8          in serial number?

 9     Q.   Are these the sample ID numbers of your tests?

10     A.   Okay, so the sample ID correspond to each specimen,

11          yes, each cells.

12     Q.   And those sample IDs run in chronologic order from 356

13          to 386?

14     A.   No, they're missing.  For example, there is 60 -- where

15          is it -- actually, 84, 85, yes, they are.

16     Q.   So you're right, they jump from 371 to 379, do you see

17          that?

18     A.   Yeah.

19     Q.   Why is that?

20     A.   Because, you see, these are already, these cells were

21          treated in different times, so that's why they get

22          different IDs.

23     Q.   Okay.

24     A.   This is a lot of work.  You can't do it in one time.

25     Q.   What type of test is -- or strike that.  Then if you
```

Ghassan Saed, Ph.D.

```
 1          turn over to Page 69 of Exhibit Number 1, which, again,
 2          my copy doesn't have a handwritten page number on it.
 3                    MR. LAPINSKI:  Counsel, just to confirm, when
 4          you refer to page numbers, you're referring to the
 5          Bates Numbers, correct?
 6                    MR. HEGARTY:  In this case I'm referring to
 7          Page 69 in Exhibit Number 1, which is the Bates Number.
 8                    MS. O'DELL:  Well, and to be -- I think in
 9          the lower right-hand corner of your page that's 94, and
10          that's what was produced so --
11                    MR. HEGARTY:  If you go to Page 94, then,
12          Doctor.
13   BY MR. HEGARTY:
14   Q.   It should be this.
15   A.   Yes.
16   Q.   Are those the same sample numbers that we looked at in
17        the prior -- on the prior page?
18   A.   What page was it?  Sorry.
19   Q.   That was Page 54.
20   A.   Yes.
21   Q.   Do those refer to the same samples?
22   A.   Yes.
23   Q.   If you turn next, then, to page Bates Number 76 Exhibit
24        Number 1, Page 100 in the laboratory notebook, there
25        are -- do you see what I'm referring you to, Doctor,
```

Ghassan Saed, Ph.D.

```
 1        Page 100?

 2   A.   Yes.

 3   Q.   There are again sample numbers listed there.  Are those

 4        for a different test?

 5   A.   This is for different test, this is Caspase-3 activity.

 6   Q.   Are you using the same sample numbers as in the

 7        previous test?

 8   A.   It should indicate here, so 368, 369, 370, so the

 9        answer is yes, some of them, the numbers that

10        correspond they are -- let me see, hold on, let me just

11        make sure.  So this is for ELISA, we did the normal --

12        so the answer is yes.

13   Q.   If you're using the same numbers for different tests,

14        how are you able to keep those straight?

15             MS. O'DELL:  Objection, form.

16             THE WITNESS:  Okay.  So let me explain this.

17        So here, this is the sample ID, the treated cells.

18   BY MR. HEGARTY:

19   Q.   That's on Page --

20   A.   54.

21   Q.   Okay.

22   A.   So this is the sample ID, and this is what are they,

23        what each cell line definition.  Now, this was

24        subjected to isolation of protein, okay, and we use

25        BSA, as we discussed, as a standard, then you isolate
```

Ghassan Saed, Ph.D.

```
 1            the total protein from it, now you can do what we did,

 2            we can do catalase, we can do SOD, we can do different

 3            markers from total proteins.  Caspase-3 is included.

 4   Q.  Got you, okay thank you.  I'm probably going into a

 5            different section that's going to take a while if you

 6            want to take a break now or keep going.

 7                    MS. O'DELL:  It's 12:15, Doctor, would you

 8            like a short break for lunch or what's your preference?

 9                    THE WITNESS:  Yes.

10                    MR. HEGARTY:  Let's go off the record.

11                    THE VIDEOGRAPHER:  Going off the record at

12            12:16 p.m.

13                    (A recess was taken.)

14                    THE VIDEOGRAPHER:  We are back on the record

15            at 1:26 p.m.

16   BY MR. HEGARTY:

17   Q.  Doctor, you brought with you a notebook that appears to

18            contain articles and perhaps a number of other

19            documents.  What is in the notebook that you have in

20            front of you?

21   A.  So I have my report that I submitted, my CV, and my

22            references.

23   Q.  I'll mark that notebook as Exhibit Number 11.

24

25
```

Ghassan Saed, Ph.D.

```
1               SAED DEPOSITION EXHIBIT NUMBER 11,

2               NOTEBOOKS,

3               WAS MARKED BY THE REPORTER

4               FOR IDENTIFICATION

5    BY MR. HEGARTY:

6    Q.   So Exhibit Number 11 is the notebook you brought with

7         you to the deposition here today?

8    A.   This, yes.

9                 MS. O'DELL:  There are actually two parts.

10   BY MR. HEGARTY:

11   Q.   There are two parts.  Where is the other part?

12                MS. O'DELL:  It's right here.

13   BY MR. HEGARTY:

14   Q.   Both parts of the notebook contain what?

15   A.   So references 86 continued 89.

16   Q.   Did you compile Exhibit Number 11?  Did you put that

17        together?

18   A.   Number 11 we're talking about?  Sorry.

19   Q.   Number 11 are both notebooks.

20   A.   Yes.

21   Q.   Did you choose the articles to put in Exhibit

22        Number 11?

23   A.   My references from the articles, yes.

24                MS. O'DELL:  Just I think there's some lack

25        of clarity.  You chose the articles.  Did you copy the
```

Ghassan Saed, Ph.D.

```
 1       pages?

 2                    THE WITNESS:  No.

 3    BY MR. HEGARTY:

 4    Q.   Did you put the notebooks together yourself?

 5    A.   No.

 6    Q.   Do you know who put the notebooks together?

 7                    MS. O'DELL:  Objection, it's a little vague.

 8                    THE WITNESS:  You guys did it.

 9    BY MR. HEGARTY:

10    Q.   Counsel for Plaintiffs put the notebooks together?

11    A.   What do you call them, sorry?

12    Q.   Counsel for Plaintiffs put the notebooks --

13    A.   Yes, sorry, I'm just having -- I thought that I put the

14         references together, yes.

15    Q.   I want to talk in more detail about Exhibit Number 7.

16         That's your manuscript.

17    A.   Okay.

18    Q.   When did the writing process begin for Exhibit 7?  And

19         this goes back to the original version that you

20         submitted to --

21    A.   Yes.

22    Q.   -- OB-GYN Oncology.

23    A.   September I think.

24    Q.   Do you know approximately when in September?

25    A.   I can't remember.
```

Ghassan Saed, Ph.D.

```
 1    Q.   Dr. Fletcher is identified as the lead author.  How did

 2         that come about?

 3    A.   She is not the lead author.

 4    Q.   Who is the lead author?

 5    A.   I am.

 6    Q.   The reason I thought she was lead author is on the

 7         second page of Exhibit Number 7 after the title she's

 8         the first author listed.

 9    A.   That's -- lead author is the corresponding author,

10         that's me.

11    Q.   What was the involvement of -- strike that.  What was

12         Dr. Fletcher's involvement in the preparation of this

13         article?

14    A.   So for the articles, she helped in doing the -- on this

15         article or experiments, the whole thing, or just this

16         article?

17    Q.   Just on the article.

18    A.   Okay, so her role was basically reading after me make

19         sure that the methods are what we really used, typos

20         and like help read proofing.

21    Q.   What was Dr. Harper's involvement in preparation of the

22         manuscript?

23    A.   Analysis of data, interpretation of data, she's a

24         clinical OB-GYN oncologist.

25    Q.   What was Dr. -- or, I'm sorry, what was Ira Memaj?
```

Ghassan Saed, Ph.D.

```
 1    A.    Ira Memaj was a medical student that helped also in

 2          looking for the grammar and proofreading mostly.

 3    Q.    What was Rong Fan's involvement?

 4    A.    Same thing.  Now, the authors that are here, not

 5          necessarily because they participated in writing the

 6          manuscript, but they own the authorship because they

 7          participated in the work that created the manuscript.

 8    Q.    What was Robert Morris's -- Dr. Robert Morris's --

 9    A.    Dr. Morris is the OB-GYN Oncology chief, and he helped

10          in also editing the manuscript and help interpretation

11          of data clinically.

12    Q.    Who prepared the original manuscript?  Who was the

13          author?

14    A.    I did.

15    Q.    Did anyone help you write the original manuscript?

16    A.    No.

17    Q.    Did anyone in any way contribute to the manuscript

18          besides those individuals listed in Exhibit Number 7?

19    A.    No.

20    Q.    Over on Page 12 in the Acknowledgments section there's

21          a notation thanking Imaan Singh.

22    A.    Yes, she was a medical student.

23    Q.    What did Imaan Singh do?

24    A.    She helped in running some experiments for us.

25    Q.    Anyone else assist in any way in the preparation of the
```

Ghassan Saed, Ph.D.

```
 1        article besides those we talked about?

 2   A.   No, so she -- that's why she's in the acknowledgment,

 3        not in the authorship, because she was repeating

 4        experiments.

 5   Q.   In connection with the experiments that you conducted

 6        that went into preparing or that led to preparing of

 7        this manuscript, did you prepare a proposal to request

 8        funding of the experiments in the article?

 9             MS. O'DELL:  Object to the form.

10             THE WITNESS:  I created a budget so to see

11        how much this will cost me.

12   BY MR. HEGARTY:

13   Q.   When you seek funding from NIH, for example, or another

14        organization, you have to prepare a formal grant

15        request where you set out and provide certain

16        information describing what you intend to do and how

17        much it's going to cost, correct?

18   A.   For NIH?

19   Q.   Yes.

20   A.   Yes.

21   Q.   Did you prepare any kind of grant request in connection

22        with the experiments that went into preparing this

23        manuscript?

24             MS. O'DELL:  Object to the form, other than

25        he's testified to.
```

Ghassan Saed, Ph.D.

```
 1                    THE WITNESS:  The answer is no.

 2   BY MR. HEGARTY:

 3   Q.   Did you submit the budget you created to anybody?

 4   A.   Official funding agencies, no.

 5   Q.   Did you provide the budget to Counsel for Plaintiffs,

 6        Beasley Allen?

 7   A.   I can't remember.

 8   Q.   Do you still have a copy of the budget?

 9   A.   I do.

10   Q.   Did you prepare any type of protocol or outline in

11        advance of the experiments describing the methods or

12        goals of the experiments?

13   A.   In writing?

14   Q.   In writing.

15   A.   I don't remember.

16   Q.   Is that something that's commonly done -- or strike

17        that.  Is that something you commonly do in your work

18        in connection with doing studies that then go into a

19        journal article?

20                    MS. O'DELL:  Object to the form.

21                    THE WITNESS:  So the way I do this, this

22        is -- again, this is routinely done in our lab, and we

23        ran a pilot experiment using PCR, using single dose,

24        and when we saw the data and we saw that there's a

25        biological effect, then we had a plan of what to do,
```

Ghassan Saed, Ph.D.

```
 1              and which is the whole study.

 2      BY MR. HEGARTY:

 3      Q.   Do you prepare that plan in writing?

 4      A.   In writing?

 5      Q.   Yes.

 6      A.   I really don't need to because it's the technology

 7           again, it is all applied in our laboratory, and we are

 8           testing the markers that we been extensively publishing

 9           on and testing through our lab.

10      Q.   For any articles that you have published in scientific

11           journals, have you ever prepared an outline or protocol

12           describing what you're going to do before you actually

13           do the experiments?

14              MS. O'DELL:  Object to the form.

15              THE WITNESS:  Yeah, so, again, I'm just

16           trying to explain to you that the methodology is in

17           place, it's in the lab, it's been published, it's been

18           referenced, and we test the same markers over and over,

19           so there is no need to every time write this down.

20      BY MR. HEGARTY:

21      Q.   But have you ever prepared in connection with a journal

22           article you're going to hopefully write after doing

23           experiments an outline or an overview or a summary of

24           what you're going to do before you then go on and do

25           it?
```

Ghassan Saed, Ph.D.

```
 1    A.    We write the methodology.

 2    Q.    So you have written methodologies for what you're going

 3          to do before you actually start the experiments?

 4                MS. O'DELL:  Object to the form, that's not

 5          what he said.

 6                THE WITNESS:  Not this experiment.

 7    BY MR. HEGARTY:

 8    Q.    On other occasions you have done that?

 9    A.    Yes.

10    Q.    On other occasions when you have published articles in

11          scientific and medical journals?

12    A.    Not all the times, no.

13    Q.    When is it that you do prepare an outline or protocol?

14    A.    When it is something that is not routinely daily test

15          that is performed in our laboratory, something

16          different.

17    Q.    Did you discuss the results of the testing or the

18          experiments with anyone outside of the authors on the

19          manuscript?

20                MS. O'DELL:  Objection to form.

21                THE WITNESS:  Yes, so the answer -- I'm

22          sorry, that wasn't the answer.  This part of this work

23          was accepted and presented at national meetings, was

24          presented at SRI, presented at ASRM, and it was open

25          for everybody to discuss.
```

Ghassan Saed, Ph.D.

```
 1   BY MR. HEGARTY:

 2   Q.   So tell me again what meetings this --

 3   A.   SRI.

 4   Q.   -- testing was presented.

 5   A.   SRI March 2018, and then if I recall correctly, ASRM

 6        October --

 7                 MS. O'DELL:  ASRM, is that what you're

 8        saying?

 9                 THE WITNESS:  No, it wasn't ASRM.  I forgot

10        which the other one -- SGO, SGO, I forgot where I

11        submitted, sorry, but I did submit two abstracts and I

12        presented them in national meetings, SRI for sure was

13        March -- I believe it was SGO.

14                 MS. O'DELL:  For the record, Doctor, what

15        does SGO stand for?

16                 THE WITNESS:  Society of Gynecology and

17        Oncology.

18   BY MR. HEGARTY:

19   Q.   In March of 2018?

20   A.   The SRI meeting, yes, that was the preliminary study.

21   Q.   The lab notebook you provided includes entries for work

22        that occurred after March 2018, correct?

23   A.   Correct.

24   Q.   What did you then present in March of 2018?

25   A.   We presented the work that we did preliminary just to
```

Ghassan Saed, Ph.D.

```
 1          show the effect on using just PCR.

 2   Q.     Did you discuss the contents of the manuscript, Exhibit

 3          Number 7, with anyone besides the authors during the

 4          time it was being written?

 5   A.     No.

 6   Q.     Did you discuss the contents of the manuscript during

 7          the time it was being written with attorneys for

 8          Beasley Allen or any other Plaintiff's Counsel in this

 9          case?

10              MS. O'DELL:  Don't discuss -- I'm going to

11          instruct you not to answer that question.

12   BY MR. HEGARTY:

13   Q.     Doctor, if you would turn to --

14              UNIDENTIFIED ATTORNEY:  Excuse me, was that a

15          yes or no question?  You're instructing him not to

16          answer whether he discussed the contents?

17              MS. O'DELL:  Well, the question presupposes

18          the subject matter of the discussion and that's the --

19          so I'm going to instruct him not to answer the

20          question.

21   BY MR. HEGARTY:

22   Q.     Doctor, would you turn to Page 12 of Exhibit 7, please.

23          Did you prepare the Conflict of Interest section on

24          Page 12?

25   A.     Yes.
```

Ghassan Saed, Ph.D.

```
1   Q.   For whom did you act as a consultant for a fee?

2   A.   Beasley Allen.

3   Q.   Why didn't you disclose Beasley Allen in this Conflict

4        of Interest disclosure?

5   A.   The name you mean?

6   Q.   Yes.

7   A.   Just add the name?  I didn't do it.

8   Q.   At the time you prepared this manuscript, you were

9        acting as a consultant for Beasley Allen in litigation

10       involving the topic of this paper, correct?

11  A.   Correct.

12  Q.   But you didn't identify that in the Conflict of

13       Interest disclosure that you were acting as a

14       consultant in litigation involving this topic for a

15       fee, correct?

16            MS. O'DELL:  Objection to form.

17            THE WITNESS:  The journal, this is sufficient

18       language for the journal.

19  BY MR. HEGARTY:

20  Q.   But you did not disclose that you were acting as a

21       consultant in litigation involving this topic, correct?

22            MS. O'DELL:  Objection to form.

23            THE WITNESS:  This is what I disclosed.

24  BY MR. HEGARTY:

25  Q.   At the time you prepared this disclosure, you were
```

Ghassan Saed, Ph.D.

```
 1          acting as a consultant -- strike that.  At the time

 2          that you prepared this conflict of interest, you were

 3          acting as a named testifying expert in the

 4          litigation -- in the talc litigation for plaintiffs

 5          lawyers, correct?

 6     A.   Is that the same question?  Yes.

 7     Q.   So at the time that you prepared this disclosure, you

 8          were not just a consultant, you were a testifying

 9          expert witness in litigation, correct?

10                    MS. O'DELL:  Objection to form.

11                    THE WITNESS:  As far as I know, I'm a

12          consultant, witness expert to consult in this matter,

13          yes.

14     BY MR. HEGARTY:

15     Q.   You did not disclose this relationship in the

16          acknowledgment, that is, this relationship that you

17          were a designated testifying expert in litigation

18          involving talc and ovarian cancer, correct?

19     A.   The language that I wrote here was sufficient by the

20          journal.

21                    MR. KLATT:  Objection, nonresponsive.

22     BY MR. HEGARTY:

23     Q.   Why didn't you disclose in this acknowledgment that you

24          were a designated expert on behalf of plaintiffs in

25          litigation involving talc and ovarian cancer?
```

Ghassan Saed, Ph.D.

```
 1   A.   No reason, I could add this --

 2   Q.   You say in the disclosure that you acted as a

 3        consultant regarding this topic for a fee.  What was

 4        the fee?

 5   A.   What was the fee?

 6   Q.   Yes.

 7   A.   I think $600 an hour.

 8   Q.   Was the fee the total amount you gave us for your

 9        invoices at the beginning of the deposition?

10   A.   Yes.  No?

11              MS. O'DELL:  Sorry, I was going to object, it

12        was a little unclear, but I think you understood his

13        question.

14   BY MR. HEGARTY:

15   Q.   Doctor, don't you agree that anyone reading this

16        article should know that you are a paid expert for

17        lawyers who have a financial interest in this subject

18        area?

19              MS. O'DELL:  Object to the form.

20              THE WITNESS:  Again, my response would be I

21        put the conflict of interest that I'm acting as a

22        consultant on this topic.

23   BY MR. HEGARTY:

24   Q.   Don't you think the --

25
```

Ghassan Saed, Ph.D.

```
 1   A.    -- for a fee.

 2   Q.    Don't you think the potential readers of this article

 3         are entitled to know that you are using this article to

 4         profit on this topic?

 5               MS. O'DELL:  Objection to form.

 6               THE WITNESS:  This is the language that is

 7         requested by the journal.

 8   BY MR. HEGARTY:

 9   Q.    Don't you think that anyone reading this article would

10         want to know that you have a financial interest in this

11         topic?

12   A.    It says clearly fee, for a fee.

13   Q.    You don't identify, though, the area of this topic in

14         which you're consulting, correct?

15               MS. O'DELL:  Objection to form.

16               THE WITNESS:  So for the reader of this, our

17         readers, it's enough to say I'm a consultant for a fee

18         on this topic.

19   BY MR. HEGARTY:

20   Q.    You are getting paid in this litigation to testify on

21         behalf of plaintiffs, correct?

22   A.    Yes.

23   Q.    Your testimony is supported by the manuscript, by

24         Exhibit Number 7, correct?

25               MS. O'DELL:  Objection to form.
```

Ghassan Saed, Ph.D.

```
 1                    THE WITNESS:  It's -- part of it is in the

 2          manuscript and part of it is not.

 3     BY MR. HEGARTY:

 4     Q.   You stand to benefit financially to the extent

 5          Plaintiff's Counsel use your article successfully in

 6          this litigation, correct?

 7                    MS. O'DELL:  Object to the form.

 8                    THE WITNESS:  I didn't understand the

 9          question.

10     BY MR. HEGARTY:

11     Q.   You stand to benefit financially to the extent that

12          Plaintiff's Counsel use your article in this

13          litigation, correct?

14                    MS. O'DELL:  Object to the form.

15                    THE WITNESS:  Can you -- I know but I don't

16          understand what you really want to say.

17     BY MR. HEGARTY:

18     Q.   You stand to benefit financially, make more money by

19          Plaintiff's Counsel using your article in this

20          litigation, correct?

21                    MS. O'DELL:  Object to the form.

22                    THE WITNESS:  No, I'm not aware, how they

23          going to make more money by using this?

24     BY MR. HEGARTY:

25     Q.   Well, they will continue to use you as an expert
```

Ghassan Saed, Ph.D.

```
 1        witness in all the cases to the extent they are

 2        successful in using your article, correct?

 3                 MS. O'DELL:  Object to the form.

 4                 THE WITNESS:  So they can use whatever they

 5        want.  This is my research and my lab.  These are the

 6        results that I stand for.

 7   BY MR. HEGARTY:

 8   Q.   Do you think they would pay you to testify in this

 9        litigation if your results were different in your

10        article?

11                 MS. O'DELL:  Object to the form.

12                 THE WITNESS:  This work, negative results or

13        positive results, both are results, so they're paying

14        for my time to consult.  Whether it's positive or

15        negative to them doesn't matter.

16   BY MR. HEGARTY:

17   Q.   Well, when you said you're acting as a consultant

18        regarding this topic, what is this topic?  Is it

19        inflammation and cancer?  Is it antioxidants?  Is it

20        talc?  How is the reader supposed to know?

21                 MS. O'DELL:  Object to the form.

22                 THE WITNESS:  If you read -- the reader will

23        read the title, which says Molecular Basis Supporting

24        the Association of Talcum Powder Use With Increased

25        Risk of Ovarian Cancer; very clear topic.
```

Ghassan Saed, Ph.D.

```
 1    BY MR. HEGARTY:

 2    Q.   The rest of the conflict of interest disclosure says

 3         that no other -- the authors declare -- the other

 4         authors declare there are no conflicts of interest; do

 5         you see that?

 6    A.   I do.

 7    Q.   So did any of the other authors consult on this topic

 8         for a fee, to your knowledge?

 9    A.   To my knowledge, no.

10    Q.   Were the other authors on this manuscript aware of your

11         relationship with the attorneys for Beasley Allen in

12         this litigation?

13    A.   Yes, they are.

14    Q.   How were they made aware of it?

15    A.   I made them aware of it.

16    Q.   When did you make them aware of it?

17    A.   When we started this whole thing.

18    Q.   What did you tell them?

19    A.   I tell them I'm acting as a -- what do you call it -- a

20         witness expert in this litigation.

21    Q.   Did you -- have you told them that you've been

22         designated to testify as an expert witness in this

23         litigation?

24              MS. O'DELL:  Objection, asked and answered.

25              THE WITNESS:  I just said -- shared with them
```

Ghassan Saed, Ph.D.

```
 1        that I was selected to be an expert witness in this

 2        topic.

 3   BY MR. HEGARTY:

 4   Q.   And you told them that before you started the

 5        experiments?

 6   A.   About, yeah.

 7   Q.   You are the senior author on this paper, correct?

 8   A.   Correct.

 9   Q.   Do you in any way supervise or do you in any way

10        supervise any of the work of the other authors?

11   A.   All the work that is in this manuscript is done under

12        my hundred percent supervision.

13   Q.   How about generally, do you supervise any of the other

14        authors?

15   A.   I do.

16   Q.   Do they report to you?

17   A.   Yes.

18   Q.   Which ones report directly to you?

19   A.   So Nicole King, Ira, Amy, and that's about all the

20        authors here.

21   Q.   Are you a resource for grant funding for things that

22        they work on?

23             MS. O'DELL:  Object to the form.

24             THE WITNESS:  Am I a resource?

25
```

Ghassan Saed, Ph.D.

```
 1    BY MR. HEGARTY:

 2    Q.   Yes.  Do they work on studies that you have received

 3         funding for?

 4    A.   No.

 5    Q.   Do they otherwise work for you -- let me strike that.

 6         Do they work for you -- have they done work for you

 7         outside of the work on this manuscript?

 8    A.   Some of them --

 9                 MS. O'DELL:  Object to form.

10                 THE WITNESS:  Some of them did.

11    BY MR. HEGARTY:

12    Q.   Do some of them still work for you?

13    A.   Yes.

14    Q.   Which of the authors still work for you?

15                 MS. O'DELL:  Object to the form.

16                 THE WITNESS:  Work for me or work with me?

17    BY MR. HEGARTY:

18    Q.   Work for you.

19    A.   Work for me?

20                 MS. O'DELL:  Object to the form.

21                 THE WITNESS:  So what's work for me means?

22         I'm their supervisor?

23    BY MR. HEGARTY:

24    Q.   Yes.

25    A.   I'm paying their salary?
```

Ghassan Saed, Ph.D.

```
 1   Q.   You're their supervisor.  Are you their supervisor?

 2   A.   Yes, I'm supervisor of Rong Fan, she is my research

 3        technician or assistant.  I am the Fellow Director for

 4        the fellowship of Amy Harper.  And let's see who's

 5        here, Ira's no longer with us, she went to medical

 6        school in New York.

 7   Q.   Do you prepare evaluations for -- have you prepared

 8        evaluations for any of the authors on this paper?

 9   A.   Previously?

10   Q.   Previously.

11   A.   Nicole Fletcher.

12   Q.   Any others?

13   A.   Yearly evaluation because she was a post doc in my lab,

14        and this year I will prepare one for Rong.

15   Q.   Reproductive Sciences is -- Reproductive Sciences is

16        published by SAGE Publications, correct?

17   A.   I don't know, they keep, they switch different

18        publishers.

19             SAED DEPOSITION EXHIBIT NUMBER 12,

20             SAGE PUBLISHING DOCUMENT,

21             WAS MARKED BY THE REPORTER

22             FOR IDENTIFICATION

23   BY MR. HEGARTY:

24   Q.   I'm going to mark as Exhibit Number 12 a printout from

25        the SAGE Publications website, it's printed out on
```

Ghassan Saed, Ph.D.

```
 1            January 16, 2019.  Do you see where it lists SAGE

 2            Publications, underneath that Reproductive Sciences?

 3     A.     This here?

 4     Q.     Yes, at the top.  SAGE and Reproductive Sciences.

 5     A.     Yes.

 6     Q.     Reproductive Sciences is a journal that has accepted

 7            your article for publication, correct?

 8     A.     Yes.

 9     Q.     This exhibit identifies the editorial policies, peer

10            review policies, and other policies of this

11            publication.  Are you familiar with all of these

12            policies?

13                    MS. O'DELL:  Object to the form.

14                    THE WITNESS:  Some.

15     BY MR. HEGARTY:

16     Q.     Would you turn over to Page 5, sorry, Page 3 of 10.

17            Under the section Funding, it states that to comply

18            with the guidance for research funders, authors, and

19            publishers issued by the Research Information Network,

20            RS additionally requires all authors to acknowledge

21            their funding in a consistent fashion under a separate

22            heading.  Do you see that?

23     A.     Yes.

24     Q.     Where in your acknowledgment do you acknowledge the

25            source of your funding?
```

Ghassan Saed, Ph.D.

```
 1    A.    Okay, so this is -- this only applies to agencies that
 2          require this.  So, for example, I got NIH grant, I got
 3          funding from NIH, I have to disclose funding from NIH.
 4          If there is no funding, if it's internal funding, you
 5          don't have to do that.
 6    Q.    Where does that standard -- where is that standard in
 7          this document?
 8    A.    This is -- I have published in this journal for the
 9          last 20 years.  This is the protocol that we use.
10    Q.    Can you cite for me any anything that came from SAGE
11          Publications saying that that's an appropriate reading
12          of the funding requirements?
13                MS. O'DELL:  Object to the form.
14                THE WITNESS:  I already told you we published
15          with SRI for several years, and my understanding that
16          if the agency, the funding agency requests that you
17          should add their name to the funding part of it, then
18          you should do that.  If it's no funding -- departmental
19          is not considered funding, that's a burden actually,
20          it's not funding.
21    BY MR. HEGARTY:
22    Q.    If you look under the section Declaration of
23          Conflicting Interests, you see the last paragraph of
24          that section before For More Information, it reads any
25          commercial or financial involvements that might
```

Ghassan Saed, Ph.D.

```
 1          represent an appearance of a conflict of interest need

 2          to be additionally disclosed in the covering letter

 3          accompanying your article to assist the editor in

 4          evaluating whether sufficient disclosure has been made

 5          within the Declaration of Conflicting Interests

 6          provided in the article.  Do you see where I'm reading?

 7     A.   Yes.

 8     Q.   Did you provide such a cover letter to the editor of

 9          Reproductive Sciences identifying your consulting

10          relationship with Beasley Allen?

11     A.   Okay, so when you go to the website Reproductive

12          Sciences and you try to upload your manuscript to be

13          considered for review on publication, there are forms

14          that -- pages that you go through, and each page you

15          have to answer the question before it allows you to

16          proceed.  So one of the pages was conflict of interest,

17          and they, at that level they just want to know if you

18          have a conflict of interest, you say "yes" or "no."

19          And then later on in the manuscript you identify the

20          conflict of interest if there is any.

21     Q.   When you were asked if you had a conflict of interest

22          how did you respond?

23     A.   Yes.

24     Q.   Then you went to the next page that that would lead you

25          to, and that's where you prepared --
```

Ghassan Saed, Ph.D.

```
 1    A.    Your manuscript.

 2    Q.    -- the Acknowledgment Section, correct?

 3    A.    No.

 4    Q.    Sorry, the Conflict of Interest Section.

 5    A.    No, no.  Okay, so you write -- this is part of the

 6          format of the manuscript, the acknowledgment, the

 7          conflict of interest, that's the setup.  Like how it

 8          says abstract, key words, introduction, methods, all

 9          that, this is part of the format, so this has to be in

10          the manuscript, we upload to them.

11    Q.    What did you type in on that online form when you said

12          yes to having a conflict of interest and then it

13          directed you to another --

14    A.    There is no other form, they direct you to upload your

15          manuscript.  They accepted your yes answer, and then

16          they allow you to proceed.  If you don't answer, you

17          are not allowed to proceed.

18    Q.    Exhibit Number 12 also says in the paragraph that I

19          read to you that in addition to what you just

20          described, that you need to include such a disclosure

21          in the cover letter accompanying your article.  First

22          of all, did you send a cover letter with your article?

23    A.    I can't remember if it was required.

24    Q.    If you sent a cover letter, do you still have a copy of

25          that cover letter?
```

Ghassan Saed, Ph.D.

```
 1    A.    If I did, yes.

 2    Q.    If you sent a cover letter, do you recall if you

 3          provided information about the conflict of interest you

 4          disclosed in your paper or manuscript?

