# Exhibit G



**Montgomery**
218 Commerce Street
P.O. Box 4160
Montgomery, AL 36103-4160

**Atlanta**
4200 Northside Parkway
Building One, Suite 100
Atlanta, GA 30327

(800) 898-2034

BeasleyAllen.com

**P. Leigh O'Dell**
leigh.odell@beasleyallen.com

April 17, 2019

**VIA ELECTRONIC MAIL**

Hon. Joel A. Pisano (Ret.)
Walsh Pizzi O'Reilly Falanga
1037 Raymond Blvd., Suite 600
Newark, New Jersey 07102

      Re:    *In re: Johnson & Johnson Talcum Powder Products Marketing, Sales Practices and Products Liability Litigation*, MDL No. 2728

Dear Judge Pisano:

    In an order dated December 27, 2018, Your Honor ordered that Plaintiffs produce lab notebooks consistent with Defendants' requests. *See* Ex. 1. Defendants had requested that Dr. Saed produce lab notebooks that provided a basis for Dr. Saed's expert report at pages 13-21. *See* Ex. 2. Dr. Saed's opinions in this case focus on Johnson's Baby Powder causing inflammation and the role of inflammation in the development of ovarian cancer.

    Complete copies of the pages from Dr. Saed's lab notebooks pertaining to his research involving talcum powder were provided by counsel prior to Dr. Saed's February 14, 2019 deposition. The actual lab notebooks were brought for inspection to both Dr. Saed's January 23rd and February 14th depositions. At the February 14th deposition, Defendants requested that Dr. Saed make the lab notebooks available for scanning by a copying service. It is against university lab policy to leave lab notebooks unattended with a 3rd party but Dr. Saed cooperated with the copying service to make the notebooks available. Dr. Saed allowed all portions of the talcum powder-related research to be scanned. Dr. Saed did not allow non-talcum powder research to be scanned as that information is beyond the scope of the Court's prior orders, is confidential, and not relevant to this litigation.

    To provide further context and make the record clear, Dr. Saed's experiments involving talcum powder were recorded in two lab notebooks: 1) Exhibit 2 to his deposition contains only talcum powder-related studies and was scanned in total; and 2) Exhibit 3 contains not only talcum

powder-related testing, but also research that is unrelated to either talcum powder or ovarian cancer. The unrelated research was not scanned.

As Dr. Saed testified, it is customary to use one lab notebook for multiple projects provided there is available room. *See* Dep. of Ghassan Saed, PhD, at 56:17 to 56:20 (Jan. 23, 2019) (Ex. 3). The first portion of the lab notebook which was marked as Exhibit 3 to Dr. Saed's deposition contains documentation and data from a research project commissioned and funded by Temple Pharmaceuticals. *See* Saed Dep. at 84:3-84:10 (Ex. 3). Temple Pharmaceuticals contracted with Wayne State University to undertake the research project as part of the FDA pre-market approval process for a pharmaceutical drug. The project involves "looking at the effect of a dipeptide on adhesion markers." *See* Saed Dep. at 56:22-23 (Ex. 3). The study design and results are proprietary and confidential. The study data is not relevant to ovarian cancer or talcum powder. Moreover, the study data and information are not subject to Your Honor's prior orders.

In sum, the portions of the lab notebooks that relate to Dr. Saed's research regarding talcum powder were scanned and provided to Defendants on two occasions. Defendants' request seeking information regarding unrelated research should be denied.

Thank you for your consideration of these matters.

Very truly yours,

*/s/ P. Leigh O'Dell*

P. Leigh O'Dell
Michelle A. Parfitt

cc: Susan Sharko, Esq. (via e-mail)
John Beisner, Esq. (via e-mail)
Jessica Brennan, Esq. (via e-mail)
Tom Locke, Esq. (via e-mail)
Chris Placitella, Esq. (via e-mail)
Warren Burns, Esq. (via e-mail)
Richard Golomb, Esq. (via e-mail)
Richard Meadow, Esq. (via e-mail)
Hunter Shkolnik, Esq. (via e-mail)
Christopher V. Tisi, Esq. (via e-mail)
Larry Berman, Esq. (via e-mail)
Dan Lapinski, Esq. (via e-mail)

