# Exhibit I



**Montgomery**
218 Commerce Street
P.O. Box 4160
Montgomery, AL 36103-4160

**Atlanta**
4200 Northside Parkway
Building One, Suite 100
Atlanta, GA 30327

(800) 898-2034

BeasleyAllen.com

**P. Leigh O'Dell**
leigh.odell@beasleyallen.com

April 23, 2019

**VIA ELECTRONIC MAIL**

Hon. Joel A. Pisano (Ret.)
Walsh Pizzi O'Reilly Falanga
1037 Raymond Blvd., Suite 600
Newark, New Jersey 07102

      Re:    *In re: Johnson & Johnson Talcum Powder Products Marketing, Sales Practices and Products Liability Litigation*, MDL No. 2728

Dear Judge Pisano:

In response to your email of April 19, 2019, the Plaintiffs' Steering Committee provides the following information in response to Your Honor's questions:

1. **Data From Other Studies Were Not Comingled**

The Court's suggestion that data from talc-related and non-talc related studies were commingled is incorrect. The non-talc related study was documented in its entirety at the beginning of the lab notebook marked as Exhibit 3. *See* Exhibit 1 (Saed Dep. at 84:3-10 (Jan. 23, 2019)). The talc-related study begins several pages after the non-talc study is concluded and continues thereafter in its entirety. The data from the two studies are not mingled together. It is significant to note that the non-talc related study could not have been kept separate from the relevant information in the lab notebook unless it was physically removed from the notebook, an option that was not acceptable to Dr. Saed.

2. **Discussion Regarding the Copying of the Lab Notebooks**

The discussion with counsel for the Johnson & Johnson Defendants took place off the record after the February 14, 2019 deposition. Mark Hagerty, counsel for Johnson & Johnson, asked me if a third party could copy the lab notebooks. I understood the request to be made in the context of complaints lodged by Mr. Hegarty regarding the quality of the scanning job that Dr. Saed's staff had done in scanning the talc-related portions of the lab notebooks. There was no request to scan the non-talc related study or statement that the "entire notebook" had to be copied. In fact, after it had been established at the January 23, 2019 deposition that the front of Exhibit 3

pertained to an entirely different and unrelated study, not one question was asked during the February 14, 2019 deposition regarding the non-talc related study. My agreement to facilitate a 3rd party scanning the talc related data was based on Defendants' discovery requests and the Court's Order to produce documents related to talc-related study data. At no time did I or any other representative of the PSC agree to have the non-talc related study scanned as it is not responsive to any discovery request propounded by Defendants and, more importantly, is proprietary in nature. The non-talc study had not been discussed at any point during the February 14, 2019, and it was the topic of less than three pages of the January 23, 2019 deposition.

3. **Additional Deposition Testimony**

Your Honor requested additional deposition testimony that might provide further context. Limited additional testimony is available, but to address Your Honor's request, Exhibit 1 to this letter includes pages 57 and 84 of Dr. Saed's January 23, 2019 deposition.

4. **Data From the Non-Talc Study**

The data from the non-talc study is contained in the lab notebook marked as Exhibit 3. The data was made available during both days of Dr. Saed's deposition. The depositions took place over a period of more than 15 hours. At the January 23rd deposition, six lawyers for defendants were present. At the February 14th deposition, four lawyers for defendants were present. At all times during the deposition, counsel had access to the lab notebook for inspection and inquiry. As noted in the deposition excerpts previously provided, counsel for Johnson & Johnson asked Dr. Saed about the subject matter of the study and beyond that, there was no further inquiry. I along with other lawyers on behalf of the PSC had access to the lab notebooks shortly prior to and during the depositions. The lab notebooks were reviewed by the PSC to identify and ensure that all talc-related data and information was disclosed in compliance with Your Honor's Order. Part of that process included a discussion with Dr. Saed regarding the non-talc related study and a cursory review of the lab notebook in order to clearly define where the documentation for the non-talc related study ended in the notebook. However, neither I nor lawyers on behalf of the PSC reviewed the data because it was proprietary, confidential, and not relevant to the Talc MDL litigation.

By Case Management Order dated December 27, 2018, Your Honor ordered that "PSC shall product Dr. Saed's laboratory notebooks…" In response to the aforementioned CMO No. 1 sought clarification that "the laboratory notebooks to be produced relate to the research referenced in the expert's report." (Dec. 27, 2018 letter from P. Leigh O'Dell to Hon. Joel A. Pisano.). Your Honor e-mailed in response to my request for clarification that plaintiffs' counsel was "correct" and that "the experts' ***materials that are subject to my order are those materials which relate to the report being considered***." (December 27, 2018 e-mail from Hon. Joel A. Pisano to P. Leigh O'Dell (emphasis added)). At no time has the non-talc study been the subject of any discovery request or Order entered by Your Honor that would have or should require production.

### 5. Disclosure Subject to the Confidentiality Order

The data from the non-talc related study is not responsive to any document request lodged before the deposition nor Your Honor's subsequent Orders. The data is not relevant to the issues in this case. The data is not likely to lead to admissible information. The study as noted previously is related to a pharmaceutical drug that treats post-operative adhesions and was done on behalf of a third-party that is not a party to this litigation. The study relates in no way to talcum powder or ovarian cancer. Therefore, it should not be subject to discovery. The fact that there is a confidentiality order in place does not negate the fact that the information is not discoverable – first, because it is not relevant and secondly, because it is proprietary. The data belongs to Temple Pharmaceuticals and should not be subject to discovery in this proceeding.

