# EXHIBIT B50

Patrick Downey

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

_____
                                    )
IN RE:  JOHNSON & JOHNSON           )   MDL NO.
TALCUM POWDER PRODUCTS              )   16-2738(FLW)(LHG)
MARKETING, SALES PRACTICES         )
AND PRODUCTS LIABILITY              )
LITIGATION                          )
                                    )
THIS DOCUMENT RELATES TO ALL        )
CASES                               )
_____)


        PURSUANT TO NOTICE, the 30(b)(6) deposition

of IMERYS TALC AMERICA, INC., through the testimony

of PATRICK DOWNEY, was taken on behalf of the

Plaintiffs at Gordon & Rees, 555 Seventeenth

Street, Suite 3400, Denver, Colorado, on

August 7, 2018, commencing at 9:36 a.m., before

Melanie L. Giamarco, Registered Professional

Reporter, Certified Realtime Reporter, and Notary

Public within Colorado.

Patrick Downey

---

## Page 2

```
 1          A P P E A R A N C E S
 2   For the Plaintiffs' Steering Committee:
         ASHCRAFT & GEREL, LLP
 3       BY:  MICHELLE A. PARFITT, ESQ.
         4900 Seminary Road, Suite 650
 4       Alexandria, Virginia  22311
         BEASLEY, ALLEN, CROW, METHVIN,
 5       PORTIS & MILES, P.C.
         BY:  P. LEIGH O'DELL, ESQ.
 6         JENNIFER K. EMMEL, ESQ.
         218 Commerce Street
 7       Post Office Box 4160
         Montgomery, Alabama  36103
 8
         MOTLEY RICE, LLC
 9       BY:  CARMEN S. SCOTT, ESQ.
         28 Bridgeside Boulevard
10       Mt. Pleasant, California  29464
11   For Johnson & Johnson:
         BY:  SHASHA Y. ZOU, ESQ.
12       ORRICK, HERRINGTON & SUTCLIFFE, LLP
         51 West 52nd Street
13       New York, New York 10019-6142
14   For Imerys Talc America, Inc.:
         ALSTON & BIRD, LLP
15       BY:  SARAH O'DONOHUE, ESQ.
         One Atlantic Center
16       1201 West Peachtree Street
         Atlanta, Georgia  30309
17
         GORDON REES SCULLY MANSUKHANI, LLP
18       BY:  KENNETH J. FERGUSON, ESQ.
         816 Congress Avenue, Suite 1510
19       Austin, Texas  78701
20       SEYFARTH SHAW, LLP
         BY:  THOMAS T. LOCKE, ESQ.
21       975 F Street, N.W.
         Washington, D.C.  20004
22
         SANDBERG, PHOENIX & VON GONTARD, P.C.
23       BY:  MARK A. PROST, ESQ.
         600 Washington Avenue, 15th Floor
24       St. Louis, Missouri  63101
25
```

## Page 3

```
 1   (Cont'd)
          A P P E A R A N C E S
 2
 3   For Imerys Talc America, Inc.:
         COUGHLIN DUFFY, LLP
         BY:  MARK K. SILVER, ESQ.
 4       350 Mount Kemble Avenue
         Post Office Box 1917
 5       Morristown, New Jersey  07962
 6   For PharmaTech Industries:
         TUCKER ELLIS, LLP
 7       BY:  TARIQ M. NAEEM, ESQ.
         950 Main Avenue, Suite 1100
 8       Cleveland, Ohio  44113
 9
10   Also Present:
11       Joel Oriat, Videographer
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
 1               I N D E X
 2   EXAMINATION OF PATRICK DOWNEY:        PAGE
     August 7, 2018
 3
 4   By Ms. O'Dell                        7

 5   EXHIBIT     DESCRIPTION              PAGE

 6   Exhibit 1   The Plaintiffs' Steering    7
                 Committee's Second Amended
 7               Notice of the 30(b)(6)
                 Deposition of Defendant
 8               Imerys Talc America, Inc.

 9   Exhibit 2   E-mail dated 7/31/18 from    7
                 Silver to Parfitt, et al.,
10               subject:  MDL 2738 -
                 Amendment to Imerys' 30(b)(6)
11               witness designations and CVs
                 for witnesses
12   Exhibit 3   6/22/18 letter to Tisi from  11
                 Silver

14   Exhibit 4   CV of Downey                 14

     Exhibit 5   Compilation of handwritten   17
15               notes of Downey, 24 pages
16   Exhibit 6   Handwritten note "Guangxi #2" 67
                 of Downey, 1 page
17
     Exhibit 7   Handwritten notes of O'Dell 105
18               taken during examination of
                 Downey, 1 page
19
     Exhibit 8   Document prepared by Rio    107
20               Tinto Minerals for IMA
21   Exhibit 9   Acquisition of Windsor      120
                 Minerals, Inc. and Western
22               Source, Inc., by Cyprus Mines
                 Corporation on January 6,
23               1989
24
25
```

## Page 5

```
 1   (Cont'd)
 2   EXHIBIT     DESCRIPTION              PAGE
 3   Exhibit 10  Sale of CIM - Stock Purchase 140
                 Agreement among Cyprus Mines
 4               Corporation, Cyprus Minerals
                 Company and RTZ America, Ic.
 5               IMERYS-MDL-AB 0008412 -
                 IMERYS-MDL-AB 0009049
 6
     Exhibit 11  Cyprus Ore Reserve          151
 7               Evaluation, Preliminary
                 Summary
 8               IMERYS 425354 - IMERYS 425391
 9   Exhibit 12  3/25/92 interoffice         174
                 correspondence to
10               Distribution from R.C. Munro,
                 subject:  Cyprus Ore Reserves
11               - Arsenic & Tremolite
                 IMERYS219720 - IMERYS219722
12
     Exhibit 13  Compilation folder entitled 182
13               "Mine Data"
                 IMERYS 436951 - IMERYS 436971
14
     Exhibit 14  Colorado School of Mines    190
15               Research Institute Geological
                 Audit, Windsor Minerals,
16               12/4/70
                 JNJ 000245002 - JNJ000245148
17
     Exhibit 15  Report entitled "Geology and 206
18               Ore Reserves of the
                 Hammondsville Ore Body," by
19               William Gregg, 2/20/78
                 IMERYS 436972 - IMERYS 437097
20
     Exhibit 16  Document entitled "Maps and 210
21               Cross Sections to Accompany
                 Report on Geology and Ore
22               Reserves"
                 JNJ000261701 - JNJ000261716
23
     Exhibit 17  U.S. Borax Drilling Log Hole 214
24               #92-1, 4/25/92
                 IMERYS 435988 - IMERYS 435990
25
```

Golkow Litigation Services - 877.370.DEPS

Patrick Downey

## Page 6

1   (Cont'd)
2   EXHIBIT      DESCRIPTION              PAGE
3   Exhibit 18   U.S. Borax Drill Log, Hole    214
            #92-2, 4/27/92
4            IMERYS 435992 - IMERYS435998
5   Exhibit 19   U.S. Borax Drill Log, Hole    215
            #92-3, 4/26/92
6            IMERYS 435996 - IMERYS 435998
7   Exhibit 20   U.S. Borax Drill Log, Hole    215
            #92-4, 4/29/92
8            IMERYS 436000 - IMERYS 436002
9   Exhibit 21   5/21/92 interoffice          218
            correspondence, with
10           attachments, to U.S.
            Borax/Los Angeles from Kellie
11           and Carpenter, subject:  Hamm
            Mine Core Drilling
12           IMERYS 238270 - IMERYS 238277
13  Exhibit 22   Appendix B5, North American   237
            Mines, Northeastern Ore
14           Bodies
            IMERYS 427291 - IMERYS 427310
15
16  Exhibit 23   Compilation of documents in   253
            file entitled "Section #1"
            IMERYS 427423 - IMERYS 427427
17
18
19
20
21
22
23
24
25

## Page 7

1              P R O C E E D I N G S
2        (Exhibits 1 and 2 were marked for
3    identification.)
4        VIDEOGRAPHER:  We are now on the record.  My
5    name is Joel Coriat.  I am the videographer,
6    representing Golkow Litigation Services.  The date
7    today is August 7, 2018.  The time is now 9:36 a.m.
8        This video deposition is being held in
9    Denver, Colorado, in the matter of
10   Johnson & Johnson talcum-powder products Marketing,
11   Sales Practices and Products Liability Litigation
12   for the U.S. District Court, District of New
13   Jersey.  The deponent is Pat Downey.  Counsel will
14   be noted on the stenographic record.
15       The court reporter is Melanie Giamarco.  She
16   will now swear in the witness.
17              PATRICK DOWNEY,
18   after having been duly sworn, was examined and
19   testified as follows:
20              EXAMINATION
21   BY MS. O'DELL:
22       Q.  Good morning, Mr. Downey.
23       A.  Good morning.
24       Q.  My name is Leigh O'Dell.  We met just a
25   few minutes ago.  And I'm here on behalf of the

## Page 8

1    Plaintiffs' Steering Committee on behalf of more
2    than 9,000 women who have filed claims who have
3    ovarian cancer, either suffering or died of ovarian
4    cancer.  And I'm here to ask you questions today on
5    behalf of Imerys.
6        Do you understand that?
7        A.  Yes.
8        Q.  Okay.  Let me show you what I've marked
9    prior to the deposition as, first, Exhibit 1, which
10   is the deposition notice, and Exhibit 2, which is
11   an e-mail from counsel for Imerys.
12       Have you seen this document before,
13   Mr. Downey?
14       A.  Yes.
15       Q.  And as I understand it, today you have
16   come to provide testimony on the topics listed in
17   the notice as amended by the e-mail from counsel, I
18   believe, on July 31st, correct?
19       A.  Yes.
20       Q.  And those topics include the talc mines,
21   the identity of the talc mines that were sources of
22   talc for Johnson & Johnson talcum-powder products,
23   which was in the notice, Roman numeral I, Topic 2;
24   do you see that, sir?
25       A.  Yes.

## Page 9

1        Q.  Great.  You're also here to provide
2    testimony for Roman numeral I, subsection 8, which
3    is processing of talc by Imerys --
4        A.  Yes.
5        Q.  -- correct?
6        A.  Mm-hmm.
7        Q.  You're here today as well to, or
8    tomorrow -- to talk about subsection Roman
9    numeral II, 9, which relates to quality assurance?
10       A.  Yes.
11       Q.  And then lastly, you're here to offer
12   testimony on behalf of Imerys for the topics Roman
13   numeral III, 1, which relates to sampling, and 2,
14   which relates to the process or handling of
15   samples, correct?
16       MR. PROST:  And 6.
17       MS. O'DELL:  Yes.  Thanks, Mark.
18       Q.  (By Ms. O'Dell)  And Number 6, protocols
19   or restrictions on mining talc for use in
20   talcum-powder products?
21       A.  Yes, those three.
22       MR. PROST:  And just one small
23   clarification, you'll see in the e-mail, with
24   respect to section Roman numeral III, 1 and 2,
25   there's sentence in there clarifying that Pat is

Patrick Downey

---

Page 10

1    designated on these topics for any part of the
2    sampling process that occurs prior to the receipt
3    of the samples by the analytical lab in San Jose,
4    California, with Julie Pier remaining designated as
5    to those topics for questions relating to the
6    testing of samples which occurs at the analytical
7    lab at the request of the analytical group.
8        Q.  (By Ms. O'Dell)  Mr. Downey, Imerys Talc
9    America is the name --
10       A.  Can you speak up a little?  I'm hard of
11   hearing.
12       Q.  Yeah, sure.
13           Imerys Talc America is the defendant in this
14   litigation.  Imerys has had numerous predecessor
15   companies, including Rio Tinto Minerals.
16           Are you aware of that, I'm sure?
17       MR. PROST:  I'm going to object to form.  I
18   think it's inaccurate saying it's a predecessor
19   company.
20       MS. O'DELL:  Okay.
21       Q.  (By Ms. O'Dell)  Well, let me just ask
22   you today --
23       MR. PROST:  And actually, Leigh, before we
24   go any further, I just wanted to make one more
25   housekeeping item.

---

Page 11

1        MS. O'DELL:  Oh, sure.
2        MR. PROST:  If I could make this as an
3    exhibit.  This is a June 22, 2018, letter from
4    Mr. Silver just memorializing the agreement that
5    Imerys made with the Plaintiffs' Steering Committee
6    as to objections to certain definitions in the
7    30(b)(6) notice.  And we'll mark this as Exhibit 3
8    Downey.
9        (Exhibit 3 was marked for identification.)
10       MR. PROST:  And I'll just say that the
11   objections are definitions number 7, 8, 9, 11 and
12   12.  We have a standing objection to those
13   definitions and we won't need to repeat those
14   throughout the deposition as those terms come up.
15       MS. O'DELL:  Yeah.  The Plaintiffs' Steering
16   Committee is aware of the objection and, obviously,
17   notes them for the record, but disagrees, and so
18   we're not bound by those objections as we ask
19   questions about, for example, the definition of
20   "asbestos" and other things going forward to the
21   deposition today.
22       Q.  (By Ms. O'Dell)  Mr. Downey, I was
23   asking you about the companies that have been
24   associated or preceded Imerys Talc America.  And I
25   want to have an understanding today as we go

---

Page 12

1    through this deposition when we're talking about
2    documents that may have arisen during a time
3    period, for example, when the company name was
4    Luzenac or relates to Rio Tinto Minerals.  I want
5    us to have an agreement that when I ask you a
6    question about those documents and I refer to
7    "Imerys," you are binding Imerys as a company in
8    relation to those topics.
9            Do we have an agreement?
10       MR. PROST:  Object to form.
11       A.  I'm not sure I understand quite what you
12   mean by binding those entities.  I'm aware of the
13   history of the company, and, you know, I'm aware of
14   Luzenac America and Rio Tinto Minerals, you know,
15   in the context of the historic -- historically
16   related parties, so I'm not sure what you mean by
17   bound.
18       Q.  (By Ms. O'Dell)  Okay.  Well, we'll go
19   through it step by step as we go through the
20   deposition, but at least let's see if we can get
21   this agreement.
22           When I refer to "Imerys," we have an
23   agreement that that encompasses Luzenac and Rio
24   Tinto?
25       A.  "Encompasses"?  I think I can agree to

---

Page 13

1    that.
2        Q.  Okay.  Fair enough.
3            We're taking your deposition here today for
4    purposes of general causation only.  The Court in
5    the MDL -- you may or may not be aware, but I need
6    to say this for the record -- has limited the scope
7    of your deposition as a corporate representative of
8    Imerys to topics that relate to the
9    general-causation aspect of the plaintiffs' case.
10   So we reserve the right to redepose you as an
11   individual or on behalf of the corporation when it
12   comes to the time period where liability
13   depositions are going forward.  And that may or may
14   not make sense to you, but I need to say that for
15   the record.
16       A.  Okay.
17       Q.  Second, I would say on Friday afternoon,
18   very late in the day after 5:00, at least 5 p.m.
19   Central time, we received a production from Imerys
20   that encompassed more than 1,600 documents.  About
21   a third or more of those involved the topics that
22   you're providing testimony on.
23       MS. O'DELL:  So I said I was going to put
24   this on the record, Counsel, so I'll do it right
25   now.

---

4  (Pages 10 to 13)

Patrick Downey

Page 14

1    Those were made available to us late by an
2  FTP link. It wasn't until Monday morning that we
3  were able to get access to those documents on our
4  review platform. We're working through those, but
5  we reserve the right to have additional time, other
6  than the two days set aside this week to depose
7  Mr. Downey on the documents that were produced to
8  us.
9      MR. SILVER: Your objection's noted. We
10  will -- we don't agree, but we can -- as always,
11  we'll meet and confer and talk about it, if
12  necessary.
13      MS. O'DELL: Fair enough.
14      Q. (By Ms. O'Dell) Mr. Downey, I want to
15  talk to you a bit about your background first. And
16  I'm going to hand to you a copy of a curriculum
17  vitae that was provided to us by your counsel.
18  I've marked it as Exhibit 4.
19      (Exhibit 4 was marked for identification.)
20      MS. O'DELL: Guys, I'm short a copy. I
21  apologize.
22      Q. (By Ms. O'Dell) Mr. Downey, did you
23  prepare this curriculum vitae?
24      A. Yes.
25      Q. And when did you prepare it? Was it

Page 15

1  prepared for purposes of this deposition?
2      A. It was updated. I mean, I think I
3  updated it about a year ago, and then I reviewed it
4  when it was provided.
5      Q. And I'm not going to spend a lot of time
6  on this, but I just want to ask you a couple of
7  preliminary questions, and then we'll come back to
8  this.
9      Is it fair to say that during your tenure
10  with Imerys that you have not had any
11  responsibility or managerial responsibility for the
12  operation of Imerys' talc mines in Vermont?
13      A. That's correct.
14      Q. And is it also fair to say that in your
15  tenure as an employee of Imerys, or one of the
16  previous predecessor companies, that you've had no
17  role in supervising or managing the processing
18  plant at West Windsor?
19      A. That's correct.
20      Q. And is it also fair to say that you've
21  not had a supervisory role, managerial role or any
22  input into the operations of the Houston processing
23  plant?
24      A. That's correct.
25      Q. In regard to the mining operations in

Page 16

1  China, is it fair to say that you have not been
2  involved in the oversight of the mining operations
3  that have resulted in talc being sold to
4  Johnson & Johnson?
5      A. That's correct.
6      Q. Mr. Downey, in the Notice of Deposition,
7  there is a section called "Instructions." I don't
8  know if you've had an opportunity to take a look at
9  that. It's on page 10 of the notice. Gives some
10  ground rules, if you will, about what I can ask you
11  in regard to your preparation for your testimony
12  here today.
13      You've provided a curriculum vitae. I thank
14  you for that. But I also want to know what you did
15  to prepare for your deposition. And so let me
16  begin by asking when you learned that you would
17  serve as a corporate representative in this
18  context.
19      A. I believe sometime in May or June, I
20  think.
21      Q. Since that time, how many times -- let's
22  say it was the end of May. Let's put it in that
23  context; does that sound fair?
24      A. Fair.
25      Q. Since May, how many times have you met

Page 17

1  with counsel to prepare for your testimony today?
2      A. On, I think, four occasions.
3      Q. When was the first time that you met
4  with Imerys' counsel?
5      A. Mid- to late June, I think.
6      Q. And do you have a specific date when you
7  met with counsel?
8      A. Not that I recall, no.
9      Q. Did you make any notes during that
10  meeting?
11      A. I've made some notes. And I believe
12  they've been provided.
13      Q. Counsel did provide a group of
14  handwritten notes to us. I'm going to mark that
15  right now as Exhibit 5.
16      (Exhibit 5 was marked for identification.)
17      Q. (By Ms. O'Dell) Are those the notes
18  that you're referring to?
19      A. Yes.
20      Q. Mr. Downey, are these notes provided in
21  chronological order? Some of them are not dated.
22  I'm just trying to get a sense of when you had
23  certain meetings and certain discussions.
24      A. I'm not sure that they're in
25  chronological order. There are some general notes

5 (Pages 14 to 17)

Patrick Downey

Page 18

1   that I think are out of order.
2       Q.  How did these notes come into existence?
3   Are these your notes, your handwritten notes?
4       A.  Yes, they are.
5       Q.  Were these taken contemporaneously with
6   the discussion that you were having?  In other
7   words, were they rewritten or are these the notes
8   you took during particular meetings or calls?
9       A.  They were contemporaneous.
10      Q.  The first page of Exhibit 5 appears to
11  be -- let me -- why don't you tell me what it is?
12      A.  It's the -- I made a note in my calendar
13  for a call with Miss Pier Julie Pier, another
14  witness who's going to be deposed in this matter.
15      Q.  And the date of this call, according to
16  your calendar, is July 27th, 2018?
17      A.  Yes, ma'am.
18      Q.  How many times had you met with counsel
19  prior to having this discussion with Miss Pier --
20  is it Peer or Pier?
21      A.  What you just said, I didn't distinguish
22  a difference.  It sounded like "Peer" to me.
23      Q.  All right.  It's a little hard to
24  understand my southern accent sometimes, too, so
25  we'll see.

Page 19

1       But -- okay.  Miss Pier, you talked with her
2   on July 27th.
3       My question is, how many times had you met
4   with counsel prior to this discussion with
5   Miss Pier?
6       A.  I'd say at least twice.  I don't recall
7   the specific dates of the meetings, but Friday,
8   July 27th, was only a few weeks ago.
9       Q.  So you met with counsel at least twice
10  prior to that time.
11      Were those -- was the first meeting in
12  person?
13      A.  Yes.
14      Q.  Where did you meet?
15      A.  In Bozeman, Montana.
16      Q.  Who did you meet with?  Who was present?
17      A.  Jim Robinson with Gordon & Rees was
18  present with me.  There was other counsel on the
19  phone, including Mark Prost, Andrew Cary.  Oh, and
20  Dave Marek.
21      Q.  Who is Dave Marek?
22      A.  He's a geologist.
23      Q.  And what's -- is he an employee of
24  Imerys?
25      A.  He's an Imerys employee.  I'm not sure

Page 20

1   which company.
2       Q.  And when you say "which company," which
3   companies are you referring to?  Imerys Talc
4   America and what other entity?
5       A.  Perhaps Imerys Talc Canada.
6       Q.  And what is -- is it Mr. Herrick?
7       A.  Marek.  M-a-r-e-k.
8       Q.  And what is -- in terms of Mr. Marek's
9   role, you said he's a geologist.
10      What's his area of responsibility?
11      A.  The ore reserves and mine-planning
12  aspects of our talc mines.
13      Q.  For all Imerys talc mines?
14      A.  I'm not sure how expansive his scope is,
15  but generally, North America.
16      Q.  Does Mr. Marek have any responsibility
17  for operations or -- strike that.
18      Does Mr. Marek have responsibility that
19  relates to the mining operations in China?
20      A.  No, I don't think so.
21      Q.  Did he provide you with information
22  regarding the mining operations in China?
23      A.  Not China, no.
24      Q.  Was anybody else present in person
25  physically at the meeting other than those you've

Page 21

1   described?
2       A.  The only two -- the only person present
3   with me, again, was Jim Robinson.  The others were
4   on the phone.
5       MS. O'DELL:  And I don't know Mr. Robinson,
6   but I believe he is counsel for Imerys; is that
7   correct?
8       MR. SILVER:  Yes.
9       MR. PROST:  Yes.
10      Q.  (By Ms. O'Dell)  And in terms of counsel
11  on the phone, who participated by telephone?
12      A.  As I said, Mr. Prost and Andrew Cary.
13      Q.  How long did the meeting last?
14      A.  I think maybe four hours or so.  It's
15  been a while.  And I have had subsequent meetings
16  with counsel.  It's kind of running together, the
17  time frames.
18      Q.  Other than -- were there any other
19  Imerys employees on the telephone besides
20  Mr. Marek?
21      A.  No.
22      Q.  What was the purpose for having
23  Mr. Marek on the phone call?
24      A.  He had information about the geology and
25  mine-planning of the Argonaut Mine in Vermont.

6 (Pages 18 to 21)

Patrick Downey

Page 22

```
 1        Q.  You've been an employee of Imerys, or
 2   Luzenac, previously, since 1994, I believe?
 3        A.  No.  1998.
 4        Q.  '98, okay.
 5            And do you have an understanding as to how
 6   long Mr. Marek has been employed by Imerys?
 7        A.  I don't know when he began, so I -- I
 8   don't know.
 9        Q.  Was it before you started with the
10   company?
11        A.  No.  I believe it was after I started.
12        Q.  Without having a specific year in mind,
13   do you have a general understanding?  Has he been
14   an employee more than ten years, for example, to
15   your knowledge?
16        A.  Yes, more than ten.
17        Q.  Used to, ten years ago, it seemed like
18   it wasn't -- it was a long time, but that only puts
19   us at 2008.
20            Let me ask.  Was Mr. Marek a geologist with
21   Imerys during the time period that the Vermont
22   mines sourced talc for J&J?
23        A.  Perhaps at the very end.
24        Q.  And that would put us at 2002 or so?
25        A.  2003.
```

Page 23

```
 1        Q.  And so as I understand it, that was your
 2   first meeting with counsel -- your first meeting in
 3   person with counsel; is that fair?
 4        A.  That's my recollection, yes.
 5        Q.  Prior to that meeting, how many
 6   telephone calls had you had with counsel for
 7   Imerys?
 8        A.  I think one, just to let me know that I
 9   had been designated for certain topics.  And we
10   just discussed the logistics of how I needed to
11   be -- come prepared --
12            MR. PROST:  Pat, obviously, don't share any
13   communications with counsel that are protected by
14   attorney-client privilege.  I think you've said
15   enough.
16        Q.  (By Ms. O'Dell)  Were you provided
17   documents to review in order to prepare for your
18   deposition?
19        A.  Yes.  I received some documents.
20        Q.  Did you receive them electronically or
21   in hard copy?
22        A.  I think the majority of them
23   electronically.
24        Q.  Approximately how many documents were
25   you provided for your preparation?
```

Page 24

```
 1        A.  I don't have a specific number.
 2        Q.  Can you give me an estimate?
 3        A.  Not really, no.
 4        Q.  Was it more than 50?
 5        A.  Probably, yeah.
 6        Q.  Was it more than 75?
 7        A.  I'd say so.  More than a hundred.
 8        Q.  Well, it seems like you've got some idea
 9   of how many there were.
10            So can you estimate for me?  Generally
11   speaking, how many documents were you provided?
12        A.  I don't think I could estimate
13   accurately anything more than a hundred.  And those
14   were the ones that -- there were a number of
15   documents that I received.  Some of them were, you
16   know, types of information, and I only up -- you
17   know, looked at examples of some.  So I didn't
18   count them all, so I don't really have an estimate.
19        Q.  When did you receive those documents?
20        A.  Early July.
21        Q.  And were they provided basically all at
22   one time?
23        A.  I think most of them, yes.
24        Q.  Were they sent to you by counsel or an
25   employee of Imerys?
```

Page 25

```
 1        A.  Mr. Marek sent me . . .
 2        Q.  Did you undertake to go through the
 3   database or files at Imerys in order to educate
 4   yourself for your deposition today?
 5        A.  I'm not sure what you mean by
 6   "database."
 7        Q.  Let's see.
 8            Did you -- I mean, you're an employee of
 9   Imerys, correct?
10        A.  Yes, I am.
11        Q.  And as an employee and in your specific
12   title -- didn't put that on your record.
13            Your specific title at this point is
14   director of NPD engineering?
15        A.  That's right.
16        Q.  So what does NPD --
17        A.  New product development.
18        Q.  And, you know, in your role as an
19   employee of Imerys, did you look through common
20   databases of documents or information in order to
21   educate yourself for your deposition?
22        A.  Yes.  Some of our quality protocols are
23   on the SharePoint system.
24        Q.  And first, why did you decide to search
25   for these quality protocols for your deposition
```

7 (Pages 22 to 25)

Patrick Downey

Page 26

1  today?
2      A.  Because they were listed amongst the
3  topics that I had been designated for.
4      Q.  Is -- were they protocols that you would
5  normally have familiarity with or employ in your
6  role as director of NPD Engineering?
7      A.  In some cases, I would refer to those
8  documents.
9      Q.  But that -- quality assurance is not
10  your primary responsibility, correct?
11      A.  No.
12      Q.  And in terms of the protocols that you
13  searched out, could you reference them either by
14  topic for me, or number?
15      A.  I reviewed some of the quality protocols
16  for our Houston facility, things about how we
17  sample -- or how we control the receipt of
18  shipments of ore from China, how we take a sample
19  of it, how it's processed at the mill, how it's
20  quarantined and how those samples are then passed
21  on to our analytical group for analyses, things
22  like that.
23      Q.  Did you print out copies of those
24  protocols?
25      A.  Yes.

Page 27

1      MS. O'DELL:  I would -- Mr. Downey searched
2  those out on his own.  They were not provided to
3  him by counsel.  I don't think the attorney-client
4  privilege applies.  So we would ask for copies of
5  whatever he pulled down from the SharePoint files
6  in order to get a sense of what those were.
7      MR. PROST:  We'll discuss it on the break.
8      Q.  (By Ms. O'Dell)  Mr. Downey, we talked
9  about the first meeting you had in person at
10  Bozeman, Montana.  You mentioned there was two
11  meetings before you actually had a phone call with
12  Miss Pier.
13      So when was the second meeting?
14      A.  Some -- it was before we met with
15  Miss Pier.  I don't recall a specific date.  I'm
16  sorry.
17      Q.  Was it in July?
18      A.  I believe so.
19      Q.  Where did the meeting take place?
20      A.  In Bozeman.
21      Q.  At your office in Bozeman?
22      A.  No.
23      Q.  Where?
24      A.  At a hotel.
25      Q.  Who was present?

Page 28

1      A.  Mr. Cary, Mr. Prost and Mr. Robinson.
2      Q.  Anybody participate by telephone?
3      A.  I don't recall.  I don't think so.
4      Q.  How long did the meeting last?
5      A.  We met for a day and a half.
6      Q.  Did you review documents during that
7  meeting?
8      A.  More than likely.  I don't recall the
9  specific meeting.
10      Q.  Did you have any other phone calls
11  during July regarding your testimony -- let me
12  start again, just to make it clear.  Sorry.
13      You had a phone call with Miss Pier on
14  July 27th?
15      A.  Yes.
16      Q.  Did you have any other phone calls with
17  Imerys employees during the month of July?
18      A.  I think the call with Dave Marek was in
19  early July.  I think I already mentioned that.
20      Q.  Yeah.  Thank you.  Your answer was
21  better than my question.  Sorry.
22      You'd been deposed a number of times,
23  Mr. Downey, so I didn't go through the ground
24  rules, but if I do ask you a bad question, you
25  don't understand it, just let me know, and I'd be

Page 29

1  happy to rephrase it.
2      Okay.  Let's move our attention back to the
3  notes that you provided that, for the record, have
4  been marked as Exhibit 5.  You had a call with
5  Miss Pier, Julie Pier, on July 27th.
6      Who set up this call?
7      A.  Andrew Cary, I believe.
8      Q.  Who was on the phone call besides
9  yourself and Miss Pier?
10      A.  Counsel, I believe Andrew Carry,
11  Mr. Prost and Mr. Robinson.
12      Q.  How long did the call last?
13      A.  I think it was an hour.
14      Q.  And if you'll turn to page 2 of
15  Exhibit 5, are those notes from the call with
16  Miss Pier?
17      A.  On page 2?
18      Q.  Yes.
19      A.  Yes.
20      Q.  And actually, page 3 also has a notation
21  "J.P."
22      Does that stand for Miss Pier Julie Pier?
23      A.  Yes, it does.
24      Q.  And you note on page 2 of the exhibit
25  that blast holes -- what did you discuss with

8 (Pages 26 to 29)

Patrick Downey

Page 30

1  Miss Pier regarding blast holes?
2      A. We discussed some of the testing of the
3  blast holes. If the lab at the mine had detected
4  amphibole, then a sample of the blast hole would be
5  forwarded to Julie for further analysis.
6      Q. And then was the discussion of blast
7  holes primarily focused on Vermont?
8      A. Yes, ma'am.
9      Q. Did you have any discussion of the
10  drilling or blasting that was done in China?
11      A. No, not with Miss Pier.
12      Q. Following the notes here, you have
13  "serpentine," I believe it's at least part of that,
14  but I can't read your writing. Sorry. What is
15  that?
16      A. Serpentinite.
17      Q. Serpentinite.
18      What was your discussion with Miss Pier
19  regarding serpentinite?
20      A. She had also mentioned that they
21  characterized the serpentinite core, specifically
22  looking for asbestos minerals, and found none.
23  They also tested a variety of waste-hole samples
24  that covered the serpentinite, again looking
25  specifically for asbestos minerals and found none.

Page 31

1      Q. And during -- you note these are
2  aggregate tests on the side.
3      What time period did this testing take
4  place?
5      A. I don't recall if she mentioned the time
6  frame. You can ask her.
7      Q. Happy to do that. And we will ask her.
8      But in terms of the specific results she's
9  referring to, did she put any time parameters on
10  that discussion?
11      A. Not that I recall.
12      Q. Did you review any documents over the
13  phone with Miss Pier?
14      A. No.
15      Q. On page 2 of your notes from your call,
16  it references China. And what was your discussion
17  with Miss Pier about China?
18      A. Well, we don't control the mine in
19  China, but I know that it's a topic that I had been
20  designated for, so I asked Julie if she -- you
21  know, if she could tell me what she knew about
22  China. And these were the notes that I took about
23  that.
24      Q. And you've never been to the mines in
25  China, true?