 5                MS. O'DELL:  Object to the form.

 6                THE WITNESS:  Yeah, if I provided the cover

 7          letter, will there be a conflict of interest in the

 8          cover letter?

 9    BY MR. HEGARTY:

10    Q.    Yes.  Do you recall if you described the conflict of

11          interest in your cover letter as required under the

12          SAGE Publishing guidelines, Exhibit Number 12?

13                MS. O'DELL:  Objection to form.

14                THE WITNESS:  Yes, so in our practice I have

15          been publishing with this particular journal and other

16          journals, I never seen a cover letter saying that we

17          have a conflict of interest.  It's not a practice of

18          talking to the editor and tell them that this is

19          what --

20    BY MR. HEGARTY:

21    Q.    In any of your prior publications have you ever

22          disclosed a conflict of interest?

23    A.    Yes.

24    Q.    And do you recall an example of when you disclosed a

25          conflict of interest?
```

Ghassan Saed, Ph.D.

```
 1   A.   When?

 2   Q.   Yes.  Do you recall an example of when you disclosed a

 3        conflict of interest?

 4   A.   Every manuscript you submit you have to disclose a

 5        conflict of interest, whether it's yes or no, you have

 6        to.

 7   Q.   Well, let me ask it a different way.  Have you ever

 8        included a conflict of interest statement like the one

 9        in your manuscript in any prior publication of yours?

10   A.   Very rare, because I never consult -- I don't consult

11        usually in this caliber, but colleagues, co-authors

12        have done that, and there are co-authors in my

13        publications.  Everybody has to disclose.

14             SAED DEPOSITION EXHIBIT NUMBER 13,

15             SAGE PUBLISHING DOCUMENT,

16             WAS MARKED BY THE REPORTER

17             FOR IDENTIFICATION

18   BY MR. HEGARTY:

19   Q.   We'll mark as Exhibit 13 another printout from the SAGE

20        Publications website on the ethics and responsibility

21        of authors.  Would you look at Exhibit 13, Doctor.

22   A.   Yes.

23   Q.   Under the section Authors, it says authors should

24        ensure that, and go down several bullet points where it

25        reads any real or apparent conflicting or competing
```

Ghassan Saed, Ph.D.

```
 1           interest is clearly stated on submission of their

 2           paper.  (This would include funding assistance).  Do

 3           you see that?

 4   A.   Where do you -- where is this --

 5   Q.   It's the bullet point, second to last bullet point at

 6           the very bottom of the page.

 7   A.   Yes.

 8   Q.   So this is saying that any -- an author should ensure

 9           that any real or apparent conflicting or competing

10           interest is clearly stated on submission of their

11           paper.  (This would include funding assistance).  Do

12           you see where I'm reading?

13   A.   Yes.

14   Q.   And is it your contention that you did that in this

15           manuscript?

16   A.   I did.

17   Q.   You did not disclose in this manuscript that you

18           received funding for this paper by attorneys in

19           litigation, did you?

20   A.   I did, yes, I said consulting for a fee.

21   Q.   Where do you make reference to consulting for a fee in

22           litigation?

23   A.   That's my --

24                MS. O'DELL:  Objection to form.

25                THE WITNESS:  That's my understanding.
```

Ghassan Saed, Ph.D.

```
 1    BY MR. HEGARTY:

 2    Q.   You chose to use the words you set out in the Conflict

 3         of Interest Section, correct?

 4    A.   Yes.

 5    Q.   You agree that your relationship as a consultant does

 6         present a conflict of interest?

 7                   MS. O'DELL:  Object to the form.

 8                   THE WITNESS:  My relationship?

 9    BY MR. HEGARTY:

10    Q.   Yes, as a consultant does present a conflict of

11         interest, which is why you included a Conflict of

12         Interest Statement, correct?

13                   MS. O'DELL:  Object to the form.

14                   THE WITNESS:  We keep going back the same

15         circles.  What's the question?

16    BY MR. HEGARTY:

17    Q.   You agree that your relationship with attorneys for

18         Beasley Allen presents a conflict of interest that you

19         needed to disclose?

20    A.   I disclosed that, yes.

21    Q.   If you would look at the letter on the very back page

22         again of Exhibit Number 7.

23                   MS. O'DELL:  Is the intent of the exhibit to

24         include all of the communications or just this one?

25                   MR. HEGARTY:  Start with this one.
```

Ghassan Saed, Ph.D.

```
 1                    The first paragraph of the letter makes

 2          reference to comments of the reviewers being included

 3          at the bottom of this letter, and we'll get to those

 4          comments, but you did receive comments back from

 5          reviewers of this article, correct?

 6                    THE WITNESS:  This is the only thing I

 7          received.

 8     BY MR. HEGARTY:

 9     Q.   Did you eventually receive comments back from reviewers

10          of the article?

11     A.   This is the only letter I received.

12     Q.   In addition to the letter, you did receive comments

13          from authors of the -- I'm sorry -- from reviewers of

14          the manuscript, correct?

15                    MS. O'DELL:  Objection, asked and answered.

16                    THE WITNESS:  Is this the whole --

17     BY MR. HEGARTY:

18     Q.   Let me mark as Exhibit 14 --

19     A.   Is this the whole letter?

20                    MS. O'DELL:  I think it's two pages.

21                    THE WITNESS:  It's two pages?  This is the

22          whole e-mail?

23

24

25
```

Ghassan Saed, Ph.D.

```
 1              SAED DEPOSITION EXHIBIT NUMBER 14,

 2              COPY OF LETTER FROM REPRODUCTIVE SCIENCES,

 3              WAS MARKED BY THE REPORTER

 4              FOR IDENTIFICATION

 5    BY MR. HEGARTY:

 6    Q.   I'm going to mark as Exhibit 14 in addition to what we

 7         had received in connection with that manuscript, but

 8         this is the letter with the reviewer comments included.

 9    A.   Yeah, this is all I received.

10    Q.   Is Exhibit Number 14 a copy of the letter with the

11         reviewer comments at the end?

12    A.   Okay, this is all I received.

13    Q.   When you say this, you're talking about --

14    A.   The letter.

15    Q.   -- number 14?

16    A.   Yeah, the e-mail.

17    Q.   The next paragraph in that e-mail, the second paragraph

18         says that the reviewers have recommended publication

19         but also suggest some minor revisions to your

20         manuscript.  Therefore, I invite you to respond to the

21         viewer's comments and revise your manuscript.  Do you

22         see where I'm reading?

23    A.   Yes.

24    Q.   Did you respond to the reviewer's comments?

25    A.   Yes.
```

Ghassan Saed, Ph.D.

```
 1   Q.   Did you respond to reviewer's comments via e-mail?

 2   A.   No, you can't do that.

 3   Q.   How did you respond to viewer's comments?

 4   A.   So you have to log in to Manuscript Central, you have

 5        to go to Revised Manuscript, and you have to include

 6        highlighted changes in the revised manuscript, and then

 7        you have to submit that to the reviewer one more time.

 8   Q.   And did you do that in this case?

 9   A.   Yes.

10   Q.   Do you still have a copy of the highlighted copy of the

11        revisions that you submitted to the reviewers?

12   A.   Yes, and, also, it's in the website for the journal.

13   Q.   If you look down at Paragraph 6 of Exhibit 14, it reads

14        when submitting your revised manuscript, you will be

15        able to respond to the comments made by the reviewers

16        in the space provided.  So is there actually a space

17        provided where you can actually communicate with the

18        reviewers?

19   A.   (Witness shakes head from side to side.) You can't

20        communicate with the reviewers.

21   Q.   Is there any way to respond?

22   A.   I don't know who they are, yes, you have to write your

23        response but to the editor, not to the reviewer.  I

24        don't know who is the reviewer.

25   Q.   So did you write a response to the comments to the
```

Ghassan Saed, Ph.D.

```
 1        editor?

 2   A.   Correct.

 3   Q.   And do you still have a copy of that response?

 4   A.   It's uploaded in the manuscript center, and I do have a

 5        copy, yes.

 6   Q.   With regard to the reviewer comments, if you look at

 7        the second page of Exhibit 14, the first sentence under

 8        Comments and Suggestions, it reads what is the

 9        mechanism by which the ovary and not the vagina, the

10        cervix, or the endometrium are susceptible to talc

11        effects?  Do you see where I'm reading?

12   A.   Yes, sorry.

13   Q.   Did you include any explanation in your revised

14        manuscript to explain the mechanism by which the ovary

15        and not the vagina and the cervix and the endometrium

16        are susceptible talc effects?

17   A.   It was in the letter and response to the reviewer, to

18        the editor, yes, it was in the form that you submit.

19   Q.   Did you revise your manuscript to include such a

20        discussion about the mechanism by which the ovary and

21        not the vagina, the cervix, or the endometrium are

22        susceptible to talc effects?

23   A.   I believe I did, I added three sentences to clarify

24        that.

25   Q.   Where in your manuscript are those three sentences?
```

Ghassan Saed, Ph.D.

```
 1    A.    I don't know, I don't know because they -- you write

 2          them, you write them in a space online, and they

 3          incorporate them into the manuscript if they agree with

 4          it, maybe disagree.  So they send it to the reviewer,

 5          and the reviewer will decide, okay, I like this

 6          explanation, add it to the manuscript, or this

 7          explanation is already in the manuscript, which I

 8          recall I said to the reviewer, to the editor.

 9    Q.    You recall saying to the editor that this -- as to this

10          comment, it was already in the manuscript?

11    A.    Yes, I said this has been addressed in this section of

12          manuscript; however, this is what we believe the

13          molecular mechanism is all about.  And he sent it to

14          the reviewer, and the reviewer will say I agree, go

15          ahead, accept, or I disagree, I think they should edit,

16          or we don't like the whole comment.

17    Q.    Do you still have a copy of your response to this

18          reviewer's comment?

19    A.    Again, this is done on the website.

20    Q.    Is that comment still on the website, to your

21          knowledge?

22    A.    I don't know, but I can find it.

23    Q.    Well, what is the mechanism by which the ovary, and not

24          the vagina, the cervix, or the endometrium are

25          susceptible to talc effects, in your opinion?
```

Ghassan Saed, Ph.D.

```
 1    A.    So, in my opinion, that talcum powder, talcum particles

 2          go -- transfer, it's an open access for genital use.

 3          When  they use it for genital use, it goes into the

 4          ovaries and incorporate into the tissues, and this

 5          continuously induce chronic inflammation that is linked

 6          strongly and actually the cause of ovarian cancer.  Why

 7          other tissues don't get it, there are more than one

 8          explanation to that if you'd like to hear it.

 9    Q.    Well, yeah, because I want to know what you believe to

10          be the difference in the ovary versus the other organs.

11    A.    Yes.  First, cancer is a tissue specific like cervical

12          cancer, HPV so -- Second is the area in the uterus is

13          full of secretion, and there is a dilution factor that

14          kick everything out, whereas if it make it -- if the

15          particles makes it to the ovaries, they sit there

16          indefinitely.

17    Q.    Anything else?

18    A.    For now.

19    Q.    What about the -- you mentioned, though, the uterus.

20          What about the vagina and cervix?

21    A.    What about --

22    Q.    Why is the ovary affected and not the vagina and

23          cervix?

24    A.    Shall I repeat that, my answer?

25    Q.    Is it the same reason in your opinion?
```

Ghassan Saed, Ph.D.

```
 1   A.   It's the wash, it's the dilution factor, it's the

 2        excretion, it's always excretions, but ovaries are not.

 3   Q.   And is that opinion somewhere in Exhibit Number 7?  You

 4        said it already is in the section.  In what section is

 5        that concept?

 6   A.   So the peristaltic travel of the talcum particles into

 7        the ovary has been actually discussed somewhere.

 8   Q.   That's over at the bottom of Page 8.  Is that the

 9        portion of the paper that you say already addresses

10        this comment?

11   A.   Yes, part of it.

12   Q.   Where else in the manuscript do you address this

13        comment by one of the reviewers?

14   A.   I think this is sufficient, in my opinion, to show

15        evidence that there is a transfer of the particles from

16        the vagina and uterus area and fallopian tube into the

17        ovaries, that's substantial.

18   Q.   The next comment reads what do the authors believe is

19        the determining factor for the increased sensitivity of

20        the epithelial ovarian cells to talc?  You see where

21        I'm reading?

22   A.   Where is that?  Where is it?

23   Q.   In the second comment that begins --

24   A.   Oh, the determining factor.

25   Q.   What is -- the second comment is what do the authors
```

Ghassan Saed, Ph.D.

```
 1        believe is the determining factor for the increased

 2        sensitivity of the epithelial ovarian cells to talc?

 3        How did you respond to that comment?

 4    A.  This is the core of the actual, the whole manuscript,

 5        is about chronic inflammation and its link to ovarian

 6        cancer.

 7    Q.  Did you revise your manuscript in response to this

 8        reviewer comment?

 9    A.  Yes.

10    Q.  How did you revise the transcript -- I'm sorry -- the

11        manuscript in response to this reviewer comment?

12    A.  So we took the last part, we cut some words out, it

13        says wordy --

14    Q.  I'm not talking about that comment yet.

15    A.  Which comment?

16    Q.  The determining factor comment.

17    A.  I told you, you don't need necessarily to agree with

18        the reviewer comment, you just put it in the -- there's

19        a box when you go online, and you just say we believe

20        that the manuscript is all about why ovarian cancer are

21        sensitive to inflammation.

22    Q.  Is that how you responded to this reviewer comment?

23    A.  Yes.

24    Q.  So what is your opinion as to what you believe the

25        determining factor is for the increased sensitivity of
```

Ghassan Saed, Ph.D.

```
 1            the epithelial ovarian cells to talc?

 2    A.    Chronic inflammation.

 3    Q.    And how is chronic inflammation -- or strike that --

 4            how are epithelial ovarian cells, how do they have

 5            increased sensitivity to chronic inflammation?

 6    A.    So this is what actually made them in the first place.

 7            It's the fact that they are exposed to continuously

 8            over time with talcum particles, and that created a

 9            chronic inflammation that actually transformed those

10            cells and caused the cells to go, the epithelial

11            ovarian cells to go cancerous with time.

12    Q.    So, in your opinion, for purposes of your biologic

13            mechanism for talc causing ovarian cancer, talc must

14            reach the ovary, correct?

15                    MS. O'DELL:  Object to the form.

16                    THE WITNESS:  Not necessarily.

17    BY MR. HEGARTY:

18    Q.    Well, the processes you just described all involve talc

19            reaching the ovary, correct?

20    A.    No.  I said any environment that create chronic

21            inflammation to the ovaries, epithelial ovarian cells,

22            normal ones, can or are known to develop this signature

23            of pro-oxidant state.  We have published that in

24            several manuscripts.

25    Q.    So, in your opinion, where must talc go to cause the
```

Ghassan Saed, Ph.D.

```
 1          inflammation that you say can cause ovarian cancer?

 2                    MS. O'DELL:  Objection to form.

 3                    THE WITNESS:  Yeah, so I don't know, but what

 4          I'm saying is the genital use of talcum powder expose

 5          the genital tract, the reproductive tract to chronic

 6          inflammation that, according to our 30 years of

 7          studies, is linked and the cause of ovarian cancer.

 8    BY MR. HEGARTY:

 9    Q.    Well, where in the genital tract must the chronic

10          inflammation occur to cause ovarian cancer?

11    A.    If the environment is chronic and it has chronic

12          inflammation -- so preferred will be -- the first thing

13          will be actual contact, which would be in the ovaries,

14          second would be fallopian tube, and there are many

15          studies now indicating that the source of epithelial

16          ovarian cancer come from fallopian tube, and fallopian

17          tube is very close to the uterus and that close to the

18          cervix and vagina, so that's an open access in the

19          body.

20    Q.    So you mentioned -- as far as where the chronic

21          inflammation must consider, you mentioned the ovary and

22          the fallopian tube.  Is there any other organ in the

23          reproductive tract that you believe if it becomes

24          inflamed due to talc can lead to ovarian cancer?

25                    MS. O'DELL:  Object to the form.
```

Ghassan Saed, Ph.D.

```
1                    THE WITNESS:  Yeah, I -- no, I understood
2           your question, but I disagree, that's not what I said.
3      BY MR. HEGARTY:
4      Q.   What did you say?
5      A.   No.  So what I said is the use of talcum powder allows
6           talcum particles, according to our research, we added
7           the particles to the cells, the cells showed
8           inflammatory response.  So we expect if the talcum
9           powder enter the genital area, go to -- and I said I,
10          you know, organized them for you, so the most effect
11          will be if they are in the ovary, and we already have
12          evidence, and not just us, every -- all the world know
13          now, that acute inflammation does not cause cancer, is
14          not linked to cancer, it may initiate cancer, but
15          chronic inflammation is the real trigger for cancer in
16          general and ovarian cancer.  And we have shown that all
17          these redox balance is altered in ovarian cancer cells.
18          So the first impact, the highest impact will be if the
19          particle is in the ovary, and this has been reported by
20          some people, and the second or less degree, less impact
21          or longer time, maybe it's the same impact but it's a
22          longer time probably, all this need to be further
23          studied, is in the fallopian tube, and then who knows
24          what it does to uterus and cervical area.
25     Q.   Well, I thought you said when you responded to the
```

Ghassan Saed, Ph.D.

```
 1          question, the comment that said the mechanism which the

 2          ovary and not the vagina, the cervix, or the

 3          endometrium are susceptible, that this washing keeps

 4          those organs from being susceptible.  So the

 5          endometrium is in the uterus, correct?

 6                    MS. O'DELL:  Object to the form.

 7                    THE WITNESS:  Okay.  So the question here

 8          they are asking about mechanisms in the ovaries, so

 9          that's what I responded to.

10     BY MR. HEGARTY:

11     Q.   Well, do you consider the endometrium to be a

12          susceptible organ to talc in the sense that it can

13          cause inflammation that can lead to ovarian cancer?

14     A.   Probably.

15     Q.   Can you cite for me any published scientific or medical

16          article reporting inflammation of the ovaries or

17          inflammation of the fallopian tubes or the endometrium

18          in women using talc?

19                    MS. O'DELL:  Object to the form.

20                    THE WITNESS:  So can I report articles for

21          you?

22     BY MR. HEGARTY:

23     Q.   Yes.

24     A.   There are -- are you talking about gynecological

25          studies that link the use of -- in women to ovarian
```

Ghassan Saed, Ph.D.

```
 1          cancer risk?

 2    Q.    Question is very specific.  Can you cite for me any

 3          published literature reporting finding chronic

 4          inflammation in the presence of talc in the fallopian

 5          tubes or ovaries or the endometrium in women using

 6          talc?

 7                    MS. O'DELL:  Objection to the form.

 8          Epidemiological studies is what the doctor asked you to

 9          clarify.  Is that what you meant?

10                    THE WITNESS:  Do you --

11    BY MR. HEGARTY:

12    Q.    I don't think -- I'm not talking about epidemiologic

13          studies.  I'm talking about can you cite for me any

14          studies that report finding inflamed tissue in the

15          presence of talc in women using talc on the perineum?

16                    MS. O'DELL:  Object to the form.

17                    THE WITNESS:  So your question is any

18          manuscript, any papers, any papers that cite or discuss

19          the presence of inflamed tissues in response to woman

20          using talcum powder.

21    BY MR. HEGARTY:

22    Q.    Correct.

23    A.    And my answer to you is I don't know any references.

24          What I do know, that there are lots of epidemiological

25          studies that link woman who uses talcum powder are at
```

Ghassan Saed, Ph.D.

```
 1            increased risk of developing ovarian cancer.  That is

 2            in the literature everywhere.  There are some few

 3            molecular work also indicating that this also can cause

 4            inflammation, oxidative stress, it's out in there.

 5            There are some other molecular works that also shows

 6            that there is actually gene expression differential,

 7            gene expression in exposure to talc, and this is

 8            really -- I mean this powder, this particle cause

 9            biological changes to the cell, so I am not surprised

10            if it does the same inside the genital tract.

11   Q.   The next comment in Exhibit Number 14 says the

12            manuscript is wordy and would benefit from an attentive

13            reduction, do you see that?

14   A.   I did.

15   Q.   How did you respond to that comment?

16   A.   I agreed, and I shaped some words unnecessary

17            references that we have established methodology that we

18            don't need to do, to have.

19            SAED DEPOSITION EXHIBIT NUMBER 15,

20            JANUARY 14, 2019 E-MAIL,

21            WAS MARKED BY THE REPORTER

22            FOR IDENTIFICATION

23   BY MR. HEGARTY:

24   Q.   I want to next mark as Exhibit 15 another reviewer

25            comment that we were provided.  Do you recognize
```

Ghassan Saed, Ph.D.

```
 1        Exhibit 15?

 2   A.   This is an e-mail from the editor.

 3   Q.   Yes.

 4   A.   Yes, saying that they accepted the manuscript.

 5   Q.   This is dated January 14, 2019, correct?

 6   A.   Okay.

 7   Q.   Is that right?

 8   A.   Yes, it says so.

 9   Q.   Then again it -- strike that.  Below it says Reviewer:

10        1, correct?

11   A.   Yes.

12   Q.   Comments to the author.  Well done.

13   A.   Yes.

14   Q.   Was there only one reviewer for purposes of your paper?

15   A.   Yes, Reviewer:  1.

16   Q.   In what I marked as Exhibit Number 15 is Reviewer 1's

17        comment after you made changes to your paper?

18   A.   Correct.

19   Q.   So the peer review for this article had one reviewer,

20        correct?

21   A.   No, I don't know.

22   Q.   Did you get comments back from any other reviewer?

23   A.   I review comments, I review manuscripts for many

24        journals.  If you have no comments or if you have good

25        comments, I don't need to show them.
```

Ghassan Saed, Ph.D.

1    Q.   Do you know how many reviewers --

2    A.   No knowledge.

3    Q.   Let me finish -- do you know how many reviewers

4         Reproductive Sciences had for your manuscript?

5    A.   No.

6              MR. HEGARTY:  Let's go off the record real

7         quick.  I need to take just a quick break and we'll be

8         right back.

9              THE VIDEOGRAPHER:  Going off the record at

10        2:23 p.m.

11             (A short recess was taken.)

12             THE VIDEOGRAPHER:  We're back on the record

13        at 2:28 p.m.

14   BY MR. HEGARTY:

15   Q.   Dr. Saed, are there any other communications between

16        you and the editors of Reproductive Sciences that we've

17        not talked about today?

18   A.   Not that I'm aware of.

19   Q.   Do you know when your article is supposed to be

20        published?

21   A.   I don't know.

22             SAED DEPOSITION EXHIBIT NUMBER 16,

23             EXPERT REPORT,

24             WAS MARKED BY THE REPORTER

25             FOR IDENTIFICATION

Ghassan Saed, Ph.D.

```
 1   BY MR. HEGARTY:

 2   Q.   I'm going to mark as Exhibit Number 16 a copy of the

 3        expert report for you we were provided in this case.

 4        Is Exhibit Number 16 your expert report in this case?

 5   A.   Yes.

 6   Q.   There are large portions of the manuscript that are

 7        identical to your report, correct?

 8   A.   I don't know about large, but based on it, yes.

 9   Q.   Which was prepared first, the manuscript or the report?

10   A.   This is November, and the manuscript was September, so

11        the manuscript was first.

12   Q.   Did you conduct the experiments that are described in

13        the manuscript for Beasley Allen?

14   A.   Say that again, please.

15   Q.   Did you conduct the experiments that are in the

16        manuscript for Beasley Allen?

17             MS. O'DELL:  Object to the form.

18             THE WITNESS:  The experiment I did, I did it

19        in my lab for me.

20   BY MR. HEGARTY:

21   Q.   Was the work that you did on -- in conducting the

22        experiments and doing the manuscript independent of

23        Beasley Allen or any counsel for Plaintiffs?

24             MS. O'DELL:  Object to the form.

25             THE WITNESS:  The work that I did in the lab,
```

Ghassan Saed, Ph.D.

```
 1          no one has any interference in how it's designed, what

 2          the method should be used, how to analyze the data, how

 3          to write the manuscript, all that is all mine.

 4                    UNIDENTIFIED ATTORNEY:  Objection,

 5          nonresponsive.

 6    BY MR. HEGARTY:

 7    Q.   Going back to my question, was the experiment you

 8          conducted and the manuscript that you wrote independent

 9          of your work with Beasley Allen in this litigation?

10                    MS. O'DELL:  Objection to the form.

11                    THE WITNESS:  So I was paid for my time as a

12          consultant, but this work was funded by my lab.

13    BY MR. HEGARTY:

14    Q.   But going back to the experiments that you did and the

15          manuscript that you wrote, were those separate -- was

16          that a separate piece of work than what you're doing

17          with Beasley Allen?

18                    MS. O'DELL:  Object to the form, asked and

19          answered.

20                    THE WITNESS:  Separate means -- what do you

21          mean by separate?

22    BY MR. HEGARTY:

23    Q.   Separate means unrelated.

24                    MS. O'DELL:  Object to the form.

25                    THE WITNESS:  Yeah, we're -- I'm hired as a
```

Ghassan Saed, Ph.D.

```
 1          witness expert in talc, ovarian cancer and oxidative

 2          stress, and I am doing work in my lab related to the

 3          consulting that what I'm doing with Beasley Allen.

 4     BY MR. HEGARTY:

 5     Q.   So was the work that you did in doing the tests and

 6          preparing the manuscript independent of your

 7          relationship with Beasley Allen?

 8               MS. O'DELL:  Objection, asked and answered.

 9               THE WITNESS:  I still don't understand the

10          independent type.

11     BY MR. HEGARTY:

12     Q.   Well, was it done --

13     A.   Can you reformat the question, please.

14     Q.   Well, was that work separate and unrelated to your work

15          with Beasley Allen?

16               MS. O'DELL:  Object to the form.

17               THE WITNESS:  It was separate, not -- it is

18          related, so I don't know about what separate means, but

19          it is related, yes, but in what caliber it's related,

20          that's what I want to emphasize.  They have no saying

21          in any of the work that has been done here.

22     BY MR. HEGARTY:

23     Q.   Would you have done this same work if you were not a

24          consultant for Beasley Allen?

25               MS. O'DELL:  Object to the form.
```

Ghassan Saed, Ph.D.

```
 1                    THE WITNESS:  I would have done the same type

 2          of rigorous testing because this is my primary focus of

 3          my laboratory, and anything that is related to

 4          inflammation, oxidative stress, and ovarian cancer, it

 5          is what we like to do in our lab.

 6   BY MR. HEGARTY:

 7   Q.   Your experiments involved Johnson's Baby Powder,

 8        correct?

 9   A.   Correct.

10   Q.   Where did you purchase the Johnson's Baby Powder that

11        you used?

12   A.   Walgreen across the street.

13   Q.   Why did you choose to use Johnson's Baby Powder in your

14        experiment?

15   A.   Because I want to see if the use of baby powder, talcum

16        powder, has any biological effect on ovarian cancer

17        cells.

18   Q.   Why did you choose the Johnson's Baby Powder brand?

19   A.   I chose Johnson & Johnson baby powder and I chose

20        Fisher.

21   Q.   Why did you choose the Johnson Baby Powder brand versus

22        another brand of talcum powder product?

23   A.   I chose Fisher.

24   Q.   Why did you choose Johnson's Baby Powder over another

25        commercially available baby powder?
```

Ghassan Saed, Ph.D.

```
 1   A.   Because the whole news and the whole media is all about

 2        Johnson & Johnson product.

 3   Q.   Did you choose Johnson's Baby Powder because that

 4        product is in this litigation?

 5   A.   Not in this litigation, but for me, because of the

 6        media and all these reports that I've been reading and

 7        the association of woman using Johnson & Johnson Baby

 8        Powder with increased risk of ovarian cancer.

 9   Q.   Within your lab notebooks, where are the tests that you

10        conducted with Fisher Scientific talcum powder?

11   A.   I can show it to you.

12   Q.   Okay.  You're looking at Exhibit Number 2, the lab

13        notebook for the experiments reflected in your --

14             MS. O'DELL:  I think it's Exhibit 3.

15             THE WITNESS:  That's Fisher.

16   BY MR. HEGARTY:

17   Q.   I'm sorry.  So Exhibit Number 3, which is the lab

18        notebook for the pilot study involved Fisher --

19   A.   Correct.

20   Q.   -- talc?

21   A.   Talc.

22   Q.   The only talc tested as reflected in Exhibit Number 2

23        is Johnson & Johnson, Johnson's Baby Powder?

24   A.   This one here, initially we used both, and then we

25        stopped using Fisher and we continued using Johnson &
```

Ghassan Saed, Ph.D.

```
 1         Johnson.

 2    Q.   Is there any reference in -- to testing Fisher talcum

 3         powder in Exhibit Number 2?

 4    A.   I can't remember.

 5    Q.   Well, the first page of your -- strike that.

 6              MS. O'DELL:  Just for the record, can we note

 7         the page it's turned to in Exhibit 3, what page is

 8         that, in the lab notebook?

 9              THE WITNESS:  Okay.

10              MS. O'DELL:  What page is it turned to?

11              MR. HEGARTY:  It's now on Pages 38 and 39.

12              MS. O'DELL:  Okay.

13    BY MR. HEGARTY:

14    Q.   If you look at Page 5 of your manuscript.

15    A.   Methodology?

16    Q.   Not of your report, your manuscript, that's Exhibit 7.

17    A.   Page 5.

18    Q.   Page 5.

19    A.   Okay.

20    Q.   At the top you say Treatment of cells.  Talcum powder

21         (Fisher Scientific, Catalog #T4-500, Lot#166820) or

22         baby powder, then referencing Johnson & Johnson, was

23         dissolved in DMSO, et cetera.  Do you see where I'm

24         reading?

25    A.   Yes.
```

Ghassan Saed, Ph.D.

```
 1   Q.   Where in your manuscript do you report the results from

 2        your tests done on Fisher Scientific talcum powder?

 3   A.   We didn't.  This is for the previous abstracts that we

 4        used which is this.

 5   Q.   So none of the data reported in your manuscript was

 6        data from experiments involving Fisher Scientific

 7        talcum powder?

 8   A.   In this manuscript, all the data here, as far as I

 9        remember, they're all done with Johnson & Johnson.

10   Q.   Did you run the exact same tests that you report in

11        your manuscript with Fisher Scientific talcum powder?

12   A.   No, we only did this with Fisher, which is PCR.

13             MS. O'DELL:  And what are you pointing to,

14        Doctor, just so the record --

15             THE WITNESS:  Which is the preliminary

16        studies that we used to publish for our SRI abstract

17        which was presented March of 2018.  There was only one

18        component, which is PCR, and some few fact -- and some

19        few markers.  This is -- this was not an extensive and

20        comprehensive study as the one described here.  This is

21        just preliminary to show there is an effect or there is

22        no effect.