# Exhibit 1



**WALSH PIZZI O'REILLY FALANGA**

One Riverfront Plaza
1037 Raymond Blvd, Suite 600
Newark, NJ 07102

T: 973.757.1100
F: 973.757.1090

WALSH.LAW

Joel A. Pisano
Direct Dial: (973) 757-1035
jpisano@walsh.law

December 27, 2018

**VIA ELECTRONIC MAIL**

All Counsel of Record

Re:  *Johnson & Johnson Talcum Powder Products, Marketing, Sales Practices and Products Liability Litigation*
Case No. 3:16-md-02738-FLW-LHG

Dear Counsel,

By Orders of the Honorable Freda L. Wolfson, U.S.D.J. dated August 30, 2017 (D.I. 536) and September 11, 2017 (D.I. 704), I was appointed as Special Master for the purpose of overseeing discovery disputes that may arise in the above-captioned multi-district litigation ("MDL"). This MDL contains product liability cases in which Plaintiffs allege that certain Johnson & Johnson products containing talcum powder (the "Products") have been the cause of ovarian cancer for thousands of women who have used the Products.[1]

This letter opinion resolves a dispute over document requests by the Johnson & Johnson defendants relating to Plaintiffs' expert, Dr. Ghassan M. Saed, and the PSC's objections to the same. The Parties raised the dispute by letters and emails to me dated December 14, 2018, December 15, 2018, and December 21, 2018, and the PSC's Response and Objections were served on December 20, 2018. I personally reviewed each of the submissions.

The PSC identified Dr. Saed as an expert witness on general causation, *i.e.*, the allegation that the Products cause ovarian cancer. Dr. Saed was identified more than one year ago and the materials in support of his opinions have been available to the PSC throughout. Dr. Saed's expert report is attached as an exhibit to the papers on this dispute and is dated November 16, 2018. He is currently scheduled to be deposed on January 23, 2019. In anticipation of his deposition, the Johnson & Johnson Defendants served document requests on the PSC. The document

---

[1] I do not provide a detailed factual and procedural background, as I write for the benefit of the Court and the parties, all being familiar with the facts of this case.

December 27, 2018
Page 2

demands are targeted to certain findings and conclusions expressed by Dr. Saed in pages 13 through 21 of his report. In addition to a request for the production of his laboratory notebooks, other demands inquire about specific conclusions that he reached and the basis for those conclusions. I therefore reject the PSC objection that the demands for production are overly broad.

In its response on December 20, 2018, the PSC objected to the requests as being "vague, ambiguous, and unduly burdensome," or that the documents requested have already been produced. They go on, then, to agree to produce Dr. Saed's laboratory notebooks. The objections are overruled for the same reason I reject the argument that the requests are overly broad. I consider the offer of the laboratory notebooks to represent that they will contain the information that actually responds to the Johnson & Johnson Defendants' requests. However, the PSC proposes that Dr. Saed will produce the laboratory notebooks at the time of his deposition.

Federal Rule of Civil Procedure 26(a)(2)(B) requires disclosure of any facts and data considered by an expert in forming his opinion as a matter of general discovery. Although the language of Rule 30(b)(2) technically does not require production of documents until the date of the deposition, such a literal reading is impractical. Without the ability to analyze Dr. Saed's laboratory notebooks prior to conducting the deposition, the Johnson & Johnson Defendants will not have the ability to prepare for a meaningful deposition. In addition, without advanced disclosure of the laboratory notebooks, the Johnson & Johnson Defendants will have no way to determine whether the notebooks actually contain the material sought in their demands. Therefore, the PSC is required to produce the laboratory notebooks by **January 2, 2019**.[2]

In addition, the Johnson & Johnson Defendants have requested information regarding the funding of Dr. Saed's research and testing. I find that to be a legitimate area for discovery and therefore the request for information as to funding should be honored.

Very truly yours,

Joel A. Pisano

cc:   Honorable Freda L. Wolfson (via ECF and First-Class Mail)
      Honorable Lois H. Goodman (via ECF and First-Class Mail)

---

[2] As the Parties are embarking on expert discovery, and to avoid this from becoming a recurring theme, the Parties are directed to produce all laboratory notebooks and any other technical material of any expert witness who has done scientific testing at least three weeks prior to the scheduled deposition for that expert witness.