Defendants' current position exemplifies their ongoing efforts to harass and intimidate Dr. Saed. Significantly, by letter dated January 25, 2019, Ms. Sharko wrote a letter to Your Honor in follow up to the January 23, 2019 deposition of Dr. Saed. In her 9-page letter Ms. Sharko outlined to Your Honor multiple concerns related to Defendants' request for documents from Dr. Saed. Six pages of Ms. Sharko's letter summarized concerns related to Dr. Saed's lab notebooks. However, glaringly absent from Ms. Sharko's diatribe was any mention of the Temple Pharmaceutical data, the need for the data, or how the data was at all relevant to Dr. Saed's opinions or this litigation. Having already been giving everything relevant to Dr. Saed's opinions, Defendants' tactic should not be entertained and to rule otherwise would expand the scope of expert discovery well beyond that which has ever been contemplated by the Federal Rules of Civil Procedure.

Thank you for your consideration of these matters.

Very truly yours,

*/s/ P. Leigh O'Dell*

P. Leigh O'Dell
Michelle A. Parfitt

cc:  Hon. Freda L. Wolfson, U.S.D.J.
Hon. Lois H. Goodman, U.S.M.J.
Susan Sharko, Esq. (via e-mail)
John Beisner, Esq. (via e-mail)
Jessica Brennan, Esq. (via e-mail)
Tom Locke, Esq. (via e-mail)
Chris Placitella, Esq. (via e-mail)
Warren Burns, Esq. (via e-mail)
Richard Golomb, Esq. (via e-mail)
Richard Meadow, Esq. (via e-mail)
Hunter Shkolnik, Esq. (via e-mail)
Christopher V. Tisi, Esq. (via e-mail)

Larry Berman, Esq. (via e-mail)
Michael M. Weinkowitz, Esq. (via e-mail)
Dan Lapinski, Esq. (via e-mail)

# Exhibit 1

```
 1     BY MR. HEGARTY:
 2     Q.   Are you confident that it was one or the other?
 3     A.   Yes.
 4     Q.   The lab notebook that we've been provided marked as
 5          Exhibit Number 2 has a first date of 10-15-17.  Is that
 6          the first date that there was any lab work done either
 7          in the pilot study or the later study?
 8     A.   No.
 9     Q.   What is the earliest date of work?
10     A.   May I have this?
11     Q.   Yeah, I'm handing you Exhibit Number 3.
12     A.   So the first work that we did with talc, 9-26.
13     Q.   Dr. Saed referred to Exhibit Number 3 and pointed me to
14          a page that's dated 9-26.  First of all, what is
15          represented or contained in Exhibit Number 3, this lab
16          notebook?
17     A.   So this part, okay, so I have to indicate something, we
18          share lab notebook, we use them for -- so not
19          necessarily one lab notebook for one project.  So, for
20          example, the first part of this lab notebook --
21                    MS. O'DELL:  Which is Exhibit 3.
22                    THE WITNESS:  -- which is Exhibit 3, looking
23          at the effect of a dipeptide on adhesion markers, and
24          then we continued with talc, so sometimes we mix up,
25          like we don't necessarily use one project for one lab
```

Ghassan Saed, Ph.D.

```
 1              notebook, okay.  So this part of the notebook --
 2     BY MR. HEGARTY:
 3     Q.       The first part?
 4     A.       The first part is for the different study.  This part
 5              where we started the actual work with talc.
 6     Q.       When you -- you started referencing the pages, this
 7              part, then what does this part represent being done?
 8     A.       This part was an experiment that we did exposing cells,
 9              ovarian cancer cells, to talc, Fisher, and look at
10              oxidative stress markers.  We used three ovarian cancer
11              cell lines, and we used macrophages of normal
12              epithelial cells.  And the result of this work was
13              submitted to Society of Reproductive Investigation
14              meeting that was held last year March, yes, last year
15              in San Diego, and you can see all the way down, this is
16              the poster that resulted from this work.
17     Q.       The poster you pointed to is on Page 63?
18     A.       Yes.
19     Q.       Was there a pilot study done before doing this
20              experiment?
21     A.       So this is a pilot study.
22     Q.       So the study that we are looking at dated -- with the
23              start date of 9-26-2017 --
24     A.       Right.
25     Q.       -- you consider that to be a pilot study?
```

Ghassan Saed, Ph.D.

```
 1    Q.   And Nicole King again is who?
 2    A.   My research post doc.
 3    Q.   Then on the other lab notebook that contained -- that
 4         was on Exhibit 2.  Exhibit 3 on the outside is
 5         something called Temple 1.  What does that mean?
 6    A.   That's a project that we did for Temple Pharmaceutical
 7         in our lab.
 8    Q.   That's a project that's -- that's the project that's in
 9         the first part of the lab notebook?
10    A.   Correct.
11              SAED DEPOSITION EXHIBIT NUMBER 9,
12              PILOT STUDY,
13              WAS MARKED BY THE REPORTER
14              FOR IDENTIFICATION
15    BY MR. HEGARTY:
16    Q.   Also provided today, which I'll mark as Exhibit
17         Number 9, are copies of what I believe to be the pilot
18         study that's contained in Exhibit Number 3.  Would you
19         look at Exhibit Number 9 and compare to Exhibit
20         Number 3, and tell me whether Exhibit Number 9 are the
21         pages copied from Exhibit Number 3, the pilot project
22         we talked about earlier along with the index?
23    A.   Yes.
24    Q.   On the first page of -- or strike that.  On Page 1 of
25         Exhibit Number 2 there's a statement at the very
```