Page 32

1      A. That's true. I have not.
2      Q. And to your knowledge, has Miss Pier
3  ever visited the mines in China?
4      A. I don't know.
5      Q. Other than the three sort of larger
6  topics that we've talked about -- blast holes,
7  serpentinite and China -- were there any other
8  topics that you discussed with Miss Pier?
9      A. I think we discussed the general overall
10  topics and how there was potential overlap between
11  topics that she was designated for and I was
12  designated for and where the -- where the cut-off,
13  so to speak, would be.
14      Q. And was it during this discussion that
15  the decision was made not to designate you as a
16  witness for Topic I, subsection 1, which relates to
17  the composition of the talcum-powder products?
18      A. I think it was discussed at that time.
19  I don't know that the final decision was made at
20  that phone call.
21      Q. Let me ask you to turn to the next page
22  of this exhibit. And they're not numbered, so we
23  just have to follow along together and make sure we
24  stay on the same page. But it appears to be notes
25  from an 8/1 discussion. And that would be

Page 33

1  August the 1st?
2      A. Yes.
3      Q. And who is "Des. G"?
4      A. Desiree Giroux.
5      Q. I'll need a little help with that
6  spelling.
7      A. I'll try my best. G-i-r-o-u-x.
8      Q. And the first name is Desiree?
9      A. Desiree.
10      Q. Desiree. So is that D-e-s-i-r --
11      A. i-r-e-e.
12      Q. i-r-e-e, okay.
13      Who is Miss Pier Giroux?
14      A. She is an employee at the Vermont talc
15  mine, and she handles the quality program there
16  now.
17      Q. Did you talk with Miss Pier Giroux by
18  telephone?
19      A. Yes.
20      Q. How long was your phone call?
21      A. Maybe 15, 20 minutes.
22      Q. And what was the purpose of your
23  discussion with Miss Pier Giroux?
24      A. To discuss the testing protocol for
25  production and from blast holes of the Vermont

9 (Pages 30 to 33)

Patrick Downey

Page 34

1  mine.
2      Q.  Who else was on the phone besides
3  yourself and Miss Pier Giroux?
4      A.  No one else.
5      Q.  And do you know her title?
6      A.  I think it's HSEQ manager.  HSEQ,
7  health, safety, environment, quality.
8      Q.  And do you know how long she's held that
9  position at the Vermont mines?
10     A.  Maybe four or five years.  I'm not sure.
11     Q.  Was Miss Pier Giroux employed by Imerys
12 and working at the Vermont mines during the time
13 period that Vermont was sourcing talc to -- for
14 Johnson & Johnson Baby Powder?
15     A.  I don't know when she hired on with us,
16 but I believe it was after that period.
17     Q.  So to be clear, Miss Pier Giroux is the
18 health and safety and quality manager --
19     A.  Currently.
20     Q.  -- currently, but she was not
21 responsible for quality assurance during the time
22 period when talc was being sourced for
23 Johnson & Johnson talcum-powder products, true?
24     A.  That's true.
25     Q.  According to your notes here,

Page 35

1  Miss Pier Giroux expressed to you that daily
2  product composites are made by mill operators, and
3  then it says, "from in-process samples analyzed by
4  XRD."  And then what's the next?
5      A.  Leco, L-e-c-o.
6      Q.  "...to determine daily," and I assume
7  that's "mineralogy"?
8      A.  That's right.
9      Q.  Do you have an understanding from
10 Miss Pier Giroux how long that, approximately, was
11 in place?
12     A.  It predates her.  My understanding is
13 that it goes back -- I think it was consistent with
14 the time period -- it was a program that was in
15 place when Cyprus purchased Windsor Minerals in
16 1989.
17     Q.  What do you base that understanding on?
18     A.  I also had a phone call with Robin
19 Reilly, and she told me what happened from, like,
20 1998 going forward.  And her description lined up
21 with what Miss Pier Giroux said.
22     And I've also seen documents of the protocol
23 that was in place in 1989.  So they're consistent
24 with one another.
25     Q.  When did you talk with Miss Pier Reilly?

Page 36

1  Robin Reilly, correct?
2      A.  Yeah.  Actually, in fact, that was in
3  person.  It was last Friday or Saturday.
4      Q.  Friday ten days ago, or just a few days
5  ago?
6      A.  Just a few days ago.
7      Q.  So that would have been August the 1st
8  or 2nd?
9      MR. PROST:  3rd.
10     MS. O'DELL:  3rd.  Oh, sorry.  3rd.
11     Q.  (By Ms. O'Dell)  How did you come to
12 meet with Miss Pier Reilly?
13     A.  She was in Montana.
14     Q.  And does she work in Montana?
15     A.  Pardon?
16     Q.  Is she an employee of Imerys Montana?
17     A.  No.  She still works out of Vermont, but
18 she was out in Montana on business.
19     Q.  Okay.  Was the purpose of
20 Miss Pier Reilly's trip to Montana to meet with you
21 for purposes of preparing for your deposition?
22     A.  No.
23     Q.  What's her position presently?
24     A.  She handles land management and
25 reclamation activities and permitting activities.

Page 37

1      Q.  At Vermont?
2      A.  At Vermont, yes.
3      Q.  And did -- has Miss Pier Reilly had
4  responsibility for sampling and quality assurance
5  at Vermont?
6      A.  From 1998, when she hired on, for a few,
7  maybe several years, she worked in the QA lab at
8  the local facility.
9      Q.  Was she a technician in the lab?
10     A.  I know she did lab analyses.  I don't
11 know if -- what her title was at that period.
12     Q.  What's her educational background?
13     A.  I'm not sure.
14     Q.  As a person who was in the lab doing
15 analyses, whatever -- well, let me ask you.
16     Do you know what type of analyses that she
17 was tasked to perform during that time period?
18     A.  She did XRD, Leco anatomic absorption
19 analyses.
20     Q.  And the --
21     A.  Perhaps others.  Those were ones we
22 discussed.
23     Q.  And for that time period, her
24 responsibility focused on performing analyses in
25 the lab.  It was not -- she was not involved in

10  (Pages 34 to 37)

Patrick Downey

Page 38

1  actually taking samples, correct?
2      A.  I'm not sure what you're asking.
3      Q.  Let's see if I can be more clear.
4      Her responsibilities related to performing
5  analyses on samples when they came to the lab,
6  true?
7      A.  Generally speaking, yes, but I can't say
8  whether or not she also had to go take samples.  I
9  don't know.  I didn't ask her that.
10      Q.  You don't know, one way or the other?
11      A.  No.
12      Q.  Did you reach out to Miss Pier Reilly or
13  did someone else facilitate the meeting with her?
14      A.  I reached out to her.
15      Q.  How long was your discussion with
16  Miss Pier Reilly?
17      A.  Ten minutes, I think.
18      Q.  Let me ask you to turn the page in the
19  exhibit, Mr. Downey, and there are some notes that
20  are titled "8/1 phone call with D. Crouse and
21  counsel."  And it says 7 to 9 a.m.
22      Is that the length of the call with
23  Mr. Crouse and counsel?
24      A.  Yes.
25      Q.  And who is D. Crouse?

Page 39

1      A.  David Crouse.
2      Q.  And is he an employee of Imerys?
3      A.  He's a former employee.
4      Q.  And what was his role as a former
5  employee?
6      A.  He had a number of roles, but he's a
7  geologist, so he's done exploration geology, mine
8  planning, ore control, a lot of things related to
9  the ores in the talc mines that we have.
10      Q.  Was Mr. Crouse ever charged with
11  responsibility for mining process in Vermont?
12      A.  Yes, ma'am.
13      Q.  And what was his responsibility?
14      A.  The ore reserves of the deposit, the
15  development aspects of it and also ore-control
16  measures.
17      Q.  And during what time period was
18  Mr. Crouse involved with the talc mines in Vermont?
19      A.  In the late 1990s and early 2000s.
20      Q.  And so his involvement, just to make
21  sure I understood what you were saying -- he had
22  responsibility in relation to Vermont talc mines
23  from the late '90s to early 2000s, fair?
24      A.  That's my recollection.
25      Q.  What did you discuss with Mr. Crouse?

Page 40

1      A.  There are several pages of notes here.
2  We discussed the general nature -- the general
3  geology of the talc deposit at Argonaut, and he
4  explained to me in pretty good detail about the
5  metamorphic processes about the deposits and why
6  there are geologic reasons for the absence of
7  chrysotile with respect to that deposit.
8      Q.  Is it your testimony that there is no
9  chrysotile in the Argonaut Mine?
10      A.  That's correct.
11      Q.  And other than your phone call with
12  Mr. Crouse, what do you base that statement on?
13      A.  Mr. Crouse also gave two depositions,
14  and he gave descriptions in those depositions of
15  that as well as his bases for making that -- or
16  making those statements.
17      Q.  Did you review those depositions prior
18  to your testimony today?
19      A.  Yes, I did.
20      Q.  While I'm on the subject, did you review
21  any other depositions of any witness in the
22  talcum-powder litigation in preparation for your
23  deposition?
24      A.  No.
25      Q.  Did you review Miss Pier's depositions

Page 41

1  or trial testimony prior to your deposition?
2      A.  No.
3      Q.  Did you review your own testimony from
4  either trial or deposition prior to the testimony
5  today?
6      A.  No.
7      Q.  You said Mr. Crouse is a former employee
8  of Imerys?
9      A.  Yes.
10      Q.  What's he doing now?
11      A.  He works for a different minerals
12  company.
13      Q.  And what's the name of that company?
14      A.  I believe it's Omya, O-m-y-a.
15      Q.  Does Mr. Crouse reside in Vermont?
16      A.  No.
17      Q.  Where does he reside?
18      A.  In Ohio, I believe.
19      Q.  And I didn't ask you this.
20      Who, other than yourself and Mr. Crouse, was
21  on the telephone call?
22      A.  Counsel.
23      Q.  Who?
24      A.  Mr. Cary, Prost, Robinson, I believe
25  Sarah O'Donahue from Alston & Bird, and Rodrigo

11 (Pages 38 to 41)

Patrick Downey

Page 42

1    Salas from Alston & Bird, also.
2        Q.  Let me ask you to turn over what appears
3    to be the third page of your notes with -- from
4    your phone call with Mr. Crouse.
5        It says "amphibole" at the top of the page;
6    do you see that?
7        A.  Yes.
8        Q.  And in relation to your conversation
9    with Mr. Crouse, you mentioned you discussed the
10   Argonaut Mine.
11       Was the primary focus of your conversation
12   the Argonaut mineral deposit and mine?
13       A.  We also discussed China as well, but we
14   probably spent more time on Argonaut.
15       Q.  Did you discuss any of the other mines
16   or deposits that Imerys owns in Vermont?
17       MR. PROST:  Object to form.
18       Q.  (By Ms. O'Dell)  Such as Hammondsville,
19   Hamm, Rainbow, Black Bear, or any of the other
20   mines?
21       A.  I believe I asked Dave if he knew about
22   those deposits.  My recollection is is that he
23   hadn't visited those during his time period.  They
24   were already -- had been phased out.  That's my
25   general recollection.

Page 43

1        Q.  Now, in the middle of the page,
2    Mr. Downey says "Argonaut"; do you see that in the
3    middle of the page?
4        A.  Yes.
5        Q.  And it has a word I can't read.  What
6    does that say?
7        A.  "Dunitic."
8        Q.  "Argonaut dunitic serpentinite was
9    altered from the outside toward the inter (sic)
10   core"; did I read that correctly?
11       A.  "Inner core."  Yes.
12       Q.  "Worked from west towards the east where
13   we see the remnants of the dunitic serpentinite,"
14   and then there's a word cut off there.
15       A.  "Core."
16       Q.  "Core."
17       You say, "Can be a transitional zone,
18   narrow, where the serpentinite is not completely
19   altered to talc magnesite"; did I read that
20   correctly?
21       A.  Yes.
22       Q.  And would you agree with me, Mr. Downey,
23   that those areas of transition where, by pressure
24   and heat, there's been a metamorphosis where the
25   alteration is not complete, that that transitional

Page 44

1    fiber can be fibrous, true?
2        MR. PROST:  Object to form.
3        A.  I disagree.
4        Q.  (By Ms. O'Dell)  If other geologists who
5    were working in Argonaut wrote contemporaneous
6    notes supporting the conclusion that transitional
7    fibers -- transitional minerals can be fibrous,
8    would you disagree with that?
9        MR. PROST:  Object to form.
10       A.  I'd have to see a document, if you're
11   saying that that was said, but I would disagree
12   with that.
13       Q.  (By Ms. O'Dell)  I made a little chart
14   here in your notes.  And let me see if I can
15   operate this effectively.
16       I said "fibrous," then I put "disagree."
17   That's your statement to me, right?  You don't
18   believe transitional fibers can be fibrous?
19       MR. PROST:  Object to form.
20       A.  In this transitional zone where I've
21   made notes, there's nothing to do with fibers
22   there.  That's the serpentinite.  It's not fibrous.
23       Q.  (By Ms. O'Dell)  And you're basing that
24   on your discussion with Mr. Crouse?
25       A.  Yes, as well as the evidence of what we

Page 45

1    know about the serpentinite.  It's a bladed habit,
2    but it's not fibrous.
3        Q.  We'll get to that.
4        You made a chart here about asbestiform
5    fibers; do you see that?  And let's just see if we
6    can agree on terminology today.  You have
7    "serpentine"; do you see that?  And then you have
8    as an asbestos variety.
9        Chrysotile is an asbestos-form serpentine
10   mineral, true?
11       A.  Chrysotile is the asbestos variety of
12   serpentine, but serpentine itself is nonasbestos.
13       Q.  But serpentine can be asbestos, true?
14       A.  No.  Chrysotile is asbestos.
15       Q.  Well, chrysotile is a subset of
16   serpentine generally.  It's just a fibrous form of
17   serpentine, true?
18       MR. PROST:  Object to form.
19       Q.  (By Ms. O'Dell)  True?
20       A.  The serpentine at Argonaut, as I
21   recall, I think, is the mineral lizardite.  I think
22   that's what it's called.  And that is nonasbestos.
23   Chrysotile is the asbestos variety of serpentine.
24       Q.  And your testimony is that chrysotile
25   has never been found at Argonaut?

Golkow Litigation Services - 877.370.DEPS

Patrick Downey

| Page 46 |
| --- |

1   A. That's correct.
2   Q. And then you go further and you talk
3   about amphiboles; do you see that?
4   A. Yes.
5   Q. And then you say "nonasbestos" in your
6   chart.
7   You take the position that tremolite is
8   nonasbestos -- is a nonasbestos amphibole?
9   A. What this chart was, for me, is of
10  these -- of the six asbestos minerals, most of them
11  are amphiboles, but then you also have the
12  serpentine group. And so it's just a sample chart
13  that shows the nonasbestos varieties and then also
14  lists the asbestos varieties.
15  Q. And so --
16  A. That's all I was doing here.
17  Q. Okay. And so you would agree, just to
18  make sure I'm reading your chart right, tremolite
19  can be asbestos?
20  MR. PROST: Object to form.
21  Q. (By Ms. O'Dell) It's on your chart
22  here.
23  A. When described as tremolite asbestos, it
24  would be asbestos, but just because you have the
25  mineral tremolite, that doesn't mean that every

| Page 47 |
| --- |

1   time you see the word "tremolite" that you're
2   talking about asbestos.
3   Q. It also doesn't mean it's not asbestos,
4   true?
5   MR. PROST: Object to form.
6   A. In what context?
7   Q. (By Ms. O'Dell) If it says
8   "tremolite" -- "tremolite" only, you can't always
9   assume that that means it's a non-asbestiform-type
10  of tremolite, true?
11  MR. PROST: Object to form; outside the
12  scope.
13  A. It would depend on the context of what's
14  written.
15  Q. (By Ms. O'Dell) Okay. So --
16  A. I'm not going to -- this is merely a
17  list of minerals.
18  Q. Okay. Well, and I'm working through it
19  with you, because I want to know what your
20  understanding is, part of us being able to work
21  through the documents we're going to go through
22  later.
23  Would you agree that tremolite -- excuse
24  me -- strike that.
25  Would you agree that actinolite can also

| Page 48 |
| --- |

1   occur in an asbestiform variety?
2   A. When identified as actinolite asbestos,
3   I would agree that it's asbestos.
4   Q. And it's your position -- you're taking
5   this on behalf of the company -- that if it just
6   refers to actinolite, then it's not asbestiform?
7   MR. PROST: Object to form; outside the
8   scope.
9   A. Again, it depends on the context.
10  Q. (By Ms. O'Dell) Anthophyllite is also
11  considered to be an asbestos variety, true?
12  A. Again, when identified mineralogically
13  as anthophyllite asbestos, that's when it's
14  asbestos.
15  Q. And it's your position, if it doesn't
16  have asbestos anthophyllite, then it's not an
17  asbestiform type, true?
18  MR. PROST: Object to form.
19  A. Again, it depends on the context of
20  whatever's written, what it's written about, as
21  well as time frame.
22  Q. (By Ms. O'Dell) What do you mean by
23  time frame?
24  A. Mineralogically, since the 1970s and
25  1980s, 1990s, there's great confusion about the

| Page 49 |
| --- |

1   actual identification of the asbestos varieties of
2   the minerals.
3   Q. Okay. If you'll turn on the next page,
4   is this a continuation of your notes from your
5   discussion with Mr. Crouse?
6   A. Yes.
7   Q. And you're discussing specifically ore
8   for J&J. And your first note is related to the
9   West Windsor float feed.
10  What is your understanding of what that
11  refers to?
12  MR. PROST: Object to form. I'm not sure
13  where you're looking.
14  Q. (By Ms. O'Dell) I thought I just turned
15  the page.
16  MR. PROST: Oh, we're in the middle of the
17  page where it says "West Windsor float feed," okay.
18  Object to form.
19  Q. (By Ms. O'Dell) Well, to be clear, I
20  was on this page -- I'm going in order -- I was on
21  this page with your chart here. And I turned the
22  page, and this is what I have.
23  MS. O'DELL: So do y'all have something
24  different?
25  MR. PROST: Looks like maybe we do. Can you

13 (Pages 46 to 49)

Patrick Downey

Page 50

1  show me what you have there?
2       MS. O'DELL:  Yeah.  Do you have this page in
3  your exhibit?
4       MR. PROST:  I'm looking for it.  That's not
5  our next page.  I'm checking to see where it is.
6       THE WITNESS:  I didn't see it.  It's not in
7  my stack.
8       Q.  (By Ms. O'Dell)  Well, I promise you, I
9  did not write this.  I didn't make it up.  So this
10  was given to me.
11       I'm assuming they're your -- that's your
12  handwriting, right?
13       MR. PROST:  Can we go off the record for a
14  second?  If I could take a look at it.
15       (A discussion held off the stenographic
16  record.)
17       VIDEOGRAPHER:  Off the record at 10:42.
18       (Recess taken.)
19       VIDEOGRAPHER:  We are back on the record at
20  10:53.
21       Q.  (By Ms. O'Dell)  Mr. Downey, before we
22  went on the break, we were talking about Exhibit 5,
23  this is my marked copy that's in front of you, your
24  notes that you took in preparation for your
25  deposition.  Specifically we were focused on -- I

Page 51

1  think it's the third page of your notes in relation
2  to your conversation with David Crouse.
3       A.  Yes.
4       Q.  And the note at the top indicates you
5  were discussing with Mr. Crouse ore for J&J or
6  Johnson & Johnson?
7       A.  Yes.
8       Q.  And the West Windsor float is listed
9  under that heading.
10       What'd you discuss with Mr. Crouse regarding
11  the West Windsor float?
12       A.  West Windsor was the flotation plant in
13  Vermont where grade 66, the talc product who
14  manufactured for Johnson & Johnson, was made.  So
15  we discussed the ore for the West Windsor flotation
16  feed.
17       Q.  Which, during Mr. Krauss' time frame,
18  came from Argonaut?
19       A.  That's correct.
20       Q.  And specifically, you focused first on
21  Argonaut main.
22       And what did you discuss in relation to
23  Argonaut main?  Which I'm assuming is short for
24  main ore body, correct?
25       A.  No, that references the Argonaut main

Page 52

1  pit.  In Crouse's prior depositions, I had read
2  where he referenced the Argonaut main and the
3  Argonaut east, and I was trying to first question
4  which area we were talking about, so that's what
5  the notation for "Argonaut main" was.  And it had
6  been mined out before Mr. Crouse was working there.
7       Q.  But Johnson & Johnson's Baby Powder was
8  sourced by Argonaut main prior to Mr. Crouse's
9  tenure with the company, true?
10       A.  I don't know.
11       Q.  In terms of Argonaut east, what was your
12  discussion?  And let me start by saying, what does
13  "Argonaut east" refer to?
14       A.  What Mr. Crouse described was the east
15  Argonaut ore body or actually mine area.
16       Q.  That's part of the same ore body as
17  Argonaut main.
18       It's one ore body, correct?
19       A.  They are of the same geology.  It's just
20  proximity and how the mine is developed, whether it
21  was in one pit versus the other.
22       Q.  Have you ever been to the Argonaut Mine?
23       A.  Yes.
24       Q.  When?
25       A.  First time was, I think, in 2000 or

Page 53

1  2001.
2       Q.  What was the reason for your visit?
3       A.  I was working at the Yellowstone Mine at
4  the time.  And I had done a technical processing
5  project.  And we had a technical meeting in
6  Vermont.  And while I was there, I got a tour of
7  the operations.
8       Q.  Was the technical meeting in Vermont
9  related to the operation of the West Windsor
10  processing plant?
11       A.  No.
12       Q.  What was it --
13       A.  Not that I remember.
14       Q.  What did it involve?
15       A.  It was a technical meeting where process
16  engineers got together and we presented our
17  projects to our colleagues.
18       Q.  So Vermont happened to be the location,
19  but the meeting was not focused solely on the
20  operations in Vermont?  You were presenting on your
21  projects in Montana?
22       A.  Yes.  I presented a project regarding
23  Montana.
24       Q.  In other words, it was a general meeting
25  of project engineers?

14 (Pages 50 to 53)

Patrick Downey

Page 54

```
1       A.  Yes.  Yes.
2       Q.  Other than that one occasion, have you
3   been to the Argonaut Mine?
4       A.  Yes.
5       Q.  How many times have you been to
6   Argonaut?
7       A.  Maybe four, maybe six over the -- you
8   know, since 2000, so over the last 15 years,
9   so . . .
10      Q.  And let me ask you, in terms of your
11  visits to the Argonaut Mine, were they for purposes
12  of other general meetings?
13      A.  Other general meetings, yes, mostly.
14  And we've -- my team has worked on a large project
15  in the plant there for the last few years, and so
16  I've been to Vermont quite a number of times.
17      Q.  And what plant are you referring to?
18      A.  Hmm?
19      Q.  What plant are you referring to?
20      A.  Ludlow Mill.
21      Q.  Have you had any involvement in relation
22  to projects or work for the West Windsor Mill?
23      A.  No.
24      Q.  And just so it's clear for the record,
25  the Ludlow Mill was not used to process talc for
```

Page 55

```
1   Johnson & Johnson's Baby Powder products, true?
2       A.  Only the crushing was done at Ludlow.
3       Q.  But the processing and other
4   manufacturing processes, such as the float feed,
5   took place at West Windsor, true?
6       A.  That's correct.  Yes.
7       Q.  You mentioned that you had visited the
8   Argonaut Mine itself four to six times?
9       A.  Thereabouts.  Yes.
10      Q.  Have you had any responsibility for the
11  operation of the Argonaut Mine?
12      A.  No.
13      Q.  Have you been tasked to work on any
14  projects specifically related to the mining
15  operation of the Argonaut Mine?
16      A.  I don't think so.
17      Q.  So looking back to your notes -- let me
18  move the page up here -- you say, "Localized narrow
19  zones of cinders where (sic) selectively
20  removed" -- "were," excuse me -- "were selectively
21  removed."
22          What's your understanding of the term
23  "cinder"?
24      A.  Cinders is a dark zone of mostly
25  chloride with quartz.
```

Page 56

```
1       Q.  Is it your understanding that cinders do
2   not involve fibrous material?
3       A.  My notes here from our -- my discussion
4   with Mr. Crouse, he said that there are no asbestos
5   minerals associated with the cinders.  It was only
6   chloride and quartz.
7       Q.  So that's what Mr. Crouse told you?
8       A.  Yes, ma'am.
9       Q.  Did you -- well, what, if anything else,
10  did you do to assure yourself that Mr. Crouse gave
11  you accurate information?
12      MR. PROST:  Object to form.
13      A.  I'm not sure what you mean.  We had
14  discussions with Mr. Crouse.  I was able to ask him
15  questions and follow-up questions, so I think my
16  notes indicate that we talked about a wide variety
17  of questions.
18      Q.  (By Ms. O'Dell)  Did you do any
19  independent research regarding cinders as they're
20  present in the Argonaut deposit?
21      A.  I reviewed other geologic papers related
22  to the general geology of Vermont as well as some
23  geologic descriptions of Argonaut itself.
24      Q.  And what papers are you referring to?
25      A.  There were some geology reports that
```

Page 57

```
1   Dave Marek gave me.
2       Q.  Were those Imerys internal documents?
3       A.  Some of them were geologic papers by
4   government institutions.  I think one or two were
5   either Imerys or Rio Tinto Minerals documents,
6   depending on time frame.
7       Q.  What -- were any of the papers that
8   you're referring to peer-reviewed geology
9   publications?
10      A.  Which ones?  I'm not sure what you're
11  asking.
12      Q.  Well, you said you reviewed geologic
13  papers in addition to your discussion with
14  Mr. Crouse, and I'm trying to understand what
15  papers you're referring to.
16      A.  I don't recall which publications these
17  were in, so I can't answer to whether they were
18  peer-reviewed or not.
19      Q.  Do you recall the authors of the
20  publications?
21      A.  No, I don't.
22      Q.  Do you have copies of those --
23      A.  Yes.
24      MS. O'DELL:  Mark, since those were provided
25  by an Imerys employee, we would ask that those be
```

15 (Pages 54 to 57)

Patrick Downey

Page 58

1    made available to us.
2         MR. PROST:  We can discuss that also on the
3    break.
4         Q.  (By Ms. O'Dell)  Looking at the next
5    page of your notes, Mr. Downey, it appears that
6    these notes also were made during your call with
7    Mr. Crouse.
8         A.  I just need to get there.  Okay.  Yes,
9    they were.
10        Q.  And pronounce the first -- spell and
11   pronounce the first word you've written there.
12        A.  Lamprophyre, l-a-m-p-r-o-p-h-y-r-e.
13        Q.  I'm going to make your "r" a little
14   bit -- you're like me.  Sometimes your R's sort of
15   don't -- so I just -- I made a little curl.
16        So dikes?
17        A.  Yes.
18        Q.  Are those often composed of a chloride?
19        A.  They are mafic dikes.  They are -- my
20   notes indicate pyroxene, biotite, hornblende,
21   magnetite, olivine and feldspar.
22        Q.  Do you know if they're often composed of
23   chlorite, in fact, in Argonaut deposit or composed
24   of chlorite?
25        MR. PROST:  Object to form.

Page 59

1         A.  I don't recall.
2         Q.  (By Ms. O'Dell)  Toward the lower half
3    of the page, you have the letters and numbers
4    A0170.9; is that correct?
5         A.  No.  That's just a 9.
6         Q.  Just a 9.  And 2002?
7         A.  Mm-hmm.
8         Q.  Does that refer to a sample that was
9    taken from Argonaut in 2002?
10        A.  That's in reference to a technical
11   report.  That's a report identifier.
12        Q.  And what type of report is it?
13        A.  It's an analytical report.
14        Q.  Is it a testing report?
15        A.  It is a test report that Julie Pier had
16   tested.  And the report was sent to Mr. Crouse, so
17   I wanted to talk to him about that.
18        Q.  Were you aware of the report before you
19   talked with Mr. Crouse?
20        A.  Yes.
21        Q.  And had you seen report prior to
22   discussing it with Mr. Crouse?
23        A.  Yes, I had.
24        Q.  And the report contained a positive
25   finding for tremolite, true?

Page 60

1         A.  The report indicated that tremolite --
2    that -- the way -- I think the report said fibrous
3    tremolite was identified in a waste-rock sample.
4         Q.  So the answer to my question is "yes"?
5         A.  What was your question again?
6         Q.  My question was, the report indicated
7    fibrous tremolite was found from a sample that was
8    taken from the Argonaut Mine, true?
9         A.  From the fringe area of the Argonaut
10   Mine.
11        Q.  How do you know it was the fringe area?
12        A.  Because I wanted to know where in
13   relationship that occurrence was relative to the
14   ore body.
15        Q.  Do you know what drill hole it was --
16   the sample was associated with?
17        A.  I believe it was drill hole 98-02.
18        Q.  Let me just -- 98?
19        A.  Yes.
20        Q.  Dash?
21        A.  02.
22        Q.  02.
23        And that would mean a drill hole that was
24   drilled in 1998?
25        A.  Yes.

Page 61

1         Q.  And it was the second hole that was
2    drilled?
3         A.  I believe so.
4         Q.  So I'm just turning one page over in
5    your notes.  And it says, "Privileged and
6    Confidential: Call with Jyrki"?
7         A.  Jyrki.
8         Q.  "Jyrki and Pat."
9         A.  Yes.
10        Q.  Who is Jyrki?
11        A.  Jyrki Bergstrom.
12        Q.  And what is -- is it
13   B-e-r-s-t-r-o-m [sic]?
14        A.  Yeah.  It's listed there under "Guests."
15        Q.  All right.  I see that.
16        And who is -- is it a Miss Pier or Mr.?
17        A.  Mr.
18        Q.  Mr. Bergstrom.  Who is Mr. Bergstrom?
19        A.  He's a geologist.
20        Q.  And who does Mr. Bergstrom work for?
21        A.  He works for Imerys Talc Europe, a
22   French company.
23        Q.  And I want to ask you about
24   Mr. Bergstrom, but first, before I do, who is Pat
25   you're referring to?

16 (Pages 58 to 61)

Patrick Downey

Page 62

1    A. That's me.
2    Q. Oh, so it's a call with Jyrki?
3    A. Jyrki.
4    Q. Jyrki.
5    A. I think it'd be unfortunate if your name
6    was "jerky."
7    Q. Yes, it would.  It would.  "Jyrki"
8    sounds much better.
9    A. Yes.
10    Q. So did you know Mr. Bergstrom prior to
11    this phone call?
12    A. I may have met him a few years ago.  I
13    knew of him.
14    Q. And Mr. Bergstrom worked -- works for
15    Imerys Europe?
16    A. Imerys Talc Europe.
17    Q. "Talc Europe."
18    And he is a geologist?
19    A. Yes.
20    Q. And what was -- first, who arranged the
21    telephone call with Mr. Bergstrom?
22    A. Mr. Cary.
23    Q. How long did the call last?
24    A. One hour.
25    Q. Who else was -- if anyone -- was a

Page 63

1    participant in the phone call?
2    A. Carolyn Geyser at Alston & Bird, Eric
3    Gardner, an Imerys attorney, Jyrki, Mr. Prost,
4    myself, Sarah O'Donahue, Andrew Cary and Jim
5    Robinson.
6    Q. So this is an accurate list of all the
7    participants on the right-hand side of the page
8    here?
9    A. Yes.
10    Q. Very good.
11    What was the purpose of your call with
12    Mr. Bergstrom?
13    A. To gain information about talc sourcing
14    from China about Guangxi number 2 grade.
15    Q. So China, Guangxi number 2?
16    A. Yes, ma'am.
17    Q. Just 2 or 2A as well?
18    A. 2.  I don't know if there's a
19    distinction between 2 and 2A.
20    Q. I've seen in some of the documents it
21    suggested that, but maybe you can explain that to
22    me.
23    Let me just pause right there.  You
24    mentioned that you talked with Mr. Crouse, also,
25    about China; did I hear you correctly?

Page 64

1    A. Yes.  Yes.
2    Q. What was your -- before we get to
3    Mr. Bergstrom, let's just complete that.  I
4    apologize.
5    What else -- what did you discuss with
6    Mr. Crouse about China?
7    A. About what he knew of sourcing from
8    China.  He had visited the mines, so he told me
9    about his visit and what he knew of the geology.
10    Q. And so Mr. Crouse had visited China, the
11    Chinese mines, at least once?
12    A. Yes.
13    Q. And do you know what time period that
14    visit took place?
15    A. In the 2000s.  I don't know if it was --
16    Q. Would it have been early 2000, since he
17    left the company in early -- you said he left the
18    company in early 2000s?
19    A. I don't think I said that.
20    Q. I may have misunderstood.  I thought you
21    said he worked in Vermont from late '90s to early
22    2000s.
23    A. He had responsibilities and oversight.
24    And he did a lot of work in Vermont, but in
25    addition, other sites, so I don't -- I don't want

Page 65

1    to leave the impression that he only worked in
2    Vermont for a period of time.
3    Q. You've never visited the mine in China,
4    true?
5    A. No.
6    Q. Had no involvement in the working
7    relationship between the Chinese mining company and
8    Imerys, true?
9    A. That's true.  I have no relationship.
10    Q. And your effort to educate yourself on
11    China involved talking with Mr. Crouse?
12    A. Yes.
13    Q. And then talking with Mr. Bergstrom,
14    true?
15    A. And talking to Julie Pier.
16    Q. Okay.  Those three Imerys employees?
17    A. Yes, ma'am.
18    Q. And other your discussions with those
19    three employees and possibly some documents, that's
20    the limit of your knowledge about the sourcing of
21    talcum powder for Johnson & Johnson's talcum-powder
22    products by Imerys?
23    A. Well, we source the ore, not talcum
24    powder, but yes.
25    Q. And my question -- it's a good

17 (Pages 62 to 65)

Patrick Downey

Page 66

1  distinction, but my question was very specific.  It
2  was the sourcing of talc for purposes of Johnson's
3  talcum-powder products.
4      A.  Yes.
5      Q.  Let me ask my question again.
6      Other than your discussions with those three
7  employees and the review of documents, that is the
8  limit of your knowledge regarding Imerys' supply of
9  Chinese talc ore for purposes of
10  Johnson & Johnson's talcum-powder products, true?
11     A.  Generally.  I don't -- sitting here
12  today, I can't recall if I gained other information
13  somehow.
14     Q.  So the answer to my question is, yes,
15  that's the limit of your knowledge?
16     A.  I believe so.
17     Q.  Okay.  Back to your discussion with
18  Mr. Bergstrom.
19     That took place last Thursday, just a few
20  days ago?
21     A.  That seems right.  Yes.
22     Q.  And you discussed with Mr. Bergstrom
23  specifically Guangxi crude number 2 --
24     A.  Yes.
25     Q.  -- that is mined in China?