23   BY MR. HEGARTY:

24   Q.   What prooxidant or anti-oxidant --

25             MS. O'DELL:  It's confusing because you're
```

Ghassan Saed, Ph.D.

```
 1        saying this, but you're referring to Exhibit 3, the

 2        study in Exhibit 3.

 3                  THE WITNESS:  This is Exhibit 3?

 4                  MS. O'DELL:  Yes.

 5                  MR. FINDEIS:  Which page of the exhibit?

 6                  THE WITNESS:  3 is --

 7                  MR. FINDEIS:  It's open to which page --

 8                  THE WITNESS:  So this is Exhibit 3, Page 38

 9        onward.

10   BY MR. HEGARTY:

11   Q.   Which pro-oxidant and anti-oxidant enzyme did you look

12        at involving Fisher Scientific talcum powder?

13   A.   So they are all listed here.  I'll tell you in one

14        second.  Catalase.

15                  MS. O'DELL:  What page?

16                  THE WITNESS:  Page 47, catalase GSR, GPX,

17        GST, MPO, nitric oxide, SOD3.

18   BY MR. HEGARTY:

19   Q.   And you say you only ran --

20   A.   PCR.

21   Q.   And what test did you do beyond PCR with Johnson's Baby

22        Powder?

23   A.   Sorry, I just want to make sure that they're all here,

24        okay.  So, sorry, what's the question?

25   Q.   What tests did you do besides PCR with Johnson's Baby
```

Ghassan Saed, Ph.D.

```
 1          Powder?

 2     A.   Okay.  So I'm now referring to this, what's this --

 3     Q.   Exhibit 2.

 4     A.   Exhibit 2 and I did --

 5               MS. O'DELL:  Page --

 6               THE WITNESS:  Here sections PCR, I did ELISA.

 7               MS. O'DELL:  What page does ELISA begin on?

 8               THE WITNESS:  53.

 9               MS. O'DELL:  Okay.

10               THE WITNESS:  I did -- all labeled here what

11          we did.  SNP analysis --

12               MS. O'DELL:  What page?  Starts --

13               THE WITNESS:  102.

14               MS. O'DELL:  Okay.

15               THE WITNESS:  I did MTT.

16               MS. O'DELL:  What page?

17               THE WITNESS:  106.  And statistics final.  So

18          that's all done with J & J Baby Powder.

19     BY MR. HEGARTY:

20     Q.   Does Exhibit Number 3 contain all the data of your PCR

21          tests for Fisher Scientific talcum powder?

22     A.   Sorry, one more time, please.

23     Q.   Does Exhibit Number 3 contain all of the data of your

24          PCR tests for Fisher Scientific talcum powder?

25     A.   That we reported this abstract at SRI, yes.
```

Ghassan Saed, Ph.D.

```
 1   Q.   In your manuscript you report the enzyme data after 72

 2        hours.

 3   A.   Enzyme?

 4   Q.   I'm sorry, the protein data after 72 hours.

 5   A.   No, I didn't.

 6   Q.   What did you report after 72 hours?

 7   A.   The effect of treatment after 72 hours.  That's totally

 8        different.

 9   Q.   Why did you choose 72 hours?

10   A.   It was from a previous paper, one of those two, 72

11        hours, they did 48 hours, 72 hours, and I picked 72

12        because there is data showing very similar, I can't

13        remember the reference of it.

14   Q.   In your report you describe the results of your tests

15        only up to 48 hours, correct?

16   A.   Where is it, my report --

17   Q.   Over on Page 14.

18   A.   Page 14.

19   Q.   In the section Treatment of Cells.

20   A.   Where does it say that?  Here?  Treatment of cells.

21        Yeah, this is not accurate, 72 hours, this is a typo.

22   Q.   So you're saying that the reference to 48 hours in

23        Exhibit Number -- what is that marked as, your report?

24             MS. O'DELL:  16.

25   BY MR. HEGARTY:
```

Ghassan Saed, Ph.D.

```
 1   Q.   16, so you're saying that the reference to 48 hours in

 2        Exhibit Number 16 is incorrect and it should be 72

 3        hours?

 4   A.   Correct, because we did all the work with 72 hours.

 5   Q.   Did you try other durations that are not reported in

 6        your report or manuscript?

 7   A.   No.

 8   Q.   At the bottom of Page 8 of your manuscript, Exhibit 7.

 9   A.   Exhibit 7, that's Exhibit 8, oh, I have two, two

10        manuscripts.

11   Q.   7 and 8 are identical.

12   A.   Okay.

13   Q.   Bottom of Page 7.

14   A.   Page 7.

15   Q.   You made reference to this before to citing to

16        something called the peristaltic pump; do you see that?

17   A.   Page 7.

18   Q.   Page 8.

19   A.   Oh, sorry, Page 8, I heard 7, sorry.  The last

20        sentence.

21   Q.   Yes, second to the last line.

22   A.   Feature of uterus, yes.

23   Q.   That reference is not in your expert report.

24   A.   This is my paper, okay.  So let's see.

25   Q.   Right, but my question is that the reference to the
```

Ghassan Saed, Ph.D.

```
 1        peristaltic pump is nowhere in Exhibit Number 16, your

 2        expert report.  Why did you not include that in your

 3        expert report?

 4   A.   Is it not included?  I don't know, I trust you.

 5                 MS. O'DELL:  Take a look.

 6                 THE WITNESS:  Let me take a look.  So Number

 7        8 is -- this is the manuscript, where are the

 8        references?  So do I have the references here?

 9   BY MR. HEGARTY:

10   Q.   I'll represent, Doctor, that it's not in there.  Do you

11        recall when you came across a reference to this phrase

12        the peristaltic pump?

13                 MS. O'DELL:  Objection to the form.

14                 THE WITNESS:  Okay, sorry.

15   BY MR. HEGARTY:

16   Q.   Yes, you do you recall when in the writing process for

17        your manuscript you came across a reference to this

18        thing called a peristaltic pump?

19                 MS. O'DELL:  Objection to form.

20                 THE WITNESS:  If I recall where I read this

21        manuscript, this reference?

22   BY MR. HEGARTY:

23   Q.   Yes, and when.

24   A.   No, I don't remember.

25   Q.   Were you -- strike that.  You made references at that
```

Ghassan Saed, Ph.D.

```
 1          part of your manuscript to 8 through 10.  Did counsel

 2          for Beasley Allen provide those references to you?

 3    A.    Absolutely not.

 4    Q.    So is it your testimony that you came up with -- that

 5          you decided on your own to make reference to the

 6          peristaltic pump in your manuscript?

 7    A.    This is not I decide on my own.  This is like a

 8          collective reading of my reading throughout the whole

 9          literature.  It's not just -- so the hypothesis that we

10          have been trying to address for the last 30 years of my

11          lab is how -- what's the trigger, what's the initiator

12          for ovarian cancer, and there are many hypotheses out

13          there, and one of the hypotheses is that something come

14          through the genital tract.

15    Q.    If you turn to Page 9 in your manuscript, you in the

16          first sentence of the second paragraph, you say in this

17          study, we have shown beyond doubt that talc alters key

18          redox and inflammatory markers, et cetera.  Do you see

19          what I'm reading?

20    A.    Yes.

21    Q.    Have you ever used the phrase "beyond doubt" before in

22          any published article of yours?

23    A.    I believe I did.

24    Q.    Can you cite for me one where you use that phrase?

25    A.    Not now.
```

Ghassan Saed, Ph.D.

```
 1    Q.    It's true, though, that whatever you found and reported

 2          in your article was under the conditions of your

 3          experiment, correct?

 4                MS. O'DELL:  Object to the form.

 5                THE WITNESS:  Can you --

 6    BY MR. HEGARTY:

 7    Q.    Everything you describe in this manuscript occurred

 8          under the conditions of your experiments, correct?

 9                MS. O'DELL:  Object to the form.

10                THE WITNESS:  So occurred means -- okay, so

11          my response to this, all the experiments that has been

12          performed here, they were performed according to the

13          standard protocols that we have extensively published

14          with.

15    BY MR. HEGARTY:

16    Q.    The statement that you make there is based on the

17          results of your cell studies, correct?

18    A.    My cell studies, yes.

19    Q.    It's not based on any data from in vivo studies,

20          correct?

21                MS. O'DELL:  Objection, form.

22                THE WITNESS:  There is no need.

23    BY MR. HEGARTY:

24    Q.    That's not my question.  My question is those

25          statements are not based on any in vivo data, correct?
```

Ghassan Saed, Ph.D.

```
1              MS. O'DELL:  Object to the form.

2              THE WITNESS:  So those, again, those results,

3        the result, no, this is -- this is what we have shown

4        in this manuscript, that's not my opinion of the whole

5        situation.  So this -- the basis of the sentence is --

6        came from the results, the experiments that we did that

7        we described here.

8   BY MR. HEGARTY:

9   Q.   Those results have not been shown in any in vivo

10       situation, whether it's human or animal, correct?

11              MS. O'DELL:  Object to the form.

12              THE WITNESS:  Similar outcome have been shown

13       in -- before, yes.

14  BY MR. HEGARTY:

15  Q.   Well, cite for me the published articles reporting the

16       same results that you got in an in vivo model.

17              MS. O'DELL:  Objection, form.

18              THE WITNESS:  There was no any in vivo

19       studies done at the molecular level.  This is -- my

20       study was the first comprehensive study that actually

21       does that.

22  BY MR. HEGARTY:

23  Q.   What you found was in cell cultures.

24  A.   These are ovarian cancer cells from patients.

25  Q.   These are not ovarian cancer cells -- these are not
```

Ghassan Saed, Ph.D.

```
 1        normal ovarian cancer cells, correct?

 2   A.   Some are, yes.

 3   Q.   Well, they've been immortalized, correct?

 4   A.   The normal variance they have been immortalized.

 5        They're sold as such.

 6   Q.   The data that you report in your manuscript has never

 7        been reported in an in vivo situation, correct?

 8             MS. O'DELL:  Object to the form.

 9             THE WITNESS:  So, again, using -- I have seen

10        reports in vivo in animals that have shown the

11        association of the talc with inflammation, yes.

12   BY MR. HEGARTY:

13   Q.   I'm talking about the very results that you report in

14        your study --

15   A.   I don't think anybody did them.

16             MS. O'DELL:  Let him finish.

17             MR. HEGARTY:  Let me finish the question.

18             MS. O'DELL:  Let me object.

19   BY MR. HEGARTY:

20   Q.   You cannot cite to any published literature showing the

21        same results that you found in your cell studies in any

22        in vivo model, animal or human, correct?

23             MS. O'DELL:  Object to the form.

24             THE WITNESS:  I have seen in animals, yes.

25
```

Ghassan Saed, Ph.D.

```
 1    BY MR. HEGARTY:

 2    Q.   What published literature reports finding the same

 3         things you report in this study in an animal model?

 4    A.   Not the same things, similar things.

 5    Q.   I'm asking --

 6    A.   Same exact?

 7    Q.   I'm asking can you cite for me any published literature

 8         reporting the same findings that you report in this

 9         article in an in vivo model?

10              MS. O'DELL:  Object to the form.

11              THE WITNESS:  Again, I repeat the same thing,

12         I say I have seen work that has been done in vivo using

13         animals, different type of animals, that show an

14         association of talcum powder to increased risk of

15         ovarian cancer.  My work that has been done here in

16         cell lines is not many laboratory have done this in

17         ovarian cancer because this is our specialty, this is

18         what we do.  So we don't have -- part of it is done

19         probably like oxidative stress as collective like, for

20         example, some manuscripts, they measure hydrogen

21         peroxide as a marker of oxidative stress, so for

22         experts in oxidative stress, you need to do more than

23         just that.  So I have seen in animals where there are

24         some biological effects in vivo.

25
```

Ghassan Saed, Ph.D.

```
 1   BY MR. HEGARTY:

 2   Q.   I'm talking about the biological effects you report in

 3        your manuscript.

 4   A.   Which include some of this.

 5   Q.   What literature can you cite for me that has shown

 6        these same biological effects in an in vivo model?

 7             MS. O'DELL:  Object to the form.

 8   BY MR. HEGARTY:

 9   Q.   The same biological effects you report in your

10        manuscript.

11             MS. O'DELL:  Object to the form, asked and

12        answered.

13             THE WITNESS:  I guess I'm not understanding

14        the question because, again, these are cell lines from

15        ovarian cancer patients, and doing work with cell lines

16        is the closest you can get to in vivo.  If there is

17        work that has been done to depict all the work I have

18        done here, this is none, to my knowledge, but there are

19        reports that clearly indicates an in vivo effect.

20   BY MR. HEGARTY:

21   Q.   What reports are you referring to?

22   A.   Animal studies.

23   Q.   Cite for me the author or name of the animal studies

24        you're referring to.

25             MR. DONATH:  Move to strike, nonresponsive.
```

Ghassan Saed, Ph.D.

```
 1                    THE WITNESS:  So, yeah, I think I referenced
 2          some animal studies work here.  Let's see.  This is the
 3          manuscript?  I'm trying to find references.  Yes.
 4          Where is that paper?  I can't remember this.  I know
 5          it's in the report.  Yeah, it's right here, sorry.  I
 6          know I referenced it here.
 7   BY MR. HEGARTY:
 8   Q.    How much more time do you need, Doctor?
 9   A.    It's been a while, so I need to find out exactly where
10          this is, but I know it's here.  So it is some cited in
11          reference 50, but that's not the author -- that's not
12          the original reference, this is a cross-reference.
13   Q.    You said cited in 50?
14   A.    Number 50, but that's a cross-reference, if I recall
15          correctly.
16   Q.    You need more time?
17   A.    I do.  I'm trying to look for it.
18   Q.    Let's go off the record.
19                    THE VIDEOGRAPHER:  Going off the record at
20          2:57 p.m.
21                    (An off-the-record discussion was held.)
22                    THE VIDEOGRAPHER:  Back on the record at 2:59
23          p.m.
24   BY MR. HEGARTY:
25   Q.    Doctor, when we went off the record momentarily you
```

Ghassan Saed, Ph.D.

```
 1          were going through your references in your report to

 2          identify any in vivo animal models that you claim show

 3          the same results that you report in your manuscript.

 4          Can you cite for us the publications that you contend

 5          show the same results as your manuscript in an animal

 6          model?

 7                    MS. O'DELL:  Object to the form.

 8                    You may answer.

 9                    THE WITNESS:  So I am responding that I read

10          in some references and reviews that there was an in

11          vivo animal studies that showed association of talcum

12          powder use with increased risk of ovarian cancer in

13          animal models, and the reference for that is in the NTP

14          studies.

15     BY MR. HEGARTY:

16     Q.   That study did not measure the pro-oxidant and

17          anti-oxidant markers that you measure in your study,

18          correct?

19     A.   They talk about oxidative stress in general,

20          inflammation in general.

21     Q.   But they don't -- that study doesn't measure the

22          pro-oxidant or anti-oxidant markers that you report in

23          your study, correct?

24     A.   That study, no.

25     Q.   The NTP study concerned findings in the lungs of the
```

Ghassan Saed, Ph.D.

```
 1          rats and mice, not the ovaries, correct?

 2     A.   No, it was summarize a review of everything, the actual

 3          study, yes.

 4     Q.   The NTP didn't look at ovarian cancer, correct?

 5     A.   I'm not sure.  I read from that study that they have

 6          summary, summary, and somewhere there I read that there

 7          was in vivo association of the talcum powder use with

 8          ovarian cancer.  So that's called reference reference.

 9     Q.   Your report --

10     A.   May I add something?  I also read it somewhere else, I

11          cannot remember right now.

12     Q.   Your report in your manuscript say that you in your

13          experiments found genotype switches at 72 hours; is

14          that correct?

15     A.   Genotype switches, what are you referring to?

16               MS. O'DELL:  What page?

17     BY MR. HEGARTY:

18     Q.   You report in your manuscript.

19     A.   Which particular --

20     Q.   Well, let me ask you about your manuscript.  Did your

21          manuscript report genotype switches at 72 hours?

22     A.   The effect of talcum 72 hours induced SNP in genetic

23          mutations.

24     Q.   And do you claim that those genetic mutations occurred

25          in all cells treated with talc, in your experiments?
```

Ghassan Saed, Ph.D.

```
 1   A.   There is a table actually that summarize the results,

 2        and it doesn't show it with all markers, so we can

 3        refer to it, so if you look, for example --

 4             MS. O'DELL:  What figure?

 5             THE WITNESS:  The figure Table 2, if you look

 6        at GSR, GSR no effect, SOD3 no effect, catalase there

 7        is an effect in some cells, not others, you can see

 8        that A2780 has no effect, the talc treatment.

 9   BY MR. HEGARTY:

10   Q.   But with regard to the cells that it did have an

11        effect, SKOV-3, for example, with regard to --

12   A.   SKOV with regard to catalase, for example, has no

13        effect.

14   Q.   With regard to --

15   A.   TOV112 with catalase there is an effect.

16   Q.   And was that effect in all the cells tested with talc?

17             MS. O'DELL:  Object to the form.

18             THE WITNESS:  I don't understand your

19        question.

20   BY MR. HEGARTY:

21   Q.   Well, don't you -- do you contend that those genotype

22        changes occurred in all cells treated with talc?

23   A.   I didn't say that.

24   Q.   Did that happen?

25   A.   No.  What I'm saying is if you treat the cell line,
```

Ghassan Saed, Ph.D.

```
 1         okay, TOV112, with talc for 72 hours, there will be an

 2         increase, an acquisition of this mutation.  Now, you're

 3         asking if I determined whether all cells in that

 4         population got this mutation.

 5   Q.    Correct.

 6   A.    The answer is I don't know.

 7   Q.    Are you able to determine the quantity of cells -- let

 8         me back up.  How many cells are in the culture?

 9   A.    Yeah, so this is DNA extracted from 1 million cells

10         treated with 100 microgram per ml of talcum powder.

11         Now, there is another way you can quantitate if we need

12         to proceed further with this.

13   Q.    Are you able to estimate the volume of cells that this

14         genotype switch occurred in?

15               MS. O'DELL:  Object to the form.

16               THE WITNESS:  The volume?

17   BY MR. HEGARTY:

18   Q.    Yes, the number.

19               MS. O'DELL:  Object to form.

20               THE WITNESS:  I just said, no, we can't.

21         This technique will tell you yes or no, doesn't tell

22         you how much -- how many, sorry.

23   BY MR. HEGARTY:

24   Q.    So would it tell you, yes, if it -- (coughing in

25         room) -- only one of the 1 ml cells?
```

Ghassan Saed, Ph.D.

```
 1                    MS. O'DELL:  Object to the form.

 2                    THE WITNESS:  Again, this is not

 3          quantitative.  This will tell you if there is a

 4          mutation or there is no mutation.

 5     BY MR. HEGARTY:

 6     Q.   Without regard to the number of cells the mutation

 7          occurred in?

 8                    MS. O'DELL:  Objection to the form.

 9                    THE WITNESS:  Okay.  I will repeat myself

10          again.  This is -- this technique will tell you if

11          there are population of cells that acquired this

12          genotype.

13     BY MR. HEGARTY:

14     Q.   Does it tell you the number of such a population?

15     A.   I just said no.

16     Q.   If you look at Page 2 of your abstract, I'm sorry, your

17          manuscript, the abstract, looking at the Abstract

18          Section, second line towards the end, you say here

19          we've demonstrated that talc induces significant

20          changes in key redox enzymes and enhances the

21          pro-oxidant state in normal and EOC cells.

22     A.   Where are you reading?  Sorry.

23     Q.   The second line, towards the end of the second line.

24     A.   Towards the end of the second line -- here, yes, I see

25          it I see it.
```

Ghassan Saed, Ph.D.

```
 1   Q.   What do you mean when you say induces significant

 2        changes?  What does that mean, what does the word

 3        significant there mean?

 4   A.   Got you.  So this means marginal change, it's not --

 5        here the words does not imply statistically significant

 6        is that you're referring to, although the results were

 7        statistically significant, this is referring to the

 8        magnitude.

 9   Q.   And how do you define -- how did you define the

10        magnitude as significant?

11   A.   You don't, many readers assume significant is

12        statistically significant.

13   Q.   Was the choice of the word significant a subjective

14        word choice by you?

15   A.   I chose this word because it applies that there is a

16        significant effect which I know it is.

17   Q.   And when you say significant effect, what do you mean?

18   A.   I mean both marginal and statistically significant.

19   Q.   What does it mean to have a marginal effect?

20   A.   Marked like, for example, it is not like 1 versus 1.35,

21        it is 1 versus 3, that's mean marginal.

22   Q.   You say about the middle of that paragraph that in all

23        talc treated cells, do you see where I'm reading?

24   A.   Yes.

25   Q.   There was a significant dose-dependent increase in
```

Ghassan Saed, Ph.D.

```
 1            pro-oxidants iNOS, nitrate/nitrite, and MPO with a

 2            concomitant decrease in anti-oxidants CAT, SOD, GSR,

 3            and GPX.  Do you see where I'm reading?

 4    A.      Yes.

 5    Q.      What do you mean when you use the phrase significant

 6            there?

 7    A.      It is indicated by the P value, so once you have the P

 8            value, that's -- indicates statistically significant.

 9    Q.      And when you say an increase and a decrease as compared

10            to what?

11    A.      To untreated.  It says all talc treated cells.

12    Q.      There is no data that correlates your findings and your

13            experiments to ovarian cancer risk in humans, correct?

14                 MS. O'DELL:  Objection, form.

15                 THE WITNESS:  One more time, please.

16    BY MR. HEGARTY:

17    Q.      Sure.  There is no data that correlates your findings

18            in this manuscript to ovarian cancer risk in women,

19            correct?

20                 MS. O'DELL:  Objection to form.

21                 THE WITNESS:  So my data explain, explain and

22            actually classify and characterize epithelial ovarian

23            cancer cells to have a pro-oxidant state, and we were

24            the first lab to actually demonstrate that epithelial

25            ovarian cancer cells manifest a pro-oxidant state by
```

Ghassan Saed, Ph.D.

```
 1          increasing in these pro-oxidants that we have here and

 2          decreasing the anti-oxidant that we studied.  So this

 3          is a -- I have written a review article about this, I

 4          have written a book chapter about this, this is the

 5          major focus of my lab is to characterize the ovarian

 6          cancer cells as a pro-oxidant, that they manifest a

 7          pro-oxidant state and we characterize it.

 8     BY MR. HEGARTY:

 9     Q.   There is no data showing that these increases or

10          decreases increase the risk of ovarian cancer in women,

11          correct?

12               MS. O'DELL:  Objection to form.

13               THE WITNESS:  Okay, so there are data that --

14          recent data that showing, for example, I'll give you an

15          example, myeloperoxidase is a marker of inflammation.

16          My lab was the first lab in the entire world to report

17          that myeloperoxidase is expressed by epithelial ovarian

18          cancer cells, although this marker is only supposed to

19          be a myeloid marker, which is a blood marker, a blood

20          cells marker, not a nonmyeloid.  Several reports later

21          they confirm my finding, and not only that, other labs

22          have just -- they reported that the SNP that we use

23          here, it is correlated with increased risk of ovarian

24          cancer, that's reported.  That's number one.

25               Another example, SOD, catalase, those two
```

Ghassan Saed, Ph.D.

```
 1         enzymes and one more -- okay, but for those two, I know
 2         for a fact that their SNPs has also been reported to be
 3         associated with increased risk of ovarian cancer in
 4         human, so that's for the genotype.
 5               For the markers, there are several studies in
 6         the literature that talk about alteration of oxidative
 7         stress and inflammation in ovarian cancer.  Our lab,
 8         other labs have published, repeatedly published this,
 9         so this is, as far as I'm concerned, this is a fact for
10         me, we have documented this, others documented this,
11         and to confirm my work with a report from a different
12         lab saying there is this myeloperoxidase SNP minus
13         463AA correlates with increased risk of ovarian cancer,
14         and we have this to be the genotype that changes in
15         talc powder, that's incredible to me.
16    BY MR. HEGARTY:
17    Q.    Identify the SNPs that you report in your manuscript
18         that have been shown to have reached genome wide
19         significance of association with ovarian cancer.
20    A.    Risk.
21               MS. O'DELL:  Object to form.
22               THE WITNESS:  Risk, so the minus, the same
23         SNP that we use here, minus 63, 463, which is the MPO
24         SNP, this SNP is recognized to be associated with
25         increased risk of ovarian cancer in a human.
```

Ghassan Saed, Ph.D.

```
1    BY MR. HEGARTY:

2    Q.   And that's been recognized to be associated in a genome

3         wide significantly way?

4                   MS. O'DELL:  Object to the form.

5                   THE WITNESS:  I don't know what you mean by

6         genome wide.

7    BY MR. HEGARTY:

8    Q.   Well, you're familiar with what the --

9    A.   SNP is --

10   Q.   -- GWAS --

11   A.   Yes.

12   Q.   -- the GWAS study is, correct?  Are you familiar with

13        that?

14                  MS. O'DELL:  Would you repeat the question?

15        I couldn't hear it.

16   BY MR. HEGARTY:

17   Q.   I asked him if he's familiar with what GWAS is.

18   A.   Yes.

19   Q.   What is it?

20   A.   It's the genome wide association where they list all

21        the SNPs and their frequency of occurrence and their

22        what they call it -- frequency of occurrence in general

23        population.

24   Q.   And what SNPs in your manuscript have been associated

25        by the GWAS studies with ovarian cancer?
```

Ghassan Saed, Ph.D.

```
 1    A.    So this, okay, we're mixing up two things.  I need to

 2          clarify this.  So the GWAS, they identify the SNP.

 3          Then investigators after the SNP has been identified by

 4          the GWAS, they pick that SNP and they say, hmm, there's

 5          a lab that published that myeloperoxidase in ovarian --

 6          in epithelial ovarian cancer where it's not supposed to

 7          be there, well, let's do this study where we see if

 8          this SNP is indeed associated with increased risk of

 9          ovarian cancer.  So that's not part of the GWAS study.

10          They use the GWAS study information like I did it.

11    Q.    That's not my question, Doctor.  My question is which

12          of the SNPs that you report in your manuscript have

13          been shown to be associated with ovarian cancer by the

14          GWAS studies?

15                MS. O'DELL:  Objection to form.

16                THE WITNESS:  I just said what I have to say.

17    BY MR. HEGARTY:

18    Q.    Well, none of the SNPs that you referred to in your

19          manuscript have been identified by the GWAS studies as

20          being associated with ovarian cancer risk, correct?

21                MS. O'DELL:  Object to the form.

22                THE WITNESS:  No, it's not correct because I

23          repeat again, the GWAS have no responsibility to tell

24          you, they don't do studies looking at association.

25          They just list SNP and prevalence in general
```

Ghassan Saed, Ph.D.

```
 1        population, very clear.

 2   BY MR. HEGARTY:

 3   Q.   So it's your contention that the GWAS, the genome wide

 4        significance of association doesn't list SNPs that are

 5        associated with ovarian cancer?

 6            MS. O'DELL:  Object to the form.

 7            THE WITNESS:  What I'm saying is, to my

 8        understanding, GWAS is an information bank where you go

 9        and you say, okay, there is -- there exists a catalase

10        SNP, which is this SNP, this specific sequence that is

11        present in .01 percent of general population.  Above

12        that will be characterized as risk factor.  So now in

13        the GWAS they identified the MPO SNP, the catalase SNP,

14        the SOD SNP, all SNPs that it's like an information

15        bank where you go to to find your information and then

16        you go and study them.  I study them, others study

17        them, different labs can study them, but they do it for

18        us.  It's like the gene sequencing bank, it's the same

19        thing, same concept, protein sequence bank.  I don't

20        need necessarily to go and sequence the whole thing to

21        understand, it's already sequenced for me.

22   BY MR. HEGARTY:

23   Q.   What does it mean for a SNP to reach genome wide

24        significance?

25   A.   So there is a cutoff that they have in their website to
```

Ghassan Saed, Ph.D.

```
 1           each based on epidemiological studies that there is

 2           association, if it increased over this level, it could

 3           be associated with diseases.

 4    Q.     Which of the SNPs that you reference in your manuscript

 5           have been associated with ovarian cancer, in other

 6           words, which have reached genome wide significance?

 7                  MS. O'DELL:  Object to the form.

 8                  THE WITNESS:  I can answer this.  I know for

 9           a fact it's catalase, not only ovarian but also in

10           breast cancer, and they are twins.

11    BY MR. HEGARTY:

12    Q.     Any others?

13    A.     I'm not -- I can't remember the actual -- for me, the

14           GWAS was an information bank where I get my -- the

15           information I need to perform the studies, like me and

16           others in the same situation.

17    Q.     Cite for me any published literature that is

18           associated -- that has shown a clinical significant

19           association between the SNPs that you reference in your

20           paper and ovarian cancer.

21    A.     I'm sorry, one more time.

22                  MS. O'DELL:  Object to the form.

23    BY MR. HEGARTY:

24    Q.     Identify for me any published literature that shows a

25           statistically significant association between the SNPs
```

Ghassan Saed, Ph.D.

1          you reference in your manuscript and ovarian cancer.

2                    MS. O'DELL:  Object to the form.

3                    THE WITNESS:  So I'm not -- I am objecting to

4          the word statistically significant, but I can identify

5          several studies that, for example, looking at catalase

6          SNP and its association with increased risk of ovarian

7          cancer, myeloperoxidase SNP and its association with

8          increased risk of ovarian cancer, there was one more

9          I'm skipping, and so those two were definitely there.

10   BY MR. HEGARTY:

11   Q.   Why do you object to my use of the phrase statistical

12        significance?

13   A.   Because I am not sure if they did -- they did molecular

14        study or they did a different type of study, so I'm

15        just, you know, not familiar with the epidemiological

16        studies that they performed.

17   Q.   Well, cite for me any studies that show, as you say, an

18        association between MPO or CAT and ovarian cancer.

19                   MS. O'DELL:  Object to the form.

20                   THE WITNESS:  MPO?

21   BY MR. HEGARTY:

22   Q.   Yes.

23   A.   The MPO SNP?

24   Q.   Yes.

25   A.   That's what we're talking about?

Ghassan Saed, Ph.D.

```
 1   Q.   Yes.

 2   A.   Yes, I can cite.

 3   Q.   Cite for me a study.

 4   A.   I don't remember it now, but there is study.

 5   Q.   Did you cite it in your manuscript?

 6   A.   I believe so.  Let's talk -- let's see about where we

 7        talk about SNP.  Okay, were the first to do this --

 8        sorry -- I would be very happy to provide you with

 9        these references that I mentioned, MPO and catalase and

10        the SNP in ovarian cancer.