# Exhibit 2

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT NEW JERSEY

| | |
|---|---|
| **IN RE JOHNSON & JOHNSON TALCUM POWDER PRODUCTS MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION** | **MDL NO. 16-2738 (FLW) (LHG)** |

## NOTICE OF ORAL AND VIDEOTAPED DEPOSITION OF GHASSAN M. SAED, PH.D AND DUCES TECUM

PLEASE TAKE NOTICE that, pursuant to Federal Rule of Civil Procedure 30(b), Defendants will take the deposition upon oral examination of Ghassan M. Saed, Ph.D. The deposition will commence on [date] at [time] at [location]. The deposition will take place before a court reporter authorized to administer oaths, pursuant to Federal Rule of Civil Procedure 28. The deposition will be recorded on video as well as by ordinary stenographic means. This deposition is being taken for the purposes of discovery, for use at trial, or for such other purposes as are permitted under the Federal Rules of Civil Procedure and other applicable rules.

Pursuant to Federal Rule of Civil Procedure 30(b)(2), the witness is requested to produce true, correct and complete copies of all documents, materials and information listed in Schedule A, no later than two (2) weeks from the date of service of this Notice.

DATED: December 6, 2018          Respectfully submitted,

*s/Susan M. Sharko*
Susan M. Sharko
DRINKER BIDDLE & REATH LLP
600 Campus Drive
Florham Park, New Jersey 07932
Telephone:  973-549-7000
Facsimile:  973-360-9831
Email:  susan.sharko@dbr.com

*s/Gene M. Williams*
Gene M. Williams
SHOOK, HARDY & BACON L.L.P.
JPMorgan Chase Tower
600 Travis St., Suite 3400
Houston, TX 77002
Telephone:  713-227-8008
Facsimile:  713-227-9508
Email:  gmwilliams@shb.com

*s/John H. Beisner*
John H. Beisner
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
1440 New York Avenue, N.W.
Washington, D.C. 20005
Telephone:  202-371-7000
Facsimile:  202-661-8301
Email: john.beisner@skadden.com

*Attorneys for Defendants Johnson & Johnson and Johnson & Johnson Consumer Inc.*

## SCHEDULE A

## DEFINITIONS

The following definitions apply to this Notice of Deposition and are deemed incorporated into each document request listed below:

1. "You" and "Your" or "witness" shall mean the deponent.

2. The term "Document" shall be synonymous in meaning and equal in scope to the usage of the term "documents or electronically stored information" in Fed. R. Civ. P. 34(a)(1)(A). A draft or non-identical copy is a separate document within the meaning of this term.

3. The terms "and," "or" and "and/or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside the scope.

## DOCUMENTS TO BE PRODUCED

1. A copy of the abstract co-authored by You (Harper/Saed 2018 Abstract), which was accepted for publication at the Society of Gynecologic Oncology 2019 proceedings.

2. All primary data underlying the experiments described on pages 13 to 21 of Your expert report in this MDL (the "report"), under the heading "Findings from recent research from my laboratory relating to the effects of talcum powder exposure in vitro," including but not limited to, the following:

    A. A list of all experimental studies performed.

    B. Experimental outlines for all experimental studies performed.

    C. A specific protocol for each experiment performed, including:

        1. The number and type of cells seeded in each experiment;

    2.  The number of cells at the time of treatment with talc or other agents;

    3.  The amount of time elapsed from the treatment of cells with talc or other agent and the harvesting of cells or cell media/supernatant;

    4.  The duration of treatment with talc or other agents; and

    5.  The number of cells at the time of harvest.

  D.  Names of personnel who conducted each study and their role on each study.

  E.  Copies of all laboratory notebook pages corresponding to the research referred to on pages 13-21 of the report by any and all personnel involved in these experiments.

  F.  Results from any and all statistical tests performed on data generated in the experimental studies described on pages 13-21 of the report, including statistical test used, p-value obtained, standard deviations, correction for multiple testing, etc.