Page 67

1      A.  Yes.
2      Q.  What mine does that ore come from?
3      A.  I had to write it down.  It's a Chinese
4  name.
5      Q.  Okay.
6      A.  (Document reviewed.)  It comes from a
7  single mine called Jizhua, J-i-z-h-u-a, or Jizhua.
8  I don't know how to pronounce it.
9      Q.  Can I see what else you've written on
10  your note there?
11     So just so we'll have it for the record, you
12  can use it during the deposition, but I'm going to
13  mark it.  This is your notes from your call with
14  Mr. Bergstrom?
15     A.  Yes.
16     MS. O'DELL:  And I'm marking that as Exhibit
17  Number 6.
18     (Exhibit 6 was marked for identification.)
19     Q.  (By Ms. O'Dell)  Who is the Guilin
20  Guiguang Talc Development Company?
21     A.  I see you have as much trouble
22  pronouncing that as me.
23     Q.  Yeah.  I do my best, but I'm not holding
24  myself as an expert in Chinese.
25     So who is that company?

Page 68

1      A.  The Guilin Guiguang Talc Development
2  Company, they are the mine operators who we source
3  Guangxi number 2 from.
4      Q.  And they're the mine operators, but the
5  mine itself is owned by the Chinese government,
6  true?
7      A.  I don't know who owns it, unless there's
8  document that I reviewed, that I don't recall now,
9  that explains the ownership.
10     Q.  What was your discussion with
11  Mr. Bergstrom?
12     A.  I'm sorry?
13     Q.  What was your discussion with
14  Mr. Bergstrom regarding Guangxi number 2?
15     A.  The name of the mines, the owners of the
16  suppliers, the geology of the deposit, its
17  mineralogy, different procedures, how they
18  controlled the ore, its supply chain, how it got
19  from the mine to the port.  Tried to be as
20  comprehensive as I could.
21     Q.  And I've turned the page in Exhibit 5.
22  And you'll see it on the screen there.
23     Are these notes that you took during your
24  call with Mr. Bergstrom?
25     A.  They are.

Page 69

1      Q.  Who provided you with the typed
2  headings?
3      A.  I made those.
4      Q.  And are the handwritten notes your own?
5      A.  Yes, they are.
6      Q.  And so your notes from your call with
7  Mr. Bergstrom would include this page that I'm
8  showing at present.
9      Are these -- the next page, are those also
10  your notes from the conversation with
11  Mr. Bergstrom?
12     A.  Yes.
13     Q.  And then turn one more page.
14     Are those notes from your conversation with
15  Mr. Bergstrom as well?
16     A.  Yes.
17     Q.  And I'm going to be where -- I'm just
18  going to write it at the top.  Okay.
19     I've highlighted, if you can see it there,
20  Mr. Downey, two words that you've written off to
21  the side.
22     Could you tell us what that says, please?
23     A.  Dolomite and magnesite.
24     Q.  Turn here to page 3 of your notes from
25  the Bergstrom call, and it says, "YB," and then it

Patrick Downey

Page 70

```
1   looks to the side you've written out "Geologist, 16
2   years experience on talc."
3        Is that an individual you're referring to,
4   "YB"?
5        A.  Yes.
6        Q.  Who are you referring to?
7        A.  Jyrki.  I didn't know how to spell his
8   name.  I forgot that there was a J at the -- a
9   silent J.
10       Q.  So this is Mr. Bergstrom?
11       A.  That's Mr. Bergstrom, yes.
12       Q.  And he works for Imerys Talc America.
13  Where is he -- where does he office?
14       MR. PROST:  This is not true.
15       Q.  (By Ms. O'Dell)  Excuse me.  I'm sorry.
16  Imerys Talc Europe.
17       A.  Yes.
18       Q.  Where does he office?
19       A.  Somewhere in France.
20       Q.  And does he have responsibility that
21  relates to talc ore that Imerys purchases from
22  Chinese mines?
23       MR. PROST:  Object to form.
24       A.  He's involved in sourcing external ores.
25       Q.  (By Ms. O'Dell)  That's not my -- really
```

Page 71

```
1   not my question.
2        My question is, does he have any
3   responsibility as an Imerys employee for the
4   process or the relationship that Imerys has with
5   the Chinese mines that they buy talc ore from?
6        MR. PROST:  Object to form.
7        MS. O'DELL:  Excuse me.  What's the
8   objection?
9        MR. PROST:  Vagueness in terms of
10  responsibility in terms of the use of the word
11  "Imerys," whether they're referring to Imerys Talc
12  America, Inc., or, you know, any company that he
13  works for.  And there are a couple of other words
14  you used at the end of the question that I thought
15  were kind of vague, and so I'm not sure that he has
16  a foundation to answer those, the way that's
17  phrased.
18       MS. O'DELL:  All right.  Well, I'll be happy
19  to rephrase it.
20       MR. PROST:  Sure.
21       Q.  (By Ms. O'Dell)  Mr. Bergstrom is an
22  employee of Imerys Europe?
23       A.  Imerys Talc Europe.
24       Q.  Imerys Talc Europe.  Let me just -- you
25  spoke to him for purposes of educating yourself
```

Page 72

```
1   about talc ore that Imerys purchases -- Imerys Talc
2   America purchases from the Guangxi -- sorry.  I
3   should say this.  I should be careful -- the Jizhua
4   mine in China, true?
5        A.  The Jizhua?  Jizhua?  Yes, that mine.
6        Q.  So you spoke with him about that mine,
7   true?  When I say "him," I'm referring to
8   Mr. Bergstrom.
9        A.  Yes.
10       Q.  And you spoke to Mr. Bergstrom for
11  purposes of educating yourself about Guangxi
12  number 2, which is an ore grade, true?
13       A.  Yes.
14       Q.  And my question to you is, in
15  Mr. Bergstrom's role as an employee of Imerys Talc
16  Europe, does he have responsibility for interacting
17  with purchasing, overseeing the Guilin Talc
18  Development Company and their mining operation?
19       MR. PROST:  Object to form.
20       A.  He makes periodic visits to there to
21  assess and monitor their production of Guangxi
22  number 2.
23       Q.  (By Ms. O'Dell)  What is Mr. Bergstrom's
24  title with Imerys Talc Europe?
25       A.  I think it's senior geology manager.
```

Page 73

```
1        Q.  Did -- excuse me.  Start again.
2        You stated that it was Mr. Bergstrom's
3   responsibility to periodically visit the mine in
4   China.
5        Do you have an understanding of how many
6   times that Mr. Bergstrom has been to the China
7   mine?
8        A.  Generally, twice a year.
9        Q.  And for what length of time has he been
10  visiting the mine twice a year?
11       A.  You mean, how long is he on-site during
12  a visit?
13       Q.  No.  I mean for what period of time has
14  he been visiting the mine on a biannual basis?
15       A.  I think since 2016.
16       Q.  So it says in your notes, "has visited
17  the Guangxi" -- maybe you mean the -- you mean the
18  Jizhua mine.  It's not Guangxi mine.  It's Jizhua
19  mine?
20       A.  Jizhua mine.  Yes.
21       Q.  J-i-z-h-u-a, mine?
22       A.  J-i-x --
23       Q.  I thought it was a Z.
24       A.  Oh, sorry.  Yes.  J-i-z-h-u-a.
25       Q.  It says he's visited two times per year
```

19 (Pages 70 to 73)

Patrick Downey

Page 74

1    since 2016. And then below, it says a "minimum of
2    1 time per year at least."
3         So in some years he only goes once, correct?
4         A. Say again?
5         Q. Some years he only goes once?
6         A. No. He said that he's been there twice
7    per year, but the minimum requirement would be at
8    least once a year, but he's going there more than
9    once a year.
10        Q. Next page, were these also notes from
11   your discussion with Mr. Bergstrom?
12        A. Yes, they are.
13        Q. And you entitled the page "Other Chinese
14   Mines"; did I read that correctly?
15        A. Yes.
16        Q. And it says, "Some Chinese mines are
17   contaminated with asbestos"?
18        A. Yes.
19        Q. And think the next bullet says, "Luz,"
20   which I'm sure means Luzenac?
21        A. Luzenac America.
22        Q. And "Imerys has never sourced from
23   them"?
24        A. Yes.
25        Q. What mines are you referring to?

Page 75

1         A. I'm aware of reports of Chinese talc
2    mines that are contaminated with asbestos, and I
3    asked Jyrki what he knew about those.
4         Q. Do you recall the names of those mines?
5         A. No.
6         Q. Did you make a note of that anywhere
7    else in these written papers provided?
8         A. You mean names of mines?
9         Q. Yes.
10        A. I didn't get any names of mines.
11        Q. Is it your understanding that the only
12   mine that has been used to source
13   Johnson & Johnson's Baby Powder products is the
14   Jizhua mine that you referred to previously?
15        A. Yes.
16        Q. And turn the page here in your notes.
17   And you titled these "OC MDL Prep"?
18        A. Yes.
19        Q. What does that "OC" stand for?
20        A. Ovarian cancer.
21        Q. And what were these notes in reference
22   to?
23        A. These are notes about the notice topics
24   that I had been assigned.
25        Q. Were these notes made in conjunction

Page 76

1    with a meeting with counsel?
2         A. Yes, they were.
3         Q. And when did this meeting take place?
4         A. In June or early July. I don't recall.
5         MR. PROST: Just to be clear, these notes
6    were pertaining to a topic that were later
7    determined to go to Julie Pier, just so there's
8    clarity in the record as to why he's taking notes
9    on Topic 1 composition, just for the record.
10        Q. (By Ms. O'Dell) And this was
11   information that you learned, Mr. Downey, during
12   that meeting, you made notes of that, correct?
13        A. Well, I made notes about the certain
14   topics. Other notes in here I had learned before
15   this meeting.
16        Q. I ask you to turn to the next page of
17   Exhibit 5, and it says "Topic 2"?
18        A. Mm-hmm.
19        Q. And it talks about the "mines that
20   supplied."
21        And I'm assuming you mean supplied talc for
22   Johnson & Johnson products?
23        A. Yeah.
24        Q. And you list four mines under the mine:
25   Hammondsville, Argonaut, Rainbow and Hamm.

Page 77

1         It says in parentheses, in relation to
2    Hammondsville, "counsel to look for historical
3    information"?
4         A. Yes.
5         Q. Were you provided historical information
6    about the Hammondsville Mine?
7         A. I don't believe so.
8         Q. It says, "Argonaut (info from Marek)"?
9         A. Marek. Dave Marek.
10        Q. And that's -- and you talked to us about
11   a meeting you had with Mr. Marek.
12        Did he provide you any written documentation
13   regarding Argonaut?
14        A. Yes. That's what we discussed.
15        Q. You're talking about the geological
16   paper?
17        A. The geology papers and such, yes.
18        Q. In relation to Rainbow, did counsel
19   provide you historical information regarding that
20   mine?
21        A. No. As I recall, I don't think we have
22   information on that. I don't know, though.
23        Q. And then as it relates to the Hamm Mine,
24   H-a-m-m, did counsel provide you historical
25   information regarding that mine?

20 (Pages 74 to 77)

Patrick Downey

Page 78

```
 1        A. I don't believe so.  Wait a minute.  I
 2   think I saw some -- I briefly reviewed some
 3   documents that did have some information on
 4   Hammondsville, Rainbow and Hamm in a document I
 5   produced yesterday.
 6        Q. Was that an internal document from
 7   Imerys?
 8        A. I believe that's in the production.
 9   It's the documents that have been produced.
10        Q. Any other information that you have
11   reviewed regarding the Hammondsville, Rainbow or
12   Hamm mines?
13        A. I'm not sure what you mean "any other
14   documents."
15        Q. You mentioned you reviewed one document
16   regarding those mines.  Is that it?
17        A. It was a stack of papers.  I don't know
18   if they were all in one document or not.
19        Q. Okay.  Regarding the Val Chisone --
20        A. Sorry.  Sometimes I get focused on
21   certain things.  I have seen information on the due
22   diligence for some of these mines.
23        Q. And any other information?
24        A. Not that I recall.
25        Q. The Val Chisone Mine you reference in
```

Page 79

```
 1   the middle of the page here -- sorry, I should move
 2   it up -- that's an Italian mine?  Talc mine?
 3        A. Yes.
 4        Q. And it's owned by Imerys Talc Italy,
 5   true?
 6        A. That's my understanding, yes.
 7        Q. When did Imerys Talc Italy purchase the
 8   Val Chisone mine?
 9        MR. PROST: I'll object to form, and outside
10   the scope.
11        Q. (By Ms. O'Dell)  You may answer.
12        A. I don't know.
13        Q. Do you know the general time period?
14        A. No.
15        Q. If you'll turn, Mr. Downey, to -- a few
16   pages over in your notes, there's a page that
17   begins "Sample retention"; do you see that?
18        A. Yes.
19        Q. And so sample retention talks about
20   core.  Does that refer to drill cores?
21        A. Yes, ma'am.
22        Q. And according to your note, the drill
23   cores "are kept in a couple shipping containers
24   stacked in boxes" and it's located at the Argonaut
25   Mine shop; did I read that correctly?
```

Page 80

```
 1        A. Yes.
 2        Q. Who provided that information to you?
 3        A. Dave Marek.
 4        Q. And that's true today, that those
 5   core -- drill cores are stored in a shipping
 6   container at the Argonaut Mine?
 7        A. I believe so.
 8        Q. You then refer to "infill."  What are
 9   you referring to there?
10        A. The development drilling.  We call it
11   development drilling, or infill drilling.
12        Q. And the development drilling, just for
13   purposes of the jury, distinguish that from the
14   process of drilling cores for mine exploration.
15        A. It's -- part of the development aspect
16   of mining is once -- the exploration generally
17   defines the limits of the ore body, but you need
18   additional information to more appropriately map
19   the specific areas that you're going to be mining
20   and the quality as well so that you can estimate,
21   for budgeting purposes and things like that, how
22   much talc is going to be mined, how much overburden
23   needs to be removed.  So you need to gather that
24   type of information in advance.  And so we do that
25   with infill drilling.
```

Page 81

```
 1        Q. And it says, in relation to that,
 2   "retains might be held for short periods of time,
 3   but plastic bags deteriorate and numbers"?
 4        A. Numbers.  Sample numbers.
 5        Q. "Sample numbers rub off."
 6        And then it says, "Stored at."  What is
 7   that, Stone House Garage?
 8        A. Yes.
 9        Q. And what's the next word?
10        A. It says, "or Green building."
11        Q. "Green building."
12        And those are both located at the Vermont --
13   let me ask you.  Where are those located?
14        A. Near the Ludlow Mine.
15        Q. Would those be near the Argonaut Mine?
16        A. Or sorry.  Argonaut Mine, yes.
17        Q. And there are retains that are currently
18   being stored at Stone House Garage or the green
19   building, true?
20        A. I'm not sure, because the notes indicate
21   that they're only retained for short periods of
22   time, and then exposure to sun and the weather, you
23   know, the bags deteriorate, so --
24        Q. And did Mr. Marek provide that
25   information to you as well?
```

21 (Pages 78 to 81)

Patrick Downey

Page 82

1    A.  That's what he told me.  That's -- yeah.
2    Q.  Did you -- excuse me.  Sorry.  Were you
3  finished?
4    A.  He provided that -- these are my notes
5  that I took of information that he provided.
6    Q.  Did you ask Mr. Marek if there are
7  infill retains currently being stored at one of
8  these locations near the Argonaut Mine?
9    A.  I don't recall if I asked that or not.
10  And even if I did ask, I don't recall that he may
11  have said.
12    Q.  What's the next word you put there, the
13  next heading?
14    A.  "Blast holes."
15    Q.  And when you say, "no retains," are you
16  saying that those are not maintained beyond seven
17  days?
18    A.  The seven-day is a turnaround for the
19  analyses, yes, prior to.  Because it's associated
20  with near-term mining activity, we need to have a
21  quick turnaround from our lab.
22    Q.  Do you know what happens to those
23  samples after they've been, you know, tested?
24    A.  They're discarded.  I don't know how
25  long afterwards, but there's numerous blast holes,

Page 83

1  and they're discarded.
2    Q.  Just to make sure I understand, you say
3  "records" and "TEM data stored in Julie Pier
4  database"; did I read that correctly?
5    A.  Yes.
6    Q.  And that's -- and who -- and Mr. Marek
7  provided that information to you as well, or
8  somebody else?
9    A.  I believe that was from Mr. Marek, yes.
10    Q.  And it says, "C of A's," which I'm
11  assuming means certificate of analyses, "stored at
12  Ludlow server," or "on," "at," "on."  I'm not sure.
13    A.  I think it was "at Ludlow server," yes.
14    Q.  Who provided that information to you?
15    A.  Mr. Marek.
16    Q.  And then I skipped this, I'm sorry.
17    "Electronic drill logs, assay spreadsheets,
18  etc., stored on the local server at site."
19    Did Mr. Marek provide that information to
20  you?
21    A.  Yes, he did.
22    Q.  And what server would Argonaut-related
23  drill logs, assay sheets, et cetera, be stored on?
24    A.  I think he was referencing the Ludlow
25  file server.

Page 84

1    Q.  So there's not an Argonaut server and a
2  Ludlow.  It's all one server?
3    A.  All one.
4    Q.  Okay.  Just a few more items here.
5    You have on the next page of your notes,
6  "Topic."  And I'd like to just ask generally when
7  you made, you know, these notes.
8    A.  I think early July.
9    Q.  Was it a part of the same in-person
10  meeting you had with counsel?
11    A.  One of them.
12    Q.  One of them.
13    And do you know if it was the first or the
14  second meeting?
15    A.  I don't remember.
16    Q.  And in terms of documents that might be
17  of assistance, who provided the information that
18  you list under that category, or that heading?
19    A.  I think it was a combination of me and
20  counsel suggesting different types of documents
21  that might be helpful.
22    Q.  Let me ask you this:  Does that say
23  "SharePoint"?
24    A.  Where?  I don't know where you're --
25    Q.  At the bottom.  I'm sorry.  Excuse me.

Page 85

1  I'm --
2    A.  Yes.
3    Q.  That says "SharePoint"?
4    A.  Yes.
5    Q.  And that's Houston quality, I'm
6  assuming, "procedures"?
7    A.  Yes.  "Houston Q procedures" would
8  indicate quality procedures.
9    Q.  And then good manufacturing practices,
10  "GMPs"?
11    A.  Yes.
12    Q.  And those are documents that you
13  described to us earlier that you found on your own?
14    A.  I didn't search all of the ones for
15  Houston.  I grabbed samples, or, you know, typical
16  types.
17    Q.  If you'll just clarify for me,
18  Mr. Downey, there are three more pages of notes.
19  And just let me ask a general question.  They all
20  have at -- most of them have "Topics" at the top.
21  Are these all notes that you took with -- excuse
22  me.
23    Were these notes sort of a continuation of
24  your notes taken during the meetings with counsel?
25    A.  Yes, ma'am.

22 (Pages 82 to 85)

Patrick Downey

Page 86

1      Q.  Let me ask you to look at this note.
2   It's on the next-to-the-last page of the exhibit.
3   And it says, "Argo blending with Hammondsville."
4      Does that indicate that Argonaut talc ore
5   was blended with Hammondsville talc ore?
6      A.  That references part of the J&J supply
7   agreement circa 1989 at the time frame that Windsor
8   Minerals was purchased by Cyprus, that there was a
9   GMP that indicated that Argonaut ore blended with
10  Hammondsville was part of their procedure.  And it
11  was specifically referencing the topic of blending
12  that was included in the notice.
13     Q.  And I've turned to the last page of your
14  notes, Exhibit 5.  And it has, at the top,
15  "Blending Vermont"?
16     A.  Yes.
17     Q.  "Hammondsville, Argonaut, Hamm,
18  Rainbow"?
19     A.  Yes.
20     Q.  Who provided the information on this --
21  that's noted here?
22     A.  I did.
23     Q.  Who gave the information to you?
24     A.  Some of it I had seen in documents
25  related to other cases.

Page 87

1      Q.  You refer to "JM."  Who does that refer
2   to?
3      A.  John McMeekin.
4      Q.  Who is John McMeekin?
5      A.  He's an attorney for Imerys.  Well, he's
6   not an Imerys attorney, but he --
7      THE WITNESS:  He's an attorney for them?
8      MR. PROST:  Outside counsel.
9      A.  Outside counsel.
10     Q.  (By Ms. O'Dell)  What is the Pipes case?
11     A.  It's a case in Oklahoma that I gave a
12  deposition on a few weeks ago.
13     Q.  What was the injury that was involved in
14  that particular case?
15     A.  Mesothelioma.
16     MS. O'DELL:  Give me just a minute.
17     (Pause.)
18     MS. O'DELL:  My colleague has pointed out to
19  me some notes from a conversation with Robin
20  Reilly, and those were not made a part of my
21  exhibit that I was previously given.
22     Q.  (By Ms. O'Dell)  So do you have those
23  as . . .
24     A.  Yes.
25     MS. O'DELL:  Can I have an extra copy of

Page 88

1   that at the break, please?
2      MR. PROST:  Sure.
3      MS. O'DELL:  I'll try to -- for purposes of
4   time, we'll move forward, but I need a copy for
5   mine.
6      Q.  (By Ms. O'Dell)  So this is a
7   conversation of notes, it appears, from
8   a conversation with Robin Reilly that you
9   referenced earlier?
10     A.  Yes, ma'am.
11     Q.  And that occurred on August the 3rd?
12     A.  Yes.
13     Q.  And that was Friday or Saturday?
14     A.  Last Friday.
15     Q.  You note here, Mr. Downey, that you
16  talked about -- you mentioned this a little bit
17  earlier, and I won't belabor it, but I want to make
18  sure I cover this.
19     With Miss Pier Reilly, you spoke with her
20  about her work at the lab at Ludlow?
21     A.  Yes.
22     Q.  And the samples being analyzed and the
23  frequency with which they were analyzed, true?
24     A.  Yes.
25     Q.  And according to this, y'all had

Page 89

1   discussions, as well, about the process float for
2   J&J talc, which I'm assuming refers to the West
3   Windsor process?
4      A.  Most -- well, it actually starts,
5   actually, at the mine and through crushing.  So
6   it's -- it does include West Windsor, but it's -- I
7   wanted -- I asked her specifically what she knew
8   about all of the supply, not just one focused area.
9      Q.  Fair enough.
10     Any other discussions that you had with
11  Miss Pier Reilly about -- excuse me, or in
12  preparation for your deposition?
13     A.  Not that I recall, no.
14     Q.  Other than the Imerys employees we've
15  discussed so far -- Mr. Crouse, former employee;
16  Mr. Marek, Miss Pier and Miss Pier Reilly -- were
17  there any other Imerys employees that you spoke
18  with about your testimony here today?
19     A.  Yes.
20     Q.  Who?
21     A.  Hans Bruning.
22     Q.  What's -- how do you spell Mr. Bruning's
23  last name?
24     A.  B-r-u-n-i-n-g.
25     Q.  And who's Mr. Bruning?

23  (Pages 86 to 89)

Patrick Downey

Page 90

1      A.  He's a geologist at Vermont currently.
2      Q.  And what was the purpose of your
3  discussion with Mr. Bruning?
4      A.  I wanted to discuss the geology of the
5  deposit and the mine planning and ore-control
6  aspects of --
7      Q.  Excuse me.
8      A.  -- mine planning and ore-control
9  aspects.
10      Q.  Of which mines?
11      A.  Of Argonaut.
12      Q.  Did you speak with Mr. Browning [sic]
13  about --
14      A.  Bruning.
15      Q.  Bruning.  Sorry.  I can't read my --
16  Bruning.
17      -- about any other mines besides Argonaut?
18      A.  I don't believe I did, no.
19      Q.  Did you speak with Mr. Bruning about any
20  other topics related to your deposition here today
21  other than --
22      A.  What do you mean?
23      Q.  -- geology and mine planning of
24  Argonaut?
25      A.  Talked about his kids.

Page 91

1      Q.  Do you and Mr. Bruning office in the
2  same building?
3      A.  No.  My office is in Montana.
4      Q.  I thought you said he was in Montana.
5      A.  No, no, no.  In Vermont.
6      Q.  In Vermont, okay.
7      So Mr. Bruning is in Vermont?
8      A.  Yes.
9      Q.  Had you known Mr. Bruning prior to your
10  call?
11      A.  Yes.
12      Q.  And did you initiate that call?
13      A.  Yes, I did.
14      Q.  Was there anyone else that participated
15  on the call either in person or on the phone?
16      A.  No.  And it wasn't a call.  It was a
17  visit in person.
18      Q.  Where did that meeting take place?
19      A.  In Vermont.
20      Q.  When did it take place?
21      A.  Early June.
22      Q.  And was the purpose of your meeting with
23  Mr. Browning to --
24      A.  Bruning.
25      Q.  Excuse me.  Bruning.

Page 92

1      -- to prepare for your deposition today?
2      A.  Yes.
3      Q.  How long was that meeting?
4      A.  About an hour.
5      Q.  Where did you meet in Vermont?
6      A.  At the Ludlow Mill and Argonaut Mine.
7      Q.  You mentioned that Mr. Bruning is a
8  geologist.
9      What's his position with Imerys?
10      A.  I don't know the name of his title, but
11  he does geology and mine planning for our mines.
12      Q.  In Vermont?
13      A.  In Vermont and elsewhere.
14      Q.  And elsewhere.
15      What's Mr. Bruning's first name?
16      A.  Hans.
17      Q.  Hans.
18      Is he an employee of Imerys Talc America?
19      A.  I believe so.
20      Q.  Is he also an employee of Imerys -- any
21  other entity of Imerys?
22      A.  No, I don't think so.
23      Q.  Does Mr. Bruning have oversight or
24  supervisory responsibility over the mining
25  operations at Argonaut presently?

Page 93

1      A.  Presently, yes, but he was not employed
2  during the time frame that we were supplying
3  product to Johnson & Johnson from Vermont.
4      Q.  Did you travel to Vermont specifically
5  to meet with Mr. Bruning?
6      A.  No.  I was there on other business.
7      Q.  Did it relate to issues regarding talcum
8  powder -- excuse me.
9      Did your visit relate to any aspect of
10  litigation?
11      A.  Say again?  The primary purpose of the
12  specific visit?
13      Q.  Yeah.
14      A.  No.
15      Q.  Let me just ask you again.  I'm sorry.
16      What was the purpose of your -- primary
17  purpose of your visit to Vermont?
18      A.  A project review of a processing project
19  at the Ludlow Mill.
20      Q.  And that's a project you mentioned to us
21  earlier?
22      A.  Yes.
23      Q.  You mentioned earlier, Mr. Downey, that
24  you met with counsel twice before your call with
25  Julie Pier on July 27th, if my memory's correct,

24 (Pages 90 to 93)

Patrick Downey

Page 94

1    and --
2        A.  I believe I met with counsel about four
3    times.  And I think we met twice before then.  I
4    didn't record -- I don't remember the dates of the
5    meetings.
6        Q.  You believe you had approximately four
7    meetings with counsel in preparation for your
8    deposition here today?
9        A.  I think so, yeah.
10       Q.  And it's your memory, your best
11   recollection, two of those occurred before your
12   call with Julie Pier, and I'm assuming two occurred
13   after the call, thereabouts?
14       A.  I think -- I think so, yeah.
15       Q.  Do you have a sense of how long each of
16   those meetings were after your call with Julie
17   Pier?
18       A.  Generally, the times that I met in
19   person with counsel, we met for about a day and a
20   half.
21       Q.  So just to summarize, you had
22   approximately four meetings with counsel, and each
23   of those meetings lasted about a day and a half,
24   fair?
25       A.  Fair.

Page 95

1        Q.  In terms of going forward in the
2    deposition, Mr. Downey, a couple things I want to
3    see if we can just agree on, okay?  We agreed on a
4    few things so far.  Let's see if there are a few
5    other things we can agree on.
6            First thing is that asbestos is a
7    carcinogen.  Can you and I agree on that?
8        A.  Yeah.  I agree that I think it's
9    well-known that asbestos can cause some types of
10   cancer.
11       Q.  So is that fair?  Asbestos is a
12   carcinogen?
13       A.  It can cause some types of cancer, yes.
14       Q.  Which is a fair definition of a
15   carcinogen?
16       A.  Sure.
17       Q.  It causes cancer, or can cause cancer in
18   humans?
19       A.  Yes.
20       Q.  Can we agree that Imerys Talc America --
21   and I'm going to put in parentheses "RTM," Rio
22   Tinto -- and Luzenac had a no-asbestos policy for
23   talc supplied to J&J; can we agree on that?
24       A.  Yes.
25       Q.  Can we agree that Imerys -- oops.  I

Page 96

1    misspelled talc.  Sorry.  I left a "c" off.
2        A.  I was wondering who was going to catch
3    that.
4        Q.  Yeah, yeah.  I'd look back periodically.
5    I'm just trying to write so neatly.  It's hard.
6    I'm feeling some pressure.  Imerys --
7        A.  Your handwriting is better than mine.  I
8    appreciate that.
9        Q.  So Imerys -- and I'm just going to say
10   "Imerys" in short for Imerys Talc America in the
11   parenthetical, is that okay with you?  Because it
12   takes a long time.
13       A.  Okay.  "Luzenac America" is on your
14   first statement there.
15       Q.  So I should put "America" right here?
16       A.  Yes.
17       Q.  And "Imerys Talc America."  I'm just
18   going to go ahead, since I've done that much, "RTM
19   & Luzenac America was/is responsible for ensuring
20   that the talc sold to J&J was" -- since they're
21   currently selling it -- "is asbestos free"; can we
22   agree on that?
23       MR. PROST:  Object to form.
24       A.  We test our product to ensure that it
25   doesn't contain measurable asbestos, and that's

Page 97

1    what I can agree to.
2        Q.  (By Ms. O'Dell)  So we can't agree that
3    it's "free," so I'm going to cross that out.
4    But --
5        A.  I can't -- you're going to need to move
6    it because I can't see that area.
7        Q.  Thank you.  So do you see that now?
8            So you cannot agree that Imerys Talc America
9    is responsible for ensuring that talc sold to J&J
10   was/is asbestos free, but you'll agree that it
11   was -- asbestos was "below detectible limits"?
12       MR. PROST:  Object to form.
13       Q.  (By Ms. O'Dell)  Is that -- can we agree
14   on that?
15       A.  Generally speaking, I would agree.
16       Q.  Okay.  "Imerys Talc America does ensure
17   that talc is asbestos free" --
18       MR. PROST:  Object to form; misstates
19   testimony.
20       Q.  (By Ms. O'Dell)  -- is that fair?
21   Because you wouldn't agree it's not -- you won't
22   agree it's asbestos free.
23           You agree that it's below detectible limits,
24   true?
25       MR. PROST:  Same objection.