11   Q.   Can you cite for me here today any studies associating

12        catalase or MPO with ovarian cancer?

13             MS. O'DELL:  Object to the form.  You mean

14        the SNP?

15             THE WITNESS:  I can't remember where I put

16        it.

17   BY MR. HEGARTY:

18   Q.   How much time do you need to look, Doctor?

19   A.   See, I write this every day so I get so overwhelmed.

20   Q.   Let's go off the record.

21   A.   So we're looking for catalase SNP for --

22             MS. O'DELL:  Stay on, if you're -- do you

23        need more time, Doctor, or are you --

24             THE WITNESS:  I'm trying to find it in my --

25             MR. HEGARTY:  Let's go off the record.
```

Ghassan Saed, Ph.D.

```
 1                      THE WITNESS:  I mean I may not even reference

 2         it here so I don't know.

 3                      THE VIDEOGRAPHER:  Going off the record at

 4         3:23 p.m.

 5                      (An off-the-record discussion was held.)

 6                      THE VIDEOGRAPHER:  We're back on the record

 7         at 3:26 p.m.

 8    BY MR. HEGARTY:

 9    Q.   Doctor, when we went off the record I asked you for any

10         studies associating catalase or MPO with ovarian

11         cancer.  You've had a chance to look for such studies,

12         and what is your response?

13    A.   So there's one study by Olson, et al., that was

14         published in Gynecology Oncology 2004.

15    Q.   How do you spell his first name?

16    A.   O-l-s-o-n, and it's looking at SOD and MPO SNP.  There

17         is an increased risk of ovarian cancer.  I couldn't

18         find the catalase one, but it is there, I can search

19         for it, it is hundred percent there.  There is another

20         one looking at Superoxide dismutase published in JBC

21         Journal by Yumin, et al.

22    Q.   How do you spell that?

23    A.   Y-u-m-i-m, Hu, H-u.  And there is one more which is

24         about catalase if you -- SNP.

25    Q.   What is the date of the Yumin article?
```

Ghassan Saed, Ph.D.

```
 1   A.   What's the data?

 2   Q.   What's the date?

 3   A.   Oh, the date, I'm sorry.  Can I look?

 4   Q.   Yes.

 5   A.   So the date was 2005.

 6   Q.   And then you believe there's an article that associates

 7        catalase to ovarian cancer?

 8   A.   Yes.

 9   Q.   You can't recall that article sitting here today?

10   A.   I have it here, it's Catalase Nucleotide SNP Strongly

11        Associated With Ovarian Cancer, this is by -- from our

12        lab and from another lab, also.

13   Q.   What is the -- who is the first author?

14   A.   From my lab?

15   Q.   Well, you said --

16   A.   This second one, the second one is by -- so this is our

17        paper, and there's one here.

18   Q.   When you say our paper, who's the lead author?

19   A.   Okay.  Can I just tell you the paper?  So this is

20        published in -- it says The Effect of Catalase SNP and

21        Susceptibility to Ovarian Cancer, and this is by --

22        published in -- doesn't -- it's in 2017, and it doesn't

23        tell me the journal, Journal of Obstetrics and

24        Gynecology, Volume 38, 2018, Issue 4.

25             And going back to your previous question, I
```

Ghassan Saed, Ph.D.

```
 1        am -- if you define lead author as corresponding author

 2        or first author?

 3   Q.   First author.

 4   A.   Is Dr. Belotte, he was an M.D., Ph.D. trained in my

 5        laboratory.  I was his Ph.D. advisor.

 6   Q.   What year?  What is the year of the article?

 7   A.   Oh, sorry, 2015.

 8   Q.   What is the name of the article?

 9   A.   Single Nucleotide Polymorphism in Catalase is Strongly

10        Associated With Ovarian Cancer Survival.

11   Q.   So that article doesn't have anything to do with

12        ovarian cancer initiation, correct?

13             MS. O'DELL:  Object to the form.

14             THE WITNESS:  Is that another question?

15   BY MR. HEGARTY:

16   Q.   Yes.

17   A.   Saying --

18   Q.   In that article, it associated catalase with ovarian

19        cancer survival, correct?

20   A.   Uh-huh.

21   Q.   It didn't associate catalase with causing ovarian

22        cancer, correct?

23             MS. O'DELL:  Object to the form.

24             THE WITNESS:  So in this article what we did,

25        we actually, this is -- we identified the SNP and
```

Ghassan Saed, Ph.D.

```
1          catalase that others also identified, and we looked at

2          the presence of the SNP in chemoresistance versus

3          sensitive looking at different parameters, and we

4          actually reversed the SNP using the CRISPR editing,

5          gene editing, and we induced apoptosis, so there was

6          like a survival mechanism.

7     BY MR. HEGARTY:

8     Q.   Doctor, the article you actually cite and which you

9          included as an author found that with regard to the

10         seven selected SNP study, no association -- you found

11         no association with ovarian cancer risk, correct?

12                   MS. O'DELL:  Object to the form.

13                   THE WITNESS:  Which article you talking

14         about?

15    BY MR. HEGARTY:

16    Q.   The article with the lead author Belotte, Belotte.

17    A.   Jimmy Belotte, okay, what about it?

18    Q.   Your article looked at CAT, CYBA, GPX1, GSR, MnSOD,

19         MPO, and NOS2, correct?

20    A.   Yes.

21    Q.   You found doing the same kind of testing you did here

22         that none of those SNPs was associated with ovarian

23         cancer risk, correct?

24                   MS. O'DELL:  Object to the form.

25                   THE WITNESS:  No.
```

Ghassan Saed, Ph.D.

```
 1                    MS. O'DELL:  Excuse me.  Object to the form.

 2           If you need to see the paper --

 3                    THE WITNESS:  Yeah, it's been a while but --

 4                    MS. O'DELL:  If you need to see the paper.

 5           SAED DEPOSITION EXHIBIT NUMBER 17,

 6           RESEARCH ARTICLE,

 7           WAS MARKED BY THE REPORTER

 8           FOR IDENTIFICATION

 9    BY MR. HEGARTY:

10    Q.   I marked as Exhibit 17 the paper.

11    A.   Very good.

12    Q.   Show me in that paper where you found an association

13         with the listed SNPs and ovarian cancer risk.

14    A.   Okay.  So there is no -- this study we looked at, this

15         particular SNP and catalase that we found, the other we

16         found that they are not associated with survival, so

17         this study was basically looking at survival of ovarian

18         cancer.  So this is not a study meant to study risk.

19                    MR. KLATT:  Objection, nonresponsive.

20    BY MR. HEGARTY:

21    Q.   If you look over at Page 11 of your manuscript.

22                    MS. O'DELL:  Which page --

23                    MR. HEGARTY:  It's Exhibit 7.

24                    MS. O'DELL:  Well, he just has one manuscript

25         in his hand.  Do you know where we are, Doctor?
```

Ghassan Saed, Ph.D.

```
 1                  THE WITNESS:  Page 11 --

 2   BY MR. HEGARTY:

 3   Q.   Yes, Page 11.  The first sentence of the third

 4        paragraph beginning To Elucidate the Mechanism, do you

 5        see that?

 6   A.   Yes.

 7   Q.   You state later in that sentence, we have examined

 8        selected known gene mutations corresponding to SNPs

 9        known to be associated with altered enzymatic activity

10        and increased cancer risk.  Do you see where I'm

11        reading?

12   A.   To elucidate the mechanism, that paragraph?

13   Q.   Yes.

14   A.   Okay.

15   Q.   And at the end of that sentence you cite Reference 28.

16   A.   Okay.

17   Q.   And Reference 28 is that Belotte article, correct?

18   A.   28 is Belotte, yes.

19   Q.   Can you hand me the Belotte article back, please.

20   A.   (Witness complied.)

21   Q.   In the Belotte article you say of the seven selected

22        SNPs studied, no association with ovarian cancer risk

23        was found.  That's what you found, correct, Doctor?

24                  MS. O'DELL:  Objection to form.  If you need

25        to see Belotte -- do you have another copy, Mike, or is
```

Ghassan Saed, Ph.D.

```
 1          that it?  And it's also in your notebook at 34 if you

 2          both need it so.

 3                    THE WITNESS:  Can I look at it?

 4     BY MR. HEGARTY:

 5     Q.   Yes, go ahead and look at 34.

 6     A.   I can't remember if we did the same SNP in both

 7          studies, so I just want to make sure that we did that,

 8          because there are several SNPs for the same enzyme

 9          reported in the GWAS.

10     Q.   How long will it take you to look at -- you did the

11          same SNPs in the Belotte article as you did here?

12     A.   I have to look at the accession numbers and compare

13          them.

14     Q.   Well, we'll maybe get to that, but my question goes

15          back to your reference on Page --

16                    MS. O'DELL:  34.

17                    MR. HEGARTY:  Your reference to that article

18          on Page 11 of your manuscript, you quote that article

19          as saying that you examined several selected known gene

20          mutations corresponding to SNPs known to be associated

21          with altered enzyme activity and increased cancer risk.

22          What part of that Belotte article shows that the SNPs

23          that you examined are associated with increased cancer

24          risk?

25                    THE WITNESS:  So if you look at the table,
```

Ghassan Saed, Ph.D.

```
 1          Page 3, Dr. Belotte's article, there is a table here
 2          that lists what is the SNP, what is the mean allele
 3          frequency occurrence, the chromosomal equation, and if
 4          it is known nucleotide switch, and the effect of
 5          activity.  So there are SNPs that affect activity of
 6          the enzymes, and if they do, they are, according to our
 7          findings, they are associated with anything that alters
 8          oxidative stress to the pro-oxidant state can
 9          contribute to increased risk.
10     BY MR. HEGARTY:
11     Q.   But you in your paper, Exhibit 17, say that the SNPs
12          you studied showed no association with ovarian cancer
13          risk, correct?
14     A.   Which one?
15     Q.   The Belotte paper.
16     A.   Oh, keep saying what paper.
17     Q.   You look at the abstract.
18     A.   So, again, we're looking at specific SNPs.
19     Q.   Correct.
20     A.   Right, so --
21     Q.   And in the specific --
22     A.   Some of the SNPs that we looked at when we did this
23          study, they were associated with survival of ovarian
24          cancer, that's what we tested.
25     Q.   None of the SNPs --
```

Ghassan Saed, Ph.D.

```
 1                    MR. KLATT:  Nonresponsive.

 2   BY MR. HEGARTY:

 3   Q.   Doctor, you also examined whether the SNPs reported in

 4        this study were associated with ovarian cancer risk,

 5        correct, not just survival?

 6                    MS. O'DELL:  Objection, form.

 7                    THE WITNESS:  Give me a moment to see, to

 8        refresh my memory.  This is 2015, so I need to remember

 9        what we did.  I have done many work.

10   BY MR. HEGARTY:

11   Q.   How much time do you need to study that article?

12   A.   Just -- okay, so in this study we only did survival,

13        the Jimmy Belotte study, this is my -- yeah, so this

14        here we only did analysis of survival.

15   Q.   Doctor, if you turn over to Page 6 of that article at

16        the very bottom, third from -- third line from the

17        bottom, you write that currently we demonstrated that

18        there is no association between the selected SNPs and

19        risk of developing ovarian cancer, citing Table 2,

20        those are your words, correct?

21   A.   Yeah, Table 2 is, let's see --

22                    MS. O'DELL:  What were you reading?

23                    MR. HEGARTY:  The bottom of Page 6 of 12.

24                    THE WITNESS:  Yeah, I see that.

25
```

Ghassan Saed, Ph.D.

```
 1    BY MR. HEGARTY:

 2    Q.   Doctor, is it your testimony that in this study you did

 3         not investigate whether the SNPs listed in Table 2 were

 4         associated with ovarian cancer risk?

 5                   MS. O'DELL:  Object to the form.

 6                   THE WITNESS:  Let me just look at this,

 7         sorry.

 8                   MR. HEGARTY:  Let's go off the record.

 9                   MS. O'DELL:  He's just looking at the table.

10         Ask him a question, he's entitled --

11                   MR. HEGARTY:  Let's go off the record.

12                   MS. O'DELL:  No, we're not.

13                   MR. HEGARTY:  We're going off the record.

14                   MS. O'DELL:  No, we're not.

15                   MR. KLATT:  We're going to call Judge Pisano.

16                   MS. O'DELL:  Wait a minute.  Let me speak.

17         If you ask the doctor about his manuscript, he is not

18         required to have put to memory every word and table in

19         the manuscript.  If you ask him about something, he is

20         entitled to look at it and reply completely.  And to

21         somehow suggest if he takes more than 15 seconds we're

22         going off the record, that's ridiculous.

23                   MR. KLATT:  It's every single time he's asked

24         a question, he wants to look something up.  This is

25         slow walking the deposition, we're not going to put up
```

Ghassan Saed, Ph.D.

```
 1        with it.

 2                   MS. O'DELL:  It is not.

 3                   MR. KLATT:  He's perfectly entitled to look

 4        things up to answer them, but it doesn't count against

 5        our time.

 6                   MS. O'DELL:  He's not looking things up.

 7        He's looking at the exhibit that had been placed before

 8        him.

 9                   THE COURT REPORTER:  Excuse me --

10                   (Simultaneous crosstalk.)

11                   MS. O'DELL:  We are on the record.

12                   And, Doctor, if you are prepared to respond

13        to the question, you may do so.  If you need a minute,

14        let us know that.

15   BY MR. HEGARTY:

16   Q.   How much time do you need to review the article,

17        Doctor?

18   A.   I'm just asking you, please, where do you see in Table

19        2.

20   Q.   I'm referring to your words at the bottom of Page 6

21        that's referring over to Table 2, and I'm asking you is

22        it your testimony that you did not investigate the

23        association in this paper between these SNPs and

24        ovarian cancer risk, is that your testimony?

25                   MS. O'DELL:  Are you quoting a sentence?
```

Ghassan Saed, Ph.D.

```
 1        What sentence are you referring to?

 2                MR. HEGARTY:  I'm not -- you're not taking

 3        this deposition of me.  I'll let my question stand.

 4                MS. O'DELL:  Object to the form of the

 5        question, it's unclear.  If there's a specific sentence

 6        you're referring to in the manuscript, you said bottom

 7        of Page 6, so if there's something you're referring to,

 8        I'd ask you direct the witness to it.

 9   BY MR. HEGARTY:

10   Q.   Can you answer my question, Doctor?

11                MS. O'DELL:  Object to the form.

12                THE WITNESS:  Where is the -- can you

13        please --

14   BY MR. HEGARTY:

15   Q.   Bottom of Page 6 for the second time.

16   A.   Yes.

17   Q.   I'm reading this to you, it says currently we

18        demonstrated that there is no association between the

19        selected SNPs and risk of developing ovarian cancer,

20        Table 2.  Do you see that?

21   A.   Yes.

22   Q.   Is it your testimony that this article did not

23        investigate an association between the selected SNPs

24        and ovarian cancer risk?

25   A.   In this study that we did with this number of people
```

Ghassan Saed, Ph.D.

```
 1          that we looked at, we found, okay, that the only

 2          catalase SNP is associated with ovarian cancer

 3          survival, none of the other SNPs were associated from

 4          these patients to increased risk of ovarian cancer.

 5     Q.   Right.

 6     A.   We only did 143, I believe, 94.

 7     Q.   So the sentence that I read to you on Page 11 of your

 8          manuscript it's citation 28 is wrong, correct?

 9                    MS. O'DELL:  Objection to form.

10                    THE WITNESS:  What's the citation?

11     BY MR. HEGARTY:

12     Q.   Well, you support the sentence that says we have

13          examined selected known gene mutations corresponding to

14          SNPs known to be associated with altered enzymatic

15          activity and increased ovarian cancer risk citing 28.

16          28 doesn't support a finding that the SNPs you tested

17          show increased ovarian cancer risk, correct?

18                    MS. O'DELL:  Object to the form.

19                    THE WITNESS:  What we -- again, this --

20          what -- the SNPs that we are used here in this study,

21          they were used in response to test the effect of talc

22          treatment, talcum powder treatment to the genetic -- to

23          the specific genetic mutations.  Now, we link survival

24          to risk, so, for example, if you look, most of our

25          hypothesis --
```

Ghassan Saed, Ph.D.

```
 1    BY MR. HEGARTY:

 2    Q.   I object to it's nonresponsive.  Doctor, you're not

 3         answering my question.  I'm going to withdraw the

 4         question.

 5              MS. O'DELL:  Don't cut him off if he's

 6         finishing --

 7              MR. HEGARTY:  He's not finishing, he's

 8         answering something else.

 9              MS. O'DELL:  He's trying to answer your

10         question.

11              MR. HEGARTY:  I withdrew the question.

12              Listen to my question, Doctor.  Does the

13         Belotte paper show that the SNPs you looked at are

14         associated with increased cancer risk?

15              THE WITNESS:  Ovarian cancer risk.

16    BY MR. HEGARTY:

17    Q.   Ovarian cancer risk.

18    A.   So what I'm trying to tell you, according to this

19         paper, we only tested limited number of patients.

20    Q.   Listen to my question.

21    A.   And I'm not sure, I'm answering, trying to answer.

22    Q.   You're not answering the question.  I'm going to

23         withdraw the question.

24    A.   Can I finish?

25    Q.   I'm going to withdraw the question.  I'm going to
```

Ghassan Saed, Ph.D.

```
 1          answer it again.

 2                    MS. O'DELL:  You can go ahead and finish.

 3                    Stop interrupting.

 4                    THE COURT REPORTER:  I cannot take

 5          everybody --

 6                    MS. O'DELL:  Here's my objection.  The

 7          witness is being interrupted while he's trying to

 8          respond to the question, and so if there's a question

 9          pending the doctor is trying to answer, you cannot

10          interrupt him.

11                    MR. HEGARTY:  Well, the record's going to

12          speak for itself as far as his nonresponsiveness to my

13          question.

14                    MS. O'DELL:  Were you finished with your

15          answer?

16                    MR. HEGARTY:  I withdrew the question.

17                    MS. O'DELL:  Were you finished with your

18          answer?

19                    THE WITNESS:  So what I'm trying to tell you,

20          I cannot remember that we did the same exact SNP in

21          Jimmy Belotte study and this study.

22      BY MR. HEGARTY:

23      Q.  That was not my question.  My question is specific to

24          this study.

25      A.  To the Jimmy Belotte study.
```

Ghassan Saed, Ph.D.

1    Q.    Correct.

2    A.    Yes.

3    Q.    And reading from your study in the abstract, starting

4          on the third line it says we sought to evaluate the

5          association of SNPs in key oxidant and anti-oxidant

6          enzymes with increased risk in survival in epithelial

7          ovarian cancer.  So you agree in this study that you

8          looked at certain specific SNPs with regard to

9          increased risk of ovarian cancer, correct?

10   A.    Those SNPs, yes.

11   Q.    You found from your study that those SNPs were not

12         associated with increased ovarian cancer risk, correct?

13   A.    Correct.

14               MS. O'DELL:  Object to the form.

15               THE WITNESS:  Correct.

16   BY MR. HEGARTY:

17   Q.    Can you cite for me any study that has shown the SNPs

18         you report, you discuss in your manuscript to occur in

19         women using talc?

20               MS. O'DELL:  Object to the form.

21               THE WITNESS:  That the SNP that we used in

22         this study --

23   BY MR. HEGARTY:

24   Q.    In the manuscript.

25   A.    In the manuscript, any of these SNPs has been

Ghassan Saed, Ph.D.

1        associated with woman using talc?

2   Q.   Correct.

3   A.   I don't know.

4   Q.   Can you report -- can you cite for me any studies

5        showing the enzyme activity that you report to have

6        occurred with application of talc use to be in women

7        using talc?

8             MS. O'DELL:  Object to the form.

9             THE WITNESS:  So if other people have done

10        the same work that I did with samples from woman who

11        got ovarian cancer and they used talc?

12   BY MR. HEGARTY:

13   Q.   Can you cite for me any study showing your findings as

14        to decrease in the expression of anti-oxidant enzymes

15        and the increased expression in pro-oxidant enzymes in

16        women using talc?

17             MS. O'DELL:  Object to the form.

18             THE WITNESS:  I can cite to you several

19        studies that have indicated the pro-oxidant state and

20        the anti-oxidant state in several human, animal, in

21        vitro studies of cells with ovarian cancer.

22   BY MR. HEGARTY:

23   Q.   That's not my question.  My question, Doctor, is can

24        you cite for me any studies showing your findings as to

25        decrease in the expression of anti-oxidants and the

Ghassan Saed, Ph.D.

```
 1          increase expression of pro-oxidants in women using talc

 2          on their bodies?

 3                    MS. O'DELL:  Object to the form.

 4                    THE WITNESS:  I don't know.

 5     BY MR. HEGARTY:

 6     Q.   Can you cite for me any study showing the results --

 7          showing any of the results in your manuscript to

 8          occur -- to have occurred in women applying talc to

 9          their bodies?

10                    MS. O'DELL:  Object to the form.

11                    THE WITNESS:  So let's go back.  I have --

12          this is important.  Good question.  My answer is

13          simple.  The fact that you -- that talc has been shown

14          to elicit a molecular response, that is same response

15          that you get in the pro-oxidant state that has been

16          published by many people in ovarian cancer, that is, to

17          my understanding, link talcum powder to increased risk

18          of ovarian cancer.

19     BY MR. HEGARTY:

20     Q.   Object as nonresponsive.  Listen to my question,

21          Doctor.  My question is can you cite for me any studies

22          showing the findings you report in your manuscript or

23          in your expert report in this case to have occurred or

24          been reported in women using talc on their bodies?

25                    MS. O'DELL:  Object to the form.
```

Ghassan Saed, Ph.D.

```
 1                    THE WITNESS:  So other than the similarities

 2          in the mechanism, direct link with woman who use

 3          specific talc on that day, I don't know.

 4    BY MR. HEGARTY:

 5    Q.   Let's take a break.

 6                    THE VIDEOGRAPHER:  We're going off the record

 7          at 3:49 p.m.

 8                    (A short recess was taken.)

 9                    THE VIDEOGRAPHER:  We're back on the record

10          at 4:05 p.m.

11    BY MR. HEGARTY:

12    Q.   Doctor, in looking at your manuscript again Page 13,

13          I'm sorry, in looking at your report, sorry, Page 13,

14          you describe the cell lines that you use for purposes

15          of your experiments, is that correct?

16    A.   In the cell lines section?

17    Q.   Yes.

18    A.   Yes.

19    Q.   Which of those cell lines -- strike that.  What sub

20          type of ovarian cancer are these cells?

21    A.   Sorry.  Unknown.

22    Q.   You don't know whether they're high grade, serous,

23          endometrioid, mucinous, clear cell?

24                    MS. O'DELL:  Object to the form.

25                    THE WITNESS:  When we purchased these cell
```

Ghassan Saed, Ph.D.

```
 1          lines from ATCC, they have described them where they

 2          isolated from and what's the patient and all that, but

 3          I can't remember exactly which one is which.

 4    BY MR. HEGARTY:

 5    Q.    So are any of these cell lines or have any of these

 6          cell lines been qualified as high grade serous ovarian

 7          cancer cell lines?

 8                MS. O'DELL:  Object to the form.

 9                THE WITNESS:  I can't remember.

10    BY MR. HEGARTY:

11    Q.    You say that your experiments used what you call --

12          well, you say immortalized human fallopian tube

13          epithelial cells FT33, is that right?

14    A.    FT33, yes.

15    Q.    Those, as you note in your paper, are immortalized cell

16          lines, correct?

17    A.    Correct.

18    Q.    And such cell lines are considered abnormal or

19          precancerous, isn't that correct?

20    A.    Not necessarily.

21    Q.    Well, they were modified to essentially live forever,

22          correct?

23    A.    No, it's not correct.

24    Q.    Well --

25    A.    They're modified so they can be consistent.
```

Q. But normal cells are not immortalized cells, correct?
A. Correct.
Q. And to immortalize a cell, you have to fundamentally change the cell, correct?
A. Not correct.
Q. Well, you typically have to induce something like the SV40 DNA tumor virus, correct?
A. Correct.
Q. And that alters the makeup of the cells, correct?
A. Not necessarily.
Q. Well, it essentially shuts off, for example, the P53 cell, P53 marker, correct?
A. Oncogene.
Q. Oncogene, correct? And these cells carry essentially a functional equivalent of four critical oncogenes, oncogenic mutations in tumor suppression pathways that have been implicated in ovarian carcinogenesis, correct?
A. Let me explain to you, I have been conducting research all my career using primary cultures of cells established from -- fresh from patient tissues as well as immortalized cell lines. The problem with using primary cultures, the results cannot be reproduced, because if you passage the cells, they change their phenotype with passages, so researcher agreed upon this

Ghassan Saed, Ph.D.

```
 1            is the best utility that you have in vitro, that you

 2            can use immortalized cell lines, at least they are

 3            all -- their machinery of gene expression is controlled

 4            and it's consistent and reproducible with passages.

 5       Q.   Did you do anything to correlate the cell lines you

 6            used to, for example, serous ovarian cancer cells in

 7            vivo?

 8                      MS. O'DELL:  Object to the form.

 9                      THE WITNESS:  Yeah, so from patients, this is

10            our -- my next interest to do, to go -- I have

11            extensive experience and expertise in isolating primary

12            cultures at zero passages from patients' tissues,

13            blood, and the fluid, and it is in my mind to do

14            further testing of talcum powder and see if we can

15            reproduce the effect on those cells.

16  BY MR. HEGARTY:

17       Q.   When you say those cells, what do you mean?

18       A.   The primary freshly established cells from different

19            histotypes of ovarian cancer.

20       Q.   Did you do anything --

21       A.   Because this is not available commercially.

22       Q.   Did you do anything to establish that the cell lines

23            you were looking at are, for example, high grade

24            serious ovarian cancer cell lines?

25                      MS. O'DELL:  Object to the form.
```

Ghassan Saed, Ph.D.

```
 1                    THE WITNESS:  So, again, I said one of the
 2           cell lines, I can't remember which, is from high grade,
 3           high serous grade.  The others are not clearly
 4           identified by the ATCC information provided.  But that
 5           was not my point of my research.  My point of my
 6           research is to see does talcum powder induces or alter
 7           oxidative stress markers that we know and we have
 8           published in several documents that is associated with
 9           ovarian cancer.
10   BY MR. HEGARTY:
11   Q.   Can you cite for me any data showing that the
12           concentrations of exposure that you used in your
13           experiments are similar or the same as would be
14           occurring in women using talc on the perineum?
15   A.   I can't tell you that.
16   Q.   Can you cite for me any data that shows that the level
17           of concentration of talc that you used in your cell
18           studies has ever occurred in women applying talc to
19           their bodies?
20                    MS. O'DELL:  Object to the form.
21                    THE WITNESS:  My response to this is I
22           consider, according to my studies, I consider talc
23           powder to be carcinogenic, and in my understanding of
24           biology of cancer, there is no minimum threshold beyond
25           which you are protected from developing cancer.  Every
```

Ghassan Saed, Ph.D.

```
 1         time you're exposed to the insult.  It's like

 2         radiation, it is a accumulative, it is registered in

 3         your body; that's my opinion.

 4   BY MR. HEGARTY:

 5   Q.    So your opinion is that one particle of talc is enough

 6         to cause inflammation to lead to ovarian cancer?

 7   A.    I did not say that.

 8   Q.    Well, how much talc must there be introduced in vivo to

 9         cause ovarian cancer?

10   A.    I don't know.

11   Q.    At what -- strike that.  What data shows that a woman

12         using talc will have the same level of talc exposure to

13         her ovarian cells or fallopian tube cells as you used

14         in your experiments?

15              MS. O'DELL:  Object to the form.

16              THE WITNESS:  So when you want to test the

17         effect of any substance in the biology of the body, you

18         always start with cell cultures, cell lines, so this is

19         pretty accepted standard.  Now, the amount of exposure

20         in cell lines, because it's direct and it is an

21         isolated environment, it is definitely not -- does not

22         correlate with the in vivo and how much you will get

23         with that exposure.  The answer is I don't know how

24         much a woman need to be exposed and for how long to

25         develop ovarian cancer in response to talcum powder
```

Ghassan Saed, Ph.D.

```
 1          use.  But what I do know, talcum powder induces -- is a
 2          carcinogenic and induces similar response to the
 3          profile that we see in pro-oxidant state that we
 4          extensively characterize in studies in ovarian cancer
 5          in our laboratory and others.
 6     BY MR. HEGARTY:
 7     Q.   It induces -- talc induces a similar response to the
 8          profile that you see in pro-oxidant state in the cell
 9          cultures that you experimented, correct, experimented
10          with, correct?
11                    MS. O'DELL:  Object to the form.
12                    THE WITNESS:  We and others have reported,
13          for example, there was a report showing that patients
14          with ovarian cancer, their blood is contain high levels
15          of pro-oxidants, so that's an indication that ovarian
16          cancer -- as a result of getting ovarian cancer your
17          blood is -- have high levels of oxidants that we
18          characterized.  And there are many other studies that
19          have shown that -- in vivo that there is an association
20          between oxidative stress and the risk of developing
21          ovarian cancer.
22     BY MR. HEGARTY:
23     Q.   But none of those studies have shown those effects in
24          women using talc, correct?
25     A.   I don't know.
```

Ghassan Saed, Ph.D.

```
 1    Q.   You don't know of any such studies?

 2    A.   I don't know if those studies included in their

 3         population women that who have used talc or not.

 4    Q.   You can't site for me any studies that have shown the

 5         levels of pro-oxidant or anti-oxidant states that you

 6         report in your papers in women using talc, correct?

 7              MS. O'DELL:  Object to the form.

 8              THE WITNESS:  I just answered you.

 9    BY MR. HEGARTY:

10    Q.   And the answer is no?

11    A.   No, no, I just -- my previous answer is the same.

12    Q.   Which is what?

13    A.   Which I said oxidative -- there have been shown that in

14         the blood of a woman with ovarian cancer, there is an

15         elevated levels of oxidants, and we're saying that if

16         talcum powder induces oxidative stress, alter oxidative

17         levels and redox balance by increasing oxidants and

18         decreasing anti-oxidants, according to our data, that

19         is an indication that it is doing -- manifesting the

20         pathogenesis of ovarian cancer.

21    Q.   The studies you're referring to --

22              MR. KLATT:  Objection, nonresponsive.

23    BY MR. HEGARTY:

24    Q.   The studies you're referring to have been reported to

25         have occurred in women with ovarian cancer, correct?
```

Ghassan Saed, Ph.D.

```
 1    A.   The blood of woman with ovarian cancer.