  G.  All results from any and all tests performed in the experimental studies described on pages 13-21 of the report.

  H.  A list of any data points or experimental replicates that were excluded from data analysis and the reasons for their exclusion.

  I.  Results from any and all analytical assays performed on talcum powder samples to determine composition, including samples from Fisher Scientific and Johnson & Johnson.

  J.  All graphs and figures generated from the data obtained from the experimental studies referred to on pages 13-21 of the report, including descriptive figure legends.

  K.  All raw data generated in the experimental studies referred to on pages 13-21 of the report, including all standard curves, positive controls and negative controls, and including but not limited to all readings or data from:

1. quantification of number of cells, amount of RNA or amount of protein from each experimental sample;

2. any and all photomicrographs of cells taken during the experiments referred to on pages 13-21 of the report;

3. quantitative RT-PCR for mRNA expression of beta-actin, CAT, iNOS, GSR, GPX1, MOP, SOD2, CA-125 and any other gene whose mRNA expression level was measured;

4. melting curve analyses for the above (3);

5. RNA concentrations and amounts for all samples analyzed;

6. protein concentrations and amounts for all samples analyzed;

7. spectrophotometric readings for ELISA assays for protein concentrations and/or amounts of CAT, SOD3, GSR, GPX1, MPO, CA-125 and any other protein whose expression was measured by ELISA;

8. any and all measurements related to the enzymatic activity of CAT, SOD3, GSR, GPX1, MPO and any other protein whose activity was measured;

9. assays for Nitrite (NO2-)/nitrate (NO3-), including HPLC analyses and profiles, fluorescence readings, and any other measurements;

10. any and all measurements and results from SNP genotyping assays, including specific expression levels;

11. any and all measurements of cell number, cell proliferation, cell apoptosis and/or cell viability related to the experiments referred to on pages 13-21 of the report;

12. any additional measurements of redox state or oxidative stress not specified above;

13. any and all measurements related to tumorigenicity in animals or in humans, or transformed state in culture of the cells used in the studies referred to on pages 13-21 of the report;

14. any and all studies demonstrating that the "normal" ovarian cells used in the studies referred to on pages 13-21 of the report are non-tumorigenic or non-transformed;

15. measurements related to cell death and/or cell viability in experiments referred to assessing the effects of talc treatment on CA-125 levels related to the cells used in the studies referred to on pages 13-21 of the report;

16. any and all measurements and/or data supporting the claim that "the CAT SNP (rs769217) . . . was induced in all normal cell lines tested and in TOV112D EOC lines", including a list of the cell lines tested that did, or did not, show this effect;

17. any and all measurements and/or data supporting the claim that "all cells, except for HOSEpiC cells, manifest the SNP genotype of GPX1 (C/T) before talc treatment. Intriguingly, talc treatment reversed this SNP genotype to the normal genotype", including a list of the cell lines tested that did, or did not, show this effect;

18. any and all measurements and/or data supporting the claim that "our results showed that talc treatment was associated with a genotype switch from common C/C genotype in NOS2 in untreated cells to T/T, the SNP genotype, in talc treated cells, except in A2780 and TOV112D", including a list of the cell lines tested that did, or did not, show this effect;

19. any and all measurements and/or data supporting the claim that "Collectively, these findings demonstrate that talc treatment induced gene point mutations that

6

happen to correspond to SNPs in locations with functional effects, thus altering overall redox balance for the initiation and development of ovarian cancer";

      20.    any and all measurements and/or data supporting the claim that "This study has shown a dose-dependent significant increase in key pro-oxidants, iNOS, NO2-/NO3-, and MPO and a concomitant decrease in key antioxidant enzymes, CAT, SOD, GPX, and GSR, in all talc treated cells (both normal and ovarian cancer) compared to controls," including a list of the cell lines tested that did, or did not, show each of these effects;

      21.    any and all measurements and/or data supporting the claim that "The mechanism by which talc alters the cellular redox and inflammatory balance involves the induction of specific mutations in key oxidant and antioxidant enzymes that correlate with alterations in their activities", including the statistical analyses performed to demonstrate correlation;

      22.    any and all measurements and/or data related to determining whether talc causes mutations;