25 (Pages 94 to 97)

Patrick Downey

Page 98

1    A.  Our talc -- we have a rigorous testing
2  program that also includes not only the testing
3  itself, but our knowledge of the ore deposits and
4  the testing that -- and sampling and mapping that
5  we do continually through the process, we are
6  confident that our products are safe, but in terms
7  of a detection limit, I'm not the expert on that.
8  Julie Pier can speak to that.
9    But the scientific instruments are not
10  available to tell us that our product is,
11  quote-unquote, asbestos free.  We can't say that in
12  this room, that the air in this room is asbestos
13  free and we've been, you know, in this room
14  together for a few hours and, you know, even say
15  that the air in this room asbestos free.  So I
16  can't really agree with the way that you've written
17  that.
18    Q.  Okay.  Let me say this:  "Imerys does
19  not certify that talc sold to J&J is asbestos
20  free" --
21    MR. PROST:  Object to form.
22    Q.  (By Ms. O'Dell)  -- is that fair, based
23  on your testimony?
24    A.  We have a rigorous testing program where
25  we test our product.  We exceed all government

Page 99

1  regulatory requirements for the safety of our
2  product.  And we believe in that strongly.  But in
3  terms of the characterization of, quote-unquote,
4  asbestos free, as I said before, we cannot make
5  that statement.  Nobody can make that statement,
6  the same as nobody can guarantee that the air that
7  we are breathing in this room is, quote-unquote,
8  asbestos free.
9    Q.  So Imerys -- it's a true statement to
10  say Imerys does not certify that talc sold to J&J
11  is asbestos free, true?
12    MR. PROST:  Object to form.
13    A.  I don't think you can answer that as a
14  true-or-false question.  You need to understand the
15  testing methodologies, the regulatory environment
16  and all that.  I can't agree to try to answer that
17  as a true-false question.
18    MS. O'DELL:  Move to strike as
19  nonresponsive.
20    Q.  (By Ms. O'Dell)  That's a true -- that's
21  either true, Mr. Downey, or it's not true.
22    MR. PROST:  Object --
23    Q.  (By Ms. O'Dell)  Imerys can't -- you've
24  testified, and I can read it back to you, that
25  Imerys cannot certify that talc sold to J&J is

Page 100

1  asbestos free, true?
2    MR. PROST:  Object to form.  This is
3  repetitive questioning three or four times now.
4  And he's answered it the best that he can.
5    MS. O'DELL:  He has not answered my
6  question.  It's a true-or-false question.  It's a
7  fair question.
8    Q.  (By Ms. O'Dell)  If you think it's
9  false, tell me how it's false, but I think what
10  I've done is summarized your previous testimony.
11    Imerys does not certify that talc sold to
12  J&J is asbestos free, true or false?
13    MR. PROST:  Object to form.  He's told you
14  he can't say just "true" or "false."  He's answered
15  the best that he can.  You've asked it five times.
16  He's -- the same way.  He says he can't answer just
17  "true" or "false."
18    MS. O'DELL:  To be fair, don't coach the
19  witness.  It's a true-or-false question.  It's very
20  clear.
21    Q.  (By Ms. O'Dell)  And I'm asking, is that
22  a true or false statement, Mr. Downey?
23    MR. PROST:  Object to form.  My
24  understanding of the deposition guidelines are to
25  avoid repetitive questions.  You've now asked the

Page 101

1  same exact question five times, which he has told
2  you he can't answer just "true" or "false."  He's
3  answered the best way that he can.  I'm not
4  coaching him.  I'm just stating what's on the
5  record here and what's happened.
6    MS. O'DELL:  It's a fair question.  What the
7  deposition protocol says is, one, you can't coach
8  the witness.  Number two, there can't be objections
9  that are lengthy.  To be fair, I think that's maybe
10  where you are.
11    But he just said in the last few minutes,
12  nobody can certify that talc is asbestos free.
13    Q.  (By Ms. O'Dell)  You've said that,
14  right?
15    MR. PROST:  Object to form.
16    Q.  (By Ms. O'Dell)  You said -- you said
17  you can't certify that talc is asbestos free
18  because you don't know if this room doesn't have
19  asbestos in it, fair?
20    MR. PROST:  Object to form.
21    A.  Again, our products meet the highest
22  safety standards.  They exceed the regulatory
23  requirements --
24    Q.  (By Ms. O'Dell)  Let me stop you right
25  there.  Let me stop you right there.

26 (Pages 98 to 101)

Patrick Downey

Page 102

1    I'm not asking you about your testing
2  protocol. Miss Pier's going to talk about that.
3  I'm asking you about -- I'm not asking you about
4  the regulatory framework.
5       I'm asking you, does Imerys certify that
6  talc sold to J&J is asbestos free? That's the
7  question. I asked that a few minutes ago. I
8  understood your answer to be, no, Imerys does not
9  certify that.
10      MR. PROST: Object to form. That misstates
11  what he said. You're not liking what he's saying,
12  but he's given you the answer to the question.
13  Object to form.
14      Q. (By Ms. O'Dell) Is that what you said,
15  Mr. Downey?
16      A. We certify that our talc does not
17  contain measurable asbestos. And your question
18  needs to be understood in the context of both the
19  scientific limits of detectability, to which Julie
20  Pier will speak to, but also the regulatory
21  requirements.
22      Q. So it's your testimony that Imerys
23  certifies to J&J that in the talc sold to J&J for
24  talcum-powder products, asbestos is below the
25  detectable limit, fair?

Page 103

1       MR. PROST: Object to form.
2       A. Again, providing the context that I've
3  previously repeated, yes.
4       Q. (By Ms. O'Dell) And "below detectible
5  limits" does not equal asbestos free.
6       MR. PROST: Object to form.
7       Q. (By Ms. O'Dell) True?
8       MR. PROST: And outside the scope.
9       A. That depends.
10      Q. (By Ms. O'Dell) True?
11      A. No, that depends.
12      Q. It can be true?
13      MR. PROST: Same objections; asked and
14  answered.
15      A. It depends.
16      Q. It can be true?
17      MR. PROST: Same objections; asked and
18  answered.
19      A. It depends.
20      Q. (By Ms. O'Dell) All right. You say it
21  depends. Okay. I'll put that right there, all
22  right?
23      A. I can't see it.
24      Q. Oh, sorry. I'm running out of room
25  here. You say that depends.

Page 104

1       I wrote, "Below detectible limit does not
2  equal asbestos free," you said it depends?
3       A. Yes.
4       Q. Okay. Let me try one more time.
5       "Imerys cannot make the statement that talc
6  sold to J&J is asbestos free."
7       MR. PROST: Objection; form, outside the
8  scope, asked and answered maybe ten times now.
9       Q. (By Ms. O'Dell) You agree with that,
10  don't you?
11      MR. PROST: Same objections.
12      A. Is there a way to expand it so I can
13  read it?
14      Q. (By Ms. O'Dell) I'll try.
15      A. Now I'm getting dizzy.
16      Q. It's very sensitive. Sorry.
17      Can you see that? Can you see that, sir?
18      A. Yes, I can. Sorry.
19      Q. Agree? Do you agree with that
20  statement?
21      MR. PROST: Same objections; asked and
22  answered multiple times.
23      A. In the context of the limitations of the
24  scientific instruments, generally I would agree
25  with that.

Page 105

1       MR. SILVER: Leigh, if it's a good time,
2  it's been almost 90 minutes, let's see if we can
3  take a break, see if lunch is here.
4       MS. O'DELL: Give me just one minute. I'm
5  just going to mark this exhibit, Exhibit 7, our
6  notes here, and we're on the Elmo.
7       (Exhibit 7 was marked for identification.)
8       MS. O'DELL: We can go. We can take a break
9  now.
10      VIDEOGRAPHER: Going off the record at
11  12:19.
12      (Recess taken.)
13      VIDEOGRAPHER: We are back on the record at
14  1:10.
15      Q. (By Ms. O'Dell) Mr. Downey, would you
16  agree with me that baby powder in Shower-to-Shower
17  talc products do not have any therapeutic benefit?
18      MR. PROST: Object to form.
19      A. You're asking a health question. I
20  don't know what you mean by "therapeutic," but to
21  the extent that they could prevent rash and
22  infection, if that's therapeutic, I suppose so.
23      Q. (By Ms. O'Dell) Is it your
24  understanding that talc-powder products can prevent
25  infection?

27 (Pages 102 to 105)

Patrick Downey

| Page 106 | Page 108 |
|---|---|

**Page 106**

1  A. I'm sorry?
2  Q. Is it your understanding that
3  talcum-powder products can prevent infection?
4  A. I don't think that's what I said.
5  MR. LOCKE: Objection; beyond the scope.
6  Q. (By Ms. O'Dell) I thought that's what
7  you said, but . . .
8  You said, "You're asking a health question.
9  I don't know what you mean by that, but to the
10  extent that that could prevent infection, it's
11  therapeutic."
12  I'm saying, is it your understanding that
13  talcum-powder products prevent infection?
14  MR. PROST: Object to form.
15  MR. LOCKE: Same objection.
16  A. I thought that I said that to the extent
17  it could prevent chaffing and, therefore, an
18  infection. That's what I meant.
19  Q. (By Ms. O'Dell) That's what you meant,
20  okay.
21  So in your mind, that would be a therapeutic
22  benefit?
23  MR. PROST: Same objection.
24  A. It could be. Again, I'm not a health
25  professional.

**Page 107**

1  Q. (By Ms. O'Dell) Let me show you what
2  I've marked, Mr. Downey, as Exhibit Number 8.
3  (Exhibit 8 was marked for identification.)
4  Q. (By Ms. O'Dell) Have you seen this
5  document before?
6  A. (Document reviewed.)
7  MR. SILVER: Leigh, the copies that you
8  handed out have no Bates number. Is there a Bates
9  number on the document?
10  MS. O'DELL: There is. Sorry.
11  MR. SILVER: Then could I just -- going
12  forward, if we could just read Bates numbers into
13  the record, it makes it easier when we have just
14  the --
15  MS. O'DELL: That's fair, because I've got
16  probably a handful that, when they copied, they
17  didn't have -- they didn't copy with a Bates. And
18  my -- I'll try to point that out. I didn't realize
19  those were some of them.
20  MR. SILVER: That's fine.
21  Q. (By Ms. O'Dell) But this -- I've marked
22  it as Exhibit 8. It's a document that has the
23  Bates number IMERYS 050651.
24  Have you seen this document before,
25  Mr. Downey?

**Page 108**

1  A. It does not look familiar, no.
2  Q. All right. This was a document prepared
3  by Rio Tinto Minerals for IMA.
4  Are you familiar with IMA?
5  A. I am familiar with an IMA.
6  Q. And which IMA are you familiar with?
7  A. Industrial Minerals Association.
8  Q. Right. And so -- and it was prepared by
9  Ed McCarthy, Julie Pier and Erik Ronald; do you see
10  that?
11  A. Yes.
12  Q. And we talked about Miss Pier being an
13  employee of Imerys.
14  Are you aware that Ed McCarthy is an
15  employee of Imerys?
16  A. He's a former employee. He retired.
17  Q. Do you know when Mr. McCarthy retired?
18  A. About a year and a half ago.
19  Q. And do you know Erik Ronald?
20  A. I knew him, yes.
21  Q. And who is Mr. Ronald?
22  A. He was a geologist with the company.
23  Q. So these are three current or former
24  Imerys employees that prepared this summary for the
25  international minerals association in October of

**Page 109**

1  2009?
2  A. For the who?
3  Q. International minerals association.
4  A. No.
5  Q. Was it --
6  A. Industrial Minerals Association.
7  Q. Excuse me. Sorry.
8  Can I say "IMA" for short?
9  A. You bet.
10  Q. Okay. I'll say that again.
11  Edward McCarthy, Julie Pier and Erik Ronald
12  were Imerys employees who prepared this summary
13  regarding talc for IMA, and it's dated
14  October 2009?
15  A. Yes.
16  Q. And you'll notice there is -- should be
17  a Bates number, IMERYS 050651, indicating that this
18  came from documents produced by Imerys in this
19  litigation.
20  A. The copy I have does not have any Bates
21  references on it.
22  Q. I'll represent that that's the case,
23  Mr. Downey.
24  I want to ask you a couple of questions
25  about this document, because it goes over some of

28 (Pages 106 to 109)

Patrick Downey

Page 110

1  the general geology of the mines in Vermont and
2  also in China.  And I apologize, again, for giving
3  you a copy without the Bates number, and so we're
4  going to have to work our way through this by
5  counting pages.
6       A.  Okay.
7       Q.  And I apologize.
8       So if you will turn, I think it's 14 pages
9  over --
10      A.  Including the title page?
11      Q.  Yes, including that.
12      So 14 pages, you'll see at the bottom of the
13  page -- I'm going to reference, Mr. Downey, a
14  heading with "Vermont"; do you see that?  Do you
15  see that?
16      A.  Oh, okay.  Yeah.
17      Q.  Okay.  And so, of course, we've been
18  talking about Vermont a good deal already today
19  because that's where Imerys, in part, sourced talc
20  for J&J.
21      And Mr. McCarthy and others write here that
22  Vermont has produced talc for over 100 years.  I'm
23  not going to read all this, but just to give you a
24  little connection.  It goes on to say, "Powder
25  production began in Johnson in 1902.  And at one

Page 111

1  time some seven mines were active in the state, but
2  production has now been limited to one mine, the
3  Argonaut"; do you see that?
4       A.  Yes.
5       Q.  And that's consistent with your
6  understanding of mining operations owned by Imerys
7  in Vermont, true?
8       A.  Yes.  I just want to make sure I'm aware
9  of the time line on things.
10      Q.  Okay.  And in talking about the talc
11  deposits -- or I should say "deposit" -- in Vermont
12  where the Hamm Mine, the Hammondsville Mine, the
13  Rainbow Mine, Argonaut that we've talked a lot
14  about, those mines are located essentially in the
15  same geologic formation that contains talc, true?
16      A.  Generally speaking, that's my
17  understanding.
18      Q.  And according to Mr. McCarthy and
19  Miss Pier, talc in Vermont was formed from the
20  alteration of peridotite -- how would you say that?
21      A.  That looks like a typo.
22      Q.  What would you -- what do you think it
23  should say?
24      A.  They might mean peridotite.
25      Q.  Peridotite or, to make it a little bit

Page 112

1  easier, ultramafic?
2       A.  Ultramafic.
3       Q.  "Ultramafic rocks of Precambrian age
4  first into serpentine and then to talc and
5  magnesium carbonate by reaction with carbon
6  dioxide."
7       Is that consistent with your understanding
8  of how talc was formed in the location where the
9  Vermont mines are located?
10      A.  No.
11      Q.  Okay.  How is your understanding
12  different?
13      A.  That the source rock was dunite, not
14  peridotite.
15      Q.  Would you agree it's ultramafic rock?
16      A.  Yes.  That's a very broad description.
17      Q.  Okay.  So you agree it's ultramafic
18  rock.  You just don't agree it's peridotite -- how
19  do you say that?  Perry dot --
20      A.  Peridotite.
21      Q.  Peridotite.  Thank you.
22      You don't agree with that.  You say it's
23  made out of what kind of rock?
24      A.  Dunite.
25      Q.  Okay.  How do you spell dunite?

Page 113

1       A.  D-u-n-i-t-e.
2       Q.  But you agree that it's first serpentine
3  and then it morphs into a talc and magnesium
4  carbonate in certain portions of the geologic
5  formation, true?
6       A.  Generally speaking, I'd say that's
7  correct, but I think the description of the geology
8  deposit by Crouse is much more informed.
9       Q.  And what description are you talking
10  about?  Should I make a telephone call with
11  Mr. Crouse?
12      A.  The phone call as well as what he
13  described in the depositions that I reviewed.  He
14  gave two depositions.
15      Q.  And you think those are more informed
16  than Mr. McCarthy, Miss Pier and Mr. Ronald?
17      A.  Yes, I do.
18      Q.  And you based that just on reviewing his
19  depositions?  You think that's a more correct
20  summation of the geology?
21      A.  Well, in part, Mr. McCarthy's not a
22  geologist; he's a chemical engineer, Ph.D.
23      Q.  Mr. Ronald's a geologist?
24      A.  Yes.
25      Q.  And Miss Pier, you held her out to be an

29 (Pages 110 to 113)

Patrick Downey

| | Page 114 |
| --- | --- |

1  expert in matters related to talc, true?
2       MR. PROST:  Object to form.
3       A.  Specifically, I think that she's a
4  mineralogist.
5       Q.  (By Ms. O'Dell)  She's a mineralogist?
6       A.  I believe that's her training.
7       Q.  Goes on to say, "The outside of the
8  deposit will usually have a thin blackwall
9  containing a biotite-chlorite schist in contact
10  with the surrounding host" -- problem --
11  "peridotite"?
12       A.  There you go.
13       Q.  I can't say it.  It's close.  Better.
14       "Subsequent shearing has complicated the
15  structures and created zones of highgrade platy
16  talc.  Grades typically run 45 to 57 percent talc,
17  with magnesite, chlorite, serpentine, quartz and
18  mica being the major impurities."
19       That's consistent with your understanding of
20  Vermont deposits, true?
21       A.  Again, the surrounding host wasn't
22  peridotite.  And I think that the geologic
23  description by Mr. Crouse is correct.
24       Q.  Mr. Crouse hasn't published that
25  geologic description, true?

| | Page 115 |
| --- | --- |

1       A.  I'm not sure.
2       Q.  And you see no Imerys production
3  documents, as you refer to them, where Mr. Crouse
4  has delineated his thoughts on the geologic
5  formations, true?
6       MR. PROST:  Object to form.
7       A.  There might be.  I can't recall right
8  now.
9       Q.  (By Ms. O'Dell)  But you're not -- you
10  can't tell me if there are, true?
11       A.  I think there are, but right now, I
12  can't -- I've reviewed numerous documents.
13       Q.  And you know, Mr. Downey -- or you may
14  not know -- that you reviewed depositions that are
15  not a part of this case and, I'm assuming, subject
16  to a protective or confidentiality order?
17       MR. PROST:  Object to form.
18       A.  I don't know.
19       Q.  (By Ms. O'Dell)  Let me ask you to turn
20  probably four or five pages over?  Yeah, five pages
21  over.  Do you see a section on China?
22       A.  Before or after?  Which way are we
23  turning?
24       Q.  A little farther into the document, so
25  five pages further into the document, you'll see a

| | Page 116 |
| --- | --- |

1  subsection that's entitle "China"; do you see that?
2       A.  Yes.
3       Q.  And this describes, generally -- and
4  we're going to go into this in some more detail,
5  but trying to get some kind of background here for
6  the jury.
7       Is it says, "China has some 120 working talc
8  mines located in three provinces, Liaoning and
9  Shangdong in the North and Guangxi in the south."
10       And we talked about Guangxi being the source
11  of Johnson & Johnson talc, true?
12       A.  Guangxi number 2 is the grade that we
13  use for Johnson & Johnson product, yes.
14       Q.  And they're talking about -- that's --
15  Guangxi is the name of the province; is that your
16  understanding?
17       A.  I forget how the name is derived.
18       Q.  All right.  It says, "Almost all the
19  talc," referring to China, "is of the
20  metasedimentary origin and much of it, especially
21  in Liaoning and Guangxi, is high purity and high
22  brightness."
23       Is that consistent with your understanding
24  of the talc deposits in China?
25       A.  I believe metasedimentary is correct,

| | Page 117 |
| --- | --- |

1  and certainly Guangxi is high purity and high
2  bright.  I can't speak for Liaoning.
3       Q.  And turn it over to the next page, the
4  document, and you'll look about midway down, the
5  paragraph beginning "The talc veins"; do you see
6  that?
7       A.  Yes.
8       Q.  And it's talking about Chinese ore
9  deposits, it's chlorite, dolomite, magnesite and
10  quartz are the main contaminants contained in those
11  deposits.
12       Is that consistent with your understanding?
13       A.  Well, this is a section of a document --
14  I can see what it says, and I'm not sure what
15  they're referencing to.  I can't tell what deposits
16  they're talking about, but that's what it says
17  here.
18       I might also add that this appears to be a
19  document that's in some form of draft and review,
20  so I don't know that it's the finished product.
21       Q.  What's your understanding of the
22  impurities or contaminants contained in the Chinese
23  ore deposits where Imerys buys talc for J&J?
24       MR. PROST:  Object to form.
25       A.  Generally speaking, it's for the Guangxi

30 (Pages 114 to 117)

Patrick Downey

Page 118

1   number 2.  It's my understanding that the other
2   minerals present include chlorite, dolomite, I'm
3   not sure about magnesite, and a trace of quartz, I
4   believe.  I can't tell from this document whether
5   it's the ore prior to selective mining or things
6   like that.  It might be the -- the in placement.  I
7   can't tell, either.
8        Q.  Is dunite a type of peridotite?
9        A.  Let me think.  I'd have to refer to my
10  notes from Crouse and see if I can refresh my
11  memory.  (Document reviewed.)
12       Q.  If you don't know, Mr. Downey, just tell
13  me you don't know, but if you -- I'll give you a
14  minute to look at your notes.
15       A.  (Document reviewed.)  My notes indicate
16  that the talc mines we're talking about in southern
17  Vermont form from pure dunitic serpentinite.  They
18  were derived from dunite.  Elsewhere --
19       Q.  Sir, I'm asking about China, not
20  Vermont.
21       A.  Right.  Oh, I'm sorry.  I lost your
22  question.
23       Q.  Okay.
24       A.  Your question was about peridotite,
25  wasn't it?

Page 119

1        Q.  It was.  Yeah.  You're right.  Keep
2   going.  I'm sorry.
3        A.  Elsewhere in my notes, peridotite is a
4   different serpentinite rock composed of pyroxene.
5   The dunite is composed of olivine.  And it's
6   very -- that's a very pure magnesium silicate.  So
7   peridotite is different than dunite.
8        Q.  But they're both ultramafic rocks, true?
9        A.  Generally, yes, that's my understanding.
10       Q.  And so in terms of peridotite, dunite is
11  a type of peridotite rock.  It's different, but
12  it's a type of peridotite rock, true?
13       A.  I don't -- I think that I would say that
14  it's a different ultramafic.  Peridotite is
15  composed of pyroxene, whereas dunite is composed of
16  olivine.
17       Q.  We might agree to disagree on that
18  point, but we'll move on.  We can get through the
19  rest of our deposition without coming to an
20  agreement on that point.
21       Let me show you what I'm marking -- I'm
22  going to transition to a new topic area, and that
23  is the topic on the notice that relates to 2A,
24  Roman numeral I, 2A, the identities and owners of
25  the source mines for Imerys or its predecessors

Page 120

1   that sold or supplied talc for use in
2   Johnson & Johnson products.
3        And so I'm going to hand you what I've
4   marked as Exhibit Number 9.
5        (Exhibit 9 was marked for identification.)
6        Q.  (By Ms. O'Dell)  And I promise, there
7   are only a few of these, but this is the second one
8   where the Bates didn't print, and rather than kill
9   another ream of paper, we have -- I've just put,
10  with the help of my colleague, put stickies on the
11  pages where we're going to be having a discussion.
12       Have you -- it's --
13       MR. SILVER:  Can I just interrupt you for
14  one sec?  Has anyone else lost the real-time?
15  Because I lost it, and I just don't know how far
16  back . . .
17       THE REPORTER:  Can we go off the record for
18  a minute?
19       MS. O'DELL:  Yes.
20       VIDEOGRAPHER:  Off the record at 1:34.
21       (Recess taken.)
22       VIDEOGRAPHER:  We are back on the record at
23  1:41.
24       Q.  (By Ms. O'Dell)  Mr. Downey, moving to
25  the topic that relates to the entities that

Page 121

1   supplied or have supplied talc to J&J for its
2   talcum-powder products -- and I put a document in
3   front of you and I've marked it as Exhibit 9.  And
4   it's Imerys Bates number 428014.
5        Have you seen this document before?
6        A.  Yes.
7        Q.  And when's the first -- when did you
8   first have an opportunity to review this document?
9        A.  I think January of this year.
10       Q.  For what purpose did you review it?
11       A.  For the case in New Jersey.
12       Q.  For the Lanzo trial?
13       A.  Yes.
14       Q.  Okay.  Where you provided testimony as a
15  corporate representative of Imerys, true?
16       A.  Yes.
17       Q.  And a couple of questions.
18       First, is it your general understanding that
19  talc for J&J's talcum-powder products was mined or
20  sourced from the Hammondsville Mine from the 1960s
21  pretty much until Argonaut came online in the
22  1990s?
23       MR. PROST:  Object to form; outside the
24  scope.
25       A.  I don't recall how far back it predates,

31 (Pages 118 to 121)

Patrick Downey

Page 122

1  but Hammondsville was an active mine and an
2  approved source in 1989 when Cyprus Mines purchased
3  Windsor Minerals.  And it operated for just a
4  couple years after that Cyprus.
5      Q.  (By Ms. O'Dell)  And in 1989 when Cyprus
6  purchased Windsor Minerals -- and that's the
7  purchase agreement that we have in front of us is
8  Exhibit 9.
9      At that time, Cyprus also owned a mine in
10 Italy, right?  The Val Chisone Mine?
11     MR. PROST:  Outside the scope.
12     A.  Are you saying that Cyprus owned that?
13     Q.  (By Ms. O'Dell)  Yes.
14     A.  No, I don't think so.
15     Q.  Don't think so?
16     A.  No.
17     Q.  And I could be -- I could be incorrect
18 about the time frame.
19     But they did own a processing plant, a
20 talc-processing plant, in South Plainfield, New
21 Jersey, at the time they purchased Windsor
22 Minerals, right?
23     MR. PROST:  Outside the scope.
24     Q.  (By Ms. O'Dell)  You testified to that
25 in your testimony at Lanzo, correct?

Page 123

1      A.  Well, I -- yes, they owned the South
2  Plainfield plant.  I just don't recall when this
3  plant closed.
4      Q.  And that was the plant where asbestos
5  was found, true?
6      MR. PROST:  Object to form; outside the
7  scope.
8      A.  What do you mean?
9      Q.  (By Ms. O'Dell)  Well, when it was
10 inspected by regulatory agencies, asbestos was
11 found, true?
12     MR. PROST:  Same objections.
13     A.  That's not quite my understanding.
14 There was some air monitoring that had been done.
15     Q.  (By Ms. O'Dell)  Did you finish your
16 answer?
17     A.  Well, without recalling the specific
18 document, I didn't review Lanzo in preparation for
19 this.
20     Q.  Do you recall that you testified that
21 the Mine Safety and Health, MSHA for short, went
22 into the South Plainfield facility in 1980,
23 inspected and determined that there was asbestos in
24 talc?  Do you recall that testimony?
25     MR. PROST:  Object to form.

Page 124

1      A.  I don't recall that being my testimony.
2      Q.  (By Ms. O'Dell)  You don't?
3      A.  No.
4      Q.  What was your testimony?
5      A.  If you have it there, we can read it
6  back.  I generally recall testimony about air
7  monitoring of the employees at South Plainfield.
8      Q.  And you don't recall them finding
9  asbestos being present in talc?
10     MR. PROST:  Object to form.
11     A.  There may have been more than one
12 document that we discussed, and I would need to see
13 the document to see if that refreshes my
14 recollection.
15     Q.  (By Ms. O'Dell)  We'll pull that up.
16 And let me get my colleague, if she would do that
17 for me.  And to save time, let's look at the
18 Exhibit 9, the purchase agreement between Windsor
19 Minerals and Cyprus Mines Corporation.
20     A.  Exhibit 9?
21     Q.  I'm sorry?
22     A.  Exhibit 9?
23     Q.  Yes, Exhibit 9.
24     Cyprus purchased the mines and the assets
25 essentially owned by West Windsor

Page 125

1      And those included the mines at Vermont as
2  well as the processing plants, true?
3      MR. PROST:  Object to form.
4      A.  Generally speaking, yes, but when you
5  say "the mines in Vermont," which mines are you
6  talking about?
7      Q.  (By Ms. O'Dell)  Okay.  Here's a list
8  here in the document.  And why don't we go through
9  it in an orderly fashion.  Let's get your general
10 knowledge.  If you'll go to the first tab, you'll
11 see that it's --
12     A.  Time out.  I'm a little bit tangled up
13 in the wire here.  All right.  There we go.
14     Q.  Okay.  If you'll go to 8.5, which is
15 tabbed for you in this -- 8.5 is a subsection of
16 the document.  And it's tabbed for you there with
17 one of the stickies; do you see that?
18     MR. LOCKE:  Sorry.  I'm just trying to see
19 the -- what exhibit is.  I don't want --
20     MS. O'DELL:  Do you need the Bates?
21     MR. LOCKE:  I wasn't able to pull it up
22 right now.  Okay.  Thanks.
23     Q.  (By Ms. O'Dell)  This section relates to
24 a Talc Supply Agreement between Cyprus and J&J.
25     And is it your understanding that a

32 (Pages 122 to 125)

Patrick Downey

<table>
<tr><td>

Page 126

1  principal part of this transaction was that there
2  would be a supply agreement for Cyprus to supply
3  talc to Johnson & Johnson for its talcum-powder
4  products?
5        MR. PROST: Object to form; outside the
6  scope.
7        A. Yes, that's my understanding. And the
8  supply agreement is part of the document.
9        Q. (By Ms. O'Dell) And when you turn over
10  further, Mr. Downey, you'll get to a section 11.2;
11  do you see that?
12       A. Yes.
13       Q. And this is an indemnification section.
14  And this represents J&J will hereby indemnify and
15  hold harmless Cyprus. And if you look further,
16  you'll see that it includes product-liability
17  actions; is that your understanding?
18       MR. PROST: Objection.
19       MR. SILVER: Objection. At this point, I'm
20  going to -- unless I can get a proffer from
21  counsel, I'm going to instruct the witness not to
22  answer. Beyond the scope.
23       MS. O'DELL: It's in the document. It's a
24  document he reviewed for purposes of responding to
25  our scope in the discussions -- or questions about

</td><td>

Page 128

1        MR. SILVER: Objection.
2  I'm instructing the witness not to answer.
3        Q. (By Ms. O'Dell) True?
4        Turn over to the next tab, sir, and you'll
5  see it's on page D2; do you see that?
6        A. D what?
7        Q. D2 is at the bottom of the page. I
8  think you're on the right page, sir.
9        A. That's a 6.
10       Q. Okay. Well, are you on the page that
11  starts "West Windsor" at the top?
12       A. No, I'm on page D6. That's the one
13  that's flagged, the next one that's flagged.
14       Q. I'm sorry, then, we missed a flag. If
15  you'll go back to D2. It lists the mines that were
16  sold as a result of this agreement; do you see
17  that?
18       A. Mine says, "Financially Active Assets."
19       Q. Let's see if I can help here. It says,
20  "Windsor Financial Active Assets." Okay. So we're
21  in the -- and it says, "Year of ACO." And then it
22  says, "Department Description or Reserves." At the
23  bottom it says D2. Is that the right page? Do you
24  mind if I look to see what you're looking at?
25  Yeah, we're on the same page. It says "D2."

</td></tr>
<tr><td>

Page 127

1  the entities that sold talc to Johnson & Johnson.
2        MR. SILVER: That question, though, has
3  nothing to do the with the topics he's here for.
4  And indemnification doesn't have anything to do
5  with general causation.
6        MS. O'DELL: So you're instructing him not
7  to --
8        MR. SILVER: I'm instructing him not to
9  answer.
10       MS. O'DELL: Okay. Are you instructing him
11  not to answer on behalf of the corporation or are
12  you instructing him not to answer in his personal
13  capacity?
14       MR. PROST: I'm instructing him not to
15  answer across the board. He's not here in his
16  personal capacity, so I guess it's in his 30(b)(6)
17  capacity.
18       Q. (By Ms. O'Dell) Have you read that
19  section before, Mr. Downey?
20       MR. SILVER: You can answer the question
21  asked of you. Have you ever read the section?
22       A. I've read it before, parts of it.
23       Q. (By Ms. O'Dell) And it refers to --
24  regardless of what it means, it refers to J&J
25  indemnifying Cyprus?

</td><td>

Page 129

1        A. Sure.
2        Q. Are these a list of the mines conveyed
3  as a part of this purchase agreement, at least in
4  part? Do you see the Hammondsville Mine?
5        A. I see where it says "Hammondsville
6  Mine," yes.
7        Q. Well, let me just stop right here,
8  because you reviewed this agreement, right?
9        A. Pardon?
10       Q. You've reviewed this agreement?
11       A. It's a lengthy agreement. I reviewed it
12  about eight months ago.
13       Q. Okay. Well --
14       A. And I didn't review it in its entirety.
15  It's quite long.
16       Q. What mines were purchased in Vermont as
17  a result of this purchase agreement between Cyprus
18  and Windsor?
19       MR. SILVER: Objection. Again, outside the
20  scope.
21       MS. O'DELL: Why is it outside the scope?
22       MR. SILVER: We're not doing a -- this --
23  these -- the topics that you identified that you
24  believe -- doesn't have anything to do with the
25  history of ownership with respect to use -- the

</td></tr>
</table>

33 (Pages 126 to 129)

Patrick Downey

Page 130

1  topic says, and I quote, 2A, "The identity,
2  locations and owners of the source mines for Imerys
3  or its predecessor talc sold or supplied."
4      We're not talking about the identities and
5  locations. We're talking about ownership
6  interests.
7      MS. O'DELL: Well, right. I'm asking him --
8  this is Cyprus purchasing the mines from Windsor.
9  And I'm asking him -- he says he's reviewed the
10 documents -- what mines were purchased? That's all
11 I want to know. I mean, I'm not trying to be
12 tricky. I'm not trying to, you know, be difficult.
13 So if there's an issue that I'm not
14 understanding --
15     MR. PROST: I think the key part of 2A is
16 the "identity locations of mines that were used to
17 source J&J talcum powder." He's prepared to do
18 that. He's not prepared to tell you what total
19 mines may have been purchased --
20     MS. O'DELL: Okay.
21     MR. PROST: -- for the company.
22     MS. O'DELL: Well, that's fair.
23     Q. (By Ms. O'Dell) I don't really care
24 about some of the others as much as I'm trying to
25 establish that this document, dated in 1989 --

Page 131

1  correct?
2      A. Yes.
3      Q. -- conveyed from Windsor to Cyprus
4  certain mines that ultimately sourced J&J talc.
5      Is that your understanding?
6      MR. SILVER: We don't have any problems with
7  that. That's not my objection. If you would
8  either -- if that's where you're going, then I
9  don't have any problems with it.
10     MS. O'DELL: That's where I'm going.
11     MR. SILVER: Okay.
12     Q. (By Ms. O'Dell) True?
13     A. Yes. The mines that -- if it's found in
14 the document, but my understanding is
15 Hammondsville, Argonaut and Rainbow were the mines
16 that Cyprus Mines acquired from -- or acquired when
17 they acquired Windsor Minerals.
18     Q. Is it also your --
19     A. And -- sorry. And just to be clear, the
20 mines that were approved sources, depending on time
21 frame, for the talc used for Johnson & Johnson
22 products.
23     Q. Also Hamm was a mine that was purchased
24 by Cyprus and was used as a source for J&J talc,
25 true?