 2    Q.   No studies have reported those same results in the

 3         blood of women who do not have ovarian cancer but are

 4         using talc on their bodies, correct?

 5    A.   One more time.

 6              MS. O'DELL:  Object to the form.

 7    BY MR. HEGARTY:

 8    Q.   No studies have reported those same results in the

 9         blood of women who do not have ovarian cancer that are

10         using talc on their bodies, correct?

11    A.   I don't know.

12    Q.   When you say you don't know, what do you mean?

13    A.   I don't know if there are studies.  So you talking --

14         are you referring to the study -- I'm only referring to

15         patients with ovarian cancer, blood, their blood have

16         high oxidants.  Now, if normal, talk about normal

17         people with normal woman with no ovarian cancer, they

18         have -- I don't know, if they use talc they will have

19         higher level of oxidants, maybe that's something we

20         need to do.

21    Q.   You don't know -- you're not aware of any data showing

22         high oxidant levels in women using talc who do not have

23         ovarian cancer?

24    A.   I would be very much interested to do it.

25    Q.   You're not aware of any such studies?
```

Ghassan Saed, Ph.D.

```
 1   A.   No.

 2   Q.   Can you can cite for me anyone in the scientific

 3        community who has accepted that talcum powder causes

 4        ovarian cancer by the mechanism that you refer to in

 5        your report?

 6   A.   Give names?

 7   Q.   Yes.

 8   A.   The co-authors of my manuscript.

 9   Q.   Anyone else?

10   A.   I'm not aware, this is a very recent study.

11   Q.   Is it your testimony that the scientific community has

12        accepted your opinion as establishing the causal

13        mechanism between talc and ovarian cancer?

14             MS. O'DELL:  Object to the form.

15             THE WITNESS:  My opinion is not out there

16        yet, it's -- this is -- the manuscript is still under

17        press, it's in press so it's not really out for the

18        readers.

19   BY MR. HEGARTY:

20   Q.   You agree that the medical community has not generally

21        accepted that talc use causes ovarian cancer?

22             MS. O'DELL:  Object to the form.

23             THE WITNESS:  That they accept --

24   BY MR. HEGARTY:

25   Q.   Yes.
```

Ghassan Saed, Ph.D.

```
 1    A.    Which community you talking about?

 2    Q.    Well, I'm talking about the medical community.

 3    A.    The doctors?

 4    Q.    Doctors.

 5    A.    Researchers?

 6    Q.    Researchers.

 7                MS. O'DELL:  Object to the form.

 8   BY MR. HEGARTY:

 9    Q.    You agree that the medical community, doctors and

10          researchers, have not generally accepted that talc use

11          causes ovarian cancer?

12                MS. O'DELL:  Object to the form.

13                THE WITNESS:  I don't know, I really don't

14          know if they do or not.

15   BY MR. HEGARTY:

16    Q.    You include in your report, in particular in the

17          summary of your report over on Page 20, in Paragraphs 5

18          and 6 that use of Johnson's Baby Powder can cause

19          ovarian cancer, and in Paragraph 6 can worsen the

20          prognosis of patients with ovarian cancer, correct?

21    A.    Correct.

22    Q.    By what methodology did you use to come to those

23          opinions?

24    A.    Okay.  So I have to distinguish between opinions versus

25          conclusion from results.  So here I cite my personal
```

Ghassan Saed, Ph.D.

```
 1          opinion.  Now, my personal opinion is based on my data

 2          that I got here.  The data that I tested, my

 3          methodology that I used, and the results of this study

 4          strongly divert -- pushed my opinion towards this.

 5   Q.     My question is a little bit different, Doctor.  By what

 6          published methodology did you use to reach your

 7          causation opinions in this case?

 8                 MS. O'DELL:  Objection, asked and answered.

 9   BY MR. HEGARTY:

10   Q.     For example, are you familiar with the Bradford Hill

11          factors or criteria?

12   A.     Okay, so are you referring to epidemiological studies?

13   Q.     No, let me back up.  Have you ever heard of the

14          Bradford Hill factors?

15   A.     No.

16   Q.     Is there -- can you cite for me any published

17          methodology that you used to look at the data, look at

18          your experiments, and come to the opinions that you set

19          out in the summary of your report?

20   A.     Yes.  I just said to you that based on my results and

21          my previous finding, previous publications with other

22          publications from other laboratories, that all agreed

23          that a factor that causes inflammation and alter these

24          signature factors, the signature for reactive oxygen

25          species the way it does it for -- that simulates
```

Ghassan Saed, Ph.D.

```
 1          ovarian cancer is in a hypothesis is a cause and

 2          effect.  My opinion is based on that.

 3     Q.   Are the methods that you used to reach those opinions

 4          published anywhere?

 5     A.   The method that we used to do -- to test the effect of

 6          talcum powder on reactive oxygen species, oxidative

 7          stress, and inflammation is very basic methodology --

 8          let me finish, please -- basic methodology that is

 9          known since early 70s or even mid 70s, some of it,

10          ELISA is a very well method, very standard method, we

11          and others use this all the time.  PCR is another well

12          established method.  Every single study now you see PCR

13          all over the places.  So what the methodology that we

14          employed here is really standard methodology, and I'm

15          really surprised that this work that has not been done

16          till now.

17     Q.   Are your opinions based solely on the experiments that

18          you did that are set out in your manuscript?

19               MS. O'DELL:  Object to the form.

20               THE WITNESS:  My opinion is based on the data

21          from this manuscript and this work that I did and,

22          also, in published literature that identify the

23          pattern, the signature of pro-oxidants in ovarian

24          cancer.

25
```

Ghassan Saed, Ph.D.

```
 1    BY MR. HEGARTY:

 2    Q.   The opinions that you set out in Paragraphs 5 and 6

 3         have never been published in the peer-reviewed

 4         literature, correct?

 5    A.   My opinion?

 6                   MS. O'DELL:  Object to the form.

 7    BY MR. HEGARTY:

 8    Q.   Yes.  The opinions in Paragraphs 5 and 6 have never

 9         been published in the peer-reviewed literature,

10         correct?

11                   MS. O'DELL:  Object to the form.

12                   THE WITNESS:  I don't understand published

13         means.

14    BY MR. HEGARTY:

15    Q.   Well, published in peer-reviewed literature.

16    A.   As what, as a manuscript?

17    Q.   In any format.  You have never set out the opinions in

18         Paragraphs 5 and 6 in any public --

19    A.   So I read this somewhere else?

20    Q.   Somewhere else.

21    A.   I never read this somewhere else.

22    Q.   So you have never provided your opinions to any of your

23         peers in any published article, correct?

24                   MS. O'DELL:  Object to the form.

25                   THE WITNESS:  That's very general.  What do
```

Ghassan Saed, Ph.D.

```
1        you mean?

2    BY MR. HEGARTY:

3    Q.   Well, my question is the opinions you said in

4         Paragraphs 5 and 6 have never been published anywhere,

5         correct?

6              MS. O'DELL:  Object to the form.

7              THE WITNESS:  No.  What I'm saying is these

8         are my own, my own opinion, my own writing, writing.

9         If someone stole this and published it, I'm not aware

10        of that, but this is my language, my words, my opinion,

11        and this is based, as I told you and as I mentioned, on

12        my data and the results of this study as well as what

13        is known for the strong link of ovarian cancer and

14        oxidative stress.

15   BY MR. HEGARTY:

16   Q.   Listen to my question.  You have never published the

17        opinions of yours set out in Paragraphs 5 and 6 of your

18        report, correct?

19             MS. O'DELL:  Object to the form.

20             THE WITNESS:  I have published that ovarian

21        cancer is characterized and ovarian cancer cells

22        manifest a pro-oxidant state, I have published that --

23   BY MR. HEGARTY:

24   Q.   Nowhere have you --

25   A.   -- that can lead to a mechanism to identify --
```

Ghassan Saed, Ph.D.

```
 1          actually, we did identify a pathogenesis, a mechanism

 2          that involves these specific pro-oxidants to be unique

 3          mechanism of survival in ovarian cancer.

 4     Q.   Nowhere have you published in any literature that talc

 5          use can cause ovarian cancer, correct?

 6     A.   Previous to this study?

 7     Q.   This study -- your report has not been published,

 8          correct?

 9     A.   No.

10     Q.   It's not been peer reviewed, correct?

11     A.   No, my report?  No.

12     Q.   What you say in your report that Johnson's Baby Powder

13          exposure can cause ovarian cancer has never been

14          published in the medical literature, correct?

15               MS. O'DELL:  Object to the form.

16               THE WITNESS:  My report has not published

17          yet.

18     BY MR. HEGARTY:

19     Q.   The opinions in your report that talcum powder exposure

20          can cause ovarian cancer have never been published,

21          correct?

22               MS. O'DELL:  Object to the form, by him or

23          others?

24               THE WITNESS:  Okay.  By me?

25
```

Ghassan Saed, Ph.D.

```
 1    BY MR. HEGARTY:

 2    Q.   By you.

 3    A.   My opinion?

 4    Q.   Yes.

 5    A.   Has never been -- I never said this before, this

 6         study --

 7    Q.   Correct.

 8    A.   -- is that what you're saying?

 9    Q.   Before your report.

10    A.   About specifically talc and ovarian cancer?

11    Q.   Yes.

12    A.   Yes.

13    Q.   And you never said in any other writing that use of

14         baby powder worsens the prognosis for patients with

15         ovarian cancer?

16    A.   I didn't write about this subject prior to starting

17         these experiments.

18    Q.   Even in your manuscript, you don't include the opinion

19         that talcum powder use causes ovarian cancer, correct?

20    A.   You cannot include opinions in manuscripts.

21    Q.   That's not my question.  My question is that your

22         manuscript does not include your opinion that talcum

23         powder use causes ovarian cancer, correct?

24    A.   I answered you.

25              MS. O'DELL:  Object to the form.
```

Ghassan Saed, Ph.D.

```
 1    BY MR. HEGARTY:

 2    Q.   Am I correct?

 3               MS. O'DELL:  Object to the form.

 4               THE WITNESS:  Excuse me, one more time.  I

 5         said in manuscripts you are not allowed to publish to

 6         draw opinions, in manuscripts you're allowed to draw

 7         conclusions, so conclusions are different than

 8         opinions.  Conclusions are based solely on the results.

 9         Opinions, you can say it, if you say it, then if they

10         accept it, it's fine, but opinions are based on not

11         just the study but your opinion in it, too, based on

12         your expertise.

13    BY MR. HEGARTY:

14    Q.   Move to strike as nonresponsive.  Doctor, listen to my

15         question.

16    A.   I'm trying.

17    Q.   Your manuscript does not include your opinion that baby

18         powder exposure can cause ovarian cancer, you don't say

19         that in your manuscript, correct?

20               MS. O'DELL:  Object to the form.

21               THE WITNESS:  I have to look in my

22         manuscript.

23    BY MR. HEGARTY:

24    Q.   Doctor, you can't tell me sitting here today --

25    A.   I'm sorry, I can't remember everything I wrote.
```

Ghassan Saed, Ph.D.

```
1    Q.   Listen to my question.

2    A.   Okay.

3    Q.   Does your manuscript say that Johnson's Baby Powder

4         exposure can cause ovarian cancer?

5    A.   In this specific language?

6    Q.   Yes.

7    A.   I have to look.

8    Q.   Okay.  How about do you have to look --

9    A.   Because you're asking me -- it's not fair, you're

10        asking me for a specific language, and I am saying, I'm

11        answering back saying that my opinion, it does.  Based

12        on the results in my manuscript, I concluded that it

13        will -- it has increased risk of ovarian cancer, yes,

14        somewhere.  I have to read.  That's what I'm saying.  I

15        don't remember where I did that.

16   Q.   Okay.

17   A.   I have to go and refer to the manuscript.  Is that

18        fair?

19   Q.   In Paragraph 6, what do you mean when you say Johnson's

20        Baby Powder exposure worsens the prognosis for patients

21        with ovarian cancer?

22   A.   Oh, we're still here?  I'm sorry, where --

23   Q.   Paragraph 6 in your report.

24   A.   Oh, my report now?

25   Q.   On Page 21.
```

Ghassan, Saed, Ph.D.

```
 1   A.   21?

 2   Q.   Yes.

 3   A.   Okay, yes, so same, same discussion.

 4   Q.   Listen to my question.  My question is what do you mean

 5        that Johnson's Baby Powder exposure worsens the

 6        prognosis for patients with ovarian cancer?

 7   A.   Can I answer?

 8   Q.   Yes.

 9   A.   Okay.  So based on our results here, we have shown that

10        there is a dose response effect of talcum powder on

11        these key markers of oxidative stress.  That's my

12        answer.

13   Q.   And how do those key -- strike that.

14   A.   Dose response.

15   Q.   What is the measure that you apply for worsening the

16        prognosis of ovarian cancer?

17   A.   Is increasing redox balance -- reactive oxygen species,

18        tilting the balance, adding more inflammatory markers

19        with time with exposure.

20   Q.   You make reference in your paper to CA-125, when I say

21        your paper I'm talking about your report and in your

22        manuscript, correct?

23   A.   Correct.

24   Q.   No studies have correlated CA-125 levels with ovarian

25        cancer risk, correct?
```

Ghassan Saed, Ph.D.

```
 1   A.   What I know is CA-125 is accepted, it's the only

 2        accepted marker because that's the only one available,

 3        although not specific to ovarian cancer, but we use it

 4        for preliminary following up treatment and diagnosis.

 5        You can, you know, I can defer to a clinician to answer

 6        more about that, but what I know is that it is not

 7        specific to ovarian cancer, endometriosis can increase

 8        levels of CA-125, some other inflammatory can do that.

 9   Q.   Doctor, listen to my question.  My question was that no

10        studies have correlated CA-125 levels with ovarian

11        cancer risk, correct?

12             MS. O'DELL:  Object to the form.

13             THE WITNESS:  Again, I told you, I'm not an

14        expert in CA-125 and its clinical utility.  What I'm

15        trying to tell you is that CA-125 is a marker that

16        clinician, OB-GYN oncologist, use to help them diagnose

17        and follow up the effect of -- the efficacy of

18        treatment.  Now, this molecule is a marker of

19        inflammation, and we and our results shows clearly that

20        talcum powder can induce this inflammatory marker that

21        has been clinically used by clinicians to help them

22        diagnose and, more importantly, follow up the efficacy

23        of treatment.

24   BY MR. HEGARTY:

25   Q.   Dr. Listen, to my question.  I'll ask a different
```

Ghassan Saed, Ph.D.

```
 1          question.  CA-125 is used only in monitoring disease

 2          progress in women who have ovarian cancer, correct?

 3     A.   I don't know if that's the only use of it.

 4     Q.   It's not used to diagnose ovarian cancer, correct?

 5     A.   I don't know.  I'm not a clinician.  I really don't

 6          know.

 7     Q.   It's not used to determine the cause of ovarian cancer,

 8          is it?

 9     A.   I don't know, you can ask.  I defer these questions to

10          a physician, OB-GYN oncologist who can answer you.  I

11          am a biological chemist, I'm molecular biologist.  I

12          will answer you within my expertise.

13     Q.   CA-125 is not used to determine whether women have an

14          inflammatory process going on in their bodies, correct?

15               MS. O'DELL:  Object to the form.

16               THE WITNESS:  If the levels of CA-125 is

17          increased in a woman, my understanding, this is a

18          strong indication to an inflammatory process going on,

19          yes.

20     BY MR. HEGARTY:

21     Q.   You're talking about in women who have ovarian cancer?

22     A.   It is also increased in women with, yes, with ovarian

23          cancer.

24     Q.   CA-125 is not used to diagnose whether inflammation is

25          going on in women who do not have ovarian cancer?
```

Ghassan Saed, Ph.D.

```
 1                    MS. O'DELL:  Object to the form.

 2                    THE WITNESS:  Ask the OB-GYN oncologist.

 3    BY MR. HEGARTY:

 4    Q.   If you look at your manuscript over at Table 2.

 5    A.   Okay.

 6    Q.   What is the mechanism by which talc causes the SNP

 7         changes or switches you report in this table?

 8    A.   Do I know the mechanism that does that?

 9    Q.   Yes.

10    A.   Precisely, no, but we have previously published a

11         report showing that development of chemoresistance,

12         which is an ovarian cancer -- ovarian cancer disease

13         that is characterized by even further enhancement of

14         oxidative stress, we have published that is associated

15         with these SNPs.  So the precise mechanism I'm

16         proposing that according to my understanding is that

17         the higher the oxidative stress level, the more chances

18         that you induce these switches, these mutations.

19    Q.   Can you cite for me any published data showing these

20         same or similar type of switches in cells that have

21         been exposed to any other substance, whether it's a

22         carcinogen or otherwise?

23    A.   If there is any other substance that induces mutations?

24    Q.   That induces the kinds of mutations that you report

25         here.
```

Ghassan Saed, Ph.D.

```
 1   A.   In the literature, there are several, many substance
 2        that have been associated with certain mutations in the
 3        DNA, yes.
 4   Q.   Well, let me ask it a different way.  Can you cite for
 5        me any substance that has been shown to cause -- or
 6        strike that, let me back up.  Is it your testimony that
 7        what you're reporting here -- that you're reporting
 8        here that talc causes mutations in DNA in 72 hours?
 9             MS. O'DELL:  Object to form.
10             THE WITNESS:  My results indicates that if
11        you treat cells with talcum powder for 72 hours and
12        look for whatever showed positive here, some showed
13        negative, that there is an induction of this specific
14        mutation in response to the treatment of talc.
15   BY MR. HEGARTY:
16   Q.   Can you cite for me any other substance that's ever
17        been reported to cause these kinds of mutations after
18        72 hours of treatment in cell cultures?
19   A.   I cannot recall now.  I'm sure I can find them.  There
20        are many in the literature, by the way, but I am citing
21        you specifically my work that I have done in my
22        laboratory that was shown that when oxidative stresses
23        further -- increased and enhanced, we develop some of
24        these mutations, cell would acquire these mutations in
25        certain key pro-oxidants and anti-oxidant enzymes that
```

Ghassan Saed, Ph.D.

```
 1            results in further inhibition of apoptosis and increase

 2            of survival -- apoptosis, cell death, cell death.

 3   Q.   Doctor, listen to my question.  Can you cite for me any

 4            other substances that have ever been reported to cause

 5            these kinds of mutations after 72 hours of treatment in

 6            cell cultures?

 7   A.   I cannot recall now.

 8   Q.   The cell cultures you used are at high oxygen levels,

 9            are at high oxygen levels than in vivo, correct?

10   A.   I don't understand the question.

11   Q.   Well, the cell cultures that you use for purpose of

12            your experiments are at higher oxygen levels than these

13            cells would experience in vivo, correct?

14   A.   You mean the whole world of researcher used?

15   Q.   No, that the cell lines that you used --

16   A.   The whole world of researcher used, same 20 percent

17            oxygen in CO2, okay, it's the same exact standard

18            protocol all over the research field.  I never heard

19            that there's anyone culturing cancer cells in a

20            different environment than -- we have done many work

21            looking at the effect of hypoxia and hyperoxia on the

22            expression of these markers in normal cells.  We have

23            done several, I have published several publications.

24            Let me help you with this information.

25   Q.   Let me withdraw the question, Doctor.  You're going on
```

Ghassan Saed, Ph.D.

```
 1        not answering my question.

 2   A.   I'm trying.

 3   Q.   No, you're not answering my question.

 4   A.   I'm answering what I understood.

 5   Q.   The tests you conducted, the experiments you conducted

 6        are higher oxygen levels than cells are exposed to in

 7        vivo, correct?

 8   A.   I'm trying to -- no, it's not, I'm trying to explain it

 9        to you.

10   Q.   They're not higher levels?

11   A.   What do you mean by in vivo?  In blood?

12   Q.   Cells inside the body.

13   A.   It's PO20, it's the same.

14   Q.   So the oxygen levels of the cells in the body are at

15        the same level as the oxygen levels of the cells in

16        your cell --

17             MS. O'DELL:  Objection.

18             THE WITNESS:  No, I said the oxygen levels in

19        the circulation in vivo is the same as the oxygen level

20        in the media where we culture cells.  This is where we

21        get it from, not from a dream, we got it from there.

22        Now, if you're referring to the oxygen levels that

23        cells are exposed to in tissues --

24   BY MR. HEGARTY:

25   Q.   Yes.
```

Ghassan Saed, Ph.D.

```
 1   A.   Nobody knows that.  There's only one single report that
 2        says in a physiology book where I was a student at that
 3        time, they're saying 6 percent, 5 to 6 percent.  But
 4        that is inside the tissues without the circulation.
 5        Now, you have to remember all cells get food from
 6        circulation, so you will have eventually enough oxygen
 7        that you're getting for.  So this is within my
 8        expertise, I've done many, many work on this.
 9   Q.   The glucose levels in your cell cultures are also
10        higher than what the cells would experience in the
11        body, correct?
12   A.   The glucose level that we use in the media, again, is
13        standard with all of any researcher on the face of this
14        earth use.  It is standard accepted levels.  So if you
15        are trying to make that what we use is different than
16        in vivo, it could be, but this is what agreed upon in
17        the research community.
18   Q.   Move to strike as nonresponsive.  Listen to my
19        question, Doctor.  Are the glucose levels in cell
20        cultures that you performed for purposes of your
21        experiments higher than the glucose levels of the cells
22        inside the body?
23             MS. O'DELL:  Objection, form, asked and
24        answered.
25             THE WITNESS:  I don't know.
```

Ghassan Saed, Ph.D.

```
 1   BY MR. HEGARTY:

 2   Q.   Aren't the cells that you experiment with in a

 3        hyperglycemic state?

 4   A.   I just told I don't know.

 5   Q.   Can high glucose levels cause an increase in reactive

 6        oxygen species?

 7   A.   Okay, so --

 8   Q.   Can they or can't they?

 9             MS. O'DELL:  He gets to -- you asked the

10        question, he --

11             THE WITNESS:  There is no yes or no answer.

12   BY MR. HEGARTY:

13   Q.   Okay.  I withdraw the question.

14   A.   If you are trying to take me to say "yes" or "no" to

15        something that I have explanation for, I think you

16        should just listen to my explanation.  I am actually --

17        this field, this field is my field, and I will tell

18        you, okay, I'll tell you that the cancer cells are --

19        their metabolism is different than normal cells because

20        their uptake, their uptake of glucose, they don't go in

21        aerobic metabolism, they go anaerobic metabolism, so it

22        doesn't matter how much glucose you give them, it

23        doesn't really.

24   Q.   If you look over on Page -- Figure 6 of your

25        manuscript, why do your normal cell lines -- strike
```

Ghassan Saed, Ph.D.

```
 1          that -- why do your control cell lines have such high

 2          levels of Caspase?

 3     A.   So it is known, as we have previously published and all

 4          other researcher who was interested in this, that

 5          cancer cells have almost shut down their apoptosis,

 6          because they have to increase their survival.  So when

 7          you compare apoptosis of any cancer cell from any type,

 8          okay, you will find their apoptosis is way, way lower

 9          than normal cells.  Normal cells, they have -- they

10          divide, they die, they reproduce, all the times.

11          Cancer cells don't like to die, they love to survive,

12          so their apoptotic pathways are not normal.

13     Q.   So then what you're reporting here are as to control

14          cells, controls in ovarian cancer cells?

15     A.   No, no.  The controls here are macrophages, it's normal

16          ovarian epithelial, and fallopian tube epithelial.

17     Q.   Why are your -- the Caspase levels higher in your

18          controls than in your talc treated cells?

19     A.   Maybe I missed the question.  I just answered that,

20          right?

21     Q.   Well, I don't think you answered my question.

22     A.   Well, let me try to understand what you want.

23     Q.   Well, the Figure 6 shows that the controls have higher

24          levels of Caspase-3 than the talc treated cells,

25          correct?
```

Ghassan Saed, Ph.D.

```
 1                MS. O'DELL:  Object to the form.  Do you need
 2        to see that in color, Doctor?  Would that help?
 3                THE WITNESS:  Yes, please.
 4                MS. O'DELL:  (Handing.)
 5                THE WITNESS:  So here, the control cells, so
 6        let's look at the normal cells -- okay, the normal
 7        cells -- well, that's the whole idea, the whole
 8        objective of this research, the whole point, that if
 9        you treat with talcum powder, talcum powder induces --
10        enhances oxidative stress that stimulate apoptosis
11        pathways and shut them down, inhibit them.  So in the
12        treated -- in the treated, they should be lower than
13        the untreated.
14   BY MR. HEGARTY:
15   Q.   What are the normal Caspase levels in a normal cell?
16   A.   It's different for different cell types, but normal
17        cell types, normal cells always have way higher
18        apoptosis than cancer cells.  This is well known
19        phenomenon.
20   Q.   At the levels you report in Figure 6?
21   A.   It depends on the cells, again, I said, it depends on
22        the cell type.  So maybe other people in their work,
23        they have different response.  But it is accepted that
24        is cancer cells, all cancer cells, no exception, have
25        lower, way lower apoptosis than normal cells.  I
```

Ghassan Saed, Ph.D.

```
 1          published previously that lower apoptosis in cancer
 2          cells is due to overexpression of nitric oxide
 3          synthase, which is a pro-oxidant, and myeloperoxidase,
 4          which is another pro-oxidant, and they work together to
 5          nitrisolate Caspase-3, that's what we're measuring
 6          here, and shutting down its activity and its apoptosis.
 7     Q.   The type of SNP changes that you report in your
 8          manuscript can be detected by Sanger sequencing,
 9          correct?
10     A.   Now, that's -- we're moving from this?
11     Q.   Yes.
12     A.   Okay, sorry, I thought we were still here.
13     Q.   Different question.
14     A.   Okay.  Give me a --
15     Q.   Can you answer my question?
16     A.   What's the question?
17     Q.   The type of SNP changes that you report in your
18          manuscript can be detected by Sanger sequencing,
19          correct?
20     A.   Yes.
21     Q.   Did you use this method?
22     A.   No.
23     Q.   Have you ever used Sanger sequencing to detect changes
24          in SNPs or to analyze SNPs?
25     A.   You mean gene mutations?
```

Ghassan Saed, Ph.D.

```
1    Q.   Gene mutations, yes.

2    A.   So the answer is nowadays no one does this from the

3         research community.  There are core facilities, labs

4         that you send to.  You don't need -- I don't believe

5         people will in their laboratories that sit down and do

6         experiments that takes forever.  They just rather send

7         it to this lab, we have -- every university have this,

8         we have a core facility that you can send to, and then

9         they will do it for you and they will give you the

10        results, so you don't need to do it yourself.

11   Q.   Is Sanger sequencing considered more accurate than

12        TaqMan?

13   A.   Pretty much I think they are the same level.

14   Q.   And you said you have used Sanger sequencing before?

15   A.   No, personally no.

16   Q.   What is the mechanism by which the SNP change, as you

17        say, talc induces cause the redox changes that you

18        report in your study?

19   A.   So talcum powder treatment increase, induces the

20        specific mutations that are associated with altering

21        the activity of the redox, the key oxidant enzymes that

22        the results will be altering the oxidated balance.

23   Q.   And what studies show that?

24   A.   This study.

25   Q.   What studies besides your study, your manuscript?
```

Ghassan Saed, Ph.D.

```
 1   A.   I believe we have published a different study with the

 2        same subject.  You want me to look for it?

 3   Q.   Not right now.

 4   A.   Okay, but we did publish that before.

 5   Q.   Did you measure changes in peroxide levels as part of

 6        your experiment?

 7   A.   Excuse me, one more time.

 8   Q.   Did you measure changes in peroxide levels as part of

 9        your experiments?

10   A.   What is peroxide level?

11   Q.   Hydrogen peroxide level.

12   A.   Oh, H2O2?

13   Q.   Yes.

14   A.   Indirectly, yes.

15   Q.   When you sat indirectly, what do you mean?

16   A.   Because it's the substrate for an enzyme, so it's an

17        enzymatic reaction.

18   Q.   Did you find any changes in hydrogen peroxide levels in

19        the talc treated cells?

20   A.   We didn't measure the actual H2O2 levels in these

21        cells.  We did measure the catalase activity that turns

22        H2O2 to H2O, which is the turnover.

23   Q.   Have you ever measured hydrogen peroxide levels in

24        these types of studies?

25   A.   Have I measured -- H2O2, I don't think so, directly,
```

Ghassan Saed, Ph.D.

```
 1        directly H2O2 levels, no.

 2   Q.   You've referred earlier to the fact that you have

 3        published abstracts that have talked about the results

 4        of the experiments we've marked as -- let me start

 5        again.  You mentioned earlier that you published the

 6        results of the experiments documented in lab notebooks

 7        marked as Exhibits 2 and 3 in the past, correct?

 8             MS. O'DELL:  Object to the form.

 9   BY MR. HEGARTY:

10   Q.   You didn't get that question?

11   A.   No.

12   Q.   You mentioned you had published the results of your

13        experiments that we've been talking about here today in

14        abstracts, correct?

15   A.   There was an SRI abstract that I presented at the SRI

16        meeting March of '18, last year, that was reflected or

17        involved this initial work that we did with Fisher with

18        PCR.

19   Q.   And you also presented at an SGO meeting, correct?

20   A.   I believe I did.

21   Q.   In either case did you disclose that you were a

22        consultant for plaintiffs counsel in litigation,

23        correct?

24   A.   When you submit the abstract, they will not let you

25        proceed until you -- yes, the answer is yes.
```

Ghassan Saed, Ph.D.

```
 1    Q.   The answer is that you did disclose?

 2    A.   I did disclose, yes.

 3    Q.   It's not included -- the disclosure's not included in

 4         the abstracts, correct.

 5    A.   They don't have it like that, no.

 6    Q.   When you presented the abstracts, did this involve

 7         standing there in front of a poster?

 8    A.   Yes.

 9    Q.   And did people come up and talk to you about your

10         posters?

11    A.   Yes.

12    Q.   Did you identify yourself as an expert in litigation

13         involving talc and ovarian cancer?

14              MS. O'DELL:  Object to the form.

15              THE WITNESS:  No one asked me.

16   BY MR. HEGARTY:

17    Q.   Did you tell them that you were?

18    A.   I didn't volunteer anything.

19    Q.   Have you provided your opinions in this case to anyone

20         outside of plaintiff's counsel or your colleagues on

21         the manuscript?

22              MS. O'DELL:  Object to the form.

23              THE WITNESS:  So you just asked me if I

24         discussed this with people that I presented to in the

25         whole meeting.
```

Ghassan Saed, Ph.D.

```
 1    BY MR. HEGARTY:

 2    Q.   Well, let me ask it a different way because I can see

 3         where you're confused.  We talked about your opinions

 4         that talc can cause ovarian cancer.