      23.    any and all DNA or RNA sequencing data, including as it may relate to evaluating whether talc causes mutations;

      24.    any and all measurements and/or data generated in the experimental studies referred to on pages 13-21 of the report that support the claim that "Johnson's Baby Powder elicits an inflammatory response in normal ovarian and tubal cells and in ovarian cancer cells";

      25.    a list of all "normal ovarian and tubal cells" evaluated in the experimental studies referred to on pages 13-21 of the report;

26. a list of all assays performed in the experimental studies referred to on pages 13-21 of the report that relate to "the development or progression of ovarian cancer";

27. any and all measurements and/or data supporting the claim that "The molecular effects resulting from Johnson's Baby Powder exposure exhibit a clear dose-response pattern";

28. any and all measurements and/or data in the experimental studies referred to on pages 13-21 of the report supporting the claim that "Johnson's Baby Powder can cause ovarian cancer";

29. any and all measurements and/or data in the experimental studies referred to on pages 13-21 of the report supporting the claim that "Johnson's Baby Powder worsens the prognosis for patients with ovarian cancer."

3. Documents reflecting the amount of funding received by You and the identity of the sources from which such funding was received for all experiments or other research that You have conducted regarding talc and ovarian cancer (whether published or unpublished), including but not limited to the Harper/Saed 2018 Abstract identified in Paragraph 1 above and the experiments referenced identified in Paragraph 2 above.

# Exhibit 3

1    BY MR. HEGARTY:

2    Q.    Are you confident that it was one or the other?

3    A.    Yes.

4    Q.    The lab notebook that we've been provided marked as

5           Exhibit Number 2 has a first date of 10-15-17.  Is that

6           the first date that there was any lab work done either

7           in the pilot study or the later study?

8    A.    No.

9    Q.    What is the earliest date of work?

10    A.    May I have this?

11    Q.    Yeah, I'm handing you Exhibit Number 3.

12    A.    So the first work that we did with talc, 9-26.

13    Q.    Dr. Saed referred to Exhibit Number 3 and pointed me to

14           a page that's dated 9-26.  First of all, what is

15           represented or contained in Exhibit Number 3, this lab

16           notebook?

17    A.    So this part, okay, so I have to indicate something, we

18           share lab notebook, we use them for -- so not

19           necessarily one lab notebook for one project.  So, for

20           example, the first part of this lab notebook --

21                MS. O'DELL:  Which is Exhibit 3.

22                THE WITNESS:  -- which is Exhibit 3, looking

23           at the effect of a dipeptide on adhesion markers, and

24           then we continued with talc, so sometimes we mix up,

25           like we don't necessarily use one project for one lab

Ghassan Saed, Ph.D.

| | | |
|---|---|---|
| 1 | Q. | And Nicole King again is who? |
| 2 | A. | My research post doc. |
| 3 | Q. | Then on the other lab notebook that contained -- that |
| 4 | | was on Exhibit 2. Exhibit 3 on the outside is |
| 5 | | something called Temple 1. What does that mean? |
| 6 | A. | That's a project that we did for Temple Pharmaceutical |
| 7 | | in our lab. |
| 8 | Q. | That's a project that's -- that's the project that's in |
| 9 | | the first part of the lab notebook? |
| 10 | A. | Correct. |
| 11 | | SAED DEPOSITION EXHIBIT NUMBER 9, |
| 12 | | PILOT STUDY, |
| 13 | | WAS MARKED BY THE REPORTER |
| 14 | | FOR IDENTIFICATION |
| 15 | BY MR. HEGARTY: | |
| 16 | Q. | Also provided today, which I'll mark as Exhibit |
| 17 | | Number 9, are copies of what I believe to be the pilot |
| 18 | | study that's contained in Exhibit Number 3. Would you |
| 19 | | look at Exhibit Number 9 and compare to Exhibit |
| 20 | | Number 3, and tell me whether Exhibit Number 9 are the |
| 21 | | pages copied from Exhibit Number 3, the pilot project |
| 22 | | we talked about earlier along with the index? |
| 23 | A. | Yes. |
| 24 | Q. | On the first page of -- or strike that. On Page 1 of |
| 25 | | Exhibit Number 2 there's a statement at the very |