Page 132

1      A. Almost. Hamm was purchased from a
2  different company.
3      Q. Okay. What company?
4      A. Omya.
5      Q. All right. When was the Hamm Mine
6  purchased by Omya?
7      A. 1988.
8      Q. So it's your understanding that Cyprus
9  purchased the Hamm Mine in 1988 from Omya, and in
10 1989 they purchased -- Cyprus purchased
11 Hammondsville, Argonaut and Rainbow?
12     A. Yes. Of the mines that eventually were
13 approved sources, or at various times were approved
14 sources for Johnson & Johnson products, those were
15 the mines that were acquired in 1988 and 1989 from
16 Omya and Windsor Minerals respectively.
17     Q. Okay. All right. Fair enough.
18     And we've already agreed that part of this
19 agreement, this purchase agreement, between Windsor
20 and Cyprus was a stock supply agreement between
21 Cyprus and Johnson & Johnson, fair?
22     A. Yes.
23     Q. And if you turn further, you'll see that
24 I've made it a part of the exhibit the Talc Supply
25 Agreement. And if you'll turn over to the first

Page 133

1  sticky there in the Talc Supply Agreement, you'll
2  see there's a section 3(a).
3      MR. PROST: If you could hold on a second,
4  I'm just trying to find it.
5      MS. O'DELL: Yeah. Sure.
6      Q. (By Ms. O'Dell) And it's page 5 of the
7  Talc Supply Agreement. Are you there, Mr. Downey?
8      A. Yeah.
9      MS. O'DELL: Mark, it's page 5. It's
10 further back in the document. It's very early in
11 the Talc Supply Agreement.
12     MR. PROST: Okay. I see. I got it.
13     Q. (By Ms. O'Dell) And my point in asking
14 about this, really, is to establish this: This
15 supply agreement between Cyprus and
16 Johnson & Johnson was such that the buyer, in other
17 words, Johnson & Johnson, agreed to buy a hundred
18 percent of their talc from Cyprus?
19     A. For the first five years, and then in
20 the next five years, it was not less than 98
21 percent.
22     Q. And if you'll turn to, really, the
23 exhibit, you'll see page E.1 of the document. This
24 is the quality standards that were part of the
25 supply agreement, correct?

34 (Pages 130 to 133)

Patrick Downey

| Page 134 |
| --- |

1    A. Yes.
2    Q. And it states, in subsection 1,
3 "Johnson & Johnson is currently and must continue
4 to be asbestos-free as defined from time to time by
5 appropriate governmental agencies in the Cosmetic,
6 Toiletries, and Fragrance Association (CTFA)."
7    Is that your understanding?
8    A. That's what it says, yes.
9    Q. And that's consistent with your
10 understanding?
11    A. Yeah.
12    Q. And if you'll look down to 3, it says,
13 "The Hammondsville and Argonaut ore bodies are
14 approved for carefully controlled selected mining
15 for ore to [sic] use in preparation of grade 66
16 talc," correct?
17    A. "For ore for use," but, yes, that's
18 correct.
19    Q. And grade 66 talc is Johnson & Johnson's
20 Baby Powder and Shower to Shower talc, correct?
21    A. Grade 66 is the talc product that we
22 manufacture for Johnson & Johnson.
23    Q. And if you'll turn over to the next
24 page, the agreement requires that the shipments
25 "may only be made from silos whose contents," and

| Page 135 |
| --- |

1 if you'll gown to subsection B, "have been tested
2 for conformance to specifications through the use
3 of test methods and techniques provided and
4 detailed by BPC as referenced in talc
5 specifications above."
6    In other words, to sum it all up, there were
7 very specific specifications that J&J required to
8 be met by all talc that was sold to it, correct?
9    A. Yes.
10    Q. And those specifications were part of
11 the purchase agreement -- or the supply agreement,
12 excuse me, true?
13    A. Yes, they were.
14    Q. And if you'll turn over to -- it's E5.
15 These are at least page 1 of the specifications and
16 requirements; is that correct?
17    A. E5?
18    Q. Yes.
19    A. It says "Page 2" on the header.
20    Q. At the bottom it says "E5," and the page
21 is entitled "Description: Properties and
22 Requirements"; do you see that?
23    A. Yes.
24    Q. And these are the specifications that
25 Cyprus was required to comply with regarding the

| Page 136 |
| --- |

1 talc supplied to J&J, correct?
2    A. Yes.
3    Q. And in relation to asbestos, the
4 standard was "None detected."
5    Asbestos is defined to be the fibrous
6 serpentine chrysotile and the fibrous forms of the
7 amphibole group as represented by amosite,
8 anthophyllite, crocidolite, tremolite and
9 actinolite; is that correct?
10    A. Yes.
11    Q. And if you'll go down further, in terms
12 of heavy metals, the specification was there could
13 be no more than 10 parts per million, true?
14    A. It says "NMT 10 PBM." That's my
15 understanding.
16    Q. "NMT" means no more than?
17    A. That's my understanding, yes.
18    Q. And as to arsenic, the standard, in
19 other words, the talc could have no more than 2
20 parts per million, true, in order to be compliant
21 with J&J's specifications?
22    A. Yes.
23    Q. And if talc supplied by Cyprus to J&J
24 had, for example, fibrous serpentine, that product
25 would be out of specifications, true?

| Page 137 |
| --- |

1    A. Yes.
2    Q. And it would be, in essence, defective
3 in comparison to the specifications required by
4 Johnson & Johnson?
5    MR. PROST: Object to form.
6    A. It would be out of specification. I
7 don't know what you mean by "defective."
8    Q. (By Ms. O'Dell) Okay. Same would be
9 true if arsenic was at a level in the talc provided
10 to J&J at a rate more than two parts per million.
11 That would be out of specification?
12    A. Yes.
13    Q. Let me have you turn over about three
14 pages. And there's a -- maybe one more,
15 Mr. Downey. There's a material safety data sheet.
16 There you go. You'll see that. It's a material
17 safety data sheet that was part of the contract,
18 supply contract, between Cyprus and J&J.
19    And you see it's dated September 13, 1985?
20    A. Looking for the date.
21    Q. It's in the upper portion of the
22 document.
23    A. Oh, I see it. Okay.
24    Q. "Date Issued." It says, "Trade name and
25 synonym grade 66 talc," right? That's J&J talc,

35 (Pages 134 to 137)

Patrick Downey

Page 138

1  true?
2      A. Yes.
3      Q. And the material safety data sheet says,
4  "Note"; do you see that?  "Does not contain
5  asbestiform minerals and contains less than 1
6  percent crystalline silica"; did I read that
7  correctly?
8      A. Yes.
9      Q. So on the material safety data sheet
10 provided by Cyprus to Johnson & Johnson, it stated
11 there were no -- that the talc does not contain
12 asbestiform minerals, true?
13     A. No.
14     Q. Okay.  Why is that not true?
15     A. This is the material safety data sheet
16 of Windsor Minerals dated 1985.  That wasn't a
17 Cyprus product at that time.
18     Q. Did you make it a part of the material
19 safety data sheet -- did Cyprus make that a part of
20 the materials they provided to Johnson & Johnson
21 when they shipped talc?
22     A. Cyprus would have updated the material
23 safety data sheet so that it would have been issued
24 from them, I would expect, but your question was
25 specifically about this document that was dated in

Page 139

1  1985, and I just wanted to make sure that the
2  record was clear.
3      Q. That's fair.
4      Have you seen the Cyprus version of this
5  material safety data sheet for grade 66 talc?
6      A. I don't recall.
7      Q. At least on this MSDS sheet, the
8  statement is that the product does not contain
9  asbestiform minerals, correct?
10     A. That's what it says.
11     Q. All right.  So Cyprus bought Windsor and
12 Argonaut and Hammondsville and Rainbow in 1989.
13 We've already established that --
14     A. Slow down.  I just want to catalog to
15 make sure that I'm following.  So you said?
16     Q. Mr. Downey, nobody ever tells me to slow
17 down, I talk so slow.  So that's a
18 once-in-a-lifetime.  But I will slow down.  So I'm
19 just wrapping up.
20     So this document was a purchase agreement
21 for Cyprus to buy Windsor Minerals, that part of
22 that transaction was the purchase of the
23 Hammondsville, Argonaut and Rainbow mines?
24     A. Yes.
25     Q. And prior to that agreement in 1989,

Page 140

1  Cyprus had already purchased the Hamm Mine in 1988,
2  true?
3      A. Yes.  That's what I said.
4      Q. And then, in 1992, Rio Tinto Minerals,
5  RTM for short, purchased Cyprus?
6      A. RT -- RTZ America purchased Cyprus Talc
7  Corp. in 1992.
8      Q. Okay.  Let me show you what I'm marking
9  as Exhibit Number 10.
10     (Exhibit 10 was marked for identification.)
11     MS. O'DELL:  And there are Bates numbers.
12 I've got one more.  Exhibit 10 is Bates-numbered
13 Imerys-MDL-AB-0008412.
14     Q. (By Ms. O'Dell)  Mr. Downey, have you
15 seen this document before?
16     A. Yes, or various portions of it.
17     Q. I will represent to you that the total
18 documents, about 900 pages -- and I have culled it
19 down to the most relevant portions.
20     A. I appreciate that.
21     Q. Yeah.
22     A. What page are you on?
23     Q. It was just a prefatory question.  I was
24 just looking at the -- I was looking, actually, at
25 page 3 of the document.  You're welcome to turn

Page 141

1  there, but I was just going to ask you a general
2  question, because I'm going to draw an objection
3  from your counsel if I ask about any of the
4  business aspects of it.
5      So the question, I really want to say
6  generally, is this was a stock purchase between
7  Cyprus Mines Corporation, Cyprus Minerals and RTZ
8  America, Inc., true?
9      A. Cyprus Minerals Company, if you want to
10 read the whole thing.  The reason I'm trying to be
11 clear is that there are so many Cyprus entities, I
12 just want to make sure we know what we're talking
13 about Cyprus.
14     Q. Well, the document says -- I'm not
15 fussing with you, this says "Cyprus Mines
16 Corporation and Cyprus Minerals Corporation," so I
17 don't want to talk at cross-purposes.  I'm not
18 looking beyond that.  I'm just telling you that's
19 what this document is.  And it's a stock purchase
20 agreement between those companies, those Cyprus
21 companies, and RTZ.
22     A. Again, for clarity, I believe it's
23 Cyprus Mines Corporation and Cyprus Minerals
24 Company, not corporation.  I'm just trying to make
25 sure we're clear.

36 (Pages 138 to 141)

Patrick Downey

| Page 142 |
|---|

1    MR. SILVER: Yeah. Leigh, I don't think --
2    just -- so the witness is, I think, looking at the
3    table of contents, and I think that's where he's
4    getting it from. I don't know what page you were
5    reading off, so that's . . .
6    MS. O'DELL: Okay.
7        A. It's the same on the cover page as well.
8        Q. (By Ms. O'Dell) Okay. I -- I mean,
9    it's really -- I was trying to read that. If I
10    read it incorrectly, I didn't mean to. So it's
11    Cyprus Mines Corporation, Cyprus Minerals Company,
12    sold stock, all the stock, of those corporations to
13    RTZ America essentially transferring ownership
14    interest in all the mines that had been sourcing
15    J&J talc which we've established were
16    Hammondsville, which was the initial mine, Hamm,
17    Rainbow, Argonaut.
18        Those assets were transferred with this
19    agreement through a stock purchase to RTZ America,
20    Inc.?
21    MR. PROST: Object to form.
22        A. The document will speak for itself.
23    There were parts of the Hamm property that were
24    left behind.
25        Q. (By Ms. O'Dell) But the Hamm Mine

| Page 143 |
|---|

1    itself was a part of the agreement that resulted in
2    ownership being transferred to Rio Tinto?
3    MR. PROST: Object to form.
4        A. There were two Hamm mines. That's why
5    I'm trying to be clear. The Hamm underground mine
6    did not transfer in this transaction. The Hamm
7    open pit did.
8        Q. (By Ms. O'Dell) Let's get more basic.
9    RTZ America is Rio Tinto. Let's make sure
10    that's clear on the record.
11        A. RTZ is Rio Tinto Zinc. That's what it
12    stood for.
13        Q. Let me ask you to turn to Bates
14    number 9025, "Schedule 5.16 Environmental
15    Information."
16        A. I'm sorry. 90?
17        Q. 9025.
18        A. 25.
19        Q. Do you see that, sir?
20        A. I'm there. Yes.
21        Q. And so this was environmental
22    information that was made a part of the stock
23    purchase agreement, correct?
24        A. Yes.
25        Q. Okay. And so if you'll turn over two

| Page 144 |
|---|

1    pages, it has due diligence regarding Vermont talc;
2    do you see that?
3        A. Can you give me a hint on where it's at?
4        Q. Yeah.
5        A. 9027?
6        Q. Yeah. 9027. Yup.
7        A. Okay. What . . .
8        Q. The upper third of the page, you see
9    April 11, 1988.
10        A. Okay.
11        Q. "Due diligence on Vermont talc," do you
12    see that?
13        A. Yes.
14        Q. And so this is information about the
15    mines owned at that time by Cyprus providing
16    due-diligence information to Rio Tinto as part of
17    this purchase agreement, correct?
18        A. More specifically, these were Rio
19    due-diligence documents that Cyprus had prepared in
20    1988 in advance of their purchase of the Vermont
21    Talc Company.
22        Q. And these were -- this was -- these were
23    documents -- this document was made a part of the
24    purchase agreement between Rio Tinto and Cyprus?
25    MR. PROST: Object to form.

| Page 145 |
|---|

1        A. It was included in the document, yes.
2        Q. (By Ms. O'Dell) Yes. And this
3    document, if you'll look down at the bottom, refers
4    to the Hamm Mine; do you see that?
5        A. Yes.
6        Q. And this states -- and this is Cyprus,
7    as you point out, writing this -- "Will require
8    selective mining to avoid actinolite and to control
9    arsenic levels."
10        That was part of the information that was
11    conveyed to Rio Tinto, true?
12    MR. PROST: Object to form.
13        A. It was information conveyed to
14    Rio Tinto, and the source of the information and
15    the date is 1988.
16        Q. (By Ms. O'Dell) Okay. Now, turn over
17    to page 6. And it's Bates number -- excuse me --
18    9030.
19        A. 30?
20        Q. Yeah. 9030. Do you see that?
21        A. I'm there. Yes.
22        Q. It says October -- dated October 19th,
23    1988.
24        A. Okay.
25        Q. It says, "Hammondsville Mine:

37 (Pages 142 to 145)

Patrick Downey

Page 146

1   Amphiboles in hanging and foot walls"; do you see
2   that?
3       A. Yes.
4       Q. "Rainbow Mine:  Elevated levels of
5   amphiboles"; do you see that?
6       A. Yes.
7       Q. "Argonaut Mine:  Amphiboles in hanging
8   walls."
9       A. "Hanging wall."
10      Q. Excuse me.  Didn't mean to put an "s" on
11  there.  "Hanging wall."
12      All right.  Did I read those correctly?
13      A. Yes.
14      Q. And that was information provided to
15  Rio Tinto as a part of this purchase agreement,
16  correct?
17      A. Yes.
18      Q. You can put that aside, Mr. Downey.
19      So in 1992, Rio Tinto purchased Cyprus
20  Mineral Company and Cyprus -- hang on, I'll get it
21  right -- Cyprus Mines Corporation and Cyprus
22  Minerals Company?
23      A. No.
24      Q. I just read it from the document.
25      A. You said that Rio Tinto purchased Cyprus

Page 147

1   Mines Corp. and Cyprus Minerals Company.  No, they
2   didn't.
3       Q. Okay.  All right.  How'd I get the
4   transaction wrong, then?  They purchased the stock?
5       A. They purchased the stock of Cyprus Talc
6   Corporation.  The document -- I can give you a
7   synopsis of it, but the document speaks for itself.
8   In 1992, for the purpose of selling the talc
9   business, Cyprus Mines Corporation took its
10  then-existing talc business and formed a new
11  corporation called Cyprus Talc Corporation.  And it
12  put the talc business into Cyprus Talc Corp.  And
13  it was that entity, Cyprus Talc Corporation, that
14  Cyprus Mines Corp. and Cyprus Minerals Company sold
15  to RTZ America except for the portion of the Hamm
16  property that was left behind.
17      Q. And in regard to the portion of the Hamm
18  property that went with the sale -- so a portion of
19  the Hamm was left behind --
20      A. Okay.  Yeah.
21      Q. -- and a portion went with the sale?
22      A. Right.
23      Q. And the portion that went with the sale
24  was the portion with the mine?
25      A. Again, there were two Hamm mines.  It

Page 148

1   was the Hamm open-pit mine that went with the
2   transaction.
3       Q. That's fair.  That's fair.
4       A. It was the Hamm underground mine that
5   was left behind.
6       Q. Yeah, that's fair.  That's what I was
7   trying to convey.  I mean, because, clearly,
8   Rio Tinto purchased the Hamm open-pit mine and,
9   indeed, after that transaction, extracted talc ore
10  that was then sold to Johnson & Johnson, true?
11      MR. PROST:  Object to form.
12      A. That acquisition was in 1992.
13      Q. (By Ms. O'Dell)  Yes.
14      A. The Hamm Mine was eventually approved as
15  a source for Johnson & Johnson product, I believe
16  it was, like, September of 1990.  There are
17  documents that show when that happened.  And I
18  don't recall how long Hamm was used as a source,
19  you know, if it continued after 1992, so I'm --
20  the -- we can find it in the documents, but I'm
21  just trying to make clear, because Hamm was used
22  for a limited period of time, and then by, like,
23  1994, Argonaut was the sole source.  That's my
24  understanding.
25      Q. Okay.  I think the timeline's a little

Page 149

1   bit different in the documents.  But you and I
2   basically agree, Hamm was a source for J&J talc --
3       A. Oh, it's clear.  Yes.
4       Q. And the open pit -- Hamm -- the open-pit
5   mine was a source for --
6       A. Yes.
7       Q. -- J&J talc.
8       Following Rio Tinto's purchase of Cyprus
9   Talc Corporation in '92, the name of the
10  corporation was changed to Luzenac America, Inc.,
11  correct?
12      A. Shortly after the transaction, Cyprus
13  Talc Corporation, that was that newly created
14  corporation about to convey the talc business -- or
15  to sell it, that was renamed Luzenac America, Inc.
16      Q. And what began as Cyprus and then
17  transitioned to RTZ America and then to Luzenac
18  America, Inc., those corporations, from 1989 until
19  2003, sold talc mined in Vermont to J&J for
20  purposes of their Baby Powder products?
21      MR. PROST:  Object to form.
22      A. Based on time frame -- when you say
23  "Cyprus," I just need to be clear, because there's
24  so many different Cyprus entities, and I don't want
25  to make a mistake on the record.

Patrick Downey

Page 150

```
 1          It's my understanding that, beginning in
 2    1989, Cyprus Mines, through its acquisition of
 3    Windsor Minerals, supplied grade 66 to
 4    Johnson & Johnson -- just a minute -- until Cyprus
 5    Mines Corp. sold off the talc business to Rio Tinto
 6    in 1992.  Then in 1992, as part of that
 7    acquisition, Luzenac America sold grade 25 to
 8    Johnson & Johnson from '92 until 2003 from Vermont.
 9      Q.  Yes.
10      A.  Or from the mines we discussed in
11    Vermont.
12      Q.  And as a part of Rio Tinto's
13    due-diligence process prior to the stock purchase
14    of Cyprus Talc, Cyprus provided information to
15    Rio Tinto on the ore bodies involved in the
16    Vermont mines as well as information about ore
17    reserves, et cetera?
18      MR. PROST:  Outside the scope.
19      Q.  (By Ms. O'Dell)  And that was all a part
20    of the due-diligence process, true?
21      A.  Due diligence is a multi-faceted process
22    to understand the nature of the business.  And
23    there are lots of types of documents and
24    information that's exchanged between the
25    corporations in regard to that due-diligence
```

Page 151

```
 1    process.
 2      Q.  Certainly, information about ore
 3    reserves would be something that a company would be
 4    very interested in prior to purchasing a mine,
 5    true?
 6      MR. PROST:  Object to form.
 7      A.  Yeah.  The ore reserves are important.
 8      Q.  (By Ms. O'Dell)  That's right.  Hugely
 9    important, because that's how you evaluate the
10    worth of that particular asset, true?
11      A.  It's one of the components that you --
12    that helps establish the value.
13      Q.  It's an important component?
14      A.  It's one of many important components.
15      Q.  Well, there's no -- if you're in the
16    mining business and there's no ore to be mined, you
17    don't want to purchase the mine, in most
18    situations, true?
19      A.  Generally speaking, I'd agree with that.
20      Q.  Yeah.
21      (Exhibit 11 was marked for identification.)
22      Q.  (By Ms. O'Dell)  Let me hand you what
23    I've marked as Exhibit 11.  It's a document
24    entitled "Cyprus Ore Reserve Evaluation Preliminary
25    Summary" by R.C. Munro.
```

Page 152

```
 1      MR. PROST:  If we could just say the Bates
 2    number?
 3      MS. O'DELL:  Yeah.  Thanks, Mark.  Happy to.
 4    Imerys 425354.
 5      Q.  (By Ms. O'Dell)  Have you seen this
 6    document before?
 7      A.  Yes.  It's been a while, but yes.
 8      Q.  And if you'll look at the introduction
 9    of the document, Mr. Downey, you'll see it says --
10      A.  Can you hold a second?
11      Q.  Sure.
12      A.  (Document reviewed.)  I may have
13    misspoke.  In the past, I've seen a document from
14    R.C. Munro that, at least on the first page, I
15    thought was familiar, but as I look in the
16    document, this -- this might be a different
17    document.
18      Q.  Okay.
19      A.  Sorry about that.
20      Q.  Yeah.  No problem.  But this is a
21    document produced by Imerys in the production for
22    the litigation, correct?
23      A.  Yes.  It has an Imerys Bates reference.
24      Q.  Would -- an ore reserve evaluation would
25    be something that would be kept by a mining company
```

Page 153

```
 1    in the normal course of business?
 2      A.  It's a document that is contained in
 3    Imerys' files.  This particular one, though, I
 4    think was a third-party document, and I don't
 5    remember its progeny, or its source.  I know it was
 6    in our files, but I don't know if it was a company
 7    document.
 8      Q.  That's really all -- that's what I'm
 9    asking.  Is it something that would be maintained
10    in the normal course of business?
11      So this is a Cyprus -- this is information
12    that's being given by Cyprus in advance of the
13    Rio Tinto transaction.  If you look, it says, "A
14    complete evaluation of CIM talc reserves is
15    underway."
16      MR. PROST:  Object to form.
17      A.  This is --
18      Q.  (By Ms. O'Dell)  Did I read that
19    correctly, sir?  That was my question.
20      A.  Well, you characterized it as
21    information provided by Cyprus.  This isn't a
22    Cyprus report.
23      Q.  Okay.  Let me go down further.
24      Is it your position that this is a document
25    that was generated by Rio Tinto?
```

39 (Pages 150 to 153)

Patrick Downey

Page 154

1    A. I don't know who it was generated by
2  other than the author is shown as R.C. Munro. I
3  don't recall -- other than his name being on the
4  document, I don't know who he worked for, but it's
5  my general understanding, based on seeing it in the
6  past, I think it was some sort of external review.
7    Q. Well, the complete evaluation is "CIM
8  talc reserves, and I believe that to mean Cyprus
9  talc reserves, "is underway."
10    And if you'll look in the first paragraph,
11  it says (as read:) Two USB senior geologists have
12  been conscripted part-time for independent reserve
13  calculations on the important talc deposits.
14    Then further, it says (as read:) We've been
15  working with Philippe Moreau of Talc Luzenac, Ernie
16  Reade of CIM and the CIM geological staff; did I
17  read that correctly?
18    MR. PROST: Object to form.
19    A. Parts of it. I think you skipped a word
20  in the upper one, and you skipped over some things.
21    Q. (By Ms. O'Dell) I didn't intend to read
22  every word, but what I read, I read correctly,
23  fair?
24    A. You skipped over some words and some
25  other things, but what you read was correct.

Page 155

1    Q. All right. Philippe Moreau is an
2  employee of Talc Luzenac. Philippe Moreau
3  currently is an employee of Imerys Europe, correct?
4    A. I have no idea.
5    Q. Have you heard that name before?
6    A. Only in a document like this.
7    Q. And you understand that he was a senior
8  geologist for Luzenac, correct?
9    A. I don't know.
10    Q. Okay. Let me ask you to turn to page 2
11  of the document. Let's see if I can get it on the
12  screen correctly.
13    It says -- it's referring to Hammondsville.
14  And that's the Hammondsville Mine, the underground
15  mine we referred to earlier, true?
16    A. Yes.
17    Q. "Hammondsville and Beaverhead appear to
18  have no significant economic value as reserves."
19    Then it talks about the Troy deposit. "The
20  usable tonnage at the Troy deposit is substantially
21  reduced."
22    A. The what? Did you say "unusual"?
23    Q. No, I didn't. "Usable."
24    A. Oh, okay. I'm sorry. My hearing isn't
25  the best. I apologize.

Page 156

1    Q. It says, "The Hamm deposit needs more
2  detailed study before its future value is
3  understood. Significant additional potential may
4  exist at Argonaut"; do you see that?
5    A. Yes.
6    Q. So this is a document that's evaluating
7  Hammondsville. It's evaluating Hamm. It's
8  evaluating Argonaut, all three mines that sourced
9  J&J talc, true?
10    MR. PROST: Object to form.
11    A. This is a document that indicates that
12  the review is ongoing.
13    Q. (By Ms. O'Dell) That's not my question,
14  sir.
15    I'm asking you, this is -- these -- the
16  review covers the three of the four mines that you
17  and I have agreed were sources of talc for J&J Baby
18  Powder and Shower to Shower; is that correct?
19    MR. PROST: Object to form and foundation.
20    A. It includes those mines, yes.
21    Q. (By Ms. O'Dell) Yes. And it says,
22  you'll look further down, "Some problems with
23  several of the mine reserve sites have emerged.
24  Fibrous minerals - tremolite and actinolite are
25  ubiquitous in several zones of the Vermont mines.

Page 157

1  The potential problems involved with fibre in
2  dumps, and to some degree in products, must be
3  carefully evaluated"; did I read that correctly?
4    A. Yes.
5    Q. If you'll turn over to page 4, at the
6  top of the page, it says, "Arsenic minerals, both
7  insoluble sulfides and the more soluble arsenate
8  minerals are problems that restrict productivity in
9  an effort to keep product under 3 parts per million
10  soluble as in the West Windsor and Johnson Mills."
11    West Windsor is the mill that processed
12  J&J's talc, correct?
13    A. Yes.
14    Q. You'll turn over to page 23 of the
15  document, do you see it's discussing Vermont? Okay.
16  Okay.
17    Talks about two dry mills, two flotation
18  plants, five mines at the three Vermont locations.
19    And then it goes down to say -- and it's
20  talking about mineralogy. It says, "The area
21  containing these reserves is all within the
22  Appalachian Ultramafic Belt that trends north-south
23  through the state. In certain areas, these
24  ultramafics host talc carbonate rock developed by
25  the alteration of serpentine bodies," correct?

40 (Pages 154 to 157)

Patrick Downey

Page 158

1      A. That's what it says.
2      Q. And that's consistent with the
3  discussion you and I had earlier, though we
4  disagree about what type of ultramafic rock may
5  have been involved, fair?
6      A. Generally, yes.
7      Q. If you'll turn over to page 24, it says,
8  (as read:) Talc alteration typically is strongest
9  at the outer borders of the talc bodies and
10  decreases gradationally inwards terminating rather
11  abruptly at the boundaries of the non-altered talc
12  serpentinite; did I read that correctly?
13      A. No.
14      Q. Okay. What'd I get wrong?
15      A. You inserted the word "talc" before
16  "serpentinite."
17      Q. Okay. "Talc alteration typically is
18  strongest at the outer borders of the talc bodies
19  and decreases gradationally inwards terminating
20  rather abruptly at the boundaries of non-altered
21  serpentinite"; did I read that correctly now?
22      A. Yes, you did.
23      Q. "Within the talc bodies are found
24  discontinuous bed-like lenticular bodies of
25  chlorite and amphibole minerals, termed locally as

Page 159

1  'cinders,' see sketch," and there's a sketch below,
2  all right? Do you see that?
3      A. Yes.
4      Q. And so according to Mr. Munro, chlorite
5  and amphibole minerals compose what are termed
6  locally there in Vermont, I'm assuming, as cinders,
7  correct?
8      MR. PROST: Object to form.
9      A. That's what it says.
10      Q. (By Ms. O'Dell) And we would agree,
11  Mr. Downey, that amphibole minerals can be
12  asbestos, such as tremolite, actinolite and other
13  types of amphiboles, true?
14      A. Generally speaking, amphiboles is a very
15  broad family of minerals that are quite common in
16  the earth's crust.
17      Q. That's not my question. I move to
18  strike the answer.
19      I'm just asking if asbestos that I listed,
20  tremolite, actinolite being two, are also part of
21  the amphibole minerals.
22      MR. PROST: Object to form.
23      Q. (By Ms. O'Dell) True?
24      A. Tremolite and actinolite are amphibole
25  minerals, yes. They occur --

Page 160

1      Q. Okay. Yes. All right. Cool.
2      MR. PROST: I think he's not finished with
3  his response. I'd like to let him finish.
4      Q. (By Ms. O'Dell) You may finish,
5  Mr. Downey, but -- and I want to be fair to you.
6  You can finish your answer, but it'll just be
7  easier if you'll answer my question when it's a
8  very clear answer, a very clear-cut question like
9  that. So you may finish.
10      MR. PROST: Well, I think he can answer to
11  the extent he thinks he needs to to honestly answer
12  the question.
13      So go ahead, Pat, if you'd like, to continue
14  what you were saying.
15      A. Tremolite and actinolite are amphibole
16  minerals. Their most common occurrence is in the
17  nonasbestos variety. Their occurrence in the
18  asbestos variety as tremolite asbestos or
19  actinolite asbestos is actually rare.
20      Q. (By Ms. O'Dell) Okay. Thank you for
21  your answer.
22      MS. O'DELL: Counsel, just so you know, that
23  response -- I didn't ask if they were rare. I
24  didn't ask how common they were. Didn't ask any of
25  those questions. So to be fair to me, I'm just

Page 161

1  asking you to instruct your client -- he can answer
2  my question. I'm going to give him a chance, and
3  I'm going to be very cordial, but he should answer
4  my question and . . .
5      MR. PROST: Sometimes I think a question
6  can't be answered with a simple yes or no, the way
7  you want it to be answered. And so I think the
8  witness was honestly trying to answer it in a way
9  that gave it full and honest context. So I'm going
10  to say -- I'm not going to tell him to limit his
11  response if he feels like he needs to answer it
12  honestly. I'm not saying to not answer the --
13      MS. O'DELL: If I have to ask the
14  question -- to be fair, if I ask the question if
15  actinolite and tremolite asbestos are amphibole
16  minerals, that's an easy "yes." I'm not being
17  tricky. That's an easy "yes." So anyway, let's --
18  I'll move on.
19      MR. PROST: Well, that's fair, but I think
20  you asked him a different question than that, but
21  you're right. Let's go on.
22      Q. (By Ms. O'Dell) Okay. This is a
23  sketch --
24      THE WITNESS: Can you just refill my water?
25      MR. PROST: Sure.