 5    A.   Oh, so we're going back here now?

 6    Q.   Yes, we're going back to your opinions.

 7    A.   Okay.

 8    Q.   Have you ever told anyone at the medical school, at

 9         Wayne State Medical School that talc use can cause

10         ovarian cancer?

11    A.   I don't recall.

12    Q.   Have you ever told anyone at Wayne State School of

13         Medicine that talc use can worsen the prognosis of

14         ovarian cancer?

15    A.   Again, I don't recall.  I don't remember.

16    Q.   Can you tell for me, when you say you can't recall

17         having had a discussion with anyone --

18    A.   I can't remember that I said that.

19    Q.   Can you cite for me anyone that you've spoken with at

20         the Wayne State School of Medicine where you've told

21         them your opinions that talc use can cause ovarian

22         cancer or can worsen ovarian cancer?

23    A.   Other than the co-authors of this study?

24    Q.   Yes.

25    A.   I haven't talked to anyone, in my school, to be
```

Ghassan Saed, Ph.D.

```
 1      specific.
 2   Q.  Are your opinions in this case premised on talc
 3       containing asbestos?
 4   A.  (Witness shakes head from side to side.) I don't know,
 5       no, my opinion has nothing to do with that.
 6   Q.  Are your opinions in any way based on talc having heavy
 7       metals in them?
 8   A.  No.
 9   Q.  Is it your opinion that talc without asbestos or
10       without any other constituents can cause ovarian
11       cancer?
12   A.  The one that I got in this bottle from J & J, yes.
13   Q.  Is it your opinion, Doctor, that your studies or your
14       experiments show that talc increases cellular
15       proliferation and decreases apoptosis?
16   A.  I'm sorry, one more time, one more time.
17   Q.  Sure.  Is it your opinions or is it your opinion that
18       talc use increases cellular proliferation and decreases
19       apoptosis in normal ovarian cells?
20   A.  My finding clearly indicates that if you treat cells
21       with talcum powder, the results of this treatment is a
22       dose response increase in proliferation and decrease in
23       apoptosis, yes.
24   Q.  In normal ovarian cells?
25   A.  In normal and in cancer cells.
```

Ghassan Saed, Ph.D.

```
 1   Q.   Cell proliferation does not mean cancer, correct?

 2   A.   Cell -- increase in cell proliferation beyond normal is

 3        a highlight of cancer cells.

 4   Q.   There is cell proliferation in normal cells in the

 5        absence of cancer, correct?

 6   A.   So good question.  So cell -- normal cells in response

 7        to agents can be temporally transit induces their

 8        proliferation, but they come back.  Cancer cells don't

 9        come back.  They will proliferate forever.

10   Q.   But you agree that cell proliferation does not equate

11        to cancer?

12   A.   Okay, I am answering you.  According to my knowledge,

13        transit, transit or let's say temporary or initial

14        induction of proliferation, it is a normal response of

15        all normal cells to agents.  If this response

16        continues, now, this is a hallmark of cancer.  It is

17        indication that this cell is going that route.

18   Q.   In the tests you conducted, the results would be

19        considered an acute response to talc, correct?

20             MS. O'DELL:  Object to the form.

21             THE WITNESS:  Yes, I understand.  In cell

22        culture you cannot distinguish between acute response

23        versus chronic response.  In cell culture you cannot do

24        that.  So in cell culture it is a response.

25   Q.   That you cannot say would occur in a chronic way?
```

Ghassan Saed, Ph.D.

```
 1                MS. O'DELL:  Objection.

 2                THE WITNESS:  I don't know if this -- okay,

 3        here's the question, so the answer is you expose cells,

 4        talcum powder, cells go crazy and they increase their

 5        proliferation.  If they don't come back, so that's the

 6        response to the acute, if they don't come back and

 7        there is talcum powder particles in there, and they

 8        keep provoking the inflammation, that transit goes into

 9        chronic inflammation.  I'm trying to think of

10        simulation to in vivo, but in cell culture you cannot

11        tell.

12   BY MR. HEGARTY:

13   Q.   Can you cite for me any studies showing increase in

14        cell proliferation in the presence of talc in vivo?

15                MS. O'DELL:  Objection, form.

16                THE WITNESS:  Very complicated question,

17        break it down for me, please.

18   BY MR. HEGARTY:

19   Q.   I don't know if I can break it down.  Can you cite for

20        me any study showing an increase in cell proliferation

21        in the presence of talc in women using talc?

22   A.   How would you measure --

23                MS. O'DELL:  Objection.

24                THE WITNESS:  How would you measure cell

25        proliferation in woman?
```

Ghassan Saed, Ph.D.

```
 1   BY MR. HEGARTY:

 2   Q.   Well, I'm asking you if you're aware of any such

 3        studies?

 4   A.   I'm answering.  I said how would you measure that?  I'm

 5        not aware, I don't know.

 6   Q.   Are you aware of any studies showing a decrease in

 7        apoptosis in the cells of women using talc?

 8   A.   Again, these studies only done in cell culture.  You

 9        cannot do this in vivo.  This has to be isolated from

10        the woman of ovarian cancer who use talc, who didn't

11        use talc, and then you look at their cells in culture

12        to determine those parameters.  You cannot determine

13        those in vivo.  Although there are pathology they can

14        do, they can do proliferation markers like KI67, it's

15        been done, it's all over, there are indications, but

16        they cannot do this in vivo.  This has been done in

17        tissues.  With woman, yes, you can do it, but to do

18        that you have to isolate the cells and then look at the

19        cell response.

20   Q.   Are there any studies showing that an increase in cell

21        proliferation, as you showed in your experiments, is

22        associated with an increase in ovarian cancer risk?

23             MS. O'DELL:  Object to the form.

24             THE WITNESS:  There are several studies that

25        shows that enhanced proliferation and reduce with
```

Ghassan Saed, Ph.D.

```
 1          contaminant decrease in apoptosis is a hallmark of

 2          ovarian cancer.

 3   BY MR. HEGARTY:

 4   Q.    Not my question, Doctor.  My question was are there any

 5          studies showing that an increase in cell proliferation,

 6          as you showed in your experiments, is associated with

 7          an increase in ovarian cancer risk?

 8                  MS. O'DELL:  Object to the form, asked and

 9          answered.

10                  THE WITNESS:  Okay, so you're asking if there

11          are reports showing that there is the increased

12          proliferation is associated with increased cancer risk?

13   BY MR. HEGARTY:

14   Q.    Correct.

15   A.    Okay, again, I'm answering, the answer is I don't know

16          because I believe that you cannot measure proliferation

17          in vivo.

18   Q.    Are there any studies showing that a decrease in

19          apoptosis, as you showed in your experiments, is

20          associated with an increase in ovarian cancer risk?

21   A.    So I would respond the same way.  I would say, again,

22          these -- to determine apoptosis, you have to isolate

23          the cells from the patient outside and do cell culture

24          and look into that, so I'm not aware.

25   Q.    Are there any studies showing either an increase in
```

Ghassan Saed, Ph.D.

```
 1          cell proliferation or a decrease in apoptosis as you

 2          have shown in your report in women using talc?

 3                    MS. O'DELL:  Object to the form.

 4                    THE WITNESS:  I'm not aware of that.

 5                    MR. HEGARTY:  Why don't we take a break, go

 6          off the record.  I need to converse with counsel for

 7          Imerys about how much time that he needs for his

 8          questioning.

 9                    MS. O'DELL:  Okay.

10                    THE VIDEOGRAPHER:  Going off the record at

11          5:04 p.m.

12                    (A short recess was taken.)

13                    THE VIDEOGRAPHER: We're back on the record at

14          5:26 p.m.

15     BY MR. HEGARTY:

16     Q.   Doctor, in your cell experiments, how did you control

17          for cross-contamination?

18                    MS. O'DELL:  I'm sorry, I didn't hear, for

19          cross-contamination?

20                    MR. HEGARTY:  Yes.

21                    THE WITNESS:  Cross-contamination, so cross-

22          contamination from each -- from the cells that I used?

23     BY MR. HEGARTY:

24     Q.   How did you control to keep from mixing up of samples?

25                    MS. O'DELL:  Object to the form.
```

Ghassan Saed, Ph.D.

```
 1                    THE WITNESS:  I'm not sure that I understood

 2          your question.  Are you referring to mixing the two

 3          cell lines, for example?

 4     BY MR. HEGARTY:

 5     Q.   Yes.

 6     A.   With each other?

 7     Q.   Correct.

 8     A.   That's not possible.

 9     Q.   Why is that not possible?

10     A.   Because each cell line is done in one experiment

11          treatment with all the doses on its own.

12     Q.   What about mixing normal cells with the -- I'm sorry,

13          how about mixing control cells with the treated cells,

14          is that possible?

15     A.   What do you mean by control cells, not treated?

16     Q.   Not treated?

17     A.   So, also, that's not possible because you -- we divide,

18          we grow the cells, one lot, one lot of cells, and then

19          we aliquot, we put 1 million cells here, 1 ml cells

20          here, and then we separate them and give the different

21          doses for each cell lines.  And the -- this thing, the

22          treatment was repeated for PCR for RNA, for protein for

23          ELISA, for proliferation assays, so it's not possible

24          that there is a mix between treated and untreated.

25     Q.   Do you know what positive and negative controls are in
```

Ghassan Saed, Ph.D.

```
 1        cell studies?

 2   A.   I do.

 3   Q.   You did not use positive and negative controls in your

 4        cell studies, correct?

 5   A.   Not correct.

 6   Q.   Well, I'm going to define positive controls as applying

 7        a known cancer causing substance to the cells.  Is that

 8        your understanding of positive control?

 9   A.   Not in these studies.

10   Q.   I'm talking about generally.

11   A.   Generally a positive control that something that you

12        know it's there and you're looking for it.

13   Q.   What is in general terms a negative control?

14   A.   A negative control, something you're not looking for,

15        it is not there.

16   Q.   Well --

17   A.   So there is negative negative and there is positive

18        positive.

19   Q.   Did you do any of your tests -- I'm sorry, did you do

20        any of your experiments using any substances known to

21        be a carcinogen?

22   A.   One more time.  I will answer you.  The answer is no,

23        okay, but you're referring to -- so there are two

24        different controls, negative and positive for the

25        target, and negative and positive for the treatment.
```

Ghassan Saed, Ph.D.

```
 1           There's two different controls, okay.  We did negative

 2           and positive for the treatment, so this is with talc,

 3           this is with no talc.  For the markers, for the

 4           markers, we have standards that with serial dilution

 5           tells you exactly how much you expect to get in there.

 6   Q.     Did you use a negative control in your cell studies

 7           with a known inert substance?

 8                   MS. O'DELL:  Object to the form.

 9                   THE WITNESS:  That's not a negative control

10           to me, it does not apply to my study.  The only

11           negative control that applies to my study is talc with

12           no talc.

13   BY MR. HEGARTY:

14   Q.     How can you rule out in your studies that any

15           particulate you added to the cell cultures would cause

16           the same thing?

17   A.     Again, we tested several fold.  So our study does not

18           qualify for a positive positive control that you're

19           referring to or a negative negative control.

20   Q.     How are you able to rule out that glass beads wouldn't

21           cause the same --

22   A.     Glass beads?

23   Q.     -- effect?  How are you able to rule out that some

24           inert part, other part -- strike that.  How would you

25           rule out that any particle wouldn't cause the same
```

Ghassan Saed, Ph.D.

```
 1          effect that you saw in your studies?

 2    A.    Very simple, the untreated didn't show that.

 3    Q.    Well, how do you rule out that the treated cells would

 4          react the same way regardless of what you put on them?

 5          In other words, if you put -- how did you rule out that

 6          any particle would not cause the same thing if you

 7          mixed it with DMSO and applied it to talc?

 8    A.    Yeah, so we did DMSO control.

 9                MS. O'DELL:  Object to the form.

10                THE WITNESS:  So we did -- took the talc,

11          mixed it with DMSO, took the DMSO, treat the cells with

12          DMSO alone and with DMSO and talc.  So if the effect

13          was due to DMSO, you would see the response in the

14          untreated cells.

15    BY MR. HEGARTY:

16    Q.    Would cornstarch cause the same result?

17    A.    I did not test it.

18    Q.    How can you rule out that cornstarch wouldn't do the

19          same thing if applied to cells?

20                MS. O'DELL:  Object to the form.

21                THE WITNESS:  I didn't rule anything, I did

22          not test it.

23    BY MR. HEGARTY:

24    Q.    Does cornstarch cause cancer?

25    A.    I did not test it.
```

Ghassan Saed, Ph.D.

```
 1   Q.   Well, in your opinion, does --

 2   A.   In my opinion?

 3   Q.   Yes.

 4   A.   From my information?  I don't think so.

 5   Q.   Could you have tested cornstarch in the same way you

 6        tested talc?

 7   A.   Could I have?

 8   Q.   Yes.

 9   A.   I can use my methodology to test that, yes, of course.

10   Q.   And are you able to say that no other particle exposed

11        in the same way that you would expose cells with talc

12        would not have caused the same result?

13             MS. O'DELL:  Object to the form.

14             THE WITNESS:  I already answered.

15   BY MR. HEGARTY:

16   Q.   What's your answer?

17   A.   Okay, I'm saying that in this study, the way this

18        study's designed to look at the effect with talc,

19        without talc, if you are looking at one marker only,

20        then maybe we should consider more, but we're looking

21        at several markers at several levels.  So we're looking

22        at mRNA DNA mRNA protein activity, several levels here.

23   Q.   But you cannot say that cornstarch wouldn't do the same

24        thing as talc did in your experiments?

25   A.   I did not study cornstarch, so I cannot tell you.
```

Ghassan Saed, Ph.D.

```
 1    Q.    We talked earlier at the beginning of the deposition

 2          about you receiving a call from Miss Thompson, correct?

 3    A.    Yes.

 4    Q.    Do you know how she came to call you in the first

 5          place?

 6    A.    From according to her?

 7    Q.    Yes.

 8    A.    Or according to me?

 9    Q.    Well, what is your understanding as to why she

10          initiated that initial call, how she came to get your

11          name?

12    A.    She found me on what do you call it -- Med Web, because

13          I had published this review article in this very

14          prestigious journal called OB-GYN Oncology.  Want to

15          let me finish?

16                MS. O'DELL:  Yes, you may finish.

17    BY MR. HEGARTY:

18    Q.    Are you finished?

19    A.    No.

20    Q.    How much more is there?

21    A.    Okay --

22                MS. O'DELL:  You may finish, Doctor.

23    BY MR. HEGARTY:

24    Q.    You mentioned that you did not agree to serve as a

25          consultant at the time of the first call, correct?
```

Ghassan Saed, Ph.D.

```
 1   A.   I didn't say I did not agree.  I said I am not -- I

 2        don't have any molecular data in my laboratory to

 3        support the direct effect of talcum powder on my

 4        markers that I studied in my lab, and I would like to

 5        do that.

 6   Q.   When in relation to the first call that you had with

 7        Miss Thompson did you agree to serve as a consultant

 8        for Beasley Allen?

 9   A.   I think it was like October sometime.

10   Q.   And in between the time of the first call and October,

11        did you have any additional calls with anyone from --

12   A.   We had the meeting September 7, if I remember.

13   Q.   At the time of that meeting, had you agreed to serve as

14        a consultant for Beasley Allen?

15   A.   I agreed in principle to serve as a consultant for what

16        I am an expert in, which is oxidative stress and

17        ovarian cancer, and I promised to run data, do some

18        work, because I wanted to find out if there is

19        molecular evidence to support the effect of talcum

20        powder on the markers that I study, which are the

21        markers of risk of ovarian cancer.

22   Q.   And you agreed to serve as a consultant, at least as to

23        oxidative stress and ovarian cancer, as of the time of

24        the meeting in September?

25             MS. O'DELL:  Object as to form.
```

Ghassan Saed, Ph.D.

```
 1                THE WITNESS:  I agreed to serve as a

 2       consultant for oxidative stress and ovarian cancer in

 3       actually the first phone call.

 4  BY MR. HEGARTY:

 5  Q.   With regard to your work in this litigation, have you

 6       reviewed any of the expert reports of any other experts

 7       designated by plaintiffs?

 8  A.   Barely I remember one or two, just briefly.  I don't

 9       even remember names.

10  Q.   Have you reviewed, for purposes of your opinions in

11       this case, anything that you did not bring with you

12       here today?

13  A.   Good question, no.

14  Q.   Are there any necessary changes to your expert report?

15  A.   As --

16  Q.   As you sit here today.

17  A.   As of now today, no.

18  Q.   Have you ever had your deposition taken before?

19  A.   No.

20  Q.   Have you ever been designated to serve as an expert

21       witness in any lawsuit?

22  A.   No.

23  Q.   You are not a medical doctor, correct?

24  A.   No.

25  Q.   You brought with you a copy of your updated CV; is that
```

Ghassan Saed, Ph.D.

```
 1       correct?

 2   A.  Correct.

 3   Q.  Yes.  I'm going to mark this Exhibit Number 18.

 4           SAED DEPOSITION EXHIBIT NUMBER 18,

 5           CURRICULUM VITAE,

 6           WAS MARKED BY THE REPORTER

 7           FOR IDENTIFICATION

 8   BY MR. HEGARTY:

 9   Q.  The CV you brought with you today, is that your current

10       curriculum vitae?

11   A.  Yes.

12   Q.  Okay.  Thank you.  You don't treat ovarian cancer

13       patients, correct?

14   A.  I am not an M.D., I'm not a medical doctor.

15   Q.  Do you teach any courses?

16   A.  In the university, yes.

17   Q.  What courses do you teach?

18   A.  They are listed here in my CV.

19   Q.  Listed in your CV?

20   A.  Yes.

21   Q.  Do you teach medical students?

22   A.  I do.

23   Q.  Those would be listed in your CV?

24   A.  Everything I teach is listed here.

25   Q.  What percentage of your time is spent teaching?
```

Ghassan Saed, Ph.D.

```
 1   A.   Okay, so we have two types of teaching in our

 2        institution they consider teaching.  We have formal

 3        courses and then we have hands-on teaching, which is

 4        required for our residency program and fellowship

 5        program.  I do more of the hands-on for the medical

 6        doctors for our residents and fellows in the

 7        department, then I help them write their thesis, design

 8        their experiments, do the work, so that's my primary --

 9        I spend almost significant time.  I can't tell you

10        exactly what I spend on that part, but I do.

11   Q.   Have you applied to be a full professor at Wayne State

12        University?

13   A.   No.

14   Q.   Why not?

15   A.   Applying for a full professor at our institution

16        requires current NIH NCI only funding, which is very

17        hard to get these days.

18   Q.   Is it your opinion that talc induces chemoresistance?

19   A.   Talc induces chemoresistance -- so we -- I have not

20        tested that, so this needs to be tested.

21   Q.   In connection with developing and setting out your

22        opinions in this case, did you review all of the animal

23        literature looking at talc and ovarian cancer?

24   A.   All of the literature, no.

25   Q.   Did you review all of the cell studies looking at talc
```

Ghassan Saed, Ph.D.

```
 1        and ovarian cancer for purposes of developing your

 2        opinions in this case?

 3   A.   To my best knowledge, yes, only like three papers out

 4        there.

 5   Q.   I'm sorry?

 6   A.   There are only like three papers out there that I can

 7        remember.

 8   Q.   Did you do a search yourself for literature concerning

 9        talc and ovarian cancer?

10   A.   Yes.

11   Q.   What search engines or tools did you use?

12   A.   I used what I always use, the PopMed.

13   Q.   You say in your report that an enhanced redox state has

14        been described with epithelial ovarian cancer.

15   A.   I'm sorry, one more time.

16   Q.   Is it your opinion that an enhanced redox state has

17        been described in patients with epithelial ovarian

18        cancer?

19   A.   With ovarian cancer patients, yes.

20   Q.   And enhanced redox state has been described with other

21        types of cancer, too, correct?  It's not unique to

22        ovarian cancer?

23   A.   Okay, I don't know about other cancer, that's not my --

24        what I do.  What I do, what I talk about, what I work

25        with is ovarian cancer.  So we did work in my lab only
```

Ghassan Saed, Ph.D.

```
 1          with ovarian cancer and these markers.

 2    Q.    Has an enhanced redox state been described with other

 3          diseases besides cancer?

 4    A.    One more time, please.

 5                MS. O'DELL:  Object to form.

 6    BY MR. HEGARTY:

 7    Q.    Has an enhanced redox state been described with

 8          diseases other than cancer?

 9    A.    I don't know.

10    Q.    You have done research looking at that pathogenesis of

11          tissue fibrosis, correct?

12    A.    Correct.

13    Q.    Tissue fibrosis does not increase the risk of

14          developing cancer, correct?

15    A.    Not correct.

16    Q.    So it's your opinion that having -- that fibrosis

17          increases the risk of cancer?

18    A.    Not correct, that's not my opinion.

19    Q.    What is your opinion with regard to the relationship

20          between fibrosis and cancer?

21    A.    Good, I like that question.  So initially when I

22          started all this work, I was interested in tissue

23          fibrosis and, in particular, keloids, hypertrophic

24          scars, postoperative adhesions development, and

25          fibroids, endometriosis, trying to answer one question
```

Ghassan Saed, Ph.D.

```
 1          in my mind, which is -- which started this whole focus
 2          of work, why, how come we have an overgrowth that is --
 3          has similar pathogenesis, yet it's not malignant, for
 4          example, fibroids, they're benign tumors, they're
 5          tumors, they're benign, what is the difference between
 6          what makes this tumor benign versus malignant?  So this
 7          is my focus and my long-term interest in my life is to
 8          figure out why is this overgrowth that has oxidative
 9          stress, high this, high this, high this, but it's not
10          malignant, fibroids, possibility of adhesions, keloids,
11          although some keloids develop -- some fibrosis
12          development of cancer, and endometriosis, for example.
13          So that's the question that I'm really interested in.
14          So that's why we look everything in comparison.  I have
15          published in here and I have published in here
16          extensively.
17     Q.   You have published that fibrosis causes cancer?
18     A.   No, I have published that the process of fibrosis is
19          very similar to the process of oncogenesis.
20     Q.   Does fibrosis cause cancer?
21               MS. O'DELL:  Object to form.
22               THE WITNESS:  In some cases it may.
23     BY MR. HEGARTY:
24     Q.   Give me an example of a type of fibrosis that can cause
25          cancer.
```

Ghassan Saed, Ph.D.

1    A.   Keloids, fibroblastoma can develop, endometriosis can

2         induce maybe ovarian cancer, there's a link between the

3         two.

4    Q.   Do postoperative adhesions cause cancer?

5    A.   We don't know.

6    Q.   Doctor, I'm going to rest for a moment and let my

7         colleague representing Imerys ask you some questions as

8         well.

9    EXAMINATION BY MR. KLATT:

10   Q.   Hello, Dr. Saed.  My name is Mike Klatt and I represent

11        Imerys Talc America in this case.  Have you ever heard

12        of Imerys Talc America before today?

13   A.   Heard on the news, yes.

14   Q.   I'm sorry?

15   A.   Heard about it, yes.

16   Q.   What do you know about Imerys?

17   A.   I know that very small thing, mining company.

18   Q.   How did you learn that?

19   A.   From the news.

20   Q.   You said just a minute ago that we don't know whether

21        postoperative intra-abdominal adhesions cause cancer;

22        is that true?

23   A.   I am not aware --

24             MS. O'DELL:  Object to the form.

25             THE WITNESS:  -- that incidence of

Ghassan Saed, Ph.D.

```
 1         postoperative adhesions development may develop into

 2         cancer.  I'm not aware of that.

 3    BY MR. KLATT:

 4    Q.   You're not aware of any evidence of that, is that what

 5         you're saying?

 6    A.   I'm not aware of a certain -- a specific situation

 7         where a patient developed postoperative adhesions, that

 8         postoperative adhesions causes some type of cancer

 9         somewhere.

10    Q.   I'm going to skip around just to follow up on some

11         stuff that Mr. Hegarty brought up during the day.  You

12         mentioned your company DS Biotech this morning.  What

13         does DS stand for?

14    A.   A name I chose.

15    Q.   The D and the S don't stand for anything in particular?

16    A.   Oh, sorry, I missed the question.  So D is Diamond Saed

17         Biotech, that's my partner, used to be long time ago.

18    Q.   You had a partner named Diamond?

19    A.   Michael Diamond.  When we first initiated this, we

20         started it, but then he moved from my institution to

21         his institution, and then I acquired the whole company.

22    Q.   So Dr. Diamond -- is it a Dr. Diamond?

23    A.   Dr. Diamond, yes.

24    Q.   He has no affiliation with DS Biotech any longer, is

25         that true?
```

Ghassan Saed, Ph.D.

```
 1    A.    No, for the last even seven, eight years.

 2    Q.    When's the last time you had an NIH NCI grant?

 3    A.    It should be in my CV, really bad memory, although I

 4          should remember such a great thing.  You want me to

 5          look for it?

 6    Q.    How long's it going to take you?

 7    A.    I don't know, I have to look in my list of grants --

 8          when was it, when was it -- do you want me to

 9          approximate?

10    Q.    Sure.

11    A.    NIH -- I think it's 2005 -- pending, submitted --

12          previously funded, okay, here we go.  So I was part of

13          the -- I was co-principal investigator in the Wayne

14          State University partnership to promote diversity for

15          reproductive sciences, that was 3,020,000 something.  I

16          was a co-investigator with Dr. Michael Diamond as a

17          principal investigator to this Wayne State Clinical

18          Translational Science Award.

19    Q.    What year is the question?

20    A.    So there are many, 2015, 2012, 2012, 2012, this was the

21          major one where I was the principal investigator

22          looking for adhesions and the role of hypoxia, and that

23          was 2012.

24    Q.    What level NIH grant was that?

25    A.    That's an RO1.
```

Ghassan Saed, Ph.D.

```
 1    Q.   Can ovulation cause the DNA damage that results in

 2         ovarian cancer?

 3    A.   You are asking my opinion?

 4    Q.   Yes.

 5    A.   Or my -- based on science?

 6    Q.   Well, I hope your opinion's based on science, but what

 7         is your opinion?

 8    A.   Okay.  So ovulation theory has been there for a long

 9         time, and I don't know if there is a link between

10         ovulation and damage to DNA particular to that.

11    Q.   Is ovulation an inflammatory event?

12    A.   It is.

13    Q.   And in a woman that has a normal reproductive life,

14         that can occur 2, 400 times in her lifetime, correct?

15    A.   I am not a reproductive scientist.

16    Q.   You don't know?

17    A.   I don't know.

18    Q.   Woman that has a 40-year reproductive life times 12?

19    A.   I do know that.

20    Q.   That's 480 ovulatory cycles, correct?

21    A.   If you say so, I don't know.

22    Q.   You don't know about this?

23    A.   I do know --

24              MS. O'DELL:  Object to the form.

25              THE WITNESS:  Excuse me, okay, I am not --
```

Ghassan Saed, Ph.D.

```
 1          again, I am not a reproductive scientist, so I know as

 2          much as anybody know, like ovulation, yes, I do know

 3          about it, I know about the ovulation theory, I know

 4          that ovulation is cause of inflammation, I do know all

 5          that.

 6   BY MR. HEGARTY:

 7   Q.   And is it your opinion, as a scientist who studied in

 8        the field you studied, that ovulation can cause ovarian

 9        cancer?

10   A.   I don't know, it needs to be tested.

11   Q.   Even though it's an inflammatory event that occurs

12        every month, correct?

13   A.   Maybe that's a natural inflammatory response.

14   Q.   But you don't know, one way or the other, correct?

15   A.   Yeah, there's a big difference between a naturally-

16        induced inflammatory response versus an external

17        exogenous induced inflammation.

18   Q.   Certainly you're aware it's the opinion of many in the

19        field that incessant ovulation does cause ovarian

20        cancer, correct.

21   A.   That was just a theory.

22   Q.   I'm sorry?

23   A.   A theory.

24   Q.   And certainly ovarian cancer risk is directly related

25        to number of lifetime ovulations, correct?
```

Ghassan Saed, Ph.D.

```
 1    A.    Not correct.

 2    Q.    You don't know that?

 3                MS. O'DELL:  Object to the form.

 4                THE WITNESS:  It's a theory; I just answered

 5          you.

 6    BY MR. KLATT:

 7    Q.    Are you aware of the data that lifetime ovulations is

 8          directly related to ovarian cancer risk?

 9                MS. O'DELL:  Object to the form.

10                THE WITNESS:  So do you mean that there are

11          data out there that is showing a direct link to normal

12          ovulation process and the development -- increased risk

13          of getting ovarian cancer?

14    BY MR. KLATT:

15    Q.    Thank you.

16                MR. LAPINSKI:  Doctor, was that an answer or

17          a question?

18                THE WITNESS:  That was a question to you.

19    BY MR. KLATT:

20    Q.    Well, I'm asking the questions, you're giving me the

21          answers.  Are you aware of data that increased number

22          of lifetime ovulations increases ovarian cancer risk?

23                MS. O'DELL:  Object to the form.

24                THE WITNESS:  And then I answered you, I

25          answered you, if you mean that you're looking for
```

Ghassan Saed, Ph.D.

```
 1          specific data that linking normal ovulation to

 2          inflammation that causes or increases the risk of

 3          ovarian cancer, is that what you mean?

 4    BY MR. KLATT:

 5    Q.    I'm simply asking you if you're aware of data that

 6          number of lifetime or of ovulations correlates with

 7          increased ovarian cancer risk; that's all I'm asking.

 8    A.    My answer again, I'm aware that this is a theory, and I

 9          don't know if it's based on data.

10    Q.    Is the mechanism that causes post-surgical adhesions

11          the same mechanism that you think can result in ovarian

12          cancer?

13    A.    No, they have similarities but not the same.

14    Q.    Can oxidative stress be induced by low vitamin E?

15    A.    I don't know.

16    Q.    Can oxidative stress be induced by low vitamin C?

17    A.    I don't know.

18    Q.    Can oxidative stress be induced by low uric acid?

19    A.    We never tested that.

20    Q.    Can oxidative stress be induced by albumin levels?

21    A.    We never tested that.

22    Q.    You said you'd never given a deposition before,

23          correct?

24    A.    Correct.

25    Q.    And you've also never testified in a court before, is
```

Ghassan Saed, Ph.D.

```
 1        that right?

 2   A.   Correct.

 3   Q.   Early this morning you said that high, very high doses

 4        of talc were toxic to cells.  What did you mean by

 5        that?

 6   A.   We tried 1,000 micrograms per ml, 1,000 micrograms per

 7        ml, induced toxicity, so decreased viability, yes.