41 (Pages 158 to 161)

Patrick Downey

Page 162

1      Q. (By Ms. O'Dell)  -- of part of the -- of
2  sort of a rough sketch, it looks like, of a talc
3  deposit in Vermont; do you see that?  And it's
4  depicting schist, right, sort of on the outer walls
5  here?  That's schist, right, as you see?  And I'm
6  doing a poor job with my highlighter coloring, but
7  what I've marked is schist, correct?
8      A. Can you blow it up?
9      Q. Yeah.  Better?  Fair?  That's what --
10 what I've colored is schist, right?
11     MR. PROST: Object to form; foundation, with
12 this sketch.
13     A. This, I think, is the first time I've
14 seen the sketch.  It lists schist on the edges.  It
15 doesn't have any arrows, you know, pointing over
16 there to the zones like he does for other examples,
17 so I don't know.
18     Q. (By Ms. O'Dell) All right.  Fair
19 enough.
20     They go on to talk about the "deleterious
21 minerals present in the bodies" at the bottom of
22 the page; do you see that?
23     "Deleterious minerals present in the
24 bodies" -- and we're talking about Vermont talc ore
25 bodies -- "include arsenic sulphides, metallic

Page 163

1  arsenates, iron and fibrous minerals, principally
2  tremolite and actinolite"; did I read that
3  correctly?
4      A. Yes.
5      Q. And so the amphibole minerals that are
6  present -- some of the deleterious source of the
7  amphibole minerals present are fibrous tremolite
8  and actinolite.  And those are asbestos, correct?
9      MR. PROST: Object to form.
10     A. That's not my understanding.
11     Q. (By Ms. O'Dell) Fibrous tremolite and
12 fibrous actinolite are considered asbestos, true?
13     MR. PROST: Object to form.
14     A. Not always.
15     Q. (By Ms. O'Dell) When they're fibrous,
16 they are generally considered to be asbestos, fair?
17     MR. PROST: Object to form.
18     A. The inclusion of the word "fiber" or
19 "fibrous" in the definition of what was asbestos,
20 it led to a lot of ambiguities and misunderstanding
21 between geologists and mineralogists and others.
22 And by itself, "fibrous," without other
23 morphological mineral logic criteria, doesn't add
24 meaning to the description.
25     MS. O'DELL: Move to strike as

Page 164

1  nonresponsive.
2      Q. (By Ms. O'Dell) Fibrous tremolite is
3  considered to be an asbestiform mineral, true?
4      MR. PROST: Object to form.  And I think his
5  answer was responsive.  This move to strike as
6  nonresponsive, as my understanding of the
7  deposition guidelines, is not a proper thing to say
8  at the deposition.
9      Q. (By Ms. O'Dell) True, Mr. Downey?
10     A. I forgot your question.  I'm sorry.
11     Q. Okay.  I'll go back.
12     Fibrous tremolite is considered to be an
13 asbestiform mineral, true?
14     MR. PROST: Object to form.
15     A. Asbestiform, or asbestos, are the
16 elongate flexible separable high-tensile-strength
17 chemically and thermally resistant -- if you want
18 to call them fibers at that point, but they need to
19 meet morphologic characteristics, not just a
20 definition of a fiber based on certain length or
21 diameter criterion.  For it to be asbestos,
22 tremolite asbestos, it needs to also exhibit the
23 morphologic characteristics that are actually
24 asbestos.
25     Q. (By Ms. O'Dell) Well, assume that

Page 165

1  whatever characteristics you have in mind are
2  met -- and I don't know what those are, and I'm not
3  asking you because I'm going to ask -- or somebody
4  on my -- on the Plaintiffs' Steering Committee will
5  ask Miss Pier about those characteristics.
6      But assuming that those characteristics are
7  met, fibrous tremolite is asbestos, true?
8      MR. PROST: Object to form.
9      Q. (By Ms. O'Dell) I'm not trying to be
10 tricky.  It's a type of asbestos.  You list it on
11 your chart in Exhibit 5.  So, true?
12     MR. PROST: Object to form.  And it's
13 getting repetitive.  You're asking him to make a
14 blanket statement.  He said he can't.  He's
15 answered the question.
16     MS. O'DELL: He hasn't answered my question.
17     MR. PROST: Well, you asked him whether
18 fibrous tremolite was asbestiform.  And he's saying
19 not necessarily.  There's all these other
20 characteristics that he said for you.  That's his
21 answer.
22     MS. O'DELL: All right.  Fair enough.
23     Q. (By Ms. O'Dell) You say not
24 necessarily.  If it says -- as fibrous tremolite,
25 it's not necessarily asbestos; is that your

42 (Pages 162 to 165)

Patrick Downey

Page 166

1  position? That's what your counsel said. I mean,
2  if that's a good summary, I want to know that.
3      A. I don't think that that's a good
4  summary, because in order to identify it and
5  describe it as asbestos, we need to use careful
6  language. And if it's the asbestos variety of
7  tremolite that exhibits those morphologic
8  characteristics of elongate fibers that are
9  separable, that are chemically and thermally
10  resistant, they're fibrile bundles that are
11  flexible, those aspects -- and Julie Pier can talk
12  more about the morphologic characteristics, but
13  they need to exhibit -- the mineral needs to
14  exhibit those characteristics in order to be
15  tremolite asbestos.
16      And the careful use of the language is not
17  to just call it tremolite, but actually to say, in
18  that form with those mineral morphologic
19  characteristics, that habit, that that is tremolite
20  asbestos.
21      Q. Okay.
22      MR. PROST: And when there's an appropriate
23  to time for you, if we could take a break pretty
24  soon. I think we've been going for a while.
25      MS. O'DELL: Okay. Let me get through with

Page 167

1  this.
2      Q. (By Ms. O'Dell) So in regard to the
3  sentence I just read, it relates to the deleterious
4  minerals present in Vermont bodies, giving it
5  context, principally -- excuse me. Back up.
6      "...fibrous minerals, principally tremolite
7  and actinolite," you're saying that's not
8  necessarily asbestos, but it's also equally true it
9  could be asbestos.
10      MR. PROST: Object to form.
11      Q. (By Ms. O'Dell) Fair?
12      A. Not with respect to. That doesn't
13  conform with our understanding.
14      Q. You're saying, on behalf of Imerys
15  categorically, there has never been tremolite
16  asbestos in the ore deposit?
17      MR. PROST: Object to form.
18      A. Correct.
19      Q. (By Ms. O'Dell) Are you saying, on
20  behalf of the company, under oath, that chrysotile
21  asbestos has never been found at Argonaut?
22      MR. PROST: Object to form.
23      A. That's correct. That's my
24  understanding.
25      Q. (By Ms. O'Dell) And would you say that

Page 168

1  it's also true in relation to the Hammondsville,
2  Hamm and Rainbow mines that neither tremolite or
3  chrysotile has been found in those mines?
4      MR. PROST: Object to form.
5      A. I'm not aware of those being found in
6  those other mines.
7      Q. (By Ms. O'Dell) And in relation to the
8  four mines that sourced J&J talc -- Hammondsville,
9  Hamm open pit, Rainbow and Argonaut -- is it your
10  testimony, on behalf of Imerys, that actinolite
11  asbestos has never been found in any of those
12  mines?
13      MR. PROST: Object to form.
14      A. That's my understanding.
15      Q. (By Ms. O'Dell) Okay. All right. Let
16  me ask you to turn to page 26. We're still on
17  Exhibit 11.
18      MR. PROST: Is now not a good time to take a
19  short break?
20      MR. SILVER: Let her finish the document.
21      MR. PROST: Oh, if you want to finish the
22  document, that's fine if you want to do that.
23      MS. O'DELL: Yeah. That'd be helpful if we
24  could do that.
25      MR. PROST: Sure.

Page 169

1      Q. (By Ms. O'Dell) On page 26, at the top,
2  it talks about "Arsenic sulphides and arsenates
3  encapsulated in talc grains are found in varying
4  degrees from deposit to deposit and appear to be
5  concentrated in the structurally distributed zones,
6  shears and fractures according to the Cyprus
7  staff"; did I read that correctly?
8      A. Yes.
9      Q. And is that consistent with your
10  understanding that arsenic occurred at high levels
11  in certain portions of the mines at Vermont?
12      MR. PROST: Object to form.
13      A. Generally speaking, it's my
14  understanding that arsenic locally could be at an
15  elevated value, but generally speaking, the talc
16  source for Johnson & Johnson was low arsenic ores
17  that had been identified and designated as such.
18      Q. (By Ms. O'Dell) It goes on to say,
19  (read as:) Fibrous amphiboles are noted in
20  footwall and hanging wall zones and in grey talcs
21  near these areas; they are found within and
22  bordering some of the "cinder" zones and at the
23  contact zone with serpentine; did I read that
24  correctly?
25      A. That's what it says.

43 (Pages 166 to 169)

Patrick Downey

Page 170

1      Q.  And the contact zone that's being
2  referred to there, Mr. Downey, is the contact zone
3  between serpentine and talc ore, correct?
4      MR. PROST:  Object to form.
5      A.  I'm not sure without spending time
6  reading the document to understand what the author
7  meant.
8      Q.  (By Ms. O'Dell)  Well, I'll note that
9  cinder is located -- this is what this is saying,
10  as I appreciate it, and correct me if I'm wrong.
11      Cinder is at the contact between serpentine
12  and talc.  We will look at some other maps, and
13  that's what I understand that sentence to say.
14      Do you have any reason to dispute that?
15      MR. PROST:  Object to form.
16      A.  Not without spending time looking at
17  more things, other things.
18      Q.  (By Ms. O'Dell)  Let me ask you to turn
19  to page 29.  And you'll see this section relates to
20  the Hamm Mine; do you see that?
21      A.  The bottom couple paragraphs?
22      Q.  Yes.  And it goes on to the next page.
23  And I'll direct you to the second paragraph.
24      It says, "The Hamm Mine has established
25  problems with high arsenic zones and areas with

Page 171

1  fibrous actinolite, but is mined for its relatively
2  high talc content and high brightness ores"; did I
3  read that correctly?
4      A.  That's what it says.
5      Q.  And if you'll go to page 32, you'll see
6  it's referring to the Ludlow Mines.  And it says,
7  in the first paragraph, bottom, "Most" -- referring
8  to the Ludlow mines, "Most have significant arsenic
9  and fibre bearing areas which must be excluded."
10      And then it talks about the Rainbow Mine.
11  And that's one of the mines that was used to source
12  J&J talc, correct?
13      A.  For a period of time, yes.
14      Q.  And if you'll keep going further,
15  there's a map that gives sort of a layout, it's not
16  detailed, but a layout of generally where the mines
17  are located.
18      And is this map generally consistent with
19  your understanding, having been there several
20  times, in terms of where the mines are generally
21  located?
22      A.  Generally speaking, yes.
23      Q.  Okay.
24      A.  I think that the East Argonaut and Main
25  are mislabeled.

Page 172

1      Q.  Okay.  Then, if you'll turn to page 34,
2  you'll see there's a section that relates it
3  Argonaut.  And it says, "The most important reserve
4  on the Ludlow trend is the Argonaut where the
5  Argonaut Main ore body open pit, a
6  three-million-ton deposit of medium (greater than
7  65 to 75 GEB)" -- which that describes brightness,
8  right?
9      A.  Yes.
10      Q.  -- "brightness reserve," and then it
11  goes on to say, (as read:) has been supplanted by
12  the development of Argonaut East ore body due to
13  the high stripping ratio and high incidence of
14  fiber-bearing zones encountered in the main ore
15  body; did I read that correctly?
16      A.  You forgot "possibly."
17      Q.  Okay.
18      MR. PROST:  Just to be clear on that one,
19  would you mind reading that with the word
20  "possibly" inserted where it was, just so it's
21  clear?
22      MS. O'DELL:  Yeah, yeah.  I'll be happy to.
23      Q.  (By Ms. O'Dell)  Okay.  I'm going to go
24  back.  This is talking about the Argonaut Main ore
25  body and juxtaposing against the Argonaut East ore

Page 173

1  body, fair?
2      A.  I haven't had time to read everything.
3  There's a description of Argonaut Main and Argonaut
4  East.
5      Q.  Okay.  It says, "The most important
6  reserve on the Ludlow trend is the Argonaut where
7  the Argonaut Main ore body open pit, a
8  three-million-ton deposit of medium (greater than
9  65 to 75 GEB) brightness reserve, has been
10  supplanted by the development of the Argonaut East
11  ore body due to the high stripping ratio and
12  possibly high incidence of fibre bearing zones
13  encountered at the main ore body"; did I read that
14  correctly now?
15      A.  Yes.
16      Q.  And this document, if you'll keep going
17  further, is on page Bates number ending 389; do you
18  see that?  We don't have a date on the overall
19  exhibit, the overall memo, that Mr. Munro wrote,
20  but at least it's after February 14th, 1992, which
21  is the date of the this interoffice correspondence
22  that's attached to the memo, correct?
23      MR. PROST:  Object to form.
24      A.  Are you representing that this was
25  attached to the original document?

44 (Pages 170 to 173)

Patrick Downey

Page 174

1    Q. (By Ms. O'Dell) Yes.
2    A. I can't tell one way or the other.
3    Q. So it appears that this document was one
4  of the pieces of information that was provided to
5  Rio Tinto as part of the sales process -- excuse
6  me -- as part of the purchase -- stock-purchase
7  process in 1992 or shortly thereafter.
8    MR. PROST: Object to form.
9    Q. (By Ms. O'Dell) Fair?
10    A. It might be dated in that time period,
11  but, again, I don't recall who R.C. Munro worked
12  for. I've seen a different document with his name
13  on it in other production.
14    MS. O'DELL: Okay. All right. Thank you,
15  Mr. Downey. We can take a short break.
16    MR. PROST: Okay. Thank you.
17    VIDEOGRAPHER: Off the record at 3:09.
18    (Recess taken.)
19    VIDEOGRAPHER: We're back on the record at
20  3:26.
21    Q. (By Ms. O'Dell) Mr. Downey, let me show
22  you what I've marked as Exhibit Number 12.
23    (Exhibit 12 was marked for identification.)
24    Q. (By Ms. O'Dell) And this is a document
25  that was produced to us in litigation. Its Bates

Page 175

1  number is IMERYS 219720.
2    Have you seen this document before?
3    A. I'm not sure.
4    Q. Did you review it in preparation for
5  your deposition today?
6    A. No.
7    Q. And this is a memo dated March 25th,
8  1992, correct?
9    A. Yes, it is.
10    Q. And the author is R.C. Munro. And he's
11  the same person -- gentleman, I suppose -- that
12  wrote the previous exhibit we were looking at
13  before the break, Exhibit Number -- I believe it
14  was number 10.
15    A. Eleven.
16    Q. Eleven. Thank you.
17    And the title of this document, this
18  interoffice correspondence, is "Cyprus Ore
19  Reserves - Arsenic and Tremolite"; do you see that?
20    A. Yes.
21    Q. And this document relates to the Cyprus
22  talc ore reserves particularly in Vermont?
23    A. That's what it says.
24    Q. And it has a -- the first section is
25  related to arsenic. And it says, "Arsenic iron

Page 176

1  sulphides (arsenopyrite) are, with their alteration
2  products, present in many of the talc-carbonate
3  schist ore zones in the Vermont area"; did I read
4  that correctly?
5    A. Yes.
6    Q. It says, "Total arsenic, as analyzed in
7  the Ludlow Rainbow deposit, averages generally less
8  than 100 parts per million but with some small
9  zones in excess of 1000 parts per million. No
10  apparent major effort is underway to regularly
11  monitor or completely assess the total arsenic
12  content of ores, tailing solids and wastes although
13  the distribution of sulphides and arsenates in talc
14  ore system is generally understood"; did I read
15  that correctly?
16    A. That's what it says.
17    Q. Mr. Munro is writing to those -- his
18  distribution list, and we have some idea of who
19  that is. If you'll turn to page 3, it includes
20  R.J. Kerstetter; G.L. Toll; G.B. Lawson, BCL;
21  J. Paulsen; and P. Moreau, Talc de Luzenac. And
22  that should be Philippe Moreau, correct?
23    A. It will seem so.
24    Q. Are you familiar with any of the other
25  individuals listed on the distribution list?

Page 177

1    A. No.
2    Q. Mr. Munro is writing this memorandum and
3  he's pointing out issues regarding arsenic and
4  tremolite in the Cyprus ore reserves, correct?
5    A. Generally, yes. I haven't read the
6  whole thing, so I don't know what he's saying, but
7  that's the topic matter.
8    Q. And if you'll see in subsection --
9  excuse me, paragraph two under "Arsenic," it says,
10  "In near surface weathering zones, crushed rock,
11  stock piles and mine working areas, the arsenic
12  sulphides (above) convert in part to the more
13  soluble arsenates, for example, the hydrous nickel
14  arsenate, annabergite," which is one of the
15  arsenates; do you see that?
16    A. That's what it says.
17    Q. It goes on to say, "Soluble arsenic is
18  measured in cores, ore samples, mill feed, product
19  and tailings. Soluble arsenic content is monitored
20  and governed under EPA/OSHA regulations," correct?
21    A. That's what it says, yes.
22    Q. And arsenic at high levels is considered
23  to be a carcinogen by the World Health
24  Organization, true?
25    A. It's my general understanding that

45 (Pages 174 to 177)

Patrick Downey

Page 178

1  arsenic has been identified as a carcinogen.  I
2  don't know at what exposure level.
3      Q.  Turning to page 2, Mr. Munro writes, "To
4  me, there also seems to be the overall risk of
5  continuing conversion of arsenic in sulfide to more
6  soluble arsenates in some stockpiles, waste, and
7  solid tailings as acid, water, air and time work on
8  them."
9      Is Mr. Munro saying that exposure of arsenic
10  sulfide to rain, to air, to time, to acid can
11  result in the arsenic sulfide converting into more
12  soluble arsenates?
13      MR. PROST:  Object to form.
14      A.  The paragraph says what it says.
15      Q.  (By Ms. O'Dell)  Do you know that to be
16  true, that if arsenic sulfides are exposed to rain,
17  acid, air, then they can convert to soluble
18  arsenic?
19      A.  Generally speaking, it's my
20  understanding that some sulfide minerals can become
21  soluble, yes, but under very specific conditions.
22      Q.  It goes on to talk about tremolite; do
23  you see that?  Are you with me, Mr. Downey?
24      A.  Yes.
25      Q.  He says, "The other serious

Page 179

1  mineralogical contaminant in the talc ores of
2  Vermont is the fibrous variety of the amphibole
3  minerals, tremolite and actinolite (hydrous calcium
4  iron-magnesium silicates) which have been
5  classified as asbestiform minerals by OSHA and
6  EPA"; did I read that correctly?
7      A.  Yes.
8      Q.  Next paragraph, "As a result, all
9  tremolite, the fibrous varieties of all amphiboles
10  and chrysotile asbestos in talc ores are a source
11  of great concern to all talc producers and
12  especially to marketers of cosmetic products,"
13  true?
14      A.  That's what it says.
15      Q.  "Cyprus claims that there are no fibres
16  in their cosmetic talc products and they work to
17  rigorously ensure this.  However, a recent paper
18  published by Rutgers University worker, Alice
19  Blount, suggests the presence of fibre in several
20  cosmetic talcs, some of which might have come from
21  Cyprus West Windsor material, which is a source of
22  great concern to Cyprus management and potentially
23  to their principal customer, Johnson & Johnson";
24  did I read that correctly?
25      A.  Yes.

Page 180

1      Q.  "Talc de Luzenac personnel are aware of
2  the situation and Philippe Moreau is quietly
3  working to identify the reality and magnitude of
4  the problem."
5      Are you aware if Mr. Moreau provided any
6  information about the concerns regarding the
7  presence of tremolite in Vermont talc to Rio Tinto?
8      MR. PROST:  Object to form.
9      A.  I don't know.
10      Q.  (By Ms. O'Dell)  Have you seen any
11  documents where Mr. Moreau has addressed the issue
12  of tremolite in asbestos fibers in Vermont talc?
13      A.  I don't recall that I've seen any
14  documents.
15      Q.  (As read:)  Vermont talcs are derived
16  from altered serpentine - a natural host for
17  asbestiform minerals.  There is certainly viable
18  tremolite and actinolite in specific zones of the
19  Vermont deposits.  Fibrous tremolite was identified
20  by the writer -- meaning Mr. Moreau -- in exposures
21  and cores at East Argonaut and the Black Bear
22  Mines.  Cyprus staff report past tremolite from the
23  Hammondsville and Clifton deposits; did I read that
24  correctly?
25      A.  Mostly.

Page 181

1      Q.  Okay.  And East Argonaut and
2  Hammondsville mines are ones that were used to
3  source J&J talc, true?
4      A.  Yes.
5      Q.  "Tremolite in these deposits is
6  encountered in the contact zones between the talc
7  and the surrounding schist"; did I read that
8  correctly?
9      A.  Yes.
10      Q.  That goes back to the discussion we had
11  before regarding Exhibit Number 11 in relation to
12  contact zones between serpentines or schist and
13  talc; do you remember that discussion?
14      A.  I recall the discussion.
15      Q.  It says -- and pick up the sentence --
16  (as read:) the surrounding schist; in the "gray
17  talcs" in the vicinity of the contacts; and
18  associated with the chlorite/amphibole waste zones
19  within the talc ores that are locally termed
20  "cinders."
21      So according to Mr. Munro,
22  "chlorite/amphibole waste zones within the talc
23  ores," that's the definition of the term "cinder";
24  do you see that, sir?
25      MR. PROST:  Object to form.

Patrick Downey

Page 182

1    A. That's what he defined as "cinders."
2    Q. (By Ms. O'Dell)  And he's referring to
3  it as the local definition of "cinder," fair?
4    A. That's what it says.
5    Q. Mr. Munro goes on to talk about Montana,
6  California and Alabama -- very near my
7  home -- but we don't need to talk about those, so
8  I'm going to ask you to put that aside.
9    And you had never seen this document before
10  you -- your deposition today; is that correct?
11    A. I don't believe I have.  As I mentioned,
12  I had seen another Munro document.  Can't tell if
13  that's the one or not.
14    Q. Let me show you what I'm marking as
15  Exhibit 13, Mr. Downey and ask you if you've seen
16  this document before.
17    (Exhibit 13 was marked for identification.)
18    A. (Document reviewed.)  No, I haven't seen
19  it.
20    Q. It is Bates number Imerys 436951.  And
21  it appears to be Imerys' copy of a folder.  It's
22  page 1.  You'll see it says "Mine Data" on what
23  appears to be on the tab of a folder.  And you open
24  it up and there's pictures of various mines, East
25  Argonaut, the Argonaut Mine.  These are hard to

Page 183

1  see, but that's -- labeled them, appears to us.
2    On page 2, if you keep flipping over, you'll
3  see the view -- south view of the Argonaut Mine and
4  aerial photo.  And on page 4 of the document, the
5  Bates number ending 54, you'll see a table there;
6  do you see that.
7    A. This one?
8    Q. Yes.  Ending in 54?  Some of them look
9  alike, so --
10    A. Yes.
11    Q. -- make sure.  Okay.  Great.
12    So this appears to be a document that
13  provides information regarding the mines -- the
14  Vermont mines, you know, that they provided
15  pictures for; do you see that?  East Argonaut,
16  Argonaut Main body, Hammondsville, and so forth?
17    A. I'm trying to get oriented with the
18  document, so . . .
19    Q. Okay.  And specifically, as you're
20  getting oriented, I'm going to ask you questions
21  about this Ore Characteristic Summary Sheet, which
22  appears to be a summary description of the ore body
23  at Argonaut.
24    In your experience in the mining industry,
25  over, you know, some decades, Mr. Downey, it's not

Page 184

1  uncommon to find summaries like this that describe
2  the ore body of a particular mine so that it can be
3  evaluated, business plans can take place,
4  et cetera, fair?
5    A. Generally speaking, but I've not seen a
6  document that looks like this before.
7    Q. Okay.  Well, take a look, just for --
8  direct our discussion.  See if I can make that a
9  little bigger.  The first sort of box that
10  I'm looking at on page Bates ending 54, that's
11  "Argonaut (EOB)"; do you see that?
12    A. Yes.
13    Q. And that's East Argonaut Mine?
14    A. I don't know.
15    Q. All right.  The date on it is
16  September 1992.
17    It's fair to say that there was Argonaut
18  Main body, and then there was another mine that was
19  Argonaut East, true?
20    A. There was the Argonaut Main pit and the
21  Argonaut East pit.
22    Q. Yes.  And if you look at this and you
23  juxtapose these two tables here, you'll see that
24  there's -- this is EOB, and that seems to be East.
25  And then there's Argonaut tables in the MOB, and

Page 185

1  that seems to be the Main body; is that a fair
2  interpretation?
3    A. I don't know what "EOB" or "MOB" mean.
4  I haven't seen those acronyms before.  You're
5  asking me to speculate on what they mean.
6    Q. And just so we can assure yourself that
7  this is not a document -- this is by a third party.
8  This is a Luzenac document.  If you'll look, it
9  says, "File:  Company:  Luzenac America Company" --
10  or it says "Company" again -- "Vermont Operations."
11  And then it says, "Product:  Talc."  I don't know
12  what it says in -- I can't see that very well in
13  terms of what the plant is.
14    A. It's scratched out.
15    Q. Could be "Argonaut" written in, but I
16  can't be sure of that at the moment, so -- but
17  clearly, we're talking about Argonaut, fair?
18    A. The other tables say "Argonaut."
19    Q. And if you'll look, it says, "Ore type"
20  in the "Summary"; do you see that?  And then it
21  says --
22    A. Where?
23    Q. In the table.
24    A. The left table?
25    Q. For "Argonaut (EOB)," yeah.  I'm just

47 (Pages 182 to 185)

Patrick Downey

Page 186

1    going to move left to right, so "Argonaut (EOB)."
2    And I'll represent to you that's east, but if you
3    disagree with that, let me know.
4          "Ore type," do you see that in the table?
5          A. Yes.
6          Q. And then it also says "Associated
7    Minerals"; do you see that?
8          A. Yes.
9          Q. And then under "Associated Minerals" for
10   "Ore Type A" there is "Actinolite," true?
11         A. That's what it says.
12         Q. And for "Ore Type C," it says associated
13   minerals is "serpentine"?
14         A. That's what it says. I don't know how
15   to read this table, though. I'm not familiar with
16   those ore types being named.
17         Q. Okay. Go down. You'll look below,
18   "General Ore Description," "Mineralogy: Mostly
19   talc carbonate core zone," appears to be 8 type
20   "next to serpentine."
21         And if you go down further --
22         A. I think that's "B type."
23         Q. "B type"? Okay. "(B type) next to
24   serpentine."
25         "Detrimental Minerals: Arsenic,"

Page 187

1    "actinolite."
2          A. "Arsenic clays actinolite."
3          Q. All right. We'll add "clays" in there.
4    "Detrimental Minerals: Arsenic, clays" and
5    "actinolite."
6          And if you go down further, it says "Ore
7    Destination: Roofing, TC 100" and then "some
8    cosmetic"; did I read that correctly?
9          A. That's what it says.
10         Q. Okay. Then we'll go over. Look at
11   "Argonaut (MOB)," which I believe to mean the main
12   Argonaut Mine; do you see that?
13         A. I see "Argonaut (MOB)," yes.
14         Q. And in "Argonaut Main," got "Ore Type
15   A," "B" and "C," and you've got "Associated
16   Minerals," and it says "Mica" and "Actinolite."
17         A. Yes.
18         Q. And below, it says, "Physical
19   Attributes: Very hot insol," which means
20   insolubles, right?
21         A. Yes.
22         Q. "...bright, flaky ore, generally good
23   for all products including cosmetics," did I read
24   that correctly?
25         A. Yes.

Page 188

1          Q. And that would include Baby Powder and
2    Shower to Shower, true?
3          A. Maybe.
4          Q. Okay. Certainly, that was the cosmetic
5    talc being sold from Argonaut during this time
6    period, correct?
7          A. The ore for Johnson & Johnson attributes
8    was known as 5904 ore type. I don't see 5904
9    listed here as one of the ore types.
10         Q. It clearly is cosmetic talc, correct?
11   Johnson & Johnson talcum-powder products are made
12   of cosmetic talc, true?
13         A. Yes.
14         Q. And there are no specific ore types
15   listed here. It's talking generally about the
16   types of applications, such as roofing, plastics,
17   and then it says "cosmetics," correct?
18         A. Under the "Ore Destination" at the
19   bottom it says "Ore Destination: Columbian Mill,
20   Roofing, Plastics (TC 100)."
21         Q. Okay. And in terms of physical
22   attributes, it says, "Generally good for all
23   products including cosmetics," correct?
24         A. That's what it says.
25         Q. Let me ask you to turn to page Bates

Page 189

1    number 436961. I want to ask you some questions
2    about the Hamm Mine.
3          And it's dated September 1992; do you see
4    that?
5          A. Yes.
6          Q. And it's got "Ore Type," list A, B and
7    C. And for associated minerals, it has actinolite
8    and serpentine, correct?
9          A. That's what it says.
10         Q. And it says, "Physical Attributes" --
11   let me go back up. Sorry.
12         (Read as:) Mineralogy: Typical talc
13   carbonate associated with serpentine. The rim of
14   the foliated talc occurs mostly on the east but
15   also high aspect ratio (flaky) talc is found the
16   pit in the bottom next to the cinders, okay?
17         (Read as:) Physical Attributes: The ore
18   deposit is on the north and -- excuse me -- is on
19   the north end of a large serpentine mass. Included
20   amphibolite and chlorite schists are removed by
21   selected mining. The ore is very bright and flaky
22   and makes a good source for both dry ground and
23   floated products; did I read that correctly?
24         A. Yes.
25         Q. And then detrimental minerals, arsenic,

48 (Pages 186 to 189)

Patrick Downey

Page 190

1  actinolite and chlorite.
2      "In-Pit Contaminants:  Serpentine, chlorite,
3  mica (schist cinders)."
4      And in terms of destination, it says -- it
5  talks about the Chester Mill.  And then it says,
6  "and float feed for West Windsor products and
7  Johnson plant."
8      West Windsor products would be
9  Johnson & Johnson talcum-powder products, true?
10     A. It might, depending on the time.
11     Q. In the 1992 time frame, West Windsor was
12 the location where Johnson's talcum-powder products
13 were processed, true?
14     A. That's correct.
15     Q. You can put that aside.  I'm going to
16 show you what I've marked as Exhibit Number 14,
17 Mr. Downey.
18     (Exhibit 14 was marked for identification.)
19     MS. O'DELL:  It's JNJ 000245002.  And that
20 is Exhibit 14.
21     Q. (By Ms. O'Dell)  Have you seen this
22 document before, Mr. Downey?
23     A. This appears to be a Johnson & Johnson
24 document.  It's an inch and a half thick.  I don't
25 know if I've seen this or not.

Page 191

1      Q. And it relates to the Hammondsville
2  Mine, correct?
3      A. That's what it says, yes.
4      Q. And it is dated 1970?
5      A. That's correct.
6      Q. And the subject is "Geological Audit,
7  Windsor Minerals, File Number 124."  And it says at
8  the bottom, "The attached report completes our work
9  on the nature and magnitude of our ore body in
10 Vermont from which we manufacture Baby Powder
11 talc," signed Bill Ashton, or W. Ashton, known as
12 Bill Ashton.
13     Have you heard of Bill Ashton before?
14     A. I think I've seen his name.
15     Q. Did you ever have the opportunity to
16 meet Mr. Ashton?
17     A. No, I don't believe so.  Is he still
18 alive?
19     Q. I believe he's deceased.
20     A. Okay.
21     Q. Now, in relation to this document, it
22 was prepared for J&J Research Center, and it
23 appears to be, as it indicated on the front, an
24 audit of the mines in Vermont.
25     Let me ask you this:  From -- beginning in

Page 192

1  1989 when Cyprus would have had ownership of the
2  Vermont talc mines, did J&J audit the operations in
3  Vermont?
4      MR. PROST:  Object to form.
5      A. I believe so.  I don't know how
6  frequently, though.
7      Q. (By Ms. O'Dell)  Do you know what the
8  criteria J&J used to conduct those audits?
9      A. Not specifically, no.
10     Q. Do you know if there were any reports
11 generated from Johnson & Johnson initiated audits
12 of the operations in Vermont?
13     A. Initiated by whom?
14     Q. Johnson & Johnson or somebody they hired
15 to act on their behalf.
16     A. I'm aware of at least one audit-type
17 report from the late 1990s that I've seen.
18     Q. And what's your understanding of that
19 particular report?
20     A. It was about the level of microbials in
21 the product.
22     Q. And what was the issue with the
23 microbials?
24     A. There were -- there was a silo of
25 material that had been quarantined.  They were

Page 193

1  following the regular process.  The material was
2  quarantined -- it was sampled.  A deposit sample
3  was obtained for the silo, or silos, and while
4  awaiting for the microbial analyses to come back,
5  that material was quarantined.  It was not shipped.
6  And the microbial count came back in exceedance of
7  the specification.  So that instigated an audit by
8  Johnson & Johnson.
9      Q. Turning back to Exhibit 14, Mr. Downey,
10 you'll see -- if you turn to the table of contents
11 on page Bates ending 4, it's about three pages into
12 the document.  Then it goes through various aspects
13 of the audit.  And you'll see from the table,
14 starting tables at the bottom of the page, that
15 there are petrographic classifications and analyses
16 of samples taken from drill cores; do you see that?
17 And it goes onto -- over onto the next page.  And
18 it lists the drill cores that are being sampled.
19 And we're going to get to some of the results.
20     But, I mean, drill cores are undertaken for
21 purposes of understanding the size and contours of
22 an ore body, fair?
23     A. Generally speaking, drill cores are used
24 to obtain geologic information that includes the
25 extents or limits of the ore body.  That's what

49 (Pages 190 to 193)

Patrick Downey

Page 194

1    you're -- that's one thing you're trying to find.
2         Q.  You're also trying to find out if there
3    are accessory minerals in the deposit that you need
4    to be concerned about in the mining process, fair?
5         A.  You need to understand the overall
6    geology of the deposit as it relates to what you're
7    trying to do.
8         Q.  That's right, because the ore -- as
9    geologists, as I understand it, think of ore,
10   that's the mineral that you're going to extract and
11   sell for purposes of a profit, right?  That's what
12   you're selling to a customer, is the ore.
13        MR. PROST:  Object to form.
14        Q.  (By Ms. O'Dell)  Fair?
15        A.  It can be.  You know, there are other
16   processes, you know, downstream that occur,
17   beneficiation and other things.
18        Q.  Of course.  And -- but just talking
19   generally, you're looking to define the ore body
20   when you're doing drilling, and particularly
21   drilling cores, and then you're looking to identify
22   any other geological information that would be
23   relevant to your mining of that particular ore
24   body, fair?
25        A.  Generally, yes.