 8   Q.   How are you defining toxicity at this time?

 9   A.   Decreases cell viability.

10   Q.   Does that mean decrease in cell number?

11   A.   No, I said cell viability.

12   Q.   What does that mean?

13   A.   Death.

14   Q.   Okay.

15   A.   Okay.

16   Q.   Do you agree with me that CA-125 levels can be

17        increased or elevated by pregnancy?

18   A.   I don't know this information.

19   Q.   Can CA-125 levels be increased during the menstrual

20        period?

21   A.   I am not an OB-GYN oncologist, I am not an expert in

22        this.  I defer this to a clinician.

23   Q.   Can CA-125 levels be increased by women who have

24        uterine fibroids?

25   A.   Again, I gave you my answer.
```

Ghassan Saed, Ph.D.

 1   Q.   Can CA-125 be increased by coronary heart disease?

 2   A.   I don't know.

 3   Q.   Can you look at Exhibit Number 1, please, which I

 4        believe is the copy of your lab book.

 5   A.   Lab report, okay.

 6   Q.   And I'm going to -- does your copy have the Bates

 7        Numbers down on the right-hand corner?

 8             MS. O'DELL:  He's looking at the actual lab

 9        notebook.

10             MR. KLATT:  Is it Bates Numbered?

11             MS. O'DELL:  Not the lab notebook, no.  We

12        have not made markings on this.

13             MR. KLATT:  Do you have a copy of Exhibit 1?

14        Let's make sure we're referring --

15             MS. O'DELL:  I think that may be yours, and,

16        Mike, if you wouldn't mind directing us to the page

17        number that's written on the actual book itself.

18             MR. KLATT:  Yeah, I'll give both the Bates

19        number and the page number.

20             MS. O'DELL:  That would be good.

21   BY MR. KLATT:

22   Q.   Are you looking now at Exhibit 1, Doctor?

23   A.   Yes.

24   Q.   And it's a copy of the lab notebook, correct?

25   A.   Yes.

Ghassan Saed, Ph.D.

```
 1    Q.   And in the lower right-hand corner there's two page
 2         numbers.  One's a stamped page number that we call a
 3         Bates Number, and the other is a handwritten page
 4         number, correct?
 5    A.   This and this?  Yes.
 6              MS. O'DELL:  Yes.
 7    BY MR. KLATT:
 8    Q.   When were those handwritten page numbers added to the
 9         lab book?
10    A.   I don't know.
11    Q.   Because we had gotten a black and white copy of the lab
12         book, and there were no page numbers on it, so were
13         they added recently?
14    A.   No, definitely not.  They should have them, you should
15         have them in your black, white and black.
16    Q.   Would you look at Exhibit 1 handwritten Page 31 Bates
17         Number, and I'll just say the last two Bates Numbers
18         02.
19    A.   Page 2, you said?
20    Q.   Yes, Page 02 is the stamp number and Page 31 --
21    A.   Yes.
22    Q.   -- is the handwritten number.
23    A.   I'm looking at it.
24    Q.   Down at the bottom it says cells doubled in one day.
25         What's that referring to?
```

Ghassan Saed, Ph.D.

```
 1    A.   Okay, so when you culture the cells, you want to get --

 2         cells divide and they double, so you want to have them

 3         in the stage -- that's just a notation that the cell

 4         doubled so we can start the experiment.

 5    Q.   And so were these cells doubling each day?

 6    A.   No, no, not necessarily.  This is just to follow up the

 7         progress of cell growth.  And then we take from that 1

 8         million cells, and then we start, because the space for

 9         the cell is very important, so if they don't double in

10         one day, it means that the space is not good and they

11         are overcrowded, so now we split them.  So this is an

12         indication that they're ready for us so we can use.

13    Q.   Did you try to measure cell proliferation in the

14         presence of talc by BRDU incorporation?

15    A.   What is PRDU?

16    Q.   BRDU incorporation, are you familiar with that method?

17    A.   BRDU?  I've never heard of that.

18    Q.   What about Ki-67, did you use that method --

19    A.   No.

20    Q.   -- in your experiments to measure cell proliferation?

21    A.   As I stated earlier, Ki-67 is used by pathologists

22         mainly or researchers in tissue sections.

23    Q.   My question is did you use it in this --

24    A.   No.

25    Q.   -- experiment?  Did you try to count cells to measure
```

Ghassan Saed, Ph.D.

```
 1        proliferation using a hemocytometer?

 2   A.   Okay, for cell proliferation we use MTT assay, that's

 3        even more accurate than what you're referring to, but

 4        we always count cells with hemocytometer to start with

 5        1 million cells, this is how we start.

 6   Q.   But did you try to measure cell proliferation in your

 7        experiments by using a hemocytometer in cell counting?

 8   A.   Cell proliferation cannot be measured by cell count.

 9   Q.   Would you agree with me that MTT is not the optimal

10        method to measure cell proliferation?

11   A.   It is one of the best methods we have tested.

12   Q.   It simply measures cell metabolism, doesn't it?

13   A.   It measures the -- it differentiates between cells,

14        cells that incorporate the dye versus cells that it

15        doesn't incorporate the dye, which means it

16        differentiates between viable cells and proliferative

17        cells.

18   Q.   And if you increase the metabolism of a certain number

19        of cells, that will increase the dye level even if you

20        don't have a greater number of cells?

21   A.   I don't know about metabolism that you're throwing in

22        here.

23   Q.   You don't know about that?

24   A.   No.

25   Q.   Can you look again, referring to Exhibit 1, and I'm
```

Ghassan Saed, Ph.D.

```
 1          referring to the Bates Stamped page that ends in -- the

 2          stamp number is 03 and the handwritten Page 32.

 3   A.     Yes.

 4   Q.     And there's a list there of sample IDs, is that

 5          correct?

 6   A.     Correct.

 7   Q.     And are those the cell lines that you tested in your

 8          experiments?

 9   A.     Yes, in this experiment.

10   Q.     And I want to make sure I understand, for each sample

11          ID, let's just take the first one Sample ID 356, the

12          EL1 untreated, so would that sample represent one plate

13          of those cells?

14   A.     The 356?

15   Q.     Right?

16   A.     It represents an aliquot of normal macrophages with no

17          treatment with talc.

18   Q.     And is it one plate of cells?

19   A.     It could be one if we need or two or three or four,

20          depends on --

21   Q.     What was it in this case?

22   A.     Any sample that carry this number is a normal

23          macrophages, you can have it in one plate, two plates,

24          five plates, 10 plates.

25   Q.     And what did you have it in your experiment?
```

Ghassan Saed, Ph.D.

```
 1   A.   Oh, that's a different question.  I thought you were
 2        talking about the sample ID refers to what.  That's my
 3        answer.
 4   Q.   I'm talking about in your experiment.
 5   A.   In my experiment, we took like, for example, normal
 6        macrophages from one plate, and we divided that into
 7        two.  One plate got treatment, the other plate no
 8        treatment.  And then we continue, we isolated RNA.
 9   Q.   So for, for example, let's take Sample ID 357, EL1 5
10        micrograms of talc?
11   A.   Yes.
12   Q.   That was on one plate?
13   A.   Okay, let me explain this one more time.  So you
14        take -- this is the stock samples, we call it 356,
15        okay.  We split that into -- we take -- we can --
16        that's why when you said one plate, it's not true,
17        because we take one, two, three, four plates, okay, so
18        each plate will get the treatment like 5 micrograms, 20
19        micrograms, 100 micrograms.
20   Q.   I understand that.  I'm just talking about Sample 357?
21   A.   357 is 1 million cells of macrophages treated with 5
22        microgram per ml of talc.
23   Q.   And it was one plate?
24   A.   1 million cells, one plate.
25   Q.   And then from that you took mRNA, correct?
```

Ghassan Saed, Ph.D.

```
 1    A.    Correct.

 2    Q.    And then from the mRNA from that one plate of cells,

 3          you took -- or created CDNA, correct?

 4    A.    Correct.

 5    Q.    And then at the end of the day, you measured that CDNA

 6          three separate times, correct?

 7    A.    Correct.

 8    Q.    And from the process I just described, that all

 9          originated for 357 from that one plate that was treated

10          with 5 micrograms of talc, correct?

11    A.    One plate, yes.

12    Q.    And did you do that for each of the cell lines listed

13          Samples 356 through 386?

14    A.    Yes, let me explain something here.  So we --

15    Q.    That's all I needed.

16    A.    Okay.  Can I explain something?

17    Q.    Sure.

18    A.    So I know what you're referring to that this is called

19          N = 1, but we have even better and more precise way of

20          measuring this very old method of doing it.  We chose

21          to do instead of repeat the same one three times, so

22          N = 3, we actually chose three different normal cells

23          and three different ovarian cancer cells, and that is

24          more powerful than using the same one three times.

25    Q.    Okay.
```

Ghassan Saed, Ph.D.

```
 1                    MR. LOCKE:  Can I just make an objection.
 2           Those are the kind of answers that your counsel can ask
 3           you the question so you can give an explanation.  All
 4           of the defendants don't have time to question you, so
 5           "yes" or "no" would be helpful, particularly at this
 6           point where we're really running out of time.
 7                    MS. O'DELL:  Well, he's been asking specific
 8           questions about plates, and for it not to be clear, and
 9           he needs to -- he needs to give a responsive answer.
10                    MR. LOCKE:  We're wasting time.
11    BY MR. KLATT:
12    Q.    What I want to know is for 357 and all the sample IDs
13           listed here, there was one individual plate for each
14           sample ID treated with a certain level of talc,
15           correct?
16    A.    Correct.
17    Q.    Easy, Doctor.
18    A.    Thank you.
19    Q.    Gene expression, measuring gene expression is not the
20           same thing as measuring gene mutations, correct?
21    A.    Gene expression refers to mRNA levels that is reflected
22           in protein levels.
23    Q.    Gene expression is something that occurs all the time
24           in our bodies every day, correct?
25    A.    Correct.
```

Ghassan Saed, Ph.D.

1   Q.   It's how we live as people, right?

2   A.   Yes.

3   Q.   If we didn't have gene expression, we'd be dead?

4   A.   I don't know why you're saying that.

5   Q.   Is it true?

6   A.   Of course.

7   Q.   You would agree with me that a reactive oxygen species,

8        and can we call that ROS for short, Doctor?

9   A.   Yes, I'm thinking, reactive oxygen and reactive

10       nitrogen species, let's call them oxidants.

11  Q.   I'm sorry?

12  A.   Oxidants.

13  Q.   Oxidants?  Well, what if I'm specifically asking about

14       ROS, reactive oxygen --

15  A.   You can, it depends on which one you would specify I

16       would answer, yes.

17  Q.   Okay.  So if I say ROS, can we agree I'm talking about

18       reactive oxygen species?

19  A.   Yes.  Which one, though?  You have to tell me.

20  Q.   As a category.

21  A.   Okay, keep going.

22  Q.   ROS aren't the same thing as inflammation, correct?

23  A.   Not correct.

24  Q.   ROS are a part of normal cell physiology, correct?

25  A.   Normal levels of ROS found in cells, yes.

Ghassan Saed, Ph.D.

```
 1    Q.    The major source of ROS comes from inside the cells

 2          from mitochondria, correct?

 3    A.    Not accurate answer, no.

 4    Q.    Can you distinguish between ROS produced inside the

 5          mitochondria of the cell from ROS produced outside the

 6          cell?

 7    A.    There are some enzymes that are produced from the

 8          mitochondria like SOD in different forms, and there are

 9          SODs that are produced from the membrane of the cell

10          and the cytoplasm, so it depends.

11    Q.    Do you agree that the persistent generation of cellular

12          ROS is a consequence of aging?

13    A.    I didn't study aging.

14    Q.    You haven't said that before?

15    A.    That --

16    Q.    The persistent generation of cellular ROS is a

17          consequence of aging.

18    A.    I don't remember.  Aging of the cells or aging of

19          people?

20    Q.    Aging of people.

21    A.    I don't remember I said that.

22    Q.    You didn't sequence the DNA in your studies to

23          determine mutations, correct?  You only used the SNP

24          gene assay?

25    A.    I used the SNP gene assay, yes.
```

Ghassan Saed, Ph.D.

```
 1    Q.   You realize the same company that made the SNP gene
 2         assay that you used also makes a gene mutation assay?
 3    A.   No, I'm not aware of that.
 4    Q.   You're not aware of that?
 5    A.   No.
 6    Q.   But so, therefore, you did not use that company's gene
 7         mutation assay in your experiments, correct?
 8              MS. O'DELL:  Object to the form.
 9              THE WITNESS:  I used the core facility at our
10         institutions, and this is what they ran and this is
11         what I have.
12    BY MR. KLATT:
13    Q.   So you did not use the gene mutation assay made by the
14         same company that makes the SNP assay that you used in
15         your studies, correct?
16              MS. O'DELL:  Object to the form.
17              THE WITNESS:  The core facility ordered the
18         kits, and they are the one who choose which company to
19         buy it from.  I have no influence in that.
20    BY MR. KLATT:
21    Q.   So was the core facility the one that decided to use
22         the SNP assay rather than the gene mutation assay or
23         was that your decision?
24    A.   That was what is available in the core facility, and I
25         said I want to use it.
```

Ghassan Saed, Ph.D.

```
 1    Q.    But you were unaware that the same company that makes

 2          the SNP assay also makes a gene mutation assay; is that

 3          true?

 4                    MS. O'DELL:  Object to the form.

 5                    THE WITNESS:  I don't even know what company

 6          you're talking about.

 7    BY MR. KLATT:

 8    Q.    Do you know what company made the SNP assay?

 9    A.    The core facility ordered the SNP kit, they just give

10          you -- I'm interested in doing the SNP mutation and

11          this is what we run, so please run these samples for

12          me.

13    Q.    Did you ask them not to use a gene mutation assay?

14    A.    Not to use?  I didn't ask them, no.

15    Q.    Would you agree with me that the determination of the

16          redox state of a cell is determined by far more enzymes

17          and proteins and substances than just the ones you

18          looked at in your talc studies?

19                    MS. O'DELL:  Object to the form.

20                    THE WITNESS:  We -- in my studies we looked

21          at there are many enzymes, but we're looking at key

22          enzymes that control the redox balance.

23    BY MR. KLATT:

24    Q.    Object, nonresponsive.  Do you agree with me that redox

25          balance in cells is controlled by far more enzymes,
```

Ghassan Saed, Ph.D.

```
 1          proteins, and substances than you looked at in your

 2          talc studies?

 3                    MS. O'DELL:  Object to the form.

 4                    THE WITNESS:  And I answered.  I said

 5          these -- the one we looked at are the main, there are

 6          others, but they're not major players.  Those are, the

 7          one we studied are the major contributor to the overall

 8          pro-oxidant state of the cell.

 9   BY MR. KLATT:

10   Q.   And some of those enzymes in some cancers are pro-

11        tumorigenic and some of those same enzymes in other

12        cancers are anti-tumorigenic, correct?

13   A.   I'm not aware of that.

14   Q.   You haven't said that before?

15   A.   Said that exact word?  No.

16   Q.   Do you recall ever saying this:  Decreasing oxidative

17        stress and increased SOD promotes apoptosis in the

18        cancer cell lines studied, but multiple other studies

19        performed using other cell lines have shown the

20        opposite, that decreased SOD can promote apoptosis?

21                    MS. O'DELL:  Object to the form.

22                    THE WITNESS:  So this -- I said that?  Or you

23        took this from my --

24   BY MR. KLATT:

25   Q.   I'm asking if you recall saying that?
```

Ghassan Saed, Ph.D.

```
 1   A.   Saying it, I don't recall saying it.

 2   Q.   Do you recall writing it?

 3   A.   Maybe, but that does not agree with what you just said,

 4        what you read.

 5   Q.   Can oxidative stress both promote apoptosis and promote

 6        cell survival?

 7   A.   Oxidative stress is a balance, so it's not just simple

 8        process.  So the outcome of this balance promote

 9        proliferation, promote survival, and decrease

10        apoptosis.

11   Q.   Can oxidative stress be both pro-tumorigenic and

12        anti-tumorigenic?

13   A.   You mean marker, some certain markers of oxidative

14        stress?  Is that what you're referring to?

15   Q.   Sure.

16   A.   Certain markers of oxidative stress can have -- can

17        induce tumors and can inhibit tumor, I'm not really

18        aware of that.

19   Q.   Are you aware of any study case report or case series

20        that says that women that use talc in the external

21        genital area have increased fibrosis or adhesions

22        anywhere in their reproductive tract?

23             MS. O'DELL:  Object to the form.

24             THE WITNESS:  Have I -- am I aware of people

25        use talcum powder is linked to development of
```

Ghassan Saed, Ph.D.

```
 1          possibility of adhesions?

 2   BY MR. KLATT:

 3   Q.   I'm asking you a very specific question.  Are you aware

 4        of any articles in the medical or scientific

 5        literature, any case studies, any case reports of women

 6        who used external talc having increased adhesions,

 7        fibrosis, granulomas anywhere in their reproductive

 8        tract?

 9               MS. O'DELL:  Object to the form.

10               THE WITNESS:  What do you mean by external?

11   BY MR. KLATT:

12   Q.   What does external mean to you?

13   A.   I'm asking you.

14   Q.   I'm asking the questions, Doctor.

15   A.   Okay, I understand, I just want to clarify.

16   Q.   Do you understand what external talc application means?

17               MS. O'DELL:  You didn't say that, you just

18        said external, so, anyway.

19               If you understand his question, answer the

20        question or define what you mean.

21   BY MR. KLATT:

22   Q.   Let me ask the question again.  Are you aware of any

23        study in the medical or scientific literature, case

24        report, that shows that external genital application of

25        talc results in increased fibrosis, granulomas, or
```

Ghassan Saed, Ph.D.

```
 1          adhesions anywhere inside the female reproductive

 2          tract?

 3                    MS. O'DELL:  Object to the form.

 4                    THE WITNESS:  I'm not aware.

 5     BY MR. KLATT:

 6     Q.   Are you aware that according to studies, anywhere from

 7          30 to 50 percent of U.S. women have used talc in the

 8          external genital area?

 9     A.   I'm sorry, say that again, sorry.

10     Q.   Are you aware from studies that anywhere from 30 to 50

11          percent of U.S. women have used talcum powder in the

12          external genital area?

13     A.   I'm not sure about the number.

14     Q.   Are you aware of any epidemic of granulomas, fibrosis,

15          or adhesions in women who use externally applied

16          genital talc?

17                    MS. O'DELL:  Object to the form.

18                    THE WITNESS:  I don't know if -- I don't know

19          if any relation between talc powder use and adhesions.

20     BY MR. KLATT:

21     Q.   Is there a way to measure the redox state directly

22          inside of cells?

23     A.   Very difficult.

24     Q.   Can it be done?

25     A.   The data will not be very reliable.
```

Ghassan Saed, Ph.D.

```
 1    Q.    Is there a method to do that?

 2    A.    You can measure H2O2, you can measure nitrosylation,

 3          degree of nitrosylation of protein, we have done that

 4          with Caspase-3 and S-nitrosylation of Caspase-3 as a

 5          measure of how the level of antioxidants.  The accurate

 6          way to measure it is to measure the key players

 7          together to have the complete picture.

 8    Q.    Those two methods that you just named, did you use

 9          those in any of your talc studies?

10    A.    What methods?

11    Q.    The methods you just listed for me which were a way to

12          directly measure the redox state of cells.

13    A.    Measuring all markers?  Oh, the other method, yes, they

14          are listed here.

15    Q.    Did you use those?

16    A.    I'm sorry, I'm missing you.  Am I use ever in my lab or

17          in this study?

18    Q.    In the talc studies.

19    A.    The S-nitrosylation of Caspase-3, we did not use in

20          this study.

21    Q.    And there was one other method that you mentioned.

22    A.    The H2O2.

23    Q.    Did you use that method in your talc --

24    A.    No, we used it for catalase activity indirectly.

25    Q.    Can we go off the record for a second.  I just need to
```

Ghassan Saed, Ph.D.

```
 1          look and see if I have any other notes.

 2                    THE VIDEOGRAPHER:  Going off the record at

 3          6:18 p.m.

 4                    (An off-the-record discussion was held.)

 5                    THE VIDEOGRAPHER:  Back on the record at 6:19

 6          p.m.

 7    BY MR. KLATT:

 8    Q.    Doctor, in your PCR studies, did you normalize for

 9          actin?

10    A.    Yes.

11    Q.    And how did you do that?

12    A.    So we did PCR for beta-actin.

13    Q.    And where is that indicated in your lab --

14    A.    It is page -- every experiment we did with PCR we ran

15          beta-actin, and if you go to Page -- what's this page

16          here --

17                    MS. O'DELL:  What's the ending Bates Number

18          on there?

19    BY MR. KLATT:

20    Q.    There may be a Bates Number in the lower right hand

21          corner.

22    A.    10.

23    Q.    Okay.  I'm with you.

24    A.    Are you there?

25    Q.    Yes.
```

Ghassan Saed, Ph.D.

```
 1   A.   It's even cut off from here, I don't know why.  But you

 2        see the standard curve?

 3   Q.   Yes.

 4   A.   Okay, so what we do here, we do a realtime RT-PCR where

 5        we design a small oligo that is flanked by the primers,

 6        and we order that to be synthesized, and we know the

 7        concentration, we dilute it down, and we create a

 8        standard curve, and we use this standard curve to

 9        extrapolate the results and normalize for our level of

10        mRNA with the treatment.

11   Q.   Can I ask you a question.  On Page 10, that indicates

12        raw data, correct?

13   A.   Page 10?

14   Q.   The page you were just looking at.

15   A.   I just want to see, it's not clear here.  I just want

16        to see what page is this here.  I'm with you.

17             MS. O'DELL:  What's the question, Mike?

18   BY MR. KLATT:

19   Q.   Looking at Page 10 on Exhibit 1, and I'm not talking

20        about the lab page number, I'm talking about the Bates

21        Number, if you look for Sample 356, you see to the

22        right there's numbers 285995.18, 273439.209?

23   A.   Uh-huh.

24   Q.   And 409589.891?

25   A.   Correct.
```

Ghassan Saed, Ph.D.

```
 1   Q.   If you turn to the next page, those numbers are

 2        replicated for Sample 356.

 3   A.   What next page?

 4   Q.   The very next page in the --

 5   A.   Here?

 6   Q.   Yeah.

 7   A.   Okay.  Where are they?  356, this is copies per

 8        micrograms of CDNA.

 9   Q.   And that corresponds to those numbers, those same three

10        numbers on the previous page, correct?

11   A.   So this is the copy number, 28274095, yeah, I see

12        they're the same.

13   Q.   But for the 357 sample, the numbers don't correspond

14        between those two pages, correct?

15   A.   Correct.

16   Q.   And can you explain why?

17   A.   So that's why we normalize, because you will have

18        different copy numbers all the time, so we normalize

19        it.

20   Q.   Can you go to the next page, which would be notebook

21        page -- handwritten Page 39 and Bates Number 11.

22   A.   39?  I'm still on the same page, right?

23             MS. O'DELL:  That's where we were I thought,

24        unless I was confused about your question.

25   BY MR. KLATT:
```

Ghassan Saed, Ph.D.

```
1   Q.   Well, Bates Number -- my Bates Number's cut off, excuse
2        me, my handwritten number's cut off so I'm going to the
3        Bates Number, which is 11.
4               MS. O'DELL:  Okay, it's Page --
5               THE WITNESS:  The next page.
6   BY MR. KLATT:
7   Q.   Okay.  And do you see the column toward the right
8        called picograms per microgram of RNA?
9   A.   Where is that?
10  Q.   The third column from the right-hand side.
11  A.   On Page -- in this page, right?
12  Q.   Page 11, Bates Stamped Page 11.
13  A.   This is the page, okay, this is the page.  So you're
14       looking at microgram?
15  Q.   Picograms per microgram per RNA, do you see that
16       column?
17  A.   I see copies per microgram for RNA, I see copies per
18       microgram for RNA, thintogram (sic) per microgram for
19       RNA. Is what you're looking at?
20  Q.   I'm looking right here, picograms per micrograms RNA
21       the third column from the right.
22  A.   1, 2, 3, that's called thintogram (sic).
23  Q.   And what's the first number in that column?
24  A.   125.  Is that what you're looking at?
25  Q.   I think we're not looking in the same place.
```

Ghassan Saed, Ph.D.

```
 1    A.    Yeah.  Is it Page 41?

 2                    MS. O'DELL:  You're on Page 11?

 3                    MR. KLATT:  Correct.

 4                    MS. O'DELL:  So I think it's this page.

 5                    THE WITNESS:  Oh.  Isn't it this page?

 6                    MS. O'DELL:  No, I think it's back, if I'm

 7          not mistaken.

 8                    THE WITNESS:  Oh, here.  We were on this

 9          page, right?

10    BY MR. KLATT:

11    Q.    I'm confused because you're looking at the real lab

12          notebook and I'm looking at --

13    A.    No, no, no, we were on the same page.  I thought you

14          asked me to go to a different page.  I see that column.

15    Q.    Just so we're on the same wavelength --

16    A.    I see it.

17    Q.    -- I'm referring to Page 11 Bates Number, correct?

18    A.    Picogram per microgram for RNA.

19    Q.    Right.

20    A.    4.58, the first number.

21    Q.    4.58?

22    A.    Uh-huh.

23    Q.    Right, and if you go -- that whole column's full of

24          numbers, correct?

25    A.    This column, yes.
```

Ghassan Saed, Ph.D.

```
 1    Q.    And then to the right of that you have an average,

 2          correct?

 3    A.    Yes.

 4    Q.    Sometimes you average two of the three numbers,

 5          sometimes you average all three numbers.

 6    A.    Correct.

 7    Q.    Why do you only average two of the three numbers

 8          sometimes?

 9    A.    If we have outlier, really high, different.

10    Q.    And what's your criteria for throwing out an outlier?

11    A.    So if you have 4.5, 4.3, and 6.5, that's an outlier.

12    Q.    What's your threshold for classifying something as an

13          outlier to not include it in your calculations?

14    A.    So if the two numbers match, the closer they match and

15          the higher the outlier is is what we determine.

16    Q.    So do you always throw out the outlier of the three

17          values?

18    A.    Not always, not necessarily.

19    Q.    So I'm just trying to figure what's your criteria

20          for --

21    A.    So if they are like, for example, close like, for

22          example, here, if we don't know that it is an outlier,

23          like, for example, here, 3.6, 4.3, 3.2, it's very hard

24          to determine an outlier, but if you have 6 and 6 and 7,

25          it is not hard.
```

Ghassan Saed, Ph.D.

```
1    Q.   Do you have a certain numerical criteria that you use

2         to classify something as an outlier that you're going

3         to exclude from your calculations?

4    A.   I just told you.

5    Q.   What's the numerical value?

6    A.   I don't have a numerical value.

7    Q.   You just eyeball it?

8              MS. O'DELL:  Object to the form.

9              THE WITNESS:  No, no, no, no, please, so I

10        just said that if the two numbers, okay, agrees very

11        close, the closer the two numbers together and the more

12        further is the other number, that is considered an

13        outlier to me.

14   BY MR. KLATT:

15   Q.   But, again, you don't have any numerical formula that

16        you follow to make that determination, correct?

17             MS. O'DELL:  Object to the form.

18             THE WITNESS:  I told you what I follow.

19   BY MR. KLATT:

20   Q.   When it's close together, you exclude the third one.

21        When it's further apart, you --

22   A.   I did not say that.

23             MS. O'DELL:  Object to the form.

24   BY MR. KLATT:

25   Q.   Then please explain numerically how you make the
```

Ghassan Saed, Ph.D.

```
 1          decision to exclude one of the three values --
 2    A.    Okay.
 3    Q.    -- or include it.
 4    A.    One more time.  So if the two number -- we have three
 5          numbers, right, three values.  If two of the three
 6          values are very close, the closer they are together,
 7          and they are more further from the third one, that
 8          third one qualifies for outlier.
 9    Q.    How close do the two have to be to exclude the third?
10    A.    Very close, have to be very close.
11    Q.    Numerically how --
12    A.    I don't know, I don't have a numerical value.
13    Q.    That's all the questions I have, Doctor.
14              MR. HEGARTY:  How much time do we have left?
15              THE VIDEOGRAPHER:  Two minutes left.
16              MS. O'DELL:  Do you have questions?
17              MR. LOCKE:  I do have a few.
18              MS. O'DELL:  You've got two minutes.
19              MR. LOCKE:  I know you've got some, too.
20              MR. HEGARTY:  I do.
21              MR. LOCKE:  Go ahead, Mark.
22           SAED DEPOSITION EXHIBIT NUMBER 19,
23           ABSTRACT SUBMITTED TO SGO,
24           WAS MARKED BY THE REPORTER
25           FOR IDENTIFICATION
```

Ghassan Saed, Ph.D.

```
 1

 2          RE-EXAMINATION BY MR. HEGARTY:

 3    Q.    Doctor, I'm showing you what I'm marking as Exhibit 19.

 4          Do you recognize Exhibit 19?

 5    A.    It looks like the abstract we submitted to SGO.

 6    Q.    This abstract in the middle refers to testing done at

 7          48 hours; is that correct?

 8    A.    48 hours is a typo everywhere you see it, I acknowledge

 9          that.

10    Q.    So you reported 48 hours in this abstract to SGO?

11    A.    Correct.  It is wrong.  All the work that I did it's 72

12          hours.

13              SAED DEPOSITION EXHIBIT NUMBER 20,

14              ABSTRACT,

15              WAS MARKED BY THE REPORTER

16              FOR IDENTIFICATION

17    BY MR. HEGARTY:

18    Q.    I'm going to mark as Exhibit Number 20 another abstract

19          of yours; is that correct?

20    A.    Where is it -- talcum powder -- where was this?

21    Q.    Do you recognize this abstract?

22    A.    March 2018, okay.

23    Q.    In the middle you report treating cells at 0, 200, and

24          500 micrograms per milliliter; is that correct?

25    A.    Yes, that was the initial study that we did.
```

Ghassan Saed, Ph.D.

```
 1    Q.    And that data is reflected in the notebooks we looked

 2          at?

 3    A.    It's here, yes.

 4                MR. KLATT:  Which notebook?

 5                MS. O'DELL:  Exhibit 3.

 6          SAED DEPOSITION EXHIBIT NUMBER 21,

 7          ABSTRACT FROM SRI,

 8          WAS MARKED BY THE REPORTER

 9          FOR IDENTIFICATION

10    BY MR. HEGARTY:

11    Q.    I'm going to mark next as Exhibit Number 21 another

12          abstract of yours from SRI; is that correct?

13    A.    SRI, March 16, this one is -- what is the title --

14          yeah, talcum powder -- yes.