Page 195

1         Q.  And so I'm going to ask you, just in
2    summary fashion, explain for the jury what it means
3    to drill for core.  I mean, I can give you my sort
4    of really rudimentary knowledge, which is you
5    drill.  The drill has essentially a cylinder.  And
6    that basically -- you pull out of the earth a
7    rounded sort of sample of all the material.  You
8    know, so if you drill 200 feet down, you pull core
9    that's 200 feet long, and it's a cylinder of a
10   certain diameter, depending on the drill, and
11   geologists look at those cores to determine what's
12   in the earth at the point of that deposit; is that
13   fair?
14        A.  Close.
15        Q.  For a nongeologist?
16        A.  For a nongeologist, I mean --
17        Q.  Yeah.  It's fair, right?  It's not as
18   accurate as maybe others can do, but that's a fair
19   summary, correct?
20        A.  You're extracting intact rock, generally
21   speaking, typically more in ten-foot sections, not
22   2700 feet at a time.
23        Q.  Right.
24        A.  But, yes.
25        Q.  But a total drill hole often will end at

Page 196

1    200 feet, 160 feet.  It's quite deep into the
2    earth, generally speaking?
3         A.  It depends on where you're targeting,
4    but it can be several hundred feet.
5         Q.  Right.  And so they may be do ten feet
6    at a time, but oft times, you're really looking to
7    see what is present quite a distance into the
8    earth, fair?
9         MR. PROST:  Object to form.
10        A.  You're using the drill and extracting
11   the cores to gain information about the rock that
12   you encounter.
13        Q.  (By Ms. O'Dell)  And cores are something
14   that, for a particular deposit, is -- one, it's an
15   expensive endeavor to drill for cores?
16        A.  Generally, yes.  As opposed to other
17   drilling methods, it's expensive.
18        Q.  Yes.
19        And the cores are something that are saved
20   for historical reference for that particular
21   mine --
22        MR. PROST:  Object to form.
23        Q.  (By Ms. O'Dell)  -- in most instances?
24        A.  I mean, you're talking generally about
25   mines.  Most core -- well, I can't say "most core."

Page 197

1    Core is often saved.
2         Q.  Yes.  And it's something that provides
3    mineralogical information, you know, for the
4    future.  So you could go back to a core that was
5    drilled in 1970 and look at it, reference it, and
6    if that area's not been mined, you would have
7    relevant information for an analysis in 2018, true?
8         MR. PROST:  Object to form; outside the
9    scope.
10        A.  I don't know about particular relevance.
11   To the extent it still existed, it might be useful.
12        Q.  (By Ms. O'Dell)  All right.  In this
13   instance, looking back at Exhibit Number 14, we're
14   looking at a report that looks at cross-sections of
15   cores that were drilled in the 1970s.  And if
16   you'll go to page 5010 -- excuse me, sir, it's
17   5010, which is very early in the document.  That's
18   the Bates number.
19        A.  Oh, I was thinking 100.  I'm sorry.
20        Q.  Yeah.  5010 is the last four digits of
21   the Bates.  And this is defined in the scope of
22   this particular study.  It says it's included an
23   examination and a detailed geologic mapping of all
24   accessible parts of the Hammondsville Mine.  All
25   available drill core was examined and the zones

Patrick Downey

Page 198

1    were split.  It says one half was sent to Golden.
2    Excuse me.  One half was sent to Golden for
3    mineralogic and mineral assaying and the remainder
4    was placed into core boxes at Windsor; do you see
5    that?
6          A.  So these -- it says "chemical assay,"
7    not "mineral."
8          Q.  Sorry.  I was reading ahead.  Excuse me.
9          Okay.  So this is a study of cores and the
10   review that Johnson & Johnson initiated to look at
11   cores to determine information about the
12   Hammondsville Mine.
13         MS. ZOU:  Objection to form.  Sorry.  Are
14   you done?  I didn't mean to interrupt.
15         MS. O'DELL:  That's okay.  Objection?
16         MS. ZOU:  Object to form; outside the scope.
17         MS. O'DELL:  Are you taking the position
18   that the Hammondsville Mine is outside the scope of
19   this deposition?
20         MS. ZOU:  No.  I'm taking the position that
21   Mr. Downey is supposed to testify about the talc
22   that Imerys sold to Johnson & Johnson, and this
23   document's from Windsor Minerals.
24         MS. O'DELL:  Okay.  But you're not disputing
25   that Imerys sold talc from the Hammondsville Mine?

Page 199

1          MS. ZOU:  I am not disputing that.
2          MS. O'DELL:  My objection to form is his
3    interpretation of the document.
4          Q.  (By Ms. O'Dell)  If you'll turn to the
5    Bates number ending 5020, it says, "Thirty-eight
6    core samples were submitted for thin-section
7    analysis.  All but a few" --
8          A.  Where at?
9          Q.  At the bottom, sir.
10         A.  Okay.
11         Q.  Do you see that?
12         "All but a few," "...were from within the
13   ore zone"; do you see that?
14         A.  Yes.
15         Q.  So that gives further information about
16   the study that's being done on the Hammondsville
17   Mine?
18         MR. PROST:  Object to form.
19         Q.  (By Ms. O'Dell)  And for purposes of
20   saving some time, let me have you turn over to
21   another page that sort of shows the scope of this
22   testing that Johnson & Johnson commissioned.  And
23   if you'll look on Bates number ending 5038 --
24         A.  Three what?
25         Q.  5038.

Page 200

1          A.  Eight?
2          Q.  Eight.  Eight.  You'll see -- 5038 --
3    you'll see that it says, "In addition, almost forty
4    samples of core material were submitted for
5    thin-section analysis to determine various
6    information about the host rock, the ore, and the
7    origin of the deposit."
8          Before we go into the results of those
9    tests, Mr. Downey, what is a thin section?  What
10   does that refer to in relation to analyzing a core
11   sample?
12         MR. PROST:  Object to form.
13         A.  I think that Julie Pier -- that's a
14   topic more on what she could discuss or describe
15   better than I could.
16         Q.  (By Ms. O'Dell)  Based on your decades
17   of experience in the mining industry and your
18   education as a geologist, what's your understanding
19   of what "thin-section analysis" means?
20         A.  Generally speaking, a thin slice of rock
21   is prepared on a slide that can be viewed under a
22   microscope.  That's my general understanding.
23         Q.  And it's often reviewed under XRD,
24   correct?
25         MR. PROST:  Object to form.

Page 201

1          A.  That's not my understanding.
2          Q.  (By Ms. O'Dell)  Okay.  Turn to Bates
3    number ending 5040, please.  Do you see that?
4          A.  Where?
5          Q.  It's "X-ray Diffraction and Microscopic
6    Data, Diamond Drill Hole 1-67-H"; do you see that?
7          A.  Yes.
8          Q.  And at the top, it shows the interval.
9          And then, to the right, it has 39 to 41; do
10   you see that?
11         A.  Yes.
12         Q.  Most often that would mean feet, right,
13   in a thin-section analysis of a core sample?
14         A.  That's in -- the interval, there's
15   "feet" in parentheses, so that indicates the units
16   that you're measuring.
17         Q.  That's right.
18         And so that would be results -- under 39.0
19   to 41.0 are the results of the samples taken at the
20   39-foot mark, between the 41-foot mark, true?
21         A.  That's what it appears to me, yes.
22         Q.  And if you'll look down in the second
23   part, you'll see "Fibrous Talc."  And under
24   "Fibrous Talc," it appears it's 20 percent fibrous
25   talc, and then going across to the lower section,

Patrick Downey

Page 202

1    10 percent fibrous talc, and then 10 percent
2    fibrous talc; do you see that?
3         MS. ZOU:  Objection; outside the scope.
4         A.  That's what it says.
5         Q.  (By Ms. O'Dell)  If you turn to the next
6    page, you'll see results from drill hole 6-67-H; do
7    you see that?
8         A.  Dash 8?
9         Q.  H.
10        A.  Okay.  Sorry.
11        Q.  H?
12        A.  With my hearing, if you enunciate the
13   ends of the words, that's my clue.
14        Q.  Yeah.  Sorry.  I'm looking down at the
15   document and not looking at you and it makes more
16   difficult.  And I apologize.
17        So we've got drill hole 6-67-H; do you see
18   that?
19        A.  Yes.
20        Q.  And that drill hole that has been -- the
21   core has been measured at various feet, 139 to
22   141.7, 149 to 153, and so on.
23        And if you look down below, you see it has
24   10 percent, 5 percent, 20 percent, 10 percent, and
25   then for two sections, 5 percent fibrous talc; do

Page 203

1    you see that?
2         A.  Yes.
3         Q.  And fibrous talc is asbestiform talc,
4    correct?
5         MR. PROST:  Object to form.
6         A.  Not to me, it's not.
7         Q.  (By Ms. O'Dell)  Is it your
8    understanding, Mr. Downey, that that fibrous talc
9    can have the same cancer-causing properties as
10   types of asbestos?
11        MR. PROST:  Object to form.
12        A.  No.
13        Q.  (By Ms. O'Dell)  Okay.  All right.  Turn
14   over to page 5050, test results for diamond drill
15   hole 44-67-H.  And they tested intervals between
16   299 feet and 309 feet.  And tremolite-actinolite
17   was .5 percent and .4 percent respectively,
18   correct?
19        A.  Yes.
20        Q.  And that was material that was examined
21   under x-ray diffraction and -- or x-ray
22   diffraction, just in there?
23        MR. PROST:  Object to form; outside the
24   scope.
25        Q.  (By Ms. O'Dell)  True?

Page 204

1         A.  I'm sorry.
2         Q.  That material was examined under x-ray
3    diffraction, true?
4         A.  That's what it says.
5         Q.  Okay.  Turn to the next page.  You'll
6    see results from diamond drill hole 45-67-8.
7    Interval between 903 and 905 feet was examined, and
8    they found .4 percent tremolite, true?
9         MS. ZOU:  Objection.
10        MR. PROST:  Join.
11        THE WITNESS:  What did you say?
12        MR. PROST:  I joined -- I joined Shasha's
13   objection.
14        A.  That's what it says.
15        Q.  (By Ms. O'Dell)  And I could go on and
16   walk you through the other tables, Mr. Downey, but
17   do you have any reason to doubt the results
18   reported in this report commissioned by
19   Johnson & Johnson?
20        MR. PROST:  Object to form.
21        MS. ZOU:  Objection.
22        A.  Miss Pier would be the one to discuss
23   any interpretation of the results.  I don't dispute
24   that these records say what they say, as written.
25        Q.  (By Ms. O'Dell)  Okay.  Has Imerys

Page 205

1    commissioned any examination of the Hammondsville
2    Mine during the time period since 1989?  And I'm
3    referring to -- when I say "Imerys," I mean Cyprus,
4    Rio Tinto, Luzenac or Imerys.
5         Are you aware of any geological survey or
6    audit that those entities have commissioned for
7    purposes of examining the Hammondsville Mine?
8         A.  That would have been in that time frame
9    that you're asking, beginning in 1989.  That's when
10   Cyprus purchased the Hammondsville Mine.  And it
11   only operated for a couple of years, so that only
12   would have been Cyprus, but I don't know if Cyprus
13   conducted a survey that you describe.  It's
14   possible.  I don't know if I've seen record of it
15   or not.
16        Q.  It's possible, but you don't know?
17        A.  I don't recall.
18        Q.  Have you ever asked for information
19   regarding the Hammondsville Mine?
20        A.  Yes.  As indicated in my notes from
21   earlier, I had asked for information.
22        Q.  But you didn't receive any?
23        A.  I think I saw some information of a set
24   of documents that were produced.  I saw them
25   sometime yesterday.

52 (Pages 202 to 205)

Patrick Downey

Page 206

1    Q.  And was that -- what document are you
2  referring to?
3    A.  As I described them earlier today, it
4  was several pages -- I don't know if it was all one
5  collection or not -- of various, but as I recall, I
6  think there was some information on Hammondsville
7  there.
8    Q.  Have you ever seen a specific
9  examination of a specific audit report or
10  examination of the Hammondsville Mine?  I mean,
11  you're talking about you've seen references.  You
12  said yesterday you saw documents that referenced
13  Hammondsville.  But I'm asking a more specific
14  question.  Not the document that just refers to it,
15  but a specific analysis, memorandum, of the
16  Hammondsville Mine.
17    A.  I don't recall.
18    Q.  Let me show you what I've marked as
19  Exhibit 15 and ask you if you've ever seen this
20  document.
21    (Exhibit 15 was marked for identification.)
22    A.  (Document reviewed.)
23    Q.  (By Ms. O'Dell)  Did Imerys counsel
24  provide this document to you in preparation for
25  your deposition today?

Page 207

1    MR. PROST:  Objection.
2    A.  I haven't seen this document before.
3    Q.  (By Ms. O'Dell)  Let me show -- ask you
4  to turn to page 2, and you'll see, Mr. Downey, it
5  is a Report of the Geology Section, Windsor
6  Minerals Inc.  It's entitled "Geology and Ore
7  Reserves of the Hammondsville Ore Body," by William
8  Gregg, dated February the 20th, 1978.
9    And you've not seen this before?
10    A.  I don't believe so, no.  (Document
11  reviewed.)
12    Q.  Have you had a moment to take a look at
13  it?
14    A.  It's a lengthy report.  The brief time I
15  have looked through it wouldn't do justice of
16  trying to figure out what it means.
17    Q.  All right.  Let me just ask you a couple
18  of general questions about the report itself.  Turn
19  to page 976.  So you'll see at the beginning
20  under "Introduction," it says the report marks the
21  completion of diamond-drilling program initiated in
22  '76 to further define the Hammondsville ore body at
23  depth below the presently worked fourth -- and
24  that's 690 feet -- level; did I read that
25  correctly?

Page 208

1    A.  Yes.
2    Q.  And that sentence underscores the fact
3  that Hammondsville, unlike Argonaut and others, was
4  an underground mine, true?
5    A.  That's correct.
6    Q.  And so this drilling was an effort to
7  evaluate the ore body around the areas that had
8  been tunnelled and were currently being mined?
9    A.  I didn't catch the first part.
10    Q.  That had been tunnelled, the underground
11  tunnels and the areas that were currently being
12  mined.  This was an effort to further define the
13  ore body in order to determine where they could
14  continue their underground mine process, fair?
15    MR. PROST:  Object to form; outside the
16  scope.
17    A.  Generally, yes.
18    Q.  (By Ms. O'Dell)  Okay.  Let me ask you
19  just a practical question.
20    On page Bates ending 991 of this document,
21  it refers to the core boxes.  And in the document
22  it says that they're stored and gives you,
23  basically, a description of where the particular
24  drill cores are stored for the specific drill
25  holes; do you see that?

Page 209

1    MR. PROST:  Object.
2    A.  I'm trying to familiarize myself with
3  what's going on here.
4    Q.  (By Ms. O'Dell)  Looks like a diagram.
5    MR. PROST:  Outside the scope.
6    A.  We're on 91?
7    Q.  (By Ms. O'Dell)  Yeah.  Mm-hmm.
8    A.  Did you say "second diagram"?
9    Q.  It's a diagram.
10    A.  Okay.
11    MS. O'DELL:  And the reason I don't think
12  it's out of the scope is because we've covered
13  cores, core logs, and this is cores.
14    Q.  (By Ms. O'Dell)  And I'm asking a
15  specific question, Mr. Downey.  In your visits to
16  Argonaut, have you visited the location where core
17  logs are stored at the Vermont mines?
18    MR. PROST:  Outside the scope.  And my
19  objection is my understanding is that it was
20  specifically made outside the scope in terms of
21  retention or storage, so . . .
22    A.  I haven't visited where the core boxes
23  are stored.
24    Q.  (By Ms. O'Dell)  Okay.  All right.
25  Mr. Downey, I would take you through that, but I'm

53 (Pages 206 to 209)

Patrick Downey

Page 210

1  going to spare you for purposes of time.
2       We've talked about Hammondsville.  And in
3  light of the fact that Imerys or the predecessor
4  companies had not performed an analysis, I have
5  brought to the deposition today the J&J analyses of
6  the Hammondsville Mine.
7       But it's your testimony you've never seen
8  those before today?
9       A.  I have not.
10      Q.  All right.  Let me show you what I'm
11 going to mark as Exhibit Number 16.
12      (Exhibit 16 was marked for identification.)
13      Q.  (By Ms. O'Dell)  And I folded this
14 because it was -- it was legal and it wouldn't fit
15 in my box.
16      MS. O'DELL:  So here you go.
17      Q.  (By Ms. O'Dell)  Have you seen these
18 maps of the Hammondsville Mine before?
19      A.  No, I have not.
20      Q.  Have you seen other maps of the
21 Hammondsville Mine, detailed maps similar to these?
22      MR. SILVER:  Can you please put on the
23 record the Bates numbers?
24      MS. O'DELL:  It's Exhibit 16, JNJ 000261701.
25      Q.  (By Ms. O'Dell)  And so to go back where

Page 211

1  we were before I put the Bates number on the
2  record, I asked you if you had seen any detailed
3  geologic maps of the Hammondsville Mine prior to
4  the set I put before you.  And as I understand it,
5  your answer's "no"?
6       A.  I don't believe I've seen any geologic
7  map -- or mine maps of Hammondsville.
8       Q.  Are you familiar with the underground
9  mining operation at Hammondsville?
10      A.  It was closed before my first trip to
11 Vermont.
12      Q.  So you're not familiar with that?
13      A.  No, not -- I don't have any personal
14 information about it, personal knowledge.
15      Q.  Do you have any knowledge that you have
16 gained about the operation of the Hammondsville
17 Mine during the course of preparing for this
18 deposition?
19      A.  No, just that I knew that it was an
20 underground mine.
21      Q.  Okay.  You may put that aside,
22 Mr. Downey.  Thank you.
23      I'm going to transition now to the Hamm
24 Mine.
25      A.  Okay.

Page 212

1       Q.  What period of time did the Hamm Mine
2  supply talc, J&J talc?
3       A.  It was first indicated as an approved
4  source, I believe, in September of 1990.
5       Q.  And when did Hamm cease to be a source
6  of talc for Johnson & Johnson products?
7       A.  Generally speaking, when Argonaut became
8  the sole source.  I think that was in '94 or '95.
9       Q.  Is that -- do you have a specific
10 recollection of that or are you just sort of
11 guessing?
12      A.  That's my recollection.
13      Q.  Is it '94 or '95?  Is that what you
14 said?
15      A.  It's '94 or '95.  That's my
16 recollection.
17      Q.  Are you aware that, in 1992, a core
18 drilling -- core drilling was performed at the Hamm
19 Mine?
20      A.  No.
21      Q.  And just for the jury's sake, Hamm is an
22 open-pit mine, correct?
23      A.  Yes.
24      Q.  And so open-pit mines involve drilling,
25 inserting, you know, dynamite or some kind of

Page 213

1  explosive into a hole, setting off the explosive,
2  removing the overburden and then, you know, mining
3  the ore that's soft, fair?
4       MR. PROST:  Object to form.
5       Q.  (By Ms. O'Dell)  I mean, that's the
6  general -- that's a general description of open-pit
7  mining?
8       A.  It can be.  It depends on the type of
9  mine, the geology and other things, other factors.
10      Q.  But for Hamm, it was an open-pit mine
11 that utilized blasting for purposes of the mining
12 process, true?
13      A.  It was an open-pit mine.  Again, I -- it
14 was closed before my first visit to Vermont.  I
15 hadn't seen the mine, so I don't have direct
16 knowledge that they blasted, but blasting is a
17 common method that is used in open-pit mining.
18      Q.  And is it your understanding that that
19 method was used at the Hamm Mine?
20      A.  I don't have any personal knowledge of
21 that.
22      Q.  Were you provided any information?  Did
23 you seek to educate yourself about the manner in
24 which mining was undertaken in the Hamm Mine?
25      A.  I did.  It may have been in some of the

Patrick Downey

Page 214

1   documents I saw sometime yesterday.  There may have
2   been something in that, but, again, that was a
3   stack of documents that I reviewed.  It may be in
4   that information.  I don't know.
5        Q.  And as you're sitting here today, you
6   don't have any --
7        A.  I don't recall.
8        Q.  You don't recall any information about
9   the mining operations at the Hamm Mine, correct?
10       A.  For Hamm specific, I don't have a
11  recollection.
12       Q.  I'm going to show you what I've marked
13  as Exhibit Number 17.
14       (Exhibit 17 was marked for identification.)
15       Q.  (By Ms. O'Dell)  It's a core log for
16  drill hole 921 -- 92-1 that was drilled on
17  April the 25th, 1992.  I'm going to hand you a
18  series of documents, Mr. Downey.
19       Second exhibit, number 18, represent to you
20  it's a core log from drill hole 92-2.
21       (Exhibit 18 was marked for identification.)
22       MS. O'DELL:  For purposes of the record,
23  Exhibit 18 is IMERYS 435996, and it's dated
24  April 26, 1992.
25       THE WITNESS:  April what?

Page 215

1        MS. O'DELL:  Excuse me.  Let me do that
2   again.  April 27, 1992.
3        And I'm going to give you the Bates number
4   again.  It's IMERYS 435992, and that's Exhibit 18.
5        I'm going to mark Exhibit 19, which is
6   IMERYS 435996.  And it is dated April 26, 1992.
7        (Exhibit 19 was marked for identification.)
8        MS. O'DELL:  I'm also going to mark Exhibit
9   Number 20, which is Imerys 436000, dated
10  April 29th, 1992.
11       (Exhibit 20 was marked for identification.)
12       Q.  (By Ms. O'Dell)  Have you seen these
13  documents before, Mr. Downey?
14       A.  No.
15       Q.  Were you aware that, prior to seeing
16  these documents, that core logging had been done in
17  the Hamm Mine in 1992?
18       A.  No.
19       Q.  I'll ask you to go back to Exhibit 17.
20  And just for purposes of educating the jury, up at
21  the top, it gives general information about the
22  location of where the core has been drilled,
23  correct?
24       A.  Yes.
25       Q.  And the location is given as a plot on

Page 216

1   essentially a grid, a mine grid, correct?
2        A.  Yes.
3        Q.  And it's north 9421.7 and then east, I
4   think it's 10093.5.
5        And so for someone reading this, that gives
6   a very specific location as to where that core was
7   taken?
8        A.  That references where the collar of the
9   drill hole was located.
10       Q.  So the drill was located there.  That's
11  where the collar was located, but the drill -- you
12  could drill either straight down or you can drill
13  at an angle.
14       And so just depends on what they were
15  actually doing, correct?
16       A.  That's correct.
17       Q.  All right.  So in this instance, the
18  inclination of where the drill was directed is
19  bearing north 50W, and then the inclination is
20  minus 70 degrees, correct?
21       A.  That's what it says.
22       Q.  And that's not unusual that you don't
23  necessarily drill straight down, for those that are
24  not familiar.
25       You drill -- you can drill at an angle, and

Page 217

1   often you do drill at an angle to try to better
2   understand the ore body?
3        A.  Yes.
4        Q.  And this particular hole was drilled to
5   250 feet?
6        A.  Yes.
7        Q.  And then you come down and it will -- it
8   provides information regarding the ore type.  And
9   it gives a description of the core that's being
10  pulled.  And then if you look to the very left,
11  that number 5, number 10, number 15, number 20,
12  that's the feet?
13       A.  In the very left column?
14       Q.  Yeah.
15       A.  Yes.
16       Q.  So as the cores are drilled and they're
17  pulled out of the shaft where the drill -- I don't
18  know if that's the correct term, but the shaft
19  where they pull the material from the hole, then a
20  geologist will look at that material and describe
21  it, and that's what becomes a core log, correct?
22       A.  Yes.
23       Q.  And so if you look across after "Core
24  Description," you'll see the percentage of talc
25  that's contained in that particular section,

Patrick Downey

Page 218

1  percentage of amphiboles; do you see that?
2       A. Yes.
3       Q. Percentage of "sulf," what does that
4  stand for?
5       A. I believe sulfide.
6       Q. Okay. And then you have percentage of
7  opaque; do you see that?
8       A. Yes.
9       Q. Okay. So -- and then you have
10  percentage of recovery.
11      And what does percentage of recovery refer
12  to?
13      A. Sometimes in a fractured zone, you don't
14  extract all of the material, and so the recovery is
15  the material that you obtained.
16      Q. Okay. So that gives us a general
17  understanding of core logs.
18      Let me show you what I'm going to mark as
19  Exhibit Number 21.
20      (Exhibit 21 was marked for identification.)
21      MS. O'DELL: And for the record, that's
22  IMERYS 238270.
23      Q. (By Ms. O'Dell) Have you seen this
24  document before?
25      A. No.

Page 219

1       Q. And this is a report from R.J. Kellie
2  and S.B. Carpenter, dated May 21st, 1992. And the
3  subject is "Hamm Core Drilling"; do you see that?
4       A. Yes.
5       Q. And does this appear to be -- and take a
6  look at it -- a report that describes the findings
7  from the drill holes that we just looked at the
8  core logs?
9       A. (Document reviewed.) What's your
10  question again? I'm sorry.
11      Q. Would you agree with me -- make it a
12  little easier -- that this report is a report from
13  R.J. Kellie and S.B. Carpenter regarding the four
14  core drills that they conducted in April of 1992,
15  hole 92-1, hole 92-2, hole 92-3 and hole 92-4?
16      MR. PROST: Object to form.
17      A. This memo describes -- or is a report
18  that includes information on those four holes, yes.
19      Q. (By Ms. O'Dell) All right. And you'll
20  see a summary at the top. He's talking about "With
21  the information gained from the recently completed
22  USB core drilling," and that's referring to
23  U.S. Borax, correct?
24      (As read:) USB core drilling, some 1.8
25  million tons of combined mineable talc ores with a

Page 220

1  waste-to-ore ratio of 0.52:1 are calculated within
2  the confines of the planned open pit at Hamm in
3  Vermont; did I read that correctly?
4       A. You missed a few words, but that's
5  generally what it says.
6       Q. Okay. Look down on paragraph two.
7  (As read:) Fibrous amphiboles (actinolite) were
8  observed only within the chloritized mafic dikes,
9  extending, in places, a couple of inches into the
10  contact talc ore; did I read that correctly?
11      A. Yes.
12      Q. And it says, "An XRD amphibole scan,
13  made on all sampled core intervals, yielded
14  negative results." And I'll talk to you about that
15  some more, okay?
16      But in terms of these chloritized mafic
17  dikes which contained actinolite, based on this
18  sentence there, those dikes were located a couple
19  of inches into the contacting talc ore, true?
20      MR. PROST: Object to form.
21      A. That's what it says.
22      Q. (By Ms. O'Dell) Okay. If you'll look
23  on page 2, bottom, it says, "In spite of production
24  demands and its overall strategic value" -- and
25  that's referring to the Hamm Mine, correct?

Page 221

1       A. I'm trying to find what's --
2       Q. Sorry. Last paragraph. "In spite of
3  the production demands and its overall strategic
4  value," and we're talking about -- "its strategic
5  value" refers to the Hamm Mine, correct?
6       A. I think that's what it says at the
7  continuation of that sentence.
8       Q. "...the ore reserves of the Hamm Mine
9  were poorly understood. Previous drilling had not
10  delineated the talc body with respect to country
11  rocks nor was ore continuity with depth clearly
12  established. In order to adequately measure the
13  remaining ore reserves, additional drill
14  information was needed, particularly at depth
15  within the limits of the proposed pit. It was also
16  necessary to interpret, with new drilling, existing
17  sources of information. Many of the available
18  drill logs simply referred to 'type 30' or 'type
19  20' ore."
20      Do you know what "type 30" ore is?
21      A. No.
22      Q. Do you know what "type 20" ore is?
23      A. No.
24      Q. "...some simply stated 'talc' or
25  'non-ore.' Believe it or not, some holes were not

Patrick Downey

Page 222

1   even logged or analyzed.  Due diligence drilling
2   was clearly necessary to complete the evaluation of
3   the important Hamm reserves"; did I read that
4   correctly?
5       A.  Yes.
6       Q.  If you'll turn the page, then it
7   describes the four in-pit sites were collected, the
8   ones we just referenced, and we marked the core
9   logs that were generated from that drilling.  And
10  it says 92.1 was to test the extent of type 30 ore.
11  And then it says talc/carbonate, 40 to 50 percent
12  talc, exposed to the pit bottom, delineate
13  serpentine -- excuse me, delineate serpentinite
14  mass.
15      Mr. Downey, was talc ore composed of
16  talc/carbonate, 40 to 55 percent, ore that would
17  have been appropriate for Johnson & Johnson's
18  talcum-powder products?
19      MR. PROST:  Object to form.
20      A.  I can't tell that from this document.
21      Q.  (By Ms. O'Dell)  Moving on to hole
22  92-1 [sic], "To add confidence to a large area of
23  projected reserves on section 4 plus 00 and
24  delineate the amphibolite exposed in the southern
25  pit wall"; did I read that correctly?

Page 223

1       A.  Yes.
2       Q.  And amphibolite is another variation of
3   amphibole, correct?
4       A.  Generally it's a -- I think a broad term
5   that collectively is amphibole minerals.
6       MR. SILVER:  Leigh, just to correct the
7   record, you had said, "moving on to hole 92-1," but
8   you read from 92-2.
9       MS. O'DELL:  Two.  I didn't -- sorry.  I
10  didn't mean to.
11      MR. SILVER:  It's fine.  It's late in the
12  day.
13      MR. PROST:  I was going to tell her.
14      MS. O'DELL:  Well, if I'm looking at
15  something and I'm saying something else, I'll often
16  get off track, so thank you for that.  I was
17  reading from 92-2.
18      Q.  (By Ms. O'Dell)  The bottom line is, the
19  core logs that we just marked as Exhibit -- I
20  believe it was 17320, are being analyzed in this
21  memo, and the specific purposes of those holes are
22  being described in this memo, correct?
23      A.  Yes.
24      Q.  Okay.  Let me ask you a few more
25  questions.

Page 224

1       If you look down to the "Drilling" section,
2   it mentions a contract mining company by the name
3   of MacKenzie Construction.
4       Who is MacKenzie Construction?
5       A.  I've seen MacKenzie Construction
6   referenced as the contract miner at Hamm.
7       Q.  And what -- in terms of contract mining,
8   what was general scope of the work of MacKenzie
9   Construction at the Hamm Mine?
10      A.  Other than that they did the contract
11  mining, I'm not sure.
12      Q.  What is meant by "contract mining"?
13      A.  Generally speaking, a mine operator can
14  either do the mining themselves or they can farm it
15  out to a third party known as a mining contractor.
16      Q.  When you say "mining," what are you
17  referring to?  Are you talking about the drilling?
18  Are you referring to blasting?  Are you referring
19  to removing overburden?  What are you referring to
20  when you're talking about a contract miner?
21      A.  Well, generally speaking, a mining
22  contractor might have the entire scope, but
23  depending on the type of mine and the type of
24  contracts, a mining contractor might -- there might
25  be more than one contractor involved, maybe one for

Page 225

1   drilling, another for doing the mining.  I don't
2   know.
3       Q.  What was -- and you're not aware of what
4   MacKenzie Construction Company's role was at the
5   Hamm Mine?
6       A.  Other than the reference that I saw that
7   they were the mining contractor, that's pretty much
8   all I know.
9       Q.  And you don't have an understanding of
10  the scope of the work that they performed at the
11  Hamm Mine, true?
12      A.  I don't know the entire scope, no.
13      Q.  Okay.  Let's turn to the last -- excuse
14  me, not the last page, but page 4 of the document
15  ending Bates 273.  It's referring to the logging
16  and sampling.
17      So the drill cores were logged at the site
18  of the drilling, correct?  It says, "Drill cores
19  were logged on-site."
20      A.  Yes.
21      Q.  And if you'll move down a paragraph, it
22  says -- excuse me, down the page to the paragraph
23  beginning, "Drilled internal waste rock"; do you
24  see that?
25      A.  Yes.