15    Q.    In the method section you report treating cells with

16          1,000 micrograms per milliliter of talc; is that

17          correct?

18    A.    That's a typo that's 100.

19    Q.    That's another mistake?

20    A.    Yes, it's 100.

21                MS. O'DELL:  I think your time's gone.

22                MR. HEGARTY:  Okay.  Well, we --

23                THE WITNESS:  And all those are the

24          preliminary that we did.

25                MR. HEGARTY:  We have request for several
```

Ghassan Saed, Ph.D.

```
1       documents to be produced, so we can go on the record

2       before we finish the deposition.  And then, also, we

3       reserve the right, as we indicated at the beginning of

4       the deposition, to seek additional time because of the

5       late productions and, also, because of the

6       nonresponsive nature Dr. Saed has been throughout the

7       deposition.

8              MS. O'DELL:  I think the objection for one

9       was objection for all, I think you made that rule,

10      Mike, but I'm glad you put -- we're going to go off the

11      record, and I may have a few questions for Dr. Saed.

12      Before I do, I will say I think to state that Dr. Saed

13      has not been responsive in his answers today is a

14      misstate.  The record and his testimony will be

15      reflective that he was attempting to respond to the

16      questions, very difficult technical questions, and so

17      he's attempted to do his best, and as we said before,

18      we've complied with all the orders of the Court and the

19      Notice of Deposition, and we'll oppose efforts at this

20      point for any additional time with him.  So let's go

21      off the record.

22             MR. HEGARTY:  And to the extent that you

23      don't have any additional questions, I just want to go

24      back on the record and make a note of the additional

25      documents we want from Dr. Saed.  We can do it now or
```

Ghassan Saed, Ph.D.

```
1        we can do it at the end.

2                     MS. O'DELL:  Why don't we wait until the end.

3                     MR. HEGARTY:  Okay.

4                     THE VIDEOGRAPHER:  Going off the record at

5        6:32 p.m.

6                     (A short recess was taken.)

7                     THE VIDEOGRAPHER:  We're back on the record

8        at 6:56 p.m.

9   EXAMINATION BY MS. O'DELL:

10  Q.   Doctor, I wanted to follow up on a few questions.

11       First, when you were acting as a consultant, you

12       referred to yourself as a consultant a number of times

13       today, was it your understanding as a consultant you

14       were also an expert witness?

15  A.   Yes.

16  Q.   And so during all the time that you were conducting the

17       studies that you testified to today, that you were

18       preparing certain publications, you were working as an

19       expert witness?

20                    MR. KLATT:  Objection, leading.

21  BY MS. O'DELL:

22  Q.   Were you working during that time period as an expert

23       witness?

24  A.   Yes.

25  Q.   Okay.  Let me see if I can direct you back to --
```

Ghassan Saed, Ph.D.

| | | |
|---|---|---|
| 1 | | actually, maybe I should do it this way, I apologize. |
| 2 | | If you would, let me hand to you what was marked as the |
| 3 | | lab notebook for your -- the experiments that were done |
| 4 | | to and reported on in your manuscript and your report, |
| 5 | | Exhibit 1.  Do you see those? |
| 6 | A. | Yes. |
| 7 | Q. | And if you turn to I think it was Page 57, Bates Number |
| 8 | | 57 -- make sure I'm at the right page.  Let me know |
| 9 | | when you get there, Doctor. |
| 10 | A. | 57? |
| 11 | Q. | Uh-huh. |
| 12 | A. | This page? |
| 13 | Q. | Maybe I wrote the page down -- oh, yeah, it's actually |
| 14 | | 84 in -- it's 57 in there and it's 84 in your main lab |
| 15 | | notebook.  You recall a number of questions about or |
| 16 | | two questions at least that I recall, and it refers to |
| 17 | | Page 84 in Exhibit 2 that corresponds to Bates Number |
| 18 | | 57 of Exhibit 1, do you recall that, and there was -- |
| 19 | | you were asked about a missing data table -- |
| 20 | A. | Correct. |
| 21 | Q. | -- that did not make it into the scanned version. |
| 22 | A. | Correct. |
| 23 | Q. | Is the data contained in the table on Page 57 of the |
| 24 | | scanned -- excuse me -- 84 of the lab notebook |
| 25 | | contained in the figure below? |

Ghassan Saed, Ph.D.

```
 1    A.   Yes.

 2    Q.   And was that figure included in the version that was

 3         provided to defense counsel?

 4    A.   Yes.

 5    Q.   Okay.  I've got one more situation like this.  If

 6         you'll turn to page -- let me get it -- it's 62 at the

 7         Bates Stamp Number version, Exhibit 1, and for the lab

 8         notebook it's Page 87.

 9    A.   Yes.

10    Q.   And I think in this instance there was a table on

11         Page 87 of the lab notebook that was not scanned in the

12         electronic version.  Is the data that's contained in

13         the table on Page 87 also in the figure that was

14         produced to Defendants?

15              MR. HEGARTY:  Objection, form.  You can

16         answer.

17              THE WITNESS:  Yes.

18    BY MS. O'DELL:

19    Q.   You were also asked a series of questions about your

20         manuscript and the use of the word marginal.  Do you

21         recall that discussion?

22    A.   Yes.

23    Q.   What did you intend by the use of the word marginal?

24    A.   I meant marked increase, marked difference.

25    Q.   Okay.  Let me change directions with you.  We got your
```

Ghassan Saed, Ph.D.

```
 1        notebook that's been marked or two notebooks that have

 2        been marked Exhibit 11, and does that contain your

 3        expert report in this case as well as the references

 4        noted in your expert report?

 5   A.   Correct.

 6   Q.   And do you have any changes that you would like to make

 7        in your expert report?

 8   A.   Yes, I do.

 9   Q.   Okay.

10   A.   So I think during that note there were some references

11        that were mislabeled, so I would like to --

12   Q.   Tell us what page you're on.

13   A.   Page 10, I'd like to add -- where it says 49, I would

14        like to add 51 there.

15   Q.   And when you say 51, do go --

16   A.   Reference number 51.

17   Q.   Okay.

18   A.   Okay.  And next page, Page 11, where it says 50 on the

19        top of the page, first line, I'd like to add the NTP

20        study 1993.

21   Q.   Okay.

22   A.   And on Page 12, I'd like to remove 4575.

23   Q.   Okay.  And where is that on Page 12?

24   A.   On the middle paragraph.

25   Q.   All right.
```

Ghassan Saed, Ph.D.

```
 1                    MR. HEGARTY:  I'm sorry, we're not getting

 2         realtime.

 3                    MS. O'DELL:  Let's go off the record.  Do you

 4         need that or can we move on?

 5                    MR. HEGARTY:  No, I need it.  I just wanted

 6         to see what he just said, and I can't, I obviously

 7         can't see it so --

 8                    MS. O'DELL:  Off the record.

 9                    THE VIDEOGRAPHER:  Going off the record at

10         7:03 p.m.

11                    (An off-the-record discussion was held.)

12                    THE VIDEOGRAPHER:  We're back on the record

13         at 7:05 p.m.

14    BY MS. O'DELL:

15    Q.   You may continue, Doctor?

16    A.   Yes.  So the Page 12, the middle paragraph, I would

17         like to delete references 4575 from the whole

18         paragraph, they don't belong there.

19    Q.   Okay.

20    A.   That's it.

21    Q.   Anything else?  Okay.  Doctor, do in vitro models

22         reliably predict the pathogenicity of potentially

23         harmful particulates or other carcinogens in humans?

24                    MR. HEGARTY:  Objection, form.

25                    THE WITNESS:  Yes.
```

Ghassan Saed, Ph.D.

```
 1    BY MS. O'DELL:

 2    Q.   You were asked a number of questions about your

 3         manuscript today.  In your manuscript you state that

 4         your findings provide a molecular mechanism for linking

 5         genital talcum powder use to increased ovarian cancer

 6         risk?

 7    A.   Yes.

 8    Q.   And does that statement relate to the pathogenesis of

 9         ovarian cancer?

10    A.   Yes.

11    Q.   Does pathogenesis refer to the molecular mechanism that

12         results in the development of a disease?

13    A.   Yes.

14    Q.   Also, in relation to your manuscript, has your

15         manuscript been peer reviewed and accepted for

16         publication?

17    A.   Yes.

18    Q.   Is the use of immortalized cells in laboratory research

19         generally accepted in your field?

20    A.   Yes.

21              MR. HEGARTY:  Objection, form.

22    BY MS. O'DELL:

23    Q.   Is it widely accepted?

24              MR. HEGARTY:  Objection, form.

25              THE WITNESS:  Yes.
```

Ghassan Saed, Ph.D.

```
 1    BY MS. O'DELL:

 2    Q.   Is it a generally accepted practice for researchers in

 3         your field to correlate findings from immortalized

 4         cells to in vivo application in humans?

 5    A.   Yes.

 6    Q.   In terms of the studies that you have conducted on

 7         talc, you mentioned that you use multiple types --

 8         multiple lines of each type of cell; do you recall

 9         that?

10    A.   Yes.

11    Q.   How many lines of or types of ovarian cells did you

12         use?

13    A.   Three different ovarian cancer cell lines and three

14         different normal cell lines.

15    Q.   And what's the reason for doing that?

16    A.   The reason is to get a rebox finding to show that it is

17         not repeated three times but the finding is reproduced

18         from three different normal or three different ovarian.

19    Q.   And could another scientist with your expertise in and

20         background in research, could they replicate the

21         studies that you've conducted?

22    A.   Yes.

23    Q.   In terms of the outcomes for oxidative stress and

24         inflammation that you saw demonstrated in your studies,

25         are there any alternative explanations for those
```

Ghassan Saed, Ph.D.

```
 1        results?
 2                    MR. HEGARTY:  Objection, form.
 3                    THE WITNESS:  That talcum powder induces
 4        inflammation that leads to increased risk of ovarian
 5        cancer.
 6   BY MS. O'DELL:
 7   Q.   Are there any other alternative explanations other than
 8        the presence of talc treating a cell?
 9   A.   This is a direct experiment showing isolated effect.
10   Q.   Based on your academic training and years of experience
11        studying ovarian cancer, does the cause and effect
12        observed in your studies make sense?
13                    MR. HEGARTY:  Objection, form.
14                    THE WITNESS:  It does.
15   BY MS. O'DELL:
16   Q.   In terms of the particular data that you evaluated, I
17        want to ask you to take a look at I think it was Bates
18        Number Page 11 of Exhibit 1, and you were asked some
19        questions about occasions when you averaged two
20        findings?
21   A.   Outliers.
22   Q.   Yes.  So address the outliers --
23   A.   Yeah, so what I forgot to say that when I was asked
24        by -- this whole statistics, I did not touch.  This was
25        done by a professional, by a statistician, and the
```

Ghassan Saed, Ph.D.

```
 1          results, his finding is in the section in the notebook.

 2          He determined everything.

 3   Q.    Would you have published your results even if they had

 4          shown there was no biological effect?

 5                    MR. HEGARTY:  Objection, form.

 6                    THE WITNESS:  Of course.

 7   BY MS. O'DELL:

 8   Q.    Is it a standard cell culture technique generally

 9          accepted in your field to split the cell culture right

10          after the cells have -- (coughing in room) -- in a

11          24-hour period?

12   A.    It is.

13   Q.    Is it a standard cell culture technique that's

14          generally accepted in your field to start experiments

15          right after splitting the cells?

16   A.    Cells have to reach confluency and then you split them,

17          yes.

18   Q.    And it's generally accepted to begin your experiments

19          right after that point?

20   A.    Correct.

21                    MS. O'DELL:  Nothing further.

22                    How long was that?

23                    THE VIDEOGRAPHER:  14 minutes.

24                    MR. HEGARTY:  Give me a second.

25
```

Ghassan Saed, Ph.D.

```
 1    RE-EXAMINATION BY MR. HEGARTY:

 2    Q.   Doctor, in connection with your work in this

 3         litigation, did the lawyers for Plaintiff provide you

 4         with any medical or scientific literature?

 5    A.   No.

 6    Q.   So none of the materials we marked as Exhibit Number 11

 7         were provided by Counsel for Plaintiffs?

 8              MS. O'DELL:  Object to the form.

 9              THE WITNESS:  Yeah, this was copied and

10         provided by them, the references I made.

11    BY MR. HEGARTY:

12    Q.   In connection with you -- strike that.  In connection

13         with any other testing you have done involving cell

14         cultures, have you ever served as an expert witness or

15         a consultant in litigation involving the same topic of

16         those experiments?

17              MS. O'DELL:  Object to the form.

18              THE WITNESS:  I never served, as I stated, as

19         an expert witness in any litigation.

20    BY MR. HEGARTY:

21    Q.   In connection with any experimental testing you've done

22         involving cell cultures, have you ever served as a paid

23         expert for plaintiffs lawyers on the same topic for

24         which you were doing those experiments?

25              MS. O'DELL:  Object to the form.
```

Ghassan Saed, Ph.D.

```
 1                   THE WITNESS:  Have I been hired by and paid

 2           for by another?  I'm sorry --

 3    BY MR. HEGARTY:

 4    Q.    Other lawyers at the same time you were doing cell

 5           culture tests involving the same topic that you were

 6           consulting with them on.

 7                   MS. O'DELL:  Object to the form.

 8                   THE WITNESS:  No.

 9    BY MR. HEGARTY:

10    Q.    You said in response to counsel's question that when

11           you used the word marginal, you meant marked.  What

12           is -- where is a written definition for marked?

13    A.    Marked.

14    Q.    I think I said that, but where is a published standard

15           for what marked means?

16    A.    This is marked is to me, but we can go the

17           statistically significance.  To me, when you have an

18           increase of 1 versus 6 fold, that's a marked increase.

19    Q.    Is there a written standard for what constitutes a

20           marked increase?

21    A.    No.

22                   MS. O'DELL:  Object to the form.

23    BY MR. HEGARTY:

24    Q.    When I asked you not long ago if you had any revisions

25           to your expert report, you answered no.  Do you recall
```

Ghassan Saed, Ph.D.

```
 1        telling me that?

 2                MS. O'DELL:  I don't recall the question

 3        being asked.

 4   BY MR. HEGARTY:

 5   Q.   I did ask.  I asked you, Doctor, didn't I, if you had

 6        any -- if you needed to revise in any way your report.

 7        Do you recall me asking that?

 8                MS. O'DELL:  Object to the form.

 9                THE WITNESS:  Probably I forgot that those

10        references need to be done.

11   BY MR. HEGARTY:

12   Q.   When did this revelation come to you?

13   A.   I mean I don't --

14                MS. O'DELL:  Object to the form.

15                THE WITNESS:  I'm not sure, we've been

16        through many, many, many questions, so I don't really

17        remember be accurately.

18   BY MR. HEGARTY:

19   Q.   Well, I asked that you question about --

20   A.   Make you did, I'm not denying, maybe you did, but I'm

21        saying there are too many things that we're covering

22        today in very small time.

23   Q.   Well, did you discover the need to make those revisions

24        before today?

25   A.   Yes, they actually they were marked in my -- with my
```

Ghassan Saed, Ph.D.

```
 1          handwriting, this is my handwriting, they were marked

 2          with my handwriting.

 3    Q.    When did you make those handwritten marks?

 4    A.    Last night, I was reviewing this, and I -- what I

 5          understood maybe your question as if I want to make

 6          something to the text, but this is like probably the

 7          end notes without the references.

 8    Q.    Did you meet with counsel for Plaintiffs yesterday?

 9    A.    Did I meet with -- yes, I did.

10    Q.    For how long?

11    A.    I can't remember, three, four hours, five hours, I

12          don't know.

13    Q.    From when to when?

14    A.    When was it, 10 maybe to 2, 3.

15    Q.    Who did you meet with?

16    A.    The three -- Leigh, Margaret, John, right, and who

17          else -- I think that's it right, I don't remember,

18          Leigh, Margaret, John, and Dan.

19    Q.    At any point in time during your consultation with

20          Plaintiff's Counsel, have you met with any other

21          lawyers that you've not identified here today?

22    A.    Have I met at any point?

23    Q.    At any point.

24    A.    I met Allison, right?

25    Q.    Any others who we haven't talked about?
```

Ghassan Saed, Ph.D.

```
1    A.   What's the name of the lady I met today --

2              MS. O'DELL:  Michelle.

3              THE WITNESS:  Michelle, I just met her today.

4         Sorry, I'm not good at names.

5              MS. O'DELL:  Alastair.

6              THE WITNESS:  And Alastair, we met today.

7    BY MR. HEGARTY:

8    Q.   You testified a moment ago that an in vitro model

9         reliably predicts that, I think, pathogenesis of

10        potentially harmful particles and other carcinogens --

11        let me back up and find that testimony -- you said

12        do -- you agreed with the question that in vitro models

13        reliably predict the pathogenesis of potentially

14        harmful particulates or other carcinogens in humans.

15        Do you recall agreeing with that statement?

16   A.   Yes.

17   Q.   What data does it take for an in vitro model to

18        reliably predict the carcinogenicity of a particle?

19   A.   What data?

20   Q.   Is it your testimony that in vitro models by themselves

21        reliably predict the carcinogenicity of a particle to a

22        human?

23   A.   Yes.

24              MS. O'DELL:  Object to the form.

25              THE WITNESS:  They do.
```

Ghassan Saed, Ph.D.

```
 1    BY MR. HEGARTY:

 2    Q.   Cite for me an instance when a carcinogen has been

 3         identified in humans based solely on an in vitro model.

 4    A.   I can't remember.

 5    Q.   When have you ever classified a substance as a

 6         carcinogen based on the result in an in vitro model?

 7    A.   In vitro model is a good predictor to determine whether

 8         a substance is carcinogenic or not, if the same effect

 9         is replicated in vivo.

10    Q.   You did not replicate your results in an in vivo model,

11         correct?

12    A.   Not yet.

13    Q.   You were asked with regard to your experimental results

14         whether there was any other alternative explanation for

15         the results.  What did you do to rule out alternative

16         explanations for the results that you found in your

17         testing?

18    A.   Because treatment without talc did not induce it, we're

19         doing a comparison, very simple comparison with and

20         without, and with did this, without, this didn't do.

21    Q.   You claim that your test results show that talc

22         increases the risk of ovarian cancer.  How did you show

23         by your test results that talc increases the risk --

24         I'm sorry -- yeah, increases the risk of ovarian

25         cancer?
```

Ghassan Saed, Ph.D.

```
 1    A.    One more time, please.

 2    Q.    How do you remember test results show that talc

 3          increases the risk of ovarian cancer?

 4    A.    By showing that the treatment with talcum powder

 5          induces the same oxidative oxidant and anti-oxidant

 6          profile that we observe in epithelial ovarian cancer

 7          cells.

 8    Q.    But no study has shown those results in women using

 9          cosmetic talc, correct?

10              MS. O'DELL:  Object to the form.

11              THE WITNESS:  So you're saying there's no

12          studies out there showing woman using the talc powder

13          have increased any of these markers?

14    BY MR. HEGARTY:

15    Q.    Correct.

16    A.    I think you asked me the same question before.

17    Q.    Let me ask it a different way, if you -- I already

18          asked you the same question.  How do you go from your

19          test results to concluding there's an increased risk of

20          cancer with applying talc to the body?

21              MS. O'DELL:  Object to the form.

22              THE WITNESS:  Again, as I stated, the

23          treatment of ovarian cancer cells, three different

24          ovarian cancer cell lines and three different normal

25          cells with talcum powder induces a profile of oxidative
```

Ghassan Saed, Ph.D.

```
 1         stress that we in our lab have extensively published

 2         and characterized for ovarian cancer cells.

 3    BY MR. HEGARTY:

 4    Q.   You characterized that state in ovarian cancer cells,

 5         correct?

 6                   MS. O'DELL:  I'm sorry --

 7                   THE WITNESS:  State?

 8    BY MR. HEGARTY:

 9    Q.   Well, the pro-oxidant and anti-oxidant state, you've

10         characterized that to exist in ovarian cancer cells,

11         correct?

12    A.   We characterized that there is an enhanced pro-oxidant

13         state in -- that manifest in ovarian cancer cells, yes.

14    Q.   You've not done any studies showing a pro-oxidant or

15         decreased anti-oxidant state in normal ovarian cancer

16         cells, correct?

17                   MS. O'DELL:  Object to the form.

18                   THE WITNESS:  Normal ovarian cancer?

19    BY MR. HEGARTY:

20    Q.   Yes.  I'm sorry -- you have not shown a pro-oxidative

21         or anti-oxidative state in normal ovarian cells?

22    A.   In response to what?

23    Q.   In response to anything.

24                   MS. O'DELL:  Object to the form.

25                   THE WITNESS:  That's a very vague question.
```

Ghassan Saed, Ph.D.

```
 1          I don't understand what you're trying to do, seriously.

 2   BY MR. HEGARTY:

 3   Q.   Well, have you ever reported finding a pro-oxidative or

 4        an anti-oxidative state in normal ovarian cells?

 5               MS. O'DELL:  Object to the form.

 6               THE WITNESS:  As compared to what?

 7   BY MR. HEGARTY:

 8   Q.   As compared to nothing.

 9   A.   How you not compare to nothing?

10   Q.   Right.

11   A.   So we comparing ovarian cancer to normal cells.

12   Q.   My question is simply in normal cells, have you ever

13        found pro-oxidative or anti-oxidative state?

14   A.   We found -- okay, maybe I know what you want me to say.

15        So there are the players, the key oxidants and key

16        anti-oxidants, they are expressed in all cells

17        including normal.  Now, the amount of -- the degree of

18        expression, that what gets screwed up and altered when

19        you develop -- you start -- cells start developing that

20        oncogenesis phenotype.

21   Q.   I need to leave Mr. Klatt a minute or two.  You

22        mentioned that you would still have published your

23        article if you found no biologic effect.  Do you recall

24        answering that question?

25   A.   Correct.
```

Ghassan Saed, Ph.D.

```
 1    Q.    Is it your belief that anyone would publish your paper

 2          if you showed no biologic effect?

 3                MS. O'DELL:  Object to the form.

 4                THE WITNESS:  Anyone not me, you talking

 5          about me?

 6    BY MR. HEGARTY:

 7    Q.    Yes, any publisher.

 8    A.    That it would be published, yes, I would consider this

 9          a very positive and very negative, same thing.

10    Q.    But do you think a journal would publish --

11    A.    Absolutely, it's a finding.

12    Q.    What is that based on?

13    A.    It's a finding.

14    Q.    Have you ever approached a journal and had them publish

15          an article on a negative finding?

16    A.    I don't know what you call negative.

17    Q.    Well, showing no biologic --

18    A.    That's not negative, that's a huge finding.

19    Q.    Okay.  All right.

20                You have questions, Mike?  Go ahead.

21    RE-EXAMINATION BY MR. KLATT:

22    Q.    Dr. Saed, are you aware that a plaintiff's expert named

23          John Godlesky has tested dozens of women's ovarian,

24          reproductive, and peritoneal tissue, and found many,

25          many nontalc particles, foreign particles in that
```

Ghassan Saed, Ph.D.

```
 1          tissue; are you aware of that?

 2     A.   No.

 3     Q.   If you tested those other foreign particles that aren't

 4          talc in the same test that you tested talc, could you

 5          get the same results?

 6               MS. O'DELL:  Object to the form.

 7               THE WITNESS:  I didn't test them.

 8     BY MR. KLATT:

 9     Q.   But is it possible that if you tested them, you could

10          get the same results?

11     A.   If I didn't test them, I will not give you an answer.

12     Q.   I'm sorry?

13     A.   I did not test them.

14     Q.   So you have no idea whether any other foreign particle

15          other than talc would result in the same findings you

16          found for talc, correct?

17               MS. O'DELL:  Object to the form.

18     BY MR. KLATT:

19     Q.   Because you haven't done the test.

20     A.   When I test, I will tell you.

21     Q.   So you can't give us any information on what any other

22          particles other than talc would do under the tests that

23          you -- let me finish -- the tests that you submitted

24          talc to, correct?

25               MS. O'DELL:  Object to the form.
```

Ghassan Saed, Ph.D.

```
 1                        THE WITNESS:  I only can give you information
 2          to the experiments that I did and --
 3     BY MR. KLATT:
 4     Q.   And you didn't do any tests on any foreign particles
 5          other than talc, correct?
 6     A.   Correct.
 7     Q.   And has all your testing on talc been paid for by the
 8          Beasley Allen firm?
 9                        MS. O'DELL:  Object to the form.
10                        THE WITNESS:  My time?
11     BY MR. KLATT:
12     Q.   Well, the testing, yeah, the time that you spent
13          testing talc.
14                        MS. O'DELL:  Object to the form.
15                        THE WITNESS:  No, testing is not -- what are
16          you trying to -- we already discussed this.  Time, they
17          paid for my time for consultation, I paid for the
18          expenses from the lab.  We already talked about that.
19                        MR. KLATT:  Okay.  Anybody else?
20                        MR. LOCKE:  Yeah.  Are you finished?
21                        MR. KLATT:  Yes.
22          EXAMINATION BY MR. LOCKE:
23     Q.   I just want to clarify for you, Doctor --
24                        MS. O'DELL:  You've got 20 seconds.
25                        MR. LOCKE:  Okay, well, I'm going to ask as
```

Ghassan Saed, Ph.D.

```
 1          many questions as I can in 20 seconds.  You're the

 2          first expert to reach the conclusions that you have in

 3          your report, is that correct?

 4                    MS. O'DELL:  Object to the form.

 5                    THE WITNESS:  That were looking at the

 6          molecular mechanism and molecular effect of talcum

 7          powder?

 8  BY MR. LOCKE:

 9  Q.   Right.

10  A.   I wasn't the first one.

11  Q.   Who did it before?

12  A.   Was Shukla and there was the -- what was the other guy

13       name, I can't remember names, but there were two or

14       three papers that look at molecular mechanisms,

15       molecular effects.

16  Q.   Okay.

17                    MS. O'DELL:  I'm sorry, time's up.

18                    MR. LOCKE:  I'm going to still object to not

19          being able to ask a couple quick questions here.

20                    MS. O'DELL:  Tom, I'm sorry, I mean this

21          is between --

22                    MR. LOCKE:  You're cutting me off.

23                    MS. O'DELL:  I've tried to be very

24          accommodating, but this is between you and your

25          co-counsel.
```

Ghassan Saed, Ph.D.

```
 1                    MR. LOCKE:  No, it's really not.

 2                    MS. O'DELL:  Yes, it is, it is.

 3                    MR. LOCKE:  Okay.  We'll be back with this

 4          witness.

 5                    MR. HEGARTY:  Do you have anything further?

 6                    MS. O'DELL:  I have nothing further.

 7                    MR. HEGARTY:  I just want to put on the

 8          record several document requests, and I certainly don't

 9          expect you to agree to them right now.

10                    We would like copies of Dr. Saed's prior

11          drafts of his manuscript; copies of any correspondence

12          with OB-GYN Oncology and its reviewers, whether it's in

13          his possession or maintained on a website; any cover

14          letters accompanying submissions of the manuscript to

15          either OB-GYN Oncology or Reproductive Sciences; all

16          communications with Dr. Saed, between Dr. Saed and

17          Beasley Allen and other plaintiffs lawyers with regard

18          to his manuscript; and the budget that Dr. Saed

19          prepared for his manuscript; as well as all accounting

20          documents, invoices, or other original documents that

21          memorialize the expenses, costs, et cetera, hours

22          worked on the manuscript that we -- that are reported

23          in Exhibit Number 5.

24                    MS. O'DELL:  You're referring to the budget

25          officer at Wayne State?
```

Ghassan Saed, Ph.D.

```
 1                    MR. HEGARTY:  Correct, and the documents that
 2          Sharon Pepe used to put together the numbers that are
 3          reported in that exhibit.  And those are at least the
 4          document requests that I can think of right now, but we
 5          reserve the right to go back and look at the transcript
 6          to see if there are any additional requests, and we
 7          will make them in a timely manner.
 8                    MS. O'DELL:  We will be happy to meet and
 9          confer on all of those items, some of which we might
10          work an agreement out, some of which we might need some
11          assistance by the Court.
12                    THE VIDEOGRAPHER:  This concludes the
13          deposition.  We're going off the record at 7:29 p.m.
14                    (The deposition was concluded at 7:29 p.m.)
15
16
17
18
19
20
21
22
23
24
25
```

Ghassan Saed, Ph.D.

```
 1                      CERTIFICATE OF NOTARY

 2

 3        STATE OF MICHIGAN          )

 4                                   ) SS

 5        COUNTY OF OAKLAND          )

 6             I, Laurel A. Frogner, Certified Shorthand

 7        Reporter, a Notary Public in and for the above county

 8        and state, do hereby certify that the above deposition

 9        was taken before me at the time and place hereinbefore

10        set forth; that the witness was by me first duly sworn

11        to testify to the truth, and nothing but the truth,

12        that the foregoing questions asked and answers made by

13        the witness were duly recorded by me stenographically

14        and reduced to computer transcription; that this is a

15        true, full and correct transcript of my stenographic

16        notes so taken; and that I am not related to, nor of

17        counsel to any party, nor interested in the event of

18        this cause.

19

20

21                     Laurel A. Frogner, CSR-2495, RMR, CRR

22                     Notary Public,

23                     Oakland County, Michigan

24                     My Commission expires:  4-22-2022

25
```

Ghassan Saed, Ph.D.

```
 1              - - - - - -

               E  R  R  A  T  A

 2              - - - - - -

 3    PAGE   LINE   CHANGE

 4    ____  ____   _____

 5       REASON:   _____

 6    ____  ____   _____

 7       REASON:   _____

 8    ____  ____   _____

 9       REASON:   _____

10    ____  ____   _____

11       REASON:   _____

12    ____  ____   _____

13       REASON:   _____

14    ____  ____   _____

15       REASON:   _____

16    ____  ____   _____

17       REASON:   _____

18    ____  ____   _____

19       REASON:   _____

20    ____  ____   _____

21       REASON:   _____

22    ____  ____   _____

23       REASON:   _____

24    ____  ____   _____

25       REASON:   _____
```

Ghassan Saed, Ph.D.

```
 1          ACKNOWLEDGMENT OF DEPONENT

 2

                 I,_____, do

 3     hereby certify that I have read the

       foregoing pages, and that the same

 4     is a correct transcription of the answers

       given by me to the questions therein

 5     propounded, except for the corrections or

       changes in form or substance, if any,

 6     noted in the attached Errata Sheet.

 7

       _____

 8     Ghassan Saed, Ph.D.       DATE

 9

10

11

12

13

14

       Subscribed and sworn

15     to before me this

       _____ day of _____, 20_____.

16

       My commission expires:_____

17

18     _____

       Notary Public

19

20

21

22

23

24

25
```