57 (Pages 222 to 225)

Patrick Downey

Page 226

```
1        Q.  "Drilled internal waste rock was
2   comprised of serpentinite and chloritized, mafic
3   dike.  Hole 92-4 penetrated garnet schist foot
4   wall.  Fibrous actinolite was seen in chloritic
5   dikes and occasionally extended a few inches into
6   the talc ore at contacts.  No other asbestos-form
7   minerals were noted in the drill cores"; did I read
8   that correctly?
9        A.  Yes.
10       Q.  So Mr. Kellie and Mr. Carpenter did note
11  fibrous actinolite in the chloritic dikes that
12  occasionally went into the talc ore, true?
13       A.  Show me again where you're reading?  I'm
14  sorry.  I lost you.
15       Q.  Same paragraph.  And really asking you
16  the question:  Actinolite, fibrous actinolite, was
17  seen in chloritic dikes that occasionally extended
18  into the talc ore, true?
19       A.  This says that "occasionally extended a
20  few inches into the talc ore at contacts."
21       Q.  It went on to say, "Analytical sample
22  intervals were selected primarily on the basis of
23  ore type."
24       So in other words, the samples that were
25  taken for purposes of analysis were selected based
```

Page 227

```
1   on ore type, correct?
2        A.  Yes.
3        Q.  "Whenever possible, sample length was 15
4   feet."
5        "Sample length" means the distance
6   between -- on a particular core, between one sample
7   and the other.  So if you had a 250-foot hole, this
8   sentence is saying the sample length was -- they
9   tried to make it 15 feet, correct?
10       A.  They said, "Whenever possible, sample
11  length was 15 feet."
12       Q.  Okay.  (As read:)  The minimum sample
13  length was 9 feet unless the interval bounded --
14  excuse me -- unless the interval bounded internal
15  waste rock.
16       MR. PROST:  Ten feet.
17       A.  I don't know if your document says 9 or
18  10.  This one says 10.
19       Q.  (By Ms. O'Dell)  Okay.  I really am
20  getting tired.  I need some more chocolate.  I did
21  see "10."  Okay.  Let me read that again.
22       "The minimum sample length was 10 feet
23  unless the interval bounded internal waste rock";
24  did I read that correctly?
25       A.  Yes.
```

Page 228

```
1        Q.  All right.  Then it says, "Talc ore
2   observed to contain fibrous amphibole was not
3   included in a sample interval"; did I read that
4   correctly?
5        A.  Yes.
6        Q.  Mr. Downey, this is talking about talc
7   ore.  And where talc ore was observed by these
8   geologists to contain fibrous amphibole, it was not
9   sampled, correct?
10       MR. PROST:  Object to form.
11       A.  It says it was not included in the
12  sample interval.
13       Q.  (By Ms. O'Dell)  Correct.  My statement
14  was correct, wasn't it?
15       A.  You can have it read back, but it says
16  what it says.
17       Q.  It says that samples of -- were not
18  taken where fibrous amphiboles were seen or
19  observed in talc ore, true?
20       A.  It says, "Talc ore observed to contain
21  fibrous amphibole was not included in a sample
22  interval."
23       Q.  Let me ask you to look -- to turn to,
24  excuse me, the last page of the document, page 6,
25  Bates number ending 275.  I ask you to look at the
```

Page 229

```
1   last paragraph.
2        A.  There's two more pages.  I don't know if
3   that's the last page of the document.
4        Q.  Yeah.  Oh, my apologies.  1275 is the
5   right page.  Okay?  Take a look at the last
6   paragraph, please.  It says, "XRD scanning did not
7   reveal the presence of amphibole in the drill core.
8   This is consistent with the selected sample
9   intervals"; did I read that correctly?
10       A.  Yes.
11       Q.  Isn't it true, Mr. Downey, that if
12  samples were not taken of fibrous amphiboles in
13  talc ore, then it's not surprising that the XRD
14  scanning would be negative?
15       MR. PROST:  Object to form.
16       Q.  (By Ms. O'Dell)  True?
17       A.  This is the first time I've seen this
18  document.  I think that there's -- I'm not familiar
19  with their methodology, but because they
20  intentionally didn't sample that interval that way,
21  this conclusion is accurate.
22       Q.  If you don't sample it, it's not
23  surprising if you don't find it, true?
24       A.  I think, based on selective mining,
25  which was what Cyprus indicated that needed to be
```

58 (Pages 226 to 229)

Patrick Downey

Page 230

1    done at Hamm in order to be able to mine it --
2         Q.  And my question -- excuse me, sir -- is
3    a little bit more simple.
4         I'm saying, if you don't sample something,
5    it's not surprised -- it's not surprising that you
6    don't find it in the test results, correct?
7         MR. PROST:  Object to form.
8         Q.  (By Ms. O'Dell)  So if they weren't
9    sampling fibrous amphiboles, the fact that the XRD
10   test for amphiboles was negative is not
11   surprising --
12        MR. PROST:  Object to form.
13        Q.  (By Ms. O'Dell)  -- true?
14        A.  It's my understanding that their
15   sampling method matched their -- what they expected
16   from selective mining.
17        Q.  So the answer to my question is "yes"?
18        A.  I forgot the way you asked your
19   question.
20        Q.  If they weren't sampling fibrous
21   amphiboles, the fact that XRD tests for amphiboles
22   was negative is not surprising.
23        MR. PROST:  Object to form.
24        Q.  (By Ms. O'Dell)  That's correct?
25        A.  Their sampling methodology was for their

Page 231

1    mining method.  They clearly have other indications
2    that the amphibole mineral is present.
3         Q.  Where does it say that their -- when we
4    went over the sampling protocol and it talked about
5    the intervals at which analytical samples were
6    taken, it does not mention selective mining, does
7    it, Mr. Downey?
8         A.  No.  The documents that I'm aware of on
9    the due diligence for Hamm, Cyprus clearly
10   indicated that selective mining was going to be
11   necessary, and that's what they employed.
12        Q.  I'm not disputing with you that
13   selective mining was employed at Hamm, but in terms
14   of this testing, selective mining is not a part of
15   the analysis that's contained in the memo that we
16   just looked at, correct?
17        A.  What do you mean it's not?
18        Q.  In terms of what they were sampling and
19   testing, selective mining was not a part of that
20   analysis?
21        A.  It's my understanding that their
22   sampling method was to correlate with their
23   selective-mining method.
24        Q.  How did you get that understanding?  You
25   didn't even know that those -- that drilling had

Page 232

1    taken place until I showed you the core logs.
2         A.  From the due-diligence reports from --
3    that Cyprus had done, it clearly states that they
4    needed to employ selective mining.
5         Q.  Okay.  And is that -- this memo that
6    we've just gone over talks in terms of sampling in
7    terms of feet.  They sampled -- they tried to
8    sample every 15 feet.  If they couldn't do that, a
9    minimum of 10 feet, they took a sample.  That's the
10   extent of their protocol for sampling in that
11   particular analysis, true?
12        A.  The selection of the sample interval is
13   also correlated to the bench height of how you are
14   mining the deposit.
15        Q.  Bench height was not mentioned in the
16   memorandum analyzing the core drilling that was
17   done at Hamm in 1992, true?
18        A.  I haven't read the entire document.
19        Q.  In the expansive portions that we've
20   gone through, bench mining was not mentioned, true?
21        A.  I don't recall seeing that.
22        Q.  And moreover, selective mining was also
23   not a part of -- selective mining was also not a
24   part of the analysis as outlined in the memorandum
25   we've marked as Exhibit 21?

Page 233

1         MR. PROST:  Object to form.
2         A.  In terms of what?
3         Q.  (By Ms. O'Dell)  Selective mining is not
4    mentioned, correct?
5         A.  I didn't see it, no.
6         MR. PROST:  You're getting close to the end
7    of that document.  I think we're hitting the home
8    stretch, kind of.  Do you want to take a final
9    five-minute break?
10        MS. O'DELL:  Yeah, that's fine.
11        MR. PROST:  That may be a good idea.
12        VIDEOGRAPHER:  All right.  Off the record at
13   5:14.
14        (Recess taken.)
15        VIDEOGRAPHER:  We're back on the record at
16   5:32.
17        Q.  (By Ms. O'Dell)  We were talking before
18   the break, Mr. Downey, about core logs and
19   specifically core drilling that was done at Hamm in
20   1992.  And let's just take a step back.
21        The purpose of doing core drilling is to
22   obtain information that can be used to create a
23   model of the particular ore body or potentially
24   some things that surround the ore body in order to
25   provide information on how to mine that particular

59 (Pages 230 to 233)

Patrick Downey

Page 234

1   deposit, true?
2       A.  I mean, that's -- that's something you
3   can use drilling for, but, yeah, you're trying to
4   find out information that's relevant to what you're
5   going to mine and how you're going to mine.
6       Q.  Yes.  And one of the things that Imerys
7   does, I understand, and as well as all modern
8   mining companies, is they take data from core logs
9   and they actually do create a computer model of the
10  particular deposit?
11      A.  Yes.
12      Q.  And Imerys routinely does that as part
13  of their business practice, true?
14      A.  Yes.
15      Q.  And so when trying to create a model or
16  an understanding of a particular deposit, you know,
17  that model is only as good as the information
18  that's provided to create it, true?
19      A.  Well, it also needs to be relevant for
20  how you plan to mine.  There's a lot of
21  information, and you're digesting information so
22  that you can make your mine plans.
23      Q.  But the mine plan and selective mining
24  is based on -- or should be based on an accurate
25  understanding of the material and minerals in a

Page 235

1   deposit, fair?
2       A.  Yes.
3       Q.  If you don't have good data about what's
4   in the deposit, you cannot effectively selectively
5   mine it, true?
6       A.  The data certainly helps, but also, part
7   of selective mining is, you know, visually
8   examining the material that you are mining.
9       Q.  And for purposes of a mine model being
10  generated following the drilling of cores, that
11  model is only going to be as good as the
12  information provided from the samples taken from that
13  core, correct?
14      A.  There's lots of ways that information
15  can be incorporated into a mine model that also
16  includes development drilling and geologic mapping
17  as the mine advances.  So the data is being
18  updated.  It's not static.
19      Q.  But the model itself is only as good as
20  the accuracy of the data that's provided to create
21  the model.
22      MR. PROST:  Object to form.
23      Q.  (By Ms. O'Dell)  True?
24      A.  Having accurate data certainly helps the
25  accuracy of the model, but the model, in and of

Page 236

1   itself, is the model.  And it's the practice of
2   using all of the knowledge, including what's in the
3   model, but also what the geologists know about the
4   deposit and what they continue to learn about the
5   deposit as they examine the mining phases as the
6   mine advances.  Are you inferring that --
7       Q.  I got to ask you a question, Mr. Downey.
8       All right.  Let me ask you one more thing
9   about the drill locations in relation to these four
10  drill holes that were drilled at the Hamm Mine in
11  '92.  And if you'll look at 92-1, which was
12  Exhibit 17, and the particular location,
13  Mr. Downey, you'll see the location was north
14  9421.7 and then east 10093.5; do you see that?
15      A.  Yes.
16      Q.  And then the second drill hole, 92-2,
17  was drilled at location north 9258.9 and then east
18  999 -- three 9s -- 9990.3; do you see that?
19      A.  Yes.
20      Q.  And that -- those drill holes, by my
21  estimation, are in the neighborhood of 180 feet
22  apart, correct?
23      A.  It's late in the day.  I'm not going to
24  do the geometry to figure out how far apart they
25  are.

Page 237

1       Q.  They're more than 10 feet apart, true?
2       A.  Yes.
3       Q.  They are more than 50 feet apart, true?
4       A.  Yes.
5       Q.  In fact, they're more than 100 feet
6   apart.
7       A.  Of the collar locations, yes.
8       Q.  And if you'll look at drill hole 3,
9   which we marked as Exhibit 18, and drill hole 4,
10  Exhibit 20, the location of the collar for those
11  drill holes is the same place, correct?
12      A.  Yes.  Looks like they were drilled at
13  different bearings.
14      Q.  Let me show you what I'm marking as
15  Exhibit Number 22.
16      (Exhibit 22 was marked for identification.)
17      MS. O'DELL:  It's Bates number ending -- or
18  excuse me, Bates number IMERYS 427291.
19      Q.  (By Ms. O'Dell)  Have you seen this
20  document before?
21      A.  I don't know.
22      Q.  If you'll turn to page 2 of the
23  document, you'll see that this is a master plan for
24  Northeastern mines, and it includes Hamm, Argonaut,
25  Rainbow; do you see that?

Patrick Downey

Page 238

1    A. Yes.
2    Q. And if you'll look at the top, then,
3    this is the fax from Luzenac Tech Center,
4    August 19th, 1993; do you see that?
5    A. Yes.
6    Q. And if you'll look on Bates number
7    ending 95, you'll see an analysis of the Hamm Mine.
8    A. Did you say 95?
9    Q. Yeah. 95. Do you see that?
10   A. I see Hamm listed, yes.
11   Q. And it says (as read:) This mining
12   locality provides cosmetic ore feed to both the
13   Johnson Mill and West Windsor.
14   And, of course, West Windsor, we agree,
15   covers Johnson & Johnson talc?
16   A. Grade 25 was manufactured at the West
17   Windsor Mill. That was the Johnson & Johnson
18   product.
19   Q. Correct. And then it says
20   "Contaminants"; do you see that?
21   A. Yes.
22   Q. "Actinolite is common with chlorite
23   cinders and schist contacts"; do you that?
24   A. Yes.
25   Q. Let me ask you to look at the bottom of

Page 239

1    the page. It's referring to the Ludlow District,
2    and then below that you see "Argonaut Mine."
3    A. Before we leave Hamm on contaminants, it
4    says, "All contaminants can be avoided by selective
5    mining."
6    Q. Okay. All right. I'll highlight that.
7    We'll see about that.
8    "Ludlow," "Argonaut Mine," do you see that
9    at the bottom of the page?
10   A. Yes.
11   Q. It says (as read:) This locality has
12   recently been explored by nine core drill holes for
13   footage of 3,712.
14   We were provided data on four drill core
15   holes.
16   Do you have any information about the other
17   five drill core holes that were done at the
18   Argonaut Mine? Strike that. Never mind.
19   A. I'm confused.
20   Q. Never mind. I'll withdraw that.
21   Okay. Turn to the next page. All right.
22   Do you see that? "Contaminants. Selective mining
23   will be required at the Argonaut Mine to avoid high
24   arsenic zones plus occasional zones of actinolite
25   with chlorite cinders and serpentinite. Much of

Page 240

1    the drilling remains to be analyzed to provide a
2    better profile of this resource"; did I read that
3    correctly?
4    A. Yes.
5    Q. Would it be fair to say that both the
6    Hamm Mine and the Argonaut Mine have deposits that
7    are irregular? So you have certain zones of talc
8    and then you'll move into zones of schist or some
9    other material?
10   MR. PROST: Object to form.
11   A. I'm not really sure what you mean.
12   Q. (By Ms. O'Dell) I'm asking if the
13   deposit of talc is a uniform body or if it's
14   irregular and that there are other minerals and
15   materials that flow in and through the talc
16   deposit.
17   A. Well, "irregular" is a vague term, so
18   I'm not sure how you mean it, as well as "other
19   minerals that flow" through the deposit. That
20   seems equally vague. I'm not sure what you mean.
21   Q. Have you ever read in a document or
22   heard anyone discuss those ore deposits and refer
23   to them as "irregular"?
24   A. I don't recall at this time.
25   Q. You've spent time this afternoon talking

Page 241

1    about selective mining in the context of the Hamm
2    Mine. We're going to go into Argonaut in just a
3    moment, but in the context of the Hamm Mine, what
4    is your understanding of how selective mining was
5    conducted?
6    A. I can give you an example.
7    Q. I don't want an example. I'm talking
8    about specifically -- just -- I don't want to cut
9    you off, but I'm running out of time, and I want to
10   be clear.
11   You've represented that the Hamm Mine was
12   selectively mined.
13   A. Yes.
14   Q. And you have testified to that under
15   oath on behalf of the company.
16   And what I want to know from you is the
17   facts you're relying on to -- well, let me back up
18   and say, I want you to describe the specific way
19   that selective mining was undertaken in the Hamm
20   Mine.
21   MR. PROST: Objection to form.
22   A. The mafic material is dark-colored. The
23   talc carbonate is a light-gray material. They're
24   readily distinguishable when you're looking at
25   them. The mine geologists can identify them. The

61 (Pages 238 to 241)

Patrick Downey

Page 242

1  driller can recognize the difference with the
2  material that's coming out of the hole.  There are
3  lots of visual clues that tell you when you are in
4  or near those zones.  And you can employ selective
5  mining based on those visual clues quite
6  successfully at Hamm and similarly at Argonaut.
7      Q.  (By Ms. O'Dell)  And so what -- let me
8  just step back and say, define "selective mining."
9  Let's just step back.  Define "selective mining."
10     A.  Define it?
11     Q.  Yes.
12     A.  Generally speaking, selective mining is
13  a method in which materials that you do not want to
14  include in the ore are removed on a selective basis
15  using distinguishable criteria when you are mining.
16     Q.  What criteria do you use to distinguish
17  those material you don't want?
18     A.  Well, I told you about the Hamm and
19  Argonaut.  One of those is the color difference.
20  It's a drastic color difference between those mafic
21  areas and the talc.  There's a color difference.
22     In addition to making the separation at that
23  point, there's also an exclusion zone adjacent to
24  that mafic of the talc carbonate that is also
25  sacrificed and rejected along with the other

Page 243

1  material.  So you have a buffer zone when you are
2  mining near those areas.
3      Q.  So selective mining is a visual process
4  of --
5      A.  There are usual.
6      Q.  -- of looking at the rock and choosing,
7  you're going to take some versus not other rocks,
8  fair?
9      A.  Visual is a component of it, but it's
10  also the understanding of the overall geology of
11  the deposit as well.
12     Q.  And other than -- it's visual, in part.
13  You mentioned color.
14     What other criteria are used in selective
15  mining?
16     A.  Well, the geologist, when examining the
17  face, can look at the mineralogy as well.  But one
18  of the first clues is to look at the color of the
19  zone, indicating that that's a likely place to --
20  or that's where the mafics are.
21     Q.  And anything besides color?
22     A.  Well, there's color.  There's rock type.
23  There's mineralogical aspects.  I'm giving --
24     Q.  What mineralogical aspect are you
25  talking about?

Page 244

1      A.  The minerals that you see.
2      Q.  I mean, you know -- I mean, is the
3  understanding of the mineralogy based on what is
4  seen in the pit when you're doing selective mining?
5      A.  That's part of it, but it's the
6  understanding of the geology and how the deposit
7  was formed and its relation to the other rock
8  types.  So there's a number of factors that -- I
9  probably can't list all of them, sitting here
10  today.
11     Q.  Is it also based on the data contained
12  in the core logs?
13     A.  That's part of the information as well.
14     Q.  And who actually does the selective
15  mining?
16     A.  In the critical zones where that's
17  necessary, typically, the geologist is with the
18  shovel operator if it's -- if they're mining it
19  with a front shovel.
20     Q.  And so it's equipment operators in the
21  pit.  We're talking about heavy equipment,
22  front-end loaders --
23     A.  They are the ones that are skilled in
24  how to --
25     Q.  Excuse me.  I'm not -- front-end loaders

Page 245

1  in the pit that are actually removing the rocks
2  from the pit in order to -- for it to be trucked to
3  West Windsor or some other location, correct?
4      A.  The heavy-equipment operators are the
5  one skilled in actually operating a piece of heavy
6  mobile equipment to do that extraction.
7      Q.  And so on a daily basis, it's the
8  equipment operator, primarily, who's making the
9  selection as to what rocks are removed from the pit
10  versus what rocks are not removed from the pit,
11  correct?  I mean, the geologist is not there all
12  day, every day, saying, "Take this rock.  Leave
13  this one."  You're not saying that, are you?
14  Because that would --
15     A.  No, I'm not.
16     Q.  That wouldn't be true.
17     A.  I'm not saying that, but in the critical
18  areas where the selective mining is most critical,
19  the geologist is involved in directing the
20  activity.
21     Q.  And how -- how, as a practical matter,
22  how is -- how does the geologist mark which rocks
23  are to be removed and which rocks are not to be
24  removed?
25     A.  I think it depends on the circumstances

62  (Pages 242 to 245)

Patrick Downey

Page 246

1  of how the rocks are exposed in the pit, its
2  orientation and things like that.
3      Q.  What's Imerys' policy in terms of
4  marking out exclusion zones in a pit?
5      A.  What do you mean "exclusion zones"?
6      Q.  You used that term.  You said there are
7  exclusion zones beyond which material -- from which
8  material shouldn't be taken for purposes of mining
9  it.  In other words, that material is not -- that's
10 "wasted," I think was the word you used.
11         What policy -- what's Imerys' policy for
12 marking exclusion zones in a pit?
13     A.  As you mine, you are continuing to
14 expose a fresh muck face.  So the way that it is
15 done is relative to a bucket width.  Tell the
16 operator to stand off a certain number of bucket
17 widths away from the zone that's being rejected
18 before mining the rest of the material as ore.
19     Q.  And --
20     A.  And these are the -- I'm not -- when I
21 say a "shovel," I don't mean a hand shovel.  This
22 is heavy mobile equipment with a bucket that's
23 maybe eight feet wide.
24     Q.  How many cubic feet is that?
25     A.  Pardon?

Page 247

1      Q.  How many cubic feet would be in a bucket
2  eight feet wide?
3      A.  I can't recall, off the top of my head,
4  how many cubic feet.
5      Q.  And so it would be incumbent upon the
6  equipment operator to stay one or two buckets,
7  whatever the geologist has suggested, from a
8  particular area when that equipment operator is
9  removing ore from a pit, correct?
10     A.  It would be?
11     Q.  Incumbent.
12     A.  Incumbent?  Yes.
13     Q.  What training does Imerys provide to
14 equipment operators regarding selective mining?
15     A.  They're trained --
16     Q.  If any.
17     A.  Sorry?
18     Q.  If any.
19     A.  They're trained to recognize different
20 features.  They're the ones doing it day after day,
21 and they get to know the deposit.  They talk with
22 the geologists.  You know, they describe what
23 they're seeing.  The geologist describes what he's
24 seeing.  It's a continual process.  And we also try
25 to use the -- a trained operator that's done it

Page 248

1  for, you know, ten years or more.
2      Q.  Is there a specific program for training
3  equipment operators that Imerys requires as a part
4  of their, just, policy and procedure for ensuring
5  that their employees are trained?
6      A.  I don't recall.
7      Q.  Is there a formal training program, in
8  other words?
9      A.  A formal training?  I know that they are
10 trained.  I don't know to what extent there's
11 documentation to describe the formal training.
12     Q.  In terms of the machinery that's
13 actually used in a pit to select ore, you know, for
14 shipment to a mill, is that typically a front-end
15 loader?
16     A.  Typically it's a shovel.
17     Q.  And when you say "a shovel," you're
18 talking about a backhoe, is what some people call
19 it?
20     A.  A backhoe that is either configured for
21 underhand or overhand.  It depends on the nature of
22 the deposit.
23     Q.  At the Hamm Mine, do you know what type
24 of equipment was used to remove ore from the pit?
25     A.  I don't recall.

Page 249

1      Q.  Have you ever known that information?
2      A.  I might have seen it.  I just can't
3  remember.
4      Q.  Within the pit itself -- any pit, not
5  just Hamm, but any pit -- it'd be fair to say it's
6  a very dusty environment.  You've got blasts going
7  off.  You're moving rocks and other dirt.  It's a
8  very -- it's not a clean environment, in other
9  words.  It's a dusty environment.
10     MR. PROST:  Object to form.
11     A.  It can be dusty at some times.
12     Q.  (By Ms. O'Dell)  And it can also be, you
13 know, a difficult place when it's dusty to identify
14 material within the pit, fair?
15     MR. PROST:  Object to form.
16     Q.  (By Ms. O'Dell)  That's why you use XRD
17 and other types of analysis to identify certain
18 minerals?
19     MR. PROST:  Objection.
20     A.  No, I don't agree with that.
21     Q.  (By Ms. O'Dell)  Visual inspection has
22 significant limitations; would you agree with that?
23     A.  There are limitations to it.
24     Q.  And those limitations grow when the pit
25 is dusty, when conditions would limit your ability

63  (Pages 246 to 249)

Patrick Downey

Page 250

1  to identify certain rocks and what they are, true?
2  I mean, that just makes -- that's common sense.
3      A. I think you're -- you don't -- I don't
4  think you're describing -- or have in mind actual
5  conditions in the pit.
6      Q. And so just -- it's your -- I mean, when
7  you say you don't think I have in mind actual
8  conditions, you think I'm misinformed to think that
9  an open-pit mine would be dusty when it's -- when
10  you haven't had rain recently? I mean, am I
11  confused on that?
12      A. You're characterizing the dust to such
13  an extent that it would obscure your ability to
14  identify what you're mining. And that I don't
15  think is correct.
16      Q. Not in whole, but it certainly would
17  obscure, to some degree, your ability to identify
18  certain rock with precision, correct?
19      A. Well --
20      Q. We can agree on that?
21      A. -- when you're mining, the dust is --
22  would be -- when the material is dropped from the
23  shovel into the truck, there's a brief period of
24  dust that's emitted when the material is falling,
25  but that's not where the actual digging is

Page 251

1  occurring.
2      Q. Well, there's dust when blasts go off,
3  correct?
4      A. There can be, yeah.
5      Q. Typically, quite a lot?
6      A. There's some.
7      Q. And so in terms of an operator, a shovel
8  operator's ability to identify a particular rock,
9  it's going to be based on, one, the conditions in
10  the pit, whether it's dusty, not dusty, true? It's
11  going -- true?
12      MR. PROST: Object to form.
13      Q. (By Ms. O'Dell) True?
14      A. When the operator is digging the rock,
15  you continue to expose fresh faces as you're
16  digging it.
17      Q. And if that ore body is irregular, in
18  other words, it's not uniform, then different
19  materials, not just talc, but other things like
20  schist, serpentinite, can be scooped up into that
21  bucket along with talc, correct?
22      A. Say again? If it's --
23      Q. I'll repeat it.
24      And in a mine where the ore body is
25  irregular, in other words, it's not uniform, then

Page 252

1  different materials, not just talc, but other
2  things like schist and cinder can be scooped up
3  into the bucket when ore is being removed from the
4  mine, correct?
5      MR. PROST: Object to form.
6      A. No, I wouldn't agree, because the way
7  that it's mined, the direction that you're mining
8  is all factored in.
9      Q. (By Ms. O'Dell) So that's impossible?
10      MR. PROST: Object to form.
11      A. I'm saying that the practices employed
12  with mining, selective mining, it takes into
13  consideration the geometry of what's being mined at
14  that time to account for potential irregularity.
15  And as I mentioned earlier, we have the offset zone
16  where we sacrifice a great deal of talc just to
17  make sure that we are not incorporating
18  accidentally this other material that you describe.
19      Q. (By Ms. O'Dell) And the accuracy -- or
20  the carefulness, I should say, of what's being
21  scooped up into the bucket for purposes of -- for
22  putting it into the truck to send it to West
23  Windsor, if you're talking about Hamm, is dependent
24  on that shovel operator, true? True?
25      I mean, the shovel operator is the one that

Page 253

1  is scooping up that ore and putting it in the
2  truck, so that what goes into that bucket is
3  dependent on the judgment that that individual
4  makes when they were removing the ore from the pit,
5  true?
6      MR. PROST: Object to form.
7      A. It depends on the informed judgment of
8  the shovel operator and any direction from the
9  geologist about how that particular section should
10  be mined.
11      Q. (By Ms. O'Dell) Some operators are not
12  geologists, correct?
13      MR. PROST: Object to form.
14      A. They're not geologists, but they have a
15  great deal of experience with the geology of the
16  mine that they are digging in. They do it day
17  after day.
18      (Exhibit 23 was marked for identification.)
19      Q. (By Ms. O'Dell) Let me show you what
20  I've marked as Exhibit 23. It's IMERYS 427423.
21      Have you seen that document before?
22      A. (Document reviewed.) No.
23      Q. Let me ask you one more follow-up
24  question to our discussion of the shovel operators.
25      Is there any minimum training required prior

64 (Pages 250 to 253)

Patrick Downey

Page 254

1  to a person being allowed to operate a shovel in an
2  Imerys talc mine?
3      A. Is there?
4      Q. Any minimum training required prior to a
5  person being allowed to operate a shovel in an
6  Imerys talc mine.
7      A. I believe for digging for ore, yes.
8      Q. What is that training?
9      A. I don't recall.
10     Q. Have you ever been to that training?
11     A. No. I'm not a shovel operator.
12     Q. Have you ever, just as a supervisor,
13  when you're -- have you ever attended that
14  training?
15     A. I've seen some of the training that's
16  occurred at Yellowstone, and it's with a geologist
17  interacting with the shovel operator.
18     Q. Do you have any personal knowledge of
19  training that was conducted at the Vermont mines
20  from 1989 to 2002 of their shovel operators?
21     A. No.
22     Q. Let me ask you to turn to page 23 of --
23  excuse me, to Exhibit 23, page 2. And this is a
24  memo dated August 6, 1998. And it relates to the
25  1998 core drilling at Argonaut; do you see that?

Page 255

1      A. Yes.
2      Q. And according to this document -- look
3  at paragraph two. The Argonaut Mine has been core
4  drilled, it says, in 1972, 1973, '78, '98 -- excuse
5  me, '89, '92 and '98; did I read that correctly?
6      A. Yes.
7      Q. So there are six occasions, six years,
8  during which core drilling was done at the Argonaut
9  Mine?
10     MR. PROST: Object to form.
11     Q. (By Ms. O'Dell) So core drilling has
12  been done in Argonaut in '72, '73, '78, 1989, 1992
13  and 1998?
14     MR. PROST: Object to form.
15     Q. (By Ms. O'Dell) Have you --
16     A. As of this memo, those were the years.
17     Q. That's fair. As of this memo, those
18  were the years core drilling had been done.
19     Have you reviewed the core logs for the core
20  drilling that was done during these six occasions?
21     A. Not all of them. I've spot-checked a
22  few of them.
23     Q. Which year?
24     A. Specifically I remember 1998. I don't
25  recall which of the other years I looked at.

Page 256

1      MR. PROST: Leigh, just so you know, about a
2  minute and a half ago, the videographer gave a
3  five-minute warning, so . . .
4      MS. O'DELL: Oh, thank you. I didn't see
5  that.
6      Q. (By Ms. O'Dell) Let me ask you, if you
7  have seen any core logs, whether you reviewed them
8  or not for drill -- core drills that occurred in
9  1978.
10     A. 1978?
11     Q. Yes.
12     A. I might have. I just don't recall.
13     MS. O'DELL: How about I save my three
14  minutes for tomorrow?
15     MR. PROST: I think it's only one minute and
16  a half now.
17     MS. O'DELL: Okay. Whatever it is.
18     MR. SILVER: We're going to do whatever Joel
19  says it is.
20     MS. O'DELL: It's good breaking point.
21     VIDEOGRAPHER: All right. Off the record at
22  6:15.
23     (Whereupon, the deposition was concluded at
24  6:15 p.m. on August 7, 2018.)
25

Page 257

1      I, PATRICK DOWNEY, do hereby certify that I
2  have read the foregoing transcript and that the
3  same and accompanying amendment sheets, if any,
4  constitute a true and complete record of my
5  testimony.
6
7
8
9      _____
         PATRICK DOWNEY
10
         ( ) No Amendments
11       ( ) Amendments Attached
12       Subscribed and sworn to before me
13  this _____ day of _____, 2018.
14
15  Notary Public: _____
16  Address: _____
17       _____
18  My commission expires: _____
19  Seal:
20
21
22
23       MLG
24
25

65 (Pages 254 to 257)

Patrick Downey

Page 258

1         REPORTER'S CERTIFICATE
2    STATE OF COLORADO          ) ss.
     COUNTY OF DENVER            )
3
4         I, MELANIE L. GIAMARCO, do hereby certify
5    that I am a Registered Professional Reporter and
6    Notary Public within the State of Colorado; that
7    previous to the commencement of the examination,
8    the deponent was duly sworn by me.
9         I further certify that this deposition was
10   taken in machine shorthand by me at the time and
11   place herein set forth, that it was thereafter
12   reduced to typewritten form, and that the foregoing
13   constitutes a true and correct transcript of the
14   proceedings had.
15        I further certify that I am not employed by,
16   related to, nor of counsel for any of the parties
17   herein, nor otherwise interested in the result of
18   the within litigation.
19        In witness whereof, I have affixed my
20   signature this 21st day of August, 2018.
21
22        Melanie L. Giamarco
          Registered Professional Reporter
23        Registered Merit Reporter
          Certified Realtime Reporter
24
     My commission expires:  August 21, 2021
25   Notary ID:  20014025991

66 (Page 258)